## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE<br>425 East 100 South<br>Salt Lake City, UT 84111,<br><br>          Plaintiff,<br><br>   v.<br><br>U.S. DEPARTMENT OF THE INTERIOR<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>BUREAU OF LAND MANAGEMENT<br>1849 C Street, N.W.<br>Washington, D.C. 20240, and<br><br>CHRISTINA PRICE, Deputy State Director,<br>Lands and Minerals<br>Utah State Office<br>Bureau of Land Management<br>440 West 200 South, Suite 500<br>Salt Lake City, UT 84101<br><br>          Defendants. | Civil Action No._____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## **INTRODUCTION**

1.      This lawsuit challenges the United States Bureau of Land Management's ("BLM") 2024 decision to reaffirm thirty-five oil and gas leases located in Utah's San Rafael Desert and the Labyrinth Canyon Wilderness. The reaffirmed leases are located on BLM-managed public lands located between Goblin Valley State Park and the San Rafael Reef Wilderness on the west, and the Labyrinth Canyon Wilderness, Horseshoe Canyon unit of

Canyonlands National Park, and the Dirty Devil region on the east and south. The San Rafael

Desert is one of the most sublime and least travelled areas in Utah.[1]

2.      One of the reaffirmed leases, the "Labyrinth Canyon Lease," is located on public

land that is now federally protected as the Labyrinth Canyon Wilderness. BLM sold the lease at

its online December 2018 competitive oil and gas lease sale. The lease became effective only a

few days before the lands encompassing the lease were designated as Wilderness in the John D.

Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act"). Pub. L. 116-9, 133

Stat 580 (Mar. 12, 2019).

3.      The underlying agency action leading to BLM's decision to reaffirm the leases at

issue here stems from a related, prior lawsuit in this Court and subsequent settlement agreement

concerning these same leases. As part of the settlement, BLM agreed to conduct additional

analysis under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, and

reevaluate whether the subject leases should be reaffirmed, cancelled, or issued with updated

terms and conditions. However, BLM's new analysis failed to analyze the direct, indirect, or

cumulative impacts of its decision and failed to analyze middle-ground alternatives, in violation

of NEPA.

4.      This lawsuit also challenges BLM's failure to provide a reasoned explanation for

its decision to reverse course and not prepare oil and gas planning and analysis for the San

Rafael Desert—analysis BLM had previously deemed a necessary prerequisite before

authorizing future leasing and development in this area. BLM's lack of a reasoned explanation

for this reversal violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-

706.

---

[1] A list of the challenged leases is attached as Exhibit 1.

5.      BLM's decision at issue in this lawsuit violates NEPA, the APA, and the regulations that implement these laws. Among other things, Plaintiff Southern Utah Wilderness Alliance ("SUWA") seeks a declaration that BLM's decision to reaffirm the leases at issue was "arbitrary, capricious…or otherwise not in accordance with law," or that the decision was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Additionally, SUWA seeks injunctive relief and an order vacating the issuance of these leases.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief); and the APA, 5 U.S.C. §§ 701-706.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants United States Department of the Interior ("Interior Department") and BLM are headquartered in Washington, D.C. Additionally, SUWA maintains an office in Washington, D.C.

8.      SUWA has standing under Article III of the U.S. Constitution because the challenged action causes its members recreational and aesthetic harm, which will be remedied by a favorable ruling from this Court.

9.      The challenged action is final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, 706.

10.      SUWA has exhausted any and all required administrative remedies.

## PARTIES

11.      Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE is a nonprofit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah, including in the San Rafael Desert, and the management of wilderness-

quality lands in their natural state for the benefit of all Americans. SUWA has long maintained an office in Washington, D.C. due to the fact that many agency decisions affecting public lands in Utah are made in the nation's capital, where the Interior Department and BLM are headquartered. SUWA has approximately 12,000 members across the nation, including in Washington, D.C. SUWA's members regularly use and enjoy the federal public lands in and around the San Rafael Desert and Labyrinth Canyon Wilderness for a variety of purposes including solitude, wildlife viewing, cultural appreciation, hiking and backcountry recreation, and aesthetic appreciation. SUWA promotes national recognition of the region's unique character through research and public education. SUWA supports administrative and legislative initiatives to permanently protect the federal public lands in Utah's wildest places. SUWA brings this action on its own behalf and on behalf of its members.

12. SUWA members frequently visit and enjoy the Labyrinth Canyon Wilderness and San Rafael Desert region. For instance, Mr. Ray Bloxham—an employee and member of SUWA—has repeatedly visited and enjoyed the public lands encompassed by and surrounding the reaffirmed leases, including the Labyrinth Canyon Lease. Specifically, Mr. Bloxham first visited this area more than two decades ago and has continued to do so dozens of times over the past twenty years. His most recent visit was in August 2024. Mr. Bloxham has plans to return to this area within the next six months, and intends to continue to visit the Labyrinth Canyon Wilderness and San Rafael Desert for years to come. Mr. Bloxham particularly enjoys the scenic views and largely untrammeled nature of the area, including its clean air, natural quiet, expansive vistas, and solitude. Mr. Bloxham also appreciates and enjoys the area's abundant wildlife and cultural and archaeological resources.

13.     SUWA's and its members' interests (including Mr. Bloxham's interests) have been impaired and irreparably harmed, and continue to be affected and permanently harmed, by BLM's decision to reaffirm issuance of the subject leases. SUWA's members have a substantial interest in ensuring that BLM complies with its procedural and substantive legal obligations and policies. SUWA's members benefit from BLM's compliance with federal laws, including NEPA. SUWA's members expect that BLM will comply with all federal environmental laws including NEPA and its action-forcing mechanisms in order to make informed decisions. Further, SUWA's members' interests will be impaired and irreparably harmed by subsequent, reasonably foreseeable development on the reaffirmed leases. Such development activities include, but are not limited to, clearing and construction of access roads and well pads, long-term if not permanent destruction of native soils and vegetation, noise and greenhouse gas emissions from vehicles and drill rigs, and industrialization of this remote area that will cause immediate—as well as sustained and prolonged—damage to the environment. This will impair SUWA's members' use and enjoyment of the San Rafael Desert and Labyrinth Canyon Wilderness. The relief sought herein will redress these resulting harms.

14.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is responsible for overseeing the management of approximately five hundred million acres of federal public land across the United States including those managed by BLM in Utah, for a variety of competing purposes, including the protection of the natural and human environment.

15.     Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States in the Interior Department. BLM is responsible for managing publicly-owned lands and minerals, in accordance with federal law. BLM is the agency that manages and leased the public lands in Utah at issue in this case.

