# Exhibit A

STEPHEN K. KAISER (UT Bar No. 18146)
KATHY A. F. DAVIS (UT Bar No. 4022)
ASSISTANT ATTORNEYS GENERAL
DEREK E. BROWN (UT Bar No. 10476)
UTAH ATTORNEY GENERAL
1594 W. North Temple Street, Suite 300
Salt Lake City, UT  84116
skkaiser@agutah.gov
kathydavis@agutah.gov

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR, *et. al.*, <br><br>       Defendants. <br><br><br> STATE OF UTAH, <br><br>       Proposed Intervenor-Defendant. | Case No. 1:24-cv-02476-RC <br><br><br> **MEMORANDUM IN SUPPORT OF PROPOSED INTERVENOR-DEFENDANT STATE OF UTAH'S MOTION TO INTERVENE** <br><br><br> Judge Rudolph Contreras |

### INTRODUCTION

Plaintiff, Southern Utah Wilderness Alliance ("SUWA" or "Plaintiff" ) seeks judicial review of the United States Bureau of Land Management's ("BLM") 2024 decision to reaffirm thirty-five oil and gas leases in southeastern Utah. (ECF-8 at 1) ("the Decision"). Plaintiff alleges that Federal Defendants failed to comply with the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA") in making the Decision. The lease sales in question originally took place in

September and December of 2018. (*Id.* at 24*)*. Plaintiff initially sued BLM in December of 2020, resulting in a settlement that required BLM to perform a supplemental NEPA analysis that included certain additional considerations. (*Id.* at 25). Following the supplemental NEPA analysis which concluded in 2024, BLM issued the Decision and reaffirmed the thirty-five oil and gas leases. (*Id.* at 26). Despite the previous settlement, SUWA again challenges the Decision. Through these lawsuits, Plaintiff has shown that its continuing goal is to impede and prevent oil and gas leasing on public lands in Utah.

The State of Utah ("State" or "Utah") opposes Plaintiff's claims and seeks to protect the State's financial and regulatory interests that will be adversely affected if the Plaintiff prevails. The State should be granted intervention in this suit as a matter of right. The State has a substantial interest in the challenged leases. Each federal oil and gas lease issued within its borders provides the State with direct and indirect revenue and employment for its citizens. The State also has a sovereign interest in regulating oil and gas extraction to ensure it is done safely and efficiently. Disposition of this matter in favor of the Plaintiff would impede the State's ability to protect these interests; such a disposition would deprive the State of revenue and conflict with its mission of providing economic opportunities and energy security for Utahns. Intervention is also necessary because the Federal Defendants cannot adequately represent the State's unique interests.

To defend against the Plaintiff's claims, the State seeks leave to intervene as a matter of right under Federal Rule of Civil Procedure 24(a)(2). Alternatively, the State requests permission to intervene under Rule 24(b)(1)(B).

## FACTUAL BACKGROUND

The Plaintiff challenges BLM's 2018 oil and gas lease sales, and the reaffirmation of those sales in 2024, and asserts violations of the APA, NEPA, and the ESA. (ECF-8 at 3).

Plaintiff specifically alleges that BLM failed to analyze and disclose cumulative impacts, failed

to provide a reasoned explanation for reversing course on the San Rafael Desert Mineral

Leasing Plan, and failed to complete ESA Section 7 Consultation. (*Id.* at 36-43). Plaintiff

requests declaratory and injunctive relief, including an order setting aside and vacating the

thirty-five leases at issue in the litigation. (*Id.* at 44).

The thirty-five challenged oil and gas lease sales are all located in southeastern Utah,

primarily in Emery County. Consistent with the requirements of NEPA, the BLM conducted an

Environmental Assessment ("EA") and issued a Finding of No Significant Impact ("FONSI")

prior to affirming the sales. *See, e.g., Environmental Assessment* DOI-BLM-UT-0000-2023-

0007-EA; *Finding of No Significant Impact* DOI-BLM-UT-0000-2023-0007-FONSI.[1] The State

takes a particular interest in all oil and gas leases in Utah, and this sale accounts for a substantial

lease sale. The State has a significant interest in protecting its unique economic, regulatory, and

sovereign interests through intervention.

