## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, | |
| Plaintiff, | Case No. 1:24-cv-02476-RC |
| v. | Judge Rudolph Contreras |
| **U.S. DEPARTMENT OF THE INTERIOR**, *et al*., | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

GLOSSARY OF TERMS ............................................................................................... vi

INTRODUCTION ........................................................................................................... 1

LEGAL BACKGROUND ............................................................................................... 3

I.      Mineral Leasing Act .......................................................................................... 3

II.     National Environmental Policy Act ................................................................... 3

III.    BLM's Oil and Gas Planning and Management Framework ............................ 5

STATEMENT OF FACTS .............................................................................................. 6

I.      The San Rafael Desert ....................................................................................... 6

II.     Price Field Office Resource Management Plan .................................................. 9

III.    BLM's Master Leasing Plan Policy and the San Rafael Desert Master Leasing Plan ..... 10

      A.      BLM's 2010 Oil and Gas Leasing Reforms ........................................ 10

      B.      The Trump Administration's "Energy Dominance" Agenda .............. 13

IV.    The Interior Department and BLM Identified Many Problems with the BLM's Broken Oil and Gas Leasing Program; BLM's Subsequent Leasing Reforms................... 15

V.     SUWA's Prior Litigation and Settlement Agreement with BLM..................... 16

VI.    The Supplemental NEPA Analysis.................................................................. 17

STARDARD OF REVIEW ........................................................................................... 19

ARGUMENT ................................................................................................................. 20

I.      BLM Failed to Provide a Reasoned Explanation Prior to Abandoning the MLP Policy or San Rafael Desert MLP ....................................................................................... 20

      A.      The Finality of The San Rafael Desert MLP is Immaterial ................. 22

      B.      BLM's MLP Process Was Designed to Provide Missing Scrutiny and Analysis. 22

      C.      BLM's Abandonment of the San Rafael Desert MLP Process Was Arbitrary and Capricious ................................................................................................ 29

II.     BLM Failed to Prepare NEPA Analysis Prior to Abandoning the MLP Policy............... 34

III.    BLM Did Not Sufficiently Consider Pronghorn Antelope in the Reevaluation EA......... 39

      A.      New Information and Changed Circumstances Regarding Pronghorn................. 39

      B.      Failure to Take a "Hard Look" at the Foreseeable Impacts to Pronghorn............ 41

## TABLE OF AUTHORITIES

**Cases**

*AFGE v.. FLRA,*
    25 F.4th 1 (D.C. Cir. 2022) ............................................................... 31

*\*Am. Wild Horse Preserv. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ................................................. passim

*Amerijet Intern. Inc. v. Pistole,*
    753 F.3d 1343 (D.C. Cir. 2014) ................................................. 29, 33

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
    462 U.S. 87 (1983) ............................................................................. 5

*Bauer v. DeVos,*
    325 F. Supp. 3d 74 (D.D.C. 2018) ................................................... 30

*Cal. ex rel. Lockyer v. U.S. Dep't. of Agric.,*
    575 F.3d 999 (9th Cir. 2009) ...................................................... 35, 38

*\*Citizens for Clean Energy v. U.S. Dep't. of the Interior,*
    384 F. Supp. 3d 1264 (D. Mont. 2019) ............................. 35, 36, 37, 38

*Ctr. for Biological Diversity v. U.S. Dep't. of the Interior,*
    72 F.4th 1166 (10th Cir. 2023) .......................................................... 3

*Diné Citizens Against Ruining Our Env't v. Bernhardt,*
    923 F.3d 831 (10th Cir. 2019) .......................................................... 44

*Dist. of Columbia v. U.S. Dep't. of Agric.,*
    496 F. Supp. 3d 213 (D.D.C. 2020) ................................................. 30

*Doe v. Mayorkas,*
    585 F. Supp. 3d 49 (D.D.C. 2022) ................................................... 31

*\*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ............................................................ 19, 30, 34

*\*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..................................................... 19, 21, 29, 34

*Fund for Animals v. Babbitt,*
    903 F. Supp. 96 (D.D.C. 1995) ........................................................ 19

*Grace v. Barr,*
    965 F.3d 883 (D.C. Cir. 2020) ......................................................... 30

*Grand Canyon Trust v. FAA*,
290 F.3d 339 (D.C. Cir. 2002) ............................................... 35, 38, 43

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022) ............................................... 30

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ............................................... 3

*Miso Transmission Owners v. FERC*,
45 F.4th 248 (D.C. Cir. 2022) ............................................... 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................... 19, 29, 30

*Organized Vill. of Kake v. U.S. Dept. of Agric.*,
795 F.3d 956 (9th Cir. 2015) ............................................... 29, 32

*Physicians for Soc. Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) ............................................... 30

*Richards v. I.N.S.*,
554 F.2d 1173 (D.C. Cir. 1977) ............................................... 19

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ............................................... 4

*S. Utah Wilderness All. v. Bernhardt*,
512 F. Supp. 3d 13 (D.D.C. 2021) ............................................... 2

*Sierra Club v. Peterson*,
717 F.2d 1409 (D.C. Cir. 1983) ............................................... 4, 6, 42

*Sierra Club v. Van Antwerp*,
661 F.3d 1147 (D.C. Cir. 2011) ............................................... 5

*Southwest Airlines Co. v. FERC*,
926 F.3d 851 (D.C. Cir. 2019) ............................................... 30

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) ............................................... 35

*Tomac v. Norton*,
433 F.3d 852 (D.C. Cir. 2006) ............................................... 43

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ............................................... 4

*W. Watersheds Project v. Zinke*,
336 F. Supp. 3d 1204 (D. Idaho 2018) ............................................... 14, 18

*WildEarth Guardians v. Bernhardt*,
502 F. Supp. 3d 237 (D.D.C. 2020) ............................................... 5

iv

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ................................................. 4, 5, 42

**Statutes**

5 U.S.C. § 706 .......................................................................................... 2, 19

30 U.S.C. § 187 ............................................................................................... 3

30 U.S.C. § 226 ............................................................................................... 3

42 U.S.C. § 4332 ....................................................................................... 4, 35

43 U.S.C. § 1712 ............................................................................................. 5

**Regulations**

40 C.F.R. § 1500.1 (2024) ............................................................................... 3

40 C.F.R. § 1501.3 (2024) ............................................................................. 35

40 C.F.R. § 1501.5 (2024) ............................................................................... 4

40 C.F.R. § 1501.6 (2024) ............................................................................... 4

40 C.F.R. § 1502.1 (2024) ............................................................................... 4

40 C.F.R. § 1508.1 (2024) ....................................................................... 4, 35

43 C.F.R. § 1610.5-3 ...................................................................................... 5

43 C.F.R. § 3101.12 ........................................................................................ 6

43 C.F.R. § 3162.3-1 ...................................................................................... 6

43 C.F.R. §§ 3120-3120.73 ............................................................................ 5

**Other Authorities**

Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 2021) ............................... 15

Exec. Order No. 13783, 82 Fed. Reg. 16093 (March 31, 2017) .............. 14, 29

Notice of Intent To Prepare a Master Leasing Plan, Amend the Resource Management Plans for
    the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment,
    Utah, 81 Fed. Reg. 31252 (May 18, 2016) ........................... 11, 12, 16, 18

Notice of Termination of the San Rafael [Desert] Master Leasing Plan, Utah, 83 Fed. Reg. 32681
    (July 13, 2018) ....................................................................................... 15

Sec'y of the Interior, Order No. 3354 (July 5, 2017) ............................... 14, 29

Sec'y of the Interior, Order No. 3398 (April 16, 2021) ................................. 15

U.S. Dep't of the Interior, Instruction Memorandum No. 2021-027, Oil and Gas Leasing – Land
    Use Planning and Lease Parcel Reviews (April 30, 2021) ....................... 15

## GLOSSARY OF TERMS

APA                Administrative Procedure Act

APD                Application for Permit to Drill

BLM                Bureau of Land Management

BMP                Best Management Practices

DR                 Decision Record

EA                 Environmental Assessment

EIS                Environmental Impact Statement

FONSI              Finding of No Significant Impact

IM 2010-117        Instruction Memorandum No. 2010-117

IM 2018-34         Instruction Memorandum No. 2018-034

LWC                Lands with Wilderness Characteristics

MLP                Master Leasing Plan

NEPA               National Environmental Policy Act

NSO                No Surface Occupancy

RFDS               Reasonably Foreseeable Development Scenario

RMP                Resource Management Plan

## **INTRODUCTION**

Federal Defendants (collectively, "BLM") manage more than 525,000 acres of public land in the San Rafael Desert—a stunning area of southeastern Utah wild lands that is nestled between Canyonlands National Park, several congressionally designated Wilderness areas, Goblin Valley State Park, and the Labyrinth Canyon stretch of the Green River.[1] BLM manages the area pursuant to the Price Field Office Resource Management Plan ("Price RMP").

In the Price RMP, BLM identified the vast majority of the San Rafael Desert as open for oil and gas leasing and development subject to the least restrictive stipulations required by law. However, BLM subsequently determined that new information "required" additional analysis before any leasing could take place in the San Rafael Desert. In accordance with the national policy in place at the time, BLM began to prepare a "master leasing plan" ("MLP")—a review process intended to provide additional planning and analysis prior to issuing new oil and gas leases in areas where, as here, the operative RMP was outdated. BLM prohibited leasing in the San Rafael Desert from 2010-2017 while this planning effort was underway. All of this changed in 2018 when BLM, hewing closely to the Trump Administration's "energy dominance" agenda, abruptly ended the nationwide MLP policy, abandoned the San Rafael Desert MLP effort, and proceeded in 2018 to sell 77 new oil and gas leases across more than 200,000 acres in the former MLP area without undertaking the analysis the agency previously maintained was required.[2] The only rationale BLM offered for its about-face was the claim that the MLP policy created "duplicative" layers of review.

---

[1] A map of the area and leases at issue in this litigation is attached as Exhibit 1. SUWA prepared this map using publicly available information and data. It is intended solely to assist the Court in identifying the challenged leases and their location in the San Rafael Desert.
[2] Thirty-five of the leases sold in 2018 are at issue in this litigation.

