# EXHIBIT 3

## Declaration of Ray Bloxham

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*
Case No. 1:24-cv-02476-RC

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF THE INTERIOR**, *et al.*, <br><br> Defendants. | Case No. 1:24-cv-02476-RC <br><br> Judge Rudolph Contreras |

## DECLARATION OF RAY BLOXHAM

I, **RAY BLOXHAM**, declare:

1. I have personal knowledge of each of the facts set forth below and, if called upon to do so, could and would testify regarding the statements that follow. This declaration is submitted in support of Plaintiff Southern Utah Wilderness Alliance's ("SUWA") Motion for Summary Judgement in the above-captioned matter.

2. I am the Field Director for SUWA, where I have been employed since 1999. I am also an active SUWA member. The Field Director position requires that I spend considerable time traveling on federal public lands managed by the Bureau of Land Management ("BLM") throughout the state of Utah. I can read and orient myself on a variety of topographic maps and am also experienced with global positioning system ("GPS") technology to do the same.

3. For more than twenty-five years I have worked to protect the wilderness-quality

federal public lands throughout the state of Utah, including the San Rafael Desert and Labyrinth Canyon Wilderness.

4. SUWA has approximately 12,000 members in all fifty states, as well as members in the District of Columbia. SUWA has long maintained an office in Washington D.C. SUWA's mission is to reserve the outstanding wilderness and other sensitive public lands at the heart of the Colorado Plateau, including the Labyrinth Canyon Wilderness and San Rafael Desert, and to advocate for management of these lands, and the associated natural and cultural resources, in their natural state for the benefit of all Americans. SUWA promotes local and national recognition of the region's unique character through research and public education; supports both administrative and legislative initiatives to permanently protect Utah's wild places within the National Park and National Wilderness Preservation System or by other protective designations where appropriate; builds support for such initiatives on both the local and national level; and provides leadership within the conservation movement through its advocacy for wilderness preservation.

5. SUWA, including myself, worked for years on the BLM's intended Master Leasing Plan ("MLP") for the San Rafael Desert. The MLP was an area-specific planning process designed to take a more focused look at planning decisions pertaining to oil and gas leasing and post-leasing development within the San Rafael Desert. SUWA submitted scoping comments regarding the San Rafael Desert MLP. SUWA also submitted additional information regarding areas within the San Rafael Desert that possess "wilderness characteristics" and recommended detailed boundary adjustment areas for the MLP. Wilderness characteristics include an area's naturalness as well as opportunities for either solitude or primitive and unconfined recreation.

2

6.     SUWA commented on the BLM's draft environmental assessment at issue in the above-captioned matter ("Reevaluation EA.").

7.     I first visited the San Rafael Desert (which encompasses the Labyrinth Canyon Wilderness and all the oil and gas leases at issue in this litigation) more than two decades ago, and have returned dozens of times since that first visit. Most recently, I visited the San Rafael Desert in March of 2025.

8.     The San Rafael Desert is remote, wild, and undisturbed by the sights and sounds of human interference and development. Future exploration and development on any of these leases will industrialize and destroy this special place, similar to the Twin Bridges project and its accompanying exploration and development activities which I observed firsthand.

9.     On one of my many trips to the San Rafael Desert, I took the following photo of the San Rafael Desert. This photo was taken from within lease UTU-93513, which is at issue in this lawsuit, and shows the spectacular scenery typical of and found throughout the region.



10. I visit the San Rafael Desert for many purposes including for recreational, aesthetic, and professional reasons, and to view and photograph wildlife such as pronghorn antelope. The San Rafael Desert is one of my favorite places and I return as often as I can to enjoy this remote and wild place. I intend to return to the San Rafael Desert within the next few months and certainly before the end of the year.

11. In my many excursions to the San Rafael Desert, I have visited or recreated on the leases at issue this case or in close proximity and within view of them. I enjoy scenic driving, hiking, camping, wildlife viewing, photography, star gazing and just reveling in the solitude and quiet of the San Rafael Desert. In particular, I enjoy exploring the remote canyons and areas of Cottonwood Wash, San Rafael Valley, Spring Canyon, Grovers Mesa, Moonshine Wash, Red Reef, Flat Tops, Sweetwater Reef, Middy Canyon, Three Canyon, Bull Bottom, Trin Alcove, Junes Bottom, Keg Spring Canyon, Keg Spring Knoll, Bowknot Bend, 5-Hole Arch, Horseshoe Canyon, The Frog, and The Spur. I also enjoy hiking and exploring in Cottonwood Wash, Horseshoe Canyon, Keg Spring Canyon, Sweetwater Reef, San Rafael Valley, and Bull Bottom. These areas are each within or near the challenged leases in this lawsuit and otherwise provide views of the public lands encumbered by them. During my travels on the few existing dirt roads in the San Rafael Desert, I have seen the public lands encompassed by the leases on multiple occasions including on my most recent trip to the area in March 2025.

12. The San Rafael Desert, including the Labyrinth Canyon Wilderness, is one of the quietest places I have ever visited. There are very few existing signs of human development. I have spent countless days exploring in and around the Labyrinth Canyon Wilderness and infrequently see or hear other vehicles or people. Due to its remote setting and lack of human

development, the Labyrinth Canyon Wilderness and surrounding areas provide some of the darkest, unspoiled, night skies—entirely free from significant light pollution. The San Rafael Desert, including the Labyrinth Canyon Wilderness, is a prime example of a natural desert landscape. The area is characterized by steep cliffs and canyons and untrammeled soils and vegetation. These values (quiet, solitude, naturalness, and expansive views) are why I come to explore, camp, and hike in the San Rafael Desert and Labyrinth Canyon Wilderness. I took the following photographs, which demonstrate many of these natural qualities and show the landscapes in and near the leases at issue in this litigation.











