**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SOUTHERN UTAH WILDERNESS
ALLIANCE,

    *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, *et al.*

    *Defendants*,

    and

THE STATE OF UTAH

    *Proposed Intervenor-Defendant*

Case No. 1:24-cv-02476-RC

The Honorable Rudolph Contreras

## MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

LEGAL BACKGROUND ................................................................................................... 2

    I.    The National Environmental Policy Act. ................................................................ 2

    II.    The Oil and Gas Leasing Process. .......................................................................... 3

FACTUAL BACKGROUND ............................................................................................... 5

    I.    BLM Begins, But Declines to Finalize, a Master Leasing Plan for the San Rafael Desert Planning Area. .................................................................................. 5

    II.    BLM Holds Lease Sales In September And December 2018. ................................. 7

    III.    SUWA Sues To Challenge September And December 2018 Lease Sales. ............. 8

    IV.    BLM Completes Supplemental NEPA Analysis. .................................................... 8

    V.    SUWA Sues Again. ............................................................................................... 10

STANDARD OF REVIEW ................................................................................................ 10

ARGUMENT ..................................................................................................................... 11

    I.    SUWA's Claims Are Time-Barred. ...................................................................... 11

    II.    BLM's Decision Not To Complete A Master Leasing Plan For The San Rafael Desert Was Not Arbitrary Or Capricious. .................................................. 13

        A.    The decision not to complete an MLP for the San Rafael Desert was not a change in official policy. ................................................................... 14

        B.    BLM's decisions were not arbitrary or capricious because they satisfied the *Fox* standard. .......................................................................... 15

            1.    The MLP process created duplicative layers of NEPA review. .................................................................................................. 17

            2.    BLM's explanation for ending the San Rafael Desert MLP process did not contradict earlier factual findings. ....................... 22

            3.    The authority SUWA provides does not compel another result. ............................................................................................... 23

    III.    BLM Did Not Have To Complete NEPA Analysis Prior To Terminating The San Rafael Desert MLP Process. .................................................................. 26

IV.    BLM's Analysis Of The Effects Of Leasing On Pronghorn Antelope
       Satisfied NEPA. ................................................................................. 28

       A.    SUWA failed to plead claims relating to pronghorn antelope. ................. 29

       B.    BLM's analysis of the effects of leasing on pronghorn antelope
             satisfies NEPA ................................................................ 30

V.     Federal Defendants Are Entitled To Summary Judgment On SUWA's
       Remaining Claims. ............................................................................. 33

VI.    Any Relief Should Be Carefully Tailored. ........................................... 34

CONCLUSION ........................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abington Mem'l Hosp. v. Burwell*,
  216 F. Supp. 3d 110 (D.D.C. 2016) ................................................................... 33

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ........................................................................... 35

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
  25 F.4th 1 (D.C. Cir. 2022) ......................................................................... 25, 34

*Am. Great Lakes Ports Ass'n v. Schultz*,
  962 F.3d 510 (D.C. Cir. 2020) ..................................................................... 34, 35

*American Wild Horse Preservation Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ........................................................................... 24

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ...................................................................................... 10, 11

*Bauer v. DeVos*,
  325 F. Supp. 3d 74 (D.D.C. 2018) ..................................................................... 24

*Becerra v. U.S. Dep't of the Interior*,
  381 F. Supp. 3d 1153 (N.D. Cal. 2019) ............................................................. 25

*Beshir v. Holder*,
  10 F. Supp. 3d 165 (D.D.C. 2014) ......................................................... 15, 16, 35

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
  575 F.3d 999 (9th Cir. 2009) ............................................................................. 28

*California v. Bernhardt*,
  472 F. Supp. 3d 573 (N.D. Cal. 2020) ............................................................... 24

*Citizens for Clean Energy v. U.S. Dep't of the Interior*,
  384 F. Supp. 3d 1264 (D. Mont. 2019) .............................................................. 27

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................................... 10

*City of Port Isabel v. FERC*,
  130 F.4th 1034 (D.C. Cir. 2025) ........................................................................ 34

*Cloud Found., Inc. v. Salazar*,
  999 F. Supp. 2d 117 (D.D.C. 2013) ................................................................... 29

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ........................................................................................... 12

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  698 F. Supp. 3d 39 (D.D.C. 2023) ..................................................................... 22

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ................................................................................................... 10

*Dist. Hosp. Partners, L.P. v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015) ..................................................................................... 14

*Dist. of Columbia v. U.S. Dep't of Agric.*,
  496 F. Supp. 3d 213 (D.D.C. 2020) ........................................................................... 24

*Doe v. Mayorkas*,
  585 F. Supp. 3d 49 (D.D.C. 2022) .............................................................................. 25

*El Puente v. U.S. Army Corps of Eng'rs*,
  100 F.4th 236 (D.C. Cir. 2024) ............................................................................ 14, 20

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ................................................................................................... 25

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ....................................................................................... 14, 16, 22

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
  463 F. Supp. 3d 1011 (D. Alaska 2020) ..................................................................... 24

*Friends of Animals v. Bureau of Land Mgmt.*,
  No. 2:16-CV-1670-SI, 2018 WL 1612836 (D. Or. Apr. 2, 2018) ......................... 8, 11

*Fund for Animals v. Mainella*,
  294 F. Supp. 2d 46 (D.D.C. 2003) .............................................................................. 26

*Fund for Animals, Inc. v. Thomas*,
  127 F.3d 80 (D.C. Cir. 1997) ..................................................................................... 26

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020) ................................................................................... 25

*Gulf Restoration Network v. Haaland*,
  47 F.4th 795 (D.C. Cir. 2022) .................................................................................... 23

*Indigenous Env't. Network v. U.S. Dep't of State*,
  347 F. Supp. 3d 561 (D. Mont. 2018) ........................................................................ 24

*Laureatus Grp., LLC v. United States Dep't of the Treasury*,
  No. CV 22-2103 (RC), 2024 WL 5278625 (D.D.C. Dec. 2, 2024) ........................... 12

*Lomak Petroleum, Inc. v. FERC*,
  206 F.3d 1193 (D.C. Cir. 2000) ................................................................................. 11

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ..................................................................................................... 2

*MISO Transmission Owners v. FERC*,
  45 F.4th 248 (D.C. Cir. 2022) .................................................................................... 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................................ 24

*Nat'l Ass'n of Home Builders v. E.P.A.*,
    682 F.3d 1032 (D.C. Cir. 2012) ........................................................................... 22, 23

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................................ 19

*Oceana, Inc. v. Evans*,
    384 F. Supp. 2d 203 (D.D.C. 2005) ............................................................................ 10

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ....................................................................................... 24

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*,
    377 F.3d 1147 (10th Cir. 2004) ..................................................................................... 4

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ..................................................................................... 24

*Rhea Lana, Inc. v. United States*,
    925 F.3d 521 (D.C. Cir. 2019) ..................................................................................... 11

*S. Utah Wilderness All. v. Bernhardt*,
    512 F. Supp. 3d 13 (D.D.C. 2021) ..................................................................... 4, 7, 18

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
    789 F.2d 26 (D.C. Cir. 1986) ...................................................................................... 11

*Saunders v. Mills*,
    172 F. Supp. 3d 74 (D.D.C. 2016) ............................................................................... 34

*Seven County Infrastructure Coalition v. Eagle County*,
    No. 23-975, 605  U.S. ---, 2025 WL 1520964 (May 29, 2025) ................................... 11, 26, 34

*Sierra Club v. Bureau of Land Mgmt.*,
    786 F.3d 1219 (9th Cir. 2015) ..................................................................................... 20

*Steele v. United States*,
    657 F. Supp. 3d 23 (D.D.C. 2023) ......................................................................... 29, 30

*Strait Shipbrokers Pte. Ltd. v Blinken*,
    560 F. Supp. 3d 81 (D.D.C. 2021) ............................................................................... 35

*Sw. Airlines Co. v. FERC*,
    926 F.3d 851 (D.C. Cir. 2019) ..................................................................................... 25

*Tomac v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ..................................................................................... 30

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ..................................................................................................... 15

*W. Energy All. v. Salazar,*
709 F.3d 1040 (10th Cir. 2013) ................................................................ 4

*W. Watersheds Project v. Bernhardt,*
519 F. Supp. 3d 763 (D. Idaho 2021) ...................................................... 23

*WildEarth Guardians v. Zinke,*
368 F. Supp. 3d 41 (D.D.C. 2019) ....................................................... 3, 4

*Wilderness Soc. v. Salazar,*
603 F. Supp. 2d 52 (D.D.C. 2009) .......................................................... 32

*Defs. of Wildlife v. Andrus,*
627 F.2d 1238 (D.C. Cir. 1980) ....................................................... 26, 27

*Williams v. Walsh,*
648 F. Supp. 3d 70 (D.D.C. 2022) .......................................................... 12

