# EXHIBIT 1

**Supplemental Declaration of Ray Bloxham**

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*
Case No. 1:24-cv-02476-RC

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF THE INTERIOR**, *et al.*, <br><br> Defendants, <br><br> and <br><br> **THE STATE OF UTAH**, <br><br> Intervenor-Defendant. | Case No. 1:24-cv-02476-RC <br><br> Judge Rudolph Contreras |

## SUPPLEMENTAL DECLARATION OF RAY BLOXHAM

I, **RAY BLOXHAM**, declare:

1. This supplemental declaration is provided in support of and to clarify statements made in my prior declaration filed in the above-captioned matter (ECF No. 29-4).

2. I have personal knowledge of, and am familiar with, each of the facts provided below.

*The December 2008 Lease Sale; Hayes & Stiles Reports*

3. The nationwide master leasing plan ("MLP") policy and concept came into existence, at least in part, because of a successful lawsuit brought by the Southern Utah Wilderness Alliance ("SUWA") and others in 2008. Specifically, the George W. Bush administration held a controversial lease sale in Utah that included more than one hundred

parcels, many in sensitive areas including within wilderness-caliber lands and adjacent to Arches and Canyonlands National Parks.

4. The proposed lease sale garnered enormous statewide and national attention and was the subject of widespread public protest.[1] SUWA and its conservation partners challenged that sale and this court enjoined the Interior Department from issuing the leases. *S. Utah Wilderness All. v. Allred*, 2009 U.S. Dist. LEXIS 30664 (D.D.C. Jan. 17, 2009).

5. I helped SUWA prepare for that litigation by, among other things, conducting field visits, reviewing lease sale-related information, and providing a declaration in support of SUWA's litigation which detailed the harm that I and SUWA would suffer if the leases were issued.

6. As all of this was occurring, the Obama administration entered office. Immediately afterward, newly appointed Interior Secretary Ken Salazar directed the Interior Department to review the controversial Utah lease sale. This review culminated in what is known as the "Hayes Report."[2] The Hayes Report identified many flaws in the Bureau of Land Management's ("BLM") oil and gas leasing process, and made numerous recommendations to improve that process.

7. One recommendation, entitled, "BLM Should Develop Guidance to Assist BLM Officials in Making Parcel-Specific Leasing Decisions," directed BLM to:

> [D]evelop and issue decision-making criteria that fills this important void and provides a rational basis to better assist BLM officials on how they should weigh competing considerations when deciding whether an individual parcel that is

---

[1] The following articles are representative of the nationwide attention the lease sale attracted: Felicity Barringer, *U.S. to Open Public Land Near Parks for Drilling*, NYTimes (Nov. 7, 2008), https://www.nytimes.com/2008/11/08/us/08lease.html; Leslie Kaufman, *Drilling Leases Scrapped in Utah*, NYTimes (Feb. 4, 2009), https://www.nytimes.com/2009/02/05/us/05leases.html.
[2] Available at: https://www.doi.gov/node/11113.

2

available for leasing as a general matter (e.g, where an [Resource Management Plan ("RMP")] would otherwise allow leasing of the parcel in question) should, in fact, be leased and for what purpose(s), give site-specific considerations.

8. Following the Hayes Report, the Interior Department issued its *Final BLM Review of 77 Oil and Gas Lease Parcels Offered in BLM-Utah's December 2008 Lease Sale* (Oct. 7, 2009), known as the "Stiles Report."[3] Among other findings, the Stiles Report concluded that many of the Utah parcels should be deferred until BLM could conduct additional environmental analysis and make changes to its governing RMPs and associated lease stipulations. It explained that deferring the sale of the Utah lease parcels may require the consideration of new lease stipulations that would necessitate amending the RMPs.

9. Soon thereafter, the Interior Department issued IM 2010-117 in which it created the nationwide MLP policy. IM 2010-117 clearly stated that the MLP policy was a direct result of the Hayes and Stiles Reports.

*The Nationwide MLP Process; SUWA's Involvement in the Utah MLPs, Including San Rafael Desert MLP*

10. Following the establishment of the nationwide MLP policy, SUWA and I actively participated for years in the planning processes that resulted from the policies set forth in IM 2010-117. For example, soon after the MLP policy was announced in 2010 I conducted hundreds of hours of on-the-ground inventories for dozens of areas throughout Utah to ground-truth information and to document the situation on the ground (*e.g.*, wilderness characteristics). SUWA provided this information to BLM and the agency, in part, used the information to establish five MLP boundaries in Utah including, but not limited to, the San Rafael Desert MLP.

---

[3] Available at: https://secure.suwa.org/site/DocServer/HayesReport_Dec08LeaseSale.pdf?docID=8361; *see also* Bureau of Land Mgmt., Press Release, *BLM Releases Report on Utah Oil and Gas Leases* (Oct. 8, 2009), https://www.doi.gov/news/pressreleases/BLM-Report-on-Utah-Oil-and-Gas-Leases.

I also engaged one-on-one with agency staff to advocate for the protection of the many resource values encompassed by the MLPs.

11. With respect to the San Rafael Desert, after BLM released its preliminary proposal for the San Rafael Desert MLP (including maps of the proposed boundary), SUWA commented on the proposal and, among other things, suggested expanded boundaries.

12. I conducted the fieldwork and related on-the-ground inventories to inform SUWA's comments regarding, among other things, the need for expanded MLP boundaries (for the San Rafael Desert MLP and the other Utah MLPs).

13. From 2010-2017, my interests (including my aesthetic, recreational, professional interests) in the public lands and resources within the MLP boundaries were protected while the MLP processes proceeded because BLM deferred all leasing in those areas to maintain a full range of potential management options.

