**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, | |
| Plaintiff, | Case No. 1:24-cv-02476-RC |
| v. | Judge Rudolph Contreras |
| **U.S. DEPARTMENT OF THE INTERIOR**, *et al*., | |
| Defendants, | |
| and | |
| **THE STATE OF UTAH**, | |
| Defendant-Intervenor. | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' AND DEFENDANT-INTERVENOR'S CROSS MOTIONS FOR SUMMARY JUDGMENT**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

GLOSSARY OF TERMS .................................................................................... vii

ARGUMENT .................................................................................................... 1

   I.  SUWA's Second and Third Causes of Action are Timely.................................. 2

       A.   The Supreme Court's *Corner Post* Decision ...................................... 2

       B.   SUWA Was First Harmed on October 23, 2018................................. 3

       C.   Alternatively, SUWA Was Harmed on May 30, 2024 ......................... 6

       D.   Counsel for BLM Cannot "Clarify" What SUWA's Declarant Meant................. 8

  II.  BLM's Decision to Abandon the MLP Process Was an Arbitrary Change in Policy that Violates the *Fox* Standard .......................................................... 11

       A.   IM 2018-034 is the Relevant Decision that Required BLM to Abandon the San Rafael Desert MLP ................................................................... 12

       B.   IM 2018-034 Was an Arbitrary Change in Agency Position that was Subject to the *Fox* Standard .................................................................... 13

       C.   BLM's Remaining Arguments Defending Its Change in Position are *Post-Hoc* Rationalizations............................................................... 20

 III.  The MLP Policy Reversal Was a NEPA Triggering Event ............................... 23

       A.   BLM Mischaracterizes SUWA's Argument; the Caselaw Supports SUWA ....... 23

       B.   The MLP Policy Reversal Reopened Millions of Acres of Public Lands in Utah to Leasing and Development..................................................... 27

 IV.  Failure to Take a Hard Look at Pronghorn Antelope....................................... 28

       A.   SUWA Properly Pled its First Cause of Action.................................... 29

       B.   SUWA Has Raised the Pronghorn Antelope Issue for Years ....................... 31

       C.   The Reevaluation EA Does Not Comply with *Tomac* and BLM Relies on *Post-Hoc* Arguments .................................................................... 32

CONCLUSION ................................................................................................39

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ................................................................................................. 3, 10

*AFGE v. FLRA*,
25 F.4th 1 (D.C. Cir. 2022) ................................................................................................. 16

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ................................................................................................. 16

*Amerijet Intern. Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ................................................................................................. 21

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ................................................................................................. 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 29

*Balt. Gas. & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) ................................................................................................. 38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................. 29

*\*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................. 2, 7, 9, 17

*Cal. Cmtys Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019) ................................................................................................. 17

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
575 F.3d 999 (9th Cir. 2009) ................................................................................................. 26

*Chiang v. Kempthorne*,
503 F. Supp. 2d 343 (D.D.C. 2007) ................................................................................................. 19

*Citizens for Clean Energy v. U.S. Dep't of the Interior*,
384 F. Supp. 3d 1264 (D. Mont. 2019) ................................................................................................. 26, 28

*Cloud Found., Inc. v. Salazar*,
999 F. Supp. 2d 117 (D.D.C. 2013) ................................................................................................. 30

*Columbia Riverkeeper v. U.S. Coast Guard*,
761 F.3d 1084 (9th Cir. 2014) ................................................................ 17

*Conley v. Gibson*,
355 U.S. 41 (1957) ................................................................................ 29

*\*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
603 U.S. 799, 814, 816 (2024) ..................................................... passim

*Defenders of Wildlife v. Andrus*,
627 F.2d 1238 (D.C. Cir. 1980) .............................................................. 24

*\*Dep't. of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ...................................................................... 20, 21, 22

*\*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ............................................................... 14, 15, 16

*\*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................... 11, 15, 16

*Friends of Cedar Mesa v. U.S. Dep't. of the Interior*,
2020 U.S. Dist. LEXIS 36614 (D. Utah March 2, 2020) .......................... 7

*Fund for Animals, Inc. v. Mainella*,
294 F. Supp. 2d 46 (D.D.C. 2003) .................................................. 25, 26

*Fund for Animals, Inc. v. Thomas*,
127 F.3d 80 (D.C. Cir. 1997) ................................................................. 25

*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) ..................................................... 16, 20, 21

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022) ............................................................... 16

*Harrison v. Lewis*,
630 F. Supp. 212 (D.D.C. 1986) ............................................................ 30

*Huffman v. Kelly*,
239 F. Supp. 3d 144 (D.D.C. 2017) ...................................................... 30

*Lone Mt. Processing v. Sec'y of Labor*,
709 F.3d 1161 (D.C. Cir. 2013) ............................................................. 16

*Mont. Wildlife Fed'n v. Bernhardt,*
2020 U.S. Dist. LEXIS 90571 (D. Mont. 2020) ........................................... 18

**Mont. Wildlife Fed'n v. Haaland,*
127 F.4th 1 (9th Cir. 2025) ................................................................... passim

**Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .............................................................. 14, 16, 20, 38

*Nat'l Env't. Ass'ns Clean Air Proj. v. EPA,*
752 F.3d 999 (D.C. Cir. 2014) .............................................................. 18

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.,*
625 F.3d 1092 (9th Cir. 2010) .............................................................. 33

*Org. Vill. of Kake v. U.S. Dep't. of Agric.,*
795 F.3d 956 (9th Cir. 2015) .............................................................. 16

*Pacific Gas & Elec. Co. v. Fed. Power Comm'n,*
506 F.2d 33 (D.C. Cir 1974) .............................................................. 19

*Pharm. Rsrch. & Mfgrs. of Am. v. U.S. DHHS,*
43 F. Supp 3d 28 (D.D.C. 2014) .............................................. 5, 16, 34

*Physicians for Soc. Resp. v. Wheeler,*
956 F.3d 634 (D.C. Cir. 2020) .............................................................. 16

*R.J. Reynolds Tobacco Co. v. U.S. Food and Drug Admin.,*
810 F.3d 827 (D.C. Cir. 2016) .............................................................. 7

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
145 S. Ct. 1497 (2025) ............................................................... 33, 34

*Southwest Airlines Co. v. FERC,*
926 F.3d 851 (D.C. Cir. 2019) .............................................................. 16

*Steele v. United States,*
657 F. Supp. 3d 23 (D.D.C. 2023) .............................................................. 30

*Swierkiewicz v. Sorema N.A.,*
534 U.S. 506 (2002) .............................................................. 29

*Texas v. United States,*
523 U.S. 296 (1998) .............................................................. 7

*Tomac v. Norton*,
433 F.3d 852 (D.C. Cir. 2006) ................................................................ 33

*W. Energy All. v. Salazar*,
2011 U.S. Dist. LEXIS 98378 (D. Wyo. 2011) ...................................... 18

*W. Watersheds Proj. v. Zinke*,
441 F. Supp. 3d 1042 (D. Idaho 2020) ............................................. 18, 19

*Wilderness Soc'y v. U.S. Dep't. of the Interior*,
2024 U.S. Dist. LEXIS 51011 (D.D.C. March 22, 2024) ...................... 33, 36

## Regulations

40 C.F.R. § 1508.1 (2024) ....................................................................... 34

## Rules

83 Fed. Reg. 32681 ................................................................................. 13

Fed. R. Civ. P. 8(a)(2) ............................................................................. 29

## GLOSSARY OF TERMS

APA                    Administrative Procedure Act

BLM                    Bureau of Land Management

EA                     Environmental Assessment

IM 2010-117            Instruction Memorandum No. 2010-117

IM 2018-034            Instruction Memorandum No. 2018-034

MLP                    Master Leasing Plan

NEPA                   National Environmental Policy Act

RMP                    Resource Management Plan

RFDS                   Reasonably Foreseeable Development Scenario

**ARGUMENT**

The San Rafael Desert is a sublime area of Utah's backcountry. It is home to an astonishing array of native pollinators, wildlife—including mule deer, pronghorn antelope, desert bighorn sheep—and numerous species listed under the Endangered Species Act such as the Mexican spotted owl and yellow-billed cuckoo. It is an expansive, wild, rugged landscape that includes more than 250,000 acres of wilderness and other wilderness-caliber lands, including the Labyrinth Canyon Wilderness.

From 2010-2017 the San Rafael Desert was removed from oil and gas leasing and development by Defendants United States Department of the Interior *et al.* (collectively, "BLM"), but soon after taking office the Trump administration reversed course and blanketed the region with oil and gas leases. Upon reevaluation, the Biden administration reaffirmed the leasing decisions providing the same unsupported, arbitrary rationales as the prior administration.

With regard to BLM's arguments raised in its opposition brief, Plaintiff Southern Utah Wilderness Alliance's ("SUWA") lawsuit is timely because SUWA first felt the harm of the agency's decision to reverse the nationwide Master Leasing Plan ("MLP") concept on October 23, 2018 when BLM issued the challenged oil and gas leases that would not have been issued but for its reversal of the MLP concept, or, in the alternative, not until May 30, 2024, when it reaffirmed those same leases. BLM failed to (1) provide a reasoned explanation for the decision to abruptly reverse course on the MLP concept, which forced the agency to stop its work on the San Rafael Desert MLP, and (2) prepare a NEPA analysis prior to abandoning that nationwide policy, which reopened millions of acres of public lands in Utah to leasing and development.

1

Finally, SUWA properly pled its claim that BLM failed to analyze foreseeable impacts to pronghorn antelope—an issue BLM had been on notice about for years.

For the reasons set forth below, and in SUWA's opening brief, BLM's decisions should be set aside and vacated.

