**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.* <br><br> *Defendants*, <br><br> and <br><br> THE STATE OF UTAH <br><br> *Intervenor-Defendant* | Case No. 1:24-cv-02476-RC <br><br> The Honorable Rudolph Contreras |

**REPLY IN SUPPORT OF FEDERAL DEFENDANTS' COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARGUMENT ....................................................................................................... 2

   I.    Statute Of Limitations ............................................................................ 2

   II.   SUWA Failed To Provide Adequate Notice Of Its Claims ................................... 3

   III.  BLM's Termination Of The Nationwide MLP Process Did Not Violate The APA ............................................................................................... 4

       A.    IM 2018-034 Was Not A Final Agency Action That Supports An APA Claim ................................................................................ 4

       B.    BLM's Argument Is Not Post-Hoc Rationalization .................................... 9

       C.    BLM Had Good Reasons To Eliminate The MLP Process ...................... 10

   IV.  BLM Did Not Have To Complete NEPA Analysis In Connection With IM 2018-034 ............................................................................................ 11

   V.   BLM's Analysis Of The Effects Of Leasing On Pronghorn Antelope Satisfied NEPA ................................................................................... 14

       A.    SUWA Failed To Plead Claims Relating To Pronghorn Antelope........... 14

       B.    BLM's Analysis Of The Effects Of Leasing On Pronghorn Antelope Satisfies NEPA ............................................................................ 15

   VI.  Any Relief Should Be Carefully Tailored ......................................................... 20

CONCLUSION ................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
  25 F.4th 1 (D.C. Cir. 2022)............................................................................ 8, 9

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017).......................................................................... 8

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000)........................................................................ 8

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015).......................................................................... 6

*Bennett v. Spear*,
  520 U.S. 154 (1997)...................................................................................... 5, 9

*California ex rel. Lockyer v. U.S. Department of Agriculture*,
  575 F.3d 999 (9th Cir. 2009)........................................................................... 13

*Citizens for Clean Energy v. U.S. Department of the Interior*,
  384 F. Supp. 3d 1264 (D. Mont. 2019)............................................................ 13

*Cloud Found., Inc. v. Salazar*,
  999 F. Supp. 2d 117 (D.D.C. 2013).................................................................. 3

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024)........................................................................................ 2

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)........................................................................................ 8

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)................................................................... 4, 8, 10, 12

*Franks v. Salazar*,
  816 F. Supp. 2d 49 (D.D.C. 2011)................................................................... 14

*Friends of Animals v. Pendley*,
  523 F. Supp. 3d 39 (D.D.C. 2021)................................................................... 7

*Fund for Animals v. Mainella*,
  294 F. Supp. 2d 46 (D.D.C. 2003)................................................................... 12

*Fund for Animals, Inc. v. Thomas*,
  127 F.3d 80 (D.C. Cir. 1997)........................................................................... 12

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020).......................................................................... 8

*Gulf Restoration Network v. Haaland*,
    47 F.4th 795 (D.C. Cir. 2022) .................................................................................. 8

*Hesai Tech. Co. v. U.S. Dep't of Def.*,
    No. CV 24-1381 (PLF), --- F. Supp. 3d ---, 2025 WL 1911673 (D.D.C. July 11, 2025) ........... 9

*Lone Mountain Processing, Inc. v. Sec'y of Lab.*,
    709 F.3d 1161 (D.C. Cir. 2013) ............................................................................... 8

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................ 8

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ................................................................................. 8

*Nat'l Min. Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ................................................................................. 5

*Nat'l Oilseed Processors Ass'n v. Browner*,
    924 F. Supp. 1193 (D.D.C. 1996) ............................................................................ 9

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) .......................................................................................... 6, 12

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) .................................................................................. 8

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ................................................................................. 8

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
    324 F.3d 726 (D.C. Cir. 2003) ................................................................................. 5

*Seven County Infrastructure Coalition v. Eagle County*,
    145 S. Ct. 1497 (2025) ..................................................................... 15, 16, 18, 19, 20

*Sierra Club v. EPA*,
    873 F.3d 946 (D.C. Cir. 2017) .............................................................................. 5, 6

*Sw. Airlines Co. v. FERC*,
    926 F.3d 851 (D.C. Cir. 2019) ................................................................................. 8

*Tomac v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ........................................................................... 16, 18

*W. Energy All. v. Salazar*,
    No. 10-CV-237F, 2011 WL 3738240 (D. Wyo. Aug. 12, 2011) ......................................... 8

*Western Watersheds Project. Zinke*,
    441 F. Supp. 3d 1042 (D. Idaho 2020) ..................................................................... 7

*WildEarth Guardians v. Bernhardt*,
    501 F. Supp. 3d 1192 (D.N.M. 2020) ....................................................................... 8

**Statutes**

42 U.S.C. § 4332(C). ............................................................................................................ 11

**Regulations**

40 C.F.R. pts. 1500-08 ......................................................................................................... 16

**Other Authorities**

90 Fed. Reg. 10,610 (Feb. 25, 2025) ................................................................................... 15

