## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, | |
| Plaintiff, | Case No. 1:24-cv-02476-RC |
| v. | Judge Rudolph Contreras |
| **U.S. DEPARTMENT OF THE INTERIOR**, *et al*., | |
| Defendants, | |
| and | |
| **THE STATE OF UTAH**, | |
| Defendant-Intervenor. | |

## JOINT APPENDIX

Landon Newell (*pro hac vice*)
Hanna Larsen (*pro hac vice*)
SOUTHERN UTAH WILDERNESS
ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
Tele: (801) 486-3161
landon@suwa.org
hanna@suwa.org

Elizabeth L. Lewis (D.C. Bar No. 229702)
William S. Eubanks II (D.C. Bar No. 987036)
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, D.C. 20006
Tele: (970) 703-6060
lizzie@eubankslegal.com
bill@eubankslegal.com

*Attorneys for Plaintiff Southern Utah
Wilderness Alliance*

**JOINT APPENDIX INDEX**

| DOCUMENT NAME[1] | AR BATES NO. RANGE FULL DOCUMENT | DATE[2] | EXCERPTS INCLUDED IN JOINT APPENDIX[3] |
|---|---|---|---|
| 20230807_SUWA_SUWAvHaaland | AR000011-19[4] | 8/7/2023 | |
| 20240530_BLM_SepDecO&GFinalEA | AR000535-852 | 5/30/2024 | |
| 20240530_BLM_SepDecO&GFONSI | AR000879-907 | 5/30/2024 | |
| 20080800_BLM_AppMOGRFDScenario | AR003132-41 | | |
| 20081000_BLM_PriceFORODRMP | AR003142-323 | 10/2008 | AR003142; AR003279 |
| 20160900_BLM_RFDScenario | AR005222-54 | 09/2016 | |
| 20180000_BLM_SeptO&GEA | AR005409-607 | 10/2018 | |
| 20180000_BLM_UpdtdO&GLeaseRfrm | AR005608-18 | 1/31/2018 | |
| 20190206_BLM_Dec2018PFODNA | AR005889-26 | 2/6/2019 | |
| SUWA Comments on the draft Reevaluation EA[5] | AR010151-81 | 9/11/2023 | |
| Oil and Gas Leasing Reform Implementation Plan | AR010182-208 | 9/2010 | |
| Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment | AR010209-57 | 5/14/2021 | |
| Plaintiffs' Second Amended and Supplemented Complaint for Injunctive and Declaratory Relief | AR010258-92 | 2/12/2021 | |
| Instruction Memorandum No. 2010-117 | AR010474-82 | 5/17/2010 | |
| SUWA Protest of the September 2018 Lease Sale | AR010493-535 | 8/6/2018 | |
| San Rafael Desert Master Leasing Plan Fact Sheet | AR010536-37 | | |
| Instruction Memorandum No. 2023-007 | AR010583-85 | 11/21/2022 | |
| SUWA Scoping Comments on September 2018 Lease Sale | AR010586-604 | 4/16/2018 | |

[1] Unless otherwise stated the document name provided is the name provided in the "filename" column in the administrative record index provided by the Bureau of Land Management.

[2] As labeled in administrative record index provided by the Bureau of Land Management, if any date is provided.

[3] If no excerpts are listed, full document included.

[4] This document is also available at AR010486-92.

[5] The administrative record combined SUWA's comments and attachments thereto into a single 1200+ page document that is challenging to scroll through. AR010149-11419 (file name: "20230912_SUWA_PblcComnt"). For clarity, the documents contained therein that are included in this Joint Appendix have been separated into individual files with their corresponding names and Bates numbers provided herein.

| | | | |
|---|---|---|---|
| Instruction Memorandum No. 2023-010 | AR010605-08 | 11/21/2023 | |
| San Rafael Desert Master Leasing Plan Appendix C – Best Management Practices | AR010609-17 | | |
| Report on the Federal Oil and Gas Leasing Program, Prepared in Response to Executive Order 14008 | AR010618-35 | 11/2021 | |
| H – 1621-1 – Planning for Fluid Mineral Resources | AR010636-743[6] | 1/28/2013 | AR010636-673 |
| San Rafael Desert Master Leasing Plan – Purpose, Need | AR010905-06 | | |
| San Rafael Desert Master Leasing Plan Appendix B – Oil and Gas Stipulations and Lease Notices | AR010921-69 | | |
| BLM Maps for San Rafael Desert MLP | AR010970-72 | | |
| San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments/Draft Environmental Assessment | AR011000-399 | 5/2017 | |
| Updated Utah Master Leasing Plan (MLP) Strategy | AR011400-09 | 8/14/2015 | |
| 20240530_BLM_SepDecO&GSalesDR | AR011420-24 | 5/30/2024 | |
| 20080800 Price FEIS | AR013948-15432 | 8/2008 | AR013948-49; AR013978-80; AR013998-99; AR014754-69; AR015355; AR015405; AR015409 |
| 20161215 Moab MLP ROD and RMP Amendments | AR015495-690 | 12/2016 | AR015495; AR015505; AR015511 |
| 20210900 EA to Drill 3 Wells and Construct Helium Extraction Facilities | AR015801-932 | 9/2023 | AR015801; AR015876 |

---

[6] This document is also available at AR004102-209 (file name: "20130128_BLM_FldMnrlRsrc").

## FW: [EXTERNAL] Suppl. NEPA analysis, SUWA v. Haaland (Case no. 1:20-cv-03654)

Price, Christina J <cjprice@blm.gov>

Mon 8/7/2023 12:03 PM

To:Moffitt, Melinda N <mmoffitt@blm.gov>;Pool, Jamie R <jpool@blm.gov>

📎 1 attachments (152 KB)

NRS-#1357271-v1-SUWA_v_Haaland_20221207_Settlement_Agreement.pdf;

Greetings,

I've already sent this to Ben and Matt. Looping you both in also

| | |
|---|---|
| | **Christina Price**<br>Deputy State Director,<br>Lands & Minerals<br><br>Utah \| Bureau of Land Management<br>Phone (Desk): 801-539-4063<br>Cell:  385-249-0647<br><br>website: www.blm.gov   email: cjprice@blm.gov |

---

**From:** Landon Newell <landon@suwa.org>
**Sent:** Monday, August 7, 2023 11:37 AM
**To:** Sawyer, Michael (ENRD) <Michael.Sawyer@usdoj.gov>; Schulte, Elizabeth A <elizabeth.schulte@sol.doi.gov>; Sheehan, Gregory J <gsheehan@blm.gov>; Price, Christina J <cjprice@blm.gov>
**Cc:** Steve Bloch <steve@suwa.org>
**Subject:** [EXTERNAL] Suppl. NEPA analysis, SUWA v. Haaland (Case no. 1:20-cv-03654)

---

> **This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

---

Dear Michael, Liz, Greg, and Christina –

On July 26, 2023, the Utah BLM released its draft environmental assessment for the *Supplemental Analysis of the September and December 2018 Oil & Gas Lease Sales* (DOI-BLM-UT-0000-2023-0007-EA) (ePlanning page available here). This is the supplemental NEPA analysis required by the settlement agreement reached between SUWA and the BLM in *SUWA v. Haaland* (Case No. 1:20-cv-03654).

AR000011

Paragraph 1 of that settlement agreement commits the BLM to prepare the above-referenced NEPA analysis. Additionally, and relevant here, Paragraph 2 of that agreement states (emphasis added):

> Upon completion of the supplemental NEPA analysis and related documentation, BLM will issue one or more decisions. In making these decisions, BLM will consider whether a resource management plan (RMP) amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations. If an RMP amendment is necessary or appropriate, BLM will consider amending or modifying the RMP, which may include rebalancing resource allocations and/or new or revised lease stipulations. BLM will also consider whether the leases challenged in this litigation should be canceled. BLM will issue the decision(s) contemplated in this paragraph no later than August 31, 2024.

The settlement agreement is attached for reference. However, the draft supplemental EA does not comply with this provision. Specifically, in the EA, BLM declined to consider an alternative that would adjust leasing categories/stipulations or consider whether an RMP amendment is necessary (page 2-5 of the draft EA, Section 2.5.1) (emphases added):

> Under the No Surface Occupancy (NSO) alternative, the BLM would only offer those LWC areas which are not identified by the BLM as a wilderness study area for lease with non-waivable NSO stipulations.
>
> The BLM dismissed this alternative because stipulations and notices, including NSO stipulations, as well as other restrictions, are already included in any lease sale. A complete list of stipulations and notices that pertain to the leases at issue in this EA are included in Appendix B. An NSO stipulation for LWCs in the PFO currently does not exist and would require an amendment to the 2008 PFO RMP. This is currently beyond the scope of the decision to be made described in Section 1.3 of this EA.

BLM's conclusion does not comply with Paragraph 2 of the settlement agreement. As such, SUWA requests that BLM immediately withdraw the draft supplemental EA and prepare a NEPA analysis that is consistent with the agreement reached by the parties—including consideration of whether a RMP amendment is necessary, and whether leasing categories or stipulations should be modified / adjusted.

Please call me at 801.428.3991 (office number) or 801.673.7318 (cell) if you'd like to discuss. We appreciate your prompt attention to this matter.
--
Landon Newell (he / him)
Staff Attorney
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, Utah 84111
Phone: 801-428-3991
E-mail: landon@suwa.org

IMPORTANT: The information in this e-mail is attorney communication and privileged.  It is intended only for the use of the addressee. If you receive this communication and are not the intended recipient, you are hereby notified that the copying or distribution of this communication is prohibited.  If you have received this communication in error, please notify us by telephone and return the message to us at the above address.

AR000012

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-03654-RC |
| | ) | The Honorable Rudolph Contreras |
| DEBRA HAALAND, in her official capacity as Secretary of the Interior, *et al*., | ) | |
| | ) | |
| Federal Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PURE HELIUM, LLC, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## STIPULATED SETTLEMENT AGREEMENT

This Stipulated Settlement Agreement ("Agreement") is entered into by and between Plaintiffs Southern Utah Wilderness Alliance, Center for Biological Diversity, Living Rivers and Natural Resources Defense Council, and Federal Defendants Debra Haaland, in her official capacity as Secretary of the U.S. Department of the Interior; Tracy Stone-Manning, in her official capacity as Director of the Bureau of Land Management ("BLM"); and BLM, who, by and through their undersigned counsel (collectively "the Parties"), state as follows:

WHEREAS, on October 23, 2018, and pursuant to the Mineral Leasing Act of 1920, BLM issued a Decision Record supported by an Environmental Assessment ("EA") and Finding

of No Significant Impact, offering seventy-six parcels for lease in Emery County, Utah on lands managed by BLM's Price Field Office ("September 2018 lease sale");[1]

WHEREAS, on December 11, 2018, BLM conducted an oil and gas lease sale, supported by a Determination of NEPA Adequacy ("DNA"), at which it sold lease UTU-93713 which is also in Emery County, Utah on lands managed by BLM's Price Field Office and is the only lease from this lease sale at issue in this litigation ("December 2018 lease sale");[2]

WHEREAS, on February 12, 2021, Plaintiffs filed a Second Amended Complaint challenging BLM's decisions authorizing the September and December 2018 lease sales, alleging, *inter alia*, that the EA and DNA supporting those decisions violated the National Environmental Policy Act ("NEPA"), ECF No. 46-1;

WHEREAS, on December 8, 2021, the Court granted a sixty-day stay of proceedings to finalize the terms of a settlement agreement and obtain the necessary approvals to formally enter into such an agreement, ECF No. 68, and further continued that stay on February 7, 2022 and April 9, 2022;

WHEREAS, the Parties, through their authorized representatives, and without any final adjudication of the issues of fact or law with respect to Plaintiffs' legal claims, have negotiated a settlement that they consider to be in the public interest and a just, fair, adequate, and equitable resolution of the disputes set forth in Plaintiffs' Second Amended Complaint;

---

[1] BLM, September 2018 Oil and Gas Lease Sale, Environmental Assessment, DOI-BLM-UT-0000-2018-0001-EA, available at https://eplanning.blm.gov/eplanning-ui/project/103243/570 (last updated Oct. 24, 2018).
[2] BLM, Price Field Office December 2018 Competitive Oil and Gas Lease Sale, DOI-BLM-UT-G020-2018-0057-DNA, available at https://eplanning.blm.gov/eplanning-ui/project/116617/570 (last updated Feb. 8, 2019).

THEREFORE, the Parties desire to resolve Plaintiffs' claims according to the terms set forth below, and thus hereby stipulate and agree as follows:

1.    BLM will conduct supplemental NEPA analysis for the leasing decisions supporting the September and December 2018 lease sales. The supplemental NEPA analysis for the two underlying lease sales shall include an assessment of the following resources: air quality, climate change, cultural resources, paleontological resources, recreation, visual resources, night skies, riparian resources, soils, water resources, vegetation, wildlife resources, special status plant and wildlife species, special designations such as Areas of Critical Environmental Concern, wilderness characteristics, and the social costs of greenhouse emissions (to the extent permitted by law). BLM's NEPA analysis will consider at least two action alternatives, in addition to the no-action alternative. BLM shall provide at least a 30-day public comment period on its supplemental NEPA analysis. This supplemental NEPA analysis will adhere to NEPA and its implementing regulations in effect prior to September 2020, to the extent permitted by law.

2.    Upon completion of the supplemental NEPA analysis and related documentation, BLM will issue one or more decisions. In making these decisions, BLM will consider whether a resource management plan (RMP) amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations. If an RMP amendment is necessary or appropriate, BLM will consider amending or modifying the RMP, which may include rebalancing resource allocations and/or new or revised lease stipulations. BLM will also consider whether the leases challenged in this litigation should be canceled. BLM will issue the decision(s) contemplated in this paragraph no later than August 31, 2024.

3.      Plaintiffs will submit to the Court a stipulation of dismissal or a motion for dismissal, and

proposed order dismissing the case without prejudice, pursuant to Fed. R. Civ. P. 41,

within seven days of execution of this Agreement.

4.      Plaintiffs' sole remedy for any failure by BLM to complete the obligations in

Paragraphs 1-2 is to rescind this Agreement and reinstate this litigation by refiling the

claims currently pending in this action. Federal Defendants acknowledge that a new

complaint would properly be designated as a related case to this matter, *see* LCvR

40.5(a)(4), and agree that they would not object to such a designation nor move to

transfer venue.

5.      Any future challenge to the adequacy of the NEPA analysis for the leasing decisions

challenged in this litigation, following the completion of the actions required by

Paragraphs 1-2 of this Agreement, must take the form of an appeal to the Interior Board

of Land Appeals or a new civil action under the judicial review provisions of the

Administrative Procedure Act, and may not be asserted as a claim for violation of this

Agreement or in a motion to enforce the terms of this Agreement. Nothing in this

Agreement precludes or limits Plaintiffs from raising any claims against future decisions

relating to the leases challenged in this litigation, including those based on the

supplemental NEPA analysis. Federal Defendants reserve the right to raise any applicable

claims or defenses to any such challenge.

6.      This Agreement is the result of compromise and settlement, and is based on and limited

solely to the facts involved in this case. This Agreement does not represent an admission

by any party to any fact, claim, or defense concerning any issue in this case. Further, this

Agreement has no precedential value and will not be used as evidence by any party in any other litigation except as necessary to enforce the terms of this Agreement.

7.    No provision of this Agreement will be interpreted as, or constitute, a commitment or requirement that Federal Defendants take action in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable law or regulation.

8.    The undersigned representatives of the Plaintiffs and Federal Defendants certify that they are fully authorized by the respective Parties whom they represent to enter into the terms and conditions of this Agreement and to legally bind such Parties to it.

9.    The Parties shall each bear their own costs, expenses, and attorneys' fees.

10.    This Agreement contains all of the terms of agreement between the Parties concerning the Plaintiffs' Second Amended Complaint, and is intended to be the final and sole agreement between the Parties with respect thereto. The Parties agree that any prior or contemporaneous representations or understanding not explicitly contained in this written Agreement, whether written or oral, are of no further legal or equitable force or effect. Any subsequent modification to this Agreement must be in writing, and must be signed and executed by the Parties.

11.    The Agreement is binding on Plaintiffs and Federal Defendants once signed by both parties.

Dated: December 7, 2022

IT IS SO STIPULATED.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

AR000017

_/s/ Michael S. Sawyer_
ARWYN CARROLL, Trial Attorney
MICHAEL S. SAWYER, Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:  202-305-0465 (Carroll)
Phone:  202–514-5273 (Sawyer)
Fax:  202-305-0506
arwyn.carroll@usdoj.gov
michael.sawyer@usdoj.gov

_Counsel for Federal Defendants_


_/s/ Stephen Bloch_
Stephen H.M. Bloch (_pro hac vice_)
Landon Newell (_pro hac vice_)
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
landon@suwa.org

_Counsel for Plaintiffs Southern Utah
Wilderness Alliance, Center for Biological
Diversity and Living Rivers_

William S. Eubanks II
DC Bar No. 987036

Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, DC 20005
(970) 703-6060
bill@eubankslegal.com

Sharon Buccino
D.C. Bar No. 432073

Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 289-6868

AR000018

sbuccino@nrdc.org

*Counsel for Plaintiff*
*Natural Resources Defense Council*

AR000019

U.S. Department of the Interior
Bureau of Land Management

**June 2024**

# Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment

## DOI-BLM-UT-0000-2023-0007-EA



**Bureau of Land Management**

Utah State Office

440 West 200 South

Salt Lake City, Utah 84101

AR000535

The Bureau of Land Management's multiple-use mission is to sustain the health and productivity of the public lands for the use and enjoyment of present and future generations. The Bureau accomplishes this by managing such activities as outdoor recreation, livestock grazing, mineral development, and energy production, and by conserving natural, historical, cultural, and other resources on public lands.

**DOI-BLM-UT-0000-2023-0007-EA**

AR000536

# CONTENTS

**Chapter 1.    Introduction** ........................................................................................... **1-1**
1.1    Background ...................................................................................................... 1-1
1.2    Purpose and Need .......................................................................................... 1-2
1.3    Decisions to be Made .................................................................................... 1-2
1.4    Plan Conformance Review ........................................................................... 1-2
    1.4.1    Price Field Office ................................................................................ 1-2
1.5    Relationship to Relevant Laws, Regulations, Policies and Other Documents or Plans ........ 1-3
    1.5.1    Other Documents ............................................................................... 1-6
    1.5.2    Other Plans ......................................................................................... 1-7
1.6    Internal Scoping ............................................................................................ 1-8
1.7    Issues ............................................................................................................... 1-8
1.8    Public Comment Period ................................................................................ 1-9
1.9    Recent Court Decisions ................................................................................ 1-9

**Chapter 2.    Description of Alternatives** ..................................................................... **2-1**
2.1    Introduction .................................................................................................... 2-1
2.2    Alternative A – No Action Alternative ...................................................... 2-1
2.3    Alternative B – Wilderness and Lands with Wilderness Characteristics Alternative .......... 2-3
2.4    Alternative C – Lease Cancellation Alternative ....................................... 2-5
2.5    Other Alternatives Considered but Not Analyzed in Detail ................... 2-5
    2.5.1    No Surface Occupancy Alternative ................................................ 2-5
    2.5.2    Phased Development Leasing Alternative ..................................... 2-5
    2.5.3    Mitigation Leasing Alternative ...................................................... 2-6

**Chapter 3.    Affected Environment and Environmental Consequences** .................. **3-1**
3.1    Introduction .................................................................................................... 3-1
    3.1.1    Reasonably Foreseeable Development Scenario .......................... 3-2
3.2    Issues Analyzed In Brief .............................................................................. 3-4
3.3    Issues Analyzed in Detail ............................................................................ 3-39
    3.3.1    Air Quality .......................................................................................... 3-39
    3.3.2    Greenhouse Gas and Social Cost of Carbon ............................... 3-49
    3.3.3    Socioeconomics and Environmental Justice ................................ 3-63
    3.3.4    Lands with Wilderness Characteristics ......................................... 3-75
    3.3.5    Wilderness ........................................................................................... 3-86
    3.3.6    Soundscapes ....................................................................................... 3-88
    3.3.7    Visual Resources ............................................................................... 3-92
    3.3.8    Night Skies .......................................................................................... 3-99
    3.3.9    Recreation ........................................................................................... 3-103
    3.3.10    Transportation and Access ............................................................ 3-106
    3.3.11    Water Resources .............................................................................. 3-110

**Chapter 4.    Consultation and Coordination** ............................................................. **4-1**
4.1    Endangered Species Act Consultation ....................................................... 4-1
4.2    Tribal Consultation ....................................................................................... 4-2
4.3    State Historic Preservation Office and Tribal Historic Preservation Office Consultation ..... 4-4

**Chapter 5.    List of Preparers** ..................................................................................... **5-1**

**Chapter 6.    References** ................................................................................................. **6-1**

AR000537

# Appendices

Appendix A. Lease List and Map
Appendix B. Stipulation and Notice List
Appendix C. Full Text Stipulation and Notices
Appendix D. Summary of the Typical Phases of Oil and Gas Development
Appendix E. Public Comments and BLM's Responses
Appendix F. Best Management Practices
Appendix G. Emissions Tables

# Figures

Figure 2-1. Location of the 59 leases under Alternative A and Alternative C........................................2-2
Figure 2-2. Leases cancelled and affirmed under Alternative B.............................................................2-4
Figure 3-1. Estimated annual greenhouse gas emissions profile over the life of a lease. .......................3-53
Figure 3-2. Environmental justice and socioeconomic analysis area.....................................................3-69
Figure 3-3. Key observation points of the lease area. ............................................................................3-93
Figure 3-4. Visual Resource Management classes for the 2018 leases and adjacent landscape. ............3-95
Figure 3-5. Viewshed analysis of lease area. .........................................................................................3-96
Figure 3-6. Depiction of artificial light and surrounding state and national parks. ..............................3-101
Figure 3-7. Travel management areas and lease areas............................................................................3-107
Figure 3-8. HUC-8 and HUC-10 watershed boundaries within analysis area. ......................................3-112
Figure 3-9. National Hydrography Dataset and National Wetland Inventory in leasing area. ..............3-113

# Tables

Table 1-1. Relationship to Statutes, Regulations, Orders, and Policies ....................................................1-4
Table 1-2. Issues Not Present in Analysis Area and Not Included in Further Detail in the
       Environmental Assessment .......................................................................................................1-9
Table 2-1. Leases to Be Affirmed under Alternative B .............................................................................2-3
Table 3-1. Onshore Leases Issued (1987–1996), Drilled, and Produced: Utah .......................................3-2
Table 3-2. Estimated Well Count and Production for the Leases .............................................................3-4
Table 3-3. Soil Slopes in the Lease Area .................................................................................................3-12
Table 3-4. Vegetation Types and Acreage ...............................................................................................3-14
Table 3-5. Acres of Potential Habitat for Federally Protected Plant Species ..........................................3-18
Table 3-6. Woodland Vegetation and Acreage by Lease ..........................................................................3-21
Table 3-7. National Wetlands Inventory Wetland Data by Lease (Acres).................................................3-23
Table 3-8. Criteria Pollutant Design Values (2020–2022).......................................................................3-40
Table 3-9. National Emissions Inventory 2020 Emissions Data for Carbon, Wayne, and Emery
       Counties ....................................................................................................................................3-41
Table 3-10. Estimated Annual Emissions from the Development of Leases..............................................3-44
Table 3-11. Global and U.S. Greenhouse Gas Emissions (2016–2020) ...................................................3-51
Table 3-12. Estimated Life of Lease Emissions from Well Development, Well Production
       Operations, Mid-Stream, and End-Use ....................................................................................3-52
Table 3-13. Comparison of Lease Sale Annual Emissions to Other Sources ...........................................3-54

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
DOI-BLM-UT-0000-2023-0007-EA
*June 2024*

Table 3-14. Comparison of the Life of Lease Emissions to Other Federal Oil and Gas Emissions ........3-54
Table 3-15. Social Cost of Greenhouse Gases Associated with Future Potential Development of the Proposed Alternative ...............................................................................................................3-57
Table 3-16. GHG Emissions from Past, Present, and Foreseeable Federal Onshore Lease Development (Mt $CO_2$e) ............................................................................................................3-60
Table 3-17. Non-Metropolitan Reference Percentages ..........................................................................3-66
Table 3-18. Environmental Justice Block Groups in Emery County by Race, Ethnicity, and Poverty ...3-70
Table 3-19. Designated Lands with Wilderness Characteristics Unit Acreage and Lease Overlap Area ..................................................................................................................................................3-76
Table 3-20. Acres of Overlap of Each Lease with All Candidate and Lands with Wilderness Characteristics Areas .........................................................................................................3-76
Table 3-21. Acreage of Overlap Between Leases and Designated Wilderness Units............................3-87
Table 3-22. National Park Service Measured Sound Pressure Levels ..................................................3-89
Table 3-23. Noise Levels Associated with Oil and Gas Activity ...........................................................3-90
Table 3-24. Visibility of Visual Resource Management Class Landscapes in the Lease Area .............3-97
Table 3-25. Visual Resource Management Classes by Lease Area .......................................................3-98
Table 3-26. Lease Visibility of Lands from Each Key Observation Point ..............................................3-98
Table 3-27. Acreage of Overlap Between Leases and Special Recreation Management Areas ...........3-104
Table 3-28. Leases within Travel Management Areas...........................................................................3-108
Table 3-29. Leases within Travel Management Areas, Wilderness and Lands with Wilderness Characteristics Alternative ..................................................................................................3-109
Table 3-30. National Hydrography Dataset and National Wetland Inventory Surface Water Features within Analysis Area.........................................................................................................3-110
Table 5-1. List of Preparers ...............................................................................................................5-1

AR000539

# LIST OF ABBREVIATIONS

**Units, Elements, and Compounds**

| | |
|---|---|
| bcf/d | billion cubic feet per day |
| bpd | barrels per day |
| $CH_4$ | methane |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| $CO_{2e}$ | carbon dioxide equivalent |
| dB | decibels |
| dBA | A-weighted decibels |
| dv | deciview |
| m | meters |
| MHz | megahertz |
| MMst | million short tons |
| Mt | megatonnes |
| $NH_4$ | ammonia |
| $NO_2$ | nitrogen dioxide |
| $NO_x$ | nitrogen oxides |
| $N_2O$ | nitrous oxide |
| $O_3$ | ozone |
| Pb | lead |
| $PM_\#$ | particulate matter |
| ppb | parts per billion |
| ppm | parts per million |
| ppt | parts per thousand |
| $SO_2$ | sulfur dioxide |
| $\mu g/m^3$ | micrograms per cubic meter |

**A**

| | |
|---|---|
| ACEC | area of critical environmental concern |
| ACHP | Advisory Council on Historic Preservation |
| AIRFA | American Indian Religious Freedom Act |
| AMR | *Utah Bureau of Land Management Air Resource Management Strategy 2022 Monitoring Report* |
| Annual GHG Report | *2021 BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends* |
| AOI | Area of Influence |
| APD | application for permit to drill |
| AQRV | air quality related value |
| ARMS | Air Resource Modeling Study |

**B**

| | |
|---|---|
| bbl | barrels |
| BLM | Bureau of Land Management |
| BMP | best management practice |
| BOEM | Bureau of Ocean Energy Management |

**C**

| | |
|---|---|
| CAA | Clean Air Act |

AR000540

| CAP | criteria air pollutant |
| CBNG | coalbed natural gas |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CIAA | cumulative impact analysis area |
| COA | condition of approval |
| CSU | controlled surface use |

**D**

December 2018 DNA | *Price Field Office December 2018 Competitive Oil and Gas Lease Sale Determination of NEPA Adequacy*
DOI | U.S. Department of the Interior

**E**

| EA | environmental assessment |
| EIA | U.S. Energy Information Administration |
| EIS | environmental impact statement |
| EJ | environmental justice |
| EO | executive order |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| EUR | estimated ultimate recovery |

**F**

| FO | field office |
| FONSI | finding of no significant impact |
| FLPMA | Federal Land Policy and Management Act |

**G**

| GAO | U.S. Government Accountability Office |
| GHG | greenhouse gas |
| GIS | geographic information system |

**H**

| HA | herd area |
| HAP | hazardous air pollutant |
| HMA | herd management areas |
| HUC | Hydrological Unit Code |

**I**

| ID Team | Interdisciplinary Team |
| IM | instruction memorandum |
| IPCC | Intergovernmental Panel on Climate Change |
| IQ | intelligence quotient |
| IRA | Inflation Reduction Act |
| IWG | interagency working group |

**K**

| KOP | key observation point |

**L**

| | |
|---|---|
| LWC | land with wilderness characteristics |
| LUP | land use plan |

**M**

| | |
|---|---|
| MLA | Mineral Leasing Act |
| MLP | master leasing plan |

**N**

| | |
|---|---|
| NAAQS | National Ambient Air Quality Standards |
| NEI | National Emissions Inventory |
| NEPA | National Environmental Policy Act |
| NETL | National Energy Technology Laboratory |
| NHD | National Hydrography Dataset |
| NHPA | National Historic Preservation Act |
| NPS | National Park Service |
| NSO | no surface occupancy |
| NWI | National Wetland Inventory |

**O**

| | |
|---|---|
| OHV | off-highway vehicle |
| OO | Onshore Order |

**P**

| | |
|---|---|
| PFO | Price Field Office |
| PFO RMP | *Price Field Office Record of Decision and Approved Resource Management Plan* |
| PFYC | Potential Fossil Yield Classification |
| PSD | prevention of significant deterioration |

**R**

| | |
|---|---|
| RFDS | reasonably foreseeable development scenario |
| RMP | resource management plan |
| ROS | Recreation Opportunity Spectrum |
| ROW | right-of-way |

**S**

| | |
|---|---|
| SC-GHG | social cost of greenhouse gases |
| September 2018 EA | *September 2018 Oil and Gas Lease Sale Environmental Assessment* |
| SHPO | State Historic Preservation Office |
| SOP | standard operating procedure |
| SQI | sky quality index |
| SRMA | special recreation management area |
| STEO | short-term energy outlook |
| State RMP | *State of Utah Resource Management Plan* |
| SUWA | Southern Utah Wilderness Alliance |
| SWCA | SWCA Environmental Consultants |

AR000542

**T**
TMA                          travel management area
TMDL                         total maximum daily load
TMP                          travel management plan

**U**
UDAQ                         Utah Division of Air Quality
UDWQ                         Utah Division of Water Quality
UDWR                         Utah Division of Wildlife Resources
Unit                         Canyonlands National Park Horseshoe Canyon Unit
USC                          United States Code
USFS                         U.S. Forest Service
USFWS                        U.S. Fish and Wildlife Service
USGS                         U.S. Geological Survey
USO                          Utah State Office

**V**
VOC                          volatile organic compound
VRM                          Visual Resource Management

**W**
WO                           Washington Office
WOTUS                        waters of the United States
WSA                          Wilderness Study Area
WSR                          Wild and Scenic River
WSRA                         Wild and Scenic Rivers Act

AR000543

# CHAPTER 1.    INTRODUCTION

## 1.1    BACKGROUND

The Bureau of Land Management (BLM) is preparing this environmental assessment (EA) in compliance with the National Environmental Policy Act (NEPA),[1] for the leasing decisions and associated NEPA documents previously prepared in connection with BLM's September 2018 Competitive Oil and Gas Lease Sale and December 2018 Competitive Oil and Gas Lease Sale, NEPA project numbers DOI-BLM-UT-0000-2018-0001-EA and DOI-BLM-UT-G020-2018-0057-DNA. This EA evaluates the potential impacts from affirming the previous leasing decisions for 59 leases (totaling 121,679.70 acres) on lands managed by the BLM Price Field Office (PFO).

The Southern Utah Wilderness Alliance, et al. (SUWA), in *SUWA v. Haaland*, Case No. 1:20-cv-03654, challenged the BLM's previous leasing decisions authorizing 77 leases in the PFO from the September and December 2018 oil and gas lease sales (Lease Sales), alleging, in part, violations of NEPA. The parties negotiated a settlement resolving the above lawsuit in which the BLM agreed to conduct additional NEPA analysis for the leasing decisions from the September and December 2018 lease sales. Eighteen of the 77 leases have since terminated. Therefore, only 59 of the 77 leases from the Lease Sales will be analyzed in this new analysis.[2,3] The 2018 NEPA documents include the *September 2018 Oil and Gas Lease Sale Environmental Assessment* (BLM 2018a) and the *Price Field Office December 2018 Competitive Oil and Gas Lease Sale Determination of NEPA Adequacy* (DNA) (BLM 2018b) and are referred to as the September 2018 EA and December 2018 DNA, respectively. This document is referred to as the *Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment* (EA).

The 59 leases cover 121,679.70 acres on public lands administered by the BLM. A list of the lease numbers, acreages, and status, along with a map, is included in Appendix A. The legal descriptions of the leases, including stipulations and notices, are found in Appendix B. The leases are located in Emery County and Wayne County, Utah, under the jurisdiction of the BLM PFO. Four of these leases – UTU93475, UTU93476, UTU93479, and UTU93480 – are currently part of a legislatively mandated land exchange with the State of Utah that BLM is processing under the John D. Dingell, Jr. Conservation, Management and Recreation Act, Public Law (PL) 116-9, Section 1255 (Dingell Act). Two additional leases – UTU93500 and UTU93503 – are part of a proposed legislative land exchange under proposed Senate Bill 1405 *Utah School and Institutional Trust Lands Administration Exchange Act of 2023*, the text of which may be found online (Congress.gov 2023).

Pursuant to 40 Code of Federal Regulations (CFR) 1508.1(ff), this EA tiers to and incorporates by reference the final environmental impact statement (EIS) contained in the PFO Resource Management

---

[1] This EA conforms to the CEQ NEPA regulations that were in place prior to September 14, 2020, to the extent permitted by law.

[2] The 59 leases analyzed in this EA are: UTU93466; UTU93468; UTU93469; UTU93470; UTU93471; UTU93472; UTU93473; UTU93474; UTU93475; UTU93476; UTU93477; UTU93478; UTU93479; UTU93480; UTU93481; UTU93482; UTU93483; UTU93484; UTU93485; UTU93486; UTU93487; UTU93489; UTU93491; UTU93492; UTU93493; UTU93495; UTU93496; UTU93497; UTU93498; UTU93499; UTU93500; UTU93501; UTU93502; UTU93503; UTU93504; UTU93505; UTU93506; UTU93507; UTU93508; UTU93509; UTU93510; UTU93511; UTU93512; UTU93513; UTU93514; UTU93518; UTU93519; UTU93520; UTU93521; UTU93523; UTU93524; UTU93525; UTU93526; UTU93527; UTU93530; UTU93533; UTU93713; and UTU93534. All leases except UTU93713 are from the September 2018 sale. UTU93713 is from the December 2018 sale.

[3] As of October 25, 2023, North American Helium fully relinquished eight leases (UTU93466; UTU93477; UTU93478; UTU93482; UTU93500; UTU93501; UTU93503; and UTU93504) and partially relinquished three leases (UTU93468; UTU93481; and UTU93483), Therefore, any decision made for this EA will not apply to the eight relinquished leases or the relinquished portions of the three leases listed above.

AR000544

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 23 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

Plan (RMP) (BLM 2008a), the September 2018 EA (BLM 2018a), and the December 2018 DNA (BLM 2018b).

This EA includes seven appendices: Appendix A, Lease List and Map; Appendix B, Stipulation and Notice List; Appendix C, Full Text Stipulations and Notices; Appendix D, Summary of the Typical Phases of Oil and Gas Development; Appendix E, Public Comments and BLM's Responses; Appendix F, Best Management Practices; and Appendix G, Emissions Tables. Appendices will be referenced throughout to provide additional context to the content of this EA.

## 1.2    PURPOSE AND NEED

The purpose of federal action is to comply with the terms of the *SUWA v. Haaland* settlement agreement and prepare additional NEPA analysis associated with the leasing decisions. The need for the action alternatives proposed is established by the BLM's responsibility under the Mineral Leasing Act (MLA), as amended, the Mining and Minerals Policy Act of 1970, the Federal Onshore Oil and Gas Leasing Reform Act of 1987, and Federal Land Policy and Management Act (FLPMA).

## 1.3    DECISIONS TO BE MADE

Based on the analysis in this EA, BLM will decide whether to affirm the BLM's 2018 leasing decisions for the remaining 59 leases, cancel these leasing decisions (or a portion therein), or amend and affirm the leases with revised terms.

## 1.4    PLAN CONFORMANCE REVIEW

Under FLPMA, the BLM must manage for multiple uses of public lands in a combination that will best meet the present and future needs of the public and the various resources based on an approved RMP. The BLM is required to declare in the RMP how the federal mineral estate will be managed, including identification of all appropriate lease stipulations (43 CFR 3101.1 and 43 CFR 1601.0-7[b]); BLM Manual 1601, *Land Use Planning* (BLM 2005) and BLM Handbook H-1624-1, *Planning for Fluid Mineral Resources* (BLM 2013a).

The proposed alternatives were reviewed for conformance (43 CFR 1610.5) with the PFO RMP (BLM 2008a), as amended.

### 1.4.1    Price Field Office

**PFO RMP, October 2008, as amended**

The PFO RMP designated approximately 1,910,000 acres of federal mineral estate open for continued oil and gas development and leasing. The PFO RMP (with associated amendments) also describes specific stipulations that would be attached to new leases offered in certain areas. Under the proposed alternatives in this EA, the leases are subject to stipulations prescribed by the PFO RMP. In addition, site visits were conducted by the PFO Interdisciplinary Team (ID Team) of resource specialists prior to the 2018 Lease Sales to verify consistency with the PFO RMP. The proposed alternatives conform to the fluid mineral leasing decisions in the RMP and subsequent amendments and are consistent with the PFO RMP's goals and objectives for natural and cultural resources. The proposed alternatives specifically conform to the PFO RMP decisions presented below.

#### 1.4.1.1    Leasable Minerals (MLE)-5 (PFO RMP, p. 125)

The BLM has identified leasing allocations for all lands within the PFO. In addition, the PFO RMP describes specific lease stipulations (PFO RMP, Appendix R-3) that apply to a variety of different

resources, including raptors, greater sage-grouse (*Centrocercus urophasianus*), and big game habitat, as well as program-related best management practices (BMPs) (PFO RMP, Appendix R-14) that may be applied on a case-by-case, site-specific basis to prevent, minimize, or mitigate resource impacts (PFO RMP, Map R-8).

### 1.4.1.2    MLE-6 (PFO RMP, p. 125)

Review all lease parcels prior to lease sale. If the PFO determines that new resource data information is available at the time of the lease review that warrants changing a leasing allocation or specific lease stipulation, the PFO will make appropriate changes through the plan maintenance or amendment process. The PFO may also apply appropriate conditions of approval (COAs) at the permitting stage to ensure conformance with the RMP and all applicable laws, regulations, and policies.

### 1.4.1.3    MLE-9 (PFO RMP, p. 126)

Oil and gas leasing management will be conducted as shown on Map R-25a of the PFO RMP (BLM 2008a):

- Areas open to leasing subject to the standard terms and conditions of the lease form (1,161,000 acres)

- Areas open to leasing subject to moderate constraints (timing limitations, controlled surface use [CSU], and lease notices) (467,000 acres)

- Areas open to leasing subject to major constraints (NSO) (282,000 acres)

- Areas unavailable to leasing (569,000 acres)

The combination of all restrictions on oil and gas development is shown on Map R-26a of the PFO RMP (BLM 2008a).

## 1.5    RELATIONSHIP TO RELEVANT LAWS, REGULATIONS, POLICIES AND OTHER DOCUMENTS OR PLANS

The mandate of the BLM, as derived from various laws, including the MLA and FLPMA, as amended, is to promote the exploration and development of oil and gas in the public domain. Additionally, the Federal Onshore Oil and Gas Leasing Reform Act of 1987 states that lease sales shall be held for each state where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary. The MLA establishes that deposits of oil and gas owned by the United States are subject to disposition in the form and manner provided by the MLA under the rules and regulations prescribed by the Secretary of the Interior, where consistent with FLPMA and other applicable laws, regulations, and policies.

Purchasers of oil and gas leases are required to comply with all applicable federal, state, and local laws and regulations, including obtaining all necessary permits prior to any lease development activities.

A listing of applicable statutes, regulations, and policies is provided in Table 1-1. Other plans are discussed in Section 1.6.

The regulations, policies, and plans that were reviewed in preparing this EA include, but are not limited to, the following:

AR000546

## Table 1-1. Relationship to Statutes, Regulations, Orders, and Policies

| Relevant Statute, Regulation, Order, or Policy | Relationship to the Proposed Alternatives |
|---|---|
| Endangered Species Act (ESA) | The ESA requires all federal departments and agencies to consult with the U.S. Fish and Wildlife Service on all actions authorized, funded, or carried out by the agency to ensure that the action will not likely jeopardize the continued existence of any threatened and endangered species or adversely modify critical habitat. See the text of stipulation HQ-TES-1 in Appendix C for details. Additional species-specific notices are attached to appropriate leases. Please refer to AIB-3, AIB-8, and AIB-11. |
| FLPMA | FLPMA established guidelines to provide for the management, protection, development, and enhancement of public lands (PL 94-579). Section 103 of FLPMA defines public lands as any lands and interest in lands owned by the United States (43 CFR 3101.1 and 43 CFR 1601.0-7(b); BLM Handbooks H-1601-1 and H-1624-1). |
| Federal Onshore Oil and Gas Leasing Reform Act | This Act directs the BLM to conduct quarterly oil and gas lease sales whenever eligible lands are available for leasing. |
| MLA | The MLA establishes that deposits of oil and gas owned by the United States are subject to disposition in the form and manner provided by the MLA under the rules and regulations prescribed by the Secretary of the Interior, where consistent with FLPMA, NEPA (PL 91-90, 42 United States Code [USC] Section 4321 et seq.), and other applicable laws, regulations, and policies. |
| National Historic Preservation Act (NHPA) | Leasing is considered an undertaking pursuant to 54 USC Section 300101 et seq., commonly known as the NHPA, as amended, and 54 USC Section 306108, commonly known as Section 106 of the NHPA (Section 106). Section 106 requires all federal agencies to take into account the effects on historic properties from a federal undertaking. As a part of Section 106, federal agencies consult with the State Historic Preservation Office (SHPO) on all undertakings authorized, funded, or carried out by the agency. Agencies may follow a phased approach to Section 106 compliance. At the leasing level, existing records reviews and consultation with SHPO, Native American Tribes, consulting parties, and the public drive identification of historic properties. Class III cultural resource surveys are an important part of identification at the lease-development level. See the text of stipulation HQ-CR-1 in Appendix C for details. |
| Helium Act of 1925, 50 USC 161 | The Helium Act of 1925 authorized the conservation, production, and exploitation of helium gas, a mineral resource pertaining to the national defense, to the development of commercial aeronautics, and for other purposes. The act grants authority to the Secretary of the Interior to enter into agreements with private parties for the recovery and disposal of helium on federal lands upon such terms and conditions as the Secretary deems fair, reasonable, and necessary. |
| Helium Stewardship Act of 2013, PL 113-40, 127 Stat. 534 | The Helium Stewardship Act of 2013 amended the Helium Act of 1925 to complete the privatization of the federal helium reserve in a competitive market fashion that ensures stability in the helium markets while protecting the interests of American taxpayers, as well as for other purposes. |
| John D. Dingell, Jr. Conservation, Management, and Recreation Act of 2019 (Dingell Act), Section 1109 | Section 1109 of the Dingell Act amends the first section of the MLA (30 USC 181) to include that "extraction of helium from gas produced from such lands shall maintain the lease as if the extracted helium were oil and gas." |

AR000547

| Relevant Statute, Regulation, Order, or Policy | Relationship to the Proposed Alternatives |
|---|---|
| Dingell Act, Part II Sections 1211–1461 | Part II of the Dingell Act covers Emery County public land management, including the San Rafael Swell Recreation Area, wilderness areas, wild and scenic river designation and wild and scenic rivers, land management and conveyances, off-highway vehicle recreation areas, and regulations guiding other conservation and wildlife actions. |
| Utah Oil and Gas Conservation Act (Utah Code Annotated 40-6-1–19) (1955) | This act governs aspects of oil and gas drilling in the state of Utah, prohibits waste of oil and gas, provides procedures for obtaining a permit and royalty payments, and creates penalties for violations of the act. |
| 43 CFR 3100 – Oil and Gas Leasing | These regulations govern onshore oil and gas leasing, development, and production of federal minerals. |
| BLM Manual 3120, *Competitive Leases* (BLM 2013b) | This manual section contains guidance and procedures for federal onshore competitive oil and gas leasing, except for the National Petroleum Reserve in Alaska. |
| BLM Handbook H-3120-1, *Competitive Leases* (BLM 2013c) | This handbook sets forth the policy and procedures required for competitive oil and gas leasing with the Federal Onshore Oil and Gas Leasing Reform Act of December 22, 1987, and the regulations in 43 CFR 3120. |
| BLM Manual MS-1794, *Mitigation* (BLM 2021a) | This manual provides guidance to support the BLM's multiple use and sustained yield mission by providing policies to: Implement consistent principles and procedures for mitigation in the BLM's authorization of public land uses. Consider mitigation well in advance of making decisions about anticipated land uses by identifying opportunities for mitigation in mitigation strategies and incorporating mitigation into land use plans and programmatic or large geographic-scale NEPA analyses. Apply mitigation to address reasonably foreseeable impacts to resources (and their values, services, and/or functions) from public land uses. |
| BLM Handbook H-1794-1, *Mitigation* (BLM 2021b) | The purpose of this handbook is to elaborate on and provide additional clarity to the policy guidance identified in the BLM Mitigation Manual (above). |
| Instruction Memorandum: Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews (BLM WO IM 2018-034) (BLM 2018c) | This IM sets out the policy of the BLM to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held in accordance with the MLA (30 USC 226), Executive Order (EO) 13783, and Secretarial Order 3354. This IM supersedes existing policy announced in IM No. 2010-117, Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews, issued on May 17, 2010, and replaces any conflicting guidance or directive found in the BLM Manual or Handbook. |
| The Utah Oil and Gas Conservation General Rules (2020 as amended) | These rules apply to any land in the state of Utah in order to conserve the natural resources of oil and gas in the state, to protect human health and the environment, to prevent waste, to protect the correlative rights of each owner and to realize the greatest ultimate recovery of oil and gas. |

AR000548

| Relevant Statute, Regulation, Order, or Policy | Relationship to the Proposed Alternatives |
|---|---|
| Inventory of Onshore Federal Oil and Natural Gas Resources and Restrictions to Their Development 2008 Phase III Inventory-Onshore United States | This inventory is a detailed review of federal oil and gas resources and constraints on their development within 18 geological provinces in the United States. This inventory serves as a planning tool for federal agencies that manage public land, including the BLM, to evaluate whether the documented impediments and restrictions are appropriate, and to what extent they constrain oil and gas development. |
| Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (1994) | This EO, issued in 1994, directs federal agencies to make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority and low-income populations. |
| Secretarial Order 3399: Department-Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-Making Process (2021) | This secretarial order prioritizes action on climate change and establishes a Departmental Climate Task Force within the Department of the Interior. This order also provides instruction on how science may be used in the decision-making process and clarifies departmental policy to improve transparency to the public on the Department's decision-making process. |

## 1.5.1    Other Documents

The following NEPA documents were reviewed and incorporated into this analysis as appropriate:

- September 2018 EA (DOI-BLM-UT-0000-2018-0001-EA) (BLM 2018a). Relevant sections referenced were the project location and legal description; project background; plan conformance review; relationship to statutes, regulations, policies, or other plans; resources/issues brought forward for analysis; environmental impacts; cumulative impacts; and coordination and consultation.

- December 2018 DNA (DOI-BLM-UT-G020-2018-0057-DNA) (BLM 2018b). Relevant sections referenced were the description of the proposed action and any applicable mitigation measures, land use plan conformance, consultation information, and the relevant attachments included with the December 2018 DNA.

- January 2021 *Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah Environmental Assessment* (DOI-BLM-UT-0000-2021-0001-EA) (BLM 2021c). This document was reviewed and referenced in the development of analysis for Sections 3.3.1 and 3.3.2 of this EA.

- 2016 *Record of Decision and Moab Master Leasing Plan/Approved Resource Management Plan Amendments for the Moab and Monticello Field Offices* (DOI-BLM-UT-Y010-2010-0001-RMP-EIS) (BLM 2016b).

In order to reduce redundant paperwork and analysis in the NEPA process, the previous documents and their associated information or analysis are hereby incorporated by reference.

## 1.5.2    Other Plans

There are two non-federal resource management planning documents that have a relationship to the proposed alternatives. Each of these are identified and discussed below. Alternative A and Alternative B conform with these plan documents as they contemplate affirming leasing decisions. Although Alternative C contemplates cancelling leases, neither the *State of Utah Resource Management Plan* (State RMP) nor the Emery County General Plan directly promote the affirmation of leases; rather, these plans support energy development while in compliance with applicable regulations (Emery County 2016; State of Utah 2018). The BLM considered these plans in the analysis of the proposed range of alternatives.

- *State RMP.* The State of Utah maintains a statewide RMP used to define the state's policies, goals, and objectives for the management of natural resources on public lands. With respect to energy production (including petroleum and natural gas), the State RMP indicates that "Utah's general policy on energy production is that it supports all forms of energy. Utah is an 'all-of-the-above' state and believes that there is room in its energy portfolio for all forms of energy" (State of Utah 2018). Specific sections of the State RMP that may be relevant to this analysis include the following:
  - The petroleum subsection of the Energy Resources chapter acknowledges the state's goal to ensure continued economic development through access to its own clean and low-cost energy resources. This is ensured by using a balance of fossil fuels and renewable resources that is market-driven, cost-effective, and environmentally responsible.
  - The natural gas subsection of the Energy Resources chapter acknowledges that a strong natural gas industry contributes to Utah's historically low energy costs and provides a foundation for success across all industrial sectors statewide. Support for natural gas development will continue to be a major component of the state's energy plan as new technologies emerge that allow energy producers to access supplies of domestic natural gas from shale formations and other unconventional reservoirs.

- *Emery County General Plan.* Emery County adopted a general plan in 1996, which was subsequently amended in 1999, 2012, and 2016. The 2016 General Plan states that "Emery County supports development of extraction industries" while expecting compliance with applicable regulations to minimize, reduce, or compensate for impacts of industrial activities including exploration, extraction, development, production, and transport (Emery County 2016). Specific sections of the Emery County RMP that may be relevant to this analysis include the following:
  - Section 6.2 acknowledges the county's public lands, the federal and state agencies, and policies that maintain them, and the opportunities for local government to participate in public land decision-making processes.
  - Section 8.7 states the county's support of mineral and energy resource extraction through the conditional use permitting process, development rights associated with mineral leases, and addressing of concerns for the environment.
  - Section 8.8 acknowledges the county's preference for public land being managed under the "multiple use and sustained yield" concept that includes, but is not limited to, grazing, all-season recreation, agriculture, wildlife, hunting, fishing, camping, historic and prehistoric cultural resources, and watershed.
  - Section 8.9 states the county's commitment to actively participating in federal and state land management decisions, to the extent allowed by federal, state, and local laws and ordinances.

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 29 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

- o Section 9.8 states the county's support of mining and mineral resource production on public lands, to the extent allowed by county ordinances, jurisdictional agencies, and local history, customs, traditions, and culture.
- o Section 9.1 states the county's desire to protect public lands without impacting the county's economy through the designation of wilderness.
- o Section 9.11.4.1 affirms the ability of the county's property owners to use and enjoy private lands located adjacent to those designated as wilderness, Wilderness Study Areas (WSAs), and all other special designation public lands.
- o Section 9.11.4.6 expresses the county's support of access to mining claims owned by individuals, groups, and businesses remaining unrestricted.

## 1.6    INTERNAL SCOPING

Internal scoping for this EA was initiated in January 2023, where the 59 leases from the September and December 2018 competitive oil and gas lease sales were presented to the ID Team. Resource specialists on the ID Team helped identify the following issues through coordination and meetings.

## 1.7    ISSUES

The Council on Environmental Quality (CEQ) regulations at 40 CFR 1500.4(i) state that the scoping process should be used "not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues narrowing the scope of the [NEPA] process accordingly." 40 CFR 1501.9(f)(1) indicates that the lead agency "shall identify and eliminate from detailed study the issues that are not significant or have been covered by prior environmental review(s), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere."

Through internal scoping the following issues were identified for detailed analysis in this EA:

- Air Quality: What type and quantity of air pollutants would be produced based on the assumptions for analysis? How would air pollutant emissions from subsequent development of the leases affect air quality resource values?

- Greenhouse Gas and Social Cost of Carbon: How would proposed and potential development of leases contribute to greenhouse gas (GHG) emissions and climate change?

- Socioeconomics/Environmental Justice: What are the potential impacts to social and economic conditions and environmental justice (EJ)?

- Lands with Wilderness Characteristics (LWCs): How would proposed and potential development of leases impact the apparent naturalness, size, and outstanding opportunities for solitude or primitive recreation experience of lands determined to possess wilderness characteristics in the short and long term?

- Wilderness: How would proposed and potential development of issued leases impact undeveloped, untrammeled, natural, and outstanding areas of solitude or primitive, unconfined recreation in designated Wilderness areas?

- Soundscapes: How would proposed and potential development of issued leases affect the visitor experience with regard to natural soundscapes on public lands and nearby National Parks?

- Visual Resources: How would proposed and potential development of leases affect inventoried visual resource values and management objectives?

Case 1:24-cv-02476-RC     Document 42     Filed 10/10/25     Page 30 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

- Night Skies: How would proposed and potential development of leases affect dark night skies in the short and long term?

- Recreation: How would proposed and potential development of leases affect recreation access, sites, and user experience within special recreation management areas (SRMAs)? How would proposed and potential development of the leases affect recreation sites, access, and user experience outside of SRMAs?

- Transportation and Access: How would proposed and potential development of leases impact public access and travel on existing travel management plan (TMP) designated routes?

- Water Resources: How would potential development of the leases impact the availability and quality of groundwater and surface water resources?

An additional 18 resource uses were identified, considered, and analyzed in brief. Explanations for why these resources were analyzed in brief are presented in Section 3.2. Table 1-2 lists resources or concerns that were considered but determined not to warrant further analysis in this EA due to the fact that the resource issue is not present in the leasing area for the 59 leases. In general, in this EA, the term *analysis area* will refer to the 59 leases totaling 121,679.70 acres. Where the analysis area may differ, it will be separately defined.

**Table 1-2. Issues Not Present in Analysis Area and Not Included in Further Detail in the Environmental Assessment**

| Resource | Rationale for Not Further Discussing in Detail in the EA |
|---|---|
| Farmlands (prime or unique) | Based on local BLM specialist knowledge and Natural Resources Conservation Service soil survey and knowledge of the soils, there are no designated prime/unique farmlands within the leases. |
| Wilderness Study Areas | There are no Wilderness Study Areas located within the lease acreage. |
| Wildlife – greater sage-grouse | There are no greater sage-grouse priority habitat management areas or general habitat management areas within the lease acreage. |
| National Historic and Scenic Trails | There are no National Scenic and Historic Trails located within the lease area. |
| National Monuments/ National Conservation Areas | There are no National Monuments or National Conservation Areas located within the lease acreage. |
| Other designations (e.g., natural areas, research natural areas, etc.) | There are no other special designations, such as natural areas, research natural areas, or outstanding natural areas, within the leases. |

## 1.8    PUBLIC COMMENT PERIOD

The BLM provided the public with an opportunity to participate in the EA process during a 30-day public review and comment period, held from July 26 to August 25, 2023. Appendix E provides a summary of the comments and responses.

## 1.9    RECENT COURT DECISIONS

The plaintiffs in *SUWA v. Haaland* (Case No. 1:20-cv-03654 (D.D.C.)) challenged the BLM's decisions authorizing 77 leases in the PFO from the September and December 2018 oil and gas lease sales, alleging, in part, violations of NEPA. The parties negotiated a settlement resolving the above lawsuit in which the

AR000552

BLM agreed to conduct additional NEPA analysis for the leasing decisions that supported the 77 challenged leases from the September and December 2018 lease sales. Eighteen of the leases have now terminated. Therefore, only 59 challenged leases from the September and December 2018 lease sales are analyzed in the new analysis.

On January 27, 2022, the United States District Court for the District of Columbia issued a decision in *Friends of the Earth v. Haaland* vacating offshore oil and gas lease sale 257 because the Department of the Interior did not quantify the effects of that sale on emissions from the foreign consumption of oil and gas, despite (in the court's view) possessing the tools and methodology to do so (2022 WL 254526 (D.D.C. Jan. 27, 2021)). Given the analysis presently available to the BLM, *Friends of the Earth v. Haaland* does not affect BLM's analysis of this proposed lease sale (BLM 2023a).

Unlike the Bureau of Ocean Energy Management (BOEM)—the agency responsible for sale 257—the BLM has not traditionally used simulation tools like MarketSim (the tool at issue in *Friends of the Earth v. Haaland* and used by BOEM in preparation for sale 257) when evaluating effects on foreign consumption from proposed BLM state office lease sales. Indeed, the *Friends of the Earth v. Haaland* court recognized that it had previously upheld BLM's decision not to consider foreign effects where the BLM had "refused to quantify emissions resulting from particular leases, and thus could not conceptualize the extent to which the lease sales would contribute to the local, regional, and global climate change" (2022 WL 254526). Likewise, the court ruled against BOEM for forgoing the foreign consumption analysis for sale 257 in part because BOEM shortly thereafter applied that analysis to a draft NEPA analysis for proposed offshore sale 258. The court's reasoning does not apply to the BLM, which, as noted above, lacks access to any historical or imminent foreign effects analysis at the level of individual BLM state office lease sales. If and when the BLM undertakes this or similar analysis in the future, it may be appropriate to include and consider that analysis when proposing onshore lease sales (BLM 2023a).

AR000553

# CHAPTER 2.     DESCRIPTION OF ALTERNATIVES

## 2.1     INTRODUCTION

This EA analyzes three alternatives: Alternative A (No Action Alternative), Alternative B (Wilderness and Lands with Wilderness Characteristics Alternative), and Alternative C (Lease Cancellation Alternative).

The leases would be subject to measures necessary to mitigate adverse impacts, according to the categories, terms, conditions, and stipulations identified in the PFO RMP, as amended (BLM 2008a). Additionally, BLM regulations at 43 CFR 3101.1-2 allow for the relocation of proposed oil and gas leasing operations up to 200 meters (m) and/or timing limitations up to 60 days in order to provide additional protection, ensuring that proposed operations minimize adverse impacts to resources, uses, and users. This approach would apply to all alternatives that consider affirmation of leases.

A stipulation and notice list, which described mitigation measures attached to each lease, was provided in the 2018 EAs. This list has been updated to reflect the leases being analyzed in this EA and is provided in Appendix B of this document. The stipulations and leases described in Appendix B are common to all alternatives and would apply regardless of which alternative is ultimately selected. Stipulations and notices that have been added since the September 2018 EA and December 2018 DNA are noted as new in Appendix B.

## 2.2     ALTERNATIVE A – NO ACTION ALTERNATIVE

Under the No Action Alternative, the BLM would affirm its previous leasing decisions to offer and issue 59 leases[1] (encompassing 121,679.70 acres) from the 2018 Lease Sales.

Figure 2-1 shows the locations of these leases. Legal land descriptions for each lease and corresponding stipulations and notices are included in Appendix B.

The leases are subject to the standard lease terms and conditions under Section 6 of the BLM Lease Form (Form 3100-11), along with all stipulations required by policy (such as the BLM Competitive Leasing Handbook H-3120-1) and stipulations identified in the PFO RMP (BLM 2008a).

---

[1] The 59 leases analyzed in this EA are: UTU93466, UTU93468, UTU93469, UTU93470, UTU93471, UTU93472, UTU93473, UTU93474, UTU93475, UTU93476, UTU93477, UTU93478, UTU93479, UTU93480, UTU93481, UTU93482, UTU93483, UTU93484, UTU93485, UTU93486, UTU93487, UTU93489, UTU93491, UTU93492, UTU93493, UTU93494, UTU93495, UTU93496, UTU93497, UTU93498, UTU93499, UTU93500, UTU93501, UTU93502, UTU93503, UTU93504, UTU93505, UTU93506, UTU93507, UTU93508, UTU93509, UTU93510, UTU93511, UTU93512, UTU93513, UTU93514, UTU93518, UTU93519, UTU93520, UTU93521, UTU93523, UTU93524, UTU93525, UTU93526, UTU93527, UTU93530, UTU93533, UTU93713, and UTU93534.



**Figure 2-1. Location of the 59 leases under Alternative A and Alternative C.**

AR000555

## 2.3    ALTERNATIVE B – WILDERNESS AND LANDS WITH WILDERNESS CHARACTERISTICS ALTERNATIVE

Under Alternative B, the BLM would cancel 48 leases (encompassing 75,494.99 acres) that contain identified LWCs and one lease, UTU93713 (encompassing 1,408.01 acres) within a designated wilderness area. The BLM would affirm its previous leasing decisions to offer and issue the 10 remaining leases (encompassing 20,779 acres; Table 2-1) from the 2018 Lease Sales (Figure 2-2).

The 10 leases carried forward would include the standard lease terms and conditions for development of the surface of oil and gas leases provided in 43 CFR 3100 (BLM Form 3100-11) along with all stipulations mandated by policy (such as BLM Handbook H-3120-1, *Competitive Leases* [BLM 2013b]) and by the PFO RMP (BLM 2008a).

Legal land descriptions for each lease and corresponding stipulations and notices, which have been attached to each lease to address resource issues found through review and analysis, are included in Appendix B. In addition to the stipulations provided for by the PFO RMP, as amended (BLM 2008a), and BLM policies, lease notices have been developed for conservation measures and have been applied on specific leases as warranted by Interdisciplinary Parcel Review Team review.

**Table 2-1. Leases to Be Affirmed under Alternative B**

| Lease Number | Acres |
|---|---|
| UTU93471 | 1,952.60 |
| UTU93472 | 2,560.00 |
| UTU93473 | 1,920.00 |
| UTU93485 | 1,951.12 |
| UTU93486 | 1,950.48 |
| UTU93487 | 1,982.36 |
| UTU93491 | 2,520.28 |
| UTU93492 | 1,600.00 |
| UTU93493 | 2,460.00 |
| UTU93494 | 1,882.16 |
| **Total** | **20,779.00** |

AR000556



**Figure 2-2. Leases cancelled and affirmed under Alternative B.**

AR000557

## 2.4    ALTERNATIVE C – LEASE CANCELLATION ALTERNATIVE

Under Alternative C, the BLM would cancel all 59 previously issued leases, and there would be no future development of any of the leases at this time. Although the No Action Alternative typically serves as the benchmark for impacts that would occur if development did not move forward, because the 59 leases have already been issued, Alternative C serves that purpose in this EA.

Choosing Alternative C would not prevent future leasing of the lands in question consistent with applicable laws and relevant land use planning decisions, and any future leasing would be subject to appropriate stipulations identified in the respective RMP.

## 2.5    OTHER ALTERNATIVES CONSIDERED BUT NOT ANALYZED IN DETAIL

On April 16, 2018, the BLM received a letter with scoping comments for the September 2018 EA (BLM 2018a) and December 2018 DNA (BLM 2018b). These comments included four suggested alternatives. One of these alternatives (leasing outside of LWCs) was brought forward by the BLM for detailed analysis (Alternative B). The remaining three alternatives were considered but ultimately dismissed from further analysis. The BLM did not consider any alternatives that were not also considered in the original 2018 analyses. A summary of each alternative, and rationale for dismissal, is provided below. No additional scoping occurred; however, the public comment period for this environmental analysis was held between July 26 and August 25, 2023.

### 2.5.1    No Surface Occupancy Alternative

Under the No Surface Occupancy (NSO) alternative, the BLM would only offer LWC areas which are not identified by the BLM as a WSA for lease with non-waivable NSO stipulations.

The BLM dismissed this alternative because stipulations and notices, including NSO stipulations, as well as other restrictions, are already included in any lease sale. A complete list of stipulations and notices that pertain to the leases at issue in this EA are included in Appendix B. An NSO stipulation for LWCs in the PFO currently does not exist and would require an amendment to the 2008 PFO RMP. This is currently beyond the scope of the decision to be made described in Section 1.3 of this EA.

### 2.5.2    Phased Development Leasing Alternative

Under the Phased Development Leasing Alternative, the BLM would require lessees and operators to first explore and develop land outside BLM-identified LWCs and to prove that such areas are capable of production in paying quantities prior to developing in BLM-identified LWCs.

The BLM dismissed this alternative as beyond the scope of the decision to be made, as described in Section 1.3 of this EA. The San Rafael Desert Master Leasing Plan (MLP) (BLM 2018d) development scenarios cited by SUWA in their 2018 comments relate to the reasonably foreseeable development scenario (RFDS). The RFDS is a forward-looking planning tool used to estimate what oil and gas exploration and development activities may occur, should a decision to lease an area be approved. The RFDS is not a concrete statement that can provide proof of oil production or paying quantities but does inform the BLM of the potential cumulative impacts that may occur should a lease area be developed. Additionally, the 2008 PFO RMP is the guiding document for identifying lands designated as open for oil and gas development; land designations can only be changed through a PFO RMP amendment. The 2018 leasing decisions were reviewed for conformance with the PFO RMP.

AR000558

### 2.5.3        Mitigation Leasing Alternative

Under the Mitigation Leasing alternative, the BLM would attach additional mitigation measures and BMPs to each lease, including CSU and NSO stipulations, to protect sensitive resources, including cultural resources and BLM-identified LWCs.

Like the NSO alternative, the BLM dismissed this alternative because opportunities to attach mitigation measures to leases are already provided through the stipulation and notice list (see Appendix B), and site-specific measures, including BMPs and other mitigation or control measures, are recommended at the application for permit to drill (APD) stage.

AR000559

# CHAPTER 3.    AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES

## 3.1    INTRODUCTION

Chapter 3 contains the effects analysis related to the issues identified in Section 1.5.3. Section 3.2 presents the issues considered but eliminated from detailed analysis. Section 3.3 presents issues analyzed in detail. Lease stipulations and notices are referred to throughout the analysis in Sections 3.2 and 3.3 in terms of their protective influence on resources that may be impacted by future potential development of the leases. Lease stipulations "are conditions of lease issuance which provide protection for other resources values or land uses by establishing authority for substantial delay or site changes or the denial of operations within the terms of the lease contract" (BLM 1990). Lease stipulations are enforceable terms of the lease contract and supersede any inconsistent provisions of the standard lease form. Lease notices (also referred to as Information Notices in BLM Handbook H-1624) provide "notice of existing requirements and may be attached to a lease by the authorized officer at the time of lease issuance to convey certain operational, procedural, or administrative requirements relative to lease management within the terms and conditions of the standard lease form" (BLM 1990). While lease notices may not serve as the basis for denial of lease operations, they offer resource protections because they result in information gathering and the identification of resource values and land uses that the BLM, based on its authority under Section 6 of the lease form, can require protection for within the constraints enumerated in the lease form (e.g., terms and conditions that would be attached at the APD stage) (also see Section 2.2). BMPs (such as the Gold Book [BLM and U.S. Forest Service (USFS 2007)] and Appendix F), standard operating procedures (SOPs), and site-specific mitigation may also be applied at the APD stage as COAs.

**Analysis Assumptions**

Under Alternative A, the BLM would affirm its previous leasing decisions for the 59 leases. Surface management, the legal land description of the leases (totaling 121,679.70 acres), and lease stipulations and notices attached to the leases are included in Appendix B. Full text descriptions of the stipulations and notices is contained in Appendix C. Under the No Action Alternative, the BLM authorized officer has the authority to affirm the leases, based on the analysis of potential effects presented in this EA.

An issued lease may be held for 10 years, after which the lease expires unless oil or gas is produced in paying quantities (43 CFR 3107.2).[1] A producing lease can be held indefinitely by economic production. The drilling of wells on leases is not permitted until the leaseholder submits, and the BLM approves (subsequent to additional site-specific environmental review documentation), a complete APD package (Form 3160-3) following the requirements specified under Onshore Oil and Gas Orders listed in 43 CFR 3162.[2] The BLM has authority, according to the standard terms and conditions of the leases, to attach COAs to the APD that reduce or avoid impacts to public land, resources, and/or resource values.

Under 43 CFR 3101.1–2, such reasonable measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Measures shall be deemed consistent with lease rights granted provided that they do not require relocation of proposed operations by more than 200 m; require that operations be sited off the leasehold; or prohibit new surface-disturbing operations for a period in excess of 60 days in any lease year.

---

[1] The regulations, however, recognize an exception to this rule for a lease that is within an operating unit and the unit is held by production of wells on other leases within the unit.
[2] Additional information regarding the BLM's oil and gas management program can be accessed online at:
https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/.

AR000560

The BLM has received APD packages on three leases evaluated in this EA (lease numbers UTU93475, UTU93476, and UTU93479) for helium production. These APDs underwent separate environmental review (DOI-BLM-UT-G020-2021-0017-EA) with the BLM and were approved on September 20, 2023. As Alternative B considers cancelling leases that contain identified LWCs; each of the three leases for which APDs have been approved would be cancelled under Alternative B.

### 3.1.1    Reasonably Foreseeable Development Scenario

The RFDS is a planning tool to provide a reasonable estimate of what oil and gas exploration and development activities might be proposed, should a decision be made to lease the area. The RFDS is a 20-year, forward-looking estimation of oil and gas exploration and development that is exclusive of other concerns that might compete for use of land in a multiple-use scenario.

When and if an APD is submitted for any of the leases, BLM would adhere to numerous IMs (as revised through the life of an active lease), including specific instructions for bonding and other laws (such as the National Historic Preservation Act [NHPA], ESA, etc.). Management provisions would adhere to Gold Book BMPs (BLM and USFS 2007) and the BMPs listed in Appendix F. In general, activities are anticipated to take place as described in Appendix D below. This appendix provides a general discussion of possible post-leasing RFDS activities. All of these activities would require additional NEPA review when a lease holder submits an APD.

The U.S. Government Accountability Office (GAO) completed a detailed data review of approximately 47,925 federal onshore oil and gas leases issued from 1987 through 1996 (GAO 2008). The GAO found that only 6% (2,904 leases) of the leases issued were drilled during the 10-year lease term, and about 5% (2,386 leases) of the leases produced oil and gas by 2007.

BLM Utah issued 10.7% (5,127) of the total federal onshore oil and gas leases (47,925) analyzed in the GAO report. Of those leases in Utah, 6.17% (323) were drilled, and 4.39% produced as depicted in Table 3-1 (GAO 2008). Over a 5-year period between 2014 and 2018, on average of only 58% of approved APDs (federal and non-federal) across Utah were developed (Utah Division of Oil, Gas and Mining 2018).

**Table 3-1. Onshore Leases Issued (1987–1996), Drilled, and Produced: Utah**

|  | Number of Leases Issued | Number of Leases Drilled | Number of Leases that Produced | Percentage of Total Leases Drilled | Percentage of Total Leases that Produced |
|---|---|---|---|---|---|
| Utah | 5,127 | 323 | 225 | 6.30% | 4.39% |

Source: GAO (2008).

The majority of the wells drilled in the PFO are drilled in coalbed natural gas (CBNG) resource in the Ferron Sandstone Member of the Mancos Shale. This relatively recent interest in CBNG also resulted in additional drilling in other coal-bearing formations, especially the Blackhawk Formation and the Emery Sandstone Member of the Mancos Shale. Most recently, interest has increased in the continuous and transitional gas resource in the Wasatch and Mesaverde Formations and potential gas resources in some deeper formations in the northeastern part of the RFDS planning area. Interests in the development of transitional gas resources are primarily in the Wasatch and Mesaverde Formations within the northeast corner of the PFO, where seismic surveys have identified drilling targets in deeper formations. These leases are in the San Rafael Group and the targeted play is most likely the Moenkopi Formation. The 2018 leases are identified as no CBNG potential and low conventional oil potential development to portions of high conventional oil potential development (Maps 3-20 and 3-21 in the PFO RMP [BLM

2008a]). Although portions of the leases are mapped in a high conventional oil potential development as determined in the RFDS, it has not come to fruition. This area is extremely exploratory. A total of 79 wells drilled have been drilled in the San Rafael Desert MLP area (BLM 2018d); many of the wells were drilled from 1985 and 1989, and all were dry holes.

The highest helium concentrations in Utah are found beneath shallow structural traps within the under-pressured Jurassic Entrada Sandstone reservoir at a depth of about 1,000 feet. There may also be significant economic helium potential in extensive and unexplored Devonian-Mississippian reservoirs of the Elbert Formation, Ouray Limestone, and Leadville Limestones. Twin Bridges, a Colorado-based company, applied for APDs and various rights-of-way (ROWs) to support the development of three mineral leases for helium on the Bowknot helium prospect in 2020 in the PFO. This project is located approximately 10 miles east of the proposed Project. The Grassy Trail helium play area also lies in Emery County, and multiple helium tests show economically viable helium deposits in that area, as well. The Utah DNR Miscellaneous Publication 174, *Proven and Hypothetical Helium Resources in Utah* (Wiseman and Eckels 2020) categorizes the region that the leases are located within as subeconomic but adjacent to known areas with high concentrations of helium (Paradox Basin). The BLM's 2007 technical note 429, *Helium Resources of the United States*, notes that there may be an estimated 76.47 billion cubic feet of measured[3] helium reserves in the Rocky Mountain region[4]; 82 billion cubic feet of probable[5] helium resources; 86.88 billion cubic feet of possible[6] helium resources, and 76.09 billion cubic feet of speculative[7] helium resources (Pacheco and Ali 2008). However, more recent findings suggest as much as 148 billion cubic feet of recoverable helium in the Rocky Mountain region (Brennen et al. 2021). Between 2002 and 2004, the BLM collected gas samples from 15 states; 60 of these samples were performed in Utah. None of the samples were taken in Emery County, however, samples taken in nearby Carbon County noted trace[8] components of helium (Gage and Driskill 2005). As global helium prices continue to be high, helium exploration and development will become more economical and may not be limited to areas of proven oil and gas production.

Over the years prior to 2018, 48 wells have been drilled in the proximity of the leases: 32 of these wells were on the leases, and all 48 wells were dry holes. The 2005 RFDS (Appendix M in the PFO RMP [BLM 2008a]) and the 2016 San Rafael Desert MLP RFDS (BLM 2018d) for oil and gas development categorizes the region the leases are within as exploratory (low potential for oil and/or natural gas development).

### 3.1.1.1    RFDS Assumption for Analysis in this EA

The leases cover 28% of the RFDS calculated for the San Rafael Desert MLP (BLM 2018d), translating to eight wells. For the analysis of the 59 leases encompassing 121,679.70 acres, it was estimated a maximum of eight wells would be drilled (BLM 2018d), and the maximum new disturbance would be 83.2 acres (one well pad at 4 acres, and access road and pipeline disturbance at 6.4 acres, for a total of 10.4 acres per well) (Table 3-2).[9] Due to the extreme exploratory nature and past unsuccessful attempts, it

---

[3] Measured reserves are materials whose quality and quantity have been determined, within a margin of error of less than 20%, from closely spaced and geologically well-known sample sites (USGS 1976).

[4] The Rocky Mountain region encompasses Idaho, Montana, Colorado, Utah, Wyoming, parts of New Mexico, and Arizona (Brennen et al. 2021).

[5] Probable reserves are calculated to be at least 50% likely to be recovered through drilling (Chen 2022).

[6] Possible reserves are unproved deposits where the probability of successful extraction is at least 10% (Fernando 2022).

[7] Speculative resources are undiscovered resources that may occur in either known types of deposits in a favorable geologic setting where no discoveries have been made, or in as yet unknown types of deposits that remain to be recognized (USGS 1976).

[8] The word *trace* is used to denote quantities of helium less than 0.005% (Gage and Driskill 2005).

[9] For the entire area within the former San Rafael Master Leasing Plan, future oil and gas drilling for the next 15 years is projected to average two wells per year for a total of 30 wells. Twelve of the wells are projected to be dry holes.

is anticipated that all wells drilled have a high probability of being a dry hole; however, for purposes of this analysis, the RFDS used is for eight wells total to be drilled on the 59 leases. The total acreage of Alternative B is approximately 17% of Alternative A. Therefore, under Alternative B (Section 2.3), the RFDS is assumed to be two total wells drilled with an estimated total surface disturbance of 20.8 acres. Given that the BLM has received and approved APD packages on three leases[10] for helium production, under Alternative A (Section 2.2), of the eight wells used for RFDS, three are assumed to be for helium development and five are assumed to be oil and gas development.

**Table 3-2. Estimated Well Count and Production for the Leases**

| Alternative | Acres | Total Estimated Wells | Surface Disturbance (acres) | Oil Production (bbl) | Gas Production (mcf) | Produced Water Production (bbl) |
|---|---|---|---|---|---|---|
| A | 121,679.70 | 5 | 52.0 | 237,455 | 195,912 | 444,013 |
| A | | 3 | 31.2 | * | * | † |
| B | 20,779 | 2 | 20.8 | 237,390 | 170, 968 | 387,545 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

Note: bbl = barrels (crude oil or produced water), mcf = thousand cubic feet.

* Assumes helium well will not produce oil and gas.

† Not available due to limited information regarding wastewater produced from helium wells. However, there could be some waste natural gas in the gas stream that would be vented, flared, or reinjected.

## 3.2    ISSUES ANALYZED IN BRIEF

Following internal scoping, 19 issues were identified, considered, and eliminated from detailed analysis by members of the ID Team in review of the proposed alternatives because these issues are either not relevant to the purpose and need or do not present a significant or potentially significant impact in which environmental analysis is necessary. Each of these issues is outlined below with a concise discussion regarding the affected area and degree of effects (i.e., short- and long-term; beneficial and adverse; effects on public health and safety, and effects that would violate Federal, State, Tribal, or local law protecting the environment) related to each issue. Stipulations HQ-TES-1 (compliance with the ESA), HQ-CR-1 (compliance with the NHPA), and Lease Notice HQ-MLA-1 (compliance with the MLA), as well as standard terms and conditions described in the lease form, would apply to all leases.

For the purposes of this analysis, short-term effects are those that cease after well construction and completion (30–60 days) or cease after interim reclamation (2–5 years). Long-term effects are considered to be those associated with operation production activities over the life of the well (for example, noise) or that otherwise extend beyond the short-term time period (for example, surface disturbance subject to final reclamation). As such, some long-term effects would cease immediately upon the end of operations, whereas other long-term effects would remain until successful landscape reclamation and remediation is accomplished. Note that the time frame for successful reclamation would vary by vegetation type and other factors such as the amount and timing of annual precipitation.

---

[10] The three helium leases with APDs are UTU93475, UTU93476, and UTU93479.

AR000563

## AIB-1 Native American Concerns

*How would potential development of the leases impact religious and traditional concerns of Native American communities?*

The PFO notified the following Tribes about the proposed September 2018 Lease Sale via certified letter sent on March 28, 2018: The Hopi Tribe, Jicarilla Apache Nation, Kaibab Band of Paiute Indians, Moapa Band of Paiute Indians, Navajo Nation, Northwest Band of Shoshone, Paiute Indian Tribe of Utah, Pueblo of Jemez, Pueblo of Laguna, Pueblo of Santa Clara, Pueblo of Zia, Pueblo of Zuni, San Juan Southern Paiute Tribe, Shoshone-Bannock Tribes (Fort Hall), Southern Ute Indian Tribe, Ute Indian Tribe, Ute Mountain Ute Tribe.

At that time, BLM received responses from the Hopi Tribe and the Southern Ute Indian Tribe requesting consultation. BLM consulted with both Tribes and provided them with copies of the cultural resources literature report for review and comment.

The PFO notified the following Tribes about the proposed December 2018 Lease Sale via certified letter sent on June 25, 2018: The Hopi Tribe, Jicarilla Apache Nation, Kaibab Band of Paiute Indians, Navajo Nation, Northwest Band of Shoshone, Paiute Indian Tribe of Utah, Pueblo of Jemez, Pueblo of Laguna, Pueblo of Santa Clara, Pueblo of Zia, San Juan Southern Paiute Tribe, Shoshone-Bannock Tribes (Fort Hall), Southern Ute Indian Tribe, Uintah Ouray Ute Indian Tribe, and the Ute Mountain Ute Tribe.

At that time, BLM received responses from the Hopi Tribe and the Southern Ute Indian Tribe requesting consultation. BLM consulted with both Tribes and provided them with copies of the cultural resources literature report for review and comment.

The BLM is not aware of any documented traditional cultural properties (TCPs) or sacred sites located within or in proximity to the leases. However, resources and locations of Native American religious and traditional concern may be present within the leases that have not been disclosed to the BLM. Should the leases be proposed for development in the future, additional coordination and consultation would be required at the APD stage. BMPs, SOPs, and site-specific mitigation may be applied at the APD stage as COAs to protect cultural resources and locations of Native American religious and traditional concern.

## AIB-2 Cultural Resources

*How would potential development of the leases impact cultural resources*?

BLM archaeologists compiled cultural resource data from the PFO cultural resource records for the September and December 2018 oil and gas lease sales in April and May 2018 for the September 2018 lease sale and June–August 2018 for the December 2018 lease sale. BLM reviewed this data against the lease locations to determine if oil and gas development could occur in accordance with the 2018 RFDS, without incurring adverse effects to historic properties, and taking into consideration impacts to cultural resources, as well. The leases were also reviewed for the application of stipulations and lease notices as required by the PFO RMPs. The Cultural Resource Stipulation, as required by BLM Handbook H-3120-1, was applied to all leases. The stipulation (HQ-CR-1) reads as follows:

*"This lease may be found to contain historic properties and/or resources protected under the National Historic Preservation Act, American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, E.O. 13007, or other statutes and executive orders. The BLM will not approve any ground disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect*

> *such properties or disapprove any activity that is likely to result in adverse effects that cannot be*
> *successfully avoided, minimized or mitigated."*

Additionally, Lease UTU-93534 lies entirely within the Dry Lake Archaeological District Area of Critical Environmental Concern (ACEC), and is subject to NSO constraints (UT-S-319) within the ACEC boundaries.

Application of these two stipulations would avoid, minimize, or mitigate adverse impacts to any cultural resources within the cultural resources analysis area; therefore, none of the alternatives discussed in detail in this EA would result in appreciable direct, indirect, or cumulative impacts to cultural resources.

Chapter 4 provides information about BLM's compliance with the NHPA, 54 USC 306108 (hereafter, Section 106). In summary, BLM reached a finding of "No Adverse Effect" to historic properties (36 CFR 800.5 (b)) for both the September and December 2018 lease sales. For the September 2018 Lease Sale, BLM consulted with the Utah State Historic Preservation Office (SHPO) in July 2018 and received SHPO concurrence on BLM's finding of No Adverse Effect on July 23, 2018. The Advisory Council on Historic Preservation (ACHP) affirmed BLM's proper application of and agreed with the finding of No Adverse Effect (36 CFR 800.5 (b)) on September 10, 2018. For the December 2018 Lease Sale, BLM consulted with the Utah SHPO in October 2018 and received SHPO concurrence on BLM's finding of No Adverse Effect on October 25, 2018. See Chapter 4 for more details about the Section 106 review.

Based on the type and density of sites within and surrounding the leases, the individual sizes of the leases, the application of the cultural resources protection stipulation and the Dry Lake ACEC NSO stipulation, and the varied topography of the leases, the BLM anticipates that reasonably foreseeable development can occur within the leases without adverse impacts to cultural resources and without an adverse effect to historic properties. Accordingly, anticipated development, as described by the RFDS described in Section 3.1.1, would also not result in direct, indirect, or cumulative impacts to cultural resources.

For future undertakings related to these leases, the BLM would not approve any ground disturbing activities until it completes its obligations to consider cultural resources under the NEPA, the NHPA, and other authorities specific to those future undertakings. New analysis of impacts to cultural resources and potential adverse effects to historic properties will be conducted during the review stage of any future site-specific development plans through new NEPA and NHPA Section 106 review processes. Future site-specific analysis may identify and document currently unknown and unrecorded cultural resources.

Lease Stipulations:

UT-S-319 *NSO Cultural ACEC* is attached to UTU-93534.

HQ-CR-1 *Cultural Resource Protection* is attached to all leases.

## AIB-3 Fish

### Non-Designated Species

*How would potential development of the leases affect non-designated fish species?*

There are no perennial streams on any of the leases and there are 204.96 miles of intermittent streams and 20.11 miles of connector channels and artificial paths within the lease boundaries (see Section 3.3.11, Table 3-30 and Figure 3-9 for details on which leases contain these features) (U.S. Geological Survey [USGS] 2019). The absence of perennial streams within the leases limits the availability of non-designated fish habitat on the leases, thereby limiting impacts to non-designated fish species. Additionally, Stipulation UT-S-127 *NSO – Intermittent and Perennial Streams* applies to all leases. This

stipulation prohibits surface-disturbing activities within 100m of riparian areas along intermittent and perennial streams and springs. Exceptions to this stipulation would only be allowed if there are no practical alternatives, the impacts of the exception could be mitigated completely, or if the exception is completed in such a way that the riparian or wetland resources is enhanced.

Although not directed at non-designated fish species, Lease Notice T&E-03 *Endangered Fish of the Upper Colorado River Drainage Basin* is attached to all leases (see Appendix B) and prohibits surface disturbance within 100-year floodplains of the Colorado River or in lands in this watershed that contain designated critical habitat for Colorado River fishes (see Appendix B). This stipulation provides additional protections for non-designated fish species. Impacts to habitat and water quality for all fish species are adequately addressed through the addition of Stipulation UT-S-127 NSO – *Intermittent and Perennial Streams*, and Lease Notices UT-LN-128 *Floodplain Management* and UT-LN-53 *Riparian Areas* applies to all leases (see Appendix B). These notices provide additional protections against habitat impacts by providing a buffer of NSO from aquatic habitat.

Lease Notices:

T&E-03 *Endangered Fish of the Upper Colorado River Drainage Basin* is attached to all leases.

UT-LN-128 *Floodplain Management* is attached to all leases.

UT-LN-53 *Riparian Areas* is attached to all leases.

Lease Stipulations:

UT-S-127 *NSO – Intermittent and Perennial Streams* is attached to all leases.

**BLM Sensitive and Federally Listed Species**

*How would potential development of the leases affect BLM sensitive species or U.S. Fish and Wildlife Service (USFWS) designated species?*

Water depletions from any portion of the Upper Colorado River drainage basin above Lake Powell are considered to adversely affect or adversely modify the critical habitat of the four resident threatened or endangered fish species: humpback chub (*Gila cypha*), razorback sucker (*Xyrauchen texanus*), Colorado pikeminnow (*Ptychocheilus lucius*), and bonytail (*Gila elegans*). However, there are no perennial streams on any of the leases. The absence of perennial streams limits the availability of designated fish habitat on the proposed leases, thereby limiting impacts to designated fish species. Critical habitat for the Colorado pikeminnow and razorback sucker has been identified adjacent to Lease UTU93534. Actions that may impact the four species mentioned above must be evaluated prior to site development with regard to the criteria described in the Upper Colorado River Endangered Fish Recovery Program. Water depletions are considered to adversely affect or modify critical habitat for the four threatened or endangered Colorado River fish that reside in the basin and must be evaluated regarding the criteria described in the Upper Colorado River Endangered Fish Recovery Program (Colorado River Recovery 2022). Under the RFDS, eight wells could be developed, which could utilize an estimated 4 to 32 acre-feet of water (see Section 3.3.11 for further details). Water use for well development would be limited to valid existing water rights.[11] Should an APD be received for development of a lease, water resources and potential impacts to

---

[11] The USFWS considers existing water rights perfected prior to 1988 to be historic, and additional Section 7 consultation is not required. Water rights perfected after 1988 are considered a new depletion and are subject formal consultation. At the leasing stage it is not possible to foresee the source of water used in lease operations nor can the BLM apply additional requirements on the selection of water rights used. Impacts to water resources, including water rights, are analyzed in further detail outside the leasing stage when and if an APD is received for a lease.

AR000566

designated species would be analyzed in detail under separate NEPA analysis, consistent with USFWS guidelines on water depletions.

Additionally, Lease Notice UT-LN-49 *Utah Sensitive Species* is added to all leases, providing the opportunity to make adjustments at the site-specific level when an APD is received to reduce potential effects to BLM sensitive aquatic species that may be in the area. BLM sensitive fish and amphibian species with potential to occur in the leases are bluehead sucker (*Pantosteus discobolus*), flannelmouth sucker (*Catostomus latipinnis*), and roundtail chub (*Gila robusta*).

At the leasing stage, it would be too speculative to identify the potential source and status of permitted water sources used in the lease development. However, to account for the potential water depletions that may affect fish in downstream locations, Lease Notice T&E-23 *Colorado River Endangered Fish* and Lease Notice T&E-03 *Endangered Fish of the Upper Colorado River Drainage Basin* are attached to all leases (see Appendix B). Application of these lease stipulations and lease notices is expected to mitigate potential impacts to listed fish species.

Lease Notices:

UT-LN-49 *Utah Sensitive Species* is attached to all leases.

T&E-03 *Endangered Fish of the Upper Colorado River Drainage Basin* is attached to all leases.

Lease Stipulations

UT-S-127: *NSO – Intermittent and Perennial Streams* is attached to all leases.

## AIB-4 Floodplains

*How would potential development of the leases impact floodplains?*

Floodplains are defined as a low-lying area adjoining a river or body of water that is subject to periodic flooding. Floodplains provide risk reduction benefits such as storing floodwater and slowing runoff, erosion control, groundwater recharge, and fish and wildlife habitat protection (Federal Emergency Management Agency 2022). A 100-year floodplain, or Special Flood Hazard Area, is defined as an area with a 1% probability of flooding in a given year, and a 500-year floodplain is an area with a 0.2% probability of flooding in a given year (Federal Emergency Management Agency 2020). No leases are located within a 100- or 500-year floodplain.

Compliance with Executive Order (EO) 11988 Floodplain Management requires project development evaluation to ensure that federal agencies "avoid to the extent possible the long- and short-term adverse impacts associated with the occupancy and modification of floodplains and avoid to the extent possible the long- and short-term adverse impacts associated with the occupancy and modification of floodplains and avoid direct or indirect support of floodplain development wherever there is a practicable alternative".

All of the leases require implementation of Stipulation UT-S-127: *Intermittent and Perennial Streams*. This stipulation includes the exclusion of surface-disturbing activities in areas within the 100-year floodplain or 100 m (330 feet) on either side from the centerline, whichever is greater, along all perennial and intermittent streams, streams with perennial reaches, and riparian areas. Exceptions to this stipulation would only be accepted if there are no practical alternatives, the impacts of said exception could be mitigated completely, or if the exception is completed in such a way that the resource is enhanced. Further stipulations or lease notices may apply to other water resources that indirectly impact floodplains,

such as stream channels and riparian areas. The stipulations, lease notices, SOPs, BMPs, and COAs implemented during the leasing process will limit or reduce the impacts to floodplains, both directly and indirectly.

Additionally, Lease Notice UT-LN-128 *Floodplain Management* would be applied to all leases. This notice requires that in order to avoid any impacts to floodplains, facilities must be located outside the 100-year floodplain and that any impacts would be minimized by modification of surface use plans within floodplains present within the lease.

Any leases that would be accessed via off-lease directional drilling from other BLM lands would be addressed through a separate decision and would assess impacts to wetlands and riparian resources.

Applying these protective measures (stipulations and lease notices) at the time of leasing will inform the lessee of the resource. The protection offered by these stipulations coincides with riparian and water quality protection measures by eliminating potential floodplain altering disturbance activities in these areas, eliminating the need for a detailed analysis of floodplains. Additional mitigation measures and buffers may be applied at the APD stage, as necessary to protect these areas. Additional site-specific NEPA analysis will occur at that time.

Lease Notices:

UT-LN-128 *Floodplain Management* is attached to all leases.

Lease Stipulations:

UT-S-127 *NSO – Intermittent and Perennial Streams* is attached to all leases.

## AIB-5 Fuels/Fire Management

*How would potential development of the leases affect fuels and fire management?*

Leasing alone has no direct impact on fuels or fire management. Following the approval of an APD, exploration and development within the wildland-urban interface would conform with the Fire Management Plan decisions to minimize wildfire size and frequency in the PFO planning area. Proper fuels management would reduce the risks of fire to wildlife and ecosystems. When applicable, the least intrusive fire suppression methods will be used over more intrusive methods. Because of these management actions, exploration and development of the leases does not conflict with the Fire Management Plan goals and objectives outlined in the PFO RMP (BLM 2008a).

Following the approval of an APD, BMPs and SOPs implemented during the lease development process would limit impacts to fuels and fire management by performing actions and following procedures that may mitigate the risk of wildfire to the area. Additionally, site-specific design features or mitigation may be applied at the APD stage as COAs to reduce or eliminate impacts to fuels/fire management, and the implementation of appropriate reclamation standards would prevent an increase of hazardous fuels. Federally, the National Interagency Fire Center guides the BLM in fire management and policies, and guiding principles from the Federal Wildland Fire Management Policy and Doctrine establish federally recognized fire stipulations, which may be applied and implemented in the lease sale area in order to prevent wildfire, respond to wildland fire, and to utilize fire as a tool to restore the landscape (National Interagency Fire Center 2023).

While fuels and fire management are not directly addressed by any stipulations, Lease Notice UT-LN-52 *Noxious Weeds* is attached to all leases, which may require lease/operator to implement BMPs to prevent

or control noxious weeds, helping reduce the spread and introduction of fuels that could elevate the risk of fire spread (see AIB-8 Vegetation).

<u>Lease Notices:</u>

UT-LN-52 *Noxious Weeds* is attached to all leases.

<u>Lease Stipulations:</u>

None.

## AIB-6 Paleontology

*How would potential development of the leases affect paleontological resources?*

The Potential Fossil Yield Classification (PFYC) is a tool that allows the BLM to predict the likelihood of a geologic unit containing paleontological resources. The PFYC is based on a numeric rating system of 1 to 5. An area identified as PFYC 1 has a very low likelihood of containing paleontological resources, whereas an area identified as PFYC 5 is a geologic unit that has a very high likelihood of containing scientifically significant paleontological resources. PFYC U is a geologic unit with unknown likelihood of containing paleontological resources. Within areas identified as PFYC 2 or 3, paleontological resource management concern is generally low to moderate because the likelihood of encountering scientifically significant fossils is relatively low to moderate. Within areas identified as PFYC 4, paleontological resource management concerns are moderate to high.

If paleontological resources exist in the decision area, impacts could result in the immediate physical loss of fossils and their contextual data. Ground disturbance could also subject fossils to long-term damage or destruction from erosion as well as create improved access and increased visibility to the public, potentially resulting in unauthorized collection or vandalism. Ground disturbance can also reveal scientifically significant fossils that would otherwise remain buried and unavailable for scientific study. Such fossils can be collected properly and curated into the museum collection of a qualified repository, making them available for scientific study and education.

Surface disturbance and risk of effects on paleontological resources associated with reasonably foreseeable environmental trends and planned actions within the analysis area would depend on the locations of proposed disturbance relative to PFYC class. As currently mapped, nearly the entire leasing area is PFYC 2 with small areas of PFYC 4 and PFYC 3; there are no PFYC 5 areas identified in the leasing area.

No surface outcroppings (exposed layers of rock) are in formations that are likely to have vertebrate fossils except for the Morrison Formation, which is exposed in locations on top of the Flattops that are unlikely sites for well pads. In the PFO RMP (BLM 2008a), Paleontological Resources PAL-4 requires an assessment of fossil resources on a case-by-case basis, with mitigation measures as necessary, before and during surface disturbance. If an APD is filed, specific clearances would be conducted and incorporated into that future NEPA process at the development stage. If paleontological resources are discovered, the Administrative Office (AO) would be contacted. BMPs, SOPs, and site-specific mitigation may be applied at the APD stage as COAs.

Effects on paleontological resources can be mitigated by standard terms and conditions, which require a lessee to conduct inventories or special studies. Site-specific projects that would cause surface disturbance in areas with unknown or moderate to high potential require a paleontological survey and/or monitoring conducted at the time of proposed lease development in accordance with NEPA, Paleontological

Resources Perseveration Act (PRPA), and FLPMA. The BLM has applied Lease Notice UT-LN-72 *High Potential Paleontological Resources* to all leases in areas that are known to contain fossils or with high potential to contain fossils (PFYC 4 and PFYC 5) (see Appendix B). This notifies the lessee/operator that surveys will be required and modifications to the surface use plan of operations may be required to protect paleontological resources from surface-disturbing activities.

Additionally, fossils uncovered during ground disturbing activities would be protected by the standard unanticipated discovery protocol. Should a lease be located in an area that has high potential for paleontological resources, COAs would be applied at the APD stage. The proponent would be required to do preconstruction surveys and/or have a paleontologist on-site for any surface-disturbing activities. The proponent is required to notify the BLM of any discoveries identified during construction.

Lease Notices:

UT-LN-72 *High Potential Paleontological Resources* is attached to all leases except the following which are in PFYC 3 or lower areas: UTU93466, UTU93468, UTU93469, UTU93470, UTU93471, UTU93472, UTU93473, UTU93483, UTU93485, UTU93486, UTU93491, UTU93525, UTU93534, UTU93713.

## AIB-7 Soils (Physical and Biological)

*How would potential development of the leases impact soils?*

The soils in the leasing area are derived primarily from sedimentary geologic deposits and have developed in alluvium and eolian sands. These soils typically form sandy loam, loamy sand, and sandy soils.

Soil movement disrupts the existing structure of the soil horizons to the depth of disturbance. When movement occurs, soil forming processes are halted and compaction of underlying horizons and loss or degradation of soil microbes may occur. These issues are compounded when fragile and/or sensitive soils are present.

Sensitive soils include those that have components that can be characterized as susceptible to compaction or other mechanical damage and/or are highly erodible when disturbed. Surface disturbance of fragile and/or sensitive soils occurring on increased slope profiles has the potential to affect soil stability and may lead to accelerated soil erosion and potential sedimentation to proximal water bodies.

Fragile soils are soil types that are easily damaged by use or disturbance and/or are those that are difficult to reclaim to pre-disturbance condition According to the NRCS, soils can be rated based on their susceptibility to degradation. Fragile soils are those that are most vulnerable to degradation. These soils tend to be highly susceptible to erosion and can have a low capacity to recover after degradation has occurred. Fragile soils are generally characterized by low content of organic matter, low aggregate stability, and weak soil structure. They are generally located on sloping ground and have sparse plant cover. The NRCS susceptibility index can be used for conservation and watershed planning to assist in identifying soils and areas highly vulnerable to degradation. Depending on inherent soil characteristics and climate, soils can vary from highly resistant or stable, to vulnerable and extremely sensitive to degradation. Under stress, fragile soils can degrade to a new altered state, which may have reduced functions and thereby affect the entire ecosystem. To assess fragility of the soil, indicators of vulnerability are used; these include organic matter content, soil structure, rooting depth, vegetative cover, slope, and aridity.

Mapped soil units within the lease areas are variable and identified using soil survey information, combined with slope and vegetation layers. Biological soil crusts consist of mats or filaments of

cyanobacteria, lichens, and mosses. These crusts play a major role in reducing water and wind erosion and preventing the establishment of invasive annual grasses (Belnap et al. 2001). These crusts are highly susceptible to disturbance and should be avoided by potential future ground disturbing actions. However, existing professional knowledge of the area suggests that there is a low likelihood of biological soil crust presence in the leasing area (J. Dalebout 2023a). To avoid impacts to fragile soil resources, should biological soil crusts be found in the leases, well pads could be moved up to 200 m per BLM regulation 43 CFR 3101.1–2. Additionally, BMPs, SOPs, and site-specific mitigation may be applied at the APD stage as COAs to further avoid impacts to biological soil crusts or other fragile soils.

Under the assumptions in Section 3.1.1, Reasonably Foreseeable Development Scenario, there would be a total of 83.2 acres of soil disturbance associated with the development of the leases.

Areas with highly sensitive fragile soils on slopes greater than 40% have an NSO stipulation (UT-S-97). This would reduce potential impacts to soils by eliminating surface disturbance in areas most prone to erosion. Leases with slopes of 20% to 40% have a CSU stipulation (UT-S-101) requiring an approved erosion control strategy and topsoil segregation/restoration plan, further reducing potential impacts to soils (Table 3-3).

**Table 3-3. Soil Slopes in the Lease Area**

| Lease | Acres of Slopes < 20% | Acres of Slopes 20%–40% | Acres of Slopes > 40% |
|---|---|---|---|
| UTU93466 | 1,964.38 | 2.63 | – |
| UTU93468 | 1,911.78 | – | – |
| UTU93469 | 1,916.65 | 0.31 | – |
| UTU93470 | 1,918.26 | – | – |
| UTU93471 | 1,945.54 | – | – |
| UTU93472 | 2,554.98 | – | – |
| UTU93473 | 1,914.94 | 2.38 | – |
| UTU93474 | 2,556.08 | 0.10 | – |
| UTU93475 | 1,850.31 | 71.38 | 45.64 |
| UTU93476 | 1,895.08 | 50.04 | 24.28 |
| UTU93477 | 1,948.99 | 53.31 | 13.67 |
| UTU93478 | 1,311.48 | 6.36 | – |
| UTU93479 | 2,557.45 | 0.25 | – |
| UTU93480 | 1,918.34 | 0.18 | – |
| UTU93481 | 2,552.07 | – | – |
| UTU93482 | 1,911.78 | 6.12 | 0.21 |
| UTU93483 | 2,557.41 | 0.01 | – |
| UTU93484 | 1,916.62 | – | – |
| UTU93485 | 1,947.03 | 4.07 | – |
| UTU93486 | 1,946.91 | 0.79 | – |

AR000571

| Lease | Acres of Slopes < 20% | Acres of Slopes 20%–40% | Acres of Slopes > 40% |
|---|---|---|---|
| UTU93487 | 1,977.59 | 1.68 | – |
| UTU93489 | 2,395.61 | 22.49 | 21.80 |
| UTU93491 | 2,474.05 | 41.95 | 0.21 |
| UTU93492 | 1,191.25 | 242.13 | 165.71 |
| UTU93493 | 2,296.41 | 118.50 | 43.79 |
| UTU93494 | 1,870.42 | 9.13 | – |
| UTU93495 | 1,958.64 | 12.96 | 0.09 |
| UTU93496 | 1,950.87 | 15.13 | 0.25 |
| UTU93497 | 1,989.18 | 14.94 | 1.12 |
| UTU93498 | 1,299.12 | 20.46 | 3.72 |
| UTU93499 | 2,550.83 | 6.22 | – |
| UTU93500 | 1,866.85 | 28.88 | 22.11 |
| UTU93501 | 2,550.14 | – | – |
| UTU93502 | 1,908.92 | 8.21 | 0.10 |
| UTU93503 | 2,556.38 | 0.29 | – |
| UTU93504 | 1,906.69 | 8.19 | 1.60 |
| UTU93505 | 1,945.32 | 5.33 | – |
| UTU93506 | 1,948.62 | 2.78 | – |
| UTU93507 | 1,981.92 | 0.31 | – |
| UTU93508 | 1,234.47 | 2.41 | – |
| UTU93509 | 2,213.98 | 240.24 | 102.22 |
| UTU93510 | 1,842.14 | 72.10 | 4.06 |
| UTU93511 | 2,477.85 | 13.12 | – |
| UTU93512 | 1,578.38 | 227.35 | 111.22 |
| UTU93513 | 2,241.61 | 248.12 | 67.58 |
| UTU93514 | 1,791.23 | 60.33 | 3.88 |
| UTU93518 | 1,320.68 | – | – |
| UTU93519 | 2,547.04 | 9.33 | 0.35 |
| UTU93520 | 1,862.72 | 52.63 | 1.19 |
| UTU93521 | 2,508.58 | 35.62 | 9.05 |
| UTU93523 | 2,543.49 | 11.68 | – |
| UTU93524 | 1,855.79 | 58.70 | 2.64 |
| UTU93525 | 1,874.18 | 0.23 | – |
| UTU93526 | 2,467.58 | 1.20 | – |

AR000572

| Lease | Acres of Slopes < 20% | Acres of Slopes 20%–40% | Acres of Slopes > 40% |
|---|---|---|---|
| UTU93527 | 2,421.94 | 4.69 | – |
| UTU93530 | 2,467.94 | 43.63 | 4.45 |
| **Grand Total** | **118,579.39** | **2,207.69** | **761.91** |

Should the proposed development of leases occur, additional site-specific analysis would be required. It is expected that reclamation procedures would be required to ensure long-term impacts to soils are minimized. Reclamation procedures would include re-vegetation (utilizing appropriate seed mixes based on the ecological site, elevation, and topography), topsoil preservation, road reclamation, and noxious weed controls. SOPs, BMPs, and site-specific design features including reclamation will be applied as COAs at the APD stage. Protection of physical and biological soil health would be further analyzed in additional site-specific NEPA at the APD stage when site specific details are known; therefore, no additional detailed analysis for leasing is required at this time.

Lease Stipulations:

UT-S-97 *Fragile Soils/Slopes for Slopes Greater Than 40%* is attached to all leases.

UT-S-101 *CSU – Fragile Soils/Slopes 20%–40%* is attached to all leases.

## AIB-8 Vegetation

### General Vegetation

*How would potential development of the leases affect general vegetation?*

Although leasing itself does not cause any ground disturbing activities, the potential for future development of any subsequently issued lease could result in new surface disturbance, increased erosion, and potential loss of vegetation within the 59 leases. The 59 leases cover a total of 121,679.70 acres. For any proposed future developments, site-specific NEPA analysis would be conducted to identify and mitigate impacts to the USFWS Area of Influence (AOI) and BLM sensitive plant species described in the section below. Table 3-4 provides the acreage of the different ecological systems or land cover types within the leases (Lowry et al. 2005).

**Table 3-4. Vegetation Types and Acreage**

| Land Cover Types | Acres in Lease Area | Acres in HUC-10 Watershed |
|---|---|---|
| Colorado Plateau Blackbrush–Mormon tea Shrubland | 60,804.44 | 402,593.75 |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | 4,576.97 | 253,980.35 |
| Colorado Plateau Pinyon-Juniper Shrubland | 737.69 | 68,604.46 |
| Colorado Plateau Pinyon-Juniper Woodland | 149.93 | 26,417.91 |
| Inter-Mountain Basins Active and Stabilized Dune | 30,395.34 | 151,459.16 |
| Inter-Mountain Basins Big Sagebrush Shrubland | 33.68 | 22,159.87 |
| Inter-Mountain Basins Greasewood Flat | 5.7 | 18.530.39 |

| Land Cover Types | Acres in Lease Area | Acres in HUC-10 Watershed |
|---|---|---|
| Inter-Mountain Basins Mat Saltbush Shrubland | 30.46 | 85,378.10 |
| Inter-Mountain Basins Mixed Salt Desert Scrub | 216.23 | 34,554.40 |
| Inter-Mountain Basins Semi-Desert Grassland | 10,333.35 | 33,260.84 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 3,203.82 | 37,690.05 |
| Inter-Mountain Basins Shale Badland | 30.61 | 47,099.73 |
| Invasive Annual and Biennial Forbland | 178.76 | 4,589.74 |
| Invasive Southwest Riparian Woodland and Shrubland | 42.25 | 13,497.27 |
| Open Water | 5.15 | 4,754.52 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 19.98 | 2000.30 |
| Southern Colorado Plateau Sand Shrubland | 10,784.61 | 42,622.31 |
| **Total acreage** | **121,548.97** | **1,230,662.76** |

Source: Southwest Regional Gap Analysis Project (Lowry et al. 2005).

Note: Due to variability in GIS data, approximately 130.7 acres of the 59 leases was not covered by land cover mapping.

Based on the acreage of wetlands within the leases in comparison to the HUC-10 watershed, significant impacts are not anticipated. After leasing has occurred, there is an expectation that exploration or development could occur, should the lessee submit an APD. Any activity that involves surface disturbance or direct resource impacts would only be authorized following a site-specific NEPA analysis. Any applicable lease stipulations and notices were provided to the buyers prior to the sale, which allows for the opportunity to adjust at the site-specific level and ensures impacts will be addressed. Reclamation provisions and procedures including re-vegetation (using appropriate seed mix based on a site's ecology, elevation, and topography) would be a part of the APD analysis. Future development proposals on the leases would be subject to the standard lease terms, and all applicable laws, regulations, and Onshore Orders in existence at the time of lease issuance.

**Special Status Plant Species**

*How would potential development of the leases affect BLM sensitive or federally listed plant species?*

Within the leases there are four BLM sensitive plant species with potential habitat and four federally listed species with potential habitat; the species and corresponding leases on which potential habitat is present are listed below. The applicable lease stipulations and notices serve to mitigate or avoid potential impacts to designated plant species. Buyers were notified of lease notices and the presence of threatened and endangered plant species prior to the time of sale. Additionally, the lease notices provide notice of the standard avoidance and minimization measures that will be expected during the development stage. Additional site-specific analysis, including the development of additional site-specific minimization measures, would be conducted when an APD is received.

While leasing does not generate direct impacts, it is expected that exploration or development could occur and result in impacts to plant community structures, species composition, and extent of native habitat types. To account for the potential discovery of populations of plant species that are either currently listed or that may be listed in the future, Lease Notice T&E-5 *Listed Plant Species* and Stipulation HQ-TES-1: Threatened & Endangered Species Act is attached to all leases. Additional site-specific investigations and potential mitigation measures would be analyzed at the APD stage. The BLM may also require

modifications to or disapprove of a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat (see Appendices B and C).

Currently, the BLM has received and approved APDs for helium production on three of the 59 leases UTU93475, UTU93476, and UTU93479. Construction of the proposed facilities would modify community structure, species composition, and extent of cover types on approximately 14 acres of native vegetation until reclamation is complete. In most cases, this means returning the land to a condition approximate or equal to that which existed prior to the disturbance. The lessee/operator shall provide a reclamation plan prior to construction in order to achieve successful reclamation in the future. Reclamation is required of any disturbed surface that is not necessary for continued production operations. Additional reclamation measures may be required based on existing conditions at the time of final abandonment. The lessee/operator would minimize disturbance to vegetative communities by including the placement of well pads in flat topography to minimize cuts and fills, closed-loop drilling to minimize pad size, rig matting to minimize compaction of soils for better reclamation, and interim and final reclamation to minimize vegetative community disturbance length of time (BLM 2021d). The following lease stipulations and notices are attached to these leases to avoid and minimize impacts to special-status plant species:

- HQ-TES-1: Threatened & Endangered Species Act

- UT-LN-49: Utah Sensitive Species

- UT-LN-51: Special Status Plants: Not Federally Listed

- T&E-5: Listed Plant Species

- T&E-13: Barneby Reed-Mustard (*Schoenocrambe barnebyi*)

- T&E-17: San Rafael Cactus (*Pediocactus despainii*)

- T&E-19: Jones Cycladenia (*Cycladenia humilis var. jonesii*)

**BLM and Utah Sensitive Plant Species**

GIS reviews have identified that potential habitat of four BLM sensitive species are present on 22 leases, as described below. However, the leases have not been thoroughly surveyed for BLM sensitive plant species. Project development and activities could impact sensitive species by loss of habitat or individual plant species. However, with lease stipulation HQ-TES-1, which applies to all leases, the BLM would not approve any ground-disturbing activity that may affect listed species or critical habitat until it completes its obligations under the applicable requirements of the ESA. The BLM may also require modifications to or disapprove of a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed plant species or the destruction or adverse modification of a designated or proposed critical habitat. Applying the identified T&E lease notices—which were developed through formal ESA Section 7 consultation with the USFWS during development of the applicable land use plan—would mitigate potential impacts from mineral development on the leases and adjacent lands.

Project development and activities could impact sensitive plant species by loss of habitat or individual plant species. Lease Notice T&E-5 Listed Plant Species is attached to all leases and requires site inventories to be completed to determine habitat suitability or the presence of plant species. Additional lease stipulations and notices impose avoidance and minimization measures for BLM and Utah sensitive plant species: LN-49, LN-51, and T&E-5. These lease notices notify the lessee/operator that potential habitat exists within the lease lands that may require siting modifications and mitigation measures to avoid and minimize impacts to BLM sensitive plant species. Strategies for avoidance and minimizing impacts include but are not limited to modification to siting or design of facilities, timing of operations,

AR000575

and specification of interim and final reclamation measures. BLM regulations at 43 CFR 3101.1-2 allow for the relocation of proposed oil and gas leasing operations up to 200 m and/or timing limitations up to 60 days in order to provide additional protection, ensuring that proposed operations minimize adverse impacts to resources, uses, and users. The full text and details of the lease stipulations and lease notices are provided in Appendix C.

Implementation of avoidance and mitigation measures are not anticipated to fully avoid impacts, and loss of individuals and habitats is still possible based on the RFDS.

Smith's wild buckwheat (*Eriogonum smithii*) has potential habitat located in the following leases: UTU93472, UTU93473, UTU93485, UTU93489, UTU93491, UTU93492, UTU93493, UTU93494, UTU93504, UTU93507, UTU93508, UTU93509, UTU93510, UTU93511, UTU93512, UTU93513, and UTU93514.

Entrada rushpink (*Lygodesmia grandiflora* var. *entrada*) has potential habitat located in the following leases: UTU93469, UTU93475, UTU93479, and UTU93501.

Paria spurge (*Euphorbia nephradenia*) has potential habitat located in the following leases: UTU93470, UTU93492, UTU93513, and UTU93514.

Additional current or future BLM sensitive plant species may be present within the leases. Therefore, additional site-specific analysis is necessary during APD review.

Lease Notices:

UT-LN-49 *Utah Sensitive Species* is attached to all leases (see Appendices B and C).

UT-LN-51 *Special Status Plants: Not Federally Listed* is attached to all leases (see Appendices B and C). Modifications to the surface use plan of operations may be required in order to protect the special status plants and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2.

**Federally Listed Plant Species**

The USFWS AOI modeled habitat data were reviewed in September 2023. There is potential habitat for five federally listed plant species located within the leases and the USFWS AOI, as described below.

Barneby reed-mustard (*Schoenocrambe barnebyi*) intersects the USFWS AOI in the following leases: UTU93468, UTU93469, UTU93470, UTU93471, UTU93472, UTU93473, UTU93474, UTU93477, UTU93478, and UTU93481. Additionally, modeled habitat outside the current USFWS AOI is found in leases UTU93466, UTU93473, UTU93474, UTU93477, and UTU93478.

San Rafael cactus (*Pediocactus despainii*) intersects the USFWS AOI in the following leases: UTU93466, UTU93468, UTU93470, UTU93473, UTU93474, UTU93475, UTU93476, UTU93478, UTU93479, UTU93480, UTU93481, UTU93482, UTU93484, UTU93489, UTU93495, UTU93496, UTU93497, UTU93498, UTU93499, UTU93500, UTU93501, UTU93502, UTU93503, UTU93504, UTU93506, UTU93507, UTU93508, UTU93511, UTU93518, UTU93519, UTU93520, UTU93521, UTU93523, and UTU93524.

Jones cycladenia (*Cycladenia humilis* var. *jonesii*) intersects the USFWS AOI in the following leases: UTU93466, UTU93468, UTU93474, UTU93534, and UTU93713. Additionally, modeled habitat outside the current USFWS AOI is found in leases UTU93466 and UTU93474.

AR000576

Navajo sedge (*Carex specuicola*) intersects the USFWS AOI in Lease UTU93474. Additionally, modeled habitat outside the current USFWS AOI is found in Lease UTU93713.

Ute ladies'-tresses (*Spiranthes diluvialis*) intersects the USFWS AOI in the following leases: UTU93490, UTU93492, UTU93493, UTU93512, UTU93513, UTU93514, and UTU93519. However, there are no wetlands present both within these leases or in the AOI that could support Ute ladies'-tresses. Therefore, there is no potential habitat for the species within the leases.

Project development and activities could impact plant species by contributing to the loss of habitat or individual plant species. There is a potential for the loss of individuals and habitat based on the RFDS. The lease stipulations and lease notice aim to reduce impacts by modifying the siting and/or the timing of activities. HQ-TES-1 serves to provide the BLM with the authority to require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. The BLM would not approve any ground-disturbing activity until it completes its obligations under applicable requirements of the ESA as amended (16 USC 1531 et seq.), including completion of any required procedure for conference or consultation. BLM regulations at 43 CFR 3101.1-2 allow for the relocation of proposed oil and gas leasing operations up to 200 m and/or timing limitations up to 60 days in order to provide additional protection, ensuring that proposed operations minimize adverse impacts to resources, uses, and users. Additionally, Lease Notice T&E-5 *Listed Plant Species* is attached to all leases and requires site inventories to be completed to determine habitat suitability or the presence of plant species. Table 3-5 displays the acreage of potential habitat for federally protected plant species within the leases.

**Table 3-5. Acres of Potential Habitat for Federally Protected Plant Species**

| Leases | *Carex specuicola* | *Cycladenia humilis* var. *jonesii* | *Pediocactus despainii* | *Schoenocrambe barnebyi* | Total Acres of all Species within Each Parcel |
|---|---|---|---|---|---|
| UTU93466 | | 217.31 | 1,006.52 | 0.01 | 1,223.84 |
| UTU93468 | | | 411.67 | | 411.67 |
| UTU93470 | | | 1.42 | | 1.42 |
| UTU93473 | | | 94.72 | 25.87 | 120.59 |
| UTU93474 | | 374.67 | 2,022.22 | 0.24 | 2,397.13 |
| UTU93475 | | | 1,907.39 | | 1,907.39 |
| UTU93476 | | | 1,905.64 | | 1,905.64 |
| UTU93477 | | | 1,863.82 | 49.22 | 1,913.04 |
| UTU93478 | | | 894.01 | 279.49 | 1,173.50 |
| UTU93479 | | | 2,209.64 | | 2,209.64 |
| UTU93480 | | | 447.03 | | 447.03 |
| UTU93481 | | | 2,082.49 | | 2,082.49 |
| UTU93482 | | | 583.08 | | 583.08 |
| UTU93484 | | | 49.76 | | 49.76 |
| UTU93485 | | | 125.48 | | 125.48 |

AR000577

| Leases | *Carex specuicola* | *Cycladenia humilis* var. *jonesii* | *Pediocactus despainii* | *Schoenocrambe barnebyi* | Total Acres of all Species within Each Parcel |
|---|---|---|---|---|---|
| UTU93489 | | | 83.47 | | 83.47 |
| UTU93495 | | | 1,971.70 | | 1,971.70 |
| UTU93496 | | | 1,966.26 | | 1,966.26 |
| UTU93497 | | | 2,005.24 | | 2,005.24 |
| UTU93498 | | | 1,323.30 | | 1,323.30 |
| UTU93499 | | | 2,372.52 | | 2,372.52 |
| UTU93500 | | | 1,904.51 | | 1,904.51 |
| UTU93501 | | | 2,477.38 | | 2,477.38 |
| UTU93502 | | | 963.23 | | 963.23 |
| UTU93503 | | | 1,610.14 | | 1,610.14 |
| UTU93504 | | | 1,666.63 | | 1,666.63 |
| UTU93506 | | | 787.51 | | 787.51 |
| UTU93507 | | | 1,282.83 | | 1,282.83 |
| UTU93508 | | | 595.23 | | 595.23 |
| UTU93511 | | | 1,416.07 | | 1,416.07 |
| UTU93518 | | | 1,308.74 | | 1,308.74 |
| UTU93519 | | | 846.85 | | 846.85 |
| UTU93520 | | | 1,685.84 | | 1,685.84 |
| UTU93521 | | | 396.60 | | 396.60 |
| UTU93523 | | | 1,237.08 | | 1,237.08 |
| UTU93524 | | | 0.27 | | 0.27 |
| UTU93534 | | 320.71 | 167.70 | | 488.41 |
| UTU93713 | 1,269.49 | 2.48 | | | 1,271.97 |
| **Total acres** | **1,269.49** | **915.16** | **43,673.99** | **354.84** | **46,213.48** |

Lease Notices:

UT-LN-126 *Navajo sedge* is attached to UTU93713.

T&E-5 *Listed Plant Species* is attached to all leases.

T&E-13 *Barneby Reed-Mustard* is attached to UTU93468, UTU93469, UTU93470, UTU93471, UTU93472, UTU93473, UTU93474, UTU93475, UTU93476, UTU93477, UTU93478, UTU93481, UTU93496, and UTU93497.

AR000578

T&E-17 *San Rafael Cactus* is attached to UTU93466, UTU93468, UTU93473, UTU93474, UTU03475, UTU03476, UTU93477, UTU93478, UTU93479, UTU93480, UTU93481, UTU93482, UTU93484, UTU93485, UTU93489, UTU93495, UTU93496, UTU93497, UTU93498, UTU93499, and UTU93500.

T&E-19 *Jones Cycladenia* is attached to all leases except for UTU93483 and UTU93525.

T&E-22 *Ute ladies'-tresses* is attached to UTU93713.

<u>Lease Stipulations</u>:

HQ-TES-1 *Threatened & Endangered Species Act* is attached to all leases.

**Invasive Species/Noxious Weeds**

*How would potential development of the leases contribute to the spread of invasive species and noxious weeds?*

On February 3, 1999, President Clinton issued EO 13112 establishing the National Invasive Species Council. EO 13112 requires federal agencies to promote activities in a manner that avoids the introduction and spread of invasive species. Invasive species affect the native plant and animal communities. While leasing does not generate any direct impacts to invasive or noxious weed species, future surface-disturbing activities have the potential to introduce and spread invasive species and noxious weeds. In 1996, the BLM created *Partners Against Weeds: An Action Plan for the Bureau of Land Management* (BLM 1996), which provides strategies to prevent and control the spread of noxious weeds. Furthermore, additional control and procedural information is documented in the 2007 Programmatic EIS and its Record of Decision: *Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States* (BLM 2007). BLM's implementation of elements of these plans can be a resource for developing mitigation measures and would help mitigate the spread of invasive species and noxious weeds during future developments.

Noxious and invasive weed species may be present on the leases. Known noxious weeds present in Emery County, Utah, that may be present on the leases include Russian olive (*Elaeagnus angustifolia*), oxeye daisy (*Leucanthemum vulgare*), black henbane (*Hyoscyamus niger*), musk thistle (*Carduus nutans*), perennial pepperweed (*Lepidium latifolium*), poison hemlock (*Conium maculatum*), puncturevine (*Tribulus terrestris*), Russian knapweed (*Acroptilon repens*), jointed goatgrass (*Aegilops cylindrica*), saltcedar (*Tamarix ramosissima*), scotch thistle (*Onopordum acanthium*), and houndstongue (*Cynoglossum officinale*) (Lowry et al. 2017). The BLM coordinates with county and local governments to conduct a program for the control of invasive species.

The lessee/operator is given notice that lands in this lease have been identified as containing or are near areas containing noxious weeds. Soil disturbance from development is an example of a potential increase in the establishment of new noxious and invasive weed populations. All disturbed areas and piles of topsoil would be reseeded with weed-free native seed mix, where preferable, the first fall after the disturbance is made to provide competition against weeds. In some instances, non-native seed can be useful for reclamation. UT-LN-52 *Noxious Weeds* is attached to all leases and would require the operator to implement measures to mitigate the spread of invasive species and noxious weeds.

Other procedures, such as requiring the use of certified weed-free seed, herbicide application, and vehicle/equipment wash stations, would be applied as necessary at the APD stage. Additional control measures and treatment would be implemented during any ground disturbing activity and as part of regular operations. BMPs, SOPs, and site-specific mitigation may be applied at the APD stage as COAs. SOP and mitigation measures for vegetation treatment, herbicide use, and prevention measures for

noxious and invasive plants are identified in the Record of Decision and Programmatic EIS, *Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States* and other associated documents. These expectations are required for all leases. Negligible impacts would be expected to result from leasing and exploration.

Lease Notices:

UT-LN-52 *Noxious Weeds* is attached to all leases.

Lease Stipulations:

UT-S-305 *CSU Noxious Weed* is attached to all leases.

## AIB-9 Woodland/Forestry

*How would potential development of the leases affect woodlands and forest resources?*

Scattered sparse woodlands exist within 14 leases, but not in quantities sufficient to establish public harvest areas. The leases and acreage of woodland habitats are listed below. There are no other special designations, such as natural areas, research natural areas, or outstanding natural areas, within the leases. The leases are within Ecoregion 20 – Colorado Plateaus, which is characterized by benches, mesas, buttes, salt valleys, cliffs, and canyons that are formed in and underlain by thick layers of sedimentary rock. Pinyon-juniper woodlands dominate higher elevations. Exploration or development would not limit use or access to any established wood sale areas. BMPs, SOPs, and site-specific mitigation may be applied at the APD stage as COAs. As per the BLM Utah Permanent Instruction Memorandum No. UTIM-2022-005, in accordance with 43 CFR8365.1-5, no permit or contract is required for a reasonable amount of personal, non-commercial, recreation-related uses of conifer and native seeds, boughs, greenery, flowers, fuelwood, and other forest products. Table 3-6 provides the acreage of woodland vegetation by habitat type and lease.

**Table 3-6. Woodland Vegetation and Acreage by Lease**

| Lease | Woodland Habitats | Acres |
|-------|-------------------|-------|
| UTU93475 | Invasive Southwest Riparian Woodland and Shrubland | 8.59 |
| UTU93477 | Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 1.25 |
| UTU93478 | Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 5.87 |
| UTU93491 | Colorado Plateau Pinyon-Juniper Woodland | 1.56 |
| UTU93492 | Colorado Plateau Pinyon-Juniper Woodland | 9.78 |
|  | Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 2.45 |
| UTU93493 | Colorado Plateau Pinyon-Juniper Woodland | 108.53 |
|  | Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 9.34 |
| UTU93495 | Invasive Southwest Riparian Woodland and Shrubland | 0.74 |
| UTU93498 | Invasive Southwest Riparian Woodland and Shrubland | 1.20 |
| UTU93506 | Colorado Plateau Pinyon-Juniper Woodland | 0.89 |
| UTU93509 | Colorado Plateau Pinyon-Juniper Woodland | 6.97 |

| Lease | Woodland Habitats | Acres |
|-------|-------------------|-------|
| UTU93512 | Colorado Plateau Pinyon-Juniper Woodland | 13.05 |
| UTU93513 | Colorado Plateau Pinyon-Juniper Woodland | 4.46 |
| UTU93533 | Colorado Plateau Pinyon-Juniper Woodland | 4.70 |
| UTU93534 | Invasive Southwest Riparian Woodland and Shrubland | 31.72 |
| | Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 1.08 |
| **Total acreage** | | **212.16** |

Source: Southwest Regional Gap Analysis Project (Lowry et al. 2005).

Surface disturbance associated with development of the leases may temporarily remove some forested or woodland surface vegetation within or adjacent to the leases. Impacts would be analyzed when an APD is submitted. Some impacts that could be expected at the APD level include the potential removal of forested or woodland surface vegetation within the well pad area and any needed access roads. However, given the small amount of woodland habitat on the 14 leases (less than 4%), it is likely that woodland habitat could be avoided through application of standard terms and conditions and siting. Lease UTU93493 has the most woodland habitat as compared to the other 13 leases. Measures such as implementing BMPs, proper reclamation, design features, stipulations, and restoration would be utilized to minimize impacts. After any wells are plugged and abandoned, revegetation would be needed to alleviate any identified impacts and to reduce the risk of infestation of weed species. Full revegetation can take between 60 to 90 years for these woodland species.

## AIB-10 Wetlands/Riparian Zones

*How would potential development of the leases impact wetlands and riparian zones?*

Riparian and wetland areas may be present in all leases. According to the USFWS National Wetland Inventory (NWI), one freshwater pond, two rivers, palustrine wetlands, and intermittent streams exist within 5 miles of some leases: Leases UTU93495 and UTU93518 are within 5 miles of the San Rafael River. Lease UTU93519 is within 5 miles of the Green River, and Leases UTU93713 and UTU93534 are within 3 miles of the Green River. UTU93534 is also within 1 mile of an unnamed freshwater pond that covers 828.5 acres.

Wetlands documented on the NWI are present within 47 of the 59 leases. Within the leases, there is a total of 559.77 acres of wetlands. Table 3-7 provides the NWI data by the acreage and type of wetlands within the leases.

**Table 3-7. National Wetlands Inventory Wetland Data by Lease (Acres)**

| Leases | L2UBFh* | L2USCh† | PEM1A‡ | PSS1B℃ | PSS1Ch§ | PUBFx¶ | PUSAx± | PUSE** | R4SBC†† | R4SBJ‡‡ | Total by Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UTU93466 | | | | | | | | | | 13.33 | **13.33** |
| UTU93468 | | | | | | | | | | 2.24 | **2.24** |
| UTU93469 | | | | | | | | | | | **0** |
| UTU93470 | | | | | | | | | | | **0** |
| UTU93471 | | | | | | | | | | | **0** |
| UTU93472 | | | | | | | | | | | **0** |
| UTU93473 | | | | | | | | | | | **0** |
| UTU93474 | | | | | | | | | | 5.66 | **5.66** |
| UTU93475 | | | | | | | | 0.82 | | 15.40 | **16.22** |
| UTU93476 | | | | | | | | | | 16.22 | **16.22** |
| UTU93477 | | | | 0.03 | | | | | | 24.14 | **24.17** |
| UTU93478 | | | | 2.91 | | | | | | 4.73 | **7.64** |
| UTU93479 | | | | | | | | | 0.89 | | **0.89** |
| UTU93480 | | | | | | | | | | | **0** |
| UTU93481 | | | | | | | | | | | **0** |
| UTU93482 | | | | | | | | | 8.49 | | **8.49** |
| UTU93483 | | | | | | | | | 1.93 | | **1.93** |
| UTU93484 | | | | | | | | | | | **0** |
| UTU93485 | | | | | | | | | 5.08 | | **5.08** |
| UTU93486 | | | | | | | | | 5.54 | | **5.54** |
| UTU93487 | | | | | | | | | 0.52 | | **0.52** |
| UTU93489 | | | | | | | | | 27.62 | | **27.62** |

AR000582

| Leases | L2UBFh* | L2USCh† | PEM1A‡ | PSS1B© | PSS1Ch§ | PUBFx¶ | PUSAx± | PUSE** | R4SBC†† | R4SBJ‡‡ | Total by Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UTU93491 | | | | | | | | | | | **0** |
| UTU93492 | | | | | | | | | 26.02 | | **26.02** |
| UTU93493 | | | | | | | | | 16.19 | 0.72 | **16.91** |
| UTU93494 | | | | | | | | | 0.66 | | **0.66** |
| UTU93495 | | | | | | | | | 8.01 | | **8.01** |
| UTU93496 | | | | | | | | | 1.97 | | **1.97** |
| UTU93497 | | | | | | | | | | 0.22 | **0.22** |
| UTU93498 | | | | | | | | | | 2.63 | **2.63** |
| UTU93499 | | | | | | | | | 2.94 | | **2.94** |
| UTU93500 | | | | | | | | | 10.01 | | **10.01** |
| UTU93501 | | | | | | | | | | | **0** |
| UTU93502 | | | | | | | | | 0.76 | | **0.76** |
| UTU93503 | | | | | | | | | 15.46 | | **15.46** |
| UTU93504 | | | | | | | | | 3.50 | | **3.50** |
| UTU93505 | | | | | | | | | 14.00 | | **14.00** |
| UTU93506 | | | | | | | | | 14.17 | | **14.17** |
| UTU93507 | | | | | | | | | 9.04 | | **9.04** |
| UTU93508 | | | | | | | | | 5.49 | | **5.49** |
| UTU93509 | | | | | | | | | 41.63 | | **41.63** |
| UTU93510 | | | | | | | | | 13.57 | | **13.57** |
| UTU93511 | | | | | | | | | 27.21 | | **27.21** |
| UTU93512 | | | | | | | | | 10.94 | | **10.94** |
| UTU93513 | | | | | | | | | 26.32 | | **26.32** |
| UTU93514 | | | | | | | | | 30.65 | | **30.65** |

Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment
DOI-BLM-UT-0000-2023-0007-EA                                                                      June 2024

| Leases | L2UBFh* | L2USCh† | PEM1A‡ | PSS1B⊘ | PSS1Ch§ | PUBFx¶ | PUSAx± | PUSE** | R4SBC†† | R4SBJ‡‡ | Total by Lease |
|---|---|---|---|---|---|---|---|---|---|---|---|
| UTU93518 | | | | | | | | | | | **0** |
| UTU93519 | | | | | | | | | | 12.13 | **12.13** |
| UTU93520 | | | | | | | | | 4.38 | 2.87 | **7.25** |
| UTU93521 | | | | | | | | | 3.08 | | **3.08** |
| UTU93523 | | | | | | | | | 0.75 | 1.42 | **2.16** |
| UTU93524 | | | | | | | | | | | **0** |
| UTU93525 | | | 1.22 | | | | | | 0.40 | 8.52 | **10.14** |
| UTU93526 | | | | | | | | | 15.62 | | **15.62** |
| UTU93527 | | | | | | | | | 3.89 | | **3.89** |
| UTU93530 | | | | | | | | | 26.06 | | **26.06** |
| UTU93533 | | | | | | | | | 33.83 | | **33.83** |
| UTU93534 | 19.54 | 0.69 | | | 1.93 | 0.02 | 0.55 | | | 2.64 | **25.36** |
| UTU93713 | | | | | | | | | | 2.59 | **2.59** |
| **Total by Wetland Type** | **19.54** | **0.69** | **1.22** | **2.93** | **1.93** | **0.02** | **0.55** | **0.82** | **416.6** | **115.44** | |
| **Total Acreage of Wetlands within Leases§** | **559.77** | | | | | | | | | | |

Source: USFWS (2023).

\* L2UBFh – Includes all wetlands and deepwater habitats with at least 25% cover of particles smaller than stones (less than 6–7 cm), and a vegetative cover less than 30%. These wetlands have been created or modified by a human-made barrier or dam that obstructs the inflow or outflow of water.

† L2USCh – Includes all wetland habitats having two characteristics: 1) unconsolidated substrates with less than 75% areal cover of stones, boulders, or bedrock; and 2) less than 30% areal cover of vegetation. These wetlands have been created or modified by a human-made barrier or dam that obstructs the inflow or outflow of water.

‡ PEM1A – The palustrine system includes all nontidal wetlands dominated by trees, shrubs, persistent emergents, emergent mosses or lichens, and all such wetlands that occur in tidal areas where salinity due to ocean-derived salts is below 0.5 parts per thousand (ppt). Surface water is present for brief periods (from a few days to a few weeks) during the growing season, but the water table usually lies well below the ground surface for most of the season.

⊘ PSS1B – The substrate is saturated at or near the surface for extended periods during the growing season, but unsaturated conditions prevail by the end of the season in most years. Surface water is typically absent but may occur for a few days after heavy rain.

§ PSS1Ch – The palustrine system includes all nontidal wetlands dominated by trees, shrubs, persistent emergents, emergent mosses or lichens, and all such wetlands that occur in tidal areas where salinity due to ocean-derived salts is below 0.5 ppt. Includes areas dominated by woody vegetation less than 6 m (20 feet) tall. The species include true shrubs, young trees (saplings), and trees or shrubs that are small or stunted because of environmental conditions. These wetlands have been created or modified by a human-made barrier or dam that obstructs the inflow or outflow of water.

¶ PUBFx – The palustrine system includes all nontidal wetlands dominated by trees, shrubs, persistent emergents, emergent mosses or lichens, and all such wetlands that occur in tidal areas where salinity due to ocean-derived salts is below 0.5 ppt. Includes all wetlands and deepwater habitats with at least 25% cover of particles smaller than stones (less than 6–7 cm), and a vegetative cover less than 30%. This modifier is used to identify wetland basins or channels that were excavated by humans.

* PUSAx – The palustrine system includes all nontidal wetlands dominated by trees, shrubs, persistent emergents, emergent mosses or lichens, and all such wetlands that occur in tidal areas where salinity due to ocean-derived salts is below 0.5 ppt. Includes all wetland habitats having two characteristics: 1) unconsolidated substrates with less than 75% areal cover of stones, boulders, or bedrock; and 2) less than 30%areal cover of vegetation. This modifier is used to identify wetland basins or channels that were excavated by humans.

** PUSE – The palustrine system includes all nontidal wetlands dominated by trees, shrubs, persistent emergents, emergent mosses or lichens, and all such wetlands that occur in tidal areas where salinity due to ocean-derived salts is below 0.5 ppt. Includes all wetland habitats having two characteristics: 1) unconsolidated substrates with less than 75% areal cover of stones, boulders, or bedrock; and 2) less than 30% areal cover of vegetation. Surface water is present for extended periods (generally for more than a month) during the growing season but is absent by the end of the season in most years. When surface water is absent, the substrate typically remains saturated at or near the surface.

†† R4SBJ – The riverine system includes intermittent streambeds with intermittent flooding.

‡‡ R4SBC – The intermittent riverine system includes streambed wetlands include channels in the estuarine system, intermittent portions of the riverine system, and all tidal channels of the riverine system that are completely dewatered at low tide. This wetland is seasonally flooded with surface water present for extended periods during the growing season but absent by the end of the season in most years. When surface water is absent, the depth to substrate saturation may vary considerably among sites and among years.

§§ Total acreage of wetlands within 48 leases. Leases relinquished by an agreement between North American Helium and SUWA are not included in the wetlands analysis.

AR000585

Although leasing itself does not cause direct impacts to wetlands or riparian zones, surface disturbance associated with potential future development of the leases may impact the riparian and wetlands areas on or adjacent to the leases. Detailed impacts of the proposed developments cannot be addressed until site specific operations are proposed and the applicable water sources are analyzed.

If wells or other developments are proposed on the leases at a future time, impacts would be analyzed on a case-by-case basis when an APD is submitted. Thus, Stipulation UT-S-127 *NSO – Intermittent and Perennial Streams* and Lease Notice UT-LN-128 *Floodplain Management* are attached to all leases. Stipulation UT-S-127 specifies that no new surface disturbance (excluding fence lines) will be allowed in areas within the 100-year floodplain or 100 meters (330 feet) on either side from the centerline, whichever is greater, along all perennial and intermittent streams, streams with perennial reaches, and riparian areas.

Prior to approving an APD, hydrologic and engineering reviews would be conducted on all proposed down-hole activities, including hydraulic fracturing (if proposed). BLM will analyze future proposals associated with leases under additional site-specific NEPA and may apply any additional requirements as necessary to protect wetland and riparian areas within the vicinity of the leases at the APD stage. Lease Notice UT-LN-53, *Riparian Areas*, is applied to all leases to reduce impacts to wetlands/riparian zones by providing a buffer along the riparian corridor of NSO.

Any proposed developments on leases would be subject to the standard lease terms and all applicable laws, regulations, and Onshore Orders in existence at the time of lease issuance. The conditions, stipulations, and notices applied to floodplain and riparian resources would protect surface water resources.

Lease Notices:

UT-LN-128 *Floodplain Management* is attached to all leases.

UT-LN-53 *Riparian Areas* is attached to all leases.

Lease Stipulations:

UT-S-127 *NSO – Intermittent and Perennial Streams* is attached to all leases.

## AIB-11 Wildlife

*How would potential development of the leases impact wildlife species?*

**Non-designated Species (including invasive species)**

Although leasing alone does not authorize surface disturbance that could impact wildlife, surface disturbance associated with future development of the leases may impact wildlife species. The BLM expects that under the RFDS there would be direct impacts to a maximum of 83.2 acres across the lease area under Alternative A. Oil and gas development is considered a level 3 threat to wildlife conservation targets as defined in Utah's Wildlife Action Plan (Utah Division of Wildlife Resources [UDWR] 2015). Level 3 threats comprise of specific categories of possible threats under broader Level 1 and Level 2 threats. Level 3 threats are also those where conservation actions can be most readily applicable. BLM may apply additional measures to protect wildlife species and their habitat within the vicinity of the leases at the APD stage in corroboration with the themes and objectives of the 2023 UDWR Strategic Plan (UDWR 2023). Analysis of site-specific impacts would consider the quantity and location of modeled and critical habitat. During the APD stage, BLM has limits on the constraints they can enforce for a potential applicant.

It is likely that short term impacts would occur during the construction and operation phases due to the presence of humans. Impacts would likely consist of effects to the soundscape from anthropogenic noise, and the disturbance of habitat. Some short-term impacts could also occur during initial phases of reclamation, including noise and temporary habitat loss but would be expected to subside following complete site reclamation. Future restoration projects in nearby areas, along with previously completed habitat restoration projects, could help offset any disturbance to wildlife habitat. Additionally, pre-disturbance surveys would be required depending on the timing, species, and habitats covered in an APD at the time of proposed development in accordance with standard terms and conditions of the lease. Surveys would inform the analysis of potential impacts on game and non-game species and their habitat. Avoidance, minimization, and mitigation measures would also be determined at the time of the APD. The BLM has the authority to attach COAs at the site-specific level to minimize significant adverse effects on resource values at the time operations are proposed.

Examples of potential mitigation measures include design modifications to avoid or minimize effects to sensitive habitats, limiting the number of well pads under simultaneous construction, seasonal restrictions, limiting the number of proposed roads, reclaiming old and/or unnecessary roads, minimizing truck traffic, noise-buffering measures, pre-development surveys, or use of special construction techniques to minimize surface disturbance to sensitive areas.

Lease UTU93534 has modeled habitat or is within 0.5 miles of modeled mule deer (*Odocoileus hemionus*) habitat. This lease contains a riparian zone and therefore Stipulation UT-S-127 *NSO – Intermittent and Perennial Streams* is applied to the riparian portion of the lease. This stipulation would protect riparian habitat from disturbance and, in doing so, would also minimize disturbance to mule deer habitat in the lease area.

All leases contain year-long crucial pronghorn (*Antilocapra americana*) habitat except for UTU93534. The leases are located within the UDWR San Rafael Desert big game management unit and the San Rafael Desert North big game management unit. Population estimates produced by the DWR suggest that in 2017, the San Rafael Desert management unit contained approximately 270 pronghorn, and the San Rafael North management unit contained approximately 1,040 pronghorn. (UDWR 2017). Together, the San Rafael Desert and San Rafael Desert North comprise 4,090,451 acres; therefore, the 83.2 potential acres of disturbance based on the RFD are unlikely to cause a significant reduction in useable habitat for this wide-ranging species.

<u>Lease Notices:</u>

None.

<u>Lease Stipulations:</u>

UT-S-127 *NSO – Intermittent and Perennial Streams* is attached to all leases.

**BLM Sensitive and Federally Listed Species**

BLM will analyze future proposals associated with leases under additional site-specific NEPA and may apply additional measures as necessary to protect designated species and their habitat within the vicinity of the leases at the APD stage. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will continue to consult with the USFWS for listed species. BLM will not approve any ground-disturbing activity until it completes its obligations under applicable requirements of the ESA, including completion of any required procedure for conference or consultation. If lease development would result in

significant impacts, even after notices, stipulations, and other mitigation measures are developed at the APD stage, an EIS would be required.

**BLM Sensitive Species**

There is potential habitat for five BLM sensitive species: 1) Townsend's big-eared bat (*Corynorhinus townsendii*), 2) monarch butterfly (*Danaus plexippus*), 3) kit fox (*Vulpes macrotis*), 4) white-tailed prairie dog (*Cynomys leucurus*), and 5) burrowing owl (*Athene cunicularia*) within the leasing area.

White-tailed prairie dog populations have remained relatively stable within their historic range since survey efforts in 2008 and were found not warranting ESA listing in 2010. There is some evidence that species abundance has declined due to control efforts and disease (UDWR 2015).

The individual home ranges of kit fox (*Vulpes macrotis*) in Utah are amongst the largest reported and have increased in the last decade, indicating a potential decline in population abundance (UWDR 2015). The 2014 habitat model for kit fox indicates a high probability of kit fox occurrence within all leases; and all leases were shown to have "good" or "very good" habitat (Crane 2023). Quality determinations for kit fox habitat were defined using ecological integrity indicator rankings developed by the UDWR and applied to the leasing area (Oliver and Tuhy 2010). However, no known kit fox dens have been observed on any of the leases, and the BLM has no recorded sightings within the leasing area. The closest kit fox sighting was located 1.38 miles from lease UTU 93534 (Kaitchuck 2023). Should additional sightings occur, Lease Notice UT-LN-49 *Utah Sensitive Species* is attached to all leases to mitigate impacts to kit fox.

Burrowing owl observations have been made on two leases (UTU93470 and UTU93520) and initial models indicate potential habitat is present on all leases; therefore, lease notice UT-LN-104 is attached to all leases to mitigate impacts to or protect the burrowing owl and/or its habitat from surface-disturbing activities. Population estimates by the UDWR suggest the burrowing owl population, despite imprecision, is increasing by 0.24%. However, distribution constriction of the species has been documented throughout the northern and eastern portions of the habitat range (UDWR 2015).

Additionally, potential habitat for Townsend's big-eared bat (*Corynorhinus townsendii*) can be found within all leases, but no populations are known to occur. The closest mine that could house bats is located 1.5 miles from lease UTU93474. One lease, UTU93713, contains suitable modeled habitat for Townsend's big-eared bat.

Potential habitat for monarch butterfly (*Danaus plexippus*) exists within all leases. Lease Notice UT-LN-156 *Pollinators and Pollinator Habitat* is attached to all leases, which requires avoiding disturbance to important pollinator plant species (such as milkweed) as well as minimizing pesticides that may harm pollinator habitat.

UT-LN-25: *White-tailed and Gunnison Prairie Dog* is attached to all leases advising the lessee that the lease contains white-tailed or Gunnison prairie dog habitat and that modifications to the surface use plan of operations may be required to protect these species from surface-disturbing activities. Lease Notice UT-LN-104 *Burrowing Owl* habitat is attached to all leases advising the lessee that the lease may contain Burrowing Owl habitat. Additionally, Lease Notice UT-LN-49 *Utah Sensitive Species* is attached to all leases. All lease notices will protect the species and their habitat during development and operations of leases through a combination of site plan design to avoid dens, nests, or roosts, buffers/setbacks from dens or nests during the birth and rearing of young.

Site-specific surveys for BLM sensitive species would be conducted at the time an APD is submitted, and stipulations would be added in the form of BMPs, lease notices, stipulations, or other measures as

necessary to protect species habitat. If lease development would still result in significant impacts, an EIS would be required at the APD stage.

<u>Lease Notices:</u>

UT-LN-25 *White-tailed and Gunnison Prairie Dog* is attached to all leases.

UT-LN-49 *Utah Sensitive Species* is attached to all leases.

UT-LN-56 *Pollinators and Pollinator Habitat* is attached to all leases.

UT-LN-104 *Burrowing Owl* is attached to all leases.

<u>Lease Stipulations:</u>

None.

**Federally Listed Species**

No known populations of federally listed animal species are located within the leases. However, four species intersect the USFWS AOI, as described below.

A small population of California condor (*Gymnogyps californianus*) have been established in northern Arizona and southern Utah since 1996 through the release of birds reared in captivity (UDWR 2015). All leases are within this experimental population range and have potential nesting/roosting habitat. There are no known condor nests located within the leases.

Modeled Mexican spotted owl (*Strix occidentalis lucida*) habitat intersects or is within 0.5 mile of the following 41 leases: UTU93471, UTU93472, UTU93474, UTU93475, UTU93476, UTU93477, UTU93478, UTU93482, UTU93485, UTU93489, UTU93491, UTU93492, UTU93493, UTU93495, UTU93496, UTU93497, UTU93498, UTU93499, UTU93500, UTU93501, UTU93502, UTU93503, UTU93504, UTU93505, UTU93508, UTU93509, UTU93510, UTU93511, UTU93512, UTU93513, UTU93514, UTU93519, UTU93520, UTU93521, UTU93523, UTU93524, UTU93527, UTU93530, UTU93533, UTU93534, and UTU93713.

The USFWS AOI for Southwestern willow flycatcher (*Empidonax traillii extimus*) intersects or is within 0.5 mile of the following 25 leases: UTU93485, UTU93486, UTU93489, UTU93495, UTU93496, UTU93499, UTU93500, UTU93501, UTU93502, UTU93503, UTU93504, UTU93505, UTU93506, UTU93507, UTU93509, UTU93510, UTU93511, UTU93512, UTU93513, UTU93514, UTU93518, UTU93519, UTU93520, UTU93534, and UTU93713. Of these leases, UTU93495, UTU93505, UTU93506, UTU93509, UTU93510, UTU93512, UTU93519, UTU93534, and UTU93713 intersect or are within 1/2 mile of potential riparian or wetland habitats and will have associated stipulations attached. The only breeding population known to exist in Utah does not intersect with any of the leases (UDWR 2015).

The USFWS AOI for yellow-billed cuckoo (*Coccyzus americanus*) intersects or is within 0.5 mile of the following three leases: UTU93513, UTU93514, and UTU93534. However, only lease UTU93534 has riparian habitat that meets the size requirements to provide suitable habitat for this species.

In accordance with lease stipulation HQ-TES-1, which applies to all of the leases, the BLM would not approve any ground-disturbing activity that may affect listed species or critical habitat until it completes its obligations under the applicable requirements of the ESA. The BLM may also require modifications to or disapprove of a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species, or to result in the destruction or adverse modification

AR000589

of a designated or proposed critical habitat. Applying the identified T&E lease notices – which were developed through formal ESA Section 7 consultation with the USFWS during development of the applicable land use plan – would mitigate potential impacts from mineral development on the leases and adjacent lands. The application of the identified lease stipulations and notices to the leases, as well as the requirements outlined in the applicable land use plan, would adequately mitigate potential impacts to listed or candidate T&E species. At the lease development stage, site-specific ESA Section 7 consultation with USFWS would occur as necessary and would take into consideration infrastructure siting, habitat suitability determinations, survey results, and any additional site-specific considerations or avoidance measures.

In addition, all leases include the following lease notices that would protect the species and their habitat from impacts during future development and operations of the leases:

Lease Notices:

HQ-TES-1 *Threatened & Endangered Species Act* is attached to all leases.

T&E-11 *California Condor* is attached to all leases.

T&E-06 *Mexican Spotted Owl* is attached to UTU93471, UTU93472, UTU93474, UTU93475, UTU93476, UTU93477, UTU93478, UTU93482, UTU93485, UTU93489, UTU93491, UTU93492, UTU93493, UTU93495, UTU93496, UTU93497, UTU93498, UTU93499, UTU93500, UTU93501, UTU93502, UTU93503, UTU93504, UTU93505, UTU93508, UTU93509, UTU93510, UTU93511, UTU93512, UTU93513, UTU93514, UTU93519, UTU93520, UTU93521, UTU93523, UTU93524, UTU93527, UTU93530, UTU93533, UTU93534, and UTU93713.

T&E-07 *Southwestern Willow Flycatcher* is attached to UTU93495, UTU93505, UTU93506, UTU93509, UTU93510, UTU93512, UTU93519, UTU93534, and UTU93713.

T&E-27 *Yellow-Billed Cuckoo* is attached to UTU93534.

Lease Stipulations:

UT-S-269 *No Surface Occupancy – Mexican Spotted Owl Nests* is attached to UTU93471, UTU93472, UTU93474, UTU93475, UTU93476, UTU93477, UTU93478, UTU93482, UTU93485, UTU93489, UTU93491, UTU93492, UTU93493, UTU93495, UTU93496, UTU93497, UTU93498, UTU93499, UTU93500, UTU93501, UTU93502, UTU93503, UTU93504, UTU93505, UTU93508, UTU93509, UTU93510, UTU93511, UTU93512, UTU93513, UTU93514, UTU93519, UTU93520, UTU93521, UTU93523, UTU93524, UTU93527, UTU93530, UTU93533, UTU93534, and UTU93713.

**Migratory Birds (including raptors)**

*How would potential development of the leases impact migratory birds?*

The Migratory Bird Treaty Act prohibits the taking (i.e., killing, capturing, selling, trading, and transport) of protected migratory birds without prior authorization by the USFWS (16 USC 703-712). In addition, IM 2008-050 (BLM 2008b) requires the BLM to address the potential effects on migratory bird populations and their habitat and implement BMPs to avoid or minimize the impacts. This is executed through measures such as seasonal limitations during nesting seasons, conducting surveys for bird nests, and monitoring populations (BLM 2008b).

Although leasing alone does not cause direct impacts to migratory birds, surface disturbance associated with future development of the leases may impact migratory birds. The BLM would analyze future

proposals associated with leases under additional site-specific NEPA and may apply any additional requirements as necessary to protect designated species and their habitat within the vicinity of the leases at the APD stage. Additionally, for the listed species, the lease notices provide notice of the standard avoidance and minimization measures that will be required during the development stage.

A determination of existing raptor habitat on a lease would occur during the APD stage. Lease Notice UT-LN-44 states that if raptor habitat exists on a lease, surveys will be required to identify any nesting birds (see Appendix B). Lease Notice UT-LN-45 notifies the lessee that surveys for nesting migratory birds may be required during migratory bird breeding season whenever surface disturbance is proposed in association with fluid mineral exploration and development within priority habitats (see Appendix B). Based on these surveys, buffers, and timing, limitations may be applied. There is potential for raptor nest locations and migratory bird breeding habitats within selected leases. Lease notices are added to those leases to reduce any future development's impacts. Burrowing owl burrows have been documented on the corner of the following leases: UTU93482, UTU93504, UTU93507, and UTU93508. Additionally, peregrine falcon (*Falco peregrinus*) nests and Swainson's hawk (*Buteo swainsoni*) observations occur near these same four leases as well.

Lease Notices:

UT-LN-44 *Raptors* is attached to all leases.

UT-LN-45 *Migratory Birds* is attached to all leases.

UT-LN-104 *Burrowing Owl Habitat* is attached to all leases.

## AIB-12 Wild Horses and Burros

*How would potential development of the leases impact wild horses and burros?*

Wild horses (*Equus ferus*) and burros (*Equus africanus asinus*) are managed under the Wild Free-Roaming Horses and Burros Act (WFRHBA) in order to sustain wild horse and burro populations "so as to achieve and maintain a thriving ecological balance" (BLM 2022c).

Under the WFRHBA, the BLM identified herd areas (HA) as places used as habitat by a herd of wild horses or burros at the time the Act was passed. To carry out its duties under this statute, the BLM periodically evaluates each HA to determine whether it has adequate resources to sustain healthy and diverse wild horse and burro populations. The areas that meet these criteria are designated as Herd Management Areas (HMAs), where horses or burros can be viably managed as a component of public lands (BLM 2016). BLM Utah manages 19 wild horse and burro HMAs in the state, covering approximately 2.4 million acres. The combined appropriate management level for all HMAs in Utah is 1,956 animals (BLM 2023a).

The 59 leases are within the Robbers Roost HA for wild horses and burros. This area was previously referred to as the Robbers Roost HMA; however, due to insufficient forage and water to maintain a genetically viable wild horse population, in 2008, the PFO RMP (BLM 2008a) identified this area as a location where the wild horse population would be allowed to decline to zero and thereafter no longer managed it as an HMA. The three designated HMAs named in the PFO RMP: Range Creek HMA, Muddy Creek HMA, and Sinbad HMA are outside the range of the leases.

Leasing alone does not authorize surface disturbance that could impact wild horses and burros. Surface disturbance associated with future development of the leases may impact wild horses and burros, although any wells that are constructed on the leases at a future time would be analyzed for impacts when an APD

is submitted. Short-term impacts would occur during the construction and operation phases due to the presence of humans, noise, and disturbance of habitat. Some short-term impacts could also occur during initial phases of reclamation but would be expected to subside following complete site reclamation. Due to the change in status from a management area to a herd area, and the allowance of the wild horse population to decline to zero, any impacts to wild horses or burros are deemed acceptable because the leasing area is no longer being managed for that resource.

## AIB-13 Geology/Mineral Resources/Energy Production

*How would potential development on the leases impact geology, mineral resources, and energy production?*

Although leasing alone does not cause direct impacts to the geological setting, mineral resources, or energy production, surface disturbance associated with future development of the leases may result in impacts. The BLM would analyze future proposals associated with leases under additional site-specific NEPA and may apply any additional requirements as necessary to reduce geological impacts and collaborate with existing energy production. If oil and gas development occurs, non-renewable natural gas and/or oil would be extracted and delivered to market. Production would result in the irretrievable loss of these resources.

Oil and gas exploration could lead to an increased understanding of the geologic setting if subsurface data obtained through lease operations becomes public record. This information promotes an understanding of mineral resources as well as geologic interpretation. While conflicts could arise between oil and gas operations and other mineral operations, these could generally be mitigated under 43 CFR 3101.1-2 and the standard lease terms where siting and design of facilities may be modified to protect other resources.

Oil and gas development can be managed to avoid or be compatible with the development of other mineral resources. The leases are outside of known Coal Fields and there are no coal leases on or pending applications to lease the federal mineral estate underlying the surface, and no mining claims or Mineral Materials permits exist on any of the leases as of June 14, 2023, so no conflicts exist with the potential development of the oil and gas resources associated with these leases.

Helium-rich gas concentrations have been documented in the San Rafael Desert in central and eastern Utah in several rock types. Much of this helium is located at a depth of about 1,000 feet (Wiseman and Eckels 2020). Minor amounts of carbon dioxide, hydrogen sulfide, and methane are commonly found commingled with helium; in high concentrations, methane can be used on-site for power generation, which would require additional infrastructure, ROWs, and environmental review. The BLM has received APD packages on three leases (lease numbers UTU93475, UTU93476, and UTU93479) for helium production in the Price area. These APDs were approved on September 20, 2023. Continued high prices of helium on the global market may result in more APDs for helium extraction in the area (Wiseman and Eckels 2020).

Oil and gas wells produce a large amount of wastewater (refer to Section 3.3.11, Water Resources, for discussion of anticipated water production); the majority of this water has high salt brine content and must be disposed of in an environmentally safe manner. In Utah, the majority (95%) of this produced water is pumped into Class II injection wells. See Section 3.3.11, Water Resources, for more details about how development will affect water resources.

In certain parts of the country, water injection has caused some induced seismicity in the form of small earthquakes. Two major factors play a role in induced seismicity from water injection: the amount of water being injected and the local geology of the water injection site.

In Utah, most wells are drilled using hydraulic fracturing, and in this technique the majority of flow back water (water originally injected from the surface) is recycled (instead of injected underground) and used in future hydraulic fracturing completions. Therefore, the underground injection of hydraulic fracturing flowback in Utah is very limited and presents little potential for inducing seismicity. Additionally, the geology in Utah is different from that in other states experiencing induced seismicity. The injection zones in Utah are located stratigraphically thousands of feet above the basement rock that may contain large unknown faults. Therefore, it currently appears that induced seismicity from water injection is not a problem in the oil fields of Utah and there has been no reported induced seismicity in Utah attributable to water injected into Class II water disposal wells (personal communication, John Rogers, Utah Division of Oil, Gas and Mining, March 27, 2018).

## AIB-14 Lands/Realty

*How would potential development of the leases impact lands and realty?*

Lands and Realty are discussed in the Price Field Office Proposed Resource Management Plan/Final EIS in terms of lands available for disposal or acquisition, availability of lands for ROWs, designation of utility corridors, and development of alternative energy sources while meeting other resource objectives (BLM 2008c). There are no Section 368 energy corridors or transmission lines which cross any of the leases, but there is one authorized ROW in proximity to six leases on the west edge of the leasing area along Highway 24. The leases closest to the ROW are UTU93466, UTU93468, UTU93469, UTU93471, UTU93472, and UTU93473; however, the ROW does not cross these leases and therefore, no impacts are expected.

At the leasing stage, it would be too speculative to identify the exact impacts on land and realty in the lease development; however, based on a review of relevant mapping and data tools, it is anticipated that lands and realty would not be impacted by the potential development of the 59 leases to the degree requiring detailed analysis in this EA, as these leases would have no effect on property boundaries. Notably, BLM has received and approved APDs for helium extraction on leases UTU93475, UTU93476, and UTU93479.

Any future development of the 59 leases would be subject to any existing land rights and interests (e.g., easements and water rights). Analysis performed at the time an APD is received for a lease would determine the location of any easements and water rights present. Any potential land use conflicts would be resolved via other means, including administrative or legal proceedings. Such resolutions would be independent from this NEPA review process. The leasing stage is not expected to have an impact on existing private and public property interests.

In accordance with WO IM 2011-122 (BLM 2011a), cadastral survey reviews were conducted to verify the legal land descriptions prior to lease issuance. Should development of these leases occur, stone survey monuments may be present and would need to be avoided, as well as any metal cap monuments that may be present. Detailed land surveys may be warranted at the APD stage on a case-by-case basis.

## AIB-15 Livestock Grazing

*How would potential development of the leases impact livestock grazing?*

There are approximately 121,549 acres available for livestock grazing within the leases across seven allotments. All leases are fully encompassed in a grazing allotment. Because rangeland conditions correlate directly with forage health and grazing operations, the BLM manages all allotments for desired conditions of rangeland health. The BLM uses the Standards for Rangeland Health and Guidelines for Grazing Management for BLM Lands in Utah to determine desired conditions and vegetation

AR000593

management and range improvements (BLM 1997). Range conditions are determined through monitoring, data analysis, and the history of allotments. The BLM predicts that demand for livestock forage and permits will remain stable due to steady demand in the area.

Surface disturbance associated with future development of the leases would involve vegetation removal and changes in forage conditions, altering the grazing availability for livestock in those disturbed areas. Future development of the leases would result in approximately 83.2 acres of new disturbance associated with reasonably foreseeable environmental trends and planned actions.

Reclamation provisions and procedures, including re-vegetation (utilizing appropriate seed mix based on the ecological site, elevation, and topography), road reclamation, range improvement project replacement and/or restoration (e.g., fences, troughs, and cattle guards), and noxious weed control measures, would be identified in future NEPA documents on a case-by-case basis and could offset surface disturbance impacts on livestock grazing. In addition, if any range improvement projects could be impacted by wells or associated infrastructure, well pads could be moved up to 200 meters to avoid rangeland improvements or vegetation monitoring plots as per 43 CFR 3101.1-2. Furthermore, BMPs, SOPs, and site-specific mitigation may be applied at the APD stage as COAs.

Leasing or production activities are not expected to cause changes to grazing permit terms and conditions. Any activity that may occur with the development of leases, such as those that involve surface disturbance or direct resource impacts, would have to be authorized as a lease operation through future NEPA analysis on a case-by-case basis at the APD stage, as they may interfere with livestock grazing practices. In addition, if any range improvement projects could be impacted by wells or associated infrastructure, well pads could be moved up to 200 meters to avoid rangeland improvements or vegetation monitoring plots per 43 CFR 3101.1-2. Additional BMPs, SOPs, and site-specific mitigation may be applied at the APD stage as COAs.

## AIB-16 Areas of Critical Environmental Concern

*How would potential development of the leases impact ACECs?*

Lease UTU93534 is partially located within the Dry Lake Archaeological District ACEC, and that portion of the lease within the ACEC is subject to an NSO stipulation. More specifically, 876.31 of the 905.98 acres of the Lease UTU93534 is within the Dry Lake Archaeological ACEC, while 29.66 acres of the lease falls outside of the ACEC. Therefore, no surface-disturbing activity on nearly 877 acres would occur if this lease is developed. The 18,000-acre Dry Lake Archaeological District ACEC was designated as an ACEC for the protection of cultural resources. This ACEC is one of the most likely locations for finding Paleo-Indian sites, the rarest site type in Utah (BLM 2008a). The PFO RMP clarifies that the Dry Lake Archaeological District ACEC is open to oil and gas leasing, though lands within the ACEC boundary must be subject to an NSO stipulation (BLM 2008a).

The BLM would analyze future proposals to develop Lease UTU93534 under site-specific NEPA and may apply any additional requirements as necessary to reduce the impacts on the Dry Lake Archaeological District ACEC.

While the PFO planning area includes additional ACECs, (such as the Big Flat Tops, Bowknot Bend, Interstate 70, Muddy Creek, Rock Art, San Rafael Canyon, San Rafael Reef, Segers Hole, Nine Mile Canyon, Cleveland-Lloyd Dinosaur Quarry, Heritage Sites, and Uranium Mining Districts ACECs) (BLM 2008a), none of these ACECs overlap with any of the leases, so they will not be impacted if the leases are subsequently developed.

Lease Stipulations:

UT-S-319 *Cultural ACEC* is attached to lease UTU93534.

## AIB-17 Human Health and Safety

*How would potential development of the leases contribute risks to human health and safety concerns?*

Within the 3.8 million-acre PFO area encompassing Carbon and Emery Counties, there are 1,322 existing active well bores of all well types across all land jurisdictions as of April 2023 (Utah Division of Oil, Gas and Mining 2023). This level of development has resulted in the following public health and safety–related risks: occasional fire starts; spills of hazardous materials, hydrocarbons, produced water, or hydraulic fracturing fluid (see Appendix D) and corresponding potential contamination of air, soil, or water; exposure to naturally occurring radioactive material (NORM) in drill cuttings or produced water (see Appendix D); traffic congestion and collisions from commercial vehicles and heavy use, especially along Highway 24; infrequent industrial accidents; presence of hydrogen sulfide ($H_2S$); or increased levels of fugitive dust ($PM_{10}$ and $PM_{2.5}$), other criteria air pollutants (CAPs), volatile organic compounds (VOCs), and hazardous air pollutants (HAPs). See the air quality analysis in Section 3.3.1 (Air Quality) for projected levels of CAPs and HAPs and their effects on air quality standards.

HAPs are known or suspected to cause cancer or other serious health effects, such as compromises to immune and reproductive systems, birth defects, developmental disorders, or adverse environmental effects resulting from either chronic (long-term) and/or acute (short-term) exposure, and/or adverse environmental effects. Breathing ground-level ozone ($O_3$) can trigger a variety of health problems, including coughing and sore or scratchy throat; difficulty breathing deeply and vigorously and pain when taking deep breaths; inflammation and damage to the airways; increased susceptibility to lung infections; aggravation of lung diseases such as asthma, emphysema, and chronic bronchitis; and an increase in the frequency of asthma attacks. Some of these effects have been found even in healthy people, but effects are more serious in people with lung diseases such as asthma. Particulate matter, also known as particle pollution or PM, is a complex mixture of extremely small particles and liquid droplets. Smaller particles (PM2.5 or smaller) are associated with more negative health effects, including respiratory and cardiovascular problems, because they can become more deeply embedded in the lungs and may even get into the bloodstream.

The following links provide additional information on air pollution health effects from the six criteria air pollutants and HAPs:

- Ozone (https://www.epa.gov/ground-level-ozone-pollution) (EPA 2023a)

- Particulates (https://www.epa.gov/pm-pollution/particulate-matter-pm-basics) (EPA 2023b)

- Nitrogen dioxide (https://www.epa.gov/no2-pollution/basic-information-about-no2) (EPA 2023c)

- Carbon monoxide (https://www.epa.gov/co-pollution/basic-information-about-carbon-monoxide-co-outdoor-air-pollution#What%20is%20CO) (EPA 2023d)

- Lead (https://www.epa.gov/lead-air-pollution/basic-information-about-lead-air-pollution#health) (EPA 2023e)

- Sulfur dioxide (https://www.epa.gov/so2-pollution/sulfur-dioxide-basics#effects)(EPA 2023f)

- Hazardous air pollutants (https://www.epa.gov/haps/health-effects-notebook-hazardous-air-pollutants) (EPA 2023g)

AR000595

The air quality analysis in Section 3.3.1 estimates the risk of cancer from HAPs and the risk of other health impacts based on exposure to CAPs. In addition to HAP and CAP levels, economic or social indicators can also influence the general health risks of a population, such as poverty status, educational attainment, or language proficiency. Headwaters Economics data for populations at risk (i.e., more likely to experience adverse health outcomes due to demographic or socioeconomic factors) show that most of the indicators for populations at risk are lower for the state of Utah compared with the nation as a whole (Headwaters Economics 2023a). Compared with the state of Utah, several of the indicators for populations at risk in Emery County are similar to state levels. However, certain indicators are noticeably higher than those of the state of Utah: these include people and families in poverty, households receiving public assistance, labor force participation, housing costs, mobile home occupancy, people that did not work, single female households, percentage of people with disabilities, and percentage of population without health insurance. The percentages of these populations at risk in Emery County exceed those within the state of Utah by 2.7% to 10.5% (Headwaters Economics 2023a).

Human health risk assessments cannot be performed until project-specific details are known so that frequency, timing, and levels of contact with potential stressors may be identified (EPA 2023h). However, each of the reasonably foreseeable environmental trends and planned actions have been, or will be, subject to relevant rules and regulations regarding public health and safety. Ongoing and future potential development would continue to present aggregate risks to human health as detailed above. When wells reach the end of their useful life and are properly plugged and reclaimed, they would no longer contribute to health and safety effects; however, depending on the level and duration of individual's exposure during well operation, some of the public health effects from air pollution may endure beyond the life of the wells (e.g., chronic respiratory problems such as asthma).

Future potential development on the leases is estimated to be 8 new wells. This is a 3.1% increase in addition to the 253 existing active wells in Emery County. When authorizing development, federal and state laws, regulations, and policy are applied to reduce effects or respond to incidents. These include the following:

- Federal, state, county, and municipal fire managers shall coordinate fire response and mitigation.

- Developers who install and operate oil and gas wells, facilities, and pipelines are responsible for complying with the applicable laws and regulations governing hazardous materials and for following all hazardous spill response plans and stipulations. The Utah Division of Oil, Gas and Mining requires similar spill response measures after release of hydrocarbons, produced water, or hydraulic fracturing fluids.

- All well pads, vehicles, and other workplaces must comply with worker safety laws as stipulated by the Occupational Safety and Health Administration (OSHA).

- Vehicular traffic and pipelines are regulated according to safety laws as stipulated by the Department of Transportation.

- Onshore Order No. 6 provides the requirements and standards for conducting oil and gas operations in an environment known to or expected to contain $H_2S$. Compliance with this Order will protect public health and safety and those personnel essential to maintaining control of the well.

See Section 3.3.11, Water Resources for further information regarding potential surface and groundwater effects and relevant regulations, stipulations, and lease notices offering protections to groundwater and surface water quality. Risks from hazardous or solid wastes would be mitigated by BMPs, SOPs, and site-specific COAs.

Hazardous materials are not known to exist on any lease. Hazardous materials associated with oil and gas operations, if not handled properly, have the potential to be spilled at the lease/drill site and would be handled during that stage of development. Such materials could include methanol, diesel fuel, unrefined petroleum, produced water, and acid. Spills during operation would be contained, reported, and cleaned up by the operator as written in the Spill Prevention, Control, and Countermeasure (SPCC) rule for wells. Stipulations UT-S-126 and UT-S-127, which are attached to all the leases, state that no surface-disturbing activities are allowed around natural springs, within 100-year floodplains, and along all perennial and intermittent streams, streams with perennial reaches, and riparian areas. These stipulations ensure that no development, and therefore no wastes that accompany development, would occur in relevant areas.

If wells are constructed on the leases at a future time, impacts would be analyzed when an APD is submitted. BLM would analyze future proposals associated with leases under an additional site-specific NEPA consultation. At the APD stage, additional site-specific NEPA would be completed and risks from hazardous materials and wastes would be mitigated by BMPs, SOPs, and site-specific design features or mitigation measures that may be applied at the APD stage as COAs.

Lease Notices:

UT-LN-128 *Floodplain Management* is attached to all leases.

Lease Stipulations:

UT-S-126 *NSO – Natural Springs* is attached to all leases.

UT-S-127 *NSO – Intermittent and Perennial Streams* is attached to all leases.

## AIB-18 Wild and Scenic Rivers

*What are the impacts of potential development of the leases on Wild and Scenic Rivers (WSRs)?*

WSRs are administered in accordance with the Wild and Scenic Rivers Act (WSRA) of 1968 (16 USC 1271-1287). The WSRA requires selected rivers to be preserved in a free-flowing condition and protected for the benefit and enjoyment of present and future generations. To be included in the National Wild and Scenic River System, a river segment must meet requirements for eligibility and suitability. To be designated as eligible, a river segment must be considered free-flowing and meet one or more of the following outstanding remarkable values (ORVs): Scenic, Recreation, Geologic, Fish, Wildlife, Cultural, Historic, or Other. To be designated as suitable, a river segment undergoes a period of study where federal agencies consider multiple resource values, level of public support, and competing uses of the river corridor. All river segments that were found suitable in the PFO RMP were those with ORVs that centered around recreational opportunities. BLM manages all eligible, suitable, and/or designated WSRs in accordance with BLM Manual 6400 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management.

Lease UTU93534 overlaps a segment of the Green River that was determined to be eligible, but not suitable, for WSR designation in the PFO RMP (BLM 2008a). Analysis of suitability and potential impacts to eligible rivers was included in the PFO RMP (BLM 2008a). The PFO RMP Record of Decision states, "Any eligible segment not determined to be suitable will receive no special protection specifically for its free-flowing values, outstandingly remarkable values, and tentative classifications" (BLM 2008a:140). Therefore, there are no expected impacts to WSRs.

## 3.3     ISSUES ANALYZED IN DETAIL

The issues identified for detailed analysis in this EA were developed in accordance with CEQ regulations and the guidelines set forth in the BLM NEPA Handbook H-1790-1 (BLM 2008d), using input from 2018 external scoping. Issues were retained for detailed analysis if that analysis is necessary to make a reasoned choice between alternatives or to determine significance, if there is disagreement about the best way to use a resource, or if there is conflict between resource impacts or uses.

### 3.3.1     Air Quality

*Issue Statement: What type and quantity of air pollutants would be produced based on the assumptions for analysis? How would air pollutant emissions from subsequent development of the leases affect air quality resource values?*

Air quality is determined by the quantity and chemistry of atmospheric pollutants in consideration of meteorological factors (i.e., weather patterns) and topography, both of which influence the dispersion and concentration of those pollutants. The presence of air pollutants is due to a number of different and widespread sources of emissions, therefore, the impact airshed analysis area for air quality is the San Rafael Swell, but air quality data is generally available at the county level so the analysis area also includes Carbon, Emery, and Wayne counties. For the purposes of this analysis, short-term effects to air quality are considered those that cease after well construction and completion (30–60 days); long-term effects are considered those associated with operation activities. Long-term effects would cease after well operation is discontinued.

The *Utah Bureau of Land Management Air Resource Management Strategy 2023 Monitoring Report* (AMR) (BLM 2022d, 2023d) discusses past, present, and foreseeable emissions and air quality data for counties in Utah using data through calendar year 2021. Information from the AMR is incorporated by reference to help describe the air quality–affected environment in airsheds where leases are located.

#### 3.3.1.1     Affected Environment

The EPA has primary responsibility for regulating air quality, including six nationally regulated ambient air pollutants known as criteria air pollutants (CAPs): carbon monoxide (CO), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur dioxide ($SO_2$) and lead (Pb). Ozone is not emitted directly into the air, but is created when its two primary components, volatile organic compounds (VOC) and oxides of nitrogen ($NO_x$), combine in the presence of sunlight. VOC and $NO_x$ are often referred to as ozone precursors, which are, for the most part, emitted directly into the atmosphere. In Utah, the largest sources of CAPs and CAP precursors emitted by humans are area sources for $PM_{10}$, $PM_{2.5}$, and ammonia ($NH_4$); on-road sources for CO and $NO_2$; point sources for $SO_2$; and oil and gas sources for VOCs. The largest sources in individual counties may vary from those producing state total emissions.

The EPA has established National Ambient Air Quality Standards (NAAQS) for CAPs (incorporated by reference from Table 1 of the AMR (BLM 2022d, 2023d)). The NAAQS are protective of human health and the environment. Compliance with the NAAQS is typically demonstrated through monitoring of ground-level concentrations of atmospheric air pollutants. Areas where design values are below the NAAQS are designated as attainment or unclassifiable. Locations where monitored pollutant concentrations are higher than the NAAQS are designated nonattainment, and air quality is considered unhealthy (BLM 2023d). Certain air pollutants have been recognized to cause notable health problems and consequential damage to the environment, either directly or in reaction with other pollutants due to their presence in elevated concentrations in the atmosphere.

$O_3$ in the troposphere causes numerous adverse health effects; short-term exposures (lasting for a few hours) can result in breathing pattern changes, reduction of breathing capacity, increased susceptibility to infections, inflammation of the lung tissue, and some immunological changes (EPA 2023a). These health problems are particularly acute in sensitive receptors such as the sick, the elderly, and young children. $NO_2$ can irritate the lungs, cause bronchitis and pneumonia, and lower resistance to respiratory infections (EPA 2023c). In terms of adverse health effects, CO competes with oxygen, often replacing it in the blood, reducing the blood's ability to transport oxygen to vital organs. The results of excess CO exposure can include dizziness, fatigue, and impairment of central nervous system functions (EPA 2023d). $SO_2$ is an irritant gas that attacks the throat and lungs and can cause acute respiratory symptoms and diminished ventilator function in children. When combined with particulate matter, $SO_2$ can injure lung tissue and reduce visibility and the level of sunlight. $SO_2$ can also yellow plant leaves and erode iron and steel (EPA 2023f). $PM_{2.5}$ and $PM_{10}$ pose a greater health risk than larger-size particles. When inhaled, these tiny particles can penetrate the human respiratory system's natural defenses and damage the respiratory tract. $PM_{2.5}$ and $PM_{10}$ can increase the number and severity of asthma attacks, cause or aggravate bronchitis and other lung diseases, and reduce the body's ability to fight infections (EPA 2023b). Prolonged exposure to atmospheric lead poses a serious threat to human health. Health effects associated with exposure to lead include gastrointestinal disturbances, anemia, kidney disease, and in severe cases, neuromuscular and neurological dysfunction. Of particular concern are low-level lead exposures during infancy and childhood. Such exposures are associated with decrements in neurobehavioral performance, including intelligence quotient (IQ) performance, psychomotor performance, reaction time, and growth. Children are highly susceptible to the effects of lead (EPA 2023e).

Air pollutant concentrations are reported using design values. A design value is a statistic that describes the air quality status of a given location relative to the level of the NAAQS. Design values are used to designate and classify nonattainment areas, as well as to assess progress towards meeting the NAAQS. Design values that are representative for the airsheds in Utah are provided in Tables 17 through 21, of the AMR. It is assumed that counties without reported design values have air pollutant concentrations below the NAAQS and good air quality, since air monitoring is usually needed only when concentrations exceed 80% of the NAAQS (40 CFR 58.14 (i)(1)). As of March 31, 2023, Carbon and Emery Counties are classified as in attainment or unclassified (EPA 2023i).

On January 6, 2023, the EPA announced a proposal to strengthen the $PM_{2.5}$ standard to better protect human health and the environment. EPA is currently taking comments on the proposal to reduce the current standard from 12 micrograms per cubic meter ($\mu g/m^3$) to a level between 8 and 11 $\mu g/m^3$, to reflect the latest health data and scientific evidence to better protect communities.

Design values that are representative for where leases are located are provided in Table 3-8. Emery and Wayne Counties do not have reported design values, so the nearby Carbon County, Utah, and Mesa County, Colorado, design values are provided. Generally, counties without reported design values have good air quality and pollutant concentrations are below the NAAQS. The main pollutants of concern within the analysis area are $PM_{2.5}$ and $O_3$, as these are the pollutants with reported design values near or above the NAAQS.

**Table 3-8. Criteria Pollutant Design Values (2020–2022)**

| Pollutant | Location | Averaging Time | Design Concentration | NAAQS |
|---|---|---|---|---|
| $NO_2$ | Carbon County, Utah | 1-hour<br>Annual | 17 ppb<br>2 ppb | 100 ppb<br>53 ppb |
| $O_3$ | Carbon County, Utah | 8-hour | 0.068 ppm | 0.070 ppm |

| Pollutant | Location | Averaging Time | Design Concentration | NAAQS |
|-----------|----------|----------------|----------------------|-------|
| PM$_{2.5}$ | Mesa County, Colorado | 24-hour Annual | 18 µg/m$^3$ 5.8 µg/m$^3$ | 35 µg/m$^3$ 9 µg/m$^3$ |

Source: EPA (2022a).

Note: Concentrations in parts per million (ppm), parts per billion (ppb) or microgram per meter square (µg/m3). Design values are based on 3-year averages.

Every 3 years, the Utah Division of Air Quality (UDAQ) compiles statewide emission inventories to assess the level of pollutants released into the air from various sources (UDAQ 2023). The UDAQ has not yet released the 2020 statewide emission inventory. Triennially, the EPA publishes a comprehensive summary of air emissions data, known as the National Emissions Inventory (NEI). The NEI is based primarily upon data provided by state, local, and tribal air agencies for sources in their jurisdictions and supplemented by data developed by the EPA. The most recent NEI data that are available is from 2020. Table 3-9 provides the 2020 emissions for the five CAPs, VOCs and HAPs for Carbon County, Wayne and Emery County, Utah.

**Table 3-9. National Emissions Inventory 2020 Emissions Data for Carbon, Wayne, and Emery Counties**

| County | NO$_x$ | CO | PM$_{10}$ | PM$_{2.5}$ | SO$_2$ | VOC | HAPs |
|--------|--------|-----|-----------|------------|--------|-----|------|
| Carbon County | 1,363 | 5,187 | 3,257 | 464 | 76 | 8,903 | 1,238 |
| Wayne County | 362 | 1,708 | 885 | 140 | 1 | 5,065 | 1,049 |
| Emery County | 15,121 | 11,727 | 4,342 | 1,144 | 4,584 | 8,688 | 1,907 |

Source: EPA (2023j).

Note: all values in tons per year.

**Hazardous Air Pollutants**

Hazardous air pollutants (HAPs) are known or suspected to cause cancer or other serious health effects, or adverse environmental effects, and are also regulated by the EPA. Examples of listed HAPs emitted by the oil and gas industry include benzene, toluene, ethyl benzene, mixed xylenes, formaldehyde, normal-hexane, acetaldehyde, and methanol. A list of HAP point source emissions by county is published by UDAQ (2022). The 2020 emissions for common oil and gas related HAPs are listed for each FO in Table 5 of the AMR (BLM 2022d, 2023d).

The EPA Air Toxics Screening Assessment is used to evaluate impacts from existing HAP emissions in Utah (EPA 2023j). The EPA has determined that the total cancer risk in Utah is 17.8 in 1 million and is 10.29 in 1 million in Emery County, where leases are located. The oil and gas industry contributes less than 0.5% to total county cancer risk, with the industry cancer risk in Emery County 0.30 in 1 million. The EPA has determined that, for Utah counties with BLM managed lands, the total cancer risk is 9.34 to 22.92 in 1 million, incorporated by reference from Table 8 of the AMR (BLM 2022d, 2023d). The total cancer risk is within the acceptable range of risk published by the EPA of 100 in 1 million as discussed in the National Contingency Plan, 40 CFR 300.430.

The noncancer respiratory hazard index for the State of Utah is 0.23 and 0.10 for Emery County. Hazard index values less than one mean it is unlikely that air toxins will cause adverse noncancer health effects

over a lifetime of exposure. Oil and gas development and other foreseeable emission sources would contribute to HAP emissions and associated carcinogenic and noncancer risks.

**Air Quality Related Values**

The prevention of significant deterioration (PSD) regulations were developed and implemented to protect public health and welfare and to preserve, protect, and enhance the air quality in national parks, wilderness areas, monuments, and other areas of special value. The assessment applies to permitting for new or modified major stationary sources in attainment areas. As part of the PSD, EPA classifies airsheds as Class I or Class II. Class I areas are areas of special national or regional natural, scenic, recreational, or historic value for which the PSD regulations provide special protection. All other areas are designated Class II areas, which allow for moderate pollution increases and reasonable growth, while still applying stringent air quality constraints (National Park Service [NPS] 2020).

Within the state of Utah there are five Class I areas: Arches National Park, Bryce Canyon National Park, Canyonlands National Park, Capitol Reef National Park, and Zion National Park; however, the analysis area does not contain any Class I areas.

Class I areas are areas that are provided special protection for air quality under the Clean Air Act (CAA). They include federal lands like national parks, national wilderness areas, and national monuments. For Class I areas, there are no leases within 100 miles of the Bryce Canyon National Park. The closest leases to Canyonland National Park are UTU93525 and UTU93533, and they are 5 and 5.5 miles away, respectively. Lease UTU93519 is 31 miles away from Arches National Park. Leases UTU93471, UTU93472, and UTU93473 are within 31 and 33 miles of Capitol Reef National Park (EPA 2023k).

Leases UTU93475, UTU93476, and UTU93479 are likely to be explored for helium as reflected in the lessee's three APDs for these leases. Lease UTU93475 is located 18 miles from Canyonland National Park, 43 miles from Arches National Park, and 42 miles from Capitol Reef National Park. Lease UTU93476 is located 20 miles from Canyonland National Park, 45 miles Arches National Park, and 40 miles from Capitol Reef National Park. Lease UTU93479 is located 17 miles from Canyonland National Park, 44 miles from Arches National Park, and 41 miles from Capitol Reef National Park.

The AMR (BLM 2022d, 2023d) discusses past, present, and foreseeable emissions and air quality data for counties in Utah. Visual range for Class I areas in Utah varies from 153.5 to 177.1 miles depending on time of year and location. Visibility trends based on air monitoring data from four Utah monitoring sites for the clearest, haziest, and most impaired categories are incorporated by reference from the AMR (Figures 3 through 6 of the AMR). The difference between the haziest and most impaired days at Bryce Canyon National Park has increased, indicating episodic events have a greater impact on visibility. The haziest days at Bryce Canyon National Park have shown little improvement due to many years of large wildfire smoke episodes. Progress toward Regional Haze Rule goals is demonstrated by the marked improvement on the most impaired days at Bryce Canyon—those with high amounts of pollutants emitted by humans—over the same time frame. Visibility in all three categories (clearest, haziest, and most impaired) at Canyonlands and Capitol Reef National Parks improved over the respective period of record at each location.

The NPS monitors and evaluates deposition to determine which parks are most at risk from air pollution and where conditions are declining or improving. Nitrogen deposition conditions in Utah national parks are fair to poor with no trend for improving or worsening conditions, while sulfur deposition conditions are good and generally improving (see Table 22 of the AMR [BLM 2023d]).

**Air Quality Design Considerations**

Design constraints and mitigation measures for reducing air emissions at the APD stage could include requiring that new stationary and replacement internal combustion gas field engines, smaller than 300 horsepower, to not emit more than 2 g of nitrogen oxides ($NO_x$) per horsepower-hour (UT-S-01), or that engines are kept in good working order, use of Tier II or higher diesel engines, dust control, flaring and other best practices as described in UT-LN-96, using regional ozone formation controls (UT-LN-99), and air dispersion modeling (UT-LN-102), or a combination of all of these. Application of stipulations and notices listed in Appendix B would be adequate for the leasing stage to disclose potential future restrictions and to facilitate the reduction of potential impacts.

The BLM mitigates pollutants through lease stipulations and notices and further NEPA actions throughout the lease process. Stipulations and notices listed in Appendix B apply to the leases issued and notify the operator of what is required (stipulation) and what could potentially be required (notice) at the APD stage. Additional air quality control measures may be warranted and imposed at the APD stage as conditions of approval. The BLM would do this in coordination with the EPA, UDAQ, and other agencies that have jurisdiction on air quality. By applying stipulations and notices, leasing would have little impact on air quality. At the APD stage, further COAs could be applied based on the environmental analysis for the APD. These control measures are dependent on future regional modeling studies or other analysis or changes in regulatory standards. Application of these notices would be sufficient to notify the lease holder of additional air quality control measures that are necessary to ensure protection and maintenance of the NAAQS. Also, any future development in nonattainment areas would be subject to the conformity process of the CAA, which may require additional mitigation or offsets.

Regulatory agencies also require various mitigations measures for oil and gas well permits. State permit-by-rule requirements are identified in Utah Administrative Code R307-504-511. Well development in Indian Country would be subject to permitting requirements in the Federal Implementation Plan for the Indian Country Minor New Source Review Program for the Oil and Natural Gas Industry (80 *Federal Register* 51991).

### 3.3.1.2    Environment Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its previous leasing decisions for the 59 leases from the 2018 Lease Sales. Any potential effects to air quality from these leases would occur when the leases are developed. As previously explained, this analysis does not authorize or guarantee the number of wells analyzed herein. The drilling of wells on a lease would not be permitted until the BLM approves an APD. Any APD received would be subject to site-specific NEPA review. However, development assumptions have been made in this EA to inform the decision because a lease must be developed to keep it from expiring.

There are four general phases of post-lease development that would generate air pollutant emissions: 1) well development (well site construction, well drilling, well completion, and interim reclamation), 2) well production operations (extraction, separation, gathering, and final reclamation), 3) mid-stream (refining, processing, storage, and transport/distribution), and 4) end-use (combustion or other uses) of the fuels produced. While well development and production operation emissions (Phases 1 and 2) occur on-lease and the BLM has program authority over these activities, mid-stream and end-use emissions (Phases 3 and 4) typically occur off-lease where the BLM has no program authority.

During well development, there could be emissions from earth-moving equipment, vehicle traffic, drilling, and completion activities. $NO_2$, $SO_2$, and CO would be emitted from vehicle tailpipes. Fugitive

dust concentrations would increase with additional vehicle traffic on unpaved roads and from wind erosion in areas of soil disturbance. Drill rig and fracturing engine operations would result mainly in $NO_2$ and CO emissions, with lesser amounts of $SO_2$. These temporary emissions would be short-term during the drilling and completion phases.

During well production operations there could be continuous emissions from separators, condensate storage tanks, and daily tailpipe and fugitive dust emissions from operations traffic. During the operational phase of a well, $NO_2$, CO, VOC, and HAP emissions would result from the long-term use of storage tanks, pumps, separators, and other equipment. Additionally, road dust ($PM_{10}$ and $PM_{2.5}$) would be produced by vehicles servicing the wells. This would be regulated by Utah Administrative Code R307-309 and R307-205, which require a Fugitive Dust Control Plan for new sources of fugitive dust one-quarter acre or greater that are located in a $PM_{10}$ or $PM_{2.5}$ nonattainment or maintenance areas (UDAQ 2017).

Given that the BLM has received and approved APD packages on three leases for helium production, of the eight wells used for the RFDS, three were assumed to be helium and five were assumed to be oil and gas. Single well emissions estimates for well development and production operations are based on Uinta Basin typical development and production operations scenarios and these single well emissions and assumptions for analysis are input into the BLM Lease Sale Emissions Tool to provide the maximum year and average year emissions over the anticipated production life of leases (BLM 2022b). Table 3-10 shows the maximum year and average year emissions over the anticipated production life of leases for the three helium wells and five oil and gas wells. More emissions detail is provided in Appendix G. Actual development of individual leases may result in higher or lower emissions for various reasons including differences with geologic formations, proximity to existing support infrastructure, differences in pace of development, different development methods and control technology used by a lessee, and other reasons. A lessee has 10 years to establish production on a lease and if production is not attempted within the 10-year timeframe, the lease will be terminated with no development or emissions occurring.

**Table 3-10. Estimated Annual Emissions from the Development of Leases**

| Activity | Field Office | County | $PM_{10}$ | $PM_{2.5}$ | $NO_x$ | CO | $SO_2$ | VOC | HAPs |
|---|---|---|---|---|---|---|---|---|---|
| Maximum year* | PFO | Emery | 7.79 | 2.57 | 33.35 | 30.79 | 0.038 | 63.24 | 5.77 |
| Average year* | PFO | Emery | 4.42 | 1.52 | 14.63 | 21.17 | 0.007 | 51.38 | 4.70 |
| 2020 NEI – Emery County* | | | 4,342 | 1,114 | 15,121 | 11,727 | 4,584 | 8,668 | 1,907 |
| Percent increase from 2020 NEI (max year) | | | 0.18% | 0.22% | 0.22% | 0.26% | 0.001% | 0.73% | 0.30% |
| Utah R307-410-4 Thresholds | | | 20 | 10 | 40 | 100 | 40 | n/a | n/a |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

* Values in tons per year. n/a – no threshold

AR000603

Emissions associated with development of eight wells would range from a 0.001% increase in $SO_2$ to a 0.71% increase in VOC in Emery County. Emissions of CAPs would also occur outside the impact analysis area from transport, processing, distribution, and end-use of produced oil and gas. Because there are potentially tens to hundreds of thousands of mid-stream and downstream emissions sources, the BLM is not able to quantify air quality and health impacts from these sources. Generally crude oil from the well fields in Utah is trucked to the Price River Terminal in Wellington, Utah, for shipment to refineries, or trucked to refineries in Salt Lake City. Following construction of the approved Uinta Basin Railway, trains on the proposed rail line could transport crude oil produced in Utah to markets across the United States. Utah's refineries produce mostly motor gasoline, diesel fuel, and jet fuel. Pipelines carry refined products from Salt Lake City's refineries to markets in Utah, Idaho, Nevada, Wyoming, eastern Washington, and Oregon. Regarding natural gas, Utah is crossed by several interstate pipelines that transport natural gas from the Opal Hub in Wyoming, from the Piceance Basin in western Colorado, and from Utah's in-state production to markets in Utah, Nevada, Idaho, and Colorado. Downstream combustion, whether in stationary facilities and motor vehicles/airplanes are regulated by the EPA, other federal agencies, or delegated state agencies. This regulatory process is designed to avoid downstream impacts to regional and local air quality.

At the leasing stage it is not possible to accurately estimate potential air quality impacts by modeling due to the variation in emission control technologies as well as construction, drilling, and production technologies applicable to oil versus gas production and utilized by various operators. Should development on the leases be proposed, and prior to authorizing specific proposed projects on the subject leases, emission inventories would need to be developed. Nearfield air quality dispersion modeling, which may also be required at that time, includes direct and cumulative impact analysis for demonstrating compliance with the NAAQS, plus analysis of impacts to air quality related values (AQRVs) (i.e., deposition, visibility), particularly as they might affect nearby Class I areas (some national parks and wilderness areas) and Class II areas of interest. Utah Administrative Code R307-410-4 lists emissions thresholds for new or modified sources, and projects with proposed emissions increases below these thresholds would not violate NAAQS alone, including secondary standards for protection of the environment. The emissions listed in Table 3-10 are below the emissions thresholds in R307-410-4.

Air quality and AQRV impacts from the development of exploration and production wells were modeled in an air quality modeling analysis prepared in support of the oil and gas leasing EIS for the Dixie and Fishlake National Forests (U.S. Department of Agriculture 2010) and are incorporated by reference to provide an indication of what leases may need additional air quality analysis at the APD stage. The analysis evaluated maximum modeled air pollutant concentrations at various distances and elevations (above and below) from a well site and compared them to Class I and Class II increment thresholds. Generally, results predicted that air quality standards would be met if the Class I airsheds are at a distance of 34 miles or greater away from a production well or 3 miles or greater away from an exploratory well. Further modeling and analysis are recommended if the source is less than 34 or 3 miles, respectively. Results predicted no potential compliance problems for Class II airsheds. Similar results and recommendations are made about visibility standards. Leases UTU93475, UTU93476, and UTU93479 are likely to be explored for helium as there have been three APDs for these leases and the leases are much greater than 3.1 miles from any Class I area. Leases UTU93525 and UTU93533 are 5 and 5.5 miles away from Canyonlands National Park, respectively, but no APDs have been received for these leases. There are no leases located within 3 miles of a Class I area; therefore, no new significant impacts to air resources would occur at Arches National Park, Canyonlands National Park, or Capitol Reef National Park from exploration of the PFO leases. However, because all leases are located within 34 miles of Canyonlands National Park, results are uncertain and further modeling and analysis would be required at the APD stage to determine whether significant impacts to air resources would occur at Canyonlands National Park from development and production of the PFO leases.

While emissions from an individual well or well pad are too small to have a substantial impact on ground-level $O_3$ concentrations, they contribute with emissions from other regional oil and gas operations to produce a cumulative $O_3$ impact. Studies like the BLM's Air Resource Modeling Study (ARMS) (BLM 2020a) have demonstrated that oil and gas activity is a primary contributor to wintertime ozone NAAQS exceedances in the Uinta Basin, which is located approximately 50 miles north of the leases.

The CAA general conformity rule (40 CFR 93) provides federal agencies a method for determining if the emissions in a nonattainment area, from an action under consideration, will delay an area from attaining the NAAQS. This is done by showing that emissions are either de minimis or conform to a state or federal implementation plan. None of the leases are located within a nonattainment area and thus do not require a general conformity applicability assessment and is not applicable to this leasing action.

If exploration occurs, short-term impacts would be stabilized or managed rapidly (within 2 to 5 years) and long-term impacts are those that would substantially remain for more than 5 years.

Substantial air resource impacts are not anticipated from the development of the leases based on the emissions estimates contained in Table 3-10, air quality analysis for similar oil and gas development in the area, and considering the location of leases relative to population centers and Class I areas. No further analysis or modeling is warranted for the leasing decision. As identified in notice UT-LN-102, additional analysis or mitigation may be required when leases are developed to ensure no adverse impacts occur.

Under the No Action Alternative, the BLM would affirm its previous leasing decisions for the 59 leases from the 2018 Lease Sales. The leases include the standard lease terms and conditions for development of surface oil and gas leases. Given that all 59 leases would be affirmed, there is potential for oil and gas development on these leases. Potential impacts to air quality would only occur if the leases are developed, otherwise no new emissions of pollutants would occur.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the BLM would cancel 48 leases (encompassing 75,494.99 acres) that contain identified LWCs, and one lease (encompassing 1,408.01 acres) within a designated wilderness area. However, under this alternative the BLM would still affirm 10 leases, which may allow for future mineral exploration and drilling activity. The leases closest to Class I areas, Leases UTU93525 and UTU93533, would be included in the 49 leases that could be cancelled, therefore potentially reducing air quality impacts. Of the 10 leases to be affirmed, the ones closest to Class I areas are Leases UTU93492 and UTU93485, located 13 miles and 14 miles, respectively, from Canyonlands National Park. Potential impacts to air quality would not occur unless these leases are developed.

Based on the RFDS, the 20.8 acres that could be developed under these alternative amounts to approximately 17% of the acreage of the No Action Alternative, which would equate to approximately 2 wells. Therefore, if the 2 wells are developed the impacts on air quality would be less than No Action Alternative. More emissions detail is provided in Appendix G. However, the three leases with APDs, Leases UTU93475, UTU93476, and UTU93479, would be cancelled under this alternative and therefore would not be developed. However, oil and gas production is typically more emissive than helium production; therefore, there is potential for alternatives that contain more oil and gas production to be more emissive than an alternative that has more wells but has helium and oil and gas production. However, since there would be 49 fewer leases under this alternative, the impacts on air quality would likely be less than under the No Action Alternative (see Table 3-10), as it is likely that fewer than eight wells would be developed.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not result in any potential impacts to air quality, as the leases would be cancelled and no development would occur at this time. However, in the absence of a Land Use Plan Amendment closing the lands to leasing, they could be considered for inclusion in future lease sales.

### 3.3.1.3    Mitigation Measures and Residual Effects

Air quality design considerations and mitigation measures for reducing air emissions have been previously discussed in Section 3.3.1.1. There are no additional required design constraints or mitigation measures for air quality.

### 3.3.1.4    Cumulative Effects

This document incorporates by reference the projected changes to air quality and AQRVs that are evaluated in the BLM's Air Resource Modeling Study (ARMS) (BLM 2020a). This modeling study provides a reference for potential changes to the affected environment occurring from existing and foreseeable emissions producing activities, including oil and gas development, within the state of Utah and the Uinta Basin.

*Emissions Trends*

Past and present actions that have affected and would likely continue to affect air quality in the analysis area include surface disturbance resulting from oil and gas development and associated infrastructure, geophysical exploration, ranching and livestock grazing, range improvements, recreation (including off-highway vehicle [OHV] use), authorization of ROWs for utilities and other uses, and road development. Past and present actions that have affected and would likely continue to affect air quality are too numerous to list here but would include the development or conversion of power plants; the development of energy sources such as oil, gas, and coal; the development of highways and railways; and the development of various industries that emit pollutants. These types of actions and activities can reduce air quality through emissions of criteria pollutants (including fugitive dust), VOCs, and HAPs, as well as contribute to deposition impacts and to a reduction in visibility.

Emissions in the oil and gas sector roughly parallel oil and gas production. Future trends in oil and gas production growth for the Rocky Mountain region are used from the U.S. Energy Information Administration (EIA) 2023 Annual Energy Outlook (EIA 2023) to provide an estimate of the change in emissions from oil and gas sources in Utah. U.S. production of natural gas and petroleum and liquids is projected to rise amid growing demand for exports and industrial uses. U.S. natural gas production is projected to increase by 15% from 2022 to 2050. Similarly, oil and gas related CAP and HAP emissions from existing and foreseeable wells, plus development of leases, are anticipated to rise due to increasing production (UDAQ 2020).

*Modeled Air Quality Projections*

In 2017, the BLM initiated the regional ARMS to evaluate foreseeable changes to air quality and AQRVs (BLM 2020a). ARMS 2017 uses the best available information on oil and gas emissions and future development plans and incorporates the latest photochemical model improvements. However, even with these improvements, photochemical models still have trouble replicating wintertime ozone concentrations. This is due to the model having difficulty replicating meteorological conditions (temperature inversions and snow cover), and the need for improved estimates for VOC speciation profiles used as model inputs.

ARMS 2017 projected oil and gas emissions for low and high development scenarios using UDAQ's Uinta Basin Oil and Gas Emissions Model (BLM 2020a). Foreseeable emissions for non-oil and gas emissions sources are incorporated from the Intermountain Data Warehouse Western Air Quality Study air quality modeling dataset (Adelman et al. 2016). Compared to the base year, the low scenario shows a decline in oil and gas production, and the high scenario shows a production increase. Analysis of ARMS 2017 emissions projections indicate that it is very likely that the HIGH scenario overestimates oil and gas VOC and $NO_x$ emissions for the future year estimates. Source apportionment is used in the modeling study to evaluate changes to air quality and AQRVs from all sources including biogenic sources, BLM Uinta Basin oil and gas sources, other oil and gas sources (including BLM authorized sources outside Duchesne and Uinta Counties), and non–oil and gas anthropogenic sources. Future year modeling results are compared with the NAAQS for criteria pollutants ($O_3$, $PM_{2.5}$, $PM_{10}$, $NO_2$, and $SO_2$) throughout the state of Utah. The contributions of BLM oil and gas development emissions to air quality and AQRVs at Utah Class I and Class II sites and at sensitive lakes are also compared against PSD increment concentrations, and visibility and deposition thresholds of concern. The model performed very well in simulating $O_3$ at some representative sites in Utah over the entire year but failed to capture wintertime $O_3$ exceedances associated with inversions in the Uinta Basin. To address the underestimation of winter $O_3$ concentration, the relative change in the modeled concentrations between the current and future year simulations are used to scale the observed current year ozone design value to obtain a projected future year design value.

The ARMS 2017 model shows potential exceedances of the $O_3$ NAAQS along the Wasatch Front, Uintah Basin, and portions of southern Utah. $O_3$ exceedances along the Wasatch Front are mainly due to non–oil and gas anthropogenic sources, exceedances in the Uinta Basin are mainly due to oil and gas sources (federal and non-federal), and exceedances in the southern part of the state are due to local and out-of-state non–oil and gas anthropogenic activities. Observed $O_3$ design values in southern Utah are below the NAAQS and continued monitoring is warranted so modeled exceedances do not become reality. Evaluation of the annual and 24-hour $PM_{2.5}$ and 24-hour $PM_{10}$ NAAQS show exceedances only occurring due to exceptional events such as wildfires. The model showed no exceedances of the $SO_2$ or $NO_2$ NAAQS. The PSD analysis showed exceedance of the Class II $NO_2$ threshold (13.3 ppb) at the Uintah and Ouray Indian Reservation, primarily from non–BLM oil and gas development.

The ARMS 2017 impact analysis results indicate that air impacts of emissions from projected oil and gas development activities under BLM jurisdiction in Uintah and Duchesne Counties for both high and low development scenarios were strongly confined to the Uinta Basin and did not contribute to the long-range transport of impacts outside of the basin. This conclusion holds true for all pollutants. Emissions from BLM oil and gas development were not responsible for any violations of the NAAQS, PSD, visibility, and deposition thresholds of concern predicted by the 2025 high and low development scenarios in areas outside of the Uinta Basin. The contributions of BLM oil and gas development emissions to all air quality and AQRVs were minor in comparison to other emission sectors. The BLM oil and gas development emissions contributed 8.88% and 4.22% respectively to the total 2025 high and low simulated daily 8-hour maximum $O_3$ concentrations in the Uinta Basin and contributed less than 0.01% to simulated daily 8-hour maximum $O_3$ outside the Uinta Basin. The maximum contribution of BLM oil and gas development emissions to total $PM_{2.5}$ concentrations are less than 1% and were four times less than contributions from other oil and gas development activities that are not on BLM lands.

*Air Quality Related Values*

AQRVs were also analyzed in the ARMS 2017 modeling study. Future year projections (both high and low scenarios) show improvements of AQRVs at Class I, Class II, and sensitive lakes in Utah compared to 2011 base year emissions. Since the air quality impacts from Uinta Basin oil and gas development were well contained within the basin as discussed previously, this emission source sector was not responsible

for any exceedances of the 0.5 and 1.0 deciview (dv) visibility thresholds occurring at Class I national parks in Utah. Biogenic emissions and non–oil and gas emissions are the main contributors to dv exceedances in Utah national parks. Bryce Canyon and Capitol Reef National Parks experienced visibility improvements in the future year scenarios compared to base year for both the worst 20% and the best 20% visibility days. Arches and Canyonlands National Parks, which are located closer to oil and gas development distributions, experienced visibility improvement for the best 20% days but slight visibility worsening for the worst 20% days. Other oil and gas development activities, including BLM development outside the Uinta Basin, are projected to produce visibility impacts exceeding the 0.5 and 1.0 dv thresholds for 21 and 2 days, respectively, at Canyonlands National Park.

The ARMS 2017 future year simulated sulfur and nitrogen depositions at sensitive areas were substantially less than those simulated during the base year. The simulated total annual nitrogen depositions by both base year and future year were below the corresponding critical loads at all assessed areas. All of Class I areas, Class II areas, and sensitive lakes experienced nitrogen deposition improvements in future year compared to base year simulations. Similar conclusions are applicable to source impacts on total annual sulfur deposition. Base year and future year simulated sulfur depositions for all Class I, Class II and sensitive lakes were well below the critical load of 5 kilogram per hectare per year. The future year also resulted in improvements on sulfur deposition at all areas.

Studies have demonstrated that oil and gas activity is a primary contributor to wintertime ozone NAAQS exceedances in the Uinta Basin. While emissions from an individual well or well pad are too small to have a substantial impact on $O_3$ concentrations, they contribute with emissions from other regional oil and gas operations to produce a cumulative $O_3$ impact.

*Hazardous Air Pollutants*

It is not possible to determine the change in cumulative cancer risk in the county from potential new wells without performing air quality modeling. However, the current county level cancer risks of around 10 in 1 million is well below the level of concern (100 in 1 million), and the current oil and gas facilities contribute less than 1 in 1 million to the county level totals. An increase in HAPs emissions from eight wells would slightly increase the cumulative contribution to cancer risk from oil and gas facilities but would not result in a substantial change to existing cumulative HAPs impacts. In summary, the cumulative air quality in the impact analysis area is maintained at current levels or projected to improve. Atmospheric concentrations for CAPs are projected to be below the NAAQS or show improvement (i.e., decreasing concentrations). Visibility is projected to improve for the best 20% days at Canyonlands National Park, the closest Class I area to the leases, and deposition is estimated to remain below critical load criteria. Emissions of HAPs are not anticipated to substantially change the cancer and noncancer respiratory risks in the area of analysis.

### 3.3.2    Greenhouse Gas and Social Cost of Carbon

*Issue Statement: How would proposed and potential development of the leases contribute to GHG emissions and climate change?*

Future development of the leases under consideration could lead to emissions of carbon dioxide ($CO_2$), methane ($CH_4$), and nitrous oxide ($N_2O$), the three most common GHGs associated with oil and gas development. These GHG emissions would be emitted if the leases are developed and from the downstream consumption of any fluid minerals that may be produced. However, the BLM cannot reasonably determine at the leasing stage whether, when, and in what manner a lease would be explored or developed. Until a lease holder submits an APD there is substantial uncertainty that exists regarding crucial factors that would affect actual GHG emissions and associated impacts, including, but not limited to, the future feasibility of developing the lease, well density, geological conditions, development type

(vertical, directional, or horizontal), hydrocarbon characteristics, specific equipment used during construction, drilling, production, abandonment operations, production and transportation, and potential regulatory changes over the 10-year primary lease term. Actual development on a lease may vary from what is analyzed in this EA and will be evaluated through site-specific NEPA analysis if an operator submits an APD or plan of development to the BLM.

For the purposes of this analysis, the BLM has evaluated the potential effects of the leasing action on climate change by estimating and analyzing potential GHG emissions from projected oil and gas development on the leases using estimates based on past oil and gas development and available information from existing development within the state.

Further discussion of climate change science and predicted impacts, as well as the reasonably foreseeable and cumulative GHG emissions associated with the BLM's oil and gas leasing actions, are included in the 2021 *BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends* (Annual GHG Report) (BLM 2022e). This report presents the estimated emissions of GHGs attributable to development and consumption of fossil fuels produced on lands and mineral estate managed by the BLM. The Annual GHG Report is incorporated by reference as an integral part of this analysis.

The BLM has prepared an *Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah EA* (Utah EA) (DOI-BLM-UT-0000-2021-0001-EA) (BLM 2021c). The BLM published the Utah EA and the signed finding of no significant impact (FONSI) on January 14, 2021. Multiple leasing decisions regarding 226 suspended Utah leases were issued throughout 2021. The Utah EA informed BLM decisions relating to the suspended leases and sold, but not-yet-issued leases. In addition, it analyzed GHGs associated with all Utah lease sales from 2014 to 2019 (including lease sales that were not challenged in litigation), the GHGs from the PFO RMP and field development EISs, previous leasing decisions where development has not occurred, and future GHG emissions based on the RFDS. The Utah EA considers GHG emissions in context with emissions from other local, regional, and national federal leasing decisions. The Utah EA is incorporated by reference in this analysis as a point of comparison to the emissions calculated in this EA.

### 3.3.2.1    Affected Environment

Climate change is a global process that is affected by the sum total of GHGs in the Earth's atmosphere. The incremental contribution to global GHGs from a single proposed land management action cannot be accurately translated into its potential effect on global climate change or any localized effects in the area specific to the action. Currently, global climate models are unable to forecast local or regional effects on resources as a result of specific emissions. However, there are general projections regarding potential impacts on natural resources and plant and animal species that may be attributed to climate change resulting from the accumulation of GHG emissions over time. GHGs influence the global climate by increasing the amount of solar energy retained by land, waterbodies, and the atmosphere. GHGs can have long atmospheric lifetimes, which allows them to become well mixed and uniformly distributed over the entirety of the Earth's surface no matter their point of origin. Therefore, potential emissions resulting from the proposed alternatives can be compared to state, national, and global GHG emission totals to provide context and potential contribution to climate change impacts.

Table 3-11 shows the total estimated GHG emissions from fossil fuels at the global, national, and state scales over the years 2016-2020. Emissions are shown in Mt per year of carbon dioxide equivalent ($CO_2e$). Chapter 3 of the Annual GHG Report contains additional information on GHGs and an explanation of $CO_2e$. State and national energy-related $CO_2$ emissions include emissions from fossil fuel use across all sectors (residential, commercial, industrial, transportation, and electricity generation) and are released at the location where the fossil fuels are consumed.

Additional information on current state, national, and global GHG emissions, as well as the methodology and parameters for estimating emissions from BLM fossil fuel authorizations and cumulative GHG emissions, is included in the Annual GHG Report (see Chapters 4, 5, and 6).

**Table 3-11. Global and U.S. Greenhouse Gas Emissions (2016–2020)**

| Scale | 2016 | 2017 | 2018 | 2019 | 2020 |
|-------|------|------|------|------|------|
| Global | 36,465.6 | 36,935.6 | 37,716.2 | 37,911.4 | 35,962.9 |
| U.S. | 5,077.0 | 5,005.5 | 5,159.3 | 5,036.0 | 4,535.3 |
| Utah | 72.0 | 72.0 | 73.8 | 74.5 | 71.4 |

Source: Annual GHG Report (BLM 2022f), Chapter 6, Tables 6-1 and 6-3; EPA (2023e) and EPA 2023n.

Note: all values in Mt of carbon dioxide equivalent.

The continued increase of anthropogenic GHG emissions over the past 60 years has contributed to global climate change impacts. A discussion of past, current, and projected future climate change impacts is described in Chapters 8 and 9 of the Annual GHG Report. These chapters describe currently observed climate impacts globally, nationally, and in each state and present a range of projected impact scenarios depending on future GHG emissions levels. These chapters are incorporated by reference in this analysis.

### 3.3.2.2     Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its decision to lease 59 leases from the 2018 Lease Sales. GHG emissions from the development of these leases would occur under the No Action Alternative. While the leasing action does not directly result in development that will generate GHG emissions, emissions from potential future development of the leases are reasonably foreseeable and can be estimated for the purposes of this lease sale. There are four general phases of post-lease development that would generate GHG emissions: 1) well development (well site construction, well drilling, and well completion), 2) well production operations (extraction, separation, gathering), 3) mid-stream (refining, processing, storage, and transport/distribution), and 3) end use (combustion or other uses) of the fuels produced. While well development and production operation emissions occur on-lease, and the BLM has program authority over these activities, mid-stream and end-use emissions typically occur off-lease where the BLM has no program authority.

Emissions inventories at the leasing stage are imprecise due to uncertainties, including the type of mineral development (oil, gas, or both), scale, and duration of potential development; types of equipment (drill rig engine tier rating, horsepower, fuel type); and the mitigation measures that a future operator may propose in their development plan. To estimate reasonably foreseeable on-lease emissions at the leasing stage, the BLM uses estimated well numbers based on state data for past lease development combined with per-well drilling, development, and operating emissions data from representative wells in the area. Given that the BLM has received and approved APD packages on three leases for helium production, of the eight wells used for the RFDS, three were assumed to be helium and five were assumed to be oil and gas. The amount of oil or gas that may be produced if the leases are developed is unknown. For purposes of estimating production and end-use emissions, potential wells are assumed to produce oil and gas in similar amounts as existing nearby wells. While the BLM has no authority to direct or regulate the end-use of the products, for the purposes of this analysis, the BLM assumes that all produced oil or gas would be combusted (such as for domestic heating or energy production). The BLM acknowledges that there may be additional sources of GHG emissions along the distribution, storage, and processing chains (commonly referred to as mid-stream operations) associated with production from the leases. These

sources may include emissions of $CH_4$ (a more potent GHG than $CO_2$ in the short term) from pipeline and equipment leaks, storage, and maintenance activities. These sources of emissions are highly speculative at the leasing stage; therefore, the BLM has chosen to assume that mid-stream emissions associated with the leases for this analysis will be similar to the national level emissions identified by the Department of Energy's National Energy Technology Laboratory (NETL) (NETL 2009, 2019).

The emission estimates calculated for this analysis were generated using the assumptions previously described above using the BLM Lease Sale Emissions Tool. Emissions are presented for each of the four phases of post-lease development described above.

- Well development emissions occur over a short period and may include emissions from heavy equipment and vehicle exhaust, drill rig engines, completion equipment, pipe venting, and well treatments such as hydraulic fracturing.

- Well production operations, mid-stream, and end-use emissions occur over the entire production life of a well, which is assumed to be 20 years for this analysis based on the productive life of a typical oil/gas field.

- Production emissions may result from storage tank breathing and flashing, truck loading, pump engines, heaters and dehydrators, pneumatic instruments or controls, flaring, fugitives, and vehicle exhaust.

- Mid-stream emissions occur from the transport, refining, processing, storage, transmission, and distribution of produced oil and gas. Mid-stream emissions are estimated by multiplying the estimated ultimate recovery (EUR) of produced oil and gas with emissions factors from NETL life cycle analysis of U.S. oil and natural gas. Additional information on emissions factors can be found in the Annual GHG Report (Chapter 4, Tables 4-7 and 4-9).

- For the purposes of this analysis, end-use emissions are calculated assuming all produced oil and gas is combusted for energy use. End-use emissions are estimated by multiplying the EUR of produced oil and gas with emissions factors for combustion established by the EPA (Tables C-1 and C-2 to Subpart C of 40 CFR 98). Additional information on emission factors and EUR factors can be found in the Annual GHG Report (Chapter 4).

Table 3-12 lists the estimated direct (well development and production operations) and indirect (mid-stream and end-use) GHG emissions in metric tons for the subject leases over the average 20-year production life of the lease. There is a lot of uncertainty in estimating the production life of a well and this is consistent with the RFDS, which is a 20-year, forward-looking estimation of oil and gas exploration and development. If the BLM were to assume a 30-year production life of the lease, the estimated direct and indirect GHG emissions would be 915,962 metric tons of $CO_2e$. This is an approximately 10% increase from the estimated direct and indirect $CO_2e$ emissions for the subject leases using a 20-year production life of the lease (see Table 3-12).

**Table 3-12. Estimated Life of Lease Emissions from Well Development, Well Production Operations, Mid-Stream, and End-Use**

| Activity | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ (100 years) | $CO_2e$ (20 years) |
|---|---|---|---|---|---|
| Well development | 9,434 | 2.07 | 0.069 | 9,515 | 9,624 |
| Well production operations | 159,745 | 369.62 | 0.320 | 170,848 | 190,327 |
| Mid-stream | 74,000 | 199.28 | 1.228 | 80,274 | 90,776 |

| Activity | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ (100 years) | $CO_2e$ (20 years) |
|---|---|---|---|---|---|
| End-use | 559,341 | 21.52 | 4.215 | 561,133 | 562,266 |
| **Total** | 802,520 | 592.50 | 5.833 | 821,769 | 852,994 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

Note: all values in metric tons.

The Utah EA analyzes GHG and how emissions relate to climate change at a lease sale scale for a 5-year period (2014–2018). It also analyzes the total potential GHG emissions from reasonably foreseeable oil and gas development for each FO planning area. Emissions calculations from the lease sales provides the decision-maker with estimates for the total potential GHG emissions based on the historical number of wells developed for a high development year (high scenario) and the average year (low scenario). In addition, the analysis compares the high and low scenarios with the RFDS for each BLM Utah FO planning area. For the PFO, 1,900 wells were assumed in the RFDS for the RMPs. Table 11 of the Utah EA provides the 2019 baseline annual GHG emissions from the 1,340 existing oil and gas wells in the PFO, showing 3,066,647 metric tons of carbon dioxide equivalent per year ($CO_2e$/year) for annual oil and gas emissions. Table 12 of the Utah EA shows the estimated emissions from construction and operating potential wells from oil and gas development in the PFO. For the 1,900 wells assumed to be developed, the single-well emissions for construction and operations were 679 metric tons of $CO_2e$ and 428 metric tons of $CO_2e$/year, respectively. The construction emissions totaled 1,289,474 metric tons of $CO_2e$ and operation emissions totaled 813,847 metric tons of $CO_2e$/year. Emissions listed in Table 3-12 are 8.5% of the construction and operation emissions listed in the Utah EA.

GHG emissions vary annually over the production life of a well due to declining production rates over time. Figure 3-1 shows the estimated GHG emissions profile over the production life of a typical lease, including well development, well production operations, mid-stream, end-use, and gross emissions.



Source: BLM Lease Sale Emissions Tool (BLM 2022b).

Note: t = metric tons.

**Figure 3-1. Estimated annual greenhouse gas emissions profile over the life of a lease.**

To put the estimated GHG emissions for this lease sale in a relatable context, potential emissions that could result from development of the leases for this sale can be compared to other common activities that generate GHG emissions and to emissions at state and national levels. The EPA GHG Equivalencies Calculator can be used to express the potential average year of GHG emissions on a scale relatable to everyday life (EPA 2023l). For instance, the projected average annual GHG emissions from potential development of the subject lease are equivalent to 6,627 gasoline-fueled passenger vehicles driven for 1 year, or the emissions that could be avoided by operating eight wind turbines as an alternative energy source or offset by the carbon sequestration of 36,606 acres of forest land.

Table 3-13 compares the estimated average annual lease sale emissions to existing federal fossil fuel (oil, gas, and coal) emissions and state and U.S. total GHG emissions from all sectors as reported in the EPA Inventory of U.S. GHG Emissions and Sinks: 1990–2020 (EPA 2022a).

**Table 3-13. Comparison of Lease Sale Annual Emissions to Other Sources**

| Reference | Mt $CO_2e$[*] (per year) | Average Year Percentage of Reference |
|---|---|---|
| Emissions from Leases (average year) | 0.031 | – |
| Utah onshore federal (oil and gas)[†] | 12.68 | 0.243% |
| U.S. onshore federal (oil and gas)[†] | 465.63 | 0.007% |
| U.S. federal – all (oil and gas)[†] | 844.27 | 0.004% |
| U.S. federal (oil, gas, and coal)[†] | 1,292.57 | 0.002% |
| Utah total (all sectors)[‡] | 71.41 | 0.043% |
| U.S. total (all sectors)[‡] | 5,981.40 | 0.001% |

[*] Estimates are based on 100 Global Warming Potential values.

[†] Federal values come from the Annual GHG Report, Tables ES-1 and ES-2. U.S Federal – All includes offshore oil and gas production (BLM 2022e).

[‡] Values comes from the EPA Inventory of U.S. GHG Emissions and Sinks: 1990–2020 (EPA 2022a) and use the Intergovernmental Panel on Climate Change (2007) Fourth Assessment Report Global Warming Potential values.

Table 3-14 compares emission estimates over the 20-year life of the lease compared to the 20-year projected federal emissions in the state and nation from existing wells, the development of approved APDs, and emissions related to reasonably foreseeable lease actions.

**Table 3-14. Comparison of the Life of Lease Emissions to Other Federal Oil and Gas Emissions**

| Reference | Mt $CO_2e$ (100 years) | Life of Lease Percentage of Reference |
|---|---|---|
| Lease sale emissions (life of lease) | 0.822 | 100.000% |
| Utah reasonably foreseeable short-term federal (oil and gas)[*] | 187.84 | 0.437% |
| Utah EIA projected long-term federal (oil and gas)[†] | 536.32 | 0.153% |

AR000613

| Reference | Mt CO₂e (100 years) | Life of Lease Percentage of Reference |
|---|---|---|
| U.S. short-term federal (oil and gas) | 4,614.81 | 0.018% |
| U.S. long-term federal (oil and gas) | 13,560.24 | 0.006% |

Source: BLM Lease Sale Emissions Tool (BLM 2022b); and Annual GHG Report (BLM 2022e), Tables 5-17 and 5-18.

* Short-term foreseeable is estimated federal emissions from existing producing wells, approved APDs, and 1 year of leasing.

† Long-term foreseeable are estimated federal emissions to meet EIA projected energy demand.

Compared to emissions from other existing and foreseeable short-term federal oil and gas development, the life of lease emissions for Alternatives A and B is between 0.15% to 0.44% of federal fossil fuel authorization emissions in the state and between 0.006% to 0.18% of federal fossil fuel authorization emissions in the nation. If foreseeable long-term federal oil and gas development and production remains a constant percentage of EIA projected energy demand, then the estimated emissions from the life of leases in the proposed alternative is between 0.006% and 0.18% of federal emissions in the nation over the next 20 years. In summary, potential GHG emissions from the proposed alternatives could result in GHG emissions of 0.781 metric tons of CO₂e over the life of the lease.

As detailed in the Annual GHG Report (BLM 2022e), which the BLM has incorporated by reference, the BLM also looked at other tools to inform its analysis, including the MAGICC model (see Section 7.0 of the Annual GHG Report). This model run suggests that "30-plus years of projected federal emissions would raise average global surface temperatures by approximately 0.0158 °C, or 1% of the lower carbon budget temperature target" (BLM 2022e:71). As this is an assessment of what the BLM has projected could come from the entire federal fossil fuel program, including the projected emissions from the proposed alternative, over the next 30 years, the reasonably foreseeable lease sale emissions contemplated in this EA are not expected to substantially affect the rate of change in climate effects, bring forth impacts that are not already identified in existing literature, or cause a change in the magnitude of impacts from climate change at the state, national, or global scales.

**Monetized Impacts from No Action Alternative Greenhouse Gas Emissions**

The social cost of carbon dioxide, social cost of nitrous oxide, and social cost of methane—together, the SC-GHG—are estimates of the monetized damages associated with incremental increases in GHG emissions in a given year.

On January 20, 2021, President Biden issued EO 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis. Section 1 of EO 13990 establishes an administration policy to, among other things, listen to the science; improve public health and protect our environment; ensure access to clean air and water; reduce GHG emissions; and bolster resilience to the impacts of climate change. Section 2 of the EO calls for federal agencies to review existing regulations and policies issued between January 20, 2017, and January 20, 2021, for consistency with the policy articulated in the EO and to take appropriate action.

Consistent with EO 13990, the CEQ rescinded its 2019 *Draft National Environmental Policy Act Guidance on Considering Greenhouse Gas Emissions* and has begun to review for update its *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* issued on August 5, 2016 (2016 GHG Guidance). While CEQ works on updated guidance, it has instructed agencies to consider and use all tools and resources available to them in assessing GHG emissions and climate change effects, including the 2016 GHG Guidance.

Regarding the use of SC-$CO_2$ or other monetized costs and benefits of GHGs, the 2016 GHG Guidance noted that NEPA does not require monetizing costs and benefits (CEQ 2016). It also noted that "the weighing of the merits and drawbacks of the various alternatives need not be displayed using a monetary cost-benefit analysis and should not be when there are important qualitative considerations" (CEQ 2016).

Section 5 of EO 13990 emphasized how important it is for federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account" and established the Interagency Working Group on Social Cost of Greenhouse Gases, United States Government (IWG). In February 2021, the IWG published *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide: Interim Estimates under Executive Order 13990* (Technical Support Document) (IWG 2021). This interim report updated previous guidance from 2016. The final report is still pending.

In accordance with this direction, this subsection provides estimates of the monetary value of changes in GHG emissions that could result from selecting each alternative. Such analysis should not be construed to mean a cost determination is necessary to address potential impacts of GHGs associated with specific alternatives. These numbers were monetized; however, they do not constitute a complete cost-benefit analysis, nor do the SC-GHG numbers present a direct comparison with other impacts analyzed in this document. For instance, the BLM's overall economic analysis for this lease sale does not monetize most of the major costs or benefits and does not include all revenue streams from the proposed alternatives but seeks to quantify certain impacts related to employment numbers and labor income. The SC-GHG is provided only as a useful measure of the benefits of GHG emissions reductions to inform agency decision-making.

For federal agencies, the best currently available estimates of the SC-GHG are the interim estimates of the SC-$CO_2$, SC-$CH_4$, and SC-$N_2O$ developed by the IWG on the SC-GHG. Select estimates are published in the Technical Support Document (IWG 2021), and the complete set of annual estimates are available on the U.S. Office of Management and Budget's website (U.S. Office of Management and Budget 2021).

The IWG's SC-GHG estimates are based on complex models describing how GHG emissions affect global temperatures, sea level rise, and other biophysical processes; how these changes affect society through, for example, agricultural, health, or other effects; and monetary estimates of the market and nonmarket values of these effects. One key parameter in the models is the discount rate, which is used to estimate the present value of the stream of future damages associated with emissions in a particular year. A higher discount rate assumes that future benefits or costs are more heavily discounted than benefits or costs occurring in the present (i.e., future benefits or costs are a less significant factor in present-day decisions). The current set of interim estimates of the SC-GHG have been developed using three different annual discount rates: 2.5%, 3%, and 5% (IWG 2021).

As expected with such a complex model, there are multiple sources of uncertainty inherent in the SC-GHG estimates. Some sources of uncertainty relate to physical effects of GHG emissions, human behavior, future population growth and economic changes, and potential adaptation (IWG 2021). To better understand and communicate the quantifiable uncertainty, the IWG method generates several thousand estimates of the social cost for a specific gas, emitted in a specific year, with a specific discount rate. These estimates create a frequency distribution based on different values for key uncertain climate model parameters. The shape and characteristics of that frequency distribution demonstrate the magnitude of uncertainty relative to the average or expected outcome.

To further address uncertainty, the IWG recommends reporting four SC-GHG estimates in any analysis. Three of the SC-GHG estimates reflect the average damages from the multiple simulations at each of the three discount rates. The fourth value represents higher-than-expected economic impacts from climate change. Specifically, it represents the 95th percentile of damages estimated, applying a 3% annual

discount rate for future economic effects. This low probability, high damage scenario represents an upper boundary of damages within the 3% discount rate model. The estimates below follow the IWG recommendations.

The SC-GHG associated with estimated emissions from future potential development of the leases are reported in Table 3-15. These estimates represent the present value (from the perspective of 2021) of future market and nonmarket costs associated with $CO_2$, $CH_4$, and $N_2O$ emissions from potential well development and operations and potential end-use, as described in Subsection 1.2.1. Estimates are calculated based on IWG estimates of social cost per metric ton of emissions for a given emissions year and the BLM's estimates of emissions in each year. They are rounded to the nearest $1,000. The estimates assume that well operations, mid-stream, and end-use emissions occur over the entire production life of a well, which is assumed to be 20 years based on the productive life of a typical oil/gas field. However, as discussed in Section 3.3.2.2, if the leases are developed, the additional minerals (oil/gas, etc.) would be added to the global market and there would be no net impact (and perhaps even a reduction) in emissions because, rather than burning carbon-intensive materials for energy, less-intensive natural gas would be used.

**Table 3-15. Social Cost of Greenhouse Gases Associated with Future Potential Development of the Proposed Alternative**

| Development Phases | Average Value, 5% Discount Rate | Average Value, 3% Discount Rate | Average Value, 2.5% Discount Rate | 95th Percentile Value, 3% Discount Rate |
|---|---|---|---|---|
| Development and operations | $2,182,000 | $8,266,000 | $12,490,000 | $25,011,000 |
| End-use | $8,699,000 | $31,803,000 | $47,703,000 | $96,163,000 |
| **Total** | **$10,881,000** | **$40,069,000** | **$60,193,000** | **$121,174,000** |

Source: BLM (2021e).

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the BLM would cancel 48 leases (encompassing 75,494.99 acres) that contain identified LWCs and one lease (encompassing 1,408.01 acres) within a designated wilderness area. However, the affirming of the other 10 leases opens up the potential for mineral exploration and drilling activity. Potential impacts to GHG and climate change would not occur unless these leases would be developed.

Based on the RFDS, the 20.8 acres associated with the Wilderness and Lands with Wilderness Characteristics Alternative is approximately 17% of the acreage of No Action Alternative, which would equate to approximately 2 wells. Therefore, if the 2 wells are developed the types of impacts would be less than described under the No Action Alternative if all eight wells were developed. More emissions detail is provided in Appendix G. However, the three leases with APDs, Leases UTU93475, UTU93476, and UTU93479, are not included in the 10 leases and therefore would not be developed. Since there are 49 fewer leases under this alternative, the impacts on GHG and climate change would likely be less than under the no action alternative (see Table 3-12), as it is likely that fewer than eight wells would be developed. The estimated direct (well development and production operations) and indirect (mid-stream and end-use) GHG emissions for the eight wells is 852,994 in metric tons over the average 20-year production life of the lease. SC-GHG associated with estimated emissions from future potential development of the leases range from $10,881,000 to $121,174,000. Since there are 49 fewer leases under

this alternative, the impacts on GHGs and climate change would likely be less than under the No Action Alternative, as it is likely that fewer than eight wells would be developed.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not result in any potential impacts to GHGs and climate change, as the leases would be cancelled and not developed at this time. Since no leases would be developed under this alternative, the impacts on GHGs and climate change would be less than under the No Action Alternative and the Wilderness and Lands with Wilderness Characteristics Alternative.

The BLM does not have a model to estimate energy market substitutions at a spatial resolution needed for this production scenario. Reductions in oil and natural gas produced from federal leases may be partially offset by non-federal production (state and private) in the United States, in which the indirect GHG emissions would be similar, or overseas, in which case the GHG emissions would likely be higher, as there are generally less regulatory requirements for production and the produced energy would need to be physically transported into the United States. There may also be substitution of other energy resources to meet energy demand. These substitution patterns will be different for oil and gas. The change in emissions from energy substitution compared to the No Action Alternative could range from a 98.5% decrease if hydroelectricity is substituted to a 110.7% increase if coal is substituted; see Table 10-3 in Section 10.0 of the Annual GHG Report (BLM 2022e).

Oil is primarily used for transportation, while natural gas is primarily used for electricity production and manufacturing, and to a lesser degree by residential and commercial users (EIA 2023). Coal and renewable energy sources are stronger substitutes for natural gas in electricity generation. The effect of substitution between different fuel sources on indirect GHG emissions depends on the replacement energy source. For example, coal is a relatively more carbon intense fuel than natural gas and hydroelectricity is the least carbon intense fuel (see Table 10-3 of the Annual GHG Report [BLM 2022e]). In the transportation sector, alternatives to oil are likely to be less carbon intensive. Finally, substitution across energy sources or oil and gas production from other locations may not fully meet the energy needs that would otherwise have been realized through production from these leases. Price effects may lower the market equilibrium quantity demanded for some fuel sources. This would lead to a reduction in indirect GHG emissions. These three effects are likely to occur in some combination under the lease cancellation alternative, but the relative contribution of each is unknown. Over the past decade the increasing mix of natural gas has contributed to lower emissions as it has replaced energy produced from coal. In 2022, high prices for natural gas and demand exceeding supply have resulted in some countries reactivating or delaying planned closures of coal-fired power plants (Kartit 2022). In the future, renewable energy is anticipated to become a larger part of the U.S. energy mix and reducing energy related carbon emissions. It has been estimated that with a 35% integration of wind and solar energy into the Western United States electric grid there would be an additional 25 to 45% reduction in carbon emissions (BLM 2022e). Regardless, GHG emissions under the lease cancellation alternative are not expected to be zero. Further discussion of past, present, and projected global and state GHG emissions can be found in Chapter 6 of the 2021 Annual GHG report (BLM 2022e).

### 3.3.2.3    Mitigation Measures and Residual Effects

GHG emissions contribute to changes in atmospheric radiative forcing, resulting in climate change impacts. GHGs act to contain solar energy loss by trapping longer wave radiation emitted from the Earth's surface and act as a positive radiative forcing component. The buildup of these gases has contributed to the current changing state of the climate equilibrium toward warming. Chapters 8 and 9 of the Annual GHG Report provide a detailed discussion of climate change science, trends, and impacts. The relationship between GHG emissions and climate impacts is complex, but a project's potential to contribute to climate change is reduced as its net emissions are reduced. When net emissions approach

zero, the project has little or no contribution to climate change. Net-zero emissions can be achieved through a combination of controlling and offsetting emissions. Emission controls (e.g., vapor recovery devices, no-bleed pneumatics, leak detection and repair, etc.) can substantially limit the amount of GHGs emitted to the atmosphere, while offsets (e.g., sequestration, low carbon energy substitution, plugging abandoned or uneconomical wells, etc.) can remove GHGs from the atmosphere or reduce emissions in other areas. Chapter 10 of the Annual GHG Report provides a more detailed discussion of GHG mitigation strategies (BLM 2022e).

Several federal agencies work in concert to implement climate change strategies and meet U.S. emissions reduction goals while supporting U.S. oil and gas development and operations. The EPA is the federal agency charged with regulation of air pollutants and establishing standards for protection of human health and the environment. The EPA has issued regulations that will reduce GHG emissions from any development related to the proposed leasing action. These regulations include the Standards of Performance for Crude Oil and Natural Gas Facilities for which Construction, Modification or Reconstruction Commenced After September 18, 2015 (49 CFR 60, Subpart OOOOa), which imposes emission limits, equipment design standards, and monitoring requirements on oil and gas facilities. A detailed discussion of existing regulations and EOs that apply to BLM management of federal lands as well as current federal and state regulations that apply to oil and gas development and production can be found in Chapter 2 of the Annual GHG Report (BLM 2022e).

Oil and gas sources operating on lands under state jurisdiction within the State of Utah are required to register with UDAQ in accordance with Utah Administrative Code R307-505. The registration process will help UDAQ identify oil and gas facilities on state lands, thereby increasing the resolution of oil and gas emissions inventories and allowing for more comprehensive compliance assessments.

The majority of GHG emissions resulting from federal fossil fuel authorizations occur outside of the BLM's authority and control (these include mid-stream and end-use emissions). These emissions are referred to as indirect emissions and generally occur off-lease during the transport, distribution, refining, and end-use of the produced federal minerals. The BLM's regulatory authority is limited to those activities authorized under the terms of the lease, which primarily occur in the upstream portions of natural gas and petroleum systems. This decision authority is applicable when development is proposed on public lands, and the BLM assesses the specific location, design, and plan of development. In carrying out its responsibilities under NEPA, the BLM has developed BMPs designed to reduce emissions from field production and operations. BMPs may include limiting emissions from stationary combustion sources, mobile combustion sources, fugitive sources, and process emissions that may occur during development of the leases. Analysis and approval of future development may include the application of BMPs within BLM's authority, included as COAs, to reduce or mitigate GHG emissions. A stipulation for Air Quality (UT-S-01), and Lease Notices for Regional Ozone Formation Controls (UT-LN-99) and Air Quality Analysis (UT-LN-102) apply to all leases. Additional measures proposed at the project development stage may be incorporated as applicant-committed measures by the project proponent or added to necessary air quality permits. Additional information on mitigation strategies, including emissions controls and offset options, are provided in Chapter 10 of the Annual GHG Report (BLM 2022e).

### 3.3.2.4    Cumulative Effects

The analysis of GHGs presented in this EA includes estimated emissions for the leases from the development, production, and end-use of federal fossil fuels. An assessment of GHG emissions from the BLM's fossil fuel authorizations, including coal and oil and gas leasing and development, is included in the Annual GHG Report (see Chapter 5) (BLM 2022e). The Annual GHG Report includes estimates of reasonably foreseeable GHG emissions related to BLM lease sales anticipated during the calendar year, as well as the best estimate of emissions from ongoing production and development of leases sold in

previous lease sales. It provides an estimate of cumulative GHG emissions from the BLM fossil fuel leasing program based on actual production and statistical trends.

The Annual GHG Report provides an estimate of short-term and long-term GHG emissions from activities across the BLM's oil and gas program. The short-term methodology presented in the Annual GHG Report includes a trends analysis of 1) leased federal lands that are held-by-production, 2) approved APDs, and 3) leased lands from competitive lease sales occurring over the next annual reporting cycle (12 months) to provide a 30-year projection of potential emissions from federal lease actions over the next 12 months. The long-term methodology uses oil and gas production forecasts from the EIA to estimate GHG emissions out to 2050 that could occur from past, present, and future development of federal oil and gas. For both methodologies, the emissions are calculated using life-cycle-assessment emissions and data factors. These analyses are the basis for projecting GHG emissions from leases that are likely to go into production during the analysis period of the Annual GHG Report and represent both a hard look at GHG emissions from fossil fuel leasing and the best available estimate of reasonably foreseeable cumulative emissions related to any one lease sale or set of quarterly lease sales.

Table 3-16 shows the aggregate GHG emissions estimate that would occur from federal leases, existing and foreseeable, between the years 2022 and 2050, using the methodology described above. A detailed explanation of the short-term and long-term methodologies are provided in Sections 4.6 and 4.7 of the Annual GHG Report.

**Table 3-16. GHG Emissions from Past, Present, and Foreseeable Federal Onshore Lease Development (Mt CO$_2$e)**

| State | Existing Wells (report year)* | Existing Wells (projected) [†] | Approved APDs[‡] | Leasing[§] | Short-Term Totals | Long-Term Totals |
|-------|------------|------------|------------|---------|------------|-----------|
| AL | 0.59 | 9.11 | 0 | 0.23 | 9.34 | 23.51 |
| AK | 1.6 | 25.29 | 33.97 | 77.64 | 136.9 | 63.23 |
| AZ | 0 | 0 | 0 | 0 | 0 | 0.00 |
| AR | 0.58 | 8.88 | 0.23 | 0.23 | 9.34 | 20.88 |
| CA | 5.27 | 44.49 | 6.94 | 0.06 | 51.49 | 200.57 |
| CO | 45.67 | 197.26 | 25.89 | 19.95 | 243.1 | 1,649.96 |
| ID | 0 | 0.03 | 0 | 0.14 | 0.17 | 0.06 |
| IL | 0 | 0.09 | 0 | 0.22 | 0.31 | 0.27 |
| IN | 0 | 0 | 0 | 0 | 0 | 0.00 |
| KS | 0.24 | 3.26 | 0 | 0.06 | 3.32 | 10.01 |
| KY | 0.01 | 0.15 | 0 | 0.04 | 0.19 | 0.38 |
| LA | 1.88 | 24.2 | 13.74 | 5.35 | 43.29 | 71.09 |
| MD | 0 | 0 | 0 | 0 | 0 | 0.00 |
| MI | 0.07 | 1.73 | 0 | 0.22 | 1.95 | 2.97 |
| MS | 0.13 | 2.15 | 0.37 | 0.37 | 2.89 | 5.49 |
| MT | 2.97 | 44.76 | 0.95 | 13.11 | 58.82 | 93.01 |
| NE | 0.01 | 0.17 | 0 | 0.04 | 0.21 | 0.40 |

| State | Existing Wells (report year)* | Existing Wells (projected) † | Approved APDs‡ | Leasing§ | Short-Term Totals | Long-Term Totals |
|---|---|---|---|---|---|---|
| NV | 0.12 | 1.55 | 0.11 | 1.08 | 2.74 | 4.72 |
| NM | 245.71 | 1,441.67 | 433.35 | 64.5 | 1,939.52 | 7,149.88 |
| NY | 0 | 0.01 | 0 | 0 | 0.01 | 0.02 |
| ND | 36.31 | 307.63 | 68.65 | 3.35 | 379.63 | 1,112.07 |
| OH | 0.1 | 0 | 0 | 0.37 | 0.37 | 6.35 |
| OK | 1.37 | 0.96 | 1.64 | 0.21 | 2.81 | 50.79 |
| OR | 0 | 0 | 0 | 0 | 0 | 0.00 |
| PA | 0 | 0.04 | 0 | 0.42 | 0.46 | 0.16 |
| SD | 0.11 | 2.01 | 0.15 | 0.15 | 2.31 | 3.99 |
| TN | 0 | 0 | 0 | 0 | 0 | 0.00 |
| TX | 2.67 | 38.03 | 11.1 | 0.42 | 49.55 | 79.25 |
| UT | 12.68 | 133.87 | 18.68 | 35.29 | 187.84 | 489.63 |
| VA | 0.01 | 0.12 | 0 | 0.03 | 0.15 | 0.30 |
| WV | 0 | 0.04 | 0 | 0.41 | 0.45 | 0.17 |
| WY | 107.53 | 1,010.09 | 184.85 | 292.71 | 1,487.65 | 4,000.90 |
| **Total onshore federal** | 465.63 | 3,297.59 | 800.62 | 516.6 | 4,614.81 | 15,040.03 |

Source: BLM (2022e).

* Sum of Tables 5-3 and 5-6 in the Annual GHG Report.

† Sum of Tables 5-5 and 5-8 in the Annual GHG Report.

‡ Sum of Tables 5-10 and 5-12 in the Annual GHG Report.

§ Sum of Tables 5-14 and 5-16 in the Annual GHG Report.

The most recent Short-Term Energy Outlook (STEO) published by the EIA (2023) predicts that the world's oil and gas supply and consumption will increase over the next 18 to 24 months. The latest STEO projections are adequate to use for the No Action Alternative discussion as the global forecast models used for the STEO are not dependent on whether the BLM issues onshore leases but are based on foreseeable short-term global supply and demand and include oil and gas development/operations on existing U.S. onshore leases. The most recent STEO includes the following projections for the next 2 years:

- Global liquid fuels consumption is projected to be 100.9 million barrels per day (bpd) in 2023 and increase by 1.8 million bpd in 2024.

- U.S. crude oil production averaged 11.9 million bpd in 2022. Production is expected to average 12.4 million bpd in 2023 and 12.6 million bpd in 2024.

- Natural gas production is expected to average 101.7 billion cubic feet per day (bcf/d) in 2024, 1% more than in 2022.

- U.S. liquid natural gas export capacity increases will contribute to liquid natural gas exports of 12 bcf/d in 2023, up from 14% from 2022. Liquid natural gas exports are predicted to increase by an average bcf/d by 5% in 2024.

- Coal production is expected to total 550 million short tons (MMst) in 2023. After increasing in both 2021 and 2022, U.S. coal production is expected to decline by 7% from more than 590 MMst in 2022 to about 550 MMst in 2023, with a further 9% decline to around 500 MMst in 2024.

- Generation from renewable sources will make up an increasing share of total U.S. electricity generation, increasing from 8% in 2023 to 9% in 2024.

Based on recent domestic and international events that have resulted in abrupt changes to the global oil and gas supply, other EIA studies and recent U.S. analyses (associated with weather impacts, etc.) regarding short-term domestic supply disruptions and shortages or sudden increases in demand demonstrate that reducing domestic supply (in the near term under the current supply and demand scenario) will likely lead to the import of more oil and natural gas from other countries, including countries with lower environmental and emission control standards than the United States (EIA 2023). Current global supply disruptions have also led to multiple releases from the U.S. Strategic Petroleum Reserve to meet consumer demand and curb price surges (EIA 2022).

The 2023 Annual Energy Outlook (EIA 2023) projects energy consumption increases through 2050 as population and economic growth outweighs efficiency gains. In the 2023 Annual Energy Outlook, crude oil production is forecast to rise in 2023 and 2024 to record high levels, then initially decline but begin to increase starting in 2030 because of changing trends in domestic crude oil production, then remaining relatively flat through 2050. However, renewable energy will be the fastest-growing U.S. energy source through 2050. Energy-related $CO_2$ emissions are expected to decrease from 2023 to 2050 because of a transition away from more carbon-intensive coal to less carbon-intensive natural gas and renewable energy for electricity generation. $CO_2$ emissions are expected to trend upward as increasing energy consumption, resulting from population and economic growth, outpaces continuing reductions in energy intensity and $CO_2$ intensity. Given these forecasts, if the leases are developed, the additional minerals (oil/gas, etc.) would be added to the global market, and there would be no net impact (and perhaps even a reduction) in emissions because rather than burning carbon-intensive materials for energy, they would be using the less carbon-intensive natural gas. Further discussion of past, present, and projected global and state GHG emissions can be found in Chapter 6 of the 2021 Annual GHG Report (BLM 2022e).

EO 14008, Tackling the Climate Crisis at Home and Abroad (January 27, 2021), directs the executive branch to establish policies or rules that put the United States on a path to achieve carbon neutrality, economywide, by no later than 2050. This goal is consistent with Intergovernmental Panel on Climate Change's (IPCC's) recommendation to reduce net annual global CO emissions between 2020 and 2030 in order to reach carbon neutrality by mid-century. Federal agencies are still in the process of developing policies that align with a goal of carbon neutrality by 2050. In the short term, the order has a stated goal of reducing economy-wide GHG emissions by 50% to 52% relative to 2005 emissions levels no later than 2030.

Carbon budgets are an estimate of the amount of additional GHGs that could be emitted into the atmosphere over time to reach carbon neutrality while still limiting global temperatures to no more than 1.5°C or 2°C above preindustrial levels. The IPCC *Special Report on Global Warming of 1.5°C* is the most widely accepted authority on the development of a carbon budget to meet the goals of the Paris Agreement. None of the global carbon budgets or pledges that countries have committed to stay within as part of the Paris Agreement are binding. Carbon budgets were originally envisioned as being a convenient tool to simplify communication of a complex issue and to assist policymakers considering options for

reducing GHG emissions on a national and global scale. Carbon budgets have not yet been established on a national or subnational scale, primarily due to the lack of consensus on how to allocate the global budget to each nation, and given this, the global budgets that limit warming to 1.5ºC or 2.0ºC are not useful for BLM decision making, particularly at the lease sale stage, as it is unclear what portion of the budget applies to emissions occurring in the United States.

However, stakeholders and members of the public have requested that the BLM consider comparing its predicted emissions in the context of global carbon budgets. Table 7-4 in the Annual GHG Report provides an estimate of the potential emissions associated with BLMs fossil fuel authorizations in relation to IPCC carbon budgets. Total federal fossil fuel authorizations including coal, natural gas, and oil represents approximately 1.75% of a suggested global carbon budget of 400 to 500 gigatonnes of $CO_2$ needed to limit global warming to 1.5ºC (0.91% for only federal oil and gas).

While continued fossil fuel authorizations will occur over the next decade to support energy demand and remain in compliance with the leasing mandates in the IRA passed in 2022, the U.S. Energy Information Administration International Energy Outlook expects renewable energy consumption to double between 2020 and 2050, with nearly equal liquid fuels consumption by 2050. The United States has committed to the expansion of renewable energy through infrastructure investments in clean energy transmission and grid upgrades include in the Bipartisan Infrastructure Investment and Jobs Act as well as clean energy investments and incentives included in the Inflation Reduction Act.

### 3.3.3    Socioeconomics and Environmental Justice

*Issue Statement: What are the potential impacts to social and economic conditions and EJ?*

#### 3.3.3.1    Affected Environment

Socioeconomic assessments evaluate the social and economic characteristics of communities which could be affected by proposed alternatives. This analysis describes and evaluates the socioeconomic and EJ impacts of the proposed and potential development of 59 oil and gas leases in Emery County, Utah.

Data were obtained from the U.S. Department of Labor, the U.S. Geological Survey Gap Analysis Program, the Bureau of Labor Statistics, local area unemployment statistics, the U.S. Department of Commerce, and the U.S. Census Bureau, as compiled by the Headwaters Economics Socioeconomic Profiles Tool developed for the BLM (Headwaters Economics 2023b). The analysis area for socioeconomic and EJ analysis is lands administered by the PFO.

Socioeconomic analysis performed as part of the *BLM Utah 2022 First Competitive Oil and Gas Lease Sale* (DOI-BLM-UT-0000-2021-0007-EA; 2022 First Competitive EA) (BLM 2022c) analyzed the impact of oil and gas leases in Emery, Uintah, and Grand Counties. Noting that Emery County is bordered to the northeast by Uintah County and to the east by Grand County, this analysis assumes the results of the 2022 First Competitive EA are generally applicable and this EA hereby incorporates several of the modeling results generated in that EA. This analysis method is typically referred to as "benefits transfer."

For EJ analysis, demographic data is used to identify minority and low-income populations, including Tribes, and evaluate whether actions considered could have disproportionately high and adverse human health or environmental effects to those populations.

AR000622

**Socioeconomics**

*Landownership*

There are 3,812,589 total acres within the analysis area. Of those, 2,730,041 acres (71.6 %), are federally owned lands, and 2,485,592 acres are managed by the BLM. A total of 606,960 acres within the analysis area are privately owned, 54 acres are Tribal lands, and 475,533 acres are owned by the State of Utah, Emery County, cities, or other non-federal agencies.

*Population, Employment, and Income*

The total population in the analysis area was 30,339 in 2021, representing a decrease of 2.9% from 2000 to 2021. The largest contributor to this change in total population was net migration. The number of employed workers in the study area in 2021 was 16,572. In 2021, the average annual unemployment rate was 3.9%; 84.6% of workers aged 16 and over within the analysis area worked in their county of residence. Per capita income in the analysis area in 2021 was $43,724 (denominated in 2021 dollars), which was an increase of 35.2% relative to 2020 (Headwaters Economics 2023b).

*Poverty, Ethnicity, and Other Demographic Indicators*

In 2021, the total number of people living in poverty in the southeastern analysis area, as defined by the U.S. Census Bureau, was 4,457 (15%) of the population. In the same year, there were 854 families living in poverty (11%). In 2021, the majority of the total population, 27,765 persons (92.4%), identified as White. Out of all persons living within the socioeconomic analysis area in 2021, 4,510 (15%) self-identified as being a member of a minority group. Of the total population, 3,392 (11.3%) self-identified as Hispanic or Latino. Of the remaining total, 173 (0.6%) self-identified as American Indian, 281 (0.9%) identified as Black or African American, 96 (0.3%) identified as Asian, 104 (0.3%) identified as Native Hawaiian or other Pacific Islander, 434 (1.4%) identified as other races not listed, and 1,194 (4%) identified as two or more races. The total number of housing units in 2021 was 13,722, of which 81.7% were occupied and 6.9% were seasonal, recreational, or occasionally occupied properties. Of those living within the analysis area aged 25 or older, 16.2% had earned a bachelor's degree or higher in 2021 (Headwaters Economics 2023b).

*Jobs by Industry*

In 2021, there were approximately 3,667 total jobs in non-services industries in the analysis area. In the same year there were an estimated 7,832 jobs in services related industries and approximately 3,052 additional jobs in the government sector. This total includes federal, state, county, and local government jobs. In 2021, the industries employing the largest numbers of employees in the analysis area were government (primarily state, county, and local government); construction and manufacturing; and trade, accommodation, and food services (Headwaters Economics 2023b).

*Wages by Industry*

Within the analysis area, the average annual wage for all reported jobs was $45,022 in 2021. The highest paying industries, on average, were mining, government, manufacturing, and information services (Headwaters Economics 2023b).

*Non-labor Income*

Non-labor income, which includes dividends, interest payments, rent, age-related transfer payments, hardship-related payments, and other transfer payments, can be important in local economies. Where non-

AR000623

labor income is a relatively high percentage of all income, it is likely that there are a higher number of retirees in comparison to other regions. In 2021, total non-labor income within the analysis area was $617,009,000, representing 46.5% of all income measured in 2021 dollars. The highest category of non-labor income in the same year was age-related transfer payments with $214,473,000 in total income, or 16.2% (Headwaters Economics 2023b).

*Federal Land Payments*

In fiscal year 2021, a total of $2,989,646 (2021 dollars) was paid by federal land management agencies to state and local governments. Of those payments, $2,593,692 were payments in lieu of taxes, and $96,915, or 3.2% of the total, were from the BLM (Headwaters Economics 2023b). Revenues generated from both competitive and non-competitive oil and gas lease sales directly impact socioeconomic resources in the analysis area via generation of revenue from the lease sales. Oil production from federal lands is subject to a 12.5% royalty payment to the federal government, half of which is provided to the state government for distribution to counties. The sale of the 59 leases totaled $3,247,652.50 in 2018. Revenues generated from rents on oil and gas leases leased but not producing in the analysis area total $182,539.50 for calendar year 2022.

**Environmental Justice**

In 1994, President Clinton issued EO 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, which requires federal agencies to consider EJ to be part of its mission. Its intent is to promote fair treatment of people of all races and income levels, so no person or group of people bears a disproportionate share of the negative effects from the country's domestic and foreign programs. Specific to the NEPA process, the EO requires that proposed projects be evaluated for "disproportionately high adverse human health and environmental effects on minority populations and low-income populations." Additionally, EO 14096 Revitalizing Our Nation's Commitment to Environmental Justice for All was issued on April 26, 2023, to promote a "whole of government approach" to environmental justice and supplement EO 12898.

The CEQ EJ guidelines for evaluating the potential environmental effects of projects under NEPA require specific identification of minority populations. This analyses used three criteria for identifying EJ communities: 1) the percentage of a Census block group's population self-identifying as something other than "White-alone not Hispanic" (referred to as minority) exceeds 50%, or, if the percentage is 10% greater than the same measure in the county; 2) the percentage of a block group's residents self-identifying as American Indian or Alaska Native Alone exceeds the county; or 3) the percentage of a block group's residents whose income is less than two times (200%) the poverty level or is greater than the same measure in the county.

The BLM defines low-income populations as individuals or groups of people whose income is less than or equal to twice (200% of) the federal poverty threshold, as identified by the U.S. Census Bureau, or if the population of the community experiencing poverty is at or above 50%. Minority populations include the following population groups: American Indian or Alaska Native, Asian, Native Hawaiian or other Pacific Islander, Black or African American, some other race (other than White), a combination of two or more races, or Hispanic. Except for White non-Hispanics, all other racial and ethnic groups are considered minorities; therefore, the total minority population of an area is calculated by subtracting the White non-Hispanic population from the total population. A minority community of concern is present if the percentage of the population self-identifying as white alone, not Hispanic is equal or greater than 50% of the population or meets the meaningfully greater threshold, calculated by comparing the minority group population with 110% of the reference area minority population. Members of Tribal populations include all persons having origins in any of the original peoples of North America and South America (including Central America) and who maintain Tribal affiliation or community attachment. Any

AR000624

American Indian or Alaska Native population qualifies as a Tribal population, and membership in a federally recognized Tribe is not required. All Tribal populations qualify as EJ populations, regardless of the percentage of the analysis area population they constitute. In addition, dispersed Tribal populations can also constitute EJ populations if they do not reside within the analysis area but depend on cultural resources or places on BLM-managed land within the analysis area (BLM 2022f).

Pursuant to BLM Guidance for Environmental Justice Baseline Analysis, which conforms with BLM IM 2022-059 *Environmental Justice Implementation*, September 2022 (BLM 2022g), non-metropolitan (non-metro) reference percentages were incorporated to provide additional context to the data presented below. The non-metro reference percentages are as follows, in Table 3-17.

**Table 3-17. Non-Metropolitan Reference Percentages**

| Geography | Percentages |
|---|:---:|
| *Low-Income Reference Percentages for the Great Basin Zone*[*] | |
| Utah (state) | 24.7 |
| Utah (non-metro) | 31.2 |
| *Minority Reference Percentages for the Great Basin Zone* | |
| Utah (state) | 22.1 |
| Utah (Meaningfully Greater Analysis) | 24.3 |
| Utah non-metro | 16.7 |
| Utah non-metro (Meaningfully Greater Analysis) | 18.4 |
| *Tribal Reference Percentages for the Great Basin Zone* | |
| Utah (state) | 2.0 |
| Utah (non-metro) | 5.0 |

Source: BLM (2022h).

[*] The Great Basin Zone, as defined in the Environmental Justice Baseline Analysis Guidance (BLM 2022h), includes Idaho, Nevada, and Utah.

Within the analysis area, all three EJ population types are present in one or more census block groups, based on analyses completed using the U.S. Census Bureau data tables (2021a, 2022b) (Table 3-17, p. 3-62) and the EPA's EJScreen Mapping tool. All of the leases are located in Census Tract 9765, Block Group 3, in the southeast portion of Emery County near the southern border with Wayne County (Figure 3-2). This area is sparsely populated, with approximately 814 residents in an area of 2589.38 square miles. This Census Tract and Block Group meet two of the previously identified CEQ criteria for EJ communities: Criteria 1 (percentage of minority residents), and Criteria 3 (percentage of low-income residents) as well as two of the Great Basin Zone non-metro reference percentages. Communities which meet any of the EJ Criteria are more likely to be disproportionately exposed to environmental harms or have an increased vulnerability to such hazards (Foresight Design Initiative 2017), and may require unique approaches to public participation, community representation, and recognition of interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of a proposed action (EPA 2023m).

To provide context for the potential hazards that the identified EJ Communities may face, the EPA's EJScreen Mapping tool standard report was reviewed for Census Tract 9765, Block Group 3. This report provides the EJ Indices for the block group as a percentile of the state of Utah, and as a national percentile (EPA 2022b). EJ Indices combine demographic factors with a single environmental factor to characterize

exposure or risk to certain variables which may impact vulnerable populations. The EJ Index is higher in block groups with larger numbers of mainly low-income and/or people of color residents with a higher environmental indicator value (EPA 2022c).

The national and state percentiles included in the standard report represent what percentage of the United States or state population has an equal or lower value, or less potential for exposure, risk, or proximity to certain facilities, or a lower percentage minority population, as compared to that block group (EPA 2022d). EJ Indices combine demographic factors with a single environmental factor, although the index does not combine various environmental factors into a cumulative score. Each environmental indicator has its own EJ Index. The EJ Index is higher in block groups with larger numbers of mainly low-income and/or people of color residents with a higher environmental indicator value (EPA 2022c). According to the Standard Report for Census Tract 9765, Block Group 3, the population in this area is above the 50th percentile in the state for lead paint[1] (90th percentile) and underground storage tanks[2] (52nd percentile). This population is also above the 50th percentile nationally for ozone[3] (87th percentile), lead paint (73rd percentile), and wastewater discharge[4] (61st percentile). This means that residents in this block group are more likely to be exposed to risks from underground storage tanks than most residents of the state. Additionally, residents in this block group are more likely to be exposed to lead paint than most residents of either the state or the nation as a whole. As noted in Section 3.2, AIB-18, no significant impacts from hazardous wastes are anticipated which could contribute to this block group's already high exposure to underground storage tanks and wastewater discharge. It is unlikely that additional lead exposure would occur during development of any lease.

While this block group scored high nationally for wastewater discharge and ozone (61st percentile and 87th percentile, respectively), the same group had lower state percentile scores (32nd percentile and 44th percentile, respectively), meaning that the majority of residents in this block group are less likely to be exposed to risks from wastewater discharges or ozone than the average resident of the state.

This block group scored below the 50th percentile in the state for particulate matter (7th percentile), diesel particulate matter (4th percentile), air toxics cancer risk and air toxics respiratory risk (no score), traffic proximity (14th percentile), superfund proximity (29th percentile), RMP Facility proximity (no score), and hazardous waste proximity (4th percentile). This means that residents in this block group are less likely to be exposed to the above indices than most residents of the state.

This block group scored below the 50th percentile nationally for particulate matter, diesel particulate matter, RMP Facility proximity, and hazardous waste proximity (no score); air toxics cancer risk (2nd percentile), air toxics respiratory index (1st percentile), traffic proximity (19th percentile), superfund proximity (4th percentile), and underground storage tanks (43rd percentile). This means that residents in this block group are less likely to be exposed to the above indices than most residents of the nation.

---

[1] The lead paint indicator is based solely on the age of the housing stock in a selected block group and highlights homes bult prior to 1960 because lead paint was commonly used during that time. This indicator does not take into account any remediation of lead paint which has occurred, such as through government programs to reduce lead or general home renovations (EPA 2022d).

[2] The intent of this indicator is to include facilities, such as treatment, storage, and disposal facilities, which were important in early EJ research and community action but are not covered in another environmental indicator (EPA 2022d).

[3] The indicator for ozone is reported in parts per billion (ppb) and are intended to highlight potential exposure. EJScreen uses distance weighted proximity as a proxy for the potential impact of specific types of facilities (EPA 2022d).

[4] The wastewater discharge indicator takes the pollutant discharge information reported from facilities to the EPA and assigns it to the streams and rivers which receive those discharges. This mapping process includes toxicity-weighted results, or giving more weight to the pollutants which have greater impact on human health. It also must account for dilution as these pollutants move downstream. The indicator ranks Census block groups based on the proximity to these stream segments and the toxicity-weighted pollutant discharge (EPA 2022d).

AR000626

The EPA's EJScreen Mapping tool does not calculate or display Tribal communities, although the percentage of a block group's residents self-identifying as American Indian or Alaska Native Alone is one of the criteria to be used for EJ analysis, according to the CEQ. As noted in Table 3-18, Census Tract 9762, Block Group 2 and Block Group 3 meet the CEQ criteria for tribal communities. The table below includes the percentage of the population who identify as American Indian or Alaska Native alone, and in parenthesis, the percentage of the population who identify as American Indian or Alaska Native alone or in combination with one or more races. While these block groups have a high percentage of residents who identify as American Indian or Alaska Native alone, none of the leases are located in these areas.

Should separate present and/or future actions undertaken by federal or non-federal entities be found to affect EJ populations within the analysis area, effects that could follow as a result of exploration, development, or production following any of the identified alternatives, could potentially compound those impacts.

AR000627



**Figure 3-2. Environmental justice and socioeconomic analysis area.**

AR000628

Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment
DOI-BLM-UT-0000-2023-0007-EA

June 2024

**Table 3-18. Environmental Justice Block Groups in Emery County by Race, Ethnicity, and Poverty**

| Geographic Area | Total Population | White Alone Not Hispanic (%) | Black or African American (%) | American Indian and Alaska Native (%)* | Asian (%) | Native Hawaiian and Other (%) Pacific Islander | Some Other Race (%) | Two or More Races (%) | Hispanic or Latino (%) | Total Racial Minority (%) | Percentage Below 200% of the Poverty Line | EJ Community? Y/N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Utah | 3,231,370 | 77.3 | 1.1 | 0.8 (1.7) | 2.3 | 0.9 | 0.3 | 3.0 | 14.4 | 22.7 | 24.7 | N/A |
| Emery County | 9,839 | 90.5 | 0.1 | 0.7 (1.69) | 0.0 | 0.4 | 0.1 | 1.8 | 6.5 | 9.5 | 31.9 | N/A |
| Census Tract 9672, Block Group 1 | 964 | 93.3 | 0.0 | 0.0 (0.0) | 0.0 | 3.9 | 0.0 | 0.0 | 2.8 | 6.7 | 16.9 | N |
| Census Tract 9762, Block Group 2 | 940 | 93.4 | 0.0 | 2.1[†] (0.0) | 0.0 | 0.0 | 0.0 | 0.6 | 3.8 | 6.6 | 24.1 | Y |
| Census Tract 9762, Block Group 3 | 1,205 | 76.7 | 0.0 | 3.8[†] (0.0) | 0.0 | 0.0 | 0.0 | 9.7 | 9.8 | 23.3[†] | 34.7[†] | Y |
| Census Tract 9762, Block Group 4 | 1,089 | 93.1 | 0.0 | 0.0 (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 6.9 | 6.9 | 41.5[†] | Y |
| Census Tract 9763, Block Group 1 | 1,375 | 96.7 | 0.0 | 0.0 (0.0) | 0.0 | 0.0 | 0.7 | 0.0 | 2.6 | 3.3 | 42.5[†] | Y |
| Census Tract 9763, Block Group 2 | 1,274 | 95.1 | 0.0 | 0.0 (0.0) | 0.0 | 0.0 | 0.0 | 1.8 | 3.1 | 4.9 | 13.3 | N |
| Census Tract 9765, Block Group 1 | 1,084 | 93.7 | 0.6 | 0.0 (0.0) | 0.0 | 0.0 | 0.0 | 2.7 | 3.0 | 6.3 | 36.5[†] | Y |
| Census Tract 9765, Block Group 2 | 1,086 | 98.6 | 0.0 | 0.0 (0.0) | 0.0 | 0.0 | 0.0 | 0.2 | 1.2 | 1.4 | 30.6 | N |
| Census Tract 9765, Block Group 3 | 822 | 67.9 | 0.0 | 0.0 (0.0) | 0.0 | 0.0 | 0.0 | 32.1 | 32.1 | 32.1[†] | 48.9[†] | Y |

Source: U.S. Census Bureau (2021a, 2021b, 2021c).

*Percentages in parenthesis represent the percentage of the population who identify as American Indian and Alaska Native alone or in combination with one or more other races.

[†]Percentages with a double asterisk meet both the CEQ EJ Community criteria as well as the BLM non-metro criteria.

### 3.3.3.2    Environmental Effects

**Socioeconomics**

Regional economic effects are typically measured in direct, indirect, and induced impacts. Direct impacts measure the economic impact of operating expenditures made by one or more economic enterprises within the analysis area on labor, materials, supplies, and productive capital. Indirect effects measure the purchase of goods and services, and the hiring of labor to meet demand for inputs that are purchased within the analysis area in support of the economic activities accounted for in the direct impacts described above. Induced effects measure the economic impact that occurs because of household purchases of goods and services by employees of the economic enterprise(s) accounted for in direct impacts. Induced effects do not represent cumulative effects. Cumulative effects are described in 3.3.3.4, below.

*Employment*

The 2022 First Competitive EA utilized 2019 IMPLAN modeling data to calculate the direct, indirect, and induced effect of oil and gas development on socioeconomic resources in Grand, Emery, and Uintah Counties, and included a multiplier on economic effects. Multipliers express the total size of the economic impact and are calculated by dividing the total effects by direct effects. As an example, an employment multiplier of 1.4 means that for each direct job supported by a specific change in economic activity, there are an additional 0.4 jobs in indirect and induced employment. Direct jobs represent positions created directly by a commercial enterprise; indirect jobs are those created as a result of spending on goods and services by the commercial enterprise or its employees.

The 2022 First Competitive EA analyzed the employment effects from the potential development of six oil and gas leases in the Vernal, Price, and Moab FOs. According to the 2022 First Competitive EA, employment effects from the potential development of the one oil and gas lease in the PFO could support 0.3 job directly (initial lease development), and less than 0.1 jobs indirectly (ongoing support). While this analysis considers 59 leases, the RFDS (as noted in Section 3.1.1) anticipates the potential development of eight wells, although it is anticipated that the wells drilled would be dry and would not produce oil and gas in paying quantities. Therefore, it is reasonable to extrapolate that should all eight wells be developed, approximately 2.4 direct jobs and less than 0.1 indirect job could be supported.

The development of leases typically occurs in three phases and associated activities: implementation, production, and reclamation. Each of these phases may indirectly impact communities in the analysis area via jobs, income, and tax revenues.

Pre-drilling exploration work is typically performed by in-house scientists and technicians employed by oil and gas companies; however, local contractors could be employed in subsequent oil and gas exploration and development activities, such as work associated with the implementation phase. Activities associated with the implementation phase could include pad construction, well drilling, development of new access roads or upgrades of existing roads, and installation of pipelines. As noted in Appendix D, drilling activities on a well typically occur 24 hours per day, seven days per week, and would require approximately 20 workers. Depending on the depth and complexity of the well, drilling could last from a few days to 1 week. These workers could spend a portion of their salary in local or regional economies for the duration of their work. However, as noted above, analysis using the RFDS anticipates approximately 2.4 direct jobs and less than 0.1 indirect job if eight wells were to be developed.

Activities associated with the production phase involve the addition of machinery such as engines for pumping oil, compressors for moving gas through pipelines, and vents for storage tanks. Local trucking companies could be hired to haul produced fluids or other project materials to and from the wells, and technicians would perform regular monitoring of the wells. As stated above, in-house scientists may be

AR000630

utilized to perform monitoring work; however, qualified local drivers could be contracted for materials transport.

The reclamation phase includes plugging wells and reclaiming the well pad and other associated disturbances such as roads and pipelines. Similar to the implementation phase, local contractors could be employed to perform construction activities associated with the plugging and reclamation of wells.

During each of the three phases, the potential for local socioeconomic impacts may increase if most of the work is supplied by local contractors and if local businesses are visited for the purchase of supplies, meals, rooms, and other items. However, given the production estimates in the RFDS (see Section 3.1.1), positive indirect impacts to socioeconomics may be minor, although the payments made at the time of auction ($3,247,652.50 in 2018), annual rent fees (10 years), and royalties (when production occurs) could provide income to county governments for schools and other expenditures.

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its decision to lease the 59 leases from the 2018 Lease Sales and would retain the bonus bids, advanced rental fees, and filing fees paid for these leases. As noted above, the sale of the 59 leases in 2018 totaled $3,247,652.50. APDs for helium production have been approved for three of these leases (UTU93475, UTU93476, and UTU93479). As noted in Section 3.1.1, the RFDS anticipates a maximum of eight wells to be drilled in the PFO. Using this assumption, it was calculated that approximately 2.4 jobs could be supported with development of eight wells. Because the No Action Alternative contemplates affirming 59 leases, the number of jobs could be higher if more than eight wells were developed (approximately 17 direct jobs). However, as noted in the RFDS, this scenario is unlikely to occur, and as such, impacts to employment, and by extension, revenues and related socioeconomic conditions, are not anticipated to be greatly affected by affirming the 2018 lease decisions. The No Action Alternative would not be expected to induce substantial growth or concentration of population, displace many people, cause substantial reduction in employment, reduce wage and salary earnings, cause a substantial net increase in county expenditures, or create a substantial demand for public services. As described above, some economic benefits could be seen in the region if all 59 leases are further explored and developed.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the BLM would cancel 48 LWC leases and the one lease located within the wilderness boundary and affirm the remaining 10 leases. BLM has not received any APDs for these 10 remaining leases; BLM received and approved three APDs for helium production on leases located on LWCs (UTU93475, UTU93476, and UTU93479). The entire acreage of the three leases with approved APDs are within LWCs and as such would be cancelled under this alternative.

The Wilderness and Lands with Wilderness Characteristics Alternative would allow for the potential exploration and development on 10 leases instead of the 59 contemplated under the No Action Alternative. As such, impacts to population growth, population density, employment, wages, or public services would be expected to be less. Under this alternative, the BLM would refund the $3,004,475 in bonus bids and $151,365 in advanced rental fees received for the 48 leases which would be cancelled. The filing fees paid for these leases are non-refundable. As noted in Section 3.1.1, the RFDS anticipates a maximum of two wells to be drilled in the PFO under the RFDS scenario for Alternative B. Using this assumption, it was calculated that approximately 0.6 jobs could be supported with development of two wells. Development of 10 wells could lead to approximately 3 jobs, however, as noted in Section 3.1.1, this scenario is unlikely to occur.

**Impacts of the Lease Cancellation Alternative**

Under the Lease Cancellation Alternative, the BLM would cancel all 59 leases and refund the total sale of the leases, minus filing fees. This alternative is not expected to induce substantial growth or concentration of population, displace many people, cause substantial reduction in employment, reduce wage and salary earnings, cause a substantial net increase in county expenditures, or create a substantial demand for public services. As this alternative contemplates cancelling all 59 leases, no economic benefits from exploration or development of wells would be seen under this alternative, and the potential 2.4 direct and 0.1 indirect jobs contemplated in Section 3.1.1 would not occur.

**Environmental Justice**

As stated above, minority, low-income and Tribal populations are known to exist within the leases. For this reason, future site development and production on the leases would require an additional EJ assessment to evaluate potential disproportionate adverse impacts on any EJ population(s) present in the area. As shown in Figure 3-2, above, no major population centers are located in the vicinity of the leases. The approximate population of Census Tract 9765, Block Group 3, is 814 residents over an area of 2,589.38 square miles. The closest town to the leases is Green River, located 12 miles north. A majority of the lands in the vicinity of the leases are federally managed and interspersed with state lands; within a ten-mile buffer of the leases, 98.6% of lands are managed by federal or state entities. One private parcel is located near lease number UTU93469; it is unknown whether this private parcel contains any permanent residences.

As noted above, Census Tract 9765, Block Group 3 meets the EJ criteria for low income and minority populations. These characteristics can contribute to residents' experiences of other resources, and exacerbate adverse effects associated with those resources, such as changes in the characteristics of the landscape, access to quality recreation, noise, and light pollution. Members of EJ communities may lack the financial ability to travel further to experience quality recreation sites, access to clear night skies or quiet landscapes, or to relocate if adverse conditions occur in their communities. While access to recreation, quiet, and open spaces are not criteria which identify EJ communities, research has shown that EJ communities experience disproportionate barriers or constraints in their experience of public or outdoor recreation, housing, and even the effects of climate change, due to elements such as historic discrimination, economic and other related disadvantages, cultural differences, personal or institutional forms of discrimination, exposure to air and water contaminants, and limitations in resources for adaptation and resiliency (American Public Health Association 2019; Bustam et al. 2011).

The impacts of the proposed range of alternatives to resources such as recreation, noise, night skies, open space, air quality, and greenhouse gas emissions is discussed in Sections 3.3.1, 3.3.2, and 3.3.4 through 3.3.9 of this EA; these impacts could contribute to adverse effects on EJ communities. However, at the leasing stage, there is insufficient detail to provide more specific analysis.

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its previous decision to lease the 59 leases. If development occurs at any of these locations, some impacts to EJ communities could occur, such as an increase in air pollutants (see Section 3.3.1, above), an increase in GHG emissions (see Section 3.3.2, above), or impacts to recreation, night skies, or noise (Sections 3.3.9, 3.3.8, and 3.3.6, respectively). However, at the leasing stage, the specific impacts are unknown. All leases have the Stipulation UT-S-01 *Air Quality* and Lease Notice UT-LN-102 *Air Quality Analysis* attached, which would mitigate air quality impacts.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the development potential and probability of development would be less than the No Action Alternative, as under this alternative, the BLM would cancel the 48 LWC leases and the one lease within a wilderness area. Should any of the remaining 10 leases be developed, increases in air pollution and GHG emissions could still occur, as well as impacts to recreation, night skies, or noise (Sections 3.3.9, 3.3.8, and 3.3.6, respectively), although specific impacts are unknown at this time. All leases have the Stipulation UT-S-01 *Air Quality* and Lease Notice UT-LN-102 *Air Quality Analysis* attached, which would mitigate air quality impacts.

**Impacts of the Lease Cancellation Alternative**

Under the Lease Cancellation Alternative, the BLM would cancel all 59 leases and no development would occur at this time; however, these leases may be sold in a future lease sale unless an amendment to the RMP is developed. Therefore, no impacts to EJ communities would be expected to occur.

### 3.3.3.3    Mitigation Measures and Residual Effects

**Socioeconomics**

There are no required design constraints or mitigation measures under socioeconomics.

**Environmental Justice**

No disproportionate adverse impacts to EJ populations are anticipated as a direct effect of the selection of any of the proposed alternatives. The EJ EO requires the BLM to minimize or mitigate any disproportionate adverse impacts to EJ populations. Should such adverse impacts be anticipated due to future exploration and development activities in connection with any leases, these potential effects and any need for minimization or mitigation would be evaluated at the APD stage through separate NEPA analysis. Lease notices, stipulations, or other mitigation measures included for recreation, night skies, noise, LWCs, and visual resources may mitigate for any indirect impacts to EJ communities which could occur under the range of proposed alternatives.

### 3.3.3.4    Cumulative Effects

According to the RFDS (Section 3.1.1), and the analysis completed in the 2022 First Competitive EA, the direct, indirect, and cumulative economic impacts from the act of leasing and subsequent potential oil and gas development in Emery County are expected to be minor. Oil and gas development affect employment and labor income generated by 1) payments to counties associated with the leasing and rent of federal minerals, 2) royalty payments associated with production of federal oil and gas, and 3) economic activity generated from drilling and associated activities. The magnitude of these types of economic effects is based upon the level and pace of development, which, while unknown at this time, can be reasonably foreseen to involve the development of between three and eight wells, contributing between 2.4 and 0.9 direct jobs, and 0.1 indirect job.

The pace and scale of oil and gas development can often concern local communities (Resources for the Future 2023). Rapid development can drive important social changes due to the influx of people to these areas who find employment in the oil and gas industry and ancillary service industries. Rapid population growth for unprepared communities can cause stress on community resources, such as educational infrastructure, roads and utilities, emergency services, and community cohesion. Should oil and gas leasing and subsequent development occur, impacts to people living near or using the area in the vicinity of the lease would potentially occur. Oil and gas exploration, drilling, or production could potentially inconvenience these people through increased traffic and traffic delays, noise, and visual impacts. These

AR000633

impacts would be particularly noticeable in rural areas in which oil and gas development has not occurred previously. However, as noted in the RFDS prepared for the Proposed PFO RMP/final EIS, the PFO has a long history of oil and gas activity, with drilling peaking in 2000 with 177 wells and reducing to 57 wells in 2003 (BLM 2005).

The level of inconvenience felt by local communities would depend on the activity affected, traffic patterns within the area, noise levels, the length of time and season in which these activities occurred, and other factors. Creation of new access roads would potentially allow increased public access and exposure of private property to vandalism. For leases in which the surface is privately owned and the mineral estate is federally owned, surface owner agreements, standard lease stipulations, and BMPs would potentially address many of the concerns of private surface owners. EO 12898 requires the analysis of disproportionately high and adverse human health effects and environmental effects on EJ populations. Based upon U.S. Census Bureau data, Emery County met the criteria for minority EJ populations due to the percentage of residents identifying themselves as belonging to a race other than white and/or of Hispanic origin. The BLM considers all input from persons or groups regardless of age, income status, race, or other social or economic characteristics.

As noted in this analysis (see Section 3.3.2, Greenhouse Gas and Social Cost of Carbon), the act of leasing itself does not contribute direct impacts to climate change. However, the U.S. Department of Health and Human Services recognizes that climate change adds to the cumulative stresses experienced by EJ communities, whose communities may have faced obstacles in accessing clean air, safe drinking water, nutritious food and safe shelter, and who may have been disproportionately exposed to pollution and associated harm that could seriously damage their health (U.S. Department of Health and Human Services 2022).While emissions inventories at the leasing stage are imprecise due to uncertainties, including the type of mineral development (oil, gas, or both), scale, and duration of potential development; types of equipment (drill rig engine tier rating, horsepower, fuel type); and the mitigation measures that a future operator may propose in their development, However, this EA did attempt to estimate the emissions, calculating that approximately 187 million tons of $CO_2e$ emissions could be expected to occur, based on past, present, and reasonably foreseeable future federal lease development. It is not possible to distinguish the role of the particular leases in this EA in those estimated emissions, although the addition of any greenhouse gases could contribute to cumulative impacts on EJ communities, including those identified in this EA.

### 3.3.4    Lands with Wilderness Characteristics

*Issue Statement: How would proposed and potential development of the leases impact the apparent naturalness, size, and opportunities for solitude and primitive recreation experience of lands determined to possess wilderness characteristics in the short and long term?*

#### 3.3.4.1    Affected Environment

BLM Manual 6310 defines LWCs as areas that have been inventoried and determined to possess 5,000 acres or more of public lands with apparent naturalness that provide outstanding opportunities for solitude and/or primitive, unconfined recreation. LWCs may also possess supplemental values of ecological, geological, or other features of scientific, educational, scenic, or historical value. An LWC determination is not a land use allocation per se and does not convey any special protective status unless an RMP decision has specifically established that a particular LWC unit will be managed to protect and preserve its wilderness characteristics. There are currently five inventoried LWCs in the PFO that overlap 48 of the 59 leases: UT-020-SRD-Sweetwater Reef A, UT-020-SRD-007, UT-020-SRD-San Rafael River B, UT-020-SRD-San Rafael River D, and UT-020-SRD-San Rafael River E. These five LWCs were identified as LWC after the publication of the 2008 RMP, and no management direction has yet been decided. These five LWCs also comprise the analysis area for this section. There is a total of 75,494.99

acres of overlap between the leases and these five LWC units. However, based on the RFDS, which anticipates development of eight wells, BLM anticipates that there could be direct impacts to 83.2 acres of LWCs.

Table 3-19 shows the acreage of LWC units that overlap lease areas and the amount of acreage in each unit that lies within the potential lease area.

**Table 3-19. Designated Lands with Wilderness Characteristics Unit Acreage and Lease Overlap Area**

| LWC Unit Name | Total Acreage of Unit | Acres in Lease Area | Percentage of Total LWC Unit Area |
|---|---|---|---|
| UT-020-SRD-Sweetwater Reef A | 69,347.70 | 37,427.34 | 54.97 |
| UT-020-SRD-007 | 8,694.30 | 349.22 | 4.02 |
| UT-020-SRD-San Rafael River B | 24,250.53 | 101.20 | 0.42 |
| UT-020-SRD-San Rafael River D | 66,849.40 | 29,055.81 | 43.46 |
| UT-020-SRD-San Rafael River E | 9,201.04 | 8,561.41 | 93.05 |

All of the LWC units listed above in Table 3-19 were identified by BLM after the completion of the 2008 PFO RMP and have therefore not been analyzed in a land use planning process. This means that 48 leases overlap LWC areas that have not been analyzed in an RMP. Management has not yet been determined for the identified LWCs listed in Table 3-19.

Table 3-20 breaks down acres of each lease with areas determined through inventories to either possess or not possess LWC. Any units listed below in Table 3-20 that are not listed above in Table 3-19 were considered for but not identified as LWCs by the BLM during or after the RMP was finalized (except for Labyrinth Canyon which, since 2019, has been a designated wilderness area). Note that in this table, units tagged as "Other" refer to acres or units that are not identified as LWC and/or were not inventoried for LWC. Of the 59 leases, 12 entirely contain LWCs, 36 partially contain LWCs, and 11 do not contain LWCs. There are three leases with approved APDs (UTU93475, UTU93476, and UTU93479), all of which overlap entirely with the UT-020-SRD-San Rafael River D LWC unit (Table 3-20).

**Table 3-20. Acres of Overlap of Each Lease with All Candidate and Lands with Wilderness Characteristics Areas**

| Lease Name<br>LWC Unit Name* | Acres Not in LWC | Acres in LWC | Total Acres |
|---|---|---|---|
| UTU93466 | 704.81 | 1,262.21 | 1,967.01 |
|    UT-020-SRD-San Rafael River D | – | 1,172.55 | 1,172.55 |
|    UT-020-SRD-San Rafael River E | – | 89.66 | 89.66 |
|    Other | 704.81 | – | 704.81 |
| UTU93468 | 188.82 | 1,722.95 | 1,911.78 |
|    UT-020-SRD-San Rafael River D | – | 285.88 | 285.88 |
|    UT-020-SRD-San Rafael River E | – | 1,437.07 | 1,437.07 |

AR000635

| Lease Name<br>LWC Unit Name* | Acres Not in LWC | Acres in LWC | Total Acres |
|---|---|---|---|
| UT-050-16-02 Blackburn Draw | 2.01 | – | 2.01 |
| Other | 186.82 | – | 186.82 |
| UTU93469 | 1,880.34 | 36.62 | 1,916.96 |
| UT-020-SRD-San Rafael River E | – | 36.62 | 36.62 |
| UT-050-16-02 Blackburn Draw | 1,157.20 | – | 1,157.20 |
| Other | 723.15 | – | 723.15 |
| UTU93470 | 571.37 | 1,346.90 | 1,918.26 |
| UT-020-SRD-010 | 42.26 | – | 42.26 |
| UT-020-SRD-San Rafael River E | – | 1,346.90 | 1,346.90 |
| UT-050-16-02 Blackburn Draw | 519.51 | – | 519.51 |
| Other | 9.60 | – | 9.60 |
| UTU93471 | 1,945.54 | – | 1,945.54 |
| UT-020-SRD-010 | 532.59 | – | 532.59 |
| UT-050-16-02 Blackburn Draw | 1,405.16 | – | 1,405.16 |
| Other | 7.80 | – | 7.80 |
| UTU93472 | 2,554.98 | – | 2,554.98 |
| UT-020-SRD-010 | 51.76 | – | 51.76 |
| UT-050-16-02 Blackburn Draw | 2,501.11 | – | 2,501.11 |
| Other | 2.11 | – | 2.11 |
| UTU93473 | 1,917.32 | – | 1,917.32 |
| UT-050-16-02 Blackburn Draw | 1,914.75 | – | 1,914.75 |
| Other | 2.56 | – | 2.56 |
| UTU93474 | 2,333.60 | 222.58 | 2,556.19 |
| UT-020-SRD-008 B | 210.86 | – | 210.86 |
| UT-020-SRD-008 C | 1,505.97 | – | 1,505.97 |
| UT-020-SRD-San Rafael River D | – | 222.58 | 222.58 |
| UT-020-SRD-San Rafael River G | 152.02 | – | 152.02 |
| Other | 464.76 | – | 464.76 |
| UTU93475 | 0.00 | 1,967.32 | 1,967.32 |
| UT-020-SRD-San Rafael River D | – | 1,967.32 | 1,967.32 |
| Other | 0.00 | – | 0.00 |
| UTU93476 | 0.00 | 1,969.40 | 1,969.40 |
| UT-020-SRD-San Rafael River D | – | 1,969.40 | 1,969.40 |
| Other | 0.00 | – | 0.00 |

AR000636

| Lease Name<br>LWC Unit Name* | Acres Not in LWC | Acres in LWC | Total Acres |
|---|---|---|---|
| UTU93477 | 9.16 | 2,006.82 | 2,015.97 |
| UT-020-SRD-008 C | 7.99 | – | 7.99 |
| UT-020-SRD-San Rafael River D | – | 2,006.82 | 2,006.82 |
| Other | 1.17 | – | 1.17 |
| UTU93478 | 1.83 | 1,316.01 | 1,317.83 |
| UT-020-SRD-San Rafael River D | – | 1,316.01 | 1,316.01 |
| Other | 1.83 | – | 1.83 |
| UTU93479 | – | 2,557.70 | 2,557.70 |
| UT-020-SRD-San Rafael River D | – | 2,557.70 | 2,557.70 |
| UTU93480 | 2.67 | 1,915.85 | 1,918.52 |
| UT-020-SRD-San Rafael River D | – | 1,507.60 | 1,507.60 |
| UT-020-SRD-San Rafael River E | – | 408.25 | 408.25 |
| Other | 2.67 | – | 2.67 |
| UTU93481 | 4.99 | 2,547.08 | 2,552.07 |
| UT-020-SRD-San Rafael River D | – | 866.13 | 866.13 |
| UT-020-SRD-San Rafael River E | – | 1,680.96 | 1,680.96 |
| Other | 4.99 | – | 4.99 |
| UTU93482 | 341.69 | 1,576.42 | 1,918.11 |
| UT-020-SRD-011 | 149.91 | – | 149.91 |
| UT-020-SRD-San Rafael River D | – | 1,567.09 | 1,567.09 |
| UT-020-SRD-San Rafael River E | – | 9.33 | 9.33 |
| UT-020-SRD-San Rafael River H | 185.69 | – | 185.69 |
| Other | 6.08 | – | 6.08 |
| UTU93483 | 280.68 | 2,276.73 | 2,557.42 |
| UT-020-SRD-010 | 189.37 | – | 189.37 |
| UT-020-SRD-011 | 80.94 | – | 80.94 |
| UT-020-SRD-San Rafael River D | – | 512.16 | 512.16 |
| UT-020-SRD-San Rafael River E | – | 1,764.58 | 1,764.58 |
| Other | 10.38 | – | 10.38 |
| UTU93484 | 128.57 | 1,788.05 | 1,916.62 |
| UT-020-SRD-010 | 124.66 | – | 124.66 |
| UT-020-SRD-San Rafael River E | – | 1,788.05 | 1,788.05 |
| Other | 3.91 | – | 3.91 |

AR000637

| Lease Name<br>LWC Unit Name* | Acres Not in LWC | Acres in LWC | Total Acres |
|---|---|---|---|
| UTU93485 | 1,951.10 | – | 1,951.10 |
| UT-020-SRD-011 | 1,949.94 | – | 1,949.94 |
| Other | 1.16 | – | 1.16 |
| UTU93486 | 1,947.70 | – | 1,947.70 |
| UT-020-SRD-010 | 1,356.41 | – | 1,356.41 |
| UT-020-SRD-011 | 586.39 | – | 586.39 |
| Other | 4.90 | – | 4.90 |
| UTU93487 | 1,979.27 | – | 1,979.27 |
| UT-020-SRD-010 | 1,979.27 | – | 1,979.27 |
| Other | 0.00 | – | 0.00 |
| UTU93489 | 2,136.88 | 303.02 | 2,439.91 |
| UT-020-SRD-Sweetwater Reef A | – | 303.02 | 303.02 |
| UT-020-SRD-011 | 1,224.64 | – | 1,224.64 |
| UT-050-16-01 Flat Tops | 901.33 | – | 901.33 |
| Other | 10.92 | – | 10.92 |
| UTU93491 | 2,516.21 | – | 2,516.21 |
| UT-020-SRD-010 | 1,892.05 | – | 1,892.05 |
| UT-050-16-01 Flat Tops | 168.57 | – | 168.57 |
| UT-050-16-02 Blackburn Draw | 446.39 | – | 446.39 |
| Other | 9.20 | – | 9.20 |
| UTU93492 | 1,599.09 | – | 1,599.09 |
| UT-050-16-01 Flat Tops | 1,595.88 | – | 1,595.88 |
| Other | 3.20 | – | 3.20 |
| UTU93493 | 2,458.69 | – | 2,458.69 |
| UT-050-16-01 Flat Tops | 2,098.20 | – | 2,098.20 |
| UT-050-16-02 Blackburn Draw | 354.22 | – | 354.22 |
| Other | 6.27 | – | 6.27 |
| UTU93494 | 1,879.55 | – | 1,879.55 |
| UT-050-16-01 Flat Tops | 142.75 | – | 142.75 |
| UT-050-16-02 Blackburn Draw | 1,733.70 | – | 1,733.70 |
| Other | 3.10 | – | 3.10 |
| UTU93495 | 852.78 | 1,118.92 | 1,971.70 |
| UT-020-SRD-009 | 844.30 | | 844.30 |
| UT-020-SRD-San Rafael River D | – | 1,118.92 | 1,118.92 |

| Lease Name<br>LWC Unit Name* | Acres Not in LWC | Acres in LWC | Total Acres |
|---|---|---|---|
| Other | 8.48 | – | 8.48 |
| UTU93496 | 0.00 | 1,966.26 | 1,966.26 |
| UT-020-SRD-San Rafael River D | – | 1,966.26 | 1,966.26 |
| Other | 0.00 | – | 0.00 |
| UTU93497 | 0.00 | 2,005.24 | 2,005.24 |
| UT-020-SRD-San Rafael River D | – | 2,005.24 | 2,005.24 |
| Other | 0.00 | – | 0.00 |
| UTU93498 | 0.00 | 1,323.30 | 1,323.30 |
| UT-020-SRD-San Rafael River D | – | 1,323.30 | 1,323.30 |
| Other | 0.00 | – | 0.00 |
| UTU93499 | 2,371.78 | 185.27 | 2,557.04 |
| UT-020-SRD-Sweetwater Reef A | – | 5.57 | 5.57 |
| UT-020-SRD-009 | 2,366.40 | – | 2,366.40 |
| UT-020-SRD-San Rafael River D | – | 179.70 | 179.70 |
| Other | 5.37 | – | 5.37 |
| UTU93500 | 176.16 | 1,741.69 | 1,917.84 |
| UT-020-SRD-Sweetwater Reef A | – | 167.32 | 167.32 |
| UT-020-SRD-009 | 169.79 | – | 169.79 |
| UT-020-SRD-San Rafael River D | – | 1,574.37 | 1,574.37 |
| Other | 6.36 | – | 6.36 |
| UTU93501 | 0.00 | 2,550.13 | 2,550.14 |
| UT-020-SRD-San Rafael River D | – | 2,550.13 | 2,550.13 |
| Other | 0.00 | – | 0.00 |
| UTU93502 | 823.41 | 1,093.82 | 1,917.23 |
| UT-020-SRD-Sweetwater Reef A | – | 1,093.82 | 1,093.82 |
| UT-020-SRD-009 | 818.92 | – | 818.92 |
| Other | 4.49 | – | 4.49 |
| UTU93503 | 3.52 | 2,553.15 | 2,556.67 |
| UT-020-SRD-Sweetwater Reef A | – | 2,182.12 | 2,182.12 |
| UT-020-SRD-San Rafael River D | – | 371.03 | 371.03 |
| Other | 3.52 | – | 3.52 |
| UTU93504 | 148.20 | 1,768.27 | 1,916.47 |
| UT-020-SRD-Sweetwater Reef A | – | 22.05 | 22.05 |
| UT-020-SRD-011 | 144.22 | – | 144.22 |

AR000639

| Lease Name<br>LWC Unit Name* | Acres Not in LWC | Acres in LWC | Total Acres |
|---|---|---|---|
| UT-020-SRD-San Rafael River D | – | 1,746.22 | 1,746.22 |
| Other | 3.98 | – | 3.98 |
| UTU93505 | – | 1,950.64 | 1,950.64 |
| UT-020-SRD-Sweetwater Reef A | – | 1,950.64 | 1,950.64 |
| UTU93506 | – | 1,951.41 | 1,951.41 |
| UT-020-SRD-Sweetwater Reef A | – | 1,951.41 | 1,951.41 |
| UTU93507 | 331.74 | 1,650.49 | 1,982.23 |
| UT-020-SRD-Sweetwater Reef A | – | 1,650.49 | 1,650.49 |
| UT-020-SRD-011 | 327.27 | – | 327.27 |
| Other | 4.47 | – | 4.47 |
| UTU93508 | 902.85 | 334.03 | 1,236.88 |
| UT-020-SRD-Sweetwater Reef A | – | 334.03 | 334.03 |
| UT-020-SRD-011 | 897.62 | – | 897.62 |
| Other | 5.23 | – | 5.23 |
| UTU93509 | 0.28 | 2,556.16 | 2,556.44 |
| UT-020-SRD-Sweetwater Reef A | – | 2,556.16 | 2,556.16 |
| Other | 0.28 | – | 0.28 |
| UTU93510 | – | 1,918.31 | 1,918.31 |
| UT-020-SRD-Sweetwater Reef A | – | 1,918.31 | 1,918.31 |
| UTU93511 | 24.38 | 2,466.58 | 2,490.96 |
| UT-020-SRD-Sweetwater Reef A | – | 2,466.58 | 2,466.58 |
| UT-020-SRD-011 | 6.91 | – | 6.91 |
| UT-050-16-01 Flat Tops | 15.60 | – | 15.60 |
| Other | 1.87 | – | 1.87 |
| UTU93512 | 3.82 | 1,913.13 | 1,916.95 |
| UT-020-SRD-Sweetwater Reef A | – | 1,913.13 | 1,913.13 |
| Other | 3.82 | – | 3.82 |
| UTU93513 | 312.55 | 2,244.75 | 2,557.31 |
| UT-020-SRD-Sweetwater Reef A | – | 2,244.75 | 2,244.75 |
| UT-050-16-03 Cowpatty Ranch | 304.04 | – | 304.04 |
| Other | 8.52 | – | 8.52 |
| UTU93514 | 875.08 | 980.35 | 1,855.43 |
| UT-020-SRD-Sweetwater Reef A | – | 980.35 | 980.35 |
| UT-050-16-01 Flat Tops | 869.31 | – | 869.31 |

| Lease Name<br>LWC Unit Name* | Acres Not in LWC | Acres in LWC | Total Acres |
|---|---|---|---|
| Other | 5.77 | – | 5.77 |
| UTU93518 | 1,051.27 | 269.40 | 1,320.68 |
| UT-020-SRD-009 | 1,048.57 | – | 1,048.57 |
| UT-020-SRD-San Rafael River D | – | 269.40 | 269.40 |
| Other | 2.70 | – | 2.70 |
| UTU93519 | 1,058.85 | 1,497.87 | 2,556.72 |
| UT-020-SRD-Sweetwater Reef A | – | 1,497.87 | 1,497.87 |
| UT-020-SRD-San Rafael River F | 1,052.52 | – | 1,052.52 |
| Other | 6.33 | – | 6.33 |
| UTU93520 | 1,590.89 | 325.66 | 1,916.55 |
| UT-020-SRD-Sweetwater Reef A | – | 224.46 | 224.46 |
| UT-020-SRD-009 | 106.46 | – | 106.46 |
| UT-020-SRD-San Rafael River B | – | 101.20 | 101.20 |
| UT-020-SRD-San Rafael River F | 1,475.97 | – | 1,475.97 |
| Other | 8.47 | – | 8.47 |
| UTU93521 | 2,550.96 | 2.29 | 2,553.25 |
| UT-020-SRD-Sweetwater Reef A | – | 2.29 | 2.29 |
| UT-020-SRD-009 | 2,515.21 | – | 2,515.21 |
| UT-020-SRD-San Rafael River F | 34.15 | – | 34.15 |
| Other | 1.59 | – | 1.59 |
| UTU93523 | 18.31 | 2,536.86 | 2,555.17 |
| UT-020-SRD-Sweetwater Reef A | – | 2,536.86 | 2,536.86 |
| UT-020-SRD-San Rafael River F | 16.22 | – | 16.22 |
| Other | 2.09 | – | 2.09 |
| UTU93524 | 1,650.40 | 266.72 | 1,917.13 |
| UT-020-SRD-Sweetwater Reef A | – | 266.72 | 266.72 |
| UT-020-SRD-009 | 1,645.06 | – | 1,645.06 |
| UT-020-SRD-San Rafael River F | 0.20 | – | 0.20 |
| Other | 5.14 | – | 5.14 |
| UTU93525 | – | 1,874.41 | 1,874.41 |
| UT-020-SRD-Sweetwater Reef A | – | 1,874.41 | 1,874.41 |
| UTU93526 | 0.19 | 2,468.59 | 2,468.79 |
| UT-020-SRD-Sweetwater Reef A | – | 2,468.59 | 2,468.59 |
| Other | 0.19 | – | 0.19 |

| Lease Name<br>LWC Unit Name* | Acres Not in LWC | Acres in LWC | Total Acres |
|---|---|---|---|
| UTU93527 | 5.86 | 2,420.77 | 2,426.63 |
| UT-020-SRD-Sweetwater Reef A | – | 2,420.77 | 2,420.77 |
| UT-020-SRD-009 | 0.34 | – | 0.34 |
| Other | 5.53 | – | 5.53 |
| UTU93530 | 1.05 | 2,514.96 | 2,516.02 |
| UT-020-SRD-Sweetwater Reef A | – | 2,514.96 | 2,514.96 |
| Other | 1.05 | – | 1.05 |
| UTU93533 | – | 1,880.67 | 1,880.67 |
| UT-020-SRD-Sweetwater Reef A | – | 1,880.67 | 1,880.67 |
| UTU93534 | 556.75 | 349.22 | 905.98 |
| Unknown | 551.92 | | 551.92 |
| UT-020-SRD-007 | – | 349.22 | 349.22 |
| Other | 4.83 | – | 4.83 |
| UTU93713 | 1,408.01 | – | 1,408.01 |
| UT-020-SRD-Labyrinth Canyon B | 1,379.74 | – | 1,379.74 |
| Other | 28.27 | – | 28.27 |
| **Total** | **46,053.99** | **75,494.99** | **121,548.98** |

*In this table, "Other" refers to acres or units that are not identified as LWC and/or were not inventoried for LWC.

### 3.3.4.2    Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its leasing decisions for the 59 leases. Three APDs, all in the UT-020-SRD-San Rafael River D LWC unit, were approved on September 20, 2023. Notably, BLM has not yet determined management for the LWC units identified after the publication of the RMP. Leasing itself does not directly impact the naturalness of LWCs, nor the outstanding opportunities for solitude and primitive recreation on such lands. However, the issuance of leases allows for mineral exploration and development activities to occur. Such mineral development in leased areas intersecting LWCs could cause indirect or direct impacts to wilderness characteristics, such as size, naturalness, solitude, and recreational opportunities in LWC areas. Approximately 62% the total acreage of all 59 leases would overlap with an LWC unit. The presence of new oil and gas infrastructure on relatively undisturbed public lands would change the character of such areas. Depending on topography, vegetation removal, grading, and the development of well pads could reduce the apparent naturalness and scenic qualities in LWC areas and reduce the quality of solitude or primitive recreational experiences. Additionally, mineral exploration and development would result in the construction or improvement of access roads, increased traffic, use of heavy machinery, and presence of workers on the landscape, all of which would produce increased levels of noise, alter the viewshed, depreciate apparent naturalness, and reduce opportunities for solitude and primitive recreation. The use of hazardous materials in mineral development sites could also harm vegetation, water resources, and wildlife in LWCs, further altering the naturalness of such lands.

The degree of the intensity of such impacts to wilderness characteristics would be influenced by the location of surface-disturbing activities, existing vehicle access to the lease, the size of the drill pad area and any associated temporary or permanent disturbance, surrounding landforms and topography, vegetation type, season of development, and reclamation processes and their duration. Areas with more terrain variation and elevation differences will offer more topographic screening of the sights and sounds of lease development. Flatter, more open areas will allow sights and sounds to be more noticeable at a greater distance from the well pad or access road. Likewise, larger vegetation, such as trees and large shrubs can help to visually screen or absorb the sounds of development more effectively. Within the lease area, the shoulder seasons of spring and fall see the most public visitation. Development during the months of moderate temperatures will likely be most noticeable and disturbing to visitors.

The highest degree of noticeable visual and auditory impacts from leasing development would be temporary and localized to the construction area and access routes, occurring during the construction, drilling, and interim reclamation phase (30-60 days). Following this period of intense activity, removal of equipment and interim reclamation of the well pad would be expected to mitigate some impacts to wilderness characteristics, with the exception of apparent naturalness within the vicinity of new developments. The long-term impacts of new surface disturbances in LWCs are two-fold: first, native vegetation in the disturbed areas may take decades to fully recover in the high desert environment even with reseeding efforts and may be hindered by grazing, invasive species, and climate change; second, improved or new access routes may increase the overall level of OHV traffic and dispersed recreation use in a given area, thereby contributing to diminishing outstanding solitude or primitive recreation opportunities and creating more impacts to naturalness from route proliferation, campsite expansion, trash, wildfires, invasive weeds, vegetation loss, and soil disturbances. Additionally, if any leases result in production wells, direct impacts including increased noise levels, changes to the viewshed, reduced naturalness, and consistent presence of workers could reasonably last for roughly 20 years into the future. Although BLM can attempt to close newly created routes or sites to public access with signs and fencing, in the open, remote environment of the lease area, enforcement and compliance can often be challenging and unsuccessful.

Per BLM Manual 6310, wilderness inventory boundaries are created by rights-of-way and constructed or improved roads (BLM 2021f). Construction or improvements of vehicle access routes to leases could potentially split or bisect a LWC unit by creating a new wilderness inventory boundary. This may result in a portion of the unit that no longer meets size criteria for LWCs thus producing a long-term loss of LWC acreage. There is potential for impacts to any portion of the 75,494.99 acres of LWCs that overlap leases through the development of those leases. However, as previously mentioned, based on the RFDS, which anticipates development of only eight wells, BLM expects that there would only be direct impacts to a maximum of 83.2 acres of LWCs. It is possible that indirect impacts would extend beyond the discrete bounds of physical disturbance. Noise from construction work and traffic may permeate into LWC areas, reducing the feeling of solitude and the naturalness of the area. The presence of workers would also reduce the feeling of solitude and may contribute to the span of noise pollution. Light pollution may also be a factor and may alter the appearance of the night sky in LWC areas near development activity.

Notably, all leases have NSO stipulations for slopes greater than 40%, intermittent and perennial streams, natural springs, and most leases have NSO stipulations for Mexican spotted owl nest sites. Most leases also have CSU stipulations for fragile slopes or slopes between 20% and 40% (for stipulation information, see Appendix B). This would limit development in those LWC areas overlapping leases that meet such criteria. Where applicable, these NSO stipulations would essentially eliminate impacts to LWC areas as no development could occur on the surface. However, the NSO stipulations only apply to areas meeting the criteria described above (slopes, perennial streams and natural springs, and Mexican spotted

owl nest sits). CSU stipulations would impose mitigations on development activity, thereby reducing the severity of development impacts but not removing all impacts to LWCs entirely.

Potential impacts of oil and gas development on designated LWCs were disclosed in the Price Field Office Proposed Resource Management Plan/Final EIS:

> Construction and operation of oil and gas wells and associated support facilities, including roads, surface and buried pipelines, powerlines, compressor stations, and other permanent structures, would create soil and vegetation disturbance and visual intrusions. The affected portions of non-WSA lands with wilderness characteristics would no longer appear natural. In addition to site-specific surface disturbance, the cumulative number of wells and density of spacing would change the natural appearance of the landscape to an industrial landscape. The noise of construction and operation of producing wells, including the presence of work crews, vehicles, and equipment, would degrade the quality of opportunities for solitude and primitive and unconfined recreation in proximity to industrial development. The sights and sounds of development would diminish with distance from the intrusions and activities; however, it is expected that sights and sounds from development would reduce the quality of opportunities for solitude and primitive and unconfined recreation up to a half-mile beyond the direct loss of natural appearance. Given the number and spacing of industrial facilities, the quality of opportunities for solitude and primitive recreation could be degraded throughout the areas with wilderness characteristics. (BLM 2008c:4–190)

Impacts to wilderness characteristics for any LWC units that were not analyzed during the RMP process are expected to be similar to those listed under the analyzed LWCs. Potential impacts would not necessarily immediately exclude an LWC unit from a future RMP decision protecting LWCs. However, impacts could potentially reduce the size, apparent naturalness, outstanding solitude, and/or primitive recreation of a given area below the threshold to qualify as LWC. If an updated LWC inventory post-lease development were to determine the area no longer possessed LWC, then that unit would not be considered in future RMP decisions for LWC management

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the BLM would cancel the 49 leases in LWC or wilderness areas, an area equivalent to 76,903 acres, thereby essentially eliminating all impacts listed under the No Action Alternative. No development would occur within the boundaries of these areas and their sizes would not be impacted or reduced to a level at which they no longer meet the 5,000-acre minimum. Impacts to apparent naturalness, outstanding solitude or primitive recreation, and supplemental values would not occur.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not result in any potential impacts to LWCs, as the leases would be cancelled and not developed at this time.

### 3.3.4.3    Mitigation Measures and Residuals Effects

There are no required design constraints or mitigation measures for LWCs.

### 3.3.4.4    Cumulative Effects

Cumulative impact analysis for LWCs was limited to the following units: Sweetwater Reef A, UT-020-SRD-007, San Rafael River D, and San Rafael River E. This area was chosen because these are the LWCs that would be directly impacted by the affirmation of the leases. Past, present, and reasonably foreseeable actions that have affected and will likely continue to affect wilderness characteristics in the planning area

include oil and gas development, range improvements, increasing recreational demands on public lands, OHV use, issuance of ROWs, and ongoing travel management planning for the PFO. These activities could introduce sights, noises, and infrastructure in or adjacent to LWCs, which could impair the feeling of solitude and degrade naturalness. Increasing visitor use in the planning area will likely intensify use of BLM-administered lands, including LWCs, potentially impacting wilderness characteristics by reducing opportunities for solitude. As part of the travel management process, the BLM may designate additional routes as closed or open to motor vehicles. Use of these designated travel routes by OHVs and other vehicles in LWCs would also introduce sights and noises that could impair the feeling of solitude and degrade naturalness. Any of these actions could also result in surface-disturbing activities that could affect the size of LWC units by reducing or eliminating portions of the LWC units. Some units could be bisected by new rights of way, or unauthorized surface disturbance could result in the degradation of wilderness characteristics. This could result in some areas, or entire LWC units, no longer meeting the minimum size criterion (5,000 acres) or no longer possessing sufficient naturalness or outstanding opportunities for solitude or primitive recreation to qualify as LWC.

Oil and gas development typically have a large footprint of road construction and surface disturbance, and therefore can cause a large impact to wilderness characteristics over course of operations. However, as noted in the RFDS, it is anticipated that only eight wells would be developed, with a maximum disturbance area of 83.2 acres.

### 3.3.5    Wilderness

*Issue Statement: How would proposed and potential development of issued leases impact undeveloped, untrammeled, natural, and outstanding areas of solitude or primitive, unconfined recreation in designated Wilderness areas?*

#### 3.3.5.1    Affected Environment

Wilderness areas, which are designated by Congress using the powers granted under the Wilderness Act of 1964, are undeveloped, intact areas of public land managed to preserve the integrity of their wilderness character. There is one such area in the PFO that overlaps one lease: Labyrinth Canyon Wilderness. Labyrinth Canyon Wilderness has an area of 54,643 acres, 1,397.74 acres (2.6%) of which overlap with Lease UTU93713. A road that runs through a portion of the lease (28.27 acres) was not included within the wilderness boundary. Labyrinth Canyon Wilderness was designated as wilderness on March 12, 2019, under the John D. Dingell, Jr. Conservation, Management, and Recreation Act, and per the Wilderness Act of 1964, all mineral estate within the established boundary of the wilderness area is subsequently withdrawn under all laws pertaining to mineral leasing (Public Law [PL] 116-9, Public Law [PL] 88-577). This lease was issued on February 8, 2019, prior to the wilderness designation, and as such, qualifies as a valid existing right under the provisions of the Wilderness Act. The Labyrinth Canyon Wilderness is located in Emery County, Utah, between the Green River Road and the right or west bank of the Green River, from its confluence with the San Rafael River south to the Emery and Wayne County line. The wilderness area includes a vast scenic landscape of high, flat sagebrush-covered ridges and mesas combined with slick rock escarpments and sandstone canyons that flow east into the Green River. Visitation is lower than at many other surrounding areas of public lands such as Moab or the San Rafael Swell, providing outstanding opportunities for experiencing solitude. Outstanding primitive recreation opportunities include camping, hiking, backpacking, climbing, and canyoneering. In particular, the road that provides access to Lease UTU93713 is also used by recreationists to access a popular, highly scenic camping location and trailhead for Fivehole or Colonnade Arch overlooking the Green River. Supplemental values include outstanding scenery, Colorado Plateau geology, cultural sites, riparian areas, and wildlife habitat. Table 3-21 shows the number of acres of wilderness units overlapping leases.

**Table 3-21. Acreage of Overlap Between Leases and Designated Wilderness Units**

| Lease Unit Wilderness Area Unit Name | Acreage not in Wilderness Area | Acreage in Labyrinth Canyon Wilderness Area | Total Acres |
|---|---|---|---|
| UTU93713 | 28.27 | 1,379.74 | 1,408.01 |

### 3.3.5.2    Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm, among others, its leasing decision for lease UTU93713 located within the Labyrinth Canyon Wilderness. Affirming the lease would not itself directly impact the naturalness of the wilderness area. However, the issuance of leases allows for mineral exploration and development activities to occur. Such mineral development in leased areas intersecting or adjacent to wilderness would likely cause indirect or direct impacts to wilderness character within the vicinity of the lease. The presence of new oil and gas infrastructure on relatively undisturbed public lands would change the character of the wilderness area. Vegetation removal, grading, and the development of well pads would degrade the qualities of naturalness and undeveloped character of the wilderness. Additionally, mineral exploration and development would result in road upgrades, increased vehicle traffic, use of heavy machinery, and presence of workers during drilling and reclamation operations, all of which would produce increased levels of mechanical noise and presence of humans, degrading outstanding opportunities to experience solitude and primitive recreation in both the short and long term. The use of hazardous materials in mineral development sites could also harm vegetation, riparian areas, and wildlife habitat in the wilderness, further altering naturalness and supplemental values. Noise and light pollution from construction and operational activities within the Labyrinth Canyon Wilderness would have effects on the natural soundscape and quality of night skies that could range beyond the immediate vicinity of construction and operational activities, permeating more remote regions of the wilderness area.

Although Lease UTU93713 overlaps 1,379.74 acres of wilderness, as shown above in Table 3-21, the RFDS makes clear that at most, only one of the eight wells accounted for in the RFDS is likely to be developed on this (or any other) lease. The single well would likely result in 10.4 acres of direct disturbance to the Labyrinth Canyon Wilderness. Per BLM Manual 6340, *Management of Designated Wilderness Areas*, mineral leases existing prior to the date of an area's designation as wilderness can be operated under the original terms and conditions.

Lease UTU93713 is located almost entirely on a high, flat, sandy, sagebrush plateau with slopes of less than 5% within the Labyrinth Canyon Wilderness. The elevation and slope aspect at UTU93713 offers some topographic screening of potential impacts from other parts of the wilderness, especially looking from the north or east. Potential impacts within UTU93713 would be most visible from locations to the south or west. The majority of potential road upgrades and pipeline development could occur within the 200-foot width of the cherry-stem road (defined as a dead-end road which extends into a wilderness inventory unit but is excluded from the unit [BLM 2021f]), which lies outside the wilderness boundary and provides existing access to the lease. However, during exploration, a well pad of approximately 4 acres in size is likely to be constructed on lands within the wilderness area immediately adjacent to the road. The ultimate amount of potential surface disturbance within the wilderness would depend on the results of exploration and any subsequent developments or reclamation. The black sagebrush vegetation dominant within the lease is likely to take decades to fully return to natural conditions prior to disturbance. Reseeding and revegetation efforts are likely to be hindered by grazing, invasive species, and climate change. A long-term impact from lease exploration, regardless of outcome, would be the

existence of a capped well. The well head and casing below ground would be a permanent degradation of the undeveloped quality of the wilderness area and withdrawn mineral estate.

Currently, the access route to UTU93713 requires high clearance vehicles to navigate safely over several sections of slick rock. It is likely that the access road to lease UTU93713 would need to be improved and widened to allow for heavy machinery access and/or pipeline construction. These potential upgrades to the route could increase OHV use and visitation to this area of the wilderness, particularly the trailhead for Fivehole or Colonnade Arch. Increased traffic and visitation could degrade outstanding opportunities for solitude and natural, undeveloped qualities of wilderness character within this part of the Labyrinth Canyon Wilderness.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the BLM would cancel Lease UTU93713 that overlaps designated wilderness. This alternative would essentially remove all direct impacts to the Labyrinth Canyon Wilderness, as Lease UTU93713 would be cancelled and not developed.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not result in any potential impacts to the Labyrinth Canyon Wilderness, as Lease UTU93713 would be cancelled and not developed. If cancelled, Lease UTU93713 would not be available for future leasing.

### 3.3.5.3     Mitigation Measures and Residual Effects

There are no required design constraints or mitigation measures for wilderness areas.

### 3.3.5.4     Cumulative Effects

The CIAA for wilderness includes the Labyrinth Canyon Wilderness. This area was chosen because it represents the wilderness areas that would be directly impacted by the affirmation of the leases. Past, present, and reasonably foreseeable actions in the vicinity of Labyrinth Canyon Wilderness that have affected and will likely continue to affect wilderness areas including potential well development as noted in the RFDS, increasing recreational demands on public lands, OHV use, issuance of ROWs, and ongoing travel management planning for the PFO. These activities could introduce sights, noises, and infrastructure in or adjacent to the wilderness area, which could impair the feeling of solitude and degrade naturalness. Increasing visitor use in the planning area will likely intensify use of BLM-administered lands, including wilderness areas, potentially reducing opportunities for solitude.

## 3.3.6     Soundscapes

*Issue Statement: How would proposed and potential development of issued leases affect the visitor experience with regard to natural soundscapes on public lands and nearby National Parks?*

### 3.3.6.1     Affected Environment

The acoustic environment, or soundscape, is the combination of all sounds in a given area. These include natural sounds, such as from wind and water and those sounds caused by insects, birds, other wildlife, and humans. Human-caused sounds are considered noise because they have the potential to affect the natural acoustical environment and the noise-sensitive resources in that environment. The surrounding communities, wilderness areas, and parks have soundscapes which enrich visitor's experience of the natural park environment and allow wildlife to better hear and communicate for survival. In the United States, noise is regulated as a nuisance by local counties and municipalities. National parks employ

AR000647

science research, BMPs, and quiet technologies to reduce disruptive sound levels and optimize the natural soundscape environment. Each national park has a unique soundscape, and these sounds are central to a visitor's experience in a park (NPS 2017).

Canyonlands National Park and Goblin Valley State Park are located 5 miles from the nearest of the leases, and the town of Hanksville, Utah, is located 9.2 miles from the nearest of the leases. The Labyrinth Canyon Wilderness overlaps with Lease UTU93713. Communities surrounding the leases are rural. Rural background noise in wilderness and rural areas are about 40 dBA (EPA 1978). The EPA guideline for residential noise is 55 dBA (EPA 1974). Sound levels in national parks and wilderness areas can vary greatly, ranging from among the quietest ever monitored to extremely loud. Table 3-22 provides some examples of sound pressure levels measured in national parks (NPS 2018).

**Table 3-22. National Park Service Measured Sound Pressure Levels**

| Sound Level (dBA) | Sound Source | Location |
|---|---|---|
| 0 | Threshold of human hearing | |
| 10 | Volcano crater | Haleakala National Park |
| 20 | Leaves rustling | Canyonlands National Park |
| 40 | Crickets at 5 meters | Zion National Park |
| 60 | Conversational speech at 5 meters | Whitman Mission National Historic Site |
| 80 | Cruiser motorcycle at 15 meters | Blue Ridge Parkway |
| 100 | Thunder | Arches National Park |
| 120 | Military jet at 100 meters at ground level | Yukon-Charley Rivers National Park |
| 126 | Cannon fire at 150 meters | Vicksburg National Military Park |

Noise levels are expressed in A-weighted decibels (dBA), which is a measure of sound as the human ear experiences it. The table above shows that, for instance, the measured sound level at Canyonlands National Park for rustling leaves was 20 dBA. The NPS provides a national soundscape map showing the typical noise level in particular areas across the United States. The NPS national soundscape map shows an L50, the noise level exceeded for 50% of the measurement duration, of approximately 30 dBA for the leases (NPS 2021). Rural background noise in wilderness and rural areas is about 40 dBA (EPA 1978).

### 3.3.6.2    Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its previous leasing decisions for the 59 leases. The leases include the standard lease terms and conditions for development of surface oil and gas leases. Given that all 59 leases would be affirmed, there is a potential for oil and gas development, thus the potential for impacts to the soundscape. There are no county noise ordinances in Emery County that quantify a noise threshold; however, a 10dBA or greater increase above background noise levels is generally accepted as sufficient to cause noise pollution (BLM 2022c).

There are differences in noise levels associated with each stage of drilling and production, including the construction of the well pad and access roads, drilling, completion, and production. The BLM published typical noise levels from oil and gas activity are presented in Table 3-23. The sound levels shown are measured at a distance of 50 feet. Also, in the course of developing the *September 2018 Oil and Gas*

AR000648

*Lease Sale Environmental Assessment*, a sound model was produced to see how noise levels associated with future mineral resource development would impact recreationists at the Canyonlands National Park Horseshoe Canyon Unit (Unit) near the two closest leases to the Unit at that time. This sound model demonstrated that a pump jack during drill pad operations generated, on average, 82 dB at 400 megahertz (MHz) measured at a distance of 50 feet, which confirms the pump jack operation noise levels in Table 3-23. No additional research regarding oil and gas development noise levels have been completed for the lease areas since the 2018 analysis therefore these assumptions are currently still applicable.

**Table 3-23. Noise Levels Associated with Oil and Gas Activity**

| Noise Source | Sound Level and 50 Feet |
|---|---|
| Well drilling | 83 dBA |
| Pump jack operation | 82 dBA |
| Produced water injection facilities | 71 dBA |

Source: BLM (2000).

Note: Sound levels are based on highest measured sound levels and are normalized to a distance of 50 feet from the source.

Using the highest noise level from the table above, the measured 83 dBA from a distance of 50 feet, and the inverse square law, the potential noise level can be estimated. At a distance of 5 miles (26,400 feet), which is the distance from either Canyonlands National Park or Goblin Valley State Park to the nearest lease, the potential noise level would be 28.5 dBA. The NPS national soundscape map shows background noise level of approximately 30 dB in the lease area (NPS 2021), and Canyonlands National Park has a measured background noise level of 20 dBA from rustling leaves. Therefore, the potential 28.5 dBA is below a 10-dBA increase over the measured Canyonlands National rural background noise and the NPS national soundscape map. Using the same methodology, the potential noise level at Hanksville, Utah, can also be estimated. At a distance of 9 miles (47,520 feet), which is the distance from Hanksville, Utah, to the nearest lease, the potential noise level would be 23.4 dBA. The NPS national soundscape map shows background noise level of approximately 30 dB in the lease area (NPS 2021), and rural background noise in wilderness and rural areas are about 40 dBA (EPA 1978). Therefore, the potential 23.4 dBA is below a 10-dBA increase over the rural background noise level and less than the NPS soundscape map background noise level. Based on these results, development would not result in any potential impacts to soundscapes.

Additionally, Lease UTU93713 overlaps acres of the Labyrinth Canyon Wilderness, which increases the potential for direct noise disturbance to the Labyrinth Canyon Wilderness. The sound levels in Table 3-23 and the 2018 sound model demonstrated that at a distance of 50 feet, there was a measured noise level of 82 dB. However, this is measured during the phase with the highest decibel level and would be short-lived (well construction and completion is assumed to last 30–60 days); typical noise levels would be expected to be lower. During construction, heavy equipment, including but not limited to bulldozers, graders, front-end loaders, and track hoes, is used to construct the pad and other features as needed for development. When construction of the well is complete, other associated equipment are moved on-site and erected. Usually, a conventional rotary drill is used. During production, high pressure pumps and a pump jack may be used. Many machines operate intermittently and the types of machines in use at a site change with the phase. Operations can produce low frequency noise that would occur for the potential 20-year life of the well.

All other leases under this alternative would be located at a greater distance and generate noise levels lower than the current background, and therefore would not result in any potential impacts to soundscapes. However, in the long term, the construction or improvements of vehicle access routes could

increase the level of public OHV use and associated visitation near developed leases, causing modest increases to noise levels in localized areas over time.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the BLM would cancel 48 leases (encompassing 75,494.99 acres) that contain identified LWCs and one lease (encompassing 1,408.01 acres) within a designated wilderness area; however, the affirming of the other 10 leases would still allow for potential mineral exploration and drilling activity. Potential impacts to the soundscape would not occur unless these leases are developed; otherwise, the current soundscape would remain intact. Furthermore, the cancellation of leases in LWC or wilderness areas would equate to less direct noise impacts to these areas.

The leases closest to Class I areas, Leases UTU93525 and UTU93533, would be included in the 49 leases that could be cancelled, therefore potentially reducing soundscape impacts to the Canyonlands National Park. Under this alternative, the closest lease to Canyonlands National Park that would not be cancelled is Lease UTU93492, located 13 miles away. The closest lease to Goblin Valley State Park that would not be cancelled is UTU93471, which is 5 miles away. As discussed above, using the highest noise level from Table 3-23, the measured 83 dBA from a distance of 50 feet, and the inverse square law, the potential noise level at a distance of 5 miles (26,400 feet) which is the distance from Goblin Valley State Park to the nearest lease, would be 28.5 dBA. The NPS national soundscape map shows background noise level of approximately 30 dB in the lease area (NPS 2021), therefore, the potential 28.5 dBA is below a 10-dBA increase over the NPS national soundscape map. Hanksville, Utah, is located approximately 9 miles from the nearest of the 10 remaining leases; the additional distance would result in significantly less impact on soundscape. Using the same methodology, the potential noise level at Hanksville, Utah, can also be estimated. Using the measured 83 dBA from a distance of 50 feet, and the inverse square law, the potential noise level at a distance of 9 miles (47,520 feet), which is the distance from Hanksville, Utah, to the nearest lease would be 23.4 dBA. The NPS national soundscape map shows background noise level of approximately 30 dB in the lease area (NPS 2021), and rural background noise in wilderness and rural areas are about 40 dBA (EPA 1978). Therefore, the potential 23.4 dBA is below a 10-dBA increase over the rural background noise level and less than the NPS soundscape map background noise level, therefore development would not result in any potential impacts to soundscapes. The cancellation of leases in wilderness areas would remove potential noise impacts in these areas. The 10 leases affirmed under this alternative would be located at a distance where noise levels from lease development would decrease and be indistinguishable from background noise sources, and therefore would not result in any potential impacts to soundscapes.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would cancel the leases; thus no development of the leases would occur at this time and, therefore, there would be no potential impacts to soundscapes under this alternative.

### 3.3.6.3     Mitigation Measures and Residual Effects

There are no required design constraints or mitigation measures for soundscape.

### 3.3.6.4     Cumulative Effects

The region surrounding Canyonlands National Park and Goblin Valley State Park is relatively pristine. Table 3-22 shows that these natural noise sources can vary greatly, ranging from among the quietest ever monitored to extremely loud. Soundscape is primarily determined by the loudest noise source; however, when two noise sources are within 10dB of each other they cumulatively have the potential to add up to 3

dB to the soundscape. Aside from the one lease directly overlapping the Labyrinth Canyon Wilderness, there is no cumulative impact to National Parks and wilderness areas because noise levels decreased with distance to levels indistinguishable from background noise levels at those locations. However, the lease located within the Labyrinth Canyon Wilderness would have an effect on the soundscape, specifically with construction and drilling having the potential to temporarily but significantly increase noise levels, as shown in Table 3-23 and the 2018 sound model which demonstrated that at a distance of 50 feet, there was a measured noise level of 82 dB which is measured during the phase with the highest decibel level and would be short-lived (well construction and completion is assumed to last 30–60 days); typical noise levels would be expected to be lower. Operational noise levels would be expected to be significantly lower, but given the proximity, operational activities have the potential to produce noise levels above the background levels for the area.

### 3.3.7    Visual Resources

*Issue Statement: How would proposed and potential development of leases affect inventoried visual resource values and management objectives?*

#### 3.3.7.1    Affected Environment

Visual resources on BLM lands are managed using four Visual Resource Management (VRM) classes: VRM Class I, II, III, and IV (BLM 1986). Oil and gas development is not compatible with VRM Class I designated areas, is often not compatible with VRM Class II designated areas, is generally compatible with VRM Class III designated areas, and is compatible with VRM Class IV designated areas (BLM 1986). Most of the lease area is classified as VRM III; however, lease UTU93713 has 313.2 acres of VRM Class II. The lease area is generally characterized by large, uniform land features, linear finger-like drainages, colors ranging from tans to olives with grays, and uniform texture. The lease area is bounded by the San Rafael Swell to the west and northwest and the Horseshoe Canyon NPS unit and the Green River to the southeast. These areas are known for unique visual features such as rare and unusual geologic formations composed of sandstone, limestone, and shale, colorful banding of sandstone cliffs, arches, spires, and dramatic canyons, prehistoric rock art, and prehistoric and historic structures (BLM 2018a). Table 3-23 depicts the VRM classes within and for the adjacent landscape of the lease area.

Key observation points (KOPs) were establised following BLM's Manual 8400, Visual Resource Management. All the KOPs depicted in Figure 3-3 are located in VRM Class III. Each point is associated with a geographic location and viewer type:

- KOP 1: BLM Road 1010 (Horse Bench) – Travel Route

- KOP 2: Five Hole Arch Trailhead – Recreation (not located on a lease)

- KOP 3: BLM Road 1010/1025 – Travel Route

- KOP 4: BLM Road 1010 Antelope Valley – Travel Route

- KOP 5: Utah State Route 24 – Travel Route



**Figure 3-3. Key observation points of the lease area.**

AR000652

A visibility analysis was performed of the lease area. Utilizing feet, which represent heights of typical drilling infrastructure, areas of visibility were calculated for each VRM class visible from each of the five KOPs. A height of 6 feet was used for the typical viewer at the KOP. Figure 3-4 depicts the location of the VRM classes and leases. Figure 3-5 depicts the viewshed analysis, representing what a 6-foot-tall person would see if potential oil and gas equipment would be visible at varying heights of 0 feet (the existing topographic surface), 30 feet, and 50 feet in height.

### 3.3.7.2    Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its previous leasing decisions for all 59 leases. The leases include the standard lease terms and conditions for development of surface oil and gas leases. Given that all 59 leases would be affirmed, there is the potential for oil and gas development. Potential impacts to the visual resources would only occur if the leases were developed, otherwise the current landscape would remain intact.

While affirming the leases would not directly impact visual resources, it does convey an expectation that drilling, development, and production would eventually occur. These impacts would result from development in the form of oil wells/pads, pipelines, compressors, overhead distribution lines, constructed roads, and other linear features. These impacts would include modifications to the existing landscape's form, line, color, and texture, as well as to the overall experience of a visitor.

As noted in the RFDS, 83.2 surface acres could be disturbed from development of eight wells. Across the 121,679.70 acres encompassed by the 59 leases, 83.2 acres is a low number and would result in a low concentration across the leasing area in southern Emery County. Each well pad would be approximately 200'x400' in size, and the roads and overhead distribution lines and pipelines would create linear clearing and permanent disturbance in the landscape. Drilling at each well pad would create a temporary disturbance in the landscape of 30 to 60 days and operation would have an impact of approximately 30 to 50 years depending on climate conditions. Potential permanent oil and gas drilling equipment are anticipated to be 50 feet or less in height, and visibility of components of that height are analyzed in the viewshed analysis below. The density, intensity, and extent of the anticipated oil and gas development would create a low impact to visual resources.

AR000653



**Figure 3-4. Visual Resource Management classes for the 2018 leases and adjacent landscape.**

AR000654



**Figure 3-5. Viewshed analysis of lease area.**

AR000655

Table 3-24 quantifies the area (acres) and percentages of each VRM class that would be visible from each KOP for Alternative A.

**Table 3-24. Visibility of Visual Resource Management Class Landscapes in the Lease Area**

| VRM Class | KOP 1 | KOP 2 | KOP 3 | KOP 4 | KOP 5 |
|---|---|---|---|---|---|
| Class I | – | 13.70 acres (<1%) | – | – | 0.17 acres (<1%) |
| Class II | – | 313.23 acres (0.4%) | – | – | – |
| Class III | 60.27 acres (85%) | 8,215.44 acres (96%) | 336.02 acres (99%) | 5,027.12 acres (99%) | 7,100.63 acres (99%) |
| Not in VRM | 10.30 acres (15%) | 23.90 acres (<1%) | 0.54 acre (1%) | 27.99 acres (1%) | 13.92 acres (<1%) |
| **Total** | **70.57 acres** | **8,566.27 acres** | **336.56 acres** | **5,055.11 acres** | **7,114.72 acres** |

There is visibility from KOPs to VRM Class I and II areas, with 13.87 and 313.23 acres, respectively. Visibility to VRM Class I is less than 1% of the total area analyzed and VRM Class II is 0.4% of the leases evaluated. The leases that consist of the No Action Alternative are primarily located in VRM Class III, where oil and gas activities are consistent with visual resource objectives and would not create much change in the landscape. VRM Class I and II are located near the Green River; however, these areas could be seen from higher points of elevation, such as the San Rafael Reef, and development would impact the visual experience.

While small in area, the visibility of oil and gas activities under the No Action Alternative do not conform to VRM Class I objectives. Of note, the non-VRM lands are Utah Trust Lands Administration lands. BLM does not assign VRM classifications to non-BLM lands.

Development would be considered and assessed as cultural modifications, which may detract from the scenery in the form of a negative intrusion. Proposed development and modifications to the existing landscape would be allowable so long as it conforms to the VRM class objectives established in the PFO RMP (BLM 2008a). In addition, a variety of BMPs, design features such as camouflage, pattern colors on infrastructure, and vegetation, as well as LUP-approved stipulations for future mineral resource development would likely mitigate, limit, and/or prevent such impacts to visual resources. Further detailed analysis of the potential impacts to visual resources would be analyzed as appropriate when oil and gas development plans and permits to drill are submitted.

Table 3-25 identifies the leases that have VRM class lands visible from each KOP. Two leases, UTU93713 and UTU93493 have visibility of VRM Class I lands from KOP 2 and 5, respectively. Additionally, lease UTU93713 has 313.2 acres of Class II lands that are visible from KOP 2. Lease UTU93713 has a total of 326.93 acres of VRM Class I and II lands visible from KOP 2. VRM Class I and II areas are characterized by their unique form, line, color, and texture and are free from structures or development that impact their scenic quality.

**Table 3-25. Visual Resource Management Classes by Lease Area**

| VRM Class | KOP 1 | KOP 2 | KOP 3 | KOP 4 | KOP 5 |
|-----------|-------|-------|-------|-------|-------|
| Class I | – | UTU93713 | – | – | UTU93493 |
| Class II | – | UTU93713 | – | – | |
| Class III | UTU93534 | UTU93519 UTU93520 UTU93523 UTU93525 UTU93526 UTU93713 | UTU93519 UTU93520 | – | UTU93466 UTU93468 UTU93469 UTU93470 UTU93471 UTU93474 UTU93477 UTU93478 UTU93481 UTU93493 UTU93494 |

* Note: VRM Class IV does not occur in the lease area.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the BLM would cancel the 49 leases in LWC or wilderness areas, an area equivalent to 76,903 acres. However, the affirming of the other 10 leases creates the potential for mineral exploration and drilling activity. Potential impacts to the visual resources would not occur unless these leases are developed, otherwise the current landscape would remain intact.

Table 3-26 identifies the remaining 10 leases. Table 3-26 identifies the leases with VRM Class visibility from each KOP. Only three leases from KOP 5 have VRM Class visibility, with lease UTU93493 having 0.17 acres of Class I. Most of the visibility of the remaining 10 leases are VRM Class III from KOP 5.

**Table 3-26. Lease Visibility of Lands from Each Key Observation Point**

| VRM Class | KOP 1 | KOP 2 | KOP 3 | KOP 4 | KOP 5 |
|-----------|-------|-------|-------|-------|-------|
| Class I | – | – | – | – | 0.17 acre UTU93493 |
| Class II | – | – | – | – | – |
| Class III | – | – | – | – | 677.78 acres UTU93471 674.4 acres UTU93493 0.40 acre UTU93494 |
| **Total** | – | – | – | – | **1,352.75 acres** |

AR000657

Of the 10 leases that would be affirmed under this alternative, lease UTU93493 has 0.17 acre of VRM Class I, which the activity of oil and gas development would not conform to the VRM class objectives. Development in other areas of the lease that are not classified as VRM I or II would be consistent with visual resource objectives and not create much change in the landscape. Lease UTU93493 is 2,458.69 acres and the VRM Class I visibility is less than 0.01% of the total lease area. The other nine leases do not have visibility from Class I or Class II lands, and oil and gas development is an allowed use in VRM Class III.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not result in any potential impact to visual resources, as the leases would be cancelled and not developed at this time.

### 3.3.7.3     Mitigation Measures and Residual Effects

Lease UTU93493 has the potential to impact VRM Class I lands; however, the area of impact is less than 0.2 acres and BLM can impose a COA at the APD stage for a site layout to avoid the area of impact. Leases UTU93713 and UTU93493 have potential impacts to VRM Class I and II lands. Stipulation UT-S-160 *Visual Resources – VRM II* applies to lease UTU93713. The stipulation requires that surface-disturbing activities comply with BLM Manual Handbook 8431-1 to retain the existing character of the landscape. Temporary exceedance may be allowed during initial development phases.

### 3.3.7.4     Cumulative Effects

The CIAA for visual resources is the 59 leases ROWs), such as those contemplated in the RFDS. Alternatives A and B would contribute to these cumulative impacts by affirming any of the 59 leases. As stated in the PFO proposed RMP and final EIS, "impacts would be caused by surface disturbance from production, exploration, and construction of drilling and mining facilities." However, these projects would be required to conform to an area's VRM objectives and lease stipulations though design, camouflage (using vegetation or patterned paint color on permanent infrastructure), and/or topographic screening. These management actions would prevent their incremental impacts on visual resources from becoming dominant features on the landscape in sensitive VRM designations" (BLM 2008c:4-444–4445). When a plan of development is created, site-specific visual contrast analysis would be conducted as appropriate per BLM policy to determine if development is in compliance with VRM standards.

## 3.3.8     Night Skies

*Issue Statement: How would proposed and potential development of leases affect dark night skies in the short and long term?*

### 3.3.8.1     Affected Environment

Night skies and astro tourism are gaining popularity in rural national and state parks as designated areas and programs focus on stars, the planets, and atmospheric phenomena. Night skies accentuate the solitude and wilderness experience that park and public lands visitors seek. Optimal night skies are free of scattered light or skyglow, which is generated by anthropogenic light from development, transportation, sports fields, or industrial operations. The scattering of artificial light in the atmosphere increases night sky luminance and erodes the visual appearance of stars and planets (BLM 2018a).

Canyonlands National Park Horseshoe Canyon Unit, Dead Horse State Park, and Goblin Valley State Park were identified as resources with designated areas that support night sky protection and experience an increase of tourism related to night skies. Canyonlands National Park is known to have one of the

darkest night skies; however, its proximity to Moab and views to Blanding and Monticello can affect night sky experiences (BLM 2018a).

One measure of night skies is the Sky Quality Index (SQI). It is an index of light pollution from skyglow with a range of 0 to 100, where 100 is a sky free from artificial skyglow. Using the most recent and best available data, the NPS's Night Sky Monitoring Database reports from 2008 indicate the SQI for Grand View Point Outlook in Canyonlands National Park is between 96 and 97, with over 3,800 stars visible during the June 25, 2011, observation period (NPS 2016a). These SQI values show that skies in this part of Canyonlands National Park, characterized by broad, sweeping views of the canyon landscape, retain their natural characteristics throughout most of the sky. The SQI data have limitations that "bright unshielded lights in the land portion of the mosaic will not be accurately measured for two reasons: they commonly are so bright their recorded luminescence exceeds the dynamic range of the detector so they become clipped or saturated at the maximum [analog to digital units] value, and the median filter will remove most of the light from these sources since they resemble stars or point sources" (NPS 2016a). The limitations of the SQI data indicate that point source lights from oil and gas development may not be completely accounted for.

Figure 3-6 depicts the existing artificial sky brightness from a model from The New World Atlas of Artificial Night Sky Brightness (Falchi et al. 2016a). The city of Moab, an oval area of yellow (brighter artificial lights), green, and blues to a gray buffer, directly affects both Arches National Park and Canyonlands National Park. Most of the leases are located outside the existing sky glow areas of Moab and Green River. The quality of the night sky within the project area is superior to most of the surrounding park units.



Source: Falchi et al. (2016b).

**Figure 3-6. Depiction of artificial light and surrounding state and national parks.**

AR000660

### 3.3.8.2     Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its previous leasing decisions for the 59 leases. The leases include the standard lease terms and conditions for development of surface oil and gas leases. Given that all 59 leases would be affirmed, there is the potential for surface oil and gas development. Potential impacts to the night skies would only occur if the leases are developed; otherwise, the current night sky would remain intact.

Future potential development of the 59 leases could introduce additional artificial lighting that would contribute to skyglow and adversely affect night skies and visitor experience in an area otherwise not impacted by skyglow. The artificial lighting from the leases would contribute to skyglow and would be generally temporary, during the 30-to-60-day development phase, when exploration operations occur 24 hours a day. Headlights from traffic to and from each well pad site at night would occur during the development period. The artificial light during the development period is transient in nature and impacts vary based on conditions such as cloud cover (height, density of clouds), weather (precipitation events), particulate matter in the air, and wind speed or direction. For example, most artificial lighting would occur during the drilling, completion, and potential flaring of a well, which could last for approximately 30 to 60 days. Lighting from the other phases of development and production would occur from vehicle traffic or safety lighting. The source of artificial lighting could be affected by the type of bulb, fixture, shade, and direction of fixture. The NPS reports that the primary sources that contribute to an increase in night sky effects (skyglow) are cities (NPS 2016b). Contributions to skyglow from future potential development of the lease would be a small contribution to the existing sources. At the completion of well pad development, existing conditions would return at each lease unless flaring occurs.

While there are 59 leases, no more than eight wells are expected from development. Impacts from oil and gas leases would be threefold: 1) during pad development and initial drilling when operations may occur at night; 2) from lights during the operation and maintenance of the well pad; and 3) from flaring of gases.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under Alternative B, the BLM would cancel the 48 leases (encompassing 75,494.99 acres) that contain identified LWCs and one lease (encompassing 1,408.01 acres) within a designated wilderness area. The BLM would affirm its previous leasing decisions for the 10 remaining leases (encompassing 20,749.45 acres; see Table 2-1). However, the potential development on these remaining 10 leases creates the potential for mineral exploration and drilling activity. Potential impacts to night skies would not occur unless these leases are developed, and the current night skies would remain intact. The 10 leases under this alternative are located more than ten miles from Canyonlands National Park Island in the Sky Unit, and likely would not result in any potential impacts to night skies of the park, affecting the visitor experience. However, development on these leases could impact visitor experiences at Goblin Valley State Park, Canyonlands National Park Horseshoe Canyon Unit, and adjacent public lands. The affirming of the ten leases may potentially impact other areas where night skies are intact, creating a new impact.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not result in any potential impacts to night skies as the leases would be cancelled and, therefore, no development would occur at this time.

### 3.3.8.3    Mitigation Measures and Residual Effects

While there are no specific lease stipulations that address night skies, mitigation measures could be applied as a COA at the APD stage and may include shaded or directional (downlit) lighting on structures, specific bulb type, and shrouded gas flare stacks.

### 3.3.8.4    Cumulative Effects

The region surrounding Canyonlands National Park Horseshoe Canyon Unit, Dead Horse State Park, and Goblin Valley State Park is relatively pristine. Due to topography, the CIAA for night skies is the leases and extends outside the lease boundaries. Past, present, and reasonably foreseeable actions that have affected and will likely continue to affect night skies include oil and gas development and issuance of ROWs. These activities could introduce artificial light, which could impair the feeling of solitude and degrade natural dark sky conditions at night. Increasing visitor use in the PFO area will likely intensify use of BLM-administered lands, potentially impacting night sky characteristics by increasing transient light pollution. Oil and gas development typically has a large footprint of road construction and surface disturbance, and therefore, an impact on night sky characteristics over the next 15 to 20 years. However, as noted in the RFDS, it is anticipated that only eight wells would be developed, with a maximum disturbance area of 83 acres. While the area of disturbance is less than 100 acres and would be distributed among the leases, the cumulative effect of artificial light on night skies would also be affected by the location and spacing of well pad sites, meteorological conditions and the type, kind, and placement of lighting resources, and location of ROWs.

## 3.3.9    Recreation

*Issue Statement: How would proposed and potential development of the leases affect recreation access, sites, and user experience within SRMAs? How would proposed and potential development of the leases affect recreation sites, access, and user experience outside of SRMAs?*

### 3.3.9.1    Affected Environment

An SRMA is an administrative unit where the existing or proposed recreation opportunities and recreation setting are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. The PFO contains numerous opportunities for both developed and dispersed recreation; specific to this assessment, the analysis area is the leasing area. The leasing area is adjacent to the San Rafael Swell SRMA and the Labyrinth Canyon SRMA. Four leases partially overlap with the San Rafael Swell SRMA and two with the Labyrinth Canyon SRMA. The San Rafael Swell SRMA is 936,479 acres and the Labyrinth Canyon SRMA is 37,203 acres. Table 3-27 shows the leases that overlap with SRMAs and the acreage that overlaps with the designated SRMA (none of the six lease areas that overlap SRMAs are fully within a SRMA). There are no BLM designated recreation areas within the leases.

The Dingell Act was signed into law in 2019; Part II of the law is specific to Emery County, Utah (Emery County Public Land Management). This includes the establishment of the San Rafael Swell Recreation Area (216,995 acres), with the purpose of protection and conservation along with enhancement of recreation resources among other resources; this recreation area is not overlapped by the lease areas. The Dingell Act provides high-level guidance regarding the management of the area, including the appropriateness of motorized use, grazing, and non-motorized recreation use. The Dingell Act also required the establishment of the San Rafael Swell Recreation Area Advisory Council. The Dingell Act also included the designation of numerous additions to the National Wilderness Preservation System within Emery County; additionally, a 63-mile reach of the Green River was designated as a WSR. The Dingell Act also conveyed land from the BLM to the State of Utah for Goblin Valley State Park and set up land exchanges between the state and the federal government.

**Table 3-27. Acreage of Overlap Between Leases and Special Recreation Management Areas**

| Lease Unit Special Recreation Management Unit | Acreage Overlap with Special Recreation Management Unit |
|---|---|
| UTU93534 (Labyrinth Canyon) | 183.60 |
| UTU93713 (Labyrinth Canyon) | 884.13 |
| **Total for Labyrinth Canyon** | **1,067.73** |
| UTU 93466 (San Rafael Swell) | 679.07 |
| UTU 93486 (San Rafael Swell) | 169.07 |
| UTU 93469 (San Rafael Swell) | 696.29 |
| UTU 93474 (San Rafael Swell) | 436.72 |
| **Total for San Rafael Swell** | **1,981.15** |

Areas within the leases (both within and outside the SRMAs) area are classified under the Recreation Opportunity Spectrum (ROS) system. ROS is a widely used planning and management framework for classifying and defining recreation opportunity environments ranging from the primitive to the urban. This continuum recognizes variation among the landscape's physical, social, and operational characteristics. The ROS was developed as a tool to facilitate recreation inventory, evaluation, management, planning, and decision-making. The 59 leases are located within ROS classification semi-primitive motorized, semi-primitive non-motorized, and roaded-natural.

Recreational visitation within the leasing area was estimated by the PFO at 8,931 annual visits in FY22 and 9,114 visits in FY23 for the San Rafael Desert area which encompasses all leases except for UTU93713. This would be considered a light amount of visitor use in the San Rafael Desert. Lease UTU93713 is located within the Labyrinth Canyon Wilderness Area, which listed dispersed, non-river-based recreation at 10,053 visits in FY22 and 10,265 visits in FY23. For the size and accessibility of the Labyrinth Canyon Wilderness, this would be considered a moderate amount of use. Most recreational activities within the leases would include OHV use and mountain biking where permitted, dispersed camping, hiking, backpacking, canyoneering, hunting, and nature photography.

### 3.3.9.2    Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its previous decisions to offer and issue the 59 leases. The issuance of leases allows for mineral exploration and development activities to occur. Mineral development in leased areas could impact recreation both in areas designated as SRMAs and areas outside SRMAs. Implementation of this alternative would result in the affirming of leases that overlap with two designated SRMAs. The leases overlap about 2% of the San Rafael SRMA (1,918.15 acres out of 936,479 total acres) and just under 3% of the Labyrinth Canyon SRMA (1,067.73 acres out of 37,203 total acres). The presence of new oil and gas infrastructure on public lands would potentially change the recreational setting of these areas. The construction or improvements of vehicle access routes could increase the long-term level of public OHV use and dispersed recreation near developed leases. Visitors seeking recreational settings consistent with primitive or non-motorized characteristics would likely be displaced to other BLM lands that provide for the recreational outcomes they seek. The period of drilling, completion, and potential flaring of a well could last approximately 30 to 60 days and this would be a time when recreationists could be especially susceptible to displacement. Further, as discussed in Section 3.3.4, Lands with Wilderness Characteristics, recreational experiences dependent on wilderness or

AR000663

wilderness-like experiences would be affected under this alternative. There is potential for impact portions of 75,494.99 acres of LWCs through the affirming of the 59 leases. However, based on the RFDS, development of only eight wells is anticipated, BLM expects that there would be direct impacts to a maximum of 83.2 acres of LWCs.

For areas not designated as SRMAs, if leases designated as semi-primitive non-motorized (under the ROS system) were to be developed, the ROS classification would shift from semi-primitive non-motorized to semi-primitive motorized. This would lead to a different recreational experience for people recreating in those areas that overlap with the semi-primitive non-motorized classification.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Implementation of this alternative would result in the affirming of 10 leases, one of which overlaps with one designated SRMA. Lease UTU93486 overlaps about 0.2% of the San Rafael SRMA (169.07 acres out of 936,479 total acres) and none within the Labyrinth Canyon SRMA. As such, the impact to SRMAs is approximately 94% less under this alternative as compared to the No Action Alternative (3048.88 acres under the No Action Alternative versus 169.07 acres under this alternative). The presence of the lease on the SRMA has the potential to effect recreation outcomes in a relatively small portion of the San Rafael SRMA as oil and gas development may occur in dispersed recreation areas or the presence of the development may create noise or visual impacts that could indirectly affect recreational experiences for certain users. Generally, recreationists who seek out experiences and settings consistent with non-motorized or primitive values would likely be displaced to other areas within the SRMA or other BLM lands that provide the appropriate setting. Impacts to LWCs and soundscapes are addressed in Sections 3.3.4 and 3.3.6, respectively.

Similar to the No Action Alternative, for areas not designated as SRMAs, the ROS classification would shift from semi-primitive non-motorized to semi-primitive motorized for areas designated as semi-primitive. The construction or improvements of vehicle access routes could increase the long-term level of public OHV use and dispersed recreation near developed leases. This would lead to a different recreational experience for people recreating in those areas that overlap with the semi-primitive non-motorized classification. If a recreationist is seeking a more primitive, non-motorized type of recreational experience, the development of these areas (similar to areas under a SRMA) could lead to their displacement to other areas offering the experience they seek.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not result in any potential impacts to recreation as the leases would be cancelled and not developed at this time.

### 3.3.9.3 Mitigation Measures and Residual Effects

Mitigation measures to account for any impacts or residual effects could be implemented in the APD stage and include locating oil and gas infrastructure outside of designated SRMAs in cases where there is partial overlap between leases and SRMAs. Mitigation would be necessary or warranted in the case where infrastructure could be located outside of SRMAs.

### 3.3.9.4 Cumulative Effects

The CIAA for recreation consists of the San Rafael Swell SRMA and the Labyrinth Canyon SRMA. The past, present, and foreseeable future actions with the potential to contribute to surface disturbance include development of new and existing mineral rights (leases) and/or realty actions (e.g., pipelines and road ROWs), such as those contemplated in the RFDS. Additionally, it is anticipated that the current grazing patterns and recreation activities will continue to occur throughout the CIAA. All of the past, present, and

reasonably foreseeable future actions listed above could displace recreationists or affect recreation by a loss or transformation of recreation opportunities. It can be anticipated that the future development of oil and gas, as described in the RFDS, could create noise and light pollution and increase traffic in the region. These actions could degrade resources important to recreationists in the San Rafael Swell SRMA and the Labyrinth Canyon SRMA (e.g., semi-primitive, non-motorized experience). Livestock grazing has and will continue to occur throughout the CIAA. In order to minimize conflict between livestock grazing and recreationists, grazing is prohibited from occurring within developed recreation sites. Although livestock grazing and recreation are generally compatible uses of public lands, the addition of the ground disturbing activities and the associated impacts of the other reasonably foreseeable future actions may increase the likelihood of displacing recreationists.

## 3.3.10    Transportation and Access

*Issue Statement: How would proposed and potential development of leases impact public access and travel on existing TMP-designated routes?*

### 3.3.10.1    Affected Environment

The PFO Travel Management Areas (TMAs) and associated plans: San Rafael Swell TMA (DOI-BLM-UT-G020-2019-0019-EA), and San Rafael Desert TMA (DOI-BLM-UT-G020-2018-0004-EA) include the lease areas; Henry Mountains TMA is south of the area in Wayne County (Figure 3-7). The San Rafael Swell and San Rafael Desert TMAs include a combined 1,533 miles of "open" motorized routes through the lease areas. Generally, routes are managed as maintenance level 1 and maintenance level 3 in the lease areas, i.e., not surfaced annually. The lease areas include approximately 9 miles of gravel roads, 495 miles of natural surface roads, 4 miles of natural surface (improved roads), 8 miles of solid (slickrock), and 945 miles of unknown or not designated routes. Transportation and access within the PFO planning area that is not within a TMA is managed according to the PFO 2008 RMP (BLM 2008a). The existing routes within the three TMAs are currently utilized by motorized vehicles, including OHVs, jeeps, motorcycles, and aircraft, as well as non-motorized uses, including mountain biking, hiking, and equestrian use. All leases except four have existing motorized access.

The State of Utah manages and maintains the major interstates and highways. BLM, Carbon County, and Emery County coordinate in development, maintenance, and management of local roads within the PFO. BLM policy is to develop and maintain roads that provide access for BLM personnel for resource management purposes. FO personnel identify which roads require maintenance from year to year. These assessments, combined with the experience as expressed by the BLM operations staff and management needs determine which roads will be maintained and improved.



**Figure 3-7. Travel management areas and lease areas.**

AR000666

There are several actively used backcountry airstrips located within the PFO. Some of these airstrips are maintained by volunteer groups. By policy, the BLM will not close backcountry airstrips without consultation and coordination with the Federal Aviation Administration and Utah Division of Aeronautics.

### 3.3.10.2    Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its previous decisions to lease the 59 leases from the 2018 Lease Sales. The development of these 59 leases may impact the current transportation network and access to BLM lands.

New route development, construction, use, and operation and maintenance would be coordinated with lease holders by the BLM. Development of a given lease could temporarily concentrate OHV use, increase traffic, or close routes/access for public safety—each resulting in changes to vehicle movement. Changes to the existing BLM transportation system from oil and gas (or helium) development activities would result in site-specific impacts to public route use and access. Public lands users may be required to travel farther or shorter distances or alter their mode of transportation to gain public access. Some changes may be beneficial, long-term changes to vehicle movement; this will be influenced by route popularity and integration into the existing route system.

Upgraded or new access routes may increase the overall long-term future level of OHV traffic and dispersed recreation use near a developed lease, thereby potentially increasing resource impacts from route proliferation, campsite expansion, trash, wildfires, invasive weeds, vegetation loss, and soil disturbances. Although BLM can attempt to close newly created routes or well sites to public access with signs and fencing, in the open, remote environment of the leasing area, enforcement and compliance can often be challenging and unsuccessful. New route development to the four leases with no current motorized access may require amendments to TMAs or the PFO RMP (BLM 2008a) to incorporate the new route into the transportation system, including additional environmental analysis, regardless of whether the public would be allowed to use the new route.

Table 3-28 shows the number of leases that could be developed in each affected TMA. Note that several leases occur within more than one TMA.

**Table 3-28. Leases within Travel Management Areas**

| Travel Management Area | Number of Leases* |
|---|---|
| San Rafael Swell | 4 |
| San Rafael Desert | 59 |
| Not within a TMA | 8 |

* Some leases overlap more than one TMA.

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

New route development under this alternative would have the same impacts as described under the No Action alternative, except there would be commensurately less impacts associated with the decreased number of leases (10) as compared to the No Action Alternative (Table 3-29).

AR000667

**Table 3-29. Leases within Travel Management Areas, Wilderness and Lands with Wilderness Characteristics Alternative**

| Travel Management Area | Number of Leases* |
|---|---|
| San Rafael Swell | 0 |
| San Rafael Desert | 10 |

* Some leases overlap more than one TMA.

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not result in any potential impacts to transportation and access as the leases would be cancelled and not developed.

### 3.3.10.3    Mitigation Measures and Residual Effects

Mitigation measures to account for any impacts or residual effects could include locating oil and gas infrastructure so that new road construction would not be required.

In the event that new road construction is required to access any of the 59 leases, the BLM would require the new road construction to follow applicable new route criteria as defined in these TMPs:

- San Rafael Swell TMP/EA
- San Rafael Desert TMP/EA

BLM Engineering staff would be involved early in the process of planning, locating, designing, and constructing new routes, and with choosing and applying associated BMPs. New routes and changes to the network require application of appropriate NEPA review. The route evaluation process and NEPA review (which may be done concurrently) must occur prior to the implementation or construction of a new route.

The BLM's travel management manual (BLM 2016c) provides broad guidelines on how to appropriately add new routes to a BLM travel network. All new roads, primitive roads, and trails would meet the standards for design, construction, and maintenance found in BLM manuals and handbooks (e.g., "Appendix 8: Trail Planning and Standards" in the BLM travel management handbook [BLM 2012]). Among other guidance, all new TMA routes would meet the standards for design, construction, and maintenance found in the BLM's Roads Design Handbook (BLM 2011b) and Primitive Roads Design Handbook.

Residual effects would likely include an increase in OHV traffic and recreation visitor use as a result of new route construction or road upgrades for drilling operations.

### 3.3.10.4    Cumulative Effects

The CIAA for transportation and access consists of the PFO. The past, present, and foreseeable future actions with the potential to contribute to changes to the transportation system and access include development of new and existing mineral rights (leases) and/or realty actions (e.g., road ROWs) such as those contemplated in the RFDS. The affirming of the 59 leases from the 2018 Lease Sales would contribute to these cumulative impacts. All of the past, present, and reasonably foreseeable future actions listed above could alter the transportation system by adding more roads and access opportunities.

### 3.3.11    Water Resources

*How would potential development of the leases impact the availability and quality of groundwater and surface water resources?*

#### 3.3.11.1    Affected Environment

The leases are located within four Hydrological Unit Code (HUC) 8 watersheds: San Rafael Watershed (HUC8-14060009), Lower Green Watershed (HUC8-14060008), Muddy Watershed (HUC8-14060002), and the Dirty Devil Watershed (HUC8-14060004) (Figure 3-8). Specific leases are located in eight different HUC 10 watersheds as shown in Table 3-30. To assess environmental consequences to water resources, the analysis area is defined as the eight HUC 10 watersheds, as listed in Table 3-30.

**Surface Water Resources**

A review of National Hydrography Dataset (NHD) data identified 204.96 miles of intermittent steams and 20.11 miles of connector channels and artificial paths within the lease boundaries (Table 3-30; Figure 3-9). A review of the NWI data identified 532.05 acres of Riverine wetlands, 1.22 acres of Freshwater Emergent wetlands,4.86 acres of Freshwater Forested/Shrub wetlands,1.39 acres of Freshwater ponds, and 20.23 acres of lakes (see Table 3-30; Figure 3-9). Wetlands in the NWI dataset may overlap or surround other surface water features in the NHD dataset depending on site-specific delineation; therefore, acreage of wetlands may be included in other surface water features presented in Table 3-30. No perennial or ephemeral streams were identified in the NHD data. Most intermittent streams within the analysis area drain toward the San Rafael River. Ephemeral and intermittent streams provide the same ecological and hydrological functions as perennial streams by moving water, nutrients, and sediment throughout the watershed (EPA 2008).

**Table 3-30. National Hydrography Dataset and National Wetland Inventory Surface Water Features within Analysis Area**

| HUC-10 Watershed | Leases within Watershed | Water Features Present in Watershed | Acres or Miles* |
|---|---|---|---|
| Cottonwood Wash | UTU93477, UTU93466, UTU93468, UTU93474, UTU93475, UTU93476, UTU93477, UTU93478, UTU93479, UTU93482, UTU93483, UTU93486, UTU93487, UTU93497, UTU93498 | Connector channel | 0.55 miles |
| | | Freshwater Forested/Shrub Wetland | 2.93 acres |
| | | Freshwater Pond | 0.82 acres |
| | | Intermittent stream/rivers | 23.85 miles |
| | | Riverine wetland | 101.93 acres |
| Taylor Canyon-Green River | UTU93713 | Intermittent stream/rivers | 0.53 miles |
| | | Riverine wetland | 0.85 acres |
| Upper Dirty Devil River | UTU93472, UTU93492, UTU93493, UTU93494 | Intermittent stream/rivers | 14.74 miles |
| | | Riverine wetland | 25.96 acres |

AR000669

| HUC-10 Watershed | Leases within Watershed | Water Features Present in Watershed | Acres or Miles* |
|---|---|---|---|
| Dugout Creek | UTU93485, UTU93489, UTU93492, UTU93493, UTU93495, UTU93496, UTU93499, UTU93500, UTU93501, UTU93502, UTU93503, UTU93504, UTU93506, UTU93506, UTU93507, UTU93508, UTU93509, UTU93510, UTU93511, UTU93512, UTU93513, UTU93514, UTU93520, UTU93521, UTU93527, UTU93530 | Connector channel[†] | 13.09 miles |
| | | Intermittent stream/rivers | 106.91 miles |
| | | Riverine wetland | 278.95 acres |
| Horseshoe Canyon | UTU93713 | Intermittent stream/rivers | 1.09 miles |
| | | Riverine wetland | 1.74 acres |
| Moonshine Wash | UTU93509, UTU93512, UTU93519, UTU93520, UTU93521, UTU93523, UTU93525, UTU93526, UTU93527, UTU93530, UTU93533 | Connector channel[†] | 4.83 miles |
| | | Freshwater Emergent Wetland | 1.22 acres |
| | | Intermittent stream/rivers | 57.28 miles |
| | | Riverine wetland | 118.87 acres |
| Robbers Roost Canyon | UTU93512, UTU93513 | Intermittent stream/rivers | 0.14 miles |
| | | Riverine wetland | 0.35 acres |
| Lower San Rafael River | UTU93521 | Connector channel[†] | 0.31 miles |
| | | Riverine wetland | 0.75 acres |
| Salt Wash-Green River | UTU93534 | Artificial Path | 0.33 miles |
| | | Connector channel[†] | 0.99 miles |
| | | Freshwater Forested/Shrub Wetland | 1.93 acres |
| | | Freshwater pond | 0.57 acres |
| | | Intermittent stream/rivers | 0.42 miles |
| | | Lake | 20.23 acres |
| | | Riverine wetland | 2.64 acres |

Note: Previously mapped surface water features have been identified based on analysis of the U.S. Geological Survey's (USGS's) NHD and the USFWS's NWI. Additional surface water features may be identified during site-specific analysis at the lease development stage, and the lessee would be required to follow applicable standard terms and conditions, as well as COAs as determined by the BLM.

* Wetlands may overlap or surround other surface water features depending on site-specific delineation; therefore, acreage of wetlands may be included in other surface water features presented in this table.

† Connector channels are used to complete the stream network through NHD waterbodies and NHD areas where there is no obvious channel. Isolated NHD waterbody features may not contain artificial paths.



**Figure 3-8. HUC-8 and HUC-10 watershed boundaries within analysis area.**

AR000671



**Figure 3-9. National Hydrography Dataset and National Wetland Inventory in leasing area.**

AR000672

The segment of the San Rafael River within 3 miles of leases UTU93498, UTU93497, UTU93496, UTU93495, and UTU93518 is impaired for aquatic life beneficial use (3C) due to O/E Bioassessment (a standard that compares the Observed (O) macroinvertebrate composition to the Expected (E) macroinvertebrate composition in the same environment without human influence) and total dissolved solids. There is an EPA-approved total maximum daily load (TMDL) for this reach that contains recommended projects, buffers, and BMPs to improve water quality conditions (Utah Division of Water Quality [UDWQ] 2004). Oil and gas development is not specifically identified as an issue in the TMDL; however, types of impacts that could occur from oil and gas development (i.e., travel, ground disturbance, etc.) are identified as potential issues that can be mitigated through appropriate BMPs. The 2008 PFO RMP Appendix 19 outlines the hydrologic modification standards for roads that would be implemented during the APD stage which would include channel alteration permits (if applicable), development of culverts for water conveyance, and other BMPs to reduce channel modification. Adequate minimum stream buffers is included as a stipulation (UT-S-127 NSO – *Intermittent and Perennial Streams*) and stipulates setbacks and buffers from the centerline of intermittent and perennial streams The BLM would implement additional COAs during the permit stage.

Lease UTU93534 is located on the west bank of the Green River. The Green River was not listed as impaired on the most recent Utah 303(d) list (UDWQ 2022). However, an area of the lease property line is proximate to the west bank of the river, which could increase sensitivity for impacts to water quality through increased sedimentation and higher risk of pollutants directly discharging into surface waters.

**Groundwater Resources**

There are five geologic units that are considered major aquifers in the area due to their large areal extent or thickness. These units include the Entrada, Navajo, and Wingate Sandstones, the Coconino Sandstone, and lateral facies equivalents in the Cutler Formation. Groundwater in the area occurs under confined, perched, and unconfined conditions. Most water in the unconsolidated deposits are unconfined, and in several areas, one or more of the major sandstone aquifers are partly or completely drained. Confined conditions mainly occur off the flanks of the San Rafael Swell where the major aquifers are buried. Groundwater levels vary greatly across the area based on depth of the aquifer contained formation and range from shallow (0.15 feet) to depths below 300 feet (USGS 1984).

The Carmel Formation has a special importance to the groundwater hydrology of the northern San Rafael Swell area due to its ability to receive recharge directly and because its formation location overlies the Navajo Sandstone that can supply and receive water between the two formations. Groundwater in the northern San Rafael Swell area is derived from precipitation and from consequent flow in upland tributaries to the Price and San Rafael Rivers, primarily during winter (USGS 1984). Much of the groundwater is discharged locally within the area and the water can move from one aquifer to another; however, most residual recharge water moves to the principal drainage channels that are mostly deeply incised into the aquifer. A small amount of groundwater flows out of the area into the low Dirty Devil River basin, and a part ultimately reaches the Green River. The Navajo Sandstone is regionally the highest quality aquifer in the area due to its shallowness, permeable nature, and fresh water (USGS 1984). Groundwater from the Navajo Sandstone is used moderately by municipal, mining, and agricultural interests (USGS 1987).

The EPA defines a sole-source aquifer as one where 1) the aquifer supplies at least 50% of the drinking water for its service area and 2) there are no reasonably available alternative drinking water sources should the aquifer become contaminated (EPA 2023l). No sole-source aquifers were identified within the analysis area through review of the EPA's Sole Source Aquifers Interactive Map and UDEQ's Utah Environmental Interactive Map (EPA 2023o; UDEQ 2023). Groundwater quality protection for oil and gas leasing, exploration, and development is outlined in IM No. UT 2020-055: Protection of Ground

Water Associated with Oil and Gas Leasing, Exploration and Development. The purpose of this IM is to clarify the process for the protection of usable groundwater zones (< 10,000 mg/L of Total Dissolved Solids, as defined in Onshore Oil and Gas Order No. 2) associated with oil and gas exploration and development activities. There were no surface or groundwater protection zone layers identified in UDEQ's Utah Environmental Interactive Map (UDEQ 2023).

## Water Rights

Waters in the PFO drainage basins are fully appropriated for irrigation and industry (Utah Division of Water Rights 2023). New appropriations are limited to small amounts of beneficial use, not to exceed 0.015 cubic feet per second, and can only be approved for domestic water for one family, stock watering, or irrigation for 0.25 acre of land or less. Water rights can still be obtained for stock ponds less than 3 acre-feet. Water sources and necessary water rights from state permitted sources are managed by Utah water appropriation policy for each water basin. Some temporary (1 year) or fixed time period water rights for drilling operations or road dust control are still available. Based on a review of the Utah Division of Water Rights interactive map, there are currently 28 water rights that intersect the leases that are primarily used for stock watering. Only one of the three leases (UTU93475) that have a recently approved APD intersect a water right, which is owned by the BLM PFO and is a point to point diversion that is limited to stock water use (Utah Division of Water Rights 2023).

### 3.3.11.2    Environmental Effects

**Impacts of the No Action Alternative**

Under the No Action Alternative, the BLM would affirm its previous leasing decisions for the 59 leases from the 2018 Lease Sales. As previously explained, this analysis does not authorize or guarantee the number of wells analyzed herein; however, as noted in Section 3.1.1, the RFDS estimates 8 potential wells could be developed under this alternative. The drilling of wells on a lease would not be permitted until the BLM approves an APD, and any APD received would be subject to site-specific NEPA review. Potential impacts to water resources would occur only if the leases are developed; otherwise, no impact on water resources would occur. However, development assumptions have been made in this EA to inform the decision because a lease must be developed to keep it from expiring.

If the leases are developed, wells within the leases would likely be developed using hydraulic fracturing techniques. However, the specific drilling technique would not be specified until an APD is received. FracFocus is an online database available to the public (FracFocus 2023). Previously, the public has expressed the following concerns:

- Spills could occur during the management of hydraulic fracturing fluids and chemicals or produced water (anticipated 444,013 bbl of produced water for the leases) that result in large volumes or high concentrations of chemicals reaching groundwater resources.

- The injection of hydraulic fracturing fluids into wells with inadequate mechanical integrity would allow gases or liquids to move to groundwater resources.

- There could be discharge of inadequately treated hydraulic fracturing wastewater to surface water resources.

Given that the BLM has received and approved APD packages on three leases for helium production, of the eight wells used for the RFDS, three were assumed to be helium and five were assumed to be oil and gas. North American Helium has secured municipal water from Green River, Utah, for development and life project supply (BLM 2023b). Water will be necessary for drilling completion operations, flowline

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 153 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

testing, and dust suppression. Final water sources and water quantity will be defined in the APD stage for any other wells drilled.

Future potential development of the leases could result in oil and gas activities, including well pad construction, drilling, completion of vertical wells, and access road construction and maintenance. These actions could impact surface water resources through disturbing vegetation, soil, and mineral substrate, which could create dust and increase runoff rates during precipitation events. The disturbed areas would be more susceptible to erosion, which could create sedimentation issues in streams. Sedimentation would most likely occur during construction of stream crossings for access roads and flowlines, and where disturbances are nearest to streams. Effects would continue until disturbed areas are stabilized though implementation of appropriate BMPs to mitigate sedimentation during construction. All leases require implementation of Stipulation UT-S-127 NSO – *Intermittent and Perennial Streams*, which stipulates setbacks and buffers from the centerline of intermittent and perennial streams, and Lease Notice UT-LN-128 *Floodplain Management*, which avoids adverse impacts to floodplains by developing facilities outside the 100-year floodplain, or minimizing or mitigating impacts by modification of surface use plans within floodplains present within the lease. Additionally, stipulations related to slope and erosion control as described in AIB-7 Soils would further protect against alterations to hydrological conditions. UT-S-126 *No Surface Occupancy - Natural Springs* would protect existing natural springs by providing a surface buffer to protect the integrity and flow patterns of spring systems. The conditions, stipulations, and notices applied to floodplain and riparian resources would protect surface water quality. If wells are constructed on the leases in the future, impacts would be analyzed when an APD is submitted, and site-specific mitigation design features may be applied at the APD stage to reduce or eliminate changes in runoff from surface disturbance.

Surface management includes the use of water to control fugitive dust from roads. The source, volume of water, and transportation methods involved will be identified in the drilling plan per Onshore Order #1. This water is from state permitted sources with valid water rights as managed by Utah Water Appropriation Policy for each water basin.

Development of oil and gas wells could increase the risk of spills that could introduce contaminants to surface water resources. The risk would be dependent on the proximity of development activities to surface water and the measures applied to address the possibility of spills reaching surface water bodies. Types of chemical additives used in well completion activities may include acids, hydrocarbons, thickening agents, gelling agents, lubricants, and other additives that are operator and location specific. The largest components in hydraulic fracturing fluid are water and sand.

Water produced along with oil and gas is often highly saline and may contain low concentrations of different chemical constituents (typically 0.3% by mass and never exceeding 2%) (EPA 2015), depending on the fracturing techniques used, and natural contaminants that may be present in the rock material. A typical oil/gas well uses approximately 20 to 25 unique chemicals during the hydraulic fracturing process, but in some cases, more than 60 distinct chemicals could be used. The five most commonly reported chemicals used in oil and gas projects are methanol; hydrotreated light petroleum distillates; hydrochloric acid; water; and isopropanol (EPA 2015). This water is usually disposed of deep underground or is treated and reused, with some allowed to partially evaporate in surface pits. During the production phase, the amount of water produced by a well can vary from close to zero to over 100 barrels of water per barrel of oil. Nationally, an average of about 10 barrels of water are produced per barrel of oil (Allison and Mandler 2018).

Leasing itself does not have a direct impact on the hydrologic conditions of the leases because the issuance of a lease does not include authorization of surface-disturbing activity. During the permitting stage, however, development of an appropriate stormwater pollution prevention plan as part of the

AR000675

General Construction Permit for disturbances greater than 1 acre would be required by the State of Utah, and the appropriate Storm Water Discharge Permit (administered by the Utah Pollutant Discharge Elimination System) would be required from the UDWQ. Additionally, during the APD stage potential impacts to waters of the United States (WOTUS) would be analyzed in further detail. This would include an aquatic resource delineation of the area that would identify perennial, intermittent, or ephemeral streams and wetlands that were not captured in NHD or NWI datasets. Section 404 of the Clean Water Act requires U.S. Army Corps of Engineers authorization for the discharge of dredged or fill material into WOTUS. If streams or wetlands are found, coordination with the U.S. Army Corps of Engineers would be needed to determine if the waters are jurisdictional WOTUS and to identify any associated permitting requirements. Activities for which permits may be required include, but are not limited to, land clearing involving relocation of soil, road construction, mining, and utility line or pipeline construction. Additionally, any proposed developments on leases would be subject to the standard lease terms and all applicable laws, regulations, and Onshore Orders in existence at the time of lease issuance. If the company plans on affecting these waters directly, a Stream Alteration Permit would be required, and additional NEPA analysis would be required to review those potential changes. Considering existing knowledge regarding resource values on the subject leases, which is based upon the analysis in the PFO RMP (BLM 2008a) and resource specialist knowledge, significant impacts beyond those already addressed in the Record of Decision for the PFO RMP are not anticipated to occur as a result of leasing these leases.

Further stipulations or lease notices may apply to other water resources that indirectly impact hydrologic conditions, such as stream channels and riparian areas. The stipulations, lease notices, SOPs, BMPs, and COAs implemented during the leasing process would limit or reduce the impacts to hydrologic conditions both directly and indirectly.

Water obtained from aquifers and surface water could result in the drawing down of the water table and reduction of available water resources for wildlife, vegetation, springs, streams, or public consumption, particularly in areas that are experiencing drought. Existing groundwater and surface water flow patterns could be affected by water used for activities on leases. The specific quantity of water required for downhole oil and gas operations depends on local geology and would be evaluated in detail at the ADP stage. The BLM requires that water resources for production originate from a source with a valid existing water right. All surface water and connected groundwater depletions within Colorado River Basin watersheds are subject to the Colorado River Endangered Fish Recovery Program.

The leases were analyzed for any overlapping drinking water protection zones for surface and groundwater sources. There were no leases within drinking water protection zones as defined by the State of Utah Division of Drinking Water based on data from UDEQ's Utah Environmental Interactive Map (UDEQ 2023). Water resource protection is provided by Onshore Orders #2 and #7. All activities with potential to impact surface or ground water flows are analyzed at the APD stage when development information is present. If wells are constructed on the leases at a future time, impacts would be analyzed when an APD is submitted. The BLM would analyze future proposals associated with leases under additional site-specific NEPA and may apply any additional requirements as necessary to protect groundwater quality within the vicinity of the leases at the APD stage.

Well bores would be cased, cemented, and pressure tested to ensure integrity. The appropriate selection of casing materials and cementing schedule would be required and reviewed by the BLM for the prevention of intermixing or water quality degradation of identified usable water formations. This would eliminate the intermixing of groundwater encountered from various aquifers encountered during the drilling process.

Water use for development of the leases assumes the water would primarily be imported and purchased from the nearest municipality based on previous oil and gas development in the area and would be finalized during the APD stage. Water uses associated with development of the leases would occur during well construction and completion period (such as hydraulic fracturing), the operation period (e.g., water use associated with dust control), and during interim and final reclamation.

It is estimated that a total of 4 to 32 acre-feet of water would be needed to drill the proposed eight exploratory wells and to suppress dust (BLM 2020b; Dalebout, 2023, November 29, 2023). If a well is successful and further development is warranted, it is estimated that up to 3 acre-feet per year would be used for operations, and 1 acre-foot per year for road maintenance (BLM 2020b). These values are estimates and can be highly variable and based on unknown factors that are not presented until the APD stage. It is expected that no water wells would be drilled on the Leases, and it is assumed that water would be sourced and imported from the nearest municipality from existing water rights, which could reduce impacts to local aquifers by preventing depletion and drawdown of groundwater resources. These assumptions are based on typical development and production operations scenarios within the project area (BLM 2020b). Actual development of individual leases may result in higher or lower water use for various reasons such as differences with geologic formations, proximity to existing support infrastructure, differences in pace of development, different development methods and control technology used by a lessee, and other reasons. Final water sources and water quantity will be defined in the APD stage. A lessee has 10 years to establish production on a lease, and if production is not established within the 10-year time frame, the lease will be terminated with no development occurring; therefore, there would be no impact on water resources (BLM 2020b).

**Impacts of the Wilderness and Lands with Wilderness Characteristics Alternative**

Under the Wilderness and Lands with Wilderness Characteristics Alternative, the BLM would cancel 48 leases (encompassing 75,494.99 acres) that contain identified LWCs and one lease (encompassing 1,408.01 acres) within a designated wilderness area. The leases nearest to the San Rafael River (UTU93498, UTU93497, UTU93496, UTU93495, and UTU93518) and to the Green River (UTU93534) would be cancelled under this alternative. This would leave 10 leases available for potential mineral exploration and drilling activities. On the 10 remaining leases there are 54.72 acres of riverine wetlands and 26.22 miles of intermittent stream/rivers identified in the NWI and NHD that could be impacted by development. Potential impacts to water resources would not occur on these remaining 10 leases unless these leases are developed.

If the 10 leases are developed under this alternative, the types of potential impacts on water resources would be similar as described under the No Action Alternative. However, the three leases with APDs, (leases UTU93475, UTU93476, and UTU93479), are not included in the 10 leases and therefore would not be developed. As there would be 49 fewer leases under this alternative, potential impacts on water resources would likely be less than under the No Action Alternative (see Table 2-1), as it is likely that only 2 wells would be developed. It is estimated that a total of 1 to 8 acre-feet of water would be needed to drill the proposed two exploratory wells and to suppress dust under this alternative (BLM 2020b; Dalebout 2023).

**Impacts of the Lease Cancellation Alternative**

The Lease Cancellation Alternative would not impact water resources by removing the potential water use for development because the leases would be cancelled and not developed.

AR000677

### 3.3.11.3     Mitigation Measures and Residual Effects

Water use and groundwater and surface water quality considerations and mitigation measures for reducing impacts to water resources have been previously discussed above. All leases require implementation of Stipulation UT-S-127 NSO – *Intermittent and Perennial Streams*, Stipulation UT-S-126 *No Surface Occupancy-Natural Springs,* and Lease Notice UT-LN-128 *Floodplain Management*, which stipulate setbacks and buffers from the centerline of intermittent and perennial streams. Additionally, stipulations related to slope and erosion control as described in AIB-7 Soils would further protect against alterations to hydrological conditions. UT-S-126 *No Surface Occupancy-Natural Springs* would protect existing natural springs. Any additional required design constraints or mitigation measures would be determined at the APD stage as COAs.

### 3.3.11.4     Cumulative Effects

The following discusses the potential changes to water resources in the affected environment occurring from existing and foreseeable surface and groundwater disturbance activities, including oil and gas development. Past and present actions that have affected and would likely continue to affect surface and groundwater quality in the analysis area include surface disturbance resulting from oil and gas development and associated infrastructure, geophysical exploration, improper livestock grazing, range improvements, recreation (including OHV use), authorization of ROWs for utilities and other uses, and road development. These types of actions and activities can impact water quality through discharge of pollutants including sediments from development and chemicals used in oil and gas projects.

If the estimated eight wells in the RFDSs are developed, an estimated use of 4 to 32 acre-feet of water would be used per year. This calculation is based on a factor of 0.5 to 4 acre-feet per vertical well, which is considered a reasonable current estimate of water use associated with drilling and completion of a single vertical well within the analysis area (BLM 2020b). If more water-intensive stimulation methods (e.g., slick water fracturing) are implemented or if laterals become longer, water use could increase. Alternatively, water use estimates could be lower if produced water is reused or recycled, or if less water-intensive stimulation methods are used (e.g., nitrogen, liquid nitrogen) in hydraulic fracturing.

The total effect of this use on groundwater aquifer levels is unknown and would be identified during the APD stage. Other projects in the area include shallow livestock water wells that are likely not in the same aquifer as oil and gas (Truman 2023). With minimal project activities other than this proposed lease sale within the analysis area, it is expected that there would be minimal and short-term cumulative effects on water resources.

AR000678

# CHAPTER 4.    CONSULTATION AND COORDINATION

## 4.1    ENDANGERED SPECIES ACT CONSULTATION

The effects of oil and gas leasing development on threatened and endangered species were analyzed through Section 7 consultation as part of the 2008 PFO RMP, including the November 2018 re-initiation that added Ute ladies'-tresses, Navajo sedge, and California condor, and the May 2020 re-initiation that added yellow-billed cuckoo.

During consultation, Lease Notices to inform lease holders of the potential of threatened and endangered species, which may be impacted by oil and gas developments were attached to leases as appropriate. The proposed alternatives are in compliance with threatened and endangered species management outlined in accordance with the requirements under the FLPMA and the NEPA. These notices are found in Appendix B of this EA.

While federal regulations and policies require the BLM to make its public land and resources available on the basis of multiple use principles, it is BLM policy to conserve and protect special status species and their habitats and to ensure that actions authorized by the BLM do not contribute to special status species becoming listed as threatened and endangered by the USFWS.

For lease sales conducted within the range of listed species covered by the referenced consultation actions, the BLM regularly corresponds with the USFWS to ensure that the proposed alternatives do not exceed the impacts analyzed in the existing consultations.

2018 Lease Sales Coordination and Consultation Timeline:

- On April 3, 2018, the BLM issued a memorandum to the Utah FO of the USFWS, enclosing the September 2018 parcels to be offered at the lease sale.

- On April 12, 2018, the memorandum was followed up with an email transmitting GIS shape files of the leases to the USFWS from the BLM.

- On June 4, 2018, the BLM sent an email to the USFWS with biological and botany reports and a summarized report in a memorandum attached. The memo requested the USFWS to provide written agreement with the BLM's finding that leasing the leases would result in a finding of "may affect, but is not likely to adversely affect."

- One June 28, 2018, the USFWS responded to the BLM in written agreement with its finding for the leases within the PFO for the September Lease Sale for all species except Colorado River endangered fish species.

- On July 2, 2018, the BLM emailed the USFWS the list of leases in the December 2018 lease sale and the associated geospatial data.

- On August 3, 2018, the USFWS agreed with the determination of "may affect, but is not likely to adversely affect" for the September Lease Sale for Colorado River endangered fish species.

- On October 11, 2018, the BLM emailed the USFWS the final species-by-lease determinations and associated notices and stipulations that would be attached.

- On November 16, 2018, the USFWS agreed with the determination of "may affect, but is not likely to adversely affect" and concluded coordination for species covered under existing programmatic consultations.

AR000679

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 158 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

- On November 20, 2018, the BLM requested re-initiation of informal Section 7 consultation on multiple land use plans for the December 2018 lease sale to add geographic areas of species not originally considered. This included informal consultation for Ute ladies'-tresses and Navajo sedge and informal conference for the California condor Experimental population.

- On November 28, 2018, the USFWS concurred with the BLM's determinations and concluded Informal Section 7 Consultation.

**2023 EA Coordination Timeline**

To account for changes in the AOIs of species between 2018 and 2023 the BLM re-engaged coordination with the USFWS.

- On July 6, 2023, the BLM emailed the USFWS with the geospatial data and its species by lease determinations of "may affect, but is not likely to adversely affect."

- On September 25, 2023, the USFWS concurred with the BLM's determinations and concluded coordination.

The BLM has received and approved APDs for helium production on three leases: UTU93475, UTU93476, and UTU93479. These APDs underwent a separate environmental review (BLM 2023c). BLM specialists determined there was no suitable habitat for any federally listed species in the proximity to the surface disturbance. Therefore, additional consultation was not required for those three APDs. When or if additional APDs are submitted to develop leases, further evaluation and Section 7 consultation with USFWS would occur, as required.

## 4.2    TRIBAL CONSULTATION

Tribal consultation for leasing actions is done on a government-to-government basis.

*September 2018 Lease Sale*

For the September 2018 Lease Sale, BLM PFO notified and initiated consultation on March 28, 2018, pursuant to NEPA, NHPA, American Indian Religious Freedom Act (AIRFA), and EO 13007, with the Paiute Indian Tribe of Utah, the Hopi Tribe, Southern Ute Indian Tribe, Kaibab Band of Paiute Indians, Jicarilla Apache Nation, San Juan Southern Paiute Tribe, Pueblo of Laguna, Pueblo of Zia, Uinta Ouray Ute Indian Tribe, Navajo Nation, Northwest Band of Shoshone, Shoshone-Bannock Tribes (Fort Hall), Ute Mountain Ute Tribe, Pueblo of Jemez, and the Pueblo of Santa Clara. BLM received responses from the Hopi Tribe and Southern Ute Indian Tribe requesting to consult through the NHPA Section 106 process for the Lease Sale.

- On April 9, 2018, BLM PFO received a response from the Hopi Tribe requesting additional information and continued Tribal consultation on the proposed lease sale undertaking as part of the NHPA Section 106 process.

- On May 2, 2018, BLM PFO received a response from the Southern Ute Indian Tribe requesting additional information on the proposed lease sale undertaking as part of the NHPA Section 106 process. They additionally deferred and concurred with recommendations from resident Tribes of Utah.[1]

- On May 25, 20238, the Southern Ute Indian Tribe requested additional information as part of the Section 106 Tribal consultation efforts and a copy of the Ute Indian Tribe's statement on the lease

---

[1] No resident Tribes of Utah provided comments on the September 2018 lease sale.

AR000680

sale. They shared that the Southern Ute Indian Tribe would concur with the recommendations and support the Ute Indian Tribe's input.[2]

- On May 30, 2018, BLM provided draft Section 106 cultural resource literature review reports to the Hopi Tribe and Southern Ute Indian Tribe for their reviews and comments.

- On June 9, 2018, BLM held a consulting party meeting at the PFO for all Tribes and consulting parties participating in the Section 106 process for the lease sale.

- On July 23, 2018, the Hopi Tribe provided comments following their review of the draft Section 106 cultural resource literature review report and disagreed with BLM's finding of "no adverse effect" to historic properties ((36 CFR 800.5 (b)).

- On July 26, 2023, the BLM notified the following Tribes about the 30-day public comment period for the EA: Hopi Tribe, Jicarilla Apache Nation, Navajo Nation, Piute Indian Tribe of Utah, Pueblo of Acoma, Pueblo of Jemez, Pueblo of Laguna, Pueblo of Santa Clara, Pueblo of Zia, Santo Domingo Pueblo, Shoshone-Bannock Tribes of the Fort Hall Reservation, Southern Ute Indian Tribe, Ute Indian Tribe of the Uintah and Ouray Reservation, Ute Mountain Ute Tribe, and White Mesa Community of the Ute Mountain Ute Tribe. The BLM provided information about how to participate and how to provide comments via ePlanning.

Due to the Hopi Tribe's disagreement with the BLM's finding of "no adverse effect" to historic properties and additional disagreement from multiple Section 106 consulting parties, the BLM requested the ACHP review the BLM's finding of "no adverse effect" to historic properties. On September 10, 2018, the ACHP provided the BLM with the results of their review and concluded that BLM had correctly applied the Criteria of Adverse Effect, pursuant to 36 CFR 800.5(a)(1), and agreed with BLM's finding of "no adverse effect" for the September 2018 Lease Sale. This concluded the Section 106 process for the Lease Sale. This information was shared with consulting parties and both the Hopi Tribe and Southern Ute Indian Tribe.

Consultation with the Hopi Tribe and Southern Ute Indian Tribe concluded for the September 2018 Lease Sale on September 10, 2018, with the conclusion of the NHPA Section 106 process. See Chapter 4.3 for additional details of the NHPA Section 106 process for the September 2018 lease sale.

*December 2018 Lease Sale*

For the December 2018 Lease Sale, BLM PFO notified and initiated consultation on June 25, 2018, pursuant to NEPA, NHPA, AIRFA, and EO 13007, with the Paiute Indian Tribe of Utah, Uintah Ouray Ute Indian Tribe, the Hopi Tribe, Navajo Nation, Southern Ute Indian Tribe, Northwest Band of Shoshone, Kaibab Band of Paiute Indians, Shoshone-Bannock Tribes (Fort Hall), Pueblo of Jemez, Pueblo of Laguna, Ute Mountain Ute Tribe, Jicarilla Apache, Pueblo of Santa Clara, Pueblo of Zia, and San Juan Southern Paiute Tribe. BLM received responses from the Hopi Tribe and Southern Ute Indian Tribe requesting to consult and consultation occurred throughout the NEPA and NHPA Section 106 processes for the Lease Sale.

- In a letter dated July 16, 2018, the Hopi Tribe responded to BLM's notification about the statewide December 2018 lease sale, which included leases in the PFO. This letter requested the cancelation of the entire lease sale. The Hopi Tribe did not specify consultation for the December 2018 lease sale pursuant to NEPA, NHPA, AIRFA, or EO 13007.

---

[2] The Ute Indian Tribe choose not to consult on the September 2018 lease sale.

- In a letter dated August 8, 20218, the Southern Ute Indian Tribe requested to consult under the NHPA Section 106 process for the entirety of the statewide December 2018 lease sale. They additionally requested to review the cultural resources literature review upon its completion.

- On September 5, 2018, the draft Section 106 cultural resources literature review was provided to the Southern Ute Indian Tribe for their review and comment. BLM received no additional responses or comments from the Southern Ute Indian Tribe after providing the draft report.

Due to disagreement from multiple consulting parties and Tribes regarding BLM's determination that the statewide lease sale NHPA Section 106 undertaking would result in a "no adverse effect" to historic properties, BLM requested the ACHP to review BLM's finding of "no adverse effect"; however, the ACHP did not provide a response. As a result, pursuant to 36 CFR 800.5(c)(3)(i), BLM Utah's NHPA Section 106 responsibilities regarding the December 2018 Lease Sale were fulfilled, and BLM reaffirmed the finding of "No Adverse Effect," pursuant to 36 CFR 800.5(c)(3)(ii)(B). This information was shared with consulting parties and Tribes.

Consultation with the Southern Ute Indian Tribe concluded for the December 2018 Lease Sale on February 8, 2018, with the conclusion of the NHPA Section 106 process and issuance of leases. See Chapter 4.3 for additional details of the NHPA Section 106 process for the December 2018 lease sale.

The BLM has received and approved APDs for helium production on three leases: UTU93475, UTU93476, and UTU93479. These APDs underwent new environmental review and Tribal consultation as directed by regulation and policy. When or if additional APDs or other future potential developments are proposed, they will be subject to additional Tribal consultation pursuant to NEPA, NHPA, AIRFA, and EO 13007 as directed by regulation and current policy.

## 4.3    STATE HISTORIC PRESERVATION OFFICE AND TRIBAL HISTORIC PRESERVATION OFFICE CONSULTATION

The BLM prepared comprehensive literature reviews and analysis of cultural resources for both the September and December 2018 lease sales as part of its reasonable and good faith effort to identify historical properties and any potential adverse effects these undertakings may have on historic properties, as required by the NHPA, 54 USC 306108 (commonly and hereafter referred to as Section 106).

The ACHP document titled *Meeting the "Reasonable and Good Faith" Identification Standards in Section 106 Review* outlines the steps to determine when a reasonable and good faith identification effort has been met (ACHP 2018). The ACHP states that prior to beginning the identification stage in the Section 106 process, the regulations require the federal agency to do the following:

- "Determine and document the APE [Area of Potential Effect] in order to define where the agency will look for historic properties that may be directly or indirectly affected by the undertaking;

- Review existing information on known and potential historic properties within the APE, so the agency will have current data on what can be expected, or may be encountered, within the APE;

- Seek information from others who may have knowledge of historic properties in the area. This includes the State Historic Preservation Officer/Tribal Historic Preservation Officer and as appropriate, Indian tribes or Native Hawaiian organizations who may have concerns about historic properties of religious and cultural significance to them within the APE" (ACHP n.d.).

Following these initial steps, the regulations set out factors the agency must consider in determining what is a "reasonable and good faith effort" to identify historic properties:

AR000682

Take into account past planning, research, and studies; the magnitude and nature of the undertaking and the degree of federal involvement; the nature and extent of potential effects on historic properties; and the likely nature and location of historic properties within the APE. The Secretary of the Interior's standards and guidelines for identification provide guidance on this subject. The agency official should also consider other applicable professional, state, tribal, and local laws, standards, and guidelines. The regulations note that a reasonable and good faith effort may consist of or include 'background research, consultation, oral history interviews, sample field investigation, and field survey.'

For lease sales, the BLM's identification process includes completing a comprehensive literature review, which consists of a review and analysis of available cultural resource records and information for each parcel included in the undertaking APE as well as the surrounding area, and proactively seeking information from others who may have knowledge of historic properties in the area.

*September 2018 Lease Sale*

As part of the Section 106 process for the September 2018 Lease Sale, the BLM notified and initiated consultation with the Paiute Indian Tribe of Utah, The Hopi Tribe, Southern Ute Indian Tribe, Kaibab Band of Paiute Indians, Jicarilla Apache Nation, San Juan Southern Paiute Tribe, Pueblo of Laguna, Pueblo of Zia, Uinta Ouray Ute Indian Tribe, Navajo Nation, Northwest Band of Shoshone, Shoshone-Bannock Tribes (Fort Hall), Ute Mountain Ute Tribe, Pueblo of Jemez, and the Pueblo of Santa Clara. See Chapter 4.2 for additional information about Tribal consultation.

BLM PFO additionally sent invitations to the following potential consulting parties: Emery County, Emery County Public Lands Administration, SUWA, Utah Professional Archaeological Council (UPAC), Utah Statewide Archaeological Society, State Institutional Trust Lands Administration, Public Lands Policy Coordinating Office (PLPCO), Utah Rock Art Research Association (URARA) in association with Johnathan Bailey, and the Southwest Utah Group of the National Park Service. As part of the invitation letters, BLM requested information for this undertaking, cultural resources, and potential effects to historic properties as a result of this lease sale. BLM received consulting party requests from the URARA, PLPCO, SUWA, and UPAC. BLM accepted these requests for consulting party status. On June 20, 2018, a consulting party meeting was held about the lease sale.

BLM reached a finding of "No Adverse Effect" to historic properties (36 CFR 800.5 (b)) for the September 2018 Lease Sale and sought concurrence with the Utah SHPO in July 2018. BLM received SHPO concurrence on BLM's finding of No Adverse Effect on July 23, 2018.

Due to disagreement from multiple consulting parties and Tribes regarding BLM's determination that the lease sale undertaking would result in "no adverse effect" to historic properties, BLM requested the ACHP to review BLM's finding of "no adverse effect." On September 10, 2018, the ACHP provided BLM the results of their review and concluded that BLM had correctly applied the Criteria of Adverse Effect, pursuant to 36 CFR 800.5(a)(1), and agreed with BLM's finding of "no adverse effect" for the September 2018 Lease Sale and thereby concluding the Section 106 process for the Lease Sale. This information was shared with consulting parties and Tribes.

*December 2018 Lease Sale*

As part of the Section 106 process for the statewide December 2018 Lease Sale, the BLM notified and initiated consultation for the PFO proposed parcels with the Paiute Indian Tribe of Utah, Uintah Ouray Ute Indian Tribe, the Hopi Tribe, Navajo Nation, Southern Ute Indian Tribe, Northwest Band of Shoshone, Kaibab Band of Paiute Indians, Shoshone-Bannock Tribes (Fort Hall), Pueblo of Jemez,

Pueblo of Laguna, Ute Mountain Ute Tribe, Jicarilla Apache, Pueblo of Santa Clara, Pueblo of Zia, San Juan Southern Paiute. See Chapter 4.2 for additional information about Tribal consultation.

BLM State Office additionally sent invitations to the following potential consulting parties as part of the statewide December 2018 Lease Sale: SUWA, UPAC, Emery County Public Lands Administration, Utah Statewide Archaeological Society, URARA, Utah School and Institutional Trust Lands Administration, PLPCO, Emery County Commission, Sevier County Commissioner, Old Spanish Trail Association, Friends of Cedar Mesa, Grand County Historic Preservation Commission, Uintah County Public Lands, Ashley National Forest, Daggett County Public Lands Advisory Committee, The Church of Jesus Christ of Latter Day Saints (LDS) Church History, Daughters of Utah Pioneers, Sons of Utah Pioneers, Uintah-Wasatch-Cache National Forest, Bureau of Indian Affairs, Daggett County Commissioner, UDWR, San Juan County, Rich County, National Trust for Historic Preservation, Region 4 of the USFS, and Timpanogos Cave National Monument. As part of the invitation letters, BLM requested information for this undertaking, cultural resources, and potential effects to historic properties as a result of this lease sale.

BLM received consulting party requests from the URARA, SUWA, National Trust for Historic Preservation, Friends of Cedar Mesa, Old Spanish Trail Association, UPAC, Grand County Historical Preservation Commission, and National Park Service. BLM accepted these requests for consulting party status. Due to the statewide nature of the lease sale, not all of the consulting parties provided information related to the lease parcels located in the PFO being re-analyzed in this EA. On September 20, 2018, a consulting party meeting was held about the December 2018 Lease Sale.

BLM reached a finding of "No Adverse Effect" to historic properties (36 CFR 800.5 (b)) for the statewide December 2018 Lease Sale and sought concurrence with the Utah SHPO in October 2018. BLM received SHPO concurrence on BLM's finding of No Adverse Effect on October 25, 2018.

Due to disagreement from multiple consulting parties and Tribes regarding BLM's determination that the statewide lease sale undertaking would result in a "no adverse effect" to historic properties, BLM requested the ACHP to review BLM's finding of "no adverse effect;" however, the ACHP declined to provide an opinion. As a result, pursuant to 36 CFR 800.5(c)(3)(i), BLM Utah's NHPA Section 106 responsibilities regarding the December 2018 Lease Sale were fulfilled, and BLM reaffirmed the finding of "No Adverse Effect," pursuant to 36 CFR 800.5(c)(3)(ii)(B). BLM issued leases sold as part of the December 2018 lease sale on February 8, 2019. This information was shared with consulting parties and Tribes.

AR000684

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 163 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

# CHAPTER 5.    LIST OF PREPARERS

## Table 5-1. List of Preparers

| Name | Area of Expertise | Organization |
|------|-------------------|--------------|
| Tylia Varilek | Archaeologist, Contracting Officers Representative, Cultural Resources, Native American Religious Concerns | BLM Utah State Office (USO) |
| Dave Cook | Wildlife Biologist, Migratory Birds, Sensitive Wildlife Species, Fish and Wildlife (excluding USFWS designated species) | BLM USO |
| Nathan Packer | Natural Resource Specialist, Project Manager | BLM USO |
| Jared Dalebout | Hydrologist, Water Use/Consumption | BLM USO |
| Jared Reese | Wildlife Biologist, Greater Sage-Grouse | BLM USO |
| Christine Fletcher | Greater Sage-Grouse Plan Implementation Coordinator | BLM USO |
| Aaron Roe | Botanist, Threatened, Endangered, Candidate, or Proposed Animal Species, Sensitive Plant Species or Proposed Plant Species | BLM USO |
| Erik Vernon | Air Quality Specialist, GHGs | BLM USO |
| Ray Kelsey | National Conservation Lands Program Lead, ACECs, National Historic Trails, Recreation, Travel and Transportation, Visual Resources, WSRs, Wilderness/WSAs/LWCs | BLM USO |
| Angela Wadman | Branch Chief, Fluid Minerals Branch Chief | BLM USO |
| Melinda Moffitt | Litigation Coordinator | BLM USO |
| Andrew Abbondanza | Land Law Examiner | BLM USO |
| April Crawley | NEPA Reviewer | BLM USO |
| Tiera Arbogast | NEPA Reviewer | BLM USO |
| Jason Burgess-Conforti | Soils | BLM USO |
| Cassie Mellon | Fisheries and Riparian | BLM USO |
| Chad Ricklefs | Project Manager | SWCA Environmental Consultants (SWCA) |
| Emily Waters | Assistant Project Manager; NEPA Writer: Socioeconomics | SWCA |
| Erin Degutis | NEPA Writer: Visuals and Night Sky | SWCA |
| Emma Clinton | NEPA Writer: Wilderness, LWCs | SWCA |
| Ryan Rausch | NEPA Writer: Transportation and Access | SWCA |
| Erin Wielenga | NEPA Writer: GHG and Social Cost of Carbon, Air Quality, Soundscapes | SWCA |
| Bill Spain | NEPA Writer: Recreation | SWCA |

| Name | Area of Expertise | Organization |
|------|-------------------|--------------|
| Bryan Klyse | NEPA Reviewer | SWCA |
| Rachel Johnson | GIS Analyst | SWCA |

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 165 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

# CHAPTER 6.    REFERENCES

Adelman, Z., U. Shankar, D. Yang, and R. Morris. 2016. *Western Air Quality Modeling Study. Photochemical Grid Mode Final Model Performance Evaluation*. Simulation 2011 Base Version B (Base11b). Available at: http://views.cira.colostate.edu/wiki/Attachments/Modeling/WAQS_Base11b_MPE_Final.pdf. Accessed April 28, 2023.

Advisory Council of Historic Preservation (ACHP). 2018. *Meeting the "Reasonable and Good Faith" Identification Standard in Section 106 Review*. Available at: https://www.achp.gov/sites/default/files/guidance/2018-05/reasonable_good_faith_identification.pdf. Accessed June 8, 2023.

———. n.d. Meeting the "Reasonable and Good Faith" Identification Standard in Section 106 Review. Available at: https://www.achp.gov/sites/default/files/guidance/2018-05/reasonable_good_faith_identification.pdf. Accessed October 11, 2023.

Allison, E., and B. Mandler. 2018. Water in the Oil and Gas Industry: An overview of the many roles of water in oil and gas operations. Available at: https://www.americangeosciences.org/geoscience-currents/water-oil-and-gas-industry. Accessed June 19, 2023.

American Public Health Association. 2019. Addressing Environmental Justice to Achieve Health Equity. Available at: https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2020/01/14/addressing-environmental-justice-to-achieve-health-equity. Accessed June 9, 2023.

Belnap, J., R. Rosentreter, S. Leonard, J.H. Kactenecker, J. Williams, and D. Eldridge. 2001. *Biological Soil Crusts: Ecology and Management*. BLM Technical Reference 1730-2. Available at: https://www.ars.usda.gov/ARSUserFiles/6112/biologicalSoilCrusts2.pdf. Accessed June 19, 2023.

Brennan, S.T., J.L. Rivera, B.A. Varela, and A.J. Park. 2021. *National Assessment of Helium Resources within known Natural Gas Reservoirs*. U.S. Geological Survey Scientific Investigations Report 2021 – 5085. Available at: https://pubs.usgs.gov/sir/2021/5085/sir20215085.pdf. Accessed October 2, 2023.

Bureau of Land Management (BLM). 1986. *Visual Resource Inventory Manual H-8410-1*. Available at: https://www.blm.gov/sites/blm.gov/files/program_recreation_visual%20resource%20management_quick%20link_%20BLM%20Handbook%20H-8410-1%2C%20Visual%20Resource%20Inventory.pdf. Accessed April 27, 2023.

———. 1990. *Planning for Fluid Mineral Resources Handbook H-1624-1*. Available at: https://www.blm.gov/sites/blm.gov/files/H-1624-1%20rel%201-1791.pdf. Accessed July 12, 2023.

———. 1996. *Partners Against Weeds: An Action Plan for the Bureau of Land Management*. Available at: https://archive.org/details/partnersagainstw27unit/mode/2up. Accessed April 27, 2023.

———. 1997. *Standards for Rangeland Health and Guidelines for Grazing Management for BLM Lands in Utah*. Available at: https://eplanning.blm.gov/public_projects/2018159/200520802/20059148/250065330/Standards%20and%20Guidelines%20for%20Rangeland%20Health.pdf. Accessed June 19, 2023.

———. 2005. *Land Use Planning Manual 1601*. Available at: https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual1601.pdf. Accessed April 26, 2023.

AR000687

———. 2005. *Proposed Resource Management Plan and Final Environmental Impact Statement for the Price Field Office*. Appendix 21 – Fluid Mineral Reasonably Foreseeable Development. Available at: https://eplanning.blm.gov/public_projects/lup/67041/83335/99934/Appendix_21-Reasonable_Foreseeable_Development_for_Minerals.pdf. Accessed May 1, 2023.

———. 2007. *Record of Decision and Final Programmatic Environmental Impact Statement Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States*. Available at: https://eplanning.blm.gov/eplanning-ui/project/70300/510. Accessed April 27, 2023.

———. 2008a. *Price Field Office Record of Decision and Approved Resource Management Plan*. Available at: https://eplanning.blm.gov/public_projects/lup/67041/83197/99802/Price_Final_Plan.pdf. Accessed April 27, 2023.

———. 2008b. Instruction Memorandum: Migratory Bird Treaty Act Interim Management Guidance. Available at: https://www.blm.gov/policy/im-2008-050. Accessed April 27, 2023.

———. 2008c. *Price Field Office Proposed Resource Management Plan/Final EIS.* Available at: https://eplanning.blm.gov/public_projects/lup/67041/108890/133209/Vol-2-04_Price-FEIS_Chapter-4.pdf. Accessed April 24, 2023.

———. 2008d. *National Environmental Policy Act Handbook H-1790-1*. Available at: https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_Handbook_h1790-1.pdf. Accessed April 27, 2023.

———. 2011a. Washington Office IM 2011-122: Plan to Ensure Adequate Cadastral Survey Review of Boundary Evidence Prior to the Approval of Significant Land and Resource Transactions and Commercial Projects. Available at: https://www.blm.gov/policy/im-2011-122. Accessed April 27, 2023.

———. 2011b. *Roads Design Handbook 9113-1*. Available at: https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_H-9113- 1.pdf. Accessed June 5, 2023.

———. 2012. *Travel and Transportation Handbook H-8342*. Available at: https://www.ntc.blm.gov/krc/uploads/750/8342%20- %20TTM%20Planning%20Handbook.pdf. Accessed June 5, 2023.

———. 2013a. *Planning for Fluid Mineral Resources Handbook H-1624-1*. Available at: https://www.blm.gov/sites/blm.gov/files/H-1624-1%20rel%201-1791.pdf. Accessed April 26, 2023.

———. 2013b. *Competitive Leases Manual 3120*. Available at: www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual3120.pdf. Accessed April 26, 2023.

———. 2013c. *Competitive Leases Handbook 3120-1*. Available at: www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_h3120.pdf. Accessed April 26, 2023.

———. 2016a. Wild Horse and Burro Program Data. Available at: https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data. Accessed June 9, 2023.

———. 2016b. *Record of Decision and Moab Master Leasing Plan/Approved Resource Management Plan Amendments for the Moab and Monticello Field Offices*. Available at: https://eplanning.blm.gov/eplanning-ui/project/68430/510. Accessed April 27, 2023.

AR000688

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 167 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

———. 2016c. *Travel and Transportation Management Manual 1626*. Available at: https://www.blm.gov/download/file/fid/7257. Accessed June 5, 2023.

———. 2018a. *September 2018 Oil and Gas Lease Sale Environmental Assessment*. NEPA Register No. DOI-BLM-UT-0000-2018-0001-EA. Available at: https://eplanning.blm.gov/eplanning-ui/project/103243/510. Accessed April 27, 2023.

———. 2018b. *Price Field Office December 2018 Competitive Oil and Gas Lease Sale Determination of NEPA Adequacy*. NEPA Register No. DOI-BLM-UT-G020-2018-0057-DNA. Available at: https://eplanning.blm.gov/eplanning-ui/project/116617/510. Accessed April 27, 2023.

———. 2018c. Instruction Memorandum: Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews. Available at: https://www.blm.gov/policy/im-2018-034. Accessed April 26, 2023.

———. 2018d. *San Rafael Desert Master Leasing Plan*. NEPA Register No. DOI-BLM-UT-G020-2016-008-EA. Available at: https://eplanning.blm.gov/eplanning-ui/project/61781/510. Accessed April 26, 2023.

———. 2020a. *BLM Utah Air Resource Management Strategy (ARMS) Modeling Study: 2017 ARMS-Phase 2*. Available at: https://eplanning.blm.gov/public_projects/101390/200239393/20030313/250036512/BLM%20Utah%20ARMS17%20Impact%20Report%20Final%20Oct%202020.pdf. Accessed April 28, 2023.

———. 2020b. *Twin Bridges Bowknot Helium Project. Administrative draft Environmental Assessment*. Available at: https://eplanning.blm.gov/public_projects/2001542/200383490/20028429/250034631/DOI-BLM-UT-G020-2020-0033-EA%20-%20Public%20Comment%20Period.pdf. Accessed December 8, 2023

———. 2021a. *Mitigation Manual MS-1794*. Available at: https://www.blm.gov/sites/default/files/docs/2021-11/MS-1794%20Rel.%201-1807.pdf. Accessed April 26, 2023.

———. 2021b. *Mitigation Handbook H-1794-1*. Available at: https://www.blm.gov/sites/default/files/docs/2021-11/H-1794-1%20Rel%201-1808.pdf. Accessed April 26, 2023.

———. 2021c. *Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah Environmental Assessment*. DOI-BLM-UT-0000-2021-0001-EA. Available at: https://eplanning.blm.gov/eplanning-ui/project/2002778/570. Accessed April 27, 2023.

———. 2021d. *Environmental Assessment to Drill Three Wells and Construct Helium Extraction Facilities*; DOI-BLM-UT-G020-2021-0017-EA. Available at: https://eplanning.blm.gov/public_projects/2011864/200474303/20086071/250092253/NAH_EA_Final%202021-017.pdf. Accessed January 17, 2024.

———. 2021e. SC-GHG Calculations. Unpublished data set by Rebecca Moore, Senior Economist, Bureau of Land Management. On file, SWCA Environmental Consultants, Salt Lake City, Utah.

———. 2021f. BLM Manual 6310 - Conducting Wilderness Characteristics Inventory on BLM Lands. Available at https://www.blm.gov/sites/default/files/docs/2021-01/BLM-Policy-Manual-6310.pdf. Accessed January 9, 2024.

AR000689

———. 2022a. *Supplemental Environmental Assessment Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Seven States from February 2015 to December 2020*. DOI-BLM-WO-3100-2023-0001-EA. Available at: https://eplanning.blm.gov/eplanning-ui/project/2022218/570. Accessed April 27, 2023.

———. 2022b. BLM Lease Sale Emissions Tool Workbook. Provided by Bureau of Land Management.

———. 2022c. *BLM Utah 2022 First Competitive Oil and Gas Lease Sale*. DOI-BLM-UT-0000-2021-0007-EA. Available at: https://eplanning.blm.gov/eplanning-ui/project/2015573/510. Accessed April 28, 2023.

———. 2022d. *Utah Bureau of Land Management Air Resource Management Strategy 2022 Monitoring Report*. Available at: https://eplanning.blm.gov/public_projects/101390/200239393/20071763/250077945/2022%20BLM%20Utah%20Air%20Monitoring%20Report%20-%20FinalVersion.pdf. Accessed April 27, 2023.

———. 2022e. 2021 *BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends*. Available at: https://www.blm.gov/content/ghg/2021/. Accessed April 27, 2023.

———. 2022f. *Addressing Environmental Justice in NEPA Documents: Frequently Asked Questions*. Available at: https://www.blm.gov/sites/default/files/docs/2022-09/IM2022-059_att1.pdf. Accessed June 13, 2023.

———. 2022g. BLM IM 2022-059 *Environmental Justice Implementation*. Available at: https://www.blm.gov/policy/im2022-059. Accessed July 20, 2023.

———. 2022h. Environmental Justice Baseline Analysis Guidance. Word document provided by Matt Fockler, Bureau of Land Management Socioeconomic specialist. Accessed June 5, 2023.

———. 2023a. *2023 BLM Utah 3rd Quarter Oil and Gas Competitive Lease Sale*. DOI-BLM-UT-0000-2023-0001-EA. Available at: https://eplanning.blm.gov/eplanning-ui/project/2022049/510. Accessed June 5, 2033.

———. 2023b. *North American Helium Wells Scoping Report*. Available at: https://eplanning.blm.gov/public_projects/2011864/200474303/20035763/250041960/NAH_Scoping_Report.pdf. Accessed December 8, 2023.

———. 2023c. *Environmental Assessment to Drill Three Wells and Construct Helium Extraction Facilities*.DOI-BLM-UT-G020-2021-0017-EA. Available at: https://eplanning.blm.gov/public_projects/2011864/200474303/20086071/250092253/NAH_EA_Final%202021-017.pdf Accessed January 4, 2023.

———. 2023d. *Utah Bureau of Land Management Air Resource Management Strategy 2023 Monitoring Report*. Available at: https://eplanning.blm.gov/public_projects/101390/200239393/20100534/251000534/2023%20BLM%20Utah%20Air%20Monitoring%20Report%20-%20Final.pdf. Accessed December 29, 2023.

Bureau of Land Management (BLM) and U.S. Forest Service (USFS). 2007. *Surface Operating Standards and Guideline for Oil and Gas Exploration and Development: The Gold Book*. Available at: https://www.blm.gov/sites/blm.gov/files/uploads/The%20Gold%20Book%20-%204th%20Ed%20-%20Revised%202007.pdf. Accessed April 27, 2023.

Bustam, T.D., B. Thapa, and N. Buta. 2011. Demographic Differences within Race/Ethnicity Group Constraints to Outdoor Recreation Participation. *Journal of Park and Recreation Administration* 29:53–71. Available at: https://www.researchgate.net/publication/259198296 _Demographic_Differences_within_RaceEthnicity_Group_Constraints_to_Outdoor_Recreation_ Participation. Accessed June 9, 2023.

Chen, James. 2022. Probable Reserves: What it Means, How it Works. Available at: https://www.investopedia.com/terms/p/probable-reserves.asp. Accessed December 15, 2023.

Colorado River Recovery. 2022. Upper Colorado River Endangered Fish Recovery Program. Available at: https://coloradoriverrecovery.org/uc/documents/recovery-action-plan-riprap/. Accessed April 27, 2023.

Congress.gov. 2023. S.140–5 - Utah School and Institutional Trust Lands Administration Exchange Act of 2023. 118th Congress Senate Committee on Energy and Natural Resources Subcommittee on Public Lands, Forests, and Mining. Available at: https://www.congress.gov/bill/118th-congress/senate-bill/1405?s=1. Accessed July 21, 2023.

Council on Environmental Quality (CEQ). 2016. *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*. Available at: https://www.govinfo.gov/content/pkg/FR-2016-08-05/pdf/2016-18620.pdf. Accessed April 27, 2023.

Crane, M. 2023. Biologist, BLM. Sept/Dec 2018 Lease Sales EA: Kit Fox habitat. Email communication. December 6, 2023.

Dalebout, Jared. 2023a. Utah State Office Hydrologist, Bureau of Land Management. Email communication between Jared Dalebout, Hydrologist, Bureau of Land Management. Email communication between Jared Dalebout, Hydrologist, Bureau of Land Management, and Julia Aaronson, SWCA Environmental Consultants, July 18, 2023.

Dalebout, Jared 2023b. Utah State Office Hydrologist, Bureau of Land Management. Email communication between Jared Dalebout, Hydrologist, Bureau of Land Management, and Emily Waters, SWCA Environmental Consultants, November 29, 2023.

Emery County. 2016. *Emery County General Plan*. Available at: https://rmp.utah.gov/documents/ bae2147fedae4c65a10eb37b8a081dca/explore. Accessed June 9, 2023.

Falchi, F., P. Cinzano, D. Duriscoe, C.C.M. Kyba, C.D. Elvidge, K. Baugh, B.A. Portnov, N.A. Rybnikova, and R. Furgoni. 2016a. The New World Atlas of Artificial Night Sky Brightness. Available at: https://www.science.org/doi/10.1126/sciadv.1600377. Accessed April 27, 2023.

———. 2016b. Supplement to The New World Atlas of Artificial Night Sky Brightness. GFZ Data Services. Available at: http://doi.org/10.5880/GFZ.1.4.2016.001. Accessed April 27, 2023.

Federal Emergency Management Agency 2020. Special Flood Hazard Area (SFHA). Available at: https://www.fema.gov/glossary/special-flood-hazard-area-sfha. Accessed October 11, 2023.

———. 2022. Benefits of Natural Floodplains. Available at: https://www.fema.gov/floodplain-management/wildlife-conservation/benefits-natural. Accessed October 11, 2023.

AR000691

Fernando, Jason. 2022. Possible Reserves: What It is, How it Works, Example. Available at: https://www.investopedia.com/terms/p/possible-reserves.asp. Accessed December 15, 2023.

Foresight Design Initiative. 2017. What Does an Environmental Justice Community Even Mean? Available at: https://www.foresightdesign.org/blog/2017/7/19/xcd8aq95i73fy933hw4ppjappv346t. Accessed July 13, 2023.

FracFocus. 2023. FracFocus Chemical Disclosure Registry. Available at: http://fracfocus.org/. Accessed December 8, 2023.

Gage, B.D., and D.L. Driskill. 2005. *Analyses of Natural Gases, 2002–2004*. Technical Note 418. Available at: https://www.blm.gov/sites/default/files/documents/files/Library_BLMTechnicalNote418.pdf. Accessed October 2, 2023.

Headwaters Economics. 2023a. Populations at Risk. Available at: https://headwaterseconomics.org/apps/economic-profile-system/49015. Accessed July 13, 2023.

———. 2023b. Bureau of Land Management Socioeconomic Profile Tool: Price Field Office. Available at: https://headwaterseconomics.org/tools/blm-profiles/. Accessed January 19, 2023.

Intergovernmental Panel on Climate Change Climate Change (IPCC). 2007. AR4 Climate Change 2007: The Physical Basis. Cambridge and New York: Cambridge University Press. Available at: https://www.ipcc.ch/report/ar4/wg1/. Accessed April 27, 2023.

Interagency Working Group on Social Cost of Greenhouse Gases, United States Government (IWG). 2021. *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide: Interim Estimates under Executive Order 13990*. Available at: https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf. Accessed April 27, 2023.

Kaitchuck, J. 2023. Biologist, BLM. BLM UT Sept/Dec 2018 Lease Sales EA: Kit Fox habitat. Email communication. September 28, 2023.

Kartit, D. 2022. Factbox: Energy crisis revises coal demand and production. Reuters. Available at: https://www.reuters.com/business/energy/energy-crisis-revives-coal-demand-production-2022-10-19/ Accessed June 16, 2023.

Lowry, J.H., Jr., R.D. Ramsey, K. Boykin, D. Bradford, P. Comer, S. Falzarano, W. Kepner, J. Kirby, L. Langs, J. Prior-Magee, G. Manis, L. O'Brien, T. Sajwaj, K.A. Thomas, W. Rieth, S. Schrader, D. Schrupp, K. Schulz, B. Thompson, C. Velasquez, C. Wallace, E. Waller, and B. Wolk. 2005. Southwest Regional Gap Analysis Project: Final Report on Land Cover Mapping Methods, RS/GIS Laboratory, Utah State University, Logan, Utah.

Lowry, B.J., C.V. Ransom, R. Whitesides, and H. Olsen. 2017. *Noxious Weed Field Guide for Utah*. Utah State University Extension. Available at: https://extension.usu.edu/files/Noxious-Weed-Field-Guide-for-Utah.pdf. Accessed June 19, 2023.

National Energy Technology Laboratory (NETL). 2009. *2008 Development of Baseline Data and Analysis of Life Cycle Greenhouse Gas Emissions of Petroleum-Based Fuels.* Tables 3-10, 4-55, and 5-10. DOE/NETL-2009/1346.

AR000692

———. 2019. *Life Cycle Analysis of Natural Gas Extraction and Power Generation.* Appendix F, Table F-31. DOE/NETL-2019/2039.

National Interagency Fire Center. 2023. Interagency standards for fire and fire aviation operations. Available at: https://www.nifc.gov/standards/guides/red-book. Accessed June 19, 2023.

National Park Service (NPS). 2016a. Night Skies – Night Sky Monitoring Database. Available at: https://www.nps.gov/subjects/nightskies/skymap.htm. Accessed April 27, 2023.

———. 2016b. Night Skies – Night Sky Monitoring Report Metrics & Glossary of Terms. Available at: https://www.nps.gov/subjects/nightskies/skydata.htm. Accessed April 27, 2023.

———. 2017. Noise Sources. Available at: https://www.nps.gov/subjects/sound/noise-sources.htm. Accessed April 27, 2023.

———. 2018. Understanding Sound. Available at: https://www.nps.gov/subjects/sound/understandingsound.htm. Accessed June 7, 2023.

———. 2020. Class I Areas. Available at: https://www.nps.gov/subjects/air/class1.htm. Accessed April 27, 2023.

———. 2021. Mapping Sound. Available at: https://www.nps.gov/subjects/sound/soundmap.htm. Accessed June 7, 2023.

Oliver; G.V., and J. Tuhy. 2010. Ecological Integrity Tables for Utah Animals of Conservation Concern. Salt Lake City, Utah: Utah Division of Wildlife Resources.

Pacheco N., and S.F. Ali. 2008. *Helium Resources of the United States – 2007. Technical Note 429*. Available at: https://ia802800.us.archive.org/26/items/heliumresourceso00pach/HeliumResourceOfTheUs2007_88073855.pdf. Accessed October 2, 2023.

Resources for the Future. 2023. The Community Impacts of Shale Gas and Oil Development. Available at: https://www.rff.org/topics/industry-and-fuels/community-impacts-shale-gas-and-oil-development/. Accessed July 13, 2023.

State of Utah. 2018. *State of Utah Resource Management Plan*. Available at: https://le.utah.gov/interim/2018/pdf/00000658.pdf. Accessed April 26, 2023.

Truman, Dana 2023. Assistant Field Office Manager, Resources, Bureau of Land Management. Email communication between Jared Dalebout, Hydrologist, Bureau of Land Management, and Emily Waters, SWCA Environmental Consultants, December 1, 2023.

U.S. Census Bureau. 2021a. American Community Survey 2021: ACS-5 Year Estimates Detailed Tables. Table B03002: Hispanic or Latino Origin by Race. Available at: https://data.census.gov/table?q=B03002&tid=ACSDT5Y2021.B03002. Accessed April 21, 2023.

———. 2021b. American Community Survey 2021: ACS-5 Year Estimates Detailed Tables. Table C17002: Ratio of Income to Poverty Level in the Past 12 Months. Available at: https://data.census.gov/table?q=C17002. Accessed April 21, 2023.

AR000693

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 172 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

———. 2021c. American Community Survey 2021: ACS 5-Year Estimates Detailed Tables. Table B02010: American Indian and Alaska Native Alone or in Combination with One or More Other Races. Available at: https://data.census.gov/table?q=Census+Table+B02010&g= 040XX00US49_050XX00US49015_1400000US49015976200,49015976300,49015976500_150 0000US490159762001,490159762002,490159762003,490159762004,490159763001,49015976 3002,490159765001,490159765002,490159765003. Accessed June 6, 2023.

U.S. Department of Agriculture. 2010. *Dixie and Fishlake National Forests Oil and Gas Leasing Environmental Impact Statements, Air Quality Monitoring Report*. Available at: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5199564.pdf. Accessed April 27, 2023.

U.S. Department of Health and Human Services. 2022. Climate Change & Health Equity, and Environmental Justice at HHS. Available at: https://www.hhs.gov/climate-change-health-equity-environmental-justice/index.html. Accessed June 6, 2023.

U.S. Energy Information Administration (EIA). 2022. U.S. to release 30 million barrels of crude oil from its Strategic Petroleum Reserve. Available at: https://www.eia.gov/todayinenergy/detail.php?id=51538. Accessed July 5, 2023.

———. 2023. Annual Energy Outlook 2023. Available at: https://www.eia.gov/outlooks/aeo/. Accessed April 27, 2023.

U.S. Environmental Protection Agency (EPA). 1974. EPA Identifies Noise Levels Affecting Health and Welfare. Available at: https://www.epa.gov/archive/epa/aboutepa/epa-identifies-noise-levels-affecting-health-and-welfare.html. Accessed October 11, 2023.

———. 1978. Protective Noise Levels. Condensed Version of EPA Levels Document. Available at: https://nepis.epa.gov/Exe/ZyPDF.cgi/20012HG5.PDF?Dockey=20012HG5.PDF. Accessed July 20, 2023.

———. 2008. *The Ecological and Hydrological Significance of Ephemeral and Intermittent Streams in the Arid and Semi-arid American Southwest*. Available at: https://www.epa.gov/sites/default/files/2015-03/documents/ephemeral_streams_report_final_508-kepner.pdf. Accessed December 8, 2023.

———. 2015. *Analysis of Hydraulic Fracturing Fluid Data from the FracFocus Chemical Disclosure Registry 1.0*. Available at: https://www.epa.gov/hfstudy/analysis-hydraulic-fracturing-fluid-data-fracfocus-chemical-disclosure-registry-1-pdf. Accessed July 13, 2023.

———. 2022a. Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2020. Washington, D.C.: U.S. Environmental Protection Agency. Available at: https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2020. Accessed April 27, 2023.

———. 2022b. EJScreen 2022 Version 2.11. Available at: https://ejscreen.epa.gov/mapper/. Accessed April 24, 2023.

———. 2022c. Frequent Questions about EJScreen. Available at: https://www.epa.gov/ejscreen/frequent-questions-about-ejscreen. Accessed June 6, 2023.

———. 2022d. How to Interpret a Standard Report in EJScreen. Available at: https://www.epa.gov/ejscreen/how-interpret-standard-report-ejscreen. Accessed June 6, 2023.

AR000694

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 173 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*           *June 2024*

———. 2023a. Ground-level Ozone Pollution. Available at: https://www.epa.gov/ground-level-ozone-pollution. Accessed July 13, 2023.

———. 2023b. Particulate Matter Basics. Available at: https://www.epa.gov/pm-pollution/particulate-matter-pm-basics. Accessed July 13, 2023.

———. 2023c. Basic Information about $NO_2$. Available at: https://www.epa.gov/no2-pollution/basic-information-about-no2. Accessed July 13, 2023.

———. 2023d. Basic Information about Carbon Monoxide Outdoor Air Pollution. Available at: https://www.epa.gov/co-pollution/basic-information-about-carbon-monoxide-co-outdoor-air-pollution#What%20is%20CO. Accessed July 13, 2023.

———. 2023e. Basic Information about Lead Air Pollution. Available at: https://www.epa.gov/lead-air-pollution/basic-information-about-lead-air-pollution#health. Accessed July 13, 2023.

———. 2023f. Sulfur Dioxide Basics. Available at: https://www.epa.gov/so2-pollution/sulfur-dioxide-basics#effects. Accessed July 13, 2023.

———. 2023g. Health Effects Notebook for Hazardous Air Pollutants. Available at: https://www.epa.gov/haps/health-effects-notebook-hazardous-air-pollutants. Accessed July 13, 2023.

———. 2023h. Human Health Risk Assessment. Available at: https://www.epa.gov/risk/human-health-risk-assessment. Accessed July 13, 2023.

———. 2023i. Utah Nonattainment/Maintenance Status for Each County by Year for All Criteria Pollutants. Available at: https://www3.epa.gov/airquality/greenbook/anayo_ut.html. Accessed April 27, 2023.

———. 2023j. 2020 National Emissions Inventory. Available at: https://www.epa.gov/air-emissions-inventories/2020-nei-supporting-data-and-summaries. Accessed June 7, 2023.

———. 2023k. Utah Class I Areas. Available at: https://www.epa.gov/visibility/list-areas-protected-regional-haze-program. Accessed April 27, 2023.

———. 2023l. Greenhouse Gas Equivalencies Calculator. Available at: https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator. Accessed April 27, 2023.

———. 2023m. Environmental Justice and National Environmental Policy Act. Available at: https://www.epa.gov/environmentaljustice/environmental-justice-and-national-environmental-policy-act. Accessed July 13, 2023.

———. 2023n. Greenhouse Gas Inventory Data Explorer. Available at: https://cfpub.epa.gov/ghgdata/inventoryexplorer/. Accessed April 27, 2023.

———. 2023l. Overview of the Drinking Water Sole Source Aquifers Program. Available at: https://www.epa.gov/dwssa/overview-drinking-water-sole-source-aquifer-program#What_Is_SSAData. Accessed December 8, 2023.

———. 2023o. Sole Source Aquifers Interactive Map. Available at: https://epa.maps.arcgis.com/apps/webappviewer/index.html?id=9ebb047ba3ec41ada1877155fe31356b. Accessed December 8, 2023.

AR000695

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 174 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*DOI-BLM-UT-0000-2023-0007-EA*
*June 2024*

U.S. Fish and Wildlife Service (USFWS) and National Marine Fisheries Service. 1998. Endangered Species Consultation Handbook. Available at: https://www.fws.gov/media/endangered-species-consultation-handbook. Accessed October 11, 2023.

———. 2023. National Wetlands Inventory – Wetland Mapper. Available at: https://www.fws.gov/program/national-wetlands-inventory/wetlands-mapper. Accessed January 2024.

U.S. Geological Survey (USGS). 2019. National Hydrography Dataset. Available at: https://www.usgs.gov/national-hydrography/national-hydrography-dataset. Accessed July 14, 2023.

———. 1991. *Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin*. Available at: https://pubs.usgs.gov/pp/1411c/report.pdf. Accessed November 30, 2023.

———. 1976. *Principles of the Mineral Resource Classification System of the U.S. Bureau of Mines and U.S. Geological Survey*. Geological Survey Bulletin 1450-A. Available at: https://pubs.usgs.gov/bul/1450a/report.pdf. Accessed December 15, 2023.

———. 1984. *Bedrock Aquifers in the Northern San Rafael Swell Area, Utah, with Special Emphasis on the Navajo Sandstone.* State of Utah Department of Natural Resources Technical Publication No. 78. Available at: https://waterrights.utah.gov/docSys/v920/w920/w92000a3.pdf. Accessed December 8, 2023.

———. 1987. *Ground-water Flow in the Navajo Sandstone in Parts of Emery, Grand, Carbon, Wayne, Arfield, and Kane Counties, Southeast Utah*. Available at: https://pubs.usgs.gov/wri/1986/4012/report.pdf. Accessed December 12, 2023.

U.S. Government Accountability Office (GAO). 2008. *Oil and Gas Leasing: Interior Could Do More to Encourage Diligent Development*. Available at: https://www.gao.gov/new.items/d0974.pdf. Accessed April 27, 2023.

U.S. Office of Management and Budget. 2021. Regulatory Matters. Available at: https://www.whitehouse.gov/omb/information-regulatory-affairs/regulatory-matters/#scghgs. Accessed April 27, 2023.

Utah Department of Environmental Quality (UDEQ). 2023. Utah Environmental Interactive Map. Available at: https://enviro.deq.utah.gov/. Accessed December 8, 2023.

Utah Division of Air Quality (UDAQ). 2017. Utah Air Quality Rules. Available at: https://deq.utah.gov/search-results?q=R307-205. Accessed April 27, 2023.

———. 2020. *2017 Statewide Emissions Inventory*. Available at: https://deq.utah.gov/air-quality/2017-statewide-emissions-inventories. Accessed April 27, 2023.

———. 2022. HAPs Point Source Summary. Available at: https://deq.utah.gov/air-quality/2017-statewide-emissions-inventories. Accessed April 27, 2023.

———. 2023. Statewide Emissions Inventory Program - Utah Department of Environmental Quality. Available at: https://deq.utah.gov/air-quality/statewide-emissions-inventory-program. Accessed April 27, 2023.

AR000696

Utah Division of Oil, Gas and Mining. 2018. Online Oil and Gas Information System. Available at: https://oilgas.ogm.utah.gov/oilgasweb/live-data-search/lds-main.xhtml. Accessed March 8, 2023.

———. 2023. Monthly Production Reports - By County. Available at: https://oilgas.ogm.utah.gov/oilgasweb/publications/monthly-rpts-by-cnty.xhtml?rptType=CNTY. Accessed July 13, 2023.

Utah Division of Water Quality (UDWQ). 2004. *Price River, San Rafael River, and Muddy Creek TMDLs for Total Dissolved Solids West Colorado Watershed Management Unit, Utah*. Available at: https://documents.deq.utah.gov/water-quality/watershed-protection/total-maximum-daily-loads/DWQ-2015-006611.pdf. Accessed December 11, 2023

———. 2022. *Final 2022 Integrated Report on Water Quality*. Available at: https://documents.deq.utah.gov/water-quality/monitoring-reporting/integrated-report/DWQ-2022-002386.pdf. Accessed December 11, 2023.

Utah Division of Water Rights. 2023 Water Rights Interactive Map. Available at: Water Rights Interactive Map. Available at: https://maps.waterrights.utah.gov/EsriMap/map.asp?layersToAdd=Policy&view=38.9230555237,-110.683988185,12. Accessed December 11, 2023.

Utah Division of Wildlife Resources (UDWR). 2015. *Utah Wildlife Action Plan*. DWR Publication 15-14. Available at: https://wildlife.utah.gov/pdf/WAP/Utah_WAP.pdf. Accessed October 3, 2023

———. 2017. *Utah Pronghorn Statewide Management Plan*. Available at: https://wildlife.utah.gov/pdf/bg/pronghorn_plan.pdf. Accessed June 21, 2023.

———. 2023. Strategic Plan. Available at: https://wildlife.utah.gov/strategic-plan.html. Accessed October 30, 2023.

Wiseman, T.J., and M.T. Eckles. 2020. *Proven and Hypothetical Helium Resources in Utah*. Utah Geological Survey Miscellaneous Publication 174. Available at: https://ugspub.nr.utah.gov/publications/misc_pubs/mp-174/mp-174-booklet.pdf. Accessed October 2, 2023.

AR000697

# Appendix A. Lease List and Map

| Lease Number | Status | Acres |
|---|---|---|
| UTU93466 | Relinquished | 1,967.64 |
| UTU93468 | Partially relinquished | 1,910.00 |
| UTU93469 | Sold | 1,920.00 |
| UTU93470 | Sold | 1,920.00 |
| UTU93471 | Sold | 1,952.60 |
| UTU93472 | Sold | 2,560.00 |
| UTU93473 | Sold | 1,920.00 |
| UTU93474 | Sold | 2,555.12 |
| UTU93475 | Sold | 1,969.20 |
| UTU93476 | Sold | 1,970.28 |
| UTU93477 | Relinquished | 2,019.64 |
| UTU93478 | Relinquished | 1,319.99 |
| UTU93479 | Sold | 2,560.00 |
| UTU93480 | Sold | 1,920.00 |
| UTU93481 | Partially relinquished | 2,555.40 |
| UTU93482 | Relinquished | 1,920.00 |
| UTU93483 | Partially relinquished | 2,560.00 |
| UTU93484 | Sold | 1,918.96 |
| UTU93485 | Sold | 1,951.12 |
| UTU93486 | Sold | 1,950.48 |
| UTU93487 | Sold | 1,982.36 |
| UTU93489 | Sold | 2,440.00 |
| UTU93491 | Sold | 2,520.28 |
| UTU93492 | Sold | 1,600.00 |
| UTU93493 | Sold | 2,460.00 |
| UTU93494 | Sold | 1,882.16 |
| UTU93495 | Sold | 1,974.48 |
| UTU93496 | Sold | 1,968.74 |
| UTU93497 | Sold | 2,014.60 |
| UTU93498 | Sold | 1,324.84 |
| UTU93499 | Sold | 2,560.00 |
| UTU93500 | Relinquished | 1,920.00 |
| UTU93501 | Relinquished | 2,556.96 |

AR000698

| Lease Number | Status | Acres |
|---|---|---|
| UTU93502 | Sold | 1,920.00 |
| UTU93503 | Relinquished | 2,560.00 |
| UTU93504 | Relinquished | 1,919.04 |
| UTU93505 | Sold | 1,953.00 |
| UTU93506 | Sold | 1,952.00 |
| UTU93507 | Sold | 1,983.00 |
| UTU93508 | Sold | 1,238.00 |
| UTU93509 | Sold | 2,560.00 |
| UTU93510 | Sold | 1,920.00 |
| UTU93511 | Sold | 2,492.00 |
| UTU93512 | Sold | 1,920.00 |
| UTU93513 | Sold | 2,560.00 |
| UTU93514 | Sold | 1,855.00 |
| UTU93518 | Sold | 1,322.23 |
| UTU93519 | Sold | 2,560.00 |
| UTU93520 | Sold | 1,920.00 |
| UTU93521 | Sold | 2,556.12 |
| UTU93523 | Sold | 2,560.00 |
| UTU93524 | Sold | 1,918.84 |
| UTU93525 | Sold | 1,874.52 |
| UTU93526 | Sold | 2,471.00 |
| UTU93527 | Sold | 2,429.84 |
| UTU93530 | Sold | 2,519.88 |
| UTU93533 | Sold | 1,883.36 |
| UTU93534 | Sold | 896.97 |
| UTU93713 | Sold | 1,410.00 |

AR000699



**Figure A-1. Map of current leases.**

AR000700

# Appendix B. Stipulation and Notice List

Items with an asterisk (*) are new notices added since the September 2018 EA (BLM 2018a) and December 2018 DNA (BLM 2018b).

In addition to the lease-specific Stipulations and Notices listed below, the stipulations and notices presented in this table would be applied to **ALL** leases:

| Stipulations | Notices |
|---|---|
| HQ-CR-1: Cultural Resources Protection (Handbook H-3120-1) | HQ-MLA-1: Notice to Lessee (MLA) |
| HQ-TES-1: Threatened & Endangered Species Act (Handbook H-3120-1) | |

## UTU93466

### (UT0918 – 038)

Township (T.) 25 South (S.), Range (R.) 12 East (E.), Salt Lake Meridian (SLM)

Sections (Secs.) 1, 11 and 12: All

1,967.64 acres

Emery County, Utah

Price Field Office

**Stipulations**

UT-S-01:                                                                  Air Quality

UT-S-97:                          NSO – Fragile Soils/Slopes for Slopes Greater Than 40%

UT-S-101:                                CSU – Fragile Soils/Slopes 20%–40%

UT-S-126:                                                       NSO – Natural Springs

UT-S-127:                              NSO – Intermittent and Perennial Streams

UT-S-285:                                            TL – Migratory Bird Nesting

UT-S-305:                                                       CSU – Noxious Weed

**HQ-CR-1:     Notices**

UT-LN-25:                                     White-Tailed and Gunnison Prairie Dog

UT-LN-44:                                                                    Raptors

UT-LN-45:                                                              Migratory Bird

AR000701

| | |
|---|---|
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| UT-LN-157: | San Rafael Swell SRMA |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93468

### (UT0918 – 040)

T. 25 S., R. 12 E., SLM

    Sec. 13: All

    Sec. 14: N2, N2SW, E2SWSW, N2NWSWSW, S2SWSWSW, SESW, SE

    Sec. 23: All

1,910.00 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |

AR000702

| | |
|---|---|
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:**    **Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| UT-LN-157: | San Rafael Swell SRMA |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| *T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

AR000703

## UTU93469

**(UT0918 – 041)**

T. 25 S., R. 12 E., SLM

    Secs. 22, 27 and 34: All

1,920.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:**    **Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |

AR000704

| | |
|---|---|
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| UT-LN-157: | San Rafael Swell SRMA |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93470

**(UT0918 – 042)**

T. 25 S., R. 12 E., SLM
    Secs. 25, 26 and 35: All

1,920.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |

AR000705

| | |
|---|---|
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93471

### (UT0918 – 043)

T. 26 S., R. 12 E., SLM
    Secs. 1, 11 and 12: All

1,952.60 Acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |

AR000706

| | |
|---|---|
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

AR000707

## UTU93472

**(UT0918 – 044)**

T. 26 S., R. 12 E., SLM
    Secs. 13, 14, 23 and 24: All

2,560.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40%t |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:    Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |

AR000708

| | |
|---|---|
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93473

### (UT0918 – 045)

T. 26 S., R. 12 E., SLM
   Secs. 25, 26 and 35: All

1,920.00 acres

Emery County, Utah (1,838.56 acres)

Price Field Office

Wayne County, Utah (81.35 acres)

Richfield Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

AR000709

**HQ-CR-1:     Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93474

**(UT0918 – 046)**

T. 24 S., R. 13 E., SLM
    Secs. 31, 33, 34 and 35: All

2,555.12 acres

Emery County, Utah

Price Field Office

AR000710

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:     Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| UT-LN-157: | San Rafael Swell SRMA |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |

AR000711

| | |
|---|---|
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93475

### (UT0918 – 047)

T. 25 S., R. 13 E., SLM
    Secs. 1, 11 and 12: All

1,969.20 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

### HQ-CR-1:    Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |

AR000712

| | |
|---|---|
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93476

**(UT0918 – 048)**

T. 25 S., R. 13 E., SLM
    Secs. 3, 9 and 10: All

1,970.28 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |

AR000713

| | |
|---|---|
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

AR000714

## UTU93477

**(UT0918 – 049)**

T. 25 S., R. 13 E., SLM

    Secs. 4, 5 and 8: All

2,019.64 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |

AR000715

| | |
|---|---|
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93478

### (UT0918 – 050)

T. 25 S., R. 13 E., SLM
  Secs. 6 and 7: All

1,319.99 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

AR000716

**HQ-CR-1:**    **Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93479

**(UT0918 – 051)**

T. 25 S., R. 13 E., SLM
    Secs. 13, 14, 23 and 24: All

2,560.00 acres

AR000717

Emery County, Utah

Price Field Office

**Stipulations**

UT-S-01:                                                                    Air Quality

UT-S-97:                             NSO – Fragile Soils/Slopes for Slopes Greater Than 40%

UT-S-101:                                          CSU – Fragile Soils/Slopes 20%–40%

UT-S-126:                                                     NSO – Natural Springs

UT-S-127:                                        NSO – Intermittent and Perennial Streams

UT-S-285:                                               TL – Migratory Bird Nesting

UT-S-305:                                                   CSU – Noxious Weed

**HQ-CR-1:    Notices**

UT-LN-25:                                     White-Tailed and Gunnison Prairie Dog

UT-LN-44:                                                              Raptors

UT-LN-45:                                                         Migratory Bird

UT-LN-49:                                                    Utah Sensitive Species

UT-LN-51:                                     Special Status Plants: Not Federally Listed

*UT-LN-52:                                                        Noxious Weeds

*UT-LN-53:                                                        Riparian Areas

UT-LN-72:                                    High Potential Paleontological Resources

*UT-LN-96:                                          Air Quality Mitigation Measures

UT-LN-99:                                          Regional Ozone Formation Controls

UT-LN-102:                                                    Air Quality Analysis

*UT-LN-104:                                                  Burrowing Owl Habitat

*UT-LN-128:                                                 Floodplain Management

UT-LN-156:                                          Pollinators and Pollinator Habitat

T&E-03:                        Endangered Fish of the Upper Colorado River Drainage Basin

T&E-05:                                                      Listed Plant Species

AR000718

| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93480

### (UT0918 – 052)

T. 25 S., R. 13 E., SLM
    Secs. 15, 21 and 22: All

1,920.00 acres

Emery County, Utah

Price Field Office

### Stipulations

| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

### HQ-CR-1:    Notices

| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |

AR000719

| | |
|---|---|
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

# UTU93481

## (UT0918 – 053)

T. 25 S., R. 13 E., SLM

    Secs. 17, 18, 19 and 20: All

2,555.40 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

AR000720

**HQ-CR-1:     Notices**

UT-LN-25:                                              White-Tailed and Gunnison Prairie Dog

UT-LN-44:                                                                                    Raptors

UT-LN-45:                                                                           Migratory Bird

UT-LN-49:                                                                    Utah Sensitive Species

UT-LN-51:                                              Special Status Plants: Not Federally Listed

*UT-LN-52:                                                                          Noxious Weeds

*UT-LN-53:                                                                            Riparian Areas

UT-LN-72:                                              High Potential Paleontological Resources

*UT-LN-96:                                                        Air Quality Mitigation Measures

UT-LN-99:                                                        Regional Ozone Formation Controls

UT-LN-102:                                                                    Air Quality Analysis

*UT-LN-104:                                                                  Burrowing Owl Habitat

*UT-LN-128:                                                                 Floodplain Management

UT-LN-156:                                                        Pollinators and Pollinator Habitat

T&E-03:                              Endangered Fish of the Upper Colorado River Drainage Basin

T&E-05:                                                                           Listed Plant Species

*T&E-11:                                                                             California Condor

*T&E-13:                                             Barneby Reed-Mustard (*Schoenocrambe barnebyi*)

T&E-19:                                             Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

*T&E-17:                                             San Rafael Cactus (*Pediocactus despainii*)

## UTU93482

### (UT0918 – 054)

T. 25 S., R. 13 E., SLM

    Secs. 25, 26 and 35: All

1,920.00 acres

Emery County, Utah

AR000721

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |

AR000722

| | |
|---|---|
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93483

**(UT0918 – 055)**

T. 25 S., R. 13 E., SLM

    Secs. 27, 28, 33 and 34: All

2,560.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:**    **Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |

AR000723

| | |
|---|---|
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |

## UTU93484

### (UT0918 – 056)

T. 25 S., R. 13 E., SLM
    Secs. 29, 30 and 31: All

1,918.96 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

### HQ-CR-1:    Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |

AR000724

| | |
|---|---|
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93485

### (UT0918 – 057)

T. 26 S., R. 13 E., SLM

   Secs. 1, 11, 12: All

1,951.12 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |

AR000725

| | |
|---|---|
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |
| HQ-CR-1: | Cultural Resource Protection |

**Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

AR000726

## UTU93486

**(UT0918 – 058)**

T. 26 S., R. 13 E., SLM

    Secs. 3, 9 and 10: All

1,950.48 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |

AR000727

| | |
|---|---|
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93487

**(UT0918 – 059)**

T. 26 S., R. 13 E., SLM
    Secs. 4, 5 and 8: All

1,982.36 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |
| HQ-CR-1: | Cultural Resource Protection |

**Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |

AR000728

| | |
|---|---|
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93489

### (UT0918 – 061)

T. 26 S., R. 13 E., SLM
    Secs. 13 and 14: All
    Sec. 23: N2, NWSW, SE
    Sec. 24: All.

2,440.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |

| | |
|---|---|
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-269: | NSO – Mexican Spotted Owl |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:     Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

AR000730

# UTU93491

## (UT0918 – 063)

T. 26 S., R. 13 E., SLM

　　Secs. 17, 18, 19 and 20: All

2,520.28 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:　　Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |

AR000731

| | |
|---|---|
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93492

**(UT0918 – 064)**

T. 26 S., R. 13 E., SLM
   Sec. 25: All
   Sec. 26: NE, SW, N2SE, W2SWSE, E2SESE
   Sec. 35: W2NE, W2, W2SE, SESE

1,600.00 acres

Emery County, Utah (1,494.96 acres)

Price Field Office

Wayne County, Utah (105.04 acres)

Richfield Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-269: | NSO – Mexican Spotted Owl |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

AR000732

**HQ-CR-1:    Notices**

| | |
|---|---:|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93493

**(UT0918 – 065)**

T. 26 S., R. 13 E., SLM

    Sec. 27: NWNE, W2SWNE, W2, SE

    Secs. 28, 33 and 34: All

2,460.00 acres

Emery County, Utah (2,249.92 acres)

AR000733

Price Field Office

Wayne County, Utah (210.08 acres)

Richfield Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |

AR000734

| | |
|---|---|
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93494

**(UT0918 – 066)**

T. 26 S., R. 13 E., SLM

    Secs. 29, 30 and 31: All

1,882.16 acres

Emery County, Utah (1,777.15 acres)

Price Field Office

Wayne County, Utah (105.01 acres)

Richfield Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |

AR000735

| | |
|---|---|
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93495

### (UT0918 – 067)

T. 25 S., R. 14 E., SLM
  Secs. 1, 11 and 12: All

1,974.48 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |

AR000736

| | |
|---|---|
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-07: | Southwestern Willow Flycatcher |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

AR000737

# UTU93496

## (UT0918 – 068)

T. 25 S., R. 14 E., SLM

    Secs. 3, 9 and 10: All

1,968.74 acres

Emery County, Utah

Price Field Office

## Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:     Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-52: | Noxious Weeds |
| UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |

AR000738

| | |
|---|---|
| UT-LN-102: | Air Quality Analysis |
| UT-LN-104: | Burrowing Owl Habitat |
| UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-13: | Barneby Reed-Mustard (*Schoenocrambe barnebyi*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93497

### (UT0918 – 069)

T. 25 S., R. 14 E., SLM

　　Secs. 4, 5 and 8: All

2,014.60 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

AR000739

**HQ-CR-1:     Notices**

UT-LN-25:                                              White-Tailed and Gunnison Prairie Dog

UT-LN-44:                                              Raptors

UT-LN-45:                                              Migratory Bird

UT-LN-49:                                              Utah Sensitive Species

*UT-LN-52:                                             Noxious Weeds

*UT-LN-53:                                             Riparian Areas

UT-LN-72:                                              High Potential Paleontological Resources

UT-LN-51:                                              Special Status Plants: Not Federally Listed

*UT-LN-96:                                            Air Quality Mitigation Measures

UT-LN-99:                                              Regional Ozone Formation Controls

UT-LN-102:                                             Air Quality Analysis

*UT-LN-104:                                           Burrowing Owl Habitat

*UT-LN-128:                                           Floodplain Management

UT-LN-156:                                             Pollinators and Pollinator Habitat

T&E-03:                              Endangered Fish of the Upper Colorado River Drainage Basin

T&E-05:                                                Listed Plant Species

*T&E-06:                                              Mexican Spotted Owl

*T&E-11:                                              California Condor

*T&E-13:                                  Barneby Reed-Mustard (*Schoenocrambe barnebyi*)

T&E-19:                                  Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

*T&E-17:                                  San Rafael Cactus (*Pediocactus despainii*)

## UTU93498

### (UT0918 – 070)

T. 25 S., R. 14 E., SLM

    Secs. 6 and 7: All

1,324.84 acres

AR000740

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:     Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |

AR000741

T&E-05:                                                                    Listed Plant Species

*T&E-06:                                                                  Mexican Spotted Owl

*T&E-11:                                                                    California Condor

T&E-19:                                      Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

*T&E-17:                                      San Rafael Cactus (*Pediocactus despainii*)

## UTU93499

### (UT0918 – 071)

T. 25 S., R. 14 E., SLM

    Secs. 13, 14, 23 and 24: All

2,560.00 acres

Emery County, Utah

Price Field Office

### Stipulations

UT-S-01:                                                                       Air Quality

UT-S-97:                         NSO – Fragile Soils/Slopes for Slopes Greater Than 40%

UT-S-101:                                  CSU – Fragile Soils/Slopes 20%–40%

UT-S-126:                                                    NSO – Natural Springs

UT-S-127:                                      NSO – Intermittent and Perennial Streams

*UT-S-269:                                          NSO – Mexican Spotted Owl Nests

UT-S-285:                                              TL – Migratory Bird Nesting

UT-S-305:                                                  CSU – Noxious Weed

HQ-CR-1:                                              Cultural Resource Protection

### Notices

UT-LN-25:                                  White-Tailed and Gunnison Prairie Dog

UT-LN-44:                                                              Raptors

UT-LN-45:                                                          Migratory Bird

UT-LN-49:                                                  Utah Sensitive Species

AR000742

| UT-LN-51: | Special Status Plants: Not Federally Listed |
|---|---|
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

## UTU93500

**(UT0918 – 072)**

T. 25 S., R. 14 E., SLM
  Secs. 15, 21 and 22: All

1,920.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| UT-S-01: | Air Quality |
|---|---|
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |

AR000743

UT-S-101:                                       CSU – Fragile Soils/Slopes 20%–40%

UT-S-126:                                                     NSO – Natural Springs

UT-S-127:                                  NSO – Intermittent and Perennial Streams

*UT-S-269:                                            NSO – Mexican Spotted Owl Nests

UT-S-285:                                               TL – Migratory Bird Nesting

UT-S-305:                                                     CSU – Noxious Weed

**HQ-CR-1:    Notices**

UT-LN-25:                                       White-Tailed and Gunnison Prairie Dog

UT-LN-44:                                                                 Raptors

UT-LN-45:                                                          Migratory Bird

UT-LN-49:                                                      Utah Sensitive Species

UT-LN-51:                                    Special Status Plants: Not Federally Listed

*UT-LN-52:                                                         Noxious Weeds

*UT-LN-53:                                                           Riparian Areas

UT-LN-72:                                      High Potential Paleontological Resources

*UT-LN-96:                                            Air Quality Mitigation Measures

UT-LN-99:                                          Regional Ozone Formation Controls

UT-LN-102:                                                      Air Quality Analysis

*UT-LN-104:                                                    Burrowing Owl Habitat

*UT-LN-128:                                                   Floodplain Management

UT-LN-156:                                        Pollinators and Pollinator Habitat

T&E-03:                   Endangered Fish of the Upper Colorado River Drainage Basin

T&E-05:                                                        Listed Plant Species

*T&E-06:                                                    Mexican Spotted Owl

*T&E-11:                                                       California Condor

T&E-19:                              Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

*T&E-17:                               San Rafael Cactus (*Pediocactus despainii*)

# UTU93501

## (UT0918 – 073)

T. 25 S., R. 14 E., SLM

    Secs. 17, 18, 19 and 20: All

2,556.96 acres

Emery County, Utah

Price Field Office

## Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:    Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |

AR000745

UT-LN-102:                                                    Air Quality Analysis

*UT-LN-104:                                                   Burrowing Owl Habitat

*UT-LN-128:                                                   Floodplain Management

UT-LN-156:                                              Pollinators and Pollinator Habitat

T&E-03:                          Endangered Fish of the Upper Colorado River Drainage Basin

T&E-05:                                                        Listed Plant Species

*T&E-06:                                                       Mexican Spotted Owl

*T&E-11:                                                        California Condor

*T&E-17:                                         San Rafael Cactus (*Pediocactus despainii*)

T&E-19:                                     Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

## UTU93502

### (UT0918 – 074)

T. 25 S., R. 14 E., SLM

    Secs. 25, 26 and 35: All

1,920.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

UT-S-01:                                                          Air Quality

UT-S-97:                                  NSO – Fragile Soils/Slopes for Slopes Greater Than 40%

UT-S-101:                                        CSU – Fragile Soils/Slopes 20%–40%

UT-S-126:                                                    NSO – Natural Springs

UT-S-127:                                        NSO – Intermittent and Perennial Streams

*UT-S-269:                                           NSO – Mexican Spotted Owl Nests

UT-S-285:                                              TL – Migratory Bird Nesting

UT-S-305:                                                    CSU – Noxious Weed

AR000746

**HQ-CR-1:     Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| T&E-06: | Mexican Spotted Owl |
| T&E-11: | California Condor |
| T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

# UTU93503

## (UT0918 – 075)

T. 25 S., R. 14 E., SLM

    Secs. 27, 28, 33 and 34: All

2,560.00 acres

Emery County, Utah

AR000747

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:     Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |

AR000748

| | |
|---|---|
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93504

**(UT0918 – 076)**

T. 25 S., R. 14 E., SLM

    Secs. 29, 30 and 31: All

1,919.04 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:**    **Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |

AR000749

| | |
|---|---|
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93505

### (UT0918 – 077)

T. 26 S., R. 14 E., SLM
    Secs. 1, 11 and 12: All

1,953.00 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |

AR000750

| | |
|---|---|
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:      Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-07: | Southwestern Willow Flycatcher |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

# UTU93506

## (UT0918 – 078)

T. 26 S., R. 14 E., SLM

AR000751

Secs. 3, 9 and 10: All

1,952.00 acres

Emery County, Utah

Price Field Office

## Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:     Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |

AR000752

| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-07: | Southwestern Willow Flycatcher |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93507

**(UT0918 – 079)**

T. 26 S., R. 14 E., SLM

    Secs. 4, 5 and 8: All

1,983.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |

AR000753

| | |
|---|---|
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93508

**(UT0918 – 080)**

T. 26 S., R. 14 E., SLM
    Secs. 6 and 7: All

1,238.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |

AR000754

| | |
|---|---|
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93509

**(UT0918 – 081)**

T. 26 S., R. 14 E., SLM

AR000755

Secs. 13, 14, 23 and 24: All

2,560.00 acres

Emery County, Utah

Price Field Office

## Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:    Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |

AR000756

| | |
|---|---|
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-07: | Southwestern Willow Flycatcher |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93510

### (UT0918 – 082)

T. 26 S., R. 14 E., SLM

    Secs. 15, 21 and 22: All

1,920.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:**    **Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |

AR000757

| | |
|---|---:|
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-07: | Southwestern Willow Flycatcher |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93511

### (UT0918 – 083)

T. 26 S., R. 14 E., SLM

    Secs. 17, 18, 19 and 20: All

2,492.00 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---:|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |

AR000758

| | |
|---|---|
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:     Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

AR000759

## UTU93512

**(UT0918 – 084)**

T. 26 S., R. 14 E., SLM

    Secs. 25, 26 and 35: All

1,920.00 acres

Emery County, Utah (1,814.60 acres)

Price Field Office

Wayne County, Utah (105.40 acres)

Richfield Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:**    **Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |

AR000760

| | |
|---|---|
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-07: | Southwestern Willow Flycatcher |
| *T&E-11: | California Condor |
| T&E-15: | Wright Fishhook Cactus (*Sclerocactus wrightiae*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93513

**(UT0918 – 086)**

T. 26 S., R. 14 E., SLM

    Secs. 29, 30 and 31: All

1,855.00 acres

Emery County, Utah (1,712.54 acres)

Price Field Office

Wayne County, Utah (142.46 acres)

Richfield Field Office

**(UT0918 – 085)**

T. 26 S., R. 14 E., SLM

    Secs. 27, 28, 33 and 34: All

2,560.00 acres

Emery County, Utah (2,348.22 acres)

AR000761

Price Field Office

Wayne County, Utah (211.78 acres)

Richfield Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-15: | Wright Fishhook Cactus (*Sclerocactus wrightiae*) |

AR000762

T&E-19:                                         Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

# UTU93514

## Stipulations

UT-S-01:                                                            Air Quality
UT-S-97:                        NSO – Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:                                CSU – Fragile Soils/Slopes 20%–40%
UT-S-126:                                               NSO – Natural Springs
UT-S-127:                            NSO – Intermittent and Perennial Streams
*UT-S-269:                                      NSO – Mexican Spotted Owl Nests
UT-S-285:                                         TL – Migratory Bird Nesting
UT-S-305:                                              CSU – Noxious Weed

## HQ-CR-1:    Notices

UT-LN-25:                                White-Tailed and Gunnison Prairie Dog
UT-LN-44:                                                            Raptors
UT-LN-45:                                                     Migratory Bird
UT-LN-49:                                               Utah Sensitive Species
UT-LN-51:                             Special Status Plants: Not Federally Listed
UT-LN-52:                                                      Noxious Weeds
UT-LN-53:                                                     Riparian Areas
UT-LN-72:                            High Potential Paleontological Resources

*UT-LN-96:                                   Air Quality Mitigation Measures
UT-LN-99:                                  Regional Ozone Formation Controls
UT-LN-102:                                             Air Quality Analysis
UT-LN-104:                                              Burrowing Owl Habitat
UT-LN-128:                                            Floodplain Management
UT-LN-156:                                Pollinators and Pollinator Habitat
T&E-03:                 Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:                                                 Listed Plant Species
T&E-06:                                               Mexican Spotted Owl
T&E-11:                                                    California Condor
T&E-19:                                         Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

AR000763

# UTU93518

## (UT0918 – 090)

T. 25 S., R. 15 E., SLM

    Secs. 6 and 7: All

1,322.23 acres

Emery County, Utah

Price Field Office

## Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:    Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |

AR000764

| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93519

### (UT0918 – 091)

T. 25 S., R. 15 E., SLM

    Secs. 13, 14, 23 and 24: All

2,560.00 acres

Emery County, Utah

Price Field Office

### Stipulations

| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

### HQ-CR-1:     Notices

| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |

AR000765

| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-07: | Southwestern Willow Flycatcher |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93520

### (UT0918 – 092)

T. 25 S., R. 15 E., SLM

Secs. 15, 21 and 22: All

1,920.00 acres

Emery County, Utah

Price Field Office

### Stipulations

| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

### HQ-CR-1:    Notices

| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |

AR000766

| | |
|---|---|
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93521

### (UT0918 – 093)

T. 25 S., R. 15 E., SLM

    Secs. 17, 18, 19 and 20: All

2,556.12 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |

AR000767

UT-S-305:                                                      CSU – Noxious Weed

**HQ-CR-1:    Notices**

UT-LN-25:                                        White-Tailed and Gunnison Prairie Dog
UT-LN-44:                                                                        Raptors
UT-LN-45:                                                                Migratory Bird
UT-LN-49:                                                        Utah Sensitive Species
UT-LN-51:                                     Special Status Plants: Not Federally Listed
*UT-LN-52:                                                              Noxious Weeds
*UT-LN-53:                                                               Riparian Areas
UT-LN-72:                                       High Potential Paleontological Resources

*UT-LN-96:                                              Air Quality Mitigation Measures
UT-LN-99:                                            Regional Ozone Formation Controls
UT-LN-102:                                                         Air Quality Analysis
*UT-LN-104:                                                       Burrowing Owl Habitat
*UT-LN-128:                                                     Floodplain Management
UT-LN-156:                                             Pollinators and Pollinator Habitat
T&E-03:                       Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:                                                              Listed Plant Species
*T&E-06:                                                         Mexican Spotted Owl
*T&E-11:                                                            California Condor
*T&E-17:                                     San Rafael Cactus (*Pediocactus despainii*)
T&E-19:                           Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

# UTU93523

**(UT0918 – 095)**

T. 25 S., R. 15 E., SLM
     Secs. 27, 28, 33 and 34: All

2,560.00 acres

Emery County, Utah

Price Field Office

**Stipulations**

UT-S-01:                                                                      Air Quality

AR000768

| | |
|---|---|
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

# UTU93524

**(UT0918 – 096)**

T. 25 S., R. 15 E., SLM

    Secs. 29, 30 and 31: All

AR000769

1,918.84 acres

Emery County, Utah

Price Field Office

## Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:     Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| *T&E-17: | San Rafael Cactus (*Pediocactus despainii*) |

AR000770

T&E-19:                                          Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

# UTU93525

**(UT0918 – 097)**

T. 26 S., R. 15 E., SLM

    Secs. 1, 11 and 12: All

1,874.52 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:**　　**Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |

AR000771

T&E-05:                                                      Listed Plant Species
*T&E-11:                                                     California Condor

# UTU93526

## (UT0918 – 098)

T. 26 S., R. 15 E., SLM

    Secs. 3, 4, 9 and 10: All

2,471.00 acres

Emery County, Utah

Price Field Office

## Stipulations

UT-S-01:                                                      Air Quality
UT-S-97:                    NSO – Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:                               CSU – Fragile Soils/Slopes 20%–40%
UT-S-126:                                            NSO – Natural Springs
UT-S-127:                          NSO – Intermittent and Perennial Streams
UT-S-285:                                       TL – Migratory Bird Nesting
UT-S-305:                                            CSU – Noxious Weed

## HQ-CR-1:    Notices

UT-LN-25:                       White-Tailed and Gunnison Prairie Dog
UT-LN-44:                                                      Raptors
UT-LN-45:                                              Migratory Bird
UT-LN-49:                                        Utah Sensitive Species
UT-LN-51:                        Special Status Plants: Not Federally Listed
*UT-LN-52:                                             Noxious Weeds
8UT-LN-53:                                             Riparian Areas
UT-LN-72:                        High Potential Paleontological Resources

*UT-LN-96:                                 Air Quality Mitigation Measures
UT-LN-99:                              Regional Ozone Formation Controls
UT-LN-102:                                          Air Quality Analysis
*UT-LN-104:                                          Burrowing Owl Habitat
*UT-LN-128:                                        Floodplain Management

AR000772

| | |
|---|---|
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93527

**(UT0918 – 099)**

T. 26 S., R. 15 E., SLM

Secs. 5, 6, 7 and 8: All

2,429.84 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:    Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |

AR000773

| | |
|---|---|
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93530

**(UT0918 – 102)**

T. 26 S., R. 15 E., SLM

    Secs. 17, 18, 19 and 20: All

2,519.88 acres

Emery County, Utah

Price Field Office

**Stipulations**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

**HQ-CR-1:**    **Notices**

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |

AR000774

| | |
|---|---|
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

## UTU93533

### (UT0918 – 105)

T. 26 S., R. 15 E., SLM

    Secs. 29, 30 and 31: All

1,883.36 acres

Emery County, Utah (1,856.75 acres)

Price Field Office

Wayne County, Utah (26.61 acres)

Richfield Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils/Slopes for Slopes Greater Than 40% |
| UT-S-101: | CSU – Fragile Soils/Slopes 20%–40% |
| UT-S-126: | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| *UT-S-269: | NSO – Mexican Spotted Owl Nests |

AR000775

| | |
|---|---|
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-305: | CSU – Noxious Weed |

## HQ-CR-1:    Notices

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| *UT-LN-52: | Noxious Weeds |
| *UT-LN-53: | Riparian Areas |
| UT-LN-72: | High Potential Paleontological Resources |
| *UT-LN-96: | Air Quality Mitigation Measures |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| *UT-LN-104: | Burrowing Owl Habitat |
| *UT-LN-128: | Floodplain Management |
| UT-LN-156: | Pollinators and Pollinator Habitat |
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plant Species |
| *T&E-06: | Mexican Spotted Owl |
| *T&E-11: | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var. *jonesii*) |

# UTU93534

## (UT0918 – 106)

T. 23 S., R. 16 E., SLM

    Sec. 11: Lots 3, 9–11, 14, NWNW, W2SW

    Sec. 14: All

896.97 acres

Emery County, Utah

Price Field Office

AR000776

## Stipulations

UT-S-01:   Air Quality

UT-S-97:   NSO – Fragile Soils/Slopes for Slopes Greater Than 40%

UT-S-101:   CSU – Fragile Soils/Slopes 20%–40%

UT-S-126:   NSO – Natural Springs

UT-S-127:   NSO – Intermittent and Perennial Streams

UT-S-169:   CSU – Cultural Resource Inventories

*UT-S-269:   NSO – Mexican Spotted Owl Nests

UT-S-285:   TL – Migratory Bird Nesting

UT-S-305:   CSU – Noxious Weed

UT-S-319:   NSO – Cultural ACEC

## HQ-CR-1:     Notices

UT-LN-25:   White-Tailed and Gunnison Prairie Dog

UT-LN-44:   Raptors

UT-LN-45:   Migratory Bird

UT-LN-49:   Utah Sensitive Species

UT-LN-51:   Special Status Plants: Not Federally Listed

UT-LN-52:   Noxious Weeds

UT-LN-53:   Riparian Areas

*UT-LN-96:   Air Quality Mitigation Measures

UT-LN-99:   Regional Ozone Formation Controls

UT-LN-102:   Air Quality Analysis

UT-LN-104:   Burrowing Owl Habitat

UT-LN-113:   Western Yellow-billed Cuckoo

UT-LN-128:   Floodplain Management

UT-LN-156:   Pollinators and Pollinator Habitat

T&E-03:   Endangered Fish of the Upper Colorado River Drainage Basin

T&E-05:   Listed Plant Species

T&E-06:   Mexican Spotted Owl

T&E-07:   Southwestern Willow Flycatcher

T&E-11:   California Condor

T&E-19:   Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

T&E-27:   Yellow-billed Cuckoo

AR000777

## UTU93713

### (UT1218 – 257)

T. 26 S., R. 17 E., SLM

> Sec. 5: W2SW, unsurveyed
>
> Sec. 6: S2, unsurveyed
>
> Sec. 7: All, unsurveyed
>
> Sec. 8: N2NE, W2, unsurveyed

1,410.00 acres

Emery County, Utah

Price Field Office

### Stipulations

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO – Fragile Soils Slopes greater than 40% |
| UT-S-101: | CSU – Fragile Soils /Slopes 20%–40% |
| UT-S-126 | NSO – Natural Springs |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-160: | CSU – Visual Resources –VRM II |
| UT-S-169: | CSU – Cultural Resource Inventories |
| UT-S-176: | CSU – Fossil Resources (Preconstruction Surveys) |
| UT-S-177: | CSU – Fossil Resources |
| UT-S-260: | TL – Raptor Habitat |
| UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-305: | CSU – Noxious Weed |
| UT-S-343: | CSU – Fossil Resource Assessment |

### HQ-CR-1:     Notices

| | |
|---|---|
| *UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| *UT-LN-49: | Utah Sensitive Species |
| *UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-52: | Noxious Weeds |
| UT-LN-53 | Riparian Areas |
| *UT-LN-104: | Burrowing Owl Habitat |

AR000778

UT-LN-126:      Navajo Sedge

*UT-LN-128:      Floodplain Management

UT-LN-156:      Pollinators and Pollinator Habitat

T&E-03:      Endangered Fish of the Upper Colorado River Drainage Basin

T&E-05:      Listed Plant Species

T&E-06:      Mexican Spotted Owl

*T&E-07:      Southwestern Willow Flycatcher

T&E-11:      California Condor

T&E-19:      Jones Cycladenia (*Cycladenia humilis* var. *jonesii*)

T&E-22:      Ute Ladies'-Tresses (*Spiranthes diluvialis*)

AR000779

# Appendix C. Full Text Stipulations and Notices

**Table C-1. Standard Lease Stipulations and Notices (from H-3120 – Competitive Leasing Handbook)\***

| Stipulation or Notice | Description/Purpose |
|---|---|
| HQ-CR-1 | **CULTURAL RESOURCE PROTECTION**<br><br>This lease may be found to contain historic properties and/or resources protected under the National Historic Preservation Act (NHPA), American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, E.O. 13007, or other statutes and executive orders. The BLM will not approve any ground disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect such properties or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated. |
| HQ-TES-1 | **THREATENED AND ENDANGERED SPECIES ACT**<br><br>The lease area may now or hereafter contain plants, animals or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that would contribute to a need to list such species or their habitat. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. 1531 et seq. including completion of any required procedure for conference or consultation. |
| HQ-MLA-1 | **NOTICE TO LESSEE – MINERAL LEASING ACT SECTION 2(A)(2)(A)**<br><br>Provisions of the Mineral Leasing Act (MLA) of 1920, as amended by the Federal Coal Leasing Amendments Act of 1976, affect an entity's qualifications to obtain an oil and gas lease. Section 2(a)(2)(A) of the MLA, 30 U.S.C. 201(a)(2)(A), requires that any entity that holds and has held a Federal Coal Lease for 10 years beginning on or after August 4, 1976, and which is not producing coal in commercial quantities from each such lease, cannot qualify for the issuance of any other lease granted under the MLA. Compliance by coal lessees with Section 2(a)(2)(A) is explained in 43 CFR 3472.<br><br>In accordance with the terms of this oil and gas lease with respect to compliance by the initial lessee with qualifications concerning Federal coal lease holdings, all assignees and transferees are hereby notified that this oil and gas lease is subject to cancellation if:  (1) the initial lessee as assignor or as transferor has falsely certified compliance with Section 2(a)(2)(A) because of a denial or disapproval by a State Office of a pending coal action, i.e., arms-length assignment, relinquishment, or logical mining unit, the initial lessee as assignor or as transferor is no longer in compliance with Section 2(a)(2)(A). The assignee or transferee does not qualify as a bona fide purchaser and, thus, has no rights to bona fide purchaser protection in the event of cancellation of this lease due to noncompliance with Section 2(a)(2)(A).<br><br>Information regarding assignor or transferor compliance with Section 2(a)(2)(A) is contained in the lease case file as well as in other Bureau of Land Management records available through the State Office issuing this lease. |

\*These stipulations are attached to all leases issued

AR000780

**Table C-2. Utah Lease Stipulations**

| Stipulation or Notice | Description/Purpose |
|---|---|
| UT-S-01 | **AIR QUALITY**<br><br>All new and replacement internal combustion gas field engines of less than or equal to 300 design-rated horsepower shall not emit more than 2 grams of $NO_x$ per horsepower-hour.<br><br>**Exception:** This requirement does not apply to gas field engines of less than or equal to 40 design-rated horsepower.<br><br>**Modification**: None **Waiver**: None **AND**<br><br>All new and replacement internal combustion gas field engines of greater than 300 design rated horsepower must not emit more than 1.0 gram of $NO_x$ per horsepower-hour.<br><br>**Exception**: None<br><br>**Modification**: None<br><br>**Waiver**: None |
| UT-S-97 | **NO SURFACE OCCUPANCY – FRAGILE SOILS/SLOPES GREATER THAN 40 PERCENT**<br><br>No surface occupancy on slopes greater than 40 percent.<br><br>Exception: If after an environment analysis the authorized officer determines that it would cause undue or unnecessary degradation to pursue other placement alternatives; surface occupancy in the area may be authorized. In addition, a plan from the operator and BLM's approval of the plan shall be required before construction and maintenance could begin. The plan would have to include:<br><br>An erosion control strategy<br><br>GIS modeling<br><br>Proper survey and design by a certified engineer<br><br>Modification: None<br><br>Waiver: None |
| UT-S-101 | **CONTROLLED SURFACE USE – FRAGILE SOILS/SLOPES 20-40 PERCENT**<br><br>In surface disturbing proposals regarding construction on slopes of 20 percent to 40 percent, include an approved erosion control strategy and topsoil segregation/restoration plan. Such construction must be properly surveyed and designed by a certified engineer and approved by the BLM prior to project implementation, construction, or maintenance.<br><br>**Exception:** If after an environment analysis the authorized officer determines that it would cause undue or unnecessary degradation to pursue other placement alternatives; surface occupancy in the area would be authorized. In addition, a plan from the operator and BLM's approval of the plan would be required before construction and maintenance could begin. The plan must include:<br><br>An erosion control strategy<br><br>GIS modeling<br><br>Proper survey and design by a certified engineer<br><br>**Modification:** Modifications also may be granted if a more detailed analysis is conducted and shows that impacts can be mitigated, e.g., Order I soil survey conducted by a qualified soil scientist, finds that surface disturbance activities could occur on slopes between 20 and 40 percent while adequately protecting areas from accelerated erosion.<br><br>**Waiver**: None |

AR000781

| Stipulation or Notice | Description/Purpose |
|---|---|
| UT-S-126 | **NO SURFACE OCCUPANCY – NATURAL SPRINGS**<br><br>No surface disturbance or occupancy will be maintained around natural springs to protect the water quality of the spring. The distance would be based on geophysical, riparian, and other factors necessary to protect the water quality of the springs. If these factors cannot be determined, a 660-foot buffer zone would be maintained.<br><br>Exception: An exception could be authorized if (a) there are no practical alternatives, (b) impacts could be fully mitigated, or (c) the action is designed to enhance the riparian resources.<br><br>Modification: None<br><br>Waiver: None |
| UT-S-127 | **NO SURFACE OCCUPANCY – INTERMITTENT AND PERENNIAL STREAMS**<br><br>No new surface disturbance (excluding fence lines) will be allowed in areas within the 100-year floodplain or 100 meters (330 feet) on either side from the centerline, whichever is greater, along all perennial and intermittent streams, streams with perennial reaches, and riparian areas.<br><br>Exception: The authorized officer could authorize an exception if it could be shown that the project as mitigated eliminated the need for the restriction.<br><br>An exception could be authorized if (a) there are no practical alternatives, (b) impacts could be fully mitigated, or (c) the action is designed to enhance the riparian resources.<br><br>Modification: None<br><br>Waiver: None |
| UT-LN-25 | **WHITE-TAILED AND GUNNISON PRAIRIE DOG**<br><br>The lessee/operator is given notice that this lease parcel has been identified as containing white-tailed or Gunnison prairie dog habitat. Modifications to the Surface Use Plan of Operations may be required in order to protect white-tailed or Gunnison prairie dog from surface disturbing activities in accordance with the Endangered Species Act and 43 CFR 3101.1-2. |
| UT-LN-44 | **RAPTORS**<br><br>Appropriate seasonal and spatial buffers shall be placed on all known raptor nests in accordance with Utah Field Office Guidelines for Raptor Protection from Human and Land use Disturbances ) and Best Management Practices for Raptors and their Associated Habitats in Utah. All construction related activities will not occur within these buffers if pre- construction monitoring indicates the nests are active, unless a site-specific evaluation for active nests is completed prior to construction and if a BLM wildlife biologist, in consultation with USFWS and UDWR, recommends that activities may be permitted within the buffer. The BLM will coordinate with the USFWS and UDWR and have a recommendation within 3-5 days of notification. Any construction activities authorized within a protective (spatial and seasonal) buffer for raptors will require an on-site monitor. Any indication that activities are adversely affecting the raptor and/or its young the on-site monitor will suspend activities and contact the BLM authorized officer immediately. Construction may occur within the buffers of inactive nests.<br><br>Construction activities may commence once monitoring of the active nest site determines that fledglings have left the nest and are no longer dependent on the nest site. Modifications to the Surface Use Plan of Operations may be required in accordance with section 6 of the lease terms and 43CFR3101.1-2. |

AR000782

| Stipulation or Notice | Description/Purpose |
|---|---|
| UT-LN-45 | **MIGRATORY BIRDS**<br><br>The lessee/operator is given notice that surveys for nesting migratory birds may be required during migratory bird breeding season whenever surface disturbances and/or occupancy is proposed in association with fluid mineral exploration and development within priority habitats. Surveys should focus on identified priority bird species in Utah. Field surveys will be conducted as determined by the authorized officer of the Bureau of Land Management.<br><br>Based on the result of the field survey, the authorized officer will determine appropriate buffers and timing limitations. |
| UT-LN-49 | **UTAH SENSITIVE SPECIES**<br><br>The lessee/operator is given notice that no surface use or otherwise disruptive activity would be allowed that would result in direct disturbance to populations or individual special status plant and animal species, including those listed on the BLM sensitive species list and the Utah sensitive species list. The lessee/operator is also given notice that lands in this parcel have been identified as containing potential habitat for species on the Utah Sensitive Species List.<br><br>Modifications to the Surface Use Plan of Operations may be required in order to protect these resources from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, Migratory Bird Treaty Act and 43 CFR 3101.1-2. |
| UT-LN-51 | **SPECIAL STATUS PLANTS: NOT FEDERALLY LISTED**<br><br>The lessee/operator is given notice that lands in this lease have been identified as containing special status plants, not federally listed, and their habitats.<br><br>Modifications to the Surface Use Plan of Operations may be required in order to protect the special status plants and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2. |
| UT-LN-52 | **NOXIOUS WEEDS**<br><br>The lessee/operator is given notice that lands in this lease have been identified as containing or is near areas containing noxious weeds. Best management practices to prevent or control noxious weeds may be required for operations on the lease. Modifications to the Surface Use Plan of Operations may be required in accordance with section 6 of the lease terms and 43 CFR 3101.1-2. |
| UT-LN-53 | **RIPARIAN AREAS**<br><br>The lessee/operator is given notice that this lease has been identified as containing riparian areas. No surface use or otherwise disruptive activity allowed within 100 meters of riparian areas unless it can be shown that (1) there is no practicable alternative; (2) that all long-term impacts are fully mitigated; or (3) that the construction is an enhancement to the riparian areas. Modifications to the Surface Use Plan of Operations may be required in accordance with section 6 of the lease terms and 43 CFR 3101.1-2. |
| UT-LN-72 | **HIGH POTENTIAL PALEONTOLOGICAL RESOURCES**<br><br>The lessee/operator is given notice that lands in this lease have been identified as having high potential for paleontological resources. Surveys will be required and modifications to the Surface Use Plan of Operations may be required in order to protect paleontological resources from surface disturbing activities in accordance with Section 6 of the lease terms and 43 CFR 3101.1-2. In addition, monitoring may be required during surface disturbing activities. |

AR000783

| Stipulation or Notice | Description/Purpose |
|---|---|
| UT-LN-96 | **AIR QUALITY MITIGATION MEASURES**<br><br>The lessee is given notice that the BLM, in coordination with the EPA and the UDAQ, among others, has developed the following air quality mitigation measures that may be applied to any development proposed on this lease. Integration of and adherence to these measures may help minimize adverse local or regional air quality impacts from oil and gas development (including but not limited to construction, drilling, and production) on regional ozone formation.<br><br>• All internal combustion equipment would be kept in good working order.<br><br>• Water or other approved dust suppressants would be used at construction sites and along roads, as determined appropriate by the authorized officer.<br><br>• Open burning of garbage or refuse would not occur at well sites or other facilities.<br><br>• Drill rigs would be equipped with Tier II or better diesel engines.<br><br>• Vent emissions from stock tanks and natural gas triethylene glycol dehydrators would be controlled by routing the emissions to a flare or similar control device, which would reduce emissions by 95% or greater.<br><br>• Low-bleed or no-bleed pneumatics would be installed on separator dump valves and other controllers.<br><br>• During completion, flaring would be limited as much as possible. Production equipment and gathering lines would be installed as soon as possible.<br><br>• Well site telemetry would be used as feasible for production operations.<br><br>• Stationary internal combustion engine would comply with the following standards: 2g $NO_x$/bhp-hr for engines <300HP; and 1g $NO_x$/bhp-hr for engines >300HP.<br><br>Additional site-specific measures may also be employed to avoid or minimize effects to local or regional air quality. These additional measures will be developed and implemented in coordination with the EPA, the UDAQ, and other agencies with expertise or jurisdiction as appropriate based on the size of the project and magnitude of emissions. |
| UT-LN-99 | **REGIONAL OZONE FORMATION CONTROLS**<br><br>To mitigate any potential impact that oil and gas development emissions may have on regional ozone formation, the following BMPs would be required for any development projects:<br><br>• Tier II or better drilling rig engines<br><br>• Stationary internal combustion engine standard of 2g $NO_x$/bhp-hr for engines <300HP and 1g $NO_x$/bhp-hr for engines >300HP<br><br>• Low-bleed or no-bleed pneumatic pump valves<br><br>• Dehydrator VOC emission controls to +95% efficiency<br><br>• Tank VOC emission controls to +95% efficiency |
| UT-LN-102 | **AIR QUALITY ANALYSIS**<br><br>The lessee/operator is given notice that prior to project-specific approval, additional air quality analyses may be required to comply with NEPA, FLPMA, and/or other applicable laws and regulations. Analyses may include dispersion modeling and/or photochemical modeling for deposition and visibility impacts analysis, control equipment determinations, and/or emission inventory development. These analyses may result in the imposition of additional project-specific air quality control measures. |

AR000784

| Stipulation or Notice | Description/Purpose |
|---|---|
| UT-LN-104 | **BURROWING OWL HABITAT**<br><br>The lessee/operator is given notice that lands in this lease have been identified as containing Burrowing Owl Habitat. Modification to the Surface Use Plan of Operations may be required in order to protect the Burrowing Owl and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2. |
| UT-LN-126 | **NAVAJO SEDGE**<br><br>In areas that contain habitat for Navajo sedge, actions will be avoided or restricted if that area is known or suspected to be habitat for Navajo sedge and the action may cause stress or disturbance to the plant.<br><br>The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage.<br><br>1.      Site inventories: a. Must be conducted to determine habitat suitability, b. Are required in known or potential habitat for all areas proposed for surface disturbance prior to initiation of project activities, at a time when the plant can be detected, and during appropriate flowering periods, c. Documentation should include, but not be limited to individual plant locations and suitable habitat distributions, and d. All surveys must be conducted by qualified individuals.<br><br>2.      Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br><br>3.      Project activities must be designed to avoid direct disturbance to populations and to individual plants:<br><br>    a.   Designs will avoid concentrating water flows or sediments into plant occupied habitat.<br><br>    b.   Construction will occur down slope of plants and populations where feasible; if well pads and roads must be sited upslope, buffers of 100 feet minimum between surface disturbances and plants and populations will be incorporated.<br><br>    c.   Where populations occur within 200 feet of well pads, establish a buffer or fence the individuals or groups of individuals during and post-construction.<br><br>    d.   Areas for avoidance will be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc.<br><br>    e.   For surface pipelines, use a 10-foot buffer from any plant locations:<br><br>    f.   If on a slope, use stabilizing construction techniques to ensure the pipelines don't move towards the population.<br><br>4.      For riparian/wetland-associated species, e.g., Navajo Sedge, avoid loss or disturbance of riparian habitats: a. Ensure that water extraction or disposal practices do not result in change of hydrologic regime.<br><br>5.      Limit disturbances to and within suitable habitat by staying on designated routes.<br><br>6.      Limit new access routes created by the project.<br><br>7.      Place signing to limit ATV travel in sensitive areas.<br><br>8.      Implement dust abatement practices near occupied plant habitat.<br><br>9.      All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area. |

AR000785

| Stipulation or Notice | Description/Purpose |
|---|---|
| | 10.  Post construction monitoring for invasive species will be required. |
| | 11.  Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in plant habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. |
| | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| UT-LN-128 | **FLOODPLAIN MANAGEMENT** |
| | The lessee/operator is given notice that, in accordance with Executive Order 11988, to avoid adverse impact to floodplains 1) facilities should be located outside the 100-year floodplain, or 2) would be minimized or mitigated by modification of surface use plans within floodplains present within the lease. |
| UT-LN-156 | **POLLINATORS AND POLLINATOR HABITAT** |
| | In order to protect pollinators and pollinator habitat, in accordance with BLM policy outlined in Instruction Memorandum No. 2016-013, Managing for Pollinators on Public Lands, and Pollinator-Friendly Best Management Practices for Federal Lands (2015), the following avoidance, minimization, and mitigation measures would apply to this parcel: |
| | 1.  Give a preference for placing well pads in previously disturbed areas, dry areas that do not support forbs, or areas dominated by nonnative grasses. |
| | 2.  Utilize existing well pads where feasible. |
| | 3.  Avoid disturbance to native milkweed patches within Monarch migration routes to protect Monarch butterfly habitat. |
| | 4.  Avoid disturbance of riparian and meadow sites, as well as small, depressed areas that may function as water catchments and host nectar- producing species, to protect Monarch butterfly habitat and nectaring sites. |
| | 5.  Minimize the use of pesticides that negatively impact pollinators. |
| | 6.  During revegetation treatments: |
| | a.  Use minimum till drills where feasible. |
| | b.  Include pollinator-friendly site-appropriate native plant seeds or seedlings in seed mixes. |
| | c.  Where possible, increase the cover and diversity of essential habitat components for native pollinators by: |
| | • Using site-appropriate milkweed seeds or seedlings within Monarch migration routes through priority sage-grouse habitat. |
| | • Using seed mixes with annual and short-lived perennial native forbs that will bloom the first year and provide forage for pollinators. |
| | • Using seed mixes with a variety of native forb species to ensure different colored and shaped flowers to provide nectar and pollen throughout the growing season for a variety of pollinators. |
| | • Seeding forbs in separate rows from grasses to avoid competition during establishment. |
| | Avoiding seeding non-native forbs and grasses that establish early and out compete slower-growing natives. |

AR000786

| Stipulation or Notice | Description/Purpose |
|---|---|
| UT-S-160 | **CONTROLLED SURFACE USE – VISUAL RESOURC–S - VRM II**<br><br>Within VRM II areas, surface disturbing activities will comply with BLM Manual Handbook 8431-1 to retain the existing character of the landscape. Exception: Recognized utility corridors are exempt. Temporary exceedance may be allowed during initial development phases.<br><br>Modification: None<br><br>Waiver: None |
| UT-S-169 | **CONTROLLED SURFACE USE – CULTURAL RESOURCE INVENTORIES**<br><br>Cultural resources inventories (including point, area, and linear features) will be required for all federal undertakings that could affect cultural resources or historic properties in areas of both direct and indirect impacts.<br><br>**Waiver of Inventory**: Although complete Class III inventories will be performed for most land use actions, an authorized officer could waive inventory for any part of an Area of Potential Effect when one or more of the following conditions exist:<br><br>Previous natural ground disturbance has modified the surface so extensively that the likelihood of finding cultural properties is negligible. (Note: This is not the same as being able to document that any existing sites may have been affected by surface disturbance; ground disturbance must have been so extensive as to reasonably preclude the location of any such sites.)<br><br>Human activity within the last 50 years has created a new land surface to such an extent as to eradicate locatable traces of cultural properties.<br><br>Existing Class II or equivalent inventory data are sufficient to indicate that the specific environmental situation did not support human occupation or use to a degree that would make further inventory information useful or meaningful.<br><br>Previous inventories must have been conducted according to current professionally acceptable standards.<br><br>Records are available and accurate and document the location, methods, and results of the inventory.<br><br>Class II "equivalent inventory data" includes an adequate amount of acreage distributed across the same specific environmental situation that is located within the study area.<br><br>Inventory at the Class III level has previously been performed, and records documenting the location, methods, and results of the inventory are available. Such inventories must have been conducted according to current professionally acceptable standards.<br><br>Natural environmental characteristics (such as recent landslides or rock falls) are unfavorable to the presence of cultural properties.<br><br>The nature of the proposed action is such that no impact can be expected on significant cultural resources.<br><br>Conditions exist that could endanger the health or safety of personnel, such as the presence of hazardous materials, explosive ordnance, or unstable structures. |
| UT-S-176 | **CONTROLLED SURFACE USE – FOSSIL RESOURCES (PRECONSTRUCTION SURVEYS)**<br><br>Preconstruction paleo surveys will be required prior to any surface disturbing activity in the Morrison, Cedar Mountain, Blackhawk, North Horn, or Chinle Formations.<br><br>Exception: The authorized officer may grant an exception if the area has previously been inventoried within the last three (3) years.<br><br>Modification: None |

AR000787

| Stipulation or Notice | Description/Purpose |
|---|---|
| | Waiver: None |
| UT-S-177 | **CONTROLLED SURFACE USE – FOSSIL RESOURCES**<br><br>A BLM permitted paleontologist will be required to be on-site during surface disturbance in any Potential Fossil Yield Classification (PFYC) 4 or 5 areas.<br><br>Exceptions: None<br><br>Modification: None<br><br>Waiver: None |
| UT-S-260 | **TIMING LIMITATION – RAPTOR HABITAT**<br><br>Raptor nesting complexes and known raptor nest sites will be closed seasonally from February 1 to July 15 within ½ mile of occupied nests.<br><br>Exception: The authorized officer may grant an exception if the raptor nest in question is deemed to be inactive by May 31 and if the proposed activity would not result in a permanent structure or facility that would cause the subject nest to become unsuitable for nesting in future years.<br><br>Modification: Season may be adjusted depending on climatic and range conditions. Distance may be adjusted if natural features provide adequate visual screening.<br><br>Waiver: This stipulation may be waived if, in cooperation with the UDWR, it is determined that the site has been permanently abandoned or unoccupied for a minimum of 3 years. |
| UT-S-269 | **NO SURFACE OCCUPANCY – MEXICAN SPOTTED OWL NESTS**<br><br>No surface occupancy with½1/2 mile of known Mexican Spotted Owl (MSO) nests.<br><br>Exception: The authorized officers may grant an exception if an environmental analysis demonstrates that the action would not impair the function or utility of the site for nesting or other owl-sustaining activities.<br><br>Modification: The authorized officers may modify the NSO area in extent if an environmental analysis finds that a portion of the area is nonessential to site utility or function or if natural features provide adequate visual or auditory screening.<br><br>Waiver: A waiver may be granted if the MSO is de-listed and the area is determined not necessary for the survival and recovery of the MSO. |
| UT-S-285 | **TIMING LIMITATION – MIGRATORY BIRD NESTING**<br><br>4.  Migratory bird nesting areas will be closed seasonally from April 15 to Augus1. Areas with migratory birds designated as BLM Special Status Species will have the highest priority.<br><br>Exception: Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or habitat conditions if activities would not cause undue stress to migratory bird populations.<br><br>Modification: Season may be adjusted depending on climatic and range conditions. Distance may be adjusted if natural features provide adequate visual screening.<br><br>Waiver: None |
| UT-S-305 | **CONTROLLED SURFACE USE – NOXIOUS WEED**<br><br>Continue implementation of noxious weed and invasive species control actions in accordance with national guidance and local weed management plans, in cooperation with State, federal, affected counties, adjoining private landowners, and other partners or interests directly affected. Implement Standard Operating Procedures and Mitigation Measures for herbicide use as well as prevention measures for noxious and invasive plants |

AR000788

| Stipulation or Notice | Description/Purpose |
|---|---|
| | identified in the Record of Decision Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic EIS and associated documents.<br><br>Exception: None<br><br>Modification: None<br><br>Waiver: None |
| UT-S-319 | **NO SURFACE OCCUPANCY – CULTURAL ACEC**<br><br>NSO for cultural values within areas of critical environmental concern (ACEC) to retain the cultural character and context of the area.<br><br>Exception: The AO may grant an oil and gas exception if it is determined that no other economic and technical feasible access is available to reach and drain the fluid mineral resources of the area. A block cultural survey must be completed and a treatment plan developed and submitted to BLM and the State Historic Preservation Office (SHPO) for their approval. The plan must contain measures to mitigate surface disturbance and reduce visual intrusion.<br><br>Modification: None<br><br>Waiver: None |
| UT-S-319 | **CONTROLLED SURFACE USE – FOSSIL RESOURCE ASSESSMENT**<br><br>An assessment of fossil resources would be required on a case-by-case basis, mitigating as necessary before and/or during surface disturbance.<br><br>Exception: The AO may grant an exception if the area has previously been inventoried and an assessment completed.<br><br>Modification: None<br><br>Waiver: None |

**Table C-3. Utah Threatened and Endangered Species Notices**

| Notice | Description/Purpose |
|---|---|
| T&E-03 | **ENDANGERED FISH OF THE UPPER COLORADO RIVER DRAINAGE BASIN**<br><br>The Lessee/Operator is given notice that the lands in this parcel contain Critical Habitat for the Colorado River fish (bonytail, humpback chub, Colorado pike minnow, and razorback sucker) listed as endangered under the Endangered Species Act, or these parcels have watersheds that are tributary to designated habitat. Critical habitat was designated for the four endangered Colorado River fishes on March 21, 1994 (59 FR 13374–13400). Designated critical habitat for all the endangered fishes includes those portions of the 100-year floodplain that contain primary constituent elements necessary for survival of the species.<br><br>Avoidance or use restrictions may be placed on portions of the lease. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following: |

AR000789

| Notice | Description/Purpose |
|---|---|
| | Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All surveys must be conducted by qualified individual(s). |
| | Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated. |
| | Water production will be managed to ensure maintenance or enhancement of riparian habitat. |
| | Avoid loss or disturbance of riparian habitats. |
| | Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. |
| | Conduct watershed analysis for leases in designated critical habitat and overlapping major tributaries in order to determine toxicity risk from permanent facilities. |
| | Implement Appendix B (Hydrologic Considerations for Pipeline Crossing Stream Channels, Technical Note 423). |
| | Drilling will not occur within 100 year floodplains of rivers or tributaries to rivers that contain listed fish species or critical habitat. |
| | In areas adjacent to 100-year flood plains, particularly in systems prone to flash floods, analyze the risk for flash floods to impact facilities, and use closed loop drilling, and pipeline burial or suspension according to Appendix B (Hydrologic Considerations for Pipeline Crossing Stream Channels, Technical Note 423, to minimize the potential for equipment damage and resulting leaks or spills. |
| | Water depletions from *any* portion of the Upper Colorado River drainage basin above Lake Powell are considered to adversely affect or adversely modify the critical habitat of the four resident endangered fish species, and must be evaluated with regard to the criteria described in the Upper Colorado River Endangered Fish Recovery Program. Formal consultation with USFWS is required for all depletions. All depletion amounts must be reported to BLM. |
| | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| T&E-05 | **LISTED PLANT SPECIES** |
| | The Lessee/Operator is given notice that the lands in this parcel contain suitable habitat for federally listed plant species under the Endangered Species Act. The following avoidance and minimization measures have been developed to facilitate review and analysis of any submitted permits under the authority of this lease: |
| | Site inventories: |
| | Must be conducted to determine habitat suitability, |
| | Are required in known or potential habitat for all areas proposed for surface disturbance prior to initiation of project activities, at a time when the plant can be detected, and during appropriate flowering periods, |
| | Documentation should include, but not be limited to individual plant locations and suitable habitat distributions, and |
| | All surveys must be conducted by qualified individuals. |

AR000790

| Notice | Description/Purpose |
|--------|-------------------|
| | Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated. |
| | Project activities must be designed to avoid direct disturbance to populations and to individual plants: |
| | Designs will avoid concentrating water flows or sediments into plant occupied habitat. |
| | Construction will occur down slope of plants and populations where feasible; if well pads and roads must be sited upslope, buffers of 300 feet minimum between surface disturbances and plants and populations will be incorporated. |
| | Where populations occur within 300 ft. of well pads, establish a buffer or fence the individuals or groups of individuals during and post- construction. |
| | Areas for avoidance will be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc. |
| | For surface pipelines, use a 10-foot buffer from any plant locations: |
| | If on a slope, use stabilizing construction techniques to ensure the pipelines don't move towards the population. |
| | For riparian/wetland-associated species, e.g., Ute ladies'-tresses, avoid loss or disturbance of riparian habitats. |
| | Ensure that water extraction or disposal practices do not result in change of hydrologic regime. |
| | Limit disturbances to and within suitable habitat by staying on designated routes. |
| | Limit new access routes created by the project. |
| | Place signing to limit ATV travel in sensitive areas. |
| | Implement dust abatement practices near occupied plant habitat. |
| | All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area. |
| | Post construction monitoring for invasive species will be required. |
| | Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in plant habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. |
| | Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated. |
| | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the Endangered Species Act. |
| T&E-06 | **MEXICAN SPOTTED OWL** |
| | The Lessee/Operator is given notice that the lands in this parcel contain suitable habitat for Mexican spotted owl, a federally listed species. The Lessee/Operator is given notice that the lands in this lease contain Designated Critical Habitat for the Mexican spotted owl, a federally listed species. Critical habitat was designated for the Mexican spotted owl on August 31, 2004 (69 FR 53181–53298). Avoidance or use restrictions may be placed on portions of the lease. |
| | Application of appropriate measures will depend whether the action is temporary or permanent, and whether it occurs within or outside the owl nesting season. |
| | A temporary action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action |

AR000791

| Notice | Description/Purpose |
|---|---|
|  | continues for more than one breeding season and/or causes a loss of owl habitat or displaces owls through disturbances, i.e. creation of a permanent structure. |
|  | The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures, will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following: |
|  | Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by qualified individual(s). |
|  | Assess habitat suitability for both nesting and foraging using accepted habitat models in conjunction with field reviews. Apply the conservation measures below if project activities occur within 0.5 mile of suitable owl habitat. Determine potential effects of actions to owls and their habitat. |
|  | Document type of activity, acreage and location of direct habitat impacts, type and extent of indirect impacts relative to location of suitable owl habitat. |
|  | Document if action is temporary or permanent. |
|  | Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated. |
|  | Water production will be managed to ensure maintenance or enhancement of riparian habitat. |
|  | Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in canyon habitat suitable for Mexican spotted owl nesting. |
|  | For all temporary actions that may impact owls or suitable habitat: |
|  | If the action occurs entirely outside of the owl breeding season (March 1 – August 31), and leaves no permanent structure or permanent habitat disturbance, action can proceed without an occupancy survey. |
|  | If action will occur during a breeding season, survey for owls prior to commencing activity. If owls are found, activity must be delayed until outside of the breeding season. |
|  | Rehabilitate access routes created by the project through such means as raking out scars, re-vegetation, gating access points, etc. |
|  | For all permanent actions that may impact owls or suitable habitat: |
|  | Survey two consecutive years for owls according to accepted protocol prior to commencing activities. |
|  | If owls are found, no actions will occur within 0.5 mile of identified nest site. If nest site is unknown, no activity will occur within the designated Protected Activity Center (PAC). |
|  | Avoid drilling and permanent structures within 0.5 mi of suitable habitat unless surveyed and not occupied. |
|  | Reduce noise emissions (e.g., use hospital-grade mufflers) to 45 dBA at 0.5 mile from suitable habitat, including canyon rims. Placement of permanent noise-generating facilities should be determined by a noise analysis to ensure noise does not encroach upon a 0.5 mile buffer for suitable habitat, including canyon rims. |
|  | Limit disturbances to and within suitable habitat by staying on approved routes. |
|  | Limit new access routes created by the project. |

| Notice | Description/Purpose |
|---|---|
|  | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the Endangered Species Act. |
| T&E-07 | **SOUTHWESTERN WILLOW FLYCATCHER**<br><br>The Lessee/Operator is given notice that the lands in this parcel contains riparian habitat that falls within the range for southwestern willow flycatcher (*Empidonax traillii extimus*), a federally listed species. Avoidance or use restrictions may be placed on portions of the lease. Application of appropriate measures will depend whether the action is temporary or permanent, and whether it occurs within or outside the nesting season. A temporary action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action continues for more than one breeding season and/or causes a loss of habitat or displaces flycatchers through disturbances, i.e., creation of a permanent structure. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures, will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following:<br><br>Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by qualified individual(s), and be conducted according to protocol.<br><br>Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br><br>Water production will be managed to ensure maintenance or enhancement of riparian habitat.<br><br>Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat.  Ensure that such directional drilling does not intercept or degrade alluvial aquifers.<br><br>Drilling activities will maintain a 300-foot buffer from suitable riparian habitat year long.<br><br>Drilling activities within 0.25 mile of occupied breeding habitat will not occur during the breeding season of May 1 to August 15.<br><br>Ensure that water extraction or disposal practices do not result in change of hydrologic regime that would result in loss or degradation of riparian habitat.<br><br>Re-vegetate with native species all areas of surface disturbance within riparian areas and/or adjacent uplands.<br><br>Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| T&E-11 | **CALIFORNIA CONDOR**<br><br>The Lessee/Operator is given notice that the lands located in this parcel contain potential habitat for the California Condor, a federally listed species. Avoidance or use restrictions may be placed on portions of the lease if the area is known or suspected to be used by condors. Application of appropriate measures will depend on whether the action is temporary or permanent, and whether it occurs within or outside potential habitat. A temporary action is completed prior to the following important season of use, leaving no |

AR000793

| Notice | Description/Purpose |
|--------|--------------------|
| | permanent structures and resulting in no permanent habitat loss. This would include consideration for habitat functionality. A <u>permanent</u> action continues for more than one season of habitat use, and/or causes a loss of condor habitat function or displaces condors through continued disturbance (i.e., creation of a permanent structure requiring repetitious maintenance, or emits disruptive levels of noise). |
| | The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following: |
| | Surveys will be required prior to operations unless species occupancy and distribution information is complete and available.  All Surveys must be conducted by qualified individual(s) approved by the BLM, and must be conducted according to approved protocol. |
| | If surveys result in positive identification of condor use, all lease activities will require monitoring throughout the duration of the project to ensure desired results of applied mitigation and protection.  Minimization measures will be evaluated during development and, if necessary, Section 7 consultation may be reinitiated. |
| | Temporary activities within 1.0 mile of nest sites will not occur during the breeding season. |
| | Temporary activities within 0.5 miles of established roosting sites or areas will not occur during the season of use, August 1 to November 31, unless the area has been surveyed according to protocol and determined to be unoccupied. |
| | No permanent infrastructure will be placed within 1.0 mile of nest sites. |
| | No permanent infrastructure will be placed within 0.5 mile of established roosting sites or areas. |
| | Remove big game carrion 100 feet from lease roadways occurring within foraging range. |
| | Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable habitat. Utilize directional drilling to avoid direct impacts to large cottonwood gallery riparian habitats. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. |
| | Re-initiation of Section 7 consultation with the Service will be sought immediately if mortality or disturbance to California condors is anticipated as a result of project activities. Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |
| | Additional measures may also be employed to avoid or minimize effects to the species between the lease sale and lease development stages. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the Endangered Species Act. |
| T&E-13 | **BARNEBY REED MUSTARD (*Schoenocrambe barnebyi*)**<br><br>In order to minimize effects to the federally threatened Barneby Reed Mustard, the Bureau of Land Management (BLM), in coordination with the U.S. Fish and Wildlife Service (Service), has developed the following avoidance and minimization measures. Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance |

AR000794

| Notice | Description/Purpose |
|---|---|
| | operations) are in compliance with the endangered Species Act (ESA). For the purposes of this document, the following terms are so defined: *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain Barneby Reed Mustard; habitat descriptions can be found in Federal Register Notice and species recovery plan links at <http:www.fws.gov/endangered/wildlife.html>.<br><br>*Occupied habitat* is defined as areas currently or historically known to support Barneby Reed Mustard; synonymous with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development:<br><br>Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable Barneby Reed Mustard habitat is present.<br><br>Site inventories will be conducted within suitable habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc. suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300-foot buffers will be maintained between surface disturbance and avoidance areas. However, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories:<br><br>Must be conducted by qualified individuals(s) and according to BLM and Service accept survey protocols,<br><br>Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually April 15 to June 5, however, surveyors should verify that the plant is flowering by contacting a BLM or USFWS botanist or demonstrating that the nearest known population is in flower),<br><br>Will occur within 300 feet from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300 feet from the perimeter of disturbance for the proposed well pad including the well pad,<br><br>Will include, but not be limited to, plant species lists and habitat characteristics, and<br><br>Will be valid until April 15 the following year.<br><br>Design project infrastructure to minimize impacts within suitable habitat:<br><br>Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300-foot buffers, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat,<br><br>Reduce well pad size to the minimum needed, without compromising safety,<br><br>Where technically and economically feasible, use directional drilling or multiple wells from the same pad,<br><br>Limit new access routes created by the project,<br><br>Roads and utilities should share common rights-of-way where possible,<br><br>Reduce the width of rights-of-way and minimize the depth of excavation needed for the roadbed; where feasible, use the natural ground surface for the road within habitat,<br><br>Place signing to limit off-road travel in sensitive areas, and<br><br>Stay on designated routes and other cleared/approved areas,<br><br>All disturbed areas will be revegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas. |

AR000795

| Notice | Description/Purpose |
|---|---|
| | Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants: |
| | Follow the above recommendations (3.) for project design within suitable habitats, |
| | To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged, |
| | Construction of roads will occur such that the edge of the right of way is at least 300 feet from any plant and 300 feet from avoidance areas, |
| | Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15 to June 5 (flowering period); dust abatement applications will be comprised of water only, |
| | The edge of the well pad should be located at least 300 feet away from plants and avoidance areas, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Surface pipelines will be laid such that a 300-foot buffer exists between the edge of the right of way and plants and 300 feet between the edge of right of way and 300 feet avoidance areas; use stabilizing and anchoring techniques when the pipeline crossed suitable habitat to ensure pipelines don't move towards the population; site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Construction activities will not occur from April 15 through June 5 within occupied habitat, |
| | Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc., |
| | Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and |
| | Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible. |
| | Occupied Barneby Reed Mustard habitats within 300 feet of the edge of the surface pipelines' rights-of-way, 300 feet of the edge of the roads' rights-of-way, and 300 feet from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities.  Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities.  Annual reports shall be provided to the BLM and the Service.  To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. |
| | Re-initiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Barneby Reed Mustard is anticipated as a result of project activities. |
| | Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |
| T&E-15 | **WRIGHT FISHHOOK CACTUS (*SCLEROCACTUS WRIGHTIAE*)**<br><br>In order to minimize effects to the federally threatened Wright Fishhook Cactus, the Bureau of Land Management (BLM), in coordination with the U.S. Fish and Wildlife Service (Service), has developed the following avoidance and minimization measures. Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance operations) are in compliance with the endangered Species Act (ESA). For the purposes of this document, the following terms are so defined: *Potential habitat* is defined as areas |

AR000796

| Notice | Description/Purpose |
|---|---|
| | which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain Wright Fishhook Cactus; habitat descriptions can be found in Federal Register Notice and species recovery plan links at |
| | <http:www.fws.gov/endangered/wildlife.html>. *Occupied habitat* is defined as areas currently or historically known to support Wright Fishhook Cactus; synonymous with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development: |
| | Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable Wright Fishhook Cactus habitat is present. |
| | Site inventories will be conducted within suitable habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc. suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300-foot buffers will be maintained between surface disturbance and avoidance areas. However, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories: |
| | Must be conducted by qualified individuals(s) and according to BLM and Service accept survey protocols, |
| | Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually April 15 to June 5th, however, surveyors should verify that the plant is flowering by contacting a BLM or USFWS botanist or demonstrating that the nearest known population is in flower), |
| | Will occur within 300 feet from the centerline of the proposed right-of- way for surface pipelines or roads; and within 300 feet from the perimeter of disturbance for the proposed well pad including the well pad, |
| | Will include, but not be limited to, plant species lists and habitat characteristics, and |
| | Will be valid until April 15 the following year. |
| | Design project infrastructure to minimize impacts within suitable habitat: |
| | Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300-foot buffers, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Reduce well pad size to the minimum needed, without compromising safety, |
| | Where technically and economically feasible, use directional drilling or multiple wells from the same pad, |
| | Limit new access routes created by the project, |
| | Roads and utilities should share common rights-of-way where possible, |
| | Reduce the width of rights-of-way and minimize the depth of excavation needed for the roadbed; where feasible, use the natural ground surface for the road within habitat, |
| | Place signing to limit off-road travel in sensitive areas, and |
| | Stay on designated routes and other cleared/approved areas, |
| | All disturbed areas will be revegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas. |

AR000797

| Notice | Description/Purpose |
|---|---|
| | Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants: |
| | Follow the above recommendations (3.) for project design within suitable habitats, |
| | To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged, |
| | Construction of roads will occur such that the edge of the right of way is at least 300 feet from any plant and 300 feet from avoidance areas, |
| | Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15 to June 5th (flowering period); dust abatement applications will be comprised of water only, |
| | The edge of the well pad should be located at least 300 feet away from plants and avoidance areas, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Surface pipelines will be laid such that a 300-foot buffer exists between the edge of the right of way and plants and 300 feet between the edge of right of way and avoidance areas; use stabilizing and anchoring techniques when the pipeline crossed suitable habitat to ensure pipelines don't move towards the population; site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Construction activities will not occur from April 15 through June 5th within occupied habitat, |
| | Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc. |
| | Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and |
| | Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible. |
| | Occupied Wright Fishhook Cactus habitats within 300 feet of the edge of the surface pipelines' rights-of-way, 300 feet of the edge of the roads' right-of- ways, and 300 feet from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. |
| | Re-initiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Wright Fishhook Cactus is anticipated as a result of project activities. |
| | Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |
| T&E-17 | **SAN RAFAEL CACTUS (*PEDIOCACTUS DESPAINII*)** |
| | In order to minimize effects to the federally threatened San Rafael Cactus, the Bureau of Land Management (BLM), in coordination with the U.S. Fish and Wildlife Service (Service), has developed the following avoidance and minimization measures. Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance operations) are in compliance with the endangered Species Act (ESA). For the purposes of this document, the following terms are so defined: *Potential habitat* is defined as areas |

AR000798

| Notice | Description/Purpose |
|---|---|
| | which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain San Rafael Cactus; habitat descriptions can be found in Federal Register Notice and species recovery plan links at |
| | <http:www.fws.gov/endangered/wildlife.html>. *Occupied habitat* is defined as areas currently or historically known to support San Rafael Cactus; synonymous with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development: |
| | Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable San Rafael Cactus habitat is present. |
| | Site inventories will be conducted within suitable habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc. suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300-foot buffers will be maintained between surface disturbance and avoidance areas. However, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories: |
| | Must be conducted by qualified individuals(s) and according to BLM and Service accept survey protocols, |
| | Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually April 15 to June 5th, however, surveyors should verify that the plant is flowering by contacting a BLM or USFWS botanist or demonstrating that the nearest known population is in flower), |
| | Will occur within 300 feet from the centerline of the proposed right-of- way for surface pipelines or roads; and within 300 feet from the perimeter of disturbance for the proposed well pad including the well pad, |
| | Will include, but not be limited to, plant species lists and habitat characteristics, and |
| | Will be valid until April 15 the following year. |
| | Design project infrastructure to minimize impacts within suitable habitat: |
| | Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300-foot buffers, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Reduce well pad size to the minimum needed, without compromising safety, |
| | Where technically and economically feasible, use directional drilling or multiple wells from the same pad, |
| | Limit new access routes created by the project, |
| | Roads and utilities should share common rights-of-way where possible, |
| | Reduce the width of rights-of-way and minimize the depth of excavation needed for the roadbed; where feasible, use the natural ground surface for the road within habitat, |
| | Place signing to limit off-road travel in sensitive areas, and |
| | Stay on designated routes and other cleared/approved areas, |
| | All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas. |

AR000799

| Notice | Description/Purpose |
|---|---|
| | Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants: |
| | Follow the above recommendations (3.) for project design within suitable habitats, |
| | To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged, |
| | Construction of roads will occur such that the edge of the right of way is at least 300 feet from any plant and 300 feet from avoidance areas, |
| | Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15 to June 5th (flowering period); dust abatement applications will be comprised of water only, |
| | The edge of the well pad should be located at least 300 feet away from plants and avoidance areas, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Surface pipelines will be laid such that a 300-foot buffer exists between the edge of the right of way and plants and 300 feet between the edge of right of way and avoidance areas; use stabilizing and anchoring techniques when the pipeline crossed suitable habitat to ensure pipelines don't move towards the population; site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Construction activities will not occur from April 15 through June 5th within occupied habitat, |
| | Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc., |
| | Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and |
| | Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible. |
| | Occupied San Rafael Cactus habitats within 300 feet of the edge of the surface pipelines' rights-of-way, 300 feet of the edge of the roads' right-of- ways, and 300 feet from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. |
| | Re-initiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the San Rafael Cactus is anticipated as a result of project activities. |
| | Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |
| T&E-19 | **JONES CYCLADENIA (*CYCLADENIA HYMILIS VAR JONESII*)** |
| | In order to minimize effects to the federally threatened Jones Cycladenia, the Bureau of Land Management (BLM), in coordination with the U.S. Fish and Wildlife Service (Service), has developed the following avoidance and minimization measures. Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance operations) are in compliance with the endangered Species Act (ESA). For the purposes of this document, the following terms are so defined: *Potential habitat* is defined as areas |

AR000800

| Notice | Description/Purpose |
|---|---|
| | which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain Jones Cycladenia; habitat descriptions can be found in Federal Register Notice and species recovery plan links at |
| | <http:www.fws.gov/endangered/wildlife.html>. *Occupied habitat* is defined as areas currently or historically known to support Jones Cycladenia; synonymous with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development: |
| | Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable Jones Cycladenia habitat is present. |
| | Site inventories will be conducted within suitable habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc. suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300-foot buffers will be maintained between surface disturbance and avoidance areas. However, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories: |
| | Must be conducted by qualified individuals(s) and according to BLM and Service accept survey protocols, |
| | Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually April 15 to June 5th, however, surveyors should verify that the plant is flowering by contacting a BLM or USFWS botanist or demonstrating that the nearest known population is in flower), |
| | Will occur within 300 feet from the centerline of the proposed right-of- way for surface pipelines or roads; and within 300 feet from the perimeter of disturbance for the proposed well pad including the well pad, |
| | Will include, but not be limited to, plant species lists and habitat characteristics, and |
| | Will be valid until April 15 the following year. |
| | Design project infrastructure to minimize impacts within suitable habitat: |
| | Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300-foot buffers, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300-foot buffers, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Reduce well pad size to the minimum needed, without compromising safety, |
| | Where technically and economically feasible, use directional drilling or multiple wells from the same pad, |
| | Limit new access routes created by the project, |
| | Roads and utilities should share commons rights-of-way where possible, |
| | Reduce the width of rights-of-way and minimize the depth of excavation needed for the roadbed; where feasible, use the natural ground surface for the road within habitat, |
| | Place signing to limit off-road travel in sensitive areas, and |
| | Stay on designated routes and other cleared/approved areas, |

AR000801

| Notice | Description/Purpose |
|--------|---------------------|
| | All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas. |
| | Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants: |
| | Follow the above recommendations (3.) for project design within suitable habitats, |
| | To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged, |
| | Construction of roads will occur such that the edge of the right of way is at least 300 feet from any plant and 300 feet from avoidance areas, |
| | Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15 to June 5th (flowering period); dust abatement applications will be comprised of water only, |
| | The edge of the well pad should be located at least 300 feet away from plants and avoidance areas, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Surface pipelines will be laid such that a 300-foot buffer exists between the edge of the right of way and plants and 300 feet between the edge of right of way and avoidance areas; use stabilizing and anchoring techniques when the pipeline crossed suitable habitat to ensure pipelines don't move towards the population; site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat, |
| | Construction activities will not occur from April 15 through June 5th within occupied habitat, |
| | Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc., |
| | Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and |
| | Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible |
| | Occupied Jones Cycladenia habitats within 300 feet of the edge of the surface pipelines' rights-of-way, 300 feet of the edge of the roads' rights-of-way, and 300 feet from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. |
| | Re-initiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Jones Cycladenia is anticipated as a result of project activities. |
| | Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |
| T&E-22 | **UTE LADIES'-TRESSES (*SPIRANTHES DILUVIALIS*)** <br> The Lessee/Operator is given notice that the lands in this parcel contain suitable habitat for Ute ladies'-tresses under the Endangered Species Act (ESA). The following avoidance and minimization measures have been developed to facilitate review and analysis of any submitted permits under the authority of this lease. In order to minimize effects to the federally threatened Ute ladies'-tresses, the BLM in coordination with the USFWS, |

AR000802

| Notice | Description/Purpose |
|---|---|
| | developed the following avoidance and minimization measures. Integration of and adherence to these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance) are in compliance with the ESA. Ute ladies'-tresses habitat is provided some protection under Executive Orders 11990 (wetland protection) and 11988 (floodplain management), as well as section 404 of the Clean Water Act. For the purposes of this document, the following terms are so defined: Potential habitat is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. Suitable habitat is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain Ute ladies'-tresses. Habitat descriptions can be found in Recovery Plans and Federal Register Notices for the species at <http://www.fws.gov/endangered/wildlife.html>. Occupied habitat is defined as areas currently or historically known to support Ute ladies'-tresses; synonymous with "known habitat. Although plants, habitat, or populations may be afforded some protection under these regulatory mechanisms, the following conservation measures should be included in the Plan of Development:
|
| | Pre-project habitat assessments will be completed across 100% of the project disturbance area, including areas where hydrology might be affected by project activities, within potential habitat prior to any ground disturbing activities to determine if suitable Ute ladies'-tresses habitat is present. |
| | Within suitable habitat, site inventories will be conducted to determine occupancy. Inventories: |
| | Must be conducted by qualified individual(s) and according to BLM and USFWS accepted survey protocols, |
| | Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance or areas that could experience direct or indirect changes in hydrology from project activities, |
| | Will be conducted prior to initiation of project activities and within the same growing season, at a time when the plant can be detected, and during appropriate flowering periods (usually August 1 and August 31 in the Uintah Basin; however, surveyors should verify that the plant is flowering by contacting a BLM or USFWS botanist or demonstrating that the nearest known population is in flower), |
| | Will occur within 300 feet from the edge of the proposed right-of-way for surface pipelines or roads; and within 300 feet from the perimeter of disturbance for the proposed well pad including the well pad, |
| | Will include, but not be limited to, plant species lists, habitat characteristics, source of hydrology, and estimated hyroperiod, and |
| | Will be valid until August 1 the following year. |
| | Design project infrastructure to minimize direct or indirect impacts to suitable habitat both within and downstream of the project area: |
| | Alteration and disturbance of hydrology will not be permitted, |
| | Reduce well pad size to the minimum needed, without compromising safety, |
| | Limit new access routes created by the project, |
| | Roads and utilities should share common rights-of-way where possible, |
| | Reduce width of rights-of-way and minimize the depth of excavation needed for the roadbed, |
| | Construction and right-of-way management measures should avoid soil compaction that would impact Ute ladies' tresses habitat, |

AR000803

| Notice | Description/Purpose |
|---|---|
| | Off-site impacts or indirect impacts should be avoided or minimized (i.e., install berms or catchment ditches to prevent spilled materials from reaching occupied or suitable habitat through either surface or groundwater), |
| | Place signing to limit off-road travel in sensitive areas, |
| | Stay on designated routes and other cleared/approved areas, and |
| | All disturbed areas will be re-vegetated with species approved by USFWS and BLM botanists. |
| | Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants: |
| | Follow the above (#3) recommendations for project design within suitable habitats, |
| | Buffers of 300 feet minimum between right of way (roads and surface pipelines) or surface disturbance (well pads) and plants and populations will be incorporated, |
| | Surface pipelines will be laid such that a 300-foot buffer exists between the edge of the right of way and the plants, using stabilizing and anchoring techniques when the pipeline crosses habitat to ensure the pipelines don't move towards the population, |
| | Before and during construction, areas for avoidance should be visually identifiable in the field (e.g., flagging, temporary fencing, rebar, etc.), |
| | Where technically and economically feasible, use directional drilling or multiple wells from the same pad, |
| | Designs will avoid altering site hydrology and concentrating water flows or sediments into occupied habitat, |
| | Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, with berms and catchment ditches to avoid or minimize the potential for materials to reach occupied or suitable habitat, and |
| | Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible. |
| | Occupied Ute ladies'-tresses habitats within 300 feet of the edge of the surface pipelines' rights-of-way, 300 feet of the edge of the roads' rights-of-way, and 300 feet from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Habitat impacts include monitoring any changes in hydrology due to project related activities. Annual reports shall be provided to the BLM and the USFWS. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. |
| | Re-initiation of section 7 consultation with the USFWS will be sought immediately if any loss of plants or occupied habitat for the Ute ladies'-tresses is anticipated as a result of project activities. |
| | Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the USFWS to ensure continued compliance with the ESA. |
| T&E-27 | **YELLOW-BILLED CUCKOO** |
| | The lessee/operator is given notice that the lands in or adjacent to this parcel contain potentially suitable habitat that falls within the range for western yellow-billed cuckoo, a Federally listed species. Avoidance or use restrictions may be placed on portions of the lease. Application of appropriate measures will depend whether the action is temporary or permanent, and whether it occurs within or outside the breeding and nesting season. A temporary action is completed prior to the following breeding season, leaving no permanent structures and resulting in no permanent habitat loss. A permanent action could |

AR000804

| Notice | Description/Purpose |
|---|---|
| | continue for more than one breeding season and/or cause a loss of habitat or displace western yellow-billed cuckoos through disturbances. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act (ESA). Integration of and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of ESA, Section 7 consultation at the permit stage. Avoidance and minimization measures include the following: |
| | Habitat suitability within the parcel and/or within a 0.5-mile buffer of the parcel will be identified prior to lease development to identify potential survey needs. Habitat suitability should be determined in accordance with *Guidelines for the identification of suitable habitat for WYBCU in Utah.* |
| | Protocol Breeding Season Surveys will be required in suitable habitats prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by permitted individual(s), and be conducted according to protocol. |
| | For all temporary actions that may impact cuckoo or suitable habitat: |
| | If action occurs entirely outside of the cuckoo breeding season (June 1 to August 31), and leaves no structure or habitat disturbance, action can proceed without a presence/absence survey. |
| | If action is proposed between June 1 to August 31, presence/absence surveys for cuckoo will be conducted prior to commencing activity. If cuckoo are detected, activity should be delayed until September 1. |
| | Eliminate access roads created by the project through such means as raking out scars, revegetation, gating access points, etc. |
| | For all permanent actions that may impact cuckoo or suitable habitat: |
| | Protocol level surveys by permitted individuals will be conducted prior to commencing activities. |
| | If cuckoos are detected, no activity will occur within 0.25-mile of occupied habitat. |
| | Avoid drilling and permanent structures within 0.25-mile of suitable habitat unless absence is determined according to protocol level survey conducted by permitted individual(s). |
| | Ensure noise levels at 0.25-mile from suitable habitat do not exceed baseline conditions. Placement of permanent noise-generating facilities should be determined by a noise analysis to ensure noise does not encroach upon the 0.25-mile buffer for suitable habitat. |
| | Temporary or permanent actions will require monitoring throughout the duration of the project to ensure that western yellow-billed cuckoo or its habitat is not affected in a manner or to an extent not previously considered. Avoidance and minimization measures will be evaluated throughout the duration of the project. |
| | Water produced as by-product of drilling or pumping will be managed to ensure maintenance or enhancement of riparian habitat. |
| | Where technically or economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling is suitable habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. |
| | Ensure that water extraction or disposal practices do not result in a change of hydrologic regime that would result in loss or degradation of riparian habitat |
| | Re-vegetate with native species all areas of surface disturbance within riparian areas and/or adjacent uplands. |

AR000805

| Notice | Description/Purpose |
|--------|---------------------|
|        | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |

AR000806

# Appendix D. Summary of the Typical Phases of Oil and Gas Development

## Introduction

The phases of oil and gas development include construction, drilling operations, completion operations, hydraulic fracturing, and production. During the construction activity phase, the area is cleared of vegetation and the pad is constructed. Throughout the drilling operation phase, equipment is moved on-site and used to install the drill rig and other associated infrastructure. At this stage, the well is drilled. Well completion follows well drilling. Well completion includes setting the casing to depth, cementing the casing,[1] and perforating the casing in target zones. If a well is going to be drilled directionally,[2] horizontally,[3] or vertically[4] this phase may be followed by hydraulic fracturing which involves pumping fracturing fluid into a formation at a calculated, predetermined rate and pressure to generate fractures or cracks in the target formation. The production phase begins when the well starts producing. The well abandonment and reclamation phases occur after the productive life of the well has concluded. Well abandonment and reclamation involve plugging wells and reclaiming the surface according to BLM guidelines and requirements.

## Construction Activities

First, new construction areas need to be cleared of all vegetation. Clearing of the proposed well pad and access road are typically limited to the smallest area possible to provide safe and efficient work areas for all phases of construction. All clearing activities are accomplished by cutting, mowing, and/or grading vegetation, as necessary. Cut vegetation may be mulched and spread on-site or hauled to a commercial waste disposal facility.

Next, heavy equipment, including but not limited to, bulldozers, graders, front-end loaders, and/or track hoes are used to construct the pad, along with other features, as needed for development. Other features may include, but are not limited to, an access road, reserve pit, pipeline, and/or fracturing pond. Cut and fills may be required to level the pad or road surfaces. Reserve pits, if authorized, are lined using an impermeable liner or other lining mechanism (i.e., bentonite or clay) to prevent fluids from leaching into the soil. Access roads may have cattle guards, gates, drainage control, or pull-outs installed, among a host of other features that may be necessary based on the site-specific situation. Long-term surface

---

[1] According to BLM regulations from 43 CFR 3160: Onshore Order No. 2, casing and cementing programs are conducted to protect and/or isolate all usable water zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals. The casing setting depth is calculated to position the casing seat opposite a competent formation which will contain the maximum pressure to which it will be exposed during normal drilling operations. Determination of casing setting depth is based on all relevant factors, including presence/absence of hydrocarbons; fracture gradients; usable water zones; formation pressures; lost circulation zones; other minerals; or other unusual characteristics. Any isolating medium other than cement shall receive approval prior to use. The deepest casing may not be cemented and may remain open hole depending on the type of formation it is located in.

[2] Vertical drilling is the process of drilling a well from the surface vertically to a subsurface location where the target oil or gas reservoir is located (U.S. Department of Energy 2015).

[3] Horizontal drilling is the process of drilling a well from the surface to a subsurface location just above the target oil or gas reservoir called the "kickoff point," then deviating the well bore from the vertical plane around a curve to intersect the reservoir at the "entry point" with a near-horizontal inclination and remaining within the reservoir until the desired bottom hole location is reached (North Dakota Department of Mineral Resources 2008).

[4] Directional drilling is the process of controlling the direction and deviation of drilling a well from the surface to a subsurface location without disturbing the land directly above the target oil or gas reservoir (U.S. Department of Energy 2015).

AR000807

disturbances such as pads and roads are typically surfaced with a layer of crushed rock. Areas not needed for long-term development are reclaimed by recontouring the surface and re-establishing vegetation.

A pipeline, if needed, is laid within a right-of-way that is first cleared of vegetation. A backhoe, or similar piece of equipment, digs a trench to a depth at least 36 inches below ground surface. After the trench is dug, the pipeline is assembled by welding pieces of pipe together to fit the contour of the pipeline's path. Once inspected, the pipe can be lowered into the trench and covered with stockpiled subsoil originally removed from the trench. Each pipeline undergoes hydrostatic testing prior to natural gas being pumped through the pipeline. This ensures the pipeline is strong enough and absent any leaks. Table D-1 includes some of the common wastes (hazardous and nonhazardous) that are produced during construction.

## Drilling Operations

When construction of the well-pad is complete, the drilling rig and associated equipment are moved on-site and erected. Usually, a conventional rotary drill rig is used. The drill rig must be capable of withstanding all the anticipated conditions that may be encountered while drilling. Wells may be drilled directionally, horizontally, or vertically based on the target formation. The depth of the well is entirely dependent on the target formation depth and may be several hundred feet deep to over 20,000 feet deep.

When a conventional reserve pit [5] system is used, drilling fluid or mud is circulated through the drill pipe to the bottom of the hole, through the bit, up the bore of the well, and finally to the surface. When drilling mud emerges from the hole, it enters the reserve pit where it remains until all fluids are evaporated and the solids can be buried.

A closed-loop system operates in a similar fashion except that when the drilling mud emerges from the hole, it passes through equipment used to screen and remove drill cuttings (rock chips) and sand-sized solids rather than going into a pit. When the solids have been removed, the drilling mud is placed into holding tanks, and from the tank, used again.

In either situation the drilling mud is maintained at a specific weight and viscosity to cool the bit, seal off any porous zones (thereby protecting aquifers and preventing damage to producing zone productivity), control subsurface pressure, lubricate the drill string, clean the bottom of the hole, and bring the drill cuttings to the surface. Water-based or oil-based muds can be used. This choice is dependent on the site-specific conditions.

Once a well has been drilled, completion operations begin. Well completion involves setting casing to depth and perforating the casing in target zones.

Wells are often treated during completion to improve the recovery of hydrocarbons by increasing the rate and volume of hydrocarbons moving from the natural oil and gas reservoir into the wellbore. These processes are known as well-stimulation treatments, which create new fluid passageways in the producing formation or remove blockages within existing passageways. They include fracturing, acidizing, and other mechanical and chemical treatments often used in combination. The results from different treatments are additive and complement each other.

## Hydraulic Fracturing

Hydraulic fracturing is a formation stimulation practice used to create additional permeability in a producing formation, thus allowing oil and/or gas to flow more readily toward and into the wellbore.

---

[5] A conventional reserve pit is a lined earthen pit excavated adjacent to a well pad and is commonly used for the disposal of drilling muds and fluids in gas or oil fields (USFWS 2009).

AR000808

Hydraulic fracturing can be used to overcome natural barriers, such as naturally low permeability or reduced permeability resulting from near wellbore damage to the flow of fluids (gas or water) to the wellbore (Groundwater Protection Council 2017). The process has been a method for additional oil and gas recovery since the 1900s; however, with the advancement of technology, in both hydraulic fracturing and horizontal drilling, it is more commonly used than previous hydraulic fracturing and horizontal drilling technologies.

Hydraulic fracturing uses high pressure pumps to pump fracturing fluid into a formation at a calculated, predetermined rate and pressure to generate fractures or cracks in the target formation. For shale developments (within Mancos shale geologic formations, for example), fracture fluids are primarily water-based fluids mixed with additives that help the water to carry "proppants" into the fractures. Proppants, which may be made up of sand, walnut hulls, or other small particles, are needed to "prop" open the fractures once the pumping of fluids has stopped. Once the fracture has initiated, additional fluids are pumped into the wellbore to continue the development of the fracture and to carry the proppant deeper into the formation. Additional fluids are needed to maintain the downhole pressure necessary to accommodate the increasing length of opened fracture in the formation.

Hydraulic fracturing increases the flow rate and volume of reservoir fluids that move from the producing formation into the wellbore. The fracturing fluid is typically more than 99% water and sand, with small amounts of readily available chemical additives used to control the chemical and mechanical properties of the water and sand mixture. Because the fluid is composed mostly of water, large volumes of water are usually needed to perform hydraulic fracturing but depends on the area being fractured. However, in some cases, water is recycled or produced water is used.

The predominant fluids currently being used for fracture treatments in the shale gas plays are water-based fracturing fluids mixed with friction-reducing additives, also known as slick water (Groundwater Protection Council 2017). The number of chemical additives used in a typical fracture treatment varies depending on the conditions of the specific well that is to be fractured. A typical fracture treatment uses very low concentrations of between three and 12 additive chemicals, depending on the characteristics of the water and the shale formation being fractured. Each component serves a specific, engineered purpose, from limiting the growth of bacteria to preventing corrosion of the well casing. The makeup of fracturing fluid varies from one geologic basin or formation to another. Because the makeup of each fracturing fluid varies to meet the specific needs of each area, there is no one-size-fits-all formula for the volumes for each additive. In classifying fracture fluids and their additives, it is important to realize that service companies that provide these additives have developed a number of compounds with similar functional properties to be used for the same purpose in different well environments. The difference between additive formulations may be as small as a change in concentration of a specific compound (Groundwater Protection Council 2017).

Before operators or service companies perform a hydraulic fracturing treatment, a series of tests are performed. These tests are designed to ensure that the well, including casing and cement, well equipment, and fracturing equipment are in proper working order and would safely withstand the application of the fracture treatment pressures and pump flow rates.

Hydraulic fracturing of horizontal shale gas wells is commonly performed in stages. Lateral lengths in horizontal wells for development may range from 1,000 feet to more than 5,000 feet. Depending on the lengths of the laterals, treatment of wells may be performed by isolating smaller portions of the lateral. The fracturing of each portion of the lateral wellbore is called a stage. Stages are fractured sequentially beginning with the section at the farthest end of the wellbore, moving up hole as each stage of the treatment is completed until the entire lateral well has been stimulated. During drilling, the BLM is on location during the casing and cementing of the surface casing, which is often the string of casing that

protects groundwater, along with other critical casing and cementing intervals. Before hydraulic fracturing takes place, all surface casing and some deeper, intermediate zones are required to be cemented from the bottom of the cased hole to the surface. The cemented well is pressure tested to ensure there are no leaks and in some cases a cement bond log is run to ensure the cement has bonded to the casing and the formation. If the fracturing of the well is considered to be a "non-routine" fracturing job for the area, the BLM would always be on-site during those operations as well as when abnormal conditions develop during the drilling or completion of a well.

Some soils and geologic formations contain low levels of radioactive material. This naturally occurring radioactive material (NORM) emits low levels of radiation, to which everyone is exposed on a daily basis. When NORM is associated with oil and natural gas production, it begins as small amounts of uranium and thorium within the rock. These elements, along with some of their decay elements, notably Radium-226 and Radium-228, can be brought to the surface in drill cuttings and produced water. Radon-222, a gaseous decay element of radium, can come to the surface along with shale gas. When NORM is brought to the surface, it remains in the rock pieces of the drill cuttings, remains in solution with produced water, or, under certain conditions, precipitates out in scales or sludges. The radiation is weak and cannot penetrate dense materials such as the steel used in pipes and tanks. The EPA has found that Utah has very low levels of NORM associated with oil and gas production waste (EPA 2023).

## Production Operations

Production equipment used during the life of the well may include a three-phase separator-dehydrator, flowlines, a meter run, tanks for condensate, produced oil and water, and heater treater. A pumpjack may be required if the back pressure of the well is too high. Production facilities are arranged to facilitate safety and maximize reclamation opportunities. All permanent aboveground structures not subject to safety considerations are painted a standard BLM environmental color or as landowner specified.

Workovers may be performed multiple times over the life of the well. Because oil and gas production usually declines over the years, operators perform workover operations, which involve cleaning, repairing, and maintaining the well for the purposes of increasing or restoring production.

## Abandonment and Reclamation

Well abandonment (whether dry hole or depleted producer) and reclamation of location, access road, and other facilities requires BLM approval. After approval, wellbores are plugged with cement as necessary to prevent fluid or pressure mitigation and to protect and isolate mineral and water resources. Wellheads are removed, and both the surface casing and the production casing are cut off below ground in compliance with federal and state regulations. The well pad, reserve pit and access are reclaimed according to BLM guidelines. This may include backfilling the pit, recontouring the surface to blend with natural surroundings and redistributing topsoil. All surfaces are then reseeded per BLM and state requirements specified in the Application for Permit to Drill (APD) approval.

## Common Wastes

Table D-1 includes some of the common wastes (hazardous and nonhazardous) that are produced during oil and gas development.

AR000810

**Table D-1. Common Wastes Produced during Oil and Gas Development**

| Phase | Waste | |
|---|---|---|
| Construction, well drilling and completion (including hydraulic fracturing) | Domestic wastes (i.e., food scraps, paper, etc.) | |
| | Excess construction materials | Woody debris |
| | Used lubricating oils | Paints |
| | Solvents | Sewage |
| | Drilling muds, including additives (i.e., chromate and barite) and cuttings; Well drilling, completion, workover, and stimulation fluids (i.e., oil derivatives such as polycyclic aromatic hydrocarbons (PAHs), spilled chemicals, suspended and dissolved solids, phenols, cadmium, chromium, copper, lead, mercury, nickel) | |
| | Equipment, power unit and transport maintenance wastes (i.e., batteries; used filters, lubricants, oil, tires, hoses, hydraulic fluids; paints; solvents) | |
| | Fuel and chemical storage drums and containers | |
| | Cementing wastes | Rig wash |
| | Production testing wastes | Excess drilling chemicals |
| | Excess construction materials | Processed water |
| | Scrap metal | Contaminated soil including hazardous and non-hazardous materials (potential) |
| | Sewage | Domestic wastes |
| Production | Power unit and transport maintenance wastes (i.e., batteries; used filters, lubricants, filters, tires, hoses, coolants, antifreeze; paints; solvents, used parts) | |
| | Discharged produced water | |
| | Production chemicals | |
| | Workover wastes (e.g., brines) | |
| Abandonment / reclamation | Construction materials | |
| | Decommissioned equipment | |
| | Contaminated soil (potential) | |
| | Equipment or wastes that could contain hazardous and nonhazardous materials | |

AR000811

# References Cited in Appendix D

North Dakota Department of Mineral Resources. 2008. *Horizontal Drilling.* Available at: https://www.dmr.nd.gov/ndgs/documents/newsletter/2008Winter/pdfs/Horizontal.pdf. Accessed September 2021.

Groundwater Protection Council. *State Oil and Natural Gas Regulations Designed to Protect Water Resources.* 3rd edition. Available at: http://www.gwpc.org/sites/default/files/State%20 Regulations%20Report%202017%20Final.pdf. Accessed September 2021.

U.S. Department of Energy. 2015. *Quadrennial Technology Review 2015, Oil and Gas Technologies. Chapter 7: Advancing Systems and Technologies to Produce Cleaner Fuels.* Available at: https://www.energy.gov/sites/prod/files/2016/05/f32/Ch.7-SI-Oil-and-Gas-Technologies.pdf. Accessed September 2021.

U.S. Environmental Protection Agency (EPA). 2023. Technology Enhanced Naturally Occurring Radioactive Material: Oil and Gas Production Wastes. Accessed from https://www.epa.gov/radiation/tenorm-oil-and-gasproduction-wastes. Accessed July 2023.

U.S. Fish and Wildlife Service (USFWS). 2009. *Reserve Pits.* Available at: https://www.fws.gov/mountain-prairie/contaminants/documents/ReservePitsBirdMortality.pdf. Accessed September 2021.

AR000812

# Appendix E. Public Comments and BLM's Responses

As detailed in Table E-1 below, the BLM assigned unique codes for all individuals, entities, and organizations who submitted comments during the comment period. The BLM evaluated all comments received and parsed them into substantive or nonsubstantive comments according to the BLM's NEPA Handbook (BLM 2008d:66). The agency then identified resource/topic areas for each of the substantive comments. The commenter codes and resource/topic areas are used in Table E-1 for responding to all substantive comments. Substantive comments are contained in Table E-2 and are representative of topics raised; single responses are provided for similarly stated comments.

Substantive comments meet the following criteria:

1. Question, with reasonable basis, the accuracy of the information in the analysis;

2. Question, with reasonable basis, the adequacy of, methodology for, or assumptions used for the analysis;

3. Present new information relevant to the analysis;

4. Present reasonable alternatives other than those analyzed; or

5. Cause changes or revisions in one or more of the alternatives.

Nonsubstantive comments generally:

1. Express opposition to or support for the proposed action or alternatives or agree or disagree with BLM policy or resource decisions without reasoning, justification, or supporting data;

2. Did not pertain to the project area or the project; or,

3. Took the form of vague or open-ended questions and did not warrant a specific response.

Similarly, comments that merely cited other comments or sources without providing reasoning or additional explanation were considered nonsubstantive.

The BLM received the following nonsubstantive comments during the comment period on the EA:

- Commenters expressed general opposition to the development and leasing and its impacts on climate change and public lands.

- They also expressed a preference for renewable energy developments and designating more conservation areas. They reference other out-of-scope BLM rulemaking efforts and requested the end of leasing for fossil fuel development in general.

The BLM classified these as nonsubstantive based on the following criteria:

- Support of or opposition to certain alternatives or favoring one alternative over another.

- Support of or opposition to the lease sale generally or the sale of specific parcels.

- Opposition to BLM Oil and Gas Leasing Program policies, BLM climate change policies, implementation of various Executive Orders, and/or BLM management generally.

- Various vague and open-ended statements regarding oil and gas leasing, renewable energy development, and the oil and gas industry.

While the BLM does not provide specific responses to each of these comments because they do not meet the criteria for being substantive, the agency thanks these commenters for their feedback. The BLM

AR000813

received a total of 17 comment letters containing 69 individual comments;[1] six of those comment letters contained 50 individual comments that were substantive. Substantive comments were grouped and summarized in Table E-2.

---

[1] While the BLM received a total of 17 comment letters, each letter may contain multiple comments. Therefore, the number of comments received is often higher than the number of letters submitted.

AR000814

**Table E-1. Public Submissions with Assigned Commenter Codes and Resource/Topic Areas**

| Name | Organization | Commenter Code | Resource/Topic Area |
|---|---|---|---|
| Chris Ramias | N/A | 1-500344198 | Recreation |
| Harry Tipton | NTEC Helium, LLC | 1-500349660 | Additional Information; Other Relevant Plans; AIB; APD; RFDS |
| Judy Ostendorf | EPA | 1-500349683 | Air Quality, RFDS, Water Resources |
| Sindy Smith | State of Utah, Public Lands Policy Coordinating Office | 1-500349730 | Other Relevant Plans |
| Landon Newell | SUWA | 1-500349731 | AIB; APD; Consultation; MLP; RFDS; Settlement Agreement; Water Resources; Wilderness; Wildlife |
| Kimberly Hartwig | NPS | EMAIL-1 | Water resources; geology; air quality. |

AR000815

**Table E-2. Comment Summary and BLM Responses**

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| 1-500349660 | Additional Information | The commenter believes BLM's assessment of the area's helium potential is out of date and submitted the following reports for the BLM's review and incorporation into the Final EA:<br>• *Analysis of Natural Gases, 2002 – 2004*. BLM Technical Note 418 (Gage and Driskill 2005)<br>• *Helium Resources of the United States – 2007*. BLM Technical Note 429 (Pacheco and Ali 2008)<br>• *National Assessment of Helium Resources Within Known Natural Gas Reservoirs* Scientific Investigations Report 2021–5085 (Brennan et al. 2021)<br>• *Proven and hypothetical helium resources in Utah: Utah Geological Survey* Miscellaneous Publication 174 (Wiseman and Eckels 2020) | 3.1.1; AIB-13 | The BLM appreciates these comments and has reviewed the newer helium reference material provided. Applicable information from these references was incorporated into the Final EA. |
| 1-500349660 | Helium | Helium was not analyzed in the mineral and energy section of the EA (AIB-13). Additionally, the BLM has received three APDs for helium development. | AIB-13 | Additional discussion of helium potential was added to AIB-13 and Section 3.2 of the EA. |
| 1-500349731 | AIB | The AIB section rationale is inadequate, particularly because the AIB sections do not contain any cumulative impacts analysis and the commenter feels that this approach violates NEPA. The BLM must correct these deficiencies by analyzing all reasonably foreseeable direct, indirect, and cumulative impacts now, at the leasing stage. Additionally, BLM did not analyze the direct, indirect, and cumulative impacts of leasing to cultural, paleontological, riparian, soils, | AIB-1–AIB-18 | As noted in the EA, 18 issues were identified, considered, and eliminated from detailed analysis. However, these issues were analyzed in brief (AIB) in Section 3.2, subsections AIB-1 through AIB-18. The reasons for eliminating the issues from detailed analysis vary; typically, stipulations and lease notices would avoid, minimize, or mitigate adverse impacts. The AIB subsections include a concise discussion regarding the affected area and degree of effects of the impact related to each issue. The subsections provide background for |

AR000816

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| | | water, vegetation, wildlife, special status plant and wildlife species, or special designations. | | not analyzing the issue in detail. Analysis of cumulative impacts associated with the issues analyzed in brief is not required because they are not related to a significant (or potentially significant) impact. See Section 6.4.1 of the BLM NEPA Handbook (BLM 2008d). By contrast, resources and issues analyzed in detail include an analysis of cumulative impacts. Additionally, analysis of each alternative considers the RFDS and potential changes in impacts based on the alternative selected. |
| 1-500349731 | AIB | The commenter believes the BLM did not analyze all the resources referred to in the settlement agreement under the NEPA hard look mandate and unlawfully deferred NEPA analysis to the APD stage. | AIB-1–AIB-18 | The settlement agreement requires this EA to "include an assessment" of various resources. The BLM assessed each of the enumerated resources and considered them in varying degrees of detail, as appropriate, based on the potential impacts to a given resource. See Section 3.2 and Section 3.3 of the EA. The BLM has complied with both the settlement agreement and NEPA. |
| 1-500349683 | Air Quality | To understand what the maximum and average year emission estimates represent, suggest the following revisions: <br> • Present a table that depicts the emissions per well by phase (construction/development and production) and per well emission factors for oil and gas wells as well as helium wells. <br> • Present a table that depicts the total emissions for the RFD by alternative. <br> • Include in the table of maximum and average year emissions the assumed number of wells drilled as well as the number of producing wells associated with the RFD for each alternative. | 3.3.1 | The BLM revised the Air Quality section of the EA and added Appendix G to include more information about emissions per well by phase, total emissions for the RFD, and the assumed number of wells associated with the RFDS for each alternative, based on available information. |

AR000817

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| 1-500349683 | Air Quality | EPA also supports the Lease Notices for air resources noted on page 3-35, which include potential mitigation measures and may require additional analyses. Clarify if UT-LN-96 is applicable since this notice is not identified for individual parcels, and none of the three notices (UT-LN-96, UT-LN-102, UT-LN-99) are found in Appendix C (which only includes stipulation UT-S-01).<br><br>Apply UT-LN-96 to all parcels and expand it to identify that Tier IV engines may be necessary for drilling and hydraulic fracturing pump engines to avoid unnecessary impacts to air quality. Additionally, near-field dispersion modeling should be conducted prior to approval of APDs to demonstrate that Tier IV equipment is not needed to avoid exceedances of the NAAQS. | 3.3.2; Appendix C | The EA was revised to clarify whether UT-LN-96 is applicable and, if so, to which parcels. The BLM also reviewed Appendix C to include UT-LN-96, UT-LN-99, and UT-LN-102. Regarding EPA's comment to potentially require Tier IV engines, EPA regulations allow for the use of less than Tier IV engines that were manufactured before 2014. If the air quality analysis at the APD stage indicates that less than Tier IV engines may cause a significant air quality impact, then the BLM may require emissions control measures, potentially including Tier IV engines, as a condition of approval. UT-LN-102 already provides notice to an operator that additional air quality analysis and control measures may be required before project-specific approval is given. Because UT-LN-102 provides notice of possible air quality control measures, there is no need to expand UT-LN-96. |
| EMAIL-1 | Air Quality | The NPS raised concerns about the potential for dust emissions to influence streamflow and other hydrologic processes and requested a Fugitive Dust Control Plan be required for any mineral activities that would disturb a surface area larger than 0.25 acre or that would involve truck traffic on unpaved or untreated surfaces. | 3.3.1 | The BLM will consider further consultation with the NPS at the APD stage if air quality analysis indicates potential impacts to Class I areas managed by the NPS. Dust emissions are regulated by State of Utah Administrative Code R307-309 and R307-205. These rules only require a Fugitive Dust Control Plan for new sources of fugitive dust one-quarter acre or greater that are located in a $PM_{10}$ or $PM_{2.5}$ nonattainment or maintenance areas. The project location is in attainment. The BLM relies on state air quality regulations to ensure there are no significant impacts due to fugitive dust emissions. This information was added to Section 3.3.1. |
| 1-500349683; 1-500349731 | APD | The commenter recommends completing as much site-specific analysis of reasonably foreseeable development as is feasible at this stage, and committing at this stage (via, e.g., attaching notices to any offered leases) to requirements for | Section 3.2; AIB-1– AIB-18 | Impacts from reasonably foreseeable future development as outlined in Section 3.1.1 are analyzed in Sections 3.2 and 3.3 based on best available information. When a lease holder submits an APD and prior to drilling, additional site-specific NEPA review of individual well |

AR000818

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| | | reasonable mitigation measures that can be predicted at this stage as potentially warranted. They also recommend providing a public comment period at the APD phase.<br><br>Do not defer analysis of reasonably foreseeable impacts to the APD stage because at that point the 'No Action Alternative' is no longer on the table with respect to the non-NSO leases. This is particularly true where the BLM has deferred analysis based on its contention that certain lease stipulations, notices, and BMPs will be adopted if/when development is proposed on the leases. | | sites, roads, and associated infrastructure would occur. During this time, the BLM has authority, according to the standard terms and conditions of the leases, to attach COAs to the APD that reduce or avoid impacts to public land, resources, and/or resource values. When and if an APD is submitted for a lease, the BLM would adhere to numerous IMs (as revised through the life of an active lease), including specific instructions for bonding and other laws (such as the NHPA, ESA, etc.). Management provisions would adhere to Gold Book BMPs (BLM and USFS 2007). |
| 1-500349731 | ESA Sec. 7 Consultation | BLM must consult with the USFWS and prepare a biological assessment to determine whether species or designated critical habitat may be affected by the proposed action and that the re-evaluation of the September and December 2018 lease sales is an agency action under the ESA.<br><br>BLM should not defer Section 7 consultation to the APD stage because incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available.<br><br>The ESA does not contemplate allowing BLM to rely on an already existing programmatic biological opinion in order to satisfy its Section 7 consultation obligations. The PFO Biological Opinion, which was specifically issued to support the Price RMP, did not "conduct independent analysis of site-specific data." Rather the PFO Biological Opinion considers, at a field office-wide level, the general impacts of oil and gas leasing on listed species within the planning area. Therefore, | Section 4.1 | The Department of the Interior has long held that the Mineral Leasing Act allows the use of a segmented decision-making process for Section 7 consultation. Additionally, USFWS regulations do not prevent evaluating on-shore mineral leasing activities through incremental-step consultation (USFWS and National Marine Fisheries Service 1998).<br><br>As noted in Chapter 4 of the EA, the BLM coordinated with USFWS on species by species findings and reinitiated consultation for species not previously covered under the BO for the RMP.<br><br>Additionally, the BLM will analyze future proposals associated with leases under additional site-specific NEPA consultation and may apply any additional requirements as necessary to protect designated species and their habitat within the vicinity of the leases at the APD stage. The BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. The BLM will not approve any ground-disturbing activity until it completes its |

AR000819

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| | | the PFO Biological Opinion alone cannot satisfy BLM's consultation duties. | | obligations under applicable requirements of the ESA, including completion of any required procedure for conference or consultation. |
| EMAIL-1 | Geology | The NPS raised concerns about the potential for earthquakes that could result from operations performed during hydraulic fracturing or injection of produced water. The NPS recommended the BLM evaluate the effects of fluid injection on the geologic formations and the susceptibility of those formations to earthquakes caused by fluid injections. | AIB-7 and AIB-13 | The BLM reviewed the geology and the effects of hydraulic fracturing on seismicity and determined that injection zones in Utah are located stratigraphically thousands of feet above basement rock. Due to this, and other factors relating to Utah geology, induced seismicity is not considered a problem in Utah oil fields. |
| 1-500349731 | MLP | The commenter does not agree with BLM's conclusion that pre-leasing NEPA analysis is beyond the scope of the proposed action. The BLM's reversal of the MLP policy meets the "relatively low" threshold standard for a NEPA triggering event and the agency failed to prepare any NEPA analysis prior to making that decision. The BLM offered these leases without first finalizing the "required" pre-leasing NEPA analysis and issued the leases subject to the outdated leasing stipulations and categories the BLM had previously explained during the MLP process failed to protect resource values in the San Rafael Desert. BLM must provide a reasoned explanation for how/why the agency's prior years-long position regarding the need for pre-leasing NEPA analysis for the San Rafael Desert was/is no longer accurate or relevant. | 1.1 | The BLM notes the comment concerning the San Rafael Desert MLP and also notes that the MLP was not finalized (BLM 2018). As stated in the EA, the purpose of this EA is to decide whether to affirm the BLM's 2018 leasing decisions for the 59 leases, cancel these leasing decisions (or a portion therein), or amend and affirm the leases with revised terms. The directives established under BLM Instruction Memoranda Nos. 2023-07 and 2023-010 apply to evaluation of parcels prior to a lease sale. This EA analyzes the action of affirming or canceling leases that were previously sold. The BLM does not always need to conduct "pre-leasing NEPA" analysis to determine if an area requires new stipulations prior to leasing. By conducting site-specific analysis in the context of an EA, the BLM can determine if the existing stipulations are adequate to protect the resources at issue. If the BLM determines that the existing stipulations are not adequate, it can complete an RMP amendment to create new stipulations or close an area to new leasing. The BLM is not precluded from determining whether an RMP amendment may be necessary to adjust resource allocations. |

AR000820

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| | | | | The BLM's decision not to prepare an MLP for the San Rafael Desert is not a major federal action requiring NEPA. The commenter appears to suggest that abandoning the MLP (which never went beyond an internal draft) "reopened" acreage to oil and gas development and, therefore, changed the status quo. However, that is not the case as these 59 lease parcels, since at least 2008, have remained open for oil and gas development in accordance with the relevant RMP. Therefore, the BLM has not changed position on the status of these lands. |
| | | | | In addition, IM 2018-34 explains why the BLM determined MLPs would no longer be developed, finding that the process created duplicative layers of NEPA review. See IM 2018-34 (superseding IM 2010-117). Consistent with case law, the BLM acknowledged its change in position regarding the preparation of an MLP, and the BLM explained why it was departing from this previous practice (duplicative NEPA review). Id. Given that the BLM never released a draft MLP to the public and that nothing in FLPMA or any other statute or regulation requires the BLM to prepare MLPs, the BLM's explanation is sufficient. |
| 1-500349730 | Other Relevant Plans | Commenters requested that the BLM review several state and county plans for consistency. These plans included the Utah State RMP (SRMP), Utah county resource management plans (CRMPs), Emery CRMP, *Utah Wildlife Action Plan*, *Utah Pronghorn Statewide Management Plan*, and the Utah Division of Wildlife Resources' (DWR) *2023 Strategic Plan*. | 1.5.1; AIB-11 | The BLM reviewed and considered the proposed action for consistency with the State RMP and the Emery CRMP. As noted in comments, specific portions of the Emery CRMP the BLM considered include Section 6.2 (Public Lands/Federal and State Agencies); Section 8.7 (Mineral and Energy Resource Extraction); Section 8.8 (Multiple-Use); Section 8.9 (Action/Implementation Steps (Policies & Guidance); Section 9.8 (Mining and Mineral Resources); Section 9.11 (Special Designation Lands); Section 9.11.4.1 (Adjacent Private Lands and Land Management); and Section 9.11.4.6 (Mineral Rights and Claims). As applicable, the findings and policies |

AR000821

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| | | | | described in the above sections of the Emery CRMP have been included in either Section 1.5.1 (Other Plans) of the EA and/or in the applicable resource sections in Chapter 3.<br><br>Similarly, the BLM considered and evaluated the State RMP policies regarding support for traditional energy development and updated Section 1.5.1 (Other Plans) of the EA accordingly.<br><br>Additionally, BLM reviewed the *Utah Wildlife Action Plan*, *Utah Pronghorn Statewide Management Plan*, and UDWR's Strategic Plan for appropriate incorporation into AIB-11. |
| 1-500349660 | Other Relevant Plans | NTEC's comments suggested reviewing and incorporating the Helium Act of 1950, the Helium Stewardship Act of 2013, and the helium-related amendment to the Mineral Leasing Act of 1920 made by the Dingell Act, Section 1109. | 1.5.1 | The BLM reviewed the suggested acts and added the Helium Act of 1925, the Helium Stewardship Act of 2013, and Section 1109 of the Dingell Act, amending Mineral Leasing Act to the Section 1.5 in the EA, as applicable. |
| 1-500349731 | Previous Policies | Previous leasing decisions under reconsideration were made by the prior administration's policy, and because that policy is no longer in effect, the BLM should make a decision to reaffirm leases under the BLM's current policies and directives under the Biden administration. BLM must apply the leasing preference criteria from IM 2023-007, Evaluating Competitive Oil and Gas Lease Sale Parcels for Future Lease Sales, to the leases being re-evaluated in this EA. | 1.5 | The directives established under BLM Instruction Memoranda Nos. 2023-07 and 2023-010 apply to evaluation of parcels prior to a lease sale. Since the BLM is not initiating a new lease sale based on expressions of interest but is reevaluating lease parcels that have already been issued, these policies are not applicable. |
| 1-500344198 | Recreation | The commenter noted that the leases in dispute in this case are located very proximate to popular recreation areas like Labyrinth Canyon and the San Rafael Reef. They stated that development in this area would negatively impact recreationalists as well as local businesses built off tourism in the area. The commenter requested that the BLM | Section 1.5; 3.3.9 | The BLM appreciates the suggestion to consider the Emery County Public Land Management Act, noting that aspects of this act were incorporated into Part II of the John D. Dingell Jr. Conservation, Management, and Recreation Act. The BLM reviewed the act for applicability to the EA, adding information about the San |

AR000822

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| | | should reevaluate the leases in accordance to their multiple-use mandate (TRUE multi-use, not skewing in favor of extractive industries). Since the time these leases were issues, Congress passed the Emery County Public Land Management Act, which evaluates the importance of recreation and conservation use of this region, while this bill did not explicitly address the area within the leased boundaries, it does provide a land management direction for the overall region that should be considered in the re-evaluation of these leases. | | Rafael Swell Recreation Area and proximity to the leasing area. |
| 1-500349683 | RFDS | The commenter expressed concerns about Alternative A's development potential for 59 lease parcels. They believe that without more information, this alternative lacks a reasonable estimation of development. It proposes that if only 10 out of 59 parcels are needed to meet the RFDS, there may be no need to lease parcels with wilderness characteristics or those in the Wilderness area. They recommend that the RFDS be crafted such that if a parcel is leased the assumed number of wells be sufficient to extract mineral resources from that lease. They also recommend the RFDS reflect a difference in the number of wells based on available acreage, which would result in a reduction in the number of wells projected for Alternative B relative to Alternative A. Without a reasonable upper estimate of wells for the Alternative A RFDS, the resulting impacts of both alternatives appear to be the same, which is misleading. The EPA recommend the RFDS be used to analyze the potential cumulative impacts to the environment resulting from that development. | 3.2; AIB-10 | The BLM has reviewed and clarified the RFDS in the EA, as applicable, including showing a difference in the number of wells based on available acreages projected for Alternative B relative to Alternative A. Additionally, the BLM notes that analysis of each alternative considers the RFDS and potential changes in impacts based on the alternative selected. The BLM revised the cumulative analysis performed for all analyzed in detail resources to add additional clarification regarding the RFDS as applicable. |

AR000823

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| 1-500349731 | RFDS | The commenter requested that the EA consider water use in the RFDS and update the water resources analysis to include this information, including how much water would be used to drill the 30 reasonably foreseeable wells predicted in the San Rafael Desert MLP; how much water would be used to develop the eight wells anticipated on the 59 lease parcels; and the cumulative impacts of water use. | 3.2; AIB-10 | The BLM has added additional analysis regarding water resources and moved the water resources issue from analyzed in brief to analyzed in detail. The BLM reviewed available data to quantify water use for the RFDS prepared for this EA, which contemplates eight potential wells developed in the leasing area. |
| 1-500349731 | RFDS | The commenter states that the September 2018 EA predicted 11 wells would be drilled, not eight as stated in the current RFDS. The BLM provides no explanation for why the RFDS is now different. | 3.2 | Both the 2018 RFDS and the RFDS for this EA are based on the 30 wells predicted in the RFDS for the MLP. The 11 well RFDS calculated for the September 2018 EA was for 96 parcels and leases being analyzed in that EA (approximately 38% of the MLP area.) The 8 well RFDS calculated for this EA is for 59 leases (approximately 28% of the MLP area.) |
| 1-500349660 | RFDS | The RFDS fail to consider the development plans of NTEC Helium. | 3.2 | The RFDS is a tool to estimate the reasonably foreseeable development of oil and gas wells and was calculated from previous analyses and estimates of oil and gas development. Section 3.1.1.1, RFDS Assumption for Analysis in this EA, notes that the BLM has received APD packages on three leases for helium production and that of the eight wells identified in the RFDS, three are assumed to be helium. Even if all eight wells are developed for helium, this does not change the RFDS. |
| 1-500349731 | Settlement Agreement | The EA does not satisfy the requirement to "consider whether a resource management plan (RMP) amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations."<br><br>The EA does not remedy the concerns raised in *SUWA v. Haaland*. The commenter incorporated their previous comments from the September EA | 1.1 | As stated in the EA, based on the analysis in this EA, the BLM will decide whether to affirm the BLM's 2018 decisions to lease the remaining 59 leases, cancel these leasing decisions (or a portion therein), or amend and affirm the leases with revised terms. While the purpose of this EA is not to complete an RMP amendment, the decision maker will consider, based on the impacts analyzed in this EA, whether it is necessary for the BLM to undertake an RMP amendment to adjust leasing |

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| | | and December DNA in their entirety as part of their response to the Reevaluation EA. | | categories or to add or modify stipulations in order to protect resources. This comment is premature because the BLM will consider an RMP amendment after completion of this EA. |
| 1-500349683; | Water Resources | The EPA is concerned that the RMP only protects perennial and intermittent streams, and not ephemeral streams, which are important for movement of water and nutrients, connectivity, and protection of downstream water quality. They recommend evaluating the potential effects to those water resources (as well as downstream surface waters) that could result from oil and gas development or committing in the Final EA to requiring conditions of approval (COAs) protecting these resources at the APD phase of development. | 3.3.11 | The BLM appreciates the EPA's comments about ephemeral streams and has included additional information, as available, regarding ephemeral streams and sole-source aquifers in the EA. Additionally, COAs are included at the time an APD is approved by the BLM. The BLM appreciates and will consider the EPA's suggestions of additional COAs to protect water resources. As noted in the EA, stipulations and lease notices are attached to appropriate leases based on preliminary analysis performed by the BLM. COAs and other protections may be added as needed pending APD approval. |
| 1-500349683 | Water Resources | EPA also suggested reviewing whether any sole-source aquifers are located within the field office and avoiding leasing over the footprint of the aquifer. | 3.3.11 | The BLM reviewed the leases for proximity to a sole-source aquifer and updated the EA accordingly. |
| 1-500349731 | Water Resources | SUWA raised concerns that the EA did not discuss or consider the effect of water use on the environment; water quantity impacts (including those anticipated from the RFDS); or groundwater availability and quality. SUWA also suggested that a sufficiently hard look at impacts would consider how water use from lease development impacts lands, forests, wildlife, livestock, or human communities, or how these impacts would be compounded by areas experiencing drought. | 3.3.11 | The BLM has added analysis regarding water resources (including groundwater) and the associated impacts. The water resources issue is now analyzed in detail in the EA. |

AR000825

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| EMAIL-1 | Water Resources | NPS raised concerns that hydraulic fracturing associated with oil and gas production has the potential to introduce contaminants into groundwater systems and requested the BLM to consult with the USGS or Utah Geological Survey regarding the effects of hydraulic fracturing in the area. | 3.3.11 | The BLM discusses the phases of oil and gas development in Appendix D of the EA. BLM will ensure the protection of groundwater resources through casing and cementing to protect groundwater resources prior to hydraulic fracturing (Appendix D). BLM understands that consumption and depletion of groundwater and surface water resources occur throughout the phases of oil and gas development. RFDs have analyzed possible ranges of depletion and use that may occur, which is highly variable and site specific. The BLM requires that water resources for production originate from a source with a valid existing water right and all surface water and connected groundwater depletions within Colorado River Basin watersheds are subject to the Colorado River Endangered Fish Recovery Program. This has been added to the EA Section 3.3.11.<br><br>As the lead agency on this EA, the BLM recognizes the expertise of other agencies such as the USGS but does not feel consultation at this stage is required. However, two USGS reports, *Bedrock Aquifers in the Northern San Rafael Swell Area, Utah, with Special Emphasis on Navajo Sandstone* (USGS 1984), and *Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin* (USGS 1991), were carefully reviewed and incorporated into this EA as appropriate. |
| 1-500349731 | Wilderness | Regardless of which alternative the BLM eventually selects in the forthcoming DR, at a bare minimum, the BLM must cancel lease UTU-93713 because this lease is fully encompassed by the Labyrinth Canyon Wilderness. | 3.3.5 | This lease was issued on February 8, 2019, prior to the wilderness designation, and as such, qualifies as a valid existing right under the provisions of the Wilderness Act. |

AR000826

| Letter Number | Resource/ Topic | Comment | Addressed in the EA, Section | Comment Response |
|---|---|---|---|---|
| 1-500349731 | Wildlife | The commenter noted that the BLM failed to take a hard look at impacts to wildlife and raised specific concerns with the BLM's consideration of pronghorn antelope (*Antilocapra americana*), and that the BLM's calculation of disturbed pronghorn habitat is inaccurate. | AIB-11 | The BLM reevaluated potential habitat for wildlife in the leasing area, including for pronghorn. This updated information has been included in the Final EA. |

AR000827

# Appendix F. Best Management Practices

## Introduction

BMPs are measures applied on a site-specific basis to reduce or eliminate adverse impacts. For each proposed action, a number of BMPs may be applied to mitigate anticipated impacts. BMPs can be voluntarily incorporated by project proponents into individual proposals as design features or added by the BLM to authorizations as conditions of approval.

BMPs should be selected based on the site-specific requirements of the project and local environment. No one management practice is best suited to every site or situation. BMPs must be adaptive and monitored regularly to evaluate effectiveness. BMPs, by their very nature, are dynamic innovations and must be flexible enough to respond to new data, field research, technological advances, and market conditions.

The BLM continues to improve the way it manages oil and gas development on public lands. Part of that improvement includes the use of BMPs to lessen the effects of oil and gas development on the environment. The oil and gas industry and the BLM are constantly developing and improving BMPs.

The BMPs listed below may be applied to proposed oil and gas activities under Alternatives B, C, and D. The list is not comprehensive and may be modified over time as conditions change and new practices are identified. Periodically, the BMPs may be updated to stay current with the latest technology and with the latest direction from the Department of the Interior and the BLM.

## Construction and Operation

- Well site locations should be planned in order to minimize long-term disruption of the surface resources and existing uses, and to promote successful reclamation.

- Existing roads will be used to the extent possible. All new roads and upgrades of existing roads will be designed to a safe and appropriate standard "no higher than necessary" to accommodate intended vehicular use and to reduce impacts to natural resources.

- No construction or routine maintenance activities shall be performed during periods when the soil is too wet to adequately support construction equipment. If such equipment creates ruts in excess of 4 inches deep, the soil shall be deemed too wet to adequately support construction equipment.

- Drainage from disturbed areas will be confined or directed so as to not cause erosion in undisturbed areas.

- Construction of access roads on steep hillsides and near water courses will be avoided where alternate routes provide adequate access.

- Access roads requiring construction with cut and fill will be designed to minimize surface disturbance and will take into account the character of the landform, natural contours, cut material, depth of cut, where the fill material will be deposited, resource concerns, and visual contrast. Roads will follow the contour of the land where practical.

- Fill material will not be cast over hilltops or into drainages. Cut slope ratios should normally be no steeper than 3:1, and fill slopes no steeper than 2:1.

- Low water-crossings will be used whenever possible.

AR000828

- Placement of facilities on hilltops and ridgelines will be avoided. Well site layout should take into account the topography and landform. Deep, vertical cuts and steep, long fill slopes should be avoided. All cut and fill slopes should be constructed to the least percent slope practical.

- Trash will be retained in portable trash containers and hauled to an authorized disposal site. Burning of trash will not be allowed on the site.

- Cattle guards will be installed and maintained whenever access roads go through pasture gates or fences. Maintenance includes cleaning out under cattle guard bases when needed.

- All pits and open cellars shall be fenced in accordance with BLM specifications.

- In coordination with the BLM and Emery or Wayne Counties, operators shall maintain existing roads in a safe, usable condition. Maintenance shall include, but is not limited to, grading, ditching, installing low water crossings, and, if needed, surfacing the road with aggregate.

- Stockpile all brush, limbs, crushed stumps, and other woody material separately from topsoil. Use the stripped vegetation for interim reclamation.

- Repair/replace fences as necessary in order to prevent cattle access to project facilities. Fences will be constructed around reserve pits to prevent wildlife entry.

- Construct a berm of sufficient capacity to contain the storage capacity of the largest tank plus sufficient freeboard to contain 150% of the volume of the largest tank to surround the tank battery.

- Apply mat drilling techniques to accelerate and enhance reclamation by decreasing soil and vegetation disturbance, especially in areas where erosive soils are present.

- Locate well pads, associated facilities, and utilities in the least environmentally sensitive areas. Locate wells outside of drainages, below ridgelines, and away from important sources of forage, cover, reproductive habitats, winter habitats, parturition areas, and brood-rearing habitats.

- Centralize and combine pipeline systems and other facilities and infrastructure to minimize disturbance during development and production.

## Air Quality and Greenhouse Gas/Fugitive Dust

- Water or alternative dust suppressants (i.e., surfactants or other erosion control materials) will be utilized to minimize fugitive dust during construction and applied on material (sand, gravel, soil, minerals, or other matter that may create fugitive dust) piles.

- All vehicles and construction equipment will be properly maintained to minimize exhaust emissions.

- Restrict vehicle speeds to approximately 10 miles per hour (mph) on well pads and production facility locations.

- Vehicles are not to exceed a speed of approximately 20 mph on any unpaved road that does not include a posted speed limit to discourage the generation of fugitive dust.

- Periodic watering or chemical stabilization of unpaved roads.

- Cover, enclose, or stabilize excavated or inactive material piles after activity ceases.

- Use telemetry and well automation to remotely monitor and control production.

- Use centrally stored water that is piped to the well pads through a temporary surface line.

AR000829

- Centralize (or consolidate) gas processing facilities (separation, dehydration, sweetening, etc.).

- Construction and drilling crews will carpool to and from the site to minimize vehicle-related emissions.

- To the extent possible, utilize solar power to power well site equipment.

- Install vapor recovery units on all oil and condensate tanks.

- Minimize the period of time between initially disturbing the soil and revegetating or other surface stabilization. Utilize interim reclamation.

- Minimize the area of disturbed land.

- Prompt revegetation of disturbed lands.

- Enclose, cover, water, or otherwise treat loaded haul trucks to minimize loss of material to wind and spillage.

- Revegetate, mulch, or otherwise stabilize the surface of all disturbed areas adjoining roads.

- Reduce elemental carbon, particularly from diesel fueled engines by utilizing controls such as diesel particulate filters on diesel engines or using lower emitting engines.

- Opportunities to reduce nitrogen oxides ($NO_x$), particularly from internal combustion engines, should be pursued to control impacts to deposition and visibility in nearby Class I areas. This may include the use of lower emitting engines, and/or add on controls (e.g., selective catalytic reduction) where appropriate.

- Reduce nitrogen oxides ($NO_x$), particularly from internal combustion engines, by controlling impacts to deposition and visibility in nearby Class I areas. This may include the use of lower emitting engines, and/or add on controls (e.g., selective catalytic reduction) where appropriate.

## Cultural Resources

- All persons who are associated with mineral operations will be informed that they will be subject to prosecution for knowingly disturbing archaeological sites or collecting artifacts.

- If any previously unidentified cultural resources or human remains are discovered as a result of mineral operations, activity in the vicinity of the discovery will cease and will be immediately reported to the BLM field office. Work may not resume at that location until approved by the BLM authorized officer.

- Use visual resource BMPs to avoid, minimize, or mitigate potential adverse effects to historic properties.

## Visual Resources/Noise/Night Skies

- Use natural or artificial features, such as topography, vegetation, or an artificial berm to help screen facilities. Design roads and other linear facilities to follow the contour of the land or mimic lines in the vegetation. Avoid a straight road that will draw the viewer's eye and attention toward production facilities.

- Paint aboveground production facilities (pumping units, pipes, compressors, tanks, treaters, etc.) a color that allows the facility to blend into the background. Also, paint all new equipment brought onto the site the same color as approved by the BLM authorized officer.

AR000830

- Semi-gloss paints should be used rather than flat paints; the selected paint color should be one or two shades darker than the background.

- During reclamation, replace soil, brush, rocks, shrub/tree debris, etc., over disturbed earth surfaces, which allows for natural regeneration rather than introducing an unnatural looking grass cover.

- Design well pads so that the edges are irregular and more natural looking. Straight-line edges should be avoided.

- Utilize "liquid gathering systems" to eliminate surface storage tanks and reduce truck trips for removal of liquids.

- Place infrastructure within or near previously disturbed locations. Pipelines and electric lines should be buried in or immediately adjacent to access roads. Surface-laid pipelines, if necessary, should also be located in or immediately adjacent to access roads.

- Minimize noise by using best available technology, such as installation of multi-cylinder pumps, hospital-grade sound-reducing mufflers, and placement of exhaust systems to direct noise away from sensitive receptors.

- Locate drill pads, roads, and facilities below ridgelines or behind topographic features to minimize auditory effects.

- Limit the use of artificial lighting during nighttime operations to only those that are determined necessary for the safety of operations and personnel.

- Utilize shielding and aiming techniques, as well as limiting the height of light poles to reduce glare and avoid light shining above horizon(s).

- Direct lights downward onto the task area. The bottom surface of the light fixture should be level, or if unable to be fully level, point it as close to straight down as possible, or shield it to avoid light being projected horizontally.

- Use lights only where needed, using light only when needed, and directing all lighting on-site.

- Use motion sensors, timers, or manual switching for areas that require illumination but are seldom occupied.

- Reduce lamp brightness and select lights that are not broad spectrum or bluish in color.

## Soil/Water/Riparian

- Minimize disturbance to natural drainage patterns. Design locations for storm conditions, ensure off-site natural runoff does not wash over the site, and use perimeter drainage ditches.

- Divert stormwater away from well locations with ditches, berms, or water bars above the cut slopes to trap well location runoff and sediments on or near the location through the use of sediment fences or water retention ponds.

- Inspect equipment routinely for leaks (diesel fuel, hydraulic fluid, lubricating oil, and coolant) and make any necessary repairs. In the event of soil contamination due to equipment fluid spills, isolate and clean up the spill immediately. Implement soil remediation and bioremediation procedures or excavate to an appropriate container and transport to an approved off-site disposal location.

AR000831

- During reclamation, apply certified weed-free mulch or other suitable materials and crimp or tackify to remain in place to reclaim areas for seed retention.

- In areas of identified biological soil crusts, the top 2 to 5 inches of topsoil, inclusive of the biological soil crusts, shall be carefully stripped and stockpiled separately from all other soil materials.

- Organic matter and debris shall be retained in the piles to help sustain biological activity and increase the effectiveness of respreading the crust material. Storage piles shall be shallow to preserve microorganisms and seeds. Respread the soil crust during interim and final reclamation. During reclamation, reestablish mounds on the surface prior to reapplying the biological soil crusts.

- Stabilize topsoil stockpiles by 1) spraying with water to establish crust, and 2) covering with biodegradable product.

- Utilize erosion control structures, such as certified weed-free straw bales, silt fences, sediment traps, water bars, drainage ditches, and sediment ponds to prevent down cutting on slopes, to reduce loss of sediment, and to avoid contamination of runoff into perennial and intermittent streams. These structures will remain in place and will be maintained until stabilization and revegetation are complete.

- Regular monitoring of revegetated and reclaimed areas will be conducted with regular maintenance or reseeding as needed until the BLM determines that the revegetation is successful.

- Topsoil will be segregated and stored separately from subsurface materials to avoid mixing during construction, storage, and interim and final reclamation. Subsurface materials will never be placed on top of topsoil material at any point in the operation. Stockpiles will be located and protected so that wind and water erosion are minimized, and reclamation potential is maximized. Ensure that the topsoil is spread evenly over the reclaimed area.

- Use closed-loop drilling systems in sensitive areas or where there is shallow groundwater.

- Substitute less toxic, yet equally effective products, for conventional drilling products.

- Disposal or emergency pits will be located in cut material rather than fill material.

- If water is encountered during construction of a pit, cease construction and immediately contact the BLM.

- Avoid constructing reserve pits in areas of shallow groundwater. To prevent contamination of groundwater and soils, use semi-closed-loop or closed-loop drilling systems or lined pits with impermeable liners.

- Where operations are conducted in the vicinity of public water sources, the operator will work with the public water supplier to identify possible methods to protect water supplies.

- At a minimum, the operator and the BLM will adhere to BLM Instruction Memorandum 2010-055 regarding the Protection of Groundwater in Association with Oil and Gas Leasing, Exploration, and Development or the latest BLM policy or guidance. Areas identified with shallow unconfined aquifers and potential unconsolidated aquifers will require additional mitigation that may include closed-loop drilling, no surface pits, or off-site location of production storage facilities; a spill prevention, control and countermeasure plan (as specified by the EPA); and a stormwater management plan. A water monitoring plan may be required to ensure the effectiveness of mitigation to protect water resources.

AR000832

- Construct all road and pipeline crossings at right angles to streams to minimize the area of disturbance.

- Locate and construct all structures crossing intermittent and perennial streams and ephemeral drainages such that they do not decrease channel stability or increase water velocity.

- Minimize crossings of streams (intermittent and perennial) with vehicles and heavy machinery.

- As specified by the authorized officer, reserve pits and other surface impoundments will be lined with synthetic liners with a minimum thickness of 12 millimeters or other materials, such as bentonite or clay. Decommission by removing all contaminants and liners and dispose of the liners in an approved waste management facility or recycle them. For additional siting and closure guidance, refer to IB No. UT 2013-038.

- Use wind fences, other forms of wind breaks, or other techniques where needed to control wind erosion and prevent downwind (off-site) emissions of fugitive dust.

- Use BLM-approved dust suppressants or other techniques when and where needed to prevent emissions of fugitive dust from development sites and associated unpaved roadways.

## Reclamation

- Provide a reclamation plan as part of mineral proposals that includes plans for both interim and final reclamation. Reclamation is required of any disturbed surface that is not necessary for continued production operations. Additional reclamation measures may be required based on existing conditions at the time of final abandonment.

- Operators would be required to follow the Green River Reclamation Guidelines for all development in the Price Field Office.

- Planning for reclamation should occur prior to construction in order to achieve successful reclamation in the future. Successful final reclamation is achieved more efficiently by locating six operations in areas that minimize reclamation needs, by sufficiently salvaging topsoil, and by completing interim reclamation.

- Reclaimed areas above pipelines that receive incidental disturbance during maintenance activities will be reseeded as soon as practical.

- Final reclamation of all mineral-related disturbances will involve recontouring of all disturbed areas, including access roads to the original contour or a contour that blends with the surrounding topography and revegetating all disturbed areas to native species. It also involves salvaging and reusing all available topsoil (whatever soil is on top) in a timely manner, revegetating disturbed areas, controlling erosion, controlling invasive non-native plant and noxious weeds, and monitoring results. Reclamation measures should begin as soon as possible after the disturbance and continue until successful reclamation is achieved.

- The long-term objective of final reclamation is to set the course for eventual ecosystem restoration, including the restoration of the natural vegetation community, hydrology, and wildlife habitats. In most cases, this means returning the land to a condition approximate to or equal to that which existed prior to the disturbance.

- During the life of the mineral operation, all disturbed areas not needed for active support of the operation should undergo interim reclamation in order to minimize the environmental impacts of development on other resources and uses. Reclamation is required of any disturbed surface that is not necessary for continued mineral operations.

AR000833

- Disturbed areas should be revegetated after the site has been satisfactorily prepared. Site preparation will include respreading topsoil to an adequate depth, and may also include ripping, tilling, disking on contour, and dozer track imprinting.

- Any topsoil pile set aside should be revegetated to prevent it from eroding and to help maintain its biological viability.

- All pits must be reclaimed to a safe and stable condition that blends with the rest of the reclaimed area. If necessary, the pit area should usually be mounded slightly to allow for settling and to allow for positive surface drainage.

- Interim reclamation of the well pad and access road will begin as soon as practical.

- Facilities will be grouped on the pads to allow for maximum interim reclamation. Interim reclamation will include road cuts and fills and will extend within proximity of the well head and production facilities.

- Respread topsoil over the entire location and revegetate to within a few feet of the production facilities unless an all-weather, surfaced access route or turn-around is needed.

- The well site must be recontoured to original contour or a contour that blends with the surrounding landform, stockpiled topsoil evenly distributed, and the site revegetated. Salvaged topsoil must be respread evenly over the surfaces to be revegetated. The topsoiled site should be prepared to provide a seedbed for reestablishment of desirable vegetation.

- Final reclamation includes recontouring the road back to the original contour, seeding, controlling noxious weeds, and may also include other techniques to improve reclamation success, such as ripping, scarifying, replacing topsoil, constructing water bars, pitting, mulching, redistributing woody debris, and barricading.

- Use stockpiled brush, limbs, crushed stumps, other woody material, and stripped vegetation for interim and final reclamation.

- Fencing will be installed to prevent livestock from grazing the reclaimed area until vegetation is reestablished.

## Vegetation/Noxious Weeds and Invasive Species

- Seeding performed as part of reclamation operations will take place in the fall from mid-October until mid-December when the ground surface is not frozen.

- Prior to commencing operations, all equipment and vehicles will be cleaned to remove seeds and soil that may contain seeds in order to avoid the spread of noxious weeds and invasive species.

- To minimize the potential of spreading weed seeds between drilling locations, compressed air will be used to remove weed seeds and soil from equipment before it is mobilized to the next drilling location.

- Develop a weed management plan on how to monitor growth of invasive species resulting from surface disturbance caused by project activities and how to control noxious weeds and invasive species through the application of commercial herbicides after obtaining a pesticide use permit from the BLM.

- Treatment to prevent the introduction or spread of invasive/noxious plants would conform to the guidelines and principles of the Western States Environmental Impact Statement for vegetation

AR000834

treatments, which specifies herbicides approved for use, treatment protocols, mitigation, and monitoring.

- Construction equipment and vehicles will not be allowed to drive through weed-infested areas.

- In coordination with the BLM and Emery and Wayne Counties, control noxious and invasive plants that become established along roads, on well pads, or adjacent to other facilities.

- Clean and sanitize all equipment brought in from other regions. Use portable washing stations to periodically wash down equipment entering and leaving well field areas, especially during muddy conditions.

## Wildlife

- Identify important, sensitive, and unique habitats and wildlife in the area. Incorporate mitigation practices that minimize impacts to these habitats.

- Plan the pattern and rate of development to avoid the most important habitats and generally reduce the extent and severity of impacts.

- Cluster drill pads, roads, and facilities in specific areas that would have a lower impact on wildlife habitat.

- Consider liquid-gathering systems to eliminate surface storage tanks and to reduce truck trips for removal of liquids.

- Place infrastructure within or near previously disturbed locations in order to avoid new impacts to wildlife habitat.

- Roads will be reclaimed as soon as possible after they are no longer required.

- Personnel will be advised to minimize stopping and exiting their vehicles in big game winter range when there is snow on the ground.

- If it is found that project activities could potentially affect raptor nesting, as determined from decreased raptor productivity or nesting, or documented nest abandonment or failure, alternate nesting sites may be constructed at a rate of up to two alternate nesting sites for one impacted nest. Existing degraded raptor nests may be upgraded or reinforced to minimize potential impacts.

- In order to minimize potential for raptor mortalities on production facility structures, raptor protection measures shall be applied (e.g., modify for raptor-safe construction, install perches, perching deterrents, nesting platforms, nest deterrent devices, etc.).

- In order to limit impacts to pronghorn antelope, avoid aggressive non-native grasses and shrubs in pronghorn habitat restoration.

- If produced water is allowed to evaporate after completion of drilling, reserve pits will be fenced on four sides to prevent entry by wildlife and/or livestock.

- Promptly report observations of potential wildlife problems to the regional office of the UDWR and, as applicable, to the USFWS.

- The operator will notify the BLM authorized officer and nearest USFWS law enforcement office within 24 hours if the operator discovers a dead or injured federally protected species (i.e., migratory bird species, bald or golden eagle, or species listed by the USFWS as threatened or endangered) in or adjacent to a pit, trench, tank, exhaust stack, or fence. (If the operator is unable

AR000835

to contact the USFWS law enforcement office, the operator must contact the nearest USFWS ecological services office.)

- Design, construct, and maintain exclosure fencing for all open cellars and pits containing freestanding fluids to prevent access to livestock and large forms of wildlife, such as deer, elk, and pronghorn. At a minimum, the operator will adequately fence all fluids pits and open cellars during and after drilling operations until the pit is free of fluids and the operator initiates backfilling. The operator will maintain the fence in order to protect public health and safety, wildlife, and livestock. (For examples of exclosure fencing design, refer to the Oil and Gas Gold Book – Exclosure Fence Illustrations, Figure 1, Page 18.) Adequate fencing (in lieu of more stringent requirements by the surface owner) includes all of the following:

    1. Construction materials will consist of steel and/or wood posts. Use a fence with five separate wires (smooth or barbed) or hog panel (16 feet long × 50 inches in height) with connectors, such as fence staples, quick-connect clips, hog rings, hose clamps, twisted wire, etc. Do not use electric fences.

    2. Set posts firmly in the ground. Stretch the wire tightly, if used, and space it evenly from the ground level to the top wire, effectively keeping out animals. Tie hog panels securely into posts and to one another using fence staples, clamps, etc. Construct the fence at least 2 feet from the edge of the pit.

    3. For reserve pits, fence all four sides as soon as the pit is constructed. Reconstruct any damage to the rig side of the fence immediately following release of the drilling rig.

    4. Maintain the erect fences in adequate condition until the pit is closed.

- The operator will prevent wildlife and livestock access (including avian wildlife) to fluids pits that contain or have the potential of containing salinity sufficient to cause harm to wildlife or livestock, hydrocarbons, surfactants, or Resource Conservation and Recovery Act of 1976–exempt hazardous substances. At a minimum, the operator will install approved netting in these circumstances, in accordance with the requirements below, immediately following release of the drilling rig. Note: The BLM generally does not approve of the use of flagging, strobe lights, metal reflectors, or noisemakers as techniques for deterring wildlife.

**Minimum Netting Requirements**

The operator will:

    1. Construct a rigid structure made of steel tubing or wooden posts with cable strung across the pit at no more than 7-foot intervals along the X- and Y-axes to form a grid of seven footsquares.

    2. Suspend netting a minimum of 4 to 5 feet above the pit surface.

    3. Use a maximum netting mesh size of 1½ inches to allow for snow loading while excluding most birds in accordance with U.S. Fish and Wildlife Service recommendations.

    4. Cover the top and sides of the netting support frame with netting and secure the netting at the ground surface around the entire pit to prevent wildlife entry at the netting edges. Note: Hog wire panels or other wire mesh panels or fencing used on the sides of the netting support frame is ineffective in excluding small wildlife and songbirds unless covered by smaller meshed netting.

AR000836

    5.   Monitor and maintain the netting sufficiently to ensure the netting is functioning as intended, has not entrapped wildlife, and is free of holes and gaps greater than 1½ inches.

- The operator will construct and maintain pits, cellars, open-top tanks, and trenches, that are not otherwise fenced, screened, or netted, to exclude livestock, wildlife, and humans (for example, lined, clean water pits; well cellars; or utility trenches) to prevent livestock, wildlife, and humans from becoming entrapped. At a minimum, the operator will construct and maintain escape ramps, ladders, or other methods of avian and terrestrial wildlife escape in pits, cellars, open-top tanks, or at frequent intervals along trenches where entrapment hazards may exist.

- Immediately following active drilling or completion operations, the operator will take actions necessary to prevent wildlife and livestock access, including avian wildlife, to all open-topped tanks that contain or have the potential to contain salinity sufficient to cause harm to wildlife or livestock, hydrocarbons, or Resource Conservation and Recovery Act of 1976–exempt hazardous substances. At a minimum, the operator will net, screen, or cover open-topped tanks to exclude wildlife and livestock and prevent mortality. If the operator uses netting, the operator will cover and secure the open portion of the tank to prevent wildlife entry. The operator will net, screen, or cover the tanks until the operator removes the tanks from the location or the tanks no longer contain substances that could be harmful to wildlife or livestock.

- The operator will prevent all hazardous, poisonous, flammable, and toxic substances from coming into contact with soil and water. At a minimum, the operator will install and maintain an impervious secondary containment system for any tank or barrel containing hazardous, poisonous, flammable, or toxic substances sufficient to contain the contents of the tank or barrel and any drips, leaks, and anticipated precipitation. The operator will dispose of fluids within the containment system that do not meet applicable state or EPA livestock water standards in accordance with state law. The operator must not drain the fluids to the soil or ground.

- The operator will design, construct, and maintain all secondary containment systems to prevent wildlife and livestock exposure to harmful substances. At a minimum, the operator will install effective wildlife and livestock exclosure systems, such as fencing, netting, expanded metal mesh, lids, and grate covers.

- The operator will construct, modify, equip, and maintain all open-vent exhaust stacks on production equipment to prevent birds and bats from entering, and to discourage perching, roosting, and nesting. Production equipment includes, but may not be limited to, tanks, heater treaters, separators, dehydrators, flare stacks, in-line units, and compressor mufflers.

AR000837

# Appendix G. Emissions Tables

This appendix provides the per-well emissions factors (GHGs and non-GHGs) by phase (well development and production operations) and by the total emissions calculated for each alternative on an annual basis. An emissions factor is a value that relates the quantity of a pollutant released into the atmosphere with an activity that generates the pollutant. They are typically expressed in units of eight or mass (e.g., pounds, kilograms, tons) per activity (e.g. duration of equipment operation, construction of an oil or gas well). Emissions factors are the basis for developing emissions inventories that are used for air quality management decisions. The BLM uses emissions inventories to evaluate the change to county-level emissions, to compare NEPA alternatives, and as inputs for air quality models if modeling is warranted. Over time, emissions factors may change due to new emissions regulations, development of control technologies, or data and information improvements for emissions.

Air pollutant emissions from oil and gas activities occur during construction and operation of a well. Construction-related emissions occur from the use of heavy machinery during pad construction, drilling, testing and completion, venting and flaring, interim reclamation, and vehicles. Construction emissions are typically a one-time occurrence. Operation/production related emissions occur from well workovers, pump engines, heaters, tanks, truck loading, fugitive leaks, pneumatics, dehydrators, compressor engines, reclamation, and vehicle traffic. Emissions from operation activities occur throughout the life of a well. Several factors, such as location, geological formation, well depth, equipment used, supporting infrastructure, and other factors, may influence actual emissions. The single well emissions for all alternatives, for both the oil and gas and helium wells, are presented in Table G-1. Annual emissions for the alternatives are based on the single-well emissions factors and the estimated number of wells developed and operating in each year. No Action Alternative emissions are presented in Table G-2 through Table G-11. Wilderness and Lands with Wilderness Characteristics Alternative emissions are presented in Table G-12 through Table G-18.

**Table G-1. Single Well Emissions Factors in Tons Per Year, and Metric Tonnes**

| Activity | $PM_{10}$ (tpy) | $PM_{2.5}$ (tpy) | VOC (tpy) | $NO_x$ (tpy) | CO (tpy) | $SO_2$ (tpy) | HAPs (tpy) | $CO_2$ (t) | $CH_4$ (t) | $N_2O$ (t) |
|---|---|---|---|---|---|---|---|---|---|---|
| Construction | 1.45 | 0.44 | 1.09 | 9.16 | 3.18 | 0.02 | 0.09 | 1179.22 | 0.26 | 0.01 |
| Production | 0.61 | 0.21 | 7.63 | 1.88 | 3.05 | 0.00 | 0.70 | 998.41 | 2.31 | 0.00 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b). Using the weighted average emissions from emissions inventories developed for different types of oil and gas development (horizontal, vertical/directional drilling for oil and gas wells) that occurred in 2022.

**Table G-2. Estimated Annual Emissions from the Development of Five Oil and Gas Leases – No Action Alternative**

| Activity | Field Office | County | $PM_{10}$ | $PM_{2.5}$ | VOC | $NO_x$ | CO | $SO_2$ | HAPs |
|---|---|---|---|---|---|---|---|---|---|
| Maximum year* | PFO | Emery | 4.5 | 1.5 | 39.3 | 18.6 | 18.4 | 0.020 | 3.581 |
| Average year* | PFO | Emery | 2.7 | 0.9 | 31.1 | 8.9 | 12.8 | 0.004 | 2.840 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

* Values in tons per year.

AR000838

**Table G-3. Estimated Annual Emissions from the Development of Three Helium Leases – No Action Alternative**

| Activity | Field Office | County | $PM_{10}$ | $PM_{2.5}$ | VOC | $NO_x$ | CO | $SO_2$ | HAPs |
|---|---|---|---|---|---|---|---|---|---|
| Maximum year* | PFO | Emery | 3.3 | 1.1 | 24.0 | 14.8 | 12.3 | 0.019 | 2.186 |
| Average year* | PFO | Emery | 1.7 | 0.6 | 20.3 | 5.8 | 8.4 | 0.003 | 1.855 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

* Values in tons per year.

**Table G-4. Estimated Life of Lease Emissions from Well Development, Well Production Operations, Mid-Stream, and End-Use – No Action Alternative – Five Oil and Gas Wells**

| Activity | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ (100 years) | $CO_2e$ (20 years) |
|---|---|---|---|---|---|
| Well development | 5,896 | 1.30 | 0.043 | 5,947 | 6,015 |
| Well production operations | 99,841 | 231.02 | 0.200 | 106,780 | 118,954 |
| Mid-stream | 74,000 | 199.28 | 1.228 | 80,274 | 90,776 |
| End-use | 559,341 | 21.52 | 4.215 | 561,133 | 562,266 |
| **Total** | 739,078 | 453.11 | 5.687 | 754,133 | 778,012 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

Note: all values in metric tons.

**Table G-5. Estimated Life of Lease Emissions from Well Development, Well Production Operations, Mid-Stream, and End-Use – No Action Alternative – Three Helium Wells**

| Activity | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ (100 years) | $CO_2e$ (20 years) |
|---|---|---|---|---|---|
| Well development | 3,538 | 0.78 | 0.026 | 3,568 | 3,609 |
| Well production operations | 59,905 | 138.61 | 0.120 | 64,068 | 71,373 |
| Mid-stream | 0 | 0.00 | 0.000 | 0 | 0 |
| End-use | 0 | 0.00 | 0.000 | 0 | 0 |
| **Total** | 63,442 | 139.39 | 0.146 | 67,636 | 74,982 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

Note: all values in metric tons.

AR000839

**Table G-6. Comparison of Lease Sale Annual Emissions to Other Sources – No Action Alternative – Five Oil and Gas Wells**

| Reference | Mt CO2e[*] (Per Year) | Average Year Percentage of Reference |
|---|---|---|
| Emissions from leases (average year) | 0.028 | – |
| Utah onshore federal (oil and gas)[†] | 12.68 | 0.220% |
| U.S. onshore federal (oil and gas)[†] | 465.63 | 0.006% |
| U.S. federal – all (oil and gas)[†] | 844.27 | 0.003% |
| U.S. federal (oil, gas, and coal)[†] | 1,292.57 | 0.002% |
| Utah total (all sectors)[‡] | 71.41 | 0.039% |
| U.S. total (all sectors)[‡] | 5,981.40 | <0.001% |

[*] Estimates are based on 100 Global Warming Potential values.

[†] Federal values come from the Annual GHG Report, Tables ES-1 and ES-2. U.S Federal – All includes offshore oil and gas production (BLM 2022e).

[‡] Values comes from the EPA Inventory of U.S. GHG Emissions and Sinks: 1990–2020 (EPA 2022a) and use the Intergovernmental Panel on Climate Change (2007) Fourth Assessment Report Global Warming Potential values.

**Table G-7. Comparison of Lease Sale Annual Emissions to Other Sources – No Action Alternative – Three Helium Wells**

| Reference | Mt CO2e[*] (Per Year) | Average Year Percentage of Reference |
|---|---|---|
| Emissions from leases (average year) | 0.003 | – |
| Utah onshore federal (oil and gas)[†] | 12.68 | 0.022% |
| U.S. onshore federal (oil and gas)[†] | 465.63 | 0.001% |
| U.S. federal – all (oil and gas)[†] | 844.27 | 0.000% |
| U.S. federal (oil, gas, and coal)[†] | 1,292.57 | 0.000% |
| Utah total (all sectors)[‡] | 71.41 | 0.004% |
| U.S. total (all sectors)[‡] | 5,981.40 | <0.001% |

[*] Estimates are based on 100 Global Warming Potential values.

[†] Federal values come from the Annual GHG Report, Tables ES-1 and ES-2. U.S Federal – All includes offshore oil and gas production (BLM 2022e).

[‡] Values comes from the EPA Inventory of U.S. GHG Emissions and Sinks: 1990–2020 (EPA 2022a) and use the Intergovernmental Panel on Climate Change (2007) Fourth Assessment Report Global Warming Potential values.

AR000840

**Table G-8. Annual GHG Emissions for the No Action Alternative in Metric Tonnes – Five Oil and Gas Wells**

| Year | # Wells Developed | # Wells Operating | Well Dev. $CO_2$ | Well Dev. $CH_4$ | Well Dev. $N_2O$ | Well Dev. $CO_2e$ (100-yr) | Well Op. $CO_2$ | Well Op. $CH_4$ | Well Op. $N_2O$ | Well Op. $CO_2e$ (100-yr) | Indirect $CO_2$ | Indirect $CH_4$ | Indirect $N_2O$ | Indirect $CO_2e$ (100-yr) | Sum $CO_2$ | Sum $CH_4$ | Sum $N_2O$ | Sum $CO_2e$ (100-yr) | Sum $CO_2e$ (20-yr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 2 | 1 | 1 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 998.4 | 2.31 | 0.002 | 1,067.8 | 41,403.3 | 12.06 | 0.362 | 41,861.5 | 43,581 | 14.63 | 0.372 | 44,119 | 44,890 |
| 3 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 27,209.3 | 7.35 | 0.239 | 27,493.6 | 28,208 | 9.66 | 0.241 | 28,561 | 29,071 |
| 4 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 18,125.2 | 5.02 | 0.159 | 18,318.3 | 19,124 | 7.33 | 0.161 | 19,386 | 19,773 |
| 5 | 1 | 2 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 53,553.8 | 15.67 | 0.468 | 54,148.5 | 56,730 | 20.55 | 0.480 | 57,473 | 58,557 |
| 6 | 1 | 3 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 76,805.1 | 22.11 | 0.671 | 77,647.3 | 80,980 | 29.30 | 0.686 | 82,040 | 83,584 |
| 7 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 50,896.2 | 14.45 | 0.445 | 51,448.6 | 53,891 | 21.39 | 0.451 | 54,652 | 55,779 |
| 8 | 1 | 4 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 3,993.6 | 9.24 | 0.008 | 4,271.2 | 75,487.8 | 22.35 | 0.658 | 76,333.7 | 80,661 | 31.85 | 0.675 | 81,794 | 83,473 |
| 9 | 1 | 5 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 91,593.8 | 27.08 | 0.799 | 92,618.8 | 97,765 | 38.89 | 0.818 | 99,147 | 101,196 |
| 10 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 60,943.1 | 18.29 | 0.531 | 61,633.2 | 65,935 | 29.84 | 0.541 | 66,972 | 68,545 |
| 11 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 40,974.2 | 13.35 | 0.354 | 41,468.9 | 45,966 | 24.91 | 0.364 | 46,808 | 48,120 |
| 12 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 27,762.9 | 10.19 | 0.237 | 28,131.3 | 32,755 | 21.74 | 0.247 | 33,470 | 34,616 |
| 13 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 18,979.1 | 8.05 | 0.160 | 19,262.6 | 23,971 | 19.60 | 0.170 | 24,602 | 25,635 |
| 14 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 13,120.9 | 6.57 | 0.108 | 13,346.2 | 18,113 | 18.12 | 0.118 | 18,685 | 19,640 |
| 15 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 9,202.7 | 5.52 | 0.073 | 9,387.3 | 14,195 | 17.07 | 0.083 | 14,726 | 15,626 |
| 16 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 6,573.7 | 4.76 | 0.051 | 6,729.3 | 11,566 | 16.31 | 0.061 | 12,068 | 12,928 |
| 17 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 4,802.7 | 4.19 | 0.035 | 4,937.3 | 9,795 | 15.74 | 0.045 | 10,276 | 11,106 |
| 18 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 3,603.8 | 3.76 | 0.025 | 3,722.7 | 8,596 | 15.31 | 0.035 | 9,062 | 9,869 |
| 19 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 2,786.7 | 3.43 | 0.018 | 2,893.7 | 7,779 | 14.98 | 0.028 | 8,233 | 9,022 |
| 20 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 2,225.2 | 3.16 | 0.013 | 2,323.0 | 7,217 | 14.71 | 0.023 | 7,662 | 8,437 |
| 21 | 0 | 5 | 0.0 | 0.00 | 0.000 | 0.0 | 4,992.0 | 11.55 | 0.010 | 5,339.0 | 1,835.2 | 2.94 | 0.010 | 1,925.6 | 6,827 | 14.49 | 0.020 | 7,265 | 8,028 |
| 22 | 0 | 4 | 0.0 | 0.00 | 0.000 | 0.0 | 3,993.6 | 9.24 | 0.008 | 4,271.2 | 1,361.9 | 2.31 | 0.007 | 1,432.9 | 5,356 | 11.55 | 0.015 | 5,704 | 6,313 |
| 23 | 0 | 4 | 0.0 | 0.00 | 0.000 | 0.0 | 3,993.6 | 9.24 | 0.008 | 4,271.2 | 1,176.2 | 2.18 | 0.006 | 1,242.6 | 5,170 | 11.42 | 0.014 | 5,514 | 6,116 |
| 24 | 0 | 4 | 0.0 | 0.00 | 0.000 | 0.0 | 3,993.6 | 9.24 | 0.008 | 4,271.2 | 1,041.6 | 2.06 | 0.005 | 1,104.3 | 5,035 | 11.30 | 0.013 | 5,375 | 5,971 |
| 25 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 743.3 | 1.51 | 0.003 | 789.3 | 3,739 | 8.44 | 0.009 | 3,993 | 4,438 |
| 26 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 480.0 | 1.00 | 0.002 | 510.2 | 2,477 | 5.62 | 0.006 | 2,646 | 2,942 |
| 27 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 441.0 | 0.95 | 0.002 | 469.8 | 2,438 | 5.57 | 0.006 | 2,605 | 2,899 |
| 28 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 212.0 | 0.46 | 0.001 | 226.1 | 1,210 | 2.77 | 0.003 | 1,294 | 1,440 |
| 29 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 30 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 31 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |

AR000841

| Year | # Wells Developed | Operating | Well Development Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Well Operation Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Indirect (Mid-Stream, End-Use) Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Sum of Direct and Indirect Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | CO₂e (20-yr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 33 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 34 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 35 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 36 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 37 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 38 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 39 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| Total (MT) | 5 | | 5,896 | 1.30 | 0.043 | 5,947 | 99,841 | 231.02 | 0.200 | 106,780 | 633,341 | 220.80 | 5.444 | 641,407 | 739,078 | 453.11 | 5.687 | 754,133 | 778,012 |
| Max Year | | | 1,179.2 | 0.26 | 0.009 | 1,189 | 4,992.0 | 11.55 | 0.010 | 5,339 | 91,594 | 27.08 | 0.799 | 92,618.8 | 97,765.0 | 38.89 | 0.818 | 99,147 | 101,196 |
| Average Year | | | | | | | 3,697.8 | 8.6 | 0.0 | 3,954.8 | 23,457 | 8.18 | 0.202 | 16,446.3 | 27,373 | 16.78 | 0.211 | 27,931 | 28,815 |

**Table G-9. Annual GHG Emissions for the No Action Alternative in Metric Tonnes – Three Helium Wells**

| Year | # Wells Developed | Operating | Well Development Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Well Operation Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Indirect (Mid-Stream, End-Use) Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Sum of Direct and Indirect Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | CO₂e (20-yr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 2 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 3 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 4 | 1 | 1 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 998.4 | 2.31 | 0.002 | 1,067.8 | 0.0 | 0.00 | 0.000 | 0.0 | 2,178 | 2.57 | 0.011 | 2,257 | 2,393 |
| 5 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 0.0 | 0.00 | 0.000 | 0.0 | 998 | 2.31 | 0.002 | 1,068 | 1,190 |
| 6 | 1 | 2 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 0.0 | 0.00 | 0.000 | 0.0 | 3,176 | 4.88 | 0.013 | 3,325 | 3,582 |
| 7 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 0.0 | 0.00 | 0.000 | 0.0 | 1,997 | 4.62 | 0.004 | 2,136 | 2,379 |
| 8 | 1 | 3 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 4,174 | 7.19 | 0.015 | 4,393 | 4,772 |
| 9 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 10 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 11 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 12 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 13 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 14 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 15 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 16 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |

AR000842

| Year | # Wells Developed | # Wells Operating | Well Development Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Well Operation Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Indirect (Mid-Stream, End-Use) Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Sum of Direct and Indirect Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | CO₂e (20-yr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 18 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 19 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 20 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 21 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 22 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 23 | 0 | 3 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995.2 | 6.93 | 0.006 | 3,203.4 | 0.0 | 0.00 | 0.000 | 0.0 | 2,995 | 6.93 | 0.006 | 3,203 | 3,569 |
| 24 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 0.0 | 0.00 | 0.000 | 0.0 | 1,997 | 4.62 | 0.004 | 2,136 | 2,379 |
| 25 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 0.0 | 0.00 | 0.000 | 0.0 | 1,997 | 4.62 | 0.004 | 2,136 | 2,379 |
| 26 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 0.0 | 0.00 | 0.000 | 0.0 | 998 | 2.31 | 0.002 | 1,068 | 1,190 |
| 27 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 0.0 | 0.00 | 0.000 | 0.0 | 998 | 2.31 | 0.002 | 1,068 | 1,190 |
| 28 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 29 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 30 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 31 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 32 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 33 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 34 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 35 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 36 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 37 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 38 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 39 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| Total (MT) | 3 | | 3,538 | 0.78 | 0.026 | 3,568 | 59,905 | 138.61 | 0.120 | 64,068 | 0 | 0.00 | 0.000 | 0 | 63,442 | 139.39 | 0.146 | 67,636 | 74,982 |
| Max Year | | | 1,179.2 | 0.26 | 0.009 | 1,189 | 2,995.2 | 6.93 | 0.006 | 3,203 | 0 | 0.00 | 0.000 | 0.0 | 4,174.5 | 7.19 | 0.015 | 4,393 | 4,772 |
| Average Year | | | | | | | 2,496.0 | 5.8 | 0.0 | 2,669.5 | | | | 0.0 | 2,643 | 5.81 | 0.006 | 2,818 | 3,124 |

AR000843

**Table G-10. Annual CAP and HAP Emissions for the No Action Alternative in Short Tons – Five Oil and Gas Wells**

| Year | # Wells Developed | # Wells Operating | Well Development Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | Well Operation Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | Sum of Well Development and Operation Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 2 | 1 | 1 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 2.1 | 0.6 | 8.7 | 11.0 | 6.2 | 0.02 | 0.79 |
| 3 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 4 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 5 | 1 | 2 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 2.7 | 0.9 | 16.4 | 12.9 | 9.3 | 0.02 | 1.49 |
| 6 | 1 | 3 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 3.3 | 1.1 | 24.0 | 14.8 | 12.3 | 0.02 | 2.19 |
| 7 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 8 | 1 | 4 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 2.4 | 0.8 | 30.5 | 7.5 | 12.2 | 0.00 | 2.79 | 3.9 | 1.3 | 31.6 | 16.7 | 15.4 | 0.02 | 2.88 |
| 9 | 1 | 5 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 4.5 | 1.5 | 39.3 | 18.6 | 18.4 | 0.02 | 3.58 |
| 10 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 11 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 12 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 13 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 14 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 15 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 16 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 17 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 18 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 19 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 20 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 21 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 22 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 23 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 24 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 25 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 26 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 27 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 28 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 29 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 30 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |
| 31 | 0 | 5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 |

AR000844

| Year | # Wells Developed | # Wells Operating | Well Development Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | Well Operation Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | Sum of Well Development and Operation Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | 0 | 4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 2.4 | 0.8 | 30.5 | 7.5 | 12.2 | 0.00 | 2.79 | 2.4 | 0.8 | 30.5 | 7.5 | 12.2 | 0.00 | 2.79 |
| 33 | 0 | 4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 2.4 | 0.8 | 30.5 | 7.5 | 12.2 | 0.00 | 2.79 | 2.4 | 0.8 | 30.5 | 7.5 | 12.2 | 0.00 | 2.79 |
| 34 | 0 | 4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 2.4 | 0.8 | 30.5 | 7.5 | 12.2 | 0.00 | 2.79 | 2.4 | 0.8 | 30.5 | 7.5 | 12.2 | 0.00 | 2.79 |
| 35 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 36 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 37 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 38 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 39 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| Total (MT) | | | 7.3 | 2.2 | 5.5 | 45.8 | 15.9 | 0.09 | 0.47 | 91.6 | 31.9 | 1,144.7 | 281.7 | 458.0 | 0.06 | 104.63 | 99 | 34 | 1,150 | 328 | 474 | 0 | 105 |
| Max Year | | | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 3.1 | 1.1 | 38.2 | 9.4 | 15.3 | 0.00 | 3.49 | 4.5 | 1.5 | 39.3 | 18.6 | 18.4 | 0.0 | 3.6 |
| Average Year | | | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.0 | 0.1 | 2.5 | 0.9 | 30.9 | 7.6 | 12.4 | 0.0 | 2.8 | 2.7 | 0.9 | 31.1 | 8.9 | 12.8 | 0.0 | 2.8 |

**Table G-11. Annual CAP and HAP Emissions for the No Action Alternative in Short Tons – Three Helium Wells**

| Year | # Wells Developed | # Wells Operating | Well Development Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | Well Operation Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | Sum of Well Development and Operation Emissions PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 2 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 3 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 4 | 1 | 1 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 2.1 | 0.6 | 8.7 | 11.0 | 6.2 | 0.02 | 0.79 |
| 5 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 6 | 1 | 2 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 2.7 | 0.9 | 16.4 | 12.9 | 9.3 | 0.02 | 1.49 |
| 7 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 8 | 1 | 3 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 3.3 | 1.1 | 24.0 | 14.8 | 12.3 | 0.02 | 2.19 |
| 9 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 10 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 11 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 12 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 13 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 14 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 15 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 16 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 17 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |

AR000845

| Year | # Wells | | Well Development Emissions | | | | | | | Well Operation Emissions | | | | | | | Sum of Well Development and Operation Emissions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Developed | Operating | $PM_{10}$ | $PM_{2.5}$ | VOC | $NO_x$ | CO | $SO_2$ | HAPs | $PM_{10}$ | $PM_{2.5}$ | VOC | $NO_x$ | CO | $SO_2$ | HAPs | $PM_{10}$ | $PM_{2.5}$ | VOC | $NO_x$ | CO | $SO_2$ | HAPs |
| 18 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 19 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 20 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 21 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 22 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 23 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 24 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 25 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 26 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 27 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 28 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 29 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 30 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 31 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 32 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 33 | 0 | 3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 |
| 34 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 35 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 36 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 37 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 38 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 39 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| Total (MT) | | | 4.4 | 1.3 | 3.3 | 27.5 | 9.5 | 0.05 | 0.28 | 54.9 | 19.1 | 686.8 | 169.0 | 274.8 | 0.04 | 62.78 | 59 | 20 | 690 | 197 | 284 | 0 | 63 |
| Max Year | | | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 1.8 | 0.6 | 22.9 | 5.6 | 9.2 | 0.00 | 2.09 | 3.3 | 1.1 | 24.0 | 14.8 | 12.3 | 0.0 | 2.2 |
| Average Year | | | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.0 | 0.1 | 1.6 | 0.6 | 20.2 | 5.0 | 8.1 | 0.0 | 1.8 | 1.7 | 0.6 | 20.3 | 5.8 | 8.4 | 0.0 | 1.9 |

AR000846

**Table G-12. Estimated Annual Emissions from the Development of Oil and Gas Leases – Wilderness and Lands with Wilderness Characteristics Alternative – Two Oil and Gas Wells**

| Activity | Field Office | County | PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs |
|---|---|---|---|---|---|---|---|---|---|
| Maximum year* | PFO | Emery | 6.3 | 2.1 | 62.1 | 24.2 | 27.6 | 0.021 | 5.674 |
| Average year* | PFO | Emery | 4.2 | 1.4 | 48.4 | 13.8 | 20.0 | 0.006 | 4.425 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

* Values in tons per year.

**Table G-13. Estimated Life of Lease Emissions from Well Development, Well Production Operations, Mid-Stream, and End-Use - Wilderness and Lands with Wilderness Characteristics Alternative – Two Oil and Gas Wells**

| Activity | CO$_2$ | CH$_4$ | N$_2$O | CO$_2$e (100 years) | CO$_2$e (20 years) |
|---|---|---|---|---|---|
| Well development | 2,358 | 0.52 | 0.017 | 2,379 | 2,406 |
| Well production operations | 39,936 | 92.41 | 0.080 | 42,712 | 47,582 |
| Mid-stream | 29,600 | 79.71 | 0.491 | 32,110 | 36,311 |
| End-use | 223,736 | 8.61 | 1.686 | 224,453 | 224,907 |
| **Total** | 295,631 | 181.24 | 2.275 | 301,653 | 311,205 |

Source: BLM Lease Sale Emissions Tool (BLM 2022b).

Note: All values in metric tons.

AR000847

**Table G-14. Comparison of Lease Sale Annual Emissions to Other Sources - Wilderness and Lands with Wilderness Characteristics Alternative – Two Oil and Gas Wells**

| Reference | Mt CO₂e[*] (Per Year) | Average Year Percentage of Reference |
|---|---|---|
| Emissions from leases (average year) | 0.013 | – |
| Utah onshore federal (oil and gas)[†] | 12.68 | 0.103% |
| U.S. onshore federal (oil and gas)[†] | 465.63 | 0.003% |
| U.S. federal – all (oil and gas)[†] | 844.27 | 0.002% |
| U.S. federal (oil, gas, and coal)[†] | 1,292.57 | 0.001% |
| Utah total (all sectors)[‡] | 71.41 | 0.018% |
| U.S. total (all sectors)[‡] | 5,981.40 | <0.001% |

[*] Estimates are based on 100 Global Warming Potential values.

[†] Federal values come from the Annual GHG Report, Tables ES-1 and ES-2. U.S Federal – All includes offshore oil and gas production (BLM 2022e).

[‡] Values comes from the EPA Inventory of U.S. GHG Emissions and Sinks: 1990–2020 (EPA 2022a) and use the Intergovernmental Panel on Climate Change (2007) Fourth Assessment Report Global Warming Potential values.

**Table G-15. Comparison of the Life of Lease Emissions to Other Federal Oil and Gas Emissions - Wilderness and Lands with Wilderness Characteristics Alternative – Two Oil and Gas Wells**

| Reference | Mt CO₂e (100 years) | Life of Lease Percentage of Reference |
|---|---|---|
| Lease sale emissions (life of lease) | 0.302 | 100.000% |
| Utah reasonably foreseeable short-term federal (oil and gas)[*] | 187.84 | 0.161% |
| Utah EIA projected long-term federal (oil and gas)[†] | 536.32 | 0.056% |
| U.S. short-term federal (oil and gas) | 4,614.81 | 0.007% |
| U.S. long-term federal (oil and gas) | 13,560.24 | 0.002% |

Source: BLM Lease Sale Emissions Tool (BLM 2022b); and Annual GHG Report (BLM 2022e), Tables 5-17 and 5-18.

[*] Short-term foreseeable is estimated federal emissions from existing producing wells, approved APDs, and 1 year of leasing.

[†] Long-term foreseeable are estimated federal emissions to meet EIA projected energy demand.

AR000848

**Table G-16. Annual GHG Emissions for the Wilderness and Lands with Wilderness Characteristics Alternative in Metric Tonnes – Two Oil and Gas Wells**

| Year | # Wells Developed | # Wells Operating | Well Dev CO₂ | Well Dev CH₄ | Well Dev N₂O | Well Dev CO₂e (100-yr) | Well Op CO₂ | Well Op CH₄ | Well Op N₂O | Well Op CO₂e (100-yr) | Indirect CO₂ | Indirect CH₄ | Indirect N₂O | Indirect CO₂e (100-yr) | Sum CO₂ | Sum CH₄ | Sum N₂O | Sum CO₂e (100-yr) | Sum CO₂e (20-yr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 2 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 3 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 4 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 5 | 1 | 1 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 998.4 | 2.31 | 0.002 | 1,067.8 | 41,403.3 | 12.06 | 0.362 | 41,861.5 | 43,581 | 14.63 | 0.372 | 44,119 | 44,890 |
| 6 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 27,209.3 | 7.35 | 0.239 | 27,493.6 | 28,208 | 9.66 | 0.241 | 28,561 | 29,071 |
| 7 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 18,125.2 | 5.02 | 0.159 | 18,318.3 | 19,124 | 7.33 | 0.161 | 19,386 | 19,773 |
| 8 | 1 | 2 | 1,179.2 | 0.26 | 0.009 | 1,189.3 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 53,553.8 | 15.67 | 0.468 | 54,148.5 | 56,730 | 20.55 | 0.480 | 57,473 | 58,557 |
| 9 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 35,401.7 | 10.05 | 0.310 | 35,785.7 | 37,399 | 14.67 | 0.314 | 37,921 | 38,694 |
| 10 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 23,686.9 | 7.10 | 0.206 | 23,954.9 | 25,684 | 11.72 | 0.210 | 26,091 | 26,708 |
| 11 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 15,959.3 | 5.27 | 0.138 | 16,153.8 | 17,956 | 9.89 | 0.142 | 18,289 | 18,810 |
| 12 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 10,830.7 | 4.05 | 0.092 | 10,976.7 | 12,828 | 8.67 | 0.096 | 13,112 | 13,569 |
| 13 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 7,416.2 | 3.22 | 0.062 | 7,529.1 | 9,413 | 7.84 | 0.066 | 9,665 | 10,078 |
| 14 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 5,136.8 | 2.64 | 0.042 | 5,227.0 | 7,134 | 7.26 | 0.046 | 7,363 | 7,745 |
| 15 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 3,611.2 | 2.23 | 0.029 | 3,685.3 | 5,608 | 6.85 | 0.033 | 5,821 | 6,182 |
| 16 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 2,586.6 | 1.92 | 0.020 | 2,649.3 | 4,583 | 6.54 | 0.024 | 4,785 | 5,130 |
| 17 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 1,895.8 | 1.70 | 0.014 | 1,950.2 | 3,893 | 6.32 | 0.018 | 4,086 | 4,419 |
| 18 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 1,427.6 | 1.53 | 0.010 | 1,475.7 | 3,424 | 6.15 | 0.014 | 3,611 | 3,935 |
| 19 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 1,108.1 | 1.39 | 0.007 | 1,151.5 | 3,105 | 6.01 | 0.011 | 3,287 | 3,604 |
| 20 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 888.2 | 1.28 | 0.005 | 927.8 | 2,885 | 5.90 | 0.009 | 3,063 | 3,374 |
| 21 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 735.0 | 1.19 | 0.004 | 771.7 | 2,732 | 5.81 | 0.008 | 2,907 | 3,214 |
| 22 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 626.9 | 1.12 | 0.003 | 661.2 | 2,624 | 5.74 | 0.007 | 2,797 | 3,099 |
| 23 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 549.3 | 1.06 | 0.003 | 581.5 | 2,546 | 5.68 | 0.007 | 2,717 | 3,016 |
| 24 | 0 | 2 | 0.0 | 0.00 | 0.000 | 0.0 | 1,996.8 | 4.62 | 0.004 | 2,135.6 | 492.3 | 1.00 | 0.002 | 522.8 | 2,489 | 5.62 | 0.006 | 2,658 | 2,955 |
| 25 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 251.0 | 0.51 | 0.003 | 266.5 | 1,249 | 2.82 | 0.003 | 1,334 | 1,483 |
| 26 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 229.0 | 0.49 | 0.001 | 243.7 | 1,227 | 2.80 | 0.003 | 1,312 | 1,459 |
| 27 | 0 | 1 | 0.0 | 0.00 | 0.000 | 0.0 | 998.4 | 2.31 | 0.002 | 1,067.8 | 212.0 | 0.46 | 0.001 | 226.1 | 1,210 | 2.77 | 0.003 | 1,294 | 1,440 |

AR000849

| Year | # Wells Developed | Operating | Well Development Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Well Operation Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Indirect (Mid-Stream, End-Use) Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | Sum of Direct and Indirect Emissions CO₂ | CH₄ | N₂O | CO₂e (100-yr) | CO₂e (20-yr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 29 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 30 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 31 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 32 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 33 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 34 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 35 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 36 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 37 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 38 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| 39 | 0 | 0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0.0 | 0.00 | 0.000 | 0.0 | 0 | 0.00 | 0.000 | 0 | 0 |
| Total (MT) | 2 | | 2,358 | 0.52 | 0.017 | 2,379 | 39,936 | 92.41 | 0.080 | 42,712 | 253,336 | 88.32 | 2.178 | 256,563 | 295,631 | 181.24 | 2.275 | 301,653 | 311,205 |
| Max Year | | | 1,179.2 | 0.26 | 0.009 | 1,189 | 1,996.8 | 4.62 | 0.004 | 2,136 | 53,554 | 15.67 | 0.468 | 54,148.5 | 56,729.8 | 20.55 | 0.480 | 57,473 | 58,557 |
| Average Year | | | | | | | 1,736.4 | 4.0 | 0.0 | 1,857.0 | 11,015 | 3.84 | 0.095 | 6,578.5 | 12,854 | 7.88 | 0.099 | 13,115 | 13,531 |

**Table G-17. Annual CAP and HAP Emissions for the Wilderness and Lands with Wilderness Characteristics Alternative in Short Tons – Two Oil and Gas Wells**

| Year | # Wells Developed | Operating | Well Development Emissions PM₁₀ | PM₂.₅ | VOC | NOₓ | CO | SO₂ | HAPs | Well Operation Emissions PM₁₀ | PM₂.₅ | VOC | NOₓ | CO | SO₂ | HAPs | Sum of Well Development and Operation Emissions PM₁₀ | PM₂.₅ | VOC | NOₓ | CO | SO₂ | HAPs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 2 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 3 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 4 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| 5 | 1 | 1 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 2.1 | 0.6 | 8.7 | 11.0 | 6.2 | 0.02 | 0.79 |
| 6 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 7 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 8 | 1 | 2 | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 2.7 | 0.9 | 16.4 | 12.9 | 9.3 | 0.02 | 1.49 |

AR000850

| Year | # Wells | | Well Development Emissions | | | | | | | Well Operation Emissions | | | | | | | Sum of Well Development and Operation Emissions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Developed | Operating | PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs |
| 9 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 10 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 11 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 12 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 13 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 14 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 15 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 16 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 17 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 18 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 19 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 20 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 21 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 22 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 23 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 24 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 25 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 26 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 27 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 28 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 29 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 30 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 31 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 32 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 33 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 34 | 0 | 2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 |
| 35 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 36 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 37 | 0 | 1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 | 0.6 | 0.2 | 7.6 | 1.9 | 3.1 | 0.00 | 0.70 |
| 38 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |

AR000851

| Year | # Wells | | Well Development Emissions | | | | | | | Well Operation Emissions | | | | | | | Sum of Well Development and Operation Emissions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Developed | Operating | PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs | PM$_{10}$ | PM$_{2.5}$ | VOC | NO$_x$ | CO | SO$_2$ | HAPs |
| 39 | 0 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.00 | 0.00 |
| Total (MT) | | | 2.9 | 0.9 | 2.2 | 18.3 | 6.4 | 0.04 | 0.19 | 36.6 | 12.7 | 457.9 | 112.7 | 183.2 | 0.02 | 41.85 | 40 | 14 | 460 | 131 | 190 | 0 | 42 |
| Max Year | | | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.02 | 0.09 | 1.2 | 0.4 | 15.3 | 3.8 | 6.1 | 0.00 | 1.40 | 2.7 | 0.9 | 16.4 | 12.9 | 9.3 | 0.0 | 1.5 |
| Average Year | | | 1.5 | 0.4 | 1.1 | 9.2 | 3.2 | 0.0 | 0.1 | 1.1 | 0.4 | 13.9 | 3.4 | 5.6 | 0.0 | 1.3 | 1.2 | 0.4 | 13.9 | 4.0 | 5.7 | 0.0 | 1.3 |

AR000852

# United States Department of the Interior
# Bureau of Land Management

---

### FINDING OF NO SIGNIFICANT IMPACT

### DOI-BLM-UT-0000-2023-0007-FONSI

---

**May 2024**

## Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment

*Location:*

Price Field Office
Emery County, Utah

---

U.S. Department of the Interior
Bureau of Land Management
Utah State Office
440 West 200 South, Suite 500
Salt Lake City, UT 84101
Phone: (801) 539-4001
Fax: (801) 539-4237



AR000879

## UNITED STATES DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

Utah State Office

440 West 200 South
Salt Lake City, Utah 84101

Phone: (801) 539-4001

## FINDING OF NO SIGNIFICANT IMPACT

### for Utah State Office September and December 2018 Oil and Gas Lease Sale Environmental Assessment

DOI-BLM-UT-0000-2023-0007-FONSI

## INTRODUCTION

The Bureau of Land Management (BLM) prepared an environmental assessment (EA) (DOI-BLM-UT-0000-2023-0007-EA) to analyze and disclose the effects of affirming 59[1] oil and gas leases on lands administered by the Price Field Office (PFO). These leases were previously issued following the BLM Utah September and December 2018 competitive lease sales (Lease Sales). The original September 2018 Lease Sale was supported by an EA (DOI-BLM-UT-0000-2018-0001-EA), and the December Lease Sale was based on a Determination of National Environmental Policy Act (NEPA) Adequacy (DNA) (DOI-BLM-UT-G020-2018-0057-DNA).

The BLM analyzed three alternatives in the EA. The No Action Alternative (Alternative A) evaluates the impacts if the BLM decides to reaffirm its previous leasing decisions for the 59 leases (encompassing 121,679.7 acres), with stipulations and notices derived from the 2008 PFO Resource Management Plan (RMP), as amended. Legal land descriptions for each lease, and corresponding stipulations and notices attached to each lease to address resource issues, are included in Appendix B of the EA. The BLM also evaluated a Wilderness and Lands with Wilderness Characteristics Alternative (Alternative B), under which the BLM would cancel 49 leases located in designated wilderness or that contain lands with wilderness characteristics (LWCs). As a result, under Alternative B, the BLM would affirm 10[2] of the 59 leases, all of which are outside wilderness boundaries and do not contain LWCs. Lastly, the BLM also analyzed a Lease Cancellation Alternative (Alterative C), under which the BLM would cancel all 59 leases.

Based on updated internal scoping, the BLM analyzed 11 issues in detail, associated with the following resources: 1) air quality pollutants and emissions; 2) greenhouse gas (GHG) emissions; 3) socioeconomics and environmental justice (EJ); 4) LWCs; 5) wilderness; 6) soundscapes; 7) visual

---

[1] A total of 59 leases were analyzed in the EA, However, on October 25, 2023, North American Helium fully relinquished eight leases (UTU93466; UTU93477; UTU93478; UTU93482; UTU93500; UTU93501; UTU93503; and UTU93504) and partially relinquished three leases (UTU93468; UTU93481; and UTU93483) originally sold at the September 2018 Lease Sale. Because these leases have been relinquished or partially relinquished, there is no decision to be made for the eight relinquished leases or the relinquished portions of the three leases listed above. A decision would only be made for the remaining 51 leases.

[2] None of the 10 leases analyzed to be affirmed under Alternative B were part of the leases relinquished by North American Helium.

AR000880

resources; 8) night skies; 9) recreation; 10) transportation and access; and 11) water resources (see EA, Section 3.3). Issues related to an additional 18 resources or resource uses were identified, analyzed in brief, and dismissed from detailed analysis (see EA Section 3.2).

## FINDING OF NO SIGNIFICANT IMPACT

Based on my review of the EA and considering the criteria of significance provided by the Council on Environmental Quality (CEQ) regulations at 40 Code of Federal Regulations (C.F.R.) § 1508.27 I have determined that affirming the 59[3] leases analyzed under Alternative A, is not a major federal action that will significantly affect the quality of the human environment. No environmental effects meet the definition of significance as defined in 40 C.F.R. § 1501.3(b), therefore, an EIS is not needed.

Under Alternative A, the effects associated with affirming the oil and gas leases have been evaluated in a manner consistent with the Council on Environmental Quality (CEQ) regulations for determining "significance." In accordance with CEQ regulation, 40 C.F.R. § 1501.3(b), a determination of significance as used in NEPA requires consideration of both "potentially affected environment" and "degree." The affected area refers to the setting in which the action would occur (national, regional, or local) and its resources. Significance varies with the setting of Alternative A. The degree of the effects refers to the severity of the impact. The degree of the effects relates to four criteria that are outlined in 40 C.F.R. § 1501.3(b)(2)(i–iv). This FONSI is based on the affected area and degree of the effects of Alternative A.

### AFFECTED AREA

Under Alternative A, the BLM would affirm 59 leases totaling 121,679.7 acres of BLM-administered lands. The leases are within areas designated open to oil and gas leasing under standard terms and conditions and special stipulations as presented in the 2008 PFO RMP, as amended. Lease stipulations and lease notices attached to the 59 leases are presented in Appendix B of the EA.

Although the act of leasing itself does not authorize development of the leases, by leasing, the BLM grants the lessee the right to use as much of the leased lands as is necessary to explore and potentially develop the leases for oil and gas production, subject to applicable laws, terms, conditions, and stipulations attached to the lease and subsequent conditions of approval (COAs) considered at the Application for Permit to Drill (APD) stage. Therefore, under Alternative A, the potential impacts associated with future development of the leases are analyzed. In addition, APDs will be subject to additional environmental review under NEPA and CEQ regulations (40 C.F.R. § 1500).

According to the Reasonably Foreseeable Development Scenario (RFDS) prepared for the EA, which assumes a 20-year time frame for the lifetime of any developed leases future potential development of the 59 leases could result in the drilling of eight wells, producing approximately 55,247 barrels of oil and 527,460 million cubic feet (mcf) of gas with a maximum associated surface disturbance of 83.2 acres. The per-well surface disturbance calculation includes one well pad at 4 acres and an access road and pipeline disturbance at 6.4 acres, for a total of 10.4 acres per well. The BLM has already reviewed and approved three APDs on UTU93475, UTU93476, and UTU93479, which North American Helium submitted for helium development.[4]

---

[3] Because of the leases relinquished by North American Helium, only 51 leases would be affirmed. However, this FONSI evaluates the impacts of affirming all 59 leases (121,679.7 acres) as analyzed in Alternative A in the EA.

[4] On September 20, 2023, the BLM approved three APDs for helium production on leases evaluated in this EA (UTU93475, UTU93476, and UTU93479). These APDs underwent separate environmental review (DOI-BLM-UT-G020-2021-0017-EA) with the BLM and were approved on September 20, 2023.

AR000881



**Figure 1. Current Leasing Area.**

AR000882

**DEGREE OF EFFECTS**

The following (taken from 40 C.F.R. § 1501.3(b)(2)(i–iv) have been considered in my evaluation of Alternative A:

    i.      Both short- and long-term effects

Short- and long-term effects related to Alternative A are analyzed in the EA in Section 3.2 (issues analyzed in brief) and Section 3.3 (issues analyzed in detail). Short-term effects include those activities that occur during initial exploration and construction and cease after well construction and completion (30-60 days) or ceases after interim reclamation (2 to 5 years); long-term effects include those indicated by analysis of activities that occur during the life of the well, including production and reclamation phases. Table 1 provides a summary of the duration of anticipated effects and associated significance of effects under Alternative A.

AR000883

**Table 1. Summary of Duration of Effects and Associated Significance Conclusions of Issues Analyzed in Detail**

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| *Air Quality (Section 3.3.1) What quantity of air pollutants would be produced based on the assumptions for analysis? How would air pollutant emissions from subsequent development of the leases affect air quality?* | If the leases are developed, short-term effects to air quality would be expected during well construction, through the use and operation of earth-moving equipment, vehicle traffic, and drilling and completion activities. Nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), and carbon monoxide (CO) would be emitted from vehicle tailpipes. Fugitive dust concentrations would increase with additional vehicle traffic on unpaved roads and from wind erosion in areas of soil disturbance with maximum amounts (in tons/year) of 7.8 for particulate matter 10 microns in diameter or smaller ($PM_{10}$) and 2.6 for particulate matter 2.5 microns in diameter or smaller ($PM_{2.5}$). Emissions associated with development of eight wells would range from a 0.001% increase in $SO_2$ to a 0.73% increase in volatile organic compounds (VOCs) in Emery County. Emissions would also include a maximum (in tons/year) of 63.2 VOC and 5.77 hazardous air pollutants (HAPs). This represents the maximum increase in pollutant emissions characteristic of the first year of construction and start of operation. A stipulation for Air Quality (UT-S-01) and Lease Notices for Regional Ozone Formation Controls (UT-LN-99) and Air Quality Analysis (UT-LN-102) apply to all leases. Application could include one or a combination of these as necessary to facilitate the reduction of potential impacts. Additional conditions of approval proposed at the project development stage may be incorporated as applicant-committed measures by the project proponent or added to necessary air quality permits. Because air quality attainment status is determined by a 3-year average and the short-term development emissions would occur over 1 year or less and are below de minimis levels (Utah administrative code R307-410-4), well development should not result in a violation of the | If leases are developed, long-term effects to air quality would be expected during well production and operations. There could be continuous emissions from separators, condensate storage tanks, and daily tailpipe and fugitive dust emissions from operations traffic. $NO_2$, CO, VOC, and HAP emissions would result from the long-term use of storage tanks, pumps, separators, and other equipment. Additionally, vehicles servicing the wells would produce road dust ($PM_{10}$ and $PM_{2.5}$). Emissions are anticipated to decline during operations and maintenance as the need for earth-moving equipment and heavy equipment decreases after initial construction and as production declines over time. Generally, results predicted that current air quality standards would be met if the Class I airsheds are 34 miles away (or greater) from a production well or three miles away (or greater) from an exploratory well. Further modeling and analysis are recommended if the source is less than 34 miles from a production well or three miles from an exploratory well. For exploratory wells, I nearest Class I area is in Canyonlands National Park, which is more than 3.1 miles away, and operations would not have any impact on these areas. However, all leases are located closer than 34 miles to Canyonlands National Park, therefore results are uncertain and further modeling and analysis would be required at the APD stage to determine if significant impacts to air resources would occur at Canyonlands National Park from development of any production wells on the leases. While emissions of ozone from an individual well or well pad are too small to substantially impact ozone ($O_3$) concentrations, they contribute with emissions from other regional oil and gas operations to produce a cumulative $O_3$ impact, especially in winter. The Air Resource Modeling Study (ARMS) 2017 model showed potential exceedances of the $O_3$ National Ambient Air Quality Standards (NAAQS) in portions of southern Utah. However, current values are below the NAAQS and continued monitoring is warranted so modeled exceedances do not become reality. Results from the BLM Lease Sale Emissions Tool show development emissions are below de minimis levels (Utah administrative code R307-410-4), and well development should not result in a violation of the NAAQS. The ARMS 2017 model predicts exceedances of $PM_{2.5}$ and $PM_{10}$ only due |

AR000884

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| | NAAQS or a significant impact to air quality under Alternative A. | to exceptional events such as wildfire. The model showed no exceedances of the $SO_2$ or $NO_2$ NAAQS. This model also shows that emissions from BLM oil and gas development are not responsible for any violations of the NAAQS, Prevention of Significant Deterioration, visibility, and deposition thresholds of concern in areas outside of the Uinta Basin. Results from the BLM Lease Sale Emissions Tool show development emissions are below de minimis levels (Utah Administrative Code R307-410-4), and well development should not result in a violation of the NAAQS.<br><br>Additionally, a stipulation for Air Quality (UT-S-01) and Lease Notices for Regional Ozone Formation Controls (UT-LN-99) and Air Quality Analysis (UT-LN-102) apply to all leases. Application could include one or a combination of all of these necessary to facilitate the reduction of potential impacts. Additional conditions of approval proposed at the project development stage may be incorporated as applicant-committed measures by the project proponent or added to necessary air quality permits.<br><br>Because modeling has shown that NAAQS and emissions are below threshold levels, and because stipulations and lease notices for Air Quality, Ozone Formation Controls, and Air Quality Analysis are included on all leases, no significant impacts are expected to occur. The stipulation, as well as additional review and design features that could be implemented during the APD stage, would limit any long-term effects. Therefore, long-term impacts to air quality are not considered to be significant under Alternative A. |
| *Greenhouse Gas and Social Cost of Carbon (Section 3.3.2) How would future potential development of the leases contribute to GHG emissions and climate change?* | Potential development of leases may result in GHG emissions. While some GHG emissions occur over a short period, impacts associated with those emissions persist in the atmosphere, therefore all GHG emissions are considered to produce long-term effects. Because stipulations for Air Quality (UT-S-01) and lease notices for Regional Ozone Formation Controls (UT-LN-99) and Air Quality Analysis (UT-LN-102) are attached to all leases, no significant short-term effects are expected under Alternative A. | If the leases are developed and if the resulting wells produce oil or gas, GHG emissions are expected to result from the downstream end-use of the fossil fuel. In the EA, the BLM assumed that all produced oil and gas would be combusted, and production would follow similar producing fields with respect to the type of oil produced and emission factors expected from future production wells (average annual emissions over the entire life of a well). Long-term effects are expected to contribute total estimated direct and indirect emissions of 0.821 megatons (Mt) carbon dioxide equivalent ($CO_2$e) (100 year). Well production operations, mid-stream, and end-use emissions occur over the entire production life of a well, which is assumed to be 20 years based on the productive life of a typical oil/gas field. The social costs range from $10,881,000 to $121,174,000. Over the next 30 years, total federal onshore leases in Utah |

AR000885

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| | | are estimated to produce emissions ranging from 187.84 Mt $CO_2e$, and nationally between 4,614.81 Mt to 13,560.24 Mt $CO_2e$. Emissions from the analyzed leases would be no more than 0.44% of long-term federal oil and gas emission in Utah and 0.18% of federal emissions in the nation, and would be equivalent to operating 6,627 gasoline-fueled passenger vehicles driven for one year. |
| | | GHG emissions analyzed in Alternative A would contribute to the current changing state of the climate equilibrium toward warming. A detailed discussion of climate change science, trends, and impacts is provided in the BLM Specialist Report on Annual GHG Emissions and Climate Trends, which is incorporated by reference in the EA. In the Annual GHG Report, the BLM looked at other tools to inform its analysis, including the MAGICC model (see Section 7.0 of the Annual GHG Report). This model run suggests that "30-plus years of projected federal emissions would raise average global surface temperatures by approximately 0.0158 °C., or 1% of the lower carbon budget temperature target." This is an assessment of what the BLM has projected could come from the entire federal fossil fuel program, including the projected emissions from the selected alternative. |
| | | There are no established thresholds for NEPA analysis to contextualize the quantifiable greenhouse gas emissions or social cost of an action in terms of the action's effect on the climate, incrementally or otherwise. The BLM acknowledges that all GHGs contribute incrementally to climate change and has displayed the greenhouse gas emissions and social cost of greenhouse gas in the EA in comparison to a variety of emissions sources and metrics. As of the publication of this FONSI, there is no scientific data in the record, including scientific data submitted during the comment period for these leases, that would allow the BLM, in the absence of an agency carbon budget or similar standard, to evaluate the significance of the greenhouse gas emissions from Alternative A. Preparation of an EIS solely for the sake of analysis of the issue of climate change is not warranted as any disclosure in such an EIS would be the same as that prepared for this EA and would not better inform decision makers or the public. |
| *Socioeconomics and Environmental Justice (Section 3.3.3) What are the* | **Socioeconomics** Short-term socioeconomic resources direct impacts include revenues generated from oil and gas lease sales. At the time of the lease sale, 49 percent of revenues | **Socioeconomics** Long-term socioeconomic resource impacts are dependent on lease development. Long-term impacts may include royalty payments and annual rent fees (for 10 years) paid to the State of Utah. Other long-term |

DOI-BLM-UT-0000-2023-0007-FONSI

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| *potential impacts to social and economic conditions and EJ communities?* | derived from the sale will be transferred to the State of Utah and distributed as directed by Utah State Legislature. Short-term direct and indirect socioeconomic impacts could occur through temporary construction jobs, resulting in transitory income influxes during construction and potential local employment opportunities during development and reclamation. Development activities may also place social and economic stresses on local communities – especially during construction – as temporary, non-local workers draw on community service pools. Development of leases under Alternative A could also change the characteristics of the landscape and impact non-market values (including sense-of-place) and market-based property values. The reasonably foreseeable development scenario for the leases in question models a scenario where eight wells are fully developed. Under this scenario and based on the drilling construction workloads identified in the EA, development would only support approximately 2.4 direct and less than 0.1 indirect job(s).<br><br>**Environmental Justice**<br>All leases are located in environmental justice identified United States Census block groups. While the direct action of leasing will have negligible disproportionate and adverse impacts to low-income, minority, and/or Native American/Alaska Native environmental justice communities in those block groups, short-term disproportionate and adverse impacts to EJ communities are anticipated as a direct effect of any construction, development, and reclamation activities under Alternative A. Development of leases under Alternative A could also change the characteristics of the landscape and impact non-market values (including sense-of-place) and market-based property values. The development of leases under Alternative A could also result in | socioeconomic impacts could include job generation and associated income stimulated during the production phase, housing, rental, and other public resource pressures on local communities, and impacts to regional sense-of-place. Measures noted in the EA, AIB-17 are anticipated to minimize potential impacts to local public resources such as medical, police, and other emergency services.<br><br>**Environmental Justice**<br>All leases are located in environmental justice identified United States Census block groups. While the direct action of leasing will have negligible disproportionate and adverse impacts to low-income, minority, and/or Native American/Alaska Native environmental justice communities in those block groups, long-term disproportionate and adverse impacts to EJ communities are anticipated as a direct effect of any construction, development, and reclamation activities under Alternative A. Development of leases under Alternative A could also change the characteristics of the landscape and impact non-market values (including sense-of-place) and market-based property values. The development of leases under Alternative A could also result in disproportionate and adverse increases to fugitive dust, traffic, noise, water pollution, and light pollution that environmental justice communities may have difficulty mitigating. According to the Environmental Protection Agency's EJScreen standard report, these EJ communities are at a higher risk for exposure to hazards from underground storage tanks, wastewater discharge, lead paint, and ozone. Alternative A is not expected to contribute to risks for hazardous waste or wastewater discharge or for lead paint. As noted in the Air Quality analysis, stipulations for regional ozone formation controls are included on all leases. Mitigation measures for air quality, noise, light pollution, and other resources that may impact EJ communities in the short-term are addressed in their respective sections (see EA, Sections 3.3.1, 3.3.6, 3.3.8, and 3.3.9).<br>No significant long-term impacts to socioeconomics and environmental justice are expected from Alternative A.<br>Should the BLM receive an APD on any of the leases, an additional site-specific NEPA analysis will be conducted. This analysis will include an evaluation of disproportionate and adverse impacts to EJ communities, describe how environmental justice community outreach was employed to |

AR000887

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| | disproportionate and adverse increases to fugitive dust, traffic, noise, water pollution, and light pollution that environmental justice communities may have difficulty mitigating. According to the Environmental Protection Agency's EJScreen standard report, these EJ communities are at a higher risk for exposure to hazards from underground storage tanks, wastewater discharge, lead paint, and ozone. Alternative A is not expected to contribute to risks for hazardous waste or wastewater discharge or for lead paint. As noted in the Air Quality analysis, stipulations for regional ozone formation controls are included on all leases. Mitigation measures for air quality, noise, light pollution, and other resources that may impact EJ communities in the short-term are addressed in their respective sections (see EA, Sections 3.3.1, 3.3.6, 3.3.8, and 3.3.9).<br><br>No significant short-term impacts to socioeconomics and environmental justice are expected from Alternative A. Should the BLM receive an APD on any of the leases, additional community and site-specific NEPA analysis will be conducted. This analysis will include an evaluation of disproportionate and adverse impacts to EJ communities, describe how environmental justice community outreach was employed to aid analysis, and will inform the BLM's decision on whether to approve the APD and, if approved, what COAs should apply. | aid analysis, and will inform the BLM's decision on whether to approve the APD and, if approved, what COAs should apply. |
| *Lands with Wilderness Characteristics (Section 3.3.4) How would proposed and potential development of the leases impact* | Mineral exploration and development activities could result in construction or improvement of roads, increased traffic, use of heavy machinery, and the presence of workers on the landscape. These impacts of mineral exploration and development could result in effects to size, naturalness, such as increased levels of soil and vegetation disturbance, and outstanding opportunities for solitude and primitive recreation experiences by | Impacts to LWCs are anticipated to decline during operations and maintenance as the use of heavy equipment, vehicle traffic, and human presence decreases. The creation or improvement of vehicle access routes may increase public off-highway vehicles (OHV) use and visitation near developed leases which may degrade solitude or natural conditions from noise, surface disturbances, and invasive species. . If any leases result in production wells, direct impacts including increased noise levels, changes to the viewshed, light pollution, reduced naturalness, and consistent |

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| *apparent naturalness, size, supplemental values, and opportunities for solitude and primitive recreation experiences within LWCs?* | introducing increased development and human presence in LWCs. Of the 59 leases, 48 overlap with LWC Units for a total of 75,494.99 acres. These LWC Units were identified as LWC after the publication of the 2008 RMP, and no management direction has yet been decided. However, based on the RFDS which estimates the development of only eight wells, the BLM anticipates that there would only be direct impacts on up to 83.2 acres of LWCs if all eight wells were developed on leases within LWC. Three APDs within LWC were approved on September 20, 2023.<br><br>The degree of the intensity of impacts to wilderness characteristics would be influenced by the location of surface-disturbing activities, the size of the drill pad area and any associated temporary or permanent disturbance, surrounding landforms and topography, vegetation type, sequence of development, and reclamation processes and their duration. Different topography or vegetation will provide varying degrees of visual and auditory screening. The size of the well pad will determine how much natural conditions are disturbed, how much reclamation is needed, and how long rehabilitation will take. The location and season of development will affect numbers of potential visitors present and how much solitude or primitive recreation will be disturbed. The highest degree of noticeable visual and auditory impacts from leasing development would be temporary and localized to the construction area and access routes, occurring during the construction, drilling, and interim reclamation phase (30-60 days). Following this period of intense activity, removal of equipment and interim reclamation of the well pad would be expected to mitigate some impacts to wilderness characteristics, with the exception of apparent naturalness, within the vicinity of new developments.<br><br>All of the leases include no surface occupancy (NSO) stipulations for slopes greater than 40%, intermittent and perennial streams, and natural springs. The 41 leases with potential Mexican spotted owl nest sites also have an | presence of workers could reasonably last for roughly 20 years into the future. Some units could be bisected by new rights-of-way or road construction which could result in a reduction in total acreage of the LWC unit. Additionally, another impact from lease exploration, even if it turns out to be a non-producing well, would be the existence of a capped and abandoned well head. The well head and casing below ground would be a permanent human development in the wilderness and could impact natural conditions such as groundwater flow.<br><br>The long-term intensity of impacts to lands with wilderness characteristics would be impacted by the details of future lease development, such as the location of the surface disturbing activities, size of the drill pad area, topography, vegetation, and plans for development, operation, and reclamation.<br><br>All leases include NSO stipulations for slopes greater than 40%, intermittent and perennial streams, and natural springs. The 41 leases with potential Mexican spotted owl nest sites also have an additional NSO stipulation that requires NSO within a half mile of known Mexican Spotted Owl nests. All leases also have CSU stipulations for fragile slopes or slopes between 20% and 40% (for stipulation information, see EA, Appendix B). This would limit development in LWC areas overlapping leases that meet such criteria. Where applicable, NSO stipulations would essentially eliminate impacts to LWC areas for those portions of the leases where NSO applies because no development could occur on the surface. CSU stipulations would also impose mitigations on development activity, thereby reducing the severity of development impacts but not eliminating impacts to LWCs entirely. Therefore, no significant long-term impacts to LWCs are expected under Alternative A. |

AR000889

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| | additional NSO stipulation that requires NSO within a half mile of known Mexican Spotted Owl nests. All leases also have controlled surface use (CSU) stipulations for fragile slopes or slopes between 20% and 40% (for stipulation information, see EA, Appendix B). This would limit development in LWC areas overlapping leases that meet such criteria. Where applicable, NSO stipulations would essentially eliminate impacts to LWC areas for those portions of the leases where NSO applies because no development could occur on the surface. CSU stipulations would also impose mitigations on development activity, thereby reducing the severity of development impacts but not eliminating impacts to LWCs entirely. Therefore, no significant short-term impacts to LWCs are expected under Alternative A. | |
| *Wilderness (Section 3.3.5)* *How would the potential development of issued leases impact undeveloped, untrammeled, natural, and outstanding solitude and primitive, unconfined recreation in designated wilderness areas?* | Only one of the 59 leases is located within a wilderness boundary. Lease UTU93713 was issued in February 2019, prior to the Labyrinth Canyon Wilderness designation. Labyrinth Canyon Wilderness has an area of 54,643 acres, 1,397.74 acres (2.6%) of which overlap with lease UTU93713. Mineral development in leased areas intersecting or adjacent to wilderness would likely cause indirect or direct impacts to the wilderness characteristics and recreational opportunities unique to designated wilderness area. These impacts could result in effects to naturalness such as increased levels of surface and visual disturbances and could also impact outstanding opportunities for solitude or primitive wilderness recreation experiences by introducing increased sights and sounds of human development and presence in the Labyrinth Canyon Wilderness. The access route for lease UTU93713 is located along a cherry stem road that falls outside the wilderness boundary and which leads to a popular recreation trail within the wilderness. The RFDS assumes that only one of the eight wells in the RFDS may be developed on this lease. The single well would at most result in 10.4 acres of direct disturbance to the Labyrinth | Mineral exploration and development would result in road upgrades, increased vehicle traffic, use of heavy machinery, and presence of workers during drilling and reclamation operations, all of which would produce increased levels of mechanical noise and presence of humans, degrading outstanding opportunities to experience solitude and primitive recreation. However, impacts to wilderness are anticipated to decline during operations and maintenance as the use of heavy equipment, vehicle traffic, and human presence decreases. The improvement of the vehicle access route to lease UTU93713 may increase public OHV use, visitation, and dispersed camping near a popular trail within the Labyrinth Canyon Wilderness which could diminish wilderness characteristics such as naturalness and outstanding opportunities for solitude. Noise and light pollution from construction and operational activities within the Labyrinth Canyon Wilderness would have effects on the natural soundscape and quality of night skies that could range beyond the immediate vicinity of construction and operational activities, permeating more remote regions of the wilderness area. Additionally, another impact from lease exploration, even if it turns out to be a non-producing well, would be the existence of a capped well head. The well head and casing below ground would be a permanent degradation of the undeveloped quality of the wilderness character within withdrawn mineral estate. Finally, full restoration of surface disturbances to the black sagebrush vegetation dominant within the lease is likely to take decades to fully return to natural conditions prior |

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| | Canyon Wilderness. However, indirect effects from noise, dust, traffic, and visual intrusions could occur over a wider area than just the surface disturbance. Because specific construction, site layout, and other development details are unknown at this time, additional analysis would be necessary if and when an APD is received for UTU93713 and would inform the BLM's decision on what COAs to apply. No significant impacts to wilderness are expected at this time. | to disturbance and could be hindered by grazing, invasive species, and climate change. However, because specific construction, site layout, and other development details are unknown at this time, additional analysis would be necessary if and when an APD is received for UTU93713 and will inform the BLM's decision on what COAs to apply. No significant impacts to wilderness are expected under Alternative A at this time. |
| *Soundscapes (Section 3.3.6) How would future potential development of the leases affect the naturalness, solitude, and primitive recreation experiences with regard to the soundscape in nearby wilderness areas and national parks?* | Short-term impacts to soundscapes in the vicinity of the leasing areas would be expected only if the leases are developed. These impacts would occur during initial exploration and development of wells due to use of heavy machinery and the presence of workers on the landscape. There are differences in noise levels associated with each stage of drilling and production, including the construction of the well pad and access roads, drilling, and completion. Typical noise levels from oil and gas development activities are 83 A-weighted decibels (dBA) at their highest (see EA, Table 3-23). Noise levels decrease with distance based on the inverse square law and are anticipated to decrease to 29 dBA at a distance of 5 miles. Lease UTU93713 overlaps acres of the Labyrinth Canyon Wilderness, which increases the potential for direct noise disturbance to the Labyrinth Canyon Wilderness during well development. For places that are distances of 5 miles or more, the noise from development would decrease and be indistinguishable from background sound levels (30 dBA). Noise increases less than 10 dBA above background levels are not expected to have an adverse impact on the soundscape, so the sound level increase from Alternative A is not expected to result in any adverse impacts to soundscapes. | During production, high pressure pumps and a pump jack may be used and can produce noise of 71 dBA and 82 dBA, respectively. Impacts to soundscapes would decline over the life of the well, as ongoing operations and production decreases, and many machines operate intermittently. The use of constructed or improved vehicle access routes could increase the level of public OHV use and associated visitation near developed leases, causing modest increases to noise levels in localized areas over time. However, as noted in the EA (see Section 3.3.6.2), most of the 59 leases would be located at a distance where noise levels from development of the leases would decrease and be indistinguishable from background noise levels. Therefore, no long-term significant impacts to soundscapes are expected under Alternative A. |
| *Visual Resources (Section 3.3.7) How would potential development of the* | Short-term impacts to visual resources would occur only if the leases are developed. Should leases be developed, impacts to visual resources would include intrusions on scenery during construction, as additional machinery, vehicles, and humans are present, and as the well pad, | Long-term impacts to visual resources would occur if the leases are developed and would include the intrusion of well infrastructure (oil wells/pads, pipelines, compressors, overhead distribution lines, constructed roads, and other linear features) into the viewshed. These impacts would include modifications to the existing landscape's form, |

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| *leases affect the visual landscape, including landscape character and views from key observation points (KOPs)?* | pipelines, and associated infrastructure are developed. Drilling at each well pad would create a temporary disturbance in the landscape of 30 to 60 days. Most of the lease area is classified as Visual Resource Management (VRM) Class III, and oil and gas development is generally compatible with VRM Class III designated areas. Two leases (UTU93713 and UTU93493) were identified which, if developed, have the potential to impact VRM Class I designated areas. However, the total area of impact for VRM Class I is less than 0.2 acres. An additional 313.23 acres of VRM Class II designated areas could potentially be impacted. The BLM can impose a COA at the APD stage for a site layout to avoid these areas of impact. Additionally, stipulation UT-S-160 CSU – Visual Resources, VRM II is attached to lease UTU93713 and requires any surface disturbing activities to comply with BLM Handbook 8431-1 to retain the existing character of the landscape. Therefore, no significant impacts to visual resources are expected under Alternative A. | line, color, and texture, as well as to the overall experience of a visitor. Ongoing operations during the production phase would also contribute vehicles and human presence in the viewshed, although it is expected that vehicle and human presence would decline over the life of the well. Following reclamation, well infrastructure, including the well pad, pipelines, and other visible features would be removed. Lease areas visible from VRM Class I and Class II designated areas are small in size and could be avoided by design of the site layout. Additionally, a lease stipulation for Visual Resources (UT-S-160), would apply to leases in VRM Class II impacted areas. Additional measures proposed at the project development stage may be incorporated as applicant-committed measures by the project proponent to avoid or mitigate visual impacts. Because lease UTU93713 is subject to stipulation UT-S-160 – CSU Visual Resources, VRM II, and because site layout and other factors can be analyzed and COAs required when and if an APD is received, no significant impacts to visual resources are expected under Alternative A. |
| *Night Skies (Section 3.3.8) How would future development of the leases affect the quality of night sky resources, including effects on International Dark Sky Parks?* | Short-term impacts to night skies would be expected to occur if the leases are developed, at which time equipment, including lighting, could be used during exploration, construction, and drilling activities. Most artificial lighting would occur during the drilling, completion, and potential flaring of a well, which could last for approximately 30 to 60 days. Lighting from the other phases of development and production would occur from vehicle traffic or safety lighting.

While most of these impacts would be expected to occur over a period of 30 to 60 days during exploration and well construction, a variety of conditions could affect the magnitude and level of skyglow introduced to the area, including cloud cover, particulate matter, weather (precipitation events), and wind speed or direction. Furthermore, contributions to skyglow from the development of leases would be a small contribution to existing sources of artificial light. Mitigation measures | Long-term impacts to night skies would occur if the leases were developed and lighting features for safety and other uses were included on or around the site infrastructure. Generally, at the completion of well pad development, existing conditions would return at each lease unless flaring occurs. Following reclamation, any lighting which had been used during the construction and production phases would be removed, therefore eliminating the impacts to night skies.

While artificial lighting would be used during a portion of the lifetime of the lease, weather patterns and existing sources of artificial light also contribute to the intensity and magnitude of skyglow. Mitigation measures could be applied as COAs at the APD stage and may include shaded or directional (downlit) lighting on structures, specific bulb type, and shrouded gas flare stacks. Because most of the impacts to night skies would occur over a 30- to 60-day period and are a small contribution to existing sources of artificial light, no long-term effects to night skies that are considered significant are expected under Alternative A. |

AR000892

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
|  | could be applied as COAs at the APD stage and may include shaded or directional (downlit) lighting on structures, specific bulb type, and shrouded gas flare stacks. Therefore, no significant impacts to night skies are expected under Alternative A. |  |
| *Recreation (Section 3.3.9) How would future development of the leases affect recreation access, sites, and user experience within special recreation management areas (SRMAs)? How would future development of the leases affect recreation sites, access, and user experience outside of SRMAs?* | Six leases partially overlap with two SRMAs (the San Rafael Swell SRMA and the Labyrinth Canyon SRMA) for a total of about 3,049 acres of overlap. The leases overlap about .2% of the San Rafael SRMA (1,918.15 acres out of 936,479 total acres) and just under 3% of the Labyrinth Canyon SRMA (1,067.73 acres out of 37,203 total acres). However, based on the RFDS of eight wells, the BLM expects that there would be direct impacts to a maximum of 83.2 acres of SRMAs if all eight wells were drilled within the SRMAs. The 59 leases are located within the Recreation Opportunity Spectrum classification semi-primitive motorized, semi-primitive non-motorized, and road-natural. If leases are developed, visitors seeking recreational settings consistent with primitive or non-motorized characteristics would likely be displaced to other BLM lands that provide for the recreational outcomes they seek. The period of drilling and completion of a well could last approximately 30 to 60 days. However, mitigation measures to account for any impacts or residual effects could be implemented, including locating oil and gas infrastructure outside of designated SRMAs if possible. For areas which are not designated as SRMAs, the recreation experience could shift from semi-primitive non-motorized to semi-primitive motorized. Because mitigation measures could be implemented, including locating oil and gas infrastructure outside of designated SRMAs, based on additional analysis when an APD for a lease is received, at this time, no significant impacts to recreation are expected under Alternative A. | Long term effects on recreation could be the displacement of primitive or non-motorized recreation activities in the lease areas during the production period of a well. Following reclamation of a site, recreation use may return to the area. Reclamation includes plugging wells and reclaiming any surface disturbance, access roads, or other facilities according to the BLM guidelines and requirements, returning the area to pre-development recreational potential. The construction or improvements of vehicle access routes could increase the long-term level of public OHV use and dispersed recreation near developed leases.

Access to the developed leases could be improved by the creation or maintenance of vehicle access routes, and increased visitation could be a long-term effect after a well's production or reclamation period if routes are not reclaimed. However, these impacts would be assessed with site-specific analysis conducted when an APD is received. Additionally, mitigation measures to account for any impacts or residual effects to leases located within existing SRMA areas could be included. Therefore, no significant impacts to recreation are expected under Alternative A. |
| *Transportation and Access (Section* | Development of a given lease could temporarily concentrate OHV use, increase traffic, or close routes/access for public safety during the initial well | In the long term, public lands users may be required to travel farther or shorter (e.g., beneficial) distances or alter their mode of transportation to gain public access to certain areas. This impact from new access roads or |

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| *3.3.10)* *How would future development of the leases impact public access and travel on existing travel management plan (TMP)-designated routes?* | development and construction activities—each resulting in changes to vehicle movement. Construction of access roads may also occur during this time, impacting traffic patterns from new access roads (new OHV users). The construction of access roads may occur and temporarily disrupt traffic patterns, public land users may need to utilize alternate routes. However, because new route development on a given lease would be coordinated between the lease holder and the BLM, and additional site-specific analysis would be performed prior to such development, no significant impacts to transportation and access are expected to occur under Alternative A. | because of the presence of drilling activities may preclude a public land user's activity or may detract from the experience of the user causing them to go elsewhere, or both. This impact would persist as long as the route is in place. During the reclamation phase, access roads constructed for site development may be removed, resulting in a long-term impact to access. The construction or improvements of vehicle access routes could increase the long-term level of public OHV use and associated resource impacts near developed leases. While development of leases may require new access roads or route development, and these new access roads (6.4 acres/well for roads and pipelines, see EA, Section 3.1.1.1) and the presence of drilling activities may contribute to longer or shorter travel times for public land users, site-specific environmental analysis will be performed when an APD for a lease is received and any development of new routes would involve coordination with the BLM and the lease holder. Therefore, no significant long-term effects are expected under Alternative A. |
| *Water Resources (Section 3.3.11) How would potential development of the leases impact the availability and quality of groundwater and surface water resources?* | Short-term impacts from Alternative A would mostly occur during the construction and maintenance phases where well pads and access roads would be constructed. These actions could impact surface water resources through disturbing vegetation, soil, and mineral substrate, which could create dust and increase runoff rates during precipitation events. The disturbed areas would be more susceptible to erosion, which could create localized sedimentation issues in nearby streams. Sedimentation would most likely occur during construction of stream crossings for access roads and flowlines and where disturbances are nearest to streams. Effects would continue until disturbed areas are stabilized though implementation of appropriate BMPs to mitigate sedimentation during construction. Additionally, stipulations, lease notices, and COAs implemented during the APD stage would limit any short-term indirect effects to water quality, water use, and disturbance near or within water sources and floodplains. Stipulation UT-S-127 NSO – Intermittent and Perennial Streams, which stipulates setbacks and buffers from the | Long-term impacts of the development of oil and gas wells could increase the risk of spills that could introduce contaminants to surface water and groundwater resources. The risk would be dependent on the proximity of development activities to surface water and the measures applied to address the possibility of spills reaching surface waterbodies. Types of chemical additives used in well completion activities could include acids, hydrocarbons, thickening agents, gelling agents, lubricants, and other additives that are operator and location specific. To mitigate these risks, all potential usable water aquifers would be cased and cemented. Well casings would be pressure tested to ensure integrity, and the appropriate selection of casing materials and cementing schedule would be required and reviewed by the BLM for the prevention of intermixing or water quality degradation of identified usable water formations. This would eliminate the intermixing of groundwater from various aquifers encountered during the drilling process. Site-specific potential for impacts to groundwater quality and quantity would be analyzed at the APD stage per UT IM 2010-055 for Protection of Groundwater. Other potential long-term impacts could arise from the depletion of water obtained from aquifers and surface water that could result in the drawing down of the water table and the reduction of available water resources for wildlife, vegetation, springs, streams, or public consumption, particularly in areas that are experiencing long term hydrologic drought. Existing |

AR000894

| Issue (EA section) | Short-Term Effects and Significance Conclusions | Long-Term Effects and Significance Conclusions |
|---|---|---|
| | centerline of intermittent and perennial streams is attached to all leases. Lease Notice UT-LN-128 Floodplain Management, which avoids adverse impacts to floodplains by developing facilities outside the 100-year floodplain, or minimizing or mitigating impacts by modification of surface use plans within floodplains present within the lease is attached to all leases. Lease Notice UT-LN-53 Riparian Areas provides for protection of riparian areas by restricting surface use or disruptive activity within a 100-foot buffer from riparian areas and is attached to all leases.<br><br>Additionally, stipulations (UT-S-97 and UT-S-101) related to slope and erosion control as described in the EA, AIB-7 would further protect against alterations to hydrological conditions. UT-S-126 No Surface Occupancy - Natural Springs is attached to all leases and would protect existing natural springs by providing a surface buffer to protect the integrity and flow patterns of spring systems. The conditions of approval, stipulations, and notices applied to floodplain and riparian resources would protect surface water quality. Therefore, no significant impacts to water resources are expected to occur under Alternative A. | groundwater and surface water flow patterns in the vicinity of developed leases could be affected by water used for activities on leases. However, it is assumed water use for development of the leases would primarily be imported and purchased from the nearest municipality based on water use plans and activity of previous oil and gas development in the area. Projected water use and estimated depletions from drilling and development activities would be finalized during the APD stage. The use of water quality stipulations including a NSO buffer surrounding springs (UT-S-126) and a NSO buffer surrounding intermittent perennial waters (UT-S-127), as well as stipulations related to slope and erosion control (UT-S-97 and UT-S-101), provide for guidance and protective measures for reducing sediment delivery and eliminating direct disturbances with surface water sources in compliance with the State of Utah (UAC R309-600). Standard operating procedures (SOPs) and BMPs such as erosion control plans in sensitive and vulnerable areas with steep slopes may be required by the authorized officer. Operational downhole regulations outlined in 43 C.F.R. § 3172 are required, as well as additional mitigation measures to protect groundwater, such as surface casing depths required at least 100 feet below the base of the usable water zone. Additionally, COAs implemented during the leasing and APD processes would limit or reduce the long-term impacts to water resources and would protect water quality, water use, and disturbance near or within water sources and floodplains. Therefore, long-term effects to water resources are not considered to be significant under Alternative A |

AR000895

ii.    Both beneficial and adverse effects

Potentially beneficial and adverse effects related to Alternative A are disclosed and analyzed in the EA in Section 3.2 (for issues analyzed in brief), and Section 3.3 (for issues analyzed in detail). For issues in Section 3.2, the potential for adverse impacts to resources will be minimized with the application of stipulations, consideration of lease proximity to sensitive resources, and consideration of the likelihood of sensitive resources to be present. Table 2 summarizes the issues analyzed in detail (see Section 3.3), including the beneficial and adverse effects associated with each issue and the incremental contribution of Alternative A to reasonably foreseeable environmental trends and planned actions.

**Table 2. Summary of Beneficial and Adverse Impacts of Issues Analyzed in Detail**

| Issue Analyzed in Detail | Impact Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
| *Air Quality (Section 3.3.1 What quantity of air pollutants would be produced based on the assumptions for analysis? How would air pollutant emissions from subsequent development of the leases affect air quality?* | All of the 59 leases are located within an attainment area (or in an unclassified area) and additional $NO_x$ and VOCs from eight wells (a 0.22% and 0.71% increase over existing annual emissions, respectively) would incrementally add to $O_3$ levels within the analysis area. |
| | Future development of the leases would also result in localized impacts to air quality due to criteria pollutant, VOC, and HAP emissions. Because there are no nearby residences to any of the leases, localized impacts to neighboring communities from future development is not an issue. However, future development of the leases would result in short-term local area increases of pollutant emissions, including particulate matter ($PM_{2.5}$ and $PM_{10}$), $NO_x$, VOCs, and $O_3$ (as a secondary pollutant), lasting an average of 30 to 60 days. Air quality is dependent on not only the quantity of air pollutants but also environmental conditions (humidity, wind direction and speed, temperature) that influence concentration and dispersion of pollutants. |
| | Localized and short-term effects on air quality from emissions of particulate matter, $NO_x$, VOCs, and HAPs are expected; however, because well development varies (i.e., permit approval, well pad construction, spudding, and completion), the phases of development may not occur in succession and may be spread out over time. |
| | Given this, the incremental addition of criteria pollutants and VOCs over the life of the lease (approximately 20 years) is not expected to result in any direct exceedances of the NAAQS for any criteria pollutants in the analysis area. These areas have not been formally declared to be in non-attainment by the U.S. Environmental Protection Agency through the State of Utah's recommendation. The BLM will continue to monitor these areas and participate in any $O_3$ initiative meetings and strategies that the State of Utah recommends. The BLM's Air Resource Modeling Study 2017 model results do not reveal any new Air Quality Related Values impacts beyond those already disclosed. In summary, the cumulative air quality in the impact analysis area is maintained at current levels or projected to improve. Atmospheric concentrations for criteria air pollutants are projected to be below the NAAQS or show improvement (i.e., decreasing concentrations). Visibility is projected to improve for best 20% days at Canyonlands National Park, the closest Class I area to the leases, and deposition is estimated to remain below critical |

AR000896

| Issue Analyzed in Detail | Impact Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
| | load criteria. |
| | Emissions associated with development of eight wells would range from a 0.001% increase in $SO_2$ to a 0.71% increase in VOC in Emery County. This represents the maximum increase in pollutant emissions characteristic of the first year of construction and start of operations. $NO_2$, $SO_2$, and CO would be emitted from vehicle tailpipes. Fugitive dust concentrations would increase with additional vehicle traffic on unpaved roads and from wind erosion in areas of soil disturbance. Drill rig, hydrofracturing, and engine operations would result mainly in $NO_2$ and CO emissions, with lesser amounts of $SO_2$. Because well development activities are temporary, these impacts are not expected to contribute to long-term adverse effects to air quality. $NO_2$, CO, VOCs, and HAP emissions would result from the long-term use of storage tanks, pumps, separators, and other equipment, in addition to fugitive dust produced by vehicles servicing the wells. However, oil and gas related emissions from existing and foreseeable wells, plus development of leases, are anticipated to remain relatively flat compared to those reported in the *2020 Statewide Emissions Inventory* prepared by the Utah Department of Environmental Quality.[5] Results from the BLM Lease Sale Emissions Tool show emissions from development of the leases are below de minimis levels (Utah Administrative Code R307-410-4), and well development should not result in a violation of the NAAQS. As identified in lease notice UT-LN-102, additional analysis or mitigation may be required at the APD stage to ensure no adverse impacts occur. |
| | No significant benefits or adverse impacts to air quality are expected from this action. |
| *Greenhouse Gas and Social Cost of Carbon (Section 3.3.2)* *How would future potential development of the leases contribute to GHG emissions and climate change?* | The BLM identified potential adverse effects to climate change through several methods, such as quantifying, as far as practicable, the reasonably foreseeable GHG emissions and the social cost of GHG emissions (SC-GHG) as a proxy for assessing climate impacts. Compared with emissions from other existing and estimated foreseeable federal oil and gas development, the estimated emissions for the life of the leases under Alternative A is 0.437% of federal fossil fuel authorization emissions in the state and 0.018% of federal fossil fuel authorization emissions in the nation. In summary, potential GHG emissions from Alternative A could result in GHG emissions of 821,769 metric tonnes of $CO_2$ over the life of the leases. Using these figures, the SC-GHG from Alternative A is estimated to range from $10.8 to $121.2 million. |
| | No significant benefits or adverse impacts to GHG emissions and climate change are expected from this action. |
| *Socioeconomics and Environmental Justice (Section 3.3.3)* *What are the potential impacts to social and economic conditions and EJ?* | **Socioeconomics** Alternative A would not be expected to induce substantial growth or concentration of population, displace many people, cause substantial reduction in employment, reduce wage and salary earnings, cause a |

[5]UDAQ 2023. Statewide Emissions Inventory Program - Utah Department of Environmental Quality. Available at: https://deq.utah.gov/air-quality/statewide-emissions-inventory-program. Accessed April 27, 2023.

AR000897

| Issue Analyzed in Detail | Impact Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
| | substantial net increase in county expenditures, or create a substantial demand for public services. As analyzed in the EA, few jobs (2.4 direct, and less than 0.1 indirect) are expected to be supported by Alternative A. Under Alternative A, revenues generated from oil and gas sales and from rents on oil and gas leases minimally benefit State of Utah socioeconomic resources. A 12.5% royalty on sold oil and gas would be paid to the federal government, and revenues from other rents in the study area totaled $182,539.50 for the 2022 calendar year. |
| | **Environmental Justice** |
| | Due to the proximity of environmental justice communities to the lease area, some disproportionate and adverse impacts to environmental justice communities could be expected under Alternative A. Lease development disproportionate and adverse impacts to these communities could include an increase in air pollutants (see EA, Section 3.3.1) and an increase in GHS emissions (see EA Section 3.3.2) as a result of fugitive dust and machinery and development emissions. Other impacts could include increased traffic, long-term change to landscape characteristics, reduced access to quality recreation, and increases to noise and light pollution. Though these impacts may impact all members of the community, they are considered disproportionate and adverse EJ impacts as EJ communities may not have the resources or community networks to move to areas that this or similar development has not impacted. |
| | It is likely that oil and gas development will also, even minutely, increase global GHG concentrations, which in turn leads to irregular and increased temperatures and dangerous climatic events. Environmental Justice communities are disproportionately and adversely affected by these changes. |
| | Mitigation measures for air quality, GHGs, and other resources that may disproportionately and adversely impact EJ communities are addressed in their respective sections. |
| | No significant benefits or adverse effects to socioeconomics and environmental justice are expected from Alternative A. Should the BLM receive an APD on any of the leases, additional community and site-specific NEPA analysis will be conducted. This analysis will include an evaluation of disproportionate and adverse impacts to EJ communities, describe how environmental justice community outreach was employed to aid analysis, and will inform the BLM's decision on whether to approve the APD and, if approved, what COAs should apply. |
| *Lands with Wilderness Characteristics (LWCs) (Section 3.3.4)* *How would proposed and potential development of the leases impact apparent naturalness, size, supplemental values, and opportunities for solitude and primitive recreation experiences within LWCs?* | Mineral development in leased areas intersecting LWCs would cause indirect or direct impacts to wilderness characteristics and recreational opportunities in LWC areas, via the presence of new oil and gas infrastructure, vegetation removal, soil contouring, and the development of well pads. The development of access roads, increased traffic, use of heavy machinery, and presence of workers on the landscape would produce increased levels of noise, alter the viewshed, decrease apparent naturalness, and reduce outstanding opportunities for solitude and primitive recreation. The long-term impacts of new surface disturbances in LWCs are two-fold: first, |

| Issue Analyzed in Detail | Impact Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
| | native vegetation in the disturbed areas may take decades to fully recover in the high desert environment even with reseeding efforts and may be hindered by grazing, invasive species, and climate change; second, improved or new access routes may increase the overall level of OHV traffic and dispersed recreation use in a given area, thereby contributing to diminishing outstanding solitude or primitive recreation opportunities. Construction or improvement of vehicle access routes to leases could potentially split or bisect a LWC unit by creating a new wilderness inventory boundary. This may result in a portion of the unit that no longer meets size criteria for LWC thus producing a long-term loss of LWC acreage. LWC units potentially impacted by development of leases include UT-020-SRD-Sweetwater Reef A, UT-020-SRD-007, UT-020-SRD-San Rafael River B, UT-020-SRD-San Rafael River D, and UT-020-SRD-San Rafael River E. Approximately 75,494 acres of those LWC units overlap with leases. However, direct impacts to LWCs would likely be no more than 83.2 acre in total, as the RFD assumes a maximum of eight wells to be drilled with 10.4 acres of associated disturbance per well. |
| | The degree of the intensity of impacts to wilderness characteristics would be influenced by the location of surface-disturbing activities, the size of the drill pad area and any associated temporary or permanent disturbance, surrounding landforms and topography, vegetation type, sequence of development, and reclamation processes and their duration. All leases have NSO stipulations for slopes greater than 40%, intermittent and perennial streams, and natural springs. The 41 leases with potential Mexican spotted owl nest sites also have an additional NSO stipulation. All leases also have CSU stipulations for fragile slopes or slopes between 20% and 40% (for stipulation information, see EA, Appendix B). This would limit development in LWC areas overlapping leases that meet such criteria. Where applicable, NSO stipulations would essentially eliminate impacts to LWC areas for those portions of the lease where NSO applies because no development could occur on the surface. CSU stipulations would also impose mitigations on development activity, thereby reducing the severity of development impacts but not entirely eliminating all impacts to LWCs. |
| | No significant benefits or adverse impacts to LWCs are anticipated under this action. |
| *Wilderness (Section 3.3.5)* *How would the potential development of issued leases impact undeveloped, untrammeled, natural, and outstanding solitude and primitive, unconfined recreation in designated wilderness areas?* | There is one wilderness area in the PFO that overlaps lease UTU93713 from the December 2018 Lease Sale: Labyrinth Canyon Wilderness. Labyrinth Canyon Wilderness spans 54,643 acres, 1,397.74 acres (2.6%) of which overlap with UTU93713. Labyrinth Canyon Wilderness was designated as wilderness in March 2019 after UTU93713 was issued. |
| | UTU93713 is located almost entirely on a flat, sandy, sagebrush plateau with slopes of less than 5% within the Labyrinth Canyon Wilderness. The elevation and slope on UTU93713 offer some topographic screening of potential impacts from other parts of the wilderness, especially looking from the north or east. Potential impacts within UTU93713 would be most visible from locations to the south or west. The majority of potential road upgrades and |

| Issue Analyzed in Detail | Impact Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
|  | pipeline development could occur within the 200-foot width of the cherry-stem road, which lies outside the wilderness and provides existing access to the lease. However, during exploration, a well pad of approximately 4 acres in size is likely to be constructed on lands within the wilderness area adjacent to the road. The ultimate amount of potential surface disturbance within the wilderness would depend on the results of exploration and any subsequent developments or reclamation. The black sagebrush vegetation dominant within the lease is likely to take decades to fully return to a state of naturalness prior to disturbance. Reseeding and revegetation efforts are likely to be hindered by grazing, invasive species, and climate change. Another long-term impact from lease exploration, regardless of outcome, would be the existence of a capped and abandoned well. The well head and casing below ground would be a permanent degradation of the undeveloped and natural qualities of wilderness character and withdrawn mineral estate. The well head would be buried, and the well casing below the surface has the potential to impact the free flow of groundwater. Currently, the access route to UTU93713 requires high clearance vehicles to navigate safely over several sections of slick rock. It is likely that the access road to lease UTU93713 would need to be improved and widened to allow for heavy machinery access and/or pipeline construction. These potential upgrades to the route could increase OHV use and visitation to this area of the wilderness, particularly the trailhead for Fivehole or Colonnade Arch. Increased traffic and visitation could degrade outstanding opportunities for solitude and natural, undeveloped conditions within this part of the Labyrinth Canyon Wilderness. While specific construction, site layout, and development details are unknown at this time, additional analysis would be performed if an APD is received to develop this lease. No benefits to wilderness are anticipated, while some adverse impacts are expected which could degrade outstanding opportunities for solitude and natural, undeveloped conditions within this part of the Labyrinth Canyon Wilderness. However, the total portion of the Labyrinth Canyon Wilderness area directly impacted is small (10.4 acres) compared to the total protected acres (54,643 acres). Indirect effects from noise, dust, traffic, and visual intrusions could occur over a wider area than just the surface disturbance Therefore, affirming UTU93713 is not expected to have significant benefits or adverse impacts on wilderness. |
| *Soundscapes (Section 3.3.6)* *How would the potential development of issued leases affect the visitor experience with regard to natural soundscapes on public lands and nearby National Parks?* | Canyonlands National Park, Goblin Valley State Park, and the town of Hanksville, Utah, are all areas in the vicinity of the leasing area that have soundscapes that allow visitors to better experience natural park environments, and wildlife to better hear and communicate for survival. Disruptive sounds are reduced in these communities. The region surrounding the leasing area is relatively undeveloped and contains few, if any, activities that currently impact the soundscape. The BLM concluded in the sound analysis (EA, Section 3.3.6) that there would be a less than a 10-decibel increase over the measured background noise in the Canyonlands National Park, Goblin Valley State Park, and Hanksville, Utah, and temporary increases in noise level in the Labyrinth Canyon Wilderness during the phase of well development with the highest decibel level. This sounds analysis |

AR000900

| Issue Analyzed in Detail | Impact Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
|  | represents the highest decibel anticipated during the short-term (30–60 days) construction period, and operational noise over the 20-year life of a well would be lower due to the intermittent operation of noise sources. The construction or improvements of vehicle access routes could also increase the level of public OHV use and associated visitation near developed leases, causing modest increases to noise levels in localized areas over time. However, due to the short duration of higher sound levels (30–60 days) and lower estimates for operational noise (20 years) no significant adverse impacts to soundscapes in the nearby communities are anticipated under Alternative A.<br><br>No significant benefits or adverse impacts to soundscapes are expected under this action. |
| *Visual Resources (Section 3.3.7)*<br>*How would potential development of the leases affect the visual landscape, including landscape character and views from KOPs?* | Impacts would result from development of the leases in the form of oil wells/pads, pipelines, compressors, overhead distribution lines, constructed roads, and other linear features. These impacts would include modifications to the existing landscape's form, line, color, and texture. Proposed development and modifications to the existing landscape would be allowable so long as it conforms to the VRM class objectives established in the 2008 PFO RMP. In addition, a variety of BMPs, design features, and land use plan–approved stipulations for future mineral resource development would likely mitigate, limit, and/or prevent such impacts to visual resources. Further detailed analysis of the potential impacts to visual resources would be analyzed at the APD stage. As noted in the EA, two leases (UTU93713 and UTU93493) were identified which, if developed, have the potential to impact a VRM Class I designated areas. However, the total area of impact for VRM Class I is less than 0.2 acres. An additional 313.23 acres of VRM Class II designated areas could potentially be impacted. However, the total area impacted would be small, and a visual resources stipulation (UT-S-160 – *CSU – Visual Resources, VRM II*) is attached to the lease UTU93713 which would mitigate impacts by requiring any surface disturbing activities to comply with BLM Handbook 8431-1 to retain the existing character of the landscape. Lease areas visible from VRM Class I and Class II designated areas are small in size and could be avoided by design of the site layout. Therefore, no significant benefits or adverse impacts to visual resources are expected under this action. |
| *Night Skies (Section 3.3.8)*<br>*How would potential development of the leases affect the quality of night sky resources, including effects on International Dark Sky Parks?* | One measure of night skies is the Sky Quality Index. It is an index of light pollution from skyglow with a range of 0 to 100, where 100 is a sky free from artificial skyglow. The National Park Survey reports that the primary sources that contribute to an increase in night sky effects (skyglow) are cities; contributions to skyglow from future development of the leases would be a small contribution to the existing sources and could adversely impact night skies, although the short duration and focused location of such impacts are not expected to be permanent. As there are currently minimal activities occurring which impact night skies in the vicinity of the leases, significant impacts are not expected. Mitigation measures could be applied as COAs at the APD stage and may include shaded or directional (downlit) lighting on structures, specific bulb type, and |

AR000901

| Issue Analyzed in Detail | Impact Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
| | shrouded gas flare stacks. |
| | No significant benefits or adverse impacts to existing night sky conditions are expected from this impact. |
| *Recreation (Section 3.3.9)* *How would potential development of the leases affect recreation access, sites, and user experience within SRMAs? How would proposed and potential development of the leases affect recreation sites, access, and user experience outside of SRMAs?* | Mineral development in leased areas could impact recreation both in areas designated as SRMAs and areas outside SRMAs. Two SRMAs are proximate in the leasing area: Labyrinth Canyon and San Rafael Swell. The San Rafael Swell SRMA is over 936,749 acres with1,067 acres of overlap with the leases. The Labyrinth Canyon SRMA is 37,203 acres with 1,981 acres of overlap with the leases. The presence of new oil and gas infrastructure could potentially change the recreational setting of these areas if wells were to occur in these recreational areas. Visitors seeking recreational settings consistent with primitive or non-motorized characteristics would likely be displaced to other BLM lands that provide for the recreational outcomes they seek. For leases that contain both SRMAs and areas not designated as such, it is desirable for the wells to be drilled in the non-designated portions of the lease. Mitigation measures, at the APD stage, to account for any impacts or residual effects could include locating oil and gas infrastructure outside of designated SRMAs, if possible, in accordance with section 6 of the standard lease terms and 43 C.F.R. § 3110.1-2. Construction or improvements of vehicle routes within a lease could provide benefits for some recreational users by increasing long-term public OHV use and dispersed recreation near the lease along with associated resource impacts. Mitigation measures could be added as COAs following additional site-specific analysis performed if an APD is received to develop a lease. These mitigation measures could reduce or avoid any impacts or residual effects to recreational experiences from construction and operation of a lease. Therefore, no significant benefits or adverse impacts are expected from this action. |
| *Transportation and Access (Section 3.3.10)* *How would potential development of the leases impact public access and travel on existing TMP designated routes?* | The development of these 59 leases may impact the current transportation network and access to BLM lands. Development of a given lease may involve construction or improvements of vehicle access routes that could concentrate OHV use, increase traffic, or temporarily close routes/access for public safety—each resulting in changes to vehicle movement. Changes to the existing BLM transportation system from oil and gas development activities would result in site-specific impacts to public route use and access. Upgraded or new access routes may increase the overall long-term future level of OHV traffic and dispersed recreation use near a developed lease. Further detailed analysis of the potential impacts to transportation and access would be analyzed as appropriate when oil and gas development plans and permits to drill are submitted. As noted in the EA, new access roads and the presence of drilling activities could contribute to longer or shorter travel times for public land users, contributing to either beneficial or adverse effects. However, site-specific environmental analysis would be performed when an APD for a lease is received, and any potential construction of new routes would involve coordination with the BLM and the |

| Issue Analyzed in Detail | Impact Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
| | lease holder prior to development of a lease. Therefore, no significant long-term effects are expected under Alternative A. No significant benefits or adverse impacts to transportation and access are expected from this action. |
| *Water Resources (Section 3.3.11: How would potential development of the leases impact the availability and quality of groundwater and surface water resources?* | The 59 leases encompass 204.96 miles of intermittent streams, 20.11 miles of connector channels and artificial paths, 532.05 acres of Riverine wetlands, 1.22 acres of Freshwater Emergent wetlands, 4.86 acres of Freshwater Forested/Shrub wetlands, 1.39 acres of Freshwater ponds, and 20.23 acres of lakes. Based on the RFDS for Alternative A, well pad development could result in an estimated eight wells with an estimated use of four to 32 acre-feet of water per year. Leasing could result in future oil and gas development activities, including well pad construction, drilling, completion of vertical wells, and access road construction and maintenance. These actions could impact surface water resources through disturbing vegetation, soil, and mineral substrate, which could create dust and increase runoff rates during precipitation events. The disturbed areas would be more susceptible to erosion, which could create localized sedimentation issues in nearby streams. Oil and gas development could increase the risk of spills that could introduce contaminants to surface water and groundwater resources. Water obtained from aquifers and surface water could result in the drawing down of the water table and reduction of available water resources for wildlife, vegetation, springs, streams, or public consumption, particularly in areas that are experiencing drought. Existing groundwater and surface water flow patterns could be affected by water used for activities on leases. The stipulations, lease notices, SOPs, BMPs, and COAs implemented during the leasing and APD processes would limit or reduce the impacts to hydrologic conditions, both directly and indirectly. Therefore, impacts to water resources are not considered significant for this action. Stipulation UT-S-127 would stipulate buffers from the centerline of intermittent and perennial streams, and Lease Notice UT-LN-128 would avoid adverse impacts to floodplains by developing facilities outside the 100-year floodplain, or minimizing or mitigating impacts by modification of surface use plans within floodplains present within the lease. Stipulation UT-S-126 No Surface Occupancy would protect existing natural springs by providing a surface buffer to protect the integrity and flow patterns of spring systems. All leases are subject to stipulation UT-S-128: NSO – Floodplains, Riparian Areas, Springs, and Public Water Reserves, which stipulates exclusion of surface-disturbing activities within 100 meters of riparian areas. No significant benefits or adverse impacts to water resources are expected from this action. |

iii.    Effects on human health and safety

Alternative A is not anticipated to significantly affect public health and safety. In the EA, the BLM analyzed the following resources and any necessary mitigation measures to be implemented at the time of development to address public safety issues: Air Quality (Section 3.3.1), Greenhouse Gas and Social Cost

AR000903

of Carbon (Section 3.3.2), Socioeconomics and Environmental Justice (Section 3.3.3),Transportation and Access (Section 3.3.10), Water Resource (Section 3.3.11) as well as Human Health and Safety (Section 3.2, AIB-18). Development and construction may contribute to public health and safety–related risks, including occasional fire starts (see Section 3.2, AIB-17); spills of hazardous materials, hydrocarbons, produced water, or hydraulic fracturing fluid (see Section 3.2, AIB-17); contamination of air, soil, or water (see Sections 3.3.1; 3.2, AIB-7; and 3.3.11); traffic congestion and collisions from commercial vehicles and heavy use (see Section 3.3.10); or increased levels of fugitive dust ($PM_{10}$) (see Section 3.3.1 and 3.2, AIB-17). To prevent impacts to human health and safety, workers on-site would follow spill prevention and control plans, fire response plans, OSHA compliance laws, and safety laws regarding transportation.

Affirming the 59 leases would not result in an exceedance of any air quality-related standard that may impact public health and safety (see EA, Section 3.3.1). Additionally, Sections 3.2 and 3.3 of the EA disclose that Alternative A would not result in significant impacts on other resources, including water quality (see Section 3.3.11) and induced seismicity (see Section 3.2, AIB-13). Because of lease notices and stipulations, site-specific BMPs and safety plans, and expected compliance with state and federal safety regulations, there would be no significant impacts on human health and safety expected under Alternative A.

    iv.      Effects that would violate federal, state, Tribal, and local laws protecting the environment

None of the effects associated with Alternative A would violate any federal, state, Tribal, or local law protecting the environment. These leasing decisions are consistent with applicable laws, land management plans, and policies.

In compliance with NEPA and the National Historic Preservation Act (NHPA), the BLM PFO has consulted with and conducted government-to-government consultation with Tribes. See Sections 4.2 and 4.3 of the EA. In July 2023, the BLM sent notification and shared information about the additional analysis of the 59 leases to Tribal Nations. No Tribes responded to the BLM's notification.

**National Historic Preservation Act**

Alternative A would be in compliance with the NHPA of 1966. The BLM documented its reasonable and good faith effort to identify effects that the two lease sales may have on historic properties, as required by the NHPA 54 USC 306108, commonly referred to as Section 106, in April and May 2018 for the September 2018 Lease Sale and in June and August 2018 for the December 2018 Lease Sale. As part of the Section 106 process, both lease sales are considered undertakings, as defined by 36 C.F.R. § 800.16(y). For each lease sale undertaking, the BLM PFO compiled cultural resource data from the PFO cultural resource records. These data were reviewed against lease locations to determine whether oil and gas development could occur without incurring adverse effects to historic properties and included consideration of impacts to cultural resources as well. The Cultural Resources Stipulation, as required by BLM Handbook H-3120-1, *Competitive Leases*, was applied to all of the leases.

Impacts to Native American concerns have been addressed in the EA (see Section 3.2, AIB-1) and through Tribal consultation (see Section 4.2).

Based on the analyses for both 2018 lease sales, which considered topography, spacing, site types, cultural and scientific values, the application of the standard Cultural Resource Protection stipulation for all leases and the UT-S-10 for Lease UTU93534, and the 2018 RFDS, the BLM reached a finding of No Adverse Effect to historic properties (36 C.F.R. § 800.5(b)) for both the September and December 2018 Lease Sales. For the September 2018 Lease Sale, the BLM consulted with the Utah State Historic

Preservation Office (SHPO) in July 2018 and received SHPO concurrence on the BLM's finding of No Adverse Effect on July 23, 2018. For the December 2018 Lease Sale, the BLM consulted with the SHPO in October 2018 and received SHPO concurrence on the BLM's finding of No Adverse Effect on October 25, 2018.

Due to disagreements with multiple consulting parties and the Hopi Tribe regarding the BLM's determination that the September 2018 Lease Sale undertaking would result in No Adverse Effect to historic properties, the BLM requested the Advisory Council on Historic Preservation (ACHP) to review the BLM's finding of effect, pursuant to 36 C.F.R. § 800.5(c)(2)(i). On September 10, 2018, the ACHP provided the BLM the results of their review and concluded that the BLM had correctly applied the Criteria of Adverse Effect, pursuant to 36 C.F.R. § 800.5(a)(1), and agreed with the BLM's finding of No Adverse Effect for the September 2018 Lease Sale. In accordance with 36 C.F.R. § 800.5(c)(3)(ii)(B), the BLM took into account the ACHP's advisory opinion, reached a final decision on its finding of No Adverse Effect to historic properties for the undertaking, and provided the ACHP, SHPO, and other consulting parties its rationale and a summary of how these advisory comments were considered in its final decision. By doing so, the BLM concluded the Section 106 process for the September 2018 Lease Sale.

Due to disagreement from multiple consulting parties and Tribes regarding the BLM's determination that the statewide December 2018 Lease Sale undertaking would result in No Adverse Effect to historic properties, the BLM requested the ACHP to review the BLM's finding of No Adverse Effect; however, the ACHP did not provide an opinion. As a result, pursuant to 36 C.F.R. § 800.5(c)(3)(i), the BLM Utah's NHPA Section 106 responsibilities regarding the December 2018 Lease Sale were fulfilled, and the BLM reaffirmed the finding of No Adverse Effect, pursuant to 36 C.F.R. § 800.5(c)(3)(ii)(B).

The current additional analysis of other resources provided in the EA does not alter the BLM's original Section 106 undertakings. Therefore, the current EA analysis does not constitute a new Section 106 undertaking requiring analysis.

The BLM has revisited and confirmed the underlying NHPA Section 106 analysis for both lease sales was sufficient. Therefore, the BLM's findings of No Adverse Effect to historic properties for both lease sales remain valid.

**Endangered Species Act**

Federal regulations and policies require the BLM to make its public land and resources available on the basis of multiple use principles, and it is BLM policy to conserve and protect special status species and their habitats to ensure that actions authorized by the BLM do not contribute to special status species becoming listed as threatened and endangered by the U.S. Fish and Wildlife Service (USFWS).

For lease sales within the range of listed species protected by consultation actions, the BLM regularly corresponds with the USFWS to ensure that the proposed alternatives do not exceed the impacts analyzed in the existing consultations.

The effects of oil and gas leasing development on threatened and endangered species were analyzed through Section 7 consultation and in the 2008 PFO RMP. Impacts to additional species were analyzed during a November 2018 reinitiation of consultation on the RMP, which added Ute ladies'-tresses (*Spiranthes diluvialis*), Navajo sedge (*Carex specuicola*), and California condor (*Gymnogyps californianus*), and in May 2020, which added yellow-billed cuckoo (*Coccyzus americanus*). The USFWS concurred with the BLM's determinations and concluded informal Section 7 consultation on November 28, 2018, for the December 2018 Lease Sale and July 07, 2020, for the September 2020 Lease Sale.

AR000905

Alternative A would be in compliance with the Endangered Species Act (ESA) (see EA, Section 2.2, AIB-12, and Section 4.1). The analysis in the EA indicates that potential habitat for four federally listed wildlife species is present within the leasing area and intersects the USFWS Area of Influence (AOI).

Of the 59 leases that would be affirmed under Alternative A, all are within the experimental population range of California condor and have potential nesting/roosting habitat. Despite having suitable nesting habitat, there are no known condor nests or activity in the vicinity of any of the leases.

Of the 59 leases, 41 intersect or are within 0.5 mile of modeled Mexican spotted owl (*Strix occidentalis lucida*) habitat; however, there are no known Mexican spotted owl populations or nests within any of the leases. More detail identifying the 41 leases is included in the EA.

The USFWS AOI for southwestern willow flycatcher (*Empidonax traillii extimus*) intersects or is within 0.5 mile for 25 of the 59 leases. Of those 25, all leases have UT-LN-53 *Riparian Areas*, attached to mitigate impacts to southwestern willow flycatcher habitat. There are no known southwestern willow flycatcher populations or nests within any of the leases. More detail identifying the 25 leases is included in the EA.

The USFWS AOI for yellow-billed cuckoo intersects with or is within 0.5 miles for three of the 59 leases. There are no known yellow-billed cuckoo populations or nests within any of the leases. More detail identifying these leases is included in the EA, (See AIB-8 and AIB-11).

Development of the leases is not expected to create adverse impacts due to stipulations and lease notices which facilitate the reduction or avoidance of effects (see EA, Appendix B); the occurrence of site-specific analysis at the APD stage, which provides additional opportunities to evaluate effects and develop mitigation measures to reduce or avoid effects; and the standard lease terms and conditions which apply to all leases and provide the BLM with the authority to require reasonable measures that reduce or avoid effects. Site-specific surveys for any ESA-designated species, including those not previously observed in a particular lease, would be conducted at the time an APD is submitted, and stipulations would be added in the form of COAs as necessary to protect species habitat.

BLM PFO biologists have reviewed the proposed leasing and determined that Alternative A would comply with threatened and endangered species management guidelines as outlined in the 2008 PFO RMP as amended, and in accordance with the requirements of the Federal Land Policy and Management Act and NEPA.

To account for changes to AOIs of species between 2018 and 2023, the BLM re-engaged coordination with the USFWS for Alternative A in the EA. On September 25, 2023, the USFWS concurred with the BLM's species determinations and that impacts are consistent with the Biological Opinion for the Price RMP and concluded coordination. If additional APDs are submitted to develop leases, further evaluation and Section 7 consultation with the USFWS would occur, as required.

## CONCLUSION

Therefore, on the basis of information provided in the EA (DOI-BLM-UT-0000-2023-0007-EA), and all other information available to me at this time, it is my determination that:

- The degree of effects of Alternative A does not rise to the level of significance requiring preparation of an EIS.

- The preferred alternative is in conformance with the 2008 PFO RMP, as amended.

- I have also considered whether an RMP amendment may be necessary and appropriate to

27

rebalance the resource allocation decisions applicable to the PFO. However, in light of my determination that affirming the previous leasing decisions (and potential development) for the 59 leases will not cause significant impacts, and considering the lease area has low potential for oil and gas resources, I have also determined that no RMP amendment is necessary at this time.

**APPROVAL**

**Signed:**

CHRISTINA PRICE    Digitally signed by CHRISTINA PRICE
Date: 2024.05.30 09:03:03 -06'00'          May 30, 2024

Christina Price                                                                              Date
Deputy State Director, Division of Lands & Minerals, Utah State Office

28

# APPENDIX M—FLUID MINERAL REASONABLY FORESEEABLE DEVELOPMENT

## I. INTRODUCTION

The Reasonably Foreseeable Development (RFD) scenarios outlined in this Environmental Impact Statement (EIS) are the Bureau of Land Management (BLM) estimates of the foreseeable oil and gas activities that could result from making public lands within a planning area available for future oil and gas leasing, as determined by the collective decisions and mitigation comprising each alternative analyzed in a land use plan. The RFD scenario does not establish a threshold for future federal leasing, exploration, or development activities. Rather, it is a scenario of actual and hypothetical activities that could result from implementing each of the alternatives and corresponding mitigation. These projected activities enable BLM to conduct an impact analysis to qualify and quantify impacts that could result from making public land available for future leasing under the constraints of each alternative. The potential impacts are then available to the decisionmaker for consideration in reaching a final judgment on which lands to make available and subject to mitigation.

The RFD scenario for the Price Resource Management Plan (RMP) identifies future exploration and development activities that can be reasonably expected to occur within the Price Field Office (PFO) planning area based on the allocation decisions, objectives, and management actions for each alternative analyzed, including the Proposed RMP. Because the Price RMP was initiated 3 years before BLM Interim Management Plan (IM) 2004-089 was adopted, the Price RFD scenario does not meet the requirements set forth by this guidance. To be precise, the RFD does not include a scenario based on the assumption that "all potentially productive areas are open under standard lease terms and conditions." There is, however, an RFD scenario for each alternative analyzed in detail. The corresponding impact analysis, like the RFD, reflects the constraints of the various goals, objectives, and management actions that comprise each alternative. The RFD meets or exceeds all other applicable guidance. The analyses for various RFD scenarios ensure that the decisionmaker is knowledgeable about the range of potential effects of making public lands within the PFO area available for oil and gas leasing.

Although BLM has no control over exploration or development activities on private or State lands, the Price RFD scenario identifies the estimated surface disturbance for all significant reasonably foreseeable oil and gas activities within the planning area (BLM, U.S. Forest Service [USFS], State of Utah, and private) during the next 15–20 years. The Price RFD scenario focuses on the estimated acres of surface disturbance from the construction of oil and gas well pads, roads, pipelines, and other reasonable impact assumptions based on past and present activities. The Price RFD scenario cannot, however, be considered a limiting factor for the number of wells drilled, the acres disturbed, or any other potential authorizations. The projected number of well pads is an estimate for analyzing potential impacts to other resources and resource uses that could result from the development of existing leases and any future leases that may be issued as a result of implementing an analyzed alternative. The number of wells per well pad is not limited by the Price RFD scenario.

The impact analysis of implementing any one of the alternatives is developed and analyzed in the context of lands currently under lease, including the direct, indirect, and cumulative impacts associated with valid existing rights and any imposed mitigation. Future Environmental Assessments (EA) and EISs for exploration and development of oil and gas resources will be tiered to this Proposed RMP/Final EIS analysis and will, at a minimum, refine the RFD scenario. For example, full field development analyses conducted 10 years from now may amend or supplement the RMP/EIS because development and impact

scenarios differ from those described in this document. Different on-the-ground conditions, more comprehensive resource information, improved technologies, and improved mitigation will probably also be factors for future consideration. The RFD scenario is a tool for analyzing the effects of making public lands available for leasing based on planned and foreseeable activities, existing data, and professional judgment with respect to extrapolation of that data.

# II. PAST AND PRESENT ACTIVITY

The PFO has a long history of oil and gas activity; however, the majority of the 1,728 wells drilled as of June 2005 (Table M-1) were drilled within the last 15 years following discovery of a large coalbed natural gas (CBNG) resource in the Ferron Sandstone Member of the Mancos Shale. This relatively recent interest in CBNG also resulted in additional drilling in other coal-bearing formations, especially the Blackhawk Formation and the Emery Sandstone Member of the Mancos Shale. Most recently, interest has increased in the continuous and transitional gas resource in the Wasatch and Mesaverde formations and potential gas resources in some deeper formations in the northeastern part of the planning area.

The geology of the planning area, past activity, and recent production rates are described in the *Mineral Potential Report* (Booz Allen Hamilton 2002). Details of past activity, listings of conventional oil and gas fields, and cumulative production and statistics for recent drilling activity are discussed in Section 3.2 of the *Mineral Potential Report*. The occurrence potential of CBNG and conventional oil and gas is shown on Maps 3-20 and 3-21. The locations of federal oil and gas leases, mostly in the northern and western parts of the area, are shown on Map 3-23. The State of Utah oil and gas leases cover blocks of State lands southwest of the PFO. Most of the central and eastern parts of the PFO are not currently leased.

Numerous seismic surveys have been conducted throughout the planning area, primarily on areas along Highway 10, in the Book Cliffs area, in the West Tavaputs region, along Highway 6, and in the southeast region.

## Table M-1. Summary Well Status, June 2005

| Well Status | Number of Wells |
|-------------|-----------------|
| Drilling | 82 |
| Producing Oil Wells | 2 |
| Producing Gas Wells | 863 |
| Shut-in Oil Wells | 22 |
| Shut-in Gas Wells | 48 |
| Service Wells (injection, disposal, monitor) | 62 |
| Shut-in Service Wells | 0 |
| Temporarily Abandoned | 11 |
| Abandoned | 277 |
| Plugged and Abandoned | 361 |
| **Total** | **1,728** |

*Source:* Utah Division of Oil, Gas and Mining 2005

Drilling for oil and gas peaked in 2001 when 174 wells were spud (Figure M-1). The number dropped to 57 in 2003, 36 in 2004, and 10 through June 2005. During the period from 2000 to 2003, only 3.2 percent of the wells drilled were considered dry (Utah Division of Oil, Gas and Mining 2005). Most of the recent wells were drilled to produce CBNG from coalbeds in the Ferron Sandstone member of the Mancos Shale in the Helper, Drunkards Wash, Huntington, and Buzzard Bench areas. The Castlegate Field in the northern part of the planning area has produced CBNG from the Blackhawk Formation. The decline in drilling over the last 5 years results from the maturing of the development within the CBNG fields.

**Figure M-1. Wells Drilled Per Year in the PFO**



Source: Utah Division of Oil, Gas and Mining 2005.

Total CBNG production peaked in 2002 at approximately 102,000,000 thousand cubic feet (mcf) or 102 billion cubic feet (bcf). Production decreased to 97.7 bcf in 2003 and 89.3 bcf in 2004 (Figure M-2). The increase in production through 2001, seen in Figure M-2, can be attributed to new well production and the continuing dewatering process. Most of the individual wells in these fields exhibit a typical CBNG production history characterized by high rates of water production initially, followed by an increase in gas production accompanied by decreasing water production, and finally a slow decrease over time in gas production.

### Figure M-2. CBNG Production per Year in the PFO



Source: Utah Division of Oil, Gas and Mining 2005.

Starting in the 1950s, gas and small amounts of oil were produced from the Green River and Wasatch formations in the Peters Point, Prickly Pear, and Stone Cabin Fields located in the northeast corner of the PFO. Cumulative gas production from this area through 2004 was approximately 7.6 bcf of gas (Utah Division of Oil, Gas and Mining 2004).

Interest is now focused on the continuous and transitional gas resources in the Wasatch and Mesaverde formations within the northeast corner of the PFO, where seismic surveys have identified drilling targets in deeper formations. Two federal exploratory units are designated in the West Tavaputs area where these formations occur and drilling interests are increasing. In the period from 2002 to 2003, 13 federal and State permits were received for drilling activities on the two units (Utah Division of Oil, Gas and Mining 2004). More recently, BLM analyzed and authorized additional drilling through the West Tavaputs Drilling Program EA. BLM anticipates many of the authorized wells will be drilled in the West Tavaputs area over the next several years. BLM has also received a proposal for additional development in this area and has published a Draft EIS on the proposed full field development. In addition to the increased drilling activity, there remains significant interest in leasing within this area as evidenced by the recent oil and gas lease sale results.

Utah and the other Rocky Mountain gas-producing States have become more integrated with the nation's natural gas system as a result of increased production and pipeline construction. In 2002, Carbon and Emery Counties ranked second and fifth respectively in gas production among Utah counties. The Kern River Pipeline crosses Utah diagonally from northeast to southwest and connects gas-producing areas in Utah and southwestern Wyoming with consumers in southern Nevada and California. This pipeline was constructed in 1991 and was expanded in 2003 to a current capacity of 1.5 bcf per day (University of Utah Bureau of Economic and Business Research 2003). A gas pipeline (Questar) from Vernal through PFO connects into the Kern River pipeline. Questar constructed a second pipeline to transport CBNG in 2001 from Price to the Kern River pipeline. In 2007, Questar extended this second pipeline from PFO toward Vernal through Nine Mile Canyon. Utah is now an overall exporter of natural gas. With the reasonably foreseeable production and expanding infrastructure, gas produced in the planning area should continue to meet increasing market demands.

# III. OIL AND GAS DEVELOPMENT POTENTIAL

Areas with a high potential for the occurrence of CBNG and conventional oil and gas are shown on Maps 3-20 and 3-21. Present activity is largely confined to development of the CBNG resource in the Ferron Sandstone coals, often called the Ferron Fairway, and the continuous and transitional gas deposits in the Wasatch and Mesaverde formations in the northeastern part of the area (Tavaputs Plateau). Companies are also starting to look at conventional oil and gas plays in the northern and southeastern portions of Emery County.

Development drilling in the Ferron Fairway follows a one well per 160-acre spacing; however, future proposals could reduce this to one well per 80-acre spacing or even less. More innovative production drilling is likely to involve directional drilling and horizontal holes from existing or new wells and horizontal wells with multiple lateral legs ("herringbone pattern"). Overall, CBNG drilling has declined in the past few years and is unlikely to return to the activity levels of 1999–2001 because of field maturity. Utah Division of Oil, Gas and Mining statistics for 2004 show that 36 wells were drilled in Carbon and Emery Counties with the majority of these being CBNG wells. Development of the CBNG fields has matured to the point where lower drilling rates will likely continue in the future. Of course, the level of development is also subject to new discoveries, new drilling and recovery technologies, or major increases or decreases in natural gas prices that could result in increased or decreased drilling/development activities. Available areas for expanding activity in the Ferron Fairway are also geologically and geographically limited.

The Wasatch Plateau is in the Manti-La Sal National Forest, where a significant number of oil and gas leases currently exist (Map 3-23). Some exploratory drilling is likely in this area during the life of the plan. Coals in the Blackhawk Formation in the Wasatch Plateau appear to have low development potential (Booz Allen Hamilton 2002). As described above, coals in the Emery Sandstone Member of the Mancos Shale are the more likely exploration targets in this area. A recent draft *Mineral Potential Report*, including the Fishlake National Forest (immediately southwest of the Manti-La Sal) projects few new wells for that area. Some areas are not being developed for oil and gas because of conflicts with coal development or issues with disposal of produced water.

The northern part of the planning area includes the Book Cliffs CBNG Play (USGS 1995; Booz Allen Hamilton 2002). Development in the Castlegate Gas Field represents the only major attempt to develop this resource to date. This field contained 19 active wells (October 2003) and has produced approximately 4.4 bcf of gas through 2003 (Utah Division of Oil, Gas and Mining 2004).

The remaining area with significant development potential is the Tavaputs Plateau area in the northeast corner of the planning area. Large blocks of lands are held under existing lease rights and there are two federal exploratory units. Applications for permit to drill (APD) have been filed for wells on both federal and State of Utah lands within the units. The targeted potential resources will be continuous and transitional gas deposits in the Wasatch and Mesaverde formations and conventional gas occurrences in deeper formations. The presence of the Sunnyside Special Tar Sands Area in the Tavaputs Plateau region has prevented some oil and gas leasing in that region; however, the Energy Policy Act of 2005 opens these areas for conventional oil and gas leasing.

A Draft EIS for full field development in the West Tavaputs area was released in February 2008. Existing wells and permit applications appear to be defining an 80-acre surface spacing for at least part of this area, where approximately 807 wells on 538 well pads are projected. Operators have proposed 40-acre downhole spacing for some interim actions, but there is the probability that an even smaller spacing will be necessary to effectively and efficiently recover the resources. Topography will affect well location, and a significant number of the wells would be directionally drilled to reduce the surface impacts. The Vernal

Field Office, immediately north of this area, includes a much larger portion of the Tavaputs Plateau region and projects that 1,500 wells will be drilled during the next 10 to 20 years.

Oil production is significantly lower than gas production in Carbon and Emery Counties. During 2004, 4,661 barrels of oil were produced in Carbon and Emery Counties (Utah Division of Oil, Gas and Mining 2006), and no significant new oil discoveries and production increases are expected. Should oil or condensate be discovered, however, it will be handled in a similar way to oil under the no-action alternative. Extremely large volumes could be marketed by pipeline; but based on existing data, the more likely handling method will be through tank storage and trucking. Current production is from the Grassy Trails Field (Map 3-21) which is nearly at the end of its life. There have been no new wells drilled in this field for the last 10 to 15 years. The oil production has been augmented by production of some condensate from the gas wells in the Tavaputs area during the first few years of their production.

In summary, based on the occurrence potential and past exploration and development activities, BLM believes that future exploration and development are most likely to occur on the Wasatch (Emery/Book Cliffs CBNG Plays) and Tavaputs Plateau. Exploration of the Wasatch Plateau will most likely focus on testing the CBNG resource contained in coalbeds in the Emery Sandstone Member of the Mancos Shale (Tabet and Quick 2003). In the Tavaputs Plateau area, the targeted resources will be continuous and transitional gas deposits in the Wasatch and Mesaverde formations and conventional gas occurrences in deeper formations. The most likely source of oil is the Grassy Trails field and condensate from gas wells in the West Tavaputs area.

## IV. BASELINE SCENARIO ASSUMPTIONS AND DISCUSSION

The RFD scenario for the Price Proposed RMP/Final EIS is based on the Proposed RMP. The RFD projects the number of well pads to be constructed in the planning area during the next 20 years on all lands (BLM, USFS, State of Utah, and private). The number of wells per well pad is not limited by the RFD scenario. The RFD scenario does not establish a threshold for future federal leasing, exploration, or development activities. Rather, it is a scenario of actual and hypothetical activities that could result from implementing the proposed RMP and alternatives and their corresponding mitigation. These projected activities enable BLM to conduct an impact analysis to qualify and quantify impacts that could result from making public land available for future leasing under the constraints of the proposed RMP and alternatives. Spacing of CBNG wells is currently at one well pad per 160 acres, but future activity could reduce the spacing to one well pad per 80-acres (note: an increase in well pad density to one well pad per 80 acres, 40 acres, or other spacing does not necessarily mean twice or four times the number of well pads as multiple wells may be drilled from a single pad). An 80-acre well pad spacing is projected for parts of the Tavaputs Plateau area, but future activity could reduce this to 40-acre spacing or even less. For this RFD scenario, it is assumed that natural gas prices will remain stable between $6.00 and $9.00 per mcf or increase gradually. It is assumed that there would be additional construction to expand pipeline capacity, including looping of existing pipelines and construction of a new pipeline(s) to meet market transportation needs. Table M-2 shows projections for total new well pads for each alternative on BLM, USFS, State of Utah, and private lands over a 20-year period.

**Table M-2. Estimated Number of Well Pad Locations Over 20 Years**

| Well Pad Location | Number of Well Pads | | | | | |
|---|---|---|---|---|---|---|
| | No Action Alternative | Alternative A | Alternative B | Alternative C | Alternative E | Proposed RMP |
| Emery/Book Cliffs Play | 700 | 900 | 800 | 700 | 700 | 900 |
| Tavaputs Plateau | 600 | 700 | 400 | 300 | 200 | 700 |
| Remaining PFO high potential area (H/D) | 220 | 260 | 180 | 80 | 50 | 260 |
| PFO low potential area (L/C) | 20 | 40 | 20 | 20 | 0 | 40 |
| **Total Well Pads** | **1,540** | **1,900** | **1,400** | **1,100** | **950** | **1,900** |

It is anticipated that approximately 75 percent of the new well pads will be on BLM land and 25 percent on USFS, State of Utah, or private lands, with most activities for BLM-managed lands occurring in the CBNG and the West Tavaputs area.

# V. DISTURBANCE AS A RESULT OF OIL AND GAS ACTIVITY

## Projected Surface Disturbance

### Purpose

The described impact estimates are for analysis purposes. Actual disturbances may vary based on multiple wells from a single pad, unforeseen economic conditions, new technologies, inaccuracies in the RFD scenario, and other changed conditions. Such changes will be addressed in any required site-specific analyses. The RFD scenario assists in identifying potential direct, indirect, short-term, long-term, cumulative, and residual impacts over the range of alternatives and land use allocation decisions described in the Proposed RMP/Final EIS analysis. The RFD analysis cannot be viewed as an absolute threshold for limiting activities, but rather as information necessary for making informed decisions regarding the allocation of lands that will be made available for oil and gas leasing under appropriate stipulations. Oil and gas implementation actions will undergo further reviews as necessary to ensure the existing EAs and EISs are adequate, current, and accurately reflect potential impacts for informed decisionmaking. Future analyses may result in modification/amendment of the proposed RMP decisions, goals, objectives, management actions, and the accompanying EIS impact analysis.

### Assumed Disturbance Values

The calculations for acres of surface disturbance are used in the impact analysis to quantify the impacts on other resources and resource uses. The following general guidelines for roads, drill pads, pipeline, and ancillary facilities were used to determine acres of surface disturbance associated with fluid minerals exploration and development activities. The assumptions are based on existing oil and gas development across the PFO. The site-specific acres of surface disturbance vary based on factors such as topography, location, and slope. BLM will use best management practices (BMP) to reduce the impact of drilling on the environment.

## Roads, Pipelines, and Powerlines

- Average initial 70 feet total width disturbance for ¾ mile per well pad (6.4 acres)
- After reclamation, average disturbance of 20 feet total width disturbance for ¾ mile per well pad (1.8 acres)

## Drill Pads

- The size of pads will vary greatly depending on numerous factors and could range from 1.0 acre to more than 3.5 acres. Average initial disturbance is estimated at 1.5 acres including pits, cuts, and fills per well pad
- After reclamation, the average disturbance is 1.0 acres per well pad

## Ancillary Facilities

- Average initial and long-term disturbance of 20 acres per facility (e.g., compressor stations and power substations)

Initial disturbance from roads, pipelines, powerlines, and drill pads per well pad is estimated to be 7.9 acres, decreasing to 2.8 acres per well pad after reclamation. These calculations assume that reclamation occurs when wells are in production. If drilling results in a dry hole, complete reclamation of the site would occur. After complete reclamation, for purposes of the RFD analysis and impacts from disturbance, it is assumed that the well was never drilled.

Using these average surface disturbance figures, the following future initial and long-term effects were calculated for each alternative: Impacts from past and present activity are estimated at 3,200 acres. Table M-3 and Table M-4 show the initial and long-term surface disturbance by alternative directly associated with the number of oil and gas well pads shown in Table M-2. The initial surface disturbance impacts from oil and gas activity for the Proposed RMP are 15,210 acres over 20 years. The long-term surface disturbance impacts from oil and gas activity for the Proposed RMP are 5,620 acres over 20 years.

Impacts from past and present activity are estimated at 3,200 acres (after reclamation), and when added to projected future activity, the estimate is about 18,500 acres in total disturbance. Future initial impacts will be reduced from 7.9 to 2.8 acres per well pad through reclamation, resulting in a net total disturbance of approximately 8,800 acres. Application of BMPs and revised mitigation resulting from improved technologies and adaptive management processes are expected to further reduce impacts in the future.

## Table M-3. Initial Surface Disturbance from Oil and Gas Activity

| Type of Activity | No Action Alternative | | Alternative A | | Alternative B | | Alternative C | | Alternative E | | Proposed RMP | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) |
| Roads, Pipelines, and Powerlines | 493 | 9,860 | 608 | 12,160 | 448 | 8,960 | 352 | 7,040 | 304 | 6,080 | 608 | 12,160 |
| Drill Pads | 116 | 2,310 | 143 | 2,850 | 105 | 2,100 | 83 | 1,650 | 71 | 1,425 | 143 | 2,850 |
| Ancillary Facilities | 10 | 200 | 10 | 200 | 10 | 200 | 10 | 200 | 7 | 140 | 10 | 200 |
| **Total Surface Disturbance** | **618** | **12,366** | **761** | **15,210** | **563** | **11,260** | **445** | **8,890** | **382** | **7,645** | **761** | **15,210** |

* Assumes that the well pads are evenly distributed over 20 years; however, this is not likely the case. Actual acres will vary by year.

## Table M-4. Long-Term Surface Disturbance from Oil and Gas Activity

| Type of Activity | No Action Alternative | | Alternative A | | Alternative B | | Alternative C | | Alternative E | | Proposed RMP | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) | Per Year (acres)* | Over 20 Years (acres) |
| Roads, Pipelines, and Powerlines | 139 | 2,772 | 171 | 3,420 | 126 | 2,520 | 99 | 1,980 | 86 | 1,710 | 171 | 3,420 |
| Drill pads | 77 | 1,540 | 95 | 1,900 | 70 | 1,400 | 55 | 1,100 | 48 | 950 | 95 | 1,900 |
| Ancillary Facilities | 10 | 200 | 10 | 200 | 10 | 200 | 10 | 200 | 7 | 140 | 10 | 200 |
| **Total Surface Disturbance** | **226** | **4,512** | **276** | **5,520** | **206** | **4,120** | **164** | **3,280** | **140** | **2,800** | **276** | **5,520** |

* Assumes that the well pads are evenly distributed over 20 years; however, this is not likely the case. Actual acres will vary by year.

AR003140

**This page intentionally left blank.**

**U.S. Department of the Interior**
Utah Bureau of Land Management

# Price Field Office

October 2008

# Record of Decision and Approved Resource Management Plan

## Public Lands USA:  Use, Share, Appreciate

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

## MLE-7

Allow leasing of oil and gas on lands within the PFO with oil shale/tar sands potential only for conventional oil and gas and coalbed natural gas. Oil shale/tar sands will be specifically excluded from the lease. This RMP will be amended upon completion of the Programmatic EIS for oil shale and tar sands resources leasing on lands administered by the BLM in Utah, Colorado, and Wyoming (Map R-23).

## MLE-8

Acknowledge future development potential for coal resources in areas where coalbed natural gas development is taking place.

## MLE-9

Oil and gas leasing management will be conducted shown on Map R-25.

- Areas open to leasing subject to the standard terms and conditions of the lease form (1,161,000 acres)

- Areas open to leasing subject to moderate constraints (timing limitations; CSU, and lease notices) (467,000 acres)

- Areas open to leasing subject to major constraints (NSO) (282,000 acres)

- Areas unavailable to leasing (569,000 acres)

The combination of all restrictions on oil and gas development is shown of Map R-26.

## MLE-10

The Federal Onshore Oil and Gas Leasing Reform Act of 1987 closed lands within BLM WSAs to oil, gas, or geothermal leasing (30 USC 226-3(a)2).

## MLE-11

Incorporated municipalities are not available for Federal mineral leasing as established in 43 CFR 3100-3(a)(2)(iii) and 3100-3(b)(2)(ii).

### Geophysical Operations Under 43 CFR 3150:

## MLE-12

Geophysical operations will be allowed consistent with existing regulations for geophysical exploration, except in the five non-WSA lands with wilderness characteristics managed in this alternative, which will be closed to activities related to geophysical operations.

AR003279




United States
Department of the Interior
Bureau of Land Management

# REASONABLY FORESEEABLE DEVELOPMENT SCENARIO
## FOR OIL AND GAS IN THE SAN RAFAEL DESERT MASTER LEASING PLAN AREA

### PRICE AND RICHFIELD FIELD OFFICES



September 2016

Bureau of Land Management
Price Field Office
125 South 600 West
Price, Utah

REASONABLY FORESEEABLE DEVELOPMENT (RFD) SCENARIO
FOR OIL AND GAS IN THE SAN RAFAEL DESERT MASTER LEASING PLAN AREA,

Prepared By:

_Don Stephens_
(Signature)

_Geologist_
(Title)

_9 - 30 - 16_
(Date)

Technical Review:

_Eric Jones_
(Signature)

_PETROLEUM ENGINEER, CANYON COUNTRY DO_
(Title)

_10·17·16_
(Date)

Technical Review:

_Chris Conrad_
(Signature)

_Geologist PG._
(Title)

_10/20/16_
(Date)

Management Acknowledgement:

_[signature]_
(Signature)

_10/24/2016_
(Date)

AR005223

RFD Scenario for Oil and Gas in the SRDMLP, Price & Richfield Field Offices, BLM

## TABLE OF CONTENTS

I. Summary ......................................................................................................... - 1 -

II. Introduction ................................................................................................... - 3 -

III. Description of Geology ................................................................................ - 4 -

IV. Past and Present Oil and Gas Exploration ............................................... - 5 -

    Geophysical Exploration ............................................................................ - 5 -

V. Past and Present Oil and Gas Development Activity ................................. - 5 -

    Oil and Gas Leasing Activity ..................................................................... - 5 -
    Historical Drilling Activity ........................................................................ - 6 -
    Historical Oil and Gas Production ............................................................ - 8 -
    Well Spacing ............................................................................................... - 8 -
    Infrastructure ............................................................................................. - 9 -
        Road Systems ....................................................................................... - 9 -
        Pipeline Systems and Gas Plants ........................................................ - 9 -
        Produced Water and Disposal Facilities ............................................ - 9 -
    Hydrogen Sulfide Gas (H2S) ...................................................................... - 9 -
    Conflicts with other Mineral Development ................................................ - 9 -

VI. Oil and Gas Occurrence Potential ............................................................. - 10 -

VII. Oil and Gas Development Potential .......................................................... - 10 -

VIII. RFD Baseline Scenario Assumptions ..................................................... - 11 -

    Assumptions for Deep Wells ...................................................................... - 11 -
    Assumptions for Horizontal Wells ............................................................. - 11 -
    Projected Level of Oil and Gas Activity .................................................... - 12 -
        Current and Forecasted Trends in Crude Oil and Natural Gas Markets ........... - 12 -
        Historical Drilling Trends for Development Areas .............................. - 13 -
        Projected Drilling Activity for Development Areas ............................. - 13 -

IX. Surface Disturbance Due to Oil and Gas Activity on All Lands ............. - 14 -

    Estimated Existing Surface Disturbance ................................................... - 15 -
    Total Estimated Future Surface Disturbance for Well Pads, Roads, and Pipelines ........... - 15 -
    Total Estimated Future Surface Disturbance for Geophysical Exploration ........... - 16 -

X. References ...................................................................................................... - 19 -

AR005224

## LIST OF TABLES

Table 1.  Status of lands in the SRD MLPA........................................................................................- 4 -
Table 2.  Wells drilled in the SRD MLPA..........................................................................................- 4 -
Table 3.  Cumulative production of oil and gas fields in the MMPLA .............................................- 8 -
Table 4.  Surface disturbance from drilling and reclamation activities in the SRD MLPA ...................- 16 -

## APPENDIX A – Maps

Map 1      San Rafael Desert Master Leasing Plan Area (SRD MLPA)
Map 2      Oil and Gas Plays
Map 3      Oil and Gas Fields
Map 4      Geophysical Surveys
Map 5      Oil and Gas Wells and Federal Oil and Gas Leases

## APPENDIX B – Charts

Chart 67    Green River Area...........................................................................................................-29-
Chart 83    Canyonlands Park Area................................................................................................-29-

AR005225

*Cover - Photograph of Vibroseis Buggies on Dawson's San Rafael Saddle 3-D Geophysical Project, T. 26 S., R. 14 E., Emery County, Utah.  Photo was taken by Don Stephens on February 12, 2008.*

AR005226

REASONABLY FORESEEABLE DEVELOPMENT (RFD) SCENARIO
FOR OIL AND GAS IN THE SAN RAFAEL DESERT MASTER LEASING PLAN AREA

## I.   Summary

A Reasonably Foreseeable Development (RFD) Scenario for oil and gas is a long-term projection of oil and gas activity. The following RFD Scenario projects the level of oil and gas activity that can reasonably be expected to occur in the San Rafael Desert Master Leasing Plan Area (SRD MLPA) during the next 15 years. This RFD document is intended to project a baseline scenario of oil and gas exploration, development, production, and reclamation activity to aid the Bureau of Land Management (BLM) with land use planning by providing a mechanism to analyze the effects that discretionary management decisions may have on oil and gas development, local and regional economies and important resource values such as air quality, cultural resources and wildlife habitat.

The SRD MLPA encompasses a total of 428,724 acres in Emery County, Utah and 96,125 acres in Wayne County, Utah, a total of 524,849 acres, 450,807 acres of which are public lands administered by the BLM. The majority of lands within the SRD MLPA (86 percent) are public lands administered by the BLM. State lands encompass 12 percent of the SRD MLPA and private lands make up 2 percent within the SRD MLP. Public lands in Emery County are managed by the Price Field Office, and public lands in Wayne County are managed by the Richfield Field Office.

The following RFD projections are based largely on local geology, current and historical trends in oil and gas activity, and forecasts of crude oil and natural gas markets. The SRD MLPA currently has no production of oil and gas. The SRD MLPA is wholly or partially within two oil and gas "Plays" as defined by the U.S. Geological Survey (USGS, 1995). The Fractured Interbed Play (Play 2103) is associated with the commercial production of oil and gas within the Moab Field Office. In addition, the Buried Fault Block Play (Play 2101) is found within the Moab Field Office and is an oil & gas producing play which could extend into the SRD MLPA. The Salt Anticline Flank Play (Play 2105) does not have production in the Moab Master Leasing Plan Area. The presence of oil & gas producing plays in the Moab Field Office gives development potential to the SRD MLPA which is adjacent to areas in the Moab Field Office which currently have commercial production of oil and gas.

The U.S. Energy Information Administration (EIA) projects the price of oil to escalate gradually and continuously through the year 2040 (final year of projection) at which time a barrel of crude oil would be $141 in 2013 dollars. Natural gas prices are presently very low, both in terms of historical trend and relative to oil on a Btu (energy equivalency) basis. The EIA projects gas prices will escalate to a final projected price of $7.85 / mcf (corrected to 2013 dollars) in the year 2040. For the purpose of projecting oil and gas drilling activity in the SRD MLPA, it is assumed that the demand and price for crude oil will improve from current low demand and the natural gas market will generally improve during the next 15 years.

There have been a total of 79 wells drilled in the SRD MLPA, with five wells drilled since 1985. The last well drilled in the SRD MLPA was in 1989. All of the wells drilled within the SRD MLPA have been plugged and abandoned. The potential for drilling success in the SRD MLPA for the future would be enhanced by advances in horizontal drilling, completion, and geophysical technology that have been made in the last 20 years. The trend in drilling and drilling success rates within the Moab Field Office in the Fractured Interbed Play (Play 2103), combined with forecasted improving market conditions, favor the potential for discovery of economic quantities of oil & gas within the SRD MLPA.

AR005227

Future oil and gas drilling for the next 15 years is projected to average two wells per year for a total of 30 wells. This would result in a total surface disturbance of 585 acres from construction of new well pads and associated infrastructure, including roads and pipelines. The estimated total existing surface disturbance from previous oil and gas activity in the SRD MLPA is 0 acres due to the fact that the last well drilled in the area was plugged and abandoned over 25 years ago. Over the next 15 years a total of 585 acres will be disturbed by oil and gas drilling activity and of that total 492 acres will be reclaimed or under reclamation giving a net surface disturbance of 93 acres.

For geophysical exploration, 270 linear miles of source lines with an associated surface disturbance of 330 acres are projected over the next 15 years. Total geophysical related surface disturbance that will be reclaimed during the next 15 years will be 264 acres, leaving a net surface disturbance of 66 acres.

The baseline RFD scenario for the SRD MLPA is summarized as follows:

- The average area of surface disturbance for each new well projected to be drilled during the next 15 years (including well pads, roads, gathering pipelines, and projected main pipeline will be 19.5 acres.
- Future oil and gas drilling for the next 15 years is projected to average two wells per year for a total of 30 wells. Twelve of the wells are projected to be dry holes.
- Future surface disturbance for 30 projected new wells and associated infrastructure will be approximately 585 acres.
- A total of 492 acres of surface disturbance will be reclaimed during the next 15 years; including 12 dry holes, and interim reclamation of 18 future producing wells.
- The total net surface disturbance for all drilling activity in the SRD MLPA over the next 15 years will equal roughly 93 acres.
- Future surface disturbance over the next 15 years for geophysical exploration (270 linear miles of source lines) will be approximately 330 acres.
- Total geophysical related surface disturbance to be successfully reclaimed during the next 15 years will be 264 acres.
- The total net surface disturbance for geophysical activity in the SRD MLPA over the next 15 years will be roughly 66 acres.

These baseline projections represent average activity levels over the next 15 years and are not intended to be thresholds for limiting future activity. Oil and gas exploration and development activity tends to be sporadic over time due to market influences and other factors affecting the oil and gas industry. Because of this, it is recognized that during the next 15 years there may be years when oil and gas activity in the SRD MLPA would be much less than the projected average levels and other years when activity may be greater.

AR005228

## II.   Introduction

In 2002, the BLM Price Field Office released a Mineral Potential Report (PMPR) assessing oil and gas within its planning area. In 2005, the BLM, Richfield Field Office released a Mineral Potential Report (RMPR) assessing oil and gas within its planning area. The Reasonably Foreseeable Development (RFD) scenarios released in 2008 for the Price and Richfield RMPs projected oil and gas activity for the entire planning areas in each field office (totaling approximately 2,500,000 million acres of surface estate for the Price Field Office and 2,100,000 acres for the Richfield Field Office). In 2008, Resource Management Plans (RMP) and Final Environmental Impact Statements, which included detailed RFD scenarios for oil and gas for the Price and Richfield Field Offices, were approved.

The BLM is now preparing the San Rafael Desert Master Leasing Plan (SRD MLP) to consider oil and gas leasing on approximately 450,807 acres of public lands within the Price and Richfield Field Offices (Map 1) in accordance with BLM Washington Office Instruction Memorandum No. 2010-117. The following RFD Scenario projects the level of oil and gas activity that can reasonably be expected to occur in the SRD MLPA during the next 15 years. In preparing this RFD scenario for the SRD MLPA, the BLM relied on the 2002 and 2005 MPR and 2008 RFD documents for information about the area's geology and its mineral occurrence and development potential. The conclusion of oil and gas occurrence is unchanged since 2008 but the development potential is greater within the SRD MLPA area due to the success of horizontal drilling in the Cane Creek shale in the Paradox Formation in adjacent areas of the Moab Field Office. The following RFD projections take into account updated information about current and historical oil and gas activities specific to the SRD MLPA and in the adjacent Moab Field Office, including; leasing, geophysical exploration, exploration drilling, production, and reclamation. Projections of future oil and gas activity in the SRD MLPA also take into consideration current and forecasted trends in the crude oil and natural gas markets.

The SRD MLP may require amendments to the Price and Richfield RMPs if new leasing stipulations and development constraints are proposed. As part of the planning process, the BLM will prepare an Environmental Assessment (EA) to comply with the requirements of the National Environmental Policy Act (NEPA). This RFD is neither a planning decision nor the "No Action Alternative" in the NEPA document. The RFD is a technical report intended to project a baseline scenario of oil and gas exploration, development, production, and reclamation activity to aid the BLM with land use planning by providing a mechanism to analyze the effects that discretionary management decisions may have on oil and gas development, local and regional economies and important resource values, such as, air quality, cultural resources, and wildlife habitat.

Pursuant to Instruction Memorandum No. 2004-089, an RFD projection assumes that all potentially productive oil and gas areas are open for leasing under standard lease terms and conditions except those areas designated as closed to leasing by law, regulation or executive order. Since there are no lands within the SRD MLPA that are closed to leasing by such authority, the following RFD baseline projection assumes that all lands in the SRD MLPA are available for leasing with standard lease terms. The SRD MLPA includes Federal, private and State lands. Lands within the SRD MLPA total approximately 524,849 acres, of which, approximately 450,807 acres are public lands administered by the BLM. The SRD MLPA does not include lands where federally owned minerals underlie surface acreage that is not administered by the BLM (split estate). Table 1 shows the land ownership status and acreage breakdown of all lands within the SRD MLPA.

AR005229

Table 1. Status of lands in the SRD MLPA

| Land status | Price FO | Richfield FO | SRD MLPA Total |
|---|---|---|---|
| | acres | acres | acres |
| BLM | 365,307 | 85,500 | 450,807 |
| State | 51,216 | 10,625 | 61,841 |
| State Parks | 0 | 0 | 0 |
| Private | 12,201 | 0 | 12,201 |
| Split Estate* | 0 | 0 | 0 |
| Total | 428,724 | 96,125 | 524,849 |

Source: BLM Green River District 2016

- Split Estate Surface rights privately owned and the subsurface mineral rights federally owned.

## III. Description of Geology

The geology of the SRD MLPA is described in detail in the Mineral Potential Reports for the Price and Richfield RMPs (BLM, 2002; BLM, 2005). Hintze in the Geologic History of Utah (Hintze, 1988) produced geologic sections in the general area, Chart 67 and Chart 83, and are in included in Appendix-B. The eastern three quarters of the SRD MLPA is within the Paradox Basin Geological Area. As part of its 1995 National Assessment of United States Oil and Gas Resources, the U.S. Geological Survey (USGS, 1995) delineated oil and gas "Plays" in the Paradox Basin (BLM, 2012). The SRD MLPA is wholly or partially within two of the oil and gas plays defined by the USGS. In March 2012, the USGS published the results of a more recent assessment of the Total Petroleum Systems (TPS) of the Paradox Basin that was based on the Total Petroleum System (TPS) rather than the plays concept (USGS, 2012). However, to maintain consistency with the Price and Richfield RMPs in describing oil and gas resources in the Price and Richfield Field Offices, the 1995 data are used. Map 2 shows the aerial extent of each oil and gas play delineated within the SRD MLPA. In addition there is a third play (2101) delineated within the MMLPA that could extend into the SRD MLPA. These three plays are:

Play 2103  Fractured Interbed Play (Unconventional Continuous Type Play)
Play 2105  Salt Anticline Flank Play (Conventional Structural Type Play)
Play 2101  Buried Fault Blocks Older Paleozoic Rocks (Conventional Structural Play)

Play 2103 (Fractured Interbed play) underlies the eastern three quarters of the SRD MLPA (BLM, 2002 and BLM, 2005) in the Paradox Basin geological area. This play is an unconventional continuous-type play that depends on extensive fracturing in the organic-rich dolomitic shale and mudstone in the interbeds between evaporites of the Paradox Formation or carbonate and clastic rocks of the related cycles on the shelf of the Paradox evaporite basin. Jointing and fracturing of the interbeds in the Paradox Fold and Fault Belt are controlled by regional tectonics and more localized salt movement, dissolution and collapse (Chidsey, 2004). This play is thought to be self-sourced from the same organic-rich black dolomitic shales and mudstones of the Paradox Formation (BLM, 2012). The Cane Creek Shale discoveries within the Moab Master Leasing Plan Area (MMLPA) are found in this play. There are no oil and gas fields in this play within the SRD MLPA; however, there are oil and gas fields in the Moab Field Office part of the play, including the Big Flat, Long Canyon, Park Road, Hell Roaring, Cane Creek, Threemile, LaSal, and Golden Eagle fields and in addition the Greentown Prospect. In addition to the Cane Creek Shale, there are other organic shales in the play, notably the Chimney Rock, Gothic, and

AR005230

Hovenweep Shales, which may provide additional drilling targets for hydrocarbon accumulations (USGS, 2012).

Play 2105 (Salt Anticline Flank play) is a conventional-type structural play and is found underlying the eastern one-third of the SRD MLP area (BLM, 2002 and BLM, 2005) that is in the Price Field Office, but does not extend into the Wayne County portion of the SRD MLPA  (Map 2).  This play is characterized by oil and gas productive Permian and Pennsylvanian reservoirs along the flanks of northwest-trending salt anticlines in the axial part of the Paradox Basin.  Source rocks are thought to be organic-rich black dolomitic shales of the Hermosa Group, as well as coaly carbonaceous shale locally present at the Cutler-Hermosa contact (BLM, 2012).  Extensive fracturing along the anticlines can also provide conduits from source rocks to reservoirs.  There is no production from reservoirs in this play within the MMLPA.  The largest accumulations in this play include the South Pine Ridge and Big Indian South fields in Utah and the Andy's Mesa and Hamilton Creek fields in the Paradox Fold and Fault Belt province of western Colorado.

Play 2101 (Buried Fault Block Play) is a conventional-type structural play and was not shown in the Price 2002 Mineral Potential Report or in the Richfield 2005 Mineral Potential Report as being present in the SRD MLP area but is present in the entire MMLPA except a small area in the southwest part.  This play includes oil and gas trapped in porous dolomite or dolomitic limestone beds of the Upper Devonian McCracken Sandstone Member of the Elbert Formation and the Mississippian Leadville Limestone (USGS, 1995).  The seals for these traps are the Pennsylvanian Paradox Formation evaporates that overlie the carbonate reservoirs or are in fault communication with them.  Probable source rocks are the organic-rich black dolomitic shales of the Pennsylvanian Paradox Formation.    Within the MMLPA, accumulations of oil and gas in this play include the Salt Wash, Big Flat, and Hatch Point fields.  The largest accumulation of oil and gas in this play (Lisbon field) is located approximately 6 miles east of the MMLPA.  With over 50 million barrels of cumulative oil production, the Lisbon field is one of the largest producing fields in Utah.

## IV.    Past and Present Oil and Gas Exploration

Geophysical Exploration

Geophysical exploration has occurred in all portions of the SRD MLPA in the past.  Both 2-D and 3-D seismic projects have taken place within the SRD MLPA. The Utah Division of Oil, Gas and Mining has a database which contains information on seismic surveys conducted within the state of Utah.  Map 4 shows the locations of these surveys within the SRD MLPA; however, this is not an exhaustive list (UDOGM, 2016).

## V.    Past and Present Oil and Gas Development Activity

Oil and Gas Leasing Activity

Authorized and pending Federal oil and gas leases within the SRD MLPA cover a total of 82,454 acres. This is approximately 16 percent of the SRD MLPA.  In addition there have been 97,452 acres of land nominated for leasing, but deferred since 2011 because the SRD MLPA was going to be prepared. The Utah State Director has deferred all lands within proposed MLPs from leasing until the MLPs are completed.  Federal oil and gas leases and deferred lands are shown on Map 5.

AR005231

Historical Drilling Activity

There have been 79 wells drilled (Table 2) in the SRD MLPA, all of which have been plugged and abandoned (Map 5).

There have been a total of five wells drilled in the SRD MLPA during the past 31 years (UDOGM, 2016). Of the five wells drilled, three were drilled on Federal lands and two were drilled on State lands.

AR005232

Table 2. Wells Drilled in the SRDMLPA

| WELL_NAME | QTR_QTR | SECTION | TOWNSHIP | RANGE | COUNTY | LEASE_NUM | ABNDON DATE |
|---|---|---|---|---|---|---|---|
| AMAX-SINCLAIR GOVT 29-48 | NWNW | 29 | 220S | 150E | EMERY | UTU-036230 | 12/3/1961 |
| GREEN RIVER DESERT U 9-7 | SWNE | 09 | 220S | 190E | EMERY | UTU-08861 | 1/5/1964 |
| 45-98 | NESW | 05 | 240S | 150E | EMERY | UTU-02410 | 4/8/1951 |
| LOOKOUT POINT UNIT 1 | SESW | 29 | 250S | 160E | EMERY | UTU-08867 | 10/25/1957 |
| MOONSHINE WASH U 1 | NESW | 32 | 250S | 150E | EMERY | ML-5030 | 10/18/1956 |
| MOONSHINE WASH U 2 | SWNE | 22 | 250S | 150E | EMERY | UTU-08741 | 7/4/1958 |
| FOREST GOVT 1 | NENE | 11 | 230S | 140E | EMERY | UTU-010358A | 6/22/1963 |
| DUGOUT CREEK U 1 | NESE | 21 | 240S | 140E | EMERY | UTU-08196A | 1/8/1959 |
| NEQUOIA ARCH U 3 | SESE | 24 | 260S | 140E | EMERY | UTU-08689 | 7/2/1960 |
| NEQUOIA ARCH U 7 | SWSW | 30 | 260S | 140E | EMERY | UTU-05546 | 12/28/1961 |
| 1 MID TOP | SESW | 17 | 260S | 130E | EMERY | UTBL-08712A | 9/6/1962 |
| MATT 1 | SESE | 19 | 230S | 140E | EMERY | UTU-09466A | 7/15/1958 |
| JAKEY'S RIDGE 12-8 | SWNW | 03 | 230S | 160E | EMERY | UTU-08970 | 8/16/1961 |
| JAKEY'S RIDGE 34-15 | SWSE | 15 | 230S | 160E | EMERY | UTU-015637 | 10/7/1961 |
| FEDERAL 1 | NWNW | 07 | 260S | 140E | EMERY | UTU-011206 | 11/6/1959 |
| NEQUOIA ARCH UNIT 8 | NWSW | 25 | 260S | 130E | EMERY | UTU-05417 | 7/14/1962 |
| NEQUOIA ARCH UNIT 10 | SWNE | 35 | 260S | 140E | EMERY | UTU-03245 | 2/23/1963 |
| USA-C M BROWN 1 | NWNW | 34 | 250S | 120E | EMERY | UTSL-169347 | 1/9/1959 |
| CHAFFIN UNIT 1 | NENW | 21 | 230S | 150E | EMERY | UTU-14680A | 9/2/1959 |
| GRUVERS MESA 1 | SENW | 19 | 240S | 160E | EMERY | UTU-014152 | 11/27/1958 |
| GRUVERS MESA 2 | NENW | 10 | 250S | 160E | EMERY | UTU-032777 | 3/10/1959 |
| GREEN RIVER UNIT 1 | NENW | 33 | 210S | 160E | EMERY | UTU-03885 | 3/22/1965 |
| BOW KNOT UNIT 14-5 | SWSW | 05 | 260S | 170E | EMERY | UTU-014242 | 7/19/1962 |
| GRAND FAULT UNIT 14-24 | SWSW | 24 | 210S | 150E | EMERY | UTU-011978 | 5/19/1961 |
| N SPRING WASH 31-15 | NWNE | 15 | 250S | 150E | EMERY | UTU-08782A | 8/11/1963 |
| FEDERAL 1 | NESW | 26 | 220S | 150E | EMERY | UTU-014710 | 12/14/1957 |
| TEMPLE SPRINGS UNIT 1 | NWNW | 14 | 250S | 130E | EMERY | UTU-013076 | 1/28/1960 |
| TEMPLE SPRINGS UNIT 2 | SESW | 22 | 250S | 140E | EMERY | UTU-031216 | 2/22/1961 |
| 1 | SWNW | 21 | 220S | 160E | EMERY | FEE | 9/20/1943 |
| FEDERAL 1 | SWNE | 15 | 240S | 160E | EMERY | UTU-0140889 | 1/30/1967 |
| TEMPLE WASH STATE 1 | NWNW | 32 | 240S | 130E | EMERY | ML-7140 | 5/6/1967 |
| TEMPLE WASH GOVT 019-1 | SWSE | 01 | 250S | 120E | EMERY | UTU-0149219 | 4/25/1967 |
| TEMPLE WASH GOVT 998-A-1 | NWNW | 01 | 250S | 130E | EMERY | UTU-0149980 | 6/14/1967 |
| Calif. Utah Oil Company 1 | SESE | 05 | 220S | 150E | EMERY | UTSL-028804 | ? |
| FEDERAL 1 | SENW | 28 | 220S | 150E | EMERY | UTU-02181 | 1/23/1952 |
| MOORE 1 | SENW | 06 | 240S | 150E | EMERY | FEE | 10/10/1954 |
| RUSSELL 1 | SWSW | 34 | 250S | 120E | EMERY | UTSL-068506 | 6/7/1953 |
| Demoine Oil Company 1 | SESW | 19 | 230S | 130E | EMERY | UTSL-033058 | ? |
| 1 | NENE | 32 | 260S | 130E | EMERY | STATE | 10/5/1946 |
| 1 | NESW | 32 | 260S | 130E | EMERY | STATE | 4/8/1947 |
| Pennzoire Oil Comapany 1 | C | 29 | 260S | 140E | EMERY | FEE | ? |
| FEDERAL 1 | SENW | 21 | 250S | 140E | EMERY | UTU-7337A | 12/11/1969 |
| USA FED 1 | SWSW | 31 | 260S | 160E | EMERY | UTU-15304 | 8/25/1972 |
| FEDERAL ARMSTRONG 1 | NENE | 10 | 240S | 140E | EMERY | UTU-0147476 | 10/9/1972 |
| FEDERAL 11-24-13 (WSW) | SENE | 11 | 240S | 130E | EMERY | UTU-0141568 | 1/29/1974 |
| JESSIES TWIST FED 1-9 | SESE | 09 | 230S | 140E | EMERY | UTU-15383 | 8/22/1978 |
| PARADOX 1-12 | NENW | 12 | 250S | 130E | EMERY | UTU-22103 | 9/28/1979 |
| PARADOX 1-23 | SESW | 23 | 240S | 130E | EMERY | UTU-81428 | 9/24/1979 |
| GEYSER DOME 1-14 | NESW | 14 | 220S | 150E | EMERY | UTU-18648 | 6/22/1982 |
| SALERATUS FED ST 2-36 | NWNW | 36 | 210S | 140E | EMERY | ML-26293 | 12/24/1981 |
| HARVEY FED 1-21 | SENW | 21 | 260S | 160E | EMERY | UTU-17554 | 5/9/1983 |
| GRUVER FED 1-22 | NENW | 22 | 240S | 160E | EMERY | UTU-38520 | 7/24/1982 |
| POOL UNIT 1 | SWSW | 17 | 260S | 170E | EMERY | UTU-18645 | 1/2/1983 |
| LITTLE FLAT TOP UNIT 1-25 | NESE | 25 | 250S | 140E | EMERY | UTU-49948 | 11/8/1983 |
| WILDCAT BUTTE UNIT 1-2 | NESE | 02 | 260S | 130E | EMERY | ML-20403 | 11/8/1983 |
| N SPRING CREEK FED 1 | NWNE | 21 | 260S | 150E | EMERY | UTU-48339 | 1/25/1985 |
| USA 1-26HR | SWNW | 26 | 220S | 140E | EMERY | UTU-53597 | 12/5/1985 |
| FEDERAL 1-29MW | NENW | 29 | 240S | 150E | EMERY | UTU-53611 | 1/27/1990 |
| NEQUOIA STATE 16-1 | SESE | 16 | 260S | 140E | EMERY | ML-40577 | 6/17/1992 |
| CITIES 7 STRAT | NWNW | 18 | 230S | 140E | EMERY | | 3/17/1963 |
| CITIES 8 STRAT | LOT7 | 01 | 230S | 130E | EMERY | | 2/23/1963 |
| STATE 36-11 | NENE | 36 | 220S | 150E | EMERY | ML-50652 | 4/17/2008 |
| NEQUOIA ARCH U 5 | SWSW | 17 | 270S | 140E | WAYNE | U-07044-A | 11/18/1959 |
| MURPHY-GOVT 1 | SESE | 13 | 270S | 140E | WAYNE | U-08665 | 3/24/1962 |
| S HANKSVILLE ST 1 | SESW | 36 | 270S | 130E | WAYNE | U-08771 | 1/30/1959 |
| GOVT MANDEL 1 | NWSE | 31 | 270S | 140E | WAYNE | U-0107781A | 1/27/1965 |
| BLACKBURN DRAW U 1 | NENE | 09 | 270S | 120E | WAYNE | U-08648 | 2/11/1959 |
| NEQUOIA ARCH U 1 | NWNW | 03 | 270S | 140E | WAYNE | U-03448-A | 3/9/1956 |
| HANKSVILLE UNIT 31-30 | NWNE | 30 | 270S | 180E | WAYNE | U-09308 | 6/4/1962 |
| NEQUOIA ARCH UNIT 6 | SENE | 32 | 270S | 150E | WAYNE | | 12/24/1960 |
| FEDERAL 1 | C-NW | 05 | 270S | 140E | WAYNE | U-032263 | 7/3/1928 |
| FEDERAL 1 | SWSW | 04 | 270S | 120E | WAYNE | SL-043820 | 7/1/1913 |
| FEDERAL 1-25 | SESE | 25 | 270S | 140E | WAYNE | U-0107718 | 7/28/1973 |
| FEDERAL 1-3 | NESW | 03 | 270S | 150E | WAYNE | U-0111534 | 3/29/1973 |
| PARADOX 1-9 | SWNE | 09 | 270S | 120E | WAYNE | U-31423 | 9/26/1979 |
| SHELL 1 (CORE HOLE) | SENW | 27 | 270S | 150E | WAYNE | | 7/14/1964 |
| SHELL 4 (CORE HOLE) | SWSW | 20 | 270S | 150E | WAYNE | | 8/13/1964 |
| SHELL 2 (CORE HOLE) | SESW | 07 | 270S | 150E | WAYNE | | 7/23/1964 |
| SHELL 3 (CORE HOLE) | N-NE | 08 | 270S | 140E | WAYNE | | 8/3/1964 |

AR005233

## Historical Oil and Gas Production

Oil or natural gas have not been discovered within the SRD MLPA. All 79 wells drilled in the SRD MLPA were dry holes. The nearest producing oil and gas fields are located east of the SRD MLPA in the Moab Field Office. These fields are located from one to twenty-five miles from the eastern border of the SRD MLPA. To give some sense of what may be discovered in the SRD MPLA, the fields in the Moab Field office produce from reservoirs in both the Buried Fault Block Play (Play 2101) and the Fractured Interbed Play (Play 2103). The Fractured Interbed Play (Play 2103) extends into the SRD MLPA; however, the Buried Fault Block Play (Play 2101) may not extend into the SRD MLPA. Table 3 presents the cumulative production data for the oil and gas fields within the MMLPA which are due east of the SRD MLPA (Map 3), and includes seven active fields, four inactive fields, and one abandoned fields (BLM, 2012). Total cumulative production from these fields within the MMLPA has been roughly 9,530,761 barrels of oil and 17.4 billion cubic feet of natural gas. An additional area of interest within the Moab Field Office is the Greentown Field. It is located approximately two miles south of Green River Utah in the northwestern portion of the Paradox Basin. The discovery well was drilled in 2005 and has produced both natural gas and gas condensate. It has had cumulative production of 70,000 barrels of condensate as of April of 2016. Production from the field is from Pennsylvania clastic sections of the Paradox Formation at depths of around 9,500 feet. It is largely undeveloped at this time.

**Table 3.** Cumulative production of oil and gas fields in the MMLPA

| Field Name | USGS Play # | Field Type | Producing Formation | Status | Discovery year | Active Wells | Cumulative Production Oil (bbl) | Cumulative Production Natural Gas (Mcf) |
|---|---|---|---|---|---|---|---|---|
| Big Flat/ Bartlett Flat | 2101/03 | Oil/Gas | Leadville/ Paradox | Active | 1955 | 20 | 5,346,145 | 3,554,084 |
| Big Flat West | 2103 | NA | Paradox | Inactive | 1993 | 1 | 0 | 0 |
| Cane Creek | 2103 | Oil | Paradox | Active | 1925 | 2 | 64,418 | 34,082 |
| Hatch Point | 2101/03 | Oil | Leadville/ Paradox | Active | 1993 | 4 | 72,205 | 35,478 |
| Hell Roaring | 2103 | Oil | Paradox | Active | 1992 | 1 | 664,323 | 581,802 |
| Lion Mesa | 2103 | Oil | Paradox | Inactive | 1984 | 0 | 1,904 | 0 |
| Long Canyon | 2103 | Oil | Paradox | Active | 1962 | 1 | 1,153,330 | 1,199,576 |
| Park Road | 2103 | Oil | Paradox | Active | 1991 | 1 | 506,231 | 237,029 |
| Salt Wash | 2101 | Oil | Leadville | Active | 1961 | 3 | 1,653,689 | 11,750,597 |
| Shafer Canyon | 2103 | Oil | Paradox | Abandoned | 1963 | 0 | 67,554 | 63,805 |
| Ten Mile | 2103 | Oil | Paradox | Inactive | 1990 | 0 | 962 | 0 |
| Golden Eagle* | 2103 | Gas | Paradox | Inactive | 2006 | 2 | 0 | 0 |
| | | | | Total | | 35 | 9,530,761 | 17,456,453 |

Source: BLM, 2012 Table 5 & UDOGM, 2016
*Field undefined

## Well Spacing

Utah Administrative Code R649-3-2 establishes well siting and spacing standards for the orderly development of an oil and gas pool. In Utah, standard well spacing for a vertical or directional oil and gas well is 40 acres. For horizontal wells, temporary spacing of 640 acres provides for anticipated pool development. The Utah Board of Oil, Gas and Mining has the authority to issue special spacing orders establishing drilling units or authorizing different well density or location patterns for particular pools to promote efficient development and protect correlative rights. For example, as fields mature, exceptions can be made to increase well density to maximize oil and gas recovery. The BLM generally defers to State of Utah well spacing.

AR005234

Infrastructure

*Road Systems*

Interstate 70 (I-70) crosses the northern portion of the SRD MLPA with State Highway 24 forming the western boundary of the SRD MLPA. The primary roads providing access to oil and gas fields in the SRD MLPA are part of the Emery and Wayne County Class B road systems and are maintained by the counties on a regular basis. Numerous secondary roads connecting to the B road systems would provide access to potential individual wells and facilities. Class B road systems in the SRD MLPA are shown on Map 1.

*Pipeline Systems and Gas Plants*

There are no interstate gas pipeline systems in the SRD MLPA. The nearest interstate pipelines to the SRD MLPA are the Williams Pipeline which transports gas, and Enterprise Products Partners, L.P. Pipeline which transports natural gas liquids. The interstate pipelines are within a designated utility corridor that parallels portions of I-70 and Highway 191 (Map 3). The two pipelines are buried side-by-side except in the northeast part of the MMLPA where the 26-inch Williams Pipeline takes a more direct route northeast from the junction of Highway 191 and Highway 313 through Arches National Park.

There are no gas plants within the SRD MLPA. There is a small gas plant approximately 10 miles east of the SRD MLPA, located roughly 14 miles southeast of the town of Green River. A second, larger gas plant is located near Canyonlands Field (Moab airport) approximately 15 miles east of the SRD MLPA.

*Produced Water and Disposal Facilities*

There is currently no water injection/disposal well within the SRD MLPA, (UDOGM, 2016).

There are no commercial water disposal facilities within the SRD MLPA. The nearest commercial water disposal facilities to the east are located along the I-70 corridor. Approximately 50 miles east of the town of Green River along I-70, at an area known as Danish Flat, is an evaporation pond disposal facility operated by Oilfield Water Logistics. Further along I-70 at Harley Dome, approximately 65 miles east of the town of Green River near the Colorado border, is the Harley Dome #1-X SWD disposal well operated by New Water Financial, LLC.

Hydrogen Sulfide Gas ($H_2S$)

Hydrogen Sulfide ($H_2S$) is a poisonous gas that can occur in association with oil and gas operations. The Mississippian Leadville Limestone is known to contain naturally high concentrations of $H_2S$. Any production from this formation in the SRD MLPA would have the potential to encounter $H_2S$. One well in the Moab Field Office in the Hatch Point field (the Hatch Point No. 1) is reported to have had some $H_2S$ in the past (BLM, 2012). $H_2S$ can also develop in wells used for water injection, particularly when the injection zone also contains oil.

Conflicts with other Mineral Development

As discussed below in section VII, the SRD MLPA has potential for oil and gas development. In addition to potential for development of oil and gas resources in the SRD MLPA, there are also high occurrence potentials for potash, salt, clay, sand, gravel, silica, gypsum, uranium and associated vanadium (BLM, 2002; BLM, 2005). There is little potential for conflict between oil and gas and other mineral development, except for potash, if it were to be developed. Known potash zones in the Paradox

Formation generally tend to be stratigraphically above the known oil and gas zones in the same formation, however, because the entire formation is suitable for the occurrence of either resource, there is potential for conflict. In addition the development of both resources simultaneously (with similar surface effects) would concentrate the intensity of surface use in a given area. Through the use of directional drilling and careful placement of potential oil and gas wells and facilities, it would be possible to mutually develop oil and gas and other mineral resources such as sand and gravel.

## VI.   Oil and Gas Occurrence Potential

The oil and gas occurrence potential within the Price and Richfield Field Offices is described in detail in the Mineral Potential Reports (MPRs) for the Price and Richfield Field Office RMPs. As described in the MPRs, the oil and gas plays covering the SRD MLPA have a high potential for the occurrence of oil and gas (BLM, 2002; BLM, 2005).

## VII.   Oil and Gas Development Potential

As described in the Price and Richfield Field Office MPRs and summarized in section III above, two oil and gas plays, the Fractured Interbed Play (2103) and the Salt Anticline Play (2105), are shown to underlie the SRD MLPA in USGS, (1995). The Fractured Interbed Play is associated with the commercial production of oil and gas in the adjacent Moab Field Office and has development potential (BLM, 2002; BLM, 2005, BLM 2012) within the SRD MLPA. A third play, the Buried Fault Block Play (Play 2101), is an oil & gas producing play within the Moab Field Office which could extend into the SRD MLPA and could have development potential within the SRD MLPA. The oil and gas plays within the SRD MLPA are shown on Map 2.

The fields in the Moab Field Office, which are adjacent to the SRD MLPA, produce from reservoirs in both the Buried Fault Block Play (Play 2101) and the Fractured Interbed Play (Play 2103) (USGS, 1995). The Fractured Interbed Play (Play 2103) extends into the SRD MLPA; however, the Buried Fault Block Play (Play 2101) may extend into the SRD MLPA. All of the 15 oil and gas fields in the MMLPA produce from reservoirs in the Buried Fault Block and/or the Fractured Interbed Play (Play 2101 and Play 2103, respectively). The Buried Fault Block Play underlies all but a small area in the southwest part of the MMLPA and the Fractured Interbed Play underlies the entire MMLPA. Within the MMLPA, there has been no commercial production of oil and gas from reservoirs in the Cretaceous Dakota to Jurassic Play (Play 2004) or the Salt Anticline Flank Play (Play 2105). All commercial production of oil and gas from these two plays is from nearby fields in the Fold and Fault Belt of the Paradox Basin. Play 2004 underlies a small area in the northern part of the MMLPA and Play 2105 is present in all but a small area in the southwest part of the MMLPA (BLM, 2012).

It is anticipated that most of the potential development in the SRD MLPA during the next 15 years will likely occur in the Fractured Interbed Play (2103) and potentially the Buried Fault Block Play (2101) if they are found to extend into the SRD MLPA given the existing adjacent fields in the Moab Field Office within these plays. The increased drilling success rates due to continued technological advances being made in the areas of horizontal drilling, fracture identification tools, hydraulic fracture stimulation, underbalanced drilling, and completions in fractured shales, all of which will help in the discovery of new fields in reservoirs that are moderate in size with more than minimal oil columns should also increase the potential for development within the SRD MLPA. In addition to the Cane Creek Shale, there are other organic shales, notably the Chimney Rock, Gothic, and Hovenweep Shales, that may also provide new drilling targets for hydrocarbon accumulations. Some development may occur in the Salt Anticline Flank play (Play 2105) as seismic technology continues to improve, allowing better definition of the location

AR005236

and nature of the structural traps in the play and promoting increased drilling and recompletion opportunities along the flanks of the salt anticlines (BLM, 2012).

## VIII.   RFD Baseline Scenario Assumptions

Assumptions for Deep Wells

Since deep wells have not been drilled in the SRD MLPA, the assumptions that were used for the MMLP RFD (BLM, 2012) for deep wells will be used for potential development within the SRD MLPA.  A few deep wells (10,000 feet or deeper) have been drilled in the MMLPA.  Three deep wells were drilled in the eastern Paradox area between 2006 and 2010 (UDOGM, 2012).  It is likely that some deep wells will be drilled in the next 15 years within the MMLPA.  The likelihood of a deep well being drilled is highest in the eastern Paradox area, but it is also feasible in other areas of the MMLPA.  The drilling of a deep well requires a larger drill rig and a larger drill pad, typically 400 feet by 450 feet (4.1 acres).  The typical vertical well in the MMLPA is 7,000 to 9,000 feet deep and normally requires a drill pad of approximately 250 feet by 350 feet (2 acres).  Although the size of a well pad for a deep well would be larger than a well pad for a typical vertical well, the expected number of deep wells is relatively few in comparison to the total number of wells likely to be drilled during the next 15 years. Therefore, for purposes of RFD projections, the relatively few expected deep wells would not substantially affect the long-term average drill pad size for the MMLPA.  Depending on the depth, total drilling time for a deep well can be significantly longer than a typical vertical well with the time being 6 to 12 weeks for deep wells and 2 to 4 weeks for typical vertical well (BLM, 2012).

Assumptions for Horizontal Wells

Since horizontal wells have not been drilled in the SRD MLPA, assumptions that the MMLPA RFD used for horizontal wells would be reasonable for potential development within the SRD MLPA. Horizontal drilling technology has been used in the MMPLA to target unconventional reservoirs in the Fractured Interbed Play which is one of the most likely plays for development within the SRD MLPA.  This technology has been used successfully in the Big Flat, Hatch Point and Salt Wash areas to produce oil from the Cane Creek Shale of the Paradox Formation.  The Cane Creek Shale is an ideal target for horizontal drilling because it is a fractured self-sourced oil reservoir that is highly over pressured.  Horizontal drilling increases the probability of encountering the near-vertical fractures needed for economic oil production.  The use of horizontal drilling in the Cane Creek has greatly improved the success rate of new economical discoveries (Chidsey, 2004).  Most of the Cane Creek discoveries since 1990 have been made using horizontal drilling technology.  The success of horizontal drilling in the Big Flat (approximately 12 miles east of the SRD MLPA) and Hatch Point (approximately 25 miles SE of the SRD MLPA) areas suggests that horizontal drilling will continue in these areas and may lead to new discoveries in the MMLPA, particularly as technology advances are being made in the areas of horizontal drilling, fracture identification tools, hydraulic fracture stimulation, underbalanced and managed-balance drilling and completions in fractured shales (BLM, 2012).

Based on past drilling in the MMLPA, a typical horizontal well requires a 4.4 acre drill pad (roughly 440 feet by 440 feet) in comparison to a 2-acre drill pad for a typical vertical well.  The larger pad size for a horizontal well is to accommodate a larger drill rig and sufficient area for additional equipment such as, specialized mud systems, directional tools, drill pipe and casing, and portable storage tanks (BLM, 2012).

It is estimated that the majority (60-80 percent) of new drilling in the MMLPA during the next 15 years will be accomplished using horizontal drilling technology to test the Cane Creek Shale or similar fractured shale interbeds of the Paradox Formation.  Depending on the length of lateral sections, drilling

time for a horizontal well in the MMLPA is typically 6-8 weeks (BLM, 2012). The SRD MLP could follow a similar development scenario if oil and gas is discovered within the SRD MLP.

The BLM expects that directional and horizontal drilling technology will be used in the MMLPA during the next 15 years to: (1) drill multiple wells from the same well pad, or (2) drill multiple laterals from a single vertical wellbore (BLM, 2012). A similar development scenario could also develop within the SRD MLP if oil and gas are discovered.

Projected Level of Oil and Gas Activity

In addition to local geology, reasonable projections of future oil and gas activity in the SRD MLPA can be made based on consideration of current and forecasted market conditions, historical drilling activity, and professional judgment.

*Current and Forecasted Trends in Crude Oil and Natural Gas Markets*

Crude oil is traded widely on the world market, largely because crude oil and the fuel products derived from it are highly transportable at low pressure. This means that although there are regional price influences, the global marketplace establishes the price of locally produced oil. Demand for liquid fuels, including crude oil derived fuels and biofuels, is primarily driven by transportation. Domestic crude oil production has increased in recent years but due to a slowdown in the world economy there has been a drop in demand which has resulted in a major decrease in price for both crude oil and natural gas. Production of both crude oil and natural gas is expected to decline in 2016 and the decreased production would be expected to continue until the world economy turns around which would result in an increase in demand for crude oil and natural gas. By 2020, domestic crude oil production is expected to level out with a slight decrease through 2040. Likewise, biofuels production, which is largely domestically produced, is expected to continue to increase when the economy improves. These conditions will decrease the volume of imported crude oil; however, oil imports will continue to be an important source of crude oil through 2040. The U.S. Energy Information Administration (EIA), in an overview of its Annual Energy Outlook for 2015, projects the price of oil to escalate gradually and continuously through the year 2040 (final year of the projection), at which time a barrel of crude oil would be $141 in 2013 dollars (EIA, 2015).

The trade of natural gas is more closely tied to pipeline infrastructure than crude oil. Because of this, gas is traded on a regional and continental basis, rather than globally, like oil. This results in sometimes dramatic regional price variation. Exploration and development of domestic natural gas has been so successful in recent years, particularly through advances in shale gas production, that supply has outreached demand, resulting in a sharp decline in natural gas prices even while crude oil prices have surged. The use of natural gas as a transportation fuel has not been widely developed, so the end uses that drive its demand are substantially different than with crude oil. Although the two are produced commonly, the difference in their respective end uses, in part, accounts for the wide gap that has developed in recent years between the values of oil and natural gas, on a Btu basis. Natural gas prices are presently very low, both in terms of historical trend, and relative to oil on a Btu (energy equivalency) basis. The EIA projects natural gas prices to escalate to a final projected price of $7.85 in the year 2040 (corrected to 2013 dollars) (EIA, 2015).

For the purpose of projecting potential oil and gas exploration activity in the SRD MLPA, it is assumed that the demand and price for crude oil and natural gas will strengthen in the future and will generally improve during the 15-year planning term.

AR005238

*Historical Drilling Trends for Development Areas*

Historical drilling activity can be used as an indicator for estimating future drilling activity. The information below includes private, State, and Federal lands within the SRD MLPA.

There have been a total of 79 wells drilled in the SRD MLPA. All of the 79 wells drilled were dry holes and were plugged and abandoned (P&A) (Table 2). No new wells have been drilled in the SRD MLPA since 1990. To get a perspective of the potential for oil and gas development within the SRD MLPA, a survey of what has occurred in the Moab Field Office in adjacent oil and gas fields would be instructive. Well drilling in the Moab Field Office has had a good success rate in the eight year period from 2006 – June 2014 (Jones, E. C., 2016). During that period, the drilling success rate increased to 52 percent due largely to the successful use of improved horizontal drilling technology in targeting unconventional reservoirs in the Cane Creek Shale. All but 4 of the 27 wells drilled in the MMLPA since 2007 were drilled within the Salt Wash-Big Flat and Hatch Point areas (See Map 3). The Salt Wash field is 2 miles east of the SRD MLPA and the Hatch Point area is approximately 25 miles southeast of the SRD MLPA. This gives a six-year combined average for these two areas of nearly four wells per year (BLM, 2012). Using improved horizontal drilling technology in targeting unconventional reservoirs, the SRD MLPA would have the potential to have successful wells completed similar to the results found within the Moab Field Office for drilling unconventional reservoirs such as in Play 2103 where the Paradox is the producing formation.

Although previous activity can be an indicator of future activity, the reliability of these forecasts is limited by unforeseen factors, such as changes in economic conditions and technology and the SRD MLPA would have to prove to have the same viability as the plays in the Moab Field Office. For the SRD MLPA, a discovery well would have to be drilled and other wells would need to be drilled to prove the viability of a new field within the SRD MLPA.

*Projected Drilling Activity for SRD MLPA*

In order to project future drilling activity, the following assumptions were made:

- The demand and price for crude oil will regain strength (the MMLP RFD was completed in 2012 with the average price of oil at $94.05 per barrel (USEIA, 2012) and the current price in October 2016 stands at $49.76 per barrel (USEIA, 2016))
- Economic quantities of oil and gas will be discovered within the SRD MLPA
- The drilling activity in the SRD MLPA could be similar to the Moab Field Office should unconventional continuous type discoveries be made in the Paradox Formation in the SRD MLPA.

The SRD MLPA has not had a successful discovery of oil & gas but the MMLPA has had oil and gas discovery and production immediately east of the SRD MLPA and therefore, leads to the possibility that oil and gas may also be found in the SRD MLPA. The majority of all drilling in the MMLPA during the past 30 years has occurred in the Salt Wash-Big Flat and Hatch Point areas. Nearly 76 percent of the total wells drilled in the MMLPA during the last 30 years were in these two areas. These two areas contain all of the producing oil and gas fields in the MMLPA. Drilling activity since 2007 has averaged four wells per year in the Salt Wash-Big Flat areas. It is projected that the average number of wells drilled per year in the Salt Wash-Big Flat area will be four wells per year. This projection is based largely on past drilling and on recent trends in drilling activity in the area, including an increase in drilling and drilling success rate as a result of improved horizontal drilling technology (BLM, 2012).

AR005239

Using the Moab Field Office Salt Wash–Big Flat development area as a template for the SRD MLPA, it could be projected that an upper average of four wells could be drilled per year in the SRD MLPA. A discovery well would first have to be drilled within the SRD MLPA and it is common for oil and gas companies to spend several years delineating and proving a new discovery. One to two wells drilled per year in the discovery phase of development would be reasonable with a ramping up to two to four wells per year in the latter years of development within the SRD MLPA. A total of up to 30 exploration and development wells within the next 15 years or an average of two wells per year would be reasonable.

Future drilling is affected by economic situations that cannot be accurately forecasted; therefore, an average was utilized to reflect the potential numbers of future wells. It is recognized that future drilling activity and future wells will not be evenly distributed throughout the development areas. When new wells are drilled, and especially if new fields are discovered, there could be additional drilling activity concentrated around the new wells.

The average annual drilling projections are not thresholds for limiting future annual drilling activity. It is recognized that there would be some years when annual drilling activity would be much less than the projected average and other years when annual drilling activity could exceed the average number of wells projected.

The average of two wells projected per year would be dependent upon a productive area being discovered and successfully developed. Horizontal drilling technology has been used successfully in the MMLPA to target unconventional reservoirs in the Cane Creek Shale of the Paradox Formation. The use of horizontal drilling in the Cane Creek has greatly improved the success rate of new economical discoveries (BLM, 2012). The upward trend in drilling activity between 2007 and 2015, and the increased drilling success rates in the Moab Field Office, combined with forecasted market conditions, favor interest in developing the SRD MLPA and future exploration and development drilling.

## IX.   Surface Disturbance Due to Oil and Gas Activity on All Lands

A wide range of variables will affect the surface disturbance from oil and gas drilling and production operations in the SRD MLPA. Factors affecting the estimates for future surface disturbances include the size of the well pad, the topography, the length of access road and pipelines, and the reclamation time frames.

The Price RMP Reasonably Foreseeable Development Scenario projected that drill pad sizes could range from 1.0 acres to more than 3.5 acres per well pad. The Richfield RMP Reasonably Foreseeable Development Scenario projected that the drill pad size would be 4 acres. The primary factor affecting the size of a well pad is the size of the drill rig needed to reach the total depth of the well. A more recent look at potential well pad size would be the MMLPA pad sizes. The typical size of existing well pads in the MMLPA is 2 acres for a vertical well (excluding deep wells) and 4.4 acres for a horizontal well. The use of horizontal drilling in the Cane Creek has greatly improved the success rate of new economical discoveries. For this reason, it was assumed that 60 to 80 percent of new wells in the MMLPA would be drilled using horizontal technology which would likely increase the drilling success rate to 50 to 70 percent (BLM, 2012). It is reasonable to project that potential well pads within the SRD MLPA would be similar in size to the Moab Field Office well pads since horizontal drilling in the Fractured Interbed Play (Play 2103) for both field offices in similar topography would need similar size pads. This would lead to the SRD MLPA having horizontal well pads of approximately 4.4 acres in size. Taking into account the smaller pad size of vertical wells, the average pad size for wells in the SRD MLPA would be approximately four acres.

AR005240

Based on a review of the Emery and Wayne County road systems, there are 203 miles of roads within the SRD MLPA that would provide access to potential oil and gas wells and associated well facilities. The Price RMP Reasonably Foreseeable Development Scenario projected the average length of each well access road would be ¾ of a mile with an average disturbance width of 70 feet (6.4 acres) of initial disturbance. After reclamation, the average road disturbance would be 20 feet total width for 3/4 mile per well pad (1.8 acres). The county Class B roads, State Highways and paved roads were not included in the mileage estimate. Potential oil and gas activities in the SRD MLPA would not be the primary use of these roads. These roads are considered a permanent part of the Emery and Wayne County road infrastructure and will not be reclaimed upon cessation of oil and gas activity.

Other factors to consider for estimating future surface disturbance is the time required for reclamation. It is assumed that all surface disturbances associated with well drilling and production operations would be successfully reclaimed within a scope of 10 years, depending on soils, vegetation, and rainfall (BLM, 2012).

Geophysical operations are temporary in nature and do not require the use of mechanized earth moving equipment to construct new roads or to prepare drill sites. Although geophysical operations may crush vegetation and cause soil compaction, they do not result in the complete clearing or removal of vegetation. Therefore, surface disturbance caused by geophysical operations typically requires less time to reclaim (1-5 years) than does the surface disturbance resulting from well drilling operations, including the construction of roads, drill pads and buried pipelines. The average length of time needed to successfully reclaim surface disturbances caused by geophysical operations is assumed to be three years. There are no existing surface disturbances attributed to geophysical operations in the SRD MLPA since there have been no geophysical operations conducted in the SRD MLPA during the past seven years.

In addition to final reclamation, interim reclamation is done on portions of well sites and pipelines which are not needed for production and maintenance operations, and on areas of access roads that are not needed for vehicle travel. This minimizes the footprint of construction disturbances, including well pads, pipelines and roads. The amount of interim reclamation can vary widely for each disturbance depending on factors such as topography and area needed for future workover rigs and other equipment use and access. It is estimated that the footprint of each new construction disturbance in the SRD MLPA would be reduced by 25 to 50 percent through interim reclamation (Price RMP Reasonably Foreseeable Development Scenario, 2008).

The 79 wells drilled in the SRD MLPA have been plugged and abandoned. Sufficient time (more than 25 years) has passed since the last wells were plugged so it is reasonable to assume that reclamation is successful.

## Estimated Existing Surface Disturbance

There is no existing surface disturbance for P&A oil and gas wells and access roads within the SRD MLPA. The most recent well drilled in the SRD MLPA was plugged and abandoned in 1990, over 25 years ago. There are no existing surface disturbances attributed to geophysical operations in the SRD MLPA since there have been no geophysical operations conducted in the SRD MLPA during the past seven years.

## Total Estimated Future Surface Disturbance for Well Pads, Roads, and Pipelines

It is assumed that that there would be an average surface disturbance of four acres per well pad, 6.4 acres for the ¾ mile, 70 foot wide access road and gathering pipeline ROW per well during the next 15 years. An additional amount of disturbance would be the acres needed to construct a projected main pipeline to take the field produced gas to an interstate pipeline.

AR005241

The total length of a main pipeline to transport natural gas or natural gas liquids from the SRD MLPA to the Williams Northwest Gas Pipeline or Enterprise Products Partners, L.P. interstate pipelines would be approximately 30 miles. The average pipeline disturbance construction width would be 75 feet and the long term ROW width would be 50 feet. This gives a total pipeline disturbance of 273 acres. The total pipeline disturbance would be expected to be fully reclaimed within 10 years.

Total surface disturbance per well, including well pad (four acres) and access roads and gathering pipelines (6.4 acres) for 30 wells would be 10.4 acres per well or a total of 312 acres of surface disturbance resulting from oil and gas drilling and production activity during the next 15 years (Table 4). This estimate is for the average surface disturbance during future drilling, but it is not a threshold for limiting future exploratory drilling programs.

The success rates for wells drilled in the SRD MLPA could be similar to the Moab Field Office success rates just east of the SRD MLPA. The MMLPA had drilling success for horizontal wells in the MMLPA. The MMLP assumed that 60 percent of the 128 wells drilled (77 wells) would be productive and 40 percent (51 wells) would be dry holes which would be abandoned and successfully reclaimed within a 10-year period within the MMLPA (BLM, 2012). Using the MMLPA area numbers of 60 percent being productive wells and 40 percent would be dry holes of the 30 projected wells to be drilled in the SRD MLPA area there would be 18 productive wells which would result in 187 total acres of surface disturbance for productive wells. The 12 projected dry holes would have 125 acres of disturbance. The total surface disturbance for all 30 wells would be 312 acres. It is estimated that the surface disturbance (footprint) associated with each new productive well in the SRD MLPA would be reduced by 50 percent through interim reclamation during the next 15 years. Interim reclamation of surface disturbances associated with the 18 productive wells would total 94 acres.

Table 4. Surface Disturbance from drilling and reclamation activities in the SRD MLPA

|  | Wells | Total surface disturbance acres |
|---|---|---|
| Existing surface disturbance<br>*Plugged and Abandoned wells (PA)* | 79 | 0 |
| Future surface disturbance for the next 15 years<br>*Projected Main Pipeline*<br>*Well Pads, Roads, gathering pipelines* | -<br>30 | 273<br>312 |
| TOTAL |  | 585 |
| Predicted reclamation in the next 15 years<br>*Interim Reclamation of future producing wells\**<br>*Reclamation of future dry wells\*\**<br>*Main Pipeline\*\** | 18<br>12<br>- | 94<br>125<br>273 |
| TOTAL |  | 492\*\*\* |

*Interim reclamation of 50% of construction
**Final reclamation is estimated to take up to 10 years
***492 reclaimed acres would be composed of both lands that have reached final reclamation status and lands still under reclamation.

In summary, the estimated total surface disturbance for future wells, roads, and pipelines in the SRD MLPA is 585 acres for the 30 wells projected over the next 15 years. At the end of the fifteen years there would be 93 acres in use for producing wells and the remaining 492 acres would be either reclaimed or in interim reclamation status. It is assumed that none of the productive wells would be abandoned in the first 15 years of production.

Total Estimated Future Surface Disturbance for Geophysical Exploration

Geophysical exploration operations have been conducted throughout the entire SRD MLPA in the past (Map 4). Although geophysical data may have been collected from an area in the past, previous

AR005242

geophysical activity does not preclude the gathering of additional data. Old data can be reprocessed, but there are limits to the quality of data that can be interpreted from the older data. Based on past geophysical activities, it is reasonable to assume that new geophysical exploration could occur anywhere within the SRD MLPA during the next 15 years.

In the past, geophysical operations in the SRD MLPA utilized either two-dimensional (2-D) or, more recently, three-dimensional (3-D) data acquisition technology (BLM, 2007). The activities require spreading cables and geophones for receiver lines and utilizing vibroseis trucks or shotholes along source lines to supply the source of energy for creating seismic reflections (seismic acoustic waves). Vibroseis buggies or buggies transporting drills typically travel cross-country. Buggies transporting drills usually follow a single route and make a single pass or round trip along the source lines. Vibroseis buggies have normally been run in single file with each buggy following the previous buggy. However, vibroseis buggies can be spread three to four abreast and run parallel to each other when recording source lines. The buggy routes can be zig-zagged (weaved) to avoid long, straight visual impacts. When vehicles travel cross-country, there is no dozing of vehicle access routes. The surface impacts from the buggies are the vehicle tracks along the buggy routes and a drill hole if it is a shothole project. Helicopters are utilized to distribute receiver cables on most big projects and for moving portable drilling equipment in terrain that is too steep for buggies. Some companies and/or geophysicists prefer vibroseis technology for gathering data, because the frequency of the source can be varied and data can be collected at several different frequencies while the vibroseis buggy is on the line. The depths and types of formations may also affect the preference of one type of source equipment over another.

Past geophysical projects are good indicators of project parameters for future geophysical surveys in the SRD MLPA. The distances between the receiver lines and the distances between the source lines would vary depending upon the depth of the target formations. For shallow depths the receiver/source lines for a 3-D project would be approximately 660 feet apart, and there would be 11 linear miles of source lines for every one square mile of project area. Based on the previous 3-D project and depths of the potential oil and gas containing formations (7,000 – 9,000 feet deep) throughout the majority of the SRD MLPA, most of the 3-D projects in the SRD MLPA would likely have source lines spaced at roughly 660 feet intervals with an average of 11 linear miles of source lines per square mile of project area.

The San Rafael Saddle 3-D geophysical project (See Map 4) was conducted within the SRD MLPA December 2007 – February 2008. The project area encompassed approximately 61 square miles (Map 4). The project utilized viroseis buggies (BLM, 2007) to generate sound waves through the ground into subsurface formations. Survey parameters for the project included 136 source lines spaced 660 feet apart totaling 685 linear miles. This equates to 11 linear miles of source lines for each square mile of project area. A 30 to 60 square mile area could be typical for future 3-D projects in the SRD MLPA during the next 15 years. An average 40 square mile 3-D project would require at least 440 linear miles of source lines where a vibroseis buggy or drill buggy would be driven. Depending on the network of existing roads and trails in the project area, it may be feasible to move some of the source points to the roads and avoid some cross-country travel with the buggy vehicles. The use of heli-portable drills in steeper terrain would also reduce the amount of source line traveled by vibroseis buggies or drill equipment.

During the past 30 years, geophysical exploration in the SRD MLPA has included one project, the San Rafael Saddle 3-D Geophysical Project, as described above. A more likely scenario for the SRD MLPA, if a discovery of oil and gas is made, would likely be similar to what has occurred in Moab Field Office. The MMLPA has averaged at least 27 linear miles of source lines per year. However, during the past 15 years, considered in the MMLPA, the average increased to 36 linear miles of source lines per year due largely to an increase in the size of 3-D projects and an increase in the overall percentage of 3-D projects compared to 2-D projects. The recent decrease in the price of oil and gas has resulted in a major decrease

AR005243

in oil and gas activity. This may continue for some time. A renewal of interest in geophysical exploration could take place in the SRD MLPA with the recovery of oil and gas prices.

In addition to 3-D projects, it could be anticipated that some 2-D projects could occur in the SRD MLPA during the next 15 years. Based on the MMLPA past projects, future 2-D geophysical surveys could vary from one-to-two lines that are one-to-two miles in length, or multiple lines several miles long within the SRD MLPA.

Projections for future geophysical exploration projects in the SRD MLPA are based on the following assumptions:

1. Geophysical exploration would be cyclic and would increase at times to correspond with increases in other oil and gas activity and taking into account that the 15 year term starts with no geophysical projects likely to take place for some time due to poor economic conditions;
2. Geophysical exploration in the SRD MLPA could be projected by what has occurred during past years within the MMLPA and would form a reasonable basis for projecting future geophysical activity in the SRD MLPA if an initial oil and gas discovery is made within the SRD MLPA;
3. Data acquisition would involve the use of 2-D, 3-D, or similar technology;
4. Measuring the exploration in linear miles of source lines would be more meaningful than the number of geophysical projects;
5. An estimate of four linear miles of source lines for every square mile of geophysical would be a conservative representation for the majority of projects in the SRD MLPA and would take into account the average of a mixture of 2-D and 3-D projects;
6. Surface disturbance would be successfully reclaimed within three years.

Using these assumptions, the 15-year projection for geophysical exploration on Federal, State, and private lands within the SRD MLPA would average 18 linear miles of source lines per year, or a total of 270 linear miles of source lines. This projection takes into account the average linear miles of source lines for the past 15 years (36 linear miles per year) which has taken place within the MMLPA and taking 50% of that value due to the uncertain nature of finding a new discovery of oil & gas and also the current depressed state of oil & gas exploration and development.

It is assumed that reclamation of surface disturbance would be successful within a scope of 3 years depending on reclamation times related to soils, vegetation, and rainfall. The 3 year reclamation time span is very conservative as the San Rafael Saddle 3-D Project was reclaimed in a 1 year time frame (BLM, 2008b). Therefore, surface disturbance resulting from geophysical activity during the first 12 years would be successfully reclaimed over the next 15 years. Assuming an average disturbance width of 10 feet for each of the 18 linear miles of projected source lines, the total surface disturbance would be 22 acres per year or 330 acres over the next 15 years. Using an average surface disturbance of 22 acres per year, total surface disturbance that would be reclaimed during the next 15 years would be 264 acres. Subtracting the acres projected to be reclaimed (264 acres) from the acres projected to be disturbed (330 acres), gives a net surface disturbance of 66 acres during the 15-year period.

AR005244

## X.    References

Bureau of Land Management, 2002, Mineral Potential Report for the Price Planning Area, Price Field Office, August 2002, 91 p.

Bureau of Land Management, WO IM 2004-89 Policy for Reasonably Foreseeable Development Scenario for Oil and Gas, January 2004.

Bureau of Land Management, 2005, Mineral Potential Report for the Richfield Planning Area, Richfield Field Office, March 2005, 72 p.

Bureau of Land Management, 2007, Environmental Assessment to Analyze Dawson Geophysical Company's Proposed San Rafael Saddle 3-D Geophysical Exploration Project, Emery County, Utah, August, August, 2007, 103 p.

Bureau of Land Management, 2008, Reasonably Foreseeable Development Scenario for Oil and Gas, Price Field Office, August, 2008, 9 p.

Bureau of Land Management, 2008a, Reasonably Foreseeable Development Scenario for Oil and Gas, Richfield Field Office, August, 2008, 11 p.

Bureau of Land Management, 2008b, San Rafael Saddle 3-D Geophysical Follow Up Monitoring Report, 2008, 50p.

Bureau of Land Management, WO IM 2010-117 Oil and Gas Leasing Reform-Land Use Planning and Lease Parcel Reviews, May 2010.

Bureau of Land Management, 2012, Reasonably Foreseeable Development Scenario for Oil and Gas in the Moab Master Leasing Plan Area, Canyon Country District, August 2012. http://www.blm.gov/style/medialib/blm/ut/moab_fo/mlp0.Par.54256.File.dat/MLP_OG_RFD_fi nal_091012_508_web.pdf

Chidsey, Thomas C., editor, 2009, The Mississippian Leadville Limestone Exploration Play, Utah and Colorado-Exploration Techniques and Studies for Independents, Final Report, prepared for U.S. Department of Energy. http://geology.utah.gov/docs/pdf/lls_finalrpt.pdf

Chidsey, Thomas C., Morgan, Craig D. and Bon, Roger L., 2004, Major Oil Plays in Utah and Vicinity-Quarterly Technical Progress Report, Contract No. DE-FC26-02NT15133: Utah Geological Survey, July 2004.

Hintze, Lehi F., 1988, Geologic History of Utah, Brigham Young University Geologic Studies Special Publication 7, 1988, 203p.

Jones, E.C., 2016, Petroleum Engineer, BLM, Oil and Gas Assumptions and Forecast for the RFD, Telephone communication, February 24, 2016.

Utah Division of Oil, Gas and Mining (DOGM), 2012, Oil and Gas Program, http://www.ogm.utah. gov/oilgas.

AR005245

Utah Division of Oil, Gas, and Mining (UDOGM), 2016, Interactive Online Map,
http://mapserv.utah.gov/oilgasmining/

Utah Division of Oil, Gas, and Mining (UDOGM), 2016, Statistics,
http://oilgas.ogm.utah.gov/Statistics/Statistics.cfm

U.S. Energy Information Administration, 2012, 2012 Brief: Average 2012 crude oil prices remain near
      2011 levels.

U.S. Energy Information Administration, 2015, Annual Energy Outlook, 2015.

U.S. Energy Information Administration, 2016, Short-Term Energy and Summer Fuels Outlook, 2016.


U.S. Geological Survey, 2012, Assessment of Undiscovered Oil and Gas Resources in the Paradox Basin
      Province, Utah, Colorado, New Mexico, and Arizona, 2011, Fact Sheet 2012-3031, March 2012,
      4 p.

U.S. Geological Survey, 1995 Assessment, Paradox Basin Province (021) Geologic Report, by Huffman,
      A.C., 9p.

AR005246

# APPENDIX – A

## Maps 1 – 5

AR005247

## Map 1 - San Rafael Desert Master Leasing Plan Area



AR005248

RFD Scenario for Oil and Gas in the SRDMLP, Price & Richfield Field Offices, BLM

## Map 2 - Oil and Gas Plays



AR005249

RFD Scenario for Oil and Gas in the SRDMLP, Price & Richfield Field Offices, BLM

## Map 3 - Oil and Gas Fields with Major Pipelines



RFD Scenario for Oil and Gas in the SRDMLP, Price & Richfield Field Offices, BLM

## Map 4 - Geophysical Surveys



AR005251

RFD Scenario for Oil and Gas in the SRDMLP, Price & Richfield Field Offices, BLM

## Map 5 - Oil and Gas Wells with Federal Oil and Gas Leases



AR005252

RFD Scenario for Oil and Gas in the SRDMLP, Price & Richfield Field Offices, BLM

# APPENDIX – B

## Charts

RFD Scenario for Oil and Gas in the SRDMLP, Price & Richfield Field Offices, BLM

## Chart 67 — GREEN RIVER AREA

FEET

| Age | Group/Formation | | Unit | Feet | Notes |
|---|---|---|---|---|---|
| Q | | | Alluvium, sediment dep | 0-100 | |
| K | | | Tuscher Fm | 400 | |
| CRETACEOUS | Mesaverde Group | | Farrer Fm | 700 | |
| | | | Fluvisole Ss Tongue | 100-150 | barren tongue of Castlegate Ss |
| | | | Neslen Fm | 200-250 | thin coal at base |
| | | | Sego Sandstone | 50-150 | |
| | | | Buck Tongue Mancos Sh | 0-50 | |
| | | | Castlegate Ss | 50 | |
| | | | Blackhawk Fm | 140 | thin coal beds |
| | | | Grassy Ss | 0-100 | |
| | | | Sunnyside Ss | 200-0 | |
| | | | Mancos Shale tongue | 100-300 | |
| | | | Kenilworth Ss | 50-150 | |
| | Mancos Shale | | Pierre fauna | | |
| | | | Tarapach Creek fauna | 3000 | Scaphites / Jnoceramus / Baculite / Desmoscaphites / fauna |
| | | | Niobrara fauna | | |
| | | | Ferron Ss M | 15-50 | Collignoniceras / Paradoxo auchone |
| | | | Tununk Mbr | 350-400 | |
| JURASSIC | Morrison Fm | Cedar Mountain Fm | Dakota Sandstone | 0-50 | |
| | | | Buckhorn Cg M | 0-70 | |
| | | | Brushy Basin M | 240-420 | |
| | | | Salt Wash Mbr | 160-290 | J-5 unconformity / red siltstone |
| | | | Tidwell Member | 20-55 | |
| | | | Summerville Fm | 30-80 | green |
| | | | Curtis Formation | 130-170 | stone gating |
| | | | Entrada Ss | 410-470 | gypsum / J-2 unconformity |
| | | | Carmel Formation | 320-500 | |
| | | | Page Sandstone | 0-80 | |
| | | | Navajo Ss | 450-510 | |
| | | | Kayenta Fm | 190-240 | |
| | | | Wingate Ss | 300-400 | |
| TRIASSIC | Chinle Fm | | Church Rock Mbr | 200-400 | |
| | | | Moss Back Cg Mbr | 60-100 | |
| | | | Temple Mountain M | 0-60 | T-3 unconformity |
| | Moenkopi Fm | | Moody Canyon & Torrey Members | 670-650 | |
| | | | Sinbad Limestone M | 30-55 | |
| | | | Black Dragon Mbr | 175-310 | Nabaﬁ'n siir reports |
| PERMIAN | Cutler Group | | Black Box Dolomite | 60-160 | |
| | | | White Rim Ss | 300-300 | 'Coconio'n in old reports |
| | | | Organ Rock Shale | 0-300 | subsurface |
| | | | Elephant Canyon Formation | 1000-1200 | Dedochelh / Subangular |
| PENNSYLVANIAN | Hermosa Group | | Honaker Trail Fm | 500-1000 | |
| | | | Paradox Fm | 1000-2200 | gypsum & anhydrite & halite |
| | | | Pinkerton Trail Fm | 0-500 | |
| | | | Molas Fm | 30 | |
| M | | | Leadville Limestone | 600-800 | conds / endothyrid fauna |
| D | | | Ouray Ls | 0-100 | |
| | | | Elbert Fm | 150-250 | |
| CAMB | | | Lynch Dolomite & "Maxfield Ls | 800-1800 | |
| | | | Ophir Fm | 150-200 | |
| | | | Tintic Quartzite | 180-350 | |
| PC | | | Granite & metamorphic rocks | | 1800 m.y. Rb-Sr |

MAPS WITH TEXT–Trimble & Doelling, 1978; Williams & Hackman, 1971; CRETACEOUS–Young, 1955, 1966; McCleeLey, 1973; Fisher et al, 1960; Lawton, 1985; Lessard, 1973; Kirch, 1960; JURASSIC–O'Sullivan, 1980s; Wright & Dickey, 1960; Doer, 1974; TRIASSIC–Stewart et al, 1972a, 1972b; Blakey, 1974; DugEl, 1971; Loope, 1979; PERMIAN–Baars, 1962; Rascoe & Baars, 1972; PENNSYLVANIAN–Wengerd, 1962; Rascoe & Baars, 1972; MISSISSIPPIAN–Craig, 1972; DEVONIAN–Baars, 1972; Parker & Roberts, 1966; CAMBRIAN–Lochman-Balk, 1971.

Geologic History of Utah
Lehi F. Hintze

## Chart 83 — CANYONLANDS PARK AREA

FEET

| Age | Group/Formation | | Unit | Feet | Notes |
|---|---|---|---|---|---|
| Q | | | Alluvium - dune/ sand | 0-100 | |
| K | Morrison Fm | | Brushy Basin Member | 300-400 | dinosaur zone |
| | | | Salt Wash Mbr | 200-400 | |
| | | | Tidwell Member | 20-40 | J-5 unconformity |
| JURASSIC | San Rafael Group | | Wanakah Formation | 0-60 | |
| | | | Entrada Sandstone | 220-350 | ARCHES NAT'L PARK |
| | | | Dewey Bridge Mbr | 20-130 | |
| | | | Page Sandstone | 0-100 | J-2 unconformity |
| | Glen Canyon Group | | Navajo Sandstone | 250-450 | rounded cliffs |
| | | | Kayenta Fm | 200-260 | DEAD HORSE POINT |
| | | | Wingate Sandstone | 20-430 | vertical cliff face / J-0 unconformity |
| TRIASSIC | Chinle Fm | | Church Rock Member | 240-310 | |
| | | | Owl Rock M. | 70-120 | |
| | | | Petrified Forest M | 50-190 | bentonite |
| | | | Moss Back Ss M | 0-100 | T-3 unconformity |
| | | | Moody Canyon M | 40-120 | |
| | Moenkopi Fm | | Torrey Member | 100-200 | |
| | | | Sinbad La Mbr | 0-30 | |
| | | | Black Dragon Mbr | 0-250 | T-1 unconformity |
| | Hoskinnini Sandstone | | | 0-50 | |
| | | | White Rim Ss | 0-250 | |
| | | | Organ Rock Fm | 0-600 | |
| PERMIAN | Cutler Group | | Cedar Mesa Sandstone | 300-1000 | Surface rock in The Needles area. Interfingers eastward with arkosic beds within the Park |
| | | | Elephant Canyon and Halgaito Fms (Cutler equivalent) | 400-1200 | Thickens and becomes less limy towards Uncompahgre Uplift to the east / unconformity |
| PENNSYLVANIAN | Hermosa Group | | Honaker Trail Formation | 1000-1500 | Oldest rocks exposed in Canyonlands, at river level in the Elysium Canyon area. |
| | | | Paradox Formation | 300-4000 | salt & potash interbedded with black shale and anhydrite |
| | | | Pinkerton Trail Formation | 200-500 | |
| | | | Molas Formation | 0-100 | Pre-Paradox rocks are known from wells and from geophysical measurements |
| MISS | | | Leadville Limestone | 400-600 | |
| D | | | Ouray Limestone | 100 | |
| | | | Elbert Formation | 300 | |
| CAMBRIAN | | | Undivided Upper Cambrian dolomite, limestone, & shale | 800-900 | |
| | | | "Bright Angel" Shale | 0-200 | |
| | | | Ignacio Quartzite | 100-200 | |
| PC | | | Metamorphic rocks | · | |

GEOLOGIC MAP – Huntoon et al, 1982; JURASSIC–Craig & Dickey, 1956; Wright & Dickey, 1956; TRIASSIC–Stewart et al, 1972a; Blakey, 1974; Huntoon & O'Sullivan & Maclachlan, 1972; PERMIAN–Baars, 1970; PENNSYLVANIAN–Welsh & Bissell, 1979; Rascoe & Wengerd, 1975; SUBSURFACE–Rocky Mountain Assoc. scale of Geologic Atlas, 1972; RIVER GUIDEBOOK – Baars & Molenaar, 1971.

Geologic History of Utah
Lehi F. Hintze

AR005254

# United States Department of the Interior
# Bureau of Land Management

---

### Environmental Assessment
### DOI-BLM-UT-0000-2018-0001-EA

---

## September 2018 Oil and Gas Lease Sale

*Location:*          Green River and Color Country District,
                     Price and Richfield Field Offices
                     Emery and Wayne Counties, Utah


*Applicant/Address:*          U.S. Department of the Interior
                              Bureau of Land Management
                              Utah State Office
                              440 West 200 South, Suite 500
                              Salt Lake City, Utah 84145-0155

---

Utah State Office
440 West 200 South, Suite 500
Salt Lake City, Utah 84145-0155
(801) 539-4000
(801) 539-4013
October 2018

---



AR005409

TABLE OF CONTENTS

# 1    CONTENTS

1    INTRODUCTION ........................................................................................................ 1
  1.1    **PROJECT LOCATION AND LEGAL DESCRIPTION** ........................................ 1
  1.2    **BACKGROUND** .......................................................................................................... 1
  1.3    **PURPOSE AND NEED** ............................................................................................ 3
    1.3.1    1.3.1  Decisions to be Made ............................................................................ 4
  1.4    **PLAN CONFORMANCE REVIEW** ...................................................................... 4
  1.5    **PUBLIC PARTICIPATION** ...................................................................................... 7
    1.5.1    Scoping ......................................................................................................... 7
  1.6    **RELATIONSHIP TO STATUTES, REGULATIONS, POLICIES OR OTHER PLANS** ...................................................................................................................... 8
  1.7    **DOCUMENTS INCORPORATED BY REFERENCE** .......................................... 9
    1.7.1    EISs, EAs and Decision Documents ........................................................... 9
    1.7.2    Other Documents ........................................................................................ 10
2    ALTERNATIVES .................................................................................................... 11
  2.1    **INTRODUCTION** .................................................................................................. 11
  2.2    **REASONABLY FORESEEABLE DEVELOPMENT SCENARIO** ...................... 11
    2.2.1    Well Drilling and Completion Operations ................................................. 12
    2.2.2    Water Usage ............................................................................................... 13
    2.2.3    Hydraulic Fracturing ................................................................................. 13
    2.2.4    Production Operations ............................................................................... 14
    2.2.5    Produced Water Handling .......................................................................... 14
    2.2.6    Maintenance Operations ............................................................................ 14
    2.2.7    Plugging and Abandonment ....................................................................... 14
  2.3    **ALTERNATIVES ANALYZED IN DETAIL** ....................................................... 14
    2.3.1    No Action Alternative ................................................................................ 14
    2.3.2    Proposed Action – Offer for Lease All Nominated Parcels, Offer Lessees of the Suspended Parcels to Lift the Suspensions if they agree to the new Stipulations and Notices in Attachment B, and offer to issue the "Sold but not Issued" leases to the buyers if they agree to the new Stipulations and Notices in Attachment B. ................................ 15
  2.4    **Alternatives Considered but not Analyzed in Detail** ............................................ 16
3    AFFECTED ENVIRONMENT ............................................................................... 18
  3.1    **INTRDUCTION** .................................................................................................... 18
  3.2    **GENERAL SETTING** ............................................................................................ 18
  3.3    **RESOURCES/ISSUES BROUGHT FORWARD FOR ANALYSIS** ...................... 18
    3.3.1    Air Quality ................................................................................................. 18
      3.3.1.1    Ozone Conditions and Trends ......................................................... 21
      3.3.1.2    Hazardous Air Pollutants ................................................................ 22
      3.3.1.3    Air Quality–Related Values ............................................................ 23
      3.3.1.4    Visibility Conditions and Trends .................................................... 24
      3.3.1.5    Deposition Conditions and Trends .................................................. 26
      3.3.1.6    Wet Deposition ................................................................................ 26

AR005410

TABLE OF CONTENTS

    3.3.1.7    Dry Deposition ................................................................ 27

   3.3.2    Areas of Critical Environmental Concern ............................. 28
   3.3.3    Cultural Resources ........................................................... 28
   3.3.4    Greenhouse Gas Emissions/Climate Change ...................... 29
   3.3.5    Lands with Wilderness Characteristics ............................... 32
   3.3.6    Pollinators ..................................................................... 35
   3.3.7    Recreation ..................................................................... 36
   3.3.8    Visual Resources ............................................................ 36
   3.3.9    Dark Night Sky/Soundscape ............................................. 38

4    ENVIRONMENTAL IMPACTS ................................................. 39
  **4.1    INTRODUCTION .............................................................. 39**
  **4.2    INDIRECT IMPACTS ....................................................... 39**
   4.2.1    Air Quality .................................................................... 39
     4.2.1.1    Impacts of No Action Alternative ................................ 39

     4.2.1.2    Impacts of Proposed Action Alternative ...................... 39

   4.2.2    Areas of Critical Environmental Concern ............................. 46
     4.2.2.1    Impacts of No Action Alternative ................................ 46

     4.2.2.2    Impacts of Proposed Action Alternative ...................... 46

   4.2.3    Cultural Resources ........................................................... 46
     4.2.3.1    Impacts of No Action Alternative ................................ 46

     4.2.3.2    Impacts of Proposed Action Alternative ...................... 47

   4.2.4    Greenhouse Gas Emissions/Climate Change ...................... 48
     4.2.4.1    Impacts of No Action Alternative ................................ 48

     4.2.4.2    Impacts of Proposed Action Alternative ...................... 48

   4.2.5    Lands with Wilderness Characteristics ............................... 52
     4.2.5.1    Impacts of No Action Alternative ................................ 52

     4.2.5.2    The No Action alternative would not result in potential impacts because the nominated parcels would not be leased or developed. Impacts of Proposed Action Alternative 52

•   **Suspended and Protested Lease Decisions** ................................................. 53

   4.2.6    Pollinators ..................................................................... 53
     4.2.6.1    Impacts of No Action Alternative ................................ 53

     4.2.6.2    Impacts of Proposed Action Alternative ...................... 53

   4.2.7    Recreation ..................................................................... 54
     4.2.7.1    Impacts of No Action Alternative ................................ 54

     4.2.7.2    Impacts of Proposed Action Alternative ...................... 54

   4.2.8    Visual Resources ............................................................ 54
     4.2.8.1    Impacts of No Action Alternative ................................ 54

AR005411

TABLE OF CONTENTS

4.2.8.2    Impacts of Proposed Action Alternative ........................................................ 55

4.2.9    Dark Night Sky/Soundscape ................................................................. 58
4.2.9.1    Impacts of No Action Alternative ........................................................ 58

4.2.9.2    Impacts of Proposed Action Alternative ................................................ 58

**4.3    CUMULATIVE IMPACTS.............................................................................. 59**
4.3.1    Introduction ............................................................................................ 59
4.3.2    Cumulative Impacts .............................................................................. 59
4.3.2.1    Air Quality ............................................................................................ 59

4.3.2.2    Areas of Critical Environmental Concern ......................................... 60

4.3.2.3    Cultural Resources ............................................................................... 60

4.3.2.4    Greenhouse Gas Emissions/Climate Change ..................................... 61

4.3.2.5    Lands with Wilderness Characteristics............................................... 62

4.3.2.6    Pollinators ............................................................................................. 62

4.3.2.7    Recreation ............................................................................................. 63

4.3.2.8    Visual Resources .................................................................................. 63

4.3.2.9    Dark Night Skies/Soundscapes ........................................................... 63

5    COORDINATION AND CONSULTATION .......................................................... 64
**5.1    LIST OF PERSONS, AGENCIES, AND ORGANIZATIONS CONSULTED...... 64**
6    References, and Appendices ......................................................................... 65
**6.1    References ............................................................................................................ 65**
**6.2    LIST OF PREPARERS ........................................................................................ 69**
**6.3    LIST OF APPENDICES........................................................................................ 69**
Appendix A    SCOPING REPORT .......................................................................... 70

Appendix B    List of Parcels and Leases with Stipulations and Notices.................... 74

Appendix C    Deferred Parcels............................................................................ 137

Appendix D    Stipulation and Notice Exhibits ...................................................... 138

Appendix E    Maps............................................................................................. 171

Appendix F    INTERDISCIPLINARY TEAM CHECKLIST .............................................. 173

Appendix G    Stipulations and Notices Originally on the SNI and Suspended Parcels .......................... 195

AR005412

Chapter 1

# 1 INTRODUCTION

## 1.1 *PROJECT LOCATION AND LEGAL DESCRIPTION*

LEGAL DESCRIPTION:

There are 78 parcels on the southern border of Emery County, two sold but not issued leases just north of the parcels in Emery County and 16 suspended leases on the northern boundary of Wayne County northeast of Hanksville, UT (Appendix D).

Please see Appendix B and Map, Figure 1.

## 1.2 *BACKGROUND*

It is the policy of the Bureau of Land Management (BLM) as derived from various laws, including the Mineral Leasing Act of 1920 (MLA) and the Federal Land Policy and Management Act of 1976 (FLPMA), to make mineral resources available for disposal and to encourage development of mineral resources to meet national, regional, and local needs.

Utah is a major source of natural gas for heating and electrical energy production in the lower 48 states. The continued sale and issuance of lease parcels facilitates exploration and production as oil and gas companies seek new areas for production or attempt to develop previously inaccessible or uneconomical reserves

The BLM's Utah State Office conducts quarterly competitive lease sales to sell available oil and gas lease parcels. A Notice of Competitive Lease Sale (NCLS), which lists lease parcels to be offered at the auction, is published by the Utah State Office (USO) at least 45 days before the auction is held. Lease stipulations applicable to each parcel are specified in the NCLS. The decision as to which public lands and minerals are open for leasing and what leasing stipulations may be necessary, based on information available at the time, is made during the land use planning process. Constraints on leasing and any future development of split estate parcels are determined by the BLM in consultation with the appropriate surface management agency or the private surface owner.

In the process of preparing a lease sale, the USO compiles a list of lands nominated and legally available for leasing, and sends a preliminary parcel list to the appropriate District Office where the parcels are located. Field Office staff then reviews the legal descriptions of the parcels to determine if they are in areas open to leasing under the relevant Resource Management Plan (RMP) and that appropriate stipulations have been included; verify whether any new information has become available that might change any analysis conducted during the planning process; confirm that appropriate consultations have been conducted; and identify any special resource conditions of which potential bidders should be made aware. For parcels nominated after January 31, 2018, the nominated parcels are posted online for a two week public scoping period. This posting also includes the appropriate stipulations as identified in the relevant RMP. The BLM

AR005413

Chapter 1

then prepares an analysis in compliance with the National Environmental Policy Act (NEPA), usually in the form of an Environmental Assessment (EA).

For this lease sale, the State Office has prepared a list of available lease parcels and associated stipulations and notices is made available to the public through a NCLS for the 76 nominated parcels. The BLM also analyzed 2 sold-but-not-issued (SNI) leases that were protested in 2006 and 16 leases that were suspended in 2006 to ensure they are in compliance with the 2008 RMP. Lease sale notices are posted on the Utah BLM website at: http://go.usa.gov/xXk8ch. The BLM may decide to defer or withhold some of the nominated parcels prior to the day of the lease sale. In such cases, the BLM prepares an errata to the NCLS. The SNI leases and suspended leases will not be part of the NCLS because they have already been sold.

The EA and an unsigned FONSI for all parcels and leases (nominated parcels, SNI, and suspended leases) are made available to the public through the concurrent posting of those documents and a NCLS at least 45 days in advance of the scheduled lease sale. The posting of the NCLS, EA and FONSI initiates a 10 day public protest period for the proposed lease sale offering that will end at least 35 days before the scheduled lease sale. The stipulations and notices applicable to each parcel proposed for lease will be specified in attachments to the NCLS. If any changes are needed to the parcels or stipulations and notices on the NCLS identified through the protest period, an erratum is posted to the BLM Utah's Oil and Gas Leasing website, and in the public room for the BLM Utah State Office, in order to notify the public of any such changes. The lease parcels, as identified by the NCLS and any errata, would be offered for sale at a competitive lease sale tentatively scheduled to be held on September 11, 2018. The SNI and suspended leases will not be included in the NCLS because they were already purchased.

If the nominated parcels are not leased at the September 2018 lease sale, then they will remain available to be leased noncompetitively for a period of up to two years to any qualified lessee at the minimum bid cost. Parcels obtained in this way may be re-parceled by combining or deleting other previously offered lands. Mineral estate that is not leased within a two-year period after an initial offering will no longer be available and must go through a competitive lease sale process again prior to being leased.

The act of leasing does not authorize any development or use of the surface of lease lands without further application by the operator and approval by the BLM. In the future, the BLM may receive Applications for Permit to Drill (APDs) for those parcels that are leased. If APDs are received, the BLM conducts additional site-specific NEPA analysis before deciding whether to approve the APD and what conditions of approval (COA) should apply.

The BLM has prepared this EA to disclose and analyze the environmental consequences of the leasing of 76 parcels during the September 2018 oil and gas lease sale and to evaluate if 2 SNI leases and 16 suspended leases should be issued or unsuspended, and if so whether updated stipulations and/or lease notices are needed. The EA is an analysis of potential impacts that could result from the implementation of a proposed action or alternatives to the proposed action. The EA ensures compliance with NEPA in making a determination as to whether any significant impacts could result from the analyzed actions. Significance is defined by NEPA and is found in

2

AR005414

Chapter 1

40 Code of Federal Regulations (CFR) § 1508.27. An EA provides evidence for determining whether to prepare an Environmental Impact Statement (EIS) or a FONSI statement. A FONSI statement, if applicable for this EA, would document the reasons why implementation of the selected alternative would not result in significant environmental impacts (effects) beyond those already addressed in the EISs prepared for the current land use plans: Price Field Office Resource Management Plan (PFO RMP) (BLM, 2008a) for the 2 SNI leases and the 76 nominated parcels and Richfield Field Office Resource Management Plan (RFO RMP) (BLM, 2008b) for the 16 suspended leases. If the decision maker determines that this project has significant impacts following the analysis in the EA, then an EIS would be prepared for the project. If not, a Decision Record (DR) may be signed for the EA approving the selected alternative, whether the Proposed Action or another alternative. This EA is tiered to and incorporates by reference the environmental impact analysis contained in both the Price and Richfield Field Office Proposed Resource Management Plans and Final Environmental Impact Statements (BLM, 2008c) (BLM, Richfield Field Office Proposed Resource Management Plan and Final Environmental Impact Statement, 2008d).

Seventy-six parcels comprising 158,944.27 acres within the Price Field Office (PFO) were nominated for the September 2018 Competitive Oil and Gas Lease Sale. We are analyzing an additional 38,879.95 acres in the Richfield Field Office (RFO) that were suspended in 2006 due to an appeal with the Interior Board of Land Appeals (IBLA) and 6398.24 acres that were SNI leases from February 2006 within the PFO. Seventy-eight parcels and leases were determined to be open to be leased for oil and gas development under the PFO RMP and 16 were determined to be open under the RFO RMP. This figure is comprised of 165342.51 acres of federal land in the PFO and 38879.95 acres of federal land in RFO and no split-estate land in either Field Office. The mineral rights for these parcels are owned by the federal government and administered by the PFO and RFO. The legal descriptions of the nominated parcels are in Appendix B.

This EA documents the review of the nominated parcels, SNI leases under the administration of the PFO and suspended leases under the administration of the RFO. It serves to verify conformance with the approved land use plan and provides the rationale for the Field Offices' recommendation to offer or to defer particular parcels from a lease sale. This EA is also being used to determine if the stipulations and lease notices attached to the parcels as part of the Proposed Action would be sufficient to protect resources and inform potential lessees of special conditions and restrictions that may constrain development. Additional lease notices may be developed during analysis, if warranted.

## *1.3  PURPOSE AND NEED*

The purpose of the Proposed Action is to respond to the nominations or expressions of interest for oil and gas leasing on specific federal mineral estate through a competitive leasing process. The need for the Proposed Action is established by the BLM's responsibility under the Mineral Leasing Act (MLA) of 1920, as amended, the Mining and Minerals Policy Act of 1970, the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (Reform Act), and the Federal Land Policy and Management Act (FLPMA) and to promote the development of oil and gas on the public domain. Parcels may be nominated by the public, the BLM or other agencies. The MLA establishes that deposits of oil and gas owned by the United States are subject to disposition in

AR005415

Chapter 1

the form and manner provided by the MLA under the rules and regulations prescribed by the Secretary of the Interior, where consistent with FLPMA and other applicable laws, regulations, and policies.

The analysis also evaluates if 2 SNI leases in the PFO and 16 suspended leases in the RFO are in compliance with the 2008 RMPs. If they are not, this document will be used to assess what additional stipulations and/or lease notices need to be attached to the parcels in order to make sure that they comply with the 2008 RMPs and have updated consultation processes.

Furthermore, the BLM will decide whether or not the stipulations from the 2008 PFO and RFO RMP's are protective enough to issue or lift the suspensions from the leases at this time. If so, the leases will be updated according to this analysis, as needed. If the new stipulations do not offer enough protection, the leases may be cancelled immediately or may remain as they are now (SNI or suspended) until a RMP amendment is completed to address the issue that needs to be mitigated.  If the stipulations are found to be sufficient, the BLM will issue a decision to the winning bidders/lease holders that they must accept the updated stipulation(s) and/or lease notices or their leases shall be cancelled.

## 1.3.1    1.3.1  Decisions to be Made

The BLM will decide whether to lease the 76 nominated parcels and, if so, under what terms. The BLM will also issue a new decision on each of the SNI leases and suspended leases; the decision will determine whether to issue the two SNI leases and lift the suspension on the 16 suspended leases and whether to modify the stipulations and notices on these 18 leases.

## *1.4  PLAN CONFORMANCE REVIEW*

The Proposed Action was reviewed for conformance (43 CFR 1610.5, BLM 1617.3) with the following plan(s):

Name of Plan:  Price Field Office Record of Decision and Resource Management Plan (RMP) (BLM, 2008a) as amended.

Date Approved: October 2008

Decision Language:  The RMP designated approximately 1,910,000 acres of federal mineral estate open for continued oil and gas development and leasing.  The RMP (with associated amendments) also describes specific stipulations that would be attached to new leases offered in certain areas.  Under the Proposed Action, parcels to be offered would be leased subject to stipulations prescribed by the RMP. Therefore, the Proposed Action conforms to the fluid mineral leasing decisions in the RMP and subsequent amendments, and are consistent with the RMP's goals and objectives for natural and cultural resources.

The Proposed Action specifically conforms to the following RMP decisions:

MLE-5 (Page 125 PFO ROD/RMP)

4

Chapter 1

The BLM has identified leasing allocations for all lands within the Price Field Office. In addition, the RMP describes specific lease stipulations (RMP, Appendix R-3) that apply to a variety of different resources including raptors, greater sage grouse, and big game habitat, as well as program-related Best Management Practices (RMP, Appendix R-14) that may be applied on a case-by-case basis, site-specific basis to prevent, minimize, or mitigate resource impacts (RMP, Map R-8).

MLE-6 (Page 125 PFO ROD/RMP)

Review all lease parcels prior to lease sale. If the Price Field Office determines that new resource data information or circumstances relevant to the decision is available at the time of the lease review that warrants changing a leasing allocation or specific lease stipulation, the Price Field Office will make appropriate changes through the plan maintenance or amendment process. The Price Field Office may also apply appropriate conditions of approval at the permitting stage to ensure conformance with the LUP and all applicable laws, regulations, and policies.

MLE-9 (Page 126 PFO ROD/RMP)

Oil and gas leasing management will be conducted as shown on Map R-25a.

- Areas open to leasing subject to the standard terms and conditions of the lease form (1,161,000 acres)
- Areas open to leasing subject to moderate constraints (timing limitations; controlled surface use (CSU), and lease notices) (467,000 acres)
- Areas open to leasing subject to major constraints (no surface occupancy (NSO)) (282,000 acres)
- Areas unavailable to leasing (569,000 acres)
  The combination of all restrictions on oil and gas development is shown on Map R-26a.

The Proposed Action is also consistent with the PFO ROD/RMP decisions and objectives as they relate to the management of the following resources (including but not limited to): air quality, BLM natural areas, cultural resources, recreation, riparian, soils, water, vegetation, fish and wildlife, and Areas of Critical Environmental Concern (ACEC). Additional RMP decisions are specified in Chapter 3 or the Interdisciplinary Team (ID team) checklist.  In addition, site visits were conducted by the PFO ID team of resource specialists for the proposed parcels to verify consistency with the PFO ROD/RMP.

It is also in conformance with the Richfield Field Office RMP

Name of Plan:  Richfield Field Office Record of Decision and Resource Management Plan (RMP) (BLM, 2008b) as amended

Date Approved: October 2008

AR005417

Chapter 1

Decision Language:  The RMP designated approximately 1,680,700 acres of federal mineral estate open for continued oil and gas development and leasing.  The RMP (with associated amendments) also describes specific stipulations that would be attached to new leases offered in certain areas.  Under the Proposed Action, parcels to be offered would be leased subject to stipulations prescribed by the RMP. Therefore, the Proposed Action conforms to the fluid mineral leasing decisions in the RMP and subsequent amendments, and are consistent with the RMP's goals and objectives for natural and cultural resources.

The Proposed Action specifically conform to the following Land Use Plan decisions:

MIN-1. (Table 19 Page 135 RFO ROD/RMP)
Issue oil and gas leases and allow for oil and gas exploration and development.

MIN-9. (Table 19 Page 136 RFO ROD/RMP)
In accordance with an UDEQ-DAQ letter dated June 6, 2008, (see Appendix 13 of the ROD/RMP) requesting implementation of interim nitrogen oxide control measures for compressor engines; BLM will require the following as a Lease Stipulation and a Condition of Approval for Applications for Permit to Drill:

- All new and replacement internal combustion gas field engines of less than or equal to 300 design-rated horsepower must not emit more than 2 gms of NOx per horsepower-hour. This requirement does not apply to gas field engines of less than or equal to 40 design-rated horsepower.
- All new and replacement internal combustion gas field engines of greater than 300 design rated horsepower must not emit more than 1.0 gms of NOx per horsepower-hour.

MIN-10. (Table 19 Page 136 RFO ROD/RMP)
Area closed to leasing: 447,300 acres

MIN-11. (Table 19 Page 136 RFO ROD/RMP)
Manage fluid mineral leases as shown on Map 23:

- Areas open to leasing with standard lease terms: 608,700 acres
- Areas open to leasing subject to Controlled Surface Use (CSU) and/or timing limitations: 917,500 acres
- Areas open to leasing subject to No Surface Occupancy (NSO): 154,500 acres

It is also consistent with RMP decisions and their corresponding goals and objectives related to the management of (including but not limited to) air quality, cultural resources, recreation, riparian, soils, water, vegetation, fish & wildlife and Areas of Critical Environmental Concern (ACEC) as well as the Surface Stipulations Applicable to Oil and Gas Leasing and Other Surface Disturbing Activities (Appendix 11 of the RMP/ROD).

AR005418

Chapter 1

Standard lease terms provide for reasonable measures to minimize adverse impacts to specific resource values, land uses, or users (Standard Lease Terms are contained in Form 3100-11, Offer to Lease and Lease for Oil and Gas, U.S. Department of the Interior, BLM, October 2008 or later edition). Compliance with valid, nondiscretionary statutes (laws) is included in the standard lease terms. Nondiscretionary actions include the BLM's requirements under federal environmental protection laws, such as the Clean Water Act, Clean Air Act, Endangered Species Act, National Historic Preservation Act, and Federal Land Policy Management Act, which are applicable to all actions on federal lands.

Once the lease has been issued, the lessee has the right to use as much of the leased land as necessary to explore for, drill for, extract, remove, and dispose of oil and gas deposits located under the leased lands, subject to the standard lease terms and additional restrictions attached to the lease in the form of lease stipulations (43 CFR 3101.1-2). Even if no restrictions are attached to the lease, the operations must be conducted in a manner that complies with environmental laws, avoids unnecessary or undue degradation of the environment and minimizes adverse impacts to the land, air, water, cultural, biological, and visual elements of the environment, as well as other land uses or users. Also included in all leases are the two mandatory stipulations for the statutory protection of cultural resources and threatened or endangered species (BLM Handbook 3120-1), which are described in Section 2.3.2. BLM would also encourage industry to consider participating in EPA's Natural Gas STAR program. The program is a flexible, voluntary partnership wherein EPA works with companies that produce, process, transmit and distribute natural gas to identify and promote the implementation of cost-effective technologies and practices to reduce emissions of methane, a greenhouse gas.

## 1.5  PUBLIC PARTICIPATION

### 1.5.1  Scoping

The principal goal of scoping is to identify issues, concerns, and potential impacts that require detailed analysis. Internal scoping was conducted through meetings of an interdisciplinary (ID) team of resource specialists and discussion of the nominated parcels. All resources considered are documented in Appendix E Interdisciplinary Team Checklist. The rationale beside each resource explains whether issues for that resource were found that required detailed analysis. However the following are questions that warrant more exploration in the analysis below:

**Air Quality**
How would oil and gas development operations that could result from leasing the proposed parcels impact air quality?

**ACEC/Cultural Resources**
How would oil and gas development operations that could result from leasing the proposed parcels impact cultural resources, particularly in the Cultural ACEC?

**Greenhouse Gas Emissions/Climate Change**
How would greenhouse gas emissions from oil and gas development operations and downstream combustion that could result from leasing the proposed parcels impact climate change?

**Lands With Wilderness Characteristics**

7

Chapter 1

How would oil and gas development operations that could result from leasing the proposed parcels impact lands determined  by the BLM to possess wilderness characteristics?

**Pollinators**
How would oil and gas development operations that could result from leasing the proposed parcels impact pollinators?

**Recreation**
How would recreational opportunities in the parcels be affected by potential development?

**Visual Resources**
How would sensitive recreational sites be affected by potential development of the lease parcels?

**Dark Night Sky/Soundscapes**
How would night skies and soundscapes at sensitive recreational sites potentially be affected by potential development?

External scoping was conducted by posting the proposed parcel list and maps for a 15-day period from March 30 to April 16, 2018, on BLM's ePlanning website at: http://go.usa.gov/xQrVg.  This external scoping process gave the public an opportunity to provide comments, which the BLM considered and incorporated into the EA as appropriate (see Appendices A and F). The BLM also sent notification of the proposed sale to affected landowners including Utah Public Lands Policy and Coordination Office, U.S. Fish and Wildlife Service, private landowners, the National Park Service, U.S. Forest Service, Utah Division of Wildlife Resources, and the State of Utah Trust Lands Administration.  A response was received from the Superintendent of the Southeast Utah Group for the National Park Service, National Park Conservation Association and Southern Utah Wilderness Alliance.

The main concerns raised in the scoping comments included potential impacts of  leasing on the following resources; lands with wilderness characteristics, air quality inside national parks, night skies inside national parks scenic viewsheds from the national park, recreational resources in the national park, impact to water quality of the San Rafael River and the Green River, greenhouse gas emissions and climate change, potential impacts to cultural resources, wild and scenic resources, paleontological resources, access to backcountry landscapes, pronghorn, kit fox, sensitive fish and wild turkey.

Concerns were addressed either by consideration and dismissal in Appendix F, or analysis in the EA that resulted in the attachment of Lease Notices to inform the potential lessees of conflicts that would have to be resolved at the time of development.

## 1.6  RELATIONSHIP TO STATUTES, REGULATIONS, POLICIES OR OTHER PLANS

The Proposed Action is in compliance with federal environmental laws and regulations, Executive Orders, and Department of Interior and BLM policies and is consistent, to the maximum extent possible, with state laws and local and county ordinances and plans, including the following:

AR005420

Chapter 1

- Federal Land Policy and Management Act (1976) as amended and the associated regulations at 43 CFR Part 1600
- Mineral Leasing Act (1920) as amended and the associated regulations at 43 CFR Part 3100
- BLM Utah Riparian Management Policy (2005)
- National Historic Preservation Act (1966) as amended and the associated regulations at 36 CFR Part 800
- Endangered Species Act (1973) as amended
- BLM Manual 6840- Special Status Species Management
- Bald and Golden Eagle Protection Act (1962)
- Migratory Bird Treaty Act (1918)
- Utah Partners in Flight Avian Conservation Strategy Version 2.0 (Parrish et al., 2002)
- Birds of Conservation Concern 2002 (USFWS 2008)
- Executive Order 13186: Responsibilities of Federal Agencies to Protect Migratory Birds
- MOU between the USDI BLM and USFWS to Promote the Conservation and Management of Migratory Birds (April 2010)
- BLM Manual 6310 - Conducting Wilderness Characteristics Inventory of BLM Lands
- BLM Manual 6320 - Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process
- BLM Handbook 3120-1 Competitive Leases (P)
- MOU Among the USDA, USDI and EPA Regarding Air Quality Analysis and Mitigation for Federal Oil and Gas Decisions Through the NEPA Process (2011)
- Protection of Ground Water Associated with Oil and Gas Leasing, Exploration and Development (BLM UT IM 2010–055)
- Updated Oil and Gas Leasing Reform —Land Use Planning and Lease Parcel Reviews (BLM  WO IM 2018-034)
- BLM-Utah Guidance for the Lands with Wilderness Characteristics Resource (IM UT 2016-027 Change 1)
- Richfield Field Office Visual Resource Inventory (2011)

These documents, and their associated analysis or information, are hereby incorporated by reference, based on their use and consideration by various authors of this document. The attached Interdisciplinary Team Checklist, Appendix F, was also developed after consideration of these documents and their contents. Each of these documents is available for review upon request to the PFO or the RFO.

## *1.7  DOCUMENTS INCORPORATED BY REFERENCE*

In order to reduce redundant paperwork and analysis in the NEPA process (*See* 40 CFR §§ 1502.20 and 1502.21) the following documents and their associated information or analysis are hereby incorporated by reference.

### 1.7.1  EISs, EAs and Decision Documents

- Price and Richfield Field Office Final Environmental Impact Statements (FEIS) and Proposed Resource Management Plans (BLM, 2008c) (BLM, Richfield Field Office

9

Chapter 1

Proposed Resource Management Plan and Final Environmental Impact Statement, 2008d) and Records of Decision (BLM, 2008a) (BLM, 2008b).

● Moab Master Leasing Plan Final Environmental Impact Statement and Proposed Resource Management Plan (BLM, 2016a)

## 1.7.2  Other Documents

*Price Field Office UT-070, Determination of NEPA Adequacy (DNA), 12/15/2005*

AR005422

# 2    ALTERNATIVES

## 2.1  INTRODUCTION

This chapter describes the alternatives analyzed in detail.  Alternatives considered but not analyzed in detail are also discussed.

## 2.2  REASONABLY FORESEEABLE DEVELOPMENT SCENARIO

In September 2016 the Price and Richfield Field Offices prepared an updated Reasonably Foreseeable Development Scenario (RFDS) for the San Rafael Desert Master Leasing Plan Area (MLPA) (BLM, 2016b).  . In January 2018, the BLM decided a plan amendment was most likely not necessary to lease these parcels but additional analysis was, therefore this EA is being prepared.  The area that was formerly called the San Rafael Desert Master Leasing Plan Area encompassed all of the parcels included in this analysis, therefore, the updated RFDS will be used as the baseline assumption for the analysis in this EA. A summary of the RFDS follows:

- The average area of surface disturbance for each new well projected to be drilled during the next 15 years (including well pads, roads, gathering pipelines, and projected main pipeline) will be 19.5 acres.
- Future oil and gas drilling for the next 15 years is projected to average two wells per year for a total of 30 wells. Twelve of the wells are projected to be dry holes.[1]
- Future surface disturbance for 30 projected new wells and associated infrastructure will be approximately 585 acres.
- A total of 492 acres of surface disturbance will be reclaimed during the next 15 years; including 12 dry holes, and interim reclamation of 18 future producing wells.
- The total net surface disturbance for all drilling activity in the San Rafael Desert Master Leasing Plan Area over the next 15 years will equal roughly 93 acres.
- Future surface disturbance over the next 15 years for geophysical exploration (270 linear miles of source lines) will be approximately 330 acres.
- Total geophysical related surface disturbance to be successfully reclaimed during the next 15 years will be 264 acres.
- The total net surface disturbance for geophysical activity over the next 15 years will be roughly 66 acres.

The baseline RFDS is summarized as follows:

---

[1]For the entire area within the former San Rafael MLPA future oil and gas drilling for the next 15 years is projected to average two wells per year for a total of 30 wells, 12 of which would be dry holes.  However, because RFDs are prepared with the assumption that all potentially productive oil and gas areas are open for leasing under standard lease terms and conditions except those areas designated as closed to leasing by law, regulation or executive order, in order to account for the acreage designated "No Surface Occupancy" by the RFO and PFO RMPs, Alternative A (the no-action alternative) of the administrative draft of the EA prepared for the MLPA assumed 29 wells would be drilled, and 17 would produce hydrocarbons.

AR005423

Chapter 2

These baseline projections represent average activity levels over the next 15 years and are not intended to be thresholds for limiting future activity. Oil and gas exploration and development activity tends to be sporadic over time due to market influences and other factors affecting the oil and gas industry. Because of this, it is recognized that during the next 15 years there may be years when oil and gas activity in the San Rafael Desert Master Leasing Plan Area would be much less than the projected average levels and other years when activity may be greater.

RFDS of the Proposed Parcels and Leases:

The parcels and leases cover 38% of the MLPA, translating to 11 wells drilled over 15 years, seven of which would be producing wells.  This would result in a total surface disturbance of 114.4acres from construction of new well pads and associated infrastructure, including roads and pipelines. The estimated total existing surface disturbance from previous oil and gas activity in the RFDS is 0 acres due to the fact that the last well drilled in the area was plugged and abandoned over 25 years ago. Over the next 15 years, it is reasonably foreseeable that a total of 114.4 acres will be disturbed by oil and gas drilling activity and of that total 96.2 acres will be reclaimed or under reclamation giving a net long term surface disturbance of 18.2 acres.

For geophysical exploration, 102.6 linear miles of source lines with an associated surface disturbance of 125.4 acres are projected over the next 15 years. Total geophysical related surface disturbance that will be reclaimed during the next 15 years will be 100.32 acres, leaving a net surface disturbance of 25.08 acres.

The following sections provide a general discussion of possible post-leasing RFD activities.  All of these activities would require additional NEPA review.


## 2.2.1  Well Drilling and Completion Operations

A drilling rig would be transported to the well pad (along with other necessary equipment). Drilling would commence with well spud. Typical drilling operations would include: adding joints of drill pipe at the surface as the hole deepens; circulating drilling fluids to cool the drill bit and remove the drill cuttings; pulling the drill pipe from the hole to replace worn drill bits; and setting strings of casing and cementing them in place. Air and/or water-based drilling fluid may be used to drill the hole. Prior to setting the production casing, open-hole well logs may be run to identify potentially productive horizons. If the evaluation concludes that sufficient natural gas and/or oil are present and recoverable, steel production casing would be installed and cemented in place.  Drilling activities on a well would typically occur 24 hours per day, seven days per week, and would require approximately 20 workers. It could require from two to four weeks to drill a well depending on the depth and complexity of the well.

Once a well has been drilled and evaluated to have sufficient oil and/or natural gas, completion operations would begin. Well completion involves perforating the production casing in target zones, followed by hydraulic fracturing (fracking) of the formation. Fracking operations include injecting an agent (e.g., water, gel, liquid, carbon dioxide, and/or nitrogen) into the formation under pressure. The fracking agent would likely contain sand or other proppant material to keep

AR005424

Chapter 2

the fractures from closing, thereby allowing fluids to be produced from the formation. The next phase of completion would be to flow and test the well to determine rates of production.

Typical equipment and vehicles used during completion activities might include carbon dioxide tanker trucks; sand transport trucks; water trucks; oil service trucks used to transport pumps and equipment for fracking; flat beds and gin trucks to move water tanks, rigs, tubing, and fracking chemicals; logging trucks (cased hole wireline trucks); pickup trucks to haul personnel and miscellaneous small materials; and workover rigs.

Completion activities on individual wells may occur 24 hours per day, seven days per week, and would require approximately 20 to 40 workers. Completion of an individual well could take from 7 to 30 days, depending on the number of completion zones.

## 2.2.2  Water Usage

The process of drilling for oil and gas requires consumptive water use. Within the affected area, a typical well drilled to the primary target formation would involve about 294,000 gallons of water. The water is used as a drilling medium, for mixing cement, and for various cleanup operations. Therefore, for the oil and gas wells projected in the proposed action, a total of about 3.2 million gallons of water (10 acre feet) could be used in the next 15 years. The source of this water would be primarily municipalities and private sources.

## 2.2.3  Hydraulic Fracturing

Fracking is a well stimulation technique used to increase oil and gas production from underground rock formations.  The RFD includes all reasonably foreseeable development technologies that may be used, and thus, this EA considers the impacts of all reasonably foreseeable oil and gas development regardless of the specific technologies used, including hydraulic fracturing. Fracking will also be evaluated at the APD stage should the lease parcel be sold/issued and a development proposal submitted. The following paragraphs provide a general discussion of the fracking process that could potentially be implemented if development were to occur, including well construction information and general conditions encountered within the PFO and RFO.

Fracking involves the injection of fluids through a wellbore under pressures great enough to fracture the oil and gas producing formations. The fluid is generally comprised of a liquid such as oil, carbon-dioxide or nitrogen, and proppant (commonly sand or ceramic beads), and a minor percentage of chemicals to give the fluid desirable flow characteristics, corrosion inhibition, etc. In the Cane Creek Unit, the producing unit closest to the parcels/leases, the most common liquid used for fracking is oil; an average of 107,826 gallons per well, as opposed to 87 gallons per well of water.[2] The proppant holds open the newly created fractures after the injection pressure is released. Oil and gas flow through the fractures and up the production well to the surface.

---

[2] These numbers are derived from FracFocus Chemical Disclosure Registry, a website managed by the Ground Water Protection Council and Interstate Oil and Gas Compact Commission to provide the public access to reported chemicals used for hydraulic fracturing.  As of November 1, 2012, all operators in the State of Utah have been required to submit the quantity and composition of fluids used to frack wells. Four wells from the Cane Creek Unit were found on FracFocus and used to calculate average water use per well for fracking.

AR005425

Chapter 2

Fracking has been used by oil and natural gas producers since the late 1940s and for the first 50 years was mostly used in vertical wells in conventional formations. Fracking is still used in these settings, but the process has evolved. Technological developments (including horizontal drilling) have led to the use of fracking in unconventional hydrocarbon formations that could not previously be profitably produced. The use of horizontal drilling through unconventional reservoirs combined with high-volume water based multi-stage fracking activities has led to an increase in oil and gas activity in several areas of the country which has, in turn, resulted in a dramatic increase in domestic oil and gas production nationally.

## 2.2.4  Production Operations

If a well is determined to be commercially productive, production facilities (gas meters, oil and water tanks, separators, etc.) would be installed on the well pad. Fluids such as oil, condensate, and produced water would likely be transferred to trucks as necessary and transported for sale or to an approved disposal site.

## 2.2.5  Produced Water Handling

Water is often associated with either produced oil or natural gas. Water is separated out of the production stream and can be temporarily stored in the reserve pit for 90 days. Permanent disposal options include surface discharge pits or underground injection. Handling of produced water is addressed in Onshore Oil and Gas Order No. 7, which prescribes measures required for the protection of surface and ground water sources.

## 2.2.6  Maintenance Operations

Wells are usually visited by a pumper on a daily basis to visually inspect equipment, gauges, etc. Well maintenance activities would occur on a year round basis.

## 2.2.7  Plugging and Abandonment

If the wells do not produce economic quantities of oil or gas, the well would be plugged and abandoned. The wells would be plugged and abandoned following specifications from a BLM Petroleum Engineer, which would include requiring cement plugs at strategic positions in the well bores.  Reclamation would meet the objectives described in the APD

## *2.3  ALTERNATIVES ANALYZED IN DETAIL*

### 2.3.1  No Action Alternative

The BLM NEPA Handbook (H-1790-1) states that for EAs the No Action Alternative generally means that the Proposed Action would not take place.  In the case of a lease sale, the parcels considered for oil and gas leasing would not be offered for lease. Under the No Action Alternative, the BLM would defer all nominated lease parcels from the September 2018 lease sale.  The parcels could be considered for inclusion in future lease sales.  Surface management would remain the same and ongoing oil and gas development would continue on surrounding private, state, and federal leases.

In the case of the SNI leases, the BLM would not issue the leases because the stipulations and notices do not comply with the PFO RMP (Sept. 2008); therefore, the BLM would not issue the

AR005426

Chapter 2

leases, reject the lease offer and issue a refund of any monies associated with these leases to the companies that bought them.

Under this alternative, the BLM would deem the leases *void ab initio* that were suspended in 2005 and 2006. All suspended leases in the planning area were issued under the management direction of the *Henry Mountain Management Framework Plan* (BLM 1982), which was superseded by the Richfield Field Office RMP in 2008 (BLM, 2008b). There were no stipulations originally attached to the leases.

### 2.3.2  Proposed Action – Offer for Lease All Nominated Parcels, Offer Lessees of the Suspended Parcels to Lift the Suspensions if they agree to the new Stipulations and Notices in Attachment B, and offer to issue the "Sold but not Issued" leases to the buyers if they agree to the new Stipulations and Notices in Attachment B.

Under this alternative, the BLM would lease Federal mineral estate in nominated parcels available for leasing in the resource area in accordance with the PFO and RFO RMPs (Sept. 2008). The BLM would also update the SNI lease stipulations and notices in accordance with the PFO RMP (Sept. 2008) and therefore, be able to issue them. The BLM would also lift the suspension on the 16 leases in the RFO after adding the appropriate lease stipulations and notices in accordance with the RFO RMP (Sept. 2008). The current lease sale includes 76 lease parcels in Emery County. Those lands proposed for lease under this alternative total 158,944.27  acres of federal surface and mineral estate (see Appendix A).  The lands have been grouped into appropriate lease parcels for competitive sale as oil and gas leases in accordance with the 43 C.F.R. § 3100 regulations.  The leases would include the standard lease terms and conditions for development of the surface of oil and gas leases provided in 43 C.F.R. § 3100. Stipulations to protect other surface and subsurface resources would also apply, as prescribed by the RMP. These stipulations are described in Appendix A.

The Competitive Leasing Handbook H-3120-1 also requires the following standard stipulations be added to every lease:

**Cultural Resources Stipulation**
This lease may be found to contain historic properties and/or resources protected under the National Historic Preservation Act, American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, E.O. 13007, or other statutes and executive orders. The BLM will not approve any ground disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the National Historic Preservation Act (NHPA) and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated.

**Threatened and Endangered Species Stipulation**

AR005427

Chapter 2

The lease may now and hereafter contain plants, animals, and their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objectives to avoid BLM approved activity that will contribute to a need to list such a species or their habitat. BLM may require modification to or disapprove a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligation under requirements of the Endangered Species Act, as amended, 16 U. S. C. § 1531 et seq., including completion of any required procedure for conference or consultation.

## *2.4*  Alternatives Considered but not Analyzed in Detail

Issue/Lift suspensions on leases without attaching new stipulations

Under this alternative, the BLM would lift the lease suspensions on leases that were suspended in 2005 and 2006. Each of the leases would be returned to active status with the same terms and conditions that were included on the lease at the time the lease was issued. All suspended leases in the planning area were issued under the management direction of the *Henry Mountain Management Framework Plan* (BLM 1982), which was superseded by the Richfield Field Office RMP in 2008 (BLM 2008b). Stipulations from the *Henry Mountain Management Framework Plan* that are attached to the suspended leases can be found in Appendix D. In the case of the two SNI leases, the BLM would issue the leases and lift the suspension on the other 16 leases without updating the lease stipulations and notices to comply with the PFO and RFO RMPs (BLM, 2008c) (BLM, 2008b).

This alternative was not analyzed in detail because there was essentially no change in any major constraints for the areas encompassed by the parcels between the previous plans and the 2008 ones. No areas were closed to leasing, and no large scale areas were identified as No Surface Occupancy (NSO). Regardless of the original lack of stipulations for the leases, all environmental laws such as the Clean Air Act, the National Historic Preservation Act, and the Endangered Species Act require compliance, and adding the additional stipulations did not substantially change this alternative from the proposed action.

Several alternatives were suggested through the scoping process, as follows;

1. A "leasing outside of wilderness-caliber lands" alternative. Under this alternative, BLM would not offer for lease any parcels in BLM-identified non-WSA lands with wilderness characteristics. (SUWA et. al., 2018, p. 17)   This alternative was not analyzed in detail because it is subsumed in the "no action" alternative.

2. A "no-surface occupancy" alternative. Under this alternative, BLM would only offer BLM-identified non-WSA lands with wilderness characteristics for lease with non-waivable no surface occupancy stipulations. (SUWA et. al., 2018, p. 17).  Such an alternative would not be in compliance with the RMP, since stipulations are derived

AR005428

Chapter 2

through the Land Use Planning process, not NEPA analysis.  (See Washington Office Instructional Memorandum N0. 2018-034 *Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews* Section B(2) "A lease stipulation may be revised consistent with modification criteria found in the RMP, or through amendment, as necessary, given conditions or issues not anticipated in the RMP."  The Price and Richfield Field Office 2008 RMPs were both prepared in full awareness that non-WSA lands with wilderness characteristics could be impaired by oil and gas development; this was not an issue that was not anticipated, but neither RMP stipulated that those lands would be offered as NSO.  An RMP amendment is not warranted at this time, so the alternative in not being analyzed in detail.

3. A "phased development-leasing" alternative. Under this alternative, BLM would require lessees and operators to first explore and develop land outside of BLM-identified non-WSA lands with wilderness characteristics – and to prove that such areas are capable of production in paying quantities – prior to developing in BLM-identified non-WSA lands with wilderness characteristics (SUWA et. al., 2018, p. 17).  This alternative was dismissed for the same reason as the previous one discussed.  Outside an RMP amendment, the BLM may not put what are, effectively, major constraints on the development leases on lands not already encumbered by major constraints under the current RMP.

4. A "mitigation leasing" alternative. Under this alternative, BLM would attach additional mitigation measures and best management practices (BMP) to each lease. This would include controlled surface use and NSO stipulations to protect sensitive resources including cultural resources and BLM-identified non-WSA lands with wilderness characteristics.  (SUWA et. al., 2018, pp. 17-18).  This alternative was dismissed because it differs little from the previous two discussed.  Many sensitive resources, such as cultural resources, can and are protected through compliance with various legislative Acts, which allow for stipulations derived from outside the RMP process, such as the one quoted in Section 2.3.2, to be attached to the parcels.

Another additional scoping comment was sent requesting that the BLM prepare an "activity plan" "to guide future oil and gas leasing in the San Rafael desert" prior to leasing the parcels.  This request was dismissed because in order to achieve the objectives of the submitters, an RMP amendment would be required.  A leasing activity plan in conjunction with an RMP amendment is essentially the same entity as a Master Leasing Plan (MLP), and according to IM 2018-034, MLPs create duplicative layers of NEPA review.

AR005429

# 3      AFFECTED ENVIRONMENT

## 3.1  INTRDUCTION

This chapter presents the potentially affected existing environment (i.e., the physical, biological, social, and economic values and resources) of the impact area as identified in the Interdisciplinary Team Checklist found in Appendix F. This chapter provides the baseline for comparison of impacts/consequences described in Chapter 4.

The CEQ Regulations state that NEPA documents "must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail" (40 CFR 1500.1(b)). While many issues may arise during scoping, not all of the issues raised warrant analysis in an EA. Issues will be analyzed if: 1) an analysis of the issue is necessary to make a reasoned choice between alternatives, or 2) if the issue is associated with a significant direct, indirect, or cumulative impact, or where analysis is necessary to determine the significance of the impacts. Appendix F identifies which parcels are dismissed from detailed analysis.

## 3.2  GENERAL SETTING

The affected area is located in the Colorado Plateau physiographic province. The nearest municipalities are the towns of Green River and Hanksville, Utah. The western boundary of the area is partially formed by State Route 24, and the eastern boundary is partially formed by the Green River. The southern boundary of the area is proximate to the Horseshoe Canyon unit of Canyonlands National Park, and the northern boundary is several miles south of the town of Green River. The area encompasses generally undeveloped BLM-administered public lands used for livestock grazing, dispersed recreation, and other multiple uses.

## 3.3  RESOURCES/ISSUES BROUGHT FORWARD FOR ANALYSIS

### 3.3.1  Air Quality

The U.S. Environmental Protection Agency (EPA) established the National Ambient Air Quality Standards (NAAQS) to limit the amount of air pollutants considered harmful to public health and the environment. Primary and secondary standards have been set for six criteria pollutants: carbon monoxide (CO), lead, nitrogen dioxide ($NO_2$),[3] ozone ($O_3$), sulfur dioxide ($SO_2$), and particulate matter (PM). Ground-level $O_3$ is not directly emitted into the air but is created by chemical reactions between $NO_x$ and volatile organic compounds (VOCs) in the presence of sunlight. The primary standards provide public health protection and also protect sensitive populations such as children and the elderly. Secondary standards provide public welfare protection, which includes protection against decreased visibility and damage to animals, crops, vegetation, and building (EPA, 2016b). Table 3-1 shows the NAAQS.

---

[3] EPA uses $NO_2$ as the indicator for the larger group of nitrogen oxides (oxides of nitrogen) or $NO_x$. However, emissions are usually reported as $NO_x$.

AR005430

Chapter 3

Ground-level $O_3$ and PM are of particular concern in the southwestern United States. Although it can occur naturally, $O_3$ is also formed under certain conditions through the reaction of its precursor gases (nitrogen oxides [$NO_x$] and VOCs), which are emitted from power generation, oil and gas production, wildfires, and other sources. Humans can experience health problems when exposed to $O_3$, and vegetation that is sensitive to $O_3$ may have slowed growth, reduced photosynthesis, and an increased risk of disease and damage (EPA, 2017b). PM, also known as particle pollution, is a complex mixture of extremely small dust, dirt, and soot particles. It is composed of coarse, inhalable particles (generally 10 micrometers in diameter and smaller [$PM_{10}$]) and fine inhalable particles (generally 2.5 micrometers and smaller [$PM_{2.5}$]). PM can be directly emitted from a source such as an unpaved road or formed in the atmosphere from reactions of chemicals such as $SO_2$ and $NO_x$. PM can cause health effects in humans, with $PM_{2.5}$ posing the greater risk because of its ability to penetrate the lungs and possibly enter the bloodstream. $PM_{2.5}$ is also the main cause of reduced visibility (haze). PM can settle on vegetation, snow, or water and has potential environmental effects such as depleting the nutrients in soil and making lakes and streams acidic (EPA, 2018c). Both $O_3$ and PM can be transported great distances, although elevated short-term, local concentrations can also occur.

*Table 3-1 National Ambient Air Quality Standards*

| Pollutant | | Primary/ Secondary | Averaging Time* | Level | Form |
|---|---|---|---|---|---|
| CO | | Primary | 8 hours | 9 ppm | Not to be exceeded more than once per year |
| | | | 1 hour | 35 ppm | |
| Lead | | Primary and secondary | Rolling 3-month average | 0.15 $\mu g/m^3$ | Not to be exceeded |
| NO2 | | Primary | 1 hour | 100 ppb | 98th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | | Primary and secondary | 1 year | 53 ppb | Annual mean |
| $O_3$ | | Primary and secondary | 8 hours | 0.070 ppm | Annual fourth-highest daily maximum 8-hour concentration, averaged over 3 years |
| PM | $PM_{2.5}$ | Primary | 1 year | 12 $\mu g/m^3$ | Annual mean, averaged over 3 years |
| | | Secondary | 1 year | 15 $\mu g/m^3$ | Annual mean, averaged over 3 years |
| | | Primary and secondary | 24 hours | 35 $\mu g/m^3$ | 98th percentile, averaged over 3 years |
| | $PM_{10}$ | Primary and secondary | 24 hours | 150 $\mu g/m^3$ | Not to be exceeded more than once per year on average over 3 years |

AR005431

Chapter 3

| Pollutant | Primary/ Secondary | Averaging Time* | Level | Form |
|-----------|--------------------|-----------------|-------|------|
| $SO_2$ | Primary | 1 hour | 75 ppb | 99th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | Secondary | 3 hours | 0.5 ppm | Not to be exceeded more than once per year |

*Source*: (EPA, 2016b).

*Notes*: μg/m³ = microgram(s) per cubic meter; ppb = part(s) per billion; ppm = part(s) per million.

* Averaging time is the time period during which pollutant concentrations are measured and averaged.

Areas that do not comply with NAAQS requirements for criteria pollutants are considered nonattainment areas. A particular geographic region may be designated an attainment area for some pollutants and a nonattainment area for others. Comprehensive state plans to reduce pollutant concentrations are required in nonattainment areas. Emery and Wayne Counties are currently in attainment with the NAAQS (EPA, 2018d). Compliance with the NAAQS is typically demonstrated by monitoring for ground-level atmospheric air pollutant concentrations. The DAQ operates and maintains a network of ambient air monitoring stations across the state to collect air quality data and to evaluate compliance with the NAAQS. No air monitoring stations exist in Emery or Wayne Counties; therefore, there are no air monitoring stations in the planning area.

An emissions inventory is a summary of emissions for a particular source during a given time period. The DAQ compiles statewide emission inventories to assess the level of pollutants released into the air from various sources. **Table 3-2** summarizes criteria pollutant emissions in Emery and Wayne Counties from the 2014 statewide emission inventory. \

*Table 3-2 2014 Criteria Pollutant Emissions in Emery and Wayne Counties by Source*

| County | Source | Emissions (tons per year) | | | | | |
|--------|--------|------|------|-----------|------------|------|------|
| | | CO | $NO_x$ | $PM_{10}$ | $PM_{2.5}$ | $SO_x$ | VOCs |
| Emery | Area Sources | 157.7 | 254.7 | 3,332.0 | 374.3 | 0.7 | 148.1 |
| | Area Sources: Oil and Gas | 160.5 | 158.1 | 8.9 | 8.4 | 1.2 | 482.5 |
| | Mobile Sources: Non-road | 475.8 | 227.4 | 16.3 | 15.7 | 1.3 | 103.7 |
| | Mobile Sources: On-road | 2,270.0 | 1390.0 | 272.8 | 98.8 | 3.8 | 238.7 |
| | Point Sources | 7,146.0 | 18,372.6 | 1,516.4 | 752.7 | 6,420.1 | 208.3 |
| | Biogenics | 7,627.0 | 0.0 | 0.0 | 0.0 | 0.0 | 34,859.9 |
| | Wildfires | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Total** | 17,837.0 | 20,402.8 | 5,146.4 | 1,249.9 | 6,427.1 | 36,041.2 |
| Wayne | Area Sources | 48.6 | 164.4 | 1,138.3 | 143.9 | 1.2 | 46.5 |
| | Area Sources: Oil and Gas | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

20

Chapter 3

| County | Source | Emissions (tons per year) | | | | | |
|---|---|---|---|---|---|---|---|
| | | CO | NO$_x$ | PM$_{10}$ | PM$_{2.5}$ | SO$_x$ | VOCs |
| | Mobile Sources: Non-road | 785.8 | 35.2 | 12.1 | 11.2 | 0.1 | 288.4 |
| | Mobile Sources: On-road | 449.2 | 124.8 | 31.0 | 10.4 | 0.5 | 45.4 |
| | Point Sources | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | Biogenics | 4,692.6 | 0.0 | 0.0 | 0.0 | 0.0 | 21,802.1 |
| | Wildfires | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Total** | 5,976.2 | 324.4 | 1,181.3 | 165.5 | 1.9 | 22,182.4 |

*Source*: (DAQ, 2014a)

.*Note*: Biogenics are emissions from natural, living sources such as vegetation and organisms

As shown in **Table 3-2**, Emery County had higher criteria pollutant emissions than Wayne County in 2014. Point sources are a large contributor to Emery County emissions. They consist of the Energy West Mining Company (Cottonwood Coal Prep Plant and Deer Creek Mine), Nielson Construction Company's Mill Flat Asphalt and Aggregate Pit, and PacifiCorp's Hunter Power Plant and Huntington Power Plant. The Hunter Power Plant and Huntington Power Plant are major sources of pollution in Emery County and the analysis area. No significant point sources exist in Wayne County (DAQ, 2014b). Wayne County also has no emissions from the oil and gas industry, unlike Emery County. There are no active oil and gas wells in the planning area; all previously existing wells have been abandoned and plugged.

Naturally occurring and prescribed fires may occur in the planning area. Prescribed fire or controlled burning is an important management tool used to reduce the risk of large, uncharacteristically severe wildfires; increase public and firefighter safety; and meet multiple resource management objectives. Such objectives may include habitat restoration, maintenance of vegetation treatments, and restoration or maintenance of ecosystem health. However, because fire produces short-term air pollution (including PM, carbon dioxide [$CO_2$], $O_3$-forming chemicals, and VOCs), smoke management is a priority during prescribed fires. Because of the type and quantity of vegetation in the planning area, wildfire is generally uncommon. No wildfire emissions are shown for either county in the 2014 emission inventory data. Historical emission inventories report wildfire emissions in Emery County in 2002 and 2005.

### 3.3.1.1 Ozone Conditions and Trends

Although the planning area does not have any air quality monitoring stations, nearby stations provide information about $O_3$ current conditions and trends. The National Park Service (NPS) evaluated long-term trends in $O_3$ concentrations for 27 national parks using the annual fourth-highest 8-hour maximum $O_3$ concentration, which reflects the form of the $O_3$ NAAQS. Of the three national parks near the planning area, only Canyonlands National Park was included in the evaluation. No significant upward or downward trends in $O_3$ concentrations were identified for this park from 1993 through 2008 (NPS, 2010). **Table 3-3** summarizes $O_3$ monitoring data from Canyonlands National Park post-2008.

AR005433

Chapter 3

*Table 3-3 $O_3$ Concentrations in Canyonlands National Park, 2009–2015*

| Year | $O_3$ NAAQS (parts per million) | | $O_3$ Concentrations in Canyonlands National Park (parts per million) |
|------|---------------------------------|---------------------------------|---|
| | **2008 NAAQS (in effect at the time of monitoring)** | **Current NAAQS (effective December 28, 2015)** | |
| 2009 | 0.075 | 0.070 | 0.068 |
| 2010 | 0.075 | 0.070 | 0.068 |
| 2011 | 0.075 | 0.070 | 0.069 |
| 2012 | 0.075 | 0.070 | 0.072 |
| 2013 | 0.075 | 0.070 | 0.066 |
| 2014 | 0.075 | 0.070 | 0.064 |
| 2015 | 0.075 | 0.070 | 0.065 |

*Source:* (NPS, 2017a) *Note:* No data were available for Arches or Capitol Reef National Parks

These data reflect a statistically significant improving trend in $O_3$ concentrations in Canyonlands National Park. The NPS indicates that human health risks from $O_3$ concentrations at Canyonlands National Park warrant moderate concern, based on several factors, including the 2011–2015 estimated $O_3$ concentration of 0.0691 parts per million. $O_3$ concentration trends at Canyonlands National Park show a statistically significant improvement for 2006-2015. The NPS also indicates that the vegetation health risk warrants moderate concern, but is showing a statistically significant improvement trend (NPS, 2017a).

### 3.3.1.2   Hazardous Air Pollutants

Hazardous air pollutants (HAPs), also known as toxic air pollutants, are known or suspected to cause cancer or other serious health effects, or adverse environmental effects. HAPs emitted by the oil and gas industry include benzene, toluene, ethyl benzene, mixed xylenes, formaldehyde, normal-hexane, acetaldehyde, and methanol. The EPA regulates 187 listed HAPs through emission standards, a risk and technology review program, mobile source rules, and other regulations.

The Clean Air Act (CAA) requires the EPA to publish a list of source categories that emit certain levels of HAPs. The list of source categories includes major sources emitting 10 tons per year (tpy) of any one HAP, or 25 tpy of any combination of HAPs, and area sources (i.e., smaller sources, such as dry cleaners). Section 112(d) of the CAA requires the EPA to promulgate regulations establishing emission standards (National Emission Standards for Hazardous Air Pollutants [NESHAPs]) for each listed source category. The standards must require the maximum degree of emission reduction determined to be achievable by each particular source category, through the application of maximum achievable control technology (MACT). Different criteria for MACT apply to different sources. Source categories for which NESHAP (MACT) standards have been promulgated include oil and natural gas production facilities, and natural gas transmission and storage.

HAP pollutant emissions in Emery and Wayne Counties are included in the 2014 statewide

AR005434

Chapter 3

emission inventory. No HAP emissions were reported for Wayne County. In Emery County, 45 HAPs were reported as being emitted from Nielson Construction Company's Mill Flat Asphalt and Aggregate Pit and PacifiCorp's Hunter Power Plant and Huntington Power Plant (DAQ, 2014c). **Table 3-4** shows HAP emissions in Emery County greater than 1,000 pounds per year or 0.5 tpy.

*Table 3-4 2014 HAP Emissions in Emery County (greater than 0.5 tpy)*

| HAP | Emery County Emissions (tpy) |
|---|---|
| Allyl chloride | 0.7 |
| Cyanide | 8.6 |
| Hydrochloric acid (hydrogen chloride) | 34.2 |
| Hydrofluoric acid (hydrogen fluoride) | 45.9 |
| Manganese (total suspended particulates) | 0.5 |
| Methyl bromide (bromomethane) | 0.6 |
| Methyl chloride (chloromethane) | 1.8 |
| Methyl hydrazine | 0.6 |
| Methylene chloride (dichloromethane) | 1.0 |
| Selenium (total suspended particulates) | 0.8 |
| Sulfuric acid | 29.0 |

*Source*: (DAQ, 2014c) Hydrochloric acid, hydrofluoric acid, sulfuric acid, and cyanide constitute the largest HAP emissions in Emery County and are emitted from the Hunter and Huntington Power Plants

### 3.3.1.3    Air Quality–Related Values

The Prevention of Significant Deterioration (PSD) is a CAA permitting program for new and modified major sources of air pollution that are located in attainment areas. It is designed to prevent NAAQS violations, preserve and protect air quality in sensitive areas, and protect public health and welfare. Under PSD regulations, the EPA classifies airsheds as Class I, Class II, or Class III. Congress designated certain existing areas as mandatory Class I areas, which preclude redesignation to a less restrictive class. Class I areas are those areas allowing for very little deterioration of air quality and Class II areas allow moderate deterioration. They are areas of special national or regional natural, scenic, recreational, or historic value for which PSD regulations provide extra protection. In all cases, pollutant concentrations cannot violate any of the NAAQS (NPS, 1981).

A PSD increment prevents the air quality in clean areas from deteriorating and is the maximum allowable increase in ambient pollutant concentrations. Significant deterioration is said to occur when the amount of new pollution would exceed the applicable PSD increment (EPA, 2016c). The allowable PSD increments of new pollution are very small in Class I areas.

Utah has five Class I areas (all national parks) (EPA, 2017d). The closest Class I areas to the planning area are as follows: Canyonlands National Park, approximately 7 miles to the southeast

23

AR005435

Chapter 3

of the planning area (the Horseshoe Canyon unit of Canyonlands National Park, which is separate from the main park boundaries, is about 1.3 miles from the nearest parcel); Arches National Park, approximately 22 miles east of the project area; and Capitol Reef National Park, approximately 24 miles west of the project area. All portions of Utah outside Class I areas are designated Class II areas. The project area is located in a Class II area. Industrial growth is allowed in these areas; however, the air quality will not be allowed to degrade to the level of the NAAQS in many parts of the state where the air is exceptionally clean (State of Utah, 2006).

PSD requirements are applicable to a source if it has the potential to exceed the major source thresholds of either 100 or 250 tpy of a regulated pollutant, depending on the type of pollutant. For stationary source categories listed in the regulation, the threshold is 100 tpy. For unlisted source categories, such as oil and gas operations, the threshold is 250 tpy. At the projected amount of oil and gas development in the reasonably foreseeable development scenario in the affected area (11 wells) (see Appendix A), PSD regulations would not likely be triggered because such development would not have the potential to emit 250 tpy of any air pollutant.

An air quality–related value (AQRV) is defined as a resource "for one or more Federal areas that may be adversely affected by a change in air quality. The resource may include visibility or a specific scenic, cultural, physical, biological, ecological, or recreational resource" identified by a federal land manager for a particular area" (Federal Land Managers, 2010). The requirement to assess impacts to AQRVs is established in the PSD rules. The federal land manager for each Class I area has the responsibility to define and protect the AQRVs at such areas, and to consider whether new emissions from proposed major facilities (or modifications to major facilities) would have an adverse impact on those values. Visibility is a common AQRV for national parks. Although the planning area does not have any air quality monitoring stations, nearby stations in national parks provide information about AQRV current conditions and trends.

3.3.1.4    Visibility Conditions and Trends

Section 169A of the CAA established a national visibility goal to prevent future visibility impairment and remedy any existing impairment in national parks and wilderness areas (Class I areas). *Visibility* refers to the clarity with which scenic vistas and landscape features are perceived at great distances. *Impairment* refers to human-caused air pollution. In 1999, the EPA promulgated the Regional Haze Rule to address regional haze, which refers to haze that impairs visibility in all directions over a large area. Haze forms when sunlight encounters particle pollution in the air. The Regional Haze Rule calls for state and federal agencies to work together to establish goals and emission reduction strategies to improve visibility in Class I areas (EPA, 2017d). States are required to address visibility in their state implementation plans.
Visibility is affected by pollutant concentrations in the air. PM pollution is the major cause of reduced visibility in many federal mandatory Class I areas, with $PM_{2.5}$ being most responsible for impacts (EPA, 2001). The five key contributors to visibility impairment in the form of $PM_{2.5}$ are sulfate, nitrate, organic carbon, elemental carbon, and crustal material. Three metrics are typically used to describe visibility: visual range (the greatest distance at which a large dark object can be seen against the background sky), light extinction coefficient (the attenuation of light per unit distance due to the scattering and absorption by gases and aerosols between the source and receptor), and the deciview (dv) haze index (derived from calculated light extinction

AR005436

Chapter 3

measurements) (EPA, 2001). One dv represents the minimal perceptible change in visibility to the average person, approximately a 10% change in light extinction. A dv scale is near zero for a pristine atmosphere and increases as visibility degrades.

Interagency Monitoring of Protected Visual Environments (IMPROVE) is a visibility monitoring program that has been collecting data since 1987 to support the visibility protection regulations for mandatory Class I areas. The closest IMPROVE site to the planning area is in Canyonlands National Park.

The NPS evaluated long-term trends in visibility for 29 national parks using annual dv on the haziest and clearest days for the period of record for each park. Of the three national parks near the planning area, only Canyonlands National Park was evaluated. From 1990 through 2008, a statistically significant trend of improving air quality was noted at Canyonlands National Park on the haziest and clearest days. However, visibility at all of the analyzed parks suffered from at least some impairment, particularly on the haziest days. In addition, visibility conditions on the clearest days were also impaired, although to a lesser degree (NPS, 2010). **Table 3-5** summarizes IMPROVE data at Canyonlands National Park post-2008. Data for Capitol Reef National Park are also included (similar data were not available for Arches National Park).

*Table 3-5 IMPROVE Visibility Data on the Haziest and Clearest Days in Canyonlands and Capitol Reef National Parks, 2009–2015*

| Year | Canyonlands National Park | | Capitol Reef National Park | |
|------|---------------------------|---|----------------------------|---|
| | **Haziest Days* (dv)** | **Clearest Days* (dv)** | **Haziest Days (dv)** | **Clearest Days (dv)** |
| 2009 | 11.5 | 3.3 | 10.3 | 2.7 |
| 2010 | 10.7 | 2.7 | 9.6 | 2.1 |
| 2011 | 9.9 | 2.7 | 9.3 | 2.9 |
| 2012 | 11.6 | 3.2 | 11.8 | 2.4 |
| 2013 | 10.4 | 3.4 | 9.9 | 2.9 |
| 2014 | 9.1 | 2.6 | 9.1 | 2.1 |
| 2015 | 9.8 | 2.5 | 9.5 | 2.6 |

*Source*: (NPS, 2017a).

*Note*: For Canyonlands National Park, the natural condition (i.e., before human activities) haze index on the haziest days is 6.4 dv. The natural condition haze index for the clearest days is 1 dv. For Capitol Reef National Park, the natural condition haze index on the haziest days is 5.7 dv. The natural condition haze index for the clearest days is 1.2 dv.

* Haziest days are the 20% of days where visibility is most limited. Clearest days are the 20% of days where visibility is most clear.

IMPROVE data from 2006 through 2015 for Canyonlands National Park indicate that there is no statistically significant trend in visibility on the 20% of clearest days. However, visibility improved on the 20% of haziest days during this time period. Overall, visibility shows impairment based on comparisons with the natural condition haze index (see Table 3-6 and table note) (NPS, 2017b). For Capitol Reef National Park from 2006 through 2015, there is no statistically significant trend in visibility on the 20% of clearest days, but there is a statistically

25

Chapter 3

significant improving trend on the 20% of haziest days (NPS, 2017c). Visibility at Capitol Reef National Park is also impaired, as shown by comparisons with the natural condition haze index.

The NPS indicates that visibility at Canyonlands National Park warrants moderate concern, based on several factors, including the 2011–2015 estimated visibility on mid-range days of 2.7 dv above natural conditions (NPS, 2017d). Visibility effects at the park include a reduction of the average natural visual range from about 170 miles without pollution to approximately 130 miles with pollution, and a reduction of the visual range to below 80 miles on high-pollution days (NPS, 2017e).

### 3.3.1.5    Deposition Conditions and Trends

Atmospheric deposition is the process by which airborne pollutants are deposited on the ground. These pollutants include $SO_2$, $NO_x$, ammonia, and mercury. Wet deposition, commonly known as acid rain, occurs when pollutants are deposited in combination with precipitation, such as rain, snow, fog, or hail. Dry deposition of particles and gases can occur when chemicals are incorporated into dust or smoke in the absence of moisture, and are then deposited on the earth's surface by settling, impaction, or adsorption. Atmospheric deposition of air pollutants can increase the acidity of soils and water resources (e.g., lakes and streams). Dry and wet deposition are combined to estimate the total deposition of pollutants to the earth's surface.

### 3.3.1.6    Wet Deposition

The National Atmospheric Deposition Program (NADP) monitors wet deposition. The NPS used NADP monitoring data to evaluate long-term trends in concentrations of ammonium, nitrate, and sulfate in wet deposition for 29 national parks. Of the national parks near the planning area, only Canyonlands National Park has an NADP monitor. From 1998 through 2008, a statistically significant degrading trend in ammonium concentrations was noted at Canyonlands National Park. During this same time period, no statistically significant trends at the park were noted for nitrate or sulfate concentrations in precipitation (NPS, 2010). **Table 3-6** summarizes NADP deposition data for Canyonlands National Park post-2008.

*Table 3-6 NDAP Wet Deposition Data for Canyonlands National Park, 2009–2015*

| Year | Wet Atmospheric Deposition in Canyonlands National Park | | |
|------|------------------------|------------------|------------------|
| | **Ammonium** | **Nitrate** | **Sulfate** |
| | **Precipitation Weighted Mean (milliequivalents per liter [μeq/L])** | | |
| 2009 | 15.4 | 16.9 | 27.5 |
| 2010 | 10.8 | 13.7 | 8.0 |
| 2011 | 16.2 | 15.1 | 12.8 |
| 2012 | 12.9 | 13.2 | 8.4 |

AR005438

Chapter 3

| Year | Wet Atmospheric Deposition in Canyonlands National Park | | |
|------|-------------------------|---------|---------|
| | Ammonium | Nitrate | Sulfate |
| | Precipitation Weighted Mean (milliequivalents per liter [µeq/L]) | | |
| 2013 | 14.2 | 13.4 | 9.7 |
| 2014 | 16.6 | 12.5 | 8.7 |
| 2015 | 13.0 | 10.8 | 7.2 |

*Source*: (NPS, 2017f) (NPS, 2017g)

*Note*: No data were available for Arches or Capitol Reef National Parks.

The NDAP data from 2009 through 2015 indicate that there is no statistically significant trend for ammonium in precipitation or sulfate in precipitation, but that the trend for nitrate in precipitation is improving. The NPS indicates that wet nitrogen deposition warrants significant concern at Canyonlands National Park, based on several factors, including the 2011–2015 estimated wet nitrogen deposition of 1.4 kilograms per hectare per year and the very highly sensitive ecosystems at the park. (NPS, 2017h) Wet sulfur deposition is in good condition at Canyonlands National Park, based on factors including the 2011–2015 estimated wet sulfur deposition of 0.5 kilograms per hectare per year (NPS, 2017i).

### 3.3.1.7   Dry Deposition

The Clean Air Status and Trends network (CASTNet) monitors dry deposition of sulfur and nitrogen species, as well as rural $O_3$ concentrations. The only CASTNet station near the planning area is in Canyonlands National Park. **Table 3-7** summarizes recent CASTNet dry deposition data for Canyonlands National Park.

*Table 3-7 CASTNet Dry Deposition Data for Canyonlands National Park, 2009–2014*

| Year | Dry Atmospheric Deposition in Canyonlands National Park | |
|------|-------------------------------------------|---------------------------|
| | Total Dry Nitrogen Deposition* (kilograms of nitrogen per hectare) | Total Dry Sulfur Deposition[†] (kilograms of sulfur per hectare) |
| 2009 | 0.71 | 0.17 |
| 2010 | 0.67 | 0.17 |
| 2011 | 0.67 | 0.17 |
| 2012 | 0.71 | 0.17 |
| 2013 | 0.72 | 0.17 |
| 2014 | 0.58 | 0.15 |

*Source*: EPA (EPA, 2017g).

*Note*: No data were available for Arches or Capitol Reef National Parks.

* Includes dry nitric acid ($HNO_3$), dry ammonium ($NH_4$), and dry nitrate ($NO_3$).

[†] Includes dry $SO_2$ and dry sulfate ($SO_4$).

27

Chapter 3

**Table 3-7** shows that dry deposition of nitrogen and sulfur has been relatively unchanged or slightly decreasing in Canyonlands National Park from 2009–2014; however, it is not known whether these trends are statistically significant.

## 3.3.2    Areas of Critical Environmental Concern

Areas of Critical Environmental Concern (ACECs) are special management areas designated by BLM to protect significant historic, cultural, or scenic values; fish and wildlife resources; natural process or systems; and/or natural hazards that have more than locally significant qualities which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource. ACECs have qualities or circumstances that make them fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change. They have been recognized as warranting protection in order to satisfy national priority concerns or to carry out the mandates of Federal Lands Policy and Management Act (FLMPA) and have qualities which warrant highlighting in order to satisfy public or management concerns about safety and public welfare. Nominated parcel 106 is within the Dry Lake Archaeological District ACEC, which was designated for relevant and important cultural values. Oil and gas leasing within the Dry Lakes ACEC is open but subject to No Surface Occupancy (BLM, 2008a, p. 131). Additionally, block cultural surveys are required before all surface disturbing activities within the ACEC.

## 3.3.3   Cultural Resources

Cultural resources are definite locations of human activity, occupation, or use identifiable though field survey, historical documentation, or oral history. The term includes archaeological, historic, and architectural sites, structures, and places with important public and scientific uses, and may include locations (sites or places) of traditional, religious, and cultural importance to specified social and/or cultural groups. Cultural resources are material places and things that are located, classified, ranked, and managed though the system of identifying, protecting, and utilizing for public benefit (BLM 8110 Manual: Glossary). Throughout this document, National Historic Preservation Act Section 106 terminology is used for cultural resources (e.g., eligible sites, historic properties, and not eligible sites), the process to identify them (e.g., Area of Potential Effect), and analysis of impacts to these resources (e.g., determination of no adverse effect) as a result of this lease sale. Terminology and definitions are available in the Section 106 implementing regulations at 36 CFR 800.

To identify cultural resources within and near the parcels, Price and Richfield archaeologists completed a records review and analysis for all parcels. The Area of Potential Effects for this undertaking is the area bounded by each parcel as well as a half-mile buffer to better account for potential indirect effects. Each parcel was analyzed for whether disturbance associated with a single well pad (the area disturbed being estimated by BLM's determined reasonably foreseeable development scenarios) could be accommodated within each parcel without adverse effects to historic properties. Both archaeologists compiled cultural resources data from their respective field office cultural resource libraries, GIS data (CURES), and the Preservation Pro database. These data sources contain information of all of the recorded cultural resource sites and cultural

AR005440

Chapter 3

resource survey data for the area available to BLM and the Utah Division of State History. Additional data sources used as appropriate include the Price and Richfield FO cultural resources planning models, which extrapolate extant cultural resources data to areas not previously surveyed; various ethnographies available for both field offices; cultural resources research data; and data from the San Rafael Desert Master Leasing Plan Class II survey and model.

In addition, the field offices are seeking additional cultural resources information from tribes, the public, and consulting parties through the Section 106 process. BLM received cultural resources location information from one consulting party; those data are included in this analysis.

 Across the parcels, 70 Class III – Intensive Pedestrian Surveys (Class III survey) have been completed; survey coverage varies widely across the parcels, ranging from 0% to 39%. Known and expected site types within the parcels run a wide spectrum of human activity. From the records review it is clear that human beings have lived on this landscape for thousands of years. The cultural resources that are present within the parcels represent nomadic and seminomadic hunting and gathering activities, lithic source material acquisition and production, and historic mining and ranching. Cultural resource sites from the prehistoric period include a number of paleo-archaic sites with possible Paleo-Indian components.  From the records review, a total of 333 sites have been recorded within these parcels. A total of 102 have been determined to be eligible to the National Register of Historic Places. The types of eligible and non-eligible prehistoric sites that are present include lithic scatters, lithic quarries, temporary camps, and rock art. The types of eligible and non-eligible historic sites include structures, roads and trails, inscriptions, and artifact scatters

### 3.3.4  Greenhouse Gas Emissions/Climate Change

Climate is the composite of generally prevailing weather conditions of a particular region throughout the year, averaged over a series of years such as temperature and precipitation. Climate change includes both historic and predicted climate shifts that are beyond normal weather variations.

Climate change is defined by the Intergovernmental Panel on Climate Change (IPCC) as "a change in the state of the climate that can be identified (e.g., by using statistical tests) by changes in the mean and/or the variability of its properties, and persists for an extended period, typically decades or longer. Climate change may be due to natural internal processes or external forcings such as modulations of the solar cycles, volcanic eruptions and persistent anthropogenic changes in the composition of the atmosphere or in land use" (IPCC, 2013).

The IPCC states: "Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentrations of greenhouse gases have increased" (IPCC, 2013). The global average surface temperature has increased approximately 1.5°F from 1880 to 2012 (IPCC, 2013). Warming has occurred on land surfaces, oceans and other water bodies, and in the troposphere (lowest layer of earth's atmosphere, up to 4-12 miles above the earth).

AR005441

Chapter 3

Earth's atmosphere has a natural greenhouse effect wherein naturally occurring gases such as water vapor, carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$) and fluorinated gases[4] absorb and retain heat. Without the natural greenhouse effect, earth would be approximately 60°F cooler (URS, 2010). Current ongoing global climate change is caused, in part, by the atmospheric buildup of GHGs, which may persist for decades or even centuries. Based on their concentrations, retentions, and strengths, GHGs vary in how they act and remain in the atmosphere. (EPA, 2017f). Each GHG has a global warming potential (GWP) that accounts for the intensity of each GHG's heat trapping effect and its longevity in the atmosphere.

The buildup of GHGs such as $CO_2$, $CH_4$, $N_2O$, and other less common gases since the start of the industrial revolution has substantially increased atmospheric concentrations of these compounds compared to background levels. At such elevated concentrations, these compounds absorb more energy from the earth's surface and re-emit a larger portion of the earth's heat back to the earth rather than allowing the heat to escape into space than would be the case under more natural conditions of background GHG concentrations.

A number of activities contribute to the phenomenon of climate change, including emissions of GHGs (especially $CO_2$ and $CH_4$) from fossil fuel development, large wildfires, activities using combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity (albedo). It is important to note that GHGs will have a sustained climatic impact over different temporal scales due to their differences in global warming potential (described above) and lifespans in the atmosphere. For example, $CO_2$ may last 50 to 200 years in the atmosphere while $CH_4$ has an average atmospheric lifetime of 12 years (URS, 2010).

The IPCC concluded that "warming of the climate system is unequivocal" and "most of the observed increase in global average temperatures since the mid-20th century is very likely due to the observed increase in anthropogenic GHG concentrations." (IPCC, 2007). Extensive research and development efforts are underway in the field of carbon capture and sequestration (CCS) technology, which could help direct management strategies in the future. The IPCC has identified a target worldwide "carbon budget" to estimate the amount of $CO_2$ the world can emit while still having a likely chance of limiting global temperature rise to 2°C above pre-industrial levels. The international community estimates this budget to be 1 trillion tonnes of carbon (WRI, 2016).

Global mean surface temperatures have increased nearly 1.0°C (1.8°F) from 1890 to 2006 (NASA, 2018). In 2001, the IPCC (2007) indicated that by the year 2100, global average surface temperatures would increase 1.4 to 5.8°C (2.5 to 10.4°F) above 1990 levels. The National Academy of Sciences (Hansen, et al., 2006) has confirmed these findings, but also indicated that there are uncertainties regarding how climate change may affect different regions. Observations and predictive models indicate that average temperature changes are likely to be greater in the Northern Hemisphere. Data indicate that northern latitudes (above 24° N) have exhibited temperature increases of nearly 1.2°C (2.1°F) since 1900, with nearly a 1.0°C (1.8°F) increase since 1970 alone. It also shows temperature and precipitation trends for the conterminous United States. For both parameters, varying rates of change are shown, but overall increases in both temperature and precipitation.

---

[4] Accessed online at: https://www.epa.gov/ghgemissions/overview-greenhouse-gases

AR005442

Chapter 3

As stated by EPA, (EPA, 2017e) the GWP was developed to allow comparisons of the global warming impacts of different GHGs. Specifically, it is a measure of how much energy the emissions of 1 ton of a gas will absorb over a given period of time, relative to the emissions of 1 ton of $CO_2$. The GWP was introduced in the IPCC First Assessment Report, where it was also used to illustrate the difficulties in comparing components with differing physical properties using a single metric. The 100-year GWP (GWP100) was adopted by the United Nations Framework Convention on Climate Change (UNFCCC) and its Kyoto Protocol and is now used widely as the default metric. It is only one of several possible emission metrics and time horizons (IPCC, 2014).

The choice of emission metric and time horizon depends on type of application and policy context; hence, no single metric is optimal for all policy goals. All metrics have shortcomings, and choices contain value judgments, such as the climate effect considered and the weighting of effects over time (which explicitly or implicitly discounts impacts over time), the climate policy goal and the degree to which metrics incorporate economic or only physical considerations. There are significant uncertainties related to metrics, and the magnitudes of the uncertainties differ across metric type and time horizon. In general, the uncertainty increases for metrics along the cause–effect chain from emission to effects (IPCC, 2014). Proposals have been made for the UNFCCC to adopt a duel-term GHG accounting standard; using the 20-year GWP (GWP20) alongside the accepted GWP100. It is argued that doing this would increase the weighting of short-lived GHG in reductions goals. However, doing so would be counterproductive as the relative cooling effect from short-lived GHG's would diminish with time and be massively outweighed by warming over subsequent decades and centuries caused by higher concentrations of CO2 and other long-lived GHG's (Analytics, 2018). The GWP100 strikes a compromise between short-lived and long-lived GHG, as warming effect will be manifest over many hundreds of years, opposed to short-lived GHG's exerting warming over only a few decades.

Shown in **Table 3-8**, are the GWPs from IPCC AR5 (IPCC, 2014) GHGs are presented using the unit of Metric Tons of $CO_2$ equivalent (MT $CO_2$e),[5] a metric to express the impact of each different GHG in terms of the amount of $CO_2$ making it possible to express GHGs as a single number. For example, 1 ton of $CH_4$ would be equal to 28 tons of $CO_2$ equivalent, because it has a GWP over 28 times that of $CO_2$. The GWP accounts for the intensity of each GHG's heat trapping effect and its longevity in the atmosphere. The GWP provides a method to quantify the cumulative effects of multiple GHGs released into the atmosphere by calculating $CO_2$ equivalent for the GHGs.

*Table 3-8 Greenhouse Gases and Their Global Warming Potentials*

| Pollutant | Carbon Dioxide ($CO_2$) | Methane ($CH_4$) | Nitrous Oxide ($N_2O$) | Hydrofluorocarbons (HFCs) | Perfluorocarbons (PFCs) | Sulfur hexafluoride ($SF_6$) |
|---|---|---|---|---|---|---|
| GWP | 1 | 28 | 265 | Up to 12,400 | 6,630-11,100 | 23,500 |

*Source*: IPCC, AR5 (IPCC, 2014)

---

[5] GHGs can also be measured as Million Metric Tons (MMT CO2e).

AR005443

Chapter 3

Because GHGs circulate freely throughout Earth's atmosphere, climate change is a global issue. The largest component of global anthropogenic GHG emissions is $CO_2$. Global anthropogenic carbon emissions reached about 7,000,000,000 MT per year in 2000 and an estimated 9,170,000,000 MT per year in 2010 (Boden, Marland, & Andres, 2013). Oil and gas production contributes to GHGs such as $CO_2$ and $CH_4$. Natural gas systems were the second largest anthropogenic source category of $CH_4$ emissions in the United States in 2015 with 162.4 MMT $CO_2e$ of $CH_4$ emitted into the atmosphere. Those emissions have decreased by 31.6 MMT $CO_2e$ (16.3 percent) since 1990 (EPA, 2017c)

## 3.3.5  Lands with Wilderness Characteristics

Lands with wilderness characteristics are areas having at least 5,000 acres in a natural or undisturbed condition, and provide outstanding opportunities for solitude and/or primitive forms of recreation. All or portions of 62 nominated parcels , totaling approximately 106,271.07 acres, and five leases totaling 4093.24 acres overlap lands with wilderness characteristics.  **Table 3-9** displays the overlap of lands with wilderness characteristics and nominated lease parcels.

*Table 3-9 Nominated Parcels Overlapping Land with Wilderness Characteristics Units*

| Parcel ID | UT-020-SRD- 007 | Dirty Devil/ French Spring Natural Area | Dirty Devil/ French Spring Unit 28 | UT- 020-SRD- Sweetwater Reef A | UT-020-SRD-Labyrinth Canyon A | UT-020-SRD-Labyrinth Canyon B | UT-020-SRD-San Rafael River B | UT-020-SRD-San Rafael River D | UT-020-SRD-San Rafael River E | Total Acres of Parcel Overlapping LWC | Percent of Parcel Overlapping LWC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 38 | | | | | | | | 1,172.55 | 89.66 | 1,262.21 | 64.2% |
| 40 | | | | | | | | 285.88 | 1,437.07 | 1,722.95 | 90.1% |
| 41 | | | | | | | | | 36.62 | 36.62 | 1.9% |
| 42 | | | | | | | | | 1,346.90 | 1,346.90 | 70.2% |
| 46 | | | | | | | | 222.58 | | 222.58 | 8.7% |
| 47 | | | | | | | | 1,967.32 | | 1,967.32 | 100.0% |
| 48 | | | | | | | | 1,969.40 | | 1,969.40 | 100.0% |
| 49 | | | | | | | | 2,006.82 | | 2,006.82 | 99.5% |
| 50 | | | | | | | | 1,316.01 | | 1,316.01 | 99.9% |
| 51 | | | | | | | | 2,557.70 | | 2,557.70 | 100.0% |
| 52 | | | | | | | | 1,507.60 | 408.25 | 1,915.85 | 99.9% |
| 53 | | | | | | | | 866.13 | 1,680.96 | 2,547.08 | 99.8% |
| 54 | | | | | | | | 1,567.09 | 9.33 | 1,576.42 | 82.2% |
| 55 | | | | | | | | 512.16 | 1,764.58 | 2,276.73 | 89.0% |
| 56 | | | | | | | | 1,788.05 | | 1,788.05 | 93.3% |

AR005444

Chapter 3

| Parcel ID | UT-020-SRD- 007 | Dirty Devil/ French Spring Natural Area | Dirty Devil/ French Spring Unit 28 | UT- 020-SRD-Sweetwater Reef A | UT-020-SRD-Labyrinth Canyon A | UT-020-SRD-Labyrinth Canyon B | UT-020-SRD-San Rafael River B | UT-020-SRD-San Rafael River D | UT-020-SRD-San Rafael River E | Total Acres of Parcel Overlapping LWC | Percent of Parcel Overlapping LWC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | | | | 303.02 | | | | | | 303.02 | 12.4% |
| 67 | | | | | | | | 1,118.92 | | 1,118.92 | 56.7% |
| 68 | | | | | | | | 1,966.26 | | 1,966.26 | 100.0% |
| 69 | | | | | | | | 2,005.24 | | 2,005.24 | 100.0% |
| 70 | | | | | | | | 1,323.30 | | 1,323.30 | 100.0% |
| 71 | | | | 5.57 | | | | 179.70 | | 185.27 | 7.2% |
| 72 | | | | 167.32 | | | | 1,574.37 | | 1,741.69 | 90.8% |
| 73 | | | | | | | | 2,550.13 | | 2,550.13 | 100.0% |
| 74 | | | | 1,093.82 | | | | | | 1,093.82 | 57.1% |
| 75 | | | | 2,182.12 | | | | 371.03 | | 2,553.15 | 99.9% |
| 76 | | | | 22.05 | | | | 1,746.22 | | 1,768.27 | 92.3% |
| 77 | | | | 1,950.64 | | | | | | 1,950.64 | 100.0% |
| 78 | | | | 1,951.41 | | | | | | 1,951.41 | 100.0% |
| 79 | | | | 1,650.49 | | | | | | 1,650.49 | 83.3% |
| 80 | | | | 334.03 | | | | | | 334.03 | 27.0% |
| 81 | | | | 2,556.16 | | | | | | 2,556.16 | 100.0% |
| 82 | | | | 1,918.31 | | | | | | 1,918.31 | 100.0% |
| 83 | | | | 2,466.58 | | | | | | 2,466.58 | 99.0% |
| 84 | | | | 1,913.13 | | | | | | 1,913.13 | 99.8% |
| 85 | | | | 2,244.75 | | | | | | 2,244.75 | 87.8% |
| 86 | | | | 980.35 | | | | | | 980.35 | 52.8% |
| 87 | | | | | | | 1,075.62 | | | 1,075.62 | 55.5% |
| 88 | | | | | | | 1,617.30 | | | 1,617.30 | 82.5% |
| 89 | | | | | | | 521.92 | 15.84 | | 537.76 | 26.7% |
| 90 | | | | | | | | 269.40 | | 269.40 | 20.4% |
| 91 | | | | 1,497.87 | | | | | | 1,497.87 | 58.6% |
| 92 | | | | 224.46 | | | 101.20 | | | 325.66 | 17.0% |
| 93 | | | | 2.29 | | | | | | 2.29 | 0.1% |
| 94 | | | | 1,916.66 | | | | | | 1,916.66 | 100.0% |
| 95 | | | | 2,536.86 | | | | | | 2,536.86 | 99.3% |

AR005445

Chapter 3

| Parcel ID | UT-020-SRD- 007 | Dirty Devil/ French Spring Natural Area | Dirty Devil/ French Spring Unit 28 | UT- 020-SRD-Sweetwater Reef A | UT-020-SRD-Labyrinth Canyon A | UT-020-SRD-Labyrinth Canyon B | UT-020-SRD-San Rafael River B | UT-020-SRD-San Rafael River D | UT-020-SRD-San Rafael River E | Total Acres of Parcel Overlapping LWC | Percent of Parcel Overlapping LWC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 96 | | | | 266.72 | | | | | | 266.72 | 13.9% |
| 97 | | | | 1,874.41 | | | | | | 1,874.41 | 100.0% |
| 98 | | | | 2,468.59 | | | | | | 2,468.59 | 100.0% |
| 99 | | | | 2,420.77 | | | | | | 2,420.77 | 99.8% |
| 100 | | | | 2,558.20 | | | | | | 2,558.20 | 100.0% |
| 101 | | | | 1,919.63 | | | | | | 1,919.63 | 100.0% |
| 102 | | | | 2,514.96 | | | | | | 2,514.96 | 100.0% |
| 103 | | | | 1,918.05 | | | | | | 1,918.05 | 100.0% |
| 104 | | | | 2,557.23 | | | | | | 2,557.23 | 100.0% |
| 105 | | | | 1,880.67 | | | | | | 1,880.67 | 100.0% |
| 106 | 349.22 | | | | | | | | | 349.22 | 38.5% |
| 107 | | | | 532.94 | 66.39 | | 1,320.26 | | | 1,919.58 | 98.5% |
| 108 | | | | 2,496.97 | 14.84 | | | | | 2,511.81 | 98.4% |
| 109 | | | | 2,554.13 | | | | | | 2,554.13 | 99.9% |
| 110 | | | | 2,382.91 | | | | | | 2,382.91 | 100.0% |
| 111 | | | | 2,542.18 | | | | | | 2,542.18 | 100.0% |
| 112 | | | | 2,456.08 | | 52.41 | | | | 2,508.49 | 99.9% |
| 113 | | | | 600.01 | | 1,656.54 | | | | 2,256.55 | 99.6% |
| UTU 081458 | | | | 183.23 | | | | | | 183.23 | 7.4% |
| UTU 084401 | | | | 2.91 | | | | | | 2.91 | 0.1% |
| UTU 081463 | | 0.02 | | | | | | | | 0.02 | 0.0% |
| UTU 084706 | | | 41.20 | | | | | | | 41.20 | 0.9% |
| UTU 085329 | | | | | 398.93 | | 2,070.77 | 1,396.18 | | 3,865.88 | 60.1% |
| **Unit Totals** | **349.22** | **0.02** | **41.20** | **62,048.45** | **480.16** | **1,708.95** | **6,707.07** | **32,255.87** | **6,773.36** | **110,364.31** | **54.1%** |

Two of the lands with wilderness characteristics units (San Rafael River E and UT-020-SRD-007) are units that were identified by BLM after the completion of the 2008 PFO RMP. Therefore, these two units have not been analyzed in a land use planning process. Parcels 38, 40, 41, 42, 52, 53, 54, 55 and 106 overlap lands with wilderness characteristics that have not been analyzed in a land use plan.

AR005446

Chapter 3

All other lands with wilderness characteristics units were analyzed in land use plans. The Sweetwater Reef (Subunit A), Labyrinth Canyon (Subunits A&B), and San Rafael Reef (Subunits B&D) are within the Price Field Office. The PFO ROD selected an alternative that emphasizes other multiple uses as a priority over protecting wilderness characteristics within these lands with wilderness characteristics units (BLM, 2008a)

The Dirty Devil/French Springs Unit 28 and natural area are within the Richfield Field Office. Approximately 0.02 acres of Parcel UTU 081463 overlaps the Dirty Devil-French Springs natural area, which is managed for protection of wilderness characteristics in the Richfield RMP (BLM, 2008b) The natural area is available for leasing with a No Surface Occupancy stipulation. For the remainder of the Dirty Devil/French Springs Unit 28, the RFO ROD selected an alternative that emphasizes other multiple uses as a priority over protecting wilderness characteristics within these lands with wilderness characteristics units (BLM, 2008b).

## 3.3.6  Pollinators

Bees and other pollinators play an important role in sustaining the nation's food supply and contributing to the agricultural sector and the health of the environment. Due to significant declines in some pollinator groups, the White House issued a Federal Strategy to Promote the Health of Honey Bees and Other Pollinators in May 2015, with the goals of reducing stressors on pollinator health, including pests and pathogens, reduced habitat, lack of nutritional resources, and exposure to pesticides. In November 2015, the BLM released Instruction Memorandum (IM) No. 2016-013 to implement the strategy. It directs Federal departments and agencies to evaluate and use their resources, facilities, and land management responsibilities to expand knowledge of pollinator health and increase habitat quality and availability. The BLM IM and the May 2015 Pollinator-Friendly Best Management Practices for Federal Lands lists actions that BLM is committed to taking to improve habitats for pollinators on BLM-administered lands. Among those commitments are:

- using pollinator friendly native plant species in vegetation management and restoration projects,
- working toward providing a suite of early blooming to late blooming flowering plants to ensure floral resources are available for pollinators throughout the growing season,
- working with the Seeds of Success program and the National Seed Strategy to collect plant species most important for pollinators locally and increase their availability in plant materials programs,
- consider the use of native milkweed seed or plugs in restoration projects within monarch butterfly migration routes,
- identify and remove invasive plants to improve pollinator habitat.

BLM does not have policy that requires inventories for pollinators prior to management actions and inventories have not been conducted to locate and identify pollinators within the parcels in the September 2018 oil and gas lease sale. However, past general surveys in the San Rafael Desert have discovered a higher than average presence of native and endemic bees (Griswold, Parker, & Tepedino, 1997).

AR005447

Chapter 3

No insect pollinators have yet been listed as Federally endangered, threatened, candidate, or proposed species or as BLM Sensitive species. The Monarch butterfly was petitioned for listing in 2014 and a status review for this species will be completed in 2019. There are several Sensitive bat species that are suspected of occurring in the project area (see IDT Checklist, Wildlife: BLM Sensitive) and these species would receive protection through the implementation of the Special Status species program. If other pollinators are added to the threatened, endangered, candidate, proposed, or Sensitive lists in the future, the BLM would manage them and their habitats to protect them from impacts of management actions through the Sensitive Species and Endangered Species Act (ESA) programs.

Pollinators associated with Special Status plants, including Jones cycladenia (*Cycladenia humilis* var. *jonesii*), Navajo sedge (*Carex specuicola*), and Ute ladies-tresses (*Spiranthes diluvialis*) would receive protection through the avoidance and minimization measures outlined in their lease notices. These measures include establishing no disturbance buffers around plants, dust abatement actions, revegetating disturbed areas with native species, monitoring and treating invasive species, protecting riparian habitats from disturbance, using directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in plant habitat, some timing limitations during the flowering period, limiting new road construction, and restricting vehicles to existing roads. These measures would protect not only Special Status plants, but all native plant species that occur around them, as well as their pollinators.

## 3.3.7  Recreation

The Recreation Opportunity Spectrum (ROS) is a widely used planning and management framework for classifying and defining recreation opportunity environments ranging from the primitive to the urban. This continuum recognizes variation among the components of any landscape's physical, social, and operational characteristics. The ROS was developed as a tool to facilitate recreation inventory, evaluation, management, planning, and decision making.  The parcels involved in this lease sale are located within ROS classification semi-primitive motorized, semi-primitive non-motorized, and roaded natural.

## 3.3.8  Visual Resources

In accordance with its mandate in the FLPMA, the BLM inventories and manages the scenic values of the public lands in accordance with national level policies established in BLM Manual Series 8400: Visual Resource Management (VRM).  The BLM's VRM system uses four types of management classes (Classes I through IV) and their associated objectives to describe the different degrees of surface disturbance or modification allowed on the public lands (**Table 3-10**).  VRM classes for the parcels included in this analysis were last established in the 2008 Approved Richfield and Price Field Office RMPs.

The 4.6 million-acres of public lands administered by the Richfield and Price Field Offices contain areas that possess a high degree of scenic quality and a high level of visual sensitivity. The visual attributes of the region have made the Price and Richfield Field Office a popular outdoor recreation destinations, and each year, an increasing number of recreational visitors come to the field offices' to recreate and sightsee.  In general, high scenic quality within the field

AR005448

Chapter 3

offices results from the extraordinarily diverse and distinct topography, geology, and cultural history.  The area possesses scenically unique vistas and river ways; rare and unusual geologic formations of sandstone, limestone, and shale; colorful and highly contrasting sandstone cliffs, arches, canyons, and spires; and an extraordinary concentration of prehistoric rock art, and prehistoric and historic structures.

Sensitive viewsheds that could potentially be impacted by future development of the parcels being proposed for leasing include those parcels within the San Rafael Desert, Robbers Roost, Green River, and Canyonlands National Park Horseshoe Canyon unit.  These viewsheds were considered sensitive because introduced changes in these landscapes from future mineral resource development could affect the experiences of recreational visitors to these local, regional, national, and/or international outdoor recreation destinations.  **Table 3-10** identifies the acreages of each VRM Class and their corresponding RMP objectives for the proposed parcels located within sensitive viewsheds.

| Table 3-10 VRM Class Objectives within Parcels with Sensitive Viewsheds | | |
|---|---|---|
| **VRM Class** | **VRM Objective** | **BLM Acreages of VRM Classes within Parcels with Sensitive Viewsheds** |
| Class I | The objective of this class is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited management activity.  The level of change to the characteristic landscape should be very low and should not attract attention. | 106: 0 acres<br>111: 0 acres<br>112: 0 acres<br>113: 0 acres<br>SNI-Suspended 85328: 0 acres |
| Class II | The objective of this class is to retain the existing character of the landscape.  The level of change to the characteristic landscape should be low.  Management activities may be seen, but should not attract the attention of the casual observer.  Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape. | 106: 0 acres<br>111: 0 acres<br>112: 0 acres<br>113: 496 acres<br>SNI-Suspended 85328: 0 acres |
| Class III | The objective of class III is to partially retain the existing character of the landscape.  The level of change to the landscape should be moderate.  Management activities may attract the attention of the casual observer, but should not dominate the view of the casual observer.  Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape. | 106: 813 acres<br>111: 2,542 acres<br>112: 2,506 acres<br>113: 1,763 acres<br>SNI-Suspended 85328: 2,439 acres |
| Class IV | The objective of Class IV is to provide for management activities that require | 106: 0 acres<br>111: 0 acres |

AR005449

Chapter 3

| Table 3-10 VRM Class Objectives within Parcels with Sensitive Viewsheds | | |
|---|---|---|
| **VRM Class** | **VRM Objective** | **BLM Acreages of VRM Classes within Parcels with Sensitive Viewsheds** |
| | major modifications to the existing character of the landscape. The level of change to the landscape can be high. The management activities may dominate the view and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repetition of the basic visual elements of form, line, color, and texture. | 112: 0 acres<br>113: 0 acres<br>SNI-Suspended 85328: 0 acres |

Since completion of the 2008 PFO and RFO RMPs. BLM has since updated the Visual Resources Inventory (VRI) for the project area, in accordance with BLM Handbook 8410-1, Visual Resource Inventory. Scenic quality is a measure of the visual appeal of a tract of land. In the visual resource inventory process, public lands are given an A, B, or C rating based on the apparent scenic quality which is determined using seven key factors: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. Further, BLM Handbook 8410 directs, "Inventory classes are informational in nature and provide the basis for considering visual values in the RMP process. They do not establish management direction and should not be used as a basis for constraining or limiting surface disturbing activities."

Although some parcels may have been inventoried containing a higher relative value of visual resources (e.g., VRI Class II or Scenic Quality Rating A), these areas are still managed under the assigned VRM classes established in the governing land use plans. VRM Classes are established during a land use planning decision making process. Changing the VRM classes is outside the scope of this EA and any changes would require a land use plan amendment .

All but two of the parcels and leases are completely within areas tentatively classified VRI Class III and IV. Parcel 106 and lease UTU-085328 both intersect areas tentatively classified VRI Class II.

### 3.3.9 Dark Night Sky/Soundscape

The night skies within the leasing area remains relatively unaffected by light pollution or "artificial skyglow" *Skyglow is the result of scattered artificial light in the atmosphere; it raises night sky luminance and creates the most visible negative effect of light pollution (Falchi et al. 2016).* The surrounding communities and parks (Capitol Reef National Park, Torey, UT, Canyonlands National Park, and Dead Horse State Park) have designated areas that support dark sky protection and are receiving an increased amount of astrotourism.

AR005450

# 4    ENVIRONMENTAL IMPACTS

## *4.1  INTRODUCTION*

This chapter discusses the environmental consequences of implementing the alternatives described in Chapter 2. Under NEPA, actions with the potential to affect the quality of the human environment must be disclosed and analyzed in terms of direct and indirect impacts—whether beneficial or adverse and short or long term—as well as cumulative impacts. Direct impacts are caused by an action and occur at the same time and place as the action. Indirect impacts are caused by an action but occur later or farther away from the resource. Beneficial effects are those that involve a positive change in the condition or appearance of a resource or a change that moves the resource toward a desired condition. Adverse effects involve a change that moves the resource away from a desired condition or detracts from its appearance or condition. Cumulative impacts are the effects on the environment that result from the incremental effect of the action when added to other past, present, and reasonably foreseeable future actions.

**No Action Alternative**

The BLM assumes that the No Action Alternative (no lease option) may result in a slight reduction in domestic production of oil and gas. This reduction would diminish federal and state royalty income, and increase the potential for federal lands to be drained by wells on adjacent private or state lands. The public's demand for oil and gas is not expected to change; oil and gas consumption is driven by a variety of complex interacting factors including energy costs, energy efficiency, availability of other energy sources, economics, demographics, and weather or climate. If the parcels are not leased, energy demand would continue to be met by other sources such as imported fuel, alternative energy sources (e.g., wind, solar), and other domestic fuel production. This displacement of supply could offset any reductions in emissions and disturbance achieved by not leasing the subject tracts in the short term.

The No Action Alternative would not meet the purpose and need for the Proposed Action.

## *4.2  INDIRECT IMPACTS*

### 4.2.1  Air Quality

4.2.1.1    <u>Impacts of No Action Alternative</u>

Under the no Action alternative, the parcels would not be sold and the leases would not be issued or have their suspensions lifted.  They could not be developed, thus no impacts to air quality would occur.

4.2.1.2    <u>Impacts of Proposed Action Alternative</u>

**Moab Master Leasing Plan**

The air quality analysis for the EIS prepared for the Moab Master Leasing Plan is incorporated by analysis.  It is summarized as follows:

AR005451

Chapter 4

### Far-Field Dispersion Modeling Analysis

The Moab MLP far-field modeling analysis examined multiple source impacts to NAAQS and air quality–related values (AQRVs) in the planning area using the CALMET/CALPUFF dispersion modeling system. Three years of meteorological datasets were used to evaluate year-to-year variability and how variability impacts modeled concentrations.

The analysis modeled for three emissions scenarios, each assuming the drilling of 232 wells (BLM, 2016a):

   High scenario: no aggregation of wells on pads, 100% of wells go into production (232 wells), 50% dust control, more unpaved roads

   Medium scenario: no aggregation of wells on pads, 60% of wells go into production (140 wells), 50% dust control, fewer unpaved roads

   Low scenario: aggregation of four wells per one pad, 60% of wells go into production (140 wells), 70% dust control, smallest amount of unpaved roads


The projected oil and gas development in the affected area is substantially lower than the action alternative scenario for oil and gas development, which is 7 producing wells which comprises 3.0% of the wells in the Moab MLP's high scenario and 5.0% of the wells in the low scenario. Based on these percentages, the use of the Moab MLP's modeling results for this analysis is conservative.

NAAQS

Maximum modeled concentrations at Arches and Canyonlands National Parks showed no exceedances of the NAAQS for any criteria pollutant for any of the modeled scenarios (BLM, 2016a) Based on these modeling results, no NAAQS exceedances are expected from planning area oil and gas development for any of the alternatives.

Prevention of Significant Deterioration

Emissions from oil and gas development are unlikely to trigger the PSD requirement of the CAA. For informational purposes the PSD analysis used in the Moab MLP is presented. The Moab MLP modeled emission rates for the highest emitting 12-month period of oil and gas development (annual $NO_2$ and annual $PM_{10}$) to assess PSD. Modeled emission rates for the 24-hour PM10 assessment were based on the highest emitting calendar day. All predicted impacts were well below associated increments, with annual NO2 at 16%, Annual PM10 at 8.8%, and 24-hour PM10 at 56.3% of the PSD increment (BLM, Moab Master Leasing Plan and Final Environmental Impact Statement, 2016a).

Visibility

The Moab MLP calculated visibility impacts from potential 24-hour primary $PM_{10}$, secondary sulfate and nitrate PM, and elemental carbon concentrations in Arches and Canyonlands National Parks. Results were compared to natural background conditions as recommended in the *Federal Land Managers' Air Quality Related Values Group (FLAG) Phase I Report – Revised 2010* (Federal Land Managers, 2010). Both the BLM 10% change in extinction (1.0 deciview [dv])

AR005452

Chapter 4

"just noticeable change" threshold and the National Park Service 5% change in extinction (0.5 dv) "half a noticeable change" adverse impacts threshold were used to assess the significance of potential impacts (BLM, 2016a).

Visibility impacts ranged from greater than 0.5 dv on 159 days at Canyonlands National Park during the 2008 meteorological year for the high emissions scenario, to no visibility impacts greater than 1.0 dv at any park for any meteorological year under the low emissions scenario. Under the low emissions scenario, visibility was impaired only in the 2008 meteorological year in Canyonlands National Park, where there were 22 days exceeding 0.5 dv (no days exceeded 1.0 dv) (BLM, 2016a). $PM_{10}$, primarily road dust from truck traffic on unpaved roads, was the main pollutant of concern under both the high and medium emissions scenarios. $NO_x$ played a greater role in visibility impacts in the low emissions scenario. The specific meteorological year used in the analysis also influenced modeled impacts. Meteorology in 2008 had substantially greater levels of impacts compared to the previous 2 years of data, which indicates sensitivity to meteorological variability. Because of the large role particulates play, adverse visibility impacts can most likely be tied to drier, hotter, and/or windier conditions (BLM, 2016a).

As discussed in Section 3.3.1.4 and shown in **Table 3-5**, visibility for Canyonlands National Park from 2006 to 2015 indicates that there is no statistically significant trend on the 20% of clearest days. Visibility improved on the 20% of haziest days during this time period. Overall, visibility shows impairment based on comparisons with the natural condition haze index. The NPS indicates that visibility at Canyonlands National Park warrants moderate concern.

Because the action alternative (Alternative A) of proposed comprise 12.1% of the producing wells in the low scenario in the Moab MLP, visibility impacts are expected to be below the 1.0-dv threshold under all four alternatives. Although it is possible that visibility impacts from oil and gas development in the planning area could exceed the 0.5-dv threshold on certain days in years with dry, hot, and/or windy conditions, it is considered unlikely based on the low number of wells for all alternatives. The Moab MLP notes that visibility impacts in the area appear to be especially sensitive to emissions of $PM_{10}$ (e.g., road dust), and to a lesser extent elemental carbon (e.g., diesel soot) and $NO_x$. The proximity of emission sources, particularly PM sources, plays a large role in the magnitude and frequency of modeled adverse visibility impacts to the AQRVs of the national parks (BLM, 2016a).

Deposition

All modeled values of sulfur and nitrogen deposition were near or below the deposition analysis thresholds (DATs) of 0.005 kilogram per hectare per year for total nitrogen and total sulfur for all of the modeled scenarios, with the exception of the high and medium emissions scenarios for nitrogen deposition in Arches and Canyonlands National Parks for the 2008 meteorological year (BLM, 2016a). Under the low emissions scenario, all modeled values were below the DAT for both total nitrogen and total sulfur, with the exception of the 2008 value for nitrogen deposition in Canyonlands National Park (0.00857 kilogram per hectare per year) (BLM, 2016a). The DATs are NPS screening level values for the additional modeled amount of sulfur and nitrogen deposition within federal areas from new or modified sources (Federal Land Managers, 2010).

As discussed in Section 3.3.1.6 and shown in **Table 3-6**, wet deposition data for Canyonlands National Park from 2009 to 2015 indicate that there is no statistically significant trend for sulfate in precipitation. The trend for nitrate in precipitation is improving during this time period.

41

AR005453

Chapter 4

However, NPS indicates that wet nitrogen deposition warrants significant concern at Canyonlands National Park based on the highly sensitive park ecosystem. Dry deposition of nitrogen and sulfur has been relatively unchanged or slightly decreasing in Canyonlands National Park from 2009 to 2014; however, it is not known if this trend is statistically significant.

Because the maximum projected producing wells in Alternative A comprise 12.1% of the producing wells in the low scenario in the Moab MLP, total sulfur and total nitrogen deposition from oil and gas development in the planning area are not expected to exceed the DATs.

Near-Field Dispersion Modeling Analysis

Near-field modeling evaluates impacts of single or closely grouped sources to nearby receptors, typically those less than 1 kilometer (0.6 mile) away. Specific characteristics of the source to be modeled (e.g., emission rates, stack heights) are required for this type of modeling. This type of data was not available for the Moab MLP because of its programmatic nature (the Moab MLP is a planning document for oil, gas, and potash leasing rather than a specific analysis of one leasing project). Instead, the BLM evaluated previous near-field modeling for specific projects in and near the Moab MLP planning area for relevance to management decisions. The previous projects consisted of the Fidelity Cane Creek project (the addition of nine exploratory wells to eight producing wells) and the Monument Buttes project (a proposal for drilling 5,750 wells) (BLM, 2016a). Based on its large size, air quality impact data from the Monument Buttes project are not applicable to the MLP/EA and are not included here.

For the Fidelity Cane Creek project, the Moab MLP indicated that predicted impacts to air quality in Canyonlands and Arches National Parks from this project's emissions were "minimal and generally below guideline criteria" (BLM, 2016a). Modeling results indicated no adverse effect on visibility from the proposed project in Canyonlands and Arches National Parks. Predicted nitrogen deposition worst-case project emissions were comparably low but slightly above the DAT. The deposition modeling represented a short-term, worst-case prediction and was "not directly comparable to the long-term deposition impacts reflected in the DAT" (BLM, 2016a). Additionally, deposition modeling used a simplified 1-year meteorological dataset instead of a three-dimensional wind field-based dataset for 3 years, which would likely show lower deposition rates than presented (BLM, 2016a).

Based on its size and location, the Fidelity Cane Creek project air quality modeling results would be applicable to proposed oil and gas development in the planning area.

Ozone Analysis

The 2013 *Western Regional Air Partnership (WRAP) West-wide Jump-start Air Quality Modeling Study (WestJumpAQMS)* was designed to provide regional technical analysis and support for $O_3$ and particulate transport and attainment demonstrations across the West (WRAP, 2013). The goals of the study included incorporating all of the recent western modeling analyses into a single modeling database; performing a comprehensive model performance evaluation in an open technical forum; performing a comprehensive source apportionment analysis to evaluate local, regional, international, and natural source impacts on $O_3$ and $PM_{2.5}$ concentrations across the West; and developing a modeling platform to be used to conduct regional air quality planning, National Environmental Policy Act (NEPA) analyses, and state implementation plan analyses in the West.

AR005454

Chapter 4

The Moab MLP used the WestJumpAQMS modeling study to evaluate $O_3$ impacts from oil and gas development in the Moab MLP planning area. Canyonlands National Park was chosen as a source receptor to evaluate local and regional emission source impacts on $O_3$. Key points from this analysis include the following (BLM, 2016a):

A modeled highest $O_3$ day at Canyonlands National Park on May 10, 2008, showing large-scale regional background data, indicated that almost 90% of modeled $O_3$ on that day was from outside the region, with sources in Utah making up the next largest contribution at 3.4%. For comparison, the Utah contribution was 29.7% on the modeled highest $O_3$ day that same year for Salt Lake City, a large metropolitan area, which reflects a much larger number of emission sources in Salt Lake City compared to the Moab MLP planning area.

Meteorological conditions can play a dominant role in source contributions to monitored or modeled values. Predominant winds can transport $O_3$ from outside the Moab MLP planning area into the Moab MLP planning area.

Based on source apportionment by state contribution data, sources in the Moab MLP planning area are unlikely to significantly contribute to modeled or monitored $O_3$ concentrations. However, they do contribute *incrementally* to both Moab MLP planning area and regional $O_3$ concentrations.

The WestJumpAQMS source apportionment tool allows the user to specify source contributions by type (e.g., mobile source, fire, oil and gas). In a modeled Moab MLP planning area $O_3$ concentration of 70.0 parts per billion (ppb), 11.7 ppb or 16.7% are from regional sources, indicating that regional sources may play an important role in ozone levels for a particular area like the Moab MLP planning area. Oil and gas emissions account for less than 1% of the regional source category emissions. Mobile sources such as cars and trucks make up the largest single category, followed by natural sources and by point sources such as power plants. This is not an unusual source category breakdown for rural airsheds in the western United States.

Emissions of $O_3$ precursor gases in the Moab MLP cumulative impact analysis area (which includes airsheds adjacent to the Moab MLP planning area) were found to contribute a relatively minor amount to modeled $O_3$ concentrations. The largest contributors of $O_3$ precursor gases were mobile sources, followed by point sources.

The ratio of emissions in the Moab MLP planning area to total regional emissions is unlikely to change to a significant degree over the life of the Moab MLP planning period. Overall, oil, gas, and potash emissions may increase observed monitored values in the Moab MLP planning area, but the region will continue to be only slightly impacted by emissions in the Moab MLP planning area.

Contributions from ozone-precursor-generating activities in the Moab MLP planning area will not be a determinant factor in $O_3$ concentrations approaching or exceeding the NAAQS.

Reasonable controls to reduce the emissions of $O_3$ precursors from oil and gas activities should be required to reduce the relatively minor contribution that emission sources in the Moab MLP cumulative impact analysis area have on regional $O_3$ formation and transport.

43

Chapter 4

### *Emissions from Potential Development of the Proposed Parcels*

Should development on the parcels be proposed, and prior to authorizing specific proposed projects on the subject leases, emission inventories would need to be developed.  Air quality dispersion modeling, which may also be required at that time, includes direct and cumulative impact analysis for demonstrating compliance with the NAAQS, plus analysis of impacts to Air Quality Related Values (i.e. deposition, visibility), particularly as they might affect nearby Class 1 areas (National Parks and Wilderness areas).  At present, control technology on some emissions sources (e.g. drill rigs) is not required by regulatory agencies.  Possible future development would result in different emission sources associated with two project phases: well development and well production.

An emissions inventory (EI) for the Lease Sale are calculated for a "typical well" and are based on the following assumptions:

- Each oil and gas well would cause 10.4 acres of surface disturbance. This acreage includes well pad, road and pipeline construction. The average pad is about 4.1 acres in size. Access and pipeline acreage can vary. Eleven acres is used here and is from the RFD (section 2.2).
- Construction activity for each well is assumed to be 10 days. It is further assumed that, based on the acreage disturbed, 4.5 days would be spent in well pad construction and 5.5 days would be spent in road and pipeline construction.
- Control efficiency of 25% for dust suppression would be achieved as a result of compliance with Utah Air Quality regulation R307-205.
- Post construction particulate matter (dust) emissions are likely to occur on a short-term basis due to loss of vegetation within the construction areas. Assuming appropriate interim reclamation, these emissions are likely to be minimal to negligible and will not be considered in this EA.
- Drilling operations would require 14 days.
- Completions and testing operations would require 3 days.
- Well pad, road, and pipeline construction activity emissions ($PM_{10}$) will be considered. Off road mobile exhaust emissions from drilling activities will be considered.
- Off road mobile exhaust emissions from heavy equipment and on road mobile emissions will not be considered as they are dispersed, sporadic, temporary, and not likely to cause or contribute to exceedance of the NAAQS.

Emission factors for activities of the proposed action were based on information contained in the EPA's Emission Factors & AP 42, Volume I, Fifth Edition (EPA.1995), available at: https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-compilation-air-emission-factors.

The production emissions from oil storage tanks was estimated based on the emission factor contained in the Colorado Department of Public Health and Environment PS Memo 05-01, Oil & Gas Atmospheric Condensate Storage Tank Batteries Regulatory Definitions and Permitting Guidance (CDPHE 2017), available at: https://environmentalrecords.colorado.gov/HPRMWebDrawer/RecordHtml/901875.

AR005456

Chapter 4

**Table 4-1: Emissions inventory summary**

| | Construction Emissions (Tons) | Drilling | Emissions (Tons) | | Completions Emissions (Tons) | | | | Ongoing Production Emissions (Tons/year) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PM10 | NOX | CO | VOC | VOC | NOx | CO | PM10 | NOX | CO | VOC | PM10 |
| Typical Well | 0.81 | 13.31 | 1.83 | 0.23 | 0.85 | 0.07 | 0.07 | 0.00 | 0.11 | 0.09 | 241.36 | 0.00 |

| | PM10 | NOx | CO | VOC | |
|---|---|---|---|---|---|
| Activity Emissions × 11 wells (15 year period) | 8.91 | 147.18 | 20.9 | 11.88 | Tons |
| Annual ongoing production emissions (7 wells) | 0.00 | 0.77 | 0.63 | 1689.52 | tpy |

Based on these data and the current NAAQS attainment status of both counties (see Section 3.2.2.1 and Tables 3-2 and 3-3), the projected emissions from oil and gas development shown in Table 4-1 would not contribute to exceedances of the NAAQS.

As discussed in Section 3.3.1.1 and shown in **Table 3-3**, Canyonlands National Park $O_3$ monitoring data from 2009 to 2015 reflect a statistically significant improving trend. During this time period, there were no exceedances of the 2008 $O_3$ NAAQS and one exceedance of the 2015 $O_3$ NAAQS (in 2012). Based on this trend, the analysis and conclusions reached in the Moab MLP, and the lower level of development projected for the planning area (than that proposed in the Moab MLP), oil and gas development in the planning area is not expected to noticeably contribute to regional $O_3$ formation and transport. It could have a minor contribution to monitored $O_3$ concentrations in Canyonlands National Park. Because these concentrations are currently showing an improving trend, it is unlikely that the proposed oil and gas development would contribute to NAAQS exceedances in the park.

The BLM has developed Best Management Practices (BMPs), which are mitigation measures applied to oil and natural gas drilling and production to help ensure that energy development is conducted in an environmentally responsible manner. The BLM encourages industry to incorporate and implement BMPs to reduce impacts to air quality through reduction of emissions, surface disturbances, and dust from field production and operations. Typical measures include:

- Open burning of garbage or refuse would not occur at well sites or other facilities;
- Drill rig would be equipped with Tier II or better diesel engines;
- Vent emissions for stock tanks and natural gas TEG dehydrators would be controlled by routing the emission to a flare or similar control device which would reduce emissions by 95% or greater;
- All internal combustion equipment would be kept in good working order;
- Flared hydrocarbon gases at high temperatures in order to reduce emissions of incomplete combustion through the use of multi-chamber combustors;
- Watering dirt roads during periods of high use to reduce fugitive dust emissions;
- Co-location of wells and production facilities to reduce new surface disturbances;
- Use of natural gas fired or electric drill rig engines;
- The use of selective catalytic reducers and low-sulfur fuel for diesel-fired drill rig engines;

AR005457

Chapter 4

- Adherence to BLM's Notice to Lessees' (NTL) 4a concerning the venting and flaring of gas on Federal leases for natural gas emissions that cannot be economically recovered;
- Protecting hydraulic fracturing sand from wind erosion;
- Implementation of directional drilling and horizontal completion technologies whereby one well provides access to petroleum resources that would normally require the drilling of several vertical wellbores;
- Requiring that vapor recovery systems be maintained and functional in area where petroleum liquids are stored; and
- Preforming interim reclamation to reclaim area of the pad not required for production facilities and to reduce the amount of dust from the pads

Additionally, the BLM encourages oil and natural gas companies to adopt other proven, cost-effective technologies and practices that improve operational efficiency and reduce natural gas emissions.

Application of Stipulation UT-S-01 and Notices UT-LN-96, UT-LN-99, and UT-LN-102 to each of the leases on federal surface would be adequate for the leasing stage to disclose potential future restrictions and to facilitate the reduction of potential impacts upon receipt of a site specific APD through application of BMPs and other technologies that may improve operational efficiency and reduce natural gas emissions.

## 4.2.2 Areas of Critical Environmental Concern

### 4.2.2.1    Impacts of No Action Alternative
The No Action alternative would not result in potential impacts because the parcels would not be leased or developed.

### 4.2.2.2    Impacts of Proposed Action Alternative
The issuance of leases would not directly impact the ACEC's relevant and important cultural values. No surface occupancy stipulation UT-S-319 would be applied within the ACEC and mitigate impacts of oil and gas development on ACEC values. BLM would add the lease stipulation UT-S-319 - No Surface Occupancy to parcel 106. Leasing the parcels under a No Surface Occupancy stipulation will prevent any future associated development from occurring within these parcels. Thus, no direct impacts to relevant and important cultural values within the Dry Lake ACEC are anticipated as a result of the proposed action. For a more detailed explanation of anticipated impacts to the specific relevant and important resource, please refer to the Cultural section in Chapter 4 of this document.

## 4.2.3 Cultural Resources

### 4.2.3.1    Impacts of No Action Alternative

The No Action Alternative would result in no impact to cultural resources because the parcels would not be leased or developed.

46

Chapter 4

4.2.3.2   Impacts of Proposed Action Alternative

Section 106 of the National Historic Preservation Act (NHPA) specifically requires federal agencies to consider the potential effects of undertakings on historic properties (cultural resources, which are listed or eligible for listing on the National Register of Historic Places (NRHP)), in the process defined in its implementing regulations at 36 CFR 800.  As part of the Section 106 analysis, BLM has completed a draft intensive records review which takes into account a wide variety of data, including the parcel size, location, current and past oil and gas leasing and development data for the area, landscape data (e.g., topography, water sources) and cultural resources data, including all previously recorded site data and survey records for the area, cultural resources potential models for the San Rafael Desert MLP, Price, and Richfield Field Offices, ethnographic data, and information gathered through formal consultation with tribes and consulting parties, and through public participation.  Although Section 106 is primarily concerned with historic properties the information from the records review is used in considering impacts to all cultural resources.

Reasonably foreseeable development resulting from leasing within the proposed area has the potential to impact cultural resources, both directly and indirectly. Potential direct effects are physical disturbance of a site from the construction of a well pad, associated access roads, or associated infrastructure (e.g., pipelines). Given the types of cultural resources known and expected in the area, potential indirect effects include changes to the landscape which result in impacts to a site's setting, feeling, or association; increased rock art exposure to dust resulting from increased traffic on roads; visual impacts to sensitive rock art sites; and the potential to increase public access, potentially leading to increased vandalism and looting.

The Criteria for Adverse Effect found at 36 CFR 800.5(a)(1) are used in this section to analyze the potential effects to historic properties. This regulation states: "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." Under Section 106, when effects from an undertaking to historic properties reach the adverse effects threshold, they must be avoided, minimized or mitigated.

In the literature review and analysis, the field offices used a reasonably foreseeable development (RFD) scenario to understand the potential impacts to cultural resources. As used in this section, RFD is defined as the expected area of surface disturbance for one well pad. RFD encompasses the total surface disturbance for construction of a well pad, access (road(s)), and associated pipelines. For purposes of this analysis, the RFD for the San Rafael Desert outlined in the San Rafael Desert Master Leasing Plan was used.  If 10.4 acres of disturbance can be accommodated within a lease parcel without adverse effects, then BLM determines that that parcel can be leased without adverse effect to historic properties.

Using these data, BLM analyzed whether reasonably foreseeable development could occur somewhere within each parcel without adverse effects to historic properties. Analysis of the

AR005459

Chapter 4

above data demonstrates that there is room for reasonably foreseeable development within all parcels without causing adverse effects, whether the result of direct effects or indirect effects. Regarding direct effects, for many parcels these effects can be avoided because there are large or moderate sized areas with known or expected site densities that can easily accommodate the appropriate acreage of disturbance without adverse effects. For the remaining parcels where site densities are higher, there are still sufficient areas to accommodate reasonably foreseeable development and stipulations attached to each parcel will ensure well pad placement will not have adverse effects to historic properties, these stipulations are discussed below. For those parcels where there are sites sensitive to indirect effects, parcels are sufficiently large and topographically complex that these effects can be avoided through judicious placement of a well pad.

The rock art brought forward by consulting parties is within canyons. While some parcels include portions of these canyons, large portions also encompass the surrounding landscape, above and outside the canyon walls and bottoms. While parcels encompass potentially sensitive rock art, impacts to setting are avoidable by placing development elsewhere in these large parcels, specifically outside and away from canyons. When a lease is sold, BLM retains control over future development plans though lease stipulations, giving BLM the authority to accomplish the types of avoidance discussed above

Meeting lease stipulation requirements is a critical component of having any future proposed development approved by the BLM. All stipulations will be enforced during any future authorization to conduct exploration or operational activities under a lease. Through the Cultural Resource Protection Stipulation attached to all leases, BLM has the authority to require modification of, or disapprove, parcel development plans if cultural resource conflicts cannot be satisfactorily resolved. This gives BLM the authority to control future development to avoid adverse effects, including, but not limited to, those caused by a degradation of setting and other indirect effects. Although there may be impacts to non-eligible sites as discussed above, no adverse effects are predicted for historic properties from exploration/development of the lease parcels.

## 4.2.4   Greenhouse Gas Emissions/Climate Change

### 4.2.4.1   Impacts of No Action Alternative

If the parcels are not leased, there would be no additional Greenhouse Gas emitted from exploration/development of the parcels, nor from combustion of any hydrocarbons extracted from the lease.

### 4.2.4.2   Impacts of Proposed Action Alternative

At this time, the BLM is disclosing the likelihood and potential magnitude of indirect and downstream GHG emissions but is not able to disclose potential impacts to climate change from the estimated downstream GHG emissions related to the proposed lease sale. The inconsistency in results of scientific models used to predict climate change at the global scale, coupled with the lack of scientific models designed to predict climate change on regional or local scales, limits the ability to quantify potential future impacts of decisions made at this level. It is therefore beyond

AR005460

Chapter 4

the scope of existing science to relate a specific source of GHG emission or sequestration with the creation or mitigation of any specific climate-related environmental effects. Although the effects of GHG emissions in the global aggregate are well-documented, it is currently impossible to determine what specific effect GHG emissions resulting from a particular activity might have on the environment. Analysis of impacts at this leasing stage would be speculative and would be not be based "reasonable projections and assumptions".

**Availability of Input Data**

There are many uncertain factors that affect the potential for GHG emissions estimates: a lease may not be sold, so no GHG emissions would be expected; a lease may be sold but never explored, so again there would be no GHG emissions; a lease may be sold and an exploratory well drilled that showed no development potential, so minimal GHG emissions would occur; or a lease may be sold, explored, and developed. GHG emission estimates also would change due to specific production volumes and variability in flaring, construction, and transportation. At this stage, it is difficult to discern with certainty what end uses for the fuels extracted from a particular leasehold might be reasonably foreseeable.

Accurate assessments of GHG emissions are not possible at the leasing stage since emissions are dependent on factors such as specific equipment used and duration of use, applicant-committed emission controls, and the expected production rate from the oil or gas well. These factors are not known at the leasing stage. Furthermore, additional infrastructure such as pipelines, roads, compressor stations, gas plants and evaporation ponds are also not reasonably foreseeable at the leasing stage and are dependent on the level of development that may occur if a parcel is leased.

GHG emissions are a potential effect of the subsequent fluid mineral exploration and/or development of any leases that are issued. Oil and gas activities may lead to the installation and production of new wells, which may consequently produce an increase in GHG emissions. The primary sources of GHG emissions related to exploration or development could include the following:

- Fossil fuel combustion for construction and operation of oil and gas facilities – vehicles driving to and from production sites, engines that drive drill rigs, etc. These produce CO2 in quantities that vary depending on the age, types, and conditions of the equipment as well as the targeted formation, locations of wells with respect to processing facilities and pipelines, and other site-specific factors;
- Fugitive $CH_4$ – $CH_4$ that escapes from wells (both gas and oil), oil storage, and various types of processing equipment. This is a source of global $CH_4$ emissions. These emissions have been estimated for various aspects of the energy sector, and starting in 2011, producers are required under 40 CFR 98, to estimate and report their $CH_4$ emissions to the EPA; and
- Combustion of produced oil and gas – it is assumed that future operations would produce marketable quantities of oil and/or gas. Combustion of the oil and/or gas would release $CO_2$ into the atmosphere.

AR005461

Chapter 4

In recent years, many states, tribes, and other organizations have initiated GHG inventories, tallying GHG emissions by economic sector. The U.S. EPA provides links to statewide GHG emissions inventories (EPA, 2017c). Estimates of GHG emissions were made by incorporating production and consumption data and emissions factors [Energy Information Administration (EIA, 2018), Utah Division of Oil Gas and Mining (UDOGM, 2018), (EPA, 2018e), and (IPCC, 2006) to equate potential activities to GHG emissions in the form of carbon dioxide equivalent ($CO_2e$). Some additional data, including the projected volume of oil or natural gas produced for an average well, number of wells (as well as other factors described in Section 3.3.1 Air Quality) were used to provide GHG estimates.

**Emissions from potential development**

Total Greenhouse GWP, which includes direct emissions of carbon dioxide, methane, and nitrous oxide from an oil or gas producing well is estimated based on using a generic emissions calculator resulting in emissions of 1,676 tons per year CO2-e for a single operational well, and 2,606 tons per year CO2-e for a single drill rig. Accurate assessments of GHG emissions are not possible at the leasing stage since emissions are dependent on factors such as specific equipment used and duration of use, applicant-committed emission controls, and the expected production rate from the oil or gas well. These factors are not known at the leasing stage. Furthermore, additional infrastructure such as pipelines, roads, compressor stations, gas plants and evaporation ponds are also not reasonably foreseeable at the leasing stage and are dependent on the level of development that may occur if the parcels are leased.

**Downstream Greenhouse Gas Emissions**
GHG emissions are estimated based on historical production rates of existing nearby wells. Due to large variability in amounts of product a well could produce downstream GHG emissions are presented as low, average, and high production scenarios estimated from current oil and gas production from nearby wells. Low production estimates are for dry wells or parcels that are not drilled, average estimates are the mean annual production of nearby wells, and the high estimate is the maximum producing nearby well. Well production data was obtained from UDOGM (UDOGM, 2018).

Indirect GHG emissions are only calculated for carbon dioxide based on combustion of the product. It is impossible to know which of these scenarios (if any) would actually occur, so emissions numbers are presented to estimate the range of possible indirect emissions that could result from the well. Using an RFD of seven producing wells for the lease sale and emission factors from the EPA (EPA, 2018e), EIA (EIA, 2018b), and IPCC (IPCC, 2006), speculated GHG emissions care presented in **Table 4-1**.

*Table 4-1 Downstream Annual GHG Emissions Estimates for Seven Wells*

|  | Annual Oil Production (bbl) | GHG Emissions (MT $CO_2$ per year) [3] | Annual Gas Production (Mcf) | GHG Emissions (MT $CO_2$ per year) [4] | Total GHG Emissions (MT $CO_2$ per year) |
|---|---|---|---|---|---|
| Low[1] | 0 | 0 | 0 | 0 | 0 |
| Average[2] | 286,076 | 123,011 | 168,553 | 9,366 | 132,384 |
| High[2] | 1,211,105 | 520,772 | 689,633 | 38,332 | 559,104 |

50

Chapter 4

1. Assumes well is non-productive
2. Well production information obtained from (UDOGM, 2018)
3. Oil well GHG indirect emission factor: 0.43 MT $CO_2$ per barrel (EPA 2018d)
4. Gas well GHG indirect emission factor are averaged from: 0.054717 MT $CO_2$ per million cubic feet (EPA, 2018e) ,117.1 lbs of CO2/MCF (EIA, 2018b), and 56,100 kg CO2/TeraJoule (IPCC, 2006) emission factors

Actual GHG emissions may range from zero (assuming no lease parcels sold or developed) to an indeterminate upper range based on realized production rates, control technology, and physical characteristics of any oil produced.

As it is not possible to assign a "significance" value or impact to these numbers, the emissions estimates themselves are presented as a proxy for impact.

**Uncertainties of GHG Calculations**
Although this EA presents a quantified estimate of potential GHG emissions associated with reasonably foreseeable oil and gas development, there is significant uncertainty in GHG emission estimates due to uncertainties with regard to eventual production volumes and variability in flaring, construction, and transportation. Additionally it is difficult to discern with certainty what end uses for the fossil fuels extracted from a particular leasehold might be reasonably foreseeable. For instance, some end uses of fossil fuels extracted from Federal leases include: combustion of transportation fuels, fuel oils for heating and electricity generation, as well as production of asphalt and road oil, and the feedstocks used to make chemicals, plastics, and synthetic materials. The BLM does not exercise control over the specific end use of the oil and gas produced from any individual federal lease and has no authority to direct or regulate the end use of the produced products. As a result, the BLM can only provide an estimate of potentialGHG emissions by assuming that all produced products would eventually be combusted.

The direct and indirect emission estimates above provide an estimate of the full potential for GHGs released into the atmosphere from initial wellsite construction, well drilling and completion, production, and end use. A rough estimate was possible using publicly available information and using estimates from future production for reasonably foreseeable development.

**<u>Possible Future Best Management Practices, Standard Operating Procedures, and/or Mitigation Measures</u>**
The BLM holds regulatory jurisdiction over portions of natural gas and petroleum systems, identified in the USEPA *Inventory of U.S. Greenhouse Gas Emissions and Sinks* [EPA 2016d]. Exercise of this regulatory jurisdiction has led to development of Best Management Practices (BMPs), which are state-of-the-art mitigation measures applied to oil and natural gas drilling and production to help ensure that energy development is conducted in an environmentally responsible manner.  BMPs used to reduce air pollutant emissions have an additional benefit of reducing GHG emissions. The BLM encourages industry to incorporate and implement BMPs to reduce impacts to climate through reduction of GHG emissions from field production and operations.  Typical measures are mentioned in section 4.2.1.

Additionally, the BLM encourages oil and natural gas companies to adopt proven, cost-effective technologies and practices that improve operational efficiency and reduce natural gas emissions. In October 2012, USEPA promulgated air quality regulations for completion of hydraulically fractured gas wells (EPA, 2017a).  These rules required air pollution mitigation measures that

AR005463

Chapter 4

reduced the emissions of volatile organic compounds during gas well completions. Mitigation included utilizing a process known as a "green" completion in which natural gas brought up during flowback is captured in tanks rather than in open fluid pits. Among other measures to reduce emissions include the USEPA's Natural Gas STAR program. The USEPA U.S. inventory data shows that industry's implementation of BMPs proposed by the program has reduced emissions from oil and gas exploration and development (EPA, 2018a).

## 4.2.5  Lands with Wilderness Characteristics

### 4.2.5.1  Impacts of No Action Alternative

### 4.2.5.2  The No Action alternative would not result in potential impacts because the nominated parcels would not be leased or developed. Impacts of Proposed Action Alternative

Although the issuance of the lease would not directly impact the wilderness characteristics (naturalness, solitude, and primitive unconfined recreation) of the area, the issuance of leases does convey an expectation that exploration drilling and development would occur. The potential development of a lease intersecting or adjacent to lands with wilderness characteristics would likely cause indirect impacts to wilderness characteristics even if the development occurred outside the lands with wilderness characteristics. A number of variables would influence the degree of impact to lands with wilderness characteristics, including where surface-disturbing activities occur, land form or topography, vegetation type, sequence of development, and reclamation time. Impacts could include loss of naturalness and loss of opportunities for solitude or primitive unconfined recreation. According to Section 2.2 of the EA up to 18.2 acres of land remain unreclaimed for the long term with the entire area encompassed by the parcels and leases. Depending on the location of the unreclaimed acreage, from 0 to 18.2 acres of lands with wilderness characteristics may be directly impacted long term from development of the leases. In addition to the impacts disclosed above, if drilling and development were to occur in lands with wilderness characteristics, the wilderness characteristics in that area would likely be reduced. Additional impacts from development could include a reduction in the size of the unit. Development associated with oil and gas leasing (e.g., well pads, access roads) could bisect or fragment a portion of the wilderness characteristics unit so that all or part of the unit no longer meets the size criteria.

The portion of parcel 106 that overlaps lands with wilderness characteristics is within an area subject to No Surface Occupancy stipulations to protect relevant and important values in the Dry Lake ACEC. Approximately 0.02 acres of Parcel UTU 081463 overlaps the Dirty Devil-French Springs natural area, which is available for leasing with a No Surface Occupancy stipulation. Leasing the parcels under a No Surface Occupancy stipulation will prevent any future associated development from occurring within these parcels. Thus, no direct impacts to wilderness characteristics within lease parcel 106 or UTU 081463 are anticipated as a result of the proposed action.

Potential impacts to wilderness characteristics as a result of oil and gas development were disclosed in the Price FEIS (BLM, 2008c, pp. 4 190-97) and the Richfield FEIS (BLM, 2008d, pp. 4 248-256). Impacts to wilderness characteristics for the UT-020-SRD-007 and San Rafael

AR005464

Chapter 4

Reef Subunit E have not been analyzed within a land use plan. The impacts from the development of a lease within these two units would be similar to those described above and in the Price FEIS (BLM, 2008c)

- **Suspended and Protested Lease Decisions**

The protested leases are located within the San Rafael River group (approximately 3,467 acres) and Labyrinth group (approximately 399 acres). A small portion of the suspended leases overlaps the Sweetwater Reef group (approximately 186 acres). The suspended leases are also adjacent to LWCs in the Dirty Devil/French Springs natural area and the Dirty Devil WSA. If the leases were issued and subsequently developed, the impacts to LWCs would be the same as the impacts to LWCs from managing them as open to leasing subject to standard terms and conditions described in this section. In areas where mineral development occurs, soil and vegetation disturbance and the presence of permanent structures would degrade the scenic values and naturalness of LWCs. The noise of construction and operation of oil and gas facilities, including the presence of work crews, vehicles, and equipment, would degrade opportunities for solitude and conflict with primitive recreational opportunities. Surface-disturbing activities could affect the size of LWCs by reducing or eliminating portions of LWCs where mineral development occurs. Some units could be bisected, or mineral development could result in the need to eliminate areas from the LWC unit through the creation of cherry stems. This could result in some areas of the affected LWC units or portions of them no longer meeting the minimum size criterion (5,000 acres); the creation of cherry stems could also affect size and naturalness of LWCs. Oil and gas leasing could also lead to the development of roads and facilities that would increase traffic, noise, and dust that could diminish wilderness characteristics.

## 4.2.6  Pollinators

### 4.2.6.1  Impacts of No Action Alternative

The No Action Alternative would not create impacts to pollinators in the project area because it would not create ground disturbance or alter habitats that pollinators depend upon.

### 4.2.6.2  Impacts of Proposed Action Alternative

The act of issuing oil and gas leases does not authorize ground disturbing or habitat altering actions that could impact pollinators. However, it is anticipated that oil and gas development will occur in the parcels in the future after an Application for Permit to Drill is submitted to the BLM.

Many pollinators that occur in desert habitats are ground dwelling species. Actions that cause ground disturbance could negatively impact them by damaging their nests, removing vegetation that pollinators depend upon for food sources or nesting substrate, and fragmenting habitat. The construction of roads and well pads would remove native plant communities and reduce the extent of habitat that supports pollinators, either in the short term or permanently. Vehicles that travel on natural surface roads create dust that clog plant pores and negatively affect plant reproduction, consequently reducing the extent of flower resources available to pollinators. Ground disturbance creates open areas that are vulnerable to invasion by nonnative plants and noxious weeds. Vehicles and equipment traveling in and out of the project area create avenues for the introduction or spread of invasive plants and noxious weeds. Many nonnative invasive plants and noxious weeds are not adapted to native pollinators and do not provide the floral resources they need.

AR005465

Chapter 4

Implementing the mitigation measures in Lease Notice #UT-LN-156 Pollinators and Pollinator Habitat, along with other mitigation measures and BLM actions, would minimize potential direct and indirect effects to pollinators and would improve pollinator habitat over the long-term.

BLM management actions that protect pollinators or minimize impacts:

- Lease Notice UT-LN-156 Pollinators and Pollinator Habitat – minimize ground disturbance where feasible, protect Monarch butterfly habitat within Monarch migration routes, revegetate disturbed areas with pollinator friendly native plants.
- BMPs implemented at the APD stage for preventing the introduction and spread of invasive plants and noxious weeds, such as washing equipment and using certified weed free seed during revegetation of disturbed areas.
- Protection of Special Status plants and their habitats through implementation of lease stipulations and notices.
- Protection of BLM Sensitive bats through implementation of lease notices.
- Focus on collection of well-adapted and ecologically appropriate native pollinator friendly forbs through the Seeds of Success and National Seed Strategy programs. Increasing native seed availability for commercial production and use in restoration projects.
- BMPs for reclamation and revegetation of disturbed areas.
- Minimize the use of pesticides that negative affect pollinators.

## 4.2.7  Recreation

### 4.2.7.1   Impacts of No Action Alternative

The No Action alternative would not result in potential impacts because the parcels would not be leased, and therefore, not developed.

### 4.2.7.2   Impacts of Proposed Action Alternative

If parcels 077, 078, 081, 082, 084, 085, 094, 097, 098, 099, 100, 101, 102, 103, 104, 105, 109, 110, 111, and 112 were developed the ROS classification would shift from a semi-primitive non-motorized classification to a semi-primitive motorized classification. This would lead to a different recreational experience for people recreating in those parcels that overlap with the semi-primitive non-motorized classifications.  If a recreationist is seeking a more primitive/ non-motorized type of recreational experience, the development of these parcels could lead to their displacement.

## 4.2.8  Visual Resources

### 4.2.8.1   Impacts of No Action Alternative

AR005466

Chapter 4

The No Action alternative would not result in potential impacts because the parcels would not be leased, and therefore, not developed.

4.2.8.2   Impacts of Proposed Action Alternative

The issuance of the proposed leases would not directly impact Visual Resources, however, the issuance of the leases does convey an expectation that drilling and development would eventually occur within the parcels in accordance with the reasonably foreseeable development scenario outlined in this EA.  These impacts would result from future development in the form of oil wells/pads, pipelines, compressors, power lines, constructed roads, and other linear features. These impacts would include modifications to the existing landscape's form, line, color, and texture.

Such proposed development and modifications to the existing landscape would be allowable so long as it conforms to the VRM Class objectives established in the 2008 Approved RMPs.  In addition, a variety of best management practices, design features, and RMP-approved stipulations for future mineral resource development would likely mitigate, limit, and/or prevent such impacts to visual resources.  Further detailed analysis of the potential impacts to visual resources would be analyzed as appropriate when oil and gas development plans and permits to drill are submitted.

BLM conducted viewshed analysis from Key Observation Points (KOPs) to determine which portions of parcels would be visible to the recreational visitors.  The viewshed analysis was based on a visitor standing at the KOP and observing anything within a 10-mile radius and at 50 feet above ground level.  The 10-mile radius was based on public comments and the curvature of the earth was taken into account when running the viewshed analysis. **Impacts to Visual Resources at Horseshoe Canyon NPS unit and the Green River would be from parcels (Parcels 106, 111, 112, 113, and 85328)**

The BLM completed a viewshed analysis to determine whether future mineral resource development within Parcels 106, 111, 112, 113, and 85328 would be visible to recreational visitors to Horseshoe Canyon NPS unit and the Green River.  This analysis included the consideration of viewshed impacts from five Key Observation Points (KOP). Only two of the five KOPs had parcels visible from their locations: (1) the Green River at the mouth of the San Rafael River; and (2) the turn off for Horseshoe Canyon Trailhead from the Lower San Rafael Road.  Figure 2 Viewshed Map identifies the lands that would be visible from the two KOPs, and **Table 4-2** identifies the acreages and percentages of each parcel that would be visible from the two KOPs.

AR005467

Chapter 4

*Table 4-2*

|  | KOP 1: Green River at the mouth of the San Rafael River | KOP 2: Horseshoe Canyon Turn Off | All KOPs |
|---|---|---|---|
| **Acreage of Parcel 106 Visible from KOP** | 113 acres |  | **113 acres (14% of parcel)** |
| **Acreage of Parcel 111 Visible from KOP** | 0 acres | 80 acres | **80 acres (3% of parcel)** |
| **Acreage of Parcel 112 Visible from KOP** | 0 acres | 852 acres | **852 acres** (33% of parcel) |
| **Acreage of Parcel 113 Visible from KOP** | 0 acres | 1,319 acres | **1,319 acres** (58% of parcel) |
| **Acreage of Parcel 85328 from KOP** | 555 acres | 0 acres | **555 acres (22% of parcel)** |

Parcel 111: The analysis concluded that 80 acres of Parcel 111, or 3%, would be collectively visible from the KOPs, which is displayed on Figure 2 Viewshed Map. Therefore, the 19.5 acres that would be involved in the reasonably foreseeable development scenario could potentially be accommodated throughout approximately 2,432 acres of Parcel 111 that would not be visible to the casual observer recreating along the Green River or from the trailhead for Horseshoe Canyon. The use of standard best management practices at the permitting phase of development, including strategic siting, color camouflaging, and vegetative screening of facilities, would also decrease the likelihood that any future development would attract the attention of the casual observer recreating along the Green River or from the trailhead for Horseshoe Canyon. Because Parcel 111 was designated as a VRM Class III in the 2008 Price RMP, leasing the parcel would conform to all applicable RMP-established VRM objectives, even if future development introduced a moderate level of change to the landscape.

Parcel 112: The analysis concluded that 852 acres of Parcel 112, or 33%, would be collectively visible from the KOPs, which is displayed on Figure 2 Viewshed Map. Therefore, the 19.5 acres that would be involved in the reasonably foreseeable development scenario could potentially be accommodated throughout approximately 1,658 acres of Parcel 112 that would not be visible to the casual observer recreating along the Green River or from the trailhead for Horseshoe Canyon. The use of standard best management practices at the permitting phase of development, including strategic siting, color camouflaging, and vegetative screening of facilities, would also decrease the likelihood that any future development would attract the attention of the casual observer recreating along the Green River or from the trailhead for Horseshoe Canyon. Because Parcel 112 was designated as a VRM Class III in the 2008 Price RMP, leasing the parcel would conform to all applicable RMP-established VRM objectives, even if future development introduced a moderate level of change to the landscape.

Parcel 113: The analysis concluded that 1,319 acres of Parcel 113, or 58%, would be collectively visible from the KOPs, which is displayed on Figure 2 Viewshed Map Therefore, the 19.5 acres that would be involved in the reasonably foreseeable development scenario could be accommodated throughout approximately 946 acres of Parcel 113 that would not be visible to the casual observer recreating along the Green River or from the trailhead for Horseshoe

AR005468

Chapter 4

Canyon.  The use of standard best management practices at the permitting phase of development, including strategic siting, color camouflaging, and vegetative screening of facilities, would also decrease the likelihood that any future development would attract the attention of the casual observer recreating along the Green River or from the trailhead for Horseshoe Canyon.  Because Parcel 113 was designated as VRM Class II and III in the 2008 Price RMP, leasing the parcel would conform to all applicable RMP-established VRM objectives, including UT-S-160 CSU for visual resources located in VRM II and for lands managed as VRM III the future development could introduced a moderate level of change to the landscape.

Parcel 85328:  The analysis concluded that 555 acres of Parcel SNI-Suspended 85328, or 22%, would be collectively visible from the KOPs, which is displayed on Figure 1 Overview Map. Therefore, the 19.5 acres that would be involved in the reasonably foreseeable development scenario could be accommodated throughout approximately 1,923 acres of parcel 85328 that would not be visible to the casual observer recreating along the Green River or from the trailhead for Horseshoe Canyon.  The use of standard best management practices at the permitting phase of development, including strategic siting, color camouflaging, and vegetative screening of facilities, would also decrease the likelihood that any future development would attract the attention of the casual observer recreating along the Green River or from the trailhead for Horseshoe Canyon.  Because Parcel 85328 was designated as VRM Class III in the 2008 Price RMP, leasing the parcel would conform to all applicable RMP-established VRM objectives, even if future development introduced a moderate level of change to the landscape.

Future development of Parcel 106 would be required to meet all applicable RMP-approved NSO stipulations that were established for the Dry Lake Area of Critical Environmental Concern (UT-S-319), Fragile Soils/Slopes Greater than 40 Percent (UT-S-97), and Natural Springs and Intermittent and Perennial Streams (UT-S-126/127).  These stipulations would likely require any future development of Parcel 106 to occur further away from the river itself, and increasing the distance of potential development from the river would also decrease the likelihood that any such development would attract the attention of the casual observer boating on the river.  In addition, the use of standard best management practices at the permitting phase of development, including strategic siting, color camouflaging, and vegetative screening of facilities, would also decrease the likelihood that any future development would attract the attention of the casual observer boating on the Green River.

Future development of Parcel 113 would be required to meet all applicable RMP- approved NSO that were established for Fragile Soils/Slopes Greater than 40 Percent (UT-S-97), and Natural Springs and Intermittent and Perennial Streams (UT-S-126/127); as well as all RMP-approved CSU stipulations that were established for Visual Resources- VRM II (UT-S-160). Approximately 496 acres of Parcel 113 was designated as a VRM Class II in the 2008 Price RMP, future development could still be accommodated on the remaining 1,796 acres, or 78%, of the parcel that was designated as a VRM Class III.  Because the portions of Parcel 113 that would likely be developed were designated as a VRM Class III in the 2008 Price RMP, leasing

AR005469

Chapter 4

the parcel would conform to all applicable RMP-established VRM objectives, even if future development had a moderate level of change.

The issuance of the proposed leases would not directly impact Visual Resources, however, the issuance of the leases does convey an expectation that drilling and development would eventually occur within the parcels in accordance with the reasonably foreseeable development scenario outlined in this EA. These impacts could result from future development in the form of oil wells/pads, pipelines, compressors, power lines, constructed roads, and other linear features. These impacts would include modifications to the existing landscape's form, line, color, and texture. Development would be assessed under the criteria for cultural modifications, which may detract from the scenery in the form of a negative intrusion. As a result of development, areas currently rated as Scenic Quality A or B could be downgraded to a lower scenic quality rating. Such proposed development and modifications to the existing landscape would be allowable so long as it conforms to the VRM Class objectives established in the Approved land use plans. In addition, a variety of best management practices, design features, and land use plan-approved stipulations for future mineral resource development would likely mitigate, limit, and/or prevent such impacts to visual resources. Further detailed analysis of the potential impacts to visual resources would be analyzed as appropriate when oil and gas development plans and permits to drill are submitted.

### 4.2.9    Dark Night Sky/Soundscape

#### 4.2.9.1    Impacts of No Action Alternative

The No Action alternative would not result in potential impacts because the parcels would not be leased, and therefore, not developed and the current dark night skies would remain intact.

#### 4.2.9.2    Impacts of Proposed Action Alternative

If development of lease parcels 103, 112 and 113 was to occur (the RFD projects 11 wells would be drilled over the 96 parcels/leases offered in the sale) nights skies could be affected.

A sound model was produced to see how noise levels associated with future mineral resource development would impact recreationists at the Canyonlands National Park Horseshoe Canyon Unit ("Unit") near parcels 112 and 113, the two closest units to the Unit.  Maps in the administrative record identifies, if a pump jack was located in a feasible location within parcels 112, or 113 and the trailhead for Horseshoe Canyon (which is within the Unit) was used as the key listening point.  This sound model demonstrates what the decibel level would be from that point.  BLM determined, based on past NEPA analysis that a pump jack during drill pad operations generated on average 82 decibels (db) @ 400 megahertz (MHz) from a distance of 50 feet.  The model concluded by the time the sound from the pumpjack located in parcel 103 reached the key observation point the decibels (db) would be 10, which is the same as breathing. The same model concluded by the time the sound from the pumpjack located on parcel 112 reached the key observation point the decibels (db) would be 18 which is less than a whisper.

AR005470

Chapter 4

Lease Notice 78, requiring best available technology to be applied to mitigate light and sound impacts to Canyonlands National Park will be attached to the lease parcels,  The practices described in the Lease Notice would substantially reduce any impacts from to the Unit.


## 4.3  CUMULATIVE IMPACTS

### 4.3.1  Introduction

NEPA requires federal agencies to consider the cumulative effects of proposals under their review.  Cumulative effects are defined in the Council on Environmental Quality (CEQ) regulations 40 CFR §1508.7 as "the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  The CEQ has stated that the "cumulative effects analyses should be conducted on the scale of human communities, landscapes, watersheds, or airsheds" using the concept of "project impact zone" (i.e., the area that might be influenced by the Proposed Action).

Offering and issuing leases for the subject parcels, in itself, would not result in cumulative impacts to any resource.  Nevertheless, future development of the leases could be an indirect effect of leasing.  The RMP/EISs, provides the BLM's analysis of cumulative effects of oil and gas development based on the reasonably foreseeable oil and gas development scenario.  This analysis is hereby incorporated by reference and is available at http://go.usa.gov/xUPAP (Price RMP) or http://go.usa.gov/xnUHK (Richfield RMP) The cumulative impacts analysis in the RMP/EIS accounted for the potential impacts of development of lease parcels in the planning area as well as past, present and reasonably foreseeable actions known at that time.  This analysis expands upon the RMP/EIS analysis by incorporating new information.


### 4.3.2  Cumulative Impacts

#### 4.3.2.1   Air Quality

The CIAA used to analyze cumulative impacts to air quality is the San Rafael Desert Master Leasing planning area, which encompasses approximately 525,000 acres of land, along with the states of Utah, Colorado, Arizona, and New Mexico. These states, which share regional air quality issues with the planning area, are included in the analysis area for the consideration of cumulative impacts.

Past and present actions that have affected and would likely continue to affect air quality in the planning area include surface disturbance resulting from oil and gas development and associated infrastructure, geophysical exploration, ranching and livestock grazing, range improvements, recreation (including OHV use), authorization of ROWs for utilities and other uses, and road development. Past and present actions in Utah, Colorado, Arizona, and New Mexico that have affected and would likely continue to affect air quality in the CIAA are too numerous to list here but would include the development of power plants; the development of energy sources such as oil, gas, and coal; the development of highways and roads; and the development of various

AR005471

Chapter 4

industries that emit pollutants. The reasonably foreseeable future activities listed in Section 4.19.2, especially oil and gas development, could also result in impacts to air quality. These types of actions and activities can reduce air quality through emissions of criteria pollutants (including fugitive dust), VOCs, and HAPs, as well as contribute to deposition impacts and to a reduction in visibility.

As discussed in Section 3.3.1.1, $O_3$ and PM are of particular concern in the southwestern United States. Section 4.2.1.2 summarizes key points from a regional $O_3$ analysis conducted for the Moab MLP. In particular, meteorological conditions can play a major role in source contributions to monitored or modeled values: predominant winds can transport $O_3$ across the region. In addition, for $O_3$, sources outside the region can contribute to high $O_3$ concentrations. Finally, oil and gas emissions account for a small amount of regional $O_3$ source category emissions (BLM, Moab Master Leasing Plan and Final Environmental Impact Statement, 2016a). With regard to PM, the Moab MLP concludes that regional ambient $PM_{2.5}$ concentrations are likely well below the NAAQS, based on IMPROVE monitoring at Canyonlands National Park, the lack of large emission sources, and the dispersed population. However, it was noted that little monitoring data exist to validate this conclusion and that $PM_{2.5}$ can contribute to regional haze and visibility degradation in Class I areas at lower ambient concentrations than the NAAQS (BLM 2015).

The Moab MLP also examines the state contribution to light extinction as a way to evaluate contributions to visibility from the Moab MLP planning area. Arizona is the dominant source of visibility-reducing components (over 21%), followed by Utah (less than 2%), New Mexico (approximately 1%), then Colorado (less than 0.5%) (BLM 2015). From a regional perspective, Utah's contribution to light extinction is relatively small.

4.3.2.2    Areas of Critical Environmental Concern

The cumulative impact area for this resource is the entire Dry Lakes ACEC (~18,000 acres). The rationale is that special management considerations are placed on the entire ACEC to protect the relevant and important (R&I) values. Past, present, and reasonably foreseeable activities within the parcels that could have potential cumulative impacts on cultural resources include increased visitation and motorized access into previously inaccessible areas. Cumulative impacts include dust accumulation and its impact on cultural resources, changes in visitation, inadvertent or advertent (i.e., vandalism and looting) damage to cultural resources, impacts to unidentified Traditional Cultural Properties and increased recreational use. Surface disturbance resulting from mineral exploration and development including road, pipeline and utility line construction could potentially cause the greatest amount of cumulative impacts to cultural resources in the parcels. These activities have the potential to increase visual, noise, atmospheric and other such intrusions that affect the cultural setting of historic properties, which may contribute to their National Register of Historic Places eligibility determinations. The Proposed Action adds the potential for development to occur in these areas. The No Action alternative would not contribute any cumulative impacts.

4.3.2.3    Cultural Resources

The CIAA for cultural resources is the entirety of the proposed lease parcels and a 0.5-mile buffer around each parcel. Sporadic oil and gas exploration has occurred in the CIAA, and may

AR005472

Chapter 4

have physically disrupted sites and or , impacted the setting and feeling of both the individual sites and landscapes surrounding them. Exploration and possible development of the lease parcels may contribute to impacts from the past and present development to non eligible sites.

### 4.3.2.4   Greenhouse Gas Emissions/Climate Change

There are no boundaries with which to identify a CIAA for climate change. The proposed action could result in a slight incremental increase in GHG emissions, thus contribute to the global impacts. It is now well established that rising global atmospheric GHG emission concentrations are affecting the Earth's climate. These conclusions are built upon a scientific record that has been created with substantial contributions from the United States Global Change Research Program (USGCRP).

Based primarily on the scientific assessments of the USGCRP, the National Research Council, and the Intergovernmental Panel on Climate Change, in 2009 the Environmental Protection Agency (EPA) issued a finding that the changes in our climate caused by elevated concentrations of greenhouse gases in the atmosphere are reasonably anticipated to endanger the public health and public welfare of current and future generations. Broadly stated, the effects of climate change observed to date and projected to occur in the future include more frequent and intense heat waves, longer fire seasons and more severe wildfires, degraded air quality, more heavy downpours and flooding, increased drought, greater sea-level rise, more intense storms, harm to water resources, harm to agriculture, ocean acidification, and harm to wildlife and ecosystems.

It is unknown if the No Action Alternative would result in decreased emissions, thus a reduced global climate change impact. It cannot be predicted if any oil and gas extracted from the proposed action would be combusted as fuel, or used as manufacturing material. In addition, other sources of fossil fuels may be extracted and combusted to meet the energy demands not met by extracting hydrocarbons from the parcels.

Research on climate change impacts is an emerging and rapidly evolving area of science, but given the lack of adequate analysis methods it is not possible to identify specific local, regional, or global climate change impacts based on potential GHG emissions from any specific project's incremental contributions to the global GHG burden. The climate change research community has not yet developed tools specifically intended for evaluating or quantifying end-point impacts attributable to the emissions of GHGs from a single source, and we are not aware of any scientific literature to draw from regarding the climate effects of individual, facility-level GHG emissions. The current tools for simulating climate change generally focus on global and regional-scale modeling. Global and regional-scale models lack the capability to represent explicitly many important small-scale processes. As a result, confidence in regional- and sub-regional-scale projections is lower than at the global scale. There is thus limited scientific capability in assessing, detecting, or measuring the relationship between emissions of GHGs from a specific single source and any localized impacts. As a consequence, impact assessment of effects of specific anthropogenic activities cannot be performed.  Additionally, specific levels of significance have not yet been established. Therefore, climate change analysis for the purpose of this document is limited to accounting and disclosing of factors that contribute to climate change. In the coming decades, climate change may lead to changes in the Mountain West and Colorado

AR005473

Chapter 4

Plateau such as warmer temperatures, less snowfall, more frequent or severe drought, increased wildland fire potential, and other potential impacts.

### 4.3.2.5   Lands with Wilderness Characteristics

The CIAA for Lands with Wilderness Characteristics includes the planning area for the San Rafael Desert MLP, LWC inventory units that extend outside the planning area, and other adjacent lands that the BLM manages for the preservation of wilderness character (i.e., WSAs).

Past, present, and reasonably foreseeable actions within the CIAA that have affected and will likely continue to affect wilderness characteristics in the planning area include oil and gas development, increasing recreational demands on public lands, OHV use, issuance of rights-of-way, and ongoing travel management planning for both the Price Field Office and Richfield Field Office. These activities could introduce sights, noises, and infrastructure in or adjacent to LWCs, which could impair the feeling of solitude and degrade naturalness. Increasing visitor use in the planning area will likely intensify use of BLM-administered lands, including natural areas and LWCs, potentially impacting wilderness characteristics by reducing opportunities for solitude. As part of the travel management process, the BLM may designate additional routes as closed and open to motor vehicles. Use of these designated travel routes by OHVs and other vehicles in LWCs would also introduce sights and noises that could impair the feeling of solitude and degrade naturalness. Any of these actions could also result in surface-disturbing activities that could affect the size of LWCs by reducing or eliminating portions of LWCs. Some units could be bisected or surface disturbance could result in the need to eliminate areas from the LWC unit through the creation of cherry stems. This could result in some areas, or entire LWC units, no longer meeting the minimum size criterion (5,000 acres).

Of all of the reasonably foreseeable future actions in the planning area, oil and gas exploration and development are anticipated to have the largest magnitude of road construction and surface disturbance and therefore the largest impact to wilderness characteristics in the planning area over the next 15 to 20 years.

### 4.3.2.6   Pollinators

The analysis area for pollinators is the project area containing the lease parcels. Land ownership is predominantly federal and state, with a small area of private ownership around parcels 106 in the northeast part of the project area.

It is unknown exactly what actions are currently occurring or will occur in the future in the project area, but it is reasonable to assume that oil and gas development will occur on BLM and state administered lands. Recreation is also likely to continue and potentially expand in the area and may involve OHVs that travel off existing roads. Insecticides that impact pollinators could be used on private lands, although this would be a small area. These activities could negatively impact pollinators if minimization and mitigation measures are not implemented. The September 2018 lease sale could contribute additional cumulative effects to pollinators if development occurs in the future on the parcels. However, it is expected that implementing the mitigation measures in Lease Notice #UT-LN-156 Pollinators and Pollinator Habitat, along with other mitigation measures and BLM actions, would minimize  direct effects from development to pollinators and would improve pollinator habitat over the long-term.

AR005474

Chapter 4

4.3.2.7   Recreation

Oil and Gas development is the only foreseen action to affect recreation.  The cumulative impacts are essentially the same as described in Section 4.2.7.2.

4.3.2.8   Visual Resources

The cumulative impacts to visual resources would be the same as the impacts to the Night Dark Skies. The CIAA for visual resources is the entirety of the proposed lease parcels and key observation points were the casual visitor could notice visual contrasts. Sporadic oil and gas development has occurred in the CIAA, most of which is not active, and exploration and possible development of the lease parcels may contribute to impacts from the past and present development

Past and present actions causing cumulative impacts to visual resources include mineral exploration, development, and extraction. If parcels were to be lease there would be surface disturbances and it would create visual contrasts, which would, resulted in contrasts of texture, form, line, and color that would be visible to the casual observer at varying distances.

Reasonably foreseeable future actions within the lease sale include these same types of actions, which would continue to create visual contrasts within the landscape.

4.3.2.9   Dark Night Skies/Soundscapes

The region surrounding the Horseshoe Canyon Unit and the Green River is relatively pristine. There are essentially no activities that would are currently affecting the Night skies and soundscape, so there is essentially no cumulative impact.

AR005475

Chapter 6

# 5      COORDINATION AND CONSULTATION

Public and agency involvement has occurred as described below.

External scoping was conducted by posting the proposed parcel list and maps for a 15-day period from March 30 to April 16, 2018, on BLM's ePlanning website at: http://go.usa.gov/xQrVg.  The results are summarized in 6.3Appendix A

## 5.1  LIST OF PERSONS, AGENCIES, AND ORGANIZATIONS CONSULTED

*Table 5-1 List of Persons, Agencies, and Organizations Consulted for Purposes of this EA*

| Name | Purpose & Authorities for Consultation or Coordination | Findings & Conclusions |
|------|------|------|
| Utah State Historic Preservation Officer (SHPO) | Consultation as required by Section 106 of the NHPA | SHPO Consultation is currently ongoing |
| Native American Tribes | Consultation as required by the American Indian Religious Freedom Act of 1978 (42 USC 1531) and NHPA (16 USC 1531) | Consultation letters were mailed on March 28, 2018 for Price and April 18, 2018 for Richfield. The Hopi and Southern Ute Tribes responded to the initial letter. Tribal consultation is currently on going. |
| Southern Utah Wilderness Alliance, Utah Rock Art Research Assocaition, … | Consultation as required by Section 106 of the NHPA | The Price and Richfield Offices mailed letters with information about the parcels on xx. A consulting party meeting was held on June 20, 2018. |
| Utah Division of Wildlife Resources | | UDWR sent a list of potential wildlife conflict via email on April 20, 2018 |
| National Park Service | Letters were sent to Stakeholders on April 3, 2018 requesting comments on the proposed parcels and leases. | The NPS sent a Memo on April 20, 2018 |
| PLPCO | | PLPCO responded with a letter dated April 16, 2018 |
| U.S. Fish and Wildlife Service | Consultation as required by the Endangered Species Act | On April 3, 2018, BLM sent a memorandum to the Utah Field Office of the Fish and Wildlife Service (FWS) enclosing the San Rafael Desert parcels to be offered at the lease sale.  On April 12, the memo was followed up with an email transmitting Geographic Information System (GIS) shape files of the parcels to the FWS.<br><br>On June 4, 2018, BLM sent an email to FWS with biological and botany reports attached. The reports where summarized in a memo that was also attached to the email.  The memo requested agreement with the BLM that leasing the San Rafael parcels would result in a finding of "may affect, but is not likely to adversely affect" |

AR005476

Chapter 6

| Name | Purpose & Authorities for Consultation or Coordination | Findings & Conclusions |
|------|--------------------------------------------------------|------------------------|
|      |                                                        | FWS responded to BLM that it agreed with its finding for the parcels within the Price Field Office, but that Richfield's BO for it RMP had not included Colorado River Endangered Fish, and so requested informal consultation.<br><br>On July 23, 2018, BLM sent FWS a memo initiating informal consultation for Colorado River fishes.  The memo determined the lease sale "may affect, but is not likely to adversely affect" the fore-named species.  On August 3, 2018, the FWS concurred with the finding, concluding consultation for the RFO. |

# 6    REFERENCES, AND APPENDICES

## 6.1  References

Analytics, C. (2018, 7). Retrieved from Climate Analytics: http://climateanalytics.org/files/20-year_gwps_bad_idea_for_climate_policy_16112017.pdf

BLM. (2008a). *Price Field Office Record of Decision & Approved Resource Management Plan.*

BLM. (2008b). *Richfield Field Office Record of Decision / Approved Management Plan.* Retrieved from BLM ePlanning NEPA Register - Richfield Field Office Record of Decision and Approved Resource Management Plan (2008): http://go.usa.gov/xnUHK

BLM. (2008c). *Price Field Office Proposed Resource Management Plan and Final Environmental Impact Statement.*

BLM. (2008d). *Richfield Field Office Proposed Resource Management Plan and Final Environmental Impact Statement.*

BLM. (2016a). *Moab Master Leasing Plan and Final Environmental Impact Statement.*

BLM. (2016b). *Reasonably Foreseeable Development Scenario for Oil and Gas in the San Rafael Desrt Master Leasing Plan Area.*

Boden, T. A., Marland, G., & Andres, R. J. (2013). *Global, regional, and national fossil fuel CO2 emissions.* U. S. Department of Energy, Carbon Dioxide Information Analysis Center. Oak Ridge TN: Oak Ridge National Laboratory. doi:10.3334/CDIAC/00001_V2013

DAQ. (2014a). *2014 State Summary of Emissions by Source.* Retrieved June 26 2018, from Utah division of Air Quality: https://deq.utah.gov/legacy/programs/air-quality/emissions-inventories/inventories/docs/state-summary-of-emissions-by-source.pdf

DAQ. (2014b). *2014 Statewide.* Retrieved June 26, 2018, from Utah Division of Air Quality: https://deq.utah.gov/legacy/programs/air-quality/emissions-inventories/inventories/docs/point-sources-by-county.pdf

DAQ. (2014c). *2014 Statewide Hazardous Air Pollutants - Point sources.* Retrieved June 26, 2018, from Utah Division of Air Quality: https://deq.utah.gov/legacy/programs/air-quality/emissions-inventories/docs/2016/2014-HAPs-Detail-by-County.pdf

AR005477

Chapter 6

EIA. (2018). *Petroleum & Other Liquids.* . Retrieved from U.S. Energy Information Administration: https://www.eia.gov/petroleum/data.php

EIA. (2018b, 07 24). *Carbon Dioxide Emissions Coefficients Potential*. Retrieved from U.S. Energy Information Administration: https://www.eia.gov/environment/emissions/co2_vol_mass.php

EPA. (2001). *Visibility Report to Congress - November 2001 Visibility in Mandatory Class 1 Areas, 1994-1998 A Report to Congress*. Retrieved June 27, 2018, from United States Environmental Protection Agency: https://www.epa.gov/visibility/visibility-report-congress-november-2001

EPA. (2016). *EPA's Study of Hydraulic Fracturing and Its Potential Impact on Drinking Water Resources -*. Retrieved July 18, 2018, from United States Environmental Protection Agency: https://www.epa.gov/hfstudy/executive-summary-hydraulic-fracturing-study-final-assessment-2016

EPA. (2016a). *EPA's Study of Hydraulic Fracturing for Oil and Gas and Its Potential Impact on Drinking Water Resources.* Retrieved from United States Environmental Protection Agency: https://www.epa.gov/hfstudy

EPA. (2016b, December 20). *NAAQS Table*. Retrieved June 26, 2018, from United States Environmental Protection Agancy: https://www.epa.gov/criteria-air-pollutants/naaqs-table

EPA. (2016c, November 29). *Prevention of Significant Deterioration Basic Information*, 26. Retrieved June 2018, from United States Environmental Protection Agency: https://www.epa.gov/nsr/prevention-significant-deterioration-basic-information

EPA. (2017a, December 5). *2012 Final Rules for Oil and Natural Gas Industry*. Retrieved from United States Environmental Protection Agency: https://www.epa.gov/controlling-air-pollution-oil-and-natural-gas-industry/2012-final-rules-oil-and-natural-gas-industry

EPA. (2017b, February 27). *Ecosystem Effects of Ozone Pollution*. Retrieved June 26, 2018, from United States Environmental Protection Agency: https://www.epa.gov/ozone-pollution/ecosystem-effects-ozone-pollution

EPA. (2017c, April 15). *Inventory of U.S. Greenhouse Gas Emissions and Sinks.* Retrieved March 23, 2018, from U. S. Enviromental Protection Agency: https://www.epa.gov/sites/production/files/2017-02/documents/2017_complete_report.pdf

EPA. (2017d, April 25). *List of Areas Protected by the Regional Haze Program*. Retrieved June 26, 2018, from United States Environmental Protection Agency: https://www.epa.gov/visibility/list-areas-protected-regional-haze-program

EPA. (2017e, February 14). *Understanding global warming potentials.* Retrieved August 24, 2017, from U. S. Environmental Protection Agency: https://www.epa.gov/ghgemissions/understanding-global-warming-potentials

EPA. (2017f, April 14). *Overview of Greenhouse Gases*. Retrieved from U. S. Environmental Protection Agency: https://www.epa.gov/ghgemissions/overview-greenhouse-gases

EPA. (2017g, August 11). *Canyonlands NP (CAN407)*. Retrieved June 28, 2018, from United State Environmental Protection Agency: https://www3.epa.gov/castnet/site_pages/CAN407.html

EPA. (2018a, July 19). *EPA's Voluntary Methane Programs for the Oil and Natural Gas Industry*. Retrieved from United States Environmental Protection Agency: https://www.epa.gov/natural-gas-star-program

AR005478

Chapter 6

EPA. (2018c, June 20). *Health and Environmental Effects of Particulate Matter (PM)*. Retrieved June 26, 2018, from United States Environmental Protection Agency: https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm

EPA. (2018d, May 31). *Criteria Pollutant Nonattainment Summary Report*. Retrieved June 26, 2018, from United States Environmental Protection Agency: https://www3.epa.gov/airquality/greenbook/ancl3.html

EPA. (2018e, March 13). *Greenhouse Gases Equivalencies Calculator - Calculations and References*. Retrieved from https://www.epa.gov/energy/greenhouse-gases-equivalencies-calculator-calculations-and-references

Federal Land Managers. (2010). *Federal Land Managers' Air Quality Related Values Work Group Phase 1 Report - Revised (2010).* Retrieved June 27, 2018, from National Parck Service: https://www.nature.nps.gov/air/Pubs/pdf/flag/FLAG_2010.pdf

GPO. (2001). *Code of Federal Regulations Title 40 - Protection of Environment*. Retrieved from Govenment Printing Office: https://www.gpo.gov/fdsys/pkg/CFR-2017-title40-vol23/xml/CFR-2017-title40-vol23-part98.xml

Griswold, T., Parker, F. D., & Tepedino, V. J. (1997). The Bees of the San Rafael Desert: Implications for teh Bee Fauna of the Grand Staircase-Escalante National Monument. *Learning from the Land Biology Section*, 175-86.

Hansen, J., Sato, M., Ruedy, R., Lo, K., Lea, D. W., & Medina-Elizade, M. (2006, September 26). Global Temperature Change. *Proceedings of the National Academy of Sciences of the USA, 103*(39). doi:0.1073/pnas.0606291103

IPCC. (2006). *Stationary Combustion*. Retrieved from Intergovernment Panel on Cliamte Change: https://www.ipcc-nggip.iges.or.jp/public/2006gl/pdf/2_Volume2/V2_2_Ch2_Stationary_Combustion.pdf

IPCC. (2007). *Climate Change 2007: Mitigation of Climate Change.* (B. Metz, O. R. Davidson, P. R. Bosch, R. Dave, & L. A. Meyer, Eds.) Retrieved August 25, 2017, from Intergovernmental Panel on Climate Change: http://www.ipcc.ch/publications_and_data/publications_ipcc_fourth_assessment_report_wg3_report_mitigation_of_climate_change.htm

IPCC. (2013). *Climate Change 2013: The Physical Science Basis.* Intergovernmental Panel on Climate Change. Retrieved from http://www.ipcc.ch/report/ar5/wg1/

IPCC. (2014). *Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. .* Geneva, Switzerland, 151 pp.: IPCC. Retrieved from http://www.ipcc.ch/report/ar5/syr/

NASA. (2018, March 23). *National Aeronautics and Space Administration Global Climate Change- Vital Signs of the Planet*. Retrieved from https://climate.nasa.gov/vital-signs/global-temperature/

NPS. (1981). *PSD Guidance Document.* Retrieved June 26, 2018, from Environmental Protection Agency: https://www.epa.gov/sites/production/files/2015-07/documents/psddoc.pdf

NPS. (2010). *Air Quality in National Parks.* Retrieved June 26, 2018, from National Park Service: https://www.nature.nps.gov/air/Pubs/pdf/gpra/AQ_Trends_In_Parks_2009_Final_Web.pdf

AR005479

Chapter 6

NPS. (2017a, August 24). *Park Conditions & Trends → Canyonlands National Park - Ozone*. Retrieved from National Park Service: https://www.nps.gov/subjects/air/park-conditions-trends.htm

NPS. (2017b, August 24). *Park Conditions & Trends → Canyonlands NP - Visiblity → 10-Year Trends.* Retrieved June 26, 2018, from National Park Service: https://www.nps.gov/subjects/air/park-conditions-trends.htm

NPS. (2017c, August 24). *Park Conditions & Trends → Capitol Reef NP - Visibility → 10-Year Trends*. Retrieved June 27, 2018, from National Park Service: https://www.nps.gov/subjects/air/park-conditions-trends.htm

NPS. (2017d, August 24). *Park Conditions & Trends → Canyonlands NP- Visibility → Summary Table*. Retrieved June 28, 2018, from National Park Service: https://www.nps.gov/subjects/air/park-conditions-trends.htm

NPS. (2017e, January 3). *Air Pollution Impacts Canyonlands National Park*. Retrieved June 28, 2018, from National Park Service: https://www.nature.nps.gov/air/Permits/aris/cany/impacts.cfm?tab=0#TabbedPanels1

NPS. (2017f, August 24). *Park Conditions & Trends → Canyonlands NP - Nitrogen Deposition → 10-Year Trends*. Retrieved June 28, 2018, from National Park Service: https://www.nps.gov/subjects/air/park-conditions-trends.htm

NPS. (2017g, August 24). *Park Conditions & Trends → Canyonlands NP - Sulfur Deposition → 10-Year Trends*. Retrieved June 28, 2018, from National Park Service: https://www.nps.gov/subjects/air/park-conditions-trends.htm

NPS. (2017h, August 24). *Park Conditions & Trends → Canyonlands NP - Nitrogen Deposition → Summary Table*. Retrieved June 28, 2018, from National Park Service.

NPS. (2017i, August 24). *Park Conditions & Trends → Sulfur Deposition → Summary Table*. Retrieved June 28, 2018, from National Park Service: https://www.nps.gov/subjects/air/park-conditions-trends.htm

Rose, S., Turner, D., Blanford, G., Bistine, J., de la Chesnaye, F., & Wilson, T. (2014). *Understanding the Social Cost of Carbon: Executive Summary.* Palo Alto: Energy & Environmental Analysis Research Group.

State of Utah. (2006, March 8). *Utah State Implementation Plan Section VIII Prevention of Significant Deterioration.* Retrieved June 26, 2018, from Utah Department of Environmental Quality: https://deq.utah.gov/legacy/laws-and-rules/air-quality/sip/docs/2006/06Jun/SecVIII-PSD.pdf

SUWA et. al. (2018). *Southern Utah Wilderness Alliance, Natural Resources Defense Council, Sierra Club, The Wilderness Society.* Scoping Comments.

UDOGM. (2018, 07). *Online Oil and Gas Information System.* Retrieved from Utah Division of Natural Resources - Utah Division of Oil, Gas and Mining: https://oilgas.ogm.utah.gov/oilgasweb/live-data-search/lds-main.xhtml

URS. (2010). *Climate Change Supplementary Information Report for Montana, North Dakota, and South Dakota, Bureau of Land Management. Report on Greenhouse Gas Emissions and Climate Change for Montana, North Dakota, and South Dakota. Technical report prepared for the Mo.*

WRAP. (2013). *Western Regional Air Partnership (WRAP) West-wide Jump-start Air Quality Modeling Study Final Report.* Retrieved from https://www.wrapair2.org/WestJumpAQMS.aspx.

AR005480

Chapter 6

WRI. (2016). *The Carbon Budget*. Retrieved from World Resources Institute:
http://www.wri.org/ipcc-infographics

## *6.2   LIST OF PREPARERS*

For a full list of the interdisciplinary reviewers, please see Appendix F

*Table 6-1  List of Preparers*

| Name | Title | Resource |
|------|-------|----------|
| Erik Vernon | Air Quality Scientist | Air Quality/Greenhouse Gas |
| Allison Ginn | National Landscape Conservation System Lead | Areas of Critical Environmental Concern, Lands with Wilderness Characteristics. |
| Nicole Lohman | Archaeologist | Cultural Resources |
| Marcia Wineteer | Wildlife Biologist | Pollinators |
| Matt Blocker | Natural Resource Specialist | Recreation |

## *6.3   LIST OF APPENDICES*

**Appendix A – Scoping Report**
**Appendix B – Proposed Action with Stipulations for Lease**
**Appendix C – Recommended Parcel Deferrals**
**Appendix D – Stipulation and Notice Exhibits**
**Appendix E – Maps**
**Appendix F – Interdisciplinary Team Checklist**
**Appendix G – Stipulations and Notices Originally on the SNI and Suspended Parcels**

AR005481

Appendix A          **SCOPING REPORT**

**Issue 1:  Development Potential –**

According to the San Rafael MLP RFD, the development potential for the parcels is greater than anticipated in the 2008 Price and Richfield RMPs (SUWA page 4 and 5)

**Issue 2- Lands with Wilderness Characteristics**

Since completion of the 2008 RMPs, new information on Lands with Wilderness Characteristics has been brought forth. (SUWA page 5)

**Issue 3 – Air Quality – Canyonlands National Park**

Since completion of the 2008 RMPs, new information on impacts to air quality in CNP has been brought forth.  BLM must analyze those impacts (SUWA page 5 and 6)  The BLM should consult with the NPS to alleviate potential adverse impacts to air quality, and air quality related values (AQRVs) such as viewsheds as addressed in the relevant MOU (NPCA page 6, NPS page 1)

**Issue 4 – Night Skies – Canyonlands National Park**

Since completion of the 2008 RMPs, new information on impacts to night skies in CNP has been brought forth.  BLM must analyze those impacts. (SUWA page 5 and 6, NPS page 1)  A stipulation requiring a Lightscape Management Plan should be added to the parcels.  (NPCA pages 8 and 9)

**Issue 5 – Scenic Viewsheds – Canyonlands National Park**

Since completion of the 2008 RMPs, new information on impacts to scenic viewsheds in CNP has been brought forth BLM must analyze those impacts. (SUWA pages 5, 6 and 10)

**Issue 6 – Recreational Resources - Canyonlands National Park**

Since completion of the 2008 RMPs, new information on impacts to recreational resources in CNP has been brought forth.  BLM must analyze those impacts. (SUWA page 5 and 6).  Development of the lease parcels could fundamentally change the backcountry experience of visitors to the Horseshoe Canyon unit of the Canyonlands National Park  (NPCA page 10)

**Issue 7 – Impacts to Glen Canyon National Recreational Area**
BLM must analyze potential direct, indirect, and cumulative impacts to Glen Canyon National Recreation Area. This includes, but is not limited to, air quality, recreational opportunities, dark night skies, viewsheds and soundscapes.  (SUWA pages 6 and 10)

Appendix A

**Issue 8 – Impacts to Water Quality of the San Rafael River –**

The segment of the San Rafael River potentially affected by a leasing decision, referred to as the San Rafael Lower, is on the state of Utah's list of 303(d) impaired waters.  It is impaired due to OE Bioassessment and total dissolved solids (TDS). *Id.* The Utah Division of Water Quality (DWQ) has prepared – and EPA approved – a total maximum daily load (TMDL) for the San Rafael River for TDS. DWQ has not prepared a TMDL for OE Bioassessment. The potential impacts to this impaired waterway, including impacts to DWQ's TMDL, must be addressed by BLM. (SUWA page 7)  Leases closest to to the San Rafael River (UTU-085328 and UTU085329) should receive strong buffer protections due to the significance of perennial and intermittent stream drainages in the area and the locations of springs (Trout Unlimited pages 12 and 13)

**Issue 9 –Impacts to Water Quality - Parcel 106**

Potential impacts from development of Parcel 106 to the Green River must be analyzed. (SUWA page 7), (Trout Unlimited pages 10-11)

**Issue 10 – Impacts to Water Quality**
BLM must analyze impacts from potential oil and gas development from development, including fracking.  (SUWA page 8) (Trout Unlimited pages 11 and 12)

**Issue 11 – Air Quality**

BLM must prepare a quantitative air quality analysis.  BLM must use the RFD for the San Rafael Desert MLP and the updated ARMS being prepared for the air quality analysis.  BLM must consider the Uinta Basin non attainment status in the analysis. (SUWA page 9)   Under NEPA, BLM is required to assess AQRVs and not allow any violations of CAA standards.  (NPCA page 7)

**Issue 12 – Downstream GHG emissions/Climate Change**
BLM must disclose downstream GHG emissions.  BLM must consider direct, indirect, and cumulative impacts to climate change from the proposed oil and gas leasing and development, including the Social Cost of Carbon  (SUWA page 9 and 10)

**Issue 13 – Viewsheds**
BLM must analyze impacts to the viewshed of recreational users on the Green River, Goblin Valley State Park, WSA, and the Dry Lake ACEC. (SUWA page 10)

**Issue 14 – Endemic Bees –**
BLM must analyze potential direct, indirect, and cumulative impacts to the San Rafael Desert's endemic bee population. (SUWA, Pages 11-12)

**Issue 15 – Cultural Resources –**
BLM must comply with the NHPA (SUWA pages 12-14).   The area contains a long standing relationship to native communities (NPCA page 6)

AR005483

Appendix A

## Issue 16 – Wild and Scenic Rivers

Parcel 106 could potentially impact a segment of the Green River found suitable for inclusion in the National Wild and Scenic Rivers System. (SUWA page 14)

## Issue 17 – Water Resources

Use of water and disposal of produced water should be considered in the EA (NPCA pages 5 and 6)

## Issue 18 – Paleontological Resources –

Paleontological Resources require thorough analysis. (NPCA page 6)

## Issue 19 Soundscapes –

BLM must analyze impacts from soundscapes to CNP (SUWA page 6).  In order to retain the existing, remote character of the San Rafael Desert landscape and adjacent national park units and the natural soundscape, a stipulation requiring an operator to submit a Noise Reduction Plan as a component of the APD should be added to the parcels. (NPCA page 10) Oil and Gas exploration and drilling activities could impact the Horseshoe Canyon Unit of the CNP. (NPS page 1)

## Issue 20 Access

BLM should ensure that development would not preclude public access to backcountry landscapes.  (NPCA page 11)

## Issue 21- Wildlife

All nominated parcels except for 106 contain crucial yearlong pronghorn habitat.  Kit fox have been documented in parcels 041, 044, 062, 063, 091, 106, and 107.  Burrowing owls have documented in parcels 076, 079, 080, and 106.  Parcel 106 has several sensitive fish species recorded in its vicinity in the Green River.  Section 106 also has wild turkey habitat. (UDWR)

## Proposed Alternatives
5. A "leasing outside of wilderness-caliber lands" alternative. Under this alternative, BLM would not offer for lease any parcels in BLM-identified non-WSA lands with wilderness characteristics.  (SUWA page 17) (SUWA p 17)
6. A "no-surface occupancy" alternative. Under this alternative, BLM would only offer BLM-identified non-WSA lands with wilderness characteristics for lease with non-waivable no surface occupancy stipulations. (SUWA page 17)
7. A "phased development-leasing" alternative. Under this alternative, BLM would require lessees and operators to first explore and develop land outside of BLM-identified non-

AR005484

Appendix A

WSA lands with wilderness characteristics – and to prove that such areas are capable of production in paying quantities – prior to developing in BLM-identified non-WSA lands with wilderness characteristics. (SUWA page 17)

8.   A "mitigation leasing" alternative. Under this alternative, BLM would attach additional mitigation measures and best management practices (BMP) to each lease. This would include controlled surface use and NSO stipulations to protect sensitive resources including cultural resources and BLM-identified non-WSA lands with wilderness characteristics.  (SUWA pages 17 and 18)


**Other Comments and Requests**

1.   Scoping reports for the San Rafael MLP are attached and incorporated in SUWAs comment letter. (SUWA page 4)
2.   BLM should remove all parcels in the lease sale identified as possessing wilderness characteristics (SWUA page 8)
3.   BLM must prepare an EIS (SUWA page 18 and 19)
4.   The BLM is requested to provide a 30 public comment period on the EA/EIS (SUWA page 19, NPCA 04-19 Letter to Ed Roberson)
5.   NPCA urges BLM to consult with other stakeholders, including NPS and outdoor recreation interests, to collaboratively determine where leasing can occur without harming Utah's cultural, natural and economic assets.
6.   BLM should prepare an "Activity Plan" prior to offering the leases.

AR005485

Appendix B          **List of Parcels and Leases with Stipulations and Notices**

**NOMINATED PARCELS**

**UT0918 – 038**
T. 25 S., R. 12 E., SLM
          Secs. 1, 11 and 12: All.
1,967.64 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat
UT-LN-157:          San Rafael Swell SRMA

**UT0918 – 039**
T. 25 S., R. 12 E., SLM
          Sec. 3: Lots 1, 2, 6-8, S2NE, S2NW, S2;
Secs. 10 and 15: All.
1,904.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%

AR005486

Appendix B

| | |
|---|---|
| UT-S-101: | CSU- Fragile Soils/Slopes 20-40 Percent |
| UT-S-126: | NSO- Natural Springs |
| UT-S-127: | NSO- Intermittent and Perennial Streams |
| UT-S-253: | Timing Limitation – Desert and Rocky Mountain Bighorn Sheep |
| UT-S-285: | TL-Migratory Bird Nesting |
| UT-S-305: | CSU- Noxious Weed |

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*

| | |
|---|---|
| UT-LN-21: | Bighorn Sheep Habitat |
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-72: | High Potential Paleontological Resources |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| UT-LN-156 | Pollinators and Pollinator Habitat |
| UT-LN-157: | San Rafael Swell SRMA |


**UT0918 – 040**
T. 25 S., R. 12 E., SLM
        Sec. 13: All;
Sec. 14: N2, N2SW, E2SWSW, N2NWSWSW, S2SWSWSW, SE;
Sec. 23: All.
1,910.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%

| | |
|---|---|
| UT-S-101: | CSU- Fragile Soils/Slopes 20-40 Percent |
| UT-S-126: | NSO- Natural Springs |
| UT-S-127: | NSO- Intermittent and Perennial Streams |
| UT-S-285: | TL-Migratory Bird Nesting |
| UT-S-305: | CSU- Noxious Weed |

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | Raptors |

AR005487

Appendix B

| | |
|---|---|
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51 | Special Status Plants: Not Federally Listed |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| UT-LN-156 | Pollinators and Pollinator Habitat |
| UT-LN-157: | San Rafael Swell SRMA |

**UT0918 – 041**
T. 25 S., R. 12 E., SLM
       Secs. 22, 27 and 34: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%

| | |
|---|---|
| UT-S-101: | CSU- Fragile Soils/Slopes 20-40 Percent |
| UT-S-126: | NSO- Natural Springs |
| UT-S-127: | NSO- Intermittent and Perennial Streams |
| UT-S-285: | TL-Migratory Bird Nesting |
| UT-S-305: | CSU- Noxious Weed |

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*

| | |
|---|---|
| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
| UT-LN-44: | RaptorsUT-LN-45:  Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51 | Special Status Plants: Not Federally Listed |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| UT-LN-156 | Pollinators and Pollinator Habitat |
| UT-LN-157: | San Rafael Swell SRMA |

**UT0918 – 042**
T. 25 S., R. 12 E., SLM
       Secs. 25, 26 and 35: All.
1,920.00 Acres
Emery County, Utah
Price Field Office
Stipulations:

AR005488

Appendix B

UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:           Air Quality Analysis
UT-LN-156            Pollinators and Pollinator Habitat


**UT0918 – 043**
T. 26 S., R. 12 E., SLM
            Secs. 1, 11 and 12: All.
1,952.60 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed

AR005489

Appendix B

UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:           Air Quality Analysis
UT-LN-156            Pollinators and Pollinator Habitat


**UT0918 – 044**
T. 26 S., R. 12 E., SLM
            Secs. 13, 14, 23 and 24: All.
2,560.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:           CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:           NSO- Natural Springs
UT-S-127:           NSO- Intermittent and Perennial Streams
UT-S-285:           TL-Migratory Bird Nesting
UT-S-305:           CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:           White-Tailed and Gunnison Prairie Dog
UT-LN-44:           Raptors
UT-LN-45:           Migratory Bird
UT-LN-49:           Utah Sensitive Species
UT-LN-51:           Special Status Plants: Not Federally Listed
UT-LN-99:           Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156           Pollinators and Pollinator Habitat


**UT0918 – 045**
T. 26 S., R. 12 E., SLM
            Secs. 25, 26 and 35: All.
1,920.00 Acres
Emery County, Utah (1,838.56 acres)
Price Field Office
Wayne County, Utah (81.35 acres)
Richfield FO

Stipulations:
UT-S-01:  Air Quality

78

AR005490

Appendix B

UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:              CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:              NSO- Natural Springs
UT-S-127:              NSO- Intermittent and Perennial Streams
UT-S-285:              TL-Migratory Bird Nesting
UT-S-305:              CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:              White-Tailed and Gunnison Prairie Dog
UT-LN-44:              Raptors
UT-LN-45:              Migratory Bird
UT-LN-49:              Utah Sensitive Species
UT-LN-51:              Special Status Plants: Not Federally Listed
UT-LN-99:              Regional Ozone Formation Controls
UT-LN-102:            Air Quality Analysis
UT-LN-156            Pollinators and Pollinator Habitat


**UT0918 – 046**
T. 24 S., R. 13 E., SLM
              Secs. 31, 33, 34 and 35: All.
2,555.12 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:              CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:              NSO- Natural Springs
UT-S-127:              NSO- Intermittent and Perennial Streams
UT-S-285:              TL-Migratory Bird Nesting
UT-S-305:              CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:              White-Tailed and Gunnison Prairie Dog
UT-LN-44:              Raptors
UT-LN-45:              Migratory Bird
UT-LN-49:              Utah Sensitive Species
UT-LN-51:              Special Status Plants: Not Federally Listed

AR005491

Appendix B

UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat
UT-LN-157:         San Rafael Swell SRMA


**UT0918 – 047**
T. 25 S., R. 13 E., SLM
          Secs. 1, 11 and 12: All.
1,969.20 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 048**
T. 25 S., R. 13 E., SLM
          Secs. 3, 9 and 10: All.
1,970.28 Acres
Emery County, Utah
Price Field Office

Stipulations:

AR005492

Appendix B

UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 049**
T. 25 S., R. 13 E., SLM
          Secs. 4, 5 and 8: All.
2,019.64 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird

AR005493

Appendix B

| | |
|---|---|
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-72: | High Potential Paleontological Resources |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| UT-LN-156 | Pollinators and Pollinator Habitat |

**UT0918 – 050**
T. 25 S., R. 13 E., SLM
      Secs. 6 and 7: All.
1,319.99 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156:  Pollinators and Pollinator Habitat

**UT0918 – 051**
T. 25 S., R. 13 E., SLM
      Secs. 13, 14, 23 and 24: All.
2,560.00 Acres
Emery County, Utah
Price Field Office

Stipulations:

AR005494

Appendix B

UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-72:            High Potential Paleontological Resources
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156:          Pollinators and Pollinator Habitat


**UT0918 – 052**
T. 25 S., R. 13 E., SLM
            Secs. 15, 21 and 22: All.
1,920.00 Acres
Emery County, Utah
Price Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird

AR005495

Appendix B

UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-72:          High Potential Paleontological Resources
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 053**
T. 25 S., R. 13 E., SLM
          Secs. 17, 18, 19 and 20: All.
2,555.40 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 054**
T. 25 S., R. 13 E., SLM
          Secs. 25, 26 and 35: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

Stipulations:

AR005496

Appendix B

UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:              CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:              NSO- Natural Springs
UT-S-127:              NSO- Intermittent and Perennial Streams
UT-S-285:              TL-Migratory Bird Nesting
UT-S-305:              CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:              White-Tailed and Gunnison Prairie Dog
UT-LN-44:              Raptors
UT-LN-45:              Migratory Bird
UT-LN-49:              Utah Sensitive Species
UT-LN-51:              Special Status Plants: Not Federally Listed
UT-LN-72:              High Potential Paleontological Resources
UT-LN-99:              Regional Ozone Formation Controls
UT-LN-102:            Air Quality Analysis
UT-LN-104:            Burrowing Owl Habitat
UT-LN-156            Pollinators and Pollinator Habitat


**UT0918 – 055**
T. 25 S., R. 13 E., SLM
              Secs. 27, 28, 33 and 34: All.
2,560.00 Acres
Emery County, Utah
Price Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:              CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:              NSO- Natural Springs
UT-S-127:              NSO- Intermittent and Perennial Streams
UT-S-285:              TL-Migratory Bird Nesting
UT-S-305:              CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
UT-LN-25:              White-Tailed and Gunnison Prairie Dog
UT-LN-44:              Raptors
UT-LN-45:              Migratory Bird

AR005497

Appendix B

UT-LN-49:        Utah Sensitive Species
UT-LN-51:        Special Status Plants: Not Federally Listed
UT-LN-99:        Regional Ozone Formation Controls
UT-LN-102:       Air Quality Analysis
UT-LN-156        Pollinators and Pollinator Habitat


**UT0918 – 056**
T. 25 S., R. 13 E., SLM
            Secs. 29, 30 and 31: All.
1,918.96 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:        CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:        NSO- Natural Springs
UT-S-127:        NSO- Intermittent and Perennial Streams
UT-S-285:        TL-Migratory Bird Nesting
UT-S-305:        CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:        White-Tailed and Gunnison Prairie Dog
UT-LN-44:        Raptors
UT-LN-45:        Migratory Bird
UT-LN-49:        Utah Sensitive Species
UT-LN-51:        Special Status Plants: Not Federally Listed
UT-LN-72:        High Potential Paleontological Resources
UT-LN-99:        Regional Ozone Formation Controls
UT-LN-102:       Air Quality Analysis
UT-LN-156        Pollinators and Pollinator Habitat


**UT0918 – 057**
T. 26 S., R. 13 E., SLM
            Secs. 1, 11, 12: All.
1,951.12 Acres
Emery County, Utah
Price Field Office

Stipulations:

86

Appendix B

UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 058**
T. 26 S., R. 13 E., SLM
          Secs. 3, 9 and 10: All.
1,950.48 Acres
Emery County, Utah
Price Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species

AR005499

Appendix B

UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 059**
T. 26 S., R. 13 E., SLM
          Secs. 4, 5 and 8: All.
1,982.36 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 060**
T. 26 S., R. 13 E., SLM
          Secs. 6 and 7: All.
1,269.16 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality

AR005500

Appendix B

UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156           Pollinators and Pollinator Habitat


**UT0918 – 061**
T. 26 S., R. 13 E., SLM
            Secs. 13 and 14: All;
Sec. 23: N2, NWSW, SE;
Sec. 24: All.
2,440.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-269:            NSO-Mexican Spotted Owl
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-06:  Mexican Spotted Owl
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog

AR005501

Appendix B

UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 062**
T. 26 S., R. 13 E., SLM
          Secs. 15, 21 and 22: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-269:          NSO-Mexican Spotted Owl
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-06:  Mexican Spotted Owl
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 063**
T. 26 S., R. 13 E., SLM
          Secs. 17, 18, 19 and 20: All.

AR005502

Appendix B

2,520.28 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156           Pollinators and Pollinator Habitat


**UT0918 – 064**
T. 26 S., R. 13 E., SLM
              Sec. 25: All;
Sec. 26: NE, SW, N2SE, W2SWSE, E2SESE;
Sec. 35: W2NE, W2, W2SE, SESE.
1,600.00 Acres
Emery County, Utah (1,494.96 ac.)
Price Field Office
Wayne County, Utah (105.04 ac.)
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-269:            NSO-Mexican Spotted Owl
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

AR005503

Appendix B

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-06:  Mexican Spotted Owl
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-72:            High Potential Paleontological Resources
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:           Air Quality Analysis
UT-LN-156            Pollinators and Pollinator Habitat


**UT0918 – 065**
T. 26 S., R. 13 E., SLM
            Sec. 27: NWNE, W2SWNE, W2, SE;
Secs. 28, 33 and 34: All.
2,460.00 Acres
Emery County, Utah (2,249.92 ac.)
Price Field Office
Wayne County, Utah (210.08 ac.)
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:           CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:           NSO- Natural Springs
UT-S-127:           NSO- Intermittent and Perennial Streams
UT-S-285:           TL-Migratory Bird Nesting
UT-S-305:           CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-72:            High Potential Paleontological Resources
UT-LN-99:            Regional Ozone Formation Controls

AR005504

Appendix B

UT-LN-102:          Air Quality Analysis
UT-LN-156           Pollinators and Pollinator Habitat


**UT0918 – 066**
T. 26 S., R. 13 E., SLM
          Secs. 29, 30 and 31: All.
1,882.16 Acres
Emery County, Utah (1,777.15 ac.)
Price Field Office
Wayne County, Utah (105.01 ac.)
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 067**
T. 25 S., R. 14 E., SLM
          Secs. 1, 11 and 12: All.
1,974.48 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality

AR005505

Appendix B

UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia (cycladenia hymilis var jonesii)
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156         Pollinators and Pollinator Habitat


**UT0918 – 068**
T. 25 S., R. 14 E., SLM
          Secs. 3, 9 and 10: All.
1,968.74 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia (cycladenia hymilis var jonesii)
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species

AR005506

Appendix B

UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 069**
T. 25 S., R. 14 E., SLM
          Secs. 4, 5 and 8: All.
2,014.60 Acres
Emery County, Utah
Price Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 070**
T. 25 S., R. 14 E., SLM
          Secs. 6 and 7: All.
1,324.84 Acres
Emery County, Utah
Price Field Office

95

Appendix B

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:           CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:           NSO- Natural Springs
UT-S-127:           NSO- Intermittent and Perennial Streams
UT-S-285:           TL-Migratory Bird Nesting
UT-S-305:           CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:           White-Tailed and Gunnison Prairie Dog
UT-LN-44:           Raptors
UT-LN-45:           Migratory Bird
UT-LN-49:           Utah Sensitive Species
UT-LN-51:           Special Status Plants: Not Federally Listed
UT-LN-72:           High Potential Paleontological Resources
UT-LN-99:           Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156:          Pollinators and Pollinator Habitat


**UT0918 – 071**
T. 25 S., R. 14 E., SLM
          Secs. 13, 14, 23 and 24: All.
2,560.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:           CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:           NSO- Natural Springs
UT-S-127:           NSO- Intermittent and Perennial Streams
UT-S-285:           TL-Migratory Bird Nesting
UT-S-305:           CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:           White-Tailed and Gunnison Prairie Dog
UT-LN-44:           Raptors

AR005508

Appendix B

UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 072**
T. 25 S., R. 14 E., SLM
          Secs. 15, 21 and 22: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 073**
T. 25 S., R. 14 E., SLM
          Secs. 17, 18, 19 and 20: All.
2,556.96 Acres
Emery County, Utah
Price Field Office

AR005509

Appendix B

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-51          Special Status Plants: Not Federally Listed
UT-LN-49:          Utah Sensitive Species
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156:          Pollinators and Pollinator Habitat


**UT0918 – 074**
T. 25 S., R. 14 E., SLM
          Secs. 25, 26 and 35: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog

AR005510

Appendix B

UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 075**
T. 25 S., R. 14 E., SLM
          Secs. 27, 28, 33 and 34: All.
2,560.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 076**
T. 25 S., R. 14 E., SLM
          Secs. 29, 30 and 31: All.
1,919.04 Acres
Emery County, Utah

99

AR005511

Appendix B


Price Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-72:            High Potential Paleontological Resources
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:            Air Quality Analysis
UT-LN-104:            Burrowing Owl Habitat
UT-LN-156:            Pollinators and Pollinator Habitat


**UT0918 – 077**
T. 26 S., R. 14 E., SLM
            Secs. 1, 11 and 12: All.
1,953.00 Acres
Emery County, Utah
Price Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species

100

Appendix B

T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:              White-Tailed and Gunnison Prairie Dog
UT-LN-44:              Raptors
UT-LN-45:              Migratory Bird
UT-LN-49:              Utah Sensitive Species
UT-LN-51:              Special Status Plants: Not Federally Listed
UT-LN-72:              High Potential Paleontological Resources
UT-LN-99:              Regional Ozone Formation Controls
UT-LN-102:            Air Quality Analysis
UT-LN-156:            Pollinators and Pollinator Habitat


**UT0918 – 078**
T. 26 S., R. 14 E., SLM
            Secs. 3, 9 and 10: All.
1,952.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:              White-Tailed and Gunnison Prairie Dog
UT-LN-44:              Raptors
UT-LN-45:              Migratory Bird
UT-LN-49:              Utah Sensitive Species
UT-LN-51:              Special Status Plants: Not Federally Listed
UT-LN-72:              High Potential Paleontological Resources
UT-LN-99:              Regional Ozone Formation Controls
UT-LN-102:            Air Quality Analysis
UT-LN-156:            Pollinators and Pollinator Habitat


**UT0918 – 079**
T. 26 S., R. 14 E., SLM
            Secs. 4, 5 and 8: All.

101

AR005513

Appendix B

1,983.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-104          Burrowing Owl Habitat
UT-LN-102:          Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 080**
T. 26 S., R. 14 E., SLM
            Secs. 6 and 7: All.
1,238.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:

AR005514

Appendix B

T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-104          Burrowing Owl Habitat
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 081**
T. 26 S., R. 14 E., SLM
          Secs. 13, 14, 23 and 24: All.
2,560.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:         CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:         NSO- Natural Springs
UT-S-127:         NSO- Intermittent and Perennial Streams
UT-S-285:         TL-Migratory Bird Nesting
UT-S-305:         CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat

AR005515

Appendix B

**UT0918 – 082**
T. 26 S., R. 14 E., SLM
        Secs. 15, 21 and 22: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:        CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:        NSO- Natural Springs
UT-S-127:        NSO- Intermittent and Perennial Streams
UT-S-285:        TL-Migratory Bird Nesting
UT-S-305:        CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:        White-Tailed and Gunnison Prairie Dog
UT-LN-44:        Raptors
UT-LN-45:        Migratory Bird
UT-LN-49:        Utah Sensitive Species
UT-LN-51:        Special Status Plants: Not Federally Listed
UT-LN-72:        High Potential Paleontological Resources
UT-LN-99:        Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156        Pollinators and Pollinator Habitat

**UT0918 – 083**
T. 26 S., R. 14 E., SLM
        Secs. 17, 18, 19 and 20: All.
2,492.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:        CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:        NSO- Natural Springs
UT-S-127:        NSO- Intermittent and Perennial Streams
UT-S-285:        TL-Migratory Bird Nesting
UT-S-305:        CSU- Noxious Weed

AR005516

Appendix B

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:             White-Tailed and Gunnison Prairie Dog
UT-LN-44:             Raptors
UT-LN-45:             Migratory Bird
UT-LN-49:             Utah Sensitive Species
UT-LN-51:             Special Status Plants: Not Federally Listed
UT-LN-72:             High Potential Paleontological Resources
UT-LN-99:             Regional Ozone Formation Controls
UT-LN-102:           Air Quality Analysis
UT-LN-156:           Pollinators and Pollinator Habitat


**UT0918 – 084**
T. 26 S., R. 14 E., SLM
            Secs. 25, 26 and 35: All.
1,920.00 Acres
Emery County, Utah (1,814.60 ac.)
Price Field Office
Wayne County, Utah (105.40 ac.)
Richfield Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-15:  Wright Fishhook Cactus *(Sclerocactus wrightiae)*
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:             White-Tailed and Gunnison Prairie Dog
UT-LN-44:             Raptors
UT-LN-45:             Migratory Bird
UT-LN-49:             Utah Sensitive Species
UT-LN-51:             Special Status Plants: Not Federally Listed
UT-LN-72:             High Potential Paleontological Resources
UT-LN-99:             Regional Ozone Formation Controls

AR005517

Appendix B

UT-LN-102:          Air Quality Analysis
UT-LN-156:          Pollinators and Pollinator Habitat


**UT0918 – 085**
T. 26 S., R. 14 E., SLM
          Secs. 27, 28, 33 and 34: All.
2,560.00 Acres
Emery County, Utah (2,348.22 ac.)
Price Field Office
Wayne County, Utah (211.78 ac.)
Richfield Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-15:  Wright Fishhook Cactus (*Sclerocactus wrightiae*)
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156:          Pollinators and Pollinator Habitat


**UT0918 – 086**
T. 26 S., R. 14 E., SLM
          Secs. 29, 30 and 31: All.
1,855.00 Acres
Emery County, Utah (1,712.54 ac.)
Price Field Office
Wayne County, Utah (142.46 ac.)
Richfield Field Office

106

AR005518

Appendix B

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:        CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:        NSO- Natural Springs
UT-S-127:        NSO- Intermittent and Perennial Streams
UT-S-285:        TL-Migratory Bird Nesting
UT-S-305:        CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:        White-Tailed and Gunnison Prairie Dog
UT-LN-44:        Raptors
UT-LN-45:        Migratory Bird
UT-LN-49:        Utah Sensitive Species
UT-LN-51:        Special Status Plants: Not Federally Listed
UT-LN-72:        High Potential Paleontological Resources
UT-LN-99:        Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156:        Pollinators and Pollinator Habitat
**UT0918 – 087**
T. 25 S., R. 15 E., SLM
        Secs. 1, 11 and 12: All.
1,939.05 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:        CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:        NSO- Natural Springs
UT-S-127:        NSO- Intermittent and Perennial Streams
UT-S-285:        TL-Migratory Bird Nesting
UT-S-305:        CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:        White-Tailed and Gunnison Prairie Dog
UT-LN-44:        Raptors
UT-LN-45:        Migratory Bird

AR005519

Appendix B

UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 088**
T. 25 S., R. 15 E., SLM
          Secs. 3, 9 and 10: All.
1,963.22 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 089**
T. 25 S., R. 15 E., SLM
          Secs. 4, 5 and 8: All.
2,018.76 Acres
Emery County, Utah
Price Field Office

AR005520

Appendix B

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat

**UT0918 – 090**
T. 25 S., R. 15 E., SLM
          Secs. 6 and 7: All.
1,322.23 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird

AR005521

Appendix B

| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-72: | High Potential Paleontological Resources |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| UT-LN-156 | Pollinators and Pollinator Habitat |

**UT0918 – 091**
T. 25 S., R. 15 E., SLM
         Secs. 13, 14, 23 and 24: All.
2,560.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:        CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:        NSO- Natural Springs
UT-S-127:        NSO- Intermittent and Perennial Streams
UT-S-285:        TL-Migratory Bird Nesting
UT-S-305:        CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:        White-Tailed and Gunnison Prairie Dog
UT-LN-44:        Raptors
UT-LN-45:        Migratory Bird
UT-LN-49:        Utah Sensitive Species
UT-LN-51:        Special Status Plants: Not Federally Listed
UT-LN-72:        High Potential Paleontological Resources
UT-LN-99:        Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156        Pollinators and Pollinator Habitat

**UT0918 – 092**
T. 25 S., R. 15 E., SLM
         Secs. 15, 21 and 22: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

110

Appendix B

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 093**
T. 25 S., R. 15 E., SLM
          Secs. 17, 18, 19 and 20: All.
2,556.12 Acres
Emery County, Utah
Price Field Office


Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird

111

Appendix B

UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 094**
T. 25 S., R. 15 E., SLM
          Secs. 25, 26 and 35: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 095**
T. 25 S., R. 15 E., SLM
          Secs. 27, 28, 33 and 34: All.
2,560.00 Acres
Emery County, Utah
Price Field Office

Stipulations:

112

AR005524

Appendix B

UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:                CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:                NSO- Natural Springs
UT-S-127:                NSO- Intermittent and Perennial Streams
UT-S-285:                TL-Migratory Bird Nesting
UT-S-305:                CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:                White-Tailed and Gunnison Prairie Dog
UT-LN-44:                Raptors
UT-LN-45:                Migratory Bird
UT-LN-49:                Utah Sensitive Species
UT-LN-51:                Special Status Plants: Not Federally Listed
UT-LN-72:                High Potential Paleontological Resources
UT-LN-99:                Regional Ozone Formation Controls
UT-LN-102:              Air Quality Analysis
UT-LN-156                Pollinators and Pollinator Habitat


**UT0918 – 096**
T. 25 S., R. 15 E., SLM
                Secs. 29, 30 and 31: All.
1,918.84 Acres
Emery County, Utah
Price Field Office


Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:                CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:                NSO- Natural Springs
UT-S-127:                NSO- Intermittent and Perennial Streams
UT-S-285:                TL-Migratory Bird Nesting
UT-S-305:                CSU- Noxious Weed


Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:                White-Tailed and Gunnison Prairie Dog
UT-LN-44:                Raptors
UT-LN-45:                Migratory Bird
UT-LN-49:                Utah Sensitive Species

AR005525

Appendix B

UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 097**
T. 26 S., R. 15 E., SLM
          Secs. 1, 11 and 12: All.
1,874.52 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51           Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat


**UT0918 – 098**
T. 26 S., R. 15 E., SLM
          Secs. 3, 4, 9 and 10: All.
2,471.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%

114

Appendix B

UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-72:            High Potential Paleontological Resources
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156           Pollinators and Pollinator Habitat


**UT0918 – 099**
T. 26 S., R. 15 E., SLM
            Secs. 5, 6, 7 and 8: All.
2,429.84 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:            CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:            NSO- Natural Springs
UT-S-127:            NSO- Intermittent and Perennial Streams
UT-S-285:            TL-Migratory Bird Nesting
UT-S-305:            CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed

AR005527

Appendix B

UT-LN-72:            High Potential Paleontological Resources
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:           Air Quality Analysis
UT-LN-156            Pollinators and Pollinator Habitat


**UT0918 – 100**
T. 26 S., R. 15 E., SLM
            Secs. 13, 14, 23 and 24: All.
2,560.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:           CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:           NSO- Natural Springs
UT-S-127:           NSO- Intermittent and Perennial Streams
UT-S-285:           TL-Migratory Bird Nesting
UT-S-305:           CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:           White-Tailed and Gunnison Prairie Dog
UT-LN-44:           Raptors
UT-LN-45:           Migratory Bird
UT-LN-49:           Utah Sensitive Species
UT-LN-51:           Special Status Plants: Not Federally Listed
UT-LN-72:           High Potential Paleontological Resources
UT-LN-99:           Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156           Pollinators and Pollinator Habitat


**UT0918 – 101**
T. 26 S., R. 15 E., SLM
            Secs. 15, 21 and 22: All.
1,920.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality

116

Appendix B

UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156:        Pollinators and Pollinator Habitat


**UT0918 – 102**
T. 26 S., R. 15 E., SLM
              Secs. 17, 18, 19 and 20: All.
2,519.88 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources

AR005529

Appendix B

UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 103**
T. 26 S., R. 15 E., SLM
          Secs. 25, 26 and 35: All.
1,920.00 Acres
Emery County, Utah (1,892.24 ac.)
Price Field Office
Wayne County, Utah (27.76 ac.)
Richfield Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-78:          Light and Sound Areas Proximate to Canyonlands National Park
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat
**UT0918 – 104**
T. 26 S., R. 15 E., SLM
          Secs. 27, 28, 33 and 34: All.
2,560.00 Acres
Emery County, Utah (2,504.48 ac.)
Price Field Office
Wayne County, Utah (55.52 ac.)
Richfield Field Office

118

Appendix B

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156:          Pollinators and Pollinator Habitat


**UT0918 – 105**
T. 26 S., R. 15 E., SLM
          Secs. 29, 30 and 31: All.
1,883.36 Acres
Emery County, Utah (1,856.75 ac.)
Price Field Office
Wayne County, Utah (26.61 ac.)
Richfield Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03: Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05: Listed Plant Species
T&E-19: Jones Cycladenia *(cycladenia hymilis var jonesii)*

AR005531

Appendix B

| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
|---|---|
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-72: | High Potential Paleontological Resources |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| UT-LN-156: | Pollinators and Pollinator Habitat |


**UT0918 – 106**
T. 23 S., R. 16 E., SLM
       Sec. 11: Lots 3, 9-11, 14, NWNW, W2SW;
Sec. 14: All.
896.97 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%

| UT-S-101: | CSU- Fragile Soils/Slopes 20-40 Percent |
|---|---|
| UT-S-126: | NSO- Natural Springs |
| UT-S-127: | NSO- Intermittent and Perennial Streams |
| UT-S-169: | CSU- Cultural Resource Inventories |
| UT-S-285: | TL-Migratory Bird Nesting |
| UT-S-305: | CSU- Noxious Weed |
| UT-S-319: | NSO-Cultural ACEC |

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-07:  Southwestern Willow Flycatcher
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*

| UT-LN-25: | White-Tailed and Gunnison Prairie Dog |
|---|---|
| UT-LN-44: | Raptors |
| UT-LN-45: | Migratory Bird |
| UT-LN-49: | Utah Sensitive Species |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-99: | Regional Ozone Formation Controls |
| UT-LN-102: | Air Quality Analysis |
| UT-LN-113: | Western Yellow-billed Cuckoo |
| UT-LN-156: | Pollinators and Pollinator Habitat |

AR005532

Appendix B


**UT0918 – 107**
T. 25 S., R. 16 E., SLM
      Secs. 5, 6 and 7: All.
1,948.91 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156:        Pollinators and Pollinator Habitat


**UT0918 – 108**
T. 25 S., R. 16 E., SLM
      Secs. 8, 17, 18 and 19: All.
2,555.48 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

AR005533

Appendix B

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 109**
T. 25 S., R. 16 E., SLM
          Secs. 20, 29, 30 and 31: All.
2,558.56 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat

AR005534

Appendix B

**UT0918 – 110**
T. 26 S., R. 16 E., SLM
       Secs. 4, 5, 6 and 7: All.
2,384.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:        White-Tailed and Gunnison Prairie Dog
UT-LN-44:        Raptors
UT-LN-45:        Migratory Bird
UT-LN-49:        Utah Sensitive Species
UT-LN-51:        Special Status Plants: Not Federally Listed
UT-LN-99:        Regional Ozone Formation Controls
UT-LN-102:      Air Quality Analysis
UT-LN-156:      Pollinators and Pollinator Habitat

**UT0918 – 111**
T. 26 S., R. 16 E., SLM
       Secs. 8, 9, 17 and 18: All.
2,541.00 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:

AR005535

Appendix B

T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-78:          Light and Sound Areas Proximate to Canyonlands National Park
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat


**UT0918 – 112**
T. 26 S., R. 16 E., SLM
          Secs. 19, 20, 30 and 31: All.
2,512.48 Acres
Emery County, Utah (2,480.43 ac.)
Price Field Office
Wayne County, Utah (32.05 ac.)
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:         CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:         NSO- Natural Springs
UT-S-127:         NSO- Intermittent and Perennial Streams
UT-S-285:         TL-Migratory Bird Nesting
UT-S-305:         CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-78:          Light and Sound Areas Proximate to Canyonlands National Park
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156:         Pollinators and Pollinator Habitat

AR005536

Appendix B

**UT0918 – 113**
T. 26 S., R. 16 E., SLM
   Secs. 21, 28 and 29: All;
Sec. 33: W2NE, NW, N2SW, SWSW.
2,280.00 Acres
Emery County, Utah (2,273.08 ac.)
Price Field Office
Wayne County, Utah (6.92 ac.)
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:  CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:  NSO- Natural Springs
UT-S-127:  NSO- Intermittent and Perennial Streams
UT-S-160:  CSU- Visual Resources-VRM II
UT-S-253:  Timing Limitation – Desert and Rocky Mountain Bighorn Sheep
UT-S-269:  NSO-Mexican Spotted Owl
UT-S-285:  TL-Migratory Bird Nesting
UT-S-305:  CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-06:  Mexican Spotted Owl
T&E-07:  Southwestern Willow Flycatcher
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:  White-Tailed and Gunnison Prairie Dog
UT-LN-44:  Raptors
UT-LN-21:  Bighorn Sheep Habitat
UT-LN-45:  Migratory Bird
UT-LN-49:  Utah Sensitive Species
UT-LN-51:  Special Status Plants: Not Federally Listed
UT-LN-99:  Regional Ozone Formation Controls
UT-LN-102:  Air Quality Analysis
UT-LN-113  Western Yellow-billed Cuckoo
UT-LN-156  Pollinators and Pollinator Habitat

## SOLD BUT NOT ISSUED LEASES

**UTU85328**
T. 24 S., R. 16 E., SLM
   Sec. 3: E2SE;
   Sec. 4: Lots 1-4, S2NE;
   Sec. 9: S2;

AR005537

Appendix B

      Sec. 10: E2NE, SWNE, S2;
      Sec. 11: NWNW;
      Sec. 15: W2NE, W2;
      Sec. 21: All;
      Sec. 22: W2.
2,478.24 Acres
Emery County, Utah
Price Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-97:  NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-269:          NSO-Mexican Spotted Owl
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-06:  Mexican Spotted Owl
T&E-07:  Southwestern Willow Flycatcher
T&E-17:  San Rafael Cactus (*Pediocactus Despainii*)
T&E-19:  Jones Cycladenia (*cycladenia hymilis var jonesii*)
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-113          Western Yellow-billed Cuckoo
UT-LN-126          Navajo Sedge
UT-LN-156          Pollinators and Pollinator Habitat


**UTU85329**
T. 24 S., R. 13 E., SLM
      Secs. 25, 26, 27 and 28: All;

T. 24 S., R. 14 E., SLM
      Sec. 1: W2SW;
      Sec. 11 and 12: All.
3920.00 Acres

AR005538

Appendix B

Emery County, Utah
Price Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-97: NSO-Fragile Soils/Slopes for Slopes Greater Than 40%
UT-S-101:          CSU- Fragile Soils/Slopes 20-40 Percent
UT-S-126:          NSO- Natural Springs
UT-S-127:          NSO- Intermittent and Perennial Streams
UT-S-225:          TL- Crucial Fawning Pronghorn Habitat
UT-S-285:          TL-Migratory Bird Nesting
UT-S-305:          CSU- Noxious Weed

Notices:
T&E-03:  Endangered Fish of the Upper Colorado River Drainage Basin
T&E-05:  Listed Plant Species
T&E-07:  Southwestern Willow Flycatcher
T&E-17:  San Rafael Cactus (*Pediocactus Despainii*)
T&E-19:  Jones Cycladenia *(cycladenia hymilis var jonesii)*
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-113          Western Yellow-billed Cuckoo
UT-LN-156          Pollinators and Pollinator Habitat


# SUSPENDED LEASES

**UTU81031**
T. 27 S., R. 13 E., SLM
          Secs. 27, 28, 29 and 31: All.
2,547.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-102:          CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-225:          TL- Crucial Fawning Pronghorn Habitat
UT-S-293:          California Condor

127

AR005539

Appendix B

Notices:
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51           Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat
T&E-25   Mexican Spotted Owl
T&E-28   California Condor

## UTU81032
T. 27 S., R. 13 E., SLM
         Secs. 33, 34 and 35: All.
1,920.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-102:          CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-225:          TL- Crucial Fawning Pronghorn Habitat
UT-S-293:          California Condor

Notices:
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51           Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat
T&E-06   Mexican Spotted Owl
T&E-11   California Condor

## UTU81033
T. 28 S., R. 13 E., SLM
         Sec. 3: N2NE, SENE, NENW;
         Sec. 4: N2NE, NW.
399.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01: Air Quality

AR005540

Appendix B

UT-S-102:                CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-225:                TL- Crucial Fawning Pronghorn Habitat
UT-S-293:                California Condor

Notices:
UT-LN-25:                White-Tailed and Gunnison Prairie Dog
UT-LN-44:                Raptors
UT-LN-45:                Migratory Bird
UT-LN-49:                Utah Sensitive Species
UT-LN-51:                Special Status Plants: Not Federally Listed
UT-LN-99:                Regional Ozone Formation Controls
UT-LN-102:               Air Quality Analysis
UT-LN-156:               Pollinators and Pollinator Habitat
T&E-06   Mexican Spotted Owl
T&E-11   California Condor

## UTU81034
T. 28 S., R. 13 E., SLM
          Sec. 5: N2.
316.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01: Air Quality
UT-S-102:                CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-225:                TL- Crucial Fawning Pronghorn Habitat

UT-S-293:                California Condor

Notices:
UT-LN-25:                White-Tailed and Gunnison Prairie Dog
UT-LN-44:                Raptors
UT-LN-45:                Migratory Bird
UT-LN-49:                Utah Sensitive Species
UT-LN-51                 Special Status Plants: Not Federally Listed
UT-LN-99:                Regional Ozone Formation Controls
UT-LN-102:               Air Quality Analysis
UT-LN-156:               Pollinators and Pollinator Habitat
T&E-06   Mexican Spotted Owl
T&E-11   California Condor

## UTU81426
T. 27 S., R. 13 E., SLM
          Secs. 1, 11, 12 and 13: All.
2,485.00 Acres

129

AR005541

Appendix B


Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:            CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-105:            CSU- Soils (High Potential for Wind Erosion)
UT-S-225:            TL- Crucial Fawning Pronghorn Habitat
UT-S-293:            California Condor


Notices:
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-72:            High Potential Paleontological Resources
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156:          Pollinators and Pollinator Habitat
T&E-11:  California Condor


**UTU81427**
T. 27 S., R. 13 E., SLM
            Secs. 3, 4, 9 and 10: All.
2,410.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:            CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-105:            CSU- Soils (High Potential for Wind Erosion)
UT-S-225:            TL- Crucial Fawning Pronghorn Habitat
UT-S-293:            California Condor


Notices:
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51            Special Status Plants: Not Federally Listed
UT-LN-72:            High Potential Paleontological Resources
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156:          Pollinators and Pollinator Habitat

AR005542

Appendix B

T&E-11:  California Condor

**UTU81428**
T. 27 S., R. 13 E., SLM
      Secs. 14, 15, 21 and 22: All.
2,560.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:        CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-105:        CSU- Soils (High Potential for Wind Erosion)
UT-S-225:        TL- Crucial Fawning Pronghorn Habitat

UT-S-293:        California Condor

Notices:
UT-LN-25:        White-Tailed and Gunnison Prairie Dog
UT-LN-44:        Raptors
UT-LN-45:        Migratory Bird
UT-LN-49:        Utah Sensitive Species
UT-LN-51:        Special Status Plants: Not Federally Listed
UT-LN-99:        Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156        Pollinators and Pollinator Habitat
T&E-11:  California Condor

**UTU81429**
T. 27 S., R. 13 E., SLM
      Secs. 23, 24, 25 and 26: All.
2,560.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:        CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-105:        CSU- Soils (High Potential for Wind Erosion)
UT-S-225:        TL- Crucial Fawning Pronghorn Habitat

UT-S-293:        California Condor

Notices:
UT-LN-25:        White-Tailed and Gunnison Prairie Dog
UT-LN-44:        Raptors
UT-LN-45:        Migratory Bird

AR005543

Appendix B

UT-LN-49:         Utah Sensitive Species
UT-LN-51          Special Status Plants: Not Federally Listed
UT-LN-99:         Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156         Pollinators and Pollinator Habitat
T&E-11:  California Condor

**UTU81455**
T. 27 S., R. 13. E., SLM
        Secs. 5, 6, 7 and 8: All.
2,378.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:         CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-105:         CSU- Soils (High Potential for Wind Erosion)
UT-S-225:         TL- Crucial Fawning Pronghorn Habitat
UT-S-293:         California Condor

Notices:
UT-LN-25:         White-Tailed and Gunnison Prairie Dog
UT-LN-44:         Raptors
UT-LN-45:         Migratory Bird
UT-LN-49:         Utah Sensitive Species
UT-LN-51          Special Status Plants: Not Federally Listed
UT-LN-99:         Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156:        Pollinators and Pollinator Habitat
T&E-11:  California Condor

**UTU81456**
T. 27 S., R. 13 E., SLM
        Secs. 17, 18, 19 and 20: All.
2,529.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:         CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-105:         CSU- Soils (High Potential for Wind Erosion)
UT-S-225:         TL- Crucial Fawning Pronghorn Habitat
UT-S-293:         California Condor

AR005544

Appendix B

Notices:
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51           Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat
T&E-11   California Condor

**UTU81458**
T. 27 S., R. 14 E., SLM
          Secs. 1, 11, 12 and 13: All.
2,483.68 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:          CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-184:          Upper Colorado River Fish
UT-S-225:          TL- Crucial Fawning Pronghorn Habitat
UT-S-293:          California Condor

Notices:
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51           Special Status Plants: Not Federally Listed
UT-LN-72:          High Potential Paleontological Resources
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:         Air Quality Analysis
UT-LN-156          Pollinators and Pollinator Habitat
T&E-03:  Colorado River Endangered Fish
T&E-11:  California Condor

**UTU81459**
T. 27 S., R. 14 E., SLM
          Secs. 14, 15, 21 and 22: All.
2,560.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:

133

AR005545

Appendix B

UT-S-01:  Air Quality
UT-S-184:             Upper Colorado River Fish
UT-S-225:             TL- Crucial Fawning Pronghorn Habitat
UT-S-293:             California Condor

Notices:
UT-LN-25:             White-Tailed and Gunnison Prairie Dog
UT-LN-44:             Raptors
UT-LN-45:             Migratory Bird
UT-LN-49:             Utah Sensitive Species
UT-LN-51:             Special Status Plants: Not Federally Listed
UT-LN-99:             Regional Ozone Formation Controls
UT-LN-102:           Air Quality Analysis
UT-LN-156            Pollinators and Pollinator Habitat
T&E-03:  Colorado River Endangered Fish
T&E-11:  California Condor

**UTU81460**
T. 27 S., R. 14 E., SLM
            Secs. 17, 18, 19 and 20: All.
2,499.12 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:            CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-105:            CSU- Soils (High Potential for Wind Erosion)
UT-S-225:            TL- Crucial Fawning Pronghorn Habitat
UT-S-293:            California Condor

Notices:
UT-LN-25:            White-Tailed and Gunnison Prairie Dog
UT-LN-44:            Raptors
UT-LN-45:            Migratory Bird
UT-LN-49:            Utah Sensitive Species
UT-LN-51:            Special Status Plants: Not Federally Listed
UT-LN-99:            Regional Ozone Formation Controls
UT-LN-102:          Air Quality Analysis
UT-LN-156           Pollinators and Pollinator Habitat
T&E-11:  California Condor

**UTU81463**
T. 27 S., R. 14 E., SLM
            Sec. 28: All;
            Sec. 29: N2, N2N2, S2SE;
            Sec. 30: All;

134

Appendix B

     Sec. 31: Lots 1, 2, NENW.
1,916.20 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-86:  NSO- Non WSA Lands With Wilderness Characteristics
UT-S-102:     CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-293:     California Condor

Notices:
UT-LN-25:     White-Tailed and Gunnison Prairie Dog
UT-LN-44:     Raptors
UT-LN-45:     Migratory Bird
UT-LN-49:     Utah Sensitive Species
UT-LN-51     Special Status Plants: Not Federally Listed
UT-LN-99:     Regional Ozone Formation Controls
UT-LN-102:     Air Quality Analysis
UT-LN-156:     Pollinators and Pollinator Habitat
T&E-11:  California Condor

**UTU84401**
T. 27 S., R. 14 E., SLM
     Secs. 3, 4, 5, 6, 7, 8, 9 and 10: All.
4,756.95 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:     CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-184:     Upper Colorado River Fish
UT-S-225:     TL- Crucial Fawning Pronghorn Habitat
UT-S-293:     California Condor

Notices:
UT-LN-25:     White-Tailed and Gunnison Prairie Dog
UT-LN-44:     Raptors
UT-LN-45:     Migratory Bird
UT-LN-49:     Utah Sensitive Species
UT-LN-51     Special Status Plants: Not Federally Listed
UT-LN-72:     High Potential Paleontological Resources
UT-LN-99:     Regional Ozone Formation Controls
UT-LN-102:     Air Quality Analysis
UT-LN-156     Pollinators and Pollinator Habitat

AR005547

Appendix B

T&E-06:  Colorado River Endangered Fish
T&E-11:  California Condor

**UTU84706**
T. 27 S., R. 14 E., SLM
        Secs. 23, 24, 25, 26 and 27: All;
        Sec. 33: NE, NESE;
        Sec. 34: N2, N2S2, SESW, SWSE;
        Sec. 35: N2, N2S2, SESW, S2SE.
4,560.00 Acres
Wayne County, Utah
Richfield Field Office

Stipulations:
UT-S-01:  Air Quality
UT-S-102:          CSU- Fragile Soils/Slopes 30 Percent or Greater
UT-S-105:          CSU- Soils (High Potential for Wind Erosion)
UT-S-184:          Upper Colorado River Fish
UT-S-225:          TL- Crucial Fawning Pronghorn Habitat
UT-S-293:          California Condor

Notices:
UT-LN-25:          White-Tailed and Gunnison Prairie Dog
UT-LN-44:          Raptors
UT-LN-45:          Migratory Bird
UT-LN-49:          Utah Sensitive Species
UT-LN-51:          Special Status Plants: Not Federally Listed
UT-LN-99:          Regional Ozone Formation Controls
UT-LN-102:        Air Quality Analysis
UT-LN-156:        Pollinators and Pollinator Habitat
T&E-03:  Colorado River Endangered Fish
T&E-11:  California Condor

AR005548

Appendix C          **Deferred Parcels**

No Parcels have been deferred at the time the Notice of Competitive Lease Sale was Released

Appendix D          Stipulation and Notice Exhibits

| STIPULATIONS | |
|---|---|
| | **AIR QUALITY** |
| **UT-S-01** | All new and replacement internal combustion gas field engines of less than or equal to 300 design-rated horsepower shall not emit more than 2 grams of $NO_x$ per horsepower-hour.<br>**Exception:** This requirement does not apply to gas field engines of less than or equal to 40 design-rated horsepower.<br>**Modification**: None<br>**Waiver**: None<br>**AND**<br>All new and replacement internal combustion gas field engines of greater than 300 design rated horsepower must not emit more than 1.0 gram of $NO_x$ per horsepower-hour.<br>**Exception**: None<br>**Modification**: None<br>**Waiver**: None |
| **UT-S-86** | **NO SURFACE OCCUPANCY – NON-WSA LANDS WITH WILDERNESS CHARACTERISTICS**<br><br>No surface occupancy within the lands managed as non-WSA lands with wilderness characteristics to protect, preserve, and maintain their wilderness characteristics.<br><br>**Exception:** None<br>**Modification:** None<br>**Waiver:** None |
| **UT-S-97** | **NO SURFACE OCCUPANCY – FRAGILE SOILS/SLOPES GREATER THAN 40 PERCENT**<br>No surface occupancy on slopes greater than 40 percent.<br>**Exception:** If after an environment analysis the authorized officer determines that it would cause undue or unnecessary degradation to pursue other placement alternatives; surface occupancy in the area may be authorized. In addition, a plan from the operator and BLM's approval of the plan shall be required before construction and maintenance could begin. The plan would have to include:<br>  An erosion control strategy;<br>  GIS modeling;<br>  Proper survey and design by a certified engineer.<br>**Modification**: None<br>**Waiver**: None |

AR005550

Appendix D

| STIPULATIONS | |
|---|---|
| **UT-S-101** | **CONTROLLED SURFACE USE – FRAGILE SOILS/SLOPES 20-40 PERCENT**<br><br>In surface disturbing proposals regarding construction on slopes of 20 percent to 40 percent, include an approved erosion control strategy and topsoil segregation/restoration plan. Such construction must be properly surveyed and designed by a certified engineer and approved by the BLM prior to project implementation, construction, or maintenance.<br><br>**Exception:** If after an environment analysis the authorized officer determines that it would cause undue or unnecessary degradation to pursue other placement alternatives; surface occupancy in the area may be authorized. In addition, a plan from the operator and BLM's approval of the plan would be required before construction and maintenance could begin. The plan must include:<br><br>An erosion control strategy;<br>GIS modeling;<br>Proper survey and design by a certified engineer.<br><br>**Modification:** Modifications also may be granted if a more detailed analysis is conducted and shows that impacts can be mitigated, e.g., Order I soil survey conducted by a qualified soil scientist, finds that surface disturbance activities could occur on slopes between 20 and 40 percent while adequately protecting areas from accelerated erosion.<br><br>**Waiver**: None |
| **UT-S-102** | **CONTROLLED SURFACE USE – FRAGILE SOILS/SLOPES 30 PERCENT OR GREATER**<br><br>No surface disturbing proposed projects involving construction on slopes greater than 30. If the action cannot be avoided, rerouted, or relocated than a proposed project will include an erosion control strategy, reclamation and a site plan with a detailed survey and design completed by a certified engineer. This proposed project must be approved by the BLM prior to construction and maintenance.<br><br>**Exception:** None<br><br>**Modification:** None<br><br>**Waiver**: None |

AR005551

Appendix D

| STIPULATIONS | |
|---|---|
| **UT-S-105** | **CONTROLLED SURFACE USE – SOILS (HIGH POTENTIAL FOR WIND EROSION)**<br><br>No surface disturbing activities on soils that have been identified by the NRCS as having high potential for wind erosion through research studies or monitoring. If surface disturbing activities cannot be avoided on areas identified as having high potential for wind erosion, require a plan of operation that addresses erosion control strategies or mitigation measures, such as signing along roadways.<br><br>**Exception:** None<br><br>**Modification:** Consider modification if site-specific environmental analysis shows that alternatives would cause undue or unnecessary degradation to surface resources and impacts from wind erosion would not affect long-term soil productivity, would not impact air quality in nearby Class I airsheds, nor pose safety hazards to recreationists or motorists.<br><br>**Waiver**: None |
| **UT-S-126** | **NO SURFACE OCCUPANCY – NATURAL SPRINGS**<br><br>No surface disturbance or occupancy will be maintained around natural springs to protect the water quality of the spring. The distance would be based on geophysical, riparian, and other factors necessary to protect the water quality of the springs. If these factors cannot be determined, a 660-foot buffer zone would be maintained.<br><br>**Exception:** An exception could be authorized if (a) there are no practical alternatives, (b) impacts could be fully mitigated, or (c) the action is designed to enhance the riparian resources.<br><br>**Modification:** None<br><br>**Waiver**: None |
| **UT-S-127** | **NO SURFACE OCCUPANCY – INTERMITTENT AND PERENNIAL STREAMS**<br><br>No new surface disturbance (excluding fence lines) will be allowed in areas within the 100-year floodplain or 100 meters (330 feet) on either side from the centerline, whichever is greater, along all perennial and intermittent streams, streams with perennial reaches, and riparian areas.<br><br>**Exception:** The authorized officer could authorize an exception if it could be shown that the project as mitigated eliminated the need for the restriction.<br><br>An exception could be authorized if (a) there are no practical alternatives, (b) impacts could be fully mitigated, or (c) the action is designed to enhance the riparian resources.<br><br>**Modification:** None<br><br>**Waiver:** None |

140

AR005552

Appendix D

| STIPULATIONS | |
|---|---|
| **UT-S-160** | **CONTROLLED SURFACE USE – VISUAL RESOURCES - VRM II**<br><br>Within VRM II areas, surface disturbing activities will comply with BLM Manual Handbook 8431-1 to retain the existing character of the landscape.<br><br>**Exception:** Recognized utility corridors are exempt. Temporary exceedance may be allowed during initial development phases.<br><br>**Modification**: None<br><br>**Waiver**: None |
| **UT-S-184** | **CONTROLLED SURFACE USE/TIMING LIMITATIONS – ENDANGERED FISH OF THE UPPER COLORADO RIVER DRAINAGE BASIN**<br><br>The Lessee/Operator is given notice that the lands in this parcel contain Critical Habitat for the Colorado River fish (bonytail chub, humpback chub, Colorado pike minnow, and razorback sucker, listed as endangered under the Endangered Species Act (ESA), or these parcels have watersheds that are tributary to designated habitat. Critical habitat was designated for the four endangered Colorado River fishes on March 21, 1994 (59 FR 13374-13400). Designated critical habitat for all the endangered fishes includes those portions of the 100-year floodplain that contain primary constituent elements necessary for survival of the species. Avoidance or use restrictions may be placed on portions of the lease. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease comply with the ESA. Integration of, and adherence to, these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of ESA Section 7 consultation at the permit stage.<br><br>Current avoidance and minimization measures include the following:<br>1. Surveys will be required prior to operations, unless species occupancy and distribution information is complete and available. All surveys must be conducted by qualified individual(s).<br>2. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br>3. Water production will be managed to ensure maintenance or enhancement of riparian habitat.<br>4. Avoid loss or disturbance of riparian habitats.<br>5. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and |

AR005553

Appendix D

| STIPULATIONS | |
|---|---|
| | eliminate drilling in suitable riparian habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. |
| | 6. Conduct watershed analysis for leases in designated critical habitat and overlapping major tributaries in order to determine toxicity risk from permanent facilities. |
| | 7. Implement the Utah Oil and Gas Pipeline Crossing Guidance (from BLM National Science and Technology Center). |
| | 8. Drilling will not occur within 100-year floodplains of rivers or tributaries to rivers that contain listed fish species or critical habitat. |
| | 9. In areas adjacent to 100-year floodplains, particularly in systems prone to flash floods, analyze the risk for flash floods to impact facilities, and use closed loop drilling, and pipeline burial or suspension according to the Utah Oil and Gas Pipeline Crossing Guidance, to minimize the potential for equipment damage and resulting leaks or spills. |
| | Water depletions from *any* portion of the Upper Colorado River drainage basin above Lake Powell are considered to adversely affect or adversely modify the critical habitat of the four resident endangered fish species, and must be evaluated with regard to the criteria described in the Upper Colorado River Endangered Fish Recovery Program. Formal consultation with USFWS is required for all depletions. All depletion amounts must be reported to BLM. |
| | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the USFWS between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| | **Exception**: None |
| | **Modification**: None |
| | **Waiver**: None |
| **UT-S-225** | **TIMING LIMITATION - CRUCIAL FAWNING PRONGHORN HABITAT** <br><br> No surface disturbing activities in crucial pronghorn antelope habitat from **May 15 through June 15** to protect species sensitivity during fawning season. <br><br> **Exception:** The authorized officer may grant an exception if the operator submits a plan that demonstrates that impacts from the proposed action can be adequately mitigated. <br><br> **Modification:** The authorized officer may modify the boundaries of the stipulation area (1) if a portion of the area is not being used as crucial pronghorn habitat during kidding season or (2) if habitat outside of stipulation boundaries is being used for crucial pronghorn habitat and needs to be protected. |

AR005554

Appendix D

| STIPULATIONS | |
|---|---|
| | **Waiver:** A waiver may be granted if the habitat is determined as unsuitable for crucial pronghorn habitat and there is no reasonable likelihood of future use as crucial pronghorn habitat |
| **UT-S-253** | **TIMING LIMITATION – DESERT AND ROCKY MOUNTAIN BIGHORN SHEEP**<br><br>No surface disturbing or otherwise disruptive activities within Desert bighorn sheep and Rocky Mountain bighorn sheep spring/lambing within crucial yearlong range from **April 15 to June 15**.<br><br>**Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or range conditions if certain criteria are met and if activities would not cause undue stress to Desert bighorn sheep and Rocky Mountain bighorn sheep populations or habitats.<br><br>**Modification:** Season may be adjusted depending on climatic and range conditions.<br><br>**Waiver:** A waiver may be granted if the habitat is determined to be unsuitable for lambing and there is no reasonable likelihood of future use as bighorn lambing grounds. |
| **UT-S-269** | **NO SURFACE OCCUPANCY – MEXICAN SPOTTED OWL NESTS**<br><br>No surface occupancy within 1/2 mile of known Mexican Spotted Owl (MSO) nests.<br><br>**Exception:** The authorized officers may grant an exception if an environmental analysis demonstrates that the action would not impair the function or utility of the site for nesting or other owl-sustaining activities.<br><br>**Modification:** The authorized officers may modify the NSO area in extent if an environmental analysis finds that a portion of the area is nonessential to site utility or function or if natural features provide adequate visual or auditory screening.<br><br>**Waiver:** A waiver may be granted if the MSO is de-listed and the area is determined as not necessary for the survival and recovery of the MSO. |
| **UT-S-285** | **TIMING LIMITATION – MIGRATORY BIRD NESTING**<br><br>Migratory bird nesting areas will be closed seasonally from **April 15 to August 1**. Areas with migratory birds designated as BLM Special Status Species will have the highest priority.<br><br>**Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or habitat conditions if activities would not cause undue stress to migratory bird populations.<br><br>**Modification:** Season may be adjusted depending on climatic and range conditions. Distance may be adjusted if natural features provide adequate visual screening.<br><br>**Waiver**: None |

AR005555

Appendix D

| STIPULATIONS |
|---|

| | **CONTROLLED SURFACE USE/TIMING LIMITATIONS – CALIFORNIA CONDOR** |
|---|---|
| **UT-S-293** | The Lessee/Operator is given notice that the lands located in this parcel contain potential habitat for the California Condor, a federally listed species. Avoidance or use restrictions may be placed on portions of the lease if the area is known or suspected to be used by condors. Application of appropriate measures will depend on whether the action is temporary or permanent, and whether it occurs within or outside potential habitat. A <u>temporary</u> action is completed prior to the following important season of use, leaving no permanent structures and resulting in no permanent habitat loss. This would include consideration for habitat functionality. A <u>permanent</u> action continues for more than one season of habitat use, and/or causes a loss of condor habitat function or displaces condors through continued disturbance (i.e. creation of a permanent structure requiring repetitious maintenance, or emits disruptive levels of noise).<br><br>The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act (ESA). Integration of, and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of ESA, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following:<br><br>1. Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by qualified individual(s) approved by the BLM, and must be conducted according to approved protocol.<br>2. If surveys result in positive identification of condor use, all lease activities will require monitoring throughout the duration of the project to ensure desired results of applied mitigation and protection. Minimization measures will be evaluated during development and, if necessary, Section 7 consultation may be reinitiated.<br>3. Temporary activities within 1.0 mile of nest sites will not occur during the breeding season.<br>4. Temporary activities within 0.5 miles of established roosting sites or areas will not occur during the season of use, August 1 to November 31, unless the area has been surveyed according to protocol and determined to be unoccupied.<br>5. No permanent infrastructure will be placed within 1.0 mile of nest sites. |

AR005556

Appendix D

| STIPULATIONS | |
|---|---|
| | 6. No permanent infrastructure will be placed within 0.5 miles of established roosting sites or areas.<br><br>7. Remove big game carrion from within 100 feet from lease roadways occurring within foraging range.<br><br>8. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable habitat utilize directional drilling to avoid direct impacts to large cottonwood gallery riparian habitats. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.<br><br>9. Re-initiation of section 7 consultation with the Service will be sought immediately if mortality or disturbance to California condors is anticipated as a result of project activities. Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA.<br><br>Additional measures may also be employed to avoid or minimize effects to the species between the lease sale and lease development stages. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA.<br><br>**Exception**: None<br><br>**Modification**: None<br><br>**Waiver**: None |
| **UT-S-305** | **CONTROLLED SURFACE USE – NOXIOUS WEED**<br>Continue implementation of noxious weed and invasive species control actions in accordance with national guidance and local weed management plans, in cooperation with State, federal, affected counties, adjoining private land owners, and other partners or interests directly affected. Implement Standard Operating Procedures and Mitigation Measures for herbicide use as well as prevention measures for noxious and invasive plants identified in the Record of Decision Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States PEIS and associated documents.<br>**Exception**: None<br>**Modification**: None<br>**Waiver**: None |

AR005557

Appendix D

| STIPULATIONS | |
|---|---|
| **UT-S-319** | **NO SURFACE OCCUPANCY – CULTURAL ACEC**<br><br>NSO for cultural values within areas of critical environmental concern (ACEC) to retain the cultural character and context of the area.<br><br>**Exception:** The AO may grant an oil and gas exception if it is determined that no other economic and technical feasible access is available to reach and drain the fluid mineral resources of the area. A block cultural survey must be completed and a treatment plan developed and submitted to BLM and the State Historic Preservation Office (SHPO) for their approval. The plan must contain measures to mitigate surface disturbance and reduce visual intrusion.<br><br>**Modification:** None<br>**Waiver:** None |

| NOTICES | |
|---|---|
| **UT-LN-21** | **BIGHORN SHEEP HABITAT**<br>The Lessee/Operator is given notice that the lands in this parcel contains habitat for desert bighorn sheep. Modifications to the surface use plan may be required in order to protect habitat from surface disturbing activities. These modifications may include such measures as timing restrictions to avoid surface use in bighorn sheep habitat during the crucial season (April 15 – June 15). Measure may also include avoidance of certain areas such as water sources and talus slopes. |
| **UT-LN-25** | **WHITE-TAILED AND GUNNISON PRAIRIE DOG**<br>The lessee/operator is given notice that this lease parcel has been identified as containing white-tailed or Gunnison prairie dog habitat. Modifications to the Surface Use Plan of Operations may be required in order to protect white-tailed or Gunnison prairie dog from surface disturbing activities in accordance with the Endangered Species Act and 43 CFR 3101.1-2. |

AR005558

Appendix D

| NOTICES | |
|---|---|
| **UT-LN-44** | **RAPTORS**<br><br>Appropriate seasonal and spatial buffers shall be placed on all known raptor nests in accordance with Utah Field Office Guidelines for Raptor Protection from Human and Land use Disturbances (USFWS 2002) and Best Management Practices for Raptors and their Associated Habitats in Utah (BLM 2006). All construction related activities will not occur within these buffers if pre-construction monitoring indicates the nests are active, unless a site-specific evaluation for active nests is completed prior to construction and if a BLM wildlife biologist, in consultation with USFWS and UDWR, recommends that activities may be permitted within the buffer. The BLM will coordinate with the USFWS and UDWR and have a recommendation within 3-5 days of notification. Any construction activities authorized within a protective (spatial and seasonal) buffer for raptors will require an on-site monitor. Any indication that activities are adversely affecting the raptor and/or its' young the on-site monitor will suspend activities and contact the BLM Authorized Officer immediately. Construction may occur within the buffers of inactive nests. Construction activities may commence once monitoring of the active nest site determines that fledglings have left the nest and are no longer dependent on the nest site. Modifications to the Surface Use Plan of Operations may be required in accordance with section 6 of the lease terms and 43CFR3101.1-2. |
| **UT-LN-45** | **MIGRATORY BIRD**<br><br>The lessee/operator is given notice that surveys for nesting migratory birds may be required during migratory bird breeding season whenever surface disturbances and/or occupancy is proposed in association with fluid mineral exploration and development within priority habitats. Surveys should focus on identified priority bird species in Utah. Field surveys will be conducted as determined by the authorized officer of the Bureau of Land Management. Based on the result of the field survey, the authorized officer will determine appropriate buffers and timing limitations. |
| **UT-LN-49** | **UTAH SENSITIVE SPECIES**<br><br>The lessee/operator is given notice that no surface use or otherwise disruptive activity would be allowed that would result in direct disturbance to populations or individual special status plant and animal species, including those listed on the BLM sensitive species list and the Utah sensitive species list. The lessee/operator is also given notice that lands in this parcel have been identified as containing potential habitat for species on the Utah Sensitive Species List. Modifications to the Surface Use Plan of Operations may be required in order to protect these resources from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, Migratory Bird Treaty Act and 43 CFR 3101.1-2. |

AR005559

Appendix D

| | NOTICES |
|---|---|
| **UT-LN-51** | **SPECIAL STATUS PLANTS: NOT FEDERALLY LISTED**<br>The lessee/operator is given notice that lands in this lease have been identified as containing special status plants, not federally listed, and their habitats. Modifications to the Surface Use Plan of Operations may be required in order to protect the special status plants and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2. |
| **UT-LN-72** | **HIGH POTENTIAL PALEONTOLOGICAL RESOURCES**<br>The lessee/operator is given notice that lands in this lease have been identified as having high potential for paleontological resources.  Surveys will be required and modifications to the Surface Use Plan of Operations may be required in order to protect paleontological resources from surface disturbing activities in accordance with Section 6 of the lease terms and 43 CFR 3101.1-2.  In addition, monitoring may be required during surface disturbing activities. |
| **UT-LN-78** | **LIGHT AND SOUND - AREAS PROXIMATE TO CANYONLANDS NATIONAL PARK**<br>Minimize noise and light pollution in areas adjacent with Canyonlands National Park using best available technology such as installation of multi-cylinder pumps, hospital sound reducing mufflers, and placement of exhaust systems to direct noise away from the National Park. Additionally, there would be a requirement to reduce light pollution by using methods such as limiting height of light poles, timing of lighting operations (meaning limiting lighting to times of darkness associated with drilling and work over or maintenance operations), limiting wattage intensity, and constructing light shields.<br><br>However, this requirement is not applicable if it affects human health and safety. Movement of operations to mitigate sound and light impacts would be required to be at least 200 meters from the boundary of the National Park in areas with the objectives of Visual Resource Management classifications of II, III and IV. |
| **UT-LN-99** | **REGIONAL OZONE FORMATION CONTROLS**<br>To mitigate any potential impact oil and gas development emissions may have on regional ozone formation, the following Best Management Practices (BMPs) would be required for any development projects:<br><br>Tier II or better drilling rig engines<br><br>Stationary internal combustion engine standard of 2g NOx/bhp-hr for engines <300HP  and 1g NOx/bhp-hr for engines >300HP<br><br>Low bleed or no bleed pneumatic pump valves<br><br>Dehydrator VOC emission controls to +95% efficiency<br><br>Tank VOC emission controls to +95% efficiency |

AR005560

Appendix D

| NOTICES | |
|---|---|
| **UT-LN-102** | **AIR QUALITY ANALYSIS**<br><br>The lessee/operator is given notice that prior to project-specific approval, additional air quality analyses may be required to comply with the National Environmental Policy Act, Federal Land Policy Management Act, and/or other applicable laws and regulations. Analyses may include dispersion modeling for deposition and visibility impacts analysis, control equipment determinations, and/or emission inventory development. These analyses may result in the imposition of additional project-specific air quality control measures. |
| **UT-LN-104** | **BURROWING OWL HABITAT**<br><br>The lessee/operator is given notice that lands in this lease have been identified as containing Burrowing Owl Habitat. Modification to the Surface Use Plan of Operations may be required in order to protect the Burrowing Owl and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2. |

AR005561

Appendix D

| | |
|---|---|
| **UT-LN-113** | **WESTERN YELLOW-BILLED CUCKOO**<br><br>The Lessee/Operator is given notice that the lands in or adjacent to this parcel contain potentially suitable habitat that falls within the range for western yellow-billed cuckoo, a federally listed species. Avoidance or use restrictions may be placed on portions of the lease. Application of appropriate measures will depend upon whether the action is temporary or permanent, and whether it occurs within or outside the breeding and nesting season. A temporary action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action could continue for more than one breeding season and/or cause a loss of habitat or displace western yellow-billed cuckoos through disturbances. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to, these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Avoidance and minimization measures include the following:<br><br>1. Habitat suitability within the parcel and/or within a 0.25 mile buffer of the parcel will be identified prior to lease development to identify potential survey needs.<br>2. Protocol Breeding Season Surveys will be required in suitable habitats prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by permitted individual(s), and be conducted according to protocol.<br>3. For all temporary actions that may impact cuckoo or suitable habitat:<br>   a. If action occurs entirely outside of the cuckoo breeding season (June 1 – Aug 31), and leaves no structure or habitat disturbance, action can proceed without a presence/absence survey.<br>   b. If action is proposed between June 1 and August 31, presence/absence surveys for cuckoo will be conducted prior to commencing activity. If cuckoo are detected, activity should be delayed until September 1.<br>   c. Eliminate access routes created by the project through such means as raking out scars, revegetation, gating access points, etc.<br>4. For all permanent actions that may impact cuckoo or suitable habitat:<br>   a. Protocol level surveys by permitted individuals will be conducted prior to commencing activities.<br>   b. If cuckoos are detected, no activity will occur within 0.25 mile of occupied habitat.<br>   c. Avoid drilling and permanent structures within 0.25 mile of suitable habitat unless absence is determined according to protocol level surveys conducted by permitted individual(s).<br>   d. Ensure noise levels at 0.25 mile from suitable habitat do not exceed baseline conditions. Placement of permanent noise-generating facilities should be determined by a noise analysis to ensure noise does not encroach upon a 0.25 mile buffer for suitable habitat. |

AR005562

Appendix D

| NOTICES |
|---|
| 5. Temporary or permanent actions will require monitoring throughout the duration of the project to ensure that western yellow-billed cuckoo or its habitat is not affected in a manner or to an extent not previous considered. Avoidance and minimization measures will be evaluated throughout the duration of the project. 6. Water produced as a by-product of drilling or pumping will be managed to ensure maintenance or enhancement of riparian habitat. 7. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. 8. Ensure that water extraction or disposal practices do not result in change of hydrologic regime that would result in loss or degradation of riparian habitat. 9. Re-vegetate with native species all areas of surface disturbance within riparian areas and/or adjacent uplands. Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |

AR005563

Appendix D

| | |
|---|---|
| **UT-LN-126** | **WESTERN YELLOW-BILLED CUCKOO**<br><br>The Lessee/Operator is given notice that the lands in or adjacent to this parcel contain potentially suitable habitat that falls within the range for western yellow-billed cuckoo, a federally listed species. Avoidance or use restrictions may be placed on portions of the lease. Application of appropriate measures will depend upon whether the action is temporary or permanent, and whether it occurs within or outside the breeding and nesting season. A temporary action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action could continue for more than one breeding season and/or cause a loss of habitat or displace western yellow-billed cuckoos through disturbances. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to, these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Avoidance and minimization measures include the following:<br><br>10. Habitat suitability within the parcel and/or within a 0.25 mile buffer of the parcel will be identified prior to lease development to identify potential survey needs.<br>11. Protocol Breeding Season Surveys will be required in suitable habitats prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by permitted individual(s), and be conducted according to protocol.<br>12. For all temporary actions that may impact cuckoo or suitable habitat:<br>   a. If action occurs entirely outside of the cuckoo breeding season (June 1 – Aug 31), and leaves no structure or habitat disturbance, action can proceed without a presence/absence survey.<br>   b. If action is proposed between June 1 and August 31, presence/absence surveys for cuckoo will be conducted prior to commencing activity. If cuckoo are detected, activity should be delayed until September 1.<br>   c. Eliminate access routes created by the project through such means as raking out scars, revegetation, gating access points, etc.<br>13. For all permanent actions that may impact cuckoo or suitable habitat:<br>   a. Protocol level surveys by permitted individuals will be conducted prior to commencing activities.<br>   b. If cuckoos are detected, no activity will occur within 0.25 mile of occupied habitat.<br>   c. Avoid drilling and permanent structures within 0.25 mile of suitable habitat unless absence is determined according to protocol level surveys conducted by permitted individual(s).<br>   d. Ensure noise levels at 0.25 mile from suitable habitat do not exceed baseline conditions. Placement of permanent noise-generating facilities should be determined by a noise analysis to ensure noise does not encroach upon a 0.25 mile buffer for suitable habitat. |

AR005564

Appendix D

| NOTICES |
|---|
| 14. Temporary or permanent actions will require monitoring throughout the duration of the project to ensure that western yellow-billed cuckoo or its habitat is not affected in a manner or to an extent not previous considered. Avoidance and minimization measures will be evaluated throughout the duration of the project.<br><br>15. Water produced as a by-product of drilling or pumping will be managed to ensure maintenance or enhancement of riparian habitat.<br><br>16. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable habitat.  Ensure that such directional drilling does not intercept or degrade alluvial aquifers.<br><br>17. Ensure that water extraction or disposal practices do not result in change of hydrologic regime that would result in loss or degradation of riparian habitat.<br><br>18. Re-vegetate with native species all areas of surface disturbance within riparian areas and/or adjacent uplands.<br><br>Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |

AR005565

Appendix D

| NOTICES | |
|---|---|
| **UT-LN-156** | <p style="text-align:center">**POLLINATORS AND POLLINATOR HABITAT**</p><p>In order to protect pollinators and pollinator habitat, in accordance with BLM policy outlined in Instruction Memorandum No. 2016-013, Managing for Pollinators on Public Lands, and Pollinator-Friendly Best Management Practices for Federal Lands (2015), the following avoidance, minimization, and mitigation measures would apply to this parcel:</p><p>1. Give a preference for placing well pads in previously disturbed areas, dry areas that do not support forbs, or areas dominated by nonnative grasses.</p><p>2. Utilize existing well pads where feasible.</p><p>3. Avoid disturbance to native milkweed patches within Monarch migration routes to protect Monarch butterfly habitat.</p><p>4. Avoid disturbance of riparian and meadow sites, as well as small depressed areas that may function as water catchments and host nectar-producing species, to protect Monarch butterfly habitat and nectaring sites.</p><p>5. Minimize the use of pesticides that negatively impact pollinators.</p><p>6. During revegetation treatments:</p><p>a. Use minimum till drills where feasible.</p><p>b. Include pollinator-friendly site-appropriate native plant seeds or seedlings in seed mixes.</p><p>c. Where possible, increase the cover and diversity of essential habitat components for native pollinators by:</p><p>▪ Using site-appropriate milkweed seeds or seedlings within Monarch migration routes through priority sage-grouse habitat.</p><p>▪ Using seed mixes with annual and short-lived perennial native forbs that will bloom the first year and provide forage for pollinators.</p><p>▪ Using seed mixes with a variety of native forb species to ensure different colored and shaped flowers to provide nectar and pollen throughout the growing season for a variety of pollinators.</p><p>▪ Seeding forbs in separate rows from grasses to avoid competition during establishment.</p><p style="text-align:center">Avoiding seeding non-native forbs and grasses that establish early and out compete slower-growing natives.</p> |

AR005566

Appendix D

| NOTICES | |
|---|---|
| **UT-LN-157** | **SAN RAFAEL SWELL SRMA**<br><br>The lessee/operator is given notice that this lease occurs within the San Rafael Swell Special Recreation Management Area (SRMA). The Price Field Office Resource Management Plan (RMP) requires the SRMA to be managed to provide the following benefits, experiences, and opportunities: undeveloped recreation tourism with portions that are destination strategy associated with OHV routes (***REC-11: Within SRMAs, manage for Recreation Opportunity Spectrum (ROS), as identified in the ROS inventory. Recreation facilities will be developed only in response to resource management needs and will be appropriate to the managerial setting identified for each ROS class).*** Development that interferes with the SRMAs goals and objectives should be avoided to the extent practicable. Modifications to the Surface Use Plan of Operations may be required in order to protect remote, expansive, intact landscapes from surface disturbing activities in accordance with section 6 of the lease terms and 43 CFR 3110.1-2 |
| **T&E-03** | **ENDANGERED FISH OF THE UPPER COLORADO RIVER DRAINAGE BASIN**<br><br>The Lessee/Operator is given notice that the lands in this parcel contain Critical Habitat for the Colorado River fish (bonytail, humpback chub, Colorado pike minnow, and razorback sucker) listed as endangered under the Endangered Species Act, or these parcels have watersheds that are tributary to designated habitat. Critical habitat was designated for the four endangered Colorado River fishes on March 21, 1994(59 FR 13374-13400). Designated critical habitat for all the endangered fishes includes those portions of the 100-year floodplain that contain primary constituent elements necessary for survival of the species. Avoidance or use restrictions may be placed on portions of the lease. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following:<br><br>1. Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All surveys must be conducted by qualified individual(s).<br><br>2. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br><br>3. Water production will be managed to ensure maintenance or enhancement of riparian habitat. |

AR005567

Appendix D

| NOTICES | |
|---|---|
| | 4. Avoid loss or disturbance of riparian habitats. |
| | 5. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. |
| | 6. Conduct watershed analysis for leases in designated critical habitat and overlapping major tributaries in order to determine toxicity risk from permanent facilities. |
| | 7. Implement Appendix B (Hydrologic Considerations for Pipeline Crossing Stream Channels, Technical Note 423). |
| | 8. Drilling will not occur within 100 year floodplains of rivers or tributaries to rivers that contain listed fish species or critical habitat. |
| | 9. In areas adjacent to 100-year flood plains, particularly in systems prone to flash floods, analyze the risk for flash floods to impact facilities, and use closed loop drilling, and pipeline burial or suspension according to Appendix B (Hydrologic Considerations for Pipeline Crossing Stream Channels, Technical Note 423, to minimize the potential for equipment damage and resulting leaks or spills. |
| | Water depletions from *any* portion of the Upper Colorado River drainage basin above Lake Powell are considered to adversely affect or adversely modify the critical habitat of the four resident endangered fish species, and must be evaluated with regard to the criteria described in the Upper Colorado River Endangered Fish Recovery Program. Formal consultation with USFWS is required for all depletions. All depletion amounts must be reported to BLM. |
| | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| T&E-05 | **LISTED PLANT SPECIES**<br>The Lessee/Operator is given notice that the lands in this parcel contain suitable habitat for federally listed plant species under the Endangered Species Act. The following avoidance and minimization measures have been developed to facilitate review and analysis of any submitted permits under the authority of this lease<br>1. Site inventories:<br>    a. Must be conducted to determine habitat suitability,<br>    b. Are required in known or potential habitat for all areas proposed for surface disturbance prior to initiation of project activities, at a time when the plant can be detected, and during appropriate flowering periods,<br>    c. Documentation should include, but not be limited to individual plant locations and suitable habitat distributions, and |

156

AR005568

Appendix D

| NOTICES |
|---|

|  | d.  All surveys must be conducted by qualified individuals. |
|---|---|

2.  Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.

3.  Project activities must be designed to avoid direct disturbance to populations and to individual plants:

   a.  Designs will avoid concentrating water flows or sediments into plant occupied habitat.

   b.  Construction will occur down slope of plants and populations where feasible; if well pads and roads must be sited upslope, buffers of 300 feet minimum between surface disturbances and plants and populations will be incorporated.

   c.  Where populations occur within 300 ft. of well pads, establish a buffer or fence the individuals or groups of individuals during and post-construction.

   d.  Areas for avoidance will be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc.

   e.  For surface pipelines, use a 10 foot buffer from any plant locations:

   f.  If on a slope, use stabilizing construction techniques to ensure the pipelines don't move towards the population.

4.  For riparian/wetland-associated species, e.g. Ute ladies-tresses, avoid loss or disturbance of riparian habitats.

5.  Ensure that water extraction or disposal practices do not result in change of hydrologic regime.

6.  Limit disturbances to and within suitable habitat by staying on designated routes.

7.  Limit new access routes created by the project.

8.  Place signing to limit ATV travel in sensitive areas.

9.  Implement dust abatement practices near occupied plant habitat.

10. All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area.

11. Post construction monitoring for invasive species will be required.

12. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in plant habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.

13. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.

AR005569

Appendix D

| NOTICES | |
|---|---|
| | Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the Endangered Species Act. |
| **T&E-06** | **MEXICAN SPOTTED OWL**<br><br>The Lessee/Operator is given notice that the lands in this parcel contain suitable habitat for Mexican spotted owl, a federally listed species. The Lessee/Operator is given notice that the lands in this lease contain Designated Critical Habitat for the Mexican spotted owl, a federally listed species. Critical habitat was designated for the Mexican spotted owl on August 31, 2004 (69 FR 53181-53298). Avoidance or use restrictions may be placed on portions of the lease. Application of appropriate measures will depend whether the action is temporary or permanent, and whether it occurs within or outside the owl nesting season.<br><br>A <u>temporary</u> action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A <u>permanent</u> action continues for more than one breeding season and/or causes a loss of owl habitat or displaces owls through disturbances, i.e. creation of a permanent structure.<br><br>The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures, will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following:<br><br>1. Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by qualified individual(s).<br>2. Assess habitat suitability for both nesting and foraging using accepted habitat models in conjunction with field reviews. Apply the conservation measures below if project activities occur within 0.5 mile of suitable owl habitat. Determine potential effects of actions to owls and their habitat.<br>   a. Document type of activity, acreage and location of direct habitat impacts, type and extent of indirect impacts relative to location of suitable owl habitat.<br>   b. Document if action is temporary or permanent.<br>3. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br>4. Water production will be managed to ensure maintenance or enhancement of riparian habitat. |

AR005570

Appendix D

| | NOTICES |
|---|---|
| | 5. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in canyon habitat suitable for Mexican spotted owl nesting.<br><br>6. For all temporary actions that may impact owls or suitable habitat:<br>    a. If the action occurs entirely outside of the owl breeding season (March 1 – August 31), and leaves no permanent structure or permanent habitat disturbance, action can proceed without an occupancy survey.<br>    b. If action will occur during a breeding season, survey for owls prior to commencing activity. If owls are found, activity must be delayed until outside of the breeding season.<br>    c. Rehabilitate access routes created by the project through such means as raking out scars, re-vegetation, gating access points, etc.<br><br>7. For all permanent actions that may impact owls or suitable habitat:<br>    a. Survey two consecutive years for owls according to accepted protocol prior to commencing activities.<br>    b. If owls are found, no actions will occur within 0.5 mile of identified nest site.  If nest site is unknown, no activity will occur within the designated Protected Activity Center (PAC).<br>    c. Avoid drilling and permanent structures within 0.5 mi of suitable habitat unless surveyed and not occupied.<br>    d. Reduce noise emissions (e.g., use hospital-grade mufflers) to 45 dBA at 0.5 mile from suitable habitat, including canyon rims.  Placement of permanent noise-generating facilities should be determined by a noise analysis to ensure noise does not encroach upon a 0.5 mile buffer for suitable habitat, including canyon rims.<br>    e. Limit disturbances to and within suitable habitat by staying on approved routes.<br>    f. Limit new access routes created by the project.<br><br>Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the Endangered Species Act. |
| T&E-07 | **SOUTHWESTERN WILLOW FLYCATCHER**<br><br>The Lessee/Operator is given notice that the lands in this parcel contains riparian habitat that falls within the range for southwestern willow flycatcher, a federally listed species. Avoidance or use restrictions may be placed on portions of the lease. Application of appropriate measures will depend whether the action is temporary or permanent, and whether it occurs within or outside the nesting season. A <u>temporary</u> action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A <u>permanent</u> action continues for more than one breeding season |

159

Appendix D

| NOTICES | |
|---|---|
| | and/or causes a loss of habitat or displaces flycatchers through disturbances, i.e. creation of a permanent structure. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures, will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following:<br><br>1. Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by qualified individual(s), and be conducted according to protocol.<br>2. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br>3. Water production will be managed to ensure maintenance or enhancement of riparian habitat.<br>4. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.<br>5. Drilling activities will maintain a 300 ft. buffer from suitable riparian habitat year long.<br>6. Drilling activities within 0.25 mile of occupied breeding habitat will not occur during the breeding season of May 1 to August 15.<br>7. Ensure that water extraction or disposal practices do not result in change of hydrologic regime that would result in loss or degradation of riparian habitat.<br>8. Re-vegetate with native species all areas of surface disturbance within riparian areas and/or adjacent uplands.<br><br>Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| | **CALIFORNIA CONDOR** |
| **T&E-11** | The Lessee/Operator is given notice that the lands located in this parcel contain potential habitat for the California Condor, a federally listed species. Avoidance or use restrictions may be placed on portions of the lease if the area is known or suspected to be used by condors. Application of appropriate measures will depend on whether the action is temporary or permanent, and whether it occurs within or outside potential habitat. A temporary action is completed prior to the following important season of use, leaving no permanent structures and resulting in no permanent habitat loss. This would include consideration for |

AR005572

| NOTICES |
| --- |
| habitat functionality. A <u>permanent</u> action continues for more than one season of habitat use, and/or causes a loss of condor habitat function or displaces condors through continued disturbance (i.e. creation of a permanent structure requiring repetitious maintenance, or emits disruptive levels of noise).<br><br>The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following:<br><br>1. Surveys will be required prior to operations unless species occupancy and distribution information is complete and available.  All Surveys must be conducted by qualified individual(s) approved by the BLM, and must be conducted according to approved protocol.<br><br>2. If surveys result in positive identification of condor use, all lease activities will require monitoring throughout the duration of the project to ensure desired results of applied mitigation and protection.  Minimization measures will be evaluated during development and, if necessary, Section 7 consultation may be reinitiated.<br><br>3. Temporary activities within 1.0 mile of nest sites will not occur during the breeding season.<br><br>4. Temporary activities within 0.5 miles of established roosting sites or areas will not occur during the season of use, August 1 to November 31, unless the area has been surveyed according to protocol and determined to be unoccupied.<br><br>5. No permanent infrastructure will be placed within 1.0 mile of nest sites.<br><br>6. No permanent infrastructure will be placed within 0.5 miles of established roosting sites or areas.<br><br>7. Remove big game carrion 100 feet from lease roadways occurring within foraging range.<br><br>8. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable habitat. Utilize directional drilling to avoid direct impacts to large cottonwood gallery riparian habitats. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.<br><br>9. Re-initiation of section 7 consultation with the Service will be sought immediately if mortality or disturbance to California condors is anticipated as a result of project activities. Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |

AR005573

Appendix D

| NOTICES | |
|---|---|
| | Additional measures may also be employed to avoid or minimize effects to the species between the lease sale and lease development stages. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the Endangered Species Act. |
| T&E-15 | **WRIGHT FISHHOOK CACTUS (*SCLEROCACTUS WRIGHTIAE*)**<br><br>In order to minimize effects to the federally threatened Wright Fishhook Cactus, the Bureau of Land Management (BLM), in coordination with the U.S. Fish and Wildlife Service (Service), has developed the following avoidance and minimization measures. Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance operations) are in compliance with the endangered Species Act (ESA). For the purposes of this document, the following terms are so defined: *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain Wright Fishhook Cactus; habitat descriptions can be found in Federal Register Notice and species recovery plan links at <http:www.fws.gov/endangered/wildlife.html>. *Occupied habitat* is defined as areas currently or historically known to support Wright Fishhook Cactus; synonymous with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development:<br><br>1. Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable Wright Fishhook Cactus habitat is present.<br>2. Site inventories will be conducted within suitable habitat to determine occupancy.  Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc. suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300' buffers will be maintained between surface disturbance and avoidance areas. However, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories:<br>   a. Must be conducted by qualified individuals(s) and according to BLM and Service accept survey protocols,<br>   b. Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually April 15th to June 5th, however, surveyors should verify that the plant is flowering by contacting a BLM or FWS |

162

AR005574

| NOTICES |
|---|

|  |  | botanist or demonstrating that the nearest known population is in flower), |
|  |  | c. Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad, |
|  |  | d. Will include, but not be limited to, plant species lists and habitat characteristics, and |
|  |  | e. Will be valid until April 15th the following year. |
|  | 3. | Design project infrastructure to minimize impacts within suitable habitat: |
|  |  | a. Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300' buffers, in general; however, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat, |
|  |  | b. Reduce well pad size to the minimum needed, without compromising safety, |
|  |  | c. Where technically and economically feasible, use directional drilling or multiple wells from the same pad, |
|  |  | d. Limit new access routes created by the project, |
|  |  | e. Roads and utilities should share common right-of-ways where possible, |
|  |  | f. Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat, |
|  |  | g. Place signing to limit off-road travel in sensitive areas, and |
|  |  | h. Stay on designated routes and other cleared/approved areas, |
|  |  | i. All disturbed areas will be revegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas. |
|  | 4. | Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants: |
|  |  | a. Follow the above recommendations (3.) for project design within suitable habitats, |
|  |  | b. To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged, |
|  |  | c. Construction of roads will occur such that the edge of the right of way is at least 300' from any plant and 300' from avoidance areas, |
|  |  | d. Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15th to June 5th (flowering period); dust abatement applications will be comprised of water only, |

163

AR005575

| NOTICES |
|---|
| |

|  |  |
|---|---|
| | e. The edge of the well pad should be located at least 300' away from plants and avoidance areas, in general; however, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat, <br> f. Surface pipelines will be laid such that a 300' buffer exists between the edge of the right of way and plants and 300' between the edge of right of way and avoidance areas; use stabilizing and anchoring techniques when the pipeline crossed suitable habitat to ensure pipelines don't move towards the population; site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat, <br> g. Construction activities will not occur from April 15th through June 5th within occupied habitat, <br> h. Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc., <br> i. Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and <br> j. Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible. <br> 5. Occupied Wright Fishhook Cactus habitats within 300' of the edge of the surface pipelines' right-of-ways, 300' of the edge of the roads' right-of-ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. <br> 6. Re-initiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Wright Fishhook Cactus is anticipated as a result of project activities. <br> Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |
| **T&E 17** | **SAN RAFAEL CACTUS (*PEDIOCACTUS DESPAINII*)** <br> In order to minimize effects to the federally threatened San Rafael Cactus, the Bureau of Land Management (BLM), in coordination with the U.S. Fish and Wildlife Service (Service), has developed the following avoidance and minimization measures. Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited |

AR005576

| NOTICES |
|---|
| to drilling, production, and maintenance operations) are in compliance with the endangered Species Act (ESA). For the purposes of this document, the following terms are so defined: *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain San Rafael Cactus; habitat descriptions can be found in Federal Register Notice and species recovery plan links at <http:www.fws.gov/endangered/wildlife.html>. *Occupied habitat* is defined as areas currently or historically known to support San Rafael Cactus; synonymous with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development:<br><br>1. Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable San Rafael Cactus habitat is present.<br>2. Site inventories will be conducted within suitable habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc. suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300' buffers will be maintained between surface disturbance and avoidance areas. However, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories:<br>   a. Must be conducted by qualified individuals(s) and according to BLM and Service accept survey protocols,<br>   b. Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually April 15th to June 5th, however, surveyors should verify that the plant is flowering by contacting a BLM or FWS botanist or demonstrating that the nearest known population is in flower),<br>   c. Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad,<br>   d. Will include, but not be limited to, plant species lists and habitat characteristics, and<br>   e. Will be valid until April 15th the following year.<br>3. Design project infrastructure to minimize impacts within suitable habitat:<br>   a. Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300' buffers, in general; however, site-specific distances |

165

Appendix D

| NOTICES |
|---|
| will need to be approved by FWS and BLM when disturbance will occur upslope of habitat,<br><br>b. Reduce well pad size to the minimum needed, without compromising safety,<br><br>c. Where technically and economically feasible, use directional drilling or multiple wells from the same pad,<br><br>d. Limit new access routes created by the project,<br><br>e. Roads and utilities should share common right-of-ways where possible,<br><br>f. Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat,<br><br>g. Place signing to limit off-road travel in sensitive areas, and<br><br>h. Stay on designated routes and other cleared/approved areas,<br><br>i. All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas.<br><br>4. Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:<br><br>a. Follow the above recommendations (3.) for project design within suitable habitats,<br><br>b. To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged,<br><br>c. Construction of roads will occur such that the edge of the right of way is at least 300' from any plant and 300' from avoidance areas,<br><br>d. Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15th to June 5th (flowering period); dust abatement applications will be comprised of water only,<br><br>e. The edge of the well pad should be located at least 300' away from plants and avoidance areas, in general; however, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat,<br><br>f. Surface pipelines will be laid such that a 300' buffer exists between the edge of the right of way and plants and 300' between the edge of right of way and avoidance areas; use stabilizing and anchoring techniques when the pipeline crossed suitable habitat to ensure pipelines don't move towards the population; site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat, |

166

AR005578

Appendix D

| | NOTICES |
|---|---|
| | g. Construction activities will not occur from April 15th through June 5th within occupied habitat, <br><br> h. Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc., <br><br> i. Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and <br><br> j. Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible. <br><br> 5. Occupied San Rafael Cactus habitats within 300' of the edge of the surface pipelines' right-of-ways, 300' of the edge of the roads' right-of-ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities.  Annual reports shall be provided to the BLM and the Service.  To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. <br><br> 6. Re-initiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the San Rafael Cactus is anticipated as a result of project activities. <br><br> Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |
| T&E-19 | **JONES CYCLADENIA (*CYCLADENIA HYMILIS VAR JONESII*)** <br><br> In order to minimize effects to the federally threatened Jones Cycladenia, the Bureau of Land Management (BLM), in coordination with the U.S. Fish and Wildlife Service (Service), has developed the following avoidance and minimization measures.  Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance operations) are in compliance with the endangered Species Act (ESA). For the purposes of this document, the following terms are so defined: *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain Jones Cycladenia; habitat descriptions can be found in Federal Register Notice and species recovery plan links at <http:www.fws.gov/endangered/wildlife.html>. *Occupied habitat* is defined as areas currently or historically known to support Jones Cycladenia; synonymous |

AR005579

Appendix D

| NOTICES |
|---|

| | with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development: |
|---|---|

1. Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable Jones Cycladenia habitat is present.

2. Site inventories will be conducted within suitable habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc. suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300' buffers will be maintained between surface disturbance and avoidance areas. However, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories:

   a. Must be conducted by qualified individuals(s) and according to BLM and Service accept survey protocols,

   b. Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually April 15th to June 5th, however, surveyors should verify that the plant is flowering by contacting a BLM or FWS botanist or demonstrating that the nearest known population is in flower),

   c. Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad,

   d. Will include, but not be limited to, plant species lists and habitat characteristics, and

   e. Will be valid until April 15th the following year.

3. Design project infrastructure to minimize impacts within suitable habitat:

   a. Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300' buffers, in general; however, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat,

   b. Reduce well pad size to the minimum needed, without compromising safety,

   c. Where technically and economically feasible, use directional drilling or multiple wells from the same pad,

   d. Limit new access routes created by the project,

   e. Roads and utilities should share common right-of-ways where possible,

168

AR005580

Appendix D

| NOTICES |
|---|
| |

f. Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat,

g. Place signing to limit off-road travel in sensitive areas, and

h. Stay on designated routes and other cleared/approved areas,

i. All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas.

4. Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:

a. Follow the above recommendations (3.) for project design within suitable habitats,

b. To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged,

c. Construction of roads will occur such that the edge of the right of way is at least 300' from any plant and 300' from avoidance areas,

d. Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15th to June 5th (flowering period); dust abatement applications will be comprised of water only,

e. The edge of the well pad should be located at least 300' away from plants and avoidance areas, in general; however, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat,

f. Surface pipelines will be laid such that a 300' buffer exists between the edge of the right of way and plants and 300' between the edge of right of way and avoidance areas; use stabilizing and anchoring techniques when the pipeline crossed suitable habitat to ensure pipelines don't move towards the population; site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat,

g. Construction activities will not occur from April 15th through June 5th within occupied habitat,

h. Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc.,

i. Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and

j. Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.

169

Appendix D

| NOTICES |
|---|
| 5. Occupied Jones Cycladenia habitats within 300' of the edge of the surface pipelines' right-of-ways, 300' of the edge of the roads' right-of-ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities.  Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities.  Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. 6. Re-initiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Jones Cycladenia is anticipated as a result of project activities. Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |

AR005582

Appendix E    **Maps**



*Figure 1 Overview Map*

AR005583

Appendix E



*Figure 2 Viewshed Map*

Appendix F      INTERDISCIPLINARY TEAM CHECKLIST

**Project Title**: September 2018 Oil and Gas Lease Sale/San Rafael Desert Parcels and Leases

**NEPA Log Number**: DOI-BLM-UT-0000-2018-0001EA

**File/Serial Number**:

**Project Leader**: Sheri Wysong

**DETERMINATION OF STAFF:** *(Choose one of the following abbreviated options for the left column)*

NP = not present in the area impacted by the proposed or alternative actions
NI = present, but not affected to a degree that detailed analysis is required
PI = present with potential for relevant impact that need to be analyzed in detail in the EA
NC = (DNAs only) actions and impacts not changed from those disclosed in the existing NEPA documents cited in
    Section D of the DNA form. The Rationale column may include NI and NP discussions.

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| **RESOURCES AND ISSUES CONSIDERED (INCLUDES SUPPLEMENTAL AUTHORITIES APPENDIX 1 H-1790-1)** | | | | |
| PI | Air Quality/Greenhouse Gas Emissions | Leasing is an administrative action that does not result in emissions of air pollutants and has no direct impacts on air resources. However, if a lease parcel is developed then construction, drilling, and operation of oil and gas wells would result in emissions of criteria pollutants which would need to be analyzed in any subsequent NEPA once specific development plans are presented. A representative emissions inventory for a single well should be included in the EA to disclose the types and likely amounts of emissions that could result from development of the parcel. Parcels are in areas of attainment/unclassifiable for all criteria pollutants. Application of Stipulation UT-S-01 and Lease Notices UT-LN-99 and UT-LN-102 is warranted for all parcels. | Erik Vernon | 5/7/18 |
| | | If lease parcels are developed it is assumed that greenhouse gases (GHG) would be emitted. GHG emissions could occur from construction, drilling, productions, and from end use combustion of the product. A representative emissions inventory of GHG's should be included and a qualitative description of climate change impacts should be included in the EA. | Erik Vernon | 5/7/18 |
| | | Leasing itself would not have impacts to air quality and Greenhouse Gas Emissions. However, should development occur on the leases, emissions from earth-moving equipment, vehicle traffic, drilling and completion activities, separators, oil storage tanks, dehydration units, and daily tailpipe and fugitive dust emissions could occur. The lease parcels are located in airsheds that are in attainment with respect to the National Ambient Air Quality Standards, and potential development emissions are unlikely to contribute to air quality issues in airsheds that are designated as non-attainment. Application of stipulation UT-S-01 (Air Quality) and lease notices UT-LN-99 (Regional Ozone Formation Controls), UTLN-102 (Air Quality Analysis) is warranted for all parcels. | Stephanie Howard, Erik Vernon | 7/20/18 |
| NP | Designated Areas: | The parcels in the RFO are not within an ACEC designation. | Clay Stewart | 4/19/18 |

AR005585

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| PI | Areas of Critical Environmental Concern | The PFO RMP of 2008 was reviewed, as were the current mapping and GIS layers. Nominated parcel 106 is within the Dry Lakes ACEC. Oil and gas leasing within this ACEC is open but subject to major constraints (RMP p. 131. Surface disturbance from potential development of the parcel could result in potential impacts to the ACEC if they are not mitigated. There are no other parcels within or near an ACEC. | Myron Jeffs | 4/27/2018 |
| | | USO: Parcel 106 overlaps the Dry Lake ACEC in the Price Field Office, which is subject to NSO. | Allison Ginn | 5/21/18 |
| | Cultural Resources (Richfield) | A letter was sent to Chris Merritt at SHPO to initiate consultation on April 18, 2018.  Letters determining interest in being a consulting party were sent on April 18, 2018 to Steve Bloch with Southern Utah Wilderness Alliance, Laura Peterson with Southern Utah Wilderness Alliance, Hannah Russell with Utah Professional Archaeological Council, Ryan Moreau with Utah Statewide Archaeological Society, Kenny Wintch with SITLA, David Yoder with PLPCO, Johnathan Bailey, Catherine Cannon with Southeast Utah Group NPS, Newell Harward with Wayne County Commissioners, Stanley Wood Wayne County Commissioner Chair, and Dennis Blackburn with Wayne County Commissioners.<br><br>Consultation letters requested that information regarding cultural resources to be submitted to the BLM by April 30, 2018 for inclusion in the draft report.  Consultation on the draft report is planned for May 30, 2018.  A meeting with consulting parties is planned for June 20, 2018. | | |
| PI | Cultural Resources | **Price and USO:** Existing surveys, documented cultural resources, and undocumented cultural resources reported to the BLM by private citizens indicate the presence of significant and potentially significant cultural resources within the proposed lease sale areas for the Price and Richfield Field Offices. Cultural resources within the lease sale area include prehistoric artifact scatters, petroglyphs, lithic quarries, historic inscriptions, historic artifact scatters, and historic structures.<br><br>Large Class III cultural resource inventories conducted in 2017 and 2006 indicate varied site density with the San Rafael Desert, with higher concentrations of sites in the east and central portions of the proposed sale, although a majority of the sites are comprised of lithic scatters and quarry sites considered not eligible to the National Register of Historic Places.<br><br>Consideration of cultural resource information and other general data including the Class II survey conducted for the San Rafael Desert Master Leasing Plan, the Price and Richfield Class I documents, specific data relating to the parcels such as topographic and soils, as well as personal knowledge and experience with the lands at issue, reasonable development of one 10.4 acre well pad development within each parcel could occur without direct adverse effects to cultural resources. Development of leases sold under the sale holds the potential for cumulative and indirect impacts, however. | Nicole Lohman | 5/31/2018 |

174

AR005586

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | The BLM will not approve any ground disturbing activities that may affect such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated.<br><br>Application of stipulation UT-S-169 (cultural resources inventory) is warranted for all parcels. Parcel 106 lies within the Dry Lake ACEC and is subject to No Surface Occupancy constraints (UT-S-10) within the ACEC boundaries.<br><br>Leasing in and of itself does not directly impact cultural resources though immediate ground disturbing activities. However, leasing is considered a federal undertaking under Section 106 and as refined though IBLA | | |
| NI | Environmental Justice | **Price:** The ethnic composition and economic situation of residents of Carbon and Emery Counties indicate that no minority or low-income populations are experiencing disproportionately high or adverse effects from current management actions (RMP EIS). Leasing would not adversely or disproportionately affect minority, low income or disadvantaged groups | Jaydon Mead | 4/27/2018 |
| | | **Richfield:** An analysis using the Environmental Protection Agency's EJSCREEN tool showed that there would be no low income or minority populations that would be disproportionately impacted by the project to a degree requiring analysis. | Brandon Jolley | 4/13/2018 |
| NP | Farmlands (Prime or Unique) | **Richfield:** There are no prime/unique farmlands present within any of the parcels according to the Soil Survey of the Henry Mountains Area, Utah (UT631). | Brant Hallows | 4/18/18 |
| | | **Price:** According to the NRCS soil survey and knowledge of the soils, there are no prime/unique farmlands within the project area. | Stephanie Bauer | 4/26/2018 |
| NI | Floodplains Wetlands/Riparian Zones | **Richfield:** Several of the parcels are intersected by ephemeral streams and associated narrow floodplains are present. It is extremely unlikely that proposed leases would lead to considerable development within these drainages. The sensitivity and potential of floodplain development is low and therefore detailed analysis is not necessary.<br>There are no Wetlands/Riparian Zones present within or near the affected area. | Mark Dean | 4/10/2018 |
| | | **Price:** Leasing of the parcels will not directly affect these resources. Because all parcels will have the following stipulations, and notices attached, impacts from development to those resources would be prevented.<br><br>UT-S-127 NO SURFACE OCCUPANCY – INTERMITTENT AND PERENNIAL STREAMS<br>UT-LN-128 FEDERAL FLOOD RISK MANAGEMENT STANDARD | Jerrad Goodell | 4/24/2018 |
| NI | Fire/Fuels Management | **Richfield:** There would be no impact to fire/fuels management | Bob Bate | 4/23/18 |
| | | **Price:** There are no current impacts to Fuels/Fire Management (both direct and indirect) at this time. Future | Stuart Bedke | 4/26/2018 |

175

AR005587

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | impacts would be negligible. Follow any seasonal fire restrictions (including open flame). | | |
| NI | Geology / Mineral Resources/Energy Production | **Richfield:** The 2008 RMP FEIS adequately address the impacts of oil and gas leasing. Oil and gas exploration could lead to an increased understanding of the geologic setting, as subsurface data obtained through lease operations may become public record. This information promotes an understanding of mineral resources as well as geologic interpretation. Depending on the success of future oil and gas drilling, non-renewable oil and/or natural gas may be extracted from productive wells and delivered to market. Production of oil and/or gas would result in the irretrievable loss of these resources. While conflicts could arise between oil and gas operations and other mineral operations, these could generally be mitigated under the regulations 3101.1-2, where proposed oil and gas operations may be moved up to 200 meters or delayed by 60 days and also under the standard lease terms (Sec. 6) where sitting and design of facilities may be modified to protect other resources. As of 4/2/2018, no active unpatented mining claims were found to be located within these parcels. Solid minerals, including coal, were also considered. No coal or mineral materials operations are present within the parcels. There are not any anticipated significant impacts to mineral resources. | Kelsey Zabrusky | 4/16/2018 |
| NI | | **Price:** There are four free use permits and one community pit for mineral materials (MM) within the lease sale area. Specifically, parcels 042, 050, 080 and 85328 contain these MM sites. It is my opinion that this fact should not affect leasing of the parcels, so long as the new lessee understands that if there is eventually a conflict with an APD and an existing MM site, the MM sites have prior rights. These MM pits are generally small in area and it seems reasonable that an O&G operator would be able to relocate a drill site somewhat, if necessary, to avoid conflicts. There are any number of potential sites within this large lease block where other MM sites could eventually be located, however, it is large enough so that relocation of a MM site could be accomplished. There are not other known locatable or leasable minerals within this block with the exception of uranium. Again, O&G development can generally be accomplished in concert with multiple land uses. | Michael Glasson | 4/25/2018 |
| NI | Geology/ Seismic | The majority of flow back water from hydraulic fracturing in Utah is recycled and used in future hydraulic fracturing completions. Therefore, the underground injection of hydraulic fracturing flow back in Utah is very limited and presents little potential for inducing seismic activity. In fact, there has been no reported induced seismicity in Utah that was from water injected into Class II wells. Oil and gas wells produce a great amount of wastewater. The majority this water has high salt brine content and must be disposed of in an environmentally safe manner. In Utah, a majority (95%) of this produced water is pumped into Class II injection wells. In certain parts of the country, water injection has caused some induced seismicity in the form of | Sheri Wysong | 6/19/18 |

AR005588

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | small earthquakes. Two major factors play a role in induced seismicity from water injection. First, the amount of water being injected. Secondly, the local geology of the water injection site. In Utah, the volumes are lower than those states experiencing induced seismicity. Also, the geology is different than those states experiencing induced seismicity. The injection zones are stratigraphically thousands of feet above the basement rock that may contain large unknown faults. Therefore, at this time it appears that induced seismicity from water injection is not a problem in the oil fields of Utah. **(Personal communication from John Rogers, Utah Division of Oil, Gas and Mining (UDOGM), March 27, 2018 to Angela Wadman, BLM).** | | |
| NP | Invasive Species/Noxious Weeds (EO 13112) | **Richfield:** Currently there are no known populations of noxious weeds within any of the listed parcels. Standard operating procedures such as washing of vehicles and annual monitoring and spraying along with site specific mitigation applied as conditions of approval (COA) at the APD stage should be sufficient to prevent the introduction of Invasive, Non-native species. All disturbed areas and piles of top soil should be reseeded with weed free seed the first fall after the disturbance is made to provide competition against weeds. Other constraints, including the use of certified weed free seed and vehicle/equipment wash stations, would be applied as necessary at the APD stage as documented in filing plans and conditions of approval. Control measures would be implemented during any ground disturbing activity. Treatment will occur as part of regular operations, BMPs, SOPs and site specific mitigation applied at the APD stage as COAs. These expectations are required for all parcels in the lease. | Brant Hallows | 4/18/18 |
| NI | | **Price:** Surface disturbing activities have the potential to introduce/spread invasive species/noxious weeds. Salt cedar and Russian olive are noxious weeds within the project boundaries. These species are located mainly in drainages and low lying areas where water accumulates. Halogeton, Russian thistle and cheatgrass are invasive species located within the project boundaries. These species are located mainly along roads and two-tracks, fence lines and other disturbed areas. Leasing of parcels is an administrative action and will not affect invasive species/noxious weeds, however site specific mitigation, BOPs and stipulations will be addressed and analyzed at the APD stage if these leases are sold. | Stephanie Bauer | 4/26/2018 |
| NI | Lands/Access | **Richfield:** As described, the proposed action would not substantially affect access to public land on a permanent basis. No roads providing access to public land would be closed for any extended period of time. The proposal would be subject to valid prior existing rights including county-maintained roads (See BLM internal/public Master Title Plat web site as there are various rights-of-way in the proposed areas). Any operations would need to be coordinated with rights-of-way (RsOW) holders and adjacent non-federal landowners. Off-lease ancillary facilities that cross public land, if any, may require a separate authorization (Generally Access Roads and utility ROW). It is anticipated that existing ROW in proposed operation areas would not be negatively | Michael Utley | 4/18/2018 |

177

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | affected because site-specific mitigation applied at the APD stage, including the ability to move operations up to 200 meters in any direction required. These measures would ensure that existing ROW would be avoided, restored, or replaced if damaged. Seasonal route restrictions should also be dealt with through site-specific mitigation on an as-needed basis. Surface disturbance within and outside described project areas would need to be rehabilitated and reseeded on a site-specific basis as directed by authorizing BLM officials. Plans should be made for removal of any generated trash/debris from public land and discarded at an authorized facility. | | |
| | | **Price:** As described, the proposed action would not affect access to public land. Off-lease ancillary facilities that cross public land, if any, may require separate authorizations. Subsequent projects should coordinate with existing ROW holders and apply operating procedures and site-specific mitigation at the APD stage that would ensure protection of existing rights. | Jaydon Mead | 4/19/2018 |
| | | **USO:** NPCA expressed concerns during scoping that, should the parcels be developed, public access could be restricted. The example NPCA gave involved access being restricted across private surface. Since there is no private surface within any of the proposed parcels, it is not an issue with this lease sale. | Sheri Wysong | |
| NI | Livestock Grazing | **Richfield:** The proposed action would be expected to temporarily remove available forage for livestock in the Pasture Canyon, Sweet water and Jeffery Well Allotment within the RFO Field office. The amount of forage removed is not expected to be significant and livestock grazing rotations and schedules are expected to not be impacted. | Jeff Reese | 4/12/18 |
| | | **Price:** The proposed action of leasing the listed parcels will not affect livestock grazing. Any future development of those parcels will need to be analyzed dependent on that development. | Mike Tweddell | 4/25/2018 |
| NII | Migratory Birds Wildlife: Migratory Birds (including raptors) | **Richfield:** There will be little to no impact on migratory birds within these leasess. Any surface disturbance within these parcels will result in migratory birds dispersing to adjacent habitat. Once operations within these parcels are completed, areas with surface disturbance will be rehabilitated and reseeded with BLM advised seed mix. | Joe Chigbrow | 4/18/2018 |
| | | **Price:** There is potential for raptor nests locations and migratory bird breeding habitats within selected parcels. Lease stipulations and notices are added to those parcels to reduce any future project's impacts. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. Lease Notice UT-LN-45, and UT-S-285 is attached to all parcels (Migratory Birds). Lease Notice UT-LN-44 is attached to all parcels (Raptors). Additional documentation is within the wildlife and botany resources report located in the project files. | Dana Truman | 4/26/2018 |
| | | **USO:** There are documented burrowing owl burrows on the corner of parcels 054, 076, 080, 079 and documented peregrine nests and Swainson's hawk observations nearby. Most of the area is suitable foraging habitat for raptors. Lease Notice UT-LN-45, and UT-S-285 is attached to all | Dave Cook | 5/30/2018 |

178

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | parcels (Migratory Birds).Lease Notice LN-44 Raptors all parcels.<br>Lease Notice UT-LN-44 is attached to all parcels (Raptors).<br>UT-LN-104 (Burrowing Owl Habitat) | | |
| NP | Designated Areas: National Historic Trails | **Richfield:** There are no designated National Historic Trails that access the lease parcels. | Clay Stewart | 4/17/18 |
| | | **Price:** The PFO RMP of 2008 was reviewed, as were the current mapping and GIS layers. There are no designated historic trails identified within the proposed leasing area. | Myron Jeffs | 4/27/2018 |
| NI | Native American Religious Concerns | **Richfield:** Tribal consultation letters were sent on 18 April 2018. Letters were sent to: Kaibab Band of Paiute Indians, Moapa Band of Paiute Indians, Navajo Nation, Paiute Indian Tribe of Utah, Pueblo of Zuni, San Juan Southern Paiute Tribe, Southern Ute Indian Tribe, The Hopi Tribe, Ute Indian Tribe, Ute Mountain Ute Tribe.<br><br>Consultation letters requested that information regarding cultural resources to be submitted to the BLM by April 30, 2018 for inclusion in the draft report. Consultation on the draft report is planned for May 30, 2018. A meeting with consulting parties is planned for June 20, 2018. | Nicole Lohman | 5/31/2018 |
| | | **Price and USO:** Tribal consultation letters were sent for the Price Field Office on 28 March 2018. The Southern Ute Tribe expressed concerns with the leasing of five parcels for cultural and religious reasons. The Hopi Tribe requested continued consultation on the undertaking due to its potential to impact cultural resources of importance to the tribe. The Price Field Office will continue consultation with the two tribes to identify areas of potential religious concerns. The Southern Ute and Hopi also requested continued consultation from the Richfield Field Office. | | |
| NI | Paleontology | **Richfield:** The parcels contain Class II and III PFYC formations. Class III formations are defined as geologic units where fossil content varies in significance, abundance, and predictable occurrence. The RFO RMP ROD Management Decision PAL-6 for paleontological resources requires a paleontological assessment prior to permitting surface disturbing activities in areas where there is a moderate potential to affect scientifically significant paleontological resources. This includes roads, pads, pump stations, pipelines, etc. Site specific analysis will be applied at the APD level by performing a pre-work paleontological inventory/survey to determine if mitigation is potentially necessary. Mitigation can be avoidance or excavation by BLM-permitted paleontologists. | Kelsey Zabrusky | 4/16/2018 |
| | | **Price:** None of the surface outcroppings are in formations that are likely to have vertebrate fossils except for the Morrison Fm. exposed on top of the Flattops which are unlikely sites for wellpads. PAL -4 of the Price RMP requires assessments of resources before and during surface disturbing activities, as appropriate. | Michael Leschin | 4/27/2018 |
| | | **Emery County –**<br><br>**Status:** no known localities, parcels contain a small area of PFYC 4, smaller area of PFYC 3 but is mostly PFYC 2<br>**Recommendations:** In PFYC 4 and 3 pre-survey of areas that will be disturbed and construction crew to report any | Greg McDonald | 7/25/18 |

179

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | finds encountered. In PFYC 4 monitoring should occur during construction.<br>LN 72 will be added to all the appropriate parcels | | |
| PI | Pollinators | **USO**:  All parcels contain habitat and may contain pollinators. In accordance with BLM policy to protect pollinators (Instruction Memorandum 2016-013 Managing for Pollinators on Public Lands and Pollinator-Friendly Best Management Practices for Federal Lands [2015]), UT-LN-156-Pollinators and Pollinator Habitat would be attached to all parcels. Implementing the avoidance, minimization, and mitigation measures would minimize impacts from oil and gas development to pollinators. | Marcia Wineteer | 5/31/2018 |
| NI | Rangeland Health Standards | **Richfield:**  The proposed action would not be anticipated to impact Rangeland Health Standards and Guidelines. Rehabilitated sites should be reseeded with BLM advised seed mix. | Jeff Reese | 4/10/18 |
| | | **Price:**  The proposed action of leasing the proposed parcels will not affect Rangeland Health. Any future development of those leased parcels will need to be analyzed on the proposed development. | Mike Tweddell | 4/25/2018 |
| PI | Recreation | **Richfield:**  Recreation use within the lease parcels is not present or considered very low. Recreationists pass through the area on open roads to access hiking and canyoneering destinations within the Dirty Devil Special Recreation Management Area (SRMA). This SRMA is located to the south of the lease parcels. If oil and gas wells were developed there could be some individual negative perceptions related to recreation use and overall experience. However, because of the geographic separation between the lease parcels and popular recreation destinations; recreation activities and experiences in the area would largely remain unchanged. | Clay Stewart | 4/19/18 |
| | | **Price:**  The lease parcels that fall west of State Route 24 are within the San Rafael Swell Special Recreation Management Area (SRMA). The RMP describes the SRMA as an area offering visitors a "…high-quality sight-seeing adventure in an expansive, undisturbed, and uninhabited natural setting…". Potential future surface disturbance within these parcels would require detailed analysis and may be subject to restrictions. The area east of State Route 24 (the bulk of the parcels) is not within a SRMA. Recreation activity here sporadic, infrequent in some areas, and of low intensity. However, the landscape does offer unique recreation opportunities in a very remote setting. Potential impacts to these opportunities would vary from parcel to parcel depending on it's location and level of proposed development | Myron Jeffs | 4/27/2018 |
| NI | Socio-Economics/SCC | **Richfield:**  No quantifiable additional or decreased economic impact to the local area would be caused by the proposed action. | Brandon Jolley | 4/13/2018 |
| | | **Price:**  The nominated parcels are located in rural areas with no commercial and minimal residential development. No impacts to socio-economics are expected to occur as a result of the proposed action. | Jaydon Mead | 4/27/2018 |
| | | The social cost of carbon protocol (SCC) was developed by a federal Interagency Working Group (IWG) to assist agencies in addressing Executive Order (EO) 12866, which required federal agencies to assess the cost and the benefits of intended regulations as part of their regulatory impact analyses. A recent Executive Order (EO) entitled "Promoting Energy | Sheri Wysong | June 1, 2018 |

180

AR005592

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | Independence and Economic Growth," issued March 28, 2017, directed that the IWG be disbanded and that technical documents issued by the IWG be withdrawn as no longer representative of federal policy. It further directed that when monetizing the value of changes in greenhouse gas emissions resulting from regulations, agencies follow the guidance contained in OMB Circular A-4 of September 17, 2003. The SCC is an estimate of the economic impacts associated with an increase in carbon dioxide emissions (typically expressed as the cost in dollars per metric tons of emissions) and generally produces a wide range of costs, with the greatest influence on costs caused by the discount rate. A lack of consensus on the appropriate discount rate often leads to large variations in SCC estimates. Although the SCC can be a helpful tool to assess the benefits of $CO_2$ reductions, it does not reflect all damages or benefits due to current modeling and data limitations. Specifically, as discussed in the comprehensive technical review commissioned by the Electric Power Research Institute (EPRI) (Rose, et al., 2014), a number of fundamental technical issues have been identified with the social cost of carbon modeling approach and estimates. Several of these issues arise from the use of three separate underlying models – with differing frameworks, assumptions, and uncertainties. The EPRI technical review "reveals significant variation across models in their structure, behavior, and results and identifies fundamental issues and opportunities for improvements" (Rose, et al., 2014). It should also be noted that the social cost of carbon protocol does not measure the actual incremental impacts of a project on the environment and does not include all damages or benefits from carbon emissions. NEPA does not require a cost-benefit analysis (40 CFR Part 1502.23) and one has not been conducted. Without a complete monetary cost-benefit analysis, which would include the social benefits of energy production to society as a whole and other potential positive effects, inclusion of a global social cost of carbon analysis would be unbalanced, potentially inaccurate, and not useful. Consequently, the increased economic activity, discussed in terms of revenue, employment, labor income, total value added, and output are simply the economic impacts associated with the Proposed Action. Economic impact is distinct from "economic benefit" as defined in economic theory and methodology, and the socioeconomic impact analysis required under NEPA is distinct from cost-benefit analysis. Detailed analysis is not required for the proposed action because 1) it is not engaged in a rulemaking for which the SCC protocol was originally developed; 2) the IWG, technical supporting documents, and associated guidance have been withdrawn; 3) NEPA does not require cost-benefit analysis and the agency did not undertake one here; and 4) because the full social impacts of oil and gas development | | |

181

AR005593

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | have not been monetized, quantifying only the costs of GHG emissions would provide information that is both potentially inaccurate and not useful. | | |
| NI | Soils | **Richfield:** Leasing would not have an impact on these resources; however there is a possibility that exploration/development could occur in the future and could have impacts to soils. These actions would be analyzed in separate NEPA documents at the time of the proposal. SOPs, BMPs and site specific design features including reclamation would be applied at the APD stage as COAs to mitigate soil disturbing actions on soils and watersheds.<br><br>The application of stipulation UT-S-102 is warranted on all parcels.<br><br>UT-S-102: "No surface disturbing proposed projects involving construction on slopes greater than 30 percent. If the action cannot be avoided, rerouted, or relocated then a proposed project will include an erosion control strategy, reclamation and a site plan with a detailed survey and design completed by a certified engineer. This proposed project must be approved by the BLM prior to construction and maintenance."<br><br>In light of existing knowledge and data regarding soils for the subject parcels and the protective measures that would be applied to development on the parcels, significant impacts are not anticipated to occur as a result of leasing the proposed parcels. | Brant Hallows | 4/18/18 |
| | | **Price:** The proposed lease sale fall within fragile soil areas, which are typically slow to develop, prone to erosion, highly saline, typically low restoration potential, and have very low organic matter. The following stipulations UT-S-96 and UT-S-100 Lease stipulations would apply to the parcels.<br><br>Biological soil crusts have been identified on most of these parcels. These communities of organisms should be avoided from potential future ground disturbing actions.<br><br>Although the lease sale allows for various assumptions on amount of potential wells sited within these leased parcels, the amount of effect to high desert soils is hard to quantify at this time. because we do not know where these potential future actions would be specifically sited, which matters when looking at site-specific impacts to soil resources, including biological soil crusts. Once we receive site specifics within these parcels, we will be able to better understand the potential effects to these fragile soil resources and provide detailed analysis at those times. Recommend adhering to all objectives in the - Green River District Reclamation Guidelines as well for any future potential impacts to soils. Especially those that relate to soil salvage and protection of the resource for restoration purposes. | Jerrad Goodell | 4/24/2018 |
| NI | Special Status Plant & Animal Species other than FWS candidate or listed species | **Richfield:** Special Status Species, such as burrowing owl and kit fox, have been observed within these parcels. The RFO RMP requires a site clearance for areas of proposed surface disturbance before those activities could occur. Surface disturbance includes roads, pads, pump stations, | Joe Chigbrow | 4/18/2018<br><br>5/31/2018 |

AR005594

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | pipelines, etc. SSS plant and wildlife clearances will determine if mitigation is required and which BMP's, associated with plants and wildlife within the RFO RMP, will take effect. | Dustin Rooks/Marcia Wineteer | |
| | | Two Sensitive plants have the potential of occurring within the sixteen parcels - Flat Top wild buckwheat (*Eriogonum corymbosum* var. *smithii*) is likely found in many if not all of Richfield's parcels because it occurs on sandy soils on the Entrada Formation. Utah spurge (*Euphorbia nephradenia*) may be present in parcels UTU-081031 and UTU-081463. The Sensitive Species Plant Lease Notice (UT-LN-51) will be attached to all parcels to notify the Lessee/Operator of the potential presence of these species and that adjustments to the plan of operations may be required to conserve and protect these species.. | | |
| NI | Plants: BLM Sensitive | **Price:** After review of BLM records there is potential habitat for BLM sensitive plants species within the proposed leased parcels. Should any special status species be found, the surface use plan of operations may be amended to protect or avoid these species. UT-LN-51 (special status species) applied to all parcels. Additional documentation is within the wildlife and botany resources report located in the project files. | Dana Truman | 4/26/2018 |
| NI | Wildlife: BLM Sensitive | **Price:** There is potential habitat for bats, white-tailed prairie dogs and possibly burrowing owls within the parcels nominated for leasing. The 2014 habitat model for Kit fox indicates a high probability of kit fox occurrence within the parcels identified for leasing. According to the ARMPA PHMA and GHMA layers in 2017 no mapped or designated sage grouse habitat occurs within the proposed lease area. Review of soils and vegetation GIS layers confirmed the lack of sagebrush and suitable habitat for sage grouse within the proposed lease area. No effects to sage grouse expected. Lease stipulations and notices will be added to those parcels to reduce any future project's impacts. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. To all parcels – UT-LN-25 (White-tailed Prairie dogs) UT-LN-104 (Burrowing Owl Habitat) UT-LN-49 (BLM Sensitive Species) Additional documentation is within the wildlife and botany resources report located in the project files. | Dana Truman | 4/26/2018 |
| NI | Wildlife: BLM Sensitive | **USO:** There are documented kit fox dens and burrowing owl burrows on some parcels. Very likely sensitive species bat habitat such as Townsend's Big-eared bats have been documented nearby. UT-LN-25 (White-tailed Prairie dogs) UT-LN-104 (Burrowing Owl Habitat) UT-LN-49 (BLM Sensitive Species) for kit fox. | Dave Cook | 5/30/2018 |
| NP | Threatened, Endangered or Candidate Plant Species | **Richfield:** Wayne County parcels are well outside habitat of the Endangered Wright Fishhook Cactus and do not contain suitable habitat for the Threatened species Jones cyclandra, Navajo sedge, and Ute ladies-tresses, or the Threatened Barneby reed-mustard. | Dustin Rooks | 4/23/2018 |

183

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| NI | | **Price:** After review of BLM records there is potential habitat for T&E plants within the proposed leased parcels. Should any special status plant species be found, the surface use plan of operations may be amended to protect or avoid these species.<br><br>T&E-05:Listed Plant Species will apply to all parcels. T&E-19 Jones cycladenia  humilis jonesii will be attached to parcels 38, 39, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 112, 113, UT-084328, UT-085329.<br>T&E-15 Wright fishhook cactus will be attached to parcels 84 and 85.<br>UT-LN-126 Navajo Sedge will be applied to parcel UT-085328.<br><br>Also in accordance with WO IM 2002-174 the ESA/listed species stipulation will be applied. Additional documentation is within the wildlife and botany resources report located in the project files. | Dana Truman | 4/26/2018 |
| NI | Wildlife: Threatened, Endangered, Proposed or Candidate | **Richfield:** No aquatic T&E species are present within these parcels; however, drainages in parcels 1458, 1459, 4401, and 4706 flow into the San Rafael River, which is part of the Upper Colorado River drainage basin above Lake Powell. Water depletions are considered to adversely affect or modify critical habitat for the four Endangered Colorado River fish. Lease stipulation UT-S-184 Upper Colorado River Fish and lease notice T&E-23 Colorado River Endangered Fish would be attached to those parcels.<br><br>T&E species, such as Mexican Spotted Owls have been observed in the slickrock canyons near the UTU 08132, 08133, and 08134 parcels. The RFO RMP Management Decision WL-30 implements Raptor BMP's establishing seasonal and spatial buffers to maintain raptor nesting and foraging habitat. The RFO RMP requires a site clearance for areas of proposed surface disturbance before those activities could occur. Surface disturbance includes roads, pads, pump stations, pipelines, etc. Wildlife clearances will determine if mitigation is required and which BMP's, associated with wildlife within the RFO RMP, will take effect. | Joe Chigbrow | 4/18/2018 |
| | | **Price:** The Lease parcels do not contain designated or proposed critical habitat for the following species:<br>Critical habitat for:<br>Mexican spotted owl – approximately 5 miles away<br>Yellow-billed cuckoo – (proposed) approximately 8 miles away<br>Southwestern willow flycatcher – greater than 150 miles away<br>California condor - greater than 150 miles away<br>There is critical habitat adjacent to the two 106 parcels for Colorado pikeminnow and razorback sucker. Lease notice T&E-03 Endangered Fish of the Upper Colorado River Drainage Basin will be attached to all lease parcels because of potential water depletions, which may affect fish in down water locations. | Dana Truman | 4/30/18 |

184

AR005596

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | There are no large wetland or riparian areas that could provide suitable nesting habitat for the Southwest willow flycatcher or yellow-billed cuckoo within the lease parcels; however, LN-T&E-7 Southwest willow flycatcher and LN-T&E-113 Yellow-billed cuckoo will be applied to parcels UTU-85329, UTU-85328, 106, and 113. All parcels will have the following stipulations and notices attached and impacts from development to the wetland and riparian resources would be prevented. UT-S-127 No surface occupancy – intermittent and perennial steams UT-LN-128 Federal Flood risk management standard WO IM-2002-174 endangered species act stipulation. Additional documentation is within the wildlife and botany resources report located in the project files. LN-T&E-6 Mexican spotted owl and stipulation UT-S-269 Mexican spotted owl will be applied to parcels 061, 062, 064, 113, and UTU-85328. | | |
| | | **USO:  The following stipulations and lease notices w**ill be applied to the Richfield FO parcels for T&E wildlife: UT-S-184 Upper Colorado Fish and T&E-23 Colorado River Endangered Fish to parcels 1458, 1459, 4401, 4706. UT-S-293 California Condor and T&E-28 California condor to parcels 1031, 1032, 1033, 1034, 1426, 1427, 1428, 1429, 1455, 1456, 1458, 1459, 1460, 1463, 4401, 4706. T&E-25 Mexican Spotted Owl to parcels 1031, 1032, 1033, 1034. | Marcia Wineteer | 5/31/2018 |
| NI | Wastes (hazardous or solid) | **Richfield:**  There are currently no known waste issues associated with the proposed lease areas. If development of roads or well pads occur, potential release from equipment could be possible. State and Federal regulations would govern the use, storage and disposal of any products that could potentially impact persons or environment. Reporting and mitigation efforts would be required should such an event occur. | Dustin Rooks | 4/23/2018 |
| | | **Price:**  No chemicals subject to reporting under SARA Title III will be used, produced, stored, transported, or disposed of annually in association with the project. Furthermore, no extremely hazardous substances, as defined in 40 CFR 355, in threshold planning quantities, will be used, produced, stored, transported, or disposed of in association with the project. Trash would be confined in a covered container and disposed of in an approved landfill. No burning of any waste will occur due to this project. Human waste will be disposed of in an appropriate manner in an approved sewage treatment center. | William Civish | 4/19/2018 |
| NI | Water Resources/Quality (drinking/surface/ground) | **Richfield:**  Oil and Gas development that may occur as a result of this lease sale may affect water resources. The decision to lease is connected to these impacts; however it does not affect water resources to a degree that detailed analysis is required. There are numerous best management practices, standard operating procedures and rules associated | Mark Dean | 4/10/2018 |

185

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | with oil and gas development and exploration that are formulated to protect water resources. Internal scoping has determined that it is generally accepted that these measures would minimize the potential for impacts to water resources and therefore detailed analysis is not required for a lease level EA. It may be necessary to undertake detailed analysis of impacts to water resources when specific plans for development are proposed, but the decision whether to complete NEPA analysis will be made at that time based on scoping, issue sensitivity, and other considerations. | | |
| | Ground Water Quality | **USO**  Hydraulic Fracturing (Fracking) is a technique developed in the 1940's.   Around 2000, the technique was combined with directional drilling to dramatically increase production from deposits previously considered uneconomical. (EPA, 2016, p. 4)

The hydraulic fracturing water cycle describes the use of water in hydraulic fracturing, from water withdrawals to make hydraulic fracturing fluids, through the mixing and injection of hydraulic fracturing fluids in oil and gas production wells, to the collection and disposal or reuse of produced water. These activities can impact drinking water resources under some circumstances. Impacts can range in frequency and severity, depending on the combination of hydraulic fracturing water cycle activities and local- or regional-scale factors. The following combinations of activities and factors are more likely than others to result in more frequent or more severe impacts:

    o   Water withdrawals for hydraulic fracturing in times or areas of low water availability, particularly in areas with limited or declining groundwater resources;
    o   Spills during the management of hydraulic fracturing fluids and chemicals or produced water that result in large volumes or high concentrations of chemicals reaching groundwater resources;
    o   Injection of hydraulic fracturing fluids into wells with inadequate mechanical integrity, allowing gases or liquids to move to groundwater resources;
    o   Injection of hydraulic fracturing fluids directly into groundwater resources;
    o   Discharge of inadequately treated hydraulic fracturing wastewater to surface water resources; and,
    o   Disposal or storage of hydraulic fracturing wastewater in unlined pits, resulting in contamination of groundwater resources.

"The above conclusions are based on cases of identified impacts and other data, information, and analyses presented in the report. Cases of impacts were identified for all stages of the hydraulic fracturing water cycle. Identified impacts generally occurred near hydraulically fractured oil and gas production wells and ranged in severity, from temporary changes in water quality to contamination that made private drinking water wells unusable." (EPA 2016 pp 1-2) | Sheri Wysong | June 1, 2018 |

AR005598

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | If fracking should occur in an area where there is no vertical separation between the hydraulically fractured rock formation and the bottom of the potential underground drinking water source, fracking fluid may be introduced into the source. However, the occurrence of fracking within a potential drinking water source is low, concentrated in a few fields in Wyoming and Montana. (EPA 2016 p. 27) Attachment 1 to this checklist verifies that fracking the parcels is well enough separated from the usable aquifers to prevent impacts from fracking the wells. The measures required (spill containment systems, casing integrity testing, pit lining), etc. for all wells drilled in Utah, fracked or not, are adequate to prevent fracking fluids as well as hydrocarbons and produced water from the wells to prevent ground/surface water contamination. The Utah Division of Oil, Gas and Mining has promulgated rules to prevent environmental impacts from fracking (Utah Administrative Code R649-3-39). Further analysis/mitigation of impacts is not warranted. | | |
| | Water: Municipal Watershed / Drinking Water Source Protection | **Price:** Leasing would not, by itself, authorize any ground disturbances which could affect Municipal Watershed / Drinking Water Source Protection. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. | Jerrad Goodell | 4/24/2018 |
| | Water: Surface Water Quality | **Price:** Leasing would not, by itself, authorize any ground disturbances which could contribute runoff affecting surface water quality. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. However, any development proposal on the leases would be subject to the standard lease terms, and all applicable laws, regulations and onshore orders in existence at the time of lease issuance. The before mentioned conditions along with the stipulations and notices applied for floodplain and riparian will protect surface water quality. Site-specific analysis would be required prior to the approval of any ground disturbance proposal on the leases. The company must adopt a spill prevention plan and storm water control plan to control any potential pollutants from reaching the surface water with in the field office, (at the site specific APD stage. If the company plans on affecting these waters directly, a Stream Alteration Permit would be required, and would also require additional NEPA to look at those changes In light of existing knowledge regarding resource values on the subject leases, which is based upon the analysis in the PFO RMP [BLM2008] resource specialist knowledge significant impacts beyond those already addressed in the Record of Decision for the PFO RMP are not anticipated to occur as a result of leasing the proposed parcels. | Jerrad Goodell | 4/24/2018 |

AR005599

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | **USO:** The segment of the San Rafael River adjacent to lease parcels is listed as impaired due to OE Bioassessment and total dissolved solids (TDS). There is an EPA approved total maximum daily load (TMDL) for this reach. This water quality condition increases sensitivity for impacts to water quality in the NEPA document, but does necessitate detailed discussion in an EA for this case. The TMDL contains recommended projects, buffers, and best management practices to improve water quality conditions. Oil and gas development is not specifically identified as an issue. The types of impacts that would occur from Oil and Gas development (i.e. travel, ground disturbance, etc.) are identified as potential issues but the TMDL expresses that they are fully mitigatable through best management practices. The BLM proposal including future development would meet and exceed these recommendations made by the TMDL. Adequate minimum buffers are already included as a stipulation and BLM would implement any needed additional conditions of approval during the permit stage.<br><br>Proximity of parcel 106 increases sensitivity for impacts to water quality in the NEPA document, but does necessitate detailed discussion in an EA for this case using the same rationale as above for parcels near San Rafael River. The Green River is not listed as impaired in Utah's 303(d) list. | Mark Dean | 5/11/2018 |
| NI<br>NI | Water Rights | **Richfield:** Water Rights are present within the affected area, but they would not be affected by the Proposed Action. Diversions of water affecting existing water rights would not occur during the leasing stage, and it would be very unlikely to occur during operation. Detailed analysis is not necessary. | Mark Dean | 4/10/2018 |
| | | **Price:** Leasing itself would not have impacts to water rights. However, should development occur on the proposed lease parcels, water rights could be impacted by the development of oil and/or gas wells. Leasing the proposed parcels would not, by itself, authorize any disturbances. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. However, any development proposal on the lease parcels would be subject to the standard lease terms, and all applicable laws, regulations and onshore orders in existence at the time of lease issuance. Site- specific analysis would be required prior to the approval of any ground disturbance proposal on the lease parcels. | Jerrad Goodell | 4/24/2018 |
| NI | Water: Hydrologic Conditions (stormwater) | **Price:** Hydrologic conditions do exist in the Price Field Office, leasing of the proposed leases would not, by itself, authorize any ground disturbances. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. However, any development proposal on the lease parcels would be subject to the standard lease terms, and all applicable laws, regulations and onshore orders in existence at the time of lease issuance. Site-specific analysis would be required prior to the approval of any ground disturbance proposal on the leases.<br><br>In light of existing knowledge regarding resource values on the subject leases, which is based upon the analysis in the PFO RMP [BLM2008] resource specialist knowledge significant impacts beyond those already addressed in the | Jerrad Goodell | 4/24/2018 |

AR005600

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | Record of Decision PFO RMP are not anticipated to occur as a result of the proposed leases. | | |
| NP | Wilderness/WSA | **Richfield:** The parcels are not within a designated Wilderness Area or Wilderness Study Area. | Clay Stewart | 4/17/18 |
| | | **Price:** The PFO RMP of 2008 was reviewed, as were the current mapping and GIS layers. There are no designated wilderness or Wilderness Study Areas within the proposed leasing area. | Myron Jeffs | 4/27/2018 |
| PI | | **Price:** The area where the parcels are proposed for leasing has been inventoried for wilderness characteristics within the last two years. Although we are not managing these areas to preserve their wilderness characteristics, the inventories found these characteristics are present | Myron Jeffs | 4/27/2018 |
| NP | | **Richfield:** The parcels overlap the Flat Tops and Cow Patty Ranch inventory units. An updated inventory was completed in 2016. The lands with wilderness characteristics inventory efforts for both units found no areas containing wilderness characteristics. | Clay Stewart | 4/19/18 |
| PI | Lands with Wilderness Characteristics | **USO**: The following parcels overlap areas that contain wilderness characteristics in the Price Field Office: 018, 020, 021, 022, 027, 028, 029, 030, 031, 032, 033, 034, 035, 046, 047, 048, 049, 051, 052, 053, 054, 055, 056, 057, 058, 059, 060, 061, 062, 063, 064, 065, 067, 068, 069, 070, 071, 072, 074, 075, 076, 077, 078, 079, 080, 081, 082, 083, 084, 085, 088, 089, 090, 091, 092, 093, 094, and 095. Additionally, a small portion of UTU-081458 and UTU-084401 intersect the UT-020-SRD-Sweetwater Reef lands with wilderness characteristics unit in the Richfield Field Office. This resource will be carried forward for analysis. | Allison Ginn | 5/21/18 |
| NP | BLM natural areas | **Price:** The PFO RMP of 2008 was reviewed, as were the current mapping and GIS layers. There are no natural areas identified within the proposed leasing area. | Myron Jeffs | 4/27/2018 |
| NP | Wild and Scenic Rivers | **Price:** The PFO RMP of 2008 was reviewed, as were the current mapping and GIS layers. There are no designated wild and scenic rivers within the proposed leasing area. | Myron Jeffs | 4/27/2018 |
| NP | Wild & Scenic Rivers | **USO:** Parcel 106 overlaps a segment of the Green River that was determined to be eligible, but not suitable, for Wild & Scenic river designation. Manual 6400 – Wild and Scenic Rivers states, "For all BLM-identified eligible and suitable rivers, the BLM must consider an alternative in the NEPA document for the proposed activity that would maintain the tentative classification **until a suitability determination is made** [emphasis added]. Analysis of suitability and potential impacts to eligible rivers was included in the Price RMP. Impacts to eligible, but not suitable, WSRs will not be carried forward for analysis in this EA. The Price Record of Decision states, "Any eligible segment not determined to be suitable will receive no special protection specifically for its free-flowing values, outstandingly remarkable values, and tentative classifications." | Allison Ginn | 5/21/18 |
| NI | Wildlife and Fish Excluding | **Richfield:** No fish species are present within these parcels. Wildlife not designated SSS, such as pronghorn have UDWR designated critical habitat in parcels UTU 81426, 81455, | Joe Chigbrow | 4/18/2018 |

189

AR005601

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | Designated/Special Status Species | 81458, 81460, 84401, and 84706. The RFO RMP Management Decision WL-26 would restrict surface disturbance activities in crucial pronghorn habitat from May 15 through June 15 UT-S-225<br><br>Richfield The RFO RMP requires a site clearance for areas of proposed surface disturbance before those activities could occur. Surface disturbance includes roads, pads, pump stations, pipelines, etc. Wildlife clearances will determine if mitigation is required and which BMP's, associated with wildlife within the RFO RMP, will take effect. | | |
| NI | Wildlife: Fish (designated or non-designated) | **Price:** Any water depletion from the Upper Colorado River Basin is likely to adversely affect critical habitat for the endangered fish of the Colorado River System. Lease notice T&E-03 Endangered Fish of the Upper Colorado River Drainage Basin should be applied to all parcels. Not all water sources are considered to be depleting from the Green River Basin the impacts and total depletion will be analyzed in the APD stage. Impacts to habitat and water quality for all fish species are adequately addressed in the Surface Water Quality, and the Steams, Riparian, Wetlands, Floodplains sections of this document.<br><br>Additional documentation is within the wildlife and botany resources report located in the project files. | Jerrad Goodell | 4/24/2018 |
| NI | Wildlife: Non-USFWS Designated | **Price:** according to the recent UDWR shapefiles and the Price RMP, within the parcels there is:<br>Desert Bighorn  Sheep – Crucial yearlong Parcel 113 and 039 Bighorn, UT-S-253.<br>Pronghorn – crucial year long<br>No designated habitat for deer or elk within the parcels.<br>The following would be added<br>UT-LN-21 (PFO) BIGHORN SHEEP HABITAT. Parcels-113, 039<br>Additional documentation is within the wildlife and botany resources report located in the project files. | Dana Truman | 4/30/18 |
| NI | Wildlife: Non-USFWS Designated | **USO:** There is no Crucial deer habitat present.  UT-LN-21 (PFO) BIGHORN SHEEP HABITAT. Parcels- 113, 039<br>There is a small amount of wild turkey habitat on UTU 085328, but the parcel is NSO.<br>A majority of the parcels contain year-long crucial pronghorn habitat and all the remaining parcels save 106 contain year-long substantial pronghorn habitat | Dave Cook | 5/30/2018 |
| NP | Woodlands/Forestry | **Richfield:** There are no woodland/forestry areas present within or near the affected area. | Bob Bate | 4/23/18 |
| | | **Price:** There are no merchantable woodland/forestry products within the proposed area. | Stephanie Bauer | 4/26/2018 |
| NI<br>NI | Vegetation Excluding Designated/Special Status Species | **Richfield:** There will be little to no impact on vegetative resources within these parcels. Any surface disturbance within these parcels will result in the initiation of BMP's within the RFO RMP, along with site specific design features, minimizing vegetation disturbance. Once operations within these parcels are completed, areas with surface disturbance will be rehabilitated and reseeded with BLM advised seed mix. | Joe Chigbrow | 4/18/2018 |
| | | **Price:** The proposed action of leasing the proposed parcels will not affect Vegetation. Any future development of those | Mike Tweddell | 4/25/2018 |

AR005602

Appendix F

| Determination | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | leased parcels will need to be analyzed on the proposed development. | | |
| | | **Richfield:** The parcels are located in VRM Class III and IV designations. The objectives of Class III is to partially retain the existing character of the landscape. The level of change to the landscape can be moderate. Management activities may attract attention, but should not dominate the view of the casual observer. The objectives of Class IV is to provide for activities that require major modification of the landscape. The level of change to the landscape can be high. Management activities may dominate the view and be the major focus of attention. Even though oil and gas development would be allowed and consistent with the aforementioned VRM Classes, impacts to visual resources should be minimized through the placement of the wells and service roads, along with selecting a paint color for the well facilities that blend well with the natural surroundings. | Clay Stewart | 4/17/18 |
| NI | Visual Resources | **Price:** Nominated parcel 113 is partially within VRM Class II. Class II management objective is to retain the existing character of the landscape. The remaining lease parcels are within VRM Class III. The management objective for Class III is to partially retain the existing character of the landscape. There can be a moderate level of change to the landscape. The leasing of the parcels is an administrative action. Future development of the leases, and surface disturbance activity would require additional analysis to determine if the actions are consistent with VRM management objectives of Class II and Class III. | Myron Jeffs | 4/27/2018 |
| | | **USO:** PI: Sensitive viewsheds were identified on public lands within or adjacent to Parcels 111, 112, and 113. Future development of these parcels could be visible from key observation points and could potentially impact Visual Resources, although such impacts would likely be mitigated through the use of best management practices. Potential future development of all parcels would conform to the Visual Resource Management objectives established in the 2008 Price and Richfield RMP. I viewshed analysis was conducted from a key observation point at Goblin Valley State Park and it was determine the nearest parcel would not be a substantive visually impacted by potential development.  Scoping comments requested that viewsheds be analyzed from nearby WSAs and ACECs. Viewsheds outside the boundaries of these designation are not considered sensitive and do not require analysis. | Matt Blocker | 5/25/18 |
| PI | Soundscapes/Night Skies | Parcels 103, 112 and 113 is close enough to the Horseshoe Canyon Unit of Canyonlands National Park, and could potentially impact the Unit from noise due to development. The closest Lease to the Glen Canyon Recreation Area (GCRA) is over 5 miles from the GCRA, on the far side of the Horse Canyon Unit and would have lesser impacts than the Unit. | Matt Blocker | 5/25/18 |
| NI | Wild Horses and Burros | **Richfield:** The RFO has an agreement with the PFO for management decisions regarding the Robbers' Roost Herd Management Area (HMA), which overlaps with the proposed leases on RFO lands. As per the RFO RMP, "Due to the very | Sue Fivecoat | 4/9/2018 |

191

AR005603

Appendix F

| Determi-nation | Resource | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | small population (currently estimated at 20 head), which is too small to maintain genetic viability, and lack of dependable water, the herd is not a viable population, and will eventually be allowed to decline to zero population". The proposed leasing would not impact this small population especially considering the RMP decision(s) to zero out the herd. (PFO Approved RMP – Wild Horses and Burros (WHB-6, WHB-11) | | |
| | | **Price:**  The proposed action is within the Robbers Roost Herd Area. The RMP has identified this area to be zeroed out of horses. As such the proposed action will not affect Wild Horses. | Mike Tweddell | 4/25/2018 |

**FINAL REVIEW:**

| Reviewer Title | Signature | Date | Comments |
|---|---|---|---|
| Environmental Coordinator | | | |
| Authorized Officer | | | |

EPA. (2016). *EPA's Study of Hydraulic Fracturing and Its Potential Impact on Drinking Water Resources -*. Retrieved July 18, 2018, from United States Environmental Protection Agency: https://www.epa.gov/hfstudy/executive-summary-hydraulic-fracturing-study-final-assessment-2016

Rose, S., Turner, D., Blanford, G., Bistine, J., de la Chesnaye, F., & Wilson, T. (2014). *Understanding the Social Cost of Carbon: Executive Summary.* Palo Alto: Energy & Environmental Analysis Research Group

AR005604

Appendix F

**Attachment**

**Consideration of Hydraulic Fracturing on Water Quality of Price Parcels**

**in BLM's September 2018 Lease EA**


**8/29/2018**


The BLM is considering offering oil and gas leases in the San Rafael Desert in the Price and Richfield Field Offices.  Hydraulic Fracturing (fracking) is unlikely to have occurred in the past in the affected area since there have been no strikes that would encite an operator to complete a well.  It is anticipated that future exploration and potential development would be consistent with that that is occurring to the east of the parcels in the Cane Creek Unit where wells are being horizontally drilled and fracked.  However, the parcels being evaluated are in an unproven area, and exploratory wells are typically drilled vertically.

If a vertical well should strike a potentially profitable target, it may be fracked as a vertical well, extended horizontally and fracked, or more wells would be drilled and fracked in the vicinity.   The BLM has considered the potential fracking and possible impacts to groundwater resources and determined that detailed analysis is not necessary due to de minimus risk to water resources.

The following considerations were used to reach this determination:

1.  Connectivity between deep and shallow groundwater zones
2.  Sensitivity of existing and potential groundwater resources
3.  Reasonably foreseeable development
4.  Water quality of oil and gas target zones


1.  <u>Alterations to deep groundwater do not affect shallow groundwater resources.</u>
    Fracking would occur at depths much deeper than used groundwater zones and therefore impacts to groundwater resources would not be expected. The deepest groundwater well in the area is drilled around 700 ft deep. It appears that all water wells in the lease area are completed in Navajo sandstone which are isolated from deeper groundwater by the Kayenta Formation. The Kayenta Formation is composed of shale, siltstone, and sandstone members and is a confining bed with low to very low hydraulic conductivity. As a result, impacts to water quality or quantity in deeper strata would not reach the Navajo sandstone aquifer. The target depth for oil and gas exploration in the lease parcels has been deeper than 4000 ft which is many strata deeper than the Navajo formation and includes several aquitards which impede migration of deeper groundwater (Weiss, 1987). The wells in the Cane Creek Unit have been drilled to depths around 8,000 ft below the surface.

2.  <u>There are no sensitive groundwater resources such as drinking water supply.</u>

193

Appendix F

Sensitivity of impacts to groundwater resources is low because there are no drinking water protection zones or domestic water sources within or near the lease parcel area. The nearest drinking water system is at Goblin Valley State Park which is about six miles west from the nearest lease parcel. Water for this system is provided from an 855 ft well drilled into Navajo Sandstone. Any future water development within or near the lease parcel area would also likely utilize the shallow Navajo sandstone aquifer which would not be affected by oil and gas development.

**3.** Reasonably foreseeable development projects limited oil and gas development.
The reasonably foreseeable development scenario indicates a low density of oil and gas development which decreases the potential for negative impacts to groundwater. The predicted rate of less than one well drilled per year is small especially considering that this would be dispersed over an area of about 50 square miles. Only a fraction of these wells would show enough potential to support fracking  and therefore any impacts would be dispersed.

**4.** Oil and gas target zones are not within usable aquifers.
Oil and gas exploration would occur in deep groundwater zones with existing poor water quality and therefore any negative impacts to water quality would have no effect to the human environment. Samples from previously drilled oil and gas wells in the target formations have revealed that this deep groundwater is very saline to briny (Weiss, 1987). There are no saltwater springs or other groundwater anomalies in the project area that would indicate a conduit exists between these deep zones and shallow zones.

BLM has considered these factors along with comments from the public and other agencies to determine whether to conduct a detailed analysis in the EA. For this analysis the BLM has determined that the level of potential impacts does not warrant a detailed analysis and therefore no additional discussion is necessary for this lease level EA.

Works Cited:

Feltis, R.D. 1966. Water From Bedrock in the Colorado Plateau of Utah. Utah State Engineer Technical Publication 15.

Weiss, Emanual, 1987. Ground-Water Flow in the Navajo Sandstone in Parts of Emery, Grand, Carbon, Wayne, Garfield, and Kane Counties, Southeast Utah. USGS Water Resources Investigations report 86-4012

AR005606

Appendix G          Stipulations and Notices Originally on the SNI and Suspended Parcels

**SNI initial stipulations UTU85328**
**UT0506-269-A**
*UT0206-197*
T. 24 S., R 16 E., Salt Lake
        Sec. 11: NWNW.
40.00 Acres
Emery County, Utah
Price Field Office

**STIPULATIONS**
UT-S-103: CSU - Visual resource management (VRM Class II) located on the entire lease.

**NOTICES**
UT-LN-56:          Price Field Office
T&E-01:  Bald Eagle
T&E-03:  Endangered Fish of the Upper Colorado River Drainage

**UT0506-269-F**
*UT0206-202*
T. 24 S., R 16 E., Salt Lake
        Sec. 15, W2NE, W2;
        Sec. 21, all;
        Sec. 22, W2.
 1,360.00 Acres
Emery County, Utah
Price Field Office

**STIPULATIONS**
UT-S-120: Unconditional NSO - No occupancy allowed in portions of the W2NWNE, E2NENW, SENW,                      N2NWSW Sec. 15; SENENW, SENW, SESWNW, NWNWSW Sec. 21.

UT-S-103: CSU - Visual resource management (VRM Class II) located on the entire lease.

UT-S-07:  TL - Crucial antelope fawning habitat located in the NWNW, NWSWNW Sec. 21. Activity                      allowed from June 16 to May 14.

**NOTICES**
UT-LN-56:          Price Field Office
T&E-06:  Mexican Spotted Owl



An official website of the United States government   Here's how you know



**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

Home / Info / Policy / Updating Oil and Gas Leasing Reform - Land Use Planning and Lease Parcel Reviews

# Updating Oil and Gas Leasing Reform - Land Use Planning and Lease Parcel Reviews

***IM 2018-034***

Instruction Memorandum

UNITED STATES DEPARTMENT OF THE INTERIOR

BUREAU OF LAND MANAGEMENT

WASHINGTON, D.C. 20240

http://www.blm.gov

01/31/2018

In Reply Refer To:

1610/3100 (210/310) P

EMS TRANSMISSION 02/01/2018

Instruction Memorandum No. 2018-034

Expires:  09/30/2021

To:             All Field Officials

From:           Deputy Director, Policy and Programs, Exercising Authority of the
Director of the Bureau of Land Management

AR005608

Case 1:24-cv-02476-RC   Document 42   Filed 10/18/25   Page 605 of 1439

Subject:        Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews

**Program Areas:**  Oil and Gas, Planning, and National Environmental Policy Act (NEPA).

**Purpose:**  This Instruction Memorandum (IM) sets out the policy of the Bureau of Land Management (BLM) to simplify and streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held in accordance with the Mineral Leasing Act (30 U.S.C. § 226), Executive Order 13783, and Secretary Order 3354.  This IM supersedes existing policy announced in IM No. 2010-117, *Oil and Gas Leasing Reform - Land Use Planning and Lease Parcel Reviews*, issued on May 17, 2010, and replaces any conflicting guidance or directive found in the BLM Manual or Handbook.

**Policy/Action:**  The following policy applies to the leasing of Federal minerals under Bureau of Land Management (BLM) administered surface,[1] state-owned surface, and private surface estates.[2]  The BLM does not manage leasing on Indian lands; therefore, this policy does not apply to Indian lands.

This policy (1) addresses land use planning, lease parcel review, lease sales and lease issuance, and IM implementation; and (2) directs the BLM to incorporate the revised policy, as appropriate, into affected BLM handbooks and manuals.

**I.    Land Use Planning**

A.    Resource Management Plans

As outlined in the BLM Handbook H-1601-1, *Land Use Planning*, the Resource Management Plan (RMP) underlies fluid minerals leasing decisions.  Through effective monitoring and periodic RMP evaluations, state and field offices will examine resource management decisions to determine whether the RMPs adequately protect important resource values in light of changing circumstances, updated policies, and new information (H-1601-1, sections V.A and B).  The results of such reviews and evaluations may require a state/field office to update resource information through land use plan maintenance, amendment, or revision.  It is BLM policy that existing land use plan decisions remain in effect until an amendment or revision is complete or approved.  Therefore, the BLM will not routinely defer leasing when waiting for an RMP amendment or revision to be signed.  Rather, when making leasing decisions, the BLM will exercise its discretion consistent with existing RMPs and the State Director should consult with the Washington Office (WO) before deciding to defer leasing of any parcels. When necessary, state/field offices will maintain or amend RMPs to

AR005609

accommodate changes in lease stipulations in accordance with guidance found in H-1610-1, *Land Use Planning*, sections VI.H and VII.B.

B.   Stipulation Consistency

The state/field offices will continue to determine appropriate stipulations for parcels offered for lease, consistent with the applicable RMP.  Each state/field office has the discretion to form Interdisciplinary Consistency Review Teams (IDCR Team) for lands under its jurisdiction.  The primary purposes of IDCR Teams are to prepare lease stipulations that are written in a BLM approved format and are consistent within each state for the protection of similar resources or resource settings,[3] and with the goal to edge-match across administrative boundaries including consideration of the management directives of surface management agencies (SMAs) of adjacent lands.

C.   Adaptive Management

In applying an Adaptive Management approach[4] to oil and gas related activities to address changing resource conditions, RMPs and associated lease stipulations must conform to the BLM instruction memorandum entitled, *Exceptions, Waivers, and Modifications of Fluid Minerals Stipulations and Conditions of Approval, and Associated Rights-of-way Terms and Conditions* (WO-IM-2008-032, dated November 27, 2007).[5]  As appropriate, stipulations will use Adaptive Management principles to incorporate the best available science, and address changing resource conditions.

## II.   Master Leasing Plans

The BLM conducted the review required by Executive Order 13783 and Secretarial Order 3354 and determined that Master Leasing Plans (MLPs) have created duplicative layers of NEPA review.  This policy, therefore, eliminates the use of MLPs.  The MLP procedures in Chapter V of BLM Handbook H-1624-1, *Planning for Fluid Minerals Resources*, are hereby rescinded.  The BLM will not initiate any new MLPs or complete ongoing MLPs under consideration as land use plan amendments.

## III.   Lease Parcel Review

The purpose of a lease parcel review by the state/field offices is to determine the conditions under which leasing is allowed to proceed, and to ensure conformance with the approved RMP.  Lease parcel reviews will be conducted and documented simultaneously with the NEPA compliance process for lease sales.

A.   Parcel Review Timeframes

AR005610

State/field offices are required, by statute (Mineral Leasing Act, 30 U.S.C. § 226(b) (1) (A)), and implementing regulation (43 CFR 3120.1-2(a)), to hold quarterly lease sales, when eligible lands are available for lease.[6]  Lease sales should occur in the last month of each calendar year quarter.

The BLM accepts Expressions of Interest (EOI) in lands for potential leasing through the National Fluids Lease Sale System (NFLSS).  Members of the public submit EOIs electronically to the BLM using NFLSS.  Once submitted, the public can view all EOIs submitted to the BLM.  The EOI submitter can track its EOI status using the EOI-specific tracking number provided by NFLSS.  NFLSS can display the dates when the EOI was submitted to, and accepted by, the BLM, and its status, such as pending review by the state office, field office, or surface management agency.  The BLM also uses the NFLSS to describe lands that the BLM has identified for leasing consideration.  NFLSS provides a link to upcoming lease sales.  The BLM will identify in NFLSS a deadline for receiving EOIs for each upcoming sale.  The deadline will be six months prior to the lease sale month.  This EOI deadline also will be posted on the state office website along with the upcoming lease sale schedule.

The timeframe for parcel review for a specific lease sale is to be no longer than 6 months.  This will include adjudicating and creating the preliminary parcel list from all timely received EOIs and the other lands identified for leasing consideration in the NFLSS, recognizing there will be exceptions due to unforeseen circumstances, including delays associated with SMA consent.

BLM will no longer use a rotating schedule for lease sales, as described in IM No. 2010-117.  Each state office will review all lands that are identified in EOIs that were submitted before the EOI cutoff date for a particular quarterly lease sale and will offer all parcels determined to be eligible and available within the state office's jurisdiction.

B.    Review of Lease Sale Parcels

Field offices have the discretion to form an Interdisciplinary Parcel Review (IDPR) Team of resource specialists to review lease sale parcels as part of compliance with NEPA and other legal and policy requirements for adequate review of parcels.

Lease sale parcel review may include the following steps:

1.    Gather and Assess Existing Information:

State/field offices will gather and evaluate existing environmental resource information and compile documentation of compliance with applicable laws, regulations, and executive orders (e.g., NEPA analysis, Endangered Species Act (ESA) (16 U.S.C. § 1531

AR005611

et seq.), and National Historic Preservation Act (NHPA) (54 U.S.C. 300101 et seq.) resource data and consultation, and socioeconomic data pursuant to Executive Order 12989).  The field offices will determine the need for additional information and develop strategies to obtain any data that may be required to support a leasing decision.

2.    Plan Conformance and Adequacy:

State/field offices will determine whether leasing the parcel is in conformance with the RMP.   A lease stipulation may be revised consistent with modification criteria found in the RMP, or through amendment, as necessary, given conditions or issues not anticipated in the RMP.

3.    Site Visits:

Site visits are not required and should only be considered when deemed necessary by the authorized officer on a case-by-case basis.  Advanced technology and information of high quality, such as geographic information system (GIS) and existing scientific reports should be used to the greatest extent practicable.  The field office may develop a risk-based approach for determining whether site visits are appropriate, based on criteria such as proximity to a sensitive resource, the adequacy of the RMP NEPA analysis to support subsequent decision-making, proximity to other development, tribal or stakeholder considerations, etc.

4.    Internal and External Coordination:

In order to achieve greater coordination and communication in managing lands and resources, state and field offices should coordinate and/or consult on the parcel review and NEPA analysis with interested parties potentially affected by the BLM's leasing decisions.

5.    Public Participation:

State and field offices may provide for public participation during the NEPA process as part of the review of parcels identified for potential leasing.

C.    ESA, NHPA, and Tribal Consultation Compliance Documentation

State and field offices will meet all requirements related to the ESA and the NHPA, as well as fulfill all tribal consultation requirements (see BLM Manual 1780, *Tribal Relations,* and BLM Handbook H-1780-1, *Improving and Sustaining BLM-Tribal Relations*), and will attach the standard ESA and NHPA lease stipulations or appropriate stipulations consistent with RMPs to any lease that is offered.  No additional coordination is required unless deemed necessary by the authorized officer, for

AR005612

example, to ensure that information is adequate to support the decision about whether to lease.

D.     NEPA Compliance Documentation

The state/field office will determine the appropriate form of NEPA compliance documentation for all lease sale parcels on BLM-managed lands, including parcels for federal subsurface minerals in split estate[7] lands.

If, through the lease parcel review process, the authorized officer confirms that the proposed leasing action has been adequately analyzed in existing NEPA document(s) and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) will be used to document NEPA compliance for the leasing decision.  If the authorized officer deems additional analysis to be necessary, then the BLM can prepare an Environmental Assessment (EA) or Environmental Impact Statement (EIS), as appropriate.

If the BLM concludes that a DNA will adequately document that existing NEPA analysis is sufficient to support the proposed action and the action is consistent with the RMP, no further public comment period is required for the DNA.

The State Director or the officer with delegated decision-making authority will use the information provided by the field office authorized officer to determine which parcels to include on an upcoming lease sale.

**IV.     Lease Sales and Lease Issuance**

A.     Public Notification of Lease Sale

The state office must post the Notice of Competitive Lease Sale (sale notice) at least 45 days prior to the start of the lease sale, consistent with the Mineral Leasing Act, 30 U.S.C. § 226(f), and BLM regulations,   43 CFR 3120.4-2.  Posting the sale notice involves posting it on the state office website, including on the ePlanning project page for the sale, with a link to the leasing website; posting the sale notice in NFLSS; and making it available in the public room.  Field or state offices will post the NEPA compliance documentation on the BLM ePlanning website and in the public room 45 days prior to the start of the sale.

For online lease sales, the state office will coordinate with the internet auction provider as needed.  No parcels will be withdrawn from lease sale during the active bidding period.

B.     Lease Sale Parcel Protests

AR005613

A 10-day public protest period will begin the day the sale notice is posted, along with applicable NEPA documentation.  State offices should attempt to resolve protests in a signed decision before the sale of the protested parcels.  Parcels subject to protests that are not resolved (i.e., pending protests) will be offered for lease sale.  A decision to deny or dismiss a protest will advise the protesting parties of their right to appeal to the Interior Board of Land Appeals (IBLA) and will state that an appeal will not automatically halt the auction process.

The number of parcels protested and the status of the protests (i.e., protests dismissed, denied, upheld, or pending) must be publicly posted the day before the sale starts on the BLM state office website and the internet auction website so that bidders understand the protest status of each parcel.  Protests upheld should be posted on the state office website and the NFLSS, using normal processes with amendments/notices to withdraw the parcel, no later than the day before the sale starts, and if applicable, on the online leasing website for the sale no later than the day before the sale starts.

C.    <u>Lease Issuance</u>

If a state office is unable to resolve all protests before the date of a sale, the sale should proceed, and the state office should resolve the protests and decide whether to issue the affected leases within 60 days after the BLM receives full payment from the successful bidder for the bonus bids, first year rentals, and administrative fees.  See 30 U.S.C. § 226(b) (1) (A).  Nevertheless, the state office should not issue a lease for a protested parcel until the protest is resolved.  State offices may use regional teams (discussed below) to facilitate timely protest resolution.  If, for any reason, resolution of a protest may take longer than 60 days, the state office will notify the BLM Washington Office in a memorandum describing the circumstances involved.  If BLM grants a protest after the date of sale (and before lease issuance), the BLM should reject the bid and refund the bonus bids and rentals paid.  State offices will post the protest resolution documents on the NFLSS and the appropriate state office website.

D.    <u>Regional Teams</u>

State offices may use regional teams to help meet the goals of having reasonable and consistent stipulations; expediting adjudication of nominations; resolving protests; issuing leases; ensuring consistency among offices in their approach to preparing protest responses and providing notification of protest status; and supporting other leasing processes.

**Implementation Timeframe:**  This policy is effective immediately in order to achieve full compliance with the parcel review 6-month timeframe.  This policy will guide leasing

AR005614

4/17/24, 9:38 AM
Case 1:24-cv-02476-RC   Document 42   Filed 10/18/25   Page 611 of 1439
Oil and Gas Leasing Reform - Land Use Planning and Lease Parcel Reviews | Bureau of Land Management

procedures for all current and future parcels under review by the field offices as of the date of this IM.

**Budget Impact:**  This policy is intended to result in additional revenue from increased lease sales and reduced costs for NEPA review, planning, responses to protests, and associated oil and gas program costs.  It is anticipated that staff resources may be shifted at times from other program areas to meet this high priority program area need.

**Background:**  On May 17, 2010, the BLM announced the previous Leasing Reform policy, IM No. 2010-117.  After more than 7 years of implementation, the BLM identified aspects of the previous policy that needed improvement.  Implementation of the previous policy resulted in delays by increasing the time required for sale notice posting.  Furthermore, protests have increased, not decreased, in recent years (FY16 and FY17) compared to pre-2010 levels. This IM aims to simplify and streamline the leasing process for more efficient and effective oil and gas lease management.

**Manual/Handbook Sections Affected:**  This IM transmits policy that will be incorporated into BLM Handbooks H-1790-1, *National Environmental Policy Act*; H-1624-1, *Planning for Fluid Mineral Resources*; H-3101-1, *Issuance of Leases*; H-3120-1, *Competitive Leases*; and Manual MS-3120, *Competitive Leases*.

**Coordination:**  This policy was coordinated with the U.S. Department of the Interior Office of the Solicitor, the BLM state and field offices, the BLM Washington Office of Energy, Minerals, and Realty Management, and the BLM Washington Office of Resources and Planning.

**Contact:**  If there are any questions concerning this IM, please contact Timothy R. Spisak, Acting Assistant Director, Energy, Minerals and Realty Management, at 202-208-4201.  For program questions, your staff may contact Lorenzo Trimble, acting Division Chief, Washington Office Division of Fluid Minerals (WO-310) at 202-912-7142 ltrimble@blm.gov.

Signed by:
Brian C. Steed
Deputy Director, Policy and Programs
Exercising Authority of the Director of the Bureau of Land Management


Authenticated by:
Catherine Emmett
WO-870, IT Policy and Planning

AR005615

[1] This policy will be implemented across the BLM as described.  Certain provisions in this policy, however, will not apply to the National Petroleum Reserve Alaska (NPR-A) because the BLM manages that area under statutory authorities, such as the Naval Petroleum Reserves Production Act of 1976, 42 U.S.C. 6501 et seq., that apply only to that area.  The BLM Alaska State Office's plan for implementing this policy will identify the provisions of this policy that will not apply to leasing in the NPR-A or in the Arctic National Wildlife Refuge.

[2] This policy does not apply to the leasing of federal minerals under lands managed by other federal surface management agencies (SMAs).  The policy, however, does apply to split estate lands within National Forest System (NFS) units (*i.e.*, lands with federal subsurface ownership and non-federal surface ownership).

[3] Stipulations for the protection of identical resource values may differ in different areas if such variation is necessitated by ecological, cultural, or other resource-specific factors that are scientifically validated (e.g., all mule deer winter habitat timing limitation stipulations in a state should be worded similarly unless there are, for example, ecological reasons for varying the effective seasonal closure date of the stipulation across the field office or state).

[4] For more information on adaptive management, see Adaptive Management:  The U.S. Department of the Interior Technical Guide Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.  See also the Department of the Interior regulations regarding implementation of NEPA at 43 CFR 46.145, as well as associated guidance issued by the Department's Office of Environmental Policy and Compliance.

[5] WO-IM-2008-032 provides guidance for (1) incorporating exception, waiver, and modification criteria into a land use plan; (2) making changes to leasing decisions/stipulations in the land use plan; and (3) reviewing and approving lease stipulation exceptions, waivers, and modifications for leases that have already been issued.

[6] Eligible lands include those identified in 43 CFR 3100.0-3 as being subject to lease and identified in 43 CFR 3120.1-1 (BLM Manual 3120, *Competitive Leases*). Lands allocated for leasing in the RMP are considered available for leasing when appropriate reviews have been conducted and all statutory requirements have been met, including compliance with the NEPA (BLM Manual Section 3120, *Competitive Leases*; Handbook H-3101-1, *Issuance of Leases*).

AR005616

[7] For split estate lands within NFS units, the necessary NEPA analysis for a leasing decision may be done through documentation prepared jointly by the FS and the BLM, or prepared by the FS and adopted by BLM.

| Fiscal Year |
| --- |
| 2018 |

View All Policies



**U.S. DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

About BLM          Website Disclaimers

Careers          Feedback

Contact Us          Report Misconduct

Maps          Office of Civil Rights

Information Center

Case 1:24-cv-02476-RC   Document 42   Filed 10/10/25   Page 614 of 1439

FOIA requests                          Disclaimer

No FEAR Act data                       Privacy policy

Office of the Inspector General        Vulnerability disclosure policy

Budget & performance reports           Cummings Act notices

Agency financial reports

Looking for U.S. government information and services?  **Visit USA.gov**

AR005618

BLM

# United States Department of the Interior
# Bureau of Land Management

---

### Determination of NEPA Adequacy
### DOI-BLM-UT-G020-2018-0057-DNA

---

#### October 2018

## Price Field Office December 2018
## Competitive Oil and Gas Lease Sale

*Location:*
Green River District
Price Field Office
Emery and Carbon Counties, Utah

---

Price Field Office
125 S 600 W
Price, Utah 84501
Phone: (435) 636-3600



AR005889

## Worksheet

## Determination of NEPA Adequacy

U.S. Department of the Interior
Utah Bureau of Land Management

The signed CONCLUSION at the end of this worksheet is part of an interim step in the BLM's internal analysis process and does not constitute an appealable decision; however, it constitutes an administrative record to be provided as evidence in protest, appeals and legal procedures.

OFFICE: Price Field Office

TRACKING NUMBER: DOI-BLM-UT-G021-2018-0057-DNA

TITLE: Price Field Office December 2018 Competitive Oil and Gas Lease Sale

LOCATION/LEGAL DESCRIPTION: See Attachment A and Attachment C.

### A. Description of the Proposed Action and Any Applicable Mitigation Measures

The Bureau of Land Management (BLM), Utah State Office, proposes to offer 3 parcels of public land within the Price Field Office for oil and gas leasing in a competitive lease sale to be held in December 2018. The parcels comprise approximately 3654.56 acres of federal mineral and surface estate in Carbon County and 1,389.5 acres in Emery County.

All parcels are open for leasing as provided in 43 CFR 3100 and BLM's Competitive Leasing Handbook H-3120-1. Stipulations and lease notices to protect surface and subsurface resources are applicable, as prescribed by the Approved Price Field Office Resource Management Plan (RMP). Parcel configuration, stipulations, and lease notices are presented in Attachment A.

If any of the parcels are not leased through competitive bidding, they may be leased non-competitively for two years following the competitive sale. Federal oil and gas leases are issued for a primary term of 10 years, after which the lease would be held indefinitely by paying production.

A lessee's right to explore and drill for oil and gas at some location in the lease is implied by issuance of the lease. The act of leasing does not authorize any development or use of the surface of lease lands without further application by the operator and approval by the BLM. In the future, the BLM may receive Applications for Permit to Drill (APDs) on those parcels that are leased. If APDs are received, the BLM conducts additional site-specific NEPA analysis before deciding whether to approve the APD and what conditions of approval should apply.

### B. Land Use Plan (LUP) Conformance
**LUP Name:** Price Field Office Resource Management Plan (RMP)

**Date Approved:** October 2008

1

The proposed action is in conformance with the Price Field Office RMP because it is specifically provided for in the following RMP management goals, objectives, and decisions:

### Price Field Office RMP Goal (page 123)

Provide opportunities for mineral exploration and development under the mining and mineral leasing laws subject to legal requirements to protect other resource values.

### Price Field Office RMP Goal (page 123)

Support the need for domestic energy resources by managing and conserving the mineral resources without compromising the long-term health and diversity of public lands.

### Price Field Office RMP Objective (page 123)

Manage oil and gas leasing, exploration, and development while minimizing impact to other resource values.

### Price Field Office RMP Decision MLE-5 (page 125)

The BLM has identified Land Use Plan leasing allocations for all lands within the PFO. In addition, the Proposed RMP describes specific lease stipulations (Appendix R-3) that apply to a variety of different resources including raptors, greater sage-grouse, and big game habitat, as well as program-related Best Management Practices (Appendix R-14) that may be applied on a case-by-case, site-specific basis to prevent, minimize, or mitigate resource impacts (Map R-8).

### Price Field Office RMP Decision MLE-9 (page 126)

Oil and gas leasing management will be conducted as shown on Map R-25:

- Areas open to leasing subject to the standard terms and conditions of the lease form (1,161,000 acres)

- Areas open to leasing subject to moderate constraints (timing limitations; CSU, and lease notices) (467,000 acres)

- Areas open to leasing subject to major constraints (NSO) (282,000 acres)

- Areas unavailable to lease (569,000 acres)

The combination of all restrictions on oil and gas development is shown on Map R-26.

2

**C. Identify the applicable National Environmental Policy Act (NEPA) documents and other related documents that cover the proposed action.**

Listed by name and date are all applicable NEPA documents that cover the proposed action:

- Price Field Office Resource Management Plan and Final Environmental Impact Statement (PFO RMP/FEIS) and Record of Decision (ROD)

- Price and Richfield Field Offices September 2018 Lease Sale EA DOI-BLM-UT-0000-2018-0001-EA

- Salt Lake Field Office September 2018 Lease Sale EA DOI-BLM-UT-W010-2018-0018-EA

- Price Field Office November 2015 Lease Sale EA DOI-BLM-UT-G021-2015-0031-EA

Listed by name and date are other documentation relevant to the proposed action (e.g. biological assessment, biological opinion, watershed assessment, allotment evaluation, and monitoring report):

- SLFO Wildlife Report for the September 2018 Lease Sale

**D. NEPA Adequacy Criteria**

**1. Is the new proposed action a feature of, or essentially similar to, an alternative analyzed in the existing NEPA document(s)? Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)? If there are differences, can you explain why they are not substantial?**

☒ Yes
☐ No

Documentation of answer and explanation:

The proposed action is a feature of the selected alternative analyzed in the PFO RMP/FEIS and impacts associated with oil and gas leasing were specifically analyzed in that NEPA document. Based on the ROD for the PFO RMP/FEIS, oil and gas leasing is open, but with a variety of different stipulations and notices as shown in Attachment A.

All 3 parcels under consideration for leasing are located with the analysis area of the PFO RMP/FEIS.

**2. Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new proposed action (or existing proposed action), given current environmental concerns, interests, and resource values?**

☒ Yes
☐ No

Documentation of answer and explanation:

3

The alternatives analyzed in the PFO RMP/FEIS were developed in a highly collaborative, community-based planning process. The BLM developed and analyzed five alternatives, including the No Action Alternative. These alternatives were developed as a result of public and cooperating agency input, which resulted in an adequate range of reasonable alternatives.

In the RMP EIS, the proposed action is a feature of the selected alternative. A BLM Interdisciplinary Team and the public have reviewed the proposed 3 parcels considered for leasing. No significant new information or other change in circumstances in regard to current environmental concerns, interests, or resource values has been identified that would substantially change the analysis of the new proposed action. Because no new environmental concerns or resource concerns or resource values have been identified to render previously analyzed alternatives inadequate, the existing range of alternatives is appropriate.

The No Action Alternatives in the MLP/FEIS and the RMP/FEIS were not equivalent to a "No-Leasing" alternative; however, the No Action Alternative from the September 2018 Price/Richfield and Salt Lake Field Office do constitute an equivalent analysis. The No Action Alternative allowed for the decision to range from leasing all the proposed parcels to leasing none of them, thus eliminating the need to include alternatives that would remove/defer any specific parcel or parcels.

**3. Is existing analysis adequate in light of any new information or circumstances (such as, rangeland health standards assessment; recent endangered species listings, updated list of BLM sensitive species)? Can you reasonably conclude that new information and new circumstances would not substantially change the analysis of the new proposed action?**

☒ Yes
☐ No

Documentation of answer and explanation:

The PFO RMP/FEIS was approved in 2008. This NEPA document offered adequate analysis for all resources including potential impacts to visual resources resulting from oil and gas leasing throughout the BLM Price Field Office. Changed circumstances/new information since the RMP ROD was signed include Air Quality, Climate Change, Visual Resources, Lands with Wilderness Characteristics and Pollinators. These were analyzed in the Salt Lake and Price/Richfield EAs.

No other new information or circumstances have been presented to the BLM Price Field Office relative to the nominated parcels. The analyses in the existing NEPA documents are adequate.

**4. Are the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?**

☒ Yes
☐ No

Documentation of answer and explanation:

4

The PFO RMP/FEIS and ARMPA/FEIS included a comprehensive quantitative and qualitative environmental analysis of the direct, indirect, and cumulative impacts of oil and gas leasing and development. The 3 parcels being considered for leasing are located within the planning area for these NEPA documents; therefore, the direct, indirect, and cumulative impacts resulting from the proposed action were analyzed.

### 5. Are the public involvement and interagency review associated with existing NEPA document(s) adequate for the current proposed action?

☒ Yes
☐ No

Documentation of answer and explanation:

The public involvement and interagency review procedures and findings made throughout the development of the PFO RMP/FEIS and ARMPA/FEIS are adequate for the proposed leasing of parcels nominated for the December 2018 oil and gas lease sale.

The interagency review associated with the development of the PFO RMP/FEIS was extensive. The following agencies/governments participated as cooperating agencies:

- The United States Environmental Protection Agency (EPA)
- The United States Fish and Wildlife Service (USFWS)
- The State of Utah
- Carbon County
- Emery County

Likewise, the interagency review associated with the development of the ARMPA/FEIS was thorough. Every county in the State of Utah was invited to participate as a cooperating agency, and of those, Carbon and Emery Counties (location of the proposed 3 lease parcels) accepted that invitation and had a Memorandum of Understanding signed with the BLM. Other cooperating agencies included:

- The State of Utah
- The State of Wyoming
- United States Forest Service
- Natural Resources Conservation Service (NRCS)
- United States Department of Defense
- USFWS
- Confederated Tribes of the Goshute Indian Reservation

Several other Native American Tribes and government agencies were invited, but did not accept the invitation to be cooperating agencies.

The appropriate consultations were completed with Native American Tribes, the State Historic Preservation Office and the Advisory Council on Historic Preservation, the USFWS, the EPA, and the United States Department of Defense.

5

AR005894

Additionally, during the development of each of the NEPA documents, the BLM followed all other public involvement protocols. The BLM issued news releases at various stages of the process, published Notices of Intent in the Federal Register, held public meetings, published Notices of Availability, released the Draft EISs for public comment, published Notices of Availability of the Final EISs in the Federal Register, and there were also protest periods and consistency reviews that took place.

**E. Persons/Agencies/BLM Staff Consulted:**

| Name | Title | Resource Represented |
|------|-------|----------------------|
| Natalie Fewings | Archeologist | Native American Consultation Cultural Resources |
| Myron Jeffs | Outdoor Recreation Planner | Visuals, Wilderness |
| Jake Palma | Environmental Coordinator | NEPA and Socioeconomics |
| Stephanie Bauer | Range Management Specialist | Soil, Vegetation, Farmlands |
| Mike Leschin | Geologist/Paleontology | Paleontology |
| Mike Tweddell | Range Management Specialist | Wild Horses and Burros |
| Dana Truman | Wildlife Biologist | Wildlife |
| Rebecca Anderson | Geologist | Geology and Minerals, Ground Water |
| Jarred Goodell | Hydrologist | Floodplains, Water Quality |
| Marc Johnson | Natural Resource Specialist | Reclamation |
| Stephanie Howard | Environmental Coordinator | Air Quality and Greenhouse Gas Emissions |
| Stuart Bedke | Fuels Specialist | Fire and fuels Management |
| Jason Carlile | Range Management Specialist | Livestock Grazing and Rangeland Health |
| Christine Cimiluca | Botanist | Threatened and Endangered Plants |

6

AR005895

**CONCLUSION** *(If you found that one or more of these criteria is not met, then you cannot conclude that the NEPA documentation fully covers the proposed action).*

Plan Conformance:

☒  This proposal conforms to the applicable land use plan.

☐  This proposal does not conform to the applicable land use plan

Determination of NEPA Adequacy

☒  Based on the review documented above, I conclude that this proposal conforms to the applicable land use plan and that the NEPA documentation fully covers the proposed action and constitutes BLM's compliance with the requirements of the NEPA.

☐  The existing NEPA documentation does not fully cover the proposed action. Additional NEPA documentation is needed if the project is to be further considered.

_____          2/6/2019
Signature of Project Lead                              Date

_____          2/6/19
Signature of NEPA Coordinator                      Date

_____          _____
Signature of the Responsible Official              Date

**Note:** The signed Conclusion on this Worksheet is part of an interim step in the BLM's internal decision process and does not constitute an appealable decision. However, the lease, permit, or other authorization based on this DNA is subject to protest or appeal under 43 CFR Part 4 and the program-specific regulations.

**ATTACHMENTS:**
Attachment A: Parcel List, Stipulations, and Notices
Attachment B: Stipulations and Notices
Attachment C: Maps
Attachment D: Interdisciplinary Team Checklist
Attachment E: Visual Resource Inventories (VRI) Maps

7

AR005896

**Attachment A: Parcel List, Stipulations, and Notices**

**UT1218 – 014 (UTU93643)**
T. 12 S., R. 9 E., SLM
        Sec. 21: N2, W2SW, SESW, SE, excepting RR ROW UTSL034773;
        Secs. 28 and 33: All.
1,891.40 Acres
Carbon County, Utah
Price Field Office

**Stipulations:**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-52: | NSO – Recreation and Administrative Sites |
| UT-S-97: | NSO - Fragile Soils Slopes greater than 40% |
| UT-S-101: | CSU – Fragile Soils /Slopes 20-40 percent |
| UT-S-127: | NSO –Intermittent and Perennial Streams |
| UT-S-156: | TL – High-Country Watershed Areas |
| UT-S-169: | CSU – Cultural Resource Inventories |
| UT-S-176: | CSU – Fossil Resources (Preconstruction Surveys) |
| UT-S-177: | CSU – Fossil Resources |
| UT-S-232: | TL – Mule Deer and Elk Crucial Winter Range |
| UT-S-248: | TL – Mule Deer Fawning and Elk Calving Areas |
| UT-S-257: | TL – Moose Winter Range |
| UT-S-260: | TL – Raptor Habitat |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-302: | NSO – Old Growth Pinon Pine |
| UT-S-305: | CSU – Noxious Weed |
| UT-S-343: | CSU – Fossil Resource Assessment |
| UT-S-356: | CSU – Greater Sage-Grouse Indirect Impacts from Noise |
| UT-S-357: | CSU – Greater Sage-Grouse Indirect Impact from Tall Structures |

**Notices:**

| | |
|---|---|
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plants |
| T&E-22: | Ute Ladies'-Tresses (*Spiranthes diluvialis*) |
| UT-LN-03: | Crucial Mule Deer and Elk Winter Habitat |
| UT-LN-08: | Crucial Elk Calving and Deer Fawning Habitat |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-52: | Noxious Weeds |
| UT-LN-60: | Steep Slopes |
| UT-LN-61: | Severe Soil Erosion & Steep Slopes |

**UT1218 – 016 (UTU93644)**
T. 12 S., R. 9 E., SLM
        Sec. 26: N2, W2SW, N2SE, SESE, excepting RR ROW UTSL034773;

8

Sec. 27: NE, W2NW, SENW, S2, excepting RR ROW UTSL034773;
        Sec. 34: All.
1,763.16 Acres
Carbon County, Utah
Price Field Office

**Stipulations:**

| | |
|---|---|
| UT-S-01: | Air Quality |
| UT-S-97: | NSO - Fragile Soils Slopes greater than 40% |
| UT-S-101: | CSU – Fragile Soils /Slopes 20-40 percent |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-156: | TL – High-Country Watershed Areas |
| UT-S-169: | CSU – Cultural Resource Inventories |
| UT-S-176: | CSU – Fossil Resources (Preconstruction Surveys) |
| UT-S-177: | CSU – Fossil Resources |
| UT-S-232: | TL – Mule Deer and Elk Crucial Winter Range |
| UT-S-248: | TL – Mule Deer Fawning and Elk Calving Areas |
| UT-S-257: | TL – Moose Winter Range |
| UT-S-260: | TL – Raptor Habitat |
| UT-S-285: | TL – Migratory Bird Nesting |
| UT-S-302: | NSO – Old Growth Pinon Pine |
| UT-S-305: | CSU – Noxious Weed |
| UT-S-343: | CSU – Fossil Resource Assessment |

**Notices:**

| | |
|---|---|
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05: | Listed Plants |
| T&E-22: | Ute Ladies'-Tresses (*Spiranthes diluvialis*) |
| UT-LN-03: | Crucial Mule Deer and Elk Winter Habitat |
| UT-LN-08: | Crucial Elk Calving and Deer Fawning Habitat |
| UT-LN-44: | Raptors |
| UT-LN-51: | Special Status Plants: Not Federally Listed |
| UT-LN-52: | Noxious Weeds |
| UT-LN-60: | Steep Slopes |
| UT-LN-61: | Severe Soil Erosion & Steep Slopes |

**UT1218 – 257 (UTU93713)**
T. 26 S., R. 17 E., SLM
        Sec. 5: W2SW;
        Sec. 6: S2;
        Sec. 7: All;
        Sec. 8: N2NE, W2.
1,389.50 Acres
Emery County, Utah

9

Price Field Office

**Stipulations:**

| | |
|---|---|
| UT-S-01: | Air Quality: |
| UT-S-97: | NSO - Fragile Soils Slopes greater than 40% |
| UT-S-101: | CSU – Fragile Soils /Slopes 20-40 percent |
| UT-S-127: | NSO – Intermittent and Perennial Streams |
| UT-S-160: | CSU – Visual Resources –VRM II |
| UT-S-169: | CSU--Cultural Resource Inventories |
| UT-S-176: | CSU – Fossil Resources (Preconstruction Surveys) |
| UT-S-177: | CSU – Fossil Resources |
| UT-S-260: | TL – Raptor Habitat |
| UT-S-269: | NSO – Mexican Spotted Owl Nests |
| UT-S-305: | CSU – Noxious Weed |
| UT-S-343: | CSU – Fossil Resource Assessment |

**Notices:**

| | |
|---|---|
| T&E-03: | Endangered Fish of the Upper Colorado River Drainage Basin |
| T&E-05 | Listed Plant Species |
| T&E-06: | Mexican Spotted Owl |
| T&E-11 | California Condor |
| T&E-19: | Jones Cycladenia (*Cycladenia humilis* var *jonesii*) |
| T&E-22: | Ute Ladies'-Tresses (*Spiranthes diluvialis*) |
| UT-LN-52: | Noxious Weeds |
| UT-LN-126 | Navajo Sedge |
| UT-LN-156: | Pollinators and Pollinator Habitat |

10

AR005899

## Attachment B – Stipulations and Notices
### Stipulation Summary Table

| Number | Utah Stipulations |
|---|---|
| **Cultural Resources**<br><br>**Handbook H-3120-1** | **CULTURAL RESOURCE PROTECTION**<br>This lease may be found to contain historic properties and/or resources protected under the National Historic Preservation Act (NHPA), American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, E.O. 13007, or other statutes and executive orders. The BLM will not approve any ground disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized or mitigated. |
| **Endangered Species Act**<br><br>**Handbook H-3120-1** | **THREATENED AND ENDANGERED SPECIES ACT**<br>The lease area may now or hereafter contain plants, animals or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that would contribute to a need to list such species or their habitat. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. 1531 et seq. including completion of any required procedure for conference or consultation. |
| **UT-S-01** | **AIR QUALITY**<br>All new and replacement internal combustion gas field engines of less than or equal to 300 design-rated horsepower shall not emit more than 2 grams of $NO_x$ per horsepower-hour.<br>**Exception:** This requirement does not apply to gas field engines of less than or equal to 40 design-rated horsepower.<br>**Modification:** None<br>**Waiver:** None<br>**AND**<br>All new and replacement internal combustion gas field engines of greater than 300 design rated horsepower must not emit more than 1.0 gram of $NO_x$ per horsepower-hour.<br>**Exception:** None<br>**Modification:** None<br>**Waiver:** None |
| **UT-S-52** | **NO SURFACE OCCUPANCY – RECREATION AND ADMINISTRATIVE SITES**<br>No surface occupancy within developed recreation and administrative sites including those authorized under the Recreation and Public Purpose Act.<br>**Exception:** An exception could be granted for surface disturbance that supports the recreation or administrative objectives of the site.<br>**Modification:** None<br>**Waiver:** None |
| **UT-S-97** | **NO SURFACE OCCUPANCY – FRAGILE SOILS/SLOPES GREATER THAN 40 PERCENT**<br>No surface occupancy on slopes greater than 40 percent.<br>**Exception:** If after an environment analysis the authorized officer determines that it would cause undue or unnecessary degradation to pursue other placement alternatives; surface occupancy in the area may be authorized. In addition, a plan from the operator and BLM's approval of the plan shall be required before construction and maintenance could begin. The plan would have to include:<br>• An erosion control strategy;<br>• GIS modeling;<br>• Proper survey and design by a certified engineer.<br>**Modification:** None<br>**Waiver:** None |

11

| Number | Utah Stipulations |
|---|---|
| UT-S-101 | **CONTROLLED SURFACE USE – FRAGILE SOILS/SLOPES 20-40 PERCENT**<br><br>In surface disturbing proposals regarding construction on slopes of 20 percent to 40 percent, include an approved erosion control strategy and topsoil segregation/restoration plan. Such construction must be properly surveyed and designed by a certified engineer and approved by the BLM prior to project implementation, construction, or maintenance.<br><br>**Exception:** If after an environment analysis the authorized officer determines that it would cause undue or unnecessary degradation to pursue other placement alternatives; surface occupancy in the area may be authorized. In addition, a plan from the operator and BLM's approval of the plan would be required before construction and maintenance could begin. The plan must include:<br><br>• An erosion control strategy;<br>• GIS modeling;<br>• Proper survey and design by a certified engineer.<br><br>**Modification:** Modifications also may be granted if a more detailed analysis is conducted and shows that impacts can be mitigated, e.g., Order I soil survey conducted by a qualified soil scientist, finds that surface disturbance activities could occur on slopes between 20 and 40 percent while adequately protecting areas from accelerated erosion.<br><br>**Waiver:** None |
| UT-S-127 | **NO SURFACE OCCUPANCY – INTERMITTENT AND PERENNIAL STREAMS**<br><br>No new surface disturbance (excluding fence lines) will be allowed in areas within the 100-year floodplain or 100 meters (330 feet) on either side from the centerline, whichever is greater, along all perennial and intermittent streams, streams with perennial reaches, and riparian areas.<br><br>**Exception:** The authorized officer could authorize an exception if it could be shown that the project as mitigated eliminated the need for the restriction.<br><br>An exception could be authorized if (a) there are no practical alternatives, (b) impacts could be fully mitigated, or (c) the action is designed to enhance the riparian resources.<br><br>**Modification:** None<br><br>**Waiver:** None |
| UT-S-156 | **TIMING LIMITATION – HIGH-COUNTRY WATERSHED AREAS**<br><br>High-country watershed areas (above 7,000 feet) will be closed seasonally from **December 1 to April 15.**<br><br>**Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic conditions if activities would not cause undue damage to soils or roads.<br><br>**Modification:** Season may be adjusted depending on climatic and vegetation conditions.<br><br>**Waiver:** Activities may be allowed as long as all surface disturbing activities are conducted before seasonal closure. |
| UT-S-160 | **CONTROLLED SURFACE USE – VISUAL RESOURCES - VRM II**<br><br>Within VRM II areas, surface disturbing activities will comply with BLM Manual Handbook 8431-1 to retain the existing character of the landscape.<br><br>**Exception:** Recognized utility corridors are exempt. Temporary exceedance may be allowed during initial development phases.<br><br>**Modification:** None<br><br>**Waiver:** None |
| UT-S-169 | **CONTROLLED SURFACE USE – CULTURAL RESOURCE INVENTORIES**<br><br>Cultural resources inventories (including point, area, and linear features) will be required for all federal undertakings that could affect cultural resources or historic properties in areas of both direct and indirect impacts.<br><br>**Waiver of Inventory:** Although complete Class III inventories will be performed for most land use actions, an authorized officer could waive inventory for any part of an Area of Potential Effect when one or more of the following conditions exist:<br><br>• Previous natural ground disturbance has modified the surface so extensively that the likelihood of finding cultural properties is negligible. (Note: This is not the same as being able to document that any existing sites may have been affected by surface |

12

| Number | Utah Stipulations |
|---|---|
| | disturbance; ground disturbance must have been so extensive as to reasonably preclude the location of any such sites.) |
| | • Human activity within the last 50 years has created a new land surface to such an extent as to eradicate locatable traces of cultural properties. |
| | • Existing Class II or equivalent inventory data are sufficient to indicate that the specific environmental situation did not support human occupation or use to a degree that would make further inventory information useful or meaningful. |
| | • Previous inventories must have been conducted according to current professionally acceptable standards. |
| | • Records are available and accurate and document the location, methods, and results of the inventory. |
| | • Class II "equivalent inventory data" includes an adequate amount of acreage distributed across the same specific environmental situation that is located within the study area. |
| | • Inventory at the Class III level has previously been performed, and records documenting the location, methods, and results of the inventory are available. Such inventories must have been conducted according to current professionally acceptable standards. |
| | • Natural environmental characteristics (such as recent landslides or rock falls) are unfavorable to the presence of cultural properties. |
| | • The nature of the proposed action is such that no impact can be expected on significant cultural resources. |
| | • Conditions exist that could endanger the health or safety of personnel, such as the presence of hazardous materials, explosive ordnance, or unstable structures. |
| UT-S-176 | **CONTROLLED SURFACE USE – FOSSIL RESOURCES (PRECONSTRUCTION SURVEYS)** Preconstruction paleo surveys will be required prior to any surface disturbing activity in the Morrison, Cedar Mountain, Blackhawk, North Horn, or Chinle Formations. **Exception:** The authorized officer may grant an exception if the area has previously been inventoried within the last three (3) years. **Modification:** None **Waiver:** None |
| UT-S-177 | **CONTROLLED SURFACE USE – FOSSIL RESOURCES** A BLM permitted paleontologist will be required to be onsite during surface disturbance in any Potential Fossil Yield Classification (PFYC) 4 or 5 areas. **Exceptions:** None **Modification:** None **Waiver:** None |
| UT-S-232 | **TIMING LIMITATION – MULE DEER AND ELK CRUCIAL WINTER RANGE** No surface disturbing or otherwise disruptive activities within mule deer and elk crucial winter range from **December 1 to April 15**. **Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or range conditions if certain criteria are met and if activities would not cause undue stress to deer and/or elk populations or habitats. **Modification:** Season may be adjusted depending on climatic and range conditions. **Waiver:** A waiver may be granted if the winter range habitat is unsuitable for or unoccupied during winter months by deer/elk and there is no reasonable likelihood of future winter range use. |
| UT-S-248 | **TIMING LIMITATION – MULE DEER FAWNING AND ELK CALVING AREAS** No surface disturbing or otherwise disruptive activities within mule deer fawning and elk calving areas from **May 15 to July 5**. **Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or range conditions if certain criteria are met and if activities would not cause undue stress to deer and elk populations or habitats. |

13

| Number | Utah Stipulations |
|---|---|
| | **Modification:** Season may be adjusted depending on climatic and range conditions. |
| | **Waiver:** A waiver may be granted if the fawning and calving habitat is unsuitable or unoccupied by deer/elk and there is no reasonable likelihood of future use. |
| UT-S-257 | **TIMING LIMITATION – MOOSE WINTER RANGE** |
| | No surface disturbing or otherwise disruptive activities within moose winter range from **December 1 to April 15.** |
| | **Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or range conditions if certain criteria are met and if activities would not cause undue stress to moose populations or habitats. |
| | **Modification:** Season may be adjusted depending on climatic and range conditions. |
| | **Waiver:** A waiver may be granted if the winter range habitat is unsuitable or unoccupied during winter months by moose and there is no reasonable likelihood of future winter range use. |
| UT-S-260 | **TIMING LIMITATION – RAPTOR HABITAT** |
| | Raptor nesting complexes and known raptor nest sites will be closed seasonally from **February 1 to July 15** within ½ mile of occupied nests. |
| | **Exception:** The authorized officer may grant an exception if the raptor nest in question is deemed to be inactive by May 31 and if the proposed activity would not result in a permanent structure or facility that would cause the subject nest to become unsuitable for nesting in future years. |
| | **Modification:** Season may be adjusted depending on climatic and range conditions. Distance may be adjusted if natural features provide adequate visual screening. |
| | **Waiver:** This stipulation may be waived if, in cooperation with the UDWR, it is determined that the site has been permanently abandoned or unoccupied for a minimum of 3 years. |
| UT-S-269 | **NO SURFACE OCCUPANCY – MEXICAN SPOTTED OWL NESTS** |
| | No surface occupancy within 1/2 mile of known Mexican Spotted Owl (MSO) nests. |
| | **Exception:** The authorized officers may grant an exception if an environmental analysis demonstrates that the action would not impair the function or utility of the site for nesting or other owl-sustaining activities. |
| | **Modification:** The authorized officers may modify the NSO area in extent if an environmental analysis finds that a portion of the area is nonessential to site utility or function or if natural features provide adequate visual or auditory screening. |
| | **Waiver:** A waiver may be granted if the MSO is de-listed and the area is determined as not necessary for the survival and recovery of the MSO. |
| UT-S-285 | **TIMING LIMITATION – MIGRATORY BIRD NESTING** |
| | Migratory bird nesting areas will be closed seasonally from **April 15 to August 1.** Areas with migratory birds designated as BLM Special Status Species will have the highest priority. |
| | **Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or habitat conditions if activities would not cause undue stress to migratory bird populations. |
| | **Modification:** Season may be adjusted depending on climatic and range conditions. Distance may be adjusted if natural features provide adequate visual screening. |
| | **Waiver:** None |
| UT-S-302 | **NO SURFACE OCCUPANCY – OLD GROWTH PINION PINE** |
| | No surface occupancy within the 160 acres containing old growth pinion pines. |
| | **Exception:** None |
| | **Modification:** None |
| | **Waiver:** None |
| UT-S-305 | **CONTROLLED SURFACE USE – NOXIOUS WEED** |
| | Continue implementation of noxious weed and invasive species control actions in accordance with national guidance and local weed management plans, in cooperation with State, federal, affected counties, adjoining private land owners, and other partners or interests directly affected. Implement Standard Operating Procedures and Mitigation Measures for herbicide use as well as prevention measures for noxious and invasive plants identified in the Record of |

14

AR005903

| Number | Utah Stipulations |
|--------|-------------------|
| | Decision Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States PEIS and associated documents. |
| | **Exception**: None |
| | **Modification**: None |
| | **Waiver**: None |
| UT-S-343 | **CONTROLLED SURFACE USE – FOSSIL RESOURCE ASSESSMENT** |
| | An assessment of fossil resources would be required on a case-by case basis, mitigating as necessary before and/or during surface disturbance. |
| | **Exception**: The AO may grant an exception if the area has previously been inventoried and an assessment completed. |
| | **Modification**: None |
| | **Waiver**: None |
| UT-S-356 | **CONTROLLED SURFACE USE – INDIRECT IMPACTS FROM NOISE** |
| | Areas outside of Priority Habitat Management Areas (PHMA), portions of the State of Utah's opportunity areas within 4 miles of a lek that is located within PHMA will be subject to the following constraints: |
| | Limit noise from discrete anthropogenic disturbances (during construction, operation, or maintenance) so it will not exceed 10 decibels above ambient sound levels (baseline as available at the signing of the GRSG RMP Amendment ROD or as first measured thereafter) at occupied leks within PHMA from 2 hours before to 2 hours after official sunrise and sunset during breeding season (e.g., while males are strutting); |
| | **AND** |
| | Limit project related noise in other PHMA habitats and seasons where it would be expected to reduce functionality of habitats that support associated GRSG populations in order to protect GRSG from indirect disturbance near leks within PHMA. |
| | **Exception**: None |
| | **Modification**: As additional research and information emerges, specific new limitations appropriate to the type of projects being considered would be evaluated and appropriate measures would be implemented where necessary to minimize potential for noise impacts on PHMA GRSG population behavioral cycles. |
| | **Waiver**: None |
| UT-S-357 | **CONTROLLED SURFACE USE – INDIRECT IMPACTS FROM TALL STRUCTURES** |
| | Areas outside of Priority Habitat Management Areas (PHMA), portions of the State of Utah's opportunity areas within 4 miles of a lek that is located within PHMA will be subject to the following constraints: |
| | Limit the placement of permanent tall structures** adjacent to breeding and nesting habitats to minimize placement of structures that introduce new perching and/or nesting opportunities for avian predators. |
| | **Exception**: None |
| | **Modification**: None |
| | **Waiver**: None |
| | **For the purposes of this restriction, a tall structure is any man-made structure that provides for perching/nesting opportunities for predators (e.g., raptors and ravens) that are naturally absent, or that decreases the use of an area by GRSG. A determination as to whether something is considered a tall structure will be made based on local conditions such as existing vegetation or topography. |

## Notice Summary Table

| Number | Utah Lease Notices |
|--------|--------------------|
| T&E-03 | **ENDANGERED FISH OF THE UPPER COLORADO RIVER DRAINAGE BASIN**<br>The Lessee/Operator is given notice that the lands in this parcel contain Critical Habitat for the Colorado River fish (bonytail, humpback chub, Colorado pike minnow, and razorback |

15

AR005904

| Number | Utah Lease Notices |
|---|---|
| | sucker) listed as endangered under the Endangered Species Act, or these parcels have watersheds that are tributary to designated habitat. Critical habitat was designated for the four endangered Colorado River fishes on March 21, 1994(59 FR 13374-13400). Designated critical habitat for all the endangered fishes includes those portions of the 100-year floodplain that contain primary constituent elements necessary for survival of the species. Avoidance or use restrictions may be placed on portions of the lease. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following:<br><br>1. Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All surveys must be conducted by qualified individual(s).<br>2. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br>3. Water production will be managed to ensure maintenance or enhancement of riparian habitat.<br>4. Avoid loss or disturbance of riparian habitats.<br>5. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.<br>6. Conduct watershed analysis for leases in designated critical habitat and overlapping major tributaries in order to determine toxicity risk from permanent facilities.<br>7. Implement Appendix B (Hydrologic Considerations for Pipeline Crossing Stream Channels, Technical Note 423).<br>8. Drilling will not occur within 100 year floodplains of rivers or tributaries to rivers that contain listed fish species or critical habitat.<br>9. In areas adjacent to 100-year flood plains, particularly in systems prone to flash floods, analyze the risk for flash floods to impact facilities, and use closed loop drilling, and pipeline burial or suspension according to Appendix B (Hydrologic Considerations for Pipeline Crossing Stream Channels, Technical Note 423, to minimize the potential for equipment damage and resulting leaks or spills.<br><br>Water depletions from *any* portion of the Upper Colorado River drainage basin above Lake Powell are considered to adversely affect or adversely modify the critical habitat of the four resident endangered fish species, and must be evaluated with regard to the criteria described in the Upper Colorado River Endangered Fish Recovery Program. Formal consultation with USFWS is required for all depletions. All depletion amounts must be reported to BLM.<br><br>Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| UT-LN-03 | **CRUCIAL MULE DEER AND ELK WINTER HABITAT**<br><br>The lessee/operator is given notice that the area has been identified as containing crucial mule deer and elk winter habitat. Exploration, drilling and other development activities may be restricted from December 1 through April 15. Modifications including seasonal restrictions may be required to the Surface Use Plan of Operations in order to protect the winter habitat. This limitation does not apply to operation and maintenance of producing wells. |
| UT-LN-08 | **CRUCIAL ELK CALVING AND DEER FAWNING HABITAT**<br><br>The lessee/operator is given notice that lands in this lease have been identified as containing crucial elk calving or deer fawning habitat. Exploration, drilling and other development activities may be restricted from May 15 through July 5 to protect calving / fawning. Modifications may be required in the Surface Use Plan of Operations including seasonal timing restrictions to protect the species and its habitat. |
| UT-LN-44 | **RAPTORS**<br><br>Appropriate seasonal and spatial buffers shall be placed on all known raptor nests in |

16

| Number | Utah Lease Notices |
|--------|--------------------|
|  | accordance with Utah Field Office Guidelines for Raptor Protection from Human and Land use Disturbances (USFWS 2002) and Best Management Practices for Raptors and their Associated Habitats in Utah (BLM 2006). All construction related activities will not occur within these buffers if pre-construction monitoring indicates the nests are active, unless a site-specific evaluation for active nests is completed prior to construction and if a BLM wildlife biologist, in consultation with USFWS and UDWR, recommends that activities may be permitted within the buffer. The BLM will coordinate with the USFWS and UDWR and have a recommendation within 3-5 days of notification. Any construction activities authorized within a protective (spatial and seasonal) buffer for raptors will require an on-site monitor. Any indication that activities are adversely affecting the raptor and/or its' young the on-site monitor will suspend activities and contact the BLM Authorized Officer immediately. Construction may occur within the buffers of inactive nests. Construction activities may commence once monitoring of the active nest site determines that fledglings have left the nest and are no longer dependent on the nest site. Modifications to the Surface Use Plan of Operations may be required in accordance with section 6 of the lease terms and 43CFR3101.1-2. |
| UT-LN-51 | **SPECIAL STATUS PLANTS: NOT FEDERALLY LISTED**<br>The lessee/operator is given notice that lands in this lease have been identified as containing special status plants, not federally listed, and their habitats. Modifications to the Surface Use Plan of Operations may be required in order to protect the special status plants and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2. |
| UT-LN-52 | **NOXIOUS WEEDS**<br>The lessee/operator is given notice that lands in this lease have been identified as containing or is near areas containing noxious weeds. Best management practices to prevent or control noxious weeds may be required for operations on the lease. |
| UT-LN-60 | **STEEP SLOPES**<br>The lessee/operator is given notice that this lease has been identified as containing steep slopes. No surface use or otherwise disruptive activity allowed on slopes in excess of 30 percent without written permission from the Authorized Officer. Modifications to the Surface Use Plan of Operations may be required in accordance with section 6 of the lease terms and 43CFR3101.1-2. |
| UT-LN-61 | **SEVERE SOIL EROSION & STEEP SLOPES**<br>The lessee/operator is given notice that the lands in this lease have been identified as having critical to severe soil erosion conditions and slopes exceeding 40%. The authorized officer may prohibit surface disturbing activities during wet and muddy periods to minimize watershed damage. Modifications to the Surface Use Plan of Operations may also be required. This limitation does not apply to operation and maintenance of producing wells. |
| UT-LN-126 | **NAVAJO SEDGE**<br>In areas that contain habitat for Navajo sedge, actions will be avoided or restricted if that area is known or suspected to be habitat for Navajo sedge and the action may cause stress or disturbance to the plant.<br>The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage.<br>1. Site inventories: a. Must be conducted to determine habitat suitability, b. Are required in known or potential habitat for all areas proposed for surface disturbance prior to initiation of project activities, at a time when the plant can be detected, and during appropriate flowering periods, c. Documentation should include, but not be limited to individual plant locations and suitable habitat distributions, and d. All surveys must be conducted by qualified individuals.<br>2. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br>3. Project activities must be designed to avoid direct disturbance to populations and to |

17

| Number | Utah Lease Notices |
|--------|-------------------|
| | individual plants: |

individual plants:

  a. Designs will avoid concentrating water flows or sediments into plant occupied habitat.
  b. Construction will occur down slope of plants and populations where feasible; if well pads and roads must be sited upslope, buffers of 100 feet minimum between surface disturbances and plants and populations will be incorporated.
  c. Where populations occur within 200 ft. of well pads, establish a buffer or fence the individuals or groups of individuals during and post-construction.
  d. Areas for avoidance will be visually identifiable in the field, e.g., flagging, temporary fencing, rebar, etc.
  e. For surface pipelines, use a 100 foot buffer from any plant locations:
  f. If on a slope, use stabilizing construction techniques to ensure the pipelines don't move towards the population.

4. For riparian/wetland-associated species, e.g. Navajo Sedge, avoid loss or disturbance of riparian habitats: a. Ensure that water extraction or disposal practices do not result in change of hydrologic regime.

5. Limit disturbances to and within suitable habitat by staying on designated routes.

6. Limit new access routes created by the project.

7. Place signing to limit ATV travel in sensitive areas.

8. Implement dust abatement practices near occupied plant habitat.

9. All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area.

10. Post construction monitoring for invasive species will be required.

11. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in plant habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.

Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA.

**Pollinators and Pollinator Habitat**

In order to protect pollinators and pollinator habitat, in accordance with BLM policy outlined in Instruction Memorandum No. 2016-013, Managing for Pollinators on Public Lands, and Pollinator-Friendly Best Management Practices for Federal Lands (2015), the following avoidance, minimization, and mitigation measures would apply to this parcel:

1. Give a preference for placing well pads in previously disturbed areas, dry areas that do not support forbs, or areas dominated by nonnative grasses.

2. Utilize existing well pads where feasible.

3. Avoid disturbance to native milkweed patches within Monarch migration routes to protect Monarch butterfly habitat.

4. Avoid disturbance of riparian and meadow sites, as well as small depressed areas that may function as water catchments and host nectarproducing species, to protect Monarch butterfly habitat and nectaring sites.

**UT-LN-156**

5. Minimize the use of pesticides that negatively impact pollinators.

6. During revegetation treatments:

a. Use minimum till drills where feasible.

b. Include pollinator-friendly site-appropriate native plant seeds or seedlings in seed mixes.

c. Where possible, increase the cover and diversity of essential habitat components for native pollinators by:

  • Using site-appropriate milkweed seeds or seedlings within Monarch migration routes through priority sage-grouse habitat.
  • Using seed mixes with annual and short-lived perennial native forbs that will bloom the first year and provide forage for pollinators.
  • Using seed mixes with a variety of native forb species to ensure different colored and shaped flowers to provide nectar and pollen throughout the growing season for a variety of pollinators.

AR005907

| Number | Utah Lease Notices |
|--------|--------------------|
|  | • Seeding forbs in separate rows from grasses to avoid competition during establishment.<br>Avoiding seeding non-native forbs and grasses that establish early and out compete slower-growing natives. |

19

AR005908

**Attachment C – Maps**



20

AR005909



21

AR005910

## Attachment D – ID Team Checklist

RESOURCES AND ISSUES CONSIDERED (INCLUDES SUPPLEMENTAL AUTHORITIES APPENDIX 1 H-1790-1)

Project Title: December 2018 Gas Lease Sale

NEPA Log Number: DOI-BLM-UT-G020-2018-0057-DNA

Project Leader: Marc Johnson

DETERMINATION OF STAFF: *(Choose one of the following abbreviated options for the left column)*
NP = not present in the area impacted by the proposed or alternative actions
NI = present, but not affected to a degree that detailed analysis is required
PI = present with potential for relevant impact that need to be analyzed in detail in the EA
NC = (DNAs only) actions and impacts not changed from those disclosed in the existing NEPA documents cited in
Section D of the DNA form. The Rationale column may include NI and NP discussions.

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| NC | Air Quality & Greenhouse Gas Emissions | No emissions would occur from leasing. However future development would result in emissions that may impact air quality as described in the 2015 and 2018 lease sale EAs for the Price area. Effective August 2018, the EPA has determined that both Carbon and Emery Counties are in attainment of the ozone NAAQS. The existing NEPA analysis is sufficient for leasing purposes to disclose potential future impacts to air quality, and the air quality lease stipulation is sufficient to minimize potential future impacts. GHG emissions from future development would occur as described in the 2018 lease sale EA. The existing NEPA analysis is sufficient for leasing purposes to disclose potential future impacts from GHG emissions to climate change, and the air quality lease stipulation would be sufficient to minimize potential future impacts. | Stephanie Howard | 8/22/18 |
| NC | BLM natural areas | The Price Field Office RMP and GIS map layers were reviewed. There are no natural areas identified in the proposed lease sale area. The existing NEPA analysis is sufficient. | Myron Jeffs | 6/27/18 |
| NI | Cultural: Archaeological Resources | The sale of a lease does not authorize any surface disturbing activities, including development of specific well pads or other oil and gas facilities. Future undertakings associated with oil and gas development on any leases sold will be analyzed through separate site specific National Environmental Policy Act actions.<br><br>In accordance with Title 36 Code of Federal Regulations Chapter VIII Part 800, the BLM will not approve any ground disturbing activities that have the potential to cause effects on historic properties until the areas | Natalie Fewings | 8/21/2018 |

22

AR005911

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | of potential effect have been analyzed and processed according to Section 106 of the National Historic Preservation Act and related authorities.<br><br>The BLM may require modifications to exploration and development proposals to protect historic properties, or disapprove any activity that is likely to result in adverse effect to historic properties that cannot be successfully avoided, minimized, or mitigated. | | |
| NI | Cultural: Native American Religious Concerns | Tribal consultation letters were sent by certified mail to the appropriate tribal representatives on June 25, 2018. The letters contained a project description, schedule, location maps, and legal descriptions of the offered parcels. The letters requested comments and concerns be submitted by July 25, 2018. The Hopi Tribe responded, requesting a copy of the Class I review and draft EA for comment (Koyiyumptewa, letter correspondence, July 16, 2018). It was also requested the sale be cancelled due to concerns related to a previous oil and gas lease sale in the Moab Field Office. The Utah BLM State Office responded to this request (Roberson, letter correspondence, July 23, 2018). | Natalie Fewings | 8/21/2018 |
| NC | Designated Areas: National Historic Trails | The Price Field Office RMP and GIS map layers were reviewed. There are no designated historic trails identified in the proposed lease sale area. The existing NEPA analysis is sufficient. | Myron Jeffs | 6/27/18 |
| NC | Designated Areas: Areas of Critical Environmental Concern | The Price Field Office RMP and GIS map layers were reviewed. There are designated ACECs identified in the proposed lease sale area. The existing NEPA analysis is sufficient. | Myron Jeffs | 6/27/18 |
| NC | Designated Areas: Wild and Scenic Rivers | The Price Field Office RMP and GIS map layers were reviewed. There are no wild and scenic rivers identified in the proposed lease sale area. The existing NEPA analysis is sufficient. | Myron Jeffs | 6/27/18 |
| NC | Designated Areas: Wilderness Study Areas | The Price Field Office RMP and GIS map layers were reviewed. There are no wilderness study areas identified in the proposed lease sale area. Parcel 257 borders Horseshoe Canyon North WSA for roughly 3 miles, but there is no overlap. The existing NEPA analysis is sufficient. | Myron Jeffs | 6/27/18 |
| NC | Environmental Justice | Based on the results of the socioeconomic and environmental impact analysis conducted for the Environmental Impact Statement for the Price Field Office Resource Management Plan, it can be concluded that those persons who reside in and around the PFO would bear some effects from the proposed action; however, any identified socioeconomic or | Jake Palma | 9/24/2018 |

23

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | environmental impacts from the proposed action would not be localized nor placed primarily on the identified minority and/or low income population components. Therefore, implementation of any of the proposed action would be in compliance with Executive Order 12898. See Section 4.6 of the FEIS for the RMP for more details. | | |
| NP | Farmlands (prime/unique) | According to the NRCS soil survey and knowledge of the soils, there are no prime/unique farmlands within the project area. | Stephanie Bauer | 4/26/18 |
| NC | Fuels/Fire Management | Proposal would not affect any current fire and fuels management activities. Future impacts would be negligible. Follow current fire restrictions. | Stuart Bedke | 9 JULY 2018 |
| NC | Geology / Minerals / Energy Production | The 2008 RMP FEIS adequately addresses the impacts of oil and gas leasing. Oil and gas exploration could lead to an increased understanding of the geologic setting, as subsurface data obtained through lease operations may become public record. This information promotes an understanding of mineral resources as well as geologic interpretation. Depending on the success of future oil and gas drilling, non-renewable oil and/or natural gas may be extracted from productive wells and delivered to market. Production of oil and/or gas would result in the irretrievable loss of these resources. While conflicts could arise between oil and gas operations and other mineral operations, these could generally be mitigated under the regulations 3101.1-2, where proposed oil and gas operations may be moved up to 200 meters or delayed by 60 days and also under the standard lease terms (Sec. 6) where siting and design of facilities may be modified to protect other resources. There no known locatable, salable or leasable minerals within this block. Again, O&G development can generally be accomplished in concert with multiple land uses. | Rebecca Anderson | 9/24/18 |
| NC | Invasive Plants / Noxious Weeds | Surface disturbing activities have the potential to introduce/spread invasive species/noxious weeds. Salt cedar, Russian olive, black henbane, musk thistle, hoary cress, perennial pepperweed, houndstongue, Dyer's woad, Canada thistle, Scotch thistle and Russian knapweed are noxious weeds within the project boundaries. These species are scattered throughout the project areas. Not all species occur in every location, however several of these species occur together. Halogeton, Russian thistle and cheatgrass are invasive species located within the project boundaries. These species are located mainly along roads and two-tracks, fence lines, fire scars and other disturbed | Stephanie Bauer | 6/29/18 |

24

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | areas. Leasing of parcels is an administrative action and will have no effect. Site-specific analysis along with mitigation, BOPs and stipulations addressing above listed invasive specces/noxious weeds will occur at the APD stage if these leases are sold. | | |
| NC | Lands/Access | The analysis contained in the Price RMP FEIS adequately addresses the impacts to Lands and Access. | Connie Leschin | 4/23/18 |
| NC | Lands with Wilderness Characteristics | The Price Field Office Resource Management Plan/Final Environmental Impact Statement (PFO RMP/FEIS) considered and analyzed 6 alternatives. These alternatives were developed to consider a range of management options and evaluate the potential impacts on resources in the PFO that might occur as a result of management decisions. The range of alternatives consisted of giving mineral resource development priority over all other uses and resource considerations to protecting, preserving, and maintaining the wilderness characteristics of all non-WSA lands found to have wilderness characteristics, including closing these areas to mineral leasing. See the PFO RMP/FEIS, pages 2-1 through 2-11, for a more detailed description of the alternatives.

Because of this range of alternatives, the PFO RMP/FEIS thoroughly discusses impacts to lands with wilderness characteristics. Those impacts are discussed in three categories: "1) impacts to all non-WSA lands with wilderness characteristics; 2) impacts to non-WSA lands not managed for protection of wilderness characteristics; and 3) impacts to non-WSA lands managed for protection of wilderness characteristics" (Page 4-173). The impacts of oil and gas development are disclosed and discussed throughout pages 4-173 to 4-213 of the PFO RMP/FEIS. In general, the PFO RMP/FEIS recognized that oil and gas development could result in a loss of natural appearance and quality of the opportunities for solitude and primitive recreation. Additionally, the PFO RMP/FEIS states, "Because mineral-related disturbances would be reclaimed, the loss of wilderness characteristics would be temporary for the life of the projects but would not be irreversible because natural appearance can be restored" (Page 4-176).

Under the 2008 RMP, only a portion of parcel 257 was within an area identified to have wilderness characteristics. Furthermore, this area was not identified in the RMP to be managed to protect, preserve, and maintain | Jake Palma | 1/30/2019 |

25

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | its wilderness characteristics. Even though a more recent lands with wilderness characteristics inventory was completed in 2016, which identified the entirety of parcel 257 as having wilderness characteristics (Labyrinth Canyon Unit B), potential impacts that could result from oil and gas development have been disclosed and analyzed in the PFO RMP/FEIS as described above. | | |
| NC | Livestock Grazing | Standard operating procedures, best management practices and site specific mitigation applied at the APD stage as conditions of approval will address livestock grazing resource issues not already analyzed in the Price RMP.<br><br>Any range improvements such as fences and cattle-guards that would be affected would be replaced or repaired by the applicant. The applicant would replace any barriers to livestock that are removed through field development. AUMs could be lost depending on where development would occur which was anticipated in the RMP vol. 2, 4-230 and 4-241. This could affect two permittees and three allotments at the APD stage.<br><br>Leasing will not have an impact to livestock grazing at this time because no ground disturbance will occur. If development of the leased parcels occur then site specific analysis needs to be completed prior to ground disturbance. | Jason Carlile | 7/9/18 |
| NC | Paleontology | Lease parcels 014 and 016 have surface exposures of North Horn Formation, a Potential Fossil Yield Classification 4 formation. The RMP adequately describes how to proceed in those circumstances. | Michael Leschin | 6.19.2018 |
| NC | Plants: BLM Sensitive | Suitable habitat for the following UT BLM Sensitive plant species is present in the proposed lease parcels, per review of BLM special status plant species data, habitat models, and physical / biological characteristics of proposed parcels (geology, soils, elevation, plant communities, etc.):<br>• Entrada Rushpink (*Lygodesmia grandiflora var. entrada*)<br>• Flat-top Buckwheat (*Eriogonum smithii*)<br>• Psoralea globemallow (*Sphaeralcea psoraloides*)<br>• Trotter's oreoxis (*Oreoxis trotteri*)<br>• Horse Canyon Stickleaf/ Bookcliffs Blazingstar (*Mentzelia multicaulis var. librina*) | Christine Cimiluca | 8/22/18 |

26

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | The PFO RMP adequately addresses BLM Sensitive plant species. Lease notice UT-LN-51 Sensitive Plants, would be applied to the following parcels: 014, 016, and 257. | | |
| NC | Plants: Threatened, Endangered, Proposed, or Candidate | Suitable habitat for threatened, endangered, candidate, or proposed (TECP) plant species may be present in the project area, per review of special status plant data, and habitat models. The PFO RMP adequately addresses listed, proposed, and candidate plant species. The following lease stipulations and /or notices would be applied: T & E 05 – Listed plant species, to all parcels T & E 22 – Ute ladies'-tresses (*Spiranthes diluvialis*), to all parcels T&E-19: Jones Cycladenia (*Cycladenia humilis* var. *jonesii*), to parcel 257 Lease notice UT-LN-126- Navajo Sedge would be applied to the following parcel: 257. | Christine Cimiluca | 8/22/18 |
| NC | Pollinators | The analysis in the Price/Richfield September 2018 Oil and Gas Lease Sale EA and the addition of LN 156 to parcel 257 is adequate to address pollinators. | Marcia Wineteer | 10.25.18 |
| NC | Rangeland Health Standards | Water quality, soils, vegetation, Threatened & Endangered Species habitat and other components of ecological conditions that are considered in Rangeland Health Standards and Guides have been analyzed in the Price RMP. Given the degree of anticipated exploration and development and application of standard operating procedures, best management practices and mitigation applied at the APD stage as conditions of approval, it is concluded that Rangeland Health Standards would continue to be met. | Jason Carlile | 7/9/18 |
| NC | Recreation | The analysis conducted in the 2008 Price Field Office RMP and associated FEIS is sufficient for this action. Parcel 014 is identified for lease that directly overlaps Price Canyon Recreation Area. Price Canyon Recreation Area includes a large fee-based campground complete with expanded amenities, vault toilet facilities, a potable water system, an overlook, a trailhead to the Ford Ridge hiking trail, and large group areas. However, the Price Field Office RMP/FEIS identifies this areas as No Surface Occupancy for fluid mineral leasing. Parcel 257 is partially located within the Labyrinth Canyon Special Recreation Management Area (SRMA). The Price Field Office Resource Management Plan does not provide any specific stipulations specific for the protection of recreation resources in the Labyrinth Canyon SRMA. However, there | Myron Jeffs Jake Palma | 6/27/18 1/30/2019 |

27

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | are some overlapping protections resulting from stipulations like Controlled Surface Use in areas with a Visual Resource Management Class II. Furthermore, the Price Field Office RMP recognized that oil and gas leasing and development could impact recreation resources. Those impacts are discussed and analyzed on page 4-269 of the Price Field Office RMP/Final Environmental Impact Statement (FEIS). The FEIS discusses impacts to recreation in each of the following leasing categories: <br><br> • Open with standard terms and conditions <br> • Open to leasing subject to minor constraints (timing limitations, controlled surface use) <br> • Open to leasing with major constraints (no surface occupancy) <br> • Unavailable to leasing <br><br> Parcel 257 has a variety of stipulations, with some locations on the parcel being subject to standard terms and conditions, timing limitations, controlled surface use, and/or no surface occupancy. <br><br> The above-mentioned disclosure and analysis of potential environmental impacts to recreation was completed for a range of alternatives in the Price Field Office RMP/FEIS. Alternative A gave mineral resource development priority over all other uses and resource considerations to the extent possible. Alternative E completely withdrew Labyrinth Canyon SRMA from mineral leasing or development. Therefore, the Price Field Office RMP/FEIS analysis of impacts to recreation resources is sufficient for the leasing of parcel 257. | | |
| NC | Socio-Economics | The direct, indirect, and cumulative impacts to socioeconomics from oil and gas leasing was considered in detail in the Environmental Impact Statement for the Price Field Office Resource management Plan throughout Section 4.6 and 4.7. In general, the analysis discuss direct economic benefits from oil and gas development, indirect economic activity from electricity generation, transportation, and other services, resource conflicts, and the quality of life in the surrounding communities resulting from oil and gas development. | Jake Palma | 9/24/2018 |
| NC | Soils: Physical / Biological | The soils within lease units are currently semi-stable with current vegetation growing. Removing the vegetation will expose the soils and the soils could become unstable. | Stephanie Bauer | 9/10/18 |

28

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | The soils could become unstable due to steep slopes with large precipitation events. Lease parcel 257 is within fragile soils, which are highly prone to erosion and have a low potential for reclamation. Leasing however, will not have any effect on soils as that is an administration action. Other stipulations would be required at the APD stage. | | |
| NC | Vegetation | Selling the lease parcels is not a surface disturbing activity, and therefore would not result in impacts to vegetation. The analysis in the 2008 RMP is adequate for the leasing process. A more site-specific analysis will be conducted at the APD stage for the effects on vegetation with the drilling process. | Jason Carlile | 7/9/18 |
| NC | Visual Resources | The parcels, or portions thereof, that are on BLM are comprised of roughly 20% VRM III and 80% VRM IV. The management objective for class III is to partially retain the existing character of the landscape, where the level of change to the landscape should be moderate. For class IV, the objective is to provide for management activities that may require major modification of the existing character of the landscape.<br><br>The parcels are located within Scenic Quality Rating Units 3, 3A, 4, and 48. The narratives of those units describe the area as "...numerous finger ridges and drainages that flow ... to the Price River canyon. Landforms are generally large but gently sloping with steeper slopes in drainages and river canyon (*p. A4*). Vegetation is predominantly sage with stands of aspen, evergreens, maples, and oak on slopes and in drainages (*p. A5*). This unit includes sage and agriculture in a bench area that transitions between formations in the Book Cliffs. Some agriculture use adds to the setting. Some small areas of aspen extend down the hills..." (*p. A159*). The ratings for these units varied from a score of 12 to 19. These scores result in the majority of the parcels receiving a B quality scenery rating, while a small portion near Highway 6 and the county line received a quality rating of A. The units received high scores for landform, color, and adjacent scenery.<br>Based solely on these scenic values, the 2011 VRI identified the BLM portions of these parcels as roughly 90% inventory class II and 10% inventory class III. These inventory classes are for informational purposes, and identified prior to management consideration of other resource uses and allocations. See Maps, Appendix D | Myron Jeffs | 9/19/18 |
| NC | Wastes (hazardous/solid) | Impacts to resources is not anticipated because of implementing management | Jake Palma | 9/24/2018 |

29

AR005918

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | actions for hazardous materials and waste as identified in the Environmental Impact Statement and the Approved Price Field Office RMP.<br><br>No impacts on hazardous material and waste as a result of management of other resources, resource uses, or support programs would occur under any alternative because of strict federal regulation of management of hazardous materials, substances, and waste; PFO and national contingency plans; BLM policy on hazardous waste disposal; and continued coordination with federal and State partners regarding hazardous materials and waste issues. | | |
| NC | Water: Groundwater Quality | The lease parcels do not occur within any Sole Source Aquifers or Drinking Water Source Protection Zones (DWSPZs). Compliance with IM UT 2010-055 would be completed prior to APD approval. Maintenance and refueling of equipment could impact water quality. However, standard protocols would minimize possibility of releases. Drill holes will be cased to an elevation below 5800 feet or when groundwater is encountered. No surface disturbance or occupancy would be maintained within 660 feet of any natural springs to protect the water quality of the spring. No new disturbance will be allowed in areas equal to the 100-year floodplain or 100 meters on either side of the center line of any stream, stream reach, or riparian area. At the time of development, drilling operators will conform to the provisions of the operational regulations and Onshore Oil & Gas Order Number 2, which requires the protection and isolation of all useable quality waters. High-country watershed areas would be closed seasonally from December 1 to April 15 to surface disturbing activity at elevations above 7,000 feet.<br>All soils with high erosion potential need care to prevent accelerated erosion that could be transported to streams that are already listed on the 303d list. This will be accomplished by careful placement of drill pads and access routes. Regular maintenance on roads and pads in highly erosive soils will be required. | Rebecca Anderson | 9/24/18 |
| NI | Water: Hydrologic Conditions (stormwater) | Leasing would not, by itself, authorize any ground disturbances which could affect Hydrologic Conditions. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. However, any | Jerrad Goodell | 08/21/2018 |

30

AR005919

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
|  |  | development proposal on the leases would be subject to the standard lease terms, and all applicable laws, regulations and onshore orders in existence at the time of lease issuance. The before mentioned conditions along with the stipulations applied in the Water: Streams portion of this document keep impacts to this resource negligible, therefore detailed analysis is not required. |  |  |
| NI | Water: Municipal Watershed / Drinking Water Source Protection | Leasing would not, by itself, authorize any ground disturbances which could affect municipal watershed / drinking water source protection zones. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. | Jerrad Goodell | 08/22/2018 |
| NI | Water: Steams, Riparian Wetlands, Floodplains | Leasing would not, by itself, authorize any ground disturbances which could affect these resources. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. However, any development proposal on the leases would be subject to the standard lease terms, and all applicable laws, regulations and onshore orders in existence at the time of lease issuance. The before mentioned conditions along with stipulation UT-S-127 applied to a parcels and UT-S-126 applied to parcels with springs will protect these resources, therefore detailed analysis is not required. | Jerrad Goodell | 06/25/2018 |
| NI | Water: Surface Water Quality | Leasing would not, by itself, authorize any ground disturbances which could contribute runoff affecting surface water quality. Site-specific analysis would be required prior to the approval of any ground disturbance proposal on the leases. The company must adopt a spill prevention plan and storm water control plan to control any potential pollutants from reaching the surface water. Any development proposal on the leases would be subject to the standard lease terms, and all applicable laws, regulations and onshore orders in existence at the time of lease issuance. The before mentioned conditions along with the stipulations and notices applied for floodplain and riparian will protect surface water quality, therefore detailed analysis is not required. | Jerrad Goodell | 08/21/2018 |
| NI | Water: Water Rights | Leasing by itself would not authorize any project development which could impact water rights. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. However, any development proposal on the leases would be subject to the standard lease terms, and all applicable laws, regulations and onshore orders in existence at the time of lease issuance. | Jerrad Goodell | 08/21/2018 |

31

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | therefore detailed analysis is not required. | | |
| NI | Water: Waters of the U.S. | The act of leasing will not affect waters of the U.S. Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. The company must adopt a SPCC plan and storm water control plan to control any potential constituents from reaching streams If the company plans on affecting these waters directly, a Stream Alteration Permit would be required, and would also require additional NEPA to look at those changes, as a result detailed analysis is not required at this time. | Jerrad Goodell | 08/21/2018 |
| NC | Wild Horses and Burros | The subject lease parcels are not within any established wild horse or burro herd management area. | Mike Tweddell | 08/22/18 |
| NC | Wildlife: Migratory Birds (including raptors) | The effects of leasing, development and the application of the BMPS for raptors was adequately analyzed in the PFO RMP. The application of buffers and timing restrictions identified in the RMP have been effective in mitigating impacts to raptors. Within the parcels proposed for the December lease sale there are known Raptor nests. The stip UT-S-260 would be applied to all parcels. | Dana Truman | 822/18 |
| NI | Wildlife: Fish (designated or non-designated) | Leasing by itself would not authorize any project development which could impact fish populations Site-specific effects cannot be analyzed until an exploration or development application is received, after leasing has occurred. However, any development proposal on the leases would be subject to the standard lease terms, and all applicable laws, regulations and onshore orders in existence at the time of lease issuance. The before mentioned conditions along with lease notice T&E-03 on all parcels will protect fish populations.<br><br>Impacts to habitat and water quality for all fish species are adequately addressed in the Surface Water Quality, and the Steams, Riparian, Wetlands, Floodplains sections of this document, therefore detailed analysis is not required. | Jerrad Goodell | 06/25/2018 |
| NC | Wildlife: Non-USFWS Designated | Many parcels have designated crucial winter range for deer, elk, and moose. The wildlife and botany report gives the specifics for each species.<br><br>The PFO RMP adequately addresses the effects to crucial winter ranges for wildlife because of drilling activities. The application of the lease notices for winter ranges will allow for site specific adjustments at the APD stage.<br>UT-LN-03 CRUCIAL MULE DEER AND | Dana Truman | 9/8/18 |

32

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | ELK WINTER HABITAT - -014 and 016<br>UT-LN-17: Crucial pronghorn fawning habitat. -257<br>UT-LN-18: Crucial pronghorn winter habitat-257 | | |
| NC | Wildlife:<br>BLM Sensitive | The Price RMP and ARMPA for sage grouse in 2018 analyzed the effects of leasing and developing oil and gas resources on sage grouse and other sensitive wildlife species. The applications of lease notices and stipulations have been effective in mitigating the site specific concerns at the APD stage. UT-LN-49 (BLM Sensitive Species) has been applied to several parcels . Additional documentation is within the wildlife and botany resources report located in the project files. | Dana Truman | 9/8/18 |
| NC | Wildlife:<br>Threatened, Endangered, Proposed or Candidate | According to the IPaC the following have potential to occur.<br>California condor, Canada lynx, southwestern willow fly catcher, yellow-billed cuckoo. -<br>The Lease parcels do not contain any designated or proposed critical habitat and it lacks suitable habit for those species. In addition, there are no reported occurrences within in the lease parcels. There are no large wetland or riparian areas that could provide suitable nesting habitat for the SWFL or YBCC within the lease parcels. And all parcels will have the following stipulations, and notices attached, impacts from development to the wetland and riparian resources would be prevented.<br><br>UT-S-127 No surface occupancy – intermittent and perennial steams<br>UT-LN-128 Federal Flood risk management standard<br>WO IM-2002-174 endangered species act stipulation.<br>The RMP analyzed the effects to these species and the implementation of the lease notices and stipulations, no additional effects are expected.<br>Additional documentation is within the wildlife and botany resources report located in the project files. | Dana Truman | 9/8/18 |
| NC | Woodlands/Forestry | See the Price Field Office Resource Management Plan Final Environmental Impact Statement Page 4-215 for a detailed discussion on impacts to woodlands and forestry.<br><br>Surface disturbing activities associated with mineral development and other permitted activities would involve clearing and grading land, which would disturb soils and damage | Stephanie Bauer | 6/29/18 |

33

AR005922

| Determination | Resource/Issue | Rationale for Determination | Signature | Date |
|---|---|---|---|---|
| | | and remove vegetation and would, in turn, lead to degradation of forest and woodland communities located within development areas. UT-LN-51 Would apply to Woodland/Forestry species within parcels 014 and 016. | | |

FINAL REVIEW:

| Reviewer Title | Signature | Date |
|---|---|---|
| Environmental Coordinator | | |
| Authorized Officer | | |

34

## Attachment E: Visual Resource Inventories (VRI) Maps



35

AR005924



36

AR005925

AR005926

Southern Utah Wilderness Alliance – National Parks Conservation Association

Comments submitted via ePlanning project portal

September 11, 2023

Nathan Packer
Angela Wadman
Utah State Office
Bureau of Land Management
440 West 200 South, Suite 500
Salt Lake City, UT 84101

> RE:  *Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment, DOI-BLM-UT-0000-2023-0007-EA*

Greetings:

The Southern Utah Wilderness Alliance ("Alliance") and National Parks Conservation Association (collectively, "SUWA") appreciate the opportunity to comment on the Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment, DOI-BLM-UT-0000-2023-0007-EA (July 2023) ("Reevaluation EA" or "EA").[1]

## I.     The EA Does Not Comply with the Settlement Agreement Reached Between the BLM and the Alliance

On December 7, 2022, the Alliance and the BLM signed a settlement agreement to resolve the litigation in *Southern Utah Wilderness Alliance v. Haaland*, Case. No. 1:20-cv-03654-RC (D.D.C.) ("Settlement Agreement") (attached). The Settlement Agreement requires BLM to conduct a supplemental NEPA analysis; specifically:

> The supplemental NEPA analysis for the two underlying lease sales shall include an assessment of the following resources: air quality, climate change, cultural resources, paleontological resources, recreation, visual resources, night skies, riparian resources, soils, water resources, vegetation, wildlife resources, special status plant and wildlife species, special designations such as Areas of Critical Environmental Concern, wilderness characteristics, and the social costs of greenhouse emissions (to the extent permitted by law).

---

[1] SUWA's comments do *not* apply to the oil and gas leases in the San Rafael Desert region held by NAH Utah, LLC. This includes the following twenty-four leases:

> UTU-93466, UTU-93468, UTU-93469, UTU-93470, UTU-93471, UTU-93473, UTU-93474, UTU-93475, UTU-93476, UTU-93477, UTU-93478, UTU-93479, UTU-93480, UTU-93481, UTU-93482, UTU-93483, UTU-93484, UTU-93485, UTU-93486, UTU-93487, UTU-93500, UTU-93501, UTU-93503, UTU-93504.

Settlement Agreement ¶ 1.

Additionally, the Settlement Agreement requires that

> Upon completion of the supplemental NEPA analysis and related documentation, BLM will issue one or more decisions. In making these decisions, BLM will consider whether a resource management plan (RMP) amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations. If an RMP amendment is necessary or appropriate, BLM will consider amending or modifying the RMP, which may include rebalancing resource allocations and/or new or revised lease stipulations.

*Id.* ¶ 2.

The Reevaluation EA does not satisfy these obligations. *First*, the EA does not satisfy paragraph 1 of the agreement, as shown in the following table.

### RESOURCE VALUES TO BE ANALYZED PERSUANT TO PARAGRAPH 1 OF THE SETTLEMENT AGREEMENT

| Resource Values Listed in Paragraph 1 | Resource Value Analyzed in EA |
|---|---|
| Air quality | X |
| Climate change | X |
| Cultural resources | |
| Paleontological resources | |
| Recreation | X |
| Visual resources | X |
| Night skies | X |
| Riparian resources | |
| Soils | |
| Water resources | |
| Vegetation | |
| Wildlife resources | |
| Special status plant and wildlife species | |
| Special designations (ACECs) | |
| Wilderness characteristics | X |
| Social cost of GHGs | X |

As shown in this table, BLM did not analyze the direct, indirect, and cumulative impacts of leasing the parcels at issue to cultural, paleontological, riparian, soils, water, vegetation, wildlife, special status plant and wildlife species, or special designations (*e.g.*, Areas of Critical Environmental Concern ("ACEC")). Instead, these resource values are addressed in what BLM labels as the "Issues Analyzed in Brief" ("AIB") section of the EA. *See generally* Reevaluation EA at 3-2 to 3-31. As discussed in more detail below, the AIB section does not satisfy BLM's NEPA hard look mandate.

2

*Second*, the Reevaluation EA does not satisfy paragraph 2 of the Settlement Agreement. Specifically, the Agreement requires BLM to "consider whether a resource management plan (RMP) amendment is necessary or appropriate to adjust leasing categories or to add or modify lease stipulations." ¶ 2. "If an RMP amendment is necessary or appropriate, BLM will consider amending or modifying the RMP, which may include rebalancing resource allocations and/or new or revised lease stipulations." *Id.*

However, in contrast, the Reevaluation EA does *not* contain this pre-leasing analysis because, according to BLM, it is "beyond the scope of the decision to be made described in Section 1.3 of this EA." Reevaluation EA at 2-5. Section 1.3 of the EA states in its entirety:

> Based on the analysis in this EA, BLM will decide whether to affirm the BLM's 2018 decisions to lease the remaining 59 leases, cancel the leasing decisions (or a portion therein), or amend and affirm the leases with revised terms.

*Id.* at 1-2. Thus, on its face, the EA does not address paragraph 2 of the Settlement Agreement nor does it conduct the required pre-leasing NEPA analysis that BLM previously determined to be necessary prior to selling new leases for development in the San Rafael Desert.

BLM's conclusion that pre-leasing NEPA analysis is beyond the scope of the proposed action is wrong and frankly backwards. BLM is proposing first to make a leasing decision (*e.g.*, whether or not to reaffirm leases) *and then* decide whether/if it is appropriate to make these same lands available for leasing at all, and if so, under what terms and conditions (*e.g.*, stipulations and leasing categories). This "lease first, think later" approach defies common sense.

As discussed in more detail below, from 2010-2017 BLM did *not* offer a single lease in the San Rafael Desert because the agency had determined that it *had to* prepare *pre*-leasing NEPA prior to offering new leases. BLM started to prepare that pre-leasing NEPA analysis which included, among other things, the preparation of new leasing categories (*e.g.*, closing areas to leasing, requiring NSO stipulations in others) and new more restrictive stipulations that would have been attached to all new leases. Thus, not only is BLM's approach backwards but it also contradicts more than seven years of agency statements, data, and analysis.

Finally, because the Reevaluation EA is crafted to answer only one narrow question (whether to reaffirm or cancel leases), it unsurprisingly does not provide information, data, or analysis in response to the separate, distinct requirement in paragraph 2 to "consider whether a [RMP] amendment is necessary . . . to adjust leasing categories or to add or modify lease stipulations." And while Section 1.3 of the EA states that the decision to be made includes whether to "amend and affirm the leases with revised terms," EA at 1-2, there is absolutely no analysis in the EA that actually explores whether or how the terms (*i.e.*, stipulations) should be amended. BLM cannot make an informed decision whether to "amend" lease stipulations without first having actually analyzed that issue. Such a decision cannot be made based on NEPA analysis that asks and answers a different question: whether to reaffirm or cancel the agency's prior leasing decisions.

AR010153

## II. BLM Must Prepare and Finalize the Pre-Leasing NEPA Analysis It Has Repeatedly Acknowledged Is Necessary Prior to Offering (or Reaffirming) Oil and Gas Leases in the San Rafael Desert

### A. Legal Standard—Policy Reversal

"An agency may not . . . depart from a prior policy *sub silentio*[.]. *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Rather, the agency must "provide a more detailed justification" for its about-face, especially when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* It is "arbitrary [and] capricious to ignore such matters." *Id.* Specifically, "it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.*

### B. BLM's Continued Failure to Provide a Reasoned Explanation for Its About-Face on the San Rafael Desert MLP

As discussed in extensive detail in the Alliance's prior comments and litigation, including the Alliance's Motion for Summary Judgment in *SUWA v. Haaland*, for nearly eight years, BLM repeatedly and publicly acknowledged that it *could not* offer new leases in the San Rafael Desert *unless and/or until* it amended the Price field office Resource Management Plan ("Price RMP"), which—according to BLM—failed to adequately account for new information, data, and changed circumstances. *See generally* Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment, 11-13, 20-33, *S. Utah Wilderness All. v. Haaland*, Case No. 1:20-cv-03654-RC (May 4, 2021) ("Alliance MSJ") (attached).

But, following the 2016 presidential election, BLM jettisoned this long-standing position without a reasoned explanation and soon thereafter offered and sold the leases at issue here—pretending as if the prior seven years of agency statements and thousands of pages of documents and analysis did not exist. *See* Alliance MSJ at 20-33 (explaining why this unexplained turnabout was illegal). This illegal about-face was the heart of the *SUWA v. Haaland* litigation. *See, e.g.*, Plaintiffs' Second Amended and Supplemented Complaint for Injunctive and Declaratory Relief, Civ. No. 1:20-cv-03654 RC, ¶¶ 109-119 (Feb. 12, 2021) ("Alliance Complaint") (attached); Alliance MSJ at 11-13, 20-33. It also was a central tenet of the Settlement Agreement. *See* Settlement Agreement ¶ 2 (BLM committed to make decisions required by the MLP process— that is, to consider new leasing stipulations and leasing categories, including whether to amend the Price RMP).

Nevertheless, the Reevaluation EA does not even address these issues, let alone provide a reasoned explanation for how/why the agency can ignore the thousands of pages of data, analysis, and information BLM gathered as part of the San Rafael Desert Master Leasing Plan ("SRD MLP") process. Nor does the EA provide a reasoned explanation for how/why it can issue leases (or here, reaffirm its prior leasing decision) in the San Rafael Desert without first finalizing the *pre*-leasing NEPA analysis it previously, repeatedly, explained was required before new leases could be offered.

AR010154

Because BLM has done nothing to address or remedy the heart of the *SUWA v. Haaland* litigation in the Reevaluation EA, SUWA incorporates in their entirety its prior comments on these lease sales, including protests, and the Alliance's Complaint and MSJ. *See generally* S. Utah Wilderness All. et al., Scoping Comments on Utah Bureau of Land Mgmt Sept. 2018 Lease Sale (Price and Richfield field offices) (April 16, 2018) ("September 2018 Comments") (attached); S. Utah Wilderness All. et al., Protest of the Utah Bureau of Land Mgmt's Notice of Competitive Oil and Gas Lease Sale to be held on or around Sept. 11, 2018 (Aug. 6, 2018) ("September 2018 Protest") (attached); S. Utah Wilderness All. et al., Scoping Comments on Utah Bureau of Land Mgmt Dec. 2018 Lease Sale (July 31, 2018) ("December 2018 Comments") (attached); S. Utah Wilderness All. et al., Protest of the Utah Bureau of Land Mgmt's Price Field Office, Dec. 2018 Competitive Oil and Gas Lease Sale, Determination of NEPA Adequacy, DOI-BLM-UT-Y020-2018-0057-DNA (Nov. 5, 2018) ("December 2018 Protest") (attached).

The Alliance's prior comments and legal filings in this matter provide an extensive background and summary of the SRD MLP process including BLM's repeated statements that it was "required" to prepare and finalize that pre-leasing analysis before the agency could offer any oil and gas lease in the San Rafael Desert. *See, e.g.*, September 2018 Comments at 3-6; September 2018 Protest at 7-10; December 2018 Comments at 5-7, 9-10; December 2018 Protest at 11-14. BLM's prior statements are numerous, detailed, supported by significant quantities of record evidence including agency-prepared information and data, and undisputed. They include, but are not limited to, the following:

*First*, in 2010, BLM established the national MLP concept in IM 2010-117, and explained that MLPs would provide the agency "a mechanism for completing the additional planning, analysis, and decision-making that may be necessary for areas meeting the [MLP] criteria." Bureau of Land Mgmt, Instruction Memorandum No. 2010-117, Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews, § II (May 17, 2010) (attached). In such circumstances, the planning and analysis would have to occur (*i.e.*, was "necessary") "prior to new oil and gas leasing because of changing circumstances, updated policies, and new information." *Id.* The preparation of an MLP was "required" if the MLP criteria were met. *Id.*

This new policy was added to BLM's fluid minerals leasing handbook. Notably, BLM's handbook clarified that MLPs are *pre*-leasing analyses, not leasing analyses:

> The MLP process takes a more focused look at [RMP] decisions pertaining to oil and gas leasing and post-leasing development of the area. The MLP establishes a guiding framework for the development of the area and provides a vision for how future development will proceed. . . . In most cases, this focused planning and analysis will result in the incorporation into the RMP of new oil and gas leasing decisions as well as development decisions. These decisions would apply to future leasing and development in that geographic area.

Bureau of Land Mgmt, H-1624-1 – Planning for Fluid Mineral Resources (P) § V.A (2018) (attached). It explained further that the pre-leasing NEPA analysis "will be prepared" if BLM determines an MLP is appropriate for a planning area. *Id.*

5

*Second*, BLM subsequently concluded that an MLP should be prepared for the San Rafael Desert. *See, e.g.*, Memorandum from Bureau of Land Mgmt re: Updated Utah Master Leasing Plan (MLP) Strategy, 2-4 (Aug. 14, 2015) ("Utah MLP Strategy") (attached). BLM explained that the purpose of the SRD MLP, consistent with the national MLP policy, was to "provide additional planning and analysis prior to new oil and gas leasing within the MLP area." Bureau of Land Mgmt, San Rafael Desert Master Leasing Plan, Purpose and Need,*1 (June 21, 2016) (attached). This included, among other listed purposes, consideration of "a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing." *Id.*

BLM explained it had "determined that the planning area sufficiently meets the criteria for developing an MLP and that additional planning and analysis are warranted before new mineral leasing and development are allowed." *Id.* at *2.

*Third*, BLM identified numerous resource issues that required additional analysis in the San Rafael Desert area, including, but not limited to, soil and water resources, wildlife, night skies, cultural resources, and wilderness characteristics. *See* 81 Fed. Reg. 31252-02, 31253, Notice of Intent to Prepare a Master Leasing Plan, Amend the Resource Management Plans for the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment, Utah (May 18, 2016).[2] *See also* Bureau of Land Mgmt, San Rafael Desert Master Leasing Plan, Fact Sheet (June 21, 2016) (same) (attached). Put differently, BLM concluded that it *could not* offer new leases in the San Rafael Desert until it prepared *pre*-leasing NEPA analysis for these resource values to determine whether it was necessary to amend the Price RMP, including lease stipulations and leasing categories.[3]

*Fourth*, BLM started to prepare an environmental assessment to conduct the required pre-leasing NEPA analysis. *See generally See* Bureau of Land Mgmt, San Rafael Desert Master Leasing Plan and Draft Res. Mgmt Plan Amend./Draft Env't Assessment, DOI-BLM-UT-G020-2016-0008-EA (May 2017) ("SRD MLP EA") (attached). The purpose of the EA was to "provide additional planning and analysis prior to new leasing of oil and gas within the planning area." *Id.* at 1-3. This included "evaluat[ing] potential development scenarios," "identify[ing] and address[ing] potential resource conflicts and environmental impacts from development," "creat[ing] oil and gas development mitigation strategies," and "consider[ing] a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing." *Id.* Similarly, the need for the MLP EA was that BLM had "determined that additional planning and analysis are warranted prior to allowing new mineral leasing and development." *Id.*

To accomplish these objectives, the EA analyzed four *pre*-leasing alternatives, including new lease stipulations and leasing categories, and analyzed the impacts of each alternative to a wide array of resource values. *See id.* at 2-1 to 2-3 (describing the four alternatives); *id.* at 4-1 to 4-182 (analyzing the impacts of each alternative); SRD MLP EA, Maps 2-2-B to 2-2-D (showing the new leasing categories of each action alternative) (attached).

---

[2] The resource values identified by BLM as requiring additional analysis are the same resource values that SUWA included in the Settlement Agreement (most of which BLM has not analyzed in the Reevaluation EA).

[3] The Reevaluation EA is *not* a pre-leasing NEPA analysis but instead has been prepared to reevaluate prior *leasing* decisions.

6

*Fifth*, BLM identified additional new information that had *not* been considered in the Price RMP and had to be analyzed prior to offering new leases in the San Rafael Desert, including:

- A planning area-wide wilderness characteristics inventory.

- A cultural resources inventory, viewshed analysis, and historic setting analysis for the Old Spanish National Historic Trail.

- Pronghorn habitat data from the Utah Division of Wildlife Resources.

- Visual resource inventories for the Price and Richfield Field Offices.

- Reasonably foreseeable development scenario for oil and gas resources.

- Recreation and cultural resources inventory data.

SRD MLP EA at 1-3. Other factors that had to be considered in the pre-leasing NEPA analysis included the need to "[e]valuate potential development scenarios," "[c]reate oil and gas development mitigation strategies," and "[c]onsider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing." 81 Fed. Reg. at 31253.

*Sixth*, as part of the SRD MLP process, BLM recognized that the Price RMP leasing stipulations no longer adequately protected resource values in the San Rafael Desert based on changed circumstances and new information. To that end, BLM prepared a comprehensive list of new stipulations that would be attached to new leases under *all* action alternatives considered in the EA. *See generally* SRD MLP EA, App. B, San Rafael Desert Master Leasing Plan Stipulations and Lease Notices (attached).[4]

*Seventh*, as part of the SRD MLP process, BLM prepared new, more restrictive, best management practices ("BMP") for oil and gas development in the San Rafael Desert. *See generally* SRD MLP EA, App. C, San Rafael Desert Master Leasing Plan Best Management Practices (attached).[5]

*Eighth,* to preserve its management options during the pre-leasing analysis process, BLM did not offer a single lease for development in the San Rafael Desert for more than seven years while the MLP policy was in place. Specifically, BLM explained: "BLM-Utah has deferred new leasing proposals submitted for all lands within the pending MLPs in order to preserve potential alternatives for those plans. As a result, millions of acres of land with oil and gas interest have been removed from availability for oil and gas leasing and development for the last several years, and this is likely to continue until the MLPs are completed." Utah MLP Strategy at 2.

---

[4] The Reevaluation EA does not attach these stipulations to any of the leases being reconsidered. Instead, BLM is relying on the same Price RMP stipulations that it previously determined were outdated and ineffective and had to be updated prior to new leasing. This is arbitrary.

[5] Like the MLP stipulations, BLM did not require these BMPs for the leases at issue and is not considering them as part of the Reevaluation EA. BLM has provided no explanation for its failure to do so.

AR010157

As discussed in detail in the Alliance's prior comments and legal filings, the Trump administration abruptly altered course and abandoned the MLP concept, including for the San Rafael Desert. However, it did not provide a reasoned explanation for this about-face. *See, e.g.*, Alliance MSJ at 20-33 (explaining how this about-face violated the law). Soon thereafter, BLM offered more than 200,000 acres of leases for development in the San Rafael Desert—including all of the leases at issue here. BLM did so without first finalizing the "required" pre-leasing NEPA analysis and issued the leases subject to the outdated leasing stipulations and categories that BLM had previously explained during the MLP process failed to protect resource values in the San Rafael Desert.

This unexplained about-face violated the law. Notably, the Reevaluation EA does nothing to resolve these issues. It is—by BLM's own admission—*not* a pre-leasing NEPA analysis. BLM must provide a reasoned explanation for how/why the agency's prior years-long position regarding the need for pre-leasing NEPA analysis for the San Rafael Desert was/is no longer accurate or relevant.

The Supreme Court's *Fox* standard requires, at a minimum, that BLM provide a "reasoned explanation" for: (1) how BLM can reaffirm its prior leasing decisions without first preparing and finalizing the pre-leasing NEPA analysis that the agency previously determined to be necessary, (2) why the updated leasing stipulations, BMPs, and leasing categories prepared in the SRD MLP EA are no longer needed or relevant, and (3) why the new information and changed circumstances previously identified by the agency are such as pronghorn habitat data and the Old Spanish National Historic Trail are no longer relevant and can now be ignored.

## C. BLM Failed to Prepare NEPA Analysis Prior to Abandoning the MLP Policy

BLM's decision to abandon the MLP policy, including the San Rafael Desert, reopened millions of acres of public lands to destructive oil and gas leasing and development—a decision that met the low threshold standard to trigger NEPA. Thus, BLM's failure to prepare NEPA analysis prior to making that decision was unlawful.

### i.  Legal Standard—NEPA Triggering Event

NEPA analysis is required for all proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Proposal" is defined as "a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects." 40 C.F.R. § 1508.1(x) (2019).[6] "Federal actions" include "new or revised agency rules . . . policies, or procedures." *id.* § 1508.18(a) (2019).

"The threshold that triggers the requirement for environmental analysis [under NEPA] is relatively low." *Cal. ex rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009).

---

[6] BLM committed to re-analyze the two lease sales, to the extent permitted by law, pursuant to the NEPA regulations that existed prior to September 2020. *See* Settlement Agreement ¶ 1.

AR010158

"If *any* 'significant' environmental impacts might result from the proposed agency action, then [NEPA analysis] must be prepared *before* agency action is taken." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'r*, 985 F.3d 1032, 1039 (D.C. Cir. 2021) (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002) (additional citations and internal alteration omitted); *see also* 40 C.F.R. § 1508.27 (2019) (defining "significance" for NEPA purposes).

One particularly analogous case is *Citizens for Clean Energy v. United States Department of the Interior*, 384 F. Supp. 3d 1264 (D. Mont. 2019). There, the court held that DOI's decision to reopen thousands of acres of public lands to coal leasing and development, and to expedite new coal leasing, without first having prepared NEPA analysis was unlawful. *Id.* at 1278-79. In 2015, then-Interior Secretary Sally Jewell issued an order (the "Jewell Order"), which directed BLM to prepare a programmatic EIS to review the Federal coal leasing program and imposed a moratorium on new coal leasing until completion of the NEPA analysis. *Id* at 1271. However, following the 2016 election, President Trump instructed newly installed Interior Secretary Ryan Zinke to rescind the Jewell Order, which he did. *Id.* at 1272. Interior Secretary Zinke's new order (the "Zinke Order") lifted the coal-lease moratorium and directed BLM to expedite new coal lease applications. *Id.*

The *Citizens for Clean Energy* court held that the Zinke Order was a NEPA triggering event because it "changed the status quo." *Id.* at 1278. Specifically, the decision "served to re-open public land to coal leasing and to expedite lease applications." *Id.* at 1279. In reaching this conclusion, the court analogized the situation to the Ninth Circuit's decision in *Lockyer*, which had involved a nationwide plan to protect roadless areas in national forests that was similarly dismantled without NEPA analysis by the next administration. *Id.* at 1278 (citation omitted).

The *Citizens for Clean Energy* court explained that on review, the Ninth Circuit in *Lockyer* had recognized that though it had only been effective seven months, the roadless rule "resulted in benefits to roadless areas and their ecosystems." *Id.* (citation omitted). Thus, the plaintiffs had raised "a substantial question as to whether the repeal of the Roadless Rule would have significant effect on the environment" (and was a NEPA triggering event). *Id.* (citation omitted). Based on these similarities, the *Citizens for Clean Energy* court found that "*Lockyer* applies to the replacement of the Jewell Order with the Zinke Order" in at least three ways. *Id.*

First, the Roadless Rule and Jewell Order were both programmatic nationwide plans to address and reevaluate agency programs. *Id.* Second, both policies, while in effect, protected thousands (or millions) of acres of public lands and the environment. *Id.* at 1279. Third, the subsequent decisions to reverse these policies re-opened the public lands to destructive activities, threatening those lands and the environment. *Id.* Thus, like the Forest Service's decision in *Lockyer*, "[t]he Zinke Order constitute[d] a major federal action sufficient to trigger NEPA." *Id.*

### ii.  BLM's Elimination of the MLP Policy Was a NEPA Triggering Event

Here, *Lockyer* and *Citizens for Clean Energy* are directly applicable to the prior administration's energy dominance policy and thus, BLM's reversal of its nationwide MLP policy triggered NEPA.

AR010159

First, similar to the Roadless Rule and Jewell Order, BLM's 2010 oil and gas leasing and development reforms, including the MLP policy, were a programmatic nationwide plan to reevaluate an agency program—here, BLM's oil and gas program. In addition, BLM's Utah-specific "Oil and Gas Leasing Reform Implementation Plan" was a programmatic plan to address and reevaluate the agency's oil and gas leasing program in Utah, including for the San Rafael Desert. *See* BLM, Oil and Gas Leasing Reform Implementation Plan, Utah State Office (Sept. 2010) (attached).

Second, as discussed in detail *supra*, as part of the reform plan, the MLP policy "removed from availability" "millions" of acres of public lands in Utah from oil and gas leasing, including more than 525,000 acres in the San Rafael Desert. Utah MLP Strategy at 2. Accordingly, for over seven years, BLM did not offer or sell a single oil and gas lease for development in any MLP area in Utah, including the San Rafael Desert, thus protecting wildlife and wildlife habitats, lands with wilderness characteristics, surface and groundwater resources, and endemic pollinators, among other resources.

Third, when BLM reversed course and terminated the 2010 leasing reforms, including the MLP policy, the agency's new policy directed by Secretarial Order 3354 and established in IM 2018-34 *expressly* reopened these same public lands, including the San Rafael Desert, to environmentally destructive oil and gas leasing and development, and established a new framework to expedite those activities while minimizing environmental review, agency oversight, and public participation. *See, e.g.*, Bureau of Land Mgmt, Instruction Memorandum No. 2018-034, Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews (Jan. 31, 2018) (attached).

Accordingly, BLM's reversal of the MLP policy, met the "relatively low" threshold standard for a NEPA triggering event and the agency's failure to prepare any NEPA analysis prior to making that decision was unlawful. *Lockyer*, 575 F.3d at 1012; *see Citizens for Clean Energy*, 384 F. Supp. 3d at 1278-79; *Grand Canyon Trust*, 290 F.3d at 340 (NEPA analysis is required if an agency action "might" have foreseeable environmental impacts).

In sum, BLM's decision to abandon the MLP concept including the SRD MLP process was a NEPA triggering event. The agency's failure to prepare a NEPA analysis prior to making that decision was unlawful.

### III.    The Reevaluation EA Fails to Take a Hard Look at the Direct, Indirect, and Cumulative Impacts of Leasing; The AIB Section Does Not Satisfy NEPA

The primary purpose of NEPA is two-fold: (1) "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "it . . . guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Thus, while "NEPA itself does not mandate particular results, but simply prescribes the necessary process," *id.* at 350, agency compliance with NEPA's action-

AR010160

forcing statutory and regulatory mandates helps federal agencies ensure that they are adhering to NEPA's purpose and policies. *See* 42 U.S.C. §§ 4321, 4331.

NEPA imposes "action-forcing procedures … requir[ing] that agencies take a 'hard look' at environmental consequences." *Methow Valley Citizens Council*, 490 U.S. at 350 (citations omitted). These "environmental consequences" may be direct, indirect, or cumulative. In the Tenth Circuit:

> [A] meaningful cumulative impact analysis must identify five things: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (citation omitted).

## A.    Issues Analyzed in Brief Unlawfully Defer NEPA Analysis to the APD Stage

The EA unlawfully defers NEPA analysis for many resource values to the drilling stage. The issuance of NSO leases, such as many of the leases at issue here, is the point at which BLM irretrievably commits public resources to development. *Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1183-84 (D. Utah 2020); *see also WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 66 (D.D.C. 2019). As a result, BLM must analyze and disclose all potential direct, indirect, and cumulative impacts prior to making that commitment. *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009).

Reasonably foreseeable impacts cannot be deferred to the APD stage because at that point "the 'No Action Alternative' is no longer on the table with respect to the non-NSO leases." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 853 (S.D. Ohio 2020). As the court in *Center for Biological Diversity* stated when it rejected a similar attempt by the Forest Service to postpone its NEPA "hard look" obligation to the APD stage:

> Defendants' decision not to conduct further review . . . was based on the assumption that there was no significant impact at the leasing stage because no surface disturbing activities [at the time of lease issuance] would occur. But this Court joins other courts in finding that this conclusion "fell short of NEPA's requirements with respect to leases lacking NSO stipulations . . . because at the leasing stage 'the agency made an irrevocable commitment to allow *some* surface-disturbing activities,' and it was therefore required to analyze those activities before it could no longer preclude them.

*Id.* at 853 (internal citations and alterations omitted). *See also Rocky Mountain Wild v. Haaland*, 2021 WL 4438032, *4 (D. Colo. Sept. 28, 2021) ("the BLM may not simply ignore evidence of

11

reasonably foreseeable environmental effects that is available to it at the time it makes its decisions").

Here, BLM has unlawfully deferred analysis of the issues included in the AIB[7] section to the APD stage. *See* Reevaluation EA at 3-3 – 3-31. For example (non-exhaustive list):

- Cultural Resources: BLM defers analysis to the APD stage because, according to the agency, each parcel contains lease stipulations designed to mitigate harm to cultural resources and "[f]or future undertakings related to these leases, the BLM would not approve any ground disturbing activities until it completes its obligations to consider cultural resources under the NEPA…New analysis of impacts to cultural resources and potential adverse effects to historic properties will be conducted during the review stage of any future site-specific development plans through new NEPA and NHPA Section 106 review processes." Reevaluation EA at 3-5.

- Paleontological Resources: BLM defers analysis to the APD stage because "[e]ffects on paleontological resources can be mitigated by standard terms and conditions, which require a lessee to conduct inventories or special studies. Site-specific projects that would cause surface disturbance in areas with unknown or moderate to high potential requires a paleontological survey and/or monitoring conducted at the time of proposed lease development in accordance with NEPA." *Id.* at 3-9.

- Wetlands/Riparian Zones: BLM defers analysis to the APD stage because "[d]etailed impacts of the proposed developments cannot be addressed until site specific operations are proposed and the applicable water sources are analyzed….If wells or other developments are proposed on the leases at a future time, impacts would be analyzed on a case-by-case basis when an APD is submitted." *Id.* at 3-20.

It is unlawful for BLM to defer this analysis to the APD stage. This is particularly true where, as here, BLM has deferred this analysis based on its contention that certain lease stipulations and notices, and BMPs will be adopted if/when development is proposed on the leases. As discussed above, during the MLP process, BLM concluded that these *same* stipulations were inadequate and had to be updated. It is arbitrary to rely on these same stipulations and BMPs and claim—without record evidence—that the stipulations will now somehow protect these resource values.

Additionally, as discussed in more detail below, the Interior Department has recognized that the oil and gas program in place when the leases were sold in 2018 (*i.e.*, these standard terms and conditions, and BMPs) failed to adequately protect the environment.[8] Precisely because these

---

[7] The AIB section appears to have replaced the IDT Checklist typically found in EAs. *See* Reevaluation EA at 3-3 ("Following internal scoping, 19 issues were identified, considered, and eliminated from detailed analysis by members of the IDT in review of the proposed alternatives. Each of these issues is outlined below with a concise discussion regarding the context and intensity of the impact related to each issue").

[8] *e.g.*, Press Release, Dept of Interior, Interior Department Issues Statement on Oil and Gas Leasing Program (Aug. 16, 2021), https://www.doi.gov/pressreleases/interior-department-issues-statement-oil-and-gas-leasing-program (recognizing, among other shortcomings in the oil and gas program, that "[p]ast operation of the program[] did not adequately reflect the breadth of the Interior Secretary's stewardship responsibilities, including conserving wildlife habitat [and]

AR010162

standard lease stipulations, notices, and BMPs fail to protect the environment, BLM must conduct thorough pre-leasing NEPA analysis, which it has not done here.

In addition, the AIB section does not contain any cumulative impacts analysis and therefore does not satisfy BLM's hard look mandate. Instead, the AIB section simply provides BLM's rationale for why the agency did not analyze these issues in detail. Because this rationale is largely due to (unlawfully) deferring such analysis to the APD stage, this approach violates NEPA. BLM must correct these deficiencies by analyzing all reasonably foreseeable direct, indirect, and cumulative impacts now, at the leasing stage. To highlight the larger problem, SUWA provides detailed comments below regarding water resources and wildlife but these same flaws persist throughout the EA for all resource values.

### B.     Water Resources

NEPA requires BLM to study the "environmental impact of the proposed action" along with "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. §§ 4332(C)(i), (ii). Water is one of the most critical environmental resources that when compromised and consumed, detrimentally affects the quality of the environment, and hinders the environment's ability to thrive. Thus, to fully comply with NEPA, BLM must analyze any water-related impacts the proposed action will have on the surrounding ecosystem. This necessarily includes addressing the direct, indirect, and cumulative impacts from the proposed action on water quantity, groundwater, and the impacts of that water use on the surrounding environment. *See* 40 C.F.R. § 1508.1(g). Like other aspects of NEPA analysis, BLM must consider water impacts at "the earliest possible time." *N.M. ex rel. Richardson*, 565 F.3d at 707 (citing 40 C.F.R. § 1501.2).

In addition to not including any cumulative impacts analysis, the Reevaluation EA fails to take a hard look at water resources for three reasons. *First*, the Reevaluation EA fails to discuss and consider the effect water use on the environment. *Second,* the EA fails to analyze water quantity impacts, including the impacts anticipated from the Reasonably Foreseeable Development Scenario ("RFDS") for the San Rafael Desert MLP. *Third*, the EA does not consider or analyze impacts to groundwater availability and quality.

### i.     Impacts of Water Use on the Environment

The Southwest, including the San Rafael Desert, is the hottest and driest region in the United States and is experiencing comparatively higher rates of warming than other regions in the country. Utah Div. of Water Res., Climate Change, Water Res., and Potential Adaptation Strategies in Utah, 1 (March 2020) ("Utah Climate Change Report") (attached). Consequently, Utah is already encountering earlier and prolonged growing seasons, increased

---

protecting historic and cultural resources"). In the present instance, BLM is relying on the same outdated and ineffective "past operations" (*e.g.*, the same lease stipulations and notices, BMPs, it has relied on for decades) as a justification to avoid its NEPA hard look mandate. Despite identifying the many problems associated with its leasing program—problems that are well-documented by the Department—the agency is conducting this reevaluation in the same manner it would have for prior lease sales without first addressing these problems or ensuring that prior mistakes will not be repeated. This is arbitrary and violates NEPA.

AR010163

evapotranspiration, and decreased rains that lead to decreased streamflow into the Colorado River. Utah Div. of Water Res., Utah State Water Plan: Uintah Basin - Planning for the Future, XIV (November 2016) ("Utah State Water Plan") (attached).

This "new normal" is expected to contribute to prolonged water shortages in the Colorado River Basin, leading to an "increase in the intensity of naturally-occurring droughts", which in turn "escalate the occurrence and severity of wildfires." P.C.D. Milly and K.A. Dunne, *Colorado River flow dwindles as warming-driven loss of reflective snow energizes evaporation*, Science Vol. 367, Issue 6483, at 3 (March 2020) (attached); Utah Climate Change Report, at i. Indeed, Colorado River's flow has already declined by 20 percent and an unprecedented water shortage is nearly certain. Milly and Dunne at 1-4; *see* Pedram Javaheri and Drew Kann, *First-ever Colorado River water shortage is now almost certain, new projections show*, CNN (May 27, 2021).[9] Thus, any additional withdrawal from Colorado River Basin water sources—and especially withdrawals of high quantities needed for minerals development—will undoubtedly exacerbate the Colorado River water shortage and create additional harm to land, wildlife, and human communities.

Indeed, because the San Rafael desert in particular is already suffering from severe drought, *see* SRD MLP EA at 3-12 to 3-13; *id.* at 3-74 ("The largest factor affecting the majority of wildlife populations and habitat trends in the [San Rafael Desert] is drought"), BLM previously recognized the need for a detailed analysis on water use in the area. Specifically, in the SRD MLP EA, BLM found that in comparison to *any other land use*, oil and gas development "cause[s] the greatest amount of reasonably foreseeable impacts to water and riparian resources." *Id.* at 4-170. And, water use impacts "would likely be greater where mineral development is more intense, in areas where development overlaps sensitive soils…where development crosses ephemeral drainages…and on state and private lands where relatively fewer protections are afforded to natural resources. *Id.*

BLM's description of severe water use impacts is especially relevant to the Reevaluation EA because *those same characteristics* are present in or near the fifty-nine leases at issue here. *See* Reevaluation EA at 3-10 (fragile and sensitive soils); S. Utah Wilderness All., Map – Oil and Gas Leasing in the San Rafael Desert 2016 – 2018 (2019) (attached) (showing state oil and gas leases adjacent to the leases included in the Reevaluation EA.) A sufficiently hard look at the relevant impacts would consider how water use "from lease development will impact the lands, forests, wildlife, livestock, or human communities in the planning area, or how these impacts are further compounded in a drought-stricken southwest, which is poised to worsen in the face of climate change." *San Juan Citizens All.*, 326 F. Supp. 3d 1227, 1253 (D.N.M. 2018).  Moreover, this analysis must occur at the leasing stage because NEPA is designed "to determine whether a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact." *Wildearth Guardians v. Bureau of Land Mgmt*, 457 F.Supp. 3d 880, 894 (D. Mont. 2020) (quoting *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004)) (internal quotations omitted).

---

[9] Available at: https://www.cnn.com/2021/05/27/weather/lake-mead-colorado-river-shortage/index.html.

AR010164

Yet, in the Reevaluation EA, BLM makes *no effort* to explain the actual environmental impacts that would result from leasing all or some of the fifty-nine parcels. Consequently, the Reevaluation EA violates NEPA.

### ii.    Water Quantity and Reasonably Foreseeable Development Scenarios

NEPA's requirement that BLM analyze all reasonably foreseeable cumulative impacts, 40 C.F.R. § 1508.1(g)(3), includes future wells identified in an RFDS. *Diné Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831, 853 (10th Cir. 2019) ("*Diné CARE I*"). Specifically, BLM's cumulative impact analysis of RFDS wells must include studying the cumulative impacts *all wells* will have on water quantity and the environment. *Id.* at 850, 856-57 (holding that BLM needed to analyze the "cumulative impacts of water resources" associated with the wells identified in the RFDS).

Here, the Reevaluation EA references the RFDS prepared for the San Rafael Desert MLP, Reevaluation EA at 3-3, which predicted that thirty wells will be drilled over the next fifteen years. Bureau of Land Mgmt, Reasonably Foreseeable Dev. Scenario for Oil and Gas in the San Rafael Desert Master Leasing Plan Area, 2 (2016). However, rather than using this number to evaluate impacts from reasonably foreseeable development, BLM created a lease sale-specific RFDS that reduced the development assumption to eight wells expected to be drilled on the fifty-nine leases at issue. Reevaluation EA at 3-3.[10] This is the full extent of BLM's "analysis." For example, the Reevaluation EA does not quantify and analyze:

- How much water will be used to drill the thirty reasonably foreseeable wells predicted in the San Rafael Desert MLP RFDS;

- How much water will be used to develop the eight wells anticipated to be drilled on the fifty-nine lease parcels; or

- The cumulative impacts of the aforementioned water use.

Instead, BLM claims that it cannot do so at the leasing stage because the nature and extent of future drilling is too speculative. *See* Reevaluation EA at 3-17 ("The specific quantity of water required for downhole oil and gas operations depends on local geology and would need to be evaluated at the ADP [sic] stage."), 3-20 ("Site-specific effects, such as the volume of water and water rights necessary, cannot be analyzed until an exploration or development application is received, at which point additional site-specific NEPA analyses would be conducted."). But that reasoning is the same argument rejected by the Tenth Circuit in *Diné CARE I*. *See* 923 F.3d at 856-57.

Moreover, BLM's conclusion is undermined by the fact that in the original September 2018 Lease Sale EA, BLM estimated that drilling one well would use approximately 294,000 gallons of water. Bureau of Land Mgmt, Env't Assessment DOI-BLM-UT-0000-2018-0001-EA

---

[10] The 2018 September EA predicted 11 wells would be drilled, not 8. *See* 2018 September EA at 12. BLM provides no explanation for why the RFDS for the same leases is now different.

15

September 2018 Oil and Gas Lease Sale, 13 (2018). It is then reasonable to calculate cumulative water usage for the thirty-well RFDS to be approximately 8.8 million gallons of water,[11] and approximately 2.3 million gallons of water for the lease sale-specific RFDS.[12] In addition, BLM *does* quantify all other equally speculative aspects of future oil and gas development, including potential oil production, gas production, and produced water from the eight estimated wells. *See* Reevaluation EA at 3-3, tbl. 3-2. These estimates are based on BLM's extensive history of permitting and monitoring oil and gas projects throughout the west. And based on this permitting history, BLM has the information and data it needs to estimate water quantity use. Indeed, the New Mexico State Office has compiled water resources data into a document specifically intended to inform NEPA analyses for proposed oil and gas development in New Mexico. *See generally*, Bureau of Land Mgmt, Water Support Document for Oil and Gas Dev. in N.M. (2020) (attached).

There is no reason why the BLM Utah office cannot develop a similar report (or why it cannot use the New Mexico BLM report to inform its analysis here). Put simply, BLM—as the Federal land management agency responsible for permitting thousands of wells, including many near the proposed parcels—has the necessary water quantity information and data to inform its analysis in the EA; it simply has chosen to ignore that information and data in the present instance. By doing so, BLM has significantly underestimated the amount of water that is likely to be consumed through oil and gas development in the arid San Rafael Desert. Turning a blind eye to its own prior assessments of reasonably foreseeable future development is the opposite of the "hard look" that NEPA requires. *See San Juan Citizens All.*, 326 F. Supp. 3d at 1254 ("Because BLM failed to use the information it had at this stage to consider the impacts of the agency action on water quantity, BLM failed to meet its duty to take a hard look at the environmental impacts of the proposed action"). As such, the Reevaluation EA violates NEPA.

Finally, in *Diné Citizens Against Ruining Our Environment v. Haaland* ("*Diné CARE II*"), the Tenth Circuit recently established the minimum threshold that BLM must meet to satisfy its NEPA hard look obligation regarding cumulative water quantity impacts. *See generally* 59 F.4th 1016 (10th Cir. 2023). Following the court's 2019 decision in *Diné CARE I*, BLM prepared an EA Addendum to address the legal failings previously identified by the court. *See id.* at 1027 (discussing the prior court decision and EA Addendum). The EA Addendum took a quantitative-comparative approach for water quantity analysis. *See id.* at 1045. For wells projected in the applicable RFDS, BLM

> considered how much water was likely to be used, including if all wells employed the most water-intensive methods. It then compared that water consumption to the total amount of water projected to be used in the region…

*Id.* at 1044. That is, BLM calculated the per-well impact based on the type of well and included the "aggregated direct impact of developing all wells associated with the proposed action, including all drilling, workover, and plugging." Bureau of Land Mgmt, *Diné CARE* Env't Assessment Addendum, 33 (Feb. 2020) ("*Diné CARE II* EA Addendum") (attached). BLM then

---

[11] $294{,}000 \frac{gallons}{well} \times 30 \ wells = 8{,}820{,}000 \ gallons$

[12] $294{,}000 \frac{gallons}{well} \times 8 \ wells = 2{,}352{,}000 \ gallons$

16

compared this aggregated total water usage from the proposed action to the total estimated water use in the relevant hydrologic region. *Id.* Because "there is a finite amount of water supporting the various water uses in a specific region," the Tenth Circuit found BLM's quantitative-comparative analysis approach sufficient to satisfy NEPA's hard look requirement. *Diné CARE II* at 1045.

In contrast, the Reevaluation EA does not include any cumulative impacts analysis for water resources. However, as demonstrated in the EA Addendum at issue in *Diné CARE II* and confirmed by the court, BLM has the tools and data available to estimate and compare direct and cumulative water quantity impacts.

The following table compares the analysis BLM conducted in the *Diné CARE II* EA Addendum and the "analysis" conducted in the Reevaluation EA:

| Type of Information/Analysis | Diné CARE II | Re-evaluation EA |
|---|---|---|
| Water Use in Basin/Hydrologic Unit by Category | ✓ | |
| Potential Water Sources | ✓ | ✓ [13] |
| Water Disposal | ✓ | ✓ |
| Direct Water Impact by Well Type | ✓ | |
| Comparison of Direct Water Use to Total Water Use in Basin/Hydrologic Unit | ✓ | |
| Identify Past, Present, and Reasonably Foreseeable Future Actions | ✓ | |
| Cumulative Water Use Based on Well Type | ✓ | |
| Cumulative Water Use Based on Drilling Technique | ✓ | |
| Comparison of Cumulative Water Use to Total Water Use in Basin/Hydrologic Unit | ✓ | |
| Mitigation Measures & Residual Impacts | ✓ | |

As this table makes clear, the water resources analysis in the Reevaluation EA falls far short of the minimum threshold required by *Diné CARE II.*

In sum, the Reevaluation EA does not, but must, include a cumulative impacts analysis for water quantity that incorporates and analyzes the thirty-well RFDS for the San Rafael Desert MLP. Assuming, *arguendo*, that the EA attempts to analyze such impacts, that "analysis" falls far short of the minimum thresholds required by *Diné CARE* and *Diné CARE II.*

    iii.    **Groundwater**

Groundwater is a critical resource that supplies many communities, particularly rural ones, with drinking water. Protecting these resources is imperative to protect human health and the

---

[13] The Reevaluation EA states only that "[w]ater sources and necessary water rights from state permitted sources are managed by Utah water appropriation policy for each water basin." Reevaluation EA at 3–20.

17

AR010167

environment, especially because groundwater will become more important as increased aridity and higher temperatures alter water use. The U.S. Environmental Protection Agency ("EPA") has noted that existing drinking water resources "may not be sufficient in some locations to meet future demand" and that future sources of fresh drinking water "will likely be affected by changes in climate and water use." Env't Prot. Agency, Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States, EPA/600/R-16/236F, 2–18 (Dec. 2016).[14] As a result, BLM must protect the quality and availability of groundwater aquifers. Indeed, during the San Rafael Desert MLP planning process, the EPA specifically requested that BLM analyze groundwater as part of its NEPA analysis for the MLP. *See* Letter from Env't Prot. Agency to Bureau of Land Mgmt, San Rafael Desert Master Leasing Plan, Res. Mgmt Plan Amend. and Nat'l Env't Pol'y Act Analysis Scoping Comments, 5-7 (June 29, 2016) ("EPA Scoping Comments") (attached).

Despite acknowledging that fracking fluid could potentially be introduced into an underground drinking water source, the EA does not include any discussion of the direct, indirect, and cumulative impacts of encountering, and possibly contaminating, the groundwater. Reevaluation EA at 3-18. Instead, BLM merely states that "[t]he appropriate selection of casing materials and cementing schedule…would eliminate the intermixing of ground water encountered from various aquifers encountered during the drilling process." *Id.* at 3-19. This is a violation of NEPA. *See Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 887 (D. Mont. 2020) (holding that BLM did not satisfy NEPA's hard look requirement because the EA at issue "fail[ed] to inform the reader whether groundwater would be unchanged, improved, or degraded and it certainly fail[ed] to explain what data would lead to these conclusions.); *Diné CARE I*, 923 F.3d at 857 (holding that BLM violated NEPA by approving permits to drill without analyzing cumulative impacts on water resources, including groundwater).

Thus, to comply with NEPA, BLM must thoroughly evaluate potential groundwater contamination by accounting for all groundwater resources that could be impacted, both by affirming some or all of the leases at issue and in the aggregate. BLM must then use this accounting to analyze how oil and gas development might impact these aquifers. Specifically, this evaluation must assess the sufficiency of the protective measures that will be employed.

## C.    Wildlife

Like with water resources, the Reevaluation EA fails to take a hard look at impacts to wildlife, and particularly pronghorn antelope (*Antilocapra americana*), even though "[a]ll leases contain year-long crucial pronghorn habitat…except for UTU93534." Reevaluation EA at 3-22. This is especially concerning considering BLM spent years gathering and analyzing new information related to pronghorn in the San Rafael Desert and knew that other past, present, and reasonably foreseeable projects in the San Rafael Desert had or would impact the species and its crucial habitat, including the lease parcels at issue here. *See* SRD MLP EA at 1-3 (explaining that a primary reason for the SRD MLP was to consider new information related to "[p]ronghorn habitat data"); *id.* at 3-76 (stating that a "large portion of the [SRD MLP] planning area [is] pronghorn crucial and substantial-value year-long habitat").

---

[14] Available at: https://www.epa.gov/hfstudy

AR010168

Nonetheless, the full extent of BLM's "analysis" of pronghorn impacts in the Reevaluation EA is as follows:

> Pronghorn populations are stable and increasing throughout the State of Utah (Utah Division of Wildlife Resources 2017) and the 83.2 potential acres of disturbance based on the RFD are unlikely to cause a significant reduction in useable habitat for this wide-ranging species.

*Id.* This statement does not contain any analysis of the direct, indirect, or cumulative impacts leasing all or some of the parcels will have on pronghorn. This failure to take a hard look at impacts to pronghorn is especially egregious because the SRD MLP process was specifically designed to ensure that that such impacts received the rigorous analysis demanded by NEPA *prior to* new leasing and development in the San Rafael Desert. *See* SRD MLP EA at 1-3, 1-5. Yet, as noted above, BLM not only abandoned the MLP process without any reasoned justification, but also failed (again) to include any cumulative impacts analysis to pronghorn that the agency previously recognized was required.

Furthermore, the "83.2 potential acres of disturbance" is based on the lease sale-specific RFDS assuming only eight wells on the fifty-nine leases. *See* Reevaluation EA at 3-3. It completely ignores and does not calculate the acres that could be impacted by other past, present, and reasonably future actions in the San Rafael Desert that may also impact pronghorn. This includes, for example, development of the thirty wells predicted in the SRD MLP RFDS or the development of the SITLA leases sold in 2016 on lands adjacent to many of the lease parcels at issue here. *See* S. Utah Wilderness All., Map – Oil and Gas Leasing in the San Rafael Desert 2016 – 2018. Thus, BLM's calculation of likely disturbed pronghorn habitat is plainly inaccurate.

For these reasons, the Reevaluation EA fails to take a hard look at impacts to pronghorn and thus violated NEPA.

## IV.     BLM Should Analyze the Proposed Action in Accordance with Current Agency Policy

The leasing decisions under reconsideration here were made by the prior administration under the "energy dominance" policy in place at that time. That policy is no longer in effect and is counter to Biden administration policy and directives related to oil and gas leasing and development. As such, the pending decision whether to reaffirm the leases at issue must be made pursuant to the BLM's current policies and directives.

The Interior Department recently confirmed that BLM's oil and gas program suffers from systemic problems. In November 2021, the Department released its review of the BLM's oil and gas program. *See generally* Dep't of Interior, Rep. on the Fed. Oil and Gas Leasing Program, Prepared in Response to Exec. Order 14008 (Nov. 2021) ("2021 DOI Report") (attached). It found that BLM's leasing program "fail[ed] to provide a fair return to taxpayers. . .; inadequately account[ed] for environmental harms to lands, waters, and other resources; foster[ed] speculation by oil and gas companies . . .; extend[ed] leasing into low potential lands that may have

19

competing higher value uses; and [kept] communities out of important conversations about how they want their public lands and waters managed." *Id.* at 3.[15]

The 2021 DOI Report identified three main categories for reform: 1) providing a fair return to the American public, 2) designing more responsible leasing and development processes that prioritize areas that are most suitable for development; and 3) creating a more transparent, inclusive, approach to leasing and development. *Id.* at 4. In short, that "a fundamental rebalancing of the Federal oil and gas program" was necessary. *Id.* at 6.

Among other recommendations, the 2021 DOI Report explained that "BLM should ensure that oil and gas is not prioritized over other land uses, consistent with BLM's mandate of multiple-use and sustained yield." *Id.* at 12. In particular, leasing of "low potential" lands for oil and gas development fosters unwarranted speculation and should be avoided. *Id.* at 13. Instead, BLM should focus its leasing, if it leases at all, "on areas that have moderate or high potential for oil and gas resources and which are in proximity to existing oil and gas infrastructure." *Id.*

Following the 2021 DOI Report, BLM issued new directives to implement these recommendations. *See generally* Bureau of Land Mgmt, Instruction Memorandum No. 2023-007, Evaluating Competitive Oil and Gas Lease Sale Parcels for Future Lease Sales (Nov. 21, 2022) ("IM 2023-07") (attached); Bureau of Land Mgmt, Instruction Memorandum No. 2023-010, Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews (Nov. 21, 2022) (attached). These directives included set forth "leasing parcel preference criteria," with the directive that BLM "will" evaluate parcels pursuant to those factors, including:

- Proximity to existing oil and gas development, giving preference to lands upon which a prudent operator would seek to expand existing operations;

- The presence of important fish and wildlife habitats or connectivity areas, giving preference to lands that would not impair the proper functioning of such habitats or corridors;

- The presence of historic properties, sacred sites, or other high value cultural resources, giving preference to lands that do not contribute to the cultural significance of such resources;

- The presence of recreation and other important uses or resources, giving preference to lands that do not contribute to the value of such uses or resources; and

- Potential for development, giving preference to lands with higher potential for development.

---

[15] The leases at issue in the EA highlight the broken BLM leasing program's shortcomings, including the fact that BLM "inadequately account[ed] for environmental harms to lands, waters, and other resources" and "foster[ed] speculation by oil and gas companies to the detriment of competition and American consumers." 2021 DOI Report at 3.

AR010170

IM 2023-07 at 1. These criteria are properly applied to all new potential lease parcels, assigning a preference value of either high or low—with "high" parcels moving forward for lease and "low" parcels generally being deferred. *Id.* Parcels are determined to be "high" preference only if they are near existing development, have high development potential, and do conflict with other important resource values (*e.g.*, wildlife, cultural). Otherwise they are determined to be "low" preference and deferred from leasing.

Here, BLM must apply these leasing preference criteria to its reevaluation of the leases at issue. *First*, the September and December 2018 leases are properly viewed as "low" preference parcels under the IM 2023-07 criteria. For example, in the Reevaluation EA, BLM describes the San Rafael Desert as "exploratory" with "low potential for oil and/or natural gas development." EA at 3-3. BLM further explains that "[t]his area is extremely exploratory. A total of 79 wells have been drilled [in the San Rafael Desert] . . . and all were dry holes." *Id.* at 3-2 to 3-3.[16] For future development on the leases, BLM explains that "[d]ue to the extreme exploratory nature and past unsuccessful attempts, it is anticipated that all wells drilled have a high probability of being a dry hole." *Id.* at 3-3.

At the same time, the San Rafael Desert is home to an astounding array of important resource values. It is home to one of the most diverse arrays of native pollinators (bees, wasps) in North America, including 49 distinct genera and 333 species. SRD MLP EA at 3-81 to 3-82. Forty-eight species were new to science as of 2016, and sixty-eight species may occur only in this region. BLM has recognized that the San Rafael Desert's unique sand dune landscape provides valuable habitat for pollinators and that the San Rafael Desert contains more "bee genera . . . than [exists] in all of New England." *Id.*

Additionally, the San Rafael Desert contains approximately 263,705 acres of wilderness-caliber lands (this includes the now designated Labyrinth Canyon Wilderness). *See id.* at 3-85. It is also home to diverse wildlife, including mule deer, pronghorn antelope, desert bighorn sheep, burrowing owl, golden eagle, Peregrine falcon, as well as species listed under the Endangered Species Act such as the Mexican spotted owl, southwestern willow flycatcher, and yellow-billed cuckoo. *See id.* at 3-54 to 3-84.

Due to the near total lack of existing development, the San Rafael Desert also offers exceptional dark night skies. In fact, the National Park Service ("NPS") previously expressed its opposition to the September 2018 lease sale because, in part, of its potential to destroy viewsheds including dark night skies at nearby Canyonlands National Park, which is a certified International Dark Sky Park. *See generally* Letter from Nat'l Park Serv. to Bureau of Land Mgmt, *RE: September 2018 Oil and Gas Lease Sale – Scoping Comments* (April 20, 2018) (attached).

The EPA likewise has highlighted the important resources in the San Rafael Desert and the need to protect them. For example, in comments submitted in support of the San Rafael Desert MLP process, EPA encouraged BLM to prepare *pre*-leasing NEPA analysis for air resources, ground

---

[16] To the best of SUWA's knowledge, there have actually been 80 wells drilled in the San Rafael Desert, with the Twin Bridges/Pure Helium Bowknot State 36-1 being the eightieth. That well was also a dry hole. *See, e.g.*, Brian Maffly, *Was a helium well in the Utah wilderness a bust?*, Salt Lake Tribune (March 22, 2021), https://www.sltrib.com/news/2021/03/22/was-helium-well-utah/.

AR010171

and surface water resources, public drinking water supplies, wetlands, riparian areas and floodplains, water resource monitoring, greenhouse gas emissions and climate change, environmental justice, RFDSs and cumulative impacts, and no lease zone designations. *See generally* EPA Scoping Comments.

Thus, the San Rafael Desert contains low potential for oil and gas, has little to no existing development, and is home to many significant resource values. As such, a decision by BLM to select Alternative A in the Reevaluation EA would run counter to BLM's current leasing policy, ignore repeated Interior Department statements that its prior leasing program was broken (the same program BLM followed when it first sold these leases in 2018), and threaten one of the most scenic, wild, ecologically diverse and remote areas in Utah.

## V.    The BLM Must Cancel Lease UTU-93713

Regardless of which alternative (or modified alternative) BLM eventually selects in the forthcoming DR, at a bare minimum, BLM must cancel lease UTU-93713. The lease is fully encompassed by the Labyrinth Canyon Wilderness and was one of the most controversial leases sold anywhere in the United States during the last administration and BLM's decision to offer it for lease implicated the host of problems identified in the 2021 DOI Report.

*First*, BLM sold UTU-93713 at the December 2018 lease sale but did not allow for any public comment on that sale. It also required the public to protest the sale in a truncated 10-day period. Courts have held that such restrictions on public participation are unlawful. *See W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1069-1073 (D. Idaho 2020) (holding that the Trump administration's restriction on public participation in oil and gas lease sales violated the law). *See also* Alliance Complaint ¶¶ 87-91 (discussing the December 2018 lease sale); Alliance MSJ at 17-19 (same).[17]

*Second*, BLM prepared a Determination of NEPA Adequacy ("DNA") to sell UTU-93713, which is not a NEPA document and does not contain NEPA analysis. Instead, a DNA is an agency-created administrative convenience which "confirms that an action is adequately analyzed in existing NEPA document(s) and is in conformance with the land use plan." Bureau of Land Mgmt, Nat'l Env't Pol'y Act Handbook H-1790-1 § 5.1 (2008). Notably, the existing NEPA documents relied on in the DNA were prepared for *other* public lands in Utah and did not analyze the impacts of selling UTU-93713, including impacts to the Labyrinth Canyon Wilderness.

Courts routinely set-aside leasing decisions issued through DNAs for failure to analyze and disclose site-specific direct, indirect, and cumulative impacts. *See, e.g.*, *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d. 1253 (D. Utah 2006); *Bd. of Cnty. Comm'rs of the Cnty. of San Miguel v. U.S. Bureau of Land Mgmt.*, 584 F. Supp. 3d 949 (D. Colo. 2022); *Bd. of Cnty.*

---

[17] In fact, the December 2018 sale in Utah included five different field offices, each with a separate leasing document. Thus, the public was required to protest five different sale documents, in the same illegal, truncated 10-day period. *See generally* Bureau of Land Mgmt, Dec. 2018 Utah Oil and Gas Lease Sale, https://eplanning.blm.gov/eplanning-ui/project/110582/510 (last updated Feb. 18, 2021).

AR010172

*Comm'rs of the Cnty. of San Miguel v. U.S. Bureau of Land Mgmt.*, --- F. Supp. 3d. ---, 2022 WL 472992 (D. Colo. Feb. 9, 2022).

*Third*, BLM rushed to issue UTU-93713 with full knowledge that the public lands encompassed by the parcel were proposed for wilderness designation and would soon be designated as such. Specifically, the lease was issued in February 2019 and Congress designated the Labyrinth Canyon Wilderness in March 2019, as part of the John D. Dingell, Jr. Conservation, Management, and Recreation Act. Pub. L. No. 116-9, 133 Stat 580 (March 12, 2019) ("*Dingell Act*").

The last-minute effort to issue this lease prior to the then-pending wilderness designation was extremely controversial. For example, following BLM's leasing decision, a coalition of United States Senators, led by Richard Durban (D-Ill) wrote to then-Interior Secretary David Bernhardt to ask that it be cancelled. Specifically, the Senators asked that Secretary Bernhardt cancel more than 500 oil and gas leases in Utah that were being reconsidered at that time due to successful lawsuits and administrative appeals, but they expressly called out UTU-93713 as most problematic:

> We are writing to call for the cancellation of hundreds of oil and gas leases across Utah that threaten our climate and, if developed, will further exacerbate the impacts of climate change. . . . We urge you to outright cancel these leases.
> . . .
>
> The more than five hundred leases being reconsidered by [BLM] are located in some of the nation's most wild, scenic, and culturally rich areas. Hundreds of them encompass [BLM]-identified lands with wilderness characteristics proposed for wilderness designation in . . . *America's Red Rock Wilderness Act*.
> . . .
>
> One lease (UTU-93713) deserves particular mention because it is <u>within</u> Congressionally designated Wilderness: the Labyrinth Canyon Wilderness area. The [BLM] issued this lease without allowing for public participation and without preparing analysis required by [NEPA].
> . . .
>
> The [BLM] rushed to issue this lease in February 2019 with full knowledge that the public lands it encompassed were set to be designated as Wilderness in the [*Dingell Act*].
> . . .
>
> Given the significance of these lands, we request that you cancel these leases.

U.S. Senate Letter to David Bernhardt at 1-2 (Dec. 21, 2020) ("Senate Letter") (attached).

*Fourth*, BLM's approval of the Twin Bridges project, which targeted UTU-93713, was equally controversial. Like the leasing decision, BLM rushed its approval of the drilling permit in the

AR010173

waning days of the prior administration. BLM approved the project just two days before Christmas of 2020.

The New York Times highlighted the then-pending Twin Bridges project as one of the four most controversial, last-minute, giveaways to Industry allies by the Trump administration. *See* Eric Lipton, *In Last Rush, Trump Grants Mining and Energy Firms Access to Public Lands*, N.Y. Times (Dec. 19, 2020) (explaining that "[w]ith time running out on the Trump administration, senior Interior Department officials were so determined to see the permit approved that they took control of the project from the local Utah [BLM] office") (attached).

The Washington Post also highlighted the controversial nature of the Twin Bridges project. *See* Juliet Eilperin et al., *Trump rolled back more than 125 environmental safeguards. Here's how.*, The Washington Post (Oct. 30, 2020) (attached). The Post explained that the development would take place "in a remote patch atop the state's Labyrinth Canyon [on] a lease awarded by the administration three weeks before Congress designated it a protected wilderness area." *Id.*

Additionally, the Senate Letter called for then-Interior Secretary Bernhardt not only to cancel the underlying lease but to reject the Twin Bridges proposal because it would "destroy [what] Congress sought to protect when it created the Labyrinth Canyon Wilderness." Senate Letter at 2.

*Fifth*, although the Federal court in Washington D.C. initially granted SUWA's request to enjoin the drilling project, the drilling was eventually allowed to proceed. The company spudded the well on January 16, 2021—four days before the Biden administration took office. The well, like all 79 other wells drilled in the San Rafael Desert, was a dry hole and the company subsequently plugged and abandoned it. *See, e.g.*, Brian Maffly, *Was a helium well in the Utah wilderness a bust?*, Salt Lake Tribune (March 22, 2021).[18] The drilling activities impacted Wilderness values and will now take decades to reclaim (if at all).

Thus, the Reevaluation EA affords BLM the opportunity to rectify many of these errors and in particular, it affords BLM the opportunity to cancel this lease and give the Labyrinth Canyon Wilderness the protection Congress intended.

## VI.    Section 7 of the Endangered Species Act Requires BLM to Consult with the U.S. Fish & Wildlife Service Before Issuing a Final Decision on the Leases.

Congress enacted the Endangered Species Act ("ESA") to provide "a program for the conservation of…endangered species and threatened species." 16 U.S.C. § 1531(b). Thus, all BLM "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of the [ESA]." *Id.* § 1531(c)(1). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3).

---

[18] https://www.sltrib.com/news/2021/03/22/was-helium-well-utah/

AR010174

Under Section 7 of the ESA, BLM shall consult with the U.S. Fish & Wildlife Service ("FWS") to "insure that any action authorized, funded, or carried out by [the] agency…is not likely to [1] jeopardize the continued existence of any endangered species or threatened species or [2] result in the destruction or adverse modification of [the critical habitat] for such species. *Id.* § 1536(a)(2). For each proposed federal action, BLM must request from FWS information to determine whether any listed or proposed species may be present in the area of the proposed agency action. *Id.* § 1536(c)(1); 50 C.F.R. § 402.12(c). If such species may be present in the proposed action area, BLM must prepare a "biological assessment" to determine whether the listed species or designated critical habitat may be affected by the proposed action. *Id.* Likewise, for candidate species, BLM must "conference" with FWS to evaluate the impacts to the proposed species and its potential critical habitat. 50 C.F.R. § 402.10(a). The biological assessment evaluates whether the species is likely to be adversely affected by the proposed action. *Id.* § 402.12(a).

If BLM determines that its proposed action may affect the species or critical habitat, it must engage in consultation with FWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If the action is likely to adversely affect a species, BLM must engage in "formal consultation" with FWS. 50 C.F.R. § 402.14(a). To complete formal consultation, FWS must provide the BLM with a "biological opinion" explaining how the proposed action will affect the listed species or its critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. If FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species, the biological opinion must outline "reasonable and prudent alternatives," if any, that could be taken by BLM without inflicting these harms. 16 U.S.C. § 1536(b)(3)(A). An action agency may not proceed with an action that would likely jeopardize a listed species. *Id.* § 1536(a)(2).

## A.   BLM's re-evaluation of the September and December 2018 lease sales is an agency action warranting formal Section 7 consultation.

"Action" is defined broadly under the ESA. It refers to "all activities or programs of any kind authorized, funded or carried out…by Federal agencies in the United States." 50 C.F.R. § 402.02. Granting a federal lease is one example expressly identified as an "action." *Id.* Other examples include "actions directly or indirectly causing modifications to the land, water, or air." *Id.* In the context of an oil and gas lease sale, an agency action encompasses "the entire leasing project, from the issuance of the leases through post-leasing development and production." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (citing *N. Slope Borough v. Andrus,* 642 F.2d 589, 608 (D.C. Cir. 1980).

The re-evaluation of the September and December 2018 lease sales is an agency action under the ESA. Although BLM avoids stating that the re-evaluation triggers BLM's consultation duties, it nonetheless acknowledges that the following federally-listed species or their critical habitat may be present on all or some of the parcels at issue:

25

| Fish | Wildlife | Plants |
|---|---|---|
| • Bonytail (*Gila elegans*) <br> • Colorado pikeminnow (*Ptychocheilus lucius*) <br> • Humpback chub (*Gila cypha*) <br> • Razorback sucker (*Xyrauchen texanus*) | • California condor (*Gymnogyps californianus*) <br> • Mexican spotted owl (*Strix occidentalis lucida*) <br> • Southwestern willow flycatcher (*Empidonax traillii extimus*) <br> • Yellow-billed cuckoo (*Coccyzus americanus*) | • Navajo sedge (*Carex specuicola*) <br> • Jones cycladenia (*Cycladenia humilis* var. *jonesii*) <br> • San Rafael cactus (*Pediocactus despainii*) <br> • Barneby reed-mustard (*Schoencrambe barnebyi*) <br> • Ute ladies'-tresses (*Spiranthes diluvialis*) |

Reevaluation EA at 3-6 (fish); 3-13, 3-14 (plants); 3-23 (wildlife). Thus, BLM is—at minimum—required to issue a biological assessment. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c); *see also* Bureau of Land Mgmt, Manual 6840 – Special Status Species Mgmt §§ .1F5, .1F5a (2008) (stating that "BLM will prepare a [biological assessment] for submittal to FWS…when seeking concurrence on a [not likely to adversely affect] determination" or when initiating formal consultation).[19]

Although BLM has not analyzed impacts to the aforementioned species in a biological assessment (or elsewhere in the re-evaluation's NEPA documentation),[20] it has concluded that affirming the leases for all or some of the parcels at issue may affect the identified species by stating that the various lease stipulations and notices "would mitigate potential impacts from mineral development on the leases and adjacent lands." Reevaluation EA at 3-23.

Furthermore, BLM acknowledges that "[w]ater depletions from any portion of the Upper Colorado River drainage basin above Lake Powe are considered to *adversely affect or adversely modify* the critical habitat of the four resident endangered fish species." Reevaluation EA at 3-6. By its own analysis, BLM has determined that the above-named wildlife and plant species may be present in the action area and that such species may be affected by affirming the leases of all or some of the parcels *and* that the Colorado River fish will be adversely affected by water depletions associated with oil and gas development. Thus, BLM is obligated to issue a biological assessment that includes:

> (i)  A clear, thorough description of the action, including any actions to minimize or avoid adverse effects on listed species or designated critical habitat.
> (ii)  A description of the area that may be directly or indirectly affected by the action.
> (iii)  Identification of any interrelated or interdependent actions.
> (iv)  A description of any listed species or designated critical habitat that may be affected, including the results of any on-site inspection(s) of the action area to determine if listed or proposed species are present or occur seasonally.

---

[19] The contents of a biological assessment are detailed in Manual 6840 § .1F5b.

[20] BLM instead defers site-specific analysis to the APD stage, which, as explained in detail below, is unlawful.

26

(v)   A review of the literature, and any other pertinent information, including available views of recognized experts on the species at issue.
(vi)  An analysis of the direct and indirect effects of the action and any interrelated or interdependent actions on the listed species and critical habitat.
(vii)  A determination of effects that is clearly supported by the analysis of effects.
(viii)  Identification of any alternate actions considered by the Federal agency for the proposed action.
(ix)…an analysis of cumulative effects.

Manual 6840 §§ .1F5, .1F5b. BLM must then provide this biological assessment to FWS and initiate formal consultation. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

Furthermore, based upon the information provided in the Reevaluation EA and the administrative record for *SUWA v. Haaland*, it is inappropriate for BLM to merely seek concurrence (again) that the leases "may affect but [are] not likely to adversely affect" the species. *See* Reevaluation EA at 4-1. A "not likely to adversely affect" ("NLAA") determination is appropriate for the relevant plant and wildlife species because an NLAA determination is only appropriate when

> the effect is 1) discountable, 2) insignificant, or 3) completely beneficial. These effects have an extremely low probability of occurrence (discountable); cannot be translated into any significant measurable effect on the species even when effects on habitat can be measured (insignificant); or are completely beneficial. For discountable and insignificant, *the risk of harm or harassment is so low that a reasonable person would not consider it a factor in making a decision on the proposed action.*

Manual 6840 § .1F5 (emphasis added). BLM does not explain why merely applying lease stipulations and notices renders effects to the listed plants and wildlife "discountable" or "insignificant." As discussed above, these stipulations are the same stipulations that BLM previously recognized in the MLP process as inadequate and that had to be amended prior to offering new leases in the San Rafael Desert (and BLM even prepared the detailed list of updated stipulations).

Additionally, it is FWS policy that it may issue an NLAA concurrence "only if ALL of the reasonably expected effects of the proposed action will be beneficial, insignificant, or discountable." U.S. Fish & Wildlife Serv. and Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook, 4-1 (1998) (capitalization in the original). Because affirming the leases will result in water depletions from the Upper Colorado River drainage basin, thereby adversely affecting the listed Colorado River fish, *see* Reevaluation EA at 3-6, it is inaccurate for BLM to conclude, and FWS to concur, that "ALL of the reasonably expected effects of the proposed action will be beneficial, insignificant, or discountable." Endangered Species Consultation Handbook at 4-1.

27

### B.     Site-specific Section 7 consultation must occur at the leasing stage and cannot be deferred to the APD stage.

A biological opinion must analyze the "effect of the entire agency action." *Conner*, 848 F.2d at 1453. In the context of oil and gas leasing and development, formal consultation between BLM and FWS must occur "at the leasing stage," and the resulting biological opinion must consider whether the consequences of leasing the nominated parcels are "likely to jeopardize the continued existence of protected species based on 'the best scientific and commercial data available.'" *Id.*

Furthermore, ESA Section 7(d) prohibits BLM from making any "irreversible or irretrievable commitment of resources" prior to the conclusion of consultation which would have "the effect or foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d); *Conner*, 848 F.2d at 1453. Relevant here, *issuing an oil and gas lease* constitutes an "irretrievable commitment of resources," thus warranting site-specific environmental analysis that necessarily includes site-specific Section 7 consultation. *N.M. ex rel. Richardson*, 565 F.3d at 718.

Here, however, BLM improperly defers the consideration of impacts and mitigation measures to protected wildlife the subsequent APD stage, asserting—without analysis or support—that

> [a]pplying the identified T&E lease notices—which were developed through formal ESA Section 7 Consultation with [FWS] during the development of the applicable land use plan—would mitigate potential impacts from mineral development on the leases and adjacent lands....At the *lease development stage*, site-specific ESA Section 7 consultation with [FWS] would occur as necessary and would take into account consideration infrastructure siting, habitat suitability determinations, survey results, and any additional site-specific considerations or avoidance measures.

Reevaluation EA at 3-23 (wildlife) (emphasis added); *see also id.* at 3-12 (vegetation). This piecemeal approach to analysis and consultation contravenes Section 7 and is foreclosed by *Conner v. Burford*. 848 F.2d at 1454-58. There, the court held that the ESA's congressional mandate requires that "a comprehensive biological opinion be prepared" for competitive oil and gas lease sales. *Id.* at 1457. This biological opinion "must be coextensive with the agency action [*i.e.*, the entire project from leasing to post-production reclamation] and T&E stipulations cannot be substituted for comprehensive biological opinions." *Id.* at 1458. In other words, FWS must (in consultation with BLM) prepare a biological opinion "assessing the potential impacts of all post-leasing activities." *Id.*

BLM attempts to justify its decision not to conduct site-specific Section 7 consultation for the Reevaluation EA by claiming that impacts to listed species are "too speculative" at the leasing stage. Reevaluation EA at 3-7. However, "incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available." *Conner*, 848 F.2d at 1454 (citing 16 U.S.C. § 1536(a)(2)). Indeed, at the leasing stage, BLM has information available to analyze

28

"where, when, or to what extent, actions may occur that may affect" listed species or their critical habitat. *Bd. of Cnty. Commissioners of Cnty. of San Miguel*, 584 F. Supp. 3d at 976. For instance,

> [l]ocation and size details bec[o]me available, and it [is] known when the leases would commence and that they are valid for ten years. The BLM could also evaluate the extent of potential activity due to the increased traffic anticipated from the lessees' staking, surveying, and accessing the parcels. And, significantly, the lease parcels could [be] considered in conjunction with any other prospective and existing leases and facilities.

*Id.* In essence, identifying the specific parcels to be leased "provide[s] more information than was reviewed at the RMP stage," thus triggering new, site-specific Section 7 consultation under the ESA. *Id.*

Moreover, BLM cannot circumvent its formal consultation obligations by attempting to instead rely on the "Incremental Step Consultation" policy articulated in Manual 6840. Bureau of Land Mgmt, Manual 6840 – Special Status Species Mgmt § .1F5i (2008). This policy allows BLM to conduct consultation in "incremental steps," but *only if* BLM undertakes an *initial formal* consultation on the entire action, and the resulting biological opinion "include[s] [FWS's] views on the *entire action*." *Id.* (citing 50 C.F.R. § 402.14(k)) (emphasis added). This requires an analysis of not only the impacts of leasing the proposed parcels, but the interrelated actions associated with exploiting the oil and as on these parcels. Furthermore, BLM may only proceed with an incremental step analysis provided

> [1] that the FWS…finding for the incremental step is not a jeopardy opinion;
> [2] the BLM continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step;
> [3] the BLM *fulfills its obligation to obtain sufficient data upon which to base the final biological opinion on the entire action*;
> [4] the incremental step does not result in the irreversible or irretrievable commitment of resources; and
> [5] there is *reasonable likelihood that the entire action will not result in jeopardizing the continued existence of a listed species or destruction or adverse modification of designated critical habitat*.

*Id.* § .1F5i(1) (emphases added).

Here, BLM has not adhered to these requirements. BLM has not initiated formal consultation with FWS regarding this re-evaluation, has failed to provide sufficient data, and neither BLM nor FWS has properly determined with a reasonable likelihood that the "entire action" would not jeopardize listed species or adversely modify critical habitat.

In short, there is no circumstance in which BLM may lawfully avoid consulting with FWS. BLM must initiate formal consultation, and a biological opinion must be rendered, before BLM can affirm any of the leases at issue.

29

### C.    BLM cannot rely on the 2008 Price RMP Programmatic Biological Opinion to satisfy its consultation obligations.

Unlike with NEPA,[21] the ESA does not contemplate allowing BLM to rely on an already-existing programmatic biological opinion in order to satisfy its Section 7 consultation obligations. *See Nat. Res. Def. Council v. Rodgers*, 381 F. Supp. 2d 1212, 1228 n.27 (E.D. Cal. 2005) (observing that "tiering" to a biological opinion is not described anywhere in the ESA or its implementing regulations). Courts have—on very rare occasion—permitted use of a programmatic biological opinion supplemented by a later project-specific biological opinion in the unique circumstance in which the "programmatic opinion was particularly thorough," and the associated land use plan was court-approved. *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 383 n.38 (E.D. Cal. 2007). More specifically, tiering to a programmatic biological opinion was allowed in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.* because the land use plan was 1) "developed on sound scientific analysis as an effective method to conserve the [northern] spotted owl," 2) previously approved by the Ninth Circuit, and 3) the associated biological opinions "conducted independent analyses of site-specific data." 378 F.3d 1059, 1067-68 (9th Cir. 2004).

Here, the Price RMP and 2008 Programmatic Biological Opinion (and its re-initiation amendments adding Ute ladies'-tresses, Navajo sedge, California condor, and yellow-billed cuckoo) do not meet the *Gifford Pinchot* criteria. The Price RMP was not developed with the intent, or as an effective method of, conserving the listed species in the planning area, nor was it approved by a court. *See* Price RMP at 1 (stating that the purpose of the RMP was to "provide a comprehensive framework for public land management within the [Price Field Office] and its allocation of resources pursuant to the multiple use and sustained yield mandate of FLPMA").

Moreover, the PFO Biological Opinion, which was specifically issued to support the Price RMP, did not "conduct[] independent analysis of site specific data." Rather the PFO Biological Opinion considers, at a field office-wide level, the general impacts of oil and gas leasing on listed species within the planning area. *See* U.S. Fish & Wildlife Serv., Programmatic Biological Op. for the Price BLM Res. Mgmt Plan 5 (2008) (noting that the effects determinations in the PFO Biological Opinion are based on the broad scale, general management policies decided in the Price RMP). For each of the analyzed species,[22] FWS based its "no jeopardy" conclusion on the condition that "[a]ll site-specific projects designed under the [Price RMP] would be subject to consultation requirements under Section 7 of the [ESA]." *Id.* at 32 (Mexican spotted owl), 45 (southwestern willow-flycatcher), 70 (San Rafael cactus), 97 (Barneby reed-mustard), 105 (Jones cycladenia), 139 (bonytail, Colorado pikeminnow, humpback chub, razorback sucker).

As explained above, the lease sale is a site-specific agency action "designed under" the Price RMP, *see* Reevaluation EA at 1-2, that is subject to Section 7 consultation requirements. By its

---

[21] NEPA regulations allow agencies to "tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues." 40 C.F.R. § 1501.11(a).

[22] Amendments to the 2008 Biological Opinion based on the November 2018 re-initiation (that added Ute ladies' tresses, Navajo sedge, and California condor) and the May 2020 re-initiation (that added the yellow-billed cuckoo) are not readily available to the public. FWS' assessment and opinion of effects to these species as a result of the Price RMP is thus unclear. SUWA requests that these amendments be made publicly available.

AR010180

own terms, the PFO Biological Opinion alone cannot satisfy BLM's consultation duties. *See e.g., Ctr. for Sierra Nevada Conservation v. U.S. Forest Serv.*, 832 F. Supp. 2d 1138 (E.D. Cal. 2011) (rejecting tiering to a programmatic biological opinion—and thus requiring site-specific Section 7 consultation—by the Forest Service because the proposed project did not conform to the assumptions reflected in the programmatic biological opinion).

SUWA appreciates your consideration of and attention to these matters.

<div align="center">

Respectfully,

/s/ Landon Newell
Landon Newell
Hanna Larsen
Staff Attorneys
Southern Utah Wilderness Alliance

</div>

<div align="center">

31

</div>

# OIL AND GAS LEASING REFORM

# IMPLEMENTATION PLAN

# UTAH STATE OFFICE

# SEPTEMBER 2010

AR010182

## I.    Introduction and Background

General

BLM Utah's Leasing Reform Implementation Plan proposes a process for ensuring orderly, effective and timely implementation of the BLM's Oil and Gas Leasing Reform, to comply with Washington Office (WO) Instruction Memorandum (IM) 2010-117.  This plan process conforms with law and regulation requiring four lease sales per year if lands are available, while also providing for a clear, consistent leasing process designed to protect multiple resource values.   Utah is currently in transition and will fully implement its Leasing Reform Implementation Plan starting with the oil and gas lease sale tentatively scheduled for May 2011.  In the interim period, Utah will be unable to complete analyses required to offer lease parcels at quarterly auctions for November 2010 and  February 2011, and is providing notification that these scheduled lease sales will be formally cancelled.

BLM Utah manages approximately 23 million surface acres and 32 million acres of Federal mineral estate within four Districts (Canyon Country, Color Country, Green River, and West Desert) and the Grand Staircase-Escalante National Monument.

Utah's Congressional, industrial, county and state government, and environmental community interests are very active in all planning and activity level projects within Utah. Public involvement throughout this process is expected and may affect projected timelines.   BLM Utah contacted neighboring BLM states and anticipates additional coordination with offices in those states.

The Stiles Report

On October 7, 2009, the "Final BLM Review of 77 Oil and Gas Lease Parcels Offered in BLM-Utah's December 2008 Lease Sale" (Stiles Report) was released.  This report was prepared in response to the "Report to Secretary Ken Salazar Regarding the Potential Leasing of 77 Parcels in Utah" submitted by Deputy Secretary of the Interior David J. Hayes on June 11, 2009.

The Stiles Report was completed by an eleven-person, multi-disciplinary review team that evaluated the 77 parcels (the Stiles parcels) from the December 2008 lease sale that were withdrawn by Secretary Salazar in February 2009.  After its review process, the team made one of three recommendations for each of the Stiles parcels: lease (open), defer, or remove from further consideration for leasing (close).   Along with leasing recommendation, the team addressed issues, concerns, and/or rationale for their recommendations, which have been considered here and will help when directing analysis in the future.

2

AR010183

## II.    Land Use Plans and Stipulation Consistency

Status of Land Use Plans

Land Use Plans (LUP) are subject to a continual process of monitoring and review for effectiveness of decisions as new policies are implemented and as new information or changed circumstances arise.  As a result, plan maintenance, amendments or revisions are undertaken routinely as needs are identified.

BLM Utah completed Resource Management Plans (RMPs) for six field offices in 2008 (Kanab, Moab, Monticello, Price, Richfield and Vernal).  The four remaining field offices (Cedar City, Fillmore, St. George and Salt Lake) are currently utilizing older plans which include RMPs and Management Framework Plans (MFPs).  Additional NEPA analyses were also prepared in conjunction with the plans, but are also dated.

Two plan revisions have been started and are in the initial stages currently.  Cedar City has just begun a plan revision, which will provide an updated basis for oil and gas decisions when completed.  St. George is also proposing a land use plan amendment in response to the enactment of the Washington County Land Use Bill (March 2009) that designated wilderness areas, wild and scenic rivers and two National Conservation Areas—all of which are withdrawn from mineral leasing.  During this plan amendment process, St. George is reviewing all areas that could be potential ACECs, which could result in new mineral restrictions.  Development of county-wide travel management plan will also be included as part of this effort.

Due to funding constraints, the remaining field offices with older LUPs, Fillmore and Salt Lake, are not currently revising their plans.

Stipulation Review

Pursuant to IM 2010-117, a list of current statewide stipulations has been forwarded to the BLM WO.  Further work on stipulation consistency efforts will be undertaken after national-level feedback on consistency and edge-matching is developed.

The existing Utah Energy Support Team has and will continue to function as the Interdisciplinary Consistency Review Team (IDCR) identified in IM 2010-117.  The Utah IDCR has undertaken a review of the existing stipulations in the six new RMPs in Utah and begun a process to achieve consistency throughout the eastern portion of the state.  Stipulations for the western portion of Utah were also compiled.

Following issuance of the WO stipulation format guidance, a review process will be initiated for each LUP in order to define and recommend appropriate changes.  After the initial drafting by the IDCR, field office review and input will ensure stipulations provide the needed protection for the resource(s).  Recommendations will also be made as to whether plan amendments are necessary or if plan maintenance actions are sufficient to adopt the new stipulations.  Throughout this process BLM Utah will be coordinating with the local, state and federal agencies, as appropriate, to ensure that the stipulation modifications provide the proper level and/or area of protection.

After stipulations are drafted, a review will be requested from the Office of the Regional Solicitor to ensure stipulation enforceability.  Once the language is agreed upon, plan

3

maintenance or amendments (as needed) will be completed to formally incorporate the modified stipulations.

<u>New Land Use Plan Stipulation Development</u>

As stipulations are developed for new RMP revisions (Cedar City and St. George), they will also be reviewed to ensure they are edge-matched across BLM administrative boundaries.  Coordination will be between district/field offices and across the Utah state line (Nevada and Arizona) to ensure consistency.  Each resource specialist will be responsible for the stipulations affecting their particular resource.  Issues that cannot be resolved between BLM states will be referred to WO for resolution. The Salt Lake and Fillmore FOs have seven governing LUP documents, and they are being considered for revision, but are not yet scheduled by the WO.  Stipulations will be developed in the same manner as explained above, as they are revised.


**III.    Master Leasing Plans**

<u>Summary of Process Undertaken</u>

Master Leasing Plans (MLPs) will be recommended utilizing the four criteria in WO IM 2010-117 to identify areas that may require MLP preparation.  The four criteria are:

1   A substantial portion of the area to be analyzed in the MLP is not currently leased.
2   There is a majority Federal mineral interest.
3   The oil and gas industry has expressed a specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.
4   Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur where there are:
    o   multiple-use or natural/cultural resource conflicts;
    o   impacts to air quality;
    o   impacts on the resources or values of any unit of the National Park System, national wildlife refuge, or National Forest wilderness area, as determined after consultation or coordination with the NPS, the FWS, or the FS; or
    o   impacts to other specially designated areas.

Preliminary reviews have been conducted to review and consider which areas would meet the four criteria and which areas would likely be appropriate for preparation of a parcel-specific NEPA documents.  As part of the review, interactive GIS-generated maps were developed, which included existing leases, wells (active and plugged-and-abandoned), land ownership, deferred parcels, unissued leases with pending protests, leases which are under suspension due to court decisions,  and expressions of interest (EOI) - all overlaid with resource data.  District managers, field office managers and

4

resource specialists from each office were consulted on areas that they felt merited further consideration.

External Proposals

Organizations outside of the government have taken an interest in the MLP concept and have submitted seven recommendations for MLPs.  Attachment 1 includes a summary of the proposals, a table identifying issues and factors considered when evaluating the proposals, and a set of maps depicting the proposed MLP areas.    Each recommendation was evaluated against the criteria listed earlier to determine if MLP preparation is warranted.  The information provided in the proposals will also be taken into consideration as areas are evaluated in the future. Additional recommendations are expected to be submitted in the future.

MLP Recommendations

The "Central Moab Area" has been identified as meeting the criteria for a Master Leasing Plan.  As shown on Map 1 in Attachment 2, large portions of the area are unleased.  The unleased areas run throughout the Central Moab Area, and the entire area has a high percentage of federal mineral interest.  Specific interest has been expressed by the oil and gas industry, and the RMP identified the area as having a high potential for oil and gas development which is confirmed by scattered producing oil wells in the proposed MLP analysis area.

Twenty of the parcels included in the Stiles Report lie within the proposed MLP area. The Stiles review team recommended that five of these parcels not be leased, and the other 15 should be deferred until further NEPA analysis could re-examine some leasing decisions.  Some of the resource values the team suggested BLM Utah look at when re-evaluating leasing in these areas were: value of scenery, recreation, travel and tourism and consider a localized air quality model, night skies and broad scale visual resource analysis.

This area is also an area of high industry interest for potash exploration.  Potash in this area occurs in deep beds, which are only conducive to solution mining via deep boreholes.  BLM Utah proposes to include potash in the MLP analysis because the exploration and development of potash would have impacts similar to oil and gas.  In fact, the Moab RMP already combines stipulations for potash and oil and gas.

AR010186

Future Analysis

Analysis of potential MLP areas will be an ongoing process. As additional MLP proposals are submitted, BLM Utah will perform the same process, and as other needs are identified, internally or externally, proposals will be generated and analyzed. The Utah State Office will conduct an initial review of leases, wells, land ownership, deferred parcels, suspended leases, and EOIs – and consider this information in the context of other resource values. If an area is identified as possibly needing a MLP, then it will be sent to the field office for further evaluation.

## IV. Lease Parcel Review Process and Field Office Rotation Schedule

Where MLPs are considered and determined to not be necessary at this time, parcel-specific NEPA analysis will be undertaken to consider EOIs and other proposals to lease (see Attachment 3). Protested leases (Sold but not Issued - SNI) and suspended leases in the vicinity of the EOIs will also be addressed in the site-specific NEPA document. The issues that were of concern in the protest or that caused the suspension of the lease will be taken into consideration in the NEPA analysis. After the NEPA analysis is completed, the appropriate action for each parcel can be determined.

Utah State Office Interdisciplinary Energy Team

BLM Utah formed an Interdisciplinary Energy Support Team in 2006 to address the increased demand for oil and gas leasing and development in Utah. This team handles the leasing process from EOIs/nominations through lease issuance, and provides assistance, review, oversight, and consistency for NEPA processes and consultation efforts. The team consists of the section chief, environmental coordinator, natural resource specialist, archaeologist, biologist, and land law examiner. Additional program coordination also includes planning, reservoir management, coal, water, air and paleontology.

Formation of Interdisciplinary Parcel Review Teams:

BLM Utah has been using an interdisciplinary process similar to the Interdisciplinary Parcel Review Team (IDPR) to examine lease parcels and prepare documents for the lease sales for the past several years. However, the challenge at this time is that implementation of IM 2010-117 will significantly increase the workload on the IDPR and field office interdisciplinary staff. With the present staff and budget, it is anticipated that field offices will not be able to complete their normal workload in addition to the added workload of leasing analysis required by leasing reform.

Rotational Parcel Review:

EOI cutoffs would occur for each district office once a year. The cutoffs would occur in the following order on the dates shown:

6

1. Color Country District Office (Jan. 4)
2. West Desert District Office (April 2)
3. Green River District Office (July 2)
4. Canyon Country District Office (Oct. 2)

EOIs would be accepted for all offices throughout the year. However review process for EOIs for the specific district offices would begin based on the dates listed above. The EOIs that have accumulated throughout the year within those district offices would be evaluated as to what level of analysis is appropriate (EA or MLP). The four criteria for MLPs will be considered, and if warranted, MLP preparation will be considered and undertaken.

BLM Utah plans to implement this IM as soon as possible and prepare to offer leases under this new guidance by May 2011. Until that time, BLM Utah will not have any lands available to lease that comply with the NEPA requirement under the new leasing reform policy. The quarterly lease sale schedule from May 2011 forward will be dependent upon the availability of lease parcels with appropriate NEPA analysis.

This plan includes a schedule for NEPA compliance for 2011 sales. Including the mandatory 30-day public comment period, the EA process will take approximately 8-10 months, depending on the office and complexity of resource issues. The NEPA compliance schedule will be evaluated after the first year of implementation to determine if a modified schedule is necessary.

Each district office would only be responsible for one lease sale per year under this sale schedule. Conducting sales based on a district rotational schedule will be a change for BLM Utah and may have a significant impact on the length of time between an EOI filing, when the parcel is scheduled to be reviewed, and its potential sale. In some cases, it could take more than a year and a half to reach auction.

This schedule includes the required notification to surface owners of split estate parcels prior to the 30-day comment period (WO IM 2010-117) and again when the parcel is included in the Notice of Competitive Oil and Gas Lease Sale (WO IM 2009-184). Both notifications will be sent by BLM Utah.

When developing this schedule consideration was given to the need to avoid overlapping periods of intense workload. While the workload for the field offices is rotational, the workload for the Energy Support Team is continuous. Once full implementation has occurred, lease sales will be in various stages simultaneously at all times.

7

<u>Steps, Criteria, and Timeframes to Address the Backlog of Deferred Parcels</u>

The Utah State Office will provide public notice to inform that all lands nominated before April 2010 will need to be re-nominated for implementation of the new lease sale rotation EOI rotation schedule.  The notice will be posted on BLM Utah's public internet site, made available in the Utah State Office Business Information Center (Public Room) and will be sent to current lessees.  This notice will prevent unnecessary work where there is no longer an interest in the nomination.

In the future, if leasing is determined to not be in conformance with the respective LUP, the parcel would be recommended for deletion, rather than deferral.  The nomination file will be closed and the nominator will be notified of the decision.

<u>Workload and Funding</u>

The workload associated with Oil and Gas Leasing Reform is anticipated to have an impact on a multitude of program areas.  Until the entire process has been completed for several sales, it is difficult to evaluate the extent of the impacts. With much of the traditional 1310 budget being reduced (and 1311 increased) the ability to fund leasing workloads is very limited.  The findings will not even be available for the post-implementation report due May 18, 2011.  A modification to Utah's Oil and Gas Leasing Reform Implementation Plan based on these could occur in late 2011.

AR010189

# Attachment 1

Externally-Proposed MLPs

1. Summary of Proposals
2. Issues and Factors Considered
3. Maps of Proposals

AR010190

**Attachment 1 – 1**

**Summary of Externally-Proposed Master Leasing Plans**

Utah has received 7 proposals for Master Leasing Plan areas.  Two proposals are in the West Desert District – one is within the Fillmore Field Office and the other spans both Salt Lake and Fillmore Field Offices. Two proposals are in the Vernal Field Office, one is in the Price Field Office, one is in the Moab Field Office, and the last is split among the Price, Richfield and Moab Field Offices.

**Western Fillmore MLP Proposal**:  Trout Unlimited proposed an unspecified area in the Fillmore Field Office containing sage grouse habitat or historic Bonneville cutthroat trout habitat.  An EA was prepared to analyze potential effects of oil and gas leasing in the Fillmore Field Office in 2009, and the resulting decision provided that oil and gas leasing would be deferred in areas containing sage grouse or historic Bonneville cutthroat trout habitat, until a plan amendment or revision was completed.

**Dinosaur Lowlands MLP Proposal** (NOTE – all statistics provided by The Wilderness Society, et al):  A coalition of The Wilderness Society/Colorado Environmental Coalition/Center for Native Ecosystems/Southern Utah Wilderness Alliance proposed this MLP, which spans the Utah-Colorado state line and comprises almost 1 million acres within Colorado's White River and Little Snake Field Offices and Utah's Vernal Field Office.  The area is 48% leased and 25% of the leased acreage is in production.  It includes the Bull Canyon, Skull Creek and Pinyon Ridge Citizen Wilderness Proposals (CWPs) in Colorado and the Bourdette Draw and Bull Canyon CWPs in Utah.  The proposal also describes the following Utah areas that were inventoried by BLM for wilderness characteristics, and may or may not have been found to contain them: Moonshine Draw, Beach Draw, Stuntz Draw, Vivas Cake Fill, Split Mountain Benches, Split Mountain Benches South, and Stone Bridge Draw.  Additionally, Daniel's Canyon was also inventoried by BLM (and found to have wilderness characteristics) but was not mentioned in the MLP proposal. The MLP proposal also describes five white-tailed prairie dog complexes, black-footed ferret habitat and reintroduction areas, greater sage-grouse habitat, raptor habitat and Graham's penstemon occurrences, and along with other native species, nominated and designated ACECs and adjacency to Dinosaur National Monument as part of its rationale.

**Eastern Book Cliffs/Piceance Basin Proposal** (NOTE – all statistics provided by The Wilderness Society, et al):  A coalition of The Wilderness Society/Colorado Environmental Coalition/Center for Native Ecosystems/Southern Utah Wilderness Alliance proposed this MLP, which spans the Utah-Colorado state line and comprises almost 850,000 acres within Colorado's White River Field Office and Utah's Vernal Field

10

Office.  The area is 56% leased; the Colorado portion is largely developed and the Utah portion is mostly undeveloped. It includes the Cripple Cowboy, Sweet Water Canyon, Hells Hole Canyon, Seep Canyon, Sunday School Canyon, and Lower Bitter Creek in Utah; Big Ridge, Canyon Pintado and Oil Spring Mountain CWPs in Colorado; and the Bitter Creek and Dragon Canyon CWPs, split between Utah and Colorado.  The MLP proposal also describes greater sage-grouse habitat, Graham's penstemon occurrences, raptor habitat, along with other native species, and nominated and designated ACECs as part of its rationale.

**Price River Proposal** (NOTE – all statistics provided by SUWA):  The Southern Utah Wilderness Alliance proposed this MLP, located in the Price Field Office in south-central Utah and comprising over one million acres.  The area is 58% BLM lands, and approximately 56% of BLM land is under lease, with 27% of that acreage in production.  The area includes the Price River, Lost Spring Wash, Mexican Mountain, Sids Mountain, and Desolation Canyon CWPs.  The MLP proposal describes recreation resources and opportunities that should be considered in the context of energy development and also addresses the need to include climate considerations (dust melting snow and effects of global climate change).

**Shadows of the Deep Creeks Proposal** (Note – all statistics provided by SUWA):  The Southern Utah Wilderness Alliance proposed this MLP, located in the Salt Lake and Fillmore Field Offices in western Utah and comprising approximately 900,000 acres. The area is 85% BLM land, with approximately 20% under lease.  The area includes the Conger Mountain, Deep Creek Mountains, Disappointment Hills, Essex Canyon, Granite Mountain, Kern Mountains, Ledger Canyon, Ochre Mountain, Snake Valley and Wild Horse Pass CWPs. The MLP proposal describes wildlife habitat, recreation opportunities and climate change as other issues that should be considered.

**Book Cliffs Divide-Grand Valley-Cisco Desert Proposal** (Note – all statistics provided by SUWA):  The Southern Utah Wilderness Alliance proposed this MLP, located in the Moab Field Office in eastern Utah and comprising approximately 400,000 acres.  The area is 84% BLM land, with approximately 60% under lease.  The area includes the Hideout Canyon, Mexico Point, and Westwater Creek CWPs, as well as the Flume Canyon, Coal Canyon and Diamond Canyon BLM reinventory areas.  The MLP proposal also describes recreation opportunities and wildlife habitat.

**San Rafael River Proposal** (Note – all statistics provided by SUWA):  The Southern Utah Wilderness Alliance proposed this MLP, located in the Moab and Price Field Offices is east-central Utah and comprising approximately 850,000 acres.  The area is 83% BLM land, with approximately 30% under lease.  The area includes Desolation Canyon, Dirty Devil, Duma Point, Flat Tops, Labyrinth Canyon, Lost Spring Wash, San Rafael River, Sweetwater Reef and Upper Horseshoe Canyon CWPs.  The MLP

11

AR010192

proposal describes cultural resources, endemic bee populations, recreation, wildlife habitat and climate change as other issues that should be considered.

12

**Attachment 1 – 2**

**Issues and Factors Considered**
**Externally-Proposed Master Leasing Plans**

| DISTRICT Field Office | Areas Considered | Issues Taken Into Consideration to Determine Potential Level of Analysis |
|---|---|---|
| CANYON COUNTRY DISTRICT<br><br>Moab Field Office | SUWA PROPOSAL:<br>Book Cliffs Divide-Grand Valley-Cisco Desert<br>MAP 1 | <ul><li>mostly leased</li><li>majority federal minerals</li><li>current industry interest in new leasing</li><li>northern portion contains many producing gas wells, southern portion has both gas and oil production</li><li>suspended and protested (SNI) leases due to wildlife issues</li><li>contains parcels that are addressed in the Stiles Report (Southern Uinta Basin group - suggesting to lease)</li><li>includes the Hideout Canyon, Mexico Point, and Diamond Canyon Citizen Wilderness Proposals (CWP).</li><li>includes Flume Canyon, Coal Canyon and Westwater Creek BLM reinventory areas</li><li>proposal also describes recreation opportunities and wildlife habitat</li></ul> |
| CANYON COUNTRY DISTRICT: Monticello Field Office | SUWA PROPOSAL:<br>Glenn Canyon/San Juan River | <ul><li>mostly unleased</li><li>majority federal interest</li><li>current industry interest in leasing within the eastern portion of the proposal</li><li>current discovery in the eastern portion of the proposal</li><li>includes Red Rock Plateau, Copper Point, Nokai Dome, White Canyon, Fort Knocker Canyon, Tuwa Canyon, Upper Red Canyon, The Needle, Arch Canyon, Allen Canyon, Hammond Canyon, Valley of the Gods, Lime Creek, The Tabernacle, San Juan River, Comb Ridge, Fish & Owl Creek Canyons, Road Canyon, Dark Canyon, Tin Cup Mesa, Cross Canyon, and Monument Canyon CWPs</li><li>proposal also describes climate considerations (dust melting snow, regional climate change, and global climate change), cultural resources (Hole in the Rock Trail and Alkali Ridge National Historic Landmark), big game, raptors, special status species, ACECs, and wild and scenic rivers</li></ul> |
| COLOR COUNRTY DISTRICT: Kanab Field Office | SUWA PROPOSAL:<br>Vermillion Cliffs/Zion | <ul><li>unleased</li><li>majority federal interest in leasing</li><li>no industry interest</li><li>includes Upper Kanab Creek, Parunuweap Canyon, Orderville Canyon, Bunting Point, Moquith Mountain, Vermillion Cliffs, and Canaan Mountain CWPs</li><li>proposal also describes global climate change (effects of GHG contributions and soil disturbances), big game habitat, Mexican spotted owl critical habitat, sensitive species, ACECs, and wild and scenic rivers</li></ul> |

13

AR010194

| COLOR COUNRTY DISTRICT: Richfield Field Office | SUWA PROPOSAL: Henry Mountains | <ul><li>mostly unleased</li><li>majority federal mineral interest</li><li>very little to no industry interest in leasing</li><li>includes Factory Butte, Red Desert, Mount Ellen, Mount Pennell, Long Canyon, Bullfrog Creek, Ragged Mountain, Bull Mountain, Dirty Devil, Fiddler Butte, Muddy Creek, Little Rockies, Cane Spring Desert, Mount Hillers, and Wild Horse Mesa CWPs</li><li>proposal also describes climate considerations (dust melting snow, regional climate change, and global climate change), sensitive flora and fauna, recreation, cultural resources, ACECs, and wild and scenic rivers</li></ul> |
|---|---|---|
| GREEN RIVER DISTRICT<br><br>Price Field Office | SUWA PROPOSAL: Price River Proposal MAP 2 | <ul><li>over half the area is already under lease</li><li>majority federal minerals</li><li>no current industry interest in new leasing</li><li>the northwest part of the proposal area is fully developed and contains hundreds of producing gas wells (addressed in prior NEPA analysis)</li><li>includes the Price River, Lost Spring Wash, Mexican Mountain, Sids Mountain, Never Sweat Wash and Desolation Canyon CWPs</li><li>proposal also describes recreation resources and opportunities that should be considered in the context of energy development and also addresses the need to include climate considerations (dust melting snow and effects of global climate change).</li></ul> |
| | SUWA PROPOSAL: San Rafael River MAP 3 | <ul><li>mostly unleased (including protested-SNI leases)</li><li>majority federal minerals</li><li>no current industry interest in new leasing</li><li>several isolated oil wells in or near the area</li><li>includes Desolation Canyon, Dirty Devil, Duma Point, Flat Tops, Labyrinth Canyon, Lost Spring Wash, San Rafael River, Sweetwater Reef and Horseshoe Canyon (South) CWPs</li><li>proposal also describes cultural resources, endemic bee populations, recreation, wildlife habitat and climate change as other issues that should be considered</li></ul> |
| | SUWA PROPOSAL: San Rafael Swell Proposal MLP | <ul><li>mostly unleased</li><li>majority federal interest</li><li>no industry interest</li><li>a few older wells in the northwestern portion of the proposal</li><li>Includes Cedar Mountain, Devil's Canyon, Eagle Canyon, Jones Bench, Limestone Cliffs, Mexican Mountain, Molen Reef, Muddy Creek, Mussentuchit Badlands, Rock Canyon, San Rafael Knob, San Rafael Reef, Sids Mountain, Upper Muddy Creek, and Wild Horse Mesa CWPs</li><li>proposal describes climate considerations (dust melting snow, regional climate change, and global climate change), sensitive flora and fauna, recreation, cultural resources, ACECs, and wild and scenic rivers</li></ul> |
| GREEN RIVER DISTRICT | SUWA et al PROPOSAL: Dinosaur | <ul><li>about half leased, half unleased</li><li>majority federal minerals</li><li>no current industry interest in new leasing</li></ul> |

14

AR010195

| Vernal Field Office | Lowlands (also includes Colorado's White River and Little Snake Field Offices) MAP 4 | • significant production on the southern portion of the area, both gas and oil<br>• suspended leases due to wildlife issues<br>• may need to revisit planning decisions regarding greater sage-grouse<br>• includes the Bourdette Draw and Bull Canyon CWPs (and Bull Canyon, Skull Creek and Pinyon Ridge Citizen Wilderness Proposals in Colorado)<br>• includes Moonshine Draw, Beach Draw, Stuntz Draw, Vivas Cake Fill, Split Mountain Benches, Split Mountain Benches South, and Stone Bridge Draw reinventory areas (also includes Daniel's Canyon reinventory area that was found to have wilderness character by BLM, but is not mentioned in SUWA's proposal)<br>• proposal also describes five white-tailed prairie dog complexes, black-footed ferret habitat and reintroduction areas, greater sage-grouse habitat, raptor habitat and Graham's penstemon occurrences, and along with other native species, nominated and designated ACECs and adjacency to Dinosaur National Monument as part of its rationale. |
| | SUWA et al PROPOSAL: Eastern Book Cliffs/Piceance Basin (also includes Colorado's White River Field Office) MAP 5 | • Utah portion is mostly unleased (while Colorado portion is mostly leased)<br>• majority federal minerals<br>• no current industry interest in new leasing<br>• some gas wells within the Utah area, major gas production in the Colorado portion and the larger region<br>• contains parcels that are addressed in the Stiles Report (Central Uinta Basin - suggesting some parcels should be deferred to consider wilderness character, sage-grouse habitat and access)<br>• includes the Cripple Cowboy, Sweet Water Canyon, Hells Hole Canyon, Seep Canyon, Sunday School Canyon, Lower Bitter Creek CWPs (all in Utah) and Bitter Creek and Dragon Canyon CWPs (split between Utah and Colorado)<br>• proposal also describes greater sage-grouse habitat, Graham's penstemon occurrences, raptor habitat, along with other native species, and nominated and designated ACECs as part of its rationale. |
| WEST DESERT DISTRICT<br><br>Fillmore Field Office | TROUT UNLIMITED PROPOSAL: Western Fillmore (NO MAP) | • mostly unleased in the western Fillmore Field Office area<br>• majority federal minerals<br>• no current industry interest in new leasing<br>• no production or discovery<br>• programmatic EA was prepared to analyze potential effects of oil and gas leasing in the Fillmore Field Office in 2009, and the resulting decision provided that oil and gas leasing would be deferred in areas containing sage grouse or historic Bonneville cutthroat trout habitat, until a plan amendment or revision was completed<br>• Note: Public Law 106-65 (section 2815) regarding planning may delay any plan amendment effort |
| WEST | SUWA | • mostly unleased |

AR010196

| DESERT DISTRICT<br><br>Fillmore Field Office and Salt Lake Field Office | PROPOSAL: Shadows of the Deep Creeks MAP 6 | <ul><li>majority federal minerals</li><li>no current industry interest in new leasing</li><li>no production or discovery</li><li>a few suspended leases due to wilderness character issues</li><li>programmatic EA was prepared to analyze potential effects of oil and gas leasing in the Fillmore Field Office in 2009, and the resulting decision provided that oil and gas leasing would be deferred in areas containing sage grouse or historic Bonneville cutthroat trout habitat, until a plan amendment or revision was completed</li><li>includes the Conger Mountain, Deep Creek Mountains, Disappointment Hills, Essex Canyon, Granite Mountain, Kern Mountains, Ledger Canyon, Ochre Mountain, Snake Valley and Wild Horse Pass CWPs</li><li>proposal also describes wildlife habitat, recreation opportunities and climate change as other issues that should be considered</li><li>Note: Public Law 106-65 (section 2815) regarding planning may delay any plan amendment effort</li></ul> |

16

# Attachment 2

## Internally-Generated Areas Considered for Analysis

1. Issues and Factors Considered
2. Maps of Proposals

AR010198

**Attachment 2 – 1**

**Issues and Factors Considered**
**Internally-Generated Areas Considered for Analysis**

| DISTRICT Field Office | Areas Considered | Issues Taken Into Consideration to Determine Potential Level of Analysis |
|---|---|---|
| CANYON COUNTRY DISTRICT<br><br>Moab Field Office | Central Moab MAP 1 | • a substantial portion of this area is currently unleased<br>• majority federal minerals<br>• current industry interest in new leasing (Stiles parcels)<br>• producing oil wells within the area, natural gas discovery adjacent to area<br>• contains parcels that are addressed in the Stiles Report (West of Arches, East of Canyonlands, and East of Arches groups - suggests revisiting leasing decisions in some areas)<br>• suspended and protested (Sold but not issued - SNI) leases due to wilderness character and National Historic Preservation Act (NHPA) issues<br>• potash prospecting permit areas and expansion of the existing Known Potash Leasing Area (KPLA) is also under consideration in this area |
| | Greater Moab MAP 2<br>[Note – Map 2 includes the area identified in Map 1, plus expands the north and western boundaries of the area, along with some expansion to the south.] | • the area is mostly leased (by expanding the Central Moab area described above to include more areas to the north and west, significant acreage was included that is already leased, thus changing the determination of this area when compared to the Central Moab area)<br>• majority federal minerals<br>• current industry interest in new leasing (Stiles parcels)<br>• producing oil and gas wells in the area, natural gas discovery adjacent to area<br>• contains parcels that are addressed in the Stiles Report (Southeast of Green River, West of Arches, East of Canyonlands, most of the East of Green River and East of Arches groups - suggests revisiting leasing decisions in some areas)<br>• suspended and protested (Sold but not issued - SNI) leases due to wilderness character and NHPA issues<br>• potash prospecting permit areas and potential KPLA is also under consideration in this area |
| | Lisbon Valley MAP 3 | • the area is mostly leased<br>• majority federal minerals<br>• no current industry interest in new leasing<br>• existing production includes oil and gas<br>• suspended and protested (SNI) leases due primarily to NHPA issues<br>• active potash leases<br>• potash prospecting permit areas and expansion of the existing KPLA is also under consideration in this area<br>• active uranium and copper mining |

AR010199

| | | |
|---|---|---|
| | Cisco desert – northwest Grand Co.<br>MAP 4 | • mostly leased<br>• majority federal minerals<br>• current industry interest in new leasing<br>• some existing oil and gas production within the area, with more development adjacent<br>• contains parcels that are addressed in the Stiles Report (Southern Uinta Basin group - suggesting to lease some and remove one parcel from leasing)<br>• suspended and protested (SNI) leases due to wildlife issues |
| CANYON COUNTRY DISTRICT<br><br>Monticello Field Office | Monticello<br>MAP 5 | • mostly leased<br>• majority federal minerals<br>• no current industry interest in new leasing<br>• existing production, both oil and gas, within the area<br>• suspended and protested (SNI) leases due to wilderness character, NHPA, and the Alkali Ridge National Historic District issues<br>• Monticello was not addressed in the Stiles Report but many of the same resources would be addressed in the analysis<br>• potash prospecting permit areas and potential KPLA is also under consideration in this area |
| | Butler Wash<br>MAP 6 | • mostly unleased<br>• majority federal minerals<br>• current industry interest in new leasing<br>• no new producing areas or discoveries nearby<br>• suspended and protested (SNI) leases due to NHPA and visual resource issues |
| COLOR COUNTRY DISTRICT<br><br>Cedar City Field Office | | New planning effort has been initiated |
| COLOR COUNTRY DISTRICT<br><br>Kanab Field Office | | No current leasing interest in new leasing |
| COLOR COUNTRY DISTRICT<br><br>Richfield Field Office | Sweetwater-Flat Tops<br>MAP 7 | • mostly unleased<br>• majority federal minerals<br>• no current industry interest in new leasing<br>• no production or discovery nearby<br>• suspended leases due to wilderness character issues |

AR010200

| | | |
|---|---|---|
| COLOR COUNTRY DISTRICT<br><br>St. George Field Office | Little Creek Mountain<br>MAP 8 | • all unleased<br>• majority federal minerals<br>• new industry interest in the area<br>• no production or discovery in this part of the state<br>• analysis could be conducted on everything for the east side of the field office outside of the National Conservation Areas |
| GREEN RIVER DISTRICT<br><br>Price Field Office | Sweetwater-Flat Tops<br>MAP 9 | • mostly unleased<br>• majority federal minerals<br>• no current industry interest in new leasing<br>• no production or discovery in the area or nearby<br>• protested (Sold but not issued – SNI) due to wilderness character issues |
| | Southeast Emery County<br>MAP 10 | • mostly unleased<br>• majority federal minerals<br>• current industry interest in new leasing<br>• no production or discovery<br>• contains parcels that are addressed in the Stiles Report (South of Green River group - suggests revisiting leasing decisions in some areas)<br>• suspended and protested (Sold but not issued - SNI) leases due to wilderness character and NHPA issues<br>• potash prospecting permit areas and potential KPLA is also under consideration in this area |
| GREEN RIVER DISTRICT<br><br>Price Field Office<br>and<br>Vernal Field Office | West Tavaputs Plateau<br>MAP 11 | • the area is about half leased<br>• majority federal minerals<br>• current industry interest in new leasing<br>• existing gas production in the area<br>• contains parcels that are addressed in the Stiles Report (Desolation Canyon and Nine Mile groups - suggests removing some parcels and deferring leasing until supplemental analysis considers air quality, dust and cultural resources, and revisiting leasing decisions in some areas)<br>• suspended and protested (SNI) leases due to wilderness character and NHPA issues<br>• discussion should tier to the West Tavaputs EIS/ROD. |
| GREEN RIVER DISTRICT<br><br>Vernal Field Office | Vernal North<br>MAP 12 | • mostly leased<br>• majority federal minerals<br>• no current industry interest in new leasing<br>• some producing oil wells in or near the area, and a few producing gas wells adjacent to the area<br>• contains parcels that are addressed in the Stiles Report (West Dinosaur - suggesting additional coordination with the NPS)<br>• suspended and protested (SNI) leases due to wilderness character and wildlife issues and may need to revisit planning decisions regarding greater sage-grouse |
| | McCook Ridge<br>MAP 13 | • mostly unleased (included Protested-SNI parcels)<br>• majority federal minerals<br>• no industry interest in new leasing |

20

| | | |
|---|---|---|
| | | • some scattered gas wells in the area, a lot of gas production to the northwest of the area<br>• contains parcels that are addressed in the Stiles Report (Central Uinta Basin suggesting some parcels should be deferred to consider wilderness character, sage-grouse habitat and access)<br>• suspended and protested (SNI) leases due to wilderness character and wildlife issues |
| WEST DESERT DISTRICT<br><br>Fillmore Field Office | Garrison<br>MAP 14 | • mostly unleased<br>• majority federal minerals<br>• recent industry interest<br>• no production or discovery<br>• programmatic EA was prepared to analyze potential effects of oil and gas leasing in the Fillmore Field Office in 2009, and the resulting decision provided that oil and gas leasing would be deferred in areas containing sage grouse or historic Bonneville cutthroat trout habitat, until a plan amendment or revision was completed<br>• Note: Public Law 106-65 (section 2815) regarding planning may delay any plan amendment effort |
| WEST DESERT DISTRICT<br><br>Salt Lake Field Office | Five Mile Pass<br>MAP 15 | • mostly unleased<br>• majority federal minerals<br>• recent industry interest in new leasing<br>• no production or discovery<br>• sage-grouse analysis needed<br>• Note: Public Law 106-65 (section 2815) regarding planning may delay any plan amendment effort. |
| | Rich County<br>MAP 16 | • mostly unleased<br>• majority federal minerals<br>• recent industry interest in leasing<br>• no production or discovery<br>• several suspended leases for NHPA issues<br>• sage-grouse and Bonneville cutthroat trout analysis needed |

NOTE – These were considered above and referenced, but not individually addressed.

| | |
|---|---|
| STILES GROUP:<br>West of Arches | 12 lease parcels from Dec. 08; Stiles concluded the parcels should be deferred until MOU is established w/NPS and a collaborative reexamination could be utilized to further consider the value of scenery, recreation, travel and tourism and consider a localized air quality model, night skies and broad scale visual resource analysis. |
| STILES GROUP:<br>Southeast of Green River | 8 lease parcels from Dec. 08; Stiles concluded that 6 parcels could be leased. Two parcels were recommended for deferral/no leasing until such time that development progresses to areas much nearer to these parcels, in the interest of orderly development. At that time, potential conflicts with recreation management objectives and wilderness characteristics should be fully considered. |

21

| STILES GROUP:<br>East of Green River (southern Book Cliffs) | 4 lease parcels from Dec. 08; Stiles concluded that 3 parcels could be leased, after clarification, and one parcel should be deferred and reviewed using the soon to be released wilderness characteristics inventory manual. |
|---|---|
| STILES GROUP:<br>East of Arches | 1 lease parcel from Dec. 08; Stiles concluded that, although NSO should provide protection, there was little reason to lease the parcel from a minerals management perspective, and many social and natural resource reasons not to lease. |
| STILES GROUP:<br>East of Canyonlands | 7 lease parcels from Dec. 08; Stiles concluded the parcels should be deferred until MOU is established w/NPS and a collaborative reexamination could be utilized to further consider the value of scenery, recreation, travel and tourism and consider a localized air quality model, night skies and broad scale visual resource analysis. |
| STILES GROUP:<br>Southern Uinta Basin | 4 lease parcels from Dec. 08; Stiles concluded that 3 parcels could be leased, but one parcel should be removed from leasing because of apparent big game crucial winter range and corridor, is bounded by two WSAs and has no apparent well location due to steep slopes and floodplains, and even with use of NSO appears to have little reason for leasing given the pattern and level of development of existing leases in the vicinity. |
| STILES GROUP:<br>South of Green River | 4 lease parcels from Dec. 08; Stiles concluded that 2 parcels could be leased, and the other 2 should be deferred until wilderness character could be inventoried and verified, because there was no evidence of wilderness characteristic inventory although the area appeared to meet minimum size and was contiguous with a large ACEC with few roads. |
| STILES GROUP:<br>Desolation Canyon | 15 lease parcels from Dec. 08; Stiles concluded that 14 parcel should be deferred to reconsider impacts on documented wilderness characteristics, impacts from expanded leasing near Nine Mile Canyon, and until the West Tavaputs EIS can inform future leasing decisions on air quality issues and the NHPA consultation associated with the EIS is completed. 11 of the 14 parcels should not be considered for leasing at the present time to ensure orderly development of the area.  One parcel is recommended to be removed from leasing because, in addition to the reasons listed above, portions of the parcel contain high quality sage grouse habitat. |
| STILES GROUP:<br>Nine Mile Canyon | 5 lease parcels (in Price and Vernal) from Dec. 08; Stiles concluded that no leasing may be preferable to leasing, but at a minimum, leasing should be deferred until supplemental environmental analysis fully considers impacts to air quality, cultural resources, big game habitat, the National Scenic Byway and visual resources, reflects ongoing NHPA consultation, and addresses methods of reducing dust associated with oil and gas traffic.<br><br>This area contains parcels that are:  addressed in the Stiles Report (suggests revisiting leasing decisions in some areas address resources such as Desolation Canyon and air quality), this effort could work toward the effort to better edge match the Vernal and Price RMP's, current industry interest, contain suspended and protested (SNI) leases due to wilderness character and NHPA issues.  Discussion should tier to the West Tavaputs EIS/ROD. |
| STILES GROUP:<br>White River | 6 lease parcels from Dec. 08; Stiles concluded that 1 parcel could be leased and that the remaining five be deferred until NSO/cherry-stemmed roads could be clarified, and consideration is given to additional stipulations (VRM |

22

| | II and mule deer and elk) |
|---|---|
| STILES GROUP: Central Uinta Basin | 10 lease parcels from Dec. 08; Stiles concluded that 2 parcels could be leased and the remaining 10 should be deferred to consider sage grouse habitat, only offered with NSO because of obvious access concerns and highly erodible soil, or should be reviewed using the soon to be released new Wilderness Characteristics Inventory manual. |
| STILES GROUP: West Dinosaur | 1 lease parcel from Dec. 08; Stiles concluded the parcel should be deferred until BLM and NPS reevaluate the merits of offering the parcel because of park proximity, and if a lease is to be offered, a lease notice identifying the need for viewshed and soundscape analysis in relation to Dinosaur NM be added – parcel could also be reconfigured to allow the immediate leasing of the western portion of the parcel, which involves split estate. |

23

# Attachment 3

(Lease Parcel Review and Lease Issuance Process for

Non-MLP Level Environmental Assessment)

AR010205

# Leasing Reform
## Lease Parcel Review and Lease Issuance Process for
## A Non-MLP Level Environmental Assessment

| Process Step | Leasing Reform Policy Process Requirements and Required Timeframes | State-Specific Process Requirements and Timeframes* |
|---|---|---|
| Expressions of Interest (EOI) are received in the State Office (SO) | SO establishes a cutoff date for incorporating EOIs into sale packages for individual Field Offices (FO). | January 4 – Color Country District<br><br>April 2 – West Desert District<br><br>July 2 – Green River District<br><br>October 2 – Canyon Country District |
| | SO reviews EOIs | 2 weeks |
| | SO sends preliminary parcel lists to designated field offices (on a rotational basis). | Allow 3 weeks for FO review and get back to SO to ensure that the parcels can be addressed in an EA. |
| Leasing Reform Process | | |
| Field Office (FO) begins parcel review process | FO Interdisciplinary Parcel Review (IDPR) Team initiates parcel review through the NEPA process. | |
| | 1. Gather Existing Information<br>2. Review for Resource Management Plan (RMP) conformance and adequacy<br>3. Review for program-specific guidance requirements<br>4. Identify other considerations<br>5. Conduct parcel site visits with appropriate IDPR team members<br>6. Ensure internal and external coordination<br>7. Ensure public participation<br>8. Identify/address consultation needs | 12 weeks |

AR010206

| Process Step | Leasing Reform Policy Process Requirements and Required Timeframes | State-Specific Process Requirements and Timeframes* |
|---|---|---|
|  | NEPA Document (EA or DNA)<br>1. Optional Scoping<br>2. **30-day** public comment period on the Environmental Assessment (EA) and unsigned Finding of No Significant Impact (FONSI) (or unsigned Determination of NEPA Adequacy (DNA)) | 4 weeks |
|  | As necessary, update the EA and unsigned FONSI based on public comments. | 6 weeks |
|  | FO sends the EA and unsigned FONSI (or the unsigned DNA) along with the parcel recommendations to the SO or to the District office who in turn reviews and forwards to the SO. | Included in 6 weeks above |
| SO reviews FO parcel recommendations and NEPA documents | Coordinate with solicitor. | 2 weeks |
| SO begins the Lease Sale process | SO posts the Sale Notice in the SO Public room and on the SO website at least **90 days** prior to the lease sale date with a link to the EA and unsigned FONSI (or the unsigned DNA). |  |
|  | **30-day** protest period begins. | 4 weeks |
|  | **60-day** protest review period begins after the protest period ends. | 8 weeks |
|  | **Note:** When possible, state offices should attempt to resolve protests before the sale of the protested parcels and publish the decisions on the SO website.<br><br>As appropriate, update the EA and unsigned FONSI (or the unsigned DNA) based on the protest(s) or protest resolution.<br><br>If all of the protests have been resolved prior to the lease sale, the authorized officer at the SO may sign the FONSI and then the decision record (or DNA) prior to holding the lease sale. |  |

26

| Process Step | Leasing Reform Policy Process Requirements and Required Timeframes | State-Specific Process Requirements and Timeframes* |
|---|---|---|
| | A **30-day** Interior Board of Land Appeals appeal period begins for the protestant upon denial of their protest. | |
| Lease sale | Conduct the lease sale. | |
| Issue the Lease(s) | Prior to issuing a lease for a parcel, the authorized officer at the SO must: 1) resolve any protest on the parcel(s) that was not resolved before the lease sale and post the decision on the SO website; and, 2) sign the FONSI (or the DNA) and then the separate decision record (decision to issue or not to issue a lease(s); and, 3) post the updated and signed documents on the SO website and in the SO public room. 4) Issue the lease(s)  **Note:**  Leases shall be issued in a timely manner (**60 days or less**) following payment by the successful bidder of the remainder of the bonus bid (bonus bid to be remitted within 10 working days after the sale).  A decision not to lease should be issued within the same timeframe. | |
| | A **30-day** Interior Board of Land Appeals appeal period begins for the protestant upon denial of their protest. | |
| | A **30-day** Interior Board of Land Appeals appeal period begins upon issuance, or a decision not to issue, the lease(s).  **Note:** To bring an appeal to IBLA, the appellant must have taken part in the process, either by making a comment or filing a protest.  Otherwise the appellant does not have standing to bring an administrative appeal. | |
| **Total Time to Process EA** | | **41 weeks** |

*Timeframes may be able to be reduced if additional staffing and funding is provided.

Note:  Plan amendments and EISs will have additional requirements and therefore take additional time.

27

AR010208

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.* | |
| Plaintiffs, | Case No. 1:20-cv-03654-RC The Honorable Rudolph Contreras |
| v. | |
| DEBRA HAALAND, in her official capacity as United States Secretary of the Interior, *et al.* | |
| Defendants, | |
| and | |
| PURE HELIUM, LLC, | |
| Intervenor-Defendant. | |

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

AR010209

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................... ii

GLOSSARY OF TERMS ...................................................................................................... vi

INTRODUCTION .................................................................................................................. 1

LEGAL BACKGROUND ...................................................................................................... 3

    I.    MINERAL LEASING ACT ................................................................................... 3

    II.   NATIONAL ENVIRONMENTAL POLICY ACT ............................................... 3

    III.  BLM'S OIL AND GAS PLANNING AND MANAGEMENT FRAMEWORK ............. 5

STATEMENT OF FACTS ..................................................................................................... 6

    I.    OIL AND GAS DEVELOPMENT IS EXACERBATING THE CLIMATE CRISIS ....... 6

    II.   THE SAN RAFAEL DESERT ............................................................................. 8

    III.  BLM'S PRICE FIELD OFFICE RESOURCE MANAGEMENT PLAN ...................... 10

    IV.  BLM'S MASTER LEASING PLAN POLICY AND THE SAN RAFAEL DESERT MASTER LEASING PLAN .................................................................................. 11

         A.   BLM's 2010 Oil and Gas Leasing Reforms ........................................... 11

         B.   The Trump Administration's "Energy Dominance" Agenda ................... 13

    V.   BLM'S SEPTEMBER 2018 OIL AND GAS LEASE SALE ......................................... 15

    VI.  BLM'S DECEMBER 2018 OIL AND GAS LEASE SALE ........................................... 17

STANDARD OF REVIEW .................................................................................................. 19

ARGUMENT ....................................................................................................................... 20

    I.    BLM FAILED TO PROVIDE A REASONED EXPLANATION PRIOR TO ABANDONING THE MLP POLICY OR SAN RAFAEL DESERT MLP ................... 20

         A.   BLM's MLP Process Was Designed to Provide Missing Scrutiny and Analysis. .... 22

         B.   BLM's Abandonment of the MLP Process Was Arbitrary and Capricious. ............ 27

    II.   BLM FAILED TO ANALYZE AND DISCLOSE THE CUMULATIVE IMPACTS OF THE PROPOSED OIL AND GAS LEASES IN THE SEPTEMBER AND DECEMBER LEASE SALES ................................................................................................. 33

         A.   NEPA Requires Analysis of Reasonably Foreseeable Cumulative Impacts ............. 33

         B.   BLM Failed to Take the Required "Hard Look" ....................................... 34

             i.     Water quantity ............................................................................. 34

             ii.    Wildlife ........................................................................................ 39

CONCLUSION .................................................................................................................... 41

AR010210

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\* *Am. Wild Horse Preserv. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ...............................................................................29, 30, 31, 32

*Amerijet Intern. Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ......................................................................................28, 31

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,
462 U.S. 87 (1983) ................................................................................................................4

*Bauer v. DeVos*,
325 F. Supp. 3d 74 (D.D.C. 2018) ......................................................................................29

*Cal. by and through Becerra v. U.S. Dept. of the Interior*,
381 F. Supp. 3d 1153 (N.D. Cal. 2019) ..............................................................................29

*California v. Bernhardt*,
472 F. Supp. 3d 573 (N.D. Cal. 2020) ................................................................................28

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .........................................................................................6, 10

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
444 F. Supp. 3d 832 (S.D. Ohio 2020) ...............................................................................35

*Del. Riverkeeper Network v. F.E.R.C.*,
753 F.3d 1304 (D.C. Cir. 2014) ..........................................................................................34

*Dist. of Columbia v. U.S. Dept. of Agric.*,
496 F. Supp. 3d 213 (D.D.C. 2020) ....................................................................................29

\* *Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ..............................................................................20, 28, 32, 33

\* *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..................................................................................20, 21, 28, 32

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
463 F. Supp. 3d 1011 (D. Alaska 2020) ..............................................................................29

*Friends of Animals v. Bureau of Land Mgmt.*,
232 F. Supp. 3d 53 (D.D.C. 2017) ........................................................................................5

ii

AR010211

*Fund for Animals v. Babbitt*,
   903 F. Supp. 96 (D.D.C. 1995) ........................................................................20

*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020) .........................................................................28

*Indigenous Envtl. Network v. U.S. Dept. of State*,
   347 F. Supp. 3d 561 (D. Mont. 2018) ..............................................................29

*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360 (1989) ...........................................................................................3

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................................19, 28

\* *Organized Vill. of Kake v. U.S. Dept. of Agriculture*,
   795 F.3d 956 (9th Cir. 2015) (en banc) .........................................28, 29, 30, 31

*Physicians for Social Responsibility v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020) .........................................................................28

\* *San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*,
   326 F. Supp. 3d 1227 (D.N.M 2018) ...............................................35, 36, 37, 38

*Sierra Club v. Peterson*,
   717 F.2d 1409 (D.C. Cir. 1983) ..............................................................4, 6, 33

*Sierra Club v. U.S. Dep't of Energy*,
   867 F.3d 189 (D.C. Cir. 2017) .........................................................................34

*Southwest Airlines Co. v. Federal Energy Regulatory Comm.*,
   926 F.3d 851 (D.C. Cir. 2019) .........................................................................28

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ...........................................................................................3

*W. Watershed Project v. Zinke*,
   336 F. Supp. 3d 1204 (D. Idaho 2018) .............................................................14

*W. Watersheds Project v. Bernhardt*,
   --- F. Supp. 3d ---, 2021 WL 517035 (D. Idaho Feb. 11, 2021) .......................29

*WildEarth Guardians v. Bernhardt*,
   --- F. Supp. 3d ---, 2020 WL 6701317 (D.D.C. Nov. 13, 2020) ..................5, 38

\* *WildEarth Guardians v. Bureau of Land Mgmt.*,
   457 F. Supp. 3d 880 (D. Mont. 2020) ...............................................35, 38, 41

AR010212

* *WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) ............................................................3, 4, 5, 33, 34, 39, 41

**Statutes**

Administrative Procedure Act,
  5 U.S.C. §706(2)(A) ...........................................................................................................19

Federal Land Policy and Management Act,
  43 U.S.C. §§ 1701–1787 ......................................................................................................5

Mineral Leasing Act,
  30 U.S.C. §§ 181-287 ...........................................................................................................3

  30 U.S.C. § 226(a) ...............................................................................................................3

National Environmental Policy Act,
  42 U.S.C. §§ 4321–4347 ......................................................................................................3

  42 U.S.C. § 4332(2)(C) ........................................................................................................4

**Regulations**

40 C.F.R. § 1500.1 ....................................................................................................................3

40 C.F.R. § 1501.4 ....................................................................................................................4

40 C.F.R § 1508.7 .................................................................................................................4, 34

40 C.F.R. § 1508.9 ....................................................................................................................4

40 C.F.R. § 1508.13 ..................................................................................................................4

43 C.F.R. § 46.120(c) ................................................................................................................5

43 C.F.R. § 1610.5-3 .................................................................................................................6

43 C.F.R. § 3101.1-2 .................................................................................................................6

43 C.F.R. §§ 3120-3120.7-3 .....................................................................................................6

43 C.F.R. § 3162.3-1 .............................................................................................................6, 8

**Other Authorities**

85 Fed. Reg. 43,304 (July 16, 2020) ........................................................................................3

Executive Order No. 13783, "Promoting Energy Independence and Economic
  Growth." .........................................................................................................................13, 27

iv

AR010213

Instruction Memorandum No. 2010-117 ...........................................................................11, 12, 21

Instruction Memorandum No. 2018-034 ................................................................................14, 27

Secretarial Order 3354 ..........................................................................................................13, 27

v

AR010214

## GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| APD | Application for Permit to Drill |
| BLM | Bureau of Land Management |
| BMP | Best Management Practices |
| DNA | Determination of NEPA Adequacy |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| GAO | Government Accountability Office |
| GHG | Greenhouse Gas |
| IM 2010-117 | Instruction Memorandum No. 2010-117 |
| IM 2018-34 | Instruction Memorandum No. 2018-034 |
| LWC | Lands with Wilderness Characteristics |
| MLP | Master Leasing Plan |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |
| NSO | No Surface Occupancy |
| RFDS | Reasonably Foreseeable Development Scenario |
| RMP | Resource Management Plan |
| SITLA | Utah School and Institutional Trust Lands Administration |

AR010215

**INTRODUCTION**

Federal Defendants (collectively, "BLM") manage more than 525,000 acres of public land in the San Rafael Desert—a sublime area of southeastern Utah wild lands that spans redrock cliffs and canyons, shifting sand dunes, and sweeping mesas. It is also an area of crucial importance to wildlife, including pronghorn antelope, and is home to an astonishing array of pollinators unique to this area. The San Rafael Desert is nestled between Canyonlands National Park, congressionally designated Wilderness areas, a popular state park, and the Labyrinth Canyon stretch of the Green River. BLM manages most of the area pursuant to the Price field office Resource Management Plan ("Price RMP").

In the Price RMP, BLM identified the vast majority of the San Rafael Desert as open for oil and gas leasing and development with the bare minimum stipulations required by law. However, BLM subsequently determined that additional analysis was "required" in order to consider new information before any leasing could take place in the San Rafael Desert, and began to prepare a "master leasing plan" ("MLP") to complete that work. BLM prohibited leasing in the area from 2010-2017 while this planning effort was underway.

All of this changed in 2018 when BLM, hewing closely to the Trump administration's "energy dominance" agenda, abruptly ended both the nationwide MLP policy and the San Rafael Desert MLP and swiftly proceeded to offer 77 new oil and gas leases across more than 200,000 acres in the former MLP area. The only fig leaf BLM offered for its about-face was the claim that the MLP policy created "duplicative" layers of review. This is a far cry from the "reasoned explanation" required by federal law for agencies to reverse course, and is both false and fails to grapple with BLM's own prior statements that such work was required before new leasing could proceed.

1

AR010216

BLM also violated federal law when it failed to account for and analyze the cumulative impacts from the sale and development of these 77 leases, along with other past, present and reasonably foreseeable activities, would wreak on water quantity and pronghorn antelope in the San Rafael Desert.



(Photograph taken within the San Rafael Desert and a lease sold at the September 2018 lease sale, looking east over other sold leases).

Because BLM's decisions violated federal law, Plaintiffs (collectively, "SUWA") respectfully request the Court declare BLM's decisions to be arbitrary and capricious, set aside and vacate the leases that are the subject of this case, and enjoin any development of those leases.[1]

---

[1] *See* Plaintiffs' Second Amended and Supplemented Complaint for Injunctive and Declaratory Relief at 1, n.1 (ECF 46-1) (listing leases).

AR010217

## LEGAL BACKGROUND

## I.  MINERAL LEASING ACT

Under the Mineral Leasing Act, 30 U.S.C. §§ 181-287, as amended, the Secretary of the Interior is responsible for the "safeguarding of the public welfare" while managing and overseeing mineral development on public lands. *Id.* § 187. The Secretary has discretion to determine where, when, and under what terms and conditions mineral leasing and development should occur on BLM-managed lands. 30 U.S.C. § 226(a).

## II.  NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1.[2] NEPA's fundamental objective is to ensure that an "agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (citations omitted). "Under NEPA, agency decisionmakers must identify and understand the environmental effects of proposed actions, and they must inform the public of those effects so that it may 'play a role in both the decisionmaking process and the implementation of the agency's decision.'" *WildEarth Guardians v. Zinke* ("*WildEarth Guardians I*"), 368 F. Supp. 3d 41, 52 (D.D.C. 2019) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)) (alteration marks omitted). Stated differently, NEPA was designed "to insure a fully informed and well-considered decision[.]" *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

---

[2] In 2020, the Council on Environmental Quality issued new NEPA regulations, which took effect on September 14, 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). However, BLM did not apply the new regulations to the challenged decisions and they do not apply here.

AR010218

"NEPA requires an agency to evaluate the environmental effects of its action at the point of commitment." *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983). This includes a cumulative impacts analysis to address "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions." 40 C.F.R § 1508.7.

NEPA requires an agency to prepare a detailed environmental impact statement ("EIS") before undertaking any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the agency is unsure whether it needs to prepare an EIS, it instead may prepare an environmental assessment ("EA"). 40 C.F.R. §§ 1501.4, 1508.9. An EA is a less comprehensive document than an EIS, but it must nonetheless analyze the effects of a proposed action and reasonable alternatives to the proposal. *Id.* § 1508.9(b). Should an agency determine in the EA that significant effects may occur, it must prepare an EIS. *Id.* § 1508.9(a)(1). Otherwise, the agency issues a Finding of No Significant Impact ("FONSI") and Decision Record ("DR") that signals the end of NEPA analysis for that action. *Id.* § 1508.13.

When reviewing a FONSI, a court in this circuit assesses whether the agency:

(1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or EA], (3) is able to make a convincing case for its [FONSI], and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*WildEarth Guardians I*, 368 F. Supp. 3d at 80 (quoting *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011)). The "hard look" requirement ensures that the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 98 (1983).

4

AR010219

BLM sometimes relies on a Determination of NEPA Adequacy ("DNA") to approve a proposed action. A DNA is not a NEPA document and does not contain NEPA analysis. *See* 43 C.F.R. § 46.120(c). Instead, it is a worksheet completed by agency staff to document their conclusions that existing NEPA analyses are sufficient. *Friends of Animals v. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 57 (D.D.C. 2017).

## III.    BLM'S OIL AND GAS PLANNING AND MANAGEMENT FRAMEWORK

BLM manages onshore oil and gas development through a three-stage process: (1) land use planning, (2) leasing, and (3) approval of drilling permits. *See WildEarth Guardians I*, 368 F. Supp. 3d at 54.

First, pursuant to the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–1787, BLM develops a broad-scale resource management plan ("RMP") which—as relevant here—specifies which lands will be open and which will be closed to oil and gas leasing, and stipulations and conditions that may be placed on any such development. *See id.* § 1712(a). An RMP does not mandate the leasing of any specific lands for oil and gas development. In the RMP process, BLM typically prepares a "reasonably foreseeable development scenario" ("RFDS"), which serves as a long-term projection of oil and gas activity for an area of public lands over a particular timeframe. *WildEarth Guardians v. Bernhardt* ("*WildEarth Guardians II*"), --- F. Supp. 3d ---, 2020 WL 6701317, at *3 (D.D.C. Nov. 13, 2020) (discussing RFDSs in the context of the three stage process). An RFDS neither mandates future development nor analyzes nor discloses environmental impacts, but instead predicts future development based "largely on local geology, current and historical trends . . . and forecasts" of energy markets. BLM002527 (RFDS for the San Rafael Desert MLP).

5

AR010220

Second, BLM may offer leases for the development of specific tracts of public lands. *See* 43 C.F.R. § 1610.5-3; *id.* §§ 3120-3120.7-3. BLM has considerable discretion to determine which lands will be leased and is not obligated to lease any particular tract of public land. If BLM issues leases without no-surface occupancy ("NSO") stipulations (referred to as "non-NSO leases" or "surface-occupancy leases"),[3] it thereafter lacks the authority to entirely preclude surface disturbance on the leasehold. *Id.* § 3101.1-2; *see also Peterson*, 717 F.2d at 1414. Thus, the issuance of a non-NSO lease is the point BLM engages in an irreversible and irretrievable commitment of resources. *Peterson*, 717 F.2d at 1414.

Third, after a parcel has been leased, the lessee may submit and BLM may approve an application for permit to drill ("APD"), which authorizes drilling and development of the lease parcel. 43 C.F.R. § 3162.3-1(c). An APD may include or be accompanied by a surface use plan of operations, right-of way application, and/or a request for authorizations which together detail proposed pipelines, roads, well pads, and other related facilities and activities. *Id.* § 3162.3-1(d)

## **STATEMENT OF FACTS**

## I.      OIL AND GAS DEVELOPMENT IS EXACERBATING THE CLIMATE CRISIS

Climate-altering greenhouse gas ("GHG") emissions are profoundly impacting our world. BLM038530-38 (summary findings in the Fourth National Climate Assessment). BLM's oil and gas leasing program contributes vast amounts of GHG pollution to the atmosphere. BLM123528-31 (BLM's calculation of GHG emissions from leasing and development). Currently, over 25 million acres of federally managed lands are leased for oil and gas development. According to the most recent data from the United States Geological Survey, "[n]ationwide emissions from

---

[3] NSO stipulations "prohibit lessees from occupying or using the surface of the leased land without further specific approval from the BLM." *Conner v. Burford*, 848 F.2d 1441, 1444 (9th Cir. 1988).

AR010221

fossil fuels produced on Federal lands" represent "23.7 percent of national emissions for $CO_2$, 7.3 percent for [methane], and 1.5 percent for [nitrous oxide] over" a ten-year period. BLM037750.

The Southwest is already suffering severe drought as a result of climate change—driven in no small part by GHG emissions from BLM's oil and gas leasing program. BLM036178-80 (discussing drought and other climate change impacts in the San Rafael Desert and beyond). Moreover, the Fourth National Climate Assessment found that climate change threatens further "aridification (a potentially permanent change to a drier environment) in much of the Southwest, through increased evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff." BLM039615; *see also* BLM039608-09 (summarizing other climate change impacts to the Southwest).

Oil and gas development exacerbates the hydrologic and drought crisis in the Southwest. The United States Government Accountability Office ("GAO") recently concluded that "the cumulative effects of using surface water or groundwater at multiple oil and gas development sites can be significant at the local level, particularly in areas experiencing drought conditions." BLM040297. Oil and gas development, including drilling and well pad construction, consumes significant quantities of surface and groundwater, further depleting these critical resources in an arid, desert environment. BLM003950 (BLM assuming that the drilling of a single well in the San Rafael Desert consumes 294,000 gallons of water).

Specific to Emery County, Utah—which encompasses the San Rafael Desert—the Utah Geological Survey has recognized that "[g]ood-quality water is scarce . . . and most water users depend on surface water from springs, streams, and reservoirs for their supply." BLM040447.

7

AR010222

## II.     THE SAN RAFAEL DESERT

The San Rafael Desert is a sublime area of Utah's backcountry, which includes the newly-designated Labyrinth Canyon Wilderness. Labyrinth Canyon is one of the most remote, wild, and rugged landscapes in the nation. BLM001896 (BLM describing the area as possessing "drastic elevation transitions" and a sense of naturalness that "is enhanced by topographic screening from deep canyons [and] rugged terrain"). Labyrinth Canyon is located at the eastern edge of the San Rafael Desert and abuts the Green River as it flows south toward its confluence with the Colorado River in the heart of nearby Canyonlands National Park. *See* BLM038487 (map of the San Rafael Desert and leases at issue in this lawsuit). In a 1999 inventory of the area's wilderness characteristics, BLM described the now-designated Wilderness area as "wild, remote, expansive, and rugged." BLM024886. "There are interesting geological features, rugged and varied terrain, extensive vistas, hidden and remote grottos, incised canyons, river floating opportunities, numerous cultural sites, a number of trails, and opportunities to climb exposed rock faces." *Id.*

The San Rafael Desert contains many unique and remarkable resource values. For example, it is home to one of the most astonishing and diverse arrays of native pollinators (bees, wasps) in North America, including 49 distinct genera and 333 species. BLM036247-48; *see also* BLM001337-48 (scientific study on "The Bees of the San Rafael Desert"). Forty-eight species were new to science as of 2016, and sixty-eight species may occur only in this region. BLM has recognized that the San Rafael Desert's unique sand dune landscape provides valuable habitat for pollinators and that the San Rafael Desert contains more "bee genera . . . than [exist] in all of New England." BLM036247-48.

8

AR010223

The San Rafael Desert is also home to diverse wildlife, including mule deer, pronghorn antelope, desert bighorn sheep, burrowing owl, golden eagle, Peregrine falcon, as well as species listed under the Endangered Species Act such as the Mexican spotted owl, southwestern willow flycatcher, and yellow-billed cuckoo. BLM036232-47.

Within the San Rafael Desert, BLM has identified more than 250,000 acres as "lands with wilderness characteristics" ("LWCs").[4] BLM036251-52. The majority of the leases at issue in this case are within these wilderness-quality lands, including, the San Rafael River and Sweetwater Reef LWC areas. BLM038487; *see also* BLM003969 (BLM's September 2018 lease sale EA stating that "[a]ll or portions of 62 [of the parcels] . . . overlap [LWCs]").

The San Rafael River LWC area is part "of the San Rafael Desert[] [and] is made up of a variety of geographic features ranging from stabilized sand dunes, incised slick rock canyons, and expanses of brush-grasslands." BLM001707. It "contains extensive undocumented cultural resources" located in a "unique, natural desert ecosystem of dry washes, oak brush-stabilized sand dunes and endemic black brush flats [that] offers exemplary opportunities for primitive and unconfined recreation opportunities while viewing wildlife in a landscape of huge skies, varied geologic forms, and unique isolated riparian systems." BLM001707-08.

The Sweetwater Reef LWC area contains similar values, as well as a "vast ruggedness" and an "overwhelming sense of and opportunity for solitude." BLM002026. It also contains "extensive undocumented cultural resources . . . which appear and disappear as shifting sands expose then recover again" and "isolated rock art and historic cabins and corrals located near springs." *Id.*

---

[4] LWCs are areas of BLM-managed public lands that appear natural (*e.g.*, lack human development), and provide "outstanding" opportunities for solitude and/or primitive types of recreation (*e.g.*, camping, hiking, wildlife viewing). BLM001376-77.

9

### III.    BLM'S PRICE FIELD OFFICE RESOURCE MANAGEMENT PLAN

In 2008, BLM finalized the Price RMP. BLM014252-648. The Price RMP allocated the public lands in the planning area as either "open" or "closed" to oil and gas leasing and development and, where open, it established the terms and conditions for future development. BLM014457. The majority of the public lands in the Price field office, including the San Rafael Desert, were designated in the RMP as open to leasing, subject to "standard terms and conditions"—that is, open to leasing subject to minimal environmentally protective stipulations and notices. *Id.*

The Price RMP also identified "big game crucial habitat" areas for mule deer, desert bighorn sheep, elk, and moose. BLM014441. The Price RMP also identified habitat for pronghorn antelope. BLM014224. At that time, BLM concluded that the San Rafael Desert contained "high"[5] and "substantial"[6] value habitat for pronghorn. *Id.* As discussed *infra*, following completion of the Price RMP, BLM determined—based on new information and data—that the San Rafael Desert actually contains "crucial year-long habitat" for pronghorn.[7] The Price RMP neither identified nor imposed lease stipulations or notices for crucial year-long pronghorn habitat in the San Rafael Desert.

---

[5] The Price RMP defines "high value" as "an area that provides for intensive use by the species." BLM012817.

[6] The Price RMP does not define this term.

[7] The Price RMP defines "crucial" habitat as "habitat on which the local population of a wildlife species depends for survival because there are no alternative ranges or habitats available. Crucial habitat is essential to the life-history requirements of a wildlife species." BLM012818. The RMP explained that the "[d]egradation or loss of crucial habitat will lead to significant declines in the wildlife population in question." *Id.*

AR010225

As part of its work leading up the Price RMP, BLM prepared a RFDS for the Price field office, which predicted 1,540 wells would be drilled in the planning area over a twenty year period. BLM012757-66.

## IV.  BLM'S MASTER LEASING PLAN POLICY AND THE SAN RAFAEL DESERT MASTER LEASING PLAN

### A.  BLM's 2010 Oil and Gas Leasing Reforms

In 2010, BLM implemented nationwide oil and gas leasing reforms to change how the agency offered and sold leases and approved development on BLM-managed public lands (herein, "IM 2010-117"). *See generally* BLM026595-606. Importantly, BLM's reforms included a policy of preparing MLPs, a specific type of land use plan amendment. BLM026597-98. MLPs were a "mechanism for completing the additional planning, analysis, and decision-making that may be necessary for areas meeting" established criteria, such as areas where "[a]dditional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur[.]" BLM026597. If an area met the criteria, then BLM's policy "required" the agency to prepare an MLP. *Id.*

As part of BLM's 2010 reforms, it established a Utah-specific "Oil and Gas Leasing Reform Implementation Plan." BLM029960-86. BLM also determined that several MLPs were required in Utah, and established the 525,000-acre San Rafael Desert MLP area.[8] BLM025433-34 (Federal Register notice announcing intent to prepare San Rafael Desert MLP); *see also* BLM030037-42 (San Rafael Desert MLP assessment). At that time, BLM explained "[t]he [San Rafael Desert] MLP process will provide additional planning and analysis for [the] area[] *prior*

---

[8] BLM finalized MLPs in other areas across the west. This included the "Moab Master Leasing Plan" in Utah, which closed hundreds of thousands of acres of public lands adjacent to and near Canyonlands and Arches National Parks to oil and gas leasing and development. *See* BLM012561-756.

11

AR010226

*to new leasing of oil and gas resources.*" BLM025434 (emphasis added). This planning process, when completed, would provide a "guiding framework for the development of the area and . . . a vision for how future development will proceed." BLM002661 (BLM's Fluid Mineral Leasing Handbook).

BLM identified numerous issues that required additional analysis in the San Rafael Desert area, including soil and water resources, wildlife, night skies, cultural resources, and wilderness characteristics. BLM002519; *see also* BLM025434 (same). BLM further explained that this analysis was required "*before new mineral leasing and development are allowed*" in the San Rafael Desert. BLM002521 (emphasis added).

In 2015, BLM began preparing its NEPA analysis for the San Rafael Desert MLP, which included: a comprehensive review of potential alternatives (including changes to what lands would be available or closed to mineral leasing), BLM002480-2517; new and updated lease stipulations and lease notices that would be applied to all new leases, BLM002422-70; new and updated "best management practices" ("BMPs") for all future development activities in the MLP area, BLM002471-79; a multi-year report on LWCs, BLM001374-2411; and a San Rafael Desert-specific RFDS, BLM002522-54. Based on this information, BLM prepared a draft EA. BLM036109-508 (draft San Rafael Desert MLP EA). However, as explained *infra*, BLM never completed this analysis or the MLP process for the San Rafael Desert.

BLM's draft MLP EA acknowledged that the agency was obligated to prepare the MLP to address new information and changed circumstances, including new pronghorn habitat data from the Utah Division of Wildlife Resources and the San Rafael Desert MLP RFDS. BLM036121; *see also* BLM026597 (IM 2010-117 explaining that MLPs may be required due to "changing circumstances, updated policies, and new information"). BLM emphasized that this

AR010227

new information had to be analyzed and disclosed in the EA "prior to new leasing of oil and gas within the planning area." BLM036121.

The agency invited public comments on the San Rafael Desert MLP and held public open house meetings to inform the public about the need for the MLP. BLM explained to the public in a "fact sheet" that "MLPs are required in areas with sensitive resources, such as the San Rafael Desert." BLM002518. It received hundreds of public comments, including from Plaintiffs. BLM002818-39, BLM003021-46. Additionally, the United States Environmental Protection Agency and the National Park Service ("NPS") submitted comments supporting the MLP and recommending specific resource values that warranted further analysis. BLM040024-37; BLM040038-39.

For over seven years while BLM's MLP policy was in place, the agency did not offer a single lease for development in the San Rafael Desert MLP area (or in any other MLP area in Utah). As BLM's Utah State Director explained in 2015: "BLM-Utah has deferred new leasing proposals submitted for all lands within the pending MLPs in order to preserve potential alternatives for those plans." BLM002556.

**B. The Trump Administration's "Energy Dominance" Agenda**

Shortly after taking office, President Trump issued Executive Order No. 13783, "Promoting Energy Independence and Economic Growth." *See* BLM131451-55. This Order required federal agencies, including BLM, to "review all existing . . . orders, guidance documents, policies, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil [and] natural gas[.]" BLM131451. Based on this Executive Order, then-Secretary of the Interior Ryan Zinke issued Secretarial Order 3354, which directed BLM to "identify additional steps to

13

enhance exploration and development of Federal onshore oil and gas resources." BLM131917. It further required that BLM "identify any provisions in [its] existing policy and guidance documents that would impede BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration and development of Federal onshore oil and gas resources." BLM131918.

In response, BLM issued Instruction Memorandum No. 2018-034 ("IM 2018-34"), which replaced BLM's 2010 leasing reform policies and established a framework for how BLM would implement the Trump administration's "energy dominance" agenda. *See* BLM002628-34. The main focus of this framework was to eliminate or curtail environmental review, agency oversight, and public involvement. *See generally W. Watershed Project v. Zinke*, 336 F. Supp. 3d 1204 (D. Idaho 2018) (holding that numerous provisions of IM 2018-34 violated federal law).

Important here, IM 2018-34 scrapped the MLP process and stopped BLM's work on the San Rafael Desert MLP and EA in its tracks. BLM002629-30. BLM's only explanation for this wholesale policy reversal was to cite to the Trump Executive Order and Zinke Secretarial Order, and conclude that "[MLPs] . . . have created *duplicative layers of NEPA review*. This policy, therefore, eliminates the use of MLPs." BLM002629 (emphasis added). When BLM ended the San Rafael Desert MLP process, it merely stated: "The preparation of [the San Rafael Desert MLP EA] is *no longer required*, and the process is hereby terminated." BLM131459 (emphasis added).

With the perceived "burdens" of environmental analysis, agency oversight, and public participation eliminated, BLM proceeded to offer, sell, and issue hundreds of oil and gas leases in former MLP areas in Utah, including the leases at issue in this lawsuit.

14

## V.    BLM'S SEPTEMBER 2018 OIL AND GAS LEASE SALE

Shortly after terminating the MLP policy and San Rafael Desert MLP process, BLM offered 76 leases, covering more than 200,000 acres of public land in the San Rafael Desert, for sale and development at its September 2018 competitive oil and gas lease sale. BLM000171 (BLM's final parcel list). The leases are, with minor exception, entirely within the former San Rafael Desert MLP boundary. BLM002786. The only documents provided by BLM for the public to review as part of the "scoping process" for the sale were a list of parcels and a non-specific list of stipulations and notices. BLM000262-312; BLM000313-328. BLM did not provide a map of the proposed parcels, identify or analyze any resource values that may be impacted or environmental concerns, or provide any substantive information for the public to review. Plaintiffs Southern Utah Wilderness Alliance (the "Alliance") and Natural Resources Defense Council ("NRDC") submitted scoping comments on BLM's leasing proposal. BLM001289-1307.

BLM also did not allow the public to review or comment on its draft EA for the September 2018 lease sale. Instead, BLM issued a final EA ("September Lease Sale EA"), and signed FONSI/DR, and required the public to protest its leasing decision in an abbreviated 10-day period, instead of the usual 30 days. BLM003934-4132 (BLM's September Lease Sale EA); BLM018757 (10-day protest period).

Despite previously acknowledging in the San Rafael Desert MLP process that numerous resources "required" additional analysis at the landscape level *before any leases could be issued*, BLM's September Lease Sale EA abandoned that programmatic analysis in favor of a more limited analysis of potential impacts related to *only* the specific lease parcels under consideration for that sale. BLM003940-41 (the "purpose and need" of the September Lease Sale EA was to

15

analyze and disclose the impacts of only the 76 parcels at issue in that sale). In so doing, the agency disregarded several entire categories of impacts that it previously stated "required" cumulative impacts analysis, including impacts to soil and water resources, riparian resources, and wildlife resources, including pronghorn. BLM004119-26 (explaining that BLM did *not* analyze and disclose these resource impacts in the September Lease Sale EA).

The NPS raised concerns in a letter to BLM about BLM's lack of analysis prior to offering the leases for sale and development. NPS explained that "[t]he activities associated with this sale have the potential to affect air quality . . . in Canyonlands National Park," for example because "the proliferation of pads and roads associated with potential future exploration and production activities enabled by the proposed lease sale . . . could result in increased emissions of fugitive dust from unpaved pads and roads." BLM008102. NPS also raised concerns about impacts to "the dark night skies" at Canyonlands National Park, as well as the "potential impacts of oil and gas exploration and drilling activities on natural soundscape conditions experienced by visitors to Canyonlands' Horseshoe Canyon Unit nearby." *Id.* BLM did not respond to the NPS's letter.

The September Lease Sale EA also failed to identify many past, present, and reasonably foreseeable actions in the San Rafael Desert, including on lands adjacent to the September leases and specifically future actions that the San Rafael Desert MLP identified as "reasonably foreseeable" in its RFDS. BLM002531-44 (the San Rafael Desert MLP RFDS discussing past and foreseeable oil and gas development in the area). The actions that BLM ignored include, but are not limited to, numerous adjacent oil and gas leases sold by the Utah School and Institutional Trust Lands Administration ("SITLA") in 2016, BLM038487 (map showing all of the lease parcels and SITLA leases), BLM's December 2018 competitive oil and gas lease sale, which was

16

AR010231

already in the planning process and included the Twin Bridges Lease in the San Rafael Desert,
BLM027002, and BLM's RFDSs prepared for the Price field office and San Rafael Desert.
BLM012757-66; BLM002522-54.

Plaintiffs, the Alliance, Center for Biological Diversity (the "Center"), and NRDC filed a
lease sale protest, BLM018832-74, which BLM denied. BLM025033-54. BLM issued the leases
subject to the outdated lease stipulations, notices, and BMPs, prepared by the agency as part of
the Price RMP—not the new stipulations, notices, and BMPs, it had determined to be required as
part of the San Rafael Desert MLP. *See* BLM002419-20 (MLP action alternatives all specifying
that any leases would have been issued subject to more restrictive NSO stipulations or controlled
surface use stipulations, or the areas would have been entirely closed to new leasing).

## VI.    BLM'S DECEMBER 2018 OIL AND GAS LEASE SALE

The Twin Bridges Lease is also entirely within the former San Rafael Desert MLP
boundary. This time, BLM did not even bother to prepare NEPA analysis. Instead, it relied on a
DNA to sell the Twin Bridges Lease for development at the agency's December 2018
competitive oil and gas lease sale. BLM030618-55.

According to BLM, a DNA was appropriate because *all* of the potential direct, indirect,
and cumulative impacts of selling the Twin Bridges Lease for development had purportedly been
analyzed and disclosed in four prior NEPA documents: the programmatic Price RMP, and three
site-specific leasing EAs prepared for *other* public lands in Utah. BLM030621 (identifying these
NEPA analyses, which according to BLM, fully "cover[ed] the proposed action"). However,
none of these prior NEPA documents identify the Twin Bridges Lease, nor analyze and disclose
site-specific impacts of the sale and development of that particular lease. BLM012767-14251
(Price field office final EIS); BLM003934-4132 (September Lease Sale EA); BLM030659-831

17

(2015 Price field office lease sale EA); BLM030832-997 (2018 Salt Lake field office lease sale EA). Nor do these prior documents provide the analysis that BLM previously found was "required" in the San Rafael Desert MLP and thus failed to analyze and disclose the impacts to various resources that the MLP would have addressed as a prerequisite prior to new leasing and development. *See generally id.*

BLM provided very little information to the public during the "scoping" process for this lease sale, merely posting a map and a list of preliminary parcels. BLM027002; BLM02703-27. Moreover, BLM did not offer a public review or comment period on the December Lease Sale DNA. Nevertheless, the Alliance and NRDC submitted comments on BLM's December 2018 lease sale. BLM027682-705. BLM then posted the final DNA to its ePlanning project website and required the public to protest that leasing decision in an abbreviated 10-day period. BLM031550. Plaintiffs, the Alliance, the Center, and Living Rivers subsequently protested BLM's leasing decision, BLM033187-209, which BLM denied. BLM034679-90.

BLM issued the Twin Bridges Lease subject to outdated lease stipulations, notices, and BMPs, prepared by the agency as part of the 2008 Price RMP, rather than the more current and more environmentally protective conditions developed during the San Rafael Desert MLP process.

The San Rafael Desert MLP area, the September and December 2018 leases, and the adjacent SITLA leases are shown on the following map:[9]

---

[9] This map is in the administrative record. BLM038487.

18



**STANDARD OF REVIEW**

The Administrative Procedure Act ("APA") requires federal courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). An action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

19

AR010234

Under the APA, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *see also Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio*"). An agency policy change complies with the APA if the agency (1) displays awareness that it is changing positions, (2) shows that the new policy is permissible under the statute, (3) believes the new policy is better, and (4) provides good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy, must include a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy. *Fox*, 556 U.S. at 515-16.

"Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing *Richards v. I.N.S.*, 554 F.2d 1173, 1177, n.228 (D.C. Cir. 1977)).

## **ARGUMENT**[10]

## I.    BLM FAILED TO PROVIDE A REASONED EXPLANATION PRIOR TO ABANDONING THE MLP POLICY OR SAN RAFAEL DESERT MLP

For over seven years, based on its 2010 nationwide oil and gas policy, BLM worked to complete the San Rafael Desert MLP process; a process the agency repeatedly determined to be "required" prior offering new leases for development in the San Rafael Desert. To this end, BLM made it more than half-way in the MLP process, which included, among other things: collecting significant new information and data regarding LWCs, water resources, and wildlife; collecting

---

[10] As demonstrated in the Declaration of Ray Bloxham attached as Exhibit A, Plaintiffs have standing in this case.

AR010235

significant new information and data related to the impacts of oil and gas leasing and

development in the San Rafael Desert; collecting new information and data regarding past,

present, and reasonably foreseeable future oil and gas development in the San Rafael Desert;

preparing an MLP-specific RFDS; and preparing a draft EA to analyze and disclose this new

information and data. During this years-long public process, BLM deferred all leasing in the San

Rafael Desert to preserve its management options for the area. BLM002556 (BLM memorandum

explaining that "all" lease nominations were deferred in MLP areas).

However, BLM never completed the San Rafael Desert MLP. Instead, following the 2016

election, the agency abruptly abandoned the MLP planning process to align itself with the Trump

administration's priorities. In doing so, BLM failed to provide a reasoned explanation for

reversing course on the MLP policy and the San Rafael Desert MLP, in violation of the APA.

*See Fox*, 556 U.S. at 516 ("a reasoned explanation is needed for disregarding facts and

circumstances that underlay . . . the prior policy").

BLM's sole justification for abandoning the San Rafael Desert MLP was that the process

ostensibly "created duplicative layers of NEPA review." BLM002629. However, this lone

perfunctory statement is not only unmoored from any "reasoned explanation" of why analysis at

the MLP level is purportedly duplicative; it is also plainly incorrect. The MLP process could not

duplicate what did not exist either at the RMP or leasing stages. Far from duplicating existing

NEPA analysis, BLM explicitly designed the MLP process to provide analysis that was lacking

both at the RMP stage and at the lease sale stage. BLM026597 (IM 2010-117 stating that the

MLP process provided "additional planning and analysis . . . prior to new oil and gas leasing

because of chang[ed] circumstances, updated policies, and new information."). Indeed, BLM's

policy was to require MLPs only where "[a]dditional analysis is needed to address likely

21

resource impacts (including cumulative impacts) if oil and gas development were to occur where there is a potential for [resource conflicts]." BLM002662.

### A. BLM's MLP Process Was Designed to Provide Missing Scrutiny and Analysis.

BLM explicitly designed its MLP process to correct serious analytical deficiencies in its prior approach to oil and gas leasing on public lands—a far cry from ostensibly duplicative NEPA review. The "facts and circumstances that underlay" the MLP policy, and the San Rafael Desert MLP, came from BLM's nationwide oil and gas leasing reforms established in 2010. BLM026597-98. These reforms were based on the Interior Department's 2009 "findings and recommendations for improving the oil and gas land use planning and lease sale parcel review processes." BLM026602; *see also* BLM002743-81 (2009 Interior Department report detailing its findings and recommendations); BLM002555 (BLM stating that its 2010 policy reforms "introduced significant changes for BLM's oil and gas lease sale review process as well as the concept of a new land use planning tool known as the MLP").

The entire purpose of the MLP policy was to provide the necessary pre-leasing NEPA review *that the agency had never previously prepared*, while at the same time stopping BLM from proceeding with leasing decisions in MLP areas in the absence of the analysis that the agency itself determined was required. As BLM explained it: "Through the MLP process, the BLM will reconsider RMP decisions pertaining to oil and gas leasing and will evaluate likely development scenarios and varying mitigation levels. . . . In most cases, this focused planning and analysis will result in the incorporation into the RMP of new oil and gas leasing decisions as well as development decisions." BLM002661.

In BLM's own words, the keystone principle underlying the entire MLP policy was to provide "additional planning and analysis . . . prior to new oil and gas leasing because of

22

chang[ed] circumstances, updated policies, and new information." BLM026597. More specifically, the agency explained that the additional planning and analysis "is needed to address likely resource impacts (including cumulative impacts) if oil and gas development were to occur where there is a potential for [resource conflicts]." *Id.* Hence, BLM designed the MLP process not to create duplicative NEPA review, but instead to provide essential analysis for resources that it had failed to previously consider.

In Utah, BLM prepared a "Leasing Reform Implementation Plan," which explained that the RMPs, including the Price RMP, "are subject to a continual process of monitoring and review . . . as new information or changed circumstances arise." BLM029962. In light of BLM's own identification of new information and changed circumstances, the agency then designated five master lease plan areas, covering millions of acres, for MLPs in Utah. BLM002556. Specific to the San Rafael Desert MLP, BLM identified "chang[ed] circumstances" and "new information" that postdated the Price RMP and thus had to be analyzed and disclosed in the MLP "prior to new leasing of oil and gas within the planning area." BLM002520. The bevy of changed circumstances and new information identified by BLM included: "[1] a planning area-wide wilderness characteristics inventory, [2] a cultural resource inventory, viewshed analysis, and historic setting analysis for the Old Spanish National Historic Trail, [3] pronghorn habitat data . . . [4] visual resource inventories for the Price [field office], [5] [a RFDS] for oil and gas resources [in the San Rafael Desert], and [6] recreational and cultural resource inventory data." BLM036121 (BLM's draft EA for the San Rafael Desert MLP).

BLM also determined that additional factors "required" preparation of this new pre-leasing NEPA analysis for the San Rafael Desert, including the need to: "[e]valuate potential development scenarios," "[c]reate oil and gas development mitigation strategies," and

AR010238

"[c]onsider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing." BLM002520.

BLM's MLP process was thus purposefully distinct from the earlier RMP process in critical ways. To begin with, the MLP process considered new information and changed circumstances that BLM could not have considered at the RMP stage because that information did not yet exist. BLM036119 (BLM explaining that the MLP was necessary "[s]ince the completion of the [Price RMP] . . . the BLM has . . . collected new information relevant to [the MLP] analysis"). Likewise, the MLP analyzed—and would have implemented as part of the action alternatives considered in the draft MLP EA—new conditions on subsequent leasing that differed significantly from the conditions in the Price RMP, such as whether lands would be available for lease, restrictions on surface occupancy or the timing and nature of future lease development. BLM036128-29 (BLM's description of the draft MLP EA alternatives); BLM002412-21 (summary of the preliminary alternatives in the MLP). Accordingly, contrary to BLM's sole reason for abandoning the MLP, the MLP process did not duplicate the NEPA analysis for the RMP.

The MLP process was also distinct from the subsequent leasing process. Indeed, as described below, during the leasing process, BLM not only failed to consider the array of new information and data that it had collected for the MLP, but also *explicitly refused* to consider alternatives or conditions on leasing that the agency itself acknowledged were reasonable during the MLP process. Hence, because the MLP considered both new information and more environmentally protective conditions on leasing, which BLM failed or refused to consider during the leasing process, the MLP would have done far more than merely duplicate the NEPA analysis at the leasing stage, as BLM now inaccurately claims.

AR010239

BLM's flat refusal at the leasing stage to consider alternatives that the agency itself

recognized as viable at the MLP stage vividly illustrates how the MLP process was distinct

rather than duplicative. For example, a key purpose of the MLP policy was to analyze new

information (*e.g.*, pronghorn habitat data, LWCs) and determine whether to create new

mitigation strategies and/or "new conditions" on development such as "prohibiting surface

occupancy or closing certain areas to leasing" to insure proper management of public resources

before irreversibly committing those resources to oil and gas leasing and development.

BLM002520. After BLM abandoned the MLP policy and proposed its September 2018 lease

sale, Plaintiffs submitted scoping comments specifically asking BLM to consider alternatives

that comported with the MLP's primary purpose, including: (1) a "leasing outside of wilderness-

caliber lands" alternative; (2) a "no-surface occupancy" alternative; (3) a "phased development-

leasing" alternative; and (4) a "mitigation leasing" alternative. BLM001305-06.

Plaintiffs' recommended alternatives were crafted purposefully to track with the

objectives of the MLP policy, including the San Rafael Desert MLP. For example, in its Fluid

Mineral Resources Handbook, which incorporated the MLP policy,[11] BLM expressly recognized

"phased leasing" as a reasonable alternative for MLP areas, stating: "Phased leasing could aid in

protecting important resource values (e.g., visual or sensitive species) in areas where the mineral

development potential and the mode of development are presently unknown." BLM002666.[12]

BLM also endorsed consideration of "phased development," "limitations on surface

---

[11] *See* BLM002661-69.
[12] BLM describes "phased leasing" as a leasing approach where "if oil and gas were successfully discovered and produced [in a particular area], there would then be the opportunity to analyze the impact of additional leasing [near that area]." BLM002666; *see also* BLM001305 (SUWA's scoping comments explaining how the phased development-leasing alternative would work in the San Rafael Desert).

AR010240

disturbance," and mitigation alternatives. BLM002665-66. And, as noted above, the draft San Rafael Desert MLP EA analyzed these precise issues, including preparation of new lease stipulations and mitigation measures. BLM002422-70; BLM002471-79; BLM002412-21.

However, in the September Lease Sale EA, BLM explicitly rejected Plaintiffs' proposal of these alternatives because they were "not in compliance with the [Price] RMP, since [such alternatives] are *derived through the Land Use Planning process, not NEPA analysis*." BLM003953-54 (emphasis added); BLM025037-38 (BLM denying SUWA's lease sale protest on this point and explaining "BLM did not consider such proposed alternatives in detail because all of them would require stipulations to be added to the parcels that are currently not allowed under the [Price RMP]"). Of course, the MLP was the land use planning process that BLM had specifically designed to consider and implement these same alternatives.

Yet, having arbitrarily abandoned the MLP process, BLM then rejected Plaintiffs' recommended "phased development-leasing" alternative because—at the leasing stage—"BLM may not put what are, effectively major constraints on the development of leases on lands not already encumbered by major restraints under the current RMP." BLM003954. In other words, according to BLM itself, the September Lease Sale EA did not—and could not—duplicate the MLP analysis because the agency's NEPA analysis at the leasing stage serves an entirely different purpose than the MLP process—to consider site-specific leasing, not area-wide *pre*-leasing land use planning. Thus, BLM's reasons for rejecting at the leasing stage the same alternatives that the agency itself accepted at the MLP stage belies the agency's conclusory position that the MLP merely created duplicative layers of NEPA review.

More broadly, based on the new information and changed circumstances identified by the agency *after* it completed the Price RMP, BLM determined to address the area-wide

26

management of the San Rafael Desert in the MLP process; this was to be BLM's vehicle to respond to the changed circumstances prior to selling new leases for development. For example, the MLP would have at least considered, and could have actually implemented, "a water management plan and water monitoring plan for mineral projects to protect nearby waters"; "protections to areas such as springs, riparian areas, and wetlands that provide habitat to special status species"; "protect[ion for] crucial pronghorn habitat"; limitations on "[w]hat areas would be available for oil and gas leasing and development"; and "restrictions and BMPs . . . to protect resource values." BLM036122-24.

In the September Lease Sale EA, BLM did not even consider these issues because that document was prepared for the narrower purpose of "respond[ing] to the nominations or expressions of interest for oil and gas leasing on specific federal mineral estate through a competitive leasing process." BLM003940. Thus, the analysis underlying an MLP is far from "duplicative," as BLM now cursorily suggests.

### B. BLM's Abandonment of the MLP Process Was Arbitrary and Capricious.

The fact of the matter is that BLM abandoned the MLP policy to align itself with Trump administration's priorities and not because the MLP policy created duplicative layers of NEPA review. Indeed, BLM was required to take this step by Executive Order 13783 which directed agencies to rescind all policies that "potentially burden[ed]" oil and gas leasing and development. BLM131451. Likewise, Secretarial Order 3354 directed BLM to "enhance exploration and development of Federal onshore oil and gas resources[.]" BLM131917. BLM then carried these directives forward in IM 2018-34, which cites to Executive Order 13783 as part of its justification for rescinding its MLP policy. BLM002629. And while it is true that "[e]lections have policy consequences," "when reversing a policy after an election, an agency

AR010242

may not simply discard prior factual findings without a reasoned explanation." *Organized Vill. of Kake v. U.S. Dept. of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc) (citing *State Farm*). *Cf. California v. Bernhardt*, 472 F. Supp. 3d 573, 605 (N.D. Cal. 2020) ("In short, BLM's reliance on Executive Order 13783 falls short of supplying the required 'reasoned explanation' for the Rescission" of the Obama administration's waste prevention rule).

But that is precisely what BLM did here. The agency's perfunctory statement that MLPs created duplicative layers of NEPA review is "not a statement of reasoning, but of conclusion." *Amerijet Intern. Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted). Moreover, BLM's unsupported, conclusory statement also directly, and entirely, contradicts the agency's own previous findings that additional planning and analysis were required prior to the agency selling new leases for development in the San Rafael Desert. *Fox*, 556 U.S. at 537 ("[i]f the agency ignores or countermands its earlier factual findings without a reasoned explanation" it violates the APA) (Kennedy, J., concurring).

Indeed, federal courts routinely reject similar unexplained or ill-explained agency about-faces. *See Encino Motorcars, LLC*, 136 S. Ct. at 2125-27 (unexplained reversal regarding application of the Fair Labor Standards Act to automobile dealership employees); *State Farm*, 463 U.S. at 46-51 (arbitrary reversal regarding the use of safety devices in automobiles); *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644-48 (D.C. Cir. 2020) (rejecting EPA's new policy of excluding from committees any scientist that had received an EPA grant); *Grace v. Barr*, 965 F.3d 883, 897-903 (D.C. Cir. 2020) (holding that a new policy regarding asylum claims was "arbitrary and capricious due to [the agency's] failure to acknowledge and explain its departure from past practice"); *Southwest Airlines Co. v. Federal Energy Regulatory Comm.*, 926 F.3d 851, 855-59 (D.C. Cir. 2019) (rejecting a newly adopted method for computing

28

AR010243

costs as a "policy inconsistent with [the agency's] earlier course of conduct," and finding that "the explanation offered [by the agency] misses the mark"); *Am. Wild Horse Preserv. Campaign v. Perdue*, 873 F.3d 914, 923-28 (D.C. Cir. 2017) (reversing unexplained change regarding the agency's management of wild horses); *Dist. of Columbia v. U.S. Dept. of Agric.*, 496 F. Supp. 3d 213, 249-50 (D.D.C. 2020) (rejecting the Department's attempt to significantly reduce federal food-stamp benefits in part because it failed to "provide a sufficiently 'reasoned explanation'" for "radical changes in long-standing policies"); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018) (rejecting the Department's stay of regulations designed to protect student loan borrowers in part because of "an unacknowledged and unexplained inconsistency [which] is the hallmark of arbitrary and capricious decision-making").[13]

For example, in *American Wild Horse Preservation Campaign*, for over two decades the Forest Service had managed a single contiguous area of public lands for the protection of wild horses. 873 F.3d at 920-22. However, in 2013, the agency reversed course and split its management of the area into two disjointed tracts of land, which removed the "Middle Section" from the larger formerly-contiguous area. *Id.* On review, the Forest Service argued that the Middle Section had only been included in the contiguous area as a result of administrative error and thus was never properly part of that larger area in the first place. *Id.* at 924. The D.C. Circuit

---

[13] *See also Kake*, 795 F.3d at 966-70 (rejecting the agency's policy reversal regarding the Roadless Rule); *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011, 1018-22 (D. Alaska 2020) (rejecting the agency's ill-explained reversal regarding the construction of a road through the Izembek National Wildlife Refuge); *Indigenous Envtl. Network v. U.S. Dept. of State*, 347 F. Supp. 3d 561, 582-84 (D. Mont. 2018) (rejecting the agency's about-face regarding a permit for a transboundary pipeline); *W. Watersheds Project v. Bernhardt*, --- F. Supp. 3d ---, 2021 WL 517035, at *18-22 (D. Idaho Feb. 11, 2021) (rejecting the agency's reversal regarding plans to protect greater sage-grouse from mining activities); *Cal. by and through Becerra v. U.S. Dept. of the Interior*, 381 F. Supp. 3d 1153, 1165-68 (N.D. Cal. 2019) (rejecting agency's repeal of regulations that governed the payment of royalties on oil and gas).

AR010244

rejected this argument because it "flatly defie[d] the plain text of the official 1991 Forest Plan, repeated official agency statements, and two decades of agency practice." *Id.*

The court further explained that the Forest Service had inappropriately "trie[d] to shrug off its [prior] inclusion of the Middle Section [in the larger contiguous area] as some sort of inconsequential and passing 'administrative error,' as though that label nullifies any agency duty to reasonably explain its about-face. But there is no 'oops' exception to the duty of federal agencies to engage in reasoned decisionmaking." *Id.* In particular, the Forest Service never explained why the prior two decades of official agency reports and statements, which contradicted its new position were no longer accurate or relevant, but rather the agency "trie[d] to whistle past that factual graveyard." *Id.* at 927. However, the APA required the Forest Service to do more—that is, it required the agency to "explain its reasons" for reversing course, which included addressing its prior statements and determinations, and the Forest Service's failure to do so was unlawful. *Id.* at 928.

Similarly and equally applicable here, in *Kake*, the Ninth Circuit rejected the U.S. Department of Agriculture's abrupt turnabout regarding the "Roadless Rule" as it applied to the Tongass National Forest, concluding that the Department failed to provide a sufficient reasoned explanation for its change in direction. In 2001, the Department promulgated the "Roadless Rule," which limited road construction and timber harvesting in national forests. 795 F.3d at 959. Relevant here, at that time, the Department determined that "exempting the Tongass National Forest from this Rule 'would risk the loss of important roadless area ecological values.'" *Id.* (internal alteration omitted). However, just two years later, following a change in presidential administration, "the Department reversed course, finding 'application of the roadless rule to the Tongass . . . unnecessary to maintain the roadless values.'" *Id.* (internal alterations omitted).

30

The Ninth Circuit held that the Department failed to justify its contradictory conclusion. According to the court, "the 2003 [decision] rests on the express finding that the Tongass Forest Plan poses only 'minor' risk to roadless values; this is a direct, and entirely unexplained, contradiction of the Department's finding in the 2001 [decision] that continued forest management under precisely the same plan was unacceptable because it posed a high risk to the 'extraordinary ecological values of the Tongass.'" *Id.* at 968. This unexplained reversal violated the APA. *Id.* at 968-69.

Here, as in *American Wild Horse Preservation Campaign* and *Kake*, BLM's conduct fails to put forth a reasoned explanation. BLM had an established policy, supported by years of agency information, data, analysis, and agency determinations. But following a change in presidential administration, the agency abruptly reversed course on the MLP policy, including the San Rafael Desert MLP, to align itself with the Trump administration's "energy dominance" agenda. This reversal reopened millions of acres of public lands to oil and gas leasing and development—lands that had been removed from availability for leasing for over seven years under the prior policy.

BLM offered a lone perfunctory explanation for that reversal: MLPs create duplicative layers of NEPA review. But that perfunctory statement is not one "of reasoning, but of conclusion." *Amerijet Intern. Inc.*, 753 F.3d at 1350. This statement is arbitrary because, as discussed *supra*, the MLP considered new information and changed circumstances that did not exist at the RMP stage, and considered alternatives that the agency *explicitly refused* to consider at the leasing stage. *See Am. Wild Horse Preserv. Campaign*, 873 F.3d at 927 (rejecting agency justification that "makes little sense").

AR010246

At a minimum, the APA required BLM to explain and justify *how* the MLP policy created duplicative layers of NEPA review or *why* such analysis was no longer required—that is, the APA required BLM to "reasonably *explain* its about-face." *Id.* at 924 (emphasis added). A "reasoned explanation" would have to address, for example, BLM's prior determination that "[a]dditional analysis is needed to address likely resource impacts (including cumulative impacts) if oil and gas development were to occur where there is a potential for [resource conflicts]." BLM002662. Likewise, BLM was obligated, but failed, to explain how and why the "new information" and "changed circumstances" that it previously identified in the San Rafael Desert MLP—such as the new "[p]ronghorn habitat data," BLM036121, and the need to "[c]onsider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing," BLM002520—somehow no longer had any relevancy.

Critically, instead of providing any reasons for discarding the facts and circumstances underlying the MLP process, BLM entirely "ignore[d] [and] countermand[ed] its earlier factual findings," *Fox*, 556 U.S. at 537, by baldly asserting that its years-long nationwide policy, which it repeatedly determined to be "required," could be cast aside in the agency's haste to align itself with the Trump administration's "energy dominance" agenda on the unsupported basis that its prior policy was "duplicative." This unsupported statement "cross[es] the line from the tolerably terse to the intolerably mute." *Am. Wild Horse Preserv. Campaign*, 873 F.3d at 928 (citation omitted); *see also Encino Motorcars, LLC*, 136 S. Ct. at 2126 (an agency policy reversal violates the APA if there are "unexplained inconsistenc[ies]") (internal alteration omitted).

Rather than address the facts and circumstances that underlay the agency's prior nationwide oil and gas program policies, including the MLP policy and San Rafael Desert MLP, BLM's perfunctory statement "gave almost no reason at all" to justify the course reversal.

AR010247

*Encino Motorcars, LLC*, 136 S. Ct. at 2127. Thus, BLM's "lack of reasoned explication for a [policy] that is inconsistent with the [agency's] longstanding earlier position results in a" decision that violates the APA. *Id.*

## II.   BLM FAILED TO ANALYZE AND DISCLOSE THE CUMULATIVE IMPACTS OF THE PROPOSED OIL AND GAS LEASES IN THE SEPTEMBER AND DECEMBER LEASE SALES

As a part of the San Rafael Desert MLP, BLM prepared a site-specific RFDS which discussed past, present, and foreseeable oil and gas development, including predicted surface disturbance related to those activities. BLM002531-44. BLM also collected new information regarding water quantity and pronghorn antelope and concluded that the agency needed to analyze and disclose the cumulative impacts of development to those resources *prior to offering new oil and gas leases for development in the MLP planning area*. BLM025434; BLM036121-23.

Nonetheless, in the September Lease Sale EA and December Lease Sale DNA, BLM entirely ignored all of the data and information it had acquired for preparation of the San Rafael Desert MLP and sold the leases at issue here without considering, analyzing, and disclosing the past, present, and reasonably foreseeable impacts to water quantity and pronghorn antelope. Thus, these leasing decisions violated NEPA's "hard look" mandate.

### A.   NEPA Requires Analysis of Reasonably Foreseeable Cumulative Impacts

NEPA's hard look mandate "requires that BLM assess the 'reasonably foreseeable' impacts of a proposed action before an 'irretrievable commitment of resources' is made that would trigger those impacts." *WildEarth Guardians I*, 368 F. Supp. 3d at 64 (quoting 42 U.S.C. § 4332(2)(C)(v)) (alteration marks omitted). In the oil and gas context, the irretrievable commitment of resources occurs at the point of lease issuance. *See Peterson*, 717 F.2d at 1414.

33

"In determining what effects are 'reasonably foreseeable,' an agency must engage in 'reasonable forecasting and speculation,' with *reasonable* being the operative word." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 198 (D.C. Cir. 2017) (citation omitted). While an "agency 'need not foresee the unforeseeable, [] by the same token neither can it avoid drafting an impact statement simply because describing the environmental effects of and alternatives to particular agency action involves some degree of forecasting.'" *Id.* (quotation marks and citation omitted); *see also Del. Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1310 (D.C. Cir. 2014).

NEPA requires an agency to analyze and disclose all foreseeable cumulative impacts of its proposed action. *See* 40 C.F.R. § 1508.7. As the D.C. Circuit has explained, a proper cumulative impact analysis must include a discussion of any "'actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area, [] the impacts or expected impacts from these other actions, and [] the overall impact that can be expected if the individual impacts are allowed to accumulate.'" *WildEarth Guardians I*, 368 F. Supp. 3d at 76 (quoting *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (2002)).

In both lease sales at issue here—the September 2018 and the December 2018 sales—BLM's discussion of cumulative impacts regarding water quantity and pronghorn antelope did not meet this standard.

## B. BLM Failed to Take the Required "Hard Look"

### i. Water quantity

All helium, natural gas, and oil wells require significant amounts of water related to drilling, exploration and production, including during road and well pad construction, drilling, and well completion. This is true regardless of how wells are drilled (*e.g.*, vertical, directional), the drilling technique used (*e.g.*, with or without hydraulic fracturing), the depth of the targeted

AR010249

formation, and the targeted resource (*e.g.*, helium, natural gas). BLM003950. Indeed, BLM itself

predicts that the drilling of a single oil and gas well in the San Rafael Desert consumes 294,000

gallons of water. *Id.* Thus, water resource impacts, like GHG emissions and climate change

impacts, are reasonably foreseeable; they "do not depend on [well] placement within a parcel[.]"

*WildEarth Guardians v. Bureau of Land Mgmt.* ("*WildEarth Guardians v. BLM*"), 457 F. Supp.

3d 880, 888 (D. Mont. 2020).

   For this reason, and as courts have made clear, at the leasing stage, BLM must (1)

quantify reasonably foreseeable water usage and (2) analyze and disclose the cumulative impacts

of such water usage in combination with any other past, present, and reasonably foreseeable

actions. More precisely, because BLM can quantify water usage, it must do so, then "discuss and

consider the effect of such water use on the environment." *San Juan Citizens All. v. U.S. Bureau

of Land Mgmt.*, 326 F. Supp. 3d 1227, 1254 (D.N.M 2018); *see also Ctr. for Biological Diversity

v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 851-53, 860–61 (S.D. Ohio 2020) (holding that

cumulative water use for fracking was reasonably foreseeable at the leasing stage). Here,

however, BLM failed both parts of the test.

   First, BLM violated NEPA's "hard look" mandate by failing to accurately quantify the

cumulative water use associated with oil and gas leasing and development. Although BLM did

make some effort to quantify cumulative water usage, its calculations were defective because it

ignored plainly available information—including the agency's own prior descriptions of

reasonably foreseeable development. In the September Lease Sale EA (on which the December

Lease Sale DNA relies), BLM took the position that the average oil and gas well drilled in the

San Rafael Desert consumes 294,000 gallons of water. BLM003950. The agency then multiplied

that figure by its lease sale-specific RFDS of 11 wells to arrive at a projection that development

AR010250

of the leases would consume 3.2 million gallons over a fifteen-year period. *Id.* However, in

making these calculations, BLM misapplied *its own prior projections* from the San Rafael Desert

MLP RFDS which predicted the development of 30 wells across the full San Rafael Desert MLP

planning area. BLM002540. That higher level of foreseeable development would amount to an

overall use of roughly 8.8 million gallons of water (30 wells multiplied by BLM's estimate of

294,000 gallons per well). In other words, by disregarding its own prior, and much higher,

projection of reasonably foreseeable development, the agency overlooked the likely use of over 5

million gallons of water.

Nor was the MLP's assessment of reasonably foreseeable development the only available

information that BLM improperly ignored. Instead, BLM also ignored the RFDS prepared for the

Price RMP, which predicted 1,540 wells. BLM012757-66. Relying on BLM's own figure of

294,000 gallons per well, that level of reasonably foreseeable development would consume over

452 million gallons of water. BLM012763. Further, BLM failed to assess the reasonably

foreseeable development of adjacent SITLA leases in the San Rafael Desert. BLM038347 (map

of the leases).

By ignoring information that was plainly available to the agency about reasonably

foreseeable development—in large part the agency's own projections—BLM significantly

undercounted the amount of water that is likely to be consumed through oil and gas development

in this arid, desert region. BLM's turning of a blind eye to its own prior assessments of

reasonably foreseeable development in this same region is the opposite of the "hard look" that

NEPA requires. *See San Juan Citizens All.*, 326 F. Supp. 3d at 1254 ("Because BLM failed to

use the information it had at this stage to consider the impacts of the agency action on water

AR010251

quantity, BLM failed to meet its duty to take a hard look at the environmental impacts of the proposed action").[14]

Second, BLM entirely failed to "discuss and consider the effect of such water use on the environment." *San Juan Citizens All.*, 326 F. Supp. 3d at 1254. A rigorous assessment of the environmental impacts of significant water use in this area is critical; the Southwestern United States and San Rafael Desert in particular is already suffering severe drought and climate change is predicted to make the situation worse. BLM039607-52 (Fourth National Climate Assessment findings for the Southwest). *See* BLM036178-79; BLM036240 ("The largest factor affecting the majority of wildlife populations and habitat trends in the [San Rafael Desert] is drought").

Indeed, BLM previously recognized the need for a detailed review of this issue in its draft San Rafael Desert MLP EA. In that document, BLM found that in comparison to *any other land use*, oil and gas development would "cause the greatest amount of reasonably foreseeable . . . impacts to water and riparian resources." BLM036474. And the agency recognized that the impacts from water usage "would likely be greater where mineral development is more intense, in areas where development overlaps sensitive soils . . . where development crosses ephemeral drainages or occurs near impaired waters, and on state and private lands where relatively fewer protections are afforded to natural resources." *Id.* BLM's description of where water usage will have especially severe impacts is particularly germane because *those same characteristics* (sensitive soils, ephemeral drainages) are present in or near the 77 lease areas at issue here.[15]

---

[14] BLM may also have significantly undercounted water usage by providing an inaccurate estimate of water use per well. For example, the Twin Bridges well consumed 1,303,404 gallons of water—more than four times as much as BLM projected for a typical well in this region. BLM123509.

[15] *See, e.g.*, BLM004119 ("The proposed lease sale [leases] fall within fragile soil areas, which are typically slow to develop, prone to erosion, highly saline, typically low restoration potential, and have very low organic matter"); BLM004112 ("Several of the parcels are intersected by

37

Nevertheless, although BLM's leasing documents made some attempt to quantify foreseeable water use (albeit inaccurately, as described above), the agency made *no effort* to explain what actual *environmental impacts* would result from that water use. For example, a sufficiently hard look at the relevant environmental impacts would consider how water use "from lease development will impact the land, forests, wildlife, livestock, or human communities in the planning area, or how these impacts are further compounded in a drought-stricken southwest, which is poised to worsen in the face of climate change." *San Juan Citizens All.*, 326 F. Supp. 3d at 1253. Yet, such a discussion of impacts from the foreseeable use of 452 million gallons of water is entirely absent from BLM's leasing analysis.

Because extensive water use was reasonably foreseeable, BLM's September Lease Sale EA violated NEPA by failing to quantify and then analyze and disclose the environmental impacts of that use.[16] *WildEarth Guardians II*, 2020 WL 6701317, at *8 n.9. This is "precisely" the type of analysis BLM should have performed at the leasing stage because NEPA is designed "to determine whether a small amount here, a small amount there, and still more at another point could add up to something with a much greater impact." *WildEarth Guardians v. BLM*, 457 F. Supp. 3d at 894 (quoting *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004)) (internal quotations omitted).

In sum, BLM had information at hand showing that reasonably foreseeable oil and gas development would consume huge amounts of water in the drought-stricken San Rafael Desert,

---

ephemeral streams"); BLM004125 ("The segment of the San Rafael River adjacent to [the] lease parcel is listed as impaired due to OE Bioassessment and total dissolved solids (TDS)").
[16] BLM's failure in the September Lease Sale EA to consider the cumulative impacts to water quantity carries over to the December 2018 lease sale DNA which, as discussed *supra*, simply affirmed BLM's position that the September EA was sufficient NEPA analysis to support sale of the Twin Bridges Lease. BLM030621 (citing September 2018 lease sale EA as well as three inapposite prior NEPA analyses).

AR010253

but nevertheless the agency failed to accurately quantify and then analyze the cumulative impacts of such development to water resources, and what that use would mean to the environment. Its failure to do so violated NEPA.

### ii. Wildlife

BLM's discussion of impacts to wildlife violates NEPA in a similar manner. As with water resources, BLM spent years gathering and analyzing significant amounts of new information related to pronghorn antelope in the San Rafael Desert, knew that the lease parcels encompassed crucial yearlong pronghorn habitat,[17] and knew that other past, present, and reasonably foreseeable projects in the San Rafael Desert had and/or would impact the species and its crucial habitat, including the oil and gas leases at issue in this lawsuit. *See* BLM036121 (BLM explaining that a primary reason for the San Rafael Desert MLP was to consider new information related to "[p]ronghorn habitat data"); BLM036242 (a "large portion of the [San Rafael Desert MLP] planning area [is] pronghorn crucial and substantial-value year-long habitat"). However, BLM unlawfully deferred all cumulative impact analysis from leasing and development regarding pronghorn antelope until the APD stage. *See* BLM004115, -20-22, -27.[18]

BLM's deferral of a cumulative impact analysis violated NEPA because it is the sale of non-NSO leases, not the APD stage, that is "the point of no return with respect to" these foreseeable wildlife impacts. *WildEarth Guardians I*, 368 F. Supp. 3d at 66. As such, BLM was "required to fully analyze the reasonably foreseeable impacts of [future development] at the leasing stage." *Id.*

---

[17] *See* supra n.7 (defining "crucial" habitat).

[18] *See* BLM004110 (identifying wildlife—including pronghorn antelope—as "NI," which the agency explains means the resource is "present, but not affected to a degree that detailed analysis is required").

39

Here, while BLM calculated that 239 acres of pronghorn habitat would be disturbed from development of 11 wells—the lease sale-specific RFDS[19]—it entirely ignored and did not calculate the acres that could be impacted by other past, present, and reasonably foreseeable future actions in the San Rafael Desert that may also impact pronghorn antelope. This includes, for example, development of the 30 wells predicted in BLM's RFDS for the San Rafael Desert MLP, the 1,540 wells predicted in the Price RMP RFDS, development of the Twin Bridges Lease (which was under consideration at the time BLM was preparing the September Lease Sale EA), and development of the SITLA leases sold in 2016 on lands adjacent to the September 2018 leases. BLM038487 (map of these leases). Thus, BLM's calculation of the acres of antelope habitat likely to be disturbed is plainly inaccurate.

Moreover, even if the 239-acre figure was accurate, which it is not, BLM never analyzed and disclosed the environmental cumulative impacts of that disturbance to pronghorn or the species' crucial habitat in the San Rafael Desert. The failure to rigorously evaluate impacts to pronghorn antelope is especially problematic because the MLP process was specifically designed to ensure that such impacts received the rigorous attention that NEPA demands prior to issuing new leases for development in the San Rafael Desert. *See* BLM036121 (noting that new "[p]ronghorn habitat data" needed to be analyzed in the MLP process); BLM036123 (explaining that a primary purpose of the MLP was to answer the question: "How would the MLP protect crucial pronghorn habitat?"). Yet, BLM not only abandoned the MLP process without any

---

[19] BLM acknowledged that all but one of the September leases were *entirely* within crucial yearlong pronghorn antelope habitat and predicted that 11 wells would be drilled on the leases, resulting in 114 acres of disturbance. *See* BLM004009, BLM003949. BLM also predicted an additional 125 acres of disturbance related to "geophysical exploration," for a total (pre-reclamation) disturbance of approximately 239 acres. BLM003949.

40

AR010255

reasoned justification, as discussed above, but also failed at the leasing stage to include any assessment of cumulative impacts to the crucial yearlong pronghorn habitat that the agency previously recognized was required.

While BLM may not foresee all the site-specific impacts of future drilling projects at the leasing stage, here, because all but one of the leases were *entirely* in pronghorn habitat, BLM "could reasonably foresee and forecast the impacts of oil and gas drilling across the leased parcels as a whole." *WildEarth Guardians* I, 368 F. Supp. 3d at 67. Thus, any alleged "inability to fully ascertain the precise extent of the effects of mineral leasing at the leasing stage cannot justify a failure to consider those effects at this stage." *WildEarth Guardians v. BLM*, 457 F. Supp. 3d at 888 (citation omitted).

BLM's failure to fully quantify, analyze, and disclose the cumulative impacts of the September leases and Twin Bridges Lease, when viewed together with all past, present, and reasonably foreseeable future actions, violated NEPA and must be set aside.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' motion for summary judgment, declare BLM's decisions to be arbitrary and capricious, set aside and vacate the 77 leases at issue here and enjoin any development of those leases.

Respectfully submitted this 14th day of May, 2021.

/s/ Landon Newell
Stephen H.M. Bloch (admitted *Pro Hac Vice*)
Landon Newell (admitted *Pro Hac Vice*)

Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
steve@suwa.org
landon@suwa.org

41

AR010256

William S. Eubanks II (D.C. Bar No. 987036)
William N. Lawton (D.C. Bar No. 1046604)

Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington D.C. 20005
bill@eubankslegal.com
nick@eubankslegal.com
*Counsel for Plaintiffs Southern Utah Wilderness Alliance, Center for Biological Diversity, and Living Rivers*

Sharon Buccino (D.C. Bar No. 432073)

Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
sbuccino@nrdc.org

*Counsel for Plaintiff Natural Resources Defense Council*

AR010257

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Southern Utah Wilderness Alliance *et al.*, | |
| Plaintiffs, | **Plaintiffs' Second Amended and Supplemented Complaint for Injunctive and Declaratory Relief** |
| v. | |
| David Bernhardt *et al.*, | Civ. No. 1:20-cv-03654 RC |
| Defendants. | |

## INTRODUCTION

1.      This lawsuit challenges four decisions by the United States Department of the Interior's Bureau of Land Management ("BLM"), all made in furtherance of oil and gas development in the San Rafael Desert region of the Colorado Plateau in southeastern Utah.[1]

2.      First, this lawsuit challenges BLM's decision to offer, sell, and issue the "Twin Bridges Lease," an oil and gas lease located on public land that is now federally protected as the Labyrinth Canyon Wilderness. BLM sold the lease to Twin Bridges Resources, LLC ("Twin Bridges") at its online December 2018 competitive oil and gas lease sale. The lease became effective only a few days before the lands encompassing the lease were designated as Wilderness in the John D. Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act"). Pub. L. 116-9, 133 Stat 580 (Mar. 12, 2019).

3.      Second, this lawsuit challenges BLM's decision to approve development of that lease, including road, well pad, and pipeline construction and the drilling of up to seven wells. Despite congressional Wilderness designation, and with time quickly running out on the Trump

---

[1] The seventy-seven leases at issue are listed in Attachment 1.

AR010258

administration, BLM rushed through a decision to authorize development. The project, titled the "Twin Bridges Bowknot Helium Project" (referred to herein as the "Twin Bridges Drilling Project"), approved the drilling of up to seven wells, road construction and widening, and installation of several pipelines. On information and belief, Twin Bridges has completed road and well pad construction activities and has begun drilling activities for the first of the seven wells. These activities have destroyed Wilderness values.

4.     Third, this lawsuit challenges BLM's decision to sell and issue oil and gas leases in the San Rafael Desert, which includes the Labyrinth Canyon Wilderness at its September 2018 competitive oil and gas lease sale ("September 2018 Leases"). The seventy-seven leases are sandwiched between Goblin Valley State Park and the newly designated San Rafael Reef Wilderness on the west and the Labyrinth Canyon Wilderness, Horseshoe Canyon unit of Canyonlands National Park, and Dirty Devil region on the east and south. This is one of the most sublime and least travelled areas of federal public lands in Utah.

AR010259



(Photograph taken from within lease UTU-93513 which was sold at the September 2018 Lease Sale, looking east over other leases also offered and sold at that sale in the greater San Rafael Desert).

5.　　Fourth, this lawsuit challenges BLM's decision to abandon midstream, and without a reasoned explanation or required environmental analysis, oil and gas planning and analysis for the San Rafael Desert; analysis the agency deemed a necessary precondition for future leasing and development.

6.　　BLM's decisions at issue in this lawsuit violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706, and the regulations and policies that implement these laws. Among other things, Plaintiffs seek a declaration that BLM's decisions to sell and issue the September 2018 Leases and Twin Bridges Lease and to approve the Twin Bridges Drilling Project were "arbitrary, capricious, . . . or otherwise not in accordance with law," or that the decision was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),

3

(D). Plaintiffs also seek injunctive relief and an order vacating the issuance of these leases and BLM's approval of the drilling project.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). This Court can provide relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 553, 702, and 706 (APA).

8. The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants David Bernhardt and, on information and belief, William Perry Pendley, both reside in Washington, D.C. Additionally, Plaintiffs Southern Utah Wilderness Alliance, Natural Resources Defense Council, and Center for Biological Diversity each maintain an office in Washington, D.C.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the decision to approve the Twin Bridges Drilling Project occurred in Washington, D.C.

## PARTIES

11. Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE (the "Alliance") is a non-profit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah, including in the San Rafael Desert and Labyrinth Canyon Wilderness, and the management of wilderness-quality lands in their natural state for the benefit of all Americans. The Alliance has long maintained an office in Washington, D.C. in light of the fact that many agency decisions that affect public lands in Utah are actually made in the nation's

4

AR010261

capital, where the Department of Interior is headquartered. The Alliance has roughly 16,000 members across the nation, including members in Washington, D.C. The Alliance's members use and enjoy federal public lands throughout the San Rafael Desert and the Labyrinth Canyon Wilderness in particular for a variety of purposes, including solitude, viewing wildlife, cultural appreciation, hiking and backcountry recreation, and aesthetic appreciation. The Alliance promotes national recognition of the region's unique character through research and public education and supports administrative and legislative initiatives to permanently protect the federal public lands in Utah's wildest places. The Alliance brings this action on its own behalf and on behalf of its members.

12.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a non-profit environmental membership organization that uses law, science, and the support of more than two million members and activists throughout the United States to protect wildlife and wild places and to ensure a safe and healthy environment for all living things. NRDC has long maintained an office in Washington, D.C. NRDC has a long-established history of working to protect public lands in Utah including the Labyrinth Canyon Wilderness and San Rafael Desert. NRDC members use and enjoy the public lands in the San Rafael Desert affected by BLM's decision to offer, sell and issue the leases at issue and to approve the Twin Bridges Drilling Project. Such use and enjoyment has been and will continue to be adversely affected by BLM's decision. NRDC brings this action on its own behalf and on behalf of its members.

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit environmental organization with over 81,000 members. The Center maintains an office in Washington D.C. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center

AR010262

has advocated and continues to advocate for increased protections for species and their habitats in Utah. The Center regularly comments on and protests oil and gas lease sale and development decisions by BLM, including those at issue here, and its members support the protection of Utah's wild and ecologically unique land. The Center brings this action on its own behalf and on behalf of its members.

14. Plaintiff LIVING RIVERS is a non-profit environmental membership organization based in Moab, Utah. Living Rivers promotes river restoration and seeks to revive natural habitat and the spirit of rivers by undoing the extensive damage done by dams, diversions, and pollution on the Colorado Plateau. Living Rivers articulates a conservation ethic of achieving ecological restoration balanced with meeting human needs. Living Rivers regularly comments on and protests proposed BLM activities, including oil and gas leasing and development decisions including those at issue here. Living Rivers' members are particularly concerned about protection of the San Rafael Desert and Labyrinth Canyon Wilderness and benefit from BLM's compliance with federal laws, including NEPA and the APA. Living Rivers brings this action on its own behalf and on behalf of its members.

15. Plaintiffs are collectively referred to herein as "SUWA."

16. SUWA members frequently visit and enjoy the Labyrinth Canyon Wilderness and San Rafael Desert region, the federal public lands at issue in this case. For decades, Mr. Ray Bloxham, an employee and member of the Alliance, as well as a member of NRDC, the Center, and Living Rivers has visited and enjoyed the public lands encompassed by and surrounding the September 2018 Leases and Twin Bridges Lease. Specifically, Mr. Bloxham first visited this area more than two decades ago and has continued to do so dozens of times over the past twenty years. His most recent visit was in February 2021. Mr. Bloxham has plans to return to this area

6

AR010263

within the next six months, and intends to continue to visit the Labyrinth Canyon Wilderness and San Rafael Desert for years to come. Mr. Bloxham particularly enjoys the scenic views and largely untrammeled nature of the area, including its clean air, natural quiet, untrammeled vistas, and solitude. Mr. Bloxham also appreciates and enjoys the area's abundant wildlife and cultural and archaeological resources.

17.    SUWA's and its members' interests have been impaired and irreparably harmed, and continue to be affected and permanently harmed, by BLM's decisions to illegally offer, sell, and issue the September 2018 Leases and Twin Bridges Lease and to unlawfully approve the Twin Bridges Drilling Project. SUWA's members have a substantial interest in ensuring that BLM complies with its procedural and substantive legal obligations and policies. SUWA's members benefit from BLM's compliance with federal laws, including NEPA. SUWA's members expect that BLM will comply with all federal environmental laws including NEPA and its action forcing mechanisms in order to make informed decisions. SUWA's members' interests have been impaired and irreparably harmed by BLM's approval of the Twin Bridges Drilling Project which authorizes permanent, irreparable harm to the federal public lands surrounding and immediately adjacent to the Labyrinth Canyon Wilderness. These development activities include, but are not limited to, clearing and construction of access roads and well pads, long-term if not permanent destruction of native soils and vegetation, noise and greenhouse gas ("GHG") emissions from vehicles and drill rigs, and industrialization of this remote area that will cause immediate, as well as sustained and prolonged damage to the environment. This will impair SUWA's members' use and enjoyment of this area, as well as the Labyrinth Canyon Wilderness. The relief sought herein will redress these resulting harms.

AR010264

18.     Defendant DAVID BERNHARDT is sued in his official capacity as Secretary of the United States Department of the Interior. In that capacity, he is responsible for ensuring that the agencies within the Department, including BLM, comply with all applicable laws and regulations, including NEPA and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787. Secretary Bernhardt is ultimately responsible for the decisions challenged here.

19.     Defendant WILLIAM PERRY PENDLEY is sued in his official capacity as de facto Acting Director of BLM. In that capacity, he is responsible for managing publicly owned lands and minerals in accordance with federal law. BLM is the agency that manages and leased the public lands in Utah approved for development at issue in this case. Acting Director Pendley is ultimately responsible for the decisions challenged here.

20.     Defendant KENT HOFFMAN is sued in his official capacity as Deputy State Director, Division of Lands and Minerals, of BLM's Utah State Office. Deputy State Director Hoffman is responsible for overseeing Utah BLM's minerals program, including the oil and gas leasing and development decisions at issue in this lawsuit. He signed the Decision Records and Protest Decisions denying the Alliance's protests of the leasing decisions at issue. Deputy State Director Hoffman is ultimately responsible for the decisions challenged here.

21.     Defendant ROGER BANKERT is sued in his official capacity as BLM's Vernal Field Office Manager. He signed the Decision Record for the Twin Bridges Drilling Project at issue. Field Office Manager Bankert is ultimately responsible for the drilling decision challenged here.

AR010265

## LEGAL FRAMEWORK

### I.     Administrative Procedure Act

22.     The APA is a limited waiver of sovereign immunity and authorizes judicial review of agency action. It provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

### II.    National Environmental Policy Act

23.     NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two primary objectives: (1) to foster informed decisionmaking by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decisionmaking. *See id.* § 1500.1(c).

24.     NEPA achieves its purpose through action forcing procedures requiring agencies to take a hard look at environmental consequences of their actions and authorizations.

25.     The Council on Environmental Quality ("CEQ") regulations implementing NEPA[2] require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

---

[2] On September 14, 2020, CEQ's revised NEPA regulations went into effect. *See generally* 85 Fed. Reg. 43304 (July 16, 2020). However, the Decision Records for the challenged leasing decisions were signed in 2018 and 2019, respectively, and are subject to the NEPA regulations in effect at that time. The Twin Bridges Drilling Project was also analyzed and approved under the NEPA regulations in effect prior to September 14, 2020.

AR010266

26.     Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a). "In the fluid minerals program, this [irreversible] commitment occurs at the point of lease issuance." BLM, H-1624-1 Planning for Fluid Mineral Resources § I.B.2, at I-2 (Jan. 28, 2013).

27.     To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an environmental impact statement ("EIS") must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, and indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16.

28.     An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

29.     If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

30.     NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action to inform its decision about whether the agency must prepare an EIS because a proposed action significantly impacts the environment. *Id.* §§ 1502.16(a)-(b), 1508.7, 1508.8.

10

AR010267

31.     Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.8(a).

32.     Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

33.     Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

34.     NEPA allows an agency to "tier" a site-specific environmental analysis for a project to a broader EIS or EA for a program or plan under which the subsequent project is carried out. *Id.* § 1508.28. When an agency tiers a site-specific analysis to a broader EIS or EA, "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.* § 1502.20.

35.     The Department of the Interior's NEPA regulations contemplate that BLM may consider whether existing EISs or EAs "adequately assess[] the environmental effects of the proposed action and reasonable alternatives." *Id.* § 46.120(c). If so, BLM may rely on a Determination of NEPA Adequacy ("DNA") to fulfill its NEPA obligations. *See id.* To rely on a DNA, an agency must evaluate "whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* BLM must explain why "any previously unanalyzed effects are not significant." *Id.* § 46.140(c). *See generally* 43 C.F.R. § 46.20 (explaining that Department of the Interior's NEPA

11

AR010268

regulations "supplement[], and is to be used in conjunction with, the CEQ regulations except where it is inconsistent with other statutory requirements.").

36.     DNAs are not NEPA documents, do not contain NEPA analysis, and are not expressly identified in CEQ's NEPA regulations. They are instead an administrative convenience created by the Department of the Interior. As such, BLM's decision to rely on a DNA must rise or fall solely on the analyses contained in the existing EISs and EAs, to which BLM is tiering in a particular instance.

### III.     Oil and Gas Development on Public Lands

37.     BLM manages onshore oil and gas development through a three-stage process: (1) land use planning, (2) leasing, and (3) approval of drilling proposals.

38.     First, pursuant to FLPMA, BLM develops a programmatic land use plan, known as a Resource Management Plan ("RMP"), specifying which lands will be open and which will be closed to oil and gas leasing, and stipulations and conditions that may be placed on any such development. *See* 43 U.S.C. § 1712(a). An RMP does not mandate leasing any specific lands for oil and gas development.

39.     Second, BLM may offer leases for the development of specific tracts of public lands. *See* 43 C.F.R. § 1610.5-3; *id.* §§ 3120-3120.7-3. BLM has considerable discretion to determine which lands will be leased and is not obligated to offer any particular tract of public land that has been nominated by industry for leasing. Pursuant to a change made in the Dingell Act, an oil and gas lessee can drill for and develop helium and continue to hold an oil and gas lease without also producing paying quantities of oil and gas. Pub. L. 116-9, 133 Stat 580, Section 1109.

12

AR010269

40.     Third, lessees must submit, and BLM must approve, applications for permits to drill before a lease may be developed. *Id.* § 3162.3-1(c).

41.     If a lease is issued without non-waivable no-surface occupancy stipulations, then BLM cannot outright prohibit surface development on that lease. 43 C.F.R. § 3101.1-2.

42.     A lessee must obtain a right-of-way or other appropriate authorization from BLM to conduct off-lease activities related to development of its lease, such road or drill pad construction, 43 C.F.R. Part 2800, or to drill through unleased lands. *Id.* Subpart 2920.

43.     A lessee intending to drill for and produce helium submits the same application to BLM for a permit to drill as for conventional oil and gas.

44.     At each stage of the three-stage process, BLM must prepare (and/or identify) NEPA analysis to analyze and disclose all of the reasonably foreseeable direct, indirect, and cumulative impacts of its decision.

## FACTUAL BACKGROUND

### I.     The Water Crisis and Prolonged Drought in the Southwest

#### A.     Climate Change Is the Driving Force Behind the Prolonged Drought in the Southwest

45.     The climate crisis has been intensively studied at global, national, and regional scales. The scientific evidence is clear and compelling—climate change is being fueled by the human-caused release of GHG emissions, in particular carbon dioxide and methane.

46.     BLM's oil and gas leasing program contributes vast amounts of GHG pollution to the atmosphere. BLM manages nearly 700 million acres of subsurface minerals, and estimates that about half of this federal mineral estate contains oil and/or natural gas. Currently, over 25 million acres of federally managed lands are leased for oil and gas development.

13

AR010270

47. According to the most recent data available from the United States Geological Survey ("USGS"), "[n]ationwide emissions from fossil fuels produced on Federal lands in 2014 were 1,279.0 million metric tons of carbon dioxide equivalent (MMT $CO_2$ Eq.) for [$CO_2$], 47.6 MMT CO2 Eq. for methane . . . and 5.5 MMT CO2 Eq. for nitrous oxide." These emissions totals represent "23.7 percent of national emissions for $CO_2$, 7.3 percent for [methane], and 1.5 percent for [nitrous oxide] over" a ten year period.

48. These climate-altering emissions are profoundly impacting our world. The western United States is particularly susceptible to the effects of climate change. The southwest is already experiencing increasing temperatures, prolonged droughts and catastrophic wildfires, with widespread impacts across its forests, wildlife, and human communities. Local economies, which are reliant on consistent precipitation and snowfall for surface and groundwater recharge, agriculture, recreation, and other uses, have also seen significant adverse impacts.

49. Additionally, the United States Global Change Research Program, a collaboration of thirteen federal agencies including BLM, has prepared a series of National Climate Assessments. With particular regard to the Southwest Region—which includes Utah—the Third National Climate Assessment provided the following overview:

- Snowpack and streamflow amounts are projected to decline in parts of the Southwest, decreasing surface water supply reliability for cities, agriculture, and ecosystems.

- The Southwest produces more than half of the nation's high-value specialty crops, which are irrigation-dependent and particularly vulnerable to extremes of moisture, cold, and heat. Reduced yields from increasing temperatures and increasing competition for scarce water supplies will displace jobs in some rural communities.

- Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have increased wildfires and impacts to people and ecosystems in the Southwest. Fire models project more wildfire and increased risks to communities across extensive areas.

14

AR010271

- Projected regional temperature increases, combined with the way cities amplify heat, will pose increased threats and costs to public health in southwestern cities, which are home to more than 90% of the region's population. Disruptions to urban electricity and water supplies will exacerbate these health problems.

50.     The Fourth National Climate Assessment, released in 2018, notes that temperatures have already "increased across almost all of the Southwest region from 1901 to 2016," magnifying the impacts of drought and wildfire. For example, hotter temperatures have already contributed to reductions in snowpack, amplifying drought conditions in the Colorado River Basin.

**B.  The Water Crisis in the Southwest**

51.     As described above, climate change has profoundly impacted water resources in the arid Southwest region of the United States. This region has been, is, and is predicted to continue to experience severe drought conditions—a result driven in no small part by BLM's oil and gas leasing program.

52.     Anthropogenic climate change, predominantly the result of GHG emissions, is profoundly impacting the Colorado River Basin in ways that are altering temperatures, streamflow, and the hydrologic cycle. The Fourth National Climate Assessment concluded that climate change threatens to lead to "aridification (a potentially permanent change to a drier environment) in much of the Southwest, through increased evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff."

53.     The state of Utah's "State Water Plan" identifies that "the Colorado River basin has warmed more than any other region of the United States." Adverse impacts of such warming include:

AR010272

- Evapotranspiration will likely increase;

- Snowpack will likely be less (largely due to higher evaporation rates) and melt earlier; and

- Future Colorado River and tributary stream-flows will likely decrease and contribute to increasing severity, frequency, and duration of future droughts.

54.     The Fourth National Climate Assessment notes that in the Southwest, "[w]ater for people and nature . . . has declined during droughts, due in part to human-caused climate change." "Intensifying droughts and occasional large floods, combined with critical water demands from a growing population, deteriorating infrastructure, and groundwater depletion, suggest the need for flexible water management techniques that address changing risks over time, balancing declining supplies with greater demands." "Higher temperatures . . . are amplifying drought in the Colorado River Basin."

55.     The drought conditions in the West and Southwest have fueled intense wildfires. According to the Fourth National Climate Assessment, "[a]nalyses estimated that the area burned by wildfires across the Western United States from 1984 to 2015 was twice what would have been burned had climate change not occurred." The drought also has struck perhaps hardest the Indigenous people of the Southwest who have been forced through history by the Federal government to reside on "the driest portions of their traditional homelands." Indigenous people "are among the most at risk from climate change, often experiencing the worst effects because of higher exposure, higher sensitivity, and lower adaptive capacity for historical, socioeconomic, and ecological reasons."

56.     Continued oil and gas development will only exacerbate the water and drought crises in the Southwest. In a recent United States Government Accountability Office ("GAO") report, the GAO concluded that "the cumulative effects of using surface water or groundwater at

16

AR010273

multiple oil and gas development sites can be significant at the local level, particularly in areas experiencing drought conditions." Specifically, the state of Utah's Geological Survey has concluded that in Emery County—the county that encompasses the San Rafael Desert and Twin Bridges Drilling Project—"[g]ood-quality water is scarce . . . and most water users depend on surface water from springs, streams, and reservoirs for their supply."

57.     According to the United States Drought Monitor, the majority of Emery County, including the San Rafael Desert, is experiencing "exceptional drought"—the worst possible rating—while the remainder of the county is in "extreme drought"—the second worst possible rating.

58.     The drilling of a single well can consume hundreds of thousands if not millions of gallons of water. In Utah, the majority of oil and gas wells are developed through hydraulic fracturing techniques—a water intensive method of development.

## II.     The San Rafael Desert and Labyrinth Canyon Wilderness

59.     The San Rafael Desert is a sublime area of Utah's backcountry, encompassing the newly-designated Labyrinth Canyon Wilderness and BLM-identified lands with wilderness characteristics such as Sweetwater Reef and the San Rafael River.

60.     The San Rafael Desert contains many unique and remarkable resource values including that it is home to one of the most astonishing and diverse arrays of native pollinators (bees, wasps) anywhere in North America. Researchers have found forty-nine different genera and 333 different species in this area. Forty-eight of these species were new to science and sixty-eight of these species may only occur in the Canyonlands region of the Colorado Plateau. BLM has recognized that "the San Rafael Desert's unique sand dune landscape provides valuable

17

AR010274

habitat for pollinators such as ground-nesting bees and wasps" and that the San Rafael Desert contains more "bee genera . . . than [exists] in all of New England."

61.     The San Rafael Desert is also home to a diverse array of endemic wildlife including mule deer, pronghorn, desert bighorn sheep, and "upland game" animals such as California quail, ring-necked pheasant, and Rio Grande turkey. It is home to at least nineteen bird species on the United States Fish and Wildlife Service's list of Birds of Conservation Concern, including Burrowing Owl, Golden Eagle, and Peregrine Falcon, and contains habitat for threatened and endangered bird species, including Mexican spotted owl, southwestern willow flycatcher, and yellow-billed cuckoo.

62.     BLM has determined that more than 250,000 acres of public lands in the San Rafael Desert contain wilderness characteristics—that is, they appear natural (*i.e.*, lack human disturbance) and contain "outstanding" opportunities for solitude and primitive and unconfined recreation such as hiking, wildlife viewing, and camping. The majority of leases at issue in this lawsuit are within BLM-identified lands wilderness characteristics.

63.     The Labyrinth Canyon Wilderness is located at the eastern edge of the San Rafael Desert and abuts the Green River as it flows south toward its confluence with the Colorado River in the heart of nearby Canyonlands National Park. It is a remote, wild, landscape.

AR010275



(Labyrinth Canyon Wilderness. The Twin Bridges Lease is located in the area highlighted by the red box.)

### III.    The San Rafael Desert Master Leasing Plan

#### A.  BLM Determines a Master Leasing Plan Is Required for the San Rafael Desert

64.    To insure the proper balance between energy development and the protection of the remarkable resources in the San Rafael Desert, BLM under the Obama administration did not offer any public lands in the region for oil and gas leasing and development for more than seven years. Instead, BLM determined that "prior to new leasing of oil and gas resources" in the San Rafael Desert it first had to prepare "additional planning and analysis" to amend the BLM's Price Field Office Resource Management Plan ("Price RMP") and replace the RMP's outdated oil and gas lease stipulations and notices. 82 Fed. Reg. 31252, 31253 (May 18, 2016).

65.    In 2010, BLM released Instruction Memorandum No. 2010-117, entitled "Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (hereinafter, "IM 2010-

AR010276

117"). IM 2010-117 introduced the Master Leasing Plan ("MLP") concept. *See id.* § II. The MLP concept recognized that in certain instances BLM's land use plans (*i.e.*, RMPs) were outdated and that "additional planning and analysis may be necessary prior to new oil and gas leasing because of changing circumstances, updated policies, and new information." *Id.* § II. In such instances, "the MLP process will be conducted *before* lease issuance and will reconsider RMP decisions pertaining to leasing." *Id.* (emphasis added). The preparation of an MLP was "required" when, among other factors, "[a]dditional analysis or information is needed to address likely resource or cumulative impacts" to numerous resource values. *Id.*

66.     Shortly after the release of IM 2010-117, BLM determined that an MLP was "required" for the public lands in the San Rafael Desert, including the lands encompassing the September 2018 Leases and the now-designated Labyrinth Canyon Wilderness and the Twin Bridges Lease. BLM stated that completion of the San Rafael Desert MLP was "warranted before new mineral leasing and development are allowed." Among other things, the San Rafael Desert MLP would "identify and address potential resources conflicts and environmental impacts from oil and gas development.

67.     In the fall of 2015, BLM began to collect the information and prepare the analysis it had determined to be necessary prior to offering new leases in the San Rafael Desert. This included thousands pages of data, information, and analysis. Among other things, the agency prepared a draft EA for the MLP, a preliminary alternatives document, an MLP-specific reasonably foreseeable development scenario ("RFDS"), held public meetings, and invited public comments on the MLP proposal.

68.     Importantly, had the MLP been completed, the September 2018 Leases and Twin Bridges Lease would not have been issued in their current forms. Instead, they would have been

AR010277

issued (if at all) with much more restrictive leasing stipulations and notices. For example, BLM would not have allowed any surface development on the lands encompassing the Twin Bridges Lease or the off-lease well pad location where the Twin Bridges Drilling Project was approved. In every action alternative in the draft EA, the lands were either limited to "no-surface occupancy" leasing, or closed to leasing altogether.

69. After BLM abandoned the MLP process in 2017 to comply with the Trump administration's "energy dominance" agenda, as discussed below, the Alliance submitted a Freedom of Information Act ("FOIA") request regarding the San Rafael Desert MLP. That FOIA request resulted in the production of 2,016 documents, totaling 20,107 pages. These documents contain hundreds of statements regarding the need for the MLP, the lack of existing information and data, and demonstrate that for more than eighteen months BLM diligently worked toward completing the San Rafael Desert MLP.

## B. The Trump Administration Reverses Course on the San Rafael Desert MLP

70. Two months after taking office President Trump issued Executive Order No. 13,783, entitled "Promoting Energy Independence and Economic Growth." *See generally* 82 Fed. Reg. 16093 (March 28, 2017). This Executive Order required administrative agencies, including BLM, to "review all existing . . . orders, guidance documents, policies, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil [and] natural gas." *Id.*

71. A few months later, the Secretary of the Interior issued Secretarial Order No. 3354, entitled "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program." *See generally* Sec. of the Interior, Order No. 3354 (July 5, 2017). This order directed BLM to "identify additional steps to enhance exploration and

AR010278

development of Federal onshore oil and gas resources." *Id.* § 3(b). It further required that BLM

"identify any provisions in [its] existing policy and guidance documents that would impede

BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration

and development of Federal onshore oil and gas resources." *Id.* § 4(b)(1).

72.    In response to Executive Order 13,783 and Secretarial Order 3354, BLM's

Washington, D.C. office issued Instruction Memorandum No. 2018-034, entitled "Updating Oil

and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (Jan. 31, 2018)

[hereinafter, "IM 2018-34"]. IM 2018-34 replaced BLM's longstanding oil and gas leasing

policy, IM 2010-117, and established the framework for how BLM would implement the Trump

administration's energy dominance agenda. Among other things, IM 2018-34: (1) eliminated the

MLP concept; (2) eliminated or significantly restricted opportunities for public involvement in

oil and gas leasing decisions; and (3) encouraged BLM to rely on existing NEPA analyses rather

than prepare site-specific NEPA analysis in order to "streamline" oil and gas leasing and

development. *See id.* §§ II, III.B.5, III.D.

73.    BLM did not prepare NEPA analysis or provide a reasoned explanation for why

the MLP concept (including the San Rafael Desert MLP) was no longer required. Instead, citing

to the aforementioned Executive Order and Secretarial Order, BLM stated only that "Master

Leasing Plans . . . have created duplicative layers of NEPA review. This policy, therefore,

eliminates the use of MLPs." *Id.* § II.

74.    When rescinding its plan to complete the San Rafael Desert MLP, BLM stated

only:

> The preparation of an Environmental Assessment associated with the San Rafael
> [Desert] Master Leasing Plan Amendment is no longer required, and the process is
> hereby terminated.

AR010279

83 Fed. Reg. 32681, 32681 (July 13, 2018).

75. With these perceived "burdens" on oil and gas leasing and development eliminated, BLM proceeded to offer hundreds of oil and gas leases in former-MLP areas, including the San Rafael Desert.

**IV. Reasonably Foreseeable Oil and Gas Development in the San Rafael Desert and Colorado Plateau Region**

76. As part of its planning process for the San Rafael Desert MLP, BLM prepared a "reasonably foreseeable development scenario" related to oil and gas development. BLM prepares an RFDS "to project a baseline scenario of oil and gas exploration, development, production, and reclamation activity" to inform future BLM decisionmaking. An RFDS is BLM's forward looking prediction of future oil and gas development for a particular area over a particular period of time based on the agency's best information and data. In other words, an RFDS "is a long-term projection of oil and gas activity."

77. Specific to the San Rafael Desert, the San Rafael Desert RFDS stated "[f]uture oil and gas drilling for the next 15 years is projected to average two wells per year for a total of 30 wells." More broadly, BLM prepared RFDSs for the agency's Price and Moab field offices— both of which encompasses part of BLM's "analysis area" for the Twin Bridges Drilling Project. These RFDSs projected that nearly two thousand oil and gas wells would be drilled across these field offices.

78. The wells projected in these RFDSs are "reasonably foreseeable future actions" for purposes of NEPA analysis. *See* 40 C.F.R § 1508.7.

79. It is not possible to develop a helium, oil, or natural gas well without water. In other words, it is reasonably foreseeable that the nearly two thousand wells projected in the RFDSs will require significant quantities (tens if not hundreds of millions of gallons) of water to

23

AR010280

develop. At each stage of the three-stage oil and gas leasing and development process, NEPA requires that BLM (1) quantify the amount of water use required to develop these wells, and (2) analyze and disclose the environmental impacts of that water use. Here, at most, BLM quantified water use related to *some* of the reasonably foreseeable oil and gas development but at no time has the agency analyzed and disclosed the environmental impacts of that water use including when it offered and sold the September 2018 Leases and Twin Bridges Lease or when it approved the Twin Bridges Drilling Project.

### V.  The September 2018 Lease Sale

80.  Immediately after abandoning the San Rafael Desert MLP process and its years-long no-leasing position, BLM proceeded to offer more than 200,000 acres in the San Rafael Desert for leasing and development. BLM prepared an EA for its September 2018 Lease Sale to analyze and disclose the potential impacts of issuing seventy-six leases for development as well as to resolve longstanding issues related to two "sold but not issued leases" and sixteen leases suspended due to litigation [hereinafter, "September 2018 Lease Sale EA."].

81.  BLM did not provide an opportunity for the public to review or comment on the draft September 2018 Lease Sale EA.

82.  The September 2018 Lease Sale EA did not analyze and disclose resource issues that had been recognized by BLM in the draft San Rafael Desert MLP as requiring consideration "prior to new leasing of oil and gas resources." For example, the September 2018 Lease Sale EA failed to analyze and disclose the impacts of leasing and development to paleontological, riparian, socioeconomic, soil and water, special status species, vegetation, and wildlife and fisheries resources. Nor did BLM provide an explanation for its changed position that these resource values no longer needed to be analyzed in a pre-leasing NEPA analysis.

24

83.     The National Park Service ("NPS") raised concerns about BLM's lack of analysis prior to offering the leases for development at the September 2018 lease sale. NPS explained that "[t]he activities associated with this sale have the potential to affect air quality . . . in Canyonlands National Park" and that "the proliferation of pads and roads associated with potential future exploration and production activities enabled by the proposed lease sale . . . could result in increased emissions of fugitive dust from unpaved pads and roads." NPS also expressed its concern about impacts to "the dark night skies" at Canyonlands National Park, "which is a certified International Dark Sky Park" and the "potential impacts of oil and gas exploration and drilling activities on natural soundscape conditions experienced by visitors to Canyonlands' Horseshoe Canyon Unit nearby." BLM did not respond to NPS's letter nor did it meaningfully address these concerns in the September 2018 Lease Sale EA.

84.     The September 2018 Lease Sale EA failed to identify past, present, and reasonably foreseeable oil and gas leasing and development in the San Rafael Desert. There were dozens of projects in the San Rafael Desert that should have been—but were not—considered in the EA. These include, but are not limited to, the following:

- In 2016, the Utah School and Institutional Trust Lands Administration ("SITLA") offered and issued 27,750 acres of leases in the San Rafael Desert for oil and gas development. The SITLA leases are *adjacent* to and/or near BLM's September 2018 Leases.

- At the same time it was preparing and finalizing the September 2018 Lease Sale EA, BLM was also preparing the leasing documents for the December 2018 Lease Sale, which included the Twin Bridges Lease.

- BLM has prepared RFDSs for this region, including for the San Rafael Desert, to anticipate reasonably foreseeable oil and gas development activity and to help inform its decisionmaking processes. As noted above, BLM estimated nearly 2000 wells would be developed in the Price and Moab Field Offices over a twenty-year period.

25

AR010282

85.     The September 2018 Lease Sale failed to identify the SITLA leases, BLM's December 2018 Lease Sale, and the BLM's RFDSs. It also failed to analyze and disclose whether the September 2018 Lease Sale, sale when viewed with the other sales and reasonably foreseeable development, would have a significant cumulative impact on the environment. All of these leases are located in the San Rafael Desert and exploration and development on them— which BLM cannot prohibit—will have cumulative impacts to the same resource values including, but not limited to, Canyonlands National Park, wildlife (including pollinators), lands with wilderness characteristics, and water resources.



86.     The Alliance, Center, and NRDC protested BLM's September 2018 leasing decision. The Alliance subsequently appealed BLM's denial of the protest to the Interior Board

26

AR010283

of Land Appeals. As discussed in prior stages of this litigation, after this Court issued its decision

in *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) (Contreras, J), BLM sought

voluntary remand of several lawsuits and administrative appeals in order to prepare "curative"

NEPA analysis regarding GHG emissions and climate change for leasing decisions from 2014-

2018 in Utah. This included the September 2018 Lease Sale EA and the December 2018 Lease

Sale, discussed *infra*. BLM finalized its curative NEPA on January 14, 2021. BLM's curative

NEPA analysis was limited to GHG emissions and climate change and did not provide new

information or analysis for any other resource value.

## VI.     The December 2018 Lease Sale

87.      BLM prepared a DNA to offer the Twin Bridges Lease for sale and development

at the agency's December 2018 Utah-BLM lease sale. *See generally* BLM, Determination of

NEPA Adequacy, DOI-BLM-UT-G020-2018-0057-DNA, Price Field Office December 2018

Competitive Oil and Gas Lease Sale (Oct. 2018) (referred to herein as the "December Lease Sale

DNA").

88.      The December Lease Sale DNA relied on other, previously prepared NEPA

documents, including the September 2018 Lease Sale EA—lease sale EAs prepared *for other*

*public lands* in the state—for *all* direct, indirect, and cumulative impacts analysis. These prior

NEPA documents did not analyze and disclose the impacts of offering the Twin Bridges Lease

for development. They also did not analyze and disclose impacts to resources identified by BLM

in the San Rafael Desert MLP as a prerequisite to new leasing and development.

89.      BLM did not analyze and disclose the cumulative impacts of offering the Twin

Bridges Lease for development when viewed together with BLM's and SITLA's other leasing

decisions discussed herein. This includes, but is not limited to, their cumulative impacts on

AR010284

Canyonlands National Park, wildlife (including pollinators), lands with wilderness characteristics, and water resources.

90.    BLM did not allow the public an opportunity to review and comment on the December Lease Sale DNA. Instead, the agency posted the final DNA and Decision Record to its ePlanning project website and required the public to protest that leasing decision in a shortened ten-day period rather than the usual thirty-day protest period, without providing a reasoned explanation for the highly truncated protest period.

91.    The Alliance and others protested the December Lease Sale DNA. BLM denied that protest.

## VII.    The Twin Bridges Drilling Project

92.    On December 23, 2020 BLM finalized the Drilling Project Decision Record, an Environmental Assessment ("Twin Bridges EA"), and FONSI to approve the Twin Bridges Drilling Project.[3]

93.    The Twin Bridges EA analyzes the drilling of up to seven wells targeting federal and state leases, construction of a drill pad, road construction and widening, and installation of several new pipelines. In total, these activities will disturb approximately 43 acres of mainly BLM-managed lands immediately adjacent and close to the Labyrinth Canyon Wilderness. This includes 9.9 acres of disturbance related to road construction, 5.4 acres of disturbance related to well pad construction, 17.8 acres of disturbance related to trenching and installation of pipelines, and a 10-acre processing facility on nearby SITLA lands. As BLM concedes, the proposed

---

[3] *See generally* BLM, Twin Bridges Bowknot Helium Project Environmental Assessment, DOI-BLM-UT-G020-2020-0033-EA (Dec. 2020); Drilling Project Decision Record; and Finding of No Significant Impact, Twin Bridges Bowknot Helium Project, DOI-BLM-UT-G020-2020-0033-EA (Dec. 2020).

AR010285

activities will impact the Labyrinth Canyon Wilderness because they will "increase the current level of disturbance at this location."

94.     The Twin Bridges EA failed to analyze and disclose the cumulative impacts of the significant water use required to develop the nearly 2000 reasonably foreseeable oil and gas wells described *supra*. Instead, in the Twin Bridges EA, BLM asserted that water resources, including water usage, were resource values that were "present, but not affected to a degree that detailed analysis is required."

95.     The Twin Bridges EA also fails to analyze and disclose the cumulative impacts to a number of other resources including, but not limited to Canyonlands National Park, wildlife (including pollinators), and lands with wilderness characteristics.

96.     This failure is driven in part by BLM's arbitrarily drawn Cumulative Impact Analysis Areas ("CIAAs") and in part by BLM's arbitrary assumption that oil and gas development potential is equally distributed across BLM's RFDSs and that an estimate of cumulative impacts can be determined by simply overlaying CIAAs and RFDSs.

## FIRST CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze and Disclose Cumulative Impacts*
*of Oil and Gas Leasing and Development*

97.     SUWA incorporates by reference all preceding paragraphs.

98.     NEPA requires BLM to take a "hard look" at all cumulative impacts of oil and gas leasing and development. *See* 40 C.F.R. § 1508.7.

99.     To determine whether a proposed action will have a significant impact, BLM must consider, among other factors: "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). NEPA's

AR010286

implementing regulations caution that "[s]ignificance cannot be avoided . . . by breaking it down into small component parts." *Id.*

100.     The September 2018 Lease Sale EA and December Lease Sale DNA and accompanying Decision Records did not analyze and disclose the cumulative impacts of BLM's leasing decisions when viewed with past, present, and reasonably foreseeable oil and gas leasing and development in the San Rafael Desert. Instead, BLM unlawfully segmented its decisions into a small component part, without considering the cumulative impacts.

101.     BLM's and SITLA's lease sales in Utah addressed herein constitute "past, present, [or] reasonably foreseeable future actions."

102.     BLM's failure to analyze and disclose the cumulative impacts of offering the September 2018 Lease Sale EA and Twin Bridges Lease for development violates NEPA's hard look mandate and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

### SECOND CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze and Disclose*
*Cumulative Impacts in the Twin Bridges EA*

103.     SUWA incorporates by reference all preceding paragraphs.

104.     As described above, BLM failed to analyze and disclose the cumulative impacts of its leasing decision when it issued the Twin Bridges Lease for development.

105.     In the Twin Bridges EA, BLM similarly failed to analyze and disclose all cumulative impacts when it approved the development of that lease to water resources and wildlife.

106.     The Twin Bridges EA did not quantify water use related to reasonably foreseeable oil and gas development, including in the San Rafael Desert, and did not analyze and disclose the

30

AR010287

environmental impact of that water use. The EA also failed to quantify and analyze the water use required to develop the September 2018 Leases and SITLA leases in the San Rafael Desert.

107.    The Twin Bridges EA likewise failed to analyze and disclose the cumulative impacts to wildlife when viewed together with past, present, and reasonably foreseeable actions in the San Rafael Desert. This includes, but is not limited to, the SITLA leases, BLM's September 2018 Leases, and BLM's RFDSs.

108.    BLM's failure to analyze the cumulative impacts of approving the Twin Bridges Drilling Project violates NEPA's hard look mandate and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
*Violation of the APA: Failure to Provide a Reasoned Explanation*
*Prior to Reversing Course on the San Rafael Desert MLP*

109.    SUWA incorporates by reference all preceding paragraphs.

110.    Federal agencies are allowed to change their prior positions. However, when an agency reverses its prior position the APA requires the agency, at a minimum, "display awareness that it *is* changing positions" and provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009).

111.    BLM did not provide a "reasoned explanation" prior to reversing course on the San Rafael Desert MLP. Starting in 2010 BLM did not offer any oil and gas leases in that planning area for more than seven years while the agency collected and analyzed significant new information related to "[a]ir quality, climate change, cultural resources, paleontological resources, recreation, visual resources, [dark] night skies, riparian resources, soil and water

31

resources, vegetation, wildlife resources, special status species, special designations, and wilderness characteristics." 81 Fed. Reg. 31252, 31253 (May 18, 2016).

112.     During that time, BLM repeatedly stated that the MLP, and the need to collect and analyze this the new information, was "necessary" and "required" "prior to new leasing of oil and gas resources." *Id.*

113.     BLM made it at least to the half-way point in the San Rafael Desert MLP process, including, but not limited to, the preparation of a draft EA, preliminary alternatives document, public hearings, and thousands of pages of supporting documents. However, BLM abandoned the MLP concept, including the San Rafael Desert MLP, following the 2016 presidential election. The abrupt reversal, memorialized in IM 2018-034 and a related Federal Register notice, was not accompanied by a reasoned explanation.

114.     BLM's decision to reverse course is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## FOURTH CAUSE OF ACTION
*Violation of NEPA: Failure to Prepare NEPA Analysis*
*Prior to Reversing Course on the San Rafael Desert MLP*

115.     SUWA incorporates by reference all preceding paragraphs.

116.     NEPA is triggered when a federal agency engages in "any major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.18(a) (major federal actions "include new and continuing activities" and "new or revised agency rules, regulations, plans, policies, or procedures").

32

AR010289

117.     Once triggered, an agency must comply with its NEPA obligations by preparing one of the following NEPA documents: (1) an EIS, (2) an EA and accompanying FONSI-DR, or (3) a "categorical exclusion" ("CX"). 40 C.F.R. §§ 1508.4, 1508.9, 1508.11.

118.     BLM did not prepare an EIS, EA, or CX prior to abandoning the MLP concept, including the San Rafael Desert MLP. The decision to abandon the MLP concept opened millions of acres of public lands across the West to new oil and gas leasing, including more than half a million acres in the San Rafael Desert (such as the lands covered by the September 2018 Leases and Twin Bridges Lease and the federal lands affected by Twin Bridges Drilling Project activities).

119.     BLM's failure to prepare NEPA analysis prior to abandoning the MLP concept and the San Rafael Desert MLP specifically was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and made without observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 706(2)(A), (D), and also in violation of NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendants and provide the following relief:

1.     Declare that Defendants violated NEPA and acted arbitrarily, capriciously, and contrary to law by issuing the September 2018 Leases and Twin Bridges Lease;

2.     Declare that Defendants violated NEPA and acted arbitrarily, capriciously, and contrary to law by approving the Twin Bridges Drilling Project;

AR010290

3.      Declare that Defendants violated NEPA and acted arbitrarily, capriciously, and contrary to law when Defendants abandoned the MLP concept, including the San Rafael Desert MLP planning process, without a reasoned explanation and without NEPA analysis;

4.      Declare unlawful and vacate IM 2018-034;

5.      Declare unlawful and vacate the September 2018 Lease Sale EA, December Lease Sale DNA, Twin Bridges Drilling Project EA, and accompanying decision records at issue in this litigation;

6.      Set aside and vacate the September 2018 Leases and Twin Bridges Lease;

7.      Enjoin Defendants from approving or otherwise taking action on any applications for permit to drill the September 2018 Leases and Twin Bridges Lease until Defendants have fully remedied these legal violations;

8.      Enjoin Defendants from approving or otherwise taking action on any applications for rights of way, road improvements or construction, or authorizations submitted as part of the Twin Bridges Drilling Project until Defendants have fully remedied these legal violations;

9.      Enjoin Defendants from offering, selling, or issuing new leases for oil and gas development on BLM managed public lands encompassed by the San Rafael Desert MLP until Defendants provide a reasoned explanation for their changed position regarding that MLP, and prepare the necessary NEPA analysis to support that new position;

10.      Award Plaintiffs the costs they have incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions; and,

11.      Provide such other relief as the Court deems just and proper.

34

Respectfully submitted this 12th day of February, 2021.

/s/ Landon Newell
Stephen H.M. Bloch (*pro hac vice*)
Landon Newell (*pro hac vice*)
Joseph J. Bushyhead (*pro hac vice*)

Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
landon@suwa.org
joe@suwa.org

William S. Eubanks II
DC Bar No. 987036

William N. Lawton
DC Bar No. 1046604

Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, DC 20005
(970) 703-6060
bill@eubankslegal.com
nick@eubankslegal.com

*Counsel for Plaintiffs Southern Utah*
*Wilderness Alliance, Center for*
*Biological Diversity and Living*
*Rivers*

Sharon Buccino
D.C. Bar No. 432073

Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 289-6868
sbuccino@nrdc.org

*Counsel for Plaintiff*
*Natural Resources Defense Council*

35



**U.S. DEPARTMENT OF THE INTERIOR**

# BUREAU OF LAND MANAGEMENT

## OIL AND GAS LEASING REFORM LAND USE PLANNING AND LEASE PARCEL REVIEWS

**IM 2010-117**
Instruction Memorandum

<div align="center">

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov

May 17, 2010

</div>

In Reply Refer To:

1610/3100 (210/310) P

EMS TRANSMISSION 05/17/2010

Instruction Memorandum No. 2010-117

Expires: 09/30/2011

To:       All Field Officials

From:      Director

Subject:     Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews
  DD: 07/02/2010; 08/16/2010; 05/18/2011

**Program Areas:** Oil and Gas, Planning, and National Environmental Policy Act (NEPA).

**Purpose:** This Instruction Memorandum (IM) establishes a process for ensuring orderly, effective, timely, and environmentally responsible leasing of oil and gas resources on Federal lands. The leasing process established in this IM will create more certainty and predictability, protect multiple-use values when the Bureau of Land Management (BLM) makes leasing decisions, and provide for consideration of natural and cultural resources as well as meaningful public involvement.

**Policy/Action:** The following policy applies to the leasing of Federal minerals under BLM-administered surface[1] state-owned surface, and private surface estates. The BLM does not manage leasing on tribal lands; therefore, this policy does not apply to tribal lands. In addition, sections I through III. F of this policy do not apply to the leasing of Federal minerals under lands managed by other Federal surface management agencies. Those sections, however, do apply to split estate lands within National Forest System (NFS) units if leasing decisions for such lands have not been analyzed in documentation prepared jointly by the U.S. Forest Service (FS) and the BLM for lands within the external boundaries[2] of NFS units.

This policy (1) addresses land use plan review, state office standardization of lease stipulations, and adaptive management; (2) introduces the Master Leasing Plan concept; and (3) identifies process requirements for reviewing oil and gas leasing expressions of interest.[3]

The U.S. Department of the Interior protects America's natural resources and heritage, honors our cultures and tribal communities, and supplies the energy to power our future. The Department fulfills its broad-ranging missions through the work of its bureaus and offices, including the BLM, the Bureau of Indian Affairs, the Bureau of Reclamation (BOR), the National Park Service (NPS), and the U.S. Fish and Wildlife Service (FWS).

As a land management agency with a multiple-use mission, the BLM will make land use decisions that sustain the health and productivity of the public lands for the use and enjoyment of present and future generations. The BLM recognizes that, in some cases, leasing of oil and gas resources may not be consistent with protection of other important resources and values, including units of the National Park System; national wildlife refuges; other specially designated areas; wildlife; and cultural, historic, and paleontological values. Under applicable laws and policies, there is no presumed preference for oil and gas development over other uses. In making its oil and gas leasing and development decisions, the BLM will consult and coordinate with other land and resource managers (Federal and non-Federal), as appropriate.

It is BLM policy to exercise its discretionary authorities, including its oil and gas leasing authority, through the use of an informed, deliberative process that includes—

- Communication with the public, tribal governments, and Federal, state, and local agencies;
- Consideration of current science and other available data;
- Compliance with existing laws, regulations, and policies; and
- Consideration of important resources and values.

AR010474

To that end, state offices will continue to respond to expressions of interest from industry in leasing particular parcels, but will also take the initiative to strategically plan for leasing and development in areas that have the potential for oil and gas development but have not been fully leased.

Upon issuance, this policy will guide land use planning and leasing procedures for future parcels not currently under review by the field offices as of the date of this IM. For parcels currently under review by the field offices, State Directors will determine whether it is appropriate to apply any part of this policy to those parcels (i.e., a Master Leasing Plan or the Interdisciplinary Review of Lease Sale Parcels process, including potential site visits and a closer look at program-specific guidance).

Each state office will develop an implementation plan and timeline to execute this IM, as explained in section IV of this IM, and will submit this implementation plan and timeline to the Director for review and approval by August 16, 2010. Lease parcels undergoing review in conformance with this IM and a Director-approved implementation plan will no longer be subject to the leasing briefing paper process set forth in the memorandum from the Acting Director, dated February 13, 2009. State offices will also submit a post-implementation report, as explained in section IV of this IM, to the Washington Office (WO) by May 18, 2011.

    I. Land Use Planning – Adequacy, Consistency, and Adaptive Management

A. <u>Resource Management Plan Adequacy</u>

As outlined in the Land Use Planning Handbook (H-1601-1), the Resource Management Plan (RMP) underlies fluid minerals leasing decisions. Through RMP effectiveness monitoring and periodic RMP evaluations, state and field offices will examine resource management decisions to determine whether the RMPs adequately reflect important resource values in light of changing circumstances, updated policies, and new information (H-1601-1, section V, A, B). The results of such reviews and evaluations may require field office resource information updates and land use plan maintenance, amendment, or revision. In some cases state and field office staff may determine that the public interest would be better served by further analysis and planning prior to making any decision whether or not to lease. For instance, new information may be available or relevant environmental conditions may have changed (e.g., species habitat and population levels may have decreased or wilderness characteristics may have become evident). In such circumstances, additional review may better inform the decision-maker. While an RMP may designate land as "open" to possible leasing, such a designation does not mandate leasing.

B. <u>Stipulation Consistency</u>

Each state office will form an Interdisciplinary Consistency Review Team(s) (IDCR Team) for lands under its jurisdiction. The primary purpose of the IDCR Team is to ensure that lease stipulations are written in a WO-approved format, stipulation language is consistent within each state office for the protection of similar resources or resource settings,[4] and stipulations edge-match across administrative boundaries. As part of this consistency review, state offices will request review by the Office of the Solicitor, usually the Regional Solicitor's Office, to ensure the enforceability of existing, new, or revised lease stipulations.

To establish a baseline for this task and to aid the WO in development of updated stipulation consistency guidance, state offices are to provide copies of all lease stipulations currently used within the state to the WO, including RMP lease stipulations not currently in statewide stipulation databases. Stipulations must be provided in Microsoft Word format, organized by protected resource, and submitted to WO-310 (Jim Perry) via email by July 2, 2010.

The IDCR Teams will work with the field offices within their state(s) and across state administrative boundaries to ensure lease stipulations edge-match appropriately across BLM administrative boundaries and other appropriate units such as a species range or an ecoregion. Edge-matching will ensure similar stipulations align on each side of the boundary, except in the circumstances described in endnote 4. Coordination may be necessary with appropriate Federal, state, and local resource management agencies as well as BLM national program leads to help ensure common resource issues are addressed appropriately and consistently.

Field offices will maintain or amend RMPs to accommodate any changes in lease stipulations in accordance with the guidance found in the Land Use Planning Handbook (H-1601-1, sections 6H and 7B).

C. <u>Adaptive Management</u>

In applying an Adaptive Management approach[5] to oil and gas related activities to address changing resource conditions, RMPs and associated lease stipulations, including those lease stipulations developed at the national level, must conform to the *Exceptions, Waivers, and Modifications of Fluid Minerals Stipulations and Conditions of Approval, and Associated Rights-of-way Terms and Conditions* (WO-IM-2008-032, dated November 27, 2007, incorporated by reference into this IM).[6] As appropriate, stipulations will use Adaptive Management principles, incorporate the best available science, and address changing resource conditions. Additionally, plan and lease stipulation "modification" criteria must also allow for an increasing level of environmental protection when changing circumstances warrant stronger measures to meet goals, objectives, and outcomes identified in RMPs.

Successful adaptive management is dependent on active monitoring. On September 30, 2009, the WO issued WO-IM-2009-224, *Use and Application of the Fluid Minerals Surface and Environmental Monitoring Program Element – MW,* incorporated by reference into this IM. The purpose of the WO-IM-2009-224 is to ensure adequate monitoring of oil and gas development. The IM requires field offices to conduct monitoring in conformance with approved decision documents and their associated NEPA documentation, assess environmental impacts from development, determine whether the BLM's standards are being met, and evaluate whether permit requirements are effective in achieving their desired intent. Congress has provided substantial monitoring funding to the BLM through the oil and gas program. Oil and

gas environmental protection specialists, wildlife biologists, archaeologists, soil scientists, air resource specialists, and hydrologists are some of the resource specialists that are expected to be funded from 1310, 1711, 9131, or 9141 accounts to conduct program element MW monitoring site visits in support of the oil and gas program.

### II. Master Leasing Plans

RMPs identify oil and gas planning decisions, such as areas closed to leasing, open to leasing, or open to leasing with major or moderate constraints (lease stipulations) based on known resource values and  reasonably foreseeable oil and gas development scenarios.  Many of the BLM's RMPs completed since 2005 also establish resource condition objectives and the general/typical best management practices that will be employed to accomplish these objectives in areas open to leasing.  In some areas, however, additional planning and analysis may be necessary prior to new oil and gas leasing because of changing circumstances, updated policies, and new information.  Criteria for determining whether such additional planning and analysis is warranted are listed below.

This policy introduces the Master Leasing Plan (MLP) concept as a mechanism for completing the additional planning, analysis, and decision-making that may be necessary for areas meeting the listed criteria.  Field offices may be familiar with Master Development Plans (MDP) (e.g., Plans of Development (POD), Full-Field Development analysis documents, etc.), that support individual post-lease development decisions.  Unlike the MDP, the MLP process will be conducted before lease issuance and will reconsider RMP decisions pertaining to leasing.  Similar to the MDP, the MLP will analyze likely development scenarios and varying mitigation levels, but at a less site-specific level than would typically be conducted in an MDP where a development plan has been fully defined by the operator(s).

The MLP process will be conducted through the NEPA process using an interdisciplinary team that will coordinate and/or consult with the public and other stakeholders that may be affected by the BLM's MLP decisions.  The MLP will ordinarily be initiated as a land use plan amendment.  However, if it is anticipated that the likely outcome of the MLP will not result in the creation of new lease stipulations or changes to existing RMP decisions warranting a plan amendment, it may not be necessary to initiate the MLP as a plan amendment.  The MLP process may also be combined with a plan revision process if schedules permit.

The preparation of an MLP is required when all four of the following criteria are met:

- A substantial portion of the area to be analyzed in the MLP is not currently leased.
- There is a majority Federal mineral interest.
- The oil and gas industry has expressed a specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.
- Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur where there are:

  - multiple-use or natural/cultural resource conflicts;
  - impacts to air quality;
  - impacts on the resources or values of any unit of the National Park System, national wildlife refuge, or National Forest wilderness area, as determined after consultation or coordination with the NPS, the FWS, or the FS; or
  - impacts on other specially designated areas.

An MLP may also be completed under other circumstances at the discretion of the Field Manager, District Manager, or State Director.

The MLP should enable field offices to (1) evaluate in-field considerations, such as optimal parcel configurations and potential development scenarios; (2) identify and address potential resource conflicts and environmental impacts from development; (3) develop mitigation strategies; and (4) consider a range of new constraints, including prohibiting surface occupancy or closing areas to leasing.

### A. Identifying and Evaluating Potential Resource Conflicts in an MLP

The following is a non-exhaustive list of important national and local resource issues that should be considered when developing an MLP:

- Ambient air quality and potential impacts, including cumulative impacts, to air quality from development.
- The effect of oil and gas leasing on lands that the BLM may identify as having wilderness characteristics and lands with special designations such as lands within the National Landscape Conservation System and Areas of Critical Environmental Concern.
- Special Recreation Management Areas.
- Nearby state, tribal, or other Federal agency lands, including NPS and FWS lands that could be adversely affected by BLM-authorized oil and gas development.
- Important cultural resources, including traditional cultural properties of importance to Native American tribes and historic trails.
- Scientifically significant paleontological resources.
- Fisheries and wildlife habitat, migration corridors, and rare plants.
- Status of visual resource inventories and appropriate designations of Visual Resource Management Classes.
- Watershed conditions, steep slopes, and fragile soils.
- Municipal watersheds and aquifers.
- Public health and safety (e.g., management of fluids and emissions).

- The ability to achieve interim and final reclamation standards (Gold Book, Chapter 6).

### B. Potential MLP Decisions

As a general rule, resource protections identified through the MLP process will be addressed as new or modified plan decisions that may include lease stipulations for new leases and/or closing certain areas to leasing.  For existing leases in the MLP area, new or modified plan decisions should be applied as conditions of approval, provided they are consistent with rights granted under the existing leases.[7] The following are examples of other planning decisions that may be made through the MLP process with supporting NEPA analysis:

- Phased leasing.
- Lease stipulations including No Surface Occupancy, Timing Limitation, and Controlled Surface Use.
- Planned or required unitization of Federal lands.
- Phased development.
- Caps on new surface disturbance, pending acceptable interim or final reclamation.
- Best management practices, such as:

  - Use of existing infrastructure.
  - Multiple wells on a single pad.
  - Requirements to reduce or capture emissions.
  - Liquids gathering systems to centralized offsite production facilities.
  - Placement of all linear disturbances in corridors.
  - Extensive interim reclamation of roadway disturbance to the road surface and of pads to the wellhead.
  - Final reclamation restoring the landform and native plant community.

III. Lease Parcel Review and Lease Issuance Process

The purpose of lease parcel review by the field offices is to determine the conditions under which leasing and eventual development should occur if allowed to proceed.  Lease parcel reviews for expressions of interest will be conducted and documented simultaneously with the NEPA compliance process.  The goal of the parcel review and NEPA compliance process is to (1) determine parcel availability; (2) evaluate existing stipulations; (3) identify new stipulations, if applicable; (4) provide for public involvement; and (5) develop detailed background information for the NEPA compliance process.

    A. <u>Parcel Review Timeframes</u>

State offices will continue to hold lease sales four times per year, as required by the Mineral Leasing Act, section 226(b)(1)(A), and 43 CFR 3120.1-2(a), when eligible lands are determined by the state office to be available for leasing.[8]  However, state offices will develop a sales schedule with an emphasis on rotating lease parcel review responsibilities among field offices throughout the year to balance the workload and to allow each field office to devote sufficient time and resources to implementing the parcel review policy established in this IM.  State offices will extend field office review timeframes, as necessary, to ensure there is adequate time for the field offices to conduct comprehensive parcel reviews.

    B. <u>State Office Leasing Targets</u>

When developing leasing performance targets/units of accomplishment for program element EI (Develop and Issue Federal Fluid Mineral Leases), state and field offices will take into account the process requirements identified in this IM and adjust the targets/units of accomplishment as appropriate.  State and field offices will ensure that the parcel review process is efficient, yet allows adequate time for a thorough and complete review.

    C. <u>Interdisciplinary Review of Lease Sale Parcels</u>

Field offices will form an Interdisciplinary Parcel Review Team (IDPR Team) of resource specialists to review lease sale parcels and ensure compliance with NEPA (see III. E. NEPA Compliance Documentation, below) and other legal and policy requirements.  The IDPR Team will include subject matter experts for the resources potentially affected by leasing.  When appropriate, the IDPR Team should consider including staff specialists from other agencies when lands and/or resources that are administered by those agencies could be impacted by future development on the lease parcels under review.  To benefit from the team's skills, experience, and expertise, the parcel reviews should be conducted in a group setting, thereby encouraging group discussion and interaction.  Data and recommendations should be reviewed and discussed as a team, allowing parcels to be compared and contrasted in an open discussion.  The IDPR Team must be familiar with current oil and gas development technologies and impacts, and should periodically visit areas of existing oil and gas development as a team to gain a better understanding of the potential impacts of development on prospective lease sale parcels.  The IDPR Team will ensure the following steps are performed for the review of parcels in each lease sale, including review of split estate parcels where the mineral estate is federally owned.  In instances where an MLP has been completed, the IDPR Team may determine that the MLP constituted a sufficient review. Managers will ensure team members have sufficient time to conduct these reviews.

    1. <u>Gather and Assess Existing Information</u>:

    Field offices will gather and evaluate existing environmental resource information and compliance documentation (e.g., NEPA analysis, Endangered Species Act (ESA) and National Historic Preservation Act (NHPA) resource data and consultation) upon which a leasing decision may be based.  The field offices will then determine the need for additional information and develop strategies to obtain any data that may be required to support a leasing decision.  Generally speaking, it is anticipated that this information will have been developed at the land use planning stage or subsequently, such as through an MLP process, if any has been conducted. However, in some circumstances it may be necessary to defer parcels from leasing while additional resource information is collected and analyzed.

    2. <u>Plan Conformance and Adequacy</u>:

Field offices will determine whether leasing the parcel is in conformance with the RMP. In addition, the field office will evaluate whether oil and gas management decisions identified in the RMP (including lease stipulations) are still appropriate and provide adequate protection of resource values (including, but not limited to, biological, cultural, visual, and socioeconomic resource values). If the lease stipulations do not provide adequate resource protection, it may be necessary to develop new lease stipulations or revise existing ones. A lease stipulation may be revised consistent with modification criteria found in the RMP, or as necessary given conditions or issues not anticipated in the RMP.

Generally, the creation or revision of a lease stipulation that is not clearly consistent with the terms, conditions, and decisions of the approved RMP, or a stipulation that is revised to change from a moderate constraint to a major constraint may not be in conformance with the RMP (43 CFR 1601.0-5(b)); therefore, a plan amendment may be necessary. New or revised stipulations must be based on best available information and science and must be reviewed by the Department of the Interior, Office of the Solicitor.

Planning decisions for oil and gas leasing are defined in the Land Use Planning Handbook as (1) open to leasing; (2) open to leasing subject to moderate constraints; (3) open to leasing subject to major constraints; or (4) closed to leasing (H-1601-1, Land Use Planning Handbook, Appendix C, 23). If a proposed modification to the terms of a stipulation changes the extent, but does not result in a new planning decision (e.g., the timing limitation protective radius increases from 2 miles to 3 miles, but the stipulation remains a moderate constraint), no plan amendment is required. The site-specific NEPA compliance documentation for the lease, however, may need to analyze the proposed stipulation modification if this analysis has not already been conducted in the NEPA documentation associated with the land use plan (see section III.E below; see also WO-IM-2008-032). Conversely, if a proposed change in the terms of a stipulation would change the degree of the constraint from moderate to major or would result in the creation of a new lease stipulation not contemplated in the RMP, a plan amendment would likely be required and, if necessary, the parcel(s) should be withheld from leasing until the plan is amended. For example, if nesting habitat formerly identified in the RMP for protection with a timing limitation stipulation (moderate) would now be protected with a No Surface Occupancy (NSO) stipulation (major), a NEPA analysis appropriate for a land use plan amendment would be required. Similarly, if a proposed restriction would limit development to 1 well location per 640 acres when the RMP analyzed development of 16 well locations per 640 acres (substantial change not analyzed in the RMP and its associated NEPA documentation), NEPA analysis appropriate for a land use plan amendment would also be required in this instance.

Resources on the ground change over time (e.g., new leks are occupied while others are abandoned). Prior to the lease sale, the field office will review its latest inventory information and apply protective lease stipulations to new leases as provided for in the RMP. Applying an existing RMP lease stipulation (e.g., NSO around a lek) to a proposed new lease, based on new inventory data (e.g., the discovery of a new lek), is considered to be in conformance with the RMP and is addressed through plan maintenance. Plan maintenance is the appropriate planning tool even if the land area where the new resource is found (e.g., new lek) had been designated in the RMP as covered by standard lease terms. See oil and gas plan maintenance examples in H-1601-1, Land Use Planning Handbook, VI, (H), 44.

3. Program-Specific Guidance:

Field offices will review parcels in light of the most current national and local program-specific guidance to determine availability of parcels for leasing and/or applicable stipulations (e.g., to address conservation strategies and protect archaeological resources, traditional cultural properties, paleontological resources, specially designated areas on or near BLM-administered lands, sensitive species, watersheds, fisheries and wildlife habitat, visual resources, air quality, and wilderness qualities).

4. Other Considerations:

There are other considerations that should be taken into account when determining the availability of parcels for lease. The following is a non-exhaustive list of considerations, further refinement of which may depend on the IDPR Team's review and site visits. Field offices should consider whether:

- There is a risk of drainage to Federal mineral resources due to development of nearby non-Federal parcels if the parcel is not leased (based upon a determination made by a Petroleum Engineer or Petroleum Geologist).
- In undeveloped areas, non-mineral resource values are greater than potential mineral development values.[9]
- Stipulation constraints in existing or proposed leases make access to and/or development of the parcel or adjacent parcels operationally infeasible, such as an NSO parcel blocking access to parcels beyond it or consecutive and overlapping timing restrictions that do not allow sufficient time to drill or produce the lease without harm to affected wildlife resources.
- Parcel configurations would lead to unacceptable impacts to resources on the parcels or on surrounding lands and cannot be remedied by reconfiguring.
- The topographic, soils, and hydrologic properties of the surface will not allow successful final landform restoration and revegetation in conformance with the standards found in Chapter 6 of the Gold Book, as revised.
- Construction and use of new access roads or upgrading existing access roads to an isolated parcel would have unacceptable impacts to important resource values.
- Leasing would result in unacceptable impacts to the resources or values of any unit of the National Park System or national wildlife refuge.
- Leasing would result in unacceptable impacts to specially designated areas (whether Federal or non-Federal) and would be incompatible with the purpose of the designation.

5. Site Visits:

In light of changing resource values, new information, and current policy, the IDPR Team or a subset of the team will usually conduct site visits to validate existing data or gather new information in order to make an informed leasing recommendation.  However, the site visits are not a substitute for acquiring the site-specific cultural or wildlife data that is typically gathered during the permit approval stage.  Site visits are highly recommended in any case involving new leasing in an area not already under oil and gas development.  It is anticipated that, at least initially, the majority of lease sale parcels under review will require site visits.  For a parcel that is inaccessible due to location or other factors, it may be sufficient to conduct a review from a nearby vantage point or to use remote-sensing data (e.g., aerial photos, satellite imagery, and topographic maps).  The IDPR Team will use data collected from site visits to evaluate the RMP oil and gas leasing management decisions, identify the resource values, evaluate the adequacy of associated stipulations in the RMP, and provide information for the NEPA compliance process.  If there is a high level of confidence in the data available to evaluate the parcel, such as would result from the recent completion of an MLP, a site visit may not be necessary.  The IDPR Team will document whether site visits occurred, or why not, and any findings as part of the administrative file.

6.Internal and External Coordination:

In order to achieve greater coordination and communication in managing shared landscapes, such as airsheds, viewsheds, watersheds, and soundscapes, state and field offices will coordinate and/or consult on the parcel review and NEPA analysis with stakeholders that may be affected by the BLM's leasing decisions.[10] Stakeholders may include parties such as:

- Federal agencies (e.g., FS, NPS, FWS, BOR, and U.S. Department of Defense).
- Adjacent BLM state and field offices, if lease nominations span or are close to administrative boundaries.
- National Landscape Conservation System managers.
- Tribal governments.
- State and local agencies (e.g., fish and game, environmental quality, and historic preservation).
- Local community stakeholders (e.g., managers of municipal watersheds and local parks).

7.Public Participation:

State and field offices will provide for public participation as part of the review of parcels identified for potential leasing through the NEPA compliance documentation process (see section III.E).  State and field offices will identify groups and individuals with an interest in local BLM oil and gas leasing, including surface owners of split estate lands where Federal minerals are being considered for leasing.  Interested groups, individuals, and potentially affected split estate surface owners[11] will be kept informed of field office leasing and NEPA activities through updated websites and email lists, and will be invited to comment during the NEPA compliance process.

D. ESA, NHPA, and Tribal Consultation Compliance Documentation

State and field offices will meet the ESA, NHPA, and General Procedural Guidance for Native American Consultation requirements for lease issuance, and will attach, at a minimum, the standard ESA and NHPA lease stipulations (Attachment 1) to any lease that is offered.  Generally, it is anticipated that the information necessary to meet this compliance requirement will have been developed at the land use planning stage (see Gather and Assess Existing Information, III. C. 1 above).  If state or field offices determine that current information is inadequate to support the decision about whether to lease, the processes for fulfilling the BLM's obligations under the ESA, NHPA, and tribal consultation requirements should be synchronized, tracked, and coordinated with the NEPA compliance process.

E. NEPA Compliance Documentation

The IDPR Team will complete site-specific NEPA compliance documentation for all BLM surface and split estate[12] lease sale parcels.  The IDPR Team may include the review of multiple parcels in a single document.  Site-specific NEPA compliance documentation must incorporate appropriate information gained through the lease parcel review process described above.  In accordance with this IM, the NEPA compliance documentation for oil and gas leasing must include an opportunity for public review, as described below, and the field office must verify that all legal requirements have been met (e.g., ESA and NHPA).

If, through the lease parcel IDPR Team review process, the authorizing official confirms that the proposed leasing action is adequately analyzed in an existing NEPA document, such as that prepared during the MLP process, and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) may be used to document NEPA compliance for the leasing decision (H-1790-1, National Environmental Policy Act Handbook, section 5.1).[13]  Although not required by law or regulation, field offices will provide a 30-day public review and comment period for the DNA.  After consideration of any public comments received on the document, the field office will either finalize the DNA or initiate other appropriate NEPA compliance review.  It is expected that the DNA process will only be appropriate in cases where the existing NEPA documentation has adequately incorporated the most current program-specific guidance.  If a DNA is not appropriate, then the field office will determine the appropriate NEPA compliance documentation (e.g., environmental assessment (EA) or environmental impact statement (EIS)) to be prepared.

Most parcels that the field office determines should be available for lease will require site-specific NEPA analysis.  This analysis will typically take the form of an EA, which would be tiered, as appropriate, to the RMP/EIS or a MLP/EA or EIS, if one has been completed for any of the parcels.  Scoping for these EAs is optional; however, the interdisciplinary review of lease sale parcels would provide input on the issues, impacts, and potential alternatives to be addressed in the EA.  The EA will analyze a no action alternative (no leasing), a proposed leasing action (leasing the parcel(s) in conformance with the land use plan), and any alternatives to the proposed action that may address unresolved resource conflicts.  In cases where the field office determines that the necessary terms and conditions under which leasing would be appropriate are not in conformance with the RMP, it will be necessary to amend the RMP before leasing is appropriate.  If it is

necessary to amend the RMP, the leasing EA (or EIS) must either meet the standards for NEPA documentation to support a plan amendment (see 43 CFR part 1600), or the affected lease parcels must be withdrawn or deferred from leasing until a plan amendment or revision can be completed at a later date.

Although not required by law or regulation, field offices will provide a 30-day public review and comment period for the EA and unsigned Finding of No Significant Impact (FONSI) for oil and gas leasing before forwarding the leasing recommendation to the State Director (see section III. F). Note: Plan amendments are subject to additional public involvement and protest requirements (43 CFR 1610.2). The field office will finalize the EA and FONSI considering any public comment received on those documents. If a FONSI is not warranted, the field office may recommend that the parcel be withheld from leasing or that an EIS be prepared to address the site-specific issues in compliance with NEPA.

   F. Leasing Recommendation

The Field Manager or District Manager will forward the finalized EA and FONSI (or finalized DNA, if appropriate) and a recommendation for each parcel reviewed to the State Director. This recommendation is not an appealable or protestable decision. Field office recommendations may include:

- Offering a lease parcel with standard stipulations only.
- Offering a lease parcel with existing, revised, and/or new stipulations.
- Offering a lease parcel with modification of parcel boundaries.
- Deferring a lease parcel from leasing, in whole or in part, pending further evaluation of specified issues.
- Withholding a lease parcel from offering in an area that is already closed in the existing RMP.
- Withholding a lease parcel from offering, in whole or in part.
- Withholding a lease parcel from offering, in whole or in part, and initiating a plan amendment to close the area to future leasing.

   G. Public Notification of Lease Sale

Field or state offices will post the NEPA compliance document on the appropriate website and make the documentation available in the public room(s). The state office will post the final sale notice at least 90 days prior to the sale date. Each sale notice will include a link to the NEPA compliance documentation.

   H. Lease Sale Parcel Protests

A 30-day protest period will begin the day the sale notice is posted, as it has in the past. The earlier posting of the sale notice will provide the state and field offices with at least 60 days to review protests before the oil and gas lease sale. The process outlined in this IM—which includes site-specific parcel analysis and increased public participation—will help identify, address, and resolve most issues before the lease sale. When possible, state offices should attempt to resolve protests before the sale of the protested parcels. Protests that are not resolved do not prevent bidding on protested parcels at the auction. Protest decisions should advise the protesting parties of their right to appeal denied protests to the Interior Board of Land Appeals (IBLA), but that appeals will not automatically halt the auction or issuance of leases.

   I. Lease Issuance

Before issuing a lease, the authorized officer at the state office will (1) sign decisions resolving all protests concerning the parcel, and (2) sign a decision record (or record of decision for an EIS) supporting issuance of the lease(s) that provides a rationale for the leasing decision, taking into account, among other things, the NEPA analysis. If a particular parcel or parcels are not the subject of a protest, sale or issuance of such parcels should not be held up pending resolution of protests on any other parcels proposed for sale. Field or state offices will post the NEPA compliance decision documents and protest decisions on the appropriate website and make the documentation available in the public room(s).

   IV. Implementation Plan and Report

Each state office will develop an implementation plan and timeline for accomplishing the tasks outlined in this IM. The implementation plan will be submitted not later than August 16, 2010, to the WO for review and approval by the Director.

The implementation plan should identify:

- A process for ensuring that lease stipulations are written in a WO-approved format, are consistent within the state for the protection of similar resources or resource settings, and edge-match appropriately across BLM administrative boundaries.
- A process for identifying areas currently meeting the criteria for initiation of the MLP process.
- MLPs or similar focused planning efforts that have been initiated or may be appropriate to initiate in the near term and any plans for initiating MLPs.
- The formation of IDPR Teams in each field office that has a lease parcel review workload.
- A rotational parcel review schedule.
- Steps, criteria, and timeframes to address the backlog of deferred parcels.

State offices will submit a post-implementation report to the WO by May 18, 2011.

The post-implementation report should identify:

- Each aspect of implementation including the effect on workloads.
- Implementation success and recommendations for improvement.
- Actions taken to enhance internal and external coordination.

AR010480

- The effect implementation of this policy has had on public involvement, including lease protests, appeals, and litigation as well as any effect on the BLM's responses, decision outcomes, and changed timeframes.
- Work products, such as one copy of a leasing EA and FONSI from each affected field office.

**Timeframe:**  This policy is effective upon issuance.  This policy will guide land use planning and leasing procedures for all future parcels not currently under review by the field offices as of the date of this IM.  For parcels currently under review by the field offices, each State Director will determine whether it is appropriate to apply any part of this policy to those parcels.  By July 2, 2010, state offices will provide to WO-310 (Jim Perry) via email, copies of all lease stipulations currently used in the state, including RMP lease stipulations not currently in statewide stipulation databases.  By August 16, 2010, state offices will submit an implementation plan and timeline to the WO for approval by the Director.  A post-implementation report will be submitted to the WO by May 18, 2011.  It is expected that this policy will be fully implemented by the state offices no later than May 18, 2011.

**Budget Impact:**  This policy will result in additional costs for NEPA review, planning, responses to protests, and associated oil and gas program costs.  It is anticipated that performance targets/units of accomplishments for resource programs will need to be adjusted.

**Background:**  On October 7, 2009, an interagency review team issued the Final Review of 77 Oil and Gas Lease Parcels Offered in BLM-Utah's December 2008 Lease Sale (UT-77 Report).  The UT-77 Report was a follow-up to a report issued by the Deputy Secretary of the U.S. Department of the Interior on June 11, 2009.  The report presented a number of findings and recommendations for improving the oil and gas land use planning and lease sale parcel review processes.  An interdisciplinary team of program specialists and managers reviewed the UT-77 Report, and many of the report findings and recommendations are incorporated in this policy.

**Manual/Handbook Sections Affected:**  This IM transmits policy that will be incorporated into BLM Handbooks H-1790-1, National Environmental Policy Act; H-1624-1, Planning for Fluid Mineral Resources; H-3101-1, Issuance of Leases; and H-3120-1, Competitive Leases.

**Coordination:**  This policy was coordinated with the U.S. Department of the Interior Office of the Solicitor, and the Renewable Resources and Planning, National Landscape Conservation System, and Minerals and Realty Management directorates.

**Contact:**  If there are any questions concerning this IM, please contact Michael D. Nedd, Assistant Director, Minerals and Realty Management, at 202-208-4201.  Your staff may contact Jim Perry, Senior Natural Resource Specialist, Washington Office Division of Fluid Minerals (WO-310), at 202-912-7145 or jim_perry@blm.gov; Robyn Shoop, Senior Mineral Leasing Specialist, Washington Office Division of Fluid Minerals (WO-310), at 202-912-7157 or robyn_shoop@blm.gov; or Shannon Stewart, Planning and Environmental Analyst, Washington Office Division of Decision Support, Planning and NEPA (WO-210), at 202-912-7219 or shannon_stewart@blm.gov.


Signed by:                                        Authenticated by:

Robert V. Abbey                                   Robert M. Williams

Director                                          Division of IRM Governance,WO-560


2 Attachments

  1 - Standard Endangered Species Act and National Historic Preservation Act Lease Stipulations (1 p)

  2 - Endnotes (2 pp)


Endnotes

---

[1] This policy will be implemented across the BLM as described above.  Certain parts of this policy, however, will not apply to the National Petroleum Reserve Alaska (NPR-A) because the BLM manages that area under some statutory authorities, such as the Naval Petroleum Reserves Production Act of 1976, 42 U.S.C. 6501 et seq., that apply only to that area.  The Alaska State Office's plan for implementing this policy will identify those parts of the policy that will not apply to leasing in the NPR-A.

[2] The external boundary of an NFS unit is defined as the outer boundary of an area encompassing all the National Forest System lands administered by a single administrative unit.  The area often encompasses private lands and other governmental agency lands.

[3] The term expression of interest also includes Pre-sale Offers.

[4] Stipulations for protection of identical resource values may differ if such variance is substantiated by ecological, cultural, or other resource-specific factors that are scientifically validated (e.g., all mule deer winter habitat timing limitation stipulations in a state should be worded similarly unless there are, for example, ecological reasons for varying the effective seasonal closure date of the stipulation across the field office or state).

[5] Adaptive Management: The U.S. Department of the Interior Technical Guide Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.  See also the Department of the Interior regulations regarding implementation of NEPA at 43 CFR 46.145, as well as associated guidance issued by the Department's Office of Environmental Policy and Compliance.

[6] WO-IM-2008-032 provides guidance for (1) incorporating exception, waiver, and modification criteria into a land use plan; (2) making changes to leasing decisions/stipulations in the land use plan; and (3) reviewing and approving lease stipulation exceptions, waivers, and modifications for leases that have already been issued.

[7] See 43 CFR 1610.5-3(b) ("the field manager shall take appropriate measures, subject to valid existing rights, to make operations and activities under existing permits [and] contracts, … conform to the approved plan or amendment within a reasonable period of time.")

[8] Eligible lands include those identified in 43 CFR 3120.1-1 as being available for leasing (BLM Manual 3120, Competitive Leases).  They are considered available for leasing when all statutory requirements have been met, including compliance with the NEPA, appropriate reviews have been conducted, and lands have been allocated for leasing in the RMP (BLM Handbook H-3101-1, Issuance of Leases).

[9] This consideration is a policy decision that is not dependent upon the economic values that may be assigned to competing resources.

[10] The process for internal and external coordination outlined in this IM is in addition to the direction under the existing regulations, handbooks, and desk guide that require consultation, coordination, and cooperation with other Federal agencies, Tribal governments, and state and local governments for all BLM planning and NEPA efforts from initiation of the land use plan through the planning, leasing, and permitting decisions, as appropriate (43 CFR 1610.3-1; 43 CFR 46.155; BLM Land Use Planning Handbook H-1601-1 I.E; BLM NEPA Handbook H-1790-1 Chapter 12; BLM Desk Guide to Cooperating Agency Relationships 2005).

[11] In addition to the notification sent to surface owners, as required in WO-IM-2009-184, *Courtesy Notification of Surface Owners When Split-Estate Lands are Included in an Oil and Gas Notice of Competitive Lease Sale* (July 24, 2009), incorporated by reference into this IM, the state or field office will also invite affected split estate surface owners to comment during the 30-day public review and comment period for the Environmental Assessment and unsigned Finding of No Significant Impact.

[12] This requirement does not apply to split estate lands within NFS units if leasing decisions for such lands are analyzed in documentation prepared jointly by the FS and the BLM for lands within the external boundaries of NFS units.

[13] The NEPA document to which the DNA refers must contain sufficient detail to address the potential direct, indirect, and cumulative effects of the proposed action(s).  Consideration must be given to new information, new or revised program-specific guidance, and new or revised lease stipulations contemplated for the lease parcel that may or may not be analyzed in the existing NEPA document.

## VIEW ALL POLICIES

## ATTACHMENTS

**IM2010-117_ATT1.PDF** (PDF / 6 KB)
**IM2010-117_ATT2.PDF** (PDF / 18 KB)

## FISCAL YEAR

2010

FOIA                PRIVACY POLICY

CAREERS             DISCLAIMER

CONTACT US          ACCESSIBILITY

MAPS                BUDGET AND PERFORMANCE

INFORMATION CENTER    AGENCY FINANCIAL REPORT

NOTICES             NO FEAR ACT

FEEDBACK           OFFICE OF CIVIL RIGHTS

REPORT MISCONDUCT

USA.GOV

WHITE HOUSE          Follow Bureau of Land Management on:

DEPARTMENT OF THE INTERIOR

**SOUTHERN UTAH WILDERNESS ALLIANCE – CENTER FOR BIOLOGICAL
DIVERSITY – NATURAL RESOURCES DEFENSE COUNCIL – SIERRA CLUB –
WESTERN WATERSHEDS PROJECT – THE WILDERNESS SOCIETY –
WILDEARTH GUARDIANS**

HAND-DELIVERED

August 6, 2018



Ed Roberson
Utah State Director
Bureau of Land Management
440 West 200 South, Suite 500
Salt Lake City, UT 84101-1345

RE:   *Protest of the Utah Bureau of Land Management's Notice of Competitive Oil and
Gas Lease Sale to be held on or around September 11, 2018*

Dear State Director Roberson,

In accordance with 43 C.F.R. §§ 4.450-2 and 3120, the Southern Utah Wilderness Alliance,
Center for Biological Diversity, Natural Resources Defense Council, Sierra Club, Western
Watersheds Project, The Wilderness Society, and WildEarth Guardians (collectively, SUWA)
hereby timely protest the September 11, 2018, offering of the following 109 oil and gas lease
sale parcels (hereinafter, Protested Parcels)[1]:

| **Salt Lake Field Office Parcels:** | UT0918-001 to - 007 (UTU-93433 to -93439); UT0918-009 (UTU-93440); UT0918-012 to -018 (UTU93441 to -93447); UT0918-027 to -037 (UTU-93455 to -93465). |
|---|---|
| **Fillmore Field Office Parcels:** | UT0918-020 to -026 (UTU93448-UTU93454). |
| **Price and Price Field Office Parcels:** | UT0918-038 to -113 (UTU-93466 to -93541). |

*See generally* BLM, September 2018 Competitive Oil and Gas Lease Sale, Salt Lake Field
Office Area Parcels, DOI-BLM-UT-W010-2018-0018-EA (July 2018) (SLFO EA); BLM,
September 2018 Oil and Gas Lease Sale, DOI-BLM-UT-0000-2018-0001-EA (July 2018) (Price
EA); BLM, September 2018 Oil and Gas Lease Sale, DOI-BLM-UT-W020-2018-0009-EA (Jan.

---

[1] Unless otherwise noted, each argument set forth herein applies to all Protested Parcels.

AR010493

2018); BLM, Notice of Competitive Oil and Gas Internet-Based Lease Sale (July 26, 2018) (attached). For the reasons discussed in SUWA's comments and the reasons discussed *infra* BLM's decision sell the Protested Parcels violates numerous federal laws including the National Environmental Policy Action (NEPA), 42 U.S.C. §§ 4321 *et seq.*; the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 *et. seq.*; the Mineral Leasing Act (MLA), 30 U.S.C. §§ 181 *et seq.*; the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101 *et seq.*; the Administrative Procedures Act (APA), 5 U.S.C. §§ 551-59, 701-06, and the Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq.*, and the regulations and policies that implement these laws.

## I.    Leasing Is the Point of Irretrievable Commitment of Resources

It is critical that BLM undertake satisfactory comprehensive NEPA analysis before deciding to offer, sell and issue the Protested Parcels; subsequent approvals by BLM will not be able to completely eliminate potential environmental impacts. Unfortunately, BLM has not fully analyzed potential irreversible and irretrievable impacts that could flow from its leasing decision. The sale of leases without no surface occupancy ("NSO") stipulations represents a full and irretrievable commitment of resources. BLM cannot make such a commitment without adequate analysis:

> BLM regulations, the courts and [Interior Board of Land Appeals ("Board")] precedent proceed under the notion that the issuance of a lease without an NSO stipulation conveys to the lessee an interest and a right so secure that full NEPA review must be conducted prior to the decision to lease.

*S. Utah Wilderness Alliance*, 159 IBLA 220, 241 (2003); *see also Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1159 (10th Cir. 2004) ("Agencies are required to satisfy the NEPA 'before committing themselves irretrievably to a given course of action, so that the action can be shaped to account for environmental values.'" (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1093 (10th Cir. 1988))). Thus, in *Southern Utah Wilderness Alliance*, the IBLA explained that

> [t]he courts have held that the Department must prepare an [environmental impact statement ("EIS")] before it may decide to issue such "non-NSO" oil and gas leases. The reason . . . is that a "non-NSO" lease "does not reserve to the government the absolute right to prevent all surface disturbing activities" and thus its issuance constitutes "an irretrievable commitment of resources" under section 102 of NEPA.

159 IBLA at 241 (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998)).

As the Board has recognized, "[i]f BLM has not retained the authority to preclude *all* surface disturbance activity, then the decision to lease is itself the point of 'irreversible, irretrievable commitment of resources' mandating the preparation of an EIS.'" *Union Oil Co. of Cal.*, 102 IBLA 187, 189 (1988) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1412 (D.C. Cir. 1983))

AR010494

(emphasis added); *see also S. Utah Wilderness Alliance*, 159 IBLA at 241-43 (same); *Sierra Club, Or. Chapter*, 87 IBLA 1, 5 (1985) (finding that because issuance of non-NSO oil and gas leases constitutes an irreversible commitment of resources, BLM cannot defer preparation of an EIS unless it either retains authority to preclude development or issues the leases as NSO).

BLM itself identifies lease issuance as the point of irretrievable commitment of resources:

> The BLM has a statutory responsibility under NEPA to analyze and document the direct, indirect and cumulative impacts of past, present and reasonably foreseeable future actions resulting from Federally authorized fluid minerals activities. *By law, these impacts must be analyzed before the agency makes an irreversible commitment. In the fluid minerals program, this commitment occurs at the point of lease issuance.*

BLM, H – 1624-1 – Planning for Fluid Mineral Resources § I.B.2, at I-2 (Jan. 28, 2013) (emphasis added) (attached); *see also S. Utah Wilderness Alliance v. Norton*, 457 F. Supp. 2d 1253, 1256 (D. Utah 2006) ("In sum, 'in the fluid minerals program, the point of irretrievable and irreversible commitment occurs at the point of lease issuance." (quoting *Pennaco*, 377 F.3d at 1160) (internal alterations omitted)).

In the present case, BLM has failed to analyze all reasonable, foreseeable potential impacts of oil and gas development from the above-listed leases and instead has unlawfully delayed that analysis to a later date, as discussed below.

## II.     BLM Failed to Consider a Reasonable Range of Alternatives

BLM violated the bedrock principle of NEPA to make an informed choice between options when it analyzed only the extreme lease-everything (Proposed Action) and lease-nothing (No Action) alternatives.

### A.  Legal Background – NEPA Alternatives

Because NEPA does not demand substantive results the statute contains "very important" procedural provisions – "provisions which are designed to see that all federal agencies do in fact exercise the substantive discretion given them." *Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission*, 449 F.2d 1109, 1112 (D.C. Cir. 1971). "These provisions are not highly flexible. Indeed, they establish a strict standard of compliance." *Id.* At the "heart" of these procedural provisions is the obligation that federal agencies consider alternatives to the proposed action – an obligation which is "operative even if the agency finds no significant environmental impact." *Dine Citizens Against Ruining our Environment v. Klein*, 747 F.Supp.2d 1234, 1254 (D. Colo. 2010), *citing Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004). A "thorough discussion of the alternatives is imperative." *All Indian Pueblo Council v. U.S.*, 975 F.2d 1437, 1444 (10th Cir. 1992).

> Of course, all of [NEPA's procedural] duties are qualified by the phrase "to the fullest extent possible." We must stress as forcefully as possible that this language

AR010495

does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow "discretionary." Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration "to the fullest extent possible" sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts.

*Calvert Cliffs' Coordinating Committee, Inc.*, 449 F.2d at 1114.

The range of alternatives an agency must analyze is dictated by a "rule of reason and practicality" based on the agency's stated purpose and need for the project. *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002), citing *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 432 (10th Cir. 1996). An agency has broad discretion to define its objectives for a project proposal. However, after "defining the objectives of an action," the agency must "provide legitimate consideration to alternatives that fall between the obvious extremes." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999). Stated differently, a broadly defined objective demands that a broader range of alternatives be analyzed by the agency:

> It is the BLM purpose and need for action that will dictate the range of alternatives and provide a basis for the rationale for eventual selection of an alternative in a decision. . . .
> ….
> … *The broader the purpose and need statement, the broader the range of alternatives that must be analyzed*.

BLM Handbook 1790-1 §§ 6.2, 6.2.1, pgs. 35-26 (emphasis added).

At all times, the analyzed range of alternatives must be "sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708 (10th Cir. 2009) (citation omitted). Though less detailed than an EIS, an EA must demonstrate that the agency took a "hard look" at alternatives – a "thoughtful and probing reflection of the possible impacts associated with the proposed project" so as to "provide a reviewing court with the necessary factual specificity to conduct its review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006); *see also* 40 C.F.R. § 1508.9(a)(1). Courts will not defer to a void and thus the administrative record must contain evidence – not merely conclusory statements by the agency – that the agency did in fact take a hard look at a broad range of NEPA alternatives. *See High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F.Supp. 3d 1174, 1186 (D. Colo. 2014), citing *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010).

### B. BLM Analyzed Only the Extreme Lease-Nothing or Lease-Everything Alternatives.

BLM's purpose and need statements in the leasing EAs are exceedingly broad:

4

AR010496

> The purpose of the *Proposed Action* is to *respond* to the nominations or expressions of interest for oil and gas leasing on specific federal mineral estate through a competitive leasing process.

Price EA at 7 (emphases added); SLFO EA at 3 (same). Within this framework BLM's "Decision to be Made" is likewise exceedingly broad: "The BLM will decide whether to lease any or all of the nominated parcels or portions thereof and, if so, under what lease terms (stipulations and/or notices)." SLFO EA at 3. *See also* Price EA at 8 ("The BLM will decide whether to lease the 76 nominated parcels and, if so, under what terms."). These sweeping objectives govern BLM's range of alternatives as well as dictate the reasonableness of recommended alternatives including those recommended by SUWA. *See* SUWA *et al.*, Scoping Comments on Utah BLM September 2018 Lease Sale (Price and Richfield field offices) at 17-18 (April 16, 2018) (comments and exhibits thereto attached).

SUWA recommended alternatives would allow BLM to "respond" to the parcel nominations and expressions of interest and thus – objectively – satisfied the purpose and need of the Price EA.[2] Nevertheless, BLM argues that its consideration of only the extremes – the lease-nothing or lease-everything alternatives – met its NEPA obligation to make an informed choice among options. BLM offers the following rationales for rejecting SUWA's recommended alternatives:

- SUWA's "leasing outside of wilderness-caliber lands" alternative "is subsumed in the 'no action' alternative";

- SUWA's "no-surface occupancy," "phased development-leasing," and "mitigation leasing" alternatives are not in compliance with the Price RMP; and

- The "activity plan" proposal was rejected on account of being essentially the same as the Master Leasing Plan (MLP) concept that BLM had revoked for creating "duplicative layers of NEPA review."

Price EA at 20-21. These rationales are arbitrary and capricious.

First, BLM never disputed – nor could it – that SUWA's recommended alternatives (1) would accomplish the purpose and need of the lease sale, (2) are technically and economically feasible, and (3) will have a lesser impact to cultural and/or wilderness resources. *See Mary Byrne, d/b/a Hat Butte Ranch*, 174 IBLA 223, 237 (2008) (reasonable alternatives are ones that "will accomplish the intended purpose, are technically and economically feasible, and yet have a lesser or no impact"). Because the purpose and need of the EAs are so broad, SUWA's recommended alternatives would meet those objectives. *See* BLM, National Environmental Policy Act, Handbook H-1790-1 § 6.2.1, at 36 (Jan. 2008) ("The broader the purpose and need statement, the broader the range of alternatives that must be analyzed.") (attached).

---

[2] SUWA's scoping comments recommended alternatives for only the Price EA. However, those same alternatives – and BLM's arbitrary reasons for rejecting them – apply with equal force to the SLFO EA and SUWA protests BLM's inadequate alternatives analysis for the SLFO EA as well.

AR010497

Second, BLM's argument that the no action alternative "subsumed" SUWA's recommended alternative, is arbitrary because it is premised *entirely* on an inapposite decision by the Interior Board of Land Appeals (Board). *See Biodiversity Conservation All.*, 183 IBLA 97 (2013). In *Biodiversity Conservation Alliance*, appellants had argued that BLM's leasing decision violated *FLPMA*, not NEPA which is the legal issue here. As the Board explained:

> [Appellants] argue[] that BLM's decision to lease the 7 parcels at issue . . . *is violative of the multiple-use management requirement of section 302(a) of FLPMA* . . . because BLM failed to determine whether the public lands at issue are suitable for designation as wilderness in accordance with section 2(c) of the Wilderness Act.

*Id.* at 108-09 (emphasis added). Based on this FLPMA claim the Board explained that "BLM is not required to consider whether lands sought to be leased should more appropriately be protected for their wilderness character . . . each time that a leasing proposal is being considered. Rather, BLM may act pursuant to the outstanding land-use planning directions of the RMP." *Id.* at 112. BLM's attempt to force the Board's FLPMA decision into a NEPA alternatives box and to reject SUWA's recommended alternatives does not withstand scrutiny.

Third, BLM's Decision to be Made for the lease sale is to: "[D]ecide whether to lease any or all of the nominated parcels *or portions* thereof and, if so, *under what lease terms* (stipulations and/or notices)." SLFO EA at 3 (emphases added); *see* Price EA at 8 ("The BLM will decide whether to lease the 76 nominated parcels and, if so, under what terms."). For the suspended leases in the Price field office, BLM explained that the "decision will determine whether to issue [the leases] and lift the suspensions . . . and whether to modify the stipulations and notices on these 18 leases." Price EA at 8. BLM's objectives strongly undercut the agency's contradictory rationales for rejecting SUWA's recommended alternatives because BLM has arbitrarily disavowed any obligation to revisit lease terms (*i.e.*, stipulations and notices).

Further, BLM failed to cite – nor can it – any provision in the RMPs or caselaw to support the assertion that RMPs somehow restrict BLM's ability to manage the pace and nature of oil and gas development on public lands, including requiring mitigation measures or phased development. To the contrary, FLPMA and the MLA afford BLM broad authority over the management of public lands, as recognized for decades by both the Board and federal courts. *See, e.g.*, *Roy G. Barton*, 188 IBLA 331 (2016); *Hawkwood Energy Agent Corp. Venture Energy, LLC*, 189 IBLA 164 (2017). BLM routinely conditions its authorizations related to oil and gas exploration and development on public land through the use of such protective measures. Ken Kreckel, Feasibility of Utilizing a Phased Development Approach to the Horse Bench Natural Gas Development, Environmental Assessment, DOI-BLM-UT-G020-2015-0011-EA (March 2018) (explaining the feasibility of requiring a phased development approach and highlighting several instances where BLM required such an approach) (attached).

Moreover, BLM's rejection of SUWA's recommended alternatives ignores the elephant in the room: BLM has recognized on numerous occasions that it needed to analyze additional protective measures, including lease stipulations and notices and the nature and pace of oil and gas development activities, in the San Rafael Desert region *prior to issuing new oil and gas*

AR010498

*leases in that region. See infra* Section III (discussing the San Rafael Desert MLP). As discussed *infra*, it is immaterial that BLM is no longer following the MLP concept because that change in position – with the unsupported assertion that MLP's create "duplicative" NEPA analysis – does not excuse BLM from the fact that the necessary analysis remains lacking. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis") (citation omitted); *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2120 (2016) ("An unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.") (internal alteration and quotations omitted; citation omitted).

Nor can BLM ignore the analysis prepared as part of the San Rafael Desert MLP planning process in an effort to streamline and facilitate oil and gas leasing and development in pursuit of its quixotic goal of "energy dominance."[3] Thus, BLM's rejection of SUWA's Activity Plan alternative, coupled with its failure to provide record evidence as to how that plan would create "duplicative" NEPA review – NEPA review that has never been performed – is arbitrary and capricious, as discussed in more detail *infra* Section III.A.

Therefore, BLM failed to analyze a reasonable range of alternatives, as required by NEPA, and the agency's rationales for doing so are arbitrary and capricious.

## III.    San Rafael Desert Master Leasing Plan

The Protested Parcels in the San Rafael Desert fall almost entirely within the San Rafael Desert MLP boundary. *See* SUWA Map – San Rafael Desert MLP and September 2018 Lease Parcels (attached). As such, the information and reports BLM (or its contractors) generated, received from the public, and/or has in its possession must be incorporated into BLM's leasing analyses and cannot be overlooked. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (an agency action is arbitrary and capricious when the agency "entirely fail[s] to consider an important aspect of the problem"); *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1237 (10th Cir. 2017) (setting aside the agency's decision because it had failed to consider all relevant factors); *New Mexico ex rel. Richardson*, 565 F.3d at 713 ("In order for a factual determination to survive review under the arbitrary and capricious standard, an agency must 'examine the relevant data and articulate a rational connection between the facts found and the decision made.'") (internal alterations and citation omitted). This includes, but is not limited to, the "Reasonably Foreseeable Development Scenario for Oil and Gas in the San Rafael Desert Master Leasing Plan Area" (Sept. 2016) (San Rafael Desert MLP RFD) (attached), "San Rafael Desert Lands with Wilderness Characteristics Inventory" (Nov. 2016) (San Rafael Desert LWC Report) (attached) and "Updated Utah Master Leasing Plan (MLP) Strategy" (Aug. 2015) (attached).

---

[3] This includes, but is not limited to, the documents that BLM has unlawfully failed to timely provide to SUWA in response to SUWA's FOIA request in this matter. *See* S. Utah Wilderness Alliance, FOIA Request, Re: San Rafael Desert Master Leasing Plan, DOI-BLM-UT-G020-2016-0008-EA (March 2, 2018) (SUWA SRD MLP FOIA) (attached). In light of BLM's failure to timely respond to SUWA's FOIA request, SUWA reserves the right to supplement this protest once it has received the public documents to which it is legally entitled and should have received months ago.

AR010499

In 2016, BLM initiated the San Rafael Desert MLP process to "provide additional planning and analysis for areas prior to new leasing of oil and gas resources." 81 Fed. Reg. 31252, 31253 (May 18, 2016). The additional analysis was needed to, among other things:

> (1) Resolve long-standing lease protests relating to parcels of land for which BLM received lease offers subject to protest, but for which BLM has not issued leases in the planning area; (2) Determine whether the BLM should cancel, modify, or lift the suspensions on suspended leases in the planning area; (3) Evaluate potential development scenarios; (4) Identify and address potential resource conflicts and environmental impacts from development; (5) Create oil and gas development mitigation strategies; and (6) Consider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing.

*Id.* BLM identified several resource values that it needed to analyze prior to moving forward with additional leasing in the MLP area including air quality, climate change, cultural resources, paleontological resources, recreation, visual resources, night skies, riparian resources, soil and water resources, vegetation, wildlife resources, special status species, special designations, and wilderness characteristics. *Id.* Additionally, BLM committed to, among other actions: "prepare development scenarios for oil and gas resources based on historical, existing, and projected levels of development," "consider a range of alternatives that focus on mitigating the impacts of development on resources that are of concern," and "use the best available scientific information and inventory and monitoring information to determine appropriate decisions for oil and gas leasing." *Id.*

It is immaterial that BLM has rescinded the MLP concept. *See* IM 2018-34 § II. Under FLPMA, BLM has an ongoing duty to inventory "public lands and their resource and other values" and to update its land use plans, based on the results of inventories. 43 U.S.C. §§ 1711(a), 1712(a); see also *Or. Natural Desert Ass'n*, 625 F.3d at 1122 (recognizing duty to update land use plans to account for new inventories). Similarly, under NEPA, BLM has a duty to update its environmental analysis when "significant new circumstances or information" exists. 40 C.F.R. § 1502.9(c)(1)(ii). Consequently, the rescission of the MLP policy does not change the fact that BLM has repeatedly and unequivocally stated that new information and analysis is necessary prior to issuing oil and gas leases in this area.

Nor does it change the fact that BLM has in its possession significant new information including, but not limited to, cultural reports, updated reasonable development scenarios for oil and gas, wilderness character inventories, and updated air quality modeling. There is no record evidence that BLM has used that information to inform its leasing decision. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463 U.S. at 43 (an agency action is arbitrary and capricious when the agency "entirely fail[s] to consider an important aspect of the problem"). Additionally, as noted *supra*, SUWA retains the right to supplement its protest once it has received BLM's determination on its outstanding FOIA request. *See* SUWA SRD MLP FOIA.

Notably, the Price and Richfield RMPs do not support a decision to offer oil and gas leases on public lands within the San Rafael Desert MLP. BLM expressly acknowledged this fact when it

AR010500

initiated the San Rafael Desert MLP process. *See* BLM, San Rafael Desert Master Leasing Plan, Purpose and Need *1 (stating that the San Rafael Desert MLP is needed to "provide additional planning and analysis prior to new oil and gas leasing within the MLP area"); *id.* at *2 (stating that "additional planning and analysis are warranted before new mineral leasing and development are allowed") (attached). Specifically, the current RMPs do not account for significant new and updated information concerning the reasonably foreseeable development (RFD) scenario, lands with wilderness characteristics and potential impacts to Canyonlands National Park.

First, in the San Rafael Desert MLP RFD, BLM concluded that "the development potential is greater" than previously thought "due to the success of horizontal drilling in the Cane Creek shale in the Paradox Formation in adjacent areas of the Moab Field Office." San Rafael Desert MLP RFD at 3. The Cane Creek Shale is concentrated in the eastern half of the San Rafael Desert MLP area and encompasses or borders numerous sensitive resources, including Canyonlands National Park, Labyrinth Canyon and LWCs. *Id.* at 23. According to the RFD, most of the wells in the Cane Creek Shale would be horizontally drilled, a technique not previously utilized in the planning area. *Id.* at 11. Horizontal drilling requires a "larger pad size . . . to accommodate a larger drill rig and sufficient area for additional equipment such as specialized mud systems, directional tools, drill pipe and casing, and portable storage tanks" than conventional vertical drilling. *Id.* As a consequence, the potential impacts on nearby lands and resources, including Canyonlands National Park, are broader and more severe than conventional types of drilling. It is these impacts, among others, that are not examined in the current RMPs for San Rafael Desert. The fact that BLM included some of the information from the San Rafael Desert RFD in the Price EA is not sufficient, because BLM has still not fully evaluated that information in the context of a land use planning process, as required by BLM Handbook 1624-1. *See* BLM Handbook 1624-1 at III-1 to -12 (requiring consideration of RFDs during the development of land use plans and stating that RFDs should inform the development and consideration of alternatives for leasing allocations and future activities).

Second, BLM has significant new information regarding wilderness characteristics in the San Rafael Desert. See San Rafael Desert LWC Report. This includes, but is not limited to, information for the San Rafael River, Labyrinth Canyon, Sweetwater Reef, Horseshoe Canyon South, Robbers Roost Flats, and Dirty Devil / French Springs units. *See id*. at 3 (Lands with Wilderness Characteristics Overview Map). The Price and Richfield RMPs pre-date this information. See, e.g., SUWA, 457 F.Supp.2d at 1264-65 (setting aside BLM's leasing decision for failure to analyze significant new wilderness character information).

Third, since 2008, BLM has obtained significant new information about the potential impacts of oil and gas development on Canyonlands National Park. This information comes from environmental analyses developed during preparation of the Moab MLP and shows that the impacts of oil and gas development on key attributes of the park, including air quality, night skies, scenic viewsheds and recreation resources, are more significant than disclosed in 2008. For example, in the Final EIS for the Moab MLP, BLM disclosed that absent heightened protections, such as NSO stipulations,

AR010501

> [n]ot all of the visual horizon of the two adjacent National Parks would be
> protected from visual impacts. . . . Mineral development facilities could exist in
> places that would disrupt the skyline view as seen from the Colorado and Green
> Rivers. Light pollution from mineral development could diminish the number of
> stars visible, thereby reducing the visual quality of the night sky.

Moab MLP Final EIS at 4-198;2 see also Analysis of the Management Situation for the Moab
MLP and Associated EIS at 2-903 ("The visual quality within the Planning Area is being
impacted by development of utility corridors, from minerals exploration and development, from
seismic exploration, and from other land-use disturbances."). "Scenic visual resources and values
are among the purposes for which Canyonlands and Arches were established." Moab MLP Final
EIS at 3-120; *see also id.* at 3-118 (noting Canyonlands National Park's 2015 designation as a
"gold-tier" International Dark Sky Park). Similarly, in regard to the park's air quality, BLM
stated that "[w]hile long term (1991-2013) trends at Canyonlands show statistically significant
improvement . . . , the most recent 10 year period indicates that this improving trend has not been
maintained." *Id.* at 3-9. Finally, in the Moab MLP and with the assistance of the U.S. Geological
Survey, BLM developed "analysis of viewsheds most likely affected by recreation and mineral
decisions." *Id.* at 3-121. This analysis, which includes the eastern extreme of the San Rafael
Desert MLP area, shows that there are numerous "high and very high recreation sites" both
within and outside of Canyonlands National Parks that are within the viewshed of potential oil
and gas lease parcels. *Id.* at 3-121-23. In connection with this sale, the National Park Service
raised many of the foregoing concerns. *See* Letter from Superintendent, Southeast Utah Group,
National Park Service, to Sheri Wysong, BLM, Re: September 2018 Oil and Gas Lease Sale –
Scoping Comments (April 20, 2018) ("Issues of concern to us include the potential effects of the
project on air quality and air quality related values . . . , visual resources and viewsheds including
the quality of night skies, and natural soundscape conditions.") (NPS Scoping Letter) (attached).

In sum, the existing RMPs are insufficient, and thus, as BLM itself has explained: "MLPs are
required in areas with sensitive resources, such as the San Rafael Desert, where mostly unleased
and undeveloped lands have been proposed for oil and gas leasing and development." BLM, San
Rafael Desert Master Leasing Plan Fact Sheet 1 (attached). BLM has likewise determined that
"additional planning and analysis are warranted before new external leasing and development are
allowed," *id.* at 2, and is needed to "resolve long-standing lease protest from the February and
May 2006 lease sale, and to complete additional analyses under NEPA for leases that were
placed in suspension in 2005 and 2006 because of litigation." *Id.* Because this information is
"required" prior to the issuance of new leases, as BLM has recognized, BLM must prepare the
above-discussed analyses prior to issuing any proposed parcel in the MLP boundary.  40 C.F.R.
§ 1502.9(c)(1)(ii) (NEPA requires federal agencies to update their environmental analyses when
"significant new circumstances or information" exists).

## A.  BLM Failed to Evaluate the San Rafael Desert Activity Plan Alternative in Detail.

BLM failed to evaluate the San Rafael Desert Activity Plan (SRD Activity Plan) in detail, which
is a reasonable alternative to the proposed action. Under NEPA, BLM must "[r]igorously explore
and objectively evaluate all reasonable alternatives. . . ." 40 C.F.R. § 1502.14(a). When

AR010502

alternatives are dismissed from detailed analysis, BLM must "briefly discuss the reasons for their having been eliminated." *Id*. Here, BLM improperly dismissed the SRD Activity Plan proposal from detailed analysis, because it incorrectly concluded that the proposal could be evaluated and adopted only through an RMP amendment. This conclusion is clearly in error, as the proposal includes a detailed discussion of why a land use planning effort is not necessary.

The SRD Activity Plan proposal is based on FLPMA and the MLA, both of which provide BLM with broad discretion over the mechanics of oil and gas leasing. As explained in the proposal,

> Under FLPMA, BLM is charged with managing public lands pursuant to land use plans and may "issue management decisions to implement" those plans. 43 U.S.C. § 1712(a), (e). BLM's land use planning handbook provides further guidance: Upon approval of the land use plan, subsequent implementation decisions are put into effect by developing implementation (activity-level or project-specific) plans. An activity-level plan typically describes multiple projects in detail that will lead to on-the-ground action. These plans traditionally focused on single resource programs (habitat management plans, allotment management plans, recreation management plans, etc.). However, activity-level plans are increasingly interdisciplinary and are focused on multiple resource program areas to reflect the shift to a more watershed-based or landscape-based approach to management. BLM H-1601-1 § II.B.2.A. Similarly, the Price RMP describes plan implementation as "a continuous and active process" that includes "activity planning." Price RMP at 60.

> The MLA also "vest[s] the Secretary with considerable discretion to determine which lands will be leased." *W. Energy Alliance v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013). BLM has utilized this discretion to avoid and minimize impacts on other resources through phased oil and gas leasing.[4] BLM has also committed to not leasing within targeted areas pending further land use planning.[5] While these examples are drawn from the land use planning context, BLM enjoys "considerable discretion" to set the timing and location of leasing outside of land use planning.

> Finally, an oil and gas leasing activity plan for San Rafael Desert is consistent with recent secretarial orders on energy development and recreation. Under Secretarial Order (S.O.) 3354, BLM must "support and improve implementation of the oil and gas quarterly lease sale" system and "identify options to improve the Federal onshore oil and gas leasing program. . . ." S.O. 3366 requires BLM to broaden and enhance recreation opportunities on public lands. An activity plan

---

[4] *See, e.g.*, Cody Field Office Approved RMP 65 (permitting leasing in elk crucial winter range "only after all parcels outside elk crucial winter range have been offered for lease, sold, and explored."), available at https://eplanning.blm.gov/epl-front-office/projects/lup/9506/63298/68540/CYFO_Final_ARMP.pdf.

[5] *See, e.g.*, BLM, White River Oil & Gas RMPA/ROD 2-45 (committing to not leasing "within either [certain] low oil and gas potential [areas] or adjacent to Dinosaur National Monument Headquarters . . . [until] after the BLM has completed a RMP Revision and determined whether or not leasing is appropriate given considerations such as the potential impacts to visual resources, night skies, and soundscapes."), available at https://eplanning.blm.gov/epl-frontoffice/projects/lup/65266/79043/91308/2015_Oil_and_Gas_Development_RMPA_ROD.pdf

11

would further both of those orders by improving the leasing process for San Rafael Desert and avoiding potential conflicts with important recreation resources.

Thus, the proposal articulated, with citations to relevant authorities, why the proposal could be evaluated and adopted outside of the land use planning process.

Yet, in the Price EA, BLM summarily refused to evaluate the proposal in detail, claiming that "in order to achieve the objectives of the submitters, an RMP amendment would be required." Price EA at 21. This determination is simply wrong, given that BLM enjoys considerable discretion over the timing and pace of leasing, as well as whether to move forward with leasing at all, under FLPMA and the MLA, which BLM failed to recognize and discuss in the leasing EA.

BLM is essentially committing the same mistake that doomed the proposed leasing plan for Colorado's Roan Plateau. There, a group of citizens developed and submitted an alternative leasing plan for an area with sensitive natural values, which BLM summarily dismissed and refused to evaluate in detail. The court held that this decision violated NEPA, because the citizens' plan was consistent with the project's purpose and need, "sufficiently distinct from other alternatives considered by the BLM," and was "feasible" (i.e., could theoretically be adopted and implemented). *Colo. Envtl. Coalition v. Salazar*, 875 F. Supp. 2d 1233, 1249 (D. Colo. 2012).

Here, the SRD Activity Plan is entirely consistent with this project's purpose and need:

> The purpose of the Proposed Action is to respond to the nominations or expressions of interest for oil and gas leasing on specific federal mineral estate through a competitive leasing process. The need for the Proposed Action is established by the BLM's responsibility under the Mineral Leasing Act (MLA) of 1920, as amended, the Mining and Minerals Policy Act of 1970, the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (Reform Act), and the Federal Land Policy and Management Act (FLPMA). . . .

Price EA at 7. Further, the SRD Activity Plan is "sufficiently distinct" from both alternatives evaluated by BLM, neither of which include or evaluate the use of phased leasing, targeted deferrals, or new lease stipulations or conditions of approval. *See* SRD Activity Plan Proposal at 7-9. Finally, as explained above, each of these measures is "feasible," in that BLM has the authority to adopt them at this stage in the process. Thus, BLM violated NEPA by not considering the SRD Activity Plan proposal in detail.

## IV.    BLM's Prioritizing of Leasing of Lands with Little or No Potential for Oil and Gas Development Violates FLPMA and the MLA

BLM's prioritizing of oil and gas leasing in lands it readily recognizes as essentially worthless for oil and gas development but exceedingly high in other values such as recreational and wilderness-caliber, is in violation of FLPMA and the MLA.

12

AR010504

### A. Legal Background – FLPMA

Under FLPMA, BLM is required to manage the public lands on the basis of multiple use and sustained yield and in a manner that does not unduly or unnecessarily degrade other uses and resources. *See* 43 U.S.C. § 1732(a). BLM "shall" manage the public lands in a manner that prohibits "unnecessary or undue degradation" of those lands. *Id.* § 1732(b). In recognition of the environmental components of the multiple use mandate, courts have repeatedly held that under FLPMA's multiple use mandate, development of public lands *is not required*, but must instead be weighed against other possible uses, including conservation to protect environmental values. *See*, *e.g., New Mexico ex rel. Richardson*, 565 F.3d at 710 ("BLM's obligation to manage for multiple use does not mean that development *must* be allowed. . . . Development is a possible use, which BLM must weigh against other possible uses — including conservation to protect environmental values, which are best assessed through the NEPA process."); *Rocky Mtn. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 n.4 (10th Cir. 1982) ("BLM need not permit all resource uses on a given parcel of land.").

Federal courts have consistently rejected efforts to affirmatively elevate energy development over other uses of public lands.  In the seminal case, *N.M. ex rel. Richardson v. BLM*, the Tenth Circuit put to rest the notion that BLM must manage chiefly for energy development, declaring that "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."  565 F.3d at 710; *see also S. Utah Wilderness Alliance v. Norton*, 542 U.S. 52, 58 (2004) (defining "multiple use management" as "striking a balance among the many competing uses to which land can be put"). Other federal courts have agreed. *See, e.g., Colo. Envtl. Coalition v. Salazar*, 875 F. Supp. 2d at 1249 (rejecting oil and gas leasing plan that failed to adequately consider other uses of public lands).

### B. Legal Background – MLA

Under the MLA, BLM can only lease lands for oil and gas development "which are known or believed to contain oil or gas deposits." 30 U.S.C. § 226(a). *See also Vessels Coal Gas, Inc.*, 175 IBLA 8, 25 (2008) ("It is well-settled under the MLA that competitive leasing is to be based upon reasonable assurance of an existing mineral deposit"). Any offered lease must then foster responsible oil and gas development, which the lessee must carry out with "reasonable diligence." 30 U.S.C. § 187. The MLA is structured to facilitate actual production of federal minerals, and thus its faithful application should discourage leasing of low (or no) potential lands.

Taken together, FLPMA and MLA prohibit BLM from offering the leases at issue here because they encompass public lands that BLM acknowledges contain little or no potential to produce oil and gas resources but are extremely important for other resource values including wildlife and cultural.

AR010505

**C. BLM Has Improperly Prioritized Oil and Gas Leasing and Development Over All Other Uses of Public Lands, Resulting in Unnecessary Degradation of Public Lands, in Violation of FLPMA, and Is Offering Non-Mineral Potential Lands, In Violation of the MLA**

BLM concedes that the Protested Parcels contain insignificant oil and gas production potential, meaning that the development thereof will almost certainly result in the unnecessary degradation of important environmental resource values with no economic return to the American public. For *all* of the ninety-four parcels offered (or proposed to be lifted out of suspension) in the Price field office, consisting of approximately 203,000 acres of public lands, BLM predicts that only eleven wells will be drilled – seven of which may result in production. *See* Price EA at 16. In fact, as recognized by BLM, the last well drilled in the *entire San Rafael Desert MLP area* – an area of more than 524,000 acres, including all of the Price field office parcels offered here – was drilled in 1989. *See* BLM, Reasonably Foreseeable Development Scenario for Oil and Gas in the San Rafael Desert Master Leasing Plan Area, Price and Richfield Offices 1 (Sept. 2016) (San Rafael Desert RFD) (attached). Unsurprisingly, that well – and *every well ever drilled in this area* – has been "plugged and abandoned" shortly after having been drilled. EA at 16. *See* San Rafael Desert RFD at 1 ("All of the wells drilled within the SRD MLPA have been plugged and abandoned"). *See also* Letter from Acting State Director, Utah, to Assistant Director, Energy, Minerals and Realty Management Directorate, Re: Updated Utah Master Leasing Plan (MLP) Strategy 3 (Aug. 14, 2015) ("There has been no oil or gas production from the MLP area.") (attached).

Similarly, the BLM West Desert District is proposing to offer thirty-three parcels, consisting of 45,227 acres of public land for oil and gas development that by the agency's own admission contain little or no potential for oil and gas production. BLM has stated that the potential for oil and gas production from these leases is "low." SLFO EA at 8. For the parcels in Utah County, BLM anticipated *three* wells would be drilled from 1989 – 2000 with *zero* of those resulting in oil and gas production. *Id.* at 9. There is only *one* active lease in the entire Pony Express Resource Area and "no federally-managed surface or sub-surface estate wells are producing in Utah and Rich County." *Id.* BLM has not provided an updated RFD for the Utah County parcels. *See id.* at 10.

Further, as BLM is aware, because the West Desert District contains such low potential for oil and gas, as demonstrated by industry's repeated failure to bid – at even the minimum day-after bargain price – on any parcels offered in that field office, BLM frequently cancels the quarterly sales for that area recognizing that it is not a worthwhile expenditure of BLM's limited resources. *See, e.g.*, Salt Lake Field Office August 2014 Oil and Gas Lease Sale, DOI-BLM-UT-W010-2014-0001-EA (none of the 33 parcels, consisting of approximately 64,610 acres in the Salt Lake field office, analyzed in this NEPA document received bids).

Finally, BLM's ill-conceived push for "energy dominance" in these areas will threaten exceptional and irreplaceable resource values including, but not limited to, endemic bees, greater sage-grouse PHMA, Canyonlands National Park, cultural resources and the Green River. *See* Presidential Executive Order on Promoting Energy Independence and Economic Growth § 1(a) (March 28, 2017) ("It is in the national interest to promote . . . our Nation's vast energy sources")

14

(attached); *id.* § 1(c) ("it is the policy of the United States that . . . agencies . . . immediately . . . suspend, revise, or rescind [regulations] that unduly burden the development of domestic energy resources"); DOI, Secretarial Order 3349, American Energy Independence (revoking numerous policies established to protect environmental resources from the adverse impacts of energy development, including oil and gas) (March 29, 2017) (attached); BLM, Instruction Memorandum 2018-034, Updating Oil and Gas Leasing Reforms – Land Use Planning and Lease Parcel Reviews (Jan. 31, 2018) (revoking Obama administration leasing policies established to protect the environment and replacing those policies with policies that "streamline the leasing process to alleviate unnecessary impediments and burdens, to expedite the offering of lands for lease, and to ensure quarterly oil and gas lease sales are consistently held") (IM 2018-34) (attached). *See* BLM, ePlanning, September 2018 Oil and Gas Lease Sale, https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=152981 (stating that the purpose of the sale is "[i]n keeping with the Administration's goal of strengthening America's energy independence").

The elevation of admittedly speculative oil and gas leasing and development over the protection of these important resource values will result in their unnecessary and unlawful degradation – values that BLM has repeatedly highlighted and recognized as being present and in need of additional protections. *See* 81 Fed. Reg. 31252, 31253 (May 18, 2016) (recognizing that BLM needed to prepare additional NEPA analysis prior to issuing new oil and gas leases for numerous resource values); BLM, Utah Wilderness Inventory 78 (1999) (the Horseshoe Canyon South unit – which encompasses parcels offered for lease – contains unique cultural resources and "is rich with paleontological remains") (attached); Utah Wilderness Inventory at 79 (the Labyrinth Canyon unit – which also encompasses parcels at issue – contains "diverse habitats, including the extensive riparian areas along the river and in major side canyons that support a large number of animal and plant species"); NPS Scoping Letter.

In sum, BLM has recognized that the parcels it is offering for oil and gas leasing and development are essentially worthless for that purpose. It is offering (or lifting out of suspension) 129 parcels but anticipates that – under the "best case" development scenario – only *fifteen* parcels will ever be developed and only *eight* of the fifteen will result in even modest oil and gas production – that is, only *six percent* of the parcels under BLM's "best case" scenario will provide an economic return to the American public.[6] Because the overwhelming majority, if not all, of these parcels do not contain oil and gas resources the speculative development thereof will unnecessarily degrade (if not entirely destroy) critical and irreplaceable environmental resource values, in violation of FLPMA and the MLA.

## V.    BLM's Rejection of the No Action Alternative Is Arbitrary and Capricious

BLM dismissed the No Action alternative without undertaking the "hard look" required by NEPA. By rejecting the No Action Alternative, BLM has effectively predetermined its leasing outcome because it only considered one NEPA alternative – leasing all parcels. This is unacceptable.

---

[6] This "positive" economic return is further reduced by the fact that BLM failed to analyze the social cost of carbon.

AR010507

First, BLM improperly dismissed the No Action alternative, contending that it would not meet the purpose and need for the Proposed Action. *See* Price EA at 43. The No Action alternative would in fact meet the broad purpose of the lease sale – it "will accomplish the project's intended purpose, [is] technically and economically feasible and will avoid or minimize adverse environmental impacts." *Roseburg Res. Co. et al.*, 186 IBLA 325, 326 (2015). The broad purpose of the lease sale is "to respond to the nominations and expressions of interest for oil and gas leasing on specific federal mineral estate." Price EA at 7. By analyzing the potential impacts of leasing the parcels at issue and deciding not to lease those parcels, BLM is in fact responding to the nominations and expressions of interest. There is no requirement that BLM must actually lease all parcels to fulfill the purpose of the lease sale. *See, e.g.*, *Hawkwood Energy Agent Corp. et al.*, 189 IBLA at 165 ("BLM's discretion allows it to choose not to lease lands for oil and gas purposes if other considerations, including aesthetic or scenic values, favor the other uses."); *Roy G. Barton*, 188 IBLA at 332 ("The BLM's discretion includes choosing not to lease lands for oil and gas purposes, if considerations such as wildlife, endangered species, recreational use, and aesthetic or scenic values favor other uses.") (internal quotations omitted). Furthermore, the No Action alternative is technically and economically feasible and will avoid adverse impacts to aesthetic, scenic, cultural, recreational, and wildlife values, among other values. Accordingly, BLM's conclusion that the No Action alternative would not meet the purpose of the lease sale is arbitrary.

Second, BLM cannot reject the No Action alternative based on its contention that, even if the parcels are not leased, energy development would nevertheless occur elsewhere with a similar impact to the environment. Price EA at 43. According to BLM,

> If the parcels are not leased, energy demand would continue to be met by other sources such as imported fuel, alternative energy sources (e.g., wind, solar), and other domestic fuel production. *This displacement of supply could offset any reductions in emissions and disturbance achieved by not leasing the subject tracts in the short term.*

*Id.* The Tenth Circuit has rejected this argument – known as "perfect substitution" – as unlawful and at odds with basic economic principles of supply and demand. In *WildEarth Guardians v. BLM*, the Tenth Circuit rejected the notion that even if BLM did not approve certain coal leases, the same amount of coal would be sourced from elsewhere at roughly the same cost and impact, and thus there was little difference between the Proposed Action and the No Action Alternative. 870 F.3d at 1235. The Court held that BLM's perfect substitution assumption violated NEPA because the agency "did not point to any information (other than its own unsupported statements) indicating that the national coal deficit of 230 million tons per year incurred under the no action alternative could easily be filled from elsewhere, or at a comparable price." *Id.* at 1234. Instead, "[t]he record contain[ed] only BLM's conclusions that the effect on demand would be 'inconsequential' with no reference to how, or if, it decided which demand-driving factors would prevail or why." *Id.* at 1235. This was not sufficient; there must be evidence upon which to base BLM's conclusions. *See id.* ("The evidence must be sufficient in volume and quality to sharply defin[e] the issues and provid[e] a clear basis for choice among options.") (internal quotations and citation omitted). "[T]he blanket assertion that coal would be substituted from other sources, unsupported by hard data, does not provide 'information sufficient to permit a reasoned choice' between the preferred alternative and no action alternative. It provided no information." *Id.*

16

Based on these facts, the court concluded BLM violated the two purposes of NEPA – to prevent uninformed agency decisions and provide adequate disclosure to allow public participation in those decisions. *Id.*

BLM's rejection of the No Action alternative in this lease sale suffers from similar problems. BLM provides no data to support its assumption that continued energy development elsewhere will "offset any reductions in emissions and disturbance achieved by not leasing the subject tracts." Price EA at 43. BLM has not pointed to or provided any record evidence for how and why the emissions and disturbances from these oil and gas lease parcels will be the same as energy developed elsewhere or through a different means – *i.e.* solar or wind. BLM cannot do so. Oil and gas development does not result in the same type or range of emissions as that which results from solar or wind energy development. Nor do those types of development necessarily result in the same level of surface disturbance. That surface disturbance would depend on site-specific factors including topography and soil type. For the same reasons discussed in *WildEarth Guardians*, BLM's assumptions are illogical, arbitrary and capricious.

## VI.    Air Quality

SUWA herein submits and incorporates in its entirety, including exhibits referenced therein, the comments prepared on behalf of SUWA by Ms. Megan Williams, an air quality expert. *See generally* Megan Williams, *Comments on the Air Quality Analysis for the September 2018 Oil and Gas Lease Sale Environmental Assessment (EA) in the Price and Richfield Field Offices, Dated July 2018, DOI-BLM-UT-0000-2018-0001-EA* (Aug. 6, 2018) (comments and exhibits thereto attached). Ms. Williams explains in detail numerous flaws in BLM's pre-leasing analysis, including but not limited to:

- BLM failed to present a representative assessment of the potential air quality impacts;

- BLM failed to identify adequate mitigation measures to address the adverse impacts shown in the Price EA;

- High background levels of air pollution in the area mean that even small increases in pollution could have significant impacts on overall air quality in the region;

- The emission inventory presented in the Price EA may underestimate emissions from the leasing activity;

- The air quality analyses relied upon in the Price EA are insufficient and predict significant impacts;

- The air quality analysis does not assure the prevention of significant deterioration of air quality; and

- The Price EA does not sufficiently address GHG emissions and potential climate change impacts from the proposed action.

17

*See generally id.* As explained by Ms. Williams, BLM has failed to analyze potential air quality impacts, in violation of NEPA, FLPMA, and the CAA.

## VII.    BLM Failed to Take a Hard Look at GHG Emission Impacts to Climate Change

BLM goes to great length to allege the difficult and speculative nature of analyzing potential impacts to climate change in an unabashed effort to avoid its NEPA obligation to take a hard look at these environmental consequences.[7] BLM arbitrarily refuses to take a hard look at and meaningfully analyze impacts of oil and gas leasing and development to climate change, including GHG emissions.

As a preliminary matter, BLM *can* analyze the social cost of carbon (along with other GHG emission impacts to climate change) but has elected not to do so in its oil and gas lease sale NEPA to avoid setting a "precedent." *See* E-mail exchange between Ms. Pierce, and Ms. Wysong 3 (Aug. 14, 2017) (BLM GHG E-mail Exchange) (attached).

Second, BLM's explanations for why it cannot calculate GHG emissions and/or analyze potential impacts to climate change have been solidly and repeatedly rejected by federal courts. *See San Juan Citizens Alliance v. U.S. Bureau of Land Mgmt.*, 2018 WL 2994406 at *10 (D.N.M. June 14, 2018) (BLM's reasoning for not analyzing indirect GHG emissions was "contrary to the reasoning in several persuasive cases that have determined that combustion emissions are an indirect effect"); *W. Org. of Res. Councils v. U.S. Bureau of Land Mgmt.*, 2018 WL 1475470 *13 (D. Mont. March 26, 2018) ("In light of the degree of foreseeability and specificity of information available to the agency while completing the EIS, NEPA requires BLM to consider in the EIS the environmental consequences of the downstream combustion of the coal, oil and gas resources potentially open to development under these RMPs."); *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) (stating that GHG emissions from the combustion of gas "are an indirect effect of authorizing this [pipeline] project, which [the agency] could reasonably foresee"); *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 2017 WL 5047901 *3 (D. Mont. Nov. 3, 2017) (stating that indirect effects from coal trains includes "the effects of the estimated 23.16 million metric tons of [GHG] emissions the Mining Plan EA concluded would result from combustion of the coal that would be extracted from the mine"); *Dine Citizens Against Ruing Our Env't v. U.S. Office of Surface Mine Reclamation & Enforcement*, 82 F.Supp. 3d 1201, 1213 (D. Colo. 2015) ("find[ing] that the coal combustion-related impacts of [the mine's] proposed expansion are an 'indirect effect' requiring NEPA analysis").

In *San Juan Citizens Alliance*, the court set aside BLM's leasing decision for failing to analyze all (or any) downstream emissions from oil and gas resources produced from the issued leases. 2018 WL 2994406 at *11. The court also found that BLM violated NEPA when it failed to analyze the impacts of GHG emissions to climate change. *Id.* By ordering BLM to analyze the indirect GHG emission impacts to climate change the court recognized that BLM *can* analyze those impacts but the agency had merely (unlawfully) elected not to do so. This holding is at direct odds with BLM's assertion in the Price EA that the agency "is disclosing the likelihood

---

[7] The Price EA does not even include a No Action Alternative section for GHG emissions or climate change. *See* Price EA at 51 (the "Impacts of No Action Alternative" in section 4.2.4.1 is blank).

AR010510

and potential magnitude of indirect and downstream GHG emissions *but is not able to disclose potential impacts to climate change from the estimated GHG emissions related to the proposed sale.*" Price EA at 51 (emphasis added). It also undercuts BLM's decision to analyze only indirect emissions for carbon dioxide and not, for example, more potent GHG emissions such as methane. *Id.* at 53 ("Indirect GHG emissions are only calculated for carbon dioxide based on combustion of the product.").[8]

The failure to analyze potential methane emissions is especially dumbfounding in light of its extremely high global warming potential. NEPA requires a "full and fair disclosure of significant environmental impacts," 40 C.F.R. § 1502.1, and federal agencies must rely on "[a]ccurate scientific analysis," which is "essential to implementing NEPA." *Id.* NEPA requires consideration of both short- and long-term effects." *Id.* § 1508.27(a). Here, BLM entirely fails to analyze methane emissions and instead attempts to avoid its "short- and long-term" NEPA analysis obligation by arguing that it is appropriate – at most – to analyze only the 100 year estimated global warming potential. *See* Price EA at 35. This both underestimates the global warming potential of methane and ignores the fact *BLM's* anticipated lifespan for each well is 15-20 years, not 100. *See* Price EA at 16 (BLM's RFD for each well is fifteen years). Despite its misplaced emphasis on the 100 year time frame, BLM does not analyze methane emission impacts for that time frame nor does it analyze the more important 20 year period, which has a significantly higher global warming potential, as recognized by the EPA:

> Because all [global warming potentials (GWP)] are calculated relative to $CO_2$, GWPs based on a shorter timeframe will be larger for gases with lifetimes shorter than that of $CO_2$, and smaller for gases with lifetimes longer than $CO_2$. For example, [methane], which has a short lifetime, *the 100-year GWP of 28-36 is much less than the 20-year GWP of 84-87.*

EPA, Greenhouse Gas Emissions, Understanding Global Warming Potentials, https://epa.gov/ghgemissions/understanding-global-warming-potentials (last updated Feb. 14, 2017) (emphasis added). The failure to take this into account undermines the accuracy and integrity of the global warming potential analysis. 40 C.F.R. § 1500.1(b); *id.* § 1502.24.

BLM's omission of impacts analysis related to methane is further troubling based on the findings of a recent study which concluded that the federal government, including BLM and EPA, has underestimated the amount of methane emitted by oil and gas operations by nearly sixty percent. *See* Envtl. Defense Fund, *New Study Finds U.S. Oil and Gas Methane Emissions Are 60 Percent Higher Than EPA Report* (June 21, 2018), https://edf.org/media/new-study-finds-us-oil-and-gas-methane-emissions-are-60-percent-higher-epa-reports-0. The new study estimates that the current leak rate from the oil and gas operations is 2.3 percent, compared to EPA's inventory estimate of 1.4 percent. *Id.* The study explains that although the percentages may appear small "the volume represents enough natural gas to fuel 10 million homes – lost gas worth an estimated $2 billion." *Id.* The prior estimate relied on by EPA was based primarily on "data collected in the early 1990s, pre-dating industry's increased use of horizontal drilling and hydraulic fracturing." Envtl. Defense Fund, *Measuring Methane: A Groundbreaking Effort to Quantify Methane*

---

[8] This is all the more arbitrary in light of BLM's recognition that GHG emissions including $CO_2$, $CH_4$, $N_2O$, and other less common gases contribute to and worsen climate change. *See* Price EA at 34.

AR010511

*Emissions from the Oil and Gas Industry* at *3 (attached). Three research findings came about as a result of this five-year study: (1) methane emissions are significant across the whole supply chain; production of oil and gas accounts for the largest share, (2) inventories systematically underestimate overall emissions, and (3) emissions from unpredictable, widespread sources are responsible for much, but not all, of the discrepancy. *Id.* at * 5. On the first point, the study concluded:

> [P]roduction and gathering emissions were found to be much higher than reported. In particular, gathering stations were found to be a major source of overlooked emissions. For well pads, site-level measurements indicate significant emissions have gone unreported. Upstream emissions are not limited to natural gas wells or hydraulically fractured wells – in fact, emissions from conventional and unconventional oil-producing wells also appear to be high.

*Id.* *6. Regarding the second finding, the study demonstrated that the typical "bottom-up" approach – which is similar to the approach used by BLM in past leasing documents – when used in isolation from other methods, "can bias the emission estimates low." *Id.* at *7.

> It is difficult to accurately quantify total emissions at a given site based on only equipment-level measurements as sources may be overlooked, unsafe to measure, or exceed the maximum emission rate of the measurement technique.

*Id.*

Third, BLM's cumulative impact analysis for GHG emissions repeats the mistakes it made in *San Juan Citizens Alliance*. Here, BLM concluded that the No Action Alternative would vary, at most, only a little from the Proposed Action with regard to GHG emissions. *See* Price EA at 63 ("It is unknown if the No Action Alternative would result in decreased emissions, thus a reduced global climate impact."). BLM also argues that it cannot translate the proposed action into effects on climate change globally, regionally, or locally. *Id. See also id.* at 53 ("it is not possible to identify specific local, regional, or global climate change impacts based on potential GHG emissions from any specific project's incremental contributions to the global GHG burden."). The court in *San Juan Citizens Alliance* rejected these exact arguments. *See* 2018 WL 2994406 at *14. Moreover, the court chided BLM for relying on "outdated scientific analyses" and ordered the agency to rely on the best available scientific information in its curative NEPA – another mistake BLM has made here. *See id.* at *15; *see also* Price EA at 34 (relying on the 2007 IPCC report rather than the 2013 report); *id.* (relying on an outdated 2006 National Academy of Sciences report). BLM does not incorporate more up to date climate change studies including the recent thirteen agency Climate Science Special Report. *See* U.S. Global Change Research Program, Climate Science Special Report, Fourth National Climate Assessment, Volume 1 (2017) (attached). *See also San Juan Citizens Alliance*, 2018 WL 2994406 at *15 (citing to this report as something BLM must rely on as best available scientific information).[9]

---

[9] Moreover, to the extent BLM analyzes any impacts at all (direct, indirect, or cumulative) it does so for only seven wells despite the fact that the agency anticipates the drilling of at least 11 wells. *See* EA at 16 (anticipating "11 wells drilled over 15 years, seven of which would be producing wells"). *But see id.* at 53 (to calculate downstream annual emissions BLM used "an RFD of seven producing wells for the lease sale and emission factors from the EPA").

AR010512

Finally, as discussed *supra*, BLM *can* analyze the social cost of carbon (along with other GHG emission impacts to climate change) but chose not to do so to avoid setting a "precedent." Further, BLM's rationale for not analyzing the social cost of carbon – that the agency "is not engaged in a rulemaking" process – is, as the agency itself has recognized, an arbitrary rationale which has been rejected by courts:

> The "only meant for rule-making" response was invalidated by a court decision and can no longer be considered an adequate response. That is why I agree with the comment [that BLM's proffered reason for not analyzing the social cost of carbon was inadequate]; our response would not hold up in court if the previous ruling were to be cited.

BLM GHG E-mail Exchange 2 (e-mail from Ms. Julie Suhr Pierece, BLM Great Basin Socioeconomic Specialist). *See also High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F.Supp. 3d 1174 (D. Colo. 2014) (rejecting BLM's "only meant for rule-making" argument with regard to the social cost of carbon). In fact, BLM's social cost of carbon expert has recognized that it is "quite easy" to include a discussion regarding the social cost of carbon if "[GHG] emission figures are available (in tons)" – which they are and can be calculated, as openly acknowledged by BLM. BLM GHG E-mail Exchange at 2. It is immaterial that the social cost of carbon concept is no longer part of BLM's policy guidance; NEPA requires that this analysis be completed prior to leasing.

## VIII.  BLM Failed to Take a Hard Look at Direct, Indirect and Cumulative Impacts, in Violation of NEPA

NEPA requires BLM analyze all potential direct, indirect and cumulative impacts that may result from implementation of a proposed actions. Direct impacts are those "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect impacts are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." *Id.* § 1508.7. Here, BLM has failed to analyze potential direct, indirect and/or cumulative impacts of its leasing decision to water usage and quality related to hydraulic fracturing during well development, its December 2018 competitive oil and gas lease sale which includes parcels immediately adjacent to parcels offered at BLM's September 2018 sale; lands with wilderness characteristics, and endemic bee species and plant species on which they rely.

### A.  Water Usage and Water Quality and Hydraulic Fracturing

NEPA requires BLM to analyze the impacts of hydraulic fracturing, including water usage and the environmental consequences of that usage. *See, e.g.*, *San Juan Citizens Alliance*, 2018 WL 2994406 at *17-19. In the present case, BLM recognizes that *all* of the wells will be developed through hydraulic fracturing (or fracking). *See* Price EA at 16 ("Well completion involves

21

AR010513

perforating the production casing in target zones, followed by hydraulic fracturing (fracking) of the formation."). BLM further explains that hydraulic fracturing has resulted in a "dramatic increase in domestic oil and gas production nationally" but "along with the production increase, fracking activities are suspected of causing contamination of fresh water by creating fluid communication between oil and gas reservoirs and aquifers." *Id.* at 17. Despite this recognized and reasonably foreseeable threat to water resources, BLM does not analyze potential impacts to water quality, in violation of NEPA. *See* Price EA at 187-90 (water resources are identified as present but not impacted to a degree warranting detailed analysis).[10]

In *San Juan Citizens Alliance*, the court set aside BLM's oil and gas leasing decision and soundly rejected the agency's arguments that it could not analyze impacts to water resources at the leasing stage. 2018 WL 2994406 (D.N.M. 2018). There, BLM had identified the primary aquifers in the area, described their depth, formation, thickness, recharge areas, transmissivity, and quality. *Id.* at *17. BLM also recognized that hydraulic fracturing uses significant quantities of water, including ground and surface. *Id.* at *18. BLM, however, refused to calculate the amount of water potentially used or needed (surface or ground) for well development, arguing that that information was too speculative at the lease sale stage. *Id.* The court unequivocally rejected that argument, noting that BLM had the ability to quantify water usage at this stage (as evidenced by BLM having done so in similar circumstances). The court held that BLM needed to both quantify the amount of water which would be used and analyze the effect of that water usage on the environment to satisfy NEPA's hard look requirement. *Id.* at *19.

In the present case, BLM has done *significantly less* than it did in *San Juan Citizens Alliance*. BLM has failed to establish even baseline data, let alone use that data to analyze potential environmental impacts. The EA is silent with regard to aquifers, including their depth, formation, thickness, recharge areas, transmissivity, or quality. Instead, BLM concluded that detailed analysis was unwarranted for groundwater resources because – without providing any record support – "[t]he measures required (spill containment systems, casing integrity testing, pit lining), etc. for all wells drilled in Utah, fracked or not, are adequate to prevent fracking fluids as well as hydrocarbons and produced water from the wells to prevent ground/surface water contamination." Price EA at 189. BLM has not collected or analyzed the requisite baseline data for, among other resources, groundwater aquifers and thus does not know whether best management practices will protect those resources.

The BLM *Price* field office has analyzed water quantity and quality impacts in past leasing EAs, undercutting the unsupported assertion made now that water resources is not an issue worth analyzing in detail. *See, e.g.*, BLM, November 2013 Oil and Gas Lease Sale, DOI-BLM-UT-G021-2013-0021-EA at 12-16, 35-36, 43 (Aug. 2013) (2013 PFO Leasing EA) (attached); BLM, November 2014 Oil and Gas Lease Sale, DOI-BLM-UT-G021-2014-029-EA at 10-13, 23-24 (Aug. 2014) (2014 PFO Leasing EA) (attached). The Price EA does not even contain the basic data or analyses provided in those prior leasing EAs. Further undercutting BLM's argument is the fact that BLM regularly identifies groundwater aquifers, including much of the data it now

---

[10] BLM's decision not to analyze impacts of hydraulic fracturing to water resources, including usage, is in conflict with the agency's – unsupported – assertion that the Price EA "considers the impacts of all reasonably foreseeable oil and gas development regardless of the specific technology used, including hydraulic fracturing." Price EA at 17.

AR010514

says it cannot produce. *See* Moab MLP FEIS, Map 3-43 (depicting the Dakota Aquifer)[11]; Moab MLP FEIS at Map 3-42 (depicting potential unconsolidated aquifers[12]; BLM Map 1, Groundwater System 2015, December 2017 Lease Sale (map depicting public water reserves and source protection zones prepared for the December 2017 lease sale) (attached); BLM Map 2, Groundwater System 2015, December 2017 Lease Sale (same) (attached).

Assessing potential impacts to ground and surface water quality and quantity is especially important in Utah and the arid San Rafael Desert, which have been in a drought cycle for more than a decade, making water quality and quantity a critical issue, especially in the face of ongoing climate change. *See, e.g.*, NPS, Series: Climate Change in the Southwest, Climate Change in the Southwest – Potential Impacts, https://nps.gov/articles/climate-change-in-the-southwest-potential-impacts.htm ("The rivers, streams, springs, wetlands, reservoirs, and lakes of the Southwest are sensitive to changes in timing, amount, and predictability of precipitation.") (last visited Aug. 1, 2018). The U.S. National Climate Assessment explained that "[t]he Southwest [including Utah] is the hottest and driest region in the United States, where the availability of water has defined its landscape, history of human settlement, and modern economy." U.S. National Climate Assessment, Climate Change Impacts in the United States, 463 (revised Oct. 2014) (attached).

In addition, BLM failed to identify the quantity of water that will be used in the fracking process, the source of that water, or the environmental impacts of removing that water for oil and gas development.[13] The Price EA is silent with regard to these basic, but important, factors, let alone

---

[11] Available at https://eplanning.blm.gov/epl-front-office/projects/lup/68430/88040/105384/Chapter3_Map3-43_DakotaAquifer.pdf.

[12] Available at https://eplanning.blm.gov/epl-front-office/projects/lup/68430/88039/105383/Chapter3_Map3-42_UnconsolidatedAquifers.pdf.

[13] Significant amounts of public information on hydraulic fracturing, water usage, and potential impacts to water resources and other environmental values such as wildlife related to oil and gas development activities is available to BLM (including information that may not be readily available to the general public, including SUWA). For example, the United States Geological Survey (USGS) maintains a public database of groundwater aquifers and potential depletion rates. *See, e.g.*, USGS, Utah Water Science Center, Groundwater Information and Data, https://ut.water.usgs.gov/infodata/groundwater.html (last updated March 2017). *See also* Utah Dept. of Natural Res. *et al.*, Groundwater Conditions in Utah, Spring of 2017, Cooperative Investigations Report No. 58 (2017) (attached). The Utah Division of Water Rights maintains databases related to well drilling, geological well logs, USGS observation wells, groundwater management, and well drawdown hydrogeology, among others. *See* Utah Div. of Water Rights, Water Well Drilling Information, https://waterrights.utah.gov/wellinfo/default.asp (revised Sept. 1, 2010). In fact, BLM itself has recognized that it is "critical" that the agency analyze impacts regarding the "effects of hydraulic fracturing and energy development on ground water and drinking water supplies and water quality." BLM, Water Resource Program Strategy, Focus on Integration, 2015-2020 at 2 (Sept. 2015) (attached). Utah BLM also maintains much of this information on its website, including *A Framework for Analyzing the Hydrologic Condition of Watersheds* (June 1998) (attached) – report prepared by the Forest Service and BLM. *See* BLM, Water, Utah, https://blm.gov/programs/natural-resources/soil-air-water/water/utah (last visited Aug. 1, 2018). Moreover, the EPA has prepared a detailed report on hydraulic fracturing for oil and gas and explored potential impacts to water resources. *See* EPA, Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States, EPA-600-R-16-236Fa (Dec. 2016) (attached). EPA concluded that "[h]ydraulic fracturing used a median of 1.5 million gallons (5.7 million liters) of water per well from 2011 through early 2013." *Id.* at 4-1. This included both ground and surface water. *Id.* Notably, EPA concluded that hydraulic fracturing is more likely to have "severe impacts" when certain circumstances exist, including: "[w]ater withdrawals for hydraulic fracturing in times or areas of low water availability, particularly in areas with limited or declining groundwater resources." EPA, Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water

AR010515

the more complex factors such as groundwater depletion rate modeling. For example, the EA does not analyze, among other things:

- The current status and conditions of the groundwater in the region and potential impacts to that groundwater both in terms of quality and quantity.

- The impact to impaired waterbodies, referred to as 303(d) streams, including the San Rafael River[14], and impacts to streams, washes and springs including Old Woman Wash, Cottonwood Wash, and Temple Wash;

- How much water will be needed either individually or cumulatively to develop the Protested Parcels; and

- The source of water necessary to develop the wells, as well as the direct, indirect, or cumulative impact of that water withdrawal, which is estimated by EPA to be as much as 1.5 million gallons per well, to wildlife, including listed fish species and animals that depend on seeps, springs, and riparian areas.

Accordingly, BLM violated NEPA by failing to analyze potential impacts to groundwater and regional water sources, failing to identify the source of water for developing the leases at issue, failing to quantify water usage or analyze potential impacts to water resources from the use of hydraulic fracturing.

## B. The December 2018 Lease Sale

BLM plans to offer at the September 2018 lease sale eleven parcels, consisting of 18,628 acres, for oil and gas development in Utah County that overlap or are near the Price River and immediately adjacent to Carbon County. *See* SLFO EA at 113, Fig. 1. *See also* SUWA MAP – September / December 2018 Lease Sale (attached). At the December 2018 lease sale, BLM plans to offer a similarly large block of parcels immediately adjacent to the September 2018 parcels but in the Carbon County side of the county line and also adjacent to or near the Price River. *See* Utah December 2018 Carbon County Oil and Gas Lease Sale Parcels, https://eplanning.blm.gov/epl-front-office/projects/nepa/110582/151362/185578/Utah_December_2018_Carbon_County_Oil_and_G

---

Cycle on Drinking Water Resources in the United States, Executive Summary, EPA-6001-R-16-236ES, at 1 (Dec. 2016) (attached). *See also* EPA, Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States, Appendices, Appendix B at B-3, tbl. B-1 (Dec. 2016) (concluding that 251 million gallons of water was used per year for hydraulic fracturing in Utah) (attached).

[14] BLM in the IDT checklist briefly discusses the San Rafael River 303(d) impairment but – inaccurately – concludes that the prepared TMDL applies to *both* impairments (*i.e.*, total dissolved solids (TDS) and OE Bioassessment). *See* EA at 190. The TMDL applies only to the TDS impairment. *See* Div. of Water Quality, Price River, San Rafael River, and Muddy Creek TMDLs for Total Dissolved Solids, West Colorado Watershed Management Unit, Utah at 1 (2004) ("the focus of this TMDL study is TDS") (attached). The Clean Water Act requires the preparation of a separate TMDL for *each* impairment. *See, e.g.*, 40 C.F.R. § 130.7. Here, the OE Bioassessment was first identified in 2010 – six years *after* EPA approved the TDS TMDL for the San Rafael River. *See* Utah Div. of Water Quality, Chapter 3: Rivers and Streams Assessments, 2016 Final Integrated Report at 14/49 (2016) (excerpts attached).

AR010516

as_Lease_Sale_Parcels.pdf. *See also* SUWA MAP – September / December 2018 Lease Sale. BLM must analyze together the impacts of these two projects and cannot divorce them and their impacts, as it has done here. *See* 40 C.F.R. § 1508.7 ("Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other . . . present, and reasonably foreseeable future actions"); *Id.* § 1508.8 ("Indirect effects" are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.").

Further, NEPA requires BLM to consider and disclose the impacts of these proposed lease parcels in a single NEPA document since they qualify as cumulative actions and/or similar actions. *See* 40 C.F.R. § 1508.25. Actions are cumulative when "viewed with other proposed actions have cumulatively significant impacts." *Id.* § 1508.25(a)(2). "Similar actions" are those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." *Id.* § 1508.25(a)(3). Here, these two blocks of lease parcels qualify as both cumulative and similar actions. For example, the parcels are adjacent to the Price River which BLM has identified as suitable for inclusion in the WSR System, as discussed *infra*. Also, the parcels are in greater sage-grouse habitat, including PHMA, as discussed *infra*. The development of the parcels for oil and gas will result in GHG emissions, air quality, and other impacts that may have cumulatively significant impacts – impacts not analyzed by BLM. Moreover, the proposals have the *exact same* purpose and need *i.e.*, to promote energy development on public lands.

Finally, BLM cannot reach a Finding of No Significant Impact without properly analyzing the cumulative impacts of leasing this large block of public land. NEPA's significance factors require BLM to analyze "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by . . . breaking [an action] down into small component parts." 40 C.F.R. § 1508.27(b)(7). BLM has not analyzed the cumulative impacts of these two proposals and there is no record evidence that BLM has even considered, let alone analyzed, whether the significance intensity factors have been triggered.

### C.  Lands with Wilderness Characteristics

BLM failed to analyze potential direct and reasonably foreseeable impacts to lands with wilderness characteristics (LWC). The majority of parcels in the Price field office overlap with LWC, as recognized in the Price EA. *See* Price EA at 36 ("All or portions of 67 nominated parcels, totaling approximately 110,364 acres, overlap [LWC]."). Several of the parcels overlap LWC identified by BLM *after* completion of the Price RMP and thus "have not been analyzed in a land use plan." Price EA at 38. However, with this basic information in hand, BLM's impact analysis provides no meaningful information on which to make an informed leasing decision. For example:

- BLM does not calculate the amount of acreage of LWC potentially lost to oil and gas exploration and development. *See* EA at 55-56. Utah BLM, including the Price field

AR010517

office, has performed this basic calculation in most, if not all, of its past leasing EAs prepared in the last decade. *See, e.g.*, 2013 PFO Leasing EA at 38 ("it is anticipated that at a minimum approximately six acres would be disturbed within the parcel as the result of the placement of a single well pad and access road"); 2014 PFO Leasing EA at 26 (same).

- BLM does not analyze whether (and how) oil and gas exploration and development will impact an LWC units wilderness qualities in light of Manual 6310 and 6320. *See generally* BLM, Manual 6310 – Conducting Wilderness Characteristics Inventory on BLM Lands (Public) (March 15, 2012) (Manual 6310) (attached); BLM, Manual 6320 – Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process (Public) (March 15, 2012) (attached). For example, Manual 6310 requires BLM, in the wilderness characteristics inventory process, to account for "outside human impacts," which "should be noted in the overall inventory area description and evaluated for its direct effects on the area." Manual 6310 § 06.C.2.b.iii. BLM also must account for "the sights and sounds from outside the inventory area on the opportunity for solitude if these impacts are pervasive and omnipresent." *Id.* § 06.C.2.c.i. And BLM must define the inventory unit boundary to exclude "substantially noticeable human-caused impacts." *Id.* § 06.C.3. Here, BLM has failed to consider these factors as they may impact wilderness characteristics or future inventories for the BLM-identified LWC in the San Rafael Desert that will be destroyed by oil and gas development. As noted, BLM failed to perform basic acreage impact calculations, let alone analyze whether the direct impacts of road and wellpad development and subsequent drilling and production will have broader impacts to wilderness-caliber lands including diminished naturalness and opportunities for solitude.

BLM's failure to analyze impacts to LWC is compounded by the agency's previous statements that "[p]rior to allowing any action on these leases [*i.e.*, the suspended leases], the BLM *must* analyze the impacts of leasing on [LWC]." BLM, San Rafael Desert Master Leasing Plan Preliminary Alternatives 4 (2016) (attached). In fact, as highlighted in SUWA's scoping comments, a primary reason underlying BLM's decision to initiate the San Rafael Desert MLP was to analyze impacts to wilderness characteristics, further undermining the agency's cursory review of this issue now. 81 Fed. Reg. at 31253.

### D. Pollinators

BLM did not take the requisite hard look at pollinators when it ignored indirect impacts and improperly discounted potential cumulative impacts to pollinators.

Ninety-four of the proposed lease parcels (or suspended parcels) are in the heart of the San Rafael Desert, which contains an astonishingly diverse array of native and endemic bees anywhere in North America. *See generally* Terry Griswold *et al.*, *The Bees of the San Rafael Desert Implications for the Bee Fauna of the Grand Staircase-Escalante National Monument*, *in* Learning from the Land, Grand Staircase-Escalante National Monument Science Symposium Proceedings, Cedar City, Utah (1997) (attached). Researchers have found forty-nine different genera and 333 different species in this area. *Id.* at 181. This is nearly half of all genera known in

AR010518

the United States. *Id.* at 176. This is also more genera and nearly as many species of bees as in all of New England. *Id.* at 175. Forty-eight of these species were new to science and sixty-eight of these species occur, as far as is known, only in the Canyonlands section of the Colorado Plateau. *See* Declaration of Dr. Vincent J. Tepedino, ¶ 6, *S. Utah Wilderness Alliance v. Bankert*, Case No. 2:07cv00292 (TC) (Oct. 9, 2007) (attached).

Plants and pollinators have a mutualistic relationship – for certain plants "pollinators are as critical as light and water" and vice versa. Carol Ann Kearns & David William Innouye, *Pollinators, Flowering Plants, and Conservation Biology*, 47 BioSceince 297, 297 (1997) (attached). Indeed, "[t]he ultimate fate of many plants may depend on preserving their mutualistic relationships with pollinators and with the web of organisms that affect both plant and pollinator." *Id.* at 298; *cf.* Matthew B. Lewis, *Roads and the Reproductive Ecology of* Hesperidanthus suffrutescens*, an Endangered Shrub* 31-32 (2013) (noting the essential role native pollinators play in the conservation of an endangered shrub in Utah) (attached). Because of the mutualistic relationship between pollinators and certain plants, any analysis of leasing and development must be broad and holistic and consider impacts to *both*.

Most of the bees found in the San Rafael Desert make their homes and nests in the ground. Decl. of Dr. Vincent J. Tepedino, ¶ 6. Many of them visit, for pollination, only flowers of one or a few closely-related plants. *Id.* This makes these bees extremely vulnerable to ground disturbing activities. *See id.*

Instead of a comprehensive analysis of potential impacts to pollinators and plants, BLM ignores important indirect impacts. *See* Price EA at 56 (discussing primarily direct impacts to pollinators). Bees are affected by decreasing water availability and alterations to natural water supply. Kearns & Innouye, *supra*, at 299. As discussed *supra*, the leases at issue in this sale will be developed via hydraulic fracturing. That hydraulic fracturing process requires large water withdrawals. Especially in the arid San Rafael Desert, any reduction in water supply could have severe impacts on pollinators as well as the plants upon which those pollinators rely. To properly analyze impacts to the diverse array of important pollinators, BLM must account for the impacts that would result from declining water availability and potential alteration to water supply.

Similarly, BLM fails to account for cumulative impacts to pollinators – those impacts "which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. The Price EA acknowledges that oil and gas development will likely occur on both state and BLM land and that recreation in the area will likely expand, including OHV travel off existing roads. Price EA at 64. However, BLM ignores the impacts to pollinators from ongoing activities like grazing. Grazing in pollinator habitat changes nesting sites, water resources and vegetation. Kearns & Inouye, *supra*, at 298. "Trampling of vegetation by livestock can directly destroy the nests of ground-nesting species and can compact the soil, constraining nest formation." *Id.* at 299. Many of the San Rafael Desert's bee species are ground-nesting, making them especially vulnerable to impacts from grazing. BLM must fully account for potential cumulative impacts to pollinators from a combination of ongoing grazing, expected increased recreational use – including expanded OHV use both on and off existing roads – and anticipated oil and gas development via hydraulic fracturing. It has not done so.

AR010519

BLM cannot rely on its unenforceable lease notice and voluntary mitigation measures to supplant a thorough cumulative impact analysis. The Pollinator Lease Notice – UT-LN-156 – simply encourages operators to minimize ground disturbance "where feasible" and to revegetate with pollinator-friendly native plants. Price EA at 56. The lease notice is not legally enforceable. Also, neither the lease notice nor the listed mitigation measures address things like increased use of natural roads which creates additional dust that interferes with pollinators or habitat fragmentation from construction of new roads or expected travel off existing roads. Furthermore, BLM points to no record evidence to support its assumption that the lease notice and voluntary mitigation measures would minimize cumulative impacts, let alone improve pollinator habitat. In fact, studies indicate that decreased pollinator diversity is correlated with oil and gas development, thereby undermining BLM's conclusion that its mitigation measures protect and improve pollinator habitat. *See, e.g.*, Steve Boyle, Richard Alward & Vincent Tepedino, *A Study of the Impacts of Oil & Gas Development on* Phacelia submutica *and* Sclerocactus spp., Technical Report (2015) (attached). BLM must fully analyze potential cumulative impacts rather that short change its analysis by relying on unproven mitigation measures.

### E.  Viewshed Analyses, Including Impacts to the Glen Canyon NRA

BLM's viewshed analysis relied on outdated information and failed to take a hard look at impacts to Glen Canyon National Recreation Area (NRA) and Goblin Valley State Park. First, BLM's baseline visual resource dated relied on the outdated 2008 RMPs rather the 2011 Visual Resource Inventories (VRIs), which replaced the 2008 VRMs. BLM states: "VRM classes for the parcels included in this analysis were last established in the 2008 [Price and Richfield RMPs]." Price EA at 40. The VRM objectives of the Price and Richfield RMPs is provided to serve as the baseline for analysis and comparison. *See id.* at 41-42, tbl. 3-10. For impacts analysis, BLM states: "[s]uch proposed development and modifications to the existing landscape [from the development of the offered leases] would be allowable so long as it conforms to the VRM Class objectives established in the 2008 Approved RMPs." *Id.* at 58. For each parcel brought forward for detailed viewshed analysis BLM further states that development thereon is lawful because it complies with the 2008 VRM management objectives. *See id.* at 58-60. These statements and conclusions are arbitrary since they overlook the critical fact that in 2011 BLM updated its VRM information for the *entire* Price and Salt Lake field offices. *See* BLM, Visual Resource Inventory, Price Field Office (Nov. 2011) (VRI and attachments thereto attached) (Price VRI); BLM, Visual Resource Inventory, Salt Lake Field Office (Nov. 2011) (Salt Lake VRI) (VRI and attachments thereto attached). Both VRIs explain that they "will serve as the baseline information for assessing potential effects to visual resources of future proposed development activities." Price VRI at 1-1; Salt Lake VRI at 1-1 (same). BLM's failure to analyze this significant new information and how it impacts the leasing decision violates NEPA and FLPMA.

Second, in the Price EA BLM arbitrarily selected Key Observation Points (KOPs) and analyzed impacts only to the "Horseshoe Canyon [extension of Canyonlands National Park] and the Green River" from four parcels and one suspended but not issued parcel. Price EA at 58. No rationale is provided for the selection of these points. *See id.* at 57-60. Notably, BLM does not explain why

AR010520

only four parcels (plus the one suspended parcel) provide sufficient baseline data to assess visual impacts of issuing ninety-four parcels for oil and gas development, nor does BLM explain why five KOPs are sufficient when the agency anticipates the drilling and development of *eleven* wells (presumably from eleven leases, although this point also is never clarified by BLM). Moreover, BLM barely mentions, let alone analyzes impacts to Glen Canyon NRA, with regard to visual resource impacts even though the NRA is located only a few miles from the large block of parcels in the San Rafael Desert.[15] The Glen Canyon NRA will be impacted by the development of wells on leases nearest the park. *See* SUWA Map – Glen Canyon NRA Viewshed (attached).[16] BLM also failed to analyze impacts to Goblin Valley State Park, which would be visually impacted by development of the offered leases. *See* SUWA Map – Goblin Valley State Park Viewshed (attached).[17] Instead, BLM concluded – without record support – that because Goblin Valley is six miles from the nearest parcel "development on the parcel would not be a substantive visual impact" and regardless, the development would be within the *2008 VRM* objectives. EA at 193.

### IX.    Failed to Take a Hard Look at the Price River "Suitable" Segment

The Utah County parcels near the Carbon County line are subject to the decades-old Pony Express RMP. *See* BLM, Record of Decision for the Pony Express Resource Management Plan and Rangeland Program Summary for Utah County (Jan. 1990) (Pony Express RMP) (attached); BLM, Proposed Pony Express Resource Management Plan and Final Environmental Impact Statement (Sept. 1988) (Pony Express FEIS) (attached). The Pony Express RMP/FEIS never identified or analyzed any stream or river, including the Price River, for inclusion in the National Wild and Scenic Rivers System (WSR System). *See generally id.* However, in 2008, the BLM Price field office determined that the segment of the Price River in Utah County qualified as "eligible" *and* "suitable" for inclusion in the WSR System. *See* Price FEIS, Map 2-67 (attached). The Price RMP states that rivers determined suitable will be managed in a manner that "maintain[s] the free-flowing character, preserve[s] or enhance[s] the outstanding remarkable values, and allow[s] no activities within the river corridor that will alter [its] tentative classification." Price RMP at 140. This includes the objective to apply management decisions "that will protect the tentative classification of wild, scenic, or recreational suitable river segments." *Id.* The Price River is tentatively classified as "scenic" and "recreational," depending on the segment. *See* Price FEIS, Map 2-67.

BLM has failed to take a hard look at this factor, including whether to supplement its NEPA analysis to account for this significant new information. *See* SLFO EA at 143 (erroneously concluding that "[t]he lease parcels do not overlap any suitable WSR segments"). BLM must defer the parcels and supplement its NEPA analysis prior to issuing its leasing decision. *See S. Utah Wilderness Alliance v. Norton*, 457 F.Supp. 2d 1253, 1255 (D. Utah 2006) (explaining that if the existing NEPA analysis does not adequately cover the proposed action BLM cannot offer lease parcels "until additional NEPA documentation is prepared"). Further,

---

[15] BLM mentions the Glen Canyon NRA once – and in so doing makes the remarkable and entirely false statement that the NRA is located "over 30 miles from" the closest lease parcel. PFO EA at 193. The NRA is less than five miles from the nearest parcel.

[16] The viewshed data for this map was generated using a 100' elevation point, the approximate height of a drill rig.

[17] The viewshed data for this map was generated using a 100' elevation point, the approximate height of a drill rig.

AR010521

Whenever a proposed action may adversely impact or be inconsistent with
identified WSR values . . . or whenever a discretionary action may change the
tentative classification . . . of a river determined to be eligible for inclusion into
the [WSR] System, the NEPA analysis for such actions will have the following
characteristics:

> 1. If the NEPA document for the proposed action is an EA, the BLM
>    *will* provide at least a 30-day public comment period.
>
> 2. [T]he BLM should *consider an alternative* that would delay
>    approval of the proposed action pending a suitability determination
>    through the BLM planning process, including a plan amendment.

BLM, Manual 6400 – Wild and Scenic Rivers – Policy and Program Direction for Identification,
Evaluation, Planning, and Management (Public) § 3-8 (July 13, 2012) (emphases added)
(attached). For leasable minerals, "consideration should be given to applying conditions
necessary to protect the values of the river corridor in the event it is subsequently included in the
National System." *Id.* at 3-9.

In the present case, BLM has failed to identify WSR as a potential issue, let alone analyze
potential impacts to the Price River's tentative classification or outstandingly remarkable values.
Moreover, BLM's rush for "energy dominance" has included the reduction or elimination of
public involvement in the lease sale process; no thirty-day comment period was provided for.
Also, as discussed *supra*, BLM considered only the no action and proposed action alternatives
and did not consider any middle-ground alternatives including one which would "delay approval
of the proposed action pending a suitability determination."

## X.      BLM's Treatment of Cultural Resources Violated the NHPA and NEPA

As BLM is aware, much of the land implicated in this lease sale is rich in cultural resources.
BLM has dual obligations when considering the impacts of its undertakings on cultural
resources. Pursuant to Section 106 of the NHPA, BLM must "make a reasonable and food faith
effort" to identify cultural resources that may be affected by an undertaking. 36 C.F.R. §
800.4(b)(1). Pursuant to NEPA, BLM must take a "hard look" at the effects of the proposed
action. *Silverton Snowmobile Club v.*, 433 F.3d at 781. BLM must comply with both statutes at
the leasing stage.

### A.  BLM's Treatment of Cultural Resources Violated the NHPA

Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the
preservation and protection of America's historic and cultural resources. *See* 54 U.S.C. §
300101. The heart of the NHPA is Section 106, which prohibits federal agencies from approving
any federal "undertaking" unless the agency takes into account the effects of the undertaking on
historic properties that are included in or eligible for inclusion in the National Register of
Historic Places. 54 U.S.C. §§ 306108, 300320; *see also Pueblo of Sandia v. United States*, 50

AR010522

F.3d 856, 859 (10th Cir. 1995). Section 106 is a "stop, look, and listen provision" that requires federal agencies to consider the effects of their actions and programs on historic properties and sacred sites before implementation. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

To adequately "take into account" the impacts on archeological resources, all federal agencies must comply with binding Section 106 regulations established by the Advisory Council on Historic Preservation (Advisory Council). Under these regulations, the first step in the Section 106 process is for an agency to determine whether the "proposed [f]ederal action is an undertaking as defined in [Section] 800.16(y)." 36 C.F.R. § 800.3(a). Undertakings include any permit or approval authorizing use of federal lands. *Id.* § 800.16(y). If the proposed action is an undertaking, the agency must determine "whether it is a type of activity that has the potential to cause effects on historic properties." *Id.* § 800.3(a). An effect is defined broadly to include direct, indirect and/or cumulative adverse effects that might alter the characteristics that make a cultural site eligible for listing in the National Register of Historic Places. *See id.* § 800.5(a)(1); *id.* § 800.16(i); 65 Fed. Reg. 77,698, 77,712 (Dec. 12, 2000).

The agency next "[d]etermine[s] and document[s] the area of potential effects" and then "[r]eview[s] existing information on historic properties within [that] area." 36 C.F.R. § 800.4(a)(1)-(2). "Based on the information gathered, . . . the agency . . . shall take the steps necessary to identify historic properties within the area of potential effects." *Id.* § 800.4(b). "The agency shall make a reasonable and good faith effort to carry out appropriate identification efforts." *Id.* § 800.4(b)(1). If the undertaking is a type of activity with the potential to affect historic properties then the agency must determine whether in fact those properties "may be affected" by the particular undertaking at hand. *Id.* § 800.4(d)(2).[18] If the agency official concludes that there *may be* an adverse effect, it engages the public and consults further with the state historic preservation officer, Native American tribes, any consulting parties, and the Advisory Council in an effort to resolve the adverse effects. *Id.* §§ 800.5(d)(2), 800.6.

As BLM acknowledges, "[o]nce the lease has been issued, the lessee has the right to use as much of the leased land as necessary to explore for, drill for, extract, remove, and dispose of oil and gas deposits located under the leased lands," subject to limited restrictions. Price EA at 11. Leasing is the point at which BLM makes an irretrievable commitment of resources such that BLM can no longer preclude surface disturbing activities on lease parcels. *See, e.g., Union Oil Co. of Cal et al.*, 102 IBLA at 189. Accordingly, BLM must fully comply with the NHPA at the leasing stage. It has failed to do so here.

SUWA is a consulting party for the September 2018 lease sale. *See* Letter from Joelle McCarthy, Acting Field Manager, BLM, to Laura Peterson, SUWA (May 2018) (attached). BLM provided SUWA and other consulting parties with a cultural resources report that included a determination that the proposed lease sale would have "no adverse effect" on cultural resources. *See* BLM, Price Field Office and Utah State Office, Cultural Resources Literature Review for September 2018 Price Field Office Oil and Gas Lease Sale 71 (May 2018) (Cultural Report) (attached). On

---

[18] BLM may also determine that there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, at which point it consults with the State Historic Preservation Officer and notifies relevant Native American tribes of its conclusion. *Id.* § 800.4(d)(1).

AR010523

July 2, 2018, SUWA submitted comments on BLM's determination of no adverse effect and disagreed with its determination. *See* SUWA, Comments on the Color Country District Determination of No Adverse Effect for the September 2018 Oil and Gas Lease Sale (July 2018) (attached). On July 26, BLM responded to SUWA's comments and indicated that portions of the report had been revised. *See* Letter from Christopher Conrad & Joelle McCarthy, BLM, to Stephen Bloch, SUWA (July 2018) (attached). SUWA has not been provided with a revised report. Accordingly, **<u>SUWA reserves the right to supplement this protest when it receives and reviews BLM's final cultural resources report.</u>**

### i. BLM's No Adverse Effect Determination is Unsupported and Arbitrary

BLM's conclusion that the sale and issuance of the ninety-four parcels in the Price and Richfield field offices will result in "no adverse effect" to historic properties is arbitrary and capricious. NHPA regulations provide that BLM must determine whether an undertaking *may* have an adverse effect on historic properties. *See* 36 C.F.R. § 800.4(d)(2); 36 C.F.R. § 800.5(a). Recently, the ACHP reiterated to BLM that "[a]n adverse effect finding does not need to be predicated on a certainty." *See* Letter from Reid J. Nelson, Director in the Office of Federal Agency Programs, Advisory Council on Historic Preservation, to Ester McCullough, Vernal Field Office Manager, Bureau of Land Management (Dec. 12, 2016) (attached). Furthermore, "adverse effects" are defined broadly and include impacts to a historic property's "location, design, setting, materials, workmanship, or association." 36 C.F.R. § 800.5(a)(1). As noted above, adverse effects include "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features." *Id.* § 800.5(a)(2)(v).

BLM bases its determination that there will be "no adverse effect" to cultural resources on an incorrect interpretation of the definition of and criteria for "adverse effects." BLM states: "[w]hile this lease sale has the potential to impact cultural resources, these impacts do no [sic] reach the significant, or adverse effects, threshold." Price EA at 50. There is no basis in the NHPA or its implementing regulations for this novel interpretation of the term "effects." NHPA regulations do not contain a significance threshold for adverse effects. *See* 30 C.F.R. § 800.5. Instead, an adverse effect occurs "when an undertaking *may* alter, directly or indirectly any of the characteristics of historic property that qualify the property for inclusion in the National Register in a manner the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* (emphasis added). The broad definition of adverse effects was intended to encompass indirect effects and requires BLM to consider all potential effects on the characteristics that contribute to a historic property's significance. *See* Protection of Historic Properties, 65 Fed. Reg. 77698, 77720 (Dec. 12, 2000). Either an effect *may* diminish the integrity of a property and must be resolved or it does not. There is no requirement for effects to meet a heightened significance threshold. *Id.* In addition, the question is whether an undertaking *may* have an adverse effect on historic properties, not whether an undertaking *will* have an adverse effect on historic properties. *Id.*

First, the Price EA itself is clear that there are *potential* impacts from leasing (or lifting the suspensions on previously suspended leases) the ninety-four parcels at issue and thus BLM's no adverse effect determination is without basis. The Price EA details potential adverse impacts to

AR010524

cultural resources from development that may occur as a result of the sale of a non-NSO lease, including "physical disturbance of a site from the construction of a well pad, associated access roads, or associated infrastructure." Price EA at 50. The Price EA also describes potential indirect effects to cultural resources, including "changes to the landscape which result in impacts to a site's setting, feeling, or association; increased rock art exposure to dust resulting from increased traffic on roads; visual impacts to sensitive rock art sites … and the potential to increase public access, potentially leading to increased vandalism and looting." *Id.* Finally, with regard to cumulative impacts, the EA explains that "exploration and possible development of the lease parcels may contribute to impacts from the past and present development, impacting the setting and feeling of both the individual sites and landscapes surrounding them." *Id.* at 63. Thus, BLM's admission that there may be direct, indirect, and cumulative impacts from leasing means BLM's assertion that there will be "no adverse effects" is incorrect. Precisely because there *may be* adverse effects, BLM must follow the processes set forth in 36 C.F.R. §§ 800.5-800.6.

Second, BLM's analysis does not support its conclusion that there is room for reasonably foreseeable development in all lease parcels without causing adverse effects to historic properties. To support its finding of no adverse effect to historic properties, BLM relies in part on its San Rafael Desert predictive model which predicts areas with high, medium, and low potential for cultural resources. *See* Price EA at 33. However, the agency largely ignores the model when it predicts high probability for cultural resources. For instance, in parcels 84 and 85 – which have not been extensively surveyed – the model predicts primarily high potential for cultural sites, with small areas of medium potential. *See* Cultural Report, App. C. Parcel 85 has minimal area with low probability in the middle of the parcel.  *Id.* In each parcel, accessing the portions of that parcel with low or medium probability would almost certainly require travel across areas with a high probability for cultural sites. *Id.* Despite this, BLM ignores its model because it purportedly contradicts the agency's perception of the area and arbitrarily concludes that reasonably foreseeable development will have no adverse effect, when such an effect is in fact possible if not very likely. *See* Cultural Report, at 38-39. However, the agency does rely on the model to support its no adverse effect conclusion when the model predicts largely low potential for cultural sites in a given parcel. *See, e.g.*, Cultural Report, at 20 (concluding that leasing parcel 20 will have no adverse effects based on predicted low and medium site probability throughout the parcel); *id.* at 48 (relying on the predicted low site probability in parcel 100 to support its conclusion that there will be no adverse effects on cultural resources). Selectively relying on information only when it supports the agency's conclusion is arbitrary and capricious.

### ii.  BLM Failed to Analyze Cumulative Impacts in its Cultural Report

BLM failed to account for potential cumulative impacts to historic properties in its Cultural Report. As discussed above, an effect is defined broadly to include potential indirect and cumulative adverse effects. *See* 36 C.F.R. § 800.5(a)(1). In its Cultural Report, BLM highlights that thirty-six wells have been previously developed in the parcels supposedly without adverse effects. Cultural Report, at 3. However, rather than utilize this information to inform its adverse effects analysis, BLM asserts that this supports its contention that reasonably foreseeable development can occur without adverse effects to historic properties. *Id.* at 73.

AR010525

BLM provides no support for its statements that the previously-developed wells have resulted in no adverse effects to historic properties. In 2000, the Advisory Council published new regulations guiding the Section 106 process. *See* Advisory Council on Historic Preservation, Protection of Historic Properties, 65 Fed. Reg. 77698 (Dec. 12, 2000). Those new regulations clarified that agencies must account for both direct and indirect effects when evaluating potential impacts to historic properties from federal undertakings. *See* Advisory Council on Historic Preservation, Protection of Historic Properties, 64 Fed. Reg. 27044, 27064 (May 18, 1999). Most of the plugged and abandoned in the parcels at issue in this lease sale were developed before 2001, before BLM was required to consider potential indirect effects in adverse effect evaluations. *See generally* Utah Department of Natural Resources Division of Oil, Gas and Mining, Data Mining, https://datamining.ogm.utah.gov/ (last visited Aug. 2018) (showing that the BLM approved development for many of the now plugged and abandoned wells in the lease sale parcels at issue between 1958 and 1990). Thus, BLM's reliance on pre-2000 development to support its alleged "no adverse effects" determination is unavailing.

Moreover, the notion that there has been development in the past that did not result in adverse effects to historic properties does not necessarily lead to the conclusion that future development on these parcels similarly would not adversely affect the historic properties contained therein. Instead, the presence of prior development highlights BLM's duty to consider the cumulative impacts of additional development. BLM makes no attempt to analyze these potential cumulative effects. This problem pervades the cultural report. *See, e.g.*, Cultural Report, at 15-16 (alleging that reasonably foreseeable development in a parcel with a reported Fremont Rock Art panel, three eligible sites, and predicted medium and high potential for cultural sites would not adversely affect historic properties because, in part, three plugged and abandoned wells were allegedly developed without adverse effects).

## B.  BLM Failed to take a Hard Look at Impacts to Cultural Resources

In addition to BLM's obligations under the NHPA, NEPA requires BLM to take a "hard look" at the environmental effects of a proposed action.  *Silverton Snowmobile Club*, 433 F.3d at 781. That "hard look" requires a "thoughtful and probing reflection of the possible impacts associated with the proposed project." *Id.* (internal quotation omitted). "General statements about 'possible' effects" are not sufficient. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

As discussed herein, BLM must undertake sufficient comprehensive NEPA analysis before deciding to offer, sell and issue the Protested Parcels because subsequent approvals by BLM will not be able to completely eliminate potential impacts to cultural resources.  "If BLM has not retained the authority to preclude *all* surface disturbing activity, then the decision to lease is itself the point of 'irreversible, irretrievable commitment of resources.'" *Union of Oil Co. of Cal.*, 102 IBLA at 189. BLM – even with the attached lease stipulations – does not retain the authority to preclude all surface disturbing activity on the lease parcels. Accordingly, it must take a hard look at impacts to cultural resources at the leasing stage. It has not done so here.

Pursuant to NEPA, BLM must analyze potential impacts to *all cultural resources*, not just historic properties. *See* BLM Manual 8100, The Foundations For Managing Cultural Resources

34

AR010526

(2004) (attached) ("Cultural Resources need not be determined eligible for the National Register of Historic Places … to receive consideration under the National Environmental Policy Act."). BLM has not done so here. Instead, it focused its discussion on only those cultural resources that are eligible for listing in the National Register of Historic Places. *See* Price EA at 32-33. Furthermore, BLM's discussion of direct, indirect, and cumulative impacts to cultural resources is insufficient. The Price EA only contains a cursory discussion of impacts to cultural resources, listing potential direct and indirect impacts and concluding – without data to supports its conclusion – that those effects will not be significant. Price EA at 50. The Price EA contains no discussion of cumulative impacts. *Id.* at 63. It merely states that exploration and development of leases parcels may impact the setting and feeling of individual sites and the surrounding landscapes. *Id.* at 63. This does not constitute a "hard look" at impacts to cultural resources.

BLM attempts to get around its "hard look" obligation by asserting that lease stipulations allow it to control future development on the lease. This is not accurate. BLM cannot preclude all surface disturbance on the leases, a lessee "has the right to use as much of the leased land as necessary to explore for drill for, extract, remove, and dispose of oil and gas deposits located under the leased land," subject to some restrictions. Price EA at 11. The Standard Cultural Resource Stipulations only states that BLM *may* require modification to exploration and development proposals. Cultural Report, at 9-10. Precisely because BLM cannot preclude – and may allow – impacts to cultural resources, it must take a "hard look" at impacts to cultural resources *before* leasing. It has not done so here.

### XI. BLM Failed to Address Impacts to Endangered and Sensitive Species in the Final EAs, in Violation of NEPA and the ESA

#### A. Threatened and Endangered Species and Critical Habitat

**Specific Parcels Protested:**

**UTU93534/UT0918-106 (Price FO)**          **Colorado Pikeminnow and Razorback Sucker and Designated Critical Habitat**

Congress enacted the ESA to provide "a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). Section 2(c) of the ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." *Id.* § 1531(c)(1). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary." *Id.* § 1532(3). Section 7(a)(1) of the ESA explicitly directs that all federal agencies "utilize their authorities in furtherance of the [aforesaid] purposes" of the ESA. *Id.* § 1536(a)(1).

Section 7 of the ESA requires BLM, in consultation with United States Fish and Wildlife Service (FWS), to insure that any action authorized, funded, or carried out by the agency is not likely to (1) jeopardize the continued existence of any threatened or endangered species, or (2) result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. §

AR010527

1536(a)(2). For each proposed federal action, BLM request from FWS whether any listed or proposed species may be present in the area of the agency action. *Id.* § 1536(c)(1); 50 C.F.R. § 402.12. If listed or proposed species may be present in such area, BLM must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. *Id*.

If BLM determines that its proposed action may affect any listed species or critical habitat, the agency must engage in formal consultation with FWS. 50 C.F.R. § 402.14. To complete formal consultation, FWS must provide BLM with a "biological opinion" explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.  If FWS concludes that the proposed action will jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).

BLM's oil and gas leasing proposal for these parcels in multiple Utah Field Offices is an agency action under the ESA. Action is broadly defined under the ESA to include all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies, including the granting of leases, and actions that will directly or indirectly cause modifications to the land, water, or air. 50 C.F.R. § 402.02. BLM, however, failed to request from FWS whether any listed or proposed species may be present in the action area. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

Because there are listed species in the action area, the ESA requires preparation of a biological assessment. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

The Price EA reveals the presence of numerous threatened, endangered, and sensitive species present and their critical habitat within the areas proposed for leasing, but fails to provide any meaningful information regarding potential effects. BLM must not only evaluate the indirect and cumulative effects on special status species under NEPA, it must also (a) consult) with FWS under Section 7 regarding the effects of oil and gas development and water use on listed species and critical habitat, and (b) evaluate the effects on sensitive species under its own sensitive species policy.

The FWS's 2008 Biological Opinion for the Price RMP considers, at a field office-wide level, the general impacts of oil and gas leasing on listed species within the planning area. Price RMP BiOp at 5-6. It explicitly conditions its findings of no jeopardy, however, on the requirement that "[a]ll site-specific projects designed under the proposed BLM Resource Management Plan would be subject to consultation requirements under Section 7 of the Endangered Species Act." *Id.* at 139. Under the explicit requirements of the Price RMP BiOP, consultation *must* occur prior to all site-specific projects.

In the context of oil and gas leasing program, the point of consultation must be at the leasing stage, and cannot be deferred until the issuance of an application for permit to drill. *See Conner v. Burford*, 848 F.2d 1441, 1454-57 (9th Cir. 2012) (finding it improper to exclude the potential effects of future lessee activity when reviewing the leasing phase for oil and gas permits on public lands). Moreover, BLM cannot rely on "Incremental Step Consultation" under BLM

<div align="center">36</div>

Manual 6840 to circumvent this requirement. That policy allows BLM to conduct consultation in "incremental steps," but *only* if BLM undertakes an initial *formal* consultation on the entire action, and the resulting biological opinion must include the FWS and/or NMFS views "*on the entire action* (50 CFR Part 402.14(k))." This requires an analysis of not only the impacts of leasing these parcels, but the interrelated actions associated with exploiting the oil and gas on these parcels. Furthermore, BLM may only proceed with the incremental step analysis

> [P]rovided that the FWS . . . finding for the incremental step is not a jeopardy opinion; the BLM continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step; the *BLM fulfills its obligation to obtain sufficient data upon which to base the final biological opinion on the entire action*; the incremental step does not result in the irreversible or irretrievable commitment of resources; and *there is reasonable likelihood that the entire action will not result in jeopardizing the continued existence of a listed species or destruction or adverse modification of designated critical habitat.*

BLM, Manual 6840 – Special Status Species Management § .1F5i(1) (Dec. 12, 2008) (emphasis added) (attached). BLM has not adhered to these requirements, since the agency has not initiated formal consultation regarding this lease sale, and has failed to provided sufficient data, nor properly determined with a reasonable likelihood that the "entire action" would not jeopardize listed species or adversely modify critical habitat.

### B.  BLM Sensitive Species (Greater sage-grouse, white-tailed prairie dog, kit fox, burrowing owl, Bonneville cutthroat trout, Colorado River cutthroat trout)

**Specific Parcels Protested:**

| | |
|---|---|
| **UTU93469/UT0918-041** | **kit fox** |
| **UTU93472/UT0918-044** | **kit fox** |
| **UTU93490/UT0918-062** | **kit fox** |
| **UTU93491/UT0918-063** | **kit fox** |
| **UTU93501/UT0918-076** | **burrowing owl** |
| **UTU93504/UT0918-079** | **burrowing owl** |
| **UTU93505/UT0918-080** | **burrowing owl** |
| **UTU93519/UT0918-091** | **kit fox** |
| **UTU93523/UT0918-106** | **burrowing owl, kit fox, as well as ESA-listed fish** |
| **UT-0918-020, -021, -022, and -024** | **Bonneville Cutthroat Trout** |
| **UT-0918-003, -004, -006, -007, -009, -013, -015, -016, -017, -027, -032, -033, -034, -035, -036, and -037** | **Colorado River Cutthroat Trout** |

AR010529

According to data from the Utah Department of Wildlife Resources, multiple parcels within the proposed lease sale provide habitat for BLM-sensitive kit fox and burrowing owl. The leasing EAs, however, fail to provide any analysis of potential impacts to these species.

Pursuant to Manual 6840, "[a]ll Federal candidate species, proposed species, and delisted species in the 5 years following delisting will be conserved as Bureau sensitive species." BLM Manual 6840 § .01.  The Objective of Manual 6840 is "[t]o initiate *proactive* conservation measures that reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of these species under the ESA." *Id.* § .02 (emphasis added).  Manual 6840 further states that it is the BLM's Policy to promote the "conservation and to minimize the likelihood and need for listing" Bureau sensitive species. *Id.* § .06

Pursuant to Manual 6840, it is the responsibility of State Directors to not only inventory BLM lands to determine the occurrence of BLM special status species, but also to determine "the condition of the populations and their habitats, and how discretionary BLM actions affect those species and their habitats." *Id.* § 04. The leasing of federal lands for oil and gas extraction is a discretionary BLM action that has the potential to adversely affect sensitive species including but not limited to the greater sage-grouse, Bonneville cutthroat trout, Colorado River cutthroat trout, burrowing owl, and kit fox. *See* BLM, Instruction Memorandum No. UT 2011-037, Attachment 2 (Utah BLM Sensitive Animals List). Deferring an analysis of the potential effects of selling oil and gas leases to the APD stage is inconsistent with the requirements of Manual 6840. If a lease is sold, the lessee acquires certain contractual rights constraining BLM authority. For example, according to 43 C.F.R. § 3101.1-2, once a lease is issued to its owner, that owner has the "right to use as much of the lease lands as is necessary to explore for, drill for, mine, extract, remove and dispose of the leased resource in the leasehold" subject to specific nondiscretionary statutes and lease stipulations. Therefore, once the lease is sold, it will be too late for BLM to ensure that sufficient protections will be in place to protect this species from the cumulative impacts of extraction-related activities.

Furthermore, pursuant to Manual 6840 Bureau sensitive species are considered BLM special status species, and Section 2 of the Manual provides specific measures that BLM is required to undertake in order to "conserve these species and their habitats." BLM Manual 6840 § .2 ("All federally designated candidate species, proposed species, and delisted species in the 5 years following their delisting shall be conserved as Bureau sensitive species."). To implement this section, BLM "*shall*... minimize or eliminate threats" affecting Bureau sensitive species, by determining their current threats and habitat needs, and ensuring that BLM activities "are carried out in a way that is consistent with its objectives for managing those species and their habitats at the *appropriate spatial scale.*" *Id.* § 2(C) (emphases added). Due to the potential harms from habitat loss and fragmentation, the appropriate spatial scale for determining threats to sensitive plants and animals from oil and gas development is the entire area subject to lease sales, rather than the piecemeal, limited APD-specific review that BLM is attempting to employ.

The need for a broader analysis to assess the threats to this species from the lease sale itself is further supported by Manual 6840's requirement that BLM work with partners and stakeholders to "develop species-specific or ecosystem-based conservation strategies," and in the absence of such strategies, to incorporate standard operating procedures and other conservation measures

38

"to mitigate specific threats to Bureau sensitive species *during the planning of activities and projects*." BLM Manual 6840 § 2(C). Postponing any analysis of impacts to sensitive plants and raptors until the later APD stage forecloses the implementation of standard procedures and conservation measures necessary to mitigate threats to the species during exploration or other actions that might take place prior to an APD being filed, since as noted above once a lease is issued, the owner has the "right to use as much of the lease lands as is necessary to explore for, drill for, mine, extract, remove and dispose of the leased resource in the leasehold." 43 C.F.R. § 3101.1-2.

Moreover, the development of species-specific and ecosystem-based conservation strategies implicitly necessitates a more holistic review of the cumulative impacts of the proposed lease sale, which cannot be accomplished through site-specific APD-stage analysis alone. And, piecemeal analyses of individual lease sales do not provide the appropriate perspective for examining the cumulative effects of hydraulic fracturing and climate change impacts at the regional and landscape scale and for making land management decisions.

Where activities have the potential to adversely impact species of concern, the general practice is to consider those impacts and address them "at the earliest possible time," in order to avoid delay, ensure that impacts are avoided and opportunities for mitigation are not overlooked. 50 C.F.R. §§ 402.14(a), (g)(8). This is likewise true in the context of even more general environmental review, such as under NEPA. *See* 40 C.F.R. § 1501.2 ("Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."). Furthermore, it is general practice to evaluate the impacts of several related projects with cumulative impacts proposed or reasonably foreseeable in the same geographic region in a single, comprehensive, analysis. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) ("when several proposals for . . . actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together."). Likewise, under the ESA an analysis of the effects of an action must consider actions that are interrelated or interdependent. 50 C.F.R. §§ 402.14 and 402.02. This suggests that BLM should consider the effects of oil and gas extraction activities at the lease sale stage, since those actions are inherent in leasing land for such purposes. It is therefore evident that in order to effectuate the policy of protecting Bureau sensitive species set forth in Manual 6840, and consistent with the established practice of early, comprehensive review of potential impacts to sensitive species, BLM must consider impacts to the Graham's and White River penstemon and other sensitive species at the lease sale, rather than waiting until the APD stage for project specific review. *See, e.g.*, BLM Manual 6840 § .06 ("Bureau sensitive species will be managed consistent with species and habitat management objectives in land use and implementation plans to promote their conservation and to minimize the likelihood and need for listing under the ESA.").

In sum, BLM has issued regulations in Manual 6840 that require the agency to undertake actions to protect candidate species, much like they protect proposed and listed species. Delaying an analysis of impacts to the greater sage-grouse and sensitive plant species until the APD stage risks harm to an at-risk species that could otherwise be avoided. A failure to address the impacts to sensitive species at the lease sale stage violates BLM's own regulations set forth in Manual

AR010531

6840, is entirely inconsistent with established practice and policies regarding species protection, and is therefore arbitrary and capricious agency action under the APA.

### C. BLM Must Analyze Impacts to Greater Sage-Grouse Habitat and Prioritize Leasing Outside of Designated Habitats.

**Specific Parcels Protested: Parcel IDs UT0918-001, -002, -003, -004, -005, -006, -007, -008, -009, -010, -011, -012, -013, -014, -015, -016, -017, -018, -019, -020, -021, -022, -023, -024, -025, -026, -027, -028, -029, -030, -031, -032, -033, -034, -035, -036, and -037.**

BLM acknowledges that most of the proposed Salt Lake field office lease sale falls within designated Priority Habitat Management Areas (PHMA) for greater sage-grouse:

> Most of the parcels (25,752 acres) are within PHMA, including all of the parcels in Rich and Summit Counties (Rich Population Area) and about half of the Utah County parcels (Carbon Population Area) (Figures 8 and 13, respectively). Seasonal habitats within the lease parcel area include breeding and nesting, brood-rearing/summer, and winter habitats.

SLFO EA at 27. As the EA acknowledges, the Rich population area is one of the largest and most stable in Utah, and important for connectivity to grouse populations in Idaho and Wyoming. *Id.* Nevertheless, BLM has failed to engage in analysis, as required by its applicable RMP, as to whether these parcels are appropriate for leasing, or whether its management objectives could be better met by prioritizing the leasing of other lands and minerals outside of PHMA.

The Utah ARMPAs, which remain in effect until amended or revised, require BLM to "Prioritize the leasing and development of fluid mineral resources outside of GRSG habitat." Utah ARMPA at 1-11. The Salt Lake and Price RMPs, as amended by the 2015 GRSG ARMPA, require that "[p]riority will be given to leasing and development of fluid mineral resources, including geothermal, outside of PHMA and GHMA. When analyzing leasing and authorizing development of fluid mineral resources, including geothermal, in PHMA and GHMA, and subject to applicable stipulations for the conservation of GRSG, priority will be given to development in non-habitat areas first and then in the least suitable habitat for GRSG. The implementation of these priorities will be subject to valid existing rights and any applicable law or regulation, including, but not limited to, 30 USC 226(p) and 43 CFR, Part 3162.3-1(h)." Utah LUPA at 2-25.

The SLFO EA, however, proposes leasing areas a majority of which fall within one of the most important sage-grouse population areas in the state, as well as a second area (the Emma Park population) that is already at risk due to anthropogenic disturbance. The EA provides no evidence whatsoever that BLM has considered, let alone prioritized, whether other lands outside of sage- grouse habitat might be more suitable for new leasing than extensive areas of PHMA within the Rich and Emma Park population areas. A proposed lease sale of primarily GRSG habitat, without adequate consideration of impacts on grouse populations and life history requirements, has the potential to violate the ARMPA.

40

Moreover, the EA fails entirely to assess the foreseeable impacts on specific grouse habitats from development outside the NSO area of the leasehold itself – including access from private surface, or from Wyoming BLM lands where PHMA is not subject to the NSO Stipulation. Without the analysis of factors including importance of the lands in question for habitat function, it is impossible for BLM understand how offering leases within sage-grouse habitat is consistent with ARMPA requirement to prioritize leasing outside such habitat.

The SLFO EA does not disclose how many leks there are in the proposed lease sale areas and whether the numbers of leks are increasing, decreasing or remaining steady. Instead the EA discusses population at leks, but the data only goes to 2013. What has happened in the five years since then? Utah is one of the few states that attempts to counts every known lek,[19] so there is more lek data available than is mentioned in the EA.[20] According to the State of Utah's Conservation Plan for greater sage-grouse, "Each year, March-May, UDWR attempts to count all occupied leks in Utah. Most leks are counted a minimum of 3 times per year." Conservation Plan for Greater Sage-grouse in Utah at 45 (Feb. 14, 2013) (attached).

The SLFO EA's lack of recent sage-grouse population data is particularly important for the Emma Park portion of the Carbon population because the COT Report identified it as a population "at risk." SLFO EA at 27. The Emma Park area is additionally significant because there is evidence of sage-grouse from the Anthro Mountain population migrating nearly 40 km to summer there. *See* Utah, DWR, The Sage-Grouse of Emma Park – Survival Production, and Habitat Use in Relation to Coalbed Methane Development, Draft at 13 (Dec. 2005). Declines in the Anthro Mountain population led resource managers to translocate sage-grouse from other areas to Anthro Mountain in 2009 and 2010. *See* Duvuvuei, Orrin V., Vital Rates, Population Trends, and Habitat-Use Patterns of a Translocated Greater Sage Grouse Population: Implications for Future Translocations (2013). All Graduate Theses and Dissertations. 2016 (attached). Despite the connection between the Emma Park area and the struggling Anthro Mountain population of sage-grouse, the potential impacts of oil and gas development in the Emma Park area on the Anthro Mountain population are not analyzed in the SLFO EA.[21]

---

[19] *See* page 15 in Western Association of Fish and Wildlife Agencies. 2015. Greater Sage-Grouse Population Trends: An Analysis of Lek Count Databases 1965-2015. Available at https://www.wafwa.org/Documents%20and%20Settings/37/Site%20Documents/News/Lek%20Trend%20Analysis%20final%208-14-15.pdf.

20 Western Watersheds Project obtained some 2017 Utah greater sage-grouse lek count data from the Utah Department of Natural Resources (Utah DNR) through a Utah Government Records Access and Management Act request. We have not included it in this protest because Utah DNR would not disclose it to us without stripping out the geographic data that would allow us to see which lease parcels it applies to. However, as a government agency, BLM would have no such problem if it asked Utah DNR for the post-2013 lek count data that should be discussed in this lease sale's EA and is not.

[21] The Anthro Mountain population is itself at risk for oil and gas development: "Berry Petroleum Company (Berry) is proposing to drill up to 400 oil and gas wells within their existing federal mineral leases. Their lease covers approximately 25,900 acres on the South Unit of Ashley National Forest, including the Anthro Mountain management area. The proposal calls for all the wells to be constructed and drilled through 2027 or 2028." See page 6 in Duvuvuei, O., and T. A. Messmer. 2011. Anthro Mountain Greater Sage- grouse Population. Jack H. Berryman Institute, Department of Wildland Resources Utah State University, Logan, UT. Available at https://digitalcommons.usu.edu/cgi/viewcontent.cgi?article=3259&context=wild_facpub.

AR010533

## REQUEST FOR RELIEF

SUWA respectfully requests the withdrawal of the Protested Parcels from the September 11, 2018 competitive oil and gas lease sale until such time as BLM resolves the above-discussed violations. Alternatively, BLM could attach non-waiveable no-surface occupancy stipulations to each of the leases and offer them for sale.

This protest is brought by and through the undersigned on behalf of SUWA. The members and staff of SUWA reside, work, recreate, or regularly visit the areas to be impacted by the proposed lease sale and therefore have an interest in, and will be adversely affected by, the proposed action.

DATED:        August 6, 2018.


Stephen H.M. Bloch
Landon Newell
Laura Peterson
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
steve@suwa.org
landon@suwa.org
laura@suwa.org


Michael Saul
Senior Attorney
Center for Biological Diversity
1536 Wynkoop Street Suite 421
Denver CO 80202
(303) 915-3808
msaul@biologicaldiversity.org


Kelly Fuller

42

AR010534

Energy Campaign
Coordinator Western
Watersheds Project
P.O. Box 779
Depoe Bay, OR
97341 928-322-8449
kfuller@westernwatersheds.org

AR010535



# San Rafael Desert Master Leasing Plan Fact Sheet

Price and Richfield Field Offices, Utah

**What is a master leasing plan?**

The Bureau of Land Management (BLM) prepares resource management plans (RMPs) that include oil and gas planning decisions for the land the agency administers. These decisions include recognizing certain land use categories: closed to leasing, open to leasing, and open to leasing with major or moderate constraints (i.e., lease stipulations). A master leasing plan (MLP) is a stepped-down leasing analysis that gives the BLM an opportunity to analyze in greater detail the impacts of leasing and development in areas where there are likely resource conflicts. MLPs are required in areas with sensitive resources, such as the San Rafael Desert, where mostly unleased and undeveloped lands have been proposed for oil and gas leasing and development. An MLP serves as a road map to guide the orderly development of oil and gas resources, while also providing protections for other important resources.

**Where is the San Rafael Desert MLP planning area located?**

The MLP planning area is located in Emery and Wayne Counties and encompasses approximately 525,000 acres of public land.  The majority of the planning area is south of Interstate 70 and east of Highway 24. The eastern boundary of the MLP planning area is generally the Green River. A small portion of the MLP area is located north of Interstate 70, west of the city of Green River, Utah, and east of the San Rafael Swell. U.S. Highway 6 bisects this part of the planning area.

**What is the purpose of the San Rafael Desert MLP?**

The purpose of the San Rafael Desert MLP is to provide additional planning and analysis for considering new oil and gas leasing within the MLP area. The MLP analysis and resulting mineral leasing decisions will enable the Price and Richfield Field Offices to (1) resolve long-standing lease protests related to parcels of land for which the BLM received lease offers subject to protest but for which the BLM has not issued leases in the planning area; (2) determine whether the BLM should cancel, modify, or lift the suspensions on suspended leases in the planning area; (3) evaluate potential development scenarios; (4) identify and address potential resource conflicts and environmental impacts from oil and gas development; (5) create mitigation strategies for oil and gas development; and (6) consider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing.

**What decisions will be made in the San Rafael Desert MLP?**

The decisions will be limited to oil and gas leasing decisions within the planning area.  These decisions may include amendments to the existing leasing decisions in the BLM Price and Richfield RMPs.

AR010536

**What federal, state, local, and tribal governmental partners is the BLM coordinating with in preparing the San Rafael Desert MLP?**

The BLM has requested the participation of the State of Utah, Wayne County, Emery County, the National Park Service, and the U.S. Fish and Wildlife Service as cooperating agencies in the National Environmental Policy Act (NEPA) process.

**What preliminary issues have been identified by the BLM?**

Preliminary issues identified by the BLM that will be addressed in the San Rafael Desert MLP are air quality, climate change, cultural resources, night skies, paleontological resources, recreation, riparian resources, socioeconomics, soil and water resources, special status species, vegetation, visual resources, wildlife and fisheries, and wilderness characteristics.

**What is the purpose of public scoping?**

The purpose of the public scoping period is to enable anyone interested in the project to suggest issues that should be addressed as the BLM works with stakeholders to develop the San Rafael Desert MLP.

**How can I submit comments to the BLM?**

The BLM will accept written comments by U.S. Postal Service or email. Commenters should reference "San Rafael Desert MLP."

U.S. Postal Service address:
BLM Price Field Office
125 South 600 West
Price, UT 84501

Email address:
BLM_UT_PR_MAIL@blm.gov

**What additional opportunities will the public have to participate in the MLP process?**

During the MLP process there will be several opportunities for public involvement. First, the BLM will make preliminary resource management alternatives available for public review in advance of issuing the draft RMP amendment and environmental assessment. Second, there will be a public comment period on the draft RMP amendments and environmental assessment. Finally, the public will have the opportunity to submit protests on the proposed RMP amendments and environmental assessment.

**When is the estimated completion date for this project?**

The estimated completion date for San Rafael Desert MLP is November 2017.

AR010537

U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT**

## EVALUATING COMPETITIVE OIL AND GAS LEASE SALE PARCELS FOR FUTURE LEASE SALES

*IM 2023-007*
Instruction Memorandum

**November 21, 2022**

**IN REPLY REFER TO:**
3120 (HQ310) P

**Post Date/EMS Transmission:** 11/21/2022

**Expires:** 09/30/2026

To: All State and Field Officials

From: Assistant Director, Energy, Minerals and Realty Management

Subject: Evaluating Competitive Oil and Gas Lease Sale Parcels for Future Lease Sales

**Program Area:** Federal Oil and Gas Leasing Program

**Purpose:** The purpose of this Instruction Memorandum (IM) and accompanying attachment is to provide guidance to the Bureau of Land Management (BLM) State and Field Offices regarding the evaluation of parcels from Expressions of Interest (EOIs) for a competitive oil and gas lease sale that are submitted and determined to be available for consideration pursuant to IM 2023-006 *Implementation of Section 50265 in the Inflation Reduction Act for Expressions of Interest for Oil and Gas Lease Sales*. The BLM manages the Federal onshore oil and gas leasing program pursuant to many statutes, including the Mineral Leasing Act of 1920, as amended (MLA), the Federal Land Policy and Management Act of 1976, and the Inflation Reduction Act of 2022 (IRA) (P.L. 117-169). The MLA, as amended by the Federal Onshore Oil and Gas Leasing Reform Act of 1987, states that competitive "[l]ease sales shall be held for each State where eligible lands are available at least quarterly" (30 U.S.C. § 226).

Specifically, this IM provides guidance to BLM offices in selecting parcels to be offered in oil and gas lease sales and it also supplements IM 2023-010, *Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews*. This IM informs the agency's organization, procedures, and practice, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. This IM does not cover all the impacts of the IRA, which passed into law on August 16, 2022. Separate guidance on the Inflation Reduction Act is also being issued.

**Administrative or Mission Related:** Mission Related.

**Policy/Action:** <u>Lease Parcel Preference Criteria</u>

The BLM office(s) will evaluate parcels from submitted EOIs for lease according to the following criteria:

1. Proximity to existing oil and gas development, giving preference to lands upon which a prudent operator would seek to expand existing operations;
2. The presence of important fish and wildlife habitats or connectivity areas, giving preference to lands that would not impair the proper functioning of such habitats or corridors;
3. The presence of historic properties, sacred sites, or other high value cultural resources, giving preference to lands that do not contribute to the cultural significance of such resources;
4. The presence of recreation and other important uses or resources, giving preference to lands that do not contribute to the value of such uses or resources; and
5. Potential for development, giving preference to lands with high potential for development.

After the conclusion of the scoping period but before issuing the draft National Environmental Policy Act (NEPA) document for the lease sale, the BLM office(s) will apply these criteria and assign a preference value of "high" or "low" to EOI parcels. The BLM will generally conduct environmental analysis for lease parcels with a high preference value first for potential inclusion in a lease sale and will defer lease parcels with a low preference value. Throughout the review period for the lease sale, BLM may also consider additional measures and deferrals to address the potential impacts of leasing, as well as new information that is presented during the NEPA process for the lease sale.

AR010583

If there are no high preference parcels available for the sale, the office will select one or more low preference parcels that present the least conflicts based on the criteria listed above in this IM, including parcels deferred from previous sales, to analyze for potential inclusion in the sale. During its evaluation of previously deferred parcels, BLM will take into account any relevant comments previously provided by the public, including in regard to BLM's application of the lease parcel preference criteria.

In so evaluating EOIs, BLM offices should be mindful that, pursuant to Section 50265(b)(1) of the IRA, the BLM may not issue wind or solar rights of way unless, among other conditions, it has leased the lesser of two million acres or "50 percent of the acreage for which expressions of interest have been submitted for lease sales during [the year prior to issuance of the right-of-way]."

Offices will use the National Fluids Lease Sale System (NFLSS) to indicate the low-preference parcels by using the deferral process and to track the parcels for which incomplete environmental analysis precludes their offering at the next sale. Attachment 1, *Guidelines for Evaluating Lease Parcels in Expressions of Interest and Recording Preferential Status in NFLSS*, contains guidance for evaluating the EOI lease parcels, recording the preference in NFLSS, and disclosing the actions taken to evaluate EOI parcels in the NEPA document.

**Status of Pending EOIs**

In the past, the BLM has offered certain lands for leasing that the EOI submitter was no longer interested in, and then received no bids on those lands. The longer it takes to offer a parcel on a lease sale, the more likely it is that the interest in the parcel may diminish. Therefore, the BLM will close all EOIs that have remained pending for three or more years. The State Office will notify each EOI submitter of a planned closure when the BLM has the contact information for the EOI submitter. The notice will provide 30-days for the EOI submitter to express a continuing interest in the EOI(s), which would result in the EOI remaining active. When the BLM closes EOIs in the NFLSS due to the age of the request, the BLM should update the EOI to a status of Closed or Rejected.

**Legal Effect**

This IM is not a rule, regulation, or other legally binding instrument, and the recommendations it contains may not apply to a particular situation based upon the individual facts and circumstances. Nothing in this IM is intended to be a regulation, modify, or amend any Federal laws or regulations, or create any rights or cause of action or trust obligation that any person or party may enforce through litigation or otherwise against the United States Government or any of its employees. This IM is solely intended to aid the BLM in the management of the Federal Oil and Gas Leasing Program. This IM is not legally enforceable. To the extent that there is any inconsistency between the provisions of this IM and any Federal regulations or laws, the regulations or laws will control.

**Budget Impact:**  There will be a minimal increase in demand on staff time with the implementation of this policy due to additional resource analysis and NFLSS data entry. The magnitude of the increase will depend on the number of EOIs received for each lease sale. All BLM offices have the capacity to accomplish the required EOI evaluation goals of this policy.

**Background:**  The BLM developed this policy in response to direction in the Department of the Interior (DOI) Report on the Federal Oil and Gas Leasing Program (November 26, 2021). The report states:

> The BLM should carefully consider what lands make the most sense to lease in terms of expected yields of oil and gas, prospects of earning a fair return for U.S. taxpayers, and conflicts with other uses, such as outdoor recreation and wildlife habitat.

The BLM offices will use the evaluation policy provided in this IM to focus its leasing efforts on lands critical to oil and gas development and reducing conflicts with other resources in the public land.

**Manual/Handbook Sections Affected:**  This IM supplements existing policy; provides additional review criteria to inform the decision-making process for oil and gas leasing; and supersedes any conflicting guidance or directive found in the BLM IM 2023-010 *Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews,* and Handbook H-3120-1, *Competitive Leases,* Rel. 3-338. The BLM will incorporate the policy contained in this IM in its next revision of BLM H-3120-1.

**Contact:**  If you have questions or concerns regarding this IM, please contact Nicholas Douglas, Assistant Director, Energy, Minerals and Realty Management, at ndouglas@blm.gov or 970-256-4944. For program questions, your staff may contact Lonny Bagley, Acting Chief, Division of Fluid Minerals, (HQ-310) at lbagley@blm.gov or 307-261-7777; or Peter Cowan, Senior Mineral Leasing Specialist (HQ-310) at pcowan@blm.gov or 720-838-1641.

**Coordination:**  This policy was coordinated with DOI Office of the Solicitor, and the BLM Headquarters Energy, Minerals, and Realty Management Directorate (HQ-300), Division of Fluid Minerals (HQ-310), and State Offices.

|  |  |
|---|---|
| Signed By | Authenticated By |
| Nicholas Douglas | Ambyr Fowler |
| Assistant Director | Division of Regulatory Affairs and Directives (HQ-630) |
| Energy, Minerals and Realty Management | |

ATTACHMENTS

AR010584

GUIDELINES FOR EVALUATING NOMINATED LEASE PARCELS AND RECORDING PREFERENTIAL STATUS IN NFLSS (DOCX / 80 KB)

FISCAL YEAR

2023

**Southern Utah Wilderness Alliance – Natural Resources Defense Council –
Sierra Club – The Wilderness Society**

Comments submitted via e-mail (dstephens@blm.gov; swysong@blm.gov) and USPS First Class
Mail – exhibits sent via USPS First Class Mail only

April 16, 2018

Don Stephens
Assistant Field Manager, Lands and Minerals Division
Bureau of Land Management
Price Field Office
Price, UT 84501

Sheri Wysong
Fluid Minerals Leasing Coordinator
Bureau of Land Management
Utah State Office
440 W 200 S, ste. 500
Salt Lake City, UT 84101

      *Re:    SUWA et al – Scoping Comments on Utah BLM September 2018 Lease Sale
             (Price and Richfield field offices)*

Greetings:

The Southern Utah Wilderness Alliance, Natural Resources Defense Council, Sierra Club, and
The Wilderness Society (collectively, SUWA) appreciate the opportunity to submit the following
scoping comments for the Bureau of Land Management (BLM), Price and Richfield field offices,
September 2018 competitive oil and gas lease sale.

## I.    NEPA Requires BLM to Conduct Site-Specific Analysis at the Leasing Stage

It is critical that BLM undertake satisfactory comprehensive NEPA analysis before deciding to
offer, sell and issue the preliminary parcels as subsequent approvals by BLM will not be able to
completely eliminate potential environmental impacts. The sale of leases without no surface
occupancy (NSO) stipulations represents a full and irretrievable commitment of resources. BLM
cannot make such a commitment without adequate analysis:

> BLM regulations, the courts and [Interior Board of Land Appeals (Board)]
> precedent proceed under the notion that the issuance of a lease without an NSO
> stipulation conveys to the lessee an interest and a right so secure that full NEPA
> review must be conducted prior to the decision to lease.

*S. Utah Wilderness Alliance*, 159 IBLA 220, 241 (2003); *see also Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1159 (10th Cir. 2004) ("Agencies are required to satisfy the NEPA 'before committing themselves irretrievably to a given course of action, so that the action can be shaped to account for environmental values.'" (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1093 (10th Cir. 1988))). Thus, in *Southern Utah Wilderness Alliance*, the IBLA explained that

> [t]he courts have held that the Department must prepare an [environmental impact statement (EIS)] before it may decide to issue such "non-NSO" oil and gas leases. The reason . . . is that a "non-NSO" lease "does not reserve to the government the absolute right to prevent all surface disturbing activities" and thus its issuance constitutes "an irretrievable commitment of resources" under section 102 of NEPA.

159 IBLA at 241 (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998)).

As the Board has recognized, "[i]f BLM has not retained the authority to preclude *all* surface disturbance activity, then the decision to lease is itself the point of 'irreversible, irretrievable commitment of resources' mandating the preparation of an EIS.'" *Union Oil Co. of Cal.*, 102 IBLA 187, 189 (1988) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1412 (D.C. Cir. 1983)) (emphasis added); *see also S. Utah Wilderness Alliance*, 159 IBLA at 241-43 (same); *Sierra Club, Or. Chapter*, 87 IBLA 1, 5 (1985) (finding that because issuance of non-NSO oil and gas leases constitutes an irreversible commitment of resources, BLM cannot defer preparation of an EIS unless it either retains authority to preclude development or issues the leases as NSO).

BLM itself identifies lease issuance as the point of irretrievable commitment of resources:

> The BLM has a statutory responsibility under NEPA to analyze and document the direct, indirect and cumulative impacts of past, present and reasonably foreseeable future actions resulting from Federally authorized fluid minerals activities. *By law, these impacts must be analyzed before the agency makes an irreversible commitment. In the fluid minerals program, this commitment occurs at the point of lease issuance.*

BLM, H – 1624-1 – Planning for Fluid Mineral Resources § I.B.2, at I-2 (Jan. 28, 2013) (emphasis added) (attached); *see also S. Utah Wilderness Alliance v. Norton*, 457 F. Supp. 2d 1253, 1256 (D. Utah 2006) ("In sum, 'in the fluid minerals program, the point of irretrievable and irreversible commitment occurs at the point of lease issuance." (quoting *Pennaco*, 377 F.3d at 1160) (internal alterations omitted)).

In the present case, BLM must analyze all reasonable, foreseeable potential impacts of oil and gas development from the preliminary parcels and cannot delay that analysis to a later date. This includes, but is not limited to, potential impacts to lands with wilderness characteristics, endemic bees, water quality, air quality, Canyonlands National Park, Glen Canyon National Recreation Area, and climate change.

2

AR010587

## II.     The San Rafael Desert Master Leasing Plan and records and information related thereto

The proposed lease parcels fall almost entirely within the San Rafael Desert Master Leasing Plan (MLP) boundary. *See* SUWA Map – San Rafael Desert MLP and September 2018 Lease Parcels (attached). As such, the information and reports BLM (or its contractors) generated, received from the public, and/or has in its possession must be incorporated into BLM's leasing analyses and cannot be overlooked. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency action is arbitrary and capricious when the agency "entirely fail[s] to consider an important aspect of the problem"); *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1237 (10th Cir. 2017) (setting aside the agency's decision because it had failed to consider all relevant factors*); New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 713 (10th Cir. 2009) ("In order for a factual determination to survive review under the arbitrary and capricious standard, an agency must 'examine the relevant data and articulate a rational connection between the facts found and the decision made.'") (internal alterations and citation omitted). This includes, but is not limited to, the "Reasonably Foreseeable Development Scenario for Oil and Gas in the San Rafael Desert Master Leasing Plan Area" (Sept. 2016) (San Rafael Desert MLP RFD) (attached), "San Rafael Desert Land with Wilderness Characteristics Inventory" (Nov. 2016) (San Rafael Desert LWC Report) (attached) and "Updated Utah Master Leasing Plan (MLP) Strategy" (Aug. 2015) (attached).

In 2016, BLM initiated the San Rafael Desert MLP process to "provide additional planning and analysis for areas prior to new leasing of oil and gas resources." 81 Fed. Reg. 31252, 31253 (May 18, 2016). The additional analysis was needed to, among other things:

> (1) Resolve long-standing lease protests relating to parcels of land for which BLM received lease offers subject to protest, but for which BLM has not issued leases in the planning area; (2) Determine whether the BLM should cancel, modify, or lift the suspensions on suspended leases in the planning area; (3) Evaluate potential development scenarios; (4) Identify and address potential resource conflicts and environmental impacts from development; (5) Create oil and gas development mitigation strategies; and (6) Consider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing.

*Id.* BLM identified several resource values that it needed to analyze prior to moving forward with additional leasing in the MLP area including air quality, climate change, cultural resources, paleontological resources, recreation, visual resources, night skies, riparian resources, soil and water resources, vegetation, wildlife resources, special status species, special designations, and wilderness characteristics. *Id.* Additionally, BLM committed to, among other actions: "prepare development scenarios for oil and gas resources based on historical, existing, and projected levels of development," "consider a range of alternatives that focus on mitigating the impacts of development on resources that are of concern," and "use the best available scientific information and inventory and monitoring information to determine appropriate decisions for oil and gas leasing." *Id.*

3

It is immaterial that BLM has rescinded the MLP concept. *See* BLM, Instruction Memorandum No. 2018-034, Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews § II. (Jan. 31, 2018) (attached). Under FLPMA, BLM has an ongoing duty to inventory "public lands and their resource and other values" and to update its land use plans, based on the results of inventories.  43 U.S.C. §§ 1711(a), 1712(a); *see also Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1122 (9th Cir. 2010) (recognizing duty to update land use plans to account for new inventories).  Similarly, under NEPA, BLM has a duty to update its environmental analysis when "significant new circumstances or information" exists.  40 C.F.R. § 1502.9(c)(1)(ii). Consequently, the rescission of the MLP policy does not change the fact that BLM has repeatedly and unequivocally stated that new information and analysis is necessary prior to issuing oil and gas leases in this area. Nor does it change the fact that BLM has in its possession significant new information including, but not limited to, cultural reports, updated reasonable development scenarios for oil and gas, wilderness character inventories, and updated air quality modeling. That information must be used by BLM to inform its leasing decision and it cannot issue any of the preliminary (or suspended/previously protested) parcels without analyzing such information. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (an agency action is arbitrary and capricious when the agency "entirely fail[s] to consider an important aspect of the problem"). Additionally, on March 2, 2018, SUWA submitted a Freedom of Information Act (FOIA) request to BLM for all records related to the San Rafael Desert MLP. *See generally* SUWA, FOIA Request, San Rafael Desert Mastering Leasing Plan, DOI-BLM-UT-G020-2016-0008-EA (March 2, 2018) (attached). BLM has yet to respond to SUWA's request. *See* Letter from Michael J. Richardson, BLM, to Landon Newell, SUWA (March 7, 2018) (stating that BLM will provide a response by May 30, 2018) (attached). <u>SUWA retains the right to supplement its comments once it has received BLM's determination on its FOIA request.</u>

In addition, SUWA herein incorporates in its entirety SUWA's scoping comments (and exhibits thereto) and SUWA's comments on BLM's preliminary alternatives (and exhibits thereto) for the San Rafael Desert MLP. *See* SUWA et al., Scoping Comments on the Bureau of Land Management's San Rafael Desert Master Leasing Plan and Final Environmental Assessment (July 1, 2016) (attached); SUWA et al., Comments on Preliminary Alternatives for San Rafael Desert Master Leasing Plan (DOI-BLM-UT-G020-2016-0008-EA) (Jan. 20, 2017) (attached). SUWA also incorporates in their entirety comments provided to BLM by the Utah Rock Art Research Association (URARA) and National Parks Conservation Association (NPCA). *See* URARA, Comments on the San Rafael Desert Master Leasing Plan DOI-BLM-UT-G020-2016-0008-EA (June 30, 2016) (attached); NPCA, Scoping Letter to BLM (July 1, 2016) (attached).

Notably, the Price and Richfield RMPs do not support a decision to offer oil and gas leases on public lands within the San Rafael Desert MLP. BLM expressly acknowledged this fact when it initiated the San Rafael Desert MLP process. *See* BLM, San Rafael Desert Master Leasing Plan, Purpose and Need *1 (stating that the San Rafael Desert MLP is needed to "provide additional planning and analysis prior to new oil and gas leasing within the MLP area"); *id.* at *2 (stating that "additional planning and analysis are warranted before new mineral leasing and development are allowed") (attached).[1] Specifically, the current RMPs do not account for significant new and updated information concerning the reasonably foreseeable development

---

[1] Also available at https://eplanning.blm.gov/epl-front-office/projects/nepa/61781/75437/83361/SRD_MLP_Purpose_and_Need.pdf.

AR010589

(RFD) scenario, lands with wilderness characteristics and potential impacts to Canyonlands National Park.

First, in the San Rafael Desert MLP RFD, BLM concluded that "the development potential is greater" than previously thought "due to the success of horizontal drilling in the Cane Creek shale in the Paradox Formation in adjacent areas of the Moab Field Office." San Rafael Desert MLP RFD at 3. The Cane Creek Shale is concentrated in the eastern half of the San Rafael Desert MLP area and encompasses or borders numerous sensitive resources, including Canyonlands National Park, Labyrinth Canyon and LWCs. *Id*. at 23. According to the RFD, most of the wells in the Cane Creek Shale would be horizontally drilled, a technique not previously utilized in the planning area. *Id*. at 11. Horizontal drilling requires a "larger pad size . . . to accommodate a larger drill rig and sufficient area for additional equipment such as specialized mud systems, directional tools, drill pipe and casing, and portable storage tanks" than conventional vertical drilling. *Id*. As a consequence, the potential impacts on nearby lands and resources, including Canyonlands National Park, are broader and more severe than conventional types of drilling. It is these impacts, among others, that are not examined in the current RMPs for San Rafael Desert.

Second, BLM has significant new information regarding wilderness characteristics in the San Rafael Desert. *See* San Rafael Desert LWC Report. This includes, but is not limited to, information for the San Rafael River, Labyrinth Canyon, Sweetwater Reef, Horseshoe Canyon South, Robbers Roost Flats, and Dirty Devil / French Springs units. *See id.* at 3 (Lands with Wilderness Characteristics Overview Map). The Price and Richfield RMPs pre-date this information. *See, e.g.*, *S. Utah Wilderness Alliance v. Norton*, 457 F.Supp.2d 1253, 1264-65 (D. Utah 2006) (setting aside BLM's leasing decision for failure to analyze significant new wilderness character information).

Third, since 2008, BLM has obtained significant new information about the potential impacts of oil and gas development on Canyonlands National Park. This information comes from environmental analyses developed during preparation of the Moab MLP and shows that the impacts of oil and gas development on key attributes of the park, including air quality, night skies, scenic viewsheds and recreation resources, are more significant than disclosed in 2008. For example, in the Final EIS for the Moab MLP, BLM disclosed that absent heightened protections, such as NSO stipulations,

> [n]ot all of the visual horizon of the two adjacent National Parks would be protected from visual impacts. . . . Mineral development facilities could exist in places that would disrupt the skyline view as seen from the Colorado and Green Rivers. Light pollution from mineral development could diminish the number of stars visible, thereby reducing the visual quality of the night sky.

5

Moab MLP Final EIS at 4-198;[2] *see also* Analysis of the Management Situation for the Moab MLP and Associated EIS at 2-90[3] ("The visual quality within the Planning Area is being impacted by development of utility corridors, from minerals exploration and development, from seismic exploration, and from other land-use disturbances."). "Scenic visual resources and values are among the purposes for which Canyonlands and Arches were established."  Moab MLP Final EIS at 3-120; *see also id*. at 3-118 (noting Canyonlands National Park's 2015 designation as a "gold-tier" International Dark Sky Park). Similarly, in regard to the park's air quality, BLM stated that "[w]hile long term (1991-2013) trends at Canyonlands show statistically significant improvement . . . , the most recent 10 year period indicates that this improving trend has not been maintained." *Id*. at 3-9. Finally, in the Moab MLP and with the assistance of the U.S. Geological Survey, BLM developed "analysis of viewsheds most likely affected by recreation and mineral decisions." *Id*. at 3-121. This analysis, which includes the eastern extreme of the San Rafael Desert MLP area, shows that there are numerous "high and very high recreation sites" both within and outside of Canyonlands National Parks that are within the viewshed of potential oil and gas lease parcels. *Id*. at 3-121-23.

In sum, the existing RMPs are insufficient and thus, as BLM itself has explained: "MLPs are *required* in areas with sensitive resources, such as the San Rafael Desert, where mostly unleased and undeveloped lands have been proposed for oil and gas leasing and development." BLM, San Rafael Desert Master Leasing Plan Fact Sheet 1 (attached).[4] BLM has likewise determined that "additional planning and analysis are warranted before new mineral leasing and development are allowed," *id.* at 2, and is needed to "resolve long-standing lease protest from the February and May 2006 lease sale, and to complete additional analyses under NEPA for leases that were placed in suspension in 2005 and 2006 because of litigation." *Id.* Because this information is "required" prior to the issuance of new leases, as BLM has recognized, BLM must prepare the above-discussed analyses prior to issuing any proposed parcel in the MLP boundary. *See, e.g.*, 40 C.F.R. § 1502.9(c)(1)(ii) (NEPA requires federal agencies to update their environmental analyses when "significant new circumstances or information" exists).

### III.    BLM Needs to Analyze Impacts to Canyonlands National Park and Glen Canyon National Recreation Area

BLM must analyze potential direct, indirect, and cumulative impacts to lands managed by the National Park Service (NPS) including Canyonlands National Park and Glen Canyon National Recreation Area. This includes, but is not limited to, air quality, recreational opportunities, dark night skies, viewsheds and soundscapes. In recent leasing proposals, NPS has demanded that BLM consider such impacts. For example:

- NPS *formally protested* Utah BLM's leasing proposal for its November 2015 lease sale, citing BLM's failure to analyze impacts to wilderness characteristics, viewsheds,

---

[2] Available at https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=99718
[3] Available at https://eplanning.blm.gov/epl-front-office/projects/lup/68430/88313/105653/Moab_Final_AMS_web.pdf
[4] Also available at https://eplanning.blm.gov/epl-front-office/eplanning/docset_view.do?projectId=61781&currentPageId=85188&documentId=75437.

AR010591

soundscapes, dark night skies, and air quality. *See* NPS Letter from Leah McGinnis, Superintendent, to Jenna Whitlock, BLM (Sept. 16, 2015) (attached).

- For Utah BLM's December 2017 lease sale, NPS stated that BLM needed to analyze impacts to Dinosaur National Monument including air quality and air quality-related values, viewsheds, natural soundscapes, dark night skies, and water quality impacts on threatened and endangered fish. *See* NPS, Scoping Comments on the Proposed December 2017 Competitive Oil and Gas Lease Sale Parcels (3100/UT922) (May 1, 2017) (attached).

- In its comments on Utah BLM's March 2018 lease sale, NPS blasted BLM's inadequate NEPA analysis with regard to potential impacts to the NPS's Southeast Utah Group areas (Arches and Canyonlands National Parks, and Hovenweep and Natural Bridges National Monuments). *See* NPS, Comments on BLM Canyon Country District Environmental Assessment for March 2018 Oil and Gas Lease Sale (Oct. 23, 2017) (NPS Comments March 2018 Lease Sale) (attached).  Specifically, NPS stated that BLM had failed to properly analyze air quality and air-quality related values, increased dust from development activities, visual resources, dark night skies, natural soundscapes, and groundwater resources. *Id.* at 2 (noting, "we feel our concerns were not fully evaluated"); *id.* at 4 (stating, "[w]e are disappointed that there is no recognition in the EA of the significant potential for degradation of dark night skies and soundscapes that would result from oil and gas exploration and development on the lease parcels"); *id.* at 5 ("Potential development impacts on soundscape resources were not adequately considered and addressed in the EA."). *See also* NPS, Scoping Comments on Canyon Country District March 2018 Oil and Gas Lease Sale (July 25, 2017) (highlighting several resource values that NPS wanted BLM to analyze in its leasing EA) (attached).

BLM must analyze these same and similar impacts in its leasing analysis at issue here. As noted *supra*, the Moab MLP provides a reasonable framework and guidance regarding potential impacts to NPS-managed lands, including Canyonlands National Park, and its analysis should be incorporated to the maximum extent here.

## IV.    Water Quality

BLM needs to analyze potential impacts to water resources including ground and surface. This includes, but is not limited to, impacts to groundwater resources from hydraulic fracturing during well drilling activities, and impacts to surface water and riparian areas such as the San Rafael and Green Rivers. For example:

- The segment of the San Rafael River potentially affected by a leasing decision, referred to as the San Rafael Lower, is on the state of Utah's list of 303(d) impaired waters. *See* Utah Division of Water Quality, Chapter 3: Rivers and Stream Assessments, 2016 Final Integrated Report at 14/49 (2016) (excerpts attached). It is impaired due to OE Bioassessment and total dissolved solids (TDS). *Id.* The Utah Division of Water Quality (DWQ) has prepared – and EPA approved – a total maximum daily load (TMDL) for the

7

San Rafael River for TDS.[5] DWQ has not prepared a TMDL for OE Bioassessment. The potential impacts to this impaired waterway, including impacts to DWQ's TMDL, must be addressed by BLM.

- Parcel 106 is adjacent to the Green River and thus impacts from the development of that parcel (or adjacent lands) must be analyzed such as from runoff during storm events or soil erosion.

- Hydraulic fracturing has contaminated and has the potential to contaminate groundwater resources. In its comments on Utah BLM's March 2018 lease sale, NPS highlighted this fact, stating, "[w]e also recommend that BLM consult with the US Geological Survey and the State of Utah regarding potential effects of oil and gas exploration and development on groundwater quantity and quality." NPS Comments March 2018 Lease Sale at 5. "These are issues of regional and national consequences and the NPS believes that incremental cumulative additional degradation of water resources puts the nation's resources and the public at risk." *Id.* at 5-6. Additionally, NPS noted that it was "concerned about the potential for earthquakes that could result from lubrication of faults, bedding planes, formation contacts, and other subsurface geological structures by injection of water during hydraulic fracturing or injection of produced waters." *Id.* at 7. EPA also has documented the impacts of hydraulic fracturing for oil and gas exploration and development. *See* EPA, *Hydraulic Fracturing for Oil and Gas: Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water and Resources in the United States* (EPA-600-R-16-236Fa) (Dec. 2016) (attached).

- The proposed parcels, in addition to those discussed *supra*, also have the potential to impact streams, washes and springs including, but not limited to, Old Woman Wash, Cottonwood Wash, and Temple Wash. *See* BLM Map, Oil & Gas Lease Sale (Sept. 2018) (depicting the preliminary parcels and major rivers, streams and washes, and related information) (attached).

BLM must analyze the direct, indirect, and cumulative impacts to these resource values at the leasing stage because that is the point at which an irretrievable commitment of resources occurs. BLM does not comply with its "hard look" requirement under NEPA by postponing this analysis until a site-specific drilling proposal is brought forward for analysis.

### V.    Lands with Wilderness Characteristics

BLM should remove each parcel in areas identified as possessing wilderness characteristics. This includes parcels in the Flat Tops, Sweetwater Reef, and San Rafael River proposed wilderness areas. *See* Price RMP, Map R-11 (Non-WSA Land with Wilderness Characteristics Approved RMP)[6]; SUWA Map, Price FO Sept 2018 Lease Sale (attached); San Rafael Desert LWC Report. BLM must comply with Utah BLM Instruction Memorandum 2016-27 and BLM Manuals 6310

---

[5] Available at https://deq.utah.gov/legacy/programs/water-quality/watersheds/docs/2006/08Aug/West_Colorado_TMDL.pdf.
[6] Available at https://eplanning.blm.gov/epl-front-office/projects/lup/67041/83200/99805/Price_Map_11_-_Non-WSA_Lands_with_Wilderness_Characteristics.pdf.

AR010593

and 6320 in its NEPA review of direct, indirect, and cumulative impacts to BLM-identified LWC. As BLM has acknowledged, "[p]rior to allowing any action on these leases [*i.e.*, the sixteen suspended leases], the BLM must analyze the impacts of leasing on lands with wilderness characteristics." BLM, San Rafael Desert Master Leasing Plan Preliminary Alternatives 4 (2016) (attached). *See also* BLM, Instruction Memorandum No. UT 2016-027, Bureau of Land Management (BLM)-Utah Guidance for the Lands with Wilderness Characteristics Resource (Sept. 30, 2016) (attached); BLM, Manual 6310 – Conducting Wilderness Characteristics Inventory on BLM Lands (Public) (March 15, 2012) (attached); BLM, Manual 6320 – Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process (Public) (March 15, 2012) (attached).

## VI.    Air Quality

BLM has not considered the effects of a decision to issue the proposed leases on air quality or how air quality in the region is being impacted by ongoing, planned, and reasonably foreseeable development in the Price and Richfield field offices. BLM must conduct comprehensive air quality modeling for the leasing EA. The Federal Land Policy and Management Act (FLPMA) prohibits BLM from approving activity that will lead to exceedances of federal and state air quality standards. The BLM must prepare quantitative air quality analysis before offering the proposed parcels for leasing and development – BLM cannot delay that analysis until it receives an APD to develop the lease. BLM must also ensure that its oil and gas leasing decision will protect Class I airsheds such as in Canyonlands National Park.

Additionally, BLM must analyze the reasonable and foreseeable indirect downstream emission impacts of its leasing decision. In recent months, federal agencies' leasing and development decisions have been struck down by federal courts, including the Tenth Circuit, for failing to take the requisite "hard look" at this issue. *See, e.g.*, *W. Organization of Res. Councils v. U.S. BLM*, 2018 WL 1475470 (D. Mont. March 26, 2018) (holding that BLM violated NEPA by failing to consider the environmental consequences of the downstream combustion of coal and oil and gas resources); *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F.Supp.3d 1074 (D. Mont. 2017) (holding that the Office of Surface Mining and Reclamation failed to take a hard look at coal combustion and transportation, and impacts to air pollution); *WildEarth Guardians v. BLM*, 870 F.3d 1222 (10th Cir. 2017) (holding unlawful BLM's coal leasing decision).

In addition, BLM must utilize its most up to date information regarding potential development in this region. This includes the Reasonable Foreseeable Development Scenario prepared for the San Rafael Desert MLP. *See* San Rafael Desert MLP RFD. And also the updated Air Resource Management Strategy (ARMS) document being prepared by BLM (and which is required to be completed by June 1, 2018) following SUWA's successful litigation in *S. Utah Wilderness Alliance v. Burke*, 981 F.Supp.2d 1099 (D. Utah 2013). Finally, the Environmental Protection Agency (EPA) will designate the Uinta Basin as nonattainment of the National Ambient Air Quality Standards (NAAQS) for ozone by or before April 30, 2018. *See* 83 Fed. Reg. 651, 653 (Jan. 5, 2018) (stating EPA plans to make its nonattainment designation "no later than April 30, 2018"). BLM's air quality analysis must take a hard look at this information.

9

## VII.    Climate Change

No matter what the current executive branch decides to do with enforcing climate policies, courts require agencies to address climate change and its potential costs in their NEPA documentation. *See, e.g.*, *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016); *High Country Cons. Adv. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1191-93 (D. Col. 2014). NEPA and relevant legal holdings require BLM to consider the direct, indirect, and cumulative impacts to climate change from the proposed oil and gas leasing and development, including the Social Cost of Carbon. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1181 (9th Cir. 2008); *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 677 (7th Cir. 2016); *W. Organization of Res. Councils,* 2018 WL 1475470 *11-13 (holding that BLM failed to consider indirect and downstream effects from the combustion activities). BLM must satisfy this requirement in its environmental analysis for the Lease Sale.

Notably, the Tenth Circuit has held that climate change "is a scientifically verified reality" and does not involve "the frontiers of science," meaning that BLM is *not* owed any greater deference in its climate change analysis. *WildEarth Guardians*, 870 F.3d at 1237. Moreover, BLM's analysis must include the direct, indirect, and cumulative impacts of oil and gas exploration and development on the proposed parcels and BLM cannot – as it has repeatedly and unlawfully done in past sales – conclude that its cumulative impact analysis satisfied its direct and indirect impacts analyses. *See, e.g.*, BLM, December 2017 Competitive Oil and Gas Lease Sale, DOI-BLM-UT-G010-2017-0028-EA 75 (June 2017) (excerpts attached).

## VIII.    Viewsheds

BLM must analyze impacts to viewsheds and viewshed-related values, including to NPS-managed lands, as discussed *supra*, but also more broadly including impacts to wilderness-caliber lands, recreation (such as along the Green River) and general aesthetics. Among other things, BLM should analyze potential direct, indirect, and cumulative impacts to:

- Recreational users on the Green River;
- Canyonlands National Park and Glen Canyon National Recreation Area;
- Goblin Valley State Park;
- Flat Tops, San Rafael River, and Sweetwater Reef proposed wilderness areas;
- The cultural landscape of the San Rafael Desert; and
- The Dry Lake Area of Critical Environmental Concern.

The viewshed analysis is necessary because, as acknowledged by BLM, the San Rafael Desert is area where there are "likely resource conflicts" with oil and gas leasing and development. BLM, San Rafael Desert Master Leasing Plan Preliminary Alternatives at 3 (MLP Alternatives Summary) (attached). In addition, SUWA provided BLM with a viewshed analysis map as part of its comments on the San Rafael Desert MLP – information which is as relevant today as it was then. *See* SUWA Map, San Rafael Desert MLP Viewshed (attached). BLM should consider this information in its leasing analysis and prepare additional updated information, as needed.

10

AR010595

Further, a detailed and thorough viewshed analysis is necessary because, as acknowledged by BLM, the San Rafael Desert remains primarily undisturbed, with a high degree of apparent naturalness. *See* MLP Alternatives Summary at 3 (noting that the San Rafael Desert qualified for the MLP concept because it is an area "where there are mostly unleased and undeveloped lands"); San Rafael Desert MLP RFD at 1 (stating that there "no production of oil and gas" in the San Rafael Desert MLP boundary, which includes the lease parcels at issue). In fact, *not a single well* has been drilled in the San Rafael Desert region since 1989. *Id.* As such, the industrialization of the San Rafael Desert as contemplated by BLM in this leasing proposal will have a significant visual impact – an impact that must be analyzed thoroughly in the leasing EA.

## IX.     Endemic Bees

BLM must analyze potential direct, indirect, and cumulative impacts to the San Rafael Desert's endemic bee population.  Bee diversity is higher in the world's deserts than almost anywhere else on the planet.  *See* J.S. Wilson *et al.*, Variation Between Bee Communities on a Sand Dune Complex in the Great Basin Desert, North America: Implications for Sand Dune Conservation, *Journal of Arid Environments*, vol. 73, 666-71, at 666 (2009) (attached). The proposed lease parcels are in the heart of the San Rafael Desert, which is no different.  In fact, it is home to one of the most astonishing and highly diverse array of native and endemic bees anywhere in North America.  *See generally* Terry Griswold *et al.*, The Bees of the San Rafael Desert Implications for the Bee Fauna of the Grand Staircase-Escalante National Monument, *in* Learning from the Land, Grand Staircase-Escalante National Monument Science Symposium Proceedings, Cedar City, Utah (1997) (attached).

Researchers have found forty-nine different genera and 333 different species in this area. *Id.* at 181.  This is nearly half of all genera known in the United States.  *Id.* at 176.  This is also more genera and nearly as many species of bees as in all of New England.  *Id.* at 175.  Forty-eight of these species were new to science and sixty-eight of these species occur, as far as is known, only in the Canyonlands section of the Colorado Plateau.  Declaration of Dr. Vincent J. Tepedino, ¶ 6, *S. Utah Wilderness Alliance v. Bankert*, Case No. 2:07cv00292 (TC) (Oct. 9, 2007) (attached).

The viability of the San Rafael Desert's bee population is especially important in light of wide-spread bee die-offs.  Wild bees provide critical ecosystem services as valuable pollinators "ensuring stable pollination to agriculture and wild plant communities." Insu Koh *et al.*, Modeling the status, trends, and impacts of wild bee abundance in the United States, *Proceedings of the Nat'l Acad. Of Sciences*, vol. 113, 140-145, at 140 (2016) (attached).  In 2009, bees contributed to about 11% of the United States' gross domestic product, or approximate $14.6 billion.  *Id.*  Despite the vital role they play in maintaining diverse ecosystems and supporting agricultural production, bees have been in decline in recent decades in the United States and worldwide. Pollinator Health Task Force, National Strategy to Promote the Health of Honey Bees and Other Pollinators, at 1 (2015) (Pollinator Health Strategy Report) (excerpts attached).  The decline is likely caused by a number of factors, including climate change, disease and pesticide use.  Koh *et al.*, at 140.  Among wild bees, habitat loss is likely the largest contributor to the decline.  *Id.*

11

"Habitat quality and quantity are central to the health of pollinator populations and ecosystems, and to the well-being of our society that is dependent on these resources." Pollinator Health Strategy Report, at 28. The National Research Council also reports that "conserving and improving habitats for wild bees is important for ensuring continued pollination services and food security." Koh *et al*., at 140.

Most of the bees found in the San Rafael Desert make their homes and nests in the ground. Decl. of Dr. Vincent J. Tepedino, ¶ 6. Many of them visit, for pollination, only flowers of one or a few closely-related plants. *Id.* This makes these bees extremely vulnerable to ground disturbing activities. *See id.* It is likely that extensive oil and gas development in the San Rafael Desert could have a significant adverse impact on these bees. BLM must analyze the direct, indirect, and cumulative impacts to endemic bees at the leasing stage.

<h2>X.    Cultural Resources</h2>

As BLM is aware, the San Rafael Desert – including the proposed lease parcels – is rich in cultural resources. BLM has dual obligations when considering the impacts of its undertakings on cultural resources. Pursuant to Section 106 of the National Historic Preservation Act (NHPA), BLM must "make a reasonable and food faith effort" to identify cultural resources that may be affected by an undertaking. 36 C.F.R. § 800.4(b)(1). Pursuant to NEPA, BLM "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," 40 C.F.R. § 1500.1(b), and must take a "hard look" at the effects of the proposed action. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006). BLM must comply with both statutes at the leasing stage.

<h3>a.    BLM Must Consider Adverse Impacts of its Undertakings on Cultural Resources</h3>

Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the preservation and protection of America's historic and cultural resources. *See* 54 U.S.C. § 300101. The heart of the NHPA is Section 106, which prohibits federal agencies from approving any federal "undertaking" unless the agency takes into account the effects of the undertaking on historic properties that are included in or eligible for inclusion in the National Register of Historic Places. 54 U.S.C. §§ 306108, 300320; *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995). Section 106 is a "stop, look, and listen provision" that requires federal agencies to consider the effects of their actions and programs on historic properties and sacred sites before implementation. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

To adequately "take into account" the impacts on archeological resources, all federal agencies must comply with binding Section 106 regulations established by the Advisory Council on Historic Preservation (Advisory Council). Under these regulations, the first step in the Section 106 process is for an agency to determine whether the "proposed [f]ederal action is an undertaking as defined in [Section] 800.16(y)." 36 C.F.R. § 800.3(a). Undertakings include any permit or approval authorizing use of federal lands. *Id.* § 800.16(y). If the proposed action is an undertaking, the agency must determine "whether it is a type of activity that has the potential to

AR010597

cause effects on historic properties." *Id.* § 800.3(a). An effect is defined broadly to include direct, indirect and/or cumulative adverse effects that might alter the characteristics that make a cultural site eligible for listing in the National Register of Historic Places. *See id.* § 800.5(a)(1); *id.* § 800.16(i); 65 Fed. Reg. 77,698, 77,712 (Dec. 12, 2000).

The agency next "[d]etermine[s] and document[s] the area of potential effects" and then "[r]eview[s] existing information on historic properties within [that] area." 36 C.F.R. § 800.4(a)(1)-(2). "Based on the information gathered, . . . the agency . . . shall take the steps necessary to identify historic properties within the area of potential effects." *Id.* § 800.4(b). "The agency shall make a reasonable and good faith effort to carry out appropriate identification efforts." *Id.* § 800.4(b)(1).

If the undertaking is a type of activity with the potential to affect historic properties then the agency must determine whether in fact those properties "may be affected" by the particular undertaking at hand. *Id.* § 800.4(d)(2).[7] Having identified the historic properties that may be affected, the agency considers whether the effect will be adverse, using the broad criteria and examples set forth in section 800.5(a)(1). Adverse effects include the "[p]hysical destruction of or damage to all or part of the property," as well as "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's historic significant historic features." *Id.* § 800.5(a)(2)(i) & (2)(v). If the agency concludes that the undertaking's effects do not meet the "adverse effects" criteria – that is, the agency concludes that there *may* not be an adverse effect from the undertaking – it is to document that conclusion and propose a finding of "no adverse effects." *Id.* § 800.5(b), 800.5(d)(1).

If the agency official concludes that there *may be* an adverse effect, it engages the public and consults further with the state historic preservation officer, Native American tribes, consulting parties, and the Advisory Council in an effort to resolve the adverse effects. *Id.* §§ 800.5(d)(2), 800.6.

### i.    Reasonable and Good Faith Effort

As discussed above, BLM must "make a reasonable and good faith effort" to identify cultural resources. 36 C.F.R. 800.4(b)(1). To do so, the agency must "take into account past planning, research and studies … the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects. To satisfy its reasonable and good faith identification efforts, BLM must – at the very least – analyze all of its existing cultural resource information.

BLM has recently completed a Class II inventory for the San Rafael Desert area with an associated archaeological site predictive model. *See* BLM, San Rafael Desert Master Leasing Plan Cultural Resources Site Location Model and Class II Sample Survey (May 2017) (San Rafael Desert Class II). While archaeological models are far from perfect, they do provide information about the potential location of undiscovered sites. *Id.* at 8-9. The predictive model

---

[7] The agency may also determine that there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them, at which point it consults with the State Historic Preservation Officer and notifies relevant Native American tribes of its conclusion. *Id.* § 800.4(d)(1).

AR010598

for the San Rafael Desert is actually a series of different models – three site type models (Historic Sites, Open Prehistoric Sites, Prehistoric Rock Art Sites) and one composite model.

To comply with NHPA requirements to make a reasonable and good faith effort to identify cultural resources, BLM must at least take into account all of its existing information about potential resources. Accordingly, BLM must analyze impacts to cultural resources using the site type models. The individual site type models provide BLM with more information about the potential resources on the ground and allow the agency to better assess potential adverse effects from the lease sale.

### <u>b.</u>  BLM Must Take a Hard Look at Potential Impacts to Cultural Resources

In addition to BLM's obligations under the NHPA, NEPA requires BLM to take a "hard look" at the environmental effects of a proposed action.  *Silverton Snowmobile Club*, 433 F.3d at 781 (10th Cir. 2006).  An EA must demonstrate "the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project." *Id.* (quoting *Comm. To Preserve Boomer Lake Park v. Dep't of Tramsp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)).  "General statements about 'possible' effects … do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).  BLM must analyze all potential direct, indirect, and cumulative impacts to cultural resources.

### XI.  Wild and Scenic Rivers

The Green River segment near Parcel 106 is "suitable" for inclusion in the National Wild and Scenic Rivers System. *See* Price RMP, Map R-30 (Suitable Wild and Scenic Rivers).[8] It is suitable for inclusion based on its scenic values. *Id.* As such, BLM must manage this river "to protect [its] outstandingly remarkable values, tentative classification, and free-flowing nature." Price FEIS at 4-376. The Green River is also "eligible" for inclusion in the National Wild and Scenic Rivers System based on its scenic, recreational, wildlife, historic, cultural, fish, geological, ecological, and paleontological values. *Id.* at 3-95, tbl. 3-38. The San Rafael River, which passes near UTU-85328 and UTU-85329 also has been determined by BLM to be eligible for inclusion in the National Wild and Scenic Rivers System based on its cultural, scenic, recreational, historical, and wildlife values. *See id.* BLM has committed to protect these remarkable values. *Id.* at 4-376.

Further, BLM in the San Rafael Desert MLP committed to "use the best available scientific information and inventory and monitoring information to determine appropriate decisions for oil and gas leasing." 81 Fed. Reg. at 31253. With this in mind, BLM must analyze in the leasing EA whether existing stipulations and notices in the Price and Richfield RMPs provide adequate protection to the outstandingly remarkable values identified in the Green and San Rafael Rivers. As with all other resource values, BLM cannot ignore the fact that it has repeatedly and affirmatively acknowledged that more analysis and information is needed prior to making a leasing decision in the San Rafael Desert region.

---

[8] Available at https://eplanning.blm.gov/epl-front-office/projects/lup/67041/83220/99825/Price_Map_30_-_Suitable_Wild_and_Scenic_Rivers.pdf.

14

## XII.    NEPA Alternatives

### a.  Legal Background

NEPA requires BLM to analyze a range of alternatives to any proposed action. *See* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004) ("An agency's obligation to consider reasonable alternatives is 'operative even if the agency finds no significant environmental impact.'") (quoting *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003)). Though less detailed than an EIS, an EA must demonstrate that the agency took a "hard look" at alternatives – a "thoughtful and probing reflection of the possible impacts associated with the proposed project" so as to "provide a reviewing court with the necessary factual specificity to conduct its review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006) (quoting *Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir.1993)); *see also* 40 C.F.R. § 1508.9(a)(1).

The range of alternatives an agency must analyze in an EA or EIS is determined by a "rule of reason and practicality" in light of a project's objective. *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002) (quoting *Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 432 (10th Cir.1996)). "NEPA 'does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective[.]'" *New Mexico ex rel. Richardson*, 565 F.3d at 708 (quoting *Colo. Envtl. Coal. v. Dombeck,* 185 F.3d 1162, 1174 (10th Cir.1999)). But the number and nature of alternatives must be "sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Id.* (quoting *Dombeck*, 185 F.3d at 1174).

In an EA, as in an EIS, the range of alternatives an agency must analyze depends on its purpose and need statement. *See Davis*, 302 F.3d at 1119; *see also* 40 C.F.R. § 1508.9(b) (requiring that EAs include "brief discussions of the need for a proposal" and alternatives to it). "Alternatives that do not accomplish the purpose of an action are not reasonable." *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1041 (10th Cir. 2001). Stated differently, "[i]t is the BLM purpose and need for action that will dictate the range of alternatives and provide a basis for the rationale for eventual selection of an alternative in a decision." BLM Handbook 1790 § 6.2. After "defining the objectives of an action," the agency must "provide legitimate consideration to alternatives that fall between the obvious extremes." *Dombeck*, 185 F.3d at 1175.

Notably, "[t]he broader the purpose and need statement, the broader the range of alternatives that must be analyzed." BLM Handbook 1790 § 6.2.1; *see also id.* § 6.6.1. "In determining the alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of implementing an alternative." *Id.* § 6.6.1, at 50. Likewise, NEPA's alternatives analysis requirement is *independent of and broader than* BLM's obligation under the Act to determine whether oil and gas leasing and development will have a significant impact to the environment:

> [C]onsideration of alternatives is critical to the goals of NEPA even where a
> proposed action does not trigger the EIS process.  This is reflected in the structure

15

of the statute: while an EIS must also include alternatives to the proposed action, . . . the consideration of alternatives requirement is contained in a separate subsection of the statute and therefore constitutes an independent requirement. The language and effect of the two subsections also indicate that the consideration of alternatives requirement is of wider scope than the EIS requirement. The former applies whenever an action involves conflicts, while the latter does not come into play unless the action will have significant environmental effects. . . . Thus the consideration of alternatives requirement is both independent of, and broader than, the EIS requirement.

*Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228-29 (9th Cir. 1988) (citations omitted).

### b.  BLM Cannot Analyze Only the Proposed Action and No Action Alternatives

BLM must analyze a broad range of NEPA alternatives because the purpose and need of an oil and gas sale is exceedingly broad (*i.e.*, to respond to lease parcel nominations). BLM's stated objectives govern its range of alternatives and dictate the reasonableness of alternatives including those proposed *infra* by SUWA. Once BLM establishes its purpose and need statement the agency must "provide legitimate consideration to alternatives that fall between the obvious extremes." *Dombeck*, 185 F.3d at 1175.

In the present case, BLM has repeatedly acknowledged that it needs to analyze a broad range of alternatives prior to moving forward with oil and gas leasing and development in the San Rafael Desert. For example:

- The Federal Register notice initiating the San Rafael Desert MLP process stated that one of its primary purposes was to "[c]onsider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing." 81 Fed. Reg. at 31253. Specifically, BLM needed to "consider a range of alternatives that focus on mitigating the impacts of development on resources that are of concern." *Id.*

- BLM already started, but has yet to complete, its NEPA analysis of four *leasing* and development alternatives for the San Rafael Desert region, including for the exact areas affected by the leasing EA. *See, e.g.*, MLP Alternatives Summary 7 (noting that "BLM has developed four preliminary alternatives"); BLM, San Rafael Desert Master Leasing Plan, Chapter 2 – Alternatives (describing the four alternatives for managing oil and gas leasing and development in the San Rafael Desert MLP) (MLP Alternatives) (attached). These alternatives (and associated leasing stipulations, notices, and leasing decisions) should be incorporated into BLM's NEPA analysis in the leasing EA. *See also* BLM, San Rafael Desert Master Leasing Plan, Appendix B – Oil and Gas Stipulations and Lease Notices (describing each oil and gas leasing stipulation and notice associated with each alternative) (attached).

Notably, BLM has stated that these alternatives need to be analyzed "prior to new leasing of oil and gas resources" in the San Rafael Desert region. 81 Fed. Reg. at 31253. In other words, BLM

AR010601

cannot rely on the outdated analysis in the Price and Richfield RMPs to justify issuance of the parcels. It is immaterial that the MLP concept has been rescinded, as discussed *supra*. BLM cannot ignore its earlier statements and commitments merely because the MLP concept is no longer the vehicle used to bring about this analysis. *See WildEarth Guardians*, 870 F.3d at 1237 ("In order for the agency's conclusions to be upheld, 'an agency must examine the relevant data and articulate a rational connection between the facts found and the decision made.") (citation and internal alterations omitted).

### c.  SUWA's Recommended Alternatives

SUWA recommends that BLM analyze the following alternatives in the leasing EA:

- A "leasing outside of wilderness-caliber lands" alternative. Under this alternative, BLM would not offer for lease any parcels in BLM-identified non-WSA lands with wilderness characteristics.

- A "no-surface occupancy" alternative.  Under this alternative, BLM would only offer BLM-identified non-WSA lads with wilderness characteristics for lease with non-waiveable no surface occupancy stipulations.

  - BLM already has recognized the need to consider alternatives such as these, stating that a primary purpose of the San Rafael Desert MLP was to "[c]onsider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing." 81 Fed. Reg. at 31253.

- A "phased development-leasing" alternative. Under this alternative, BLM would require lessees and operators to first explore and develop land <u>outside</u> of BLM-identified non-WSA lands with wilderness characteristics – and to prove that such areas are capable of production in paying quantities – prior to developing in BLM-identified non-WSA lands with wilderness characteristics.

  - BLM has the authority to require this approach and, notably, has already recognized the need to do so in the San Rafael Desert, stating that a primary purpose of the MLP was to "[e]valuate potential development scenarios." 81 Fed. Reg. at 31253.

  - BLM has also identified the need to "prepare development scenarios for oil and gas resources" prior to leasing in the San Rafael Desert. *Id.*  BLM has already begun to analyze four leasing alternatives, which to varying levels encompass SUWA's recommended alternative; that analysis should be carried forward into this alternative. *See generally* MLP Alternatives.

- A "mitigation leasing" alternative. Under this alternative, BLM would attach additional mitigation measures and best management practices (BMP) to each lease. This would include controlled surface use and NSO stipulations to protect sensitive resources

AR010602

including cultural resources and BLM-identified non-WSA lands with wilderness characteristics.

- o BLM has the authority to require this approach and, notably, has already recognized the need to analyze such an approach in the San Rafael Desert region that is the subject of this lease sale. Two primary purposes of the San Rafael Desert MLP were to "[c]reate oil and gas development mitigation strategies," and "[c]onsider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing." 81 Fed. Reg. at 31253.

- o Further, BLM has already started to analyze four leasing alternatives, which to varying levels encompass SUWA's recommended alternative; that analysis should be carried forward into this alternative. *See generally* MLP Alternatives.

Each of SUWA's recommended alternatives are reasonable, non-speculative, technically feasible, and without question would accomplish BLM's stated purpose and need for its leasing EA. Moreover, each of these alternatives are well within BLM's statutory mandate and authority under FLPMA. As such, BLM much analyze and consider each alternative.

### XIII.  BLM Must Prepare an Environmental Impact Statement

The controversial nature of oil and gas leasing, including the proximity to Canyonlands National Park and Glen Canyon National Recreation Area in the present case, coupled with BLM's repeated and unequivocal statements that significantly more information and analysis must be considered prior to issuing new oil and gas leases in the San Rafael Desert, require BLM to prepare an EIS.

An EIS must be prepared for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1124 (9th Cir. 2004) ("[A]n EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factors.'") (emphasis in the original); *Natural Res. Def. Council v. Herrington*, 768 F.2d 1355, 1430 (D.C. Cir. 1985) (agency must make a "convincing case that [the impacts of its action are] insignificant").

Several intensity factors are satisfied in the present case, requiring BLM to prepare an EIS. Specifically, the leasing proposal is one which "affects public health or safety." 40 C.F.R. § 1508.27(b)(2). Additionally, it involves "[u]nique characteristics . . . such as proximity to historic or cultural resources, park lands . . . wild and scenic rivers, [and] ecologically critical areas." *Id.* § 1508.27(b)(3). Likewise, BLM's leasing proposal and its associated environmental impacts are "highly controversial." *Id.* § 1508.27(b)(4). These intensity factors have been triggered in the present case. Further, as discussed *supra*, BLM has unequivocally recognized the need for more information and analysis "prior to new leasing of oil and gas resources" in the areas targeted for lease now. 81 Fed. Reg. at 31253.

AR010603

The change in presidential administration and BLM leadership and associated priorities, including the ill-conceived rush for "energy dominance" and return to the lease everything, lease everywhere leasing policies of the George W. Bush administration, do not alleviate or excuse BLM from its prior statements and commitments regarding the San Rafael Desert region. Those prior statements and commitments, coupled with the controversial nature of the leasing proposal, along with its location in the heart of the San Rafael Desert, require BLM to prepare an EIS.

### XIV.  BLM Must Provide the Public an Opportunity to Review and Comment on the Leasing EA or EIS

"Federal agencies *shall to the fullest extent possible* . . . [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2 (emphasis added). SUWA requests that BLM make available the leasing EA or EIS to the public for review and comment. Specifically, SUWA requests that BLM provide a 30 day comment period due to the fact that this leasing proposal will have ongoing and irretrievable impacts to public lands and resources including Canyonlands National Park, Glen Canyon National Recreation Area, and wilderness-caliber lands, among other resource values.

SUWA appreciates your consideration of these scoping comments.

Sincerely,

Steve Bloch
Landon Newell
Laura Peterson
Southern Utah Wilderness Alliance
425 E 100 S
Salt Lake City, Utah 84111

19

U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT**

# OIL AND GAS LEASING – LAND USE PLANNING AND LEASE PARCEL REVIEWS

*IM 2023-010*
Instruction Memorandum

**November 21, 2023**

**Post Date/EMS Transmission:** 11/21/2022

**Expires:** 09/30/2026

To: All Field Officials

From: Principal Deputy Director

Subject: Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews

**Program Area:** Oil and Gas, Planning, and National Environmental Policy Act (NEPA)

**Purpose:** This Instruction Memorandum (IM) sets out the policy of the Bureau of Land Management (BLM) to ensure that oil and gas lease sales are held in accordance with the Mineral Leasing Act (MLA) (30 U.S.C. 226), Inflation Reduction Act of 2022 (IRA) (Pub. L. No. 117-169), and other applicable laws. This IM updates and supersedes policy announced in IM No. 2021-027, *Oil and Gas Leasing – Land Use Planning and Lease Parcel Reviews*, and supersedes any conflicting guidance or directive found in Handbooks H-1790-1, *National Environmental Policy Act* (Rel. 1-1710, 1/30/2008); H-1624-1, *Planning for Fluid Mineral Resources* (Rel. 1-1749, 1/28/2013); H-3101-1, *Issuance of Leases* (Rel. 3-308, 2/2/1996); H-3120-1, *Competitive Leases* (Rel. 3-338, 2/18/2013); and Manual MS-3120, *Competitive Leases* (Rel. 3-337, 2/18/2013).

**Administrative or Mission Related:** Mission Related

**Policy/Action:** The following policy applies to the leasing of Federal oil and gas under the BLM administered surface,[1] state-owned surface, and private surface estates.[2] The BLM does not manage leasing on Indian lands; therefore, this policy does not apply to Indian lands.

This policy addresses land use planning, lease parcel review, lease sales, lease issuance, and IM implementation and directs the BLM to incorporate the revised policy, as appropriate, into the affected BLM handbooks and manuals.

I. Land Use Planning

As outlined in the BLM Handbook H-1601-1, *Land Use Planning*, Resource Management Plans (RMPs) underlie oil and gas leasing decisions. Through effective monitoring and periodic RMP evaluations, state and field offices will examine resource management decisions to determine whether the RMPs adequately protect important resource values in light of changing circumstances, updated policies, and new information (H-1601-1, sections V.A and B). The results of such reviews and evaluations may require a state/field office to update resource information through land use plan maintenance, amendment, or revision. In the interim, the BLM will exercise its discretion regarding whether to defer any oil and gas leasing parcels from lease sales. When necessary, state/field offices will maintain or amend RMPs to accommodate changes in lease stipulations in accordance with guidance found in H-1610-1, *Land Use Planning*, sections VI.H and VII.B.

II. Lease Parcel Review

The purpose of a lease parcel review by the state and field offices is to determine the conditions under which leasing may be allowed to proceed and to ensure conformance with the approved RMP. Lease parcel reviews will be conducted and documented simultaneously with the NEPA compliance process for oil and gas lease sales.

　　◦ *A. Expressions of Interest Subject to Lease Parcel Review*

The BLM will evaluate and consider expressions of interest (EOIs) in accordance with IM 2023-006, *Implementation of Section 50265 in the Inflation Reduction Act for Expressions of Interest for Oil and Gas Lease Sales*. Under that IM and consistent with longstanding practice, the BLM will conduct an initial screening of all timely submitted EOIs, including to determine whether they address lands that the BLM has the authority to lease. The BLM will ensure EOIs are consistent with the criteria and direction set forth in IM 2023-006.

　　◦ *B. Parcel Review Timeframes*

State offices will hold lease sales, as required by Section 226(b)(1)(A) of the MLA; Section 50265 of the IRA; and 43 CFR. 3120.1-2(a), when eligible lands are determined by the BLM state office to be available for oil and gas leasing and through exercise of their discretion via the process described below. When eligible lands are available, BLM will develop a quarterly sale schedule, which should consider, among other factors, rotating lease parcels

responsibilities among state and field offices to allow those BLM offices to most efficiently manage agency workload. The BLM will balance the workload and allow each office to devote sufficient time and resources to implement the parcel review policy established in this IM. State offices will extend field office review timeframes, as necessary, to ensure there is adequate time for the field offices to conduct comprehensive parcel reviews.

○ *C. Review of Lease Sale Parcels*

State and field offices will form an Interdisciplinary Parcel Review (IDPR) Team of resource specialists to review lease sale parcels as part of compliance with NEPA and other legal and policy requirements for adequate review of parcels.

Lease sale parcel review will, at a minimum, include the following steps:

1. *Gather and Assess Existing Information*

State and field offices will gather and evaluate existing environmental resource information and compile documentation of compliance with applicable laws, regulations, and executive orders (e.g., NEPA analysis, Endangered Species Act (ESA) (16 U.S.C. 1531 *et seq.*), and National Historic Preservation Act (NHPA) (54 U.S.C. 300101 *et seq.*) resource data and consultation, and socioeconomic data pursuant to Executive Order 12989). The BLM will determine the need for additional information and develop strategies to obtain any data that may be required to support a leasing decision.

2. *Site Visits*

Site visits are not required in all instances but may be deemed necessary by the authorized officer on a case-by-case basis, such as for Tribal or stakeholder considerations or when existing data is not adequate.

3. *Public Participation/Coordination*

State and field offices will provide for public participation as part of the review of parcels identified for potential leasing through the NEPA compliance documentation process (see section III.D). State and field offices will identify groups and individuals with an interest in the local BLM oil and gas leasing, including surface owners of split estate lands where Federal minerals are being considered for leasing. Interested groups, individuals, and potentially affected split estate surface owners[3] will be kept informed of field office leasing and NEPA activities through updated websites and email lists and will be invited to comment during the NEPA compliance process.  The BLM will also undertake formal Tribal consultation and communication as outlined in D.

4. *Identification of Potential Lease Sale Parcels*

The BLM will identify parcels for consideration during the lease sale review process based on:

- EOIs that are submitted pursuant to Section III.A, above, including EOIs that were deferred from consideration for prior sales where the BLM determines that the issue(s) underlying the deferral(s) have been fully resolved; and
- Nominations developed by the BLM after applying applicable screening criteria and determining that offering the certain lands for leasing would further the purposes of the MLA, the IRA, and other applicable laws, rules, and policies.

Further, the BLM may consider parcels that were previously offered at competitive lease sales, but which did not result in the issuance of a lease. When considering such parcels, the BLM will evaluate whether the underlying NEPA documentation is adequate and whether further consultation under the ESA, NHPA, and other legal authorities is required. If the previously offered parcels require further NEPA analysis and/or consultation, then the BLM will complete those steps before reoffering the parcels for sale.

○ *D. ESA, NHPA, and Tribal Consultation Compliance Documentation*

State and field offices will meet all requirements related to the ESA and the NHPA, as well as fulfill all Tribal consultation requirements (see the BLM Manual 1780, *Tribal Relations*, and the BLM Handbook H-1780-1, *Improving and Sustaining BLM-Tribal Relations*), and will attach the standard ESA and NHPA lease stipulations or appropriate stipulations consistent with the applicable RMP to any lease that is offered.

○ *E. NEPA Compliance Documentation*

The IDPR Team[4] will complete site-specific NEPA compliance documentation for all the BLM surface and split estate[5] lease sale parcels. In accordance with this IM, the NEPA compliance documentation for oil and gas leasing will include the following opportunities for public participation: (1) scoping period (minimum 30 days); (2) draft NEPA document review and comment period (minimum 30 days); and (3) protest period (30 days).

If the authorizing official confirms that the proposed leasing action is adequately analyzed in an existing NEPA document and is in conformance with the approved RMP, a Determination of NEPA Adequacy (DNA) may be used to document NEPA compliance for the leasing decision (H-1790-1, National Environmental Policy Act Handbook, section 5.1).[6] It is expected that the DNA process will only be appropriate in cases where the existing NEPA documentation is consistent with the most current program-specific guidance. If a DNA is not appropriate, then the field office will determine the appropriate NEPA compliance documentation (e.g., environmental assessment (EA) or environmental impact statement (EIS)) to be prepared.

The EA or EIS will analyze a no action alternative (no leasing) and a proposed leasing action (leasing the parcel(s) in conformance with the land use plan and the criteria set forth in IM-2023-007, *Evaluating Competitive Oil and Gas Lease Sale Parcels for Future Lease Sales*). If the BLM includes both low and high preference parcels in the lease sale upon application of the criteria set forth in IM-2023-007, the BLM should include additional alternatives to the proposed action reflecting various options for including or deferring those parcels. The BLM may include other alternatives based upon any other factor bearing on the eligibility and/or availability of lands for leasing. In cases where the BLM determines that the necessary terms and conditions under which leasing would be appropriate are not in conformance with the RMP, it will be necessary to amend the RMP before potentially offering the parcels for leasing. If it is necessary to amend the RMP, the leasing EA (or EIS) must either meet the standards for NEPA documentation to support a plan amendment (see 43 CFR 1600), or the affected lease parcels must be deferred from leasing until a plan amendment or revision can be completed at a later date.

AR010606

The IDPR Team will finalize the EA and FONSI considering any public comment received on those documents. If a FONSI is not warranted, the IDPR Team may recommend that the parcel be withheld from leasing or that an EIS be prepared to address the site-specific issues in compliance with NEPA.

III. Lease Sales and Lease Issuance

◦ A. Public Notification of Lease Sale

The state office must post the Notice of Competitive Lease Sale (sale notice) at least 45 days prior to the start of the lease sale, consistent with the Mineral Leasing Act, 30 U.S.C. 226(f), and the BLM regulations, 43 CFR 3120.4-2. The BLM should post the sale notice on the National Fluid Lease Sale System (NFLSS) and make it available in the public room. Also, the BLM should display the NFLSS website link on the state office website and the ePlanning project page for the sale to reduce duplicate postings and minimize the BLM's workload. Field or state offices will post the NEPA compliance documentation on the BLM ePlanning website and in the public room at least 45 days prior to the start of the sale.

For online lease sales, the NFLSS will communicate directly with the internet auction provider. The provider may contact the state office as needed, and the state office may contact the provider as needed. No parcels will be removed from a lease sale during the active bidding period.

◦ B. Lease Sale Parcel Protests

A 30-day protest period will begin the day the sale notice is posted. The process outlined in this IM—which includes site-specific parcel analysis and increased public participation—will help identify, address, and resolve many issues before the lease sale. State offices should attempt to resolve protests before the sale of the protested parcels. Protests that are not resolved do not prevent bidding on protested parcels at the auction. Protest decisions should advise the protesting parties of their right to appeal denied protests to the Interior Board of Land Appeals, but that appeals will not automatically halt the auction or issuance of leases. State Offices will post all received protests documents on the NFLSS website.

◦ C. Lease Issuance

The BLM cannot issue a lease for a protested parcel until the protest is resolved. The BLM will generally resolve protests prior to holding lease sales. If a state office is unable to resolve all protests before the date of a sale, the sale may proceed, and the state office should resolve the protests and decide whether to issue the affected leases within 60 days after the BLM receives full payment from the successful bidder for the bonus bid, first year rental, and administrative fees. See 30 U.S.C. 226(b) (1) (A). If the BLM grants a protest after the date of sale (and before lease issuance), the BLM should reject the bid and refund the bonus bids and rentals paid. State offices will post all protest resolution documents on the NFLSS.

If the BLM cannot resolve the protests and issue the lease within 60 days from the date that the BLM receives full payment from the successful bidder for the bonus bid, first year rental, and administrative fees, the BLM should issue a notice to the successful bidder (see Notice for Delay in Lease Issuance Template (Attachment 1)) and provide the successful bidder an opportunity to decline the lease. If the successful bidder so declines, the BLM will not issue the lease and will refund the bonus bid and advanced rental paid to the remitter. The BLM may reoffer the lands at a future competitive sale.

◦ D. Formal Nomination Process

The BLM reserves the right to employ the formal nomination process set forth in 43 CFR 3120.3-1 through 3120.3-7; the BLM Handbook H-3120-1, *Competitive Leases*; and the BLM Manual MS-3120, *Competitive Leases*. Before using this process, the BLM will publish a notice in the *Federal Register* and accept comments for a period of 30 days, as required by 43 CFR 3120.3, Handbook H-3120-1, and Manual MS-3120.

◦ E. Prohibition on Noncompetitive Leasing

Under the Inflation Reduction Act of 2022, the BLM no longer has the authority to issue noncompetitive oil and gas leases. Accordingly, the BLM will reject any application for a noncompetitive oil and gas lease that it receives. Further, any and all provisions of the BLM's Handbook, Manual, and other policy documents that concern the authorization of noncompetitive oil and gas leases are hereby rescinded.

IV. Application

This IM governs the BLM procedure and organization and is not a substantive rule, regulation, or other legally binding instrument, and the recommendations it contains may not apply to a particular situation based upon the individual facts and circumstances. Nothing in this IM is intended to modify or amend any Federal laws or regulations, nor create any rights or cause of action or trust obligation that any person or party may enforce through litigation or otherwise against the United States Government or any of its employees or officers. This IM is not legally enforceable. To the extent that there is any inconsistency between the provisions of this IM and any Federal regulations or laws, the regulations or laws will control.

---

[1] This policy will be implemented across the BLM as described herein. Certain provisions in this policy will not apply in some contexts, including to elements of leasing within the National Petroleum Reserve in Alaska (NPR-A), because the BLM manages that area under statutory authorities, such as the Naval Petroleum Reserves Production Act of 1976, 42 U.S.C. 6501 *et seq.*, that apply only to that area.

[2] This policy does not apply to the leasing of Federal oil and gas under lands managed by other Federal Surface Management Agencies. The policy, however, does apply to split estate lands within National Forest System (NFS) units (i.e., lands with Federal subsurface ownership and non-Federal surface ownership).

[3] For split estate lands within National Forest System units, the necessary NEPA analysis for a leasing decision may be done through documentation prepared jointly by the Forest Service (FS) and the BLM or prepared by the FS and adopted by the BLM.

[4] This requirement does not apply to split estate lands within National Forest System units if leasing decisions for such lands are analyzed in documentation prepared jointly by the FS and the BLM for lands within the external boundaries of National Forest System units.

AR010607

[5] For split estate lands within National Forest System units, the necessary NEPA analysis for a leasing decision may be done through documentation prepared jointly by the FS and the BLM or prepared by the FS and adopted by the BLM.

[6] The NEPA document to which the DNA refers must contain sufficient detail to address the potential direct, indirect, and cumulative effects of the proposed action(s). Consideration must be given to new information, new or revised program-specific guidance, and new or revised lease stipulations contemplated for the lease parcel that may or may not be analyzed in the existing NEPA document.

**Budget Impact:**  This policy will result in a minimal impact to the BLM's budget.

**Background:**  On April 30, 2021, the BLM issued an updated leasing policy, IM No. 2021-027. After the Inflation Reduction Act of 2022 became law, the BLM identified aspects of the previous policy that needed improvement. This IM aims to streamline the leasing process and to provide consistency for the public participation periods in the leasing process.

**Manual/Handbook Sections Affected:**  This IM transmits policy that will be incorporated into Handbooks H-1790-1, *National Environmental Policy Act* (Rel. 1-1710, 1/30/2008); H-1624-1, *Planning for Fluid Mineral Resources* (Rel. 1-1749, 1/28/2013); H-3101-1, *Issuance of Leases* (Rel. 3-308, 2/2/1996); H-3120-1, *Competitive Leases* (Rel. 3-338, 2/18/2013); and ManualMS-3120, *Competitive Leases* (Rel. 3-337, 2/18/2013).

**Contact:**  If you have questions or concerns regarding this IM, please contact Nada Culver, at (202) 255-6979. For program questions, your staff may contact Lonny Bagley, Acting Chief, Division of Fluid Minerals, (HQ-310) at lbagley@blm.gov or (307) 622-6956; or Peter Cowan, Senior Mineral Leasing Specialist (HQ-310) at picowan@blm.gov or (720) 838-1641.

**Coordination:**  This policy was coordinated with the U.S. Department of the Interior's Office of the Solicitor and the BLM Headquarters, Energy, Minerals, and Realty Management (HQ-300).

| Signed By | Authenticated By |
|---|---|
| Nada Culver | Ambyr Fowler |
| Principal Deputy Director | Division of Regulatory Affairs and Directives (HQ-630) |

## ATTACHMENTS

**IM 2023-010 ATT 1** (PDF / 116 KB)

## FISCAL YEAR

2023

AR010608

# SAN RAFAEL DESERT MASTER LEASING PLAN
# APPENDIX C—BEST MANAGEMENT PRACTICES

## INTRODUCTION

Best Management Practices (BMPs) are measure applied on a site-specific basis to reduce or eliminate adverse impacts. For each proposed action, a number of BMPs may be applied to mitigate anticipated impacts. BMPs can be voluntarily incorporating by project proponents into individual proposals as design features, or added by the Bureau of Land Management (BLM) to authorizations as conditions of approval.

BMPs should be selected based on the site specific requirements of the project and local environment. No one management practice is best suited to every site or situation. BMPs must be adaptive and monitored regularly to evaluate effectiveness. BMPs by their very nature are dynamic innovations and must be flexible enough to respond to new data, field research, technological advances, and market conditions.

The BLM continues to improve the way it manages oil and gas development on public lands. Part of that improvement includes the use of BMPs to lessen the effects of oil and gas development on the environment. The oil and gas industry and the BLM are constantly developing and improving BMPs.

The BMPs listed below may be applied to proposed oil and gas activities in the San Rafael Desert (SRD) Master Leasing Plan (MLP) area under Alternatives B, C, and D. The list is not comprehensive and may be modified over time as conditions change and new practices are identified. Periodically, the BMPs may be updated to stay current with the latest technology and with the latest Department of Interior and BLM direction.

## Construction and Operations

- Well site locations should be planned in order to minimize long-term disruption of the surface resources and existing uses, and to promote successful reclamation.

- Existing roads will be used to the extent possible. All new roads and upgrades of existing roads will be designed to a safe and appropriate standard "no higher than necessary" to accommodate intended vehicular use and to reduce impacts to natural resources.

- No construction or routine maintenance activities shall be performed during periods when the soil is too wet to adequately support construction equipment. If such equipment creates ruts in excess of four inches deep, the soil shall be deemed too wet to adequately support construction equipment.

- Drainage from disturbed areas will be confined or directed so as to not cause erosion in undisturbed areas.

- Construction of access roads on steep hillsides and near water courses will be avoided where alternate routes provide adequate access.

- Access roads requiring construction with cut and fill will be designed to minimize surface disturbance; and will take into account the character of the landform, natural contours, cut material, depth of cut, where the fill material will be deposited, resource concerns, and visual contrast. Roads will follow the contour of the land where practical.

- Fill material will not be cast over hilltops or into drainages. Cut slope ratios should normally be no steeper than 3:1 and fill slopes no steeper than 2:1.

- Low water-crossings will be used whenever possible.

- Placement of facilities on hilltops and ridgelines will be avoided. Well site layout should take into account the topography and landform. Deep, vertical cuts and steep, long fill slopes should be avoided. All cut and fill slopes should be constructed to the least percent slope practical.

1

AR010609

- Trash will be retained in portable trash containers and hauled to an authorized disposal site. Burning of trash will not be allowed on the site.

- Cattleguards will be installed and maintained whenever access roads go through pasture gates or fences. Maintenance includes cleaning out under cattle guard bases when needed.

- All pits and open cellars shall be fenced in accordance with BLM specifications.

- In coordination with the BLM and Emery or Wayne County, operators shall maintain existing roads in a safe, usable condition. Maintenance shall include, but is not limited to, grading, ditching, installing low water crossings, and, if needed, surfacing the road with aggregate.

- Stockpile all brush, limbs, crushed stumps, and other woody material separately from topsoil. Use the stripped vegetation for interim reclamation.

- Repair/replace fences as necessary in order to prevent cattle access to project facilities. Fences will be constructed around reserve pits to prevent wildlife entry.

- Construct a berm of sufficient capacity to contain the storage capacity of the largest tank plus sufficient freeboard to contain 150 percent of the volume of the largest tank to surround the tank battery.

- Apply mat drilling techniques to accelerate and enhance reclamation by decreasing soil and vegetation disturbance, especially in areas where erosive soils are present.

- Locate well pads, associated facilities, and utilities in the least environmentally sensitive areas. Locate wells outside of drainages, below ridgelines, away from important sources of forage, cover, reproductive habitats, winter habitats, parturition areas, and brood-rearing habitats.

- Centralize and combine pipeline systems and other facilities and infrastructure to minimize disturbance during development and production.

## Air Quality and Greenhouse Gas/Fugitive Dust

- Water or alternative dust suppressants (i.e. surfactants or other erosion control materials) will be utilized to minimize fugitive dust during construction and applied on material (sand, gravel, soil, minerals, or other matter that may create fugitive dust) piles.

- All vehicles and construction equipment will be properly maintained to minimize exhaust emissions.

- Restrict vehicle speeds to approximately 10 miles per hour (mph) on well pads and production facility locations.

- Vehicles are not to exceed a speed of approximately 20 mph on any unpaved road that does not include a posted speed limit to discourage the generation of fugitive dust.

- Periodic watering or chemical stabilization of unpaved roads.

- Cover, enclose, or stabilize excavated or inactive material piles after activity ceases.

- Use telemetry and well automation to remotely monitor and control production.

- Use centrally stored water that is piped to the well pads through a temporary surface line.

- Centralize (or consolidate) gas processing facilities (separation, dehydration, sweetening, etc.).

- Construction and drilling crews will carpool to and from the site to minimize vehicle-related emissions.

- To the extent possible, utilize solar power to power well site equipment.

- Install vapor recovery units on all oil and condensate tanks.

- Minimize the period of time between initially disturbing the soil and revegetating or other surface

2

stabilization. Utilize interim reclamation.

- Minimize the area of disturbed land.

- Prompt revegetation of disturbed lands.

- Enclose, cover, water, or otherwise treat loaded haul trucks to minimize loss of material to wind and spillage.

- Revegetate, mulch, or otherwise stabilize the surface of all disturbed areas adjoining roads.

- Reduce elemental carbon, particularly from diesel fueled engines by utilizing controls such as diesel particulate filters on diesel engines, or using lower emitting engines.

- Opportunities to reduce nitrogen oxides (NOx), particularly from internal combustion engines, should be pursued to control impacts to deposition and visibility in nearby Class 1 areas. This may include the use of lower emitting engines, and/or add on controls (e.g. selective catalytic reduction) where appropriate.

- Reduce nitrogen oxides (NOx), particularly from internal combustion engines, by controlling impacts to deposition and visibility in nearby Class 1 areas. This may include the use of lower emitting engines, and/or add on controls (e.g. selective catalytic reduction) where appropriate.

## Cultural Resources

- All persons who are associated with mineral operations will be informed that they will be subject to prosecution for knowingly disturbing archaeological sites or collecting artifacts.

- If any previously unidentified cultural resources or human remains are discovered as a result of mineral operations, activity in the vicinity of the discovery will cease and will be immediately reported to the BLM Field Office. Work may not resume at that location until approved by the BLM Authorized Officer.

- Use visual resource BMP's to avoid, minimize, or mitigate potential adverse effects to historic properties.

## Visual Resources/Noise/Night Skies

- Use natural or artificial features, such as topography, vegetation, or an artificial berm to help screen facilities. Design roads and other linear facilities to follow the contour of the land or mimic lines in the vegetation. Avoid a straight roads that will draw the viewer's eye and attention toward production facilities.

- Paint above ground production facilities (pumping units, pipes, compressors, tanks, treaters, etc.) a color that allows the facility to blend into the background. Also, paint all new equipment brought onto the site the same color as approved by the BLM Authorized Officer.

- Semi-gloss paints should be used rather than flat paints; the selected paint color should be one or two shades darker than the background.

- During reclamation, replace soil, brush, rocks, shrub/tree debris, etc., over disturbed earth surfaces, which allows for natural regeneration rather than introducing an unnatural looking grass cover.

- Design well pads so that the edges are irregular and more natural-looking. Straight line edges should be avoided.

- Utilize "liquid gathering systems" to eliminate surface storage tanks and reduce truck trips for removal of liquids.

- Place infrastructure within or near previously disturbed locations. Pipelines and electric lines should be buried in or immediately adjacent to access roads. Surface-laid pipelines, if necessary, should also be located in or immediately adjacent to access roads.

3

- Minimize noise by using best available technology, such as installation of multi-cylinder pumps, hospital grade sound reducing mufflers, and placement of exhaust systems to direct noise away from sensitive receptors.

- Locate drill pads, roads, and facilities below ridgelines or behind topographic features to minimize auditory effects.

- Limit the use of artificial lighting during nighttime operations to only those that are determined necessary for the safety of operations and personnel.

- Utilize shielding and aiming techniques, as well as limiting the height of light poles to reduce glare and avoid light shining above horizon(s).

- Direct lights downward onto the task area. The bottom surface of the light fixture should be level, or if unable to be fully level, point it as close to straight down as possible, or shield it to avoid light being projected horizontally.

- Use lights only where needed, using light only when needed, and directing all lighting onsite.

- Use motion sensors, timers, or manual switching for areas that require illumination, but are seldom occupied.

- Reduce lamp brightness and select lights that are not broad spectrum or bluish in color.

## Soil/Water/Riparian

- Minimize disturbance to natural drainage patterns. Design locations for storm conditions, ensure offsite natural runoff does not wash over site, and use perimeter drainage ditches.

- Divert storm water away from well locations with ditches, berms, or waterbars above the cut slopes to trap well location runoff and sediments on or near the location through the use of sediment fences or water retention ponds.

- Inspect equipment routinely for leaks (diesel fuel, hydraulic fluid, lubricating oil, and coolant) and make any necessary repairs. In the event of soil contamination due to equipment fluid spills, isolate and clean up the spill immediately. Implement soil remediation and bioremediation procedures or excavate to an appropriate container and transport to an approved offsite disposal location.

- During reclamation, apply certified weed free mulch or other suitable materials and crimp or tackify to remain in place to reclaim areas for seed retention.

- In areas of identified biological soil crusts, the top 2 to 5 inches of topsoil, inclusive of the biological soil crusts, shall be carefully stripped and stockpiled separately from all other soil materials

- Organic matter and debris shall be retained in the piles to help sustain biological activity and increase the effectiveness of respreading the crust material. Storage piles shall be shallow to preserve microorganisms and seeds. Respread the soil crust during interim and final reclamation. During reclamation, reestablish mounds on the surface prior to reapplying the biological soil crusts.

- Stabilize topsoil stockpiles by 1) spraying with water to establish crust, and 2) cover with biodegradable product.

- Utilize erosion control structures, such as certified weed free straw bales, silt fences, sediment traps, waterbars, drainage ditches, and sediment ponds to prevent down cutting on slopes, to reduce loss of sediment, and to avoid contamination of runoff into perennial and intermittent streams. These structures will remain in place and will be maintained until stabilization and revegetation are complete.

- Regular monitoring of revegetated and reclaimed areas will be conducted with regular maintenance or reseeding as needed until the BLM determines that the revegetation is successful.

- Topsoil will be segregated and stored separately from subsurface materials to avoid mixing during

4

construction, storage, and interim and final reclamation. Subsurface materials will never be placed on top of topsoil material at any point in the operation. Stockpiles will be located and protected so that wind and water erosion are minimized and reclamation potential is maximized. Ensure that the topsoil is spread evenly over the reclaimed area.

- Use closed-loop drilling systems in sensitive areas or where there is shallow groundwater.

- Substitute less toxic, yet equally effective products, for conventional drilling products.

- Disposal or emergency pits will be located in cut material rather than fill material.

- If water is encountered during construction of a pit, cease construction and immediately contact BLM.

- Avoid constructing reserve pits in areas of shallow groundwater. To prevent contamination of groundwater and soils, use semi-closed-loop or closed-loop drilling systems or lined pits with impermeable liners.

- Where operations are conducted in the vicinity of public water sources, the operator will work with the public water supplier to identify possible methods to protect water supplies.

- At a minimum, the operator and the BLM will adhere to BLM Instruction Memorandum 2010-055 regarding the Protection of Groundwater in Association with Oil and Gas Leasing, Exploration, and Development or the latest BLM policy or guidance. Areas identified with shallow unconfined aquifers and potential unconsolidated aquifers will require additional mitigation that may include closed loop drilling, no surface pits, offsite location of production storage facilities; a spill prevention, control and countermeasure plan (as specified by the Environmental Protection Agency [EPA]); and a storm water management plan. A water monitoring plan may be required to ensure the effectiveness of mitigation to protect water resources.

- Construct all road and pipeline crossings at right angles to streams to minimize the area of disturbance.

- Locate and construct all structures crossing intermittent and perennial streams and ephemeral drainages such that they do not decrease channel stability or increase water velocity.

- Minimize crossings of streams (intermittent and perennial) with vehicles and heavy machinery.

- As specified by the Authorized Officer, reserve pits and other surface impoundments will be lined with synthetic liners with a minimum thickness of 12 millimeters or other materials, such as bentonite or clay. Decommission by removing all contaminants and liner and dispose of the liners in an approved waste management facility or recycle them. For additional siting and closure guidance, refer to IB No. UT 2013-038.

- Use wind fences, other forms of wind breaks, or other techniques where needed to control wind erosion and prevent downwind (off-site) emissions of fugitive dust.

- Use BLM-approved dust suppressants or other techniques when and where needed to prevent emissions of fugitive dust from development sites and associated unpaved roadways.

## Reclamation

- Provide a reclamation plan as part of mineral proposals that includes plans for both interim and final reclamation. Reclamation is required of any disturbed surface that is not necessary for continued production operations. Additional reclamation measures may be required based on existing conditions at the time of final abandonment.

- Operators would be required to following the Green River Reclamation Guidelines for all development in the Price Field Office.

- Planning for reclamation should occur prior to construction in order to achieve successful reclamation in the future. Successful final reclamation is achieved more efficiently by locating

5

operations in areas that minimize reclamation needs, the sufficient salvage of topsoil, and completion of interim reclamation.

- Reclaimed areas above pipelines receiving incidental disturbance during maintenance activities will be reseeded as soon as practical.

- Final reclamation of all mineral related disturbances will involve recontouring of all disturbed areas, including access roads to the original contour or a contour that blends with the surrounding topography and revegetating all disturbed areas to native species. It also involves salvaging and reusing all available topsoil (whatever soil is on top) in a timely manner, revegetating disturbed areas, controlling erosion, controlling invasive non-native plant and noxious weeds, and monitoring results. Reclamation measures should begin as soon as possible after the disturbance and continue until successful reclamation is achieved.

- The long-term objective of final reclamation is to set the course for eventual ecosystem restoration, including the restoration of the natural vegetation community, hydrology, and wildlife habitats. In most cases, this means returning the land to a condition approximating or equal to that which existed prior to the disturbance.

- During the life of the mineral operation, all disturbed areas not needed for active support of the operation should undergo interim reclamation in order to minimize the environmental impacts of development on other resources and uses. Reclamation is required of any disturbed surface that is not necessary for continued mineral operations.

- Disturbed areas should be revegetated after the site has been satisfactorily prepared. Site preparation will include respreading topsoil to an adequate depth, and may also include ripping, tilling, disking on contour, and dozer track imprinting.

- Any topsoil pile set aside should be revegetated to prevent it from eroding and to help maintain its biological viability.

- All pits must be reclaimed to a safe and stable condition that blends with the rest of the reclaimed area. If necessary, the pit area should usually be mounded slightly to allow for settling, to allow for positive surface drainage.

- Interim reclamation of the well pad and access road will begin as soon as practical.

- Facilities will be grouped on the pads to allow for maximum interim reclamation. Interim reclamation will include road cuts and fills and will extend to within close proximity of the well head and production facilities.

- Respread topsoil over the entire location and revegetate to within a few feet of the production facilities, unless an all-weather, surfaced, access route or turn-around is needed.

- The well site must be recontoured to original contour or a contour that blends with the surrounding landform, stockpiled topsoil evenly distributed, and the site revegetated. Salvaged topsoil must be respread evenly over the surfaces to be revegetated. The topsoiled site should be prepared to provide a seedbed for reestablishment of desirable vegetation.

- Final reclamation includes recontouring the road back to the original contour, seeding, controlling noxious weeds, and may also include other techniques to improve reclamation success, such as ripping, scarifying, replacing topsoil, constructing waterbars, pitting, mulching, redistributing woody debris, and barricading.

- Use stockpiled brush, limbs, crushed stumps, other woody material, and stripped vegetation for interim and final reclamation.

- Fencing will be installed to prevent livestock from grazing the reclaimed area until vegetation is reestablished.

AR010614

**Vegetation/Noxious Weeds and Invasive Species**

- Seeding performed as part of reclamation operations will take place in the fall from mid-October until mid-December when the ground surface is not frozen.

- Prior to commencing operations, all equipment and vehicles will be cleaned to remove seeds and soil that may contain seeds in order to avoid the spread of noxious weeds and invasive species.

- To minimize the potential of spreading weed seeds between drilling locations, compressed air will be used to remove weed seeds and soil from equipment before it is mobilized to the next drilling location.

- Develop a weed management plan on how to monitor growth of invasive species resulting from surface disturbance caused by project activities and how to control noxious weeds and invasive species through the application of commercial herbicides after obtaining a Pesticide Use Permit from the BLM.

- Treatment to prevent the introduction or spread of invasive/noxious plants would conform to the guidelines and principles of the Western States Environmental Impact Statement for vegetation treatments, which specifies herbicides approved for use, treatment protocols, mitigation, and monitoring.

- Construction equipment and vehicles will not be allowed to drive through weed-infested areas.

- In coordination with the BLM and Emery and Wayne Counties, control noxious and invasive plants that become established along roads, on well pads, or adjacent to other facilities.

- Clean and sanitize all equipment brought in from other regions. Use portable washing stations to periodically wash down equipment entering and leaving well field areas, especially during muddy conditions.

**Wildlife**

- Identify important, sensitive, and unique habitats and wildlife in the area. Incorporate mitigation practices that minimize impacts to these habitats.

- Plan the pattern and rate of development to avoid the most important habitats and generally reduce the extent and severity of impacts.

- Cluster drill pads, roads, and facilities in specific areas that would have a lower impact on wildlife habitat.

- Consider liquid gathering systems to eliminate surface storage tanks and reduce truck trips for removal of liquids.

- Place infrastructure within or near previously disturbed locations in order to avoid new impacts to wildlife habitat.

- Roads would be reclaimed as soon as possible after they are no longer required.

- Personnel will be advised to minimize stopping and exiting their vehicles in big game winter range when there is snow on the ground.

- If it is found that project activities could potentially affect raptor nesting, as determined from decreased raptor productivity or nesting, or documented nest abandonment or failure, alternate nesting sites (ANS) may be constructed at a rate of up to two ANSs for one impacted nest. Existing degraded raptor nests may be upgraded or reinforced to minimize potential impacts.

- In order to minimize potential for raptor mortalities on production facility structures, raptor protection measures shall be applied (e.g., modify for raptor-safe construction, install perches, perching deterrents, nesting platforms, nest deterrent devices, etc.).

7

- In order to limit impacts to pronghorn antelope, avoid aggressive non-native grasses and shrubs in pronghorn habitat restoration.

- If produced water is allowed to evaporate after completion of drilling, reserve pits will be fenced on four sides to prevent entry by wildlife and/or livestock.

- Promptly report observations of potential wildlife problems to the regional office of the Utah Division of Wildlife Resources (UDWR) and, as applicable, to the U.S. Fish and Wildlife Service (USFWS).

- The operator will notify the BLM Authorized Officer and nearest USFWS Law Enforcement office within 24 hours if the operator discovers a dead or injured Federally protected species (i.e., migratory bird species, bald or golden eagle, or species listed by the USFWS as threatened or endangered) in or adjacent to a pit, trench, tank, exhaust stack, or fence. (If the operator is unable to contact the USFWS Law Enforcement office, the operator must contact the nearest USFWS Ecological Services Office.)

- Design, construct, and maintain exclosure fencing for all open cellars and pits containing freestanding fluids to prevent access to livestock and large forms of wildlife, such as deer, elk, and pronghorn. At a minimum, the operator will adequately fence all fluids pits and open cellars during and after drilling operations until the pit is free of fluids and the operator initiates backfilling. The operator will maintain the fence in order to protect public health and safety, wildlife, and livestock.

  (For examples of exclosure fencing design, refer to the Oil and Gas *Gold Book* – Exclosure Fence Illustrations, Figure 1, Page 18.)

  Adequate fencing (in lieu of more stringent requirements by the surface owner) includes all of the following:

  1. Construction materials will consist of steel and/or wood posts. Use a fence with five separate wires (smooth or barbed) or hog panel (16-foot length by 50-inch height) with connectors, such as fence staples, quick-connect clips, hog rings, hose clamps, twisted wire, etc. Do not use electric fences.

  2. Set posts firmly in the ground. Stretch the wire, if used, tightly and space it evenly, from the ground level to the top wire, effectively keeping out animals. Tie hog panels securely into posts and to one another using fence staples, clamps, etc. Construct the fence at least 2 feet from the edge of the pit.

  3. For reserve pits, fence all four sides as soon as the pit is constructed. Reconstruct any damage to the rig side of the fence immediately following release of the drilling rig.

  4. Maintain the erect fences in adequate condition until the pit has been closed.

- The operator will prevent wildlife and livestock access (including avian wildlife) to fluids pits that contain or have the potential of containing salinity sufficient to cause harm to wildlife or livestock, hydrocarbons, surfactants, or Resource Conservation and Recovery Act-exempt hazardous substances. At a minimum, the operator will install approved netting in these circumstances, in accordance with the requirements below, immediately following release of the drilling rig.

  Note: The BLM generally does not approve of the use of flagging, strobe lights, metal reflectors, or noisemakers as techniques for deterring wildlife.

  Minimum Netting Requirements

  The operator will:

  1. Construct a rigid structure made of steel tubing or wooden posts with cable strung across the pit at no more than 7-foot intervals along the X- and Y-axes to form a grid

8

of 7-foot squares.

2. Suspend netting a minimum of 4 to 5 feet above the pit surface.

3. Use a maximum netting mesh size of 1½ inches to allow for snow loading while excluding most birds in accordance with U.S. Fish and Wildlife Service recommendations. Refer to: http://www.fws.gov/mountain-prairie/contaminants/contaminants1c.html.

4. Cover the top and sides of the netting support frame with netting and secure the netting at the ground surface around the entire pit to prevent wildlife entry at the netting edges. Note: Hog wire panels or other wire mesh panels or fencing used on the sides of the netting support frame is ineffective in excluding small wildlife and songbirds unless covered by smaller meshed netting.

5. Monitor and maintain the netting sufficiently to ensure the netting is functioning as intended, has not entrapped wildlife, and is free of holes and gaps greater than 1½ inches.

- The operator will construct and maintain pits, cellars, open-top tanks, and trenches, that are not otherwise fenced, screened, or netted, to exclude livestock, wildlife, and humans (for example, lined, clean water pits; well cellars; or utility trenches) to prevent livestock, wildlife, and humans from becoming entrapped. At a minimum, the operator will construct and maintain escape ramps, ladders, or other methods of avian and terrestrial wildlife escape in pits, cellars, open-top tanks, or at frequent intervals along trenches where entrapment hazards may exist.

- Immediately following active drilling or completion operations, the operator will take actions necessary to prevent wildlife and livestock access, including avian wildlife, to all open-topped tanks that contain or have the potential to contain salinity sufficient to cause harm to wildlife or livestock, hydrocarbons, or Resource Conservation and Recovery Act of 1976-exempt hazardous substances. At a minimum, the operator will net, screen, or cover open-topped tanks to exclude wildlife and livestock and prevent mortality. If the operator uses netting, the operator will cover and secure the open portion of the tank to prevent wildlife entry. The operator will net, screen, or cover the tanks until the operator removes the tanks from the location or the tanks no longer contain substances that could be harmful to wildlife or livestock.

- The operator will prevent all hazardous, poisonous, flammable, and toxic substances from coming into contact with soil and water. At a minimum, the operator will install and maintain an impervious secondary containment system for any tank or barrel containing hazardous, poisonous, flammable, or toxic substances sufficient to contain the contents of the tank or barrel and any drips, leaks, and anticipated precipitation. The operator will dispose of fluids within the containment system that do not meet applicable State or U. S. EPA livestock water standards in accordance with State law. The operator must not drain the fluids to the soil or ground.

- The operator will design, construct, and maintain all secondary containment systems to prevent wildlife and livestock exposure to harmful substances. At a minimum, the operator will install effective wildlife and livestock exclosure systems, such as fencing, netting, expanded metal mesh, lids, and grate covers.

- The operator will construct, modify, equip, and maintain all open-vent exhaust stacks on production equipment to prevent birds and bats from entering, and to discourage perching, roosting, and nesting. Production equipment includes, but may not be limited to, tanks, heater-treaters, separators, dehydrators, flare stacks, in-line units, and compressor mufflers.

9

# REPORT ON THE FEDERAL OIL AND GAS LEASING PROGRAM

*Prepared in Response to Executive Order 14008*

U.S. Department of the Interior

November 2021

AR010618

**I.  INTRODUCTION** ............................................................................................ **3**

  Overview: The Federal Oil and Gas Program ....................................................... 4

    Onshore ........................................................................................................... 4

    Offshore .......................................................................................................... 5

  The Need for Reform .......................................................................................... 6

**II.  RECOMMENDATIONS** ............................................................................... **6**

  Providing a Fair Return to American Taxpayers and States ................................ 7

    Onshore ........................................................................................................... 7

      Royalties ...................................................................................................... 7

      Bonus Bids ................................................................................................... 8

      Rental Rates ................................................................................................. 9

      Bonding ........................................................................................................ 9

    Offshore .......................................................................................................... 10

      Royalties and Royalty Relief ...................................................................... 10

      Financial Assurances .................................................................................. 11

      Fitness to Operate ....................................................................................... 12

  Designing More Responsible Processes .............................................................. 12

    Onshore ........................................................................................................... 12

      Low Potential Lands .................................................................................... 12

      Bidding Requirements ................................................................................. 13

    Offshore .......................................................................................................... 13

  Creating a More Inclusive and Just Approach to Managing Public Lands and Waters ........ 14

**III. CONCLUSION** ............................................................................................. **14**

**IV. ENDNOTES** ................................................................................................... **15**

AR010619

## I.    INTRODUCTION

This report responds to Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad,* which directed the Department of the Interior (DOI) to conduct a review of Federal oil and gas leasing and permitting practices.[1] This report considers both onshore and offshore oil and gas leasing programs in light of the Secretary of the Interior's broad stewardship responsibilities over public lands and Federal offshore waters.

The review found a Federal oil and gas program that fails to provide a fair return to taxpayers, even before factoring in the resulting climate-related costs that must be borne by taxpayers; inadequately accounts for environmental harms to lands, waters, and other resources; fosters speculation by oil and gas companies to the detriment of competition and American consumers; extends leasing into low potential lands that may have competing higher value uses; and leaves communities out of important conversations about how they want their public lands and waters managed.

The fiscal components of the onshore Federal oil and gas program are particularly outdated, with royalty rates that have not been raised for 100 years. States with leading oil and gas production apply royalty rates on State lands that are significantly higher than those assessed on Federal lands. The Texas royalty rate, for example, can be double the Federal rate. Likewise, bonding levels have not been raised for 50 years. Federal minimum bids and rents have been the same for over 30 years. These antiquated approaches hurt not only the Federal taxpayer but also State budgets because States receive a significant share of Federal oil and gas revenues.

For decades, the Government Accountability Office (GAO) and DOI's Office of Inspector General (OIG) have sounded the alarm bell on the Federal oil and gas program. The GAO, a non-partisan independent agency that works for Congress, has consistently called for Congress and the Executive Branch to reform oil and gas leasing on Federal lands. The OIG, which provides independent oversight of DOI, has regularly highlighted energy management in its annual reports on major management and performance challenges,[2] saying, "many of DOI's energy programs are vulnerable to waste, fraud, and mismanagement, which can jeopardize public safety and environmental integrity and increase the financial burden on the American public."[3]

To inform this report, DOI reviewed studies, some going back decades, of the Federal oil and gas program's deficiencies, including from GAO and OIG. The DOI also conducted formal Tribal consultations; held a forum with expert panelists; reviewed public feedback; and met with States, members of Congress, and representatives from the oil and gas industry, labor organizations, conservation organizations, Indigenous organizations, environmental justice organizations, and academics. Issues were identified across all steps of Federal oil and gas development, from land use planning to decommissioning.

This review and outreach reconfirmed well-documented and long reported deficiencies in the Federal oil and gas program that support this report's findings and recommendations related to fiscal terms and bonding. This report identifies a number of recommendations that begin to modernize Federal land management. The reforms serve three main programmatic goals:

AR010620

- Providing a fair return to the American public and States from Federal management of public lands and waters, including for development of energy resources;
- Designing more responsible leasing and development processes that prioritize areas that are most suitable for development and ensure lessees and operators have the financial and technical capacity to comply with all applicable laws and regulations; and
- Creating a more transparent, inclusive, and just approach to leasing and permitting that provides meaningful opportunity for public engagement and Tribal consultation.

These recommendations represent an overdue reform agenda, which is urgent even as the Interior Department begins to take into account new stressors and new opportunities for our public lands and waters, including addressing biodiversity loss, tackling climate change, and deploying new technology ranging from harnessing offshore wind in public waters, to sequestering carbon on public lands. Accordingly, this report focuses primarily on necessary reforms to the fiscal terms, leasing process, and remediation requirements related to deficiencies with the Federal oil and gas program, which are well documented as detailed below.

As the Department considers how to best implement the recommendations contained in this report,[4] the Administration will continue to work closely with Congress, State, Tribal and local officials, industry, labor organizations, environmental justice communities, and stakeholders to ensure that proper consideration is given to creating jobs, harnessing American ingenuity, and building a brighter, more sustainable future.

## Overview: The Federal Oil and Gas Program

### *Onshore*

The Bureau of Land Management (BLM) oversees 245 million acres of Federal public lands, including lands that are managed for outdoor recreation; development of oil, gas, coal, and renewable energy resources; grazing and timber production; safeguarding treasured cultural heritage and sacred sites; and supporting wildlife habitat and ecosystem functions.

In 1976, the Federal Land Policy and Management Act (FLPMA) established particular land and resource management authorities for BLM, bringing to the forefront multiple-use, sustained yield, and environmental protection as the guiding principles for public land management.[5] The FLPMA directs BLM to manage some areas for conservation to consider the best use of public lands in a broader context than economic return, and to take action necessary to prevent unnecessary or undue degradation of the lands. One of the many uses that BLM oversees is the management of energy and mineral resource development on approximately 245 million acres of Federal onshore lands and 700 million acres of subsurface Federal minerals, which is guided by the Mineral Leasing Act.[6]

Federal onshore oil and gas production accounts for approximately seven percent of domestically produced oil and eight percent of domestically produced natural gas. The BLM currently manages 37,496 Federal oil and gas leases covering 26.6 million acres with nearly 96,100 wells.[7] Of the more than 26 million onshore acres under lease today to the oil and gas industry, nearly 13.9 million (or 53 percent) of those acres are non-producing.[8]

AR010621

The oil and gas industry has a substantial number of unused permits to drill onshore. As of September 30, 2021, the oil and gas industry holds more than 9,600 approved permits that are available to drill. In fiscal year (FY) 2021, BLM approved more than 5,000 drilling permits, and more than 4,400 are still being processed.[9] Industry suggests that the significant surplus of leases and permits is necessary for a successful business model, but this speculative approach contributes to unbalanced land management. When land is under contract for potential oil and gas activity, the shared public lands cannot be managed for other purposes, such as conservation or recreation.

*Offshore*

The Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement (BSEE) work to ensure the development of energy and mineral resources on the U.S. Outer Continental Shelf (OCS) is done in a safe and environmentally and economically responsible way. The OCS is comprised of submerged lands generally starting three nautical miles offshore the United States[10]—totaling nearly 2.3 billion acres in the Pacific, Atlantic, Gulf of Mexico and offshore Alaska and Hawaii. These offshore areas also have shared uses, such as supporting marine wildlife habitat, coastal tourism, subsistence uses, recreational and commercial fishing, and national defense activities.

The Outer Continental Shelf Lands Act (OCSLA) explains that the OCS is a "vital natural resource reserve held by the Federal Government for the public,"[11] and establishes policies and procedures to develop and manage OCS oil and gas resources, achieve national economic and energy policy goals, enhance national security, and reduce dependence on foreign sources of energy.[12] In recognition of the significant impacts on coastal and non-coastal areas that exploration, development, and production of OCS resources can have, OCSLA requires that development be conducted in a safe manner and subject to environmental safeguards. Amendments made to OCSLA in 1978 established the policy that oil and natural gas resources on the OCS should be preserved, protected, and developed in a manner that is consistent with the need to meet the nation's energy needs; balance development with protection of the human, marine, and coastal environments; and ensure a fair and equitable return on resources through a competitive leasing process.

In FY 2020, the OCS produced approximately 642 million barrels of oil and 910 million cubic feet of gas, accounting for 16 percent of all oil production and 3 percent of natural gas production in the United States.[13] Most of this production is in the Gulf of Mexico, where the amount of acreage under lease has declined by more than two-thirds over the last 10 years.[14] This decline is mostly driven by market conditions and changes in companies' strategic approach to leasing. Of the more than 12 million acres under lease, about 45 percent is either producing oil and gas or is subject to approved exploration or development plans, which are preliminary steps leading to production. The 55 percent of the leased acreage that is non-producing may be in an earlier stage of the development process, or being held for speculative reasons, indicating a sufficient inventory of leased acreage to sustain development for years to come.

AR010622

## The Need for Reform

In recent decades, the nation's energy needs and the mix of resources available on domestic and global energy markets have materially changed, while the statutes and policies underpinning the nation's oil and gas program have remained largely static. Utility-scale renewable energy production has emerged as a viable source of energy that can be generated on public lands and in offshore waters. The direct and indirect impacts associated with oil and gas development on our nation's land, water, wildlife, and the health and security of communities—particularly communities of color, who bear a disproportionate burden of pollution—merit a fundamental rebalancing of the Federal oil and gas program.

The Federal oil and gas program has been identified on GAO's "High Risk List" for more than a decade, which notes programs and operations that are "vulnerable to waste, fraud, abuse, or mismanagement, or in need of transformation."[15] As far back as 1989, GAO noted that BLM "is not exercising balanced stewardship over the public lands."[16] In 1990, GAO observed that BLM would approve "some drilling permits without first completing the environmental studies."[17] This Administration has taken action to stop that practice. Indeed, GAO has issued frequent reports outlining serious concerns with the onshore oil and gas leasing program. In just the last three years, GAO has highlighted deficiencies with noncompetitive leasing (GAO-21-138), royalty relief policies (GAO-21-169T), data collection (GAO-21-209), ensuring a fair return (GAO-19-718T), and bonding and reclamation practices (GAO-19-615). Offshore, GAO has raised recent concerns about decommissioning liabilities (GAO-16-40), safety and environmental oversight (GAO-17-293), fiscal returns from the leasing program (GAO-19-531), and pipeline safety and decommissioning (GAO-21-293).

Internally, OIG has regularly highlighted energy management in its annual reports of "Major Management and Performance Challenges facing the U.S. Department of the Interior," stating, "many of DOI's energy programs are vulnerable to waste, fraud, and mismanagement, which can jeopardize public safety and environmental integrity and increase the financial burden on the American public."[18] In recent years, OIG has identified specific concerns with the collection, verification, and distribution of energy resource revenues; issues arising from aging onshore and offshore infrastructure; oversight and management of oil and gas production; and offshore environmental compliance and enforcement, among other issues.[19]

Members of Congress from both sides of the aisle have also introduced various bills in recent years to reform and reimagine the Federal leasing programs. The bills include proposals to raise royalty rates to provide a fair return to taxpayers; address bonding deficiencies to ensure that companies properly restore public lands following extractive activities; support non-extractive uses of public lands and waters; restore community input in leasing decisions; and set emissions reductions strategies, among other reforms.

## II.    RECOMMENDATIONS

What follows is a high-level blueprint to begin to modernize the onshore and offshore oil and gas leasing programs in order to better restore balance and transparency to public land and ocean management and deliver a fair and equitable return to American taxpayers.[20]

6

AR010623

## Providing a Fair Return to American Taxpayers and States

*Onshore*

Adjusting and modernizing the fiscal terms used in the Federal onshore oil and gas program increases returns to the public and disincentivizes speculators or less responsible actors. The GAO has reported extensively that taxpayers have not received a fair rate of return due to outdated fiscal terms.[21] For example, Federal onshore oil and gas royalty rates are consistently lower than on State-issued leases and Federal offshore leases (see Tables 1 and 2); in fact, onshore royalty rates have never been raised. Likewise, bonding levels have not been raised for 60 years, and minimum bids and rents have been the same for over 30 years. If a lease is not sold competitively at auction, for two years it can be sold non-competitively for a modest administrative fee, with no bonus bid required. These noncompetitive leases are frequently less diligently developed as competitively issued leases. From 2013 to 2019, average revenues from competitive leases were nearly three times greater than revenues from noncompetitive leases.[22]

Such low prices for leases, coupled with generous 10-year lease initial terms that are frequently extended, encourage speculators to purchase leases with the intent of waiting for increases in resource prices, adding assets to their balance sheets, or even reselling leases at a profit rather than attempting to produce oil or gas. In one particularly egregious recent case, an individual purchased nearly 300 oil and gas leases and resold many of them almost immediately for up to 13 times the original purchase price.[23] Speculators, not taxpayers, receive the profits from these resales. Because information on lease resales is not easily accessible, local communities are often in the dark when it comes to who has the right to develop oil and gas nearby.

The BLM should improve the return to taxpayers and create an oil and gas program that is more consistent with BLM's multiple-use and sustained yield mandates. Consideration should be given to raising royalty rates and, to the extent allowed by statute, to increasing the current minimum levels for bids, rents, royalties, and bonds. Congressional passage of pending bipartisan legislation could further modernize fiscal terms. States will also benefit from a modernized fiscal system since they receive 49 percent of all oil and gas revenues generated from public lands within their borders.[24] Onshore revenues also fund water reclamation projects throughout the West through contributions to the Reclamation Fund, and may also contribute to the National Parks and Public Land Legacy Restoration Fund.

*Royalties*

The Mineral Leasing Act was passed in 1920 and set royalties at a minimum of 12.5 percent for oil and gas produced from public lands. Today, 100 years later, leases are still being sold using these low rates, which are out of step with modern times. Numerous public reports provide support for raising royalty rates for leasing on public lands, and nearly all State and private lands require that operators pay a royalty rate higher than 12.5 percent.[25] In June 2017, GAO reported that studies showed that raising Federal royalty rates for onshore oil and gas could "decrease production on federal lands by a small amount or not at all but could increase overall federal revenue."[26]

7

**Table 1: Oil and Gas Royalty Rates across Federal Public, Private, and State Lands**[27]

| Leasing Jurisdiction | Oil & Gas Royalty Rate |
|---|---|
| California | Negotiated lease-by-lease, but generally no less than 16.67 percent |
| Colorado | 20 percent |
| Montana | 16.67 percent |
| New Mexico | 18.75-20 percent |
| North Dakota | 16.67 or 18.75 percent depending on the county |
| Oklahoma | 18.75 percent |
| Texas | 20-25 percent |
| Utah | 16.67 percent |
| Wyoming | 16.67 percent |
| Private Lands | Generally, 12.5-25 percent |
| Federal Lands | 12.5 percent, sometimes less |

This table shows the oil and gas royalty rate based on jurisdiction.

Taxpayers for Common Sense released a report last year stating that the Federal Government "lost up to $12.4 billion in revenue from oil and gas drilling on federal lands from 2010 through 2019" because Federal royalty rates are too low.[28] Additionally, the same report found little evidence supporting claims that increasing the Federal onshore royalty rate would drive developers away and reduce overall revenues. This finding aligns with the results seen in Colorado and Texas, where there was no significant effect on production from State lands after State royalty rates were raised.[29]

The BLM should begin to adjust royalties for competitive leases offered in individual lease sales and initiate a rulemaking to establish a higher minimum royalty for onshore oil and gas leases. The BLM also should consider limiting discretionary royalty relief, which it has provided extensively to lessees in the recent past, while it updates its current royalty relief guidance and reassesses the economic assumptions used during royalty relief application evaluations.

*Bonus Bids*

A bonus bid is the price paid at a lease sale for an oil and gas lease. The minimum bonus bid is set at $2 per acre—an amount that has not been changed since 1987.[30] If an area offered for lease does not receive a bid during the lease sale, the bonus bid is waived, and the area can be acquired during the next two years by the first party that pays a nominal application fee.

The GAO found that leases purchased with a higher bonus bid of more than $100 per acre are over 20 times more likely to be developed in their first lease term than leases purchased with the minimum bid of $2 per acre.[31] The BLM should initiate rulemaking to increase the minimum bid to discourage speculators and to provide a better return to the taxpayer.

AR010625

*Rental Rates*

Companies pay rent until the lease is in production, and then they pay royalties on the oil and gas produced. The rental rates, which have not changed since 1987, are $1.50 per acre per year for the first five years, then $2 per acre per year for the next five years, at which point a non-producing lease would expire. The lease is automatically extended as long as production continues.

A GAO report from 2009 concluded that:

> Interior does less to encourage development of federal oil and gas leases than some state and private landowners. Interior officials cited one lease provision that may encourage development—escalating rental rates. … Compared to Interior, the eight states we reviewed undertook more efforts to encourage development on their oil and gas leases, using increasing rental rates as well as shorter lease terms and escalating royalty rates. Some states also do more than Interior to structure leases to reflect the likelihood of oil and gas production, which may encourage faster development.[32]

The BLM should initiate a rulemaking in order to increase rental rates for future lease sales.

*Bonding*

Current regulations require financial assurance from all lessees to ensure compliance with lease terms and requirements, which is generally provided in the form of a lease surety bond. A lease surety bond remains in place until all lease obligations have been met, including decommissioning, which can extend beyond the expiration of the lease. A surety bond can be issued as a lease-specific bond, a statewide bond, or a nationwide bond, and additional bonds may be necessary to ensure compliance with lease obligations and regulations.

Insufficient bonding levels provide an inadequate incentive for companies to meet their reclamation obligations and increase the risk that taxpayers will be required to cover the cost of reclaiming wells in the event that the operator refuses to do so or declares bankruptcy. According to a 2019 GAO report:

> … weaknesses with bonds for coal mining and for oil and gas development pose a financial risk to the federal government as laws, regulations, or agency practices have not been adjusted to reflect current economic circumstances. We have also reported that BLM has no mechanism to pay for reclaiming well sites that operators have not reclaimed.[33]

The risks associated with low bonding rates have become more apparent in light of the recent increase in bankruptcies. Company liquidations often result in wells becoming orphaned, which then fall to the Federal Government or States to address, while some companies have used Chapter 11 restructuring to get out of reclamation obligations.[34]

According to the same 2019 GAO report, oil and gas lease bonds do not provide sufficient financial assurance because, among other things, most individual, statewide, and nationwide lease bonds are set at regulatory minimum values that have not been adjusted for inflation since the 1950s and 1960s.[35] These minimum bond amounts and the year calculated are: individual lease, $10,000—1960; statewide, $25,000—1951; nationwide, $150,000—1951.[36] The National Petroleum Reserve—Alaska bonds were set in 1981; an individual lease is $100,000, and a

9

AR010626

reserve-wide bond is $300,000.[37] While individual States have bonding levels that are often too low to fully reclaim modern horizontally-drilled wells, most States require significantly higher bonds than the Federal Government, often with bonding requirements that adjust based on the depth and number of wells covered.[38]

The BLM should increase minimum bond amounts and set the appropriate levels taking into consideration changes in technology, the complexity and depth of modern wells, inflation, and the risk of abandonment. While such regulations are being developed, BLM should adjust bonds for individual, high risk leases through adequacy reviews and when leases are reinstated or applications for permits to drill are extended.

*Offshore*

*Royalties and Royalty Relief*

The BOEM evaluates lease terms on a sale-by-sale basis to ensure they are consistent with current market or resource conditions. The OCSLA sets the minimum offshore royalty rate at 12.5 percent and directs that leasing be conducted in a way that ensures the government receives fair market value (FMV). OCSLA also directs that management of the OCS be conducted in a way that considers economic, social, and environmental values, and protects the human, marine, and coastal environments.

A 2019 GAO report that assessed BOEM's process to evaluate whether it was receiving FMV for offshore leases recommended that BOEM take steps to reform its methodology to ensure that it was capturing the full value of the lease tracts it was offering.[39] The BOEM is in the process of responding to several of GAO's recommendations concerning oil and gas valuation procedures.

**Table 2: Offshore Oil and Gas Royalty Rates (BOEM)**

| Water Depth (meters) | Royalty Rate Prior to 2007[40] | Royalty Rate 2007 | Royalty Rate 2008-March 2017 | Royalty Rate August 2017-2020 (Sale 256) |
|---|---|---|---|---|
| 0 to < 200m | 16.67% | 16.67% | 18.75% | 12.5% |
| 200 to < 400m | 16.67% | 16.67% | 18.75% | 18.75% |
| 400m+ | 12.5% | 16.67% | 18.75% | 18.75% |

This table shows the royalty rate based on water depth. Fiscal terms are evaluated and set on a sale-by-sale basis. Date ranges indicate the years in which sales were held using those terms.

Revenues from lease sales, royalties on production, and rental fees are distributed to the U.S. Treasury, several coastal States through OCSLA section 8(g) and the Gulf of Mexico Energy Security Act, the Historic Preservation Fund, the Land and Water Conservation Fund, and Legacy Restoration Fund.[41]

AR010627

As with BLM, BOEM, and BSEE will be continuing to study the most appropriate method for revising royalty rates and other fiscal terms to monetarily account for the costs of carbon dioxide, methane, and nitrous oxide.

Also similar to BLM, BOEM and BSEE have the authority to provide discretionary royalty relief depending on economic circumstances, and those agencies likewise will be reevaluating existing royalty relief guidance and the economic assumptions used to evaluate royalty relief applications,[42] insofar as royalty relief can have the effect of subsidizing uneconomic production at taxpayers' expense. The BSEE recently determined, for example, that the April 2020 Special Case Royalty Relief guidance neither formalized application and evaluation procedures nor provided adequate training to implement them, and BSEE has discontinued this specific royalty relief option.

*Financial Assurances*

Financial assurance requirements for operators offshore are similar to those onshore: all lessees must provide a general lease surety bond, which covers all terms and conditions of a lease and remains in place until all lease obligations have been met, including decommissioning, which can extend beyond the expiration of the lease. A surety bond can be issued as a lease-specific bond or as an area-wide bond that guarantees obligations on all leases held by a lessee within a specified area. Additional bonds may be necessary to ensure compliance with lease obligations and regulations.

**Table 3. Bonding Amounts for Offshore Oil and Gas Activity**[43]

| Lease Activity | Lease-Specific Bond Amount | Area-Wide Bond Amounts |
|---|---|---|
| No approved operational activity | $50,000 | $300,000 |
| Exploration Plan | $200,000 | $1,000,000 |
| Development Production Plan | $500,000 | $3,000,000 |
| Pipeline Right of Way (ROW) | N/A | $300,000 |

This table shows the amounts for lease-specific and area-wide bonds.

Lessees, owners of operating rights, and ROW holders are jointly and severally responsible for decommissioning obligations and are required to perform this duty in a timely manner, consistent with regulations and guidance.

Recent bankruptcies have in some cases resulted in companies being unable to cover their decommissioning liabilities, leading to orphaned wells and idle infrastructure. The BSEE estimates that the liability for currently orphaned infrastructure on the OCS is approximately $65 million, with the potential to increase if more companies go bankrupt and create additional orphaned infrastructure. The GAO recently found that there were approximately $2.3 billion in decommissioning liabilities on the OCS that were not covered by bonds, and roughly $33 billion in liabilities had bonds waived because the financial condition of the leaseholder was considered

AR010628

strong enough.[44] The current regulatory structure governing financial assurances does not have the appropriate checks to intervene in advance of bankruptcies to require additional financial assurances. Financial assurance coverage should be strengthened to protect the Federal Government and taxpayers and to ensure that companies are financially able to meet their lease and decommissioning obligations.

In 2020, BOEM and BSEE published a notice of proposed rulemaking to address this issue.[45] The agencies will carefully consider comments received on both the proposed rule and this review to inform their approach for improving financial assurance requirements to better manage the risks associated with industry activities on the OCS.

*Fitness to Operate*

Offshore leases are significantly more expensive to acquire than onshore leases, which, among other reasons, results in less of a role for speculators in the leasing process. However, companies with poor environmental, safety, or reclamation histories are still allowed to bid for leases or acquire them from other companies. The BOEM plans to develop a "Fitness to Operate" standard for companies seeking to be designated as oil and gas operators and evaluate how to apply such a standard to potential new lessees or current lessees seeking to gain additional properties. The Fitness to Operate standard will establish criteria that companies would need to meet in order to operate on the U.S. OCS. Requiring companies to meet minimal fitness to operate standards will ensure companies can meet their safety, environmental, and financial responsibilities.

## Designing More Responsible Processes

<u>Onshore</u>

Through the land use planning process, BLM determines what lands may be available for oil and gas leasing, what lease stipulations will be applied to protect other resources and values, and what "conditions of approval" may be necessary on permits to drill for additional protection. The land use planning process requires extensive collaboration with Tribal, State, and local governments and the public regarding how Federal lands will be used and minerals will be extracted at specific locations.

As an overarching policy, BLM should ensure that oil and gas is not prioritized over other land uses, consistent with BLM's mandate of multiple-use and sustained yield. The BLM should carefully consider what lands make the most sense to lease in terms of expected yields of oil and gas, prospects of earning a fair return for U.S. taxpayers, and conflicts with other uses, such as outdoor recreation and wildlife habitat. The BLM should always ensure it is considering the views of local communities, Tribes, businesses, State and local governments, and other stakeholders.

*Low Potential Lands*

Common practice in BLM land use planning has been to leave the majority of Federal lands open for leasing and allow industry to drive decisions on what areas will be nominated for oil and gas leasing. Since there is no cost to nominate parcels of land for leasing, there is little disincentive for companies to identify large amounts of acreage regardless of the resource potential of that

AR010629

land or how seriously the nominator is considering bidding for the nominated parcels. The burden and expense then fall on BLM to process those parcels, triggering the dedication of BLM staff resources to analyze marginal lands that companies may not be interested in bidding on and that may never be leased, much less developed. At the same time, sales of large amounts of low-potential land often ignite local community concerns (particularly since low-potential lands are more likely to be in areas that are not accustomed to local oil and gas development) and result in protests that are time-consuming and resource-intensive to adjudicate.

The BLM should evaluate operational adjustments to its leasing program that will avoid nomination or leasing of low potential lands and instead focus on areas that have moderate or high potential for oil and gas resources and which are in proximity to existing oil and gas infrastructure.

*Bidding Requirements*

The current leasing process does not thoroughly screen buyers, which creates the potential for widespread speculative leasing, unqualified buyers, and large numbers of leases that may be issued noncompetitively. Indeed, speculative leasing has been observed in the leasing program as far back as 1980, when GAO wrote, "We found much inactive land being held by individuals who were not affiliated with oil companies and were, therefore, presumably speculators."[46]

Unlike the offshore or coal leasing programs, the onshore oil and gas program does not pre-clear bidders based on their ability to responsibly and diligently pursue development. Combined with artificially low minimum bids and rental rates, the system is easily taken advantage of by speculators seeking to re-sell leases at higher prices later, and it allows bidders to shield the identity of companies purchasing leases, leaving communities in the dark as to who is seeking to develop oil and gas on nearby public lands.

The BLM should consider reforms that ensure that bidders—and any subsequent proposed leaseholders or operators—are publicly identified and financially and technically qualified to develop leases.

<u>Offshore</u>

For future National OCS Oil and Gas Leasing Programs, BOEM should consider advancing alternatives to the practice of area-wide leasing, under which the entire planning area is offered with few exclusions for a lease sale. Area-wide leasing is not required under OCSLA; it was first implemented by Interior Secretary James Watt in 1982 and has since been applied during the majority of OCS lease sales. An early assessment of the practice by GAO in 1985 found that the first 10 area-wide lease sales resulted in an estimated loss of $7 billion to the Federal Government,[47] and a review of the process published in 2006 found that area-wide leasing significantly reduced the amount of competition and the value of bids for each lease tract.[48] Moving to a leasing model where smaller areas are offered according to a number of criteria—including environmental protection, subsistence use needs, resource potential and financial considerations—will help ensure that American taxpayers are receiving a fair return for offshore oil and gas resources.

AR010630

## Creating a More Inclusive and Just Approach to Managing Public Lands and Waters

The stewardship mission of DOI mandates processes for outreach and receipt of public input, including from communities that may be most affected by DOI activities. These processes have not always been adequate, fair, or equitable, which thus perpetuates environmental injustice. Practices such as allowing anonymous lease nominations and recent efforts to restrict or eliminate public notice and comment periods can leave local community voices—including, in particular, Tribal voices—out of leasing and permitting processes. The DOI should undertake meaningful Tribal consultations and solicit public input more generally regarding its leasing and permitting processes.

## III.   CONCLUSION

Modernization of the Federal oil and gas program has been delayed for decades to the detriment of the American public, their public lands and waters, the environment, wildlife, and more. In its current form, the program falls short of serving the public interest in a number of important respects. It provides insufficient opportunities for public input, shortchanges taxpayers and States, and tilts toward opening up low potential lands without adequately considering competing multiple-use opportunities.

This report lays out actions that the Administration is considering taking, consistent with legal authorities and the Executive Branch's broad discretion, to provide a fair return to taxpayers and to steward shared resources. It also encourages Congress to act on pending legislation to provide fundamental reforms to the onshore and offshore oil and gas programs.

The DOI will continue to seek out honest and pragmatic paths forward—in concert with communities; Federal, State, local, and Tribal leaders; businesses and labor; and other stakeholders—to bring a common purpose to the management of America's public lands and waters, and the value they hold.

AR010631

# IV.    ENDNOTES

[1] Exec. Order No. 14,008, 86 Fed. Reg. 7,619 (Jan. 27, 2021).

[2]  U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management and Performance Challenges Facing the U.S. Department of the Interior for Fiscal Year 2019," November 2019, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-0; U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management and Performance Challenges Facing the U.S. Department of the Interior for Fiscal Year 2018, November 2018, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-1; U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management and Performance Challenges Facing the U.S. Department of the Interior," November 2017, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-2; U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management and Performance Challenges Facing the U.S. Department of the Interior," November 2016, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-3.

[3] U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management And Performance Challenges Facing The U.S. Department Of The Interior," November 2015, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-4.

[4] This report includes only suggestions as to future Departmental actions, which will be promulgated, if at all, in compliance with the Administrative Procedure Act and other applicable law. This report is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officer or employees, or any other person.

[5] 43 U.S.C. § 1701.

[6] 30 U.S.C. § 181.

[7] Bureau of Land Management, *Oil and Gas Statistics*, available at https://www.blm.gov/programs-energy-and-minerals-oil-and-gas-oil-and-gas-statistics.

[8] Ibid.

[9] Bureau of Land Management, *APD Status Report September 2021*, available at https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/operations-and-production/permitting/applications-permits-drill.

[10] The OCS begins nine nautical miles off the Gulf of Mexico coasts of Florida and Texas.

[11] 43 U.S.C. § 1332(3).

[12] 43 U.S.C. §§ 1331-1356.

[13] U.S. Department of the Interior, "Natural Resources Revenue Data," available at https://revenuedata.doi.gov/; U.S. Energy Information Administration, "Crude Oil Production," available at https://www.eia.gov/dnav/pet/pet_crd_crpdn_adc_mbbl_a.htm; U.S. Energy

AR010632

Information Administration, "Natural Gas Gross Withdrawals and Production," Marketed Production data series, available at https://www.eia.gov/dnav/ng/ng_prod_sum_a_EPG0_VGM_mmcf_m.htm.

[14] Bureau of Ocean Energy Management, "Combined Leasing Report July 1, 2021" and "Combined Leasing Report As of February 3, 2011," available at https://www.boem.gov/oil-gas-energy/leasing/combined-leasing-status-report.

[15] U.S. Government Accountability Office, "OFFSHORE OIL AND GAS: Opportunities Exist to Better Ensure a Fair Return on Federal Resources," (2019); High Risk List," U.S. Gov't Accountability Office, https://www.gao.gov/high-risk-list.

[16] U.S. General Accounting Office, Change in Approach Needed to Improve the Bureau of Land Management's Oversight of Public Lands 1 (1989).

[17] U.S. General Accounting Office, "FEDERAL LAND MANAGEMENT: Better Oil and Gas Information Needed to Support Land Use Decisions," June 1990, available at http://archive.gao.gov/d24t8/141709.pdf.

[18] U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management And Performance Challenges Facing The U.S. Department Of The Interior," November 2015, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-4.

[19] U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management and Performance Challenges Facing the U.S. Department of the Interior for Fiscal Year 2019," November 2019, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-0; U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management and Performance Challenges Facing the U.S. Department of the Interior for Fiscal Year 2018, November 2018, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-1; U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management and Performance Challenges Facing the U.S. Department of the Interior," November 2017, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-2; U.S. Department of the Interior Office of Inspector General, "Inspector General's Statement Summarizing the Major Management and Performance Challenges Facing the U.S. Department of the Interior," November 2016, available at https://www.doioig.gov/reports/other/inspector-generals-statement-summarizing-major-management-and-performance-3.

[20] This report focuses on reforms to the oil and gas leasing program, but DOI will also be conducting similar analyses and reviews on the Federal coal program to identify reforms in that program as well, including exploring ways that the costs of climate change are appropriately reflected in coal leasing terms.

[21] U.S. Government Accountability Office, "OFFSHORE OIL AND GAS: Opportunities Exist to Better Ensure a Fair Return on Federal Resources," September 2019, available at https://www.gao.gov/assets/gao-19-531.pdf.

AR010633

[22] U.S. Government Accountability Office, "OIL AND GAS: Onshore Competitive and Noncompetitive Lease Revenues," November 2020, available at https://www.gao.gov/assets/gao-21-138-highlights.pdf.

[23] N. Groom, "How a Burmese immigrant profited by flipping cheap oil leases from Trump auctions," *Reuters,* March 2021, available at https://www.reuters.com/article/us-usa-drilling-myanmar-insight/how-a-burmese-immigrant-profited-by-flipping-cheap-oil-leases-from-trump-auctions-idUSKBN2BE1C5.

[24] 30 U.S.C. § 191.

[25] Taxpayers for Common Sense, "Royally Losing: Higher Royalties on State and Offshore Oil and Gas Production Reap Billions More than Drilling on Federal Lands," February 2020, available at https://www.taxpayer.net/wp-content/uploads/2020/02/TCS-Royally-Losing-2020.pdf.

[26] U.S. Government Accountability Office, "OIL, GAS, AND COAL ROYALTIES: Raising Federal Rates Could Decrease Production on Federal Lands but Increase Federal Revenue," June 2017, available at https://www.gao.gov/assets/gao-17-540.pdf.

[27] Taxpayers for Common Sense, "Royally Losing: Higher Royalties on State and Offshore Oil and Gas Production Reap Billions More than Drilling on Federal Lands," February 2020, available at https://www.taxpayer.net/wp-content/uploads/2020/02/TCS-Royally-Losing-2020.pdf.

[28] Ibid.

[29] Taxpayers for Common Sense, "Royally Losing: Higher Royalties on State and Offshore Oil and Gas Production Reap Billions More than Drilling on Federal Lands," February 2020, available at https://www.taxpayer.net/wp-content/uploads/2020/02/TCS-Royally-Losing-2020.pdf; U.S. Government Accountability Office, "OIL, GAS, AND COAL ROYALTIES: Raising Federal Rates Could Decrease Production on Federal Lands but Increase Federal Revenue," June 2017, available at https://www.gao.gov/assets/gao-17-540.pdf.

[30] 30 U.S.C. § 226(b)(1)(B); 43 C.F.R. § 3120.1-2.

[31] U.S. Government Accountability Office, "OIL AND GAS: Onshore Competitive and Non-Competitive Lease Revenues," November 2020, available at https://www.gao.gov/assets/gao-21-138.pdf.

[32] U.S. Government Accountability Office, "OIL AND GAS LEASING: Federal Oil and Gas Resource Management and Revenue Collection in Need of Comprehensive Reassessment," March 2009, available at https://www.gao.gov/assets/gao-09

[33] U.S. Government Accountability Officer, "FEDERAL ENERGY DEVELOPMENT: Challenges to Ensuring a Fair Return for Federal Energy Resources," September 2019, available at https://www.gao.gov/assets/gao-19-718t.pdf.

[34] N. Sadasivam, "How bankruptcy lets oil and gas companies evade cleanup rules,*" Grist*, June 2021, available at https://grist.org/accountability/oil-gas-bankruptcy-fieldwood-energy-petroshare/.

[35] U.S. Government Accountability Office, "FEDERAL ENERGY DEVELOPMENT: Challenges to Ensuring a Fair Return for Federal Energy Resources," September 2019, available at https://www.gao.gov/assets/gao-19-718t.pdf.

AR010634

---

[36] 43 C.F.R. §§ 3104.2, 3104.3

[37] 43 C.F.R. § 3134.1.

[38] Western Organization of Resource Councils, "BLM Oil and Gas Bonding Rules Leave Lands a Mess and Taxpayers Responsible," April 2020, available at http://www.worc.org/publication/8671/.

[39] U.S. Government Accountability Office, "OFFSHORE OIL AND GAS: Opportunities Exist to Better Ensure a Fair Return on Federal Resources," September 2019, available at https://www.gao.gov/assets/gao-19-531.pdf.

[40] Predominant royalty rates, particularly in the decades immediately preceding 2006. But not all lease sales, particularly older ones, had these exact royalty rates.

[41] U.S. Department of the Interior, "Natural Resources Revenue Data," available at https://revenuedata.doi.gov/.

[42] Congressional Research Service, "Offshore Royalty Relief: Status During the COVID-19 Pandemic," May 2020, available at https://crsreports.congress.gov/product/pdf/IN/IN11380.

[43] 30 C.F.R. §§ 556.900, 556.901.

[44] U.S. Government Accountability Office, "Offshore Oil and Gas Resources: Actions Needed to Better Protect Against Billions of Dollars in Federal Exposure to Decommissioning Liabilities," December 2015, available at https://www.gao.gov/products/gao-16-40.

[45] 85 Fed. Reg. 65,904 (Oct. 16, 2020).

[46] U.S. General Accounting Office, "Impact of Making The Onshore Oil And Gas Leasing System More Competitive," March 1980, available at https://www.gao.gov/assets/emd-80-60.pdf.

[47] U.S. General Accounting Office, Early Assessment of Interior's Area-Wide Program for Leasing Offshore Lands (1985).

[48] J. Boué and others, "A Question of Rigs, of Rules, or of Rigging the Rules?: Upstream Profits and Taxes in US Gulf Offshore Oil and Gas, *Oxford University Press,* 2006.

AR010635

**Form 1221-2**
**(June 1969)**



**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

**MANUAL TRANSMITTAL SHEET**

Release
1-1749

Date
1/28/13

**Subject**

**H – 1624-1 – Planning for Fluid Mineral Resources**

1. **Explanation of Materials Transmitted:** This release inserts Chapter V, Master Leasing Plans and a Glossary, into H-1624-1 – Planning for Fluid Mineral Resources, Rel. No. 1-1583 dated 5/7/1990.

2. **Reports Required:** None.

3. **Materials Canceled:** None.

4. **Filing Instructions:** File as directed below

      **REMOVE**               **INSERT**

      None                   **Chapter V and the Glossary (11 pages)**

*Michael Pool*

**Acting Director,**
**Bureau of Land Management**

AR010636

**Form 1221-2**
**(June 1969)**



### UNITED STATES
### DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT

**MANUAL TRANSMITTAL SHEET**

| | |
|---|---|
| **Release** | 1-1583 |
| **Date** | 5/7/90 |

Subject

H-1624-1 PLANNING FOR FLUID MINERAL RESOURCES

---

1. <u>Explanation of Materials Transmitted</u>:  This Handbook provides detailed instructions for complying with the fluid minerals supplemental program guidance (SPG) for resource management planning as prescribed in BLM Manual Section 1624.2.  It contains, among other things, procedural guidance for analyzing and documenting reasonably foreseeable fluid mineral development and the impacts of such development on the human environment.

2. <u>Reports Required</u>:  Within the next year, after the field has had some experience in implementing this Handbook guidance, the Washington Office will request Field Office comments to determine if changes are warranted.  Additional related guidance on pre-lease and post-lease plan conformance and NEPA compliance review procedures and more detailed guidance on cumulative impact analysis procedures may also be incorporated into the Handbook at that time.

3. <u>Materials Superseded</u>:  None.

4. <u>Filing Instructions:</u>  File as directed below.

      <u>REMOVE</u>                <u>INSERT</u>
        None                 H-1624-1

                            (Total:  50 Sheets)

                            *Carson W. Culp, Jr.*
                            Acting Deputy Director

AR010637

H-1624-1  -  PLANNING FOR FLUID MINERAL RESOURCES

Table of Contents

CHAPTER I - PRODUCTION

| | | Page |
|---|---|---|
| A. | Purpose of the Handboook …………………………………………….. | I-1 |
| B. | Overview of the Decision Tiers in the Fluid Minerals Program……………………… | I-1 |
| | 1. Policy Tier………………………………………………………………… | I-1 |
| | 2. Resource Management  Planning Tier………………………………………….. | I-1 |
| | 3. Activity Planning and  Implementation Tier……………………………………… | I-2 |

CHAPTER II – CONDUCTING PREPLANNING

| A. | Introduction……………………………………………………………… | II-1 |
|---|---|---|
| | 1. Planning Schedule……………………………………………………….. | II-1 |
| | 2. Preplanning Activity……………………………………………………… | II-1 |
| B. | Scheduling Inventories and Assessments…………………………………………… | II-1 |
| C. | Determining Scope and Level of Effort…………………………………………… | II-1 |
| D. | Digitizing Data……………………………………………………………... | II-2 |

CHAPTER III – CONDUCTING AND DOCUMENTING  THE ANALYSES OF FACTORS

| A. | Introduction……………………………………………………………… | III-1 |
|---|---|---|
| B. | Procedural  Guidance…………………………………………………….. | III-1 |
| | 1. Assemble Data and Information……………………………………………… | III-1 |
| | 2. Identify and Describe Existing Management Practices…………………………… | III-4 |
| | 3. Analyze Resource Capability and Potential…………………………………….. | III-4 |
| | 4. Project Reasonably Foreseeable Development (RFD) Under | |
| | Existing Management……………………………………………………… | III-7 |
| | 5. Analyze the Impacts Resulting From the Continuation of | |
| | Existing Management……………………………………………………… | III-9 |
| | 6. Identify Problems and Opportunities Associated with | |
| | Existing Management……………………………………………………… | III-10 |
| | 7. Formulate Alternatives to Existing Management………………………………… | III-10 |
| | 8. Develop RFD Scenarios and Analyze Impacts for Each | |
| | Alternative………………………………………………………………… | III-12 |
| C. | Documentation Guidance ………………………………………………………… | III-12 |
| | 1. In the Unpublished Planning Records………………………………………… | III-12 |
| | 2. In the RMP/EIS……………………………………………………………... | III-12 |

CHAPTER IV – DOCUMENTING AND DISPLAYING DETERMINATIONS

| A. | Introduction……………………………………………………………… | IV-1 |
|---|---|---|
| B. | Management Areas………………………………………………………………... | IV-1 |
| C. | Management Direction…………………………………………………………… | IV-1 |
| | 1. Existing Leases……………………………………………………………... | IV-1 |
| | 2. Lease Stipulations…………………………………………………………… | IV-2 |
| | 3. Stipulation Waivers, Exceptions and Modifications…………………………………. | IV-3 |
| | 4. Geophysical Exploration ……………………………………………………… | IV-3 |
| D. | Management Objectives…………………………………………………………… | IV-3 |

H-1624-1 – PLANNING FOR FLUID MINERAL RESOURCES

Table of Contents (cont'd)

CHAPTER V – MASTER LEASING PLANS

A.    Introduction……………………………………………………………………    V-1
B.    MLP Criteria………………………………………………………………......    V-1
C.    Elements of an MLP……………………………………………………………    V-2
D.    Potential Development…………………………………………………………    V-6
E.    Identifying and Evaluating Potential Resource Conflicts in an MLP……………………………    V-7
F.    Developing an MLP through the RMP Revision or Amendment Process……………………..    V-7

Illustrations

1.    Summary of BLM Planning Process
2.    Recommended Format/Content for Planning Documents Involving Fluid Minerals
3.    Example of How Constraints Can Be Summarized for Alternatives
4.    Example of RMP Documentation of the Affected Environment – Excerpts From Geology and Mineral resources and Socioeconomic Sections
5.    Example of Reasonably Foreseeable Development Scenario and Assumptions Used in an Area of Moderate to Low Oil and Gas Potential
6.    Analysis in an Area of High Oil and Gas Potential

AR010639

CHAPTER I - INTRODUCTION

A.  Purpose of the Handbook.

        This Handbook is intended for use by the Bureau of Land Management (BLM) specialists involved in preparing planning and associated environmental analyses and documents.  It is also intended for use by BLM officials responsible for development, oversight and compliance with Section 202 of the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA) within the fluid minerals program.

        The purpose of this Handbook is to provide guidance on how to comply with the resource management planning requirements set forth in the supplemental program guidance for fluid minerals (BLM Manual Section 1624.2).  The 1624.2 Manual establishes the fluid minerals determinations that, except under certain specified circumstances (see BLM MS 1620.06), are required in every resource management plan (RMP) prepared by the BLM.  The BLM Manual Section 1624.2 also identifies factors which should be analyzed and considered in making fluid mineral determinations.  The guidance provided in Chapters 2, 3, and 4 of this Handbook is intended to assist in preparing the following: an RMP, a plan amendment, or a planning analysis involving fluid minerals; an environmental assessment (EA) tiered to the existing environmental document or a supplemental environmental impact statement (EIS) involving fluid minerals; a fluid minerals EA or EIS that is prepared in an area where there is no land use plan; and a plan or environmental document of another surface management agency (SMA) involving fluid minerals where the BLM is a cooperating agency.

B.  Overview of the Decision Tiers for the Fluid Minerals Program.

        The BLM's planning and NEPA guidance provides for tiered decision making (see BLM MS 1601.1 and the BLM NEPA Handbook, H-1790-1).  In the fluid minerals program the major decision tiers are as follows:

    1.  Policy Tier.  The Director establishes Bureauwide policies and procedures for the leasing of Federal fluid minerals and the management of exploration, utilization, development and abandonment activities on Federal oil and gas or geothermal leases.  Bureauwide policy and procedural guidance is set forth in regulations, manuals, instruction memoranda, interagency and intergovernmental agreements, operating orders, and notices to lessees.  State Directors may supplement this guidance through State Office instruction memoranda or manual guidance.  The following are examples of documents which contain national policy and procedural guidance relating to planning and NEPA compliance for the fluid minerals program:

a.  <u>Regulations</u>.  40 CFR Part 1500 (NEPA), 43 CFR Part 1600 (Planning), 43 CFR Part 3100 (Oil and Gas Leasing), 43 CFR Part 3200 (Geothermal Resource Leasing).

b.  <u>Operating Orders and Notices to Lessees</u>.  Onshore Oil and Gas Order No.1 and NTL's 2B, and 3A, Geothermal Resources Operational Orders Nos. 1, 2, 3, and 4.

c.  <u>Manuals</u>.  BLM Manual Series 1600 (Planning), BLM MS 1790 (NEPA), BLM MS 3031 (Energy and Mineral Resource Assessment), BLM Manuals Series 3100 (Onshore Oil and Gas Leasing), and BLM Manual Series 3200 (Geothermal Resource Leasing).

d.  <u>Handbooks</u>.  BLM H-1790-1 (NEPA), BLM Handbook Series 3100 (Onshore Oil and Gas Leasing), and BLM Handbook Series 3200 (Geothermal Resource Leasing).

e.  <u>Interagency Agreements</u>.  The 1984 Interagency Agreement between the BLM and the Forest Service on fluid mineral leasing, the 1987 Interagency Agreement between the BLM and the National Park Service (NPS) on geothermal leasing, and the 1984 Memorandum of Understanding between the BLM and the Department of Defense on fluid mineral leasing.  State Offices may also have interagency agreements which prescribe policies or procedures affecting the fluid minerals program, e.g., agreements with the Governor's Office on consistency review procedures for resource management planning.

2.  <u>Resource Management Planning Tier</u>.  The State Director determines where and under what conditions oil and gas or geothermal exploration, development, and utilization activities will be permitted.  These determinations are made in RMP's or plan amendments in accordance with policies and procedures set forth in BLM's planning regulations and manual guidance. These determinations are the basis for the timing, surface use, and no surface occupancy stipulations that are attached to a Federal oil and gas or geothermal lease.  The RMP also identifies the circumstances necessary for granting a waiver, exception or modification to any stipulation.

Compliance with NEPA has been integrated into BLM's resource management planning process.  The BLM has a statutory responsibility under NEPA to analyze and document the direct, indirect and cumulative impacts of past, present and reasonably foreseeable future actions resulting from Federally authorized fluid minerals activities.  By law, these impacts must be analyzed before the agency makes an irreversible commitment.  In the fluid minerals program, this commitment occurs at the point of lease issuance.  Therefore, the EIS prepared with the RMP is intended to satisfy NEPA requirements for issuing fluid mineral leases (see Chapter III of this Handbook).  Bureauwide standards and guidelines for complying with NEPA requirements are set forth in the BLM NEPA Handbook (H-1790-1).

AR010641

3.  <u>Activity Planning and Implementation Tier</u>.  The District or Area Manager establishes the site specific conditions under which exploration, development, and abandonment will be permitted on specific leases, and determines if stipulation waivers, exceptions or modifications are warranted.  All site specific determinations must conform with the RMP and are established in the process of approving notices of intent, applications for permit to drill (APD's), geothermal drilling permits (GDP's), field development plans, utilization plans and permits, sundry notices, and reclamation plans.  Activity planning related to other resource programs addresses the impacts, if any, of the fluid minerals program on that resource or activity and the impacts of any conditions or restrictions on the fluid minerals program.

CHAPTER II – CONDUCT PREPLANNING

A. Introduction.

1. Planning Schedule. Every year the BLM and the FS jointly publish a Federal Register notice to notify other Federal agencies, State and local governments, Tribal governing bodies, user groups, and the general public of their respective land use planning schedules. The BLM portion of this notice is prepared by the Washington Office using information provided by BLM State Offices. It lists, by State, District, and Resource Area, all major resource management planning efforts currently underway or tentatively scheduled to begin within the next three years.

2. Preplanning Activity. Resource management planning activities that occur between the preliminary identification of a new planning start in the planning schedule and the publication in the Federal Register of the Notice of Intent (NOI) to prepare an RMP or plan amendment are commonly referred to as preplanning. (See BLM Manual Section 1631.3 for a general discussion of these preplanning activities.) If fluid minerals are to be adequately addressed in a proposed RMP or plan amendment involving fluid minerals, the tasks described in the following three sections should be completed during the preplanning period.

B. Scheduling Inventories and Assessments.

State Office program leads for fluid minerals should review the BLM's annual planning schedule to identify areas where additional inventory work may be required to support projected new planning starts. Assuming that new starts are identified three years in advance, any collection of information and data and/or mineral inventory work that may be required can be completed before the planning effort is formally initiated. Data on fluid mineral resources should be gathered and analyzed, as outlined in Chapter III.

C. Determining Scope and Level of Effort.

During the preplanning period a number of preliminary decisions are made about the scope and focus of the proposed planning effort, the organization of the planning team, who will do what, when it will be done, and how it will be funded. Depending on the State, the document that summarizes these preplanning decisions may be called a preparation plan, a preplanning analysis, a project management plan, or a preplanning contract.

The preplanning document is usually prepared by the planning team leader, working with the interdisciplinary planning team, and line management. The document is usually completed prior to issuing the Notice of Intent and it is normally signed by the Area Manager, the District Manager, and the State Director.

The fluid minerals program should be represented in one form or another in the discussions that lead to the preplanning document. This document specifies, among other things, whether fluid minerals activities will be associated with any preliminarily identified planning issues or management concerns, how fluid minerals will be handled in the preliminarily identified plan alternatives, how existing fluid minerals NEPA documentation will be incorporated into the published documents, and the extent to which the fluid minerals specialist will be involved in the planning effort. (See the "Preplanning Contract Training Package" prepared by the Phoenix Training Center, l600-INT-3, for a detailed discussion of preplanning activities and the contents of a preplanning contract.)

Note that, unless an exception applies, <u>fluid minerals determinations are required in every RMP regardless of whether or not fluid minerals is associated with a planning issue or management concern</u>. This should be reflected in the preplanning document. If management has decided to use one of the exceptions discussed in BLM Manual Section 1620.06, the preplanning document should explain why the requisite determinations will not be made. However, it is highly unlikely that one of the exceptions could ever be justifiably used for fluid minerals determinations.

D.  <u>Digitizing Data</u>.

During the preplanning period, decisions are also made about whether the proposed RMP or plan amendment will be prepared using automated resource data. Assistance on automating is readily available from the Area, District, or State Offices as well as the Service Center. If management decides that automated data will be employed, the following fluid minerals related information should be considered for automation purposes: public land survey, surface ownership, mineral rights status, transportation and utility corridors, withdrawals, fluid minerals leases, lease stipulations and areas covered by the stipulations, well locations, oil and gas or geothermal fields, potential for occurrence and development and/or oil and gas or geothermal plays, petroleum information (PI) data, and geologic strata.

Standards of accuracy should be identified for each data set entered. In general, statistics on land surveys and land status are considerably more accurate than estimates of mineral resource potential. For example, land ownership data may be accurate to within 0.01 acre but the mapped boundary line identifying mineral potential may only be accurate to within plus or minus 2 miles.

When using digital products, care should be taken to ensure that the final numbers do not imply a greater degree of accuracy than can be supported by the resource evaluations or the intended degree of management constraints. Composite estimates for all mineral potential within the planning area might be shown to the nearest 1,000, 5,000, 10,000 acres, or whatever increment best fits the data.

AR010644

CHAPTER III - CONDUCTING AND DOCUMENTING THE ANALYSES OF FACTORS

A.  Introduction.

The BLM's planning regulations (43 CFR 1610.4) describe a nine step process, following preplanning, for preparing resource management plans or plan amendments.  These steps are: (1) identify issues; (2) develop planning criteria; (3) collect data; (4) analyze the management situation; (5) formulate alternatives; (6) estimate effects; (7) select the preferred alternative; (8) select the plan; and (9) monitor and evaluate the plan.  These steps and the requirements for interagency coordination and consultation and public participation are discussed in detail in BLM Manual Sections 1614 through 1616 (see Illustration 1).

The interdisciplinary planning team, working with line management, goes through each of these steps in every resource management planning effort.  Although the planning process is portrayed as a series of sequential and discrete steps, in practice, the process is intended to be iterative and dynamic.  If fluid minerals determinations are being made and/or affected by other resource determinations, a fluid minerals specialist should be involved in every step of the process.

The supplemental program guidance for fluid minerals (MS 1624.2) identifies three factors of analysis which should be considered in making fluid minerals determinations in resource management plans or plan amendments: (1) the potential for fluid mineral occurrence and development; (2) the cumulative impacts of reasonably foreseeable development; and (3) the necessity for constraints (BLM MS 1624.22).  These analyses are completed during the planning process.  This chapter provides guidance on how to analyze and document the analyses of these factors.

B.  Procedural Guidance.

1.  Assemble Data and Information.  The interdisciplinary team begins compiling relevant data and information early in the planning process, preferably during preplanning.  The fluid minerals specialist should focus attention on collecting data to assist in conducting the analyses of the factors identified in the supplemental program guidance for fluid minerals.  The fluid mineral specialist is expected to review data from available sources (e.g., USGS, DOE, American Petroleum Institute, Potential Gas Committee, State agencies, professional societies, and academic sources) to develop a broad data base.  BLM files are also important sources of information; they may consist of oil/gas/geothermal maps, well location file cards, well completion reports, and production reports.  Previous mineral assessments, such as KGS/KGRA and prospectively valuable classifications, and other evaluations that may have been done for technical reports, exchanges, withdrawals and other actions, may be used as data sources.  In many cases, this information has already been compiled and summarized on maps and data bases.  Some of this information can be obtained from commercial computer services, such as Petroleum Information and Dwights, or may be provided by service companies.  Special procedures and restrictions on using proprietary data and information are discussed in BLM MS 1273.3.

Exclusive of those areas closed to fluid mineral development by law, regulation, Executive Order, and Secretarial decision, fluid minerals data and information for the entire planning area (e.g., resource area) should be assembled regardless of surface or mineral ownership.  Data on fluid mineral resources and activities in areas adjacent to the planning area may also be useful and necessary for analyzing the potential for occurrence and development and projecting reasonably foreseeable development.  The types of data and information generally useful for analyzing fluid minerals potential and estimating impacts are discussed in greater detail below:

a.  <u>Past and present data on leasing and development activities and operations</u>.  Data and information on historic trends and patterns of fluid mineral exploration and development activities in the planning area, including both boom and bust periods, as well as industry expressions of interest in future leasing and development should be assembled.  Generally this information will include past and present data on:

(1) The number and location of leases, units, communitization agreements, development contracts, areas where bonuses have been paid, and areas with comparatively high percentage of leased land.

(2) The number, location, and types of wells drilled under each lease (e.g., wildcat, development, injection, and disposal); the representative depth of wells drilled; the number and location of dry holes; the success ratio for wells drilled; the location, production history and life expectancy of producing fields.

(3) The nature and size of typical facilities or developments associated with fluid mineral exploration and development, e.g., drillpads, pits, roads, pipelines, transmission lines, production facilities, gas storage projects, enhanced recovery projects, water source wells, routine hydraulic fracturing, tank batteries, and other ancillary facilities.

(4) The nature and extent as well as the timing and sequence of typical exploration and development activities and operations, including general information on input requirements and residual outputs or waste products.

(5) Social and economic information related to fluid mineral resources, including employment and income patterns and trends in the affected area.

b.  <u>Geological data and estimates of fluid mineral resources</u>.  The fluid minerals specialist should review available geologic and fluid mineral resource data and information and consolidate it for the respective planning area.  The types of data that will be useful for planning and NEPA compliance purposes include:

AR010646

(1) Estimates of recoverable and undiscovered resources, including unconventional fluid mineral resources (i.e., coal bed methane, tar sands, and tight gas sands).  The U.S. Geological Survey's oil and gas resource estimates of undiscovered resources are discussed in greater detail in item c. below.

(2) Structural and stratigraphic data and information related to basins, fields and plays (may include regional structure contour and isopach data; this type of information may be obtained from maps showing faults, major folds, volcanic features, and distribution of geologic formations, etc.).

(3) Geophysical (seismic) and geochemical data that pertain to the location and analysis of the fluid mineral resource potential.

(4) Geothermal features and thermal gradient data and information.

c.  U.S. Geological Survey Estimates of Oil and Gas Resources.  Available USGS resource estimates are analyzed along with BLM-derived estimates to identify oil and gas activity and discovery trends.  The Deputy State Director for Mineral Resources is responsible for ensuring that USGS resource estimates and unpublished reports are available to the BLM fluid minerals specialist.  The USGS oil and gas resource assessment for the United States is summarized in the "Estimates of Undiscovered Conventional Oil and Gas Resources in the United States - a Part of the Nation's Energy Endowment" (published jointly by the USGS and MMS).  More details regarding USGS oil and gas resource estimates for each province and play are or will be available as a series of open file releases.

The USGS defines more than 200 separate plays in the onshore United States.  Each play consists of the area containing geologically related oil and gas accumulations.  The boundary of each play depends on the stratigraphy, structure and maturation of the source and reservoir beds.  For each play the fields were divided into three groupings: the first third discovered, the second third discovered and the last third discovered.  For each third, the sizes of the largest discovery and the average discovery are determined.  Further expected field sizes and number of remaining fields are projected from this data.  The USGS reports contain three useful pieces of information: the play area and boundary; the estimated total remaining undiscovered oil and gas resources in each play; and the number of fields remaining to be discovered and distribution of field size.  Most USGS reports also contain discovery rates in terms of fields discovered per number of wildcat tests.

Three important aspects of the USGS analysis deserve special attention. First, the USGS includes as recoverable resources those resources which cannot currently be drilled because of economic limits.  Thus, the largest remaining resources of several plays lie in the undrilled deep part of basins rather than the shallow areas where the present drilling and production are concentrated.  Secondly, the USGS estimates the resources of undeveloped areas, mainly in Alaska, which have little or no drilling.  Third, the USGS estimates do not include unconventional oil and gas resources, such as tar sands, coal-bed methane, and tight gas sands.

2. <u>Identify and Describe Existing Management Practices</u>.   The interdisciplinary team identifies and describes existing management practices and activities for all of the resources and resource uses in the planning area.   This is generally completed prior to or early during the analysis of the management situation (step four of the planning process).   The fluid minerals specialist focuses on describing existing management relative to fluid minerals.

a.   The description of fluid minerals management practices should be based on existing policies, rules, operating orders, notices, directives and management plans (e.g., an existing MFP or RMP and associated NEPA documentation).   The description should reflect how the program operates in the planning area, including permitting and procedural requirements of other agencies or levels of government for leasing, exploration and development.

b.   To facilitate preparation of documents that will eventually be published for public review, existing fluid minerals practices should be described, to the extent possible, in terms of the determinations set forth in MS 1624.2.   Management areas should be identified, i.e., areas currently open to development under standard terms and conditions, areas currently open with minor constraints, areas currently open with major constraints, and areas closed to leasing.   How existing leases are managed, including direction and practices related to lease stipulations, stipulation waivers, geophysical exploration and rehabilitation activities, should also be identified and described.

c.   The description should cover the entire planning area, regardless of surface or mineral ownership.   In other words, it should cover leasing, exploration, and development activities and practices in the planning area, as well as adjacent areas that logically should be included because of common resources or shared ecosystems, regardless of whether or not the BLM administers the surface and/or subsurface.   Information on terms and conditions should be based on existing management or land use plans and programs of surface management agencies and other agencies external to the BLM (e.g., USFS, NPS, Bureau of Reclamation, Military, State, Tribal and local agencies).

3. <u>Analyze Resource Capability and Potential</u>.   Based on available data, the interdisciplinary team analyzes the capability or potential of the resources as necessary to identify management opportunities and limitations.   The analysis must be completed prior to or as part of step four of the planning process when the planning team analyzes the management situation.   The fluid minerals specialist focuses on analyzing fluid mineral occurrence and development potential.

a.   <u>Oil and Gas Resources</u>.   With respect to oil and gas resources, the fluid minerals specialist should consider the USGS resource estimates.   These estimates may not cover all the oil and gas resources in a BLM planning unit.   The specialist will need to independently estimate all other oil and gas resources in the planning unit and integrate them into the planning document.

Other oil and gas resources include additional play resources based on new data available after the USGS study, resources of small fields which were not dealt with by the USGS, resources of frontier plays disregarded by USGS, and resources contained in unconventional reservoirs (e.g., tight sands, coal bed methane, and tar sands). The fluid minerals specialist will need to analyze and discuss unconventional oil and gas resources not covered by the USGS estimates in the same manner as conventional resources are treated.

The USGS resource estimates are based on oil and gas plays which, in many instances, are larger than a planning unit. Therefore, a portion of the total oil and gas estimate in a play must be allocated to the individual planning unit. The resource occurrence potential within a play is assumed to be constant within a play, but the resource estimate does not imply a uniform distribution of the oil and gas resources nor of development potential within the play. Oil and gas recoverable resources are locally dependent upon factors such as porosity, permeability, depth, trap size, and surface locality. Most of the USGS assessment techniques do not address the parameters on a local level.

All USGS and BLM generated plays must be treated similarly. The general procedure is as follows: determine the percentage of the plays encompassed by the planning unit; identify the limiting reservoir and geologic parameters attributable to the planning unit for each play (e.g., porosity, pinchouts, structure, and thermal maturation); determine a projected field size distribution for, each play; identify those areas within each play which have the potential for discovery of commercial fields during the life of the plan; and allocate resource estimates by play to the planning unit. The fluid mineral resources that are identified should be expressed as a range. Note that the estimated total remaining fluid mineral resources in the study area will not be discovered during the life of the plan. The analysis should be coordinated with all other planning units within each play.

b. <u>Geothermal Resources</u>. With respect to geothermal resources, the fluid minerals specialist will need to compile available geothermal resource data and structural-geologic information to make a determination regarding the location and extent of geothermal resources potentially available for electrical generation or direct use applications. The geothermal resources that should be analyzed include hydrothermal convection (i.e., vapor- and hot water-dominated) systems, hot igneous (i.e., molten or hot dry rock) systems, and conduction-dominated areas (i.e., high heat flow provinces).

c. <u>Rating and Mapping Potential</u>. As a part of this analysis, a resource potential map should be produced which shows: major geologic trends; USGS or other published play boundaries or KGRA boundaries; play boundaries for conventional and unconventional oil and gas resources developed by BLM; and areas of high, medium, low or no potential for occurrence and development as outlined below. In rating and mapping potential, include a description of the level of confidence which indicates the approximate accuracy of any boundaries identified (i.e., using standard cartographic techniques).

AR010649

(1) <u>Oil and Gas</u>.  Due to the nearly ubiquitous presence of hydrocarbons in sedimentary rock, use the following for classifying oil and gas potential:

HIGH.  Inclusion in an oil and gas play as defined by the USGS national assessment, or, in the absence of a play designation by USGS, the demonstrated existence of: source rock, thermal maturation, <u>and</u> reservoir strata possessing permeability and/or porosity, and traps.  Demonstrated existence is defined by physical evidence or documentation in the literature.  (Note that reasonable adjustments to any USGS play areas and boundaries may be made if it is apparent that a particular boundary was set up based on administrative convenience rather than a definable change in geological character.)

MEDIUM.  Geophysical or geological indications that the following may be present: source rock, thermal maturation, and reservoir strata possessing permeability and/or porosity and traps. Geologic indication is defined by geological inference based on indirect evidence.

LOW.  Specific indications that one or more of the following may not be present: source rock, thermal maturation, or reservoir strata possessing permeability and/or porosity, and traps.

NONE.  Demonstrated absence of (1) source rock, (2) thermal maturation, or (3) reservoir rock that precludes the occurrence of oil and/or gas.  Demonstrated absence is defined by physical evidence or documentation in the literature.

(2) <u>Geothermal</u>.  Use the following for classifying geothermal potential:

HIGH.  Inclusion in a KGRA; or the existence of a hydrothermal convection system demonstrated by geological evidence of: a structural fault/fracture system and related thermal spring activity or other thermal features (i.e., geysers, fumaroles, mud volcanoes, vents, etc.); and high subsurface temperatures measured in wells and/or estimated from geochemical temperature indicators.  Demonstrated existence is defined by physical evidence or documentation in the literature.

MEDIUM.  Existence of a hot igneous system demonstrated by geologic evidence of Late Tertiary or Quaternary volcanism and higher than normal geothermal gradient as documented in existing literature.

LOW.  Existence of a conduction-dominated area demonstrated by geologic evidence of radiogenic heat production or geopressured environment and higher than normal geothermal gradient as documented in existing literature.

NONE.  Demonstrated absence of evidence indicating the existence of hydrothermal convection systems, hot igneous systems, and higher than normal geothermal gradient. Demonstrated absence is defined by physical evidence or documentation in the literature.

AR010650

4. <u>Project Reasonably Foreseeable Development (RED) Under Existing Management</u>. The next step is for the interdisciplinary team to project management activities and actions, including developments, which are likely to occur in the planning area over the life of the plan (i.e., generally 15 to 20 years or whatever has been determined to be the planning horizon or timeframe for the RMP) assuming continuation of existing management. The fluid minerals specialist focuses attention on projecting fluid minerals leasing, exploration, development, production and abandonment activities. The description of existing fluid minerals practices and information on existing leases and related exploration and development activities as well as the potential for development in the planning area provides the basis for projecting the RFD under existing management. The level of detail necessary for describing the reasonably foreseeably development scenario is basically a function of: the amount of geologic data available regarding fluid mineral potential; and the nature or level of resource conflicts or controversies, i.e., planning issues or management concerns involving fluid mineral leasing and development. The RFD scenario for fluid minerals should address the following:

a. The delineation of areas with similar (e.g., high, medium, low or none) exploration and development potential; the number, density and type of wells likely to be drilled within these areas (e.g., wildcat, development, deep, shallow, or other); and the estimated cumulative production by type of product (e.g., oil, gas, geothermal or by-products). The projection should reflect, as necessary, the estimated percent of the activity that is likely to occur on land managed by the BLM and other Federal surface management agencies.

(1) In areas where previous development has occurred, the projections should be based on past and present leasing, exploration, and development activity as *well* as professional judgment on geological and related technological and economic factors. Extrapolations of historical drilling and/or production activity may be used as the basis for projections. The location of proven reserves, including reserves in existing fields/pools that may be developed by secondary or other enhanced recovery methods, should also be taken into consideration. The historical drilling record should be reviewed for wells that were completed as producers and dry holes. This information may then be analyzed by the specialist to determine success rates and/or discovery rates in areas with similar development potential. Historical cumulative production may also be compared to the number of wells it took to produce the reserves in order to estimate the number of wells it may take to produce a comparable field/pool.

(2) In frontier areas and areas of low development potential, these analyses may not be possible due to lack of drilling or production data. In such areas, geologic, leasing, and existing exploration information (e.g., wildcat tests, geophysical exploration) may be the only sources of information available. For these areas, an assumption shall be made that a baseline discovery will involve certain exploration activity leading up to a discovery and subsequent baseline development activity. To ensure NEPA compliance, a minimum level of exploration and development activities should be projected over the life of the RMP.

AR010651

H-1624-1 – PLANNING FOR FLUID MINERAL RESOURCES – CHAPTER III

III-8

(3) Assumptions used in projecting exploration and development activities (e.g., regarding prospect size, well spacing, technological changes or applications, economic conditions, product prices, etc.) should be explicitly documented in the analysis.

(4) An example of how the projected level of oil and gas activity may be documented is shown below.  Always assume at least one boom and bust cycle over the life of the plan.

It is expected that 70 to 80 wildcat wells will be drilled in the next 10 years with a discovery rate of 1 in 7.  The 10 fields discovered are expected to range in size from half a million barrels to *5* million barrels according to USGS estimates (See Appendix A for a list of the field sizes).  Normal spacing for fields in the play is 40 acres and the average recovery is a half million barrels per well.  The total number of new producing wells expected (including approximately 10 successful wildcat wells) is *25* to 30.  It is also expected that 20 to *25* additional wells will be drilled in existing fields.  About 200 presently producing wells will be abandoned and the production sites reclaimed.

b.  Typical surface and subsurface developments and activities that are likely if these types of wells are drilled (e.g., drillpads, pits, roads, pipelines, transmission lines, production facilities, gas storage projects, enhanced recovery projects, water source wells, routine hydraulic fracturing, tank batteries, and other ancillary facilities, whether direct or in association with exploration and development).  Historical and current fluid minerals operations information should be reviewed to determine what these developments and activities might be.  Standard and directional drilling activities and potential secondary or other enhanced recovery activities should be considered.  Other activities that should be reviewed and considered are seismic operations, and subsequent well operations that may result in additional surface disturbance.  To facilitate post lease NEPA compliance, particular attention should be given to describing those activities that are not categorically excluded from NEPA documentation.

c.  Land use requirements that would be associated with these exploration, development and utilization activities (e.g., surface use requirements in acres or linear miles of access and pipelines), sequence, timing and duration requirements (e.g., field life), waste disposal needs (e.g., produced water, $H_2S$, $CO_2$ venting, and flaring), and special requirements or surface use needs associated with disposal activities.  The specialist should review fluid minerals information (e.g., APDs, plans of operation and utilization, well records, etc.) and analyze available data to project average surface land use needs for these activities.  Also the specialist should analyze available data to estimate the duration of the various phases, e.g., exploration, drilling, and production phases.

5.  <u>Analyze the Impacts Resulting From the Continuation of Existing Management</u>.  Upon completion of a reasonably foreseeable scenario for all resources and resource uses, the interdisciplinary team is in a position to analyze the potential direct, indirect and cumulative impacts assuming continuation of existing management practices.

Impacts are the ecological, aesthetic, historic, cultural, economic, social, or health effects caused by an action.  Direct impacts are those which occur at the same time and place as the action.  Indirect impacts are those which occur later in time or farther removed in distance from the action but are still reasonably foreseeable (e.g., growth inducing effects, effects on population size or density and related effects on natural systems, etc.).  Cumulative impacts are those which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions.

Based on the projection of RFD, the interdisciplinary team analyzes the potential impacts resulting from exploration activities, producing wells, facilities, roads, pipelines, abandonments, and reclamation.  With respect to fluid minerals, the analysis of impacts should address the following:

a.  The site specific direct and indirect impacts normally associated with the type of exploration, development, production and abandonment activities likely to occur in the planning area, i.e., impacts of the typical exploration and development activities.

b.  The direct, indirect and cumulative impacts of the exploration, development, production and abandonment activities projected to occur over the life of the plan i.e., total impacts including the cumulative impacts resulting from all the activities projected in the RFD.  Impacts on all resources, regardless of who owns or manages the resources, must be identified and analyzed.  Impacts caused by activities of other surface management agencies and agencies or persons external to the BLM must also be addressed in this analysis.

c.  The mitigation, including rehabilitation and abandonment, measures that would be employed to avoid or reduce adverse impacts based on existing management practices, i.e., terms and conditions on exploration and development activities.  Mitigation measures include constraints, requirements or conditions which are imposed on fluid mineral lessees to avoid or reduce adverse impacts on the environment, including resources owned or managed by other public agencies or private parties.

d.  The residual impacts that would remain following the application of the mitigation measures identified above, i.e., effectiveness of mitigation measures in ameliorating potential impacts.

e.  The impacts of existing management of other resources and uses on fluid minerals leasing, exploration, development, production and abandonment activities, including production opportunities foregone.

f.   The extent to which there is incomplete or unavailable information which is relevant to the analysis of adverse impacts and essential to a reasoned choice among alternatives.  If such information cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the fluid minerals specialist must identify the existing credible scientific evidence which is relevant to the analysis of adverse impacts and analyze the impacts based upon theoretical approaches or research methods generally accepted in the scientific community.  For purposes of this analysis, impacts which have catastrophic consequences, even if their probability of occurrence is low, should be addressed provided that the analysis is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.  A worst case analysis is not required.  (See 40 CFR 1502.22.)

6.   Identify Problems and Opportunities Associated with Existing Management.   The interdisciplinary team uses the results of the preceding impact analysis to identify potential opportunities and/or problems associated with continuation of existing management.  Problems may involve unacceptable or controversial impacts on other resource values or uses, including those resources owned or managed by other public agencies or private parties.

7.   Formulate Alternatives to Existing Management.   Based on the analysis of the management situation, the interdisciplinary team formulates a reasonable range of alternatives to existing management.  Alternatives are directed towards responding to identified issues and concerns, resolving the problems with existing management, and exploring opportunities for enhancing or expanding resources or resource uses.  The fluid mineral specialist generally focuses on opportunities or problems related to or dealing with fluid mineral development.  However, the analysis and formulation of alternatives requires involvement of all resource specialists.

a.     If no opportunities or problems related to or dealing with fluid minerals management are identified, then the manner in which fluid minerals are managed will be, generally speaking, the same across all alternatives.   Keep in mind that NEPA requires consideration of alternatives if the proposal involves unresolved conflicts, concerning alternative uses of available resources (Section 102(e) of NEPA).

b.   In many resource areas, existing management guidance covers some, but not all, of the determinations called for in the SPG for fluid minerals.  For example, there may be existing management direction concerning areas open and closed to leasing but none concerning geophysical exploration.  If this is the case, at least one alternative to existing management must be formulated and analyzed in the RMP or plan amendment, namely, an alternative that includes all of the required determinations.

c.  If opportunities and problems or unresolved conflicts are identified, the interdisciplinary team will formulate one or more alternatives to address them.  With respect to fluid minerals, alternatives formulated will vary in terms of where, when, and how fluid minerals exploration and development will be authorized.

d.   Generally, based on the team's review of opportunities and problems, they will identify any surface or subsurface management constraints or mitigating measures that are required to take advantage of opportunities and to resolve any problems.  These mitigating measures or constraints, if greater than those that could be imposed under the standard terms and conditions of a fluid mineral lease, are then translated into lease stipulations.  In identifying constraints on fluid minerals activities, the team should consider the following:

(1) The least restrictive stipulation that effectively accomplishes the resource objectives or uses for a given alternative should be used.

(2) If multiple stipulations are proposed for the same area, the potential effects of overlaps should be considered.  For example, if overlapping seasonal restrictions effectively preclude any surface disturbing activity year round, modifying those stipulations should be considered; or if other resource values are of high enough value and the protections are justified in the public interest, a no-surface-occupancy (NSO) stipulation should be employed in lieu of the seasonal restrictions.

e.   Several alternatives will generally be developed to address opportunities and problems identified.  For example, there may be an opportunity or need to establish a resource condition objective related to a desired plant community in a given area.  The same area may be identified as having the potential as a special recreation management area.  If the area is already an active fluid minerals area with high or medium potential for further development, the team will need to determine what, if any, problems or conflicts may arise as a result of these multiple resource objectives and uses.  Several alternatives may be developed to address these problems or conflicts and to allow for multiple uses in the area.  In one alternative, the team may identify any changes (from existing management) in surface and/or subsurface management constraints for fluid minerals activities that would be required to meet the resource condition objective and manage the area as a special recreation management area.  Such constraints, if greater than those that could be imposed under the terms and conditions of the standard lease form, would be translated into lease stipulations for that alternative.  In another alternative, more constraints on recreation use may be imposed to resolve conflicts with relatively fewer constraints on fluid minerals activities as a result.  In yet another alternative, the area may be closed to additional leasing.

f.   Each alternative is formulated and described to the same level of detail and in the same manner as was done for describing the existing management. To facilitate preparation of documents that will eventually be published, the constraints associated with fluid minerals aspects of each alternative should be described in terms of the SPG determinations.

8. <u>Develop RFD Scenarios and Analyze Impacts for Each Alternative</u>.  If the proposed alternatives to existing management vary significantly in terms of the manner in which fluid minerals are managed, the fluid minerals specialist, working with or through the interdisciplinary team, will have to generate a separate RFD scenario for each alternative to the same level of detail as was done for the RFD assuming continuation of existing management (see B.4. above).  The team will then use these scenarios to help analyze the potential direct, indirect, and cumulative impacts of each alternative (see B.5. above).  The analysis of impacts is generally used as the basis for comparing and eva1uating the alternatives.  Management then selects one of the alternatives as the preferred alternative or develops another alternative (e.g., using a combination of existing alternatives) as the preferred.  This may involve additional analysis of the "new" alternative to ensure that impacts have been adequately addressed.

(3) <u>Documentation Guidance</u>.

1. <u>In the Unpublished Planning Records</u>.  Most of the information and data assembled and used in analyzing the factors will be maintained in the unpublished planning records, generally as part of the analysis of the management situation.  The management situation analysis is a working "document" or set of records used by the interdisciplinary planning team to describe existing management, help identify problems and opportunities and formulate plan alternatives.

a.  The analysis of the potential of the potential for development may be documented in a minerals report in accordance with BLM MS 3060. A format for the mineral assessment report is outlined in BLM MS 3031.

b.  The description of existing management and the analysis of opportunities and problems associated with such management is documented in the management situation analysis.

c.  Working documents associated with the formulation of alternatives and any technical reports or computations used to analyze environmental impacts are also maintained in the unpublished records.

2. <u>In the RMP EIS</u>.  Generally, the information presented in the published draft RMP/draft EIS and proposed RMP/final EIS is limited to that which will assist the public and other reviewers in understanding and evaluating the alternatives and their impacts.  The results of the analysis of factors considered in making fluid minerals determinations, however, are summarized and incorporated into the RMP/EIS.  Illustration 2 identifies appropriate places within the established format standards for draft, proposed and approved RMPs or plan amendments and associated EISs for documenting fluid minerals information (also see BLM Manual Section 1602, Plan Documentation and Records).  Additional guidance on presenting fluid minerals data and information in the RMP/EIS is provided below.  The planning team, however, must use their best judgment regarding the extent of coverage.

a.  Existing fluid minerals management, including constraints, is summarized and presented in the RMP/EIS as the "no action" alternative.  This alternative serves as the baseline for discussing the other alternatives and for comparing the effects of choosing one alternative over another.

b.  Each alternative to existing management is described to the same level of detail as the "no action" alternative.  Alternative fluid minerals determinations and management constraints are summarized and incorporated, as appropriate, into one or more of the alternatives presented. Illustration 3 provides an example of how constraints can be summarized for alternatives using narrative, maps, and tables.  If a closure or operating constraint is discretionary with the BLM, evidence that a less restrictive mitigation measure was considered should be reflected in the range of alternatives analyzed in detail.

c.  The potential for occurrence and development is often useful in describing features of alternatives.  Illustration 3, referenced above, exhibits how one can superimpose the potential for development on the map of areas open and closed to leasing.  A table summarizing the availability of land for leasing and development relative to resource potential is prepared for at least the preferred alternative (see MS 1624, Appendix 1).  The acreage estimates shown in the table should be rounded to reflect the accuracy of the data (see discussion in Chapter II.D.).

d.  Fluid minerals management actions or features which are common to all alternatives are generally only documented once in the plan to minimize redundancy in the text.  They may be documented separately or incorporated in the description of one alternative and cross-referenced in the description of the other alternatives.

e.  A brief description of the geologic environment and the social and economic conditions related to fluid mineral activities which have occurred or are occurring in the planning area are summarized in RMP/EIS.  The discussion should focus on those aspects of the existing environment that would be affected by the alternatives being considered.  The extent of the discussion of fluid minerals resources will vary across plans based on the extent of past and present as well as projected fluid minerals activity and its actual or potential influence and importance in the human environment.  Information for this description is drawn from the material prepared for the analysis of the management situation.  An example of a description of fluid minerals related aspects of the affected environment along with maps, tables, and other figures to support the text are shown in Illustration 4.

f.  The assumptions on which the impact analysis is based are discussed in the RMP/EIS.  At a minimum, a description of typical exploration and development activities and a description of the reasonably foreseeable development (RFD) over the life of the plan are presented in the RMP/EIS.  Any variations in the RFD across alternatives should be clearly described.  An example of the RFD scenario and assumptions used in projecting impacts in an area of moderate and low fluid mineral potential is shown in Illustration 5.

g.  The direct and indirect impacts as well as the cumulative impacts of reasonably foreseeable development must be described in the RMP/EIS for each alternative, including the no action alternative.  The impacts discussion may be presented by resource or by alternative. Impacts which are common to all alternatives, e.g., impacts related to a typical operation, only need to be summarized once in the document and cross referenced in the discussion of impacts for each alternative.  An example of an RFD scenario and the cumulative impacts of development for an area of high potential is shown in Illustration 6.  A matrix or table summarizing the alternatives and the impacts of alternatives is prepared and displayed in the RMP/EIS.  This summary table may portray the differences, if any, in the RFD associated with each alternative as well as the differences in direct, indirect, and cumu1ative impacts on the human environment.  Documentation requirements associated with incomplete or unavailable data, if any, should be followed in discussing impacts.  (See 40 CFR 1502.22.)

h.  Mitigation measures and the effectiveness of such measures are described in the RMP/EIS.  For the preferred alternative the RMP/EIS should provide evidence that less restrictive measures were considered but found inadequate to provide effective protection for other land uses or resource values determined through the planning process to be deserving of protection.

i.  Any detailed technical or programmatic material which supports the main body of the RMP/EIS text and is helpful to understanding that text are included in appendices.  The following may be included in an appendix:

(1) Detailed information regarding past and present fluid minerals activity or geological features in the planning area which supports the projections of RFD.  Such information may be placed in an appendix if the planning team determines that this information is sufficiently important for reviewers to understand the RMP/EIS.

(2) Additional details on the impacts of the RFD scenario.  Such description may serve to facilitate any subsequent NEPA review if sufficient details are provided on how projected exploration and development activities will be managed and on the nature of the typical site specific impacts normally associated with such activities.

(3) A detailed description of how the fluid minerals program operates in the State.  A detailed description of Federal, State or local permitting requirements and other operational requirements that are common to all fluid minerals activities statewide is often useful to reviewers but not essential in the main body of the text.

AR010658

CHAPTER IV - DOCUMENTING AND DISPLAYING DET'ERMINATIONS

A. <u>Introduction</u>.

The SPG for fluid minerals describes a number of fluid mineral determinations that, except under certain specified circumstances, are required in every resource management plan and every fluid minerals plan amendment (BLM MS 1624.21).

B. <u>Management Areas</u>.

The RMP or plan amendment must identify those portions of the resource area that will be: 1) open to leasing, exploration and development under the terms and conditions of the standard lease form; 2) open to leasing, exploration and development under seasonal or other minor constraints; 3) open to leasing, exploration and development under no-surface-occupancy and similar major constraints; 4) closed to leasing for discretionary reasons; and/or (5) closed to leasing for nondiscretionary reasons.

These management area determinations must be displayed on a map for at least the preferred alternative. This map may be supplemented by narrative or tables that describe the constraints and the acres affected by each constraint. The acreage estimates should be rounded to reflect the accuracy of the data (see discussions on data accuracy in Chapter II.D. and Chapter III.B.3.c. and example shown in Illustration 3).

The narrative should explain the extent to which management determinations were influenced as a result of coordination with other surface management agencies (both Federal and State) and private owners. The narrative should summarize the justification for constraints, nondiscretionary and discretionary closures, including references to any applicable laws, executive orders, etc.

C. <u>Management Direction</u>.

The plan or plan amendment must also establish guidelines on how fluid minerals exploration and development activities will be managed in the resource area. These guidelines should cover at least the following topics.

1. <u>Existing Leases</u>. The plan or plan amendment must describe how, if at all, identified leasing, exploration, development, production and abandonment constraints or requirements will be applied in areas currently under lease. The constraints and requirements identified in a plan or plan amendment must be applied to all new leases and all lease renewals. Such constraints or requirements may also be applied to new use authorizations on existing leases provided that they are within the authority reserved by the terms and conditions of the lease. The plan or plan amendment should clearly describe the long term resource condition objectives for areas currently under development. Such objectives may be used to guide rehabilitation activities - prior to abandonment.

AR010659

2. <u>Lease Stipulations</u>.  The RMP/EIS serves as the primary vehicle for identifying and documenting the need for constraints on fluid mineral exploration and development activities.  Constraints in the form of stipulations are conditions of lease issuance which provide protection for other resources values or land uses by establishing authority for substantial delay or site changes or the denial of operations within the terms of the lease contract.  Constraints in the form of conditions of approval (COAs) on applications for permit to drill (APDs) are site specific requirements or measures imposed to protect resources or resource values.  COAs must be reasonable and consistent with lease rights.

The authorized officer has the authority to relocate, control timing, and impose other mitigation measures under Section 6 of the Standard Lease Forms (BLM Oil and Gas Lease Form 3100-11 and BLM Geothermal Lease Form 3200-24).  Lease stipulations should always be used to clarify our intent if we know in advance of the need to protect certain resources or resource values.  (see 43 CFR 3101.1 and BLM MS 3101 for additional guidance on lease stipulations.)

The plan or plan amendment must describe the resource condition objectives that have been established and the types of lease stipulations, conditions of approval, and levels of protection (setbacks, slopes, seasonal limits, and other constraints whether minor or major) that will be employed to accomplish these objectives.  The need for stipulations and/or conditions of approval and to set protection levels should be supported by the analyses in the RMP.  The resource condition objectives and associated stipulations, conditions of approval and protection levels should be described in the RMP.

3. <u>Stipulation Waivers, Exceptions and Modifications</u>.  The plan or plan amendment serves as a vehicle for explaining to industry and the public the conditions under which waivers, exceptions, or modifications of lease stipulations may be granted.  A waiver is a permanent exemption to a lease stipulation.  An exception is a one time exemption to a lease stipulation which is determined on a case-by-case basis.  A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease (see MS 3103).

All circumstances for granting a waiver, exception, or modification must be documented in the plan or plan amendment.  For example, the plan or plan amendment may determine that there will be no new surface disturbance allowed on identified elk winter range between November 15 and April 15.  This constraint would be imposed on any new lease in the form of a stipulation.  The plan or plan amendment would describe all situations for granting a waiver, exception or modification to this stipulation.  The plan may indicate that a waiver could be granted if it is determined that elk no longer use the area for winter range, an exception could be granted if a mild winter was occurring and the long term weather forecast was for continuation of this trend, and a modification could be granted if it is determined the elk have changed their migration patterns and are not entering the area until mid-December, thus justifying a change in the start of the seasonal constraint to December 15.

The plan or plan amendment should also identify the documentation requirements for supporting a waiver, exception or modification and any public notification associated with granting them.

4. <u>Geophysical Exploration</u>.  Generally, all areas open to fluid mineral leasing are open to geophysical exploration.  The plan or plan amendment should identify any areas which are closed to leasing but open to geophysical exploration subject to certain conditions or restrictions, e.g., in wilderness study areas.  The plan or plan amendment must also determine the conditions under which geophysical exploration is to be allowed with consideration given to different geophysical methods and practices to be followed.  This can usually be handled by identifying those situations, if any, in which geophysical exploration will be treated differently than development activities, i.e., identify restrictions on geophysical methods or practices which apply in specific areas or under certain circumstances.

D. <u>Management Objectives</u>.

The planning team may also establish management objectives related to fluid minerals in the plan or plan amendment which are not required under the supplemental program guidance for fluid minerals but which may be needed to achieve multiple-use objectives for the planning area. For example, long term mitigation objectives may be established to reduce conflicts between fluid minerals and renewable resources by creating opportunities for renewable resources in areas outside high and moderate fluid mineral areas.  In other words, teams may wish to identify and consider opportunities, particularly in high and medium fluid mineral potential areas, that exist for enhancing renewable resource values such that present day conflicts could be resolved and areas now subject to NSO could one day be leased with surface occupancy allowed or areas now subject to closure could be leased with less restrictive mitigating measures.

AR010661

CHAPTER V – MASTER LEASING PLANS

A.  Introduction.

The BLM introduced the Master Leasing Plan (MLP) as part of its 2010 Oil and Gas Leasing Reform effort.   In some distinct geographic areas, additional planning and analysis may be necessary prior to new or additional oil and gas leasing and development because of changing circumstances, updated policies, and new information.  The MLP process takes a more focused look at resource management plan (RMP) decisions pertaining to oil and gas leasing and post-leasing development of the area.  The MLP establishes a guiding framework for the development of the area and provides a vision for how future development will proceed.

Through the MLP process, the BLM will reconsider RMP decisions pertaining to oil and gas leasing and will evaluate likely development scenarios and varying mitigation levels.  The BLM will conduct the MLP process at a more focused level than the broader level of analysis normally conducted in an RMP, but at a less site-specific level than would typically be conducted for a master development plan where the operator has proposed a fully defined development plan.  The geographic area covered by an MLP will ordinarily be a specifically identified portion of the applicable RMP planning area.  In most cases, this focused planning and analysis will result in the incorporation into the RMP of new oil and gas leasing decisions as well as development decisions.  These decisions would apply to future leasing and development in that geographic area.

The BLM will conduct the MLP process in accordance with the National Environmental Policy Act (NEPA) process, using an interdisciplinary team that will involve the public and stakeholders that may be affected by the BLM's MLP decisions.  The BLM will ordinarily initiate an MLP as an RMP amendment.  However, if the BLM anticipates that the likely outcome of the MLP will not result in the creation of new lease stipulations or changes to existing RMP decisions warranting a plan amendment, it may not be necessary to initiate the MLP as a plan amendment.  The NEPA analysis for the MLP will likely provide a basis for tiering for future leasing or developmental analysis, potentially narrowing the scope of analysis needed for subsequent NEPA review.

An MLP will be prepared when the criteria listed below are met, or at the discretion of the BLM.  Preparation of an MLP can occur through the RMP amendment process or as part of an RMP revision.  Because MLP analysis is more focused than the broader level of analysis normally conducted in an RMP revision and because the scope of an MLP is narrower than an RMP revision, initiating an MLP through the RMP amendment process may provide the best opportunity for developing MLPs.

B.  MLP Criteria.

The preparation of an MLP is required when all four of the following criteria are met:

1.  A substantial portion of the Federal lands in the MLP area is not currently leased.

AR010662

2. There is a majority Federal mineral interest in the MLP area.

3. The oil and gas industry has expressed a specific interest in leasing in the MLP area demonstrated through discussions, expressions of interest, or existing leases in the area, and there is a moderate or high potential for oil or gas confirmed by the discovery of oil or gas in the general area.

4. Additional analysis is needed to address likely resource impacts (including cumulative impacts) if oil and gas development were to occur where there is a potential for:

   - Multiple-use or natural/cultural resource conflicts; or
   - Impacts to air quality; or
   - Impacts on the resources or values of a unit of the National Park System, national wildlife refuge, or National Forest wilderness area, as determined after consultation or coordination with the National Park Service (NPS), Fish and Wildlife Service (FWS), or Forest Service; or
   - Impacts on other specially designated areas.

The BLM may also prepare an MLP under other circumstances at the discretion of the Field Manager, District Manager, or State Director.

C. Elements of an MLP.

The two main elements of master leasing planning for an area are the development of (1) resource condition objectives and (2) resource protection measures.

1. Resource Condition Objectives.

   The BLM will develop resource condition objectives to provide standards for subsequent development and reclamation of the MLP analysis area (see also: H-1601-1, *Land Use Planning Handbook*, page 12, Types of Land Use Plan Decisions, Desired Outcomes). The underlying RMP may already include resource condition objectives for all or a portion of the MLP analysis area.  If so, an MLP may retain the resource condition objectives in the applicable RMP.  Alternatively, the BLM may adopt new resource condition objectives for the MLP area based on new or updated information or policy standards and incorporate these new objectives into the RMP through amendment or revision.

   Examples of resource condition objectives could include:

   - Sagebrush communities will include native grass and forb cover in balance with open to moderate (5 to 25 percent) shrub canopy cover and within the ecological site potential.  Perennial grass components will be at or above 10 percent cover. Native forb composition will be at or above 5 percent cover.

- Visibility-impairing pollutants levels will be managed to achieve the reasonable progress goals and timeframes established within the State of Wyoming's Regional Haze State Implementation Plan (SIP).
- Riparian areas will be managed for properly functioning condition (PFC); stream channel morphology and functions are appropriate for local soil type, climate, and landform.

The MLP should identify the resource protection measures, such as lease stipulations, that are necessary for achieving the resource condition objectives.

2. Resource Protection Measures.

The term "resource protection measures," as used in this section of the handbook, means any practice or action that would reduce environmental impacts and help achieve resource condition objectives.  Resource protection measures may include management actions, such as phased leasing or unitization of an area; closing lands to leasing; lease stipulations restricting the timing, location, or method of operations; or conditions of approval that incorporate Best Management Practices (BMP) for reducing the environmental impact of operations.  Refer to BMP definition in Onshore Oil and Gas Order Number 1 (72 FR 10329, March 7, 2007.)

Land use planning policy for the oil and gas program requires an RMP to identify where the BLM has opened or closed the planning area to leasing.  For open areas, the RMP also must identify the constraints (stipulations) that will apply to future leases, such as timing limitations, controlled surface use, or no surface occupancy (H-1601-1, *Land Use Planning Handbook*, Appendix C, II, H, (pages 23–24)).  These land use planning-level decisions guide future land management actions and site-specific implementation decisions.  Through the MLP process, the BLM may reconsider existing RMP decisions including areas designated in the RMP as open or closed to leasing and existing lease stipulations (e.g., timing limitations, controlled surface use, and no surface occupancy) and their associated exception, waiver, and modification criteria.  The BLM may also adopt new management actions in the RMP by identifying specific conditions of approval necessary for achieving the MLP's resource condition objectives.

The BLM should incorporate resource protection measures, such as unitization requirements or surface disturbance limits (caps) that apply broadly to the development of an entire field, into the RMP as lease stipulations.  Similarly, resource protection measures that the BLM has traditionally characterized as BMPs (e.g., emissions controls, liquids gathering systems, extensive interim reclamation, etc.), and applied as conditions of approval at the time of permitting, may also be incorporated into the RMP through controlled surface use stipulations.  Incorporating resource protection measures into the RMP as lease stipulations will ensure that the BLM will apply the resource protection measures to new leases and associated development, and enables bidders to better identify the resource protection costs associated with development of the lease parcels.

Field offices are encouraged to utilize adaptive management principles to address uncertainty regarding development and the effectiveness of stipulations in achieving resource condition objectives.  (Refer to Adaptive Management: The U.S. Department of the Interior Technical Guide (2009), and any updates thereto, for additional guidance.)  The BLM should design lease stipulations and Conditions of Approval to be adaptable to changing resource conditions and development technologies.  (Refer to the Lease Stipulation section of this handbook.)  The BLM should design the purpose and criteria for exception, waiver, and modification for each stipulation to recognize and accommodate changing environmental protection needs over time.  For example, the BLM should write modification criteria to allow for both increasing and decreasing levels of environmental protection as a means for adapting to changing circumstances, such as improving or deteriorating resource conditions, wildlife population movements, or relevant new scientific information, that may warrant less or more protective measures to meet goals, objectives, and outcomes in RMPs.

In limited circumstances, establishing resource condition objectives may provide a sufficient basis for applying resource protection measures as Conditions of Approval without the need for a lease stipulation.  For existing leases, these instances will generally be limited to where (1) the new requirements are consistent with rights granted to the holder under the lease; and (2) the resource condition objectives are quantitative, specific, and measureable.  With respect to potential new leases, however, field offices are encouraged to include an Information Notice (43 CFR 3101.1-3), also referred to by the BLM as a Lease Notice, in the Notice of Competitive Lease Sale to advise potential lessees of important resource concerns and the possibility of additional constraints at the time of permitting.

MLPs must identify whether the resource protection measures identified in the MLP will also apply to areas currently under lease.  The Federal Government retains certain rights when issuing an oil and gas lease.  While the BLM may not unilaterally add a new stipulation to an existing lease that it has already issued, the BLM can subject development of existing leases to reasonable conditions, as necessary,  through the application of Conditions of Approval at the time of permitting.  The new constraints must be consistent with the applicable land use plan and not in conflict with rights granted to the holder under the lease.  The Interior Board of Land Appeals has made clear that, when making a decision regarding discrete surface-disturbing oil and gas development activities following site-specific environmental review, the BLM has the authority to impose reasonable protective measures not otherwise provided for in lease stipulations, to minimize adverse impacts on other resource values.  See 30 U.S.C. §226(g); 43 CFR 3101.1-2.  *See Yates Petroleum Corp.*, 176 IBLA 144 (2008); *National Wildlife Federation,* 169 IBLA 146, 164 (2006).

AR010665

Examples of Resource Protection Measures.

The following are examples of resource protection measures that the BLM may adopt to reduce environmental impacts and help achieve resource condition objectives within the MLP area.

- Planned or required unitization of Federal lands might be considered in areas where working with only one operator, rather than many, would increase the likelihood of eliminating redundant infrastructure and corridors, thereby reduce habitat fragmentation.

- Phased development may be appropriate where it is important to leave areas of habitat undisturbed by ongoing construction and drilling activity while other areas are developed.  Developed areas would be required to undergo interim reclamation before drilling could move on to the next area.

- Limitations on surface disturbance (pending acceptable interim/final reclamation) may be placed on the percentage of bare ground allowed in a developed area at any one time in order to preserve habitat in important wildlife areas or reduce erosion in areas with highly erosive soils.

- Multiple wells per well pad may be required to limit the number of surface locations in scenic areas, fragile soil areas, or important wildlife habitat while still allowing the necessary number of downhole locations.

- Liquids gathering pipeline systems feeding centralized offsite production facilities may greatly reduce year-round fluids haul traffic during the life of the field in areas of important wildlife habitat.

- Newer technologies to reduce/capture emissions may be considered to ensure full field development does not contribute to eventual nonattainment of national ambient air quality standards under the Clean Air Act or adversely impact Air Quality Related Values, such as visibility.

- Practices to protect scenic quality by reducing the visual contrast of development may be considered, such as (1) siting roads to follow the contours of the landscape; (2) siting well locations where they are less visible and where cuts and fills can be minimized; (3) consolidating and using low profile equipment; (4) screening, disguising, or placing equipment offsite; (5) painting equipment to blend with the background; and (6) burying pipelines and powerlines in existing disturbed areas.

- Placement of all linear disturbances (e.g., powerlines, pipelines, roads) in common corridors and development of a comprehensive area wide planned transportation network across jurisdictions might eliminate unnecessary cross-country clearing and resulting fragmentation of habitat.

- Extensive interim reclamation of roadway disturbance up to or including the road surface and reclamation of pads to the well head/production facilities would minimize long-term surface disturbance in order to reduce vegetative loss, reduce opportunity for invasive species, stabilize soils, protect water and air quality, maintain visual resources, and improve and accelerate opportunities for successful final reclamation.

- Final reclamation fully restoring the original landform and re-establishing the native plant community would help to restore important ecosystems, wildlife habitat, hydrologic systems, and scenic resources.

- Phased leasing could aid in protecting important resource values (e.g., visual or sensitive species) in areas where the mineral development potential and the mode of development are presently unknown.  Phased leasing could provide the opportunity to lease a limited and less sensitive portion of the area for development in order to determine the area's production potential.  Leasing decisions in the RMP could adopt an adaptive management approach so that if oil and gas were successfully discovered and produced, there would then be the opportunity to analyze the impact of additional leasing.  (Phased leasing differs from the rest of the examples in this list because it is an approach to decision-making regarding lease issuance, rather than a stipulation applied to a lease. Nevertheless, phased leasing is a management tool that may be considered as part of developing an MLP.  However, prior to selecting this tool, the BLM should consider  the potential effect on orderly mineral resource development, extraction, and drainage.)

D.  Potential Development.

When sufficient information is available, the MLP should include a Reasonably Foreseeable Development (RFD) scenario that projects the anticipated oil and gas exploration and development activity in the MLP area.  (Refer to the RFD chapter in this handbook.)  This forecasting will provide a basis upon which the BLM may determine the need for additional resource protection measures.  The RFD is based primarily on geology (potential for oil and gas resource occurrence), and past and present oil and gas activity (e.g., locations, characteristics, and trends).  Other factors should also be considered, such as changing economics, evolving drilling and production technology development, existing or anticipated infrastructure, and transportation.  If necessary information is not available, the best available data should be used and analytical assumptions regarding development should be clearly explained in the NEPA document for the MLP.  The analysis of the RFD within the MLP should enable field offices to evaluate in-field considerations such as potential development scenarios, desired major transportation and utility corridors, and desired surface spacing.

E.  Identifying and Evaluating Potential Resource Conflicts in an MLP.

The following non-exhaustive list of important national and local resource issues should be considered, as applicable, by the interdisciplinary team when developing an MLP:

1.  Ambient air quality and potential impacts, including cumulative impacts, to Air Quality or Air Quality Related Values, such as visibility, from development.

2.  The effect of oil and gas leasing on special designations such as units within the National Landscape Conservation System, Special Recreation Management Areas, and Areas of Critical Environmental Concern.

3.  Inventoried lands with wilderness characteristics.

4.  Nearby state, Tribal, or other Federal agency lands, including National Park Service (NPS) and Fish and Wildlife Service (FWS) lands, that could be adversely affected by BLM-authorized oil and gas development.

5.  Important cultural resources, including traditional cultural properties of importance to Native American tribes and historic trails.

6.  Scientifically significant paleontological resources.

7.  Fisheries and wildlife habitat, migration corridors, and rare plants.

8.  The status of visual resource inventories and appropriate designations of Visual Resource Management Classes.

9.  Watershed conditions, steep slopes, and fragile soils.

10. Surface water and groundwater protection, including municipal watersheds and aquifers.

11. Public health and safety (e.g., management of fluids and emissions).

12. The ability to achieve interim and final reclamation standards (Gold Book, Chapter 6).

13. Other mineral potential and the effect of developing oil and gas on the other mineral resources.

F.  Developing an MLP through the RMP Revision or Amendment Process.

The following guidance outlines the general principles for developing an MLP through the RMP revision or amendment process and preparing the supporting NEPA analysis.  Given the individual circumstances specific to each planning area in an RMP revision or amendment, it may be necessary to modify the approach outlined below:

1.  The MLP should be easily recognizable throughout the RMP document (e.g., discussing master leasing planning in the Executive Summary of the RMP).

2.  Field offices should consider incorporating the purpose and need for developing an MLP as a separate and distinct element of the purpose and need statement for the overall RMP.

3.  Development of the MLP should be included as part of the discussion of the scoping process and planning issues.

4.  The application of the MLP criteria to the area should be described.  If an area does not meet the criteria requiring an MLP and the BLM is choosing to exercise its discretion to complete an MLP, the rationale for preparing an MLP should be discussed.

5.  The boundaries of any MLP area should be clearly delineated on a map.

6.  The MLP information should fall within the Leasable Minerals section of the alternatives, affected environment, and environmental consequences chapters of the RMP's supporting NEPA analysis.

7.  The planning document should include alternative ways of implementing the MLP.  One way to accomplish this is to develop MLP-specific sub-alternatives within the MLP alternative or alternatives of the overall RMP.  For example, if a Draft RMP included an MLP as part of Alternative B, a field office could develop alternatives B-1, B-2, and B-3 within Alternative B that vary the stipulations, Conditions of Approval, and other management actions in the MLP area.

8.  In the affected environment chapter, discuss the relevant resource values and uses present in the MLP area that may result in conflicts with oil and gas development (whether actual or reasonably foreseeable).

9.  Project the reasonably foreseeable development for the area, identify resource condition objectives, and adopt resource protection measures using the guidance in section C of this chapter.

10. The analysis should demonstrate the effectiveness of resource protection measures for helping to achieve resource objectives.

11. In the environmental consequences chapter, the analysis should include a discussion that is specific to the MLP area and its identified resource values.  The MLP analysis will generally address oil and gas development in greater detail than is found in the remainder of the RMP, but in less detail than if a development plan had been submitted by an operator.   An analytical discussion of the effects of resource protection measures and other management actions proposed in the MLP-specific sub-alternatives may reach a conclusion similar in scope to the following example:  "The management actions (1, 2, 3, etc.) applied in [Name of MLP area] will result in less adverse impacts to the following

resource values (1, 2, 3, etc.), as evidenced by less overall surface disturbance, shorter periods of disturbed surface [etc.]."

12. Decisions in the Record of Decision or other decision document should specify what elements of the MLP alternatives are being selected for adoption in the RMP, if any.

13. Above all, the analytical approach should remain consistent with basic concepts of analysis under NEPA; analysis can only address what is reasonably foreseeable.  The level of detail of the analysis should be tailored to support the level and specificity of the decisions being made.

**Glossary**

| | |
|---|---|
| Condition of Approval (COA) | A site-specific and enforceable requirement included in an approved Application for Permit to Drill (APD) or Sundry Notice that may limit or amend the specific actions proposed by the operator.  Conditions of Approval minimize, mitigate, or prevent impacts to public lands or other resources. |
| Information Notice (Also referred to as a Lease Notice) | An Information Notice provides notice of existing requirements and may be attached to a lease by the authorized officer at the time of lease issuance to convey certain operational, procedural, or administrative requirements relative to lease management within the terms and conditions of the standard lease form.  Information notices may not serve as the basis for denial of lease operations. |
| Lease Stipulation | A stipulation is an enforceable term of the lease contract, supersedes any inconsistent provisions of the standard lease form, and is attached to and made a part of the lease.  Lease stipulations further implement BLM regulatory authority to protect resources or resource values. Lease stipulations are designed to provide a level of protection for other resource values or land uses by restricting lease operations during certain times or in certain locations or to avoid unacceptable impacts, to an extent greater than  the lease terms in the standard form approved by the Director. |
| Lease Stipulation Types | |
| • No Surface Occupancy (NSO) | Use or occupancy of the land surface for fluid mineral exploration or development is prohibited in order to protect identified resource values. The minerals under NSO lands may potentially be developed by directionally or horizontally drilling from nearby lands that do not have the NSO limitation. |
| • Timing Limitation (TL) | Prohibits surface use during a specified time period to protect identified resource values.  (Seasonal Restriction) |
| • Controlled Surface Use (CSU) | Use and occupancy is allowed (unless restricted by another stipulation), but identified resource values require special operational constraints that may modify lease rights. |
| Lease Stipulation and Permit Condition of Approval Exceptions, Waivers, and Modifications. | |
| • Exception | A one-time exemption for a particular site within the leasehold; exceptions are determined on a case-by-case basis; the stipulation continues to apply to all other sites within the leasehold.  An exception is a limited type of waiver. |
| • Waiver | A permanent exemption from a lease stipulation.  The stipulation no longer applies anywhere within the leasehold. |
| • Modification | A change to the provisions of a lease stipulation, either temporarily or for the term of the lease.  May maintain, increase, or decrease the level of environmental protection.  Depending on the specific modification, the stipulation may or may not apply to all sites within the leasehold to which the restrictive criteria are applied. |

| Master Leasing Plan (MLP) | A plan that includes analysis of a distinct geographic area that takes a more closely-focused look at RMP decisions pertaining to leasing and post-leasing development of the area.  The MLP also establishes a guiding framework for the development of the area and provides a vision for how future development will proceed. |
|---|---|
| Reasonably Foreseeable Development Scenario (RFD) | A technical report containing a long-term projection (scenario) of a particular use of the public lands, in this case oil and gas exploration, development, production, and reclamation activity. |

H-1624-1 – PLANNING FOR FLUID MINERAL RESOURCES

Illustration I
(III.A)

## Summary of BLM Planning Process

| Process Phase | PREPLANNING | NOTICE OF INTENT | 1 IDENTIFY ISSUES | 2 PLANNING CRITERIA | 3 INVENTORY DATA COLLECT | 4 MGMT SITUATION ANALYSIS |
|---|---|---|---|---|---|---|
| P U R P O S E | "To establish a commitment to the project at all levels within BLM." "To scope out the key elements of project management." | "To get started." "To seek public involvement." | "To orient the process on problems/multiple-uses conflicts to be addressed in detail." "To focus attention on the critical tradeoffs." "To ask the questions that must be answered." | "To provide sideboards/constrai nts on issues to be addressed." "To guide development of the RMP." "To define the scope of the analysis." | "To provide essential facts for making analysis, evaluations, and decisions." | "To describe existing environmental elements and socio-economic conditions." "To describe current BLM management." "To determine ability of public lands to respond to the issues and concerns." "To identify management opportunities and limitations." |
| P R O D U C T S | "A 'contact' or Preplanning analysis that includes project support requirements, public participation, plan schedules, team make-up, budget, and training needs." | "A Federal Register Notice." "Media announcements." "Letters to mailing list." | "A clear statement of a manageable number of significant issues for internal tracking, review, and inclusion in the RMP." | "A complete list for use by interdisciplinary team during process." "A summary for public review (usually with the issues in newsletter or other form) and inclusion in RMP." | "A collection of data in various forms from all sources: old planning documents, digital data, new inventory results, resource program data and other source material." | "This may be a shelf document or part of the RMP; usually 3 parts are included." "Resource Area Profile or the Affected Environment Chapter." "Existing Management Situation or 'No Action' alternative." "Capability Analysis as building blocks for other alternatives." |

| Process Phase | 5 ALTERNATIVE FORMULATION | 6 ESTIMATION OF EFFECTS | 7 SELECT ALTERNATIVE | 8 SELECT THE RMP | 9 MONITORING AND EVALUATION |
|---|---|---|---|---|---|
| P U R P O S E | "To portray a mix of multiple uses and actions which could resolve the issues and address concerns." "To identify full range of options." "To provide different answers to the planning questions." | "To describe potential impacts and changes that would occur with each alternative." "To identify ways to avoid or mitigate the adverse impacts." | "To identify which alternative best resolves the issues." "To clearly explain the course of the action BLM proposes to take." "To provide the opportunity for public review and comment." | "To select the proposed RMP and approve it considering public review and comment." "To document the decision." | "To track implementation of action plan decisions." "To help keep the RMP current." "To determine if implementation is successful in meeting RMP objectives." "To assess whether the RMP continues to reflect the best resource management decisions." |
| P R O D U C T S | "Descriptions of several comprehensive management alternatives, each of which could be a complete plan." "Together with the 'No Action' alternative (see phase 4), this makes up the alternatives Chapter of the RMP." | "The Environmental Consequences Chapter of the RMP." | "The description of the Preferred Alternative and the rationale for its selection." "The Draft RMP/Draft EIS." | "The Proposed RMP/Final EIS. Record of public comment, Governor's review, protests and responses." "The Approved RMP and Record of Decision." | "A monitoring plan that describes the standards, methods and intervals for monitoring and evaluating the RMP." "The documented results of monitoring including the data and analysis leading to any decision to modify the RMP through plan maintenance, amendment, or preparation of a new plan." |

BLM MANUAL

Rev. 5/7/90

# SAN RAFAEL DESERT MASTER LEASING PLAN

**BLM**

**Price and Richfield Field Offices**

## PURPOSE

The purpose of the San Rafael Desert MLP is to provide additional planning and analysis prior to new oil and gas leasing within the MLP area. The MLP analysis and resulting mineral leasing decisions will enable the Price and Richfield Field Offices to:

1. Resolve long-standing lease protests related to parcels of land for which the BLM received lease offers subject to protest but for which the BLM has not issued leases in the planning area

2. Determine whether the BLM should cancel, modify, or lift the suspensions on suspended leases in the planning area

3. Evaluate potential development scenarios

4. Identify and address potential resource conflicts and environmental impacts from oil and gas development

5. Create mitigation strategies for oil and gas development

6. Consider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing



# SAN RAFAEL DESERT MASTER LEASING PLAN

## NEED

The BLM introduced MLPs as part of its 2010 Oil and Gas Leasing Reform effort (Memorandum No. 2010-117, Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews).  These reforms, including MLPs, have been incorporated and supplemented in various BLM handbooks, including H-1624-1, Planning for Fluid Mineral Resources.

The BLM has determined that the planning area sufficiently meets the criteria for developing an MLP and that additional planning and analysis are warranted before new mineral leasing and development are allowed. Furthermore, this MLP is needed to resolve long-standing lease protests from the February and May 2006 lease sale, and to complete additional analyses under NEPA for leases that were placed in suspension in 2005 and 2006 because of litigation.



# SAN RAFAEL DESERT MASTER LEASING PLAN
# APPENDIX B—OIL AND GAS
# STIPULATIONS AND LEASE NOTICES

## STIPULATIONS APPLICABLE TO OIL AND GAS LEASING

**Table B-1** includes oil and gas leasing stipulations associated with each alternative. Stipulations included in Alternative A (No Action Alternative) come from the Price and Richfield RMPs. If the No Action Alternative is selected, future leasing actions would be subject to these conditions. The stipulations considered under Alternatives B, C, and D are new lease stipulations being considered as part of this MLP and land use plan amendment process. The stipulations included in this table would only apply to oil and gas leasing and development in the SRD MLP planning area.

### Description of Stipulations

The following tables show resources of concern and stipulations including exceptions, modifications, and waivers by alternative.  Where appropriate, the purpose of the stipulation is also explained. Public lands in the SRD MLP area have been categorized as 1) open to oil and gas leasing subject to the standard lease terms and applicable laws, regulations, and orders; 2) open to oil and gas leasing subject to minor constraints/special stipulations (TL and/or CSU stipulations); 3) open to oil and gas leasing subject to major constraints (NSO stipulations); or 4) closed to oil and gas leasing.

General stipulations, which are applied to all leases, including leases that are issued in areas that are open subject to standard lease terms, are not included in the table below. Areas identified as "closed" are unavailable for oil and gas leasing. Therefore, there is no need for stipulations. Areas that are closed to oil and gas leasing vary by alternative, and are discussed in Chapter 2.

### Exceptions, Modifications, and Waivers

In some cases, stipulations may be excepted, modified, or waived by the Authorized Officer. An exception is a one-time exemption for a particular site within a leasehold; exceptions are determined on a case-by-case basis; the stipulation continues to apply to all other sites within the leasehold. A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. A waiver is a permanent exemption from a lease stipulation. The stipulation no longer applies within the leasehold. The environmental analysis document prepared for site-specific oil and gas proposals (i.e., APDs, sundry notices) also would need to address proposals to exempt, modify, or waive a surface stipulation. Specific exceptions, modifications, and waivers are included in the table below.

## OIL AND GAS LEASE NOTICES

**Table B-2** includes the oil and gas lease notices that would be applied to leases within the SRD MLP planning area under various alternatives. A lease notice provides more detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders. A lease notice also addresses special items the lessee should consider when planning operations, but does not impose lease stipulations.

**Table B-1. Oil and Gas Leasing Stipulations**

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| Air Quality | Planning Area | CSU | | X | | X | All new and replacement internal combustion gas-fired field engines of less than or equal to 300 design-rated horsepower shall not emit more than 2 grams of NOx per horsepower-hour.  This requirement does not apply to gas field engines of less than or equal to 40 design-rated horsepower. <br><br> All new and replacement internal combustion gas-fired field engines of greater than 300 design-rated horsepower must not emit more than 1 gram of NOx per horsepower-hour. <br><br> **Purpose:** Minimize impacts to air quality. <br><br> **Exception:** None. <br><br> **Modification:** The Authorized Officer may modify the stated requirements in accordance with updated specifications to comply with the Clean Air Act, or as deemed necessary to ensure that the stipulation is sufficient to maintain air quality and protect air quality related values in nearby national parks. <br><br> **Waiver**: None. |
| Air Quality | Planning Area | CSU | | X | X | X | To mitigate any potential impact oil and gas development emissions may have on regional ozone formation, or to the extent such emissions may cause or contribute to adverse air quality related values (AQRV) impacts (including visibility) in nearby national parks, apply a CSU stipulation across the Planning Area that requires the following minimum standards: <br><br> 1. Drill rig engines must meet Tier II or better standards, as necessary based on air quality conditions or projections, and consistent with the most stringent EPA emissions standards that are in force at the time of installation or approval. <br><br> 2. Stationary internal combustion engine standard of 2g NOx/bhp-hr for engines<300HP and 1g NOx/bhp-hr for engines >300 HP. <br><br> 3. Low bleed or no bleed pneumatic controller. <br><br> 4. Dehydrator VOC emission controls to +95 percent efficiency. <br><br> 5. Tank VOC emission controls to +95 percent efficiency equivalent to NSPS subpart 0000. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Purpose:** Minimize impacts to air quality.<br><br>**Exception:** None.<br><br>**Modification:** The Authorized Officer may modify the stated requirements in accordance with updated specifications to comply with the Clean Air Act, or as deemed necessary to ensure that the stipulation is sufficient to maintain air quality and protect air quality related values in nearby national parks.<br><br>**Waiver:** None. |
| Air Quality | Planning Area | CSU | | X | | X | A Fugitive Dust Control Plan would be required for oil and gas activities that would disturb a surface area larger than 0.25 acre, or that would result in substantial increases in truck traffic on unpaved or untreated surfaces.<br><br>**Purpose:** Minimize impacts to air quality.<br><br>**Exception:** None.<br><br>**Modification:** None.<br><br>**Waiver:** None. |
| Air Quality/Night Skies | Planning Area | CSU | | X | | | In the absence of a pipeline, to capture gas associated with production from an oil well, use of a combustor or other best available technologies would be required. Venting or open flaring would be prohibited.<br><br>**Purpose:** Minimize impacts to air quality.<br><br>**Exception:** None.<br><br>**Modification:** None.<br><br>**Waiver:** None. |
| Air Quality/Night Skies | Planning Area | CSU | | | X | | In the absence of a pipeline, to capture gas associated with production from an oil well, use of a combustor or other best available technologies would be required.<br><br>**Purpose:** Minimize impacts to air quality.<br><br>**Exception:** Venting or open flaring would be prohibited except in the limited circumstances identified in the BLM's methane waste prevention rule.<br><br>**Modification:** None.<br><br>**Waiver:** None. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| Air Quality/Night Skies | Planning Area | CSU | | | | X | In the absence of a pipeline, to capture gas associated with production from an oil well, use of a combustor or other best available technologies would be required. To minimize impacts on air quality and AQRVs, as well as minimize emissions of greenhouse gases, venting or open flaring would be prohibited. Evaluation of all reasonable and technically feasible gas capture technologies would be required as part of operator plan approvals.<br><br>**Purpose:** Minimize impacts to air quality.<br><br>**Exception:** Venting or open flaring would be prohibited except in the limited circumstances identified in the BLM's methane waste prevention rule. In the case of an exception, a visual screen must be used to minimize sky glow, glare, and adverse visual effects on night sky resources.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Multiple | Three Rivers Mineral Withdrawal | NSO | | | X | | No surface-disturbing activities within the area of the Three Rivers locatable mineral withdrawal.<br><br>**Purpose:** Minimize impacts to the Green River.<br><br>**Exception:** None.<br><br>**Modification:** None.<br><br>**Waiver:** None. |
| Lands with Wilderness Characteristics | Lands with Wilderness Characteristics | NSO | | X | | | No surface-disturbing activities related to oil and gas operations would be allowed in areas identified by the BLM as having wilderness characteristics during the 2016 wilderness characteristics inventory.<br><br>**Purpose:** Minimize impacts to lands with wilderness characteristics.<br><br>**Exception:** None.<br><br>**Modification:** None.<br><br>**Waiver:** None. |
| Lands with Wilderness Characteristics | Labyrinth Canyon Unit | NSO | | | | X | No surface-disturbing activities related to oil and gas operations would be allowed in portions of the Labyrinth Canyon Unit that were inventoried by BLM and found to have wilderness characteristics during the 2016 inventory. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Purpose**: Minimize impacts to lands with wilderness characteristics in the Labyrinth Canyon Unit. **Exception**: None. **Modification**: None. **Waiver**: None. |
| Lands with Wilderness Characteristics | Lands with Wilderness Characteristics | CSU | | | | X | In areas identified by the BLM as having wilderness characteristics during the 2016 wilderness characteristics inventory: <br> • No disturbance would be allowed within the viewshed of the Green River. <br> • Well pads would be placed no closer than 640 acres (approximately 1 mile) apart. <br> • Production facilities would be co-located and designed to minimize surface impacts. <br> • Pipelines and utilities would be buried, to the extent practical, and placed along existing roads. <br> • Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance. <br> • During final reclamation, fully restore the original landform. Travel routes would be restored to their original character. <br><br> **Purpose**: Minimize impacts to lands with wilderness characteristics. **Exception**: None. **Modification**: None. **Waiver**: None. |
| Lands with Wilderness Characteristics | Labyrinth Canyon Unit | CSU | | | X | | In areas inventoried by BLM and found to have wilderness characteristics in the Labyrinth Canyon unit: <br> • No disturbance would be allowed within the viewshed of the Green River. <br> • Well pads would be placed no closer than 320 acres apart. <br> • Production facilities would be co-located and designed to minimize surface impacts. <br> • Pipelines and utilities would be buried, to the extent practical, and placed along existing roads. <br> • Require interim reclamation of roadway disturbance and reclamation of well |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | pads to well head/production facilities to minimize long-term surface disturbance.<br>• During final reclamation, fully restore the original landform. Travel routes would be restored to their original character.<br><br>**Purpose**: Minimize impacts to lands with wilderness characteristics in the Labyrinth Canyon Unit.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Paleontological Resources | Planning Area (RFO) | CSU | X | | | | Require on-the-ground paleontological inventories prior to permitting surface disturbing activities in areas where there is a high potential to affect scientifically significant paleontological resources.<br><br>Require paleontological assessments prior to permitting surface disturbing activities in areas where there is a moderate potential to affect scientifically significant paleontological resources.<br><br>For all permitted actions occurring in paleontologically sensitive areas, include stipulation(s) to cover unanticipated paleontological discoveries during disturbance. This stipulation would mandate work stoppage (or avoidance), notification to the authorized officer, and protection of the material and geological context if any paleontological resources were discovered during disturbance activities. Other stipulations might be appropriate on a case-by-case basis.<br><br>**Purpose**: Protect paleontological resources.<br><br>**Exception**: None.<br><br>Modification: None.<br><br>**Waiver**: None. |
| Paleontological Resources | Planning Area (PFO) | CSU | X | | | | An assessment of fossil resources will be required on a case-by-case basis, mitigating, as necessary, before and during surface disturbance.<br><br>**Purpose**: Protect paleontological resources.<br><br>**Exception**: The AO may grant an exception if the area has previously been inventoried and an assessment completed. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Paleontological Resources | Areas with PFYC of class 4 and 5 | CSU | | X | X | X | Preconstruction paleo surveys and construction monitoring by a BLM permitted paleontologist would be required for all surface disturbing oil and gas activities in potential fossil yield classification (PFYC) 4 and 5 areas. |
| | | | | | | | Where monitoring encounters vertebrate and vertebrate trace fossils during oil and gas operations, all operations must cease until the BLM Authorized Officer determines whether the site can be avoided, protected, or must be fully excavated. |
| | | | | | | | **Purpose**: Protect paleontological resources. |
| | | | | | | | **Exception**: The AO may grant an exception if the area has previously been inventoried. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Oil and Gas Resources | Split-Estate Lands (RFO) | Varies | X | | | | Lease split-estate lands according to BLM RMP stipulations for adjacent or nearby public lands or plans of other surface management agencies, consistent with federal laws, 43 CFR 3101, and the surface owners' rights. |
| | | | | | | | **Purpose:** To reduce potential surface use conflicts. |
| | | | | | | | **Exception:** The Authorized Officer would apply the same lease exceptions as those applied to surrounding lands with Federal surface. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Oil and Gas Resources | Split-Estate Lands | Varies | | X | X | X | On split-estate lands, BLM would apply the same lease stipulations as those applied to surrounding lands with Federal surface. Mitigation measures to protect other resource values would be developed during the appropriate site-specific environmental analysis and would be attached as conditions of approval to permits in consultation with the surface owner or surface management agency. |
| | | | | | | | **Purpose:** To reduce potential surface use conflicts. |
| | | | | | | | **Exception:** Whether exceptions apply would depend on the stipulation. |
| | | | | | | | **Modification:** Whether exceptions apply would depend on the stipulation. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|:--:|:--:|:--:|:--:|---|
| | | | A | B | C | D | |
| | | | | | | | **Waiver:** Whether exceptions apply would depend on the stipulation. |
| Natural Areas | Dirty Devil/French Springs and Horseshoe Canyon South | NSO | X | | X | X | No surface occupancy within the lands managed as BLM natural areas to protect, preserve, and maintain their wilderness characteristics.<br><br>**Purpose**: To protect, preserve, and maintain areas managed for their wilderness characteristics.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Recreation | Recreation Focus Areas in the Price and Richfield ERMAs | NSO | | X | | | No surface occupancy would be allowed within the following recreation focus areas:<br><br>• Fossil Point<br>• Dry Lake<br>• Three Canyon<br>• Saucer Basin/Moonshine Wash<br>• The Cone<br>• Keg Knoll<br>• Sweetwater Reef<br>• Cottonwood Wash<br>• Horseshoe Canyon Trailhead<br><br>**Purpose:** To protect recreational uses and experiences.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Recreation | Recreation Focus Areas in the Price and Richfield ERMAs | NSO | | | | X | No surface occupancy would be allowed within the following recreation focus areas:<br><br>• Fossil Point<br>• Dry Lake<br>• Three Canyon<br>• Saucer Basin/Moonshine Wash<br>• Keg Knoll<br>• Sweetwater Reef<br>• Horseshoe Canyon Trailhead |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Purpose:** To protect recreational uses and experiences. |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Recreation | Recreation Focus Areas in the Price and Richfield ERMAs | CSU | | | | X | In the Cone and Cottonwood Wash recreation focus areas:<br>• Well pads would be placed no closer than 640 acres (approximately 1 mile) apart.<br>• Production facilities would be co-located and designed to minimize surface impacts.<br>• Pipelines and utilities would be buried, to the extent practical, and placed along existing roads.<br>• Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance.<br>• During final reclamation, fully restore the original landform.  Travel routes would be restored to their original character.<br><br>**Purpose:** To protect recreational uses and experiences.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Recreation | Recreation Focus Areas in the Price and Richfield ERMAs | CSU | | | X | | Within recreation focus areas in the San Rafael Desert:<br>• Well pads would be placed no closer than 160 acres apart.<br>• Production facilities would be co-located and designed to minimize surface impacts.<br>• Pipelines and utilities would be buried, to the extent practical, and placed along existing roads.<br>• Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance.<br>• During final reclamation, fully restore the original landform.  Travel routes would be restored to their original character. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Purpose:** To protect recreational uses and experiences. |
| | | | | | | | **Exception:** None. |
| | | | | | | | **Modification:** None. |
| | | | | | | | **Waiver:** None. |
| Recreation | Labyrinth Canyon SRMA | CSU | | | X | | In the Labyrinth Canyon SRMA:<br>• No disturbance would be allowed within the viewshed of the Green River.<br>• Well pads would be placed no closer than 320 acres apart.<br>• Production facilities would be co-located and designed to minimize surface impacts.<br>• Pipelines and utilities would be buried, to the extent practical, and placed along existing roads.<br>• Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance.<br>• During final reclamation, fully restore the original landform. Travel routes would be restored to their original character.<br><br>**Purpose:** To protect recreational uses and experiences.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Recreation | Labyrinth Canyon SRMA | NSO | | X | | X | No surface occupancy would be allowed in the Labyrinth Canyon SRMA.<br><br>**Purpose:** To protect recreational uses and experiences.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Recreation | Dirty Devil/Robbers Roost SRMA | NSO | | X | | | No surface occupancy would be allowed within the portion of the Dirty Devil/Robber's Roost SRMA in the planning area.<br><br>**Purpose:** To protect recreational uses and experiences. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver:** None. |
| Recreation | Dirty Devil/Robbers Roost SRMA | NSO | X | | X | X | No surface occupancy for leases within VRM Class II areas and canyon rims within the viewshed of canyons (approximately one-quarter mile) to protect scenic values and opportunities for primitive and semi-primitive recreation. **Purpose:** To protect recreational and visual resources. **Exception:** Consider exceptions if oil and gas exploration and development would not impair identified scenic and primitive or semi-primitive recreational resources. Modification: None. **Waiver**: None. |
| Recreation | Green River/Labyrinth Canyon Rim | NSO | | | X | | No surface occupancy within 1 mile of the Green River/Labyrinth Canyon Rim. **Purpose:** To protect recreation experiences along the rim of the Green River. **Exception**: None. **Modification**: None. **Waiver**: None. |
| Recreation | Horseshoe Canyon Rim | NSO | | | X | X | No surface occupancy within 1 mile of the Horseshoe Canyon Rim. **Purpose:** To protect recreation experiences along the rim of Horseshoe Canyon. **Exception**: None. **Modification**: None. **Waiver**: None. |
| Recreation | Green River/Labyrinth Canyon Rim | NSO | | | | X | No surface occupancy within1 mile of the Green River/Labyrinth Canyon Rim north of the San Rafael River. **Purpose:** To protect recreation experiences along the rim of the Green River. **Exception**: None. **Modification**: None. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Waiver:** None. |
| Recreation | Key Observation Points | NSO | | X | | | No surface occupancy within 3 miles of the following key observation points:<br><br>• Keg Knoll<br>• Wolverton Overlook<br>• Horseshoe Canyon Trailhead<br>• Trin Alcove/Three Canyon<br>• Bull Bottom<br><br>**Purpose:** To protect viewpoints, lookouts, dispersed camping, and trailheads.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Recreation | Key Observation Points | NSO | | | X | X | No surface occupancy within 1 mile of the following key observation points:<br><br>• Keg Knoll<br>• Wolverton Overlook<br>• Horseshoe Canyon Trailhead<br>• Trin Alcove/Three Canyon<br>• Bull Bottom<br><br>**Purpose**: To protect viewpoints, lookouts, dispersed camping, and trailheads.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Recreation | Key Observation Points | CSU | | | | X | Prior to authorizing any surface disturbing activities within 1-3 miles of the following key observation points a viewshed analysis will be completed. If an area is determined to be within the viewshed, a visual resource contrast rating, including visual simulations, would be completed in accordance with BLM Manual 8431. Site-specific mitigation measures would be identified for all disturbances that are visible between 1-3 miles that minimize visual impacts, regardless of the areas visual resource management class.<br><br>• Keg Knoll<br>• Wolverton Overlook |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | • Horseshoe Canyon Trailhead<br>• Trin Alcove/Three Canyon<br>• Bull Bottom<br>**Purpose**: To protect viewpoints, lookouts, dispersed camping, and trailheads.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Recreation | Key Observation Points | NSO | | X | | | No surface occupancy within 3 miles of the following travel corridors:<br><br>    • Lower San Rafael Road from Highway 24 to Horseshoe Canyon<br>    • Lower San Rafael Road from Green River to Horseshoe Canyon<br>**Purpose**: To protect primary travel corridors.<br>**Exception**: None.<br>**Modification**: None.<br>**Waiver**: None. |
| Recreation | Key Observation Points | NSO | | | | X | No surface occupancy within 1 mile of the following travel corridors:<br><br>    • Lower San Rafael Road from Saucer Basin Road to Horseshoe Canyon.<br>    • Lower San Rafael Road from the San Rafael River to Horseshoe Canyon.<br>**Purpose**: To protect primary travel corridors.<br>**Exception**: None.<br>**Modification**: None.<br>**Waiver**: None. |
| Recreation | Key Observation Points | CSU | | | | X | Prior to authorizing any surface disturbing activities within 1-3 miles of the following travel corridors a viewshed analysis will be completed. If an area is determined to be within the viewshed, a visual resource contrast rating, including visual simulations, would be completed in accordance with BLM Manual 8431. Site-specific mitigation measures would be identified for all disturbances that are visible between 1-3 miles that minimize visual impacts, regardless of the areas visual resource management class. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | • Lower San Rafael Road from Saucer Basin Road to Horseshoe Canyon.<br>• Lower San Rafael Road from the San Rafael River to Horseshoe Canyon.<br>**Purpose**: To protect primary travel corridors.<br>**Exception**: None.<br>**Modification**: None.<br>**Waiver**: None. |
| Soil Resources | Saline Soils in the Mancos Shale | TL | | X | | | Do not allow surface disturbing activities during the period from December 1 to April 15. This restriction includes heavy equipment traffic on existing roads associated with drilling and completion operations.<br>**Purpose:** To minimize watershed damage including compaction, rutting, and topsoil loss.<br>**Exception:** Adjustments to timing restriction could be considered by the Authorized Officer on a case-by-case basis, depending on current soil and weather conditions.<br>**Modification**: None.<br>**Waiver**: None. |
| Soil Resources | Saline Soils in the Mancos Shale | TL | | | X | X | Do not allow surface disturbing activities during the period from December 1 to April 15. This restriction does not include heavy equipment traffic on existing roads associated with drilling and completion operations.<br>**Purpose:** To minimize watershed damage including compaction, rutting, and topsoil loss.<br>**Exception:** Adjustments to timing restriction could be considered by the Authorized Officer on a case-by-case basis, depending on current soil and weather conditions.<br>**Modification**: None.<br>**Waiver**: None. |
| Soil Resources | Soils with high wind erosion potential | CSU | | X | X | X | Require use of BMPs (**Appendix C**) to minimize or mitigate wind erosion and emissions of fugitive dust. Areas characterized by fine sandy soils with high wind erosion potential, including dune complexes, should be avoided to the extent possible. If avoidance is not possible, then operators must provide a written Plan of Development that identifies specific measures that will be implemented to effectively mitigate and prevent accelerated wind erosion and downwind (off-site) emissions of |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | fugitive dust. Use of wind fences or other forms of wind breaks, dust suppressants, or other methods of erosion control may be required. **Purpose:** To protect soils, minimize topsoil loss, and avoid erosion. **Exception**: None. **Modification**: None. **Waiver**: None. |
| Soil Resources | Steep Slopes (RFO) | CSU | X | X | X | X | Construction on slopes greater than 30 percent would be avoided. If the action cannot be avoided, a proposal would include an erosion control strategy, reclamation and site plan with a detailed survey and design completed by a certified engineer. This proposal must be approved by the BLM prior to construction and maintenance. **Purpose:** To protect soils and avoid erosion. **Exception**: None. **Modification**: None. **Waiver**: None. |
| Soil Resources | Steep Slopes (PFO) | CSU | X | X | X | X | In surface disturbing proposals regarding construction on slopes of 20 percent to 40 percent, include an approved erosion control strategy and topsoil segregation/restoration plan. Such construction must be properly surveyed and designed by a certified engineer and approved by the BLM prior to project implementation, construction, or maintenance. **Purpose:** To protect soils and avoid erosion. **Exception:** If after an environment analysis the authorized officer determines that it would cause undue or unnecessary degradation to pursue other placement alternatives; surface occupancy in the area may be authorized. In addition, a plan from the operator and BLM's approval of the plan would be required before construction and maintenance could begin. The plan must include: • An erosion control strategy; • GIS modeling; • Proper survey and design by a certified engineer. **Modification:** Modifications also may be granted if a more detailed analysis is conducted and shows that impacts can be mitigated, e.g., Order I soil survey |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | conducted by a qualified soil scientist, finds that surface disturbance activities could occur on slopes between 20 and 40 percent while adequately protecting areas from accelerated erosion.<br><br>**Waiver**: None. |
| Soil Resources | Steep Slopes (PFO) | NSO | X | | | | No surface occupancy on slopes greater than 40 percent.<br><br>**Purpose:** To protect soils and avoid erosion.<br><br>**Exception:** If after an environment analysis the authorized officer determines that it would cause undue or unnecessary degradation to pursue other placement alternatives; surface occupancy in the area may be authorized. In addition, a plan from the operator and BLM's approval of the plan shall be required before construction and maintenance could begin. The plan would have to include:<br>• An erosion control strategy;<br>• GIS modeling;<br>• Proper survey and design by a certified engineer.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Soil Resources | Steep Slopes | NSO | | X | X | X | No surface occupancy on slopes greater than 40 percent.<br><br>**Purpose:** To protect soils and avoid erosion.<br><br>**Exception:** None.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Water Resources | Riparian and Wetlands (RFO) | NSO | X | | | | No surface disturbance and/or occupancy within buffer zones around natural springs. Base the size of the buffer on hydrological, riparian, and other factors necessary to protect the water quality of the springs. If these factors cannot be determined, maintain a 330-foot buffer zone from outer edge.<br><br>**Exception:** Consider exceptions if it can be shown that (1) there are no practical alternatives to the disturbance, (2) all long-term impacts can be fully mitigated, and (3) the activity will benefit and enhance the riparian area. Consider compensatory mitigation where surface disturbance cannot be avoided within riparian wetland habitats on a site-specific basis. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Modification:** None.<br>Waiver: None. |
| Water Resources | Natural Springs (PFO) | NSO | X | | | | No surface disturbance or occupancy will be maintained around natural springs to protect the water quality of the spring. The distance would be based on geophysical, riparian, and other factors necessary to protect the water quality of the springs. If these factors cannot be determined, a 660-foot buffer zone would be maintained.<br>**Purpose:** To protect springs and riparian areas.<br>**Exception:** An exception could be authorized if (a) there are no practical alternatives, (b) impacts could be fully mitigated, or (c) the action is designed to enhance the riparian resources.<br>Modification: None.<br>**Waiver**: None. |
| Water Resources | Intermittent and Perennial Streams (PFO) | NSO | X | | | | No new surface disturbance (excluding fence lines) will be allowed in areas within the 100-year floodplain or 100 meters (330 feet) on either side from the centerline, whichever is greater, along all perennial and intermittent streams, streams with perennial reaches, and riparian areas.<br>**Purpose:** To protect perennial and intermittent streams and riparian areas.<br>**Exception:** The authorized officer could authorize an exception if it could be shown that the project as mitigated eliminated the need for the restriction.<br>An exception could be authorized if (a) there are no practical alternatives, (b) impacts could be fully mitigated, or (c) the action is designed to enhance the riparian resources.<br>**Modification**: None.<br>**Waiver**: None. |
| Water Resources | Water Resources | NSO | | X | | X | No surface occupancy within public water reserves, 100-year floodplains, and within 660 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs.<br>**Purpose:** To protect public water reserves, 100-year floodplains, intermittent and perennial streams, rivers, springs, wetlands, riparian areas, and water wells.<br>**Exception:** The Authorized Officer may grant an exception for road and pipeline |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | crossings if (a) there are no practical alternatives; (b) impacts can be mitigated; or (c) proposed operations would result in less impact then locating the facilities in other locations.<br><br>**Modification**: None.<br><br>**Waiver:** None. |
| Water Resources | Water Resources | NSO | | | X | | No surface occupancy within public water reserves, 100-year floodplains, and within 330 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs.<br><br>**Purpose:** To protect public water reserves, 100-year floodplains, intermittent and perennial streams, rivers, springs, wetlands, riparian areas, and water wells.<br><br>**Exception:** The Authorized Officer may grant an exception for road and pipeline crossings if (a) there are no practical alternatives; (b) impacts can be mitigated; or (c) proposed operations would result in less impact then locating the facilities in other locations.<br><br>**Modification**: None.<br><br>**Waiver**: None. |
| Water Resources | Ephemeral Streams | NSO | | X | | | No surface occupancy would be allowed within 100 feet of ephemeral streams.<br><br>**Purpose:** To protect ephemeral streams.<br><br>**Exception:** None.<br><br>**Modification**: None.<br><br>**Waiver:** None. |
| Water Resources | Ephemeral Streams | NSO | | | X | X | No surface occupancy would be allowed within 100 feet of ephemeral streams.<br><br>**Purpose:** To protect ephemeral streams.<br><br>**Exception:** The Authorized Officer may grant an exception for road and pipeline crossings if (a) there are no practical alternatives; (b) impacts can be mitigated; or (c) proposed operations would result in less impact then locating the facilities in other locations.<br><br>**Modification**: None. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Waiver**: None. |
| Special Designations: ACEC | Tidwell Draw | NSO | X | X | | X | Oil and gas leasing would be open to leasing subject to major constraints. **Purpose:** To protect relevant and important historic values. **Exception:** None. **Modification:** None. **Waiver:** None. |
| Special Designations: ACEC | Tidwell Draw | CSU | | | X | | Do not allow surface disturbing activities that adversely impact the physical evidence of past mining activities. **Purpose:** To protect relevant and important historic values. **Exception:** None. **Modification:** None. **Waiver:** None. |
| Special Designations: ACEC | Dry Lake ACEC | NSO | X | | | | No surface occupancy on federal land for the protection of cultural resources. **Purpose:** To protect relevant and important cultural values. **Exception:** The Authorized Officer may grant an oil and gas exception if it is determined that no other economic and technically feasible access is available to reach and drain the fluid mineral resources of the area. A block cultural survey must be completed and a treatment plan developed and submitted to BLM and the State Historic Preservation Office (SHPO) for their approval. The plan must contain measures to mitigate surface disturbance and reduce visual intrusion. **Modification:** None. **Waiver:** None. |
| Special Designations: ACEC | Dry Lake ACEC | NSO | | X | X | X | No surface occupancy on federal land for the protection of cultural resources. **Purpose:** To protect relevant and important cultural values. **Exception:** None. **Modification:** None. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Waiver**: None. |
| Special Designations: NHT | Old Spanish Trail | CSU | X | | | | Cultural resources inventories (including point, area, and linear features) will be required for all federal undertakings that could affect cultural resources or historic properties in areas of both direct and indirect impacts.

**Purpose:** Preserve the integrity of landscapes along the Old Spanish National Historic Trail.

**Exception**: None.

**Modification**: None.

**Waiver:** Although complete Class III inventories will be performed for most land use actions, an authorized officer could waive inventory for any part of an Area of Potential Effect when one or more of the following conditions exist:

• Previous natural ground disturbance has modified the surface so extensively that the likelihood of finding cultural properties is negligible. (Note: This is not the same as being able to document that any existing sites may have been affected by surface disturbance; ground disturbance must have been so extensive as to reasonably preclude the location of any such sites.)
• Human activity within the last 50 years has created a new land surface to such an extent as to eradicate locatable traces of cultural properties.
• Existing Class II or equivalent inventory data are sufficient to indicate that the specific environmental situation did not support human occupation or use to a degree that would make further inventory information useful or meaningful.
• Previous inventories must have been conducted according to current professionally acceptable standards.
• Records are available and accurate and document the location, methods, and results of the inventory.
• Class II "equivalent inventory data" includes an adequate amount of acreage distributed across the same specific environmental situation that is located within the study area.
• Inventory at the Class III level has previously been performed, and records documenting the location, methods, and results of the inventory are available. Such inventories must have been conducted according to current professionally acceptable standards.
• Natural environmental characteristics (such as recent landslides or rock falls) are unfavorable to the presence of cultural properties. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | • The nature of the proposed action is such that no impact can be expected on significant cultural resources.<br>• Conditions exist that could endanger the health or safety of personnel, such as the presence of hazardous materials, explosive ordnance, or unstable structures. |
| Special Designations: NHT | Old Spanish Trail | NSO | | X | | | No surface occupancy would be allowed within 3 miles of the Old Spanish Trail within the Planning Area. This stipulation would apply to the congressionally designated route and to any draft refinements of this route.<br><br>**Purpose:** Preserve the integrity of landscapes along the Old Spanish National Historic Trail.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Wavier**: None. |
| Special Designations: NHT | Old Spanish Trail | NSO | | | | X | No surface occupancy would be allowed within 1 mile of high potential sites and route segments within the Planning Area. This stipulation would apply to the congressionally designated route or the latest verified trail location.<br><br>**Purpose:** Preserve the integrity of landscapes along the Old Spanish National Historic Trail.<br><br>**Exception**: None.<br><br>**Modification**: None.<br><br>**Wavier:** The Authorized Officer may waive the stipulation if it is determined that the Old Spanish National Historic Trail does not exist within the area. |
| Special Designations: NHT | Old Spanish Trail | CSU | | | | X | Prior to authorizing any surface disturbance in areas that are within 1-3 miles of high potential sites and route segments, a viewshed analysis will be completed from the Old Spanish Trail. If an area is determined to be within the viewshed, a visual resource contrast rating, including visual simulations, would be completed in accordance with BLM Manual 6280. In order to protect the historic integrity of the trail, mitigation measures would be identified that minimize visual impacts, regardless of the areas visual resource management class. In addition, coordination with trail administration (i.e., BLM and NPS) will be required. This stipulation would apply to the congressionally designated route or the latest verified trail location. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Purpose:** Preserve the integrity of landscapes along the Old Spanish National Historic Trail. |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Wavier:** The Authorized Officer may waive the stipulation if it is determined that the Old Spanish National Historic Trail does not exist within the area. |
| Special Designations: NHT | Old Spanish Trail | CSU | | | X | | Maintain the current setting within 2 miles of the trail. This stipulation would apply to the congressionally designated route or the latest verified trail location. |
| | | | | | | | **Purpose:** Preserve the integrity of landscapes along the Old Spanish National Historic Trail. |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Wavier:** The Authorized Officer may waive the stipulation if it is determined that the Old Spanish National Historic Trail does not exist within the area. |
| Special Designations: Wild and Scenic Rivers | Green River Suitable Segment (Confluence of the San Rafael River to Canyonlands National Park) | NSO | X | | X | | No surface occupancy would be allowed within the Green River suitable WSR segment (Confluence of the San Rafael River to Canyonlands National Park). |
| | | | | | | | **Purpose:** To protect the outstanding and remarkable values of the Green River. |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Visual Resources | VRI Class II areas | NSO | | X | | | No surface occupancy would be allowed in VRI Class II areas. |
| | | | | | | | **Purpose:** To protect high quality visual resources. |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Visual Resources | VRI Class II areas | CSU | | | | X | In VRI class II areas, prior to authorizing any surface disturbing activity, a visual resource contrast rating would be completed in accordance with BLM Manual 8431. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | Mitigation measures would be identified to retain the existing character of the landscape. |
| | | | | | | | **Purpose:** To protect high quality visual resources. |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Visual Resources | VRM Class II Areas (PFO) | CSU | X | | | | Within VRM II areas, surface disturbing activities will comply with BLM Manual Handbook 8431-1 to retain the existing character of the landscape. |
| | | | | | | | **Purpose:** To protect high quality visual resources. |
| | | | | | | | **Exception:** Recognized utility corridors are exempt. Temporary exceedance may be allowed during initial development phases. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Visual Resources | VRM Class II Areas (RFO) | CSU | X | | | | Surface disturbing activities must meet the objectives of VRM Class II. |
| | | | | | | | **Purpose:** To protect high quality visual resources. |
| | | | | | | | **Exception:** The level of change to the landscape should be low; management activities may be seen, but should not attract the attention of the casual observer. Any change to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape. Surface disturbing activities that are determined to be compatible and consistent with the protection or enhancement of the resource values are exempted. Also, recognized utility corridors are exempted only for utility projects, which would be managed according to VRM Class III objectives. |
| | | | | | | | **Modification**: None |
| | | | | | | | **Waiver**: None |
| Visual Resources | VRM Class II Areas | NSO | | X | | | No surface occupancy would be allowed in VRM Class II areas. |
| | | | | | | | **Purpose:** To protect high quality visual resources. |
| | | | | | | | **Exception**: None. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver:** None. |
| Visual Resources | VRM Class II Areas | CSU | | | X | X | In VRM class II areas, prior to authorizing any surface disturbing activity, a visual resource contrast rating would be completed in accordance with BLM Manual 8431. Mitigation measures would be identified to retain the existing character of the landscape. |
| | | | | | | | **Purpose:** To protect high quality visual resources. |
| | | | | | | | **Exception:** Temporary exceedance may be allowed during construction phase. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Visual Resources-Night Skies | Planning Area | CSU | | X | | X | Operators are required to comply with the following: |
| | | | | | | | • Limit the use of artificial lighting during nighttime operations to only those that are determined necessary for safety. |
| | | | | | | | • Utilize shielding and aiming techniques as well as limiting the height of light poles to reduce glare and avoid light shining above horizons. |
| | | | | | | | • Direct lights downward onto the task area. The bottom surface of the light fixture should be level, or if unable to be fully level, point it as close to straight down as possible or shield it to avoid light being projected horizontally. |
| | | | | | | | • Use motion sensors, timers, or manual switching for areas that require illumination but are seldom occupied. |
| | | | | | | | • Reduce lamp brightness and select lights that are not broad spectrum or bluish in color. |
| | | | | | | | **Purpose:** To protect night skies. |
| | | | | | | | **Exception:** The Authorized Officer may grant an exception if actions are necessary for human health and safety. The Authorized Officer could also grant an exception if it could be demonstrated that other options could produce similar reduction in night sky light pollution to those listed above. |
| | | | | | | | **Modification:** None. |
| | | | | | | | **Waiver:** None. |
| Auditory | Lands near | CSU | | X | X | X | Mitigate noise levels so there is no change in the natural ambient sound as recorded in |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| Management - Soundscape | Canyonlands National Parks | | | | | | Canyonlands National Park or Glen Canyon National Recreation Area. This stipulation applies to all phases of oil and gas operations and at all sites and facilities. **Purpose:** To protect the soundscapes of Nation Park units. **Exception**: None. **Modification**: None. **Waiver**: None. |
| Auditory Management - Soundscape | Planning Area | CSU | | X | | X | Noise levels from production equipment may not exceed 45 decibels as measured at 350 feet from the source. **Purpose:** To protect the soundscapes in the planning area. **Exception**: None. **Modification**: None. **Waiver**: None. |
| Wildlife Resources | Pronghorn Habitat (RFO) | TL | X | | | | No surface disturbing activities in crucial pronghorn antelope habitat from May 15 through June 15 to protect species sensitivity during fawning season. **Purpose:** To minimize stress and disturbance to pronghorn. **Exception:** The authorized officer may grant an exception if the operator submits a plan that demonstrates that impacts from the proposed action can be adequately mitigated. **Modification:** The authorized officer may modify the boundaries of the stipulation area (1) if a portion of the area is not being used as crucial pronghorn habitat during kidding season or (2) if habitat outside of stipulation boundaries is being used for crucial pronghorn habitat and needs to be protected. **Waiver:** A waiver may be granted if the habitat is determined as unsuitable for crucial pronghorn habitat and there is no reasonable likelihood of future use as crucial pronghorn habitat. |
| Wildlife Resources | Pronghorn Habitat | TL | | X | X | X | No surface disturbing activities in crucial pronghorn antelope habitat from May 15 through June 15 to protect the species during sensitive fawning seasons. **Purpose:** To minimize stress and disturbance to pronghorn. **Exception:** The Authorized Officer may grant an exception if the operator submits a |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | plan that demonstrates impacts from the proposed action can be adequately mitigated or if it is determined the habitat is not being utilized. This stipulation does not apply to the maintenance and operation of existing facilities. **Modification**: None. **Waiver**: None. |
| Special Status Species | White-tailed Prairie Dog Habitat | CSU | X | | | | No surface-disturbing activities within 660 feet of prairie dog colonies identified within prairie dog habitat. No permanent aboveground facilities are allowed within the 660 feet buffer. **Purpose:** To minimize stress and disturbance to white-tailed prairie dogs. **Exception:** An exception may be granted by the authorized officer if the applicant submits a plan that indicates that impacts of the proposed action can be adequately mitigated or, if due to the size of the town, there is no reasonable location to develop a lease and avoid colonies the authorized officer will allow for loss of prairie dog colonies and/or habitat to satisfy terms and conditions of the lease. **Modification:** The authorized officer may modify the boundaries of the stipulation area if portions of the area do not include prairie dog habitat or *active* colonies are found outside current defined area, as determined by BLM. **Waiver:** May be granted if in the leasehold if it is determined that habitat no longer exists or has been destroyed. |
| Special Status Species | White-tailed Prairie Dog Habitat | CSU | | X | X | X | No surface-disturbing activities within 660 feet of prairie dog colonies identified within prairie dog habitat. No permanent aboveground facilities are allowed within the 660 feet buffer. **Purpose:** To minimize stress and disturbance to white-tailed prairie dogs. **Exception:** An exception may be granted by the authorized officer if the applicant submits a plan that indicates that impacts of the proposed action can be adequately mitigated. **Modification:** The authorized officer may modify the boundaries of the stipulation area if portions of the area do not include prairie dog habitat or *active* colonies are found outside current defined area, as determined by BLM. **Waiver:** May be granted if in the leasehold if it is determined that habitat no longer exists or has been destroyed. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | A | B | C | D | |
| Special Status Species | Migratory Birds (PFO) | TL | X | | | | Migratory bird nesting areas will be closed seasonally from April 15 to August 1. Areas with migratory birds designated as BLM Special Status Species will have the highest priority. **Purpose**: Protect high-value breeding habitat. **Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or habitat conditions if activities would not cause undue stress to migratory bird populations. **Modification:** Season may be adjusted depending on climatic and range conditions. Distance may be adjusted if natural features provide adequate visual screening. **Waiver**: None. |
| Special Status Species | Migratory Birds | TL | | X | X | X | During nesting season for migratory birds (April 15-August 1), avoid surface-disturbing activities in occupied migratory bird habitat.  Breeding season surveys would be required. **Purpose**: Protect high-value breeding habitat. **Exception:** Upon review and monitoring, the authorized officer may grant exceptions because of climatic and/or habitat conditions. **Modification:** Season may be adjusted depending on climatic and range conditions. Distance may be adjusted if natural features provide adequate visual screening. Waiver: None. |
| Special Status Species | Raptors | TL/CSU | | | | | Apply seasonal restrictions and spatial buffers on all known raptor nests in accordance with Utah Field Office Guidelines for Raptor Protection from Human and Land use Disturbances (USFWS 2002). In addition, operators would be required to mitigate unavoidable impacts to raptors and their habitats. The amount and type of mitigation should be based on losses in habitat value. **Purpose**: To protect high-value raptor habitat. **Exception**: <br>• Short term land use and human use activities may be allowed within the spatial buffer of an occupied nest outside the seasonal buffer, after coordination with appropriate Service, UDWR, and/or land management |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | agency biologists. |
| | | | | | | | • If a nest site is deemed unoccupied, after sufficient time has elapsed in a specified breeding season and prior to the beginning of the next year's breeding season, short-term land use and human activity could be allowed within the nesting area. |
| | | | | | | | • Long-term land use activities and human use activities may occur in proximity to unoccupied nests if impacts are mitigated prior to initiation of the long-term disturbance. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver:** A stipulation may be waived if a raptor nest is permanently abandoned or has been physically damaged past the point of repair by raptors. |
| Special Status Species | Jones Cycladenia | CSU | | X | | | Surveys would be required in all modeled habitat. Preclude surface-disturbing activities within 300 feet of occupied habitat. |
| | | | | | | | **Purpose:** To protect Jones Cycladenia occupied habitat. |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Special Status Species | Jones Cycladenia | CSU | | | X | X | Surveys would be required in all modeled habitat where there is moderate potential for occupation. The need for surveys would be determined on a case-by-case basis by the BLM. |
| | | | | | | | Preclude surface-disturbing activities within 300 feet of occupied habitat. |
| | | | | | | | **Purpose:** To protect Jones Cycladenia occupied habitat. |
| | | | | | | | **Exception**: None. |
| | | | | | | | Modification: None. |
| | | | | | | | Waiver: None. |
| Special Status Species | Wright Fishhook Cactus | CSU | | X | | | Surveys would be required in all modeled habitat. Preclude surface-disturbing activities within 300 feet of occupied habitat. |
| | | | | | | | **Purpose:** To protect Wright Fishook cactus occupied habitat. |
| | | | | | | | **Exception**: None. |

| Resource of Concern | Applicable Area | Stip. Code | Alternative | | | | Stipulation Description |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D | |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |
| Special Status Species | Wright Fishhook Cactus | CSU | | | X | X | Surveys would be required in all modeled habitat where there is moderate potential for occupation. The need for surveys would be determined on a case-by-case basis by the BLM. |
| | | | | | | | Preclude surface-disturbing activities within 300 feet of occupied habitat. |
| | | | | | | | **Purpose**: To protect Wright Fishhook cactus occupied habitat. |
| | | | | | | | **Exception**: None. |
| | | | | | | | **Modification**: None. |
| | | | | | | | **Waiver**: None. |

**Table B-1. Oil and Gas Lease Notices**

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| Air Quality | Planning Area | X | | X | | A condition of approval will be attached to all APDs requiring that new and replacement internal combustion gas field engines of less than or equal to 300 design-rated horsepower shall not emit more than 2 grams of NOx per horsepower-hour.  This requirement does not apply to gas field engines of less than or equal to 40 design-rated horsepower. <br><br>All new and replacement internal combustion gas field engines of greater than 300 design-rated horsepower must not emit more than 1 gram of NOx per horsepower-hour. |
| Air Quality | Planning Area | X | | | | The lessee is given notice that the Bureau of Land Management (BLM) in coordination with the U.S. Environmental Protection Agency and the Utah Department of Air Quality, among others, has developed the following air quality mitigation measures that may be applied to any development proposed on this lease. Integration of and adherence to these measures may help minimize adverse local or regional air quality impacts from oil and gas development (including but not limited to construction, drilling, and production) on regional ozone formation.<br><br>• All internal combustion equipment would be kept in good working order.<br>• Water or other approved dust suppressants would be used at construction sites and along roads, as determined appropriate by the Authorized Officer.<br>• Open burning of garbage or refuse would not occur at well sites or other facilities.<br>• Drill rigs would be equipped with Tier II or better diesel engines.<br>• Vent emissions from stock tanks and natural gas TEG dehydrators would be controlled by routing the emissions to a flare or similar control device which would reduce emissions by 95% or greater.<br>• Low bleed or no bleed pneumatics would be installed on separator dump valves and other controllers.<br>• During completion, flaring would be limited as much as possible. Production equipment and gathering lines would be installed as soon as possible.<br>• Well site telemetry would be utilized as feasible for production operations.<br>• Stationary internal combustion engine would comply with the following standards:  2g NOx/bhp-hr for engines <300HP; and 1g NOx/bhp-hr for engines >300HP.<br><br>Additional site-specific measures may also be employed to avoid or minimize effects to local or regional air quality. These additional measures will be developed and implemented in coordination with the U.S. Environmental Protection Agency, the Utah Department of Air Quality, and other agencies with expertise or jurisdiction as appropriate based on the |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | size of the project and magnitude of emissions. |
| Air Quality | Planning Area | X | | | | To mitigate any potential impact oil and gas development emissions may have on regional ozone formation, the following Best Management Practices (BMPs) would be required for any development projects:<br>• Tier II or better drilling rig engines<br>• Stationary internal combustion engine standard of 2g NOx/bhp-hr for engines <300HP and 1g NOx/bhp-hr for engines >300HP<br>• Low bleed or no bleed pneumatic pump valves<br>• Dehydrator VOC emission controls to +95% efficiency<br>• Tank VOC emission controls to +95% efficiency |
| Air Quality | Planning Area | X | X | X | X | The lessee/operator is given notice that prior to project-specific approval, additional air quality analyses may be required to comply with the National Environmental Policy Act, Federal Land Policy and Management Act, and/or other applicable laws and regulations. Analyses may include dispersion modeling for deposition and visibility impacts analysis, control equipment determinations, and/or emission inventory development. These analyses may result in the imposition of additional project-specific air quality control measures. |
| Special Designations: NHT | Old Spanish Trail | | | | X | Within 2-miles of the Old Spanish Trail, modifications to the Surface Use Plan of Operations may be required in order to conserve, protect, and restore the National Trail resources, qualities, values, and associated settings. Additionally, coordination with the National Park Service and BLM will be necessary. This lease notice applies to the congressionally designated route or the latest verified trail location. |
| Special Designations: ACEC | Tidwell Draw | | | | X | Apply a Lease Notice to inform the lessee/operator that compensatory mitigation may be required for all disturbances in the ACEC.<br><br>Mitigation may include restoration of historic sites, conducting oral histories, or development of interpretive/educational materials. |
| Wildlife Resources | Pronghorn Fawning (PFO) | X | | | | The lessee/operator is given notice that lands in this lease have been identified as containing antelope fawning habitat. Exploration, drilling, and other development activities may be restricted from May 1 through June 15 to protect antelope fawning. Modifications may be required in the Surface Use Plan of Operations including seasonal timing restrictions to protect the species and its habitat. |
| Wildlife Resources | Crucial Pronghorn Fawning Habitat (PFO) | X | | | | The lessee/operator is given notice that lands in this lease have been identified as containing crucial antelope fawning habitat. Exploration, drilling and other development activities would be restricted from April 15 through June 15 to protect antelope fawning. |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | Modifications may be required in the Surface Use Plan of Operations including seasonal timing restrictions to protect the species and its habitat. |
| Wildlife Resources | Pronghorn Winter Habitat (PFO) | X | | | | The lessee/operator is given notice that lands in this lease have been identified as containing crucial pronghorn winter habitat. Exploration, drilling and other development activities would be restricted from December 1 through April 15 to protect crucial winter range. |
| Wildlife Resources | Pronghorn Habitat | | X | X | X | Compensatory mitigation may be required for all disturbances in crucial pronghorn habitat. Mitigation should be planned to offset the loss of habitat directly and indirectly affected by oil and operations.<br><br>Offset the loss of important habitat by completing rehabilitation and enhancement projects in appropriate locations in the region or landscape.<br><br>Habitat rehabilitation and enhancement projects may include, but are not limited to:<br>• Water developments Springs/seeps;<br>• Wetland development Ponds/reservoirs;<br>• Big game guzzlers;<br>• Vegetation Enhancement;<br>• Wells/windmills for wildlife waters;<br>• Seeding and planting of grasses and shrubs;<br>• Fencing or fencing upgrades to protect or enhance wildlife habitats; or<br>• Reclamation of previous disturbances, such as undesignated routes. |
| Water Resources | Riparian | X | | | | The lessee/operator is given notice that this lease has been identified as containing riparian areas. No surface use or otherwise disruptive activity allowed within 100 meters of riparian areas unless it can be shown that (1) there is no practicable alternative; (2) that all long-term impacts are fully mitigated; or (3) that the construction is an enhancement to the riparian areas. Modifications to the Surface Use Plan of Operations may be required in accordance with section 6 of the lease terms and 43CFR3101.1-2. |
| Water Resources | Public Water Reserves | X | | | | The lessee/operator is given notice that lands in this lease have been identified as a designated Public Water Reserve. Surface occupancy or use is subject to the Public Water Reserve Executive Order No. 107. Modification to the Surface Use Plan of Operations may be required for the protection of the reserve up to and including no surface occupancy or use. Protection of a designated public water reserve as discussed in Public Water Reserve Executive Order No. 107. This limitation does not apply to operations and maintenance of producing wells. |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| Soil Resources | Erosive Soils | X | | | | The lessee/operator is given notice that lands in this lease contain soils that are unusually susceptible to wind and/or water erosion. Best management practices to reduce and/or prevent erosion may be required for operations on the lease. These practices could involve but would not be limited to interim reclamation of well locations and access roads soon after the well is put into production, re-contouring most of the well location and re-top soiling and re-vegetating the entire well pad with native species, and re-vegetating road cuts, fills and borrow ditches. |
| Paleontology Resources | High Potential Areas | X | | | | The lessee/operator is given notice that lands in this lease have been identified as having high potential for paleontological resources. Planned projects should be consistent with BLM Manual and Handbook H8270-1, Chapter III (A) and III (B) to avoid areas where significant fossils are known or predicted to occur or to provide for other mitigation of possible adverse effects (RX, NF, ESR). Modifications to the Surface Use Plan of Operations may be required in order to protect paleontological resources from surface disturbing activities in accordance with Section 6 of the lease terms and 43 CFR 3101.1-2. |
| Cultural Resources | Notification and consultation regarding cultural resources | X | X | X | X | The lease area may now or hereafter be found to contain historic properties and/or resources protected under the National Historic Preservation Act (NHPA), the Archaeological Resources Protections Act (ARPA), the Native American Graves Protection and Repatriation Act (NAGPRA), the American Indian Religious Freedom Act (AIRFA), other statues and Executive Order 13007, and which may be of concern to Native American tribes, interested parties, and the State Historic Preservation Officer (SHPO). BLM will not approve any ground disturbing activities as part of future lease operations until it completes applicable requirements of the National Historic Preservation Act (NHPA), including the completion of any required procedure for notification and consultation with appropriate tribe(s) and/or the SHPO. BLM may require modifications to exploration and development proposals to further its conservation and management objectives on BLM-approved activities that are determined to affect or impact historic or cultural properties and/or resources. |
| Cultural Resources | Planning Area | X | | | | This parcel is located in an area of high concentrations of cultural resources. Known cultural sites are fragile and many are buried under sandy deposits which migrate due to their susceptibility to wind. These sites, or large portions, are not visible from the surface. Therefore, the following mitigation measures may be applied to any surface disturbance of this parcel: 1) pre-surface disturbance cultural resource inventories; 2) pre-surface disturbance subsurface testing; 3) monitoring of ground disturbance; and 4) post-disturbance monitoring identifying resources as the soils stabilize around a project. |
| Cultural | Planning Area | X | | | | The lessee/operator is given notice that lands in this lease contain significant Cultural |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| Resources | | | | | | Resources. Modifications to the Surface Use Plan of Operations may be required for the protection of these resources. Class III level block inventories may be required to determine resource location and possible impact to the resource. |
| Cultural Resources | High Potential Areas | | X | X | X | The lessee/operator is given notice that in areas with high potential for cultural site occurrence there is a higher likelihood of encountering cultural resource concerns (i.e., potential adverse effects) that may require archaeological monitoring, ethnographic data collection, data recovery, and mitigation of historic properties in order to exercise lease rights. |
| Cultural Resources | Planning Area | | X | X | X | The lessee/operator is given notice that measures to mitigate the potential impacts to TCPs or cultural plants identified through consultation may be required.  Mitigation would be developed through further consultation with affected groups, which may include measures to maintain the viewshed and intrinsic values, as well as the auditory, visual, and aesthetic settings of the resources. |
| Cultural Resources | Planning Area | | X | | | The lessee/operator is given notice that a viewshed analysis may be required for cultural sites that are eligible for inclusion on the National Register, or properties of traditional religious and cultural importance to an Indian Tribe. If the analysis shows that the oil and gas development would have adverse effects to the historic properties, the project may require relocation or redesign. |
| Cultural Resources | Planning Area | | | | X | The lessee/operator is given notice that a viewshed analysis may be required for cultural sites that are eligible for inclusion on the National Register when location, setting, or feeling contribute to the overall integrity of a site, or properties of traditional religious and cultural importance to an Indian Tribe.  If the analysis shows that the oil and gas development would have adverse effects to the historic properties, the project may require relocation or redesign. |
| Special Status Species | Utah Sensitive Species | X | X | X | X | The lessee/operator is given notice that no surface use or otherwise disruptive activity would be allowed that would result in direct disturbance to populations or individual special status plant and animal species, including those listed on the BLM sensitive species list and the Utah sensitive species list. The lessee/operator is also given notice that lands in this parcel have been identified as containing potential habitat for species on the Utah Sensitive Species List. Modifications to the Surface Use Plan of Operations may be required in order to protect these resources from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, Migratory Bird Treaty Act and 43 CFR 3101.1-2. |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| Special Status Species | Special Status Plants | X | X | X | X | The lessee/operator is given notice that lands in this lease have been identified as containing special status plants, not federally listed, and their habitats. Modifications to the Surface Use Plan of Operations may be required in order to protect the special status plants and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2. |
| Special Status Species | Burrowing Owl (PFO) | X | X | X | X | The lessee/operator is given notice that lands in this lease have been identified as containing Burrowing Owl Habitat. Modification to the Surface Use Plan of Operations may be required in order to protect the Burrowing Owl and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2. |
| Special Status Species | Kit Fox | | X | X | X | The lessee/operator is given notice that prior to conducting surface disturbing activities in potential habitat, kit fox surveys would be required. Preclude surface-disturbing activities within 660 feet (200 meters) of an occupied kit fox den. |
| Special Status Species | Colorado River Endangered Fish | X | X | X | X | The Lessee/Operator is given notice that the lands in this parcel contain Critical Habitat for the Colorado River fish (bonytail, humpback chub, Colorado pike minnow, and razorback sucker) listed as endangered under the Endangered Species Act, or these parcels have watersheds that are tributary to designated habitat. Critical habitat was designated for the four endangered Colorado River fishes on March 21, 1994(59 FR 13374-13400). Designated critical habitat for all the endangered fishes includes those portions of the 100-year floodplain that contain primary constituent elements necessary for survival of the species. Avoidance or use restrictions may be placed on portions of the lease. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of and adherence to these measures will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following:<br>• Surveys will be required prior to operations unless species occupancy and distribution information is complete and available.  All surveys must be conducted by qualified individual(s).<br>• Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated.<br>• Water production will be managed to ensure maintenance or enhancement of riparian habitat. |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | • Avoid loss or disturbance of riparian habitats. <br> • Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers. <br> • Conduct watershed analysis for leases in designated critical habitat and overlapping major tributaries in order to determine toxicity risk from permanent facilities. <br> • Implement Appendix B (Hydrologic Considerations for Pipeline Crossing Stream Channels, Technical Note 423). <br> • Drilling will not occur within 100 year floodplains of rivers or tributaries to rivers that contain listed fish species or critical habitat. <br> • In areas adjacent to 100-year flood plains, particularly in systems prone to flash floods, analyze the risk for flash floods to impact facilities, and use closed loop drilling, and pipeline burial or suspension according to Appendix B (Hydrologic Considerations for Pipeline Crossing Stream Channels, Technical Note 423), to minimize the potential for equipment damage and resulting leaks or spills. <br><br> Water depletions from any portion of the Upper Colorado River drainage basin above Lake Powell are considered to adversely affect or adversely modify the critical habitat of the four resident endangered fish species, and must be evaluated with regard to the criteria described in the Upper Colorado River Endangered Fish Recovery Program. Formal consultation with USFWS is required for all depletions. All depletion amounts must be reported to BLM. <br><br> Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| Special Status Species | Mexican Spotted Owl | X | X | X | X | The Lessee/Operator is given notice that the lands in this parcel contain suitable habitat for Mexican spotted owl, a federally listed species. The Lessee/Operator is given notice that the lands in this lease contain Designated Critical Habitat for the Mexican spotted owl, a federally listed species. Critical habitat was designated for the Mexican spotted owl on August 31, 2004 (69 FR 53181-53298). Avoidance or use restrictions may be placed on portions of the lease. Application of appropriate measures will depend whether the action is temporary or permanent, and whether it occurs within or outside the owl nesting season. <br><br> A temporary action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action continues for more than one breeding season and/or causes a loss of owl habitat or |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | displaces owls through disturbances, i.e. creation of a permanent structure. |
| | | | | | | The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act. Integration of, and adherence to these measures, will facilitate review and analysis of any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Current avoidance and minimization measures include the following: |
| | | | | | | 1. Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by qualified individual(s). |
| | | | | | | 2. Assess habitat suitability for both nesting and foraging using accepted habitat models in conjunction with field reviews. Apply the conservation measures below if project activities occur within 0.5 mile of suitable owl habitat. Determine potential effects of actions to owls and their habitat. |
| | | | | | |    a. Document type of activity, acreage and location of direct habitat impacts, type and extent of indirect impacts relative to location of suitable owl habitat. |
| | | | | | |    b. Document if action is temporary or permanent. |
| | | | | | | 3. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated and, if necessary, Section 7 consultation reinitiated. |
| | | | | | | 4. Water production will be managed to ensure maintenance or enhancement of riparian habitat. |
| | | | | | | 5. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in canyon habitat suitable for Mexican spotted owl nesting. |
| | | | | | | 6. For all temporary actions that may impact owls or suitable habitat: |
| | | | | | |    a. If the action occurs entirely outside of the owl breeding season (March 1 – August 31), and leaves no permanent structure or permanent habitat disturbance, action can proceed without an occupancy survey. |
| | | | | | |    b. If action will occur during a breeding season, survey for owls prior to commencing activity. If owls are found, activity must be delayed until outside of the breeding season. |
| | | | | | |    c. Rehabilitate access routes created by the project through such means as raking |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | out scars, re-vegetation, gating access points, etc.<br><br>7. For all permanent actions that may impact owls or suitable habitat:<br><br>   a. Survey two consecutive years for owls according to accepted protocol prior to commencing activities.<br>   b. If owls are found, no actions will occur within 0.5 mile of identified nest site. If nest site is unknown, no activity will occur within the designated Protected Activity Center (PAC).<br>   c. Avoid drilling and permanent structures within 0.5 mi of suitable habitat unless surveyed and not occupied.<br>   d. Reduce noise emissions (e.g., use hospital-grade mufflers) to 45 dBA at 0.5 mile from suitable habitat, including canyon rims. Placement of permanent noise-generating facilities should be determined by a noise analysis to ensure noise does not encroach upon a 0.5 mile buffer for suitable habitat, including canyon rims.<br>   e. Limit disturbances to and within suitable habitat by staying on approved routes.<br>   f. Limit new access routes created by the project.<br><br>6. Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the Endangered Species Act. |
| Special Status Species | Bald Eagle | X | X | X | X | The lessee/operator is given notice that lands in this lease have been identified as containing Bald Eagle Habitat. Modifications to the Surface Use Plan of Operations may be required in order to protect the Bald Eagle and/or habitat from surface disturbing activities. |
| Special Status Species | Bald Eagle | X | | | | The Lessee/Operator is given notice that the lands in this parcel contains nesting/winter roost habitat for the bald eagle. The bald eagle was de-listed in 2007; however, it is still afforded protection under the Bald and Golden Eagle Protection Act (16 U.S.C. 668-668c, 1940). Therefore, avoidance or use restrictions may be placed on portions of the lease. Application of appropriate measures will depend on whether the action is temporary or permanent, and whether it occurs within or outside the bald eagle breeding or roosting season. A temporary action is completed prior to the following breeding or roosting season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action continues for more than one breeding or roosting season and/or causes a loss of eagle habitat or displaces eagles through disturbances, i.e. creation of a permanent structure. The following avoidance and minimization measures have been designed to ensure activities carried out on the lease will not lead to the need to consider listing the eagle as threatened |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | or endangered. Integration of, and adherence to the following measures will facilitate review and analysis of any submitted permits under the authority of this lease. Current avoidance and minimization measures include the following: |

1. Surveys will be required prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by qualified individual(s), and be conducted according to protocol.
2. Lease activities will require monitoring throughout the duration of the project. To ensure desired results are being achieved, minimization measures will be evaluated.
3. Water production will be managed to ensure maintenance or enhancement of riparian habitat.
4. Temporary activities within 1.0 mile of nest sites will not occur during the breeding season of January 1 to August 31, unless the area has been surveyed according to protocol and determined to be unoccupied.
5. Temporary activities within 0.5 miles of winter roost areas, e.g., cottonwood galleries, will not occur during the winter roost season of November 1 to March 31, unless the area has been surveyed according to protocol and determined to be unoccupied.
6. No permanent infrastructure will be placed within 1.0 mile of nest sites.
7. No permanent infrastructure will be placed within 0.5 miles of winter roost areas.
8. Remove big game carrion from within 100 feet of lease roadways occurring within bald eagle foraging range.
9. Avoid loss or disturbance to large cottonwood gallery riparian habitats.
10. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable habitat. Utilize directional drilling to avoid direct impacts to large cottonwood gallery riparian habitats. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.
11. All areas of surface disturbance within riparian areas and/or adjacent uplands should be re-vegetated with native species.

Additional measures may also be employed to avoid or minimize effects to the species between the lease sale stage and lease development stage. These additional measures will be developed and implemented in coordination with the U.S. Fish and Wildlife Service.

| Resource of Concern | Applicable Area | A | B | C | D | Lease Notice Description |
|---|---|---|---|---|---|---|
| Special Status Species | Golden Eagle Habitat | X | X | X | X | The lessee/operator is given notice that lands in this lease have been identified as containing Golden Eagle Habitat. Modifications to the Surface Use Plan of Operations may be required in order to protect the Golden Eagle and/or habitat from surface disturbing |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | activities. |
| Special Status Species | Raptors | X | | | | Appropriate seasonal and spatial buffers shall be placed on all known raptor nests in accordance with Utah Field Office Guidelines for Raptor Protection from Human and Land use Disturbances (USFWS 2002) and Best Management Practices for Raptors and their Associated Habitats in Utah (BLM 2006). All construction related activities will not occur within these buffers if pre-construction monitoring indicates the nests are active, unless a site-specific evaluation for active nests is completed prior to construction and if a BLM wildlife biologist, in consultation with USFWS and UDWR, recommends that activities may be permitted within the buffer. The BLM will coordinate with the USFWS and UDWR and have a recommendation within 3-5 days of notification. Any construction activities authorized within a protective (spatial and seasonal) buffer for raptors will require an on-site monitor. Any indication that activities are adversely affecting the raptor and/or its' young, the on-site monitor will suspend activities and contact the BLM Authorized Officer immediately. Construction may occur within the buffers of inactive nests. Construction activities may commence once monitoring of the active nest site determines that fledglings have left the nest and are no longer dependent on the nest site. Modifications to the Surface Use Plan of Operations may be required in accordance with section 6 of the lease terms and 43CFR3101.1-2. |
| Special Status Species | Migratory Birds | X | | | | The lessee/operator is given notice that surveys for nesting migratory birds may be required during migratory bird breeding season whenever surface disturbances and/or occupancy is proposed in association with fluid mineral exploration and development within priority habitats. Surveys should focus on identified priority bird species in Utah. Field surveys will be conducted as determined by the authorized officer of the Bureau of Land Management. Based on the result of the field survey, the authorized officer will determine appropriate buffers and timing limitations. |
| Special Status Species | Southwestern Willow Flycatcher Habitat | X | X | X | X | The lessee/operator is given notice that the lands in this parcel contains riparian habitat within the range for southwestern willow flycatcher. In order to protect southwestern willow flycatcher habitat and avoid negative impacts to the species, actions would be avoided or restricted that may cause stress and disturbance during nesting and rearing of their young. Appropriate measures would depend on whether the action is temporary or permanent, and whether it occurs within or outside the nesting season. A temporary action is completed prior to the following breeding season leaving no permanent structures and resulting in no permanent habitat loss. A permanent action continues for more than one breeding season and/or causes a loss of habitat or displaces flycatchers through disturbances, i.e., creation of a permanent structure. Current avoidance and minimization |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | measures include the following: <br><br> 1. Surveys would be required prior to operations unless species occupancy and distribution information is complete and available.  All surveys must be conducted by qualified individual(s) and be conducted according to protocol. <br> 2. Activities would require monitoring throughout the duration of the project.  To ensure desired results are being achieved, minimization measures would be evaluated and, if necessary, Section 7 consultation reinitiated. <br> 3. Water production would be managed to ensure maintenance or enhancement of riparian habitat. <br> 4. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat.  Ensure that such directional drilling does not intercept or degrade alluvial aquifers. <br> 5. Activities would maintain a 300 feet buffer from suitable riparian habitat year long. <br> 6. Activities within 0.25 mile of occupied breeding habitat would not occur during the breeding season of April 15 to August 15. <br> 7. Ensure that water extraction or disposal practices do not result in change of hydrologic regime that would result in loss or degradation of riparian habitat. <br> 8. Re-vegetate with native species all areas of surface disturbance within riparian areas and/or adjacent land. <br><br> Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the USFWS between the lease sale stage and lease development stage to ensure continued compliance with the ESA. |
| Special Status Species | Yellow-billed Cuckoo Habitat | X | X | X | X | The lessee/operator is given notice that the lands in or adjacent to this parcel contain potentially suitable habitat that falls within the range for western yellow-billed cuckoo, a federally listed species.  Application of appropriate measures will depend whether the action is temporary or permanent, and whether it occurs within or outside the breeding and nesting season.  A temporary action is completed prior to the following breeding season, leaving no permanent structures and resulting in no permanent habitat loss.  A permanent action could continue for more than one breeding season and/or cause a loss of habitat or displace western yellow-billed cuckoos through disturbances (e.g., generation of noise between June 15 and August 31).  The following avoidance and minimization measures have been designed to ensure activities carried out on the lease are in compliance with the Endangered Species Act.  Integration of and adherence to these measures will facilitate review and analysis of |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | any submitted permits under the authority of this lease. Following these measures could reduce the scope of Endangered Species Act, Section 7 consultation at the permit stage. Avoidance and minimization measures include the following: |

1. Habitat suitability within and/or directly adjacent to the parcel will be identified prior to lease development to identify potential survey needs.
2. Protocol Breeding Season Surveys will be required in suitable habitats prior to operations unless species occupancy and distribution information is complete and available. All Surveys must be conducted by permitted individual(s), and be conducted according to protocol.
3. Temporary or permanent actions will require monitoring throughout the duration of the project to ensure that western yellow-billed cuckoo or its habitat is not affected in a manner or to an extent not previous considered. Avoidance and minimization measures will be evaluated throughout the duration of the project.
4. Water production will be managed to ensure maintenance or enhancement of riparian habitat.
5. Where technically and economically feasible, use directional drilling or multiple wells from the same pad to reduce surface disturbance and eliminate drilling in suitable riparian habitat. Ensure that such directional drilling does not intercept or degrade alluvial aquifers.
6. New roads, pipelines, or powerlines will be sited outside a 300 foot buffer of suitable habitat.
7. Drilling and pumping pads will be sited outside a 300 foot buffer from suitable habitat. Measures such as the use of hospital-grade mufflers and electric pumps or other suitable measures will be used to ensure noise levels at the edge of suitable habitat do not exceed baseline conditions.
8. Drilling activities within 0.25 miles of occupied habitat will not occur during the breeding season, which is from June 15 to August 31.
9. Ensure that water extraction or disposal practices do not result in a change of hydrologic regime that would result in loss or degradation of riparian habitat.
10. Re-vegetate all areas of surface disturbance with native species within riparian areas and/or adjacent uplands.

Additional measures to avoid or minimize effects to the species may be developed and implemented in consultation with the U.S. Fish and Wildlife Service between the lease sale stage and lease development stage to ensure continued compliance with the ESA.

| Resource of Concern | Applicable Area | A | B | C | D | Lease Notice Description |
|---|---|---|---|---|---|---|
| Jones cycladenia | Potential, suitable, and occupied | X | X | X | X | The lessee/operator is given notice that the lands located in this parcel contain potential habitat for Jones cycladenia. |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | habitat | | | | | In order to minimize effects to the federally threatened Jones cycladenia, the BLM, in coordination with the USFWS has developed the following avoidance and minimization measures.  Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance operations) are in compliance with the ESA.  For the purposes of this document, the following terms are so defined: *potential habitat* is defined as areas that satisfy the broad criteria of the species habitat description, usually determined by preliminary, in-house assessment.  *Suitable habitat* is defined as areas that contain or exhibit the specific components or constituents necessary for plant persistence determined by field inspection and/or surveys; it may or may not contain Jones cycladenia; habitat descriptions can be found in Federal Register Notice and species recovery plan links at <http:www.fws.gov/endangered/wildlife.html>.  *Occupied habitat* is defined as areas currently or historically known to support Jones cycladenia; synonymous with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development: |

1.  Pre-project habitat assessments will be completed across 100 percent of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable Jones cycladenia habitat is present.

2.  Site inventories will be conducted within suitable habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous, due to topography, slope, etc., suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300 foot buffers will be maintained between surface disturbance and avoidance areas.  However, site specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat.  Where conditions allow, inventories:

    a.  Must be conducted by qualified individuals(s) and according to BLM and Service accepted survey protocols.
    b.  Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season at a time when the plant can be detected (usually April 15 to June 5; however, surveyors should verify that the plant is flowering by contacting a BLM or USFWS botanist or demonstrating that the nearest known population is in flower),
    c.  Will occur within 300 feet from the centerline of the proposed right-of-way (ROW) for surface pipelines or roads; and within 300 feet from the perimeter of disturbance for the proposed well pad, including the well pad,

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | d.  Will include, but not be limited to, plant species lists and habitat characteristics.<br>e.  Will be valid until April 15 of the following year.<br><br>3.  Design project infrastructure to minimize impacts within suitable habitat:<br><br>a.  Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300 foot buffers, in general; however, site-specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat.<br>b.  Reduce well pad size to the minimum needed without compromising safety.<br>c.  Where technically and economically feasible, use directional drilling or multiple wells from the same pad.<br>d.  Limit new access routes created by the project.<br>e.  Roads and utilities should share common ROWs where possible.<br>f.  Reduce the width of ROWs and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat.<br>g.  Place signing to limit off-road travel in sensitive areas.<br>h.  Stay on designated routes and other cleared/approved areas.<br>i.  All disturbed areas will be re-vegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas.<br><br>4.  Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants:<br><br>a.  Follow the above recommendations in Section 3 for project design within suitable habitats.<br>b.  To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged.<br>c.  Construction of roads will occur such that the edge of the ROW is at least 300 feet from any plant and 300 feet from avoidance areas,<br>d.  Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15 to June 5 (flowering period); dust abatement applications will be comprised of water only.<br>e.  The edge of the well pad should be located at least 300 feet away from plants |

| Resource of Concern | Applicable Area | Alternative A | B | C | D | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | | | | | and avoidance areas, in general; however, site specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat,<br>f. Surface pipelines will be laid such that a 300 foot buffer exists between the edge of the ROW and plants and 300 feet between the edge of ROW and avoidance areas; use stabilizing and anchoring techniques when the pipeline crossed suitable habitat to ensure pipelines don't move towards the population; site specific distances will need to be approved by USFWS and BLM when disturbance will occur upslope of habitat.<br>g. Construction activities will not occur from April 15 through June 5 within occupied habitat.<br>h. Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc.,<br>i. Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat., and<br>j. Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible.<br><br>5. Occupied Jones cycladenia habitats within 300 feet of the edge of the surface pipelines' ROWs, 300 feet of the edge of the roads' ROWs, and 300 feet from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities. Annual reports shall be provided to the BLM and the USFWS. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the USFWS.<br><br>6. Re-initiation of Section 7 consultation with the USFWS will be sought immediately if any loss of plants or occupied habitat for the Jones cycladenia is anticipated as a result of project activities.<br><br>Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the USFWS to ensure continued compliance with the ESA. |
| Special Status Species | Wright Fishhook Cactus | X | X | X | X | In order to minimize effects to the federally threatened Wright Fishhook Cactus, the Bureau of Land Management (BLM), in coordination with the U.S. Fish and Wildlife Service |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | (Service), has developed the following avoidance and minimization measures. Implementation of these measures will help ensure the activities carried out during oil and gas development (including but not limited to drilling, production, and maintenance operations) are in compliance with the endangered Species Act (ESA). For the purposes of this document, the following terms are so defined: *Potential habitat* is defined as areas which satisfy the broad criteria of the species habitat description; usually determined by preliminary, in-house assessment. *Suitable habitat* is defined as areas which contain or exhibit the specific components or constituents necessary for plant persistence; determined by field inspection and/or surveys; may or may not contain Wright Fishhook Cactus; habitat descriptions can be found in Federal Register Notice and species recovery plan links at <http:www.fws.gov/endangered/wildlife.html>. *Occupied habitat* is defined as areas currently or historically known to support Wright Fishhook Cactus; synonymous with "known habitat." The following avoidance and minimization measures should be included in the Plan of Development:<br><br>1. Pre-project habitat assessments will be completed across 100% of the project disturbance area within potential habitat[1] prior to any ground disturbing activities (including ATV use) to determine if suitable Wright Fishhook Cactus habitat is present.<br>2. Site inventories will be conducted within suitable habitat to determine occupancy. Where standard surveys are technically infeasible and otherwise hazardous due to topography, slope, etc. suitable habitat will be assessed and mapped for avoidance (hereafter, "avoidance areas"); in such cases, in general, 300' buffers will be maintained between surface disturbance and avoidance areas. However, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat. Where conditions allow, inventories:<br>   a. Must be conducted by qualified individuals(s) and according to BLM and Service accept survey protocols,<br>   b. Will be conducted in suitable and occupied habitat for all areas proposed for surface disturbance prior to initiation of project activities and within the same growing season, at a time when the plant can be detected (usually April 15th to June 5th, however, surveyors should verify that the plant is flowering by contacting a BLM or FWS botanist or demonstrating that the nearest known population is in flower),<br>   c. Will occur within 300' from the centerline of the proposed right-of-way for surface pipelines or roads; and within 300' from the perimeter of disturbance for the proposed well pad including the well pad,<br>   d. Will include, but not be limited to, plant species lists and habitat characteristics, |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | and |
| | | | | | | e.  Will be valid until April 15th the following year. |
| | | | | | | 3.  Design project infrastructure to minimize impacts within suitable habitat: |
| | | | | | |    a.  Where standard surveys are technically infeasible, infrastructure and activities will avoid all suitable habitat (voidance areas) and incorporate 300' buffers, in general; however, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat, |
| | | | | | |    b.  Reduce well pad size to the minimum needed, without compromising safety, |
| | | | | | |    c.  Where technically and economically feasible, use directional drilling or multiple wells from the same pad, |
| | | | | | |    d.  Limit new access routes created by the project, |
| | | | | | |    e.  Roads and utilities should share common right-of-ways where possible, |
| | | | | | |    f.  Reduce the width of right-of-ways and minimize the depth of excavation needed for the road bed; where feasible, use the natural ground surface for the road within habitat, |
| | | | | | |    g.  Place signing to limit off-road travel in sensitive areas, and |
| | | | | | |    h.  Stay on designated routes and other cleared/approved areas, |
| | | | | | |    i.  All disturbed areas will be revegetated with native species comprised of species indigenous to the area and non-native species that are not likely to invade other areas. |
| | | | | | | 4.  Within occupied habitat, project infrastructure will be designed to avoid direct disturbance and minimize indirect impacts to populations and to individual plants: |
| | | | | | |    a.  Follow the above recommendations (3.) for project design within suitable habitats, |
| | | | | | |    b.  To avoid water flow and/or sedimentation into occupied habitat and avoidance areas, silt fences, hay bales, and similar structures or practices will be incorporated into the project design; appropriate placement of fill is encouraged, |
| | | | | | |    c.  Construction of roads will occur such that the edge of the right of way is at least 300' from any plant and 300' from avoidance areas, |
| | | | | | |    d.  Roads will be graveled with occupied habitat; the operator is encouraged to apply water for dust abatement to such areas from April 15th to June 5th (flowering period); dust abatement applications will be comprised of water only, |
| | | | | | |    e.  The edge of the well pad should be located at least 300' away from plants and avoidance areas, in general; however, site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat, |
| | | | | | |    f.  Surface pipelines will be laid such that a 300' buffer exists between the edge of the right of way and plants and 300' between the edge of right of way and avoidance areas; use stabilizing and anchoring techniques when the pipeline |

| Resource of Concern | Applicable Area | Alternative | | | | Lease Notice Description |
|---|---|---|---|---|---|---|
| | | A | B | C | D | |
| | | | | | | crossed suitable habitat to ensure pipelines don't move towards the population; site-specific distances will need to be approved by FWS and BLM when disturbance will occur upslope of habitat, g. Construction activities will not occur from April 15th through June 5th within occupied habitat, h. Before and during construction, areas for avoidance should be visually identifiable in the field, e.g., flagging temporary fencing, rebar, etc., i. Place produced oil, water, or condensate tanks in centralized locations, away from occupied habitat, and j. Minimize the disturbed area of producing well locations through interim and final reclamation. Reclaim well pads following drilling to the smallest area possible. 5. Occupied Wright Fishhook Cactus habitats within 300' of the edge of the surface pipelines' right-of-ways, 300' of the edge of the roads' right-of-ways, and 300' from the edge of the well pad shall be monitored for a period of three years after ground disturbing activities. Monitoring will include annual plant surveys to determine plant and habitat impacts relative to project facilities.  Annual reports shall be provided to the BLM and the Service. To ensure desired results are being achieved, minimization measures will be evaluated and may be changed after a thorough review of the monitoring results and annual reports during annual meetings between the BLM and the Service. 6. Re-initiation of section 7 consultation with the Service will be sought immediately if any loss of plants or occupied habitat for the Wright Fishhook Cactus is anticipated as a result of project activities. Additional site-specific measures may also be employed to avoid or minimize effects to the species. These additional measures will be developed and implemented in consultation with the U.S. Fish and Wildlife Service to ensure continued compliance with the ESA. |

**Map 2-2-B Oil and Gas Leasing Categories (Alt B)**



Legend:

- Closed
- NSO
- CSU/TL
- San Rafael Desert Master Leasing Plan Area

- Field Office Boundary
- County Boundary
- Township Boundary
- Major Road
- River

**Landownership**
- Bureau of Land Management
- Military Reservations and Corps of Engineers
- National Park Service

- Private
- State
- State Parks and Recreation
- State Wildlife Reserve/Management Area

Preliminary Alternatives Public Review
December 15, 2016.

No warranty is made by the Bureau of Land Management as to accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

AR010970

## Map 2-2-C Oil and Gas Leasing Categories (Alt C)



**Legend**

Closed
NSO
CSU/TL
Open
San Rafael Desert Master Leasing Plan Area

Field Office Boundary
County Boundary
Township Boundary
Major Road
River

**Landownership**
Bureau of Land Management
Military Reservations and Corps of Engineers
National Park Service

Private
State
State Parks and Recreation
State Wildlife Reserve/Management Area

Preliminary Alternatives Public Review
December 15, 2016.

No warranty is made by the Bureau of Land Management as to accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

AR010971

## Map 2-2-D Oil and Gas Leasing Categories (Alt D)



Preliminary Alternatives Public Review
December 15, 2016.

No warranty is made by the Bureau of Land Management as to accuracy, reliability, or completeness of these data for individual use or aggregate use with other data.

AR010972

**BLM**

# United States Department of the Interior
# Bureau of Land Management

---

### Environmental Assessment
### DOI-BLM-UT-G020-2016-0008-EA

---

**May 2017**

# San Rafael Desert Master Leasing Plan
# and
# Draft Resource Management Plan Amendments/
# Draft Environmental Assessment

Price Field Office
125 South 600 West
Price, Utah 84501
(435) 636-3600

and

Richfield Field Office
150 East 900 North
Richfield, Utah 84701
(435) 896-1500



AR011000

AR011001

The Bureau of Land Management

Our Vision      To enhance the quality of life for all citizens through the balanced stewardship of
                America's public lands and resources.

Our Mission     To sustain the health, diversity, and productivity of the public lands for the
                use and enjoyment of present and future generations.

Our Values      To serve with honesty, integrity, accountability, respect, courage, and commitment
                to make a difference.

Our Priorities  To improve the health and productivity of the lands to support the BLM
                multiple use mission.

                To cultivate community-based conservation, citizen-centered stewardship, and
                partnership through consultation, cooperation, and communication.

                To respect, value, and support our employees, giving them resources and
                opportunities to succeed.

                To pursue excellence in business practices, improve accountability to our
                stakeholders, and deliver better service to our customer.

On the Cover:

AR011003

# CONTENTS

**CHAPTER 1— Introduction, Purpose and Need** ...................................................................1-1

1.1    Introduction ...........................................................................................................1-1

1.2    Purpose ..................................................................................................................1-3

1.3    Need ......................................................................................................................1-3

1.4    Issues ....................................................................................................................1-3

1.5    Issues Considered but not Analyzed in Detail .....................................................1-6

1.6    Planning Criteria ...................................................................................................1-7

1.7    Relationship to Other Policies, Plans, and Programs ...........................................1-8

**CHAPTER 2— Alternatives** ..........................................................................................2-1

2.1    Introduction ...........................................................................................................2-1

2.2    Description of the Alternatives .............................................................................2-1

2.3    Alternatives Considered but not Analyzed in Detail ............................................2-3

2.4    Alternatives Tables ...............................................................................................2-4

**CHAPTER 3— Affected Environment** .........................................................................3-1

3.1    Introduction ...........................................................................................................3-1

3.2    Air Quality ............................................................................................................3-1

3.3    Climate Change .....................................................................................................3-10

3.4    Soil Resources .......................................................................................................3-14

3.5    Water Resources ....................................................................................................3-16

3.6    Vegetation .............................................................................................................3-22

3.7    Cultural Resources ................................................................................................3-32

3.8    Paleontological Resources .....................................................................................3-44

3.9    Visual Resources and Night Skies ........................................................................3-47

3.10   Auditory Management (Soundscapes) ...................................................................3-50

3.11   Special Status Species ..........................................................................................3-54

3.12   Wildlife and Fisheries ..........................................................................................3-74

3.13   Lands with Wilderness Characteristics .................................................................3-84

3.14   Recreation .............................................................................................................3-90

3.15   Oil and Gas Resources ..........................................................................................3-99

3.16   Special Designations .............................................................................................3-103

3.17   Socioeconomics ....................................................................................................3-108

3.18   Health and Safety ..................................................................................................3-1

**CHAPTER 4— Environmental Consequences** ..............................................................4-1

4.1    Introduction ...........................................................................................................4-1

4.2    Air Quality ............................................................................................................4-4

4.3    Climate Change .....................................................................................................4-14

4.4    Soil Resources .......................................................................................................4-21

4.5    Water Resources ....................................................................................................4-31

4.6    Vegetation .............................................................................................................4-45

| | | |
|---|---|---|
| 4.7 | Cultural Resources | 4-56 |
| 4.8 | Paleontological Resources | 4-60 |
| 4.9 | Visual Resources and Night Skies | 4-64 |
| 4.10 | Auditory Management (Soundscapes) | 4-73 |
| 4.11 | Special Status Species | 4-81 |
| 4.12 | Wildlife and Fisheries | 4-97 |
| 4.13 | Lands with Wilderness Characteristics | 4-112 |
| 4.14 | Recreation | 4-126 |
| 4.15 | Oil and Gas Resources | 4-149 |
| 4.16 | Special Designations | 4-158 |
| 4.17 | Socioeconomics | 4-163 |
| 4.18 | Health and Safety | 4-163 |
| 4.19 | Cumulative Impacts | 4-166 |
| **CHAPTER 5— Consultation and Coordination** | | **5-1** |
| 5.1 | Introduction | 5-1 |
| 5.2 | Consultation and Coordination | 5-1 |
| 5.1 | Public Outreach and Participation | 5-3 |
| 5.3 | List of Preparers | 5-4 |
| **CHAPTER 6— References** | | **6-1** |

## APPENDICES

Appendix A.    Reasonably Foreseeable Development Scenario for Oil and Gas in the San Rafael Desert Master Leasing Plan Area.
Appendix B.    Oil and Gas Lease Stipulations and Notices
Appendix C.    Best Management Practices for Alternatives B, C, and D
Appendix D.    Stipulations on Suspended Leases
Appendix E.    Best Management Practices for Alternative A

## FIGURES

Figure 3-1.    Global GHG emissions by gas, 1990–2010. 3-11
Figure 3-2.    Greenhouse gas emissions in the United States from 1990 through 2010. Source: EPA (2016k). 3-12
Figure 3-3.    Seasonally Adjusted Unemployment Rates, Emery County, 2009–2016 3-117
Figure 3-4.    Seasonally Adjusted Unemployment Rates, Wayne County, 2009–2016 3-117

# MAPS

Map 1-1.     San Rafael Desert Master Leasing Plan Planning Area
Map 2-1.     Lands with Wilderness Characteristics
Map 2-2-A.   Oil and Gas Leasing Categories (Alt A)
Map 2-2-B.   Oil and Gas Leasing Categories (Alt B)
Map 2-2-C.   Oil and Gas Leasing Categories (Alt C)
Map 2-2-D.   Oil and Gas Leasing Categories (Alt D)
Map 2-3.     Three Rivers Locatable Mineral Withdrawal
Map 2-4.     Paleontological Resources
Map 2-5.     Special Designations and Special Recreation Management Areas
Map 2-6.     Recreation Focus Areas and Canyon Rims
Map 2-7.     Key Observation Points
Map 2-8-B.   Travel Corridors (Alt B)
Map 2-8-D.   Travel Corridors (Alt D)
Map 2-9.     Soil Resources
Map 2-10.    Steep Slopes
Map 2-11.    Water Resources
Map 2-12.    Special Status Animal Species
Map 2-13.    Special Status Plant Species
Map 2-14.    Visual Resources
Map 2-15.    Pronghorn Habitat
Map 3-1.     Subwatersheds crossed by the Planning Area
Map 3-2.     Land Cover Types
Map 3-3.     Visual Resource Inventory
Map 3-4.     Mule Deer and Bighorn Sheep Habitat
Map 3-5.     Lands with Wilderness Characteristics Groups for Analysis
Map 3-6.     Recreation Opportunity Spectrum

# TABLES

Table 2-1.    Air Quality ........................................................................................ 2-6
Table 2-2.    Cultural Resources ............................................................................ 2-10
Table 2-3.    Lands with Wilderness Characteristics ............................................ 2-12
Table 2-4.    Oil and Gas ...................................................................................... 2-13
Table 2-5.    Paleontology .................................................................................... 2-15
Table 2-6.    Recreation ........................................................................................ 2-16
Table 2-7.    Special Designations ........................................................................ 2-22
Table 2-8.    Soil and Water Resources ................................................................ 2-25
Table 2-9.    Special Status Species ...................................................................... 2-30
Table 2-10.   Vegetation ........................................................................................ 2-35
Table 2-11.   Visual Resources Management/Auditory Management (Soundscapes) ........................ 2-36
Table 2-12.   Wildlife and Fisheries ...................................................................... 2-38
Table 3-1.    Landownership and Land Management in the Planning Area .......... 3-1
Table 3-2.    National Ambient Air Quality Standards.......................................... 3-2
Table 3-3.    2014 Criteria Pollutant Emissions in Emery and Wayne Counties by Source ................ 3-4
Table 3-4.    $O_3$ Concentrations in Canyonlands National Park, 2009–2015 ........................ 3-5

Table 3-5.    2014 HAP Emissions in Emery County (greater than 0.5 tpy) ...........................................3-6
Table 3-6.    IMPROVE Visibility Data on the Haziest and Clearest Days in Canyonlands and
             Capitol Reef National Parks, 2009–2015..............................................................3-8
Table 3-7.    NDAP Wet Deposition Data for Canyonlands National Park, 2009–2015......................3-9
Table 3-8.    CASTNet Dry Deposition Data for Canyonlands National Park, 2009–2014 ...............3-10
Table 3-9.    Utah GHG Emissions by Sector ................................................................................3-13
Table 3-10.   Named Streams within the Analysis Area .................................................................3-18
Table 3-11.   Land Cover Types in the Vegetation Analysis Area ...................................................3-23
Table 3-12.   Designated Noxious Weeds in Utah ........................................................................3-29
Table 3-13.   Prehistoric Site or Component Types in the Analysis Area*......................................3-37
Table 3-14.   Prehistoric Sites or Components in the Analysis Area by Time Period .......................3-38
Table 3-15.   Historic Site Types in the Analysis Area ..................................................................3-38
Table 3-16.   Historic Themes in the Analysis Area ......................................................................3-39
Table 3-17.   General Land Office Maps Covering the Analysis Area .............................................3-41
Table 3-18.   Abandoned Wells in the Analysis Area ....................................................................3-42
Table 3-19.   Potential Fossil Yield Classification Designations within the Planning Area ...............3-46
Table 3-20.   Visual Resource Management Class Acreage Distribution in the Planning Area...........3-48
Table 3-21.   Visual Resource Inventory Class Acreage Distribution in the Planning Area................3-49
Table 3-22.   Perceived Change in Decibel Levels ........................................................................3-51
Table 3-23.   Sound Levels for Common Noise Sources ................................................................3-51
Table 3-24.   Noise Levels Associated with Oil and Gas Sources ..................................................3-52
Table 3-25.   BLM Sensitive Plant Species that May Occur in the Planning Area............................3-58
Table 3-26.   BLM Sensitive Wildlife Species that May Occur in the Planning Area........................3-70
Table 3-27.   Mule Deer Habitat .................................................................................................3-76
Table 3-28.   Pronghorn Habitat ................................................................................................3-77
Table 3-29.   Bighorn Sheep Habitat...........................................................................................3-77
Table 3-30.   BCC Region 16 and Utah PIF High-Priority Species That May Occur in Planning
             Area .....................................................................................................................3-79
Table 3-31.   Lands with Wilderness Characteristics Units in the Planning Area .............................3-86
Table 3-32.   Off-Highway Vehicle Registrations in Emery and Wayne Counties from 2012 to
             2016.....................................................................................................................3-97
Table 3-33.   Visitor Data for the Maze District of Canyonlands National Park ...............................3-98
Table 3-34.   Visitor Use Data for Labyrinth Canyon ...................................................................3-98
Table 3-35.   Current Oil and Gas Leasing Categories for BLM-Administered Public Lands in the
             Planning Area....................................................................................................3-101
Table 3-36.   Areas of Critical Environmental Concern in the Planning Area .................................3-104
Table 3-37.    Land Management in the Study Area ....................................................................3-110
Table 3-38.   2010 Population, Area, and Population Density of the Study Area ............................3-110
Table 3-39.   Income Levels in the Socioeconomic Study Area, 2009–2014 (2014 $)....................3-111
Table 3-40.   Environmental Justice Indicators, Minority Population, 2010 Census and 2009–2015
             ACS ...................................................................................................................3-115
Table 3-41.   Emery County Employment by Industry, 2001–2015 ...............................................3-118
Table 3-42.   Wayne County Employment by Industry, 2001–2015 ..............................................3-119
Table 3-43.   Emery County Earnings by Industry, 2001–2015 (1,000s of 2015 $)........................3-121
Table 3-44.   Wayne County Earnings by Industry, 2001–2015 (1,000s of 2015 $) .......................3-122
Table 3-45.   Emery County Employment and Wages by Industry, 2015 (2015 $)..........................3-123
Table 3-46.   Wayne County Employment and Wages by Industry, 2015 (2015 $) .........................3-124
Table 3-47.   Components of Personal Income, Emery County, 1970–2015 (1,000s of 2015 $) ........3-125

San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments/Draft
Environmental Assessment

Table 3-48.  Components of Personal Income, Wayne County, 1970–2015 (1,000s of 2015 $) ....... 3-126
Table 3-49.  Components of Non-Labor Income, 2015, Percent of Total Personal Income .............. 3-126
Table 3-50.  Tourism Spending, Employment, and Tax Revenue for Emery and Wayne Counties
            and State of Utah, 2015 ....................................................................................... 3-131
Table 3-51.  Economic Impacts of MLP BLM Public Land Recreation, Day Use Market Segment,
            2011 .................................................................................................................... 3-132
Table 3-52.  Economic Impacts of MLP BLM Public Land Recreation, Non-Local Camping
            Market Segment, 2011 ........................................................................................ 3-132
Table 3-53.  Economic Impacts of MLP BLM Public Land Recreation, Non-Local Lodging
            Market Segment, 2011 ........................................................................................ 3-133
Table 3-54.  Recreation Consumer Surplus Values per Person per Day by Activity and Region
            (2010 $) ............................................................................................................... 3-134
Table 4-1.   Types of Impacts .................................................................................................. 4-1
Table 4-2.   Projected Oil and Gas Development and Surface Disturbance on Bureau of Land
            Management–Administered Public Lands by Alternative (over the next 15 years) .......... 4-3
Table 4-3.   Emissions from Projected Oil and Gas Development in the Planning Area ..................... 4-5
Table 4-4.   Direct GHG Emissions from Projected Oil and Gas Development in the Planning
            Area ..................................................................................................................... 4-15
Table 4-5.   Indirect GHG Emissions from Projected Oil and Gas Development in the Planning
            Area ..................................................................................................................... 4-16
Table 4-6.   Sensitive Soils by Oil and Gas Leasing Category in Alternative A ................................ 4-22
Table 4-7.   Sensitive Soils by Oil and Gas Leasing Category in Alternative B ................................ 4-25
Table 4-8.   Sensitive Soils by Oil and Gas Leasing Category in Alternative C ................................ 4-27
Table 4-9.   Sensitive Soils by Oil and Gas Leasing Category in Alternative D ................................ 4-30
Table 4-10.  Land Cover Types by Oil and Gas Leasing Category under Alternative A .................... 4-47
Table 4-11.  Land Cover Types by Oil and Gas Leasing Category under Alternative B .................... 4-50
Table 4-12.  Land Cover Types by Oil and Gas Leasing Category under Alternative C .................... 4-52
Table 4-13.  Land Cover Types by Oil and Gas Leasing Category in Alternative D ......................... 4-55
Table 4-14.  Probability for the Occurrence of Cultural Sites ......................................................... 4-57
Table 4-15.  Probability for the Occurrence of Cultural Sites by Alternative and Oil and Gas
            Leasing Category ................................................................................................. 4-58
Table 4-16.  Oil and Gas Leasing Categories by PFYC under Alternative A ..................................... 4-60
Table 4-17.  Oil and Gas Leasing Categories by PFYC under Alternative B ..................................... 4-62
Table 4-18.  Oil and Gas Leasing Categories by PFYC under Alternative C ..................................... 4-62
Table 4-19.  Oil and Gas Leasing Categories by PFYC under Alternative D ..................................... 4-63
Table 4-20.  Oil and Gas Leasing Categories by VRI Class under Alternative A ............................... 4-65
Table 4-21.  Oil and Gas Leasing Categories by VRM Class under Alternative A ............................. 4-65
Table 4-22.  Oil and Gas Leasing Categories by VRI Class under Alternative B ............................... 4-67
Table 4-23.  Oil and Gas Leasing Categories by VRM Class under Alternative B ............................. 4-67
Table 4-24.  Oil and Gas Leasing Categories by VRI Class under Alternative C ............................... 4-69
Table 4-25.  Oil and Gas Leasing Categories by VRM Class under Alternative C ............................. 4-69
Table 4-26.  Oil and Gas Leasing Categories by VRI Class under Alternative D ............................... 4-71
Table 4-27.  Oil and Gas Leasing Categories by VRM Class under Alternative D ............................. 4-71
Table 4-28.  Special Status Species Habitat by Oil and Gas Leasing Category in All Alternatives ..... 4-83
Table 4-29.  Wildlife Habitats by Oil and Gas Leasing Category under Alternatives A through D ..... 4-99
Table 4-30.  LWC Groups by Oil and Gas Leasing Category under Alternative A ........................... 4-113
Table 4-31.  LWC Groups by Oil and Gas Leasing Category under Alternative B ............................ 4-116
Table 4-32.  LWC Groups by Oil and Gas Leasing Category under Alternative C ........................... 4-118

San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments/Draft
Environmental Assessment

Table 4-33.    LWC Groups by Oil and Gas Leasing Category under Alternative D .......................... 4-123

Table 4-34.    Oil and Gas Leasing Categories in the Dirty Devil/Robbers Roost SRMA in the
Planning Area (all alternatives) ...................................................................... 4-127

Table 4-35.    Oil and Gas Leasing Categories in the Labyrinth Canyon SRMA in the Planning
Area (all alternatives) .................................................................................... 4-128

Table 4-36.    Oil and Gas Leasing Categories for ROS Classes in the Labyrinth Canyon SRMA in
the Planning Area (all alternatives) ............................................................... 4-129

Table 4-37.    Oil and Gas Leasing Categories in the Recreation Focus Areas (all alternatives) ......... 4-132

Table 4-38.    Projected Oil and Gas Development and Surface Disturbance on Bureau of Land
Management Lands (over the next 15 years) ............................................................ 4-151

Table 4-39.    Oil and Gas Leasing Categories under Each Alternative ............................................. 4-153

Table 4-40.    ACECs by Mineral Leasing Category ...................................................................... 4-158

Table 5-1.     Native American Tribes Contacted for Consultation ...................................................... 5-2

Table 5-2.     Bureau of Land Management Preparers ............................................................................ 5-5

Table 5-3.     Non-Bureau of Land Management Preparers (SWCA Environmental Consultants) ......... 5-6

# CHAPTER 1—INTRODUCTION, PURPOSE AND NEED

## 1.1 INTRODUCTION

The San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments/Draft Environmental Assessment (referred to hereafter as the MLP/EA) has been prepared by the United States Department of the Interior, Bureau of Land Management (BLM) Price and Richfield Field Offices.

The amendments to the Price and Richfield Field Offices' records of decision and resource management plans (referred hereafter as the ROD/RMPs) (BLM 2008a, 2008b) are focused exclusively on management decisions pertaining to oil and gas resources in the planning area. Due to the limited focus of this planning effort, decisions for other resources that would normally be considered in a full RMP revision are not addressed.

The planning area is located in Emery and Wayne Counties in Utah and encompasses approximately 525,000 acres of public land primarily located south of Interstate 70 and east of State Route 24. The eastern boundary of the planning area is generally the Green River. A small portion of the planning area is located north of Interstate 70, west of the city of Green River, Utah, and east of the San Rafael Swell. U.S. Highway 6 crosses this part of the planning area (Map 1-1).

This MLP/EA is being prepared to implement new oil and gas leasing policy, to resolve long-standing lease protests, and to complete supplemental analyses required under the National Environmental Policy Act (NEPA) for leases that were placed in suspension because of litigation. Since the completion of the Price and Richfield Field Offices' ROD/RMPs in 2008 (BLM 2008a, 2008b), the BLM has also collected new information relevant to this analysis. Additional information regarding oil and gas leasing policy and lease issues in the planning area and new information that has been collected since completion of the Price and Richfield Field Offices' ROD/RMPs are included in the sections below.

## 1.1.1 Updated Policy

On May 17, 2010, the BLM Washington Office (WO) issued Instruction Memorandum (IM) No. 2010-117: Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews (BLM 2010a). Subsequently, in January 28, 2013, guidance included in IM 2010-117 was incorporated into BLM Handbook (H) 1624-1 – *Planning for Fluid Mineral Resources* (BLM 2013). As part of its oil and gas leasing reform policy, the BLM introduced the MLP concept. MLPs provide a mechanism for completing additional planning, analysis, and decision-making in areas that meet certain criteria. The preparation of an MLP is required when the following criteria are met:

1. A substantial portion of the area to be analyzed in the MLP is not currently leased.

2. There is a majority of federal mineral interest.

3. The oil and gas industry has expressed a specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.

4. Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur where there are multiple-use or natural and cultural resource conflicts; impacts to air quality; impacts to the resources or values of any unit of the National Park Service system, a national wildlife refuge, or a National Forest System wilderness area, as determined after consultation or coordination with the National Park Service, the U.S. Fish and Wildlife Service, or the U.S. Forest Service; or impacts to other specially designated areas.

In addition to the abovementioned criteria, the BLM's leasing reform policy states that MLPs may be completed under other circumstances at the State Director's discretion.

1 Following issuance of IM No. 2010-117 (BLM 2010a), the BLM Utah State Office was asked to develop
2 a leasing reform implementation plan. In February 2011, the BLM Director approved the BLM Utah State
3 Office's leasing reform implementation plan, which included a commitment to complete five MLPs,
4 including one for an area referred to at the time as the "San Rafael River." Subsequently, in August 2015,
5 the BLM changed the name of the project area to the "San Rafael Desert" to more accurately describe
6 public lands in the planning area.

7 The planning area meets most of the criteria for preparation of an MLP, but it does not fully meet
8 criterion 3 listed above. Although there are existing leases and although the oil and gas industry has
9 expressed a specific interest in additional leasing, there has been no discovery of oil and gas resources.
10 Nevertheless, the State Director has determined that completion of an MLP in the area is appropriate,
11 primarily because of long-standing lease issues that must be resolved in the planning area.

## 1.1.2       Protested and Suspended Leases

13 Of particular importance in this planning process is the resolution of 16 protested and suspended oil and
14 gas leases in the SRD MLP planning area.

15 On August 1, 2006, the United States District Court of Utah issued a ruling in *Southern Utah Wilderness*
16 *Alliance* [SUWA] *v. Norton* [BLM] (2:04CV574). In that ruling, the court reversed and remanded the
17 BLM's decision to lease 16 parcels included in the November 2003 competitive oil and gas lease sale.
18 The court ruled that the BLM violated NEPA by failing to consider significant new information on
19 wilderness characteristics before leasing.

20 Pending before the courts were two additional lawsuits, *SUWA et al. v. Lynn Scarlett* [BLM] (2:06-cv-
21 0342) and *SUWA et al. v. Dirk Kempthorne* [BLM] (2:08-cv-0064) that presented similar legal and factual
22 issues to those addressed by the court in *SUWA v. Norton*. Because these cases were similar, the BLM
23 decided to suspend the contested leases involved in the pending cases and motioned that the court remand
24 the decisions back to the agency for further consideration. The court agreed to the BLM's motion. All
25 suspended leases located in the SRD MLP planning area were part of these two lawsuits. Before allowing
26 any action on these leases, the BLM must conduct supplemental NEPA analysis. Following the NEPA
27 analysis, the BLM will issue a new decision on each lease and may cancel or modify the leases or lift the
28 lease suspensions.

29 In addition to the aforementioned suspended leases, the SRD MLP planning area includes several lease
30 parcels that were sold at the February and May 2006 lease sales but never issued. These leases, which
31 were sold just prior to the *SUWA v. Norton* decision, were protested because the BLM did not consider
32 information on wilderness characteristics before leasing. The BLM has not resolved all of the lease
33 protests.

34 The BLM's *Land Use Planning Handbook* (H-1601-1) (BLM 2005) gives the agency discretion to use a
35 single land use planning and NEPA process to make both land use planning and implementation
36 decisions, provided that both types of decisions are adequately addressed with the appropriate level of
37 NEPA analysis. In addition to a land use planning–level analysis, this EA includes a site-specific analysis
38 of the impacts of oil and gas leasing in areas where there are suspended and protested leases. Completion
39 of this EA will fulfill the BLM's obligations to conduct supplemental NEPA analysis for all leases in
40 question. Implementation decisions regarding the protested and suspended leases will be made at the
41 same time the BLM decides whether to amend the Price and Richfield Field Offices' ROD/RMPs. The
42 BLM will clearly distinguish which decisions are implementation decisions.

43 Implementation-level decisions in this EA will be appealable for 30 days after a decision record (DR) is
44 signed. Planning decisions will be made in accordance with the BLM's planning regulations in 43 Code
45 of Federal Regulations (CFR) 1600. Before land use planning decisions are finalized and selected, they
46 must be presented to the public as proposed decisions that can protested with the BLM Director.

### 1.1.3    New Information

Since the Price and Richfield Field Offices' ROD/RMPs were completed in 2008 (BLM 2008a, 2008b), the following new information has been identified for consideration in the MLP/EA process:

- A planning area–wide wilderness characteristics inventory
- A cultural resources inventory, viewshed analysis, and historic setting analysis for the Old Spanish National Historic Trail
- Pronghorn habitat data from the Utah Division of Wildlife Resources
- Visual resource inventories for the Price and Richfield Field Offices
- Reasonably foreseeable development scenario for oil and gas resources (Appendix A)
- Recreation and cultural resources inventory data

## 1.2    PURPOSE

The MLP/EA process will provide additional planning and analysis prior to new leasing of oil and gas within the planning area. The MLP/EA will enable the Price and Richfield Field Offices to 1) resolve long-standing lease protests relating to parcels of land for which the BLM received lease offers subject to protest but for which the BLM has not issued leases in the planning area; 2) determine whether the BLM should cancel, modify, or lift the suspensions on suspended leases in the planning area; 3) evaluate potential development scenarios; 4) identify and address potential resource conflicts and environmental impacts from development; 5) create oil and gas development mitigation strategies; and 6) consider a range of new conditions, including prohibiting surface occupancy or closing certain areas to leasing.

## 1.3    NEED

The BLM introduced MLPs as part of its 2010 Oil and Gas Leasing Reform effort (IM No. 2010-117) (BLM 2010a). These reforms have been incorporated into and supplemented in various BLM handbooks, including H-1624-1 BLM 2013. In response to this policy, the State Director has determined that additional planning and analysis are warranted prior to allowing new mineral leasing and development. Furthermore, the MLP is needed to resolve long-standing lease protests from the February and May 2006 lease sale, and to complete supplemental NEPA for leases that were placed in suspension in 2005 and 2006 because of litigation.

## 1.4    ISSUES

Public scoping began with the publication of the notice of intent in the *Federal Register* on May 19, 2016. The scoping period included two public scoping meetings held in Green River and Castle Dale, Utah. The formal scoping period ended on July 1, 2016. During the scoping process, the BLM received approximately 350 comments that were extracted from approximately 20 unique comment submissions. In addition, the BLM received multiple form letters.

Listed below are issues that were identified during scoping. Issues are organized by resource topic, and similar issues are grouped together where possible.

### 1.4.1    Air Quality

- How would the MLP address emissions and pollutants affecting air quality resulting from oil and gas development?

1  •  What mitigation measures and design features would be implemented to address potential impacts
2     to air quality or air quality–related values?

3  •  What would be the effect of oil and gas activities on ozone formation in the region?

4  •  How would the MLP address fugitive dust and dust suppression associated with mineral
5     operations?

6  •  How would the MLP address contributions from fugitive dust on early snowmelt?

### 1.4.2    Climate Change

8  •  What direct and indirect greenhouse gas emissions would be associated with oil and gas
9     development in the MLP area?

10 •  What design features and technologies would be necessary to minimize contributions to
11    greenhouse gas emissions and climate change?

12 •  How would climate change, in conjunction with any planned leasing and development,
13    cumulatively effect vegetation, wildlife, and other resources in the MLP area?

### 1.4.3    Soil Resources

15 •  What stipulations should be applied to mineral leasing to protect steep slopes?

16 •  How would the BLM prevent erosion in areas where sand dunes are held intact by native grasses?

17 •  How should the MLP/EA address soils, sensitive soils, and biological soil crusts?

### 1.4.4    Water Resources

19 •  What stipulations would be applied to oil and gas leasing in order to protect aquifers, wetlands,
20    springs, seeps, rivers, streams, and riparian areas?

21 •  How would the MLP identify and address surface water quality and impaired or threatened water
22    body segments?

23 •  Would the MLP require a water management plan and water monitoring plan for mineral projects
24    to protect nearby water uses?

25 •  How would the MLP address the effect of sedimentation from mineral development on surface
26    water quality?

27 •  How would the MLP mitigate potential significant impacts to water resources including those
28    impacts associated with drilling and production; potential spills; and leaks from pits, evaporation
29    ponds, and pipelines?

30 •  What BMPs would be developed to protect stream crossings and ephemeral washes?

### 1.4.5    Vegetation

32 •  How would the MLP address the control of noxious weeds and invasive species?

33 •  How would native grasslands be protected from oil and gas development?

### 1.4.6    Cultural Resources

35 •  How would the MLP protect important historic and cultural sites, including Paleoindian sites in
36    the planning area?

### 1.4.7    Paleontological Resources

- What type of paleontological survey would be required to determine if resources exist where oil and gas development is permitted?

### 1.4.8    Wilderness Characteristics

- How would mineral leasing and development impact lands with wilderness characteristics?
- What management actions and/or stipulations would be needed to reduce or eliminate impacts to lands with wilderness characteristics from mineral development?

### 1.4.9    Visual Resources, Night Skies, Auditory Management

- How would important viewsheds from the Horseshoe Canyon unit of Canyonlands National Park be protected?
- How would important viewsheds from the Green River be protected?
- How would important viewsheds along the Green River Labyrinth Canyon rim be protected?
- How would the BLM utilize up-to-date visual resource inventories?
- What mitigation measures would be developed in order to minimize impacts to the visual quality of the area from mineral leasing and development?
- What provisions would be developed to minimize noise levels associated with mineral development near the Horseshoe Canyon unit of Canyonlands National Park and Labyrinth Canyon?
- How would ambient noise impact visitors on public lands and wildlife?
- What mitigation measures would be developed to minimize impacts to night skies?

### 1.4.10    Special Status Species

- How would the MLP address impacts to migratory birds and their habitats?
- How would the MLP protect special status species?
- How would the MLP provide protections to areas such as springs, riparian areas, and wetlands that provide habitat to special status species?
- What surveys would be considered for protection of special status species prior to mineral activities?

### 1.4.11    Wildlife and Fisheries

- How would the MLP protect native and endemic bees and bee habitat from oil and gas development?
- How would the MLP protect crucial pronghorn habitat?
- What lease stipulations and BMPs for oil and gas would be developed to provide the necessary protections for fish and wildlife habitat?
- What surveys would be considered for the protection of wildlife species prior to mineral activities?

**1.4.12    Recreation**

- How would mineral leasing and development impact recreation resources and experiences?

- What protections would be applied to overlooks and viewsheds associated with recreation experiences?

- How would the MLP protect roads, trails, and sites that support hiking, biking, boating, off-highway vehicle use, camping, equestrian use, and rock climbing from mineral development?

- How should recreation areas adjacent to the Horseshoe Canyon unit of Canyonlands National Park be protected?

- How should recreation opportunities and experiences in Labyrinth Canyon be protected?

- How should special recreation management areas (SRMAs) designated in the Price and Richfield Field Offices' ROD/RMPs (BLM 2008a, 2008b) be protected?

- How should recreation areas that are outside of the SRMAs be protected?

**1.4.13    Oil and Gas**

- What areas would be available for oil and gas leasing and development, and what restrictions and BMPs would be imposed to protect resource values?

**1.4.14    Special Designations**

- How would mineral leasing decisions impact areas with special designations?

- What restrictions or stipulations would be placed on mineral development to provide the necessary protections for designated areas of critical environmental concern (ACECs), the Green River suitable wild and scenic river segment, and the Old Spanish National Historic Trail?

- How would the BLM address the protection of the Old Spanish National Historic Trail segment located within the planning area?

**1.4.15    Socioeconomics**

- What are the potential impacts associated with mineral development to the local communities, including impact to jobs, tax revenues, and personal incomes?

- What are the economic impacts of natural resources extraction relative to the economic impacts of outdoor recreation and tourism?

## 1.5    ISSUES CONSIDERED BUT NOT ANALYZED IN DETAIL

During the public scoping period, interested members of the public recommended that the BLM consider the establishment of new ACECs, wild and scenic rivers, and SRMAs, and consider whether certain areas warrant the protection of their wilderness characteristics. As previously mentioned, this plan amendment is focused exclusively on oil and gas resources and will not include decisions regarding new designations or whether lands inventoried by the BLM as having wilderness characteristics should be managed to protect, preserve, and maintain these characteristics.

During scoping, the BLM determined that there are a number of public land resources and BLM program areas that would not be impacted to the extent that detailed analysis is required. For example, given the types of vegetation present in the planning area, oil and gas leasing decisions would have no impact on fire and fuels management or forestry and woodland products.

Oil and gas leasing and development has the potential to impact other resource uses; however, because the projected amount of development is low (see Appendix A), the BLM does not anticipate that potential changes in oil and gas management would have a measureable impact on travel management, existing or future lands and realty authorizations, or livestock grazing operations. In addition, conflicts with the extraction of locatable, salable, and other leasable mineral resources are not expected because there is generally low occurrence and development potential for other mineral resources in the planning area.

The planning area includes portions of the Robbers Roost wild horse herd area. The Price Field Office RMP, completed in 2008, set the appropriate management level for this herd area at zero. Currently, there are approximately 30 horses in the herd area. Given the large size of the herd area, the small size of the population, and the low level of expected development, the BLM has determined that potential oil and gas leasing would not impact wild horses to an extent that detailed analysis is required.

Finally, although the potential for impacts to lands with wilderness characteristics is one of the primary issues addressed in this analysis, impacts to wilderness study areas (WSAs) are not addressed in the direct and indirect impacts analysis because there are no WSAs in the SRD MLP planning area. Impacts to WSAs that are outside of the planning area but contiguous with lands with wilderness characteristics that are in the planning area, are discussed in the cumulative impacts section.

## 1.6  PLANNING CRITERIA

Planning criteria are based on appropriate laws, regulations, BLM Manual sections, and policy directives, as well as on public participation and coordination with cooperating agencies, other federal agencies, state and local governments, and Native American tribes. Planning criteria are the standards, rules, and factors used to resolve issues and develop alternatives. Planning criteria are prepared to ensure that decision-making is tailored to the issues and to ensure that the BLM avoids unnecessary data collection and analysis. Planning criteria are also developed to guide the development of alternatives. The planning criteria to be considered in the development of the MLP/EA are as follows:

1.  Limit the scope to RMP decisions pertaining to oil and gas leasing and post-leasing development of the area

2.  Resolve long-standing lease protests and decide whether to cancel, modify, or lift the suspension on suspended leases in the planning area

3.  Recognize valid existing rights

4.  Address only management of public lands (including federal mineral estate under non-federal surface in a "split estate" situation)

5.  Use a collaborative, multi-jurisdictional approach to determine how mineral leasing will be managed

6.  Ensure that its management decisions are as consistent as possible with local, state, and other federal agency plans

7.  Prepare development scenarios for oil and gas resources based on historical, existing, and projected levels of development

8.  Consider a range of alternatives that focus on mitigating the impacts of development on resources that are of concern

9.  Address the socioeconomic impacts of the alternatives

10. Use the best available scientific information and inventory and monitoring information to determine appropriate decisions for oil and gas leasing

## 1.7   Relationship to Other Policies, Plans, and Programs

The SRD MLP is being prepared to comply with IM No. 2010-117 (BLM 2010a) and with H-1624-1 (BLM 2013) Chapter V, Master Leasing Plans, as well as other BLM policy directives.

The Federal Land Policy and Management Act (FLPMA) Title II, Section 202, requires that the BLM coordinate planning efforts with Native American tribes, other federal agencies, and state and local governments. To accomplish this directive, the BLM has invited other federal, state, and local agencies to participate as cooperating agencies in this planning process. The BLM has also consulted with Native American tribes. FLPMA and the planning regulations require that BLM plans be consistent with approved or adopted plans of other federal, state, and local governments to the extent that those plans are consistent with federal law and regulations applicable to the public lands. In keeping with the above mandates, the Price and Richfield Field Offices have asked cooperating agencies and Native American tribes to review the MLP/EA and inform the agency of any inconsistencies. Potentially relevant plans include the following:

- Emery County General Plan (revised 2012)
- Draft Wayne County Resource Management Plan (2017)
- Canyonlands National Park Resource Management Plan (1996)
- Canyonlands National Park General Management Plan (1979)
- Canyonlands National Park Backcountry Management Plan (1984, 1995)
- Canyonlands Wilderness Recommendation (1974)
- Colorado Pikeminnow Recovery Plan (2002)
- Humpback Chub Recovery Plan (2002)
- Bonytail Chub Recovery Plan (2002)
- Recovery Implementation Program Environmental Assessment (EA) for the Endangered Fish Species in the Upper Colorado River Basin (1987)
- Mexican Spotted Owl Recovery Plan (2012)
- Razorback Sucker Recovery Plan (2002)
- Final Recovery Plan for Southwestern Willow Flycatcher (2002)
- Wright Fishhook Cactus Recovery Plan (1985)
- Recovery Plan for the California Condor (1996)
- Final Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States Programmatic EIS and associated ROD (2007)

# CHAPTER 2—ALTERNATIVES

## 2.1  INTRODUCTION

This chapter presents four alternatives for managing oil and gas leasing and development for Bureau of Land Management (BLM)-administered lands and minerals in the San Rafael Desert (SRD) Master Leasing Plan (MLP) planning area.

Under each alternative, the BLM has identified leasing stipulations, lease notices, oil and gas leasing decisions, and best management practices (BMP). The BLM developed these alternatives to respond to issues raised during the public scoping process (presented in Chapter 1).

Oil and gas leasing stipulations include timing limitation (TL), controlled surface use (CSU), and no surface occupancy (NSO). Lands may also be closed to leasing or open to leasing subject to standard lease terms and applicable laws, regulations, and orders (also referred to as "standard terms and conditions"). A TL stipulation prohibits surface use during specified time periods. A CSU stipulation requires special operational constraints. An NSO stipulation prohibits the use or occupancy of the surface for exploration and development of oil and gas. Oil and gas resources under NSO lands may be developed by directionally or horizontally drilling from nearby lands that do not have an NSO limitation or through inclusion in a "unitized" area, which allocates production and royalties to the lease due to drainage from adjacent wells. Lease stipulations developed through this planning process would only apply to oil and gas leasing and development, not to other surface-disturbing activities.

Under some alternatives, stipulations may be excepted, modified, or waived by the Authorized Officer. An exception is a one-time exemption for a particular site in a leasehold. Exceptions are determined on a case-by-case basis, and the stipulation continues to apply to all other sites in the leasehold. A modification is a change to the provisions of a lease stipulation, either temporarily or for the term of the lease. A waiver is a permanent exemption from a lease stipulation; the stipulation no longer applies in the leasehold. Exceptions, modifications, or waivers of surface stipulations would be considered based on the subsequent site-specific analysis. Exceptions, modifications, and waivers to lease stipulations are described in Appendix B.

Lease notices provide lease holders with additional information on limitations that already exist in law, lease terms, regulations, or operational orders. A lease notice also addresses special items the lessee should consider when planning operations. Lease notices that would be applied in the planning area are also included in Tables 2-1 through 2-12 and Appendix B.

BMPs are state-of-the-art mitigation measures applied on a site-specific basis to minimize or eliminate environmental or social impacts. BMPs are applied to management actions to aid in achieving desired outcomes for safe, environmentally sound resource development by preventing, minimizing, or mitigating adverse impacts and reducing conflicts. For each proposed action, as many BMPs may be applied as determined necessary to mitigate the expected impacts. In some cases, operators may incorporate BMPs into individual project proposals as design features. Alternatively, the BLM may incorporate BMPs into its authorizations as conditions of approval. BMPs applied to the alternatives are provided in Appendix C.

## 2.2  DESCRIPTION OF THE ALTERNATIVES

The four alternatives presented in detail by resource in Tables 2-1 through 2-12 of this chapter are as follows.

---

## 2.2.1    Alternative A No Action

Alternative A is the No Action Alternative, and it is a continuation of current management direction contained in the Price and Richfield Field Offices' ROD/RMPs, which were completed in 2008 (BLM 2008a, 2008b). Under the current RMPs, the majority of lands in the planning area are open to leasing with no specific constraints. New oil and gas leasing would generally be subject to standard lease terms and applicable laws, regulations, and orders. Mitigation measures could be considered on a site-specific basis during the development phase to minimize environmental or social impacts.

This alternative has been sub-divided into two alternatives in order to address the issue of lease suspensions in the planning area. All decisions except the implementation decisions pertaining to suspended leases would be the same.

Alternative A-1: Under this alternative, the BLM would lift the lease suspensions on leases that were suspended in 2005 and 2006. Each of the leases would be returned to active status with the same terms and conditions that were included on the lease at the time the lease was issued. All suspended leases in the planning area were issued under the management direction of the *Henry Mountain Management Framework Plan* (BLM 1982), which was superseded by the Richfield Field Office RMP in 2008 (BLM 2008b). Stipulations from the *Henry Mountain Management Framework Plan* that are attached to the suspended leases can be found in Appendix D.

Alternative A-2: Under this alternative, the BLM would modify the terms and conditions of the leases that were suspended in 2005 and 2006 to be consistent with the lease terms and conditions contained in the Richfield Field Office ROD/RMP (BLM 2008b). Lease holders interested in retaining their leases would be required to accept the modified terms and conditions outlined in Appendices B and E, which include additional stipulations intended to protect air resources. If a lease holder is unwilling to accept the modified terms and conditions, the leases would be canceled and the BLM would be required to issue the lease holder(s) a refund.

Additional information regarding the history of suspended leases in the planning area can be found in Section 1.1.2.

Although different stipulations would be attached to the currently suspended leases under Alternatives A-1 and A-2, the actual differences between these alternatives would be small. If Alternative A-1 is selected, the BLM, during the site-specific analysis associated with processing of any application for ground-disturbing activities, would attach as conditions of approval that are similar, if not identical, to management actions included in the 2008 Richfield Field Office ROD/RMP (BLM 2008b).

## 2.2.2    Alternative B

Alternative B was developed in response to comments that suggested major constraints should be placed on oil and gas leasing and development in most of the planning area due to impacts to recreation, wilderness characteristics, cultural and historic resources, and natural ecosystems. Under this alternative, oil and gas leasing would be allowed in most of the planning area, but stipulations would prohibit the use or occupancy of the surface for exploration and mineral development. Where possible, minerals under public lands that have surface use restrictions could be accessed by directionally or horizontally drilling from nearby lands that do not have surface use limitations. Under Alternative B, public lands within 1.0 mile of the Green River and the Horseshoe Canyon unit of Canyonlands National Park would be closed to oil and gas leasing. Lands inventoried and found to have wilderness characteristics during the 2016 inventory would be managed subject to NSO stipulations.

## 2.2.3     Alternative C

Alternative C takes into consideration feedback received by the State of Utah and Emery and Wayne Counties during the alternatives development planning process. Providing the opportunity for oil and gas leasing and development is prioritized in the majority of the planning area. This alternative recognizes the importance of sensitive resource areas such as Horseshoe Canyon and Labyrinth Canyon. Under this alternative, the BLM would place major constraints on oil and gas leasing and development in areas within 1.0 mile of the Green River through Labyrinth Canyon and the Horseshoe Canyon unit of Canyonlands National Park. The BLM would place minor and moderate constraints on oil and gas leasing and development in areas that have recreational value or other sensitive resources. Lands with wilderness characteristics would generally remain open to leasing subject to standard terms and conditions.

## 2.2.4     Alternative D

Similar to Alternative C, this alternative recognizes the importance of resources such as Horseshoe Canyon and Labyrinth Canyon. However, Alternative D places additional surface use restrictions on public lands surrounding these areas. This alternative recognizes the increased public interest in the San Rafael Desert and the importance of minimizing resource conflicts by protecting recreational opportunities and experiences from the impacts of oil and gas leasing and development. Under Alternative D, the BLM would make public lands within 1.0 mile of the Green River through Labyrinth Canyon and the Horseshoe Canyon unit of Canyonlands National Park closed to oil and gas leasing. Lands with wilderness characteristics in the remainder of the Labyrinth Canyon inventory unit would be managed subject to NSO stipulations. Additionally, the BLM would place a combination of major and moderate constraints on leasing and development in other areas that have visual sensitivity, recreational value, wilderness characteristics, or other sensitive resources.

## 2.3     ALTERNATIVES CONSIDERED BUT NOT ANALYZED IN DETAIL

## 2.3.1     Expansion of the San Rafael Desert Master Leasing Plan Area

During the scoping process, a consortium of stakeholder groups requested that the BLM expand the SRD MLP/EA planning area boundaries to include additional public lands located primarily to the south and west of the current planning area. In response to these comments, the Price Field Office conducted an independent analysis of these areas to determine whether they met the MLP criteria identified in Washington Office (WO) Instruction Memorandum (IM) 2010-117 Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Review, which was subsequently incorporated into various BLM handbooks, including H-1624-1, Planning for Fluid Mineral Resources.

The BLM's leasing reform policies direct the agency to use the following criteria in determining whether preparation of an MLP may be required.

1.  A substantial portion of the area is not leased.

2.  There is a majority federal mineral interest.

3.  The oil and gas industry has expressed specific interest in leasing, and there is a moderate or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.

4.  Additional analysis or information is needed to address likely resource or cumulative impacts if oil and gas development were to occur whether there are multiple use or natural resource conflicts, impacts to air quality, impacts on the resource values of the National Park Service system, a national wildlife refuge, or a National Forest System wilderness area, or impacts on other specially designated areas.

An MLP may also be completed under other circumstances at the State Director's discretion.

1  Public lands in the proposed expansion area have experienced some oil and gas exploration resulting in
2  numerous plugged and abandoned wells; however, there has been no oil and gas production. Therefore,
3  these areas do not fully meet MLP criterion 3 because there has been no discovery of oil or gas resources.

4  After a review of the MLP evaluation, the State Director decided not to expand the MLP area because
5  expansion of the boundaries does not meet the purpose and need for the project, which is, in part, to
6  resolve long-standing lease protests and complete the court-mandated NEPA analysis for leases placed in
7  suspension because of litigation.

8  Additionally, the decision to initiate a land use plan amendment is a discretionary agency action. If the
9  BLM decides to initiate a plan amendment, planning regulations and policies give the agency broad
10  discretion in determining the appropriate geographic extent of the planning area.

## 2.3.2    Phased Leasing

12  During the public scoping and the preliminary alternatives review periods, stakeholders suggested that the
13  BLM should consider an alternative that requires phased leasing and phased development. Phased leasing
14  and phased development, which are identified in IM 2010-117 as examples of planning decisions that
15  may be made through the MLP process, are tools that can be used by the BLM to control the pace,
16  density, and location of development. For example, in some areas with known development potential,
17  phased development has been used to limit the percentage of surface disturbance on the landscape.

18  To date, there has been no oil and gas discovery in the planning area. In addition, the Reasonably
19  Foreseeable Development Scenario (RFD) prepared specifically for this EA (see Appendix A), indicates
20  that limited oil and gas development is expected in the planning area during the next 15 years. Given the
21  low RFD, the BLM has determined that it is unnecessary to consider an alternative that places specific
22  limitations on the pace of development in the planning area. The BLM is also considering other planning
23  decisions that address issues related to the density and location of development. According to the BLM's
24  RFD, if no stipulations are placed on oil and gas leases, new surface disturbance is not expected to exceed
25  585 acres. Notably, this acreage represents 0.1% of the planning area.

26  Organizations also recommended that the BLM consider a phased leasing approach that prioritizes leasing
27  and subsequent development in areas with high development potential and low resource conflict. Under
28  this phased leasing approach, oil and gas development would kept away from low to medium
29  development potential areas that may have high resource sensitivity. This approach to leasing does not
30  work in the SRD MLP planning area because the known higher oil and gas potential generally overlaps
31  the areas that have sensitive resources (i.e., the eastern side of the project planning area).

## 2.4    ALTERNATIVES TABLES

33  Tables 2-1 through 2-12 include management actions that would apply to oil and gas leasing and
34  development in the SRD MLP planning area. All decisions are considered to be land use planning
35  decisions except MLE-1 and MLE-2. These decisions, which deal with suspended and protested leases in
36  the SRD MLP planning area are considered implementation decisions.

37  The SRD MLP planning area includes multiple resources. The BLM has considered oil and gas decisions
38  that are intended to reduce conflict or minimize impacts on each resource from development. Because
39  multiple resources may be present in the same area, multiple decisions may apply to—or be layered
40  over—the same area. In these cases, the most restrictive management decision would apply.

1    For example, the BLM may place a timing limitation on development in an area that has been identified
2    as crucial habitat for wildlife. The purpose of this management decision would be to avoid disrupting
3    wildlife during a particular period when wildlife is known to be present in the area. It is possible that this
4    same area may also have important scenic values. The BLM may decide that it should not allow surface
5    occupancy of the land in order to retain scenic the character of the landscape. In this example, the BLM
6    considered separate but appropriate management prescriptions for different resources. When the BLM
7    determines the leasing category, this area would be identified as open to leasing subject to major
8    constraints, because an NSO stipulation is more restrictive than a timing limitation.

1    **Table 2-1. Air Quality**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objective** | | | | |
| Maintain or improve existing air quality and air quality-related values (e.g. visibility) by ensuring that all authorized uses on public lands comply with and support Federal, State, and local laws and regulations for protecting air quality. | | | | |
| **Management Actions Common To All Alternatives** | | | | |
| AQ-1 | Manage all BLM and BLM-authorized activities to maintain air quality within the thresholds established by the State of Utah Ambient Air Quality Standards and to ensure that those activities continue to keep the area as attainment, meet prevention of significant deterioration of Class I and Class II increments, and protect the air quality related values (AQRV) in the Class I air shed of the National Parks (e.g., Arches, Canyonlands, and Capitol Reef) as well as Class II areas. | | | |
| AQ-2 | BLM would continue to work cooperatively with State, Federal, and tribal entities in developing air quality assessment protocols to address cumulative impacts and regional air quality issues. | | | |
| AQ-3 | Project specific analyses would consider use of quantitative air quality analysis methods (i.e. modeling), when appropriate as determined by BLM, in consultation with State, Federal and tribal entities. | | | |
| **Management Actions By Alternative** | | | | |
| AQ-4 | No similar action. | Comply with Utah Air Conservation (UAC) Regulation R446-1. The best air quality control technology, as per guidance from the Utah Division of Air Quality (UDAQ), would be applied to actions on public lands as needed to meet air quality standards. | Same as Alternative B. | Same as Alternative B. |
| AQ-5 | No similar action. | Comply with UAC Regulations R446-1-4.5.3 and R307-205, which prohibit the use, maintenance, or construction of roadways without taking appropriate dust abatement measures. Compliance would be obtained through special stipulations as a requirement on new projects and through the use of dust abatement control techniques in problem areas. | Same as Alternative B. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| AQ-6 | National Ambient Air Quality Standards are enforced by the Utah Department of Environmental Quality, Division of Air Quality (UDEQ-DAQ), with Environmental Protection Agency (EPA) oversight. When processing land use authorizations additional emission control requirements to reduce potential air quality impacts would be considered on a case-by-case basis in processing land use authorizations. | National Ambient Air Quality Standards are enforced by the Utah Department of Environmental Quality, Division of Air Quality (UDEQ-DAQ), with Environmental Protection Agency (EPA) oversight. When processing land use authorizations additional emission control requirements to reduce potential air quality impacts would be considered on a case-by-case basis in consultation with UDAQ, EPA, and other Federal agencies whose lands may be impacted by the proposal. | Same as Alternative B. | Same as Alternative B. |
| AQ-7 | BLM would require as a Condition of Approval for Applications for Permits to Drill: 1. All new and replacement internal combustion oil and gas field engines of less than or equal to 300 design-rated horsepower must not emit more than 2 grams of NOx per horsepower-hour. This requirement does not apply to oil and gas field engines of less than or equal to 40 design-rated horsepower. 2. All new and replacement internal combustion oil and gas field engines of greater than 300 design rated horsepower must not emit more than 1.0 gram of NOx per horsepower-hour. | Apply a CSU stipulation throughout the planning area that requires the following to mitigate the impacts to air quality and greenhouse gas emissions: 1. All new and replacement internal combustion gas-fired field engines of less than or equal to 300 design-rated horsepower shall not emit more than 2 grams of NOx (mono-nitrogen oxides) per horsepower-hour. 2. All new and replacement internal combustion gas-fired field engines of greater than 300 design-rated horsepower shall not emit more than 1 gram of NOx per horsepower-hour. The Authorized Officer may modify the stated requirements in accordance with updated specifications to comply with the Clean Air Act, or as deemed necessary to ensure that the stipulation is sufficient to maintain air quality and protect AQRV in nearby national parks. | Same as Alternative A. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| AQ-8 | No similar action. | To mitigate any potential impact that oil and gas development emissions may have on regional ozone formation, or to the extent such emissions may cause or contribute to adverse AQRV impacts (including visibility) in nearby national parks, apply a CSU stipulation across the planning area that requires the following minimum standards:<br><br>• Drill rig engines that meet Tier II or better standards, as necessary, based on air quality conditions or projections, and consistent with the most stringent EPA emissions standards that are in force at the time of installation or approval.<br>• Stationary internal combustion engine standard of 2g NOx/brake horsepower-hour (bhp-hr) for engines<300HP and 1g NOx/bhp-hr for engines >300 HP.<br>• Low-bleed or no-bleed pneumatic controller.<br>• Dehydrator Volatile Organic Compound (VOC) emission controls to +95 percent efficiency.<br>• Tank VOC emission controls to +95 percent efficiency equivalent to NSPS subpart 0000. | Same as Alternative B. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| AQ-9 | Apply a lease notice across the planning area to inform the lessee/operator that prior to project-specific approval, additional air quality analyses may be required to comply with the NEPA, FLPMA, and/or other applicable laws and regulations. Analyses may include dispersion modeling for deposition and visibility impacts analysis, control equipment determinations, and/or emission inventory development. These analyses may result in the imposition of additional project-specific air quality control measures. | Same as Alternative A. | Same as Alternative A. | Same as Alternative A. |
| AQ-10 | No similar action. | Apply a CSU stipulation requiring a fugitive dust control plan for oil and gas activities that would disturb a surface area larger than 0.25 acre, or that would result in substantial increases in truck traffic on unpaved or untreated surfaces. | Same as Alternative A. | Same as Alternative B. |
| AQ-11 | No similar action. | To minimize impacts on air quality and AQRVs, as well as minimize emissions of greenhouse gases, apply a planning area-wide CSU that prohibits venting or open flaring of associated gas. | In the absence of a pipeline, to capture gas associated with production from an oil well, use of a combustor or other best available technologies would be required. Venting or open flaring would be prohibited except in circumstances identified in existing rules. | In the absence of a pipeline, to capture gas associated with production from an oil well, use of a combustor or other best available technologies would be required. To minimize impacts on air quality and AQRVs, as well as minimize emissions of greenhouse gases, venting or open flaring would be prohibited except in circumstances identified in existing rules.<br><br>Where open flaring is allowed, a visual screen must be used to minimize sky glow, glare, and adverse visual effects on night sky resources. |

1
2

1    **Table 2-2.  Cultural Resources**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objectives** | | | | |
| Identify, preserve, and protect significant cultural resources and ensure that they are available for appropriate uses for present and future generations. | | | | |
| Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration or potential conflict with other resource uses by ensuring that all authorizations will comply with the National Historic Preservation Act, Section 106. | | | | |
| **Management Actions Common to All Alternatives** | | | | |
| CUL-1 | All leases may be found to contain historic properties and/or resource protected under the NHPA, American Indian Religious Freedom Act, Native American Graves Protection and Repatriation Act, E.O. 13007, or other statues and executive orders. The BLM will not approve any ground disturbing activities that may affect any such properties or resources until it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM may require modification to exploration or development proposals to protect such properties, or disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided, minimized, or mitigated. | | | |
| **Management Actions By Alternative** | | | | |
| CUL-2 | No similar action. | Apply a lease notice throughout the planning area to mitigate the potential impacts to TCPs or cultural plants identified through consultation. Mitigation would be developed through further consultation with affected groups which may include measures to maintain the viewshed and intrinsic values, as well as the auditory, visual, and esthetic settings of the resources. | Same as Alternative B. | Same as Alternative B. |
| CUL-3 | Cultural viewsheds were not addressed. This means that a lease notice requiring viewshed assessment for cultural sites may not be applied. | Apply a lease notice throughout the planning area requiring viewshed analysis for cultural sites that are eligible for inclusion on the National Register, or properties of traditional religious and cultural importance to an Indian Tribe. If the analysis shows that the oil and gas development would have adverse effects to the historic properties, the project may require relocation or redesign. | Same as Alternative A. | Apply a lease notice throughout the planning area requiring viewshed analysis for cultural sites that are determined eligible for inclusion on the National Register when location, setting, or feeling contribute to the overall integrity of a site, or properties of traditional religious and cultural importance to an Indian Tribe. If the analysis shows that the oil and gas development would have adverse effects to the historic properties, the project may require relocation or redesign. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| CUL-4 | No similar action.<br>The potential for encountering cultural sites was not addressed. This means that a lease notice informing the operator that it may be more difficult or costly to exercise lease rights may not be applied. | Apply a lease notice to areas of high potential for cultural site occurrence, informing the lessee/operator that a higher likelihood of encountering cultural resource concerns (i.e., potential adverse effects) that may require archaeological monitoring, ethnographic data collection, data recovery, and mitigation of historic properties may be required. | Same as Alternative B. | Same as Alternative B. |

1

1    **Table 2-3.  Lands with Wilderness Characteristics**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objective** | | | | |
| Minimize impacts to lands determined by BLM to have wilderness characteristics. | | | | |
| **Management Actions by Alternative** | | | | |
| WC-1 | *Richfield*: Manage the Dirty Devil/French Springs and Horseshoe Canyon South non-WSA lands with wilderness characteristics (identified as Natural Areas in the Richfield ROD) (Map 2-1) as NSO, no exceptions, waivers, or modifications. | Close the Dirty Devil/French Springs and Horseshoe Canyon South non-WSA lands with wilderness characteristics (identified as Natural Areas in the ROD) to leasing. | Same as Alternative A. | Same as Alternative A. |
| WC-2 | No similar action. The Price and Richfield RMPs do not include any oil and gas stipulations specific to other non-WSA lands with wilderness characteristics in the MLP area. | Manage all lands identified by the BLM as having wilderness characteristics during the 2016 wilderness characteristics inventory (Map 2-1) as NSO. | Manage lands identified as having wilderness characteristics in the Labyrinth Canyon unit as CSU. In this area: • No disturbance would be allowed within the viewshed of the Green River. • Well pads would be placed no closer than 320 acres apart. • Production facilities would be co-located and designed to minimize surface impacts. • Pipelines and utilities would be buried, to the extent practical, and placed along existing roads. • Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance. • During final reclamation, fully restore the original landform. Travel routes would be restored to their original character. Manage all other lands identified as having wilderness characteristics in the planning area as open to leasing subject to standard terms and conditions. | Manage lands identified as having wilderness characteristics in the Labyrinth Canyon unit as NSO. Apply a CSU stipulation to all other lands identified by BLM as having wilderness characteristics during the 2016 wilderness characteristics inventory. In these areas: • Well pads would be placed no closer than 640 acres (1 mile) apart. • Production facilities would be co-located and designed to minimize surface impacts. • Pipelines and utilities would be buried, to the extent practical, and placed along existing roads. • Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance. • During final reclamation, fully restore the original landform. Travel routes would be restored to their original character. |

1    **Table 2-4. Oil and Gas**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objective** | | | | |
| Provide opportunities for environmentally responsible exploration and development subject to appropriate BLM policies, laws, and regulations. | | | | |
| **Management Actions by Alternative** | | | | |
| **Oil and Gas Suspended Lease Decisions (Implementation Decision)** | | | | |
| MLE-1 | Alternative A-1: Rescind the suspension on leases. Alternative A-2: Modify the terms and conditions on leases that are in suspension to be consistent with Richfield RMP/ROD (BLM 2008b). | Cancel all suspended leases. | Modify the lease terms and conditions on the leases that are in suspension to be consistent with Alternative C. | Modify the lease terms and conditions on the leases that are in suspension to be consistent with Alternative D. |
| **Lease Protest Resolution (Implementation Decision)** | | | | |
| MLE-2 | Resolve lease protests and issue protested leases with terms and conditions that are consistent with the Price RMP/ROD (BLM 2008a). | Resolve the lease protests by denying the leases. | Issue the protested leases with terms and conditions that are consistent with Alternative C. | Issue the protested leases with terms and conditions that are consistent with Alternative D. |
| **Oil and Gas Leasing Stipulations** | | | | |
| MLE-3 | Approximately 399,462 acres would be open to oil and gas leasing, subject to standard terms and conditions. Approximately 19,083 acres would be open to oil and gas leasing subject to CSU and TL stipulations. Approximately 33,627 acres would be open to oil and gas leasing subject to a NSO stipulation. Approximately 220 acres would be closed to oil and gas leasing. See Map 2-2-A. | Approximately 0 acres would be open to oil and gas leasing, subject to standard terms and conditions. Approximately 98,164 acres would be open to oil and gas leasing subject to CSU and TL stipulations. Approximately 324,161 acres would be open to oil and gas leasing subject to a NSO stipulation. Approximately 30,068 acres would be closed to oil and gas leasing. See Map 2-2-B. | Approximately 37,865 acres would be open to oil and gas leasing, subject to standard terms and conditions. Approximately 362,127 acres would be open to oil and gas leasing subject to CSU and TL stipulations. Approximately 52,208 acres would be open to oil and gas leasing subject to a NSO stipulation. Approximately 193 acres would be closed to oil and gas leasing. See Map 2-2-C. | Approximately 0 acres would be open to oil and gas leasing, subject to standard terms and conditions. Approximately 339,884 acres would be open to oil and gas leasing subject to CSU and TL stipulations. Approximately 92,170 acres would be open to oil and gas leasing subject to a NSO stipulation. Approximately 20,339 acres would be closed to oil and gas leasing. See Map 2-2-D. |
| MLE-4 | No similar action. | Close to leasing the area covered by the Three Rivers locatable mineral withdrawal. | Manage areas covered by the Three Rivers locatable mineral withdrawal as NSO. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| MLE-5 | *Richfield*: Subject geophysical operations under 43 CFR 3150 to the oil and gas leasing restrictions with the following exceptions:<br><br>• Consider geophysical operations proposed for lands that are designated as NSO or closed to leasing for approval when (1) the circumstances or relative resource values in the areas have changed, (2) less restrictive requirements could be developed to protect the resource of concern, or (3) operations could be conducted without causing unacceptable impact to the resources of concern (MIN-12).<br><br>*Price*: Geophysical operations will be allowed consistent with existing regulations for geophysical exploration (MLE-12). | Do not allow geophysical operations in areas closed to leasing.<br><br>Only allow heliport geophysical operations in areas that are managed as NSO. | Do not allow geophysical operations in areas closed to leasing.<br><br>Geophysical operations would be allowed in areas managed as NSO under the following conditions:<br><br>• No new road construction or road improvements<br>• No staging areas<br>• Full reclamation of all surface disturbance<br>• No geophysical operations in crucial pronghorn antelope habitat from May 15 through June 15 | Same as Alternative C. |
| **Best Management Practices** | | | | |
| MLE-6 | The Price RMP (Appendix R-14) and the Richfield RMP (Appendix 15) include a list best management practices that typically apply to oil and gas development. These measures summarized in **Appendix E**. | Require implementation of BMPs that minimize the potential resource impacts associated with oil and gas development (see **Appendix C** for a list of BMPs, by resource). | Same as Alternative B. | Same as Alternative B. |

1

1  **Table 2-5. Paleontology**

| Decision | Alternative A(No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objective** | | | | |
| Protect paleontological resources from surface-disturbing activities. | | | | |
| **Management Actions By Alternative** | | | | |
| PAL-1 | *Price and Richfield*: Mitigate adverse impacts on vertebrate and significant non-vertebrate paleontological resources resulting from authorized surface disturbing actions.<br><br>*Price*: An assessment of fossil resources will be required on a case-by-case basis, mitigating, as necessary, before and during surface disturbance.<br><br>*Richfield*: Require on-the-ground paleontological inventories prior to permitting surface disturbing activities in areas where there is a high potential to affect scientifically significant paleontological resources.<br><br>*Richfield*: Require paleontological assessments prior to permitting surface disturbing activities in areas where there is a moderate potential to affect scientifically significant paleontological resources.<br><br>*Richfield*: For all permitted actions occurring in paleontologically sensitive areas, include stipulation(s) to cover unanticipated paleontological discoveries during disturbance. This stipulation would mandate work stoppage (or avoidance), notification to the authorized officer, and protection of the material and geological context if any paleontological resources were discovered during disturbance activities. Other stipulations might be appropriate on a case-by-case basis. | Apply a CSU stipulation requiring survey and monitoring for all surface disturbing oil and gas activities in potential fossil yield classification (PFYC) 4 and 5 areas (Map 2-3).<br>Where monitoring encounters vertebrate and vertebrate trace fossils during oil and gas operations, all operations must cease until the BLM Authorized Officer determines whether the site can be avoided, protected, or must be fully excavated. | Same as Alternative B. | Same as Alternative B. |

2

San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments/Draft Environmental Assessment

1    **Table 2-6. Recreation**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objective** | | | | |
| To provide for multiple recreational uses of the public lands and sustain a wide range of recreation opportunities and potential experiences for visitors and residents, while supporting local economic stability and sustaining the recreation resource base and sensitive resource values. | | | | |
| **Management Actions By Alternative** | | | | |
| REC-1 | No similar action. There are no oil and gas leasing decisions specific to the Labyrinth Canyon SRMA (Map 2-4). | Manage the Labyrinth Canyon SRMA as NSO. | Manage lands in the Labyrinth Canyon SRMA as CSU. In this area: <br>• No disturbance would be allowed within the viewshed of the Green River. <br>• Well pads would be placed no closer than 320 acres apart. <br>• Production facilities would be co-located and designed to minimize surface impacts. <br>• Pipelines and utilities would be buried, to the extent practical, and placed along existing roads. <br>• Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance. <br>• During final reclamation, fully restore the original landform. Travel routes would be restored to their original character. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| REC-2 | *Richfield*: Manage oil and gas leasing in the Dirty Devil/Robbers Roost SRMA (Map 2-4) (outside of the WSA) as follows: Lease VRM Class II areas and canyon rims within the viewshed of all canyons (approximately one-quarter mile) as NSO (10,382 acres). Lease the remainder of the SRMA is subject to CSU and/or timing limitations (4,647 acres). | Manage all lands in the Dirty Devil/Robbers Roost SRMA (outside of the WSA) as NSO. | Same as Alternative A. | Same as Alternative A. |
| REC-3 | No similar action. | Close to leasing all lands within 1 mile of the Green River/Labyrinth Canyon Rim (Map 2-5). | Manage all lands within 1 mile of the Green River/Labyrinth Canyon Rim as NSO. | Manage all lands within 1 mile of the Green River/Labyrinth Canyon Rim that are north of the San Rafael River as NSO. Manage all lands within 1 mile of the Green River/Labyrinth Canyon Rim south of the San Rafael River as closed to oil and gas leasing and development. |
| REC-4 | No similar action. | Close to leasing all lands within 1 mile of the Horseshoe Canyon Rim (Map 2-5). | Manage all lands within 1 mile of Horseshoe Canyon Rim as NSO. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| REC-5 | No similar action. | Manage the following recreational focus areas in the Price and Richfield ERMAs as NSO (Map 2-5):<br><br>• Fossil Point<br>• Dry Lake<br>• Three Canyon<br>• Saucer Basin/Moonshine Wash<br>• The Cone<br>• Keg Knoll<br>• Sweetwater Reef<br>• Cottonwood Wash<br>• Horseshoe Canyon Trailhead | Manage the following recreational focus areas in the Price and Richfield ERMAs as CSU:<br><br>• Fossil Point<br>• Dry Lake<br>• Three Canyon<br>• Saucer Basin/Moonshine Wash<br>• The Cone<br>• Keg Knoll<br>• Sweetwater Reef<br>• Cottonwood Wash<br>• Horseshoe Canyon Trailhead<br><br>In these areas:<br><br>• Well pads would be placed no closer than 160 acres apart.<br>• Production facilities would be co-located and designed to minimize surface impacts.<br>• Pipelines and utilities would be buried, to the extent practical, and placed along existing roads.<br>• Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance.<br>• During final reclamation, fully restore the original landform. Travel routes would be restored to their original character. | Manage the following recreational focus areas in the Price and Richfield ERMAs as NSO:<br><br>• Fossil Point<br>• Dry Lake<br>• Three Canyon<br>• Saucer Basin/Moonshine Wash<br>• Keg Knoll<br>• Sweetwater Reef<br>• Horseshoe Canyon Trailhead<br>Manage the following recreational focus areas in the Price and Richfield Extensive Recreation Management Areas as CSU:<br>• The Cone<br>• Cottonwood Wash<br><br>In these areas:<br><br>• Well pads would be placed no closer than 640 acres (1 mile) apart.<br>• Production facilities would be co-located and designed to minimize surface impacts.<br>• Pipelines and utilities would be buried, to the extent practical, and placed along existing roads.<br>• Require interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities to minimize long-term surface disturbance.<br>• During final reclamation, fully restore the original landform. Travel routes would be restored to their original character. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| REC-6 | No similar action. | Manage all lands within 3 miles of the following key observation (Map 2-6) points as NSO:<br>• Keg Knoll<br>• Wolverton Overlook<br>• Horseshoe Canyon Trailhead<br>• Trin Alcove/Three Canyon<br>• Bull Bottom | Manage all lands within 1 mile of the following key observation points as NSO:<br>• Keg Knoll<br>• Wolverton Overlook<br>• Horseshoe Canyon Trailhead<br>• Trin Alcove/Three Canyon<br>• Bull Bottom | Manage all lands within 1 mile of the following key observation points as NSO:<br>• Keg Knoll<br>• Wolverton Overlook<br>• Horseshoe Canyon Trailhead<br>• Trin Alcove/Three Canyon<br>• Bull Bottom<br>• Manage all lands between 1-3 miles from the following key observation points as CSU:<br>• Keg Knoll<br>• Wolverton Overlook<br>• Horseshoe Canyon Trailhead<br>• Trin Alcove/Three Canyon<br>• Bull Bottom<br>Prior to authorizing any surface disturbing activities, a viewshed analysis will be completed from all applicable key observation points. If an area is determined to be within the viewshed, a visual resource contrast rating, including visual simulations, would be completed in accordance with BLM Manual 8431. Site-specific mitigation measures would be identified for all disturbances that are visible within 3 miles that minimize visual impacts, regardless of the area's visual resource management class. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| REC-7 | No similar action. | Manage all lands within 3 miles of the following travel corridors as NSO:<br>• Lower San Rafael Road from Hwy 24 to Horseshoe Canyon<br>• Lower San Rafael Road from Green River to Horseshoe Canyon (Map 2-7-B) | Same as Alternative A. | Manage all lands within 1 mile of the following travel corridors as NSO.<br>• Lower San Rafael Road from Saucer Basin Road to Horseshoe Canyon.<br>• Lower San Rafael Road from the San Rafael River to Horseshoe Canyon (Map 2-7-D).<br>Manage all lands between 1-3 miles from the following travel corridors as CSU.<br><br>• Lower San Rafael Road from Saucer Basin Road to Horseshoe Canyon.<br>• Lower San Rafael Road from the San Rafael River to Horseshoe Canyon<br>Prior to authorizing any surface disturbing activities a viewshed analysis will be completed from all applicable travel corridors. If an area is determined to be within the viewshed, a visual resource contrast rating, including visual simulations, would be completed in accordance with BLM Manual 8431. Site-specific mitigation measures would be identified for all disturbances that are visible within 3 miles that minimize visual impacts, regardless of the area's visual resource management class. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| REC-8 | No similar action. | In order to minimize impacts to night skies, apply a planning area-wide CSU stipulation requiring operators to:<br>• Limit the use of artificial lighting during nighttime operations to only those that are determined necessary for safety.<br>• Utilize shielding and aiming techniques as well as limiting the height of light poles to reduce glare and avoid light shining above horizons.<br>• Direct lights downward onto the task area. The bottom surface of the light fixture should be level, or if unable to be fully level, point it as close to straight down as possible or shield it to avoid light being projected horizontally.<br>• Use motion sensors, timers, or manual switching for areas that require illumination, but are seldom occupied.<br>• Reduce lamp brightness and select lights that are not broad spectrum or bluish in color. | Same as Alternative A. | Same as Alternative B. |
| REC-9 | No similar action. | Prior to APD approval, operators would be required to submit a Lighting Plan to the BLM to address the requirements of decision REC-8. These Lighting Plans would include information such as:<br>• Number of lights and lumen output<br>• Fixture design<br>• Lamp color temperature | Same as Alternative A. | Same as Alternative A. |

1

1  **Table 2-7. Special Designations**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Areas of Critical Environmental Concern** | | | | |
| **Objective** | | | | |
| Manage ACECs to protect and prevent damage to the relevant and important values such as historic, cultural, scenic, fish and wildlife, and natural systems or processes. | | | | |
| **Management Actions Common to all Alternatives** | | | | |
| ACEC-1 | The Big Flat Tops ACEC (190 acres) is managed as closed to oil and gas leasing and development (Map 2-4). | | | |
| **Management Actions by Alternative** | | | | |
| ACEC-2 | The Dry Lake Archeological District ACEC (Map 2-4) is open to leasing subject to major constraints (NSO). | Same as Alternative A, except no exceptions, waivers, or modifications. | Same as Alternative B. | Same as Alternative B. |
| ACEC-3 | The Uranium Mining District ACEC (Tidwell Draw) (Map 2-4) is open to leasing subject to major constraints (NSO). | Same as Alternative A. | Manage the Tidwell Draw site in the Uranium Mining District ACEC as open to leasing subject to minor constraints (CSU). Do not allow surface disturbing activities that adversely impact the physical evidence of past mining activities. Apply a lease notice to inform the lessee/operator that compensatory mitigation may be required for all disturbances in the ACEC. Mitigation may include restoration of historic sites, conducting oral histories, or development of interpretive/educational materials. | Same as Alternative A. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **National Historic Trails** | | | | |
| **Objective** | | | | |
| Preserve the integrity of landscapes along the Old Spanish National Historic Trail (OSNHT) on public lands within the planning area. | | | | |
| **Management Actions by Alternative** | | | | |
| TRA-1 | Oil and gas leasing will be open to leasing subject to minor constraints (timing limitations, CSU, lease notices) (Map 2-4). | Conserve, protect, and restore the National Trail resources, qualities, values, and associated settings.<br><br>In order to protect the integrity of the Old Spanish Trail, manage all lands within 3 miles as NSO.<br><br>This stipulation would apply to the congressionally designated route and to any draft refinements of this route. | Apply a lease notice along the length of the Old Spanish Trail. The lease notice, which would apply to a 2-mile width on both sides, would give notice to lessees/operators that modifications to the Surface Use Plan of Operations may be required in order to conserve, protect, and restore the National Trail resources, qualities, values, and associated settings. Additionally, coordination with the National Park Service and BLM will be necessary.<br><br>Apply a CSU stipulation to high potential sites and route segments. The CSU stipulation would require the lessee to maintain the current setting within 2 miles of the trail.<br><br>This lease notice and stipulation would apply to the congressionally designated route or the latest verified trail location. | Conserve, protect, and restore the National Trail resources, qualities, values, and associated settings.<br><br>In order to protect the integrity of the Old Spanish Trail:<br><br>Manage all lands within 1 mile of high potential sites and route segments as NSO.<br><br>Manage all lands between 1-3 miles from high potential sites and route segments as CSU.<br><br>Prior to authorizing any surface disturbance, a viewshed analysis will be completed from the Old Spanish Trail. If an area is determined to be within the viewshed, a visual resource contrast rating, including visual simulations, would be completed in accordance with BLM Manual 6280. In order to protect the historic integrity of the trail, mitigation measures would be identified that minimize visual impacts, regardless of the area's visual resource management class. In addition, coordination with trail administration (i.e., BLM and NPS) will be required.<br><br>These stipulations would apply to the congressionally designated route or the latest verified trail location. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Wild and Scenic Rivers** | | | | |
| **Objective** | | | | |
| Maintain and enhance the free flowing character, preserve and enhance the outstandingly remarkable values, and allow no activities within the river corridor that will alter their classification as suitable for Congressional designation in the National Wild and Scenic River (WSR) System. | | | | |
| **Management Actions by Alternative** | | | | |
| WSR-1 | The Green River suitable segment from the confluence of the San Rafael River to Canyonlands National Park (scenic) (Map 2-4) is managed as NSO. | Close to leasing the Green River suitable segment from the confluence of the San Rafael River to Canyonlands National Park (scenic). | Same as Alternative A. | Same as Alternative B. |

1

1    **Table 2-8. Soil and Water Resources**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objectives** | | | | |
| Manage soil, water, and riparian resources to enhance ecosystem health and provide for public uses. | | | | |
| Avoid or minimize the disturbance, loss, or degradation of soil, surface and groundwater resources, riparian areas, wetlands, and associated floodplains. | | | | |
| **Management Actions By Alternative** | | | | |
| **Soil Resources** | | | | |
| SOL-1 | No similar action. | Apply a CSU stipulation that requires use of BMPs (**Appendix C**) to minimize or mitigate wind erosion and emissions of fugitive dust. Areas characterized by fine sandy soils with high wind erosion potential (Map 2-8), including dune complexes, should be avoided to the extent possible. If avoidance is not possible, then operators must provide a written Plan of Development that identifies specific measures that will be implemented to effectively mitigate and prevent accelerated wind erosion and downwind (off-site) emissions of fugitive dust. Use of wind fences or other forms of wind breaks, dust suppressants, or other methods of erosion control may be required. | Same as Alternative B. | Same as Alternative B. |
| SOL-2 | No similar Action. | Apply a timing limitation stipulation to saline soils in the Mancos Shale (Map 2-8). Do not allow surface disturbing activities during the period from December 1 to April 15. This restriction includes heavy equipment traffic on existing roads associated with drilling and completion operations. | Apply a timing limitation stipulation to saline soils in the Mancos Shale. Do not allow surface disturbing activities during the period from December 1 to April 15. This restriction does not include heavy equipment traffic on existing roads associated with drilling and completion operations. | Same as Alternative C. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| SOL-3 | *Price:* Any surface disturbing proposal regarding construction on slopes of 20 percent to 40 percent must include an approved erosion control strategy and topsoil segregation/restoration plan. Such construction must be properly surveyed and designed by a certified engineer and approved by the BLM prior to project implementation, construction, or maintenance (SOL-1) (Map 2-9).<br><br>Allow no surface disturbance on slopes greater than 40 percent (except as allowed through exceptions, waivers, or modification as described in Appendix R-3) (SOL-2).<br><br>*Richfield:* Surface disturbing proposed projects involving construction on slopes greater than 30% will be avoided. If the action cannot be avoided, rerouted, or relocated then a proposed project will include an erosion control strategy, reclamation and site plan, with a detailed survey and design completed by a certified engineer. This proposed project must be approved by the BLM prior to construction and maintenance (Map 2-9). | Same as Alternative A, except no exceptions, waivers, or modifications to the NSO stipulation in the Price RMP that prohibits surface disturbance on slopes greater than 40 percent. | Same as Alternative B. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Water Resources** | | | | |
| WAT-1 | *Richfield:* The BLM will continue its cooperative work with the State Division of Water Quality to monitor water quality. Water quality monitoring will be conducted at designated water quality sampling stations or chosen reaches, on a priority basis, using indicators that are chosen in coordination with the State Division of Water Quality. The State Division of Water Quality publishes a biennial report on water quality conditions in the state including a list of impaired water.<br><br>*Price*: Implement appropriate best management practices such as those found in the Utah Nonpoint Source Management Plan and other reference documents for protection, soil, water, and riparian resources. | BLM would take appropriate actions to maintain water quality by working with the Utah Division of Water Quality and other agencies in accordance with the MOU regarding implementing the nonpoint source water quality program in the State of Utah. This MOU addresses the development of monitoring data and BMPs to protect water resources. The BLM would meet State and Federal water quality standards, including designated beneficial uses and anti-degradation requirements. | Same as Alternative B. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| WAT-2 | *Richfield*: Maintain buffer zones of no surface disturbance and or occupancy around natural springs unless it can be shown that (1) there are no practical alternatives, or (2) all long-term impacts can be fully mitigated, or (3) the activity will benefit and enhance the riparian area. Base the size of the buffer zone on hydrological, riparian, and other factors necessary to protect the water quality of the springs. If these factors cannot be determined, maintain a 330-foot buffer zone from outer edge (Map 2-10). *Price:* No surface disturbance or occupancy will be maintained around natural springs to protect the water quality or the spring. The distance will be based on geophysical, riparian, and other factors necessary to protect the water quality of the springs. If these factors cannot be determined, a 660-foot buffer zone will be maintained. No new surface disturbance (excluding fence lines) will be allowed in areas within the 100-year floodplain or 100 meters (330 feet) on either side from the centerline, whichever is greater, along all perennial and intermittent streams, streams with perennial reaches, and riparian areas (Map 2-10). | Apply an NSO stipulation to preclude oil and gas activities within public water reserves, 100-year floodplains and within 660 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs. | Apply an NSO stipulation within public water reserves, 100-year floodplains, and within 330 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| WAT-3 | No similar action.<br>Water resources along ephemeral streams were not specifically addressed. This means that a lease stipulation along ephemeral streams would not be applied. | Apply an NSO stipulation to preclude oil and gas activities within 100 feet of ephemeral streams (Map 2-10). | Apply an NSO stipulation to preclude oil and gas activities within 100 feet of ephemeral streams. An exception could be granted for road and pipeline crossings. Roads and pipelines crossing ephemeral steams would be constructed in accordance with best management practices outlined in **Appendix C**. | Same as Alternative C. |
| WAT-4 | *Richfield:* Implement appropriate BMPs designed to protect water quality for all ground disturbing activities (Appendix 14).<br>*Price:* No similar action. | Apply BMPs to drilling operations for the protection of surface and groundwater resources (**Appendix C**). | Same as Alternative B. | Same as Alternative B. |
| WAT-5 | No similar action.<br>Shallow aquifers and potential unconsolidated aquifers were not addressed. This means that BMPs may not be applied to protect shallow aquifers and potential unconsolidated aquifers. | Apply BMPs for the protection of shallow aquifers and potential unconsolidated aquifers (**Appendix C**). | Same as Alternative B. | Same as Alternative B. |

1

1    **Table 2-9. Special Status Species**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objective** | | | | |
| Maintain, protect, and enhance habitats of Federally listed threatened, endangered, or candidate plant or animal species to promote recovery to the point that they no longer need protection under the Endangered Species Act. | | | | |
| Maintain, protect, and enhance habitats of BLM Sensitive plant and animal species to prevent the listing of these species under the Endangered Species Act. | | | | |
| **Management Actions Common To All Alternatives** | | | | |
| SSS-1 | Threatened and endangered species conservation measures and lease notices developed in consultation with USFWS would be used for all surface-disturbing activities to comply with the Endangered Species Act and BLM Manual 6840, Special Status Species Management. These species include: Mexican spotted owl, Southwestern willow flycatcher, yellow-billed cuckoo, bonytail, Colorado pikeminnow, humpback chub, razorback sucker, Jones cycladenia, and Wright fishhook cactus. | | | |
| SSS-2 | Utah and BLM sensitive species mitigation measures and lease notices developed in consultation with the State of Utah would be used for all surface disturbing activities to comply with BLM Manual 6840, Special Status Species Management. These species include: bluehead sucker, flannelmouth sucker, roundtail chub, Jones Indigo bush, Paria spurge, flattops buckwheat, trotter orexis, and hole-in-the-rock prairie clover. | | | |
| SSS-3 | Colorado River Endangered Fish (Endangered) (Map 2-11):<br><br>No surface-disturbing activities within the 100-year floodplain of the Green River and associated back waters would be allowed. Any exceptions to this requirement would require consultation with USFWS. Restrictions on surface disturbance within this critical habitat would be developed through this consultation process.<br><br>Water depletions from any portions of the Upper Colorado River drainage basin are considered to adversely affected and adversely modify the critical habitat of the endangered fish species (bonytail, Colorado pikeminnow, humpback chub, and razorback sucker). Section 7 consultation would be completed with the USFWS prior to any such water depletions. | | | |
| SSS-4 | Mexican Spotted Owl (Threatened) (Map 2-11):<br><br>Prior to authorizing any surface disturbing activities, surveys would be required in potential habitat and must follow survey protocol outlined by the USFWS.<br><br>Protect occupied habitat by precluding temporary activities from March 1 through August 31. Permanent actions are prohibited year-round within 0.5 mile of a PAC.<br><br>If BLM determines that a proposed action may affect Mexican spotted owl (MSO) or its habitat, consultation with USFWS would be initiated. | | | |
| SSS-5 | Southwestern Willow Flycatcher (Threatened):<br><br>If BLM determines that a proposed action may affect Southwestern willow flycatcher (SWFL) or its habitat, consultation with USFWS would be initiated.<br><br>Protect SWFL and their habitat by precluding surface-disturbing activities within a 100-meter buffer of suitable habitat year long. Activities within 0.25 mile of occupied breeding habitat would not occur during the breeding season, April 15 through August 15. | | | |
| SSS-6 | Yellow-billed Cuckoo (Threatened):<br><br>If BLM determines that a proposed action may affect the yellow-billed cuckoo or its habitat, consultation with the USFWS would be initiated.<br><br>Protect the yellow-billed cuckoo and its habitat by precluding surface-disturbing activities within 0.25 mile of occupied habitat within riparian areas from June 15 through August 31. | | | |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Management Actions by Alternative** | | | | |
| SSS-7 | White-tailed Prairie Dog Habitat (Map 2-11) (Sensitive): White-tailed prairie dog surveys would be required within mapped habitat. Do not allow surface disturbing activities within 660 feet of prairie dog colonies identified within prairie dog habitat. No above-ground facilities are allowed within the 660 feet buffer. | White-tailed Prairie Dog Habitat (Sensitive): Same as Alternative A; however, changes have been made to the exceptions, modifications, and waivers criteria. | Same as Alternative B. | Same as Alternative B. |
| SSS-8 | Kit Fox (Sensitive): There are no stipulations or lease notices specific to kit fox. The lessee/operator is also given general notice that lands may include potential habitat for species on the Utah Sensitive Species List. | Kit Fox (Sensitive): Prior to conducting surface disturbing activities in potential habitat, kit fox surveys would be required. Preclude surface-disturbing activities within 660 feet (200 meters) of an occupied kit fox den. | Same as Alternative B. | Same as Alternative B. |
| SSS-9 | Jones Cycladenia (Threatened) (Map 2-12): *Price*: There is no specific decision related to the Jones Cycladenia. General special status species decisions and USFWS conservation measures apply. *Richfield*: The Jones Cycladenia does not occur in the Richfield Field Office. | Jones Cycladenia (Threatened): Surveys would be required in all modeled habitat. Preclude surface-disturbing activities within 300 feet of occupied habitat. | Jones Cycladenia (Threatened): Surveys would be required in all modeled habitat where there is moderate potential for occupation. The need for surveys would be determined on a case-by-case basis by the BLM. Preclude surface-disturbing activities within 300 feet of occupied habitat. | Same as Alternative C. |
| SSS-10 | Wright fishhook cactus (Endangered) (Map 2-12): *Richfield*: There is no specific decision related to the Wright fishhook cactus. General special status species decisions and USFWS conservation measures apply. *Price*: There is no specific decision related to the Wright fishhook cactus. General special status species decisions and USFWS conservation measures apply. | Wright fishhook cactus (Endangered): Surveys would be required in all modeled habitat. Preclude surface-disturbing activities within 300 feet of occupied habitat. | Wright fishhook cactus (Endangered): Surveys would be required in all modeled habitat where there is moderate potential for occupation. The need for surveys would be determined on a case-by-case basis by the BLM. Preclude surface-disturbing activities within 300 feet of occupied habitat. | Same as Alternative C. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| SSS-11 | *Price*: Migratory bird nesting areas will be closed seasonally from **April 15 to August 1**. Areas with migratory birds designated as BLM Special Status Species will have the highest priority. *Richfield*: No similar action. Lessees/operators are given notice that surveys for nesting migratory birds may be required during migratory bird breeding season whenever surface disturbances and/or occupancy is proposed in association with fluid mineral exploration and development within priority habitats. | During nesting season for migratory birds (April 15-August 1), avoid surface-disturbing activities in occupied migratory bird habitat. Breeding season surveys would be required. | Same as Alternative B. | Same as Alternative B. |
| **Raptors** | | | | |
| SSS-12 | There are no lease stipulations for raptors. The Lessee/operator is given notice that raptor management would be guided by the use of Best Management Practices for Raptors and Their Associated Habitats in Utah (Utah BLM 2006, Appendix E "Best Management Practices for Raptors and Their Associated Habitats in Utah"), utilizing seasonal and spatial buffers, as recommend by the Utah Field Office of the USFWS (2002), as well as mitigation, to maintain and enhance raptor nesting and foraging habitat, while allowing other resource uses. | Apply seasonal restrictions (TL) and spatial buffers (CSU) on all known raptor nests in accordance with Utah Field Office Guidelines for Raptor Protection from Human and Land use Disturbances (USFWS 2002). In addition, operators would be required to mitigate unavoidable impacts to raptors and their habitats. The amount and type of mitigation should be based on losses in habitat value. | Same as Alternative B. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| SSS-13 | Bald Eagle (Sensitive): There are no lease stipulations for Bald Eagles. The lessee/operator is given notice that portions of their lease may contain Bald Eagle habitat. In Bald Eagle habitat, the lessee/operator may be required to follow avoidance and minimization measures and/or modify their Surface Use Plan of Operations to protect the Bald Eagles and/or habitat from surface disturbing activities. | See raptor stipulation above. | Same as Alternative B. | Same as Alternative B. |
| SSS-14 | Golden Eagle (Sensitive): There are no lease stipulations for Golden Eagles. The lessee/operator is given notice that portions of their lease may contain Golden Eagle habitat. In Golden Eagle Habitat, the lessee/operator may be required to modify their Surface Use Plan of Operations to protect the Golden Eagles and/or habitat from surface disturbing activities. | See raptor stipulation above. | Same as Alternative B. | Same as Alternative B. |
| SSS-15 | Ferruginous Hawk (Sensitive): There are no lease stipulations or notices specific to Ferruginous Hawk. The lessee/operator is also given general notice that lands may include raptor habitat and that spatial buffers will be placed on raptor nests in accordance with Utah Field Office Guidelines for Raptor Protection from Human and Land use Disturbances (USFWS 2002) and Best Management Practices for Raptors and their Associated Habitats in Utah (BLM 2006). | See raptor stipulation above. | Same as Alternative B. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| SSS-16 | Burrowing Owl (Sensitive):<br><br>There are no stipulations for burrowing owls. In burrowing owl habitat, a lease notice is applied notifying operators that modification to the Surface Use Plan of Operations may be required in order to protect the Burrowing Owl and/or habitat from surface disturbing activities in accordance with Section 6 of the lease terms, Endangered Species Act, and 43 CFR 3101.1-2. | See raptor stipulation above. | Same as Alternative B. | Same as Alternative B. |

½

1    **Table 2-10. Vegetation**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objectives** | | | | |
| Minimize impacts to vegetative communities. | | | | |
| Control invasive and non-native weed species and prevent the introduction of new invasive species. | | | | |
| **Management Actions By Alternative** | | | | |
| VEG-1 | *Richfield*: The use and perpetuation of native species would be emphasized. However, when restoring or rehabilitating disturbed or degraded rangelands, non-intrusive, non-native plant species may be used where native species:<br>• Are not available<br>• Are not economically feasible<br>• Cannot achieve desired future conditions, desired plan communities, or other ecological objectives as well as non-native species, and/or<br>• Cannot complete with already established non-native species<br>• Non-native forbs and perennial grasses could be used in preference to monocultures of non-native annuals.<br>*Price*: Promote the use of native plant species that are desirable for wildlife, livestock, watershed management, and other resource values while maintaining vegetation species diversity. | Native species would be use when restoring or rehabilitating disturbed areas.<br>In addition, Apply BMPs from **Appendix C** for reclamation, soils, and noxious weeds. | Same as Alternative A.<br>In addition, Apply BMPs from **Appendix C** for reclamation, soils, and noxious weeds. | Same as Alternative C. |
| VEG-2 | Control noxious weed species and prevent the infestation and spread of invasive species. Develop cooperating agreements with other Federal, State, local, and private organizations to control invasive and noxious weed species. | Same as Alternative A.<br>In addition, apply BMPs from **Appendix C** to control noxious weeds and invasive species. | Same as Alternative B. | Same as Alternative B. |

3

1    **Table 2-11. Visual Resources Management/Auditory Management (Soundscapes)**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Visual Resources** | | | | |
| **Objectives** | | | | |
| Manage public lands in a manner that protects the quality of scenic values. | | | | |
| **Management Actions By Alternative** | | | | |
| VRM-1 | *Price*: Apply a CSU stipulation for mineral leasing to all areas designated as VRM Class II. This requires all surface disturbing activities to comply with BLM Manual Handbook 8431-1 to retain the existing character of the landscape. *Richfield*: Apply a CSU stipulation for mineral leasing to all areas designated as VRM Class II. Surface disturbing activities must meet the objectives VRM class II. The level of change to the landscape should be low; management activities may be seen, but should not attract the attention of the casual observer. Any change to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape. Surface disturbing activities that are determined to be compatible and consistent resource values are exempted. | Apply an NSO stipulation to all areas inventoried as VRI Class II or designated (VRM) as Class II (Map 2-13). | Apply a CSU stipulation for oil and gas leasing to all areas designated as VRM Class II. Prior to authorizing any surface disturbing activity, a visual resource contrast rating would be completed in accordance with BLM Manual 8431. Mitigation measures would be identified to retain the existing character of the landscape. | Apply a CSU stipulation for oil and gas leasing to all areas inventoried as VRI Class II or designated as VRM Class II. Prior to authorizing any surface disturbing activity, a visual resource contrast rating would be completed in accordance with BLM Manual 8431. Mitigation measures would be identified to retain the existing character of the landscape. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Auditory Management (Soundscapes)** | | | | |
| **Objective** | | | | |
| Manage sensitive public lands to preserve soundscapes that enhance recreational experiences. | | | | |
| **Management Actions By Alternative** | | | | |
| AUD-1 | No similar action. Auditory management was not specifically addressed. This means that BMPs or lease stipulations would not be applied to protect natural soundscapes. | Apply a planning area-wide CSU stipulation requiring that noise levels from production equipment do not exceed 45 decibels as measured at 350 feet from the source. Mitigate noise levels so there is no change in the natural ambient sound as recorded in Canyonlands National Park or Glen Canyon National Recreation Area. This stipulation applies to all phases of oil and gas operations and at all sites and facilities. | Mitigate noise levels so there is no change in the natural ambient sound as recorded in Canyonlands National Park or Glen Canyon National Recreation Area. This stipulation applies to all phases of oil and gas operations and at all sites and facilities. | Same as Alternative B. |

1
2

1    **Table 2-12. Wildlife and Fisheries**

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Objectives** | | | | |
| Maintain, protect, and enhance habitats to support natural wildlife diversity, reproductive capability, and a healthy, self-sustaining population of wildlife and fish species. | | | | |
| Manage crucial, high-value, and unfragmented habitats as management priorities. | | | | |
| **Management Actions by Alternative** | | | | |
| WL-1 | *Price*: The Price RMP does not include any oil and gas stipulations related to pronghorn habitat. *Richfield RMP*: The Richfield RMP includes a stipulation that restricts surface disturbing activities in crucial pronghorn antelope habitat from May 15 through June 15 to protect the species during sensitive fawning seasons. However, according to the Richfield RMP, there are no mapped protected wildlife habitats (Richfield RMP Map 8) in the SRD MLP area. | Apply a TL stipulation restricting surface disturbing activities in crucial pronghorn antelope habitat from May 15 through June 15 to protect the species during sensitive fawning seasons (Map 2-14). In addition, apply BMPs for the protection of pronghorn during oil and gas development (**Appendix C**). | Same as Alternative B. | Same as Alternative B. |

| Decision | Alternative A (No Action) | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| WL-2 | No similar action. | Apply a lease notice to inform the lessee/operator that compensatory mitigation may be required for all disturbances in crucial pronghorn habitat. Mitigation should be planned to offset the loss of habitat directly and indirectly affected by oil and gas operations.<br><br>Offset the loss of important habitat by completing rehabilitation and enhancement projects in appropriate locations in the region or landscape.<br><br>Habitat rehabilitation and enhancement projects may include, but are not limited to:<br><br>• Water developments Springs/seeps;<br>• Wetland development Ponds/reservoirs;<br>• Big game guzzlers;<br>• Vegetation Enhancement<br>• Wells/windmills for wildlife waters;<br>• Seeding and planting of grasses and shrubs;<br>• Fencing or fencing upgrades to protect or enhance wildlife habitats; or<br>• Reclamation of previous disturbances, such as undesignated routes. | Same as Alternative B. | Same as Alternative B. |

1
2

1    *This page intentionally blank*

# CHAPTER 3—AFFECTED ENVIRONMENT

## 3.1 INTRODUCTION

Chapter 3 describes the current conditions and trends for resources, resource uses, and social and economic values within the planning area. Information from this chapter will inform the analysis of impacts from implementation of the proposed alternatives presented in Chapter 2. The impacts analysis is presented in Chapter 4.

This chapter was developed using the best available data for each resource and resource use. The data have been gathered from a variety of sources, including the Bureau of Land Management (BLM) Price and Richfield Field Offices, other agencies, published and unpublished reports, databases, and websites. For some resources (e.g., lands with wilderness characteristics), the BLM has conducted new inventories in the planning area to inform the master leasing plan (MLP) process.

### 3.1.1 Planning Area Overview

The planning area for the San Rafael Desert MLP is approximately 526,174 acres and includes a portion of BLM-administered public lands and federal mineral estate managed by the BLM's Price and Richfield Field Offices in Emery and Wayne Counties (see Map 1-1). The planning area is located in the Colorado Plateau physiographic province. The nearest municipalities are the towns of Green River and Hanksville, Utah. The western boundary of the planning area is partially formed by State Route 24, and the eastern boundary is partially formed by the Green River. The southern boundary of the planning area abuts the Horseshoe Canyon unit of Canyonlands National Park, and the northern boundary borders the town of Green River. The planning area encompasses a mix of land uses, and includes an airport, a state wildlife management area, and generally undeveloped BLM-administered public lands used for livestock grazing, dispersed recreation, and other multiple uses. Table 3-1 lists the approximate acreages of private land, state-managed land, and federally managed land in the planning area.

**Table 3-1. Landownership and Land Management in the Planning Area**

| Owner or Agency | Area (acres)[*] | Percentage[*] |
|---|---|---|
| Bureau of Land Management | 451,134 | 85.7% |
| Private | 12,204 | 2.3% |
| State sovereign lands | 1,447 | 0.3% |
| Utah School and Institutional Trust Lands Administration | 57,584 | 10.9% |
| State wildlife management area | 3,521 | 0.7% |

[*]Acreages and percentages are approximate and may not sum to the entire planning area.

## 3.2 AIR QUALITY

### 3.2.1 Introduction

The analysis area for impacts to air quality is the planning area, which encompasses approximately 525,000 acres of land, along with the states of Utah, Colorado, Arizona, and New Mexico. These states, which share regional air quality issues with the planning area, are included in the analysis area for the consideration of cumulative impacts.

1    ## 3.2.2    Resource Conditions and Trends

2    ### 3.2.2.1    *Ambient Air Quality*

3    **Criteria Air Pollutants**

4    The U.S. Environmental Protection Agency (EPA) established the National Ambient Air Quality
5    Standards (NAAQS) to limit the amount of air pollutants considered harmful to public health and the
6    environment. Primary and secondary standards have been set for six criteria pollutants: carbon monoxide
7    (CO), lead, nitrogen dioxide ($NO_2$),[1] ozone ($O_3$), sulfur dioxide ($SO_2$), and particulate matter (PM).
8    Ground-level $O_3$ is not directly emitted into the air but is created by chemical reactions between $NO_x$ and
9    volatile organic compounds (VOCs) in the presence of sunlight. The primary standards provide public
10    health protection and also protect sensitive populations such as children and the elderly. Secondary
11    standards provide public welfare protection, which includes protection against decreased visibility and
12    damage to animals, crops, vegetation, and buildings (EPA 2016a). Table 3-2 shows the NAAQS.

13    Ground-level $O_3$ and PM are of particular concern in the southwestern United States. Although it can
14    occur naturally, $O_3$ is also formed under certain conditions through the reaction of its precursor gases
15    (nitrogen oxides [$NO_x$] and VOCs), which are emitted from power generation, oil and gas production,
16    wildfires, and other sources. Humans can experience health problems when exposed to $O_3$, and vegetation
17    that is sensitive to $O_3$ may have slowed growth, reduced photosynthesis, and an increased risk of disease
18    and damage (EPA 2016b). PM, also known as particle pollution, is a complex mixture of extremely small
19    dust, dirt, and soot particles. It is composed of coarse, inhalable particles (generally 10 micrometers in
20    diameter and smaller [$PM_{10}$]) and fine inhalable particles (generally 2.5 micrometers and smaller [$PM_{2.5}$]).
21    PM can be directly emitted from a source such as an unpaved road or formed in the atmosphere from
22    reactions of chemicals such as $SO_2$ and $NO_x$. PM can cause health effects in humans, with $PM_{2.5}$ posing
23    the greater risk because of its ability to penetrate the lungs and possibly enter the bloodstream. $PM_{2.5}$ is
24    also the main cause of reduced visibility (haze). PM can settle on vegetation, snow, or water and has
25    potential environmental effects such as depleting the nutrients in soil and making lakes and streams acidic
26    (EPA 2016c). Both $O_3$ and PM can be transported great distances, although elevated short-term, local
27    concentrations can also occur.

28    **Table 3-2. National Ambient Air Quality Standards**

| Pollutant | Primary/ Secondary | Averaging Time* | Level | Form |
|-----------|--------------------|-----------------|-------|------|
| CO | Primary | 8 hours | 9 ppm | Not to be exceeded more than once per year |
|    |         | 1 hour | 35 ppm | |
| Lead | Primary and secondary | Rolling 3-month average | 0.15 $\mu g/m^3$ | Not to be exceeded |

---

[1] EPA uses $NO_2$ as the indicator for the larger group of nitrogen oxides (oxides of nitrogen) or $NO_x$. However,
emissions are usually reported as $NO_x$.

| Pollutant | | Primary/Secondary | Averaging Time* | Level | Form |
|---|---|---|---|---|---|
| NO$_2$ | | Primary | 1 hour | 100 ppb | 98th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | | Primary and secondary | 1 year | 53 ppb | Annual mean |
| O$_3$ | | Primary and secondary | 8 hours | 0.070 ppm | Annual fourth-highest daily maximum 8-hour concentration, averaged over 3 years |
| PM | PM$_{2.5}$ | Primary | 1 year | 12 μg/m$^3$ | Annual mean, averaged over 3 years |
| | | Secondary | 1 year | 15 μg/m$^3$ | Annual mean, averaged over 3 years |
| | | Primary and secondary | 24 hours | 35 μg/m$^3$ | 98th percentile, averaged over 3 years |
| | PM$_{10}$ | Primary and secondary | 24 hours | 150 μg/m$^3$ | Not to be exceeded more than once per year on average over 3 years |
| SO$_2$ | | Primary | 1 hour | 75 ppb | 99th percentile of 1-hour daily maximum concentrations, averaged over 3 years |
| | | Secondary | 3 hours | 0.5 ppm | Not to be exceeded more than once per year |

1  *Source*: EPA (2016a).

2  *Notes*: μg/m$^3$ = microgram(s) per cubic meter; ppb = part(s) per billion; ppm = part(s) per million.

3  * Averaging time is the time period during which pollutant concentrations are measured and averaged.

4  Areas that do not comply with NAAQS requirements for criteria pollutants are considered nonattainment
5  areas. A particular geographic region may be designated an attainment area for some pollutants and a
6  nonattainment area for others. Comprehensive state plans to reduce pollutant concentrations are required
7  in nonattainment areas. Emery and Wayne Counties are currently in attainment with the NAAQS (EPA
8  2016d; Utah Division of Air Quality [DAQ] 2013). Compliance with the NAAQS is typically
9  demonstrated by monitoring for ground-level atmospheric air pollutant concentrations. The DAQ operates
10  and maintains a network of ambient air monitoring stations across the state to collect air quality data and
11  to evaluate compliance with the NAAQS. No air monitoring stations exist in Emery or Wayne Counties;
12  therefore, there are no air monitoring stations in the planning area.

13  An emissions inventory is a summary of emissions for a particular source during a given time period. The
14  DAQ compiles statewide emission inventories to assess the level of pollutants released into the air from
15  various sources. Table 3-3 summarizes criteria pollutant emissions in Emery and Wayne Counties from
16  the 2014 statewide emission inventory.

1    **Table 3-3.  2014 Criteria Pollutant Emissions in Emery and Wayne Counties by Source**

| County | Source | Emissions (tons per year) | | | | | |
|---|---|---|---|---|---|---|---|
| | | CO | NOx | PM10 | PM2.5 | SOx | VOCs |
| Emery | Area Sources | 157.7 | 254.7 | 3,332.0 | 374.3 | 0.7 | 148.1 |
| | Area Sources: Oil and Gas | 160.5 | 158.1 | 8.9 | 8.4 | 1.2 | 482.5 |
| | Mobile Sources: Non-road | 475.8 | 227.4 | 16.3 | 15.7 | 1.3 | 103.7 |
| | Mobile Sources: On-road | 2,270.0 | 1390.0 | 272.8 | 98.8 | 3.8 | 238.7 |
| | Point Sources | 7,146.0 | 18,372.6 | 1,516.4 | 752.7 | 6,420.1 | 208.3 |
| | Biogenics | 7,627.0 | 0.0 | 0.0 | 0.0 | 0.0 | 34,859.9 |
| | Wildfires | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Total** | **17,837.0** | **20,402.8** | **5,146.4** | **1,249.9** | **6,427.1** | **36,041.2** |
| Wayne | Area Sources | 48.6 | 164.4 | 1,138.3 | 143.9 | 1.2 | 46.5 |
| | Area Sources: Oil and Gas | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | Mobile Sources: Non-road | 785.8 | 35.2 | 12.1 | 11.2 | 0.1 | 288.4 |
| | Mobile Sources: On-road | 449.2 | 124.8 | 31.0 | 10.4 | 0.5 | 45.4 |
| | Point Sources | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | Biogenics | 4,692.6 | 0.0 | 0.0 | 0.0 | 0.0 | 21,802.1 |
| | Wildfires | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Total** | **5,976.2** | **324.4** | **1,181.3** | **165.5** | **1.9** | **22,182.4** |

2    *Source*: DAQ (2014a).

3    *Note*: Biogenics are emissions from natural, living sources such as vegetation and organisms.

4    As shown in Table 3-3, Emery County had higher criteria pollutant emissions than Wayne County in
5    2014. Point sources are a large contributor to Emery County emissions. They consist of the Energy West
6    Mining Company (Cottonwood Coal Prep Plant and Deer Creek Mine), Nielson Construction Company's
7    Mill Flat Asphalt and Aggregate Pit, and PacifiCorp's Hunter Power Plant and Huntington Power Plant.
8    The Hunter Power Plant and Huntington Power Plant are major sources of pollution in Emery County and
9    the analysis area. No significant point sources exist in Wayne County (DAQ 2014b). Wayne County also
10    has no emissions from the oil and gas industry, unlike Emery County. There are no active oil and gas
11    wells in the planning area; all previously existing wells have been abandoned and plugged.

12    Naturally occurring and prescribed fires may occur in the planning area. Prescribed fire or controlled
13    burning is an important management tool used to reduce the risk of large, uncharacteristically severe
14    wildfires; increase public and firefighter safety; and meet multiple resource management objectives. Such
15    objectives may include habitat restoration, maintenance of vegetation treatments, and restoration or
16    maintenance of ecosystem health. However, because fire produces short-term air pollution (including PM,
17    carbon dioxide [$CO_2$], $O_3$-forming chemicals, and VOCs), smoke management is a priority during

1  prescribed fires. Because of the type and quantity of vegetation in the planning area, wildfire is generally
2  uncommon. No wildfire emissions are shown for either county in the 2014 emission inventory data.
3  Historical emission inventories report wildfire emissions in Emery County in 2002 and 2005.

4  ### *Ozone Conditions and Trends*

5  Although the planning area does not have any air quality monitoring stations, nearby stations provide
6  information about $O_3$ current conditions and trends. The National Park Service (NPS) evaluated long-term
7  trends in $O_3$ concentrations for 27 national parks using the annual fourth-highest 8-hour maximum $O_3$
8  concentration, which reflects the form of the $O_3$ NAAQS. Of the three national parks near the planning
9  area, only Canyonlands National Park was included in the evaluation. No significant upward or
10 downward trends in $O_3$ concentrations were identified for this park from 1993 through 2008 (NPS 2010a).
11 Table 3-4 summarizes $O_3$ monitoring data from Canyonlands National Park post-2008.

12 **Table 3-4. $O_3$ Concentrations in Canyonlands National Park, 2009–2015**

| Year | $O_3$ NAAQS (parts per million) | | $O_3$ Concentrations in Canyonlands National Park (parts per million) |
|------|---------------------------------|--------------------------------------------|-----|
|      | **2008 NAAQS (in effect at the time of monitoring)** | **Current NAAQS (effective December 28, 2015)** |     |
| 2009 | 0.075 | 0.070 | 0.068 |
| 2010 | 0.075 | 0.070 | 0.068 |
| 2011 | 0.075 | 0.070 | 0.069 |
| 2012 | 0.075 | 0.070 | 0.072 |
| 2013 | 0.075 | 0.070 | 0.066 |
| 2014 | 0.075 | 0.070 | 0.064 |
| 2015 | 0.075 | 0.070 | 0.065 |

13 *Source:* NPS (2015a).

14 *Note*: No data were available for Arches or Capitol Reef National Parks.

15 These data reflect a statistically significant improving trend in $O_3$ concentrations in Canyonlands National
16 Park. The NPS indicates that human health risks from $O_3$ concentrations at Canyonlands National Park
17 warrant moderate concern, based on several factors, including the 2011–2015 estimated $O_3$ concentration
18 of 0.0691 parts per million. The NPS also indicates that the vegetation health risk warrants moderate
19 concern (NPS 2014a).

20 **Hazardous Air Pollutants**

21 Hazardous air pollutants (HAPs), also known as toxic air pollutants, are known or suspected to cause
22 cancer or other serious health effects, or adverse environmental effects. HAPs emitted by the oil and gas
23 industry include benzene, toluene, ethyl benzene, mixed xylenes, formaldehyde, normal-hexane,
24 acetaldehyde, and methanol. The EPA regulates 187 listed HAPs through emission standards, a risk and
25 technology review program, mobile source rules, and other regulations.

26 The Clean Air Act (CAA) requires the EPA to publish a list of source categories that emit certain levels
27 of HAPs. The list of source categories includes major sources emitting 10 tons per year (tpy) of any one
28 HAP, or 25 tpy of any combination of HAPs, and area sources (i.e., smaller sources, such as dry
29 cleaners). Section 112(d) of the CAA requires the EPA to promulgate regulations establishing emission
30 standards (National Emission Standards for Hazardous Air Pollutants [NESHAPs]) for each listed source

1 category. The standards must require the maximum degree of emission reduction determined to be
2 achievable by each particular source category, through the application of maximum achievable control
3 technology (MACT). Different criteria for MACT apply to different sources. Source categories for which
4 NESHAP (MACT) standards have been promulgated include oil and natural gas production facilities, and
5 natural gas transmission and storage.

6 HAP pollutant emissions in Emery and Wayne Counties are included in the 2014 statewide emission
7 inventory. No HAP emissions were reported for Wayne County. In Emery County, 45 HAPs were
8 reported as being emitted from Nielson Construction Company's Mill Flat Asphalt and Aggregate Pit and
9 PacifiCorp's Hunter Power Plant and Huntington Power Plant (DAQ 2014c). Table 3-5 shows HAP
10 emissions in Emery County greater than 1,000 pounds per year or 0.5 tpy.

11 **Table 3-5. 2014 HAP Emissions in Emery County (greater than 0.5 tpy)**

| HAP | Emery County Emissions (tpy) |
|---|---|
| Allyl chloride | 0.7 |
| Cyanide | 8.6 |
| Hydrochloric acid (hydrogen chloride) | 34.2 |
| Hydrofluoric acid (hydrogen fluoride) | 45.9 |
| Manganese (total suspended particulates) | 0.5 |
| Methyl bromide (bromomethane) | 0.6 |
| Methyl chloride (chloromethane) | 1.8 |
| Methyl hydrazine | 0.6 |
| Methylene chloride (dichloromethane) | 1.0 |
| Selenium (total suspended particulates) | 0.8 |
| Sulfuric acid | 29.0 |

12 *Source*: UDAQ (2014c).

13 Hydrochloric acid, hydrofluoric acid, sulfuric acid, and cyanide constitute the largest HAP emissions in
14 Emery County and are emitted from the Hunter and Huntington Power Plants.

15 ### 3.2.2.2  *Air Quality–Related Values*

16 The Prevention of Significant Deterioration (PSD) is a CAA permitting program for new and modified
17 major sources of air pollution that are located in attainment areas. It is designed to prevent NAAQS
18 violations, preserve and protect air quality in sensitive areas, and protect public health and welfare. Under
19 PSD regulations, the EPA classifies airsheds as Class I, Class II, or Class III. Congress designated certain
20 existing areas as mandatory Class I areas, which preclude redesignation to a less restrictive class. Class I
21 areas are those areas allowing for very little deterioration of air quality. They are areas of special national
22 or regional natural, scenic, recreational, or historic value for which PSD regulations provide extra
23 protection. Class II areas allow moderate deterioration, and Class III areas allow more deterioration. In all
24 cases, pollutant concentrations cannot violate any of the NAAQS (NPS 1981).

25 A PSD increment prevents the air quality in clean areas from deteriorating and is the maximum allowable
26 increase in ambient pollutant concentrations. Significant deterioration is said to occur when the amount of
27 new pollution would exceed the applicable PSD increment (EPA 2016e). The allowable PSD increments
28 of new pollution are very small in Class I areas.

Utah has five Class I areas (all national parks) (EPA 2016f). The closest Class I areas to the planning area are as follows: Canyonlands National Park, approximately 3 miles to the southeast of the planning area (the Horseshoe Canyon unit of Canyonlands National Park, which is separate from the main park boundaries, is adjacent to the east border of the planning area); Arches National Park, approximately 22 miles east of the project area; and Capitol Reef National Park, approximately 24 miles west of the project area. All portions of Utah outside Class I areas are designated Class II areas. The project area is located in a Class II area. Industrial growth is allowed in these areas; however, the air quality will not be allowed to degrade to the level of the NAAQS in many parts of the state where the air is exceptionally clean (Utah Air Quality Board 2006).

PSD requirements are applicable to a source if it has the potential to exceed the major source thresholds of either 100 or 250 tpy of a regulated pollutant, depending on the type of pollutant. For stationary source categories listed in the regulation, the threshold is 100 tpy. For unlisted source categories, such as oil and gas operations, the threshold is 250 tpy. At the projected amount of oil and gas development in the reasonably foreseeable development scenario in the planning area (30 wells) (see Appendix A), PSD regulations would not likely be triggered because such development would not have the potential to emit 250 tpy of any air pollutant.

An air quality–related value (AQRV) is defined as a resource "for one or more Federal areas that may be adversely affected by a change in air quality. The resource may include visibility or a specific scenic, cultural, physical, biological, ecological, or recreational resource" identified by a federal land manager for a particular area" (Federal Land Manager's Air Quality Related Values Work Group [FLAG] 2010). The requirement to assess impacts to AQRVs is established in the PSD rules. The federal land manager for each Class I area has the responsibility to define and protect the AQRVs at such areas, and to consider whether new emissions from proposed major facilities (or modifications to major facilities) would have an adverse impact on those values. Visibility is a common AQRV for national parks. Although the planning area does not have any air quality monitoring stations, nearby stations in national parks provide information about AQRV current conditions and trends.

**Visibility Conditions and Trends**

Section 169A of the CAA established a national visibility goal to prevent future visibility impairment and remedy any existing impairment in national parks and wilderness areas (Class I areas). *Visibility* refers to the clarity with which scenic vistas and landscape features are perceived at great distances. *Impairment* refers to human-caused air pollution. In 1999, the EPA promulgated the Regional Haze Rule to address regional haze, which refers to haze that impairs visibility in all directions over a large area. Haze forms when sunlight encounters particle pollution in the air. The Regional Haze Rule calls for state and federal agencies to work together to establish goals and emission reduction strategies to improve visibility in Class I areas (EPA 2017a). States are required to address visibility in their state implementation plans.

Visibility is affected by pollutant concentrations in the air. PM pollution is the major cause of reduced visibility in many federal mandatory Class I areas, with $PM_{2.5}$ being most responsible for impacts (EPA 2001). The five key contributors to visibility impairment in the form of $PM_{2.5}$ are sulfate, nitrate, organic carbon, elemental carbon, and crustal material. Three metrics are typically used to describe visibility: visual range (the greatest distance at which a large dark object can be seen against the background sky), light extinction coefficient (the attenuation of light per unit distance due to the scattering and absorption by gases and aerosols between the source and receptor), and the deciview (dv) haze index (derived from calculated light extinction measurements) (EPA 2001). One dv represents the minimal perceptible change in visibility to the average person, approximately a 10% change in light extinction. A dv scale is near zero for a pristine atmosphere and increases as visibility degrades.

1  Interagency Monitoring of Protected Visual Environments (IMPROVE) is a visibility monitoring program
2  that has been collecting data since 1987 to support the visibility protection regulations for mandatory
3  Class I areas. The closest IMPROVE site to the planning area is in Canyonlands National Park.

4  The NPS evaluated long-term trends in visibility for 29 national parks using annual dv on the haziest and
5  clearest days for the period of record for each park. Of the three national parks near the planning area,
6  only Canyonlands National Park was evaluated. From 1990 through 2008, a statistically significant trend
7  of improving air quality was noted at Canyonlands National Park on the haziest and clearest days.
8  However, visibility at all of the analyzed parks suffered from at least some impairment, particularly on the
9  haziest days. In addition, visibility conditions on the clearest days were also impaired, although to a lesser
10  degree (NPS 2010a). Table 3-6 summarizes IMPROVE data at Canyonlands National Park post-2008.
11  Data for Capitol Reef National Park are also included (similar data were not available for Arches National
12  Park).

13  **Table 3-6.  IMPROVE Visibility Data on the Haziest and Clearest Days in Canyonlands and**
14  **Capitol Reef National Parks, 2009–2015**

| Year | Canyonlands National Park | | Capitol Reef National Park | |
|------|---------------------------|--------------------------|----------------------------|---------------------|
|      | Haziest Days* (dv) | Clearest Days* (dv) | Haziest Days (dv) | Clearest Days (dv) |
| 2009 | 11.5 | 3.3 | 10.3 | 2.7 |
| 2010 | 10.7 | 2.7 | 9.6 | 2.1 |
| 2011 | 9.9 | 2.7 | 9.3 | 2.9 |
| 2012 | 11.6 | 3.2 | 11.8 | 2.4 |
| 2013 | 10.4 | 3.4 | 9.9 | 2.9 |
| 2014 | 9.1 | 2.6 | 9.1 | 2.1 |
| 2015 | 9.8 | 2.5 | 9.5 | 2.6 |

15  *Source*: NPS (2015b).

16  *Note*: For Canyonlands National Park, the natural condition (i.e., before human activities) haze index on the haziest days is 6.4 dv. The natural
17  condition haze index for the clearest days is 1 dv. For Capitol Reef National Park, the natural condition haze index on the haziest days is 5.7 dv.
18  The natural condition haze index for the clearest days is 1.2 dv.

19  * Haziest days are the 20% of days where visibility is most limited. Clearest days are the 20% of days where visibility is most clear.

20  IMPROVE data from 2006 through 2015 for Canyonlands National Park indicate that there is no
21  statistically significant trend in visibility on the 20% of clearest days. However, visibility improved on the
22  20% of haziest days during this time period. Overall, visibility shows impairment based on comparisons
23  with the natural condition haze index (see Table 3-6 and table note) (NPS 2015b). For Capitol Reef
24  National Park from 2006 through 2015, there is no statistically significant trend in visibility on the 20%
25  of clearest days, but there is a statistically significant improving trend on the 20% of haziest days (NPS
26  2014b). Visibility at Capitol Reef National Park is also impaired, as shown by comparisons with the
27  natural condition haze index.

28  The NPS indicates that visibility at Canyonlands National Park warrants moderate concern, based on
29  several factors, including the 2011–2015 estimated visibility on mid-range days of 2.7 dv above natural
30  conditions (NPS 2016). Visibility effects at the park include a reduction of the average natural visual
31  range from about 170 miles without pollution to approximately 130 miles with pollution, and a reduction
32  of the visual range to below 80 miles on high-pollution days (NPS 2017a).

1 **Deposition Conditions and Trends**

2 Atmospheric deposition is the process by which airborne pollutants are deposited on the ground. These
3 pollutants include $SO_2$, $NO_x$, ammonia, and mercury. Wet deposition, commonly known as acid rain,
4 occurs when pollutants are deposited in combination with precipitation, such as rain, snow, fog, or hail.
5 Dry deposition of particles and gases can occur when chemicals are incorporated into dust or smoke in the
6 absence of moisture, and are then deposited on the earth's surface by settling, impaction, or adsorption.
7 Atmospheric deposition of air pollutants can increase the acidity of soils and water resources (e.g., lakes
8 and streams). Dry and wet deposition are combined to estimate the total deposition of pollutants to the
9 earth's surface.

10 *Wet Deposition*

11 The National Atmospheric Deposition Program (NADP) monitors wet deposition. The NPS used NADP
12 monitoring data to evaluate long-term trends in concentrations of ammonium, nitrate, and sulfate in wet
13 deposition for 29 national parks. Of the national parks near the planning area, only Canyonlands National
14 Park has an NADP monitor. From 1998 through 2008, a statistically significant degrading trend in
15 ammonium concentrations was noted at Canyonlands National Park. During this same time period, no
16 statistically significant trends at the park were noted for nitrate or sulfate concentrations in precipitation
17 (NPS 2010a). Table 3-7 summarizes NADP deposition data for Canyonlands National Park post-2008.

18 **Table 3-7.  NDAP Wet Deposition Data for Canyonlands National Park, 2009–2015**

| Year | Wet Atmospheric Deposition in Canyonlands National Park | | |
|------|------|------|------|
|      | Ammonium | Nitrate | Sulfate |
|      | Precipitation Weighted Mean (milliequivalents per liter [µeq/L]) | | |
| 2009 | 15.4 | 16.9 | 27.5 |
| 2010 | 10.8 | 13.7 | 8.0 |
| 2011 | 16.2 | 15.1 | 12.8 |
| 2012 | 12.9 | 13.2 | 8.4 |
| 2013 | 14.2 | 13.4 | 9.7 |
| 2014 | 16.6 | 12.5 | 8.7 |
| 2015 | 13.0 | 10.8 | 7.2 |

19 *Source*: NPS (2015c).

20 *Note*: No data were available for Arches or Capitol Reef National Parks.

21

22 The NDAP data from 2009 through 2015 indicate that there is no statistically significant trend for
23 ammonium in precipitation or sulfate in precipitation, but that the trend for nitrate in precipitation is
24 improving. The NPS indicates that wet nitrogen deposition warrants significant concern at Canyonlands
25 National Park, based on several factors, including the 2011–2015 estimated wet nitrogen deposition of 1.4
26 kilograms per hectare per year and the very highly sensitive ecosystems at the park. Wet sulfur deposition
27 is in good condition at Canyonlands National Park, based on factors including the 2011–2015 estimated
28 wet sulfur deposition of 0.6 kilograms per hectare per year (NPS 2015c).

1  *Dry Deposition*

2  The Clean Air Status and Trends network (CASTNet) monitors dry deposition of sulfur and nitrogen
3  species, as well as rural $O_3$ concentrations. The only CASTNet station near the planning area is in
4  Canyonlands National Park. Table 3-8 summarizes recent CASTNet dry deposition data for Canyonlands
5  National Park.

6  **Table 3-8. CASTNet Dry Deposition Data for Canyonlands National Park, 2009–2014**

| Year | Dry Atmospheric Deposition in Canyonlands National Park | |
|------|-------------------------------------------------------|---|
| | **Total Dry Nitrogen Deposition\*** (kilograms of nitrogen per hectare) | **Total Dry Sulfur Deposition[†]** (kilograms of sulfur per hectare) |
| 2009 | 0.71 | 0.17 |
| 2010 | 0.67 | 0.17 |
| 2011 | 0.67 | 0.17 |
| 2012 | 0.71 | 0.17 |
| 2013 | 0.72 | 0.17 |
| 2014 | 0.58 | 0.15 |

7  *Source*: EPA (2016g).

8  *Note*: No data were available for Arches or Capitol Reef National Parks.

9  \* Includes dry nitric acid ($HNO_3$), dry ammonium ($NH_4$), and dry nitrate ($NO_3$).

10  [†] Includes dry $SO_2$ and dry sulfate ($SO_4$).

11  Table 3-8 shows that dry deposition of nitrogen and sulfur has been relatively unchanged or slightly
12  decreasing in Canyonlands National Park from 2009–2014; however, it is not known whether these trends
13  are statistically significant.

14  **3.3    CLIMATE CHANGE**

15  **3.3.1    Introduction**

16  *Global warming* refers to the ongoing rise in global average temperature near the Earth's surface. It is
17  caused mostly by increasing concentrations of greenhouse gases (GHGs) (primarily $CO_2$, methane,
18  nitrous oxide [$N_2O$], and fluorinated gases) in the atmosphere, and it is changing climate patterns. *Climate
19  change* refers to any significant change in the measures of climate (e.g., temperature, precipitation, and
20  wind patterns) lasting for an extended period of time (EPA 2016h).

21  In 2010, the National Research Council concluded that "climate change is occurring, is caused largely by
22  human activities, and poses significant risks for a broad range of human and natural systems" (National
23  Research Council 2010). The Intergovernmental Panel on Climate Change (IPCC) states that "human
24  influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the
25  highest in history. Recent climate changes have had widespread impacts on human and natural systems"
26  (IPCC 2014). The IPCC also indicates that the effects of anthropogenic GHG emissions are "extremely
27  likely" to have been the dominant cause of observed warming since the mid-twentieth century (IPCC 2014).

28  The buildup of GHGs in the atmosphere and the warming of the planet are causing increases in ocean
29  temperatures, sea level, and acidity; changes in temperature and precipitation patterns; melting of glaciers
30  and sea ice; changes in the frequency, intensity, and duration of extreme weather events; and shifts in

1  ecosystem characteristics (e.g., the length of growing seasons, timing of flower blooms, and migration of
2  birds). In addition, the changing climate has impacts on human health and well-being, such as heat-related
3  illnesses and deaths, the prolonging of allergy seasons, availability of water supplies, and the increased
4  spread of diseases such as Lyme disease and West Nile virus (EPA 2016i).

5  Secretarial Order No. 3289 directs the BLM and other Department of the Interior agencies to apply
6  scientific tools to address the impacts of climate change on water, land, and other natural and cultural
7  resources. In addition, the CEQ published final guidance in 2016 for federal departments and agencies on
8  considering GHG emissions and the effects of climate change in NEPA reviews. The guidance provides a
9  framework to consider both the effects of a proposed action on climate change, as indicated by its GHG
10  emissions, and the effects of climate change on a proposed action (CEQ 2016).

11  ### 3.3.2    Global Conditions and Trends

12  $CO_2$ is the primary GHG emitted through human activities that contributes to climate change; it is
13  followed by methane, $N_2O$, and fluorinated gases (EPA 2016j). Figure 3-1 shows global GHG emissions
14  by gas from 1990 through 2010.



15
16  *Source*: EPA (2014).
17  *Note*: The term carbon dioxide equivalent ($CO_2e$) is a metric measure used to compare emissions from various GHGs based on their global
18  warming potential. For any quantity and type of GHG, $CO_2e$ represents the amount of $CO_2$ that would have the equivalent global warming
19  impact. The $CO_2e$ for a gas is derived by multiplying the tons of the gas by the associated global warming potential.

20  **Figure 3-1.  Global GHG emissions by gas, 1990–2010.**

21  As shown in Figure 3-1, global emissions of all major GHGs increased between 1990 and 2010. The
22  energy sector (energy production and use) was the largest contributor to global GHG emissions in 2010
23  (32,678 million metric tons of carbon dioxide equivalent [$CO_2e$], or about 71% of the total), followed by
24  agriculture (5,999 million metric tons of $CO_2e$, or about 13% of the total) (EPA 2014a). The majority of
25  emissions come from three regions: Asia, Europe, and the United States. These regions accounted for
26  88% of total global emissions in 2012 (EPA 2015).

1  **3.3.3    National and Regional Conditions and Trends**

2  Figure 3-2 shows U.S. GHG emissions by gas from 1990 through 2010.



3

4  **Figure 3-2. Greenhouse gas emissions in the United States from 1990 through 2010. Source: EPA**
5  **(2016k).**

6  As shown in Figure 3-2, $CO_2$ is the primary GHG emitted through human activities in the United States
7  that contributes to climate change. GHG emissions in the United States totaled 6,870 million metric tons
8  of $CO_2$e in 2014, which is a 7% increase since 1990 but a 7% decrease since 2005. During the period
9  from 1990 through 2014, $CO_2$ emissions increased by approximately 9%, methane emissions decreased
10  by 6%, $N_2O$ emissions decreased by 1%, and fluorinated gas emissions increased by 77% (EPA 2016k).
11  Electricity generation was the largest contributor to U.S. GHG emissions in 2014 (2,081 million metric
12  tons of $CO_2$e), followed by transportation (1,810 million metric tons of $CO_2$e), and industry (1,462
13  million metric tons of $CO_2$e) (EPA 2014b).

14  In May 2014, the U.S. Global Change Research Program released *Climate Change Impacts in the United*
15  *States: The Third National Climate Assessment* (Assessment), a comprehensive report on climate change
16  and its impacts in the United States (Melillo et al. 2014). In the Assessment, the Southwest region
17  includes Arizona, California, Colorado, Nevada, New Mexico, and Utah. According to the Assessment,
18  the decade 2001–2010 was the warmest in the 110-year record for the Southwest region, with
19  temperatures almost 2 degrees Fahrenheit (°F) higher than historic averages and with fewer cold air
20  outbreaks and more heat waves. Regional annual average temperatures are projected to rise by 2.5°F to
21  5.5°F by 2041–2070, assuming continued growth in global emissions. Key climate change highlights for
22  this region include the following, excerpted directly from Chapter 20 of the Assessment:

23       •   Snowpack and streamflow amounts are projected to decline in parts of the Southwest,
24           decreasing surface water supply reliability for cities, agriculture, and ecosystems.

1    • The Southwest produces more than half of the nation's high-value specialty crops,
2      which are irrigation-dependent and particularly vulnerable to extremes of moisture,
3      cold, and heat. Reduced yields from increasing temperatures and increasing
4      competition for scarce water supplies will displace jobs in some rural communities.

5    • Increased warming, drought, and insect outbreaks, all caused by or linked to climate
6      change, have increased wildfires and impacts to people and ecosystems in the
7      Southwest. Fire models project more wildfire and increased risks to communities
8      across extensive areas.

9    • Flooding and erosion in coastal areas are already occurring even at existing sea levels
10     and damaging some California coastal areas during storms and extreme high tides. Sea
11     level rise is projected to increase as Earth continues to warm, resulting in major damage
12     as wind-driven waves ride upon higher seas and reach farther inland.

13   • Projected regional temperature increases, combined with the way cities amplify heat,
14     will pose increased threats and costs to public health in southwestern cities, which are
15     home to more than 90% of the region's population. Disruptions to urban electricity and
16     water supplies will exacerbate these health problems. (Garfin et al. 2014)

### 3.3.4    Utah Conditions and Trends

18  Utah's gross GHG emissions increased by 40% from 1990 to 2005, while national emissions rose by only
19  16% during this period. Based on these data, Utah's GHG emissions appear to be rising at a faster rate
20  than those of the United States as a whole. Table 3-9 shows historical 2005 Utah GHG emissions and
21  projected 2020 Utah GHG emissions by sector.

**Table 3-9.  Utah GHG Emissions by Sector**

| Sector | Utah GHG Emissions (million metric tons of $CO_2e$) | |
|---|---|---|
| | **2005 (Historical)** | **2020 (Projected)** |
| Electricity Production | 25.6 | 36.6 |
| Residential/Commercial/Non-fossil Industry | 12.2 | 16.3 |
| Transportation | 16.9 | 22.4 |
| Fossil Fuel Industry | 4.1 | 4.6 |
| Industrial Processes | 3.7 | 5.8 |
| Waste Management | 2.0 | 4.7 |
| Agriculture | 4.2 | 5.8 |
| **Total Gross Emissions** | **68.8** | **96.1** |

23  *Source*: Center for Climate Strategies (2007).

24  As shown in Table 3-9, Utah's gross GHG emissions are projected to increase by 39.7% by 2020 from
25  2005 levels. The main source of Utah's GHG emissions is electricity production, followed by
26  transportation.

27  Temperatures in the state of Utah have warmed by about 2°F in the past century. Heat waves are
28  becoming more common. Snow is melting earlier in spring, and the snowpack has been decreasing since
29  the 1950s. In the coming decades, the flow of water in Utah's rivers is likely to decrease. Overall, the

1 changing climate is likely to increase the need for water but reduce the supply. The frequency and
2 intensity of wildfires are expected to increase, and the productivity of ranches and farms is expected to
3 decrease. Warmer and drier conditions may also increase the ability of pests and diseases to become
4 established (EPA 2016l).

5 **3.4   SOIL RESOURCES**

6 The analysis area for soil resources is the subwatersheds (HUC 12) crossed by the planning area (Map 3-
7 1). This area covers approximately 901,313 acres. The analysis area was selected because it represents a
8 natural boundary within which changes to soils in the planning area could affect soils, water, vegetation,
9 or other resources on BLM-administered public lands.

10 Stable and productive soils provide the foundation for other resources and for resource uses. Soils are the
11 medium for plant growth and provide nourishment for nearly all terrestrial organisms, supporting a wide
12 variety of plant and animal communities within the planning area. Soils are derived primarily from the
13 geologic formations that occur throughout the planning area; from materials washed down by rivers and
14 streams; and from windblown sands and silts known as loess, residuum, colluvium, alluvium, aeolian
15 sands.

16 Soils are linked to nutrient and hydrologic cycles, energy flows, and other ecological processes. Soils in
17 the planning area can have well developed biological soil crusts. Biological crust communities can
18 provide significant protection from wind and water erosion. Disturbance of biological crusts affects most
19 soils, some more than others, depending on soil type and biotic community.

20 **3.4.1   Resource Conditions**

21 The planning area occurs entirely within the Colorado Plateau ecological province. Soils of the Colorado
22 Plateau are relatively young and undeveloped and are dominated by Aridisols and Entisols. The
23 distribution and occurrence of soils depends on a number of factors, including the interaction of relief
24 (slope), aspect, parent material (geology), living organisms, and climate.

25 The analysis area contains a variety of soil types, including soils that are sensitive in nature such as
26 moderately saline and highly erodible soils. Special management is necessary to protect sensitive soils
27 from accelerated erosion and associated degradation. These soils may be especially vulnerable to impacts
28 and harder to reclaim or restore after disturbance.

29 ***3.4.1.1   Sensitive Soils***

30 **Wind Erodible Soils**

31 Some soils in the planning area are more susceptible than others to wind and water erosion. Although
32 these soils have naturally high rates of erosion, their erosion rates are easily accelerated by surface-
33 disturbing activities. Best management practices to protect soil stability include interim reclamation;
34 mulching bare ground with natural materials; and limiting or seasonally restricting surface-disturbing
35 activities such as grazing, off-road travel, and oil and gas and mineral exploration and development,
36 especially during drought conditions.

37 Soils are especially susceptible to wind erosion when plant cover and/or biological soil crust cover are
38 removed. A well-developed biological soil crust can prevent soil movement during high-wind events,
39 especially when interspersed between shrubs. Increases in wind-erosion rates increase regional dust
40 production, which can affect regional snowmelt conditions.

1  Within the analysis area, sandy soils have formed stabilized sand dunes. These dunes are sensitive to
2  disturbance and wind erosion, which could cause destabilization. Relying on a composite of NRCS
3  provisional soils data and Utah 1:500k geological maps, Map 2-9 shows areas of sandy soils susceptible
4  to erosion and dune destabilization. There are 355,985 acres of sandy soils highly susceptible to wind
5  erosion in in the analysis area and 303,070 acres within the planning area.

6  ### *Wind Erosion and Fugitive Dust*

7  Increased dust levels are a national and regional concern, as windblown dust deposited on snow-covered
8  mountain peaks can cause earlier and faster snowmelt events. Earlier snowmelts can cause earlier peak
9  flows and result in lower water yields.

10  An implication of wind-borne sediment is its effect on snowpack in downwind mountain ranges and,
11  ultimately, on water yield to the Colorado River and its tributaries. Airborne dust that collects on
12  mountain snow decreases snow reflectance and accelerates spring snowmelt. For example, in 2009, the
13  San Juan Mountains experienced heavy fallout from spring dust storms; even though the snow pack was
14  average, spring snow melt was the earliest on record at 50 days earlier than normal (Painter et al. 2010).
15  Painter et al. (2010) modeled the impacts of dust on snow to estimate dust's contribution to changes in
16  runoff in the Upper Colorado River Basin during the timeframe 1916 to 2003. The group found that while
17  modeled natural flow peaked in June and produced runoff into July, post-disturbance (present-day) runoff
18  increased in April, peaked in May, and dropped off in June.

19  The models by Painter et al. (2010) indicate that dust is reducing the flow of the Colorado River by 5%
20  (two times the annual allotment for Las Vegas). Early snowmelt from accumulated dust (26–50 days) is
21  greater than that predicted for temperature and precipitation changes from climate change (5–15 days).
22  The authors believe that regional efforts at dust abatement and soil stabilization could have a mitigating
23  effect on the runoff response of the Upper Colorado River as well as on future regional impacts of climate
24  change (Bryce 2012).

25  Potential sources of dust that may contribute to accelerated snowmelt were compiled as part of the
26  Colorado Plateau Rapid Ecoregional Assessment Report (Bryce 2012). The dataset shows a number of
27  factors that may contribute to dust production at a location, including areas around mines and oil/gas
28  wells, areas with low vegetation cover or with invasive annual vegetation, areas of recent disturbance,
29  unpaved roads, and areas with soils with high potential for wind erosion. A large portion of the planning
30  area was rated as having one to two factors that may contribute to dust production (Bryce 2012).

31  ### Steep Slopes

32  Surface disturbances such as road or well pad construction and large-truck traffic on steep slopes can
33  increase erosion and surface runoff rates. The analysis area contains 77,368 acres of steep slopes (slopes
34  greater than 30%), as shown on Map 2-10. The 2008 Price RMP does not allow new surface-disturbing
35  activities on slopes greater than 40%; surface-disturbing activities on slopes ranging from 21% to 40%
36  require an erosion-control strategy and topsoil segregation/restoration plan to be approved by the BLM
37  before construction. The 2008 Richfield RMP requires that projects involving construction on slopes
38  greater than 30% will be avoided. If an action cannot be avoided, rerouted, or relocated, then the proposed
39  project will include an erosion-control strategy, reclamation, and site plan, with a detailed survey and
40  design completed by a certified engineer. This proposed project must be approved by the BLM before
41  construction and maintenance.

42  ### Saline Soils

43  The analysis area contains approximately 56,186 acres of Mancos Shale–derived soils, which are known
44  to be moderately saline. Mancos Shale–derived soils occur along the northern portion of the planning
45  area, as shown on Map 2-9. Soils with moderate salinity content have naturally high erosion rates and

1 low reclamation potential. They are highly susceptible to surface disturbance, and their erosion rates are
2 easily accelerated. Erosion of saline soils affects the water quality of downstream watersheds, raising
3 salinity, selenium, and sediment loads and associated water chemistry parameters (TDS, Total
4 Suspended Solids, etc.).

5 **Biotic Soil Crusts**

6 Biotic soil crusts consist of mats or filaments of cyanobacteria, fungi, and lichen. Development of biotic
7 soil crust is strongly influenced by soil texture, soil chemistry, and soil depth. Crusts are more developed
8 in shallow, sandy, non-saline soils but can also be found throughout saline soil areas. They tend to be
9 commonly found associated with soils high in gypsum. Soil crust species richness varies by soil type and
10 parent material, with species richness higher on gypsiferous soils, non-calcareous sandy soils, and
11 limestone-derived soils. Many of the vegetative communities in the planning area have evolved with the
12 presence of biological soil crusts.

13 Biotic soil crusts play a major role in reducing water and wind erosion and in preventing the
14 establishment of invasive annual grasses. Biotic soil crusts fix atmospheric nitrogen and carbon, retain
15 soil moisture, and provide surface cover. Crust composition and level of abundance can be used to
16 determine the ecological history and condition of a site (BLM 2001).

17 Loss of biotic soil crust leads to reduced soil productivity, decreased plant cover and vigor, and increased
18 wind and water erosion. Severity, size, frequency, and timing of a surface-disturbing activity affect the
19 degree of impacts to biotic soil crusts. Fine-textured soils have faster crust recovery rates than coarse-
20 textured soils (BLM 2001). "Soil crust populations are degraded when mechanical disturbances such as
21 vehicular traffic, land clearing, or trampling disturb the soil surface. While any of these disturbances may
22 not directly eliminate soil crusts, repeated disturbance degrades and fragments crust cover and may keep
23 it in an early successional state" (BLM 2001; Bryce 2012).

24 Although soil crusts exist throughout the planning area, there are areas with high-density or well-
25 developed crusts or unusual crust components. Areas with higher potential for high-density or well-
26 developed crusts include shallow, sandy areas associated with rock outcrops.

27 ## 3.4.2    Resource Trends

28 Soils within the planning area currently experience low levels of disturbance, and many previous BLM-
29 authorized surface disturbances there have been reclaimed. Surface disturbance from previous oil and gas
30 exploration and geophysical exploration has been largely reclaimed, as the last oil or gas well in the
31 planning area was drilled, plugged, and abandoned in 1989 and the last geophysical activities were
32 completed in 2007/2008. Relatively little development of new routes has occurred in the planning area
33 over the past 30 years. Ongoing livestock grazing may contribute to soil disturbance, especially in areas
34 where livestock congregate. Additionally, OHV use and other dispersed recreation may contribute to
35 localized impacts on soil resources.

36 ## 3.5    WATER RESOURCES

37 ### 3.5.1    Resource Conditions

38 The analysis area for water and riparian resources consists of the subwatersheds (HUC 12) crossed by the
39 planning area (Map 3-1). This area covers approximately 901,313 acres. The analysis area was selected
40 because it represents a natural boundary within which changes in water resources in the planning area
41 could affect water, riparian, wildlife, or other resources on BLM-administered public lands.

1 ### 3.5.1.1    Water

2 **Surface Water**

3 Surface waters within the analysis area include the Green River, the San Rafael River, the Dirty Devil
4 River, intermittent streams and washes, and springs and seeps (Map 2-11). Numerous stock ponds and
5 small reservoirs within the analysis area seasonally provide water to livestock and wildlife. Many surface
6 waters have water rights associated with their uses; the water rights are managed by the State of Utah.

7 The 100-year floodplains of all perennial, intermittent, and ephemeral drainages are important
8 components of the surface water system, as they provide needed drainage for stormwater and large flash
9 floods within the analysis area. It is important to allow stormwater to flow through the drainage system
10 without accelerated erosion and/ or sedimentation. Unstable conditions can add sediments or other
11 pollutants to the naturally sediment-rich hydrologic systems, causing water-quality impairments within
12 the Colorado River Basin.

13 The UDEQ conducts monitoring of some of the surface water resources within the analysis area,
14 including the San Rafael, Green, Fremont, and Dirty Devil Rivers. UDEQ collects water chemistry data
15 such as temperature, dissolved oxygen, pH, TDS, and other parameters and also collects macro-
16 invertebrate samples. Using that monitoring data, UDEQ completes detailed assessments to determine the
17 conditions of those water resources and submits the information to the U.S. EPA every 2 years in the
18 Integrated Report or Utah's List of Impaired Waters. Currently the San Rafael River is the only water
19 body in the planning area that has been determined by the Utah Division of Water Quality (UDWQ) to be
20 impaired and not meeting state standards, while within the larger analysis area the Fremont and Dirty
21 Devil Rivers are on the impaired list.

22 ### *Rivers*

23 The Green River forms the eastern boundary of the planning area for almost 40 miles. The headwaters of
24 the Green River are located in Wyoming and northern Utah. The Green River's flows in the planning area
25 are dam controlled, with the Flaming Gorge Dam more than 100 miles upstream of the analysis area
26 providing the primary control. Streamflows have been measured by the USGS near the town of Green
27 River, Utah, just upstream of the planning area, since 1894. The average base flow in the analysis area is
28 about 3,000 cubic feet per second (cfs), with average daily stream flows ranging from 2,100 cfs in
29 December and January to 20,000 cfs in early June. In June 1917, stream flow at this site peaked at 68,000
30 cfs (USGS 2017a).

31 The San Rafael River begins at the confluence of Huntington, Cottonwood, and Ferron Creeks and flows
32 southeastward toward its confluence with the Green River. The San Rafael River is the last major
33 tributary of the Green River before the latter joins the Colorado River in Canyonlands National Park.
34 Except for brief, high-intensity monsoonal storms, stream flow within the San Rafael River depends upon
35 runoff from the nearby mountains. The average base flow in the analysis area is about 127 cfs, with
36 average daily stream flows ranging from 34 cfs in January to 600 cfs in early June (USGS 2017b).

37 The Dirty Devil River is in the southern portion of the analysis area, just outside the planning area. The
38 river forms at the confluence of the Fremont River and Muddy Creek and runs for approximately 80
39 miles, flowing southeast in the analysis area and then south to meet the Colorado River. Average daily
40 stream flows range from 36 to 160 cfs, with an average base flow of about 100 cfs (USGS 2017c).

41 ### *Streams*

42 Within the analysis area are 2,500 miles of intermittent streams and stream segments, with an additional
43 70 miles of perennial streams and stream segments that flow year round (Map 2-11). These streams are
44 mainly fed by springs and seeps, are enhanced seasonally by snowmelt and monsoonal flood flows, drain
45 the analysis area, and flow into the Green, Dirty Devil, and San Rafael Rivers. The named stream
46 segments within the analysis area and their watersheds are listed in Table 3-10.

1    **Table 3-10. Named Streams within the Analysis Area**

| Watershed | Stream | Perennial/Intermittent | Miles within Analysis Area |
|---|---|---|---|
| Dugout Creek | Dugout Creek | Intermittent | 18.90 |
| Horseshoe Canyon | Barrier Creek | Perennial | 20.10 |
| Moonshine Wash | Antelope Valley Wash | Intermittent | 21.20 |
| Outlet Muddy Creek | Muddy Creek | Perennial | 15.70 |
| Outlet Muddy Creek | Wild Horse Creek | Intermittent | 0.03 |
| Upper Dirty Devil River | Fremont River | Perennial | 0.10 |

2    *Springs/Seeps*

3    Springs and seeps are important sources of water in isolated areas, providing water for wildlife and
4    grazing as well as supporting riparian vegetation and wildlife habitats. These water sources are directly
5    related to groundwater and are affected by changes to groundwater water quality conditions or flow
6    conditions. Spring flows often have seasonal and annual variations with a delayed response to recharge
7    conditions. This delay may be short term, with quick responses to drought conditions, or may be long
8    term, with changes taking years to appear. Seep and spring locations are shown on Map 2-11.

9    *100-Year Floodplains*

10    Washes and their associated floodplains convey stormwater runoff through the watersheds to the Green,
11    Dirty Devil, and San Rafael Rivers. Each wash or drainage has an adjacent floodplain that is essential for
12    conveying stormwater runoff, especially during substantial precipitation events. The 100-year floodplain
13    is the floodplain that conveys stormwater runoff for a 100-year flood event, a flood event that has a 1%
14    probability of occurring in any given year. Based on the expected 100-year flood flow rate in a given
15    drainage, the 100-year floodplain is the area of inundation. The locations of these 100-year floodplains
16    vary depending on topography, floodplain, and channel profile (widths, depths). Specific mapping of the
17    100-year floodplains has not been completed in the planning area. However, modeling and analysis to
18    identify the floodplain can be completed to inform the analysis and authorization of surface disturbances
19    on BLM-administered public lands at the time surface use authorizations are requested. In order to protect
20    floodplains and reduce erosion and associated sedimentation, the Price and Richfield Field Offices'
21    ROD/RMPs restrict surface-disturbing activities within these 100-year floodplains.

22    **Surface Water Quality**

23    Natural processes and human actions influence the chemical, physical, and biological characteristics of
24    surface water, which can vary seasonally. Indicators of water quality include but are not limited to:

25    • Chemical characteristics (e.g., pH, conductivity, dissolved oxygen, dissolved solids, salinity),

26    • Physical characteristics (e.g., suspended sediments, temperature, and turbidity), and

27    • Biological characteristics (e.g., macro-invertebrate communities, bacteria levels, algae and fish
28      species).

Potential concerns with water quality within the analysis area can include high stream temperatures, low dissolved-oxygen levels, high sediment loads, high nutrient levels, high levels of TDS, and salinity. High stream temperatures and low dissolved-oxygen levels are associated with low stream flow conditions but can result from lack of riparian vigor and shading. High sediment loads are often associated with natural flood events but can be increased by surface disturbances upstream in the watershed.

**Impaired Waters/ Total Maximum Daily Load Reports**

With sufficient data, UDEQ can determine whether a stream meets state standards. If a problem is documented in a stream segment, that segment will be included by the State of Utah on the List of Impaired Waters of Utah (303[d] list) submitted to the EPA every 2 years. Then a study will be required to determine how to reduce pollutants and restore all beneficial uses. Such as study is called a Total Maximum Daily Load (TMDL), and it establishes the maximum amount of a pollutant allowed in the water while maintaining all of its designated beneficial uses. Three water bodies within the analysis area were determined by UDEQ to be impaired: the San Rafael River, the Dirty Devil River, and the Freemont River.

The San Rafael River, the only impaired water within the planning area, was listed in 2010 for impairment to the OE bioassessment standard (comparing the observed macroinvertebrate composition to what the expected macroinvertebrate composition would be without human influence on the river) and in 2016 for impairment to the TDS standard. A TMDL for the West Colorado Watershed Management Unit, including the Price River, San Rafael River, and Muddy Creek, was approved by the State of Utah, Division of Water Quality, in 2004 for TDS. The lower San Rafael River is considered to be non-supporting of the Beneficial Use Class 4 - Agriculture. The criterion for TDS in streams is 1,200 mg/L for waters for agricultural use. Mean TDS for the Lower San Rafael River is 2,549 mg/L (UDWQ 2004). These high TDS concentrations are attributed to continual loading from natural sources, inflows, and irrigation return flows. The San Rafael River was also included on the 303(d) list for the bioassessment standard for not supporting Beneficial Use Classification 3C – Nongame fish and other aquatic life. A TMDL for this classification has not been developed.

The Freemont River has an approved TMDL for the Freemont River Watershed, approved in 2002. The Fremont River is considered to be non-supporting of the agricultural beneficial use classification because the river has high levels of TDS. Mean TDS levels are 1,095, but 23% of the samples exceeded the criterion of 1,200 mg/L. TDS levels generally exceed target levels only during the summer months, when flow levels are low (UDWQ 2002).

The Dirty Devil River is also considered non-supporting of the agricultural beneficial use classification because the river has high levels of TDS. The river does not have an approved TMDL.

## *Salinity*

High salinity levels in surface waters are a water quality concern of national significance recognized in the Colorado River Basin Salinity Control Act of 1974. Salinity contributions are from both point sources and nonpoint sources. During low-flow periods, salt contribution comes solely from point sources, including seeps, springs, and groundwater flow. During high-flow periods, non-point sources, including erosion of saline soils, become major contributors to salinity problems.

The primary nonpoint sources of salinity in the analysis area are the diffuse overland runoff from saline soils and erosion and transport of saline soils during flow events. The Mancos Shale is recognized as the largest contributor of nonpoint salinity in the Upper Colorado River Basin (Laronne 1977). Approximately 56,186 acres of Mancos Shale-derived soils are in the northern portion of the analysis area. Any surface disturbance on these soils increases erosion and associated salinity and sediment loading to the Colorado River Basin, especially when the soils are wet and easily compacted.

**Groundwater**

Groundwater resources vary in quality, quantity, and depths throughout the analysis area. Groundwater is the source of water for most springs and seeps as well as some streams in the analysis area, supporting riparian resources and wildlife habitat. Groundwater wells within the analysis area provide water to livestock and wildlife, while water wells in communities adjacent to the planning area are important sources of public drinking water.

Changes to groundwater conditions such as water quality, quantity, or depth can affect surface water resources over time. Likewise, groundwater resources, recharged by infiltration of snowmelt, rainwater, and sometimes stream flows, can be affected by surface-water conditions and climatic variations.

*Aquifers*

Of the geologic units present in the analysis area, five are considered to be major aquifers because of their large areal extent or thickness or their potential for locally large yields to individual wells. These units are the Entrada Sandstone, Navajo Sandstone, Wingate Sandstone, Coconino Sandstone, and rocks of the Mississippian age. The Navajo Sandstone is regionally the most shallow and permeable and contains the best quality water (Hood and Patterson 1984). Several other geologic units in the analysis area also are aquifers, but they are restricted in potential development owing to their thinness, distribution of permeable zones, or chemical quality of water. They include older alluvium, the Salt Wash Sandstone Member of the Morrison Formation, the Curtis Sandstone, the Carmel Formation, and the Moss Back Member of the Chinle Formation (Hood and Patterson 1984).

The Carmel Formation is also important to the groundwater hydrology of the area, as the unit is widely exposed and can receive recharge directly. The formation overlies the Navajo Sandstone and can supply water to or receive water from the Navajo Sandstone. The Carmel Formation also contains large amounts of evaporates that contribute to the deterioration of the chemical quality of both groundwater and surface waters in the area (Hood and Patterson 1984).

Groundwater recharge occurs from precipitation. Water use from groundwater is primarily for livestock watering and mining use (Hood and Patterson 1984). No public water system facilities or groundwater protection zones exist in the analysis area. Groundwater in the area is too saline for municipal use.

*Monitoring*

Groundwater monitoring is under way within the analysis area and is conducted by the USGS Division of Water Resources. The monitoring involves measuring artesian or pumped flows and water chemistry parameters on select water wells in the analysis area. These wells are revisited on a regular basis over a period of several years. The USGS has sampled a water well near State Route 24 and Lower San Rafael Road several times in the past decade, measuring depth to water surface, which averages 326 feet below land surface.

**Water Rights**

The administration of water rights is the responsibility of the Utah State Division of Water Rights. The planning area is located in Water Right Area 93. There are a total of 306 active water-rights applications filed on water sources, both groundwater and surface water sources, within the analysis area. The BLM has 32 approved water right applications on water sources located on BLM lands (DEQ 2017). These water rights are primarily used for livestock and wildlife purposes.

### 3.5.1.2     Riparian

Riparian and wetland areas are sensitive vegetative or physical ecosystems that develop in association with surface or subsurface water (Leonard et al. 1992). Riparian/wetland habitats are fragile resources and are often among the first landscape features to reflect impacts from management activities. These habitats are used as indicators of overall land health and watershed condition. Healthy riparian systems filter and purify water, reduce sediment loads and enhance soil stability, reduce destructive energies associated with flood events, provide physical and thermal micro-climates in contrast to surrounding uplands, and contribute to groundwater recharge and base flow (BLM 1991).

Riparian and wetland areas in the analysis area include but are not limited to areas adjacent to waterways with either perennial or intermittent flows, areas with surface and/or subsurface water, springs, seeps, and ponds. Riparian areas are recognized as "a form of wetland transition" between permanently saturated wetlands and upland areas (Leonard et al. 1992). Riparian and wetland ecosystems are classified by type based on hydrologic, geomorphologic, and biological factors (Cowardin et al. 1979).

Riparian resources account for 10,709 acres within the analysis area and 4,215 acres within the planning area for a total of less than 1% of lands in the planning area (Map 2-11). The majority of these resources are located along the Green River and the San Rafael River. Vegetation in the riparian areas consists of the SWReGAP Invasive Southwest Riparian Woodland and Shrubland community, which is dominated by introduced riparian woody species such as tamarisk and Russian olive (*Eleagnus angustifolius*), and the Rocky Mountain Lower Montane Riparian Woodland and Shrubland community, which is typically dominated by trees such as Fremont cottonwood (*Populus fremontii*), willow species (*Salix* spp.), and box elder (*Acer negundo*), as well as sedges, rushes, and grasses.

Tamarisk are invasive trees that have become established on many rivers, tributaries, and drainages throughout the West. Tamarisk out-compete native species, forming dense monocultures that crowd and shade out native riparian forage, resulting in reduced plant and wildlife diversity. Tamarisk establishes dense communities in corridors bordering the riparian waterways that close off access to recreational opportunities such as fishing and bird watching. Dense thickets produce an aggressive fuels accumulation and create wildfire hazards along drainages and rivers. Tamarisk has had a negative impact on the San Rafael River, including loss of habitat biodiversity, aggressive fuels accumulation, and river channel narrowing. Tamarisk are concentrated along the San Rafael River and floodplain. The density of the tamarisk result in is minimal native vegetation in the associated understory. The tamarisk beetle *(Diorahbda elongata)* has existed in the project area for several years and has defoliated and continues to defoliate the majority of the tamarisk. In some areas where the tamarisk beetle has defoliated the tamarisk, willows are starting to reestablish on the banks of the river.

Both the Price and Richfield Field Offices' ROD/RMPs include decisions to avoid surface-disturbing activities near springs and riparian areas. The Richfield Field Office ROD/RMP specifies no disturbance within 100 m (330 feet) of natural springs, and the Price Field Office ROD/RMP states that a 200-m (660-foot) buffer will be maintained around springs. The Price Field Office ROD/RMP also specifies no surface disturbance within 100 m of riparian areas, floodplains, springs, or other water features. These decisions apply to all oil and gas exploration, drilling, and development activities, including access roads and pipelines.

## 3.5.2     Resource Trends

### 3.5.2.1     Water

Surface water in the analysis area continues to be used for agriculture and recreation. Water quality conditions have remained steady. A TMDL was developed for the San Rafael River in 2004 for TDS, but the river has remained on the 303(d) list for non-attainment of that standard. Agricultural use upstream of the analysis area is one of the main contributors of TDS.

1  Groundwater use remains low in the analysis area, as the water is too saline for domestic purposes. With
2  few uses in the analysis area, water quality is not heavily monitored and likely remains steady.

### 3.5.2.2    Riparian

4  In 2015, BLM began implementing the San Rafael River Restoration Project. The project was designed to
5  improve the ecological condition of the lower San Rafael River, which has degraded severely over time
6  through a combination of impacts, including altered flow regimes and non-native vegetation
7  encroachment. Implementation of the project will improve the riparian habitat in the planning area.

## 3.6    VEGETATION

9  The analysis area for vegetation resources is the subwatersheds (HUC 12) crossed by the planning area
10  (Map 3-1). The analysis area covers approximately 901,313 acres and was selected because it represents a
11  natural boundary within which changes in vegetation within the planning area could affect soil, water,
12  other vegetation, or other resources on BLM-administered public lands.

13  Vegetation in the planning area provides benefits for wildlife and livestock such as forage and browse,
14  cover, and nesting habitat for a variety of wildlife species. Vegetation also functions in the hydrologic
15  cycle as a dynamic interface between the soil and atmosphere. It intercepts precipitation, retards overland
16  flow, retains soil moisture and nutrients (root absorption), and transports water and nutrients back to the
17  atmosphere via stems and leaves (evapotranspiration). Vegetation is also contributes to the aesthetic
18  setting for visitors to the planning area.

19  The State of Utah is divided into five major eco-regions determined by geographic and climatic similarity.
20  The planning area occurs entirely within the Colorado Plateau eco-region. The climate and geology of the
21  Colorado Plateau allow for the growth of many endemic and rare plant species and, thus, a substantial
22  amount of biodiversity.

### 3.6.1    Resource Conditions

### 3.6.1.1    Vegetation Communities

25  Vegetation communities across the analysis area were identified using land cover data developed by the
26  Southwest Regional Gap Analysis Project (SWReGAP) (Prior-Magee et al. 2007). SWReGAP land cover
27  data were intended to be used for depicting the distribution of various land cover types at scales of
28  1:100,000 or smaller. While adequate for characterizing land cover and vegetation over large areas, these
29  data are less accurate when viewed for smaller, localized areas.

30  The land cover types within the planning area are listed in Table 3-11 and are displayed on Map 3-2.
31  Cover types are described in the sections following Table 3-11 (USGS 2005). The cover types that do not
32  have significant native vegetation (Open Water, Disturbed, and Developed areas) are presented in the
33  table but are not discussed in this document.

1   **Table 3-11. Land Cover Types in the Vegetation Analysis Area**

| Land Cover Type | Planning Area (acres) | Analysis Area (acres) | Analysis Area (percentage) |
|---|---|---|---|
| Agriculture | 20 | 559 | 0.1% |
| Colorado Plateau Blackbrush-Mormon-Tea Shrubland | 229,652 | 314,179 | 34.9% |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | 37,080 | 134,509 | 14.9% |
| Colorado Plateau Pinyon-Juniper Shrubland | 1,802 | 19,592 | 2.2% |
| Colorado Plateau Pinyon-Juniper Woodland | 415 | 2,432 | 0.3% |
| Developed, Medium - High Intensity | 466 | 870 | 0.1% |
| Developed, Open Space - Low Intensity | 104 | 505 | 0.1% |
| Disturbed, Oil Well | 7 | 61 | 0.0% |
| Inter-Mountain Basins Active and Stabilized Dune | 113,419 | 147,950 | 16.4% |
| Inter-Mountain Basins Big Sagebrush Shrubland | 115 | 5,566 | 0.6% |
| Inter-Mountain Basins Greasewood Flat | 12,570 | 19,928 | 2.2% |
| Inter-Mountain Basins Mat Saltbush Shrubland | 56,032 | 105,269 | 11.7% |
| Inter-Mountain Basins Mixed Salt Desert Scrub | 9,407 | 20,734 | 2.3% |
| Inter-Mountain Basins Semi-Desert Grassland | 15,779 | 26,230 | 2.9% |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 10,100 | 20,601 | 2.3% |
| Inter-Mountain Basins Shale Badland | 9,796 | 30,014 | 3.3% |
| Invasive Annual and Biennial Forbland | 1,495 | 2,770 | 0.3% |
| Invasive Annual Grassland | 3 | 22 | 0.0% |
| Invasive Southwest Riparian Woodland and Shrubland | 4,043 | 9,523 | 1.1% |
| Open Water | 956 | 3,815 | 0.4% |
| Rocky Mountain Cliff and Canyon | 0 | 7 | 0.0% |
| Rocky Mountain Gambel Oak-Mixed Montane Shrubland | 0 | 12 | 0.0% |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 173 | 1,186 | 0.1% |
| Southern Colorado Plateau Sand Shrubland | 22,743 | 34,978 | 3.9% |

2   ## Agriculture

3   The agriculture landcover type includes both pasture/hay (areas of grasses, legumes, or grass-legume
4   mixtures planted for livestock grazing or the production of seed or hay crops, typically on a perennial
5   cycle, where pasture/hay vegetation accounts for greater than 20% of total vegetation) and Cultivated
6   crops (areas used for the production of annual crops, such as corn, soybeans, vegetables, tobacco, and
7   cotton, and also perennial woody crops such as orchards and vineyards, where crop vegetation accounts
8   for greater than 20% of total vegetation). This cover type also includes all land being actively tilled.

**Colorado Plateau Blackbrush-Mormon-Tea Shrubland**

This ecological system occurs on the Colorado Plateau on benchlands, colluvial slopes, pediments, or bajadas. Elevation ranges from 560 to 1,650 m above sea level. Substrates are shallow, typically calcareous, non-saline, and gravelly or sandy soils over sandstone or limestone bedrock, caliche, or limestone alluvium. This ecological system also occurs in deeper soils on sandy plains where it may have invaded desert grasslands. The vegetation is characterized by extensive open shrublands dominated by *Coleogyne ramosissima* often with *Ephedra viridis*, *Ephedra torreyana*, or *Grayia spinosa*. Sandy portions may include *Artemisia filifolia* as codominant. The herbaceous layer is sparse and composed of graminoids such as *Achnatherum hymenoides*, *Pleuraphis jamesii*, or *Sporobolus cryptandrus*.

**Colorado Plateau Mixed Bedrock Canyon and Tableland**

The distribution of this ecological system is centered on the Colorado Plateau where it is composed of barren and sparsely vegetated landscapes (generally <10% plant cover) of steep cliff faces, narrow canyons, and open tablelands of predominantly sedimentary rocks, such as sandstone, shale, and limestone. Some eroding shale layers similar to Inter-Mountain Basins Shale Badland may be interbedded between the harder rocks. The vegetation is characterized by very open tree canopy or scattered trees and shrubs with a sparse herbaceous layer. Common species includes *Pinus edulis*, *Pinus ponderosa*, *Juniperus* spp., *Cercocarpus intricatus*, and other short-shrub and herbaceous species that utilize moisture from cracks and pockets where soil accumulates.

**Colorado Plateau Pinyon-Juniper Shrubland**

This ecological system is characteristic of the rocky mesa tops and slopes on the Colorado Plateau and western slope of Colorado, but these stunted tree shrublands may extend farther upslope along the low-elevation margins of taller pinyon-juniper woodlands. Sites are drier than those in the Colorado Plateau Pinyon-Juniper Woodland. Substrates are shallow and rocky with shaley soils at lower elevations (1,200–2,000 m). Localized patches of this system grade into Colorado Plateau Mixed Bedrock Canyon and Tableland. The vegetation is dominated by dwarfed (usually <3 m tall) *Pinus edulis* and/or *Juniperus osteosperma* trees forming extensive, tall shrublands in the region along low-elevation margins of pinyon-juniper woodlands. Other shrubs may include *Artemisia nova*, *Artemisia tridentata* ssp. *wyomingensis*, *Chrysothamnus viscidiflorus*, and *Coleogyne ramosissima*. Herbaceous layers are sparse to moderately dense and typically composed of xeric graminoids.

**Colorado Plateau Pinyon-Juniper Woodland**

This ecological system occurs in the dry mountains and foothills of the Colorado Plateau including the Western Slope of Colorado to the Wasatch Range, south to the Mogollon Rim and east into the northwestern corner of New Mexico. It is typically found at lower elevations ranging from 1,500 to 2,440 m above sea level. These woodlands occur on warm, dry sites on mountain slopes, mesas, plateaus, and ridges. Severe climatic events, such as freezing temperatures and drought, that occur during the growing season are thought to limit the distribution of pinyon-juniper woodlands to relatively narrow altitudinal belts on mountainsides. Soils supporting this system vary in texture ranging from stony, cobbly, gravelly sandy loams to clay loam or clay. *Pinus edulis* and/or *Juniperus osteosperma* dominate the tree canopy. In the southern portion of the Colorado Plateau in northern Arizona and northwestern New Mexico, *Juniperus monosperma* and hybrids of *Juniperus* spp. may dominate or codominate the tree canopy. *Juniperus scopulorum* may codominate or replace *Juniperus osteosperma* at higher elevations. Understory layers are variable and may be dominated by shrubs or graminoids, or may be absent. Associated species include *Arctostaphylos patula*, *Artemisia tridentata*, *Cercocarpus intricatus*, *Cercocarpus montanus*, *Coleogyne ramosissima*, *Purshia stansburiana*, *Purshia tridentata*, *Quercus gambelii*, *Bouteloua gracilis*, *Pleuraphis jamesii*, or *Poa fendleriana*. This system occurs at higher

1 elevations than Great Basin Pinyon-Juniper Woodland and Colorado Plateau shrubland systems where
2 sympatric.

### Inter-Mountain Basins Active and Stabilized Dune

4 This ecological system occurs in Intermountain West basins and is composed of unvegetated to
5 moderately vegetated (<10%–30% plant cover) active and stabilized dunes and sandsheets. Species
6 occupying these environments are often adapted to shifting, coarse-textured substrates (usually quartz
7 sand) and form patchy or open grasslands, shrublands, or steppe composed of *Achnatherum hymenoides*,
8 *Artemisia filifolia*, *Artemisia tridentata* ssp. *tridentata*, *Atriplex canescens*, *Ephedra* spp., *Coleogyne*
9 *ramosissima*, *Ericameria nauseosa*, *Leymus flavescens*, *Prunus virginiana*, *Psoralidium lanceolatum*,
10 *Purshia tridentata*, *Sporobolus airoides*, *Tetradymia tetrameres*, or *Tiquilia* spp.

### Inter-Mountain Basins Big Sagebrush Shrubland

12 This ecological system occurs throughout much of the western United States, typically in broad basins
13 between mountain ranges, plains, and foothills at elevations between 1,500 and 2,300 m above sea level.
14 Soils are typically deep, well drained, and non-saline. These shrublands are dominated by *Artemisia*
15 *tridentata* ssp. *tridentata* and/or *Artemisia tridentata* ssp. *wyomingensis*. Scattered *Juniperus* spp.,
16 *Sarcobatus vermiculatus*, and *Atriplex* spp. may be present in some stands. *Ericameria nauseosa*,
17 *Chrysothamnus viscidiflorus*, *Purshia tridentata*, or *Symphoricarpos oreophilus* may codominate
18 disturbed stands. Perennial herbaceous components typically contribute less than 25% vegetative cover.
19 Common graminoid species include *Achnatherum hymenoides*, *Bouteloua gracilis*, *Elymus lanceolatus*,
20 *Festuca idahoensis*, *Hesperostipa comata*, *Leymus cinereus*, *Pleuraphis jamesii*, *Pascopyrum smithii*, *Poa*
21 *secunda*, or *Pseudoroegneria spicata*.

### Inter-Mountain Basins Greasewood Flat

23 This ecological system occurs throughout much of the western United States in Intermountain basins and
24 extends onto the western Great Plains. It typically occurs near drainages on stream terraces and flats or
25 may form rings around more sparsely vegetated playas. Sites typically have saline soils and a shallow
26 water table; they may flood intermittently but remain dry for most growing seasons. The water table
27 remains high enough to maintain vegetation, despite salt accumulations. This system usually occurs as a
28 mosaic of multiple communities, with open to moderately dense shrublands dominated or codominated by
29 *Sarcobatus vermiculatus*. *Atriplex canescens*, *Atriplex confertifolia*, or *Krascheninnikovia lanata* may be
30 present to codominant. Occurrences are often surrounded by mixed salt desert scrub. The herbaceous
31 layer, if present, is usually dominated by graminoids. There may be inclusions of *Sporobolus airoides*,
32 *Distichlis spicata* (where water remains ponded the longest), or *Eleocharis palustris*.

### Inter-Mountain Basins Mat Saltbush Shrubland

34 This ecological system occurs on gentle slopes and rolling plains on the northern Colorado Plateau and in
35 the Uinta Basin on Mancos Shale and in arid, wind-swept basins and plains across parts of Wyoming.
36 Substrates are shallow, typically saline, alkaline, fine-textured soils developed from shale or alluvium and
37 may be associated with shale badlands. Infiltration rate is typically low. These landscapes typically
38 support dwarf-shrublands composed of relatively pure stands of *Atriplex* spp. such as *Atriplex corrugata*
39 or *Atriplex gardneri*. Other dominant or codominant dwarf-shrubs may include *Artemisia longifolia*,
40 *Artemisia pedatifida*, or *Picrothamnus desertorum*, sometimes with a mix of other low shrubs such as
41 *Krascheninnikovia lanata* or *Tetradymia spinosa*. *Atriplex confertifolia* or *Atriplex canescens* may be
42 present, but they do not codominate. The herbaceous layer is typically sparse. Scattered perennial forbs
43 occur, such as *Xylorhiza glabriuscula* and *Sphaeralcea grossulariifolia*, and the perennial grasses
44 *Achnatherum hymenoides*, *Bouteloua gracilis*, *Elymus elymoides*, *Elymus lanceolatus* ssp. *lanceolatus*,
45 *Pascopyrum smithii*, or *Sporobolus airoides* may dominate the herbaceous layer. In less-saline areas,

---

1 there may be inclusions grasslands dominated by *Hesperostipa comata*, *Leymus salinus*, *Pascopyrum*
2 *smithii*, or *Pseudoroegneria spicata*. In Wyoming and possibly elsewhere, inclusions of non-saline,
3 gravelly barrens or rock outcrops dominated by cushion plants such as *Arenaria hookeri* and *Phlox hoodii*
4 without dwarf-shrubs may be present. Annuals are seasonally present and may include *Eriogonum*
5 *inflatum*, *Plantago tweedyi*, and the introduced annual grass *Bromus tectorum*.

## Inter-Mountain Basins Mixed Salt Desert Scrub

7 This extensive ecological system includes open-canopied shrublands of typically saline basins, alluvial
8 slopes, and plains across the Intermountain western United States. This type also extends in limited
9 distribution into the southern Great Plains. Substrates are often saline and calcareous, medium- to fine-
10 textured, alkaline soils, but they include some coarser-textured soils. The vegetation is characterized by a
11 typically open to moderately dense shrubland composed of one or more *Atriplex* species such as *Atriplex*
12 *confertifolia*, *Atriplex canescens*, *Atriplex polycarpa*, or *Atriplex spinifera*. Other shrubs that codominate
13 may include *Artemisia tridentata* ssp. *wyomingensis*, *Chrysothamnus viscidiflorus*, *Ericameria nauseosa*,
14 *Ephedra nevadensis*, *Grayia spinosa*, *Krascheninnikovia lanata*, *Lycium* spp., *Picrothamnus desertorum*,
15 or *Tetradymia* spp. *Sarcobatus vermiculatus* is generally absent but, if present, does not codominate. The
16 herbaceous layer varies from sparse to moderately dense and is dominated by perennial graminoids such
17 as *Achnatherum hymenoides*, *Bouteloua gracilis*, *Elymus lanceolatus* ssp. *lanceolatus*, *Pascopyrum*
18 *smithii*, *Pleuraphis jamesii*, *Pleuraphis rigida*, *Poa secunda*, or *Sporobolus airoides*. Various forbs are
19 also present.

## Inter-Mountain Basins Semi-Desert Grassland

21 This widespread ecological system occurs throughout the Intermountain western United States on dry
22 plains and mesas at elevations ranging from 1,450 m to 2,320 m. These grasslands occur in lowland and
23 upland areas and may occupy swales, playas, mesa tops, plateau parks, alluvial flats, and plains, but sites
24 are typically xeric. Substrates are often well-drained sandy or loamy soils derived from sedimentary
25 parent materials but are quite variable and may include fine-textured soils derived from igneous and
26 metamorphic rocks. The dominant perennial bunch grasses and shrubs within this system are all very
27 drought resistant. These grasslands are typically dominated or codominated by *Achnatherum hymenoides*,
28 *Aristida* spp., *Bouteloua gracilis*, *Hesperostipa comata*, *Muhlenbergia* sp., or *Pleuraphis jamesii*, and
29 may include scattered shrubs and dwarf-shrubs of species of *Artemisia*, *Atriplex*, *Coleogyne*, *Ephedra*,
30 *Gutierrezia*, or *Krascheninnikovia lanata*.

## Inter-Mountain Basins Semi-Desert Shrub Steppe

32 This ecological system occurs throughout the Intermountain western United States, typically at lower
33 elevations on alluvial fans and flats with moderate to deep soils. This semi-arid shrub-steppe is typically
34 dominated by graminoids (>25% cover) with an open shrub layer. Characteristic grasses include
35 *Achnatherum hymenoides*, *Bouteloua gracilis*, *Distichlis spicata*, *Hesperostipa comata*, *Pleuraphis*
36 *jamesii*, *Poa secunda*, and *Sporobolus airoides*. The woody layer is often a mixture of shrubs and dwarf-
37 shrubs. Characteristic species include *Atriplex canescens*, *Artemisia tridentata*, *Chrysothamnus greenei*,
38 *Chrysothamnus viscidiflorus*, *Ephedra* spp., *Ericameria nauseosa*, *Gutierrezia sarothrae*, and
39 *Krascheninnikovia lanata*. *Artemisia tridentata* may be present but does not dominate. The general aspect
40 of occurrences may be either open shrubland with patchy grasses or a patchy open herbaceous layer.
41 Disturbance may be important in maintaining the woody component. Microphytic crust is very important
42 in some stands.

**Inter-Mountain Basins Shale Badland**

This widespread ecological system of the Intermountain western United States is composed of barren and sparsely vegetated substrates (<10% plant cover) typically derived from marine shales, but it also includes substrates derived from siltstones and mudstones (clay). Landforms are typically rounded hills and plains that form a rolling topography. The harsh soil properties and high rate of erosion and deposition are driving environmental variables supporting sparse dwarf-shrubs (e.g., *Atriplex corrugata*, *Atriplex gardneri*, and *Artemisia pedatifida*) and herbaceous vegetation.

**Invasive Annual and Biennial Forbland**

These areas are dominated by introduced annual and/or biennial forb species such as *Halogeton glomeratum*, *Kochia scoparia*, and *Salsola* spp.

**Invasive Annual Grassland**

These areas are dominated by introduced annual grass species such as *Avena* spp., *Bromus* spp., and *Schismus* spp.

**Invasive Southwest Riparian Woodland and Shrubland**

These areas are dominated by introduced riparian woody species such as *Tamarix* spp. and *Elaeagnus angustifolius*.

**Rocky Mountain Cliff and Canyon**

This ecological system of barren and sparsely vegetated landscapes (generally <10% plant cover) is found from foothill to subalpine elevations on steep cliff faces, narrow canyons, and smaller rock outcrops of various igneous, sedimentary, and metamorphic bedrock types. It is located throughout the Rocky Mountains and northeastern Cascade Ranges in North America. Also included are unstable scree and talus slopes that typically occur below cliff faces. This system may include small patches of dense vegetation, but it typically includes scattered trees and/or shrubs. Characteristic trees include *Pseudotsuga menziesii*, *Pinus ponderosa*, *Pinus flexilis*, *Populus tremuloides*, *Abies concolor*, *Abies lasiocarpa*, or *Pinus edulis* and *Juniperus* spp. at lower elevations. Scattered shrubs such as species of *Holodiscus*, *Ribes*, *Physocarpus*, *Rosa*, and *Juniperus; Jamesia americana*; *Mahonia repens*; *Rhus trilobata*; and *Amelanchier alnifolia* may be present. Soil development is limited, as is herbaceous cover.

**Rocky Mountain Gambel Oak-Mixed Montane Shrubland**

This ecological system occurs in the mountains, plateaus, and foothills in the southern Rocky Mountains and Colorado Plateau including the Uinta and Wasatch Ranges and the Mogollon Rim. These shrublands are most commonly found along dry foothills, lower mountain slopes, and at the edge of the western Great Plains at elevations ranging from 2,000 to 2,900 m above sea level, and they are often situated above pinyon-juniper woodlands. Substrates are variable and include soil types ranging from calcareous, heavy, fine-grained loams to sandy loams, gravelly loams, clay loams, deep alluvial sand, and coarse gravel. The vegetation is typically dominated by *Quercus gambelii* alone or codominant with *Amelanchier alnifolia*, *Amelanchier utahensis*, *Artemisia tridentata*, *Cercocarpus montanus*, *Prunus virginiana*, *Purshia stansburiana*, *Purshia tridentata*, *Robinia neomexicana*, *Symphoricarpos oreophilus*, or *Symphoricarpos rotundifolius*. There may be inclusions of other mesic montane shrublands with *Quercus gambelii* absent or as a relatively minor component. This ecological system intergrades with the lower montane-foothills shrubland system and shares many of the same site characteristics. Density and cover of *Quercus gambelii* and *Amelanchier* spp. often increase after fire.

**Rocky Mountain Lower Montane Riparian Woodland and Shrubland**

This system is found throughout the Rocky Mountain and Colorado Plateau regions within a broad elevation range from 900 to 2,800 m above sea level. This system often occurs as a mosaic of multiple communities that are tree-dominated with a diverse shrub component. This system is dependent on a natural hydrologic regime, especially annual to episodic flooding. Occurrences are found within the flood zones of rivers, on islands, on sand or cobble bars, and on immediate streambanks. They can form large, wide occurrences on mid-channel islands in larger rivers or narrow bands on small, rocky canyon tributaries and well-drained benches. This system is also typically found in backwater channels and other perennially wet but less-scoured sites such as floodplains swales and irrigation ditches. Dominant trees may include *Acer negundo*, *Populus angustifolia*, *Populus balsamifera*, *Populus deltoides*, *Populus fremontii*, *Pseudotsuga menziesii*, *Picea pungens*, *Salix amygdaloides*, and *Juniperus scopulorum*. Dominant shrubs include *Acer glabrum*, *Alnus incana*, *Betula occidentalis*, *Cornus sericea*, *Crataegus rivularis*, *Forestiera pubescens*, *Prunus virginiana*, *Rhus trilobata*, *Salix monticola*, *Salix drummondiana*, *Salix exigua*, *Salix irrorata*, *Salix lucida*, *Shepherdia argentea*, and *Symphoricarpos* spp. Exotic trees of *Elaeagnus angustifolia* and *Tamarix* spp. are common in some stands. Generally, the upland vegetation surrounding this riparian system is different and ranges from grasslands to forests.

**Southern Colorado Plateau Sand Shrubland**

This large-patch ecological system is found on the south-central Colorado Plateau in northeastern Arizona and extends into southern and central Utah. It occurs on windswept mesas, in broad basins, and on plains at low to moderate elevations (1,300–1,800 m above sea level). Substrates are stabilized sandsheets or shallow to moderately deep sandy soils that may form small hummocks or small coppice dunes. This semi-arid, open shrubland is typically dominated by short shrubs (10–30% cover) with a sparse graminoid layer. The woody layer is often a mixture of shrubs and dwarf-shrubs. Characteristic species include *Ephedra cutleri*, *Ephedra torreyana*, *Ephedra viridis*, and *Artemisia filifolia*. *Coleogyne ramosissima* is typically not present. *Poliomintha incana*, *Parryella filifolia*, *Quercus havardii* var. *tuckeri*, or *Ericameria nauseosa* may be present or dominant locally. *Ephedra cutleri* and *Ephedra viridis* often assume a distinctive matty growth form. Characteristic grasses include *Achnatherum hymenoides*, *Bouteloua gracilis*, *Hesperostipa comata*, and *Pleuraphis jamesii*. The general aspect of occurrences is an open low shrubland but may include small blowouts and dunes. Occasionally, grasses may be moderately abundant locally and form a distinct layer. Disturbance may be important in maintaining the woody component. Aeolian processes are evident in the form of pedicelled plants, occasional blowouts, or small dunes, but the generally higher vegetative cover and less-prominent geomorphic features distinguish this system from Inter-Mountain Basins Active and Stabilized Dune.

### 3.6.1.2   *Invasive Species and Noxious Weeds*

One of the BLM's highest priorities is to promote ecosystem health, and one of the greatest obstacles to achieving this goal is the rapid expansion of invasive, non-native species or weeds across public lands. A noxious weed is any plant designated by a federal, state, or county government as injurious to public health, agriculture, recreation, wildlife, or property. Noxious weeds are capable of invading plant communities and replacing native species, and they are particularly successful following a disturbance. If not eradicated or controlled, noxious and invasive weeds could jeopardize the health of the public lands and the myriad activities that occur there.

Noxious weeds are designated and regulated by various state and federal laws. The State of Utah Commissioner of Agriculture and Food has designated a list of noxious weeds (State of Utah 2016) (Table 3-12). The Emery County Weed Board has also identified one species (Russian olive [*Elaeagnus angustifolia*]) as noxious in Emery County. Wayne County has not identified any county noxious weeds.

1    **Table 3-12. Designated Noxious Weeds in Utah**

| Common Name | Scientific Name | Classification* |
|---|---|---|
| Common crupina | *Crupina vulgaris* | 1A |
| African rue | *Peganum harmala* | 1A |
| Small bugloss | *Anchusa arvensis* | 1A |
| Mediterranean sage | *Salvia aethiopis* | 1A |
| Spring millet | *Milium vernale* | 1A |
| Syrian beancaper | *Zygophyllum fabago* | 1A |
| Ventenata (North Africa grass) | *Ventenata dubia* | 1A |
| Plumeless thistle | *Carduus acanthoides* | 1A |
| Malta starthistle | *Centaurea melitensis* | 1A |
| Camelthorn | *Alhagi maurorum* | 1B |
| Garlic mustard | *Alliaria petiolata* | 1B |
| Purple starthistle | *Centaurea calcitrapa* | 1B |
| Goatsrue | *Galega officinalis* | 1B |
| African mustard | *Brassica tournefortii* | 1B |
| Giant reed | *Arundo donax* | 1B |
| Japanese knotweed | *Polygonum cuspidatum* | 1B |
| Blueweed (Vipers bugloss) | *Echium vulgare* | 1B |
| Elongated mustard | *Brassica elongata* | 1B |
| Common St. Johnswort | *Hypericum perforatum* | 1B |
| Oxeye daisy | *Leucanthemum vulgare* | 1B |
| Cutleaf vipergrass | *Scorzonera laciniata* | 1B |
| Leafy spurge | *Euphorbia esula* | 2 |
| Medusahead | *Taeniatherum caput-medusae* | 2 |
| Rush skeletonweed | *Chondrilla juncea* | 2 |
| Spotted knapweed | *Centaurea stoebe* | 2 |
| Purple loosestrife | *Lythrum salicaria* | 2 |
| Squarrose knapweed | *Centaurea virgata* | 2 |
| Dyers woad | *Isatis tinctoria* | 2 |
| Yellow starthistle | *Centaurea solstitialis* | 2 |
| Yellow toadflax | *Linaria vulgaris* | 2 |
| Diffuse knapweed | *Centaurea diffusa* | 2 |
| Black henbane | *Hyoscyamus niger* | 2 |
| Dalmation toadflax | *Linaria dalmatica* | 2 |
| Russian knapweed | *Acroptilon repens* | 3 |

| Common Name | Scientific Name | Classification* |
|---|---|---|
| Houndstounge | *Cynoglossum officinale* | 3 |
| Perennial pepperweed (Tall whitetop) | *Lepidium latifolium* | 3 |
| Phragmites (Common reed) | *Phragmites australis ssp.* | 3 |
| Tamarisk (Saltcedar) | *Tamarix ramosissima* | 3 |
| Hoary cress | *Cardaria spp.* | 3 |
| Canada thistle | *Cirsium arvense* | 3 |
| Poison hemlock | *Conium maculatum* | 3 |
| Musk thistle | *Carduus nutans* | 3 |
| Quackgrass | *Elymus repens* | 3 |
| Jointed goatgrass | *Aegilops cylindrica* | 3 |
| Bermudagrass | *Cynodon dactylon* | 3 |
| Perennial Sorghum spp. | including but not limited to Johnson Grass *(Sorghum halepense)* and sorghum | 3 |
| Cogongrass (Japanese blood grass) | *Imperata cylindrica* | 4 |
| Myrtle spurge | *Euphorbia myrsinites* | 4 |
| Dames Rocket | *Hesperis matronalis* | 4 |
| Scotch broom | *Cytisus scoparius* | 4 |
| Russian olive | *Elaeagnus angustifolia* | Declared by Emery County |

* Classifications are as follows:

Class 1A: Early Detection Rapid Response Watch List. Declared noxious and invasive weeds not native to the state of Utah and not known to exist in the state that pose a serious threat to the state and should be considered a very high priority.

Class 1B: Early Detection Rapid Response. Declared noxious and invasive weeds not native to the state of Utah that are known to exist in the state in very limited populations and that pose a serious threat to the state and should be considered a very high priority.

Class 2: Control. Declared noxious and invasive weeds not native to the state of Utah that pose a threat to the state and should be considered a high priority for control. Weeds listed in the control list are known to exist in varying populations throughout the state. The concentration of these weeds is at a level where control or eradication may be possible.

Class 3: Containment. Declared noxious and invasive weeds not native to the state of Utah that are widely spread. Weeds listed in the containment noxious weeds list are known to exist in various populations throughout the state. Weed control efforts may be directed at reducing or eliminating new or expanding weed populations. Known and established weed populations, as determined by the weed control authority, may be managed by any approved weed control methodology, as determined by the weed control authority. These weeds pose a threat to the agricultural industry and agricultural products.

Class 4: Prohibited. Declared noxious and invasive weeds not native to the state of Utah that pose a threat to the state through the retail sale or propagation in the nursery and greenhouse industry. Prohibited noxious weeds are annual, biennial, or perennial plants that the commissioner designates as having the potential or are known to be detrimental to human or animal health, the environment, public roads, crops, or other property.

A systematic weed inventory has not been completed for the planning area, although the BLM typically requires inventories as a component of any surface-disturbing activity the agency authorizes. Extensive tamarisk and Russian olive infestations are known to occur along the perennial waterways in the planning area and have resulted in vegetation compositions far removed from native riparian plant communities. Prior to the initiation of the Lower San Rafael River Restoration Project, nearly all tamarisk on the San Rafael River was defoliated by the tamarisk leaf beetle *(Diorhaba* spp.). The tamarisk beetle was initially released at Fuller Bottom by the Emery County Weed Department in 2005 and was subsequently released at Hatt's Ranch. Thus, the beetle has been present in the lower San Rafael River for several years and may start to induce tamarisk mortality in the next few years, depending on the root mass of plants and the

1  intensity of defoliation (BLM 2014a). The BLM's physical removal of extensive stands of tamarisk
2  associated with the Lower San Rafael River Restoration Project in recent years has decreased the
3  distribution and density of tamarisk along the San Rafael River in the planning area.

4  To control weeds on BLM-administered public lands in the planning area, the BLM partners with Wayne
5  and Emery Counties and utilizes integrated pest management strategies (i.e., the combined use of
6  mechanical, cultural, chemical, manual, biological, and prevention measures).

7  Weed-eradication methods, such as herbicide spraying, on BLM-administered public lands must be
8  consistent with the record of decision for the *Final Vegetation Treatments Using Herbicides on BLM*
9  *Lands in 17 Western States Programmatic Environmental Impact Statement* (BLM 2007a). The BLM
10 typically attaches stipulations to land-use authorizations for BLM-administered public lands that prevent
11 the introduction and spread of noxious weeds. For revegetation purposes, the use and perpetuation of
12 native species is a priority, except for certain situations where non-native species may be desirable.

## 3.6.2    Resource Trends

### *3.6.2.1    Vegetation Communities*

15 The distribution of vegetation types in the planning area over time is primarily influenced by soil type,
16 temperature, elevation, precipitation, and topography, and also by land management activities such as
17 livestock and wildlife grazing, road and minerals development, and recreation and OHV use. Vegetation
18 communities were impacted by severe drought conditions existing in the area from 1998 through 2004.

19 Livestock grazing occurs throughout the planning area, and, in some areas, the existing vegetation shows
20 signs of past BLM-authorized surface disturbances. Recreation is becoming more popular in some
21 portions of the planning area. The BLM's Assessment, Inventory, and Monitoring program and ongoing
22 evaluation and renewal of grazing permits in the planning area are implemented to help ensure that
23 rangelands and vegetation communities are not unduly impacted by livestock grazing. Likewise, the BLM
24 will place restrictions on recreation activities in areas where adverse impacts on vegetation are occurring.

25 In 2012, the BLM completed a Rapid Ecoregional Assessment (REA) Report for the Colorado Plateau
26 (Bryce et al. 2012). This report constitutes the best available information regarding climate change and its
27 impacts on vegetation in the planning area.

28 The REA used a regional climate model to predict changes in precipitation and temperature in the
29 Colorado Plateau between 2010 and 2060. The climate model projects increasing temperatures in all
30 seasons. For 2015 to 2030, the model shows less precipitation annually, in winter, and especially in
31 summer (reduction in the monsoon). For 2045 to 2060, the model shows a slight increase in annual
32 precipitation, particularly during winter months. The ecoregion is expected to undergo general warming
33 over the entire region with as much as 2° Celsius increase by 2060 in some locations, particularly in the
34 southern portion of the ecoregion. Average summer temperatures are expected to increase, but even
35 greater increases are simulated for the winter months (Bryce et al. 2012).

36 Precipitation is expected to decline throughout much of the year during the 2015 to 2030 time period
37 (with the exception of a couple months in the fall), with severe drought likely to occur in some areas. The
38 2045 to 2060 time period remains drier (or comparable to historic conditions) during most of the year, but
39 sporadic wetter months result in some areas expressing overall projected increases in annual precipitation.
40 For the seasonal results, summer (July through September) showed more spatial variability in
41 precipitation than did the winter season (January through March) (Bryce et al. 2012).

42 The REA also used a model to predict changes in vegetation resulting from changes in temperature and
43 precipitation. The model predicts that climate conditions will change to favor more grasses and shrubland
44 over other vegetation types. The results do not mean the potential vegetation type will necessarily be
45 established during a particular time period, only that climate conditions would be optimal for their

1  development there at that time period if seed sources were available and human intervention did not occur
2  to destabilize soils or modify its hydrological properties. Many other factors will affect future vegetation
3  type such as human-caused fire, invasive species introduction, or dispersal factors. The projections may
4  also indicate trends where vegetation mortality may occur (Bryce et al. 2012).

5  Winter precipitation is critical to perennial native plants and biological soil crusts, and it enhances annual
6  productivity especially for plants that are less adapted to drought. If both winter and summer precipitation
7  is reduced, trees, especially pinyon pine and biological soil crusts, may be reduced, and shrubs (e.g.
8  blackbrush) are likely to continue to expand (Bryce et al. 2012).

### 3.6.2.2   Invasive Species and Noxious Weeds

10  The spread of noxious weeds and invasive species across the planning area is an ongoing concern for all
11  BLM actions. To help address this issue, the BLM has developed and incorporated BMPs into the Price
12  and Richfield Field Offices' ROD/RMPs and requires implementation of these BMPs on BLM-authorized
13  actions. Ongoing land uses including recreation, OHV use, livestock grazing, and other surface-disturbing
14  activities will likely continue to introduce and spread invasive species and noxious weeds in the planning
15  area. This spread may be exacerbated by droughts that stress native vegetation.

16  Recent actions associated with the Lower San Rafael River Restoration Project have removed extensive
17  stands of tamarisk, and these areas are trending toward more natural riparian conditions. However, with
18  removal of the tamarisk, secondary weeds and tamarisk re-sprouts are becoming an issue. On-going
19  management will be necessary to continue this trend toward more natural vegetation conditions, and
20  complete removal of tamarisk from the planning area is unlikely.

21  In areas adjacent to the planning area, populations of Russian knapweed have also reached high levels in
22  many river corridors with camelthorn and Ravenna grass (*Saccharum ravennae*) following suit. New
23  species invasions such as these threaten existing vegetation communities, species diversity, and habitats
24  of special status species.

### 3.7   CULTURAL RESOURCES

26  Cultural resources are any prehistoric or historic district, site, building, structure, or object considered
27  important to a culture, subculture, or community for scientific, traditional, religious, or other purposes.
28  These are the resources that provide insight into the human experience, past and present. Archaeological
29  resources are areas where prehistoric or historic activity measurably altered the earth or where deposits of
30  physical remains (e.g., arrowheads, pottery, and bottles) are discovered. Prehistoric cultural resources are
31  those materials deposited or left behind prior to the entry of non–Native American (i.e., European)
32  explorers and settlers into an area. Historic cultural resources are those materials deposited or left behind
33  after the European presence was permanently established. Architectural and engineering resources include
34  standing buildings, districts, bridges, dams, and other structures of historic or aesthetic value. Traditional
35  resources can include archaeological resources, structures, topographic features, habitats, plants, wildlife,
36  and minerals that Native Americans or other groups consider essential for the preservation of traditional
37  culture. Cultural resources also include places identified by traditional groups (e.g., Native American
38  tribes) as sacred or otherwise important to the maintenance of group identity, even if no physical
39  manifestations of past activities are present at that location. Traditional values can be manifested at
40  locations called traditional cultural properties (TCPs). The sections below outline human use of the
41  planning area and surrounding region because this is the context in which locations achieve cultural
42  significance. The known cultural resources in the planning area are summarized below.

### 3.7.1    Resource Conditions

The planning area region features a variety of environmental settings with diverse resources that have been used by humans for millennia. These geographies include portions of the northern Colorado Plateau and eastern Great Basin and portions of the Greater Southwest, Great Basin, and Rocky Mountain cultural traditions. The region contains a diverse collection of prehistoric archaeological sites, historic archaeological sites and localities, and locations of religious and cultural significance to Native American tribes. For BLM management purposes, cultural resources take the form of sites, artifacts, buildings, structures, ruins, features, and landscapes with particular cultural importance. With a few exceptions, cultural resources must be at least 50 years old to be considered significant, or eligible for or listed on, the National Register of Historic Places (NRHP).

Archaeologists divide human use of the region into five broad time periods and base the definitions of each period on temporal, behavioral, and technological considerations. These five temporal classes are the Paleoindian, Archaic, Formative, Protohistoric, and Historic periods. The first four (Paleoindian, Archaic, Formative, and Protohistoric) are collectively referred to as Prehistoric periods, and they predate the region's written history. The Historic period includes Euro-American expansion into the region and contact with local Native American groups.

### *3.7.1.1    Prehistoric Culture History*

#### Paleoindian

As is the case throughout North America, the earliest compelling evidence for a human presence in the Great Basin and northern Colorado Plateau dates to approximately 13,000 calendar years ago (Beck and Jones 1997; see Gilbert et al. 2008 for recently discovered earlier evidence from the western Great Basin; Graf and Schmitt 2007). The Paleoindian period represents adaptations to terminal Pleistocene environments and is characterized by small groups of relatively mobile foragers who used most sites only briefly or infrequently. Paleoindian archaeology is sparse on the Colorado Plateau, especially in comparison with the Great Plains region, so considerations of Paleoindian lifeways in the planning area must therefore be extrapolated from regional data.

#### Archaic

The relative continuity of behavior and material culture throughout the Paleoindian and Archaic eras in this region has prompted some scholars to dismiss the distinctions between these time periods as "negligible" and to regard the entire temporal stretch as a continuum called the "Paleoarchaic." However, regardless of the striking similarity of these two time periods throughout the region, there is sufficient behavioral and material variability within them to warrant examining each individually (Aton 2009; Meltzer 2009:239–281; Simms 2008:141–180).

In the Great Basin, Simms (2008) divides the Archaic period into three sub-periods: the Early Archaic (8,000–7,000 years B.P.), Middle Archaic (7,000–3,000 years B.P.), and Late Archaic (3,000–1,000 years B.P.). On the Colorado Plateau, however, other authors (e.g., Matson 1991) divide the Archaic period into four sub-periods with slightly different date ranges: Early Archaic (approximately 8,000–6,000 years B.P.), Middle Archaic (6,000–4,000 years B.P.), Late Archaic (4,000–3,000 years B.P.), and Terminal Archaic (3,000–2,500 years B.P.). Most Southwest archaeologists lump the Terminal Archaic into the early Basketmaker II period (e.g., Charles and Cole 2006). Given the closer proximity and greater relevance of the Great Basin literature to the planning area, this document follows Simms's chronology.

Early Archaic sites are vanishingly rare in and around the region. However, the overwhelming majority of known archaeological sites within and around the planning area are lithic scatters that are unfortunately devoid of diagnostic artifacts, so Early Archaic occupation may indeed have occurred. As with the Early Archaic, there is a scarcity of Middle Archaic sites in and around the planning area. The most-diagnostic

1    and illustrative Middle Archaic archaeology comes instead from places like Hogup Cave and Lakeside
2    Cave far to the west.

3    As elsewhere on the Colorado Plateau, Late Archaic occupation is far better represented in the region
4    immediately surrounding the planning area than are the earlier Archaic phases. A dramatic rock art panel
5    that has been dated to the Late Archaic period looms over Range Creek Canyon (Aton 2009:77), and a
6    site called Cedar Siding Shelter located about 30 miles southeast of Price represents probably the only
7    significant investigation into the Archaic period near the planning area (Spangler 1995:111).
8    Investigations at that site by Martin (1983) revealed sporadic occupation starting around 4,000 years B.P.
9    and continuing until approximately 1,980 years B.P. (i.e., well into the Formative period, which included
10   practice of horticulture). The cultural continuity observed by Martin (1983:118–120) during his
11   excavations at Cedar Siding Shelter suggest that, unlike with the Paleoindian and Archaic temporal
12   boundary, there may indeed have been in situ development and transition between the Archaic and the
13   Formative periods.

14   **Formative**

15   The Formative era is marked by an emphasis on domesticated plants, most notably corn (*Zea mays*), or
16   maize; sedentary or semi-sedentary settlement near areas optimal for horticulture; and the introduction of
17   pottery (Matson 1991). The Formative era in the planning area is represented by Fremont occupation.

18   The Fremont archaeological complex represents an extension of horticultural adaptations into the far
19   northern Colorado Plateau, the Wasatch Plateau, and the eastern Great Basin. The distribution of Fremont
20   ceramics covers an even larger area, ranging from what is now central Nevada into southern Idaho and
21   southwestern Wyoming (e.g., Hockett and Morgenstein 2003). The date range that Madsen and Schmitt
22   (2005) use for this period is 2,100 years B.P. to 500 years B.P., which calibrates to ca. 150 B.C. to A.D.
23   1450 (see also Massimino and Metcalfe 1999). Calibrated B.C. and A.D. dates will be used from this
24   point forward.

25   Although there is evidence for considerable adaptive diversity in the eastern Great Basin and surrounding
26   areas throughout prehistory, this is especially the case for the Formative period. As Madsen and Simms
27   (1998) note, groups attributed to the Fremont complex adopted a variety of subsistence and mobility
28   strategies, and individuals within those groups may have pursued a range of strategies within their
29   lifetimes (see also Barlow 2002; Coltrain and Leavitt 2002). Fremont sites range from fairly large, settled
30   villages, particularly on either side of the Wasatch Plateau, to more ephemeral camps that suggest a high
31   degree of mobility. Caves also continued to be used during the Formative period (e.g., Aikens 1970;
32   Bryan 1977). The full range of subsistence strategies from pure hunting and gathering to relatively
33   intensive farming is evident at Fremont sites. Barlow (2002) suggests that such variability in the
34   importance of horticulture was due to variability over time and space in the productivity of wild
35   resources, noting that intensive horticulture would have been economical only when and where high-
36   return wild resources were encountered infrequently.

37   Fremont populations before A.D. 900 flourished to the north of the planning area in the Uinta Basin and
38   to the west in the San Rafael Swell. Both of those groups differed considerably from the Fremont that
39   subsequently lived around Desolation Canyon and the Tavaputs Plateau from A.D. 900 to A.D. 1300
40   (Aton 2009:79). Numerous Fremont sites or sites with Fremont components have been reported in the
41   part of the planning area managed by the Price Field Office. Nine Mile Canyon is noted for its extensive
42   assemblage of Fremont rock art panels and for storage and living structures of stone masonry laid with
43   mud mortar. Found in 1950 in Range Creek Canyon, the iconic Pilling figurines, a set of 11 clay
44   figurines, were made by Fremont artisans and closely resemble the anthropomorphs in much of Fremont
45   rock art. Excavations at Windy Ridge Village, Crescent Ridge, and Power Pole Knoll (Madsen 1975)
46   helped to establish local architectural and ceramic chronologies. Additionally, ongoing research by the

1 University of Utah in Range Creek Canyon (e.g., Boomgarden et al. 2014) continues to explicate and
2 refine Fremont horticultural practices in the area.

3 **Protohistoric**

4 In Formative chronology, the time period between the Fremont occupation and the Historic (Euro-
5 American) period marks the abandonment of horticulture and sedentary settlement systems. The
6 disappearance of a sedentary, horticultural lifeway among the Fremont and the return to a hunter-gatherer
7 subsistence pattern by about A.D. 1300 is a perplexing problem, although coincident timing with the
8 abandonment of most of the Colorado Plateau and aggregation of Pueblo peoples into supra-communities
9 like those at the Hopi Mesas is suggestive of regional climatic factors (Benson and Berry 2009; Glowacki
10 2015; Spangler 1995; Varien 2006).

11 It is commonly believed that during the Protohistoric period the Numic-speaking Utes were the primary
12 occupants of eastern and central Utah. Evidence from linguistic and archaeological investigations suggest
13 that Numic-speaking peoples immigrated into the region by about A.D. 1100, or shortly before the
14 disappearance of the Formative-era peoples, and researchers have historically attributed this to an
15 expansion of Numic-speaking populations from homelands in the southwestern Great Basin (Spangler
16 1995:599). Currently, however, there is little consensus about the timing of the Numic expansion, how it
17 occurred, why it occurred, the relationship of Numic-speaking populations to existing resident
18 populations, how settlement patterns and subsistence strategies differed from pre-Numic populations, and
19 whether or not a "Numic expansion" indeed even occurred (Spangler 1995:599). Indeed, as early as the
20 1930s, archaeologists like Julian Steward wrote about a distinctive break between archaeological deposits
21 associated with the Fremont and ones associated with the people who came after (Simms 2008:231). The
22 abandonment of the region by Fremont horticulturalists and its subsequent occupation by Numic-speaking
23 Native American tribes may both be reactions to independent variables rather than having anything
24 directly to do with one another (Spangler 1995:172).

25 In and around the planning area, evidence of occupation by Numic-speaking peoples during this time
26 includes Ute rock art panels, occasional Numic sherds, and the recovery of at least one Numic-style
27 basket in Nine Mile Canyon (Spangler 1995:173). At sites near Thompson and in the San Rafael Swell,
28 additional finds substantiate a Numic-speaking Late Prehistoric presence in the planning area (Spangler
29 1995:173). Most notably, in 1969 a bundle of Numic artifacts called the Sitterud Bundle was collected in
30 Emery County and found to contain leather sinew and cordage, a snare, leather leggings, some squawbush
31 berries, and a number of bone and lithic tools (Benson 1982).

32 *3.7.1.2    Historic Culture History*

33 The Historic period in Utah refers to the time recorded by Euro-American history. The Historic period in
34 Utah started with the first Euro-American explorers trekking through the state and continues to the
35 present. The first known Europeans to enter the area of Emery County were probably Mauricio Arze
36 and Lagos Garcia of New Mexico (Geary 1996:24–25). Destined for the Sevier Valley in central Utah to trade
37 furs in 1813, Arze and Garcia may have traveled through the San Rafael Desert to the southern end of
38 Castle Valley in western Emery County. Jedediah Smith is reported to have traveled through the area 13
39 years later, during his 1826 to 1827 expedition (Geary 1996:25–26).

40 During the early- to mid-1800s, the primary travel corridor through Emery County and the future Utah
41 territory as a whole was the Old Spanish Trail. The Old Spanish Trail entered "Emery County by way of a
42 ford about three miles north of Green River City" (Geary 1996:26). "The Green River crossing and
43 Wasatch (Salina) Pass were key points on the [Old] Spanish Trail, a nineteenth-century trade route
44 between the Hispanic settlements in New Mexico and those in California" (Geary 1996:2). John Wesley
45 Powell began the first of his two expeditions down the Green and Colorado Rivers in the spring of 1869.

Powell summarily recorded his impressions of these areas during his journey along the rivers and during his overland hiking expeditions through the San Rafael Desert (Geary 1996).

As with most regions of Utah, the first deliberate Euro-American settlement of Emery County occurred at the behest of the Church of Jesus Christ of Latter-Day Saints (Mormon Church) leader Brigham Young. In 1877, Young ordered several families to establish a community in the area. The settlement marked a transition in the methodology of Mormon pioneering; it was the last settlement directed to be established by Young and the first in a region surveyed for entry under the revised laws of the Homestead Act, the original version of which became applicable in Utah in 1869.

From the beginning, agriculture and raising livestock were the economic mainstays of the region. Within 30 years of the first Euro-American permanent settlement, 25,918 acres were under cultivation in the county (Geary 1996:130). As was the case throughout the desert West, agricultural expansion was made possible only through the construction of extensive systems of irrigation canals. By the end of the nineteenth century, more than 154 miles of canals had been constructed in Emery County alone. The most extensive of these waterways was the Cleveland Canal, completed in 1888.

The completion of the Denver & Rio Grande Western (D&RGW) in 1883, linking Salt Lake City to Denver, proved to be an economic boon for the residents of Emery County, particularly those living in Green River. This prosperity lasted only a decade, however, because most railroad operations shifted to the town of Helper in Carbon County. Rail service in Emery County did continue to operate but on a much smaller scale (Geary 1996:108–112).

Although the completion of the D&RGW Railroad stimulated mining in Emery County, the first mining operation in the area predated both the development of the rail line and the first Mormon settlement. As early as 1875, coal mines were being worked on the Wasatch Plateau. None of these early mines, however, proved prosperous. The first mines were originally operated on a small scale during the fall and winter months in order to obtain coal for heating area homes. Soon, several major, local mining syndicates acquired property in the eastern canyons of the Wasatch Plateau and, in conjunction with the railroad, began what has become a long history of coal extraction (Geary 1996:136).

As was common throughout the state, Emery County residents felt a surge of patriotism during World War I, with many enlisting and serving both domestically and abroad. However, the decrease in the number of young men in the area took a toll on the local workforce, creating a labor shortage for the mines and farms and temporarily pushing wages higher. When the war overseas came to an end, the residents of Emery County felt the sting of the downside of a wartime economy as markets for industrial and agricultural goods and services returned to their normal levels. Combined with a slump in coal mine production and decreases in land values, this signaled the future economic outlook for the county.

Residents of Emery County did not immediately feel the impacts of the stock market crash in 1929. It took a couple of years before the true impact of the Great Depression was felt in the area, and the local economy reached its lowest point. It is estimated that as many as 40% of the families in Emery County were receiving federal aid at some point during the Depression years (Geary 1996:275). As was occurring throughout the nation, the federal relief programs designed to lessen the effects of the Great Depression initiated a second wave of public works and improvement projects. Most of the projects of this nature undertaken in the county during this time were under the auspices of the Civilian Conservation Corps and the Works Progress Administration.

Recovery from the economic hardship of the 1930s was slow for Emery County. Unlike many counties farther north, Emery County did not enjoy as much of the economic fortunes associated with the nation's entry into World War II. Only one significant development occurred in the area in direct association with the war efforts—the opening of a mine intended to supply coke coal to Geneva Steel in Utah County (Geary 1996:304). The lack of employment opportunities in the area forced many families to relocate to other counties, beginning a 30-year population decline (Geary 1996:315).

1  ## 3.7.2    Resource Trends

2  For the discussion that follows, the cultural resources analysis area is defined to include the entirety of the
3  planning area. This analysis area is assumed to encompass all areas where potential direct, indirect, or
4  cumulative effects to cultural resources might occur. SWCA conducted a files search of cultural resources
5  information maintained by the Utah Division of State History (UDSH) for the entire analysis area to
6  assess the extent of previously conducted cultural resources inventories and the quantities and types of
7  cultural resources known to exist within the analysis area. Most of the analysis area has not been
8  inventoried for cultural resources. Current records indicate that a total of 17,402 acres in the analysis area
9  has been subjected to intensive-level archaeological surveys. Existing data for 110 previously conducted
10  surveys in the analysis area indicates the earliest survey was conducted in 1973 and the most recent in
11  2015. Only 30 of the 110 surveys were conducted within the past 10 years and only 11 within the past 5
12  years. Most of the surveys were linear, with very few large block surveys. The largest survey was a
13  seismic survey conducted by Southwest Archaeological Consultants in 2007 (U07SZ1167b) in the south-
14  central portion of the analysis area. In all, 321 sites have been documented in the analysis area. Of the 321
15  sites, 270 are prehistoric, 17 are historic, 24 are multicomponent, and 10 are an unknown site class; 292 of
16  the sites are located on BLM-managed land, and the remaining 29 sites are lands managed or owned by
17  other entities. Most of the previously documented sites are located in the 2007 Southwest Archaeological
18  Consultants survey area in the south-central portion of the analysis area.

19  ### 3.7.2.1    Archaeological Sites

20  According to UDSH data, most of the prehistoric sites or prehistoric components that could be assigned to
21  a site type are open lithic scatters (204) and open artifact scatters (77). The remaining 13 prehistoric sites
22  are open architectural, open artifact scatters with thermal feature(s), open lithic scatters with thermal
23  feature(s), other/unknown, rock art, and sheltered non-architectural (Table 3-13). In addition to the sites
24  known from UDSH data, 17 rock art locations recorded by the Utah Rock Art Research Association
25  (URARA) in Cottonwood Wash are in the analysis area. Most of the prehistoric sites date to the Archaic,
26  Fremont, Formative (general), and Paleoarchaic periods (Table 3-14).

27  **Table 3-13.  Prehistoric Site or Component Types in the Analysis Area\***

| Site Type | Site Count |
|---|---|
| Isolated artifact | 0 |
| Isolated other feature(s) | 0 |
| Isolated thermal feature(s) | 0 |
| Lithic source | 0 |
| Open architectural | 1 |
| Open artifact scatter | 77 |
| Open artifact scatter with thermal feature(s) | 5 |
| Open lithic scatter | 204 |
| Open lithic scatter with thermal feature(s) | 3 |
| Other/unknown | 1 |
| Quarry | 0 |
| Rock art | 18 |

| Site Type | Site Count |
|---|---|
| Sheltered architectural | 0 |
| Sheltered non-architectural | 2 |
| **Total** | **311** |

\* Includes rock art sites recorded by the Utah Rock Art Research Association.

**Table 3-14.  Prehistoric Sites or Components in the Analysis Area by Time Period**

| Category | Corresponding Codes | Site/Component Count |
|---|---|---|
| Paleoarchaic | PA | 7 |
| Archaic (general) | AR, EA, LA, MA | 15 |
| Early Archaic | EA | 1 |
| Middle Archaic | MA | 2 |
| Late Archaic | LA | 1 |
| Formative (general) | FR | 9 |
| Fremont | FR | 9 |
| Late Prehistoric | LP | 5 |
| Unknown | NI, ZZ | 265 |
| **Total** | | **314** |

According to UDSH data, most historic sites or historic components known to exist within the analysis area are artifact scatters (24), artifact scatters with thermal feature(s) (5), and architectural-farming/ranching (4). The remaining eight historic sites are architectural-other, architectural-residential, railroad, trail/road with artifacts, and trail/road without artifacts (Table 3-15). Five historic themes were noted for the historic sites documented in the analysis area: farming/ranching (agriculture), unknown, transportation (including roads/trails), railroad, and mining/mineral extraction (Table 3-16). Finally, the historic sites are primarily associated with Euro-Americans, with one site each associated with Basques and Mexicans. The remainder have unknown affiliation.

**Table 3-15.  Historic Site Types in the Analysis Area**

| Site Type | Count |
|---|---|
| Architectural-farming/ranching | 4 |
| Architectural-general industrial | 0 |
| Architectural-mining | 0 |
| Architectural-other | 3 |
| Architectural-residential | 1 |
| Artifact scatter | 24 |
| Artifact scatter with thermal feature(s) | 5 |
| Cemetery/burial | 0 |

| Site Type | Count |
|-----------|-------|
| Isolated artifact | 0 |
| Isolated other features | 0 |
| Mining | 0 |
| Other/unknown | 0 |
| Railroad | 2 |
| Rock or tree art | 0 |
| Trail/road with artifacts | 1 |
| Trail/road without artifacts | 1 |
| Transmission | 0 |
| Water control | 0 |
| **Total** | **41** |

1    **Table 3-16.  Historic Themes in the Analysis Area**

| Theme | Code | Theme 1 Count | Theme 2 Count |
|-------|------|---------------|---------------|
| Farming/ranching (agriculture) | FR | 23 | 0 |
| Mining/mineral extraction | MN | 1 | 1 |
| Railroad | RR | 2 | 1 |
| Transportation (including roads/trails) | RT | 3 | 0 |
| Unknown | ZZ | 11 | 0 |
| **Total** | | **40** | **2** |

2    *3.7.2.2*    ***Formal Systems of Recognition***

3    In the analysis area, the importance of cultural resources can be acknowledged in several ways. On a
4    national level, a site or building of importance can be listed on the NRHP or as a National Historic
5    Landmark (NHL). On a state level, the Utah Century Register of Historic Houses and the Utah State
6    Register of Historic Sites recognize cultural resources, but neither of these lists has been updated since
7    1988. NRHP eligibility is temporally fluid, and the status of any given site can change over time.
8    Accordingly, NRHP eligibility statements in available site records typically document a time-specific
9    NRHP eligibility recommendation made by the researchers who recorded the site, or those records
10    document an agency's determination of a site's NRHP eligibility. For those sites documented in the
11    analysis area, 67 have been recommended eligible and another 23 have been determined eligible for the
12    NRHP.

13    A check of the NHL list, the Utah Century Register of Historic Houses, and the Utah Register of Historic
14    Sites revealed no properties, sites, or historic districts listed within the analysis area. The following GIS
15    layers were examined for the analysis area: NRHP, State Historic Districts, Historic Trails, NHL, and
16    UDSH Historic Properties.

17    One historic property, the Lower San Rafael Bridge, is included in UDSH's online Preservation Pro
18    database and was documented using Historic American Buildings Survey/Historic American Engineering

1   Record (HABS/HAER) methods. The bridge was replaced in 1996. The expanded Horseshoe Canyon
2   Archaeological District is not in the analysis area but is immediately adjacent to its southeast boundary.
3   No NRHP-listed properties, NHLs, or historic districts were noted in the analysis area.

4   TCPs are areas identified as culturally important to Native American or other groups who consider a
5   location important for the preservation of traditional culture. These resources can include archaeological
6   resources, structures, topographic features, habitats, plants, wildlife, and minerals identified by traditional
7   groups as sacred or otherwise important to the maintenance of group identity, even if no physical
8   manifestations of past activities are present at that location. Groups who identify a culturally sensitive
9   area may ask that its location not be revealed. For this reason, documented TCPs are not common. The
10  Green River, which abuts the eastern side of the analysis area, is the only known TCP, and it is considered
11  culturally important by the Navajo Nation.

### 3.7.2.3    Special Designations

13  Special designations—ACECs, WSAs, special recreation areas, and special management areas—were
14  reviewed for their potential to contain cultural resources. Three ACECs are located in the analysis area:
15  Big Flat Tops, Dry Lake Archaeological District, and Tidwell Draw of the Uranium Mining Districts.
16  Only the Dry Lake Archaeological District and Tidwell Draw of the Uranium Mining Districts are
17  cultural or historic in nature. Tidwell Draw is also located within the UDOGM San Rafael River District.
18  The Dry Lake Archaeological District likely dates to the Paleoarchaic period, and additional prehistoric
19  sites would be expected within this ACEC. The Tidwell Draw portion of the Uranium Mining Districts
20  ACEC would likely have a higher percentage of uranium and vanadium mine sites dating to 1900 and
21  later. No WSAs, special recreation areas, or special management areas were noted in the analysis area.

### 3.7.2.4    Undocumented Cultural Resources

23  Given that the majority of the analysis area has not been previously surveyed, there is considerable
24  potential for undocumented archaeological sites to exist in the unsurveyed areas. Areas with high
25  potential for undocumented prehistoric sites include known water sources. Areas with high potential for
26  undocumented historic sites include historic mining and oil and gas well locations, historic locations
27  indicated on GLO maps, historic trail and road corridors, and known historic springs and water sources.
28  Named streams and rivers in the analysis area include the San Rafael River, Green River, Dugout Creek,
29  and Antelope Valley Wash. Thirteen named springs exist in the analysis area: North Spring, Hooch
30  Spring, Village Home Spring, Twin Springs, Sweetwater Spring, Old Man Spring, Upper Dugout Spring,
31  Keg Spring, Dugout Spring, Saddle Horse Spring, Cottonwood Spring, Moonshine Spring, and Crows
32  Nest Spring.

33  Two historic trails, the Fremont Trail and the Old Spanish Trail, were identified in GIS trails data within
34  the analysis area. Both trails cross the northern portion of the analysis area. The cemeteries GIS layer for
35  Utah was examined, but no cemeteries were noted in the analysis area.

36  An inventory was made of BLM GLO maps covering the analysis area. In all, 41 GLO maps dating
37  between 1879 and 1957 were identified for the analysis area (Table 3-17). More than three-quarters of
38  these GLO maps were made before 1950. These maps can provide additional information about historic
39  resources in the analysis area. GLO maps examined for the analysis area show historic roads, cabins,
40  ranches, oil wells, springs, railroad alignments, trails, named settlements, and a mail trail. These historic
41  resources, many of which have not yet been formally documented, should be sought out and verified as to
42  their continued existence and condition. All of these GLO features fall under the historic themes observed
43  in the existing historic site data.

1    **Table 3-17. General Land Office Maps Covering the Analysis Area**

| Township | Range | GLO Plat Year | Surveyor |
|---|---|---|---|
| 21 South | 14 East | 1885 | Pancake |
| | | 1947 | Yundt |
| 21 South | 15 East | 1907 | Heist |
| 21 South | 16 East | 1882 | Ferron |
| | | 1883 | Ferron |
| 22 South | 14 East | 1885 | Pancake |
| | | 1915 | Miller |
| 22 South | 15 East | None | – |
| 22 South | 16 East | 1899 | Blossom |
| 23 South | 14 East | 1885 | Pancake |
| 23 South | 15 East | 1907 | Heist |
| 23 South | 16 East | 1879 | Dickert |
| | | 1899 | Blossom |
| 24 South | 13 East | 1915 | Miller |
| 24 South | 14 East | 1885 | Pancake |
| 24 South | 15 East | 1885 | Pancake |
| 24 South | 16 East | 1879 | Dickert |
| | | 1914 | Miller |
| 25 South | 12 East | 1935 | Moore |
| 25 South | 13 East | 1935 | Clark |
| 25 South | 14 East | 1935 | Moore |
| 25 South | 15 East | 1935 | Moore |
| 25 South | 16 East | 1879 | Dickert |
| | | 1935 | Moore |
| 25 South | 17 East | 1875 | Dickert |
| | | 1956 | Russell |
| 26 South | 12 East | 1936 | Moore |
| 26 South | 13 East | 1935 | Clark |
| 26 South | 14 East | 1955 | Russell |
| 26 South | 15 East | 1879 | Dickert |
| | | 1947 | Bird |
| 26 South | 16 East | 1955 | Edmonds |

| Township | Range | GLO Plat Year | Surveyor |
|----------|-------|---------------|----------|
| 26 South | 17 East | 1955 | Lewis |
| | | 1956 | Russell |
| 27 South | 11 East | 1879 | Dickert |
| | | 1941 | Bird |
| 27 South | 12 East | 1936 | Moore |
| 27 South | 13 East | 1957 | Sylvester |
| 27 South | 14 East | 1947 | Bird |
| 27 South | 15 East | 1879 | Dickert |
| | | 1947 | Bird |
| 27 South | 16 East | 1947 | Nelson |

The USGS topoView online historical topographic map collection is an easily accessed source for historic topographic maps of the analysis area; maps range in scale from 1:24,000 to 1:250,000. This online collection allows a user to download topographic maps in several formats. At present, the National Geospatial Program is still scanning and georeferencing maps, but when it is complete, the collection will include scans of paper maps from 1884 through 2006 (USGS topoView 2015).

Historic aerial imagery can complement topographic maps during background research and potentially confirm property and/or structure locations depending on the quality of the imagery. Imagery available from the Utah Geological Survey's Aerial Imagery Collection ranges in date from 1935 through the present. Not all areas have early imagery available.

Based on UDOGM's abandoned well data provided to SWCA by the agency, there are at least 36 abandoned oil and gas well locations in the analysis area that could be historic in age. All 36 of these are located on BLM-managed lands (Table 3-18). The wells are concentrated in the northern and southern ends of the analysis area.

**Table 3-18. Abandoned Wells in the Analysis Area**

| Well Name | Township | Range | Section | County | Company Name | Lease Number |
|-----------|----------|-------|---------|--------|--------------|--------------|
| AMAX-SINCLAIR GOVT 29-4B | T22.0S | R15.0E | 29 | Emery | Amax Petroleum Corp | UTU-036250 |
| GREEN RIVER DESERT U 9-7 | T22.0S | R15.0E | 09 | Emery | Amax Petroleum Corp | UTU-08861 |
| 45-56 | T24.0S | R15.0E | 05 | Emery | General Petroleum Corp | UTU-02410 |
| LOOKOUT POINT UNIT 1 | T25.0S | R16.0E | 29 | Emery | Standard Oil Co Of Calif | UTU-08867 |
| MOONSHINE WASH U 2 | T25.0S | R15.0E | 22 | Emery | Continental Oil Company | UTU-08741 |
| FOREST GOVT 1 | T23.0S | R14.0E | 11 | Emery | Forest Oil Corp | UTU-010356A |

| Well Name | Township | Range | Section | County | Company Name | Lease Number |
|-----------|----------|-------|---------|--------|--------------|--------------|
| DUGOUT CREEK U 1 | T24.0S | R14.0E | 21 | Emery | Humble Oil & Refining Co | UTU-08196A |
| NEQUOIA ARCH U 3 | T26.0S | R14.0E | 26 | Emery | Humble Oil & Refining Co | UTU-08699 |
| NEQUOIA ARCH U 7 | T26.0S | R14.0E | 30 | Emery | Humble Oil & Refining Co | UTU-05546 |
| 1 MID TOP | T26.0S | R13.0E | 17 | Emery | Larue, E B Jr | UTSL-08712A |
| HATT 1 | T23.0S | R14.0E | 19 | Emery | Lion Oil Company | UTU-09466A |
| JAKEY'S RIDGE 12-3 | T23.0S | R16.0E | 03 | Emery | Mobil Oil Corporation | UTU-08970 |
| JAKEY'S RIDGE 34-15 | T23.0S | R16.0E | 15 | Emery | Mobil Oil Corporation | UTU-015637 |
| FEDERAL 1 | T26.0S | R14.0E | 07 | Emery | Odessa Natural Corp | UTU-011206 |
| NEQUOIA ARCH UNIT 9 | T26.0S | R13.0E | 25 | Emery | Pan American Petroleum Corp | UTU-05417 |
| NEQUOIA ARCH UNIT 10 | T26.0S | R13.0E | 35 | Emery | Pan American Petroleum Corp | UTU-03245 |
| USA-C M BROWN 1 | T25.0S | R12.0E | 24 | Emery | Pan American Petroleum Corp | UTSL-169347 |
| CHAFFIN UNIT 1 | T23.0S | R15.0E | 21 | Emery | Shell Oil Company | UTU-14680A |
| GRUVERS MESA 1 | T24.0S | R16.0E | 19 | Emery | Shell Oil Company | UTU-014152 |
| GRUVERS MESA 2 | T25.0S | R16.0E | 10 | Emery | Shell Oil Company | UTU-032777 |
| BOW KNOT UNIT 14-5 | T26.0S | R17.0E | 05 | Emery | Superior Oil Company | UTU-014242 |
| GRAND FAULT UNIT 14-24 | T21.0S | R15.0E | 24 | Emery | Superior Oil Company | UTU-011978 |
| N SPRING WASH 31-15 | T25.0S | R15.0E | 15 | Emery | Superior Oil Company | UTU-08782A |
| FEDERAL 1 | T22.0S | R15.0E | 26 | Emery | Texas Eastern Trans Co | UTU-014710 |
| TEMPLE SPRINGS UNIT 1 | T25.0S | R13.0E | 14 | Emery | Texaco Inc | UTU-013076 |
| TEMPLE SPRINGS UNIT 2 | T25.0S | R14.0E | 22 | Emery | Texaco Inc | UTU-031216 |
| 1 | T22.0S | R16.0E | 21 | Emery | Whisnant, W P | FEE |
| FEDERAL 1 | T22.0S | R15.0E | 28 | Emery | Equity Oil Company | UTU-02181 |
| RUSSELL 1 | T25.0S | R12.0E | 34 | Emery | Delhi-Taylor Oil Corp | UTSL-068506 |
| NEQUOIA ARCH U 5 | T27.0S | R14.0E | 17 | Wayne | Amerada | U-07044-A |
| MURPHY-GOVT 1 | T27.0S | R14.0E | 13 | Wayne | Arco Oil & Gas Company | U-08665 |
| BLACKBURN DRAW U 1 | T27.0S | R12.0E | 09 | Wayne | Humble Oil & Refining Co | U-08648 |
| NEQUOIA ARCH U 1 | T27.0S | R14.0E | 05 | Wayne | Humble Oil & Refining Co | U-05448-A |

| Well Name | Township | Range | Section | County | Company Name | Lease Number |
|-----------|----------|-------|---------|--------|--------------|--------------|
| HANKSVILLE UNIT 31-30 | T27.0S | R13.0E | 30 | Wayne | Superior Oil Company | U-09308 |
| FEDERAL 1 | T27.0S | R14.0E | 05 | Wayne | Texas Production Co | U-032263 |
| FEDERAL 1 | T27.0S | R12.0E | 04 | Wayne | Mt Vernon Oil Co | SL-043820 |

Source: Data provided by UDOGM.

In all likelihood, numerous prehistoric and historic cultural resources exist in unsurveyed portions of the analysis area. The number, nature, and location of these unidentified resources likely vary depending on a host of factors. Through extensive study of archaeological sites throughout the West, archaeologists have identified a number of key factors that influence site locations and types. Many of these factors are environmental and include elevation, slope, aspect, distance to permanent and/or intermittent water, and the presence or absence of key resources (e.g., food resources and raw materials for tools, etc.). Significant variation also depends on the time period (prehistoric or historic) considered. An archaeological site location model using available cultural resources records has been developed for the analysis area and will be used to assess possible project effects to cultural resources in the next chapter.

## 3.8  PALEONTOLOGICAL RESOURCES

The analysis area for paleontological resources is the planning area (Map 2-4), which covers approximately 526,174 acres. This analysis area was selected because it represents the area within which paleontological resources on BLM-administered public land may be affected.

### 3.8.1  Resource Conditions

Paleontological resources are the fossilized remains, traces, or imprints of organisms preserved in or on the Earth's crust that are of paleontological interest and that provide information about the history of life on Earth (Paleontological Resources Preservation Act [PRPA], Section 6301; 16 USC 470aaa). Among paleontologists, fossils are generally considered to be scientifically significant if they are unique, unusual, rare, diagnostically or stratigraphically important, or add to the existing body of knowledge in a specific area of the science. The BLM considers all vertebrate fossils to be scientifically significant. Invertebrate and plant fossils may be determined to be significant on a case-by-case basis.

The BLM has identified uniform procedural guidance and four objectives for managing paleontological resources on the land it administers: 1) locating, evaluating, managing, and protecting paleontological resources; 2) facilitating appropriate scientific, educational, and recreational uses of fossils; 3) ensuring that proposed land uses do not inadvertently damage or destroy important paleontological resources; and 4) fostering public awareness of the nation's rich paleontological heritage (BLM 1998).

#### 3.8.1.1  *Potential Fossil Yield Classification*

Under the Potential Fossil Yield Classification (PFYC) system, geologic units are classified based on the relative abundance of vertebrate fossils or uncommon invertebrate or plant fossils and their sensitivity to adverse impacts; a higher class number indicates a higher potential for fossils to occur. This classification is best applied at the geologic formation or member level. It is not intended to be an assessment of whether important fossils are known to occur occasionally in these units (i.e., a few important fossils or localities widely scattered throughout a formation does not necessarily indicate a higher class), nor is it intended to be applied to specific sites or areas. The classification system is intended to provide baseline guidance for assessing and mitigating impacts to paleontological resources. In many situations, the

classification should be an intermediate step in the analysis, and should be used to assess additional mitigation needs. PFYC classes are defined as follows:

- Class 1: Geologic units that are unlikely to contain recognizable fossil remains. Management concern for paleontological resources in Class 1 units is negligible or not applicable. No assessment or mitigation is needed except in very rare circumstances. The presence of significant fossils in Class 1 units is non-existent or extremely rare.

- Class 2: Sedimentary geologic units that are not likely to contain vertebrate fossils or scientifically significant invertebrate or plant fossils. The potential for affecting vertebrate fossils or uncommon invertebrate or plant fossils is low. Management concern for paleontological resources is low, and management actions are not likely to be needed. Localities containing important resources may exist, but they would be rare and would not influence the classification.

- Class 3: Fossiliferous sedimentary geologic units where fossil content varies in significance, abundance, and predictable occurrence or sedimentary units of unknown fossil potential. These units are often marine in origin with sporadic known occurrences of vertebrate fossils. Vertebrate fossils and uncommon invertebrate fossils are known to be present inconsistently, and predictability is known to be low. Class 3 includes units that are poorly studied and/or poorly documented so that the potential yield cannot be assigned without ground reconnaissance. Management concern for paleontological resources in these units is moderate or cannot be determined from existing data. Surface-disturbing activities may require field assessment to determine a further course of action. The Class 3 category includes a broad range of potential impacts. Geologic units of unknown potential, as well as units of moderate or infrequent fossil occurrence are included. Assessment and mitigation efforts also include a broad range of options. Surface-disturbing activities would require sufficient assessment to determine whether significant fossil resources are present in the area of a proposed action and whether the action could affect the paleontological resources.

- Class 4: Geologic units that contain a high occurrence of significant fossils but that have less risk of human-caused adverse impacts and/or less risk of natural degradation. The potential for affecting significant fossils is moderate to high and depends on the proposed action. The bedrock unit has high potential, but a protective layer of soil, thin alluvial material, or other mitigating circumstances may lessen or prevent potential impacts to the bedrock resulting from the activity. Mitigation efforts must include assessment of the disturbance (e.g., the removal or penetration of protective surface alluvium or soils), the potential for future accelerated erosion, and the potential for increased ease of access resulting in greater looting potential. If impacts to significant fossils are anticipated, on-the-ground surveys prior to authorizing the surface-disturbing action would usually be necessary. On-site monitoring may also be necessary during construction activities. Management prescriptions for resource preservation and conservation through controlled access or special management designation should be considered. Class 4 and Class 5 units are often combined as Class 5 for general applications such as planning efforts or preliminary assessments because a designation of Class 4 is determined based on local mitigating conditions and the impacts of the planned action.

- Class 5: Highly fossiliferous geologic units that regularly and predictably produce vertebrate fossils or uncommon invertebrate or plant fossils and that are at risk of human-caused adverse impacts or natural degradation. These include units in which vertebrate fossils or uncommon invertebrate or plant fossils are known and documented to be present consistently, predictably, or abundantly. Class 5 pertains to highly sensitive units that are well exposed with little or no soil or vegetative cover, units in which outcrop areas are extensive, and exposed bedrock areas that are larger than 2 contiguous acres.

1  Management concern for paleontological resources in Class 5 units/areas is high because the potential for
2  affecting significant fossils is high. Vertebrate fossils and uncommon invertebrate fossils are known or
3  can be reasonably expected in the planning area. Assessment by a qualified paleontologist would be
4  required in advance of surface-disturbing activities or land tenure adjustments, and mitigation will often
5  be necessary before and/or during surface-disturbing actions. Field surveys prior to authorizing any
6  surface-disturbing activities will usually be necessary. On-site monitoring may also be necessary during
7  construction activities. Designation of areas of special interest and concern may be appropriate. Class 2,
8  3, and 5 areas within the planning area are shown on Map 2-4 and listed in Table 3-19.

9  **Table 3-19. Potential Fossil Yield Classification Designations within the Planning Area**

| PFYC Designation | Geologic Units | Acres in the Planning Area |
|---|---|---|
| Class 2 | Glen Canyon Group (Navajo, Kayenta, Wingate, Moenave) Surficial alluvium and colluvium, Surficial aeolian deposits, Surficial older alluvium and colluvium | 315,636 |
| Class 3 | Indianola, Mancos, Frontier, Straight Cliffs, Iron Springs, Summerville, Entrada, Caramel, Arapien, Twin Creek | 164,521 |
| Class 5 | Dakota, Cedar Mountain, Kelvin, Morrison | 46,017 |

10  ## 3.8.2   Resource Trends

11  The BLM paleontology program is mandated under the PRPA to manage paleontological resources using
12  scientific principles and expertise. Natural or accelerated erosion, decay, improper collection, and
13  vandalism can remove, alter, or damage those characteristics that make the paleontological resource
14  scientifically important or enjoyable to the public. The Price and Richfield Field Offices' ROD/RMPs
15  (BLM 2008a, 2008b) require mitigation of adverse impacts on vertebrate and significant invertebrate
16  paleontological resources resulting from surface-disturbing activities. An assessment of fossil resources is
17  required in the Richfield RMP before permitting surface-disturbing activities can be permitted in areas
18  with moderate to high potential to affect scientifically significant paleontological resources. In the Price
19  Field Office, assessments are required on a case-by-case basis before and during surface disturbance.

20  A search of the Utah Geological Survey (UGS) fossil database in 2017 revealed a total of 50
21  paleontological localities in the planning area (UGS Fossil Locality Database 2017). Of those, 21 are
22  vertebrate fossils, three are tracks from vertebrates, 15 are invertebrate fossils, and five are petrified
23  wood. Six records do not specify the type.

24  Collection of paleontological resources from BLM-administered land in the planning area is allowed with
25  some restrictions, depending on the significance of the paleontological resources. Under the existing
26  regulations for both field offices, the collection of common invertebrate or plant paleontological resources
27  for personal, noncommercial use is allowed in reasonable quantities except on developed recreation sites
28  and areas or where otherwise posted or prohibited. Vertebrate and significant invertebrate fossils can be
29  collected only under a permit that is issued to qualified researchers. Permission to collect significant plant
30  and invertebrate fossils is determined on a case-by-case basis and must be identified in decision
31  documents. Professional paleontologists conducting research or assessment and mitigation are regulated
32  through the permit process. The BLM issued three excavation permits the planning area in the last 11
33  years.

Fossil Point in the planning area is a popular recreational area and has exposed vertebrate fossils. Located south of Green River, Utah, the site has experienced damage and theft of fossils by the public.

Fossil theft and vandalism occur with some regularity throughout the planning area. Only a small number of these occurrences are ever prosecuted. The escalating commercial value of fossils also means that fossils on federal lands are increasingly subject to theft and vandalism. These crimes reduce scientific and public access to scientifically significant and instructive paleontological resources, and destroy the contextual information critical for interpretation.

## 3.9    VISUAL RESOURCES AND NIGHT SKIES

The BLM's visual resource management (VRM) system is a way to identify and evaluate scenic values to determine the appropriate levels of management to apply to a defined area. VRM is a tool to identify and map essential landscape settings and, in turn, develop management guidelines. It also provides a way to analyze potential visual impacts and apply visual design techniques to ensure that surface-disturbing activities are in harmony with their surroundings. The BLM's VRM system helps to ensure that actions taken on BLM-administered land will maintain the visual and scenic qualities associated with landscapes.

The analysis area for visual resources is the planning area plus the viewshed from the Horseshoe Canyon unit of Canyonlands National Park and the Green River Labyrinth Canyon rim (see Maps 2-6). The planning area is largely undeveloped, with few human-made structures or other developments, and is a mostly natural landscape. The topography is characterized as a flat plateau with incised valleys and canyons; buttes and red rock outcrops dot the landscape. The San Rafael River crosses the planning area from the northwest to the planning area's eastern side before joining the Green River. From the surface of the plateau and elevated areas, many distant peaks—including the La Sal Mountains, which are as much as 45 miles from the planning area—are visible on clear days. From elevated locations in the planning area, 360-degree views of southeastern Utah can be seen.

Areas adjacent to the planning area such as the Green River Labyrinth Canyon and Canyonlands National Park are renowned for opportunities to view naturally dark night skies. These night skies are among the most unspoiled that remain in the continental United States, and the Canyonlands National Park is certified as an International Dark Sky Park for the quality of its pristine night sky viewing. Naturally dark skies are identified as an important resource in Canyonlands National Park for the stunning starscapes that are often visible (NPS 2017b). Opportunities to view night skies have become an important component of the overall recreational experiences of BLM and NPS visitors.

### 3.9.1    Resource Conditions

The BLM uses a visual resource inventory (VRI) and the resulting VRI classes, to inform management decisions including assignment of visual resource management (VRM) classes to a given area. The VRI class does not always match the VRM class because the VRM class considers factors other than those used to establish the VRI classes (see VRI and VRM discussion below).

#### 3.9.1.1    *Visual Resource Management Classes*

Current management objectives for visual resources in the planning area are prescribed in the Price and Richfield Field Offices' RMP-RODs, completed in 2008 (BLM 2008a, 2008b). The VRM classes range from Class 1 to Class IV, as prescribed by the BLM's *Manual 8400 - Visual Resource Management* (BLM 1984). The VRM class assigned to a given area determines the amount of change or contrast from development activities to the elements of the landscape that are allowable under the current RMPs. The VRM class is determined by considering the VRI, discussed below, and other resource concerns or uses. When disclosing the impacts  that development activities may have on the visual characteristics of the

landscape, the analysis is based on a contrast rating, which is the degree of visual contrasts created in line, form, color, and texture and land, water, vegetation and structures from a proposed action. The VRM class management objectives are as follows (BLM 2012a):

- Class I objective: To preserve the existing character of the landscape. The level of change to the characteristic landscape should be very low and must not attract attention. Class I can only be applied to lands with a special designation such as a WSA or ACEC.

- Class II objective: To retain the existing character of the landscape. The level of change to the characteristic landscape should be low.

- Class III objective: To partially retain the existing character of the landscape. The level of change to the characteristic landscape should be moderate.

- Class IV objective: To provide for management activities which require major modification of the existing character of the landscape. The level of change to the characteristic landscape can be high.

VRM class acreages in the planning area are listed in Table 3-20 and depicted in Map 2-14. The acreages include BLM-administered lands only.

**Table 3-20. Visual Resource Management Class Acreage Distribution in the Planning Area**

| VRM Class | Acres |
|-----------|-------|
| Class I | 225 |
| Class II | 14,233 |
| Class III | 390,234 |
| Class IV | 46,442 |
| **Total** | **451,134** |

### 3.9.1.2    *Visual Resource Inventory Classes*

The BLM conducted an inventory of visual values, known as a visual resource inventory (VRI), across the planning area in 2011 in accordance with the BLM's *Manual H-8410-1 - Visual Resources Inventory* (BLM 1986). The BLM categorizes visual resources into inventory classes, which are based on scenic quality evaluations, analysis of sensitivity level, and the delineation of distance zones. The VRI process consists of the following:

- A scenic quality evaluation to rate the visual appeal of an area

- An analysis of sensitivity level to assess public concern about an area's scenic quality and sensitivity to potential changes in the visual setting

- A delineation of distance zones to indicate the relative visibility of the landscape from primary travel routes or observation points

The inventory classes represent the relative values of the visual resources. Inventory Classes I and II represent areas with the most value. Inventory Class III represents a moderate value. Inventory Class IV represents areas with the least value. Inventory Class I can be applied only to lands with a special designation where a management decision has been made to maintain a natural landscape. Table 3-21 lists the acreage in the planning area by VRI class resulting from the 2011 inventory. While the current VRM

1  prescriptions from the Price and Richfield Field Offices' ROD/RMPs were designated prior to the 2011 VRI
2  and have not been amended, the 2011 VRI results may be used during the MLP planning process to assist
3  the BLM in identifying appropriate mineral leasing stipulations to mitigate impacts on visual resources.
4  These acreages include both BLM-administered lands and non-BLM lands within the planning area.

5  **Table 3-21.  Visual Resource Inventory Class Acreage**
6  **Distribution in the Planning Area**

| VRI Classes | Acres |
|-------------|-------|
| Class I | 0 |
| Class II | 25,681 |
| Class III | 34,925 |
| Class IV | 465,568 |
| **Total** | **526,174** |

7  Class II areas include portions of Saucer Basin/Moonshine Wash, Keg Knoll, and Trin Alcove/Three
8  Canyon recreation focus areas, a portion of the Labyrinth SRMA and other viewpoints on the Green River
9  Labyrinth Canyon rim (see Map 3-3). The rest of the planning area is inventoried as Class III and Class
10  IV.

11  **3.9.2    Resource Trends**

12  Visual values in the planning area have not experienced great change in the last several years because the
13  area is remote and development has been minimal. Some linear features such as user-created OHV trails
14  and two-track roads used for previous seismic studies or for access to the canyon rim have appeared in
15  some areas and can be seen at a distance. Grazing activities are occasionally evidenced by the visibility of
16  corrals or fencing, cattle trails, and livestock. Mechanical removal of salt cedar (tamarisk), along the San
17  Rafael River has resulted in some visual modification to riparian areas over the last decade.

18  As part of the MLP process, the BLM identified key observation points (KOPs) within the planning area
19  to focus the alternatives on areas where viewers are more likely to seek visually appealing experiences.
20  These areas are shown in Map 2-7 and include overlooks to view the Green River Labyrinth Canyon
21  corridor and access points to canyon hiking such as the Horseshoe Canyon Trailhead. The KOPs include
22  Bull Bottom, Trin Alcove/Three Canyon Overlook, Wolverton Overlook, Keg Knoll, and the Horseshoe
23  Canyon Trailhead (see Map 2-6). The primary travel route in the planning area, known as Lower San
24  Rafael Road, is also identified as a linear key observation corridor, and is shown on Map 2-8-B. These
25  KOPs and the viewsheds from these KOPs have the highest potential value for those recreationists and
26  other users for whom scenic quality is an important component of their experience (see Section 4.14 for
27  full analysis of impacts to recreation). Other areas likely to be visited are the miles of OHV, bike,
28  equestrian, and foot trails occasionally visited in the planning area by recreationists, hunters, permitted
29  livestock grazing allotment holders, and scenic drivers within the planning area or along highways
30  bordering the planning area such as Interstate 70 or State Route 24.

## 3.10 AUDITORY MANAGEMENT (SOUNDSCAPES)

### 3.10.1 Introduction

The analysis area for auditory management (soundscapes) consists of the planning area and adjacent lands that have sensitive receptors and that could be affected by decisions in the planning area. The adjacent lands include the following:

- Portions of the Labyrinth Canyon and Dirty Devil/Robbers Roost SMRAs that are south and east of the planning area and above the rim of the Green River

- The Horseshoe Canyon unit of Canyonlands National Park

### 3.10.2 Resource Conditions

#### 3.10.2.1    Soundscape

A soundscape consists of both natural and human-created sounds and is the total acoustic environment of an area. Like scenery or water, a soundscape is a valuable resource that can be degraded easily or destroyed by inappropriate sounds or sound levels. Soundscapes, like airsheds and viewsheds, transcend management boundaries and may require management.

Sound can be defined as any pressure variation that the human ear can detect. It occurs from vibrations or sound waves radiating through air, water, or solid objects. For the purposes of this analysis, noise is defined as unwanted sound that interferes with normal activities or that in some way reduces the quality of the environment.

The natural and human-created sounds within a soundscape are characterized as being heard at noise-sensitive human receptors. Noise-sensitive human receptors are places where sounds can be heard; they may consist of residences, hospitals, libraries, recreation areas, churches, and similar locations. Studies have shown direct links between noise and health. Noise-induced hearing loss is the most common health effect (EPA 2017b). In addition, noise can reduce the quality of the visitor recreation experience on public lands. Although noise is known to have an effect on wildlife health and behavior, this section considers sound and noise levels as they relate to the human environment.

#### 3.10.2.2    Sound Level Characteristics and Sound Data

Humans experience sound based on frequency, amplitude, and time pattern. Frequency or pitch is defined as the number of pressure variations per second in the air, and it is expressed in hertz (Hz). Humans can generally hear sound in the 20- to 20,000-Hz range. Amplitude is the magnitude or intensity of a sound and is usually expressed in decibels (dB), which is a dimensionless ratio of sound pressure to a reference pressure (usually 20 micropascals). The threshold of human hearing is 0 dB. Decibels are measured on a logarithmic scale. A change in sound level of 10 dB is perceived by the average person as doubling (or halving) the level of loudness (Table 3-22).

1    **Table 3-22. Perceived Change in Decibel Levels**

| Change in Sound Level | Perceived Change to the Human Ear |
|---|---|
| ±1 dB | Not perceptible |
| ±3 dB | Threshold of perception |
| ±5 dB | Clearly noticeable |
| ±10 dB | Twice (or half) as loud |
| ±20 dB | Fourfold (4×) change |

2    Note: For comparison purposes, the threshold of human hearing is 0 dB.
3    Source: Minnesota Pollution Control Agency (1999)

4    Because the human ear perceives sounds at low frequencies differently than it does sounds at high
5    frequencies, measured sound levels may be adjusted to correspond to human hearing. The A-weighted
6    decibel (dBA) is the adjusted unit of sound used to describe the human response to noise. Sound levels
7    and perception by the human ear are presented in Table 3-23. Sound and noise are also considered in
8    terms of time patterns; noise can be continuous (e.g., the sound of a waterfall or machinery operating
9    without interruption in the same mode), intermittent (e.g., aircraft take-offs and landings), or impulsive
10   (e.g., noise from impacts or explosions such as from a gunshot). Sound and noise can fluctuate and vary
11   over time (e.g., the loudness of traffic at a busy intersection).

12   **Table 3-23. Sound Levels for Common Noise Sources**

| Noise Source or Noise Environment | Sound Level (dBA) | Characteristic Impression |
|---|---|---|
| Jackhammer | 130 | Threshold of pain |
| Jet aircraft takeoff at 100 feet | 120 | Uncomfortably loud |
| Riveting machine at operator's position | 110 | Extremely loud |
| Industrial boiler room | 90 | |
| Quiet air compressor at 50 feet | 70 | Very loud |
| Normal conversational speech at 5-10 feet | 60 | |
| Open office area background level | 50 | Quiet |
| Residential with soft radio music | 40 | |
| Soft whisper at two feet | 30 | Very quiet |
| Concert hall | 20 | |

13   Note: For comparison purposes, the threshold of human hearing is 0 dB.
14   Source: Cavanaugh and Tocci (1998)

15   Although dBA indicates the level of noise at a specific point in time, noise levels within a soundscape can
16   vary continuously and can include sounds from a variety of sources. This variation can be accounted for
17   using the energy-equivalent sound level ($L_{eq}$). The A-weighted $L_{eq}$ is the dBA average over some time
18   interval.

19   Noise levels can be affected by the distance of the noise receptor from the noise source. Attenuation (the
20   reduction of sound intensity by various means) as a result of distance typically has a drop-off rate of 6
21   dBA with every doubling of distance from the point source, assuming no interference from obstacles,

1   atmospheric conditions (e.g., rain, snow, and wind), or site-specific terrain (e.g., hills and forests)
2   (Minnesota Pollution Control Agency 1999).

3   **Oil and Gas Noise Contributions**

4   Although data regarding noise levels from oil and gas activities are generally limited, both the BLM and
5   U.S. Bureau of Reclamation have published noise levels for some oil and gas activities. Table 3-24 shows
6   noise levels associated with specific oil and gas activities.

7   **Table 3-24. Noise Levels Associated with Oil and Gas Sources**

| Sound Source | Time Pattern | BLM Data | Bureau of Reclamation Data |
|---|---|---|---|
| | | (dBA)* | |
| Well drilling | Intermittent, fluctuating | 83 | – |
| Pump jack operation | Long term, continuous | 82 | – |
| Produced-water injection facilities | Long term, continuous | 71 | – |
| Natural gas compressors | Long term, continuous | 89 | 62–87 |
| Site construction and rehabilitation: earth moving and agricultural equipment | Intermittent, fluctuating | – | 93–108 |
| Oil and gas drilling/workover | Intermittent, fluctuating | – | 100–130 |
| Oil and gas fracturing operation | Intermittent, fluctuating | – | 100–145 |
| Oil and gas operations | Long term, continuous | – | 62–87 |

8   *Sound levels are normalized to a distance of 50 feet (15 meters) from the source.
9   Sources: BLM 2000; Bureau of Reclamation 2008.

10   ### 3.10.2.3   *Analysis Area Noise Levels*

11   The natural soundscape is an important component of the recreational experience enjoyed by visitors to
12   the analysis area. The existing soundscape in the analysis area includes noise from vehicles on State
13   Route 24 and Interstate 70, localized vehicular traffic, aircraft overflights, OHV users, boaters, mountain
14   bikers, climbers, other recreation users, and livestock grazing operations. Noise from localized vehicular
15   traffic is loudest immediately adjacent to roads and parking areas, but it can be audible a long distance
16   from roads if there are low levels of natural sound in the background. Sounds tend to travel a great
17   distance in the desert. Natural sounds such as birdsong and the sound of running water are also present in
18   the analysis area.

19   The level of highway noise in the analysis area from State Route 24 and Interstate 70 depends on the
20   volume of traffic on each route, the speed of the traffic, and the number of trucks in the traffic flow. The
21   loudness of traffic noise generally increases with heavier traffic volumes, higher speeds, and a greater
22   number of trucks. Traffic noise can also be increased by factors such as defective mufflers, other faulty
23   vehicle equipment, or steep inclines (FHWA 1980). A medium-sized truck traveling at 50 miles per hour
24   has a perceived relative loudness of 80 dBA from 50 feet away, and a modified motorcycle traveling at
25   the same speed has a perceived relative loudness of 90 dBA from 50 feet away (FHWA 1980). Traffic
26   noise is usually not a serious problem for people more than 500 feet from heavily traveled freeways or
27   more than 100–200 feet from lightly traveled roads (FHWA 1980).

1   The majority of the analysis area is not near State Route 24 or Interstate 70, and portions of its
2   soundscape may compare to an agricultural area such as a tomato field or to a small town or quiet
3   suburban area. A typical day-night average sound level (the 24-hour A-weighted equivalent sound level
4   with a 10-decibel penalty applied to nighttime levels, or $L_{dn}$) for a tomato field on a farm is 44 dBA,
5   whereas a small town cul-de-sac and wooded residential area both have a typical day-night average sound
6   level of 50 dBA (EPA 1974). However, much of the analysis area (and especially more remote parts such
7   as the recreation focus areas and KOPs) likely has average sound levels well below 44 to 50 dBA. Natural
8   sound predominates, and human-caused noise, such as aircraft overflights or vehicle traffic, consists of
9   distinct noise events. Existing ambient sound levels in these areas may be similar to a representative
10  sound level of 20 dBA from leaves rustling in Canyonlands National Park (Ambrose and Burson 2004). It
11  should be noted that although there is often less sensitivity to noise in developed areas, the soundscape of
12  the analysis area is expected to be natural, with little, if any, human-caused noise in backcountry and
13  wilderness-like areas (Ambrose and Burson 2004).

14  Noise-sensitive human receptors in the analysis area primarily consist of recreation users in Labyrinth
15  Canyon and the Dirty Devil/Robbers Roost SRMAs, in Horseshoe Canyon, and in the five KOPs
16  identified in the Visual Resources and Night Skies section (Bull Bottom, TrinAlcove/Three Canyon,
17  Wolverton Overlook, Keg Knoll, and the Horseshoe Canyon trailhead).

18  ### 3.10.2.4     Regulatory Summary

19  Laws and guidelines at the federal level that are most relevant to the assessment of noise impacts in the
20  analysis area include the following:

21  • Noise Control Act of 1972, as amended (PL 92-574, 42 USC 4901 et seq.)

22  • Clean Air Act Title IV – Noise Pollution (42 USC 7641)

23  • The Quiet Communities Act of 1978 (PL 95-609, 92 USC 3079)

24  • Occupational Safety and Health Administration Occupational Noise Exposure; Hearing
25    Conservation Amendment (29 CFR 1910)

26  • NPS Director's Order #47: Soundscape Preservation and Noise Management and other park
27    soundscape management policies

28  There is no state or local noise control program for the analysis area.

29  The Noise Control Act of 1972 established a national policy to promote an environment free from noise
30  that jeopardizes the health or welfare of the American population (EPA 1974). In 1974, the EPA
31  identified a 24-hour exposure level of 70 dB as the level of environmental noise to prevent measurable
32  hearing loss over a lifetime. In addition, noise levels of 55 dB outdoors and 45 dB indoors were identified
33  as requisite to protect public health and safety from activity interference and annoyance (EPA 1974). A
34  small town and quiet suburban community typically has an outdoor day-night sound level of 50 dB; a
35  suburban community has an outdoor day-night sound level of 55 dB (EPA 1974).

36  Clean Air Act Title IV gives the EPA the authority to investigate and study noise and its effect,
37  disseminate information to the public regarding noise pollution, respond to inquiries on matters related to
38  noise, and evaluate the effectiveness of existing regulations for protecting public health and welfare. It
39  also directed the EPA to establish the Office of Noise Abatement and Control, which was phased out in
40  1982 with the decision that noise issues were best handled at the state and local level.

41  The Quiet Communities Act of 1978 amended portions of the 1972 Noise Control Act, expanding the
42  EPA's mission to control noise pollution and undertake research and public information initiatives. It also
43  required coordination between federal agencies on noise control.

1  The Occupational Health and Safety Act of 1970 established hearing conservation noise exposure
2  regulations for workers. The purpose of the act is to ensure safe and healthful working conditions.
3  Worksite noise levels are regulated by 29 CFR 1910.95, which deals with occupational noise exposure.
4  This section limits the noise pressure level to 90 dBA continuous exposure for an 8-hour day. If workers
5  are exposed to an 8-hour time-weighted average of 85 dBA or greater, a worker hearing protection
6  program must be implemented.

7  NPS Director's Order #47 outlines agency operational policies that require the protection, maintenance,
8  or restoration of natural soundscape resources in a condition unimpaired by inappropriate or excessive
9  noise sources. The NPS has established additional management policies for soundscape protection,
10  including policies for cultural soundscape management, overflight management, and motorized
11  equipment in national parks.

### 3.10.2.5    Current Management

13  There is no management direction for auditory management (soundscapes) in either the Price or Richfield
14  Field Office's ROD/RMPs (BLM 2008a, 2008b). The travel management decisions in the Richfield Field
15  Office ROD/RMP indicate that the designation of routes should take into account "noise and other
16  factors" (BLM 2008b).

### 3.10.3   Resource Trends

18  Nearly 64 million people live within 25 miles of BLM-administered public land. The population in the
19  West continues to increase at a rapid rate and, as a result, so does the use of public lands (BLM 2014b).
20  Human-created noise levels are expected to rise with the increased use of public lands, and management
21  of soundscapes will require more attention.

22  Changing patterns of human use and land use continually affect the acoustic environment. In general,
23  soundscape management is becoming more complex and challenging with an increase in threats to
24  acoustic resources (NPS n.d. [2017]). Resource planning for soundscapes is an important step to address
25  threats to BLM resources from noise and other soundscape changes.

### 3.11  SPECIAL STATUS SPECIES

27  Special status species include species listed as threatened, endangered, or candidates for listing under the
28  Endangered Species Act (ESA) and species designated as sensitive by the BLM. The BLM is responsible
29  for managing habitat for special status plant and animal species as well as managing special status plants.
30  The BLM RMPs for the Price and Richfield Field Offices allocate resources on public lands for special
31  status species. The RMPs also require the implementation of stipulations, such as restrictions on surface
32  disturbance and seasonal and spatial buffers to protect individuals and habitats for special status species.

33  BLM State Directors designate species within their respective states as BLM sensitive. Species designated
34  as BLM sensitive must be native species found on BLM-administered lands for which the BLM has the
35  capability to significantly affect the conservation status of the species through management, and either

36    1.  there is information that a species has recently undergone, is undergoing, or is predicted to
37        undergo a downward trend such that the viability of the species or a distinct population segment
38        of the species is at risk across all or a significant portion of the species' range; or

39    2.  the species depends on ecological refugia or specialized or unique habitats on BLM-administered
40        lands, and there is evidence that such areas are threatened with alteration such that the continued
41        viability of the species in that area would be at risk.

The BLM's objectives for managing special status species are to

1. conserve and/or recover ESA-listed species and the ecosystems on which they depend so that ESA protections are no longer needed for these species, and

2. initiate proactive conservation measures that reduce or eliminate threats to BLM sensitive species to minimize the likelihood of and need for listing of these species under the ESA.

The analysis area for special status species varies by species. For special status fish and wildlife species for which habitats have been delineated or modeled by BLM or another regulatory agency, the analysis area is the extent of the habitats crossed by the planning area. For special status fish and wildlife species for which habitats have not been delineated, the analysis area is the subwatersheds (Hydrologic Unit Code [HUC] 12) crossed by the planning area. For special status plants, the analysis area is the extent of identified habitats within the subwatersheds (HUC 12) crossed by the planning area. The analysis areas were selected because they represent the areas within which changes to special status species populations could be observed as a result of impacts on the soil, water, vegetation, or individuals of each species in the planning area.

### 3.11.1  Resource Conditions

This section describes the existing condition of special status species that are known to or may occur on BLM-administered public lands in the planning area. BLM developed this information by reviewing lists of species listed under the ESA that may occur in the planning area (USFWS 2017) and the Utah BLM sensitive species lists (BLM 2010b, 2011) and identifying species that may occur in the planning area using the best available information, including known sightings and historic locations and habitat conditions in the planning area.

#### *3.11.1.1    Special Status Plants*

#### Species Listed Under the Endangered Species Act

#### *Jones Cycladenia (Cycladenia humilis var. jonesii) – Threatened*

Regulatory Status

Jones cycladenia (*Cycladenia humilis* var. *jonesii*) was proposed for listing on January 10, 1985 (*Federal Register* 50:1247–1251). On May 5, 1986, the USFWS listed Jones cycladenia as a threatened species (*Federal Register* 51:16526–16530).

Critical habitat has not been designated for Jones cycladenia. USFWS has not finalized or approved a comprehensive recovery plan for the species, but a recovery outline was published in December 2008 (USFWS 2008a). The recovery outline is intended to guide recovery efforts and inform consultation and permitting activities until a comprehensive recovery plan for the species has been finalized and approved.

Distribution and Habitat Requirements

Jones cycladenia occurs between 4,390 and 6,000 feet (1,338 and 1,829 meters [m]) above mean sea level (amsl) in plant communities of mixed desert scrub, juniper, or wild buckwheat-Mormon tea. It is found on gypsiferous, saline soils of Cutler, Summerville, and Chinle Formations (USFWS 2008a). Populations are found on all aspects and on slopes that range from moderate to steep (USFWS 2008b).

Jones cycladenia is known from 26 sites. A "site" is a uniquely named occurrence, distinct from other named occurrences by distance or landscape structure, such as elevation, slope position, or characteristics of intervening habitat. These 26 sites are located in five areas, termed "complexes." The five Jones

1 cycladenia complexes include Joe Hutch Creek, San Rafael, Moab, and Greater Circle Cliffs in Utah, and
2 Pipe Springs in Arizona (USFWS 2008a).

3 <u>Primary Threats to Survival</u>

4 At the time of listing, Jones cycladenia was known from three sites with low numbers. It was thought to
5 be a Tertiary relict, poorly adapted to the present-day arid climatic regime. The Jones cycladenia
6 ecosystem was thought to be fragile, easily degraded, and slow to recover (*Federal Register* 51:16526–
7 16530). Ongoing and potential anthropogenic impacts on habitat include off-highway vehicle (OHV) use;
8 oil, gas, and mineral exploration, including uranium mining and tar sands; and livestock grazing (although
9 the rule notes the probability of grazing causing serious damage was low) (*Federal Register* 51:16526–
10 16530). Habitat disturbance was thought to be reducing seedling establishment. Jones cycladenia was also
11 at risk as a result of inadequate state and federal regulatory mechanisms (USFWS 2008a).

12 The variety's threatened status has prompted federal land managers to implement protective measures to
13 limit impacts from OHV and mountain bike use, cattle grazing, and extractive activities. While these
14 threats have been managed to reduce anthropogenic impacts, these issues remain an ongoing and long-
15 term concern. Specifically, mountain biking and OHV use occurs near the Moab and San Rafael
16 complexes; cattle grazing occurs at sites in the San Rafael complex; and uranium mining and tar sands
17 extraction are foreseeable threats in both the San Rafael and Greater Circle Cliffs complexes (both
18 complexes are in Designated Special Tar Sands Areas) (USFWS 2008a).

19 Since listing, a number of other biological limiting factors have been revealed. Preliminary research (1988
20 to 1993) has shown that the plant has low fruit production and seed set, likely due to a complicated
21 pollination system and inadequate pollinator abundance (i.e., pollinators may have been lost or may be
22 migratory and appear episodically). No seedling germination events have been documented (USFWS
23 2008a). Genetic research at the San Rafael (the Spotted Wolf Canyon site), Moab (two separate sites at
24 Onion Creek and Castle Valley), and Greater Circle Cliffs complexes (one site at Deer Point, one site at
25 Silver Falls Canyon, and one site at Purple Hills) indicates that these sites of Jones cycladenia are
26 genetically distinct and not inbred, but may face other genetic limitations, such as genetic bottlenecking
27 or genetic drift. Several researchers have concluded that an ongoing lack of population recruitment may
28 result in a permanent loss of genetically important individuals or occupied sites. The species' fractured
29 distribution could further complicate issues associated with limited natural reproduction, dispersal
30 constraints, and genetic risks (USFWS 2008a).

31 Other factors reported since the time of listing include natural predation and relations to fragile
32 cryptobiotic crusts in some locations (USFWS 2008a).

33 <u>Occurrence in the Planning Area</u>

34 The BLM Price Field Office conducted studies in 2012 and 2014 to document distribution, identify
35 habitat requirements, and model the extent of suitable habitat of the species. The study indicates that the
36 species is not known to occur in the planning area. However, there are several known occupied sites along
37 the San Rafael River, approximately 1.75 miles west of the planning area. Additionally, the study
38 modeled potentially suitable habitat for the species. There are approximately 32,500 acres of habitat
39 classified as low-probability habitat, 148,367 acres of habitat classified as medium-low, 15,196 acres of
40 habitat classified as medium-high probability habitat, and 118,164 acres of habitat classified as highest
41 probability habitat in the planning area (Map 2-13 ) (Sansom and Elliott 2014).

1 ***Wright Fishhook Cactus (Sclerocactus wrightiae) – Endangered***

2 <u>Regulatory Status</u>

3 Wright fishhook cactus (*Sclerocactus wrightiae*) was listed as endangered under the ESA in October 1979
4 (*Federal Register* 44:58868). No critical habitat has been designated for the species. USFWS completed a
5 90-day finding on a petition to delist the species in 2005 in which the USFWS found that there is no
6 substantial information that would indicate that delisting of Wright fishhook cactus may be warranted
7 (*Federal Register* 70:44544). USFWS initiated a 5-year status review of the species in 2016 (*Federal*
8 *Register* 81:33698).

9 <u>Distribution and Habitat Requirements</u>

10 The Wright fishhook cactus is known from Emery, Sevier, Wayne, and Garfield Counties in south-central
11 Utah. Populations of Wright fishhook cactus occur primarily on lands managed by the BLM out of the
12 Price and Richfield Field Offices and by the National Park Service (USFWS 2008c).

13 The Wright fishhook cactus is found on semi-barren sites in salt desert shrub, pinyon/juniper woodland-
14 low shrub, pinyon/juniper woodland-grassland, pinyon/juniper woodland-big sage phase, mixed
15 grassland, and mixed desert shrub communities. The cactus is most commonly found between the
16 elevations of 4,200 and 7,600 feet (1,280 and 2,315 m) (USFWS 2008c).

17 The Wright fishhook cactus is found on a variety of geological formations. It appears that the Wright
18 fishhook cactus does not solely occur on any particular formation but is most commonly found on the
19 Curtis, Mancos Shale, and Summerville Formations (USFWS 2008c).

20 <u>Primary Threats to Survival</u>

21 Potential human threats to the Wright fishhook cactus populations and suitable habitat include recreation,
22 including OHV use; energy and mineral exploration and development, including associated ancillary
23 facilities and disturbances; infrastructure development; and illegal collection (USFWS 1985). BLM has
24 also documented impacts to the species from trampling as a result of livestock grazing, which is a major
25 threat to this species. Illegal collection and removal of individuals and populations also constitutes a
26 significant threat to the species (BLM 1979, Christiansen 1991, and USFWS 1979, as cited in USFWS
27 2008c).

28 <u>Occurrence in the Planning Area</u>

29 The Wright fishhook cactus in known to occur in several locations of the southwestern portion of the
30 planning area in the vicinity of Hanksville. BLM has mapped a total of 2,293 acres of suitable habitat in
31 the planning area (Map 2-13).

32 **BLM-Sensitive Species**

33 Table 3-25 identifies BLM sensitive plant species that may occur or are known to occur in the planning
34 area.

1 **Table 3-25. BLM Sensitive Plant Species that May Occur in the Planning Area**

| Common Name (Scientific Name) | County | Habitat Information | Potential Occurrence Rating* |
|---|---|---|---|
| Rabbit Valley gilia (*Aliciella caespitosa*) | Wayne | Pinyon-juniper-mountain mahogany communities at 1,735–2,595 m amsl on Navajo Sandstone and Carmel Limestone Formations, in crevices and on talus. | 2 |
| Mussentuchit Creek gilia (*Aliciella tenuis*) | Emery | Shadscale, ephedra, wyethia, Indian ricegrass, pinyon-juniper, and mountain mahogany communities at 1,585–2,170 m. | 3 |
| Peabody's milkvetch (*Astragalus pubentissimus* var. *peabodianus*) | Emery | Entrenched channels cut into the escarpments draining the south and wet flanks of the Tavaputs Plateaus, in and below the Cretaceous Straight Cliffs' coal-bearing sequences. Sandy drainage bottoms in pinyon-juniper and mixed desert shrub communities at 1,300–1,770 m amsl. | 1 |
| Loa milkvetch (*Astragalus welshii*) | Wayne | Sagebrush, pinyon-juniper, and sagebrush-aspen communities, exclusively on igneous gravels at 2,135–2,810 m amsl. | 1 |
| Bolander's camissonia (*Camissonia bolanderi*) | Emery | Gypsiferous Triassic Moenkopi Formation in Emery County, Utah. It is a narrowly restricted edaphic endemic. It is known only from the type locality at the upper Tidwell Draw in the San Rafael Desert. It occurs in association with *Atriplex* spp. and *Ephedra* spp. at 4,780 feet (1,457 m) amsl and was found next to a telephone pole (Atwood and Welsh 2007). The type locality is about 1 mile from the planning area, but Moenkopi Formation is not present in planning area. | 2 |
| Creutzfeldt's cryptantha (*Cryptantha creutzfeldtii*) | Emery | Barren clay knolls and shale slopes of the Mancos Shale Formation in shadscale and mat-saltbush communities at 1,600–2,073 m amsl; in silty-clay soils of the Blue Gate Member of the Mancos Shale, which is often overlain by a veneer of fragments from the overlying Emery Sandstone. | 3 |
| Featherleaf springparsley (*Cymopterus beckii*) | Wayne | Sandy or stony places, pinyon-juniper-mountain brush, ponderosa pine-manzanita, conifer-oak, and Douglas-fir communities at 1,700–2,635 m. | 1 |
| Maguire's fleabane (*Erigeron maguirei*) | Emery | Exposed mesas and steep, narrow canyons cut into Navajo Sandstone; cool, shaded, mesic sites in crevices that collect soil and organic matter and, less frequently, along canyon bottom washes at 1,600–2,170 m amsl. Cool, mesic wash bottoms and dry, partially shaded slopes of eroded sandstone cliffs of Wingate, Chinle, and Navajo Sandstone Formations in mountain shrub, Douglas-fir, ponderosa pine, and lower limits of juniper woodland communities between 5,400 and 7,100 feet amsl (Utah Rare Plant Guide 2017a). | 1 |
| Flat-top buckwheat (*Eriogonum smithii*) | Emery, Wayne | Purple sage, matchweed, ephedra-Indian ricegrass, and rabbitbrush communities, on the Entrada Formation, and on stabilized sand dunes at 1,585–1,710 m amsl. | 3 |
| Paria spurge (*Euphorbia nephradenia*) | Emery, Wayne | Mat saltbush, blackbrush, ephedra, and mixed sandy desert shrub communities, mainly on Tropic Shale and Entrada Formations at 1,155–1,465 m amsl. | 3 |

| Common Name (Scientific Name) | County | Habitat Information | Potential Occurrence Rating* |
|---|---|---|---|
| Rushpink skeletonplant (*Lygodesmia entrada*) | Emery | Juniper and mixed desert shrub communities at 1,340–1,465 m amsl. | 3 |
| Manystem blazingstar (*Mentzelia multicaulis* var. *librina*) | Emery | Sagebrush, rabbitbrush, and pinyon-juniper communities at approximately 1,890 m amsl on Mancos Shale and Price River Formations. | 3 |
| Trotter's alpine parsley (*Oreoxis trotteri*) | Emery | In crevices or in sandy pockets on the Moab Tongue and occasionally the Slick Rock members of the Entrada Sandstone. Found in the open, although usually on sites with a northern aspect, and, less frequently, in alcoves and along shaded cliff bases. Mixed juniper and warm desert shrub community at 1,359–1,573 m amsl. | 2 |
| Jones dalea (*Psorothamnus polydenius* var. *jonesii*) | Emery | Shadscale, mat saltbush, ephedra, and galleta grass communities on Mancos Shale Formation (Blue Gate and Tununk members) and less commonly on sandy terrace gravels at 1,270–1,500 m amsl. | 4 |
| Jane's globemallow (*Sphaeralcea janeae*) | Wayne (Millard benches) | Warm and salt desert shrub on the Shinarump and Moenkopi Formations, and White Rim and Organ Rock members of the Cutler Formation at 1,220–1,405 m amsl. Frequently on sandy and gravelly soils of the weathered underlying formations, often on river benches and roadsides. | 1 |
| Psoralea globemallow (*Sphaeralcea psoraloides*) | Emery, Wayne | Zuckia-ephedra, shadscale, buckwheat, ephedra, pepperweed, and pinyon-juniper communities on saline and gypsiferous Mancos Shale (Tununk member), Buckhorn Conglomerate, Curtis Sandstone, Entrada siltstone, Carmel, Kaibab limestone at 1,220–1,925 m amsl. Occupies hogbacks and intervening strike valleys along the eastern and southeastern footslope of the San Rafael Swell. | 4 |
| Cedar Mountain fame flower (*Talinum thompsonii*) | Emery | Siliceous conglomerate gravels of Cedar Mountain Formation in pinyon-juniper and ponderosa pine communities at approximately 2,290 m. <br><br> Shallow, gravelly soils comprised mainly of rounded, siliceous pebbles of the Buckhorn Conglomerate of the Cedar Mountain Formation in pinyon-juniper, sagebrush, and ponderosa pine communities at 2,000–2,500 m amsl (Welsh et al. 2003). | 2 |
| Alpine greenthread (*Thelesperma windhamii*) | Wayne | Pinyon-juniper, mountain brush, and bristlecone pine communities at 2,100–2,745 m amsl on Carmel Limestone and on sand associated with the Navajo and Entrada Formations. | 2 |

1  * Potential Occurrence Rating:
2      1.  Very Low or No Potential. Suitable habitat is not present.
3      2.  Low Potential. Less than 100 acres of suitable habitat present/or low quality suitable habitat is present.
4      3.  Medium Potential. Suitable habitat is present.
5      4.  High Potential. High quality suitable habitat is present and/or historic records of species presence
6      5.  Very High Potential. Occupied habitat is present. [Not used in this table, but here for reference.]

1  **_Species Descriptions_**

2  Rabbit Valley gilia (_Aliciella caespitosa_)

3  A perennial herb with sparsely leafy flowering stems, 3 to 8.5 cm tall, this plant arises from a densely
4  leafy base. Flowers (June–July) are scarlet red, occasionally fading to maroon or purple. This plant was
5  first collected in 1875 and was not seen again for almost 90 years.

6  Mussentuchit Creek gilia (_Aliciella tenuis_)

7  A tufted, short to long-lived perennial herb, 0.5 to 1.5 decimeters (dm) tall, this plant has lobed basal
8  leaves. Forms mounds with age. The plant is densely covered with glandular hairs that are often covered
9  with adhering sand grains. Flowers (May–July) are pale blue.

10  Peabody's milkvetch (Astragalus pubentissimus var. peabodianus)

11  Plants grow as low, rounded clumps with spreading lower branches in the sandy drainage bottoms, and
12  the flowers vary in color from plant to plant and even within a single plant, with the older flowers
13  different in color from younger ones.

14  Loa milkvetch (Astragalus welshii)

15  A perennial herb, 4 to 20 centimeters (cm) tall, this plant has whitish (drying yellowish-white), often
16  purple-tinged flowers in bloom May to early June.

17  Bolander's camissonia (_Camissonia bolanderi_)

18  Bolander's camissonia was first located and described as a species in 2005. It is known only from a single
19  location in the upper Tidwell Draw, approximately 15 miles northwest of the town of Green River. This
20  location is on the Triassic Moenkopi Formation in association with saltbush and ephedra at 4,780 feet
21  amsl (Atwood and Welsh 2007).

22  Creutzfeldt's cryptantha (_Cryptantha creutzfeldtii_)

23  A perennial herb, this plant is 7 to 23 cm tall, with many stems. Clusters of white flowers bloom from
24  April to early June.

25  Featherleaf springparsley (_Cymopterus beckii_)

26  A perennial herb, up to 4 dm tall, this plant produces bright yellow flowers in compact clusters in the spring.

27  Maguire's fleabane (_Erigeron maguirei_)

28  A hairy perennial herb, 7 to 25 cm tall, this plant has one to four flower heads with pinkish-white rays,
29  and yellow disk flowers are borne on the ends of the stems. The plant blooms from May to June.

30  Flat-top buckwheat (_Eriogonum smithii_)

31  An erect to spreading, bright green shrub, this plant is 4 to 8 dm tall and produces open clusters of bright
32  yellow flowers.

33  Paria spurge (Euphorbia nephradenia)

34  A slightly succulent annual herb 1 to 2.5 dm tall, this plant produces small flowers inside yellow-green
35  cup-shaped structures. Each flower cluster produces a rounded seed capsule, which droops out of the
36  center the flowering structure. The plant blooms from June through August.

1  Rushpink skeletonplant (*Lygodesmia entrada*)

2  A perennial herb with thin, woody stems, the plant is typically 2.5 to 4.5 dm tall. White flower heads
3  bloom from May to June. The plants produce a milky juice.

4  Manystem blazingstar (*Mentzelia multicaulis* var. *librina*)

5  The plants are characterized by diffusely branched stems up to 3 dm tall, simple pinnatifid leaves with
6  narrow lobes, and scarcely winged seeds. Plants produce flowers and fruit June through August (Colorado
7  Rare Plant Guide 2017).

8  Trotter's alpineparsley (*Oreoxis trotteri*)

9  This is a clump-forming perennial herb. Clumps are up to 5 dm wide and 4 to 8 cm tall. Clusters of
10  yellow flowers bloom in late April and May.

11  Jones dalea (Psorothamnus polydenius var. jonesii)

12  This is an armed shrub 1.5 to 8 dm tall with ascending branches. Leaflets are curved, at least some over 4
13  millimeters (mm) long. Branches velvety with short hairs, conspicuously glandular with yellow or orange
14  resinous glands (Utah Rare Plant Guide 2017b).

15  Jane's globemallow (*Sphaeralcea janeae*)

16  This is a perennial herb, 3 to 9 dm tall, that produces a cluster of orange flowers from May to July. It is
17  similar to *Sphaeralcea leptophylla* in general habit during early anthesis. However, at maturity, it
18  becomes much taller than *S. leptophylla* and differs in color, simulating the large, rounded growth form
19  and yellowish-green color of the unrelated *Psoralidium junceum* and *Amsonia tomentosa* (Welsh et al.
20  2008). Also differs from *S. leptophylla* in having green leaves with rays of hairs steeply ascending, as
21  opposed to gray leaves with spreading rays (Utah Rare Plant Guide 2017c).

22  Psoralea globemallow (*Sphaeralcea psoraloides*)

23  This is a perennial herb, 1.4 to 3.5 dm tall, with deeply lobed, yellow green leaves. Orange flowers bloom
24  mid –May through July. The trifoliolate to three-lobed typically yellow green leaves are diagnostic for
25  this species, although there are gray green phases sometimes growing intermixed with the more typical
26  yellow green phases (Welsh et al. 2008). Its leaves are wedge shaped to rounded at the base and longer
27  than broad, which may also help to distinguish it from *S. coccinea*, which has cordate leaves broader than
28  long (Neese 1987 cited in Jones 2004). Furthermore, its flowers, borne singly at each node, may assist in
29  distinguishing from *S. grossulariifolia* and *S. parvifolia*, which have two or several-flowered clusters
30  (Neese 1987 cited in Jones 2004). This plant is a self-incompatible, obligate out-crossing species that is
31  likely dispersed by wind and rain (Jones 2004).

32  Cedar Mountain fameflower (*Talinum thompsonii*)

33  This is a succulent perennial herb that forms low clumps, up to 1 dm across, and produces loose clusters
34  of pink flowers from July to September.

35  Alpine greenthread (*Thelesperma windhamii*)

36  This is a perennial herb, 2 to 7 cm tall, with a thick, branching caudex. Leaves are mainly basal, pinnately
37  to subpalmately lobed or some entire; flower stems are pubescent at least on the lower portion (Utah Rare
38  Plant Guide 2017d).

1  ### 3.11.1.2     Special Status Fish

2  **Species Listed Under the Endangered Species Act**

3  ***Humpback chub* (Gila cypha) – *Endangered***

4  <u>Regulatory Status</u>

5  The humpback chub (*Gila cypha*) was listed as endangered under the Endangered Species Preservation
6  Act (ESPA) on March 11, 1967 (*Federal Register* 32:4001). With the 1973 passage of the ESA, which
7  superseded the ESPA, the species retained its endangered status. On April 18, 2007, the USFWS initiated
8  a 5-year species status review (*Federal Register* 72:19549), which was completed in 2011 (USFWS
9  2011a).

10  In March 1994, the USFWS designated seven reaches critical habitat for the species in the Colorado River
11  system, including portions of the Colorado, Green, and Yampa Rivers in the Upper Basin and portions of
12  the Colorado and Little Colorado Rivers in the Lower Basin, totaling 379 river-miles of critical habitat for
13  the species (*Federal Register* 59:13374).

14  <u>Distribution and Habitat Requirements</u>

15  Humpback chubs are found in large rivers in a variety of habitats. Adults have been found in deep
16  turbulent currents, shaded canyon pools, and areas under shaded ledges in moderate current, riffles, and
17  eddies (*Federal Register* 59:13374–13400). Young and spawning adults generally are found in sandy runs
18  and backwaters (USFWS 1990) in the Colorado, Green, Lower Yampa, and White Rivers.

19  Historically, the humpback chub was found throughout the Colorado River Basin from western Colorado
20  and Wyoming to northern Arizona in the Colorado, Green, Lower Yampa, and White Rivers. Currently,
21  there are six known self-sustaining populations consisting of 7,300 to 13,800 wild adults. Five
22  populations exist in the Upper Colorado River basin and one in the Lower Colorado River basin. The
23  Upper Colorado River basin populations are present in the Colorado River (Black Rocks, Westwater, and
24  Cataract Canyons in Utah), the Yampa River (Yampa Canyon in Colorado), and the Green River
25  (Desolation/Gray Canyons in Utah).

26  <u>Primary Threats to Survival</u>

27  The current primary threats to the humpback chub are loss, fragmentation, and modification of habitat due
28  to construction and operation of the Hoover Dam. The dam has led to impoundment of streams causing
29  stream inundation, reduced water temperatures, reduced spring flow, sediment capture, and increased
30  daily fluctuation in flow. Decreased temperatures and flow reduction may impede successful spawning
31  and increase competition with other species. As with the other Colorado River Basin endangered fishes,
32  predation by introduced species also likely contributed to the decline of the species. Species such as bass,
33  sunfish, catfish, red shiner, and redside shiner prey on the eggs and young of a number of native fish
34  species (*Federal Register* 45:27710).

35  Other threats include hybridization with *G. elegans* (bonytail) and *G. robusta* (roundtail chub), introduced
36  parasites, and effects of a small population size. In addition to possible genetic effects and higher
37  vulnerability to catastrophic events, small population size in fish can contribute to low reproductive
38  success during spawning. Increased hybridization among the native Gila species is thought to be
39  symptomatic of changes in habitat and movement patterns, leading to the genetic introgression (Utah
40  Natural Heritage Program [UNHP] 2003). The introduced Asian tapeworm also may be a serious threat to
41  the survival of the humpback chub.

1　Occurrence in the Planning Area

2　There is no designated critical habitat for the humpback chub in the planning area.

3　The nearest known populations to the planning area are in the Colorado River (Cataract Canyon) and the
4　Green River (Desolation/Gray Canyons).

5　**Bonytail (Gila elegans) – Endangered**

6　Regulatory Status

7　The bonytail (*Gila elegans*) was first proposed for listing as endangered under the ESA on April 24, 1978,
8　(*Federal Register* 43:17375), and the final listing rule was released in 1980 (*Federal Register* 45:27710).

9　Critical habitat for the bonytail and other listed Colorado River fish was designated in 1994 (*Federal*
10　*Register* 59:13374). The designation included seven reaches of the Colorado River system, including
11　portions of the Colorado, Green, and Yampa Rivers in the Upper Basin and the Colorado River in the
12　Lower Basin, totaling 312 river-miles.

13　Distribution and Habitat Requirements

14　Formerly abundant throughout the Colorado River and its larger tributaries, the bonytail has been found
15　from the Green River in Wyoming and Utah; the Yampa and Gunnison Rivers in Colorado; the Colorado
16　River in Arizona, Colorado, Nevada, and California; San Juan River in New Mexico; and the Gila and
17　Salt Rivers in Arizona (USFWS 2002a). Extirpated or declining across most of its range, the bonytail is
18　now one of the most critically imperiled North American freshwater fishes.

19　Primary Threats to Survival

20　Threats to the species include streamflow regulation, habitat modification or destruction, and competition
21　with and predation by non-native fish species. Historically, the species inhabited the large, turbid
22　mainstream rivers of the Colorado River Basin that alternated between swift water canyons characterized
23　by torrential rapids and slow, meandering, sandy-bottomed stretches. The Colorado River and its major
24　tributaries have been greatly altered by dams and diversions, eliminating much of the bonytail's original
25　habitat. The lower Colorado River basin is now an alternating series of reservoirs and cold tailwaters that
26　do not provide the warm-water temperature needed for bonytails to spawn. Predation by introduced
27　species such as bass, sunfish, catfish, red shiner, and redside shiner reduce survival of juvenile bonytails
28　and further contribute to the species' low recruitment (*Federal Register* 45:27710). Stocking efforts have
29　been adjusted to release larger size classes of bonytails in an attempt to reduce the risk of predation on
30　juveniles, but even the largest individuals regularly stocked (approximately 10 inches) appear to be
31　susceptible to predation by striped bass (*Morone saxatilis*) in reservoirs (Karam and Marsh 2010).

32　Occurrence in the Planning Area

33　There is no designated critical habitat for the bonytail in the planning area.

34　Known locations include the Yampa River in Dinosaur National Monument, the Green River in Gray and
35　Desolation Canyons, the Colorado River near Black Rocks (Kaeding et al. 1986) and Cataract Canyon
36　(*Federal Register* 59:13374), Lake Mohave near the Arizona–Nevada border, and Lake Havasu in
37　Arizona and California (USFWS 2002a). Bonytails have also dispersed into the San Rafael River from
38　release sites in the Colorado or Green rivers and likely made greater use of the river historically (BLM
39　2014a).

1    *Colorado Pikeminnow (Ptychocheilus lucius) - Endangered*

2    Regulatory Status

3    Colorado pikeminnow was listed as endangered (as the Colorado River squawfish) under the ESPA on
4    March 11, 1957 (*Federal Register* 32:4001) and as endangered under the ESA on its passage in 1973.
5    Two reintroduced Colorado pikeminnow populations have been designated as Nonessential Experimental
6    Populations (NEP) under Section 10(j) of the ESA (*Federal Registe*r 50:30188). An additional
7    reintroduced population has been proposed for designation as an NEP (*Federal Register* 52:32143), but
8    the ruling has never been finalized. A 5-year review was initiated on April 18, 2007 (*Federal Register*
9    72:19549), and completed in 2011 (USFWS 2011b).

10    On March 21, 1994, the USFWS designated 1,148 river-miles as critical habitat in six reaches of the
11    Colorado River system, including portions of the Colorado, Green, Yampa, White, and San Juan Rivers
12    *(Federal Register* 59:13374).

13    Distribution and Habitat Requirements

14    The Colorado pikeminnow is found in warm-water reaches of the main stem Colorado River and larger
15    tributaries. Adults have been found in various habitats, including deep, turbid, strongly flowing water;
16    eddies; runs; flooded bottoms; and backwaters. Lowlands inundated during high spring flows appear to be
17    important habitats for health and reproductive conditioning, as the fish use these habitats to offset winter
18    stress and replenish energy stores needed for long migrations and spawning. In winter, adults are most
19    commonly found in shallow, ice-covered shoreline areas (USFWS 2002b).

20    Adults migrate long distances (Tyus and McAda 1984) and seek whitewater canyons for spawning. They
21    appear to select river canyons receiving groundwater discharge from sandstone and limestone seeps, and
22    return to the same spawning site every year. Only two principal spawning sites have been identified, both
23    in the Green River subbasin. One site is near Three Fords Canyon in Gray Canyon of the Lower Green
24    River, and the other is in the lower 20 miles of the Yampa River (USFWS 2002b). After hatching, the
25    larvae drift downstream and then move to shoreline areas and backwaters. Juvenile pikeminnow
26    temporarily occupy shallow, ephemeral backwaters formed in late summer by receding water levels (Utah
27    Division of Wildlife Resources [UDWR] 1997).

28    The Colorado pikeminnow was once widespread in the large rivers of the Colorado River and major
29    tributaries, but its historical distribution was much greater than at present. The last capture of a wild
30    Colorado pikeminnow in the lower Colorado River was in 1975 (Minckley et al. 2003). The three
31    remaining wild populations are found in the Green, upper Colorado, and San Juan River subbasins.

32    Primary Threats to Survival

33    Threats to the Colorado River Basin endangered fishes include streamflow regulation, habitat
34    modification or destruction, and competition/predation from non-native fish species. Historically, the
35    species inhabited the large, turbid main stem rivers of the Colorado River Basin that alternated between
36    swift water canyons characterized by torrential rapids and slow, meandering, sandy-bottomed stretches.
37    The Colorado River has been greatly altered by dams and diversions eliminating much of the Colorado
38    pikeminnow original habitat. Currently, the lower Colorado River Basin is an alternating series of
39    reservoirs and cold tailwaters that do not provide the warm-water temperature needed for the Colorado
40    pikeminnow to spawn. Predation by introduced species also likely contributed to the decline of the
41    species. Species such as bass, sunfish, catfish, red shiner, and redside shiner prey on the eggs and young
42    of a number of native fish species (*Federal Register* 45:27710).

Occurrence in the Planning Area

The Green River in the planning area is designated critical habitat for the Colorado pikeminnow (Map 2-12).

The species is known to occur in the planning area in the Green River (from Lodore Canyon to the Colorado River confluence) and is also known to occur in the San Rafael River (2.8 miles downstream of the Hatt Ranch diversion to the Green River confluence) (BLM 2014a).

### Razorback Sucker (*Xyrauchen texanus*) – Endangered

Regulatory Status

The razorback sucker (*Xyrauchen texanus*) was first proposed for listing as a threatened species under the ESA of 1973 on April 24, 1978 (*Federal Register* 43:17375). On May 27, 1980, the USFWS withdrew the proposal because it was not finalized within the 2-year time limit from the initial publication in the *Federal Register* (*Federal Register* 45:35410). In 1989, the USFWS received a petition requesting that the razorback sucker be listed as an endangered species. A positive finding was made and subsequently published by the USFWS on October 23, 1991 (*Federal Register* 56:54957). A 5-year review was initiated on April 18, 2007 (*Federal Register* 72:19549) and completed in 2012 (USFWS 2012a). Another 5-year review was initiated in 2016 (*Federal Register* 81:33698).

In March 1994, the USFWS designated 15 reaches of the Colorado River system, including portions of the Green, Yampa, Duchesne, Colorado, White, Gunnison, and San Juan Rivers in the Upper Basin and portions of the Colorado, Gila, Salt, and Verde Rivers in the Lower Basin, totaling 1,724 river-miles of critical habitat for the species (*Federal Register* 59:13374).

Distribution and Habitat Requirements

Razorback sucker habitat includes slow areas, backwaters, and medium to large eddies of medium-sized to large rivers and their impoundments. Three of the four remaining populations of more than 100 individuals are found in reservoirs. Flooded lowlands and lower portions of tributary streams serve as resting and feeding areas during breeding season in the Green River Basin. The razorback sucker is commonly associated with sandy, muddy, and rocky substrates in areas with little aquatic vegetation. In Lake Mohave, individuals were associated with inshore habitats, except during the hotter months, when they moved offshore, possibly to avoid warmer water temperatures (USFWS 2002c).

In streams, spawning occurs most commonly near shores in streams over silty sand, gravel, or rock substrate. In reservoirs, spawning occurs on gravel bars swept clean by wave action or along shorelines over mixed substrates. Larvae appear to remain in gravel initially, swim up in the shallow littoral zone for a few weeks after hatching, and then disperse to deeper waters. Seasonally inundated flood plains provide favorable feeding areas for young (USFWS 2002c).

Historically, the razorback sucker was widely distributed and abundant in the Colorado River and major tributaries from Northern Mexico through Arizona and Utah into Wyoming, Colorado, and New Mexico. Now, it is much reduced in range and abundance.

Primary Threats to Survival

Primary threats to the razorback sucker are non-native fishes and invertebrates and human alteration of riparian habitat. Predation on larvae and juveniles by introduced fishes results in low and sometimes absent recruitment despite confirmed spawning and hatched larvae. Competition with and predation by exotic crayfish also may have been documented in some areas. Hybridization with other suckers is a potential problem in some locations. The loss, fragmentation, and modification of habitat due to construction and operation of dams greatly restrict the amount of suitable habitat. Dams lead to impoundment of streams, causing changes in winter and spring flows, altered river temperatures, and reduced flooding (USFWS 2002c).

1    Occurrence in the Planning Area

2    The Green River in the planning area is designated critical habitat for the razorback sucker (Map 2-12).

3    In the Upper Colorado River Basin, razorback suckers are considered extant in four locations: Westwater
4    and Cataract Canyons, the Utah–Colorado border on the Colorado River, Desolation and Gray Canyons of
5    the Green River, and a population in northwestern Colorado on the Yampa River. These known
6    populations are outside the planning area; however, the species has been recorded in the Lower San
7    Rafael and Green Rivers in the planning area (BLM 2014a).

8    **BLM Sensitive Species**

9    No BLM sensitive fish species are known to occur in the planning area. Flannelmouth sucker
10   (*Catostomus latipinnis*), bluehead sucker (*Catostomus discobolus*), and roundtail chub (*Gila robusta*) are
11   species that are known to exist in the planning area and are species for which BLM is a signatory to a
12   conservation agreement, though these species are not specifically designated as sensitive. These species
13   are addressed in Section 3.11.

14   *3.11.1.3    Special Status Wildlife*

15   **Species Listed Under the Endangered Species Act**

16   ***California Condor (Gymnogyps californianus) – Endangered, Experimental***

17   Regulatory Status

18   The California condor (*Gymnogyps californianus*) was listed as an endangered species on March 11, 1967
19   (*Federal Register* 32:4001). A special provision of the ESA, the 10(j) rule, allows for the designation of
20   NEP for listed species. Reintroduction efforts for the condor in northern Arizona were developed under
21   this rule (*Federal Register* 61:54045). In Utah, California condors are considered endangered west of
22   Interstate (I-) 15 and north of I-70. Any condors that leave the experimental population area will be
23   considered endangered (*Federal Register* 61:54043).

24   Critical habitat for the condor was established in 1977 (*Federal Register* 42:47840).

25   Distribution and Habitat Requirements

26   Condors occupy remote rugged areas at low to moderate elevations that support large mammals (e.g.,
27   deer), which they consume as carrion. These birds require cliff sites or caves for nesting and cliffs, tall
28   conifers, or snags for roosting. Condors prefer nest sites inaccessible to terrestrial predators. Because they
29   are such large birds, they typically select roosting sites near cliffs where updrafts provide adequate lift for
30   them to take flight (AGFD 2017; USFWS 1996).

31   Historically, the California condor ranged in the 1800s from British Columbia to Baja California . The
32   fossil record indicates that in prehistoric times these non-migratory birds also were present across the
33   southern United States to Florida, and north along the east coast to New York. By the 1970s, condors
34   were resident only in southern California, with breeding sites limited to the Los Padres National Forest
35   (AGFD 2017; USFWS 1996).

36   In 1992, releases to the wild began in central and southern California, to be followed by releases in the
37   Vermilion Cliffs area of Arizona in 1996 and in Baja California in 2002. As of 2011 there are currently 97
38   wild condors in California, 74 in Arizona, and 20 in Baja California (AGFD 2017). The Vermilion Cliffs
39   population is managed by the BLM (AGFD 2017). The current range of this population is centered on the
40   Colorado River Basin in northern Arizona and southern Utah.

1  Primary Threats to Survival

2  Because condors have a low reproductive rate, condor populations can be influenced even by sporadic
3  mortality (USFWS 1996). Shooting and egg collecting contributed to the decline of condors in the 1800s
4  and 1900s. Other causes of decline in the condor population include pesticides such as DDT, which cause
5  eggshell thinning; lead poisoning as the result of ingesting lead fragments from unrecovered or field
6  dressed deer; secondary poisoning from ingesting carcasses of poisoned coyotes; collision and
7  electrocution hazards associated with electric transmission lines; and conversion of ranch lands (where
8  condors feed on dead livestock) to housing (AGFD 2017; USFWS 1996).

9  Occurrence in the Planning Area

10  There is no California condor designated critical habitat in the planning area.

11  There are no known occurrences or nesting sites for California condor in the planning area, though the
12  area does provide suitable foraging habitat.

13  *Mexican Spotted Owl (Strix occidentalis lucida) – Threatened*

14  Regulatory Status

15  The Mexican spotted owl (*Strix occidentalis lucida*) was listed as threatened under the ESA on March 16,
16  1993 (*Federal Register* 58:14248). Critical habitat originally was designated on March 16, 1993 (*Federal
17  Register* 58:14248), and subsequently revoked on March 25, 1998 (*Federal Register* 63:14378). Critical
18  habitat was designated again on February 1, 2001 (*Federal Register* 66:8530) and further revised to its
19  current extent on August 31, 2004 (*Federal Register* 69:53181). Designated critical habitat is located in
20  Utah, Colorado, Arizona, and New Mexico.

21  Distribution and Habitat Requirements

22  The Mexican spotted owl is a permanent resident in the interior mountain ranges of western North
23  America, from southern Utah and central Colorado south through the mountains of Arizona, New
24  Mexico, and extreme west Texas.

25  Across the species' range, the Mexican spotted owl normally occupies old-growth forest in mixed conifer,
26  pine-oak woodland, deciduous riparian, or a combination of these habitats that will support a home range
27  of 1,400 to 4,500 acres. Habitat also typically has a structured canopy, a perennial water source, and a
28  rodent dominated prey base of adequate size. In Utah, however, breeding owls primarily inhabit deep,
29  steep-walled canyons and hanging canyons. These canyons typically are surrounded by terrain that does
30  not appear to provide nest/roost habitat but may provide foraging habitat for owls (USFWS 2012b).
31  Mexican spotted owl home ranges include activity centers that represent concentrated use areas for
32  nesting, roosting, and foraging. Protected Activity Centers designated by the USFWS (2012b) require a
33  minimum of 600 acres centered on known or potential nest sites where disturbance should be avoided to
34  conserve core use areas.

35  Primary Threats to Survival

36  The primary threat to Mexican spotted owls in the United States is the risk of stand-replacing wildfire
37  (USFWS 2012b). However, fire is not a landscape-scale threat to Mexican spotted owl habitat on the
38  Colorado Plateau, as the cliff and canyon habitat experiences a very low incidence and extent of stand-
39  replacing fire (USFWS 2012b).

Occurrence in the Planning Area

There is no designated critical habitat for Mexican spotted owl in the planning area. The nearest designated critical habitat is approximately 5.5 miles southeast of the planning area in Canyonlands National Park.

There are also no confirmed reports of Mexican spotted owls in the planning area, though surveys for the species have never been conducted in the planning area. Cliffs and canyons in the planning area do provide suitable nesting habitat for the species, and there have been anecdotal reports of a Mexican spotted owl being found dead on a road in the planning area in the past. A statewide habitat modeling exercise identified 51 acres of potential nesting habitat and 35,294 acres of potential foraging habitat for the species in the planning area (Map 2-12).

### Southwestern Willow Flycatcher (Empidonax traillii extimus) – Endangered

Regulatory Status

The southwestern willow flycatcher was listed as endangered under the ESA on February 27, 1995 (*Federal Register* 60:10695). Critical habitat originally was designated on July 22, 1997 (*Federal Register* 62:39129), and revised in response to legal actions in 2005 (*Federal Register* 70:60886) and 2013 (*Federal Register* 78:343). Designated critical habitat is located in California, Nevada, Utah, Colorado, Arizona, and New Mexico.

Distribution and Habitat Requirements

The southwestern willow flycatcher breeds in relatively dense riparian tree and shrub communities associated with rivers, swamps, and other wetlands, including lakes (e.g., reservoirs). Most of these habitats are classified as forested wetlands or scrub-shrub wetlands. Habitat requirements for wintering are not well known, but include brushy savanna edges, second growth, shrubby clearings and pastures, and woodlands near water (USFWS 2002d).

The historical breeding range of the southwestern willow flycatcher included southern California, southern Nevada, southern Utah, Arizona, New Mexico, western Texas, southwestern Colorado, and extreme northwestern Mexico (USFWS 2002d). The flycatcher's current range is similar to the historical range, but the quantity of suitable habitat within that range is much reduced from historical levels. The flycatcher occurs from near sea level to over 2,600 m amsl, but is primarily found in lower elevation riparian habitats. Throughout its range, the flycatcher's distribution follows that of its riparian habitat; relatively small, isolated, widely dispersed locales in a vast arid region (USFWS 2002d).

Primary Threats to Survival

The southwestern willow flycatcher has experienced extensive loss and modification of breeding habitat, with consequent reductions in population levels. Destruction and modification of riparian habitats have been caused mainly by a reduction or elimination of surface and subsurface water as a result of diversion and groundwater pumping; changes in flood and fire regimes from dams and stream channelization; clearing and controlling vegetation; livestock grazing; changes in water and soil chemistry due to disruption of natural hydrologic cycles; and establishment of invasive non-native plants. Concurrent with habitat loss have been increases in brood parasitism by the brown-headed cowbird (*Molothrus ater*), which inhibit reproductive success and further reduce population levels (USFWS 2002d).

Occurrence in the Planning Area

There is no designated critical habitat for southwestern willow flycatcher in or near the planning area.

1   The riparian habitats along the San Rafael and Green Rivers in the planning area could provide suitable
2   nesting habitat for the species. However, no nesting activity has been documented in or near the planning
3   area.

4   ***Western Yellow-billed Cuckoo (Coccyzus americanus) – Threatened***

5   Regulatory Status

6   The western Distinct Population Segment (DPS) of the yellow-billed cuckoo was listed as threatened by
7   USFWS in 2014 (*Federal Register* 79:59992). Following the proposed listing of the DPS, the USFWS
8   proposed critical habitat for the yellow-billed cuckoo in 2014 (*Federal Register* 79:48547). Critical
9   habitat was proposed in nine states, including Utah, though a final rule has not been published.

10  Distribution and Habitat Requirements

11  The western yellow-billed cuckoo was formerly widespread and locally common in California and
12  Arizona; locally common in New Mexico, Oregon, and Washington; and local and uncommon along
13  drainages in western Colorado, western Wyoming, Idaho, Nevada, and Utah (*Federal Register* 66:38611).
14  Populations of yellow-billed cuckoos in the western United States have declined over the past century,
15  and their breeding range has contracted.

16  The western yellow-billed cuckoo prefers large stands of dense riparian woodlands for nesting that are
17  primarily composed of cottonwood (*Populus fremontii*), willow (*Salix* spp.), and mesquite (*Prosopis* spp.)
18  along riparian corridors in otherwise arid areas. While yellow-billed cuckoos typically avoid
19  monocultures of tamarisk for nesting, tamarisk may be a component of nesting habitat (*Federal Register*
20  79:48548). Several studies have reported western yellow-billed cuckoos preferring to nest in tracts greater
21  than 25 acres in size. Water is required near the nesting site; this, along with dense vegetation, maintains
22  the humidity required in the nesting area for hatching eggs and rearing chicks. Migration, stopover, and
23  dispersal habitat is apparently similar to nesting habitat, but patch size may be smaller than required for
24  nesting, and vegetation structure may differ in structure (e.g., percentage canopy cover, presence and
25  composition of understory) (*Federal Register* 79:48547).

26  Primary Threats to Survival

27  The primary threat to western yellow-billed cuckoos is the loss of high-quality riparian habitat suitable for
28  nesting. Riparian habitat throughout the western United States has been modified or destroyed by dams,
29  water diversions, river flow management, stream channelization and stabilization, conversion to
30  agricultural uses (e.g., livestock grazing), construction of urban and transportation infrastructure, and
31  increased wildfire. Habitat fragmentation and invasion of native habitats by non-native plant species
32  (especially tamarisk) result from the aforementioned habitat-modifying factors (*Federal Register*
33  78:61622).

34  Other natural and anthropogenic factors threatening the continued existence of yellow-billed cuckoo
35  include a small overall population size, isolation of populations, lack of immigration, chance weather
36  events, fluctuating availability of prey populations, pesticides, collisions with tall vertical structures
37  during migration, spread of the introduced tamarisk leaf beetle as a biocontrol agent in the Southwest that
38  results in defoliation of non-native habitats occasionally used for nesting, and climate change (*Federal
39  Register* 78:61622).

40  Occurrence in the Planning Area

41  There is no proposed critical habitat for yellow-billed cuckoo in the planning area. The nearest proposed
42  critical habitat is approximately 8 miles southeast of the planning area in Canyonlands National Park
43  along the Green River.

1   The riparian habitats along the San Rafael and Green Rivers in the planning area could provide suitable
2   nesting habitat for the species. However, no nesting activity has been documented in or near the planning
3   area.

4   **BLM Sensitive Species**

5   Table 3-26 identifies BLM sensitive wildlife species that may or are known to occur in the planning area.

6   **Table 3-26. BLM Sensitive Wildlife Species that May Occur in the Planning Area**

| Common Name (Scientific Name) | Habitat Description | Amount of Habitat in Planning Area (acres) |
|---|---|---|
| Allen's big-eared bat (*Idionycteris phyllotis*) | Mine tunnels and boulder piles in forested mountain areas; also pinyon-juniper habitat or saltcedar. | Unknown |
| Bald eagle (*Haliaeetus leucocephalus*) | Roosts and nests in tall trees near bodies of water. | |
| Big free-tailed bat (*Nyctinomops macrotis*) | Rocky and woodland habitats, roosts in caves, mines, old buildings, and rock crevices. | Unknown |
| Bobolink (*Dolichonyx oryzivorus*) | Riparian or wetland areas. | Unknown |
| Burrowing owl (*Athene cunicularia*) | Open grassland and prairies. | Unknown |
| Cornsnake (*Elaphe guttata*) | Riparian areas, including rocky hillsides, forests, canyons, and stream and river margins. | Unknown |
| Ferruginous hawk (*Buteo regalis*) | Flat and rolling terrain in grassland or shrub steppe; nests on elevated cliffs, buttes, or creek banks. | |
| Great Plains toad (*Bufo cognatus*) | Cropland/hedgerow, desert, grassland/herbaceous, shrubland/chaparral, suburban/orchard. | Unknown |
| Fringed myotis (*Myotis thysanodes*) | Desert and woodland areas, roosts in caves, mines, and buildings. | Unknown |
| Kit fox (*Vulpes macrotis*) | Semidesert grasslands and open shrublands. | |
| Long-billed curlew (*Numenius americanus*) | Grassland/herbaceous. | Unknown |
| Peregrine falcon (*Falco peregrinus*) | Steep, rocky canyons near riparian or wetland areas. | Unknown |
| Short-eared owl (*Asio flammeus*) | Grasslands, shrublands, and other open habitats. | Unknown |
| Spotted bat (*Euderma maculatum*) | Found in a variety of habitats, ranging from deserts to forested mountains; roost and hibernate in caves and rock crevices. | Unknown |
| Townsend's big-eared bat (*Corynorhinus townsendii*) | Occurs in many types of habitat, but is often found near forested areas; roosts and hibernates in caves, mines, and buildings. | Unknown |
| Western red bat (*Lasiurus blossevillii*) | Hardwood and mixed forest, suburban/orchard, hardwood and mixed woodland, and riparian. | Unknown |
| White-tailed prairie dog (*Cynomys leucurus*) | Grasslands, semidesert, and montane shrublands. | |

1 *Species' Descriptions*

2 Allen's big-eared bat (*Idionycteris phyllotis*)

3 Allen's big-eared bat (*Idionycteris phyllotis*) inhabits mountainous regions of the southwestern United
4 States and Mexico. The northernmost limit of its range is in Utah, where it occurs in the southern third of
5 the state, including in Grand, San Juan, Washington, Garfield, and Kane Counties. Allen's big-eared bats
6 occur primarily in forested mountain areas, from pine and oak to riparian woodlands of cottonwood and
7 willow. In Utah, this species has been collected in arid environments of pinyon-juniper habitat or
8 saltcedar. Females segregate from males during the summer breeding season to form maternity colonies.
9 These colonies typically are located in mine tunnels or in boulder piles (UDWR 2011). The planning area
10 may contain suitable habitat for the species.

11 Bald eagle (Haliaeetus leucocephalus)

12 Utah's wintering bald eagle (*Haliaeetus leucocephalus*) population is typically found near rivers, lakes,
13 and marshes where unfrozen, open waters offer the opportunity to prey on fish and waterfowl. The San
14 Rafael and Green River corridors are used by Utah's wintering bald eagles. The eagles begin to arrive in
15 November and migrate north by March. Utah also hosts a small population of desert bald eagles that can
16 be found in desert valleys, far from any water. These eagles feed primarily on carrion. There are no
17 known bale eagle nests in the planning area. Egg laying and incubation occur from February through
18 May, with eaglets hatching during May and early June and fledging by early July. The bald eagle
19 continues to be protected by the Migratory Bird Treaty Act (MBTA) and the Bald and Golden Eagle
20 Protection Act.

21 Big free-tailed bat (*Nyctinomops macrotis*)

22 The big free-tailed bat (*Nyctinomops macrotis*) is listed as a BLM Sensitive Species because of declining
23 population sizes and limited distribution within the State. It is a migratory species and is known from the
24 southern half of Utah, although it may range farther north. The big free-tailed bat has been captured in
25 riparian, desert shrub and montane forest habitat types (UDWR 2011). The planning area contains
26 potential habitat for the species.

27 Bobolink (Dolichonyx oryzivorus)

28 The bobolink (*Dolichonyx oryzivorus*) is listed as a BLM sensitive species and a state sensitive species
29 because of rangewide declining populations and limited habitat. Wet meadow habitats—the preferred
30 bobolink habitat—have been decreased and fragmented in Utah as a result of many of the same factors
31 that impact riparian areas, e.g., agricultural encroachment, urban encroachment, road development, water
32 development (reservoirs and in-stream flow depletions), and channelization (Parrish et al. 2002). The
33 planning area contains potential winter habitat for the species.

34 Burrowing owl (Athene cunicularia)

35 The burrowing owl (*Athene cunicularia*) is listed as a BLM sensitive species to recent decreases in
36 population size. Burrowing owls are neotropical migrants, nest underground in burrows, and are typically
37 found in open desert grassland and shrubland areas that are level and well drained. They depend on
38 burrowing mammals for nest sites and are often associated with prairie dog colonies. The decline of the
39 owl's population across its range appears to be due primarily to agricultural practices, use of pesticides,
40 and the decline of prairie dog colonies. The planning area contains prairie dog colonies and other suitable
41 burrowing owl potential nesting habitat.

1   Cornsnake (Elaphe guttata)

2   The cornsnake is listed as a BLM sensitive species because of its limited distribution and its potential for
3   genetic uniqueness from the cornsnakes east of the Continental Divide. The cornsnake is associated with
4   the Colorado and Green River corridors, and population declines are attributed to habitat degradation,
5   vegetative changes, and illegal collection (UDWR 2011). The planning area contains suitable habitat for
6   the species along the San Rafael and Green Rivers.

7   Ferruginous hawk (*Buteo regalis*)

8   The ferruginous hawk (*Buteo regalis*) is the largest of the North American buteos. It is a neotropical
9   migrant breeding from southwestern Canada to central Arizona, New Mexico, and northern Texas and
10   wintering in California to northern Mexico. It is a year-round resident from Nevada through western and
11   southern Utah, northern Arizona, and New Mexico to eastern Colorado and South Dakota. In Utah, the
12   ferruginous hawk nests at the edge of juniper habitats and open, desert and grassland habitats in the
13   western, northeastern, and southeastern portions of the state. Ferruginous hawks are highly sensitive to
14   human disturbance and are also threatened by habitat loss from surface disturbance, agricultural practices,
15   and urban encroachment. They have experienced decline across much of their range and have been
16   extirpated from some of their former breeding grounds in Utah (UDWR 2011). The planning area
17   contains suitable nesting and foraging habitat for the species.

18   Fringed myotis (*Myotis thysanodes*)

19   The fringed myotis bat (*Myotis thysanodes*) is listed as BLM sensitive species because of limited
20   distribution within the state. This species occurs predominantly in southern Utah, although records of this
21   species occur throughout the state. Fringed myotis occur in a variety of habitat, including riparian, desert
22   shrub, pinyon-juniper woodland, mountain meadow, ponderosa pine, and montane forest (UDWR 2011).
23   The planning area contains potential habitat for the species.

24   Great Plains toad (*Bufo cognatus*)

25   The Great Plains toad (*Bufo cognatus*) is a common and widespread toad that occurs across the central
26   United States, much of Mexico, and limited areas of Canada. In Utah, the Great Plains toad occurs in
27   scattered areas throughout the state, where it prefers desert, grassland, and agricultural habitats. In cold
28   winter months, the Great Plains toad burrows underground and becomes inactive (UDWR 2011). UDWR
29   has located Great Plains toad along the San Rafael River at Hatts Ranch and Frenchman in recent years
30   (Keller 2016). However, this species is highly mobile and is likely to be present in other locations along
31   the San Rafael River. The planning area also contains additional habitat for the species along the Green
32   River.

33   Kit fox (Vulpes macrotis)

34   The kit fox (*Vulpes macrotis*) most often occurs in open prairie, plains, and desert habitats. It
35   opportunistically eats small mammals (primarily rabbits and hares), small birds, invertebrates, and plant
36   matter. The species is primarily nocturnal, but individuals may be found outside their dens during the day.
37   The kit fox mates in late winter, with a litter of four to seven pups being born about 2 months later.
38   Young first leave the den about 1 month after birth, in late spring or early summer. The planning area
39   contains large areas of suitable kit fox habitats, and the species is known to occur in the planning area.

40   Long-billed curlew (*Numenius americanus*)

41   The long-billed curlew (*Numenius americanus*) breeds from south-central British Columbia, southern
42   Alberta, southern Saskatchewan, and southern Manitoba south to east-central California, central Nevada,
43   central Utah, central New Mexico, and northern Texas, and east to southwestern North Dakota,

1  northwestern South Dakota, north-central Nebraska, and southwestern Kansas. The long-billed curlew is a
2  fairly common summer resident and migrant in Utah, especially through the central and more northern
3  valleys. It is less common in the Colorado River drainage. This species lives and breeds in higher and
4  drier meadowlands than many other shorebird species (Parrish et al. 2002). The planning area contains
5  suitable habitat for the species.

6  Peregrine falcon (*Falco peregrinus*)

7  The peregrine falcon (*Falco peregrinus*) was listed as an endangered species in 1970 under the
8  Endangered Species Conservation Act of 1969 but after a successful recovery due to restrictions on the
9  use of organochlorine pesticides, the species was delisted in 1999 (*Federal Register* 64:46543). The
10  peregrine falcon is a widely distributed bird, occurring from the tundra to the tropics in a variety of
11  different terrestrial habitats. The species most commonly occupies cliff habitats with open landscapes for
12  foraging in proximity to water (coasts, lakes, rivers, etc.), but also occurs in artificial habitats such as
13  towers, buildings, and urban settings. Although the peregrine falcon is still rare in Utah, it has become
14  much more abundant throughout its range in recent years. The planning area does contain potential
15  nesting and foraging habitat for the species, especially in canyons on and adjacent to the Green River. No
16  formal nesting surveys have been completed in the planning area.

17  Short-eared owl (*Asio flammeus*)

18  The short-eared owl (*Asio flammeus*) is usually found in grasslands, shrublands, and other open habitats.
19  There is some concern that short-eared owl populations are declining. The planning area contains suitable
20  habitat for the species, though no formal nesting surveys have been completed.

21  Spotted bat (Euderma maculatum)

22  The spotted bat (*Euderma maculatum*) occupies a wide variety of habitats, but has been collected most
23  often in dry, rough, desert terrain. Roosts are typically in rock crevices or under loose rocks or boulders.
24  The spotted bat is considered rare in Utah (although the spotted bat's distribution ranges throughout the
25  western states from British Columbia to Mexico). The spotted bat has a very low reproductive potential,
26  and therefore once populations are reduced they rebuild slowly (UDWR 2011). The planning area
27  contains suitable habitat for the species.

28  Townsend's big-eared bat (*Corynorhinus townsendii*)

29  The Townsend's big-eared bat (*Corynorhinus townsendii*) is a BLM sensitive species due to limited
30  distribution and a declining population (Oliver 2000). The Townsend's big-eared bat is a cave-roosting
31  species that moves into human-made caves such as mines and buildings. Unlike many other bats, they are
32  unable to crawl into crevices and usually roost in enclosed areas where they are vulnerable to disturbance.
33  The Townsend's big-eared bat is quite sensitive to human disturbance, and this appears to be the primary
34  cause of population decline for this species. This bat is colonial during the maternity season, when
35  compact clusters of up to 200 individuals might be found. Maternity roosts form in the spring and remain
36  intact during the summer. Site fidelity is high, and if undisturbed, the bats will use the same roost for
37  many generations. The planning area contains suitable habitat for the species.

38  Western red bat (Lasiurus blossevillii)

39  The western red bat (*Lasiurus blossevillii*) occurs in the western United States and parts of Mexico. The
40  species is extremely rare in Utah, being known from only a few locations in Utah. Western red bats are
41  normally found near water, often in wooded areas. Some individuals may hibernate during cold times of
42  year, but most members of the species migrate south to warmer climates for the winter. The species is
43  nocturnal; daytime roosting usually occurs in trees. Females may give birth to one litter of two to four

1  young during late spring. Western red bats eat insects, often foraging near riparian areas (UDWR 2011).
2  The planning area contains suitable habitat for the species.

3  White-tailed prairie dog (*Cynomys leucurus*)

4  White-tailed prairie dogs (*Cynomys leucurus*) inhabit mountain valleys, semidesert grasslands,
5  agricultural areas, and open shrublands in Western North America. In Utah, white-tailed prairie dogs
6  occur in the eastern portion of the state, primarily in the Uintah Basin and the northern portion of the
7  Colorado Plateau. White-tailed prairie dog colonies are located in Grand, Emery, and Carbon Counties. In
8  1985, colonies of white-tailed prairie dog were mapped and population densities estimated in an attempt
9  to identify potential reintroduction sites for black-footed ferrets (*Mustela nigripes*). Though these surveys
10  were not exhaustive, 63,397 acres of colonies were mapped in the three counties. Surveys completed in
11  2002 on public lands within southeastern Utah identified only 10,257 acres of active colonies, or an 84%
12  decline in occupied acreage of white-tailed prairie dog colonies since 1985. This decrease was attributed,
13  at least in large part, to outbreaks of sylvatic plague (UDWR 2011). There are 8,094 acres of mapped
14  white-tailed prairie dog colonies in the planning area (Map 2-12), and additional habitats also exist that
15  are capable of supporting the species.

## 3.11.2  Resource Trends

17  Very little information is available with which to assess trends for special status species in the planning
18  area. In general, wildlife populations in relatively undeveloped landscapes similar to the planning area are
19  a function of habitat availability and quality. Habitat availability has stayed relatively constant in the
20  planning area, as few surface disturbing activities have been implemented. Livestock grazing, OHV use,
21  and dispersed recreation activities do occur and recreational use is increasing. However, these activities
22  occur at relatively low intensities and therefore are not anticipated to be substantially affecting special
23  status species trends.

24  The largest factor affecting the majority of wildlife population and habitat trends in the planning area is
25  drought. The planning area has experienced extended periods of moderate to severe drought in 2000–
26  2003 and again in 2012–2016 that contributed to habitat deterioration. As of January 2017, the drought in
27  the planning area is easing somewhat, and the area is classified as experiencing somewhat abnormally dry
28  conditions (U.S. Drought Monitor 2017). Special status species habitat and populations are anticipated to
29  be responding positively to the easing of drought.

30  BLM began implementing the San Rafael River Restoration Project in 2015; that process is ongoing. The
31  San Rafael River Restoration Project was designed to improve the ecological condition of the lower San
32  Rafael River, which has degraded severely over time through a combination of impacts, including altered
33  flow regimes and non-native vegetation encroachment. Implementation of the project will improve the
34  riparian and aquatic habitat in the planning area, including developing riffles, pools, and backwaters,
35  which were lacking before the project began. This project will greatly improve the riparian and aquatic
36  habitat in the San Rafael River in the planning area, and it is anticipated that species that depend on
37  riparian and aquatic habitats will respond with increases in their distribution and numbers as a result.

## 3.12  WILDLIFE AND FISHERIES

39  The analysis area for wildlife and fisheries varies by species. For species for which habitats have been
40  delineated by the UDWR, the analysis area is the extent of the habitats crossed by the planning area. For
41  species for which habitats have not been delineated by UDWR, the analysis area is the subwatersheds
42  (HUC 12) crossed by the planning area. The analysis areas were selected because they represent the areas
43  within which changes to wildlife and fisheries populations could be observed as a result of impacts on the
44  soil, water, vegetation, or wildlife and fisheries in the planning area.

The planning area is located in the Colorado Plateau and contains a diversity of habitats and landforms that support a variety of wildlife and fish species. With the exception of species listed under the ESA, the UDWR manages wildlife populations in the planning area, including establishing management goals and objectives. The BLM Price and Richfield Field Offices manage wildlife habitats that occur on BLM-administered public lands in the planning area and coordinate closely with the UDWR on issues related to wildlife habitat management and to ensure that wildlife habitats identified by the UDWR are recognized in planning efforts.

The BLM RMPs for the Price and Richfield Field Offices allocate resources on public lands, including forage, for wildlife and fish species. The RMPs also require the implementation of stipulations, such as restrictions on surface disturbance and seasonal and spatial buffers to protect individuals and habitats for big-game species, migratory birds, raptors, reptiles, amphibians, and other non-game species.

The BLM's management of wildlife habitat has had, and will continue to have, an impact on both local communities and those that exist outside the Colorado Plateau. There is regional interest in the overall condition and management of wildlife habitats in the planning area. In the past, a majority of the local interest has been focused on big-game management and associated recreational activities. Because many of the wildlife species found in the planning area regularly cross federal, state, and private lands, a collaborative effort between all land managers and owners is for effective wildlife management in the planning area.

Special status species, including BLM-sensitive and species listed as threatened or endangered under the ESA are addressed in Section 3.11.

## 3.12.1    Resource Conditions

### 3.12.1.1    Big Game

Habitats for many big-game species within the planning area are delineated by UDWR. UDWR also develops management plans and establishes population objectives for big-game species. In developing and mapping big-game habitats, UDWR designates season of use (e.g., summer, winter, fawning) and habitat importance (i.e., substantial or crucial). Crucial habitat is defined as habitat essential to the life history requirements of the species for which it was designated. The UDWR periodically reviews these habitat areas through coordination with the various land management agencies and revises habitat boundaries as needed.

### Mule Deer (Odocoileus hemionus)

Mule deer (*Odocoileus hemionus*) occupy most ecosystems in Utah but likely attain their greatest densities in shrublands on areas characterized by rough, broken terrain and abundant browse and cover. Mule deer summer range habitat types include spruce/fir, aspen, alpine meadows, and large, grassy parks located at higher elevations. Winter range habitat primarily consists of shrub-covered, south-facing slopes and often coincides with areas of concentrated human use and occupation. Because of learned behavioral use patterns passed on from one generation to the next, deer migrate for the winter into the same areas every year, regardless of forage availability or condition. These generally are areas with shallow snow depth, which allow easier movement, with pinyon-juniper and sagebrush vegetation types. These vegetation types provide deer with both escape and thermal cover.

Limiting factors that often control mule deer populations include the availability of crucial/critical winter habitat and fawning areas, extreme weather (heavy snowfall and persistent cold temperatures, and extended drought) disease (most notably chronic wasting disease in the Rocky Mountains region), predation, competition for forage with livestock, legal harvest, and the effects of human-induced habitat alteration (Sanchez-Rojas and Gallina-Tessaro 2008).

1 The majority of the planning area does not provide high-quality mule deer habitat, though UDWR has
2 mapped substantial value year-long mule deer habitat in the planning area along the San Rafael and Green
3 Rivers, and along the southeastern boundary of the planning area (Map 3-4). Table 3-27 presents the mule
4 deer habitats identified by UDWR in the planning area and analysis area. The mule deer that occupy this
5 area are a part of the UDWR's San Rafael Deer Herd Unit. The UDWR's Herd Unit Management Plan
6 identifies the management goals for this unit as

7     Manage for a population of healthy animals capable of providing a broad range of recreational
8     opportunities, including hunting and viewing. Balance deer herd impacts on human needs, such as
9     private property rights, agricultural crops and local economies. Maintain the population at a level
10     that is within the carrying capacity of the available habitat. Range Trend data is not collected on
11     the San Rafael unit. The majority of deer on this unit utilize agricultural areas to some extent
12     throughout the winter. (UDWR 2012)

13                **Table 3-27. Mule Deer Habitat**

| Habitat Type | Area in Planning Area (acres) |
| --- | --- |
| Year-long, substantial | 34,608 |

14 The San Rafael Deer Herd Unit has a population objective of 1,000 wintering deer, though UDWR does
15 not monitor or model this population; a population estimate is not available (UDWR 2012). Statewide,
16 deer populations showed a sharp decline during winter 1992–1993, though since then the statewide deer
17 herd has shown an increasing trend. The statewide population had good growth during the mid to late
18 1990s, but then declined during the severe drought years from 2000 to 2003, when fawn production was
19 reduced. The harsh winters in northern Utah in 2007–2008 and in southern Utah in 2009–2010 lowered
20 adult and fawn survival and also caused population declines. Despite of those weather events, the deer
21 population in Utah has grown at an average rate of 1.6% over the past 20 years and is now at a level not
22 seen since 1992 (UDWR 2014).

23 **Pronghorn (Antilocapra americana)**

24 Pronghorn (*Antilocapra americana*) can be found throughout the western United States, Canada, and
25 northern Mexico. They are generally associated with open plains, where they feed mainly on forbs and
26 grasses. Pronghorn prefer to occupy areas with large tracts of flat to rolling open terrain where they rely
27 on keen eyesight and swift movement to avoid predators. They also rely on vegetation within the shrub
28 and grassland plant communities for food. Pronghorn are often found in small groups and are usually
29 most active during the day.

30 A critical limiting factor in much of Utah's pronghorn habitat is the lack of succulent forbs and grasses on
31 spring/summer ranges. This is the result of xeric, low annual precipitation conditions on many of Utah's
32 pronghorn units, combined with persistent early spring grazing practices (UDWR 2009).

33 Pronghorn populations in Utah during the early 1900s were located in the west desert from Beaver
34 County north to the Idaho state line and in Daggett County in northeastern Utah adjacent to the Wyoming
35 state line. Beginning in 1945 and continuing to the present, transplants of pronghorn to other areas in the
36 state have resulted in a wider distribution in most of Utah's suitable desert habitats and have increased the
37 statewide population to an estimated 12,000–14,000 animals (UDWR 2009).

38 UDWR has identified large portions of the planning area as pronghorn crucial and substantial-value year-
39 long habitat (Map 2-15). Table 3-28 presents the pronghorn habitats identified by UDWR in the planning
40 area and analysis area. The pronghorn that occupy this area are a part of the UDWR's San Rafael Desert
41 Unit. UDWR has not developed Unit specific management plans for pronghorn.

1

**Table 3-28.  Pronghorn Habitat**

| Habitat Type | Area in Planning Area (acres) |
|---|---|
| Year-long, crucial | 264,278 |
| Year-long, substantial | 154,880 |

2   Pronghorn were released into the San Rafael Desert Unit in 1949 (35 animals), 1984 (151 animals), 1985
3   (157 animals), 2005 (24 animals), and 2006 (26 animals) (UDWR 2009). These animals and their
4   descendants occupy the UDWR-identified pronghorn habitat in the planning area. In 2008, the pronghorn
5   population in the San Rafael Desert is estimated to be 275 with an increasing 5- and 10-year trend
6   (UDWR 2009).

**Desert Bighorn Sheep (*Ovis canadensis nelson*)**

8   Desert bighorn sheep (*Ovis canadensis nelson*) are native to Utah are uniquely adapted to inhabit some of
9   the most remote and rugged parts of the Colorado Plateau. Habitat is characterized by rugged terrain,
10  including canyons, gulches, talus cliffs, steep slopes, mountaintops, and river benches (Shakleton et al.
11  1999). Desert bighorn generally occur in Southern Utah and do not migrate.

12  Utah's desert bighorn sheep populations declined significantly from historic levels during European
13  settlement as a result of competition with domestic livestock for forage and space, vulnerability to
14  domestic livestock-borne diseases, habitat conversions away from native grasslands toward shrub lands as
15  a result of excessive grazing and fire suppression, and unregulated hunting. Whereas some herds suffered
16  early extirpation, others remained relatively unexploited until the 1940s and 1950s, when uranium was
17  discovered on the Colorado Plateau. By the 1960s, only a small population of desert bighorns remained in
18  Utah along the remote portions of the Colorado River (UDWR 2013).

19  The current population estimate for desert bighorns in Utah managed by UDWR is 2,000 and has been
20  relatively stable for the past 10 years. Utah currently has 12 distinct populations of desert bighorn sheep.
21  Of those 12, three are showing increasing trends, four are stable, and five are showing declining trends or
22  have low numbers of sheep. The population of bighorn sheep that uses habitats in and adjacent to the
23  planning area is a part of the San Rafael, Dirty Devil; and San Rafael, Maze (Canyonlands National Park),
24  subunits. The San Rafael, Dirty Devil, subunit has shown a general declining trend, with population
25  counts of 115 animals in 2008, 67 in 2010, and 66 in 2012 (UDWR 2013). UDWR has not developed
26  unit-specific management plans for bighorn sheep. Population trend information is not available for the
27  San Rafael Maze subunit.

28  UDWR has identified small portions of the planning area as bighorn sheep year-long crucial and
29  substantial habitat. These areas are generally related to the steep canyons associated with Labyrinth
30  Canyon along the Green River and various side canyons, including Horseshoe, Keg Spring, and Three
31  Canyons (Map 3-4). Table 3-29 presents the bighorn sheep habitat identified by UDWR in the planning
32  area and analysis area.

33

**Table 3-29.  Bighorn Sheep Habitat**

| Habitat Type | Area in Planning Area (acres) |
|---|---|
| Year-long substantial | 413 |
| Year-long crucial | 3,684 |

### 3.12.1.2    Upland Game

UDWR has identified habitat for upland game in the planning area, including California quail (*Callipepla californica*), ring-necked pheasant (*Phasianus colchicus*), and Rio Grande turkey (*Meleagris gallopavo*). In general, California quail habitat is identified along the San Rafael and Green River corridors, ring-necked pheasant habitat is identified in the vicinity of the town of Green River, and Rio Grande turkey habitat is identified along the Green River corridor.

Annual fluctuations for most upland game bird and small-mammal populations correlate closely to annual climatic patterns. Mild winters and early spring precipitation during the months of March, April, and May are associated with increases in upland game populations. Warm, dry weather, especially during June, is generally considered vital for the survival of newly born young of many upland game species. The planning area has experienced periods of moderate to severe drought in recent years, which has contributed to habitat deterioration for upland game. As of January 2017, the drought in the planning area has eased somewhat, and the area is classified as experiencing somewhat abnormally dry conditions (U.S. Drought Monitor 2017). Population levels and trends for upland species typically mimic habitat quality.

### 3.12.1.3    Migratory Birds

A wide variety of songbirds, neotropical migrants, waterfowl, and raptors spend at least part of the year within the planning area (Parrish et al. 2002). These species use a wide variety of habitats found within the planning area for important functions, including migration stopover, breeding, nesting, and foraging. The term "migratory bird" is used in this document as a regulatory term reflecting any species protected under the MBTA and addressed under other federal policies derived from the MBTA and does not directly refer to the biological definition of a migratory bird. Many species protected under the MBTA are year-round residents and do not migrate.

The MBTA (16 U.S.C. 703–712) broadly protects more than 1,000 avian species as listed in 50 CFR 10.13 and is administered by the USFWS. The MBTA makes it unlawful to pursue, hunt, kill, capture, possess, buy, sell, purchase, or barter any migratory bird, including the feathers or other parts, nests, eggs, or migratory bird products. The most recent list of birds protected under the MBTA includes 1,026 species (*Federal Register* 78(212):65844-65874). In addition to the MBTA, some migratory bird species are also protected under the Endangered Species Act (16 U.S.C. 1531 *et seq.*) and the Bald and Golden Eagle Protection Act (16 U.S.C. 668–668d).

Executive Order (EO) 13186, "Responsibilities of Federal Agencies to Protect Migratory Birds," was issued in 2000 and directs federal agencies to take certain actions to further implement the MBTA. The federal agencies are directed to develop and implement a Memorandum of Understanding (MOU) with the USFWS to promote conservation of migratory bird populations. Pursuant to this EO, BLM entered into BLM "Memorandum of Understanding WO-230-2010-04 Between the Bureau of Land Management and the U.S. Fish and Wildlife Service to Promote the Conservation of Migratory Birds." This MOU outlines a collaborative approach to promote the conservation of migratory bird populations and is intended to strengthen migratory bird conservation efforts by identifying and implementing strategies to promote conservation and reduce or eliminate adverse impacts on migratory birds through enhanced collaboration between the BLM and the USFWS in coordination with state, tribal, and local governments.

BLM implements EO 13186 and MOU WO-230-2010-04 by identifying migratory bird species of concern that are likely to occur on public lands and may be affected by BLM planning and implementation decisions, evaluating the effects of BLM's decisions on these species in NEPA documents, and implementing recommended conservation measures where appropriate. In Utah, BLM identifies migratory bird species of concern using resources, including the USFWS's Birds of Conservation Concern (BCC) and Utah PIF American Landbird Conservation Plan.

1   The overall goal of the BCC is to accurately identify the migratory and non-migratory bird species
2   (beyond those already listed under the ESA as threatened or endangered) that represent the highest
3   conservation priorities for the USFWS. The most recent BCC list was published in 2008 and is organized
4   into 37 Bird Conservation Regions. The planning area is entirely within Region 16 (Colorado Plateau)
5   (USFWS 2008d). The Utah PIF American Landbird Conservation Plan was completed in 2002 as a
6   statewide avian conservation strategy identifying "priority species" for conservation because of declining
7   abundance, declining distribution, or vulnerability to various local and/or rangewide risk factors (Parrish
8   et al. 2002).

9   The Utah PIF Priority Species List and the BCC list for Region 16 (Colorado Plateau) were used to
10  identify priority species and their potential habitats within the planning area. Table 3-30 lists the BCC and
11  PIF species that may occur within the planning area. Map 3-2 displays the distribution of land cover types
12  that function as potential migratory bird habitats in the planning area.

13  **Table 3-30. BCC Region 16 and Utah PIF High-Priority Species That May Occur in Planning Area**

| Species | BCC* | PIF† | Utah Sensitive Species‡ | Primary Breeding Habitat† | Secondary Breeding Habitat† | Winter Habitat† | Utah Population Trend (% population change 1966–2012)§ |
|---|---|---|---|---|---|---|---|
| Black-throated Gray Warbler | | X | | pinyon-juniper woodland | mountain scrub | migrant | +2.5 |
| Bobolink | | X | X | wet meadow | agriculture | high desert scrub | N/A |
| Brewer's Sparrow | X | X | | shrub steppe | high desert scrub | migrant | -1.2 |
| Broad-tailed Hummingbird | | X | | lowland riparian | mountain riparian | migrant | -2.5 |
| Burrowing Owl | X | | X | high desert scrub | grassland | migrant | -0.7 |
| Ferruginous Hawk | | X | X | pinyon-juniper | shrubsteppe | grassland | −1.7 |
| Gambel's Quail | | X | | low desert scrub | lowland riparian | low desert scrub | -−2.0 |
| Golden Eagle | X | | | cliff | high desert scrub | high desert scrub | -−1.0 |
| Grace's Warbler | X | | | ponderosa pine | mixed conifer | migrant | +1.8 |
| Gray Vireo | X | X | | pinyon-juniper woodland | oak | migrant | −1.2 |
| Juniper Titmouse | X | | | pinyon-juniper woodland | pinyon-juniper woodland | pinyon-juniper woodland | +1.3 |
| Long-billed Curlew | X | X | X | grassland | agriculture | migrant | +0.9 |

| Species | BCC* | PIF[†] | Utah Sensitive Species[‡] | Primary Breeding Habitat[†] | Secondary Breeding Habitat[†] | Winter Habitat[†] | Utah Population Trend (% population change 1966–2012)[§] |
|---|---|---|---|---|---|---|---|
| Lucy's Warbler | | X | | lowland riparian | low desert scrub | migrant | N/A |
| Peregrine Falcon | X | | | cliff | lowland riparian | wetlands | +0.8 |
| Pinyon Jay | X | | | pinyon-juniper woodland | ponderosa pine | pinyon-juniper woodland | N/A |
| Prairie Falcon | X | | | cliff | high desert scrub | agriculture | +0.9 |
| Sage Sparrow | | X | | shrub steppe | high desert scrub | low desert scrub | −1.1 |
| Virginia's Warbler | | X | | oak | pinyon-juniper woodland | migrant | +2.6 |
| Yellow-billed Cuckoo | | X | X | lowland riparian | agriculture | migrant | N/A |

1  * Utah Partners in Flight Avian Conservation Strategy Version 2.0 (Parrish et al. 2002)

2  [†] Birds of Conservation Concern 2008 (USFWS 2008d)

3  [‡] Utah Sensitive Species List (UDWR 2015)

4  [§] North American Breeding Bird Survey (Sauer et al. 2012)

5  Long-distance migration across state and international boundaries requires that suitable types and extents
6  of habitat be present to support all stages of a bird's life and exposes birds to a variety of potential
7  stressors that may be addressed or exacerbated by diverse regulatory regimes. Migratory bird population
8  levels are often closely correlated to habitat availability and condition, and some species are used as
9  indicators of habitat availability and quality.

10  Within Utah, PIF identifies lowland riparian is the habitat used most by Utah's avifauna. This habitat type
11  is present in the planning area, especially along the San Rafael and Green Rivers. At least 42% of Utah's
12  avian species use lowland riparian as either breeding habitat or in winter. In addition, lowland riparian is
13  the habitat used most by the priority species (Parrish et al. 2002). Other important migratory bird habitats
14  identified by the Utah PIF that are present in the planning area include low and high desert scrub, and
15  cliffs. At least 23 avian species select low desert scrub as breeding habitat, and an additional two species
16  select this habitat in winter (Parrish et al. 2002). Five priority species select high desert scrub as breeding
17  habitat, and two priority species select cliff habitat as breeding habitat (Parrish et al. 2002).

18  **Raptors**

19  Raptors (hawks, eagles, falcons; some definitions also include vultures and owls) are addressed equally
20  with all other bird species protected under the MBTA and do not receive additional protections by the
21  MBTA, EO 13186, or the MOU between the USFWS and BLM. However, raptors are especially sensitive
22  to land management activities; therefore, BLM typically provides management prescriptions to prevent
23  impacts from BLM-authorized activities. These special prescriptions often include buffer zones around
24  sensitive nest or roost sites developed in coordination with the USFWS *Utah Field Office Guidelines for*
25  *Raptor Protection from Human and Land Use Disturbances* (Romin and Muck 2002).

1  Raptors that are known to or may occur in the planning area include but are not limited to bald eagle,
2  peregrine falcon, golden eagle, ferruginous hawk, Swainson's hawk, northern harrier, osprey, sharp-
3  shinned hawk, Cooper's hawk, red-tailed hawk, prairie falcon, American kestrel, turkey vulture, great
4  horned owl, short-eared owl, long-eared owl, Mexican spotted owl. Within the planning area, cliffs are
5  the most important raptor nesting habitats.

6  **Waterfowl**

7  Waterfowl (ducks, geese, and swans) in the planning area are generally associated with the San Rafael
8  and Green Rivers. Some waterfowl can also be found in isolated riparian areas, stock ponds, and
9  reservoirs. Some individuals or species breed, winter, or remain yearlong in the Utah, while larger
10  numbers pass through the area during the spring and fall migration. Many species feed on insects and
11  small fish or amphibians in addition to aquatic plant foods. In addition, some species feed frequently on
12  upland grasses and forbs in grassy fields and meadows where such vegetation is succulent and habitat is
13  sufficiently open to preclude hiding predators and enable rapid flight.

14  Waterfowl population trends generally throughout the planning area and region are stable to increasing
15  (Sauer et al. 2012). Blue-winged teal was the only species that was considered to have a decreasing trend
16  in population (Sauer et al. 2012).

17  ### 3.12.1.4    Reptile, Amphibian, and Other Non-Game Species

18  The planning area contains a high diversity of reptile, amphibian, and other non-game species, including
19  small mammals, birds, and invertebrates, because of the variety of habitats found within the area. The
20  planning area contains various riparian, shrub, grassland, cliff, pinyon-juniper woodland, and ridgetop
21  habitats that support these species.

22  Reptiles likely to occur in a wide range of habitats in the planning area include fence lizard (*Sceloporus*
23  *undulatus*), garter snake (*Thamnophis elegans*), and Great Basin gopher snake (*Pituophis catenifer*
24  *deserticola*).

25  Aquatic habitats located in the planning area support amphibians, including toads and frogs. Amphibian
26  species require aquatic and semi-aquatic habitats for breeding and often use adjacent terrestrial habitats
27  during nonbreeding periods. Most frog species overwinter in the bottom substrates of their aquatic
28  habitats. Amphibians likely to occur in the project area include the northern leopard frog (*Rana pipiens*),
29  spotted toad (*B. punctatus*), western toad (*B. boreas*), Woodhouse's toad (*B. woodhousii*), Great Basin
30  spadefoot toad (*Spea intermontana*), and Couch's spadefoot toad (*Scaphiopus couchii*). Great Plains toad
31  is also known to occur in the planning area, though this species is addressed in Section 3.11.

32  Mammals likely to be present in planning area include small aerial species such as bat (*Vespertilionidae,*
33  *Molossidae,* and *Phyllostomidae*) and terrestrial species, which include mouse and vole (*Muridae*), shrew
34  (*Soricidae*), rat (*Dipodomys* and *Neotoma* spp.), gopher (*Geomyidae*), and chipmunk (*Tamias striatus*).
35  Mid-sized mammals likely to be present include skunk (*Mephitidae*), rabbit (*Sylvilagus* spp.), hare (*Lepus*
36  spp.), beaver (*Castor canadensis*), and raccoon (*Procyon lotor*). Meso- and large-bodied carnivores likely
37  to be present include badger (*Taxidea taxus*), fox (*Vulpes* spp.), and coyote (*Canis latrans*).

38  Very little is known about the status of most of these species, though the availability of suitable habitat
39  provides a proxy for potential occurrence.

40  ### 3.12.1.5    Native Pollinators

41  Research has shown that that San Rafael Desert, including the planning area, has a very high diversity of
42  insect pollinators. One study found 68 endemic species of bees in the San Rafael Desert, as well as
43  disjuncts from both the Great Plains and the Mojave and Sonoran Deserts (Griswold et al. 1997). This
44  same research also identified 48 new species of bees and found that numbers of bee genera in the San

1  Rafael Desert is more than in all of New England (Griswold et al. 1997). Another study found that one-
2  third of Utah's bee species live in an area (centered on the San Rafael Desert) that covers only 2% of the
3  State (Jones 1999). In addition, describing 48 new species in the San Rafael Desert, the researchers also
4  documented the deepest bee nest ever recorded in North America and nests in honeycomb-like holes in
5  sandstone (Jones 1999).

6  The diversity of bees in the San Rafael Desert is partly the result of floral specialization; at least one-third
7  of the bee species in the San Rafael Desert specialize on plants at the family or generic level (Griswold et
8  al. 1997). Because of floral specialization among pollinators, preservation of rare endemic plants requires
9  considerations to conserve habitat of their pollinators, as well as habitat for the plants themselves, and
10 vice-versa. In general, insect pollinators, including bees, are highly specialized and have co-evolved with
11 specific plant hosts, which may make them less adaptable to anthropogenic disturbances and changing
12 conditions. For example, in a study of reproduction of the Jones cycladenia (*Cycladenia humilis* var.
13 *jonesii*), a species listed as threatened under the ESA that may occur in the planning area, researchers
14 speculated that low reproductive success may have been because the plant's original pollinator was no
15 longer consistently found within the plant's range (Sipes and Tepedino 1995).

### 3.12.1.6    Fisheries

17 The San Rafael and Green Rivers both support fisheries within the planning area. There are no other
18 perennial waters in the planning area that support fish.

## San Rafael River

20 The fish habitat in the lower San Rafael River in the planning area was historically degraded by a suite of
21 anthropogenic impacts. The main cause of physical degradation on the San Rafael River has been the
22 altered hydrology. The magnitude and duration of snowmelt floods have been reduced, compared with the
23 early 1900s, as a result of decreased precipitation and water storage. Monsoon floods have also been
24 reduced in magnitude but still transport large quantities of sediment to the river, which is deposited on the
25 floodplain and as levees or berms along the channel. The reduced frequency of large snowmelt floods that
26 transported large quantities of sediment through the river system has led to narrowing and confinement of
27 the channel and to a loss of complex habitat used by native fish. Tamarisk colonization in the 1950s
28 accelerated channel narrowing by stabilizing channel bars and floodplain sediments and has subsequently
29 reduced opportunities for native vegetation recruitment, especially cottonwood trees. The loss of the
30 processes that created and maintained stream and floodplain habitat has contributed to reduced
31 populations of native fish and vegetation. Native fish are also impacted by a diversion dam that prevents
32 upstream movement, by predation and competition from non-native fish, and by dewatering of the river
33 during dry periods. Because of these threats, populations of native fish in the lower portion of the San
34 Rafael River are persisting primarily as a result of immigration from the Green River and from upstream
35 source populations (BLM 2014a). Recent implementation of the San Rafael River Restoration Project has
36 begun to address some of these issues (refer to Section 3.11.2); however, many of these challenges (e.g.,
37 altered hydrology) still exist.

38 Four native fish species have been observed regularly within the San Rafael River during sampling:
39 speckled dace (*Rhinichthys osculus*), flannelmouth sucker (*Catostomus latipinnis*), bluehead sucker
40 (*Catostomus discobolus*), and roundtail chub (*Gila robusta*) (Bottcher 2009; McAda et al. 1980;
41 Walsworth 2011). A rangewide conservation agreement was signed to manage the flannelmouth sucker,
42 bluehead sucker, and roundtail chub in 2004 (UDWR 2006). Densities of the three species have been
43 consistently higher in sampling locations in the upper San Rafael River than in the lower San Rafael
44 River, and lower-river populations are thought to be maintained only by immigration from the upper river
45 and the Green River (Bottcher 2009; McAda et al. 1980; Walsworth 2011). Sampling in the planning area
46 has often found no native fish, indicating very low densities of native fish. One reason for low densities of
47 native fish in the planning area is a lack of available habitat, particularly a lack of pools, riffles, and

backwaters, which are preferred habitats for native fish. Surveys of the lower river conducted in 2010 found that each of the project reaches contained <20% pool, riffle, and backwater habitats by area (BLM 2014a).

Non-native fish are also found in the lower San Rafael River and include red shiner (*Cyprinella lutrensis*), sand shiner (*Notropis stramineus*), mosquitofish (*Gambusia* spp.), fathead minnow (*Pimephales promelas*), common carp (*Cyprinus carpio*), black bullhead (*Ameiurus melas*), and channel catfish (*Ictalurus punctatus*) (Bottcher 2009; McAda et al. 1980; Walsworth 2011). Non-native fish are preying on and competing with the three species in the lower San Rafael River and are a severe threat to persistence of native fish in the lower river (Walsworth 2011; Walsworth et al. 2013). Competition may be especially intense in the lower river because of the limited availability of habitat for production of food resources such as macroinvertebrates (Walsworth 2011).

Native fish populations within the San Rafael River are likely limited by occasional drying of the lower river during periods of low water and complete freezing of the water column during cold periods in winter (BLM 2014a). Temperature may also limit distribution of native fish in the lower river. Temperature monitoring by the USGS at the SH-24 bridge between 1950 and 1977 indicated that summer temperatures at this location consistently approached and sometimes exceeded 30 degrees Celsius (°C), which is at the upper end of temperature preferences for the three species (Bezzerides and Bestgen 2002). Temperatures exceeding 35°C have also been observed in isolated pools when the river has become dewatered (Bottcher 2009). Even if temperatures do not exceed 30°C in the summer, as the temperature increases, metabolic demands increase. The low productivity, combined with competition from non-native species in the lower San Rafael River, may prevent native fish from obtaining sufficient resources to meet metabolic demands when temperatures are elevated. Thus, temperature may be a limiting factor for native fish in some years.

Overall the reduced density of the three species in project reaches on the lower San Rafael River has been attributed to a suite of factors, including competition and predation from non-native fish, dewatering during dry periods, low productivity, increased water temperatures, and a lack of complex habitat, including riffles, pools, and backwaters (Bottcher 2009; Walsworth 2011). However, where isolated sections of the lower river contain more complex habitat, such as at tributary confluences, higher densities of the three species have been found or are predicted to occur (BLM 2014a; Walsworth 2011). Thus, the lack of available habitat in project areas is a key limiting resource for native fish populations.

## Green River

The portions of the Green River in the planning area is known to support native and non-native fish, including flannelmouth sucker, blueheaded sucker, channel catfish, roundtail chub, speckled dace, fathead minnow, red shiner, sand shiner, smallmouth bass, largemouth bass, carp, black bullhead, yellow bullhead, walleye, northern pike. The Green River also has been affected by flow modifications and tamarisk colonization, which affects fish habitat in the San Rafael River. However, compared with the San Rafael River, the Green River has much higher flow; therefore, the river's fishery is not limited by summer temperature or winter freezing in the same manner as the San Rafael fishery.

## 3.12.2   Resource Trends

Very little information is available with which to assess trends for wildlife and fisheries in the planning area. In general, wildlife populations in relatively undeveloped landscapes similar to the planning area are a function of habitat availability and quality. Habitat availability has stayed relatively constant in the planning area, as few surface disturbing activities have been implemented. Livestock grazing, OHV use, and dispersed recreation activities do occur, and recreational use is increasing. However, these activities occur at relatively low intensities and therefore are not anticipated to substantially affect wildlife trends.

The largest factor affecting wildlife population and habitat trends in the planning area is drought. The planning area experienced extended periods of moderate to severe drought from 2000 to 2003 and again

1 from 2012 to 2016, which that contributed to habitat deterioration. As of January 2017, the drought in the
2 planning area has eased somewhat, and the area is classified as experiencing somewhat abnormally dry
3 conditions (U.S. Drought Monitor 2017). Wildlife habitat and populations are anticipated to respond
4 positively to the easing of drought.

5 BLM began implementing the San Rafael River Restoration Project in 2015, and that process is ongoing.
6 The San Rafael River Restoration Project was designed to improve the ecological condition of the lower
7 San Rafael River, which has been degraded severely over time through a combination of impacts,
8 including altered flow regimes and non-native vegetation encroachment. Implementation of the project
9 will improve the riparian and aquatic habitat in the planning area, including developing riffles, pools, and
10 backwaters, which were lacking before the project began. This project will greatly improve the riparian
11 and fish habitat in the San Rafael River in the planning area, and it is anticipated that native fish
12 populations will increase in their distribution and numbers as a result.

13 **3.13 LANDS WITH WILDERNESS CHARACTERISTICS**

14 **3.13.1 Introduction**

15 This section describes the affected environment for lands with wilderness characteristics (LWCs). The
16 analysis area for LWCs includes the planning area as well as LWC inventory units that extend outside the
17 planning area and other adjacent lands that the BLM manages for the preservation of wilderness character
18 (i.e., wilderness study areas [WSAs]). The analysis area includes the Sweetwater Reef Unit A, San Rafael
19 River Units A through E, Units 5 and 7, Labyrinth Units A and B, the Dirty Devil/French Springs LWC
20 units, the Dirty Devil WSA, the Horseshoe Canyon North WSA, and the Horseshoe Canyon South WSA
21 (see Map 2-1).

22 The BLM's authority to recommend lands for Congressional wilderness designation expired in 1991
23 under FLPMA Section 603 (43 USC 1782). However, Congress gave the BLM broad authority and
24 discretion under FLPMA, aside from Section 603, to identify LWCs and, if appropriate, to manage lands
25 to protect such characteristics. The LWC inventory authority comes from FLPMA, Title II, Section 201
26 (43 USC 1711(a)) that states the BLM is to "prepare and maintain on a continuing basis an inventory of
27 all public lands and their resource and other values." The BLM makes decisions regarding the
28 management of resources present on BLM-administered public lands, including LWCs, through the RMP
29 planning process.

30 One of the key characteristic of lands meeting the qualities of wilderness is the requirement under the
31 Wilderness Act that the parcels of land contain at least 5,000 contiguous roadless acres or be of sufficient
32 size to allow for their preservation and use in an unimpaired condition. BLM Manual 6310—Conducting
33 Wilderness Characteristics Inventory on BLM Lands (BLM 2012b) requires the areas being evaluated to
34 be at least 5,000 acres in size, contiguous to other protected lands with wilderness characteristics, of
35 sufficient size to be able to preserve and use in an unimpaired condition, or a roadless island.

36 The other two major criteria in evaluating wilderness characteristics is the naturalness of an area and
37 opportunities for solitude or a primitive and unconfined type of recreation. While the Wilderness Act
38 discusses and mandates these key characteristics of wilderness, the act does not clarify these terms. The
39 BLM has subsequently defined these terms in BLM Manual 6310 and has described how to assess these
40 conditions on parcels. The following are the terms clarified by BLM policy that are used to describe these
41 key wilderness characteristics.

42 **Naturalness:** Lands and resources exhibit a high degree of naturalness when affected primarily by the
43 forces of nature and where the imprint of human activity is substantially unnoticeable. The BLM has the
44 authority to inventory, assess, and/or monitor the attributes of the lands and resources on public lands,
45 which, taken together, are an indication of an area's naturalness. These attributes may include the

---

1  presence or absence of roads and trails, fences, and other improvements; and the nature and extent of
2  landscape modifications; the presence of native vegetation communities; and the connectivity of habitats.

3  **Opportunities for solitude and primitive and unconfined recreation:** Visitors may have outstanding
4  opportunities for solitude or primitive and unconfined types of recreation when the sights, sounds, and
5  evidence of other people are rare or infrequent; where visitors can be isolated, alone, or secluded from
6  others; where the use of the area is through non-motorized, non-mechanical means; and where no or
7  minimal developed recreation facilities are encountered.

8  **Supplemental values:** Another component of LWCs is that those lands may also contain ecological,
9  geological, or other features of scientific, educational, scenic, or historical value; these are known as
10  supplemental values. Although supplemental values are not required in the BLM's policy on wilderness
11  characteristics, these values are of particular importance and reflect the character of the area. For
12  example, some areas in the planning area may show wilderness characteristics by meeting the definitions
13  for size, naturalness, and opportunities for solitude and primitive and unconfined recreation and also by
14  providing historical value to others by preserving Native American ruins or rock art.

15  ## 3.13.2    Resource Conditions

16  ### 3.13.2.1    Lands with Wilderness Characteristics

17  All lands within the Price and Richfield Field Offices underwent an initial inventory for wilderness
18  characteristics in 1979. The initial inventory led to some lands undergoing a more intensive inventory,
19  which led to a subset of these lands being identified as WSAs. These lands have been managed since this
20  identification to prevent impairment of their wilderness characteristics until Congress decides on their
21  final disposition. The Secretary of the Interior directed the BLM in 1996 to reexamine some of the lands
22  originally inventoried in 1979. In response, the BLM inventoried these lands and found approximately 2.6
23  million acres of public land in Utah (outside of existing WSAs) to have wilderness characteristics (BLM
24  1999). This effort is referred to as the 1999 inventory. As part of the 2008 Richfield and Price Field
25  Offices' RMP processes, the BLM reexamined some portions of the 1999 inventory. However, prior to
26  2016, the BLM had never completed a full LWC inventory for many areas within the planning area.

27  In 2016, the Price and Richfield Field Offices conducted a wilderness inventory for the planning area. The
28  2016 LWC inventory included 449,394 acres and 20 inventory units (BLM 2016). The effort was
29  intended to document the presence or absence of wilderness characteristics consistent with BLM Manual
30  6310 (BLM 2016). Of the 20 units that were inventoried, 263,705 acres, or 13 units, were determined to
31  have wilderness characteristics (see Map 2.1, Table 3-31). Approximately 250,994 acres within these
32  units falls within the planning area. For the purposes of this analysis, the LWC units are grouped by
33  proximity, and their acreages are shown in Table 3-31. Map 3-5 displays the boundaries of the LWC
34  groups used in the analysis.

1 **Table 3-31. Lands with Wilderness Characteristics Units in the Planning Area**

| Group Name | Units Composing Group | Acres in the Planning Area | Total LWC Acreage |
|---|---|---|---|
| Sweetwater Reef | Sweetwater Reef Unit A (69,348 acres) | 69,348 | 69,348 |
| San Rafael River | San Rafael River Unit A (6,354 acres) | 122,804 | 122,929 |
| | San Rafael River Unit B (24,248 acres) | | |
| | San Rafael River Unit C (7,162 acres) | | |
| | San Rafael River Unit D (66,794 acres in planning area; 66,849 acres LWC total) | | |
| | San Rafael River Unit E (9,132 acres in planning area; 9,201 acres LWC total) | | |
| | Unit 6 (9,112 acres) | | |
| Units 5 and 7 | Unit 5 (5,616 acres) | 14,144 | 14,144 |
| | Unit 7 (8,528 acres) | | |
| Dirty Devil/French Springs | Dirty Devil/French Springs Units 1 and 3 (5,454 acres in planning area; 17,343 acres LWC total) | 13,601 | 26,272 |
| | Horseshoe Canyon South (8,147 acres in planning area; 8,929 acres LWC total) | | |
| Labyrinth | Labyrinth Unit A (20,023 acres in planning area; 20,025 acres LWC total) | 31,098 | 31,102 |
| | Labyrinth Unit B (11,075 acres in planning area; 11,077 acres LWC total) | | |
| **Total of All Units** | | **250,994** | **263,705** |

## 2 Description of Lands with Wilderness Characteristics Groups

3 The following sections summarize the naturalness, opportunities for solitude and primitive and
4 unconfined recreation, supplemental values, and evidence of human activity for the five groups of LWCs.
5 This information was extracted from the 1999 *Utah Wilderness Inventory* and the *San Rafael Desert*
6 *Lands with Wilderness Characteristics Inventory* (BLM 2016). For more detailed information on each of
7 the units, please refer to the inventories.

### 8 *Sweetwater Reef Group*

9 The Sweetwater Reef group is composed of the Sweetwater Reef Unit A (69,348 acres). The Sweetwater
10 Reef Unit A is primarily in Emery County with a portion of the southern boundary located in Wayne
11 County. The Lower San Rafael Road and Saucer Basin Road border the unit. This unit covers an area of
12 the San Rafael Desert made up of a variety of geographic features ranging from stabilized sand dunes,
13 incised slick rock canyons, and expanses of brush-grasslands to the uplifted Sweetwater Reef. The unit is
14 bordered by bladed natural surface roads and is located east of State Route 24 and west of the Horseshoe
15 Canyon unit of Canyonlands National Park.

16 The unique natural desert ecosystem of dry washes, oak brush–stabilized sand dunes, and endemic
17 blackbrush flats offers exemplary opportunities for primitive and unconfined recreation. Additionally, this
18 area offers opportunities for viewing wildlife in a landscape of huge skies, varied geologic forms, and
19 unique isolated riparian systems.

1    The unit contains extensive undocumented cultural resources in the form of lithic scatters, which appear
2    and disappear as shifting sands expose and then recover them. The unit also contains isolated rock art and
3    historic cabins and corrals located near springs. Some of the earliest petroleum exploration occurred in
4    this part of the San Rafael Desert in the 1920s. The most substantial human activity observed and noted
5    was the existence of roads and berms from historic seismic activity. Mineral exploration, probably during
6    the 1950s and 1960s, left the unit crisscrossed with long stretches of lines and routes, which are in various
7    stages of natural rehabilitation. In some cases, the lines have naturally reclaimed to the point that they are
8    barely visible and the average visitor would not notice them (BLM 2016).

### San Rafael River Group

10    The San Rafael River group consists of San Rafael River Units A through E and Unit 6 (see Map 3-5).
11    The San Rafael River group is located in Emery County. The group is bounded by State Route 24 and the
12    Cottonwood Spring Loop Road on the west side, by the Gillies Ranch Road on the north side, the Lower
13    San Rafael Road on the east side, and by the Saucer Basin, Dugout Creek, Sand, Spring Canyon, and
14    Landing Field Roads on the south side.

15    These units cover an area of the San Rafael Desert made up of a variety of geographic features ranging
16    from mesa tops, river bottoms, and incised slick rock canyons to expanses of brush-grasslands. The
17    unique natural desert ecosystem of dry washes, slot canyons, alcoves, slickrock, oak brush–stabilized
18    sand dunes, and endemic blackbrush flats offers exemplary opportunities for primitive and unconfined
19    recreation and wildlife viewing in a landscape of huge skies, varied geologic forms, and unique isolated
20    riparian systems. Although Unit 6 provides outstanding opportunities for solitude, its sand, topography,
21    and location make it difficult and undesirable for most of the public, and it therefore it does not provide
22    outstanding opportunities for primitive and unconfined recreation. Due to the vast ruggedness of the
23    overall area, outstanding opportunities for solitude exists.

24    The most substantial human activity observed were haul locations accessed only by the grazing permittee.
25    Many units contain several range improvements including water haul locations, tanks and troughs,
26    corrals, salt and mineral haul locations, and spring locations. In San Rafael River Unit C, some historic
27    routes from mineral exploration, probably during the 1950s and 1960s, can be seen. Today, these historic
28    routes are in various stages of natural rehabilitation. In some cases, the lines have naturally reclaimed to
29    the point that they are barely visible and the average visitor would not notice them. Dispersed campsites,
30    a mountain biking area, a slot canyon hike, and a reclaimed airstrip are also among the human activities
31    observed in one of the units. San Rafael River Units C through E have seismic exploration lines and ATV,
32    motorcycle, and jeep trails throughout, but these are not maintained except by the passage of
33    vehicles.

34    Many of the units contains extensive undocumented cultural resources in the form of lithic scatters, which
35    appear and disappear as shifting sands expose and then recover them. One unit also contains isolated rock
36    art and a historic corral. Some of the earliest petroleum exploration occurred in this part of the San Rafael
37    Desert in the 1920s. Portions of the Dry Lake ACEC, which is managed for its relevant and important
38    values of cultural resources, are located within San Rafael River Unit A (BLM 2016).

### Units 5 and 7 Group

40    The Units 5 and 7 group cover 14,144 acres in total. Units 5 and 7 are bounded on the west by the Lower
41    San Rafael Road, to the north and south by BLM Designated Route 501 and BLM Designated Route 701,
42    respectively, and to the east by Fossil Point Road, which is also the shared boundary between the units.

43    These units have been affected by range improvements, and have evidence of mining and mineral
44    exploration. These impacts have naturally reclaimed to the point that they are difficult to see, and these
45    features would not be generally recognizable to the public. These units have some vegetation such as

1  grasses and small brush, whereas other areas are covered only in sand and rock. The topography of the
2  units is typical of the general area and includes some large hills, washes, and small canyons.

3  These units provide outstanding opportunities for solitude. Visitors who explore the central portions of
4  the units, away from boundary roads and primitive routes, encounter topography that allows them to be
5  shielded from the sights and sounds of vehicle traffic. There are no authorized routes or ways that access
6  the middle of the units.

7  These units provide outstanding opportunities for primitive and unconfined recreation. There are many
8  opportunities to hike and explore small canyons, washes, sand dunes, and hills. The southern boundary of
9  Unit 5 and the northern boundary of Unit 7 provide access to Fossil Point, where visitors can discover and
10  examine paleontological resources including fascinating bones. The eastern boundary for each of the units
11  is the Green River, which also provides many unconfined recreation opportunities such as hiking and
12  boating access. Portions of the Dry Lake ACEC can be found within both units (BLM 2016).

### Dirty Devil/French Springs Group

14  The Dirty Devil/French Springs Group is composed of the northern portions of Dirty Devil/French
15  Springs Units 1 and 3 (5,454 acres) and the Horseshoe Canyon South unit (8,147 acres). The southern
16  portions of Units 1 and 3 and the remainder of the Dirty Devil/French Springs units fall outside of the
17  planning area. The units that fall within the planning area straddle the Emery and Wayne County line in
18  the southern portion of the planning area. Approximately 31% of the Dirty Devil/French Springs Units 1
19  and 3 and 91% of the Horseshoe Canyon South unit lie within the planning area.

20  The Dirty Devil area is remote and has a rich prehistory and history. The archaeological resources in the
21  area are impressive, and the outlaw history of this area is extensive. Part of the Outlaw Trail that stretched
22  from Montana to Mexico is located here. Butch Cassidy and his Wild Bunch were some of the most
23  famous of the outlaws to frequent this region (BLM 1999).

24  The Dirty Devil area is crisscrossed by deeply incised canyons creating a landscape of topographic
25  extremes. It has remained largely unchanged since the post–World War II uranium exploration boom. The
26  units are used for grazing and recreation. The portion of Dirty Devil Unit 1 that falls within the planning
27  area is mainly the access road to the Dirty Devil River. Seismic lines and range improvements are present
28  but the units are not substantially impacted by intrusions.

29  Horseshoe Canyon South has a diverse combination of incised sandstone canyons and rugged benchlands,
30  and it includes the headwaters and entire upper drainage of Horseshoe Canyon. The unit is contiguous to
31  the Horseshoe Canyon South WSA. Vegetation above the canyon bottoms is predominantly sagebrush
32  and blackbrush grasslands, with scattered stands of piñon and juniper at the higher elevations and along
33  the canyon breaks. Riparian species in the canyons include Fremont cottonwood, willow, common reed
34  grass, and tamarisk. Grazing use continues to be permitted throughout most of the unit, although many
35  areas remain largely ungrazed because of a lack of access and limited reliable water sources. Human
36  activities include mineral and petroleum exploration activities, some widely scattered old seismograph
37  lines, and range developments; however, the seismograph lines are generally screened by the vegetation
38  and topography.

39  The Dirty Devil/French Springs units and the Horseshoe Canyon South unit provide abundant
40  opportunities for solitude due to the large scale of the country, the expansive and rugged terrain, and
41  ample topographic screening. The inventory units are contiguous to and are an extension of the Horseshoe
42  Canyon South WSA and the Dirty Devil WSA, respectively, which have outstanding opportunities for
43  primitive and unconfined recreation. The remoteness, expansive views, significant cultural history,
44  limited visitation, and diversity and quality of recreational activities in these units combine to create
45  outstanding opportunities for the visitor seeking remote recreation experiences.

*Labyrinth Group*

The Labyrinth Group is composed of Labyrinth Unit A (20,025 acres) and Labyrinth Unit B (11,077 acres). The Labyrinth Group is bounded on the west by the Lower San Rafael Road, on the north by Road LC-A-001, on the east by the Green River and the Horseshoe Canyon North WSA, and on the south by Road LC-B-018.

Labyrinth Unit A is composed of sagebrush and blackbrush flats along the upper benches and knolls and the incised canyons of the main chasm of Labyrinth Canyon, as well as riverine-influenced zones along the Green and San Rafael Rivers. Labyrinth Unit B also is composed of sagebrush and blackbrush flats along the upper benches and knolls, but it is farther from the Green River. The Labyrinth Unit B ranges from a gently sloping to a rugged, broken landscape of ridges and escarpments cut by side canyons. Spring Canyon and Horseshoe Canyon provide access to the Green River and are two extensive canyon systems in the area.

The predominantly desert landscapes within both units provide views of diverse geological formations, some of which include high desert plateaus that transition to steep canyons that eventually give way to various washes throughout the units (and the surrounding WSA in the case of Labyrinth Unit B), where drastic elevation transitions are prevalent. Naturalness is enhanced by topographic screening from deep canyons, rugged terrain, and the natural re-vegetation of disturbed areas, which obscures most intrusions in the predominantly blackbrush communities. Vegetation includes, but is not limited to, native grasses and shrubs, which are sparse in some areas.

Human impacts are present in both units in the form of reclaiming seismic lines and range improvements. Major current human uses also include recreation-based activities due to the remoteness of this area. Activities such as hunting, hiking, exploring, sightseeing, photography, camping, and river rafting access would be most likely to occur within this area.

Steep and rugged topography, as well as the extensive side canyons, cliffs and other topographical features maintain the area's natural character and also provide outstanding opportunities for solitude. Labyrinth Unit B is contiguous to the Horseshoe Canyon North WSA and the Canyonlands National Park Horseshoe Canyon unit; both provide and are managed for outstanding opportunities for solitude. Due to the remoteness and topography found within these units, outstanding opportunities for primitive and unconfined recreation are prevalent. Some of these activities may include hiking, canyoneering, mountain biking, floating, and primitive camping.

Scenic quality is excellent within these units. There are extensive views of red, buff, and purple sandstone canyons, domes, alcoves, multiple arches, and sheer cliff faces of spectacular dimensions.

There are several historic features, including sheep access trails to the river. These units contain the same type of nationally significant, prehistoric cultural sites and rock art found within the Horseshoe Canyon unit of Canyonlands National Park.

These units provides exceptionally diverse habitats. Most important are the extensive riparian areas found along the river and major side canyons. An expanding herd of desert bighorn sheep inhabits the rims and canyons. The endangered Colorado pikeminnow, humpbacked chub, bonytail chub, and razorbacked sucker are all found in the Green River. Labyrinth Unit B has an abundant pronghorn population, and one of only a few herds in Utah that was not eliminated by the human settlement.

The 2008 Price Field Office ROD/RMP established several "special" categories along the Green River through Labyrinth Canyon for the purpose of protecting values and prescribing management direction as follows:

- The Labyrinth Canyon SRMA within the inventory area and WSA recognize the intensive and special recreation values of the canyon.

- The Bowknot Bend ACEC within the WSA protects the ungrazed vegetation communities on the isolated mesa tops that have remained completely undisturbed.
- The Green River through Labyrinth Canyon is suitable as scenic for inclusion in the National Wild and Scenic Rivers System (BLM 2008).

### 3.13.2.2    Natural Areas

In general, non-WSA LWCs that are managed according to an approved BLM RMP to protect wilderness values while allowing other uses as appropriate are referred to as BLM "natural areas" (BLM 2008b). BLM natural areas are managed to preserve, protect, and maintain the values of primitive recreation, the appearance of naturalness, and opportunities for solitude (BLM 2008b).

There are two natural areas identified in the Richfield Field Office ROD/RMP located within the planning area. One is the Horseshoe Canyon South natural area; for this natural area 3,733 acres of the 12,147 acres identified in the 2008 Richfield Field Office ROD/RMP falls within the planning area (see Map 2-1). The other is the Dirty Devil/French Springs natural area; for this natural area 138 acres of the 6,081 acres identified in the 2008 Richfield Field Office ROD/RMP fall within the planning area (see Map 2-1).

## 3.13.3    Resource Trends

The presence or absence of wilderness characteristics on BLM-administered public lands can be modified by human activities such as approved land uses or by the natural reclamation process through which evidence of past disturbances can be reduced or eliminated over time. As a result, BLM-administered lands that have been inventoried previously and not found to have wilderness characteristics could be found to have wilderness characteristics in future inventories, and visa-versa.

Evidence of human activities such as seismic studies and cross-country travel in the planning area have been reduced or eliminated over time by the natural reclamation process. Recreation development has been limited in the area due to its remoteness, and recreationists have been drawn to surrounding areas such as Canyonlands and Arches National Parks. For these reasons, several areas that were inventoried by the BLM in 1999 and determined not to have naturalness were found to have wilderness characteristics in the 2016 inventory (BLM 2016).

Recreation and human activities in the planning area are expected to increase in the next 20 years. Recreational destinations surrounding Moab are saturated with visitors, and the public is looking for other areas to recreate. Additionally, there is the potential for BLM-authorized land uses such as oil and gas development in the planning area. Oil and gas development is now more likely than ever as a result of available modern horizontal drilling and hydraulic fracturing technologies. Recreational development and other BLM-authorized land uses could reduce the presence of LWCs in the planning area in the future.

## 3.14  RECREATION

### 3.14.1    Introduction

The analysis area for recreation consists of the planning area and adjacent lands that could be affected by decisions regarding the planning area. The adjacent lands include the following:

- The Green River corridor through Labyrinth Canyon and related Green River tributaries.
- Lands managed by the Moab Field Office east of the Green River and east of the planning area. (Management decisions in the Moab Field Office may affect users' river experiences and users accessing the river from the planning area.)
- Portions of the Labyrinth Canyon and Dirty Devil/Robbers Roost SRMAs, which are south and east of the planning area and above the rim of the Green River

1       • The Horseshoe Canyon unit of Canyonlands National Park

## 3.14.2   Resource Use Conditions

### 3.14.2.1     Dispersed Recreation and Visitation

The planning area is in a region of Utah that is well known for its recreational opportunities. Three national parks, the San Rafael Swell, and Goblin Valley State Park are located within 25 miles of the planning area and offer multiple recreation activities. The Green River, which forms the eastern boundary of the planning area, is a popular destination for river rafting, and the nearby Henry Mountains offer hunting, hiking, camping, and other recreational activities.

Recreation is a highly valued use of BLM-administered public land in the planning area. Because there are no developed recreation sites in the planning area, all recreation is considered to be dispersed. Visitors to the planning area currently engage in a wide variety of motorized and non-motorized recreational activities. The busiest seasons tend to be spring and fall, although visitation occurs throughout the year. Recreation activities include climbing, hiking, canyoneering, biking, OHV (ATV and motorcycle) use, driving for pleasure, cultural and paleontological resource viewing, boating on the Green and San Rafael Rivers, camping, hunting, and horseback and mule riding.

An important element of recreation is the visitor experience. Different types of visitors seek different experiences for their chosen recreation activity. The visitor experience depends on factors such as interaction with other people (a low degree of interaction to a high degree of interaction), the presence of infrastructure (no infrastructure to heavy infrastructure such as developed campgrounds), the level of risk (low-risk activities to high-risk activities), opportunities for solitude and closeness to nature, and the level of physical effort (easy to strenuous). The BLM seeks to provide multiple visitor experiences meeting different recreation needs and desires while observing resource protection and other management requirements.

### 3.14.2.2     Current Management

Management goals and decisions for recreation in the planning area are described in the current BLM ROD/RMPs for the Price and Richfield Field Offices (BLM 2008a, 2008b). Recreation goals in the Price ROD/RMP (BLM 2008a) are as follows:

- To establish management that provides necessary public services, authentic recreation experiences, and opportunities within allowable use levels; minimizes user conflicts; and maintains the healthy ecosystems and settings that provide the basis for recreation and experience.

- To provide an environment for and encourage entrepreneurial activities that are supportive of the recreation program goals and objectives.

Recreation goals in the Richfield ROD/RMP (BLM 2008b) are as follows:

- To provide recreational opportunities in a variety of physical, social, and administrative settings, from primitive to near-urban, that allow visitors to have desired recreational experiences and enjoy the resulting benefits.

- To provide opportunities for recreational experiences unique to the lands managed by the Richfield Field Office consistent with resource capabilities and mandated resource requirements and to provide for visitor education and interpretation of the recreational opportunities.

- To work with local communities to foster recreation and tourism.

- To provide for public health, education, and safety through interpretation, facility development, and visitor management.

1     •   To maintain important recreational values and sites in federal ownership to ensure a continued
2           diversity of recreation settings, activities, and opportunities.

3 Each ROD/RMP provides extensive lists of management actions or decisions for recreation, including
4 general management decisions for recreation and specific management decisions for developed
5 recreation sites, use of the Recreation Opportunity Spectrum (in the Price Field Office ROD/RMP), each
6 SRMA, extensive recreation management areas (ERMAs), special recreation permitting, and OHV
7 recreation.

## 3.14.2.3     *Special Recreation Management Areas*

9 Recreation management areas compose the system used by the BLM to manage recreational use of public
10 lands. All public lands managed by the BLM fall within either a SRMA or an ERMA. SRMAs are
11 evaluated and designated through the BLM's preparation of RMPs. The current SRMAs in the planning
12 area were designated in the 2008 BLM ROD/RMPs for the Price and Richfield Field Offices (BLM
13 2008a, 2008b). A SRMA is an area where the existing or proposed recreation opportunities and recreation
14 setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially
15 as compared to other areas used for recreation. A SRMA is managed to protect and enhance a targeted set
16 of activities, experiences, benefits, and desired recreation setting characteristics. There are two SRMAs in
17 the planning area: the Dirty Devil/Robbers Roost SRMA and the Labyrinth Canyon SRMA (Map 2-5).
18 ERMAs are managed to support and sustain the existing recreation use and demand. However, recreation
19 may not be the primary management objective in these areas so recreational activities may be subject to
20 fewer restrictions.

21 The Dirty Devil/Robbers Roost SRMA and the Labyrinth Canyon SRMA are described here.

## Dirty Devil/Robbers Roost SRMA

23 The Dirty Devil/Robbers Roost SRMA covers 290,500 acres and is managed by the Richfield Field
24 Office. The planning area contains 15,032 acres, or 5.2%, of this SRMA and intersects the northernmost
25 portion of the SRMA (see Map 2-5). The Dirty Devil/Robbers Roost SRMA surrounds the Horseshoe
26 Canyon unit of Canyonlands National Park and includes tributaries of Horseshoe Canyon. The Richfield
27 Field Office ROD/RMP states that Horseshoe Canyon should be managed as part of the Dirty
28 Devil/Robbers Roost SRMA (BLM 2008b). A portion of the Horseshoe Canyon Trailhead recreation
29 focus area (see Section 3.14.2.5) is within the SRMA in the planning area. The Horseshoe Canyon
30 Trailhead provides access from the west rim of Horseshoe Canyon into the canyon bottom.

31 The Dirty Devil/Robbers Roost SRMA is in remote desert country where plateau rangeland is incised by
32 Navajo sandstone slots that release into large, deep canyons. The Dirty Devil River flows from north to
33 south through the western portion of the SRMA, which is outside of the planning area. The Dirty Devil
34 River has low water flows but is floatable by kayakers and canoers at certain times of the year, typically
35 spring and early summer (American Whitewater 2012). This SRMA, including the portion of the SRMA
36 in the planning area, provides opportunities for primitive and semi-primitive recreation, including
37 canyoneering, backcountry camping, and hiking. In particular, the Dirty Devil River corridor, its
38 tributaries, and the Horseshoe Canyon drainage offer primitive and semi-primitive, non-motorized
39 recreation experiences, and the bench lands of the SRMA offer semi-primitive motorized recreation
40 experiences on designated routes.

## Labyrinth Canyon SRMA

42 The Labyrinth Canyon SRMA covers 45,862 acres and is administered by the Price Field Office. The
43 planning area contains 9,732 acres, or 21.2%, of the western and northern portions of the SRMA. The
44 SRMA in the planning area is managed under the ROS as P (1,571 acres), SPNM (3,796 acres), SPM
45 (4,334 acres), and RN (31 acres). In the planning area, the SRMA follows the western planning area

boundary in a wide block from the border between Emery and Wayne Counties to a location containing private lands south of the confluence of the San Rafael and Green Rivers. This portion of the SRMA includes some tributary canyons of the Green River. The SRMA in the planning area continues north of the confluence almost to the city of Green River and becomes more segmented and narrow (see Map 2-5). Portions of the Three Canyon and Keg Knoll recreation focus areas (see Section 3.14.2.4) are within the SRMA in the planning area. Three Canyon is a side canyon of Labyrinth Canyon and is often visited by river rafters on a hike. It is also a less technical canyon for canyoneering (although side forks of the canyon have more technical canyoneering routes). It contains a small intermittent stream and occasional pools. The Keg Knoll recreation focus area is a popular dispersed camping site.

The Green River, a large-volume desert river meandering through the scenic high-walled cliffs of Labyrinth Canyon, is easily accessible to floaters and runs through the Labyrinth Canyon SRMA. It is federally adjudicated as navigable water, and lands below the 1897 high water line are state owned. The flat water of the canyon attracts numerous recreationists seeking a scenic river float. Impacts occur from concentrated use along the river, primarily in camping areas. Resource damage may also occur because the canyon attracts a large number of novice and first-time river runners (BLM 2008a).

### *Recreation Opportunity Spectrum*

The Recreation Opportunity Spectrum (ROS) is a tool used by BLM recreation planners to identify existing outdoor recreational opportunities and management potential based on a combination of three criteria: recreational activity, setting, and experience. The range of recreational opportunities in the Price Field Office portion of the planning area (Emery County) has been inventoried into five ROS classes by the Price Field Office. (The Richfield Field Office has not conducted a ROS inventory.) Although the entire Price Field Office portion of the planning area has been inventoried for ROS, BLM management objectives in the Price Field Office ROD/RMP only specify use of the ROS in SRMAs (to guide decision-making on projects with the potential to change the physical, managerial, or social settings that create the available recreation opportunities and experiences) (BLM 2008a). Within the Labyrinth Canyon SRMA, the BLM Price Field Office manages for the ROS classes identified in the inventory (BLM 2008a).

The ROS classes for the Emery County portion of the planning area are shown in Map 3-6 and described here:

1. Primitive (P): Areas characterized by a roadless, essentially unmodified natural environment. There is a very high probability of solitude in P-class areas. Motorized use is prohibited. Approximately 1,891.6 acres of the planning area in Emery County are inventoried as P.

2. Semi-Primitive Nonmotorized (SPNM): Areas characterized by a roadless, predominantly unmodified environment. There may be rustic improvements to protect resources, and there is a high probability of solitude in SPNM-class areas. Motorized use is prohibited. Approximately 36,258.0 acres of the planning area in Emery County are inventoried as SPNM.

3. Semi-Primitive Motorized (SPM): Areas that are the same as SPNM except that motorized use is permitted. There is a moderate probability of solitude in SPM areas. Approximately 291,093.9 acres of the planning area in Emery County are inventoried as SPM.

4. Roaded Natural (RN): Areas characterized by a generally natural environment and that have evidence of natural resource modification that is in use and harmony with the natural environment. Developments such as campgrounds, trailheads, and boat launches may be present. Users of RN-class areas will encounter moderate evidence of human sights and sounds and moderate user concentrations at campsites. Approximately 38,253.9 acres of the planning area in Emery County are inventoried as RN.

5. Rural (R): Areas characterized by a substantially modified natural environment. Heavy site modifications and facilities may be present. There is a high degree of interaction with people in R-class areas. Approximately 0.1 acre of the planning area in Emery County is inventoried as R.

A sixth ROS class, Urban (U), is characterized by a user-intensive, developed, and modified resource setting. There is no land inventoried as U in the planning area.

RN and R classes typically require very little BLM management. The P, SPNM, and SPM classes are designed to provide certain types of recreation experiences and settings, and may require BLM management to meet the recreation objectives. As shown in Map 3-6, most of the planning area is inventoried as SPM followed by RN and SPMN.

### 3.14.2.4    Recreation Focus Areas

In response to comments received during public scoping, the BLM conducted an inventory of recreational uses in the planning area to assist in the development of the MLP. The inventory resulted in the identification of recreation focus areas that attract higher recreation interest and have more concentrated recreational use than other portions of the planning area. The term "recreation focus area" is not intended to be a designation in a BLM RMP, nor does it carry management implications. The BLM is not considering changing any decisions related to recreation in the existing RMPs through the MLP process. The eight recreation focus areas identified during the inventory are shown in Map 2-6 and described below:

- Fossil Point (4,947 acres): The Fossil Point recreation focus area provides outstanding opportunities for self-guided hikes and exploration of paleontological remains, as well as viewing scenic vistas of the La Sal and Henry Mountains.

- Dry Lake Archaeological District (14,023 acres): This recreation focus area is also part of an ACEC (18,000 acres) with archaeological and geologic values. It has multiple, apparently undisturbed lithic scatters and types of sites such as lithic procurement areas, shelters, and campsites. The Dry Lake Archaeological District is one of the most likely locations for finding Paleoindian sites (the rarest site type in Utah). There are also opportunities for hiking, accessing the Green River, driving for pleasure, and viewing the $CO_2$-driven cold water Tumbleweed Geyser.

- Three Canyon (16,440 acres): The Three Canyon recreation focus area provides spectacular views and recreation opportunities, including hiking, climbing, canyoneering, single-track trail riding, camping, and driving for pleasure.

- Saucer Basin/Moonshine Wash (14,791 acres): This recreation focus area provides outstanding opportunities for hiking and exploring in Moonshine Wash Canyon. Saucer Basin is a circular depression surrounded by a ring of low hills; the area as a whole has great opportunities for hiking, backpacking, climbing, camping, and driving for pleasure to scenic viewpoints. The Saucer Basin/Moonshine Wash recreation focus area has the potential for expanding mountain biking and single-track trail use along its many slickrock sections.

- The Cone (12,409 acres): The Cone recreation focus area provides exceptional views of the Cone, which is a single rising mountain that can be viewed from miles away. The area has opportunities for hiking, canyoneering, hunting, climbing, and driving for pleasure, as well as scenic views and outstanding dispersed camping.

- Keg Knoll (7,469 acres): The Keg Knoll recreation focus area is a launching point for multiple hiking, camping, and exploring opportunities. It has an outstanding 360-degree view and is a destination for dispersed campers.

- Sweetwater Reef (8,164 acres): The Sweetwater Reef focus area is a ridge that provides an impressive view of the San Rafael desert. It contains OHV roads and trails that lead to breathtaking views, as well as launching points for hiking, biking, climbing, and canyoneering.

- Cottonwood Wash (4,598 acres): The Cottonwood Wash focus area provides an opportunity to hike and explore the Cottonwood Wash drainage, which contains culturally significant writings and historic cowboy camps.

- Horseshoe Canyon Trailhead (2,033 acres): The Horseshoe Canyon Trailhead recreation focus area provides trail access from the west rim of Horseshoe Canyon into the canyon bottom to view significant rock art. Primitive camping is allowed at the trailhead with a permit from Canyonlands National Park. This area may also be used as a base for other recreational activities in nearby canyons.

### 3.14.2.5    Horseshoe Canyon Unit of Canyonlands National Park

Horseshoe Canyon is part of the Maze District of Canyonlands National Park, but it is a detached unit located west of the main Maze District. It is a canyon with sheer sandstone walls and mature cottonwood groves along an intermittent stream in the canyon bottom. Horseshoe Canyon contains some of the most significant rock art (Barrier Canyon style) in North America. Most visitors access the canyon from the west on a 30-mile graded dirt road from Utah State Route 24. It can also be accessed on a dirt road traveling south from Green River. Both of these access routes cross the planning area and expose visitors to the recreation offerings in the planning area. The west rim trailhead into Horseshoe Canyon provides primitive camping with a vault toilet but no water. Visitors can hike into the canyon or access the canyon on horseback. NPS rangers provide guided walks in spring and fall.

### 3.14.2.6    Special Recreation Permits

Special recreation permits (SRPs) are authorizations that allow specified recreational uses of the public lands and related waters. They are issued as a means to manage visitor use, ensure public health and safety, protect recreation, protect natural and cultural resources, and provide a fair monetary return to the public for certain recreation uses on public lands. SRPs are authorized by the Federal Lands Recreation Enhancement Act. There are five types of uses for which SRPs are required: commercial, competitive, vending (the sale of goods and services on public lands in conjunction with a recreation activity), individual or group use in special areas, and organized group activity and event use.

The Price Field Office issues SRPs as discretionary actions subject to environmental analysis and according to established evaluation factors. The Richfield Field Office issues SRPs on a case-by-case basis and also subject to environmental analysis. According to the Richfield Field Office ROD/RMP, SRPs are currently in place for commercial uses in its planning area; examples include canyoneering, rock climbing, backpacking, hiking, guided hunting, and vehicle tours (BLM 2008b).

### 3.14.2.7    Visual Landscape

The visual landscape is an important resource for recreation users in the planning area. Scenic views and visual characteristics may be the primary reason recreation users come to a particular location. The visual landscape is often an essential part of a hiking or backpacking experience, and it adds to the quality of other recreation experiences such as camping and climbing.

A visual resource inventory was conducted for the planning area in 2011. Visual resource inventory classes were identified, and these are discussed in Section 3.9. As part of the MLP process, the BLM identified key observation points (KOPs) within the planning area where viewers are more likely to be present and seeking visually appealing experiences. The KOPs are as follows:

- Bull Bottom: Located at the end of Bull Bottom Road, this KOP provides access to the Bull Bottom overlook and is at the entrance to the Labyrinth Canyon narrows. It is a remarkable 360-degree vantage point, with foreground, middle ground, and background views. Slickrock buttes, rolling hills, cliff walls, and patches of open grassy areas with sparse rabbitbrush and other vegetation are visible.

- Trin Alcove/Three Canyon: Located at the end of Trin Alcove Road in a parking area, this KOP provides 360-degree views of the foreground, middle ground, and background. The flat, brilliant, white slickrock of Three Canyons is easily seen from the KOP. Slickrock buttes, rolling slickrock hills, various rock formations, patchy vegetation, and great color variation are also visible. Trin Alcove/Three Canyon KOP is also used as a camping area.

- Wolverton Overlook: This KOP is located in an area of flat topographical relief with views for many miles in almost all directions. The visible landscape includes blackbrush, rabbitbrush, sparse grasses, and a wide variety of slickrock colors.

- Keg Knoll: Keg Knoll KOP is one of the highest points overlooking the planning area. It has 360-degree views of the foreground, middle ground, and background. The visible landscape includes blackbrush, rabbitbrush, sparse grasses, and a wide variety of slickrock colors. This KOP is a recreation destination with a trailhead and multiple hiking, camping, and exploration options.

- Horseshoe Canyon Trailhead: This KOP is located at the trailhead providing the main access into Horseshoe Canyon for hikers and those wishing to see the rock art in the canyon. The view into the planning area consists of a rolling ridge created by sand with blackbrush, rabbitbrush, and sparse grasses to the west. In other directions, the viewshed is larger and the foreground, middle ground, and background can be seen from the trailhead.

Bull Bottom, Trin Alcove/Three Canyon, and Wolverton Overlook KOPs are in or adjacent to the Three Canyon recreation focus area. Keg Knoll is in the Keg Knoll recreation focus area. Horseshoe Canyon Trailhead is in the Horseshoe Canyon Trailhead recreation focus area.

### 3.14.2.8    Motorized and Mechanized Recreation

Both motorized recreation (OHV) and mechanized recreation (mountain biking) occur in the planning area. OHV use consists of ATVs and off-road motorcycles. Most OHV riders choose to ride large loops of approximately 60 to 70 miles on roads and BLM-designated routes although there are no designated OHV trails in the planning area. Likewise, there are no designated trails for mountain biking, but mountain biking use does occur on some slickrock expanses and roads in the planning area.

Both the Price and Richfield Field Offices ROD/RMPs indicate that the overall number of registered OHVs in Utah has grown significantly (BLM 2008a, 2008b). The Price Field Office ROD/RMP indicates that OHV use is the fastest growing activity in the planning area. OHV registrations in Emery and Wayne Counties for the past 5 years are shown in Table 3-32.

1    **Table 3-32. Off-Highway Vehicle Registrations in Emery and Wayne Counties from 2012 to 2016**

| Year | Type of Off-Highway Vehicle | Off-Highway Vehicle Registrations | | |
|---|---|---|---|---|
| | | Emery County | Wayne County | Total for Both Counties |
| 2012 | ATV | 1,314 | 286 | 2,835 |
| | Off-highway motorcycle | 924 | 311 | |
| 2013 | ATV | 1,294 | 309 | 2,735 |
| | Off-highway motorcycle | 847 | 285 | |
| 2014 | ATV | 1,288 | 320 | 2,637 |
| | Off-highway motorcycle | 770 | 259 | |
| 2015 | ATV | 1,320 | 331 | 2,675 |
| | Off-highway motorcycle | 779 | 245 | |
| 2016 | ATV | 1,296 | 324 | 2,554 |
| | Off-highway motorcycle | 690 | 244 | |

2    Source: Utah State Tax Commission (2012, 2013, 2014, 2015, 2016)

3    As shown in Table 3-32, more ATV registrations than motorcycle registrations are occurring in both
4    counties, and Emery County has more OHV registrations than does Wayne County. Total OHV
5    registrations in both counties have decreased by 9.9% over the last 5 years. However, a number of OHV
6    users in the planning area come from areas of Utah outside Emery and Wayne Counties. OHV users may
7    also come from other western states such as Colorado. The data in Table 3-32 reflect potential local users
8    only.

9    **3.14.3    Resource Use Trends**

10    *3.14.3.1    Recreation Visitation*

11    Recreation visitation to the planning area is not currently tracked by the BLM. However, the NPS collects
12    visitor data for Canyonlands National Park. (The Horseshoe Canyon unit of Canyonlands National Park is
13    located adjacent to the western border of the planning area and the Maze District of Canyonlands National
14    Park is located approximately 3.0 miles southeast of the planning area.) Access to Horseshoe Canyon and
15    the Maze District of Canyonlands National Park is through dirt roads that cross the planning area. There
16    are no designated campgrounds in the Horseshoe Canyon unit, and many visitors camp in the planning
17    area to facilitate a visit to Horseshoe Canyon. Table 3-33 shows visitor data for the Maze District of
18    Canyonlands National Park (including Horseshoe Canyon) from 1991 to 2016. Although there is some
19    fluctuation from year to year, overall visitor use appears to be increasing in Horseshoe Canyon and in the
20    Maze District.

1    **Table 3-33. Visitor Data for the Maze District of Canyonlands National Park**

| Maze District Areas | Total Annual Visitors Maze District of Canyonlands National Park | | | | | |
|---|---|---|---|---|---|---|
| | **1991** | **1996** | **2001** | **2006** | **2011** | **2016** |
| Maze Overlook | 956 | 1,733 | 2,128 | 1,769 | 1,101 | 1,701 |
| Land of Standing Rocks | 1,344 | 1,593 | 1,370 | 1,356 | 1,118 | 1,485 |
| Horseshoe Canyon | 3,529 | 7,693 | 5,871 | 4,426 | 6,635 | 8,166 |
| **Total visitors** | **5,829** | **11,018** | **9,369** | **7,551** | **8,854** | **11,352** |

2    Source: NPS (1991, 1996, 2001, 2006, 2011, 2016).

3    Visitor use data is also available for Labyrinth Canyon through boater permitting and is shown in Table 3-
4    34.

5    **Table 3-34. Visitor Use Data for Labyrinth Canyon**

| Visitor Use Data | Year | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| Permits | 252 | 405 | 446 | 550 | 564 | 562 |
| Users | 1,217 | 1,918 | 2,314 | 3,083 | 3,171 | 2,872 |
| User days * | 6,256 | 10,558 | 12,360 | 17,041 | 14,778 | N/A |

6    Source: Blocker (2017)

7    * User days are defined as the number of days the user was on the river in Labyrinth Canyon.

8    N/A = not available.

9    Based on the data in Table 3-34, visitor use of Labyrinth Canyon increased approximately 161% from
10   2011 to 2015 but declined slightly in 2016.

11   In Utah as a whole, tourism is increasing. Visits to Arches National Park increased 26.7% from 2010 to
12   2014; visits to Canyonlands National Park increased 24.4% from 2010 to 2014, and visits to Capitol Reef
13   National Park increased 18.7% during the same time period (University of Utah 2014). Visits to Utah's
14   national parks increased 15.6% from 2014 (Utah Tourism Industry Association 2016). From 2014 to
15   2015, 25 out of 29 counties experienced year-over increases in taxable leisure and hospitality sales, with
16   one of the largest annual increases being in Wayne County (18%). In addition, 26 of 29 counties
17   experienced year-over increases in leisure and hospitality jobs and county transient room sales tax
18   revenue (Utah Tourism Industry Association 2016). If tourism in Utah continues to grow, visitation and
19   recreational use in Canyonlands National Park, Labyrinth Canyon, and the planning area is likely to
20   increase.

21   ### 3.14.3.2    *User Conflict and Displacement*

22   Recreation activities can conflict with one another and affect the available recreation opportunities and
23   experiences. For example, heavy use of an area by OHV riders may displace non-motorized users such as
24   hikers or those seeking solitude. Recreation activities may also affect other resources and uses of the
25   planning areas (e.g., damage to cultural resources, disturbance of wildlife habitat, and disruption of
26   grazing). Some recreation visitors may see their use of the public lands as the highest and best use,

1  exhibiting a low tolerance for competing users. When various recreational activities reach certain
2  thresholds in heavily used areas, the public may resent multiple use management on BLM public lands.

3  **3.15 OIL AND GAS RESOURCES**

4  **3.15.1 Introduction**

5  This section discusses the affected environment for oil and gas resources. Other mineral resources,
6  including other leasable, salable, and locatable minerals, will not be addressed in detail in this EA because
7  the MLP would have no effect on these resources or BLM's current management of these resources as
8  outlined in the existing BLM Price and Richfield Offices' ROD/RMPs (BLM 2008a, 2008b). The
9  rationale for exclusion of other minerals outside oil and gas from detailed analysis can be found in
10  Chapter 1. The analysis area for oil and gas is the planning area because this is the area that would be
11  affected by oil and gas leasing decisions in the MLP.

12  The BLM Price and Richfield Field Offices released mineral potential reports (MPRs) and reasonably
13  foreseeable development (RFD) scenarios in association with development of the 2008 RMPs. The MPRs
14  evaluated the occurrence and potential of locatable, leasable (including oil and gas), and salable mineral
15  resources within the jurisdiction of the field offices. The RFD is a technical report intended to project a
16  baseline scenario of oil and gas exploration, development, production, and reclamation activity to aid the
17  BLM with land-use planning by providing a mechanism to analyze the effects that discretionary
18  management decisions may have on oil and gas development; local and regional economies; and
19  important resource values such as, air quality, cultural resources, and wildlife habitat. The RFDs
20  completed for the 2008 RMPs projected oil and gas activity for both field offices (see Appendix A).

21  In accordance with BLM Washington Office Instruction Memorandum (IM) No. 2010-117: Oil and Gas
22  Leasing Reform – Land Use Planning and Lease Parcel Reviews (BLM 2010a), the BLM prepared an
23  RFD for the San Rafael Desert MLP planning area in preparation for the planning process. The RFD was
24  finalized in 2016. Excerpts from the RFD are included below in the Existing Resource Use and Trends
25  section. The entire RFD can be found on the BLM's eplanning website for the project.

26  **3.15.2 BLM Management of Oil and Gas Resources**

27  The BLM administers the mineral resources on the nation's public lands, including oil and gas.
28  Development of these resources depends on decisions in the land-use planning process. Various laws,
29  including FLPMA (43 USC 1701, et seq.), mandate that the BLM administer the exploration for and
30  development of these mineral resources on public lands for the benefit of the citizens of the United States.
31  Through the BLM's regulations, U.S. citizens or corporations may acquire the rights to explore or
32  develop mineral resource deposits on the public lands.

33  The leasing and development of oil and natural gas is accomplished in several stages. The first stage is
34  categorization of the land for land-use planning purposes, during which a determination is made regarding
35  which lands should be leased and with what restrictions. The second stage is leasing. The third stage is
36  exploration, development, production, and reclamation.

37  For fluid leasable mineral resources, the land-use plan must identify lands in four land-use categories:
38  open to leasing with standard stipulations; open to leasing with minor and moderate constraints; open to
39  leasing with highly restrictive, major constraints; and closed to leasing. In detail they are as follows:

40  • Open with Standard Stipulations: This category identifies lands that are open to exploration and
41    development subject to standard lease stipulations on a standard lease form. Standard terms and
42    conditions for oil and gas leasing allow the BLM to impose reasonable measures, such as
43    modifying well siting or timing of operations to minimize resource impacts.

- Open with Minor or Moderate Constraints: This category identifies lands that are open to leasing with relatively minor and moderate constraints such as seasonal restrictions, including those with timing limitations (TL) such as seasonal closures for wildlife or controlled surface use (CSU) such as requiring 40-acre well spacing. These areas possess other land uses or resource values such as critical special status plant and wildlife species habitat that might conflict with fluid leasable exploration and development; therefore, moderately restrictive lease stipulations may be required to mitigate these impacts. The stipulations are used where resource values require some sort of special protection but the conflicts with fluid leasable exploration and development are not of sufficient magnitude to preclude surface occupancy.

- Open with Major Constraints: This mineral lease category identifies areas that are open to exploration and development but subject to highly restrictive lease stipulations, including No Surface Occupancy (NSO). These areas possess special resource values or land uses such as camping or picnic areas, scenic areas, Recreation and Public Purpose patents and leases, important historical or archaeological areas, and buffer zones along the boundaries of special-use areas such as wild and scenic river corridors. This category is used for those areas where a number of seasonal or other minor constraints would severely restrict exploration and development.

- Closed to Leasing: This lease category identifies areas that are closed to leasing either by discretionary or non-discretionary decisions. These areas have other land uses or resource values that cannot be adequately protected even with the most restrictive lease stipulations. Closing these areas to leasing is the only way to ensure their appropriate protection. Discretionary closures involve lands where BLM has determined that energy or mineral leasing, entry, or disposal, even with the most restrictive stipulations or conditions, would not be in the public interest. Non-discretionary closures involve lands that are specifically closed to energy or mineral leasing; entry; or disposal by law, regulations, secretarial decision, or executive order.

Before a holder of a BLM oil and gas lease conducts any surface-disturbing activities, BLM approval must be obtained. Drilling proposals are subject to environmental review, lease terms, and stipulations that are attached to the lease, as well as necessary mitigation measures that are consistent with lease rights. A lease notice provides lease holders with additional information on limitations that already exist in law, lease terms, regulations, or operational orders. A lease notice also addresses special items the lessee should consider when planning operations.

### 3.15.3   Existing Resource Use and Trends

#### *3.15.3.1   Existing Leasing Categories*

The planning area contains approximately 452,392 acres of BLM-administered public lands and mineral estate. Current oil and gas leasing categories and acreages for BLM-administered public lands and mineral estate in the planning area are shown in Table 3-35 and on Map 2-2-A. No split-estate lands are in the planning area.

1  **Table 3-35. Current Oil and Gas Leasing Categories for BLM-Administered**
2  **Public Lands in the Planning Area**

| Category | Acreage |
|---|---|
| Open with standard terms and conditions | 399,462 |
| Open with minor or moderate constraints (TL/CSU) | 19,083 |
| Open with major constraints (NSO) | 33,627 |
| Closed | 220 |
| **Total** | **452,392** |

3  ### 3.15.3.2    *Oil and Gas Leasing and Exploration Activity*

4  The planning area currently supports no production of oil and gas. Seventy-nine wells have been drilled in
5  the planning area, all of which have been plugged and abandoned. Five wells have been drilled in the
6  planning area during the past 31 years. The last well drilled in the planning area was in 1989. The
7  potential for future drilling success in the planning area would be enhanced by the advances in horizontal
8  drilling, completion, and geophysical technology that have been made in the past 20 years. The trend in
9  drilling and drilling success rates within the BLM Moab Field Office in the Fractured Interbed Play (Play
10  2103), which extends into the planning area, combined with forecasted improving market conditions,
11  favor the potential for discovery of economic quantities of oil and gas within the planning area (see
12  Appendix A).

13  Four sold but not issued lease parcels are within the planning area. The parcels were protested but sold at
14  the February and May 2006 lease sales. In addition, 16 oil and gas leases for parcels within the planning
15  area have been suspended as a result of litigation so that the BLM can re-evaluate leasing decisions based
16  on new information regarding non-WSA LWC.

17  Authorized and pending federal oil and gas leases within the planning area cover a total of 82,454 acres or
18  16% of the planning area. In addition, 97,452 acres of land have been nominated but deferred in the
19  planning area since 2011. Existing federal oil and gas leases are shown on Map 1-1.

20  **Geophysical Exploration**

21  Geophysical exploration has historically occurred in all portions of the planning area. Both 2-D and 3-D
22  seismic projects have taken place there. During the past 30 years, geophysical exploration in the planning
23  area has included one project, completed in 2007/2008 (see Appendix A).

24  ### 3.15.3.3    *Historical Drilling and Production*

25  **Oil and Gas**

26  Neither oil nor natural gas has been discovered within the planning area. The nearest producing oil and gas
27  fields are located east of the planning area in the jurisdiction of the Moab Field Office. These fields are
28  located from 1 to 25 miles from the eastern border of the planning area. The Moab Master Leasing Plan
29  Planning Area, which abuts the planning area on the east, includes seven active fields, four inactive fields,
30  and one abandoned field (BLM 2012c). Total production from these fields within the Moab Master Leasing
31  Plan Planning Area has been roughly 9,530,761 barrels of oil and 17.4 billion cubic feet of natural gas.

32  In Utah, standard well spacing for a vertical or directional oil and gas well is 40 acres. For horizontal wells,
33  temporary spacing of 640 acres provides for anticipated pool development. The Utah Board of Oil, Gas
34  and Mining has the authority to issue special spacing orders establishing drilling units or authorizing

different well density or location patterns for particular pools to promote efficient development and protect correlative rights. For example, as fields mature, exceptions can be made to increase well density to maximize oil and gas recovery. The BLM generally defers to State of Utah well spacing (see Appendix A).

No interstate gas pipeline systems, gas plants, water injection/disposal wells, or commercial water disposal facilities are within the planning area. The nearest interstate pipelines to the planning area are the Williams Pipeline, which transports gas, and Enterprise Products Partners, L.P. Pipeline, which transports natural gas liquids. A small gas plant is approximately 10 miles east of the planning area and roughly 14 miles southeast of the town of Green River, Utah. A second, larger gas plant is located near Canyonlands Field (Moab airport) approximately 15 miles east of the planning area (see Appendix A).

### 3.15.3.4   Development Potential

The baseline assumptions for oil and gas and geophysical exploration presented in this section represent average activity levels over the next 15 years and are not intended to serve as thresholds for limiting future activity. Oil and gas exploration and development activity tends to be sporadic over time because of market influences and other factors affecting the oil and gas industry. As a result, it is recognized that during the next 15 years there may be years when oil and gas activity in the planning area is much less than the projected average levels and other years when activity is greater.

### Oil and Gas Resources

As described in the Price and Richfield Field Office MPRs, two oil and gas plays, the Fractured Interbed Play (2103) and the Salt Anticline Play (2105), underlie the planning area. The Fractured Interbed Play is associated with the commercial production of oil and gas in the adjacent jurisdiction of the Moab Field Office and has development potential within the planning area. A third play, the Buried Fault Block Play (Play 2101), is an oil-and-gas-producing play within the jurisdiction of the Moab Field Office that could extend and have development potential within the planning area (see Appendix A).

Increased drilling success rates resulting from continued technological advances in horizontal drilling, the development of fracture identification tools, hydraulic fracture stimulation, underbalanced drilling, and completions in fractured shales—all of which will help in the discovery of new fields in moderately sized reservoirs with more than minimal oil columns—should increase the potential for development within the planning area. In addition to the Cane Creek Shale, other organic shales, notably the Chimney Rock, Gothic, and Hovenweep Shales, that may provide new drilling targets for hydrocarbon accumulations. Some development may occur in the Salt Anticline Flank play (Play 2105) as seismic technology continues to improve, allowing better definition of the location and nature of the structural traps in the play and promoting increased drilling and recompletion opportunities along the flanks of the salt anticlines (BLM 2012c).

Domestic crude oil production has increased in recent years; however, a slowdown in the world economy has resulted in a drop in demand and subsequently a substantial decrease in price for crude oil and natural gas. Production of crude oil and natural gas is expected to decline in 2016, and the decreased production is expected to continue until the world economy turns around. Domestic crude oil production is expected to level out by 2020 and then slightly decrease through 2040. For the purpose of projecting potential oil and gas exploration activity in the planning area, it is assumed that the demand and price for crude oil and natural gas will increase in the future and during the 15-year planning term (see Appendix A).

Future oil and gas drilling for the next 15 years in the planning area is projected to average two wells per year for a total of 30 wells. This would result in a total surface disturbance of 585 acres from construction of new well pads and associated infrastructure, including roads and pipelines. The estimated total existing surface disturbance from previous oil and gas activity in the planning area is 0 acres because the last well drilled there was plugged and abandoned more than 25 years ago. Over the next 15 years a total of 585

1  acres is expected to be disturbed by oil and gas drilling activity; of that total 492 acres would be
2  reclaimed or under reclamation, resulting a net surface disturbance of 93 acres (see Appendix A).

3  **Geophysical Exploration**

4  For geophysical exploration, 270 linear miles of source lines with an associated surface disturbance of
5  330 acres are projected over the next 15 years. Total geophysical-related surface disturbance that will be
6  reclaimed during the next 15 years will be 264 acres, resulting a net surface disturbance of 66 acres (see
7  Appendix A).

8  **3.16  SPECIAL DESIGNATIONS**

9  According to the BLM's land use planning policy, "special designations" fall into two categories: 1)
10 congressional designations and 2) administrative designations (e.g., those applied by the BLM through
11 the land use planning process). Congressional designations include national monuments and
12 congressionally designated national conservation areas, national recreation areas, cooperative
13 management and protection areas, outstanding natural areas, forest reserves, and national and scenic
14 historic trails. Administrative designations include identified WSAs; river segments to be assessed under
15 the Wild and Scenic Rivers Act of 1968; areas of critical environmental concern (ACECs), which include
16 the more specific sub-types of research natural areas and outstanding natural areas; and BLM Scenic or
17 Back Country Byways, national recreation trails, watchable wildlife viewing sites, and wild horse and
18 burro ranges (BLM 2005).

19 **3.16.1    Areas of Critical Environmental Concern**

20 *3.16.1.1    Resource Conditions*

21 Section 202(c)(3) of FLPMA requires that priority be given to the designation and protection of ACECs.
22 FLPMA Section 103(a) defines ACECs as public lands where special management attention is required to
23 protect and prevent irreparable damage to important historic, cultural, or scenic values; fish and wildlife
24 resources; or other natural systems or processes; or to protect life and safety from natural hazards (BLM
25 2008).

26 The BLM designates ACECs and their appropriate management during the development of RMPs. There
27 is no one method of management for all ACECs. Special management is designed specifically for the
28 relevant and important values of each ACEC and therefore varies from area to area.

29 *3.16.1.2    Relevance and Importance Criteria*

30 To be considered for designation as an ACEC, an area must meet the requirements of relevance and
31 importance as described in 43 CFR 1610.7.2. The definitions for relevance and importance are as follows:

32 **Relevance**

33 An area is considered relevant if it contains one or more of the following:

34 • A significant historic, cultural, or scenic value (e.g., rare or sensitive archaeological resources and
35   religious or cultural resources important to Native Americans).

36 • A fish and wildlife resource (e.g., habitat for endangered, sensitive, or threatened species, or
37   habitat essential for maintaining species diversity).

38 • A natural process or system (e.g., endangered, sensitive, or threatened plant species; rare,
39   endemic, or relict plants or plant communities; and rare geologic features).

- A natural hazard (e.g., areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs). A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of the natural process.

## Importance

The value, resource, system, process, or hazard described above must have substantial significance to satisfy the importance criterion. This generally means it is characterized by one or more of the following:

- Has more than locally significant qualities that give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource

- Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change

- Has been recognized as warranting protection in order to satisfy national priority concerns or to carry out the mandates of FLPMA

- Has qualities that warrant highlighting in order to satisfy public or management concerns about safety and public welfare

- Poses a significant threat to human life and safety or to property

Three ACECs fall within the planning area. The analysis area for ACECs consists of the ACECs in their entirety within and outside the planning area. Table 3-36 identifies the three existing ACECs and their relevant and important values.

**Table 3-36. Areas of Critical Environmental Concern in the Planning Area**

| ACEC | Area (acres) | Relevant and Important Values |
|------|-------------|-------------------------------|
| Dry Lake Archaeological District | 18,009 | Archaeology, geology |
| Tidwell Draw (one of the four sites in the Uranium Mining Districts ACEC) | Approximately 899 acres of the total 1,966 ACEC acreage is within the planning area. | Historic mining |
| Big Flat Tops | 192 | Relict vegetation |

### *3.16.1.3   Dry Lake Archaeological District Area of Critical Environmental Concern*

**Description of Area**

The Dry Lake Archaeological District ACEC is located south of the town of Green River, Utah. It is bounded by the Green River on the east side, and the San Rafael River runs through its southeast corner.

**Relevance and Importance Criteria**

The Dry Lake Archaeological District ACEC contains rare or sensitive archaeological resources and religious or cultural resources important to Native Americans. The ACEC has a multitude of apparently undisturbed, single-episode lithic scatters and other site types such as lithic procurement sites, shelters, and campsites. It is a known location for Paleoindian sites, which is the rarest and oldest site type in Utah.

The area also contains the Dry Lake Meander, two large, well-expressed abandoned meanders of the Green River. The site of the meander scar indicates that abandonment must have occurred during either the Early Pleistocene or the Late Pliocene periods when the volume of water in the river was greater than

it is now. Related geologic values are visible where the Summerville and Curtis Formations erode to form an escarpment, colorful promontories, and stepped terraces, especially in Curtis beds. It is the Paleoindian lithic scatters that qualify this area for ACEC designation. Individually, these sites have little or no scientific value, but collectively they are a valuable resource.

### 3.16.1.4    Tidwell Draw (Uranium Mining Districts Area of Critical Environmental Concern)

**Description of the Area**

Tidwell Draw is located west of Green River, north of I-70 near the San Rafael River. Along with the Hidden Splendor, Susan B, and Lucky Strike mining districts, it is one of the four mining districts that are part of the Uranium Mining Districts ACEC. Only a portion (899 acres, or 46%) of Tidwell Draw falls within the planning area.

**Relevance and Importance Criteria**

Tidwell Draw has significant historical value. This ACEC includes several significant mining sites associated with the development of uranium as part of the United States' efforts during the escalation of the Cold War in the 1950s. These sites have the remains of the habitations of the miners, which provide evidence of the non-mining parts of their lives, and the remains of mining efforts, which demonstrate the technology of the era.

The sites are part of a national effort: the development of uranium as a deterrent in the Cold War. The history of these sites can be retrieved only through studies of the resources on the ground along with oral histories. Tidwell Draw mining district, although lacking the dramatic scenery and romance of the other districts, produced the greatest economic gain and was the last to remain in production.

### 3.16.1.5    Big Flat Tops Area of Critical Environmental Concern

**Description of the Area**

The Big Flat Tops ACEC is just north of the Emery County line southwest of the town of Green River, Utah.

**Relevance and Importance Criteria**

The Big Flat Tops ACEC contains isolated relict plant communities that remain unaltered by human intervention or domestic livestock grazing. The area has potential for scientific study and can serve as a comparison area for similar vegetation communities that have been grazed. The mesa top supports a little-disturbed vegetation community that would fill identified needs of Utah's growing system of natural areas.

One of the BLM sensitive species—Smith wild buckwheat (*Eriogonum smithii*)—occurs within this ACEC. The Nature Conservancy (Tuhy 1986) has recommended designation as a research natural area (RNA) for the North Big Flat Tops area to provide a location where natural ecosystem structure and function can be studied.

## 3.16.2    Wild and Scenic Rivers

### 3.16.2.1    Resource Conditions

Congress enacted the Wild and Scenic Rivers Act (WSRA) (16 USC 1271–1287) on October 2, 1968, to address the need for a national system of river protection. The WSRA stipulates that selected rivers

should be preserved in a free-flowing condition with outstandingly remarkable values in their natural condition and should be protected for the benefit and enjoyment of present and future generations.

Section 5(d)(1) of the WSRA directs federal land management agencies to consider potential wild and scenic rivers in their land and water planning processes. To fulfill this requirement, the BLM evaluated river and stream segments to determine whether they might be eligible for inclusion in the National Wild and Scenic Rivers System (NWSRS) during the 2008 Price Field Office RMP effort.

Consideration of whether a river should be designated for inclusion in the NWSRS can be broken into three phases:

- Determination of eligibility: Federal agencies conduct an evaluation of river features to determine which rivers qualify to be added to the NWSRS.

- Determination of suitability: Most commonly, federal agencies conduct a review and then recommend to Congress which rivers should be protected.

- Designation: Congress designates a river as wild, scenic, or recreational.

The Green River defines the northeastern boundary of the planning area from the I-70 crossing near the town of Green River to the northern tip of the Horseshoe Canyon WSA. The 20-mile segment within the planning area from the San Rafael River to just north of Key Canyon was determined to be suitable for consideration as part of the NWSRS and will be the analysis area for this EA (see Map 2-5). The other segment of the Green River in the planning area from the town of Green River to the San Rafael River was determined eligible but not suitable (BLM 2008).

The Green River eligibility report identified cultural, recreation, scenic, fish, and paleontology as the outstandingly remarkable values for the Green River segment that falls in the planning area. This area has evidence of significant occupation and use by prehistoric peoples and includes rock art and other features that remain significant to some Native American populations today. Many sites are eligible for the National Register of Historic Places. The Morrison Formation, a geologic outcrop known for its vertebrate fossils including dinosaur bones, is exposed along the Green River. Indeed, the geology of the area, with varnished cliffs of Wingate Formation and deeply incised canyons, creates some of the high scenic value in the area. This portion of the river provides habitat for four endangered fish, including spawning habitat for the Colorado pikeminnow. There are great opportunities for dispersed camping and hiking to cultural sites, unique geologic features, and other attractions.

Under the NWSRS, rivers are classified as wild, scenic, or recreational, as follows:

- Wild river areas: Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

- Scenic river areas: Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

- Recreational river areas: Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

The Green River segment in the planning has a tentative classification of scenic.

Guidance for selecting and managing wild and scenic river segments is contained in *Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management, Bureau of Land Management Manual – 8351* (BLM 1993).

The management prescriptions put forth in the Price 2008 RMP to protect the outstandingly remarkable values that include paleontologic resources, fish, cultural and historic resources, recreation, and scenery values. Current prescriptions for this segment include managing the river corridor as VRM II, as NSO for oil and gas, limiting travel to designated routes, and allowing grazing to continue as currently allocated (BLM 2008).

In addition, the BLM works cooperatively with the State of Utah, local and tribal governments, and federal agencies to reach consensus regarding recommendations to Congress for the inclusion of rivers into the NWSRS. The BLM will also continue to work with affected local, state, federal, and tribal partners to identify in-stream flows necessary to meet critical resource needs, including values related to the subject segments, so that they may be identified for inclusion into future recommendations to Congress.

## 3.16.3    National Historic Trails

The National Trails System Act of 1968 provides for the establishment of a system that includes recreational, scenic, and historic trails. A national historic extended trail must possess several qualities for designation. The trail must be at least 100 miles in length and follow the original route as closely as possible. The trail must be established by historic use and be historically significant as a result of that use. The trail must be of national significance with respect to any of several broad categories of American history, such as trade and commerce, exploration, migration and settlement, or military campaigns. Finally, the trail must have significant potential for public recreational use or historical interest based on historic interpretation and appreciation.

The BLM manages historic trails under the auspices of *Manual 6280 – Management of National Scenic and Historic Trails and Trails Under Study or Recommended as Suitable for Congressional Designation (Public)* (BLM 2012d), *Manual 8353 – Trail Management Areas – Secretarially Designated National Recreation, Water, and Connecting and Side Trails (Public)* (BLM 2012e), and *Manual 6250 – National Scenic and Historic Trail Administration* (BLM 2012f).

### 3.16.3.1    Old Spanish Trail

The Old Spanish National Historic Trail (OST) is a 2,700-mile historical trade route that connects Santa Fe, New Mexico, to Los Angeles, California. The trail passes through the states of New Mexico, Colorado, Utah, Arizona, Nevada, and California, and runs through areas of deep canyons, arid deserts, and high mountains. It is considered one of the most difficult trade routes in the United States. The OST was designated by Congress as a National Historic Trail in December 2002. By memorandum from the Secretary of the Interior, the Old Spanish National Historic Trail is jointly administered by the BLM and the National Park Service working in partnership with other federal, state, and local government agencies, as well as private landowners who manage or own lands along the trail route.

The *Old Spanish National Historic Trail Final Comprehensive Strategy* was released in late 2016 (U.S. Department of the Interior, National Park Service-National Trails Intermountain Region, and Bureau of Land Management Utah 2016). The document does not propose specific land management actions, but it will serve the functions of a comprehensive management plan by identifying high-potential sites and segments, refining route alignments, presenting the official trail logo, and establishing the foundations for future trail planning efforts.

Nine miles of the OST falls within the northernmost portion of the planning area. The analysis area for the OST is from the Green River Crossing (see Map 2-5) to 3 miles west of the western planning area boundary. The western limit of the analysis area was developed through a viewshed analysis that depicted the topography that could be seen from the western project boundary.

The segments of the OST that fall within the planning area are considered to be high-potential routes with high-potential historic sites. The term "high-potential historic sites" refers to those historic sites related to the route, or sites in close proximity thereto, that provide opportunity to interpret the historic significance of the trail during the period of its major use. Criteria for consideration as high-potential sites include historic significance, presence of visible historic remnants, scenic quality, and relative freedom from intrusion. The term "high-potential route segments" refers to those segments of a trail that would afford a high-quality recreation experience in a portion of the route having greater-than-average scenic values or that would afford an opportunity to vicariously share the experience of the original users of a historic route (16 USC 1251).

The segments in the planning area were selected for the outstanding recreational opportunities to follow the known trail location in an area with a retained setting and better-than-average scenery (Sweeten 2017). The opportunity for people to have a vicarious experience is great. There are also multiple identified trail segments and sites found in the area (Sweeten 2017).

## 3.17 SOCIOECONOMICS

### 3.17.1    Introduction

Given the limited scope of the MLP/EA, the topics covered in this section are more limited than for a comprehensive RMP/EIS planning effort. In this BLM planning action, there may be socioeconomic impacts related to:

- restrictions on mineral development, specifically oil and gas leasing;

- impacts on social and economic values associated with recreation, based on visual and other impacts of mineral development on the recreation experience and potential restrictions on recreation activities in and around mineral development sites; and

- nonmarket values, including ecosystem services.

Conceivably there could be some impacts to additional resource uses. However, as discussed in Chapter 1, the BLM has determined that there is no potential for significant impact to some resources and they are not discussed further in this section. Therefore, the focus of this section is on information relevant to oil and gas development and production, and recreation.

#### 3.17.1.1    Definitions of Labor and Non-Labor Income Used in this Section

Personal Income: Income received from all sources, including income received from participation in production as well as from government and business transfer payments. It is the sum of compensation of employees (received), supplements to wages and salaries, proprietors' income with inventory valuation adjustment and capital consumption adjustment (CCAdj), rental income of persons with CCAdj, personal income receipts on assets, and personal current transfer receipts, less contributions for government social insurance.

### Labor Income

Labor Earnings / Net Earnings: Earnings by place of work is the sum of wage and salary disbursements, supplements to wages and salaries, and proprietors' income. Net earnings by place of residence is earnings by place of work, less contributions for government social insurance, plus an adjustment to convert earnings by place of work to a place of residence basis.

**Non-Labor Income**

Dividends, Interest, and Rent: Personal dividend income, personal interest income, and rental income of persons with capital consumption adjustment, sometimes referred to as "investment income" or "property income."

Dividends: This component of personal income consists of the payments in cash or other assets, excluding the corporation's own stock, made by corporations located in the United States or abroad to persons who are U.S. residents. It excludes that portion of dividends paid by regulated investment companies (mutual funds) related to capital gains distributions.

Interest: This component of personal income is the interest income (monetary and imputed) of persons from all sources.

Rent: Rental income is the net income of persons from the rental of real property except for the income of persons primarily engaged in the real estate business; the imputed net rental income of the owner-occupants of nonfarm dwellings; and the royalties received from patents, copyrights, and the right to natural resources.

Transfer Payments (Personal Current Transfer Receipts): This component of personal income is payments to persons for which no current services are performed. It consists of payments to individuals and to nonprofit institutions by federal, state, and local governments and by businesses. Government payments to individuals includes retirement and disability insurance benefits, medical benefits (mainly Medicare and Medicaid), income maintenance benefits, unemployment insurance compensation, veterans' benefits, and federal education and training assistance. Government payments to nonprofit institutions exclude payments by the federal government for work under research and development contracts. Business payments to persons consists primarily of liability payments for personal injury and of corporate gifts to nonprofit institutions.

Income Maintenance: Income maintenance payments consists largely of supplemental security income payments, family assistance, food stamp payments, and other assistance payments, including general assistance.

Unemployment Insurance Compensation: Unemployment insurance compensation includes state unemployment compensation, unemployment compensation of federal civilian employees, unemployment compensation of railroad employees, unemployment compensation of veterans, and trade adjustment allowances to workers who are unemployed because of adverse economic effects of international trade arrangements.

Retirement and Other: Retirement and other consists of retirement and disability insurance benefit payments, medical benefits, veterans benefit payments, federal education and training benefits, other government payments to individuals, government payments to nonprofit institutions, and business payments. However, disbursements received from private retirement programs (e.g., from 401k accounts) are not included. The BEA REIS data do not currently capture this source of income, which is an important source of income in counties with substantial populations of retired persons. (Definitions from BEA 2010.)

### 3.17.2    Overview of the Socioeconomic Study Area

The socioeconomic study area (study area) has been defined to include all of Emery and Wayne Counties. It is likely that any social or economic impacts from the management alternatives would occur mostly within these two counties. Although the geographic extent of the two counties is larger than that of the planning area, including all of the counties is reasonable because of the key role of the county governments in providing public services (e.g., roads, emergency services) related to use of the planning area.

1  The current land management within the study area is presented in Table 3-37. The BLM is the largest
2  land manager in both counties. Altogether, the federal government manages approximately 79.5% of the
3  land area of Emery County, 85.6% of Wayne County, and 81.7% of the study area.

4  **Table 3-37.  Land Management in the Study Area**

| Ownership | Emery County | | Wayne County | | Study Area | |
|---|---|---|---|---|---|---|
| | Acres | % | Acres | % | Acres | % |
| BLM | 2,060,540 | 72.0 | 892,437 | 56.5 | 2,952,957 | 66.5 |
| National Park Service | 2,108 | 0.1 | 298,050 | 18.9 | 300,158 | 6.8 |
| USFS | 212,238 | 7.4 | 160,566 | 10.2 | 372,804 | 8.4 |
| State of Utah | 348,392 | 12.2 | 169,800 | 10.8 | 518,192 | 11.7 |
| Private | 238,623 | 8.3 | 57,889 | 3.7 | 296,512 | 6.7 |
| Total | 2,861,996 | 100 | 1,578,834 | 100 | 4,440,830 | 100 |

5  Source: Headwaters Economics (2016).

6  According to U.S. Census Bureau data as shown in Table 3-38, the total resident population of the study
7  area in 2010 was 13,754. The study area has a number of towns and small cities with concentrated
8  populations, but the majority of the area is very sparsely populated. The overall population density of the
9  study area is 1.18 persons per square mile, which is very low compared to the population density of Utah
10  and the nation.

11  **Table 3-38.  2010 Population, Area, and Population Density of the Study Area**

| Geographic Area | 2010 Population | Land Area (Million Acres) | Land Area (Square Miles) | Persons Per Square Mile |
|---|---|---|---|---|
| Emery County | 10,976 | 2.86 | 4,462 | 2.5 |
| Wayne County | 2,778 | 1.58 | 2,461 | 1.1 |
| Study Area | 13,754 | 4.44 | 11,491 | 1.18 |
| Utah | 2,763,885 | 52.59 | 82,169 | 33.6 |
| United States | 308,745,538 | 2,260.42 | 3,531,905 | 87.4 |

Sources: Population—U.S. Census Bureau (2010a); Land Area—U.S. Census Bureau Quickfacts (2010).

12  The history of the study area is primarily a story of the Native American cultures, settlement by Mormon
13  pioneers, agricultural use, development of mineral resources, and recent influxes of residents and tourists
14  attracted by the beauty and recreational resources of the region. The Price and Richfield FEIS/Proposed
15  RMPs (BLM 2008a, 2008b) provide summaries of the history of Emery and Wayne Counties, and that
16  information is not repeated here. An additional source of information is the set of county profiles
17  published by the Utah Historical Society (Utah Division of State History).

1    **3.17.3    Social and Cultural Conditions**

2    *3.17.3.1    Communities*

3    Emery County spans approximately 2.86 million acres. Most population centers are concentrated along
4    Utah State Highway 10 in the northwest corner of the county, with the exception of the city of Green
5    River in the extreme east side of the county. The city of Castle Dale is the county seat of Emery County
6    and had 1,657 persons in the 2010 census. Huntington is the largest town in the county with just over
7    2,000 residents. The seven other incorporated towns in the county generally have 1,000 residents or less.

8    Wayne County is roughly 23 miles wide north–south, and 105 miles long east–west. The county includes
9    two of Utah's national parks: Capitol Reef in the west-center and Canyonlands on the eastern border. Ten
10   communities are located in the county, most of which are quite small. The county seat is Loa, which
11   numbered 572 residents in 2010. The town closest to the MLP area is Hanksville, with a population in
12   2010 of 219.

13   **Demographics**

14   Average income levels in the study area are lower than those of the state or nation, as shown in Table 3-
15   39. According to ACS data, the median family income in Emery County is over $10,000 lower than that
16   of Utah, and the median family income in Wayne County is nearly $20,000 lower than that of Utah. The
17   per capita income levels are also presented in Table 3-39. However, the median family income figures
18   listed in the table are from the ACS, and the per capita income figures are from the BEA. Because of the
19   different datasets, which use different sampling methods and include different components of income, the
20   per capita income figures have somewhat different relationships. As with the median family income
21   figures, the Wayne County per capita income figure is substantially lower than the statewide figure.
22   However, the Emery County per capita income is higher than the state per capita income. These
23   differences also reflect in part the difficulties in measuring per capita income, especially in small
24   populations. The BEA data have some flaws. The data are designed to measure payments to factors of
25   production, not the money income of households (Hoffman and Rex 2010). However, the data are used by
26   the State of Utah, including in the county tables in the annual economic report to the governor.

27   Table 3-39 also shows county-wide poverty levels. The percentage of individuals in poverty in Emery
28   County is similar to that for Utah and the nation. The percentage of individuals in poverty in Wayne
29   County is much higher.

30   **Table 3-39.  Income Levels in the Socioeconomic Study Area, 2009–2014 (2014 $)**

| Geographic Area | Median Household Income (2009–2014) | Per Capita Income (2014) | Individuals Below Poverty Level (%) (2009–2014) |
|---|---|---|---|
| Emery County | $50,653 | $20,274 | 12.9% |
| Wayne County | $43,393 | $19,950 | 14.1% |
| Utah | $59,846 | $24,312 | 11.3% |
| United States | $53,482 | $28,555 | 13.5% |

Source: U.S. Department of Commerce (2015).
Note: Per capita and household income can vary greatly depending on the data source, particularly for the small sample sizes typical of rural
areas. For example the BEA's data for both counties reports per capita income at 50% higher than does ACS. Both data sources rely on
surveys, but are taken in different time periods and with different groups. For a discussion of these differences, see Katz (2012). Explaining
Long-term Differences Between Census and BEA Measures of Household Income, BEA, Washington, D.C.

### 3.17.3.2    Public Services

Local governments in the study area maintain critical public infrastructure such as roads and provide a wide range of public services that benefit residents, visitors, and businesses. Other local governments in the study area provide infrastructure and services in addition to those provided by the counties. These governments include the cities and towns listed earlier, and a number of districts and special service districts for schools, fire protection, recreation, transportation, health care, mental health, cemetery maintenance, water, sewer, housing, mosquito abatement, solid waste, and general services. Public infrastructure and services that could potentially be impacted by BLM decisions include roads, water and wastewater infrastructure, landfills, law enforcement, fire and emergency response, schools, and healthcare facilities and services. Impacts on public services may occur in a variety of ways. They may be direct, such as wear and tear on roads due to increased heavy truck traffic with resource development, or indirect, such increased demand on schools or healthcare facilities if resource development leads to significant population increases.

### 3.17.3.3    Stakeholders

Many organizations are stakeholders in the use and management of BLM public lands. These stakeholder organizations and individuals have widely varying interests in the use and management of these resources. Different types of stakeholders have distinct sets of attitudes, beliefs, values, opinions, and perceptions about public resources and the effects of various management policies and actions. These views reflect different cultural as well as economic linkages people have to public lands.

Broad categories of stakeholders affected by the decisions to be made in this planning action are identified and characterized below. The categorization of stakeholders is not meant to imply that all individuals and social groups fit into a single category; many individuals or organizations may have multiple interests. The point of categorization is to facilitate the impacts analysis phase of the planning process by allowing differentiation of social impacts based on broad differences in socio-cultural linkages to public lands and peoples' associated points of view.

**Habitat and Resource Conservation Stakeholders**

These stakeholders have a number of conservation objectives, but most believe broadly that protecting at-risk species and maintaining habitats and ecosystems for all species is a fundamental value and should be a high priority in public policy. Most believe in the intrinsic value of wildlife, well-functioning ecosystems, and pristine areas. Some advocate resource conservation for human as well as wildlife needs, pointing to the beauty and solitude values of unspoiled areas in the planning area.

These stakeholders see a number of threats to species and habitat protection and to resource conservation generally. A major concern for them is oil and gas development due to impacts from associated roads, drilling pads, pipelines, etc. Additional resource conservation topics that are of interest to members of this stakeholder category include water, air, and soil resources; and vegetation and riparian zone management. Persons and organizations concerned with protection of paleontological, cultural, and historic sites also generally fit into this category of resource conservation stakeholders. Although mineral development is the primary concern of this stakeholder category, other sources of impacts on habitat and other conservation values are concerns to some in this category.

Based on their values and various concerns, these stakeholders favor designation of new protected areas and strong restrictions and stipulations on resource development. They advocate development of specific management actions (prescriptions, restrictions, and/or mitigations) to meet desired conditions for priority species and habitats, to support other species, and to protect the ecosystem and other resources (e.g., water, cultural, and scenic resources).

**Recreation Stakeholders**

Many types of recreational activities are available in the planning area. The primary concern of most recreation stakeholders is potential degradation and loss of recreational use values from mineral resource development. These stakeholders typically view resource development as having permanent impacts on recreation. They seek protection of areas with high recreation values so that future generations can enjoy these values. For many recreationists, maintaining recreation values and habitat or ecosystem values go hand-in-hand; they say that healthy ecosystems support positive recreation experiences. For many recreation stakeholders, the preservation of natural soundscapes is also important, in order to provide users with adequate opportunities for quiet recreation. They see resource development and new roads as antithetical to this objective.

**Mineral Development and Production Stakeholders**

These stakeholders believe mineral development, including oil and gas, is a vital component of the national, state, and local economies—creating jobs, generating income, and contributing tax and royalty payments to all levels of government. Throughout the West, many of these stakeholders also believe mineral development and production is socially important because it has been part of the social fabric of some communities for years, and because it supports the social systems of local communities by providing private-sector livelihoods and revenues to government. Mineral development stakeholders are concerned that MLP decisions involving restrictions and stipulations on mineral development could have adverse impacts on the industry in the planning area and on the local economies. Many are concerned about limitations that would reduce future development or increase the costs of development; some are concerned that restrictions could abrogate operators' valid existing rights.

**Visual Resource Stakeholders**

These stakeholders focus on the scenic qualities of the area. Although they share many of the perspectives of habitat and resource conservation stakeholders and recreation stakeholders, visual resource stakeholders emphasize the role of visual resources as the fundamental asset underlying both direct recreational use of public lands and general tourism in the region. They believe the scenic quality of the landscape in and around the planning area is world renowned and that national parks and other federally and state managed lands are a huge economic draw to southern Utah and the area in and around the MLP planning area because of their scenic qualities. Based on this view of visual resources as a unique and valuable asset, these stakeholders emphasize that the visual integrity of the area needs to be maintained. Many of these stakeholders are also concerned with preservation of soundscapes with minimal unnatural noises, and preservation of dark night skies free of light pollution. Some note the aesthetic role that vegetation has on the landscape, and the potential for disruption of natural vegetative cover from resource development. In addition, some of these stakeholders note the potential for deterioration of air quality caused by airborne pollutants and fugitive dust from resource development, and highlight the importance of protecting the surrounding Class 1 airsheds of the neighboring national parks.

### 3.17.4  Environmental Justice

Evaluation of environmental justice (EJ) impacts requires identification of minority and low-income populations (including Native American tribes) within the affected area and evaluation of the potential for the alternatives to have disproportionately high and adverse impacts on such populations. This section includes a screening analysis of the study area to identify the presence and location of any "EJ populations."

The most recent data that are broken-down to the sub-county level in the study area are from the 2010 Census for minority populations and from the Census Bureau's 2009–2015 ACS for poverty. Both sources provide data for cities, towns, and Census Demographic Profiles (CDPs), which are notable

population concentrations in unincorporated areas. This "place" level of geography is appropriate for a BLM planning-level decision, as it provides a reasonably disaggregated view of population variations across a large study area.

Data for race, Hispanic identification, poverty rates, and margins of error associated with poverty rates for study area cities, towns, and CDPs are summarized in Table 3-40. The table also presents the corresponding data for two reference populations: the state of Utah and the United States. In the table, the data for each minority or poverty group are expressed as a percentage of the total population. For this screening analysis, the convention noted above has been adopted: if the minority population or population in poverty is 10 percentage points or more greater than for one of the reference populations (i.e., the lower percentage figure for either the state or the United States), the area is "flagged" as being a potential EJ population and therefore an area of potential concern from an EJ perspective.

No determination is made here as to the likelihood of disproportionately high and adverse effects on these populations. That can only be determined once the management alternatives are defined and the impact analyses are performed. Based on the available data and the definitions and threshold values noted above, the following places are flagged for further EJ consideration in the impacts analysis process.

- Emery County: the city of Green River flagged for some other race and population in poverty.
- Wayne County: the town of Bicknell flagged for population in poverty.

As the table footnotes indicate, estimates for populations in poverty from the ACS tend to have very high margins of error for smaller communities. The actual poverty rate for Bicknell (at the 90% confidence interval) could be anywhere between 6.3% and 52.0%, given the margin of error of 22.7%, plus or minus.

1    **Table 3-40. Environmental Justice Indicators, Minority Population, 2010 Census and 2009–2015 ACS**

| Geographic Area | Total Population (2010) | Race | | | | | | | Hispanic (%) | Percent Below Poverty | Margin of Error for Poverty Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | White (%) | Black/ African American (%) | American Indian/ Alaska Native (%) | Asian (%) | Native Hawaiian/ Pacific Islander (%) | Some Other Race (%) | Two or More Races (%) | | | |
| United States | 308,745,538 | 72.4 | 12.6 | 0.9 | 4.8 | 0.2 | 6.2 | 2.9 | 16.3 | 15.5 | +/-0.1 |
| Utah | 2,763,885 | 86.1 | 1.1 | 1.2 | 2.0 | 0.9 | 6.0 | 2.7 | 13.0 | 12.3 | +/-0.2 |
| Emery County | 10,976 | 93.9 | 0.2 | 0.7 | 0.3 | 0.1 | 3.8 | 0.9 | 6.0 | 11.2 | +/-2.6 |
| Wayne County | 2778 | 97.8 | 0.1 | 0.5 | 0.7 | 0.1 | 2.2 | 1.7 | 4.2 | 15.4 | +/-5.7 |
| Bicknell | 327 | 96.0 | 0.6 | 0.6 | 0.3 | 0.3 | 1.8 | 1.2 | 0.9 | 29.3 | +/-22.7 |
| Castle Dale | 1,630 | 97.1 | 0.1 | 1.3 | 0.2 | 0.1 | 0.6 | 0.5 | 2.9 | 10.8 | +/-7.8 |
| Clawson | 163 | 98.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 | 1.2 | 1.8 | 15.2 | +/-20.6 |
| Cleveland | 464 | 99.6 | 0.0 | 0.2 | 0.2 | 0.0 | 0.0 | 0.0 | 0.2 | 15.3 | +/-10.0 |
| Elmo | 418 | 95.7 | 0.7 | 0.5 | 0.2 | 0.0 | 1.4 | 1.4 | 1.5 | 16.0 | +/-9.3 |
| Emery | 288 | 95.5 | 0.0 | 0.7 | 0.1 | 0.0 | 1.7 | 0.1 | 3.1 | 11.7 | +/-7.3 |
| Ferron | 1,626 | 96.0 | 0.5 | 1.0 | 0.2 | 0.0 | 1.2 | 1.1 | 2.6 | 9.9 | +/-6.0 |
| Green River | 952 | 79.3 | 0.3 | 0.7 | 0.5 | 0.0 | 18.5 | 0.7 | 21.4 | 30.7 | +/-9.4 |
| Hanksville | 219 | 98.2 | 0.0 | 0.0 | 0.5 | 0.0 | 0.0 | 1.4 | 0.9 | 18.6 | +/-24.0 |
| Huntington | 2,129 | 91.3 | 0.2 | 0.9 | 0.3 | 0.3 | 0.6 | 1.0 | 8.9 | 9.6 | +/-3.7 |
| Loa | 572 | 96.5 | 0.2 | 0.2 | 0.9 | 0.2 | 0.3 | 1.7 | 4.0 | 15.5 | +/-9.9 |

| Geographic Area | Total Population (2010) | Race | | | | | | | Hispanic (%) | Percent Below Poverty | Margin of Error for Poverty Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | White (%) | Black/ African American (%) | American Indian/ Alaska Native (%) | Asian (%) | Native Hawaiian/ Pacific Islander (%) | Some Other Race (%) | Two or More Races (%) | | | |
| Orangeville | 1,470 | 98.6 | 0.1 | 0.1 | 0.2 | 0.0 | 0.3 | 0.5 | 1.4 | 5.5 | +/-4.6 |
| Teasdale CDP | 191 | 95.3 | 0.0 | 2.6 | 1.0 | 0.5 | 0.0 | 0.5 | 1.6 | 6.1 | +/-10.3 |
| Torrey | 182 | 90.7 | 0.0 | 0.0 | 0.0 | 0.0 | 7.1 | 2.2 | 9.9 | 31.5 | +/-20.1 |

1  Source for race and ethnicity: U. S. Census (2010b)
2  Source for poverty rates: U.S. Department of Commerce (2015). Note: For smaller communities such as those in the planning area, ACS margins of error can be substantial.
3  Table values may not always add up to 100%.

1    **3.17.5    Economic Conditions**

2    *3.17.5.1    Employment*

3    Figure 3-1 and Figure 3-2 illustrate the unemployment rate in Emery and Wayne Counties, respectively,
4    in recent years. In both counties, unemployment increased significantly from the beginning of the period
5    shown and remained high until the last quarter of 2011, when it began to decline. This pattern mirrors
6    state and national trends, but the unemployment rates in the two counties have been higher, at least since
7    2015.

8    The unemployment rate in Emery County was lower than the national rate throughout most of this period,
9    but exceeded the national rate starting in 2015. The unemployment rate in Emery County has exceeded
10   the state rate since 2011, and currently (August 2016) stands at 6.3%. This is considerably higher than
11   both the state and national rates of 3.7% and 4.9%, respectively. In Wayne County, the unemployment
12   rate has exceeded the national and state rates throughout most of the time period, and to a greater degree
13   than in Emery County. As of August 2016, Wayne County's unemployment rate stood at 7.9%,
14   considerably higher than both the state and national rates of 3.7% and 4.9%, respectively.



15
16   Source: Utah Department of Workforce Services (2016).

17   **Figure 3-3. Seasonally Adjusted Unemployment Rates, Emery County, 2009–2016**



18
19   Source: Utah Department of Workforce Services (2016).

20   **Figure 3-4. Seasonally Adjusted Unemployment Rates, Wayne County, 2009–2016**

21   Historical economic data by industry demonstrate the relative importance of different industries to the
22   study area over time. This section and the next focus on jobs and labor earnings by specific industry for
23   recent years. The tables below provide trends in employment for 2001 to 2015, for each county, by North
24   American Industry Classification System (NAICS) code. These data show details and differences in
25   employment trends by sector at the local county level.

1 Note that although BEA estimates annual employment for counties nationwide, BEA does not disclose
2 some information (e.g., total employment for an industry sector that has few companies within a
3 particular geography) to ensure that it does not violate confidentiality for those companies. However, the
4 provider of the BEA data used in this report, Headwater Economics, has a methodology to provide
5 estimates for non-disclosed data. These estimates are incorporated in various tables and figures
6 throughout this report. Also note that the three sector categories—Services related, Non-services related,
7 and Government—are categories created by Headwater Economics. While not official BEA categories,
8 they provide useful high-level groupings of roughly similar industries.

9 As shown in Table 3-41, the largest industries in Emery County in 2005 were government (915 jobs),
10 retail trade (630 jobs), and farming (589 jobs). From 2001 to 2015, almost all industries experienced
11 employment losses, with total jobs in Emery County down; the construction and professional and
12 technical services industries showed the largest declines. The employment picture in Wayne County has
13 both similarities and differences to that of Emery County, as shown in Table 3-42 The largest industries
14 in Wayne County in 2015 were accommodation and food services (294 jobs), followed closely by
15 government (270 jobs) and construction (208 jobs). Wayne County showed a slight increase in total
16 employment from 2001 to 2015.

17 **Table 3-41. Emery County Employment by Industry, 2001–2015**

| | 2001 | 2005 | 2010 | 2015 | Change 2010-2015 |
|---|---|---|---|---|---|
| **Total Employment (number of jobs)** | 5,335 | 5,560 | 5,598 | 5,036 | -562 |
| **Non-services related** | ˜996 | ˜1,012 | ˜1,240 | ˜1,432 | ˜192 |
| Farm | 560 | 516 | 575 | 589 | 14 |
| Forestry, fishing, & ag. services | na | na | na | na | na |
| Mining (including fossil fuels) | na | na | na | 339 | na |
| Construction | 382 | 433 | 605 | 434 | -171 |
| Manufacturing | 54 | 63 | 60 | 70 | 10 |
| **Services related** | ˜2,173 | ˜2,198 | ˜2,267 | ˜2,089 | -˜178 |
| Utilities | na | na | na | na | na |
| Wholesale trade | na | na | na | 40 | na |
| Retail trade | 613 | 622 | 611 | 630 | 19 |
| Transportation and warehousing | 159 | 189 | 105 | ˜105 | ˜0 |
| Information | 171 | 152 | 137 | ˜128 | -˜9 |
| Finance and insurance | ˜86 | ˜100 | ˜151 | 115 | -˜36 |
| Real estate and rental and leasing | ˜19 | ˜83 | ˜114 | ˜73 | -˜41 |
| Professional and technical services | 114 | 126 | 258 | 139 | -119 |
| Management of companies and enterprises | 43 | 32 | ˜35 | ˜25 | -˜10 |
| Administrative and waste services | 142 | ˜152 | ˜136 | ˜105 | -˜31 |
| Educational services | 18 | na | na | na | na |

|  | 2001 | 2005 | 2010 | 2015 | Change 2010-2015 |
|---|---|---|---|---|---|
| Health care and social assistance | 127 | na | na | na | na |
| Arts, entertainment, and recreation | 41 | 36 | 34 | 22 | -12 |
| Accommodation and food services | 251 | 314 | 290 | 308 | 18 |
| Other services, except public administration | 389 | 392 | 396 | 399 | 3 |
| **Government** | 914 | 882 | 938 | 915 | -23 |

1  All employment data are reported by place of work.

2  na = not available. Estimates for data that were not disclosed are shown in italics. Actual and estimated data may not add to totals.

3  Source: EPS-HDT (2016).

4  **Table 3-42. Wayne County Employment by Industry, 2001–2015**

| Industry | 2001 | 2005 | 2010 | 2015 | Change 2010–2015 |
|---|---|---|---|---|---|
| **Total Employment (number of jobs)** | **1,710** | **1,633** | **1,737** | **1,763** | **26** |
| **Non-services related** | *417* | *404* | *393* | *462* | *69* |
| Farm | 214 | 200 | 207 | 202 | -5 |
| Forestry, fishing, & ag. services | na | na | na | na | na |
| Mining (including fossil fuels) | 14 | 13 | *17* | *17* | *0* |
| Construction | 134 | 160 | 135 | 208 | 73 |
| Manufacturing | 55 | 31 | 34 | 35 | 1 |
| **Services related** | 842 | 739 | 900 | 927 | 27 |
| Utilities | na | na | na | na | na |
| Wholesale trade | *23* | *21* | 27 | *25* | *-2* |
| Retail trade | 148 | 127 | 123 | 145 | 22 |
| Transportation and warehousing | *28* | *25* | *25* | *28* | *3* |
| Information | *5* | *3* | *0* | *2* | *2* |
| Finance and insurance | na | na | na | 30 | na |
| Real estate and rental and leasing | 22 | 24 | 29 | 31 | 2 |
| Professional and technical services | *30* | *31* | *45* | 53 | *8* |
| Management of companies and enterprises | 0 | 0 | 0 | 0 | 0 |
| Administrative and waste services | 16 | *14* | *16* | *23* | *7* |
| Educational services | *3* | *5* | *15* | 15 | *0* |
| Health care and social assistance | *197* | *199* | *218* | 127 | *-91* |

| Industry | 2001 | 2005 | 2010 | 2015 | Change 2010–2015 |
|---|---|---|---|---|---|
| Arts, entertainment, and recreation | *34* | 21 | 42 | 51 | 9 |
| Accommodation and food services | *262* | 191 | 277 | 294 | 17 |
| Other services, except public administration | 74 | 78 | 83 | 103 | 20 |
| **Government** | 309 | 279 | 305 | 270 | -35 |

1  All employment data are reported by place of work.

2  na: Not available. Estimates for data that were not disclosed are shown in italics. Actual and estimated data may not add to totals.

3  Source: EPS-HDT (2016).

### 3.17.5.2    Earnings and Pay

Earnings for Emery County by industry for 2001 to 2015 are shown in Table 3-43 in total dollars and as a percentage of total earnings. In 2015, the three largest industries by earnings are the same as the three largest industries by number of jobs, but the relative rankings and sizes are different. Government is the largest industry by earnings, with $50.4 million in earnings, or 26.2% of all earnings in the county. Accommodation and food services is the second-largest industry (17.8 %), followed by retail trade (11.5%). Accommodation and food services had the largest numerical gain in earnings from 2001 to 2009 ($9.8 million), followed by government ($8.4 million) and health care and social assistance ($4.7 million). The greatest percentage gains in this period were made in educational services (118.1%), professional and technical services (81.6%), and finance and insurance (72.6%). Professional and technical services did not show up as a top industry by employment in the discussion above, but based on the earnings data it appears to be an important emerging industry—besides having the second highest rate of earnings growth, it also had the fifth highest numerical increase in earnings ($4.0 million). For comparison purposes, in earnings the mining industry was the eighth largest industry in the county in 2009 and had the tenth largest increase in earnings from 2001 ($0.8 million, representing 14.6% growth). In summary, the earnings data show the dominant importance of service sector industries, along with government, to the Emery County economy.

For Wayne County, Table 3-44 presents earnings data for the same period. In 2009, by far the largest industry by earnings in this county was government, with $80.5 million in earnings, or 42.8% of all earnings. The second largest, at $25.3 million (13.5% of earnings), was mining. The third largest was health care and social assistance (9.6%), with accommodation and food services close behind (8.8%). The largest numerical increases in earnings from 2001 to 2010 were in government ($6.5 million), mining ($5.7 million), and health care and social assistance ($3.8 million). The largest percentage increases (over 1,000%) were in two industries that barely had a presence in Wayne County in 2001 but grew to important size by 2009: finance and insurance, and information. The third largest percentage gain was in administrative and waste services (276%), which also had the fourth largest numerical increase in earnings ($2.6 million). Notably, although farming was a top industry in 2009 by employment, it does not show up as a top industry in the earnings data; in fact, farming had negative earnings in 2009. This dichotomy frequently occurs in farming in many parts of the nation and is due to the extreme volatility of income from year to year in this sector, relative to expenses. In summary, based on earnings data, the Wayne County economy has a very strong reliance on wages in the government sector, with a strong role also played by mining and certain service industries.

1  **Table 3-43. Emery County Earnings by Industry, 2001–2015 (1,000s of 2015 $)**

| Industry | 2001 | 2005 | 2010 | 2015 | Change 2010–2015 |
|---|---|---|---|---|---|
| **Labor Earnings** | $233,969 | $245,053 | $265,480 | $205,782 | -$59,698 |
| **Non-services related** | *$16,309* | *$21,538* | *$37,817* | *$56,106* | *$18,289* |
| Farm | -$333 | $2,174 | $575 | $5,294 | $4,719 |
| Forestry, fishing, & ag. services | na | na | na | na | na |
| Mining (including fossil fuels) | na | na | na | $26,572 | na |
| Construction | $15,444 | $17,971 | $36,182 | $22,775 | -$13,407 |
| Manufacturing | $1,198 | $1,392 | $1,060 | $1,465 | $405 |
| **Services related** | *$40,472* | *$44,246* | *$65,093* | *$49,199* | *-$15,894* |
| Utilities | na | na | na | na | na |
| Wholesale trade | na | na | na | $1,559 | na |
| Retail trade | $10,286 | $10,688 | $10,513 | $10,946 | $433 |
| Transportation and warehousing | $9,570 | $9,696 | $4,045 | *$3,992* | *-$53* |
| Information | $6,858 | $7,138 | $7,435 | *$4,926* | *-$2,509* |
| Finance and insurance | *$1,567* | *$1,598* | *$3,411* | $2,001 | *-$1,410* |
| Real estate and rental and leasing | *$165* | *$534* | *$425* | *$455* | *$30* |
| Professional and technical services | $2,966 | $2,826 | $19,123 | $3,862 | -$15,261 |
| Management of companies and enterprises | $901 | $631 | *$1,995* | *$888* | *-$1,107* |
| Administrative and waste services | $1,293 | *$2,216* | *$3,935* | *$1,978* | *-$1,957* |
| Educational services | *$33* | na | na | na | na |
| Health care and social assistance | $2,825 | na | na | na | na |
| Arts, entertainment, and recreation | $406 | -$348 | *$27* | *$25* | *-$2* |
| Accommodation and food services | $4,204 | $5,782 | $4,661 | $5,235 | $574 |
| Other services, except public administration | $13,117 | $12,953 | $15,186 | $13,332 | -$1,854 |
| **Government** | $41,904 | $41,578 | $48,873 | $43,626 | -$5,247 |

2  All employment data are reported by place of work.
3  na = not available.
4  Estimates for data that were not disclosed are shown in italics. Actual and estimated data may not add to totals.
5  Source: EPS-HDT (2016).
6

1    **Table 3-44. Wayne County Earnings by Industry, 2001–2015 (1,000s of 2015 $)**

| Industry | 2001 | 2005 | 2010 | 2015 | Change 2010–2015 |
|---|---|---|---|---|---|
| **Labor Earnings** | $58,943 | $52,255 | $48,236 | $47,665 | -$571 |
| **Non-services related** | *$11,201* | *$10,567* | *$5,858* | *$10,444* | *$4,586* |
| Farm | $6,092 | $4,834 | $1,467 | $3,716 | $2,249 |
| Forestry, fishing, & ag. services | na | na | na | na | na |
| Mining (including fossil fuels) | $122 | *$30* | *-$139* | *-$178* | *-$39* |
| Construction | $3,266 | $5,126 | $3,906 | $6,257 | $2,351 |
| Manufacturing | $1,721 | $577 | $624 | $649 | $25 |
| **Services related** | $18,598 | $17,535 | $19,420 | $19,015 | -$405 |
| Utilities | na | na | na | na | na |
| Wholesale trade | *$746* | *$624* | $783 | *$557* | *-$226* |
| Retail trade | $2,934 | $4,291 | $1,862 | $2,210 | $348 |
| Transportation and warehousing | *$3,574* | *$3,060* | *$2,594* | *$2,483* | *-$111* |
| Information | $166 | *$183* | *$175* | *$224* | $49 |
| Finance and insurance | na | na | na | $77 | na |
| Real estate and rental and leasing | $198 | $106 | *$27* | $93 | *$66* |
| Professional and technical services | *$1,078* | *$659* | *$985* | $1,144 | *$159* |
| Management of companies and enterprises | $0 | $0 | $0 | $0 | $0 |
| Administrative and waste services | $479 | *$248* | *$320* | *$405* | *$85* |
| Educational services | $70 | $79 | $258 | $154 | -$104 |
| Health care and social assistance | $7,362 | $6,701 | $6,626 | $3,646 | -$2,980 |
| Arts, entertainment, and recreation | $510 | $78 | $553 | $526 | -$27 |
| Accommodation and food services | $5,558 | $2,909 | $4,637 | $5,026 | $389 |
| Other services, except public administration | $2,228 | $2,349 | $2,290 | $2,470 | $180 |
| **Government** | $14,236 | $14,857 | $16,375 | $15,046 | -$1,329 |

2    All employment data are reported by place of work.

3    na = not available.

4    Estimates for data that were not disclosed are shown in italics. Actual and estimated data may not add to totals.

5    Source: EPS-HDT (2016).

6    The average annual wages by industry for the two counties in 2015 are presented in Tables 3-45 and 3-46.
7    The tables also present employment by industry to indicate the relative importance of each industry. The
8    industry categories are different for these tables than the categories used in earlier tables. Wage levels are
9    important because the best-paying jobs are not always in the largest industries.

1   The average annual wage in Emery County in 2015 was $43,769. The highest average wages in Emery
2   County were in the natural resources and mining sector (this sector is a combination of mining and other
3   natural resource industries) at $70,600, followed by utilities ($55,196) and construction ($50,777).
4   Notably, average wages in the leisure and hospitality industry were well below the county-wide average,
5   at $13,884. Jobs in this industry tend to be lower paying and are often seasonal or less than full-time.
6   In Wayne County, the average annual wage in 2015 was $28,797. The highest average wages were in
7   state government ($57,111), federal government ($52,325), and natural resources and mining ($43,336).
8   As in Emery County, average wages in the leisure and hospitality industry were well below the county-
9   wide average, at $16,219.

10  **Table 3-45. Emery County Employment and Wages by Industry, 2015 (2015 $)**

| Industry | Employment | % of Total Employment | Avg. Annual Wages | % Above or Below Avg. |
|---|---|---|---|---|
| **Total** | **3,151** | | **$43,769** | |
| **Private** | **2,287** | **72.6%** | **$48,572** | **11.0%** |
| **Non-Services Related** | **675** | **21.4%** | **$59,895** | **36.8%** |
| Natural Resources and Mining | 315 | 10.0% | $70,600 | 61.3% |
| Agriculture, forestry, fishing & hunting | 21 | 0.7% | $30,506 | -30.3% |
| Mining (incl. fossil fuels) | 294 | 9.3% | $73,463 | 67.8% |
| Construction | 344 | 10.9% | $50,577 | 15.6% |
| Manufacturing (Incl. forest products) | 16 | 0.5% | $49,508 | 13.1% |
| **Services Related** | **1,612** | **51.2%** | **$43,830** | **0.1%** |
| Trade, Transportation, and Utilities | 891 | 28.3% | $55,196 | 26.1% |
| Information | na | na | na | na |
| Financial Activities | na | na | na | na |
| Professional and Business Services | 91 | 2.9% | $44,993 | 2.8% |
| Education and Health Services | 74 | 2.3% | $20,376 | -53.4% |
| Leisure and Hospitality | 272 | 8.6% | $13,884 | -68.3% |
| Other Services | 126 | 4.0% | $40,888 | -6.6% |
| Unclassified | 0 | 0.0% | na | na |
| **Government** | **864** | **27.4%** | **$31,054** | **-29.1%** |
| Federal Government | 55 | 1.7% | $48,042 | 9.8% |
| State Government | 59 | 1.9% | $49,863 | 13.9% |
| Local Government | 750 | 23.8% | $28,329 | -35.3% |

This table shows wage data from the Bureau of Labor Statistics, which does not report data for proprietors or the value of benefits.
Source: U.S. Department of Labor (2016).

**Table 3-46. Wayne County Employment and Wages by Industry, 2015 (2015 $)**

| Industry | Employment | % of Total Employment | Avg. Annual Wages | % Above or Below Avg. |
|---|---|---|---|---|
| **Total** | 967 | | $28,797 | |
| **Private** | 710 | 73.4% | $25,777 | -10.5% |
| **Non-Services Related** | 175 | 18.1% | $39,354 | 36.7% |
| Natural Resources and Mining | 46 | 4.8% | $43,336 | 50.5% |
| Agriculture, forestry, fishing & hunting | na | na | na | na |
| Mining (incl. fossil fuels) | na | na | na | na |
| Construction | 124 | 12.8% | $38,747 | 34.6% |
| Manufacturing (Incl. forest products) | 5 | 0.5% | $17,778 | -38.3% |
| **Services Related** | 535 | 55.3% | $21,336 | -25.9% |
| Trade, Transportation, and Utilities | 162 | 16.8% | $23,246 | -19.3% |
| Information | na | na | na | na |
| Financial Activities | 0 | 0.0% | na | na |
| Professional and Business Services | na | na | na | na |
| Education and Health Services | 91 | 9.4% | $30,413 | 5.6% |
| Leisure and Hospitality | 252 | 26.1% | $16,219 | -43.7% |
| Other Services | 21 | 2.2% | $22,376 | -22.3% |
| Unclassified | 0 | 0.0% | na | na |
| **Government** | 258 | 26.7% | $36,996 | 28.5% |
| Federal Government | 82 | 8.5% | $52,325 | 81.7% |
| State Government | 22 | 2.3% | $57,111 | 98.3% |
| Local Government | 154 | 15.9% | $25,960 | -9.9% |

This table shows wage data from the Bureau of Labor Statistics, which does not report data for proprietors or the value of benefits.
Source: U.S. Department of Labor (2016).

### 3.17.5.3    *Personal Income*

Personal income is income received from all sources, including income received from participation in production as well as from government and business transfer payments. Total personal income includes labor earnings and non-labor income, which includes dividends, interest, and rent, and also transfer payments. (The definitions of these categories, and important components of these categories, are provided in Section 3.17.1.1.) Trends in high-level categories of total personal income for the two counties in the study area are presented in Tables 3-47 and 3-48. Table 3-49 shows how the two counties compared to state and national totals in 2015.

The key trend shown in these tables is the long-term decrease in labor earnings as a percentage of total personal income, and the corresponding increase in non-labor income as a percentage of total personal income, reflecting national trends. Statewide, the percentage of income from non-labor sources has

increased from 22.4% in 1970 to 32.2% as of 2015; nationally non-labor income increased from 22.7% in 1970 to 36.1% in 2015 (per EPS-HDT).

Both components of non-labor income—dividends, interest, and rent; and transfer payments—have increased statewide and nationally. Within transfer payments, income maintenance benefits (welfare) and unemployment insurance compensation income have remained relatively stable as a percentage of total income, while retirement and other income have increased. These trends reflect an aging population. As the average age has increased, a greater percentage of the population has entered retirement and left the workforce. In addition, income from dividends, interest, and rent has increased in Utah and nationally, as the wealth of upper income and upper middle income portions of the population has increased over recent decades.

Within the study area, non-labor income has become even more important than it is statewide and nationally. In 2015, non-labor income comprised 37.7% of total personal income in Emery County, and 45.6% in Wayne County. As with the state and nation, both components of non-labor income—dividends, interest, and rent; and transfer payments—have increased significantly in both counties since 1970. However, in both counties in 2015 the dividends, interest, and rent component was smaller than the transfer payments component. This is likely the result of an aging and somewhat poorer population in both counties, relative to the state and nation.

**Table 3-47. Components of Personal Income, Emery County, 1970–2015 (1,000s of 2015 $)**

| Source of Income | 1970 | 1980 | 1990 | 2000 | 2015 | Change 2000–2015 |
|---|---|---|---|---|---|---|
| **Total Personal Income** | 85,452 | 243,843 | 234,839 | 269,191 | 318,751 | 49,560 |
| Labor Earnings | 64,761 | 196,911 | 173,578 | 191,439 | 198,482 | 7,043 |
| Non-Labor Income | 20,692 | 46,933 | 61,261 | 82,380 | 120,269 | 37,889 |
| Dividends, Interest, and Rent | 9,635 | 23,655 | 30,350 | 34,584 | 43,545 | 8,961 |
| Age-Related Transfer Payments | 6,279 | 12,198 | 16,112 | 26,982 | 51,375 | 24,393 |
| Hardship-Related Transfer Payments | 2,130 | 4,126 | 8,312 | 14,773 | 18,239 | 3,466 |
| Other Transfer Payments | 2,435 | 6,893 | 6,434 | 5,986 | 7,110 | 1,124 |
| **Percent of Total** | | | | | | **% Change 2000–2015** |
| **Total Personal Income** | | | | | | 18.4% |
| Labor Earnings | 75.8% | 80.8% | 73.9% | 71.1% | 62.3% | 3.7% |
| Non-Labor Income | 24.2% | 19.2% | 26.1% | 30.6% | 37.7% | 46.0% |
| Dividends, Interest, and Rent | 11.3% | 9.7% | 12.9% | 12.8% | 13.7% | 25.9% |
| Age-Related Transfer Payments | 7.3% | 5.0% | 6.9% | 10.0% | 16.1% | 90.4% |
| Hardship-Related Transfer Payments | 2.5% | 1.7% | 3.5% | 5.5% | 5.7% | 23.5% |
| Other Transfer Payments | 2.8% | 2.8% | 2.7% | 2.2% | 2.2% | 18.8% |

All income data in the table above are reported by *place of residence*. Labor earnings and non-labor income may not add to total personal income due to adjustments made by the Bureau of Economic Analysis.
Source: U.S. Department of Commerce (2016a).

1    **Table 3-48.  Components of Personal Income, Wayne County, 1970–2015 (1,000s of 2015 $)**

| Source of Income | 1970 | 1980 | 1990 | 2000 | 2015 | Change 2000–2015 |
|---|---|---|---|---|---|---|
| **Total Personal Income** | 22,950 | 39,674 | 42,805 | 62,817 | 84,359 | 21,542 |
| Labor Earnings | 16,420 | 26,238 | 25,966 | 40,163 | 45,928 | 5,765 |
| Non-Labor Income | 6,529 | 13,436 | 16,839 | 23,693 | 38,431 | 14,738 |
| Dividends, Interest, and Rent | 3,612 | 7,673 | 9,135 | 13,010 | 19,126 | 6,116 |
| Age-Related Transfer Payments | 1,776 | 3,944 | 5,219 | 7,007 | 13,214 | 6,207 |
| Hardship-Related Transfer Payments | 0 | 765 | 1,339 | 2,279 | 4,137 | 1,858 |
| Other Transfer Payments | 415 | 932 | 1,121 | 1,343 | 1,954 | 611 |
| **Percent of Total** | | | | | | **% Change 2000–2015** |
| **Total Personal Income** | | | | | | 34.3% |
| Labor Earnings | 71.5% | 66.1% | 60.7% | 63.9% | 54.4% | 14.4% |
| Non-Labor Income | 28.4% | 33.9% | 39.3% | 37.7% | 45.6% | 62.2% |
| Dividends, Interest, and Rent | 15.7% | 19.3% | 21.3% | 20.7% | 22.7% | 47.0% |
| Age-Related Transfer Payments | 7.7% | 9.9% | 12.2% | 11.2% | 15.7% | 88.6% |
| Hardship-Related Transfer Payments | 0.0% | 1.9% | 3.1% | 3.6% | 4.9% | 81.5% |
| Other Transfer Payments | 1.8% | 2.3% | 2.6% | 2.1% | 2.3% | 45.5% |

All income data in the table above are reported by *place of residence*. Labor earnings and non-labor income may not add to total personal income due to adjustments made by the Bureau of Economic Analysis.
Source: U.S. Department of Commerce (2016a).

2    **Table 3-49.  Components of Non-Labor Income, 2015, Percent of Total Personal Income**

| Source of Income | Emery County | Wayne County | Utah | United States |
|---|---|---|---|---|
| **Total Non-Labor Income** | 37.7% | 45.6% | 32.2% | 36.1% |
| **Dividends, Interest, Rent** | 13.7% | 22.7% | 18.6% | 18.8% |
| **Age-Related Transfer Payments** | 16.1% | 15.7% | 7.5% | 9.7% |
| Social Security | 10.6% | 10.0% | 4.7% | 5.6% |
| Medicare | 5.5% | 5.7% | 2.8% | 4.1% |
| **Hardship-Related Payments** | 5.7% | 4.9% | 3.6% | 5.5% |
| Medicaid | 3.3% | 1.8% | 1.9% | 3.6% |
| Income maintenance ("welfare") | 2.2% | 2.5% | 1.6% | 1.7% |
| Unemployment ins. compensation | 0.3% | 0.6% | 0.2% | 0.2% |

| Source of Income | Emery County | Wayne County | Utah | United States |
|---|---|---|---|---|
| **Other Transfer Payments** | 2.2% | 2.3% | 2.4% | 2.1% |
| Veterans benefits | 0.4% | 0.7% | 0.6% | 0.7% |
| Education and training assistance | 0.3% | 0.3% | 0.6% | 0.4% |
| All other, incl. Workers' comp. | 1.5% | 1.4% | 1.2% | 1.0% |

1   Source: U.S. Department of Commerce (2016a).

### 3.17.5.4   Public Finance

BLM public lands and federal mineral estate managed within the study area affect government budgets at local (county, city, town, school district, and special district), state, and federal levels based on revenues from sales taxes, property taxes, Payments in Lieu of Taxes (PILT), mineral royalties, severance taxes, fees, and other funding sources. Likewise, lands and federal mineral estate in the study area result in government expenditures for management, law enforcement, and other activities.

### 3.17.5.5   Federal Government Revenues

The federal government's Office of Natural Resources Revenue (ONRR) collects royalties and rents from leases of federal lands for production of coal, oil, gas, and other leasable minerals. Royalties for oil and gas are generally 12.5% of the value of production. Annual rental payments for oil and gas are $1.50 per acre for the first 5 years and $2.00 per acre each subsequent year. Rents for oil and gas are only paid on undeveloped oil and gas leases, which typically expire after 10 years if not developed. Other minerals have different royalty and rental rates, as defined in 43 CFR Chapter II, Subchapter C, Minerals Management.

Royalties and rents are collectively referred to as mineral lease revenue. The federal government also collects bonuses on certain leases. Bonus payments are one-time payments (based on competitive bids) to the federal government for a leased parcel of federal land for a 10-year period for oil and gas.

The federal government returns approximately 49% of the total collected revenues to the state in which the mineral production occurred.[2] In Utah, these payments are then distributed by the state by appropriation or statutory formula (Utah Code 59-21-1).

Utah received from the federal government $67.9 million in total mineral lease payments in Fiscal Year (FY) 2016 (BLM ONRR year). This represents a steep decline from recent years, due presumably to lower mineral prices and reduced production. The state allocates approximately 42% of mineral lease payments to the Permanent Community Impact Board (PCIB). The PCIB, in turn, distributes funds to county and local governmental entities for a wide variety of projects. These monies can be in the form of outright grants and/or low-interest loans. The PCIB funds projects statewide on a competitive basis, and not necessarily to each county proportionate to its relative share of minerals production. The majority of the remaining mineral lease payments are distributed to counties, unusually proportionate to production within that county. Utah's total mineral lease payments to counties were $26,740,984 in FY 2016 (Utah

---

[2] The state share is sometimes said to be 50%. However, since FY 2008, Congress has annually required a 2% deduction (equivalent to 1% of total mineral revenues) from each year's state payments as part of the Interior, Environment, and Related Agencies Appropriations Acts to partially cover the costs of administering the federal mineral leasing program. This is a simpler form of an authority known as "net receipts sharing" that was in place until 2000. The state share was 50% between 2000 and 2008. Additional information is available at: http://www.whitehouse.gov/sites/default/files/omb/budget/fy2012/assets/int.html, Mineral Leasing and Associated Payments section.

1 Department of Transportation 2016). The counties are then legally required to distribute these monies to
2 quasi-governmental entities known as Special Service Districts.

3 In FY 2016, the state distributed $577,774 in mineral lease payments to Emery County, and no monies to
4 Wayne County. The PCIB distributed $2,608,585 in loans and grants to Emery County in 2016, and
5 $395,000 to Wayne County in grants (PCIB 2016).

6 BLM Field Offices collect fees and other revenue for a variety of other uses of BLM-managed lands.
7 These revenue sources include right-of-way (ROW) rents, recreation fees, grazing fees, various permit
8 fees, and more. Revenues from sales of land and vegetative and mineral materials, along with ROW rents,
9 mostly go to the federal treasury, while recreation fees are generally retained by the Field Office. Section
10 3 grazing permit fees generate revenue for the U.S. Treasury, of which 12.5% is returned to the local
11 Grazing Board via the state in which the grazing lands are located. This money is then disbursed to local
12 ranchers through the local Grazing Board, using a 40/60 matching-funds formula, for use in range
13 improvements and maintenance projects, per the Taylor Grazing Act, Section 10.

14 In FY 2015, BLM payments from the above totaled $104,406 and $42,631, respectively, to Emery and
15 Wayne Counties (EPS-HDT 2016). A Profile of Federal Land Payments. (Downloaded 12-19-2016 from
16 https://headwaterseconomics.org/tools/economic-profile-system/#fedpayments-report-section).

### 3.17.5.6   State Government Revenues

18 As noted above, the federal government through ONRR pays the State of Utah 49% of the federal mineral
19 lease and bonus revenues it collects from lands in the state. The state retains some of this revenue for state
20 purposes, and distributes some to local governments. The State of Utah collects several taxes and fees that
21 derive from natural resources on both private lands and public lands.

22 • Oil and Gas Severance Tax. The tax ranges from 3% to 5% based on the value of the oil or gas,
23   and 4% for natural gas liquids. Value is measured at the well or when the product leaves the field
24   where it is produced.

25 • Oil and Gas Conservation Fee. The fee is 0.2% of the value at the well.

26 • Income Taxes. There are various state income tax rates, depending on individual or corporate
27   status, type of corporation, taxable income, etc. The state requires 5% withholding on most
28   mineral production income (Utah Code 59-6-102).

29 The amounts collected through the taxes and fees above are a function of sales prices and actual
30 production, making estimates of future collections tenuous at best. Most severance tax revenues are
31 remitted directly to the State's General Fund, making them available for expenditures as the legislature
32 sees fit. There is no direct correspondence between a particular county's natural resource production and
33 the amount (if any) of severance tax revenues flowing indirectly back to a county. Oil and gas operations
34 also produce revenue for the state through sales taxes on purchases of goods. In addition, employees of
35 these firms, as well as their suppliers, indirectly contribute to state revenues through income taxes, and
36 through sales taxes on re-spending of income.

### 3.17.5.7   Local Government Revenues

38 Local governments benefit from several sources of revenue related to public lands and minerals, including
39 the following.

40 • Recreation, travel, and tourism-related revenues – primarily a variety of sales and use taxes that
41   generate revenue as visitors to BLM public lands spend money on lodging, restaurants, other
42   food, gas, equipment rentals, guide services, and other supplies and services. These taxes may be

collected and retained by local government, or collected by the state but distributed back to local government. Businesses in this industry also pay property taxes to local governments.

- Natural resource-related revenues – including sales and use taxes from mining and agricultural businesses, property taxes on natural resources properties (including buildings and other improvements on public lands), property taxes on agricultural lands (ranching on private land is often closely tied to public grazing lands), distributions of federal mineral royalties received from the state, and distributions from or tied to BLM and USFS revenue collections such as grazing fees.

- Landownership-related revenues – in particular, PILT that replace property taxes that would otherwise be collected if land were privately owned. PILT payments totaled $1,266,020 and $471,940, respectively, to Emery and Wayne Counties (EPS-HDT 2016). A Profile of Federal Land Payments. Downloaded 12-19-2016 from https://headwaterseconomics.org/tools/economic-profile-system/#fedpayments-report-section).

### 3.17.6    Government Expenditures

#### 3.17.6.1    State and Local Government Expenditures and Services

Management of BLM-administered land may affect state and local expenditures. For instance, recreation on public lands requires some support from local government for road maintenance, law enforcement, and search and rescue. Heavy truck traffic from mineral development and production may significantly impact roads. It is difficult to separate expenditures related to BLM-administered land from expenditures related to other land. The types of state and local expenditures that may be affected include

- maintenance of state and local roads,

- law enforcement personnel and equipment,

- emergency medical services,

- search and rescue teams,

- conservation and wildlife management,

- fire management,

- solid waste collection and disposal, and

- public utilities.

These expenditures may be affected in two ways. First, increased use of public land resources may result in greater needs for the types of services and infrastructure listed above. For instance, increased backcountry recreational use may put greater demands on local search and rescue teams. Increased heavy truck traffic from oil and gas development may increase road maintenance needs. In addition, in less common cases where use of public land resources leads to substantially increased employment opportunities (such as in an energy development boom), population in study area communities may increase, which often leads to increased demand for the services and infrastructure listed above, and may lead to additional needs, such as increased school space, teachers, and other public facilities and personnel.

#### 3.17.6.2    BLM Expenditures

BLM expenditures related to federal lands benefit the local economy because federal salaries to land management staff that reside in the study area and federal contracts to businesses located in or with employees residing in the study area represent inflows of money.

1 **BLM Public Land Uses and Values**

2 This section profiles some of the uses of BLM public lands in the planning area. It describes some of the
3 economic and social implications of those uses, including quantitative values where available. As noted in
4 the introduction chapter of this section, social and economic impacts from MLP decisions are most likely
5 to occur with respect to a) oil and gas development and production, and b) recreation. Therefore, these
6 two resource uses are addressed in detail below.

### 7 *3.17.6.3    Oil and Gas*

8 The BLM has prepared a Reasonably Foreseeable Development (RFD) Scenario for oil and gas for the
9 two-county planning area (see Appendix A). As the RFD reports, neither county currently produces oil
10 and gas. As of early 2017, there was zero employment in oil and gas or related industries in either county
11 (U.S. Department of Commerce 2016b). Nonetheless, there is potential for successful oil and gas
12 exploration and development within the planning area. This is predicated on the relative success of oil and
13 gas operations in the adjacent Moab MLP planning area over the past few decades, and is more fully
14 described in the RFD. The RFD projects a total of 30 wells drilled over the planning horizon of 15 years,
15 with a 60% success rate. This level of activity assumes all BLM lands would be available with standard
16 restrictions. Since the San Rafael Desert RFD is heavily predicated on the Moab MLP model, the impact
17 analyses of Chapter 4 will rely on the assumptions for costs contained in the that model.

18 Authorized and pending federal oil and gas leases within the SRD MLPA cover a total of 82,454 acres.
19 This is approximately 16% of the SRD MLPA. In addition there have been 97,452 acres of land
20 nominated for leasing, but deferred since 2011.

### 21 **3.17.7    Recreation**

### 22 *3.17.7.1    Status and Trends in the Socioeconomic Study Area*

23 The two counties of the study area are rich in outdoor recreational resources. These resources are enjoyed
24 by local residents and attract many non-residents. Visitation for outdoor recreation—whether passive
25 pursuits like scenic drives or high-energy active sports like mountain biking and OHV riding—supports a
26 vibrant tourism industry. This industry is an important economic base for the study area, as shown in the
27 Economic Conditions section above.

28 The Utah Office of Tourism has commissioned the Gardner Institute at the University of Utah to compile
29 data on recreation and tourism use by county in Utah. The data include information on numbers of visitors
30 as well as employment and taxes generated by this visitation. Table 3-50 presents selected economic data
31 related to leisure and hospitality for the two counties and the state of Utah. Although the percentage of the
32 labor force in this industry is similar for Emery County and the State, the percentage for Wayne County is
33 about triple the State average. This is likely due to the presence of a major national park (Capitol Reef) in
34 the county.

1   **Table 3-50. Tourism Spending, Employment, and Tax Revenue for Emery and Wayne Counties**
2   **and State of Utah, 2015**

|  | **Emery County** | **Wayne County** | **Utah** |
|---|---|---|---|
| Leisure and Hospitality | | | |
| Taxable Sales | $15,610,165 | $15,417,965 | $6,606,009,002 |
| Employment | 272 | 252 | 133,613 |
| Percentage of Total Employment | 11.9 | 35.5 | 11.9 |
| Tax Revenues[3] | $934,381 | $385,363 | $143,328,028 |

3   Source: Gardner Policy Institute (2015).

### 3.17.7.2    BLM Resource Use

5   BLM public lands in the study area are used for a wide variety of recreational pursuits. The BLM
6   categorizes recreation in three ways: dispersed recreation, developed recreation, and activities managed
7   under special recreation permits.

8   *Dispersed Recreation* – This refers to all recreation occurring outside of developed recreation sites.
9   Popular dispersed uses include hiking, backpacking, mountain biking, OHV riding, hunting, rock
10  climbing, photography, automobile touring/sightseeing, bird watching, camping, rock hounding, and
11  visiting archeological sites.

12  *Developed Recreation* – Developed recreation sites incorporate visitor use infrastructure such as roads,
13  parking areas, and facilities to protect the resource and support recreational users in their pursuit of
14  activities, experiences, and benefits. Visitor use infrastructure is a management tool that can minimize
15  resource impacts, concentrate use, and reduce visitor conflicts.

16  *Special Recreation Permitting* – SRPs are issued to manage visitor use, protect natural and cultural
17  resources, and accommodate commercial recreational uses and may be issued for 10 years or less with
18  annual renewal. Commercial SRPs are issued to outfitters, guides, vendors, recreation clubs, and
19  commercial competitive event organizers providing recreational opportunities or services without
20  employing permanent facilities.

21  All recreation activities provide socioeconomic value. The value may be as simple as increased quality of
22  life for the participants, which can be measured as described in the section on non-market values. In
23  addition, recreationists often spend money in order to recreate. Local recreationists pay for gas to reach a
24  site, and may buy equipment, purchase food and drink, and make other purchases locally. Non-local
25  recreationists may do all this, and pay for lodging, restaurants, guides and outfitters, etc. All of these
26  actions generate local economic activity. Expenditures by non-local recreationists are particularly
27  important as they represent new income in the region.

28  The market-based economic impacts of recreation on BLM public lands can be estimated using the
29  IMPLAN model. The general economic impact estimation methodology is as follows.

30      • Quantify recreational visitation to the area of interest (i.e., BLM public lands in the SRD MLP
31         planning area).

---

3 Includes county transient room tax, municipal transient room tax, resort communities sales tax, restaurant tax and
motor vehicle leasing tax.

- Estimate the local (Emery and Wayne Counties) expenditures of the recreational users associated with their recreational visits.

- Multiply visitation by expenditures per visit to determine total expenditures.

- Allocate the total expenditures to the various economic sectors (lodging, retail, services, etc.) to which the various portions of the expenditures accrue.

- Run these value allocations through the IMPLAN economic impact model to determine direct, indirect, and induced economic impacts.

With respect to Step 1, recreational use is tracked in the BLM's Recreation Management Information System (RMIS), based on data from traffic counters, visitor registers, and other sources. Recent recreation use levels in the MLP planning area are shown in Table X. These figures include recreational use under SRPs as well as general use (dispersed recreation and developed site recreation).

[SWCA removed table based on comment from Tyler Ashcroft regarding data accuracy for San Rafael MLP planning area.]

To use these data in economic impact modeling, it is necessary to parse the visits into market segments, and apply expenditure estimates for each market segment. The best data for this purpose come from studies[4] conducted by the National Park Service (NPS) for various types of categories, including one appropriate for the MLP area. The NPS has been able to identify spending patterns by type of use (e.g., local vs. nonlocal, day vs. overnight, camping vs. commercial lodging, etc.). A particular locality can then input total recreation visitor days allocated by type of visit, which then provides input data for IMPLAN.

Table 3-51, Table 3-52, and Table 3-53 present the results of the IMPLAN analysis for each market segment.

**Table 3-51. Economic Impacts of MLP BLM Public Land Recreation, Day Use Market Segment, 2011**

| Type of Impact | Employment (jobs) | Labor Income | Value Added | Economic Output |
|---|---|---|---|---|
| Direct Impact | 16.2 | $626,775 | $1,046,176 | $1,302,342 |
| Indirect Impact | 1.0 | $34,327 | $58,930 | $105,052 |
| Induced Impact | 2.2 | $71,006 | $149,042 | $236,012 |
| Total Impact | 19.4 | $732,107 | $1,254,148 | $1,643,405 |

**Table 3-52. Economic Impacts of MLP BLM Public Land Recreation, Non-Local Camping Market Segment, 2011**

| Type of Impact | Employment (jobs) | Labor Income | Value Added | Economic Output |
|---|---|---|---|---|
| Direct Impact | 84.0 | $3,903,827 | $6,566,006 | $6,847,238 |
| Indirect Impact | 3.7 | $133,824 | $247,095 | $426,764 |
| Induced Impact | 13.0 | $413,120 | $864,969 | $1,372,675 |
| Total Impact | 100.7 | $4,450,770 | $7,678,070 | $8,646,677 |

[4] Cullinane Thomas C., and L. Koontz. 2016. 2015 National Park visitor spending effects: Economic contributions to local communities, states, and the nation. Natural Resource Report NPS/NRSS/EQD/NRR—2016/1200. National Park Service, Fort Collins, Colorado.

1  **Table 3-53. Economic Impacts of MLP BLM Public Land Recreation, Non-Local Lodging Market**
2  **Segment, 2011**

| Type of Impact | Employment (jobs) | Labor Income | Value Added | Economic Output |
|---|---|---|---|---|
| Direct Impact | 655.9 | $16,753,244 | $27,555,188 | $46,440,450 |
| Indirect Impact | 64.1 | $2,221,352 | $4,031,874 | $7,216,056 |
| Induced Impact | 61.0 | $1,940,455 | $4,062,719 | $6,447,538 |
| Total Impact | 781.0 | $20,915,051 | $35,649,782 | $60,104,045 |

3  The tables above demonstrate that the economic impacts of overnight recreational visitor use of BLM
4  lands in the area are significantly larger than the economic impacts of recreational day use, which is
5  predominantly by local residents. The economic impacts of recreationists who use local lodging are
6  significantly higher than the impacts of those who camp, largely due to the higher cost of a night in
7  lodging versus a camping site, and the additional expenditures (e.g., restaurant meals) of most lodgers
8  compared to most campers. It is important to note that not all of these economic impacts, particularly for
9  the camping and lodging segments, should be attributed to BLM public lands only, let alone to the MLP
10 planning area. Visitors to BLM lands in the study area often visit other attractions such as national and
11 state parks on the same trip.

12 ## 3.17.8    Nonmarket Values

13 In addition to the economic benefits described in previous sections, it is important to also consider
14 nonmarket values associated with BLM activities in Emery and Wayne Counties. Unlike gasoline or
15 employee wages, these values either do not have a market or (in the case of property values) do have a
16 market but are difficult to quantify. Despite the difficulties associated with measurement of these values,
17 it is well accepted that the natural and cultural resources of an area, and the open space the area may
18 provide, can have a dollar value. For example, it is common for real estate investors to pay more for view
19 lots or for property adjacent to open space, or for people to make financial donations to help protect old-
20 growth forests, endangered species, or other sensitive resources.

21 There are many types of nonmarket values, three of which are considered in this discussion: the economic
22 benefits to local communities from the amenity values provided by open space and scenic landscapes; the
23 economic benefits to individuals such as the unpriced value recreationists experience; and ecosystem
24 service values, which refers to the ways that healthy ecosystems support, enable, or protect human
25 activity. Each is considered in turn below.

26 ## 3.17.9    Economic Benefits to Local Economies

27 There is a body of evidence suggesting that "natural amenities" such as scenery, access to recreation, and
28 the presence of protected areas (such as designated wildernesses or other forms of protection) have
29 positive economic benefits for communities possessing such amenities. A study by Headwaters
30 Economics (2007) summarizes much of the available research and reaches several conclusions.

31 • Retirees are attracted to areas which possess high levels of natural amenities.

32 • Entrepreneurs and employees who are not dependent on a particular workplace location ("cyber-
33   commuters") are attracted to areas that possess high levels of natural amenities.

34 • A positive relationship exists between environmental protection and in-migration, retaining
35   businesses and attracting new businesses.

36 There is no evidence to suggest that protection of public lands is detrimental to local economies.

### 3.17.10  Economic Benefits to Individuals

The term nonmarket values refers to the benefits individuals attribute to experiences of the environment or uses of natural and cultural resources that do not involve market transactions and therefore lack prices. Examples include the benefits received from wildlife viewing, hiking in a wilderness, or hunting for recreation. Estimates of nonmarket values supplement estimates of income generated from commodity uses to provide a more complete picture of the economic implications of proposed resource management decisions.

Although there are difficulties associated with measurement of nonmarket values, it is well accepted that the natural and cultural resources of an area and the open space the area may provide can have dollar values. For example, it is common for people to make financial donations to help protect old-growth forests, endangered species, or other sensitive resources.

In examining nonmarket values, economists often distinguish between "use value" and "non-use value." Use value refers to the benefits an individual derives from some direct experience or activity, such as climbing a spectacular peak, hunting, or wildlife viewing. In contrast, non-use value refers to the utility or psychological benefit some people derive from the existence of some environmental condition that may never be directly experienced: an unspoiled canyon or the continued presence of an endangered species.

Nonmarket use values have been studied extensively for a wide variety of recreation "goods." To help the reader understand the potential nonmarket value of some of the planning area's natural and cultural resources, examples of a range of typical nonmarket use values—consumer surplus values—for recreation activities are summarized in Table 3-54, adapted from a recent Oregon State University report (Rosenberger 2011). This report summarizes the findings from 353 studies (totaling 2,703 different value estimates) covering the United States Canada from 1958 to 2006, and separates the studies by region. These data indicate that visitors may be getting great value for their recreation activities in the study area, and may be more willing as a result to visit here and continue to contribute their spending to the local economy.

**Table 3-54.  Recreation Consumer Surplus Values per Person per Day by Activity and Region (2010 $)**

| Activity | Western United States | | | Total (United States and Canada) | | |
|---|---|---|---|---|---|---|
| | N | Mean | SE | N | Mean | SE |
| Backpacking | 2 | $39.85 | 15.1 | 38 | $13.33 | 2.2 |
| Bicycling | --- | --- | --- | 19 | $42.67 | 5.6 |
| Camping | 58 | $21.68 | 3.0 | 80 | $19.98 | 2.4 |
| Freshwater fishing | 302 | $81.81 | 4.4 | 809 | $61.21 | 2.2 |
| Saltwater fishing | 40 | $143.46 | 18.4 | 123 | $109.39 | 10.2 |
| Nonmotorized boating | 45 | $112.12 | 18.0 | 85 | $107.36 | 12.8 |
| Beach | 20 | $57.81 | 15.7 | 68 | $58.98 | 8.1 |
| Hiking | 70 | $55.54 | 7.5 | 86 | $60.63 | 7.9 |
| Big game hunting | 171 | $78.91 | 5.0 | 459 | $69.69 | 2.8 |
| Small game hunting | 34 | $72.94 | 14.8 | 70 | $52.51 | 8.3 |
| Waterfowl hunting | 31 | $58.10 | 10.4 | 130 | $48.88 | 4.0 |

| Activity | Western United States | | | Total (United States and Canada) | | |
|---|---|---|---|---|---|---|
| | N | Mean | SE | N | Mean | SE |
| Motorized boating | 20 | $48.55 | 20.3 | 75 | $40.27 | 6.7 |
| Mountain biking | 15 | $180.67 | 36.2 | 16 | $172.95 | 34.7 |
| Off-road vehicle | 6 | $42.02 | 5.7 | 13 | $35.64 | 4.0 |
| Picnicking | 8 | $19.06 | 1.9 | 19 | $20.70 | 4.1 |
| Rock climbing | 6 | $34.63 | 4.0 | 14 | $60.52 | 18.5 |
| Sightseeing | 12 | $44.28 | 11.9 | 22 | $45.94 | 9.8 |
| Swimming | 8 | $28.88 | 7.2 | 14 | $26.24 | 4.7 |
| Wildlife viewing | 91 | $63.99 | 6.3 | 324 | $48.72 | 2.8 |
| General recreation | 83 | $31.97 | 4.2 | 146 | $47.73 | 5.5 |
| Other recreation | 64 | $33.25 | 6.5 | 93 | $34.51 | 4.9 |
| Total | 1,086 | $69.34 | 2.3 | 2,703 | $59.60 | 1.3 |

N = number of estimates on an activity reported across the literature

Mean = mean consumer surplus per visitor-day for that activity in 2010 dollars

SE = standard error of the mean, with larger values relative to the mean indicating larger response variability

Source: Rosenberger (2011).

By applying the range of values in Table 3-54 to recreational usage figures (visitor days), or a range from specific individual studies that are most comparable to the planning area, an estimate of the recreation-related nonmarket use value, the consumer surplus, can be derived for the planning area. The resulting figure represents the total nonmarket use value recreationists derive from these activities, or alternatively, can be seen as the total additional amount recreationists would be willing to pay for the related recreation activities if a fee for participation were required.

With respect to non-use values, economists differentiate various types, including option values and existence values. Option value represents the benefits from having natural or cultural resources available for future use, whereas existence value reflects the benefits derived from knowing these resources simply exist. Evidence for the existence of these non-use values is ample. Local, state, and national taxpayers support a large variety of conservation and protection programs (e.g., NPS, state parks, local parks and parkways, open space initiatives, etc.) through their tax dollars—programs that are very popular but support many resources that many taxpayers will never visit. A large number of non-profits are devoted to a wide variety of conservation and wildlife-related causes; many if not most donors to these groups derive no direct benefit from their contributions. Giving USA reported charitable contributions by individuals, foundations, and corporations totaled $373.25 billion in 2015, of which $10.68 billion went to the "environment/animals" sector (Giving USA 2016). Examples of individual organizations with substantial contributions include the World Wildlife Fund with over $305 million in contributions from all sources in 2016 (World Wildlife Fund 2016). The Nature Conservancy, with over 1 million members, primarily in the United States, received over $578 million in contributions (The Nature Conservancy 2016). Although this generalized evidence of non-use values is clear, estimating non-use values for specific resources is difficult and often controversial. BLM guidance recommends that use values be emphasized rather than non-use values (BLM 2010c).

### 3.17.11    Economic Benefits from Ecosystem Services

Nonmarket values of open space and well-managed natural resources also include a broad range of human benefits resulting from healthy ecosystem conditions and functions. These benefits include potable water from groundwater recharge, flood control from intact wetlands, and carbon sequestration from healthy forests and certain agricultural lands. These human benefits from ecosystems are known as "ecosystem services" (Ruhl et al. 2007).

The value of open space as a natural system is receiving increased world-wide attention. Both private firms and governmental entities are discovering that it can be less costly to protect these kinds of resources than to correct damage that may result from not considering these resources. A commonly cited example is the value of protecting municipal watersheds, which may be less costly than treating polluted water sources.

1 **3.18 HEALTH AND SAFETY**

2 The analysis area for health and safety is the planning area. The analysis area was selected because it
3 represents the area in which health and safety may be affected by activities on BLM-administered land.

4 A management priority for the BLM is ensuring health and human safety on the public lands it
5 administers. The BLM's goals are to effectively manage safety hazards and hazardous materials, protect
6 the health and safety of public land users, protect the natural and environmental resources, minimize
7 future hazardous risks including costs and liabilities, and mitigate physical hazards in compliance with all
8 applicable laws, regulations, and policies. The BLM follows its national, state, and local contingency
9 plans as they apply to emergency responses. These plans are also consistent with federal and state laws
10 and regulations.

11 The planning area is located in a remote area with little industrial activity and no current production of oil
12 and gas. The closest community is Green River, Utah, north of the planning area. No residential dwellings
13 are located in the planning area, and no occupied permanent structures exist on BLM-administered lands
14 within the planning area. Temporary, secondary living quarters (i.e., trailers) exist in association with
15 livestock grazing operations in the planning area. The Green River Municipal Airport is located on private
16 land within the planning area.

17 Most of the roads in the planning area are unpaved and provide access to resources such as grazing
18 allotments, range improvements, and recreational opportunities on federal lands. Interstate 70 crosses the
19 northern portion of the planning area, and State Route 24 runs along the western border. Most of the
20 county roads within the planning area are unmaintained or only occasionally maintained (e.g., bladed
21 once or twice per year). Roads in the planning area are used for recreation such as OHV use and scenic
22 driving or are used to access national parks and sites for camping, climbing, hiking, canyoneering, and
23 cultural and paleontological resource viewing.

24 Worker safety for oil and gas development on BLM-administered public land is regulated under the
25 Occupational Safety and Health Act of 1970, as amended (29 USC 651 et seq.). This act requires
26 employers and operators to provide a safe and healthy workplace for employees and requires the BLM to
27 track and monitor reportable incidents of accidents and injury.

28 **3.18.1 Hazardous Materials**

29 The planning area currently has no production of oil and gas. There are no known hazardous materials in
30 the planning area.

31 The EPA and federal, state, and local governments have numerous laws and policies designed to protect
32 the public. Two federal laws are described here:

33 The Resource Conservation and Recovery Act (RCRA), passed in 1976, establishes a comprehensive
34 program for managing hazardous wastes from the time they are produced until their disposal. EPA
35 regulations define solid wastes as any "discarded materials," with a list of exclusions. Solid waste does
36 not refer to a waste's physical state; it can include solid, liquid, or contained gaseous material that is being
37 discarded. A "hazardous waste" is a solid waste that is listed by the EPA as a hazardous waste or exhibits
38 any of the characteristics of hazardous wastes (ignitability, corrosivity, reactivity, or toxicity), except for
39 those wastes listed as exempt. On July 6, 1988, the EPA determined that wastes from oil and gas
40 exploration, development, and production would not be regulated as hazardous wastes under RCRA. A
41 rule of thumb was developed to determine whether wastes from exploration, development, and production
42 are likely to be considered exempt or non-exempt from RCRA regulations. If the waste came from
43 downhole or if the waste was generated by contact with the oil and gas production stream during removal
44 of produced water or other contaminants, it is likely to be considered exempt from RCRA by the EPA.

1  Typical wastes associated with the oil and gas production include trash, sanitary wastes, produced water,
2  and produced hydrocarbons. Based on the rule of thumb, these are generally exempt from RCRA
3  regulations.

4  The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), enacted in
5  1980, addresses the release (e.g., spilling, leaking, dumping, or accumulation) or threat of release of
6  hazardous substances into the environment. Although many oil and gas constituent wastes are exempt from
7  RCRA hazardous waste regulations, certain contaminants are still subject to regulations as hazardous
8  substances under CERCLA. The UDEQ administers hazardous waste regulations for oil and gas activities in
9  Utah.

10  The EPA hazardous substances reportable quantities list and the Emergency Planning and Community
11  Right-to-Know Act (EPCRA) list in 40 CFR 302–312 (EPA 2010) provides reportable quantities for
12  hazardous chemicals. Storage of hazardous chemicals at quantities greater than the reportable quantities
13  must be reported to the EPA, as required by the EPCRA regulations. Any release of a hazardous
14  substance above the specified reportable quantity for that hazardous substance must be reported to the
15  EPA.

16

# CHAPTER 4—ENVIRONMENTAL CONSEQUENCES

## 4.1 INTRODUCTION

The purpose of this chapter is to analyze and disclose the potential effects of the federal action on the human environment. The Council on Environmental Quality (CEQ) regulations for implementing the National Environmental Policy Act of 1969 (NEPA) states that the "human environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment (40 Code of Federal Regulations [CFR] 1508.14). The federal action is the Bureau of Land Management's (BLM) selection of a master leasing plan (MLP) and possible land use plan amendments on which future land use actions will be based.

This chapter objectively evaluates the potential environmental impacts of implementing each management alternative described in Chapter 2. Chapter 3 describes the existing conditions of the resources and resource uses that would be affected by the management alternatives. The organization of this chapter parallels that of Chapter 3, in that the resource programs are presented in the same order. Because resources and resource uses are often interrelated, one section may refer to another.

### 4.1.1 Types of Impacts

Throughout this chapter, the terms *impact* and *effect* are used interchangeably. Impacts can be direct, indirect, or cumulative. Impacts may be positive (beneficial) or negative (adverse). The analysis of impacts compares the types and intensity of impacts among the alternatives. In some cases, adverse impacts that occur to resource values or uses under a particular alternative are of a lower intensity as compared to other alternatives. In these cases, the reduction of an impact is considered a positive effect on the affected resource values or uses, as it compares to other alternatives. Table 4-1 provides an overview of the general types of impacts discussed in this chapter.

**Table 4-1. Types of Impacts**

| Type | Description |
|---|---|
| Direct impacts | Direct impacts occur at the same time and place as the action responsible for the impact. For example, removal of vegetative cover caused by facility construction would be considered a direct impact to vegetation resources. |
| Indirect impacts | Indirect impacts are temporally and spatially removed from the action responsible for the impact, but are related to the action through a process of cause and effect. For example, removal of vegetative cover caused by facility construction that consequently results in increased surface runoff and sedimentation of nearby streams would be considered an indirect impact to water resources. |
| | Indirect impacts may reach beyond the natural and physical environment (i.e., environmental impact) to include growth-inducing effects and other effects related to induced changes to resource uses (i.e., non-environmental impact). |
| Cumulative impacts | Cumulative impacts result from the incremental impact of an action when added to other past, present, and reasonably foreseeable actions, regardless of which agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions that take place over time. |

## 4.1.2    Methods of Analysis

The BLM manages public lands in accordance with the Federal Land Policy and Management Act of 1976 (FLPMA) and other applicable laws. The FLPMA requires the BLM to manage public lands and resources according to the principles of multiple use and sustained yield, including recognizing the nation's needs for domestic sources of minerals, food, timber, and fiber. To ensure that the BLM meets its mandate of multiple use in land management actions, the impacts of the alternatives on resources and resource uses are identified and assessed as part of the planning process.

The analysis of the alternatives in this environmental assessment (EA) focuses on identifying the types of impacts anticipated to occur and estimating their potential intensity. The analysis is organized by resource program and discloses the potential impacts to each resource program from implementing each of the proposed alternatives. The impact analysis for Alternative A (No Action) was prepared first to serve as the baseline for alternative comparison. It is important to note that management decisions for each resource or resource use directly or indirectly relate to each other; therefore, impacts to one particular resource program may also apply to other programs. It is recommended that the reader review all impact analyses to attain a comprehensive description of the impacts to the resource or resource use in question.

Potential impacts to certain land use activities can be compared spatially among the alternatives by using geographic information system (GIS) data. The locations of resources and management thereof are shown on Maps 2-1 through 2-15. These maps should be reviewed in conjunction with the impact analyses.

Acreage calculations used in this analysis are approximate values for alternative comparison and analytic purposes only and do not reflect exact measurements of on-the-ground resources and actions. These acreage values were calculated using Esri ArcGIS Desktop 10.4.1 software. The projection of GIS data that was analyzed to provide the acreage calculations is Universal Transverse Mercator (UTM) zone 12 north, based on the North American Datum of 1983 (NAD83).

## 4.1.3    Assumptions

Assumptions for analysis are made to assist in determining the potential environmental, social, and economic impacts of the alternatives (Chapter 2) on the affected environment (Chapter 3). They are based on expected trends (e.g., population growth or decline within and adjacent to the planning area), expected demands (e.g., increases in certain kinds of recreational use), and the likelihood of resource development (e.g., the reasonably foreseeable development [RFD] scenario for oil and gas). Assumptions are for analysis purposes only. They are presumed true for the purpose of equitably comparing the alternatives; do not constrain or define management; and are based on observations, historical trends, and professional judgment. Assumptions are generally made for the expected life of the San Rafael Desert master leasing plan (MLP), unless otherwise stated. General assumptions applicable to all resources and resource uses are described below. Resource-specific assumptions are described under each resource program in the sections that follow.

The anticipated level of oil and gas development under each alternative is an important assumption used in the preparation of the analysis for each resource considered in this section. The BLM prepared an RFD scenario (see Appendix A) to project a baseline scenario of oil and gas exploration, development, production, and reclamation activity in the planning area during the next 15 years. The RFD was used to predict the number of oil and gas wells and associated surface disturbance from oil and gas development on BLM-administered public lands for each alternative. To complete these estimates, the total number of wells, surface disturbance, and disturbance associated with geophysical exploration as identified in the RFD was multiplied by the percentage of BLM-administered lands open for oil and gas leasing subject to standard terms and conditions, or open to leasing subject to CSU/TL stipulations for each alternative. Lands open to leasing subject to an NSO stipulation or as closed to leasing were not considered open. Actual surface disturbance under each alternative could be higher or lower than these estimates, and these calculations do not provide a limit on oil and gas activity or surface disturbance for any alternative.

1  Additionally, the calculations do not consider factors such as the ability to access oil and gas resources in
2  areas managed with NSO stipulations from adjacent open lands, or from adjacent private or state lands, or
3  the possibility of some CSU stipulations limiting the density of oil and gas development in areas open to
4  leasing. Based on this analysis, Table 4-2 lists the projected oil and gas development and associated
5  surface disturbance under each alternative on BLM-administered public lands in the planning area over
6  the next 15 years.

7  **Table 4-2.  Projected Oil and Gas Development and Surface Disturbance on Bureau of Land**
8  **Management–Administered Public Lands by Alternative (over the next 15 years)**

| Action | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Number of wells | 28 | 7 | 27 | 23 |
| Gross surface disturbance from oil and gas wells (acres disturbed) | 541 | 127 | 517 | 440 |
| Net surface disturbance from oil and gas wells after reclamation (acres disturbed) | 86 | 20 | 82 | 70 |
| Gross geophysical surface disturbance (acres disturbed) | 305 | 72 | 292 | 248 |
| Net geophysical surface disturbance after reclamation (acres disturbed) | 61 | 14 | 58 | 50 |

9  In addition to the assumptions related to the RFD, the following general assumptions were used in the
10 environmental effects analysis:

11 • The decisions proposed in the alternatives apply to public lands and areas that require federal
12   permitting or authorization. However, cumulative impact analyses also consider decisions made
13   for resources managed by other entities or individuals.

14 • The planning criteria described in Chapter 1 apply to all alternatives.

15 • The alternatives would be implemented as described in Chapter 2 and associated appendices.

16 • Implementation actions would comply with valid existing rights and all federal laws, regulations,
17   and policies.

18 • Authorized existing leases would be subject to the specific lease stipulations that were applied
19   under previous land use plans and identified in the lease at the time of issuance. However, the
20   resource protection measures identified in the MLP/EA would also apply to the areas currently
21   under lease where they do not conflict with the rights granted to the holder of the lease. The
22   federal government retains certain rights when issuing an oil and gas lease. Although the BLM
23   may not unilaterally add a new stipulation to an existing lease that it has already issued, the BLM
24   can subject development of existing leases to reasonable conditions, as necessary, through the
25   application of conditions of approval at the time of permitting.

26 • Exceptions to mineral leasing stipulations are found in Appendix B. Those exceptions, which
27   affect analytic comparisons, are specifically addressed in this chapter.

28 • Reference in the MLP/EA to "mineral" leasing or development applies to oil and gas. However,
29   reference to the Three Rivers mineral withdrawal refers to locatable minerals.

30 • Sufficient funding and personnel would be available to implement the MLP/EA.

- The temporal extent of direct and indirect impacts to resources associated with mineral development would be generally 15 to 20 years in shrub communities and 20 to 25 years in desert communities from the cessation of operations when reclamation is complete and impacts are fully mitigated.

- Worst-case scenario situations are not analyzed, although it is acknowledged that these unlikely events could occur.

- Best management practices (BMPs) are measures applied on a site-specific basis to reduce or eliminate adverse impacts. For any proposed oil and gas activities in the planning area, appropriate BMPs would be selected on a case-by-case basis to meet the site-specific requirements of the project and local environment from the list of BMPs listed in Appendix C or Appendix E, depending on the alternative selected.

- Oil and gas operators would be required to conform to the BLM's *Surface Operating Standards and Guidelines for Oil and Gas Development - The Gold Book* (BLM 2007b).

- Precise, quantitative estimates of impacts generally are not possible because the exact locations of future actions are unknown.

## 4.1.4   Availability of Data and Incomplete Information

The best available data were used in the preparation of the analysis contained in the MLP/EA. However, certain information is unavailable or requires site-specific information to analyze. Because of a lack of quantitative data or specific oil and gas leasing or development proposals, some impacts can be discussed only in qualitative terms. Subsequent project-level NEPA documents will provide the opportunity to collect site-specific data and analyze these data in quantitative terms.

## 4.2   AIR QUALITY

This section presents potential impacts to air quality from implementation of the management actions presented in Chapter 2. Existing conditions for air quality in the analysis area are described in Chapter 3.

### 4.2.1   Assumptions

- All federal and state air quality requirements would be met.

- The quantitative analysis includes only emissions from oil and natural gas well development on BLM-administered public lands. Activities related to other resources and uses, such as recreation, lands and realty actions, prescribed burning, vegetation management, and transportation, are assumed to be minor sources of emissions (or do not have well-defined emission rates and levels) and therefore were not quantified.

- BMPs would be followed for all soil- and surface-disturbing activities related to oil and gas leasing and development.

- Changes in air quality from pollution could impair scenic quality by obscuring distant views; however, the Clean Air Act sets limits on the allowable degradation of visibility in Class I areas (e.g., Canyonlands National Park). Dust or haze that originates from the planning area cannot exceed the allowable prevention of significant deterioration scenic air quality standards for air pollutants in Canyonlands National Park.

- The *Moab Master Leasing Plan and Draft Resource Management Plan Amendments/Draft Environmental Impact Statement for the Moab and Monticello Field Offices* (Moab MLP) (BLM 2015) contains a detailed analysis of emissions, pollutants, and impacts to air quality from

proposed oil and gas development in a 785,567-acre planning area. Based on the proximity of the Moab MLP planning area to the San Rafael MLP/EA planning area (the Green River forms part of the west boundary of the Moab MLP planning area and part of the east boundary of the San Rafael MLP/EA planning area), the similarity of the oil and gas fields beneath each planning area, and the similarity of the proposed types of development, the Moab MLP air analysis is used in this section to estimate certain impacts from oil and gas development.

- Generic emissions estimates and profiles are used to estimate nitrogen oxides ($NO_X$), inhalable particles (generally 10 micrometers in diameter and smaller [$PM_{10}$]) and fine inhalable particles (generally 2.5 micrometers and smaller [$PM_{2.5}$]), sulfur dioxide ($SO_2$), volatile organic compound (VOC), and hazardous air pollutant (HAP) emissions for a variety of oil and gas activities and equipment (see Section 4.2.2).

## 4.2.2    Oil and Gas Development Emissions Estimates

Emissions estimates for oil and gas development in the planning area were calculated using the *Oil Template from the Emissions Inventory Toolkit* developed for the BLM by URS Corporation (URS 2012). The template calculates emissions of criteria pollutants ($NO_X$, $PM_{2.5}$, $PM_{10}$, and $SO_2$), VOCs, HAPs, and direct greenhouse gases (GHGs) (carbon dioxide [$CO_2$], methane [$CH_4$], and nitrous oxide [$N_2O$]) based on the level of production and number of wells drilled. GHGs are discussed in Section 4.3. Carbon monoxide (CO) was not included in this emissions analysis because there is very little potential for emissions of this pollutant to cause or contribute to any recognizable air quality issue; PM and ozone ($O_3$) (and its $NO_X$ and VOC precursor gases) are the primary pollutants of concern in the analysis area, and both Emery and Wayne Counties are currently in attainment with the CO National Ambient Air Quality Standards (NAAQS). A summary of pollutant emissions from projected oil and gas development in the San Rafael MLP/EA planning area is shown in Table 4-3. The table discloses estimated annual emissions from construction, operations, maintenance, and reclamation based on the drilling of two wells per year for 15 years (for a total of 30 wells) (see Appendix A). This drilling assumption comes from a reasonably foreseeable development scenario (RFD) for oil and gas in the planning area developed by the BLM in September 2016. The RFD projects the level of oil and gas activity that can reasonably be expected to occur in the planning area over the next 15 years. RFD projections are based on local geology, current and historical trends in oil and gas activity, and forecasts of crude oil and natural gas markets (see Appendix A).

**Table 4-3. Emissions from Projected Oil and Gas Development in the Planning Area**

| Planning Area Oil and Gas Development | Total Annual Emissions (tons per year) | | | | | |
|---|---|---|---|---|---|---|
| | **$NO_x$** | **$PM_{10}$** | **$PM_{2.5}$** | **$SO_2$** | **VOCs** | **HAPs** |
| Construction | 2.8 | 47.1 | 6.4 | 0.02 | 5.4 | 0.2 |
| Operations | 6.9 | 336.2 | 33.8 | 0.03 | 5,570.0 | 131.6 |
| Maintenance | 3.8 | 117.2 | 11.8 | 0.08 | 1.5 | 0.2 |
| Reclamation | 0.6 | 0.7 | 0.1 | 0.02 | 0.05 | 0.01 |
| **Total Annual Emissions** | **14.0** | **501.1** | **52.2** | **0.2** | **5,576.9** | **132.0** |

Note: Numbers may not add up due to rounding.

The 2014 annual emissions inventories for Emery and Wayne Counties are shown in Table 3-3, Chapter 3. Estimated $NO_x$ emissions from oil and gas development in the planning area would represent a 0.1% increase to the total 2014 Emery County $NO_x$ emissions and a 4.3% increase to the total 2014 Wayne County $NO_x$ emissions. Estimated $PM_{10}$ emissions would represent a 9.7% increase to the total 2014 Emery County $PM_{10}$ emissions and a 42.4% increase to the total 2014 Wayne County $PM_{10}$ emissions. Estimated $PM_{2.5}$ emissions would represent a 4.2% increase to the total 2014 Emery County $PM_{2.5}$ emissions and a 31.5% increase to the total 2014 Wayne County $PM_{2.5}$ emissions. Estimated $SO_2$ emissions would represent a 0.003% increase to the total 2014 Emery County $SO_2$ emissions and a 10.5% increase to the total 2014 Wayne County $SO_2$ emissions. Estimated VOC emissions would represent a 15.5% increase to the total 2014 Emery County VOC emissions and a 25.1% increase to the total 2014 Wayne County VOC emissions. These calculations are conservative in that they assume that all emissions would occur in each of the counties; this is essentially double counting project emissions. Emissions would actually be split between the two counties, and the increases to each county's emissions would be smaller. In addition, all oil and gas development would not be completed in 1 year but would be spaced over 15 years.

Based on these data and the current NAAQS attainment status of both counties (see Section 3.2.2.1 and Tables 3-2 and 3-3), the projected emissions from oil and gas development shown in Table 4-3 would not contribute to exceedances of the NAAQS.

### 4.2.3    Moab MLP Air Quality Analysis

#### 4.2.3.1    Far-Field Dispersion Modeling Analysis

The Moab MLP far-field modeling analysis examined multiple source impacts to NAAQS and air quality–related values (AQRVs) in the planning area using the CALMET/CALPUFF dispersion modeling system. Three years of meteorological datasets were used to evaluate year-to-year variability and how variability impacts modeled concentrations.

The analysis modeled for three emissions scenarios, each assuming the drilling of 232 wells (BLM 2015):

- High scenario: no aggregation of wells on pads, 100% of wells go into production (232 wells), 50% dust control, more unpaved roads

- Medium scenario: no aggregation of wells on pads, 60% of wells go into production (140 wells), 50% dust control, fewer unpaved roads

- Low scenario: aggregation of four wells per one pad, 60% of wells go into production (140 wells), 70% dust control, smallest amount of unpaved roads

The projected oil and gas development in the planning area is substantially lower than all three Moab MLP scenarios for oil and gas development. Alternative A is projected to have 17 producing wells, Alternative B is projected to have four producing wells, Alternative C is projected to have 16 producing wells, and Alternative D is projected to have 14 producing wells (these projections assume a 60% success rate for all wells drilled under all alternatives). Alternative A's 17 producing wells in the planning area comprise 7.3% of the wells in the Moab MLP's high scenario and 12.1% of the wells in the low scenario. Based on these percentages, the use of the Moab MLP's modeling results for this analysis is conservative.

### NAAQS

Maximum modeled concentrations at Arches and Canyonlands National Parks showed no exceedances of the NAAQS for any criteria pollutant for any of the modeled scenarios (BLM 2015). Based on these modeling results, no NAAQS exceedances are expected from planning area oil and gas development for any of the alternatives.

**Visibility**

The Moab MLP calculated visibility impacts from potential 24-hour primary $PM_{10}$, secondary sulfate and nitrate PM, and elemental carbon concentrations in Arches and Canyonlands National Parks. Results were compared to natural background conditions as recommended in the *Federal Land Managers' Air Quality Related Values Group (FLAG) Phase I Report – Revised 2010* (FLAG 2010). Both the BLM 10% change in extinction (1.0 deciview [dv]) "just noticeable change" threshold and the National Park Service 5% change in extinction (0.5 dv) "half a noticeable change" adverse impacts threshold were used to assess the significance of potential impacts (BLM 2015).

Visibility impacts ranged from greater than 0.5 dv on 159 days at Canyonlands National Park during the 2008 meteorological year for the high emissions scenario, to no visibility impacts greater than 1.0 dv at any park for any meteorological year under the low emissions scenario. Under the low emissions scenario, visibility was impaired only in the 2008 meteorological year in Canyonlands National Park, where there were 22 days exceeding 0.5 dv (no days exceeded 1.0 dv) (BLM 2015). $PM_{10}$, primarily road dust from truck traffic on unpaved roads, was the main pollutant of concern under both the high and medium emissions scenarios. $NO_x$ played a greater role in visibility impacts in the low emissions scenario. The specific meteorological year used in the analysis also influenced modeled impacts. Meteorology in 2008 had substantially greater levels of impacts compared to the previous 2 years of data, which indicates sensitivity to meteorological variability. Because of the large role particulates play, adverse visibility impacts can most likely be tied to drier, hotter, and/or windier conditions (BLM 2015).

As discussed in Section 3.2.2.2 and shown in Table 3-6, visibility for Canyonlands National Park from 2006 to 2015 indicates that there is no statistically significant trend on the 20% of clearest days. Visibility improved on the 20% of haziest days during this time period. Overall, visibility shows impairment based on comparisons with the natural condition haze index. The NPS indicates that visibility at Canyonlands National Park warrants moderate concern.

Because the maximum projected producing wells in Alternative A comprise 12.1% of the producing wells in the low scenario in the Moab MLP, visibility impacts are expected to be below the 1.0-dv threshold under all four alternatives. Although it is possible that visibility impacts from oil and gas development in the planning area could exceed the 0.5-dv threshold on certain days in years with dry, hot, and/or windy conditions, it is considered unlikely based on the low number of wells for all alternatives. The Moab MLP notes that visibility impacts in the area appear to be especially sensitive to emissions of $PM_{10}$ (e.g., road dust), and to a lesser extent elemental carbon (e.g., diesel soot) and $NO_x$. The proximity of emission sources, particularly PM sources, plays a large role in the magnitude and frequency of modeled adverse visibility impacts to the AQRVs of the national parks (BLM 2015).

**Deposition**

All modeled values of sulfur and nitrogen deposition were near or below the deposition analysis thresholds (DATs) of 0.005 kilogram per hectare per year for total nitrogen and total sulfur for all of the modeled scenarios, with the exception of the high and medium emissions scenarios for nitrogen deposition in Arches and Canyonlands National Parks for the 2008 meteorological year (BLM 2015). Under the low emissions scenario, all modeled values were below the DAT for both total nitrogen and total sulfur, with the exception of the 2008 value for nitrogen deposition in Canyonlands National Park (0.00857 kilogram per hectare per year) (BLM 2015). The DATs are NPS screening level values for the additional modeled amount of sulfur and nitrogen deposition within federal areas from new or modified sources (NPS 2010b).

As discussed in Section 3.2.2.2 and shown in Table 3-7, wet deposition data for Canyonlands National Park from 2009 to 2015 indicate that there is no statistically significant trend for sulfate in precipitation. The trend for nitrate in precipitation is improving during this time period. However, NPS indicates that wet nitrogen deposition warrants significant concern at Canyonlands National Park based on the highly

1  sensitive park ecosystem. Dry deposition of nitrogen and sulfur has been relatively unchanged or slightly
2  decreasing in Canyonlands National Park from 2009 to 2014; however, it is not known if this trend is
3  statistically significant.

4  Because the maximum projected producing wells in Alternative A comprise 12.1% of the producing wells
5  in the low scenario in the Moab MLP, total sulfur and total nitrogen deposition from oil and gas
6  development in the planning area are not expected to exceed the DATs.

### 4.2.3.2    Near-Field Dispersion Modeling Analysis

8   Near-field modeling evaluates impacts of single or closely grouped sources to nearby receptors, typically
9   those less than 1 kilometer (0.6 mile) away. Specific characteristics of the source to be modeled (e.g.,
10  emission rates, stack heights) are required for this type of modeling. This type of data was not available
11  for the Moab MLP because of its programmatic nature (the Moab MLP is a planning document for oil,
12  gas, and potash leasing rather than a specific analysis of one leasing project). Instead, the BLM evaluated
13  previous near-field modeling for specific projects in and near the Moab MLP planning area for relevance
14  to management decisions. The previous projects consisted of the Fidelity Cane Creek project (the addition
15  of nine exploratory wells to eight producing wells) and the Monument Buttes project (a proposal for
16  drilling 5,750 wells) (BLM 2015). Based on its large size, air quality impact data from the Monument
17  Buttes project are not applicable to the MLP/EA and are not included here.

18  For the Fidelity Cane Creek project, the Moab MLP indicated that predicted impacts to air quality in
19  Canyonlands and Arches National Parks from this project's emissions were "minimal and generally
20  below guideline criteria" (BLM 2015). Modeling results indicated no adverse effect on visibility from the
21  proposed project in Canyonlands and Arches National Parks. Predicted nitrogen deposition worst-case
22  project emissions were comparably low but slightly above the DAT. The deposition modeling represented
23  a short-term, worst-case prediction and was "not directly comparable to the long-term deposition impacts
24  reflected in the DAT" (BLM 2015). Additionally, deposition modeling used a simplified 1-year
25  meteorological dataset instead of a three-dimensional wind field-based dataset for 3 years, which would
26  likely show lower deposition rates than presented (BLM 2015).

27  Based on its size and location, the Fidelity Cane Creek project air quality modeling results would be
28  applicable to proposed oil and gas development in the planning area.

### 4.2.3.3    Ozone Analysis

30  The 2013 *Western Regional Air Partnership (WRAP) West-wide Jump-start Air Quality Modeling Study*
31  *(WestJumpAQMS)* was designed to provide regional technical analysis and support for $O_3$ and particulate
32  transport and attainment demonstrations across the West (WRAP 2014). The goals of the study included
33  incorporating all of the recent western modeling analyses into a single modeling database; performing a
34  comprehensive model performance evaluation in an open technical forum; performing a comprehensive
35  source apportionment analysis to evaluate local, regional, international, and natural source impacts on $O_3$
36  and $PM_{2.5}$ concentrations across the West; and developing a modeling platform to be used to conduct
37  regional air quality planning, National Environmental Policy Act (NEPA) analyses, and state
38  implementation plan analyses in the West.

39  The Moab MLP used the WestJumpAQMS modeling study to evaluate $O_3$ impacts from oil and gas
40  development in the Moab MLP planning area. Canyonlands National Park was chosen as a source
41  receptor to evaluate local and regional emission source impacts on $O_3$. Key points from this analysis
42  include the following (BLM 2015):

43  • A modeled highest $O_3$ day at Canyonlands National Park on May 10, 2008, showing large-scale
44     regional background data, indicated that almost 90% of modeled $O_3$ on that day was from outside
45     the region, with sources in Utah making up the next largest contribution at 3.4%. For comparison,

the Utah contribution was 29.7% on the modeled highest $O_3$ day that same year for Salt Lake City, a large metropolitan area, which reflects a much larger number of emission sources in Salt Lake City compared to the Moab MLP planning area.

- Meteorological conditions can play a dominant role in source contributions to monitored or modeled values. Predominant winds can transport $O_3$ from outside the Moab MLP planning area into the Moab MLP planning area.

- Based on source apportionment by state contribution data, sources in the Moab MLP planning area are unlikely to significantly contribute to modeled or monitored $O_3$ concentrations. However, they do contribute *incrementally* to both Moab MLP planning area and regional $O_3$ concentrations.

- The WestJumpAQMS source apportionment tool allows the user to specify source contributions by type (e.g., mobile source, fire, oil and gas). In a modeled Moab MLP planning area $O_3$ concentration of 70.0 parts per billion (ppb), 11.7 ppb or 16.7% are from regional sources, indicating that regional sources may play an important role in ozone levels for a particular area like the Moab MLP planning area. Oil and gas emissions account for less than 1% of the regional source category emissions. Mobile sources such as cars and trucks make up the largest single category, followed by natural sources and by point sources such as power plants. This is not an unusual source category breakdown for rural airsheds in the western United States.

- Emissions of $O_3$ precursor gases in the Moab MLP cumulative impact analysis area (which includes airsheds adjacent to the Moab MLP planning area) were found to contribute a relatively minor amount to modeled $O_3$ concentrations. The largest contributors of $O_3$ precursor gases were mobile sources, followed by point sources.

- The ratio of emissions in the Moab MLP planning area to total regional emissions is unlikely to change to a significant degree over the life of the Moab MLP planning period. Overall, oil, gas, and potash emissions may increase observed monitored values in the Moab MLP planning area, but the region will continue to be only slightly impacted by emissions in the Moab MLP planning area.

- Contributions from ozone-precursor-generating activities in the Moab MLP planning area will not be a determinant factor in $O_3$ concentrations approaching or exceeding the NAAQS.

- Reasonable controls to reduce the emissions of $O_3$ precursors from oil and gas activities should be required to reduce the relatively minor contribution that emission sources in the Moab MLP cumulative impact analysis area have on regional $O_3$ formation and transport.

As discussed in Section 3.2.2.1 and shown in Table 3-4, Canyonlands National Park $O_3$ monitoring data from 2009 to 2015 reflect a statistically significant improving trend. During this time period, there were no exceedances of the 2008 $O_3$ NAAQS and one exceedance of the 2015 $O_3$ NAAQS (in 2012). Based on this trend, the analysis and conclusions reached in the Moab MLP, and the lower level of development projected for the planning area (than that proposed in the Moab MLP), oil and gas development in the planning area is not expected to noticeably contribute to regional $O_3$ formation and transport. It could have a minor contribution to monitored $O_3$ concentrations in Canyonlands National Park. Because these concentrations are currently showing an improving trend, it is unlikely that the proposed oil and gas development would contribute to NAAQS exceedances in the park.

## 4.2.4    Impacts Common to All Alternatives

This section discusses air quality impacts that are common to all alternatives.

Criteria pollutant (including fugitive dust), HAP, and VOC emissions from project activities would have short-term adverse impacts to air quality in the analysis area and could temporarily reduce visibility or contribute to deposition in the local area. These impacts would vary with the stage of project activity (construction, operations, maintenance, or reclamation) and would end once reclamation is complete. Impacts are not anticipated at the regional level.

Attaching lease notices and stipulations to permitted activities, not allowing mineral leasing and other surface-disturbing activities, and using air quality BMPs would reduce impacts to air quality by limiting activities that increase air emissions, including fugitive dust.

Compliance with the NAAQS and with the Utah state implementation plan (Utah Air Quality Board 2006), along with a quantitative analysis of potential air quality impacts for project-specific developments, would help maintain air quality in the planning area.

An increase in fugitive dust from oil and gas production in the planning area could affect snowpacks. According to the BLM's *Colorado Plateau Rapid Ecoregional Assessment Report*, "one of the farthest reaching implications of wind-borne sediment is its effect on snowpack in downwind mountain ranges and ultimately, on water yield to the Colorado River and its tributaries" (BLM 2012g). Modeling has found that dust is reducing the flow on the Colorado River by 5%. In addition, early snowmelt from accumulated dust is greater than the early snowmelt predicted for temperature and precipitation changes caused by climate change. Areas near oil and gas wells are one of the factors that contribute to dust production (BLM 2012g). Fugitive dust impacts would vary by alternative. Based on the amount of estimated surface disturbance and air quality BMPs, Alternative A has the potential to create the most fugitive dust, followed by Alternatives C, D, and B.

Prohibiting or avoiding surface-disturbing activities during the migratory bird nesting season (April 15 through August 1) and restricting surface-disturbing activities near special status species' habitats and in pronghorn fawning season (May 15 through June 15) could reduce air emissions during these timeframes. However, these restrictions could compress air emissions into the remaining months (such as fall and winter).

## 4.2.5    Impacts from Alternative A (No Action)

Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to standard terms and conditions, approximately 19,083 acres would be open to oil and gas leasing subject to CSU and/or TL stipulations, approximately 33,627 acres would be open to oil and gas leasing subject to an no surface occupancy (NSO) stipulation, and approximately 220 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative A is estimated to consist of 28 wells. These wells would result in approximately 541 acres of surface disturbance, of which 86 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative A would be anticipated to result in 305 acres of surface disturbance, of which approximately 61 acres would be unreclaimed in 15 years. This is the largest amount of anticipated surface disturbance and developed wells under all four alternatives. Of the 28 developed wells, 17 are expected to become successful producing wells under Alternative A (see Appendix A).

No lease stipulations for air quality would be applied under Alternative A.

Under Alternative A, no BMPs would be applied specifically to protect air quality; however, BMPs requiring interim reclamation, the repair of eroded roads, final reclamation, the drilling multiple wells from a single well pad, and the use of common rights-of-way (ROWs) would help limit impacts to air quality.

Under Alternative A, several air quality lease notices would be attached to all issued leases. A condition of approval would be attached to all applications for permit to drill (APDs) requiring that new and replacement internal oil and gas field engines shall not emit more than 1 or 2 grams of $NO_x$ per

1  horsepower-hour, depending on the engine design. In addition, a list of air quality mitigation measures
2  would be applied to any development proposals on leases, including keeping all internal combustion
3  equipment in working order, using water or other dust suppressants at construction sites and along roads,
4  and equipping drill rigs with Tier II or better engines. Finally, BMPs would be required for any
5  development project, including the use of low-bleed or no-bleed pneumatic pump valves and tank
6  emission controls to +95% efficiency. The conditions of approval, mitigation measures, and BMPs in
7  these lease notices would reduce some impacts to air quality.

### 4.2.5.1    *Suspended and Protested Lease Decisions*

8
9  Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to
10 standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO
11 stipulations. If the leases were subsequently developed, the impacts to air quality from issuing the leases
12 subject to the terms and conditions contained within the Price and Richfield ROD/RMPs (BLM 2008a,
13 2008b) (Alternative A-2) would be the same as the impacts to air quality from managing them as open or
14 NSO described in this section. If the BLM were to rescind the suspensions on the suspended leases
15 (Alternative A-1) and the leases were subsequently developed, the impacts to air quality that would occur
16 in the leased areas would be the same as those described for areas managed as open to leasing subject to
17 standard terms and conditions. Under Alternative A-2, the suspended leases would be subject to the
18 conditions, including stipulations and BMPs, in the Richfield ROD/RMP (BLM 2008b). Because there
19 are no air quality stipulations or BMPs in the Richfield ROD/RMP, impacts to air quality from oil and gas
20 development in the suspended and protested lease areas would be the same as under Alternative A-1
21 where the leasing categories are the same. However, it is possible that Alternative A-2 stipulations for
22 other resources, such as the CSU and/or TL stipulation that surface-disturbing activities must meet visual
23 resource management (VRM) Class II objectives or the NSO stipulation for slopes greater than 40%,
24 could slightly reduce fugitive dust emissions when compared to Alternative A-1.

25 Under both Alternatives A-1 and A-2, if a lessee proposes to develop these leases (e.g., drill a well), the
26 BLM would evaluate the lessee's proposal in a site-specific environmental review. If during the site-
27 specific environmental review process the BLM determines that additional mitigation measures are
28 required to protect air quality, those mitigation measures would be included as conditions of approval to
29 future site-specific authorizations (e.g., emission control requirements).

## 4.2.6    Impacts from Alternative B

30
31 Under Alternative B, no acreage would be open to oil and gas leasing subject to standard terms and
32 conditions, approximately 98,164 acres would be open to oil and gas leasing subject to CSU and/or TL
33 stipulations, approximately 324,161 acres would be open to oil and gas leasing subject to an NSO
34 stipulation, and approximately 30,068 acres would be closed to oil and gas leasing. Reasonably
35 foreseeable development under Alternative B is estimated to consist of seven wells. These wells would
36 result in approximately 127 acres of surface disturbance, of which 20 acres would remain unreclaimed in
37 15 years. Geophysical survey operations under Alternative B would be anticipated to result in 72 acres of
38 surface disturbance, of which approximately 14 acres would be unreclaimed in 15 years. This is the
39 smallest amount of anticipated surface disturbance and developed wells under all four alternatives. Of the
40 seven developed wells, four are expected to become successful producing wells under Alternative B (see
41 Appendix A).

42 Alternative B would apply a CSU and/or TL stipulation to mitigate impacts to air quality requiring that all
43 new and replacement internal combustion gas field engines not emit more than 1 or 2 grams of $NO_x$ per
44 horsepower-hour, depending on the design-rated horsepower of the engine. Alternative B would also
45 apply a CSU and/or TL stipulation to mitigate impacts to regional ozone formation and AQRVs in nearby
46 national parks requiring 1) that drill rig engines meet Tier II or better standards as necessary based on air
47 quality conditions; 2) that stationary internal combustion engines meet a standard of 1 or 2 grams of $NO_x$

per horsepower-hour, depending on the design-rated horsepower of the engine; 3) the use of low-bleed or no-bleed pneumatic controllers; 4) the use of dehydrator VOC emission controls; and 5) the use of VOC emission controls. Alternative B would also apply an air quality CSU and/or TL stipulation requiring the use of a combustor or other best available technologies in the absence of a pipeline to capture gas associated with production from an oil well. Venting or open flaring of gases would be prohibited. To mitigate PM, Alternative B would apply a CSU stipulation requiring a fugitive dust control plan for oil and gas activities that disturb an area larger than 0.25 acre or that would result in substantial increases in truck traffic on unpaved or untreated surfaces. There would be no exceptions, modifications, or waivers to these stipulations.

Multiple BMPs would be applied under Alternative B for air quality and fugitive dust, including using dust suppressants, properly maintaining vehicles and construction equipment to minimize exhaust emissions, restricting vehicle speed, watering or chemically stabilizing unpaved roads, covering or treating loaded haul trucks to minimize loss of material, centralizing gas processing facilities, carpooling, using solar power to power well site equipment when possible, installing vapor recovery tanks on all oil and condensate tanks, and using controls to reduce elemental carbons and $NO_x$ from engines.

Under Alternative B, stipulations for other resources such as lands with wilderness characteristics (LWCs), recreation, soils, water resources, areas of critical environmental concern (ACECs), the Old Spanish National Historic Trail (OST), wild and scenic rivers, visual resources, and wildlife would also help limit impacts to air quality because the amount of surface disturbance would be reduced. For example, an NSO stipulation would be applied to visual resource inventory (VRI) and VRM Class II areas and to special recreation management areas (SRMAs), key observation points (KOPs), and recreation focus areas.

Alternative B would have the smallest impact to air quality among the four alternatives, based on the low amount of projected wells and surface disturbance (seven wells; 199 acres), the percentage of the planning area that would have an NSO stipulation or be closed to development (78.3%), and the CSU and/or TL stipulations and BMPs that would be implemented to control pollutant emissions.

### 4.2.6.1     *Suspended and Protested Lease Decisions*

Under Alternative B, the BLM would cancel all suspended leases, resolve the protests on the protested leases, and deny the leases. Air quality in the areas of suspended and protested leases would not be affected by oil and gas activities resulting from operators exploring for and developing oil and gas resources. However, air quality in the areas of suspended and protested leases could be affected by development in other parts of the planning area.

### 4.2.7     Impacts from Alternative C

Under Alternative C, 37,865 acres would be open to oil and gas leasing subject to standard terms and conditions, approximately 362,127 acres would be open to oil and gas leasing subject to CSU and/or TL stipulations, approximately 52,208 acres would be open to oil and gas leasing subject to an NSO stipulation, and approximately 192 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative C is estimated to consist of 27 wells. These wells would result in approximately 517 acres of surface disturbance, of which 82 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative C would be anticipated to result in 292 acres of surface disturbance, of which approximately 58 acres would be unreclaimed in 15 years. This is slightly less than the anticipated surface disturbance and developed wells under Alternative A, but more than the anticipated surface disturbance and developed wells under Alternatives B and D. Of the 27 developed wells, 16 are expected to become successful producing wells under Alternative C (see Appendix A).

Alternative C would apply a CSU and/or TL stipulation to mitigate impacts to regional $O_3$ formation and AQRVs in nearby national parks requiring 1) that drill rig engines meet Tier II or better standards as necessary based on air quality conditions; 2) that stationary internal combustion engines meet a standard of 1 or 2 grams $NO_x$ per horsepower-hour, depending on the design-rated horsepower of the engine; 3) the use of low-bleed or no-bleed pneumatic controllers; 4) the use of dehydrator VOC emission controls; and 5) the use of tank VOC emission controls. Alternative C would also apply an air quality CSU and/or TL stipulation requiring, where feasible, the use of a combustor or other best available technologies in the absence of a pipeline to capture gas associated with production from an oil well. Venting or open flaring of gases would be prohibited except in circumstances identified in existing rules. There would be no other exceptions, modifications, or waivers to these stipulations.

Alternative C would apply the same BMPs as Alternative B.

Under Alternative C, stipulations for other resources such as LWCs, natural areas, recreation, soils, water resources, ACECs, the OST, wild and scenic rivers, and wildlife would also help limit impacts to air quality because the amount of surface disturbance would be reduced. For example, an NSO stipulation would be applied to the Dirty Devil/French Springs LWC units, including Horseshoe Canyon South, and within 1 mile of the Horseshoe Canyon rim.

A condition of approval would be attached to all APDs under Alternative C requiring that new and replacement internal oil and gas field engines shall not emit more than 1 or 2 grams of $NO_x$ per horsepower-hour, depending on the engine design.

Impacts to air quality from Alternative C would be greater than under Alternatives B and D, but less than Alternative A, based on the amount of projected wells and surface disturbance (27 wells; 809 acres), the percentage of the planning area that would have an NSO stipulation or be closed to development (11.6%), and the CSU and/or TL stipulations and BMPs that would be implemented to control pollutant emissions.

### 4.2.7.1    *Suspended and Protested Lease Decisions*

Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to standard terms, 39,766 acres would be issued subject to CSU or TL stipulations, and 318 acres would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative C would be the same as the impacts to air quality described in this section from managing areas as open to leasing subject to standard terms and conditions, open to leasing subject to CSU or TL stipulations, or open to leasing subject to NSO stipulations.

### 4.2.8    Impacts from Alternative D

Under Alternative D, no acreage would be open to oil and gas leasing subject to standard terms and conditions, approximately 339,884 acres would be open to oil and gas leasing subject to CSU and/or TL stipulations, approximately 92,170 acres would be open to oil and gas leasing subject to an NSO stipulation, and approximately 20,339 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative D is estimated to consist of 23 wells. These wells would result in approximately 440 acres of surface disturbance, of which 70 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative D would be anticipated to result in 248 acres of surface disturbance, of which approximately 50 acres would be unreclaimed in 15 years. This is the less than the anticipated surface disturbance and developed wells under Alternatives A and C, but more than the anticipated surface disturbance and developed wells under Alternative B. Of the 23 developed wells, 14 are expected to become successful producing wells under Alternative D (see Appendix A).

Alternative D would apply the same CSU and/or TL stipulation to mitigate impacts to air quality as Alternative B, requiring that all new and replacement internal combustion gas field engines not emit more than 1 or 2 grams of $NO_x$ per horsepower-hour, depending on the design-rated horsepower of the engine. Alternative D would also apply a CSU and/or TL stipulation to mitigate impacts to regional $O_3$ formation and AQRVs in nearby national parks requiring 1) that drill rig engines meet Tier II or better standards as necessary based on air quality conditions; 2) that stationary internal combustion engines meet a standard of 1 or 2 grams of $NO_x$ per horsepower-hour, depending on the design-rated horsepower of the engine; 3) the use of low-bleed or no-bleed pneumatic controllers; 4) the use of dehydrator VOC emission controls; and 5) the use of tank VOC emission controls. Alternative D would also apply an air quality CSU and/or TL stipulation requiring the use of a combustor or other best available technologies in the absence of a pipeline to capture gas associated with production from an oil well. Evaluation of all reasonable and technically feasible gas capture technologies would be required as part of operator plan approvals. Venting or open flaring of gases would be prohibited, except in circumstances identified in existing rules. In the case of an exception, a visual screen would be required to minimize skyglow, glare, and adverse visual effects on night sky resources. To mitigate PM, Alternative D would apply a CSU stipulation requiring a fugitive dust control plan for oil and gas activities that disturb an area larger than 0.25 acre or that would result in substantial increases in truck traffic on unpaved or untreated surfaces.

Alternative D would apply the same BMPs as Alternative B.

Under Alternative D, stipulations for other resources such as LWCs, natural areas, recreation, soils, water resources, ACECs, the OST, and wildlife would also help limit impacts to air quality. For example, a CSU and/or TL stipulation would be applied to avoid areas with high wind erosion potential, and an NSO stipulation would be applied to the Tidwell Draw and Dry Lake Archaeological District ACECs under this alternative.

Impacts to air quality under Alternative D would be greater than under Alternative B, but less than Alternatives A and C, based on the amount of projected wells and surface disturbance (23 wells; 688 acres), the percentage of the planning area that would have an NSO stipulation or be closed to development (24.9%), and the CSU and/or TL stipulations and BMPs that would be implemented to control pollutant emissions

### 4.2.8.1    *Suspended and Protested Lease Decisions*

Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU or TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative D would be the same as the impacts to air quality from managing lands as open to leasing subject to CSU or TL stipulations, or open to leasing subject to NSO stipulations described in this section.

## 4.3   CLIMATE CHANGE

This section presents potential impacts to climate change from implementation of the management actions presented in Chapter 2. Existing conditions for climate change in the analysis area are described in Chapter 3.

### 4.3.1   Assumptions

- All federal and state air quality requirements would be met.

1  • The quantitative analysis includes only GHG emissions from oil and natural gas well
2      development on BLM-administered public lands. Activities related to other resources and uses,
3      such as recreation, lands and realty actions, prescribed burning, vegetation management, and
4      transportation, are assumed to be minor sources of GHG emissions or are not well-defined
5      concerning GHG emission rates and levels, and therefore GHG emissions from these activities
6      were not quantified.

7  • Generic emissions estimates and profiles were used to estimate GHG emissions for a variety of
8      oil and gas activities and equipment.

## 9  4.3.2  Oil and Gas Development GHG Emissions Estimates

10  *CEQ Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas*
11  *Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* (CEQ
12  2016:10) recommends that agencies "use the projected GHG emissions associated with proposed actions
13  as a proxy for assessing proposed actions' potential effects on climate change in NEPA analysis." In
14  addition, the CEQ recommends inclusion of a qualitative summary discussion of the impacts of GHG
15  emissions. Section 3.3 contains a qualitative summary discussion of general GHG emission impacts, and
16  this section provides estimated GHG emissions from the projected oil and gas development in the
17  planning area.

18  Direct GHG emissions estimates for oil and gas development in the planning area were calculated using
19  the Oil Template from the Emissions Inventory Toolkit developed for the BLM by URS Corporation
20  (URS 2012). The template calculates direct emissions of criteria pollutants ($NO_X$, $PM_{2.5}$, $PM_{10}$, $SO_2$),
21  VOCs, HAPs, and GHGs ($CO_2$, $CH_4$, and $N_2O$) based on the level of production and number of wells
22  drilled. Criteria pollutant, VOC, and HAP emissions are discussed in Section 4.2.2. A summary of direct
23  GHG emissions from projected oil and gas development in the planning area is shown in Table 4-4. The
24  table discloses estimated annual emissions from construction, operations, maintenance, and reclamation
25  based on the drilling of two wells per year for 15 years for a total of 30 wells (see Appendix A).

26  **Table 4-4. Direct GHG Emissions from Projected Oil and Gas Development in the Planning Area**

| Planning Area Oil and Gas Development | Total Annual GHG Emissions (tons per year) | | | |
|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$[*] |
| Construction | 4,664.1 | 18.6 | 0.1 | 4,611.4 |
| Operations | 4,353.4 | 1,638.7 | 0.1 | 35,216.3 |
| Maintenance | 520.2 | 0.004 | 0.03 | 480.3 |
| Reclamation | 76.2 | 0.001 | 0.001 | 69.5 |
| **Total annual emissions** | **9,613.9** | **1,657.3** | **0.3** | **40,377.6** |

27  *Total $CO_2e$ emissions are calculated using the global warming potential (GWP) of each gas. GWPs were developed to allow comparisons of
28  global warming impacts between different gases. The GWP is a measure of the total energy that a gas absorbs over a particular period of time
29  (usually 100 years) compared to $CO_2$. The larger the GWP, the more warming the gas causes. $CO_2e$ is calculated by multiplying the mass
30  emissions of the GHG by the GWP for the GHG. $CO_2e$ totals in this column are in metric tons.

31  Note: Numbers may not match due to rounding.

1  Indirect GHG emissions would also occur from the combustion of the oil and gas extracted from the
2  planning area (Table 4-5). Indirect GHG emissions are estimated based on the speculative annual oil and
3  gas production for 30 operating wells at build-out (year 15). This is a conservative estimate because
4  Alternative A is projected to have 17 producing wells, Alternative B is projected to have four producing
5  wells, Alternative C is projected to have 16 producing wells, and Alternative D is projected to have 14
6  producing wells (assuming a 60% success rate for all wells drilled). Indirect GHG emissions are
7  calculated only for $CO_2$ based on combustion of the product. For the purposes of the emissions estimates,
8  the BLM assumed that each oil well would produce an average of 550 barrels of oil per day and that each
9  natural gas well would produce an average of 238 million cubic feet per day.

10  **Table 4-5. Indirect GHG Emissions from Projected Oil and Gas Development in the Planning Area**

| Fuel Type | Annual Production | Annual $CO_2$ Emissions (tons per year) |
|---|---|---|
| Oil | 6,022,500 barrels per year | 2,589,675 |
| Natural gas | 2,606,100 million cubic feet per year | 142,598 |
| Total emissions | N/A | 2,732,273 |

11  Note: The indirect emissions factor for oil is 0.43 metric tons of $CO_2$ per barrel. The indirect emissions factor for natural gas is 0.054717 metric
12  tons of $CO_2$ per million cubic feet (EPA 2017c).

13  Because it is not possible to assign a "significance" value or impact to these numbers, the emissions
14  estimates themselves are presented as a proxy for impact. This is consistent with CEQ guidance (CEQ
15  2016).

16  ### 4.3.2.1    *Uncertainties of GHG Calculations*

17  Although estimates of potential GHG emissions associated with reasonably foreseeable oil and gas
18  development have been presented, there is significant uncertainty in these estimates because eventual
19  production volumes are unknown and because of the variability in flaring, construction, and
20  transportation.

21  There is also uncertainty with regard to the net effects of reasonably foreseeable oil and gas development
22  on climate; although BLM actions may contribute to the climate change phenomenon, the specific effects
23  of those actions on the global climate are speculative, given the current state of the science. Inconsistencies
24  in the results of scientific models designed to predict climate change on regional or local scales limit the
25  ability to quantify potential future impacts of decisions made at this level. Determining the significance of
26  any discrete amount of GHG emissions is beyond the limits of existing science at this time.

27  **End Uses**

28  The GHG emissions estimates provide a complete GHG lifecycle of a well from site inspection to
29  potential indirect emissions through combustion. Rough estimates were possible using publicly available
30  information and future production estimates for reasonably foreseeable development. With respect to
31  indirect $CO_2$ emissions estimates, it is a difficult to discern with certainty what end uses might be
32  reasonably foreseeable for the fuels extracted from a particular leasehold. For instance, end uses of fossil
33  fuels extracted from federal leases can include combustion of transportation fuels, combustion of fuel oils
34  for heating and electricity generation, production of asphalt and road oil, and production of the feedstocks
35  used to make chemicals, plastics, and synthetic materials. At this time, there is uncertainty with regard to
36  the actual development that may occur in the planning area.

It is important to note that the BLM does not exercise control over the specific end use of the oil and gas produced from any individual federal lease. The BLM has no authority to direct or regulate the end use of produced oil and/or gas. As a result, the BLM can only provide an estimate of potential GHG emissions using national approximations of where or how the end use may occur based on the variety of potential end uses for oil, condensate, and natural gas.

**Availability of Input Data**

As noted above, the CEQ recommends that agencies use projected GHG emissions as a proxy for assessing a proposed action's potential climate change impacts. Emissions estimates were made based on readily available data and reasonable assumptions about potential future development.

### 4.3.2.2    *Monetizing Costs and Benefits: Social Cost of Greenhouse Gases*

The 2016 CEQ guidance states that "NEPA does not require monetizing costs and benefits" and allows for agency discretion in including monetized assessment of the impacts of GHGs in NEPA documents (CEQ 2016). The BLM finds that including monetary estimates of the social cost of GHGs in its NEPA analysis for the proposed oil and gas development in the planning area would not be useful. There is no court case or existing guidance requiring the inclusion of the social cost of carbon in the NEPA context. Estimating the social cost of carbon is challenging because it is intended to model effects on the welfare of future generations at a global scale caused by additional carbon emissions occurring in the present. Although the Interagency Working Group on Social Cost of Carbon, convened by the U.S. Office of Management and Budget, has developed estimates of the social cost of $CO_2$, $CH_4$, and $NO_x$ emissions, the inclusion of meaningful monetary estimates of the social cost of carbon would not provide additional pertinent information to the decision maker in this case.

Given the global nature of climate change, estimating the social cost of carbon for an individual decision requires assessing the impact of the project on the global market for the commodity in question. While the BLM is able to estimate the GHG emissions associated with reasonably foreseeable oil and gas development, this EA does not estimate the net effect of this action on global GHG emissions or climate change. Depending on the global demand for oil and gas, the net effect of this project may be partially offset by changes in production in other locations. Accounting for this potential substitution effect is technically challenging.

### 4.3.2.3    *Possible Future Best Management Practices, Standard Operating Procedures, and/or Mitigation Measures*

The BLM holds regulatory jurisdiction over portions of natural gas and petroleum systems identified in the EPA's Inventory of U.S. Greenhouse Gas Emissions and Sinks (EPA 2016m). Exercise of this regulatory jurisdiction has led to the development of BMPs for application to oil and natural gas drilling and production to help ensure that energy development is conducted in an environmentally responsible manner. The BLM encourages industry to incorporate and implement these BMPs to reduce impacts to air quality and climate change by addressing emissions, surface disturbance, and dust from field production and operations. Typical BMPs include the following:

- Open burning of garbage or refuse would not occur at well sites or other facilities.

- Drill rigs would be equipped with Tier II or better diesel engines.

- Vent emissions from stock tanks and natural gas triethylene glycol (TEG) dehydrators would be controlled by routing the emissions to a flare or similar control device, which would reduce emissions by 95% or greater.

1  • All internal combustion equipment would be kept in good working order.

2  • Flare hydrocarbon gases at high temperatures in order to reduce emissions of incomplete
3  combustion through the use of multi-chamber combustors.

4  • Water dirt roads during periods of high use to reduce fugitive dust emissions.

5  • Co-locate wells and production facilities to reduce new surface disturbances.

6  • Use natural gas–fired or electric drill rig engines.

7  • Use selective catalytic reducers and low-sulfur fuel for diesel-fired drill rig engines.

8  • Adhere to the BLM's Notice to Lessees 4A concerning the venting and flaring of gas on federal
9  leases for natural gas emissions that cannot be economically recovered.

10  • Protect hydraulic fracturing sand from wind erosion.

11  • Implement directional drilling and horizontal completion technologies, where one well provides
12  access to petroleum resources that would normally require the drilling of several vertical
13  wellbores.

14  • Require that vapor recovery systems be maintained and functional in areas where petroleum
15  liquids are stored.

16  • Perform interim reclamation to reclaim areas of pads not required for production facilities and to
17  reduce the amount of dust from pads.

18  ### 4.3.3  Impacts Common to All Alternatives

19  Attaching lease notices and stipulations to permitted activities, not allowing mineral leasing, and the use
20  of air quality and climate change BMPs would reduce impacts to climate change by limiting activities that
21  increase GHG emissions.

22  Compliance with the NAAQS and the Utah State Implementation Plan, along with quantitative analysis of
23  potential air quality impacts for project-specific developments, would help maintain air quality in the
24  planning area and reduce climate change impacts.

25  The primary sources of GHG gas emissions from oil and gas development in the planning area would be
26  fossil fuel combustion (e.g., from vehicles driving to and from well sites and from engines that drive drill
27  rigs); fugitive methane that escapes from oil and gas wells, oil storage, and various types of processing
28  equipment; and the combustion of produced oil and gas.

29  Oil and gas development in the planning area will increase GHG emissions that contribute to climate
30  change impacts.

31  On the Colorado Plateau, climate change is expected to intensify the hydrologic cycle (resulting in more-
32  intense runoff), reduce streamflow, cause declines in native fish diversity, increase soil erosion, increase
33  non-native species populations, increase the frequency and intensity of fire, and shift vegetation
34  composition, diversity, and growth (BLM 2012g). Some of these impacts, such as increased soil erosion
35  and increased frequency and intensity of fire, could reduce air quality in the analysis area through fugitive
36  dust and other pollutant emissions, which could trigger additional federal protections for air quality.
37  However, the projected oil and gas development in the planning area would not necessarily be subject to
38  the full extent of these expected climate change impacts because of its relatively short project life.

### 4.3.4    Impacts from Alternative A (No Action)

Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to standard terms and conditions; approximately 19,083 acres would be open to oil and gas leasing subject to CSU/TL stipulations; approximately 33,627 acres would be open to oil and gas leasing subject to an NSO stipulation; and approximately 220 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative A is estimated to consist of 28 wells. Of the 28 developed wells, 17 would be expected to become successful producing wells under this alternative (see Appendix A). Alternative A would result in the greatest number of developed and producing wells of all four alternatives.

No lease stipulations for air quality or climate change would be applied under Alternative A. There are no BMPs under Alternative A that would be applied specifically to limit GHG emissions; however, BMPs that require centralizing production facilities, the drilling of multiple wells from a single well pad, and bioremediation of oil field wastes and spills could help limit GHG emissions. In addition, the BLM's Alternative A condition of approval for applications for permits to drill, which establishes emissions limitations on internal gas field engines, could reduce GHG emissions.

#### 4.3.4.1    Suspended and Protested Lease Decisions

Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to standard terms and conditions and 113 acres of protested leases would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts on climate change from issuing the leases subject to the terms and conditions contained within the Price and Richfield Field Offices' ROD/RMPs (Alternative A-2) would be the same as the impacts on climate change from managing them as open subject to standard terms and conditions or subject to NSO stipulations, as described in this section. If the BLM were to rescind the suspensions on the suspended leases (Alternative A-1) and the leases were subsequently developed, the impacts on climate change that would occur in the leased areas would be the same as those described for climate change in areas open to leasing subject to standard terms and conditions. Under Alternative A-2, the suspended leases would be subject to the conditions, including stipulations and BMPs, in the Richfield Field Office ROD/RMP. Because there are no climate change or air quality stipulations or BMPs in that ROD/RMP, impacts to climate change from oil and gas development in the suspended and protested lease areas would be the same as under Alternative A-1, where the leasing categories are the same.

Under both Alternatives A-1 and A-2, if a lessee proposes to develop these leases (e.g., drill a well), the BLM would evaluate the lessee's proposal in a site-specific environmental review. If during the site-specific environmental review process the BLM determines that additional mitigation measures are required to protect resources of concern, those mitigation measures would be included as conditions of approval to future site-specific authorizations (e.g., application of appropriate BMPs).

### 4.3.5    Impacts from Alternative B

Under Alternative B, no acreage would be open to oil and gas leasing subject to standard terms and conditions; approximately 98,164 acres would be open to oil and gas leasing subject to CSU/TL stipulations; approximately 324,161 acres would be open to oil and gas leasing subject to an NSO stipulation; and approximately 30,068 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative B is estimated to consist of seven wells. Of the seven developed wells, four would be expected to become successful producing wells under this alternative (see Appendix A). Alternative B would result in the fewest developed and producing wells under all four alternatives.

Although there are no stipulations under Alternative B specifically for climate change, the air quality stipulations for this alternative (see Section 4.2.6) would help reduce GHG emissions. There would be no exceptions, modifications, or waivers to these stipulations.

1  Multiple BMPs would be applied under Alternative B for greenhouse gases, including the proper
2  maintenance of vehicles and construction equipment to minimize exhaust emissions, vehicle speed
3  restrictions, use of telemetry and well automation to remotely monitor and control production, use of
4  centrally stored water that is piped to the well pads through a temporary surface line, centralizing or
5  consolidating gas processing facilities (e.g., separation, dehydration, sweetening), carpooling, use of solar
6  power to power well site equipment when possible, installation of vapor recovery tanks on all oil and
7  condensate tanks, and use of controls to reduce elemental carbons and $NO_x$ from engines.

8  Alternative B would have the smallest impact on climate change of the four alternatives, based on the
9  extent of development and production (seven wells developed and four producing wells).

### 4.3.5.1     *Suspended and Protested Lease Decisions*

11  Under Alternative B, the BLM would cancel all suspended leases and resolve the protests on the protested
12  leases and deny the leases. Climate change would not be affected by greenhouse gas emissions resulting
13  from operators exploring for and developing oil and gas resources in suspended and protested lease areas.

## 4.3.6   Impacts from Alternative C

15  Under Alternative C, 37,865 acres would be open to oil and gas leasing subject to standard terms and
16  conditions; approximately 362,127 acres would be open to oil and gas leasing subject to CSU/TL
17  stipulations; approximately 52,208 acres would be open to oil and gas leasing subject to an NSO
18  stipulation; and approximately 192 acres would be closed to oil and gas leasing. Reasonably foreseeable
19  development under Alternative C is estimated to consist of 27 wells. Of the 27 developed wells, 16 would
20  be expected become successful producing wells under this alternative (see Appendix A). Alternative C
21  would result in slightly fewer developed and producing wells than would Alternative A but more than
22  would Alternatives B and D.

23  Although there are no stipulations under Alternative C specifically for climate change, the air quality
24  stipulations for this alternative (see Section 4.2.7) would help reduce GHG emissions. Venting or flaring
25  would be prohibited except in circumstances identified in existing rules. Allowing exceptions for venting
26  or flaring as identified in existing rules would increase GHG emissions; such emissions would be similar
27  to the emissions from Alternative A, which does not prohibit venting or flaring.

28  Alternative C would apply the same BMPs as would Alternative B.

29  Impacts to climate change under Alternative C would be greater than those under Alternatives B and D
30  but slightly less than those under Alternative A, based on the extent of development and production (27
31  wells developed and 16 producing wells).

### 4.3.6.1     *Suspended and Protested Lease Decisions*

33  Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to
34  standard terms and conditions, 39,766 acres would be issued subject to CSU/TL stipulations, and 318
35  acres would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts
36  of modifying the terms and conditions of the suspended and protested leases and issuing the leases
37  consistent with Alternative C would be the same as the impacts to climate change described in this section
38  from managing areas as open to leasing subject to standard terms and conditions, open to leasing subject
39  to CSU/TL stipulations, or open to leasing subject to NSO stipulations.

## 4.3.7   Impacts from Alternative D

41  Under Alternative D, no acreage would be open to oil and gas leasing subject to standard terms and
42  conditions; approximately 339,884 acres would be open to oil and gas leasing subject to CSU/TL
43  stipulations; approximately 92,170 acres would be open to oil and gas leasing subject to an NSO
44  stipulation; and approximately 20,339 acres would be closed to oil and gas leasing. Reasonably

1   foreseeable development under Alternative D is estimated to consist of 23 wells. Of the 23 developed
2   wells, 14 would be expected become successful producing wells under this alternative (see Appendix A).
3   Alternative D would result in fewer developed and producing wells than would Alternatives A and C but
4   more than would Alternative B.

5   Although there are no stipulations under Alternative D specifically for climate change, the air quality
6   stipulations for this alternative (see Section 4.2.8) would help reduce GHG emissions. Venting or flaring
7   would be prohibited except in circumstances identified in existing rules. Allowing exceptions for venting
8   or flaring as identified in existing rules would increase GHG emissions; such emissions would be similar
9   to the emissions from Alternative A, which does not prohibit venting or flaring.

10  Alternative D would apply the same BMPs as would Alternative B.

11  Impacts to climate change under Alternative D would be greater than those under Alternative B but less
12  than those under Alternatives A and C, based on the extent of development and production (23 wells
13  developed and 14 producing wells).

### 4.3.7.1    *Suspended and Protested Lease Decisions*

15  Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to
16  CSU/TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. If the leases were
17  subsequently developed, the impacts of modifying the terms and conditions of the suspended and
18  protested leases and issuing the leases consistent with Alternative D would be the same as the impacts to
19  climate change from managing lands as open to leasing subject to CSU/TL stipulations, or open to leasing
20  subject to NSO stipulations, as described in this section.

## 4.4    SOIL RESOURCES

22  This section presents potential impacts to soil resources from implementing management actions
23  presented in Chapter 2. Existing conditions concerning soil resources are described in Chapter 3.

### 4.4.1    Assumptions

25  • Wind and water erosion are the primary mechanisms for loss of soil productivity.

26  • Wind erosion can impact soil productivity in a similar manner as water erosion.

27  • Eroded soil can be deposited as sediment at any point downslope or can be transported to the
28     drainage network and ultimately to water bodies such as streams, rivers, lakes, and reservoirs.

29  • The amount of sediment from upland soil erosion that is transported to streams and other water
30     bodies is dependent on distance to the water body, slope, soil texture, filtering capacity of upland
31     and riparian vegetation, storm intensity, duration, and runoff generated.

32  • The removal of vegetation or biological soils crusts increases soil susceptibility to erosion via
33     wind and water erosion by decreasing soil strength, reducing infiltration, increasing runoff,
34     altering soil structure, and reducing protection of the surface from raindrop impact.

35  • Vegetation and biological soil crusts increase soil organic matter, aggregation of soil particles,
36     and soil porosity, all of which increase soil resistance to erosion.

37  • Management actions that mitigate adverse impacts to soil and vegetation resources can help
38     minimize soil erosion and sediment, salt, and excess nutrient loading to water bodies.

39  • Short-term erosion impacts depend on soil texture and type, porosity and permeability, landscape
40     position, slope of the land, magnitude and type of disturbance, type of vegetation, and the length
41     of time it takes for the disturbed area to become revegetated with a self-sustaining, perennial plant
42     community.

1 • Long-term erosion impacts are those impacts that continue after vegetation has become
2 reestablished. They are due in part to changes in the vegetation community but to a greater extent
3 to a surface area that remains void of vegetation, such as pads and roads.

4 • When all other factors are held constant, the degree to which soils are impacted (i.e., erosion may
5 occur) are proportional to the area disturbed.

## 4.4.2  Impacts Common to All Alternatives

7 The following discussions represent impacts on soil resources that would not vary by alternative.

8 Management of the Big Flat Tops ACEC as closed to oil and gas leasing and development would prevent
9 surface disturbance, thereby maintaining vegetation, maintaining soil stabilization, preventing erosion and
10 fugitive dust, and protecting biological crusts. This management would preclude impacts to soil resources
11 from oil and gas development, including soil compaction and soil loss resulting from removal of
12 vegetation, surface disturbance, and subsequent wind and water erosion within the ACEC.

13 Under all alternatives, surface-disturbing projects on steep slopes would be limited. Within the Price Field
14 Office, surface-disturbing activities on slopes ranging from 21% to 40% would require an erosion-control
15 strategy and topsoil segregation or restoration plan to be approved by the BLM before construction. In the
16 Richfield Field Office, projects involving construction on slopes greater than 30% would be avoided. If
17 an action cannot be avoided, rerouted, or relocated, then the proposed project would include an erosion-
18 control strategy, reclamation, and site plan, with a detailed survey and design completed by a certified
19 engineer. These actions would reduce the potential impacts on soils located on steep slopes, which are
20 particularly susceptible to wind and water erosion following disturbances from oil and gas exploration
21 and development.

## 4.4.3  Impacts from Alternative A (No Action)

23 Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to
24 standard terms and conditions, approximately 19,083 acres would be open to oil and gas leasing subject to
25 CSU and TL stipulations, approximately 33,626 acres would be open to oil and gas leasing subject to a
26 NSO stipulation, and approximately 220 acres would be closed to oil and gas leasing. Table 4-6 shows the
27 acres of sensitive soils that occur within the planning area within the areas that are open and closed for oil
28 and gas leasing, as well as the acres of each type that occur within the areas stipulated as NSO, CSU, and
29 TL for Alternative A.

30 **Table 4-6.  Sensitive Soils by Oil and Gas Leasing Category in Alternative A**

| Sensitive Soil Category | Open (acres) | CSU and TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| **Slopes** | | | | |
| < 20% | 380,552 | 18,155 | 29,518 | 168 |
| 21%–30% | 9,494 | 453 | 1,646 | 12 |
| 31%–40% | 4,266 | 207 | 915 | 7 |
| > 40% | 5,150 | 268 | 1,547 | 34 |
| **Saline Soils (Mancos Shale–derived soils)** | 21,804 | 3,392 | 267 | 0 |
| **Soils with High Erosion Potential** | 245,721 | 7,806 | 14,729 | 2 |

Under Alternative A, BLM would not apply a lease stipulation to minimize or mitigate wind erosion and emissions of fugitive dust in areas characterized by fine sandy soils with high wind erosion potential. These decisions would allow surface disturbance and disruption of existing soil crusts in these sandy soils that are sensitive to disturbance and wind erosion and have been observed to be difficult to reclaim from past disturbances. Surface disturbance in these areas could cause destabilization of dunes, loss of soil crusts, increased wind and water erosion, and increased emissions of fugitive dust.

Under Alternative A, BLM would also not apply a TL stipulation requiring avoidance of disturbance to saline soils in the Mancos Shale during the wet portions of the year. These soils are highly sensitive to surface disturbance, and their erosion rates are easily accelerated. If a TL is not applied in these areas, surface oil and gas exploration and development activities, including soil disturbance and mobilization of soils from vehicle use, could occur during the wetter portions of the year. This disturbance could lead to the erosion of saline soils and could affect the water quality of downstream waterbodies such as the Green and Colorado Rivers. Effects could include increased salinity, selenium, and sediment loads and associated water chemistry parameters (TDS, total suspended solids, etc.).

Under Alternative A, BLM would allow exceptions or modifications of the stipulation in the Price ROD/RMP (BLM 2008a) that prohibits surface disturbance on slopes greater than 40%. Although BLM would only allow exceptions or modifications to this stipulation when a more detailed analysis is conducted and shows that impacts can be mitigated, allowing exceptions or modifications to this stipulation would increase surface disturbance and soil destabilization in an area where the risk of soil erosion is exceptionally high. Even with the implementation of measures and strategies to reduce the risk of soil erosion, some loss of soils, increased wind and water erosion, and increased emissions of fugitive dust would likely occur.

Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to standard terms and conditions, and approximately 19,083 acres would be open to oil and gas leasing subject to CSU and TL stipulations. None of the CSU or TL stipulations under Alternative A would reduce impacts on soil resources. Managing these areas identified as open to leasing and development subject to standard lease terms and conditions or CSU and TL stipulations would allow the development of well pads and associated infrastructure, which would involve land-clearing and surface disturbances. These actions remove and disturb vegetation and biological soil crusts, expose soils to the erosive forces of water and wind, and result in soil erosion and a reduction of soil productivity in both the short term, during construction activities, and in the long term, as permanent structures, such as well pads and roads are maintained. Impacts could include reduced soil productivity; loss of soils from water and wind erosion; long-term soil destabilization as a result of difficulties in reclamation; and increases in sediment, salinity, and other soil-based pollutants in nearby waterways.

Under Alternative A, approximately 33,626 acres would be open to oil and gas leasing subject to an NSO stipulation, and approximately 220 acres would be closed to oil and gas leasing. Applying an NSO stipulation or closing areas to oil and gas leasing would prevent surface-disturbing activities from oil and gas development within 100-year floodplains, steep slopes, natural springs, natural areas, SRMAs, and ACECs. The NSO stipulations and decisions to close areas to leasing could protect soil resources present in these areas from surface disturbance, prevent soil loss, reduce erosion and fugitive dust, prevent mobilization of saline soil materials, and protect biological soil crusts. However, under Alternative A, BLM would allow some exceptions, modifications, or waivers for NSO stipulations (e.g., in SRMAs where oil and gas exploration and development would not impair identified scenic and primitive or semi-primitive recreational resources, or on steep slopes where a more detailed analysis is conducted and shows that impacts can be mitigated). Granting exceptions, modifications, or waivers to NSO stipulations would allow impacts on soil resources from oil and gas development in areas where NSO stipulations are applied. These impacts would be similar to the impacts on soils that would occur in areas that are open to oil and gas leasing subject to standard terms and conditions.

Under Alternative A, geophysical operations could be allowed on lands closed to leasing or subject to NSO stipulations under certain circumstances in the Richfield Field Office and would be allowed consistent with existing regulations for geophysical exploration in the Price Field Office. Allowing geophysical operations in areas closed to mineral leasing or subject to NSO stipulations would allow for impacts to soil resources similar to the impacts to soils from geophysical operations that would occur in areas that are open to oil and gas leasing subject to standard terms and conditions.

The BMPs that would be applied to oil and gas leases under Alternative A would require interim reclamation of the well and access road to prevent and reduce soil erosion, beginning as soon as practicable after a well is placed in production. Facilities would be grouped on the pads to allow for maximum interim reclamation. Interim reclamation would include road cuts and fills and would extend to within close proximity of the wellhead and production facilities. Final reclamation of all oil and gas disturbance would involve recontouring of all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography, and revegetating all disturbed areas. Roads would follow the contour of the land where practical, and existing oil and gas roads that are in eroded condition would be brought to BLM standards within a reasonable period of time. These stipulations and BMPs would minimize impacts to soil resources by minimizing soil loss and erosion.

Under Alternative A, BLM estimates that 28 oil and gas wells would be drilled in the planning area over the next 15 years. These wells would result in approximately 541 acres of surface disturbance, of which 86 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative A are anticipated to result in 305 acres of surface disturbance, of which approximately 61 acres would be unreclaimed in 15 years. BMPs that would be applied to oil and gas leases under Alternative A for reclamation and soils, including requirements for interim reclamation, would indirectly benefit soil resources by minimizing soil loss and erosion. However, because of the difficulty in reclaiming surface disturbances in the planning area, the areas that are reclaimed would not be anticipated to return to natural conditions until 20 to 25 years or more after initial reclamation.

Out of all alternatives considered in the MLP/EA, Alternative A would be anticipated to result in the greatest surface disturbance and impacts to soils. As described previously, surface disturbance can result in increased erosion of soils, including increases in windblown dust that can be deposited on snow-covered mountain peaks and cause earlier and faster snowmelt events. Although the magnitude of the surface disturbance and the resulting increases in windblown dust under Alternative A would be minor compared to the existing surface disturbance and associated generation of windblown dust in the Colorado Plateau region, Alternative A would have the greatest anticipated surface disturbance and resulting contribution to regional production, transport, and deposition of dust on snow-covered peaks. The dust generated by oil and gas activities under Alternative A could have a minor contribution to earlier and faster snowmelt events and reduced water yield to the Colorado River and its tributaries.

### 4.4.3.1    *Suspended and Protested Lease Decisions*

Under Alternative A, 45,043 acres of suspended and protested leases would be issued subject to standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO stipulations. Protested leases would be resolved and issued with terms and conditions that are consistent with the Price ROD/RMP (BLM 2008a). The areas encompassed by the suspended and protested leases contain sensitive soil resources, including steep slopes and sandy soils that are difficult to reclaim and are highly susceptible to wind and water erosion.

Under Alternative A-1, BLM would rescind the suspensions on suspended leases. If those leases were subsequently developed, the impacts to soils in the leased areas could be the same as those described in this section as open to leasing subject to standard terms and conditions.

Under Alternative A-2, suspended leases would be subject to the terms and conditions contained within the Richfield ROD/RMP (BLM 2008b). If those leases were subsequently developed, the impacts to soils

1  from issuing the leases subject to the terms and conditions contained within the Price and Richfield RMPs
2  would be the same as the impacts described in this section to those managed as open or NSO. Under
3  Alternative A-2, the suspended leases would be subject to the conditions, including reclamation
4  stipulations and BMPs included in the Richfield ROD/RMP. Modifying the stipulations to be consistent
5  with the Richfield ROD/RMP (Alternative A-2) would reduce long-term impacts to soils by improving
6  the reclamation of disturbances, reestablishing vegetation, stabilizing soils, and preventing erosion
7  resulting from oil and gas development activities compared to Alternative A-1.

8  ### 4.4.4   Impacts from Alternative B

9  Under Alternative B, 0 acres would be open to oil and gas leasing subject to standard terms and
10  conditions, approximately 98,164 acres would be open to oil and gas leasing subject to CSU and TL
11  stipulations, approximately 324,161 acres would be open to oil and gas leasing subject to a NSO
12  stipulation, and approximately 30,068 acres would be closed to oil and gas leasing. Table 4-7 shows the
13  acres of sensitive soils that occur within the planning area within the areas that are open and closed for oil
14  and gas leasing, as well as the acres of each type that occur within the areas stipulated as NSO, CSU, and
15  TL for Alternative B.

16  **Table 4-7.  Sensitive Soils by Oil and Gas Leasing Category in Alternative B**

| Sensitive Soil Category | Open (acres) | CSU and TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| **Slopes** | | | | |
| < 20% | 0 | 95,068 | 307,719 | 25,607 |
| 21%–30% | 0 | 1,634 | 8,243 | 1,728 |
| 31%–40% | 0 | 704 | 3,742 | 948 |
| > 40% | 0 | 758 | 4,457 | 1,785 |
| **Saline Soils (Mancos Shale–derived soils)** | 0 | 7,630 | 15,728 | 2,106 |
| **Soils with High Erosion Potential** | 0 | 61,635 | 197,233 | 9,391 |

17  Under Alternative B, BLM would apply a lease stipulation to minimize or mitigate wind erosion and
18  emissions of fugitive dust in areas characterized by fine sandy soils with high wind erosion potential.
19  These decisions would help prevent loss and degradation of soils sensitive to disturbance and wind
20  erosion, including sandy soils that have been observed to be difficult to reclaim from past disturbances.
21  This stipulation would help reduce destabilization of dunes, promote the formation of biological soil
22  crusts in disturbed areas, decrease wind and water erosion, and decrease emissions of fugitive dust.
23  Because this decision would reduce production of fugitive dust, it could also help reduce the planning
24  area's contributions to regional dust-on-snow issues.

25  Under Alternative B, TL stipulations would prevent surface disturbance on saline soils in the Mancos
26  Shale–derived soils (Map 2-9). These stipulations would not allow surface-disturbing activities from
27  December 1 to April 15 when the area receives the most moisture and when soils are commonly wet. This
28  stipulation includes heavy equipment traffic on existing roads associated with drilling and completion
29  operations. This TL would reduce the impacts of disturbance to saline soils compared with Alternative A,
30  including reducing the amount of erosion of saline soils that could affect the water quality of downstream
31  waterbodies such as the Green and Colorado Rivers. Effects that would be reduced include increased
32  salinity, selenium, and sediment loads and associated water chemistry parameters (TDS, total suspended
33  solids, etc.).

1    Under Alternative B, BLM would not allow exceptions or modifications of the stipulation in the Price
2    RMP that prohibits surface disturbance on slopes greater than 40%. Not allowing exceptions or
3    modifications to this stipulation would preclude surface disturbance and soil destabilization in an area
4    where risk of soil erosion is exceptionally high. This measure would reduce the risk of soil erosion, loss
5    of soils, increased wind and water erosion, and increased emissions of fugitive dust compared to
6    Alternative A.

7    Under Alternative B, approximately 98,164 acres would be open to oil and gas leasing subject to CSU
8    and TL stipulations. The CSU stipulations applied under Alternative B could minimize impacts to soil
9    resources in the planning area by limiting the amount of surface-disturbing activities associated with oil
10   and gas leasing and development, thereby maintaining vegetation, stabilizing soil, and limiting erosion.
11   For example, applying a CSU requiring a fugitive dust control plan for oil and gas activities that would
12   disturb a surface area larger than 0.25 acre, or that would result in substantial increases in truck traffic on
13   unpaved or untreated surfaces could reduce the loss of soil resources to wind and water erosion, including
14   reducing the production of fugitive dust and contributions to regional dust-on-snow issues.

15   Under Alternative B, approximately 324,161 acres would be open to oil and gas leasing subject to an
16   NSO stipulation, and approximately 30,068 acres would be closed to oil and gas leasing. Applying an
17   NSO stipulation or closing areas to oil and gas leasing would prevent surface-disturbing activities from
18   oil and gas development within large portions of the planning area. In areas that are closed to leasing,
19   soils would be protected from disturbance. The NSO stipulations could protect soil resources present in
20   these areas from surface disturbance, prevent soil loss, reduce erosion and fugitive dust, prevent
21   mobilization of saline soil materials, and protect biological soil crusts. Under Alternative B, BLM would
22   not allow exceptions, modifications, or waivers to most NSO stipulations. Not allowing exceptions,
23   modifications, or waivers would reduce impacts to soils in areas that would be subject to NSO
24   stipulations compared to Alternative A.

25   Under Alternative B, geophysical operations would not be permitted in areas closed to leasing, and only
26   heliport geophysical operations would be allowed in areas that are managed subject to NSO stipulations.
27   This management of geophysical operations would provide better protection for soils in areas managed as
28   closed to oil and gas leasing or open subject to NSO stipulations, including prevention of surface
29   disturbance, soil loss, and fugitive dust, and would reduce erosion resulting from geophysical operations
30   compared to Alternative A.

31   Alternative B would require implementation of updated BMPs to minimize the potential resource impacts
32   associated with oil and gas developments. Compared to the BMPs in Alternative A, these BMPs include
33   measures to reduce fugitive dust, protect soil and water resources, improve reclamation success, reduce
34   impacts on vegetation, and prevent the spread of noxious weeds and invasive species. These BMPs would
35   reduce the long-term impacts of oil and gas development on soils by minimizing the area of disturbed
36   land and promoting improved reclamation planning and practices, including use of erosion-control
37   structures and improved topsoil salvage. The revised BMPs would improve reclamation practices
38   compared to Alternative A by protecting topsoil, which would be carefully stripped and stockpiled
39   separately from all other soil materials along with organic matter and debris to help sustain biological
40   activity. Compared to Alternative A, these BMPs would reduce the time required to stabilize soils and
41   reestablish vegetation on areas disturbed by oil and gas activities and promote a more rapid return to
42   natural conditions in disturbed areas.

43   Under Alternative B, BLM estimates that seven oil and gas wells would be drilled in the planning area
44   over the next 15 years. These wells would result in approximately 127 acres of surface disturbance, of
45   which 20 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative
46   B are anticipated to result in 72 acres of surface disturbance, of which approximately 14 acres would be
47   unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative B would

1 promote more rapid and successful reclamation of surface disturbance compared to Alternative A,
2 indirectly benefiting soil resources by minimizing soil loss and erosion.

3 Among the alternatives considered in the MLP/EA, Alternative B would be anticipated to result in the
4 least surface disturbance and impacts to soils. As described previously, surface disturbance can result in
5 increased erosion of soils, including increases in windblown dust that can be deposited on snow-covered
6 mountain peaks, which can cause earlier and faster snowmelt events. The magnitude of the surface
7 disturbance and the resulting increases in windblown dust under Alternative B would be minor compared
8 to the existing surface disturbance and associated generation of windblown dust in the Colorado Plateau
9 region. Among the alternatives considered in the MLP/EA, Alternative B would have the least anticipated
10 surface disturbance and resulting contribution to regional production, transport, and deposition of dust on
11 snow-covered peaks. The dust generated by oil and gas activities under Alternative B could have a minor
12 contribution to earlier and faster snowmelt events and reduced water yield to the Colorado River and its
13 tributaries.

### 4.4.4.1    *Suspended and Protested Lease Decisions*

15 Under Alternative B, BLM would cancel all suspended leases and resolve the protests on the protested
16 leases and deny the leases. The soils in the areas of suspended and protested leases would not be affected
17 by oil and gas activities resulting from operators exploring for and developing oil and gas resources.
18 Current soil conditions and trends would be anticipated to continue for the foreseeable future.

## 4.4.5    Impacts from Alternative C

20 Under Alternative C, approximately 37,866 acres would be open to oil and gas leasing subject to standard
21 terms and conditions, approximately 362,127 acres would be open to oil and gas leasing subject to CSU
22 and TL stipulations, approximately 52,207 acres would be open to oil and gas leasing subject to a NSO
23 stipulation, and approximately 191 acres would be closed to oil and gas leasing. Table 4-8 shows the
24 acres of sensitive soils that occur within the planning area within the areas that are open and closed for oil
25 and gas leasing, as well as the acres of each type that occur within the areas stipulated as NSO, CSU, and
26 TL for Alternative C.

27 **Table 4-8. Sensitive Soils by Oil and Gas Leasing Category in Alternative C**

| Sensitive Soil Category | Open (acres) | CSU and TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| **Slopes** | | | | |
| < 20% | 35,436 | 347,661 | 45,154 | 142 |
| 21%–30% | 1,359 | 7,375 | 2,861 | 10 |
| 31%–40% | 563 | 3,244 | 1,581 | 6 |
| > 40% | 508 | 3,847 | 2,611 | 33 |
| **Saline Soils (Mancos Shale–derived soils)** | 0 | 23,218 | 2,245 | 0 |
| **Soils with High Erosion Potential** | 0 | 249,055 | 19,204 | 0 |

28 Under Alternative C, BLM would apply a lease stipulation to minimize or mitigate wind erosion and
29 emissions of fugitive dust in areas characterized by fine sandy soils with high wind erosion potential and
30 would not allow exceptions or modifications of stipulations in the Price RMP that prohibit surface
31 disturbance on slopes greater than 40%. These decisions would be the same as the corresponding
32 decisions for Alternative B and would be anticipated to have the same soil resource impacts and benefits.

1   Under Alternative C, TL stipulations would prevent surface disturbance on saline soils in the Mancos
2   Shale–derived soils (Map 2-9). These stipulations would not allow surface-disturbing activities from
3   December 1 to April 15 when the area receives the most moisture and when soils are commonly wet;
4   however, heavy equipment traffic on existing roads associated with drilling and completion operations
5   would not be subject to this timing restriction. This TL would reduce the impacts of disturbance to saline
6   soils, as compared with Alternative A, including reducing the amount of erosion of saline soils that could
7   affect the water quality of downstream waterbodies such as the Green and Colorado Rivers, but it would
8   allow for more disturbance than permitted under Alternative B. Effects that would be reduced include
9   increased salinity, selenium, and sediment loads and associated water chemistry parameters (TDS, total
10  suspended solids, etc.).

11  Under Alternative C, approximately 37,866 acres would be open to oil and gas leasing subject to standard
12  terms and conditions. Managing these areas identified as open to leasing and development subject to
13  standard lease terms and conditions would allow the development of well pads and associated
14  infrastructure, which would involve land-clearing and surface disturbances. These actions remove and
15  disturb vegetation and biological soil crusts, expose soils to the erosive forces of water and wind, and
16  result in soil erosion and reduction of soil productivity in both the short term, during construction
17  activities, and in the long term, as permanent structures, such as well pads and roads are maintained.
18  Impacts could include reduced soil productivity; loss of soils from water and wind erosion; long-term soil
19  destabilization as a result of difficulties in reclamation; and increases in sediment, salinity, and other soil-
20  based pollutants in nearby waterways.

21  Under Alternative C, approximately 362,127 acres would be open to oil and gas leasing subject to CSU
22  and TL stipulations. The CSU stipulations applied under Alternative C could minimize impacts to soil
23  resources in the planning area by limiting the amount of surface-disturbing activities associated with oil
24  and gas leasing and development, thereby maintaining vegetation, stabilizing soil, and limiting erosion.
25  Under Alternative C, CSU stipulations would be applied for steep slopes, PFYC 4 and 5 areas, areas
26  characterized by fine sandy soils with high wind erosion potential, lands identified as having wilderness
27  characteristics in the Labyrinth Canyon unit, the Labyrinth Canyon SRMA, potions of Dirty
28  Devil/Robbers Roost SRMA, recreation focus areas, the Tidwell Draw site in the Uranium Mining
29  District, the Old Spanish Trail high potential sites and route segments, and areas designated as VRM
30  Class II. Alternative C also includes CSU stipulations that would limit the density of oil and gas
31  development. These decisions would be made for resources including recreation focus areas, lands
32  identified as having wilderness characteristics in the Labyrinth Canyon unit, and the Labyrinth Canyon
33  SRMA. In these areas, the stipulations that would limit the density of oil and gas development would also
34  reduce the intensity of impacts on soil resources, including soil compaction, damage to biological soil
35  crusts, and wind and water erosion. Under Alternative C, the Tidwell Draw Uranium District ACEC
36  would be managed as CSU, which could allow for more disturbance to soils within the ACEC than would
37  be permitted under Alternatives A or B, where the ACEC would be managed as NSO.

38  Under Alternative C, 52,207 acres would be open to oil and gas leasing subject to an NSO stipulation;
39  and approximately 191 acres would be closed to oil and gas leasing. In Alternative C, applying an NSO
40  stipulation to oil and gas leasing or closing areas to leasing would prevent surface-disturbing activities
41  from oil and gas development within the Three Rivers locatable mineral withdrawal, natural areas, within
42  1 mile of Labyrinth Canyon rim, within 1 mile of Horseshoe Canyon rim, within 1 mile of key
43  observation points, and within the Green River WSR suitable section from the confluence of the San
44  Rafael River to Canyonlands National Park. The NSO stipulations could also protect soil resources from
45  vegetation removal, prevent soil loss and fugitive dust, reduce erosion, and prevent loss of biological soil
46  crusts resulting from oil and gas development. The Big Flat Tops ACEC would be closed to leasing and
47  would provide similar benefits as applying NSO stipulations. Under Alternative C, BLM would allow
48  some exceptions, modifications, or waivers to some of the NSO stipulations; however, fewer exceptions,
49  modifications, or waivers would be granted compared to Alternative A. Allowing fewer exceptions,

1  modifications, or waivers would reduce impacts to soils in areas that would be subject to NSO
2  stipulations compared to Alternative A.

3  Under Alternative C, geophysical operations would not be permitted in areas closed to leasing and would
4  be allowed in areas that are managed subject to NSO stipulations, though no new road construction or
5  improvements would be permitted, and BLM would require full reclamation of all surface disturbance.
6  This management of geophysical operations would provide better protection for soils in areas managed as
7  closed to oil and gas leasing or open subject to NSO stipulations compared to Alternative A by preventing
8  surface disturbance and soil erosion, and by reclamation practices.

9  Similar to Alternative B, under Alternative C, the BMPs that are currently used for oil and gas leases in
10 the planning area would be updated to include additional state-of-the-art BMPs. The benefits to soil
11 resources in the planning area from updating the BMPs under Alternative C would be the same as those
12 described under Alternative B.

13 Under Alternative C, BLM estimates that 27 wells oil and gas wells would be drilled in the planning area
14 over the next 15 years. These wells would result in approximately 517 acres of surface disturbance, of
15 which 82 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative
16 C is anticipated to result in 292 acres of surface disturbance, of which approximately 58 acres would be
17 unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative C would
18 promote more rapid and successful reclamation of surface disturbance compared to Alternative A,
19 indirectly benefiting soil resources by minimizing soil loss and erosion.

20 Alternative C would be anticipated to result in less surface disturbance and impacts to soils compared to
21 Alternative A, but more surface disturbance and impacts compared to Alternative B. As described
22 previously, surface disturbance can result in increased erosion of soils, including increases in windblown
23 dust that can be deposited on snow-covered mountain peaks, which can cause earlier and faster snowmelt
24 events. The magnitude of the surface disturbance and the resulting increases in windblown dust under
25 Alternative C would be minor compared to the existing surface disturbance and associated generation of
26 windblown dust in the Colorado Plateau region. Alternative C would have less anticipated surface
27 disturbance and resulting contribution to regional production, transport, and deposition of dust on snow-
28 covered peaks compared to Alternative A, and more than Alternative B. The dust generated by oil and gas
29 activities under Alternative C could have a minor contribution to earlier and faster snowmelt events and
30 reduced water yield to the Colorado River and its tributaries.

## 4.4.5.1     *Suspended and Protested Lease Decisions*

32 Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to
33 standard terms, 39,766 acres would be issued subject to CSU or TL stipulations, and 318 acres would be
34 issued subject to NSO stipulations. If the leases were subsequently developed, the impacts of modifying
35 the terms and conditions of the suspended and protested leases and issuing the leases consistent with
36 Alternative C would be the same as the impacts on soils described in this section from managing areas as
37 open to leasing subject to standard terms and conditions, open to leasing subject to CSU or TL
38 stipulations, or open to leasing subject to NSO stipulations described for Alternative C.

## 4.4.6   Impacts from Alternative D

40 Under Alternative D, 0 acres would be open to oil and gas leasing subject to standard terms and
41 conditions, approximately 339,885 acres would be open to oil and gas leasing subject to CSU and TL
42 stipulations, approximately 92,169 acres would be open to oil and gas leasing subject to a NSO
43 stipulation, and approximately 20,340 acres would be closed to oil and gas leasing. Table 4-9 shows the
44 acres of sensitive soils that occur within the planning area within the areas that are open and closed for oil
45 and gas leasing, as well as the acres of each type that occur within the areas stipulated as NSO, CSU, and
46 TL for Alternative D.

1    **Table 4-9. Sensitive Soils by Oil and Gas Leasing Category in Alternative D**

| Sensitive Soil Category | Open (acres) | CSU and TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| **Slopes** | | | | |
| < 20% | 0 | 328,492 | 82,974 | 16,928 |
| 21%–30% | 0 | 5,958 | 4,428 | 1,220 |
| 31%–40% | 0 | 2,560 | 2,157 | 678 |
| > 40% | 0 | 2,875 | 2,610 | 1,514 |
| **Saline Soils (Mancos Shale–derived soils)** | 0 | 18,759 | 6,630 | 75 |
| **Soils with High Erosion Potential** | 0 | 222,850 | 39,298 | 6,110 |

2  Under Alternative D, BLM would apply a lease stipulation to minimize or mitigate wind erosion and
3  emissions of fugitive dust in areas characterized by fine sandy soils with high wind erosion potential,
4  would not allow exceptions or modifications of stipulations in the Price RMP that prohibit surface
5  disturbance on slopes greater than 40%, and would apply the same TL stipulations to prevent surface
6  disturbance on saline soils in the Mancos Shale–derived soils as would be applied under Alternative C.
7  These decisions would be the same as the corresponding decisions for Alternative C and would be
8  anticipated to have the same soil resource impacts and benefits.

9  Under Alternative D, approximately 339,885 acres would be open to oil and gas leasing subject to CSU
10  and TL stipulations. The CSU stipulations applied under Alternative D, especially those that would limit
11  the density of oil and gas development, could reduce the intensity and extent of disturbance to soils. Areas
12  where CSU stipulations that would limit oil and gas development density under Alternative D include
13  LWC units (with the exception of the Labyrinth Canyon LWC unit) and the Cone and Cottonwood Wash
14  recreation focus areas. The density limitations in these areas under Alternative D would require lower
15  density oil and gas development and result in reduced disturbance of soils compared to Alternative C.
16  Applying a CSU requiring a fugitive dust control plan for oil and gas activities that would disturb a
17  surface area larger than 0.25 acre, or that would result in substantial increases in truck traffic on unpaved
18  or untreated surfaces, could reduce the impacts of fugitive dust on snowpack.

19  Under Alternative D, approximately 92,169 acres would be open to oil and gas leasing subject to an NSO
20  stipulation, and approximately 20,340 acres would be closed to oil and gas leasing. The NSO stipulations
21  under Alternative D would be applied for Dirty Devil/French Springs and Horseshoe Canyon South non-
22  WSA lands with wilderness characteristics; lands identified as having wilderness characteristics during
23  the 2016 inventory in the Labyrinth Canyon unit; the Labyrinth Canyon SRMA; portions of Dirty
24  Devil/Robbers Roost SRMA; all lands within 1 mile of the Green River Labyrinth Canyon rim that are
25  north of the San Rafael River; the Fossil Point, Dry Lake, Trin Alcove/Three Canyon, Saucer
26  Basin/Moonshine Wash, Keg Knoll, Sweetwater Reef, and Horseshoe Canyon Trailhead recreation focus
27  areas; all lands within 1 mile of key observation points and travel corridors; the Dry Lake Archaeological
28  District ACEC; the Uranium Mining District ACEC (Tidwell Draw); all lands within 1 mile of high
29  potential sites and route segments along the Old Spanish Trail, steep slopes; areas within public water
30  reserves, 100-year floodplains and areas within 660 feet of intermittent and perennial streams, rivers,
31  riparian areas, wetlands, water wells, and springs; and areas within 100 feet of ephemeral streams. Areas
32  that would be closed to oil and gas leasing would include the Big Flat Tops ACEC, the Three Rivers
33  locatable mineral withdrawal, all lands within 1 mile of the Green River Labyrinth Canyon rim south of
34  the San Rafael River, all lands within 1 mile of the Horseshoe Canyon rim, and the Green River suitable
35  segment from the confluence of the San Rafael River to Canyonlands National Park. The NSO
36  stipulations and decisions to close areas to oil and gas leasing could also protect soil resources from

1  vegetation removal, prevent soil loss and fugitive dust, reduce erosion, and prevent loss of biological soil
2  crusts resulting from oil and gas development.

3  Under Alternative D, the BLM would allow minimal exceptions, modifications, or waivers to NSO
4  stipulations. Fewer exceptions, modifications, or waivers would be granted compared to Alternatives A
5  and C. Allowing fewer exceptions, modifications, or waivers would reduce impacts to soils, including soil
6  erosion and fugitive dust in areas that would be subject to NSO stipulations, compared to Alternatives A
7  and C.

8  Under Alternative D, geophysical operations would be managed in the same manner and would be
9  anticipated to have the same impacts as Alternative C.

10  Similar to Alternatives B and C, under Alternative D, the areas that are currently used for oil and gas
11  leases in the planning area would be updated to include additional state-of-the-art BMPs. The benefits to
12  soil resources in the planning area from updating the BMPs under Alternative D would be the same as
13  those described under Alternative B.

14  Under Alternative D, the BLM estimates that 23 oil and gas wells would be drilled in the planning area
15  over the next 15 years. These wells would result in approximately 440 acres of surface disturbance, of
16  which 70 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative
17  D are anticipated to result in 248 acres of surface disturbance, of which approximately 50 acres would be
18  unreclaimed in 15 years. BMPs that would be applied to oil and gas leases under Alternative D would
19  promote more rapid and successful reclamation of surface disturbance compared to Alternative A,
20  indirectly benefiting soil resources by minimizing soil loss and erosion.

21  Alternative D would be anticipated to result in less surface disturbance and impacts to soils compared to
22  Alternatives A and C, but more surface disturbance and impacts compared to Alternative B. As described
23  previously, surface disturbance can result in increased erosion of soils, including increases in windblown
24  dust that can be deposited on snow-covered mountain peaks, which can cause earlier and faster snowmelt
25  events. The magnitude of the surface disturbance and the resulting increases in windblown dust under
26  Alternative D would be minor compared to the existing surface disturbance and associated generation of
27  windblown dust in the Colorado Plateau region. Alternative D would have less anticipated surface
28  disturbance and resulting contribution to regional production, transport, and deposition of dust on snow-
29  covered peaks compared to Alternatives A and C, and more than Alternative B. The dust generated by oil
30  and gas activities under Alternative D could have a minor contribution to earlier and faster snowmelt
31  events and reduced water yield to the Colorado River and its tributaries.

32  ### 4.4.6.1    *Suspended and Protested Lease Decisions*

33  Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU
34  or TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. If the leases were
35  subsequently developed, the impacts of modifying the terms and conditions of the suspended and
36  protested leases and issuing the leases consistent with Alternative D would be the same as the impacts on
37  soils from managing lands as open to leasing subject to CSU or TL stipulations, or open to leasing subject
38  to NSO stipulations described for Alternative D.

39  ## 4.5   WATER RESOURCES

40  This section presents the potential impacts to water and riparian resources from implementing the
41  management actions presented in Chapter 2. Existing conditions concerning water and riparian resources
42  are described in Chapter 3.

1    **4.5.1    Assumptions**

2    • Alternatives that would have fewer restrictive stipulations around surface water resources,
3       riparian areas, and soils sensitive to erosion would have greater impacts on riparian areas and
4       surface water resources.

5    • The degree of impact attributed to any one disturbance or series of disturbances would be
6       influenced by several factors, including location in the watershed; the type, time, and degree of
7       disturbance; existing vegetation; precipitation; and mitigating actions applied to the disturbance.

8    • Current trends in plant succession and vegetation health would continue.

9    • Where assessments for rangeland health standards have been conducted, riparian plant
10      communities are functioning properly or are in the process of achieving proper functioning
11      condition.

12   • Noxious and invasive weeds would continue to be introduced and spread as a result of ongoing
13      vehicle traffic in and out of the planning area, recreational activities, wildlife and livestock
14      grazing and movements, and surface-disturbing activities.

15   • Weed and pest control would be carried out in coordination with the appropriate County weed
16      and pest control district and owners of adjacent properties.

17   • A regulatory requirement applied to all oil and gas leases, regardless of management
18      classification, represents an obligation for all drilling operations to implement casing and
19      cementing programs that are conducted in a manner that protects and/or isolates all usable
20      groundwater zones.

21   **4.5.2    Impacts Common to All Alternatives**

22   The following discussions represent impacts on soil resources that would not vary by alternative.

23   For all alternatives, the potential impacts on groundwater resources from oil and gas extraction, including
24   hydraulic fracturing, could result in contamination of aquifers during drilling through the introduction of
25   drilling fluids, cross-contamination of aquifers when drilling fluids introduced into one aquifer travel
26   upward into shallower units due to improperly sealed well casings, and contamination of shallow aquifers
27   and surface water by improperly managed or closed reserve pits. Additionally, although unlikely, it is
28   possible for casings to fail, causing extended fracture growth and allowing hydraulic fracturing fluid to
29   migrate into source water zones.

30   For all alternatives, attaching lease notices and requiring conservation measures for all surface-disturbing
31   activities for western yellow-billed cuckoo, southwestern willow flycatcher, and Colorado River
32   endangered fish species would limit impacts from oil and gas development on riparian and aquatic
33   habitats for these species. Because these species rely on the limited riparian and aquatic habitats in the
34   planning area, these lease notices would also minimize damage to or loss of riparian areas and help
35   protect surface water resources in the planning area by limiting surface disturbance or other oil and gas
36   development activities in or adjacent to the Green and San Rafael Rivers.

37   Attaching lease notices and requiring mitigation measures for all surface-disturbing activities to protect
38   Utah and BLM sensitive species (e.g., bluehead sucker) would limit impacts from oil and gas
39   development to these species and their habitat because the BLM would require assessments to determine
40   whether a species is present and, depending on the results of the assessments, the implementation of
41   avoidance measures for that species during exploration and development. Because these species occupy
42   the aquatic and riparian habitats in the planning area, these lease notices would also help reduce impacts
43   on surface water resources in the planning area by limiting surface disturbance or other oil and gas
44   development activities in or adjacent to the Green and San Rafael Rivers.

1  Management of the Big Flat Tops ACEC as closed to oil and gas leasing and development would prevent
2  surface disturbance, thereby maintaining vegetation and preventing increased runoff, erosion, and
3  sedimentation. This management would preclude impacts to water resources from oil and gas
4  development including increased runoff and sedimentation resulting from the removal of vegetation,
5  surface disturbance, and subsequent erosion within the ACEC.

## 4.5.3  Impacts from Alternative A (No Action)

7  Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to
8  standard terms and conditions; approximately 19,083 acres would be open to oil and gas leasing subject to
9  CSU/TL stipulations; approximately 33,627 acres would be open to oil and gas leasing subject to NSO
10  stipulations; and approximately 220 acres would be closed to oil and gas leasing.

11  Under Alternative A, the BLM estimates that 28 oil and gas wells would be drilled in the planning area
12  over the next 15 years. These wells would result in approximately 541 acres of surface disturbance, of
13  which 86 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative
14  A are anticipated to result in 305 acres of surface disturbance, of which approximately 61 acres would be
15  unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative A for
16  reclamation, including requirements for interim reclamation, would indirectly benefit water and riparian
17  resources by minimizing erosion, sedimentation, and water quality degradation. However, because of the
18  difficulty of reclaiming surface disturbances in the planning area, the areas that are reclaimed would not
19  be anticipated to return to natural conditions until 20 to 25 years or more after initial reclamation. Among
20  all alternatives, Alternative A would be anticipated to result in the greatest surface disturbance and
21  impacts to water and riparian resources.

22  Managing areas identified as open to leasing and development subject to standard lease terms and
23  conditions or CSU/TL stipulations would allow the development of well pads and associated
24  infrastructure, which would involve land clearing and surface disturbances. These actions would result in
25  the removal of vegetative cover, soil compaction, and increased erosion rates due to the exposure of soil
26  particles to wind and water. There is a close correlation between the condition of soil and vegetation and
27  water quality. Removal of vegetation and biological soil crusts generally increases the rate at which water
28  flows off the land. Substantial disturbance to soil, including compaction of soil or decreased vegetative
29  cover would increase water runoff. Soil disturbance would also alter the timing and duration of runoff;
30  reduce infiltration capacity; and accelerate erosion, sedimentation, and the addition of nutrients and
31  sediment loads to stream channels, thereby degrading water quality, channel structure, and overall
32  watershed health. As the amount of surface disturbance increases, the ability of a watershed to buffer high
33  flows, filter water and sediment, and provide habitat, such as stream cover, decreases. Impacts to impaired
34  waters, like the San Rafael River, would include increased TDS loads and the inability to meet TMDL
35  requirements. These impacts would occur in the short term (during construction activities) and in the long
36  term as permanent structures such as well pads and roads are maintained.

37  Applying NSO stipulations or closing areas to oil and gas leasing under Alternative A would prevent
38  surface-disturbing activities from oil and gas development from occurring within 100-year floodplains,
39  steep slopes, natural springs, natural areas, SRMAs, ACECs, and along the Green River where it is
40  suitable for wild and scenic river designation. The NSO stipulations and decisions to close areas to
41  leasing could protect water and riparian resources present in these areas from surface disturbance, reduce
42  erosion and sedimentation, prevent mobilization of saline soil materials, and protect riparian habitat, as
43  well as protect groundwater quality. However, under Alternative A, the BLM would allow some
44  exceptions, modifications, or waivers for NSO stipulations (e.g., in SRMAs where oil and gas exploration
45  and development would not impair identified scenic and primitive or semi-primitive recreational
46  resources, or on steep slopes where a more detailed analysis shows that impacts can be mitigated).
47  Granting exceptions, modifications, or waivers to NSO stipulations would allow for impacts on water and
48  riparian resources from oil and gas development in areas where NSO stipulations are applied. These

impacts would be similar to the impacts on water and riparian resources that would occur in areas that are open to oil and gas leasing subject to standard terms and conditions.

Under Alternative A, geophysical operations could be allowed on lands closed to leasing or subject to NSO stipulations under certain circumstances in the Richfield Field Office and would be allowed consistent with existing regulations for geophysical exploration in the Price Field Office. Allowing geophysical operations in areas closed to mineral leasing or subject to NSO stipulations would allow for impacts on water and riparian resources such as surface disturbance, erosion, and sedimentation and degradation of water quality resulting from geophysical operations.

The BMPs that would be applied to oil and gas leases under Alternative A would require interim reclamation of the well and access roads to prevent and reduce soil erosion, beginning as soon as practicable after a well is placed in production. Final reclamation of all oil and gas disturbance would involve 1) recontouring all disturbed areas, including access roads, to the original contours or to contours that blend with the surrounding topography and 2) revegetating all disturbed areas. Roads would follow the contours of the land where practical, and existing oil and gas roads that are in eroded condition would be brought to BLM standards within a reasonable period of time. Any spills or wastes that result from oil and gas activities would require bioremediation. These stipulations and BMPs would minimize impacts to water and riparian resources by minimizing soil erosion, sedimentation, and impacts on water quality from soil pollutants.

The process of drilling for oil and gas requires consumptive water use. Within the planning area, a typical well drilled to the primary target formation would involve about 294,000 gallons of water. The water is used as a drilling medium, for mixing cement, and for various cleanup operations. Therefore, for the oil and gas wells projected in Alternative A, a total of about 8.2 million gallons of water could be used in the next 15 years. The source of this water would be primarily municipalities and private sources. Water obtained from aquifers and surface water could result in the drawing down of the water table and the reduction of available water resources for wildlife, vegetation, springs, streams, or public consumption. Withdrawal could affect local groundwater flow patterns and create changes in the quality and quantity of the remaining groundwater. However, detailed impacts of this water use cannot be addressed until site-specific operations identify the water source.

### 4.5.3.1    *Surface Water*

Under Alternative A, the Price Field Office would protect water quality by implementing appropriate BMPs such as those found in the Utah Nonpoint Source Management Plan (UDEQ 2013) and other reference documents for protection of soil, water, and riparian resources. The Richfield Field Office would continue working cooperatively with the UDWQ to monitor water quality at designated sampling stations. The BLM would not take specific actions to implement the nonpoint source water quality program, reducing their ability to meet state and federal water quality standards and meet TMDL requirements for the San Rafael River.

The BLM would apply an NSO stipulation under Alternative A within buffers around natural springs. Within the Richfield Field Office area, the size of the buffer with no surface disturbance or occupancy would be based on hydrological, riparian, and other factors necessary to protect the water quality of the springs. If these factors cannot be determined, a 330-foot buffer zone from the outer edge would be maintained. Exceptions in the Richfield Field Office area would be allowed if it can be shown that 1) there are no practical alternatives, 2) all long-term impacts can be fully mitigated, or 3) the activity will benefit and enhance the riparian area. Within the Price Field Office area, the NSO stipulation would apply within a buffer around natural springs, the size of which would be based on geophysical, riparian, and other factors necessary to protect the water quality of the spring. If these factors cannot be determined, a 660-foot buffer zone would be maintained. No exceptions would be allowed in the Price Field Office. The decision to apply an NSO stipulation around springs would protect surface water and groundwater quality

1   by preventing surface disturbance and associated erosion and sedimentation in areas adjacent to important
2   surface water resources and by preventing loss of riparian vegetation and important habitat for riparian-
3   dependent species.

4   Additionally, NSO stipulations in the Price Field Office would apply to the 100-year floodplain, or within
5   330-feet of the stream's centerline, whichever is greater, along all perennial and intermittent streams,
6   streams with perennial reaches, and riparian areas, including along the San Rafael and Green Rivers. This
7   action would protect water quality and riparian habitat by preventing surface disturbance and associated
8   sedimentation and water pollution from oil and gas operations in the areas directly adjacent to surface
9   waters. The Richfield Field Office does not include stipulations for these surface water resources, which
10  could result in loss of riparian vegetation, disturbance and erosion within streams, and loss of aquatic and
11  riparian habitat from oil and gas exploration and development.

12  The BLM would not apply a lease stipulation under Alternative A to minimize disturbance within and
13  near ephemeral streams. These decisions would allow surface disturbance to occur within and along
14  ephemeral streams, which could alter timing and duration of runoff; reduce infiltration capacity; and
15  accelerate erosion, sedimentation, and the addition of nutrients and sediment loads to stream channels,
16  including the San Rafael and Green Rivers. The changes in the timing and duration of runoff and
17  introduced pollutants could degrade water quality, affect stream and river channel structure, and decrease
18  overall watershed health.

19  Under Alternative A, the BLM Richfield Field Office would implement appropriate BMPs outlined in the
20  Richfield Field Office ROD/RMP designed to protect water quality for all ground-disturbing activities.
21  The Price Field Office would implement BMPs from other documents such as those found in the Utah
22  Nonpoint Source Management Plan (UDEQ 2013). BMPs would reduce the amount of erosion and
23  potential pollutants (e.g., sediment, salt, and excess nutrients) that would end up in runoff, protecting
24  water quality in streams and waterways, including the San Rafael and Green Rivers.

25  Under Alternative A, the Green River suitable segment from the confluence of the San Rafael River to
26  Canyonlands National Park (Map 2-5) would be managed as NSO. Prohibiting surface exploration and
27  development for oil and gas would protect riparian and water resources along the WSR suitable segment
28  of the Green River from vegetation loss, soil erosion, sedimentation, and contamination of surface water.
29  Allowing oil and gas resources under NSO stipulations to be developed by directionally drilling from
30  nearby lands would include some risk for groundwater contamination, which could end up in the Green
31  River through seeps and springs.

32  As described in Section 4.4, under Alternative A, the BLM would not apply a timing limitation stipulation
33  requiring avoidance of disturbance to saline soils in the Mancos Shale during the wet portions of the year.
34  These soils are highly sensitive to surface disturbance, and their erosion rates are easily accelerated. If a
35  timing limitation stipulation is not applied in these areas, surface oil and gas exploration and development
36  activities including soil disturbance could occur during the wetter portions of the year. This disturbance
37  could lead to erosion of saline soils and could affect water quality of downstream water bodies, including
38  the San Rafael, Green, and Colorado Rivers. Effects could include increased salinity, selenium, sediment
39  loads, and associated water chemistry parameters (e.g., TDS and total suspended solids).

40  Additionally, under Alternative A, the BLM would allow exceptions to or modifications of stipulations in
41  the Price Field Office ROD/RMP that prohibits surface disturbance on slopes greater than 40%. While the
42  BLM would only allow exceptions or modifications to this stipulation when a more detailed analysis
43  shows that impacts can be mitigated, allowing exceptions or modifications to this stipulation would
44  increase surface disturbance and soil destabilization in an area where risk of soil erosion is exceptionally
45  high. Even with the implementation of measures and strategies to reduce the risk of soil erosion, increased
46  water erosion and sedimentation downstream would likely occur.

### 4.5.3.2    Groundwater

The BLM would not apply additional BMPs under Alternative A to protect shallow aquifers and potential unconsolidated aquifers. Shallow and unconsolidated aquifers are susceptible to contamination during drilling through the introduction of drilling fluids and contamination of groundwater and surface water from improperly managed or closed reserve pits. This management decision would not implement additional risk-reducing measures beyond required oil and gas well casing and cementing programs that are intended to protect against contamination of groundwater and aquifers.

### 4.5.3.3    Riparian Resources

Under Alternative A, the BLM would apply an NSO stipulation within buffers around natural springs. Within the Richfield Field Office area, the size of the buffer with no surface disturbance or occupancy would be based on hydrological, riparian, and other factors necessary to protect the water quality of the springs. If these factors cannot be determined, a 330-foot buffer zone from the outer edge would be maintained. Exceptions would be allowed in the Richfield Field Office area if it can be shown that 1) there are no practical alternatives, 2) all long-term impacts can be fully mitigated, or 3) the activity would benefit and enhance the riparian area. Within the Price Field Office area, the NSO stipulation would apply within a buffer around natural springs, the size of which would be based on geophysical, riparian, and other factors necessary to protect the water quality of the spring. If these factors cannot be determined, a 660-foot buffer zone would be maintained. No exceptions would be allowed in the Price Field Office. The decision to apply an NSO stipulation around springs would protect surface water and groundwater quality and prevent the loss of riparian vegetation and important habitat for riparian-dependent species.

Additionally, NSO stipulations in the Price Field Office area would apply to the 100-year floodplain, or within 330-feet of the stream's centerline, whichever is greater, along all perennial and intermittent streams, streams with perennial reaches, and riparian areas, protecting water quality and riparian habitat. The Richfield Field Office does not include stipulations for these surface water resources, which could result in the loss of riparian vegetation, disturbance and erosion within streams, and the loss of aquatic and riparian habitat.

Under Alternative A, the Green River WSR suitable segment from the confluence of the San Rafael River to Canyonlands National Park would be managed as NSO. Prohibiting surface exploration and development for oil and gas would protect riparian areas along the WSR suitable segment of the Green River from vegetation loss, soil erosion, and sedimentation.

### 4.5.3.4    Suspended and Protested Lease Decisions

Under Alternative A, 45,043 acres of suspended and protested leases would be issued subject to standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO stipulations. Protested leases would be resolved and issued with terms and conditions that are consistent with the Price Field Office ROD/RMP. The areas encompassed by the suspended and protested leases contain sensitive soil resources including steep slopes and sandy soils that are difficult to reclaim and that are highly susceptible to wind and water erosion and therefore contribute to sedimentation and affect water quality. The suspended lease areas also include intermittent and ephemeral streams, riparian areas, and public water reserves within the Upper Dirty Devil watershed (HUC 10 1407000403) and the Robbers Roost watershed (HUC 10 1407000402), which both drain into the Dirty Devil River and then into the Colorado River. The protested lease areas contain a high density of intermittent and ephemeral streams and springs, and are located near the San Rafael River in three watersheds: Cottonwood Wash (HUC 10 1406000907), Lower San Rafael River (HUC 10 1406000910), and Moonshine Wash (HUC 10 1406000909), which all drain into the San Rafael River and then into the Green River.

1   If the protested leases were issued with terms and conditions that are consistent with the Price Field
2   Office ROD/RMP, impacts on water and riparian resources, including intermittent and ephemeral
3   streams, springs, and riparian areas would be the same as those described above for Alternative A.

4   Under Alternative A-1, the BLM would rescind the suspensions on suspended leases. The leases were
5   issued under the direction of the Henry Mountain Management Framework Plan without specific
6   stipulations to protect seeps, springs, intermittent and ephemeral streams, or public water reserves. If a
7   lessee proposes to develop theses leases (e.g., drill a well), the BLM would evaluate the lessee's proposal
8   in a site-specific environmental review. If during the site-specific environmental review process the BLM
9   determines that additional mitigation measures are required to protect resources of concern, those
10  mitigation measures would be included as conditions of approval to future site-specific authorizations.
11  For the water resources present in the suspended lease areas, the BLM would likely add conditions of
12  approval similar to the stipulations in the Richfield Field Office ROD/RMP. Therefore, if those leases
13  were subsequently developed, the impacts on water and riparian areas in the leased areas would be the
14  same as those described for surface water and groundwater and riparian resources for Alternative A.

15  Under Alternative A-2, the suspended leases would be subject to the conditions, stipulations, and BMPs
16  included in the Richfield Field Office ROD/RMP, such as the stipulation to implement appropriate BMPs
17  designed to protect water quality for all ground-disturbing activities. Modifying the stipulations to be
18  consistent with the Richfield Field Office ROD/RMP (Alternative A-2) would ensure that the leases are
19  issued with stipulations to reduce long-term impacts on water and riparian resources by improving the
20  reclamation of disturbances, stabilizing soils, and protecting water quality by preventing introduction of
21  sediment and pollutants resulting from oil and gas development activities compared to those under
22  Alternative A-1. However, because the BLM would likely require similar or the same stipulations as
23  conditions of approval during subsequent site-specific environmental review process, the impacts of
24  Alternative A-2 would be the same as the impacts of Alternative A-1.

## 4.5.4   Impacts from Alternative B

26  Under Alternative B, 0 acres would be open to oil and gas leasing subject to standard terms and
27  conditions; approximately 98,164 acres would be open to oil and gas leasing subject to CSU/TL
28  stipulations; approximately 324,161 acres would be open to oil and gas leasing subject to NSO
29  stipulations; and approximately 30,068 acres would be closed to oil and gas leasing.

30  Under Alternative B, the BLM estimates that seven oil and gas wells would be drilled in the planning area
31  over the next 15 years. These wells would result in approximately 127 acres of surface disturbance, of
32  which 20 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative
33  B are anticipated to result in 72 acres of surface disturbance, of which approximately 14 acres would be
34  unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative B would
35  promote more rapid and successful reclamation of surface disturbance compared to those under
36  Alternative A, indirectly benefiting water resources by minimizing erosion, sedimentation, and declines in
37  water quality. Among all alternatives, Alternative B would be anticipated to result in the least amount of
38  surface disturbance and impacts to water and riparian areas.

39  Under Alternative B, the application of CSU/TL stipulations could minimize impacts to water and
40  riparian resources in the planning area by limiting the amount of surface-disturbing activities associated
41  with oil and gas leasing and development, thereby limiting erosion and potential pollutants (sediment,
42  salt, and excess nutrient loading) that would end up in runoff and that could affect the water quality of
43  downstream watersheds. Additionally, stipulations to protect surface water and groundwater quality and
44  aquifers would prevent contamination associated with drilling operations from oil and gas leasing and
45  development.

Applying NSO stipulations or closing areas to oil and gas leasing under Alternative B would prevent surface-disturbing activities from oil and gas development within large portions of the planning area (Map 2-2-B). The NSO stipulations could protect water and riparian resources by preventing disturbance within and near springs, riparian areas, and ephemeral streams, thereby preventing vegetation loss, soil erosion, and increased runoff and transport of salts and sediments to nearby surface water bodies, and could also protect groundwater quality and flow conditions, recharge areas, spring flows, and surface water quality.

The BLM would not allow exceptions, modifications, or waivers to most NSO stipulations under Alternative B. Not allowing exceptions, modifications, or waivers would reduce impacts to water and riparian resources in areas that would be subject to NSO stipulations compared to Alternative A.

Under Alternative B, geophysical operations would not be permitted in areas closed to leasing, and only heliport geophysical operations would be allowed in areas that are managed as NSO. This management of geophysical operations would provide better protection for water and riparian resources in areas managed as closed to oil and gas leasing or open subject to NSO stipulations, including prevention of surface disturbance, erosion, sedimentation, and the degradation of water quality resulting from geophysical operations compared to Alternative A.

Alternative B would require implementation of updated BMPs to minimize the potential resource impacts associated with oil and gas developments. Compared to Alternative A, these BMPs include measures to minimize disturbance in intermittent and perennial streams and ephemeral drainages, and would protect groundwater quality during drilling operations and from contamination from reserve pits. The BMPs would reduce the long-term impacts of oil and gas development on water and riparian areas by minimizing the area of disturbed lands, especially along streams and drainages, promoting improved reclamation planning and practices and improved erosion control, and preventing groundwater contamination due to drilling activities and from use of reserve pits. The revised BMPs would improve groundwater protections in shallow or nonconsolidated aquifers compared to those under Alternative A by requiring closed loop drilling, lined reserve pits, or no surface pits.

Within the planning area, a typical well drilled to the primary target formation would involve approximately 294,000 gallons of water. Water used as a drilling medium, for mixing cement, and for various cleanup operations for the oil and gas wells projected in Alternative B would total approximately 2.1 million gallons of water that could be used in the next 15 years. The source of this water is primarily municipalities and private sources. Water obtained from aquifers and surface water could result in the drawing down of the water table and a reduction of available water resources for wildlife, vegetation, springs, streams, or public consumption. Withdrawal could affect local groundwater flow patterns and create changes in the quality and quantity of the remaining groundwater. However, detailed impacts of this water use cannot be addressed until site specific operations identify the water source.

### 4.5.4.1 Surface Water

Under Alternative B, the BLM would take appropriate actions to maintain water quality by working with the Utah Division of Water Quality and other agencies in accordance with the MOU regarding implementing the nonpoint source water quality program in the State of Utah. This MOU addresses the development of monitoring data and BMPs to protect water resources. The BLM would meet state and federal water quality standards, including designated beneficial uses and anti-degradation requirements, including on impaired waters such as the San Rafael River.

The BLM would apply an NSO stipulation under Alternative B to preclude oil and gas activities within public water reserves and 100-year floodplains, and within 660 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs. The NSO stipulation would reduce impacts to surface water resources and riparian areas in the planning area compared with Alternative A, by increasing the size of the NSO buffers and not allowing for exceptions. This would prevent vegetation loss, soil erosion, and increased runoff and transport of salts and sediments to nearby surface water bodies, and would also protect groundwater quality and flow conditions, recharge areas, spring flows, and surface water quality.

The BLM would also apply an NSO stipulation under Alternative B to prevent surface disturbance along ephemeral streams. This stipulation would preclude oil and gas activities within 100 feet of ephemeral streams (Map 2-11). The NSO stipulation would reduce the impacts of oil and gas activities on water quality compared with Alternative A by reducing the amount of erosion and potential pollutants (e.g., sediment, salt, and excess nutrient loading) that would end up in runoff and that could affect the water quality of downstream waterbodies, including the San Rafael, Green, and Colorado Rivers.

Applying a TL stipulation under Alternative B for oil and gas leases prohibiting surface-disturbing activities on saline soils in the Mancos Shale–derived soils from December 1 to May 31 could provide additional protections to the Colorado River system's water resources by minimizing soil runoff and erosion. In addition, this stipulation could help to maintain water quality by limiting potential salt and selenium loading to surface water and downstream waterbodies, including the Green and Colorado Rivers.

Additionally, under Alternative B, the BLM would not allow exceptions or modifications to the stipulation in the Price Field Office ROD/RMP that prohibits surface disturbance on slopes greater than 40%. Not allowing exceptions or modifications to this stipulation would preclude surface disturbance and soil destabilization in an area where risk of soil erosion is exceptionally high. This measure would reduce the risk of increased water erosion, sedimentation, and movement of pollutants downstream compared to Alternative A.

### 4.5.4.2    *Groundwater*

Under Alternative B, the BLM would apply stipulations to protect surface and groundwater resources. BMPs would prevent the potential contamination of surface and groundwater as a result of drilling operations. BMPs include the use of closed-loop drilling systems in sensitive areas or where there is shallow groundwater; substituting less-toxic products for conventional drilling products, such as mud and pipe dope; avoiding construction of reserve pits in areas of shallow groundwater; and using semi-closed-loop or closed-loop drilling systems and lining pits with impermeable liners to prevent contamination of groundwater and soils. These decisions would reduce the impacts on water quality compared with those under Alternative A by reducing the potential for contamination of surface water and groundwater.

The BLM would also apply stipulations under Alternative B to protect shallow aquifers and potential unconsolidated aquifers. BMPs specify that oil and gas exploration and development in areas identified with shallow unconfined aquifers and potential unconsolidated aquifers would require additional mitigation such as closed loop drilling; no surface pits; off-site location of production storage facilities; a spill prevention, control, and countermeasure plan; and a storm water management plan. A water monitoring plan may be required to ensure the effectiveness of mitigation to protect water resources. This measure would reduce the risk of contamination and degradation of water quality within aquifers compared to Alternative A.

### 4.5.4.3    *Riparian*

Under Alternative B, the BLM would apply an NSO stipulation to preclude oil and gas activities within public water reserves and 100-year floodplains, and within 660 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs. The NSO stipulation would reduce impacts to riparian areas in the planning area compared with Alternative A by increasing the size of the NSO buffers and not allowing for exceptions. This would prevent vegetation loss, soil erosion, and increased runoff and transport of salts and sediments to nearby surface water bodies, and would also protect groundwater quality and flow conditions, recharge areas, spring flows, and surface water quality.

Under Alternative B, the Green River WSR suitable segment from the confluence of the San Rafael River to Canyonlands National Park would be closed to leasing. Managing the area as closed to leasing for oil and gas development would protect riparian and water resources along the WSR suitable segment of the Green River from vegetation loss, soil erosion, sedimentation, and introduction of pollutants into surface water and groundwater as a result of surface disturbance and hydraulic fracturing.

1  #### 4.5.4.4     Suspended and Protested Lease Decisions

2  Under Alternative B, the BLM would cancel all suspended leases and resolve the protests on the protested
3  leases and deny the leases. Water and riparian resources in the areas of suspended and protested leases
4  would not be directly affected by oil and gas exploration and development activities. Current water and
5  riparian conditions and trends would be anticipated to continue for the foreseeable future.

6  ### 4.5.5   Impacts from Alternative C

7  Under Alternative C, approximately 37,865 acres would be open to oil and gas leasing subject to standard
8  terms and conditions; approximately 362,127 acres would be open to oil and gas leasing subject to
9  CSU/TL stipulations; approximately 52,208 acres would be open to oil and gas leasing subject to NSO
10  stipulations; and approximately 192 acres would be closed to oil and gas leasing.

11  Under Alternative C, the BLM estimates that 27 oil and gas wells would be drilled in the planning area
12  over the next 15 years. These wells would result in approximately 517 acres of surface disturbance, of
13  which 82 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative
14  C are anticipated to result in 292 acres of surface disturbance, of which approximately 58 acres would be
15  unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative C would
16  promote more rapid and successful reclamation of surface disturbance compared to those under
17  Alternative A, indirectly benefiting water resources by minimizing erosion and sedimentation. Alternative
18  C would be anticipated to result in less surface disturbance and fewer impacts to water and riparian
19  resources than under Alternative A but more surface disturbance and impacts than under Alternative B.

20  Managing areas identified as open to leasing and development subject to standard lease terms and
21  conditions would allow the development of well pads and associated infrastructure, which would involve
22  land clearing and surface disturbances. These actions expose soils and result in soil erosion and
23  sedimentation of downstream waters in both the short term during construction activities and in the long
24  term as permanent structures such as well pads and roads are maintained. Impacts could include altered
25  timing and duration of runoff; reduced infiltration capacity; and accelerated erosion, sedimentation, and
26  the addition of nutrients and sediment loads to stream channels, thereby degrading water quality, channel
27  structure, and overall watershed health.

28  The CSU/TL stipulations applied under Alternative C could minimize impacts to water and riparian
29  resources in the planning area by limiting the amount of surface-disturbing activities associated with oil
30  and gas leasing and development, thereby maintaining vegetation, stabilizing soil, and limiting erosion.
31  Under Alternative C, TL stipulations would be applied to saline soils, and CSU stipulations would be
32  applied for steep slopes, PFYC 4 and 5 areas, areas characterized by fine sandy soils with high wind
33  erosion potential, lands identified as having wilderness characteristics in the Labyrinth Canyon unit, the
34  Labyrinth Canyon SRMA, potions of the Dirty Devil/Robbers Roost SRMA, all recreation focus areas,
35  the Tidwell Draw site in the Uranium Mining District, the Old Spanish Trail high potential sites and route
36  segments, and in areas designated as VRM Class II.

37  Alternative C also includes CSU stipulations that would limit the density of oil and gas development.
38  These decisions would be made for resources including recreation focus areas, lands identified as having
39  wilderness characteristics in the Labyrinth Canyon unit, and the Labyrinth Canyon SRMA. In these areas,
40  the stipulations that would limit the density of oil and gas development would also reduce the intensity of
41  impacts on water resources, including vegetation loss, soil erosion, and increased runoff and transport of
42  salts and sediments to nearby surface water bodies.

43  In Alternative C, applying NSO stipulations to oil and gas leasing or closing areas to leasing would
44  prevent surface-disturbing activities from oil and gas development within the Three Rivers locatable
45  mineral withdrawal, natural areas, areas within 1 mile of Labyrinth Canyon rim, areas within 1 mile of
46  Horseshoe Canyon rim, areas within 1 mile of key observation points, and the Green River WSR suitable

1    section from the confluence of the San Rafael River to Canyonlands National Park. The NSO stipulations
2    could also protect water and riparian resources from vegetation loss, soil erosion, increased runoff, and
3    transport of salts and sediments to nearby surface water bodies including the San Rafael and Green
4    Rivers. NSO stipulations could also protect groundwater quality and flow conditions, recharge areas,
5    spring flows, and surface water quality. The Big Flat Tops ACEC would be closed to leasing, which
6    would provide similar benefits as applying NSO stipulations. Under Alternative C, the BLM would allow
7    some exceptions, modifications, or waivers to some of the NSO stipulations; however, fewer exceptions,
8    modifications, or waivers would be granted compared to Alternative A. Allowing fewer exceptions,
9    modifications, or waivers would reduce impacts to water and riparian resources in areas that would be
10   subject to NSO stipulations as compared to Alternative A.

11   Under Alternative C, geophysical operations would not be permitted in areas closed to leasing and would
12   be allowed in areas that are managed as NSO, although no new road construction or improvements would
13   be permitted and the BLM would require full reclamation of all surface disturbance. This management of
14   geophysical operations would provide better protection for water in areas managed as closed to oil and
15   gas leasing or open subject to NSO stipulations compared to Alternative A by preventing surface
16   disturbance, erosion, sedimentation, and degradation of water quality, and by improving reclamation
17   practices.

18   As described under Alternative B, the BMPs that are currently used for oil and gas leases in the planning
19   area would be updated under Alternative C to include additional state-of-the-art BMPs. The benefits to
20   water and riparian resources in the planning area from updating the BMPs under Alternative C would be
21   the same as those described under Alternative B.

22   Within the planning area, a typical well drilled to the primary target formation would involve
23   approximately 294,000 gallons of water. Water used as a drilling medium, for mixing cement, and for
24   various cleanup operations for the oil and gas wells projected in Alternative C would total approximately
25   7.9 million gallons of water that could be used in the next 15 years. The source of this water is primarily
26   municipalities and private sources. Water obtained from aquifers and surface water could result in the
27   drawing down of the water table and reduction of available water resources for wildlife, vegetation,
28   springs, streams, or public consumption. Withdrawal could affect local groundwater flow patterns and
29   create changes in the quality and quantity of the remaining groundwater. However, detailed impacts of
30   this water use cannot be addressed until site specific operations identify the water source.

31   ### 4.5.5.1    *Surface Water*

32   Under Alternative C, the BLM would take the same actions as would be applied under Alternative B to
33   maintain water quality by working with the Utah Division of Water Quality and other agencies in
34   accordance with the MOU regarding implementing the nonpoint source water quality program in the State
35   of Utah. The BLM would not allow exceptions or modifications of stipulations in the Price RMP that
36   prohibit surface disturbance on slopes greater than 40%. These decisions would be the same as the
37   corresponding decisions for Alternative B and would be anticipated to have the same water and riparian
38   resource impacts and benefits.

39   The BLM would apply an NSO stipulation under Alternative C to preclude oil and gas exploration and
40   development within public water reserves and 100-year floodplains, and within 330 feet of intermittent
41   and perennial streams, rivers, riparian areas, wetlands, water wells, and springs. This stipulation would
42   reduce the impacts of oil and gas activities on water quality and riparian resources compared with
43   Alternative A, including reducing the amount of disturbance occurring in close proximity to riparian areas
44   with the potential to affect water quality, but would allow for more disturbance near riparian areas than
45   would be permitted under Alternative B. This stipulation would prevent vegetation loss, soil erosion, and
46   increased runoff and transport of salts and sediments to nearby surface water bodies, and would also
47   protect groundwater quality and flow conditions, recharge areas, spring flows, and surface water quality.

Under Alternative C, the BLM would apply an NSO stipulation to preclude oil and gas activities within 100 feet of ephemeral streams. An exception could be granted for road and pipeline crossings. Roads and pipelines crossing ephemeral steams would be constructed in accordance with BMPs outlined in Appendix C. This stipulation would reduce the impacts of oil and gas activities on ephemeral streams compared with Alternative A, including reducing the amount of disturbance along ephemeral drainages, erosion, and sedimentation in waters downstream, but the exceptions would allow for more disturbance near ephemeral streams than would be permitted under Alternative B. This stipulation would prevent vegetation loss, soil erosion, and increased runoff and transport of salts and sediments to nearby surface water bodies.

Applying a TL stipulation for oil and gas leases under Alternative C prohibiting surface-disturbing activities on saline soils in the Mancos Shale-derived soils from December 1 to May 31 could provide additional protections to the Colorado River system's water resources by minimizing soil runoff and erosion. However, heavy equipment traffic on existing roads associated with drilling and completion operations would not be subject to this timing restriction. This TL would reduce the impacts of disturbance to saline soils, as compared with Alternative A, including reducing the amount of erosion of saline soils that could affect the water quality of downstream waterbodies such as the Green and Colorado Rivers, but it would allow for more disturbance than permitted under Alternative B. Effects that would be reduced include increased salinity, selenium, and sediment loads and associated water chemistry parameters (e.g., TDS and total suspended solids).

### 4.5.5.2    Groundwater

The BLM would apply the same stipulations to protect surface and groundwater resources, and to protect shallow aquifers and potential unconsolidated aquifers as would be applied under Alternative B. These decisions would be the same as the corresponding decisions for Alternative B and would be anticipated to have the same soil resource impacts and benefits.

### 4.5.5.3    Riparian Resources

Under Alternative C, the BLM would apply an NSO stipulation to preclude oil and gas exploration and development within public water reserves and 100-year floodplains, and within 330 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs. This stipulation would reduce the impacts of oil and gas activities on water quality and riparian resources compared with Alternative A, including reducing the amount disturbance occurring in close proximity to riparian areas with the potential to affect water quality, but would allow for more disturbance near riparian areas than permitted under Alternative B. This stipulation would prevent vegetation loss, soil erosion, and increased runoff and transport of salts and sediments to nearby surface water bodies, including the San Rafael and Green Rivers, and would also protect groundwater quality and flow conditions, recharge areas, spring flows, and surface water quality.

Under Alternative C, the Green River WSR suitable segment from the confluence of the San Rafael River to Canyonlands National Park (Map 2-5) would be managed as NSO. This decision would be the same as the corresponding decision for Alternative A and would be anticipated to have the same impacts and benefits to water and riparian resources.

### 4.5.5.4    Suspended and Protested Lease Decisions

Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to standard terms, 39,766 acres would be issued subject to CSU/TL stipulations, and 318 acres would be issued subject to NSO stipulations. The areas encompassed by the suspended and protested leases contain sensitive soil resources including steep slopes and sandy soils that are difficult to reclaim and highly susceptible to wind and water erosion and that therefore contribute to sedimentation and affect water

1   quality. The suspended lease areas also include intermittent and ephemeral streams, riparian areas, and
2   public water reserves within the Upper Dirty Devil watershed (HUC 10 1407000403) and the Robbers
3   Roost watershed (HUC 10 1407000402), which both drain into the Dirty Devil River and then into the
4   Colorado River. The protested lease areas contain a high density of intermittent and ephemeral streams
5   and springs, and are located near the San Rafael River in three watersheds: Cottonwood Wash (HUC 10
6   1406000907), Lower San Rafael River (HUC 10 1406000910), and Moonshine Wash (HUC 10
7   1406000909), which all drain into the San Rafael River and then into the Green River. If the leases were
8   subsequently developed, the impacts of modifying the terms and conditions of the suspended and
9   protested leases and issuing the leases consistent with Alternative C would be the same as the impacts on
10  water and riparian resources described for Alternative C.

## 4.5.6   Impacts from Alternative D

12  Under Alternative D, 0 acres would be open to oil and gas leasing subject to standard terms and
13  conditions; approximately 339,884 acres would be open to oil and gas leasing subject to CSU and TL
14  stipulations; approximately 92,170 acres would be open to oil and gas leasing subject to an NSO
15  stipulation; and approximately 20,339 acres would be closed to oil and gas leasing.

16  Under Alternative D, the BLM estimates that 23 oil and gas wells would be drilled in the planning area
17  over the next 15 years. These wells would result in approximately 440 acres of surface disturbance, of
18  which 70 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative
19  D is anticipated to result in 248 acres of surface disturbance, of which approximately 50 acres would be
20  unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative D would
21  promote more rapid and successful reclamation of surface disturbance compared to Alternative A,
22  indirectly benefiting water resources by minimizing erosion and sedimentation. Alternative D would be
23  anticipated to result in less surface disturbance and fewer impacts to water and riparian resources
24  compared to Alternatives A and C but more surface disturbance and impacts compared to Alternative B.

25  Under Alternative D, TL/CSU stipulations, especially those that would limit the density of oil and gas
26  development, could reduce the intensity and extent of disturbance to soils, thereby reducing the amount of
27  erosion and potential pollutants (e.g., sediment, salt, and excess nutrient loading) that would end up in
28  runoff and that could affect water quality of downstream watersheds. TL stipulations would be applied to
29  saline soils; areas where CSU stipulations that would limit oil and gas development density under
30  Alternative D include LWC units (with the exception of the Labyrinth Canyon LWC unit) and The Cone
31  and Cottonwood Wash recreation focus areas. The density limitations in these areas under Alternative D
32  would require lower-density oil and gas development and would result in reduced surface disturbance and
33  impacts to water and riparian resources compared to Alternative C.

34  NSO stipulations would be applied under Alternative D for the Dirty Devil/French Springs LWS units
35  and the Horseshoe Canyon South non-WSA lands with wilderness characteristics; lands identified as
36  having wilderness characteristics during the 2016 inventory in the Labyrinth Canyon unit; the Labyrinth
37  Canyon SRMA; portions of the Dirty Devil/Robbers Roost SRMA; all lands within 1 mile of the Green
38  River Labyrinth Canyon rim that are north of the San Rafael River; the Fossil Point, Dry Lake, Trin
39  Alcove/Three Canyon, Saucer Basin/Moonshine Wash, Keg Knoll, Sweetwater Reef, and Horseshoe
40  Canyon Trailhead recreation focus areas; all lands within 1 mile of KOPs and travel corridors; the Dry
41  Lake Archaeological District ACEC; the Tidwell Draw ACEC; all lands within 1 mile of high-potential
42  sites and route segments along the Old Spanish Trail; steep slopes; areas within public water reserves and
43  100-year floodplains and within 660 feet of intermittent and perennial streams, rivers, riparian areas,
44  wetlands, water wells, and springs; and areas within 100 feet of ephemeral streams. Areas that would be
45  closed to oil and gas leasing would include the Big Flat Tops ACEC, the Three Rivers locatable mineral
46  withdrawal, all lands within 1 mile of the Green River Labyrinth Canyon rim south of the San Rafael
47  River, all lands within 1 mile of the Horseshoe Canyon rim, and the Green River suitable segment from
48  the confluence of the San Rafael River to Canyonlands National Park. The NSO stipulations and

1  decisions to close areas to oil and gas leasing could also protect water and riparian resources from
2  vegetation loss, soil erosion, and increased runoff and transport of salts and sediments to nearby surface
3  water bodies, and could also protect groundwater quality and flow conditions, recharge areas, spring
4  flows, and surface water quality.

5  The BLM would allow minimal exceptions, modifications, or waivers to NSO stipulations under
6  Alternative D. Fewer exceptions, modifications, or waivers would be granted compared to those under
7  Alternatives A and C. Allowing fewer exceptions, modifications, or waivers would reduce impacts to
8  water and riparian resources including soil erosion, increased runoff, sedimentation, and degradation of
9  water quality in areas that would be subject to NSO stipulations as compared to Alternatives A and C.

10  Under Alternative D, geophysical operations in areas managed as closed to leasing of NSO would be
11  conducted in the same manner and would be anticipated to have the same impacts on water and riparian
12  resources as Alternative C.

13  As described in Alternative B, the BMPs that are currently used for oil and gas leases in the planning area
14  would be updated under Alternative D to include additional state-of-the-art BMPs. The benefits to water
15  and riparian resources in the planning area from updating the BMPs under Alternative D would be the
16  same as those described under Alternative B.

17  Within the planning area, a typical well drilled to the primary target formation would involve about
18  294,000 gallons of water. Water used as a drilling medium, for mixing cement, and for various cleanup
19  operations for the oil and gas wells projected in Alternative D would total approximately 6.8 million
20  gallons of water that could be used in the next 15 years. The source of this water would be primarily
21  municipalities and private sources. Water obtained from aquifers and surface water could result in the
22  drawing down of the water table and a reduction of available water resources for wildlife, vegetation,
23  springs, streams, or public consumption. Withdrawal could affect local groundwater flow pattern and
24  create changes in quality and quantity of the remaining groundwater. However, detailed impacts of this
25  water use cannot be addressed until site specific operations identify the water source.

26  ### 4.5.6.1    *Surface Water*

27  The BLM would take appropriate actions under Alternative D to maintain water quality by working with
28  the Utah Division of Water Quality and other agencies in accordance with the MOU regarding
29  implementing the nonpoint source water quality program in the State of Utah. NSO stipulations for the
30  buffer around intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs
31  would be 660 feet, the same as Alternative B. These decisions would be the same as the corresponding
32  decisions for Alternative B and would be anticipated to have the same water and riparian resource impacts
33  and benefits.

34  Under Alternative D, the BLM would apply an NSO stipulation to preclude oil and gas activities within
35  100 feet of ephemeral streams, with the same exceptions for road and pipeline crossings as Alternative C.
36  The BLM would not allow exceptions or modifications to the stipulation in the Price Field Office
37  ROD/RMP that prohibits surface disturbance on slopes greater than 40%, and would apply the same TL
38  stipulations that would prevent surface disturbance on saline soils in the Mancos Shale–derived soils as
39  would be applied under Alternative C. These decisions would be the same as the corresponding decisions
40  for Alternative C and would be anticipated to have the same water and riparian resource impacts and
41  benefits.

### 4.5.6.2    *Groundwater*

Under Alternative D, the BLM would apply the same stipulations to protect surface and groundwater resources and to protect shallow aquifers and potential unconsolidated aquifers as would be applied under Alternative B. These decisions would be the same as the corresponding decisions for Alternative B and would be anticipated to have the same water and riparian resource impacts and benefits.

### 4.5.6.3    *Riparian Resources*

Under Alternative D, the BLM would apply NSO stipulations around intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and springs within a buffer of 660 feet, the same as Alternative B. This decision would be the same as the corresponding decision for Alternative B and would be anticipated to have the same water and riparian resource impacts and benefits.

Under Alternative D, the Green River WSR suitable segment from the confluence of the San Rafael River to Canyonlands National Park (Map 2-5) would be closed to leasing. This decision would be the same as the corresponding decision for Alternative B and would be anticipated to have the same water and riparian resource impacts and benefits.

### 4.5.6.4    *Suspended and Protested Lease Decisions*

Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU/TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. The areas encompassed by the suspended and protested leases contain sensitive soil resources including steep slopes and sandy soils that are difficult to reclaim and are highly susceptible to wind and water erosion and therefore contribute to sedimentation and affect water quality. The suspended lease areas also include intermittent and ephemeral streams, riparian areas, and public water reserves within the Upper Dirty Devil watershed (HUC 10 1407000403) and the Robbers Roost watershed (HUC 10 1407000402), which both drain into the Dirty Devil River and then into the Colorado River. The protested lease areas contain a high density of intermittent and ephemeral streams and springs, and are located near the San Rafael River in three watersheds: Cottonwood Wash (HUC 10 1406000907), Lower San Rafael River (HUC 10 1406000910), and Moonshine Wash (HUC 10 1406000909), which all drain into the San Rafael River and then into the Green River. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative C would be the same as the impacts on water and riparian resources described for Alternative C.

## 4.6    VEGETATION

This section presents potential impacts to vegetation resources from implementing management actions presented in Chapter 2. Existing conditions concerning vegetation resources are described in Chapter 3.

### 4.6.1    Assumptions

- Adequate vegetative ground cover and species composition for site stabilization typically would occur within 15 to 20 years in shrub communities and 20 to 25 years in desert communities.

- In disturbed areas, re-establishment of a vegetative landscape and plant composition similar to adjacent undisturbed lands, including trees and shrubs, could take in excess of 100 years.

- All plant communities would be managed toward achieving a mix of species composition, cover, and age classes across the landscape.

- The degree of impact attributed to any one disturbance or series of disturbances would be influenced by several factors, including location; the type, time, and degree of disturbance; and existing vegetation, precipitation, and mitigating actions applied to the disturbance.

1 • Noxious and invasive weeds would continue to be introduced and spread as a result of ongoing
2 vehicle traffic in and out of the planning area, recreational activities, wildlife and livestock
3 grazing and movements, and surface-disturbing activities.

4 ## 4.6.2   Impacts Common to All Alternatives

5 The following discussions represent impacts to vegetation resources that would not vary by alternative.

6 Management of the Big Flat Tops ACEC as closed to oil and gas leasing and development would
7 preclude impacts from oil and gas development, including surface disturbance, loss of vegetation, and
8 introduction and spread of non-native, invasive species and noxious weeds into the relict vegetation
9 community present within the ACEC.

10 Controlling noxious weed species, preventing the infestation and spread of invasive species, and
11 developing cooperating agreements with other federal, state, local, and private organizations to control
12 invasive and noxious weed species would reduce the introduction and spread of non-native, invasive
13 species and noxious weeds throughout the planning area.

14 Lease notices and associated management of the following special status species would preclude impacts
15 from oil and gas development to habitats for these species: Mexican spotted owl (*Strix occidentalis*
16 *lucida)*, southwestern willow flycatcher (*Empidonax traillii extimus*), yellow-billed cuckoo (*Coccyzus*
17 *americanus*), bonytail (*Gila elegans*), Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub
18 (*Gila cypha*), and razorback sucker (*Xyrauchen texanus*). This management would prevent surface
19 disturbance, loss of vegetation, and the introduction and spread of non-native, invasive species and
20 noxious weeds into the vegetation community present in these species' habitats, including the 100-year
21 floodplain of the Green River and possibly some riparian areas within the planning area.

22 ## 4.6.3   Impacts from Alternative A (No Action)

23 Under Alternative A, approximately 399,462 acres (88%) would be open to oil and gas leasing subject to
24 standard terms and conditions, approximately 19,083 acres (4%) would be open to oil and gas leasing
25 subject to CSU/TL stipulations, approximately 33,627 acres (7%) would be open to oil and gas leasing
26 subject to NSO stipulations, and approximately 220 acres (0%) would be closed to oil and gas leasing.

27 Under Alternative A, the BLM estimates that 28 oil and gas wells would be drilled in the planning area
28 over the next 15 years. These wells would result in approximately 541 acres of surface disturbance and
29 removal of vegetation, of which 86 acres would remain unreclaimed in 15 years. Geophysical survey
30 operations under Alternative A are anticipated to result in 305 acres of surface disturbance and the
31 removal of vegetation, of which approximately 61 acres would be unreclaimed in 15 years. The BMPs
32 that would be applied to oil and gas leases under Alternative A would promote reclamation of surface
33 disturbance to some degree. However, because of the difficulty of reclaiming surface disturbances in the
34 planning area, the areas that are reclaimed would not be anticipated to return to natural conditions until 20
35 to 25 years or more after initial reclamation.

36 Managing the areas identified as open to leasing and development subject to standard lease terms and
37 conditions would result in the damage or removal of vegetation from the development of well pads and
38 associated infrastructure. Invasive, non-native plant species and noxious weeds could be introduced and
39 spread by vehicles and machinery during development activities, which could change habitat composition
40 and function, making habitat inhospitable for native plant species and could lead to further losses of
41 native vegetation. These impacts to vegetation would be limited, to some degree, by the implementation
42 of BMPs described later in this section.

1   The TL stipulations under Alternative A would prevent surface disturbance during specific timeframes,
2   which could support vegetation growth during the periods of closure; however, disturbance and
3   vegetation removal could still occur outside of the seasonal closures, ultimately leading to some loss of
4   vegetation from oil and gas development. The CSU stipulations could reduce the intensity and extent of
5   disturbance to vegetation in areas such as steep slopes, SRMAs, areas adjacent to the Old Spanish Trail,
6   and VRM Class II areas by minimizing surface disturbance, vegetation damage or removal, soil loss,
7   erosion, and the introduction and spread of invasive, non-native plant species and noxious weeds.

8   Under Alternative A, applying an NSO stipulation or closing areas to oil and gas leasing would prevent
9   surface-disturbing activities from oil and gas development within 100-year floodplains, steep slopes,
10  natural springs, natural areas, SRMAs, and ACECs. The NSO stipulations could protect vegetation
11  resources from damage or removal, prevent soil loss, and reduce erosion. The prevention of surface
12  disturbance would reduce the potential for the introduction and spread of invasive, non-native plant
13  species and noxious weeds, supporting the native vegetation communities and ecosystems. However,
14  under Alternative A, the BLM would allow some exceptions, modifications, or waivers for NSO
15  stipulations (e.g., in SRMAs where oil and gas exploration and development would not impair identified
16  scenic and primitive or semi-primitive recreational resources, or on steep slopes when a more detailed
17  analysis shows that impacts can be mitigated). Granting exceptions, modifications, or waivers to NSO
18  stipulations would allow for impacts to vegetation resources from oil and gas development in areas where
19  NSO stipulations are applied. These impacts would be similar to the impacts to vegetation that would
20  occur in areas that are open to oil and gas leasing subject to standard terms and conditions.

21  Under Alternative A, geophysical operations could be allowed on lands closed to leasing or subject to
22  NSO stipulations under certain circumstances in the Richfield Field Office and would be allowed
23  consistent with existing regulations for geophysical exploration in the Price Field Office. Allowing
24  geophysical operations in areas closed to mineral leasing or subject to NSO stipulations would allow for
25  impacts to vegetation resources similar to the impacts to vegetation that would occur in areas that are
26  open to oil and gas leasing subject to standard terms and conditions.

27  As described in Chapter 3, vegetation communities were identified using land cover data developed by
28  the SWReGAP (Prior-Magee et al. 2007). Table 4-10 presents the acres of each land cover type that occur
29  within the planning area within the areas that are closed to oil and gas leasing, open to oil and gas leasing
30  subject to standard terms and conditions, and open to oil and gas leasing subject to NSO or CSU/TL
31  stipulations.

32  **Table 4-10. Land Cover Types by Oil and Gas Leasing Category under Alternative A**

| Land Cover Type | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Colorado Plateau Blackbrush-Mormon-Tea Shrubland | 184,190 | 7,983 | 11,120 | 14 |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | 25,515 | 1,162 | 4,922 | 126 |
| Colorado Plateau Pinyon-Juniper Shrubland | 1,466 | 43 | 116 | 1 |
| Colorado Plateau Pinyon-Juniper Woodland | 290 | 56 | 4 | 2 |
| Developed, Medium - High Intensity | 269 | 19 | 0 | 0 |
| Disturbed, Oil Well | 7 | 0 | 0 | 0 |
| Inter-Mountain Basins Active and Stabilized Dune | 87,439 | 2,054 | 9,169 | 1 |
| Inter-Mountain Basins Big Sagebrush Shrubland | 107 | 0 | 1 | 0 |

| Land Cover Type | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Inter-Mountain Basins Greasewood Flat | 7713 | 1247 | 898 | 0 |
| Inter-Mountain Basins Mat Saltbush Shrubland | 35,998 | 4,134 | 2,891 | 46 |
| Inter-Mountain Basins Mixed Salt Desert Scrub | 5,142 | 1,159 | 595 | 23 |
| Inter-Mountain Basins Semi-Desert Grassland | 14,114 | 384 | 45 | 1 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 8,846 | 95 | 60 | 7 |
| Inter-Mountain Basins Shale Badland | 7,604 | 382 | 532 | 0 |
| Invasive Annual and Biennial Forbland | 954 | 63 | 360 | 0 |
| Invasive Annual Grassland | 3 | 0 | 0 | 0 |
| Invasive Southwest Riparian Woodland and Shrubland | 450 | 97 | 1,542 | 0 |
| Open Water | 75 | 35 | 425 | 0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 31 | 3 | 35 | 0 |
| Southern Colorado Plateau Sand Shrubland | 19,246 | 167 | 912 | 0 |

The climate in the planning area is arid, and past reclamation of disturbances has been difficult, including the reestablishment of vegetation on oil and gas well pads, roads, and areas that have been disturbed from seismic activities. Alternative A contains some stipulations and BMPs that would help improve reclamation success. Under Alternative A, the use and perpetuation of native plant species would be emphasized in reclamation actions. However, when restoring or rehabilitating disturbed or degraded rangelands, non-intrusive, non-native plant species may be used. The BMPs that would be applied to oil and gas leases under Alternative A would require interim reclamation of the well and access road and would begin as soon as practicable after a well is placed in production. Facilities would be grouped on the pads to allow for maximum interim reclamation. Interim reclamation would include road cuts and fills and would extend to within close proximity of the wellhead and production facilities. Final reclamation of all oil and gas disturbance would involve recontouring all disturbed areas, including access roads, to the original contour or a contour that blends with the surrounding topography and revegetating all disturbed areas. Even with these stipulations and BMPs, it is anticipated that reclamation of some disturbances and reestablishment of vegetation on areas disturbed by oil and gas activities would be difficult and could take 20 to 25 years or more under Alternative A.

### 4.6.3.1    Suspended and Protested Lease Decisions

Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts to vegetation from issuing the leases subject to the terms and conditions contained within the Price and Richfield ROD/RMPs (Alternative A-2) would be the same as the impacts to vegetation from managing them as open or NSO described in this section. If BLM were to rescind the suspensions on the suspended leases (Alternative A-1) and the leases were subsequently developed, the impacts to vegetation that would occur in the leased areas could be the same as those described for managing vegetation as open to leasing subject to standard terms and conditions. Under Alternative A-2, the suspended leases would be subject to the conditions, including reclamation stipulations and BMPs included in the Richfield ROD/RMP. Modifying the stipulations to be consistent with the Richfield ROD/RMP (Alternative A-2) would improve the reclamation of disturbances, including reestablishment of vegetation and prevention of introduction and spread of non-

1  native, invasive plant species and noxious weeds resulting from oil and gas development activities
2  compared to Alternative A-1.

3  Under both Alternatives A-1 and A-2, if a lessee proposes to develop these leases (e.g., drill a well), the
4  BLM would evaluate the lessee's proposal in a site-specific environmental review. If during the site-
5  specific environmental review process the BLM determines that additional mitigation measures are
6  required to protect resources of concern, those mitigation measures would be included as conditions of
7  approval to future site-specific authorizations (e.g., application of appropriate BMPs).

## 4.6.4   Impacts from Alternative B

9   Under Alternative B, 0 acre (0%) would be open to oil and gas leasing subject to standard terms and
10  conditions, approximately 98,164 acres (22%) would be open to oil and gas leasing subject to CSU/TL
11  stipulations, approximately 324,161 acres (72%) would be open to oil and gas leasing subject to NSO
12  stipulations, and approximately 30,068 (7%) acres would be closed to oil and gas leasing.

13  Under Alternative B, the BLM estimates that seven oil and gas wells would be drilled in the planning area
14  over the next 15 years. These wells would result in approximately 127 acres of surface disturbance and
15  the removal of vegetation, of which 20 acres would remain unreclaimed in 15 years. Geophysical survey
16  operations under Alternative B are anticipated to result in 72 acres of surface disturbance and the removal
17  of vegetation, of which approximately 14 acres would be unreclaimed in 15 years. The BMPs that would
18  be applied to oil and gas leases under Alternative B would promote more rapid and successful reclamation
19  of surface disturbance compared to Alternative A. However, because of the difficulty of reclaiming
20  surface disturbances in the planning area, some reclaimed areas would not be anticipated to return to
21  natural conditions until up to 20 to 25 years after initial reclamation.

22  The TL stipulations under Alternative B would prevent surface disturbance during specific timeframes,
23  which could support vegetation growth during the periods of closure; however, disturbance and
24  vegetation removal could still occur outside of the seasonal closures, ultimately leading to some loss of
25  vegetation from oil and gas development. The CSU stipulations applied under Alternative B could reduce
26  the intensity and extent of disturbance in the planning area. Applying a CSU stipulation that
27  requires a fugitive dust control plan for oil and gas activities that would disturb a surface area larger than
28  0.25 acre, or that would result in substantial increases in truck traffic on unpaved or untreated surfaces,
29  could reduce the impacts of dust on vegetation near the dust-producing activities including decreased
30  transpiration and photosynthesis. Applying a CSU stipulation that requires use of BMPs to minimize or
31  mitigate wind erosion and emissions of fugitive dust would substantially improve reclamation success and
32  reestablishment of vegetation removed as a result of oil and gas operations in the planning area by
33  preventing erosion of soils and loss of seed material necessary for reestablishment of vegetation.

34  Under Alternative B, applying an NSO stipulation or closing areas to oil and gas leasing would prevent
35  surface-disturbing activities from oil and gas development within large portions of the planning area (Map
36  2-2-B). In areas that open subject to NSO stipulations or closed to leasing, vegetation would be protected
37  from damage and removal or from the introduction and spread of invasive, non-native plant species and
38  noxious weeds resulting from oil and gas development. The NSO stipulations could also protect
39  vegetation resources from damage or removal, prevent soil loss, and reduce erosion resulting from oil and
40  gas development. The prevention of surface disturbance would reduce the potential for the introduction
41  and spread of invasive, non-native plant species and noxious weeds, supporting the native vegetation
42  communities and ecosystems. Under Alternative B, the BLM would not allow exceptions, modifications,
43  or waivers to most NSO stipulations. Not allowing exceptions, modifications, or waivers would reduce
44  impacts to vegetation in areas that would be subject to NSO stipulations compared to Alternative A,
45  which would allow more exceptions, modifications, or waivers.

1  Under Alternative B, geophysical operations would not be permitted in areas closed to leasing, and only
2  heliport geophysical operations would be allowed in areas that are open subject to NSO stipulations. This
3  management of geophysical operations would provide better protection for vegetation in areas managed
4  as closed to oil and gas leasing or open subject to NSO stipulations, including prevention of surface
5  disturbance, damage or removal of vegetation, and introduction and spread of invasive, non-native plant
6  species and noxious weeds compared to Alternative A.

7  As described in Chapter 3, vegetation communities were identified using land cover data developed by
8  the SWReGAP (Prior-Magee et al. 2007). Table 4-11 presents the acres of each land cover type that occur
9  within the planning area within the areas that are closed to oil and gas leasing, open to oil and gas leasing
10  subject to standard terms and conditions, and open to oil and gas leasing subject to NSO or CSU/TL
11  stipulations.

12  **Table 4-11. Land Cover Types by Oil and Gas Leasing Category under Alternative B**

| Land Cover Type | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Colorado Plateau Blackbrush-Mormon-Tea Shrubland | 0 | 43,214 | 148,063 | 12,031 |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | 0 | 5,044 | 20,917 | 5,764 |
| Colorado Plateau Pinyon-Juniper Shrubland | 0 | 199 | 1,301 | 126 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 25 | 313 | 14 |
| Developed, Medium - High Intensity | 0 | 58 | 226 | 3 |
| Disturbed, Oil Well | 0 | 0 | 0 | 7 |
| Inter-Mountain Basins Active and Stabilized Dune | 0 | 17,577 | 77,023 | 4,064 |
| Inter-Mountain Basins Big Sagebrush Shrubland | 0 | 4 | 103 | 1 |
| Inter-Mountain Basins Greasewood Flat | 0 | 3,188 | 5,528 | 1,142 |
| Inter-Mountain Basins Mat Saltbush Shrubland | 0 | 10,664 | 28,655 | 3,750 |
| Inter-Mountain Basins Mixed Salt Desert Scrub | 0 | 1,537 | 3,960 | 1,422 |
| Inter-Mountain Basins Semi-Desert Grassland | 0 | 3,220 | 11,293 | 31 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 3,561 | 5,391 | 56 |
| Inter-Mountain Basins Shale Badland | 0 | 3,595 | 4,807 | 116 |
| Invasive Annual and Biennial Forbland | 0 | 110 | 1,120 | 147 |
| Invasive Annual Grassland | 0 | 0 | 3 | 0 |
| Invasive Southwest Riparian Woodland and Shrubland | 0 | 0 | 1,746 | 343 |
| Open Water | 0 | 0 | 0 | 535 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 0 | 53 | 17 |
| Southern Colorado Plateau Sand Shrubland | 0 | 6,166 | 13,660 | 500 |

Under Alternative B, only native species would be used when restoring or rehabilitating disturbed areas, and the BMPs that are currently used for oil and gas leases in the planning area would be updated to include additional state-of-the-art BMPs. Compared to Alternative A, these BMPs include measures to reduce fugitive dust, protect soil and water resources, improve reclamation success, reduce impacts on vegetation, and prevent the spread of noxious weeds and invasive species. These BMPs would reduce the long-term impacts of oil and gas development to vegetation by minimizing the area of disturbed land and promoting improved reclamation planning and practices, including improved topsoil salvage, seedbed preparation, and seeding, and preventing livestock from grazing the reclaimed area until vegetation is reestablished. The revised BMPs would also reduce the introduction and spread of non-native, invasive plant species and noxious weeds compared to Alternative A by improving equipment cleaning and by the coordination, planning, and execution of noxious weed prevention measures. Compared to Alternative A, these BMPs would reduce the time required to reestablish vegetation on areas disturbed by oil and gas activities and promote a more rapid return to natural conditions in disturbed areas.

### 4.6.4.1     Suspended and Protested Lease Decisions

Under Alternative B, the BLM would cancel all suspended leases and resolve the protests on the protested leases and deny the leases. The vegetation in the areas of suspended and protested leases would not be affected by oil and gas activities resulting from operators exploring for and developing oil and gas resources. Current vegetation conditions and trends conditions would be anticipated to continue for the foreseeable future.

## 4.6.5   Impacts from Alternative C

Under Alternative C, approximately 37,865 acres (8%) would be open to oil and gas leasing subject to standard terms and conditions, approximately 362,127 acres (80%) would be open to oil and gas leasing subject to CSU/TL stipulations, approximately 52,208 acres (12%) would be open to oil and gas leasing subject to NSO stipulations, and approximately 192 acres (0%) would be closed to oil and gas leasing.

Under Alternative C, the BLM estimates that 27 oil and gas wells would be drilled in the planning area over the next 15 years. These wells would result in approximately 517 acres of surface disturbance and removal of vegetation, of which 82 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative C are anticipated to result in 292 acres of surface disturbance and removal of vegetation, of which approximately 58 acres would be unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative C would promote more rapid and successful reclamation of surface disturbance compared to Alternative A. However, because of the difficulty of reclaiming surface disturbances in the planning area, some reclaimed areas would not be anticipated to return to natural conditions until up to 20 to 25 years after initial reclamation.

Managing the areas identified as open to leasing and development subject to standard lease terms and conditions would result in the damage or removal of vegetation from the development of well pads and associated infrastructure. Invasive, non-native plant species and noxious weeds could be introduced and spread by vehicles and machinery during development activities, which could change habitat composition and function, making habitat inhospitable for native plant species and could lead to further losses of native vegetation.

The TL stipulations under Alternative C would prevent surface disturbance during specific timeframes, which could support vegetation growth during the periods of closure; however, disturbance and vegetation removal could still occur outside of the seasonal closures, ultimately leading to some loss of vegetation from oil and gas development. The CSU stipulations applied under Alternative C, especially those that would limit the density of oil and gas development, could reduce the intensity and extent of disturbance to vegetation. These areas include the Labyrinth Canyon LWC, SRMAs, recreation focus areas, areas designated as VRM Class II, and areas within 2 miles of the Old Spanish Trail. Similar to

1  Alternative B, Alternative C would also require the use of BMPs to minimize or mitigate wind erosion
2  and emissions of fugitive dust, which would substantially improve reclamation success and
3  reestablishment of vegetation removed as a result of oil and gas operations in the planning area by
4  preventing erosion of soils and loss of seed material necessary for reestablishment of vegetation. Under
5  Alternative C, the Tidwell Draw Uranium District ACEC would be managed subject to a CSU stipulation,
6  which could allow for more disturbance and removal of vegetation within the ACEC than would be
7  permitted under Alternatives A or B, where the ACEC would be managed subject to an NSO stipulation.

8  Under Alternative C, applying an NSO stipulation to oil and gas leasing would prevent surface-disturbing
9  activities from oil and gas development within the Three Rivers locatable mineral withdrawal, designated
10 natural areas, within 1 mile of the Labyrinth Canyon rim, within 1 mile of Horseshoe Canyon rim, within
11 1 mile of key observation points, and the Green River suitable section from the confluence of the San
12 Rafael River to Canyonlands National Park. The NSO stipulations could also protect vegetation resources
13 from damage or removal, prevent soil loss, and reduce erosion resulting from oil and gas development.
14 The prevention of surface disturbance would reduce the potential for the introduction and spread of
15 invasive, non-native plant species and noxious weeds, supporting the native vegetation communities and
16 ecosystems. Under Alternative C, the BLM would allow exceptions, modifications, or waivers to some of
17 the NSO stipulations; however, fewer exceptions, modifications, or waivers would be granted compared
18 to Alternative A. Allowing fewer exceptions, modifications, or waivers would reduce impacts to
19 vegetation in areas that would be subject to NSO stipulations compared to Alternative A, which would
20 allow more exceptions, modifications, or waivers.

21 Under Alternative C, geophysical operations would not be permitted in areas closed to leasing and would
22 be allowed in areas that are managed subject to NSO stipulations, though no new road construction or
23 improvements would be permitted, and the BLM would require full reclamation of all surface
24 disturbance. This management of geophysical operations would provide better protection for vegetation in
25 areas managed as closed to oil and gas leasing or open subject to NSO stipulations, including prevention
26 of surface disturbance and damage or removal of vegetation, improved reclamation practices, and reduced
27 likelihood of introduction and spread of invasive, non-native plant species and noxious weeds compared
28 to Alternative A.

29 As described in Chapter 3, vegetation communities were identified using land cover data developed by
30 the SWReGAP (Prior-Magee et al. 2007). Table 4-12 presents the acres of each land cover type that occur
31 within the planning area within the areas that are closed to oil and gas leasing, open to oil and gas leasing
32 subject to standard terms and conditions, and open to oil and gas leasing subject to NSO or CSU/TL
33 stipulations.

34 **Table 4-12. Land Cover Types by Oil and Gas Leasing Category under Alternative C**

| Land Cover Type | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Colorado Plateau Blackbrush-Mormon-Tea Shrubland | 11,951 | 173,117 | 18,240 | 0 |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | 3,204 | 20,325 | 8,080 | 116 |
| Colorado Plateau Pinyon-Juniper Shrubland | 64 | 1,402 | 160 | 0 |
| Colorado Plateau Pinyon-Juniper Woodland | 11 | 327 | 13 | 2 |
| Developed, Medium - High Intensity | 6 | 276 | 5 | 0 |
| Disturbed, Oil Well | 0 | 0 | 7 | 0 |
| Inter-Mountain Basins Active and Stabilized Dune | 15,002 | 72,842 | 10,820 | 0 |

| Land Cover Type | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Inter-Mountain Basins Big Sagebrush Shrubland | 0 | 107 | 1 | 0 |
| Inter-Mountain Basins Greasewood Flat | 837 | 7,020 | 2,001 | 0 |
| Inter-Mountain Basins Mat Saltbush Shrubland | 2,905 | 34,222 | 5,897 | 46 |
| Inter-Mountain Basins Mixed Salt Desert Scrub | 426 | 4,474 | 1,996 | 23 |
| Inter-Mountain Basins Semi-Desert Grassland | 197 | 14,292 | 55 | 1 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 1,317 | 7,524 | 161 | 5 |
| Inter-Mountain Basins Shale Badland | 1,228 | 6,811 | 478 | 0 |
| Invasive Annual and Biennial Forbland | 102 | 780 | 494 | 0 |
| Invasive Annual Grassland | 0 | 3 | 0 | 0 |
| Invasive Southwest Riparian Woodland and Shrubland | 0 | 0 | 2,089 | 0 |
| Open Water | 0 | 0 | 535 | 0 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 0 | 70 | 0 |
| Southern Colorado Plateau Sand Shrubland | 615 | 18,605 | 1,106 | 0 |

Under Alternative C, the use and perpetuation of native plant species would be emphasized in reclamation actions. However, when restoring or rehabilitating disturbed or degraded rangelands, non-intrusive, non-native plant species may be used. Unlike Alternative B, this would allow for the use of non-native species in reclamation as needed. Additionally, similar to Alternative B, under Alternative C, the BMPs that are currently used for oil and gas leases in the planning area would be updated to include additional state-of-the-art BMPs. The benefits to vegetation resources in the planning area from updating the BMPs under Alternative C would be the same as those described under Alternative B.

### 4.6.5.1    *Suspended and Protested Lease Decisions*

Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to standard terms, 39,766 acres would be issued subject to CSU/TL stipulations, and 318 acres would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative C would be the same as the impacts to vegetation described in this section from managing areas as open to leasing subject to standard terms and conditions, open to leasing subject to CSU/TL stipulations, or open to leasing subject to NSO stipulations.

### 4.6.6   Impacts from Alternative D

Under Alternative D, 0 acre (0%) would be open to oil and gas leasing subject to standard terms and conditions, approximately 339,884 acres (75%) would be open to oil and gas leasing subject to CSU/TL stipulations, approximately 92,170 acres (20%) would be open to oil and gas leasing subject to a NSO stipulation, and approximately 20,339 acres (4%) would be closed to oil and gas leasing.

Under Alternative D, the BLM estimates that 23 oil and gas wells would be drilled in the planning area over the next 15 years. These wells would result in approximately 440 acres of surface disturbance and removal of vegetation, of which 70 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative C are anticipated to result in 248 acres of surface disturbance and the

1   removal of vegetation, of which approximately 50 acres would be unreclaimed in 15 years. The BMPs
2   that would be applied to oil and gas leases under Alternative D would promote more rapid and successful
3   reclamation of surface disturbance compared to Alternative A. However, because of the difficulty of
4   reclaiming surface disturbances in the planning area, some reclaimed areas would not be anticipated to
5   return to natural conditions until up to 20 to 25 years after initial reclamation.

6   The TL stipulations under Alternative D would prevent surface disturbance during specific timeframes,
7   which could support vegetation growth during the periods of closure; however, disturbance and
8   vegetation removal could still occur outside of the seasonal closures, ultimately leading to some loss of
9   vegetation from oil and gas development. The CSU stipulations applied under Alternative D, especially
10  those that would limit the density of oil and gas development, could reduce the intensity and extent of
11  disturbance to vegetation. Areas where CSU stipulations would be applied under Alternative D that would
12  limit oil and gas development density include LWC units, with the exception of the Labyrinth Canyon
13  LWC unit and The Cone and Cottonwood Wash recreation focus areas. The density limitations in these
14  areas under Alternative D would require lower density oil and gas development and would result in
15  reduced removal of vegetation compared to Alternative C. Applying a CSU stipulation requiring a
16  fugitive dust control plan for oil and gas activities that would disturb a surface area larger than 0.25 acre,
17  or that would result in substantial increases in truck traffic on unpaved or untreated surfaces, could reduce
18  the impacts of dust to vegetation (including decreased transpiration and photosynthesis) near the dust-
19  producing activities. Similar to Alternative B, Alternative D would also require the use of BMPs to
20  minimize or mitigate wind erosion and emissions of fugitive dust and would substantially improve
21  reclamation success and reestablishment of vegetation removed as a result of oil and gas operations in the
22  planning area by preventing erosion of soils and loss of seed material necessary for reestablishment of
23  vegetation.

24  In Alternative D, applying an NSO stipulation to oil and gas leasing would prevent surface-disturbing
25  activities from oil and gas development within existing natural areas; the Labyrinth Canyon LWC unit;
26  SRMAs; all lands within 1 mile of the Green River Labyrinth Canyon rim that are north of the San Rafael
27  River; the Fossil Point, Dry Lake, Trin Alcove/Three Canyon, Saucer Basin/Moonshine Wash, Keg
28  Knoll, Sweetwater Reef, and Horseshoe Canyon Trailhead recreation focus areas; lands within 1 mile of
29  key observation points and travel corridors; Tidwell Draw Uranium Mining District ACEC; lands within
30  1 mile of portions of the Old Spanish Trail; steep slopes; and areas near 100-year floodplains and other
31  surface water resources. The NSO stipulations could also protect vegetation resources from damage or
32  removal, prevent soil loss, and reduce erosion resulting from oil and gas development. The prevention of
33  surface disturbance would reduce the potential for the introduction and spread of invasive, non-native
34  plant species and noxious weeds, supporting the native vegetation communities and ecosystems.

35  Under Alternative D, the BLM would allow minimal exceptions, modifications, or waivers to NSO
36  stipulations. Fewer exceptions, modifications, or waivers would be granted compared to Alternatives A
37  and C. Allowing fewer exceptions, modifications, or waivers would reduce impacts to vegetation
38  including vegetation damage, removal, and introduction of invasive, non-native plant species and noxious
39  weeds in areas that would be subject to NSO stipulations compared to Alternatives A and C.

40  Under Alternative D, geophysical operations in areas closed to leasing or managed subject to NSO
41  stipulations would be managed in the same manner as Alternative C. The types of impacts to vegetation in
42  these areas would be similar to the impacts to vegetation described for Alternative C; however, under
43  Alternative D, there would be more areas managed as closed to leasing or open subject to NSO
44  stipulations compared to Alternative C. Additionally, under Alternatives D, the BLM predicts that there
45  would be slightly fewer geophysical exploration activities compared to Alternative C. Therefore,
46  Alternative D would have fewer impacts to vegetation from geophysical exploration compared to
47  Alternative C.

1   As described in Chapter 3, vegetation communities were identified using land cover data developed by
2   the SWReGAP (Prior-Magee et al. 2007). Table 4-13 presents the acres of each land cover type that occur
3   within the planning area within the areas that are closed to oil and gas leasing, open to oil and gas leasing
4   subject to standard terms and conditions, and open to oil and gas leasing subject to NSO or CSU/TL
5   stipulations.

6   **Table 4-13. Land Cover Types by Oil and Gas Leasing Category in Alternative D**

| Land Cover Type | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Colorado Plateau Blackbrush-Mormon-Tea Shrubland | 0 | 148,756 | 43,861 | 10,691 |
| Colorado Plateau Mixed Bedrock Canyon and Tableland | 0 | 16,455 | 10,525 | 4,746 |
| Colorado Plateau Pinyon-Juniper Shrubland | 0 | 1,290 | 213 | 123 |
| Colorado Plateau Pinyon-Juniper Woodland | 0 | 306 | 31 | 14 |
| Developed, Medium - High Intensity | 0 | 167 | 120 | 0 |
| Disturbed, Oil Well | 0 | 0 | 7 | 1 |
| Inter-Mountain Basins Active and Stabilized Dune | 0 | 83,835 | 12,613 | 2,216 |
| Inter-Mountain Basins Big Sagebrush Shrubland | 0 | 75 | 32 | 1 |
| Inter-Mountain Basins Greasewood Flat | 0 | 6,244 | 3,371 | 242 |
| Inter-Mountain Basins Mat Saltbush Shrubland | 0 | 30,107 | 12,437 | 525 |
| Inter-Mountain Basins Mixed Salt Desert Scrub | 0 | 3,749 | 2,631 | 539 |
| Inter-Mountain Basins Semi-Desert Grassland | 0 | 14,089 | 431 | 24 |
| Inter-Mountain Basins Semi-Desert Shrub Steppe | 0 | 8,232 | 725 | 50 |
| Inter-Mountain Basins Shale Badland | 0 | 7,581 | 899 | 38 |
| Invasive Annual and Biennial Forbland | 0 | 768 | 570 | 39 |
| Invasive Annual Grassland | 0 | 0 | 3 | 0 |
| Invasive Southwest Riparian Woodland and Shrubland | 0 | 0 | 1,762 | 327 |
| Open Water | 0 | 0 | 25 | 509 |
| Rocky Mountain Lower Montane Riparian Woodland and Shrubland | 0 | 0 | 55 | 15 |
| Southern Colorado Plateau Sand Shrubland | 0 | 18,229 | 1,856 | 241 |

7   Under Alternative D, the requirements for plant species to be used in reclamation and the benefits to
8   vegetation resources from this management would be the same as Alternative C. Additionally, similar to
9   Alternatives B and C, under Alternative D, the BMPs that are currently used for oil and gas leases in the
10  planning area would be updated to include additional state-of-the-art BMPs. The benefits to vegetation
11  resources in the planning area from updating the BMPs under Alternative D would be the same as those
12  described under Alternative B.

1 *4.6.6.1*     ***Suspended and Protested Lease Decisions***

2 Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU
3 or TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. If the leases were
4 subsequently developed, the impacts of modifying the terms and conditions of the suspended and
5 protested leases and issuing the leases consistent with Alternative D would be the same as the impacts to
6 vegetation from managing lands as open to leasing subject to CSU/TL stipulations, or open to leasing
7 subject to NSO stipulations described in this section.

8 **4.7**    C**ULTURAL** R**ESOURCES**

9 This section presents potential impacts to cultural resources from implementation of the management
10 actions presented in Chapter 2. Existing conditions for cultural resources in the analysis area are described
11 in Chapter 3.

12 **4.7.1    Evaluating Impacts to Cultural Resources**

13 Most of the cultural resources documented in the planning area are archaeological sites—both prehistoric
14 and historic in age. The principal concern for impacts to these sites relates to disturbance of artifacts,
15 features, and/or architecture present at the site in ways that reduce their integrity, alter their association
16 with traditional values, and reduce the potential to recover data relevant to important questions in history
17 or prehistory. Archaeological data consist of both objects (in the broad sense of artifacts, features,
18 architecture, etc.) and the spatial relationships between these objects. The ability to interpret and
19 understand these sites and their placement in the past is based on recovering not only the objects—or
20 material culture—themselves, but also recovering the spatial relationships between these different aspects
21 of material culture. Accordingly, surface and subsurface disturbances that change these important spatial
22 relationships have the greatest potential for adverse impacts to cultural resources. These impacts can
23 include elimination or reduction of the physical integrity and setting of a site, including National Register
24 of Historic Places (NRHP)–eligible sites, landscapes, sacred sites, and cultural theme areas. Other impacts
25 can include disruption or reduction of the religious values of sites and areas, reduction or loss of the data
26 potential of a site, or damage to traditional collection areas.

27 Once an archaeological site has been impacted, the effect typically cannot be reversed. Accordingly,
28 impacts to cultural resources from surface disturbance are long term and permanent. Nonetheless, short-
29 term effects from visual or auditory impacts may occur, and these can often be mitigated or
30 accommodated. Potential impacts to specific cultural resources from the proposed alternatives are
31 difficult to quantify precisely. The alternatives do not stipulate exact locations for surface-disturbing
32 activities, nor are the specific locations of all cultural resources in the planning area fully known. Still, it
33 is possible to estimate impacts based on the proposed general locations of activities within the planning
34 area that have a high, medium, or low probability of containing cultural resources.

35 To estimate the distribution of cultural resources within the planning area, a site location model was
36 developed using available site documentation. Through extensive study of archaeological sites throughout
37 the West, researchers have identified a number of key factors that influence site locations and types,
38 including elevation, slope, aspect, distance to permanent and/or intermittent water, and the presence or
39 absence of resources of interest (food resources, mineral resources, etc.). Using many of these factors, a
40 site location model for the planning area was developed in an effort to better estimate the potential
41 impacts of each alternative. This model was then used to rank all portions of the planning area as having
42 either high, medium, or low probability for the occurrence of cultural sites (Table 4-14).

1    **Table 4-14.  Probability for the Occurrence of Cultural Sites**

| Site Probability | Estimated Acreage | Percentage of Lands in the Planning Area |
|---|---|---|
| High | 3,750 | 1% |
| Medium | 31,459 | 7% |
| Low | 416,111 | 92% |

2  ### 4.7.2  Assumptions

3  - Protection for all cultural resources would occur in accordance with federal laws and BLM
4    regulations and agreements, regardless of whether the resources are specifically identified in the
5    MLP/EA.

6  - Adverse impacts to cultural resources from surface-disturbing activities would occur primarily at
7    the time the initial surface disturbance occurs. Therefore, the projected numbers for short-term
8    surface disturbance are used to quantify impacts to cultural resources.

9  - There is a direct correlation between the number of sites that could be impacted by various
10   mineral actions and the degree, nature, and quantity of surface-disturbing activities allowed
11   within the planning area. In general, the more surface disturbance associated with mineral
12   development, the greater the likelihood for adverse impacts to cultural resources.

13  - The cultural resources site location model is sufficient for management purposes and for
14   comparing alternative impacts.

15  ### 4.7.3  Impacts Common to All Alternatives

16  All leases may be found to contain historic properties and/or resources protected under the National
17  Historic Preservation Act (NHPA), American Indian Religious Freedom Act, Native American Graves
18  Protection and Repatriation Act, Executive Order 13007, or other statues and executive orders. The BLM
19  would not approve any ground-disturbing activities that may affect any such properties or resources until
20  it completes its obligations under applicable requirements of the NHPA and other authorities. The BLM
21  may require modification to exploration or development proposals to protect such properties, or it may
22  disapprove any activity that is likely to result in adverse effects that cannot be successfully avoided,
23  minimized, or mitigated.

24  ### 4.7.4  Impacts from Alternative A (No Action)

25  Under Alternative A, approximately 399,276 acres would be managed as open to leasing with standard
26  terms and conditions. An additional 18,932 acres would be managed with CSU/TL stipulations. Together
27  these comprise approximately 93% of the planning area. Within this area, projected development would
28  occur, and the associated surface disturbance could adversely impact cultural resources.

29  The remaining 7% of the planning area would be subject to either NSO stipulations (32,921 acres) or
30  would be closed to leasing (192 acres). These major constraints would protect cultural resources within
31  these areas by precluding surface mineral development.

32  Under Alternative A, cultural viewsheds are not addressed. This means that a lease notice requiring a
33  viewshed assessment for NRHP-eligible cultural sites or for properties of traditional religious and cultural
34  importance to an Indian tribe may not be applied.

1  The entire planning area has been assessed for the potential for the occurrence of cultural resources. Each
2  acre of the planning area has been ranked as having high, medium, or low probability of containing
3  cultural resources (see Table 4-14). Per oil and gas leasing category, Table 4-15 presents the total acreage,
4  by alternative, for areas having a high, medium, or low probability of containing cultural resources.

5  **Table 4-15. Probability for the Occurrence of Cultural Sites by Alternative and Oil and Gas**
6  **Leasing Category**

| Cultural Site Occurrence Probability | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Open (acres)** | | | | |
| High probability | 2,787 | N/A | 772 | N/A |
| Medium probability | 25,958 | N/A | 2,539 | N/A |
| Low probability | 370,530 | N/A | 34,531 | N/A |
| **CSU and TL (acres)** | | | | |
| High probability | 303 | 399 | 2,454 | 1,950 |
| Medium probability | 1,826 | 6,963 | 24,206 | 19,933 |
| Low probability | 16,803 | 90,735 | 335,280 | 317,804 |
| **NSO (acres)** | | | | |
| High probability | 587 | 3,058 | 451 | 1,544 |
| Medium probability | 3,557 | 21,094 | 4,595 | 8,254 |
| Low probability | 28,778 | 299,829 | 46,301 | 82,272 |
| **Closed (acres)** | | | | |
| High probability | 74 | 293 | 74 | 257 |
| Medium probability | 118 | 3,402 | 118 | 3,272 |
| Low probability | 0 | 25,548 | 0 | 16,036 |

7

## 8  4.7.5  Impacts from Alternative B

9  Applying a lease notice throughout the planning area to mitigate the potential impacts to traditional
10  cultural properties (TCPs) or to other culturally important resources identified through consultation could
11  provide protections to these localities from surface-disturbing activities and from indirect visual impacts.
12  Mitigation would be developed through further consultation with affected groups, and may include
13  measures to maintain the viewshed and intrinsic values, as well as the auditory, visual, and esthetic
14  settings of the resources.

15  Applying a lease notice throughout the planning area requiring viewshed analysis for cultural sites that
16  are eligible for the NRHP or for properties of traditional religious and cultural importance to an Indian
17  tribe could provide protections to these localities from indirect visual impacts. If project-specific analysis
18  shows that the oil and gas development would have adverse effects to historic properties, the project may
19  require relocation or redesign.

1   Applying a lease notice in areas having a high probability of containing cultural resources and informing
2   the lessee or operator of the higher likelihood of encountering cultural resource concerns (i.e., potential
3   adverse effects requiring mitigation) within these areas could provide protections to these localities from
4   surface-disturbance impacts. In all, 3,750 acres of the planning area have been characterized as having a
5   high probability of containing cultural resources.

6   Under Alternative B, 3,351 acres of areas having a high probability of containing cultural resources are
7   managed with an NSO stipulation or as closed. These major constraints would protect areas with a high
8   probability of containing cultural resources by precluding development.

9   ### 4.7.6   Impacts from Alternative C

10  Impacts from applying a lease notice throughout the planning area to mitigate the potential impacts to
11  TCPs or other culturally important resources identified through consultation would be the same as those
12  described under Alternative B.

13  Impacts from applying a lease notice throughout the planning area requiring viewshed analysis for
14  NRHP-eligible cultural sites or for properties of traditional religious and cultural importance to an Indian
15  tribe would be the same as those described under Alternative A.

16  Impacts from applying a lease notice to areas having a high probability of containing cultural resources
17  and informing the lessee or operator of the higher likelihood of encountering cultural resource concerns
18  (i.e., potential adverse effects requiring mitigation) within these areas would be the same as those
19  described under Alternative B.

20  In Alternative C, 525 acres of areas having a high probability of containing cultural resources are
21  managed with an NSO stipulation or as closed. These major constraints would protect areas these areas by
22  precluding development.

23  ### 4.7.7   Impacts from Alternative D

24  Impacts from applying a lease notice throughout the planning area to mitigate the potential impacts to
25  TCPs or to cultural plants identified through consultation would be the same as those described under
26  Alternative B.

27  Applying a lease notice throughout the planning area requiring viewshed analysis for cultural sites that
28  are determined eligible for the NRHP when location, setting, or feeling contribute to the overall integrity
29  of a site, or for properties of traditional religious and cultural importance to an Indian tribe could provide
30  protections to these localities from indirect visual impacts. If project-specific analysis shows that the oil
31  and gas development would have adverse effects to the historic properties, the project may require
32  relocation or redesign.

33  Impacts from applying a lease notice to areas having a high probability of containing cultural resources
34  and informing the lessee or operator of the higher likelihood of encountering cultural resource concerns
35  (i.e., potential adverse effects requiring mitigation) within these areas would be the same as those
36  described under Alternative B.

37  In Alternative D, 1,801 acres of areas having a high probability of containing cultural resources are
38  managed with an NSO stipulation or as closed. These major constraints would protect these areas by
39  precluding development.

1  **4.8  PALEONTOLOGICAL RESOURCES**

2  This section presents potential impacts to paleontological resources from implementing management
3  actions presented in Chapter 2. Existing conditions concerning paleontological resources are described in
4  Chapter 3. The loss of any identifiable paleontological resource that could yield important information
5  about the history of life on Earth or that embodies the distinctive characteristics of a type of organism,
6  environment, period of time, or geographic region, would result in an adverse impact. Impacts to
7  paleontological resources primarily concern the potential destruction of non-renewable paleontological
8  resources and the loss of information associated with these resources. Impacts can also include the
9  unlawful or unauthorized collection of paleontological resource remains. If fossiliferous bedrock or
10  surficial sediments are disturbed, the disturbance could result in the destruction of paleontological
11  resources and subsequent loss of information.

12  **4.8.1  Assumptions**

13  • Surveys would be required in areas categorized as Potential Fossil Yield Classification (PFYC) 4 5.

14  • Scientifically significant paleontological resources would continue to be found within the
15  planning area throughout several geologic formations exposed at the surface.

16  • Inventories required prior to surface disturbance in high-probability areas would result in the
17  identification and evaluation of previously undiscovered resources, which the BLM would then
18  manage accordingly.

19  **4.8.2  Impacts Common to All Alternatives**

20  Under all alternatives, attaching lease notices, stipulations, and other requirements to permitted activities
21  would further prevent adverse impacts to paleontological resources. Along with on-site evaluations,
22  surface disturbances under all alternatives could expose fossils that would otherwise have been buried
23  until exposed by natural erosion. These premature fossil discoveries would thereby enhance scientific
24  knowledge.

25  **4.8.3  Impacts from Alternative A (No Action)**

26  Under Alternative A, approximately 418,545 acres would be available for oil and gas leasing and
27  development, would be managed as either open with standard terms and conditions or with CSU and/or
28  TL stipulations, and would comprise approximately 93% of the BLM-administered land in the planning
29  area. The remaining 7% of BLM-administered land in the planning area (approximately 33,847 acres)
30  would be managed as NSO or closed to leasing. Table 4-16 lists the acres of oil and gas leasing categories
31  by PFYC.

32  **Table 4-16. Oil and Gas Leasing Categories by PFYC under Alternative A**

| PFYC | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed (acres) |
|------|--------------|-----------------------|-------------|----------------|
| 2 | 245,164 | 8,961 | 21,741 | 28 |
| 3 | 124,024 | 7,475 | 5,540 | 67 |
| 5 | 30,274 | 2,648 | 6,346 | 125 |

Under Alternative A, surface-disturbing activities on lands managed as open or as CSU and/or TL could damage or destroy unidentified paleontological resources. These impacts could occur directly or through soil compaction and removal, which can lead to accelerated erosion and exposure of fossils. Impacts to unidentified paleontological resources would often be greater than impacts to previously identified resources (and thereby either avoided or subjected to mitigation measures) because recording and evaluating these unidentified resources would not occur before they are damaged. However, the potential for impacts would be reduced because an inventory would be required before surface disturbance. These impacts would complicate mitigation procedures and result in a loss of scientific information. If paleontological resources that are discovered during disturbing activities remain salvageable, further impacts could be mitigated through recovery of the fossil material and related data. The highest potential for impacts to paleontological resources under Alternative A would be on the approximately 30,274 acres of land managed as open subject to standard terms and conditions that occur within PFYC 5 areas.

On lands managed as NSO, major constraints on surface disturbance would protect paleontological resources within these areas. The potential for impacts to paleontological resources from oil and gas development would be eliminated on lands closed to oil and gas leasing. Among the alternatives, Alternative A would have the least amount of land managed as NSO or closed to leasing, and the largest amount of land available (managed as open or CSU and/or TL) for oil and gas leasing in PFYC 5 areas.

Under Alternative A, adverse impacts to vertebrate and significant non-vertebrate paleontological resources resulting from authorized surface-disturbing activities would be mitigated. Where there is a moderate or high potential to affect scientifically significant paleontological resources, on-the-ground paleontological inventories would be required prior to permitting surface-disturbing activities. Such inventories would help to avoid areas where impacts to scientifically significant paleontological resources occur. A stipulation would also be applied that addresses unanticipated discoveries. This stipulation would mandate work stoppage (or avoidance), a notification to the authorized officer, and the protection of the material and geological context if any paleontological resources were discovered during disturbance activities.

### 4.8.3.1    *Suspended and Protested Lease Decisions*

Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts to paleontological resources from issuing the leases subject to the terms and conditions contained within the Price and Richfield ROD/RMPs (BLM 2008a, 2008b) (Alternative A-2) would be the same as the impacts to paleontological resources from managing them as open or NSO as described in this section. If the BLM were to rescind the suspensions on the suspended leases (Alternative A-1) and the leases were subsequently developed, the impacts to paleontological resources that would occur in the leased areas could be the same as those described for managing lands as open to leasing subject to standard terms and conditions. Under Alternative A-2, the suspended leases would be subject to the conditions, including reclamation stipulations and BMPs included in the Richfield ROD/RMP (BLM 2008b).

### 4.8.4    Impacts from Alternative B

Under Alternative B, approximately 98,164 acres would be available for oil and gas leasing and development, would be managed with CSU and/or TL stipulations, and would comprise approximately 23% of the BLM-administered land in the planning area. The remaining 77% of BLM-administered land in the planning area (approximately 354,229 acres) would be managed as NSO or closed to leasing. Table 4-17 lists the acres of oil and gas leasing categories by PFYC.

1    **Table 4-17. Oil and Gas Leasing Categories by PFYC under Alternative B**

| PFYC | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed (acres) |
|------|------|------|------|------|
| 2 | 0 | 59,864 | 198,780 | 17,249 |
| 3 | 0 | 25,441 | 103,630 | 8,035 |
| 5 | 0 | 12,859 | 21,750 | 4,784 |

2    Under Alternative B, surface-disturbing activities on lands managed as CSU and/or TL could impact
3    paleontological resources in the same manner as described for lands managed as CSU and/or TL under
4    Alternative A. The highest potential for impacts to paleontological resources under Alternative B would
5    be on the approximately 12,859 acres of land managed as CSU and/or TL that occur within PFYC 5 areas.
6    However, a CSU stipulation requiring surveying and monitoring for all surface-disturbing oil and gas
7    activities in PFYC 5 areas would help reduce the potential for adverse impacts to paleontological
8    resources. Where monitoring encounters vertebrate and vertebrate trace fossils during oil and gas
9    operations, all operations would be required to cease until the authorized officer determines whether the
10   site can be avoided, can be protected, or must be fully excavated.

11   On lands managed as NSO, major constraints on surface disturbance would protect paleontological
12   resources within these areas. Lands closed to oil and gas leasing would eliminate the potential for impacts
13   to paleontological resources from oil and gas development. Among the alternatives, Alternative B would
14   have the largest amount of land managed as NSO or closed to leasing, and the least amount of land
15   available (managed as CSU and/or TL) for oil and gas leasing in PFYC 5 areas.

16   ### 4.8.4.1    *Suspended and Protested Lease Decisions*

17   Under Alternative B, BLM would cancel all suspended leases, resolve the protests on the protested leases,
18   and deny the leases. The paleontological resources in the areas of suspended and protested leases would
19   not be affected by operators exploring for and developing oil and gas resources.

20   ## 4.8.5    Impacts from Alternative C

21   Under Alternative C, approximately 399,992 acres would be available for oil and gas leasing and
22   development, would be managed as either open with standard terms and conditions or with CSU and/or
23   TL stipulations, and would comprise approximately 88% of the BLM-administered land in the planning
24   area. The remaining 12% of BLM-administered land in the planning area (approximately 52,401 acres)
25   would be managed as NSO or closed to leasing. Table 4-18 lists the acres of oil and gas leasing categories
26   by PFYC.

27   **Table 4-18. Oil and Gas Leasing Categories by PFYC under Alternative C**

| PFYC | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed (acres) |
|------|------|------|------|------|
| 2 | 7,926 | 237,716 | 30,251 | 0 |
| 3 | 28,674 | 96,030 | 12,335 | 67 |
| 5 | 1,265 | 28,381 | 9,622 | 125 |

1　Under Alternative C, surface-disturbing activities on lands managed as open subject to standard terms and
2　conditions or CSU and/or TL could impact paleontological resources in the same manner as described for
3　lands managed as open or CSU and/or TL under Alternative A. The highest potential for impacts to
4　paleontological resources under Alternative C would be on the approximately 1,265 acres of land
5　managed as open subject to standard terms and conditions that occur within PFYC 5 areas.

6　On the approximately 28,381 acres of land managed as CSU and/or TL in PFYC 5 areas, a stipulation
7　requiring surveying and monitoring for all surface-disturbing oil and gas activities would help reduce the
8　potential for adverse impacts to paleontological resources. Where monitoring encounters vertebrate and
9　vertebrate trace fossils during oil and gas operations, all operations would be required to cease until the
10　authorized officer determines whether the site can be avoided, can be protected, or must be fully
11　excavated.

12　On lands managed as NSO, major constraints on surface disturbance would protect paleontological
13　resources within these areas. Lands closed to oil and gas leasing would eliminate the potential for impacts
14　to paleontological resources from oil and gas development. Among the alternatives, Alternative C would
15　have the third largest amount of land managed as NSO or closed to leasing, and the second largest amount
16　of land available (managed as open or CSU and/or TL) for oil and gas leasing in PFYC 5 areas.

17　### 4.8.5.1　*Suspended and Protested Lease Decisions*

18　Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to
19　standard terms, 39,766 acres would be issued subject to CSU and/or TL stipulations, and 318 acres would
20　be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts of
21　modifying the terms and conditions of the suspended and protested leases and issuing the leases
22　consistent with Alternative C would be the same as the impacts to paleontological resources described in
23　this section from managing areas as open to leasing subject to standard terms and conditions, open to
24　leasing subject to CSU and/or TL stipulations, or open to leasing subject to NSO stipulations.

25　### 4.8.6　Impacts from Alternative D

26　Under Alternative D, approximately 339,884 acres would be available for oil and gas leasing and
27　development, would be managed with CSU and/or TL stipulations, and would comprise approximately
28　75% of the BLM-administered land in the planning area. The remaining 25% of BLM-administered land
29　in the planning area (approximately 112,509 acres) would be managed as NSO or closed to leasing. Table
30　4-19 lists the acres of oil and gas leasing categories by PFYC.

31　**Table 4-19. Oil and Gas Leasing Categories by PFYC under Alternative D**

| PFYC | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed (acres) |
|------|------|------|------|------|
| 2 | 0 | 214,563 | 48,317 | 13,013 |
| 3 | 0 | 97,678 | 33,490 | 5,938 |
| 5 | 0 | 27,643 | 10,362 | 1,388 |

32　Under Alternative D, surface-disturbing activities on lands managed as CSU and/or TL could impact
33　paleontological resources in the same manner as described for lands managed as CSU and/or TL under
34　Alternative A. The highest potential for impacts to paleontological resources under Alternative D would
35　be on the approximately 27,643 acres of land managed as CSU and/or TL that occur within PFYC 5 areas.
36　However, like Alternatives B and C, this alternative has a CSU stipulation requiring surveying and
37　monitoring for all surface-disturbing oil and gas activities in PFYC 5 areas, which would help reduce the

1  potential for adverse impacts to paleontological resources. Where monitoring encounters vertebrate and
2  vertebrate trace fossils during oil and gas operations, all operations would be required to cease until the
3  authorized officer determines whether the site can be avoided, can be protected, or must be fully
4  excavated.

5  On lands managed as NSO, major constraints on surface disturbance would protect paleontological
6  resources within these areas. Lands closed to oil and gas leasing would eliminate the potential for impacts
7  to paleontological resources from oil and gas development. Among the alternatives, Alternative D would
8  have the second largest amount of land managed as NSO or closed to leasing, and the second least
9  amount of land available (managed as CSU and/or TL) for oil and gas leasing in PFYC 5 areas.

10  ### 4.8.6.1    *Suspended and Protested Lease Decisions*

11  Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU
12  or TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. If the leases were
13  subsequently developed, the impacts of modifying the terms and conditions of the suspended and
14  protested leases and issuing the leases consistent with Alternative D would be the same as the impacts to
15  paleontological resources from managing lands as open to leasing subject to CSU or TL stipulations, or
16  open to leasing subject to NSO stipulations described in this section.

17  ## 4.9    VISUAL RESOURCES AND NIGHT SKIES

18  This section presents potential impacts to visual resources and night skies from implementing
19  management actions presented in Chapter 2. Existing conditions concerning visual resources and night
20  skies management are described in Chapter 3.

21  ### 4.9.1    Assumptions

22  • All proposed actions would comply with BLM VRM guidelines and policy.

23  • All air quality impacts would comply with PSD class standards and policies of the NPS.

24  • Contrast rating analyses would be completed during project-level implementation as appropriate.

25  • All management actions that permit surface disturbance could have adverse impacts on visual
26  resources to some degree by introducing new visual elements onto the landscape or intensifying
27  existing visual elements by altering the line, form, color, and/or textures that characterize the
28  existing landscape.

29  ### 4.9.2    Impacts Common to All Alternatives

30  Employing dust abatement measures to comply with Utah Administrative Code (UAC) R307-205 and
31  maintaining air quality in accordance with UAC R307-205 would support visual quality by promoting
32  clear scenic vistas.

33  The Big Flat Tops ACEC is inventoried as visual resource inventory (VRI) Class I and is closed to
34  leasing under all alternatives; for these reasons, there would be no impacts to the visual resources of this
35  ACEC under any alternatives.

36  Artificial lighting used during night-time oil and gas development activities could have an adverse impact
37  to night skies. Viewsheds of visually sensitive areas outside the planning area may be affected by the use
38  of artificial lighting during oil and gas development activities.

1  ### 4.9.3    Impacts from Alternative A (No Action)

2  Under Alternative A, approximately 418,545 acres would be available for oil and gas leasing and
3  development, would be managed as either open with standard terms and conditions or with CSU and/or
4  TL stipulations, and would comprise approximately 93% of the BLM-administered land in the planning
5  area. The remaining 7% of BLM-administered land in the planning area (approximately 33,847 acres)
6  would be managed as NSO or closed to leasing. Table 4-20 lists the acres of oil and gas leasing categories
7  by VRI Class. Table 4-21 lists the acres of oil and gas leasing categories by VRM Class.

8  **Table 4-20. Oil and Gas Leasing Categories by VRI Class under Alternative A**

| VRI Class | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed |
|-----------|------|------|------|------|
| I | 0 | 0 | 0 | 0 |
| II | 14,942 | 109 | 6,382 | 9 |
| III | 25,679 | 2,727 | 2,841 | 19 |
| IV | 358,805 | 16,243 | 24,395 | 192 |

9  **Table 4-21. Oil and Gas Leasing Categories by VRM Class under Alternative A**

| VRM Class | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed |
|-----------|------|------|------|------|
| I | 5 | 0 | 0 | 220 |
| II | 20 | 2,418 | 11,796 | 0 |
| III | 357,037 | 13,086 | 21,291 | 0 |
| IV | 42,379 | 3,570 | 494 | 0 |

10  Under Alternative A, areas managed as open subject to standard terms and conditions or as CSU and/or
11  TL (approximately 2,443 acres) could experience oil and gas development activities that affect visual
12  resources in those areas. Potential visual impacts caused by oil and gas development include an increase
13  in visual contrasts of line, form, color, and texture created by well pads, drill rigs, and other infrastructure.
14  Under this alternative, a CSU stipulation would be applied to all areas designated as VRM Class II. In
15  VRM Class II areas, any surface-disturbing activities must retain the existing character of the landscape.
16  To meet the requirements of VRM Class II, the level of change to the landscape should be low;
17  management activities may be seen but should not attract the attention of the casual observer. Any change
18  to the landscape must repeat the basic elements of form, line, color, and texture found in the predominant
19  natural features of the characteristic landscape. Surface-disturbing activities that are determined to be
20  compatible and consistent with resource values are exempted. The CSU stipulation does not address
21  impacts to night skies. Thus, these areas could experience impacts to night skies resulting from artificial
22  lighting used during night-time oil and gas development activities.

23  Among the alternatives, Alternative A would have the largest acreage of VRI Classes I and II areas
24  (15,068 acres) and VRM Classes I and II areas (2,443 acres) managed as open subject to standard terms
25  and conditions or CSU and/or TL.

26  Under Alternative A, the Dirty Devil/Robbers Roost SRMA would be managed so that VRM Class II
27  areas and canyon rims within the viewshed of all canyons (approximately 0.25 mile) are managed as
28  NSO. This would affect approximately 10,382 acres of the SRMA. Exceptions would be considered if oil
29  and gas exploration and development would not impair identified scenic and primitive or semi-primitive
30  recreational resources. The NSO stipulation would eliminate the potential for visual impacts caused by oil

and gas development, such as the increase in visual contrasts of line, form, color, and texture created by well pads, drill rigs, and other infrastructure. The NSO stipulation would also eliminate the potential for oil and gas development to cause night sky impacts in these areas. However, there would be a potential for fugitive dust to affect the VRI and VRM Class II areas if horizontal drilling occurs on adjacent lands. The remainder of the Dirty Devil/Robbers Roost SRMA (approximately 4,647) would be subject to CSU and/or timing limitations. Areas managed as CSU and/or TL could experience oil and gas development activities that affect visual resources in those areas. Potential visual impacts caused by oil and gas development include an increase in visual contrasts of line, form, color, and texture created by well pads, drill rigs, and other surface structures.

Alternative A includes no specific restrictions on venting or open flaring of gas captured during oil well production. Thus, open flaring could impact night skies under this alternative.

Examples of potential mitigation measures that could minimize potential impacts to visual resources under all alternatives include the following:

- Selecting well pad sites that have low visibility. Low visibility techniques include locating facilities on low-lying ground, avoiding locations near prominent natural features, avoiding ridgetops and slopes, considering locating well pads away from main roads, and using natural and artificial features to screen well pads and facilities from scenic areas.

- Using paints and stains on structures that allow them to blend in with the surrounding landscape.

- Designing access roads and pipelines to follow the contour of the landforms or mimic lines in vegetation.

- Blending or "feathering" the borders of disturbed areas to reduce line, form, and color contrasts.

### 4.9.3.1    Suspended and Protested Lease Decisions

Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO stipulations. Protested leases are within a 3-mile buffer of two key observation points (KOPs) (Bull Bottom and Trin Alcove/Three Canyon). Protested leases also overlap VRI Class II areas near these two KOPs, as well as the Saucer Basin/Moonshine Wash recreation focus area. Suspended leases overlap the Sweetwater Reef recreation focus area. If the leases were subsequently developed, the impacts to visual resources and night skies from issuing the leases subject to the terms and conditions contained within the Price and Richfield ROD/RMPs (BLM 2008a, 2008b) (Alternative A-2) would be the same as the impacts to visual resources and night skies from managing them as open or NSO as described in this section. Under Alternative A-2, the suspended leases would be subject to the conditions, including reclamation stipulations and BMPs included in the Richfield ROD/RMP.

If the BLM were to rescind the suspensions on the suspended leases (Alternative A-1) and the leases were subsequently developed, the impacts to visual resources and night skies that would occur in the leased areas could be the same as those described for managing lands as open to leasing subject to standard terms and conditions.

### 4.9.4    Impacts from Alternative B

Under Alternative B, approximately 98,164 acres would be available for oil and gas leasing and development, would be managed with CSU and/or TL stipulations, and would comprise approximately 23% of the BLM-administered land in the planning area. The remaining 77% of BLM-administered land in the planning area (approximately 354,229 acres) would be managed as NSO or closed to leasing. Table 4-22 lists the acres of oil and gas leasing categories by VRI Class. Table 4-23 lists the acres of oil and gas leasing categories by VRM Class.

1   **Table 4-22. Oil and Gas Leasing Categories by VRI Class under Alternative B**

| VRI Class | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed |
|-----------|-------------|----------------------|-------------|--------|
| I | 0 | 0 | 0 | 0 |
| II | 0 | 0 | 14,193 | 7,250 |
| III | 0 | 7,668 | 16,502 | 7,086 |
| IV | 0 | 90,493 | 293,423 | 15,719 |

2   **Table 4-23. Oil and Gas Leasing Categories by VRM Class under Alternative B**

| VRM Class | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed |
|-----------|-------------|----------------------|-------------|--------|
| I | 0 | 0 | 30 | 195 |
| II | 0 | 0 | 4,689 | 9,544 |
| III | 0 | 63,357 | 307,785 | 20,272 |
| IV | 0 | 34,805 | 11,636 | 0 |

3   Under Alternative B, areas managed as CSU and/or TL (approximately 98,164 acres) could experience oil
4   and gas development activities that affect visual resources in those areas. Potential visual impacts caused
5   by oil and gas development include an increase in visual contrasts of line, form, color, and texture created
6   by well pads, drill rigs, and other surface structures. However, all areas managed as CSU and/or TL under
7   this alternative are in VRI Class III or IV and VRM Class III or IV areas.

8   Among the alternatives, Alternative B would have the smallest acreage of VRI Classes I and II areas
9   (0 acres) and VRM Classes I and II areas (0 acres) managed as open subject to standard terms and
10  conditions or CSU and/or TL.

11  Under this alternative, an NSO stipulation with no exceptions, modifications, or waivers would be applied
12  to all areas inventoried as VRI Class II or designated as VRM Class II. The VRI Class II areas in the
13  planning area include Moonshine Wash, Trin Alcove/Three Canyon, and other viewpoints on the Green
14  River Labyrinth Canyon rim. The VRM Class II areas in the planning area primarily include areas in the
15  southeast part of the planning area north and south of the Keg Knoll area and around the Horseshoe
16  Canyon Trailhead, as well as areas in the northwest part of the planning area overlooking the San Rafael
17  River (see Map 2-14).

18  Managing VRI and VRM Class II areas with an NSO stipulation would help preserve visual resources in
19  these visually sensitive locations of the planning area. The NSO stipulation would eliminate the potential
20  for visual impacts caused by oil and gas development, such as the increase in visual contrasts of line,
21  form, color, and texture created by well pads, drill rigs, and other surface structures. The NSO stipulation
22  would prevent such surface disturbance, which would help retain the existing character of the landscape.
23  The NSO stipulation would also eliminate the potential for oil and gas development to cause night sky
24  impacts in these areas. However, there would be a potential for fugitive dust to affect VRI and VRM
25  Class II areas if horizontal drilling occurs on adjacent lands.

26  Under Alternative B, the Labyrinth Canyon SRMA and the Dirty Devil/Robbers Roost SRMA (outside
27  the WSA) would be managed as NSO with no exceptions, modifications, or waivers. The NSO stipulation
28  would eliminate the potential for visual impacts caused by oil and gas development in these SRMAs.
29  People using these areas would not be impacted by the visual contrast associated with oil and gas

development. The NSO stipulation would also eliminate the potential for oil and gas development to cause night sky impacts to these SRMAs. However, there would be a potential for fugitive dust to affect these SRMAs if horizontal drilling occurs on adjacent lands.

All lands within 1 mile of the Green River Labyrinth Canyon rim and Horseshoe Canyon rim would be closed to leasing under this alternative. Closure to leasing would eliminate the potential for visual impacts caused by oil and gas development in these areas. Closing these lands to leasing would also eliminate the potential for oil and gas development to cause night sky impacts in these areas. However, there would be a potential for fugitive dust to affect these areas if horizontal drilling occurs on adjacent lands.

Under Alternative B, the following recreation focus areas would also be managed as NSO with no exceptions, modifications, or waivers: Fossil Point, Dry Lake Archaeological District, Three Canyon, Saucer Basin/Moonshine Wash, The Cone, Keg Knoll, Sweetwater Reef, Cottonwood Wash, and Horseshoe Canyon Trailhead.

All lands within 3 miles of the following KOPs (Map 2-7) would also be managed as NSO with no exceptions, modifications, or waivers: Keg Knoll, Wolverton Overlook, Horseshoe Canyon Trailhead, Trin Alcove/Three Canyon, and Bull Bottom.

Under this alternative, all lands within 3 miles of the following travel corridors would be managed as NSO with no exceptions, modifications, or waivers: Lower San Rafael Road from State Route 24 to Horseshoe Canyon and Lower San Rafael Road from Green River to Horseshoe Canyon (Map 2-8-B).

Managing these areas as NSO would eliminate potential visual impacts from oil and gas development. People using these recreation focus areas and travel corridors would not be impacted by the visual contrast associated with oil and gas development. However, there would be a potential for fugitive dust to affect the visual resources of these recreation focus areas and travel corridors if horizontal drilling occurs on adjacent lands.

Under this alternative, a planning area–wide CSU would prohibit venting or open flaring of gas captured during oil well production. This would eliminate potential impacts to night skies from open flaring.

Under Alternative B, to minimize impacts to night skies, a planning area–wide CSU stipulation would require operators to apply various measures affecting artificial lighting. These measures include limiting artificial lighting during nighttime operations to those that are necessary for safety, using shielding and aiming techniques, limiting the height of light poles, using motion sensors or timers for lighting, and selecting lights that are not bluish in color or broad spectrum. This CSU would help reduce the potential adverse impacts that oil and gas development might have on night skies in the planning area and sensitive areas adjacent to the planning area because it would help direct lighting downward rather than above horizons, it would limit the use of artificial lighting when operations do not require it, and it would result in artificial lighting that uses a less visible spectrum.

Prior to APD approval, operators would be required to submit a lighting plan to the BLM. These lighting plans would include information such as the number of lights and lumen output, fixture design, and lamp color temperature. Requiring a lighting plan would help the BLM and operators identify potential mitigation measures to reduce the potential adverse impacts that oil and gas development might have on night skies in the planning area and sensitive areas adjacent to the planning area.

### 4.9.4.1    *Suspended and Protested Lease Decisions*

Under Alternative B, the BLM would cancel all suspended leases, resolve the protests on the protested leases, and deny the leases. The visual resources and night skies in the areas of suspended and protested leases would not be affected by operators exploring for and developing oil and gas resources.

1    ### 4.9.5    Impacts from Alternative C

2    Under Alternative C, approximately 399,992 acres would be available for oil and gas leasing and
3    development, would be managed as either open with standard terms and conditions or with CSU and/or
4    TL stipulations, and would comprise approximately 88% of the BLM-administered land in the planning
5    area. The remaining 12% of BLM-administered land in the planning area (approximately 52,401 acres)
6    would be managed as NSO or closed to leasing. Table 4-24 lists the acres of oil and gas leasing categories
7    by VRI Class. Table 4-25 lists the acres of oil and gas leasing categories by VRM Class.

8    **Table 4-24. Oil and Gas Leasing Categories by VRI Class under Alternative C**

| VRI Class | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed |
|---|---|---|---|---|
| I | 0 | 0 | 0 | 0 |
| II | 2,602 | 10,958 | 7,882 | 9 |
| III | 1,334 | 22,041 | 7,891 | 19 |
| IV | 33,928 | 329,095 | 36,420 | 192 |

9    **Table 4-25. Oil and Gas Leasing Categories by VRM Class under Alternative C**

| VRM Class | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed |
|---|---|---|---|---|
| I | 0 | 6 | 27 | 192 |
| II | 0 | 3,976 | 10,258 | 0 |
| III | 31,745 | 318,646 | 41,023 | 0 |
| IV | 6,119 | 39,481 | 843 | 0 |

10    Under Alternative C, areas managed as open subject to standard terms and conditions and areas managed
11    as CSU and/or TL (approximately 399,992 acres) could experience oil and gas development activities that
12    affect visual resources in those areas. Potential visual impacts caused by oil and gas development include
13    an increase in visual contrasts of line, form, color, and texture created by well pads, drill rigs, and other
14    surface structures.

15    Among the alternatives, Alternative C would have the second largest acreage of VRI Classes I and II
16    areas (13,579 acres) and VRM Classes I and II areas (3,982 acres) managed as open subject to standard
17    terms and conditions or CSU and/or TL.

18    Under Alternative C, a CSU stipulation would be applied to all areas designated as VRM Class II. The
19    VRM Class II areas in the planning area primarily include areas in the southeast part of the planning area
20    north and south of the Keg Knoll area and around the Horseshoe Canyon Trailhead, as well as areas in the
21    northwest part of the planning area overlooking the San Rafael River. The CSU would require that, prior
22    to authorizing any surface-disturbing activity, a visual resource contrast rating would be completed in
23    accordance with BLM Manual 8431 (BLM 1986). Mitigation measures would then be identified to retain
24    the existing character of the landscape.

25    Managing VRM Class II areas with this CSU stipulation would help minimize impacts to visual resources
26    in these visually sensitive parts of the planning area. The CSU stipulation's required mitigation measures
27    would minimize the potential for visual impacts caused by oil and gas development, such as the increase

in visual contrasts of line, form, color, and texture created by well pads, drill rigs, access roads, and other associated surface disturbance and structures. The human-made structures and surface disturbance associated with oil and gas development would contrast with the undisturbed natural landscape and could be seen from the VRM KOPs.

Under Alternative C, all lands in the Labyrinth Canyon SRMA would be managed as CSU. The CSU applies spacing requirements for well pads, co-location requirements for production facilities, a requirement that pipelines and utilities be paced along existing roads to the extent practical, an interim reclamation requirement, and a requirement that final reclamation fully restore the original landform and that travel routes be restored to their original character. This CSU would help minimize potential impacts to visual resources in this SRMA by reducing density of well pads and co-locating surface-disturbing activities and structures where possible. The Dirty Devil/Robbers Roost SRMA would be managed in the same manner and with the same potential visual impacts as are described under Alternative A.

All lands within 1 mile of the Green River Labyrinth Canyon rim and Horseshoe Canyon rim would be managed as NSO under this alternative with no exceptions, modifications, or waivers. Managing these areas as NSO would eliminate potential visual impacts from oil and gas development in these areas. People using these areas would not be impacted by the visual contrast associated with oil and gas development. However, there would be a potential for fugitive dust to affect the visual resources of these areas if horizontal drilling occurs on adjacent lands.

Under Alternative C, the following recreation focus areas would also be managed as CSU: Fossil Point, Dry Lake Archaeological District, Three Canyon, Saucer Basin/Moonshine Wash, The Cone, Keg Knoll, Sweetwater Reef, Cottonwood Wash, and Horseshoe Canyon Trailhead. The CSU applies spacing requirements for well pads (at least 160 acres apart), co-location requirements for production facilities, a requirement that pipelines and utilities be paced along existing roads to the extent practical, an interim reclamation requirement, and a requirement that final reclamation fully restore the original landform and that travel routes be restored to their original character. This CSU would help minimize potential impacts to visual resources in these recreation focus areas by reducing density of well pads and co-locating surface-disturbing activities and structures where possible.

Under this alternative, all lands within 1 mile of the following KOPs would be managed as NSO with no exceptions, modifications, or waivers: Keg Knoll, Wolverton Overlook, Horseshoe Canyon Trailhead, Trin Alcove/Three Canyon, and Bull Bottom. Managing these areas as NSO would eliminate potential visual impacts from oil and gas development. People using these areas would not be impacted by the visual contrast associated with oil and gas development. However, there would be a potential for fugitive dust to affect the visual resources of these areas if horizontal drilling occurs on adjacent lands.

Under this alternative, venting or open flaring of gas captured during oil well production would be prohibited except in circumstances identified in existing rules. This would help reduce the potential impact on night skies from open flaring.

### 4.9.5.1    *Suspended and Protested Lease Decisions*

Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to standard terms, 39,766 acres would be issued subject to CSU or TL stipulations, and 318 acres would be issued subject to NSO stipulations. Protested leases are within a 3-mile buffer of two KOPs (Bull Bottom and Trin Alcove/Three Canyon). Protested leases also overlap VRI Class II areas near these two KOPs, as well as the Saucer Basin/Moonshine Wash recreation focus area. Suspended leases overlap the Sweetwater Reef recreation focus area. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative C would be the same as the impacts to visual resources and night skies described in this section from managing areas as open to leasing subject to standard terms and conditions, open to leasing subject to CSU or TL stipulations, or open to leasing subject to NSO stipulations.

1  **4.9.6    Impacts from Alternative D**

2  Under Alternative D, approximately 339,884 acres would be available for oil and gas leasing and
3  development, would be managed with CSU and/or TL stipulations, and would comprise approximately
4  75% of the BLM-administered land in the planning area. The remaining 25% of BLM-administered land
5  in the planning area (approximately 112,509 acres) would be managed as NSO or closed to leasing. Table
6  4-26 lists the acres of oil and gas leasing categories by VRI Class. Table 4-27 lists the acres of oil and gas
7  leasing categories by VRM Class.

8  **Table 4-26. Oil and Gas Leasing Categories by VRI Class under Alternative D**

| VRI Class | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed |
|---|---|---|---|---|
| I | 0 | 0 | 0 | 0 |
| II | 0 | 4,452 | 10,006 | 6,984 |
| III | 0 | 14,835 | 9,345 | 7,086 |
| IV | 0 | 320,573 | 72,806 | 6,256 |

9  **Table 4-27. Oil and Gas Leasing Categories by VRM Class under Alternative D**

| VRM Class | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed |
|---|---|---|---|---|
| I | 0 | 2 | 28 | 195 |
| II | 0 | 2,288 | 3,618 | 8,327 |
| III | 0 | 292,415 | 87,239 | 11,760 |
| IV | 0 | 45,166 | 1,277 | 0 |

10  Under Alternative D, areas managed as open subject to standard terms and conditions and areas managed
11  as CSU and/or TL (approximately 339,884 acres) could experience oil and gas development activities that
12  affect visual resources in those areas. Potential visual impacts caused by oil and gas development include
13  an increase in visual contrasts of line, form, color, and texture created by well pads, drill rigs, and other
14  surface structures.

15  Among the alternatives, Alternative D would have the second smallest acreage of VRI Classes I and II
16  areas (4,454 acres) and VRM Classes I and II areas (2,290 acres) managed as open subject to standard
17  terms and conditions or CSU and/or TL.

18  Under this alternative, a CSU stipulation for oil and gas leasing would be applied to all areas inventoried
19  as VRI Class II or designated as VRM Class II. The VRI Class II areas in the planning area include
20  Moonshine Wash, Trin Alcove/Three Canyon, and other viewpoints on the Green River Labyrinth
21  Canyon rim (see Map 2-14). The VRM Class II areas in the planning area primarily include locations in
22  the southeast part of the planning area north and south of the Keg Knoll area and around the Horseshoe
23  Canyon Trailhead, as well as locations in the northwest part of the planning area overlooking the San
24  Rafael River. The CSU would require that, prior to authorizing any surface-disturbing activity, a visual
25  resource contrast rating would be completed in accordance with BLM Manual 8431 (BLM 1986).
26  Mitigation measures would then be identified to retain the existing character of the landscape.

27  Managing VRI and VRM Class II areas with this CSU stipulation would help minimize impacts to visual
28  resources in these visually sensitive parts of the planning area. The CSU stipulation's required mitigation

1  measures would minimize the potential for visual impacts caused by oil and gas development, such as the
2  increase in visual contrasts of line, form, color, and texture created by well pads, drill rigs, and other
3  surface structures.

4  Under Alternative D, the Labyrinth Canyon SRMA would be managed in the same manner and with the
5  same potential visual impacts as are described under Alternative B. The Dirty Devil/Robbers Roost
6  SRMA would be managed in the same manner and with the same potential visual impacts as are
7  described under Alternative A.

8  All lands within 1 mile of the Green River Labyrinth Canyon rim that are north of the San Rafael River
9  would be managed as NSO with no exceptions, modifications, or waivers. Managing these areas as NSO
10  would eliminate potential visual impacts from oil and gas development. People using these areas would
11  not be impacted by the visual contrast associated with oil and gas development. However, there would be
12  a potential for fugitive dust to affect the visual resources of these areas if horizontal drilling occurs on
13  adjacent lands.

14  All lands within 1 mile of the Green River Labyrinth Canyon rim that are south of the San Rafael River
15  would be closed to oil and gas leasing and development. Closure to leasing would eliminate the potential
16  for visual impacts caused by oil and gas development in these areas. People using these areas would not
17  be impacted by the visual contrast associated with oil and gas development. However, there would be a
18  potential for fugitive dust to affect these areas if horizontal drilling occurs on adjacent lands.

19  All lands within 1 mile of the Horseshoe Canyon rim would be managed in the same manner and with the
20  same potential visual impacts as are described under Alternative B.

21  Under this alternative, the following recreation focus areas would be managed as NSO with no
22  exceptions, modifications, or waivers: Fossil Point, Dry Lake Archaeological District, Three Canyon,
23  Saucer Basin/Moonshine Wash, Keg Knoll, Sweetwater Reef, and Horseshoe Canyon Trailhead.

24  All lands within 1 mile of the following KOPs would be managed as NSO with no exceptions,
25  modifications, or waivers: Keg Knoll, Wolverton Overlook, Horseshoe Canyon Trailhead, Trin
26  Alcove/Three Canyon, and Bull Bottom.

27  All lands within 1 mile of the following travel corridors would be managed as NSO with no exceptions,
28  modifications, or waivers: Lower San Rafael Road from Saucer Basin Road to Horseshoe Canyon and
29  Lower San Rafael Road from the San Rafael River to Horseshoe Canyon (Map 2-8-D).

30  Managing these areas as NSO would eliminate potential visual impacts from oil and gas development.
31  People using these recreation focus areas and travel corridors would not be impacted by the visual
32  contrast associated with oil and gas development. However, there would be a potential for fugitive dust to
33  affect the visual resources of these recreation focus areas and travel corridors if horizontal drilling occurs
34  on adjacent lands.

35  Under Alternative D, The Cone and Cottonwood Wash recreation focus areas would be managed as CSU.
36  The CSU stipulation applies spacing requirements for well pads (at least 1 mile apart), co-location
37  requirements for production facilities, a requirement that pipelines and utilities be paced along existing
38  roads to the extent practical, an interim reclamation requirement, and a requirement that final reclamation
39  fully restore the original landform and that travel routes be restored to their original character. This CSU
40  would help minimize potential impacts to visual resources in these recreation focus areas by reducing
41  density of well pads and co-locating surface-disturbing activities and structures where possible.

42  Under Alternative D, artificial lighting used during night-time oil and gas development activities could
43  have an adverse impact to night skies. Viewsheds of visually sensitive areas outside of the planning area
44  may be affected by the use of artificial lighting during night-time oil and gas development activities.

Under this alternative, venting or open flaring of gas captured during oil well production would be prohibited except in circumstances identified in existing rules. In the case of an exception, a visual screen must be used to minimize skyglow, glare, and adverse visual effects to night sky resources.

### 4.9.6.1    *Suspended and Protested Lease Decisions*

Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU or TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. Protested leases are within a 3-mile buffer of two KOPs (Bull Bottom and Trin Alcove/Three Canyon). Protested leases also overlap VRI Class II areas near these two KOPs, as well as the Saucer Basin/Moonshine Wash recreation focus area. Suspended leases overlap the Sweetwater Reef recreation focus area. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative D would be the same as the impacts to visual resources and night skies from managing lands as open to leasing subject to CSU or TL stipulations or open to leasing subject to NSO stipulations described in this section.

## 4.10   AUDITORY MANAGEMENT (SOUNDSCAPES)

This section presents potential impacts to soundscapes from implementation of the management actions presented in Chapter 2. Existing conditions for soundscapes in the analysis area are described in Chapter 3.

### 4.10.1  Assumptions

- Visitors to the analysis area could be impacted by noise from oil and gas development, including equipment use and vehicle noise associated with well pad construction, well drilling and completion, well head operation, and operation and maintenance activities.

- The primary driver of the intensity of noise impacts resulting from oil and gas development would be the management decisions for noise under each alternative. Management decisions for other resources would affect noise impacts to a lesser degree.

- All other factors held constant, alternatives that would be anticipated to result in more oil and gas development would be likely to produce more noise and have a higher impact to the existing soundscape.

### 4.10.2  Description of General Impacts in the Analysis Area

As described in Chapter 3, portions of the analysis area can be compared to an agricultural area such as a tomato field or to a small town or quiet suburban area. A typical day-night average sound level for a tomato field on a farm is 44 A-weighted decibels (dBA), whereas a small town cul-de-sac and wooded residential area both have a typical day-night average sound level of 50 dBA (EPA 1974). However, much of the analysis area (and especially more remote parts such as the recreation focus areas and KOPs) likely has average sound levels well below 44 to 50 dBA. Background sound levels in these areas may be similar to a representative sound level of 20 dBA from leaves rustling in Canyonlands National Park (Ambrose and Burson 2004). Noise levels associated with oil and gas sources can range from 62 to 145 dBA (see Table 3-24).

Noise-sensitive human receptors, primarily consisting of recreation users in the Labyrinth Canyon and the Dirty Devil/Robbers Roost SRMAs, in Horseshoe Canyon, and in the five KOPs (Bull Bottom, TrinAlcove/Three Canyon, Wolverton Overlook, Keg Knoll, and the Horseshoe Canyon Trailhead), would experience elevated noise levels when near oil and gas development. Assuming a background noise level of 50 dBA in the analysis area, noise at 62 dBA from a natural gas compressor would be

perceived as approximately twice as loud as the background noise. Noise at 87 dBA from oil and gas operations would be perceived as over eight times louder than the background noise. Assuming a background noise level of 20 dBA in the analysis area, noise at 62 dBA from a natural gas compressor would be perceived as approximately 16 times as loud as the background noise. Noise at 87 dBA from oil and gas operations would be perceived as over 64 times louder than the background noise. Such noise would reduce the quality of the visitor recreation experience on public lands and could affect human health at higher levels such as 145 dBA.

In portions of the analysis area near State Route 24 and Interstate 70, ambient noise levels depend on the volume, speed, and quantity of nearby traffic. As described in Chapter 3, a medium-sized truck traveling at 50 miles per hour has a perceived relative loudness of 80 dBA from 50 feet away, and a modified motorcycle traveling at the same speed has a perceived relative loudness of 90 dBA from 50 feet away (FHWA 1980). Depending on the traffic on State Route 24 and Interstate 70, noise levels associated with oil and gas sources near these roads may be more likely to blend into background traffic noise.

The perception of noise levels by human receptors is affected by the distance of the receptor from the noise source. Attenuation or a reduction in sound intensity occurs as a result of distance (and of the presence of obstacles or certain atmospheric conditions). Therefore, alternatives that limit oil and gas development near noise-sensitive human receptors in the Labyrinth Canyon and the Dirty Devil/Robbers Roost SRMAs, in Horseshoe Canyon, and in the five KOPs would have lower noise impacts.

## 4.10.3 Impacts Common to All Alternatives

This section discusses soundscape impacts that would not vary by alternative.

For all oil and gas leases under all alternatives, a special status species lease notice would be attached that includes a requirement for noise emissions to be reduced to 45 dBA at 0.5 mile from suitable Mexican spotted owl habitat, including canyon rims, when permanent actions may impact owls or their habitat. A noise analysis would also be required for the placement of permanent noise-generating facilities under this lease notice. A special status species lease notice would also be attached to all leases for the yellow-billed cuckoo under all alternatives. This lease notice would include a requirement for the use of noise-reduction measures to ensure noise levels at the edge of suitable yellow-billed cuckoo habitat do not exceed baseline conditions. Both lease notices would reduce overall noise impacts in areas with Mexican spotted owl and yellow-billed cuckoo habitat.

Climate change would not increase or decrease noise impacts for any of the alternatives.

## 4.10.4 Impacts from Alternative A (No Action)

Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to standard terms and conditions, approximately 19,083 acres would be open to oil and gas leasing subject to CSU and/or TL stipulations, approximately 33,627 acres would be open to oil and gas leasing subject to a NSO stipulation, and approximately 220 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative A is estimated to consist of 28 wells and 541 acres of surface disturbance in areas open to oil and gas leasing.

Auditory management would not be specifically addressed under Alternative A because there is no auditory management direction in the current Price and Richfield ROD/RMPs (BLM 2008a, 2008b). No lease stipulations would be applied under Alternative A to decrease noise impacts and to protect natural soundscapes in the analysis area. One noise BMP, the use of noise-reduction techniques and designs to reduce noise from compressors or other motorized equipment, would be applied to oil and gas leasing and development. This BMP would reduce noise from oil and gas development activities and associated impacts to noise-sensitive human receptors.

1    Under Alternative A, an NSO stipulation would be applied to portions of the Dirty Devil/Robbers Roost
2    SRMA, which would minimize impacts to noise-sensitive human receptors in these areas. However, the
3    remaining portions of the SRMA would allow oil and gas development with CSU stipulations. Although
4    CSU stipulations could reduce some of the noise impacts, noise-sensitive human receptors in these areas
5    would still be affected. In addition, adjacent areas would be open to oil and gas leasing subject to standard
6    terms and conditions. Noise impacts in adjacent areas could be detectable by noise-sensitive human
7    receptors in the SRMA depending on the distance and sound intensity of the noise source. An NSO
8    stipulation would be applied to the Green River suitable segment from the confluence of the San Rafael
9    River to Canyonlands National Park under Alternative A (which includes portions of the Labyrinth
10    Canyon SRMA). The NSO stipulation would limit impacts to noise-sensitive human receptors where it is
11    in effect; however, other portions of the Labyrinth Canyon SRMA would be open to oil and gas leasing
12    subject to standard terms and conditions. Noise-sensitive human receptors in or adjacent to the areas open
13    to oil and gas leasing would experience noise impacts. Impacts to noise-sensitive human receptors in
14    Horseshoe Canyon and in the Horseshoe Canyon Trailhead KOP would be limited by NSO and CSU
15    stipulations along the west rim of the canyon. CSU stipulations would generally provide less reduction in
16    noise impacts than NSO stipulations because some surface would still be permitted. Alternative A does
17    not stipulate protections for the remaining four KOPs; they are generally located in or adjacent to areas
18    open to oil and gas leasing subject to standard terms and conditions. Noise-sensitive human receptors in
19    these KOPs would experience noise impacts. Other resource TL stipulations under Alternative A would
20    prevent noise during specific timeframes such as the fawning season for pronghorn and the migratory bird
21    nesting season; however, noise would still occur outside of these seasonal closures. The CSU limitations
22    under Alternative A would reduce noise in certain areas such as white-tailed prairie dog habitat and steep
23    slopes (greater than 30%). Applying NSO stipulations under Alternative A (to portions of the Dirty
24    Devil/Robbers Roost SRMA, the Dirty Devil/French Springs Units 1 and 3 and Horseshoe Canyon South
25    LWCs, steep slopes [greater than 40%], the Tidwell Draw ACEC, the Dry Lake Archaeological District
26    ACEC, portions of the Green River, and areas with specific water resources) or closing areas to oil and
27    gas leasing would reduce or prevent oil and gas development noise from reaching noise-sensitive human
28    receptors in these areas.

29    However, under Alternative A, the BLM would allow some exceptions, modifications, and waivers for
30    TL stipulations in pronghorn habitat and for migratory birds, and for CSU stipulations in white-tailed
31    prairie dog habitat. Exceptions for NSO stipulations in portions of the Dirty Devil/Robbers Roost SRMA,
32    the Dry Lake Archaeological District ACEC, steep slopes (greater than 40%), and in areas with specific
33    water resources would be allowed. Granting exceptions, modifications, or waivers to TL, CSU, and NSO
34    stipulations would allow for noise impacts from oil and gas development in areas where such stipulations
35    are applied. These impacts would be similar to the noise impacts that would occur in areas that are open
36    to oil and gas leasing subject to standard terms and conditions.

37    ### 4.10.4.1    *Suspended and Protested Lease Decisions*

38    Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to
39    standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO
40    stipulations. If the leases were subsequently developed, the types of impacts to soundscapes from issuing
41    the leases subject to the terms and conditions contained within the Price and Richfield ROD/RMPs (BLM
42    2008a, 2008b) (Alternative A-2) would be the same as the impacts to soundscapes described from
43    managing them as open to leasing subject to standard terms and conditions described in this section; the
44    NSO areas would not be large enough to eliminate sound impacts from oil and gas development. If the
45    BLM were to rescind the suspensions on the suspended leases (Alternative A-1) and the leases were
46    subsequently developed, the impacts to soundscapes that would occur in the leased areas would be the
47    same as those described for managing areas as open to leasing subject to standard terms and conditions.
48    Under Alternative A-2, the suspended leases would be subject to the conditions, including stipulations
49    and BMPs included in the Richfield ROD/RMP (BLM 2008b). Although the Richfield ROD/RMP

contains no auditory management direction and would not require noise stipulations, it has a noise BMP that would reduce noise from oil and gas development activities and associated impacts to noise-sensitive human receptors (BLM 2008b).

Because some of the protested leases are located in or very close to the Labyrinth Canyon SRMA and in the Bull Bottom and Trin Alcove/Three Canyon KOPs, and because these leases would be issued subject to standard terms and conditions, noise-sensitive human receptors in these areas could experience degradation of the soundscape from oil and gas development. The noise BMP that would be applied under Alternative A-2 would limit some of the noise impact. Similarly, the suspended leases are very close to the Dirty Devil/Robbers Roost SRMA. Noise-sensitive human receptors in the SRMA, especially receptors along the canyon rims, could experience degradation of the soundscape from oil and gas development.

Under both Alternatives A-1 and A-2, if a lessee proposes to develop theses leases (e.g., drill a well), the BLM would evaluate the lessee's proposal in a site-specific environmental review. If during the site-specific environmental review process the BLM determines that additional mitigation measures are required to protect resources of concern, those mitigation measures would be included as conditions of approval to future site-specific authorizations (e.g., application of appropriate BMPs).

## 4.10.5 Impacts from Alternative B

Under Alternative B, 0 acres would be open to oil and gas leasing subject to standard terms and conditions, approximately 98,164 acres would be open to oil and gas leasing subject to CSU and/or TL stipulations, approximately 324,161 acres would be open to oil and gas leasing subject to a NSO stipulation, and approximately 30,068 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative B is estimated to consist of seven wells and 127 acres of surface disturbance in areas with CSU, TL, and/or NSO stipulations.

Alternative B would apply a noise CSU stipulation requiring that noise levels from production equipment do not exceed 45 decibels as measured at 350 feet from the source. Alternative B would also apply a noise CSU stipulation requiring that noise levels be mitigated so that there is no change in the natural ambient sound as recorded in Canyonlands National Park. No exceptions, modifications, or waivers would be allowed for these stipulations. The first CSU stipulation would reduce noise levels from operating wells to estimated background levels that exist in some portions of the analysis area, such as areas near dirt roads, near parking areas, or near livestock operations (44–50 dBA); however, noise levels would still exceed the 20-dBA background level present in more remote portions of the analysis area. At the 45-decibel level, which can be described as between very quiet and quiet (see Table 3-23), noise-sensitive human receptors in more remote areas may still hear noise from oil and gas activities above background noise levels when near the noise source. In portions of the analysis area near State Route 24 and Interstate 70, the CSU stipulation could reduce oil and gas noise levels to below that of traffic noise levels. The second stipulation protects the soundscape of Canyonlands National Park by ensuring that sound levels in the park are not impacted by noise from oil and gas development near the park. This stipulation would likely reduce noise near Canyonlands National Park to levels similar to 20 dBA, minimizing noise impacts in these areas. The CSU stipulations under Alternative B would promote more noise reduction than the BMP prescribed under Alternative A because they require mitigation to estimated background levels.

Alternative B would apply BMPs that require the minimization of noise by using best available technology (e.g., installation of multi-cylinder pumps, installation of hospital grade sound-reducing mufflers, placement of exhaust systems to direct noise away from noise-sensitive human receptors) and that require the location of drill pads, roads, and facilities below ridgelines or behind topographic features to minimize auditory effects. These BMPs are more stringent than the BMP prescribed under Alternative A and would further reduce noise impacts.

Under Alternative B, an NSO stipulation would be applied for the Labyrinth Canyon and Dirty Devil/Robbers Roost SRMAs that would minimize impacts to noise-sensitive human receptors in the SRMAs. Areas adjacent to both SRMAs would either be NSO or have CSU and/or TL limitations, which would reduce the chance of noise impacts traveling from outside the SRMAs to noise-sensitive human receptors in the SRMAs. Impacts to noise-sensitive human receptors in Horseshoe Canyon and in the Horseshoe Canyon Trailhead KOP would not occur under Alternative B because they would be closed to oil and gas development, along with adjacent areas. Alternative B would attach an NSO stipulation (within 3 miles of each KOP) to protect all five KOPs. Noise-sensitive human receptors in these KOPs would not likely experience noise impacts.

In addition to the CSU stipulations for noise, other resource TL stipulations under Alternative B to protect saline soils in the Mancos Shale, pronghorn during fawning season, and migratory bird nesting would prevent noise during specific timeframes. Noise would still occur outside of these seasonal closures, but it would be mitigated by the noise stipulation. CSU limitations for other resources under Alternative B would reduce noise in certain areas such as areas with soils that have high wind erosion potential, steep slopes (greater than 30%), white-tailed prairie dog habitat, and areas with special status plants. Applying NSO stipulations under Alternative B (to LWCs, nine recreation focus areas, the Labyrinth Canyon SRMA, the Dirty Devil/Robbers Roost SRMA, KOPs, steep slopes [greater than 40%], the Tidwell Draw ACEC, the Dry Lake Archaeological District ACEC, the OST, VRI and VRM Class II areas, and areas with specific water resources) or closing areas to oil and gas leasing would prevent oil and gas development noise from reaching noise-sensitive human receptors in these areas. Alternative B would also apply an NSO stipulation within 3 miles of the Lower San Rafael Road from State Route 24 to Horseshoe Canyon and from Green River to Horseshoe Canyon, which would reduce noise in these areas.

Under Alternative B, the BLM would allow some exceptions, modifications, and waivers for TL stipulations for saline soils in the Mancos Shale, for pronghorn habitat, for migratory birds, and for CSU stipulations in white-tailed prairie dog habitat. Granting exceptions, modifications, or waivers to TL, CSU, and NSO stipulations would allow for noise impacts from oil and gas development in areas where such stipulations are applied. However, these impacts to the primary noise-sensitive human receptors would be mitigated by the two noise stipulations.

### 4.10.5.1    Suspended and Protested Lease Decisions

Under Alternative B, the BLM would cancel all suspended leases, resolve the protests on the protested leases, and deny the leases. The soundscapes in the areas of suspended and protested leases would not be affected by oil and gas exploration or development activities. Current soundscape conditions and trends would be anticipated to continue for the foreseeable future.

### 4.10.6  Impacts from Alternative C

Under Alternative C, 37,865 acres would be open to oil and gas leasing subject to standard terms and conditions, approximately 362,127 acres would be open to oil and gas leasing subject to CSU and/or TL stipulations, approximately 52,208 acres would be open to oil and gas leasing subject to a NSO stipulation, and approximately 192 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative C is estimated to consist of 27 wells and 517 acres of surface disturbance in areas open to oil and gas leasing.

Alternative C would apply a noise CSU stipulation requiring that noise levels be mitigated so that there is no change in the natural ambient sound as recorded in Canyonlands National Park. No exceptions, modifications, or waivers would be allowed for this stipulation. This stipulation protects the soundscape of Canyonlands National Park by ensuring that sound levels in the park are not impacted by noise from nearby oil and gas development. Oil and gas development in the analysis area near Canyonlands National Park would require noise mitigation and would have noise levels that do not impact noise-sensitive

1  human receptors; however, development in portions of the analysis area that are located at a greater
2  distance from the park would not require mitigation and would cause noise levels to exceed the estimated
3  background levels (20 dBA in more remote areas and 44 to 50 dBA in other areas such as near dirt roads,
4  near parking areas, or near livestock operations). The CSU stipulation under Alternative C would promote
5  less noise reduction than those stipulations prescribed under Alternative B (and Alternative D) because it
6  only addresses oil and gas leasing and development near Canyonlands National Park. However,
7  Alternative C's stipulation provides more noise mitigation for some of the noise-sensitive human
8  receptors than the BMP under Alternative A.

9  Alternative C would apply the same BMPs as Alternative B; these BMPs would have the same impacts
10 and benefits to soundscapes as described in Alternative B.

11 Under Alternative C, an NSO stipulation would be applied to portions of the Dirty Devil/Robbers Roost
12 SRMA that would reduce impacts to noise-sensitive human receptors in these areas; however, noise
13 impacts could occur in other portions of the SRMA or from adjacent areas that are open to oil and gas
14 leasing subject to standard terms and conditions or subject to CSU and/or TL limitations. A CSU
15 stipulation would be applied for the Labyrinth Canyon SRMA under Alternative C, which would limit
16 impacts to noise-sensitive human receptors in the SRMA by spacing well pads at least 320 acres apart and
17 away from the viewshed of the Green River. Noise-sensitive human receptors in this SRMA would
18 experience some noise, but the intensity and frequency of the impact would be reduced when compared to
19 areas open to oil and gas development subject to standard terms and conditions. Impacts to noise-sensitive
20 human receptors in Horseshoe Canyon and in the Horseshoe Canyon Trailhead KOP would be minimized
21 by an NSO stipulation within 1 mile of the canyon rim. Alternative C would also apply an NSO
22 stipulation (within 1 mile of each KOP) for all five KOPs. Noise-sensitive human receptors at these KOPs
23 would be unlikely to experience noise impacts.

24 In addition to the CSU stipulation for noise, other resource TL stipulations under Alternative C to protect
25 saline soils in the Mancos Shale, pronghorn during fawning season, and migratory bird nesting would
26 prevent noise during specific timeframes; however, noise would still occur outside of these seasonal
27 closures. CSU stipulations for other resources under Alternative C would reduce noise in LWCs in
28 Labyrinth Canyon, recreation focus areas, the Labyrinth Canyon SRMA, soils with high wind erosion
29 potential, steep slopes (greater than 30%), the Tidwell Draw ACEC, the OST, white-tailed prairie dog
30 habitat, and areas with special status plants. Applying NSO stipulations under Alternative C (to the Three
31 Rivers Mineral Withdrawal, the Dirty Devil/French Springs Units 1 and 3 and Horseshoe Canyon South
32 LWCs, portions of the Dirty Devil/Robbers Roost SRMA, Green River Labyrinth Canyon rim and
33 Horseshoe Canyon rim, KOPs, steep slopes (greater than 40%), areas with specific water resources, the
34 Dry Lake Archaeological District ACEC, and portions of the Green River) or closing areas to oil and gas
35 leasing would prevent oil and gas development noise from reaching noise-sensitive human receptors in
36 these areas.

37 However, under Alternative C, the BLM would allow some exceptions, modifications, and waivers for TL
38 stipulations for saline soils in the Mancos Shale, for pronghorn habitat, for migratory birds, and for CSU
39 stipulations in white-tailed prairie dog habitat and the OST. Exceptions for NSO stipulations in portions
40 of the Dirty Devil/Robbers Roost SRMA and for some water resources would be allowed. Granting
41 exceptions, modifications, or waivers to TL, CSU, and NSO stipulations would allow for noise impacts
42 from oil and gas development in areas where such stipulations are applied. These impacts would be
43 similar to the noise impacts that would occur in areas that are open to oil and gas leasing subject to
44 standard terms and conditions, unless the impacts occurred near Canyonlands National Park, in which
45 case they would be mitigated.

1  ### 4.10.6.1    Suspended and Protested Lease Decisions

2  Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to
3  standard terms, 39,766 acres would be issued subject to CSU and/or TL stipulations, and 318 acres would
4  be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts of
5  modifying the terms and conditions of the suspended and protested leases and issuing the leases
6  consistent with Alternative C would be the same as the impacts to soundscapes described in this section
7  from managing areas as open to leasing subject to standard terms and conditions, open to leasing subject
8  to CSU and/or TL stipulations, and open to leasing subject to NSO stipulations.

9  Because some of the protested leases under Alternative C are located in or very close to the Labyrinth
10  Canyon SRMA and in the Bull Bottom and Trin Alcove/Three Canyon KOPs, and because most of these
11  leases would be issued with a CSU and/or TL stipulation, noise-sensitive human receptors in these areas
12  could experience noise from oil and gas development during specific periods (when timing limitations are
13  not in effect) that would reduce the quality of the recreation experience. Similarly, the suspended leases
14  are very close to the Dirty Devil/Robbers Roost SRMA. Because most of the suspended leases would be
15  issued with a CSU and/or TL stipulation, noise-sensitive human receptors in the SRMA could experience
16  noise from oil and gas development during specific time periods.

17  ## 4.10.7  Impacts from Alternative D

18  Under Alternative D, 0 acres would be open to oil and gas leasing subject to standard terms and
19  conditions, approximately 339,884 acres would be open to oil and gas leasing subject to CSU and/or TL
20  stipulations, approximately 92,170 acres would be open to oil and gas leasing subject to a NSO
21  stipulation, and approximately 20,339 acres would be closed to oil and gas leasing. Reasonably
22  foreseeable development under Alternative D is estimated to consist of 23 wells and 440 acres of surface
23  disturbance in areas with CSU, TL, and/or NSO stipulations.

24  Alternative D would implement the same noise stipulations on oil and gas leases as Alternative B.
25  Alternative D would apply a CSU stipulation requiring that noise levels from production equipment do
26  not exceed 45 decibels as measured at 350 feet from the source. Alternative D would also apply a noise
27  CSU stipulation requiring that noise levels be mitigated so that there is no change in the natural ambient
28  sound as recorded in Canyonlands National Park. No exceptions, modifications, or waivers would be
29  allowed for these stipulations. The first CSU stipulation would reduce noise levels from operating wells
30  to estimated background levels that exist in some portions of the analysis area, such as near dirt roads,
31  near parking areas, or near livestock operations (44–50 dBA); however, noise levels would still exceed
32  the 20-dBA background level present in more remote portions of the analysis area. At the 45-decibel
33  level, which can be described as between very quiet and quiet (see Table 3-23), noise-sensitive human
34  receptors in more remote areas may still hear noise from oil and gas activities above background noise
35  levels when close to the noise source. In portions of the analysis area near State Route 24 and Interstate
36  70, the CSU stipulation could reduce oil and gas noise levels to below that of traffic noise levels. The
37  second stipulation protects the soundscape of Canyonlands National Park by ensuring that sound levels in
38  the park are not impacted by noise from oil and gas development near the park. This stipulation would
39  likely reduce noise near Canyonlands National Park to levels similar to 20 dBA, minimizing noise
40  impacts in these areas.

41  Alternative D would apply the same BMPs as Alternatives B and C; these BMPs would have the same
42  impacts and benefits to soundscapes as described in Alternative B.

43  Under Alternative D, an NSO stipulation would be applied to the Labyrinth Canyon SRMA that would
44  minimize impacts to noise-sensitive human receptors in the SRMA. An NSO stipulation would be applied
45  to portions of the Dirty Devil/Robbers Roost SRMA that would reduce impacts to noise-sensitive human
46  receptors in these areas; however, other portions of the SRMA would be subject to CSU and/or TL
47  stipulations. Noise-sensitive human receptors in portions of the SRMA where oil and gas development is

1  subject to CSU and/or TL stipulations would experience some noise, but the intensity and frequency of
2  the impact would be reduced when compared to areas open to oil and gas development subject to standard
3  terms and conditions. Impacts to noise-sensitive human receptors in Horseshoe Canyon and in the
4  Horseshoe Canyon Trailhead KOP would be minimized by an NSO stipulation within 1 mile of the
5  canyon rim. Alternative D would also apply an NSO stipulation (within 1 mile of each KOP) to protect all
6  five KOPs. Noise-sensitive human receptors at these KOPs would be unlikely to experience noise
7  impacts.

8  In addition to the CSU stipulations for noise, other resource TL stipulations under Alternative D to protect
9  saline soils in the Mancos Shale, pronghorn during fawning season, and migratory bird nesting would
10 prevent noise during specific timeframes. Noise would still occur outside of these seasonal closures, but it
11 would be mitigated by the noise stipulations. CSU limitations for other resources under Alternative D
12 would reduce noise in LWCs, two recreation focus areas, soils with high wind erosion potential, steep
13 slopes (greater than 30%), white-tailed prairie dog habitat, and areas with special status plants. Applying
14 NSO stipulations under Alternative D (in the Labyrinth Canyon LWC Unit, the Dirty Devil/French
15 Springs Units 1 and 3 and Horseshoe Canyon South LWCs, seven recreation focus areas, the Labyrinth
16 Canyon SRMA, portions of the Dirty Devil/Robbers Roost SRMA, Horseshoe Canyon rim, Green River
17 Labyrinth Canyon rim, KOPs, steep slopes (greater than 40%), the Tidwell Draw ACEC, the Dry Lake
18 Archaeological District ACEC, the OST, and areas with specific water resources) or closing areas to oil
19 and gas leasing would prevent oil and gas development noise from reaching noise-sensitive human
20 receptors in these areas. Alternative D would also apply an NSO stipulation within 1 mile of the Lower
21 San Rafael Road from Saucer Basin Road to Horseshoe Canyon and from the San Rafael River to
22 Horseshoe Canyon, which would reduce noise in these areas.

23 Under Alternative D, the BLM would allow some exceptions, modifications, and waivers for TL
24 stipulations for saline soils in the Mancos Shale, for pronghorn habitat, for migratory birds, and for CSU
25 stipulations for white-tailed prairie dog habitat. Exceptions and waivers for NSO stipulations in portions
26 of the Dirty Devil/Robbers Roost SRMA, for some water resources, and for the OST would be allowed.
27 Granting exceptions, modifications, or waivers to TL, CSU, and NSO stipulations would allow for noise
28 impacts from oil and gas development in areas where such stipulations are applied. However, these
29 impacts would be mitigated by the two noise stipulations.

### 4.10.7.1    *Suspended and Protested Lease Decisions*

31 Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU
32 and/or TL stipulations and 3,132 acres would be issued subject to NSO stipulations. If the leases were
33 subsequently developed, the impacts of modifying the terms and conditions of the suspended and
34 protested leases and issuing the leases consistent with Alternative D would be the same as the impacts on
35 soundscapes from managing lands as open to leasing subject to CSU and/or TL stipulations, or open to
36 leasing subject to NSO stipulations described in this section.

37 Because some of the protested leases under Alternative D are located in or very close to the Labyrinth
38 Canyon SRMA and in the Bull Bottom and Trin Alcove/Three Canyon KOPs and because most of these
39 leases would be issued with a CSU and/or TL stipulation, noise-sensitive human receptors in these areas
40 could experience noise from oil and gas development during specific periods (when timing limitations are
41 not in effect) that would reduce the quality of the recreation experience. Similarly, the suspended leases
42 are very close to the Dirty Devil/Robbers Roost SRMA. Because most of the suspended leases would be
43 issued with a CSU and/or TL stipulation, noise-sensitive human receptors in the SRMA could experience
44 noise from oil and gas development during specific time periods.

1   **4.11 SPECIAL STATUS SPECIES**

2   This section presents potential impacts to habitat for special status species from implementing the
3   management actions presented in Chapter 2. Existing conditions concerning special status species are
4   described in Chapter 3.

5   **4.11.1 Assumptions**

6   • Local populations are naturally affected by non-human-caused factors such as climate, natural
7     predation, disease outbreaks, natural fire regimes, and competition for available habitat from
8     other native species.

9   • Climatic fluctuation (e.g., drought) would continue to influence the health and productivity of
10    special status species habitat on an annual basis.

11  • Actions affecting one special status species would have similar impacts on other species that use
12    the same habitats or areas.

13  • Surface-disturbing activities could lead to modification (positive or negative), loss (short-term or
14    long-term), or fragmentation of special status species habitat and/or the loss or gain of
15    individuals, depending on the amount of area disturbed, species affected, and location of the
16    disturbance.

17  • Changes in air, water, and habitat quality could lead to direct impacts and could have cumulative
18    impacts on species survival.

19  • Impacts to special status species could be more significant than impacts to non–special status
20    species.

21  • The USFWS would be consulted on any action that could affect any listed plant, fish, or wildlife
22    species or their habitat. Consultation with the USFWS, as required by the ESA, would ensure
23    additional protection for special status species from oil and gas leasing and development. The
24    USFWS would have jurisdiction over the management of federally listed plant, fish, and wildlife
25    populations, critical habitat, and migratory birds.

26  • The total amount of new surface disturbance allowed by an alternative is a good index of
27    potential impacts to special status species. Success of reclamation measures prescribed as a
28    condition of development is unknown, and the potential impact of surface disturbance on special
29    status species populations could be underestimated.

30  • Adequate vegetative ground cover and species composition for site stabilization typically would
31    occur within 15 to 20 years in shrub communities and 20 to 25 years in desert communities.

32  • In disturbed areas, re-establishment of a vegetative landscape and plant composition similar to
33    adjacent undisturbed lands, including trees and shrubs, could take in excess of 100 years.

34  • The health of fisheries in the planning area is directly related to the overall health and functional
35    capabilities of riparian and wetland resources, which in turn reflect watershed health.

36  **4.11.2 Impacts Common to All Alternatives**

37  The following discussions represent impacts to special status species that would not vary by alternative.

38  Attaching stipulations for special status species to permitted activities and requiring the use of BMPs
39  would limit negative impacts to those species and their habitats through such actions as preventing
40  surface disturbance in and near their habitats, which would prevent habitat degradation and damage;
41  reducing the introduction and spread of non-native, invasive species and noxious weeds; minimizing the
42  presence of humans and noise from machinery and vehicles associated with mineral leasing; limiting the
43  potential for direct mortality as a result of damage to burrows or collisions with oil and gas equipment and
44  traffic; and reducing habitat fragmentation.

1    For all alternatives, attaching lease notices and requiring conservation measures for all surface-disturbing
2    activities for Jones cycladenia, Wright fishhook cactus, western yellow-billed cuckoo, southwestern
3    willow flycatcher, Colorado River endangered fish, and the Mexican spotted owl would ensure
4    compliance with the ESA and limit impacts from oil and gas development to these species. Such lease
5    notices would minimize damage to or loss of these species' habitats resulting from surface disturbance or
6    other oil and gas development activities. These lease notices include prohibiting surface disturbance in the
7    100-year floodplain of the Green River and associated back waters to protect Colorado River endangered
8    fish, protecting Mexican spotted owl occupied habitat by prohibiting temporary activities from March 1
9    through August 31 and permanent actions year-round within 0.5 mile of a Protected Activity Center,
10    precluding surface-disturbing activities within a 100-meter buffer of suitable habitat year-long and within
11    0.25 mile of occupied breeding habitat during the breeding season to protect the southwestern willow
12    flycatcher, and precluding surface-disturbing activities within 0.25 mile of occupied habitat in riparian
13    areas from June 15 through August 31 to protect the western yellow-billed cuckoo.

14    Attaching lease notices and requiring mitigation measures for all surface-disturbing activities to protect
15    Utah and BLM sensitive species (e.g., burrowing owl, bluehead sucker, Jones indigo bush, and hole-in-
16    the-rock prairie clover) would limit impacts from oil and gas development to these species because the
17    BLM would require assessments to determine whether a species is present and, depending on the results
18    of the assessments, the implementation of avoidance measures for that species during exploration and
19    development.

20    Management of the Big Flat Tops ACEC as closed to oil and gas leasing and development would prevent
21    impacts from oil and gas development including surface disturbance, loss of vegetation, and the
22    introduction and spread of non-native, invasive species and noxious weeds on special status species
23    present in the ACEC.

24    Controlling noxious weed species and preventing the infestation and spread of invasive species as well as
25    developing cooperating agreements with other federal, state, local, and private organizations to control
26    invasive and noxious weed species would reduce the introduction and spread of non-native, invasive
27    species and noxious weeds in the planning area. Non-native, invasive species and noxious weeds degrade
28    the habitats of special status species; management actions to prevent their introduction and spread would
29    benefit all special status species.

30    Management actions to protect wildlife, migratory birds, and raptors would benefit special status species
31    in the planning area. Depending on the alternative, the BLM would implement different management
32    actions in habitats that are occupied by wildlife, migratory birds, and raptors (e.g., prohibiting surface-
33    disturbing activities in crucial pronghorn habitat during fawning season and application of seasonal
34    restrictions and spatial buffers on known raptor nests). Special status species that share these habitats
35    would also be protected by the stipulations and would benefit from the undisturbed habitat and forage; the
36    reduction in the potential for the introduction and spread of invasive, non-native plant species; and the
37    reduced presence of humans and machinery associated with oil and gas exploration and development.
38    Some of these management actions would protect riparian and upland vegetation, reduce sedimentation
39    and siltation of streambeds, and support water quality for fish habitat.

40    Under all alternatives, avoiding surface-disturbing activities in occupied migratory bird habitat during the
41    nesting season would minimize and prevent impacts such as noise, human presence, physical destruction
42    of nests, and nest failure and abandonment to special status species that are migratory birds (e.g., western
43    yellow-billed cuckoo, bald eagle, bobolink, and burrowing owl). Oil and gas exploration and development
44    activities could still occur in migratory bird habitats outside of the nesting season, which could result in
45    the removal and modification of migratory bird habitats and disturbance or displacement of migratory
46    birds that are special status species during foraging, sheltering, migration, and other activities.

47    Management actions that support good air quality (e.g., the use of dust mitigation measures) could reduce
48    impacts to vegetation and stream channels from dust accumulation and airborne pollutants. These actions
49    would support healthy foliage for special status plant and wildlife species and healthy water quality for
50    special status fish species.

On the Colorado Plateau, climate change is expected to intensify the hydrologic cycle (e.g., causing more intense runoff), reduce streamflow, cause declines in native fish diversity, increase soil erosion, increase non-native species populations, increase the frequency and intensity of fire, and shift vegetation composition, diversity, and growth (Bryce et al. 2012). A reduction in streamflow, more-intense runoff resulting in increased erosion, and declines in native fish diversity could all negatively affect special status fish species in the long term. An increased frequency and intensity of fire and shifts in vegetation composition, diversity, and growth could have negative or positive impacts on the current habitat compositions of special status species. For example, climate and soil modeling to predict future vegetation conditions in the Colorado Plateau ecoregion indicates that a potential shift in major vegetation types through time is expected based on plant functional groups (BLM 2012g). The modeling predicts that climate conditions will change to favor more grasses and shrubland subtropical xeromorphic (e.g., Gambel oak and western juniper) (Bryce et al. 2012). Based on this information, special status species whose habitats consist primarily of grasses and subtropical xeromorphic shrubland may benefit from changing conditions while species that require different habitats may be negatively impacted. Modeling was conducted on a limited number of mammal, bird, and fish species to examine each species' response to potential exposure to climate change. Each of the mammal species modeled showed a unique signature in the climate model results; bird and fish species also showed species-specific patterns (Bryce et al. 2012). Based on this analysis, climate change would likely have different impacts on different special status species in the planning area. Climate change impacts cannot necessarily be generalized across species.

## 4.11.3  Impacts from Alternative A (No Action)

Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to standard terms and conditions; approximately 19,083 acres would be open to oil and gas leasing subject to CSU/TL stipulations; approximately 33,627 acres would be open to oil and gas leasing subject to an NSO stipulation; and approximately 220 acres would be closed to oil and gas leasing. For those special status plant, fish, and wildlife species with designated, modeled, or mapped habitat in the planning area, Table 4-28 presents the habitat that would be located in each leasing category under each alternative.

**Table 4-28. Special Status Species Habitat by Oil and Gas Leasing Category in All Alternatives**

| Oil and Gas Leasing Category | Acres of Special Status Species Habitat | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| **Modeled habitat for Jones cycladenia (threatened plant species)** | | | | |
| Open | | | | |
| Highest probability | 105,484.7 | 0.0 | 5,435.3 | 0.0 |
| Medium-high probability | 13,121.2 | 0.0 | 130.0 | 0.0 |
| Medium-low probability | 135,067.4 | 0.0 | 20,186.8 | 0.0 |
| Low probability | 19,424.7 | 0.0 | 8,255.9 | 0.0 |
| CSU/TL | | | | |
| Highest probability | 4,138.3 | 32,549.1 | 100,249.6 | 92,067.2 |
| Medium-high probability | 1,687.3 | 1,914.2 | 14,373.1 | 12,480.8 |
| Medium-low probability | 4,498.6 | 30,805.5 | 116,072.8 | 113,776.4 |
| Low probability | 495.7 | 158.4 | 7,875.3 | 11,645.6 |

| Oil and Gas Leasing Category | Acres of Special Status Species Habitat | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| NSO | | | | |
|   Highest probability | 7,887.9 | 74,760.0 | 11,843.4 | 16,291.4 |
|   Medium-high probability | 63.2 | 12,588.9 | 370.8 | 2,022.3 |
|   Medium-low probability | 7,951.7 | 112,671.5 | 11,266.7 | 29,983.4 |
|   Low probability | 11,920.9 | 25,572.7 | 15,710.2 | 17,019.8 |
| Closed | | | | |
|   Highest probability | 17.4 | 10,291.2 | 0.0 | 9,169.7 |
|   Medium-high probability | 194.3 | 562.9 | 192.0 | 562.8 |
|   Medium-low probability | 8.6 | 4,049.4 | 0.0 | 3,766.5 |
|   Low probability | 0.0 | 6,110.3 | 0.0 | 3,176.0 |
| **Suitable habitat for Wright fishhook cactus (endangered plant species)** | | | | |
|   Open | 1,806.5 | 0.0 | 1,122.5 | 0.0 |
|   CSU/TL | 384.9 | 1,317.3 | 1,034.6 | 2,094.4 |
|   NSO | 0.0 | 874.1 | 34.3 | 97.0 |
|   Closed | 0.0 | 0.0 | 0.0 | 0.0 |
| **Designated Critical Habitat for the Colorado pikeminnow (endangered fish species)** | | | | |
|   Open | 78.2 | 0.0 | 0.0 | 0.0 |
|   CSU/TL | 37.4 | 0.0 | 0.0 | 0.0 |
|   NSO | 427.7 | 0.0 | 543.4 | 24.7 |
|   Closed | 0.0 | 543.4 | 0.0 | 518.7 |
| **Designated Critical Habitat for the razorback sucker (endangered fish species)** | | | | |
|   Open | 79.3 | 0.0 | 0.0 | 0.0 |
|   CSU/TL | 37.4 | 0.0 | 0.0 | 0.0 |
|   NSO | 433.9 | 0.0 | 550.6 | 25.0 |
|   Closed | 0.0 | 550.6 | 0.0 | 525.6 |
| **Modeled habitat for the Mexican spotted owl (threatened wildlife species)\*** | | | | |
|   Open | 25,074.3/35.2 | 0.0/0.0 | 1,065.1/0.0 | 0.0/0.0 |
|   CSU/TL | 1,289.7/0.0 | 9,513.0/0.0 | 23,875.8/26.8 | 22,309.0/26.8 |
|   NSO | 3,085.8/9.8 | 16,741.4/26.8 | 4,517.0/18.2 | 4,239.5/0.0 |
|   Closed | 71.9/0.9 | 3,267.3/19.2 | 63.9/0.9 | 2,973.2/19.2 |

| Oil and Gas Leasing Category | Acres of Special Status Species Habitat | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| **Mapped colonies of white-tailed prairie dog (BLM sensitive wildlife species)** | | | | |
| Open | 0.0 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 4,964.5 | 3,955.2 | 5,229.4 | 4,699.4 |
| NSO | 320.0 | 1,329.3 | 55.2 | 585.1 |
| Closed | 0.0 | 0.0 | 0.0 | 0.0 |

*Acreage listed first is from the 1997 Willey-Spotsky Mexican Spotted Owl Habitat Model (foraging habitat); acreage listed second is from the 2007 model (nesting habitat).

For special status species listed under the ESA but with no designated, modeled, or mapped habitat in the planning area (i.e., humpback chub, bonytail, California condor, southwestern willow flycatcher, and western yellow-billed cuckoo) and for BLM sensitive plant and wildlife species that may occur in the planning area (Tables 3-25 and 3-26), impacts from oil and gas leasing and development would likely be proportional to the amount of projected disturbance under Alternative A. Impacts would consist of those described for wildlife in Section 4.12.3. The bonytail has been known to occur in the San Rafael River. The California condor has suitable foraging habitat in the planning area, and the southwestern willow flycatcher and western yellow-billed cuckoo have suitable nesting habitat in the riparian environment of the San Rafael and Green Rivers in the planning area (Section 3.11.1).

Under Alternative A, the BLM estimates that 28 oil and gas wells would be drilled in the planning area over the next 15 years. These wells would result in approximately 541 acres of surface disturbance and impacts on special status species habitat, of which 86 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative A are anticipated to result in 305 acres of surface disturbance and impacts on special status species habitat, of which approximately 61 acres would be unreclaimed in 15 years. Alternative A is anticipated to result in more oil and gas leasing, exploration, and development activities than the other alternatives analyzed in this EA. As a result, Alternative A would have the largest impact on special status species and their habitats in the planning area. Impacts would be similar to those described for wildlife in Section 4.12.3.

Allowing oil and gas leasing on 399,462 acres subject to standard terms and conditions (open) would result in the damage or removal of special status species habitat from the development of well pads and associated infrastructure. Invasive, non-native plant species could be introduced and spread by vehicles and machinery during development activities, which could change habitat composition and function, reducing forage quality and usable habitat for special status species. Runoff from development could lead to streambank erosion, vegetation loss, sedimentation of streambeds, and stream channel alteration, reducing habitat quality for special status fish. Direct mortality of special status species could occur as a result of damage to burrows or collisions with oil and gas equipment and traffic. Displacement of special status species from occupied habitats would likely occur as a result of equipment noise and human presence associated with oil and gas exploration and development. The largest land cover types in the open areas that could be developed are Colorado Plateau Blackbrush-Mormon-Tea Shrubland (184,190 acres) and Inter-Mountain Basins Active and Stabilized Dune (87,439 acres), although all vegetation types present in the planning area would have some areas open for development (Table 4-10). These vegetation communities provide habitat for special status species described in Chapter 3, such as burrowing owl, kit fox, white-tailed prairie dog, short-eared owl, Jones cycladenia, flat-top buckwheat, Paria spurge, Jane's globemallow, and other sensitive raptors, reptiles, and amphibians.

Applying CSU/TL stipulations under Alternative A to oil and gas leasing could reduce loss, damage, or degradation of special status species habitat within 19,083 acres. More specifically, impacts would be reduced to white-tailed prairie dog habitat through application of a special status species lease stipulation that prohibits surface-disturbing activities within 660 feet of prairie dog colonies identified within prairie dog habitat. No permanent aboveground facilities would be allowed within the 660-foot buffer. This stipulation would also provide habitat protections from disturbance associated with oil and gas development for other special status species associated with prairie dogs, such as burrowing owls. Exceptions, modifications, and waivers would be allowed for this stipulation. Granting exceptions, modifications, or waivers to this stipulation would allow for impacts to the white-tailed prairie dog and its habitat from oil and gas development in areas where CSU/TL stipulations are applied.

CSU/TL stipulations under Alternative A for other wildlife, such as prohibiting surface-disturbing activities in crucial pronghorn habitat during fawning season and closing migratory bird nesting areas during the nesting season, would prevent surface disturbance during specific timeframes, which could protect special status species during the periods of closure from disturbance by humans or machinery. Disturbance, damage, or loss of habitat could occur outside of the seasonal closures, ultimately leading to some loss of special status species habitat from oil and gas development. Other CSU/TL stipulations under Alternative A could reduce disturbance to steep slopes and VRM Class II areas, minimizing surface disturbance, habitat damage, habitat loss, erosion, runoff, and the introduction and spread of invasive, non-native plant species. The largest land cover types that are covered by CSU/TL stipulations are Colorado Plateau Blackbrush-Mormon-Tea Shrubland (7,983 acres) and Inter-Mountain Basins Mat Saltbush Shrubland (4,134 acres), although most vegetation types present in the planning area would have some areas managed as CSU/TL (Table 4-10). These vegetation communities provide habitat for special status species described in Chapter 3, including burrowing owl, kit fox, white-tailed prairie dog, short-eared owl, Jones cycladenia, flat-top buckwheat, Paria spurge, rushpink skeletonplant, maystem blazingstar, Jane's globemallow, and sensitive raptors, reptiles, and amphibians; these habitat areas would receive some reduction in surface disturbance or disruption from this management.

Applying an NSO stipulation under Alternative A for oil and gas leasing would prevent surface-disturbing activities in 33,627 acres of the planning area. The NSO stipulation would protect special status species habitat from damage, removal, or degradation; reduce the presence of infrastructure, humans, and machinery; and reduce habitat fragmentation. Preventing future mineral development disturbance caused by roads, structures, drilling operations, and human activity could reduce a majority of stressors to special status species, reduce disruption of habitat, and allow for continued habitat connectivity. NSO stipulations under Alternative A would be applied to the Dirty Devil/French Springs natural area; the Horseshoe Canyon South natural area; portions of the Dirty Devil/Robbers Roost SRMA; the Dry Lake ACEC; the Tidwell Draw ACEC; the Green River suitable segment from the confluence of the San Rafael River to Canyonlands National Park, steep slopes, and areas within 330 feet of springs, floodplains, perennial and intermittent streams, streams with perennial reaches, and riparian areas and wetlands. Through the prevention of surface disturbance, these NSO stipulations would reduce the potential for the introduction and spread of invasive, non-native plant species; support intact habitats that allow for migration corridors; and support desired forage and cover for special status species. The NSO stipulations that protect water resources would apply to riparian and aquatic habitats, including those along the San Rafael and Green Rivers. These habitats support special status fish in the planning area and provide important water sources and riparian breeding, foraging, nesting, and sheltering habitat for special status species including southwestern willow flycatcher and yellow-billed cuckoo. The NSO stipulations could prevent soil loss, erosion, or sedimentation of streambeds; support good water quality; and provide protection of habitat for special status fish. The land cover types that would receive the most protection under the NSO stipulation are Colorado Plateau Blackbrush-Mormon-Tea Shrubland (11,120 acres) and Inter-Mountain Basins Active and Stabilized Dune (9,169 acres), although most vegetation types present in the planning area would have some areas managed as NSO (Table 4-10).

1  Under Alternative A, the BLM would allow some exceptions, modifications, or waivers for NSO
2  stipulations (e.g., in the Dirty Devil/Robbers Roost SRMA where oil and gas exploration and
3  development would not impair identified scenic and primitive or semi-primitive recreational resources, or
4  on steep slopes when a more detailed analysis is conducted and shows that impacts can be mitigated).
5  Granting exceptions, modifications, or waivers to NSO stipulations would allow for impacts to special
6  status species and their habitats from oil and gas development in areas where NSO stipulations are
7  applied. These impacts would be similar to the impacts on special status species and their habitats that
8  would occur in areas that are open to oil and gas leasing subject to standard terms and conditions.

9  The BLM would allow geophysical operations under Alternative A on lands closed to leasing or subject to
10  NSO stipulations under certain circumstances in the Richfield Field Office; geophysical operations would
11  also be allowed in the Price Field Office consistent with existing regulations for geophysical exploration.
12  Allowing geophysical operations in areas closed to mineral leasing or subject to NSO stipulations would
13  allow for impacts on special status species and their habitats similar to the impacts on these resources that
14  would occur in areas that are open to oil and gas leasing subject to standard terms and conditions.

15  The BMPs that would be applied to oil and gas leases under Alternative A would promote reclamation of
16  surface disturbance to some degree. However, because of the difficulty of reclaiming surface disturbances
17  in the planning area, reclaimed areas would not be anticipated to return to natural conditions for 20 to 25
18  years or more after initial reclamation. The BMPs for Alternative A also include the monitoring of
19  wildlife to evaluate the effects of oil and gas development, the possible use of seasonal restrictions on
20  public vehicular access where there are wildlife conflict issues, and the use of noise reduction techniques
21  and designs to reduce noise from compressors or other motorized equipment. Where development does
22  occur, these measures would help reduce impacts to special status species such as habitat degradation,
23  species displacement and disturbance, and accidental mortality.

24  Even with the NSO stipulations, CSU/TL stipulations, lease notices, and BMPs, it is anticipated that
25  impacts on special status species and their habitats would occur under Alternative A because of the
26  projected total number of wells (28 wells) and associated surface disturbance (846 acres).

27  ### 4.11.3.1    Suspended and Protested Lease Decisions

28  Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to
29  standard terms and conditions and 113 acres of the suspended and protested leases would be issued subject
30  to NSO stipulations. The areas encompassed by the suspended and protested leases contain modeled
31  habitats for Mexican spotted owl and Jones cycladenia, as well as habitats for other special status plants
32  and wildlife described in Chapter 3. Some of the protested leases are located near the San Rafael River,
33  which provides riparian and aquatic habitat for special status species such as bonytail and razorback sucker
34  and which may provide habitat for yellow-billed cuckoo and southwestern willow flycatcher. If the leases
35  were subsequently developed, the impacts on these resources from issuing the leases subject to the terms
36  and conditions contained within the Price and Richfield Field Offices' ROD/RMPs (Alternative A-2)
37  would be the same as the impacts from managing them as open or NSO described in this section. If the
38  BLM were to rescind the suspensions on the suspended leases (Alternative A-1) and the leases were
39  subsequently developed, the impacts on special status species and their habitats that would occur in the
40  leased areas would be the same as those described for special status species habitats as open to leasing
41  subject to standard terms and conditions. The application of special status species lease notices common to
42  all alternatives would help protect special status species in the areas of suspended and protested leases.

43  Under both Alternatives A-1 and A-2, if a lessee proposes to develop these leases (e.g., drill a well), the
44  BLM would evaluate the lessee's proposal in a site-specific environmental review. If during the site-
45  specific environmental review process the BLM determines that additional mitigation measures are
46  required to protect resources of concern, those mitigation measures would be included as conditions of
47  approval to future site-specific authorizations (e.g., application of appropriate BMPs).

## 4.11.4  Impacts from Alternative B

Under Alternative B, 0 acres would be open to oil and gas leasing subject to standard terms and conditions; approximately 98,164 acres would be open to oil and gas leasing subject to CSU/TL stipulations; approximately 324,161 acres would be open to oil and gas leasing subject to an NSO stipulation; and approximately 30,068 acres would be closed to oil and gas leasing. For those special status plant, fish, and wildlife species with designated, modeled, or mapped habitat in the planning area, Table 4-28 presents the habitat that would be located in each leasing category under each alternative (including Alternative B).

For special status species that are listed under the ESA but that have no designated, modeled, or mapped habitat in the planning area (i.e., humpback chub, bonytail, California condor, southwestern willow flycatcher, and western yellow-billed cuckoo) and for BLM sensitive plant and wildlife species that may occur in the planning area (Tables 3-25 and 3-26), impacts from oil and gas leasing and development would likely be proportional to the amount of projected disturbance under Alternative B. Impacts would consist of those described for wildlife in Section 4.12.3. The bonytail has been known to occur in the San Rafael River. The California condor has suitable foraging habitat in the planning area, and the southwestern willow flycatcher and western yellow-billed cuckoo have suitable nesting habitat in the riparian environment of the San Rafael and Green Rivers in the planning area (Section 3.11.1).

The BLM estimates that seven oil and gas wells would be drilled in the planning area over the next 15 years under Alternative B. These wells would result in approximately 127 acres of surface disturbance and impacts on special status species habitat, of which 20 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative B are anticipated to result in 72 acres of surface disturbance and impacts on special status species habitat, of which approximately 14 acres would be unreclaimed in 15 years. Alternative B is anticipated to result in the smallest amount of oil and gas leasing, exploration, and development activities of the alternatives analyzed in this EA. As a result, Alternative B would be anticipated to have the smallest impact on special status species and their habitats in the planning area. Impacts would consist of those described for wildlife in Section 4.12.3 and would generally be the same type as would occur under Alternative A (e.g., disturbance and displacement of special status species and loss, degradation, and fragmentation of habitat).

Applying CSU/TL special status species stipulations under Alternative B to oil and gas leasing would reduce loss, damage, or degradation of special status species habitat within 98,164 acres. More specifically, impacts would be reduced to white-tailed prairie dog habitat through application of a special status species lease stipulation that prohibits surface-disturbing activities within 660 feet of prairie dog colonies identified within prairie dog habitat. No permanent aboveground facilities would be allowed within the 660-foot buffer. This stipulation would also provide habitat protections from disturbance associated with oil and gas development for other special status species associated with prairie dogs, such as burrowing owls. Exceptions, modifications, and waivers would be allowed for this stipulation, but they would more stringent than those allowed for Alternative A. For example, under Alternative B, the BLM authorized officer would not be able to grant exceptions if there is no reasonable location to develop a lease and avoid colonies due to the size of the town. Granting exceptions, modifications, or waivers to this stipulation under Alternative B would allow for impacts on the white-tailed prairie dog and its habitat from oil and gas development in areas where CSU/TL stipulations are applied; however, the impacts would need to be adequately mitigated. Under Alternative B, a CSU/TL stipulation would also apply to surface-disturbing activities within 300 feet of occupied Jones cycladenia and Wright fishhook cactus habitat, and surveys would be required in all modeled habitats. No exceptions, modifications, or waivers would be allowed for this stipulation. These stipulations would help ensure that any individual Jones cycladenia and Wright fishhook cactus that are present in the planning area are located and avoided during oil and gas exploration and development, although requiring surveys in all modeled habitats would increase costs for oil and gas operators. Under Alternative B, a lease notice would also be applied for the kit fox that requires surveys and prohibits surface-disturbing activities within 660 feet of an occupied kit

1  fox den. This lease notice would help prevent negative impacts on kit fox including accidental destruction
2  of dens or disturbance to active dens when compared to Alternative A because surveys would be required
3  in all habitats and an avoidance distance for active dens is identified.

4  CSU/TL stipulations for other wildlife under Alternative B (e.g., prohibiting surface-disturbing activities
5  in crucial pronghorn habitat during fawning season, applying seasonal restrictions and spatial buffers on
6  all known raptor nests, and closing migratory bird nesting areas during nesting season) could prevent
7  surface disturbance during specific timeframes. Special status species that use these habitats would also
8  be protected by the stipulations during the periods of closure and would benefit from the undisturbed
9  habitat and forage, the reduction in the potential for the introduction and spread of invasive and non-
10 native plant species, and the reduced presence of humans and machinery associated with oil and gas
11 exploration and development. The mitigation and management of raptors and their habitats under
12 Alternative B would also benefit special status species raptors and migratory birds by protecting nesting
13 and foraging habitat, reducing disturbance from humans and development activities, and protecting cover,
14 forage, and habitat corridors. Disturbance and damage or loss of habitat to special status species could
15 occur outside of the seasonal closures, ultimately leading to some loss of habitat from oil and gas
16 development.

17 Other CSU/TL stipulations under Alternative B could reduce disturbance to soils with high wind erosion
18 potential, saline soils in the Mancos Shale, and steep slopes, minimizing surface disturbance, habitat
19 damage, habitat loss, erosion, runoff, and the introduction and spread of invasive, non-native plant
20 species. Alternative B would also include CSU stipulations for night skies and noise, which would help
21 limit disruption from humans and machinery to special status species. The largest land cover types that
22 are covered by CSU/TL stipulations are Colorado Plateau Blackbrush-Mormon-Tea Shrubland (43,214
23 acres) and Inter-Mountain Basins Active and Stabilized Dune (17,577 acres), although most vegetation
24 types present in the planning area would have some areas managed as CSU/TL (Table 4-11). These
25 vegetation communities provide habitat for special status species described in Chapter 3 such as
26 burrowing owl, kit fox, white-tailed prairie dog, short-eared owl, Jones cycladenia, flat-top buckwheat,
27 Paria spurge, Jane's globemallow, and special status raptors, reptiles, and amphibians; these habitat areas
28 would receive some reduction in surface disturbance or disruption from this management.

29 Under Alternative B, applying an NSO stipulation or closing areas to oil and gas leasing would prevent
30 surface-disturbing activities from oil and gas leasing development within 354,229 acres. The NSO and
31 closed stipulations would protect special status species habitat from damage, removal, or degradation;
32 reduce the presence of infrastructure, humans, and machinery; and limit habitat fragmentation. Preventing
33 future mineral development disturbance caused by roads, structures, drilling operations, and human
34 activity could reduce a majority of stressors to special status species, reduce disruption of habitat, and
35 allow for continued habitat connectivity. NSO stipulations under Alternative B would be applied for lands
36 with wilderness characteristics, the Labyrinth Canyon SRMA, the Dirty Devil/Robbers Roost SRMA,
37 recreation focus areas, lands within 3 miles of KOPs, lands within 3 miles of the priority travel corridors,
38 the Dry Lake ACEC, the Tidwell Draw ACEC, lands within 3 miles of the Old Spanish Trail, steep slopes
39 (greater than 40%), VRI and VRM Class II areas, areas within 100 feet of ephemeral streams, areas
40 within public water reserves, areas within 100-year floodplains, and areas within 660 feet of intermittent
41 and perennial streams, rivers, riparian areas, wetlands, water wells, and springs. Areas closed to oil and
42 gas leasing would include the Dirty Devil/French Springs LWC units, the Horseshoe Canyon South
43 Natural Area, the Three Rivers locatable mineral withdrawal, all lands within 1 mile of the Green River
44 Labyrinth Canyon rim, all lands within 1 mile of the Horseshoe Canyon rim, and the Green River suitable
45 segment from the confluence of the San Rafael River to Canyonlands National Park.

46 The NSO stipulations and decisions to close areas to oil and gas leasing under Alternative B would reduce
47 the potential for the introduction and spread of invasive, non-native plant species; support intact habitats
48 that allow for migration corridors; and support desired forage and cover for special status species. The
49 NSO stipulations that protect water resources would apply to riparian and aquatic habitats, including those

along the San Rafael and Green Rivers. These areas provide habitat for threatened and endangered species including yellow-billed cuckoo, southwestern willow flycatcher, Colorado pikeminnow, razorback sucker, and bonytail, as well as other special status fisheries in the planning area. These areas also provide important water sources and riparian breeding, foraging, nesting, and sheltering habitat for other special status species. The NSO stipulations and closed areas could prevent soil loss, erosion, or sedimentation of streambeds; support good water quality; and provide protection of habitat for special status fish. Under Alternative B, the NSO stipulations would provide a larger area of protection around sensitive aquatic and riparian habitats compared to Alternative A. The land cover types that would receive the largest area of habitat protected under the NSO stipulation and areas closed to leasing are Colorado Plateau Blackbrush-Mormon-Tea Shrubland (148,063 acres NSO and 12,031 acres closed) and Inter-Mountain Basins Active and Stabilized Dune (77,023 acres NSO and 4,064 acres closed), although most vegetation types present in the planning area would have some areas managed as NSO or closed (Table 4-11).

Under Alternative B, the BLM would not allow exceptions, modifications, or waivers to most NSO stipulations. Not allowing exceptions, modifications, or waivers would reduce impacts to special status species and their habitats in areas that would be subject to NSO stipulations when compared to Alternative A, which would allow more exceptions, modifications, or waivers.

Geophysical operations would not be permitted under Alternative B in areas closed to leasing, and only heliport geophysical operations would be allowed in areas that are managed as NSO. This management of geophysical operations would provide better protection for special status species and their habitats in areas managed as closed to oil and gas leasing or subject to NSO stipulations, including prevention of surface disturbance, damage or removal of vegetation, and introduction and spread of invasive, non-native plant species and noxious weeds, when compared to Alternative A.

The BMPs that would be applied to oil and gas leases under Alternative B would promote more rapid and successful reclamation of surface disturbance (and a more rapid return to functioning special status species habitat) compared to Alternative A. However, because of the difficulty of reclaiming surface disturbances in the planning area, reclaimed areas would not be anticipated to return to natural conditions for 20 to 25 years or more after initial reclamation. Compared to Alternative A, the BMPs for Alternative B include measures that would reduce impacts on special status species and their habitats from oil and gas development, including measures to protect soil and water resources, improve reclamation success, prevent the spread of noxious weeds and invasive species, mitigate unavoidable impacts on wildlife habitats, and exclude wildlife from hazardous areas such as open pits, tanks, and trenches. These BMPs would reduce the impacts of oil and gas development on special status species and their habitats by minimizing the area of disturbed land, avoiding impacts from known oil and gas development that are hazardous to wildlife (e.g., produced water ponds), promoting improved reclamation planning and practices, and compensating for unavoidable loss of habitat values. The revised BMPs would also reduce the introduction and spread of non-native, invasive plant species and noxious weeds compared to Alternative A by improving equipment cleaning and improving the coordination, planning, and execution of noxious weed prevention measures.

### 4.11.4.1    Suspended and Protested Lease Decisions

Under Alternative B, the BLM would cancel all suspended leases and resolve the protests on the protested leases and deny the leases. Special status species and their habitats that occupy the areas of suspended and protested leases would not be affected by oil and gas activities resulting from operators exploring for and developing oil and gas resources. Current trends in special status species populations and habitat conditions in these areas would be anticipated to continue for the foreseeable future.

1  **4.11.5  Impacts from Alternative C**

2  Under Alternative C, approximately 37,865 acres would be open to oil and gas leasing subject to standard
3  terms and conditions; approximately 362,127 acres would be open to oil and gas leasing subject to
4  CSU/TL stipulations; approximately 52,208 acres would be open to oil and gas leasing subject to NSO
5  stipulations; and approximately 192 acres would be closed to oil and gas leasing. For those special status
6  plant, fish, and wildlife species with designated, modeled, or mapped habitat in the planning area, Table
7  4-28 presents the habitat that would be located in each leasing category under each alternative (including
8  Alternative C).

9  For special status species that are listed under the ESA but that have no designated, modeled, or mapped
10  habitat in the planning area (i.e., humpback chub, bonytail, California condor, southwestern willow
11  flycatcher, and western yellow-billed cuckoo) and for BLM sensitive plant and wildlife species that may
12  occur in the planning area (Tables 3-25 and 3-26), impacts from oil and gas leasing and development
13  would likely be proportional to the amount of projected disturbance under Alternative C. Impacts would
14  consist of those described for wildlife in Section 4.12.3. The bonytail has been known to occur in the San
15  Rafael River. The California condor has suitable foraging habitat in the planning area, and the
16  southwestern willow flycatcher and western yellow-billed cuckoo have suitable nesting habitat in the
17  riparian environment of the San Rafael and Green Rivers in the planning area (Section 3.11.1).

18  Under Alternative C, the BLM estimates that 27 wells oil and gas wells would be drilled in the planning
19  area over the next 15 years. These wells would result in approximately 517 acres of surface disturbance
20  and impacts on special status species habitat. Of this 517-acre area, 82 acres would remain unreclaimed in
21  15 years. Geophysical survey operations under Alternative C are anticipated to result in 292 acres of
22  surface disturbance and impacts on special status species habitat, of which approximately 58 acres would
23  be unreclaimed in 15 years. Alternative C would be anticipated to result in slightly less oil and gas
24  leasing, exploration, and development activities over the next 15 years in the planning area compared to
25  Alternative A. Alternative C would have slightly fewer overall impacts on special status species and their
26  habitats compared to Alternative A and substantially more impacts on these resources compared to
27  Alternative B. The types of impacts on special status species and their habitats under Alternative C would
28  be the same as those that would occur under Alternatives A and B and the same as those described for
29  wildlife in Section 4.12.3 (e.g., disturbance and displacement of special status species and loss,
30  degradation, and fragmentation of habitat).

31  Allowing oil and gas leasing on 37,865 acres subject to standard terms and conditions (open) would result
32  in the damage or removal of special status species habitat from the development of well pads and
33  associated infrastructure. Invasive, non-native plant species could be introduced and spread by vehicles
34  and machinery during development activities, which could change habitat composition and function,
35  reducing forage quality and usable habitat for special status species. Runoff from development could
36  reduce habitat quality for special status fish by causing streambank erosion, vegetation loss,
37  sedimentation of streambeds, and stream channel alteration. Direct mortality of special status species
38  could occur as a result of damage to burrows or nests and collisions with oil and gas equipment and
39  traffic. Displacement of special status species from occupied habitats would likely occur as a result of
40  equipment noise and human presence associated with oil and gas exploration and development. The
41  largest land cover types in the open areas that could be developed are Colorado Plateau Blackbrush-
42  Mormon-Tea Shrubland (11,951 acres) and Inter-Mountain Basins Active and Stabilized Dune (15,002
43  acres), although most vegetation types present in the planning area would have some areas open (Table 4-
44  12). These vegetation communities provide habitat for special status species described in Chapter 3 such
45  as burrowing owl, kit fox, white-tailed prairie dog, short-eared owl, Jones cycladenia, flat-top buckwheat,
46  Paria spurge, Jane's globemallow, raptors, reptiles, and amphibians; these habitat areas would receive
47  some reduction in surface disturbance or disruption from this management.

1    Applying CSU/TL stipulations under Alternative C to oil and gas leasing could reduce loss, damage, or
2    degradation of special status species habitat within 362,127 acres. More specifically, impacts would be
3    reduced to white-tailed prairie dog habitat through the application of the same special status species lease
4    stipulation for this species as that included under Alternative B. This stipulation would also provide
5    habitat protections from disturbance associated with oil and gas development for other special status
6    species associated with prairie dogs, such as burrowing owls. A special status species CSU/TL stipulation
7    would also apply to surface-disturbing activities within 300 feet of occupied Jones cycladenia and Wright
8    fishhook cactus habitat under Alternative C. Surveys would be required in all modeled habitat where there
9    is a moderate potential for occupation. No exceptions, modifications, or waivers would be allowed for the
10   plant stipulations. This survey stipulation is less stringent than the survey stipulation under Alternative B
11   (which requires surveys in all modeled habitats). Under the Alternative C survey requirement, there is a
12   possibility that some plants could be missed. However, the costs would be lower for oil and gas operators.
13   Under Alternative C, a lease notice would also be applied for the kit fox that requires surveys and
14   prohibits surface-disturbing activities within 660 feet of an occupied kit fox den. This lease notice would
15   help prevent negative impacts on kit fox including accidental destruction of dens or disturbance to active
16   dens when compared to Alternative A because surveys would be required in all habitats and an avoidance
17   distance for active dens is identified.

18   Under Alternative C, the BLM would apply the same CSU/TL stipulations for other wildlife (pronghorn
19   habitat, migratory birds, and raptors) as would be applied under Alternative B. The impacts and benefits
20   to special status species of applying these stipulations would be the same as those described for these
21   management actions under Alternative B. Other CSU/TL stipulations under Alternative C could reduce
22   disturbance to lands with wilderness characteristics in the Labyrinth Canyon Unit, recreation focus areas,
23   the Labyrinth Canyon SRMA, saline soils in the Mancos Shale, soils with high wind erosion potential,
24   steep slopes, the Tidwell Draw ACEC, areas within 2 miles of the Old Spanish Trail, and VRM Class II
25   areas. Other stipulations could minimize surface disturbance, habitat damage, habitat loss, erosion, runoff,
26   and the introduction and spread of invasive, non-native plant species. Alternative C would also include a
27   CSU/TL stipulation that could reduce the effects of noise, including displacement from otherwise suitable
28   habitats, on special status species in the planning area; however, this stipulation would be less protective
29   in areas farther away from the Horseshoe Canyon unit of Canyonlands National Park when compared to
30   Alternative B.

31   Alternative C contains some CSU stipulations that would limit the density of oil and gas development. As
32   densities of wells, roads, and facilities increase in wildlife habitat, habitat within and near well fields may
33   become progressively less effective until most animals no longer use these areas (Sawyer 2002).
34   Therefore, CSU stipulations that limit oil and gas development density could benefit special status species
35   and their habitats to a greater degree than other CSU stipulations applied under Alternative C by reducing
36   the intensity and extent of disturbance to habitats, reducing displacement of wildlife, and maintaining
37   habitat effectiveness. The largest land cover types covered by the CSU/TL stipulations are Colorado
38   Plateau Blackbrush-Mormon-Tea Shrubland (173,117 acres) and Inter-Mountain Basins Active and
39   Stabilized Dune (72,842 acres), although most vegetation types present in the planning area would have
40   some areas managed as CSU/TL (Table 4-12). These vegetation communities provide habitat for special
41   status species described in Chapter 3 such as burrowing owl, kit fox, white-tailed prairie dog, short-eared
42   owl, Jones cycladenia, flat-top buckwheat, Paria spurge, Jane's globemallow, and special status raptors,
43   reptiles, and amphibians; these habitat areas would receive some reduction in surface disturbance or
44   disruption from this management.

45   Under Alternative C, applying an NSO stipulation or closing areas to oil and gas leasing would prevent
46   surface-disturbing activities from oil and gas leasing development on 52,400 acres. The NSO and closed
47   stipulations could protect special status species habitat from damage, removal, or degradation; reduce the
48   presence of infrastructure, humans, and machinery; and reduce habitat fragmentation. Preventing future
49   mineral development disturbance caused by roads, structures, drilling operations, and human activity could

1  reduce a majority of stressors to special status species, reduce disruption of habitat, and allow for continued
2  habitat connectivity. The NSO stipulations under Alternative C would be applied for the Dirty
3  Devil/French Springs natural area and the Horseshoe Canyon South natural area, the Three Rivers
4  locatable mineral withdrawal, portions of the Dirty Devil/Robbers Roost SRMA, all lands within 1 mile of
5  the Green River Labyrinth Canyon rim, all lands within 1 mile of Horseshoe Canyon rim, all lands within 1
6  mile of KOPs, the Green River suitable segment from the confluence of the San Rafael River to
7  Canyonlands National Park, steep slopes (greater than 40%), the Dry Lake Archaeological District ACEC,
8  areas within 100 feet of ephemeral streams, areas within public water reserves, areas within 100-year
9  floodplains, and areas within 330 feet of intermittent and perennial streams, rivers, riparian areas, wetlands,
10 water wells, and springs. Areas closed to oil and gas leasing would include the Big Flat Tops ACEC.

11 Through the prevention of surface disturbance, the Alternative C NSO stipulations would reduce the
12 potential for the introduction and spread of invasive, non-native plant species; support intact habitats that
13 allow for migration corridors; and support desired forage and cover for special status species. The NSO
14 stipulations that protect water resources would apply to riparian and aquatic habitats, including those
15 along the San Rafael and Green Rivers. These areas provide habitat for threatened and endangered species
16 including yellow-billed cuckoo, southwestern willow flycatcher, Colorado pikeminnow, razorback
17 sucker, and bonytail, as well as other special status species fisheries in the planning area. These areas also
18 provide important water sources and riparian breeding, foraging, nesting, and sheltering habitat for other
19 special status species. The NSO stipulations could prevent soil loss, erosion, or sedimentation of
20 streambeds; support good water quality; and provide protection of habitat for special status fish. The NSO
21 stipulations under Alternative C would provide a smaller area of protection around these sensitive aquatic
22 and riparian habitats when compared to that of Alternative B. Similar to Alternative B, NSO stipulations
23 would be applied for ephemeral streams under Alternative C; they would not be applied under Alternative
24 A. The NSO stipulation for ephemeral streams would protect important desert washes that affect water
25 quality in downstream perennial waters inhabited by special status fish. The land cover types that would
26 receive the largest area of habitat protected under the NSO stipulation and areas closed to leasing are
27 Colorado Plateau Blackbrush-Mormon-Tea Shrubland (18,240 acres NSO) and Inter-Mountain Basins
28 Active and Stabilized Dune (10,820 acres NSO), although most vegetation types present in the planning
29 area would have some areas managed as NSO or closed (Table 4-12).

30 Under Alternative C, the BLM would allow exceptions, modifications, or waivers to some of the NSO
31 stipulations; however, fewer exceptions, modifications, or waivers would be granted compared to those
32 under Alternative A. Allowing fewer exceptions, modifications, or waivers would reduce impacts to
33 special status species and their habitats in areas that would be subject to NSO stipulations compared to
34 Alternative A.

35 Under Alternative C, geophysical operations would not be permitted in areas closed to leasing and would
36 be allowed in areas that are managed as NSO, though no new road construction or road improvements
37 would be permitted and the BLM would require full reclamation of all surface disturbance. Compared to
38 Alternative A, this management of geophysical operations would provide better protection for special
39 status species and their habitats in areas managed as closed to oil and gas leasing or open subject to NSO
40 stipulations, including prevention of surface disturbance and associated special status species
41 displacement, habitat loss, and degradation; improved reclamation practices; and reduced likelihood of
42 introduction and spread of invasive, non-native plant species and noxious weeds.

43 The BMPs that would be applied for Alternative C are the same as those that would be applied for
44 Alternative B; the benefits of using the BMPs would be the same as those described for Alternative B.
45 The BMPs that would be applied to oil and gas leases under Alternative C would promote more rapid and
46 successful reclamation of surface disturbance compared to the BMPs that would be applied under
47 Alternative A. However, because of the difficulty of reclaiming surface disturbances in the planning area,
48 some reclaimed areas would not be anticipated to return to natural conditions until up to 20 to 25 years
49 after initial reclamation.

### 4.11.5.1    Suspended and Protested Lease Decisions

Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to standard terms, 39,766 acres would be issued subject to CSU/TL stipulations, and 318 acres would be issued subject to NSO stipulations. The areas encompassed by the suspended and protested leases contain modeled habitats for Mexican spotted owl and Jones cycladenia, as well as habitats for other special status plants and wildlife described in Chapter 3. Some of the protested leases are located near the San Rafael River, which provides riparian and aquatic habitat for special status species such as bonytail and razorback sucker, and which may provide habitat for yellow-billed cuckoo and southwestern willow flycatcher. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative C would be the same as the impacts on those resources from managing them as open to leasing subject to standard terms and conditions, open to leasing subject to CSU/TL stipulations, or open to leasing subject to NSO stipulations described in this section. Under Alternative C, portions of protested leases would be issued with stipulations that would limit oil and gas development density to no greater than one well pad per 160 acres. Compared to Alternative A, which would also issue the leases subject to varying stipulations, issuing the suspended and protested leases with these stipulations could reduce the intensity and extent of disturbance to special status species habitats that would occur if the leases were subsequently developed, reducing displacement of species and maintaining habitat effectiveness.

## 4.11.6  Impacts from Alternative D

Under Alternative D, 0 acres would be open to oil and gas leasing subject to standard terms and conditions; approximately 339,884 acres would be open to oil and gas leasing subject to CSU/TL stipulations; approximately 92,170 acres would be open to oil and gas leasing subject to NSO stipulations; and approximately 20,339 acres would be closed to oil and gas leasing. For those special status plant, fish, and wildlife species with designated, modeled, or mapped habitat in the planning area, Table 4-28 presents the habitat that would be located in each leasing category under each alternative (including Alternative D).

For special status species listed under the ESA but with no designated, modeled, or mapped habitat in the planning area (i.e., humpback chub, bonytail, California condor, southwestern willow flycatcher, and western yellow-billed cuckoo) and for BLM sensitive plant and wildlife species that may occur in the planning area (Tables 3-25 and 3-26), impacts from oil and gas leasing and development would likely be proportional to the amount of projected disturbance under Alternative D. Impacts would consist of those described for wildlife in Section 4.12.3. The bonytail has been known to occur in the San Rafael River. The California condor has suitable foraging habitat in the planning area, and the southwestern willow flycatcher and western yellow-billed cuckoo have suitable nesting habitat in the riparian environment of the San Rafael and Green Rivers in the planning area (Section 3.11.1).

Under Alternative D, the BLM estimates that 23 oil and gas wells would be drilled in the planning area over the next 15 years. These wells would result in approximately 440 acres of surface disturbance and impacts on special status species habitat, of which 70 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative D are anticipated to result in 248 acres of surface disturbance and impacts on special status species; of this 248-acre area, approximately 50 acres would be unreclaimed in 15 years. Alternative D would be anticipated to result in slightly less oil and gas leasing, exploration, and development activity over the next 15 years in the planning area compared to that under Alternatives A and C. As a result, Alternative D would be anticipated to have slightly fewer overall impacts on special status species and their habitats compared to those under Alternatives A and C, and substantially more impacts on these resources compared to those under Alternative B. The types of impacts on special status species and their habitats under Alternative D would be the same as those that would occur under the other alternatives. These impacts are the same as those described for wildlife in Section 4.12.6 (e.g., disturbance and displacement of special status species and loss, degradation, and fragmentation of habitat).

1    Applying CSU/TL stipulations in Alternative D to oil and gas leasing could reduce loss, damage, or
2    degradation of special status species habitat within 339,884 acres. Under Alternative D, the BLM would
3    apply the same special status species CSU/TL stipulations on white-tailed prairie dog, kit fox, Jones
4    cycladenia, and Wright fishhook cactus as would be applied under Alternative C. Therefore, the impacts
5    and benefits of applying these stipulations on special status species and their habitats in the planning area
6    would be the same as those described for these management actions under Alternative C.

7    Under Alternative D, the BLM would apply the same CSU/TL stipulations for other wildlife (pronghorn
8    habitat, migratory birds, and raptors) as would be applied under Alternatives B and C. The impacts and
9    benefits to special status species of applying these stipulations would be the same as those described for
10   these management actions under Alternative B. Other CSU/TL stipulations applied under Alternative D
11   could reduce impacts to lands with wilderness characteristics (with the exception of the Labyrinth Canyon
12   Unit), The Cone and Cottonwood Wash recreation focus areas, all lands between 1 to 3 miles of KOPs and
13   key travel corridors, saline soils in the Mancos Shale, soils with high wind erosion potential, steep
14   slopes, all lands within 1 to 3 miles from high potential sites and route segments along the Old Spanish
15   Trail, and VRI and VRM Class II areas. Alternative D would also include the same CSU/TL stipulations
16   as Alternative B to reduce the effects of noise and light from oil and gas development on special status
17   species in the planning area.

18   Alternative D contains some CSU stipulations that would limit the density of oil and gas development.
19   These stipulations would be applied in lands with wilderness characteristics with the exception of the
20   Labyrinth Canyon Unit and The Cone and Cottonwood Wash recreation focus areas. The CSU
21   stipulations that would limit the density of oil and gas development under Alternative D would be more
22   restrictive and would cover a larger geographic area than would similar stipulations that would be applied
23   under Alternative C. As densities of wells, roads, and facilities increase in wildlife habitat, habitat within
24   and near well fields becomes progressively less effective until most animals no longer use these areas
25   (Sawyer 2002). Therefore, CSU stipulations that limit oil and gas development density could benefit
26   special status species and their habitats to a greater degree than could other types of CSU stipulations
27   applied under Alternatives A and C by reducing the intensity and extent of disturbance to special status
28   species habitats, reducing displacement of wildlife, and maintaining habitat effectiveness. The largest
29   areas of land cover types that are covered by the CSU/TL stipulations are Colorado Plateau Blackbrush-
30   Mormon-Tea Shrubland (148,756 acres) and Inter-Mountain Basins Active and Stabilized Dune (83,835
31   acres), although most vegetation types present in the planning area would have some areas managed as
32   CSU/TL (Table 4-13). These vegetation communities provide habitat for special status species described
33   in Chapter 3 such as burrowing owl, kit fox, white-tailed prairie dog, short-eared owl, Jones cycladenia,
34   flat-top buckwheat, Paria spurge, Jane's globemallow, raptors, reptiles, and amphibians; these habitat
35   areas would receive some reduction in surface disturbance or disruption from this management.

36   Under Alternative D, applying an NSO stipulation or closing areas to oil and gas leasing would prevent
37   surface-disturbing activities from oil and gas leasing development within 112,509 acres. The NSO and
38   closed stipulations would protect special status species habitat from damage, removal, or degradation;
39   reduce the presence of infrastructure, humans, and machinery; and reduce habitat fragmentation.
40   Preventing future mineral development disturbance caused by roads, structures, drilling operations, and
41   human activity could reduce a majority of stressors to special status species, reduce disruption of habitat,
42   and allow for continued habitat connectivity. The NSO stipulations under Alternative D would be applied
43   to the Dirty Devil/French Springs and Horseshoe Canyon South natural areas, lands with wilderness
44   characteristics in the Labyrinth Canyon Unit, the Labyrinth Canyon SRMA, portions of the Dirty
45   Devil/Robbers Roost SRMA, all lands within 1 mile of the Green River Labyrinth Canyon rim that are
46   north of the San Rafael River, all lands within 1 mile of Horseshoe Canyon rim, seven recreation focus
47   areas (Fossil Point, Dry Lake, Three Canyon, Saucer Basin/Moonshine Wash, Keg Knoll, Sweetwater
48   Reef, and Horseshoe Canyon Trailhead), areas within 1 mile of KOPs and key travel corridors, steep
49   slopes (greater than 40%), the Dry Lake Archaeological District ACEC, Tidwell Draw ACEC, all lands

1    within 1 mile of high potential sites and route segments along the Old Spanish Trail, areas within 100 feet
2    of ephemeral streams, areas within public water reserves, areas within 100-year floodplains, and areas
3    within 660 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and
4    springs. Areas that would be closed to oil and gas leasing would include the Big Flat Tops ACEC, the
5    Three Rivers locatable mineral withdrawal, all lands within 1 mile of the Green River Labyrinth Canyon
6    rim south of the San Rafael River, all lands within 1 mile of the Horseshoe Canyon rim, and the Green
7    River suitable segment from the confluence of the San Rafael River to Canyonlands National Park.

8    Through the prevention of surface disturbance, the Alternative D NSO stipulations and decisions to close
9    areas to oil and gas leasing would reduce the potential for the introduction and spread of invasive, non-
10   native plant species; support intact habitats that allow for migration corridors; and support desired forage
11   and cover for special status species. Under Alternative D, riparian and aquatic habitats in the planning
12   area, including those along the San Rafael and Green Rivers would either be closed to oil and gas leasing
13   or open subject to NSO stipulations. These areas provide habitat for threatened and endangered species
14   including yellow-billed cuckoo, southwestern willow flycatcher, Colorado pikeminnow, razorback
15   sucker, and bonytail, as well as other special status species fisheries in the planning area. These areas also
16   provide important water sources and riparian breeding, foraging, nesting, and sheltering habitat for other
17   special status species. The closures and NSO stipulations under Alternative D would provide larger areas
18   of protection around these sensitive aquatic and riparian habitats compared to the areas under Alternatives
19   A and C, and the same area of protection as that under Alternative B. Similar to Alternatives B and C,
20   NSO stipulations would be applied for ephemeral streams under Alternative D; these stipulations would
21   not be applied under Alternative A. The NSO stipulation for ephemeral streams would protect important
22   desert washes that provide special status species habitat and affect water quality in downstream perennial
23   waters. The NSO stipulations could prevent soil loss, erosion, or sedimentation of streambeds; support
24   good water quality; and provide protection of habitat for special status fish. The land cover types that
25   would receive the largest area of habitat protected under the NSO stipulation and areas closed to leasing
26   are Colorado Plateau Blackbrush-Mormon-Tea Shrubland (43,861 acres NSO and 10,691 acres closed)
27   and Inter-Mountain Basins Active and Stabilized Dune (12,613 acres NSO and 2,216 acres closed),
28   although most vegetation types present in the planning area would have some areas managed as NSO or
29   closed (Table 4-13).

30   Under Alternative D, the BLM would allow minimal exceptions, modifications, or waivers to NSO
31   stipulations. Fewer exceptions, modifications, or waivers would be granted compared to Alternatives A
32   and C. Allowing fewer exceptions, modifications, or waivers would reduce impacts to special status
33   species and their habitats in areas that would be subject to NSO stipulations, when compared to
34   Alternatives A and C.

35   Under Alternative D, geophysical operations would be managed in the same manner and would be
36   anticipated to have the same impacts as under Alternative C.

37   The BMPs for Alternative D and the benefits of using the BMPs would be the same as those described for
38   Alternatives B and C.

39   ### 4.11.6.1    *Suspended and Protested Lease Decisions*

40   Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to
41   CSU/TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. The areas
42   encompassed by the suspended and protested leases contain modeled habitats for Mexican spotted owl
43   and Jones cycladenia, as well as habitats for other special status plants and wildlife described in Chapter
44   3. Some of the protested leases are located near the San Rafael River, which provides riparian and aquatic
45   habitat for special status species such as bonytail and razorback sucker, and which may provide habitat
46   for yellow-billed cuckoo and southwestern willow flycatcher. If the leases were subsequently developed,
47   the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the

1 leases consistent with Alternative D would be the same as the impacts on those resources from managing
2 them as open to leasing subject to CSU/TL stipulations, or open to leasing subject to NSO stipulations
3 described in this section. Under Alternative D, portions of the suspended and protested leases would be
4 issued with stipulations that would limit oil and gas development density to no greater than one well pad
5 per 640 acres. Compared to Alternatives A and C, which would also issue the leases subject to varying
6 stipulations, issuing the suspended and protested leases with these stipulations would reduce the intensity
7 and extent of disturbance to special status species habitats that could occur if the leases were subsequently
8 developed, reducing displacement of species and maintaining habitat effectiveness.

## 9 4.12 WILDLIFE AND FISHERIES

10 This section presents potential impacts to habitat for wildlife and fish from implementing management
11 actions presented in Chapter 2. Existing conditions concerning wildlife and fisheries resources are
12 described in Chapter 3.

### 13 4.12.1 Assumptions

14 • Local populations of native wildlife and fish are naturally affected by non-human-caused factors
15    such as climate, natural predation, disease outbreaks, natural fire regimes, and competition for
16    available habitat from other native species.

17 • Climatic fluctuation in the planning area would continue to influence the health and productivity
18    of wildlife habitat on an annual basis.

19 • The more acreage of habitat protected from surface disturbance or human presence, the less
20    potential for adverse impacts to targeted species.

21 • Substantial modifications to habitat suitability can impact the survivability and viability of
22    populations (e.g., higher winter mortality, reduced reproductive success).

23 • Crucial winter ranges, transitional ranges, migration corridors, and birthing areas are important
24    wildlife habitat.

25 • Natural variability in wildlife health, population levels, and habitat conditions would continue in
26    the planning area. Periods of mild or severe weather as well as outbreaks of wildlife disease or
27    insects/diseases that impact habitat could impact wildlife population levels.

28 • Precise, quantitative estimates of impacts generally are not possible because the exact locations of
29    future actions are unknown, population data for wildlife species are often lacking, or habitat types
30    affected by surface-disturbing activities cannot be predicted.

31 • The health of fisheries in the planning area is directly related to the overall health and functional
32    capabilities of riparian and wetland resources, which in turn reflect watershed health.

33 • Any activities that affect the ecological condition of the watershed and its vegetative cover could
34    directly or indirectly affect the aquatic environment. The degree of impact attributed to any one
35    disturbance or series of disturbances is influenced by location within the watershed, time and
36    degree of disturbance, existing vegetation, and hydrologic condition.

37 • In general, surface disturbance impacting one species would have similar impacts to other species
38    using the same habitats or areas.

39 • Ground-disturbing activities could lead to modification (positive or negative), loss (short-term or
40    long-term), or fragmentation of wildlife habitat and/or loss or gain of individuals, depending on
41    the amount of area disturbed, species affected, and location of the disturbance.

1     •   The total amount of new surface disturbance allowed by an alternative is a good index of
2          potential impacts to wildlife and fish.

3     •   Adequate vegetative ground cover and species composition for site stabilization typically would
4          occur within 15 to 20 years in shrub communities and 20 to 25 years in desert communities.

5     •   In disturbed areas, re-establishment of a vegetative landscape and plant composition similar to
6          adjacent undisturbed lands, including trees and shrubs, could take in excess of 100 years.

## 4.12.2 Impacts Common to All Alternatives

8   The following discussions represent impacts to wildlife and fisheries that would not vary by alternative.

9   Oil and gas leasing stipulations to protect migratory birds and their nesting habitats in the planning area
10 would be similar under all alternatives. Alternatives B, C, and D would update the language contained in
11 the existing BLM ROD/RMPs to clarify the requirements for protecting migratory birds and their nesting
12 habitats. However, the on-the-ground management of oil and gas operations to protect migratory birds
13 would not change. Under all alternatives, avoiding surface-disturbing activities in occupied migratory bird
14 habitat during the nesting season would avoid and minimize impacts to migratory bird breeding activities.
15 Impacts such as noise, human presence, and physical destruction of active migratory birds nests and
16 young could result in mortality of migratory birds and nest failure or abandonment. Other wildlife species
17 that use these habitats during these sensitive periods could also be protected from disturbance. Oil and gas
18 exploration and development activities could still occur in migratory bird habitats outside of the nesting
19 season, which could result in the removal and modification of migratory bird habitats and disturbance or
20 displacement of migratory birds during foraging, sheltering, migration, and other activities.

21 Management of the Big Flat Tops ACEC as closed to oil and gas leasing and development would
22 preclude impacts from oil and gas development including surface disturbance; loss of vegetation;
23 introduction and spread of non-native, invasive species and noxious weeds; and other impacts to wildlife
24 habitat present in the ACEC. The ACEC is located on a large bluff that is not accessible to most large
25 mammals. Therefore, this management would benefit species that can access the ACEC, such as
26 migratory birds, raptors, bats, and small non-game species that can scale the cliffs.

27 Controlling noxious weed species; preventing the infestation and spread of invasive species; and
28 developing cooperating agreements with other federal, state, local, and private organizations to control
29 invasive and noxious weed species would reduce the introduction and spread of non-native, invasive
30 species and noxious weeds throughout the planning area. Non-native, invasive species and noxious weeds
31 degrade wildlife habitats, and management actions to prevent their introduction and spread would benefit
32 all wildlife species.

33 Management of threatened and endangered species including Mexican spotted owl, southwestern willow
34 flycatcher, yellow-billed cuckoo, bonytail, Colorado pikeminnow, humpback chub, and razorback sucker
35 would protect riparian and upland vegetation, reduce sedimentation and siltation of streambeds, and
36 support water quality for fish habitat. The prevention of surface disturbance could reduce the potential for
37 the introduction and spread of invasive, non-native plant species, providing additional protection to
38 stream health and fish habitat. Wildlife that use riparian, upland, and wetland habitat that would be
39 protected by these stipulations would benefit from the undisturbed habitat and forage and from the
40 reduced presence of humans and machinery associated with oil and gas exploration and development.
41 Fish that use the same waterways as bonytail, Colorado pikeminnow, humpback chub, and razorback
42 sucker such as speckled dace (*Rhinichthys osculus*), flannelmouth sucker (*Catostomus latipinnis*),
43 bluehead sucker (*Catostomus discobolus*), and roundtail chub (*Gila robusta*) would be protected by the
44 decisions that would avoid and minimize oil and gas activity in these important fish habitats in the
45 planning area.

1  **4.12.3  Impacts from Alternative A (No Action)**

2  Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to
3  standard terms and conditions, approximately 19,083 acres would be open to oil and gas leasing subject to
4  CSU/TL stipulations, approximately 33,627 acres would be open to oil and gas leasing subject to an NSO
5  stipulation, and approximately 220 acres would be closed to oil and gas leasing. Table 4-29 presents the
6  designated wildlife habitats that would be located in each leasing category under each alternative.

7  **Table 4-29. Wildlife Habitats by Oil and Gas Leasing Category under Alternatives A through D**

| Leasing Category | Alternative A (acres) | Alternative B (acres) | Alternative C (acres) | Alternative D (acres) |
|---|---|---|---|---|
| **Mule deer year-long substantial (34,608 acres in the planning area)** | | | | |
| Open | 14,911 | 0 | 2,262 | 0 |
| CSU/TL | 1,835 | 291 | 4,862 | 4,055 |
| NSO | 8,683 | 10,049 | 18,306 | 9,778 |
| Closed | 0 | 15,089 | 0 | 11,596 |
| **Pronghorn year-long substantial (154,880 acres in the planning area)** | | | | |
| Open | 119,267 | 0 | 27,240 | 0 |
| CSU/TL | 6,388 | 43,844 | 94,078 | 103,394 |
| NSO | 6,991 | 85,156 | 11,328 | 26,073 |
| Closed | 0 | 3,646 | 0 | 3,179 |
| **Pronghorn Year-long Crucial (264,278 acres in the planning area)** | | | | |
| Open | 219,305 | 0 | 0 | 0 |
| CSU/TL | 5,591 | 33,584 | 218,783 | 180,522 |
| NSO | 8,809 | 186,485 | 14,927 | 40,625 |
| Closed | 196 | 13,833 | 192 | 12,754 |
| **Bighorn sheep year-long substantial (413 acres in the planning area)** | | | | |
| Open | 0 | 0 | 0 | 0 |
| CSU/TL | 28 | 0 | 0 | 0 |
| NSO | 373 | 0 | 402 | 0 |
| Closed | 0 | 402 | 0 | 402 |
| **Bighorn sheep year-long crucial (3,684 acres in the planning area)** | | | | |
| Open | 320 | 0 | 0 | 0 |
| CSU/TL | 20 | 0 | 26 | 29 |
| NSO | 3,242 | 29 | 3,557 | 3,554 |
| Closed | 1 | 3,554 | 0 | 0 |

1  Under Alternative A, the BLM estimates that 28 oil and gas wells would be drilled in the planning area
2  over the next 15 years. These wells would result in approximately 541 acres of surface disturbance and
3  impacts to wildlife habitat, of which 86 acres would remain unreclaimed in 15 years. Geophysical survey
4  operations under Alternative A are anticipated to result in 305 acres of surface disturbance and impacts to
5  wildlife habitat, of which approximately 61 acres would be unreclaimed in 15 years. The BMPs that
6  would be applied to oil and gas leases under Alternative A would promote reclamation of surface
7  disturbance to some degree. However, because of the difficulty of reclaiming surface disturbances in the
8  planning area, the areas that are reclaimed would not be anticipated to return to natural conditions until 20
9  to 25 years or more after initial reclamation.

10  Alternative A would be anticipated to result in more oil and gas leasing, exploration, and development
11  activities and associated surface disturbance among the alternatives analyzed in the MLP/EA. As a result,
12  Alternative A would be anticipated to have the greatest impacts to fish and wildlife and their habitats in
13  the planning area. These impacts would include disturbance and displacement of wildlife and loss,
14  degradation, and fragmentation of wildlife habitat. Direct habitat loss or degradation of habitat would
15  force wildlife to relocate to other areas where competition for forage and other habitat resources would
16  increase. Increased competition for resources could lead to decreased health and reproduction and could
17  result in increased predation or mortality. As habitat fragmentation occurs and the density of wells, roads,
18  and facilities increases, habitat in and near well fields would become progressively less effective until
19  most animals no longer use these areas. Animals that remain within the affected zones would be subjected
20  to increased physiological stress. Where development occurs near sensitive habitat for big game, such as
21  winter range or other limited habitat, the health of the populations could be impacted through reduced
22  reproduction or by limiting the availability of valuable forage resources during sensitive timeframes
23  (Sawyer 2002).

24  Under Alternative A, the lease notices for management of raptors and their habitats would be included on
25  oil and gas leases issued by the BLM (see Table 2-9; SSS-12 through SSS-16). The BLM would manage
26  raptors and their habitats as identified in *Best Management Practices for Raptors and Their Associated*
27  *Habitats in Utah* (BLM 2006) and *Utah Field Office Guidelines for Raptor Protection from Human and*
28  *Land use Disturbances* (Romin and Muck 2002). This management would directly benefit raptor species
29  such as red-tailed hawk (*Buteo jamaicensis*), ferruginous hawk (*Buteo regalis*), bald and golden eagles
30  (*Haliaeetus leucocephalus* and *Aquila chrysaetos*), and peregrine falcon (*Falco peregrinus*) and their
31  habitat by reducing disturbing activities and human presence, allowing species to remain in desired
32  habitat for hunting, nesting, and reproduction. Maintaining and enhancing habitat for raptors would
33  directly benefit those species by providing desired nesting and foraging habitat. Other wildlife species
34  would also benefit from spatial buffers and habitat protection from reduced disturbance from humans and
35  development activities, protecting cover, forage, and habitat corridors.

36  Under Alternative A, timing limitations are not identified for crucial pronghorn habitats in the planning
37  area under the management direction in the existing ROD/RMPs. Since the completion of the existing
38  ROD/RMPs in 2008, the Utah Division of Wildlife Resources (UDWR) has mapped substantial and
39  crucial value pronghorn habitat in the planning area. Because the pronghorn habitat was identified after
40  the completion of the ROD/RMPs in 2008, it is likely that the BLM would apply a timing limitation to
41  proposed oil and gas leasing parcels located in crucial pronghorn habitat during site-specific leasing
42  environmental analysis. However, if the TL stipulations were not applied, pronghorn could be disturbed
43  during sensitive calving timeframes. These timeframes are important for successful reproduction and
44  maintenance of healthy herds. Disturbance during these timeframes could result in pronghorn expending
45  energy to move away from oil and gas activity, possibly making calves more susceptible to predation.

46  Under Alternative A, management actions for BLM-sensitive species including white-tailed prairie dog
47  (*Cynomys leucurus*) and the notification of operators that lands may include potential habitat for species
48  on the Utah Sensitive Species List would benefit wildlife in the planning area. In habitats that are
49  occupied by these sensitive species, the BLM would implement management actions such as precluding

1    surface disturbance within 660 feet of occupied white-tailed prairie dog colonies. Other wildlife that use
2    the habitats would also be protected by these stipulations and would benefit from the undisturbed habitat
3    and forage; the reduction in the potential for the introduction and spread of invasive, non-native plant
4    species; and the reduced presence of humans and machinery associated with oil and gas exploration and
5    development.

6    Allowing oil and gas leasing on 399,462 acres subject to standard terms and conditions (open) would
7    result in the damage or removal of wildlife habitat from the development of well pads and associated
8    infrastructure. Invasive, non-native plant species could be introduced and spread by vehicles and
9    machinery during development activities, which could change habitat composition and function, reducing
10   forage quality and usable habitat for wildlife species. Runoff from development could lead to streambank
11   erosion, vegetation loss, sedimentation of streambeds, and stream channel alteration, which would reduce
12   the quality of habitat for fish and aquatic species. Direct mortality of wildlife could occur as a result of
13   damage to burrows or nests and collisions with oil and gas equipment and traffic. Displacement of
14   wildlife from occupied habitats would likely occur as a result of equipment noise and human presence
15   associated with oil and gas exploration and development. The largest areas of vegetation within the areas
16   open to oil and gas leasing subject to standard terms and conditions that could be developed would be
17   Colorado Plateau Blackbrush-Mormon-Tea Shrubland (184,190 acres) and Inter-Mountain Basins Active
18   and Stabilized Dune (87,439 acres), although all vegetation types present in the planning area would have
19   some areas open to oil and gas leasing (Table 4-10). These vegetation types provide habitat for fish and
20   wildlife described in Chapter 3, including upland game, migratory birds, raptors, reptiles, amphibians,
21   other non-game species, and native pollinators.

22   Applying CSU/TL stipulations in Alternative A to oil and gas leasing could reduce loss, damage, or
23   degradation of fish and wildlife habitat within 19,083 acres. Under Alternative A, there are no specific TL
24   stipulations that would be applied to fish or wildlife habitats that have not been discussed as common to
25   all alternatives (e.g., migratory bird TL stipulations). The TL stipulations applied to migratory birds could
26   prevent surface disturbance during specific timeframes, which could protect fish and wildlife during the
27   periods of closure from disruption or disturbance from humans or machinery. Adjusting the timing of
28   disturbance could allow wildlife to remain in desired habitat during sensitive timeframes and within
29   important habitat. Disturbance, damage, or loss of habitat could occur outside of the seasonal closures,
30   ultimately leading to some loss of habitat from oil and gas development. The CSU stipulations could
31   reduce disturbance to steep slopes, areas within the Dirty Devil/Robbers Roost SRMA, and VRM Class II
32   areas, minimizing surface disturbance, habitat loss or damage, erosion, runoff, and the introduction and
33   spread of invasive, non-native plant species. The largest areas of vegetation within the areas subject to
34   CSU/TL stipulations would be Colorado Plateau Blackbrush-Mormon-Tea Shrubland (7,983 acres) and
35   Inter-Mountain Basins Mat Saltbush Shrubland (4,134 acres), although most vegetation types present in
36   the planning area would have some areas managed subject to CSU/TL stipulations (Table 4-10). These
37   vegetation types provide habitat for fish and wildlife described in Chapter 3, including upland game,
38   migratory birds, raptors, reptiles, amphibians, other non-game species, and native pollinators, which
39   would receive some reduction in surface disturbance or disruption from this management.

40   Applying an NSO stipulation in Alternative A for oil and gas leasing would prevent surface-disturbing
41   activities from oil and gas leasing development within the 33,627 acres. The NSO stipulation could
42   protect wildlife habitat from damage, removal, or degradation; reduce the presence of infrastructure,
43   humans, and machinery; and reduce habitat fragmentation. Removing future disturbance from roads,
44   structures, drilling operations, and human disturbance from mineral development could reduce most
45   stressors and disruption of habitat and could allow for continued habitat connectivity. The NSO
46   stipulations under Alternative A would be applied for portions of the Dirty Devil/Robbers Roost SRMA;
47   the Dry Lake Archaeological District ACEC; the Tidwell Draw ACEC; the Green River suitable segment
48   from the confluence of the San Rafael River to Canyonlands National Park; steep slopes; and areas within
49   330 feet of springs, floodplains, perennial and intermittent streams, streams with perennial reaches, and

1   riparian areas springs. These NSO stipulations could prevent future habitat fragmentation and barriers in
2   migration corridors for big game and other migratory wildlife species, allowing wildlife to move between
3   crucial winter ranges, fawning/calving/birthing area, and breeding or nesting habitat, and providing
4   overall habitat protection. The prevention of surface disturbance would reduce the potential for the
5   introduction and spread of invasive, non-native plant species, supporting intact habitat and desired forage
6   and cover for wildlife. The largest areas of vegetation within the areas subject to an NSO stipulation
7   would be Colorado Plateau Blackbrush-Mormon-Tea Shrubland (11,120 acres) and Inter-Mountain
8   Basins Active and Stabilized Dune (9,169 acres), although most vegetation types present in the planning
9   area would have some areas managed subject to NSO stipulations (Table 4-10). Of particular note, the
10  NSO stipulations would apply to riparian and aquatic habitats, including those along the San Rafael and
11  Green Rivers. These habitats support all of the fisheries in the planning area and provide important water
12  sources and riparian breeding, foraging, nesting, and sheltering habitat for many wildlife species. The
13  NSO stipulation could prevent soil loss, erosion, or sedimentation of streambeds, and could support water
14  quality and provide protection of habitat for fisheries and other aquatic species.

15  Under Alternative A, the BLM would allow some exceptions, modifications, or waivers for NSO
16  stipulations (e.g., in SRMAs where oil and gas exploration and development would not impair identified
17  scenic and primitive or semi-primitive recreational resources, or on steep slopes a more detailed analysis
18  is conducted and shows that impacts can be mitigated). Granting exceptions, modifications, or waivers for
19  NSO stipulations would allow for impacts to fish and wildlife and their habitats from oil and gas
20  development in areas where NSO stipulations are applied. These impacts would be similar to the impacts
21  to fish and wildlife and their habitats that would occur in areas that are open to oil and gas leasing subject
22  to standard terms and conditions.

23  Under Alternative A, the BLM would allow geophysical operations on lands closed to leasing or subject
24  to NSO stipulations under certain circumstances in the Richfield Field Office and would be allowed
25  consistent with existing regulations for geophysical exploration in the Price Field Office. Allowing
26  geophysical operations in areas closed to mineral leasing or subject to NSO stipulations would allow for
27  impacts to fish and wildlife and their habitats similar to the types of impacts to these resources that would
28  occur in areas that are open to oil and gas leasing subject to standard terms and conditions. These impacts
29  would be allowed in areas where impacts from oil and gas drilling and production would be precluded by
30  the application of NSO stipulations or closing the areas to leasing. Because less surface disturbance is
31  anticipated from geophysical operations than from oil and gas drilling, the magnitude of the impacts from
32  geophysical operations would be anticipated to be less than the impacts from oil and gas exploration and
33  production.

34  BMPs that would be applied to oil and gas development under Alternative A would help reduce impacts
35  to fish and wildlife and their habitats where development does occur. Measures such as interim
36  reclamation of well sites and access roads, completion of final reclamation and revegetation activities,
37  raptor perch avoidance devices on powerlines, drilling multiple wells from a single well pad where
38  feasible, noise reduction techniques, and monitoring of wildlife to evaluate the effects of oil and gas
39  development would help avoid and minimize impacts to fish and wildlife including habitat loss and
40  fragmentation, displacement and disturbance, and accidental mortality. Even with these stipulations and
41  BMPs, it is anticipated that impacts to fish and wildlife and their habitats would occur under Alternative
42  A. Additionally, reclamation of some disturbances and reestablishment of vegetation on areas disturbed
43  by oil and gas activities would be difficult and would take 20 to 25 years or more under Alternative A.

44  ### 4.12.3.1    *Suspended and Protested Lease Decisions*

45  Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to
46  standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO
47  stipulations. The areas encompassed by the suspended and protested leases contain pronghorn crucial and
48  substantial value year-long habitat, as well as other habitats for upland game, migratory birds, raptors,

1  reptiles, amphibians, other non-game species, and native pollinators described in Chapter 3. If the leases
2  were subsequently developed, the impacts to these resources from issuing the leases subject to the terms
3  and conditions contained within the Price and Richfield ROD/RMPs (Alternative A-2) would be the same
4  as the impacts to those resources from managing them as open or NSO described in this section. If the
5  BLM were to rescind the suspensions on the suspended leases (Alternative A-1) and the leases were
6  subsequently developed, the impacts to fish and wildlife and their habitats that would occur in the leased
7  areas could be the same as those described for managing fish and wildlife habitats as open to leasing
8  subject to standard terms and conditions. Under both Alternatives A-1 and A-2, if a lessee proposes to
9  develop theses leases (e.g., drill a well), the BLM would evaluate the lessee's proposal in a site-specific
10  environmental review. If during the site-specific environmental review process the BLM determines that
11  additional mitigation measures are required to protect resources of concern, those mitigation measures
12  would be included as conditions of approval to future site-specific authorizations (e.g., application of
13  appropriate BMPs).

## 4.12.4  Impacts from Alternative B

15  Under Alternative B, 0 acre would be open to oil and gas leasing subject to standard terms and conditions,
16  approximately 98,164 acres would be open to oil and gas leasing subject to CSU/TL stipulations,
17  approximately 324,161 acres would be open to oil and gas leasing subject to an NSO stipulation, and
18  approximately 30,068 acres would be closed to oil and gas leasing. Table 4-29 presents the designated
19  wildlife habitats that would be located in each leasing category under each alternative.

20  Under Alternative B, the BLM estimates that seven oil and gas wells would be drilled in the planning area
21  over the next 15 years. These wells would result in approximately 127 acres of surface disturbance and
22  impacts to fish and wildlife habitat, of which 20 acres would remain unreclaimed in 15 years.
23  Geophysical survey operations under Alternative B are anticipated to result in 72 acres of surface
24  disturbance and impacts to fish and wildlife habitat, of which approximately 14 acres would be
25  unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative B would
26  promote more rapid and successful reclamation of surface disturbance compared to Alternative A by
27  setting site-specific reclamation planning and implementation standards and implementing state-of-the-art
28  reclamation practices. However, because of the difficulty of reclaiming surface disturbances in the
29  planning area, some reclaimed areas would not be anticipated to return to natural conditions until up to 20
30  to 25 years after initial reclamation.

31  Alternative B would be anticipated to result in the fewest oil and gas leasing, exploration, and
32  development activities and the least associated surface disturbance among the alternatives analyzed in the
33  MLP/EA. As a result, Alternative B would be anticipated to have the fewest impacts to fish and wildlife
34  and their habitats in the planning area. The types of impacts to fish and wildlife and their habitats under
35  Alternative B would be the same as would occur under Alternative A, but of a different magnitude. The
36  impacts would include disturbance and displacement of wildlife and loss, degradation, and fragmentation
37  of wildlife habitat. Direct habitat loss or degradation of habitat would force wildlife to relocate to other
38  areas where competition for forage and other habitat resources would increase. Increased competition for
39  resources could lead to decreased health and reproduction and could result in increased predation or
40  mortality. As habitat fragmentation occurs and the density of wells, roads, and facilities increases, habitat
41  within and near well fields would become progressively less effective until most animals no longer use
42  these areas. Animals that remain within the affected zones would be subjected to increased physiological
43  stress. Where development occurs near sensitive habitat for big game, such as winter range or other
44  limited habitat, the health of the populations could be impacted through reduced reproduction or by
45  limiting the availability of valuable forage resources during sensitive timeframes (Sawyer 2002).

46  Under Alternative B, the BLM would apply seasonal restrictions (TL) and spatial buffers (CSU) on all
47  known raptor nests in accordance with *Utah Field Office Guidelines for Raptor Protection from Human
48  and Land use Disturbances* (Romin and Muck 2002). This management would provide similar benefits to

raptors and their habitats as the lease notices that would be applied under Alternative A. These benefits include reducing disturbing activities and human presence around sensitive nesting locations, which allows species to remain in desired habitat for hunting, nesting, and reproduction. However, some impacts to raptor habitats could still occur outside areas managed subject to TL/CSU stipulations. In addition, under Alternative B, operators would be required to mitigate unavoidable impacts to raptors and their habitats. The amount and type of mitigation would be based on losses in habitat value. Mitigation of unavoidable impacts to raptor habitats would benefit raptors by ensuring the presence and effectiveness of habitat features important for nesting, foraging, sheltering, and other important raptor life functions are not degraded by oil and gas activity in the planning area. Because many other species also use similar habitats as raptors, the mitigation and management of raptors and their habitats under Alternative B would also benefit other species in the same manner.

The BLM would apply a TL stipulation restricting surface-disturbing activities in crucial pronghorn habitat from May 15 through June 15 under Alternative B. These timeframes are important for successful reproduction and maintenance of healthy pronghorn herds. Disturbance during these timeframes could result in pronghorn expending energy to move away from oil and gas activity, possibly making calves more susceptible to predation. Applying a TL stipulation would prevent disturbance to pronghorn from oil and gas operations during these sensitive time periods. Under Alternative B, the BLM would also apply a lease notice to inform the lessee or operator that compensatory mitigation may be required for all disturbances in crucial pronghorn habitat. Mitigation should be planned to offset the loss of habitat directly and indirectly affected by oil and gas operations. This lease notice would help avoid, minimize, and reduce over time the impacts of oil and gas activities on pronghorn habitats that occur outside of the sensitive calving period. These habitat impacts can include loss, degradation, and fragmentation of habitat, introduction and spread of noxious weeds, and avoidance of habitats as a result of noise and human presence, which can result in a reduction of carrying capacity and reduced pronghorn populations. Mitigation that could be required under Alternative B includes development of water sources, vegetation enhancement, habitat restoration and reclamation, and fencing upgrades. These mitigation efforts would provide similar benefits to other fish and wildlife species that use habitats similar to pronghorn in the planning area.

Under Alternative B, management actions for BLM-sensitive species including white-tailed prairie dog and kit fox (*Vulpes macrotis*) would benefit other wildlife species in the planning area. In habitats that are occupied by these sensitive species, the BLM would implement management actions such as precluding surface disturbance within 660 feet of occupied white-tailed prairie dog colonies and kit fox dens. Other wildlife that use the habitats would also be protected by these stipulations and would benefit from the undisturbed habitat and forage; the reduction in the potential for the introduction and spread of invasive, non-native plant species; and the reduced presence of humans and machinery associated with oil and gas exploration and development.

Applying CSU/TL stipulations in Alternative B to oil and gas leasing could reduce loss, damage, or degradation of fish and wildlife habitat within 98,164 acres. Under Alternative B, the TL stipulations applied for pronghorn and saline soils in the Mancos Shale would prevent surface disturbance during specific timeframes, which could protect fish and wildlife during the periods of closure from disruption or disturbance from humans or machinery. Adjusting timing of disturbance could allow wildlife to remain in desired habitat during sensitive timeframes and within important habitat. Disturbance, damage, or loss of habitat could occur outside of the seasonal closures, ultimately leading to some loss of habitat from oil and gas development. The CSU stipulations applied under Alternative B could reduce disturbance to steep slopes, PFYC 4 and 5 areas, and areas characterized by fine sandy soils with high wind erosion potential. These measures would minimize surface disturbance; habitat loss or damage; erosion; runoff; and the introduction and spread of invasive, non-native plant species. Alternative B would also include CSU stipulations that could reduce the effects of noise, including displacement from otherwise suitable habitats, on wildlife throughout the planning area. The largest areas of vegetation within the areas subject

1    to CSU/TL stipulations would be Colorado Plateau Blackbrush-Mormon-Tea Shrubland (43,214 acres)
2    and Inter-Mountain Basins Active and Stabilized Dune (17,577 acres), although most vegetation types
3    present in the planning area would have some areas managed with CSU/TL stipulations (Table 4-11).
4    These vegetation types provide habitat for fish and wildlife described in Chapter 3, including upland
5    game, migratory birds, raptors, reptiles, amphibians, other non-game species, and native pollinators,
6    which would receive some reduction in surface disturbance or disruption from this management.

7    Under Alternative B, applying an NSO stipulation or closing areas to oil and gas leasing would prevent
8    surface-disturbing activities from oil and gas leasing development within 354,229 acres. The NSO and
9    closed stipulations could protect wildlife habitat from damage, removal, or degradation; reduce the
10   presence of infrastructure, humans, and machinery; and reduce habitat fragmentation. Removing future
11   disturbance from roads, structures, drilling operations, and human disturbance from mineral development
12   could reduce most stressors and disruption of habitat and could allow for continued habitat connectivity.
13   The NSO stipulations under Alternative B would be applied for all lands identified by the BLM as having
14   wilderness characteristics during the 2016 wilderness characteristics inventory; the Labyrinth Canyon and
15   Dirty Devil/Robbers Roost SRMAs; recreation focus areas; lands within 3 miles of key observation
16   points; lands within 3 miles of priority travel corridors; the Dry Lake Archeological District and Tidwell
17   Draw ACECs; lands within 3 miles of the Old Spanish Trail; steep slopes; public water reserves; 100-year
18   floodplains and within 660 feet of intermittent and perennial streams, rivers, riparian areas, wetlands,
19   water wells, and springs within 100 feet of ephemeral streams; and areas designated as VRM Class II and
20   inventoried as VRI Class II. Areas closed to oil and gas leasing would include the Dirty Devil/French
21   Springs and Horseshoe Canyon South non-WSA lands with wilderness characteristics, the Three Rivers
22   locatable mineral withdrawal, all lands within 1 mile of the Green River Labyrinth Canyon rim, all lands
23   within 1 mile of the Horseshoe Canyon rim, and the Green River suitable segment from the confluence of
24   the San Rafael River to Canyonlands National Park.

25   The NSO stipulations and decisions to close areas to oil and gas leasing under Alternative B could
26   prevent future habitat fragmentation and barriers in migration corridors for big game and other migratory
27   wildlife species, allowing wildlife to move between crucial winter ranges, fawning/calving/birthing area,
28   and breeding or nesting habitat, and providing overall habitat protection. The prevention of surface
29   disturbance would reduce the potential for the introduction and spread of invasive, non-native plant
30   species, supporting intact habitat and desired forage and cover for wildlife. The largest areas of vegetation
31   within the areas subject to an NSO stipulation and areas closed to leasing would be Colorado Plateau
32   Blackbrush-Mormon-Tea Shrubland (148,063 acres NSO and 12,031 acres closed) and Inter-Mountain
33   Basins Active and Stabilized Dune (77,023 acres NSO and 4,064 acres closed), although most vegetation
34   types present in the planning area would have some areas managed subject to NSO stipulations or
35   managed as closed (Table 4-11). Of particular note, the NSO stipulations would apply to riparian and
36   aquatic habitats, including those along the San Rafael and Green Rivers, and large areas of the Green
37   River would be closed to leasing. These habitats support all of the fisheries in the planning area and
38   provide important water sources and riparian breeding, foraging, nesting, and sheltering habitat for many
39   wildlife species. The NSO stipulations under Alternative B would provide a larger area of protection
40   around these sensitive aquatic and riparian habitats compared to Alternative A. The NSO stipulations and
41   closed areas could prevent soil loss, erosion, or sedimentation of streambeds, and could support water
42   quality and provide protection of habitat for fisheries and other aquatic species.

43   Under Alternative B, the BLM would not allow exceptions, modifications, or waivers to most NSO
44   stipulations. Not allowing exceptions, modifications, or waivers would reduce impacts to fish and wildlife
45   and their habitats in areas that would be subject to NSO stipulations compared to Alternative A, which
46   would allow more exceptions, modifications, or waivers.

47   Under Alternative B, geophysical operations would not be permitted in areas closed to leasing, and only
48   heliport geophysical operations would be allowed in areas that are managed subject to NSO stipulations.
49   This management of geophysical operations would provide better protection for fish and wildlife and their

1  habitats in areas managed as closed to oil and gas leasing or open subject to NSO stipulations, including
2  prevention of surface disturbance; damage or removal of vegetation; and introduction and spread of
3  invasive, non-native plant species and noxious weeds compared to Alternative A. Similar to Alternative
4  A, the magnitude of the impacts from geophysical operations would be anticipated to be less than the
5  impacts from oil and gas exploration and production because less surface disturbance is anticipated from
6  geophysical operations than from oil and gas drilling.

7  Under Alternative B, only native plant species would be used when restoring or rehabilitating disturbed
8  areas, and the BMPs that are currently used for oil and gas leases in the planning area would be updated
9  to include additional state-of-the-art BMPs. Compared to Alternative A, these BMPs include measures
10  that would reduce impacts to fish and wildlife and their habitats from oil and gas development, including
11  measures to protect soil and water resources; improve reclamation success; prevent the spread of noxious
12  weeds and invasive species; mitigate unavoidable impacts on wildlife habitats; and exclude wildlife from
13  hazardous areas including open pits, tanks, and trenches. These BMPs would reduce the impacts of oil
14  and gas development to fish and wildlife and their habitats by minimizing the area of disturbed land,
15  avoiding impacts from known oil and gas development that are hazardous on wildlife (e.g., produced
16  water ponds), promoting improved reclamation planning and practices, and compensating for unavoidable
17  loss of habitat values. The revised BMPs would also reduce the introduction and spread of non-native,
18  invasive plant species and noxious weeds compared to Alternative A by improving equipment cleaning,
19  and coordination, planning, and executing noxious weed prevention measures. Compared to Alternative
20  A, these BMPs would reduce the time required to reestablish vegetation on areas disturbed by oil and gas
21  activities and promote a more rapid return to functioning wildlife habitat in disturbed areas.

### 4.12.4.1    *Suspended and Protested Lease Decisions*

23  Under Alternative B, the BLM would cancel all suspended leases and resolve the protests on the protested
24  leases and deny the leases. The fish and wildlife and their habitats that occupy the areas of suspended and
25  protested leases would not be affected by oil and gas activities resulting from operators exploring for and
26  developing oil and gas resources. Current trends in fish and wildlife populations and habitat conditions
27  would be anticipated to continue for the foreseeable future.

### 4.12.5  Impacts from Alternative C

29  Under Alternative C, approximately 37,865 acres would be open to oil and gas leasing subject to standard
30  terms and conditions, approximately 362,127 acres would be open to oil and gas leasing subject to
31  CSU/TL stipulations, approximately 52,208 acres would be open to oil and gas leasing subject to an NSO
32  stipulation, and approximately 192 acres would be closed to oil and gas leasing. Table 4-29 presents the
33  designated wildlife habitats that would be located in each leasing category under each alternative.

34  Under Alternative C, the BLM estimates that 27 oil and gas wells would be drilled in the planning area
35  over the next 15 years. These wells would result in approximately 517 acres of surface disturbance and
36  impacts to fish and wildlife habitat, of which 82 acres would remain unreclaimed in 15 years.
37  Geophysical survey operations under Alternative C are anticipated to result in 292 acres of surface
38  disturbance and impacts to fish and wildlife habitat, of which approximately 58 acres would be
39  unreclaimed in 15 years. The BMPs that would be applied to oil and gas leases under Alternative C would
40  promote more rapid and successful reclamation of surface disturbance compared to Alternative A by
41  setting site-specific reclamation planning and implementation standards and implementing state-of-the-art
42  reclamation practices. However, because of the difficulty of reclaiming surface disturbances in the
43  planning area, some reclaimed areas would not be anticipated to return to natural conditions until up to 20
44  to 25 years after initial reclamation

---

1   Alternative C would result in slightly fewer oil and gas leasing, exploration, and development activities
2   and less associated surface disturbance over the next 15 years in the planning area compared to
3   Alternative A. As a result, Alternative C would have slightly fewer overall impacts to fish and wildlife
4   and their habitats compared to Alternative A, and substantially more impacts on these resources compared
5   to Alternative B. The types of impacts to fish and wildlife and their habitats under Alternative C would be
6   the same as those that would occur under Alternatives A and B, but of a different magnitude.

7   Under Alternative C, the BLM would apply the same seasonal restrictions (TL) and spatial buffers (CSU)
8   on known raptor nests, crucial pronghorn habitats, and BLM-sensitive species including white-tailed
9   prairie dog and kit fox as would be applied under Alternative B. Therefore, the impacts and benefits of
10  applying these stipulations on fish and wildlife and their habitats in the planning area would be the same
11  as those described for these management actions under Alternative B.

12  Allowing oil and gas leasing on 37,865 acres subject to standard terms and conditions (open) would result
13  in the damage or removal of wildlife habitat from the development of well pads and associated
14  infrastructure. Invasive, non-native plant species could be introduced and spread by vehicles and
15  machinery during development activities, which could change habitat composition and function, reducing
16  forage quality and usable habitat for wildlife species. Runoff from development could lead to streambank
17  erosion, vegetation loss, sedimentation of streambeds, and stream channel alteration, which would reduce
18  the quality of habitat for fish and aquatic species. Direct mortality of wildlife could occur as a result of
19  damage to burrows or nests and collisions with oil and gas equipment and traffic. Displacement of
20  wildlife from occupied habitats would likely occur as a result of equipment noise and human presence
21  associated with oil and gas exploration and development. The largest areas of vegetation within the areas
22  open to oil and gas leasing subject to standard terms and conditions that could be developed would be
23  Colorado Plateau Blackbrush-Mormon-Tea Shrubland (11,951 acres) and Inter-Mountain Basins Active
24  and Stabilized Dune (15,002 acres), although most vegetation types present in the planning area would
25  have some areas open (Table 4-12). These vegetation types provide habitat for fish and wildlife described
26  in Chapter 3, including upland game, migratory birds, raptors, reptiles, amphibians, other non-game
27  species, and native pollinators.

28  Applying CSU/TL stipulations in Alternative C to oil and gas leasing could reduce loss, damage, or
29  degradation of fish and wildlife habitat within 362,127 acres. Under Alternative C, the TL stipulations
30  applied for pronghorn and saline soils in the Mancos Shale would prevent surface disturbance during
31  specific timeframes, which could protect fish and wildlife during the periods of closure from disruption or
32  disturbance from humans or machinery. Adjusting timing of disturbance could allow wildlife to remain in
33  desired habitat during sensitive timeframes and within important habitat. Disturbance, damage, or loss of
34  habitat could occur outside of the seasonal closures, ultimately leading to some loss of habitat from oil
35  and gas development. The CSU stipulations applied under Alternative C could reduce disturbance to steep
36  slopes, PFYC 4 and 5 areas, areas characterized by fine sandy soils with high wind erosion potential,
37  lands identified as having wilderness characteristics in the Labyrinth Canyon unit, the Labyrinth Canyon
38  SRMA, portions of Dirty Devil/Robbers Roost SRMA, recreation focus areas, the Tidwell Draw site in
39  the Uranium Mining District, the Old Spanish Trail to high potential sites and route segments, and in
40  areas designated as VRM Class II. These measures would minimize surface disturbance, habitat loss or
41  damage, erosion, runoff, and the introduction and spread of invasive, non-native plant species. Alternative
42  C would also include CSU stipulations that could reduce the effects of noise, including displacement from
43  otherwise suitable habitats, on wildlife throughout the planning area. However, these stipulations that
44  would reduce the effects of noise on wildlife would be somewhat less protective in areas further away
45  from the Horseshoe Canyon Unit of Canyonlands National Park compared to Alternative B.

1  Alternative C contains some CSU stipulations that would limit the density of oil and gas development. As
2  densities of wells, roads, and facilities increase in wildlife habitat, habitat within and near well fields
3  become progressively less effective at providing for the breeding, feedings, and sheltering needs of
4  wildlife until most animals no longer use these areas (Sawyer 2002). Therefore, CSU stipulations that
5  limit oil and gas development density could benefit fish and wildlife and their habitats to a greater degree
6  than other CSU stipulations applied under Alternative C by reducing the intensity and extent of
7  disturbance to wildlife habitats, reducing displacement of wildlife, and maintaining habitat effectiveness.
8  The largest areas of vegetation within the areas subject to CSU/TL stipulations would be Colorado
9  Plateau Blackbrush-Mormon-Tea Shrubland (173,117 acres) and Inter-Mountain Basins Active and
10  Stabilized Dune (72,842 acres), although most vegetation types present in the planning area would have
11  some areas managed subject to CSU/TL stipulations (Table 4-12). These vegetation types provide habitat
12  for fish and wildlife described in Chapter 3, including upland game, migratory birds, raptors, reptiles,
13  amphibians, other non-game species, and native pollinators, which would receive some reduction in
14  surface disturbance or disruption from this management.

15  Under Alternative C, applying an NSO stipulation or closing areas to oil and gas leasing would prevent
16  surface-disturbing activities from oil and gas leasing development within 52,400 acres. The NSO and
17  closed stipulations could protect wildlife habitat from damage, removal, or degradation; reduce the
18  presence of infrastructure, humans, and machinery; and reduce habitat fragmentation. Removing future
19  disturbance from roads, structures, drilling operations, and human disturbance from mineral development
20  could reduce most stressors and disruption of habitat and could allow for continued habitat connectivity.
21  The NSO stipulations under Alternative C would be applied for Dirty Devil/French Springs and
22  Horseshoe Canyon South non-WSA lands with wilderness characteristics; the Three Rivers locatable
23  mineral withdrawal; portions of Dirty Devil/Robbers Roost SRMA; all lands within 1 mile of the Green
24  River Labyrinth Canyon rim; all lands within 1 mile of Horseshoe Canyon rim; all lands within 1 mile of
25  key observation points; the Green River suitable segment from the confluence of the San Rafael River to
26  Canyonlands National Park; steep slopes; within public water reserves; within 100-year floodplains;
27  within 330 feet of intermittent and perennial streams, rivers, riparian areas, wetlands, water wells, and
28  springs; and within 100 feet of ephemeral streams. Areas closed to oil and gas leasing would include the
29  Big Flat Tops ACEC.

30  The NSO stipulations and decisions to close areas to oil and gas leasing under Alternative C could
31  prevent future habitat fragmentation and barriers in migration corridors for big game and other migratory
32  wildlife species, allowing wildlife to move between crucial winter ranges, fawning/calving/birthing area,
33  and breeding or nesting habitat, and providing overall habitat protection. The prevention of surface
34  disturbance would reduce the potential for the introduction and spread of invasive, non-native plant
35  species, supporting intact habitat and desired forage and cover for wildlife. The largest areas of vegetation
36  within the areas subject to an NSO stipulation and areas closed to leasing would be Colorado Plateau
37  Blackbrush-Mormon-Tea Shrubland (18,240 acres NSO) and Inter-Mountain Basins Active and
38  Stabilized Dune (10,820 acres NSO), although most vegetation types present in the planning area would
39  have some areas managed subject to NSO stipulations or managed as closed (Table 4-12). Of particular
40  note, the NSO stipulations would apply to riparian and aquatic habitats, including those along the San
41  Rafael and Green Rivers. These habitats support all of the fisheries in the planning area and provide
42  important water sources and riparian breeding, foraging, nesting, and sheltering habitat for many wildlife
43  species. The NSO stipulations under Alternative C would provide a smaller area of protection around
44  these sensitive aquatic and riparian habitats compared to Alternative B. Similar to Alternative B, NSO
45  stipulations would be applied for ephemeral streams under Alternative C, which are not applied under
46  Alternative A. The NSO stipulation for ephemeral streams would protect important desert washes that
47  provide important wildlife habitat and affect water quality in downstream perennial waters. The NSO
48  stipulations and closed areas could prevent soil loss, erosion, or sedimentation of streambeds, and could
49  support water quality and provide protection of habitat for fisheries and other aquatic species.

1  Under Alternative C, the BLM would allow exceptions, modifications, or waivers to some of the NSO
2  stipulations; however, fewer exceptions, modifications, or waivers would be granted compared to
3  Alternative A. Allowing fewer exceptions, modifications, or waivers would reduce impacts to fish and
4  wildlife and their habitats in areas that would be subject to NSO stipulations compared to Alternative A,
5  which would allow more exceptions, modifications, or waivers.

6  Under Alternative C, geophysical operations would not be permitted in areas closed to leasing and would
7  be allowed in areas that are managed subject to NSO stipulations, though no new road construction or
8  improvements would be permitted, and the BLM would require full reclamation of all surface
9  disturbance. This management of geophysical operations would provide better protection for fish and
10 wildlife and their habitats in areas managed as closed to oil and gas leasing or open subject to NSO
11 stipulations, including prevention of surface disturbance and associated wildlife displacement; prevention
12 of habitat loss and degradation damage; improved reclamation practices; and reduced likelihood of
13 introduction and spread of invasive, non-native plant species and noxious weeds compared to Alternative
14 A. Similar to Alternative A, the magnitude of the impacts from geophysical operations would be
15 anticipated to be less than the impacts from oil and gas exploration and production because less surface
16 disturbance is anticipated from geophysical operations than from oil and gas drilling.

17 Similar to Alternative B, under Alternative C, the BMPs that are currently used for oil and gas leases in
18 the planning area would be updated to include additional state-of-the-art BMPs. The benefits to fish and
19 wildlife and their habitats in the planning area from updating the BMPs under Alternative C would be the
20 same as those described under Alternative B.

### 4.12.5.1    *Suspended and Protested Lease Decisions*

22 Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to
23 standard terms, 39,766 acres would be issued subject to CSU/TL stipulations, and 318 acres would be
24 issued subject to NSO stipulations. The areas encompassed by the suspended and protested leases contain
25 pronghorn crucial and substantial value year-long habitat, as well as other habitats for upland game,
26 migratory birds, raptors, reptiles, amphibians, other non-game species, and native pollinators described in
27 Chapter 3. If the leases were subsequently developed, the impacts of modifying the terms and conditions
28 of the suspended and protested leases and issuing the leases consistent with Alternative C would be the
29 same as the impacts to those resources from managing them as open to leasing subject to standard terms
30 and conditions, open to leasing subject to CSU/TL stipulations, or open to leasing subject to NSO
31 stipulations described in this section. Under Alternative C, portions of protested leases would be issued
32 with stipulations that would limit oil and gas development density to no greater than one well pad per 160
33 acres. Compared to Alternative A, which would also issue the leases subject to varying stipulations,
34 issuing the suspended and protested leases with these stipulations could reduce the intensity and extent of
35 disturbance to wildlife habitats that could occur if the leases were subsequently developed, reducing
36 displacement of wildlife and maintaining habitat effectiveness.

## 4.12.6  Impacts from Alternative D

38 Under Alternative D, 0 acre would be open to oil and gas leasing subject to standard terms and conditions,
39 approximately 339,884 acres would be open to oil and gas leasing subject to CSU/TL stipulations,
40 approximately 92,170 acres would be open to oil and gas leasing subject to an NSO stipulation, and
41 approximately 20,339 acres would be closed to oil and gas leasing. Table 4-29 presents the designated
42 wildlife habitats that would be located in each leasing category under each alternative.

43 Under Alternative D, the BLM estimates that 23 oil and gas wells would be drilled in the planning area
44 over the next 15 years. These wells would result in approximately 440 acres of surface disturbance and
45 impacts to fish and wildlife habitat, of which 70 acres would remain unreclaimed in 15 years.
46 Geophysical survey operations under Alternative C would result in 248 acres of surface disturbance and

1  impacts to fish and wildlife habitat, of which approximately 50 acres would be unreclaimed in 15 years.
2  The BMPs that would be applied to oil and gas leases under Alternative D would promote more rapid and
3  successful reclamation of surface disturbance compared to Alternative A by setting site-specific
4  reclamation planning and implementation standards and implementing state-of-the-art reclamation
5  practices. However, because of the difficulty of reclaiming surface disturbances in the planning area,
6  some reclaimed areas would not be anticipated to return to natural conditions until up to 20 to 25 years
7  after initial reclamation.

8  Alternative D would be anticipated to result in slightly fewer oil and gas leasing, exploration, and
9  development activities and less associated surface disturbance over the next 15 years in the planning area
10  compared to Alternatives A and C. As a result, Alternative D would be anticipated to have slightly fewer
11  overall impacts on fish and wildlife and their habitats compared to Alternatives A and C, and substantially
12  fewer impacts to these resources compared to Alternative B. The types of impacts to fish and wildlife and
13  their habitats under Alternative D would be the same as those that would occur under Alternatives A, B,
14  and C but of a different magnitude.

15  Under Alternative D, the BLM would apply the same seasonal restrictions (TL) and spatial buffers (CSU)
16  on known raptor nests, crucial pronghorn habitats, and white-tailed prairie dog and kit fox as would be
17  applied under Alternatives B and C. Therefore, the impacts and benefits of applying these stipulations on
18  fish and wildlife and their habitats would be the same as those described for the management actions
19  under Alternatives B and C.

20  Applying CSU/TL stipulations in Alternative D to oil and gas leasing could reduce loss, damage, or
21  degradation of fish and wildlife habitat within 339,884 acres. Under Alternative D, the TL stipulations
22  applied for pronghorn and saline soils in the Mancos Shale would prevent surface disturbance during
23  specific timeframes, which could protect fish and wildlife during the periods of closure from disruption or
24  disturbance from humans or machinery. Adjusting timing of disturbance could allow wildlife to remain in
25  desired habitat during sensitive timeframes and within important habitat. Disturbance, damage or loss of
26  habitat could occur outside of the seasonal closures, ultimately leading to some loss of habitat from oil
27  and gas development. The CSU stipulations applied under Alternative D could reduce disturbance to
28  steep slopes, PFYC 4 and 5 areas, areas characterized by fine sandy soils with high wind erosion
29  potential, lands identified by BLM as having wilderness characteristics during the 2016 wilderness
30  characteristics inventory with the exception of the Labyrinth Canyon unit, portions of Dirty
31  Devil/Robbers Roost SRMA, the Cone and Cottonwood Wash recreation focus areas, all lands between 1
32  – 3 miles of the key observation points and travel corridors, all lands within 1-3 miles from high potential
33  sites and route segments along the Old Spanish Trail, and areas inventoried as VRI Class II or designated
34  as VRM Class II. Alternative D would also include CSU stipulations that could reduce the effects of
35  noise, including displacement from otherwise suitable habitats, on wildlife throughout the planning area.

36  Additionally, Alternative D contains some CSU stipulations that would limit the density of oil and gas
37  development. These stipulations would be applied in lands identified by BLM as having wilderness
38  characteristics during the 2016 wilderness characteristics inventory with the exception of the Labyrinth
39  Canyon unit and the Cone and Cottonwood Wash recreation focus areas. The CSU stipulations that would
40  limit the density of oil and gas development under Alternative D would be more restrictive and would
41  cover a larger geographic area than similar stipulations that would be applied under Alternative C. As
42  densities of wells, roads, and facilities increase in wildlife habitat, habitat within and near well fields
43  becomes progressively less effective at providing for the breeding, feedings, and sheltering needs of
44  wildlife until most animals no longer use these areas (Sawyer 2002). Therefore, CSU stipulations that
45  limit oil and gas development density could benefit fish and wildlife and their habitats to a greater degree
46  than other CSU stipulations applied under Alternatives C or D by reducing the intensity and extent of
47  disturbance to wildlife habitats, reducing displacement of wildlife, and maintaining habitat effectiveness.
48  The largest areas of vegetation within the areas subject to CSU/TL stipulations would be Colorado
49  Plateau Blackbrush-Mormon-Tea Shrubland (148,756 acres) and Inter-Mountain Basins Active and

1  Stabilized Dune (83,835 acres), although most vegetation types present in the planning area would have
2  some areas managed subject to CSU/TL stipulations (Table 4-13). These vegetation types provide habitat
3  for fish and wildlife described in Chapter 3 including upland game, migratory birds, raptors, reptiles,
4  amphibians, other non-game species, and native pollinators; which would receive some reduction in
5  surface disturbance or disruption from this management.

6  Under Alternative D, applying an NSO stipulation or closing areas to oil and gas leasing would prevent
7  surface-disturbing activities from oil and gas leasing development within 112,509 acres. The NSO and
8  closed stipulations could protect wildlife habitat from damage, removal, or degradation; reduce the
9  presence of infrastructure, humans, and machinery; and reduce habitat fragmentation. Removing future
10 disturbance from roads, structures, drilling operations, and human disturbance from mineral development
11 could reduce most stressors and disruption of habitat and could allow for continued habitat connectivity.
12 The NSO stipulations under Alternative D would be applied to Dirty Devil/French Springs and Horseshoe
13 Canyon South non-WSA lands with wilderness characteristics; lands identified as having wilderness
14 characteristics during the 2016 inventory in the Labyrinth Canyon unit; the Labyrinth Canyon and
15 portions of Dirty Devil/Robbers Roost SRMAs; all lands within 1 mile of the Green River Labyrinth
16 Canyon rim that are north of the San Rafael River; the Fossil Point, Dry Lake, Trin Alcove/Three
17 Canyon, Saucer Basin/Moonshine Wash, Keg Knoll, Sweetwater Reef, and Horseshoe Canyon Trailhead
18 recreation focus areas; all lands within 1 mile of key observation points and travel corridors; the Dry Lake
19 Archeological District and Tidwell Draw ACECs; all lands within 1 mile of high potential sites and route
20 segments along the Old Spanish Trail; steep slopes; areas within public water reserves; areas within 100-
21 year floodplains and within 660 feet of intermittent and perennial streams, rivers, riparian areas, wetlands,
22 water wells, and springs; and areas within 100 feet of ephemeral streams. Areas that would be closed to
23 oil and gas leasing would include the Big Flat Tops ACEC, the Three Rivers locatable mineral
24 withdrawal, all lands within 1 mile of the Green River Labyrinth Canyon rim south of the San Rafael
25 River, all lands within 1 mile of the Horseshoe Canyon rim, and the Green River suitable segment from
26 the confluence of the San Rafael River to Canyonlands National Park.

27 The NSO stipulations and decisions to close areas to oil and gas leasing under Alternative D could
28 prevent future habitat fragmentation and barriers in migration corridors for big game and other migratory
29 wildlife species, allowing wildlife to move between crucial winter ranges, fawning/calving/birthing area,
30 and breeding or nesting habitat, and providing overall habitat protection. The prevention of surface
31 disturbance would reduce the potential for the introduction and spread of invasive, non-native plant
32 species, supporting intact habitat and desired forage and cover for wildlife. The largest area of vegetation
33 within the areas subject to an NSO stipulation and within areas closed to leasing would be Colorado
34 Plateau Blackbrush-Mormon-Tea Shrubland (43,861 acres NSO and 10,691 acres closed) and Inter-
35 Mountain Basins Active and Stabilized Dune (12,613 acres NSO and 2,216 acres closed), although most
36 vegetation types present in the planning area would have some areas managed subject to NSO stipulations
37 or managed as closed (Table 4-13).

38 Under Alternative D, riparian and aquatic habitats in the planning area, including those along the San
39 Rafael and Green Rivers, would either be closed to oil and gas leasing or open subject to NSO
40 stipulations. These habitats support all of the fisheries in the planning area and provide important water
41 sources and riparian breeding, foraging, nesting, and sheltering habitat for many wildlife species. The
42 NSO stipulations under Alternative D would provide a larger areas of protection around these sensitive
43 aquatic and riparian habitats compared to Alternatives A and C, and the same area of protection as
44 Alternative B. Similar to Alternatives B and C, NSO stipulations would be applied for ephemeral streams
45 under Alternative D, which would not be applied under Alternative A. The NSO stipulation for ephemeral
46 streams would protect important desert washes that provide important wildlife habitat and affect water
47 quality in downstream perennial waters. The NSO stipulations and closed areas could prevent soil loss,
48 erosion, or sedimentation of streambeds, and could support water quality and provide protection of habitat
49 for fisheries and other aquatic species.

Under Alternative D, the BLM would allow minimal exceptions, modifications, or waivers to NSO stipulations. Fewer exceptions, modifications, or waivers would be granted compared to Alternatives A and C. Allowing fewer exceptions, modifications, or waivers would reduce impacts to fish and wildlife and their habitats in areas that would be subject to NSO stipulations compared to Alternatives A and C.

Under Alternative D, geophysical operations would be managed in the same manner and would be anticipated to have the same impacts as they would under Alternative C.

Similar to Alternatives B and C, under Alternative D, the BMPs that are currently used for oil and gas leases in the planning area would be updated to include additional state-of-the-art BMPs. The benefits to fish and wildlife and their habitats in the planning area from updating the BMPs under Alternative D would be the same as those described under Alternative B.

### 4.12.6.1    Suspended and Protested Lease Decisions

Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU/TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. The areas encompassed by the suspended and protested leases contain pronghorn crucial and substantial value year-long habitat, as well as other habitats for upland game, migratory birds, raptors, reptiles, amphibians, other non-game species, and native pollinators described in Chapter 3. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative D would be the same as the impacts to those resources from managing them as open to leasing subject to CSU/TL stipulations, or open to leasing subject to NSO stipulations described in this section. Under Alternative D, portions of the suspended and protested leases would be issued with stipulations that would limit oil and gas development density to no greater than more well pad per 640 acres. Compared to Alternatives A and C, which would also issue the leases subject to varying stipulations, issuing the suspended and protested leases with these stipulations would reduce the intensity and extent of disturbance to wildlife habitats that could occur if the leases were subsequently developed, reducing displacement of wildlife and maintaining habitat effectiveness.

### 4.13    LANDS WITH WILDERNESS CHARACTERISTICS

This section presents potential impacts to lands with wilderness characteristics (LWCs) from implementing actions presented in Chapter 2. Existing conditions concerning LWCs are described in Chapter 3.

### 4.13.1    Assumptions

- The BLM would continue to manage LWCs that are identified as "Natural Areas" in the ROD/RMPs to protect their wilderness characteristics.

- Impacts to LWCs include those that affect the size, naturalness, solitude, or primitive recreation opportunities within inventoried LWCs.

### 4.13.2    Impacts from Alternative A (No Action)

### 4.13.2.1    Lands with Wilderness Characteristics

Under Alternative A, approximately 213,802 acres of LWCs would be open to oil and gas leasing subject to standard terms and conditions, approximately 10,759 acres would be open to oil and gas leasing subject to CSU/TL stipulations, approximately 25,455 acres would be open to oil and gas leasing subject to an NSO stipulation, and approximately 2 acres would be closed to oil and gas leasing. Table 4-30 lists acres of oil and gas leasing categories for each LWC group.

1  **Table 4-30. LWC Groups by Oil and Gas Leasing Category under Alternative A**

| LWC Group | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Sweetwater Reef | 69,140 | 2 | 28 | 0 |
| San Rafael River | 116,890 | 550 | 4,772 | 0 |
| Units 5 and 7 | 4,999 | 0 | 9,045 | 0 |
| Dirty Devil/French Springs | 18 | 9,077 | 4,491 | 2 |
| Labyrinth | 22,755 | 1,130 | 7,119 | 0 |

2  **Sweetwater Reef Group**

3  Under Alternative A, there would be no oil and gas stipulations specific to the Sweetwater Reef group,
4  and only small portions of the group would have stipulations applied for other resources. Therefore,
5  nearly all of the Sweetwater Reef group (approximately 69,140 acres or 99.9%) would be managed as
6  open subject to standard terms and conditions. Managing the areas identified as open to leasing and
7  development subject to standard lease terms and conditions could result in the surface disturbance from
8  the development of well pads and associated infrastructure. The surface disturbance, noise, and human
9  activity associated with oil and gas development in these areas could lead to the loss of scenic values,
10  naturalness, opportunities for primitive and unconfined recreation, and solitude. Oil and gas development
11  in these areas could also lead to the development of roads and facilities and an increase in noise, and dust
12  that would diminish wilderness characteristics. Surface-disturbing activities could affect the size of LWCs
13  by reducing or eliminating portions of LWCs where mineral development occurs. Some units could be
14  bisected, or mineral development could result in the need to eliminate areas from the LWC unit through
15  the creation of cherry stems. This could result in some areas, or entire LWC units, no longer meeting the
16  minimum size criterion (5,000 acres); the creation of cherry stems could also affect size and naturalness
17  of LWCs.

18  **San Rafael River Group**

19  Under Alternative A, there would be no oil and gas stipulations specific to the San Rafael River group.
20  Therefore, most of the San Rafael River group (approximately 116,890 acres or 95.6%) would be
21  managed as open subject to standard terms and conditions. The potential impacts to LWCs in the areas
22  open subject to standard terms and conditions would be the same in nature as the impacts described for
23  the Sweetwater Reef group.

24  Under Alternative A, NSO and CSU stipulations applied to protect other resources from potential adverse
25  impacts of oil and gas development could also help protect LWCs from potential adverse impacts. For
26  example, Alternative A would apply a CSU stipulation for VRM Class II areas in the planning area, some
27  of which would overlap LWCs in the San Rafael River group. This CSU stipulation would help protect
28  these LWCs from potential changes to the landscape that might affect the naturalness of the areas.
29  However, this CSU stipulation would apply to only 0.5% of the San Rafael River group. Alternative A
30  would also apply NSO stipulations for areas within the San Rafael River group with slopes greater than
31  40%, as well as around natural springs, areas within the 100-year floodplain of all perennial and
32  intermittent streams, streams with perennial reaches, and riparian areas. These NSO stipulations would
33  help protect LWCs from the potential adverse impacts of oil and gas development in these areas.
34  However, these NSO stipulations would apply to only 3.9% of the San Rafael River group. Because such
35  a small area would be managed subject to CSU or NSO stipulations, there is a potential for surface-
36  disturbing activities to affect the size of LWCs by reducing or eliminating portions of LWCs where
37  mineral development occurs.

**Units 5 and 7 Group**

Under Alternative A, there would be no oil and gas stipulations specific to the Units 5 and 7 group. Approximately 4,999 acres (approximately 35.6%) of the Units 5 and 7 group would be open subject to standard terms and conditions. The potential impacts to these 4,999 acres would be the same in nature as the impacts described for the Sweetwater Reef group. However, Alternative A applies an NSO stipulation to the Dry Lake Archaeological District ACEC, which is within the Units 5 and 7 group. This NSO could help protect the LWCs in the Units 5 and 7 group from the potential adverse impacts of oil and gas development. This NSO stipulation would apply to approximately 64.4% of the Units 5 and 7 group. However, under Alternative A, the BLM may grant an exception to the NSO stipulation if it is determined that no other economic and technically feasible access is available to reach and drain the fluid mineral resources of the area. If exceptions are granted to the NSO stipulation, the effects on the wilderness characteristics in the Units 5 and 7 group would be the same as the effects of managing the area as open to oil and gas leasing subject to standard terms and conditions.

**Dirty Devil/French Springs Group**

Under Alternative A, the BLM would manage most of the Dirty Devil/French Springs group (approximately 66.8%) as CSU/TL. Approximately 32.0% of the Dirty Devil/French Springs group would be managed subject to an NSO stipulation. NSO and CSU stipulations applied to protect other resources from the potential adverse impacts of oil and gas development would also help protect LWCs from potential adverse impacts. For example, Alternative A would manage all VRM Class II areas and canyon rims within the viewshed of all canyons in the Dirty Devil/Robbers Roost SRMA (outside of the WSA) as NSO. The rest of the SRMA would be subject to CSU/TL stipulations. Managing these areas subject to NSO stipulations with no exceptions, waiver, or modifications would minimize surface disturbance from oil and gas development, which typically consists of soil and vegetation disturbance and the presence of permanent structures that can result in degradation to the scenic values and naturalness of LWCs. Managing these areas subject to NSO stipulations would also help prevent oil and gas development's impacts to opportunities for primitive and unconfined recreation, as well as solitude in the Dirty Devil/French Springs group. All other LWCs in the Dirty Devil/French Springs group (approximately 0.1%) would be managed as open subject to standard terms and conditions.

**Labyrinth Group**

Under Alternative A, there would be no oil and gas stipulations specific to the Labyrinth group. Most of the Labyrinth group (approximately 22,755 acres or 73.4%) would be managed as open subject to standard terms and conditions, whereas approximately 3.6% would be managed subject to CSU stipulations, and 23.0% would be managed subject to an NSO stipulation. The potential impacts to the area that would be open subject to standard terms and conditions would be the same in nature as the impacts described for the Sweetwater Reef group. The NSO and CSU stipulations applied to protect other resources from the potential adverse impacts of oil and gas development would also help protect LWCs from potential adverse impacts.

For example, Alternative A would apply a CSU stipulation for VRM Class II areas in the planning area, some of which would overlap LWCs in the Labyrinth group (approximately 3.6%). This CSU stipulation would help protect these LWCs from potential changes to the landscape that might affect the naturalness of the areas. Because most of the Labyrinth group would be managed as open, there is a potential for surface-disturbing activities to affect the size of LWCs by reducing or eliminating portions of LWCs where mineral development occurs.

1  In total, NSO stipulations would apply to approximately 23.0% of the Labyrinth group. Alternative A
2  would apply NSO stipulations for areas within the Labyrinth group, including the Green River Wild and
3  Scenic River–suitable segment from the confluence of the San Rafael River to Canyonlands National
4  Park, with slopes greater than 40%, as well as around natural springs, areas within the 100-year
5  floodplain of all perennial and intermittent streams, streams with perennial reaches, and riparian areas.
6  These NSO stipulations would help protect LWCs from potential adverse impacts of oil and gas
7  development in these areas.

## 4.13.2.2    Natural Areas

9   Under Alternative A, the BLM would manage the Dirty Devil/French Springs and Horseshoe Canyon
10  South natural areas as open to leasing subject to NSO stipulations with no exceptions, modifications, or
11  waivers. Managing these natural areas subject to NSO stipulations would prevent potential impacts to
12  their wilderness characteristics including surface disturbance, noise, and human activity associated with
13  oil and gas development within the natural areas. Additionally, the NSO stipulations would prevent
14  development in the natural areas that could bisect or result in the need to eliminate areas from the natural
15  areas through the creation of cherry stems. However, because lands adjacent to the Dirty Devil/French
16  Springs and Horseshoe Canyon South Natural Areas would be managed as open to leasing subject to
17  CSU/TL stipulations or standard terms and conditions, oil and gas development including development of
18  roads and facilities and an increase in traffic, noise, and dust on adjacent lands could result in the loss of
19  some of the scenic values, naturalness, opportunities for primitive and unconfined recreation, and solitude
20  within portions of the natural areas.

## 4.13.2.3    Wilderness Study Areas

22  The Dirty Devil, Horseshoe Canyon South, and Horseshoe Canyon North WSAs are adjacent to the
23  planning area. These WSAs are closed to leasing; however, the adjacent lands within the planning area
24  would be open to leasing subject to standard, CSU/TL, or NSO stipulations under Alternative A. In areas
25  where the adjacent lands are managed open to leasing subject to standard or CSU/TL stipulations, oil and
26  gas development including development of roads and facilities and an increase in traffic, noise, and dust
27  on adjacent lands could result in the loss of some of the scenic values, naturalness, opportunities for
28  primitive and unconfined recreation, and solitude within portions of the WSAs.

### Suspended and Protested Lease Decisions

30  The protested leases are located within the San Rafael River group (approximately 3,467 acres) and
31  Labyrinth group (approximately 399 acres). A small portion of the suspended leases overlaps the
32  Sweetwater Reef group (approximately 186 acres). The suspended leases are also adjacent to LWCs in the
33  Dirty Devil/French Springs natural area and the Dirty Devil WSA. Because the portions of the suspended
34  leases fall within an area that would be managed under the current Richfield ROD/RMP as open to
35  leasing subject to standard terms and conditions, there would be no difference between the impacts of
36  Alternatives A-1 and A-2 on LWCs. If the leases were issued and subsequently developed, the impacts to
37  LWCs would be the same as the impacts to LWCs from managing them as open to leasing subject to
38  standard terms and conditions described in this section. In areas where mineral development occurs, soil
39  and vegetation disturbance and the presence of permanent structures would degrade the scenic values and
40  naturalness of LWCs. The noise of construction and operation of oil and gas facilities, including the
41  presence of work crews, vehicles, and equipment, would degrade opportunities for solitude and conflict
42  with primitive recreational opportunities. Surface-disturbing activities could affect the size of LWCs by
43  reducing or eliminating portions of LWCs where mineral development occurs. Some units could be
44  bisected, or mineral development could result in the need to eliminate areas from the LWC unit through
45  the creation of cherry stems. This could result in some areas of the affected LWC units or portions of
46  them no longer meeting the minimum size criterion (5,000 acres); the creation of cherry stems could also

1 affect size and naturalness of LWCs. Oil and gas leasing could also lead to the development of roads and
2 facilities that would increase traffic, noise, and dust that could diminish wilderness characteristics.

3 ## 4.13.3    Impacts from Alternative B

4 ### *4.13.3.1    Lands with Wilderness Characteristics*

5 Under Alternative B, 0 acre of LWCs would be open to oil and gas leasing subject to standard terms and
6 conditions, 0 acre would be open to oil and gas leasing subject to CSU/TL stipulations, approximately
7 227,674 acres would be open to oil and gas leasing subject to an NSO stipulation, and approximately
8 22,344 acres would be closed to oil and gas leasing. Table 4-31 lists acres of oil and gas leasing
9 categories for each LWC group.

10 **Table 4-31. LWC Groups by Oil and Gas Leasing Category under Alternative B**

| LWC Group | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Sweetwater Reef | 0 | 0 | 69,170 | 0 |
| San Rafael River | 0 | 0 | 122,212 | 0 |
| Units 5 and 7 | 0 | 0 | 14,044 | 0 |
| Dirty Devil/French Springs | 0 | 0 | 9,171 | 4,417 |
| Labyrinth | 0 | 0 | 17,348 | 13,656 |

11 Under Alternative B, the use of BMPs (see Appendix C) could reduce the effects of mineral leasing and
12 development on LWCs by limiting facility visibility and noise, reducing traffic, and limiting other
13 mineral-related impacts to the scenic values, naturalness, opportunities for primitive and unconfined
14 recreation, and solitude of the LWCs. BMPs to reduce night sky impacts would provide a more ideal
15 setting for opportunities for primitive and unconfined recreation. BMPs to mitigate mineral operation
16 noise would decrease mineral operation impacts to the background setting, which would protect
17 opportunities for primitive and unconfined recreation, as well as solitude.

18 **Sweetwater Reef Group**

19 Under Alternative B, the Sweetwater Reef group would be managed as open to leasing subject to an NSO
20 stipulation. The NSO stipulation would protect the LWCs in the Sweetwater Reef group from the
21 potential adverse impacts of oil and gas development, which typically consist of soil and vegetation
22 disturbance and the presence of permanent structures that can result in degradation to the scenic values
23 and naturalness of LWCs. Managing these areas subject to NSO stipulations would also help minimize oil
24 and gas development's impacts on opportunities for primitive and unconfined recreation, as well as
25 solitude in these LWCs. Managing these areas subject to NSO stipulations would also prevent mineral
26 development, which could result in the need to eliminate areas from the LWC units. Although unlikely,
27 impacts to LWCs could occur under Alternative B if the areas are leased and the operator chooses to
28 construct surface facilities and access the leased minerals from adjacent private or SITLA lands. In the
29 event that operators access the minerals through surface facilities on private or SITLA lands, the impacts
30 to the Sweetwater Reef group could include localized loss of scenic values, naturalness, opportunities for
31 primitive and unconfined recreation, and solitude around the areas where the surface facilities are
32 installed.

**San Rafael River Group**

Under Alternative B, the San Rafael River group would be managed subject to an NSO stipulation. The NSO stipulation would protect the LWCs in the San Rafael River group from the potential adverse impacts of oil and gas development in the same manner that is described above for the NSO stipulation applied to the Sweetwater Reef group under Alternative B.

**Units 5 and 7 Group**

Under Alternative B, the Units 5 and 7 group would be managed subject to an NSO stipulation. The NSO stipulation would protect the LWCs in the Units 5 and 7 group from the potential adverse impacts of oil and gas development in the same manner that is described above for the NSO stipulation applied to the Sweetwater Reef group under Alternative B.

**Dirty Devil/French Springs Group**

Under Alternative B, the BLM would close the non-WSA LWCs in the Dirty Devil/French Springs group (identified as a natural area in the Richfield ROD/RMP) to leasing, as well as close all lands within 1 mile of the Horseshoe Canyon rim to leasing. This would total 4,417 acres or approximately 32.5% of the Dirty Devil/French Springs group. Closing these lands to leasing would prevent impacts to wilderness characteristics that typically result from oil and gas development, including eliminating the risk of operators accessing minerals from adjacent private or SITLA parcels. All other LWCs in the Dirty Devil/French Springs group (approximately 67.5%) would be managed subject to an NSO stipulation, which would protect the LWCs from the potential adverse impacts of oil and gas development in the same manner that is described above for the NSO stipulation applied to the Sweetwater Reef group under Alternative B.

**Labyrinth Group**

Under Alternative B, the BLM would close all lands within 1 mile of the Green River Labyrinth Canyon rim to leasing, which would comprise approximately 44.0% of the Labyrinth group. Closing these lands to leasing would prevent impacts to wilderness characteristics that typically result from oil and gas development. All other LWCs in the Labyrinth group (approximately 56.0%) would be managed subject to an NSO stipulation, which would protect the LWCs from the potential adverse impacts of oil and gas development in the same manner that is described above for the NSO stipulation applied to the Sweetwater Reef group under Alternative B.

### 4.13.3.2    Natural Areas

Under Alternative B, the BLM would close the Dirty Devil/French Springs and Horseshoe Canyon South natural areas to leasing, and the adjacent lands would be managed subject to NSO stipulations. Closing the natural areas to leasing would prevent impacts to wilderness characteristics from oil and gas development within the natural areas. The management of the adjacent lands as open subject to NSO stipulations would also prevent impacts that could result in the loss of some of the scenic values, naturalness, opportunities for primitive and unconfined recreation, and solitude within portions of the natural areas.

### 4.13.3.3    Wilderness Study Areas

The Dirty Devil, Horseshoe Canyon South, and Horseshoe Canyon North WSAs are adjacent to the planning area. These WSAs are closed to leasing.

The Dirty Devil WSA is partially adjacent to the Dirty Devil/French Springs group, which would be managed subject to an NSO stipulation under Alternative B. In these areas, the wilderness characteristics

1 in the WSA would be further protected by the NSO stipulations applied to adjacent lands. The Dirty Devil
2 WSA is also partially adjacent to an area that would be open to leasing subject to CSU/TL stipulations
3 under this alternative. In these areas, oil and gas development including development of roads and
4 facilities and an increase in traffic, noise, and dust on adjacent lands could result in the loss of some of the
5 scenic values, naturalness, opportunities for primitive and unconfined recreation, and solitude within
6 portions of the WSA.

7 Horseshoe Canyon South and Horseshoe Canyon North WSAs are adjacent to areas that would be
8 managed subject to NSO stipulations or closed to leasing under Alternative B. In these areas, the
9 wilderness characteristics in the WSAs would be further protected by the decisions to close adjacent lands
10 to leasing or apply NSO stipulations.

11 **Suspended and Protested Lease Decisions**

12 Under Alternative B, the BLM would cancel all suspended leases and resolve the protests on the protested
13 leases and deny the leases. Protested leases are located within the San Rafael River group (approximately
14 3,467 acres) and Labyrinth group (approximately 399 acres). A small portion of suspended leases overlap
15 the Sweetwater Reef group (approximately 186 acres). Because these leases would be cancelled and
16 denied, the LWCs in the areas of suspended and protested leases would not be affected by operators
17 exploring for and developing oil and gas resources.

18 ## 4.13.4  Impacts from Alternative C

19 ### *4.13.4.1    Lands with Wilderness Characteristics*

20 Under Alternative C, approximately 25,496 acres of LWCs would be open to oil and gas leasing subject
21 to standard terms and conditions, approximately 185,328 acres would be open to oil and gas leasing
22 subject to CSU/TL stipulations, approximately 39,194 acres would be open to oil and gas leasing subject
23 to an NSO stipulation, and 0 acre would be closed to oil and gas leasing. Table 4-32 lists acres of oil and
24 gas leasing categories for each LWC group.

25 **Table 4-32. LWC Groups by Oil and Gas Leasing Category under Alternative C**

| LWC Group | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Sweetwater Reef | 0 | 69,067 | 103 | 0 |
| San Rafael River Area | 25,139 | 89,891 | 7,181 | 0 |
| Units 5 and 7 | 339 | 2,242 | 11,463 | 0 |
| Dirty Devil/French Springs | 18 | 8,144 | 5,427 | 0 |
| Labyrinth Units | 0 | 15,984 | 15,020 | 0 |

26 Under Alternative C, the use of BMPs (see Appendix C) could reduce the effects of mineral leasing and
27 development on LWCs in the same manner as described for Alternative B.

28 **Sweetwater Reef Group**

29 Under Alternative C, LWCs in the San Rafael River group would be managed as open subject to standard
30 terms and conditions. However, CSU stipulations applied to protect other resources from the potential
31 adverse impacts of oil and gas development would apply to most of the Sweetwater Reef group and
32 would help protect LWCs from potential adverse impacts. Approximately 99.9% of the Sweetwater Reef
33 group would be managed subject to CSU stipulations. For example, to prevent potential adverse impacts

1     to recreation, the Sweetwater Reef recreation focus area, which is located within the Sweetwater Reef
2     group, would be managed subject to CSU stipulations. The CSU stipulation for the recreation focus area
3     would require that well pads be placed no closer than 160 acres apart. Production facilities would be co-
4     located and designed to minimize surface impacts. Pipelines and utilities would be buried, to the extent
5     practical, and placed along existing roads. Interim reclamation of roadway disturbance would be required.
6     Reclamation of well head/production facilities would be required to minimize long-term disturbance. Full
7     restoration of the original landform would be required during final reclamation. Restoring travel routes to
8     their original character would also be required. These actions could reduce the impacts that oil and gas
9     development have on scenic values, naturalness, opportunities for primitive and unconfined recreation, as
10    well as solitude within the Sweetwater Reef group. Despite the minimization of impacts on these
11    wilderness characteristics within the recreation focus area, surface-disturbing activities would be allowed
12    and would have the potential to affect the size of LWCs by reducing or eliminating the presence of
13    wilderness character in portions of LWCs where mineral development occurs.

## San Rafael River Group

15    Under Alternative C, LWCs in the San Rafael River group would be managed as open subject to standard
16    terms and conditions. However, NSO and CSU stipulations applied to protect other resources from the
17    potential adverse impacts of oil and gas development would also help protect LWCs from potential
18    adverse impacts. CSU stipulations would apply to approximately 73.6% of the San Rafael River group,
19    and NSO stipulations would apply to approximately 5.9% of the group, leaving approximately 20.6%
20    managed as open to leasing subject to standard terms and conditions. For example, a CSU stipulation
21    would be applied to all areas designated as VRM Class II that would require that a visual resource
22    contrast rating be completed in accordance with BLM Manual 8431 (Visual Resource Contrast Rating)
23    (BLM 1986), and that mitigation measures be identified to retain the existing character of the landscape.
24    Because the San Rafael River group contains VRM Class II areas, this CSU would help protect LWCs in
25    the San Rafael River group from the potential adverse impacts of oil and gas development that might
26    affect the naturalness of the LWCs.

27    Several recreation focus areas in the planning area would be managed subject to a CSU stipulation under
28    Alternative C, which would require that well pads be placed no closer than 160 acres apart. The recreation
29    focus areas that are subject to this CSU stipulation and that overlap the San Rafael River group include
30    Saucer Basin/Moonshine Wash, Cottonwood Wash, and The Cone. The impacts of this CSU stipulation to
31    wilderness characteristics are summarized above for the Sweetwater Reef group.

## Units 5 and 7 Group

33    Under Alternative C, LWCs in the Units 5 and 7 group would be managed as open subject to standard
34    terms and conditions. However, NSO and CSU stipulations applied to protect other resources from the
35    potential adverse impacts of oil and gas development would also help protect LWCs from potential
36    adverse impacts. CSU stipulations would apply to approximately 16.0% of the Units 5 and 7 group, and
37    NSO stipulations would apply to approximately 81.6% of the group, leaving approximately 2.4% of the
38    group managed as open subject to standard terms and conditions. The NSO stipulations applied within the
39    Units 5 and 7 group would be applied for the Dry Lake Archeological District ACEC and to all lands
40    within 1 mile of the Green River Labyrinth Canyon rim. The areas would be managed subject to an NSO
41    stipulation with no exceptions, modifications, or waivers. Because this area overlaps the Units 5 and 7
42    group and because no exceptions, modifications, or waivers would be permitted, this NSO would also
43    help prevent potential adverse impacts to LWCs in the Units 5 and 7 group.

44    Several recreation focus areas in the planning area would be managed with a CSU stipulation that would
45    require that well pads be placed no closer than 160 acres apart under Alternative C. The recreation focus
46    areas that are subject to this CSU stipulation and that overlap the Units 5 and 7 group include Fossil Point

1  and Dry Lake. The impacts of this CSU stipulation to wilderness characteristics are summarized above for
2  the Sweetwater Reef group.

### Dirty Devil/French Springs Group

4  Under Alternative C, LWCs in the Dirty Devil/French Springs group would be managed as open subject
5  to standard terms and conditions. However, NSO and CSU stipulations applied to protect other resources
6  from the potential adverse impacts of oil and gas development would also help protect LWCs from
7  potential adverse impacts. In total, CSU stipulations would apply to approximately 59.9% of the Dirty
8  Devil/French Springs group, and NSO stipulations would apply to approximately 39.9%, leaving less than
9  1% of the group managed as open.

10  Under Alternative C, the BLM would apply the same NSO stipulations to the Dirty Devil/French Springs
11  and Horseshoe Canyon South natural areas as under Alternative A. Managing these 3,871 acres
12  (approximately 28.5% of the group) subject to NSO stipulations with no exceptions, waivers, or
13  modifications would help prevent surface disturbance from oil and gas development, which typically
14  consists of soil and vegetation disturbance and the presence of permanent structures that can result in
15  degradation to the scenic values and naturalness in this portion of the LWC group. Managing these areas
16  subject to NSO stipulations would also help prevent oil and gas development's impacts on opportunities
17  for primitive and unconfined recreation, as well as solitude, in the Dirty Devil/French Springs group.

18  Under Alternative C, the BLM would manage all lands within 1 mile of Horseshoe Canyon rim and
19  Horseshoe Canyon Trailhead subject to NSO stipulations with no exceptions, modifications, or waivers.
20  Because these areas overlap the Dirty Devil/French Springs group, these NSO stipulations would also
21  help protect LWCs in the Dirty Devil/French Springs group from the potential adverse impacts of oil and
22  gas development.

23  Several recreation focus areas in the planning area would be managed with a CSU stipulation that would
24  require that well pads be placed no closer than 160 acres apart under Alternative C. The Horseshoe
25  Canyon Trailhead recreation focus area would be subject to this CSU stipulation, and it overlaps the Dirty
26  Devil/French Springs group. The impacts of this CSU stipulation to wilderness characteristics are
27  summarized above for the Sweetwater Reef group.

### Labyrinth Group

29  Under Alternative C, the Labyrinth Canyon LWC Unit within the Labyrinth group would have a CSU
30  stipulation applied that would not allow any disturbance within the viewshed of the Green River and
31  would require that well pads would be placed no closer than 320 acres apart. Other restrictions would also
32  apply in this area, as described in Chapter 2. These restrictions also apply to the Labyrinth Canyon
33  SRMA. These actions could reduce the impacts that oil and gas development have on wilderness
34  characteristics, including scenic values, naturalness, opportunities for primitive and unconfined
35  recreation, as well as solitude within the LWCs in the Labyrinth Canyon group. The requirement that well
36  pads be placed no closer than 320 acres apart would provide additional protections for wilderness
37  characteristics compared to similar stipulations that would require that well pads be placed no closer than
38  160 acres apart. However, these stipulations would permit surface-disturbing activities and mineral
39  development within the LWC units, and these activities would have the potential to affect the size of
40  LWCs by reducing or eliminating the presence of wilderness character in portions of LWCs where
41  mineral development occurs.

42  Under this alternative, NSO and CSU stipulations applied to protect other resources from the potential
43  adverse impacts of oil and gas development would also help protect LWCs from potential adverse
44  impacts. In total, CSU stipulations would apply to approximately 51.6% of the Labyrinth group, and NSO
45  stipulations would apply to approximately 48.4% of the group. NSO stipulations would apply to the
46  Horseshoe Canyon South natural area; all lands within 1 mile of the Keg Knoll, Wolverton Overlook,
47  Trin Alcove/Three Canyon, and Bull Bottom KOPs; and all lands within 1 mile of Green River Labyrinth

1  Canyon rim. These NSO stipulations would have no exceptions, modifications, or waivers. These NSO
2  stipulations would help protect LWCs in the Labyrinth group from the potential adverse impacts of oil
3  and gas development.

4  Several recreation focus areas in the planning area would be managed with a CSU stipulation that would
5  require that well pads be placed no closer than 160 acres apart under Alternative C. The recreation focus
6  areas that are subject to this CSU stipulation and that overlap the Labyrinth group are Three Canyon and
7  Keg Knoll. The impacts of this CSU stipulation to wilderness characteristics are summarized above for
8  the Sweetwater Reef group.

### 4.13.4.2    Natural Areas

10  Under Alternative C, the BLM would manage the Dirty Devil/French Springs and Horseshoe Canyon
11  South natural areas subject to NSO stipulations with no exceptions, waivers, or modifications. These NSO
12  stipulations would help prevent impacts to wilderness characteristics within the natural areas that
13  typically result from oil and gas development. The areas adjacent to the natural areas would be managed
14  subject to an NSO stipulation (Dirty Devil/French Springs) and both NSO and CSU/TL stipulations
15  (Horseshoe Canyon South). The management of the adjacent lands as open subject to NSO stipulations
16  would also prevent impacts that could result in the loss of some of the scenic values, naturalness,
17  opportunities for primitive and unconfined recreation, and solitude within portions of the natural areas. In
18  areas where the adjacent lands would be managed as open subject to CSU/TL stipulations, oil and gas
19  operations on adjacent lands could result in the loss of some of the scenic values, naturalness,
20  opportunities for primitive and unconfined recreation, and solitude within portions of the natural areas.

### 4.13.4.3    Wilderness Study Areas

22  The Dirty Devil, Horseshoe Canyon South, and Horseshoe Canyon North WSAs are adjacent to the
23  planning area. These WSAs are closed to leasing.

24  The Dirty Devil WSA is adjacent to areas within the planning area that would be managed subject to NSO
25  stipulations and also areas that would be open to leasing subject to standard terms and conditions under
26  Alternative C. In areas where the WSA is adjacent to areas that would be managed subject to an NSO
27  stipulation, the wilderness characteristics in the WSA would be further protected by the NSO stipulations
28  applied to adjacent lands. In areas adjacent to lands open to leasing subject to standard terms and
29  conditions, oil and gas development including development of roads and facilities and an increase in
30  traffic, noise, and dust on adjacent lands could result in the loss of some of the scenic values, naturalness,
31  opportunities for primitive and unconfined recreation, and solitude within portions of the WSA.

32  Horseshoe Canyon South and Horseshoe Canyon North WSAs are adjacent to areas that would be
33  managed subject to NSO stipulations and open to leasing subject to CSU/TL stipulations under
34  Alternative C. In areas adjacent to lands that would be managed subject to an NSO stipulation, the
35  wilderness characteristics in the WSAs would be further protected by the decisions to apply NSO
36  stipulations. In areas adjacent to lands open to leasing subject to CSU/TL stipulations, oil and gas
37  development including development of roads and facilities and an increase in traffic, noise, and dust on
38  adjacent lands could result in the loss of some of the scenic values, naturalness, opportunities for
39  primitive and unconfined recreation, and solitude within portions of the WSA.

40  **Suspended and Protested Lease Decisions**

41  Under Alternative C, protested leases are located within the San Rafael River group (approximately 3,467
42  acres) and Labyrinth group (approximately 399 acres). A small portion of suspended leases overlaps the
43  Sweetwater Reef group (approximately 186 acres). If the leases were subsequently developed, the impacts
44  of modifying the terms and conditions of the suspended and protested leases and issuing the leases

consistent with Alternative C would be the same as the impacts on the San Rafael River and Sweetwater Reef groups described in this section.

The approximately 186 acres of suspended leases overlapping the Sweetwater Reef recreation focus area in the Sweetwater Reef group would be managed subject to CSU stipulations. The protested leases overlapping the Saucer Basin/Moonshine Wash recreation focus area (approximately 2,071 acres) in the San Rafael River group, and the protested leases overlapping the Three Canyon recreation focus area (approximately 399 acres) in the Labyrinth group would also be managed subject to CSU stipulations. These CSU stipulations would require that well pads be placed no closer than 160 acres apart. Production facilities would be co-located and designed to minimize surface impacts. Pipelines and utilities would be buried, to the extent practical, and placed along existing roads. Interim reclamation of roadway disturbance would be required. Reclamation of well head/production facilities would be required to minimize long-term disturbance. Full restoration of the original landform would be required during final reclamation. Restoring travel routes to their original character would also be required. These actions could reduce the impacts that oil and gas development have on scenic values, naturalness, opportunities for primitive and unconfined recreation, as well as solitude within the affected groups. Despite the minimization of impacts to these wilderness characteristics within the recreation focus area, surface-disturbing activities would be allowed and would have the potential to affect the size of LWCs by reducing or eliminating the presence of wilderness character in portions of LWCs where mineral development occurs.

The approximately 1,396 acres of protested leases that do not overlap recreation focus areas in the San Rafael River group would be managed as open subject to CSU/TL stipulations. The stipulations in these areas would largely be related to seasonal avoidance of crucial pronghorn habitats. Where mineral development occurs in these areas, soil and vegetation disturbance and the presence of permanent structures would degrade the scenic values and naturalness of LWCs. The noise of construction and operation of oil and gas facilities, including the presence of work crews, vehicles, and equipment, would degrade opportunities for solitude and conflict with primitive recreational opportunities. Surface-disturbing activities could affect the size of LWCs by reducing or eliminating portions of LWCs where mineral development occurs. Some units could be bisected or mineral development could result in the need to eliminate areas from the LWC unit through the creation of cherry stems. This could result in some areas, or entire LWC units, no longer meeting the minimum size criterion (5,000 acres); the creation of cherry stems could also affect size and naturalness of LWCs. Oil and gas leasing could also lead to the development of roads and facilities that would increase traffic, noise, and dust that could diminish wilderness characteristics.

## 4.13.5  Impacts from Alternative D

### 4.13.5.1     Lands with Wilderness Characteristics

Under Alternative D, 0 acre of LWCs would be open to oil and gas leasing subject to standard terms and conditions, approximately 161,667 acres would be open to oil and gas leasing subject to CSU/TL stipulations, approximately 70,265 acres would be open to oil and gas leasing subject to an NSO stipulation, and 18,085 acres would be closed to oil and gas leasing. Table 4-33 lists acres of oil and gas leasing categories for each LWC group.

1    **Table 4-33. LWC Groups by Oil and Gas Leasing Category under Alternative D**

| LWC Group | Open (acres) | CSU/TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Sweetwater Reef | 0 | 52,848 | 16,322 | 0 |
| San Rafael River Area | 0 | 100,335 | 21,877 | 0 |
| Units 5 and 7 | 0 | 1,520 | 11,434 | 1,090 |
| Dirty Devil/French Springs | 0 | 6,964 | 3,284 | 3,340 |
| Labyrinth Units | 0 | 0 | 17,348 | 13,656 |

2    Under Alternative D, the use of BMPs (see Appendix C) could reduce the effects of mineral leasing and
3    development on LWCs in the same manner as described for Alternative B.

4    **Sweetwater Reef Group**

5    Under Alternative D, CSU stipulations would apply to approximately 76.4% of the Sweetwater Reef
6    group, and NSO stipulations would apply to approximately 23.6% of the group. An NSO stipulation with
7    no exceptions, modifications, or waivers would apply to the Sweetwater Reef recreation focus area, which
8    falls within the Sweetwater Reef group. The CSU stipulation applied to the LWC group under Alternative
9    D would not allow well pads to be placed closer than 640 acres apart. Production facilities would be co-
10   located and designed to minimize surface impacts. Pipelines and utilities would be buried, to the extent
11   practical, and placed along existing roads. Interim reclamation of roadway disturbance would be required.
12   Reclamation of well head/production facilities would be required to minimize long-term disturbance. Full
13   restoration of the original landform would be required during final reclamation. Restoring travel routes to
14   their original character would also be required. The CSU stipulation would reduce the amount of surface
15   disturbance from oil and gas development permitting within the LWC group compared to Alternative C.
16   The CSU stipulation could reduce the impacts that oil and gas development have on scenic values,
17   naturalness, opportunities for primitive and unconfined recreation, as well as solitude within the
18   Sweetwater Reef group. Despite the minimization of impacts to these wilderness characteristics, surface-
19   disturbing activities would be allowed and would have the potential to affect the size of LWCs by
20   reducing or eliminating the presence of wilderness character in portions of LWCs where mineral
21   development occurs.

22   Under this alternative, NSO and CSU stipulations applied to protect other resources from the potential
23   adverse impacts of oil and gas development would also help protect LWCs from potential adverse
24   impacts. For example, a recreation-related stipulation would manage the Sweetwater Reef recreation
25   focus area as NSO with no exceptions, modification, or waivers. Because this area overlaps the
26   Sweetwater Reef group, this NSO would help protect LWCs in this group from the potential adverse
27   impacts of oil and gas development.

28   **San Rafael River Group**

29   Under Alternative D, approximately 82.1% of the San Rafael River group would be managed subject to
30   CSU stipulations, and approximately 17.9% of the group would be managed subject to an NSO
31   stipulation. The San Rafael River group would be managed with the same CSU stipulation that would be
32   applied to the Sweetwater Reef group. This management would have the same effects on wilderness
33   characteristics as described for the Sweetwater Reef group.

34   NSO and CSU stipulations applied to protect other resources from the potential adverse impacts of oil and
35   gas development would also help protect LWCs from potential adverse impacts. For example, a CSU
36   stipulation for all areas inventoried as VRI Class II or designated as VRM Class II would require that,
37   prior to authorizing surface-disturbing activities, a visual resource contrast rating be completed and

1  mitigation measures be identified that retain the existing character of the landscape. Because VRI Class II
2  and VRM Class II areas overlap the San Rafael River group, this CSU stipulation would help protect the
3  naturalness of the LWCs in this group.

4  Under Alternative D, the Saucer Basin/Moonshine Wash recreation focus area would be managed subject
5  to an NSO stipulation with no exceptions, modification, or waivers. Because this area overlaps the San
6  Rafael River group, this NSO would help protect LWCs in this group from the potential adverse impacts
7  of oil and gas development. Another recreation-related CSU stipulation would be applied to The Cone
8  and Cottonwood Wash recreation focus areas. This CSU stipulation would require that well pads be
9  placed no closer than 640 acres apart. This CSU stipulation would have the same impacts as the CSU
10 stipulation applied to the San Rafael River group.

## Units 5 and 7 Group

12 Under Alternative D, approximately 7.8% of the Units 5 and 7 group would be closed to leasing,
13 approximately 10.8% of the group would be managed subject to CSU stipulations, and approximately
14 81.4% of the group would be managed subject to an NSO stipulation. The Units 5 and 7 group would be
15 managed with the same CSU stipulation that would be applied to the Sweetwater Reef group. This
16 management would have the same effects on wilderness characteristics as described for the Sweetwater
17 Reef group.

18 NSO and CSU stipulations applied to protect other resources from the potential adverse impacts of oil and
19 gas development would also help protect LWCs from potential adverse impacts. Under Alternative D, the
20 Fossil Point and Dry Lake recreation focus areas would be managed subject to an NSO stipulation with
21 no exceptions, modification, or waivers. Because these areas overlap the Units 5 and 7 group, this NSO
22 stipulation would help protect LWCs in this group from the potential adverse impacts of oil and gas
23 development.

## Dirty Devil/French Springs Group

25 Under Alternative D, approximately 24.6% of the Dirty Devil/French Springs group would be closed to
26 leasing, approximately 51.3% of the group would be managed subject to CSU stipulations, and
27 approximately 24.2% of the group would be managed subject to an NSO stipulation. The Dirty
28 Devil/French Springs group would be managed with the same CSU stipulation that would be applied to
29 the Sweetwater Reef group. This management would have the same effects on wilderness characteristics
30 as described for the Sweetwater Reef group.

31 The BLM would manage the Dirty Devil/French Springs natural area, which is located within the Dirty
32 Devil/French Springs group, subject to an NSO stipulation with no exceptions, waivers, or modifications.
33 Managing this area subject to an NSO stipulation with no exceptions, waiver, or modifications would
34 minimize surface disturbance from oil and gas development, which typically consists of soil and
35 vegetation disturbance and the presence of permanent structures that can result in degradation to the
36 scenic values and naturalness of LWCs. Managing these areas subject to an NSO stipulation would also
37 help minimize oil and gas development's impacts on opportunities for primitive and unconfined
38 recreation, as well as solitude in the Dirty Devil/French Springs group.

39 The BLM would manage areas within 1 mile of the Horseshoe Canyon rim as closed to leasing under
40 Alternative D. This management would preclude impacts to wilderness characteristics from oil and gas
41 exploration and development in portions of the Dirty Devil/French Springs group located within 1 mile of
42 the Horseshoe Canyon rim.

## Labyrinth Group

44 Under Alternative D, NSO stipulations would apply to approximately 56.0% of the Labyrinth Canyon
45 group, and the remaining 44.0% of the group would be closed to leasing. Managing the LWCs in the

1  Labyrinth Canyon group subject to NSO stipulations with no exceptions, waivers, or modifications would
2  minimize surface disturbance from oil and gas development, which typically consists of soil and
3  vegetation disturbance and the presence of permanent structures that can result in degradation to the
4  scenic values and naturalness of LWCs. Managing these areas subject to an NSO stipulation would also
5  help minimize oil and gas development's impacts to opportunities for primitive and unconfined
6  recreation, as well as solitude in the Labyrinth Canyon group. Although unlikely, there is some potential
7  that impacts to LWCs in the Labyrinth Canyon group under Alternative D if the areas are leased and the
8  operator chooses to construct surface facilities and access the leased minerals from adjacent private or
9  SITLA lands. In the event that operators access the minerals through surface facilities on private or
10 SITLA lands, the impacts to the Sweetwater Reef group could include localized loss of scenic values,
11 naturalness, opportunities for primitive and unconfined recreation, and solitude around the areas where
12 the surface facilities are installed.

13 Under Alternative D, the BLM would close all lands to leasing within 1 mile of the Horseshoe Canyon
14 rim. Because this area overlaps the Labyrinth group, this stipulation would protect LWCs in this group
15 from the potential adverse impacts of oil and gas development.

### 4.13.5.2    Natural Areas

17 Under Alternative D, the BLM would manage the Dirty Devil/French Springs and Horseshoe Canyon
18 South natural areas subject to an NSO stipulation with no exceptions, waivers, or modifications.
19 Additionally, portions of the Horseshoe Canyon South natural area would be closed to leasing as a result
20 of a decision to close to leasing areas within 1 mile of the Horseshoe Canyon rim. These NSO stipulations
21 and decisions to close the areas to leasing would help prevent impacts to wilderness characteristics within
22 the natural areas that typically result from oil and gas development.

23 The areas adjacent to the natural areas would be managed subject to an NSO stipulation (Dirty
24 Devil/French Springs) and both NSO stipulations and would be closed to leasing (Horseshoe Canyon
25 South). The management of the adjacent lands as open subject to NSO stipulations or closed to leasing
26 would also prevent impacts that could result in the loss of some of the scenic values, naturalness,
27 opportunities for primitive and unconfined recreation, and solitude within portions of the natural areas.

### 4.13.5.3    Wilderness Study Areas

29 The Dirty Devil, Horseshoe Canyon South, and Horseshoe Canyon North WSAs are adjacent to the
30 planning area. These WSAs are closed to leasing.

31 The Dirty Devil WSA is adjacent to areas within the planning area that would be managed subject to an
32 NSO stipulation and also areas that would be open to leasing subject to CSU/TL stipulations under
33 Alternative D. In areas where the WSA is adjacent to areas that would be managed subject to an NSO
34 stipulation, the wilderness characteristics in the WSA would be further protected by the NSO stipulations
35 applied to adjacent lands. In areas adjacent to lands open to leasing subject to CSU/TL stipulations, oil
36 and gas development including development of roads and facilities and an increase in traffic, noise, and
37 dust on adjacent lands could result in the loss of some of the scenic values, naturalness, opportunities for
38 primitive and unconfined recreation, and solitude within portions of the WSA.

39 Horseshoe Canyon South and Horseshoe Canyon North WSAs are adjacent to areas that would be
40 managed subject to CST/TL stipulations, NSO stipulations, and closed to leasing under Alternative D. In
41 areas adjacent to lands that would be managed subject to NSO stipulations or closed to leasing, the
42 wilderness characteristics in the WSAs would be further protected by the decisions to close adjacent lands
43 to leasing or to apply NSO stipulations. In areas adjacent to lands open to leasing subject to CSU/TL
44 stipulations, oil and gas development, including development of roads and facilities and increased traffic,
45 noise, and dust on adjacent lands, could result in the loss of some of the scenic values, naturalness,
46 opportunities for primitive and unconfined recreation, and solitude within portions of the WSAs.

**Suspended and Protested Lease Decisions**

Under Alternative D, protested leases are located within the San Rafael River group (approximately 3,467 acres) and Labyrinth group (approximately 399 acres). A small portion of suspended leases overlaps the Sweetwater Reef group (approximately 186 acres). If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative D would be the same as the impacts to the San Rafael River and Sweetwater Reef groups described in this section.

The approximately 186 acres of suspended leases overlapping the Sweetwater Reef recreation focus area in the Sweetwater Reef group would be managed subject to an NSO stipulation with no exceptions, modifications, or waivers. The protested leases overlapping the Saucer Basin/Moonshine Wash recreation focus area (approximately 2,071 acres) in the San Rafael River group, and the protested leases overlapping the Three Canyon recreation focus area (approximately 399 acres) in the Labyrinth group would also be managed subject to an NSO stipulation with no exceptions, modifications, or waivers. Managing these areas subject to NSO stipulations with no exceptions, modifications, or waivers would help prevent adverse impacts to the wilderness characteristics of the LWCs in these groups.

Approximately 1,396 acres of protested leases that do not overlap recreation focus areas in the San Rafael River group would be managed subject to a CSU stipulation. The CSU stipulation and its potential impacts to LWC are described above for the San Rafael River group.

## 4.14  RECREATION

This section presents potential impacts to recreation, including recreation in SRMAs and recreation focus areas, from implementation of the management actions presented in Chapter 2. Existing conditions for recreation in the analysis area are described in Chapter 3.

### 4.14.1 Assumptions

- The demand for most recreation activities would continue to increase. The compound growth rate over the last 10 years was 3.1%. This trend is expected to persist.
- Most recreation use in the planning area is for private use.
- Recreation use is dispersed throughout the planning area; however, recreation use in some areas is more concentrated.
- SRMAs would continue to be managed to provide opportunities that meet recreational user demand, expectations, and needs.

### 4.14.2 Impacts Common to All Alternatives

This section discusses recreation impacts that would not vary by alternative.

Attaching lease notices and stipulations to permitted activities and the use of BMPs would help protect the recreation experience by placing limits or constraints on oil and gas development in areas where recreation often occurs (e.g., NSO stipulations in SRMAs or CSU stipulations in recreation focus areas, and minimizing noise with best available technology).

Compliance with air quality standards and dust abatement requirements could help maintain the quality of recreation experiences by protecting existing scenery and viewsheds.

Avoiding construction on slopes greater than 30%, prohibiting construction on slopes greater than 40%, and prohibiting surface occupancy in the Dry Lake ACEC could reduce impacts to recreation by limiting the amount of surface disturbance and oil and gas infrastructure.

Climate change may affect the seasons and times of the year that recreation visitation occurs. If climate change extends the summer season (making temperatures hotter for longer periods of time), recreation visits may be compressed into shorter spring and fall seasons; crowding and overuse could occur. Climate change impacts on resources such as vegetation could make them more susceptible to harm from recreation uses. Climate change could also change water levels in the San Rafael River and Green River, which could affect the availability and quality of the recreation visitor experience in these areas, possibly reducing visitor use.

## 4.14.3  Impacts from Alternative A (No Action)

Under Alternative A, approximately 399,462 acres would be open to oil and gas leasing subject to standard terms and conditions; approximately 19,083 acres would be open to oil and gas leasing subject to CSU/TL stipulations; approximately 33,627 acres would be open to oil and gas leasing subject to an NSO stipulation; and approximately 220 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative A is estimated to consist of 28 wells. These wells would result in approximately 541 acres of surface disturbance, of which 86 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative A are anticipated to result in 305 acres of surface disturbance, of which approximately 61 acres would be unreclaimed in 15 years. This is the largest amount of anticipated surface disturbance and developed wells under all four alternatives.

Under Alternative A, the following lease stipulation for recreation would be applied: an NSO stipulation would prohibit surface occupancy for leases within VRM Class II areas and canyon rims within viewsheds of canyons (approximately 0.25 mile) in the Dirty Devil/Robbers Roost SRMA to protect scenic values and opportunities for primitive and semi-primitive recreation. The BLM would consider exceptions if oil and gas exploration and development would not impair identified scenic and semi-primitive recreational resources. The remainder of the SRMA would be subject to CSU/TL stipulations.

There are no BMPs under Alternative A that would be applied specifically to protect recreation; however, BMPs requiring interim reclamation, the painting of above ground facilities, the following of land contours with new roads, the recontouring of all disturbed areas during reclamation, the burial of power and flow lines, the drilling of multiple wells from a single well pad, noise reduction techniques, screening facilities from view, proper placement of facilities (below ridgelines and hilltops), and the use of common ROW corridors would reduce visual and noise impacts to recreation visitors.

### *4.14.3.1    SRMAs*

Portions of two SRMAs are located in the planning area: the Dirty Devil/Robbers Roost SRMA and the Labyrinth Canyon SRMA.

### Dirty Devil/Robbers Roost SRMA

Table 4-34 shows the oil and gas categories for the Dirty Devil/Robbers Roost SRMA in the planning area for all four alternatives, including Alternative A.

**Table 4-34. Oil and Gas Leasing Categories in the Dirty Devil/Robbers Roost SRMA in the Planning Area (all alternatives)**

| Oil and Gas Leasing Categories | Dirty Devil/Robbers Roost SRMA in the Planning Area (acres) | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| Open | 0.2 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 10,382.2 | 0.1 | 8439.7 | 7,088.5 |

| Oil and Gas Leasing Categories | Dirty Devil/Robbers Roost SRMA in the Planning Area (acres) | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| NSO | 4,647.0 | 9,471.4 | 6,592.3 | 3,599.9 |
| Closed | 2.5 | 5,560.4 | 0.0 | 4,343.5 |

Under Alternative A, the majority of the Dirty Devil/Robbers Roost SRMA in the planning area (69.1%) would have a CSU/TL stipulation. The remainder of the SRMA in the planning area (30.9%) would be managed subject to NSO stipulations, as described in Section 4.14.3. CSU/TL stipulations, such as avoiding construction on steep slopes and prohibiting surface disturbance during pronghorn fawning season and migratory bird nesting season, could reduce overall impacts to recreation in the SRMA during the seasonal limitations; however, the quality of the recreation experience would still be degraded outside seasonal closures due to the noise, dust, increased traffic, and visual intrusions of oil and gas development. Applying an NSO stipulation or closing areas to oil and gas leasing would prevent impacts to the recreation experience, with the possible exception of traffic, noise, nighttime lighting, and dust coming from adjacent areas if horizontal drilling is possible.

The NSO stipulation for the Dirty Devil/Robbers Roost SRMA would protect scenic values and opportunities for primitive and semi-primitive recreation in the SRMA's VRM Class II areas and canyon rims for a radius of approximately 0.25 mile. Exceptions to the NSO stipulation would be considered if identified scenic and primitive or semi-primitive recreational resources would not be impaired. The NSO stipulation would protect the canyon rims, and the CSU/TL stipulations would protect the rim trailheads and top-of-rim camping in the SRMA. Together, these stipulations would protect primitive and semi-primitive recreation experiences such as boating, canyoneering, backpacking, and hiking at or near the SRMA's canyon rims (with the possible exception of impacts from adjacent areas as described above).

## Labyrinth Canyon SRMA

Table 4-35 shows the oil and gas categories for the Labyrinth Canyon SRMA in the planning area for all four alternatives, including Alternative A.

**Table 4-35. Oil and Gas Leasing Categories in the Labyrinth Canyon SRMA in the Planning Area (all alternatives)**

| Oil and Gas Leasing Categories | Labyrinth Canyon SRMA in the Planning Area (acres) | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| Open | 3,963.5 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 97.0 | 0.0 | 2,374.5 | 0.0 |
| NSO | 5,626.0 | 2,990.4 | 7,337.7 | 3,204.9 |
| Closed | 25.8 | 6,721.9 | 0.0 | 6,507.4 |

Under Alternative A, the majority of the Labyrinth Canyon SRMA in the planning area (57.9%) would be managed as open subject to NSO stipulations. The NSO areas would include many of the in-canyon experiences and canyon rims in the SRMA, which would help protect the primitive boating experience along this portion of the Green River. The remainder of the SRMA in the planning area (40.8%) would be managed as open subject to standard lease terms and conditions, managed as open subject to CSU/TL

stipulations (1.0%), and managed as closed to leasing (0.3%). Applying an NSO stipulation or closing areas to oil and gas leasing would prevent impacts to the recreation experience, with the possible exception of traffic, noise, nighttime lighting, and dust coming from adjacent areas if horizontal drilling is possible. CSU/TL stipulations (e.g., avoiding construction on steep slopes, and prohibiting surface disturbance during pronghorn fawning season and migratory bird nesting season) could reduce overall impacts to recreation in the SRMA during the seasonal limitations; however, the quality of the recreation experience would still be degraded outside seasonal closures due to the noise, dust, increased traffic, and visual intrusions of oil and gas development. Areas that are open to oil and gas drilling would have the greatest potential for adverse impacts to the quality of the recreation experience.

Alternative A includes an NSO stipulation for the Green River suitable segment from the confluence of the San Rafael River to Canyonlands National Park. This stipulation could eliminate visual and noise impacts that are incompatible with the recreation setting of the river in the SRMA, which includes quiet, solitude, and outstanding scenery (with the possible exception of impacts from adjacent areas as described above).

### Price Field Office ROS

As discussed in Chapter 3, BLM management objectives in the Price Field Office ROD-RMP specify use of the ROS only in SRMAs. Within SRMAs, the BLM Price Field Office manages for the ROS classes identified in the inventory (BLM 2008a). The only SRMA in the planning area managed by the Price Field Office is the Labyrinth Canyon SRMA. The Richfield Field Office does not use the ROS for management purposes.

Table 4-36 shows oil and gas leasing categories for ROS classes in the portion of the Labyrinth Canyon SRMA in the planning area for all four alternatives, including Alternative A.

**Table 4-36. Oil and Gas Leasing Categories for ROS Classes in the Labyrinth Canyon SRMA in the Planning Area (all alternatives)**

| Oil and Gas Leasing Categories | ROS Classes in the Labyrinth Canyon SRMA in the Planning Area (acres) | | | | |
|---|---|---|---|---|---|
| | Primitive | Semi-Primitive Nonmotorized | Semi-Primitive Motorized | Roaded Natural | Rural |
| **Alternative A** | | | | | |
| Open | 0.1 | 1,794.3 | 2,140.6 | 28.4 | 0.0 |
| CSU/TL | 0.0 | 58.8 | 38.2 | 0.0 | 0.0 |
| NSO | 1,559.0 | 1,941.1 | 2,126.0 | 0.0 | 0.0 |
| Closed | 12.2 | 0.0 | 13.5 | 0.0 | 0.0 |
| **Alternative B** | | | | | |
| Open | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| NSO | 121.7 | 389.7 | 2,479.0 | 0.0 | 0.0 |
| Closed | 1,449.7 | 3,404.5 | 1,839.3 | 28.4 | 0.0 |

| Oil and Gas Leasing Categories | ROS Classes in the Labyrinth Canyon SRMA in the Planning Area (acres) | | | | |
|---|---|---|---|---|---|
| | Primitive | Semi-Primitive Nonmotorized | Semi-Primitive Motorized | Roaded Natural | Rural |
| **Alternative C** | | | | | |
| Open | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 2.6 | 309.4 | 2,062.5 | 0.0 | 0.0 |
| NSO | 1,568.8 | 3,484.7 | 2,255.8 | 28.4 | 0.0 |
| Closed | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Alternative D** | | | | | |
| Open | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| NSO | 121.7 | 389.7 | 2,671.8 | 21.8 | 0.0 |
| Closed | 1,449.7 | 3,404.5 | 1,646.6 | 6.6 | 0.0 |

Under Alternative A, most of the Labyrinth Canyon SRMA that is classified as primitive would have an NSO stipulation or would be closed to leasing. Most of the semi-primitive nonmotorized areas would have an NSO stipulation (51.2%) or would be open to leasing subject to standard terms and conditions (47.3%). Likewise, most of the semi-primitive motorized areas would have an NSO stipulation (49.2%) or would be open to leasing subject to standard terms and conditions (49.6%). The roaded natural areas in the SRMA would be classified as open to leasing subject to standard terms and conditions. There are no rural areas in the SRMA.

The largest impact from oil and gas development on the desired characteristics of the ROS settings in the Labyrinth Canyon SRMA would occur in the semi-primitive nonmotorized and semi-primitive motorized areas that are classified as open to leasing subject to standard terms and conditions. According to the Price Field Office ROD/RMP (BLM 2008a), semi-primitive nonmotorized areas should be characterized by elements such as distance from roads (at least 1.0 mile) or isolation by topography, a natural setting with some subtle modifications, rare and isolated structures, and little or no evidence of motorized routes. Semi-primitive motorized areas should be characterized by distance from roads (0.25 mile from interstate or state roads); a natural setting with moderate modifications; isolated structures; and strong evidence of motorized trails, routes, and roads. Oil and gas leasing and development would introduce visual, light, dust, and noise impacts through surface disturbance, infrastructure, vehicles, and equipment that would detract from the semi-primitive settings of these classes. Related traffic and roads would impact semi-primitive nonmotorized areas to a greater extent than semi-primitive motorized areas, because semi-primitive nonmotorized areas should be characterized by few or no motorized routes.

Where NSO stipulations are in effect in semi-primitive nonmotorized or semi-primitive motorized areas, the semi-primitive quality and desired ROS characteristics of these areas would not be impacted by oil and gas development, with the possible exception of traffic, noise, nighttime lighting, and dust coming from adjacent areas if horizontal drilling is possible. CSU/TL stipulations specified for other resources, such as avoiding construction on steep slopes and prohibiting surface disturbance during pronghorn fawning season and migratory bird nesting season, could reduce overall impacts to semi-primitive areas; however, impacts would still occur outside seasonal closures.

1    ### *4.14.3.2    Recreation Focus Areas*

2    Table 4-37 shows the oil and gas categories for the nine recreation focus areas in the analysis area for all
3    four alternatives, including Alternative A.

1    **Table 4-37. Oil and Gas Leasing Categories in the Recreation Focus Areas (all alternatives)**

| Oil and Gas Leasing Categories | Recreation Focus Areas in the Planning Area (acres) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Fossil Point | Dry Lake | Three Canyon | Saucer Basin/ Moonshine Wash | The Cone | Keg Knoll | Sweetwater Reef | Cottonwood Wash | Horseshoe Canyon Trailhead |
| **Alternative A** | | | | | | | | | |
| Open | 2,207.9 | 48.0 | 10,559.6 | 12,312.6 | 10,716.1 | 3,473.2 | 6,961.6 | 3,136.5 | 46.1 |
| CSU/TL | 9.8 | 1.5 | 67.8 | 3.6 | 0.0 | 0.0 | 0.0 | 0.0 | 1,100.9 |
| NSO | 2,476.5 | 11,206.8 | 2,667.5 | 836.8 | 306.5 | 3,387.6 | 6.1 | 153.8 | 849.2 |
| Closed | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 25.5 | 0.0 | 0.0 | 0.1 |
| **Alternative B** | | | | | | | | | |
| Open | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| NSO | 2,847.5 | 8,234.4 | 6,108.8 | 13,153.0 | 11,022.6 | 3,414.8 | 6,967.7 | 3,290.3 | 130.4 |
| Closed | 1,846.8 | 3,021.9 | 7,186.0 | 0.0 | 0.0 | 3,471.5 | 0.0 | 0.0 | 1,865.9 |
| **Alternative C** | | | | | | | | | |
| Open | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 1,047.0 | 47.8 | 5,517.7 | 11,826.6 | 10,099.6 | 2,414.3 | 6,908.7 | 3,160.4 | 130.4 |
| NSO | 3,647.2 | 11,208.5 | 7,777.2 | 1,326.4 | 923.1 | 4,471.9 | 59.0 | 129.9 | 1,865.9 |
| Closed | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Alternative D** | | | | | | | | | |
| Open | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CSU/TL | 0.0 | 0.0 | 0.0 | 0.0 | 9,295.7 | 0.0 | 0.0 | 3,021.5 | 0.0 |
| NSO | 4,068.9 | 10,357.2 | 6,169.3 | 13,153.0 | 1,726.9 | 3,414.8 | 6,967.7 | 268.8 | 268.4 |
| Closed | 625.3 | 899.0 | 7,125.6 | 0.0 | 0.0 | 3,471.5 | 0.0 | 0.0 | 1,727.9 |

2

1  Under Alternative A, most of the recreation focus areas would be managed subject to NSO stipulations
2  and open under standard terms and conditions:

3  • Fossil Point: 52.8% NSO and 47.0% open
4  • Dry Lake: 99.6% NSO and 0.4% open
5  • Three Canyon: 20.1% NSO and 79.4% open
6  • Saucer Basin/Moonshine Wash: 6.4% NSO and 93.6% open
7  • The Cone: 2.8% NSO and 97.2% open
8  • Keg Knoll: 49.2% NSO and 50.4% open
9  • Sweetwater Reef: 0.1% NSO and 99.9% open
10 • Cottonwood Wash: 4.7% NSO and 95.3% open

11 The exception would be Horseshoe Canyon Trailhead, of which 55.1% would be managed subject to
12 CSU/TL stipulations, 42.5% would be managed subject to NSO stipulations, and 2.3% would be managed
13 as open subject to standard terms and conditions.

14 Based on the percentage of lands open to oil and gas leasing subject to standard terms and conditions
15 under Alternative A, recreationists in the Three Canyon, Saucer Basin/Moonshine Wash, The Cone, and
16 Sweetwater Reef recreation focus areas would be most likely to experience impacts from oil and gas
17 development. The recreation experience in the Dry Lake recreation focus area would be the most
18 protected through the use of NSO stipulations.

19 Under Alternative A, in portions of the recreation focus areas open to oil and gas leasing and development
20 subject to standard terms and conditions, the quality of the recreation experience could decrease as a
21 result of oil and gas exploration and development. Increased human activity; surface disturbance; and the
22 presence of wells and associated oil and gas infrastructure, equipment, and vehicles would increase road
23 traffic, noise, nighttime lighting, and dust while creating a negative visual impact in otherwise natural
24 areas. Visual impacts and noise would reduce the naturalness of the recreation focus areas for
25 backcountry users and would reduce opportunities for solitude. The increase in noise associated with oil
26 and gas equipment and changes in night skies from lighting associated with oil and gas development
27 would affect recreation settings. Recreationists could be displaced to other areas.

28 Portions of recreation focus areas with NSO stipulations would not be impacted by oil and gas
29 development, with the possible exception of traffic, noise, nighttime lighting, and dust coming from
30 adjacent areas if horizontal drilling is possible. Closing portions of recreation focus areas would eliminate
31 impacts and protect viewsheds, air quality, and soundscapes for recreation. CSU/TL stipulations, such as
32 avoiding construction on steep slopes and prohibiting surface disturbance during pronghorn fawning
33 season and migratory bird nesting season, could reduce overall impacts; however, impacts to the quality
34 of the recreation experience would still occur outside seasonal closures.

35 ### 4.14.3.3    *Horseshoe Canyon Unit*

36 Alternative A would specify few management decisions for recreation near the Horseshoe Canyon Unit of
37 Canyonlands National Park; however, management for the adjacent SRMAs and Horseshoe Canyon
38 South natural area would provide some protection for recreation experiences. The Horseshoe Canyon
39 South natural area would be managed as open to oil and gas leasing subject to NSO stipulations, which
40 would prevent surface occupancy within this area to protect, preserve, and maintain its wilderness
41 characteristics. There are no exceptions, modifications, or waivers to this stipulation. The recreation
42 experience would be protected in the portions of the Dirty Devil/Robbers Roost and Labyrinth Canyon
43 SRMAs that are managed as open to leasing subject to NSO stipulations, in the Horseshoe Canyon South
44 natural area, and in the adjacent Horseshoe Canyon Unit of Canyonlands National Park, with the possible

exception of traffic, noise, and dust coming from nearby areas if horizontal drilling is possible. Areas of the SRMAs that are managed with CSU/TL stipulations would partially protect the recreation experience, but would allow for some road traffic, noise, nighttime lighting, and dust. Not protecting all of the Horseshoe Canyon rim with NSO stipulations under Alternative A would allow for impacts to the recreation experience in this area. In addition, not protecting the travel corridors to Horseshoe Canyon (the Lower San Rafael Road from State Route 24 and the Lower San Rafael Road from Green River) would allow for impacts to the recreation experience, primarily the loss of scenic viewsheds and the potential for noise and light pollution.

Of the Horseshoe Canyon Trailhead recreation focus area, 55.1% would be managed subject to CSU/TL stipulations, 42.5% would be managed subject to NSO stipulations, and 2.3% would be managed as open subject to standard terms and conditions. The Horseshoe Canyon Trailhead is also a KOP. Portions of the recreation focus area that would be managed subject to NSO stipulations would generally be protected from impacts to the recreation experience resulting from oil and gas exploration and development. The portions of the recreation focus area that are open to leasing subject to standard terms and conditions would not be protected. Areas open to leasing subject to CSU stipulations would limit some of the oil and gas development impacts to the recreation experience.

### 4.14.3.4    Visual Landscape

Under Alternative A, there are no specific recreation stipulations to protect the recreation experience at the five KOPs. However, the Bull Bottom, Trin Alcove/Three Canyon, Wolverton Overlook, and Horseshoe Canyon Trailhead KOPs would be protected by the NSO and CSU stipulations for the Dirty Devil/Robbers Roost SRMA and the Green River wild and scenic river suitable segment. Where NSO stipulations are in place, the recreation experience at the KOPs would be protected; however, the viewsheds from these KOPs may be impacted because oil and gas development would be open subject to standard terms and conditions in the viewsheds. The visual landscape from the KOPs is an important resource for recreation users; development in the viewshed would detract from the quality of the recreation experience. Where CSU stipulations are in place, some impacts to the recreation experience at each KOP could occur, including road traffic, noise, nighttime lighting, dust, and a reduction in the quality of the scenic view because of nearby oil and gas development. The Keg Knoll KOP is located in or adjacent to areas open to leasing subject to standard terms and conditions; the recreation experience and setting at this KOP would not be protected under Alternative A.

Other impacts to visual resources are discussed in Section 4.9.

### 4.14.3.5    Motorized and Mechanized Recreation

As discussed in Chapter 3, both motorized recreation (OHV) and mechanized recreation (mountain biking) occur in the planning area. Of the four alternatives, Alternative A would result in the largest amount of surface disturbance (846 acres) and the largest number of wells (28 wells). Therefore, it would likely have the greatest impact on motorized and mechanized recreation. Oil and gas development could increase the number of roads available for motorized recreation, if recreation access to such roads is permitted. However, negative impacts to the motorized recreation experience would occur through increased road traffic and dust, potential deterioration of roads shared by all users, and changes to scenic values.

There are no designated trails for mountain biking in the analysis area, but mountain biking use occurs on some slickrock expanses and roads in the planning area. Negative impacts to the mechanized recreation experience would occur from increased road traffic, dust, noise, and human activity due to oil and gas development. In addition, visual impacts from oil and gas development in otherwise natural areas would detract from the quality of the recreation experience for mountain bikers.

1  ### 4.14.3.6    Suspended and Protested Lease Decisions

2  Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to
3  standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO
4  stipulations. If the leases were subsequently developed, the impacts on recreation from issuing the leases
5  subject to the terms and conditions contained within the Price and Richfield Field Offices ROD/RMPs
6  (Alternative A-2) would be the same as the impacts to recreation from managing areas as open to leasing
7  subject to standard terms and conditions or subject to NSO stipulations described in this section. If the
8  BLM were to rescind the suspensions on the suspended leases (Alternative A-1) and the leases were
9  subsequently developed, the impacts on recreation that would occur in the leased areas would be the same
10  as those described for areas open to leasing subject to standard terms and conditions. Under Alternative
11  A-2, the suspended leases would be subject to the conditions, including stipulations and BMPs, in the
12  Richfield Field Office ROD/RMP. The recreation lease stipulation for the Dirty Devil/Robbers Roost
13  SMRA would not impact the areas with suspended and protested leases. However, recreation BMPs that
14  would be applied under Alternative A-2 (e.g., painting aboveground facilities) would reduce impacts to
15  the recreation experience from oil and gas development on suspended and protested leases. There would
16  be no similar reduction to impacts under Alternative A-1.

17  Portions of the suspended leases are in or adjacent to the Sweetwater Reef recreation focus area, and
18  portions of the protested leases are in the Saucer Basin/Moonshine and Three Canyon recreation focus
19  areas. Some of the protested leases are also in or very close to the Labyrinth Canyon SRMA and in the
20  Bull Bottom and Trin Alcove/Three Canyon KOPs. Because the portions of the leases in the two
21  recreation focus areas, the Labyrinth Canyon SRMA, and the two KOPs are mostly open to oil and gas
22  leasing and would be subject to standard terms and conditions if the leases were subsequently developed,
23  recreation users in these areas would experience impacts to the quality of the recreation experience and
24  the recreation setting. Increased human activity, surface disturbance, the presence of wells and associated
25  oil and gas infrastructure, equipment, and vehicles would increase road traffic, noise, nighttime lighting,
26  and dust while creating a negative visual impact in otherwise natural areas. Visual impacts and noise
27  would reduce the naturalness of these areas for backcountry users and reduce opportunities for solitude.
28  The increase in noise associated with oil and gas equipment and changes in night skies from lighting
29  associated with oil and gas development would affect recreation settings. Recreationists may be displaced
30  to other areas. The application of recreation BMPs would help limit impacts to these areas under
31  Alternative A-2 (e.g., screening facilities from view).

32  Under both Alternatives A-1 and A-2, if a lessee proposes to develop the leases (e.g., drill a well), the
33  BLM would evaluate the lessee's proposal in a site-specific environmental review. If during the site-
34  specific environmental review process the BLM determines that additional mitigation measures would be
35  required to protect resources of concern, those mitigation measures would be included as conditions of
36  approval to future site-specific authorizations (e.g., application of appropriate BMPs).

37  ## 4.14.4  Impacts from Alternative B

38  Under Alternative B, no acreage would be open to oil and gas leasing subject to standard terms and
39  conditions; approximately 98,164 acres would be open to oil and gas leasing subject to CSU/TL
40  stipulations; approximately 324,161 acres would be open to oil and gas leasing subject to an NSO
41  stipulation; and approximately 30,068 acres would be closed to oil and gas leasing. Reasonably
42  foreseeable development under Alternative B is estimated to consist of seven wells. These wells would
43  result in approximately 127 acres of surface disturbance, of which 20 acres would remain unreclaimed in
44  15 years. Geophysical survey operations under Alternative B are anticipated to result in 72 acres of
45  surface disturbance, of which approximately 14 acres would be unreclaimed in 15 years. This is the
46  smallest amount of anticipated surface disturbance and developed wells under all four alternatives.

The following lease stipulations for recreation would be applied under Alternative B to protect recreation uses and experiences and to protect sensitive viewpoints:

- All nine recreation focus areas, the Labyrinth Canyon SRMA, and the Dirty Devil/Robbers Roost SRMA would be managed subject to NSO stipulations.

- The five KOPs (Keg Knoll, Wolverton Overlook, Horseshoe Canyon Trailhead, Trin Alcove/Three Canyon, and Bull Bottom) would be managed subject to NSO stipulations for a radius of 3.0 miles.

- The Lower San Rafael Road from State Route 24 to Horseshoe Canyon and from Green River to Horseshoe Canyon would be managed subject to NSO stipulations for a radius of 3.0 miles.

There would be no exceptions, modifications, or waivers to any of these stipulations.

There are no BMPs under Alternative B that would be applied specifically to protect recreation; however, BMPs requiring the use of natural or artificial features to help screen facilities, designing linear facilities to follow landform contours or mimic vegetation lines, painting aboveground facilities to blend into the background, avoiding straight-line edges on well pads, utilizing liquid gathering systems to eliminate surface storage tanks and reduce truck trips, minimizing noise with best available technology, limiting the use of artificial lighting, and using light shielding and aiming techniques would reduce visual, noise, and night sky impacts to recreation visitors.

Under Alternative B, stipulations for other resources such as air quality, night skies, visual resources, lands with wilderness characteristics, soils, water resources, ACECs, the Old Spanish Trail, and the soundscape would also help limit impacts to recreation. For example, an NSO stipulation would be applied to lands with wilderness characteristics and to areas within 100 feet of ephemeral streams.

### 4.14.4.1    SRMAs

Portions of two SRMAs are located in the planning area: Dirty Devil/Robbers Roost SRMA and Labyrinth Canyon SRMA.

### Dirty Devil/Robbers Roost SRMA

Table 4-34 shows the oil and gas categories for the Dirty Devil/Robbers Roost SRMA in the planning area for all four alternatives, including Alternative B.

Under Alternative B, the majority of the Dirty Devil/Robbers Roost SRMA in the planning area (63.0%) is NSO. The remainder of the SRMA in the planning area (37.0%) would be closed to oil and gas leasing. The NSO stipulation for the Dirty Devil/Robbers Roost SRMA would protect recreational settings, uses, and experiences in this area. Applying this stipulation and closing areas to oil and gas leasing would prevent impacts to recreation, with the possible exception of traffic, noise, nighttime lighting, and dust coming from adjacent areas if horizontal drilling is possible.

### Labyrinth Canyon SRMA

Table 4-35 shows the oil and gas categories for the Labyrinth Canyon SRMA in the planning area for all four alternatives, including Alternative B.

Under Alternative B, the majority of Labyrinth Canyon SRMA in the planning area (69.2%) would be categorized as closed to leasing. The remainder of the SRMA in the planning area (30.8%) would be managed subject to NSO stipulations. The NSO stipulation for the Labyrinth Canyon SRMA would protect recreational settings, uses, and experiences in this area. Applying this stipulation and closing areas to oil and gas leasing would prevent impacts to recreation, with the possible exception of traffic, noise, nighttime lighting, and dust coming from adjacent areas if horizontal drilling is possible. There is a small

1  possibility that access to leased areas managed subject to NSO stipulations could occur from parcels of
2  land owned by SITLA; oil and gas leasing and development could occur in the SRMA on SITLA lands.

3  Overall, Alternative B would provide more protection to SRMAs and their associated recreation
4  experiences in the planning area than would the other alternatives because under Alternative B no areas
5  would be managed subject to CSU/TL stipulations or would be open to leasing subject to standard terms
6  and conditions (see Table 4-35).

7  ### *Price Field Office ROS*

8  Table 4-36 shows oil and gas leasing categories for ROS classes in the portion of Labyrinth Canyon
9  SRMA in the planning area for all four alternatives, including Alternative B.

10  Under Alternative B, 7.7% of the Labyrinth Canyon SRMA in the planning area that is classified as
11  primitive would be managed subject to NSO stipulations, and 92.3% would be closed to oil and gas
12  leasing and development. The semi-primitive nonmotorized areas in the SRMA would be managed
13  subject to NSO stipulations (10.3%) or would be closed (89.7%). Likewise, most of the semi-primitive
14  motorized areas would have an NSO stipulation (57.4%) or would be closed (42.6%). The roaded natural
15  areas in the SRMA would be classified as closed. There are no rural areas in the SRMA.

16  There would be no impact from oil and gas development on the desired characteristics of the ROS
17  settings in the Labyrinth Canyon SRMA under Alternative B, because the NSO stipulations and closed
18  areas would cover all of the SRMA in the planning area. The quality of the recreation experience would
19  not be impacted by oil and gas development, with the possible exception of traffic, noise, nighttime
20  lighting, and dust coming from adjacent areas if horizontal drilling is possible. There is a small possibility
21  that access to leased areas managed as NSO could occur from parcels of land owned by SITLA; oil and
22  gas leasing and development could occur in the SRMA on SITLA lands.

23  Alternative B would provide more protection to desired ROS settings (primarily the semi-primitive
24  nonmotorized and semi-primitive nonmotorized settings) in the portions of the Labyrinth Canyon SRMA
25  in the planning area than would Alternatives A and C (see Table 4-36). Alternative B would offer a
26  similar level of protection for desired ROS settings as would Alternative D.

27  ### 4.14.4.2    Recreation Focus Areas

28  Table 4-37 shows the oil and gas categories for the nine recreation focus areas in the analysis area for all
29  four alternatives, including Alternative B.

30  Under Alternative B, all of the recreation focus areas would be managed subject to NSO stipulations
31  and/or would be closed to oil and gas leasing:

32  • Fossil Point: 60.7% NSO and 39.3% closed

33  • Dry Lake: 73.2% NSO and 26.8% closed

34  • Three Canyon: 45.9% NSO and 54.1% closed

35  • Saucer Basin/Moonshine Wash: 100% NSO

36  • The Cone: 100% NSO

37  • Keg Knoll: 49.6% NSO and 50.4% closed

38  • Sweetwater Reef: 100% NSO

39  • Cottonwood Wash: 100% NSO

40  • Horseshoe Canyon Trailhead: 6.5% NSO and 93.5% closed

San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments/Draft
Environmental Assessment

Under this alternative, the recreation experience in all of the recreation focus areas would be protected through the use of the NSO stipulation and/or closure to oil and gas leasing and development. There would be no visual, noise, nighttime lighting, or dust impacts in the recreation focus areas, with the possible exception of such impacts coming from adjacent areas if horizontal drilling is possible. There is a small possibility that access to leased areas managed as NSO could occur from parcels of land owned by SITLA; oil and gas leasing and development could occur in the recreation focus areas on SITLA lands.

Overall, Alternative B would provide more protection to recreation focus areas and their associated recreation experiences than would the other alternatives because no areas would be managed subject to CSU/TL stipulations or would be open to leasing subject to standard terms and conditions (see Table 4-37).

### 4.14.4.3    Horseshoe Canyon Unit

Alternative B would provide several management decisions for recreation near the Horseshoe Canyon Unit of Canyonlands National Park to protect sensitive viewpoints. The Horseshoe Canyon Trailhead KOP would be managed subject to NSO stipulations for a radius of 3.0 miles, and the Horseshoe Canyon Trailhead recreation focus area would be managed subject to NSO stipulations. In addition, the Lower San Rafael Road from State Route 24 to Horseshoe Canyon and from Green River to Horseshoe Canyon would be managed subject to NSO stipulations for a radius of 3.0 miles. This stipulation would protect the recreation experience for visitors using the travel corridors to access recreation areas, including scenic viewsheds and a semi-primitive experience. Alternative B would also close lands in the planning area that are adjacent to the Horseshoe Canyon Unit, because they are part of the Dirty Devil/Robbers Roost SRMA. There are no exceptions, modifications, or waivers to these stipulations. These stipulations and closures would protect the recreation experience in and near the Horseshoe Canyon Unit (including travel corridors), with the possible exception of traffic, noise, and dust coming from adjacent areas if horizontal drilling is possible. The travel corridors would be protected for a 3.0-mile radius; it is unlikely that horizontal drilling would impact visitors on these roads.

### 4.14.4.4    Visual Landscape

Under Alternative B, the five KOPs would be managed subject to NSO stipulations for a radius of 3.0 miles. Based on this stipulation, the recreation experience and settings at these KOPs would be protected from impacts caused by oil and gas leasing and development. In addition, the application of a 3.0-mile radius would protect scenic viewsheds for recreation users at each KOP.

The NSO stipulations for recreation under Alternative B would also protect scenic values and the visual landscape for recreationists in the portions of the SRMAs in the planning area, in the nine recreation focus areas, and along the Horseshoe Canyon travel corridor. Stipulations for visual resources under Alternative B would also prohibit surface occupancy in VRI Class II and VRM Class II areas with no exceptions, modifications, or waivers. A CSU/TL stipulation for night skies under this alternative would also limit night sky impacts by requiring operators to implement specific light-restricting BMPs.

Other impacts to visual resources are discussed in Section 4.9.

### 4.14.4.5    Motorized and Mechanized Recreation

Of the four alternatives, Alternative B is expected to result in the least amount of surface disturbance (199 acres) and the smallest number of wells (seven wells). Therefore, it would have a lower impact on motorized and mechanized recreation than would the other alternatives with one exception: the possible addition of new roads for oil and gas development would be limited, with little opportunity to expand available road use for motorized recreation (assuming recreation access to oil and gas roads would be allowed). Some negative impacts to the motorized recreation experience would occur through increased road traffic and dust, potential deterioration of roads shared by all users, and changes to scenic values, but these impacts would be minimized by recreation and other stipulations under Alternative B.

1  Some negative impact to the mechanized recreation experience would occur from increased road traffic,
2  dust, noise, human activity, and changes to viewsheds due to oil and gas development; these impacts
3  would detract from the quality of the recreation experience for mountain bikers. However, as with
4  motorized recreation, such impacts would be minimized by recreation and other stipulations under
5  Alternative B.

### 4.14.4.6    Suspended and Protested Lease Decisions

7  Under Alternative B, the BLM would cancel all suspended leases and would resolve the protests on the
8  protested leases and deny the leases. Recreation users in areas of suspended and protested leases would
9  not be affected by oil and gas activities resulting from operators exploring for and developing oil and gas
10  resources (unless these areas are leased in the future subject to the leasing decisions in the revised plan).
11  Current recreation conditions and trends would be anticipated to continue for the foreseeable future.

### 4.14.5    Impacts from Alternative C

13  Under Alternative C, 37,865 acres would be open to oil and gas leasing subject to standard terms and
14  conditions; approximately 362,127 acres would be open to oil and gas leasing subject to CSU/TL
15  stipulations; approximately 52,208 acres would be open to oil and gas leasing subject to an NSO
16  stipulation; and approximately 192 acres would be closed to oil and gas leasing. Reasonably foreseeable
17  development under Alternative C is estimated to consist of 27 wells. These wells would result in
18  approximately 517 acres of surface disturbance, of which 82 acres would remain unreclaimed in 15 years.
19  Geophysical survey operations under Alternative C is anticipated to result in 292 acres of surface
20  disturbance, of which approximately 58 acres would be unreclaimed in 15 years. This is slightly less than
21  the anticipated surface disturbance and developed wells under Alternative A, but more than the
22  anticipated surface disturbance and developed wells under Alternatives B and D.

23  The following lease stipulations for recreation would be applied under Alternative C to protect
24  recreational uses and experiences, scenic values, opportunities for primitive and semi-primitive
25  recreation, and sensitive viewpoints:

26  •  The nine recreation focus areas would have a CSU/TL stipulation: Well pads would be placed no
27     closer than 160 acres (four wells per square mile) apart; production facilities would be co-located
28     and designed to minimize surface impacts; pipelines and utilities would be buried to the extent
29     practical and placed along existing roads; interim reclamation of roadway disturbance and
30     reclamation of well pads to well head/production facilities would be required to minimize long-
31     term surface disturbance; and the original landform would be fully restored during final
32     reclamation (travel routes would also be fully restored to their original character).

33  •  The Labyrinth Canyon SRMA would have the same CSU/TL stipulation as would the recreation
34     focus areas, except that wells would be placed no closer than 320 acres apart and no disturbance
35     would be allowed within the viewshed of the Green River.

36  •  The Dirty Devil/Robbers Roost SRMA would be managed subject to NSO stipulations for leases
37     within VRM Class II areas and canyon rims within viewsheds of canyons (approximately 0.25
38     mile).

39  •  Green River Labyrinth Canyon rim, Horseshoe Canyon rim, and the five KOPs would be
40     managed subject to NSO stipulations within 1.0 mile of the rims and each KOP.

41  The NSO stipulation for the Dirty Devil/Robbers Roost SRMA would allow exceptions if oil and gas
42  exploration and development would not impair identified scenic and primitive or semi-primitive
43  recreation. There would be no other exceptions, modifications, or waivers to the stipulations.

44  There are no BMPs under Alternative C that would be applied specifically to protect recreation; however,
45  the BMPs for other resources described under Alternative B would also apply to Alternative C. These
46  BMPs would reduce visual, noise, and night sky impacts to recreation visitors.

1  Under Alternative C, stipulations for other resources such as lands with wilderness characteristics, natural
2  areas, soils, water resources, ACECs, the Old Spanish Trail, wild and scenic rivers, and the soundscape
3  would also help limit impacts to recreation. For example, an NSO stipulation would be applied along the
4  Green River from the confluence of the San Rafael River to Canyonlands National Park and a CSU/TL
5  stipulation would be applied to mitigate noise levels so that there would be no change in the natural
6  ambient sounds as recorded in Canyonlands National Park.

7  ### 4.14.5.1    SRMAs

8  ### Dirty Devil/Robbers Roost SRMA

9  Table 4-34 shows the oil and gas categories for the Dirty Devil/Robbers Roost SRMA in the planning
10 area for all four alternatives, including Alternative C.

11 Under Alternative C, 43.9% of the Dirty Devil/Robbers Roost SRMA in the planning area would be
12 managed subject to NSO stipulations, and 56.1% would be managed subject to CSU/TL. Applying an
13 NSO stipulation would prevent impacts to the recreation setting and experience, with the possible
14 exception of traffic, noise, nighttime lighting, and dust coming from adjacent areas if horizontal drilling is
15 possible. The CSU/TL stipulation for recreation, as described above, requires the placement of well pads
16 no closer than 320 acres apart and prohibits disturbance within the viewshed of the Green River. This
17 stipulation would reduce the frequency and intensity of impacts from oil and gas development to the
18 recreation setting; however, some impacts would still occur in these areas. Visual, light, and noise
19 impacts from surface disturbance, infrastructure, vehicles, and equipment would still detract from the
20 recreation experience.

21 The NSO stipulation for the Dirty Devil/Robbers Roost SRMA would protect scenic values and
22 opportunities for primitive and semi-primitive recreation in the SRMA's VRM Class II areas and within
23 0.25 mile of canyon rims. Exceptions to the NSO stipulation would be considered if identified scenic and
24 primitive or semi-primitive recreational resources would not be impaired by oil and gas development.

25 ### Labyrinth Canyon SRMA

26 Table 4-35 shows the oil and gas categories for the Labyrinth Canyon SRMA in the planning area for all
27 four alternatives, including Alternative C.

28 Under Alternative C, the majority of the Labyrinth Canyon SRMA in the planning area (75.6%) would be
29 managed subject to NSO stipulations. The remainder of the SRMA in the planning area (24.4%) would be
30 managed subject to CSU/TL stipulations. Applying an NSO stipulation would prevent impacts to the
31 recreation experience, with the possible exception of traffic, noise, nighttime lighting, and dust coming
32 from adjacent areas if horizontal drilling is possible. CSU/TL stipulations such as prohibiting disturbance
33 within the viewshed of the Green River, spacing well pads, burying pipelines and utilities, and
34 implementing specific reclamation requirements, would lessen the frequency and intensity of impacts to
35 recreation; however, some impacts from oil and gas development would still occur in these areas. Visual,
36 light, and noise impacts from surface disturbance, infrastructure, vehicles, and equipment would still
37 detract from the recreation experience.

38 Alternative C would apply an NSO stipulation within 1.0 mile of the Green River Labyrinth Canyon rim.
39 When compared to Alternative A, which would apply an NSO stipulation to the rim only, Alternative C
40 would provide more protection for recreationists on the river and at the canyon rims. The quality of the
41 recreation experience and setting (e.g., scenic viewsheds, quiet, and opportunities for a primitive
42 experience) would be better protected under this alternative at these locations than it would under
43 Alternative A.

Overall, Alternative C would provide more protection to SRMAs and their associated recreation experiences in the planning area than would Alternative A but less protection than would Alternatives B and D, which have fewer acres with CSU/TL stipulations and more acres closed to oil and gas leasing (see Table 4-35).

### Price Field Office ROS

Table 4-36 shows oil and gas leasing categories for ROS classes in the portion of Labyrinth Canyon SRMA in the planning area for all four alternatives, including Alternative C.

Under Alternative C, 99.8% of the Labyrinth Canyon SRMA in the planning area that is classified as primitive would have an NSO stipulation. The majority of the semi-primitive nonmotorized areas (91.8%) would have an NSO stipulation. Of the semi-primitive motorized areas, 52.2% would have an NSO stipulation and 47.8% would have a CSU/TL stipulation. The roaded natural areas in the SRMA would be managed subject to NSO stipulations. There are no rural areas in the SRMA.

The largest impact from oil and gas development on the desired characteristics of the ROS settings in the Labyrinth Canyon SRMA would occur in the semi-primitive motorized class and a small area of the semi-primitive nonmotorized class with CSU/TL stipulations. The CSU/TL stipulations, which include prohibiting disturbance within the viewshed of the Green River, spacing well pads, burying pipelines and utilities, and implementing specific reclamation requirements, would lessen the frequency and intensity impacts to the semi-primitive ROS settings in the Labyrinth Canyon SRMA. However, oil and gas development would still have visual, light, and noise impacts through surface disturbance, infrastructure, vehicles, and equipment that would detract from semi-primitive settings of these classes. Related traffic and roads would impact semi-primitive nonmotorized areas to a greater extent than they would semi-primitive motorized areas, because semi-primitive nonmotorized areas should be characterized by few or no motorized routes.

Where NSO stipulations are in effect, the desired ROS characteristics of these areas would not be impacted by oil and gas development, with the possible exception of traffic, noise, nighttime lighting, and dust coming from adjacent areas if horizontal drilling is possible. There is a small possibility that access to leased areas managed as NSO could occur from parcels of land owned by SITLA; oil and gas leasing and development could occur in the SRMA on SITLA lands.

### 4.14.5.2    Recreation Focus Areas

Table 4-37 shows the oil and gas categories for the nine recreation focus areas in the analysis area for all four alternatives, including Alternative C.

Under Alternative C, all of the recreation focus areas would be managed subject to NSO and CSU/TL stipulations:

- Fossil Point: 77.7% NSO and 22.3% CSU/TL
- Dry Lake: 99.6% NSO and 0.4% CSU/TL
- Three Canyon: 58.5% NSO and 41.5% CSU/TL
- Saucer Basin/Moonshine Wash: 10.1% NSO and 89.9% CSU/TL
- The Cone: 8.4% NSO and 91.6% CSU/TL
- Keg Knoll: 64.9% NSO and 35.1% CSU/TL
- Sweetwater Reef: 0.8% NSO and 99.2% CSU/TL
- Cottonwood Wash: 3.9% NSO and 96.1% CSU/TL
- Horseshoe Canyon Trailhead: 93.5% NSO and 6.5% CSU/TL

Based on the percentages of lands with CSU/TL stipulations, recreationists in the Saucer Basin/Moonshine Wash, The Cone, Sweetwater Reef, and Cottonwood Wash recreation focus areas would be most likely to experience impacts from oil and gas development. The recreation experience in the Dry Lake and Horseshoe Canyon Trailhead recreation focus areas would be the most protected through the use of NSO stipulations.

Under Alternative C, in portions of the recreation focus areas with a CSU/TL stipulation, oil and gas leasing and development would be limited as discussed in Section 4.14.5. Wells would be spaced no closer than 160 acres apart, which would reduce impacts to recreation when compared to areas that are leased as open to oil and gas development subject to standard terms and conditions (which would have no well spacing requirements). These CSU/TL limitations would lessen the intensity and frequency of impacts to the recreation setting and experience. However, some impacts from oil and gas development would still occur in these areas and would detract from the recreation experience. Increased human activity, surface disturbance, the presence of wells and associated oil and gas infrastructure, equipment, and vehicles would increase road traffic, noise, nighttime lighting, and dust, and would create a negative visual impact in otherwise natural areas. Visual impacts and noise would reduce the naturalness of the recreation focus areas for backcountry users and would reduce opportunities for solitude.

Portions of recreation focus areas with NSO stipulations would not be impacted by oil and gas development, with the possible exception of traffic, noise, and dust coming from adjacent areas if horizontal drilling is possible.

Overall, Alternative C would provide more protection to recreation focus areas and their associated recreation experiences in the planning area than would Alternative A but less protection than would Alternatives B and D, which have fewer acres with CSU/TL stipulations and more acres closed to oil and gas leasing (see Table 4-37).

### 4.14.5.3     Horseshoe Canyon Unit

Alternative C would specify several management decisions for recreation near the Horseshoe Canyon Unit of Canyonlands National Park to protect recreation experiences along the rim of the canyon. Under Alternative C, areas within 1.0 mile of the Horseshoe Canyon rim and within 1.0 mile of the Horseshoe Canyon Trailhead KOP would be managed subject to NSO stipulations. There are no exceptions, modifications, or waivers to these stipulations. These stipulations would protect the recreation experience immediately near and in the Horseshoe Canyon Unit, with the possible exception of traffic, noise, and dust coming from adjacent areas if horizontal drilling is possible.

A small portion of the Horseshoe Canyon Trailhead recreation focus area (6.5%) would have a CSU/TL stipulation. Although the CSU/TL stipulation would limit some of the effects of oil and gas development to the recreation experience, recreationists would still be impacted as discussed in Section 4.14.5.3. The remainder of the Horseshoe Canyon Trailhead recreation focus area would be managed as open to oil and gas leasing subject to NSO stipulations.

Under Alternative C, an NSO stipulation would be applied to Horseshoe Canyon South Natural Area that would prevent surface occupancy within this area to protect, preserve, and maintain its wilderness characteristics. There are no exceptions, modifications, or waivers to this stipulation. The recreation experience would be protected in this area, with the possible exception of traffic, noise, and dust coming from adjacent areas if horizontal drilling is possible. Not protecting the travel corridors to Horseshoe Canyon (the Lower San Rafael Road from State Route 24 and the Lower San Rafael Road from Green River) would allow for impacts to visitors using these roads to reach recreation destinations, including the loss of scenic viewsheds and the potential for noise and light pollution.

#### 4.14.5.4    Visual Landscape

Under Alternative C, the five KOPs would be managed subject to NSO stipulations for a radius of 1.0 mile. Based on this stipulation, the recreation experience and settings at these KOPs would be protected from impacts caused by oil and gas leasing and development. The application of a 1.0-mile radius would provide some protection for scenic views from each KOP. This protection of viewsheds would be less than that provided under Alternative B (which stipulates a 3.0-mile radius) but more than that provided under Alternative A (which does not provide a radius).

The NSO and CSU/TL stipulations for recreation under Alternative C would protect scenic values and the visual landscape for recreationists primarily in the Dirty Devil/Robbers Roost SRMA (within VRM Class II areas and canyon rims within viewsheds of canyons) within 1.0 mile of the Green River Labyrinth Canyon rim and within 1.0 mile of the Horseshoe Canyon rim, and limit impacts to visual resources in the recreation focus areas and Labyrinth Canyon SRMA.

Other impacts to visual resources are discussed in Section 4.9.

#### 4.14.5.5    Motorized and Mechanized Recreation

Of the four alternatives, Alternative C is expected to result in the second-largest amount of surface disturbance (809 acres) and the second-largest number of wells (27 wells). Therefore, it would likely have a greater impact on motorized and mechanized recreation than would Alternatives B and D. Oil and gas development could increase the number of roads available for motorized recreation, if recreation access to such roads is permitted. Negative impacts to the motorized recreation experience would occur through increased road traffic and dust, potential deterioration of roads shared by all users, and changes to scenic values. The intensity and frequency of the impacts would be reduced by the recreation CSU/TL and NSO stipulations for this alternative.

Negative impacts to the mechanized recreation experience would occur from increased road traffic, dust, noise, human activity, and changes to viewsheds due to oil and gas development; these impacts would detract from the quality of the recreation experience for mountain bikers. However, as for motorized recreation, such impacts would be reduced by the recreation stipulations under Alternative C.

#### 4.14.5.6    Suspended and Protested Lease Decisions

Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to standard terms, 39,766 acres would be issued subject to CSU/TL stipulations, and 318 acres would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative C would be the same as the impacts on recreation from managing areas as open to leasing subject to standard terms and conditions, open to leasing subject to CSU/TL stipulations, or open to leasing subject to NSO stipulations described in this section. Under Alternative C, some leases would be issued with stipulations that would limit oil and gas development density through well pad spacing. Compared to Alternative A, issuing the suspended and protested leases with these stipulations would reduce the intensity of impacts to recreation if the leases were subsequently developed.

Portions of the suspended leases are in or adjacent to the Sweetwater Reef recreation focus area, and portions of the protested leases are in the Saucer Basin/Moonshine and Three Canyon recreation focus areas. Some of the protested leases are also in or very close to the Labyrinth Canyon SRMA and in the Bull Bottom and Trin Alcove/Three Canyon KOPs. Oil and gas development in or near these recreation focus areas, KOPs, and the Labyrinth Canyon SRMA would result in increased human activity, surface disturbance, and the presence of wells and associated oil and gas infrastructure, equipment, and vehicles, which would increase road traffic, noise, nighttime lighting, and dust. Visual impacts and noise would reduce the naturalness of these areas for backcountry users and would reduce opportunities for solitude.

The increase in noise associated with oil and gas equipment and changes in night skies from lighting associated with oil and gas development would affect recreation settings. Recreationists may be displaced to other areas.

The recreation focus areas and Labyrinth Canyon SRMA would have CSU/TL stipulations that would limit (but not eliminate) impacts to recreation in the protested or suspended lease areas. If areas of the Labyrinth Canyon SRMA that have NSO stipulations intersect protested lease areas, there would be no impacts to recreation in these lease areas. The Bull Bottom and Trin Alcove/Three Canyon KOPs would have NSO stipulations within 1.0 mile of each KOP, which would prevent impacts to recreation within the 1.0-mile radius.

There are no BMPs under Alternative C that would be applied specifically to protect recreation in suspended or protested lease areas; however, the BMPs for other resources described under Alternative B would also apply to Alternative C. These BMPs would reduce visual, noise, and night sky impacts to recreation visitors.

### 4.14.6  Impacts from Alternative D

Under Alternative D, no acreage would be open to oil and gas leasing subject to standard terms and conditions; approximately 339,884 acres would be open to oil and gas leasing subject to CSU/TL stipulations; approximately 92,170 acres would be open to oil and gas leasing subject to an NSO stipulation; and approximately 20,339 acres would be closed to oil and gas leasing. Reasonably foreseeable development under Alternative D is estimated to consist of 23 wells. These wells would result in approximately 440 acres of surface disturbance, of which 70 acres would remain unreclaimed in 15 years. Geophysical survey operations under Alternative D are anticipated to result in 248 acres of surface disturbance, of which approximately 50 acres would be unreclaimed in 15 years. This is the less than the anticipated surface disturbance and developed wells under Alternatives A and C but more than the anticipated surface disturbance and developed wells under Alternative B.

The following lease stipulations for recreation would be applied under Alternative D to protect recreational uses and experiences, to protect scenic values and opportunities for primitive and semi-primitive recreation, and to protect sensitive viewpoints:

- Seven of the nine recreation focus areas (Fossil Point, Dry Lake, Trin Alcove/Three Canyon, Saucer Basin/Moonshine Wash, Keg Knoll, Sweetwater Reef, and Horseshoe Canyon Trailhead) would be managed subject to NSO stipulations.

- The remaining two recreation focus areas (The Cone and Cottonwood Wash) would have a CSU/TL stipulation: well pads would be placed no closer than 640 acres (one well per square mile) apart; production facilities would be co-located and designed to minimize surface impacts; pipelines and utilities would be buried, to the extent practical, and placed along existing roads; interim reclamation of roadway disturbance and reclamation of well pads to well head/production facilities would be required to minimize long-term surface disturbance, and the original landform would be fully restored during final reclamation (travel routes would also be fully restored to their original character).

- The Labyrinth Canyon SRMA would be managed subject to NSO stipulations.

- The Dirty Devil/Robbers Roost SRMA would be managed subject to NSO stipulations for leases within VRM Class II areas and canyon rims within viewsheds of canyons (approximately 0.25 mile). The NSO stipulation for the Dirty Devil/Robbers Roost SRMA would allow exceptions if oil and gas exploration and development would not impair identified scenic and primitive or semi-primitive recreation.

- Horseshoe Canyon rim and the five KOPs would be managed subject to NSO stipulations within 1.0 mile of the rim and each KOP.

- Green River Labyrinth Canyon rim would be managed subject to NSO stipulations within 1.0 mile of the rim north of the San Rafael River.

- The five KOPs would also have the following CSU/TL stipulation: prior to authorizing any surface-disturbing activities within 1.0 to 3.0 miles of the KOPs, a viewshed analysis would be completed. If an area is determined to be within the viewshed, a visual resource contrast rating, including visual simulations, would be completed in accordance with BLM Manual 8431. Site-specific mitigation measures would be identified for all disturbances that are visible within 1.0 to 3.0 miles that minimize visual impacts, regardless of the area's VRM class.

- The Lower San Rafael Road from Saucer Basin Road to Horseshoe Canyon and from the San Rafael River to Horseshoe Canyon would be managed subject to NSO stipulations for a radius of 1.0 mile. These travel corridors would also have the same CSU/TL stipulation as the KOPs, except that mitigation measures would be identified for all disturbances that are visible within 3.0 miles, instead of 1.0 to 3.0 miles.

There are no BMPs under Alternative D that would be applied specifically to protect recreation; however, the BMPs for other resources described under Alternative B would also apply to Alternative D. These BMPs would reduce visual, noise, and night sky impacts to recreation visitors.

Under Alternative D, stipulations for other resources such as lands with wilderness characteristics, natural areas, soils, water resources, ACECs, the Old Spanish Trail, night skies, and the soundscape would also help limit impacts to recreation. For example, an NSO stipulation would be applied to the Dirty Devil/French Springs and Horseshoe Canyon South natural areas and a CSU/TL stipulation would be applied to areas with high wind erosion potential.

### *4.14.6.1    SRMAs*

**Dirty Devil/Robbers Roost SRMA**

Table 4-34 shows the oil and gas categories for the Dirty Devil/Robbers Roost SRMA in the planning area for all four alternatives, including Alternative D.

Under Alternative D, 23.9% of the Dirty Devil/Robbers Roost SRMA in the planning area would be managed subject to NSO stipulations, 47.2% would be managed subject to CSU/TL stipulations, and 28.9% would be closed to oil and gas leasing and development. Closing areas to oil and gas leasing and development and applying an NSO stipulation to portions of the Dirty Devil/Robbers Roost SRMA would protect recreational uses and experiences in these areas, with the possible exception of traffic, noise, nighttime lighting, and dust coming from adjacent areas if horizontal drilling is possible. There is a small possibility that access to leased areas managed subject to NSO stipulations could occur from parcels of land owned by SITLA; oil and gas leasing and development could occur in the SRMA on SITLA lands. Approximately half of the SRMA would be managed subject to CSU/TL stipulations. CSU/TL stipulations would reduce the frequency and intensity of impacts from oil and gas development to the recreation setting; however, some impacts would still occur in these areas. Visual, light, and noise impacts from surface disturbance, infrastructure, vehicles, and equipment would still detract from the recreation experience.

The NSO stipulation for the Dirty Devil/Robbers Roost SRMA would protect scenic values and opportunities for primitive and semi-primitive recreation in the SRMA's VRM Class II areas and within 0.25 mile of canyon rims. Exceptions to the NSO stipulation would be considered if identified scenic and primitive or semi-primitive recreational resources would not be impaired by oil and gas development.

1  **Labyrinth Canyon SRMA**

2  Table 4-35 shows the oil and gas categories for the Labyrinth Canyon SRMA in the planning area for all
3  four alternatives, including Alternative D.

4  Under Alternative D, the Labyrinth Canyon SRMA in the planning area would be managed subject to
5  NSO stipulations (33.0%) or closed (67.0%). The NSO stipulation and closure of areas in the Labyrinth
6  Canyon SRMA would protect recreational settings, uses, and experiences in this area. Impacts to
7  recreation from oil and gas development would be prevented, with the possible exception of traffic, noise,
8  nighttime lighting, and dust coming from adjacent areas if horizontal drilling is possible.

9   Overall, Alternative D would provide more protection to SRMAs in the planning area than would
10  Alternatives A and C, because it would have fewer areas open to oil and gas leasing with standard terms
11  and conditions or managed subject to CSU/TL stipulations. Alternative D provides similar protection to
12  the SRMAs as Alternative B but would have some areas with CSU/TL stipulations (see Table 4-35) in the
13  Dirty Devil/Robbers Roost SRMA that would experience impacts from oil and gas development.

14  *Price Field Office ROS*

15  Table 4-36 shows oil and gas leasing categories for ROS classes in the portion of Labyrinth Canyon
16  SRMA in the planning area for all four alternatives, including Alternative D.

17  Under Alternative D, 7.7% of the Labyrinth Canyon SRMA in the planning area that is classified as
18  primitive would be managed subject to NSO stipulations and 92.3% would be closed to leasing and
19  development. The semi-primitive nonmotorized areas in the SRMA would have an NSO stipulation
20  (10.3%) or would be closed (89.7%). Likewise, the semi-primitive motorized areas in the SRMA would
21  have an NSO stipulation (61.9%) or would be closed (38.1%). The roaded natural areas in the SRMA
22  would be managed subject to NSO stipulations (76.8%) or closed (23.2%). There are no rural areas in the
23  SRMA.

24  There would be no impact from oil and gas development on the desired characteristics of the ROS
25  settings in the Labyrinth Canyon SRMA under Alternative D, because the NSO stipulations and closed
26  areas cover all of the SRMA in the planning area. The quality of the recreation experience would not be
27  impacted by oil and gas leasing development, with the possible exception of traffic, noise, nighttime
28  lighting, and dust coming from adjacent areas if horizontal drilling is possible. There is a small possibility
29  that access to leased areas managed as NSO could occur from parcels of land owned by SITLA; oil and
30  gas leasing and development could occur in the SRMA on SITLA lands.

31  Alternative D would provide more protection to desired ROS settings in portions of the Labyrinth Canyon
32  SRMA in the planning area than would Alternatives A and C because it has no areas that are open subject
33  to standard terms and conditions or to CSU/TL stipulations. It offers a similar level of protection for
34  desired ROS settings as Alternative B (see Table 4-36).

35  **4.14.6.2    Recreation Focus Areas**

36  Table 4-37 shows the oil and gas categories for the nine recreation focus areas in the analysis area for all
37  four alternatives, including Alternative D.

38  Under Alternative D, seven of the recreation focus areas would be managed subject to NSO stipulations
39  and/or closed:

40  • Fossil Point: 86.7% NSO and 13.3% closed

41  • Dry Lake: 92.0% NSO and 8.0% closed

42  • Three Canyon: 46.4% NSO and 53.6% closed

1  • Saucer Basin/Moonshine Wash: 100% NSO

2  • Keg Knoll: 49.6% NSO and 50.4% closed

3  • Sweetwater Reef: 100% NSO

4  • Horseshoe Canyon Trailhead: 13.4% NSO and 86.6% closed

5  The two remaining recreation focus areas would be managed subject to NSO and CSU/TL stipulations:

6  • The Cone: 15.7% NSO and 84.3% CSU/TL

7  • Cottonwood Wash: 8.2% NSO and 91.8% CSU/TL

8  Based on the percentage of lands with CSU/TL stipulations, The Cone and Cottonwood Wash recreation
9  focus areas would be most likely to experience impacts from oil and gas development. The recreation
10  experience in the remaining recreation focus areas would be protected through the use of the NSO
11  stipulation and/or closure to oil and gas leasing and development. There would be no visual, noise,
12  nighttime lighting, or dust impacts in these recreation focus areas, with the possible exception of such
13  impacts coming from adjacent areas if horizontal drilling is possible. There is a small possibility that
14  access to leased areas managed subject to NSO stipulations could occur from parcels of land owned by
15  SITLA; oil and gas leasing and development could occur in the recreation focus areas on SITLA lands.

16  Under Alternative D, in portions of The Cone and Cottonwood Wash recreation focus areas with CSU/TL
17  stipulations, oil and gas leasing and development would be limited as discussed in Section 4.14.6. These
18  limitations would lessen the intensity and frequency of impacts to the recreation setting and experience.
19  However, some impacts from oil and gas development would still occur in these areas and would detract
20  from the recreation experience. Increased human activity, surface disturbance, the presence of wells and
21  associated oil and gas infrastructure, equipment, and vehicles would increase road traffic, noise, nighttime
22  lighting, and dust, and would create a negative visual impact in otherwise natural areas. Visual impacts
23  and noise would reduce the naturalness of the recreation focus areas for backcountry users and would
24  reduce opportunities for solitude.

### 4.14.6.3    *Horseshoe Canyon Unit*

26  Alternative D would specify multiple management decisions for recreation near the Horseshoe Canyon
27  Unit of Canyonlands National Park to protect recreation uses and experiences along the rim of the canyon
28  and in and near the park. Under Alternative D, the Horseshoe Canyon Trailhead recreation focus area,
29  areas within 1.0 mile of the Horseshoe Canyon rim, and areas within 1.0 mile of the Horseshoe Canyon
30  Trailhead KOP would all be managed subject to NSO stipulations. In addition, the Lower San Rafael
31  Road from Saucer Basin Road to Horseshoe Canyon and from the San Rafael River to Horseshoe Canyon
32  would be managed subject to NSO stipulations for a radius of 1.0 mile, protecting the Horseshoe Canyon
33  Unit's primary travel corridors. This NSO stipulation would protect scenic viewsheds for a 1.0-mile
34  radius around the roads that visitors use to reach Horseshoe Canyon and would minimize impacts such as
35  noise, light pollution, and opportunities for a semi-primitive experience. There are no exceptions,
36  modifications, or waivers to these stipulations.

37  A CSU/TL stipulation would also be specified under Alternative D to protect the Horseshoe Canyon
38  Trailhead KOP and the main travel corridors to Horseshoe Canyon. This stipulation would require
39  viewshed analyses before any surface-disturbing activities within 1.0 to 3.0 mile and possibly visual
40  resource contrast ratings and site-specific mitigation measures.

41  These stipulations would protect the recreation setting and experience in and near the Horseshoe Canyon
42  Unit, as well as its main travel corridors, with the possible exception of traffic, noise, and dust coming
43  from adjacent areas if horizontal drilling is possible.

#### 4.14.6.4    Visual Landscape

Under Alternative D, the five KOPs would be managed subject to NSO stipulations for a radius of 1.0 mile, and all lands between 1.0 to 3.0 miles from each KOP would be managed subject to CSU stipulations. Based on this stipulation, the recreation experience and setting at these KOPs would be protected from impacts caused by oil and gas leasing and development. The application of a 1.0-mile radius would provide some protection for scenic views from each KOP. The application of a CSU stipulation within a 1.0 to 3.0–mile radius would reduce the frequency and intensity of viewshed impacts around each KOP. In addition, Alternative D would require a viewshed analysis from applicable KOPs before any surface disturbance is authorized and the possible implementation of mitigation measures for any visual impacts. These measures would provide more protection for viewsheds than that provided under Alternatives A and C but less protection for viewsheds than that provided under Alternative B.

The NSO stipulations for recreation under Alternative D would protect scenic values and the visual landscape for recreationists in seven of the nine recreation focus areas, in the portion of the Labyrinth Canyon SRMA in the planning area, in VRM Class II areas and canyon rims within the viewsheds of canyons in the Dirty Devil/Robbers Roost SRMA, at Horseshoe Canyon rim, at Green River Labyrinth Canyon rim north of the San Rafael River, and along the Horseshoe Canyon travel corridors (within 1.0 mile). The Cone and Cottonwood Wash recreation focus areas would have a CSU/TL stipulation, which would lessen the impacts of oil and gas leasing and development on the visual landscape.

In addition, stipulations for visual resources under Alternative D would require visual resource contrast ratings in VRI and VRM Class II areas. A CSU/TL stipulation for night skies under this alternative would limit night sky impacts by requiring operators to implement specific light-restricting BMPs.

Other impacts to visual resources are discussed in Section 4.9.

#### 4.14.6.5    Motorized and Mechanized Recreation

Of the four alternatives, Alternative D is expected to result in the second-lowest amount of surface disturbance (688 acres) and number of wells (23 wells). Therefore, Alternative D would have a larger impact on motorized and mechanized recreation than would Alternative B but less than would Alternatives A and C. Oil and gas development could increase the number of roads available for motorized recreation, if recreation access to such roads is permitted. Some negative impacts to the motorized recreation experience would occur through increased road traffic and dust, potential deterioration of roads shared by all users, and changes to scenic values. These impacts would be limited by recreation and other stipulations under Alternative D.

Some negative impact to the mechanized recreation experience would occur from increased road traffic, dust, noise, human activity, and changes to viewsheds due to oil and gas development; these impacts would detract from the quality of the recreation experience for mountain bikers. However, as with motorized recreation, such impacts would be limited by recreation and other stipulations under Alternative D.

#### 4.14.6.6    Suspended and Protested Lease Decisions

Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU/TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. If the leases were subsequently developed, the impacts of modifying the terms and conditions of the suspended and protested leases and issuing the leases consistent with Alternative D would be the same as the impacts on recreation from managing areas as open to leasing subject to CSU/TL stipulations or open to leasing subject to NSO stipulations described in this section. Under Alternative D, some of the leases would be issued with stipulations that would limit oil and gas development density (well pads would be placed no closer than 640 acres apart). Compared to Alternatives A and C, issuing the suspended and protested

1   leases with these stipulations would reduce the intensity of the impact to the recreation experience and
2   setting if the leases were subsequently developed.

3   Portions of the suspended leases are located in or adjacent to the Sweetwater Reef recreation focus area,
4   and portions of the protested leases are located in the Saucer Basin/Moonshine and Three Canyon
5   recreation focus areas. Some of the protested leases are also located in or very close to the Labyrinth
6   Canyon SRMA and in the Bull Bottom and Trin Alcove/Three Canyon KOPs. The three recreation focus
7   areas and the Labyrinth Canyon SRMA would have NSO stipulations that would prevent impacts to
8   recreation in the protested or suspended lease areas. The NSO stipulations would generally minimize
9   impacts from oil and gas development on recreation users in the recreation focus areas or KOPs.
10  However, development of leases that are located near the recreation focus areas and KOPs (in areas that
11  would be open for oil and gas development subject to CSU/TL limitations) could impact recreation users
12  through increased traffic, noise, dust, and nighttime lighting.

13  There are no BMPs under Alternative D that would be applied specifically to protect recreation in
14  protested or suspended lease areas; however, the BMPs for other resources described under Alternative B
15  would also apply to Alternative D. These BMPs would reduce visual, noise, and night sky impacts to
16  recreation visitors.

## 4.15  Oil and Gas Resources

18  This section presents potential impacts to oil and gas leasing from implementing management actions
19  presented in Chapter 2. Existing conditions concerning oil and gas management are described in Chapter
20  3. The following section lists the assumptions that apply to the analysis of potential impacts to oil and gas
21  resources.

### 4.15.1  Assumptions

23  •   Minerals and energy management policies dictated by law, regulation, statute, or policy
24      (including standard lease terms or other stipulations) would be applied equally across all
25      alternatives.

26  •   Oil and gas exploration and development could continue to occur in the planning area during the
27      planning period.

28  •   Leaseholders have the right to explore, develop, and produce oil and gas resources from any
29      valid, existing lease, even if the area containing the lease were proposed to be closed to future
30      leasing.

31  •   A valid, existing oil and gas lease is a legal contract secured by a leaseholder before the effective
32      date of the planning area notice of intent for the MLP process.

33  •   Managing areas subject to NSO stipulations would restrict surface disturbance on BLM-managed
34      lands. However, private and state lands that are intermixed throughout the planning area would
35      have no such restriction and could be developed. Therefore, it is conceivable that there could be
36      surface disturbance and other adverse impacts from oil and gas development within areas subject
37      to NSO stipulations that are not under BLM jurisdiction.

38  •   The resource protection measures identified in the MLP/EA will also apply to areas currently
39      under lease where they do not conflict with the rights granted to the holder of the lease. While the
40      BLM may not unilaterally add a new stipulation to an existing lease that it has already issued, the
41      BLM can subject the development of existing leases to reasonable measures in order to minimize
42      impacts to other resource values. These reasonable measures would be applied as Conditions of
43      Approval to post-lease actions (e.g., permits to drill) and may include, but are not limited to,
44      modification to siting or design of facilities, timing of operations, and specification of interim and
45      final reclamation measures.

- Directional and/or horizontal drilling could be used to access hydrocarbon resources under areas constrained by surface use restrictions (e.g., NSO restrictions).

- Directional and/or horizontal drilling viability and offset distance vary with the target formation, the top depth of the target formation, and formation productivity.

- Based on past BLM drilling experience, plugging and closure procedures have been shown to be effective in protecting groundwater resources.

- Adequate vegetative ground cover and species composition for site stabilization typically would occur within 15 to 20 years in shrub communities and 20 to 25 years in desert communities.

- Re-establishment of slow-growing vegetation, such as trees and shrubs, in disturbed areas would create a vegetative landscape similar to adjacent undisturbed lands in excess of 100 years.

- Dry holes would be abandoned and successfully reclaimed within 15 to 20 years in shrub communities and 20 to 25 years in desert communities. Re-establishment of slow growing vegetation, such as trees and shrubs, in disturbed areas would create a vegetative landscape similar to adjacent undisturbed lands in excess of 100 years.

- Geophysical exploration would beneficially impact oil and gas development by providing data necessary for prudent placement of well pads, resulting in potentially higher success rates and less total drilling.

The BLM prepared a RFD scenario (see Appendix A) to project a baseline scenario of oil and gas exploration, development, and production, as well as reclamation activity in the planning area over the next 15 years. The RFD was used to predict the number of oil and gas wells and associated surface disturbance from oil and gas development on BLM-administered public lands for each alternative. To complete these estimates, the total number of wells, surface disturbance, and disturbance associated with geophysical exploration as identified in the RFD was multiplied by the percentage of BLM-administered lands open for oil and gas leasing subject to standard terms and conditions, or open to leasing subject to CSU/TL stipulations for each alternative. Lands open to leasing subject to an NSO stipulation or as closed to leasing were not considered open. Actual surface disturbance under each alternative could be higher or lower than these estimates, and these calculations do not provide a limit on oil and gas activity or surface disturbance for any alternative. Additionally, the calculations do not consider factors such as the ability to access oil and gas resources in areas managed subject to NSO stipulations from adjacent open lands or on adjacent private or state lands, or the possibility of some CSU stipulations limiting the density of oil and gas development in areas open to leasing.

Table 4-38 lists the projected oil and gas development and associated surface disturbance under each alternative on BLM-administered land in the planning area over the next 15 years. Among the alternatives, the number of projected wells ranges between seven and 28.

1  **Table 4-38.  Projected Oil and Gas Development and Surface Disturbance on Bureau of Land**
2  **Management Lands (over the next 15 years)**

| Action | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Wells | 28 | 7 | 27 | 23 |
| Gross surface disturbance (acres disturbed) | 541 | 127 | 517 | 440 |
| Net surface disturbance after reclamation (acres disturbed) | 86 | 20 | 82 | 70 |
| Gross geophysical surface disturbance (acres disturbed) | 305 | 72 | 292 | 248 |
| Net geophysical surface disturbance (acres disturbed) | 61 | 14 | 58 | 50 |

3  ## 4.15.2  Impacts Common to All Alternatives

4  Meeting state and federal air quality standards could result in additional emissions control requirements
5  that could result in delays and extra costs for oil and gas operations on federal lands.

6  Requiring project-specific analyses to use quantitative air quality analysis methods (i.e., modeling), when
7  appropriate, would result in potential delays and additional costs.

8  Applying an NSO stipulation to lands would require the use of more costly directional and horizontal
9  drilling to access the underlying federal oil and gas resources.

10  Applying lease notices for complying with mitigation requirements for raptors, migratory birds, and
11  species listed under the ESA (USFWS 2017) and included on the Utah BLM sensitive species list (BLM
12  2010b, 2011) could result in delays and additional costs to oil and gas operations. For example, surface-
13  disturbing activities are to be avoided in occupied migratory bird habitat during the nesting season (April
14  15 through August 1). Buffers around habitat for sensitive and federally listed species where surface-
15  disturbing activities are precluded could also result in fewer acres available for oil and gas development.
16  Prohibiting surface-disturbing activities within the 100-year floodplain of the Green River and associated
17  backwaters to protect federally listed fish species would require the use of more costly directional and
18  horizontal drilling to access any underlying federal oil and gas resources in these areas. Stipulations
19  associated with sensitive and federally listed species are discussed in more detail in Section 4.11.

20  Timing limitations for wildlife and special status species do not substantially vary across alternatives.
21  Timing limitations vary by species, and overlapping timing limitations can occur on some acreages. The
22  greater the overlap of timing restrictions for different species, the greater the potential economic cost to
23  oil and gas operators. Timing limitations aimed at mitigating potential impacts to wildlife are discussed in
24  more detail in Section 4.12. Though these seasonal restrictions can seem cumbersome, upfront work
25  between the BLM and applicants early in the development stage of these projects can simplify survey
26  needs, ensure that there is an ample window of time to complete projects or develop project plans, ensure
27  that federal acts are not violated, and minimize impacts to protected and state sensitive species and big
28  game. Accurate surveys completed at the correct time would help to avoid delays, facilitate project
29  planning, and allow accurate environmental analysis that is less likely to be litigated, thus allowing the
30  project to move forward in a timely fashion.

1  ### 4.15.3    Impacts from Alternative A (No Action)

2  #### 4.15.3.1    *Oil and Gas Suspended Lease Decisions*

3  As discussed in Section 3.15.3.2, there are 16 leases (approximately 38,769 acres) in the planning area
4  that are currently suspended. Under Alternative A-1, these suspensions would be rescinded. The leases
5  are in areas managed as open subject to standard terms and conditions. Areas open subject to standard
6  terms and conditions have the most flexibility for oil and gas exploration and development, and therefore
7  this decision would provide beneficial impacts for the oil and gas program. Oil and gas operations
8  conducted in open areas also generally impose the least economic cost to operators.

9  Under Alternative A-2, the terms and conditions on the 16 suspended leases would be modified to be
10  consistent with the Richfield ROD/RMP (BLM 2008b). Potential impacts to oil and gas development
11  from the stipulations that would apply to these leases are described in more detail in Section 4.15.3.3. The
12  BLM would offer the lessee the option of either accepting the new lease terms or having the lease
13  cancelled. Cancellation would be done through a BLM administrative process and would require that the
14  BLM refund any bonus bids and lease payments.

15  #### 4.15.3.2    *Lease Protest Resolution*

16  Under Alternative A, the lease protests on four leases (described in Section 3.15.3.2) would be resolved
17  and the protested leases would be issued with terms and conditions that are consistent with the Price
18  ROD/RMP (BLM 2008a). These leases include approximately 6,274 acres that would be managed as
19  open subject to standard terms and conditions. The leases in areas open subject to standard terms and
20  conditions would have the most flexibility for oil and gas exploration and development, which would
21  provide beneficial impacts for the oil and gas program. Oil and gas operations conducted in open areas
22  also generally impose the least economic cost to operators. Approximately 113 acres would be managed
23  as NSO. The NSO stipulation could increase the complexity of oil and gas operations and slow down
24  production. Development in NSO areas would require the use of more costly methods, such as directional
25  and horizontal drilling, to access oil and gas resources. The NSO stipulation would preclude the use of the
26  surface for the development of oil and gas, but would still allow the recovery of these resources at a
27  greater economic cost. The BLM would offer the lessee the option of either accepting the new lease terms
28  or having the lease cancelled. Cancellation would be done through a BLM administrative process and
29  would require that the BLM refund any bonus bids and lease payments.

30  #### 4.15.3.3    *Oil and Gas Leasing Stipulations*

31  Under Alternative A, approximately 418,545 acres would be available for oil and gas leasing and
32  development, managed as either open with standard terms and conditions (approximately 399,462 acres)
33  or with CSU and/or TL stipulations (approximately 19,083 acres), comprising approximately 93% of the
34  BLM-administered land in the planning area. Table 4-39 lists the acres of oil and gas leasing categories
35  by alternative. The approximately 399,462 acres subject to standard terms and conditions (open) would
36  provide the most flexibility for oil and gas exploration and development. Oil and gas operations
37  conducted in open areas generally impose the least economic cost to operators. The approximately 19,083
38  acres managed with CSU and/or TL stipulations may result in additional economic costs and delays for
39  oil and gas operators by limiting the siting of operations and requiring specialized equipment, design
40  considerations, and erosion control plans. TL stipulations would result in additional economic costs and
41  delays by requiring surveys, avoidance of occupied areas, rerouting of roads and pipelines, and re-siting
42  of oil and gas facilities, or extra operational time if the surface disturbance window does not
43  accommodate an individual project schedule and timeline and if project activities need to be postponed.

1    **Table 4-39. Oil and Gas Leasing Categories under Each Alternative**

| Alternative | Open (acres) | CSU and/or TL (acres) | NSO (acres) | Closed (acres) |
|---|---|---|---|---|
| Alternative A | 399,462 | 19,083 | 33,627 | 220 |
| Alternative B | 0 | 98,164 | 324,161 | 30,068 |
| Alternative C | 37,865 | 362,127 | 52,208 | 192 |
| Alternative D | 0 | 339,884 | 92,170 | 20,339 |

2    The remaining 7% of the BLM-administered land in the planning area would be subject to NSO
3    stipulations (approximately 33,627 acres) or closed to mineral leasing (approximately 220 acres). NSO
4    stipulations could increase the complexity of oil and gas operations and slow production. Development in
5    NSO areas would require the use of more costly methods, such as directional and horizontal drilling, to
6    access oil and gas resources. NSO stipulations would preclude the use of the surface for the development
7    of oil and gas but would still allow the recovery of these resources at a greater economic cost. Precluding
8    surface disturbance in areas with NSO stipulations would decrease the number of wells drilled during the
9    planning period. The closure of approximately 220 acres to oil and gas leasing in Alternative A would
10   eliminate opportunities to develop oil and gas resources in those areas.

11   The projection for oil and gas development for Alternative A is 28 wells over 15 years.

12   Under the Richfield Field Office ROD/RMP (BLM 2008b), geophysical operations are subject to oil and
13   gas leasing restrictions under 43 CFR 3150. However, the BLM will consider approving geophysical
14   operations proposed for lands that are designated as NSO or closed to leasing when 1) the circumstances
15   or relative resource values in the areas have changed, 2) less-restrictive requirements could be developed
16   to protect the resource of concern, or 3) operations could be conducted without causing unacceptable
17   impact to the resources of concern. Because regulations applicable to geophysical operations are already
18   in effect, this would have no impact on the existing costs and time associated with oil and gas geophysical
19   operations.

20   Under the Price Field Office ROD/RMP (BLM 2008a), geophysical operations are allowed, consistent
21   with existing regulations for geophysical exploration. Because regulations applicable to geophysical
22   operations are already in effect, this would have no impact on the existing costs and time associated with
23   oil and gas geophysical operations.

24   This alternative would apply BMPs from the Price ROD/RMP (RMP Appendix R-14) (BLM 2008a) and
25   the Richfield ROD/RMP (RMP Appendix 15) (BLM 2008b) that typically apply to oil and gas
26   development. These measures are summarized in Appendix E. These BMPs could increase the economic
27   costs associated with oil and gas development and could delay some oil and gas development activities.

28   ## 4.15.4    Impacts from Alternative B

29   ### 4.15.4.1    Oil and Gas Suspended Lease Decisions

30   As discussed in Section 3.15.3.2, there are 16 leases (approximately 38,769 acres) in the planning area
31   that are currently suspended. Under Alternative B, all the suspended leases would be cancelled.
32   Approximately 5,971 acres of area covered by the suspended leases would be managed as CSU and/or
33   TL. Approximately 23,065 acres of the area covered by the suspended leases would be managed as NSO.
34   Approximately 838 acres of the area covered by the suspended leases would be closed to leasing.
35   Potential impacts to oil and gas development from the stipulations that would apply to these areas are
36   described in more detail in Section 4.15.3.3.

1  ### 4.15.4.2  Lease Protest Resolution

2  Under Alternative B, the lease protests on four leases (described in Section 3.15.3.2) would be resolved
3  and the leases would be denied. The four protested lease areas compose a total of approximately 6,388
4  acres, with approximately 2,513 acres managed as CSU and/or TL and approximately 3,875 acres
5  managed as NSO. Potential impacts to oil and gas development from these stipulations are described in
6  more detail in Section 4.15.3.3.

7  ### 4.15.4.3  Oil and Gas Leasing Stipulations

8  Under Alternative B, approximately 98,164 acres would be managed with CSU and/or TL stipulations,
9  covering approximately 22% of the BLM-administered land in the planning area (see Table 4-39). No
10  acres would be managed for oil and gas leasing subject to standard terms and conditions (open). The
11  approximately 98,164 acres managed with CSU and/or TL stipulations may result in additional economic
12  costs and delays to oil and gas operators by limiting the siting of operations and requiring specialized
13  equipment, design considerations, and erosion control plans. TL stipulations would result in additional
14  economic costs and delays by requiring surveys, avoidance of occupied areas, rerouting of roads and
15  pipelines, and re-siting of oil and gas facilities, or extra operational time if the surface disturbance
16  window does not accommodate an individual project schedule and timeline and if project activities need
17  to be postponed.

18  The remaining 78% of the planning area would be subject to NSO stipulations (approximately 324,161
19  acres) or closed to mineral leasing (approximately 30,068 acres). NSO stipulations could increase the
20  complexity of oil and gas operations and slow production. Development in NSO areas would require the
21  use of more costly methods, such as directional and horizontal drilling, to access oil and gas resources.
22  NSO stipulations would preclude the use of the surface for the development of oil and gas but would still
23  allow the recovery of these resources at a greater cost. Precluding surface disturbance in areas with NSO
24  stipulations would decrease the number of wells drilled during the planning period. The closure of
25  approximately 30,068 acres to oil and gas leasing under Alternative B would eliminate opportunities to
26  develop oil and gas resources in those areas. Among the acres closed to leasing would be the area covered
27  by the Three Rivers locatable mineral withdrawal.

28  The projection for oil and gas development for Alternative B is seven wells over 15 years. This is the
29  fewest wells projected for any of the alternatives, followed by Alternatives D, C, and A. The large
30  acreage closed to leasing (approximately 7% of the planning area) or managed as NSO (approximately
31  72% of the planning area) under Alternative B is the primary reason that this alternative has the lowest
32  number of projected wells.

33  This alternative would apply restrictions to geophysical operations, including not allowing geophysical
34  operations in areas closed to leasing and only allowing heliport geophysical operations in areas that are
35  managed as NSO. Requiring heliport geophysical operations in NSO areas would increase economic costs
36  for operators.

37  Under this alternative, restrictions on surface-disturbing activities within habitat for threatened,
38  endangered, and sensitive species would limit oil and gas development. These restrictions are described in
39  more detail in Section 4.11.

40  This alternative would require implementation of BMPs that minimize the potential resource impacts
41  associated with oil and gas development (see Appendix C for a list of BMPs by resource). These BMPs
42  could increase the economic costs associated with oil and gas development and could delay some oil and
43  gas development activities.

1  ## 4.15.5    Impacts from Alternative C

2  ### 4.15.5.1    Oil and Gas Suspended Lease Decisions

3  As discussed in Section 3.15.3.2, there are 16 leases in the planning area that are currently suspended.
4  Under Alternative C, the lease terms and conditions on the suspended leases would be modified to be
5  consistent with Alternative C. The stipulations that would be applied to these leases are described in more
6  detail in Section 4.15.4.3. The BLM would offer the lessee the option of either accepting the new lease
7  terms or having the lease cancelled. Cancellation would be done through a BLM administrative process
8  and would require that the BLM refund any bonus bids and lease payments.

9  ### 4.15.5.2    Lease Protest Resolution

10 Under Alternative C, the lease protests on four leases (described in Section 3.15.3.2) would be resolved
11 and the leases would be issued with terms and conditions that are consistent with Alternative C. The
12 stipulations that would be applied to these leases are described in more detail in Section 4.15.4.3. The
13 BLM would offer the lessee the option of either accepting the new lease terms or having the lease
14 cancelled. Cancellation would be done through a BLM administrative process and would require that the
15 BLM refund any bonus bids and lease payments.

16 ### 4.15.5.3    Oil and Gas Leasing Stipulations

17 Under Alternative C, approximately 399,992 acres would be available for oil and gas leasing and
18 development and would be managed as either open with standard terms and conditions (approximately
19 37,865 acres) or with CSU and/or TL stipulations (approximately 362,175 acres), comprising
20 approximately 88% of the BLM-administered land in the planning area (see Table 4-39). The
21 approximately 37,865 acres subject to standard terms and conditions (open) would provide the most
22 flexibility for oil and gas exploration and development, which would provide beneficial impacts for the
23 oil and gas program. Oil and gas operations conducted in open areas generally impose the least economic
24 cost to operators. The approximately 362,175 acres managed with CSU and/or TL stipulations may result
25 in additional economic costs and delays to oil and gas operators by limiting the siting of operations and
26 requiring specialized equipment, design considerations, and erosion control plans. Approximately 15,984
27 acres (4%) of the lands proposed to be managed under CSU/TL stipulations under this alternative would
28 be managed with a more restrictive CSU stipulation in the Labyrinth LWC Units and in the Labyrinth
29 Canyon SRMA. Note that the Labyrinth LWC unit overlaps the Labyrinth Canyon SRMA in its entirety.
30 These stipulations would require that well pads be placed no closer than 320 acres apart and that no
31 disturbance would be allowed within the viewshed of the Green River. These decisions could cause
32 adverse impacts by limiting development and increasing economic costs. TL stipulations would result in
33 additional economic costs and delays by requiring surveys, avoidance of occupied areas, rerouting of
34 roads and pipelines, and re-siting of oil and gas facilities, or extra operational time if the surface
35 disturbance window does not accommodate an individual project schedule and timeline and if project
36 activities need to be postponed.

37 The remaining 12% of the BLM-administered land in the planning area would be subject to NSO
38 stipulations (approximately 52,208 acres) or closed to mineral leasing (approximately 192 acres). NSO
39 stipulations could increase the complexity of oil and gas operations and slow production. Development in
40 NSO areas would require the use of more costly methods, such as directional and horizontal drilling, to
41 access oil and gas resources. NSO stipulations would preclude the use of the surface for the development
42 of oil and gas, but would still allow the recovery of these resources at a greater economic cost. Precluding
43 surface disturbance in areas with NSO stipulations would decrease the number of wells drilled during the
44 planning period. Among the acres managed as NSO would be the areas covered by the Three Rivers
45 locatable mineral withdrawal. The closure of approximately 192 acres to oil and gas leasing in Alternative
46 C would eliminate opportunities to develop oil and gas resources in those areas.

1  The projection for oil and gas development for Alternative C is 27 wells over 15 years. After Alternative
2  A, this is the second-highest number of wells projected for any of the alternatives, followed by
3  Alternatives D and B. Alternative C also has the second-highest number of acres that would be managed
4  as open (approximately 8% of the planning area) and the second-lowest number of acres that would be
5  managed as NSO (approximately 12% of the planning area).

6  Under this alternative, geophysical operations would not be allowed in areas closed to leasing.
7  Geophysical operations would be allowed in areas managed as NSO under the following conditions:

8  • No new road construction or road improvements

9  • No staging areas

10  • Full reclamation of all surface disturbance

11  • No geophysical operations in crucial pronghorn habitat from May 15 through June 15

12  These restrictions on geophysical operations could increase economic costs for operators and could delay
13  some oil and gas development activities.

14  Under this alternative, restrictions on surface-disturbing activities within habitat for threatened,
15  endangered, and sensitive species would limit oil and gas development. These restrictions are described in
16  more detail in Section 4.11.

17  This alternative would require implementation of BMPs that minimize the potential resource impacts
18  associated with oil and gas development (see Appendix C for a list of BMPs by resource). These BMPs
19  could increase the economic costs associated with oil and gas development and could delay some oil and
20  gas development activities.

21  ## 4.15.6    Impacts from Alternative D

22  ### 4.15.6.1    Oil and Gas Suspended Lease Decisions

23  As discussed in Section 3.15.3.2, there are 16 leases in the planning area that are currently suspended.
24  Under Alternative D, the lease terms and conditions on the suspended leases would be modified to be
25  consistent with Alternative D. The stipulations that would be applied to these leases are described in more
26  detail in Section 4.15.5.3. The BLM would offer the lessee the option of either accepting the new lease
27  terms or having the lease cancelled. Cancellation would be done through a BLM administrative process
28  and would require that the BLM refund any bonus bids and lease payments.

29  ### 4.15.6.2    Lease Protest Resolution

30  Under Alternative D, the lease protests on four leases (described in Section 3.15.3.2) would be resolved
31  and the leases would be issued with terms and conditions that are consistent with Alternative D. The
32  stipulations that would be applied to these leases are described in more detail in Section 4.15.5.3. The
33  BLM would offer the lessee the option of either accepting the new lease terms or having the lease
34  cancelled. Cancellation would be done through a BLM administrative process and would require that the
35  BLM refund any bonus bids and lease payments.

36  ### 4.15.6.3    Oil and Gas Leasing Stipulations

37  Under Alternative D, approximately 339,884 acres would be managed with CSU and/or TL stipulations,
38  comprising approximately 75% of the BLM-administered land in the planning area (see Table 4-39). No
39  acres would be managed for oil and gas leasing subject to standard terms and conditions (open). The
40  approximately 339,884 acres managed with CSU and/or TL stipulations may result in additional
41  economic costs and delays to oil and gas operators by limiting the siting of operations and requiring

specialized equipment, design considerations, and erosion control plans. Approximately 161,667 acres of LWC units would be managed with a CSU stipulation, 48% of all lands managed as CSU under this alternative. The LWC stipulations would require that well pads be placed no closer than 640 acres apart and that no disturbance would be allowed within the viewshed of the Green River. These stipulations would be far more restrictive to oil and gas development than stipulations under Alternative C, where only the Labyrinth LWC unit (15,984 acres) would have a 320-acre spacing requirement between wells. These decisions would cause adverse impacts by limiting development and increasing economic costs. TL stipulations would result in additional economic costs and delays by requiring surveys, avoidance of occupied areas, rerouting of roads and pipelines, and re-siting of oil and gas facilities, or extra operational time if the surface disturbance window does not accommodate an individual project schedule and timeline and project activities need to be postponed.

The remaining 25% of the BLM-administered land in the planning area would be subject to NSO stipulations (approximately 92,170 acres) or closed to mineral leasing (approximately 20,339 acres). NSO stipulations could increase the complexity of oil and gas operations and slow production. Development in NSO areas would require the use of more costly methods, such as directional and horizontal drilling, to access oil and gas resources. NSO stipulations would preclude the use of the surface for the development of oil and gas, but would still allow the recovery of these resources at a greater economic cost. Precluding surface disturbance in areas with NSO stipulations would decrease the number of wells drilled during the planning period. Among the acres managed as NSO would be areas covered by the Three Rivers locatable mineral withdrawal. The closure of approximately 20,339 acres to oil and gas leasing in Alternative B would eliminate opportunities to develop oil and gas resources in those areas.

The projection for oil and gas development for Alternative D is 23 wells over 15 years. This is the second-lowest number of wells projected for any of the alternatives; it is more than for Alternative B but less than for Alternatives C and A. The large acreage closed to leasing (approximately 4% of the planning area) or managed as NSO (approximately 20% of the planning area) under Alternative D is the primary reason that this alternative has the second-lowest number of projected wells.

Under this alternative, geophysical operations would not be allowed in areas closed to leasing. Geophysical operations would be allowed in areas managed as NSO under the following conditions:

- No new road construction or road improvements

- No staging areas

- Full reclamation of all surface disturbance

- No geophysical operations in crucial pronghorn habitat from May 15 through June 15

These restrictions on geophysical operations could increase economic costs for operators and could delay some development activities.

Under this alternative, restrictions on surface-disturbing activities within habitat for threatened, endangered, and sensitive species would limit oil and gas development. These restrictions are described in more detail in Section 4.11.

This alternative would require implementation of BMPs that minimize the potential resource impacts associated with oil and gas development (see Appendix C for a list of BMPs by resource). These BMPs could increase the economic costs associated with oil and gas development and could delay some oil and gas development activities.

1    **4.16  SPECIAL DESIGNATIONS**

2    **4.16.1    Areas of Critical Environmental Concern**

3    This section presents potential impacts to areas of critical environmental concern from implementing
4    management actions presented in Chapter 2. Existing conditions concerning ACECs are described in
5    Chapter 3.

6    *4.16.1.1    Assumptions*

7    • The analysis of effects on ACECs from the implementation of management actions is limited to
8        the protection of relevant and important values and the prevention of damage to them.

9    *4.16.1.2    Dry Lake Archaeological District Area of Critical Environmental Concern*

10   **Impacts from Alternative A**

11   Applying an NSO stipulation to mineral leasing in the Dry Lake Archaeological District ACEC would
12   prevent surface disturbance from mineral development, which would protect cultural resources, prevent
13   erosion and runoff from development activities, and protect the relevant and important values of the
14   ACEC. However, under Alternative A, an exception would be allowed in circumstances in which there is
15   no other economic and technically feasible access to the fluid mineral resources of the area. The required
16   block cultural survey and treatment plan would lay out mitigation measures to prevent adverse effects to
17   historic properties depending on the site type. However, the treatment plan would not prevent surface
18   disturbance or visual intrusions in the ACEC. The introduction of visual, atmospheric, or audible
19   elements could diminish the integrity of the cultural landscape and result in adverse effects to the relevant
20   and important values of the ACEC.

21   Table 4-40 shows the acreage of mineral leasing categories for the Dry Lake Archaeological District
22   ACEC for each alternative.

23   **Table 4-40. ACECs by Mineral Leasing Category**

| Oil and Gas Leasing Categories | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| **Dry Lake Archaeological District ACEC** | | | | |
| Open and CSU/TL | 0 | 0 | 0 | 0 |
| NSO | 18,009 | 14,212 | 18,009 | 16,802 |
| Closed | 0 | 3,797 | 0 | 1,207 |
| **Tidwell Draw ACEC** | | | | |
| Open | 0 | 0 | 0 | 0 |
| CSU/TL | 0 | 0 | 899 | 0 |
| NSO | 899 | 899 | 0 | 899 |
| Closed | 0 | 0 | 0 | 0 |
| **Big Flat Tops ACEC** | | | | |
| Open, CSU/TL, and NSO | 0 | 0 | 0 | 0 |
| Closed | 192 | 192 | 192 | 192 |

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the Dry Lake Archaeological District ACEC, and therefore there would be no impacts related to these decisions.

**Impacts from Alternatives B, C, and D**

Applying an NSO stipulation to mineral leasing in the Dry Lake Archaeological District ACEC would prevent surface disturbance from mineral development, which would protect cultural resources, prevent erosion and runoff from development activities, and protect the relevant and important values of the ACEC. There would be no exceptions to the NSO allocation under this alternative.

Under Alternatives B and D, approximately 3,797 acres and 1,207 acres, respectively, would be closed to oil and gas leasing to protect other resource values. Although this would not change the impacts from oil and gas leasing within the ACEC because both NSO stipulations and closed designations do not allow for surface disturbance, there would be indirect beneficial impacts to the Dry Lake Archaeological District ACEC from preventing surface disturbance outside the ACEC. This would protect portions of the viewshed from the ACEC and could protect the area's location, setting, or feeling; the setting that contributes to the overall integrity of a cultural resource site; or properties of traditional religious and cultural importance.

Applying lease notices for cultural resources under Alternatives B, C, and D to mitigate the potential impacts to traditional cultural properties through consultation and to protect high-potential sites would provide additional protections and therefore beneficial impacts to the ACEC through avoidance of sites and maintenance of the existing landscape. Alternatives B and D would add stipulations requiring a viewshed analysis to maintain and protect the viewshed and intrinsic values of the ACEC, whereas Alternatives A and C would have no such requirement. Alternative B would require a viewshed analysis for cultural sites that are eligible for the National Register of Historic Places, which would offer slightly greater protections than would Alternative D, which would require only a viewshed analysis for eligible sites when the location, setting, or feeling contribute to the overall integrity of a site or for properties of traditional religious and cultural importance to a Native American tribe.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the Dry Lake Archaeological District ACEC, and therefore there would be no impacts related to these decisions.

### 4.16.1.3    *Tidwell Draw (Uranium Mining Districts Area of Critical Environmental Concern)*

**Impacts from Alternatives A, B, and D**

Applying an NSO stipulation to mineral leasing in the Tidwell Draw ACEC would prevent surface disturbance from mineral development, which would protect historic resources, prevent erosion and runoff from development activities, and protect the relevant and important values of the ACEC. There would be no exceptions to the NSO allocation under these alternatives.

Table 4-40 shows the acreage of mineral leasing categories for the Tidwell Draw ACEC.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the Tidwell Draw ACEC, and therefore there would be no impacts related to these decisions.

**Impacts from Alternative C**

Applying a CSU stipulation to mineral leasing in the Tidwell Draw ACEC would allow for surface disturbance within the ACEC. However, no surface disturbance would be allowed that would adversely impact the physical evidence of past mining activities. Additionally, compensatory mitigation including restoration of historic sites, conducting oral histories, or developing interpretive materials may be required. Therefore, there would be no impacts to the relevant and important values of the ACEC.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the Tidwell Draw ACEC, and therefore there would be no impacts related to these decisions.

### 4.16.1.4     Big Flat Tops Area of Critical Environmental Concern

**Impacts Common to All Alternatives**

The Big Flat Tops ACEC would be closed to oil and gas leasing under all alternatives, which would preclude impacts to the relevant and important values of the ACEC from oil and gas development including surface disturbance, loss of vegetation, and introduction and spread of non-native, invasive species and noxious weeds into the relict vegetation community.

Table 4-40 shows the acreage of mineral leasing categories for the Big Flat Tops ACEC.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the Big Flat Tops ACEC, and therefore there would be no impacts related to these decisions.

## 4.16.2     Wild and Scenic Rivers

This section presents potential impacts to suitable WSRs from implementing management actions presented in Chapter 2. Existing conditions concerning suitable WSRs are described in Chapter 3.

### 4.16.2.1     Assumptions

- The analysis of effects on WSRs is limited to the protection of the outstandingly remarkable values (ORVs) and the prevention of damage to them.

- Existing suitable WSR designations would continue.

### 4.16.2.2     Impacts Common to All Alternatives

There would be no impacts to WSRs that are common to all alternatives.

### 4.16.2.3     Impacts from Alternative A

Applying an NSO stipulation to the suitable WSR segment along the Green River would prevent mineral development and the associated surface disturbance that could adversely impact vegetation, soils, and scenic values within the suitable WSR segment. Preventing surface disturbance could support the ORVs of this river segment.

Under Alternative A, areas beyond the protected WSR corridor would be open to oil and gas leasing subject to standard terms and conditions, and in some cases these areas could be visible from the river. Development of oil and gas in these areas would have an adverse impact on the scenery, which is an ORV of the WSR segment.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the suitable WSR segment along the Green River, and therefore there would be no impacts related to these decisions.

### 4.16.2.4    Impacts from Alternative C

Applying an NSO stipulation to the suitable WSR segment along the Green River would prevent mineral development and the associated surface disturbance that could adversely impact vegetation, soils, and scenic values within the suitable WSR segment. Preventing surface disturbance could support the ORVs of this river.

Under Alternative C, all lands within 1.0 mile of the Green River Labyrinth Canyon rim would be managed subject to NSO stipulations. This would have a beneficial impact by protecting the scenery within the viewshed of the river corridor, which is an ORV of the WSR segment.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the suitable WSR segment along the Green River, and therefore there would be no impacts related to these decisions.

### 4.16.2.5    Impacts from Alternatives B and D

Impacts to the suitable WSR segment would be similar to those described under Alternatives A and C, except that oil and gas leasing closures would add further protection to these suitable WSRs where scenery is an ORV. Closing the suitable WSR segment to mineral leasing would preclude drilling from adjacent lands to access the underlying federal mineral resources.

Under Alternatives B and D, all lands within 1.0 mile of the Green River Labyrinth Canyon rim along the suitable WSR segment would be closed to oil and gas leasing and development. This would have a beneficial impact by protecting the scenery within the viewshed of the river corridor, which is an ORV of the WSR segment.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the suitable WSR segment along the Green River, and therefore there would be no impacts related to these decisions.

## 4.16.3    National Historic Trails

### 4.16.3.1    Old Spanish National Historic Trail

This section presents potential impacts to the Old Spanish National Historic Trail (OST) from implementing management actions presented in Chapter 2. Existing conditions concerning the OST are described in Chapter 3.

**Assumptions**

- Under all alternatives, the OST would be managed to safeguard the nature and purposes of the trail. This would minimize adverse impacts to the resources, qualities, values, associated settings, and primary use or uses of the trail.
- Under all alternatives, proposed management would not substantially interfere with or be incompatible with the nature and purposes of the OST.
- A majority of the OST within the planning area is leased and could be subject to oil and gas development according to the terms and conditions of the existing leases.

### 4.16.3.2    Impacts from Alternative A

Under Alternative A, a CSU stipulation would be applied along the OST corridor that would require cultural resources inventories for all federal undertakings. Inventories could be waived if there is extensive previous natural ground disturbance, existing cultural resources inventories indicating no previous human occupation and/or natural resources conditions that make the area unfavorable to the presence of cultural resources. Impacts to cultural resources would be unlikely under this alternative due to the requirements related to the Class III inventories; however, the natural condition of the trail including the scenic integrity could be altered because there could be new surface disturbance and infrastructure present in and along the trail. This would result in adverse impacts to the scenic integrity of the trail.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the OST, and therefore there would be no impacts related to these decisions.

### 4.16.3.3    Impacts from Alternative B

Under Alternative B, an NSO stipulation would be applied within 3.0 miles of the OST in the planning area. This stipulation would apply to the congressionally designated route and to any draft refinements of this route. There would be no exceptions, waivers, or modifications to the NSO stipulation.

Applying an NSO stipulation along the congressionally designated route and to any draft refinements of this route would preserve the historic and scenic integrity and natural condition of the trail in its entirety, including the viewshed. When compared to the area protected by Alternatives A, C, and D, the area protected by Alternative B would be greater. The NSO stipulation would apply to a 3.0-mile-wide buffer on both sides of the entire OST in the planning area for a total area of 31,102 acres.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the OST, and therefore there would be no impacts related to these decisions.

### 4.16.3.4    Impacts from Alternative C

Under Alternative C, a CSU stipulation would be applied to high-potential sites and segments along the congressionally designated OST and to any draft refinements of this route to reduce and potentially eliminate the impacts to the historical integrity of the trail. The stipulation to maintain the current setting within 2.0 miles of the trail (an area covering 22,317 acres) may require modifications to the surface use plan of operations to protect the OST resources, qualities, values, and associated settings, and would preserve the historic and scenic integrity and natural condition of the trail in its entirety, including the viewshed within those 2.0 miles. There would be no exceptions or modifications to the stipulations allowed under this alternative. A waiver of this stipulation would be allowed if it is determined that the OST does not exist within the lease area.

However, outside of the 2.0 miles there could be impacts to the scenic integrity and natural condition of the trail if development were to occur within the viewshed of the trail. The protections to the scenic integrity of the OST would be greater under Alternative C than they would be under Alternative A but less so than under Alternatives B and D.

**Suspended and Protested Lease Decisions**

There are no suspended or protested leases within the OST, and therefore there would be no impacts related to these decisions.

1 ### 4.16.3.5    Impacts from Alternative D

2 Under Alternative D, an NSO stipulation would be applied within 1.0 mile (11,452 acres) of the OST within the
3 planning area. This stipulation would apply to the congressionally designated route and to any draft refinements of
4 this route. The stipulation could be waived if the OST does not exist in the lease area. Applying an NSO stipulation
5 along the congressionally designated route and to any draft refinements of this route would preserve the historic
6 integrity and natural condition of the trail in its entirety, including its viewshed.

7 CSU stipulations would be applied within 1 to 3 miles of the OST. The CSU stipulations would require that visual
8 resource contrast ratings, including visual simulations, be completed if the area falls within the viewshed of the trail.
9 Assessing the visual contrasts and simulating the impacts would allow for targeted mitigations, thereby reducing the
10 visual impacts of a proposed action. The protections to the scenic integrity under Alternative D would be greater
11 than those under Alternatives A and C but not as great as the protections under Alternative B.

12 ## Suspended and Protested Lease Decisions

13 There are no suspended or protested leases within the OST, and therefore there would be no impacts
14 related to these decisions.

15 ## 4.17  SOCIOECONOMICS

16 [Information to be provided by the BLM for inclusion in the public draft EA.]

17 ## 4.18  HEALTH AND SAFETY

18 This section presents the potential impacts to health and safety from implementing management actions
19 presented in Chapter 2. Existing conditions concerning health and safety are described in Chapter 3.

20 ### 4.18.1    Assumptions

21 • The risk of health and safety impacts is proportional to the level of oil and gas activity in the
22 planning area.

23 • The only occupied structures on BLM-administered lands in the planning area are temporary,
24 secondary living quarters (i.e., trailers) in support of livestock grazing.

25 ### 4.18.2    Impacts from Alternative A (No Action)

26 Under Alternative A, BLM estimates that 28 oil and gas wells would be drilled in the planning area over
27 the next 15 years. Compared to the other alternatives considered in the MLP/EA, Alternative A is
28 estimated to result in the highest number of oil and gas wells drilled over the next 15 years. Therefore, it
29 is assumed that Alternative A would also result in the greatest use of oil and gas exploration, drilling, and
30 extraction equipment and the highest number of vehicle trips needed for well drilling,
31 completion, operation, and maintenance. For the purposes of this analysis, BLM assumes that the
32 potential risk to health and safety is proportional to the level of oil and gas activity. Therefore, Alternative
33 A would have the highest potential for risk to health and safety among the alternatives considered in the
34 MLP/EA.

35 Because there are no permanent structures on the BLM-administered public lands in the planning area,
36 there would be no anticipated oil and gas development near occupied structures on BLM-administered
37 lands under Alternative A. Health and safety impacts that could occur under Alternative A include a risk
38 of potential injuries to workers from accidents that might occur during oil and gas exploration, well
39 drilling, well stimulation and completion, operation of facilities, and reclamation activities. These
40 accidents may involve explosions, presence of hazardous vapors or chemicals, pinch points on equipment
41 and vehicles, or other industrial accidents. Increased traffic associated with the development and

1  operation of oil and gas facilities would pose a risk for vehicular accidents for both oil and gas workers
2  and the general public visiting and traveling on BLM-administered public lands. Other impacts to health
3  and safety could include spills or the presence of hazardous materials produced by or used in drilling for
4  oil and gas. Hazardous materials that could be produced by oil and gas wells include produced oil, gas,
5  and water, as well as chemicals such as hydrogen sulfide.

6  As described in Section 3.18, health and human safety on BLM-administered public lands is a
7  management priority for the BLM. The potential for impacts to health and safety would be managed in
8  compliance with applicable federal and state laws, regulations, and policies, such as the Occupational
9  Safety and Health Act of 1970, as amended (29 USC 651 et seq.).

### 4.18.2.1    *Suspended and Protested Lease Decisions*

11  Under Alternative A, 45,043 acres of the suspended and protested leases would be issued subject to
12  standard terms and conditions, and 113 acres of protested leases would be issued subject to NSO
13  stipulations. If the leases were subsequently developed, the possible impacts to health and safety would be
14  the same as those described above for Alternative A. The impacts to health and safety from issuing the
15  leases subject to the terms and conditions contained within the Price and Richfield ROD/RMPs
16  (Alternative A-2) would be the same as the impacts from rescinding the suspensions on the suspended
17  leases (Alternative A-1).

### 4.18.3    Impacts from Alternative B

19  Under Alternative B, BLM estimates that seven oil and gas wells would be drilled in the planning area
20  over the next 15 years. Compared to the other alternatives considered in the MLP/EA, Alternative B is
21  estimated to result in the fewest oil and gas wells drilled over the next 15 years. Therefore, it is assumed
22  that Alternative B would also result in the lowest use of oil and gas exploration, drilling, and extraction
23  equipment and the lowest number of employees and vehicle trips needed for well drilling, completion,
24  operation, and maintenance. For the purposes of this analysis, BLM assumes that the potential risk to
25  health and safety is proportional to the level of oil and gas activity. Therefore, Alternative B would have
26  the lowest potential for risk to health and safety among the alternatives considered in the MLP/EA.

27  Because there are no permanent structures on BLM-administered public lands in the planning area, there
28  would be no anticipated oil and gas development near occupied structures on BLM-administered lands
29  under Alternative B. The types of health and safety impacts that could occur under Alternative B would
30  be the same as those described under Alternative A.

31  As described in Section 3.18, health and human safety on BLM-administered public lands is a
32  management priority for BLM. The potential for impacts to health and safety would be managed in
33  compliance with applicable federal and state laws, regulations, and policies, such as the Occupational
34  Safety and Health Act of 1970, as amended (29 USC 651 et seq.).

### 4.18.3.1    *Suspended and Protested Lease Decisions*

36  Under Alternative B, BLM would cancel all suspended leases and resolve the protests on the protested
37  leases and deny the leases. The existing health and safety conditions in the areas of suspended and
38  protested leases would not be affected by oil and gas activities resulting from operators exploring for and
39  developing oil and gas resources.

### 4.18.4    Impacts from Alternative C

41  Under Alternative C, BLM estimates that 27 oil and gas wells would be drilled in the planning area over
42  the next 15 years. Alternative C is estimated to result in only slightly fewer oil and gas wells drilled in the
43  planning area over the next 15 years compared to Alternative A, and more wells than Alternatives B and

D. Therefore, it is assumed that Alternative C would also have the second highest use of oil and gas exploration, drilling, and extraction equipment and the second highest number of employees and vehicle trips needed for well drilling, completion, operation, and maintenance. For the purposes of this analysis, BLM assumes that the potential risk to health and safety is proportional to the level of oil and gas activity. Therefore, Alternative C would have the second highest risk to health and safety among the alternatives considered in the MLP/EA.

Because there are no permanent structures on BLM-administered public lands in the planning area, there would be no anticipated oil and gas development near occupied structures on BLM-administered lands under Alternative C. The types of health and safety impacts that could occur under Alternative C would be the same as those described under Alternative A.

As described in Section 3.18, health and human safety on BLM-administered public lands is a management priority for BLM. The potential for impacts to health and safety would be managed in compliance with applicable federal and state laws, regulations, and policies, such as the Occupational Safety and Health Act of 1970, as amended (29 USC 651 et seq.).

### 4.18.4.1     *Suspended and Protested Lease Decisions*

Under Alternative C, 5,073 acres of the suspended and protested leases would be issued subject to standard terms, 39,766 acres would be issued subject to CSU or TL stipulations, and 318 acres would be issued subject to NSO stipulations. If the leases were subsequently developed, the possible impacts to health and safety would be the same as those described above for Alternative A.

## 4.18.5     Impacts from Alternative D

Under Alternative D, BLM estimates that 23 oil and gas wells would be drilled in the planning area over the next 15 years. Alternative D is estimated to result in slightly fewer oil and gas wells drilled in the planning area over the next 15 years compared to Alternatives A or C, and more wells than Alternative B. Therefore, it is assumed that Alternative D would also have the third highest use of oil and gas exploration, drilling, and extraction equipment and the third highest number of employees and vehicle trips needed for well drilling, completion, operation, and maintenance. For the purposes of this analysis, BLM assumes that the potential risk to health and safety is proportional to the level of oil and gas activity. Therefore, Alternative D would have the third highest risk to health and safety among the alternatives considered in the MLP/EA.

Because there are no permanent structures on BLM-administered public lands in the planning area, there would be no anticipated oil and gas development near occupied structures on BLM-administered lands under Alternative D. The types of health and safety impacts that could occur under Alternative D would be the same as those described under Alternative A.

As described in Section 3.18, health and human safety on BLM-administered public lands is a management priority for BLM. The potential for impacts to health and safety would be managed in compliance with applicable federal and state laws, regulations, and policies, such as the Occupational Safety and Health Act of 1970, as amended (29 USC 651 et seq.).

### 4.18.5.1     *Suspended and Protested Lease Decisions*

Under Alternative D, 42,025 acres of the suspended and protested leases would be issued subject to CSU or TL stipulations, and 3,132 acres would be issued subject to NSO stipulations. If the leases were subsequently developed, the possible impacts to health and safety would be the same as those described above for Alternative A.

1  **4.19  CUMULATIVE IMPACTS**

2  This section defines cumulative impacts, describes the methodology used for assessing these impacts,
3  describes projects and activities considered in this assessment, and presents the results organized by
4  resource topic.

5  The CEQ regulations for implementing NEPA define *cumulative impacts* as "The impacts on the
6  environment which result from the incremental impact of the action when added to other past, present,
7  and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person
8  undertakes such other actions. Cumulative impacts can result from individually minor but collectively
9  significant actions taking place over a period of time" (40 CFR 1508.7).

10  The full effect of any single action cannot be determined by considering that action in isolation; rather, it
11  must be determined by considering the likely result of that action in conjunction with many others. The
12  cumulative impact analysis for the MLP/EA evaluates the potential impacts associated with the
13  management alternatives in combination with the potential impacts associated with other relevant
14  activities that have occurred, are occurring, or are likely to occur within the area of analysis.

15  **4.19.1  Impact Assessment Methodology**

16  BLM planning-level decisions are programmatic decisions that allocate resources or specify allowable
17  uses in all or portions of the planning area to emphasize certain management direction. As a result, the
18  cumulative impact analysis is also broad and general in nature. The analysis presents ranges and
19  qualitative conclusions as opposed to bounded quantified details. More detailed cumulative impacts
20  analyses will be considered in subsequent NEPA documents that analyze specific projects or programs
21  based on the information available at the time those analyses are prepared.

22  An analysis and a description of the identifiable effects of past actions are required to the extent they are
23  relevant and useful in analyzing whether the reasonably foreseeable effects of the alternatives may have a
24  continuing, additive, and significant relationship to those present effects. Based on scoping, agencies have
25  discretion in determining what information is useful concerning the effects of past actions for the
26  agency's analysis of the effects of the present action and alternatives. Effects of past actions and activities
27  on resources are manifested in the current condition of the resource, which is described in Chapter 3
28  (Affected Environment) for resources on BLM-administered public lands in the planning area. Specific
29  information presented in Chapter 3 is not repeated here.

30  CEQ guidance directs the cumulative impact analysis to focus on important issues of national, regional, or
31  local significance. The analysis presented here focuses on alternative mineral leasing and development
32  decisions in conjunction with other past, present, and reasonably foreseeable actions. Not all issues
33  identified for direct or indirect impact assessment in the MLP/EA are analyzed for cumulative effects.
34  Because of the wide geographic scope of a cumulative impact assessment and the variety of activities
35  assessed, cumulative impacts are commonly examined at a more qualitative and less-detailed level than
36  are direct and indirect impacts.

37  Public documents prepared by federal, state, and local government agencies are the primary sources of
38  information regarding past, present, and reasonably foreseeable actions considered in the cumulative
39  effects analysis. Actions undertaken by private persons and entities are assumed to be captured in the
40  information made available by such agencies. Speculative or uncommitted projects are not included in the
41  projections. These projections are not planning decisions, and using them in this analysis does not
42  constitute approval by the BLM or any authorizing agency. Furthermore, these projections do not set a
43  limit or cap on future BLM actions. Unforeseen changes in such factors as economics, public demand,
44  and federal, state, and local laws and policies could result in different outcomes than those projected for
45  this analysis.

Potential cumulative impacts are described for each affected resource within a defined cumulative impact analysis area (CIAA), which is also described in Chapter 3 as the analysis area for each resource. The CIAA covers different geographic areas depending on the specific resource being evaluated. CIAAs that extend beyond the planning area are largely for resources that are mobile or that migrate, compared to resources that are stationary. For example, the air quality CIAA is large because it is based on the complex interaction between climatic factors, terrain, and the potential for significant impacts to occur in sensitive areas within the airshed. Smaller CIAAs were established for resources that are stationary such as cultural resources or minerals. In some cases, these CIAAs might be the same as the planning area boundary. Activities and development that occur within or outside the CIAAs have the potential to create cumulative impacts on the specific resource being analyzed.

The BLM considered the following factors in this cumulative impact assessment:

- Federal, non-federal, and private actions

- The potential for effects to cross political and administrative boundaries

- Other spatial and temporal characteristics of each affected resource

- The comparative scale of cumulative impacts across alternatives

- Scoping comments.

Temporal and spatial boundaries used in the cumulative analysis are developed on the basis of resources of concern and actions that might contribute to an impact. The baseline year for the cumulative impacts analysis is 2017. The reasonably foreseeable actions used in this analysis are projected using a 15-year planning horizon.

## 4.19.2 Projects and Activities Considered

The following current and reasonably foreseeable future activities were identified as having the greatest likelihood to generate potential cumulative impacts when added to activities associated with the alternatives for the MLP/EA:

Oil and gas

- Actions described in the RFD for oil and gas (see Appendix A).

Recreation

- Continued maintenance and use of the Horseshoe Canyon Trailhead (Richfield Field Office)

- Continued issuance and some increase in BLM Special Recreation Permits and recreationists traveling through the Richfield Field Office portion of the MLP/EA planning area to other destinations. However, the Richfield Field Office ROD/RMP decisions for the Dirty Devil/Robbers Roost SRMA limit the size and number of groups in the area, which will limit opportunities for increased BLM Special Recreation Permits groups, especially in the spring and fall (Richfield Field Office).

- Continued issuance of BLM Special Recreation Permits for Labyrinth Canyon river trips (Price Field Office)

Travel management

- The Richfield Field Office will be reanalyzing portions of the TMP approved in conjunction with the 2008 Richfield Field Office ROD/RMP. The updated TMP for the Henry Mountains Travel Management Area will include the Richfield Field Office portions of the MLP/EA planning area. It is anticipated that this TMP effort will be started during FY 2017 (Richfield Field Office).

- Development of the San Rafael Desert TMP (Price Field Office)

Livestock grazing

- Grazing permittees in the Sweetwater, Pasture Canyon, and Jeffery Well Allotments continue to look for opportunities to develop water through wells and pipelines to allow for better livestock distribution and reduce the need to haul water. Preliminary discussions have occurred regarding a pipeline extension from Texas Hill south and regarding wells within Pasture Canyon and Jeffery Well Allotments (Richfield Field Office).

- Development of the Texas Corp Well 1 (Price Field Office)

- Development of the Dugout Allotment boundary fence (Price Field Office)

Paleontological resources

- Development of additional parking and interpretation infrastructure at Fossil Point (Price Field Office)

Fish and wildlife

- Continued implementation of the San Rafael River Restoration Project (Price Field Office)

Lands and realty

- Issuance of the Gillies Ranch Road right-of-way (Price Field Office)

- Issuance of a right-of-way for the Emery Telcom Fiber Optic Line along State Route 24 (Price Field Office)

Activities and development that occur within the CIAAs have the potential to create cumulative impacts on the specific resource being analyzed. Anticipated oil and gas projects within the planning area are encompassed by the oil and gas RFD for the planning area. The projects listed above are not presented as an exhaustive list of actions; however, every effort has been made to present a representative list of actions that could contribute to cumulative impacts. Past decisions and management that continue to affect cumulative impacts are described in Chapter 3.

## 4.19.3    Cumulative Impacts by Resource

### 4.19.3.1    *Air Quality*

The CIAA used to analyze cumulative impacts to air quality is the planning area, which encompasses approximately 525,000 acres of land, along with the states of Utah, Colorado, Arizona, and New Mexico. These states, which share regional air quality issues with the planning area, are included in the analysis area for the consideration of cumulative impacts.

Past and present actions that have affected and would likely continue to affect air quality in the planning area include surface disturbance resulting from oil and gas development and associated infrastructure, geophysical exploration, ranching and livestock grazing, range improvements, recreation (including OHV use), authorization of ROWs for utilities and other uses, and road development. Past and present actions in Utah, Colorado, Arizona, and New Mexico that have affected and would likely continue to affect air quality in the CIAA are too numerous to list here but would include the development of power plants; the development of energy sources such as oil, gas, and coal; the development of highways and roads; and the development of various industries that emit pollutants. The reasonably foreseeable future activities listed in Section 4.19.2, especially oil and gas development, could also result in impacts to air quality. These types of actions and activities can reduce air quality through emissions of criteria pollutants (including fugitive dust), VOCs, and HAPs, as well as contribute to deposition impacts and to a reduction in visibility.

1   As discussed in Section 3.2.2.1, $O_3$ and PM are of particular concern in the southwestern United States.
2   Section 4.2.3.3 summarizes key points from a regional $O_3$ analysis conducted for the Moab MLP. In
3   particular, meteorological conditions can play a major role in source contributions to monitored or
4   modeled values: predominant winds can transport $O_3$ across the region. In addition, for $O_3$, sources
5   outside the region can contribute to high $O_3$ concentrations. Finally, oil and gas emissions account for a
6   small amount of regional $O_3$ source category emissions (BLM 2015). With regard to PM, the Moab MLP
7   concludes that regional ambient $PM_{2.5}$ concentrations are likely well below the NAAQS, based on
8   IMPROVE monitoring at Canyonlands National Park, the lack of large emission sources, and the
9   dispersed population. However, it was noted that little monitoring data exist to validate this conclusion
10  and that $PM_{2.5}$ can contribute to regional haze and visibility degradation in Class I areas at lower ambient
11  concentrations than the NAAQS (BLM 2015).

12  The Moab MLP also examines the state contribution to light extinction as a way to evaluate contributions
13  to visibility from the Moab MLP planning area. Arizona is the dominant source of visibility-reducing
14  components (over 21%), followed by Utah (less than 2%), New Mexico (approximately 1%), then
15  Colorado (less than 0.5%) (BLM 2015). From a regional perspective, Utah's contribution to light
16  extinction is relatively small.

17  Oil and gas leasing and development would continue in the planning area under all alternatives, and the
18  projected development and associated surface-disturbing activities would result in impacts to air quality.
19  However, these impacts would be limited through the use of NSO stipulations, CSU and/or TL
20  stipulations, and the closure of areas to oil and gas development. Under Alternative A, 92.5% of the
21  planning area would be open to oil and gas development subject to standard lease terms and conditions or
22  open to oil and gas development with CSU and/or TL stipulations (7.5% would have an NSO stipulation
23  or be closed to leasing). Under Alternative B, 21.7% of the planning area would be open to oil and gas
24  development subject to standard lease terms and conditions or open to oil and gas development with CSU
25  and/or TL stipulations. Alternative C would result in 88.4% of the planning area as open to oil and gas
26  development subject to standard lease terms and conditions or open to oil and gas development with CSU
27  and/or TL stipulations. Alternative D would result in 75.1% of the planning area as open to oil and gas
28  development subject to standard lease terms and conditions or open to oil and gas leasing with CSU
29  and/or TL stipulations. Based on these percentages, Alternative B would have the lowest cumulative
30  impact to air quality, followed by Alternatives D and C. However, based on the air quality analysis in
31  Section 4.2, none of the alternatives are expected to have noticeable cumulative impacts to air quality at
32  the regional level.

33  ### 4.19.3.2    Climate Change

34  Because climate change and global warming are global phenomena, the direct and indirect effects
35  analysis for climate change in Section 4.3 (including GHG emissions from the projected oil and gas
36  development) is also an analysis of the projected development's cumulative effects for the purposes of
37  this NEPA document. Consistent with 2016 CEQ guidance, the BLM has determined that this analysis
38  "will adequately address the cumulative impacts for climate change from the proposed action and its
39  alternatives and a separate cumulative effects analysis for GHG emissions is not needed" (CEQ 2016).

40  ### 4.19.3.3    Soils

41  The CIAA used to analyze cumulative impacts to soil resources is the subwatersheds (HUC 12) crossed
42  by the planning area (Map 3-1). The CIAA covers approximately 901,313 acres and was selected because
43  it represents a natural boundary within which changes to soils within the planning area could affect soils,
44  water, vegetation, or other resources on BLM-administered public lands.

45  Past and present actions that have affected and will continue to affect soils in the CIAA include surface
46  disturbance as a result of oil and gas development and associated infrastructure, geophysical exploration,

1  livestock grazing, range improvements, OHV use, authorization of rights-of-way, and recreation. These
2  activities could result in short-term and long-term impacts to soils by contributing to reduced soil
3  productivity, soil compaction, loss of biological soil crusts, soil erosion, and surface runoff. Development
4  activities would also increase the potential for fugitive dust, which could contribute to regional dust-on-
5  snow issues and associated earlier and faster snowmelt events and reduced water yield to the Colorado
6  River and its tributaries. These changes, along with ongoing landscape-scale phenomena including
7  climate change and drought, would lead to a loss of soil productivity and increase in soil erosion and soil
8  loss in the CIAA over time.

9  Oil and gas development and associated infrastructure are anticipated to cause the greatest amount of
10  reasonably foreseeable future surface disturbance and impacts to soils in the planning area through
11  construction of well pads, roads, pipelines, and other infrastructure. The impacts would likely be greater
12  where mineral development is more intense, in areas where development overlaps sensitive soils (e.g.,
13  sandy wind erodible soils, steep slopes, or saline soils), and on state and private lands where relatively
14  less protections are afforded to natural resources. Increased mineral development could lead to an
15  increase in the potential for reduced soil productivity and soil erosion.

16  Under all alternatives in the MLP/EA, the projected oil and gas development would result in surface
17  disturbance, which would contribute to the cumulative impacts to soils. The alternatives that would be
18  anticipated to result in more disturbance associated with oil and gas development would have a larger
19  contribution to the cumulative impacts to soils. Alternative A is anticipated to result in the most surface
20  disturbance associated with oil and gas development, followed in descending order by Alternatives C, D,
21  and B. The application of updated state-of-the-art BMPs to site-specific projects and requirements for
22  reclamation and interim reclamation and protection of biological soil crusts under Alternatives B, C, and
23  D would help minimize and reduce over time the relative contribution of impacts from oil and gas
24  development to the total impact to soils in the CIAA.

### 4.19.3.4    Water Resources

26  The CIAA used to analyze cumulative impacts on water and riparian resources is the subwatersheds
27  (HUC 12) crossed by the planning area (Map 3-1). The CIAA covers approximately 901,313 acres and
28  was selected because it represents a natural boundary within which changes to water resources in the
29  planning area could affect water quality, riparian habitats, wildlife, or other resources on BLM-
30  administered public lands.

31  Past and present actions that have affected and will continue to affect water and riparian areas in the
32  CIAA include surface disturbance as a result of oil and gas development and associated infrastructure,
33  geophysical exploration, agriculture, livestock grazing, range improvements, OHV use, authorization of
34  rights-of-way, and recreation. These activities could result in short-term and long-term impacts on water
35  and riparian areas by contributing to loss of vegetation and biological soil crusts, soil erosion, surface
36  runoff, and by introducing sediment and pollutants into waterways. These changes, along with ongoing
37  landscape-scale phenomena including climate change and drought, would lead to an increase in soil
38  erosion and reduction in water quality in the CIAA over time.

39  Oil and gas development and associated infrastructure are anticipated to cause the greatest amount of
40  reasonably foreseeable future surface disturbance and impacts to water and riparian resources in the
41  planning area through construction of well pads, roads, pipelines, and other infrastructure. The impacts
42  would likely be greater where mineral development is more intense, in areas where development overlaps
43  sensitive soils (e.g., sandy wind erodible soils, steep slopes, or saline soils), where development crosses
44  ephemeral drainages or occurs near impaired waters, and on state and private lands where relatively fewer
45  protections are afforded to natural resources. Increased mineral development could lead to an increase in
46  the potential for soil erosion and decreased water quality.

1   Under all alternatives, the projected oil and gas development would result in surface disturbance, which
2   would contribute to the cumulative impacts on surface water, groundwater, and riparian areas. The
3   alternatives that would be anticipated to result in more oil and gas wells and more disturbance associated
4   with oil and gas development would have a larger contribution to the cumulative impacts on water.
5   Alternative A is anticipated to result in the most wells and surface disturbance associated with oil and gas
6   development, followed in descending order by Alternatives C, D, and B. The application of updated state-
7   of-the-art BMPs to site-specific projects and requirements for reclamation and interim reclamation,
8   protection of groundwater, and minimizing disturbance at stream and ephemeral drainage crossings under
9   Alternatives B, C, and D would help minimize and reduce over time the relative contribution of impacts
10  from oil and gas development to the total impact on water and riparian resources in the CIAA.

11  ### 4.19.3.5    Vegetation

12  The CIAA used to analyze cumulative impacts to vegetation resources is the subwatersheds (HUC 12)
13  crossed by the planning area (Map 3-1). The CIAA covers approximately 901,313 acres and was selected
14  because it represents a natural boundary within which changes in vegetation within the planning area
15  could affect soil, water, other vegetation, or other resources on BLM-administered public lands.

16  Past and present actions that have affected and will continue to affect vegetation in the CIAA include
17  surface disturbance resulting from oil and gas development and associated infrastructure, geophysical
18  exploration, livestock grazing, range improvements, OHV use, authorization of ROWs, and recreation.
19  These activities could result in short-term and long-term damage or removal of vegetation, soil
20  compaction, soil erosion, and surface runoff. Development activities would also modify the composition
21  and structure of vegetation communities and increase the potential for introduction or spread of invasive,
22  non-native plant species and noxious weeds, especially in disturbed areas and along travel corridors. These
23  changes, along with ongoing landscape-scale phenomena including climate change and drought, would
24  lead to an increased distribution of altered and degraded vegetation communities in the CIAA over time.

25  Oil and gas development and associated infrastructure are anticipated to cause the greatest amount of
26  surface disturbance and impacts to vegetation through construction of well pads, roads, pipelines, and
27  other infrastructure. The impacts would likely be greater where mineral development is more intense, in
28  areas where development overlaps with more sensitive or more difficult to reestablish vegetation (e.g.,
29  sandy soils in desert vegetation communities), and on state and private lands where relatively fewer
30  protections are afforded to natural resources. Increased mineral development could lead to an increase in
31  the potential for vegetation loss and the introduction of invasive, non-native plant species.

32  Under all alternatives in the MLP/EA, the projected oil and gas development and associated surface-
33  disturbing activities would result in vegetation loss, which would contribute to the cumulative impacts for
34  vegetation. The alternatives that would be anticipated to result in more disturbance associated with oil and
35  gas development would have a larger contribution to the cumulative impacts to vegetation. Alternative A
36  is anticipated to result in the most surface disturbance associated with oil and gas development, followed
37  in descending order by Alternatives C, D, and B. The application of updated, state-of-the-art BMPs to
38  site-specific projects and requirements for reclamation and interim reclamation and control of noxious
39  weeds under Alternatives B, C, and D would help minimize and reduce over time the relative contribution
40  of impacts from oil and gas development to the total impact on vegetation in the CIAA.

41  ### 4.19.3.6    Cultural Resources

42  The CIAA for cultural resources consists of the public lands within the MLP/EA planning area because
43  the projected development for the alternatives in the MLP/EA would not affect cultural resources outside
44  the planning area. Cumulative impacts to cultural resources within the CIAA can occur to the physical
45  remains of historic properties and can also impact the integrity of the visual setting where the property is
46  located. Current and future actions in the CIAA that are most likely to contribute to the cumulative

impacts to cultural resources and resources of religious or traditional importance to Native American tribes include oil and gas leasing and development and updates to the Richfield Field Office travel management plan. These actions are associated with surface-disturbing activities and increased human presence, which could affect cultural resources and cultural landscapes through loss and disturbance, changes in setting, and theft or vandalism.

On public lands, these actions would require adherence to cultural resource laws and regulations that would prevent or mitigate potential adverse impacts. However, the potential for cumulative impacts to cultural resources include state and private lands within the planning area, which are not afforded the same protection as on public lands.

The mineral development projected in the different alternatives for the MLP/EA would result in surface-disturbing activities, which could contribute to the cumulative impacts to cultural resources. The alternative with the highest amount of area precluded from mineral surface development (i.e., closed to leasing or managed with NSO stipulations) would have the least potential for contributing to cumulative impacts. Conversely, the alternative with the least amount of area precluded from mineral surface development would have the greatest potential for contributing to cumulative impacts. Therefore, Alternative B would contribute the least to cumulative impacts for cultural resources and Alternative A would contribute the most. Alternatives C and D would contribute an intermediate amount. The incremental contribution of the alternatives for the MLP/EA on the cumulative impacts to cultural resources is anticipated to be minimal because cultural resources are managed and protected on public lands in compliance with federal laws, regulations, and policies.

### 4.19.3.7    Paleontological Resources

The CIAA used to analyze cumulative impacts to paleontological resources is the 525,000-acre planning area. Surface-disturbing activities associated with oil and gas leasing and development resulting from the alternatives for the MLP/EA are not expected to affect paleontological resources outside the planning area.

Past, present, and reasonably foreseeable future actions that have contributed to the cumulative impacts for paleontological resources include cross-country OHV use, dispersed camping, mining, and oil and gas development. Ongoing, permitted activities such as oil and gas development could also inadvertently impact paleontological resources in areas where the potential for significant paleontological resources is high. Beyond authorized ground disturbance, cumulative impacts could occur from erosion, unauthorized collection, and vandalism. These cumulative impacts could result in the unmitigated loss of scientific information and could reduce the educational and interpretative potential of the resource.

For oil and gas development that results from the alternatives presented in the MLP/EA, adverse impacts to paleontological resources would be minimized through existing laws, regulations, lease stipulations, and BMPs within areas classified as PFYC 3, 4, and 5. Measures to identify resources in areas with high potential for paleontological resources would allow evaluation by paleontologists in areas that had not been previously studied, and fossils that would have otherwise been destroyed would be avoided or recovered and made available for study. Alternatives that provide the most constraints to oil and gas development and the associated surface-disturbing activities would contribute the least to the cumulative impacts to paleontological resources. Therefore, the incremental contribution to the cumulative impacts for paleontological resources would be the greatest under Alternative A followed in descending order by Alternatives C, D, and B.

### 4.19.3.8     Visual Resources, Night Skies

The CIAA used to analyze cumulative impacts to visual resources and night skies is the planning area and viewsheds from adjacent national parks. Surface-disturbing activities associated with oil and gas leasing and development resulting from the alternatives for the MLP/EA are not expected to affect visual resources and night skies outside of this CIAA.

Past, present, and reasonably foreseeable future actions and conditions within the CIAA that have affected and will likely continue to affect visual resources are mining, oil and gas development, road and trail construction, pipelines, transmission lines, and other structures. However, the CIAA is a relatively undeveloped landscape, with very few cultural modifications.

Oil and gas development presents the greatest potential future impacts to visual resources and night skies. Oil and gas development involves the construction of roads, well pads, pipelines, and facilities along with well drilling, production equipment, and vehicle traffic. Visual resources would be impacted because of the incremental increase in visual contrasts of line, form, color, and texture created by well pads, drill rigs, and other surface structures. Oil and gas development would also cause an incremental impact to night skies in the planning area as a result of artificial lighting and flaring that occur during nighttime operations.

All the alternatives for the MLP/EA include actions that would mitigate the visual impacts associated with oil and gas development. These actions include employing protections for VRI Class II areas and VRM Class II areas, using BMPs for visual resources, and precluding surface-disturbing activities around certain recreational areas. The objective for VRM Class II is that the oil and gas development activities cannot attract the attention of the casual observer from KOPs. Because of these provisions, the contribution of the alternatives in the MLP/EA to the cumulative impacts for visual resources would be minimized or substantially reduced. As discussed in Section 4.9, because of the level of oil and gas development proposed under each alternative, Alternative B would likely result in the least impact to visual resources, followed by Alternative D, Alternative C, and Alternative A. However, the bulk of the impacts to visual resources in the CIAA will result from other past and present activities. The alternatives would add incrementally to the cumulative impacts caused by these past and present activities, along with reasonably foreseeable future actions.

Artificial lighting used during night-time oil and gas development activities could have an adverse impact to night skies. Viewsheds of visually sensitive areas outside of the planning area may be affected by the use of artificial lighting during night-time oil and gas development activities. Alternatives A and C do not include any stipulations that specifically address potential impacts to night skies. Alternative D includes a stipulation that requires that a visual screen be used to minimize skyglow, glare, and adverse visual effects to night sky resources from open flaring. Alternative B applies a planning area–wide CSU stipulation that includes several measures aimed at mitigating impacts to night skies. Thus, Alternative B would likely result in the least impact to night skies, followed by Alternative D, and Alternatives A and C. However, the bulk of the impacts to night skies in the CIAA will result from other existing activities. The alternatives would add incrementally to the cumulative impacts caused by these existing activities, along with reasonably foreseeable future actions.

Climate change is an ongoing trend that may impact visual resources in the planning area by affecting precipitation and temperature patterns and resulting in changes to or loss of vegetation in the CIAA, as well as a potential increase in the incidences of wildfire in the CIAA. Changes to or loss of vegetation, as well as increased incidences of wildfire, would cause an increase in visual contrasts of line, form, color, and texture within the CIAA landscape.

### 4.19.3.9     Auditory Management (Soundscapes)

The CIAA used to analyze cumulative impacts to soundscapes consists of the planning area and adjacent lands that have noise-sensitive human receptors and that could be affected by decisions in the planning area. The adjacent lands are as follows:

- Portions of the Labyrinth Canyon and Dirty Devil/Robbers Roost SMRAs that are south and east of the planning area and above the rim of the Green River

- The Horseshoe Canyon unit of Canyonlands National Park

Past and present actions that have affected and would likely continue to affect soundscapes in the CIAA include surface disturbance resulting from oil and gas development and associated infrastructure, geophysical exploration, ranching and livestock grazing, range improvements, recreation (including OHV use), authorization of ROWs for utilities and other uses, and road development. These activities could result in short-term and long-term noise in different patterns (continuous, intermittent, or impulsive) that exceed background levels. The reasonably foreseeable future activities listed in Section 4.19.2 could also result in short-term and long-term noise in different patterns that exceed background levels.

Oil and gas development and associated infrastructure are anticipated to cause a larger amount of noise than most of the past, present, and future activities, through construction of well pads, roads, pipelines, and other infrastructure, and through operations and maintenance. The impacts would likely be greater where mineral development is more intense and in areas where development overlaps with noise-sensitive human receptors.

Under all alternatives, the projected oil and gas development and associated surface-disturbing activities would result in noise. Only unmitigated noise or noise that is partially mitigated would contribute to cumulative impacts from noise. Alternatives B and D would implement the same noise stipulation to reduce noise levels from operating wells to estimated background levels that exist in some portions of the analysis area, such as near dirt roads, near parking areas, or near livestock operations (44–50 dBA); however, noise levels would still exceed the 20-dBA background level present in more remote portions of the analysis area. Alternatives B and D would also implement a stipulation to protect the soundscape of Canyonlands National Park by ensuring that sound levels in the park are not impacted by noise from nearby oil and gas development. This stipulation would likely reduce noise near Canyonlands National Park to levels similar to 20 dBA, minimizing noise impacts in these areas. Under both alternatives, some areas with a 20-dBA background level could experience cumulative noise impacts.

Under Alternative A, there would be no lease stipulations or BMPs applied to protect soundscapes. Under Alternative C, noise levels would be mitigated to protect the soundscape of Canyonlands National Park by ensuring that sound levels in the park are not impacted by noise from nearby oil and gas development. Under Alternatives A and C, there would be more cumulative noise impacts in the CIAA than under Alternatives B and D. Alternative A is estimated to result in 28 wells and 541 acres of surface disturbance, and Alternative C is estimated to result in 27 wells and 517 acres of surface disturbance. Based on these projected numbers, Alternative A would have a slightly larger contribution to noise cumulative impacts in the CIAA than Alternative C.

### 4.19.3.10     Special Status Species

The CIAAs used to analyze cumulative impacts on special status species varies by species' habitats. For special status fish and wildlife species for which habitats have been delineated or modeled by the BLM or another regulatory agency, the CIAA is the extent of the habitats crossed by the planning area. For special status fish and wildlife species for which habitats have not been delineated, the CIAA is the subwatersheds (HUC 12) crossed by the planning area. For special status plants, the CIAA is the extent of identified habitats within the subwatersheds (HUC 12) crossed by the planning area. These CIAAs were selected because they represent the areas within which changes to special status species populations could be observed as a result of impacts on the soil, water, vegetation, or individuals of each species in the planning area.

Past and present actions that have affected and will continue to affect special status species and their habitats in the CIAAs include surface disturbance resulting from oil and gas development and associated infrastructure, geophysical exploration, ranching and livestock grazing, range improvements, OHV use, authorization of rights-of-way for utilities and other uses, road development, and recreation. These activities could result in short-term and long-term habitat loss, degradation, and fragmentation. Individuals could be displaced from otherwise suitable habitats because of human presence or other anthropogenic disturbance factors (e.g., traffic, noise, recreation, livestock grazing activities), especially during sensitive time periods such as winter, birthing, nesting, and early rearing of young. Loss of vegetation from development activities would remove cover and forage and would degrade habitat. Special status species populations are more sensitive to these types of impacts than are other wildlife and fish species because many of them rely on unique and rare habitat niches. Additionally, many of these species have experienced declines in population, health, and/or habitat resulting in their designation as a special status species. Over time, these impacts, along with ongoing landscape-scale phenomena including climate change and drought, could reduce the capability of habitats in the planning area to maintain current special status species populations.

Of the reasonably foreseeable future activities listed in Section 4.19.2, oil and gas development and associated infrastructure are anticipated to cause the greatest amount of surface disturbance and impacts to special status species and their habitats through construction of well pads, roads, pipelines, and other infrastructure. The impacts would likely be greater where mineral development is more intense and in areas where development overlaps with habitats that are limited (especially important for special status species survival) or difficult to reclaim. The degree of impact would depend on the timing of development activities and whether the amount of activity outpaces the successful reclamation and revegetation efforts in disturbed areas. As development occurs, displacement of special status species could result in increased competition for resources and stresses on special status species and other wildlife occupying undeveloped lands. Impacts may also be greater on state and private lands where relatively fewer protections are afforded to special status species habitats.

Under all alternatives, the projected oil and gas development and associated surface-disturbing activities would contribute to the incremental loss, degradation, and fragmentation of special status species habitats and impacts on special status species populations in the CIAAs. All of the alternatives considered in this EA have specific actions that would help avoid, minimize, and mitigate impacts on special status species and their habitats resulting from oil and gas development activities. These actions include CSU/TL and NSO stipulations; lease notices; and BMPs. Despite these stipulations and actions, the alternatives projected to result in more disturbance associated with oil and gas development would have a larger contribution to cumulative impacts on special status species. Under Alternative A, 92.5% of the planning area would be open to oil and gas development subject to standard lease terms and conditions or open to oil and gas development with CSU/TL stipulations, and 7.5% would have an NSO stipulation or be closed to leasing. Under Alternative B, 21.7% of the planning area would be open to oil and gas development subject to standard lease terms and conditions or open to oil and gas development with CSU/TL stipulations. Alternative C would result in 88.4% of the planning area being open to oil and gas development subject to standard lease terms and conditions or open to oil and gas development with CSU/TL stipulations. Alternative D would result in 75.1% of the planning area being open to oil and gas development subject to standard lease terms and conditions or open to oil and gas leasing with CSU/TL stipulations. Based on these percentages, Alternative B would have the smallest cumulative impact to special status species, followed by Alternatives D, C, and A.

The application of BMPs to site-specific projects and requirements for off-site mitigation for impacts on various habitats under Alternatives B, C, and D would help minimize and reduce over time the relative contribution of impacts from oil and gas development to the total impact on special status species and their habitats in the CIAAs for these alternatives.

### 4.19.3.11    Wildlife and Fisheries

The CIAA used to analyze cumulative impacts to wildlife and fisheries varies by species. For species for which habitats have been delineated by the UDWR, the CIAA is the extent of the habitats crossed by the MLP/EA planning area. For species for which habitats have not been delineated by UDWR, the CIAA is the subwatersheds (HUC 12) crossed by the planning area. The CIAAs were selected because they represent the areas within which changes to wildlife and fisheries populations could be observed as a result of impacts to the soil, water, vegetation, or individual animals or fish in the planning area.

Past and present actions that have affected and will continue to affect fish and wildlife and their habitats in the CIAA include surface disturbance resulting from oil and gas development and associated infrastructure, geophysical exploration, livestock grazing, range improvements, OHV use, authorization of rights-of-way, and recreation. Many of these activities could result in short-term and long-term habitat loss, degradation, and fragmentation, whereas others (e.g., livestock water developments) may benefit wildlife by providing water sources in areas where availability of water limits wildlife populations. Individuals could be displaced from otherwise suitable habitats because of human presence or other anthropogenic disturbance factors (e.g., traffic, noise, recreation, livestock grazing activities) during sensitive time periods such as winter, birthing, nesting, and early rearing of young. Loss of vegetation from development activities would remove cover and forage, degrade habitat, and could increase forage competition among grazing animals. Over time, these impacts, along with ongoing landscape-scale phenomena including climate change and drought, could reduce the capability of habitats in the planning area to maintain current fish and wildlife populations.

Oil and gas development and associated infrastructure are anticipated to cause the greatest amount of surface disturbance and impacts to fish and wildlife and their habitats through construction of well pads, roads, pipelines, and other infrastructure. The impacts would likely be greater where mineral development is more intense or in areas where development occurs in habitats that are limited, especially important for wildlife survival, or difficult to reclaim. The degree of impact would depend on the timing of development activities and whether the amount of activity outpaces the successful reclamation and revegetation efforts in disturbed areas. As development occurs, displacement of wildlife could result in increased competition for resources and stresses on wildlife occupying undeveloped lands. Impacts may also be greater on state and private lands where relatively fewer protections are afforded to fish and wildlife habitats.

Under all alternatives in the MLP/EA, the projected oil and gas development and associated surface-disturbing activities would contribute to the incremental loss, degradation, and fragmentation of fish and wildlife habitats and to impacts on fish and wildlife populations in the CIAA. The alternatives that would be anticipated to result in more disturbance associated with oil and gas development would have a larger contribution to the cumulative impacts to fish and wildlife. All of the alternatives considered in the MLP/EA have specific actions that would help avoid, minimize, and mitigate impacts to fish and wildlife and their habitats resulting from oil and gas development activities. These actions include TL, CSU, and NSO stipulations; mitigation actions; and BMPs for fish and wildlife.

Despite these stipulation and actions to help avoid, minimize, and mitigate impacts to fish and wildlife and their habitats, alternatives that would be anticipated to result in more disturbance associated with oil and gas development would have a greater contribution to the cumulative impacts to fish and wildlife and their habitats. Alternative A is anticipated to result in the most surface disturbance associated with oil and gas development, followed in descending order by Alternatives C, D, and B. Applying updated state-of-the-art BMPs to site-specific projects and requiring off-site mitigation for impacts to various habitats under Alternatives B, C, and D would help minimize and reduce over time the relative contribution of impacts from oil and gas development to the total impact on fish and wildlife and their habitats in the CIAA for these alternatives.

### 4.19.3.12    Lands with Wilderness Characteristics

The CIAA for LWC includes the planning area, LWC inventory units that extend outside the planning area, and other adjacent lands that the BLM manages for the preservation of wilderness character (i.e., WSAs).

Past, present, and reasonably foreseeable actions within the CIAA that have affected and will likely continue to affect wilderness characteristics in the planning area include oil and gas development, increasing recreational demands on public lands, OHV use, issuance of rights-of-way, and ongoing travel management planning for both the Price Field Office and Richfield Field Office. These activities could introduce sights, noises, and infrastructure in or adjacent to LWCs, which could impair the feeling of solitude and degrade naturalness. Increasing visitor use in the planning area will likely intensify use of BLM-administered lands, including natural areas and LWCs, potentially impacting wilderness characteristics by reducing opportunities for solitude. As part of the travel management process, the BLM may designate additional routes as closed and open to motor vehicles. Use of these designated travel routes by OHVs and other vehicles in LWCs would also introduce sights and noises that could impair the feeling of solitude and degrade naturalness. Any of these actions could also result in surface-disturbing activities that could affect the size of LWCs by reducing or eliminating portions of LWCs. Some units could be bisected or surface disturbance could result in the need to eliminate areas from the LWC unit through the creation of cherry stems. This could result in some areas, or entire LWC units, no longer meeting the minimum size criterion (5,000 acres).

Of all of the reasonably foreseeable future actions in the planning area, oil and gas exploration and development are anticipated to have the largest magnitude of road construction and surface disturbance and therefore the largest impact to wilderness characteristics in the planning area over the next 15 to 20 years.

Alternative A does not specifically manage oil and gas development to reduce impacts to LWCs. Under Alternative A, 89.8% of the LWCs in the planning area would be open to leasing subject to standard terms and conditions or open subject to CSU/TL stipulations. Under Alternative A, 10.2% of the LWCs would be open to leasing subject to NSO stipulations. Alternative A has the greatest potential to introduce sights, noises, and infrastructure in or adjacent to LWCs, which could impair the feeling of solitude and degrade naturalness. Over time, under Alternative A, oil and gas exploration and development could contribute to the loss of wilderness character in many areas where leasing and surface occupancy are permitted.

Alternative B would manage all LWCs in the planning area as open to leasing subject to NSO stipulations. Under Alternative B, 92.8% of the LWCs in the planning area would be open to leasing subject to NSO stipulations, and 7.2% of the LWCs would be closed to leasing. Alternative B would largely avoid impacts to LWCs from oil and gas development. Therefore, the greatest impacts to LWCs over the next 15 to 20 years under this alternative would come from other resource uses, such as recreation, OHV use, and travel management planning. These resource uses have the potential to introduce sights, noises, and infrastructure in or adjacent to LWCs, which could impair the feeling of solitude and degrade naturalness. However, the magnitude of cumulative impacts to LWCs under Alternative B would be much less than all other alternatives considered in the MLP/EA.

Alternative C would make some management decisions that would reduce impacts from oil and gas development on LWCs. Under Alternative C, 84.3% of the LWCs in the planning area would be open to leasing subject to standard terms and conditions or open subject to CSU/TL stipulations. Under Alternative C, 15.7% of the LWCs would be open to leasing subject to NSO stipulations. Alternative C would permit the introduction of sights, noises, and infrastructure in or adjacent to LWCs from oil and gas development, which could impair the feeling of solitude and degrade naturalness. Over time, under Alternative C, oil and gas exploration and development could contribute to the loss of wilderness character in many areas where leasing and surface occupancy are permitted. Oil and gas development would be anticipated to be the largest impact to LWCs over the next 15 to 20 years under Alternative C, and the impacts would be slightly less in magnitude compared to Alternative A.

1    Alternative D would make more management decisions that would reduce impacts from oil and gas
2    development to LWCs compared to Alternatives A and C, but would be less restrictive than Alternative
3    B. Under Alternative D, 64.7% of the LWCs in the planning area would be open to leasing subject
4    CSU/TL stipulations, 28.1% of the LWCs would be open to leasing subject to NSO stipulations, and
5    7.2% of the LWCs would be closed to leasing. In areas managed subject to CSU stipulations, Alternative
6    D would permit the introduction of sights, noises, and infrastructure in or adjacent to LWCs from oil and
7    gas development, which could impair the feeling of solitude and degrade naturalness. The density of oil
8    and gas development would be reduced in LWCs compared to Alternatives A or C. Over time, under
9    Alternative D, oil and gas exploration and development could contribute to the loss of wilderness
10   character in areas where leasing and surface occupancy are permitted. Oil and gas development would be
11   anticipated to be the largest impact to LWCs over the next 15 to 20 years under Alternative D. The
12   impacts to LWCs would be less in magnitude compared to Alternatives A or C.

13   ### 4.19.3.13    Recreation

14   The CIAA used to analyze cumulative impacts on recreation consists of the planning area and adjacent
15   lands that could be affected by decisions regarding the planning area. The adjacent lands include the
16   following:

17   •   The Green River corridor through Labyrinth Canyon and related Green River tributaries.

18   •   Lands managed by the Moab Field Office east of the Green River and east of the planning area.
19       (Management decisions in the Moab Field Office may affect users' river experiences and users
20       accessing the river from the planning area.)

21   •   Portions of the Labyrinth Canyon and Dirty Devil/Robbers Roost SRMAs, which are south and
22       east of the planning area and above the rim of the Green River

23   •   The Horseshoe Canyon unit of Canyonlands National Park

24   Past and present actions that have affected and would likely continue to affect recreation in the CIAA
25   include surface disturbance resulting from oil and gas development and associated infrastructure,
26   geophysical exploration, ranching and livestock grazing, range improvements, authorization of rights-of-
27   way for utilities and other uses, and road development. The reasonably foreseeable future activities listed
28   in Section 4.19.2, especially oil and gas development, could also result in impacts to recreation. These
29   types of actions and activities can reduce the quality of the recreation experience. Some actions such as
30   oil and gas development, road development, and authorization of rights-of-ways for utilities cause
31   impacts such as permanent infrastructure, noise, increased traffic, and reductions in scenic quality and
32   therefore have a greater effect on recreation than other actions such as livestock grazing and restoration
33   projects. This discussion focuses on oil and gas development because cumulative impacts to recreation
34   are primarily driven by this activity.

35   Of all the present actions and RFFAs, oil and gas development and associated infrastructure are
36   anticipated to cause the largest amount of surface disturbance and impacts to recreation through
37   construction of well pads, roads, pipelines, and other infrastructure. Surface disturbance, the presence of
38   oil and gas infrastructure, and vehicles from oil and gas development would increase road traffic, noise,
39   nighttime lighting, and dust for recreation visitors, while creating a negative visual impact in otherwise
40   natural areas. Visual impacts and noise would reduce the naturalness of the planning area for backcountry
41   users and reduce opportunities for solitude. The increase in noise associated with oil and gas equipment
42   and changes in night skies from lighting associated with oil and gas development would affect recreation
43   settings. Other RFFAs may contribute to these impacts (e.g., issuance of a right-of-way for the Emery
44   Telcom Fiber Optic Line along State Route 24 and development of the Texas Corp Well 1 for livestock
45   grazing) but on a smaller scale than oil and gas development. Oil and gas development impacts would
46   likely be greater where mineral development is more intense, in areas where development overlaps areas
47   of concentrated recreation such as recreation focus areas, and on state lands where relatively less

1  protection is afforded to the quality of the recreation experience. Increased mineral development could
2  lead to an increased potential for negative impacts to the quality of the recreation experience and the
3  naturalness of the recreation setting.

4  Oil and gas leasing and development would continue in the planning area under all alternatives, and the
5  projected development and associated surface-disturbing activities would result in impacts to recreation.
6  However, these impacts would be limited through the use of NSO stipulations, CSU/TL stipulations, and
7  the closure of areas to oil and gas development. Under Alternative A, 92.5% of the planning area would
8  be open to oil and gas development subject to standard lease terms and conditions or open to oil and gas
9  development with CSU/TL stipulations (7.5% would have an NSO stipulation or be closed to leasing).
10 Under Alternative B, 21.7% of the planning area would be open to oil and gas development subject to
11 standard lease terms and conditions or open to oil and gas development with CSU/TL stipulations.
12 Alternative C would result in 88.4% of the planning area as open to oil and gas development subject to
13 standard lease terms and conditions or open to oil and gas development with CSU/TL stipulations.
14 Alternative D would result in 75.1% of the planning area open to oil and gas development subject to
15 standard lease terms and conditions or open to oil and gas leasing with CSU/TL stipulations. Based on
16 these percentages, Alternative B would have the least cumulative impact to recreation, followed by
17 Alternatives D and C.

18 ### 4.19.3.14    *Oil and Gas Resources*

19 The CIAA used to analyze cumulative impacts on oil and gas development is the 525,000-acre planning
20 area. Past, present, and reasonably foreseeable future actions and conditions within the CIAA that have
21 affected and that will likely continue to affect oil and gas are market forces, availability of resources for
22 development, regulatory and development constraints, and reservoir/reserve depletion.

23 The management actions proposed in the alternatives for the MLP/EA would cumulatively impact oil and
24 gas development through surface use restrictions (e.g., closures and CSU, TL, and NSO stipulations) that
25 ultimately would decrease the amount of oil and gas development in the planning area. Precluding surface
26 disturbance could prevent the construction of some well pads, access roads, pipelines, and ancillary
27 facilities. Off-site methods such as directional drilling would be required to access oil and gas resources
28 in areas managed with an NSO stipulation. In some cases, an operator could place a well pad, access road,
29 or production facility in a less-sensitive area and drill from the well pad directionally to recover reserves
30 underlying the area prohibited from surface-disturbing activities. The equipment and personnel required
31 for directional drilling could increase the complexity of operations and slow the drilling process. Closures
32 and surface use restrictions could cause an operator to move to nearby private or state land (if similar
33 resources are available with fewer restrictions) and drill wells that could lead to drainage of federal
34 reserves and loss of federal revenue. However, the indirect and cumulative effects of consolidating
35 infrastructure could reduce the need for ancillary infrastructure over the larger region as infrastructure
36 becomes more centralized and less infrastructure would be necessary for the delivery of products.

37 Oil and gas leasing and development would continue under all alternatives. The restrictions imposed by
38 leasing stipulations (CSU, TL, NSO) and closed areas result in impacts to oil and gas development, such
39 as decreased amount of oil and gas extraction, delays in oil and gas extraction, increased requirements and
40 complexity of operations, and additional costs. Under all alternatives, the lease stipulations reduce the 30
41 well pads that were projected in the RFD scenario for oil and gas on all lands (federal, state, and private)
42 within the planning area over the next 15 years. There are 28 wells projected for Alternative A, seven
43 wells projected for Alternative B, 27 wells projected for Alternative C, and 23 wells projected for
44 Alternative D. Alternative A would allow the greatest number of wells to be developed and would have
45 the fewest restrictions on development, which would result in the largest incremental addition to oil and
46 gas development in the planning area, followed by Alternatives C and D. Alternative B would allow the
47 fewest wells to be developed because of the constraints imposed by lease stipulations and closures, which
48 would result in the smallest incremental addition to oil and gas development in the planning area.

1 Climate change is an ongoing trend that may impact oil and gas development in the planning area.
2 Climate change is expected to result in increased incidences of drought in the planning area, which could
3 impact special status species and, in turn, increase restrictions on oil and gas development in areas where
4 special status species occur.

### 4.19.3.15 Special Designations, Areas of Critical Environmental Concern

6 The cumulative impacts analysis area (CIAA) for ACECs consists of the ACECs in their entirety within
7 and outside the planning area. The ACECs are the Dry Lake Archaeological District ACEC, the Tidwell
8 Draw portion of the Uranium Mining District ACEC, and the Big Flat Tops ACEC. The relevant and
9 important values that were used to establish the ACECs include archaeology, geology, historic mining,
10 and relict vegetation. These values can be adversely impacted by surface-disturbing activities; however,
11 past actions have not resulted in degrading these values to the extent that the areas did not warrant an
12 ACEC designation.

13 Under all alternatives except Alternative C for the Tidwell Draw ACEC, surface-disturbing activities
14 associated with mineral development are precluded in the ACECs. Therefore, the relevant and important
15 values are protected, and there would be minimal potential for contributing to the cumulative impacts for
16 ACECs. With the exceptions of the development of the travel management plans and grazing, most of the
17 RFFAs would not occur within the ACECs and would not add to cumulative impacts. Although surface
18 disturbance would be allowed under Alternative C for the Tidwell Draw ACEC, stipulations preclude any
19 surface disturbance that would impact the physical evidence of past mining activities, thereby protecting
20 the relevant and important values for the ACEC. Therefore, all alternatives would protect the relevant and
21 important values of the ACECs for the foreseeable future. However, climate change and drought could
22 lead to an increased distribution of altered and degraded vegetation communities in the CIAA over time,
23 which would have an impact on the relict vegetation, which is the relevant and important value of the Big
24 Flat Tops ACEC.

### 4.19.3.16 Special Designations, Wild and Scenic Rivers

26 The CIAA for suitable wild and scenic rivers (WSRs) is the suitable Green River segment that runs from
27 the confluence of the Lower San Rafael River and the Green River to the Canyonlands National Park
28 boundary. The ORVs that were used to establish the WSR include cultural resources, recreation, scenic
29 values, fish, and paleontology. These values can be adversely impacted by surface-disturbing activities;
30 however, past actions have not resulted in degrading these values to the extent that the rivers did not
31 warrant designation as suitable for the National Wild and Scenic Rivers System.

32 Past and present actions that have affected and would continue to affect WSRs in the CIAA include
33 surface disturbance outside the WSR corridor resulting from oil and gas development and associated
34 infrastructure, geophysical exploration, livestock grazing, and recreation. Under all alternatives for the
35 MLP/EA, surface-disturbing activities associated with mineral development would be precluded in the
36 suitable WSR segment. However, under Alternative A, scenic values could be compromised by mineral
37 development conducted adjacent to the WSR boundaries where horizontal drilling could be used to access
38 the minerals beneath the WSRs. Therefore, under Alternative A, oil and gas leasing and development
39 could contribute to the incremental impacts on the Green River WSR suitable segment.

40 Alternatives B and D would provide the greatest protections to the Green River suitable WSR segment by
41 closing the WSR corridor and areas within 1.0 mile of the Labyrinth Canyon rim to mineral leasing.
42 Alternative C would provide similar protections by applying an NSO stipulation to these areas. Under
43 these alternatives, oil and gas leasing and development would not contribute to the incremental impacts
44 on the Green River WSR suitable segment.

45 Recreation RFFAs, including the issuance of special recreation permits (SRPs), under all alternatives
46 could contribute incrementally to cumulative impacts because the greater the number of permits, the

1   greater the potential for human-caused impacts such as surface disturbance (including vegetation
2   removal), wildlife disturbance, and water quality degradation. Climate change and drought could lead to
3   an increased distribution of altered and degraded vegetation communities and a decrease or shift in
4   wildlife populations. These changes would have an adverse impact to the recreation, scenic, and fish
5   ORVs and would contribute to the cumulative impacts.

### 4.19.3.17   Special Designations, National Historic Trails

7   The CIAA for the Old Spanish National Historic Trail (OST) is the trail corridor plus a 3.0-mile buffer on
8   either side from the Green River Crossing (see Map 2-5) to 3.0 miles west of the western planning area
9   boundary. Management of national historic trails in the planning area is coordinated with the National
10  Park Service and local non-federal partners. The continued collaboration with these partners in managing
11  the trail in accordance with the comprehensive management plan (NPS 1999) could decrease the potential
12  for degradation and assist in the preservation of natural, cultural, and historic trail resources. However, it
13  is important to note that large portions of the OST corridor in the planning area have already been leased
14  for oil and gas development, and, even with collaboration and implementation of the comprehensive
15  management plan, adverse impacts could occur.

16  Past actions that have affected and will continue to affect the integrity of viewsheds in scenic and cultural
17  landscapes along the OST include the presence of power lines, pipelines, roads, and facilities.
18  Additionally, the RFFAs of increased recreational use, grazing, and lands and realty actions could create
19  more surface disturbance through the creation of errant trails, vegetation loss, and development of
20  infrastructure for ROWs. Portions of the trail in the planning area are located on private property and not
21  subject to BLM regulations, which could result in adverse impacts in the form of surface disturbance and
22  changes to the viewshed from infrastructure.

23  Projected mineral development resulting from the alternatives in the MLP/EA could also contribute to
24  cumulative impacts to the visual setting of the OST through the placement of drill rigs, well pads,
25  production facilities, roads, and pipelines. The alternatives in the MLP/EA would provide varying
26  mitigation measures for protecting the historic integrity and condition of the OST, but the contribution to
27  the cumulative impacts under any alternative should be minor due to the protections provided by the law
28  and the comprehensive management plan. Alternative A would provide stipulations for protecting the
29  OST; however, these stipulations would be focused on protecting cultural resources, not the scenic
30  integrity of the trail, and could result in contributing the most to the cumulative impacts to the OST.
31  Alternative B would provide the greatest level of protection and a fewer cumulative impacts to the OST
32  by specifying a 3.0-mile NSO stipulation, which would protect the cultural resources and the scenic and
33  historical integrity of the trail. Alternative C would provide more protection than would Alternative A by
34  employing a CSU stipulation on 2.0 miles of the trail, but Alternative C would provide less protection
35  than would Alternative D, which would provide for an NSO stipulation within 1.0 mile and a CSU
36  stipulation between 1.0 and 3.0 miles. Additionally, climate change and drought could lead to an
37  increased distribution of altered and degraded vegetation communities. These changes could have an
38  adverse impact on the scenic integrity of the OST and could contribute to cumulative impacts.

### 4.19.3.18   Socioeconomics

40  [Information to be provided by the BLM for inclusion in the public draft EA.]

### 4.19.3.19   Health and Safety

42  The CIAA for health and safety is the planning area. Past, present, and reasonably foreseeable future
43  actions and conditions within the CIAA that have affected and will likely continue to affect health and
44  safety are risks such as heavy equipment use and traffic associated with mining, oil and gas development,
45  livestock grazing, tourism, recreation, vehicle traffic, and construction activities involving roads,
46  pipelines, transmission lines, and other structures.

1   All alternatives would allow oil and gas development in a manner that would incrementally increase the
2   risk of potential health and safety impacts in the planning area. Aside from livestock grazing, future oil
3   and gas development is the primary industrial activity in the planning area that would affect health and
4   safety. As discussed in Section 4.18, the impacts to health and safety for each alternative are expected to
5   be proportional to the number of wells that are expected to be drilled over the next 15 years under each
6   alternative. Alternative A would have the highest potential for health and safety impacts among the
7   alternatives, followed by Alternative C and Alternative D, with Alternative B having the lowest potential
8   for health and safety impacts among the alternatives.

9   Health and safety impacts that could occur from future oil and gas leasing and development include a risk
10  of potential injuries to workers from accidents that might occur during oil and gas exploration, well
11  drilling, well stimulation and completion, operation of facilities, and reclamation activities. These
12  accidents may involve explosions, the presence of hazardous vapors or chemicals, pinch points on
13  equipment and vehicles, or other industrial accidents. Increased traffic associated with the development
14  and operation of oil and gas facilities would pose a risk for vehicular accidents for both oil and gas
15  workers and the general public visiting and traveling on BLM-administered public lands. Other impacts to
16  health and safety could include spills or the presence of hazardous materials produced by or used in
17  drilling for oil and gas. Hazardous materials that could be produced by oil and gas wells include produced
18  oil, gas, and water, as well as chemicals such as hydrogen sulfide. These potential health and safety
19  impacts would add cumulatively to the past, present, and reasonably foreseeable health and safety impacts
20  in the CIAA.

# CHAPTER 5—CONSULTATION AND COORDINATION

## 5.1  INTRODUCTION

This chapter describes the consultation and coordination that occurred prior to and during preparation of the San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments/Draft Environmental Assessment (referred to hereafter as the MLP/EA). The consultation process began with the publication of the notice of intent (NOI) on May 18, 2016, as required by 43 Code of Federal Regulations (CFR) 1610.2(c). The Bureau of Land Management (BLM) decision-making process is conducted in accordance with the requirements of National Environmental Policy Act (NEPA), the regulations of the Council on Environmental Quality (CEQ), and the policies and procedures used by the Department of the Interior and the BLM to implement NEPA. NEPA and its associated regulatory and policy framework require the following: 1) that all federal agencies involve interested members of the public as well as state and local governments, other federal agencies, and federally recognized Native American tribes in their decision making process; 2) that a reasonable range of alternatives is developed; and 3) that all potential impacts of the proposed actions and alternatives are disclosed.

The MLP/EA was prepared by an interdisciplinary team of resource specialists from the Price and Richfield Field Offices and by SWCA Environmental Consultants, the contractor hired to assist in the preparation of the MLP/EA. The BLM and cooperating federal, state, and county agencies provided technical review and support.

This environmental document was prepared in consultation and coordination with various federal, state, and local agencies, organizations, and individuals. Agency consultation and public participation have been accomplished through a variety of formal and informal methods, including scoping meetings, workshops, correspondence, and meetings with various public agencies and interest groups. This chapter summarizes these activities.

## 5.2  CONSULTATION AND COORDINATION

Federal laws require the BLM to consult with Native American tribes, the State Historic Preservation Office (SHPO), the U.S. Fish and Wildlife Service (USFWS), and the Environmental Protection Agency (EPA) during the planning and NEPA processes. This section documents the specific consultation and coordination efforts undertaken by the BLM throughout the entire process of developing the MLP/EA.

### 5.2.1  Native American Tribes

The BLM is mandated to consult with Native American tribes to identify cultural values, religious beliefs, and traditional practices that may be affected by actions on federal lands. Laws and executive orders requiring such consultation include the following:

- National Environmental Policy Act of 1969, as amended
- National Historic Preservation Act of 1966, as amended
- American Indian Religious Freedom Act of 1978
- Native American Graves Protection and Repatriation Act of 1990, as amended
- Federal Land Management and Policy Act of 1976
- Archaeological Resources Protection Act of 1979
- Executive Order 11593 – Protection and Enhancement of the Cultural Environment

1    • Executive Order 12898 – Environmental Justice

2    • Executive Order 13007 – Indian Sacred Sites

3    • Executive Order 13175 – Consultation and Coordination with Indian Tribal Governments

4    Additionally, the BLM has developed guidelines for consultation with Native American tribes. BLM
5    Manual 8120 *Tribal Consultation Under Cultural Resources* (BLM 2004a) and H-8120-1 *General*
6    *Procedural Guidance for Native American Consultation* (BLM 2004b) provide consultation requirements
7    and procedural guidance to ensure the consultation record demonstrates "that the responsible manager has
8    made a reasonable and good faith effort to obtain and consider appropriate Native American input in
9    decisionmaking" (BLM 2004b). Recommended procedures for initiating the consultation process include
10   project notification, preferably by certified mail, follow-up contact (e.g., telephone calls), and meetings
11   when appropriate (BLM 2004b). Table 5-1 lists Native American tribes consulted for this planning effort.

12   **Table 5-1.  Native American Tribes Contacted for Consultation**

| Native American Tribes | |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

13   On (Month Date, 2016), the BLM sent consultation letters to the tribes listed in Table 5-1 above.

14   [Information to be provided by the BLM for inclusion in the public draft EA.]

15   **5.2.2    State Historic Preservation Office**

16   Section 106 of the National Historic Preservation Act requires federal agencies to take into account the
17   effects of their undertakings on historic properties and to afford the SHPO reasonable opportunity to
18   comment on such undertakings. A copy of the MLP/EA will be sent to the SHPO for their review and
19   comment. The BLM will initiate SHPO consultation on the proposed resource management plan
20   amendments, and the BLM will finalize SHPO consultation before the decision record is signed.

21   **5.2.3    U.S. Fish and Wildlife Service**

22   The BLM must consult with the USFWS in accordance with Section 7 of the Endangered Species Act and
23   the Fish and Wildlife Coordination Act prior to initiation of a project that may affect federally listed
24   special status species.

The MLP/EA is considered a major federal project, and the BLM will initiate consultation with the USFWS by submitting a biological assessment (BA) when the proposed MLP for the final EA is determined. The USFWS may concur with the BLM's determination in the BA via a memorandum, or the USFWS will prepare a biological opinion (BO) that advises the BLM on the actions that must be taken to protect federally listed special status species. The BLM will finalize Section 7 consultation before the decision record is signed.

### 5.2.4    Environmental Protection Agency

The BLM initiated coordination with the EPA early in the planning process. The EPA was contacted about being a cooperating agency, and chose to participate as an informal cooperating agency with special expertise in air and water quality. Along with the other cooperating agencies, the EPA participated in an alternatives development workshop. Additionally, the EPA has been provided a copy of the draft alternatives and draft appendices for review and comment.

### 5.2.5    Cooperating Agency Involvement

Cooperating agencies are those other federal agencies, state agencies, and local governments that have jurisdiction by law (40 CFR 1508.15) or special expertise (40 CFR 1508.26) and that choose to participate in a cooperating agency role. Cooperating agencies participate in the various steps of the BLM's planning process, as feasible given the constraints of their resources and expertise (43 CFR 1601.0-5). The BLM collaborates with cooperating agencies in identifying issues, collecting inventory data, formulating alternatives, estimating effects of the alternatives, and developing a preferred alternative. The following government entities have accepted the BLM's invitation to become cooperating agencies in the planning process for the MLP/EA:

- Emery County
- Wayne County
- State of Utah
- National Park Service
- Environmental Protection Agency

A cooperating agency scoping meeting was held on June 16, 2016, in Castle Dale, Utah, with the county commissioners and other county representatives from both Emery and Wayne Counties. Additionally, a separate cooperating agency scoping meeting was held on June 16, 2016, in Castle Dale, Utah, with the National Park Service. The purpose of these meetings was to inform these cooperating agencies about the MLP/EA process, provide an update on the baseline inventories (the reasonably foreseeable development scenario, the cultural resources Class I and Class II inventories, and the lands with wilderness characteristics inventory), share the MLP project schedule, and begin a discussion on issues identification. On November 2 and 3, 2016, a cooperating agency alternatives development workshop was held in Castle Dale, Utah. Representatives of all five cooperating agencies attended the 2-day workshop.

## 5.1 PUBLIC OUTREACH AND PARTICIPATION

The BLM has invited public participation throughout the MLP/EA planning process. Public involvement has included the following:

- Public scoping
- Public review and comment period for alternatives
- Project website
- Review of the MLP/EA draft

## 5.2.6    Public Scoping

On May 18, 2016, the Price and Richfield Field Offices initiated the planning process with the publication of the NOI in the *Federal Register*. The NOI announced the Price and Richfield Field Offices' intent to prepare the San Rafael Desert MLP, potential amendments to the Price and Richfield RMPs, and the associated EA. The NOI initiated the scoping period, which ended July 1, 2016. The purpose of scoping, as required by NEPA, is to involve the public in the planning process and use the comments received to identify the issues to be addressed in the MLP/EA (40 CFR 1501.7). These issues assist the BLM in the development of alternatives and analysis that will be evaluated in the EA. Scoping also provides the public an opportunity to learn about the management of public lands and helps the BLM identify the public's concerns regarding resources within the planning area.

Two public scoping meetings were held. The first meeting was held in Green River, Utah, on June 15, 2016. The second meeting was in Castle Dale, Utah, on June 16, 2016. Each meeting was 2 hours long. A Microsoft Powerpoint presentation with background information was given, and BLM resource specialists from a number of resource areas were available to answer questions and provide additional information about these and other specific issues throughout the meeting.

Throughout the scoping period, the BLM received approximately 1,200 comment letters, which included approximately 350 individual comments from 15 unique submissions. These comments came from individuals, other agencies, and special interest groups. All comments were addressed in the development of alternatives.

## 5.2.7    Public Review And Comment Period for Alternatives

On December 15, 2016, the BLM released draft alternatives for the public to review and comment on. This comment period ended on January 20, 2017. Eight comment letters were received from stakeholders, three comment letters were received from cooperating agencies, and four comment letters were received from individuals, resulting in a total of 134 individual comments.

## 5.2.8    Project Website

Information regarding the MLP/EA can also be found at the project website (http://go.usa.gov/cJcPw). The purpose of the website is to provide notice and access to the public for all pertinent documents associated with the planning process.

## 5.2.9    Review of the MLP/EA

Public participation will continue with the release of the draft MLP/EA. The public is provided with an opportunity to review and comment on the contents of this document during a 30-day public comment period. After the draft MLP/EA is released to the public, the BLM will analyze all public comments received and will finalize the MLP/EA. After the Proposed San Rafael Desert MLP and RMP Amendments/EA is released to the public, the BLM will conduct a 60-day Governor's Office consistency review and schedule a 30-day protest period. The BLM will resolve all protests on the final Proposed San Rafael Desert MLP and RMP Amendments/EA, and will issue the approved MLP decision record.

## 5.3    LIST OF PREPARERS

As required by NEPA (40 CFR 1502.17), Tables 5-2 and 5-3 list the people primarily responsible for preparing the MLP/EA and their qualifications. SWCA Environmental Consultants, a contractor selected to prepare the MLP/EA as directed by the BLM, has, in accordance with 40 CFR 150.5(c), certified that it does not have any financial or other interest in the outcome of the decisions to be made pursuant to the MLP/EA.

1     **Table 5-2. Bureau of Land Management Preparers**

| Name | Education | Project Role |
|------|-----------|--------------|
| Leonard Herr | B.S., Natural Resources, Humboldt State University | Air resources |
| Jeffery Brower | | Soil and water resources |
| Jerrad Goodell | | Riparian resources |
| Amber Koski | | Cultural resources, national historic trails |
| Nicole Lohman | | Cultural resources, national historic trails |
| Michael Leschin | | Paleontological resources |
| Joshua Winkler | | Visual resources, areas of critical environmental concern, recreation |
| Matthew Blocker | | Wild and scenic rivers, recreation, wilderness, wilderness characteristics |
| Bill Stevens | B.A., History, Loyola University Chicago M.A., History, University of Toronto M.B.A., Accounting, University of Chicago Ph.D., Accountancy, University of Illinois at Urbana-Champaign | Socioeconomics |
| Tyler Ashcroft | | Project manager |
| Jake Palma | B.A., American Studies, Utah State University M.P.A., Public Administration, Southern Utah University | Co-project manager |
| Leah Lewis | | Wildlife, migratory birds, threatened and endangered species, Utah BLM sensitive species |
| Christine Cimiluca | | Vegetation |
| Sue Fivecoat | | Co-project manager (Richfield Field Office) |
| Myron Jeffs | | Visual resources, areas of critical environmental concern, recreation, wilderness, wilderness characteristics (Richfield Field Office) |

2

1    **Table 5-3.  Non-Bureau of Land Management Preparers (SWCA Environmental Consultants)**

| Name | Education | Project Role |
|---|---|---|
| Deb Reber | B.A., Natural Resource Management, California State University, Chico | Project manager, reviewer, lands with wilderness characteristics, special designations, and oil and gas resources |
| Reid Persing | B.A., Chemistry, Biochemistry, University of Colorado | Assistant project manager, reviewer, vegetation, special status species, and wildlife and fisheries |
| Gretchen Semerad | B.S., Biology; Gonzaga University M.S., Environmental Science; Washington State University | Air quality, climate change, auditory management, recreation, and special status species |
| Jenny Addy | B.S., Conservation and Restoration Ecology; e: Range Ecology, Utah State University | Soil resources and water resources, and health and safety |
| Kelly Beck | B.S., Anthropology; University of Utah M.A. with distinction, Anthropology; California State University, Chico Ph.D., Anthropology; University of Utah | Cultural resources |
| Jeremy Eyre | B.A., Political Science; e: International Relations, University of Utah J.D., Law; e: Environmental & Natural Resources, University of Utah | Health and safety, visual resources and night skies, lands with wilderness characteristics, and oil and gas resources |
| Paige Marchus | B.A., Journalism; Pacific University | Visual resources and night skies |
| Kari Chalker | B.A., Anthropology, University of Florida M.A., Liberal Education, St. Johns College | Technical editor |
| Linda Burfitt | B.A., Media Communications, University of Windsor, Ontario A.F., Forestry, Sir Sandford Fleming College, Ontario A.S., Ecosystem Management, Sir Sandford Fleming College, Ontario | Technical editor |
| Debbi Smith | Certified Microsoft Office Expert in Word, Excel, PowerPoint, Outlook and Publisher | Formatter |
| Allen Stutz | GIS Certificate of Advanced Study, University of Denver B.S., Biology: Ecology, Evolution, Conservation, University of Washington B.S., Zoology, University of Washington | GIS |
| Rachel Johnson | B.S., Natural Resources and Environmental Science, Paul Smith's College | GIS |

2

3

# CHAPTER 6—REFERENCES

Aikens, C. M. (editor). 1970. *Hogup Cave*. University of Utah Press, Salt Lake City.

Ambrose, Skip, and Shan Burson. 2004. Soundscape Studies in National Parks. The George Wright Forum. Volume 21, Number 1. Available at: http://www.georgewright.org/211ambrose.pdf. Accessed April 18, 2017.

American Whitewater. 2012. Dirty Devil - Hanksville to Hite. Available at: http://www.americanwhitewater.org/content/River/detail/id/10280/. Accessed January 20, 2017.

Arizona Game and Fish Department. 2017. California Condor Recovery. Available at: https://www.azgfd.com/wildlife/speciesofgreatestconservneed/californiacondors. Accessed January 24, 2017.

Aton, J. M. 2009. *The River Knows Everything: Desolation Canyon and the Green*. Utah State University Press, Logan.

Atwood, N.D., and S.L. Welsh. 2007. New taxa of *Camissonia* (Onagraceae); *Erigeron, Hymenoxys*, and *Tetradymia* (Compositae); *Lepidium* and *Physaria* (Cruciferae) from Arizona, New Mexico, and Utah. *Rhodora* 109(940):395–414.

Barlow, K. R. 2002. Predicting Maize Agriculture among the Fremont: An Economic Comparison of Farming and Foraging in the American Southwest. *American Antiquity* 67(1):65–88.

Beck, C., and G. T. Jones. 1997. The Terminal Pleistocene/Early Holocene Archaeology of the Great Basin. *Journal of World Prehistory* 11:161–236.

Benson, L. V., and M. S. Berry. 2009. Climate Change and Cultural Response in the Prehistoric American Southwest. *Kiva: The Journal of Southwestern Anthropology and History* 75(1):89–119.

Benson, M. P. 1982. The Sitterud Bundle: A Prehistoric Cache from Central Utah. In *Archaeological Investigations in Utah at Fish Springs, Clay Basin, San Rafael Swell, and Southern Henry Mountains*, edited by R. E. Fike and D. B. Madsen. Bureau of Land Management, Utah State Office, Salt Lake City.

Bezzerides, N., and Bestgen, K. 2002. Final Report – Status review of roundtail chub, flannelmouth sucker, and bluehead sucker in the Colorado River basin. Larval Fish Laboratory, Colorado State University Fort Collins, Colorado.

Boomgarden, S., D. Metcalfe, and C. Springer. 2014. Prehistoric Archaeology in Range Creek Canyon, Utah: A Summary of Activities of the Range Creek Field Station. *Utah Archaeology* 27(1):9–32.

Bottcher, J. L. 2009. Maintaining population persistence in the face of an extremely altered hydrograph: implications for three sensitive fishes in a tributary of the Green River, Utah. Master's thesis, Utah State University, Logan. Available at: http://digitalcommons.usu.edu/cgi/viewcontent.cgi?article=1492&context=etd. Accessed January 20, 2017.

Bryan, A. L. 1977. Smith Creek Cave. In *The Archaeology of Smith Creek Canyon, Eastern Nevada*, edited by D. R. Tuohy and D. L. Rendall. Nevada State Museum Anthropological Papers No. 17. Nevada State Museum, Carson City.

Bryce, S. A., J. R. Strittholt, B. C. Ward, and D. M. Bachelet. 2012. *Colorado Plateau Rapid Ecoregional Assessment Report*. Prepared for the U.S. Department of the Interior, Bureau of Land Management, Denver, Colorado. Available at: http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html#memo. Accessed April 10, 2017.

Bureau of Economic Analysis (BEA). 2010. Regional Economic Accounts, Regional Definitions. Available at: http://www.bea.gov/regional/definitions/. Accessed June 2010.

Bureau of Land Management (BLM). 1982. Henry Mountain Management Framework Plan. U.S. Department of the Interior Bureau of Land Management, Utah State Office, Richfield District, Sevier River Resource Area.

———. 1984. Manual 8400-Visual Resource Management. Available at: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.34032.Fi le.dat/8400.pdf. Accessed February 15, 2017.

———. 1986. Manual H-8410-1 – Visual Resource Inventory. Available at: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.31679. File.dat/H-8410.pdf. Accessed February 15, 2017.

———. 1986. *Manual 8431 - Visual Resource Contrast Rating*. Rel. 8-30. January 17, 1986. Available at: https://www.sites.blm.gov/files/program_recreation_visual%20resource%20management_quick%20link_BLM%20Handbook%20H-8431-1%2C%20Visual%20Resource%20Contrast%20Rating.pdf. Accessed April 20, 2017.

———. 1991. Riparian-Wetland Initiative for the 1990s, BLM/WO/GI- 91/001+4340. Bureau of Land Management, Denver, Colorado.

———. 1993. Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, and Management. BLM Manual 8351. Rel. December 22, 1993.

———. 1998. General Procedural Guidance for Paleontological Resource Management, BLM Handbook H-8270-1. Bureau of Land Management, Washington, D.C.

———. 1999. Utah Wilderness Inventory. Available at: http://digitallibrary.utah.gov/awweb/awarchive?type=file&item=56265. Accessed February 21, 2017.

———. 2000. Draft Resource Management Plan Amendment/Environmental Impact Statement for Federal Fluid Minerals Leasing and Development in Sierra and Otera Counties. Available at the office of SWCA Environmental Consultants, Salt Lake City, Utah.

———. 2001. *Biological Soil Crusts: Ecology and Management, TR 1730-2*. U.S. Department of the Interior Bureau of Land Management, Washington, D.C.

———. 2004a. BLM Manual 8120–Tribal Consultation Under Cultural Resources Authorities. Available at: https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_H-8120-1.pdf. Accessed February 2017.

———. 2004b. BLM Manual Handbook H-8120-1 – Guidelines for Conducting Tribal Consultation Available at: https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_H-8120-1.pdf. Accessed February 2017.

———. 2005. H-1601-1 Land Use Planning Handbook. Bureau of Land Management. Available at: https://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_handbook.Par.54063. File.dat/h1601-1.pdf. Accessed February 24, 2017.

———. 2006. Best Management Practices for Raptors and Their Associated Habitats in Utah, August 2006.

———. 2007a. Record of Decisions for the Final Vegetation Treatments Using Herbicides Programmatic Environmental Impact Statement. Bureau of Land Management, Washington, D.C.

———. 2007b. *Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book*. 4th ed. Rev. 2007. Available at: http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/best_management_practices/gold_book.html. Accessed January 9, 2017.

———. 2008a. Price Field Office Record of Decision and Approved Resource Management Plan. Available at: https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=96976. Accessed January 20, 2017.

———. 2008b. Richfield Field Office Record of Decision and Approved Resource Management Plan. Available at: https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=99311. Accessed January 20, 2017.

———. 2010a. Instruction Memorandum (IM) No. 2010-117: Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews. United States Department of the Interior Bureau of Land Management, Washington D.C.

———. 2010b. Utah BLM Sensitive Fish and Wildlife Species List. December 20, 2010.

———. 2010c. Instruction Memorandum No. 2010-061. Guidance on Estimating Nonmarket Environmental Values. February 16, 2010.

———. 2011. Sensitive Plant Species Lists for Utah. February 2011.

———. 2012a. BLM webpage: VRM System. Available at: https://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html. Accessed February 25, 2017.

———. 2012b. BLM Manual 6310—Conducting Wilderness Characteristics Inventory on BLM Lands (Public). Available at: https://www.blm.gov/or/plans/rmpswesternoregon/files/lwci-manual.pdf. Accessed February 16, 2017.

———. 2012c. Reasonably Foreseeable Development Scenario for Oil and Gas in the Moab Master Leasing Plan Area, Canyon Country District, August 2012. http://www.blm.gov/style/medialib/blm/ut/moab_fo/mlp0.Par.54256.File.dat/MLP_OG_RFD_final_091012_508_web.pdf.

———. 2012d. Management of National Scenic and Historic Trails and Trails under Study or Recommended as Suitable for Congressional Designation (Public). BLM Manual 6280. Rel. September 14, 2012.

———. 2012e. Trail Management Areas – Secretarially Designated National Recreation, Water, and Connecting and Side Trails (Public). BLM Manual 8353. Rel. September 14, 2012.

———. 2012f. National Scenic and Historic Trail Administration (Public). BLM Manual 6250. Rel. September 14, 2012.

———. 2012g. Colorado Plateau Rapid Ecoregional Assessment Report. Available at: https://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html. Accessed March 30, 2017.

———. 2013. BLM H-1624-1 – *Planning for Fluid Mineral Resources.* United States Department of the Interior Bureau of Land Management.

———. 2014a. Lower San Rafael River Restoration Project. Environmental Assessment DOI-BLM-UT-G022-2013-0060-EA. Bureau of Land Management, Price Field Office.

———. 2014b. Infographic: The Growing West. Available at: https://www.blm.gov/about/data. Accessed January 24, 2017.

———. 2015. Moab Master Leasing Plan and Draft Resource Management Plan Amendments/Draft Environmental Impact Statement for the Moab and Monticello Field Offices. Available at: https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=99718. Accessed March 28, 2017.

———. 2016. San Rafael Desert Lands with Wilderness Characteristics Inventory. Available at: https://eplanning.blm.gov/epl-front-office/projects/nepa/61781/93142/112262/FINAL_-_San_Rafael_Desert_Lands_with_Wilderness_Characteristics_Inventory_November_2016.pdf. Accessed February 21, 2017.

Bureau of Reclamation, Upper Colorado Region. 2008. Finding of No Significant Impact – Proposed Resource Management Plan for the Navajo Reservoir Area, CRSP, Colorado/New Mexico. Available at: https://www.usbr.gov/uc/envdocs/ea/navajo/NavajoResRMP-FEA.pdf. Accessed January 24, 2014.

Cavanaugh, William J., and Gregory C. Tocci. 1998. Environmental Noise. The Invisible Pollutant. Published in ESC. Volume 1 Number 1, Fall 1998. USC Institute of Public Affairs. Available at: http://www.nonoise.org/library/envarticle/index.htm. Accessed January 23, 2017.

Center for Climate Strategies. 2007. Final Utah Greenhouse Gas Inventory and Reference Case Projections, 1990- 2020. Available at: http://www.deq.utah.gov/Admin/DocLibrary/docs/2011/brac/finalreport/Sec-B-GHG_INVENTORY.pdf. Accessed January 18, 2017.

Charles, M. C., and S. J. Cole. 2006. Chronology and Cultural Variation in Basketmaker II. *Kiva: The Journal of Southwestern Anthropology and History* 72(2):167–216.

Colorado Rare Plant Guide. 2017. *Nuttallia multicaulis,* Many-stem stickleaf. Available at: http://www.cnhp.colostate.edu/download/projects/rareplants/guide_print.asp?id=23569. Accessed January 23, 2017.

Coltrain, J. B., and S. W. Leavitt. 2002. Climate and Diet in Fremont Prehistory: Economic Variability and Abandonment of Maize Agriculture in the Great Salt Lake Basin. *American Antiquity* 67(3):453–485.

Council on Environmental Quality. 2016. Final Guidance for Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews. Previously available at: https://www.whitehouse.gov/administration/eop/ceq/initiatives/nepa/ghg-guidance. Accessed March 30, 2017. PDF available at the office of SWCA Environmental Consultants, Salt Lake City, Utah.

Cowardin, L. W., V. Carter, F. C. Golet, and E. T. LaRoe. 1979. *Classification of Wetlands and Deepwater Habitats of the United States, FWS/OBS-79/31.* U.S. Fish and Wildlife Service, Office of Biological Services, Washington, D.C.

Blocker, Matt. 2017. Email communication from Matt Blocker, Outdoor Recreation Planner, Bureau of Land Management Price Field Office, to Deb Reber, SWCA Environmental Consultants, on January 19, 2017.

ENVIRON International Corporation, Alpine Geophysics, LLC, and University of North Carolina. 2013. Western Regional Air Partnership (WRAP) West-wide Jump-start Air Quality Modeling Study. Final Report. Available at: https://www.wrapair2.org/WestJumpAQMS.aspx. Accessed March 29, 2017.

Environmental Protection Agency (EPA). 1974. Office of Noise Abatement and Control. 1974. Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety. Available at: http://www.nonoise.org/library/levels74/levels74.htm. Accessed January 23, 2017.

———. 2001. Visibility in Mandatory Federal Class I Areas (1994-1998). A Report to Congress. Available at: https://www.epa.gov/visibility/visibility-report-congress-november-2001. Accessed January 17, 2017.

———. 2010. Consolidated List of Chemical Subject to the Emergency Planning and Community Right-to-Know Act (EPCRA), Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and Section 112(r) of the Clean Air Act. Office of Solid Waste and Emergency Response. EPA 550-B-10-001. Available at: http://nepis.epa.gov/Exe/ZyPDF.cgi/P1007520.PDF?Dockey=P1007520.PDF. Accessed January 24, 2017.

———. 2014a. Climate Change Indicators: Global Greenhouse Gas Emissions. Global Greenhouse Gas Emissions by Sector, 1990–2010. Available at: https://www.epa.gov/climate-indicators/climate-change-indicators-global-greenhouse-gas-emissions. Accessed January 18, 2016.

———. 2014b. Climate Change Indicators: U.S. Greenhouse Gas Emissions. U.S. Greenhouse Gas Emissions and Sinks by Economic Sector, 1990–2014. Available at: https://www.epa.gov/climate-indicators/climate-change-indicators-us-greenhouse-gas-emissions. Accessed January 18, 2016.

1  ———. 2015. Climate Change Indicators: Global Greenhouse Gas Emissions. Global Carbon Dioxide
2     Emissions by Region, 1990–2012. Available at: https://www.epa.gov/climate-indicators/climate-
3     change-indicators-global-greenhouse-gas-emissions. Accessed January 18, 2016.

4  ———. 2016a. NAAQS Table. Available at: https://www.epa.gov/criteria-air-pollutants/naaqs-table.
5     Accessed January 11, 2017.

6  ———. 2016b. Ozone Pollution. Ecosystem Effects of Ozone Pollution. Available at:
7     https://www.epa.gov/ozone-pollution/ecosystem-effects-ozone-pollution. Accessed January 18,
8     2017.

9  ———. 2016c. Particulate Matter (PM) Pollution. Health and Environmental Effects of Particulate
10    Matter. Available at: https://www.epa.gov/pm-pollution/health-and-environmental-effects-
11    particulate-matter-pm. Accessed January 18, 2017.

12 ———. 2016d. Criteria Pollutant Nonattainment Summary Report. Available at:
13    https://www3.epa.gov/airquality/greenbook/ancl3.html. Accessed January 11, 2017.

14 ———. 2016e. Prevention of Significant Deterioration. Basic Information. Available at:
15    https://www.epa.gov/nsr/prevention-significant-deterioration-basic-information. Accessed
16    January 16, 2017.

17 ———. 2016f. List of 156 Mandatory Class I Federal Areas. Available at:
18    https://www.epa.gov/visibility/list-156-mandatory-class-i-federal-areas. Accessed January 16,
19    2017.

20 ———. 2016g. Air & Radiation. CAMD. CASTNET. Canyonlands NP (CAN407). Available at:
21    https://www3.epa.gov/castnet/site_pages/CAN407.html. Accessed January 17, 2017.

22 ———. 2016h. *Climate Change*. Basic Information. Available at:
23    https://www3.epa.gov/climatechange/basics/. Accessed January 18, 2016.

24 ———. 2016i. Overview of Climate Change Science. Available at: https://www.epa.gov/climate-change-
25    science/overview-climate-change-science. Accessed January 19, 2017.

26 ———. 2016j. Sources of Greenhouse Gas Emissions. Available at:
27    https://www.epa.gov/ghgemissions/sources-greenhouse-gas-emissions. Accessed January 18,
28    2016.

29 ———. 2016k. Climate Change Indicators: U.S. Greenhouse Gas Emissions. Available at:
30    https://www.epa.gov/climate-indicators/climate-change-indicators-us-greenhouse-gas-emissions.
31    Accessed January 18, 2017.

32 ———. 2016l. What Climate Change Means for Utah. EPA 430-F-16-046. Available at:
33    https://www.epa.gov/climate-impacts/climate-change-impacts-state. Accessed January 18, 2016.

34 ———. 2016m. Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2014. EPA 430-R-16-
35    002. Available at: https://www.epa.gov/ghgemissions/us-greenhouse-gas-inventory-report-
36    archive. Accessed March 30, 2017.

37 ———. 2017a. Visibility – Regional Haze Program. Available at:
38    https://www.epa.gov/visibility/visibility-regional-haze-program. Accessed January 17, 2017.

———. 2017b. Clean Air Act Title IV – Noise Pollution. Available at: https://www.epa.gov/clean-air-act-overview/clean-air-act-title-iv-noise-pollution. Accessed January 24, 2017.

———. 2017c. Energy and the Environment. Greenhouse Gases Equivalencies Calculator – Calculations and References. Therms and Mcf of Natural Gas. Available at: https://www.epa.gov/energy/greenhouse-gases-equivalencies-calculator-calculations-and-references. Accessed March 30, 2017.

EPS-HDT. 2016. A Profile of Federal Land Payments. Available at: https://headwaterseconomics.org/tools/economic-profile-system/#fedpayments-report-section. Accessed December 19, 2016.

———. 2016. Socioeconomic Measures Report, December 7, 2016, based on 2016 data from the Bureau of Economic Analysis, REIS, Table CA25N

Gardner Policy Institute. 2015. University of Utah, County Tourism Profiles 2015. Available at: http://gardner.utah.edu/county-tourism-profiles/. Accessed January 5, 2017.

Garfin, G., G. Franco, H. Blanco, A. Comrie, P. Gonzalez, T. Piechota, R. Smyth, and R. Waskom. 2014. Chapter 20: Southwest. Climate Change Impacts in the United States: The Third National Climate Assessment, J. M. Melillo, Terese Richmond, G.W. Yohe, Eds. U.S. Global Change Research Program. Available at: http://nca2014.globalchange.gov/report/regions/southwest. Accessed January 18, 2016.

Geary, E. A. 1996. *A History of Emery County*. Utah Centennial County History Series. Utah State Historical Society, Salt Lake City, Utah.

Gilbert, M. T. P., D. L. Jenkins, A. Götherstrom, N. Naveran, J. J. Sanchez, M. Hofreiter, P. F. Thomsen, J. Binladen, T. F. G. Higham, R. M. Yohe II, R. Parr, L. S. Cummings, and E. Willerslev. 2008. DNA from Pre-Clovis Human Coprolites in Oregon, North America. *Science* 320(5877):786–789.

Giving USA. 2016. Charitable contributions in 2015. Available at: https://givingusa.org/giving-usa-2016/. Accessed January 6, 2017.

Glowacki, D. M. 2015. *Living and Leaving: A Social History of Regional Depopulation in Thirteenth-Century Mesa Verde*. University of Arizona Press, Tucson.

Graf, K. E., and D. N. Schmitt (editors). 2007. *Paleoindian or Paleoarchaic? Great Basin Human Ecology at the Pleistocene/Holocene Transition*. University of Utah Press, Salt Lake City.

Griswold, T., F.D. Parker, and V.J. Tepedino. 1997. The bees of the San Rafael desert: implications for the bee fauna of the Grand Staircase Escalante National Monument. In *Learning From the Land: GSENM Science Symposium Proceedings*. Cedar City, Utah.

Headwaters Economics. 2016. A Profile of Land Use, Emery and Wayne Counties. Available at: https://headwaterseconomics.org/tools/economic-profile-system/#government-report-section. Accessed December 5, 2016.

Hockett, B. S., and M. Morgenstein. 2003. Ceramic Production, Fremont Foragers, and the Late Archaic Prehistory of the North-Central Great Basin. *Utah Archaeology* 16:1–36.

Hoffman, Dennis, and Tom R. Rex. 2010 (February). The Magnitude and Causes of Arizona's Low Per Capita Income. Center for Competitiveness and Prosperity Research, L. William Seidman Research Institute, W. P. Carey School of Business, Arizona State University. Available at: http://wpcarey.asu.edu/seidman/Reports/P3/income_02-10.pdf. Accessed December 2012.

Hood, J. W., and D.J. Patterson. 1984. U. S. Geological Survey. Bedrock Aquifers in the Northern San Rafael Swell Area, Utah, With Special Emphasis on the Navajo Sandstone. State of Utah Department of Natural Resources Technical Publication No. 78.

Intergovernmental Panel on Climate Change. 2014. Climate Change 2014: Synthesis Report. Contribution of Working Groups I, II, and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Core Writing Team, R.K. Pachauri and L.A. Meyer (eds.)]. Summary for Policymakers. Available at: http://ipcc.ch/report/ar5/syr/. Accessed January 18, 2016.

Jones, A. 2004. The status of *Sphaeralcea psoraloides*. Wild Utah Project. Available at: http://wildutahproject.org/files/Sphpsoralstatusreview.pdf. Accessed January 23, 2017.

Jones, L. 1999. This scientist is making quite a buzz. Grist Magazine, September 24, 1999. Available at: http://grist.org/article/jones-bee/. Accessed January 19, 2017.

Kaeding, L.R., B.D. Burdick, P.A. Schrader, and W.R. Noonan. 1986. Recent capture of a bonytail (*Gila elegans*) and observations of this nearly extinct Cyprinid from the Colorado River. *Copeia* 4:1021–1023.

Karam A. P., and P. C. Marsh. 2010. Predation of adult razorback sucker and bonytail by striped bass in Lake Mohave, Arizona-Nevada. *Western North American Naturalist* 70:117–120.

Keller, Dan. 2016. Email between Dan Keller, Utah Division of Wildlife Resources biologist, and Jerrad Goodell, Bureau of Land Management aquatic ecologist on December 22, 2016.

Laronne, J. B. 1977. *Dissolution Potential of Surficial Mancos Shale and Alluvium*. Unpublished PhD dissertation, Colorado State University, Fort Collins.

Leonard, S., G. Staidl, J. Fogg, K. Gebhardt, W. Hagenbuck, and D. Prichard. 1992. *Riparian Area Management: Procedures for Ecological Site Inventory with Special Reference to Riparian-wetland Sites, BLM/SC/PT-92/004*. Bureau of Land Management, Service Center, Denver, Colorado.

McAda, C. W., C. R. Berry, and C. E. Phillips, Jr. 1980. Distribution of fishes in the San Rafael River system of the upper Colorado River basin. *Southwestern Naturalist*, 25: 41–49.

Madsen, D. B., and D. N. Schmitt. 2005. *Buzz-Cut Dune and Fremont Foraging at the Margin of Horticulture*. Anthropological Papers No. 124. University of Utah Press, Salt Lake City.

Madsen, D. B., and M. S. Berry. 1975. A Reassessment of Northeastern Great Basin Prehistory. *American Antiquity* 40(4):391–405.

Madsen, D. B., and S. R. Simms. 1998. The Fremont Complex: A Behavioral Perspective. *Journal of World Prehistory* 12(3):255–336.

Martin, C. W., H. J. Armstrong, S. M. Crum, B. J. Kutz and L. A. Wheeler. 1983. *Cedar Siding Shelter Archaeological Excavation of a Multi-aspect Overhang: Emery County, Utah*. Cultural Resource Series No.15. Bureau of Land Management, Salt Lake City, Utah.

1  Massimino, J., and D. Metcalfe. 1999. New Form for the Formative. *Utah Archaeology* 12:1–16.

2  Matson, R. G. 1991. *Origins of Southwestern Agriculture*. University of Arizona Press, Tucson.

3  Melillo, J. M., Terese Richmond, G.W. Yohe, Eds. 2014. Climate Change Impacts in the United States:
4      The Third National Climate Assessment, U.S. Global Change Research Program. Available at:
5      http://nca2014.globalchange.gov/report. Accessed January 18, 2016.

6  Meltzer, D. J. 2009. *First Peoples in a New World: Colonizing Ice Age America*. University of California
7      Press.

8  Minckley, W. L., P. C. Marsh, J. E. Deacon, T. E. Dowling, P. W. Hedrick, W. J. Matthews, and G.
9      Mueller. 2003. A Conservation Plan for Native Fishes of the Lower Colorado River. *BioScience*
10     53:219-234. Available at: https://academic.oup.com/bioscience/article/53/3/219/251948/A-
11     Conservation-Plan-for-Native-Fishes-of-the-Lower. Accessed January 24, 2017.

12  Minnesota Pollution Control Agency. 1999. A Guide to Noise Control in Minnesota. Acoustical
13     Properties, Measurement, Analysis, Regulation. Available at:
14     http://www.nonoise.org/library/sndbasic/sndbasic.htm. Accessed January 23, 2017.

15  Mule Deer and Pronghorn Populations in Western Wyoming. *Transactions of the 67th North American
16     Wildlife and Natural Resources Conference,* 67:350–365.

17  National Park Service (NPS). 1981. *PSD Guidance Document*. Available at:
18     https://www.epa.gov/sites/production/files/2015-07/documents/psddoc.pdf. Accessed January
19     16, 2017.

20  ———. 1991. Visitor Use Statistics. Canyonlands NP (CANY) Reports. District Report. Dec 1991. This
21     Year YTD Data. Available at: https://irma.nps.gov/Stats/Reports/Park/CANY. Accessed January
22     19, 2016.

23  ———. 1996. Visitor Use Statistics. Canyonlands NP (CANY) Reports. District Report. Dec 1996. This
24     Year YTD Data. Available at: https://irma.nps.gov/Stats/Reports/Park/CANY. Accessed January
25     19, 2016.

26  ———. 2001. Visitor Use Statistics. Canyonlands NP (CANY) Reports. District Report. Dec 2001. This
27     Year YTD Data. Available at: https://irma.nps.gov/Stats/Reports/Park/CANY. Accessed January
28     19, 2016.

29  ———. 2006. Visitor Use Statistics. Canyonlands NP (CANY) Reports. District Report. Dec 2006. This
30     Year YTD Data. Available at: https://irma.nps.gov/Stats/Reports/Park/CANY. Accessed January
31     19, 2016.

32  ———. 2010a. Air Quality in National Parks. 2009 Annual Performance & Progress Report. Natural
33     Resource Report NPS/NRPC/ARD/NRR-2010/266. Available at:
34     https://www.nature.nps.gov/air/Pubs/pdf/gpra/AQ_Trends_In_Parks_2009_Final_Web.pdf.
35     Accessed January 16, 2016.

36  ———. 2010b. Federal Land Managers' Air Quality Related Values Group (FLAG) Phase I Report –
37     Revised 2010. Natural Resource Report NPS/NRPC/NRR—2010/232. Available at:
38     https://www.nature.nps.gov/air/Permits/flag/index.cfm. Accessed March 28, 2017.

———. 2011. Visitor Use Statistics. Canyonlands NP (CANY) Reports. District Report. Dec 2011. This Year YTD Data. Available at: https://irma.nps.gov/Stats/Reports/Park/CANY. Accessed January 19, 2016.

———. 2014a. Air Quality Conditions & Trends by Park. Canyonlands National Park. Ozone. Available at: https://www.nature.nps.gov/air/data/products/parks/index.cfm. Accessed January 18, 2017.

———. 2014b. Air Quality Conditions & Trends by Park. Canyonlands National Park and Capitol Reef National Park. Visibility. Available at: https://www.nature.nps.gov/air/data/products/parks/index.cfm. Accessed January 18, 2017.

———. 2015a. Air Quality Conditions & Trends by Park. Canyonlands National Park. Ozone. Available at: https://www.nature.nps.gov/air/data/products/parks/index.cfm. Accessed January 18, 2017.

———. 2015b. Air Quality Conditions & Trends by Park. Canyonlands National Park and Capitol Reef National Park. Visibility. Available at: https://www.nature.nps.gov/air/data/products/parks/index.cfm. Accessed January 18, 2017.

———. 2015c. Air Quality Conditions & Trends by Park. Canyonlands National Park. Nitrogen and Sulfur Deposition. Available at: https://www.nature.nps.gov/air/data/products/parks/index.cfm. Accessed January 18, 2017.

———. 2016. Visitor Use Statistics. Canyonlands NP (CANY) Reports. District Report. Dec 2016. This Year YTD Data. Available at: https://irma.nps.gov/Stats/Reports/Park/CANY. Accessed January 19, 2016.

———. 2017a. Canyonlands National Park. Air Pollution Impacts. Visibility. Available at: https://www.nature.nps.gov/air/Permits/aris/cany/impacts.cfm?tab=0#TabbedPanels1. Accessed January 17, 2017.

———. 2017b. Canyonlands National Park. Stargazing. Available online at: https://www.nps.gov/cany/planyourvisit/stargazing.htm. Accessed on January 19, 2017.

———. 2017. Air Quality Conditions & Trends by Park. Canyonlands NP – Visibility. Available at: https://www.nature.nps.gov/air/data/products/parks/index.cfm. Accessed on January 17, 2017.

———. n.d. [2017]. Managing Sounds. Available at: https://www.nps.gov/subjects/sound/management.htm. Accessed January 24, 2017.

National Park Service, U.S. Forest Service, and U.S. Fish and Wildlife Service. 2010. *Federal Land Manager's Air Quality Related Values Work Group (FLAG) Phase I Report – Revised (2010). Natural Resource Report NPS/NRPC/NRR—2010/232.* Available at: http://www.nature.nps.gov/air/pubs/pdf/flag/FLAG_2010.pdf. Accessed January 16, 2016.

National Research Council. 2010. *Advancing the Science of Climate Change, Report in Brief.* Available at: http://nas-sites.org/americasclimatechoices/sample-page/panel-reports/87-2/. Accessed January 18, 2016.

Oliver, G. V. 2000. *The Bats of Utah: A Literature Review, UDWR Publication 00-14*. Utah Natural Heritage Program, Utah Division of Wildlife Resources, Salt Lake City, Utah.

Painter, T. H., J. S. Deems, J. Belnap, A. F. Hamlet, C. C. Landry, and B. Udall. 2010. *Response of Colorado River runoff to dust radiative forcing in snow*. Proceedings of the National Academy of Sciences of the United States of America. October 5, 2010. Vol. 107, no. 40.

Parrish, J. R., F. P. Howe, R. E. Norvell. 2002. Utah Partners in Flight Avian Conservation Strategy Version 2.0. Utah Partners in Flight Program, Utah Division of Wildlife Resources, Salt Lake City, Utah. UDWR Publication Number 02-27. i–xiv + 302 pp.

Prior-Magee, J.S., K.G. Boykin, D.F. Bradford, W.G. Kepner, J.H. Lowry, D.L. Schrupp, K.A. Thomas, and B.C. Thompson, editors. 2007. Southwest Regional Gap Analysis Project Final Report. U.S. Geological Survey, Gap Analysis Program, Moscow, ID. Available at: http://swregap.nmsu.edu/report/SWReGAP%20Final%20Report.pdf. Accessed January 9, 2017.

Romin, L.A., and J.A. Muck. 2002. Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances. U.S. Fish and Wildlife Service, Utah Ecological Services, West Valley City.

Rosenberger, Randall. 2011. Recreation Use Values Database (overview document). Available at: http://recvaluation.forestry.oregonstate.edu/. Accessed August 2012.

Sanchez-Rojas, G., and S. Gallina-Tessaro. 2008. *Odocoileus hemionus. The IUCN Red List of Threatened Species 2008*: e.T42393A10690708. Available at: http://dx.doi.org/10.2305/IUCN.UK.2008.RLTS.T42393A10690708.en. Accessed January 18, 2017.

Sansom, T., and B. Elliott. 2014. 2014 Jones' Cycladenia Studies (*Cycladenia humilis* var. *jonesii*) in Utah. Prepared by JG Management Systems, Inc., Grand Junction, Colorado.

Sauer, J. R., J. E. Hines, J. E. Fallon, K. L. Pardieck, D. J. Ziolkowski, Jr., and W. A. Link. 2012. *The North American Breeding Bird Survey, Results and Analysis 1966–2012, Version 12.13*. Patuxent Wildlife Research Center, Laurel, Maryland. Available at http://www.mbr-pwrc.usgs.gov/bbs/bbs2011.html. Accessed January 20, 2017.

Sawyer, H., F. Lindzey, D. McWhirter, and K. Andrews. 2002. Potential Effects of Oil and Gas Development on Mule Deer and Pronghorn Populations in Western Wyoming. *Transactions of the 67th North American Wildlife and Natural Resources Conference,* 67:350–365.

Simms, S. R. 2008. *Ancient Peoples of the Great Basin and Colorado Plateau*. Left Coast Press Inc., Walnut Creek, California.

Sipes, S., and V. Tepedino, V. 1995. Pollinator Lost? Reproduction by the Enigmatic Jones Cycladenia *(Cycladenia humilis* var. *jonesii).* Manuscript in Southwestern rare and endangered plants: Proceedings of the Second Conference; 1995 September 11–14; Flagstaff, Arizona. Available at: https://books.google.com/books?hl=en&lr=&id=9rLdXFkBZMgC&oi=fnd&pg=PA158&dq=Sipes+and+Tepedino+cycladenia&ots=6oTYdAIcV7&sig=RrX44bbo4_9ytbIAGpXg1E3P75A#v=onepage&q=Sipes%20and%20Tepedino%20cycladenia&f=false. Accessed January 20, 2017.

Spangler, J. D. 1995. *Paradigms and Perspectives: A Class I Overview of Cultural Resources in the Uinta Basin and Tavaputs Plateau, Vol. 2 and 3*. Uinta Research, Salt Lake City, Utah.

State of Utah. 2016. Rule 68-9-2. Designation and Publication of State Noxious Weeds. December 1, 2016.

Sweeten, Rob. 2017. Email communication between Rob Sweeten and Deb Reber, SWCA Environmental Consultants. February 13, 2017.

The Nature Conservancy. 2016. Annual Report. Available at http://www.nature.org/about-us/our-accountability/annual-report/2016-financial-report-with-report-of-independent-auditors.pdf. Accessed January 6, 2017.

Tyus, H.M., and C.W. McAda. 1984. Migration, movements, and habitat preferences of Colorado squawfish, *Ptychocheilus lucius*, in the Green, White, and Yampa Rivers, Colorado and Utah. *The Southwestern Naturalist* 29(3):289–299.

University of Utah. The Policy Institute. 2014. Utah Tourism Data Sheet. Available at: http://gardner.utah.edu/wp-content/uploads/2015/08/UtahTourismDataSheet20141.pdf. Accessed January 20, 2017.

URS Corp. 2012. *Emission Inventory Toolkit*, prepared by URS Corp. for the Bureau of Land Management.

U.S. Census Bureau. 2010a. Census, Profile of General Population and Housing Characteristics: 2010 Demographic Profile Data.

U. S. Census. 2010b. Table QT-P3 Race and Hispanic or Latino Origin 2010 Census Summary File 1.

U.S. Census Bureau Quickfacts. 2010.

U.S. Department of Commerce. 2015. Census Bureau, American Community Survey Office, Washington, D.C. Available at: http://www.census.gov/quickfacts/table/INC110214/00,49055,49015,49. Accessed December 6, 2016.

U.S. Department of Commerce. 2016a. Bureau of Economic Analysis, Regional Economic Accounts, Washington, D.C. Tables CA05, CA05N & CA35.

U.S. Department of Commerce. 2016b. Census Bureau, County Business Patterns, Washington, D.C. Available at: https://headwaterseconomics.org/tools/economic-profile-system/#mining-report-section. Accessed January 4, 2017.

U.S. Department of the Interior, National Park Service-National Trails Intermountain Region, and Bureau of Land Management, Utah. 2016. Old Spanish National Historic Trail Final Comprehensive Administrative Strategy. Available at http://www.stgeorgeutah.com/wp-content/uploads/2016/09/NPS_Old_Spanish_Trail_Final.pdf. Accessed February 24, 2017.

U.S. Department of Labor. 2016. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, Washington, D.C.

U.S. Department of Transportation, Federal Highway Administration. 1980. Highway Traffic Noise. Available at: http://www.nonoise.org/library.htm. Accessed February 8, 2017.

U.S. Drought Monitor. 2017. Map of current drought conditions in Utah, January 17, 2017. Available at: http://droughtmonitor.unl.edu/Home/StateDroughtMonitor.aspx?UT. Accessed January 19, 2017.

U.S. Fish and Wildlife Service (FWS). 1985. Wright Fishhook Cactus Recovery Plan. Prepared in cooperation with the Wright Fishhook Cactus Recovery Committee. U.S. Fish and Wildlife Service, Denver, Colorado.

———. 1990. Humpback Chub Recovery Plan. Mountain-Prairie Region (6), Denver, Colorado.

———. 1996. Recovery Plan for the California Condor. Third Revision. Portland, Oregon.

———. 2002a. Bonytail (Gila elegans) Recovery Goals: Amendment and Supplement to the Bonytail Chub Recovery Plan. Mountain-Prairie Region (6), Denver, Colorado.

———. 2002b. Colorado Pikeminnow (*Ptychocheilus lucius*) Recovery Goals: Amendment and Supplement to the Colorado Pikeminnow Recovery Plan. Mountain-Prairie Region (6), Denver, Colorado.

———. 2002c. Razorback Sucker (*Xyrauchen texanus*) Recovery Goals: Amendment and Supplement to the Razorback Sucker Recovery Plan. Mountain-Prairie Region (6), Denver, Colorado.

———. 2002d. Southwestern Willow Flycatcher Recovery Plan. Albuquerque, New Mexico.

———. 2008a. Recovery Outline for the Jones Cycladenia (*Cycladenia humilis* var. *jonesii*). Utah Ecological Services, West Valley City.

———. 2008b. U.S. Fish and Wildlife Service Biological Opinion for Bureau of Land Management Resource Management Plan, Price Field Office. Utah Ecological Services, West Valley City.

———. 2008c. U.S. Fish and Wildlife Service Biological Opinion for the Richfield Bureau of Land Management Resource Management Plan. Utah Ecological Services, West Valley City.

———. 2008d. Birds of Conservation Concern 2008. United States Department of Interior, Fish and Wildlife Service, Division of Migratory Bird Management, Arlington, Virginia. 85 pp.

———. 2011a. Humpback chub (*Gila cypha*) 5-Year Review: Summary and Evaluation. Upper Colorado River Endangered Fish Recovery Program. Denver, Colorado.

———. 2011b. Colorado Pikeminnow (*Ptychocheilus lucius*) 5-Year Review: Summary and Evaluation, Upper Colorado River Endangered Fish Recovery Program. Denver, Colorado.

———. 2012a. Razorback Sucker (*Xyrauchen texanus*) 5-Year Review: Summary and Evaluation, Upper Colorado River Endangered Fish Recovery Program. Denver, Colorado.

———. 2012b. Final Recovery Plan for the Mexican Spotted Owl (*Strix occidentalis lucida*), First Revision. U.S. Fish and Wildlife Service, Albuquerque, New Mexico. 413 pp.

———. 2017. IPaC Resource List for Emery, Grand, and Wayne Counties. Available at: https://ecos.fws.gov/ipac/location/6APPQ3ZVBVH65NRF3DXWHJZGZU/resources. Accessed January 23, 2017.

U.S. Geological Survey (USGS). 2005. Southwest Regional GAP Analysis Project - Land Cover
   Descriptions. Available at: http://swregap.nmsu.edu/HMdatabase/landc_database_report.pdf.
   Accessed January 18, 2016.

———. 2017a. USGS Stream Gage 09315000 Green River at Green River, Utah. Available at:
   https://nwis.waterdata.usgs.gov/ut/nwis/uv/?site_no=09315000. Accessed February 22, 2017.

———. 2017b. USGS Stream Gage 09328500 San Rafael River Near Green River, Utah. Available at:
   https://nwis.waterdata.usgs.gov/ut/nwis/uv/?site_no=09328500&agency_cd=USGS. Accessed
   February 22, 2017.

———. 2017c. USGS Stream Gage 09333500 Dirty Devil River above Poison Spring Wash Near
   Hanksville, Utah. Available at:
   https://waterdata.usgs.gov/nwis/inventory/?site_no=09333500&agency_cd=USGS. Accessed
   February 22, 2017.

Utah Air Quality Board. 2006. Utah State Implementation Plan Section VIII Prevention of Significant
   Deterioration. Available at:
   http://www.deq.utah.gov/Laws_Rules/daq/sip/docs/2006/06Jun/SecVIII-PSD.pdf. Accessed
   January 16, 2017.

Utah Department of Environmental Quality. 2013. Utah Statewide Nonpoint Source Pollution
   Management Plan. Available at:
   https://deq.utah.gov/ProgramsServices/programs/water/nps/mgmtplan2013/index.htm. Accessed
   May 5, 2017.

———. 2017. Utah Environmental Interactive Map. Available at: http://enviro.deq.utah.gov/. Accessed
   January 31, 2017.

Utah Department of Workforce Services. 2016. Current Economic Snapshot – Emery County, December
   7, 2016. Based on U.S. Bureau of Labor Statistics data.

Utah Division of Air Quality (DAQ). 2013. Available at:
   http://www.deq.utah.gov/ProgramsServices/programs/air/emissionsinventories/docs/2013/03Mar
   /NONATTAINMENT_MAP.pdf. Accessed January 11, 2017.

———. 2014a. 2014 State Summary of Emissions by Source. Available at:
   http://www.deq.utah.gov/ProgramsServices/programs/air/emissionsinventories/inventories/14Sta
   teList.htm. Accessed January 11, 2017.

———. 2014b. 2014 Statewide Point Sources by County. Available at:
   http://www.deq.utah.gov/ProgramsServices/programs/air/emissionsinventories/inventories/14Sta
   teList.htm. Accessed January 11, 2017.

———. 2014c. HAPs Detail by County. Available at:
   http://www.deq.utah.gov/ProgramsServices/programs/air/emissionsinventories/inventories/14Sta
   teList.htm. Accessed January 12, 2017.

Utah Division of Water Quality. 2002. Fremont River Watershed Water Quality Management Plan.
   September 27, 2002.

———. 2004. Price River, San Rafael River, and Muddy Creek TMDLs for Total Dissolved Solids West
   Colorado Watershed Management Unit, Utah. August 4, 2004.

Utah Division of Wildlife Resources (UDWR). 1997. Inventory of Sensitive Species and Ecosystems in Utah. Paper No. 402, Salt Lake City, Utah.

———. 2006. Range-wide conservation agreement and strategy for roundtail chub (*Gila robusta*), bluehead sucker (*Catostomus discobolus*), and flannelmouth sucker (*Catostomus latipinnis*). Publication number 06-18. Available: https://wildlife.utah.gov/pdf/UT_conservation_plan_5-11-07.pdf. Accessed January 20, 2016.

———.2009. Utah Pronghorn Statewide Management Plan. Available at: https://wildlife.utah.gov/hunting/biggame/pdf/Statewide_prong_mgmt_2009.pdf. Accessed January 18, 2017.

———. 2012. Deer Herd Unit Management Plan, Deer Herd Unit #12 (San Rafael). Available at: https://wildlife.utah.gov/hunting/plans/deer_12.pdf. Accessed January 18, 2017.

———. 2013. Utah Bighorn Sheep Statewide Management Plan. Available at: https://wildlife.utah.gov/hunting/biggame/pdf/bighorn-plan.pdf. Accessed January 18, 2017.

———. 2014. Utah Mule Deer Statewide Management Plan. Available at https://wildlife.utah.gov/hunting/biggame/pdf/mule_deer_plan.pdf. Accessed January 18, 2017.

———. 2015. Utah Sensitive Species List. October 1, 2015. Available at: http://dwrcdc.nr.utah.gov/ucdc/ViewReports/SS_List.pdf. Accessed on January 19, 2017.

Utah Division of Wildlife Resources (UDWR). 2011. Utah Sensitive Species List. March 29, 2011.

Utah Geological Survey. 2017. Fossil Locality Database.

Utah Natural Heritage Program (UNHP). 2003. Vertebrate information compiled by the Utah Natural Heritage Program: A Progress Report. Salt Lake City, Utah.

Utah Rare Plant Guide. 2017a. *Erigeron maguirei*. Available at: http://www.utahrareplants.org/rpg_species.html. Accessed January 23, 2017.

———. 2017b. *Psorothamnus polydenius* var. *jonesii*. Available at: http://www.utahrareplants.org/rpg_species.html. Accessed January 23, 2017.

———. 2017c. *Sphaeralcea janeae*. Available at: http://www.utahrareplants.org/rpg_species.html. Accessed January 23, 2017.

———. 2017d. *Thelesperma windhamii*. Available at: http://www.utahrareplants.org/rpg_species.html. Accessed January 23, 2017.

Utah State Tax Commission. 2012. Utah Tax Information. Motor Vehicle, Watercraft and Other Registrations 2010 & Newer. 2012 Off-road Registrations by County and Vehicle Type. Available at: http://tax.utah.gov/econstats/mv/registrations-2010#2015. Accessed January 20, 2017.

Utah State Tax Commission. 2013. Utah Tax Information. Motor Vehicle, Watercraft and Other Registrations 2010 & Newer. 2013 Off-road Registrations by County and Vehicle Type. Available at: http://tax.utah.gov/econstats/mv/registrations-2010#2015. Accessed January 20, 2017.

Utah State Tax Commission. 2014. Utah Tax Information. Motor Vehicle, Watercraft and Other Registrations 2010 & Newer. 2014 Off-road Registrations. Available at: http://tax.utah.gov/econstats/mv/registrations-2010#2015. Accessed January 20, 2017.

Utah State Tax Commission. 2015. Utah Tax Information. Motor Vehicle, Watercraft and Other Registrations 2010 & Newer. 2015 Registrations. Available at: http://tax.utah.gov/econstats/mv/registrations-2010#2015. Accessed January 20, 2017.

Utah State Tax Commission. 2016. Utah Tax Information. Motor Vehicle, Watercraft and Other Registrations 2010 & Newer. 2016 Registrations. Available at: http://tax.utah.gov/econstats/mv/registrations-2010#2015. Accessed January 20, 2017.

Utah Tourism Industry Association. 2016. Tourism Works! White Paper. Fall 2016. Available at: http://utahtourism.org/?page_id=9. Accessed January 20, 2017.

Varien, M. D. 2006. Turbulent Times in the Mesa Verde World. In *The Mesa Verde World: Explorations in Ancestral Pueblo Archaeology*, edited by D. G. Noble. School of American Research Press, Santa Fe, New Mexico.

Walsworth, T. E. 2011. Analysis of food web effects of non-native fishes and evaluation of restoration potential for the San Rafael River, Utah. Master's thesis. Utah State University, Logan.

Walsworth, T. E., P. Buddy, and G. P. Thiede. 2013. Longer food chains and crowded niche space: effects of multiple invaders on desert stream food web structure. *Ecology of Freshwater Fish* 22:439–452.

Welsh, S. L., N. D. Atwood, and L. C. Higgins. 2008. *A Utah Flora*. 4th edition, revised. Provo, Utah: Brigham Young University Print Services.

Welsh, S.L., N.D. Atwood, S. Goodrich, and L.C. Higgins (eds.). 2003. *A Utah Flora*. 3rd edition. Brigham Young University, Provo, Utah.

World Wildlife Fund (WWF). 2016. Annual Report. Available at: http://assets.worldwildlife.org/financial_reports/27/reports/original/WWF_AR_2016.pdf?14799 14569&_ga=1.100121182.1552829152.1483730634. Accessed January 6, 2017.



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Utah State Office
440 West 200 South, Suite 500
Salt Lake City, UT 84101
http://www.blm.gov/ut/st/en.html



IN REPLY REFER TO:
3100 (UT920)

AUG 1 4 2015

Memorandum

To:         Assistant Director, Energy, Minerals and Realty Management Directorate
            (WO-300, MIB, Room 5625)

From:       Acting State Director, Utah (UT-910)

Subject:    Updated Utah Master Leasing Plan (MLP) Strategy

## BACKGROUND

This memorandum revises and supersedes the memorandum issued by this office on May 29,
2015, with the subject of "Updated Bureau of Land Management (BLM) Utah Master Leasing
Plan (MLP) Strategy and Initiation of the San Rafael Desert MLP."

In May 2010, BLM issued Washington Office (WO) Instruction Memorandum No. 2010-117
(Leasing Reform). This directive introduced significant changes for BLM's oil and gas lease
sale review process as well as the concept of a new land use planning tool known as the MLP. In
describing the MLP concept, Leasing Reform directed BLM state offices to use the following
four criteria to identify areas where MLP preparation may be required:

1. A substantial portion of the area is not leased.
2. There is a majority federal mineral interest.
3. The oil and gas industry has expressed a specific interest in leasing, and there is a moderate
   or high potential for oil and gas confirmed by the discovery of oil and gas in the general area.
4. Additional analysis or information is needed to address likely resource or cumulative impacts
   if oil and gas development were to occur where there are multiple use or natural resource
   conflicts, impacts to air quality, impacts on the resources or values of any unit of the National
   Park System or National Wildlife Refuge or a National Forest System wilderness area, or
   impacts on other specially designated areas.

An MLP may also be completed under other circumstances at the State Director's discretion.

1

AR011400

In February of 2011, the BLM Director approved BLM-Utah's Leasing Reform implementation plan, which included preparation of the following five MLPs:

- Moab (Canyon Country District Office)
- San Rafael River[1] (Green River and Color Country District Offices)
- Vernal (Green River District Office)
- Glen Canyon[2] (Canyon Country District Office)
- Book Cliffs Divide-Cisco[3] (Canyon Country District Office)

All five of BLM-Utah's approved MLPs are within land use planning areas for which Resource Management Plans (RMPs) were completed in 2008. Four of the five MLPs would be prepared as "stand alone" planning efforts; the Vernal MLP would likely be part of a larger plan amendment effort, as discussed below.

The BLM-Utah Canyon Country District is currently preparing the Moab MLP, which includes an environmental impact statement (EIS) and will amend the Moab and Monticello RMPs. A public review period for the preliminary alternatives for the Moab MLP concluded on May 28, 2014; the draft MLP/EIS is scheduled to be released for public review by the end of August this year, and a Record of Decision (ROD) is anticipated in the summer of 2016. In addition to oil and gas, the Moab MLP addresses potash leasing and development.

Funding and staffing limitations, as well as other planning priorities, have impeded BLM-Utah's ability to initiate its other four pending MLPs. In accordance with the discretion afforded to State Directors by Leasing Reform, BLM-Utah has deferred new leasing proposals submitted for all lands within the pending MLPs in order to preserve potential alternatives for those plans. As a result, millions of acres of land with oil and gas interest have been removed from availability for oil and gas leasing and development for the last several years, and this is likely to continue until the MLPs are completed.

In order to identify actions that could be taken to facilitate the completion of its MLPs in a timelier and more effective manner, BLM-Utah conducted supplemental reviews of its approved MLPs in 2013, 2014 and again in 2015. Based on the latest review, BLM-Utah developed the following strategy for addressing the uninitiated MLPs.

## DISCUSSION

### San Rafael Desert MLP – Initiate preparation

To more accurately describe the area encompassed by the initially proposed San Rafael River MLP, the name has been changed to the San Rafael Desert MLP. The San Rafael Desert MLP consists of 524,854 acres located in Emery and Wayne Counties. It meets the majority of the criteria for preparation of an MLP as described below:

1) A substantial portion (70%) of the MLP is currently unleased. (Meets criterion #1)

---

[1] Name now changed to the San Rafael Desert MLP
[2] Name now changed to the San Juan MLP
[3] Name now changed to the Cisco Desert MLP

AR011401

2) There is a majority Federal mineral interest (83%). (Meets criterion #2)

3) There was some industry interest in leasing before designation of the MLP. A few of the December 2008 lease sale parcels, which were later withdrawn, were along the western bank of the Green River. The area has had some exploration for oil and gas in the past resulting in numerous plugged and abandoned wells. There has been no oil or gas production from the MLP area. Overall, this criterion is not met due to there being no discovery of oil or gas within the MLP area. (Does not meet criterion #3)

4) There is a potential that oil and gas development could conflict with the resources and values of Canyonlands National Park, which is east of and downwind from the MLP area. Possibly affected resources could include visuals, air quality, night skies and recreation. (Could meet criterion #4)

A primary reason for initiating an MLP in the San Rafael Desert area is to resolve long-standing lease protests and complete "curative NEPA" for leases which were placed in suspension because of litigation. There are five "sold-but-not-issued" lease parcels within the San Rafael Desert MLP. Those parcels were protested and sold at the February 2006 and May 2006 lease sales. These protests would be resolved through the MLP effort.

Of particular importance is resolution of the 16 suspended oil and gas leases within the MLP area. A summary of the issues regarding the 16 suspended leases is below:

- Leases litigated in the United States District Court, District of Utah: *Southern Utah Wilderness Alliance (SUWA) et al v. Gale Norton (BLM)*, 2:04-cv-0574-DAK (filed 8/2/2006); *SUWA et al v Lynn Scarlett (BLM)*, 2:06-cv-0342-DAK (filed 4/25/2006); and *SUWA et al v Dirk Kempthorne (BLM)*, 2:08-cv-0064-DAK (filed 12/16/2008). In these cases, the plaintiffs alleged that BLM violated the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA) and had improperly issued the 16 leases discussed here, as well as numerous other leases throughout the state.

- August 1, 2006, the United States District Court ruled on *SUWA v Norton*, 2:04-cv-0574-DAK. The court ruled that BLM violated NEPA by not considering non-wilderness study area (WSA) lands with wilderness characteristics (WC). It reversed BLM's decision that denied SUWA's protest and remanded it back to BLM to consider new information about wilderness values and characteristics on the parcels (leases).

- Lawsuits 2:06-cv-0342-DAK and 2:08-cv-0064-DAK were pending before the same judge in the same court. The plaintiffs made the same allegations as those made by SUWA in 2:04-cv-0574-DAK regarding BLM's failure to consider significant new information on WC in violation of NEPA.

- Because of the similarities in 2:06-cv-0342-DAK and 2:08-cv-0064-DAK, BLM agreed to suspend the contested leases and motioned the court to have these cases remanded back for further consideration.

- The court agreed to BLM's motion and also stated that it was unnecessary to rule on SUWA's claims of NHPA violations because they had already remanded the cases back to BLM because of the NEPA problems.

The action currently before BLM is to cancel the lease(s), modify the stipulations, or simply lift the suspensions on these suspended leases based on a NEPA analysis that includes non-WSA lands with WC. This would be done during the San Rafael Desert MLP effort.

AR011402

It is anticipated that the San Rafael Desert MLP could be accomplished through an environmental assessment (EA) to be prepared by the Price and Richfield Field Offices. The Price Field Office would be the lead office as the majority of acreage is within that office. The MLP/EA would likely amend leasing decisions in the Price and Richfield Field Office RMPs signed in 2008.

## Vernal MLP - Postpone preparation

A plan evaluation "Core Team" composed of staff from the WO-210, Division of Decision Support, Planning and NEPA, the Utah State Office and the Green River District Office completed an evaluation of the 2008 Vernal Field Office RMP between September of 2014 and January of 2015, in order to evaluate implementation of the plan and consider the potential scope of a Vernal MLP. In doing so, it became apparent that there are a number of potential planning actions and/or programmatic resource issues that would only be partially addressed by the analysis in an MLP. For example, a commitment was made by BLM while resolving protests of the 2008 RMP to address, as part of the next planning process in the Vernal Field Office, two proposed Areas of Critical Environmental Concern (ACECs) that were submitted, but inadvertently overlooked, during the 2008 Vernal RMP preparation process. The potential benefits of utilizing the Vernal MLP to codify certain conservation measures contained within a recently executed conservation agreement for the Graham's and White River beardtongues, two sensitive plant species with substantial areas of protected habitat within the boundaries of the Vernal MLP were also considered. The team also evaluated reconsidering management decisions in the Vernal RMP related to white-tailed prairie dog and travel management issues.

The evaluation ultimately showed that the resources of concern most needing to be addressed are geographically well beyond the proposed MLP analysis area and beyond the identified scope of the MLP. Therefore, it has been decided to postpone preparation of the MLP and pursue other options to address the resource issues identified. Currently under consideration is to undertake a plan amendment (or amendments) of sufficient geographic scope to address the deficiencies identified in the plan evaluation and include an MLP analysis as part of the overall plan, similar to how MLPs are being conducted in other states.

## Cisco Desert MLP – Initiate cultural resource inventories and start public planning process following Moab MLP

To more accurately describe the area encompassed by the initially proposed Book Cliffs Divide – Cisco MLP, the name has been changed to the "Cisco Desert MLP." The Cisco Desert MLP encompasses approximately 320,000 acres of land that is located within Grand County, Utah, and the BLM Utah's Canyon County District. With regard to Leasing Reform's four criteria for MLP preparation, the existing conditions for the Cisco Desert MLP planning area are as follows:

1) A substantial portion (50%) of the MLP is currently unleased. Furthermore, considering BLM Utah's policy to defer "new" leasing within the boundaries of its MLPs pending their completion and that it is more likely than not that some of the currently existing leases within the MLP will either expire or terminate before BLM-Utah completes an MLP for the area, it is anticipated that the proportion unleased lands within the Cisco Desert MLP will increase in the near future. (Meets criterion #1)

4

AR011403

2) There is a majority Federal mineral interest (86%) within the MLP.  (Meets criterion #2)
3) In the time since BLM-Utah first implemented Leasing Reform (2011), the oil and gas
industry has submitted nominations that collectively encompass a majority of the unleased lands
within the Cisco Desert MLP.  Nominations of lands within the MLP have diminished with
recent lease sales, but this may be attributable to the industry's recognition of BLM-Utah's
decision to defer leasing within MLPs pending the completion of the subject MLP.  While most
of the historical oil and gas exploration that has occurred within the Cisco Desert MLP has been
unsuccessful, there are, however, a few leases currently producing oil and/or gas leases within
the planning area for the MLP (mostly in proximity to the MLP's southern and western
boundaries).  Given the historical trends and limited scale for oil and gas production within the
MLP, as well as the recent decline in nominations, there is a degree of uncertainty as to whether
the Cisco Desert MLP meets criterion #3.  However, considering that a majority of the unleased
lands within the MLP has been nominated within the last five years, along with the presence of
existing oil and gas production within the planning area, albeit at a relatively minimal scale,
there is a possibility that additional information (e.g. new exploration, etc.) could reveal that the
Cisco Desert MLP does in fact meet criterion #3. (Possibly meets criterion #3)
4) The applicable land use plan, the Moab Field Office Record of Decision and Approved
Resource Management Plan (2008) (Moab RMP), for the Cisco Desert MLP appears to have
adequately considered reasonably foreseeable resource conflicts of any significance.  However, it
is possible that the conditions for a particular resource(s) within the Cisco Desert MLP may have
changed in the time since the issuance of the Moab RMP such that the resource(s) could benefit
from reconsideration through the MLP process. (Could meet criterion #4)

While it fails to meet all four of the criteria that, if present, would require the preparation of an
MLP, the planning area for the Cisco Desert MLP does encompass several "sold-but-not-issued"
and suspended lease parcels, which BLM-Utah will seek to address through the MLP process.
More specifically, the Cisco Desert MLP encompasses four ("sold-but-not-issued") lease parcels
that were sold at an oil and gas lease sale held in November of 2005, but for which leases have
not been issued due to an unresolved protest of the parcels that involves potential conflicts
between oil and gas development and habitat for white-tailed prairie dog, a Utah sensitive
species.  The Cisco Desert MLP also encompasses ten leases that have been in a suspended
status for several years as a result of the following lawsuits, which were filed in the United States
District Court for the District of Utah: *SUWA et al v. Gale Norton (BLM)*, 2:04-cv-0574-DAK
(filed 8/2/2006);  *SUWA et al v Lynn Scarlett (BLM)*, 2:06-cv-0342-DAK (filed 4/25/2006); and
*SUWA et al v Dirk Kempthorne (BLM)*, 2:08-cv-0064-DAK (filed 12/16/2008).

Much like with the San Rafael Desert MLP, BLM-Utah plans to utilize the MLP process for the
Cisco Desert MLP in order to address the unresolved protest for the "sold-but-not-issued" lease
parcels and to guide future decisions regarding whether to cancel, modify or lift the suspensions
on the suspended leases within the MLP planning area.

In order to facilitate its timely and efficient completion, BLM-Utah will initiate preparation
efforts for the Cisco Desert MLP by obligating fiscal year (FY) 2015 funds for conducting
"Class I" and "Class II" cultural resources inventories within the MLP planning area.
Conducting these cultural inventories will help BLM-Utah better understand and characterize the
density and distribution of cultural resources within the planning area, which will assist in

AR011404

making well-informed and timely oil and gas leasing decisions both during and after the MLP preparation process.

The cultural resources inventories that will be completed within the Cisco Desert MLP are one component of a larger landscape-level cultural resources inventory and mitigation strategy, which BLM-Utah recently developed for eastern Utah that encompasses, in addition to the Cisco Desert MLP, the planning area for the San Juan MLP (see below). The BLM-Utah will initiate these BLM-funded cultural resources inventories in the late summer of 2015.

Because of the level of staff and other resources that the Canyon Country District is currently devoting to completing the Moab MLP, BLM-Utah plans to initiate formal public scoping efforts for the Cisco Desert MLP project in 2016. The results of the cultural resources inventories conducted within the planning area will be utilized, along with other factors, to determine the scope of the Cisco Desert MLP project. The BLM-Utah will then publish a Notice of Intent (NOI) in the *Federal Register* to initiate public scoping for the Cisco Desert MLP project.

### San Juan MLP – Postpone preparation

The planning area for the San Juan MLP is known to contain significant prehistoric archaeological resources. Not surprisingly, the potential impacts to these resources from fluid mineral development have been a focal point for several oil and gas lease sale protests of proposed lease parcels within the MLP. These protests have identified several cultural resource sites and landscapes within the MLP planning area that could be impacted by oil and gas development, including those located in or near Alkali Ridge, the Montezuma Creek watershed, and the San Juan River. During recent oil and gas lease sales, BLM-Utah has deferred several proposed lease parcels within the MLP boundary because of determinations that additional analysis was needed in order to assess and address the potential impacts of oil and gas leasing on cultural resources.

In light of the extraordinary cultural resources within the planning area for the San Juan MLP and the associated concerns that those resources could be adversely impacted by oil and gas development, as a part of the previously discussed landscape-level cultural resources inventory and mitigation strategy, BLM-Utah will complete a "Class I" and "Class II" cultural resources inventories within the planning area for the San Juan MLP. Also as previously discussed, BLM Utah plans to begin conducting these cultural resources inventories in the late summer or early fall of 2015. Once complete, these cultural resources inventories will help BLM to better understand and characterize the density and distribution of the cultural resources within the San Juan MLP planning area, which will assist the Bureau in making well-informed and timely oil and gas leasing decisions in the future.

However, given the resources that the Canyon County District is devoting to completing the Moab MLP and then Cisco Desert MLP, it would be impractical for the District to initiate the San Juan MLP at this time. As such, BLM-Utah intends to postpone the San Juan MLP pending the completion of the Moab and Cisco Desert MLPs. Once the Moab and Cisco Desert MLPs have been completed, preparation of the San Juan MLP will be reevaluated within the context of the resource conditions within the MLP planning area.

AR011405

## NEXT STEPS

**Complete the Moab MLP -** Following publication of the Draft MLP/EIS scheduled for later this summer, comments will be analyzed and incorporated into the Final MLP/EIS with a Record of Decision expected in the summer 2016.

**Initiate the San Rafael Desert MLP -** Initiate formal preparation of the San Rafael Desert MLP by publishing an NOI in the *Federal Register* to provide for the potential amendment of leasing decisions in the Price Field Office (Green River District) and Richfield Field Office (Color Country District) RMPs. At this time, we estimate 25 months from the NOI to complete an EA-level MLP. The BLM-Utah has identified $200,000 from its FY2015 budget to initiate the planning effort this FY; $773,000 in additional funding would be needed in FY16 and FY17 to complete the project.

**Initiate Cisco Desert MLP cultural resource inventories and start public planning process following Moab MLP -** Once the Moab MLP is complete, the results of the cultural resources inventories within the planning area for the Cisco Desert MLP can be utilized as a reference in determining the scope for the Cisco Desert MLP project. The BLM-Utah would then publish an NOI in the *Federal Register* to initiate formal public scoping for the Cisco Desert MLP project.

Attachments:
1. Map of BLM Utah MLPs (1 pp)
2. Map of the San Rafael Desert MLP (1 pp)
3. Map of the Cisco Desert MLP (1pp)

AR011406

**Attachment 1**

# BLM Utah MLPs



AR011407

**Attachment 2**



San Rafael Desert MLP - Suspended/SNI Leases

9

AR011408

**Attachment 3**



Cisco Desert Master Leasing Plan - Oil and Gas
Bureau of Land Management - Utah

August 2015

AR011409

BLM

# United States Department of the Interior
# Bureau of Land Management

---

**DECISION RECORD**
**Environmental Assessment**
**DOI-BLM-UT-0000-2023-0007**

---

**May 2024**

# Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment

*Location:*

Price Field Office,
Emery County, Utah

---

U.S. Department of the Interior
Bureau of Land Management
Utah State Office
440 West 200 South, Suite 500
Salt Lake City, UT 84101
Phone: (801) 539-4001
Fax: (801) 539-4237



# DECISION RECORD

Based on my review of the *Utah State Office Evaluation of September* and *December 2018 Oil and Gas Lease Sales Environmental Assessment* (EA) (DOI-BLM-UT-0000-2023-0007) and associated finding of no significant impact (FONSI) for the September and December 2018 Oil and Gas Lease Sales for the Price Field Office (PFO), it is my decision to select and implement "Alternative A – No Action Alternative".[1] More specifically, it is my decision to affirm with modified stipulations and notices, as provided in Appendix B of the EA, 51 oil and gas leases covering a total of 102,299.14 acres located within the Price Field Office (PFO) planning area (Affirmed Leases) (Table 1-1).[2]

**Table 1-1. Decision for Each of the Leases and Their Corresponding Acreage**

| Lease | Lease Acreage | Lease Decision | Lease | Lease Acreage | Lease Decision |
|-------|---------------|----------------|-------|---------------|----------------|
| **UTU93466** | **1,967.64** | **Relinquished** | UTU93499 | 2,560.00 | Affirm |
| **UTU93468** | **640.00** | **Relinquished** | **UTU93500** | **1,920.00** | **Relinquished** |
| | **1,270.00** | **Affirm** | | | |
| UTU93469 | 1,920.00 | Affirm | **UTU93501** | **2,556.96** | **Relinquished** |
| UTU93470 | 1,920.00 | Affirm | UTU93502 | 1,920.00 | Affirm |
| UTU93471 | 1,952.60 | Affirm | **UTU93503** | **2,560.00** | **Relinquished** |
| UTU93472 | 2,560.00 | Affirm | **UTU93504** | **1,919.04** | **Relinquished** |
| UTU93473 | 1,920.00 | Affirm | UTU93505 | 1,953.00 | Affirm |
| UTU93474 | 2,555.12 | Affirm | UTU93506 | 1,952.00 | Affirm |
| UTU93475 | 1,969.20 | Affirm | UTU93507 | 1,983.00 | Affirm |
| UTU93476 | 1,970.28 | Affirm | UTU93508 | 1,238.00 | Affirm |
| **UTU93477** | **2,019.64** | **Relinquished** | UTU93509 | 2,560.00 | Affirm |
| **UTU93478** | **1,319.99** | **Relinquished** | UTU93510 | 1,920.00 | Affirm |
| UTU93479 | 2,560.00 | Affirm | UTU93511 | 2,492.00 | Affirm |
| UTU93480 | 1,920.00 | Affirm | UTU93512 | 1,920.00 | Affirm |
| **UTU93481** | **1,277.24** | **Relinquished** | UTU93513 | 2,560.00 | Affirm |
| | **1,278.16** | **Affirm** | | | |
| **UTU93482** | **1,920.00** | **Relinquished** | UTU93514 | 1,855.00 | Affirm |
| **UTU93483** | **1,280.00** | **Relinquished** | UTU93518 | 1,322.23 | Affirm |
| | **1,280.00** | **Affirm** | | | |

[1] Copies of the EA and FONSI can be found on the BLM National NEPA Register project page at https://eplanning.blm.gov/eplanning-ui/project/2024998/510.

[2] A total of 59 leases were analyzed in the EA, However, on October 25, 2023, North American Helium fully relinquished eight leases (UTU93466; UTU93477; UTU93478; UTU93482; UTU93500; UTU93501; UTU93503; and UTU93504) and partially relinquished three leases (UTU93468; UTU93481; and UTU93483). Because these leases have been relinquished or partially relinquished, there is no decision to be made for the eight relinquished leases or the relinquished portions of the three leases listed above.

AR011421

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment
Decision Record*                                                                                      *May 2024*

| Lease | Lease Acreage | Lease Decision | Lease | Lease Acreage | Lease Decision |
|---|---|---|---|---|---|
| UTU93484 | 1,918.96 | Affirm | UTU93519 | 2,560.00 | Affirm |
| UTU93485 | 1,951.12 | Affirm | UTU93520 | 1,920.00 | Affirm |
| UTU93486 | 1,950.48 | Affirm | UTU93521 | 2,556.12 | Affirm |
| UTU93487 | 1,982.36 | Affirm | UTU93523 | 2,560.00 | Affirm |
| UTU93489 | 2,440.00 | Affirm | UTU93524 | 1,918.84 | Affirm |
| UTU93491 | 2,520.28 | Affirm | UTU93525 | 1,874.52 | Affirm |
| UTU93492 | 1,600.00 | Affirm | UTU93526 | 2,471.00 | Affirm |
| UTU93493 | 2,460.00 | Affirm | UTU93527 | 2,429.84 | Affirm |
| UTU93494 | 1,882.16 | Affirm | UTU93530 | 2,519.88 | Affirm |
| UTU93495 | 1,974.48 | Affirm | UTU93533 | 1,883.36 | Affirm |
| UTU93496 | 1,968.74 | Affirm | UTU93534 | 896.97 | Affirm |
| UTU93497 | 2,014.60 | Affirm | UTU93713 | 1,410.00 | Affirm |
| UTU93498 | 1,324.84 | Affirm | | | |

## AUTHORITIES

The authority for this decision derives from the Mineral Leasing Act of 1920 (MLA), 30 United States
Code (USC) 226 and 43 Code of Federal Regulations (C.F.R.) § 3100.

## PLAN CONFORMANCE

As documented in Section 2.1 of the EA, three alternatives were reviewed and found to be in
conformance with the PFO Record of Decision and approved Resource Management Plan (2008).
Detailed information regarding the conformance and consistency of the alternatives with specific
management decisions within the applicable land use plans is provided in the EA.

## ALTERNATIVES CONSIDERED

In the EA, which evaluates the environmental impacts of the 59 leases, the BLM considered three
alternatives in detail: Alternative A – No Action Alternative (affirm all 59 leases), Alternative B –
Wilderness and Lands with Wilderness Characteristics Alternative (affirm 10 leases, cancel 49 leases),
and Alternative C – Lease Cancellation Alternative (cancel all 59 leases).

The BLM originally considered affirming 59 leases. However, on October 4, 2023, North American
Helium fully relinquished eight leases and partially relinquished three leases (see footnote 2). Therefore,
under Alternative A, the BLM authorized officer has the authority to selectively affirm the September and
December 2018 leasing decisions for 51 leases (encompassing 102,299.14acres). Legal land descriptions
for each lease, as well as the corresponding stipulations and notices attached to each lease to address
resource issues, are included in Appendix B of the EA. The BLM also analyzed Alternative B –
Wilderness and Lands with Wilderness Characteristics Alternative , which considered the impacts if the
BLM were to cancel 41 of the 51 leases to address potential impacts to lands with wilderness
characteristics (LWCs) and a designated Wilderness area. Under Alternative B, the BLM would affirm its
previous leasing decisions for the remaining ten leases. In the EA, the BLM also considered an alternative
where no leasing would occur, and the BLM would cancel the remaining 51 leases (Alternative – Lease

AR011422

Case 1:24-cv-02476-RC    Document 42    Filed 10/10/25    Page 1407 of 1439

*Utah State Office Evaluation of September and December 2018 Oil and Gas Lease Sales Environmental Assessment*
*Decision Record*                                                                                      *May 2024*

Cancellation Alternative). The Lease Cancellation Alternative establishes a baseline for analysis, enabling the decision-maker to compare the magnitude of environmental effects of Alternatives A and B.

## FINDING OF NO SIGNIFICANT IMPACT

Based on the analysis of potential environmental impacts contained in the EA and considering the potentially affected environment and the degree of effects factors described in 40 C.F.R § 1501.3(b), a Finding of No Significant Impact (FONSI) was prepared. As detailed in the EA and FONSI, affirming the 51 leases with modified stipulations and notices does not constitute a major federal action that will have a significant effect on the quality of the human environment, individually or cumulatively with other actions in the lease area.

## PUBLIC INVOLVEMENT

The BLM prepared the EA in full compliance with the requirements of the National Environmental Policy Act of 1969 (NEPA), and its implementing regulations at 40 C.F.R § 1500 to 1508, and BLM Manual 3120, *Competitive Leases* which included the posting of a draft of the EA for public review and comment.[3] The BLM provided the public with an opportunity to participate in the EA process during a 30-day public review and comment period, held from July 26 to August 25, 2023. The BLM received a total of 17 comment letters containing 69 individual comments. Of these, six comment letters contained substantive comments. The BLM considered the public comments, along with other information from both external and internal sources, and used them, as appropriate, in the preparation of the EA (EA, Appendix F). Additional consultation, coordination, and environmental analysis will be required if the BLM receives an application for permit to drill any of the Affirmed Leases. The BLM has already reviewed and approved three APDs (for leases UTU93475, UTU93476, and UTU93479) which North American Helium submitted in 2019 to develop helium.

## RATIONALE FOR DECISION

Pursuant to requirements of the MLA, 30 USC 181 et seq., as amended by the Federal Onshore Oil and Gas Leasing Reform Act of 1987, Public Law No. 100-203, the BLM Utah holds competitive oil and gas lease sales on a quarterly basis in order to respond to public requests for "nominated" federal lands to be made available for oil and gas leasing (30 USC 226(b)(1)(A); 43 C.F.R § 3120.1-1). As provided in Sections 102(a)(12) and 103(l) of FLPMA (43 USC 1701(a)(12) and 1702(l)), oil and gas leasing is a "principal use" for public lands. The BLM issues oil and gas leases on public lands in order to provide for the orderly development of the fluid mineral resources under its jurisdiction in a manner that is consistent with the multiple use management provided for by FLPMA. For example, Section 102 of FLPMA imposes upon the BLM a responsibility to manage the public lands in a manner that "recognizes the nation's need for domestic sources of minerals." In most instances, before oil and/or gas, which could assist in meeting the nation's needs for domestic sources of minerals, can be produced from public lands, an oil and gas lease must be issued for the lands. As such, the offering and issuance of oil and gas leases meets the purpose and need for action relevant to the responsibilities placed upon the BLM pursuant to the MLA and FLPMA.

Considering the potentially affected environment and the degree of effects factors described in 40 C.F.R § 1501.3(b), the BLM determined in the FONSI that affirming the leases, as provided for by Alternative A of the EA, does not constitute a major federal action that will have a significant effect on the quality of the human environment, individually or cumulatively with other actions in the lease area. Lease stipulations and standard lease terms and conditions for the leases address resource concerns identified in the NEPA

---

[3] 2013c. *Competitive Leases Handbook 3120-1*. Available at:
www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_h3120.pdf. Accessed April 26, 2023.

AR011423

review process (EA, Appendix B). I have made this decision because it minimizes impacts to resources while adhering to the BLM's responsibilities under the MLA, as amended; the Mining and Minerals Policy Act of 1970; the Federal Onshore Oil and Gas Leasing Reform Act of 1987; and the Federal Land Policy and Management Act of 1976 (FLPMA); and other applicable laws.

As described above, I have determined that the EA was conducted in a manner that is consistent with the applicable land use plans, laws, regulations, and policies. The September and December 2018 lease sales serve to facilitate the orderly development of fluid mineral resources under the jurisdiction of the BLM in a manner that is consistent with the requirements of FLPMA and NEPA to manage the public lands for multiple uses while considering the potential impacts to the environment and other resources that may be present.

For the reasons previously stated, it is my decision to affirm the 51 selected oil and gas leases as described above.

## APPEALS

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 C.F.R § 4. Instructions for filing an appeal are contained on the attached Form 1842-1.

Signed:

CHRISTINA PRICE   Digitally signed by CHRISTINA
                  PRICE
                  Date: 2024.05.30 09:06:45 -06'00'

May 30, 2024

Christina Price, Deputy State Director, Lands and Minerals                                    Date
Utah State Office

AR011424



U.S. Department of the Interior

Utah Bureau of Land Management

Price Field Office

August 2008

# Proposed Resource Management Plan and Final Environmental Impact Statement

Volume 1 of 3

Public Lands USA: Use, Share, Appreciate

AR013948

Price Field Office Proposed Resource Management Plan & Final Environmental Impact Statement

Volume I: Preface, Executive Summary, Chapters 1 - 3

BLM-UT-PL-08-01-1610
FES-08-29
UT-070-2002-011

August 2008

AR013949

plan. The ROD will state the decision on the RMP, the reasons for the decision, identify all alternatives, and state compliance with applicable laws. The Approved RMP will provide guidance for all subsequent site-specific decisions and implementation and activity plans within the PFO. Many land use planning decisions are implemented or become effective upon publication of the ROD for the Approved RMP and may include desired conditions, land use allocations (allowable uses), or designations and special designations. These designations include the following:

- VRM class designations
- OHV area designations
- Areas closed and open to oil and gas leasing and the stipulations applied
- WSR suitability recommendations
- ACEC designations
- ROW avoidance/exclusion

**This page intentionally left blank.**

# CHAPTER 1—INTRODUCTION, PURPOSE AND NEED

## 1.1 BACKGROUND

A Resource Management Plan (RMP) guides management actions on public lands. The Bureau of Land Management (BLM) documents broad-scale land use plan decisions in an RMP that covers each program area and guides subsequent site-specific implementation. Comprehensive in nature, RMPs address resource management issues identified through public, agency, and interagency scoping efforts as well as resource management according to laws, regulations, and BLM policies. The RMP establishes goals and objectives for resource management, actions needed to achieve them, and parameters for using BLM lands. Lands open or available for certain uses, including any applicable restrictions, and lands closed to certain uses are also identified. When there are competing resource uses and values in the same area, the Federal Land Policy and Management Act (FLPMA) of 1976, as amended, requires the BLM to manage the public lands and their various resources so they are used in the combination that will best meet the present and future needs of the American people.

The approval of this RMP constitutes a major federal action, and pursuant to the National Environmental Policy Act of 1969 (NEPA) requires preparation of an Environmental Impact Statement (EIS). NEPA requires federal agencies to consider environmental consequences in their decisionmaking process. This EIS was prepared to formulate the RMP while fulfilling the requirements of NEPA in 40 Code of Federal Regulations [CFR] 1500–1508 and 43 CFR 1601.0-6. The EIS informs decisionmakers and the public of a range of reasonable alternatives, associated environmental impacts, and any mitigation measures required for selection of an alternative.

Currently, land managed by the Price Field Office (PFO) is managed using the 1983 *Price River Management Framework Plan* (MFP) and supplements and the 1991 *San Rafael RMP* and amendments. The Proposed RMP/Final EIS resulted from internal interdisciplinary team coordination, public involvement and the gathering of the best available information. The BLM published a Notice of Intent (NOI) in the *Federal Register* on November 7, 2001 announcing its intention to replace the Price River and San Rafael land use plans and prepare an EIS. The BLM provided extensive opportunities for public and other agency involvement during the scoping process. Scoping meetings were held in six cities and ended February 15, 2002. More information on the scoping process is presented in Chapter 5 and in the *Scoping Report for the Price RMP and EIS (2002)*. The information submitted by citizens and groups helped the BLM identify the issues that were addressed during this planning process.

Based on agency expertise and issues raised by the public, the BLM prepared a Draft Resource Management Plan /Draft Environmental Impact Statement (Draft RMP/EIS) with a full description of the affected environment, a reasonable range of alternatives, and an analysis of the impacts of each alternative. The BLM published the Notice of Availability (NOA) for the Price Draft RMP/EIS for public review and comment in the *Federal Register* on July 16, 2004. This initiated the 90-day public comment period; public requests extended the public comment period for another 45 days, which concluded on November 29, 2004. In addition, four public meetings were held in August 2004 to provide an opportunity for the public to comment on the Price Draft RMP/EIS.

The original NOA for the Draft RMP/EIS released July 2004 was augmented with an NOA published in the *Federal Register* on December 13, 2005, providing the public with information on Areas of Critical Environmental Concern (ACEC) considered in the Draft RMP/EIS and specifically requesting public comments on the ACECs. Specifically, this NOA published information about each existing and potential ACEC as required in 43 CFR 1610.7-2. This initiated a 60-day public comment period. Public comments

- Maps were updated to correct minor errors, and improve readability, present new information, and display the Proposed RMP decisions.

## 1.8.1    Summary of Changes between the Preferred Alternative (Draft EIS) and the Proposed RMP (Final EIS)

- A high-country watershed stipulation has been added to protect areas above 7,000 feet.
- More restrictive management prescriptions have been applied to Greater sage-grouse habitat.
- The appropriate management level for the Muddy Creek wild horse herd has been increased by 25 horses.
- The criteria-based voluntary relinquishment decision in the Draft EIS has been revised consistent with BLM policy.
- A prescription has been added for managing livestock grazing in the Range Creek allotment.
- Boundaries of the Desolation Canyon SRMA have been revised to match the no action alternative boundary. The Range Creek SRMA has been carried forward from Alternative C, where it was part of the Desolation Canyon SRMA.
- There have been minor adjustments to management prescriptions in most of the SRMAs.
- Five areas of non-WSA lands with wilderness characteristics (totaling 97,100 acres) would be managed to protect, preserve, and maintain their wilderness characteristics.
- Designated off-highway vehicle routes have been adjusted from 247 miles in the Preferred Alternative of the Draft RMP/EIS to 606 miles in the Proposed RMP in this document. These additional 359 miles of routes were identified in the Draft RMP/EIS as part of the Alternative A route designation.
- Oil and gas leasing decisions (i.e., open with standard terms and conditions, minor and major constraints, and unavailable) have been revised to be consistent with other resource decisions, such as ACECs, VRM class objectives, and non-WSA lands with wilderness characteristics.
- The Reasonable Foreseeable Development for oil/gas was modified in the Proposed RMP to be the same as Alternative A in the Draft RMP/EIS.
- ACEC boundaries for the Interstate 70, Rock Art, San Rafael Canyon, Nine Mile Canyon, Uranium Mining District, and Heritage Sites have been adjusted for various reasons.
- The Range Creek and Sids Mountain ACECs have not been carried forward.
- The San Rafael River and the recreational segment of the Green River near the Town of Green River have not been carried forward as suitable for inclusion into the National Wild and Scenic Rivers System.
- Two scenic segments of the Green River through Desolation Canyon would be managed as suitable for inclusion into the National Wild and Scenic Rivers System with a Wild tentative classification.
- The management of WSAs, if released by Congress, has been changed and would be managed according to the prescriptions in the RMP.
- More restrictive decisions have been added to manage the Old Spanish Trail.
- In August 2005, the Utah Division of Wildlife Resources (UDWR) changed its wildlife habitat classification system. Prior to 2005, the UDWR classification system distinguished between "critical" habitat (an area that provides for biological and/or behavioral requisites necessary to sustain the existence and/or perpetuation of a wildlife population) and "high value" (an area that provides for intensive use by the species). The UDWR has come under criticism for using the term "critical," because the term refers to habitat federally designated by the U.S. Fish and Wildlife Service as required by the Endangered Species Act (ESA).

  In previous BLM planning efforts, mitigation decisions (usually timing stipulations) for impacts to UDWR's "critical" habitats have been integrated into the planning process. BLM rarely

incorporated management decisions in its RMPs for "high value" habitats. UDWR changed its classification system to include "critical" habitat with "high value" habitat, in part to accommodate the limitations of having classifications that were of no practical value to land managers. The new term "crucial" habitat is defined by UDWR as "habitat on which the local population of a wildlife species depends for survival because there are no alternative ranges or habitats available. Crucial habitat is essential to the life-history requirements of a wildlife species. Degradation or loss of crucial habitat will lead to significant declines in the wildlife population in question."

Crucial habitat boundaries appear larger on the wildlife maps in this Proposed RMP because they are a combination of UDWR's old "critical" habitat and "high value" habitat, with some minor modifications. Timing stipulations for each of the species now apply to the whole crucial habitat area. It is important to note however, that the application of waivers, exceptions and modifications, as outlined in Appendix G, will be taken into consideration and used where/when applicable for all surface disturbing activities in these areas. The range of alternatives in the Draft RMP/Draft EIS considered both of UDWR's old classifications of critical and high value habitat. Minor boundary modifications have been made by UDWR prior to incorporating them into crucial habitat boundaries. Because this information was taken into consideration and analyzed in the Draft, these minor changes are not considered significant in terms of resource uses and/or analysis in this Proposed RMP, and therefore a supplement to this EIS is not necessary for this purpose.

## 1.8.2 Summary of Changes between the Draft RMP/EIS and the Proposed RMP/Final EIS

### Executive Summary

- The Executive Summary was rewritten to reflect the Proposed RMP.

### Chapter 1

- Added a summary of changes between the Draft RMP/EIS and the Proposed RMP/Final EIS.
- Added language to describe the relationship of this plan to the National Programmatic EIS for Tar Sands and Oil Shale and the West-wide Energy Corridor Programmatic EIS.

### Chapter 2

- Added a section describing alternatives considered but eliminated from detailed analysis.
- Removed decisions related to predator control through Animal Plant Health Inspection Service.
- High-use zones within SRMAs have been renamed as recreation management zones (RMZ).
- References to Special Recreation Permit group size have been removed from all of the alternatives.
- The coal leasing decisions have added a map reference of lands available for further coal leasing consideration.
- Areas previously referred to as "closed to oil and gas leasing" are now referred to as "unavailable for oil and gas leasing." This is a terminology change only.
- Areas withdrawn or recommended for withdrawal from locatable minerals (alternatives and maps) have been revised; specifically the oil shale and Three Rivers withdrawals have been added to the maps and WSAs (not currently recommended for withdrawal through an ACEC management prescription) have been removed.

widening the existing segment and alternative routes. Water quality, air quality, cultural resources, wildlife fragmentation, and increased traffic impacts would likely be associated with this project.

## Actions on Private Lands

**Logging on Private Land.** Logging for Douglas fir, white fir, and Ponderosa pine occurs frequently on private lands adjacent to the PFO. Harvests often do not account for BMPs or sustainability, which leads to increased erosion and sediment loading in streams. These actions lead to increased habitat fragmentation and spread of noxious weeds.

**Elk Ranching.** Private elk ranching occurs near the PFO in Castle Dale, Willow Creek, Ferron, Emery, and potentially on the Tavaputs Plateau for private hunting and production of antlers and meat. Elk ranches could increase disease transmission to wildlife. High fences are often erected around these operations, which sometimes cut off wild big-game migration routes and limit movement on adjacent public and private lands.

## 4.7.3    Cumulative Impacts by Resource

### Resources

#### Air Quality

Dispersed recreation, prescribed burning activities, and mineral and energy development cause emissions of particulate matter, carbon monoxide, nitrogen oxides, sulfur dioxide, and VOC, that are currently below regulatory thresholds. In the future, emissions from these activities could incrementally affect ambient air quality, visibility, and atmospheric deposition. The cumulative impact analysis of air quality within and near the PFO includes major sources such as coal-fired power plants and cogeneration facilities. No other RFDs would increase regulated pollutants in the area.

#### Ambient Air Quality

Data contained in the Ferron Natural Gas Project and the Price River Coalbed Methane Project EISs were used to determine the baseline conditions after the development of proposed energy resources was complete. The modeled $NO_2$ and CO air quality impacts potentially associated with the Ferron Natural Gas Project demonstrated that there is no exceedance of $NO_2$ increments and no effect on the regional haze in the vicinity of the PFO or on any nearby Class I areas. Electrification has proven to be the best method of extraction because it decreases gaseous emissions compared with other options used in the PFO. See the February 2006 *Price RMP Air Quality Baseline and Analysis Report* for additional details.

Since the completion of the Ferron Natural Gas and Price Coalbed Methane EISs, the Ferron Natural Gas Field has almost entirely been converted to electric-powered compressors, and the entire Price coalbed natural gas field has been converted to electric power.

Sources other than the Ferron natural gas and Price coalbed natural gas compressors contribute 97.4 percent of the emissions in the vicinity of the PFO.

The $NO_x$ emissions from the future BLM activities for all alternatives range from 1,381 to almost 3,223 tons per year. Current emissions from the permitted major sources in the area are more than 38,000 tons per year. Considering that the permitted sources do not calculate emissions from some of the sources and that the permitted emissions come from single-point sources, the incremental impact from emissions resulting from BLM activities would be low, compared with existing sources.

**Cumulative Effect on Far-Field Class I Regional Haze**

In the Ferron Gas Project separate analyses were performed for different compressor configurations (BLM 1999a). For the scenario where all compressors were fueled by natural gas from the operating wells, the cumulative effect could be to reduce the standard visual range more than 10 percent for 11 days at Capitol Reef National Park and 2 days at Canyonlands National Park. The standard visual range reduction might be from 5 percent to 10 percent for 47 days at Capitol Reef National Park and 16 days at Canyonlands National Park.

The scenario where electric compressors were used has resulted in no direct air quality or visibility impacts.

**Cumulative Effect on Near-Field Regional Haze**

The modeled incremental effects of the proposed Ferron Natural Gas-fired compressors on near-field regional haze resulted in 11 days in which standard visual range was reduced by at least 10 percent (BLM 1999a).

The use of all electric compressors associated with the Ferron Natural Gas Projects has resulted in no direct air quality or visibility impacts. Since this is a qualitative study, it is not clear if Price would have the same results (BLM 1999a).

**Soil, Water, and Riparian**

The CIAA for soil, water, and riparian resources includes the PFO and watershed boundaries extending outside the PFO. RFD, power plant operations, coal mines, water projects, road projects, and logging on private lands could increase erosion and sediment loading and reduce water quality and quantity in the PFO. Continued mineral development and livestock grazing would increase the demand for water supply as use increased. Surface disturbing activities within and adjacent to the PFO that disturb vegetation would cause soil compaction and channel overland flows, and would increase sediment and nutrient loads to stream channels. Significant, cumulative losses of vegetation could occur from case-by-case management in areas of intense surface disturbance, making it difficult to achieve management goals. In combination with continued surface-disturbing activities and resource management, actions outside the decision area, such as the water projects on the Gooseberry Narrows dam, Flaming Gorge dam, and Gordon Creek dam, could alter stream hydrology and morphology an the river environment. Management actions for soil, water, and riparian in the PFO would not have an incremental impact on the overall cumulative effect from other past, present, and reasonably foreseeable actions on soil, water, and riparian resources.

**Vegetation**

The CIAA used to analyze cumulative impacts on vegetation includes the PFO and all Level 5 watersheds that intersect the PFO. Potential, cumulative impacts on vegetation would occur from a combination of activities and land uses occurring within the analysis boundary. In general, any land use activity that occurs within the CIAA would affect vegetation through removal, trampling, degradation, and changes to community composition. Major impacts on vegetation would result primarily from activities that directly disturb soils and remove vegetation, such as mineral development activities, livestock grazing, and dispersed recreation. Oil and gas development would likely cause the greatest amount of surface disturbance through the construction of well pads, roads, pipelines, and other facilities. Cumulative impacts would likely be greater in the area of high potential for oil and gas development (Maps 3-20 and 3-21) where mineral development would be more intense. Large-scale and/or frequent surface disturbances would increase the extent of exposed soil, which would increase surface runoff and the mobilization of soil and nutrients necessary for plant survival. Such disturbances would also alter the

composition and structure of vegetation communities, increase the potential for the introduction and establishment of noxious weeds, and reduce species diversity, primary production, and the recruitment of new plants. This, in turn, would make vegetation communities less resilient to disease, drought, fire, non-native species invasion, and other natural disturbances/stressors.

The incremental impact on vegetation communities would depend on the timing of activities and whether the amount of activity within the CIAA outpaced successful reclamation and revegetation efforts in disturbed areas. Overall, the implementation of BLM's mitigation guidelines, BMPs, restrictions on surface use, and actions designed to actively enhance environmental values would incrementally protect vegetation resources and thereby help mitigate the effects caused by surface disturbances. Specifically, vegetation treatments would help mitigate these effects by removing undesired species, increasing species diversity and age class, improving vegetation composition and structure, and increasing vegetation cover.

**Cultural Resources**

Impacts associated with resource decisions from this RMP, combined with other past, present, and reasonably foreseeable actions, could produce cumulative impacts on cultural resources and resources of religious or traditional importance to Native American tribes associated with the PFO. The CIAA for cultural resources includes the PFO and neighboring lands with connected cultural resources.

Concurrent planning projects in the region include the BLM Vernal, Richfield, and Moab-Monticello Field Offices' RMPs. Resource decisions for these planning areas, which are adjacent to the PFO, would provide protection of cultural resources throughout the region. Required inventories prior to surface disturbance would increase the number of identified sites and decrease the potential for damage from surface disturbing activities. Similar management direction and resource uses occur in these planning areas.

Former, present, and anticipated mineral development would disturb a large proportion of the ground surface when considered across the entire landscape. Each disturbed area for a well pad or road increases the opportunity for both direct and indirect impacts on cultural resource sites. However, all such development is subject to Section 106 of the NHPA and other federal laws, regulations, and policies that require the identification of important cultural resources within the area of potential effects for these undertakings and consider alternatives to avoid or mitigate these impacts. In this manner, the incremental effect on cultural resources could be reduced. As noted in Chapter 3, Section 3.2.4, cultural resource inventories associated with mineral development have resulted in the identification of cultural resource sites. It is anticipated that continued development would result in the continued identification of sites and increase the knowledge of cultural resources in the region. Identifying cultural resources largely through Section 106 compliance would continue to focus the identification and study of cultural resources to narrow pipeline corridors and ROWs on well pads and areas of public lands where new surface facilities for proposed underground coal mines are projected (one new coal mine projected). However, cultural resources are best interpreted when studied on a landscape level, identifying regional similarities and variations. Continuing to identify and study cultural resource sites through project mitigation would preserve the cultural resources, but if not done with proper consideration and foresight could result in the loss of regional cultural context. Professional research, documentation, and preservation where necessary would mitigate incremental impacts by preserving the regional context and values associated with the individual and collective sites.

In general, implementation of the array of resource decisions under Alternative E would have the lowest degree of incremental negative impact on cultural resources within the PFO because of that alternative's restrictions on surface disturbing activities. Although no direct correlation exists between acres of surface and subsurface disturbance and numbers of cultural resources affected, this general trend holds true. By

comparison, the No Action Alternative and Alternative A have the potential for roughly comparable levels of incremental impact on cultural resources, whereas Alternative E would have the least potential. Decisions under Alternative A have the greatest incremental impacts because it has greatest level of anticipated mineral development compared to 60 percent of the PFO that would receive protection through management of WSA and non-WSA lands with wilderness character under Alterative E. Under all the alternatives, cultural resources would be managed in compliance with federal law, regulation, and policies that require the preservation of cultural resource either in place or through data recovery which would reduce incremental impacts overall. Although the potential for significant impacts remains, it is associated with unanticipated discoveries of cultural resources.

Potential congressional designation of WSR segments would require a Class III cultural resource survey to identify and monitor cultural resources. Some cultural resources would require additional mitigation measures because of public interaction with the resource.

**Paleontological Resources**

The CIAA for paleontological resources includes the PFO and neighboring lands with connected paleontological resources.

Concurrent planning projects in the region include the BLM Vernal, Richfield, and Moab-Monticello Field Offices' RMPs. Resource decisions for these planning areas, which are adjacent to the PFO, would provide protection for paleontological resources throughout the region. Assessments prior to surface disturbance would increase the number of identified localities and decrease the potential for damage from surface disturbing activities. Similar management direction and resource uses occur in these planning areas.

Although it is expected that some fossils would be destroyed in the course of legitimate uses of public lands, mitigation measures would likely bring paleontologists to areas where fossils had not been previously studied. Thus, fossils that would otherwise have disintegrated over time because of weathering and erosion would be collected, placed in repositories, and protected in perpetuity. Beyond mineral development, cumulative impacts on paleontological resources could occur through incremental degradation of the resource base from a variety of sources, reducing the information and interpretive potential of the paleontological resource values. Mineral development on lands not covered by federal laws or policies protecting paleontological resources could decrease the regional resource base, increasing the scientific value of the paleontological resources within the PFO. The incremental effect of surface disturbing activities within areas containing significant fossils, especially mineral development in the region, could have the potential to damage this fragile, nonrenewable resource. However, existing laws, regulations, and policies provide ample opportunity to mitigate effects through avoidance or data recovery efforts.

**Visual Resources**

Impacts associated with resource decisions from this RMP, combined with other past, present, and reasonably foreseeable actions, could produce cumulative impacts on visual resources. The CIAA for visual resources includes the PFO and neighboring lands within the viewshed of the PFO. Development actions within and outside the PFO could produce long-term cumulative impacts on visual resources. Reasonably foreseeable future actions, including planning efforts to locate and develop mineral and hydrocarbon resources within the PFO would have incremental effects on visual resources. Impacts would be caused by surface disturbance from production, exploration, and construction of drilling and mining facilities. However, these projects would be required to conform to an area's VRM objectives through design, camouflage, and/or topographic screening. These management actions would prevent their

incremental impacts on visual resources from becoming dominant features on the landscape in sensitive VRM designations.

Continued recreational OHV use would also maintain the various routes throughout the PFO. The No Action Alternative and Alternative A would have the greatest incremental cumulative impact because they would manage the largest number of OHV routes. Alternative E would manage the fewest miles of OHV routes, and 60 percent of the PFO would receive protection through management of WSA and non-WSA lands with wilderness character, resulting in the smallest incremental impacts from the landscape contrast associated with linear route disturbances. The Proposed RMP would protect visual resources on approximately 38 percent of the PFO managed as either VRM Class I or Class II. While less than Alternative E, the VRM Classes in the Proposed RMP concentrate more protective management in areas of higher visual quality and sensitivity while allowing for the continued use and enjoyment of public lands.

The growing need to decrease the potential for catastrophic fire in the region through mechanical treatments aimed at reducing fuel loads would gradually alter landscapes where treatments are conducted. Smoke from prescribed fires used for the same purpose would sporadically affect the quality of viewsheds and interfere with the public's viewing of scenery. The incremental impact of mechanical treatments and prescribed fires when added to past, present and reasonably foreseeable actions would minimally contribute to the overall cumulative impact.

**Special Status Species**

The CIAA for special status species includes the PFO and all watersheds that intersect the PFO. BLM-permitted activities, RFD, power plant operations, coal mines, water projects, road projects, and logging on private lands would result in ground disturbance that could accumulate to affect large expanses of habitat. Surface disturbances could remove or degrade native vegetation, fragment habitats, introduce invasive weeds, displace species, cause abandonment of nesting and breeding areas, reduce availability of key habitat components, and reduce reproduction and survivability. The increased roads, oil and gas wells, and rate of vegetation treatments proposed would convert more areas to unsuitable or marginal habitat for special status species. However, under all alternatives, all permitted activities, including reasonably foreseeable well development on federal minerals, coal mine leases, water projects, and major road projects, would require USFWS and BLM consultation to ensure that projects would not cumulatively or incrementally affect special status species. In addition, BLM policy requires other special status species of non-federal status (such as Utah BLM Sensitive Species and State-listed species) to receive the same protection and consideration as federally protected species.

Depending on the extent and timing of activity, general uses could cause incremental effects to habitats that might be occupied by special status species or provide necessary habitat components over time. Such impacts could include trampling of special status species plants, damage to special status species habitats, and the introduction of noise or dust that could disturb species during sensitive periods, introduce invasive weeds or disease, degrade special status species habitat, and cause direct or stress-related mortality. Stationary species such as plants would be particularly susceptible to cumulative effects from recreation. As casual use increases over time because of population increases or popularity of the area for recreation activity, cumulative impacts could become significant for some species.

**Fish and Wildlife**

The CIAA for effects to fish and wildlife falls within the boundaries of the PFO. Impacts on fish and wildlife habitat would vary by alternative. However, most impacts would be considered moderate because

of actions such as minerals development, OHV use, and livestock grazing, that could result in the loss, alteration, and fragmentation of habitats and displacement of wildlife.

Most cumulative impacts on wildlife habitat would result from surface disturbing and disruptive activities, such as mineral development and associated wells, roads, pipelines, facilities, and open pit mines on private, State, and other federal lands within the PFO. The Lila Canyon coal mine and coal mine near Castledale would result in habitat fragmentation of wildlife habitat because of proposed roads, portal facilities, powerlines, and other infrastructure to support the mines. Coalbed natural gas and oil and gas well development in existing fields could affect crucial big game habitat as development increases. The Price CBNG Project, Ferron Natural Gas Project, and Castlegate CBNG Project would affect mule deer and elk populations and winter habitat, which would reduce regional big game populations, habitat carrying capacity, and hunting opportunities.

The Gooseberry Narrows Dam project would reduce water flows in Upper Fish Creek, reduce downstream flows in the lower Price River below Wellington, decrease the quality of Blue Ribbon fisheries, alter habitat for fish species of concern, and alter affected stream morphology on BLM-managed lands between Price and Castle Gate. The Gordon Creek Dam could also reduce water quality and quantity below Wellington, which could affect stream morphology and fish and wildlife species.

Road improvement projects on US-6 and SR-10 would cause short-term displacement of wildlife from these areas because of human presence. However, because of the existing nature of these routes, minimal additional habitat fragmentation would occur.

Loss of vegetation attributed to development activities would reduce the available habitat and the quality of the habitat, and could increase forage competition among grazing animals. Habitats might be made unavailable to wildlife because of human disturbance factors (e.g., traffic or noise during sensitive time periods such as winter, birthing, nesting, and early rearing of young). Impacts on wildlife could be potentially significant if increased development and surface disturbance altered existing migration corridors where access to important habitat areas would be greatly reduced.

Private elk ranching near the PFO in Castle Dale, Willow Creek, Ferron, Emery, and potentially on the Tavaputs Plateau could increase disease transmission to wildlife and increase the effects of habitat fragmentation in these areas resulting from erection of high fences that inhibit wildlife movement.

Alternative A would result in the greatest incremental effects on wildlife attributed to the greatest amount of development with the least amount of protections. Alternative E would result in the least incremental impact attributed to the least amount of development and the greatest level of protection.

**Wild Horses and Burros**

Cumulative impacts on wild horses and burros would occur only within the HMAs. OHV use would cause minimal impacts, and mineral development would be the source of most of the notable impacts on wild horses and burros because of repeated human activity that would displace herds to less desirable forage areas and to places farther from water sources, which could also disrupt herd activity by affecting herd productivity. Vegetation loss primarily from mineral development, and, to a lesser degree, from OHV use, vegetation treatments, and wildland or prescribed fire, would incrementally affect wild horses and burros. The incremental increase of activities in the HMA could displace herds and disrupt herd activity, but vegetation treatments and fires would enhance and improve available forage for herds over the long-term.

**Fire and Fuels**

The cumulative impact analysis boundary for fire and fuels management includes the PFO. Effects on fire frequency, intensity, and suppression activities resulting from actions the BLM has taken within the PFO would combine with similar effects caused by activities sponsored by other groups and private interests to create cumulative impacts on fire management within the analysis boundary. As development, recreational activities, and general use of the area increase, so would the number of potential ignition sources and, consequently, the probability of wildland fire occurrence. This would increase the need for federal, State, and local agencies to suppress wildland fires to protect life, property, and sensitive resources. Development of the area would also increase the number of WUI areas, which would put additional pressure on fire suppression efforts because these areas are high priority areas for fire suppression. Suppression activities within WUI areas can be more dangerous, time-consuming, and expensive than suppression in undeveloped areas.

In addition, activities associated with fire suppression, recreation, development, and general land use would incrementally contribute to the cumulative modification of the composition and structure of vegetation communities and increase the spread of noxious and invasive weeds. Such effects would, in turn, alter the fire regime of the area, potentially increasing the frequency, size, and intensity of wildland fires. However, developed areas and associated roads and ROW corridors could also provide increased accessibility to remote areas for fire suppression equipment and provide fuel breaks in the case of wildland fire events. Additional cumulative effects would occur because of all projects and activities within the analysis boundary that create air emissions (e.g., oil and gas development, prescription fire, vehicle use, and all surface disturbing activities that mobilize dust). Compliance with applicable smoke management regulations would assure that the use of prescribed fire within the PFO could continue.

**Lands with Wilderness Characteristics**
**(WSAs and Non-WSA Lands With Wilderness Characteristics)**

The CIAA for lands with wilderness characteristics (WSA and non-WSAs) includes the region surrounding the PFO boundary. Other federal lands with wilderness characteristics in Utah are currently being managed to protect those values. These are identified in Table 4-71.

**Table 4-71. Federal Lands in Utah That Are Being Managed to Protect Wilderness Characteristics**

| Land Administrator | Administrative Unit | Acres | Percentage of Land in Utah* |
|---|---|---|---|
| BLM | Designated Wilderness | 127,700 | 0.24 |
| BLM | Wilderness Study Areas | 3,214,740 | 6.1 |
| National Park Service | Recommended Wilderness | 1,467,082 | 2.79 |
| U.S. Forest Service | Designated Wilderness | 773,124 | 1.47 |
| U.S. Forest Service | Recommended Wilderness | 83,390 | 0.16 |
| **Totals** | | **5,666,036** | **10.76** |

*The percentage figures shown in the table are based on a total land area of 52,541,440 acres in Utah.

In addition to the 5,666,036 acres currently being managed to protect and preserve their wilderness characteristics (Table 4-71), the BLM is considering management options for an additional 2,847,156 acres (5.4 percent of lands in Utah) of non-WSA lands with wilderness characteristics in six ongoing land use planning efforts. This includes the 937,440 acres in the PFO, which is approximately 33 percent of all the non-WSA lands with wilderness characteristics that the Utah BLM is considering.

Cumulative effects on these lands would vary among the alternatives. However, they would be proportional to the amount of surface disturbing activities and OHV use that would be allowed. These impacts would be greatest under the No Action Alternative (oil and gas development and cross-country OHV use) and Alternative A (oil and gas development) because of the cumulative effects of potential development, surface disturbance, and OHV use. Alternative E would provide the greatest level of protection to non-WSA lands with wilderness characteristics because of its restrictions on surface disturbance and identified OHV routes in these areas. Under Alternative E, management of the 937,440 acres of non-WSA lands with wilderness characteristics would incrementally increase the number of acres in Utah managed to protect wilderness characteristics by 16 percent. If the BLM were to protect all non-WSA lands with wilderness characteristics throughout the State of Utah, it would increase the acreage under such management by 50 percent. Overall, about 16 percent of the 52 million surface acres in Utah would then be managed in a way that provides some level of protective management for wilderness characteristics. This would result in a vast increase in the amount of land managed specifically for primitive recreation uses, but it would also reduce the opportunities for oil and gas development or ROW development. This could increase costs to projects as they seek to avoid the various areas managed for wilderness characteristics.

As a result of implementing the management prescriptions under the Proposed RMP, wilderness characteristics on five areas (97,100 acres) of non-WSA areas with wilderness characteristics would be managed to protect, preserve and maintain those characteristics within the Price Field Office. Due to the location of these five areas within the PFO, which have low mineral potential and are isolated due to geography/topography, surface disturbing activities would not likely occur within these areas. Under the Proposed RMP, not managing 840,340 acres of non-WSA lands with wilderness characteristics within the PFO could lead to a loss of wilderness characteristics in the region. However, cumulatively the number of acres being protected for their wilderness characteristics in the region is larger.

Alternative E, restricts surface disturbing activities and protects the wilderness characteristics in all the 937,440 non-WSA acres that the BLM has inventoried to have wilderness characteristics. Conversely, development of ROWs would remove opportunities for solitude and primitive recreation during construction. Surface disturbance associated with development would eliminate naturalness in some portions of non-WSA lands with wilderness characteristics under Alternative E, and to a lesser extent, the other alternatives, including the Proposed RMP. Following construction activities, naturalness would remain impacted for above-ground facilities, while reclamation of subsurface ROWs would reduce the loss of naturalness.

Based on the "Cotter Decision" (State of Utah v. Andrus, 1979), "BLM is obligated to provide reasonable access to State sections." The decision notes that the BLM can regulate the method and route of access to SITLA lands encircled by federal land; however, the regulation may not prevent the State or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. While there has been no current demand for access to these sections, such actions could occur within the planning window. Providing access could diminish or eliminate wilderness characteristics in the areas adjacent to the access routes. The magnitude and duration of the impact would depend on the location of the route, type of access, and type of development being supported by the access. Because WSAs (Congressionally mandated) would be managed to maintain their wilderness

characteristics, impacts would be mitigated and likely would result in only localized and short-term disturbance.

Logging on private land inholdings within WSAs or non-WSA lands with wilderness characteristics could result in a loss of naturalness and solitude for these areas because of a common lack of BMPs or sustainability, which leads to increased erosion and sediment loading in streams and therefore increased habitat fragmentation and spread of noxious weeds. Additionally, impacts from activities associated with oil and gas lease development within WSAs would result in a temporary loss of naturalness, solitude, and primitive recreation within these areas from noise and surface disturbance. Implementation of the interim management guidelines that prohibit impairment would greatly reduce incremental impacts in areas containing oil and gas leases within a WSA by requiring stringent mitigation measures on development.

## Resource Uses

### Forest and Woodland

The CIAA used to analyze cumulative impacts on forest and woodland resources includes the PFO and all Level 5 watersheds that intersect the PFO. Potential, cumulative impacts on forests and woodlands would occur from a combination of activities and land uses occurring within the analysis boundary. In general, any land use activity that occurred within the CIAA would affect forest and woodland cover through removal, trampling, degradation, and changes to community composition. This, in turn, would reduce opportunities for forest and woodland product harvest by reducing the productivity of these vegetation communities. Major impacts on forest and woodland vegetation communities would result primarily from activities that directly disturb soils and remove vegetation, such as mineral development activities, livestock grazing, and dispersed recreation. Oil and gas development would likely cause the greatest amount of surface disturbance through the construction of well pads, roads, pipelines, and other facilities. Cumulative impacts would likely be greater in the area of high potential for oil and gas development (Maps 3-20 and 3-21) where mineral development would be more intense. Large-scale and/or frequent surface disturbances would increase the extent of exposed soil, which would increase surface runoff and the mobilization of soil and nutrients necessary for plant survival. Such disturbances would also alter the composition and structure of forest and woodland communities, increase the potential for the introduction and establishment of noxious weeds, and reduce species diversity, primary production, and the recruitment of new understory plants. This, in turn, would make forest and woodland communities less resilient to disease, drought, fire, non-native species invasion, and other natural disturbances and stressors. Overall, the alternatives could result in direct as well as indirect impacts to forest and woodland resources, which would contribute a minimal incremental effect to the overall cumulative impact from past, present and reasonably foreseeable actions.

### Livestock Grazing

The CIAA used to analyze cumulative impacts on livestock grazing includes all grazing allotments within the PFO. Potential, cumulative impacts on livestock grazing operations would occur from a combination of vegetation treatments, surface disturbing activities, the presence of grazing wildlife, and general human disturbance. These activities could result in forage loss and degradation and livestock displacement, harassment, and injury. Vegetation treatments designed to enhance rangeland conditions would generally result in increased forage production.

Existing and future oil and gas development projects, recreation use, and big game populations located within the analysis boundary would reduce AUMs and forage available for livestock and cause a cumulative increase in soil disturbance, vegetation removal, noxious and invasive weed proliferation, and

livestock displacement. Impacts would be greater in areas with large populations of big game and areas with high-density mineral development projects. These impacts could result in substantial rangeland degradation and thereby jeopardize compliance with the *Utah Standards for Rangeland Health* on some allotments. If livestock grazing were considered to be a factor in violating the standards, the responsible livestock operator could be required to make adjustments to grazing practices.

Oil and gas development activities and related construction of roads, pipelines, and well pads would be the primary cause of direct forage removal and weed proliferation. Implementing BLM's mitigation guidelines, restrictions on surface use, *Utah Standards for Rangeland Health*, and vegetation treatments, and monitoring efforts would provide protection of forage resources on federal lands, which would help reduce overall effects to livestock grazing operations.

Overall, the incremental contribution of the alternatives to the cumulative effect could result in forage removal and weed proliferation. However, implementing BLM's mitigation guidelines, restrictions on surface use, *Utah Standards for Rangeland Health*, vegetation treatments, and monitoring efforts would provide protection of forage resources on federal lands, which would help reduce incremental impacts.

**Recreation**

The CIAA for recreation includes BLM-administered lands within the PFO. Cumulative impacts would likely occur when management actions allowed for increased surface disturbing activities or other activities that could displace recreationists or affect recreation by a loss of recreation opportunities, including OHV use opportunities. Management proposed under Alternative A would likely increase incremental impacts on non-motorized recreation opportunities because of development activities and reduced surface disturbance restrictions. Conversely, management under Alternative C would offer increased protection of primitive and semi-primitive recreation opportunities. OHV opportunities would be affected under Alternative A because of increased mineral development potential, which would cause conflicts between users and development personnel. However, Alternative A would also have the largest amount of identified trails compared with the other alternatives. The cumulative impacts on OHV opportunities under Alternative E would be the greatest because of the increased amount of area being closed to OHV use. Development activities could degrade certain recreational settings, resulting in the degradation of some recreational opportunities and experiences. Impacts could occur because of increased recreational demand and use to a point where conflicts would occur with unconfined dispersed recreational opportunities. The cumulative effect of these actions would degrade resources important to recreationists and increase user conflicts between mineral development personnel, equipment, and operations, and motorized and non-motorized recreationists.

**Lands and Realty**

The lands and realty CIAA is the PFO because LTA criteria apply only within its boundaries.

Cumulative impacts on lands and realty could occur through changes in the designation and development of land resources and in changes to access of the land. The number of land use authorizations, particularly ROWs and permits, is a function of demand for these uses. Increasing development on adjacent federal, State, and private lands would likely result in additional requests for and approval of land use authorizations for facilities such as roads, utilities, and communication sites.

Under all alternatives, decisions made by adjacent landowners could affect future decisions on the public lands. Land exchanges would continue to consolidate public lands and facilitate land management. Existing or future decisions by private land owners to deny public and BLM administrative use of

traditional access routes to public lands could require LTAs to obtain additional access easements or land ownership adjustments to secure access.

For Alternatives A, B, C, and E and the Proposed RMP, the identification of ROW avoidance and exclusion areas on BLM lands could incrementally reduce the locations for major utility corridors, communication sites, and transportation systems ROWs. In addition, similar restrictions on ROW development on adjacent lands, particularly National Forest System lands could further reduce these locations.

**Minerals and Energy Development**

The CIAA for energy and minerals includes the PFO boundary. Oil and gas development, which includes tar sands and oil shale, has the largest development potential, consisting of 950 to 1,900 well pads developed over the next 20 years on all lands within the PFO. It is anticipated that approximately 75 percent of the new well pads would be on BLM lands and 25 percent on USFS lands, State of Utah lands, or private lands. These numbers represent allowable development under each of the alternatives and do not represent actual wells that would be drilled. The impact analyses contained in Sections 4.2 through 4.6 analyzed the impacts from oil and gas development based on the RFD presented in Appendix M. Because these analyses considered impacts from the entire RFD, by each alternative, impacts from minerals development on BLM land (75 percent of the RFD) as well as non-BLM lands (25 percent of the RFD) were considered above. As a result, the reader is referred to those sections for a complete review of both direct, indirect, and cumulative impacts from oil and gas development. Based on the RFD, BLM is anticipated to incrementally account for the cumulative impacts associated with 75 percent of oil and gas development.

An increase in public demand for energy and mineral resources could have a cumulative impact on energy and minerals development. Continued increases in oil and gas prices would favor continued exploration and development of these resources. Interest in developing coal and other mineral resources could increase the development of these resources within the PFO and potentially foster additional infrastructure and other mineral activity. Increased area protections under Alternative E would incrementally restrict leasing on approximately 1,000,000 acres in areas with high potential for oil and gas development because they are within WSAs and non-WSA lands with wilderness characteristics. This restriction would incrementally reduce the potential for production of oil and natural gas from public lands and could also affect the ability of the State of Utah to lease its 187,000 acres of in-holdings. In addition, about 19,200 acres of potential coal resources would be unavailable for further consideration for leasing under Alternative E. The incremental contribution of restrictions on mineral development could reduce the potential for economic extraction of mineral resources. Alternative A and the Proposed RMP would each provide for the greatest number of oil and gas well pads compared to the other alternatives.

All the alternatives would close at least 25 percent of the PFO to mineral materials disposal, with the Proposed RMP closing 33 percent and Alternative E closing 62 percent of the PFO. In the No Action Alternative, Alternatives A and B and the Proposed RMP, the abundance of these resources and the location of the closures (not always overlapping the occurrence of salable minerals) would cumulatively result in negligible impacts to future mineral material disposal.

## Special Designations

**Wilderness Study Areas**

See the Lands with Wilderness Characteristics section above, which discusses the cumulative impacts to all wilderness characteristics, regardless of management.

**Areas of Critical Environmental Concern**

The CIAA for ACECs is the potential ACEC boundaries. Cumulative impacts from implementing other resource decisions within and outside the PFO on currently designated and potential ACECs would be minimal, with the exception of mineral and OHV decisions. The nature of the R&I values associated with the potential ACECs tends to result in impacts that occur quickly but recover slowly, if at all, as in the case of impacts on cultural sites. Therefore, any impact would result in a incremental increase in impacts to R&I values. The potential for such damage to potential ACECs would be greatest under Alternative A, which designates the fewest number of potential ACECs. Alternatives C and E would result in the lowest potential for cumulative impacts resulting in irreparable damage to R&I values. In that alternative, all potential ACECs would be designated and would have special management to protect their R&I values. In the Proposed RMP, the R&I values associated with all the existing and potential ACECs would not be threatened with irreparable damage, either through management associated with a designated ACEC or from management associated with other resources and uses (e.g., SRMAs, WSAs, or the general management prescriptions in the absence of the ACEC).

There could be cumulative impacts to the R&I values from actions on State or private lands. Based on the "Cotter Decision" (State of Utah v. Andrus, 1979), "BLM is obligated to provide reasonable access to State sections." The decision notes that the BLM can regulate the method and route of access to SITLA lands encircled by federal land; however, the regulation may not prevent the State or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. While no current demand for access to these sections in ACECs was presented as reasonably foreseeable, such actions could occur within the planning window. Providing access could impact R&I values associated with ACECs on public lands in the areas adjacent to the access routes. The magnitude and duration of the impact would depend on the location of the route, type of access, and type of development being supported by the access. The BLM would work with the given proponent seeking access to reduce any potential impacts to be negligible. Because of this, impacts would be mitigated and likely would result in only localized and short-term impacts to R&I values.

The incremental impacts from the alternatives to the overall cumulative effect would range from the greatest for Alternative A and the lowest for Alternative E. In is anticipated that most of the impacts to R&I values, limited as they may be as described in the ACEC analysis above, would be due to actions proposed in this EIS. In the Proposed RMP, this would result in preventing irreparable damage to all R&I values.

**Wild and Scenic Rivers**

Any river determined suitable by the BLM as part of the RMP revision process would be recommended to the Congress for its consideration to designate into the National Wild and Scenic River System. Congressional designation of a river would ensure the continued management by the BLM for the protection of its outstandingly remarkable values and free-flowing character, and apply a classification by which the river's corridor would be managed (see Appendix C for a description of classifications).

The BLM would initiate a river management plan within one year of designation, which would provide a mechanism to ensure river values are protected. During preparation of a river management plan, the BLM would develop management objectives for the river in cooperation with local and State governments, other federal agencies, and with the involvement of the public through the NEPA process.

Any WSR designations would have no effect on existing, valid water rights. Section 13 (b) of the Wild and Scenic River Act states that jurisdiction over waters is determined by established principles of law. In Utah, water adjudication is the responsibility of the State of Utah.

The BLM may acquire a federal reserved water right for a designated WSR under State law. Where the Congress has withdrawn and reserved public lands by statute or for a specific federal purpose, such as designation of a river into the National Wild and Scenic River System, the responsible federal land managing agency may assert a federal reserved water right to appurtenant and unappropriated water with a priority date as of the date of designation, junior to all existing rights, but only in the minimum amount necessary to fulfill the primary purpose of the reservation. In practice, however, federal reserved water rights have not always been claimed if alternative means of ensuring sufficient flows are adequate.

In the case of the Green River, the reauthorization of the Flaming Gorge Dam by the Bureau of Reclamation would adjust the operation of the dam in order to protect and assist in recovery of populations and designated critical habitat for the four endangered fish. The change in flow regimes as part of the operation adjustment would enhance the fish values present in the Green River identified to be outstandingly remarkable, while not compromising any other river values. Because of this, the BLM recognizes the prescribed flow regime for Flaming Gorge Dam to be sufficient to support the purposes of the Wild and Scenic Rivers Act and has no intention to assert a reserved water right to secure an instream flow for the Green River. The BLM's recommendation to the Congress would not include such an assertion.

Designation of the Green River would have no effect on the Colorado River Compact of 1922 or subsequent interstate agreements pertaining to the upper Colorado River system. Section 13 (e) of the Wild and Scenic Rivers Act states, "Nothing contained in this Act shall be construed to alter, amend, repeal, interpret, modify, or be in conflict with any interstate compact made by any states which contain any portion of the national wild and scenic rivers system." This provides explicit assurance that an existing interstate compact would have precedence over any action taken relative to the Wild and Scenic Rivers Act, including designation.

Upon designation, Section 7 of the Wild and Scenic Rivers Act prohibits any federal agency from assisting in the development of water resources projects that would have a "direct and adverse" effect on the values for which a river was designated. This also precludes federal assistance to projects below or above a designated river segment that are determined by the managing agency (the BLM in this case) to "invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present…as of the date of designation…."

Under Alternatives C and E, if the Congress were to designate Gordon Creek as a WSR, the construction of Gordon Creek Dam would be precluded because it would directly and adversely affect the values for which Gordon Creek was designated.

Under Alternatives B, C, and E, any federal action related to the expansion of the PacifiCorp Hunter Plant would have to be carefully analyzed under NEPA to evaluate its effects on the San Rafael River, if it were to be designated by the Congress. If the power plant's expansion were found to "invade or unreasonably diminish" the San Rafael River's scenic, recreational, or wildlife values, then the expansion would not be permitted. Similarly, under these alternatives, the effects of the Gooseberry Narrows Dam on the Price River, if it were designated, would have to be evaluated against the "invade or unreasonably diminish" standards.

Management of designated rivers would provide for projects intended to comply with the Colorado River Salinity Control Act. Given the complementary objectives of the Wild and Scenic Rivers Act and the Colorado River Salinity Control Act with regard to water quality, salinity control projects would generally be beneficial to stream segments, instead of adversely affecting or unreasonably diminishing their values including water quality.

Congressional designation of a river under the Wild and Scenic Rivers Act neither gives nor implies government control of private lands within the river corridor. Private land owners would be able to use their property as they had before designation, although they would be encouraged to meet the standards of the designation.

The Wild and Scenic Rivers Act allows the Federal Government to acquire non-federal lands through acquisition of fee title, whether by purchase, exchange, donation, or another method, but not more than an average of 100 acres per river mile within the corridor (there are generally 320 acres in a river mile). If 50 percent or more of the river corridor acreage is in public ownership (e.g., federal, State, or local), acquisition can only be on a willing seller–willing buyer basis.

A scenic easement may be acquired by the Federal Government across private lands, which, depending on the terms and conditions of the easement, may only involve the protection of narrowly defined visual qualities with no provisions for public use. There are no limitations on how many acres of scenic easement may be acquired.

Condemnation of lands as a last resort for the purpose of protecting WSR values is permitted under very limited circumstances. The Federal Government has rarely exercised its eminent domain powers with respect to WSRs and not since early implementation of the act, when the attitudinal climate was one of federal acquisition.

Upon designation, public lands within a designated river corridor (the area on both sides of a river within one-quarter mile of the high water mark) classified as Wild are withdrawn from appropriation under the mining and mineral leasing laws in accordance with Section 9 of the Wild and Scenic Rivers Act. Valid existing rights, however, would be honored. For rivers designated as Scenic or Recreational, leasing mineral resources or filing new mining claims are allowed but activities are subject to reasonable access and conditions that minimize surface disturbance, water sedimentation, pollution, visual impairment, and other measures that would protect the river's values. Incremental impacts to suitable wild and scenic rivers would be limited due to management actions that are designed to protect their outstandingly remarkable values.

**Other Special Designations**

The CIAA for National Historic Trails is the extent of the Old Spanish Trail. The management contained in the No Action Alternative and Alternatives A, B, C, and E, combined with the management of adjacent land management agencies and development projects, would result in cumulative impacts on all three trail segments. In the long term, development would increase, and the historic character of these segments would be affected. Under the Proposed RMP, management associated with the segments within the PFO would incrementally reduce the magnitude of impacts on the segments' historical character. Adjacent federal land management agencies would be required to provide protection of this national designation. Development on State and private land through scattered BLM land on the Green River Crossing to Walker Flat and Big Flat to Walker Flat segments would decrease the historic character of the landscape.

The CIAA for Backways and Byways is the extent of the ways. Working with the other State and federal agencies and byway committees to promote, interpret, and protect the values for which the byways were established would provide heritage tourism opportunities. The incremental contribution of the alternatives to the overall cumulative effect to Backways and Byways is minimal.

The CIAA for National Landmarks is the extent of the designation. No incremental impacts on National Landmarks would occur from management of other resources, resource uses, designations, or support programs because of management associated with the decisions and analysis in this document.

## Support

### Transportation and Motorized Access

Cumulative impacts on transportation systems and motorized access would result from projects that increase traffic and subsequent transportation improvements and maintenance. Projects that could increase traffic would result from developing mineral resources, increasing energy production at power plants, and pursuing highway improvement projects. The CIAA for transportation system and motorized access is the PFO.

Under all alternatives, reasonably foreseeable mineral development (Appendix M) and recreation demand, in addition to projects that encourage mineral and energy production, could increase the need to improve or maintain the transportation system and motorized access. Roads and pipelines constructed could expand the existing transportation system network and facilitate motorized access. The No Action Alternative and Alternative A could have the greatest incremental impact on the improvements and maintenance of the transportation system and motorized access because they propose the most development of mineral and energy resources. Alternative E could have the least amount of incremental impacts because of the reduction in the area available for mineral and energy resource development. Incremental impacts under Alternative B and the Proposed RMP would be less than under the No Action Alternative and Alternative A and greater than under Alternatives C and E.

### Hazardous Material and Waste

No cumulative or incremental impacts on hazardous material and waste from management of other resources, resource uses, or support programs would occur under any alternative because of the strict federal regulation of management of hazardous materials, substances, and waste, PFO and national contingency plans, BLM policy on hazardous waste disposal, and continued coordination with federal and State partners regarding hazardous materials and waste issues (e.g., abandoned mine lands).

## Socioeconomic

From a socioeconomic standpoint, mineral and energy development in the study area has the greatest potential for cumulative impacts. Oil and gas development has the greatest potential for cumulative economic impacts, with as many as 1,900 well pads expected to be developed in the study area in the next 20 years. Approximately 75 percent of these locations are expected to be on BLM-administered lands, and the impact of this development has already been considered under socioeconomic impacts. The additional development activity (25 percent) is expected to occur on USFS, State of Utah, or private lands. This additional development would also have incremental economic benefits to local communities, such as increased employment and income generation. In addition, the State of Utah and communities within the study area are expected to benefit from increases in tax revenues associated with natural resource development.

Employment and income are also expected to increase in the local area because of the development of a coal mine near Castledale, a new gypsum mine, a new uranium mine, and a new humate mine. Another project that is expected to have an economic impact is the expansion in the PacifiCorp Hunter Plant, which is expected to increase employment by as many as 350 employees.

The cumulative impact of all of these development activities would be an increase in employment in the study area. This increase in employment would also likely lead to changes in population during the study period. Although changes in population might have other implications for the study area, such as impacts on available housing and government services, these impacts are expected to be insignificant because the

study area appears able to absorb an employment increase. This is because the study area has demonstrated that it can support much larger populations, as in the 1980s when the population in Carbon and Emery counties were at their highest levels in 30 years. This new or expanded economic activity might also affect the expected trends in population in the study area. As discussed in Chapter 3, the population is expected to continue to decline in Carbon and Emery counties through 2010, and is then predicted to begin to increase. Expanded economic activity might cause a reverse in this trend earlier than expected and influence population gains earlier in the study period.

Overall, most individuals' lifestyles and social interactions (such as community cohesion, community stability, and social organization) would remain essentially the same as current conditions. However, changes in population composition caused by an increase in employment might occur as new individuals move into the area.

Continuing energy and mineral development would also cause dissatisfaction among individuals and groups displaced by development activities. For instance, some recreationists might be temporarily displaced by increased well drilling and field development. In addition, some individuals and groups might experience long-term impacts from a loss of open landscapes and solitudes caused by development activities.

Lifestyles, attitudes, beliefs, values, social structure, culture, and population characteristics affect, and are affected by, development activities throughout the study area, including activities on BLM-administered lands. Continued management actions, in combination with other development activities, are expected to cause controversy within local communities. Long-term residents within the PFO have long-held opinions that there is a need to balance conservation of natural resources with the economic viability of resource-based industries. Therefore, residents generally support the development of minerals and energy as long as development does not damage wildlife habitats or degrade the quality of recreational experiences. However, individuals who value natural beauty and visual resources would be affected by energy and mineral development in the study area. During the study period, these attitudes and opinions would generally remain the same. As a result, some local residents would support further development activities, but others would be dissatisfied if development activities reduced recreational activities and overall ecosystem health. In addition, some individuals might be dissatisfied if areas within the study area were not left undisturbed. It is expected that these conflicts would continue during the study period.



## Fluid Mineral Leasing
## Proposed RMP

**Map 2-34**

- Areas open to leasing, subject to the standard terms and conditions of the lease form
- Areas open to leasing, subject to minor constraints (Timing Limitations; Controlled Surface Use, Lease Notices)
- Areas open to leasing, subject to major constraints (No Surface Occupancy)
- Areas unavailable to leasing - Includes WSAs
- Federal Minerals Open to Leasing Subject to Forest Service Constraints





Source: BLM Price Field Office



**Pronghorn Antelope Habitats**

Map 3-9



- Crucial Value - Year Long
- High Value - Year Long
- High Unoccupied Value - Year Long
- Limited Value - Year Long
- Substantial Value - Year Long



Source: Utah Division of Wildlife Resources



## Big Game Crucial Habitats
## Proposed RMP

**Map 3-12a**



| | |
|---|---|
| Mule Deer Habitat | Moose Habitat |
| Mule Deer Fawning | Rocky Mountain Bighorn Sheep Habitat |
| Desert Bighorn Sheep Habitat | Rocky Mountian Elk Habitat |
| Rocky Mountain Elk Calving | |







Surface disturbing activities are not excluded in these areas.  All timing and controlled surface use
limitations are subject to waivers, exceptions, and/or modifications identified in Appendix G.

Source: UDWR 2006, 2008

# Record of Decision

## and

## Moab Master Leasing Plan/

## Approved Resource Management Plan Amendments

### for the

## Moab and Monticello Field Offices





CANYON COUNTRY DISTRICT OFFICE

BLM

## December 2016

AR015495

# CHAPTER 1—RECORD OF DECISION

## 1.1    DECISION

The decision is hereby made to approve the attached Moab Master Leasing Plan (MLP) and Resource Management Plan (RMP) Amendments for the Moab and Monticello Field Offices (hereafter referred to as Approved Plan). The Approved Plan was prepared under the authority of the Federal Land Policy and Management Act (FLPMA) and in accordance with the Bureau of Land Management (BLM) planning regulations (43 CFR 1600), BLM Washington Office Instruction Memorandum 2010-117; *Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews* (May 17, 2010), and BLM Handbook H-1624-1; *Planning for Fluid Mineral Resources* (January 28, 2013).

An environmental impact statement (EIS) was prepared for the Approved Plan in compliance with the National Environmental Policy Act (NEPA) of 1969. The Approved Plan is nearly identical to the Proposed Plan in the Moab Master Leasing Plan and Proposed Resource Management Plan Amendments/Final Environmental Impact Statement for the Moab and Monticello Field Offices (MLP/FEIS) published in July 2016.

## 1.1.1    Modifications, Clarifications, and Corrections

No modifications, clarifications, or corrections were made to the Proposed Plan as a result of the Governor's Consistency Review or protests received by the BLM Washington Office on the MLP/FEIS.

Based on consultation with the United States Fish and Wildlife Service (USFWS), a few minor clarifications were made to lease notices provided in the Proposed Plan. These clarifications were incorporated into the Approved Plan by this Record of Decision (ROD). Details regarding these clarifications are provided in section 1.6.2 with respect to consultation with the USFWS. The language in the lease notices is prescribed by the USFWS and the analysis in the MLP/FEIS assumes that application of the lease notices would protect threatened and endangered species and their habitat. Therefore, minor clarifications to these lease notices would not change the analysis and, as a result, would not involve significant new information relevant to environmental concerns that would warrant a supplement to the MLP/FEIS.

Similarly, since the issuance to the MLP/FEIS, the Council on Environmental Quality (CEQ) has released final guidance for Federal agencies on how to consider the impacts of their actions on global climate change as part of their project-specific NEPA reviews. This final guidance provides a framework for agencies to consider the effects of a proposed action on climate change, as indicated by its estimated greenhouse gas emissions. Consistent with CEQ guidance, an analysis of the impacts for the alternatives in the MLP/FEIS from greenhouse gases is included in Appendix C to this ROD. Because the rough estimates included in Appendix C were developed using publicly available calculators and were based on development projections that were disclosed in the MLP/FEIS, the BLM has determined that the estimates amount to minor clarifications to the overall analysis in the MLP/FEIS and does not constitute new information requiring a supplement to the MLP/FEIS. This determination is also consistent with the CEQ's statement that it does not expect Federal agencies to apply its August 1 guidance to proposed actions for which a final EIS has already been issued.

# 1.5    PUBLIC INVOLVEMENT, CONSULTATION, AND COORDINATION

## 1.5.1    Public Involvement

On March 5, 2012, the BLM Canyon Country District Office initiated a planning process with the publication of the Notice of Intent (NOI) in the Federal Register. The NOI announced the Canyon Country District Office's intent to prepare an MLP, potential amendments to the Moab and Monticello RMPs, and an associated EIS. The NOI also initiated the scoping period, which ended on May 7, 2012.

Three public scoping meetings were held over a one-week period in March and April 2012. The meetings were conducted in an open-house format for two hours. Several informational posters and maps regarding specific resource uses and issues were displayed at the meetings. These posters and maps served as a starting point for attendees to discuss planning issues with BLM resource specialists and also helped participants to provide feedback and comments on specific policies and issues.

On May 14, 2014, the BLM Canyon Country District Office sponsored a three-hour open house meeting to allow interested members of the public to review the preliminary range of alternatives for the Moab MLP/DEIS. Maps of the preliminary alternatives were available for viewing and BLM resource specialists and managers were present to answer questions. In addition, a PowerPoint presentation was projected which outlined the MLP process and information about submitting comments.

On August 21, 2015, the BLM and the Environmental Protection Agency (EPA) published a Notice of Availability (NOA) for the MLP/DEIS in the *Federal Register* (80 FR 50867) which initiated a formal public comment period (94 days) which ended on November 23, 2015. The public was informed of the availability of the MLP/DEIS via news releases, the planning website, and postcards distributed to the MLP mailing list The MLP/DEIS was distributed to appropriate Federal agencies with jurisdiction by law or special expertise and to State and local agencies, including Indian Tribes. Copies of the MLP/DEIS were also made available to the public at public libraries, the MLP website, and BLM offices.

The public was provided with an opportunity to review and comment on the MLP/DEIS during the public comment period. Three public meetings were held during the comment period to inform the public about the MLP/DEIS. The meetings were conducted in an open-house format for about a two to three hour period. Several informational posters and maps regarding specific resource uses and issues were displayed at the meetings. In addition, large maps of the alternatives in the MLP/DEIS were available for viewing along with a PowerPoint presentation which outlined the MLP process and information about submitting comments. After public review of this information, BLM managers and resource specialists with a variety of disciplines were available to answer questions and provide additional information throughout the meetings.

On July 22, 2016 the EPA published of Notice of Availability in the *Federal Register* (81 FR 47793) which announced the publication of the MLP/FEIS. The public was informed of the availability of the MLP/FEIS via news releases, the planning website, and postcards distributed to the MLP mailing list. The MLP/FEIS as well as all the background documents were available on the Moab MLP planning website. A 30-day protest period commenced on July 22, 2016 and ended on August 22, 2016. In addition, a 60-day Governor's Consistency Review period began when the protest period commenced.

Five protest letters were received during the 30-day protest period and were subsequently resolved by the BLM Director, whose decision constitutes final agency action.

AR015511

# Environmental Assessment
# to Drill Three Wells and Construct Helium Extraction Facilities

**DOI-BLM-UT-G020-2021-0017-EA**



September 2023

AR015801

any raptor species of concern. The district files and an onsite field visit with BLM and NAH representatives held April 25, 2019, to the Proposed Project did not identify any known raptor nest sites. Some of the more prominent raptors that may utilize the Proposed Project and surrounding areas based on high desert habitat associations (J. R. Parrish et al, 2002) include, but are not limited to, the ferruginous hawk, golden eagle, prairie falcon, red-tailed hawk, Cooper's hawk, American kestrel, northern harrier, and great horned owl. Other species may be present year-round or seasonally in the spring or fall as they migrate through the area. Nesting tends to be concentrated around cliffs, large trees, embankments, and other habitat features. Raptor management for the BLM is guided by *Guidelines for Raptor Protection from Human and Land Use Disturbances"*, Appendix 5 in the 2008 Price RMP (USDI-BLM, 2008a). These best management practices include seasonal timing limitations, seasonal buffers, and controlled surface measures such as surface occupancy limitations during species-specific nesting seasons to protect raptor species (L. A. Romin et al., 2002).

### 3.10.1.3 Burrowing Owls

A general biological resources survey within the Proposed Project was conducted in May and July 2019. No burrowing owls or burrowing owl nest sites were observed (Mt. Nebo Scientific, Inc. 2020). However, during an additional field visit to the site on March 18, 2021, a burrowing owl was documented foraging within the Proposed Project (USDI-BLM 2021b). In Utah, white-tailed prairie dog burrows are the main source of nest sites for burrowing owls. The Proposed Project is located 0.25 miles from the nearest documented white-tailed prairie dog colony. Burrowing owls potentially occupy 94,400 acres of white-tailed prairie dog habitat in the San Rafael Desert area, per BLM district files and USGS GAP analysis habitat models (https://maps.usgs.gov/gap-species/#sv-aADSAx).

### 3.10.1.4 Pronghorn

The Proposed Project is within crucial pronghorn year-long habitat per review of BLM GIS data. The function of crucial habitat is to protect and provide shelter and forage to pronghorn, including when fawning and wintering. The Proposed Project is also within the San Rafael Desert pronghorn hunt unit, which consists of 3,013,214 acres of public and private lands. Population estimates for pronghorn for this hunt unit are 240 individuals, which is below the target object of 275 (UDWR 2020).

AR015876