## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| U.S. DEPARTMENT OF THE INTERIOR, *et al.*, | : | Civil Action No.:   24-2476 (RC) |
| | : | |
| | : | Re Document Nos.:   29, 31, 35 |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| THE STATE OF UTAH | : | |
| | : | |
| Intervenor-Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

### Denying Plaintiff's Motion for Summary Judgment; and Granting Defendants' and Intervenor-Defendant's Cross-Motions for Summary Judgment

## I.  INTRODUCTION

In August 2024, Plaintiff Southern Utah Wilderness Alliance ("SUWA") filed suit against the Department of the Interior ("DOI"), DOI's Bureau of Land Management ("BLM"), and Christina Price in her official capacity as Deputy State Director, Lands and Minerals, in BLM's Utah State Office (collectively, "Defendants"), regarding BLM's decision to reaffirm thirty-five oil and gas leases in Utah.  BLM first decided to sell the leases at issue in 2018.  SUWA sued, resulting in a settlement agreement where, *inter alia*, BLM agreed to prepare a supplemental analysis under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12. After completing its analysis, BLM reaffirmed the leases in 2024.  In this case, SUWA has moved for summary judgment on its claims alleging violations of NEPA and the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706. Defendants and Intervenor-Defendant the State of Utah have cross-moved for summary judgment. For the reasons stated below, the Court denies SUWA's motion for summary judgment, and grants Defendants' and Intervenor-Defendant's cross-motions for summary judgment.

## II. BACKGROUND

### A. Statutory and Regulatory Background

Multiple statutes govern the development of oil and gas resources on federal lands. These include the Mineral Leasing Act, Federal Land Policy and Management Act, and NEPA.

#### 1. Mineral Leasing Act

The Mineral Leasing Act of 1920 ("MLA") tasks the Secretary of the Interior with managing and overseeing mineral development on public lands. 30 U.S.C. § 187. The MLA provides for oil and gas development on these lands, and requires that lease sales "be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." *Id.* § 226(b)(1)(A). But the MLA gives the Secretary broad authority to prescribe conditions on the development of that land. *See id.* § 226; *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 52 (D.D.C. 2019).

#### 2. Federal Land Policy and Management Act

The Federal Land Policy and Management Act of 1976 ("FLPMA") directs the BLM to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. §§ 1731(b), 1732(a). "[M]ineral exploration and production" is one of the "principal or major uses" prescribed by the FLPMA. *Id.* § 1702(l). The FLPMA also directs BLM to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id.* § 1712(a).

3.  National Environmental Policy Act

In addition to the MLA and FLPMA, the NEPA provides additional steps that BLM must take when leasing federal lands for oil and gas development.  "NEPA does not work by mandating that agencies achieve particular substantive environmental results.  Rather, NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321).  In this way, "NEPA is *a purely procedural statute*."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 173 (2025).

NEPA requires agencies to prepare a "detailed statement" for proposed "major Federal actions significantly affecting the quality of the human environment" that analyzes the environmental impacts of the proposed action.  42 U.S.C. § 4332(2)(C).  This report is referred to as an Environmental Impact Statement ("EIS") and must include "reasonably foreseeable environmental effects of the proposed agency action," as well "alternatives to the proposed agency action."  *Id.*; 40 C.F.R. § 1502.3.[1]  These "effects" include direct, indirect, and cumulative effects or impacts.  40 C.F.R. § 1508.8.  But an EIS is not always required before an agency takes a proposed action; an agency can instead prepare an Environmental Assessment

---

[1] For consistency, the Court cites to the 1978 NEPA regulations promulgated by the Council on Environmental Quality that were in effect when BLM sold the leases at issue here in 2018, and on which BLM's 2024 decision was based, despite these regulations no longer being in effect.  *See* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55,978 (Nov. 29, 1978) (codified at 40 C.F.R. pts. 1500-1508); Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10,610 (Feb. 25, 2025); Mem. in Supp. Fed. Defs.' Combined Cross Mot. Summ. J. & Opp'n ("Defs.' MSJ") at 2 n.1, ECF No. 30; AR 15, ECF No. 42.

("EA") to determine whether the proposal's impact on the environment will not be significant, in which case an EIS is not required.  *See* 40 C.F.R. §§ 1501.3, 1508.9.

"For multi-stage agency programs, such as the oil and gas development program at issue here, NEPA provides that the environmental analysis conducted at each stage," whether an EIS or EA, "may incorporate by reference previous, related analyses."  *See WildEarth Guardians*, 368 F. Supp. 3d at 53.  The purpose of this "tiering" is to "eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."  40 C.F.R. §§ 1502.20, 1508.28.

### 4.  Oil & Gas Leasing

"Oil and gas development on federal land is typically conducted through a three-stage process governed by the FLPMA, NEPA, and the BLM's Land Use Planning Handbook.  These stages are: (1) land use planning; (2) leasing; and (3) drilling."  *WildEarth Guardians*, 368 F. Supp. 3d at 54.