16.     Defendant CHRISTINA PRICE is sued in her official capacity as the Deputy

State Director, Lands and Minerals, of BLM's Utah State Office. Deputy State Director Price is

responsible for overseeing BLM Utah's mineral program, including the BLM field office where

the oil and gas leasing decision at issue in this lawsuit is located. Deputy Director Price signed

and is ultimately responsible for the decision challenged here.

17.     The Interior Department, BLM, and Ms. Price are collectively referred to as

"Federal Defendants" or "Defendants."

## LEGAL FRAMEWORK

## I.     Administrative Procedure Act

18.     Judicial review of agency actions under NEPA and its implementing regulations

is governed by the APA, which provides judicial review for "[a] person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute." 5 U.S.C. § 702. The APA is a limited waiver of sovereign

immunity and review is limited to "final agency action for which there is no other adequate

remedy in a court." *Id.* § 704.

19.     Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law, … in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right; . . . [or] without observance of procedure required by law."

5 U.S.C. § 706(2)(A), (C), (D).

## II. National Environmental Policy Act[2]

20. Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA "is our basic charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two primary objectives: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decision-making. *Id.* § 1500.1(c).

21. NEPA achieves its purpose through action-forcing procedures that require agencies to take a hard look at the environmental consequences of their actions and authorizations.

22. NEPA requires agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

23. Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. § 1501.2.

24. NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."

---

[2] On September 14, 2020, and April 20, 2022, the Council on Environmental Quality ("CEQ") revised the regulations that implement NEPA. *See generally* 85 Fed. Reg. 43304 (July 16, 2020); 87 Fed. Reg. 23453 (April 20, 2022). The latter revision, in effect, restored certain provisions of the NEPA regulations that had existed prior to the 2020 revision. However, pursuant to a settlement agreement with SUWA, discussed in more detail *infra*, Federal Defendants agreed to (and did) prepare the NEPA analysis challenged in this lawsuit pursuant to NEPA and its implementing regulations in effect prior to September 2020, to the extent permitted by law. Thus, SUWA cites to the NEPA regulations in effect prior to the 2020 revision.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Thus, NEPA requires that all federal agencies prepare "a detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Known as an environmental impact statement ("EIS"), this statement must "rigorously explore and objectively evaluate all reasonable alternatives," including the no action alternative; analyze all direct, indirect, and cumulative environmental impacts; and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16.

25.     An agency may also prepare an EA to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

26.     NEPA's requirement to "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources…" is independent of whether an agency prepares an EA or EIS. 42 U.S.C. § 4332(2)(E).

27.     If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

28.     NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action. 40 C.F.R. §§ 1508.7, 1508.8

29.     Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." 40 C.F.R. § 1508.8(a).

30.     Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

31.     Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

32.     The Court of Appeals for the D.C. Circuit has explained that

> a meaningful cumulative impact analysis must identify five things: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions - past, present, and proposed, and reasonably foreseeable - that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Tomac v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (cleaned up).

## III.    Oil and Gas Development on Public Lands

33.     BLM manages onshore oil and gas development through a three-stage process: (1) land use planning, (2) leasing, and (3) approval of drilling proposals.

34.     First, pursuant to the Federal Land Policy and Management Act, BLM develops a programmatic land use plan, known as a Resource Management Plan ("RMP"), specifying which lands will be open and which will be closed to oil and gas leasing, and stipulations and conditions that may be placed on any such development. *See* 43 U.S.C. § 1712(a). An RMP does not mandate that BLM lease any specific public lands for oil and gas development.

35.     Second, BLM may offer leases for the development of specific tracts of public lands. *See* 43 C.F.R. §§ 1610.5-3, 3120-3120.7-3.[3] BLM has considerable discretion to determine which lands will be leased and is not obligated to offer any particular tract of public land that has been nominated by industry for leasing.

36.     Third, lessees must submit, and BLM must approve, applications for a permit to drill before a lease may be developed. 43 C.F.R. § 3162.3-1(c).

37.     If a lease is issued without non-waivable no-surface occupancy ("NSO") stipulations, then BLM cannot outright prohibit surface development on that lease. 43 C.F.R. § 3101.1-2.

38.     At each stage of this process, BLM must prepare NEPA analysis to analyze and disclose all of the reasonably foreseeable direct, indirect, and cumulative impacts of its decision.

## FACTUAL BACKGROUND

### I.     San Rafael Desert and Labyrinth Canyon Wilderness

39.     The San Rafael Desert is a sublime area of Utah's backcountry, encompassing the Labyrinth Canyon Wilderness and BLM-identified lands with wilderness characteristics ("LWC") such as Sweetwater Reef and the San Rafael River.

---

[3] On June 22, 2024, the BLM's revised Mineral Leasing Act ("MLA") regulations went into effect. *See* 89 Fed. Reg. 30916 (April 23, 2024). The challenged decision in this lawsuit was made prior to that date. Thus, unless otherwise stated, SUWA cites to the MLA regulations in effect when BLM made its decision.



(Moonshine Wash in the San Rafael Desert. Copyright Ray Bloxham/SUWA)

40.     The San Rafael Desert contains many unique and remarkable resource values including that it is home to one of the most astonishing and diverse arrays of native pollinators (*e.g.*, bees, wasps) anywhere in North America. Researchers have found forty-nine different genera and 333 different species in this area. Forty-eight of these species were new to science and sixty-eight of these species may only occur in the Canyonlands region of the Colorado Plateau. BLM has recognized that "the San Rafael Desert's unique sand dune landscape provides valuable habitat for pollinators such as ground-nesting bees and wasps" and that the San Rafael Desert contains more "bee genera . . . than [exists] in all of New England." Bureau of Land Mgmt., San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments/Draft Environmental Assessment, DOI-BLM-UT-G020-2016-0008-EA, at 3-81 to 3-82 (May 2017) ("San Rafael Desert MLP").

41.     The San Rafael Desert is also home to a diverse array of endemic wildlife including mule deer, pronghorn, desert bighorn sheep, and "upland game" animals such as California quail, ring-necked pheasant, and Rio Grande turkey. It is home to at least nineteen bird species on the United States Fish and Wildlife Service's list of Birds of Conservation Concern, including burrowing owl, golden eagle, and peregrine falcon, and contains habitat for threatened and endangered bird species, including Mexican spotted owl, southwestern willow flycatcher, and yellow-billed cuckoo.

42.     BLM has determined that more than 250,000 acres of public lands in the San Rafael Desert contain wilderness characteristics—that is, they appear natural (*i.e.*, lack human disturbance) and contain "outstanding" opportunities for solitude and primitive and unconfined recreation such as hiking, wildlife viewing, and camping. The majority of leases at issue in this lawsuit are within BLM-identified LWC.