## ARGUMENT

### I.    Utah is entitled to intervene as a matter of right.

This Circuit has set forth four elements that must be satisfied to intervene as of right:

(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally

protected interest in the action; (3) the action threatens to impair that interest; and (4) no

existing party adequately represents that interest. *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C.

Cir. 2008) (*quoting SEC v. Prudential Sec. Inc.*, 136 F.3d 153,156 (D.C.Cir.1998)). Because

the State meets its burden on each of these factors, it is entitled to intervene as of right.

---

[1] Available at: https://eplanning.blm.gov/eplanning-ui/project/2024998/570 (last visited April 1, 2024).

### A.   Utah's motion is timely.

Among the factors to be considered in evaluating timeliness are: (1) the time elapsed since the inception of the action; (2) the purpose for which intervention is sought; (3) the need for intervention to preserve the proposed intervenor's rights; and (4) the probability of prejudice to existing parties. *Karsner*, 532 F.3d at 886. Of these factors, prejudice against existing parties is the most important for determining timeliness. *Roane v. Leonhart*, 741 F.3d 147, 151–52 (D.C. Cir. 2014).

The State satisfies the four timeliness factors. The amended complaint was filed in November 2024 and this case has not progressed beyond the initial stages. Federal Defendants filed an answer to Plaintiff's Amended Complaint on January 17, 2025. (ECF-17). A Scheduling Order was entered on January 28, 2025. (ECF-19). In accordance with the Scheduling Order, briefing will commence with the filing of Plaintiff's brief, which will occur no earlier than April 25, 2025. The Federal Defendants' brief is due June 18, 2025, at the earliest. Should intervention be granted, the State would request staggered briefing and, therefore, would likely not submit any substantive filing until late June 2025.  At this preliminary stage, the State's intervention will not prejudice other parties because it will not delay resolution of this case. The State's motion is timely.

### B.   Utah has legally protected interests in this action.

To evaluate a legally protected interest, the requirement functions "primarily [as] a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967). Sufficient interest exists for purposes of Rule 24(a)(2) "where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove

the party's benefit." *Crossroads Grassroots Policy Strategies v. Federal Election Comm'n*, 788 F.3d 312, 317 (D.C. Cir. 2015). That the State is concerned with oil and gas activities on public lands within its borders cannot be in doubt.

The State's economic and regulatory interests in the disputed leases are clear and compelling, necessitating its involvement in this case as an intervenor of right. The State is involved in the issuance and permitting of every federal oil and gas lease within Utah, including the thirty-five leases at issue in this case. *See* UTAH CODE ANN. § 40-6-18. Multiple state agencies participate in the development of federal analyses of environmental impacts.  These state agencies include: the Public Lands Policy Coordinating Office, the Department of Wildlife Resources, the Division of Oil, Gas, and Mining, and the Office of Energy Development. The State submits comments directed to environmental assessments after considering feedback from these agencies, each of which contributes unique perspectives. Indeed, the State provided comments during the NEPA process at issue in this case. (Attachment A).

Even after the leasing sales conclude, the State continues to be involved. Oil and gas extraction and production are permitted by State agencies. *See* UTAH CODE ANN. § 40-6-1. The State has a sovereign interest and duty to its citizens in ensuring that any energy production occurring within the State is done safely and efficiently. The State has and will continue to provide regulatory oversight to the oil and gas lease challenged by Plaintiff, which affects large swaths of Utah land. *See, e.g.,* UTAH CODE ANN. § 40-6-1, *et seq.*

Economic interests, including the State's revenues, constitute legally protected interests that warrant intervention. *See e.g., Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (Threatened loss of tourist dollars, and the consequent reduction in funding for Mongolia's conservation program, constitute a concrete and imminent injury

which is traceable to government action and justified grant of intervention to Mongolian agency). Revenue and royalties received from federal mineral leasing within the State is shared between federal and state governments. In 2019, oil and natural gas industries provided more than $12.4 billion to the State's economy.[2] Each of the challenged leases in this case represents a potential revenue source for the State.