In December 2020, Plaintiff Southern Utah Wilderness Alliance ("SUWA") challenged BLM's 2018 leasing decisions. *See generally S. Utah Wilderness All. v. Bernhardt*, 512 F. Supp. 3d 13 (D.D.C. 2021). Rather than respond to SUWA's motion for summary judgment, BLM and SUWA entered a settlement agreement ("Settlement Agreement") that required the agency to: (1) prepare a supplemental analysis of the 2018 leasing decisions under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331-4370m-12; and (2) conduct an analysis similar to the MLP process—*i.e.*, the process that, until 2018, BLM considered necessary to inform its oil and gas leasing decisions in the San Rafael Desert—and through that evaluation, consider whether it "is necessary or appropriate" to amend or modify the Price RMP by "rebalancing resource allocations", "add[ing] or modify[ing] lease stipulations", and/or "cancel[ing]" the 2018 leases.

In 2024, BLM issued its supplemental NEPA analysis ("Reevaluation EA") in which the agency reaffirmed its decision to issue the 2018 leases. However, the Reevaluation EA failed to satisfy BLM's obligations under NEPA, its implementing regulations, the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, and the Settlement Agreement. For example, BLM limited the scope of the impacts analysis to include only <u>some</u> of the resource values required by the Settlement Agreement. Moreover, at no point in either the Reevaluation EA or any other decision document did BLM "consider whether a [RMP] amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations"—the precise issue identified in the Agreement and required by the San Rafael Desert MLP process before the agency could resume leasing in the area.

Regarding the agency's decision to abandon the San Rafael Desert MLP, BLM merely repeated its prior Trump-era response that the MLP process created duplicative layers of review. At no time did BLM explain how the thousands of pages of data, information, studies and

analysis—which all pointed to the need for additional programmatic review of leasing in the San Rafael Desert—were no longer relevant or necessary. In short, BLM papered over its 2018 leasing analysis and rubberstamped the prior decisions.

Because BLM's new decision violates federal law, SUWA respectfully requests the Court declare BLM's decision to be arbitrary and capricious, set aside and vacate the leases that are the subject of this case, and enjoin any development of those leases.

## LEGAL BACKGROUND

### I.    Mineral Leasing Act

Under the Mineral Leasing Act, 30 U.S.C. §§ 181-287, as amended, the Secretary of the Interior is responsible for the "safeguarding of the public welfare" while managing and overseeing mineral development on public lands. *Id.* § 187. The Secretary has discretion to determine where, when, and under what terms and conditions mineral leasing and development should occur on BLM-managed lands. 30 U.S.C. § 226(a).

### II.   National Environmental Policy Act

NEPA is the "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a) (2024).[3] NEPA's fundamental objective is to ensure that an "agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (citations omitted). "Under NEPA, agency decisionmakers must identify and understand the environmental effects of proposed actions, and they must inform the public of those effects so that it may 'play a role in both the

---

[3] Over the past several years, the NEPA regulations have been subject to modifications and revocation. SUWA cites to the 2024 version of the regulations, which was the version in effect at the time BLM issued its decision. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Dep't. of the Interior*, 72 F.4th 1166, 1178, n.6 (10th Cir. 2023).

decisionmaking process and the implementation of the agency's decision.'" *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 52 (D.D.C. 2019) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)) (alteration marks omitted). In essence, NEPA was designed "to insure a fully informed and well-considered decision[.]" *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

"NEPA requires an agency to evaluate the environmental effects of its action at the point of commitment." *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983). This includes a cumulative impacts analysis to address "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions." 40 C.F.R § 1508.1(g)(3).

NEPA requires an agency to prepare a detailed environmental impact statement ("EIS") before undertaking any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the agency is unsure whether it needs to prepare an EIS, it instead may prepare an environmental assessment ("EA"). 40 C.F.R. §§ 1501.5, 1508.1(j). While less comprehensive than an EIS, an EA must nonetheless analyze the effects of a proposed action and reasonable alternatives to the proposal. *Id.* § 1501.5(c). Should an agency determine in the EA that significant effects may occur, it must prepare an EIS. *Id.* § 1502.1. Otherwise, the agency issues a Finding of No Significant Impact ("FONSI") and Decision Record ("DR") that signals the end of NEPA analysis for that action. *Id.* § 1501.6.

When reviewing a FONSI, courts in this Circuit assesses whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or EA], (3) is able to make a convincing case for its [FONSI], and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*WildEarth Guardians*, 368 F. Supp. 3d at 80 (quoting *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011)). The "hard look" requirement ensures that the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 98 (1983).

## III.    BLM's Oil and Gas Planning and Management Framework

BLM manages onshore oil and gas development through a three-stage process: (1) land use planning; (2) leasing; and (3) approval of drilling permits. *See WildEarth Guardians*, 368 F. Supp. 3d at 54.

*First*, pursuant to the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–1787, BLM develops a broad-scale RMP which, relevant here, specifies which lands will be available (or not) for oil and gas leasing, and the stipulations and conditions that may be placed on any such development. *See id.* § 1712(a). An RMP does not mandate the leasing of any specific lands for oil and gas development. In the RMP process, BLM typically prepares a "reasonably foreseeable development scenario" ("RFDS"), which serves as a long-term projection of oil and gas activity for an area of public lands over a particular timeframe. *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 243 (D.D.C. 2020) (discussing RFDSs in the context of the three-stage process). An RFDS neither mandates future development, nor analyzes or discloses environmental impacts. Instead, it predicts future development based "largely on local geology, current and historical trends . . . and forecasts" of energy markets. AR005227 (RFDS for the San Rafael Desert MLP).

*Second*, BLM may offer leases for the development of specific tracts of public lands. *See* 43 C.F.R. §§ 1610.5-3, 3120-3120.73. BLM has considerable discretion to determine which

lands will be offered for lease, and is not obligated to lease any particular tract of public land. For leases that do not contain so-called no-surface occupancy ("NSO") stipulations ("non-NSO leases"), once sold BLM lacks the authority to entirely preclude surface disturbance on the leasehold. *Id.* § 3101.12; *see also Peterson*, 717 F.2d at 1414. Thus, the issuance of a non-NSO lease is the point at which BLM engages in an irreversible and irretrievable commitment of resources. *Id.*

*Third*, after a parcel has been leased, the lessee may submit and BLM may approve an application for permit to drill ("APD"), which authorizes drilling and development of the lease parcel. 43 C.F.R. § 3162.3-1(c). An APD may include or be accompanied by a surface use plan of operations, rights-of-way application, and/or a request for authorizations which together detail proposed pipelines, roads, well pads, and other related facilities and activities. *Id.* § 3162.3-1(d).

## STATEMENT OF FACTS[4]

## I.     The San Rafael Desert

The San Rafael Desert is a sublime area of Utah's backcountry. The greater San Rafael Desert contains many unique and remarkable resource values. For example, it is home to one of the most astonishing and diverse arrays of native pollinators (*e.g.*, bees, wasps) in North America, including 68 endemic bee species. AR011138. BLM has recognized that the San Rafael Desert's unique sand dune landscape provides valuable habitat for pollinators and that it contains more "bee genera . . . than [exists] in all of New England." AR011138-39. Indeed, despite covering only two percent of Utah, the San Rafael Desert is home to one-third of the state's bee species. AR011139.

---

[4] A timeline of relevant events discussed herein is attached as Exhibit 2.

The San Rafael Desert is also home to diverse wildlife, including mule deer, pronghorn antelope, desert bighorn sheep, burrowing owl, golden eagle, Peregrine falcon, as well as species listed under the Endangered Species Act such as the Mexican spotted owl, southwestern willow flycatcher, and yellow-billed cuckoo. AR011131-40.

The San Rafael Desert includes some of the most remote, wild, and rugged landscapes in the nation. For example, the Labyrinth Canyon Wilderness is centered around Labyrinth Canyon, which is rimmed with towering spires and colorful sandstone walls.



(Labyrinth Canyon Wilderness. Lease UTU-93713, which is at issue in this litigation is located in the area highlighted by the red box)

Labyrinth Canyon is located at the eastern edge of the San Rafael Desert and abuts the Green River as it flows south toward its confluence with the Colorado River in the heart of nearby Canyonlands National Park. *See* AR000555 (map of the San Rafael Desert and leases at issue in this lawsuit). The Labyrinth Canyon Wilderness "includes a vast scenic landscape of high, flat sagebrush-covered ridges and mesas combined with slick rock escarpments and sandstone canyons that flow east into the Green River." AR000645. Far from the beaten path, "[v]isitation is lower than at many other surrounding areas of public lands . . . providing

7

outstanding opportunities for experiencing solitude." *Id.* "Outstanding primitive recreation

opportunities include camping, hiking, backpacking, climbing, and canyoneering*." Id.*

"Supplemental values" in the Wilderness "include outstanding scenery, Colorado Plateau

geology, cultural sites, riparian areas, and wildlife habitat." *Id.*

        In addition to designated Wilderness Areas, BLM has identified more than 250,000 acres

within the San Rafael Desert as "lands with wilderness characteristics" ("LWC").[5] AR011142-

43. The majority of the leases at issue in this case are within these wilderness-quality lands,

including among others, the San Rafael River and Sweetwater Reef LWC areas. AR000634 (48

of the 59 leases considered in BLM's NEPA analysis overlap LWC).

        The San Rafael River LWC area is part "of the San Rafael Desert[] [and] is made up of a

variety of geographic features ranging from stabilized sand dunes, incised slick rock canyons,

and expanses of brush-grasslands." AR011144. It is a "unique natural desert ecosystem of dry

washes, oak brush-stabilized sand dunes and endemic black brush flats [that] offers exemplary

opportunities for primitive and unconfined recreation opportunities while viewing wildlife in a

landscape of huge skies, varied geologic forms, and unique isolated riparian systems."

AR011144.

        The Sweetwater Reef LWC area contains similar values, as well as "extensive

undocumented cultural resources" and a "variety of geographic features ranging from stabilized

sand dunes, incised slick rock canyons, and expanses of brush-grasslands to the uplifted

Sweetwater Reef." AR011143. It is an area that "offers opportunities for viewing wildlife in a

---

[5] LWC areas are BLM-managed public lands that BLM has determined are eligible for
congressional wilderness designation due to their naturalness (*e.g.*, lack human development),
and "outstanding" opportunities for solitude and/or primitive types of recreation (*e.g.*, camping,
hiking, wildlife viewing). AR011141-42.

landscape of huge skies, varied geologic forms, and unique isolated riparian systems."
AR011143.