13. I am unfortunately all too familiar with the impacts of oil and gas leasing and

development in Utah, including in the San Rafael Desert. I have seen places, wildlife habitats and landscapes I love to hike and explore transformed by oil and gas development: remote areas overrun with truck traffic and drilling activities; once natural places degraded through well pad construction and pipeline installation; air quality degraded through flaring and increased travel on dirt. This includes the aforementioned Twin Bridges project, which developed/targeted one of the leases at issue in the Reevaluation EA.[1]

14. Development on any of the reaffirmed leases challenged in this litigation will degrade the naturalness of this unique place, destroy the outstanding solitude, create dust and pollution, increase ambient background noise levels, destroy wildlife habitat, including for pronghorn, and contribute to increases in greenhouse gas emissions. Development activities will include, but not be limited to, new roads, upgrading of existing roads, and increased traffic. In addition, well pads will be constructed, drilling activities will take place and pipelines and related infrastructure will be installed. The new surface disturbance will be—and the recent Twin Bridges disturbance is—visible from long distances in this undeveloped and expansive area. For example, I was able to see and hear the Twin Bridges development activities from numerous vantage points in the area, including the vast amount of dust associated with those activities. Other impacts from the expanded drill pad and widened roads (*e.g.*, areas cleared of vegetation) remain visible today.

15. I visit the Labyrinth Canyon Wilderness and San Rafael Desert to appreciate nature, observe wildlife, to enjoy expansive views of the red rock canyons, and buttes, to escape

---

[1] The Twin Bridges project lease (UTU-93713) is one of the thirty-five leases at issue in SUWA's litigation.

8

the noise and sights of development—I do not come here to view drill rigs, traffic, noise and light pollution from drilling, processing facilities and destroyed soils and vegetation.

16. All of this oil and gas development will directly affect and harm my recreational and aesthetic interests and make it more difficult for me to observe wildlife such as pronghorn antelope. I do not want to see or hear more development in this area, including new or upgraded roads and well pads. The development activities will create industrial noise and lighting in a natural landscape and lead to increased vehicle travel to and from the well pad sites. These activities will destroy the naturalness of the area, the quiet, solitude, and the dark night skies that I appreciate every time I camp or hike in this area.

17. My aesthetic, recreational, and professional interests are harmed by BLM's failure to undertake the requisite environmental analysis prior to reaffirming the leases for development. Without this information, neither BLM nor the public, including SUWA and myself, know the true extent of potential direct, indirect, and cumulative impacts to the irreplaceable resources in the San Rafael Desert.

18. I am harmed by BLM's abrupt reversal in policy and decision not to undertake the pre-leasing analysis related to oil and gas development in the San Rafael Desert as part of the San Rafael Desert MLP. By suddenly abandoning that process, BLM ignored new information regarding wilderness characteristics, water resources, wildlife including pronghorn, and other resources in the San Rafael Desert. This new information demonstrated that much of the public lands in the San Rafael Desert are unsuitable for oil and gas development.

19. Notably, if BLM had completed the MLP process the thirty-five leases at issue in this lawsuit either would not have been issued, because the areas would have been "closed" to new leasing, or issued but with significantly more stringent and protective stipulations and

notices such as no-surface occupancy ("NSO"). For example, under every proposed action alternative in the draft San Rafael Desert MLP environmental assessment, BLM would have required either NSO or "controlled surface use" stipulations for all new leases located in BLM-identified lands with wilderness characteristics (the vast majority of all the leases are in such areas). Similarly, the lease targeted by the Twin Bridges project (UTU-93713) under every proposed action alternative in the MLP would not have been issued at all (because the area would have been "closed" to leasing) or issued with NSO stipulations, which would have—if the MLP had been completed—entirely prevented the Twin Bridges drilling and development activities discussed above.

20. However, the leases at issue in this litigation were not sold and issued (or reaffirmed) with these updated, more environmentally protective, stipulations and restrictions on surface disturbance. Instead, when BLM abandoned the MLP process it sold—and has now reaffirmed—the leases subject to the less environmentally protective stipulations developed in its 2008 land use plan for this area.

21. My interests, as well as SUWA's interests, would be redressed by a favorable result in this lawsuit. With a favorable result in this case, BLM would be required to prepare the pre-leasing analysis it previously and repeatedly found to be required before new leasing in the San Rafael Desert could occur. In addition, BLM would be required to properly analyze and disclose the direct, indirect, and cumulative impacts of leasing and development, and analyze and disclose the environmental impacts of completing—or not—the San Rafael Desert MLP. This analysis—both on the suitability of oil and gas development on the lands at issue and the environmental impacts—could lead to a cancellation of some or all of the leases or to land use

plan amendments that would reduce (or limit) environmental impacts of oil and gas leasing and development in the San Rafael Desert, including the Labyrinth Canyon Wilderness.

I declare, under penalty of perjury, that foregoing is true and correct.

DATED: April 23, 2025

_____
Ray Bloxham