**Statutes**

28 U.S.C. § 2401 ........................................................................................ 12

30 U.S.C. § 181 ........................................................................................... 3

30 U.S.C. § 226(a) ....................................................................................... 4

42 U.S.C. § 4332 ............................................................................... 2, 3, 26

42 U.S.C. §§ 4321 ....................................................................................... 2

43 U.S.C. § 1712 ............................................................................... 3, 4, 18

43 U.S.C. § 1732 ......................................................................................... 3

5 U.S.C. § 706 ........................................................................................... 10

**Regulations**

40 C.F.R. § 1501.1 (1978) ........................................................................... 2

40 C.F.R. § 1501.6(a) ............................................................................... 5, 6

40 C.F.R. § 1502.3 ....................................................................................... 2

40 C.F.R. § 1508.9 ....................................................................................... 3

40 C.F.R. § 1502.16 ..................................................................................... 3

43 C.F.R. § 1610.1 ..................................................................................... 18

43 C.F.R. § 3100 ...................................................................................... 3, 4

43 C.F.R. § 3120.1 ....................................................................................... 3

43 C.F.R. § 3162.3-1 .................................................................................... 4

43 C.F.R. § 46.100 ..................................................................................... 26

43 C.F.R. § 3120.1-1 .................................................................................................. 4

43 Fed. Reg. 55 (Nov. 29, 1978) ............................................................................... 2

51 Fed. Reg. 15 (Apr. 25, 1986) ............................................................................... 2

81 Fed. Reg. 31 (May 18, 2016) ............................................................................... 6

83 Fed. Reg. 32 (July 13, 2018) ................................................................ 7, 12, 16, 23

85 Fed. Reg. 43 (July 16, 2020) ................................................................................ 2

90 Fed. Reg. 10 (Feb. 25, 2025) ............................................................................... 2

## INTRODUCTION

Plaintiff Southern Utah Wilderness Alliance ("SUWA") brought this suit in August 2024 against the U.S. Department of the Interior, the Bureau of Land Management ("BLM"), and Christina Price, Deputy State Director for the Utah State Office (collectively, "Federal Defendants").  SUWA ostensibly challenged whether supplemental environmental analysis BLM completed in support of 35 oil and gas leases in Utah's San Rafael Desert violated the National Environmental Policy Act ("NEPA").  But SUWA's motion for summary judgment instead focuses on BLM's July 2018 decision to hold lease sales without first completing a discretionary land-use-planning process known as a master leasing plan ("MLP").

SUWA contends that BLM's decision not to complete an MLP for the San Rafael Desert was arbitrary and capricious.  But as much as SUWA might wish that BLM's preparation of an MLP could be summoned back into existence, there is no legal basis to do so (or to compel BLM to do so).  BLM's decision not to complete an MLP was reasonable because existing, statutorily mandated processes did all the same things an MLP was intended to do.  Thus, preparing an MLP was duplicative and unnecessary.  BLM, moreover, had no obligation to conduct NEPA analysis to support this discretionary decision, which did not alter the substantive legal status quo or undo a finalized agency action.

SUWA's claims fail to overcome procedural hurdles, too.  The Administrative Procedure Act's ("APA") six-year statute of limitations bars SUWA's challenges to BLM's July 2018 decision not to complete an MLP for the San Rafael Desert area, as well as SUWA's claims regarding the lack of accompanying NEPA analysis.  SUWA also failed to plead with any clarity its claims concerning the effect of the leases on pronghorn antelope, and the Court should decline to entertain them for the first time at summary judgment.  And SUWA's request for relief, which

1

at bottom seeks to compel BLM to restart a land-use-planning process that it abandoned more than six years ago, is a dramatic overreach.  For all of these reasons, the Court should deny SUWA's motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.

## LEGAL BACKGROUND

**I.    The National Environmental Policy Act.**

NEPA requires that federal agencies consider the environmental consequences of major federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4332; 40 C.F.R. § 1501.1 (1978).[1]  NEPA focuses the attention of agencies and the public on a proposed action so that its consequences may be studied before implementation.  42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

To this end, NEPA requires preparation of an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332 (2)(C); 40 C.F.R. § 1502.3.  The EIS must examine, among other things, "alternatives to the proposed action" and the project's direct, indirect, and cumulative impacts.

---

[1] The Council on Environmental Quality initially promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978) (codified at 40 C.F.R. pts. 1500-1508), and substantively amended those regulations in 1986, *see* NEPA Regulations, 51 Fed. Reg. 15,618 (Apr. 25, 1986) (codified at 40 C.F.R. pt. 1502).  In 2020, CEQ substantially revised the regulations and noted that agency NEPA actions begun before the effective date of the revised regulation (September 14, 2020) could continue under the pre-existing regulations.  *See* Update to Regulations, 85 Fed. Reg. 43,304, 43,339 (July 16, 2020).  CEQ made further substantial revisions in September 2020, as well as in 2021 and 2024, and rescinded all NEPA-implementing regulations in April 2025.  *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020); Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025).  BLM prepared the supplemental NEPA analysis at issue here pursuant to the regulations in effect prior to September 2020, AR000015, which were promulgated in 1978; accordingly, all citations herein are to the 1978 regulations.

42 U.S.C. § 4332 (2)(C)(iii); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. But not every major Federal action requires an EIS. If an agency prepares an Environmental Assessment ("EA"), *see* 40 C.F.R. § 1508.9, and concludes that project impacts will not be significant, it may issue a finding of no significant impact ("FONSI") and forego preparation of an EIS. *Id.* §§ 1501.3, 1501.4(c), (e), 1508.9. EAs may be "tiered" to broader EISs in order to "eliminate repetitive discussions . . . and to focus on the actual issues ripe for decision at each level of environmental review." *Id.* §§ 1502.20, 1508.28.

## II. The Oil and Gas Leasing Process.

BLM manages oil and gas development on federal land consistent with the Mineral Leasing Act of 1920 ("MLA") and the Federal Land Policy and Management Act of 1976 ("FLPMA"). *See* 43 C.F.R. § 3100.0-3. The MLA specifically provides for the leasing of public lands for oil and gas development, 30 U.S.C. § 181, and states that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly." *Id.* § 226(b)(1)(A); *see also* 43 C.F.R. § 3120.1-2. FLPMA directs BLM to "manage the public lands under principles of multiple use and sustained yield," 43 U.S.C. § 1732(a), and identifies "mineral exploration and production" as a "principal or major use." *Id.* § 1702(*l*).

Generally, oil and gas development on federal lands involves three steps. BLM conducts NEPA review at each of these three stages. First, BLM develops an area-wide Resource Management Plan ("RMP"), specifying what areas will be open to development and the conditions placed on such development. 43 U.S.C. § 1712; *WildEarth Guardians v. Zinke ("WEG I")*, 368 F. Supp. 3d 41, 54 (D.D.C. 2019). Such a plan may also incorporate a reasonably foreseeable development scenario ("RFDS") "which projects the scope and pace of oil and gas development within the planning area." *WEG I*, 368 F. Supp. 3d at 54.

Second, BLM may grant leases for the development of specific sites within an area that is open to leasing, subject to the requirements of the RMP. 43 U.S.C. § 1712(e). Leasing decisions occur later in time, in a separate administrative process requiring yet additional NEPA review. *WEG I*, 368 F. Supp. 3d at 54. *See also* 30 U.S.C. § 226(a); 43 C.F.R. § 3100. "BLM may impose terms and conditions on the leases, including conditions designed to protect the environment." *S. Utah Wilderness All. v. Bernhardt ("SUWA")*, 512 F. Supp. 3d 13, 17 (D.D.C. 2021) (citing 43 C.F.R. § 3101.1-3).

Third and finally, a lessee may file an Application for Permit to Drill ("APD"), which requires BLM review and approval before the lessee can act upon it. *WEG I*, 368 F. Supp. 3d at 54; 43 C.F.R. § 3162.3-1(c). BLM must conduct a third layer of NEPA review and approve the APD before a lessee may "commenc[e] any 'drilling operations' or 'surface disturbance preliminary thereto.'" *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151–52 (10th Cir. 2004) (quoting 43 C.F.R. § 3162.3-1(c)). "BLM may condition APD approval on the lessee's adoption of 'reasonable measures,' delimited by the lease and the lessee's surface use rights, to mitigate the drilling's environmental impacts." *SUWA*, 512 F. Supp. 3d at 17 (citing 43 C.F.R. § 3101.1-2).

This case involves the second stage, leasing. The leases at issue here were offered via competitive lease sales, where the highest bidders secure the right to develop, subject to constraints, the federal minerals within the bounds of any lease awarded to them. 30 U.S.C. § 226(b)(1)(A). In determining which lands to offer for lease, BLM considers public expressions of interest and conducts its own internal review process. 43 C.F.R. §§ 3120.1-1, 3120.3-1. Before holding a lease sale, BLM reviews potential parcels to ensure conformance with the relevant RMP. *Id.*; *see also W. Energy All. v. Salazar*, 709 F.3d 1040, 1043 (10th Cir. 2013).

BLM often prepares EAs for lease sales to analyze and disclose the environmental impacts of the proposed leasing decision and any alternatives.  If, based on the EA, BLM determines that the lease sale will not significantly affect the environment, it issues a finding of no significant impact ("FONSI"), 40 C.F.R. § 1501.6(a), and decision record.  The decision record identifies which parcels, if any, will be offered in the upcoming lease sale and which parcels, if any, BLM has decided not to offer in the sale.