*IM 2018-034; Cancellation of the MLPs; Issuance of Leases in the San Rafael Desert MLP Area*

14. BLM rescinded the nationwide MLP policy on January 31, 2018 when it issued IM 2018-034.

15. Consistent with the decision in IM 2018-034 to rescind the nationwide MLP policy, BLM subsequently rescinded all pending Utah MLPs, including the San Rafael Desert MLP—these were separate decisions, the MLP policy rescission and the subsequent decision to stop work on the Utah MLPs. By rescinding the MLP policy, IM 2018-034 forced BLM to stop work on the San Rafael Desert MLP process (as well as the other Utah MLPs). IM 2018-034 had the practical effect of reopening the MLP areas to new leasing because those areas had been off-limits for more than seven years while the MLP policy was in place.

16. Almost immediately after backtracking on the MLP policy and then the San Rafael Desert MLP process, BLM's Utah state office issued and sold the leases challenged in SUWA's current lawsuit at the agency's September and December 2018 lease sales. I participated in the underlying leasing decisions by, among other things, conducting field visits, reviewing information, and helping SUWA prepare comments on the proposals.

17. In October 2018, when BLM denied SUWA's lease sale protest and issued the September 2018 leases, was the first time I felt the on-the-ground, concrete effects of BLM's earlier decision to reverse course on the national MLP Policy. It is my understanding that BLM would not have issued the leases but for its decision to rescind the MLP policy because the agency had not offered any leases in the MLP areas for over seven years while the policy was in effect. Additionally, BLM issued the September 2018 leases without the new, more environmentally protective stipulations, notices, and Best Management Practices the agency had prepared as part of the San Rafael Desert MLP process—these environmentally protective measures, if finalized, would have protected and benefited my interests by, among other things, limiting the scope and extent of oil and gas activity in areas that I care about. In other words, had BLM completed the San Rafael Desert MLP process, the leases either would not have been issued (because BLM had proposed closing many of the areas to leasing), or would have been issued subject to more environmentally protective measures, such as requiring no-surface occupancy.

18. The decisions to issue these leases harmed my interests because it irretrievably committed the public lands at issue to development (and did so subject to weaker, outdated stipulations etc.), as I have explained above and in my original declaration. ECF No. 29-4 ¶¶ 14-21. That is, the industrial activity associated with lease development will create noise and dust,

greenhouse gas pollution, remove soil and vegetation, destroy wildlife habitat (including for pronghorn antelope) and otherwise industrialize this remote, natural landscape—and do so at a greater extent and scope than would have occurred if the MLP process had not been terminated.

*The Settlement Agreement & Reevaluation EA*

19. I helped SUWA prepare for the initial lawsuit filed in 2020 to challenge BLM's leasing decisions and its approval of the Bowknot Bend drilling project. *S. Utah Wilderness All. v. Bernhardt* ("*SUWA*"), 512 F. Supp. 3d 13 (D.D.C. 2021). This included conducting additional field visits, reviewing BLM's information and data, and providing a declaration in support of SUWA's litigation.

20. I also participated in, and am otherwise familiar with, the Settlement Agreement reached between SUWA and the BLM as a result of the *SUWA* litigation. This included reviewing settlement agreement drafts, proposals, counter-offers, and participating in phone calls.

21. Based on these communications and information, it was my, and SUWA's, understanding that BLM would consider, analyze and disclose the MLP-related resources and factors listed in the Settlement Agreement—which by design were intended to mirror the causes of action raised in the *SUWA* litigation.

22. Thus, when the Settlement Agreement was signed, my interests were no longer harmed by the underlying decisions that were first challenged in the *SUWA* litigation, including BLM's decisions to abandon the nationwide MLP policy and the MLP processes in Utah, because the agency had committed to reevaluate its prior leasing decisions and issue new decision(s).

23. Additionally, following the Settlement Agreement, BLM maintained the status quo by not offering any new leases in the former San Rafael Desert MLP planning area—similar to the pause on new leasing from 2010-2017. This fact was significant to me because I believed it showed that BLM intended to follow through with its commitments in the Settlement Agreement by maintaining the status quo to preserve its potential management options for the former MLP area.

24. BLM issued its Decision Record and accompanying Reevaluation EA and Finding of No Significant Impact in May 2024. At this time, BLM simply reaffirmed its prior decisions—including issuing the leases subject to the outdated stipulations, notices, and Best Management Practices that the San Rafael Desert MLP was designed to amend and replace.

25. This May 2024 decision harmed my interests. *See* ECF No. 29-4, ¶¶ 14-21. As I explained in my prior declaration, I am harmed by BLM's "abrupt reversal in policy and decision not to undertake the pre-leasing analysis related to oil and gas development in the San Rafael Desert as part of the San Rafael Desert MLP." *Id.* ¶ 18. To be clear, when BLM rescinded the nationwide MLP policy in IM 2018-034 that decision created a domino effect, setting in motion a chain of events: 1) it forced BLM to stop work on the San Rafael Desert MLP (and other Utah MLPs), 2) it resulted in leasing in the former San Rafael Desert MLP area (and other former MLP areas), and 3) BLM promptly issued the challenged leases—at which point, I first felt the real-world effects of IM 2018-034. At this time, I also learned that BLM had no intention of preparing the San Rafael Desert MLP, or another MLP, or analyzing the impacts of not doing so.

26. As explained in my original declaration and above, those harms were—for a time—eliminated following the Settlement Agreement. However, once BLM failed to address those issues in the Reevaluation EA and instead merely readopted its prior decisions and

7

rationales, my interests in seeing the San Rafael Desert protected from the impacts of oil and gas leasing and development were harmed once again.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:   August 5, 2025

_____
Ray Bloxham