## I.     SUWA's Second and Third Causes of Action are Timely

BLM argues that SUWA's second and third causes of action are time-barred. *See* ECF No. 30 at 11-13, 26.[1] Not so. BLM's arguments run into the "immutable obstacle" that the United States Supreme Court recognized in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*: that 28 U.S.C.§ 2401(a) is a plaintiff-centric accrual rule such that its 6-year statute of limitations begins to run only when the plaintiff has a complete and present cause of action. 603 U.S. 799, 814, 816 (2024). Here, SUWA had a complete and present cause of action on October 23, 2018, or, in the alternative, not until May 30, 2024.

SUWA's second and third causes of action are therefore timely.

### A.     The Supreme Court's *Corner Post* Decision

The Supreme Court recently made clear that a "claim accrues when the plaintiff has the right to assert it in court—and in the case of the APA [Administrative Procedure Act], that is when the plaintiff is injured by final agency action." *Corner Post*, 603 U.S. at 804. An action is final if it "mark[s] the consummation of the agency's decisionmaking process," and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations and citations omitted).

"An APA plaintiff does not have a complete and present cause of action until she suffers an injury from final agency action, so the statute of limitations does not begin to run until she is

---

[1] The State of Utah did not raise any new arguments in their opposition motion but instead adopted BLM's arguments in their entirety. *See* ECF Nos. 34, 35.

injured." *Corner Post*, 603 U.S. at 809. "Importantly . . . a cause of action accrues on the date

that damage is sustained and not the date when causes are set in motion which ultimately

produce injury." *Id.* at 810 (cleaned up). Thus, "it [is] well understood that a claim does not

'accrue' as soon as defendant acts, but only after the plaintiff suffers the injury required to press

her claim in court." *Id.* at 811.

Notably, based on this plaintiff-centric rule, the statute of limitations "begins when *the*

*cause of action associated with the complaint*—the plaintiff's cause of action—is complete." *Id.*

at 817 (emphasis in original). "[T]his rule vindicates the APA's 'basic presumption' that anyone

injured by agency action should have access to judicial review." *Id.* at 824 (citing *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 140 (1967)).

As discussed below, the causes of action associated with SUWA's amended complaint

became "complete and present" on October 23, 2018, or, in the alternative, on May 30, 2024.

### B.    SUWA Was First Harmed on October 23, 2018

The real-world effects of BLM's January 2018 decision to abruptly reverse and rescind

the nationwide MLP policy, which forced BLM to end the San Rafael Desert MLP planning

process, were not felt by SUWA until October 23, 2018. On that date, BLM issued all but one of

the challenged leases—leases that otherwise would not have been issued but for the MLP policy

reversal—and thus the real-world consequences of the agency's MLP policy reversal were felt

by SUWA for the first time.[2] SUWA timely filed its lawsuit on August 28, 2024.

---

[2] One lease (UTU-93713) was sold at BLM's December 2018 sale and issued on February 8, 2019. AR005889-926.

### i.    The nationwide MLP policy and BLM's decision not to lease in MLP areas in Utah

The MLP concept's history and application in Utah including the San Rafael Desert is set forth in SUWA's amended complaint and opening brief. *See, e.g.*, ECF No. 8 ¶¶ 59-71, 80-126; ECF No. 29-1 at 10-18, 20-39. Relevant here, to implement the nationwide MLP policy in Utah, BLM crafted an "Oil and Gas Leasing Reform Implementation Plan." AR010182-208. Critically, while the MLP policy was in place from 2010-2017, BLM-Utah did not offer a single oil and gas lease in any identified MLP boundary. As the agency explained it:

> BLM-Utah has deferred new leasing proposals submitted for all lands within the pending MLPs in order to preserve potential alternatives for those plans. As a result, millions of acres of land with oil and gas interest have been removed from availability for oil and gas leasing and development . . . and this is likely to continue until the MLPs are completed.

AR011401.

Additionally, the San Rafael Desert MLP process, which was established as a result of the nationwide MLP policy, would have restricted future oil and gas leasing and development by either closing areas to leasing or adding updated, more environmentally protective, lease stipulations and notices on development (*e.g.*, no-surface occupancy). AR010921-68 (providing the new, strengthened stipulations that would have been required if BLM completed the MLP process).

Put simply, the nationwide MLP policy protected SUWA's interests for more than seven years by deferring millions of acres in Utah from new leasing and development and initiating a process to amend and strengthen the stipulations placed on future development, if not outright close certain areas to future leasing.

### ii.     *IM 2018-034 and Resumed Leasing in MLP Boundaries*

In January 2018, the Trump administration began implementing a different set of priorities regarding oil and gas leasing on BLM-managed lands. AR005608-17. Specifically, Instruction Memorandum 2018-034 ("IM 2018-034") put into motion a series of events that would eventually—on October 23, 2018—harm SUWA's interests. *First*, IM 2018-034 eliminated and rescinded the nationwide MLP concept. *Second*, in July 2018, BLM abandoned the San Rafael Desert MLP process—this was an unavoidable result of the earlier rescission of the national MLP policy. 83 Fed. Reg. 32681 (July 13, 2018) (explaining that development of the San Rafael Desert MLP is terminated because "BLM issued [IM 2018-034], which terminates the Master Leasing Process").

*Third*, with the MLP policy eliminated, BLM began preparations to resume oil and gas leasing in the former MLP boundaries, including in the San Rafael Desert. AR005476. SUWA submitted scoping comments and subsequently protested BLM's leasing decision. AR010586-604; AR010493-534.

*Finally*, on October 23, 2018, BLM denied SUWA's lease sale protest regarding the September 2018 lease sale and issued the challenged leases. AR005409-607 ("September 2018 Lease Sale EA").[3] The leases were issued without the updated stipulations and other measures contemplated by BLM during the MLP process and were located in areas that (1) had been removed from leasing for more than seven years while the MLP policy was in effect, and (2) would have been closed to new leasing or subject to restrictions on development (*e.g.*, no-surface

---

[3] The Decision Record for the September 2018 Lease Sale EA is not in the administrative record. It is available at https://tinyurl.com/2018LeaseSaleDR (last visited Aug. 5, 2025). Likewise, BLM's denial of SUWA's protest is available at https://tinyurl.com/SUWAProtestDenial (last visited Aug. 5, 2025). The Court may take "judicial notice of information posted on official public websites of government agencies." *Pharm. Rsrch. & Mfgrs. of Am. v. U.S. DHHS*, 43 F. Supp 3d 28, 33 (D.D.C. 2014) (Contreras, J.).

occupancy) in each alternative of the San Rafael Desert MLP environmental assessment ("San Rafael Desert MLP EA"). *See, e.g.*, AR010970-72.

### iii.    SUWA Feels the Real-World Effects of BLM's MLP Policy Reversal

It was at this time—October 23, 2018—that SUWA first felt the concrete effects of BLM's MLP policy reversal—that is, the time at which SUWA had a "complete and present cause of action . . . [and] suffer[ed] an injury from final agency action." *Corner Post*, 603 U.S. at 809. Notably, here, SUWA's "cause of action[s] accrue[d] on the date that damage [was] sustained"—here, October 23, 2018—"and not the date when causes [were] set in motion which ultimately produce[d] injury"—January 2018. *Id.* (cleaned up) (emphases added); *see also* Suppl. Decl. of Ray Bloxham ¶¶ 17-18, 25-26 (detailing his injuries from issuance of the challenged oil and gas leases) (attached as Ex. 1).[4]

Thus, SUWA's lawsuit, filed on August 28, 2024, is timely.

### C.    Alternatively, SUWA Was Harmed on May 30, 2024

SUWA's prior litigation and subsequent Stipulated Settlement Agreement with BLM is discussed in SUWA's prior filings. *See, e.g.*, ECF No. 8 ¶¶ 86-93; ECF No. 29-1 at 16-18. Relevant here, SUWA's prior litigation challenged, *inter alia*, BLM's MLP policy reversal and its failure to prepare a NEPA analysis prior to abandoning that policy. AR010288-90. The Settlement Agreement was designed to "resol[ve] . . . the disputes set forth in Plaintiffs' Second Amended Complaint." AR010487. Importantly, because BLM committed in the Agreement to address SUWA's concerns via a supplemental NEPA process (*i.e.*, the Reevaluation EA), SUWA was no longer harmed by the challenged decisions. *See* Suppl. Decl. of Ray Bloxham ¶¶ 21-23;

---

[4] As discussed below, counsel for BLM mischaracterized Mr. Bloxham's statements made in his initial declaration (ECF No. 29-4). As a result, SUWA provides this supplemental declaration to clarify Mr. Bloxham's prior statements.

*cf. Friends of Cedar Mesa v. U.S. Dep't. of the Interior*, 2020 U.S. Dist. LEXIS 36614, at *9 (D. Utah March 2, 2020) (BLM agreed to reexamine the challenged leasing decisions and thus "[u]nder these circumstances, no substantial controversy of sufficient immediacy and reality exists regarding Plaintiffs' claims").

 Put differently, following the Settlement Agreement, while BLM's pending Reevaluation EA process was ongoing, SUWA was no longer harmed by and therefore could not challenge BLM's abandonment of the MLP policy, the agency's failure to prepare NEPA prior to abandoning that policy, or the 2018 leasing decisions, because the agency had committed to reexamine those issues and make new decision(s). *See* Bloxham Suppl. Decl. ¶¶ 21-23. Notably, SUWA could not have brought a new legal challenge to BLM's prior decisions because, when BLM agreed to prepare a supplemental NEPA analysis to reconsider them, there were no longer any final agency action(s) and thus any challenge brought at that time would have been unripe. *Bennett*, 520 U.S. at 177-78 (to be final, an agency's action must (1) "mark the consummation of the agency's decision[-]making process—it must not be of a merely tentative or interlocutory nature" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."); *see also R.J. Reynolds Tobacco Co. v. U.S. Food and Drug Admin.*, 810 F.3d 827, 830 (D.C. Cir. 2016) ("A claim is not adequately 'ripe for adjudication . . . if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *Corner Post*, 603 U.S. at 811 ("we have rejected the possibility that a limitations period commences at a time when the plaintiff could not yet file suit as inconsistent with basic limitations principles") (cleaned up); *id.* at 819 (section 2401(a) "show[s] Congress's concern for plaintiffs who might lose a cause of action through no fault of their own").