## INTRODUCTION

Plaintiff Southern Utah Wilderness Alliance's ("SUWA") briefing presents a landscape of shifting sands.  As originally set forth in the Complaint, the gravamen of SUWA's claim was that Defendant Bureau of Land Management's ("BLM") 2024 reevaluation of certain 2018 lease sales (the "Reevaluation EA") was legally insufficient.  SUWA amended its Complaint to add claims under the Endangered Species Act ("ESA") related to these lease sales.  Then, on summary judgment, SUWA abandoned its ESA claims.  Instead, SUWA argued that the Reevaluation EA did not adequately document the effects of the lease sale on pronghorn antelope (which is not a species listed as threatened or endangered under the ESA), and devoted the majority of its brief to Claims Two and Three of its Complaint—that BLM did not provide a reasoned explanation for the termination of the San Rafael Desert Master Leasing Plan ("San Rafael Desert MLP"), a decision that, SUWA says, required National Environmental Policy Act ("NEPA") analysis.  SUWA's Response Brief changes direction yet again.  SUWA presents almost no argument about the San Rafael Desert MLP and instead claims that its target all along was BLM's January 2018 decision to terminate the nationwide MLP program ("IM 2018-034").

The piecemeal briefing adds some confusion to the mix, but the outcome is nevertheless clear.  That SUWA presses arguments that it did not plead with any clarity in its Complaint, and challenges something that is not a final agency action, bars its claims.  To the extent the Court reaches the substance of SUWA's claims, they lack merit.  BLM reasonably explained the decision to end both MLP processes, had no obligation to prepare NEPA analysis prior to ending those processes, and adequately documented the environmental effects of the leasing decision on pronghorn antelope.  The Court should grant summary judgment in favor of BLM, the Department of the Interior, and Christina Price ("Federal Defendants").

1

# ARGUMENT

## I.    Statute Of Limitations.

In an APA case, the statute of limitations begins to run when an agency action injures the plaintiff.  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 809 (2024).  In the first round of briefing, SUWA's declarant averred that he was "harmed by BLM's abrupt reversal in policy and decision not to undertake the pre-leasing analysis related to oil and gas development in the San Rafael Desert as part of the San Rafael Desert MLP."  Pl.'s Mot. for Summ. J. ("Pl.'s Opening Br."), Ex. 3 ¶ 18, Dkt. No. 29-4.  If that were indeed the timing and nature of the declarant's injury, SUWA's claims would likely be time-barred.  Now, SUWA's declarant says that he actually felt the harm arising from the end of the MLP program generally, and the San Rafael Desert MLP specifically, no sooner than October 2018, when BLM issued the first tranche of challenged leases.  Reply in Supp. of Pl.'s Mot. for Summ. J. and Opp'n to Defs.' and Def.-Intervenor's Cross Mots. for Summ. J. ("Pl.'s Resp. Br.") 2, Dkt. No. 37; Pl.'s Resp. Br., Ex. 1 ¶ 25, Dkt. No. 37-1.

This second declaration may resolve the statute of limitations question in this case.  But it bears noting that, at a minimum, this case presents none of the fairness concerns at issue in *Corner Post*.  In *Corner Post*, the plaintiff truck stop came into existence more than six years after the promulgation of the challenged regulation.  603 U.S. at 806.  Here, SUWA was in existence during, aware of, and allegedly involved in the San Rafael Desert MLP process "for years" before it ended.  Dkt. No. 37-1 ¶ 10.  Insofar as SUWA contends that it "could not challenge BLM's abandonment of the MLP policy" or "the agency's failure to prepare NEPA prior to abandoning that policy . . . because the agency had committed to reexamine those issues and make new decision(s)," Dkt. No. 37 at 7, the argument finds no support in the referenced settlement.  That settlement concerned NEPA analysis for the lease sales at issue and did not

commit BLM to reconsider the MLP policy. Nothing prevented SUWA from challenging IM 2018-034 and BLM's termination of the San Rafael Desert MLP within six years of either decision.

## II.    SUWA Failed To Provide Adequate Notice Of Its Claims.

SUWA clarifies in its Response Brief that the agency action it contends was arbitrary and capricious, and should have been accompanied by NEPA analysis, was IM 2018-034. Dkt. No. 37 at 12-13. This January 2018 instruction memorandum ended the nationwide MLP process. AR005610. This recasting of SUWA's challenge comes as something of a surprise. SUWA labeled the claims it pursues in this vein, respectively, "*Failure to Provide a Reasoned Explanation Prior to Reversing Course on the San Rafael Desert MLP*" and "*Failure to Prepare NEPA Analysis Prior to Reversing Course on the San Rafael Desert MLP*." First Am. Compl. 38, 39, Dkt. No. 8. BLM prepared an administrative record related to the Reevaluation EA, rather than nationwide policy decisions. And to the extent SUWA challenged IM 2018-034 in its Opening Brief, given this litigation's context, it read most naturally as a challenge as applied to the San Rafael Desert MLP, the 2018 oil and gas lease sales, and the Reevaluation EA.

"Defendants are entitled to fair notice of claims advanced in litigation" and "[n]ew claims cannot be pled in summary judgment briefs." *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 127 (D.D.C. 2013). SUWA's approach has worked to Federal Defendants' detriment, leaving only a reply brief to respond to SUWA's "actual" claims, and without the benefit of a responsive administrative record. The Court could fairly grant summary judgment in Federal Defendants' favor on these claims on this basis alone.