At the first stage, BLM prepares a Resource Management Plan ("RMP") for a given area that specifies which lands will be available for oil and gas leasing, and any stipulations and conditions for that development.  43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0-5(n).  "The plan typically incorporates a reasonably foreseeable development scenario ("RFDS"), which projects the scope and pace of oil and gas development within the planning area."  *WildEarth Guardians*, 368 F. Supp. 3d at 54.  Regulations require that RMPs be accompanied by an EIS.  *See* 43 C.F.R. § 1601.0-6.  And the RMP may be revised "when appropriate."  43 U.S.C. § 1712(a).

At the second stage, BLM may grant leases for oil and gas development on lands designated as available, consistent with any requirements under the RMP.  30 U.S.C. § 226(a); 43 U.S.C. § 1712(e).  "BLM may impose terms and conditions on the leases, including conditions

designed to protect the environment." *WildEarth Guardians*, 368 F. Supp. 3d at 54.  These

leasing decisions also require NEPA analysis and time for public comment.  *See* 43 C.F.R.

§ 3120.42.

At the third stage, the lessee may file an Application for Permit to Drill ("APD").  *See* 43

C.F.R. § 3162.3-1(c).  "BLM may condition APD approval on the lessee's adoption of

'reasonable measures,' delimited by the lease and the lessee's surface use rights, to mitigate the

drilling's environmental impacts." *WildEarth Guardians*, 368 F. Supp. 3d at 54.  "Before

approving any Application for Permit to Drill . . . the authorized officer shall prepare an

environmental record of review or an environmental assessment, as appropriate."  43 C.F.R.

§ 3162.5-1(a).  Only after the APD is approved may drilling operations commence.  *Id.* § 3162.3-

1(c).

## B.  Factual and Procedural Background

BLM manages the land at issue in Utah's San Rafael Desert pursuant to the Price Field

Office Resource Management Plan ("Price RMP").  *See* AR 544–46.  BLM finalized the Price

RMP in 2008.  AR 3142.  The Price RMP determined which lands were available for oil and gas

leasing and established conditions for future development.  *See* AR 3279.

In 2010, BLM introduced the concept of a Master Leasing Plan ("MLP").  BLM

Instruction Memorandum 2010-117 ("IM 2010-117"), Oil and Gas Leasing Reform – Land Use

Planning and Lease Parcel Reviews (May 17, 2010), AR 10474–82.  MLPs were a mechanism

for addressing areas already subject to an RMP where "additional planning and analysis may be

necessary prior to new oil and gas leasing because of changing circumstances, updated policies,

and new information."  AR 10476.  The MLP process was intended to be conducted "before lease

issuance" so that BLM could "reconsider RMP decisions pertaining to leasing."  *Id.*

Accordingly, BLM anticipated that an MLP would "ordinarily be initiated as a land use plan amendment." *Id.* BLM instructed that MLPs would be required in scenarios where four criteria were met, but stated that MLPs could "also be completed under other circumstances at the discretion of the Field Manager, District Manager, or State Director." *Id.*

In 2015, the Utah State Office of the BLM began preparing an MLP for the San Rafael Desert, even though an MLP was not required by IM 2010-117 for this area. *See* AR 11401–02. The practical effect of this and other MLPs in Utah was that "millions of acres of land with oil and gas interest" had been "removed from availability for oil and gas leasing and development" since 2010, and would "likely" remain unavailable "until the MLPs [were] completed." AR 11401. A "primary reason" for initiating the San Rafael Desert MLP was "to resolve long-standing lease protests and complete 'curative NEPA' for leases which were placed in suspension because of litigation." AR 11402. BLM anticipated that this could be done through an EA that would "likely amend leasing decisions" in the Price RMP. AR 11403. BLM's Price and Richfield Field Offices began working on the EA for the San Rafael Desert MLP. *See* Notice of Intent to Prepare a Master Leasing Plan, Amend the Resource Management Plans for the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment, Utah, 81 Fed. Reg. 31,252 (May 18, 2016). In 2016, BLM prepared an RFDS for the San Rafel Desert MLP Area. *See* AR 5222–54. But the San Rafael Desert MLP was never completed.

In 2017, President Trump issued Executive Order No. 13783, which directed the heads of federal agencies to review existing regulations and "suspend, revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law." Promoting Energy Independence and Economic Growth § 1(c), 82 Fed. Reg. 16093 (Mar. 28, 2017). The Secretary of the Interior

6

responded with his own order, which directed BLM to "(a) support and improve the implementation of the oil and gas quarterly lease sale provision found in the Mineral Leasing Act; (b) identify options to improve the Federal onshore oil and gas leasing program . . . as well as identify additional steps to enhance exploration and development of Federal onshore oil and gas resources . . . ; and (c) develop an effective strategy to address permitting applications efficiently and effectively . . . ."  Sec'y of the Interior, Order No. 3354, at 1–2 (July 5, 2017).