43.     The Labyrinth Canyon Wilderness is located at the eastern edge of the San Rafael Desert and abuts the Green River as it flows south toward its confluence with the Colorado River in the heart of nearby Canyonlands National Park. It is a remote, wild, landscape.

44.     Congress designated the Labyrinth Canyon Wilderness on March 12, 2019 in the Dingell Act. The Labyrinth Canyon Lease, which the Trump administration rushed to issue only a few days before the Dingell Act was enacted, is located in the heart of this Wilderness.



(Labyrinth Canyon Wilderness. The Labyrinth Canyon Lease is located in the area highlighted by the red box.)

45.     Members of Congress objected to the Trump administration BLM's last-minute fossil fuel giveaway in the heart of the Labyrinth Canyon Wilderness and requested that then-Secretary of the Interior, David Bernhardt, cancel the Labyrinth Canyon Wilderness Lease (UTU-93713). *See generally* Letter from U.S. Senator Richard J. Durbin (D. Ill.) *et al.*, to Interior Secretary David Bernhardt (Dec. 21, 2020) (attached as Ex. 2) (requesting that the lease be cancelled because development of the lease "will destroy [what] Congress sought to protect when in created the Labyrinth Canyon Wilderness").

**II.     BLM Determines a Master Leasing Plan Is Required for the San Rafael Desert**

46.     To ensure the proper balance between energy development and the protection of the remarkable resources in the San Rafael Desert, from 2010 to 2017 BLM did not offer any public lands in the region for oil and gas leasing and development. Instead, BLM determined that

"prior to new leasing of oil and gas resources" in the San Rafael Desert the agency first had to prepare "additional planning and analysis" to amend the BLM's Price Field Office Resource Management Plan ("Price RMP") and replace the RMP's outdated oil and gas lease stipulations and notices. 82 Fed. Reg. 31252, 31253 (May 18, 2016).

47.      In 2010, BLM released Instruction Memorandum No. 2010-117, entitled "Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" ("IM 2010-117"). IM 2010-117 introduced the Master Leasing Plan ("MLP") concept. *See id.* § II. The MLP concept recognized that in certain instances BLM's land use plans (*i.e.*, RMPs) were outdated and "additional planning and analysis may be necessary prior to new oil and gas leasing because of changing circumstances, updated policies, and new information." *Id.* § II. In such instances, "the MLP process will be conducted <u>before</u> lease issuance and will reconsider RMP decisions pertaining to leasing." *Id.* (emphasis added). The preparation of an MLP was "required" when, among other factors, "[a]dditional analysis or information is needed to address likely resource or cumulative impacts" to numerous resource values. *Id.*

48.      Shortly after the release of IM 2010-117, BLM determined that an MLP was "required" for the public lands in the San Rafael Desert and Labyrinth Canyon Wilderness, including the lands encompassed by the leases at issue in this litigation. BLM stated that completion of the San Rafael Desert MLP was "warranted before new mineral leasing and development are allowed." Bureau of Land Mgmt., San Rafael Desert Master Leasing Plan, Purpose and Need, at *2 (undated). Among other things, the San Rafael Desert MLP would "identify and address potential resources conflicts and environmental impacts from oil and gas development." *Id.* at 1.

49.     In the fall of 2015, BLM began to collect the information and prepare the analysis it had determined to be necessary prior to offering new leases in the San Rafael Desert. This included thousands of pages of data, information, and analysis. Among other things, the agency prepared a draft EA for the MLP, a preliminary alternatives document, an MLP-specific reasonably foreseeable development scenario, held public meetings, and invited public comments on the MLP proposal.

50.     Importantly, had the MLP been completed, the leases at issue would not have been issued in their current forms. Instead, they would have been issued (if at all) with much more restrictive leasing stipulations and notices. For example, BLM would not have allowed any surface development on the lands encompassing the Labyrinth Canyon Lease, and would have required stricter stipulations to protect wildlife habitats and BLM-identified LWC.

51.     After BLM abandoned the MLP process in 2017 to comply with the Trump administration's "energy dominance" agenda, discussed *infra*, SUWA submitted a Freedom of Information Act ("FOIA") request to BLM regarding the San Rafael Desert MLP. That FOIA request resulted in the production of 2,016 documents, totaling 20,107 pages. These documents contain hundreds of statements regarding the need for the MLP, the lack of existing information and data deemed necessary to support new leasing decisions, and demonstrate that for more than eighteen months BLM diligently worked toward completing the San Rafael Desert MLP.

**III.    The Trump Administration Reverses Course on the San Rafael Desert MLP**

52.     Two months after taking office President Trump issued Executive Order No. 13,783, entitled "Promoting Energy Independence and Economic Growth." *See generally* 82 Fed. Reg. 16093 (March 28, 2017). This Executive Order required administrative agencies, including BLM, to "review all existing . . . orders, guidance documents, policies, and any other

similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil [and] natural gas." *Id.*

53.     A few months later, the Secretary of the Interior issued Secretarial Order No. 3354, entitled "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program." *See generally* Sec. of the Interior, Order No. 3354 (July 5, 2017).[4] That order directed BLM to "identify additional steps to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 3(b). It further required that BLM "identify any provisions in [its] existing policy and guidance documents that would impede BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 4(b)(1).

54.     In response to Executive Order 13,783 and Secretarial Order 3354, BLM's Washington, D.C. office issued Instruction Memorandum No. 2018-034, entitled "Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (Jan. 31, 2018) ("IM 2018-34").[5] IM 2018-34 replaced BLM's longstanding oil and gas leasing policy, IM 2010-117, and established the framework for how BLM would implement the Trump administration's energy dominance agenda. Among other things, IM 2018-34: (1) eliminated the MLP concept; (2) eliminated or significantly restricted opportunities for public involvement in oil and gas leasing decisions; and (3) encouraged BLM to rely on existing NEPA analyses rather than prepare new site-specific NEPA analysis in order to "streamline" oil and gas leasing and development. *See id.* §§ II, III.B.5, III.D.

---

[4] Available at https://www.doi.gov/sites/doi.gov/files/uploads/doi-so-3354.pdf (last visited Aug. 27, 2024).
[5] Available at https://www.blm.gov/policy/im-2018-034 (last visited Aug. 27, 2024).

55.     BLM did not prepare NEPA analysis or provide a reasoned explanation for why

the MLP concept (including the San Rafael Desert MLP) would no longer be followed. Instead,

citing to the aforementioned Executive Order and Secretarial Order, BLM stated only that

"Master Leasing Plans . . . have created duplicative layers of NEPA review. This policy,

therefore, eliminates the use of MLPs." *Id.* § II.