Oil and gas leasing also provides economic opportunities for Utahns. Leases generate employment opportunities and contribute to decreased energy costs. Energy jobs are high-paying jobs. This economic activity also produces indirect revenue for the State in the form of increased income and sales tax. In 2019, oil and natural gas development throughout the entire State of Utah generated $6.1 billion in wages and supported over 103,000 Utah jobs.[3] Abundant energy resources in the State means oil and gas will continue to play a significant role in the State's future energy economy.

For all these reasons, the State has substantial and protectable interests in the challenged parcels and lease sales and has strong economic and regulatory interests at risk in this case which justifies State intervention. *See WildEarth Guardians v. Salazar*, 272 F.R.D. 4, 18 (D.D.C. 2010) (granting Wyoming intervention in suit challenging coal lease and finding state interests in (1) participation in regulatory process, (2) regulating environmental quality within its borders, and (3) protecting its economic stake in leases).

### C. The Plaintiff's challenge threatens to impair Utah's interests.

In addition to having a protectable interest, an intervenor must be "so situated that disposing of the action may as a practical matter impair of impede the [applicant's] ability to

---

[2] American Petroleum Institute, *Impacts of the Natural Gas and Oil Industry on the U.S. Economy in 2019*, (July 2021), https://www.api.org/-/media/Files/Policy/American-Energy/PwC/API-PWC-UT.pdf  (last visited Apr. 8, 2025).
[3] *Id.*

protect its interests..." Rule 24(a)(2). The State will suffer a concrete injury-in-fact should this Court rule in Plaintiff's favor. If the United States is required to redo its EA with additional analysis for a *third* time, the State would *again* be required to expend substantial time and resources to comment and participate in this process. Further, overturning the challenged lease sale would eliminate revenue sources and injure the State and its citizens economically while the sales are again reevaluated.

This case involves exclusively Utah lease sales, covering thirty-five parcels in southeastern Utah. The Plaintiff's renewed litigation clearly seeks to force the United States to either indefinitely delay or eliminate federal oil and gas leasing for this region. The State's interest in favorable outcomes from the lease sales could be upset without intervention. Therefore, the State satisfies the practical impairment requirement, warranting intervention in this case.

### D.  Existing parties cannot adequately represent the State's interests.

The burden of showing other parties cannot adequately represent an intervenor's interests is "minimal" and a movant need only show representation of its interest "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (citation omitted). Generally, government entities cannot adequately represent the interest of other parties in lawsuits challenging government action. *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986). In this case, Federal Defendants have no clear interest in protecting the State's sovereign interests in the management of its environmental resources or the State's protection of its economy and revenues.

The State's interests in regulating oil and gas operations and protecting State revenue and employment opportunities differ from the Federal Defendants' interest in defending the

BLM NEPA analysis. The State's interests in the long-term continuation and promotion of oil

and gas leasing in Utah also may not align with the United States' policy interests. Furthermore,

the "federal defendants have an obligation to represent the interests of the entire country,"

whereas the State is more narrowly concerned with the interests of Utahns. *Atl. Sea Island Grp.*

*LLC v. Connaughton*, 592 F. Supp. 2d 1, 7 (D.D.C. 2008) (citation omitted) (finding federal

defendants inadequately represented state interests). The State clearly meets the minimal burden

of showing current parties may not adequately represent the State's own unique interests.

In conclusion, the State meets all the requirements of Rule 24(a)(2). The State is

seeking intervention early enough in this action as to not cause prejudice against other parties.

The State has significant economic interests at stake, including revenue from severance taxes,

ad valorem taxes, and federal mineral royalties. The State also has a legally protected interest in

regulating oil and gas development within its borders. Granting the Plaintiff's requested relief

could strip the State of its benefits it has received from the challenged lease sales. No party to

this action can adequately represent the State's unique interests. Accordingly, the State should

be allowed to intervene as of right.