(Moonshine Wash in the San Rafael Desert. Copyright Ray Bloxham/SUWA)

## II.     Price Field Office Resource Management Plan

In 2008, BLM finalized the Price RMP. AR003142-3323. The Price RMP designated the

public lands in the planning area as either "open" or "closed" to oil and gas leasing and

development and, where open, established the terms and conditions for future development.

AR003279. The majority of the public lands covered by the RMP, including the San Rafael

Desert, were designated as open to leasing, subject to "standard terms and conditions"—that is,

open to leasing and development subject to the least environmentally protective stipulations and

notices. AR003279; AR015355.

The Price RMP identified habitat for pronghorn antelope. AR015409; AR003323.[6] With

regard to the San Rafael Desert, the Price RMP identified the area as containing "high"[7] and

"substantial"[8] value habitat for the species. AR015405. As discussed *infra*, following completion

of the Price RMP, BLM determined—based on new information and data—that the San Rafael

Desert actually contains "crucial year-long habitat" for pronghorn.[9] The Price RMP neither

identified nor required lease stipulations or notices for crucial year-long pronghorn habitat in the

San Rafael Desert—because that resource had not yet been identified.

As part of its work leading up the Price RMP, BLM prepared an RFDS for the Price Field

Office, which predicted that 1,540 wells would be drilled in the planning area over a twenty-year

period. AR003132-3141.

## III.    BLM's Master Leasing Plan Policy and the San Rafael Desert Master Leasing Plan

### A.    BLM's 2010 Oil and Gas Leasing Reforms

In 2010, BLM implemented nationwide oil and gas leasing reforms to change how the

agency offered and sold leases and approved development on BLM-managed public lands

(herein, "IM 2010-117"). AR010474-82; AR010662-70. Importantly, BLM's reforms included a

policy of preparing MLPs, a specific type of land use plan amendment. AR010476-77. MLPs

---

[6] BLM did not include the Price RMP maps in the administrative record. However, Map R-8 is available at https://tinyurl.com/Price-RMP-Map-8 (last visited April 24, 2025). The Court may take "judicial notice of information posted on official public websites of government agencies." *Pharmaceutical Research & Mfgrs. of Am. v. U.S. DHHS*, 43 F. Supp 3d 28, 33 (D.D.C. 2014) (Contreras, J.).
[7] The Price RMP defines "high value" as "an area that provides for intensive use by the species." AR013997.
[8] The Price RMP does not define this term.
[9] The Price RMP defines "crucial" habitat as "habitat on which the local population of a wildlife species depends for survival because there are no alternative ranges or habitats available. Crucial habitat is essential to the life-history requirements of a wildlife species." AR013998. The RMP explained that the "[d]egradation or loss of crucial habitat will lead to significant declines in the wildlife population in question." AR013998.

were a "mechanism for completing the additional planning, analysis, and decision-making that

may be necessary for areas meeting" established criteria, such as areas where "[a]dditional

analysis or information is needed to address likely resource or cumulative impacts if oil and gas

development were to occur[.]" AR010476. If an area met the criteria, BLM's policy "required"

that the agency prepare an MLP. *Id.*

Importantly, the MLP process was to be "conducted <u>before</u> lease issuance" and "through

the NEPA process." *Id.* (emphasis added). The MLP was intended to "reconsider RMP decisions

pertaining to [oil and gas] leasing" in part by "analyz[ing] likely development scenarios and

varying mitigation levels." *Id.* The MLP process and accompanying NEPA review was therefore

intended to provide a programmatic review of leasing decisions (and their alternatives) with an

eye towards resolving resource conflicts <u>before</u> it is too late, as opposed to an abbreviated site-

specific review of the impacts of a particular leasing decision.

As part of BLM's 2010 reforms, it established a Utah-specific "Oil and Gas Leasing

Reform Implementation Plan." AR010182-208. BLM also determined that several MLPs were

required in Utah, and established the 525,000-acre San Rafael Desert MLP area.[10] *See generally*

Notice of Intent To Prepare a Master Leasing Plan, Amend the Resource Management Plans for

the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment,

Utah, 81 Fed. Reg. 31252 (May 18, 2016); *see also* AR011400-09 (Updated Utah BLM MLP

strategy). At that time, BLM explained "[t]he [San Rafael Desert] MLP process will provide

additional planning and analysis for [the] area[] <u>prior to new leasing of oil and gas resources</u>." 81

---

[10] BLM finalized MLPs in other areas across the west. For instance, the "Moab Master Leasing Plan," also in Utah, closed hundreds of thousands of acres of public lands adjacent to and near Canyonlands and Arches National Parks to oil and gas leasing and development. *See* AR015495-690.

Fed. Reg. at 31253 (emphasis added). This planning process, when completed, would provide a

"guiding framework for the development of the area and . . . a vision for how future development

will proceed." AR010662 (BLM's Fluid Mineral Leasing Handbook).

BLM identified numerous issues that required additional analysis in the San Rafael

Desert area, including soil and water resources, wildlife, night skies, cultural resources, and

wilderness characteristics. 81 Fed. Reg. at 31253; AR010537 (same). BLM further explained that

this analysis was required "before new mineral leasing and development are allowed" in the San

Rafael Desert. AR010906 (emphasis added); AR011012 ("additional planning and analysis are

warranted prior to allowing new mineral leasing and development") (emphasis added).

In 2015, BLM began preparing its NEPA analysis for the San Rafael Desert MLP, which

included, among other things: a comprehensive review of potential alternatives (including

changes to what lands would be available or closed to mineral leasing);[11] new and updated lease

stipulations and lease notices that would be applied to all new leases, AR010921-969; new and

updated "best management practices" ("BMPs") for all future development activities in the MLP

area, AR010609-17; a multi-year report on LWC;[12] and a San Rafael Desert-specific RFDS,

AR005222-54. Based on this information, BLM prepared a draft EA and released it for public

review and comment. AR011000-11399 ("San Rafael Desert MLP EA").

BLM's draft San Rafael Desert MLP EA acknowledged that the agency was obligated to

prepare the MLP to address new information and changed circumstances, including new

---

[11] Bureau of Land Mgmt., *San Rafael Desert Master Leasing Plan: Preliminary Alternatives* (2015), *available at* https://tinyurl.com/SRD-MLP-Alternatives (last visited April 24, 2025); Bureau of Land Mgmt., *San Rafael Desert Master Leasing Plan: Alternatives Summary* (2015), *available at* https://tinyurl.com/SRD-MLP-Alternatives-Summary (last visited April 24, 2025).
[12] Bureau of Land Mgmt., *San Rafael Desert Lands with Wilderness Characteristics Inventory* (2016), *available at* https://tinyurl.com/SRD-LWC-Inventory (last visited April 24, 2025).

pronghorn habitat data from the Utah Division of Wildlife Resources and the San Rafael Desert MLP RFDS. AR011012; *see also* AR010476 (IM 2010-117 explaining that MLPs may be required due to "changing circumstances, updated policies, and new information"). BLM emphasized that this new information had to be analyzed and disclosed in the EA "prior to new leasing of oil and gas within the planning area." AR011012.

The agency invited public comments on the draft San Rafael Desert MLP EA and held open house meetings to inform the public about the need for the MLP. BLM explained in a fact sheet that "MLPs are required in areas with sensitive resources, such as the San Rafael Desert." AR010536. BLM received hundreds of public comments, including from SUWA. Additionally, the United States Environmental Protection Agency and the National Park Service submitted comments supporting the MLP and recommending specific resource values that warranted further analysis. *See, e.g.*, AR010907-920.

For over seven years while BLM's MLP policy was in place, the agency did not offer a single lease for development in the San Rafael Desert MLP area (or in any other proposed MLP area in Utah). As BLM's Utah State Director explained in 2015: "BLM-Utah has deferred new leasing proposals submitted for all lands within the pending MLPs in order to preserve potential alternatives for those plans." AR011401.

But BLM did not complete the San Rafael Desert MLP, or make the pre-leasing decisions it had determined were necessary because, as discussed below, the agency abandoned that process mid-step in its haste to align itself with the Trump Administration's "energy dominance" agenda.

B.    **The Trump Administration's "Energy Dominance" Agenda**

Shortly after taking office in 2017, President Trump issued Executive Order No. 13783, "Promoting Energy Independence and Economic Growth." 82 Fed. Reg. 16093 (March 31,

13

2017). This Order required federal agencies, including BLM, to "review all existing . . . orders, guidance documents, policies, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil [and] natural gas[.]" *Id.* Based on this Executive Order, then-Secretary of the Interior Ryan Zinke issued Secretarial Order 3354, which directed BLM to "identify additional steps to enhance exploration and development of Federal onshore oil and gas resources." Sec'y of the Interior, Order No. 3354, at 1 (July 5, 2017) ("Secretarial Order 3354").[13] It further required that BLM "identify any provisions in [its] existing policy and guidance documents that would impede BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration and development of Federal onshore oil and gas resources." *Id.* at 2; *see also* AR000548 (citing Secretarial Order 3354).

In response, BLM issued Instruction Memorandum No. 2018-034 ("IM 2018-34"), which replaced BLM's 2010 leasing reform policies and established a framework for how BLM would implement the Trump Administration's "energy dominance" agenda. AR005608-17. The main focus of this framework was to eliminate or curtail environmental review, agency oversight, and public involvement. *See generally W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204 (D. Idaho 2018) (holding that numerous provisions of IM 2018-34 violated federal law).

IM 2018-34 scrapped the nationwide MLP process and stopped BLM's work on the San Rafael Desert MLP EA in its tracks. AR005610. BLM's only explanation for this wholesale policy reversal was to cite Executive Order 13783 and Secretarial Order 3354, and conclude that "[MLPs] . . . have created duplicative layers of NEPA review. This policy, therefore, eliminates the use of MLPs." AR005610 (emphasis added). When BLM ended the San Rafael Desert MLP

---

[13] *Available at* https://tinyurl.com/SO-3354 (last visited April 24, 2025).

process, it merely stated: "The preparation of [the San Rafael Desert MLP EA] is <u>no longer required</u>, and the process is hereby terminated." Notice of Termination of the San Rafael [Desert] Master Leasing Plan, Utah, 83 Fed. Reg. 32681 (July 13, 2018) (emphasis added).