## FACTUAL BACKGROUND

### I.    BLM Begins, But Declines to Finalize, a Master Leasing Plan for the San Rafael Desert Planning Area.

In May 2010, BLM introduced the concept of master leasing plans "as a mechanism for completing the additional planning, analysis, and decision-making that may be necessary for areas meeting" certain listed criteria.  Instruction Memorandum ("IM") 2010-117, Oil and Gas Leasing Reform Land Use Planning and Lease Parcel Reviews (May 17, 2010), AR010476.  In essence, the MLP concept resembled BLM's existing RMP process, but differed in that the MLP focused on a smaller geographic area and only considered mineral extraction (while an RMP accounts for grazing, recreation, roads, and other uses of public lands).  BLM acknowledged that MLPs would duplicate other land use planning documents when it noted that "[m]any of the BLM's RMPs . . . also establish resource condition objectives and the general/typical best management practices that will be employed to accomplish these objectives in areas open to leasing."  *Id*.  Although MLPs afforded an opportunity for "additional planning and analysis . . . prior to new oil and gas leasing," the May 2010 IM required them only when four specific criteria were met.  *Id*.  BLM entrusted the decision to prepare an MLP under circumstances where those criteria were not met to "the discretion of the Field Manager, District Manager, or

State Director." *Id*. Critically, BLM only prepared MLPs as a matter of policy; they are not, and have never been, required by statute or regulation.

In 2015, BLM prepared a strategy for completing certain MLPs for federal public lands in Utah. AR011400. BLM concluded that the San Rafael Desert area did not meet all four criteria set out by IM 2010-117, and so an MLP was not required under then-existing policy. But BLM nonetheless, as a matter of discretion, began preparing one. AR011401-02. BLM's stated "primary reason" for doing so was "to resolve long-standing lease protests and complete 'curative NEPA' for leases which were placed in suspension because of litigation." AR011402. The MLP effort would also resolve protests over "five sold-but-not-issued lease parcels" in the area. *Id*. At the same time, exercising "the discretion afforded to State Directors by Leasing Reform, the BLM-Utah . . . deferred new leasing proposals submitted for all lands within the approved, but pending MLPs in order to preserve potential alternatives for those MLPs," and stated that this deferral was "likely to continue until the MLPs [were] completed." AR011401.

BLM's Price and Richfield Field Offices then began preparing an EA for the San Rafael Desert MLP. *See* Notice of Intent To Prepare a Master Leasing Plan, Amend the Resource Management Plans for the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment, Utah, 81 Fed. Reg. 31,252 (May 18, 2016). BLM prepared a high-level "fact sheet" to provide information about the MLP to the public as part of soliciting comments about the scope of its analysis. AR010536. BLM also held public meetings to provide further information and solicit comments, and during at least one of those meetings, presented slides on the proposed purpose and need for the MLP. AR010905-06. In 2016, BLM developed an RFDS in preparation for the MLP analysis, AR005222-54, and began to prepare a draft EA for the San Rafael Desert MLP. AR011000-399.

Ultimately, however, BLM declined to complete the EA or even issue a draft for public review. AR000821 (noting that "BLM never released a draft MLP to the public")[2]. In 2018, before the draft EA was finalized, BLM ended the MLP policy. IM 2018-034, Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews (Jan. 31, 2018), AR005608-18. BLM explained that the MLP process "created duplicative layers of NEPA review" in light of other land-use-planning processes. AR005610. On July 13, 2018, BLM published a Notice of Termination for the San Rafael Desert MLP, which referenced BLM's ending of the MLP policy more generally. Notice of Termination of the San Rafael Swell Master Leasing Plan, Utah, 83 Fed. Reg. 32,681 (July 13, 2018).

## II.    BLM Holds Lease Sales In September And December 2018.

BLM had, in its discretion, refrained from holding lease sales while preparing the MLP, *see* AR011401, but BLM's Utah State Office restarted the lease sale process after BLM terminated the MLP policy, *see* AR000544. In support of the September 2018 lease sale, BLM prepared an EA. AR005409. For the December 2018 lease sale, BLM prepared a Determination

---

[2] SUWA insists throughout its brief that the draft EA for San Rafael Desert MLP was "released . . . for public review and comment," ECF No. 29-1 at 12, that BLM "invited public comments on the draft San Rafael Desert MLP EA," *id*. at 13, and that "BLM received hundreds of comments, including from SUWA," *id*. SUWA does not provide any record cites in support of these statements. Although BLM received comments during the scoping period, these comments were not responsive to a draft EA. And the draft EA included in the administrative record, which was attached to a public comment by SUWA concerning the Reevaluation EA, contains numerous placeholders indicating that the draft was internal to BLM and not intended for public use. *See* AR011358 (placeholder stating "[Information to be provided by the BLM for inclusion in the public draft EA.]"), AR011376 (similar), AR011379 (similar)). Although not reflected in the administrative record, BLM's understanding is that SUWA obtained this document through a Freedom of Information Act request.

of NEPA Adequacy[3] ("DNA") and concluded that four existing NEPA analyses sufficiently

addressed the issues that any NEPA analysis prepared in connection with the December 2018

lease sale would address.  AR005889, AR005892.  Through this process, BLM's Price Field

Office ultimately offered 77 leases.  AR000544.

### III.    SUWA Sues To Challenge September And December 2018 Lease Sales.

In 2020, SUWA and three other environmental organizations sued in this Court to

challenge the adequacy of BLM's NEPA analysis in connection with the September 2018 and

December 2018 lease sales.[4]  Docket No. 1:20-cv-03654-RC, ECF No. 46-1, AR010258,

AR010286-88.  The parties ultimately settled that case in December 2022 by written agreement

(the "Settlement Agreement"), whereby BLM agreed to prepare a new NEPA analysis to address

alleged deficiencies in the prior analysis.[5]  AR000017.

### IV.    BLM Completes Supplemental NEPA Analysis.

In June 2024, BLM completed the supplemental NEPA analysis (the "Reevaluation EA")

it had agreed to undertake in the Settlement Agreement.  AR000535.  BLM tiered its analysis to

---

[3] A Determination of NEPA Adequacy "'confirms that an action is adequately analyzed in existing NEPA document(s) and is in conformance with the [applicable] land use plan.'" *Friends of Animals v. Bureau of Land Mgmt.*, No. 2:16-CV-1670-SI, 2018 WL 1612836, at *9 (D. Or. Apr. 2, 2018) (quoting U.S. Department of Interior, Bureau of Land Management, National Environmental Policy Act Handbook, H–1790–1 at § 5.1).

[4] Just as it does in the present litigation, SUWA also challenged BLM's decision not to complete an MLP for the San Rafael Desert area and the alleged failure to prepare NEPA analysis in connection with that decision.  AR010288-90.

[5] Although referenced for context, the specific terms of the Settlement Agreement are not relevant here as SUWA does not seek enforcement of that Agreement, nor could it.  The Agreement provides that SUWA's "sole remedy for any failure by BLM to complete [its] obligations . . . is to rescind this Agreement and reinstate this litigation by refiling the claims currently pending in this action," and further that any such litigation "may not be asserted as a claim for violation of this Agreement or in a motion to enforce the terms of this Agreement." AR000016.

the 2008 Price RMP, as well as the September 2018 EA and December 2018 DNA in support of the original lease sales. AR000544-45. BLM considered all of the environmental impacts it had agreed to consider in the Settlement Agreement for the remaining 59 leases[6] at issue. AR000563-678. BLM analyzed two alternatives in addition to the no-action alternative. AR000554-59. The public had from July 26, 2023, to August 25, 2023, to provide comments, to which BLM responded. AR000552, AR000813. BLM stated that it would "consider an RMP amendment after completion of this EA." AR000825. And ultimately, in reliance upon the Reevaluation EA, BLM elected to affirm the 51 remaining leases.[7] AR011421.

SUWA made a series of comments in response to the Reevaluation EA, some of which restated its position raised in its prior lawsuit about BLM's alleged "reversal of the MLP policy." AR000820. SUWA reiterated its concerns about BLM's supposed failure to "finaliz[e] the 'required' pre-leasing NEPA analysis" and "provide a reasoned explanation for how/why the agency's prior yearslong position regarding the need for pre-leasing NEPA analysis for the San Rafael Desert was/is no longer accurate or relevant." *Id.* In response to these concerns, BLM explained that "the MLP was not finalized," it had numerous other avenues—including "site-specific analysis" and "an RMP amendment"—to implement new leasing stipulations, and the MLP process "created duplicative layers of NEPA review." AR000820-21. In addition, BLM explained that the "decision not to prepare an MLP for the San Rafael Desert is not a major federal action requiring NEPA" because "these 59 lease parcels, since at least 2008, have

---

[6] Eighteen of the 77 leases at issue the first time SUWA brought suit terminated before BLM completed the supplemental NEPA analysis. AR000544.

[7] While BLM was in the process of completing the Reevaluation EA, lessee North American Helium fully relinquished eight leases. AR011421.

remained open for oil and gas development in accordance with the relevant RMP," and thus BLM "has not changed position on the status of these lands."  AR000821.