BLM issued its new decision on May 30, 2024. AR011420-24. The final Reevaluation EA and accompanying Decision Record merely parroted BLM's prior rationales for abandoning the MLP policy and failing to prepare NEPA analysis prior to abandoning that policy. AR000820-21. This new decision harmed SUWA's interests. *See* Bloxham Suppl. Decl. ¶¶ 24-26. SUWA's lawsuit (specifically its second and third causes of action), filed less than three months later, is therefore timely.

### D.    Counsel for BLM Cannot "Clarify" What SUWA's Declarant Meant

In Mr. Bloxham's declaration he stated that, among other things, he worked for years on the MLP process, is harmed by the abrupt MLP reversal which led to BLM's decision to issue the leases, and was and continues to be harmed by BLM's October 2018 leasing decision and May 2024 decision to reaffirm the leases. ECF No. 29-4 ¶¶ 5, 16-20. Now, counsel for BLM puts words in Mr. Bloxham's mouth and mischaracterizes his statements. *See, e.g.*, ECF No. 30 at 12 (attempting to explain what Mr. Bloxham meant by "reversal"). In doing so, counsel asserts that Mr. Bloxham "does not identify a separate harm relating to BLM's explanation in the Reevaluation EA of its decision not to complete the MLP process." *Id.* at 13. To avoid any potential confusion, SUWA provides the supplemental declaration of Mr. Bloxham who can speak for himself and add context and detail to his prior statements. *See* Bloxham Suppl. Decl. ¶¶ 25-26.

Among other statements, Mr. Bloxham's supplemental declaration details that:

- He understood BLM's reversal of the MLP policy (*i.e.*, IM 2018-034) to be a separate decision from BLM's July 2018 decision not to move forward with the San Rafael Desert MLP;

- He was harmed by the September and December 2018 leasing decisions;

- He is familiar with the Settlement Agreement and participated in the underlying process that led to that Agreement;

- His harms ceased to exist when the Settlement Agreement was finalized because BLM had committed to address in a future decision all of the issues raised in SUWA's prior litigation; and

- He was and continues to be harmed by BLM's May 2024 final Reevaluation EA and Decision Record which did not consider, analyze and disclose the resource values and MLP-related issues the agency identified in the draft San Rafael Desert MLP EA.

*See id.* ¶¶ 15, 17-18, 21-26.

Based on a misconstruing of Mr. Bloxham's statements, counsel for BLM concludes: "[i]t cannot be the case . . . that the mere mention of a prior decision in a subsequent environmental analysis serves to restart the statute of limitations." ECF No. 30 at 13. Continuing this theme, counsel states: "[o]therwise, any commenter could make an end-run around the statute of limitations by raising concerns about an agency decision in a later planning process—even decades after the fact." *Id.* These arguments miss the mark for two reasons.

*First*, as explained above, BLM did not merely "mention" its prior decision not to prepare the San Rafael Desert MLP in the Reevaluation EA. Instead, BLM's prior decision was the animating force behind the entire reevaluation process. But rather than take this work seriously, the agency instead simply parroted its prior unsupported conclusory statement for having abandoned the MLP process mid-stream. AR000820-21. Thus, the 6-year statute of limitations applicable to SUWA's second and third causes of action in the amended complaint restarted when BLM made that new, final decision in May 2024—that is, when the agency completed its reevaluation process. *Bennett*, 520 U.S. at 177-78; *Corner Post*, 603 U.S. at 809.

*Second*, BLM's end-run argument "hits the immutable obstacle of § 2401(a)'s text"—that is, it conflicts with the plaintiff-centric holding in *Corner Post*. 603 U.S. at 814. In effect, BLM argues that section 2401(a) is a defendant-centric, finality-focused, statute of repose. According

to BLM, section 2401(a) establishes a fixed point in time for all plaintiffs to challenge agency action. ECF No. 30 at 13. But this notion was squarely addressed and rejected by *Corner Post*. There, the Supreme Court held that the plaintiff (a business) could challenge a regulation promulgated years before the business even existed. *Id.* at 806 (noting that the plaintiff "did not exist when" the agency made the challenged decision). This was so, because under § 2401(a) "a cause of action accrues on the date that damage is sustained and not the date when causes are set in motion which ultimately produce injury." *Id.* at 810 (cleaned up).

Relevant here, the Supreme Court rejected the argument that section 2401(a) operates as a fixed point in time for all plaintiffs and for all challenges (*i.e.*, a statute of repose). *See Corner Post*, 603 U.S. at 812 ("Section 2401(a) . . . operates as a statute of limitations rather than a statute of repose");[5] *id.* at 823 (rejecting the argument that "agencies . . . need the finality of a 6-year cutoff"); *but see* ECF No. 30 at 13 (dismissing SUWA's argument because "[o]therwise, any commenter could make an end-run around the statute of limitations by raising concerns about an agency decision in a later planning process—even decades after the fact"). The fact that parties may challenge an agency decisions years or decades after the fact, is of no legal significance: a decision "that makes it six years without being contested does not enter a promised land free from legal challenge." *Corner Post*, 603 U.S. at 823 (quotation and citation omitted). Rather, section 2401(a)'s "plaintiff-centric accrual rule . . . vindicates the APA's 'basic presumption' that anyone injured by agency action should have access to judicial review." *Id.* at 824 (quoting *Abbott Labs*, 387 U.S. at 140).

---

[5] A statute of limitations "creates a time limit for suing in a civil case, based on the date when the claim accrued." *Corner Post*, 603 U.S. at 812 (cleaned up). In contrast, a statute of repose "puts an outer limit on the right to bring a civil action that is measured not from the date of which the claim accrues but instead from the date of the last culpable act or omission of the defendant." *Id.* (cleaned up).

As explained above, SUWA was harmed in May 2024 when BLM issued the Decision

Record for the Reevaluation EA, at which time SUWA learned, with certainty, that BLM had no

intention of preparing the San Rafael Desert MLP, or another MLP, or analyzing the impacts of

not doing so in a NEPA analysis. *See* Supp. Decl. of Ray Bloxham ¶¶ 24-26; *see also Corner

Post*, 603 U.S. at 813 ("Because injury, not just finality, is required to sue under the APA,

[plaintiff's] cause of action was not complete and present until it was injured by [the agency

action].") SUWA filed its lawsuit three months later. Thus, the second and third causes of action

are timely.

## II.    BLM's Decision to Abandon the MLP Process <u>Was</u> an Arbitrary Change in Policy that Violates the *Fox* Standard

BLM attempts to defend its failure to provide a reasoned explanation for abandoning the

nationwide MLP concept (and the San Rafael Desert MLP process) by using *post-hoc* rationales

to mischaracterize the facts, caselaw, and SUWA's arguments. BLM (1) erroneously asserts that

the decision at issue was the local, internal, and informal decision to specifically stop the San

Rafael Desert MLP and that it was not subject to the standard set forth in *F.C.C. v. Fox*

*Television Stations, Inc.*, 556 U.S. 502 (2009); and (2) claims that its decision nonetheless

complied with *Fox*. These arguments are unavailing.

*First*, it was IM 2018-034 that changed BLM's policy on MLPs, not the specific decision

to stop developing the San Rafael Desert MLP. Abandonment of the San Rafael Desert MLP was

merely a forced result of that national policy change. *Second*, BLM was required to provide a

reasoned explanation for changing its MLP policy because instruction memoranda are

reviewable under the APA. *Finally*, BLM's alternative argument, that it nonetheless did provide

a reasoned explanation, is entirely reliant on impermissible *post-hoc* rationales.

**A.     IM 2018-034 is the Relevant Decision that Required BLM to Abandon the San Rafael Desert MLP**

At the outset, BLM inappropriately attempts to narrow the scope of SUWA's argument that BLM failed to provide a reasoned explanation for stopping the MLP implementation process by arguing that it was the internal, informal decision to specifically stop the San Rafael Desert MLP that represented BLM's change in position. *See* ECF No. 30 at 14 ("SUWA challenges something preliminary, internal, and discretionary: the decision not to finish an incomplete planning document."). But that is not what SUWA is challenging, nor is it what actually happened.

BLM's MLP policy, as SUWA has always maintained and the facts confirm, was a national policy that was first established in Instruction Memorandum No. 2010-117 ("IM 2010-117"), AR010474-82, and that governed MLP development for BLM-managed lands throughout the western United States, including, but not limited to, the San Rafael Desert in Utah. *See, e.g.*, AR015505 (explaining that the Moab MLP was prepared in accordance with IM 2010-117); ECF No. 8 ¶¶ 60-63, 67-70, 107-10, 145-48; ECF No. 29-1 at 10-13, 20, 22-25. 32-33. In response to IM 2010-117, BLM incorporated the MLP policy into its national agency-wide Handbook H-1624-1 *Planning for Fluid Mineral Resources*. AR004102 (stating that the Handbook is amended to include a chapter on MLPs); AR004128-38 (outlining the specific steps BLM will take to prepare and issue an MLP). Also in response to IM 2010-117, BLM's Utah State Office developed an "Oil and Gas Leasing Reform Implementation Plan" that outlined why and how BLM Utah would move forward with the MLP process. *See generally* AR010182-208.