For the sake of thoroughness and without waiving the above argument, Federal Defendants will respond to SUWA's claims, as set forth in SUWA's Response Brief, on the

merits.[1]  SUWA's Response Brief notably retreats from its assertion that the termination of the San Rafael Desert MLP itself was legally insufficient.  Federal Defendants do not waive or abandon the arguments specific to the San Rafael Desert MLP in this Reply but focus on the arguments set forth in SUWA's Response.

## III.    BLM's Termination Of The Nationwide MLP Process Did Not Violate The APA.

SUWA argues that BLM's IM 2018-034 required a reasoned explanation under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), that BLM did not provide.  SUWA also asserts that nearly all of BLM's argument in its Opening Brief amounts to forbidden post-hoc rationalization.  Neither argument has merit.

### A.    IM 2018-034 Was Not A Final Agency Action That Supports An APA Claim.

SUWA argues that "BLM's MLP policy reversal in IM 2018-034 constitutes a change in position that required a reasoned explanation in accordance with *Fox*," and further that IM 2018-034 was a binding, final agency action that admits of judicial review.  Dkt. No. 37 at 13-20.  In support of this argument, SUWA states that courts "have applied the APA's reasoned decision-making mandate and *Fox's* criteria for evaluating changes in position to many different types of agency decisions[,]" not just official policies.  *Id.* at 15.  SUWA then cites a series of cases that, it argues, stand for the proposition that "guidance documents and instruction memoranda . . . have binding effect and [are] therefore judicially reviewable."  *Id.* at 17-18.

---

[1] Federal Defendants' Opening Brief acknowledged the potential ambiguity of SUWA's challenge and reserved the right to respond in full in the reply.  Mem. in Supp. of Fed. Defs.' Cross Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Fed. Defs.' Opening Br.") 28 n.10, Dkt. No. 30.  That the Opening Brief focused on SUWA's allegations as applied to the San Rafael Desert MLP specifically was not a disingenuous attempt to narrow the scope of SUWA's challenge, *contra* Dkt. No. 37 at 12, 24, but a good faith effort to understand and respond to an ambiguous brief and Complaint.

In an APA claim, the Court's "authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'" *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (citation omitted). To constitute a final agency action, first, the action "must mark the 'consummation' of the agency's decisionmaking process . . . And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). "[T]he basic question is 'whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule.'" *Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017). To answer this question, courts consider (1) "the actual legal effect (or lack thereof) of the agency action in question on regulated entities"; (2) "the agency's characterization of the guidance"; and (3) "whether the agency has applied the guidance as if it were binding on regulated parties." *Id.* (citation omitted). "The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).

Here, SUWA challenges a policy change designed to reorder BLM's internal planning processes, which is not an action with binding legal effect on the regulated public. The sequence of events is as follows. In 2010, BLM began the MLP process—a discretionary, supplemental land-use-planning process like a Resource Management Plan ("RMP"), but focused only on oil and gas leasing, and in specific areas. AR011400; AR010474 (referring to process as "discretionary"); AR010476-77 (describing MLPs). BLM's Utah State Office made the discretionary decisions to begin the San Rafael Desert MLP (the area did not meet the criteria listed in IM 2010-117) and to defer leasing while it prepared the San Rafael Desert MLP.

AR011401-02.  In 2018, BLM ended the MLP process nationwide, AR005610, and BLM-Utah's discretionary decisions to begin the MLP process and defer leasing came to an end.   The impact of IM 2018-034 as applied here was that BLM ceased use of a discretionary, internal land-use-planning process that was not required by law in the first place.  SUWA has not explained how this change had an actual legal effect on it or the regulated public.  Nor could it:  the legal status of the lands as open to leasing did not change throughout this process, *see* AR010477 (directive to state offices in IM 2010-117 to "continue to hold lease sales four times per year"); BLM's statutory or regulatory obligation (that is to say, none) to prepare an MLP remained the same; and the leasing process, dictated by statute and regulation, also stayed the same before and after.

Concerning the other factors set forth in *Sierra Club*, 873 F.3d at 951, BLM characterized IM 2018-034 as "set[ting] out the policy of the Bureau of Land Management to simplify and streamline the leasing process."  AR005609.  BLM did not publish IM 2018-034 in the Code of Federal Regulations or the Federal Register.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015).  And BLM has not applied IM 2018-034 as though it were binding on regulated parties; indeed, concerning the termination of the MLP process, there is nothing to apply to anyone outside of BLM.

SUWA cites *Bennett v. Spear*, Dkt. No. 37 at 17, but does not articulate how IM 2018-034 affected a legal right or obligation, or was a decision from which legal consequences flow.  SUWA's declarant avers that the lease sales were the agency action that directly caused him harm.  Dkt. No. 37-1 ¶ 25.   But land-use plans like the MLP are separate decisions from lease sales.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69, 70 (2004) (explaining that "land use plans are a preliminary step in the overall process of managing public lands" and "are normally not used to make site-specific implementation decisions").  IM 2018-034 neither reopened the

6

San Rafael Desert to leasing, *see* Section IV, *infra*, nor compelled BLM to offer these parcels for lease; the dominoes do not fall as inexorably as SUWA suggests.  *See* Dkt. No. 37-1 ¶ 25.  IM 2018-034 fails the second prong of the *Bennett* analysis because it created no rights or obligations and had no legal consequences for the regulated public.