Accordingly, BLM issued Instruction Memorandum 2018-34 ("IM 2018-34"), Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews (Jan. 31, 2018). AR 5608.  IM 2018-34 explicitly superseded IM 2010-117.  AR 5609.  IM 2018-34 reiterated that RMPs "underlie[] fluid minerals leasing decisions," and that "[t]hrough effective monitoring and periodic RMP evaluations, state and field offices will examine resource management decisions to determine whether the RMPs adequately protect important resource values in light of changing circumstances, updated policies, and new information."  *Id.*  IM 2018-34 also explained that the "results of such reviews and evaluations may require a state/field office to update resource information through land use plan maintenance, amendment, or revision."  *Id.*

Importantly here, IM 2018-34 also explicitly "eliminate[d] the use of MLPs."  AR 5610. It provided that "BLM will not initiate any new MLPs or complete ongoing MLPs under consideration as land use plan amendments," based on a determination that MLPs "have created duplicative layers of NEPA review."  *Id.*

About six months later, BLM's Utah office followed suit and terminated the San Rafael Desert MLP.  Notice of Termination of the San Rafael Swell Master Leasing Plan, Utah, 83 Fed. Reg. 32,681 (July 13, 2018).  With the MLP out of the way, BLM restarted the quarterly lease sale process in September 2018 and prepared the required EA.  *See* AR 5409.  The office again

held a December 2018 lease sale and incorporated prior NEPA analysis for that decision.  *See*

AR 5889.  BLM sold the leases at issue here through those two lease sales in 2018.  AR 544.

In December 2020, SUWA and other environmental groups sued the Secretary of the

Interior and other officers for conduct relating to 77 leases from the September and December

2018 sales.  *Id.*; *see* Compl., *S. Utah Wilderness All. v. Bernhardt*, No. 20-cv-3654 (D.D.C.

Dec. 14, 2020).  The parties entered into a settlement agreement, whereby BLM agreed to

prepare supplemental NEPA analysis for the 2018 lease sales.  *See* AR 13–19.

In June 2024, BLM released the final version of that supplemental analysis, its

"Reevaluation EA."  AR 535.  BLM tiered its analysis to the 2008 Price RMP and its 2018 EA.

AR 544–45.  Ultimately, BLM decided to affirm its prior leasing decisions for the leases at issue.

AR 11421.

In August 2024, SUWA brought this suit challenging BLM's decision to reaffirm 35 of

the oil and gas leases and sought declaratory and injunctive relief based on alleged NEPA and

APA violations.  Compl. ¶¶ 114–39, ECF No. 1.  In November 2024, SUWA amended its

Complaint, alleging two additional causes of action based on the Endangered Species Act

("ESA"), 16 U.S.C. §§ 1531–1544.  *See* Am. Compl. ¶¶ 160–72, ECF No. 8.  In April 2025, the

State of Utah moved to intervene as a defendant in this case, ECF No. 25, and the Court granted

that motion, ECF No. 32.

While Utah's motion to intervene was pending, SUWA moved for summary judgment.

Pl.'s Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 29.  SUWA moves on only three of its six claims:

(1) that BLM's failure to provide a reasoned explanation for abandoning its MLP policy violated

the APA, Pl.'s MSJ at 20–34; (2) that BLM's failure to prepare NEPA analysis before abandoning

its MLP policy violated NEPA, *id.* at 34–39; and (3) that BLM's 2024 Reevaluation EA did not

sufficiently analyze the cumulative impacts of the leasing decisions on pronghorn antelope in

violation of NEPA, *id.* at 39–44.  SUWA seemingly abandons its ESA claims.  *See generally* Pl.'s

MSJ.  Defendants cross-moved for summary judgment.  *See* Mem. in Supp. Fed. Defs.'

Combined Cross Mot. Summ. J. & Opp'n ("Defs.' MSJ"), ECF Nos. 30–31.  The State of Utah

has also cross-moved for summary judgment, but rather than filing its own brief, joined and

adopted the Federal Defendants' briefings.  ECF Nos. 35, 40.  The motions are now fully briefed

and ready for the Court's consideration.  *See* Reply Supp. Pl.'s Mot. Summ. J. ("Pl.'s Reply"),

ECF No. 37; Reply Supp. Fed. Defs.' Combined Cross Mot. Summ. J. & Opp'n ("Defs.' Reply"),

ECF No. 39.

## III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  But when reviewing agency action, courts review the administrative record and

"invalidat[e] the [agency's] actions only if, based on that record, they are 'arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law.'"  *Stand Up for Cal.! v. U.S.*

*Dep't of Interior*, 879 F.3d 1177, 1181 (D.C. Cir. 2018) (quoting *Dist. Hosp. Partners, L.P. v.*

*Burwell*, 786 F.3d 46, 54 (D.C. Cir. 2015)); 5 U.S.C. § 706(2)(A).  Agency action is arbitrary and

capricious "if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs.*

*Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Arbitrary and

capricious review is "highly deferential" and "presumes agency action to be valid."  *Am.*

*Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976)).  The agency action need only be "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021).

NEPA requires agencies to prepare a "detailed statement" for proposed "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). As the Supreme Court has recently emphasized, "NEPA is a *purely procedural statute*."  *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180.  Thus, "an agency's only obligation is to prepare an adequate report."  *Id.*  And as with all cases reviewed under the APA's arbitrary-and-capricious standard of review, "the central principle of judicial review in NEPA cases is deference."  *Id.* at 179.