56.     In a public statement explaining its decision to no longer complete the San Rafael

Desert MLP, BLM stated only:

> The preparation of an Environmental Assessment associated with the San Rafael
> [Desert] Master Leasing Plan Amendment is no longer required, and the process is
> hereby terminated.

83 Fed. Reg. 32681, 32681 (July 13, 2018).

57.     With these perceived "burdens" on oil and gas leasing and development

eliminated, BLM proceeded to offer hundreds of oil and gas leases in former-MLP areas,

including the leases in the San Rafael Desert at issue in this litigation.

58.     BLM's rushed, thinly analyzed, energy dominance leasing decisions have

consistently—and with few exceptions—been set aside as unlawful by federal courts, including

by this Court. *See, e.g.*, *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237 (D.D.C. 2020);

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880 (D. Mont. 2020);

*Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169 (D. Utah 2020); *W. Watersheds

Project v. Zinke*, 441 F. Supp. 3d 1042 (D. Idaho 2020). As a result of legal and administrative

challenges, millions of acres of Trump-era leases have been cancelled and thousands of leases

suspended and/or forced to be reexamined by BLM. *See, e.g.*, Juliet Eilperin and Darryl Fears,

*Judge voids nearly 1 million acres of oil and gas leases, saying Trump policy undercut public input*, The Washington Post (Feb. 28, 2020).[6]

## IV.    Biden Administration Rejects All Aspects of the Trump Administration Energy Dominance Agenda; Recognizes that the BLM's Oil and Gas Program Is Broken

59.    The Biden administration quickly revoked and rescinded all aspects of the Trump administration's energy dominance agenda as contrary to federal laws and principles of informed agency decision-making. *See* Exec. Order No. 13990, 86 Fed. Reg. 7037, 7041 (Jan. 20, 2021) (revoking Executive Order No. 13783); Sec'y of the Interior, Order No. 3398 § 4 (April 16, 2021) (revoking Secretarial Order No. 3354);[7] U.S. Dep't of the Interior, Instruction Memorandum No. 2021-027, Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews (April 30, 2021) ("IM 2021-27") (revoking and superseding IM 2018-34);[8] *see also W. Watersheds Project*, 441 F. Supp. 3d at 1089 (vacating provisions of IM 2018-034 and oil and gas leases issued pursuant to those provisions).

60.    In early 2021, the Biden administration also directed the Interior Department to conduct a review of BLM's oil and gas program. Exec. Order 14008, Tacking the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619, 7624-25 (Jan. 27, 2021).

61.    In November 2021, the Interior Department issued its report concluding that BLM's oil and gas program—the same program in effect when the challenged leases were sold in 2018—suffered from systemic problems. *See generally* Dep't of Interior, Rep. on the Fed. Oil and Gas Leasing Program, Prepared in Response to Exec. 14008 (Nov. 2021) ("2021 Oil and Gas

---

[6] Available at https://www.washingtonpost.com/climate-environment/2020/02/27/judge-voids-nearly-1-million-acres-oil-gas-leases-saying-trump-policy-undercut-public-input/ (last visited Aug. 27, 2024).
[7] Available at https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3398-508_0.pdf (last visited Aug. 27, 2024).
[8] Available at https://www.blm.gov/policy/im-2021-027 (last visited Aug. 27, 2024).

Report").[9] Specifically, the oil and gas program "inadequately account[ed] for environmental harms to lands, waters and other resources; foster[ed] speculation by oil and gas companies . . .; extend[ed] leasing into low potential lands that may have competing higher value uses; and [kept] communities out of important conversations about how they want their public lands and waters managed." *Id.* at 3.

62.     The 2021 Oil and Gas Report identified three main categories for reform: (1) providing a fair return to the American public; (2) designing more responsible leasing and development processes that prioritize areas that are most suitable for development; and (3) creating a more transparent, inclusive, approach to leasing and development. *Id.* at 4. In short, it concluded that "a fundamental rebalancing of the Federal oil and gas program" was necessary. *Id.* at 6.

63.     Among other recommendations, the Report explained that the leasing of "low potential" lands for oil and gas development fosters unwarranted speculation and should be avoided. *Id.* at 12-13.

64.     BLM subsequently issued new directives to implement the Interior Department's recommendations. *See generally* Bureau of Land Mgmt., Instruction Memorandum No. 2023-007, Evaluating Competitive Oil and Gas Lease Sale Parcels for Future Lease Sales (Nov. 21, 2022) ("IM 2023-07");[10] Bureau of Land Mgmt., Instruction Memorandum No. 2023-010, Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews (Nov. 21, 2022) ("IM 2023-10").[11] Among other directives, this included establishing a "leasing parcel preference criteria,"

---

[9] Available at https://www.doi.gov/sites/doi.gov/files/report-on-the-federal-oil-and-gas-leasing-program-doi-eo-14008.pdf (last visited Aug. 27, 2024).
[10] Available at https://www.blm.gov/policy/im-2023-007 (last visited Aug. 27, 2024).
[11] Available at https://www.blm.gov/policy/im-2023-010 (last visited Aug. 27, 2024).

along with instructions that BLM "will" evaluate parcels pursuant to those factors, which include:

- Proximity to existing oil and gas development, giving preference to lands upon which a prudent operator would seek to expand existing operations;

- The presence of important fish and wildlife habitats or connectivity areas, giving preference to lands that would not impair the proper functioning of such habitats or corridors;

- The presence of historic properties, sacred sites, or other high value cultural resources, giving preference to lands that do not contribute to the cultural significance of such resources;

- The presence of recreation and other important uses or resources, giving preference to lands that do not contribute to the value of such uses or resources; and

- Potential for development, giving preference to lands with higher potential for development.

IM 2023-07 at 1; *see also* 43 C.F.R. § 3120.32 (2024) (same).

65.     BLM must apply the criteria to all nominated parcels under agency review, assigning a preference value of either high or low—with "high" parcels brought forward for leasing and "low" parcels deferred. IM 2023-07 at 1.

66.     In sum, BLM and the Interior Department concluded that, among other shortcomings, the prior oil and gas program inadequately accounted for environmental harms and promoted lease speculation by encouraging BLM to issue oil and gas leases for public lands with "low potential" for development.