## II.    Utah has Article III Standing.

This Circuit also requires that a party seeking to intervene as of right "demonstrate

Article III standing" in the form of (1) injury in fact, (2) causation, and (3) redressability. *Defs.*

*of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013).[4] The inquiry as to whether a

---

[4] This Court has previously held, "Although 'intervenors must demonstrate Article III standing,' *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013), in this Circuit '[t]he standing inquiry is repetitive in the case of intervention as of right because an intervenor who satisfies Rule 24(a) will also have Article III standing,' *Akiachak Nativ Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 7 (D.D.C. 2008); *see also WildEarth Guardians v. Salazar* ('*WildEarth I*'), 272 F.R.D. 4, 13 n.5 (D.D.C. 2010) ("In most instances, the standing inquiry will fold into the underlying inquiry under Rule 24(a): generally speaking, when a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet constitutional

proposed intervenor has standing turns on whether there is an invasion of a legally protected interest that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; (c) which would be traceable to the plaintiff's challenge; and (d) would be prevented by defeating the plaintiff's challenge. *Crossroads*, 788 F.3d at 316-17 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 650 (1992)) (quotations omitted). The factors for Article III standing entirely overlap with the requirements for intervention as a matter of right, but the State will briefly reiterate its interests and their relation to this litigation. *See Akiachak Nativ Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 7 (D.D.C. 2008).

### A. Utah has protectable interests that will be injured by awarding the requested relief.

Utah has a significant, substantive interest in the oil and gas leasing decisions implicated by Plaintiff's Amended Complaint. As discussed above, every federal oil and gas lease issued within the State's borders provides Utah with direct and indirect revenue totaling in the billions of dollars, as well as employment for its citizens and lowered energy costs.[5] "Actual economic loss" is a "classic form of concrete and particularized harm." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 9 (D.C. Cir. 2015).

In addition to economic interests, Utah has a significant regulatory interest in oil and gas extraction. The State is involved in the issuance and permitting of every federal oil and gas lease within its borders. *See* UTAH CODE ANN. § 40-6-1, *et seq.* There can be no question that the State has substantial and protectable interests that are at imminent risk should Plaintiff be successful.

---

standing requirements, and *vice versa*.")." *Friends of Cedar Mesa v. U.S. Dep't of Interior*, No. 1:21-cv-00971-RC (D.D.C. June 27, 2022), ECF 24, p. 3, FN 1.

[5] American Petroleum Institute, *Impacts of the Natural Gas and Oil Industry on the U.S. Economy in 2019*, (July 2021), https://www.api.org/-/media/Files/Policy/American-Energy/PwC/API-PWC-UT.pdf  (last visited Apr. 8, 2025).

**B. Granting the State intervention will ensure that Utah can protect its interests against Plaintiff's requested relief and see that its interests are not impaired.**

The third prong of the standing requirement is that the injury be redressable by means of the relief sought. *Norton*, 322 F.3d at 733. In this case, the redressability of the injury to Utah's interests is to allow the lease sales to stand without requiring a third NEPA analysis, which would require the State to again spend time and resources to comment and participate in the process. Further, disposition in favor of the Plaintiff would impede the State's ability to protect its interests, and would deprive the State of revenue, along with economic opportunities and energy security for its citizens.

**III.    In the alternative, the State should be allowed to intervene permissively.**

If the Court does not grant the State intervention as a matter of right, the Court should allow the State to intervene permissively. The Court has discretion to grant intervention to any party that "has a claim or defense that shares with the main action a common question of law or fact." Rule 24(b)(1). The State's defense of the oil and gas lease issued within its borders shares common questions of law and fact with the main action. Furthermore, as required by Rule 24(b), the motion is timely and will not unduly delay or prejudice adjudication of the claims in this matter. Accordingly, if the Court does not allow the State to intervene as a matter of right, it should use its discretion to grant permissive intervention.

## CONCLUSION

The Plaintiff, for a second time, asks this Court to set aside thirty-five oil and gas lease sales conducted by BLM in Utah. The State has a significant interest in ensuring the validity of these lease sales and will suffer significant harm if the Plaintiff prevails. This motion is timely and no present party will adequately represent the State's economic, regulatory and sovereign interests. Accordingly, the State requests that this Court grant its motion to intervene.