With the perceived "burdens" of environmental analysis, agency oversight, and public participation eliminated, BLM proceeded to offer, sell, and issue hundreds of oil and gas leases in former MLP areas in Utah, including the leases in the San Rafael Desert here at issue.

## IV.    The Interior Department and BLM Identified Many Problems with the BLM's Broken Oil and Gas Leasing Program; BLM's Subsequent Leasing Reforms

Following the 2021 presidential election, the Biden Administration quickly rescinded all aspects of the Trump Administration's energy dominance agenda as contrary to federal laws and principles of informed agency decision-making. Exec. Order No. 13990, 86 Fed. Reg. 7037, 7041 (Jan. 2021) (revoking Executive Order 13783); Sec'y of the Interior, Order No. 3398 § 4 (April 16, 2021) (revoking Secretarial Order No. 3354);[14] U.S. Dep't of the Interior, Instruction Memorandum No. 2021-027, Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews (April 30, 2021) (revoking and superseding IM 2018-34).[15]

The Interior Department conducted a review of its oil and gas program—the same program in effect when the challenged leases were first sold in 2018—and concluded that it suffered from systemic problems. AR010618-35. Specifically, the oil and gas program "inadequately account[ed] for environmental harms to lands, waters and other resources; foster[ed] speculation by oil and gas companies . . .; [and] extend[ed] leasing into low potential lands that may have competing higher value uses[.]" AR010620.

---

[14] *Available at* https://tinyurl.com/SO-3398 (last visited April 24, 2025).
[15] *Available at* https://tinyurl.com/IM-2021-027  (last visited April 24, 2025).

The Interior Department identified several key areas for review, AR010621, and concluded that, at its core, "a fundamental rebalancing of the Federal oil and gas program" was necessary. AR010623. Among other recommendations, the report explained that the leasing of "low potential" lands for oil and gas development fosters unwarranted speculation and should be avoided. AR010629-30. BLM subsequently issued new directives to implement these recommendations. AR10583-84; AR10605-08.

Despite this new information and agency directives, BLM refused in the Reevaluation EA to follow its new guidance and instead relied on unlawful and withdrawn Trump-era leasing policies to double down on its 2018 leasing decisions.

**V.     SUWA's Prior Litigation and Settlement Agreement with BLM**

Shortly after SUWA filed its motion for summary judgment, *see generally* Mot. for. Summ. J., *S. Utah Wilderness All. v. Bernhardt*, 1:20-cv-3654-RC (May 14, 2021) (ECF No. 56), SUWA and the BLM negotiated the Settlement Agreement to resolve the litigation. AR010486-92. The Agreement required BLM to take two primary actions. *First*, BLM committed to prepare a supplemental NEPA analysis, which would analyze and disclose the same resource values that would have been analyzed in the San Rafael Desert MLP. AR010488 (Section 1 of the agreement). *Second*, as part of that supplemental analysis, BLM committed to "consider whether a [RMP] amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations." AR010488 (Section 2 of the agreement).

In short, the Agreement required BLM to disclose and analyze the same resource value impacts and pre-leasing issues that would have been considered by BLM had the agency not jettisoned the San Rafael Desert MLP in 2018. *Compare* AR010488 (settlement agreement), *with* 81 Fed. Reg. at 31253 (identifying the same resource values for analysis); AR011012-15 (same), *and* 81 Fed. Reg. at 31253 (explaining that the MLP "could result in new oil and gas leasing

16

stipulations and development scenarios which would require amendments to the [Price RMP]");
AR011010 (explaining that the MLP EA was being prepared to amend the Price RMP and "[t]he
amendments to the [RMP] . . . are focused exclusively on management decisions pertaining to oil
and gas resources in the planning area").

## VI.    The Supplemental NEPA Analysis

BLM released the draft Reevaluation EA in July 2023. AR000282-534. SUWA
commented on the draft explaining that BLM had failed to comply with the terms of the
Settlement Agreement because: (1) the Reevaluation EA did not analyze impacts to listed
resource values; and (2) BLM had failed to consider the pre-leasing issues identified in the
Agreement (*i.e.*, whether to amend or review the RMP). AR010151-53. In addition, SUWA
explained that BLM should consider the proposed action pursuant to its 2021 guidance and
policy rather than the rescinded, unlawful leasing policy of IM 2018-34. AR010169-72.

SUWA further explained that BLM had—again—failed to explain the agency's 2018
changed position respecting the necessity of the San Rafael Desert MLP, or why the information
and data collected for that MLP were no long relevant. SUWA likewise explained that BLM had
failed to prepare the necessary NEPA analysis prior to abandoning the MLP concept. AR010154-
60.

BLM did not make any material changes in the final Reevaluation EA based on SUWA's
comments or concerns. AR000535-852; AR011420-24. Instead, BLM claimed that it had
prepared the Reevaluation EA to comply with the Settlement Agreement. AR000544-45. But,
this ignored the fact that the EA disclosed and analyzed impacts to only a subset of the resource
values identified in the Agreement (and the San Rafael Desert MLP EA). AR010152 (providing

a table of resources analyzed/not analyzed in the draft EA); *but see* AR011012-15 (resource

values identified in the San Rafael Desert MLP EA); 81 Fed. Reg. at 31253 (same).

Additionally, the Reevaluation EA explained that the consideration of the need for a

possible RMP revision or amendment—which again, was required by the Settlement

Agreement—was <u>beyond the scope of analysis</u>, despite the plain language of the Agreement and

BLM's acknowledgment that the EA was being prepared to comply with that Agreement.

*Compare* AR000545 ("The purpose of [the] federal action is to comply with the terms of the . . .

settlement agreement"), *with* AR000558 (rejecting SUWA's recommended alternatives—which

were the same alternatives considered in the San Rafael Desert MLP EA—because they were,

according to BLM, "beyond the scope of the decision to be made" in the EA), *and* AR000820

(responding to SUWA's comment on this point by stating, "[t]he BLM does not . . . need to

conduct 'pre-leasing NEPA' analysis to determine if an area requires new stipulations prior to

leasing").

Likewise, BLM parroted its previous insufficient Trump-era explanation for abandoning

the nationwide MLP concept generally and the San Rafael Desert MLP process specifically: the

MLP "process created duplicative layers of NEPA review." AR000821. But, when making this

statement, BLM relied on IM 2018-34, AR000821 (citing IM 2018-34); AR000548 (same),

which at that point had been (1) vacated by a federal court as illegal, *see W. Watersheds Project*,

336 F. Supp. 3d 1204; and (2) rescinded and superseded by Biden Administration-era leasing

policy, *see* AR010583-84 (BLM's new leasing policy, which replaced IM 2018-34 and was in

effect when BLM prepared the supplemental leasing EA); AR010605-08 (same).

## STARDARD OF REVIEW

The APA requires federal courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under the APA, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio*"). An agency policy change complies with the APA if the agency (1) displays awareness that it is changing positions, (2) shows that the new policy is permissible under the statute, (3) believes the new policy is better, and (4) provides good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy, must include a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy. *Fox*, 556 U.S. at 515-16.

"Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing *Richards v. I.N.S.*, 554 F.2d 1173, 1177, n.228 (D.C. Cir. 1977)).

19

**ARGUMENT**[16]

The Reevaluation EA violates the APA because at no time has BLM provided a reasoned explanation for abandoning the San Rafael Desert MLP process, particularly in light of the facts and circumstances that underlaid or were identified by the MLP policy and process. Similarly, BLM's unexplained about-face reopened millions of acres of public lands in Utah (and nationally) to destructive oil and gas leasing and development—a decision that triggered the agency's obligation to prepare a NEPA analysis prior to doing so. Finally, the Reevaluation EA failed to take the necessary "hard look" at the potential impacts to pronghorn antelope, in violation of NEPA.

**I.    BLM Failed to Provide a Reasoned Explanation Prior to Abandoning the MLP Policy or San Rafael Desert MLP**

For over seven years, based on its 2010 nationwide oil and gas policy, BLM worked to complete the San Rafael Desert MLP; a process the agency repeatedly determined to be "required" prior to offering new leases for development in the San Rafael Desert. BLM made it more than halfway in developing the MLP, which included, among other things: collecting significant new information and data regarding LWC, water resources, and wildlife; collecting significant new information and data related to the impacts of oil and gas leasing and development in the San Rafael Desert; collecting new information and data regarding past, present, and reasonably foreseeable future oil and gas development in the San Rafael Desert; preparing an MLP-specific RFDS; and preparing a draft EA to analyze and disclose this new information and data. During this years-long public process, BLM deferred all leasing in the San

---

[16] As demonstrated in the Declaration of Ray Bloxham (attached as Exhibit 3), SUWA has standing in this case.

Rafael Desert to preserve its management options for the area. AR011401 (BLM memorandum explaining that "all" lease nominations were deferred in MLP areas).

However, BLM never completed the San Rafael Desert MLP. Instead, following the 2016 election, the agency abruptly abandoned the MLP planning process to align itself with the Trump Administration's priorities and offered, sold and issued the leases at issue in this case. In 2024, BLM doubled-down on this unreasoned reversal in the Reevaluation EA and adopted its prior Trump-era justification. At no point has BLM provided a reasoned explanation for reversing course on the MLP policy and the San Rafael Desert MLP, in violation of the APA. *See Fox*, 556 U.S. at 516 ("a reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy.").

Instead, in the Reevaluation EA, BLM once again failed to address the elephant in the room, stating only:

> [1] The BLM notes [SUWA's] comment concerning the San Rafael Desert MLP and also notes that the MLP was not finalized.
> . . .
>
> [2] The BLM does not always need to conduct "pre-leasing NEPA" analysis to determine if an area requires new stipulations prior to leasing. By conducting site-specific analysis in the context of an EA, the BLM can determine if the existing stipulations are adequate to protect the resources at issue. If the BLM determines that the existing stipulations are not adequate, it can complete an RMP amendment to create new stipulations or close an area to new leasing.
> . . .
>
> [3] In addition, IM 2018-34 explains why BLM determined MLPs would no longer to be [sic] developed, finding that the process created duplicative layers of NEPA review. . . . the BLM explained why it was departing from this previous practice (duplicative NEPA review) [citing IM 2018-34].