V.    **SUWA Sues Again.**

SUWA filed the complaint that began this lawsuit on August 28, 2024, challenging the adequacy of the supplemental NEPA analysis, which supports the re-affirmance of the 35 leases, and reiterating its claims regarding the San Rafael Desert MLP that it had asserted in 2020.  ECF No. 1.  SUWA thereafter amended its complaint to add claims under the Endangered Species Act, ECF No. 8, which it has now abandoned, *see* Argument, Section V, *infra*.  The State of Utah filed a motion to intervene on April 9, 2025.  ECF No. 25.  Pursuant to the Court's April 8, 2025 Order, SUWA filed its Motion for Summary Judgment on April 25, 2025.  ECF No. 29.

## STANDARD OF REVIEW

SUWA asks the Court to overturn BLM's actions under the APA.  The APA allows review of "agency action," and dictates the type of agency action that is judicially reviewable, when it is judicially reviewable, the scope of review permitted, and the standard to be applied by a reviewing court.  5 U.S.C. §§ 701–706.  In evaluating the legal sufficiency of informal agency actions, such as those challenged here, the Court applies the "arbitrary and capricious" standard of the APA.  5 U.S.C. § 706(2)(A).  *See also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004).  The standard of review for decisions challenged on these grounds is narrow and the agency's actions "are presumed valid."  *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 211 (D.D.C. 2005).

"The court is not empowered to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Rather, a court's role is to decide whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.*; *see also Baltimore Gas & Elec. Co. v. Natural*

*Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). Judicial review of agency action under the APA is "based solely on the record compiled by the agency when issuing its decision . . . ." *Rhea Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019). And "the party challenging an agency's action as arbitrary and capricious bears the burden of proof." *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000) (quoting *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc)).

The Supreme Court recently clarified the fundamental principles of judicial review for NEPA claims. In *Seven County Infrastructure Coalition v. Eagle County*, No. 23-975, 605 U.S. ---, 2025 WL 1520964 (May 29, 2025), the Court explained that a "course correction" was "appropriate to bring judicial review under NEPA back in line with statutory text and common sense." *Id*. at *9. It rejected the practice of courts taking "an aggressive role in policing agency compliance," and held that the "bedrock principle" governing review in NEPA cases is "[d]eference." *Id.* at *6, *9. It recognized that "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry" when analyzing impacts under NEPA, and clarified that these choices must be upheld if "they fall within a broad zone of reasonableness." *Id.* at *8. Consistent with those principles, the role of courts in NEPA litigation is limited to ensuring "that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec.*, 462 U.S. at 97–98 (1983).

## ARGUMENT

### I.    SUWA's Claims Are Time-Barred.

The main thrust of SUWA's argument is that BLM erred when it decided not to complete an MLP for the San Rafael Desert before offering leases for sale in that area or, at the least, should have completed NEPA analysis before making the decision not to complete an MLP.

BLM made these decisions in July 2018, and SUWA sued to challenge them in August 2024—after the relevant statute of limitations had expired.

"A suit challenging final agency action pursuant to the APA must be commenced within six years after the right of action first accrues." *Williams v. Walsh*, 648 F. Supp. 3d 70, 90 (D.D.C. 2022) (citation and brackets omitted); *see also* 28 U.S.C. § 2401(a).  The APA statute of limitations "begins to run only when the plaintiff has a complete and present cause of action." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 813 (2024).  Since the Supreme Court's decision in *Corner Post*, at least one court in this district has looked to the date "the alleged injury occurred" as the date a claim accrues for statute of limitation purposes. *Laureatus Grp., LLC v. United States Dep't of the Treasury*, No. CV 22-2103 (RC), 2024 WL 5278625, at *2 n.5 (D.D.C. Dec. 2, 2024).

Here, on July 13, 2018, BLM announced that it would not complete San Rafael Desert Master Leasing Plan, a decision which "[took] effect immediately."  83 Fed. Reg. 32,681.  And SUWA's standing declarant has averred, "I am harmed by BLM's abrupt reversal in policy and decision not to undertake the pre-leasing analysis related to oil and gas development in the San Rafael Desert as part of the San Rafael Desert MLP."  ECF No. 29-4 ¶ 18.  The "reversal" at issue could not be anything other than BLM's July 2018 announcement that it had decided not to complete an MLP for the San Rafael Desert, making that decision the moment of alleged injury.  SUWA had six years, or until July 13, 2024, to sue based on this alleged injury but did not file this lawsuit until August 28, 2024.  Thus, SUWA's Claims Two and Three, which pertain to BLM's decision not to complete an MLP for the San Rafael Desert and the alleged failure to conduct NEPA analysis before doing so, respectively, are time-barred.

SUWA attempts to frame its MLP-related claims in the context of the Reevaluation EA. *See* ECF No. 8 ¶ 148 ("The Reevaluation EA . . . incorporates IM 2018-34 as the agency's 'explanation' for its abrupt reversal."). Yet SUWA also argues in its briefing that "the MLP policy was . . . distinct from BLM's lease reevaluation process conducted in 2024." ECF No. 29-1 at 25. SUWA's standing declarant does not identify a separate harm relating to BLM's explanation in the Reevaluation EA of its decision not to complete the MLP process. It cannot be the case, moreover, that the mere mention of a prior decision in a subsequent environmental analysis serves to restart the statute of limitations. Otherwise, any commenter could make an end-run around the statute of limitations by raising concerns about an agency decision in a later planning process—even decades after the fact.

SUWA's suggestion, moreover, that "in the Reevaluation EA, BLM made a new decision not to prepare a NEPA analysis prior to abandoning the San Rafael Desert MLP process" is chronologically nonsensical. ECF No. 29-1 at 37. BLM decided not to complete an MLP for the San Rafael Desert in 2018. BLM could not have made a new decision, in 2024, not to complete a NEPA analysis "prior to abandoning" a process that had ended six years beforehand. The Court should not entertain these claims and should grant summary judgment in Federal Defendants' favor on Claims Two and Three.

## II.     BLM's Decision Not To Complete A Master Leasing Plan For The San Rafael Desert Was Not Arbitrary Or Capricious.

Plaintiffs assert that BLM failed to provide a "reasoned explanation" for its decision not to complete an MLP for the San Rafael Desert area. *See* ECF No. 29-1 at 20-34. But no statute or regulation required BLM to develop an MLP, and the associated EA never progressed beyond an internal draft. BLM retained the discretion to end the San Rafael Desert MLP process before

its completion. And even if BLM was required to give a "reasoned explanation" for not

completing the San Rafael Desert MLP process, it did so.

     A.    <u>The decision not to complete an MLP for the San Rafael Desert was not a change
in official policy.</u>

     A court may set aside, as "arbitrary or capricious," an agency's change in policy for

which it did not "provide reasoned explanation . . . ." *F.C.C. v. Fox Television Stations, Inc.*,

556 U.S. 502, 515 (2009). But as an initial matter, BLM's decision not to complete an MLP for

the San Rafael Desert area need not satisfy the *Fox* standard. The discretionary decision to begin

to develop an MLP does not constitute an agency policy as contemplated by the Court in *Fox*,

and the San Rafael Desert MLP never progressed beyond the initial draft stage.

     SUWA challenges something preliminary, internal, and discretionary: the decision not to

finish an incomplete planning document. The standard set forth in *Fox* does not apply to this sort

of decision. *See El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 256 (D.C. Cir. 2024)

(explaining that "preliminary correspondence . . . did not embody the sort of authoritative agency

policy or position that triggers the rule" from *Fox*); *Dist. Hosp. Partners, L.P. v. Burwell*, 786

F.3d 46, 58 (D.C. Cir. 2015) (declining to apply *Fox* where a plaintiff sought to "impugn" a

rulemaking with a draft rule because the "draft was never 'on the books' in the first place").

Under SUWA's view, an agency would be required to provide a reasoned, public explanation

every time it elects not to finish a project or draft document. The law does not demand this.

     Contrary to SUWA's argument, then, the finality (or lack thereof) of the San Rafael

Desert MLP is material here. *See* ECF No. 29-1 at 22. Had BLM completed the MLP and

bound itself to new leasing restrictions going forward, the decision to rescind the document

would likely have amounted to a reversal of policy that triggered analysis under the *Fox* rubric.

14

But where, as here, the MLP did not progress beyond the internal draft stage, BLM was well within its discretion to choose not to complete the process.

Furthermore, to the extent SUWA seeks an order that compels BLM to either complete the San Rafael Desert MLP or to explain why it should not have to do so, that relief is unavailable because IM 2010-117—which established the MLP process—was an internal, non-binding, unenforceable agency guidance document. *See Beshir v. Holder*, 10 F. Supp. 3d 165, 180 (D.D.C. 2014); *see also See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524-25, 543-48 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them"). And even were the IM enforceable, it did not require completion of an MLP for any specific geographic area. Instead, it required an MLP only for areas that met all of four specific criteria, which BLM-Utah determined that the San Rafael Desert did not meet. AR010476; AR011401-02. SUWA fails to identify an official policy upon which BLM supposedly reversed course, or any legal obligation that would compel BLM to complete the San Rafael Desert MLP, and as such its claims concerning the San Rafael Desert MLP lack merit.