BLM continued to operate under the nationwide MLP framework until it was eliminated in January 2018 by IM 2018-034. *See* AR005610. Thus, it was the issuance of IM 2018-034 that changed BLM's position on its policy for MLP development across the nation. *See, e.g.*, ECF

12

No. 8 ¶¶ 67-70, 108-10, 147-48; ECF No. 29-1 at 14-15, 21, 29. The subsequent decision to stop development of the San Rafael Desert MLP was simply an unavoidable outcome required by IM 2018-034. *See* 83 Fed. Reg. 32681 (explaining that development of the San Rafael Desert MLP is terminated because "BLM issued [IM 2018-034], which terminates the Master Leasing Process."); *see also* ECF No. 29-1 at 15, 29 n.19.

The Court should disregard BLM's overly-narrow characterization of SUWA's argument and instead consider it (and BLM's counterargument) in light of the facts as they actually are:

- BLM created its national MLP policy and ordered their development and implementation in IM 2010-117;

- The San Rafael Desert MLP was being developed in accordance with IM 2010-117;

- IM 2018-034 revoked IM 2010-117, eliminated the MLP process, and memorialized BLM's change in its position regarding its nationwide MLP policy stating only that the MLP process "created duplicative layers of NEPA review";

- In response to IM 2018-034, BLM stopped developing the San Rafael Desert MLP; and

- In 2024, BLM affirmed its prior justification for abandoning the MLP process in the Reevaluation EA without providing any further explanation.

Considering these facts, it is clear that BLM's MLP policy reversal in IM 2018-034 constitutes a change in position that required a reasoned explanation in accordance with *Fox*. Because BLM gave no such explanation, its decision to end the MLP development process was arbitrary and capricious.

**B.    IM 2018-034 Was an Arbitrary Change in Agency Position that was Subject to the *Fox* Standard**

"An agency changing its course must supply a reasoned analysis," otherwise its change in position is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 57 (1983) (citation omitted). That is, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43 (cleaned up). As explained below, this requirement applies with equal force to changes made to, among other things, notice-and-comment rulemakings, agency policies, discrete agency decisions, and other agency standards and procedures.

BLM argues that the "decision not to complete an MLP for the San Rafael Desert was not a change in official policy" and therefore BLM did not need to provide a reasoned explanation in accordance with *Fox*. ECF No. 30 at 14. This argument is unpersuasive. *First*, as explained *supra*, BLM ties its argument to the wrong decision—it is IM 2018-034, not the specific San Rafael Desert MLP decision that represents BLM's change in position, which is subject to *Fox*.

*Second*, contrary to a significant body of precedent, BLM argues that *Fox* only applies to "official" agency policies and not "non-binding, unenforceable agency guidance document[s]." ECF No. 30 at 15. This argument is flawed because (1) nowhere in *Fox* does the court limit its holding to "official" agency policies, and even if such a limitation is inferred, by definition, instruction memorandums are official BLM policies, and (2) instruction memoranda—in particular IM 2018-034—are enforceable and therefore judicially reviewable.

> i.    ***Fox*'s holding is not limited to "official" agency policies and Instruction Memoranda are precisely the type of agency policy that is subject to *Fox***

It is a bedrock principle of administrative law that "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (emphasis added). "When an agency changes its existing position . . . [it] must at least 'display awareness that it is changing position'

and 'show that there are good reasons for the new <u>policy</u>.'"[6] *Id.* (quoting *Fox*, 556 U.S. at 515)

(emphasis added). The new policy must also be "permissible under the [applicable] statute." *Fox*,

556 U.S. at 515.

BLM claims that *Fox* does not apply to "an informal, non-binding, unenforceable agency

guidance document" such as an instruction memorandum like IM 2010-117 or IM 2018-034.

ECF No. 30 at 15. *Fox* is not properly understood as being limited to "official" policies or

limiting its use of the word "policies" to a specific type of agency action. To the contrary, courts

(including the Supreme Court) have applied the APA's reasoned decision-making mandate and

*Fox's* criteria for evaluating changes in position to <u>many</u> different types of agency decisions.

The following table[7] groups applicable caselaw according to the general type of agency

action taken by the respective agency that was ultimately found to be unlawful.

---

[6] BLM describes *Fox's* "reasoned explanation" criteria as a four-factor test:

> An agency's change in policy is not arbitrary or capricious when: (1) the agency "display[s] awareness that it *is* changing position," (2) the agency "show[s] that there are good reasons for the new policy," though they need not be "*better* than the reasons for the old one," (3) the agency "*believes*" the new policy "to be better," which can be demonstrated by "the conscious change of course,"; and (4) the "new policy is permissible under the statute . . . ."

ECF No. 30 at 15-16 (quoting *Fox*, 556 U.S. at 515). Here, SUWA's focus is on the second factor. SUWA does not dispute that BLM displayed awareness that it was changing its position on its MLP policy nor does SUWA argue that BLM did not believe the new policy to be better. And, although other provisions of IM 2014-034 were ultimately held to be unlawful, SUWA does not argue that the absence of an MLP policy is impermissible under relevant statutes. *See Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 39-40 (9th Cir. 2025).
[7] This table highlights several relevant decisions finding an arbitrary and capricious change in agency position; it is not an exhaustive list.

| Informal Rulemaking | Agency Policy Memoranda, Statements & Directives | Discrete, Specific Agency Actions | Other Agency Standards & Procedures (*e.g.*, administrative adjudication) |
|---|---|---|---|
| *State Farm*, 463 U.S. 29 (1983)<br><br>*Encino Motorcars*, 579 U.S. 211 (2016) | *Mont. Wildlife Fed'n*, 127 F.4th 1 (9th Cir. 2025)[8]<br><br>*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)<br><br>*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020)<br><br>*AFGE v. FLRA*, 25 F.4th 1 (D.C. Cir. 2022) | *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017)<br><br>*Gulf Restoration Network v. Haaland*, 47 F.4th 795 (D.C. Cir. 2022)<br><br>*Org. Vill. of Kake v. U.S. Dep't. of Agric.*, 795 F.3d 956 (9th Cir. 2015) | *Fox*, 556 U.S. 502 (2009)<br><br>*Lone Mt. Processing v. Sec'y of Labor*, 709 F.3d 1161 (D.C. Cir. 2013)<br><br>*Southwest Airlines Co. v. FERC*, 926 F.3d 851 (D.C. Cir. 2019) |

Moreover, BLM's instruction memoranda <u>are</u> official BLM policies. As BLM explains it, instruction memoranda "are directives that supplement the BLM manual sections and handbooks. Instruction memorandum . . . <u>contain new policy</u> or procedures that must reach BLM employees quickly, <u>interpret existing policies</u> or provide one-time instructions." *Instruction Memorandum*, Bureau of Land Mgmt. (last visited Aug. 5, 2025), https://www.blm.gov/policy/instruction-memorandum (emphases added) (screenshot attached as Ex. 2);[9] *see also* AR010474 (stating that IM 2010-117 "establishes a process for ensuring

---

[8] The plaintiffs in *Montana Wildlife Federation* challenged IM 2018-034, the <u>same</u> instruction memorandum at issue in this litigation. The 9th Circuit held that BLM's policy change regarding public participation during NEPA processes was arbitrary and capricious. *See* 127 F.4th at 39-40.

[9] The Court may take judicial notice of the content on this webpage because it is posted on an "official public website[] of [a] government agenc[y]." *Pharm. Rsrch. & Mfgrs. of Am.*, 43 F. Supp 3d at 33.

orderly, effective, timely, and environmentally responsible leasing of oil and gas resources on

Federal lands" and that "[t]his <u>policy</u>… (2) introduces the Master Leasing Plan concept…")

(emphasis added); AR005609 (stating that the purpose of IM 2014-034 was to "set out the <u>policy</u>

of [BLM] to simplify and streamline the leasing process to alleviate unnecessary impediments

and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease

sales are consistently held…") (emphasis added).

Instruction memoranda are thus one example of where BLM is required to demonstrate

reasoned decision-making, especially when it is changing the agency's position on a prior

national policy. *Mont. Wildlife Fed'n*, 127 F.4th at 39-40 (applying *Fox* and holding that BLM's

policy decision in IM 2018-034 to shorten public participation periods was arbitrary and

capricious).

### ii.    *IM 2018-034 is an enforceable, judicially reviewable agency action that required BLM to demonstrate reasoned decision-making*

The availability of judicial review under the APA (and thus a determination of whether

an agency has reasonably explained its change in position), is governed by finality, not whether

the agency's decision has the force and effect of law. *Cal. Cmtys Against Toxics v. EPA*, 934

F.3d 627, 635 (D.C. Cir. 2019). An agency action is final if it (1) "mark[s] the consummation of

the agency's decisionmaking process," and (2) is "one by which the rights or obligations have

been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78.

Thus, judicial review under the APA applies to any agency action that satisfies *Bennett*, even if

the agency itself does not label its decision as "final." *See Cal. Cmtys. Against Toxics*, 934 F.3d

at 635 (stating that interpretive rules can be final); *Columbia Riverkeeper v. U.S. Coast Guard*,

761 F.3d 1084, 1094-95 (9th Cir. 2014) ("[A]n agency's characterization of its action as being

provisional or advisory is not necessarily dispositive…. Under the APA, for instance, even if the

agency does not label its decision or action as final, it may be reviewable[.]"). Likewise, even if the agency does not frame a particular decision as "binding" it does not mean the decision does not have that effect. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020-21 (D.C. Cir. 2000) ("If an agency acts as if a document issued at headquarters is controlling in the field . . . then the agency's document is for all practical purposes 'binding.'"). And, if an agency decision has a binding effect, it satisfies the second *Bennett* factor. *Id.* at 1022 n.15 (an agency action has a binding effect if it alters legal rights and obligations).