SUWA's arguments to the contrary are unpersuasive.  As an initial matter, BLM's instruction memoranda are not, invariably, "final agency actions that have binding effect and [are] therefore judicially reviewable."  Dkt. No. 37 at 18.  There is no magic to the "IM" label; the point of the inquiry is the legal effect of the agency action on the regulated public.  *See generally Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 55 (D.D.C. 2021) (holding that "2019 Instruction Memorandum is a non-binding guidance document from BLM" that "did not require notice and comment under the APA").

 The out-of-circuit *Western Watersheds Project v. Zinke* opinion addressed a different part of IM 2018-034—a part of the IM that concerned public participation and lease sale protests—which the court concluded had an impact "upon the rights and abilities of parties like [the plaintiff] to participate in or challenge such practices and decisions."  441 F. Supp. 3d 1042, 1064 (D. Idaho 2020), *aff'd in part, rev'd in part and remanded sub nom. Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025).  It is not persuasive authority where, as here, the impact of IM 2018-034's elimination of the MLP process was internal to BLM and SUWA has identified no comparable impact on the public.

Nor is *Western Watersheds Project* the only opinion to examine whether IM 2018-034 was a final agency action.  The court in *WildEarth Guardians v. Bernhardt* considered a similar argument as in *Western Watersheds Project* and reached the opposite conclusion, under a heading labeled "IM 2018-034 did not constitute a final agency action because it did not affect

legal rights and obligations[,]" and explained that "IM 2018-034 is by and large an expression of BLM's internal policies and procedures" that "alter[s] some of the agency's internal policies and procedures to expedite the leasing of federal land for oil and gas development."  501 F. Supp. 3d 1192, 1221, 1225 (D.N.M. 2020).  The court further explained, "[t]he changes at issue merely reflect the differing priorities of two administrations, and it is not the Court's role to judge or overturn such preferences."  *Id*. at 1224.  Federal Defendants submit that *WildEarth Guardians* is the better reasoned opinion, but in any event neither case addresses the MLP program—which falls more plainly into the category of internal policy than other parts of IM 2018-034.

SUWA's remaining cases are distinguishable.  Put broadly, the actions in the cases SUWA cites either had a tangible legal impact on non-government actors, *see Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 638 (D.C. Cir. 2020); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1017, 1023 (D.C. Cir. 2000); *W. Energy All. v. Salazar,* No. 10-CV-237F, 2011 WL 3738240, at *1, *6 (D. Wyo. Aug. 12, 2011), or else did not examine whether there was a "final agency action," *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34 (1983); *Fox*, 556 U.S. at 510; *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 798 (D.C. Cir. 2022); *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 4 (D.C. Cir. 2022); *Grace v. Barr*, 965 F.3d 883, 891 (D.C. Cir. 2020); *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 852 (D.C. Cir. 2019); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017); *Lone Mountain Processing, Inc. v. Sec'y of Lab.*, 709 F.3d 1161, 1162-63 (D.C. Cir. 2013); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 959, 962 (9th Cir. 2015).

The bulk of Federal Defendants' argument in the Opening Brief concerned the San Rafael Desert MLP itself—an internal draft document, prepared at BLM's discretion. A draft document is by definition not the "consummation" of agency decision-making within the meaning of *Bennett*, 520 U.S. at 177-78; SUWA does not press the point in its response. To be sure, IM 2018-034 has an aspect of finality that the draft San Rafael Desert MLP EA lacked. But IM 2018-034 is also an internal agency action that did not create legal rights or obligations and, thus, does not admit of APA review. SUWA's Claim Two should be dismissed on this basis.

B.     BLM's Argument Is Not Post-Hoc Rationalization.

BLM explained in IM 2018-034 that the MLP process "created duplicative layers of NEPA review," and on that basis "eliminate[d] the use of MLPs." AR005610. SUWA asserts that "counsel for BLM is limited to arguing that BLM's one sentence justification is a reasoned explanation for BLM's policy change." Dkt. No. 37 at 21 (emphasis in original). Thus, SUWA says, any argument that goes beyond a defense of that one sentence amounts to "impermissible *post-hoc* rationalizations that must be disregarded by the Court." *Id*. at 22.

"The rule against post-hoc rationalizations does not prevent a court from considering a more detailed explanation of an agency's action in response to a legal challenge." *Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996). "Post hoc rationalizations are precluded; post hoc explanations are not." *Id*. Put differently, "there is a difference between (1) an agency failing to explain the basis for its decision in any meaningful way and then seeking to amplify its reasoning after the fact for the purposes of litigation, and (2) an agency seeking to offer a clearer or more detailed explanation of the justification offered." *Hesai Tech. Co. v. U.S. Dep't of Def.*, No. CV 24-1381 (PLF), --- F. Supp. 3d ---, 2025 WL

1911673, at *16 (D.D.C. July 11, 2025) (citation modified), *appeal docketed*, No. 25-5256 (D.C. Cir. July 16, 2025).