## IV.  ANALYSIS

The Court first analyzes SUWA's APA claim based on BLM's ending of its MLP policy, which had the practical effect of terminating the San Rafael Desert MLP.  The Court then addresses whether BLM was required to conduct NEPA analysis before terminating the MLP policy, and whether the Reevaluation EA's analysis of pronghorn antelope satisfied NEPA's requirements.  The Court concludes that BLM's decision to end its MLP policy was reasonable and, though succinct, reasonably explained.  And no NEPA analysis was needed to make this procedural change, as the entire purpose of the decision was to reduce duplicative, redundant NEPA analysis.  Lastly, affording the BLM due deference for its NEPA analysis, the Court is satisfied that BLM adequately considered the cumulative effects of its leasing decisions on pronghorn antelope.  Accordingly, the Court denies SUWA's motion for summary judgment, and grants Defendants' and Intervenor-Defendant's cross-motions.

### A.  Arbitrary & Capricious Review of BLM's Termination of the MLP Policy

Though SUWA initially argued that the "Reevaluation EA violates the APA because at no time has BLM provided a reasoned explanation for abandoning the San Rafael Desert MLP process," Pl.'s MSJ at 20; Am. Compl. ¶¶ 143–49, SUWA clarified in its reply brief that the policy change it is challenging is IM 2018-34's ending of the MLP policy, and that the abandonment of the San Rafael Desert MLP was a "forced result" of that allegedly arbitrary policy change, Pl.'s Reply at 11.  Thus, the relevant issue is whether BLM's termination of its MLP policy in 2018 was arbitrary and capricious because BLM failed to provide a reasoned explanation for its policy change.[2]  *Id.*  BLM responds that its explanation was sufficient, and that IM 2018-34 was not the kind of policy change that required explanation.[3]  Defs.' Reply at 4–11.  The Court is satisfied that BLM's explanation for ending its MLP policy, though brief, was reasonable.

---

[2] Defendants argue in their cross-motion for summary judgment that SUWA's claims based on IM 2018-34 are time-barred by the APA's six-year statute of limitations.  *See* Defs.' MSJ at 11–13; 28 U.S.C. § 2401(a).  In response, SUWA submitted a declaration explaining that it was first injured when BLM sold the leases at issue in October 2018, which would make its August 2024 Complaint timely.  *See* Pl.'s Reply at 6.  SUWA relies on *Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 603 U.S. 799, 825 (2024), in which the Supreme Court held that an "APA claim does not accrue for purposes of § 2401(a)'s 6-year statute of limitations until the plaintiff is injured by final agency action."  Defendants concede that the "declaration may resolve the statute of limitations question in this case."  Defs.' Reply at 2.  The Court, therefore, does not base its decision on this statute-of-limitations argument.

[3] The parties dispute whether IM 2018-34 constitutes "final agency action" subject to judicial review under the APA, 5 U.S.C. § 704.  *See* Pl.'s Reply at 17–18; Defs.' Reply at 5–9.  The parties' focus seems misplaced.  No one disputes that the agency's later actions, for instance, the 2018 lease sales, constitute final agency action sufficient to make this case appropriate for judicial review.  Thus, even accepting as true Defendants' argument that IM 2018-34 was not a final agency action, it may still be an "intermediate agency action or ruling not directly reviewable [that] is subject to review on the review of the final agency action."  5 U.S.C. § 704.  And because finality is not jurisdictional, *see Trudeau v. FTC*, 456 F.3d 178, 183–85 (D.C. Cir. 2006), the Court need not decide whether the lease sales constitute final agency action, as Defendants did not raise this argument.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). A reasoned explanation displays awareness that the agency is changing its position; shows that there are good reasons for the new policy, though those reasons need not be better than the reasons for the old policy; and is permissible under the statutory scheme. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). If the new policy relies on factual findings that contradict the factual findings underlying the old policy, then the agency must explain that contradiction.[4] *Id.* at 515–16.

Here, "SUWA's focus is on" whether BLM provided good reasons for its new policy. *See* Pl.'s Reply at 15 n.6. The reason BLM provided for ending its nationwide MLP policy was simple: MLPs had "created duplicative layers of NEPA review." AR 5610. BLM maintained this explanation in its 2024 Reevaluation EA. AR 821 ("BLM acknowledged its change in position regarding the preparation of an MLP, and the BLM explained why it was departing from this previous practice (duplicative NEPA review)."). This explanation seems reasonable. In the context of the three-stage process for oil and gas production on federal lands, the MLP policy was akin to a "Stage 1.5" or a "Stage 1 Redo." *See* AR 10476 (describing MLPs as "reconsider[ing] RMP decisions pertaining to leasing"). And no relevant statute requires MLPs, as SUWA concedes. *See* Pl.'s Reply at 15 n.6. BLM's explanation for removing this duplicative step may have been short, but the reasonableness of an explanation does not hinge on its length.

---

[4] To the extent SUWA argued in its motion that BLM was required to explain factual "findings" in the draft San Rafael Desert MLP that was never published before ending the San Rafael Desert MLP, *see* Pl.'s MSJ at 33, SUWA appears to have abandoned this line of argument in its reply brief by arguing that IM 2018-34 is the "relevant decision," *see* Pl.'s Reply at 12. Thus, the factual findings BLM would need to consider would be those underpinning its decision to implement MLPs in IM 2010-117. SUWA makes no argument regarding any factual findings supporting IM 2010-117 that BLM failed to consider, so the Court deems this argument forfeited.