## V.     Reasonably Foreseeable Oil and Gas Development in the San Rafael Desert and Colorado Plateau Region

67.     As part of its planning process for the San Rafael Desert MLP, BLM prepared a reasonably foreseeable development scenario ("RFDS") related to oil and gas development. BLM prepares an RFDS "to project a baseline scenario of oil and gas exploration, development,

production, and reclamation activity" to inform future BLM decision-making. An RFDS is
BLM's forward-looking prediction of future oil and gas development for a particular area over a
particular period of time based on the agency's best information and data. In other words, an
RFDS "is a long-term projection of oil and gas activity." Bureau of Land Mgmt., Reasonably
Foreseeable Development Scenario for Oil and Gas in the San Rafael Desert Master Leasing
Plan Area, at 1 (Sept. 2016).[12]

68.    BLM also prepared RFDSs for the agency's Price and Moab field offices—both
of which encompass BLM's "analysis area" for the decision at issue in this litigation. These
RFDSs projected that nearly two thousand oil and gas wells would be drilled across these field
offices over a 15-20-year period.

69.    Specific to the San Rafael Desert, the San Rafael Desert RFDS stated "[f]uture oil
and gas drilling for the next 15 years is projected to average two wells per year for a total of 30
wells." *Id.* at 2 (Sept. 2016).

70.    The wells projected in these RFDSs are "reasonably foreseeable future actions"
for purposes of NEPA analysis. *See* 40 C.F.R § 1508.7.

71.    It is not possible to develop a helium, oil, or natural gas well without the use of
water to support drilling and development operations. In other words, it is reasonably foreseeable
that the nearly two thousand wells projected in the RFDSs will require significant quantities of
water to develop (tens if not hundreds of millions of gallons).

72.    At each stage of the three-stage oil and gas leasing and development process,
NEPA requires that BLM (1) quantify the amount of water use required to develop reasonably

---

[12] Available at
https://eplanning.blm.gov/public_projects/nepa/61781/93142/112263/SRD_MLP_Reasonably_F
oreseeable_Development_Scenario.pdf (last visited Aug. 27, 2024).

foreseeable wells, and (2) analyze and disclose the environmental impacts of that water use. In the NEPA analysis at issue here, BLM did not quantify, analyze, or disclose the water use associated with all foreseeable wells, and did not analyze and disclose the environmental impacts of that water use.

**VI.     SUWA's Prior Litigation Challenging Leases Sold in the San Rafael Desert**

73.     On December 14, 2020, SUWA and other conservation organizations filed litigation in this Court to challenge BLM's decisions to sell the leases in the San Rafael Desert at the agency's September and December 2018 competitive oil and gas lease sales. *See generally S. Utah Wilderness All. v. Bernhardt* ("*SUWA v. Bernhardt*"), Case No. 1:20-cv-03654 (Contreras, J.).

74.     On December 18, 2020, the plaintiffs filed a motion for temporary restraining order and preliminary injunction to stop the imminent development and drilling of the Labyrinth Canyon Lease. *SUWA v. Bernhardt*, ECF No. 9-1. The Court temporarily enjoined the drilling project. *SUWA v. Bernhardt*, ECF No. 25.

75.     The plaintiffs subsequently filed an amended complaint and renewed motion for temporary restraining order and preliminary injunction. *SUWA v. Bernhardt*, ECF Nos. 32, 33-1. The Court denied the motion. *See SUWA v. Bernhardt*, 512 F. Supp. 3d 13 (D.D.C. 2021).

76.     Soon after the Court's decision, the lessee drilled the Labyrinth Canyon Lease on a surface location at the edge of the Labyrinth Canyon Wilderness. The well turned out to be a dry hole and was subsequently plugged and abandoned and the well pad partially reclaimed.

77.     The plaintiffs subsequently filed a second amended complaint and a motion for summary judgment. *SUWA v. Bernhardt*, ECF Nos. 46-1, 56-1. The second amended complaint challenged, *inter alia*, BLM's failure to analyze and disclose the cumulative impacts of oil and

gas leasing and development, as required by NEPA, and BLM's failure to provide a reasoned explanation prior to reversing course on the San Rafael Desert MLP, as required by the APA. *See SUWA v. Bernhardt*, ECF. 56-1, at 29-32.

78.     After the plaintiffs filed its second amended complaint, the plaintiffs and Federal Defendants started to explore the potential for settlement. An agreement was finalized in December 2022. Pursuant to the agreement, BLM agreed to prepare a supplemental NEPA analysis for the challenged leasing decisions that would assess the following resources: air quality, climate change, cultural resources, paleontological resources, recreation, visual resources, night skies, riparian resources, soils, water resources, vegetation, wildlife resources, special status plant and wildlife species, special designations such as Areas of Critical Environmental Concern ("ACEC"), wilderness characteristics, and the social costs of greenhouse emissions (to the extent permitted by law). *See* Stipulated Settlement Agreement ¶ 1 (Dec. 7, 2022) (attached as Ex. 3).

79.     Additionally, BLM agreed to consider "whether a resource management plan (RMP) amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations." *Id.* ¶ 2.

80.     Based on the commitments made by both parties to the agreement, the plaintiffs and Federal Defendants filed a stipulated dismissal. *SUWA v. Bernhardt*, ECF No. 79.

**VII.    The Supplemental NEPA Analysis**

81.    In July of 2023, BLM released the draft supplemental NEPA analysis contemplated in the settlement agreement ("Reevaluation EA").[13] SUWA submitted timely comments on the draft Reevaluation EA and raised each issue discussed in more detail below.

82.    The National Park Service ("NPS") also commented on the Reevaluation EA. NPS explained that "oil and gas exploration and development on these parcels will negatively impact the visitor experience . . . and the natural and cultural resources protected within the parks[.]" Letter from Kimberly Hartwig, Chief of Resource Stewardship and Science, Southeast Utah Group, to Nathan Packer, Bureau of Land Mgmt., 2 (Sept. 28, 2023) (attached as Ex. 4). NPS expressed concerns with the potential impacts of oil and gas development on the leases to climate change, air quality, dark night skies, soundscapes, groundwater quality and quantity, and cultural resources, among other resource values. *See id.* at 1-6.

83.    In 2018, NPS had raised similar concerns in a letter to BLM regarding the agency's initial leasing proposal for the San Rafael Desert region. *See generally* Letter from Kate Cannon, Superintendent, Southeast Utah Group, to Sheri Wysong, Bureau of Land Mgmt. (April 20, 2018) (attached as Ex. 5).

84.    In the Reevaluation EA, BLM addressed some of these concerns in its response to public comments but did not analyze and disclose the potential impacts to many of the resource values of concern highlighted by SUWA and the NPS.

---

[13] The project website is available at https://eplanning.blm.gov/eplanning-ui/project/2024998/510 (last updated May 30, 2024).