Dated this 9th day of April, 2025.

Attorneys for Proposed Intervenor-Defendant

/s/ Stephen K. Kaiser
Stephen K. Kaiser
Kathy A. F. Davis
Assistant Attorneys General

**CERTIFICATE OF SERVICE**

I certify that on this 9th day of April, 2025, I electronically filed the foregoing with the Clerk of the U.S. District Court for the District of Columbia and served all parties using the CM/ECF system.


/s/ Stephen K. Kaiser

Stephen K. Kaiser

# ATTACHMENT A



## State of Utah

SPENCER J. COX
*Governor*

DEIDRE M. HENDERSON
*Lieutenant Governor*

## Department of Natural Resources

JOEL FERRY
*Executive Director*

## Public Lands Policy Coordinating Office

REDGE B. JOHNSON
*Director*

September 11, 2023

*Submitted electronically:*
*https://eplanning.blm.gov/eplanning-ui/project/2024998/570/8003836/comment*

Christina Price
Deputy State Director
Lands and Minerals
Utah State Office
Bureau of Land Management
440 West 200 South
Salt Lake City, Utah 84101

RE:  **Supplemental Analysis of the September and December 2018 Oil & Gas Lease
Sales**
DOI-BLM-UT-000-2023-0007-EA
RDCC Project No. 85506

Dear Ms. Price:

The State of Utah ("State"), through the Public Lands Policy Coordinating Office
("PLPCO"), appreciates the opportunity to offer comments on the BLM's *Utah State Office
Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental
Assessment* and the accompanying *Finding of No Significant Impact (FONSI)* made available
for comment on July 26, 2023 (hereafter, the "Supplemental Analysis").  The Supplemental
Analysis applies to 59 oil and gas lease parcels in Emery County, Utah, administered by the
BLM's Price Field Office.  Valid mineral rights exist for these parcels.

The State offered scoping comments in support of the September 2018 lease sale by
letter dated April 16, 2018, and incorporates those comments by reference.

As a general policy, the State encourages the responsible and appropriate
development and use of natural resources to promote economic development for the benefit

**Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales**
September 11, 2023
Page 2

of its citizenry and to support the State's Utah Energy and Innovation Plan and Resource Management Plan. As such, the State submits the following comments in response to the BLM's request for comments ("RFC").

## I.    Utah's Public Lands Policy Coordinating Office

This letter begins with a brief description of the commenter's mission and areas of expertise. Here, the commenter, PLPCO, is a state agency, whose broad mission is to coordinate, promote, and implement Utah's public land priorities. In addition to developing and coordinating the State's public lands policy initiatives, PLPCO is also involved in many different facets of public land management policy, including overseeing the State's Resource Development Coordinating Committee ("RDCC") which is responsible for commenting on the development and conservation proposals on Utah's public lands as well as assisting in resource management planning at the State and County levels. Because of PLPCO's broad mission and expertise, the agency is involved in various issues and projects that involve energy development, which will be impacted by the BLM's Supplemental Analysis.

## II.    Coordination / Consistency Requirements of Resource Management Planning

On a further introductory note, it is important to highlight the fact that under the Federal Land Policy and Management Act of 1976 ("FLPMA"), when developing or creating Resource Management Plans, federal agencies, such as the BLM, are required to coordinate its plans with state and local government plans to the greatest degree possible, consistent with federal law.

In the past, no state or local plans existed in Utah with which to ensure consistency with federal land use plans.

However, as of 2018, the State of Utah has adopted a State Resource Management Plan ("SRMP") and all twenty-nine (29) counties in the State have adopted County Resource Management Plans ("CRMPs"). The effort to adopt the SRMP and CRMPs was a first-of-its-kind effort not only in Utah but nationwide. The state and the counties frequently use their plans to coordinate management actions with the Bureau of Land Management and the U.S. Forest Service. All these plans include locally adopted objectives and policies for many aspects of not only federal land management but also include findings, provisions, and policies relating to natural resource development and how BLM lands are managed within County and State boundaries.

**Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales**
September 11, 2023
Page 3

   While not a direct response to the BLM's RFC, the State now specifically requests, under the Coordination and Consistency requirements discussed above, all land-use actions that occur on federally managed land because of the Supplemental Analysis be consistent with the Utah SRMP and the Utah CRMPs to the greatest degree possible, consistent with federal law.

## III. Consistency with the Emery County Resource Management Plan (CRMP)

   The BLM is required to make land use decisions in a manner consistent with local plans, to the greatest extent possible, consistent with federal law.  Section 1.5.1 of the Supplemental Analysis recognizes the Emery CRMP and the county policies promoting energy development.  The Emery County, Utah CRMP (https://utah-resource-management-planning-plpco.hub.arcgis.com/pages/county-management-plans) contains several findings and policies that are applicable to this Supplemental Analysis; as follows, with the most applicable to this analysis in **bolded text**:

   *Section 6.2:  <u>Public Lands/Federal and State Agencies</u>*

   ***Approximately ninety-two percent of Emery County is comprised of public land managed by federal or state agencies. County industries such as agriculture, mining, tourism, gas and oil development, and recreation depend on the continued use and availability of these lands and their accompanying resources for economic growth and stability.*** *Emery County acknowledges the existence of federal laws such as the Endangered Species Act, the National Environmental Policy Act, and the Federal Land Policy and Management Act under which federal land managers/agencies must work; as well as State statutes, regulations, and rules which define State agencies responsibilities regarding State managed land and resources (i.e., the Utah Forest Practices Act, UCA 65A-8a-et seq.). However, these laws also specifically identify opportunities for local governments to participate in public land management decision-making processes.* ***The County expects that federal and state agencies will consider and address the County's concerns, interests, and objectives as stated in the County's General Plan when fulfilling their responsibilities.***

   *In response to these interests and concerns, the County will:*
- *actively participate in all relevant State and Federal public land management decisions by serving as a cooperating agency in land use planning processes;*

- ***support multiple-use management by the BLM*** *and USFS in their properly adopted management plans;*

**Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales**
September 11, 2023
Page 4

- *support continued access to natural resources including but not limited to coal, natural gas, uranium, and gypsum;*
- *support continued access and development of lands managed by the School and Institutional Trust Lands Administration (SITLA) and other state lands;*
- *support responsible use of public land resources; and*
- *work to preserve and maintain public land access routes as adopted in the county travel plan.*

Section 8.7:  <u>Mineral and Energy Resource Extraction</u>

**Emery County supports the development of extraction industries.** *In practice, this is accomplished through a thoughtful and consistent application of the Conditional Use Permit process.* **Emery County recognizes the development rights associated with mineral leases and acknowledges the importance of these resources to local, State, and national economies.**

Section 8.8:  <u>Multiple-Use</u>

**Emery County's position is that public land should be managed under the "multiple-use and sustained yield" concept.** *Emery County's definition of multiple-use includes but is not limited to, traditional consumptive and non-consumptive uses such as grazing, all-season recreation, timber harvest, wilderness, mining,* **oil/gas exploration and development***, agriculture, wildlife, hunting, fishing, camping, historic and prehistoric cultural resources, and watershed. Single-use management is only acceptable when its need has been legitimately documented such that relevancy to Emery County is conclusive.*

**County industries such as agriculture, timber, grazing, tourism, and mining depend on the continued use, and availability of access to public land and its resources.** *Because decisions to alter the management, access, and use of these resources directly impact County interests, the County will be an active partner in the preservation, protection, and prudent management of our natural resources, including local cultural and heritage resources.*

Section 8.9:  <u>Action/Implementation Steps (Policies & Guidelines)</u>

*The County will actively participate in federal and state land management decisions by coordinating and cooperating in discussing public land issues/problems and possible solutions with land managers and other stakeholders.*

**Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales**
September 11, 2023
Page 5

Section 9.8:  <u>Mining and Mineral Resources</u>

**Emery County recognizes that the development of its abundant mineral resources is desirable and contributes to the economic well-being of the County, State and the nation. Federal and State public land laws as well as land management plans provide for comprehensive and continuous oversight of the administration of a mining system which allows for exploration and production of mineral resources on public lands throughout the country. Accordingly, it is the policy of Emery County to encourage responsible stewardship of the environment in conjunction with mineral exploration and development.** *The County supports mineral exploration and development on public lands that is:*

- *conducted subject to permits issued by jurisdictional agencies;*
- *consistent with County ordinances;*
- *consistent with local history, customs, traditions and culture;*
- *free from legally and scientifically invalid and unreasonable barriers;*
- *is consistent with the 1872 mining law;*
- *considers resource potential data that is available from industry, Utah Geological Survey, Department of the Interior, Department of Agriculture; and*
- *consistent with sound economic and environmental practices.*

Section 9.11:  <u>Special Designation Lands</u>

**Emery County believes it is possible to protect public lands without impacting its economy; that it can develop and expand its local economy without endangering the wilderness values present in some areas of the public lands.**

**Emery County supports the wise use, conservation, and protection of the nation's public lands and the resources associated with these lands, including prudent and appropriate management prescriptions established to achieve wise use**. *These prescriptions may include the designation of Wilderness.*

**Emery County supports multiple use relative to public and private recreational and cultural opportunities on special designation lands that are compatible with local customs, historic practices, and traditions. Land use in special designated lands should be managed within the constraints of private property rights**. *Given the significant number of acres within Emery County under public ownership and special designation, Emery County*

**Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales**
September 11, 2023
Page 6

*opposes the designation of buffer zones between special designation lands, multiple use lands, and private property.*

*Emery County finds that:*

1. ***Proposed designation and conservation actions relative to special designation lands should be coordinated with the County. Negative socioeconomic impacts to the County and/or its residents should be fully mitigated,*** *and should be found to be consistent with the County General Plan prior to designation by agencies, Congress, or the current administration;*

2. ***The County reserves its right and ability to coordinate planning and management processes with agencies based on the potential and actual consequences to the tax base and residents' continued interest in historic, traditional, cultural, economic, and natural resources;***

*Section 9.11.4.1:  Adjacent Private Lands and Land Management*

***The County affirms the ability of the County property owners to use and enjoy private lands located adjacent to Wilderness, Wilderness Study Areas, and all other special designation public lands.***

*Condemnation of private property in conjunction with designations of public lands should not be initiated, nor the imposition of involuntary conservation measures and/or easements for any purpose. Public lands should be managed according to its unique qualities, designations, and uses, not as interlinking parts of larger wholes or regions.* ***Emery County asserts that no protective perimeter or "buffer zone" exists around any Wilderness or Wilderness Study Area (WSA).***

***The fact that an activity or use, on land outside any Wilderness or WSA, can be seen or heard within the Wilderness or WSA, shall not preclude such activity or use outside.***

*Section 9.11.4.6:*  ***<u>Mineral Rights</u>*** *<u>and Claims</u>*

*Access to mining claims owned by individuals, groups, and businesses should not be restricted. Roads that exist at the time of designation that serve mining claims should not be closed, nor should the agencies unreasonably withhold use permits for access to such roads.*

DNR, Public Lands Policy Coordinating Office, 1594 W North Temple, #320, PO Box 145610, Salt Lake City, Utah 84114 · 385-228-8443

**Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales**
September 11, 2023
Page 7

Conclusion:  Affirming the 59 leases as proposed in Alternative A and in the Finding of No Significant Impact is the only alternative consistent with the Emery CRMP. Alternative B, which would affirm only 10 of the 59 leases, and Alternative C, which would cancel all 59 leases, would not be consistent with the Emery CRMP.