AR000820-21.[17] This "response" is generally non-responsive and otherwise arbitrary, the crux of which appears to be: the MLP process created duplicative NEPA review.

## A.     The Finality of The San Rafael Desert MLP is Immaterial

The fact that the San Rafael Desert MLP was never finalized is merely a self-evident conclusory statement, not a reasoned explanation for abandoning seven years of agency policy, information, and data. Specifically, it is not an explanation for why the thousands of pages of information and data related to the MLP are no longer relevant; information does not cease to exist merely because a NEPA process was not finalized.

Critically, in the Reevaluation EA, BLM <u>did not</u> examine the myriad of data and "determine if the existing stipulations are adequate to protect resources at issue." Indeed, BLM <u>expressly declined to do so</u> because, according to the agency, making such a determination was "beyond the scope of the decision to be made" in the EA. AR000558. BLM thus attempts to whistle past the factual graveyard by ignoring both its previous position and the new information that the agency <u>for years</u> argued was essential to review prior to offering new leases for development.

## B.     BLM's MLP Process Was Designed to Provide Missing Scrutiny and Analysis

BLM explicitly designed its MLP process to correct serious analytical deficiencies in its prior approach to oil and gas leasing on public lands—a far cry from ostensibly duplicative NEPA review.[18] The "facts and circumstances that underlay" the MLP policy, and the San

---

[17] BLM's response to SUWA's broad-ranging, and multifaceted comments related to the MLP, which were not a single point or comment, is lumped into a single response box labeled "MLP." AR000820-21. The provided block quote is SUWA's best effort to pull out the threads of BLM's response that respond to SUWA's argument that the agency failed to provide a reasoned explanation for abandoning the MLP process.

[18] As noted above, the Biden Administration subsequently identified systemic problems with the national oil and gas program in place when BLM first offered and sold the leases at issue.

Rafael Desert MLP, came from BLM's nationwide oil and gas leasing reforms established in 2010. AR010476-77. These reforms were based on the Interior Department's 2009 "findings and recommendations for improving the oil and gas land use planning and lease sale parcel review processes." AR010481; *see also* AR011400 (BLM stating that its 2010 policy reforms "introduced significant changes for BLM's oil and gas lease sale review process as well as the concept of a new land use planning tool known as the MLP").

1.    *The purpose of the MLP policy was to consider and analyze new information and changed circumstances*

The entire purpose of the MLP policy was to provide the necessary pre-leasing NEPA review <u>that the agency had never previously prepared</u>, while at the same time pausing leasing decisions in the MLP areas in the absence of the analysis that BLM itself determined was required. As BLM explained it:

> [t]hrough the MLP process, the BLM will reconsider RMP decisions pertaining to oil and gas leasing and will evaluate likely development scenarios and varying mitigation levels. . . . In most cases, the focused planning and analysis will result in the incorporation into the RMP of new oil and gas leasing decisions as well as development decisions.

AR010662; *see also* AR011019-20 (the San Rafael Desert MLP EA: each action alternative would have resulted in a plan amendment to add new, more protective, oil and gas stipulations and notices); AR010921-68 (Appendix B to the San Rafael Desert MLP EA: providing the stipulations and notices that would have been added to future leases, if the MLP had been completed and the RMP amended).

---

Nonetheless, through the Reevaluation EA BLM reaffirmed the leases subject to the old, broken leasing program, and BLM explicitly rejected SUWA's argument that the agency should consider the leases through the lens of BLM's updated policies and information for leasing and development which were designed to improve the prior, broken, system. AR010169-72 (SUWA's comments on this point); AR000822 (BLM refusing to rely on the new, current, policies and instead claiming "these policies are not applicable").

23

In BLM's own words, the keystone principle underlying the entire MLP policy was to provide "additional planning and analysis . . . prior to new oil and gas leasing because of chang[ed] circumstances, updated policies, and new information." AR010662; AR010476 (same). More specifically, the agency explained that the additional planning and analysis "is needed to address likely resource impacts (including cumulative impacts) if oil and gas development were to occur where there is a potential for [resource conflicts]." AR010663. Hence, BLM designed the MLP process not to create duplicative NEPA review, but instead to provide essential analyses that were missing in the Price RMP, including analyses for resources that it had failed to previously consider or for which there was new information.

In Utah, BLM prepared a "Leasing Reform Implementation Plan," which explained that the RMPs, including the Price RMP, "are subject to a continual process of monitoring and review . . . as new information or changed circumstances arise." AR010184. In light of BLM's own identification of new information and changed circumstances, the agency then designated five master leasing plan areas, covering millions of acres, for MLPs in Utah. AR011400-06. Specific to the San Rafael Desert MLP, BLM (1) identified "chang[ed] circumstances" and "new information" that post-dated the Price RMP that (2) had to be analyzed and disclosed in the MLP "prior to new leasing of oil and gas within the planning area." AR010905. The bevy of changed circumstances and new information identified by BLM included:

> [1] a planning area-wide wilderness characteristics inventory, [2] a cultural resource inventory, viewshed analysis, and historic setting analysis for the Old Spanish National Historic Trail, [3] pronghorn habitat data . . . [4] visual resource inventories for the Price [field office], [5] [a RFDS] for oil and gas resources [in the San Rafael Desert], and [6] recreational and cultural resource inventory data.

AR011012.

BLM also determined that additional factors "required" preparation of this new pre-leasing NEPA analysis for the San Rafael Desert, including the need to "[e]valuate potential development scenarios," "[c]reate oil and gas development mitigation strategies," and "[c]onsider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing." AR010905; AR010536 (BLM San Rafael Desert Fact Sheet).

2.    *The MLP process was purposefully distinct from the Price RMP*

BLM's San Rafael Desert MLP process was thus purposefully distinct from the earlier RMP process in critical ways. To begin with, the MLP process considered new information and changed circumstances that BLM could not have considered when the Price RMP was prepared because that information did not yet exist. AR011010 (BLM explaining that the MLP was necessary "[s]ince the completion of the [Price RMP] . . . the BLM has . . . collected new information relevant to [the MLP] analysis"). Likewise, the MLP analyzed new stipulations and notices on subsequent leasing that differed significantly from those imposed in the Price RMP, such as whether certain lands would be available for lease, restrictions on surface occupancy, and/or the timing and nature of future lease development. AR011018-20 (BLM's description of the draft MLP EA alternatives); AR011023-56 (comparing the alternatives in the MLP). Accordingly, contrary to BLM's reason for abandoning the MLP, the MLP process did not duplicate the NEPA analysis for the RMP.

The MLP policy was also distinct from BLM's lease reevaluation process conducted in 2024. In that process, BLM not only failed to consider the array of new information and data that it had collected for the MLP, but also explicitly refused to consider alternatives or conditions on leasing that the agency itself acknowledged were reasonable in the draft MLP EA. AR000558 (dismissing the NSO stipulations considered in the MLP by citing the Price RMP stipulations and noting, "[a]n NSO stipulation for LWCs in the [Price RMP] currently does not exist and

25

would require an amendment to the [RMP]"); *id.* (dismissing the development scenario alternative (considered in the MLP) because the alternative was "beyond the scope of the decision to be made" in the Reevaluation EA); AR000559 (dismissing the Mitigation Leasing alternative); *but see* AR011019-20 (considering these same or similar alternatives in the San Rafael Desert MLP EA); AR015801-932 (a EA prepared to approve drilling <u>on leases</u> sold at the September 2018 sale but in which BLM <u>did not analyze a mitigation alternative</u>); AR006452-757 (same but for a lease sold at the December 2018 sale).

Hence, because the San Rafael Desert MLP considered both new information and more environmentally protective conditions on leasing, which BLM failed or refused to consider during the leasing process and reevaluation process, the MLP would have done far more than merely duplicate the NEPA analysis conducted at the leasing stage (and the reevaluation), as BLM now inaccurately claims.

3.      *The MLP analyzed a distinct set of pre-leasing issues—issues not considered or analyzed at the leasing or reevaluation stages*

BLM's flat refusal at the leasing stage and then again in the Reevaluation EA to consider alternatives that the agency itself recognized as viable at the MLP stage vividly illustrates how the MLP process was distinct and additive rather than duplicative. For example, a key purpose of the MLP policy was to analyze new information (*e.g.*, pronghorn habitat data, LWC) and determine whether to create new mitigation strategies and/or "new conditions" (*e.g.*, stipulations) on development such as "prohibiting surface occupancy or closing certain areas to leasing" to insure proper management of public resources before irreversibly committing those resources to oil and gas leasing and development. AR010905. After BLM abandoned the MLP policy and proposed its September 2018 lease sale, SUWA submitted comments specifically asking BLM to consider alternatives that comported with the MLP's primary purpose, including (1) a "leasing

26

outside of wilderness-caliber lands" alternative; (2) a "no-surface occupancy" alternative; (3) a phased development leasing" alternative; and (4) a "mitigation leasing" alternative. AR010602-03.

Likewise, SUWA's recommended alternatives for the Reevaluation EA were purposefully crafted to track with the objectives of the MLP policy, including the San Rafael Desert MLP. For example, in its 2013 Fluid Mineral Resources Handbook, which incorporated the MLP policy, BLM expressly recognized "phased leasing" as a reasonable alternative for MLP areas, stating: "[p]hased leasing could aid in protecting important resource values (*e.g.*, visual or sensitive species) in areas where the mineral development potential and the mode of development are presently unknown." AR010667. BLM also endorsed consideration of "phased development," "limitations on surface disturbances," and mitigation alternatives. AR010666. And, as explained above, the draft San Rafael Desert MLP EA analyzed these precise issues, including preparation of new lease stipulations and mitigation measures. AR010921-69; AR010609-17.

However, BLM refused to consider and analyze these alternatives in both its initial leasing analysis and the Reevaluation EA because the Price RMP—the precise document it had previously recognized was outdated—contained a list of stipulations and notices that were applied to the leases. AR000558-59. Of course, with the MLP process, BLM had concluded just the opposite and thus specifically designed the MLP to consider and implement these same alternatives.