B.    BLM's decisions were not arbitrary or capricious because they satisfied the *Fox* standard.

Alternatively, even if the decision not to complete an MLP for the San Rafael Desert area were a change in policy, BLM satisfied the standard set forth in *Fox*. An agency's change in policy is not arbitrary or capricious when: (1) the agency "display[s] awareness that it *is* changing position," (2) the agency "show[s] that there are good reasons for the new policy," though they need not be "*better* than the reasons for the old one," (3) the agency "*believes*" the new policy "to be better," which can be demonstrated by "the conscious change of course,"; and

(4) the "new policy is permissible under the statute . . . ." *Fox*, 556 U.S. at 515. Under this standard, a court may set aside, as "arbitrary or capricious," an agency's change in policy for which it did not "provide reasoned explanation . . . ." *Id.* BLM satisfied each of those requirements here.

First, BLM "display[ed] awareness that it [was] changing position." *Id.* BLM issued a new IM, explaining that it was ending the MLP concept, and issued a Notice of Termination for the San Rafael Desert MLP in the Federal Register. AR005610; 83 Fed. Reg. 32,681. Second, BLM gave "good reasons for the new policy." *Id.* BLM explained in IM 2018-34 that the MLP concept set forth in IM 2010-117 "created duplicative layers of NEPA review." AR005610. And BLM declined to complete an MLP for the San Rafael Desert area because it had terminated the MLP concept itself. 83 Fed. Reg. 32,681. Third, this "conscious change of course adequately indicate[s]" that BLM believed that ending the MLP concept, and thus not completing the San Rafael Desert MLP, would be the better course. *Fox*, 556 U.S. at 515. In IM 2018-034, BLM set out a policy "to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens"—and ending the MLP concept, with the duplicative layers of review it imposed, was part of that policy decision. AR005609. And fourth, because neither the MLA nor FLPMA, which govern land-use planning, required MLPs, ending both the concept and the San Rafael Desert MLP process was "permissible under the statute."[8] *Fox*, 556 U.S. at 515. BLM's decisions to end the MLP concept and to terminate the San Rafael Desert MLP process were not arbitrary and capricious.

---

[8] IM 2010-117 itself—which established the MLP process—was an internal agency guidance document, and therefore not enforceable against BLM. *Beshir*, 10 F. Supp. 3d at 180. And the San Rafael Desert area did not meet all four criteria that would require production of an MLP, making the decision to prepare one BLM's discretionary decision. AR011401-02.

Plaintiffs challenge only one of these elements, and argue that BLM did not provide a "reasoned explanation" for these decisions on several fronts.  But none of those challenges, nor any of the cases Plaintiffs cite in support, alter this outcome.

        1.     *The MLP process created duplicative layers of NEPA review.*

SUWA argues at length that BLM's conclusion that the MLP process duplicated other NEPA processes was unreasonable.  *See* ECF No. 29-1 at 22-28.  In support of this argument, SUWA makes two primary points: (1) that the MLP process was distinct from the 2008 Price RMP because BLM intended it to consider different information and restrictions on leasing, *see* ECF No. 29-1 at 23-25; and (2) that the MLP considered issues not accounted for at the leasing stage (including the Reevaluation EA), *see id.* at 25-28.

These arguments fail to persuade.  Just because elements of the draft San Rafael Desert MLP have yet to be incorporated into the Price RMP or added as stipulations in the lease sale or Reevaluation EA does not make the MLP process, as a whole, meaningfully distinct from other land-use-planning efforts.  BLM can indeed consider the elements about which SUWA expresses concern—new information, changed circumstances, and more restrictive leasing stipulations— through existing, statutorily mandated processes.  BLM therefore reasonably concluded that the use of MLPs "created duplicative layers of NEPA review," AR005610, and it follows that the San Rafael Desert MLP was one such duplicative layer.  This is so for two primary reasons.

First, BLM accomplishes many of the same goals of the MLP process—addressing changed circumstances, updated policies, and new information—through the RMP process, which is also a region-wide, pre-leasing planning document.  For example, BLM explained that the MLP concept would allow it to "reconsider RMP decisions pertaining to [oil and gas] leasing" and "analyze likely development scenarios and varying mitigation levels . . . ."

AR010476.  BLM also explained that the "two main elements" of an MLP are "the development of (1) resource condition objectives and (2) resource protection measures," which, respectively, could be "incorporate[d] . . . into the RMP through amendment or revision" or might prompt BLM to "adopt new management actions in the RMP."  AR010662-63.  These are plainly all actions that BLM could also take directly through either preparing or amending RMPs.  *See* 43 U.S.C. § 1712; 43 C.F.R. § 1610.1 *et seq*.  Indeed, BLM conceived the MLP concept as a sort of RMP amendment.  *See* AR010476 ("The MLP will ordinarily be initiated as a land use plan amendment.").  So, the general statements of policy underlying the MLP concept upon which Plaintiffs rely apply equally to the RMP process.  Everything an MLP could do, an RMP can do as well.

Second, BLM can consider imposing restrictions on development later in the regulatory process.  Leases, by default, include the protective stipulations set forth in the governing RMP.  But at the APD stage, "BLM may condition APD approval on the lessee's adoption of 'reasonable measures,' delimited by the lease and the lessee's surface use rights, to mitigate the drilling's environmental impacts."  *SUWA*, 512 F. Supp. 3d at 17 (citing 43 C.F.R. § 3101.1-2).

SUWA contends that, because BLM intended the MLP concept to be "purposefully distinct" from the earlier RMP process and to fill a gap in "pre-leasing NEPA review that the agency had never previously prepared," BLM's reason for ending the San Rafael Desert MLP process was arbitrary and capricious.  ECF No. 29-1 at 23-24, 25, 29, 32-33.  True, BLM intended the MLP concept "to provide 'additional planning and analysis . . . prior to new oil and gas leasing because of chang[ed] circumstances, updated policies, and new information.'"  *Id*. at 24 (quoting AR010662; AR010476).  But BLM thereafter concluded that the MLP process was duplicative of other NEPA review processes and ceased use of the concept.  And BLM has no

obligation to conduct new or even supplemental NEPA analyses every time new information arises. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72–73 (2004). In the land-use-planning context, BLM has discretion to decide how and when to address new information, policies, and circumstances after an RMP has issued—such as through a new RMP or an RMP amendment. BLM may also analyze new information in environmental analyses underlying lease sales. SUWA offers no authority for the proposition that BLM must analyze new information through the MLP process. Neither the MLA, nor FLPMA, nor BLM's regulations require it to engage in the MLP process; BLM created it of its own initiative by an internal memorandum. BLM can do away with its creation by internal memorandum, too.

BLM concisely summarized many of these points in the Reevaluation EA. In response to SUWA's comments reiterating its concerns about the 2018 decision not to complete an MLP for the San Rafael Desert area, BLM explained that it had numerous other avenues—including "site-specific analysis" and "an RMP amendment"—to implement new leasing stipulations. AR000820. BLM further explained that it is "not precluded from determining whether an RMP amendment may be necessary to adjust resource allocations." AR000820. Thus, BLM explained how the MLP policy created duplicative layers of NEPA review, why that analysis was no longer required, and how it could account for new information and changed circumstances going forward. Thus, it is not the case that BLM's description of the MLP process as duplicative of

existing land-use-planning processes is too "perfunctory" to support BLM's alleged reversal of position.[9]  *See* ECF No. 29-1 at 33.

SUWA also argues that, because BLM stated that certain decisions were "beyond the scope" of the Reevaluation EA, the MLP process was not duplicative of existing processes.  ECF No. 29-1 at 27-28.  SUWA takes these statements out of context.  The scope of the decision before BLM in the Reevaluation EA was "whether to affirm the BLM's 2018 leasing decisions for the remaining 59 leases, cancel these leasing decisions (or a portion therein), or amend and affirm the leases with revised terms."  AR000545.  In the course of the Reevaluation EA process, BLM also "considered whether an RMP amendment may be necessary and appropriate to rebalance the resource allocation decisions applicable to the [Price Field Office]," but ultimately decided that no RMP amendment was necessary in light of the "determination that affirming the previous leasing decisions (and potential development) for the 59 leases will not cause significant impacts" to the environment.  AR000906-07.  The RMP includes all leasing stipulations that are included, by default, in a lease.  So, if the 59 leases had no significant impact, it follows that the RMP, seen through the lens of the Reevaluation EA, did not need amendment.  If, on the other hand, BLM had found significant impacts to the environment, this could have been a sign that the RMP's stipulations needed reinforcement or amendment.  BLM's explanation that two alternatives that would entail amending the 2008 Price RMP were "beyond

---

[9] SUWA also contends that BLM had to, but failed to, explain "<u>why</u> the updated leasing stipulations, BMPs, and leasing categories prepared in the San Rafael Desert MLP EA are no longer needed or relevant."  ECF No. 29-1 at 33 (emphasis in original).  BLM does not contend that the information in the EA is unneeded or irrelevant, and even if it did, because the MLP EA was not a final document, BLM had no obligation to explain a reversal from those findings.  *See El Puente*, 100 F.4th at 256; *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1226 (9th Cir. 2015).  Suffice it to say that BLM could account for all of these elements in other planning processes.

the scope" of the decision in the Reevaluation EA makes good sense given BLM's finding of no significant impact. This does not mean, and does not say, that BLM lacked all ability to add more restrictive lease terms, or consider new information, outside of the MLP process.