Indeed, courts have previously found guidance documents and instruction memoranda to be final agency actions that have binding effect and therefore judicially reviewable. *See, e.g.*, *Appalachian Power Co.*, 208 F.3d at 1021, 1023 (holding that an EPA guidance memorandum had binding effect and was final agency action); *Nat'l Env't. Ass'ns Clean Air Proj. v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014) (holding that a directive to Regional Air Directors to explain the applicability of a particular court case was final agency action); *Mont. Wildlife Fed'n v. Bernhardt*, 2020 U.S. Dist. LEXIS 90571, *21-22 (D. Mont. 2020) *aff'd sub nom. Mont. Wildlife Fed'n v. Bernhardt*, 127 F.4th 1 (9th Cir. 2025); *W. Energy All. v. Salazar*, 2011 U.S. Dist. LEXIS 98378, *19-21 (D. Wyo. 2011) (finding that BLM IM 2010-118 was a final agency action that violated the APA).

Of particular note, the very instruction memorandum at issue here, IM 2018-034, was held to have binding effect and be a final agency action that was subject to judicial scrutiny (and ultimately found to be arbitrary and capricious because it lacked reasoned decision-making). *W. Watersheds Proj. v. Zinke*, 441 F. Supp. 3d 1042, 1060-66 (D. Idaho 2020) *aff'd in part, rev'd in*

*part, sub nom. Mont. Wildlife Fed'n v. Bernhardt*, 127 F.4th 1 (9th Cir 2025).[10] The *Western*

*Watersheds Project* court held IM 2018-034 had binding effect because, *inter alia*, "it

implements a *required* template for BLM's oil and gas leasing process in language that can only

be understood as 'finally determinative of the issues or rights to which it is addressed.'" *Id.* at

1061 (quoting *Pacific Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 48 (D.C. Cir

1974)). And, "IM 2018-034 unequivocally replaces IM 2010-117 and was 'effective

immediately' . . . 'across the BLM'" and thus "[s]uch definiteness lets the air out of any

argument that IM 2018-034 operates only as provisional guidance." *Id.* at 1062 (citing *Chiang v.*

*Kempthorne*, 503 F. Supp. 2d 343, 350 (D.D.C. 2007)).

      BLM does not grapple with the *Western Watersheds Project* decision or attempt to

distinguish that court's key jurisdictional finding. Instead, BLM completely ignores it and

instead generically suggests that, across the board, instruction memoranda are not subject to

judicial review because they are "internal, non-binding, unenforceable agency guidance

document[s]." ECF No. 30 at 15. As demonstrated by the above-cited caselaw, this assertion is

simply wrong. Moreover, BLM claims that even if IM 2010-117 (BLM does not even mention

IM 2018-034) was enforceable "SUWA fails to identify an official policy upon which BLM

supposedly reversed course, or any legal obligation that would compel BLM to complete the San

Rafael Desert MLP[.]" *Id.* To the contrary, SUWA has consistently maintained that the MLP

policy set forth in IM 2010-117 is the one BLM reversed course on. ECF No. 8 ¶¶ 60-67, 143-

49, ECF No. 29-1 at 10-12, 14-15, 20-21. And, as explained *supra*, this was an "official" BLM

policy.

---

[10] On appeal, the question of whether IM 2018-034 was judicially reviewable under the APA was
no longer at issue.

Finally, with respect to its second cause of action, SUWA has asked the Court to:

> [d]eclare that Defendants violated NEPA and the APA, and acted arbitrarily, capriciously, <u>and contrary to law when Defendants abandoned the MLP concept</u>, including the San Rafael Desert MLP planning process, without a reasoned explanation… [and] [e]njoin Defendants from offering, selling, or issuing new leases for oil and gas development on BLM-managed public lands encompassed by the San Rafael Desert MLP until Defendants provide a reasoned explanation for their changed position regarding that MLP[.]

ECF No. 8 at 44 (Prayer for Relief paragraphs 2, 7) (emphasis added). Thus, contrary to BLM's arguments, SUWA is <u>not</u> asking the Court to compel BLM to complete the San Rafael Desert MLP. ECF No. 30 at 15 (arguing that "SUWA fails to identify . . . any legal obligation that would compel BLM to complete the San Rafael Desert MLP").

### C.    BLM's Remaining Arguments Defending Its Change in Position are *Post-Hoc* Rationalizations

"An agency must defend its actions based on the reasons it gave when it acted." *Dep't. of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). That is, the Court cannot accept "counsel's *post hoc* rationalizations for agency action." *State Farm*, 563 U.S. at 50; *see also Grace*, 965 F.3d at 903 ("when assessing the reasonableness of an agency's action, we look only to what the agency said at the time of the action—not to its lawyers' post-hoc rationalizations.") (cleaned up).

In 2018, BLM's entire explanation for eliminating the nationwide MLP policy in IM 2018-034 was contained in one sentence:

> The BLM conducted the review required by Executive Order 13783 and Secretarial Order 3354 and determined that [MLPs] <u>have created duplicative layers of NEPA review</u>.

AR005610 (emphasis added). BLM's 2024 Decision Record for the Reevaluation EA did not provide any additional explanation (indeed, the Decision Record does not even mention the MLP policy or IM 2018-034). *See generally* AR011420-24. BLM's only acknowledgement of its

reversal of the MLP policy and the San Rafael Desert MLP is in response to SUWA's comments

on the draft Reevaluation EA. But BLM again stated only that:

> IM 2018-34 explains why the BLM determined MLPs would no longer to be
> developed, finding that the process <u>created duplicative layers of NEPA review</u>.

AR000821 (emphasis added).

Therefore, when defending its decision to issue IM 2018-034 and end the MLP concept,

<u>counsel for BLM is limited to arguing that BLM's one sentence justification is a reasoned</u>

<u>explanation for BLM's policy change</u>. *See Regents of the Univ. of Cal.*, 591 U.S. at 24 (counsel

cannot "rely upon reasons absent from [the agency's] original decision"); *Grace*, 965 F.3d at

903. And, of course, BLM's perfunctory statement is "not a statement of reasoning, but of

conclusion." *Amerijet Intern. Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation

omitted).

Nonetheless, counsel for BLM now attempts to argue that elimination of the MLP policy

was reasonable because:

1. The Resource Management Plan ("RMP") process would "accomplish[] many of
   the same goals of the MLP process" such as "addressing changed circumstances,
   updated policies, and new information." ECF No. 30 at 17. Thus, MLPs were not
   necessary because "[e]verything an MLP could do, an RMP can do as well." *Id.* at
   18.

2. "BLM can consider imposing restrictions on development later in the regulatory
   process." *Id.* Specifically, at the drilling stage, "BLM may condition [drilling]
   approval on the lessee's adoption of reasonable measures, delimited by the lease
   and the lessee's surface use rights, to mitigate the drilling's environmental
   impacts." *Id.* (citation and internal quotation marks omitted).

3. "BLM has discretion to decide how and when to address new information, policies,
   and circumstances after an RMP is issued—such as through a new RMP or an RMP
   amendment." *Id.* at 19.

4. "Neither the [Mineral Leasing Act], nor [the Federal Land Policy and Management
   Act], nor BLM's regulations require it to engage in the MLP process[.]" *Id.*

BLM's counsel frames these rationales as reasons <u>why</u> the MLP policy created duplicative layers of NEPA review and claims, without any citations to the Reevaluation EA or reference thereto that these were summarized throughout that document. ECF No. 30 at 19. <u>They were not</u>. Instead, these rationales are being presented as reasons for BLM's policy reversal for the first time now that IM 2018-034 and the Reevaluation EA are being litigated. It is thus irrelevant whether these newly-proffered rationales explain why the MLP policy created duplicative NEPA review (they don't). BLM did not articulate these points to defend its change in position in 2018 when it issued IM 2018-034, nor in 2024 when it issued its decision on the Reevaluation EA. *See Regents of the Univ. of Cal.*, 591 U.S. at 24 (counsel cannot "rely upon reasons absent from [the agency's] original decision"). As such, BLM's argument is entirely reliant on impermissible *post-hoc* rationalizations that must be disregarded by the Court.

Additionally, BLM asserts that its "subsequent use of MLP data illustrates the degree to which these land-use-planning processes [*i.e.*, the RMP and MLP processes] overlap," thereby supporting BLM's conclusion that "the MLP process was duplicative of other processes." ECF No. 30 at 21. But this is another *post-hoc* rationalization that attempts to expand the scope of BLM's stated justification. BLM never stated that "the MLP process was duplicative of <u>other</u> <u>processes</u>." *Id.* (emphasis added). BLM stated that it was eliminating the MLP process because it "created duplicative layers of <u>NEPA review</u>;" full stop. AR005610 (emphasis added); AR000821 (emphasis added). Thus, it is immaterial whether "subsequent use of MLP data" demonstrates redundancy between <u>land-use planning</u> processes.

***

In summary, BLM's defense of its MLP policy reversal misses the mark for several reasons. The relevant decision the Court must assess is BLM's decision to eliminate its MLP

policy in IM 2018-034; BLM's decision to stop the San Rafael Desert MLP was simply a result of IM 2018-034. Moreover, BLM's MLP policy reversal in IM 2018-034 (and as reaffirmed by the Reevaluation EA decision) constitutes a change in position that required a reasoned explanation because IM 2018-034 had binding effect and is a final agency action. BLM's arguments defending BLM's one-line justification for the MLP policy reversal are impermissible *post-hoc* rationalizations. As such, BLM has not demonstrated that its decision to change its position on its nationwide MLP policy was the product of reasoned decision-making.