Here, BLM explained that the MLP process "created duplicative layers of NEPA review" and on that basis eliminated the program.  AR005610.  Federal Defendants' argument offers a more detailed explanation of that justification—that is, why the MLP process was duplicative given other NEPA review processes.  This is so for the following reasons, which SUWA has suggested are impermissibly post hoc.  First, the MLP process is duplicative because the preparation of a Resource Management Plan and the accompanying NEPA review accomplishes all of the same planning objectives and can account for new information.  Dkt. No. 30 at 17-21. Second, the MLP process is duplicative because BLM can add lease restrictions later in the regulatory process.  *Id*. at 18.  In short, the MLP process is duplicative because existing, legally required regulatory processes and NEPA reviews achieve everything the MLP was meant to do. *Id*. at 19.  The San Rafael Desert MLP illustrates that redundancy.  *Id*. at 21.  These reasons are merely a more detailed explanation of the justification BLM offered at the time, and responsive to the arguments that SUWA made in its Opening Brief, *see id*. at 17 (citing Pl.'s Opening Br. 22-28, Dkt. No. 29-1).  The rule SUWA espouses concerning *post-hoc* rationalization, that an agency's explanation of a decision in court must be "limited to" the four corners of the justification itself, would hamstring the government and make it unable to defend agency action.

C.    BLM Had Good Reasons To Eliminate The MLP Process.

In response to SUWA's clarifying footnote about the scope of its challenge, *see* Dkt. No. 37 at 15 n.6, BLM indeed had "good reasons" to rescind IM 2010-117, issue IM 2018-034, and eliminate the MLP process.  *Fox*, 556 U.S. at 515.  This is so for the same reasons stated in Section III.B, *supra*, and in Federal Defendants' Opening Brief, *see* Dkt. No. 30 at 17-23.  To

recap, the MLP process (including the San Rafael Desert MLP) was duplicative because existing, statutorily mandated land-use-planning and leasing processes, along with the NEPA analysis that accompanies those decisions, do everything that the MLP was intended to do. Thus, to streamline the oil and gas leasing process, BLM eliminated a duplicative layer of environmental analysis. SUWA, notably, does not respond to the substance of this argument, and instead focuses its fire on the contention that Federal Defendants' argument is *post-hoc* rationalization. But the point remains: BLM had good reasons to consider the MLP process duplicative and end it. Defendants are thus entitled to summary judgment on SUWA's Claim Two.

## IV.     BLM Did Not Have To Complete NEPA Analysis In Connection With IM 2018-034.

SUWA states in its response brief that its "actual argument" is "that the nationwide directive in IM 2018-034 to abruptly reverse course on the MLP concept . . . forced BLM to abandon the Utah-MLPs including for the San Rafael Desert," and "was a NEPA triggering event because it materially altered the status quo by reopening millions of acres across the West and in Utah to new leasing and development including in the San Rafael Desert." Dkt. No. 37 at 24. This argument fares no better than what Federal Defendants previously understood SUWA's position to be, and for similar reasons.

The section of IM 2018-034 that ended the MLP program was not a "major Federal action[]" that required NEPA analysis. 42 U.S.C. § 4332(C). Just like the decision to terminate the San Rafael Desert MLP, IM 2018-034 did not itself "reopen[]" any lands for oil and gas leasing. Dkt. No. 37 at 24. Indeed, Section III of IM 2010-117 directed state offices to "continue to hold lease sales four times per year, as required by the Mineral Leasing Act," AR010477, and Section II of 2018-034 does not say anything about federal lands being open or closed to oil and gas leasing in relation to the MLP process, AR005610. As noted in a 2015

BLM memorandum, the basis for the deferral of new leasing was as follows: "[i]n accordance with the discretion afforded to State Directors by Leasing Reform, BLM-Utah has deferred new leasing proposals submitted for all lands within the pending MLPs in order to preserve potential alternatives for those plans."  AR011401.  BLM, however, made no promises about the continued exercise of this discretion, and noted that this deferral was merely "likely to continue until the MLPs are completed."  *Id*.  And the later, site-specific decisions concerning lease sales are separate from land-use-planning decisions, anyway.  *Norton*, 542 U.S. at 69, 70.

Citing the "purpose" section of the IM, which was to "simplify and streamline the leasing process," SUWA mischaracterizes IM 2018-034 as a "directive to immediately resume oil and gas leasing in the former MLP areas."  Dkt. No. 37 at 25 (citing AR005609).  This is not a "directive to immediately resume oil and gas leasing in the former MLP areas" because it (1) does not direct BLM field offices to do anything with respect to leasing, (2) gives no indication of immediacy, (3) does not suggest that oil and gas leasing would "resume" (rather than continue as mandated by law), and (4) lacks any reference to the "former MLP areas."  *See* AR005609. The decision to defer leasing while BLM prepared MLPs was a separate exercise of discretion. SUWA's argument rests on a directive that does not exist.