*See Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 939 (D.C. Cir. 2017) ("But '*State Farm* does not require a word count; a short explanation can be a reasoned explanation.'" (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 248 (D.C. Cir. 2008))).  SUWA tries to cast BLM's explanation as "not a statement of reasoning, but of conclusion."  Pl.'s Reply at 21 (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)).  But unlike in *Amerijet*, where the agency merely parroted the language of its rules to determine an exception was not warranted, here, BLM provided a reason to end its policy, albeit succinctly.  *See Amerijet*, 753 F.3d at 1350.  The "why" provided by BLM was that MLPs were duplicative.  *See id.* at 1350–51; AR 5610.  And SUWA's arguments that MLPs were not duplicative are unconvincing.

SUWA argues that "BLM designed the MLP process not to create duplicative NEPA review, but instead to provide essential analyses that were missing in the Price RMP, including analyses for resources that it had failed to previously consider or for which there was new information."  Pl.'s MSJ at 24.  But as Defendants explain, BLM can achieve the same goals through other land-use planning efforts.  *See* Def.'s MSJ at 17 ("BLM accomplishes many of the same goals of the MLP process—addressing changed circumstances, updated policies, and new information—through the RMP process, which is also a region-wide, pre-leasing planning document.").  In fact, IM 2018-34 addressed SUWA's concerns regarding "new information and changed circumstances that did not exist at the RMP stage."  Pl.'s MSJ at 33.  As BLM explained, "[t]hrough effective monitoring and periodic RMP evaluations, state and field offices will examine resource management decisions to determine whether the RMP[s] adequately protect important resource values in light of changing circumstances, updated policies, and new information."  AR 5609.  In fact, BLM acknowledged that MLPs would largely be used as a way

of amending RMPs in IM 2010-117.  *See* AR 10476 ("The MLP will ordinarily be initiated as a land use plan amendment.").  Thus, SUWA's argument that the purpose of MLPs was to reconsider RMPs in light of new information, a goal BLM stated could be achieved through already existing RMP amendment procedures, demonstrates the duplicative nature of MLPs.

And SUWA's reliance on *American Wild Horse Preservation Campaign* is misplaced. *See* Pl.'s MSJ at 31–33; *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017).  There, the D.C. Circuit held that the Forest Service acted arbitrarily when it failed to acknowledge that it had changed the classification of a 23,000-acre tract of land, which it had documented and treated as part of wild horse territory for over two decades, as no longer within that territory.  *Am. Wild Horse*, 873 F.3d at 918, 924, 927.  And the court rejected the Forest Service's argument that its decision to treat that land as wild horse territory in the first place had simply been "administrative error."  *Id.* at 918.  But here, BLM explicitly acknowledged that it was changing policies, and gave an actual reason for the change.  *See* AR 5610.  BLM's argument is not that implementation of MLPs was an administrative error, but that it was duplicative, and thus unnecessary.

For these reasons, BLM's decision to end the MLP policy was reasonable, and its explanation that the policy was duplicative of other NEPA analysis was sufficient.  Thus, Defendants and Intervenor-Defendant are entitled to summary judgment on this claim.

### B.  Whether Termination of the MLP Policy Required NEPA Analysis

SUWA also moves for summary judgment on its claim that BLM's failure to provide NEPA analysis prior to ending the MLP policy violated NEPA.  Pl.'s MSJ at 34–39; Am. Compl. ¶¶ 150–54.  Defendants respond that the "section of IM 2018-034 that ended the MLP program was not a 'major Federal action[]' that required NEPA analysis."  Defs.' Reply at 11 (alteration in

original) (quoting 42 U.S.C. § 4332(2)(C)).  The Court is persuaded by Defendants' argument
that ending the MLP policy, which was essentially a procedural step to reconsider certain land-
use planning decisions, is not the type of "major Federal action[]" that required additional NEPA
analysis.  *See* 42 U.S.C. § 4332(2)(C).

NEPA analysis is only required for "proposals for legislation and other major Federal
actions."  42 U.S.C. § 4332(2)(C).  Under the applicable regulations, federal actions include
"[a]doption of official policy," "[a]doption of formal plans," "[a]doption of programs," and
"[a]pproval of specific projects."  40 C.F.R. § 1508.18(b).  But a new national policy is not a
"major federal action" under NEPA if it "maintain[s] the substantive *status quo*."  *Fund for
Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997).  For example, in *Fund for Animals*,
the D.C. Circuit held that the Forest Service's adoption of a national policy that left bear "baiting
regulation to individual states that ha[d] adopted adequate regulatory provisions" was not a
"major Federal action" that required NEPA analysis, reasoning that in the only state that
remained federally regulated prior to adoption of the policy, "the effect there was minimal
because the substantive requirements of [the state's] regulations var[ied] only insignificantly
from those of the federal special use permit conditions they replaced."  *Id.* at 83–84.