A. **Failure to take a "hard look" at the direct, indirect, and cumulative impacts of leasing**

85.     The EA failed to analyze the resources set forth in the settlement agreement, as shown in the following chart:

**RESOURCE VALUES TO BE ANALYZED PERSUANT TO
PARAGRAPH 1 OF THE SETTLEMENT AGREEMENT**

| Resource Values Listed in Paragraph 1 | Resource Value Analyzed in EA |
|---|---|
| Air quality | X |
| Climate change | X |
| Cultural resources | |
| Paleontological resources | |
| Recreation | X |
| Visual resources | X |
| Night skies | X |
| Riparian resources | |
| Soils | |
| Water resources | |
| Vegetation | |
| Wildlife resources | |
| Special status plant and wildlife species | |
| Special designations (ACECs) | |
| Wilderness characteristics | X |
| Social cost of GHGs | X |

86.     These resource values were included in the settlement agreement because they are the same resources that BLM previously recognized <u>had</u> to be analyzed prior to offering parcels for leasing and development.

87.     BLM did not analyze and disclose the impacts to these resources in the Reevaluation EA because, according to the agency, the agency had attached stipulations and notices from the <u>Price RMP</u> to the leases—the same stipulations and notices BLM previously identified as outdated and inadequate when it initiated the San Rafael Desert MLP process. *See, e.g.*, Reevaluation EA at 3-5 (Cultural resources: "The leases were also reviewed for the application of stipulations and lease notices as required by the [Price RMP]"); *id.* at 3-10

25

(Paleontology: relying on PAL-4, a stipulation from the Price RMP); *id.* at 3-27 to 32 (Wildlife: relying repeatedly on stipulations and lease notices derived from the Price RMP).

88.     BLM provided no explanation for why it was relying on the same lease stipulations and notices that it previously concluded were outdated and inadequate.

89.     Moreover, for the resources listed in the EA as "analyzed in brief" and for those brought forward for detailed analysis in the EA, BLM failed to take the "hard look" mandated by NEPA. For example, the resources addressed in BLM's "analyzed in brief" section of the EA do not analyze and disclose cumulative impacts. Instead, that section only provides generic, broad statements about potential risk and future harm, defers all analysis to the drilling stage, and, as noted above, tiers to and otherwise relies on the Price RMP's outdated lease stipulations and notices.

90.     Likewise, for the resource values "analyzed in detail" in the EA, BLM did not analyze and disclose cumulative impacts. The Reevaluation EA does not identify other actions, the impacts or expected impacts from these other actions, or the overall impact that can be expected if the individual impacts are allowed to accumulate.

**B.     Failure to Provide Reasoned Explanation for Reversal of Prior Position**

91.     The Reevaluation EA failed to consider whether a land use plan amendment was necessary to strengthen leasing categories and stipulations prior to offering the parcels for leasing and development—something BLM previously recognized had to be revisited prior to issuing leases in the San Rafael Desert and had agreed to consider in the settlement agreement with SUWA. Instead, BLM stated that this issue was "beyond the scope of the decision to be made in . . . this EA." Reevaluation EA at 2-6.

92.     BLM's explanation contradicts the purpose of the EA, which was to "comply with the terms of the [*SUWA v. Bernhardt*] settlement agreement and prepare additional NEPA analysis associated with the leasing decisions." *Id.* at 1-2. That agreement required BLM to "consider whether a [RMP] amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations." Settlement Agreement § 2.

93.     Moreover, BLM did not provide a reasoned explanation for how or why it could reaffirm leases in the San Rafael Desert without first preparing the pre-leasing NEPA analysis it had previously concluded in the MLP process was necessary prior to offering leases for development.

94.     For over seven years, based on its 2010 nationwide oil and gas policy, BLM worked to complete the San Rafael Desert MLP which included, among other things: collecting new information and data regarding LWCs, water resources, and wildlife; collecting significant new information and data related to the impacts of oil and gas leasing and development in the San Rafael Desert; collecting new information and data regarding past, present, and reasonably foreseeable future oil and gas development in the San Rafael Desert; preparing an MLP-specific RFDS; and preparing a draft EA to analyze and disclose this new information and data. During this years-long public process, BLM deferred all leasing in the San Rafael Desert to preserve its management options for the area.

95.     However, following the 2016 election, the agency abruptly abandoned the MLP planning process to align itself with the Trump administration's priorities. In doing so, BLM failed to provide a reasoned explanation for reversing course on the MLP policy and the San Rafael Desert MLP.

96.     The Reevaluation EA repeated BLM's prior mistake. In response to SUWA's comment on the Reevaluation EA to this point, BLM stated:

> The BLM notes the comment concerning the San Rafael Desert MLP and also notes that the MLP was not finalized.
> . . .
>
> The BLM does not always need to conduct "pre-leasing NEPA" analysis to determine if an area requires new stipulations prior to leasing. By conducting site-specific analysis in the context of an EA, the BLM can determine if the existing stipulations are adequate to protect the resources at issue. If the BLM determines that the existing stipulations are not adequate, it can complete an RMP amendment to create new stipulations or close an area to new leasing.
> . . .
>
> In addition, IM 2018-34 explains why BLM determined MLPs would no longer be developed, finding that the process created duplicative layers of NEPA review.

Reevaluation EA, App. E at E-6 to E-7.

97.     The fact that the MLP was never finalized is merely a self-evident conclusory statement, not a reasoned explanation for abandoning seven years of agency position, information, and data.

98.     Similarly, the Reevaluation EA did not "determine if the existing stipulations are adequate to protect resources at issue" as BLM states because doing so was, according to BLM, "beyond the scope of the decision to be made [in the EA]." Reevaluation EA at 2-5.

99.     BLM's reliance on IM 2018-34 is likewise misplaced because the Biden administration revoked and rescinded that IM in 2021. *See* IM 2021-27; *W. Watersheds Project*, 441 F. Supp. 3d at 1089 (vacating provisions of IM 2018-034 and oil and gas leases issued pursuant to those provisions). Moreover, the sum of BLM's explanation in IM 2018-34 is:

> The BLM conducted the review required by [Trump administration's energy dominance orders] and determined that Master Leasing Plans (MLPs) have created duplicative layers of NEPA review. This policy therefore, eliminates the use of MLPs . . . The BLM will not initiate any new MLPs or complete ongoing MLPs under consideration as land use plan amendments.

IM 2018-34 § II.

100.     BLM does not explain how the MLP process creates duplicative NEPA review. Nor does BLM explain how the thousands of pages of data, information, studies and analysis regarding the need for the San Rafael Desert MLP prior to offering new leases in the San Rafael Desert are no longer accurate, necessary, or relevant.