## IV. Consistency with the State of Utah Resource Management Plan (SRMP)

The BLM is required to make land use decisions in a manner consistent with state plans, to the greatest extent possible, consistent with federal law.  Section 1.5.1 of the Supplemental Analysis recognizes the Utah SRMP and the state policies promoting energy development.  The energy chapter, petroleum subsection, of the SRMP states that: *"One of Utah's goals is to ensure the state's continued economic development through access to its own clean and low-cost energy resources. This will allow the state to meet projected energy growth demands by making balanced use of fossil fuels and renewable resources in market-driven, cost-effective, and environmentally responsible ways.*

- *Support for continued traditional energy development from oil and gas is essential to the state's energy plan. That* plan *calls on the state to:*
    - *Facilitate the expansion of responsible development of Utah's energy resources, including traditional, alternative, and renewable sources.*
    - *Pursue opportunities for Utah to export fuels, electricity, and technologies to regional and global markets."*

The energy chapter, natural gas subsection, of the SRMP states that: *"Energy development is of particular importance in Utah because of the associated capital investment, job creation, and revenue. A strong natural gas industry contributes to Utah's historically low energy costs and provides a foundation for success across all industrial sectors statewide.*

*Support for continued natural gas development in Utah is a major component of the state's energy plan. The benefits of developing this abundant and clean resource will continue to play a key role in Utah's economic future and the nation's energy independence. Technologies continue to emerge that are allowing energy producers to access significant and growing supplies of domestic natural gas from shale formations and other unconventional reservoirs."*

Conclusion:  Affirming the 59 leases as proposed in Alternative A and in the Finding of No Significant Impact is the only alternative consistent with the Utah SRMP.  Alternative

**Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales**
September 11, 2023
Page 8

B, which would affirm only 10 of the 59 leases, and Alternative C, which would cancel all 59 leases, would not be consistent with the Utah SRMP.

## V.    Wildlife

The Division of Wildlife Resources ("DWR") provided wildlife information during the 2018 analysis. DWR appreciates the incorporation of recommended crucial time periods for wildlife within the lease parcels. DWR recommends maintaining crucial wildlife time frames in the Supplemental Analysis of the September and December 2018 Oil and Gas Lease Sales Environmental Assessment. The assessment aligns with the state's Wildlife Action Plan, Utah Pronghorn Statewide Management Plan, and DWR's Strategic Plan to conserve wildlife and their habitats.

If you have wildlife questions, please contact the DWR's Impact Analysis Biologist in DWR's Price office, Kade Lazenby, at klazenby@utah.gov or 435-820-6015.

## VI.    Adequacy of the Supplemental NEPA Analysis

Pursuant to the settlement agreement, the BLM has provided further NEPA analysis to address Air Quality, Greenhouse Gas and Social Cost of Carbon, Socioeconomics/Environmental Justice, Lands with Wilderness Characteristics, Wilderness, Soundscapes, Visual Resources, Night Skies, Recreation, Transportation, and Access.

The State has reviewed the EA and FONSI and finds that the BLM did take the required hard look at these potentially impacted resources and conditions and properly found that the affirmation of the 59 leases would not be anticipated to have significant negative impacts on the environment. Compliance with the National Historic Preservation Act and the Endangered Species Act has been demonstrated.

Knowing the lack of drilling success in this area, the reasonably foreseeable development assumption of only eight wells and approximately 83.2 acres of surface disturbance seems reasonable if further exploration provides an incentive to drill. No Surface Occupancy (NSO) and Controlled Surface Use (CSU) stipulations lessen the potential environmental impacts as will additional stipulations and lease notices. If Applications for

**Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales**
September 11, 2023
Page 9

Permits to Drill (APDs) are received by the BLM, an additional environmental review will occur at that time, and mitigation measures will be applied.

     The predicted 83.2 acres of surface disturbance amounts to only 0.11 percent of the lands with wilderness characteristics in the area.  If the leases are developed, local roads will be improved, which would provide safer access for recreationists in the future.

     Thank you for the opportunity to review the Supplemental Analysis of the September and December 2018 Oil and Gas Lease Sales and to submit comments.  The State encourages the BLM to move forward with its decision to select Alternative A and defend such action, should challenges arise, as this is the only Alternative that is consistent with local and state resource management plans.

     Please contact this office to discuss any further questions or concerns.

     Sincerely,

     Redge B. Johnson
     Director