Yet, having arbitrarily abandoned the MLP process, BLM rejected SUWA's recommended "phased development leasing" alternative as "beyond the scope of the decision to be made," and because "the [Price RMP] is the guiding document for identifying lands

27

designated as open for oil and gas development; land designations can only be changed through a . . . RMP amendment." AR000558. In other words, according to BLM itself, the Reevaluation EA did not—and could not—duplicate the MLP analysis because the agency's NEPA analysis at the leasing stage serves an entirely different purpose than the MLP process: to consider site-specific leasing, not area-wide pre-leasing, programmatic land use planning. Thus, BLM's reasons for rejecting at the leasing stage (and reevaluation stage) the same alternatives that the agency itself accepted as the MLP stage belies the agency's conclusory position that the MLP merely created duplicative layers of NEPA review.

More broadly, based on the new information and changed circumstances identified by the agency after it completed the Price RMP, BLM determined in 2015 that it should address the area-wide management of the San Rafael Desert in the MLP process; this was to be BLM's vehicle to respond to the on-the-ground changed circumstances prior to selling new leases for development. For example, the MLP would have at least considered—and perhaps implemented— "a water management plan and water monitoring plan for mineral projects to protect nearby waters"; "protections to areas such as springs, riparian areas, and wetlands that provide habitat to special status species"; protect[ion for] crucial pronghorn habitat"; limitations on "[w]hat areas would be available for oil and gas leasing and development; and "restrictions and BMPs . . . to protect resource values." AR011013-15.

In the Reevaluation EA, BLM did not even consider these issues because they were deemed to be beyond the scope of the decision to be made. Thus, the analysis underlying the MLP is far from "duplicative," as BLM now cursorily suggests.

**C.    BLM's Abandonment of the San Rafael Desert MLP Process Was Arbitrary and Capricious**

In reality, BLM abandoned the MLP policy to align itself with Trump Administration priorities and not because the MLP created duplicative layers of NEPA review.[19] It is true that "[e]lections have policy consequences," but "when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation." *Organized Vill. of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc) (citing *State Farm*); *cf. California v. Bernhardt*, 472 F. Supp. 3d 573, 605 (N.D. Cal. 2020) ("In short, BLM's reliance on Executive Order 13783 falls short of supplying the required 'reasoned explanation' for the Rescission" of the Obama Administration's waste prevention rule).

But that is precisely what BLM did here. The agency's perfunctory statement that MLPs created duplicative layers of NEPA review is "not a statement of reasoning, but of conclusion." *Amerijet Intern. Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted). Moreover, BLM's unsupported, conclusory statement also directly contradicts the agency's own previous findings that additional planning and analysis were required prior to the agency selling new leases for development in the San Rafael Desert. *Fox*, 556 U.S. at 537 ("[i]f the agency ignores or countermands its earlier factual findings without a reasoned explanation" it violates the APA) (Kennedy, J., concurring).

_____

[19] Indeed, BLM was required to take this step by Executive Order 13783 which directed agencies to rescind all policies that "potentially burden[ed]" oil and gas leasing and development. 82 Fed. Reg. at 16093. Likewise, Secretarial Order 3354 directed BLM to "enhance exploration and development of Federal onshore oil and gas resources[.]" Secretarial Order 3354 § 3(b). BLM adhered to these directives IM 2018-34, which cites both orders as justification for rescinding its MLP policy. AR005610. And, as noted, the Reevaluation EA carried this same justification forward relying entirely on the "explanation" provided in IM 2018-34. AR000821; AR000548. Of course, at the time BLM made this statement in the Reevaluation EA, IM 2018-34 was <u>not</u> "the policy of the BLM" because, among other reasons: (1) it had been set aside as unlawful by a federal court, and (2) fully rescinded and replaced by the Biden Administration. AR010583-85 (BLM's new policy); AR010605-08 (same).

Indeed, federal courts—including in many decisions from the D.C. Circuit and this Court—routinely reject similar unexplained or ill-explained agency about-faces. *See, e.g.*, *Encino Motorcars, LLC*, 579 U.S. at 220-24 (unexplained reversal regarding application of the Fair Labor Standards Act to automobile dealership employees); *State Farm*, 463 U.S. at 46-51 (arbitrary reversal regarding the use of safety devices in automobiles); *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644-48 (D.C. Cir. 2020) (rejecting EPA's new policy of excluding from committees any scientist that had received an EPA grant); *Grace v. Barr*, 965 F.3d 883, 897-903 (D.C. Cir. 2020) (holding that a new policy regarding asylum claims was "arbitrary and capricious due to [the agency's] failure to acknowledge and explain its departure from past practice"); *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 855-59 (D.C. Cir. 2019) (rejecting a newly adopted method for computing costs as a "policy inconsistent with [the agency's] earlier course of conduct," and finding that "the explanation offered [by the agency] misses the mark"); *Am. Wild Horse Preserv. Campaign v. Perdue*, 873 F.3d 914, 923-28 (D.C. Cir. 2017) (reversing unexplained change regarding the agency's management of wild horses); *Dist. of Columbia v. U.S. Dept. of Agric.*, 496 F. Supp. 3d 213, 249-50 (D.D.C. 2020) (rejecting the Department's attempt to significantly reduce federal food-stamp benefits in part because it failed to "provide a sufficiently 'reasoned explanation'" for "radical changes in long-standing policies"); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018) (rejecting the Department's stay of regulations designed to protect student loan borrowers in part because of "an unacknowledged and unexplained inconsistency [which] is the hallmark of arbitrary and capricious decision-making"); *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022) (the agency unlawfully "brushed aside the report as beyond the scope of the supplemental EIS. This unexplained about-face was . . . arbitrary"); *Miso Transmission Owners v. FERC*, 45 F.4th 248, 264 (D.C. Cir.

2022) ("An agency ignoring its own qualms is not reasoned decisionmaking"); *AFGE v.. FLRA*, 25 F.4th 1, 7 (D.C. Cir. 2022) (agency's decision was arbitrary because it "fail[ed] to grapple with the agency's own past policy choices"); *Doe v. Mayorkas*, 585 F. Supp. 3d 49, 62 (D.D.C. 2022) ("Based on that years-long record . . . the Court concludes that the agency was required to acknowledge and explain its apparent change in position").

For example, in *American Wild Horse Preservation Campaign*, the Forest Service had managed a single contiguous area of public lands for the protection of wild horses for over two decades. 873 F.3d at 920-22. However, in 2013, the agency reversed course and split its management of the area into two disjointed tracts of land, which removed the "Middle Section" from the larger formerly-contiguous area. *Id.* On review, the Forest Service argued that the Middle Section had only been included in the contiguous area as a result of administrative error and thus was never properly part of that larger area in the first place. *Id.* at 924. The D.C. Circuit rejected this argument because it "flatly defie[d] the plain text of the official 1991 Forest Plan, repeated official agency statements, and two decades of agency practice." *Id.*

The court further explained that the Forest Service had inappropriately "trie[d] to shrug off its [prior] inclusion of the Middle Section [in the larger contiguous area] as some sort of inconsequential and passing 'administrative error,' as though that label nullifies any agency duty to reasonably explain its about-face." *Id.* However, "there is no 'oops' exception to the duty of federal agencies to engage in reasoned decisionmaking." *Id.* In particular, the Forest Service never explained why the prior two decades of official agency reports and statements, which contradicted its newly stated position, were no longer accurate or relevant, but instead "trie[d] to whistle past that factual graveyard." *Id.* at 927. The APA requires the Forest Service to do more—that is, it requires the agency to "explain its reasons" for reversing course, which included

31

addressing its prior statements and determinations. The Forest Service's failure to do so was unlawful. *Id.* at 928.

Similarly, in *Kake*, the Ninth Circuit rejected the U.S. Department of Agriculture's abrupt turnabout regarding the "Roadless Rule" as it applied to the Tongass National Forest, concluding that the Department failed to provide a sufficient reasoned explanation for its change in direction. In 2001, the Department promulgated the "Roadless Rule," which limited road construction and timber harvesting in national forests. 795 F.3d at 959. Relevant here, at that time, the Department determined that "exempting the Tongass National Forest from this Rule 'would risk the loss of important roadless area ecological values.'" *Id.* (alteration omitted). However, just two years later, following a change in presidential administration, "the Department reversed course, finding 'application of the roadless rule to the Tongass . . . unnecessary to maintain the roadless values.'" *Id.* (internal alterations omitted).

The Ninth Circuit held that the Department failed to justify its contradictory conclusion. According to the court, "the 2003 [decision] rests on the express finding that the Tongass Forest Plan poses only 'minor' risk to roadless values;" however, the 2003 conclusion was "a direct, and entirely unexplained, contradiction of the Department's finding in the 2001 [decision] that continued forest management under precisely the same plan was unacceptable because it posed a high risk to the 'extraordinary ecological values of the Tongass.'" *Id.* at 968. This unexplained reversal violated the APA. *Id.* at 968-69.

Here, as in *American Wild Horse Preservation Campaign* and *Kake*, BLM failed to put forth a reasoned explanation for its abrupt departure from the San Rafael Desert MLP and, more importantly, the facts and circumstances underlying that policy. BLM had an established policy and applied that policy to the San Rafael Desert to reach the determination, supported by years of

agency information, data, and analysis, that the Price RMP was insufficient to support oil and gas leasing in the area, and thus, that an MLP was required before leasing could resume. But, following a change in presidential administration, the agency abruptly reversed course on the San Rafael Desert MLP (and indeed, on the MLP policy generally), to align itself with the Trump Administration's "energy dominance" agenda. This reversal reopened hundreds of thousands of acres of public lands in the San Rafael Desert (and millions of acres in Utah) to oil and gas leasing and development—lands that had been removed from availability for leasing for over seven years under the prior policy.

BLM offered a perfunctory explanation for that reversal: MLPs create duplicative layers of NEPA review. However, as explained herein, that perfunctory statement is not one "of reasoning, but of conclusion," and therefore cannot support BLM's reversal of position. *Amerijet Intern. Inc.*, 753 F.3d at 1350. Indeed, as explained, the San Rafael Desert MLP considered new information and changed circumstances that did not exist at the RMP stage, and considered alternatives that the agency <u>explicitly refused</u> to consider at the leasing stage (or in the Reevaluation EA). *See Am. Wild Horse Preserv. Campaign*, 873 F.3d at 927 (rejecting agency justification that "makes little sense").