SUWA also suggests that BLM concluded that "the thousands of pages of information and data related to the MLP are no longer relevant" or "cease[d] to exist." ECF No. 29-1 at 22. Not so. BLM concluded that the MLP process was duplicative of other processes but never dismissed or disposed of the data collected in support of the MLP process. Indeed, in the Reevaluation EA, BLM cited the reasonably foreseeable development scenario prepared in connection with the San Rafael Desert MLP (a document that, unlike the draft MLP EA, was actually finalized). *See* AR000558, AR000562, AR000689. If anything, BLM's subsequent use of MLP data illustrates the degree to which these land-use-planning processes overlap.

Lastly, SUWA argues that BLM did not sufficiently explain its decision to terminate the San Rafael Desert MLP process after it identified potential leasing limitations in *that* process that could not be incorporated during the leasing stage. ECF No. 29-1 at 26-27. In doing so, Plaintiffs rely heavily on the draft MLP EA—a draft begun in support of a land-use-planning decision, which itself was never finalized or released to the public. SUWA's citations to the internal draft EA, then, do not reflect any formal, adopted positions of BLM. The draft was still in the process of being internally considered, revised, and vetted. SUWA might just as well cite an agency's proposed rule, prior to notice and comment, as evidence of final, binding regulations. That BLM could not incorporate an incomplete land-use-planning-level analysis into a leasing decision does not render its explanation for terminating that land-use-planning process arbitrary and capricious, particularly when it could address the relevant issues through other land-use-planning means. SUWA's arguments on this front are meritless.

21

2.    *BLM's explanation for ending the San Rafael Desert MLP process did not contradict earlier factual findings*.

SUWA argues that BLM's explanation for not completing the San Rafael Desert MLP is not "reasoned" because it contradicts earlier "factual findings" and statements. *See* ECF No. 29-1 at 29. Specifically, SUWA contends that BLM's explanation for ending the San Rafael Desert MLP process contradicted earlier determinations that an MLP was "required prior to the agency selling new leases for development in the San Rafael Desert." ECF No. 29-1 at 29. In so doing, SUWA invokes the requirement that an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy . . . ." *Fox*, 556 U.S. at 515.

For the requirement to provide a "more detailed justification" to apply, the plaintiff must identify "contradictory" findings; if an agency "did not rely on new facts," but rather "reevaluat[ed] which policy would be better in light of the facts," *Fox* does not compel the agency to provide a more detailed justification. *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1038 (D.C. Cir. 2012); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 75 (D.D.C. 2023) (declining to apply higher standing given lack of "specific factfindings that contradict" prior position).

None of the statements that SUWA invokes constitute "factual findings" for purposes of *Fox*; instead, BLM simply reevaluated the policy decision that it must complete an MLP before it offered more leases for sale. Throughout its brief, SUWA cites the same three documents for the proposition that BLM at some point determined that an MLP was "required" for the San Rafael Desert. *See* ECF No. 29-1 at 12-13, 24-25, 34. SUWA relies on general statements drawn from a fact sheet and a two-slide presentation given at the scoping stage to explain the purpose of the

22

MLP, *see* AR010905-06, AR010536-37, as well as the statement of need in the draft San Rafael

Desert MLP EA, AR011012—which was never completed or issued to the public, *see*

AR000821.  But BLM maintained the consistent position throughout this process that the

decision to undertake preparation of an MLP for the San Rafael Desert area was discretionary.

AR011401-02.  Specifically, BLM stated that its "primary reason for initiating" the MLP was "to

resolve long-standing lease protests and complete 'curative NEPA' for leases which were placed

in suspension because of litigation."  AR011402.

Absent from BLM's rationale for the commencement of this process is a factual finding

that preparing an MLP was "required," whether by IM 2010-117 or some other obligation.  And

the fact that BLM later, after rescinding the IM that instituted the MLP process in the first place,

"reevaluat[ed] which policy would be better" and elected, in its discretion, not to finish the MLP

does not compel it to provide a "more detailed justification."  *Nat'l Ass'n of Home Builders*, 682

F.3d at 1038.  In short, BLM's decision not to complete an MLP for the San Rafael Desert area

neither contradicts its earlier factual findings nor compels a more detailed explanation than BLM

has already given.

3.    *The authority SUWA provides does not compel another result.*

SUWA relies on a series of cases for the proposition that BLM's decision to discontinue

the MLP concept constituted an "unexplained or ill-explained agency about-face."  ECF No. 29-

1 at 30; *see also id*. at 29-34.  But none of those decisions support that proposition in this

context.

Most of the cases on which SUWA relies address reversals of final decisions rendered

through the notice-and-comment rulemaking process.  For example, *Gulf Restoration Network v.*

*Haaland*, 47 F.4th 795 (D.C. Cir. 2022), concerned whether the Bureau of Ocean Energy

Management's EISs, prepared in conjunction with lease sales in the Gulf of America and finalized after public comment, complied with NEPA.  *Id*. at 799, 803.  Similarly, *W. Watersheds Project v. Bernhardt*, 519 F. Supp. 3d 763, 790–95 (D. Idaho 2021), addressed BLM's 2019 amendments to its 2015 sage-grouse planning decisions—both of which were the result of completed planning processes.  *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015), likewise concerned two final decisions issued two years apart taking opposite positions based on the same factual record.  Finally, *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 923–28 (D.C. Cir. 2017), concerned the Forest Service's de-designation in 2013 of a given tract of land as "Wild Horse Territory" that had been treated as such under final planning decisions going back to 1975.

Put simply, none of these cases come close to requiring the same level of explanation for ending a non-final land-use-planning process implemented through a non-binding internal memorandum.  Even if they did, BLM's explanation for ending the MLP concept—that it duplicated other NEPA analyses—was both accurate and consistent with its acknowledgement in IM 2010-117 that RMPs "also establish resource condition objectives and the general/typical best management practices that will be employed to accomplish these objectives in areas open to leasing."  AR010476.

Most of the rest of Plaintiffs' cases likewise address agency action that altered or rescinded already-final decisions or implemented regulations—neither of which exists here. *See e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) (rescinded final rule); *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644–48 (D.C. Cir. 2020) (EPA directive departed from OGE ethics regulations); *Dist. of Columbia v. U.S. Dep't of Agric.*, 496 F. Supp. 3d 213, 249–50 (D.D.C. 2020) (rescinded final rule); *Bauer v.*

*DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018) (stay of final rule); *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011, 1018–22 (D. Alaska 2020) (agency action contrary to earlier final decision); *California v. Bernhardt*, 472 F. Supp. 3d 573, 605 (N.D. Cal. 2020) (rescinded final rule); *Indigenous Env't. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 582–84 (D. Mont. 2018) (finding agency decision contrary to earlier final decision); *Cal. by & through Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1165–68 (N.D. Cal. 2019) (repeal of regulations).

Other cases relied on by Plaintiffs address a change of policy acknowledged for the first time in an enforcement action, adjudication, or a formal statement of policy.  But changes in policy implemented through enforcement actions, adjudications, and other public-facing formal procedures implicate reliance interests of parties subject to those processes that are not in play here.  In the present case, SUWA challenges BLM's decision to change course on an internal memorandum that did not create any enforceable rights.  In short, SUWA has offered no authority for the proposition that BLM's decision not to complete an MLP for the San Rafael Desert area amounted to an "about-face" that required a substantial explanation.  *See e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 218-223 (2016) (agency changed interpretation of key term in regulations through enforcement action); *MISO Transmission Owners v. FERC*, 45 F.4th 248, 257 (D.C. Cir. 2022) (agency used methodology in rate determination that court held arbitrary and capricious); *Doe v. Mayorkas*, 585 F. Supp. 3d 49, 62 (D.D.C. 2022) (agency changed approach as pertains to immigration status of at-risk migrant children); *Grace v. Barr*, 965 F.3d 883, 897–903 (D.C. Cir. 2020) (agency changed approach to adjudicating asylum claims); *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 855–59 (D.C. Cir. 2019) (agency dismissed complaints based on changed approach to calculations); *Am. Fed'n of Gov't Emps., AFL-CIO v.*

25

*Fed. Lab. Rels. Auth.*, 25 F.4th 1, 3 (D.C. Cir. 2022) (agency changed policy setting forth

interpretation of statute).  BLM need not have provided a more expansive explanation than it did.