## III.    The MLP Policy Reversal Was a NEPA Triggering Event

Similar to the argument above, BLM has mischaracterized the scope and nature of SUWA's third cause of action and thus the caselaw the agency relies on is easily distinguishable. Additionally, the decision to reverse the nationwide MLP concept, which forced BLM to abandon the MLPs in Utah, had the effect of reopening millions of acres of public lands to leasing and development—lands that otherwise would not have been available. This outcome easily triggered the agency's obligations under NEPA.

### A.    BLM Mischaracterizes SUWA's Argument; the Caselaw Supports SUWA

BLM again mischaracterizes SUWA's argument. SUWA is not arguing that BLM's decision to abandon the San Rafael Desert MLP process was a NEPA triggering event. Instead, SUWA has consistently maintained that the national directive set out in IM 2018-034 to abandon the MLP concept, which forced BLM to abandon the San Rafael Desert MLP process, was a NEPA triggering event. *See* ECF No. 8 ¶ 153 ("BLM did not prepare [a NEPA analysis] prior to abandoning the MLP concept") (emphasis added); *id.* ("The initial decision [*i.e.*, IM 2018-034] reaffirmed by BLM in the Reevaluation EA to abandon the MLP concept opened millions of acres of public lands across the West [*i.e.*, not just the San Rafael Desert] to new oil and gas leasing") (emphases added); *id.* ¶ 154 ("BLM's failure to prepare NEPA analysis prior to

23

abandoning the <u>MLP concept</u>, . . . was arbitrary [and] capricious") (emphasis added); *see also* ECF No. 29-1 at 34 ("BLM's decision to abandon the <u>MLP policy</u> . . . reopened millions of acres of public lands to destructive oil and gas leasing and development—a decision that met the low threshold standard to trigger NEPA.") (emphasis added).

Based on its mischaracterization of SUWA's argument, BLM contends that "SUWA challenges a decision that is too internal and preliminary to qualify as a major federal action"— specifically, the "decision to undertake the <u>San Rafael Desert MLP</u>. . .." ECF No. 30 at 26-27 (emphasis added). But that's not SUWA's argument. Nowhere does BLM respond to SUWA's actual argument: that the nationwide directive in IM 2018-034 to abruptly reverse course on the MLP concept, which in turn forced BLM to abandon the Utah-MLPs including for the San Rafael Desert, was a NEPA triggering event because it materially altered the status quo by reopening millions of acres across the West and in Utah to new leasing and development including in the San Rafael Desert. ECF No. 29-1 at 34-39.

When SUWA's argument is viewed accurately the cases cited by BLM are inapposite or actually support SUWA's argument, ECF No. 30 at 26, and the cases relied on by SUWA— *Citizens for Clean Energy* and *Lockyer*—remain squarely on all fours with its claims. *See* ECF No. 29-1 at 35-36. For example, in *Defenders of Wildlife v. Andrus*, the court held that there must be an "overt" rather than "passive" act by the federal agency to trigger NEPA. 627 F.2d 1238, 1245 (D.C. Cir. 1980). Put differently, "NEPA only refers to decisions which the agency anticipates will lead to actions . . . [t]hat is, only when an agency reaches the point in its deliberations when it is ready to propose a course of action need it be ready to produce an impact statement." *Id.* at 1243.

That is precisely the situation here. Pursuant to the Trump administration's "energy dominance" agenda, IM 2018-034 "propose[d] a course of action"—the elimination of a nationwide policy and accompanying directive to immediately resume oil and gas leasing in the former MLP areas. AR005609 (the "purpose" of IM 2018-034 was, among other things: "to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens [and] to expedite the offering of lands for lease"); AR005610 (eliminating the MLP concept). BLM Utah dutifully and promptly followed that directive by abandoning the Utah MLPs and immediately began selling oil and gas leases in the former MLP areas including the San Rafael Desert. AR005420 (explaining that BLM held a scoping period for the September 2018 lease sale "from March 30 to April 16, 2018"—that is, the scoping period took place less than two months after BLM issued IM 2018-034); AR005422-21 (stating the September 2018 lease sale was "in compliance with . . . BLM policies . . . including the following: . . . IM 2018-034").

The D.C. Circuit's decision in *Fund for Animals, Inc. v. Thomas* is not to the contrary. There, the challenged policy merely gave its blessing to activity that had already been authorized years prior (and was ongoing) and thus did nothing more than allow the activity to continue in a substantially similar manner. 127 F.3d 80, 83 (D.C. Cir. 1997) ("the effect . . . was minimal because the substantive requirements of Wyoming's regulations vary only insignificantly from those of the [federal policy challenged in that case]"). As such, "the new national policy maintained the substantive *status quo*, it cannot be characterized as a 'major federal action' under NEPA." *Id.* at 84 (citations omitted). Similarly, *Fund for Animals, Inc. v. Mainella* involved a challenge to an agency's <u>failure to act</u>, which is not the case here: BLM undisputedly acted when it issued IM 2018-034. 294 F. Supp. 2d 46, 56 (D.D.C. 2003) (stating, "[w]hile the [agency] could have acted to prohibit the hunt, [it] did not."). Critically, there, the "plaintiffs

ha[d] failed to designate even one overt act that the federal defendants ha[d] taken regarding the black bear hunt." *Id.* at 57. Thus, the agency's "failure to exercise [its] discretion to prohibit the hunt is not federal action, which is needed to trigger the duty to prepare an [NEPA document]." *Id.*

Here, the facts of the present case could not be more different. Specifically, from 2010-2017 the status quo was: (1) a nationwide policy directing BLM to amend relevant RMPs to strengthen oil and gas leasing stipulations (*e.g.*, close areas to new leasing), and (2) no new leasing in the Utah-MLPs boundaries while that policy was in effect. AR010476-77; AR010662-72; AR011401. IM 2018-034—an "overt act"—eliminated that policy and directed BLM to immediately resume new leasing in the former MLPs boundaries (which the agency did). AR005608-10.

Finally, based on its mischaracterization of SUWA's argument, BLM attempts to distinguish the facts of *Citizens for Clean Energy v. U.S. Department of the Interior*, 384 F. Supp. 3d 1264 (D. Mont. 2019), and *California ex rel. Lockyer v. U.S. Department of Agriculture*, 575 F.3d 999 (9th Cir. 2009). ECF No. 30 at 27-28. According to BLM, *Citizens for Clean Energy* is distinguishable because it involved "a final agency decision that substantively changed the status quo"—but SUWA's challenge does not. *Id.* That is simply wrong. As explained *supra*, the decision to reverse course on the MLP concept via IM 2018-034 is a final agency action and, as discussed herein and in SUWA's opening brief, the decision materially and significantly altered the status quo. *See* ECF No. 29-1 at 34-39 (discussing this in more detail).

Likewise, BLM attempts to distinguish *Lockyer* by stating the plaintiffs in that case had "challenged a final rule, subject to notice and comment, published in the Federal Register, which altered existing regulations"—elements of a more "formalized" agency position than existed in

the present case. ECF No. 30 at 28. But again, BLM's distinction is misplaced because it is based on the inaccurate assumption that SUWA is challenging the reversal of the San Rafael Desert MLP, not the national MLP policy reversal. To the contrary, the national MLP policy was a formalized agency position, as explained above. And, in a similar vein to *Lockyer*, IM 2010-117 established a national policy (AR010474-82), the public could (and did) comment on the various MLPs (AR015511), the intent to prepare an MLP was published in the Federal Register, 81 Fed. Reg. 31252-02, and, both IM 2010-117 and IM 2018-034 altered the agency's nationwide approach for oil and gas leasing and development. *See also* ECF No. 29-1 at 37-39 (providing additional similarities between *Lockyer* and the present case).

Thus, BLM's decision in IM 2018-034 to reverse course on the MLP concept, which forced BLM Utah to abandon the San Rafael Desert MLP process and reopened millions of acres to leasing and development, satisfied the relatively low threshold for triggering NEPA.

**B.    The MLP Policy Reversal Reopened Millions of Acres of Public Lands in Utah to Leasing and Development**

Relatedly, BLM argues "SUWA's contention . . . that BLM 'reopened' public lands to leasing pursuant to executive order and secretarial order is contrary to fact," contending that under the relevant RMP ("Price RMP") "these lands were legally open to leasing throughout the MLP process." ECF No. 30 at 27. This argument misses the point. Whether the lands remained "legally open" to leasing is irrelevant. Instead, for more than seven years, <u>because of its nationwide policy</u>, BLM did not offer a single oil and gas lease in any BLM Utah MLP boundary—a deliberate decision that protected "millions of acres of land" by "<u>remov[ing] [the lands] from availability</u> for oil and gas leasing and development[.]" AR011401 (emphasis added).

The public lands at issue in *Citizens for Clean Energy* also remained "legally open" to new coal leasing in the relevant land use plans while the Jewell Order coal moratorium was in effect, because that moratorium applied to all BLM-managed lands and minerals across the United States (though it did not alter the underlying RMPs). 384 F. Supp. 3d at 1271. Nonetheless, the court had little trouble holding that the Zinke Order, which revoked the Jewell Order, had the effect of "reopening" those lands for coal and was therefore a NEPA triggering event. *Id.* at 1278 ("The Zinke Order Changed the status quo."). Specifically, "[t]he Zinke Order lifted the Jewell Order's moratorium and directed BLM to expedite coal leases." *Id.* This directive "provides the agency action" that triggered NEPA. *Id.*; *see also id.* at 1279 ("The Zinke Order served to re-open public land to coal leasing and to expedite lease applications.").