Just like the cases in Federal Defendants' Opening Brief, then, SUWA challenges an action that "maintained the substantive *status quo*[.]"  *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997).  The land in the San Rafael Desert remained legally open to leasing throughout the MLP saga, in accordance with the Price RMP, before and after IM 2018-034; BLM's Utah field offices simply deferred new lease proposals as a matter of discretion. AR011401.  And SUWA's primary complaint is that BLM's field offices failed "to exercise . . . discretion" to continue to keep the land in the San Rafael Desert off the market.  *Fund for*

12

*Animals v. Mainella,* 294 F. Supp. 2d 46, 57 (D.D.C. 2003).  Here, BLM had no obligation to prepare a separate NEPA analysis.  As a matter of course, BLM's existing and subsequent NEPA analyses related to individual lease sales capture the environmental impacts of leasing in the San Rafael Desert.  The continuation of the status quo is not a NEPA-triggering event.

*Citizens for Clean Energy v. U.S. Department of the Interior*, 384 F. Supp. 3d 1264 (D. Mont. 2019), and *California ex rel. Lockyer v. U.S. Department of Agriculture*, 575 F.3d 999 (9th Cir. 2009), remain distinguishable.  In *Citizens for Clean Energy*, Secretary Jewell ordered a nationwide moratorium on coal leasing, which Secretary Zinke revoked.  384 F. Supp. 3d at 1276-77.  As discussed above, IM 2010-117 did not create a moratorium on leasing, and IM 2018-034 did not end a moratorium.  There is no analogous change at issue in this case.  Similarly in *Lockyer*, the plaintiffs challenged the rescission of a rule that actually had a direct legal impact on the ground: the Ninth Circuit noted the "substantive differences between localized forest management under the individual forest plans and the uniform nationwide protections imposed by the Roadless Rule[.]"  575 F.3d at 1014.  Here, in contrast, SUWA has not been able to identify any analogous substantive changes related to either IM 2018-034's elimination of the MLP process or the termination of the San Rafael Desert MLP.  Instead, its concern is the thematically related, close-in-time, but ultimately separate discretionary decisions to stop deferring lease proposals and offer new leases for sale.  And that is not enough to compel BLM to prepare a NEPA analysis.  The Court should grant summary judgment to Federal Defendants on Count Three of SUWA's Complaint.[2]

---

[2] Similar to Count Two, SUWA does not provide further argument specific to the San Rafael Desert in its Response Brief, though it remains ambiguous whether it has abandoned that argument entirely.  To the extent SUWA in fact contends that the termination of the San Rafael Desert MLP itself required NEPA analysis, Federal Defendants' Opening Brief provides a sufficient response.  Dkt. No. 30 at 26-28.

**V.    BLM's Analysis Of The Effects Of Leasing On Pronghorn Antelope Satisfied NEPA.**

In its only argument concerning the Reevaluation EA, SUWA argues that BLM's analysis of the effects of reaffirming the leases on pronghorn antelope habitat violated NEPA. Dkt. No. 29-1 at 39.  The Court should decline to consider this argument because SUWA did not set forth such a claim in its Complaint.  But even if SUWA had pled this claim properly, it lacks merit.

    A.    <u>SUWA Failed To Plead Claims Relating To Pronghorn Antelope.</u>

SUWA's own characterization of the claim it now advances under this heading is a minor concession to Federal Defendants' argument that SUWA failed to plead its pronghorn antelope claims.  SUWA says there is "no serious question that SUWA has properly pled its first cause of action regarding BLM's failure to take a hard look at cumulative impacts to pronghorn antelope[.]"  Dkt. No. 37 at 31.  This marks a retreat from the arguments SUWA advanced in its Opening Brief, which also criticized BLM's analysis of "reasonably foreseeable direct and indirect impacts."  Dkt. No. 29-1 at 42.  The abandonment of these earlier arguments illustrates that Federal Defendants' argument on this front is indeed "serious."  *Contra* Dkt. No. 37 at 31.

Nor is it necessarily the case that a plaintiff may cast a broad net in its complaint and pick a subset of that claim to advance at summary judgment.  For example, where a Complaint alleged "maladministration" of the ESA, the court did not permit the plaintiff, at summary judgment, to identify a new part of the statute the government defendant allegedly maladministered.  *Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011).  SUWA did not plead allegations sufficient to state the current claim it makes with respect to pronghorn antelope. Although the Complaint alleges that pronghorn antelope live in the San Rafael Desert, there is no mention of the alleged "(1) impacts during sensitive pronghorn calving season, (2) impacts to

14

successful pronghorn reproduction and maintenance of healthy herds, and (3) pronghorn becoming more susceptible to predation after being forced to move to new areas because of oil and gas activity" that appears to be the basis for SUWA's present argument.  Dkt. No. 29-1 at 40. To allege simply that BLM failed to consider the cumulative impacts on, *inter alia*, "wildlife" (which only adverted specifically to "pollinators" and could refer to any of approximately twenty different species SUWA referenced in its Complaint, *see* Dkt. No. 8 ¶¶ 53-54, 128) did not serve to apprise Federal Defendants of the nature of SUWA's claims.  Dkt. No. 8 ¶ 142.

SUWA's assertion that BLM says it "had no idea that SUWA was concerned with" pronghorn antelope is a straw man argument.  Dkt. No. 37 at 31.  True, SUWA raised this concern at various times throughout the past six years, and the agency's prior consideration of the impacts of oil and gas leasing on pronghorn antelope allowed BLM to advance responsive argument.  But the question is whether SUWA's Complaint adequately pled the claim it now advances with respect to pronghorn antelope.  The answer to that question is no.