Here, the portion of IM 2018-34 that ended the MLP policy did not alter any substantive
land-use plan or change any substantive decision of whether certain lands were open or closed to
oil and gas leasing.  *See* AR 5610.  Nor did it prohibit BLM from amending any current land-use
plans, including the Price RMP.  *See* AR 5609–10.  The only change implemented was
procedural—that an additional round of NEPA analysis was no longer necessary.  *See* AR 5610.
The thrust of SUWA's argument to the contrary is "that the nationwide directive in IM 2018-034
to abruptly reverse course on the MLP concept, which in turn forced BLM to abandon the Utah-

MLPs including for the San Rafael Desert, was a NEPA triggering event because it materially altered the status quo by reopening millions of acres across the West and in Utah to new leasing and development including in the San Rafael Desert." Pl.'s Reply at 24. But SUWA overstates the direct effects of IM 2018-34 in a few ways.

First, SUWA likens IM 2010-117 to a moratorium on leasing, like in *Citizens for Clean Energy*. *See* Pl.'s MSJ at 35–39; *Citizens for Clean Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264 (D. Mont. 2019). In that case, the Former Secretary of the Interior "imposed a moratorium on new coal leasing" in 2016 until completion of a programmatic EIS. *Citizens for Clean Energy*, 384 F. Supp. 3d at 1271. After President Trump took office, his Secretary of the Interior issued an order lifting the moratorium and directing BLM to expedite coal leases. *Id.* at 1271–72. The district court found that order to have "changed the status quo." *Id.* at 1278.

Here, however, SUWA identifies no such programmatic moratorium. IM 2010-117 did not purport to act as a moratorium on oil and gas leasing nationwide. *See* AR 10474–82. In fact, the San Rafael Desert area did not meet all the criteria that would have made an MLP mandatory under IM 2010-117 in the first place. *See* AR 10476, 11402. Rather, as an exercise of discretion, BLM-Utah paused leasing decisions while the MLP was in progress. AR 11401–02. That discretion, rather than IM 2010-117, was the impediment to lease sales in the San Rafael Desert until 2018. Thus, IM 2018-34's rescinding of the MLP policy in IM 2010-117 is not analogous to an order lifting a previous order's moratorium.

In addition to *Citizens for Clean Energy*, SUWA also argues that *Lockyer* is "squarely on all fours with its claims." *See* Pl.'s Reply at 24. In *Lockyer*, plaintiffs challenged the Forest Service's implementation of the "State Petitions Rule" to replace the "Roadless Rule." *See California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1004 (9th Cir. 2009). The Forest

Service promulgated the Roadless Rule in 2001, which generally prohibited road construction, reconstruction, and timber harvest in roadless areas that were managed by the Forest Service.  *Id.* at 1006.  In 2005, the Forest Service announced the State Petitions Rule, which removed the text of the Roadless Rule and its nationwide protections, and instead gave states an 18-month period to petition for roadless area protections.  *See id.* at 1007–08.  The Forest Service designated this new rule as falling within a categorical exclusion from NEPA because it was merely procedural.  *Id.* at 1008.  But the Ninth Circuit disagreed, noting the "substantive differences between localized forest management under the individual forest plans and the uniform nationwide protections imposed by the Roadless Rule."  *Id.* at 1014.  The court accordingly concluded that "a primary purpose of the State Petitions Rule was taking substantive environmental protections off the books."  *Id.* at 1015.  Thus, the court held that NEPA analysis was required for that agency action.  *Id.* at 1018.

But here, SUWA has failed to identify any similar substantive change.  IM 2010-117 did not dictate specific changes to land-use planning documents, but instead required the procedural step of an MLP to reconsider prior land-use decisions.  AR 10476.  So, IM 2018-34's removal of that procedural step is similarly just that, procedural.  *See* AR 5610.  To be sure, after BLM-Utah decided not to complete the San Rafael Desert MLP, it was free to proceed with leasing lands pursuant to the Price RMP.  *See* AR 11401.  But, as Defendants note, the San Rafael Desert MLP was never required by IM 2010-117—and the Price RMP has remained in effect since 2008—so it is unclear how IM 2018-34's ending of the MLP policy changed the "substantive *status quo*" for oil and gas leasing for the land at issue here.  *See Fund for Animals*, 127 F.3d at 84.  This conclusion is also pragmatic.  SUWA contends that for BLM to reduce "duplicative layers of NEPA review," BLM had to prepare additional NEPA analysis.  *See* AR 5610.  This would make

little sense, especially where the agency had already concluded that existing procedures adequately accounted for conducting NEPA analysis to revise land use planning documents before lease sales are made. *See* AR 5609–13. Thus, the Court agrees with Defendants that BLM was not required to prepare NEPA analysis to end its MLP policy.

### C. Whether BLM's Analysis of Pronghorn Antelope Satisfied NEPA

SUWA's final claim on which it moves for summary judgment alleges that BLM's Reevaluation EA failed to consider the cumulative impacts of its oil and gas leasing decisions on pronghorn antelope, in violation of NEPA. Pl.'s Reply at 32–38; Am. Compl. ¶¶ 134–42. Defendants respond that SUWA failed to plead any claim related to pronghorn antelope, and that regardless, the Reevaluation EA, which tiered to the 2018 leasing EA and the 2008 Price RMP, adequately addresses pronghorn antelope, especially under the deferential standard of review for NEPA claims. *See* Def.'s Reply at 14–19; AR 544–45. Despite SUWA's deficient pleading of this claim,[5] the Court agrees with Defendants that BLM's explanation was adequate and grants them summary judgment on this basis.