**C.     BLM's Decision to Reaffirm Leases was Made Pursuant to Outdated and Replaced Policies and Procedures**

101.     In the Reevaluation EA, BLM followed a leasing review procedure that had previously been revoked and replaced by the Interior Department and reaffirmed the issuance of the thirty-five leases with their outdated stipulations and notices.

102.     In its comments on the Reevaluation EA, SUWA explained that the pending decisions whether to reaffirm the leases at issue must be made pursuant to the BLM's current policies and directives, including the 2021 Oil and Gas Report and IM Nos. 2023-07 and -10.

103.     Unfortunately, BLM did not follow the procedures set forth in the 2021 Oil and Gas Report and its current IMs. Instead, the Reevaluation EA explained that, for example, BLM reviewed the leases consistent with IM 2018-34 which "sets out the policy of the BLM to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens [and] to expedite the offering of lands for lease[.]" Reevaluation EA at 1-5.

104.     As detailed *supra*, BLM's current policy is set out in, among other places, the 2021 Oil and Gas Report, IM 2023-07 and IM 2023-10. For instance, IM 2023-07 established a "lease parcel preference criteria," as discussed above. *See also* 43 C.F.R. § 3120.32 (2024) (also containing the lease parcel preference criteria). This policy was in effect when BLM prepared the Reevaluation EA.

105.     This policy encourages BLM to lease parcels, if at all, near existing development, with preference given to parcels with "high" potential for development. *See id.* At the same time, BLM should defer leasing in areas with important/sensitive environmental resources (*e.g.*, wildlife, cultural, recreation). *See generally id.*

106.     Nonetheless, the Reevaluation EA did the exact opposite: it reaffirmed leases with <u>virtually zero</u> development potential, far from existing development, and in exceptionally important and sensitive areas including the Labyrinth Canyon Wilderness. For example, in the EA, BLM explains that "[t]his area is extremely exploratory" with no documented successful wells over the past sixty years despite more than 79 attempts. Reevaluation EA at 3-3. *Id.* Thus, "[d]ue to the extreme exploratory nature and past unsuccessful attempts, it is anticipated that all wells drilled have a high probability of being a dry hole." *Id.* at 3-3 to 3-4.

107.     At the same time, BLM recognized that the public lands at issue contained important resources including wetlands, wildlife, and wilderness-caliber lands. *See, e.g.*, *id.* at 3-22 ("Wetlands documented . . . are present within 47 of the 59 leases"); *id.* at 3-28 ("All leases [except one] contain year-long crucial pronghorn habitat"); *id.* at 3-29 ("There is potential habitat for five BLM sensitive species: 1) Townsend's big-eared bat, 2) monarch butterfly, 3) kit fox, 4) white-tailed prairie dog, and 5) burrowing owl"); *id.* at 3-30 (many of the leases intersect with or are near modeled habitat for threatened and endangered species such as Mexican spotted owl, Southwestern willow fly catcher, and yellow-billed cuckoo); *id.* at 3-75 (there are five BLM-identified LWCs that overlap the leases).

108.     To justify its decision not to follow the leasing preference criteria, BLM explained that it did not need to follow its current leasing policy—but instead could rely on revoked and enjoined Trump-era leasing policy—because IM 2023-07 and -10 "apply to

evaluation of parcels prior to a lease sale" and "BLM is not initiating a new lease sale based on expressions of interests but is reevaluating lease parcels that have already been issued." Reevaluation EA, App. E at E-8. But this explanation confuses the entire purpose of the EA, which was to reevaluate whether the leases should have been issued in the first place and, if so, under what terms and conditions.

109. Additionally, in the Reevaluation EA, BLM provided no response to SUWA's comment that the proposed action was in direct conflict with the detailed findings and recommendations made in the 2021 Oil and Gas Report. Specifically, that report concluded that BLM's prior oil and gas program—the same program BLM followed to first sell the leases in 2018—suffered from systemic flaws. Among other issues, the Interior Department concluded that the oil and gas program in effect in 2018:

- "inadequately account[ed] for environmental harms to lands, waters, and other resources";

- "foster[ed] speculation by oil and gas companies"; and

- "extend[ed] leasing into low potential lands that may have competing higher value uses".

2021 Oil and Gas Report at 3.

110. However, BLM's decision to reaffirm the thirty-five leases at issue here merely carried forward the shortcomings and problems identified by the Interior Department, without any explanation for why doing so was reasonable, or how the three factors identified above would be resolved or avoided.

111. For example, BLM's decision extended leasing into low (or no) production lands that have competing higher value uses (*e.g.*, Congressionally-designated Wilderness), as explained above.

112. The decision also fosters speculation because BLM did not reaffirm the leases subject to the updated annual rentals required by Congress in the Inflation Reduction Act and revised MLA regulations, but instead reaffirmed them subject to the replaced and revoked rentals—the same rentals the Interior Department explained in its report that "encourage speculators to purchase leases with the intent of waiting for increases in resource prices, adding assets to their balance sheets, or even reselling leases at a profit rather than attempting to produce oil or gas." 2021 Oil and Gas Report at 7.

113. In sum, the agency relied on an outdated, revoked, and enjoined leasing policy (IM 2018-34); ignored relevant Interior Department policy that encourages BLM to avoid leasing in low potential areas, especially when the areas have the potential for high resource value conflict; and reaffirmed leases subject to outdated fiscal terms and conditions that the agency has acknowledged foster rampant speculation and other abuses of public lands and minerals. Rather than review the prior leasing decisions with fresh eyes—the entire purpose of the Reevaluation EA—BLM rubberstamped its prior leasing decisions without accounting for and addressing new information, changed circumstances, or conflicting information.

**FIRST CAUSE OF ACTION**
*Violation NEPA: Failure to Analyze and Disclose Cumulative Impacts*
*of Oil and Gas Leasing and Development*

114. SUWA incorporates by reference all preceding paragraphs.

115. NEPA requires BLM to take a "hard look" at all cumulative impacts of oil and gas leasing and development. *See* 40 C.F.R. § 1508.7.

116. In the D.C. Circuit, "a meaningful cumulative impact analysis must identify five things:"

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions - past,

present, and proposed, and reasonably foreseeable - that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Tomac*, 433 F.3d at 864 (cleaned up).

117.    The Reevaluation EA does not identify the area in which the effects of the proposed action will be felt.

118.    The Reevaluation EA does not identify the impacts that are expected in the area from the proposed project.

119.    The Reevaluation EA does not identify other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area.

120.    The Reevaluation EA does not identify the impacts or expected impacts from these other actions.

121.    The Reevaluation EA does not identify the overall impact that can be expected if the individual impacts are allowed to accumulate.