At a minimum, the APA required BLM to explain and justify (1) <u>how</u> the MLP policy created duplicative layers of NEPA review; (2) <u>why</u> such analysis was no longer required; (3) <u>why</u> the updated leasing stipulations, BMPs, and leasing categories prepared in the San Rafael Desert MLP EA are no longer needed or relevant, *see, e.g.*, AR010921-969; AR010609-17; AR010970-72; and (4) <u>why</u> the new information and changed circumstances previously identified by the agency, such as pronghorn habitat data and the Old Spanish National Historic Trail, are no longer relevant and can now be ignored. *See, e.g.*, AR011012. That is, the APA

required BLM to "reasonably <u>explain</u> its about-face." *Am. Wild Horse Preserv. Campaign*, 873 F.3d at 924 (emphasis added).

Critically, instead of providing any reasons for discarding the facts and circumstances underlying the MLP process, BLM entirely "ignore[d] [and] countermand[ed] its earlier factual findings," *Fox*, 556 U.S. at 537, by baldly asserting in the Reevaluation EA that its years-long MLP policy—which it repeatedly determined to be "required" before leasing in the San Rafael Desert could proceed—was unnecessarily "duplicative" and thus, could be cast aside in the agency's haste to align itself with the Trump Administration's "energy dominance" agenda. This unsupported statement "cross[es] the line from the tolerably terse to the intolerably mute." *Am. Wild Horse Preserv. Campaign*, 873 F.3d at 928 (citation omitted); *see also Encino Motorcars, LLC*, 136 S. Ct. at 2126 (an agency policy reversal violates the APA if there are "unexplained inconsistenc[ies]") (internal alteration omitted).

Rather than address the facts and circumstances that underlay the agency's prior nationwide oil and gas program policies, including the MLP policy and San Rafael Desert MLP, BLM's perfunctory statement "gave almost no reason at all" to justify the course reversal. *Encino Motorcars, LLC*, 579 U.S. at 222. Thus, BLM's "lack of reasoned explication for a [policy] that is inconsistent with the [agency's] longstanding earlier position results in a" decision that violates the APA. *Id.*

## II.    BLM Failed to Prepare NEPA Analysis Prior to Abandoning the MLP Policy

BLM's decision to abandon the MLP policy, including the San Rafael Desert, reopened millions of acres of public lands to destructive oil and gas leasing and development—a decision that met the low threshold standard to trigger NEPA. Thus, BLM's failure to prepare NEPA analysis prior to making that decision was unlawful.

NEPA analysis is required for all proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Proposal" is defined as "a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." 40 C.F.R. § 1508.1(ff). "Federal actions" include, among other things, "[a]doption of official policy," "[a]doption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based," "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan," and "decisions allocating agency resources to implement a specific statutory program or executive directive." *Id.* § 1508.1(w)(1)(ii), (iii), (iv).

"The threshold that triggers the requirement for environmental analysis [under NEPA] is relatively low." *Cal. ex rel. Lockyer v. U.S. Dep't. of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009). "If *any* 'significant' environmental impacts might result from the proposed agency action, then [NEPA analysis] must be prepared *before* agency action is taken." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1039 (D.C. Cir. 2021) (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002) (additional citations and internal alteration omitted); *see also* 40 C.F.R. §§ 1508.1(mm) (defining "significant effects"), 1501.3(d) (describing what the agency must consider to make a significance determination).

One particularly analogous case is *Citizens for Clean Energy v. United States Department of the Interior*, 384 F. Supp. 3d 1264 (D. Mont. 2019). There, the court held that the Interior Department's decision to reopen thousands of acres of public lands to coal leasing and development, and to expedite new coal leasing, without first having prepared a NEPA analysis was unlawful. *Id.* at 1278-79. In 2015, then-Interior Secretary Sally Jewell issued an order (the

"Jewell Order"), which directed BLM to prepare a programmatic EIS to review the Federal coal leasing program and imposed a moratorium on new coal leasing until completion of that NEPA analysis. *Id* at 1271. However, following the 2016 election, President Trump instructed newly installed Interior Secretary Ryan Zinke to rescind the Jewell Order, which he did. *Id.* at 1272. Interior Secretary Zinke's new order (the "Zinke Order") lifted the coal-lease moratorium and directed BLM to expedite new coal lease applications. *Id.*

The *Citizens for Clean Energy* court held that the Zinke Order was a NEPA triggering event because it "changed the status quo." *Id.* at 1278. Specifically, the decision "served to re-open public land to coal leasing and to expedite lease applications." *Id.* at 1279. In reaching this conclusion, the court analogized the situation to the Ninth Circuit's decision in *Lockyer*, which had involved a nationwide plan to protect roadless areas in national forests that was similarly dismantled without NEPA analysis by the next administration. *Id.* at 1278 (citation omitted).

The *Citizens for Clean Energy* court explained that on review, the Ninth Circuit in *Lockyer* had recognized that though it had only been effective seven months, the roadless rule "resulted in benefits to roadless areas and their ecosystems." *Id.* (citation omitted). Thus, the plaintiffs had raised "a substantial question as to whether the repeal of the Roadless Rule would have significant effect on the environment." *Id.* (citation omitted).

Based on these similarities, the *Citizens for Clean Energy* court found that "*Lockyer* applies to the replacement of the Jewell Order with the Zinke Order" in at least three ways: (1) the Roadless Rule and Jewell Order were both programmatic nationwide plans to address and reevaluate agency programs, *id.*; (2) both policies, while in effect, protected thousands (or millions) of acres of public lands and the environment, *id.* at 1279; and (3) the subsequent decisions to reverse these policies re-opened the public lands to destructive activities, threatening

those lands and the environment. *Id.* Thus, like the Forest Service's decision in *Lockyer*, "[t]he Zinke Order constitute[d] a major federal action sufficient to trigger NEPA." *Id.*

Here, the *Lockyer* and *Citizens for Clean Energy* decisions are on all fours with BLM's reversal of its nationwide MLP policy which triggered NEPA.

*First*, as a preliminary matter, in the Reevaluation EA, BLM made a new decision not to prepare a NEPA analysis prior to abandoning the San Rafael Desert MLP process. AR010158-60 (SUWA raised this issue in comments on the Reevaluation EA). Specifically, BLM rejected SUWA's comments on this point stating "[t]he commenter appears to suggest that abandoning the MLP (which never went beyond an internal draft) 'reopened' acreage to oil and gas development and, therefore, changed the status quo. However, that is not the case as [the areas encompassed by the leases] since at least 2008, have remained open for oil and gas development in accordance with the [Price] RMP." AR000821. But, as explained above, this statement is demonstrably false. As BLM itself a in 2015: "BLM-Utah has deferred new leasing proposals . . . for <u>all</u> lands within the pending MLPs in order to preserve potential alternatives for those plans. As a result, millions of acres of land with oil and gas interest have been <u>removed from availability</u> for oil and gas leasing and development for the last several years" AR011401(emphases added).

*Second*, like the Roadless Rule and Jewell Order, BLM's 2010 oil and gas leasing and development reforms, including the MLP policy, were a programmatic nationwide plan to reevaluate an agency program (here, BLM's oil and gas program). AR010747-82; AR010662-70. In addition, BLM's Utah-specific "Oil and Gas Leasing Reform Implementation Plan" was a programmatic plan to address and reevaluate the agency's oil and gas leasing program in Utah, including for the San Rafael Desert. AR010182-208.

*Third*, as discussed *supra*, as part of the reform plan, the MLP policy "removed from availability" "millions" of acres of public lands in Utah from oil and gas leasing, including more than 525,000 acres in the San Rafael Desert. AR011401. Accordingly, for over seven years, BLM did not offer or sell a single oil and gas lease for development in any MLP area in Utah, including the San Rafael Desert, thus protecting wildlife and wildlife habitats, lands with wilderness characteristics, surface and groundwater resources, and endemic pollinators, among other resources. AR011401.

*Fourth*, when BLM reversed course and terminated the 2010 leasing reforms, including the MLP policy, the agency's new policy directed by Executive Order 13783 and Secretarial Order 3354 and then established in IM 2018-34 <u>expressly</u> reopened these same public lands, including the San Rafael Desert, to environmentally destructive oil and gas leasing and development, and established a new framework to expedite those activities while minimizing environmental review, agency oversight, and public participation. AR005608-15 (IM 2018-34); AR005421 (stating that BLM was holding the initial September 2018 lease sale to comply with, *inter alia*, IM 2018-34); AR005892 (BLM's leasing document for the December 2018 sale tiered to the September 2018 lease sale EA); AR000548 (Reevaluation EA prepared consistent with IM 2018-34).

Accordingly, BLM's new energy dominance policy decisions, including the reversal of the MLP policy and the refusal to evaluate this issue in the Reevaluation EA, met the "relatively low" threshold standard for a NEPA triggering event and the agency's failure to prepare any NEPA analysis prior to making that decision was unlawful. *Lockyer*, 575 F.3d at 1012; *see Citizens for Clean Energy*, 384 F. Supp. 3d at 1278-79; *Grand Canyon Trust*, 290 F.3d at 340

(NEPA analysis is required if an agency action "might" have foreseeable environmental

impacts).

### III.    BLM Did Not Sufficiently Consider Pronghorn Antelope in the Reevaluation EA

BLM likewise acted arbitrarily and capriciously by failing to adequately consider how

pronghorn antelope would be affected by the issuance of oil and gas leases. In particular, since

the release of the Price RMP, new data leading to changed circumstances affecting pronghorn

have come to light, yet BLM did not incorporate this information into the Reevaluation EA.

Additionally, BLM failed to take a hard look at impacts to pronghorn antelope by not

considering reasonably foreseeable direct, indirect, and cumulative impacts to the species.

### A.    New Information and Changed Circumstances Regarding Pronghorn

As discussed above, based on changed circumstances and new information, BLM

publicly and repeatedly recognized that, among other things, it could <u>not</u> continue to rely on the

outdated lease stipulations and notices established in the Price RMP, and <u>had to</u> update them

prior to offering new oil and gas leases for development in the San Rafael Desert (*i.e.*, it had to

prepare the MLP and accompanying <u>pre</u>-leasing NEPA analysis). Relevant here, this included

new information related to "[p]ronghorn habitat data from the Utah Division of Wildlife

Resources." AR011012.