### III.    BLM Did Not Have To Complete NEPA Analysis Prior To Terminating The San Rafael Desert MLP Process.

SUWA argues that BLM should have, but failed to, prepare a NEPA analysis before it

terminated the MLP policy.  As an initial matter, this claim is plainly time-barred.  *See* Argument

Section I, *supra*.  But the substance of SUWA's argument lacks merit, too, and falters against the

"bedrock principle of judicial review in NEPA cases"—that is, "[d]eference."  *Seven County*,

2025 WL 1520964, *9.

NEPA requires BLM to analyze environmental impacts for "major Federal actions"

within its purview.  42 U.S.C. § 4332(C); *see also* 43 C.F.R. § 46.100(a) ("A bureau proposed

action is subject to the procedural requirements of NEPA if it would cause effects on the human

environment, and is subject to bureau control and responsibility." (citations omitted)).  But not

everything an agency does, or chooses not to do, constitutes a major federal action.  Certain

decisions are too inchoate to qualify as "actions."  *Defs. of Wildlife v. Andrus*, 627 F.2d 1238,

1243 (D.C. Cir. 1980) ("[O]nly when an agency reaches the point in its deliberations when it is

ready to propose a course of action need it be ready to produce an impact statement.").  New

policies that "maintain[] the substantive *status quo*" similarly do not qualify.  *Fund for Animals,*

*Inc. v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997).  And some discretionary decisions—

particularly "failure[s] to exercise . . . discretion" to act—do not trigger the obligation to prepare

a NEPA document.  *Fund for Animals v. Mainella,* 294 F. Supp. 2d 46, 57 (D.D.C. 2003)

(discussing *Defenders of Wildlife*, 627 F.2d 1238).

Here, SUWA challenges a decision that is too internal and preliminary to qualify as a

major federal action.  BLM's decision to undertake the San Rafael Desert MLP was

discretionary, just like the decision to defer leasing decisions until it completed the MLP.

SUWA now challenges BLM's failure to continue to exercise that discretion, which does not

qualify as a major federal action subject to NEPA review.  And BLM's course of conduct

maintained the substantive status quo:  the San Rafael Desert was legally open to leasing

throughout the MLP decisionmaking process, blocked only by BLM's discretionary choice to

defer lease sales.  *See* AR011401 (explaining that BLM was exercising "the discretion afforded

to State Directors" to "defer[] new leasing proposals").  Indeed, BLM did not make a firm

commitment to defer leasing during the MLP process, instead noting that the deferral of leasing

proposals was "*likely* to continue until the MLPs [were] completed."  *Id*. (emphasis added).

BLM had no obligation to prepare NEPA analyses in connection with the end of this

discretionary pause.

SUWA's contention, moreover, that BLM "reopened" public lands to leasing pursuant to

executive and secretarial orders is contrary to fact.  *See* ECF No. 29-1 at 38.  Pursuant to the

2008 Price RMP, these lands were legally open to leasing throughout the MLP process.  And

SUWA's suggestion that BLM heedlessly or recklessly expedited oil and gas leasing, *see* ECF

No. 29-1 at 38, is similarly at odds with the record:  BLM duly prepared environmental analyses

in support of these lease sales, the substance of which SUWA barely takes issue with in this

litigation.

SUWA's out-of-circuit precedent is not to the contrary.  In *Citizens for Clean Energy v.

U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264, 1271 (D. Mont. 2019), at issue before the court

was the propriety of an agency decision not to undertake NEPA analysis in conjunction with a

Secretarial Order that undid a prior Secretarial Order, lifted a moratorium on coal leasing, and

expedited the leasing process—in other words, a final agency decision that substantively

changed the status quo.  In contrast here, SUWA challenges BLM's decision not to finish a land

use planning process that it was never required to undertake, and complains that BLM should

have continued deferring lease sales—another action BLM had no obligation to undertake.  The

more formal and final actions at issue in *Citizens for Clean Energy* are plainly distinguishable

from the actions and omissions at issue here.

> The plaintiffs in *Lockyer* similarly challenged a more formalized rule than the agency

action at issue here.  *California ex rel. Lockyer v. U.S. Dep't of Agric. ("Lockyer")*, 575 F.3d

999, 1008 (9th Cir. 2009).  The plaintiffs in *Lockyer* challenged a final rule, subject to notice and

comment, published in the Federal Register, which altered existing regulations.  *Id*.  Not so here,

where the agency action is a discretionary decision to undertake—but not complete—an optional

planning process.  SUWA's argument that BLM had to complete a NEPA review in conjunction

with the decision not to complete an MLP for the San Rafael Desert area lacks merit.[10]

## IV.    BLM's Analysis Of The Effects Of Leasing On Pronghorn Antelope Satisfied NEPA.

> In its only argument that squarely addresses the substance of the Reevaluation EA,

SUWA argues that BLM's analysis of the effects of reaffirming the leases on pronghorn antelope

---

[10] SUWA's Complaint could be read to challenge both the decision not to complete an MLP for the San Rafael Desert area and the decision to terminate the nationwide MLP concept without NEPA analysis.  *Compare* ECF No. 8 at 39 (characterizing third cause of action as "*Violation of NEPA: Failure to Prepare NEPA Analysis Prior to Reversing Course on the San Rafael Desert MLP*") *with id*. ¶ 154 ("BLM's failure to prepare NEPA analysis prior to abandoning the MLP concept and the San Rafael Desert MLP specifically was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  Any challenge to the January 2018 decision to terminate the nationwide MLP concept is long since time-barred.  And, in any event, the bulk of SUWA's argument is directed more specifically to the San Rafael Desert MLP.  This brief therefore focuses on the specific decision concerning the San Rafael Desert area, though many of the same arguments apply to the MLP process more generally; Federal Defendants further reserve the right to raise additional responsive arguments in reply to the extent SUWA clarifies its position.

habitat violated NEPA.  ECF No. 29-1 at 39.  As an initial matter, the Court should decline to consider this argument because SUWA did not set forth such a claim in its Complaint.  But even if SUWA had pled this claim properly, it lacks merit.

    A.    <u>SUWA failed to plead claims relating to pronghorn antelope.</u>

    SUWA failed to plead its NEPA claims relating to pronghorn antelope with any specificity.  "Defendants are entitled to fair notice of claims advanced in litigation.  New claims cannot be pled in summary judgment briefs."  *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 127 (D.D.C. 2013).  That a factual allegation "hints" at a claim does not suffice, and the lack of an "express claim" may prompt a court not to entertain an argument.  *Steele v. United States*, 657 F. Supp. 3d 23, 48 (D.D.C. 2023).

    Here, none of SUWA's six causes of action reference pronghorn antelope.  *See* ECF No. 8 ¶¶ 134-172.  Over the course of SUWA's 45-page complaint, there are exactly two references to pronghorn antelope:  first, noting that they live in the San Rafael Desert, *id*. ¶ 54, and second, in a string cite stating that BLM "recognized that the public lands at issue contained important resources" (including pronghorn habitat), *id*. ¶ 120.  But nowhere in the Complaint does SUWA allege with any specificity that BLM's analysis in the Reevaluation EA as pertains to pronghorn antelope violated NEPA.

    This failure to provide adequate notice is not cured by SUWA's more general allegation that BLM failed to analyze and disclose cumulative impacts of oil and gas leasing development as to several resources, among them "wildlife (including endemic pollinators)."  ECF No. 8 ¶ 142.  No doubt pronghorn antelope are wildlife (albeit not endemic pollinators), but this sentence lacks sufficient specificity to put Federal Defendants on notice of the claims SUWA now advances.  Much of SUWA's argument, moreover, goes beyond the alleged failure to

analyze and disclose cumulative impacts and accuses BLM of (1) a failure to account for, in its later analysis of pronghorn antelope habitat, specific language in the draft San Rafael Desert MLP EA, ECF No. 29-1 at 39-41, and (2) a failure to analyze reasonably foreseeable direct and indirect impacts (as opposed to cumulative impacts), *id*. at 42.  To the extent, then, that the Court concludes that SUWA did sufficiently plead its claims related to pronghorn antelope, it should consider only those claims related to BLM's alleged failure to disclose cumulative impacts.

B.     BLM's analysis of the effects of leasing on pronghorn antelope satisfies NEPA.

Even if SUWA had properly pled this claim, it still fails because BLM satisfied NEPA's requirements.  At a minimum, BLM's analysis falls within the "broad zone of reasonableness" that the Court "should not micromanage."  *Seven County*, 2025 WL 1520964, *8.

In the Reevaluation EA, BLM concluded that the leasing in question was "unlikely to cause a significant reduction in usable habitat" given the number of pronghorn antelope, their "wide-ranging nature," and the size of the San Rafael Desert relative to the area that might be disturbed by drilling activities (over 4 million acres of habitat versus 83.2 acres that could be affected).  AR000587.  This was a manifestly reasonable conclusion.  BLM, moreover, tiered its analysis in the Reevaluation EA to the September 2018 lease sale EA, which in turn tiers to the 2008 Price RMP EIS, which analyzed the region-wide impact of oil-and-gas development within the Price Field Office's jurisdiction on pronghorn antelope and their habitat.  AR000544-45 (Reevaluation EA tiers to September 2018 lease sale EA and 2008 Price RMP).

The analyses to which BLM tiered the Reevaluation EA easily satisfy the cumulative impacts standard in *Tomac v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006), which requires BLM to identify five things:

(1) the area in which the effects of the proposed project will be felt;
(2) the impacts that are expected in that area from the proposed

project; (3) other actions—past, present, and proposed, and
reasonably foreseeable—that have had or are expected to have
impacts in the same area; (4) the impacts or expected impacts from
these other actions; and (5) the overall impact that can be expected
if the individual impacts are allowed to accumulate.