The same is true here. IM 2018-034 revoked IM 2010-117 and established a new, nationwide policy and process to "expedite the offering of lands for lease." AR005609. This decision and directive had the effect of reopening millions of acres of public lands in Utah to oil and gas leasing and development that had been removed from availability under the prior policy. Thus, IM 2018-034 "provide[d] the agency action" that trigged NEPA. *Citizens for Clean Energy*, 384 F. Supp. 3d at 1278; *see also* ECF No. 29-1 at 34-39 (providing additional detail).

## IV.    Failure to Take a Hard Look at Pronghorn Antelope

BLM argues that SUWA failed to put the agency on notice that SUWA planned to challenge the agency's pronghorn antelope analysis and, regardless, the Reevaluation EA fully analyzed this issue. ECF No. 30 at 28-33. This is wrong for three reasons. *First*, SUWA properly pled the pronghorn analysis issue in its amended complaint. *Second*, for years, SUWA has repeatedly raised this issue with the agency. And *third*, the Reevaluation EA—on its face—fails

to satisfy the D.C. Circuit's standard for a meaningful cumulative impact analysis and counsel for BLM's arguments to the contrary are either factually wrong or *post-hoc*, or both.

### A.    SUWA Properly Pled its First Cause of Action

Federal Rule of Civil Procedure 8 requires that a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Courts must construe Rule 8 "liberally" in the plaintiff's favor, provided the complaint "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)). That is, a complaint needs only to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is "plausible on its face" when the complaint contains facts that "allow[] the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Here, SUWA provided facts throughout its amended complaint indicating that its first cause of action encompassed BLM's failure to analyze cumulative impacts to wildlife and, in particular, pronghorn antelope. *See, e.g.*, ECF No. 8 at ¶ 54 ("The San Rafael Desert is also home to a diverse array of endemic wildlife including…pronghorn"), ¶ 63 (explaining that had the San Rafael Desert MLP been completed leases would have been subject to stricter stipulations designed to protect wildlife habitat), ¶ 91 (explaining that the Settlement Agreement required BLM to provide supplemental analysis on wildlife impacts), ¶ 98 (listing wildlife resources as one of the issues BLM committed to analyzing in the Reevaluation EA), ¶ 120 (explaining that all but one lease "contain year-long crucial pronghorn habitat"), ¶ 142 (stating that BLM's "failure to identify, analyze, and disclose the cumulative impacts of oil and gas leasing and development to…wildlife [*e.g.*, pronghorn]…violates NEPA.").

29

Yet BLM claims this information was somehow insufficient to put the agency on notice. In support of its position, BLM cites *Cloud Foundation, Inc. v. Salazar*, 999 F. Supp. 2d 117 (D.D.C. 2013) and *Steele v. United States*, 657 F. Supp. 3d 23 (D.D.C. 2023). ECF No. 30 at 29. These cases are both easily distinguishable. *Cloud Foundation* involved a situation where the plaintiff sought to expand the scope of a claim to cover other agency actions. 999 F. Supp. 2d at 127. Specifically, the plaintiff brought a "narrow" cause of action but then in its summary judgment motion "expand[ed] their claim to challenge" something else entirely. *Id.* Here, in contrast, SUWA has done the opposite by narrowing the general wildlife cause of action to include only pronghorn antelope—an issue it repeatedly raised for years with the agency.

*Steele* involved a case where the plaintiff failed to allege a particular legal violation. *See* 657 F. Supp. 3d at 48. Specifically, the plaintiff failed to plead "an express claim that the [agency] exceed[ed] its statutory authority under the [relevant statute]." *Id.* Based on these facts, the court held that "[n]ew claims cannot be pled in summary judgment briefs." *Id.* (quoting *Cloud Found.*, 999 F. Supp. 2d at 48). In contrast, here, SUWA's amended complaint pled a particular legal violation: BLM's violation of NEPA. ECF No. 8 ¶¶ 134-142.

Finally, courts have found that defendants were properly put on notice as to the nature of a plaintiff's cause of action when the defendant was able to respond to the claim on the merits. *Huffman v. Kelly*, 239 F. Supp. 3d 144, 155 (D.D.C. 2017); *Harrison v. Lewis*, 630 F. Supp. 212, 213-14 (D.D.C. 1986). As explained below, not only does the record contain <u>ample</u> evidence that BLM was well-aware of SUWA's claim that BLM needed to take a hard look at impacts to wildlife, and especially pronghorn, but BLM used that evidence to respond to the merits of SUWA's claim.

There is no serious question that SUWA has properly pled its first cause of action regarding BLM's failure to take a hard look at cumulative impacts to pronghorn antelope, and BLM was sufficiently on notice of the nature of that claim.

### B.     SUWA Has Raised the Pronghorn Antelope Issue for Years

Despite the lengthy history of the San Rafael Desert MLP—including SUWA's continued involvement in that process—and one of BLM's stated purpose of the MLP process to consider new information related to "[p]ronghorn habitat data from the Utah Division of Wildlife Resources," AR011012, now, for the first time, BLM asserts it had no idea that SUWA was concerned with, or may challenge, the agency's failure to analyze and disclose impacts to pronghorn. ECF No. 30 at 29-30.

This assertion is flatly contradicted by record evidence. For example, SUWA already sued BLM once over the agency's failure to take a hard look at impacts to pronghorn antelope before conducting the September and December 2018 lease sales. *See, e.g.*, AR010254-56. Following that litigation, pronghorn were specifically included in the Settlement Agreement as a resource value that SUWA was concerned about, and that BLM agreed to reanalyze in the Reevaluation EA. AR010488. SUWA subsequently commented on the draft Reevaluation EA and raised the issue of BLM's failure to fully analyze the impacts of leasing to the species. *See, e.g.*, AR010157 (explaining that an underlying factor of the MLP process was to consider new pronghorn data); AR010158 (explaining that BLM's about-face on the MLP failed to grapple with "the new information and changed circumstances previously identified by the agency such as pronghorn habitat data"); AR010168-69 (explaining that the draft Reevaluation EA failed to analyze impacts to wildlife, including pronghorn). BLM acknowledged SUWA's comments regarding pronghorn and provided a brief response thereto. AR000827. SUWA's amended

complaint repeats and expands on all of this information. *See* ECF No. 8 ¶¶ 59-71, 86-113, 134-142.

Thus, the record clearly reflects that BLM has been on notice for years about SUWA's concern over pronghorn and that SUWA has consistently alleged that BLM failed to take a hard look at impacts to wildlife, including pronghorn. And, importantly, <u>BLM had a full opportunity to respond to these arguments and, in fact, has done so here</u>. *See* ECF No. 30 at 30-33; *see also Huffman*, 239 F. Supp. 3d. at 155 (finding that the defendant was sufficiently put on notice as to the nature of the claim against him, "particularly because the <u>defendant was able to respond to [the] claims on the merits</u>.") (emphasis added).

### C.     The Reevaluation EA Does Not Comply with *Tomac* and BLM Relies on *Post-Hoc* Arguments

For the first time in briefing, counsel for BLM claims that the agency satisfied its NEPA hard look requirement in the Reevaluation EA because the EA tiered to the September 2018 Lease Sale EA and the Price RMP and, counsel asserts, those analyses "easily satisfy the cumulative impacts standard" in the D.C. Circuit. ECF No. 30 at 30. This is wrong for several reasons.

To begin with, it is of little significance that the Reevaluation EA tiered to outdated NEPA documents. As explained in SUWA's opening brief and herein, one of the primary purposes of the San Rafael Desert MLP EA was to consider and analyze <u>new information</u> related to pronghorn habitat data. AR011012. This new information did not exist when BLM prepared the Price RMP and thus any tiered-to analysis would be, at best, incomplete. Similarly, the September 2018 Lease Sale EA did not consider, analyze or disclose this new information but instead also tiered to the outdated Price RMP, and BLM subsequently issued the challenged

leases subject to the old stipulations, notices, and Best Management Practices contained in that RMP. AR005421-22; *see also* ECF 29-1 at 39-44 (discussing these points in more detail).

Notably, as noted above, the September 2018 Lease Sale EA did not bring wildlife, including pronghorn, forward for analysis but instead concluded that resource value did not warrant analysis. Thus, there was no analysis in that document to tier to. AR005595 ("Wildlife: BLM Sensitive" section for the Price Field Office: does not even identify pronghorn); *id.* "Wildlife: BLM Sensitive section for the USO [Utah State Office]: same); AR005602 ("Wildlife: Non-USFWS Designated" section for the Price Field Office: stating only "Pronghorn – crucial year long"); *id.* ("Wildlife: Non-USFWS Designated" section for USO: stating only "[a] majority of the parcels contain year-long crucial pronghorn habitat and all the remaining parcels save 106 contain year-long substantial pronghorn habitat"). BLM cannot tier to—and the Court cannot defer to—a void. *See Wilderness Soc'y v. U.S. Dep't of the Interior*, 2024 U.S. Dist. LEXIS 51011, at *91 (D.D.C. March 22, 2024) (citing *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010)).

Additionally, contrary to BLM's arguments, the Reevaluation EA fails to meet the D.C. Circuit's cumulative impact test. ECF No. 30 at 30-31. In the D.C. Circuit

> a meaningful cumulative impact analysis must identify five things: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions – past, present, and proposed, and reasonably foreseeable – that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Tomac v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (cleaned up).[11]

---

[11] The Supreme Court's recent decision in *Seven Counties Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025), did not alter the *Tomac* factors. There, the Supreme Court held that an agency need not analyze the <u>indirect</u> impacts of other actions that are too remote in time

The Reevaluation EA failed to satisfy the first, second, fourth and fifth *Tomac* standards for the reasons discussed below. *First*, counsel for BLM claims the agency identified the area in which the effects will be felt (the first *Tomac* factor). ECF No. 30 at 31. But the provided cite (AR000557) is simply a map of the leases under reevaluation and fails to provide any pronghorn information or data (such as habitat). Additionally, the cited map was not created for the purpose counsel now claims (*i.e.*, pronghorn impact analysis area), but instead was created to show the "[l]eases cancelled and affirmed under Alternative B." AR000557.