B.    BLM's Analysis Of The Effects Of Leasing On Pronghorn Antelope Satisfies NEPA.

SUWA's claim related to pronghorn antelope still fails on the merits.  As an initial matter, it is true that the Supreme Court's decision in *Seven County Infrastructure Coalition v. Eagle County* did not specifically overrule the D.C. Circuit's opinion in *Tomac v. Norton*, *see* Dkt. No. 37 at 33 n.11, which establishes a multi-factor process for the analysis of cumulative impacts under NEPA.  That said, the *Seven County* opinion emphasizes that NEPA's focus is on the "proposed action," rather than projects separate in time and place.  145 S. Ct. 1497, 1514 (2025).  NEPA itself does not require agencies to undertake a cumulative effects analysis, and the Council for Environmental Quality regulations that previously used this term have been removed from the Code of Federal Regulations.  *See* Removal of NEPA Implementing

15

Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025) (to be codified at 40 C.F.R. pts. 1500-08). The continuing validity of *Tomac* and its progeny is therefore uncertain, given that the fourth and fifth factors look beyond the "proposed action."

More generally, the *Seven County* opinion is an important "course correction" that bears on SUWA's NEPA claim. 145 S. Ct. at 1514. The Court emphasized the reviewing court's limited role in reviewing NEPA analyses, explaining, "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 1515. This deference looms particularly large when a court considers "whether a particular report is detailed enough in a particular case," which "should not be excessively second-guessed." *Id*. at 1512.

SUWA asks the Court to second-guess the amount of detail in the Reevaluation EA. SUWA says that, for this decision, BLM failed to satisfy the first, second, fourth, and fifth *Tomac* factors: that is, the area in which the effects of the proposed action will be felt, the impacts that are expected to be felt in that area from the proposed action, the impacts or expected impacts from other past, present, and reasonably foreseeable actions in the same area, and the overall impact that can be expected if the various impacts in the area accumulate. Dkt. No. 37 at 33-34 (citing *Tomac v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006)). Not so; BLM's analysis satisfied NEPA, particularly in light of the Supreme Court's *Seven County* decision, and these arguments lack merit.

First, BLM identified the area in which the effects of the proposed action would be felt. BLM mapped out where the leases are, *see* AR000557, AR000700; stated which leases contain pronghorn habitat, AR000587 (all leases except for UTU93534); and explained what environmental effects might be expected from the leasing activity in that area, AR000587. SUWA identifies no legal authority to support the proposition that BLM had to prepare a specific

map layering the impact of the proposed activity over pronghorn habitat (or the other twenty or so plant and wildlife species SUWA references in its Complaint), or that BLM had to use a pronghorn-specific map prepared in a separate draft analysis.  *See* Dkt. No. 37 at 34.  And BLM explained that further site-specific analysis would take place at a later stage of the leasing process.  AR000586-87.  That SUWA would have preferred more detail or for BLM to present the information in a different format is insufficient reason to conclude that BLM violated NEPA.

Second, BLM did identify the impacts that are expected in the area.  SUWA says that BLM "simply concluded that 83.2 acres is a smaller number than 4,090,451 acres and therefore impacts to pronghorn would be insignificant."  Dkt. No. 37 at 34-35.  To the contrary, the Reevaluation EA explained (as noted in Federal Defendants' Opening Brief, Dkt. No. 30 at 31) that "during the construction and operation phases . . . impacts would likely consist of effects to the soundscape from anthropogenic noise, and the disturbance of habitat."  AR000587.  BLM also explained that the anticipated impacts would affect only a small percentage of pronghorn habitat and thus was unlikely to have a significant impact.  *See* AR000587.  But an acres-to-acres comparison is plainly not all that BLM did.[3]

Third, BLM identified the impacts from other nearby projects.  BLM tiered the Reevaluation EA to the Price RMP, a high-level, region-wide planning document, and the Price RMP EIS identifies the general impacts of other nearby projects on wildlife—as applied here, that "[h]abitats might be made unavailable to wildlife because of human disturbance factors (e.g., traffic or noise during sensitive time periods such as winter, birthing, nesting, and early rearing

---

[3] SUWA also identifies a minor discrepancy between estimates of pronghorn population between different years of data.  Dkt. No. 37 at 35.  It is not clear what bearing these figures have on BLM's alleged failure to analyze the environmental effects of the project—that is, the nature of impacts that may arise from oil and gas leasing.

of young)."  AR014759.  BLM also identified, in prior planning documents and the Reevaluation

EA, the anticipated scale of these other impacts.  *See* AR000562 (stating that a total of 79 oil and

gas wells have ever been drilled in San Rafael Desert MLP area, all of which were "dry holes");

AR003132-40 (Appendix M to Price RMP/EIS detailing foreseeable impact of oil and gas

leasing in Price field office area).  The fourth factor of *Tomac* requires an agency to disclose the

"impacts or expected impacts from . . . other actions" in the area.  433 F.3d at 864.  The

collection of documents BLM has compiled over the years did so; SUWA notably offers no legal

authority to suggest that BLM's analysis was insufficient.