As discussed above, because "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry" when conducting NEPA analysis, the Supreme Court has instructed courts to "afford substantial deference" to agencies and not to "micromanage those agency choices so long as they fall within

---

[5] Defendants are correct to fault SUWA for hiding the ball on its claim regarding pronghorn antelope. *See* Defs.' MSJ at 29–30. SUWA's Amended Complaint mentions pronghorn antelope twice, both times in lists with many other types of wildlife. *See* Am. Compl. ¶¶ 54, 120. In its first cause of action for "Failure to Analyze and Disclose Cumulative Impacts of Oil and Gas Leasing and Development," SUWA did not mention pronghorn antelope even once. *See id.* ¶¶ 134–42. Despite these deficiencies, the Court is satisfied that the record sufficiently supports BLM's position that it adequately disclosed the cumulative effects of its leasing decisions on pronghorn antelopes, and grants Defendants' motion on this basis.

a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182–83. A

"cumulative impact" in the NEPA context is "the impact on the environment which results from

the incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions." 40 C.F.R. § 1508.7. The D.C. Circuit has identified five topics that

must be included in a meaningful cumulative analysis: "(1) the area in which the effects of the

proposed project will be felt; (2) the impacts that are expected in that area from the proposed

project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have

had or are expected to have impacts in the same area; (4) the impacts or expected impacts from

these other actions; and (5) the overall impact that can be expected if the individual impacts are

allowed to accumulate."[6] *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852,

864 (D.C. Cir. 2006) (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

SUWA challenges each factor but the third. *See* Pl.'s Reply at 34.

First, BLM identified the areas in which pronghorn antelope may be affected by the

leasing decisions when it identified the areas that were at issue in the lease sales. *See* AR 555,

557, 700. Additionally, BLM identified which leases contain pronghorn antelope habitats.

AR 587 ("All leases contain year-long crucial pronghorn (*Antilocapra americana*) habitat except

for UTU93534."). And though "leasing alone does not authorize surface disturbance that could

impact wildlife," BLM used its 2016 San Rafael Desert MLP RFDS to anticipate that future

---

[6] Defendants note that the validity of *TOMAC*'s fourth and fifth factors is uncertain in light of the Supreme Court's decision in *Seven County*, but argue those factors are satisfied here. *See* Defs.' Reply at 15–18; *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 186–87 ("Importantly, the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand—not other future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration."). Because the Court agrees that BLM's cumulative analysis was sufficient, it need not decide the impact of *Seven County* on the *TOMAC* factors.

development would lead to "direct impacts to a maximum of 83.2 acres across the lease area."[7] AR 562, 586. Contrary to SUWA's position that "the EA ignored . . . twenty-two foreseeable wells anticipated in the MLP RFDS" by "analyz[ing] the impacts of only eight wells," Pl.'s MSJ at 44, the Reevaluation EA explained that for "the entire area within the former San Rafael [MLP], future oil and gas drilling for the next 15 years" was projected to total 30 wells, but for the roughly 122,000 acres covered by the leases at issue, "it was estimated a maximum of eight wells would be drilled" based on the 2016 RFDS. AR 562 & n.9. Thus, BLM satisfied the first *TOMAC* factor.

Second, BLM identified the expected impacts in those areas. SUWA argues that "the agency simply concluded that 83.2 acres is a smaller number than 4,090,451 acres and therefore impacts to pronghorn would be insignificant." Pl.'s Reply at 34–35. But SUWA appears to have overlooked BLM's earlier statement that impacts to wildlife might include "effects to the soundscape from anthropogenic noise, and the disturbance of habitat." AR 587. And because future production would affect only about 83 acres of a region with over 4 million acres, BLM's conclusion that "the 83.2 potential acres of disturbance based on the RFD are unlikely to cause a significant reduction in useable habitat for this wide-ranging species" was not unreasonable. AR 587. SUWA also faults BLM for relying on a 2017 figure of 270 pronghorn antelope in the area, rather than a 2023 figure of 240 pronghorn antelope, which was below a target of 275. *See* Pl.'s Reply at 35 (quoting AR 15876). But SUWA fails to explain how this discrepancy in the pronghorn antelope population between those two years meaningfully affects whether BLM

---

[7] SUWA faults BLM for using the word "direct," arguing that the "EA does not even attempt to perform a cumulative impact analysis." Pl.'s MSJ at 43; Pl.'s Reply at 38. But in the context of the RFDS, this sentence from the Reevaluation EA states that BLM predicts it is reasonably foreseeable that future development will directly impact 83.2 acres, which is separate from analyzing direct impacts of the leasing decision. *See* AR 586.

identified expected impacts under *TOMAC*'s second factor.  To the contrary, the Court is satisfied

that BLM's consideration of effects to pronghorn soundscapes and habitat was sufficient under

the deferential NEPA standard of review.