122.    BLM's failure to identify, analyze, and disclose the cumulative impacts of oil and gas leasing and development to a wide array of resource values including, but not limited to, the Labyrinth Canyon Wilderness, BLM-identified LWC, wildlife (including endemic pollinators), and water resources (*e.g.*, ground and surface water quantity), violates NEPA and its regulations, and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

### SECOND CAUSE OF ACTION
*Violation of the APA: Failure to Provide a Reasoned Explanation Prior to Reversing Course on the San Rafael Desert MLP*

123.    SUWA incorporates by reference all preceding paragraphs.

124.    Federal agencies may change their prior positions. However, when an agency reverses its prior position, the APA requires the agency to, at a minimum, "display awareness that it _is_ changing positions" and provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." _Fed. Commc'n Comm'n v. Fox Television Stations, Inc._, 556 U.S. 502, 515-516 (2009) (emphasis in original).

125.    BLM did not provide a "reasoned explanation" prior to reversing course on the San Rafael Desert MLP. Starting in 2010, BLM did not offer any oil and gas leases in that planning area for more than seven years while the agency collected and analyzed significant new information related to "[a]ir quality, climate change, cultural resources, paleontological resources, recreation, visual resources, [dark] night skies, riparian resources, soil and water resources, vegetation, wildlife resources, special status species, special designations, and wilderness characteristics." 81 Fed. Reg. 31252, 31253 (May 18, 2016).

126.    During that time, BLM repeatedly stated that the MLP, and the need to collect and analyze this the new information, was "necessary" and "required" "prior to new leasing of oil and gas resources." _Id._

127.    BLM made it at least to the half-way point in the San Rafael Desert MLP process, including, but not limited to, the preparation of a draft EA, preliminary alternatives document, public hearings, and thousands of pages of supporting documents. However, BLM abandoned the MLP concept, including the San Rafael Desert MLP, following the 2016 presidential election. The abrupt reversal, memorialized in IM 2018-034 and a related Federal Register notice, was not accompanied by a reasoned explanation.

128.    The Reevaluation EA merely incorporates IM 2018-34 as the agency's "explanation" for its abrupt reversal.

129.     BLM's decision to reverse course in abandoning the San Rafael Desert MLP process and refusing to consider the factors BLM previously said were necessary before any new oil or gas leasing could occur is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

### THIRD CAUSE OF ACTION
*Violation of NEPA: Failure to Prepare NEPA Analysis*
*Prior to Reversing Course on the San Rafael Desert MLP*

130.     SUWA incorporates by reference all preceding paragraphs.

131.     NEPA is triggered when a federal agency engages in "any major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.18(a) (major federal actions "include new and continuing activities" and "new or revised agency rules, regulations, plans, policies, or procedures").

132.     Once triggered, an agency must comply with its NEPA obligations by preparing one of the following NEPA documents: (1) an EIS, (2) an EA and accompanying FONSI and Decision Record, or (3) a "categorical exclusion" ("CX"). 40 C.F.R. §§ 1508.4, 1508.9, 1508.11.

133.     BLM did not prepare an EIS, EA, or CX prior to abandoning the MLP concept, including the San Rafael Desert MLP. The initial decision reaffirmed by BLM in the Reevaluation EA to abandon the MLP concept opened millions of acres of public lands across the West to new oil and gas leasing, including more than half a million acres in the San Rafael Desert and Labyrinth Canyon Wilderness.

134.     BLM's failure to prepare NEPA analysis prior to abandoning the MLP concept and the San Rafael Desert MLP specifically was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and made without observance of procedure required by

law, in violation of the APA, 5 U.S.C. §§ 706(2)(A), (D), and NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations.

### FOURTH CAUSE OF ACTION
*Violation of the APA: Failure to Consider and Analyze*
*Evidence that Contradicts BLM's Position*

135.     SUWA incorporates by reference all preceding paragraphs.

136.     An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

137.     When enforcing this standard, "the D.C. Circuit has 'not hesitated' to set aside agency action when the agency ignores 'evidence contradicting its position.'" *Wilderness Soc'y*, 2024 U.S. Dist. LEXIS 51011, *45 (citations omitted).

138.     The Reevaluation EA ignores evidence that contradicts BLM's position and ultimate decision. Among other overlooked shortcomings, BLM reaffirmed leases:

- that have—by the agency's own admission—extremely "low" potential for development, but high resource value conflicts (*e.g.*, Labyrinth Canyon Wilderness);

- that are subject to stipulations and notices that the agency previously, and repeatedly, recognized to be outdated and ineffective;

- that were issued under the agency's prior oil and gas program—a program that the Interior Department has found "inadequately account[ed] for environmental harms to lands, waters, and other resources"; 2021 Oil and Gas Report at 3.

- pursuant to revoked and enjoined leasing policy, while at the same time refusing to apply the agency's current leasing policy to the same decision.

139.    BLM's decision is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## PRAYER FOR RELIEF

SUWA respectfully requests that this Court enter judgment in SUWA's favor and against Federal Defendants and provide the following relief:

1.    Declare that Defendants violated NEPA and the APA, and acted arbitrarily, capriciously, and contrary to law by issuing the decision at issue in this litigation;

2.    Declare that Defendants violated NEPA and the APA, and acted arbitrarily, capriciously, and contrary to law when Defendants abandoned the MLP concept, including the San Rafael Desert MLP planning process, without a reasoned explanation and without NEPA analysis;

3.    Declare that Defendants acted arbitrarily, capriciously, and contrary to law when Defendants ignored information that contradicted its position;

4.    Declare unlawful and vacate the Reevaluation EA and accompanying decision record at issue in this litigation;

5.    Set aside and vacate the thirty-five leases at issue in this litigation;

6.    Enjoin Defendants from approving or otherwise acting on any applications for permit to drill any of the leases at issue until Defendants have fully remedied these legal violations;

7.    Enjoin Defendants from offering, selling, or issuing new leases for oil and gas development on BLM-managed public lands encompassed by the San Rafael Desert MLP until

Defendants provide a reasoned explanation for their changed position regarding that MLP, and prepare the necessary NEPA analysis to support that new position;

8.      Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein;

9.      Award Plaintiff the costs it has incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable provisions; and

10.      Grant such other relief the Court deems just and proper.

Respectfully submitted this 28th day of August, 2024.

*/s/Elizabeth L. Lewis*
Elizabeth L. Lewis
D.C. Bar No. 229702
(202) 618-1007
lizzie@eubankslegal.com

William S. Eubanks II
D.C. Bar No. 987036
(970) 703-6060
bill@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, D.C. 20006

*Counsel for Plaintiff Southern Utah
Wilderness Alliance*