In the San Rafael Desert MLP EA, BLM recognized that this new information severely

undermined its prior conclusions; specifically, its conclusion that the 2008 Price RMP

stipulations and notices adequately protected pronghorn from oil and gas development:

> Under Alternative A [the no action alternative that would maintain
> the status quo of the Price RMP], <u>timing limitations are not
> identified for crucial pronghorn habitats in the planning area under
> the management direction in the existing [Price RMP]</u>. Since the
> completion of the [Price RMP] in 2008, the Utah Division of
> Wildlife Resources (UDWR) has mapped substantial and crucial
> value pronghorn habitat in the [MLP] planning area. Because the

> pronghorn habitat was identified after the completion of the [Price RMP] in 2008, <u>it is likely that [in the San Rafael Desert MLP EA/DR] the BLM would apply a timing limitation</u> to proposed oil and gas leasing parcels located in crucial pronghorn habitat during site-specific leasing environmental analysis. However, <u>if the [timing limitation] stipulations are not applied, pronghorn could be disturbed during sensitive calving timeframes. These timeframes are important for successful reproduction and maintenance of healthy herds. Disturbances during these timeframes could result in pronghorn expending energy to move away from oil and gas activity, possibly making calves more susceptible to predation</u>.

AR011295 (emphases added).[20] Additionally, BLM recognized that <u>compared to any other activity on public lands in the San Rafael Desert</u>, "[o]il and gas development and associated infrastructure are anticipated to cause the greatest amount of surface disturbance and impacts to . . . wildlife and their habitats through construction of well pads, roads, pipelines, and other infrastructure." AR011371.

In short, BLM recognized that <u>if</u> a timing limitation stipulation was <u>not</u> applied to future leases, <u>then</u> at least three foreseeable impacts could (or would) occur: (1) impacts during sensitive pronghorn calving season, (2) impacts to successful pronghorn reproduction and maintenance of healthy herds, and (3) pronghorn becoming more susceptible to predation after being forced to move to new areas because of oil and gas activity—and these facts were compounded by the reality that oil and gas development in the San Rafael Desert would harm pronghorn more than any other use of the public lands.

Critically, the timing limitation stipulation was <u>not</u> applied to future leases, including the leases at issue here, because, as explained above, BLM jettisoned the MLP process mid-step to

---

[20] Under each action alternative in the MLP EA BLM <u>would have</u> required timing limitations, and <u>would have</u> changed the leasing categories to protect pronghorn (*e.g.*, closed, no-surface occupancy). AR011299 (Alternative B: timing limitation from May 15 – June 15); AR011302 (Alternative C: same); AR011305 (Alternative D: same).

comply with the Trump Administration's priorities. AR000558-59 (refusing to amend the Price

RMP stipulations because doing so was, according to BLM, beyond the scope of the proposed

action); AR000554 (Reevaluation EA: explaining that under the no action alternative—BLM's

selected alternative—the "leases are subject to the . . . stipulations identified in the [Price

RMP]"); AR005416 (September 2018 lease sale EA: "Under the Proposed Action, parcels to be

offered would be leased subject to stipulations prescribed by the [Price] RMP"); AR005890

(December 2018 lease sale DNA: the sale was "in conformance with the Price [RMP]").[21]

## B.     Failure to Take a "Hard Look" at the Foreseeable Impacts to Pronghorn

Despite the leases not being subject to any pronghorn timing limitation stipulation, the

Reevaluation EA failed to consider, let alone analyze the foreseeable impacts to pronghorn

calving season, reproduction, maintaining herd health, and species predation. Instead, the grand

total of the agency's "analysis" in the EA is the following statement:

> All leases contain year-long crucial pronghorn . . . habitat except for
> UTU93534. The leases are located within the UDWR San Rafael
> Desert big game management unit and the San Rafael Desert North
> big game management unit. Population estimates produced by the
> DWR suggest that in 2017, the San Rafael Desert management unit
> contained approximately 270 pronghorn and the San Rafael North
> management unit contained approximately 1,040. Together, the San
> Rafael Desert and San Rafael Desert North comprise 4,090,451
> acres; therefore, the 83.2 potential acres of disturbance based on the
> RFD[S] are unlikely to cause a significant reduction in useable
> habitat for this wide-ranging species.

AR000587 (internal citation omitted). This conclusory paragraph is not an impacts analysis.

---

[21] The Price RMP stipulation "UT-S-225 TL – Crucial Fawning Pronghorn Habitat" was
attached to several of the "Sold But Not Issued Leases" and "Suspended Leases" at issue in the
September 2018 sale, *see* AR005539-48, but none of those leases are at issue in this lawsuit and,
as noted above, that stipulation was based on the pronghorn information BLM had in 2008 when
it finalized the Price RMP, not the new information it obtained during the MLP process.

1.    *Failure to analyze reasonably foreseeable direct and indirect impacts*

BLM's statement fails to wrestle with the critical fact that the agency previously acknowledged that impacts could occur to pronghorn calving season, reproduction, herd health, and that oil and gas development in this area could make the species more susceptible to predation, if future development was not subject to timing limitations—the precise situation at hand. AR011295. *See Peterson*, 717 F.2d at 1414 ("the decision to allow surface disturbing activities has been made at the leasing stage and, under NEPA, this is the point at which the environmental impacts of such activities must be evaluated") (emphasis in original); *WildEarth Guardians*, 368 F. Supp. 3d at 66 ("the leasing stage is the point of no return with respect to" environmental impacts, and thus BLM is "required to fully analyze the reasonably foreseeable impacts of those [impacts].").

At a bare minimum, BLM should have addressed this reality by disclosing and analyzing in the Reevaluation EA how and why these impacts would not occur in the absence of any timing limitation stipulation (despite the agency's evidence to the contrary), or how and why any such impacts would not be significant (despite the agency's evidence to the contrary). Without considering these factors, there is simply no record support for BLM's assertion that the impacts to pronghorn are "unlikely to cause a significant reduction in useable habitat for this wide-ranging species." AR000587.

2.    *Failure to analyze foreseeable cumulative impacts*

Furthermore, BLM's "analysis" in the Reevaluation EA does not even attempt to consider, let alone analyze the cumulative impact to pronghorn. In this Circuit,

> a meaningful cumulative impact analysis must identify five things:
> (1) the area in which the effects of the proposed project will be felt;
> (2) the impacts that are expected in that area from the proposed
> project; (3) other actions – past, present, and proposed, and
> reasonably foreseeable – that have had or are expected to have

> impacts in the same area; (4) the impacts or expected impacts from
> these other actions; and (5) the overall impact that can be expected
> if the individual impacts are allowed to accumulate.

*Tomac v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (quoting *Grand Canyon Trust*, 290 F.3d at

345) (internal quotations omitted). Put simply, BLM "cannot treat the identified environmental

concern in a vacuum." *Grand Canyon Trust*, 290 F.3d at 346. But that's precisely what happened

here.

Referencing the generic category of "wildlife," the Reevaluation EA states: "BLM

expects that under the RFDS there would be <u>direct</u> impacts to a maximum of 83.2 acres across

the lease area[.]" AR000586 (emphasis added). However, because BLM concluded that

"wildlife" was an issue to be "analyzed in brief" in the EA, its analysis is limited to a cursory

summary of <u>direct</u> impacts and potential mitigation efforts that may or may not be implemented.

AR000587. The EA does not even attempt to perform a cumulative impact analysis. *Id.*; *see also*

AR010161-63 (SUWA comment letter on the Reevaluation EA explaining that BLM's Issues

Analyzed in Brief sections in the EA failed to comply with NEPA, including cumulative impact

analysis).

Nowhere in the Reevaluation EA for wildlife, including pronghorn antelope, does BLM

identify or analyze "other actions – past, present, and proposed, and reasonably foreseeable –

that have had or are expected to have impacts in the same area," "the impacts or expected

impacts from these other actions," or "the overall impact that can be expected if the individual

impacts are allowed to accumulate." *Tomac*, 433 F.3d at 864.

These omissions are arbitrary enough on their own, but made worse by the fact that BLM

readily acknowledged in the EA that there <u>are</u> other foreseeable projects (past, present, or future)

that may impact the same pronghorn habitat in the San Rafael Desert and beyond. For example,

BLM identified past actions including 79 oil-gas wells that have already been drilled in the San Rafael Desert. AR000562. And, BLM identified foreseeable projects in the San Rafael Desert including the thirty wells anticipated in the San Rafael Desert MLP RFDS, with their approximately 585 acres of surface disturbance. AR005242. More broadly, the Price RMP anticipated the drilling of 1,540 wells throughout the entire field office. AR003132-41. But the Reevaluation EA analyzed the impacts of only eight wells. AR000562 ("it was estimated that a maximum of eight wells would be drilled"). Thus, the EA ignored the remaining twenty-two foreseeable wells anticipated in the MLP RFDS and the 1,532 in the Price RMP RFDS. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 853 (10th Cir. 2019) ("the . . . RFDS made it reasonably foreseeable that 3,960 . . . wells would be drilled, and NEPA therefore required the BLM to consider the cumulative impacts of those wells in the EA[.]").[22] Put simply, the Reevaluation EA does not comply with the D.C. Circuit's *Tomac* standard for analyzing cumulative impacts.

## CONCLUSION

For the reasons set forth above, the Court should grant SUWA's motion for summary judgment, declare BLM's decision to be arbitrary and capricious, set aside and vacate the thirty-five leases at issue here and enjoin any development of those leases.

---

[22] BLM's "analysis area" for pronghorn is not defined, but appears to be large—more than 4 million acres, so most, if not all, of the foreseeable wells in both RFDSs certainly fall within that undefined boundary. AR000587 ("the San Rafael Desert and Sand Rafael Desert North comprise 4,090,451 acres").

Respectfully submitted this 25th Day of April, 2025.

/s/ Hanna Larsen
Landon Newell (*pro hac vice*)
Hanna Larsen (*pro hac vice*)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
Tele: (801) 486-3161
landon@suwa.org
hanna@suwa.org

Elizabeth L. Lewis (D.C. Bar No. 229702)
William S. Eubanks II (D.C. Bar No. 987036)
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, D.C. 20006
Tele: (970) 703-6060
lizzie@eubankslegal.com
bill@eubankslegal.com

*Attorneys for Plaintiff*
*Southern Utah Wilderness Alliance*