(citations omitted).  BLM identified the area in which the effects of the lease sale would be felt,

*see* AR000557 (map of all lease parcels), and the impacts that would be expected in that area, *see*

AR000587 ("during the construction and operation phases . . . impacts would likely consist of

effects to the soundscape from anthropogenic noise, and the disturbance of habitat").  BLM has

catalogued the other past, present, and future actions expected in the same area.  *See* AR000562

(stating that a total of 79 oil and gas wells have ever been drilled in San Rafael Desert MLP area,

all of which were "dry holes"); AR003132-40 (Appendix M to Price RMP/EIS detailing

foreseeable impact of oil and gas leasing in Price field office area).  BLM has disclosed the

impacts on wildlife from the activity in this area.  *See* Price RMP/EIS, AR014759 ("Loss of

vegetation attributed to development activities would reduce the available habitat and the quality

of the habitat, and could increase forage competition among grazing animals.  Habitats might be

made unavailable to wildlife because of human disturbance factors (e.g., traffic or noise during

sensitive time periods such as winter, birthing, nesting, and early rearing of young).").  And

BLM considered the additive impact of the lease sale.  *See* AR000586 (noting potential for

"surface disturbance" on an additional 83.2 acres).  Again, given the wide-ranging nature of the

pronghorn antelope, the expansive habitat available to them in the San Rafael Desert area, and

the relatively small amount of acreage at issue, BLM reasonably concluded that the impacts,

cumulative and otherwise, to pronghorn antelope of the 59 leases at issue in the Reevaluation EA were not significant.[11]

BLM was not obligated to engage in any further analysis of the effect on pronghorn habitat prior to the lease sale, rather than at the APD stage. Though "an agency cannot defer analyzing the reasonably foreseeable environmental impacts of an activity past the point when that activity can be precluded," *WEG I*, 368 F. Supp. 3d at 65, BLM did not run afoul of that admonition here. In *WEG I*, the relevant point in the decision process was the oil-and-gas leasing stage because the leases at issue contained no "stipulations preventing oil and gas drilling without further post-lease approval by BLM" and because even exploration of the parcels could produce greenhouse-gas emissions, the cumulative effect of which BLM had not analyzed. *Id.* at 65–66.

Here, however, BLM noted the presence of pronghorn habitat in certain parcels, and explained that, depending on the outcome of "pre-disturbance surveys," it could impose on lessees additional mitigation measures at the APD stage. AR000587. These measures could include "design modifications to avoid or minimize effects to sensitive habitats, limiting the number of well pads under simultaneous construction, seasonal restrictions, limiting the number of proposed roads, reclaiming old and/or unnecessary roads, minimizing truck traffic, noise-buffering measures, pre-development surveys, or use of special construction techniques to minimize surface disturbance to sensitive areas." *Id.* "That [BLM] may continue to assess impacts as more information becomes available" at the APD stage "does not indicate that [it]

---

[11] This analysis would also satisfy the "reasonably foreseeable direct and indirect impacts" analysis had SUWA pled such a claim its Complaint. *See* ECF No. 29-1 at 42.

failed to take a 'hard look' at the environmental consequences of its proposed action" at the leasing stage. *Wilderness Soc. v. Salazar*, 603 F. Supp. 2d 52, 62 (D.D.C. 2009).

Much of SUWA's argument about pronghorn antelope revolves around statements in the draft San Rafael Desert MLP EA. Even if SUWA had properly pled these claims (which it did not), these arguments are unpersuasive for many of the reasons set forth in Argument Section II.A, *supra*. By way of summary, SUWA identifies no authority that statements in a draft land-use-planning document, never released to the public in final form, constitute "factual findings" that BLM must account for in later environmental analyses. SUWA's arguments concerning BLM's alleged failure to analyze the impact of the lease sale on pronghorn antelope habitat lack merit.

Lastly, and contrary to SUWA's contention, BLM addressed the development of the broader number of wells predicted for the entire San Rafael Desert in both the reasonably foreseeable development scenario BLM prepared during the MLP process as well as the Price Field Office RMP/EIS. *See* ECF No. 29-1 at 43-44. BLM tiered its analysis in the Reevaluation EA to, and incorporated by reference, the EIS for the Price RMP. AR000544-45. And BLM repeatedly cited the reasonably foreseeable development scenario—which it recognized was a source of information as to "the potential cumulative impacts that may occur should a lease area be developed"—in the Reevaluation EA. AR000558, AR000562-63. SUWA fails to explain how this analysis was insufficient.

## V.    Federal Defendants Are Entitled To Summary Judgment On SUWA's Remaining Claims.

SUWA has not moved for summary judgment with respect to three of its claims. Through its first claim for relief, SUWA challenges BLM's alleged failure, in the Reevaluation EA, to disclose cumulative impacts of oil and gas leasing and development. ECF No. 8 ¶¶ 134-

142.  And in its fifth and sixth causes of action, SUWA alleges that BLM's leasing decisions

violated the Endangered Species Act.  *Id.* ¶¶ 160-172.  SUWA has not, however, presented

arguments or evidence in support of any of these claims.  Federal Defendants are therefore

entitled to summary judgment on the first, fifth, and sixth causes of action in the Amended

Complaint.  *See Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 142 (D.D.C. 2016)

(deeming waived arguments not raised in summary judgment brief); *Saunders v. Mills*, 172 F.

Supp. 3d 74, 96 (D.D.C. 2016) (same).

## VI.    Any Relief Should Be Carefully Tailored.

SUWA seeks as remedies vacatur of the 35 challenged oil and gas leases, the decision to

reaffirm these leases, BLM's decision not to complete an MLP for the San Rafael Desert, and

BLM's abandonment of the "Master Leasing Plan policy."  ECF No. 29-5 at 1.  SUWA further

seeks an injunction that would bar Federal Defendants from approving APDs on the challenged

leases, or from offering, selling, or issuing any new leases until they have "provide[d] a reasoned

explanation for their changed position regarding the Master Leasing Plan policy" and "prepare[d]

an environmental analysis prior to reopening the public lands in former-planning area for oil and

gas leasing and development."  *Id.* at 1-2.

SUWA overreaches in its requested remedies.  As an initial matter, vacatur is not a

mandatory remedy.  The Supreme Court recently emphasized that even if an environmental

analysis "falls short in some respects, that deficiency may not necessarily require a court to

vacate the agency's ultimate approval of a project, at least absent reason to believe that the

agency might disapprove the project if it added more[.]"  *Seven County*, 2025 WL 1520964, *9.

Courts in this district routinely remand agency actions without vacating them to give the agency

a chance to address deficiencies in their process or reasoning.  *See, e.g., City of Port Isabel v.*

*FERC*, 130 F.4th 1034, 1036–37 (D.C. Cir. 2025); *Am. Great Lakes Ports Ass'n v. Schultz*, 962

F.3d 510, 518–19 (D.C. Cir. 2020).

A remand without vacatur would be the appropriate remedy if SUWA were to prevail on

its claims. "To determine whether to remand without vacatur, this court considers first, the

seriousness of the action's deficiencies, and, second, the likely disruptive consequences of

vacatur." *Am. Great Lakes Ports Ass'n*, 962 F.3d at 518 (quoting *Allied-Signal, Inc. v. U.S.

Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)) (cleaned up). Here, the

consequences of vacatur would be substantial. SUWA has requested that BLM's 2018 decision

to end the MLP policy—potentially not just for San Rafael Desert area, but nationwide—be

vacated. Such a decision would reinstall internal, unenforceable agency guidance that terminated

six years ago, which could cause widespread confusion and disruption in the oil and gas leasing

process. *See Beshir*, 10 F. Supp. 3d at 180.

SUWA also seeks what would amount to mandatory injunctions compelling additional

land use planning—divorced from any statutory or regulatory requirement—prior to offering

leases in the San Rafael Desert. "Mandatory injunctions that would change the status quo are

disfavored . . . especially when directed at the United States Government." *Strait Shipbrokers

Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (citation omitted). To the extent

the Court rules in SUWA's favor, the remedy should be limited to remand for further analysis of

the 35 leases that SUWA challenged in this litigation—rather than the more sweeping and

intrusive relief that SUWA seeks.

## **CONCLUSION**

The Court should not entertain SUWA's claims in the first instance given the procedural

bars to adjudication, but if it does, SUWA's claims lack merit for all the reasons stated herein.

Summary judgment should be granted in Federal Defendants' favor.

Respectfully submitted this 18th day of June, 2025,

ADAM R. F. GUSTAFSON
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

/s/ *John Karl Heise*
John Karl Heise, Trial Attorney
(California Bar No. 331615)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel.: (202) 305-0421
John.Heise@usdoj.gov

Alison C. Finnegan, Senior Trial Attorney
(Pennsylvania Bar No. 88519)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0500; Fax: (202) 305-0275
Alison.C.Finnegan@usdoj.gov

*Counsel for Federal Defendants*