Notably, BLM created a pronghorn habitat map and collected other pronghorn data during the MLP process which would have informed the impacts analysis area, but the agency ignored it (along with the rest of the MLP information). *See* Bureau of Land Mgmt., San Rafael Desert MLP, Map 2-15 Pronghorn Habitat.[12] And nowhere in the EA does BLM claim—as counsel for BLM does now—that the foreseeable impacts to pronghorn will be limited to the four corners of the lease parcels.

*Second*, BLM did not analyze the impacts that are expected in the area from the proposed action (the second *Tomac* factor). ECF No. 30 at 31. Instead, the agency simply concluded that

---

or place and over which the agency lacks jurisdiction (*i.e.*, decision-making authority). *Id.* at 1515 (explaining that the case involved whether the agency had properly considered "projects that are separate in time or place" and whether "those projects fall outside the [agency's] authority"). Specifically, these factors implicate an "[i]ndirect effects" analysis which is defined as the impacts "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.1(i)(2) (2024) (emphasis added). To that end, the Supreme Court never once mentions "cumulative" impact in its *Seven Counties* decision. Here, SUWA has brought a cumulative impact argument and the past, present, and reasonably foreseeable projects in the San Rafael Desert region identified by the agency are oil and gas projects on BLM-managed public lands (*i.e.*, the agency has jurisdiction over them)— and the agency does not dispute that it had/has jurisdiction over these other projects.
[12] Available at https://tinyurl.com/PronghornMap (last visited Aug. 5, 2025). As noted above, the Court may take "judicial notice of information posted on official public websites of government agencies." *Pharm. Rsrch. & Mfgrs. of Am.*, 43 F. Supp 3d at 33.

83.2 acres is a smaller number than 4,090,451 acres and therefore impacts to pronghorn would be insignificant. AR000587. This conclusory assumption ignores relevant information and does not explain <u>why</u> BLM believes that impacts to 83.2 acres of pronghorn impacts are not significant; it is not an impact analysis.

For example, the Reevaluation EA states that the "San Rafael Desert management unit" contains 270 pronghorn. *Id.* But, that number isn't tethered to anything to provide any context and is also inaccurate. The 270 population estimate is based on a <u>2017</u> Utah Division of Wildlife Resource report. AR000587 (providing the population estimate and citing "UDWR 2017").[13] However, in 2023 BLM received a drilling proposal to develop leases in the San Rafael Desert that were sold at the 2018 September sale. AR015801-932. As part of the NEPA process, BLM collected new information for the same management unit and concluded that the unit contained "240 individuals, which is below the target object[ive] of 275." AR015876. In other words, pronghorn in the San Rafael Desert management unit were not doing that well—their population numbers were ten percent below the state's goal and had declined since 2017. Notably, the new 2023 data was available to BLM when it prepared the Reevaluation EA but it was ignored and the agency instead relied on the outdated 2017 data.

*Third*, SUWA has demonstrated that BLM did not analyze the impacts or expected impacts of the other projects (the fourth *Tomac* factor). ECF No. 29-1 at 42-44. In response, counsel for BLM cites an excerpt from the Price RMP—which broadly concludes that development in the 2,500,000-million-acre BLM field office may cause (unidentified) habitat

---

[13] UDWR 2017 is not defined in the Reevaluation EA. But, to the best of SUWA's knowledge, it refers to "2017, *Utah Pronghorn Statewide Management Plan*" which is the only 2017 Utah Division of Wildlife Resource's report listed in the citing references section of the EA. AR000697.

loss for (unidentified) species and "human disturbance factors" may make habitat "unavailable to wildlife"—to argue that BLM in fact performed this analysis. ECF No. 30 at 31 (citing AR014759). But the cited provision does not even mention pronghorn or the San Rafael Desert. AR014759. It is unsurprising that the Price RMP—a high level, programmatic land use plan— did not provide this site-specific, or region-specific, analysis since the RMP is meant only to "<u>guide</u>[] subsequent site-specific implementation." AR013980 (emphasis added); *see also* AR013978 (The RMP "will provide guidance for all subsequent site-specific decisions"); *Wilderness Soc'y*, 2024 U.S. Dist. LEXIS 51011, at *59 (explaining that an RMP's "general analysis does not substitute for a more specific review at the leasing stage—especially when [the RMP] promised a more granular analysis was forthcoming").

Moreover, counsel for BLM's argument is *post-hoc*. *See* ECF 30 at 31. The only explanation provided in the Reevaluation EA by BLM in response to SUWA's comments on this point is the following:

> The BLM reevaluated potential habitat for wildlife in the leasing area, including for pronghorn. This updated information has been included in the Final EA.

AR000827. The Reevaluation EA's only reference to pronghorn (*i.e.* the "updated information") is found at AR000587, but that passing reference does not include a cumulative impact analysis nor claim the Price RMP performed that analysis. Thus, the Court should not entertain BLM's current argument raised for the first time in briefing.

*Finally*, BLM did not analyze the overall impact to pronghorn habitat that can be expected if the individual impacts from this action (the lease sales) and others are allowed to accumulate (the fifth *Tomac* factor). Counsel for BLM states that the agency satisfied this obligation by noting how much surface disturbance <u>the proposed action</u> would cause (83.2 acres). ECF No. 30 at 31. Simply calculating the foreseeable disturbance of the proposed project

(and nothing else) is not a cumulative impacts analysis. Put simply, this one-sentence statement does not disclose the surface disturbance of other projects (past, present, or reasonably foreseeable), or the significance of those impacts to pronghorn.

For example, as discussed above, BLM states elsewhere in the Reevaluation EA that 79 wells have been drilled in the San Rafael Desert region. But, the EA does not disclose if those wells and accompanying disturbances (*e.g.*, well pads, access roads) occurred in the year-long crucial pronghorn habitat, the extent of the disturbances, or whether they have been reclaimed (or the extent/success of the reclamation). Likewise, counsel for BLM claims the agency catalogued these other actions, citing the 2005 Reasonably Foreseeable Development Scenario ("RFDS") prepared for the Price RMP. Even assuming that is accurate, those other actions are not disclosed or analyzed in the Reevaluation EA, nor are the foreseeable actions identified in the more recent San Rafael Desert MLP RFDS.

These other actions have had, or will have, significant additive impacts. For instance, the San Rafael Desert MLP EA stated that the foreseeable wells "would result in approximately 541 acres of surface disturbance and impacts to wildlife habitat, of which 86 acres would remain unreclaimed in 15 years." AR011295. And, "because of the difficulty of reclaiming surface disturbances in the planning area, the areas that are reclaimed would not be anticipated to return to normal conditions until 20 to 25 years or more after initial reclamation." *Id.* Additionally, all of this activity "could result in pronghorn expending energy to move away from oil and gas activity, possibly making calves more susceptible to predation." *Id.*

But, none of this information was accounted for in the Reevaluation EA.[14] Instead, counsel for BLM now attempts to turn BLM's statement regarding the foreseeable <u>direct</u> impacts of the proposed action into a cumulative impact analysis, which is both *post-hoc* and inconsistent with what the agency itself said. AR000586 (stating that the 83.2 acres is the "direct impact[]" of the proposed action).

***

In sum, BLM's arguments in defense of its failure to consider the cumulative impacts of wildlife, including pronghorn all fail. Not only did SUWA sufficiently and properly plead its cause of action regarding this argument based on facts alleged in its amended complaint, but it did so after repeatedly putting BLM on notice of its concerns, which is reflected in the record. Moreover, BLM's response on the merits of this argument are entirely impermissible *post-hoc* rationalizations that, in any case, are refuted by record evidence. Therefore, the Court should reject BLM's arguments.

---

[14] Counsel for BLM makes the remarkable assertion that "SUWA identifies no authority that statements in [the San Rafael Desert MLP EA], [which was] never released to the public in final form, constitute 'factual findings' that BLM must account for in later environmental analyses." ECF No. 30 at 33. Counsel provides no legal support for this assertion. To the contrary, NEPA's primary purpose, indeed, one of its "twin aims," is that the agency make an informed decision— that is, that the agency "consider every significant aspect of the environmental impact of a proposed action." *Balt. Gas. & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983). An uninformed decision is arbitrary and capricious. *State Farm*, 463 U.S. at 43 (an action is "arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem"). Here, counsel for BLM would have the Court conclude that BLM acted reasonably by ignoring a mountain of evidence, thousands of pages of agency-created information and data, simply because the agency—for political reasons; not because the information or data was no longer accurate or relevant—changed course mid-stream on the underlying proposed action (the San Rafael Desert MLP).

## **CONCLUSION**

For the reasons set forth above, and in SUWA's opening brief, the Court should grant

SUWA's motion for summary judgment, declare BLM's decisions to be arbitrary and capricious,

set aside and vacate the thirty-five challenged leases and enjoin any development of those leases.

Respectfully submitted this 5th Day of August, 2025.

*/s/ Hanna Larsen*
Landon Newell (*pro hac vice*)
Hanna Larsen (*pro hac vice*)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
Tele: (801) 486-3161
landon@suwa.org
hanna@suwa.org

Elizabeth L. Lewis (D.C. Bar No. 229702)
William S. Eubanks II (D.C. Bar No. 987036)
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, D.C. 20006
Tele: (970) 703-6060
lizzie@eubankslegal.com
bill@eubankslegal.com

*Attorneys for Plaintiff*
*Southern Utah Wilderness Alliance*