Fourth, BLM considered the additive impact of the proposed action: that there is the

potential for surface disturbance and associated environmental effects on an additional 83.2 acres

of pronghorn habitat.  *See* AR000586-87.  This information, taken together with the information

about oil and gas development in the area from prior planning documents, suffices to show the

overall impact of this project, taken together with impacts from other nearby projects.

In sum, SUWA asks the Court to do exactly what the Supreme Court in *Seven County*

told reviewing courts not to do: to "excessively second-guess[]" whether the Reevaluation EA is

"detailed enough" as applied to pronghorn antelope.  145 S. Ct. at 1512.  SUWA's unilateral

preference for BLM to have provided more detail and presented the data in a different way does

not suffice to make out a NEPA violation.

SUWA again accuses BLM of providing a *post-hoc* argument on this front.  Dkt. No. 37

at 36.  As is relevant here, in the Reevaluation EA, BLM summarized a comment from SUWA as

follows: "BLM failed to take a hard look at impacts to wildlife and raised specific concerns with

the BLM's consideration of pronghorn antelope (*Antilocapra americana*), and . . . BLM's

calculation of disturbed pronghorn habitat is inaccurate."  AR000827.  BLM responded, "BLM

reevaluated potential habitat for wildlife in the leasing area, including for pronghorn. This updated information has been included in the Final EA." *Id*. True, BLM omitted a separate cumulative impacts analysis section for wildlife in the Reevaluation EA because it concluded the project was not likely to have a significant impact on wildlife. AR000816-17. As noted in Federal Defendants' Opening Brief, Dkt. No. 30 at 30, this was, as applied to pronghorn antelope, a manifestly reasonable conclusion; in the wake of *Seven County*, the Court's analysis could end there. But the point remains that, assuming for sake of argument that a cumulative impacts analysis was required, the information is all there, in the Reevaluation EA and the documents to which it tiered. *See* AR000557, AR000586-87, AR000700, AR014759. And SUWA does not explain how identifying elements of the challenged document (the Reevaluation EA), or documents to which the Reevaluation EA tiered its analysis (like the Price RMP EIS), could qualify as a *post-hoc* rationalization of the agency's decision—indeed, those documents are constituent parts of the agency's decision.

Lastly, SUWA reemphasizes that the Reevaluation EA should have accounted for information in the draft San Rafael Desert MLP EA. Dkt. No. 37 at 32, 37, 38 n.14. Again, the San Rafael Desert MLP EA was a draft document that BLM never released to the public; as such, information contained therein does not constitute "factual findings" that the agency must later account for. SUWA says that in making this argument, "[c]ounsel for BLM" has made a "remarkable assertion" that lacks legal support. *Id*. at 38 n.14. But SUWA has the burden of proving its claims and offers no legal authority to the contrary apart from platitudes about agency decision-making. *Id*. What would be "remarkable" is if internal, never-finished draft documents were binding on agencies in later decisions. SUWA's argument lacks merit, and the Court should grant summary judgment to Federal Defedants on SUWA's Count One.

**VI.    Any Relief Should Be Carefully Tailored.**

As originally stated in its proposed order, SUWA sought as remedies vacatur of the 35 challenged oil and gas leases, the decision to reaffirm these leases, BLM's decision not to complete an MLP for the San Rafael Desert, and BLM's abandonment of the "Master Leasing Plan policy."  Pl.'s Opening Br., [Proposed] Order, 1, Dkt. No. 29-5.  In the conclusion of its response brief, SUWA's request for relief states only that the Court should "declare BLM's decisions to be arbitrary and capricious, set aside and vacate the thirty-five challenged leases and enjoin any development of those leases."  Dkt. No. 37 at 39.

For absence of doubt, vacatur of all "decisions" at issue in this litigation would be an overly broad and inappropriate remedy.  Were the Court to vacate BLM's decision to end the MLP policy, the impact, presumably, would be to reinstate a nationwide land-use-planning policy, set forth in IM 2010-117, that BLM abandoned over seven years ago, and which is not required by law.  Similarly, vacatur of the decision to end the San Rafael Desert MLP would presumably reinstall that planning process, relief that SUWA now says it is not seeking.  Dkt. No. 37 at 20.

So too for the 35 leases themselves.  In *Seven County*, the Supreme Court noted that even if an environmental analysis "falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more."  145 S. Ct. at 1514. SUWA has litigated these leases for seven years, through three Presidential administrations. BLM has provided ample information about and a thorough analysis of the environmental impacts of the project.  To the extent the Court rules in SUWA's favor, the remedy should be

limited to remand for further analysis of the 35 leases that SUWA challenged in this litigation, rather than something more.

## CONCLUSION

The Court should not entertain SUWA's claims in the first instance given the procedural bars to adjudication, but if it does, SUWA's claims lack merit for all the reasons stated herein. Summary judgment should be granted in Federal Defendants' favor.

Respectfully submitted this 12th of September, 2025,

ADAM R. F. GUSTAFSON
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

/s/ *John Karl Heise*
John Karl Heise, Trial Attorney
(California Bar No. 331615)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Tel.: (202) 305-0421
John.Heise@usdoj.gov

Alison C. Finnegan, Senior Trial Attorney
(Pennsylvania Bar No. 88519)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 532-3312; Fax: (202) 305-0275
Alison.C.Finnegan@usdoj.gov

*Counsel for Federal Defendants*

21