For the fourth factor, BLM identified the expected impacts from past, present, and

proposed, and reasonably foreseeable actions.  To do so, the Reevaluation EA tiered to the Price

RMP,[8] which included analysis on the cumulative effects of development for wildlife habitats,

though it did not discuss pronghorn antelope specifically.  *See* AR 14759.  Even so, that analysis

considered reductions in available habitat and quality of habitat, increased foraging competition,

human disturbance factors, and the risk of significant impacts if development and surface

activities disturbed migration corridors.  *See id.*  Defendants also cite to the Price RMP Fluid

Mineral RFDS, AR 3132–40, and the Reevaluation EA's statement that all 79 wells drilled in the

San Rafael Desert MLP area were dry holes as supporting its analysis of cumulative effects.  *See*

Defs.' Reply at 18 (citing AR 562).  The Reevaluation EA even considered the 2016 MLP RFDS

and noted that it also categorized the region the leases are within "as exploratory (low potential

for oil and/or natural gas development)."  AR 562.  Taken together, especially in light of the 2016

RFDS and consideration of actual drilling results in the area, the Court is satisfied that BLM

considered the impacts of reasonably foreseeable future development in the Reevaluation EA.

For the fifth factor, the Court is also satisfied that BLM considered these impacts in the

aggregate.  As mentioned above, BLM used the RFD for the area to determine that only 83.2

---

[8] SUWA takes issue with BLM's tiering to the Price RMP, which SUWA considers
"outdated NEPA documents."  *See* Pl.'s Reply at 32.  But the Price RMP was the operative land-
use planning document, and "NEPA does not provide a legal duty to supplement" an EIS.  *See W.
Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1245 (D.C. Cir. 2018).  Thus, SUWA's claims
based on the Price RMP EIS being outdated fall flat.  And as discussed above, BLM has the
authority to revise the Price RMP based on new information.

acres across the lease area would likely be directly affected by the lease sale decisions. AR 586. Given BLM's explanation that pronghorn antelope are a "wide-ranging species," BLM's conclusion that any impact to the portion of pronghorn antelope living within those 83.2 acres was "unlikely to cause a significant reduction in useable habitat" for the species is reasonable and reasonably explained. *See* AR 587.

Lastly, SUWA faults BLM for failing to account for findings in the draft San Rafael Desert MLP EA, which was never published or finalized. *See* Pl.'s Reply at 37–38. BLM understands that SUWA obtained this draft through a Freedom of Information Act request. *See* Defs.' MSJ at 7 n.2. Though it may be arbitrary for an agency simply to ignore pertinent data, SUWA provides no authority for the proposition that BLM was required to account for analysis contained in such an internal, draft document. *See* Pl.'s Reply at 38 n.14. Regardless, the record belies SUWA's suggestion that BLM was "ignoring a mountain of evidence, thousands of pages of agency-created information and data." *Id.* The evidence SUWA has identified for the Court amounts to a map showing pronghorn antelope habitats in the San Rafael Desert MLP Area;[9] a statement from the draft MLP that BLM was considering new pronghorn habitat data, AR 11012; a chart categorizing the leasing status of pronghorn habitats within the MLP area under proposed plans, AR 11294; and a few passages discussing how those alternatives may affect pronghorn habitats and populations, *see* AR 11295, 11299. For example, one passage states:

> Because the pronghorn habitat was identified after the completion of the ROD/RMPs in 2008, it is likely that the BLM would apply a timing limitation to proposed oil and gas leasing parcels located in crucial pronghorn habitat during site-specific leasing environmental analysis. However, if the TL stipulations were not applied, pronghorn could be disturbed during sensitive calving timeframes. These timeframes are important for successful reproduction and maintenance of healthy herds. Disturbance during these timeframes could result in pronghorn

---

[9] https://eplanning.blm.gov/public_projects/nepa/61781/93140/112248/Map_2-15_Pronghorn_Habitat.pdf [https://perma.cc/6LU4-9SBM].

expending energy to move away from oil and gas activity, possibly making calves
more susceptible to predation.

AR 11295.  This draft analysis is hardly the "mountain of evidence" that SUWA suggests.  And

none of the evidence SUWA identifies calls into question the Reevaluation EA's analysis.  In

sum, applying the deferential standard announced in *Seven Counties*, the Court is satisfied that

the BLM's 2024 Reevaluation EA adequately considered the cumulative effects that its 2018

leasing decisions would have on pronghorn antelope.  As a result, Defendants and Intervenor-

Defendant are entitled to summary judgment on this claim.

* * *

The Court grants Defendants summary judgment on the three claims on which SUWA

moved.  Defendants argue that they are entitled to summary judgment on the claims in SUWA's

Amended Complaint on which SUWA did not move for summary judgment.  *See* Defs.' MSJ

at 33–34 (citing *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 142 (D.D.C. 2016)).

After having a full opportunity to respond to Defendants' motion, SUWA makes no argument to

the contrary.  *See generally* Pl.'s Reply.  Accordingly, the Court will deem those other claims

waived, and grant Defendants' and Intervenor-Defendant's cross-motion for summary judgment

on those claims, as well.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (ECF No. 29) is

**DENIED**; and Defendants' and Intervenor-Defendant's Cross-Motions for Summary Judgment

(ECF Nos. 31, 35) are **GRANTED**.  An order consistent with this Memorandum Opinion is

separately and contemporaneously issued.


Dated:  December 17, 2025                                RUDOLPH CONTRERAS
                                                         United States District Judge